# PUBLIC SUBMISSION

**As of:** 12/30/25, 7:54 AM
**Received:** September 13, 2025
**Status:** Posted
**Posted:** September 18, 2025
**Tracking No.** mfi-kld9-6tld
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-9910
Comment ED-2025-OPE-0016-9910 on FR Doc # 2025-15665 represents 613 comments.

---

## Submitter Information

**Name:** Mayra Arellano

---

## Redacted Comment

Director, Policy Coordination Group Tamy Abernathy,To whom it may concern:I am writing to strongly oppose the proposal to completely upend the Public Service Loan Forgiveness (PSLF) program. Cutting workers off from PSLF eligibility because of unrelated political differences between the current administration and a public service employer is a cruel and short-sighted policy that turns public service workers into political pawns. This baseless proposal ignores the will of Congress, our elected representatives, in establishing this important program. If Congress wanted to add these absurd conditions onto the program, they could have. They chose not to. If public service employers are engaging in truly illegal activity, it should be dealt with in the courts, as has always been the case, not by punishing public service workers. There is no reason to take away a benefit as important as lifting the burden of student debt solely based on the opinion of one official. There is no improving this proposal. It should be completely withdrawn and discarded. I urge you to listen to me and the countless other public service workers who will be harmed by it. We do not appreciate being treated as political pawns. Sincerely,Mayra Arellano (redacted PII)

# PUBLIC SUBMISSION

**As of:** 12/30/25, 8:07 AM
**Received:** August 18, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Tracking No.** meh-8sfm-rccz
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10646
Comment ED-2025-OPE-0016-10646 on FR Doc # 2025-15665 represents 12 comments.

---

## Submitter Information

**Name:** Anonymous Anonymous
**Email:** jwebst9@emory.edu

---

## General Comment

Public Comment on Proposed Rule: Public Service Loan Forgiveness Program (Docket ID ED–2025–OPE–0016)

To Whom It May Concern,

I am writing as a private citizen who works in the nonprofit sector and depends on the Public Service Loan Forgiveness (PSLF) program to make a career in public service possible. I strongly oppose the proposed changes to PSLF that would exclude organizations deemed to have a "substantial illegal purpose" from qualifying as employers.

The PSLF program was designed to reward individuals who dedicate their careers to serving the public. It has been a lifeline for me and countless colleagues who chose lower-paying nonprofit work because we are committed to strengthening our communities. By tying eligibility to broad and ambiguous definitions of "illegal purpose," this proposed rule risks undermining that commitment and placing public servants in the crossfire of political debates.

Here are my concerns:

Punishing Employees for Employers' Actions: Under this rule, employees could lose credit toward forgiveness through no fault of their own, simply because of how their employer is characterized. This creates instability and punishes workers who have acted in good faith.

Chilling Effect on Public Service Careers: Many people, especially young professionals with significant student debt, only enter the nonprofit sector because PSLF makes it financially possible. Adding uncertainty about whether their employer qualifies will deter people from pursuing service careers, weakening the very workforce PSLF was created to support.

Risk of Politicization: The proposed definition of "substantial illegal purpose" is vague and open to misuse. Organizations engaged in civil rights, immigration support, reproductive health, or other advocacy could be unfairly targeted. Borrowers should not lose PSLF eligibility because of shifting political winds or attempts to silence certain policy perspectives.

The integrity of the PSLF program should be strengthened, not compromised. Borrowers need clarity and consistency so they can plan their lives and careers. Instead of adopting this rule, the Department should focus on making PSLF more transparent, more accessible, and more reliable for the public servants it was designed to support.

I urge the Department to withdraw this proposal. Protecting PSLF is about more than student loans—it is about ensuring that people like me, and the communities we serve, can continue to build a stronger, fairer future for everyone.

Respectfully,

Private Citizen

# PUBLIC SUBMISSION

**As of:** 12/30/25, 8:02 AM
**Received:** August 25, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Category:** Institutional and Loan Servicers
**Tracking No.** mes-0dny-s5rm
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10648
Comment ED-2025-OPE-0016-10648 on FR Doc # 2025-15665 represents 27 comments.

---

## Submitter Information

**Name:** Angie Hale
**Address:** United States,
**Email:** hale5288@pacificu.edu

---

## General Comment

"PSLF was created to reward public service—not political loyalty. The law clearly includes all 501(c)(3) nonprofits and government jobs. This proposed rule is dangerously vague, ideologically motivated, and punishes workers for the legal actions of their employers. I strongly oppose it and urge the Department to withdraw this provision."

**As of:** 12/30/25, 8:01 AM
**Received:** August 20, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Category:** Individual
**Tracking No.** mej-zftr-vte2
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10649
Comment ED-2025-OPE-0016-10649 on FR Doc # 2025-15665 represents 27 comments.

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

The proposed rule is contrary to federal law. Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Current law requires all 501(c)(3) organizations to be eligible as a qualified employer under PSLF. The definition of "public service job" in the PSLF statute states that the term "public service" job means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The Department of Education does not have the authority to further restrict eligibility under PSLF.

The proposed rule inserts politics and ideology into the program. The rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. In doing so, the Department could seek to exclude nonprofit employers working with undocumented immigrants, supporting transgender children, or advancing racial and social equity. This opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology. Nonprofits must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees.

The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce.

The proposed rule does not provide adequate due process for employers. The determination to strip the eligibility of an organization is determined by a "preponderance of the evidence" and without the opportunity to appeal to an independent authority.

A process already exists to remove eligibility from organizations who are engaging in illegal activity. If an organization engages in substantial illegal activities, there is a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.

The Department lacks the capacity and expertise to implement the proposed rule. The Department of Education is facing significant staff shortages and will not be able to bear the administrative burdens of making these determinations and enforcing the processes that would need to be put in place to implement it. They also do not have the expertise to make a determination of which organizations are engaging in illegal activities.

# PUBLIC SUBMISSION

**As of:** 12/30/25, 8:06 AM
**Received:** August 20, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Category:** Civil Rights
**Tracking No.** mek-cyer-udcs
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10650
Comment ED-2025-OPE-0016-10650 on FR Doc # 2025-15665 represents 14 comments.

---

## Submitter Information

**Name:** Hali Guerin
**Address:**
Rapid City, SD, 57703
**Email:** Halishanelemartin@gmail.com
**Phone:** 6053413489

---

## General Comment

Trump and McMahon’s proposed rule is extremely illegal and poses a direct attack on free speech for public service workers across the country.

**As of:** 12/30/25, 8:04 AM
**Received:** September 14, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Category:** Institution of Higher Education
**Tracking No.** mfk-ik3b-z6at
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10651
Comment on ED-2025-OPE-0016-10651 FR Doc # 2025-15665 represents 55 comments.

---

## Submitter Information

**Name:** Mariana Davila
**Address:**
Austin,

---

## General Comment

I am writing to express my concern
regarding the proposed changes to the Public Service Loan Forgiveness (PSLF) program. The PSLF program has been instrumental in my ability to pursue a career in school psychology, a field dedicated to serving children and families, often in underserved communities. The financial relief offered by PSLF has allowed me to accept a position in a high-need school district, where I can make a significant difference in the lives of students who often lack access to crucial mental

health services. Without PSLF, the burden of student loan debt would have made this career path financially unsustainable.
I am particularly concerned about proposed changes to the definition of a 'qualifying employer.' Any modification that narrows the scope of eligible employers, especially those impacting school districts and educational service agencies, would have a detrimental impact on the recruitment and retention of school psychologists. School psychologists are already in high demand, and reducing PSLF eligibility would further discourage qualified professionals from serving in public schools, particularly those in rural and low-income areas where the need is greatest. This will ultimately harm the students who rely on our services.
The current PSLF eligibility criteria are vital for attracting and retaining dedicated professionals in public service roles like school psychology. Weakening this program will exacerbate existing shortages and negatively impact the mental health and academic well-being of countless students.
I urge the Department of Education to carefully consider the potential consequences of these proposed changes and to maintain the current PSLF eligibility criteria. Protecting PSLF is essential for ensuring that schools across the nation can continue to attract and retain qualified

school psychologists who are committed to serving the needs of all students.
Thank you for your time and consideration.

# PUBLIC SUBMISSION

**As of:** 12/30/25, 8:04 AM
**Received:** September 10, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Tracking No.** mfe-kilu-fw2s
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10652
Comment ED-2025-OPE-0016-10652 on FR Doc # 2025-15665 represents 33 comments.

---

## Submitter Information

**Name:** Jessica Heard
**Address:**
Cincinnati, OH, 45236
**Email:** jgheard@gmail.com
**Phone:** 201-793-1088

---

## General Comment

Secretary McMahon,

Thank you for the opportunity to provide comments on the proposed rule, which proposes to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Jessica Heard, and I write to you on behalf of Building for Mission. I live in Cincinnati, OH and am directly impacted by the decisions being made in this rulemaking process.

Nonprofit organizations play a critical role in providing essential services to communities, often with limited resources. The PSLF program is one of the few tools available to help attract and retain highly qualified staff in these mission-driven roles. Adding unnecessary administrative barriers or duplicative oversight processes would not only burden nonprofits but also risk undermining their ability to recruit and retain the workforce they need to carry out their work.

There is already an existing process within the IRS to strip a nonprofit of its 501(c) status if they are found to be engaging in illegal activities, which would remove the employer and its workers from PSLF eligibility. The Department is attempting to circumvent the existing IRS processes – any additional procedure would be duplicative, unnecessary, and confusing. Furthermore, the Department does not have the statutory authority to make these changes.

Thank you for considering this input as part of the rulemaking process. I respectfully request that the Department ensure that the final rule reflects the needs and voices of those most affected by these policies.

Sincerely,

Jessica Heard
Cincinnati, OH

ED_00011

**As of:** 12/30/25, 7:59 AM
**Received:** August 19, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Category:** Other
**Tracking No.** mei-ehoy-qzut
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10653
Comment ED-2025-OPE-0016-10653 on FR Doc # 2025-15665 represents 118 comments.

---

## Submitter Information

**Name:** Gail Miller
**Email:** Gsmiller@hvc.rr.com

---

## General Comment

I oppose the proposed changes to the Public Service Loan Forgiveness (PSLF) program.

The Department of Education’s proposed regulation is a gross misuse of power and an illegal attempt to deny PSLF to employers whose work does not align with the Trump Administration's agenda. If implemented, the regulation will cause harm to millions of borrowers who were promised student debt cancellation through PSLF, and who often made career choices based on this promise.

The PSLF program was enacted by Congress almost 20 years ago as a way for public service workers to achieve student debt cancellation after working for ten years at a qualifying government agency, nonprofit, or entity. No exceptions. PSLF is a bipartisan program created by Congress, and it should not be up to the Department of Education to take it away from certain employers.

I urge you to keep the promise that Congress made to Americans and eliminate this proposal immediately.

**As of:** 12/30/25, 7:54 AM
**Received:** August 31, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Tracking No.** mf0-bl49-egeg
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10654
Comment ED-2025-OPE-0016-10654 on FR Doc # 2025-15665 represents 217 comments.

---

## Submitter Information

**Name:** Connie Dooley
**Address:**
Blue Bell, PA, 19422
**Email:** caedooley@verizon.net
**Phone:** 212-317-7098

---

## General Comment

As a concerned citizen, I see the value that dedicated public servants bring to our communities. Their sacrifices make our lives collectively safer and better. Public Service Loan Forgiveness allows us to serve those who serve us by making these necessary careers appealing to those best equipped for them.

However, I worry that this program has been taken advantage of by non profits with connections to foreign terrorist organizations, illegal immigration, and trans activism. Instead of supporting borrowers who dedicate their careers to public service, we, the taxpayers, are now supporting ideologically extreme, divisive, discriminatory, and even illegal activities.

I strongly support the current administration's amendments to Public Service Loan Forgiveness. PSLF should reward and encourage lawful public service!

**As of:** 12/30/25, 7:53 AM
**Received:** September 04, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Tracking No.** mf6-7t6g-2re0
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10655
Comment ED-2025-OPE-0016-10655 on FR Doc # 2025-15665 represents 1252 comments.

---

## Submitter Information

**Name:** Stephanie Williams
**Address:**
Gilroy, CA, 95020
**Email:** swilliams@ipasinc.net
**Phone:** 408-201-9850

---

## General Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

I strongly oppose the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. The proposal would give officials at the U.S. Department of Education authority to decide—based on politics or ideology—which nonprofit organizations are eligible to participate in the Public Service Loan Forgiveness (PSLF) program.

PSLF was designed to support those who dedicate their careers to public service — teachers, nurses, government employees, active-duty service members, veterans, nonprofit staff, and more. Instead of strengthening the workforce pipeline, the proposed rule would punish nonprofits and their employees for engaging in work that some political leaders dislike.

By making it harder for nonprofits to recruit and retain staff, the proposed rule threatens to deprive communities of services they rely on to lead safe, healthy lives – education, health care, legal aid, housing, and more. Rural communities and low-income neighborhoods will be hit hardest, as they already face shortages of doctors, teachers, and public defenders.

The Department of Education's use of "substantial illegal purpose" is undefined, opening the door for political repression as officials would have broad discretion to determine activities "illegal" with no evidence of wrongdoing. Moreover, the Department lacks both the capacity and the expertise to investigate nonprofits. Staff shortages are already undermining the agency's core responsibility: to protect students' civil rights and ensure equal educational opportunity for all.

I urge the Department of Education to withdraw the proposed rule and preserve PSLF eligibility for all qualifying nonprofits. Thank you for considering this comment.

# PUBLIC SUBMISSION

**As of:** 12/30/25, 7:52 AM
**Received:** August 26, 2025
**Status:** Posted
**Posted:** September 19, 2025
**Tracking No.** mes-uew5-qs3f
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-10656
Comment ED-2025-OPE-0016-10656 on FR Doc # 2025-15665 represents 7265 comments.

---

## Submitter Information

**Name:** Rachel Sisk

---

## Redacted Comment

Secretary of Education Linda McMahon,I am writing because I strongly oppose the proposed changes to the Public Service Loan Forgiveness (PSLF) programI am incredibly concerned, outraged, and disappointed by the Trump Administration’s proposal to deny PSLF access to workers who serve vulnerable communities like immigrants, people of color, and transgender youth. We urge the Department of Education to eliminate this proposed rule.The Department of Education’s proposed regulation is a gross misuse of power and an illegal attempt to deny PSLF to employers whose work does not align with the Trump Administration's agenda. If implemented, the regulation will cause harm to millions of borrowers who were promised student debt cancellation through PSLF, and who often made career choices based on this promise.The PSLF program was enacted by Congress almost 20 years ago as a way for public service workers to achieve student debt cancellation after working for ten years at a qualifying government agency, nonprofit, or entity. No exceptions. PSLF is a bipartisan program created by Congress, and it should not be up to the Department of Education to take it away from certain employers.This proposal is illegal and cruel. I urge you to keep the promise that Congress made to Americans and eliminate this proposal immediately.Rachel Siskrachelsisk (Redacted PII)

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:49 AM
**Received:** August 18, 2025
**Status:** DoNotPost
**Tracking No.** meh-5pmy-1tdv
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-7218
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Test

**As of:** 12/19/25, 7:49 AM
**Received:** August 18, 2025
**Status:** DoNotPost
**Category:** Teacher
**Tracking No.** mei-0kjh-rgkh
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-7796
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Shana Faulkner
**Address:**
Centennial, CO, 80122
**Email:** furious.46comfort@icloud.com

---

## General Comment

My name is Shana Faulkner and I work as a public school teacher living in Centennial, Colorado, and I oppose the proposed changes to the Public Service Loan Forgiveness (PSLF) program.

As a federal student loan borrower, I am incredibly concerned, disheartened, disappointed, and angry about the Trump Administration's proposal to deny PSLF access to workers who serve vulnerable communities like immigrants, people of color, and transgender youth. We urge the Department of Education to eliminate this proposed rule.

I grew up in a home with two teachers as parents. I saw firsthand the economic struggles they endured to raise me in the best possible environment they could. They constantly went into debt because of their laughably low salaries, but they did it because they knew the value of education and the impact they could have on children. With the promise of PSLF, I thought I could enter into the education system and make the kind of impact I saw them make, while providing a future for any children I would have. Unfortunately, if PSLF is taken away, I will face the same kind of financial hardship that I watched my parents face. I may not even be able to afford having a child because the cost of living has increased so much faster than the salary I have been given.

The Department of Education's proposed regulation is a gross misuse of power and an illegal attempt to deny PSLF to employers whose work does not align with the Trump Administration's agenda. If implemented, the regulation will cause harm to millions of borrowers who were promised student debt cancellation through PSLF, and who often made career choices based on this promise.

The PSLF program was enacted by Congress almost 20 years ago as a way for public service workers to achieve student debt cancellation after working for ten years at a qualifying government agency,

nonprofit, or entity. No exceptions. PSLF is a bipartisan program created by Congress, and it should not be up to the Department of Education to take it away from certain employers.

This proposal is illegal and cruel. Teaching is a difficult profession with little incentive to entice future educators. While I know that the administration's goal of dismantling the Education Department and privatizing education would be fast tracked, it is imperative to ensure that future teachers are quality teachers who want to remain in the profession.

I urge you to keep the promise that Congress made to Americans and eliminate this proposal immediately.

Sincerely,

Shana Faulkner

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:51 AM
**Received:** August 20, 2025
**Status:** DoNotPost
**Category:** Other
**Tracking No.** mek-cdq6-a4si
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-8470
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Lauranne Williams
**Address:**
   Lexington,  KY,  40516
**Email:** laurannew94@hotmail.com
**Phone:** 4102795573

---

## General Comment

Docket ID ED-2025-OPE-0016
"The proposed regulations would prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that engage in activities that have a substantial illegal purpose."
My comments focus on Federal Qualified Health Centers (FQHC). I am deeply disturbed that providers (doctors and dentists) who have the least input on patient population are being penalized and not the FQHC administrators who control the patient base including treating illegals to receive Medicaid payouts and encounter fees.
There is a high turnover of medical providers in FQHCs because of burnout. This is well documented:
"Providers at Federally Qualified Health Centers (FQHC) are at high risk for burnout due to high patient volumes; inadequate staffing; and balancing the demands of patients, families, and team members." J Gen Intern Med. 2024 Jan 25;39(9):1567–1574. doi: 10.1007/s11606-024-08633-w"
The issue of burnout is an important element in this issue. Burnout results in high turnover.
Administrators who deal with high turnover become indifferent to the concerns of, in their minds, a temporary staffer.
FQHC providers who are carrying student debt want to help the populace but also have their debt paid off after ten years of hard and draining service.
The workplace environment may not be healthy because of patient load coupled with administrator's indifference towards their "rotating" staff. This indifference results in not listening to the medical provider's concerns with some administrators stating that providers can leave or be fired. This leads to fear that if a medical provider speaks out about how a FQHC is managed including seeing illegals that provider will be fired.
FQHCs see providers as a means to an end-income. The provider losing PSLF benefit does not affect the

FQHC. The provider will stay employed or start over at a new FQHC, which may force a physical move. Yet, this directive which focuses on organizations not following policy penalizes the provider who has no control and carrying student debt.

FQHCs discourage providers from asking about a person's status. If providers can figure out if a person is illegal, should they deny treatment? Should they physically remove the person from the clinic? Call the police? Contact a government entity and ask for help? Who would they contact?

I support not funding illegals but target the person in control-the administrators not the person following orders-the providers. Because the proposed regulation is a fiasco for the provider. Either quitting or being fired if they do not see illegals or losing their PSLF benefits if they do see illegals. FQHCs should support U.S. Citizens and be held accountable but target the right people - administrators not providers.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:53 AM
**Received:** August 20, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** mek-ee5a-32u1
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-8495
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Sarah Stokes
**Address:**
  Orlando, FL, 32806
**Email:** sarahstokes813@gmail.com
**Phone:** 8134470659

---

## General Comment

Those that qualify for PSLF serve some of the highest needs in our country. Don't add more restrictions!

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:53 AM
**Received:** August 20, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** mek-eeio-mddo
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-8497
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Sarah Stokes
**Address:**
   Orlando, FL, 32806
**Email:** sarahstokes813@gmail.com
**Phone:** 8134470659

---

## General Comment

Those that qualify for PSLF serve some of the highest needs in our country. Don't add more restrictions!

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:54 AM
**Received:** August 22, 2025
**Status:** DoNotPost
**Category:** Private/Non-Profit Institution of Higher Education
**Tracking No.** mem-k4h6-ead3
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-8714
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Angie rademacher
**Address:**
Milwaukie, 97222
**Email:** angie_rademacher@yahoo.com
**Phone:** 5037539913

---

## General Comment

The public loan forgiveness program is a very valuable program and will be an unfortunate loss to our institution. The program greatly impacts the future of many individuals, including myself who just became eligible and will greatly impact my financial future if taken away. It's terrible the choice our institution must make to maintain this program but the impact of losing the valuable program and impact of the financial future and how that impacts our families also cannot be understated.

**As of:** 12/19/25, 7:54 AM
**Received:** August 22, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** men-9wro-3mmn
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-8824
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Nealay Vasavda
**Email:** nealay.vasavda@outlook.com

---

## General Comment

I am writing to express my strong support for the Public Service Loan Forgiveness (PSLF) program and to share my serious concerns regarding the ambiguity in the proposed rule to exclude employers with a "substantial illegal purpose." This proposed change, while seemingly well-intentioned, introduces a dangerous level of subjectivity that could unjustly penalize dedicated public servants.

Like many others, I chose a career in public service driven by a calling to serve the community, not by financial gain. I have made significant career decisions and passed on more lucrative opportunities in the private sector to pursue this passion, with the understanding that PSLF would be there to help manage my student debt after ten years of service.

The language in the proposed rule—specifically phrases like "substantial illegal purpose," "illegal discrimination," and "violating State law"—is dangerously vague. Without explicit definitions and citations of specific federal and state laws or statutes, the Department of Education grants itself broad and subjective authority to determine an employer's eligibility. This could lead to the arbitrary disqualification of employers for reasons that are not directly related to an employee's public service work.

To maintain the integrity of the PSLF program and protect the thousands of public servants who rely on it, I urge the Department explicitly define "substantial illegal purpose" (i.e., cite specific laws and statutes that constitute a "substantial illegal purpose" and make these definitions clear and public).

In addition, the criteria for disqualifying an employer must be based on objective, legal findings, such as court judgments or official government agency determinations ONLY.

The PSLF program is a vital lifeline that encourages talented individuals to serve the public good. Please do not weaken this essential program by introducing ambiguous language that could undermine the very

foundation of trust it is built upon. Please consider the profound and negative impact that a lack of clarity could have on thousands of borrowers and the public they serve.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:55 AM
**Received:** August 25, 2025
**Status:** DoNotPost
**Tracking No.** mer-7llr-04da
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-9147
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Amy Chin-Lai
**Address:**
    Washington,  DC,  20005
**Email:** amy@actionnetwork.org

---

## General Comment

Fed Reg Dept of Education,

this is just a test

Amy
District of Columbia

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:55 AM
**Received:** August 25, 2025
**Status:** DoNotPost
**Tracking No.** mer-bvp8-h8uw
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-9228
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Amy Chin-Lai

---

## General Comment

Fed Reg Dept of Education,this is just a testAmyDistrict of Columbia

**As of:** 12/19/25, 7:55 AM
**Received:** August 28, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** mev-z7hc-mqqp
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-11632
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Parker Scott
**Address:**
MT,
**Email:** commimpactcoord@uwyellowstone.org

---

## General Comment

I do not support the proposed rule change for PLSF eligibility. Politicizing the PLSF is wrong and harmful, not only because it is unfair to those who have followed the rules and are otherwise eligible for this forgiveness but because it is changing the rules based on political whims that will likely change back as soon as a new administration takes office.

You would be punishing hard working Americans who are doing service for their country and their fellow citizens based on bigoted views of transgender Americans, Immigrants and those committed to equity and social justice. It is discrimination and it is wrong.

This rule change proposal should be voted down and wasting time on rules who's only intent is to politically attack and do harm to Americans who this administration disagrees with is incompetence and abuse of federal rule making processes.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:56 AM
**Received:** September 02, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** mf2-xp8z-89lm
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-12073
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Douglas Coates
**Address:**
Northville, MI, 48167

---

## General Comment

These proposed changes are vague. Attempting to enforce them as written will lead to endless litigation and make teachers, health care workers, and other public servants wildly uncertain as to whether they will qualify for PSLF. To make it worse, it's the perceived actions of the employers, not the employees, that matter according to this proposed rule. This proposed rule would harm the economic future of real people.

**As of:** 12/19/25, 7:56 AM
**Received:** September 04, 2025
**Status:** DoNotPost
**Tracking No.** mf6-612v-tvk2
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-12670
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Meghan R.
**Address:** United States,
**Email:** meghan_1124@yahoo.com

---

## General Comment

The PSLF program was established by the College Cost Reduction and Access Act of 2007 (CCRAA), which amended section 455(m) of the Higher Education Act of 1965 to "allow for cancellation of remaining loan balances for eligible Direct Loan borrowers after they have made 120 monthly payments under a qualifying repayment plan while working at a qualifying public service or nonprofit employer." See Federal Register, Vol. 90, No. 157, pg. 40156. In 2020, the definition of an eligible "public service organization" under the PSLF was expanded to include employees of organizations engaged in religious activities. In 2022, the Department changed the term ‘‘public service organization’’ to the term ‘‘qualifying employer,’’ which further expanded the definition to include any non-governmental public service. Up until this point, the statute has been repeatedly amended to make the PSLF program more accessible, not less. This proposed rule thus undermines significant legislative history and intent.

I strongly oppose the Department of Education's proposed rule, which narrows the definition of "qualifying employer" for Public Service Loan Forgiveness ("PSLF") programs by excluding nonprofits that engage in activities deemed to have a "substantial illegal purpose." This rule unnecessarily overreaches in its stated goal of "safeguarding taxpayer funds" by granting the Secretary of Education (unduly influenced by the President) broad discretion to decide who is excluded from PLSF on an arbitrary basis. While the Department argues that these organizations who have a substantial illegal purpose are "acting in contravention with the public good," it is this rule that is far more likely to contravene the public good. Adopting this rule could result in the exclusion of nonprofit organizations that provide vital services (such as those supporting transgender children, undocumented immigrants, or addressing issues of racial bias amongst government agencies or police departments) simply because they run contrary to the current administration's political motivations.

The rule also conflicts with the existing regulations framework, under which, as mentioned above, all 501(c)(3) organizations are eligible as "qualifying employers" for the purposes of PSLF. See https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/questions. Thus, it expressly

defies the intent of the legislature, whose job it is to draft these regulations. Moreover, there is no appeals process to an independent authority laid out in the proposed rule. This essentially subjects 501(c)(3) organizations to a partisan and arbitrary evaluation process without recourse. Thus, it not only raises potential issues with procedural fairness and due process, but also undermines public trust in organizations that have long been dedicated to doing crucial work for people in need.

This proposed regulation also has a potential devastating social impact. Currently, PSLF is crucial to organizations' ability to hire staff necessary to carrying out their missions. This staff includes attorneys, teachers, and healthcare providers. An inability to hire and retain staff would prevent organizations from engaging in their vital work, thus having the potential to destabilize social justice efforts throughout the nation. Millions of vulnerable people and countless communities rely on nonprofit organizations and their staff for services on a regular basis. This proposed regulation would leave many of them without access to the consistent services that PSLF makes possible - with nothing emerging to take their place.

All of these reasons make clear the proposed regulation should not be enacted.

**As of:** 12/19/25, 7:57 AM
**Received:** September 05, 2025
**Status:** DoNotPost
**Category:** Civil Rights
**Tracking No.** mf6-qdjj-q2pv
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-12823
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Jenny Dudley
**Address:**
League City, TX, 77573
**Email:** Jennycdudley@gmail.com

---

## General Comment

The Direct Loan Forgiveness Program is absolutely critical to helping those Americans and causes that are most vulnerable to political bullying. It must be preserved and there should be no hate-motivated "carve outs" for which government and nonprofit employers can participate. In the current administration, this regulation will overtly be targeted to organizations that help transgender people -- who are every bit as American and Children of God as any other citizen. With this foothold, the government can easily cut resources for other groups, including minorities, non-Christians, women, and people with disabilities. We need to establish regulations that protect and increase rights of Americans. This regulations shamefully does te exact opposite.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:57 AM
**Received:** September 08, 2025
**Status:** DoNotPost
**Tracking No.** mfb-u12i-kpju
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-14097
Comment on FR Doc # 2025-15665

## Submitter Information

**Name:** Ben Abraham

## General Comment

Secretary of Education Linda McMahon,My name is Ben Abraham and I work as an American librarian.As a federal student loan borrower, I am very troubled by the proposed changes to the PSLF program. This program was enacted by Congress two decades ago as a way to incentivize Americans to enter public service by offering student debt forgiveness after working for ten years at a qualifying public service employer. There were no political "litmus tests" for qualifying employers in this agreement, and it is unfair for this administration to try to unilaterally impose them now. Besides overreaching, these proposed changes are petty and cruel.If implemented, the new regulations will cause harm to millions of borrowers who were promised student debt cancellation through PSLF, and who, like me, made career choices based on this promise.I urge you to keep the promise that Congress made to Americans and eliminate this proposal immediately. Please be the grownup in the room; millions of American borrowers are counting on this agency to honor their word.Sincerely,Ben AbrahamBen Abrahambenjaminabrhm@gmail.com170 11th Avenue, Apt. 101Seattle, Washington 98122

**As of:** 12/19/25, 7:59 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt36-spr5
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15262
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 7:59 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt36-w3r3
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15263
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation’s children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:00 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt36-ukd3
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15264
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:00 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt36-wj0n
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15265
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:00 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-htmy
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15266
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:01 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-iwf2
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15267
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:01 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-jeeq
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15269
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:02 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-lcei
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15270
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
   San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a "substantial illegal purpose." While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:02 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-lfjc
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15271
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:04 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-l1ex
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15272
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a “substantial illegal purpose.” While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:04 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Category:** Local educational agency
**Tracking No.** mff-kt38-mzqp
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15273
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Steven George Palafox
**Address:**
San Antonio, TX, 78258
**Email:** stevenpalafox@gmail.com
**Phone:** 2103178009

---

## General Comment

Thank you for the opportunity to provide input on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. My name is Steven Palafox, and I serve as a school psychologist in Northside ISD.

I respectfully urge the Department of Education to reconsider the proposed amendments that could disqualify entire employers from PSLF eligibility based on allegations of a "substantial illegal purpose." While accountability for unlawful actions is important, applying sanctions at the employer level rather than to individuals found guilty of misconduct risks unfairly penalizing thousands of dedicated public servants who have no involvement in such activities.

School psychologists and other mental health professionals are essential in addressing the growing youth mental health crisis in our PK-12 schools. Every day, students and educators face significant emotional, behavioral, and safety challenges, often under the shadow of potential tragedy. Rather than restricting programs like PSLF, which help recruit and retain professionals in high-need schools, we should be expanding access to ensure that students receive the support they urgently need.

If the Department is seeking to strengthen oversight, a more effective approach would be to tie PSLF determinations to individual accountability. For example, denying PSLF benefits to employees who are personally found guilty of engaging in illegal conduct ensures that misconduct is addressed without jeopardizing access to mental health care and other critical services for students.

The PSLF program plays a crucial role in ensuring that public schools, particularly those serving low-income and rural communities, can attract and retain qualified professionals. Undermining this program

will only worsen shortages and negatively impact the mental health, safety, and academic outcomes of our nation's children.

I urge the Department to maintain PSLF protections for school districts and other public service employers and to focus accountability measures on individuals directly responsible for wrongdoing. Protecting PSLF is not only about fairness to employees, it is about sustaining a workforce that is essential to the well-being and future success of students across the country.

Thank you for your time and consideration.

**As of:** 12/19/25, 8:05 AM
**Received:** September 11, 2025
**Status:** DoNotPost
**Tracking No.** mff-pd92-oo85
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-15382
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Lee Gautier
**Address:**
Malvern, PA, 19355
**Email:** lee.t.gautier@gmail.com
**Phone:** 7035934691

---

## General Comment

I oppose the Department’s proposal to exclude employers with a “substantial illegal purpose” from PSLF eligibility. While the goal of preventing abuse is understandable, the rule is written so broadly and vaguely that it risks undermining the very purpose of PSLF.

Borrowers make career and financial decisions in good faith, often sacrificing higher pay to serve vulnerable communities. This rule would allow the Department to retroactively invalidate entire categories of employers based on contested interpretations of state or federal law, leaving borrowers suddenly disqualified through no fault of their own. The vague criteria, coupled with the 10-year wait to regain eligibility, create profound uncertainty for both workers and organizations.

PSLF should remain a stable and reliable program that encourages commitment to public service. Instead of punishing borrowers who are trying to help their communities, the Department should target bad actors directly through enforcement mechanisms, without jeopardizing the livelihood and loan relief of thousands of public servants.

For these reasons, I urge the Department to withdraw this proposed rule.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:05 AM
**Received:** September 12, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** mfh-3476-x54d
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-16149
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Megan Mikienis
**Address:** United States,
**Email:** meganmikienis@gmail.com

---

## General Comment

I am in support of this proposed rule. It is crucial that we do not give government funding to individuals who are employed by companies preforming illegal activities. This in turn gives an incentive to not commit crimes and to not support companies committing crimes. Taxpayer dollars should not be going in support of illegal activity.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:06 AM
**Received:** September 16, 2025
**Status:** DoNotPost
**Tracking No.** mfm-rg9j-lfth
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-17620
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Penny Briner Ewell
**Address:**
Prescott, AZ, 86303
**Email:** redleaf63@gmail.com
**Phone:** 212-552-6794

---

## General Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

On behalf of the American Association of University Women (AAUW) - Prescott, Arizona branch, we oppose the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. Under the proposal, the Department of Education would have authority to decide which nonprofit organizations are eligible to participate in the PSLF program, excluding those the Department deems to have an "illegal purpose." The use of such broad language could give officials authority to decide which nonprofit missions are "acceptable" based on political ideology.

Much of Arizona is made up of rural communities. These communities have difficulty recruiting public servants -- health care workers, teachers, government employees, nonprofit community service workers, public defenders -- due to lower wages, housing concerns, and transportation necessities. The PSLF program helps recruit these necessary employees to rural and low-income communities. If health care facilities, schools, veteran and social service organizations cannot guarantee their employees eligibility for the PSLF program, there is one less incentive for potential employees to serve these areas. We need inducements to keep the best candidates in the public sector and rural communities.

The Internal Revenue Service has oversight to remove an organization's 501(c)(3) status should an organization engage in illegal activity, thus making the organization ineligible for PSLF as well. This need not be complicated by the Department of Education whose mission "...is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access for students of all ages." (www.ed.gov) Whereas the administration of PSLF falls under the jurisdiction of the Department of Education, investigating tax exempt organizations for ill defined illegal activity seems outside the scope of the department's mission.

We urge the Department of Education to withdraw the proposed rule, ensuring that PSLF eligibility does not become one of political ideology, but rather one of serving our communities. Thank you for your thoughtful consideration of this matter.

Sincerely,
Board of Directors
AAUW-Prescott, Prescott, AZ

As of: 12/19/25, 8:06 AM
Received: September 16, 2025
Status: DoNotPost
Tracking No. mfm-sjib-wy1u
Comments Due: September 17, 2025
Submission Type: Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-17713
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Jill Dahlman
**Address:**
Rancho Cordova, CA, 95670
**Email:** jilldahlman@yahoo.com
**Phone:** 555-555-5555

---

## General Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

I am a voting US citizen whose lineage pre-dates the Revolutionary War. My maternal line was active in New York City politics, so it should come as no surprise that I was brought up to speak out on issues I am passionate about. When I began college, the PSLF was one of the reasons I opted to dedicate my life to teaching. I have now taught for more than 20 years. I currently am employed by a private college teaching first-year students to learn to write effectively. I am writing today to strongly oppose the Department of Education's proposed changes to the Public Service Loan Forgiveness (PSLF) program.

My father was a commander in the Navy. They don't get paid much, and I am the last of four. While my father was putting his life on the line for this country, he also encouraged me to attend college, to put (as he used to say) "my God-given talents" in the service of others. Teaching is such a vocation for me.

All of this is to say that I grew up in a middle-class family without a heckuva lot of money. My eldest sibling attend a conservatory, my elder brother was a business major. I am a mix of both. The key here is that by the time it was my turn to go to school, there wasn't anything left. Loans were the only option I had, and since I was planning on going into teaching anyway, because I knew about the PSLF, I went

confidently, imaging that my loans would one day be forgiven. It was a promise from the government, and it was that promise that spurred me on. As I am sure you are aware, the PSLF was created to encourage people to dedicate their careers to public service — as teachers, nurses, nonprofit staff, public defenders, service members, and more. The program has been a lifeline for many of us who chose to serve our communities, often at lower pay, because we believed in the value of this work. I am a member of that group of people, and I willingly went into it based upon the promises of the federal government. Now you are seeking to break that promise.

If these new rules to break the government's promise go into effect, the result will be fewer qualified professionals choosing or staying in public service. Students of all ages still need to be taught how to read and write. Communities that already struggle — rural areas, low-income neighborhoods, and schools or clinics that depend on dedicated staff — will be left with even fewer resources. The breaking of this rule is giving a fatalistic determination as to who gets the promise kept, and that's patently unfair. If the federal government wants more babies to be born, someone or something needs to bear the cost of educating those children. If you think education is expensive, try illiteracy. The very brain you are denying education to is a guarantee of higher crime and not enough qualified people to do the jobs for future generations. Again, this is an expense we can ill afford.

My parents raised me to believe in the government since it would have the best interests of each and every citizen i mind--not just those with whom you politically agree. As I teach my students, and in the words of our founding father Thomas Jefferson has said, "God forbid we should ever be 20 years without such a rebellion" (referring to Shay's rebellion). Good trouble is possible, but not if you don't teach students how to read or write. We are in the midst of such a rebellion by today's political climate. Let's not make it worse by condemning public servants and non-profit organization employees to a life of poverty from which they cannot recover. Education is the key to a thriving democracy. Good debate is possible. And if you don't fear your position nis wrong, then you should be welcoming dialogue. I urge the Department to withdraw this harmful rule and keep PSLF open to all qualified nonprofits and the workers who dedicate their careers to serving the public.

Thank you for your consideration.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:07 AM
**Received:** September 16, 2025
**Status:** DoNotPost
**Tracking No.** mfm-u1j2-d2tq
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-17778
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Janet Eller
**Address:**
St. Augustine, FL, 32092
**Email:** janet_eller@aol.com
**Phone:** 208-420-1431

---

## General Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

I am writing to strongly oppose the Department of Education's proposed changes to the Public Service Loan Forgiveness (PSLF) program. PSLF was created to encourage people to dedicate their careers to public service — as teachers, nurses, nonprofit staff, public defenders, service members, and more. As a retired teacher I know how the PSLF helped and continues to help young people who would like to enter the public service sector afford their educations and move forward. Some of our brightest and best students always forgo the public service sector because the pay is almost always low when compared to business sectors. We need great teachers in our schools please don't discourage these dedicated young people from entering education because they can't see a way to pay back educational loans.

Don't politicize PSLF by letting appointed officials decide which nonprofit organizations should actually be considered to eligible when the standards of measure may be vague or ideological. The purpose of PSLF should always be about a service the nonprofit provides not because it aligns with political ideology. The value of a nonprofits' mission should be the service it provides to humanity. PSLF was not intended to be based on political partisanship. This could lead to political repression and basically end free speech because organizations might be silenced for fear of losing PSLF for their staff.

If these rules go into effect fewer qualified professionals will never enter the public service sector and/or the professionals in public service may choose not to remain. I taught in rural schools and in schools serving low income areas. These rules could make it even more difficult to staff schools in those areas. Teachers need ,more encouragement not less.

I am especially concerned about the undefined terms in the proposal, like "substantial illegal purpose." These are so broad that they could be used to target nonprofits unfairly, even when there's no evidence of wrongdoing. The Department already struggles with capacity in its core mission to enforce civil rights in education. Diverting resources into policing nonprofit missions is a misuse of limited staff and authority.

I urge the Department to withdraw this harmful rule and keep PSLF open to all qualified nonprofits and the workers who dedicate their careers to serving the public.

Thank you for your consideration.

Janet Eller
St Augustine Florida

**As of:** 12/19/25, 8:07 AM
**Received:** September 16, 2025
**Status:** DoNotPost
**Tracking No.** mfm-u44t-1ih6
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-17787
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Janet Eller
**Address:**
St. Augustine, FL, 32092
**Email:** janet_eller@aol.com
**Phone:** 208-420-1431

---

## General Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

I am writing to strongly oppose the Department of Education's proposed changes to the Public Service Loan Forgiveness (PSLF) program. PSLF was created to encourage people to dedicate their careers to public service — as teachers, nurses, nonprofit staff, public defenders, service members, and more. As a retired teacher I know how the PSLF helped and continues to help young people who would like to enter the public service sector afford their educations and move forward. Some of our brightest and best students always forgo the public service sector because the pay is almost always low when compared to business sectors. We need great teachers in our schools please don't discourage these dedicated young people from entering education because they can't see a way to pay back educational loans.

Don't politicize PSLF by letting appointed officials decide which nonprofit organizations should actually be considered to eligible when the standards of measure may be vague or ideological. The purpose of PSLF should always be about a service the nonprofit provides not because it aligns with political ideology. The value of a nonprofits' mission should be the service it provides to humanity. PSLF was not intended to be based on political partisanship. This could lead to political repression and basically end free speech because organizations might be silenced for fear of losing PSLF for their staff.

If these rules go into effect fewer qualified professionals will never enter the public service sector and/or the professionals in public service may choose not to remain. I taught in rural schools and in schools serving low income areas. These rules could make it even more difficult to staff schools in those areas. Teachers need ,more encouragement not less.

I am especially concerned about the undefined terms in the proposal, like "substantial illegal purpose." These are so broad that they could be used to target nonprofits unfairly, even when there's no evidence of wrongdoing. The Department already struggles with capacity in its core mission to enforce civil rights in education. Diverting resources into policing nonprofit missions is a misuse of limited staff and authority.

I urge the Department to withdraw this harmful rule and keep PSLF open to all qualified nonprofits and the workers who dedicate their careers to serving the public.

Thank you for your consideration.

Janet Eller
St Augustine Florida

**As of:** 12/19/25, 8:07 AM
**Received:** September 16, 2025
**Status:** DoNotPost
**Tracking No.** mfn-0t0h-sbf4
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-18121
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Susan Baird
**Address:**
Palm Coast, FL, 32164
**Email:** aauwflbaird@gmail.com
**Phone:** 386-793-4123

---

## General Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

As a member of the American Association of University Women, a nonprofit that has been in existence since 1881, I am opposed to allowing the Department of Education decide which nonprofits are eligible to have their employees receive public service loan forgiveness. Congress created the Public Service Loan Forgiveness (PELF) program to strengthen public service. This program is an important financial incentive that helps nonprofits recruit and retain top talent despite lower salaries. Weakening it will drive doctors, teachers, social workers and civil rights advocates away.

The Department of Education's proposal gives the government power to decide which nonprofit missions are "acceptable". This sets a dangerous precedent. It allows officials to decide – based on politics or ideology – which missions count as public service.
Here in Flagler County, Florida there are many nonprofits that provide much needed services. Removing this benefit will punish nonprofits and their employees.

I urge the Department of Education to withdraw the proposed rule and preserve PSLF eligibility for all

qualified nonprofits.
Sincerely,
Susan Baird

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:08 AM
**Received:** September 16, 2025
**Status:** DoNotPost
**Category:** Local Government (Other)/Local Elected
**Tracking No.** mfn-2eme-6hps
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-18230
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Email:** jblakemore@acgov.org
**Government Agency Type:** Local
**Government Agency:** Alameda County (California) Board of Supervisors

---

## General Comment

Alameda County, California, submits the attached comments regarding the proposed changes to the Public Service Loan Forgiveness (PSLF) program.

**As of:** 12/19/25, 8:10 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Military
**Tracking No.** mfo-8lds-tdps
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19500
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Brian Macone
**Address:**
Charlestown, MA, 02129
**Email:** bwmacone@gmail.com

---

## General Comment

Hello,

I am writing to strongly oppose the proposed changes outlined in the notice "William D. Ford Federal Direct Loan (Direct Loan) Program" (2025-15665). I believe these changes will undermine the federal student loan system and harm borrowers—particularly those who have entered public service careers based on a good-faith understanding of the government's commitments.

For the past 6 years I have treated Veterans and active-duty Service Members who are suffering from the effects of traumatic brain injuries, posttraumatic stress, chronic pain, and other invisible wounds of war. There's nothing illegal, controversial, or woke about my work or about the work my non-profit employer performs every day. To do this work I needed to complete more than 10 years of undergraduate and graduate education, followed by supervised post-doctoral training where I earned barely enough money to pay for rent and groceries. As soon as I was fully licensed and qualified, I enthusiastically took this lower-paying job based on the promise of loan forgiveness at the end of 10 years of service.

I sincerely hope I can continue providing high-quality care to America's warriors at absolutely no cost to them. However, if the government arbitrarily deems my employer as ineligible for Public Service Loan Forgiveness, I will have no choice but to leave this job. To have any realistic chance of repaying my student debt, I'll need to take a more lucrative job in private practice helping only the wealthy and elite. I am just one of the thousands of people who have committed our expertise to helping others, who will be significantly burdened by the proposed changes.

Thank you for considering my comments. I strongly urge the Department of Education to reject all proposed policy changes. These changes would renege on the agreement that Congress made with

borrowers and public servants when it created the William D. Ford Federal Direct Loan Program. Moreover they would harm the Veterans and Service Members who depend on nonprofit care, among countless other US citizens and taxpayers.

Sincerely,
Brian Macone, Psy.D.
Neuropsychologist

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:14 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Other
**Tracking No.** mfo-8p5u-8jv6
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19504
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Naomi B
**Address:**
Schenectady, NY, 12306
**Email:** N.Butner@gmail.com

---

## General Comment

I am writing to express my opposition to the proposed changes to PSLF. I have student loans that are eligible for forgiveness under the current program. I entered into my loan contracts with my government and chose jobs in public service. There is justifiable reliance on the current program because I relied on PSLF to my detriment. I forfeited other, higher paying employment opportunities in the private sector due to the incentive to have my loans forgiven after working in public service and paying on my loans for 10 years. No reasonable person would agree that working as a public-school teacher in a state that also has a sanctuary city, like New York or Illinois, constitutes employment that engages in a substantial illegal purpose. How can being a law enforcement officer in one of this administration's targeted states exempt them from public service loan forgiveness because their work is connected to a substantial illegal purpose? Consider how a hospice nurse will remain saddled with student loan debt if that hospital employer offers gender-affirming care to transgender individuals. If the current administration wishes to make changes to the program, consider doing so in a gradual manner, and recruit logical thinkers to help arrive at better justifications. The public is not buying this rationale. Most Americans do not fear immigrants, nor see them as a threat. To try and draw a link between states with laws that promote the dignified treatment of immigrants and the state being an employer that engages in substantial illegal purpose does compute in the minds of reasonable, prudent people. I am a student loan borrower working in public service. I am not a pawn for a radical political agenda.

**As of:** 12/19/25, 8:14 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Business
**Tracking No.** mfo-ckfl-dspc
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19670
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** CLONE ATM CARD
**Address:**
CALIFORNIA, CA, 776676
**Email:** evelysvenhaggblom@gmail.com
**Phone:** +14646656776

---

## General Comment

GET YOUR BLANK ATM CARD
Get $5,500 USD every day, for six months!
See how it works
Do you know you can hack into any ATM machine with a hacked ATM card??
Make up your mind before applying, straight deal…
We have specially programmed ATM cards that can be used to hack ATM machines, the ATM cards can be used to withdraw at the ATM or swipe, at any store or POS. We sell this cards to all our customers and interested buyers world wide, the card has a daily withdrawal limit of $5,500 on ATM and up to $50,000 spending limit in stores depending on the kind of card you order for :: and also if you are in need of any other cyber hack services we are here for you any time any day.
This ATM card is based on percentage. Daily amount withdraw you give me 20% Deal.??
Here is our price list for the ATM CARDS:
Cards that withdraw $5,500 per day costs $380 USD
Cards that withdraw $10,000 per day costs $665 USD
Cards that withdraw $35,000 per day costs $3,550 USD
Cards that withdraw $50,000 per day costs $5,500 USD
Cards that withdraw $100,000 per day costs $8,000 USD

The price include shipping fees and charges, Although its prices are negotiable, You can also order a bank transfer using our bank account hacking and transfer services online, get up to $1 Million USD bank transfer, contact us today Via: hackedatmsellerteam01@hotmail.com / atmcardclonerhacker@mail4.uk

**As of:** 12/19/25, 8:15 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Minority-Serving Institutions
**Tracking No.** mfo-d44h-3f7z
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19694
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Ashley Tucker
**Address:** United States,
**Email:** ashley.mg.tucker@gmail.com

---

## General Comment

The proposed rule is contrary to federal law. Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Further, The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce. Lastly, A process already exists to remove eligibility from organizations who are engaging in illegal activity. If an organization engages in substantial illegal activities, there is a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.

**As of:** 12/19/25, 8:16 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** mfo-govk-dxlj
**Comments Due:** September 17, 2025
**Submission Type:** API

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19888
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Email:** msanchez@unidosus.org
**Organization:** UnidosUS

---

## General Comment

Please see the attached comment from UnidosUS.

---

## Attachments

UnidosUS_Public Comment September 2025_Docket ID ED-2025-OPE-0016



HEADQUARTERS
Raul Yzaguirre Building
1126 16th Street NW, Suite 600
Washington, DC 20036-4845

202.785.1670
202.776.1792
unidosus.org

September 17, 2025
Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue, SW
Washington, DC 20202

**RE:** Notice of Proposed Rulemaking Docket ID ED-2025-OPE-0016

Submitted electronically via Regulations.gov

Dear Ms. Abernathy,

We submit this written public comment in response to the U.S. Department of Education's (the Department's) Notice of Proposed Rulemaking (NPRM) on changes to employer eligibility under the Public Service Loan Forgiveness (PSLF) program.[1]

UnidosUS, previously known as NCLR (National Council of La Raza), is the nation's largest Hispanic civil rights and advocacy organization.[2] Through its unique combination of expert research, advocacy, programs and an Affiliate Network of nearly 300 community-based organizations across the United States and Puerto Rico, UnidosUS simultaneously challenges the social, economic and political barriers at the national and local levels.

As a leading advocate for education policy that encompasses the perspectives of Latinos in higher education, UnidosUS rejects the Department's efforts to restrict nonprofit employer eligibility and opposes any politically motivated attempts to undermine the longstanding commitment made to borrowers who have been faithfully making payments for years, trusting the program's promise of eventual forgiveness.

The Department's proposal exceeds congressional intent, violates constitutional principles, is poorly designed and inherently flawed, and could cause devastating harm to Latino communities. For these reasons, we urge the Department to immediately withdraw this unlawful NPRM.

[1] U.S. Department of Education, "William D. Ford Federal Direct Loan (Direct Loan) Program," Federal Register 90, no. 157 (August 18, 2025): 40130-40196, https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program.
[2] The terms "Hispanic" and "Latino" are used interchangeably by the U.S. Census Bureau and throughout our materials to refer to persons of Mexican, Puerto Rican, Cuban, Central and South American, Dominican, Spanish, and other Hispanic descent; they may be of any race.

**The Department's proposal clearly violates the statute and congressional intent and therefore lacks legal authority.**

The Department's efforts fundamentally contradict the statutory structure and congressional intent behind the establishment of the PSLF program, as outlined in the College Cost Reduction and Access Act of 2007.[3] When Congress created the program, the statute established qualifying employer eligibility for "[a]n organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code.[4]   This language is unambiguous and provides no exception to the Secretary that would permit the executive branch to exclude otherwise qualifying employers on ideological or political grounds. Millions of students relied upon the stable, statutory and longstanding interpretation of the law to plan their lives and academic decisions.

Now the Department proposes to provide the Secretary of Education with the authority to disqualify otherwise statutorily eligible employers based on a new "substantially illegal purpose" standard not established by Congress.[5] This proposal is contradicted by the statute, which unambiguously defines eligible employers to include all 501(c)(3) organizations. For this reason, the change sought by the Department would require an act by Congress and cannot be done via rulemaking.

**The Department's proposal clearly violates constitutional protections.**

The Department's proposed rule represents efforts to engage in viewpoint discrimination, in violation of the First Amendment, by weaponizing the PSLF program against 501(c)(3) non-profit organizations and governments that may not support or have views that are different from the administration's specific agenda.

The proposed "substantial illegal purpose" standard would violate free speech and associational protections guaranteed by the First Amendment.[6] The administration proposal provides a list of several suggested "violations" of its new standard that make clear that they are designed to target organizations that may choose to pursue lawful activities that conflict with the administration's particular goals or priorities, including those serving immigrant communities, promoting LGBTQ+ rights or fighting discrimination in access to services and goods. These categories of so-called "substantial illegal activity" are proposed as justification to

---

[3] College Cost Reduction and Access Act of 2007, Pub. L. No. 110-84, 121 Stat. 784, 801 (2007).
[4] 34 C.F.R. § 685.219(b)(27)(iii)
[5] Husch Blackwell, "Executive Order Highlights Risks to Nonprofit Tax-Exempt Status," March 10, 2025, https://www.huschblackwell.com/newsandinsights/executive-order-highlights-risks-to-nonprofit-tax-exempt-status.
[6] Student Defense, "Student Defense Statement on Trump's Executive Order on PSLF," March 7, 2025, https://www.defendstudents.org/news/student-defense-statement-on-trumps-executive-order-on-pslf.

harass and intimidate organizations that advocate for causes or communities that may be disfavored by the current administration.

The proposed rule provides overly broad, ambiguous definitions for each of its proposed category of activities which are not defined within the statute. For example, the proposal conflates “illegal discrimination” with lawful efforts to support diversity, equity and inclusion (DEI).

Such ambiguity is particularly concerning because the rule also violates due process as it would allow the Secretary to exercise significant discretion, serving as an arbiter that can determine organizational eligibility, without the opportunity to appeal to an independent authority.

Such discretion is concerning, given that the Department has already demonstrated a willingness to engage in unlawful viewpoint discrimination. A federal court recently held in *American Federation of Teachers v. Department of Education*, the Department’s new guidance on diversity, equity and inclusion constituted “textbook viewpoint discrimination” that exceeded the Department’s authority and violated constitutional rights.[7] The inclusion of “illegal discrimination” is particularly concerning given this Administration's demonstrated pattern of reinterpreting civil rights laws without legal support, including repeatedly accusing schools of violating Title VI and Title IX without substantiation.[8]

The Department’s proposed rule also contains other fundamental flaws that would exacerbate its harmful effects.

**The Department’s proposed rule unfairly penalizes all employees as a group.**

The rule would penalize employees of certain organizations based on viewpoint or cause, regardless of their level of involvement or knowledge of the organization’s now-disfavored activities. As categories of penalized activities are a novel development from this scheme, neither organizations nor their employees would be in a position to anticipate this interpretation of the policy of law.

To the contrary, the PSLF was created to incentivize talented professionals to enter public service careers and serve many or all of the different kinds of underserved communities. Under this rule, PSLF participants will have no assurance that their individual dedication to public service guarantees them loan forgiveness. Even an organization that is doing work that may be

---

[7] American Federation of Teachers et al. v. Department of Education, No. 1:25-cv-00628-SAG, 2025 WL 2374697, at 21, 23, 26, 27 (D. Md. Aug. 14, 2025), https://cases.justia.com/federal/district-courts/maryland/mddce/1:2025cv00628/577437/83/0.pdf?ts=1755251872.

[8] U.S. Department of Education, "U.S. Department of Education Takes Action to Eliminate DEI," accessed September 16, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-eliminate-dei.

supported today could face a future rule that suddenly alters the parameters to exclude them. Impacting the strategic decisions and focus of the nonprofit sector as a whole is far beyond the remit of this statute.

In the prior stage of the rulemaking process, negotiators explicitly expressed such concerns. Despite the Department's reassurances of a reconsideration process, the proposal lacks a mechanism for employees to challenge inaccurate decisions.

Moreover, the proposal will produce a chilling effect that could discourage individuals from pursuing public service altogether, doing the opposite of the program's congressional intent.

**The Department's proposed rule creates an unnecessary parallel tax-status adjudication system.**

The Secretary of Education is nominated and confirmed to lead the Department of Education, not to adjudicate the tax status of organizations across the nonprofit sector. Both the Secretary and Department lack the expertise and statutory authority to make tax-status determinations, which are traditionally reserved for the Internal Revenue Service and federal law enforcement agencies. Such determinations require specialized expertise that neither the Department nor the Secretary possesses. The rule would therefore require the establishment of the Department's own parallel tax-status enforcement system, allowing the Secretary to make judgments regarding whether an organization deserves tax-exempt status.

Should the Department have legitimate concerns regarding an organization's 501(c)(3) status, such determinations should be made by the Internal Revenue Service in accordance with existing processes. The rule unnecessarily would both duplicate and undermine such processes, while providing insufficient or missing procedural safeguards.

**The Department's proposed rule is arbitrary, making it impracticable or impossible for organizations to comply.**

The proposal's ambiguous list of prohibited activities would create arbitrary, impractical and even impossible compliance burdens for community-serving organizations.

Organizations that inherently advocate for marginalized communities and challenge current policies would not be able to predict with certainty that their activities would not be deemed problematic now or by future administrations. Forcing organizations to choose to continuously reassess and self-censor their work or to risk losing a critical staff retention tool would undermine their missions and effectiveness, undermining the purpose and goals of the PSLF program.

In the prior stage of the rulemaking, negotiators explicitly expressed such concerns. In response, the Department added consideration of materiality, meaning that the Department will measure the frequency and severity of an employer's action, to the rule. Such vague additional terms do nothing to assure organizations of the ability to plan or to exercise their associational and viewpoint rights or make it simpler or easier for employees to make decisions under the rule. At the same time, the Department lowered the required standard of evidence from clear and convincing to the much lower standard of "preponderance of the evidence." Under this lower proposed standard, the Department needs only to show that an organization is "more likely than not" to be engaged in prohibited activities, raising the level of implied threat to lawfully protected activities.

Organizations and employees cannot reasonably comply under these circumstances or be assured that this or future administrations will not use these rules to arbitrarily punish organizations over a policy disagreement with the current administration.

**The Department's proposed rule lacks the necessary staffing and expertise to implement it successfully.**

The rule's reliance on a laborious assessment process for making eligibility determinations is strikingly at odds with the ongoing effort to dismantle the Department, given its diminishing staff capacity. Since January, the Department has sought to eliminate approximately half of its workforce and shuttered numerous offices, resulting in significant backlogs in various student aid offices.[9]

The ability to successfully implement the current PSLF program remains in question, and the adjudications required by this proposed rule will challenge the Department further. Without more staffing capacity, it is difficult to imagine the Department can properly administer the program without resulting in unnecessary harm to — and delays in processing for — all PSLF participants. Notably, under the first Trump administration, the Department rejected 99% of PSLF applicants for loan forgiveness.[10]

The Department claims fewer than 10 organizations would be impacted annually, an estimate that it failed to justify. It also failed to explain how it made such a determination. Given the ambiguous definitions, such an estimate seems unrealistic and a gross underestimation.

---

[9] Student Borrower Protection Center, "New Court Filing Reveals Backlog of 2 Million Borrower Payment Plan Applications," May 16, 2025, https://protectborrowers.org/new-court-filing-reveals-backlog-of-2-million-borrower-payment-plan-applications/.
[10] U.S. Government Accountability Office, "Student Loan Forgiveness: Education Could Do More to Help Eligible Public Service Workers Navigate the Application Process," GAO, September 10, 2019, https://www.gao.gov/products/gao-19-717t.

Even if such estimates are correct, as noted above, the Department lacks the expertise required to make tax-status determinations or assess criminal violations, as required by the rule. The Department is making broad claims of authority and expertise it simply does not possess, without a legal mandate or the staffing capacity that would be necessary.

**The Department's proposed rule will be devastating for Latinos and local communities.**

Like many Americans, Latinos are being crushed by student loan debt, making it impossible to plan for the future. When these professionals — teachers, librarians, firefighters — commit to giving back through public service careers that are often less lucrative than the private sector, Congress has recognized that there is both a moral obligation and an economic incentive to honor that commitment through loan forgiveness. Accessing public service careers should not be limited to those born with wealth.

The changes to this program will confuse and discourage Americans, including Latinos, from pursuing careers in public service. They ultimately would push people away from considering employment in the public sector. This would be devastating to those who would otherwise dedicate their lives to public service, deeply affecting Latinos who comprise 20% of the nonprofit workforce.[11]

Public service employers across the nation underscore the need for PSLF as it empowers student loan borrowers to pursue careers in public service. The U.S. is currently facing a nonprofit staff shortage that will be exacerbated by changes to PSLF eligibility. About three-quarters of nonprofits have reported persistent job vacancies in roles that directly impact their ability to serve their local communities.[12] Many positions in job opportunities related to public service go unfilled due to economic pressures and the anxieties of student loan repayment.

Nearly 40% of public employees are more likely to view student loan debt as a major factor in choosing to work in the private sector instead of pursuing careers in public service.[13] Importantly, the Department failed as part of their impact analysis to determine how this rule

[11] Candid, "What to Know About U.S. Nonprofit Sector Demographics," *Candid Insights*, May 15, 2025, https://candid.org/blogs/diversity-in-nonprofit-sector-candid-demographic-data-report/.

[12] Johnson Center for Philanthropy, "The Nonprofit Workforce is in Crisis," January 15, 2025, https://johnsoncenter.org/blog/the-nonprofit-workforce-is-in-crisis/.

[13] MissionSquare Retirement, "Student Debt is a Major Source of Economic Stress for U.S. Public and Private Sector Workers, New MissionSquare Research Institute Study Finds," October 22, 2024, https://www.missionsq.org/about-us/news-and-updates/media-inquiries/news-20241022-studentdebtmajorsourceeconomicstressmsristudy.html.

would deter public sector growth and the resulting impacts on the economies of local communities.

Limiting eligibility for PSLF would be detrimental to the often-underserved local communities that rely on the services provided by nonprofits. PSLF lowers key barriers to entry into careers in legal aid, teaching and public safety that face critical underrepresentation of Latinos. These communities' nonprofit workers can continue to serve so long as these workers can benefit through PSLF without having to worry about their jobs due to the arbitrary, sudden and unpredictable loss of their employer's eligibility.

**Recommendations**

For the reasons outlined above, the Department's proposed rule represents an unlawful attempt to exceed statutory authority, violates constitutional protections and weaponizes a federal program for political purposes. The Department undermines the very intent of the PSLF program, as a tool to incentivize highly skilled Americans to pursue public service by serving underserved communities, and to recognize their decades-long dedication to such service.

UnidosUS urges the Department to immediately withdraw this NPRM in its entirety, and instead to implement the PSLF program as Congress intended, with existing eligibility for 501(c)(3) organizations. The millions of Americans dedicated to public service deserve better than to be targeted as part of partisan politics.

**As of:** 12/19/25, 8:17 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** mfo-gyxw-x44k
**Comments Due:** September 17, 2025
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19902
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Brandon Tullis
**Address:**
1005 W 1350 S, UT, 84663
**Email:** tullis.brandon@gmail.com
**Phone:** 801-722-9566

---

## General Comment

Didn't receive email receipt for first submission (mfo-fv20-b2pg), worried may have entered wrong email address, submitting again with correct info here:

My name is Brandon Tullis and I'm a hospitalist with Intermountain Health in Utah. As a public servant and internal medicine physician, I am 8 of 10 years into the public service loan forgiveness (PSLF) program. I have made major life decisions based on the promises made to me by the government, and I heavily rely on PSLF now since I have stuck with >6% interest federal loans rather than refinancing to 2% interest private loans. I have also taken not-for-profit jobs that offered lower pay than for-profit jobs I could have gotten elsewhere, again, in order to maintain my eligibility for PSLF.

PSLF is a smart workaround to address a rampant problem of ballooning tuition costs and a shortage of service in the public sector. It allows students from any socioeconomic background to aspire to become a doctor, not just those who have financial help from their parents. This leads to more doctors serving the general public, including in underserved areas of the nation such as rural areas, rather than just finding work at a for-profit institution where they can make more money.

The proposed amendment to 34 CFR 685.219 (c) is like charging an employee a steep fine after discovering their employer was cheating on the company taxes. This proposed rule change punishes the public servants working for these organizations more than it punishes the organizations themselves. The cost-benefit analysis of these proposed changes details how much money this will save taxpayers, but neglects to mention how these taxpayer dollars were already promised and committed to public servants who have been upholding their end of their contracts with the government. If the intent is to punish the organization and not the individual, then the proposed rule changes should add a clause stating that

qualifying monthly payments for borrowers would not be impacted by these rule changes, as long as the borrower continues to work for an employer that was previously considered a not-for-profit entity when they were hired.

The language of these proposed rule changes is also a major cause for concern. The proposed addition to § 685.219(h) would allow the Secretary of the Department of Education - a single individual - the power to revoke the tax-exempt status of organizations by deciding whether they have participated in "substantial illegal activity". This would lock all of that organization's employees out from obtaining PSLF unless they switched jobs (and it is unlikely there would be enough local qualifying jobs available to meet that demand). Revoking these tax benefits will cause affected organizations to stop trying to meet other standards that not-for-profit organizations must comply with. As a result, less public service will be provided, which will harm our communities. This is a relatively easy problem to fix. The revoking of not-for-profit status should be tied to a legally binding court finding of guilt, not a "preponderance of evidence" as determined by the Secretary of Education.

In summary, the proposed rule-making is shortsighted at best, malicious and destructive at worst. If this proposed rule change is allowed to continue, any intended benefit to American taxpayers will inevitably backfire. In the medical field alone, the cost of medical care will go up, and the quality of patient care will go down.

Furthermore, even if this proposed rule-making were financially sound, it is unethical. People have built their lives around the promises of the PSLF program. Finding a loophole to escape promises made to public servants years ago is not an acceptable way to save taxpayer money, regardless of the political views of the company those public servants work for. Please reconsider.

Thank you for taking the time to read some of my deep concerns about these proposed rule changes.

Brandon Tullis, MD
Internal Medicine Physician

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:18 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** mfo-hw09-yjfj
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19938
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Email:** msanchez@unidosus.org
**Organization:** UnidosUS

---

## General Comment

Please see the attached UnidosUS corrected comment, replacing a previously submitted comment id: mfo-govk-dxlj

---

## Attachments

unidosus_publicstudentloanforgiveness_nprmcomment_91725



HEADQUARTERS
Raul Yzaguirre Building
1126 16th Street NW, Suite 600
Washington, DC 20036-4845

202.785.1670
202.776.1792
unidosus.org

September 17, 2025

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue, SW
Washington, DC 20202

**RE:** Notice of Proposed Rulemaking Docket ID ED-2025-OPE-0016

Submitted electronically via Regulations.gov

Dear Ms. Abernathy,

We submit this written public comment in response to the U.S. Department of Education's (the department's) Notice of Proposed Rulemaking (NPRM) on changes to employer eligibility under the Public Service Loan Forgiveness (PSLF) program.[1]

UnidosUS, previously known as NCLR (National Council of La Raza), is the nation's largest Hispanic civil rights and advocacy organization.[2] Through its unique combination of expert research, advocacy, programs and an Affiliate Network of nearly 300 community-based organizations across the United States and Puerto Rico, UnidosUS simultaneously challenges the social, economic and political barriers at the national and local levels.

As a leading advocate for education policy that encompasses the perspectives of Latinos in higher education, UnidosUS rejects the department's efforts to restrict nonprofit employer eligibility and opposes any politically motivated attempts to undermine the longstanding commitment made to borrowers who have been faithfully making payments for years, trusting the program's promise of eventual forgiveness.

The department's proposal exceeds congressional intent, violates constitutional principles, is poorly designed and inherently flawed and could cause devastating harm to

---

[1] U.S. Department of Education, "William D. Ford Federal Direct Loan (Direct Loan) Program," Federal Register 90, no. 157 (August 18, 2025): 40130-40196, https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program.

[2] The terms "Hispanic" and "Latino" are used interchangeably by the U.S. Census Bureau and throughout our materials to refer to persons of Mexican, Puerto Rican, Cuban, Central and South American, Dominican, Spanish, and other Hispanic descent; they may be of any race.

Latino communities. For these reasons, we urge the department to immediately withdraw this unlawful NPRM.

**The department's proposal clearly violates the statute and congressional intent, and therefore lacks legal authority.**

The department's efforts fundamentally contradict the statutory structure and congressional intent behind the establishment of the PSLF program, as outlined in the College Cost Reduction and Access Act of 2007.[3] When Congress created the program, the statute established qualifying employer eligibility for "[a]n organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code."[4] This language is unambiguous, and provides no exception to the secretary that would permit the executive branch to exclude otherwise qualifying employers on ideological or political grounds. Millions of students relied upon the stable, statutory and longstanding interpretation of the law to plan their lives and academic decisions.

Now the department proposes to provide the U.S. Secretary of Education with the authority to disqualify otherwise statutorily eligible employers based on a new "substantially illegal purpose" standard not established by Congress.[5] This proposal is contradicted by the statute, which unambiguously defines eligible employers to include all 501(c)(3) organizations. For this reason, the change sought by the department would require an act by Congress and cannot be done via rulemaking.

**The department's proposal clearly violates constitutional protections.**

The department's proposed rule represents efforts to engage in viewpoint discrimination, in violation of the First Amendment, by weaponizing the PSLF program against 501(c)(3) non-profit organizations and governments that may not support or have views that are different from the administration's specific agenda.

The proposed "substantial illegal purpose" standard would violate free speech and associational protections guaranteed by the First Amendment.[6] The administration proposal provides a list of several suggested "violations" of its new standard that make

---

[3] College Cost Reduction and Access Act of 2007, Pub. L. No. 110-84, 121 Stat. 784, 801 (2007).

[4] 34 C.F.R. § 685.219(b)(27)(iii)

[5] Husch Blackwell, "Executive Order Highlights Risks to Nonprofit Tax-Exempt Status," March 10, 2025, https://www.huschblackwell.com/newsandinsights/executive-order-highlights-risks-to-nonprofit-tax-exempt-status.

[6] Student Defense, "Student Defense Statement on Trump's Executive Order on PSLF," March 7, 2025, https://www.defendstudents.org/news/student-defense-statement-on-trumps-executive-order-on-pslf.

clear that they are designed to target organizations that may choose to pursue lawful activities that conflict with the administration's particular goals or priorities, including those serving immigrant communities, promote LGBTQ+ rights or fighting discrimination in access to services and goods. These categories of so-called "substantial illegal activity" are proposed as justification to harass and intimidate organizations that advocate for causes or communities that may be disfavored by the current administration.

The proposed rule provides overly broad, ambiguous definitions for each of its proposed category of activities, which are not defined within the statute. For example, the proposal conflates "illegal discrimination" with lawful efforts to support diversity, equity and inclusion (DEI).

Such ambiguity is particularly concerning because the rule also violates due process as it would allow the secretary to exercise significant discretion, serving as an arbiter that can determine organizational eligibility, without the opportunity to appeal to an independent authority.

Such discretion is concerning, given that the department has already demonstrated a willingness to engage in unlawful viewpoint discrimination. A federal court recently held in *American Federation of Teachers v. Department of Education*, the department's new guidance on diversity, equity and inclusion constituted "textbook viewpoint discrimination" that exceeded the Department's authority and violated constitutional rights.[7] The inclusion of "illegal discrimination" is particularly concerning given this administration's demonstrated pattern of reinterpreting civil rights laws without legal support, including repeatedly accusing schools of violating Title VI and Title IX without substantiation. [8]

The department's proposed rule also contains other fundamental flaws that would exacerbate its harmful effects.

**The department's proposed rule unfairly penalizes all employees as a group.**

The rule would penalize employees of certain organizations based on viewpoint or cause, regardless of their level of involvement or knowledge of the organization's now-disfavored activities. As categories of penalized activities are a novel development from this scheme,

[7] American Federation of Teachers et al. v. Department of Education, No. 1:25-cv-00628-SAG, 2025 WL 2374697, at 21, 23, 26, 27 (D. Md. Aug. 14, 2025), https://cases.justia.com/federal/district-courts/maryland/mddce/1:2025cv00628/577437/83/0.pdf?ts=1755251872.

[8] U.S. Department of Education, "U.S. Department of Education Takes Action to Eliminate DEI," accessed September 16, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-eliminate-dei.

neither organizations nor their employees would be in a position to anticipate this interpretation of the policy of law.

To the contrary, the PSLF was created to incentivize talented professionals to enter public service careers and serve many or all of the different kinds of underserved communities. Under this rule, PSLF participants will have no assurance that their individual dedication to public service guarantees them loan forgiveness — even an organization that is doing work that may be supported today could face a future rule that suddenly alters the parameters to exclude them. Impacting the strategic decisions and focus of the nonprofit sector as a whole is far beyond the remit of this statute.

In the prior stage of the rulemaking process, negotiators explicitly expressed such concerns. Despite the department's reassurances of a reconsideration process, the proposal lacks a mechanism for employees to challenge inaccurate decisions.

Moreover, the proposal will produce a chilling effect that could discourage individuals from pursuing public service altogether, doing the opposite of the program's congressional intent.

**The department's proposed rule creates an unnecessary parallel tax-status adjudication system.**

The Secretary of Education is nominated and confirmed to lead the U.S. Department of Education, not to adjudicate the tax status of organizations across the nonprofit sector. Both the secretary and department lack the expertise and statutory authority to make tax-status determinations, which are traditionally reserved for the Internal Revenue Service (IRS) and federal law enforcement agencies. Such determinations require specialized expertise that neither the department nor the secretary possesses. The rule would therefore require the establishment of the Department's own parallel tax-status enforcement system, allowing the secretary to make judgments regarding whether an organization deserves tax-exempt status.

Should the department have legitimate concerns regarding an organization's 501(c)(3) status, such determinations should be made by the IRS in accordance with existing processes. The rule unnecessarily would both duplicate and undermine such processes, while providing insufficient or missing procedural safeguards.

**The department's proposed rule is arbitrary, making it impracticable or impossible for organizations to comply.**

The proposal's ambiguous list of prohibited activities would create arbitrary, impractical and even impossible compliance burdens for community-serving organizations.

Organizations that inherently advocate for marginalized communities and challenge current policies would not be able to predict with certainty that their activities would not be deemed problematic now or by future administrations. Forcing organizations to choose to continuously reassess and self-censor their work or to risk losing a critical staff retention tool would undermine their missions and effectiveness, undermining the purpose and goals of the PSLF program.

In the prior stage of the rulemaking, negotiators explicitly expressed such concerns. In response, the department added consideration of materiality, meaning that the department will measure the frequency and severity of an employer's action, to the rule. Such vague additional terms do nothing to assure organizations of the ability to plan or to exercise their associational and viewpoint rights or make it simpler or easier for employees to make decisions under the rule. At the same time, the department lowered the required standard of evidence from clear and convincing to the much lower standard of "preponderance of the evidence." Under this lower proposed standard, the department needs only to show that an organization is "more likely than not" to be engaged in prohibited activities, raising the level of implied threat to lawfully protected activities.

Organizations and employees cannot reasonably comply under these circumstances or be assured that this or future administrations will not use these rules to arbitrarily punish organizations over a policy disagreement with the current administration.

**The department's proposed rule lacks the necessary staffing and expertise to implement it successfully.**

The rule's reliance on a laborious assessment process for making eligibility determinations is strikingly at odds with the ongoing effort to dismantle the department, given its diminishing staff capacity. Since January, the department has sought to eliminate approximately half of its workforce and shuttered numerous offices, resulting in significant backlogs in various student aid offices.[9]

[9] Student Borrower Protection Center, "New Court Filing Reveals Backlog of 2 Million Borrower Payment Plan Applications," May 16, 2025, https://protectborrowers.org/new-court-filing-reveals-backlog-of-2-million-borrower-payment-plan-applications/.

The ability to successfully implement the current PSLF program remains in question, and the adjudications required by this proposed rule will challenge the department further. Without more staffing capacity, it is difficult to imagine the department can properly administer the program without resulting in unnecessary harm to — and delays in processing for — all PSLF participants. Notably, under the first Trump administration, the department rejected 99% of PSLF applicants for loan forgiveness.[10]

The department claims fewer than 10 organizations would be impacted annually, an estimate that it failed to justify. It also failed to explain how it made such a determination. Given the ambiguous definitions, such an estimate seems unrealistic and a gross underestimation.

Even if such estimates are correct, as noted above, the department lacks the expertise required to make tax-status determinations or assess criminal violations, as required by the rule. The department is making broad claims of authority and expertise it simply does not possess, without a legal mandate or the staffing capacity that would be necessary.

**The department's proposed rule will be devastating for Latinos and local communities.**

Like many Americans, Latinos are being crushed by student loan debt, making it impossible to plan for the future. When these professionals — teachers, librarians, firefighters — commit to giving back through public service careers that are often less lucrative than the private sector, Congress has recognized that there is both a moral obligation and an economic incentive to honor that commitment through loan forgiveness. Accessing public service careers should not be limited to those born with wealth.

The changes to this program will confuse and discourage Americans, including Latinos, from pursuing careers in public service. They ultimately would push people away from considering employment in the public sector. This would be devastating to those who would otherwise dedicate their lives to public service, deeply affecting Latinos who comprise 20% of the nonprofit workforce.[11]

Public service employers across the nation underscore the need for PSLF as it empowers student loan borrowers to pursue careers in public service. The U.S. is currently facing a nonprofit staff shortage that will be exacerbated by changes to PSLF eligibility. About three-

---

[10] U.S. Government Accountability Office, "Student Loan Forgiveness: Education Could Do More to Help Eligible Public Service Workers Navigate the Application Process," GAO, September 10, 2019, https://www.gao.gov/products/gao-19-717t.

[11] Candid, "What to Know About U.S. Nonprofit Sector Demographics," *Candid Insights*, May 15, 2025, https://candid.org/blogs/diversity-in-nonprofit-sector-candid-demographic-data-report/.

quarters of nonprofits have reported persistent job vacancies in roles that directly impact their ability to serve their local communities.[12] Many positions in job opportunities related to public service go unfilled due to economic pressures and the anxieties of student loan repayment.

Nearly 40% of public employees are more likely to view student loan debt as a major factor in choosing to work in the private sector instead of pursuing careers in public service.[13] Importantly, the department failed as part of their impact analysis to determine how this rule would deter public sector growth and the resulting impacts on the economies of local communities.

Limiting eligibility for PSLF would be detrimental to the often underserved local communities that rely on the services provided by nonprofits. PSLF lowers key barriers to entry into careers in legal aid, teaching and public safety that face critical underrepresentation of Latinos. These communities' nonprofit workers can continue to serve so long as these workers can benefit through PSLF without having to worry about their jobs due to the arbitrary, sudden and unpredictable loss of their employer's eligibility.

**Recommendations**

For the reasons outlined above, the department's proposed rule represents an unlawful attempt to exceed statutory authority, violate constitutional protections and weaponize a federal program for political purposes. The department undermines the very intent of the PSLF program, as a tool to incentivize highly skilled Americans to pursue public service by serving underserved communities, and to recognize their decades-long dedication to such service.

UnidosUS urges the department to immediately withdraw this NPRM in its entirety, and instead to implement the PSLF program as Congress intended, with existing eligibility for 501(c)(3) organizations. The millions of Americans dedicated to public service deserve better than to be targeted as part of partisan politics.

[12] Johnson Center for Philanthropy, "The Nonprofit Workforce is in Crisis," January 15, 2025, https://johnsoncenter.org/blog/the-nonprofit-workforce-is-in-crisis/.

[13] MissionSquare Retirement, "Student Debt is a Major Source of Economic Stress for U.S. Public and Private Sector Workers, New MissionSquare Research Institute Study Finds," October 22, 2024, https://www.missionsq.org/about-us/news-and-updates/media-inquiries/news-20241022-studentdebtmajorsourceeconomicstressmsristudy.html.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:20 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** Student
**Tracking No.** mfo-hx85-srk9
**Comments Due:** September 17, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-19940
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Email:** eguillory@acenet.edu
**Organization:** American Council on Education

---

## General Comment

See attached file(s)

---

## Attachments

09172025 ACE PSLF Modification Opposition Letter



September 17, 2025

The Honorable Linda McMahon
Secretary
United States Department of Education
400 Maryland Ave, SW
Washington, DC 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon:

On behalf of the American Council on Education (ACE), and the undersigned higher education associations, we write to express our strong opposition to the changes proposed to the Public Service Loan Forgiveness (PSLF) program in the Notice of Proposed Rulemaking (NPRM) issued on August 18 in the Federal Register.[1] These proposed changes, while aligned with Executive Order 14187 issued on February 3,[2] are not aligned with the law or congressional intent.

The PSLF program was created in the College Cost Reduction and Access (CCRAA) Act of 2007,[3] on a bipartisan basis in both the House and Senate and was signed into law by President George W. Bush. Congress created PSLF to ensure a brighter future with less financial burden for public servants, and lawmakers wanted to properly recognize the contributions and challenges of public service while encouraging participation in these careers. As clearly articulated in statutory language, the law defined public service employment as full-time jobs at government and 501(c)(3) nonprofit organizations, and particularly identified fields of employment such as emergency management, social work in a public child or family service agency, public library sciences, and public education.[4]

In the August 18 NPRM, the Department of Education attempts to justify its proposal to deny certain organizations qualifying employer status because the Higher Education Act (HEA) does not define the term *public service*. However, the HEA clearly defines a public service job without a need to bifurcate *public service* and *job*. In fact, Congress wanted to ensure that it was clear what types of jobs would qualify for PSLF and as a result the Department was only given narrow authority to alter this definition in the limited circumstances of jobs in high-need subject areas of shortage.

The PSLF program was created to benefit individuals who chose public service jobs and these are the very people that will be severely harmed if these proposed regulations were to go into

---

[1] William D. Ford Federal Direct Loan (Direct Loan) Program, Volume 90 F.R. 40154-40176 (proposed August 18, 2025)(to be codified at 34 C.F.R. Part 685).
https://owl.purdue.edu/owl/research_and_citation/apa_style/apa_formatting_and_style_guide/apa_legal%20references%20.html

[2] Exec. Order No. 14187, 3 C.F.R. 8771-8773 (2025). https://www.govinfo.gov/content/pkg/FR-2025-02-03/pdf/2025-02194.pdf

[3] Congress.gov. (2007, September 27). *H.R.2669 - College Cost Reduction and Access Act*. Retrieved August 20, 2025, from https://www.congress.gov/bill/110th-congress/house-bill/2669?q=%7B%22search%22%3A%22college+cost+reduction+and+access+act+%22%7D&s=2&r=1

[4] A full list of public service jobs can be found in the Higher Education Act of 1965, 20 U.S.C. 1087e(m). (2025). https://www.govinfo.gov/content/pkg/COMPS-765/pdf/COMPS-765.pdf

effect. Currently, there are over 2.5 million borrowers, with a cumulative loan balance of $225 billion, who are employed at organizations with qualifying employer status.[5] Of these borrowers, only 20,400 have made over 119 payments towards their student loan forgiveness, which leaves millions of borrowers who will see their eligibility put at risk should these regulations go into effect on July 1, 2026.[6] These borrowers entered their professions making a conscious choice to forego higher salaries in order to serve the public across a range of critical needs with the expectation that the law would be observed and they would be eligible for loan relief if they met the requirements.

This is not the only likely harm to borrowers that would result from the proposed regulations, as the Department acknowledges that they may impose further costs to borrowers including potential delays in loan forgiveness processing due to an employer losing qualifying employer status as well as potential misunderstandings of the new regulations leading borrowers to be confused and delaying the application of the forgiveness benefit. The Department states:

> Borrowers who are employed by organizations disqualified under the new rules may experience a temporary disruption in their progress toward loan forgiveness. These borrowers will need to transition to qualifying employers to continue receiving credit for their payments. Borrowers who misunderstand the new rules may apply for forgiveness without knowing or understanding the implications of the new rule on their former or current employer as they may no longer be a qualifying employer.[7]

It is not an easy feat for a borrower to simply “switch” employers, and it is unreasonable to assume that this is actually a viable option for borrowers.[8] Compounding the above harm to borrowers is that the regulations prevent them from even requesting a reconsideration of the Department’s decision to revoke their employer of qualifying employer status.

It is our hope that you will reconsider this proposal and approach any changes to the PSLF program with the goal of improving the program to ensure borrowers receive the benefits they are entitled to and that the law guarantees. We are happy to work with you on ways to improve the program for student loan borrowers outside of changes to the actual law.

We appreciate your time and consideration.

Sincerely,

Ted Mitchell
President

AACTE: American Association of Colleges for Teacher Education
AccessLex Institute
Achieving the Dream

---

[5] Federal Student Aid. (n.d.). *Public Service Loan Forgiveness Data.* U.S. Department of Education. Retrieved August 20, 2025, from https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data
[6] The number of borrowers in the next category with 97-119 payments is 355,500. Of these borrowers, those with more than 11 additional payments or more could potentially see a loss in student loan forgiveness.
[7] William D. Ford Federal Direct Loan (Direct Loan) Program, Volume 90 F.R. 40168 (proposed August 18, 2025)(to be codified at 34 C.F.R. Part 685)
[8] This is especially true for women and borrowers of color due to disparities in earnings and employment within the labor market.

ACPA-College Student Educators International
AICUP-Association of Independent Colleges and Universities in Pennsylvania
American Association of Colleges and Universities
American Association of Colleges of Nursing
American Association of Collegiate Registrars and Admissions Officers
American Association of Collegiate Registrars and Admissions Officers
American Association of Community Colleges
American Association of Veterinary Medical Colleges
American Council on Education
American Library Association
Association for Institutional Research
Association of American Law Schools
Association of American Medical Colleges
Association of American Universities
Association of Community College Trustees
Association of Governing Boards
Association of Governing Boards of Universities and Colleges
Association of Independent Colleges & Universities in Massachusetts
Association of Independent Colleges and Universities of Rhode Island
Association of Jesuit Colleges and Universities
Association of Schools and Colleges of Optometry
Association of Schools and Programs of Public Health
College and University Professional Association for Human Resources
College and University Professional Association for Human Resources
Complete College America
Council for Advancement and Support of Education
Council for Opportunity in Education
Council of Independent Colleges
EDUCAUSE
Higher Education Loan Coalition
Higher Learning Commission
Hispanic Association of Colleges and Universities
Maryland Independent College and University Association
Middle States Commission on Higher Education
NAFSA: Association of International Educators
NASPA-Student Affairs Administrators in Higher Education
National Association for College Admission Counseling
National Association of College and University Business Officers
National Association of Student Financial Aid Administrators
National Council for Community and Education Partnerships
New England Commission of Higher Education
North Carolina Independent Colleges and Universities

# PUBLIC SUBMISSION

**As of:** 12/19/25, 8:21 AM
**Received:** September 17, 2025
**Status:** DoNotPost
**Category:** State agency
**Tracking No.** mfo-mcpf-4e44
**Comments Due:** September 17, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-7221
William D. Ford Federal Direct Loan (Direct Loan) Program

**Document:** ED-2025-OPE-0016-DRAFT-20080
Comment on FR Doc # 2025-15665

---

## Submitter Information

**Name:** Kira Fickenscher
**Address:**
   Olympia,  WA,  98502
**Email:** kiraf.87@gmail.com
**Phone:** 4257650494

---

## General Comment

The proposed rule changes are arbitrary and capricious, and the new proposed definitions are written in a way that allows the current administration to deny relief to employees based on political alignment, that is to say, to rule out government and nonprofit entities that the current administration disagrees with politically. The way it's written could allow entire state governments - large agencies! - to be disqualified based on administrative whims. This will cause irreparable harm to many thousands of hardworking Americans who have dedicated themselves to service to their communities, accepting lower-paying work in exchange for the promise of PSLF. It's shameful that this is on the table at all.

An official website of the United States Government. 

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 18, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Linda McMahon
Acting Undersecretary James Bergeron
Office of Postsecondary Education
US Dept. of Education
Lyndon Baines Johnson Building
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

The Human Service Chamber of Franklin County is a membership organization supporting over 200 health and human service 501(c)(3) nonprofits that serve individuals and families in the Columbus region. From our membership alone, health and human service nonprofits employ over 20,000 people in our community and provide services to hundreds of thousands. These organizations and the people who work at these organizations provide services that are critical to helping people survive and thrive.

As with nonprofits across the country, our members' employees are deeply committed to public service, yet face low compensation, high workloads, and systemic underinvestment in the health and human services sector.

For many, Public Service Loan Forgiveness ("PSLF") is an essential tool that makes it possible for people to remain in nonprofit careers. With a continuing nonprofit workforce shortage across the country, we believe it is paramount that broad access to PSLF should be preserved, not restricted.

We appreciate the opportunity to provide public feedback on these topics under negotiation:

Give Feedback

The proposed rule is contrary to federal law.
When Congress established the PSLF Program in 2007 with broad, bipartisan support, its clear intent was to offer meaningful debt relief to those seeking to build long-term careers in public service. Lawmakers recognized that these roles, while vital, are often underpaid and offer fewer financial incentives than private-sector careers. Any narrowing of the definition of “qualifying employer” would undermine this legislative purpose.

The Department of Education does not have the authority to restrict eligibility under PSLF. We recommend that the Department of Education continue recognizing all 501(c)(3) organizations as qualifying employers under PSLF, without imposing additional criteria that reduce access or create complexity, confusion, and additional administrative burden.

The proposed rule inserts politics and ideology into the program.
This proposed rule is an attempt to impose politics and ideology on a program that millions of borrowers depend on. It replaces the clarity of law with the subjective, politically motivated criteria that would be confusing for most people to understand and navigate. This is an abuse of regulatory power and a betrayal of the public servants this program was designed to support. This proposed rule also opens the door for this and future administrations to change program eligibility based on their priorities or ideology. Nonprofits must be able to identify and meet needs in their communities without fear of political retribution.

The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities.
Nonprofit workers who have devoted their lives to serving others could suddenly find their employment disqualified if this proposed rule goes into effect. It would upend years of service, destabilize the nonprofit workforce, and strip vital services from communities in need because of politics and ideology, which could change rapidly. Without consistent and clear rules, nonprofit professionals cannot rely on this program to make decisions about their career path. This will harm nonprofits, making it harder to attract a skilled workforce, and it will harm people and communities who rely on these services.

The PSLF program is a lifeline for those who choose public service over higher salaries in the private sector. This proposed rule is an attempt to harm underserved communities and the nonprofits and the nonprofit workers who serve them by undermining federal law and inserting politics and ideology into the PSLF program.

Thank you for your consideration of this input as part of the rulemaking process.

Sincerely,
Bhumika Patel
Deputy Director
Human Service Chamber of Franklin County

Give Feedback

Attachments 2

10/10/25, 2:05 PM Regulations.gov

Dept of Ed Public Comments

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10030/attachment_1.pdf)

HSC PSLF Public Comments Dept of Ed 9.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10030/attachment_2.pdf)

**Comment ID**

ED-2025-OPE-0016-10030

**Tracking Number**

mfo-3rut-z8m6

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Give Feedback

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

https://www.regulations.gov/comment/ED-2025-OPE-0016-10030 3/4

ED_00100

10/10/25, 2:05 PM Regulations.gov

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10030 4/4

ED_00101



September 17, 2025

Linda McMahon
Acting Undersecretary James Bergeron
Office of Postsecondary Education
US Dept. of Education
Lyndon Baines Johnson Building
400 Maryland Avenue SW
Washington, DC 20202

**RE: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]**

The Human Service Chamber of Franklin County is a membership organization supporting over 200 health and human service 501(c)(3) nonprofits that serve individuals and families in the Columbus region. From our membership alone, health and human service nonprofits employ over 20,000 people in our community and provide services to hundreds of thousands. These organizations and the people who work at these organizations provide services that are critical to helping people survive and thrive.

As with nonprofits across the country, our members' employees are deeply committed to public service, yet face low compensation, high workloads, and systemic underinvestment in the health and human services sector.

For many, Public Service Loan Forgiveness ("PSLF") is an essential tool that makes it possible for people to remain in nonprofit careers. With a continuing nonprofit workforce shortage across the country, we believe it is paramount that broad access to PSLF should be preserved, not restricted.

We appreciate the opportunity to provide public feedback on these topics under consideration:

**The proposed rule is contrary to federal law.**
When Congress established the PSLF Program in 2007 with broad, bipartisan support, its clear intent was to offer meaningful debt relief to those seeking to build long-term careers in public service. Lawmakers recognized that these roles, while vital, are often underpaid and offer fewer financial incentives than private-sector careers. Any narrowing of the definition of "qualifying employer" would undermine this legislative purpose.

The Department of Education does not have the authority to restrict eligibility under PSLF. We recommend that the Department of Education continue recognizing all 501(c)(3) organizations as qualifying employers under PSLF, without imposing additional criteria that reduce access or create complexity, confusion, and additional administrative burden.



**The proposed rule inserts politics and ideology into the program.**

This proposed rule is an attempt to impose politics and ideology on a program that millions of borrowers depend on. It replaces the clarity of law with the subjective, politically motivated criteria that would be confusing for most people to understand and navigate. This is an abuse of regulatory power and a betrayal of the public servants this program was designed to support. This proposed rule also opens the door for this and future administrations to change program eligibility based on their priorities or ideology. Nonprofits must be able to identify and meet needs in their communities without fear of political retribution.

**The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities.**

Nonprofit workers who have devoted their lives to serving others could suddenly find their employment disqualified if this proposed rule goes into effect. It would upend years of service, destabilize the nonprofit workforce, and strip vital services from communities in need because of politics and ideology, which could change rapidly. Without consistent and clear rules, nonprofit professionals cannot rely on this program to make decisions about their career path. This will harm nonprofits, making it harder to attract a skilled workforce, and it will harm people and communities who rely on these services.

The PSLF program is a lifeline for those who choose public service over higher salaries in the private sector. This proposed rule is an attempt to harm underserved communities and the nonprofits and the nonprofit workers who serve them by undermining federal law and inserting politics and ideology into the PSLF program.

Thank you for your consideration of this input as part of the rulemaking process.

Sincerely,

Bhumika Patel
Deputy Director

966 South High Street
Columbus, OH 43206
humanservicechamber.org



September 17, 2025

Linda McMahon
Acting Undersecretary James Bergeron
Office of Postsecondary Education
US Dept. of Education
Lyndon Baines Johnson Building
400 Maryland Avenue SW
Washington, DC 20202

**RE: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]**

The Human Service Chamber of Franklin County is a membership organization supporting over 200 health and human service 501(c)(3) nonprofits that serve individuals and families in the Columbus region. From our membership alone, health and human service nonprofits employ over 20,000 people in our community and provide services to hundreds of thousands. These organizations and the people who work at these organizations provide services that are critical to helping people survive and thrive.

As with nonprofits across the country, our members' employees are deeply committed to public service, yet face low compensation, high workloads, and systemic underinvestment in the health and human services sector.

For many, Public Service Loan Forgiveness ("PSLF") is an essential tool that makes it possible for people to remain in nonprofit careers. With a continuing nonprofit workforce shortage across the country, we believe it is paramount that broad access to PSLF should be preserved, not restricted.

We appreciate the opportunity to provide public feedback on these topics under consideration:

**The proposed rule is contrary to federal law.**

When Congress established the PSLF Program in 2007 with broad, bipartisan support, its clear intent was to offer meaningful debt relief to those seeking to build long-term careers in public service. Lawmakers recognized that these roles, while vital, are often underpaid and offer fewer financial incentives than private-sector careers. Any narrowing of the definition of "qualifying employer" would undermine this legislative purpose.

The Department of Education does not have the authority to restrict eligibility under PSLF. We recommend that the Department of Education continue recognizing all 501(c)(3) organizations as qualifying employers under PSLF, without imposing additional criteria that reduce access or create complexity, confusion, and additional administrative burden.



**The proposed rule inserts politics and ideology into the program.**
This proposed rule is an attempt to impose politics and ideology on a program that millions of borrowers depend on. It replaces the clarity of law with the subjective, politically motivated criteria that would be confusing for most people to understand and navigate. This is an abuse of regulatory power and a betrayal of the public servants this program was designed to support. This proposed rule also opens the door for this and future administrations to change program eligibility based on their priorities or ideology. Nonprofits must be able to identify and meet needs in their communities without fear of political retribution.

**The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities.**
Nonprofit workers who have devoted their lives to serving others could suddenly find their employment disqualified if this proposed rule goes into effect. It would upend years of service, destabilize the nonprofit workforce, and strip vital services from communities in need because of politics and ideology, which could change rapidly. Without consistent and clear rules, nonprofit professionals cannot rely on this program to make decisions about their career path. This will harm nonprofits, making it harder to attract a skilled workforce, and it will harm people and communities who rely on these services.

The PSLF program is a lifeline for those who choose public service over higher salaries in the private sector. This proposed rule is an attempt to harm underserved communities and the nonprofits and the nonprofit workers who serve them by undermining federal law and inserting politics and ideology into the PSLF program.

Thank you for your consideration of this input as part of the rulemaking process.

Sincerely,

Bhumika Patel
Deputy Director

966 South High Street
Columbus, OH 43206
humanservicechamber.org

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

I am an attorney serving low-income individuals who otherwise would not be able to afford legal services. I entered law school and took out 6 figures of loans with the understanding that I could work at any nonprofit organization promoting free legal services for individuals. This new rule adds arbitrary, ill-defined criteria to restrict some legal service providers from accessing public service loan forgiveness. This is detrimental not only to those of us who feel passionate about providing universal legal services, but also our clients who rely on us to enforce their rights. These restrictions will prevent legal services from being accessible to many people because it de-incentivizes attorneys from pursuing public service work. It allows the Secretary of Education to have unfettered discretion to designate certain types of legal services as "illegal," a term not defined by the rule. Access to the courts and the law is a universal right, and we should be incentivizing free legal services, not creating more barriers for attorneys interested in public service work. This will also greatly lessen the pool of highly qualified attorneys who attended higher caliber law schools, since their tuition is higher. I for example attended a top 14 law school with the expectation that my six figures of student loans would be forgiven after 10 hard years of public service work. If this rule is passed, I may have to switch career paths to the detriment of my clients. This rule is ill-defined and misguided, and I am in strong opposition.

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10044

**Tracking Number**

mfi-nvca-lwqi

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 13, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

I am an attorney at a nonprofit legal aid organization in San Diego. I write in my individual capacity in strong opposition to the proposed changes to the Public Service Loan Forgiveness program.

I am a participant in PSLF and direct beneficiary of the PSLF program. I am terrified of losing my progress with PSLF and of no longer being able to work in public service if the program is altered so drastically.

I have seen first-hand how difficult it is to recruit and retain new attorneys. Law school debt is extremely high, and the nonprofit I work for cannot compete with the salaries offered in the private sector. The main way that many new attorneys, including myself, can work in nonprofits is through PSLF.

The proposed activities that could decertify an employer are vague and confusing. If a legal aid organization hires housing attorneys, but also advises immigrants on their rights, the hurt will not be limited to the immigration attorneys if that activity is deemed “illegal” - it will impact all the services we provide and will harm veterans and seniors who receive critical and free legal advice.

I personally cannot continue working in public service without the guarantee of forgiven loans in ten years due to the low nature of my salary and the high cost of living in San Diego. I know I’m not the only one. This proposed rule is a disservice to the public and indigent folks who can’t afford legal representation. This will drive attorneys from the nonprofit sector, and leave low income Americans with even fewer options. All we do is provide free legal assistance to those who need it. Legal aid providers have no political agenda and serve no illegal purpose.

I urge you to withdraw these proposals and preserve this critical benefit for nonprofit workers.

Give Feedback

10/10/25, 2:06 PM Regulations.gov

**Comment ID**

ED-2025-OPE-0016-10045

**Tracking Number**

mfi-skf2-qp47

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 13, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Give Feedback

Support (/support)

https://www.regulations.gov/comment/ED-2025-OPE-0016-10045 2/2

ED_00109

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

On behalf of Advocates for Children of New York (AFC), thank you for the opportunity to provide comments on the proposed rule to amend the regulations regarding the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

AFC is a 501(c)(3) non-profit organization that works to ensure a high-quality education for New York students who face barriers to academic success. Every year, we help thousands of individual families navigate New York City's complex education system. For example, we assist parents of students with disabilities in getting the special education services their children need.

Staff members, including advocates and attorneys, who work at AFC have relied on and benefited from the Public Service Loan Forgiveness program. In fact, we have had employees work at AFC who would not have been able to accept the job without this program.

Given the importance of the PSLF program to our staff, AFC strongly opposes the proposed rule and the limitations it could impose on continued, reliable access to PSLF. Federal law makes clear that eligibility under PSLF applies to all charitable non-profit organizations, regardless of their missions or the communities they serve. Under current law, all 501(c)(3) organizations are eligible as qualified employers under PSLF. The definition of "public service job" in the PSLF statute states that the term means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The Department of Education does not have the authority to further restrict eligibility under PSLF.

Give Feedback

The proposed rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. We worry about the possibility of inappropriately excluding non-profit employers from this program. The rule opens the door to this Administration and future Administrations changing eligibility for the program based on their priorities or ideology. Non-profit organizations must be able to identify and meet local needs without

political interference, fear of retribution, or removal from a program designed to support their employees. Employees accepting a public service job at a non-profit organization should be able to rely on continued access to PSLF and not have to worry about the organization becoming ineligible for the program so long as the organization maintains its 501(c)(3) status. If an organization engages in substantial illegal activities, there is already a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.

Without assurances that program rules will remain consistent over the long term, non-profit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the families and communities that rely on non-profit organizations and the essential services they provide by making it harder to recruit an effective, skilled workforce.

AFC strongly opposes the proposed rule and urges you not to move forward with the proposed changes. Thank you for considering our input.

**Comment ID**

ED-2025-OPE-0016-10062

**Tracking Number**

mfk-kn1s-ll1g

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 14, 2025

Give Feedback

Your Voice in Federal Decision Making

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The American College of Physicians offers the attached comments on the proposed rule.

Attachments 1

PSLF Proposed Rule

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10066/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10066

**Tracking Number**

mfm-nxju-9d1z

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 16, 2025

The Honorable Linda McMahon
Secretary
U.S. Department of Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

Re: Docket ID ED-2025-OPE-0016, Public Service Loan Forgiveness (PSLF) program

Dear Secretary McMahon:

The American College of Physicians (ACP) appreciates the opportunity to comment on the Department's proposed rule regarding the Public Service Loan Forgiveness (PSLF) program. The College strongly supports the PSLF program. Loan forgiveness is a powerful tool to attract and retain physicians in public service and nonprofit roles, particularly in primary care, where workforce shortages are most severe.

ACP is the largest medical specialty organization and the second largest physician membership society in the United States. ACP members include 162,000 internal medicine physicians, related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge, clinical expertise, and compassion to the preventive, diagnostic, and therapeutic care of adults across the spectrum from health to complex illness.

**Importance of PSLF to the Primary Care Workforce**

The College has long been concerned about the shortage of primary care physicians in the U.S., particularly the supply of internal medicine physicians, who are at the forefront of managing chronic diseases and providing comprehensive and coordinated long-term care. As the National Academies of Sciences, Engineering, and Medicine has emphasized, "Primary care is the only health care component where an increased supply is associated with better population health and more equitable outcomes. For this reason, primary care is a common good, making the strength and quality of the country's primary care services a public concern."

The Health Resources and Services Administration (HRSA) estimates that the United States needs 13,075 additional primary care physicians to remove all current primary care shortage designations and predicts a shortage of 87,150 primary care physicians by 2037.[i] Our nation will not be able to expand

access, improve health outcomes, and decrease health care expenditures without taking steps to facilitate careers in primary care, starting with measures to make medical education affordable.

ACP views the escalating cost of medical education as a critical issue, significantly deterring medical students and residents from entering careers in primary care—a trend with serious implications for the future of the healthcare system. Today, 71% of medical students graduate with debt, with more than half owing more than $200,000. Confronted with such financial burdens, many physicians opt for higher-paying specialties or avoid working in settings that offer lower salaries. The PSLF program provides an essential counterbalance, enabling physicians to serve in nonprofit and public settings without compromising their financial stability.

**Concerns with the Proposed Rule**

The proposed definition of "qualifying employer" excludes organizations engaged in activities with a "substantial illegal purpose." While we recognize the Department's interest in protecting program integrity, the proposed language is overly broad and could have unintended consequences for physicians serving in nonprofit hospitals, clinics, academic centers, and community health organizations.

Primary care physicians often practice in complex regulatory environments and care for patients whose needs may intersect with contested policy areas. Uncertainty about PSLF eligibility for nonprofit employers may deter physicians from working in precisely the settings where they are most needed. Physicians have a professional and ethical duty to provide evidence-based care in accordance with established clinical standards. They should not be penalized—nor should their nonprofit employers lose PSLF eligibility—for fulfilling that responsibility.

**Impact on Access to Care**

Patients in communities already experiencing physician shortages depend heavily on nonprofit hospitals, community health centers, and academic medical practices. These facilities are often the main entry point for preventive services, chronic disease management, and coordinated long-term care. If PSLF eligibility is narrowed in a way that destabilizes nonprofit employers or discourages physicians from working in them, patients will face longer wait times, reduced availability of primary care services, and diminished continuity of care. In rural and underserved areas, even the loss of a small number of physicians can translate into thousands of patients without timely access to a primary care physician.

**Recommended Modifications**

ACP strongly supports the preservation of the existing definition of a qualifying employer for eligibility purposes under PSLF. As the Department considers updates, we urge the preservation of eligibility for

physicians employed or trained by nonprofit hospitals, clinics, foundations, and other health care organizations.

If the Department moves forward with changes, we recommend the inclusion of safeguards, including:

- **Protect current PSLF participants.** Physicians who have already committed years of service, or residents currently in training, should not lose credit toward forgiveness because of later changes in their employer's status.
- **Provide clear, narrow definitions.** Terms such as "substantial illegal purpose" should be precisely defined to prevent misinterpretation and unintended disqualification of nonprofit health care employers.
- **Allow corrective pathways.** Employers that address concerns in good faith should be able to regain eligibility quickly, ensuring physicians are not penalized for circumstances beyond their control.

Thank you for the opportunity to submit comments on this critical issue. The College stands ready to work with the Department to ensure PSLF continues to support the nation's health care workforce and expand access to primary care. Please contact Renee Butkus, Director, Health Policy at rbutkus@acponline.org if you have any questions or need any additional information.

Sincerely,

Jason M. Goldman

Jason M. Goldman, MD, MACP
President

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comment of the U.S. Program of the International Center for Not-for-Profit Law - ICNL.

Attachments 1

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10076/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10076

**Tracking Number**

mfm-vv2v-mwbm

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



www.icnl.org
info@icnl.org

PRESENTED TO

DEPARTMENT OF EDUCATION
SEPTEMBER 16, 2025

PUBLIC COMMENT

# Why proposed changes to regulations for Public Service Loan Forgiveness Program should be rejected

The U.S. Program of the International Center for Not-for-Profit Law (ICNL) submits these comments in response to the Notice of Proposed Rulemaking (NPRM) from the Education Department on proposed amendments to the implementing regulations for the Public Service Loan Forgiveness (PSLF) program.

These proposed regulations should be rejected because:

1. **The proposed regulations are in conflict with statute.** The College Cost Reduction and Access Act makes the public service loan forgiveness program available to any borrower who has been "employed in a public service job" for the duration designated in the Act. The Act defines "public service job" to include an "organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under 501(a) of such Code". (*see* Public Law 110-84, Sec. 401) In conflict with this clear statutory definition, in its proposed regulations the Department seeks to define "qualifying employer" in the regulations to exclude "organizations that engage in activities that have a substantial illegal purpose". The statute nowhere provides authority to the Department to effectively create this alternative definition to what is a covered "public service job". If this regulatory change were adopted, a court could strike it down as being in conflict with and unauthorized under the College Cost Reduction Access Act. *See* 5 U.S. Code §706 (A reviewing court under the Administrative Procedure Act shall "hold unlawful and set aside agency action, findings, and conclusions found to



be . . . in excess of statutory jurisdiction, authority, or limitations"); *Loper Bright Enterprises v. Raimondo* 603 U.S 369 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").

2. **The proposed regulations are unnecessary**. The Department claims that it used the IRS's illegality doctrine "as a basis" for excluding organizations from the PSLF program that engage in activities with a "substantial illegal purpose." However, it is unclear why the Department needs to be empowered to exclude these nonprofits from the PSLF when the IRS, under the illegality doctrine, is already empowered to strip nonprofits of their tax-exempt status if they have an illegal purpose or engage in substantial illegal activity. Nonprofits that lose their tax-exempt status would then be ineligible to be a "public service job" under the PSLF program. If the goal of the proposed regulations is to ensure that nonprofits that engage in serious illegal activity are not eligible employers under the PSLF program, this is already addressed by the IRS's illegality doctrine. Further, the Department of Education lacks the same substantive expertise as the IRS to gather facts related to or apply this doctrine.

3. **The proposed comments have an arbitrary and potentially politicized definition of "substantial illegal purpose"**. While the Department claims it uses the IRS's illegality doctrine as the basis for its proposed regulation, the process it proposes is actually quite different and more prone to politicization. The Department's proposed regulations define "substantial illegal purpose" to include just six categories of activities, including "aiding or abetting violations" of immigration laws; "supporting terrorism"; or engaging in a pattern of violating state laws (which is further defined to only include a subset of crimes such as disorderly conduct or obstruction of highways).

   This proposal for defining "substantial illegal purpose" is markedly different than the IRS's illegality doctrine. As will be discussed in the next point, it is unclear if all the listed activities in the Education Department's proposed definition of "substantial illegal purpose" are actually illegal or how they will be interpreted by the Secretary. Further, in defining "substantial illegal purpose" the Department seemingly



arbitrarily lists just six categories of activities. As such, "substantial illegal purpose" could easily become a term subject to the whims of whatever administration is in power to target nonprofits and other entities with which it disagrees.

4. **The proposed regulations have an unconstitutionally vague and overbroad definition of "substantial illegal purpose".** The proposal defines "substantial illegal purpose" to include a number of activities where it is unclear if the activity is actually illegal or what the potential reach of the prohibition might be. Consider the listed prohibited activity of "supporting terrorism". While the regulation uses 18 U.S.C. 2331 to define "terrorism", nowhere is the vague word of "supporting" defined in this statute or in the proposed regulations. Nor is there a *mens rea* requirement in the proposed regulations for the prohibition on "supporting terrorism." As such, it is unclear what activity or expression may or may not be covered by the proposed regulation, creating a vague and potentially overbroad prohibition that could include protected First Amendment expression.

5. **The rights savings provisions in the proposed regulation fails to address its constitutional infirmities.** In the NPRM the Department explicitly recognizes concerns expressed during earlier consultations that the Secretary "would use authority under this proposed standard to target free speech." In response, the department added (h)(2) to the proposed regulations that would bar the Secretary from "determin[ing] an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution."

   Yet, this savings provision fails to address the constitutional infirmities in the proposed regulation. As the Supreme Court noted in *United States v. Stevens*, 559 U.S. 460 (2010) when discussing a savings provision in legislation at issue in that case, "We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." Even with such a savings provision, the underlying statute would still be unconstitutionally overbroad and vague and have a chilling impact on expressive activities.



In Executive Order 14149 ("Restoring Freedom of Speech and Ending Federal Censorship") President Trump affirmed that it is federal government policy that "that no Federal Government officer, employee, or agent engages in or facilitates any conduct that would unconstitutionally abridge the free speech of any American citizen". As currently written this proposed regulation would infringe Americans' free speech rights as it is overbroad and vague, chilling constitutionally protected speech. The inclusion of (h)(2) fails to address these concerns.

6. **The proposed comments have insufficient due process protections**. Under the proposed regulation, a nonprofit's employees will no longer be eligible for the PSLF program if "The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose." This proposed process provides unilateral authority to the Secretary to suspend a nonprofit from being a qualifying employer without appeal first to any neutral arbitrator. It also does not require the Secretary to provide the evidence to the nonprofit upon which they are basing their decision. In effect, it provides the Secretary vast discretion to unilaterally decide what nonprofits may be in violation of the proposed regulation without having to provide evidence or first have the case decided by an impartial decisionmaker. As such, this proposed process fails to meet due process protections guaranteed under the Constitution. *See Goldberg v. Kelly*, 397 U.S. 254 (1970)

In sum, the proposed regulation would create an unnecessary process for suspending certain employers from the PSLF program that is in conflict with the College Cost Reduction and Access Act. It creates clear First Amendment and due process concerns, while risking politicization of the implementation of the Program. As a result, it will likely create confusion over which employers would qualify for the PSLF program either now or in the future, leading many to not enter the nonprofit sector or pursue other public sector jobs out of concern that their loans may not be eligible for loan forgiveness. This proposal should be rejected.

*For more information about these comments contact Nick Robinson at nrobinson@icnl.org*

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The Barbara McDowell Social Justice Center (the "Center") joins in the chorus of objections submitted in opposition to the Department of Education's (the "Department") proposed rule amending the Public Service Loan Forgiveness ("PSLF") program under 34 C.F.R. § 685.219. The Center's full comment submission is provided in the attached PDF file. The text below is a summary.

The Center respectfully urges the Department to withdraw its proposed changes to the PSLF program for the following reasons:

- By exceeding the Department's statutory authority, the proposed rule violates federal law by attempting to redefine PSLF eligibility beyond what Congress intended for all 501(c)(3) organizations.

- By introducing politics and ideology into a neutral-based program, the proposed rule violates fundamental First Amendment rights, disproportionately penalizes certain public service organizations, and causes a chilling effect on them and their employees.

- By shifting the burden of risk of PSLF ineligibility from the organization to the individual borrower, the proposed rule runs counter to the public policy goals of the PSLF program, risks destabilizing the nonprofit workforce, and weakens that sector's ability to meet critical community needs.

- By implementing vague and politically-charged definitions and failing to provide any meaningful avenues of review, the proposed rule denies employers and employees adequate due process.

- By ignoring existing IRS rules which already provide the reliable legal means to strip a nonprofit of its 501(c)(3) status and remove it and its employees from PSLF eligibility, the proposed rule circumvents IRS authority and wastes taxpayer dollars on duplicative and unnecessary procedures.

While the Center appreciates the Department's efforts to refine loan forgiveness programs, the proposed

Give Feedback

rule instead unlawfully restricts PSLF eligibility, distorts a bipartisan program into a political weapon, undermines the very goals of the PSLF program, and administratively bloats an already strained Department. We respectfully request that the Department withdraw this proposed rule and instead uphold PSLF's original bipartisan intent: to support public service. To do otherwise denies the ultimate beneficiaries of the PSLF program—vulnerable communities—the highly skilled services they need.

Attachments 1

BMSJC Public Comments - 9.16.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10078/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10078

**Tracking Number**

mfm-r1r6-mhnh

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Give Feedback

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 16, 2025

Submitted via *www.regulations.gov*

The Honorable Linda McMahon
Secretary of Education
United States Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW
Washington, D.C. 20202

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID: ED-2025-OPE-0016]**

Dear Secretary McMahon:

The Barbara McDowell Social Justice Center (the "Center") joins in the chorus of objections submitted in opposition to the Department of Education's (the "Department") proposed rule amending the Public Service Loan Forgiveness ("PSLF") program under 34 C.F.R. § 685.219.

The Center respectfully urges the Department to withdraw its proposed changes to the PSLF program for the following reasons:

- By exceeding the Department's statutory authority, the proposed rule violates federal law by attempting to redefine PSLF eligibility beyond what Congress intended for all 501(c)(3) organizations.

- By introducing politics and ideology into a neutral-based program, the proposed rule violates fundamental First Amendment rights, disproportionately penalizes certain public service organizations, and causes a chilling effect on them and their employees.

- By shifting the burden of risk of PSLF ineligibility from the organization to the individual borrower, the proposed rule runs counter to the public policy goals of the PSLF program, risks destabilizing the nonprofit workforce, and weakens that sector's ability to meet critical community needs.



- By implementing vague and politically-charged definitions and failing to provide any meaningful avenues of review, the proposed rule denies employers and employees adequate due process.

- By ignoring existing IRS rules which already provide the reliable legal means to strip a nonprofit of its 501(c)(3) status and remove it and its employees from PSLF eligibility, the proposed rule circumvents IRS authority and wastes taxpayer dollars on duplicative and unnecessary procedures.

While the Center appreciates the Department's efforts to refine loan forgiveness programs, the proposed rule instead unlawfully restricts PSLF eligibility, distorts a bipartisan program into a political weapon, undermines the very goals of the PSLF program, and administratively bloats an already strained Department. We respectfully request that the Department withdraw this proposed rule and instead uphold PSLF's original bipartisan intent: to support public service. To do otherwise denies the ultimate beneficiaries of the PSLF program—vulnerable communities—the highly skilled services they need.

## I. The Center Supports The PSLF Program

The Center, a 501(c)(3) public service organization, pursues systemic reforms that promote equity, inclusion, and full participation in society. Inspired by Barbara McDowell's legacy as a visionary litigator and tireless advocate for social justice, we work through three core strategies—impact litigation, grantmaking, and advocacy—to dismantle entrenched inequities in access to benefits, children's rights, disability justice, discrimination, domestic violence, due process, environmental justice, healthcare, homelessness, housing, Native American rights, prisoners' rights, refugee and immigration rights, voting rights, and veterans' rights. Our mission statement is "fighting injustices, catalyzing change." Among other things, the Center litigates cases and provides critical funding to nonprofits advancing justice nationwide. Through this work, the Center has seen firsthand how public interest lawyers and nonprofit professionals enhance essential services and support justice at the local, state, and federal levels.

The PSLF program in its current form is essential to the provision of legal and other public services to under-served communities. By providing dedicated individuals with the means to pursue public service careers, PSLF is critical to the ability of nonprofits, who rely on those individuals, to provide services to populations who most need them. By mitigating the burden of educational debt, the PSLF program ensures that talented attorneys, social workers, educators, and nonprofit staff can pursue and remain in positions that would



otherwise by financially untenable. Similarly, it enables nonprofits to compete for and retain talented attorneys, paralegals, and staff in areas where the need is great, but where salaries cannot match the private sector. Without PSLF, many professionals would find public service unsustainable, and nonprofits would struggle to fill critical staffing, all to the detriment of our most vulnerable populations. At bottom, the PSLF program makes justice more accessible.

Many of the Center's grantees rely on dedicated attorneys and paralegals to represent clients who otherwise have no voice in our legal system. Without the PSLF program, these organizations will face even greater challenges in recruiting and retaining qualified staff. The Center's ability to partner with them in litigation and sustain their impact through grantmaking will be significantly impaired. Thus, curtailing PSLF would not only burden individual public interest professionals with untenable debt, but also directly undermine the capacity of the Center and its nonprofit partners to meet the urgent needs of vulnerable populations.

## II. The Proposed Rule Violates Federal Law

Congress established the PSLF program in 2007 to encourage skilled professionals to pursue and remain in public service careers despite lower wages. In nearly two decades of the bipartisan-supported program, no Administration has redefined what is considered a qualifying employer. The strength and import of the PSLF program lies in its fairness and clarity. By statute, all full-time employment with 501(c)(3) nonprofit organizations qualifies as public service under the law. Congress explicitly determined that PSLF eligibility applies to all charitable nonprofit organizations, regardless of their missions, activities, or communities served, so long as they are recognized under section 501(c)(3) of the Internal Revenue Code and are exempt from taxation under section 501(a). The statute does not allow for any exceptions—if the employer is a qualified nonprofit, it is eligible under the PSLF program.

Thus, the statute defines PSLF eligibility by employer type, not political alignment. That definition is neutral, objective, and deliberately broad. There are no exceptions. This Administration's attempt to rewrite the statute by regulation—choosing which lawful organizations "count" based on ideology—is both an abuse of power and a direct violation of the Department's limited statutory authority. Only Congress can change the eligibility rules for PSLF. Lacking the authority to override Congress's explicit mandate, redefine eligibility, impose additional restrictions, or otherwise condition participation on an

Barbara McDowell Social Justice Center
3607 Whispering Lane, Falls Church, VA 22041
(703) 354 - 8432
Tax ID Number: 88-1621102



BARBARA MCDOWELL
SOCIAL JUSTICE CENTER

FIGHTING INJUSTICES | CATALYZING CHANGE

employer's politics or ideological mission, the Department's proposed rule is *ultra vires* and contrary to federal law.

Beyond its legal infirmities, the proposed rule harms the very people the PSLF program was meant to support: those individuals who choose careers not for wealth, but for public service to populations who most need their skilled help. The PSLF program has been—for over two decades and continues to be—the government's commitment that if individuals forego the private sector and spend ten years strengthening our communities, we as a nation will support them by materially reducing their student loan burden. To break that commitment now to pursue a political agenda is a clear message to all public servants that their sacrifice is subject to the whims of an Administration's partisan preferences. And, it further buttresses the public's distrust in its federal government.

**III. The Proposed Rule Politicizes PSLF And Violates First Amendment Rights**

The proposed rule grants the Secretary broad discretion to deem certain nonprofit organizations ineligible for PSLF based on alleged violations of law or perceived conflicts with established public policy. Among other things, the proposed rule gives the Secretary discretion to determine whether an organization is engaged in "substantial illegal activities." Such discretion injects politics, bias, and ideology into what Congress has always deemed a clear, bright-line eligibility standard, which opens the door to arbitrary and ideologically motivated enforcement and disproportionate scrutinization and penalization of certain public service organizations. This discretion patently violates the right to free speech and free association under the First Amendment. This also creates a chilling effect for borrowers who may avoid working in critical areas of public service out of fear that future disqualifications will erase their loan forgiveness. As Congress intended, PSLF should remain a neutral, reliable program, not one subject to shifting political priorities or weaponization by the existing or any Administration, and by extension, the Department.

**IV. The Proposed Rule Introduces Vague And Overbroad Definitions That Harm Public Servants And Communities**

PSLF has long been a bipartisan program, designed to attract and retain skilled professionals in fields such as legal services, education, health care, and social work. Borrowers structure careers, financial decisions, and family choices around PSLF eligibility. The proposed rule introduces vague terms and undefined references to "illegal discrimination" or "foreign terrorist organizations," which causes great uncertainty into program rules, thus deterring talented individuals from entering or remaining in public



service. In addition, the proposed rule permits PSLF disqualification based on conduct unrelated to the borrower's role or knowledge. This change risks penalizing borrowers for the actions of their employers over which they have no control or knowledge, or forces them to constantly monitor their employers for potential legal exposure. This manifest unlawful and illegal change will weaken nonprofit capacity nationwide. And ultimately, the communities most harmed will be those most in need—children, refugees and immigrants, veterans, the homeless, persons with disabilities, and other vulnerable populations who rely on nonprofit services.

**V. The Proposed Rule Denies Due Process**

The proposed rule allows the Department to strip PSLF eligibility from organizations based on a mere "preponderance of the evidence," without affording them the right to appeal to an independent authority. This lack of procedural safeguards grossly undermines fundamental principles of fairness and fails to protect against arbitrary or politically motivated decisions.

**VI. Existing Mechanisms Already Protect Against Abuse**

Rather than reducing regulatory burdens, the proposed rule would increase them. The Department already has an established process for addressing nonprofits allegedly engaging in "substantial illegal activities" through the IRS's oversight of nonprofit compliance. The IRS has the authority to revoke 501(c)(3) status from organizations engaged in "substantial illegal activities." Once that status is lost, the organization would automatically become ineligible under PSLF. This process has due process protections that are materially absent in the proposed rule. The Department should not unnecessarily duplicate or override processes already entrusted to the IRS, which, unlike the Department, has experience in evaluating tax exempt qualifications based on the tax law concept of "substantial illegal activities." The proposed rule increases administrative costs, risks inconsistent outcomes, and diminishes accountability.

**VII. The Proposed Rule Wastes Taxpayer Resources**

Finally, the proposed rule would waste scarce taxpayer resources by requiring the Department to develop new enforcement processes that it is simply not equipped to handle. The Department does not have the capacity or the expertise to determine which organizations are engaging in so-called illegal activities. The Department is already experiencing significant staff shortages and is struggling to administer PSLF effectively. Imposing these additional burdens would create administrative chaos, harming both



FIGHTING INJUSTICES | CATALYZING CHANGE

borrowers and employers. Furthermore, as mentioned above, this expansion of bureaucracy is unnecessary and duplicative, given that the IRS already regulates nonprofit organizations and removes 501(c)(3) status from organizations engaging in substantial illegal activity.

**VIII. Conclusion**

Public service should be celebrated and supported, not weaponized to satisfy a political agenda. The PSLF program must remain anchored in its original purpose: to sustain and strengthen the public service workforce on which our communities most at risk depend.

By interjecting ideological discretion and bias into a nonpartisan program and allowing the Department to unilaterally exclude certain employers from eligibility based on policy interpretations rather than the objective criteria established by Congress, the proposed changes to PSLF not only unlawfully stray from the program's purpose, but are harmful to borrowers, organizations, and the communities they serve. Such changes exceed statutory authority, politicize a vital program, undermine due process, waste taxpayer resources, and destabilize nonprofit employment. The Department's unlawful proposed rule will chill the willingness of individuals to perform public interest, limit the ability of nonprofits to protect and support people most in need, unfairly overburden professionals with loans, waste taxpayer money, and, ultimately, undermine trust in the government's commitments to its citizens.

We respectfully urge the Department to withdraw this proposal and, instead, focus on strengthening PSLF's accessibility, reliability, and efficiency.

Respectfully submitted,

Barbara McDowell Social Justice Center

By: Gerald Hartman, President
George Mykulak, Senior Litigation Director

Barbara McDowell Social Justice Center
3607 Whispering Lane, Falls Church, VA 22041
(703) 354 - 8432
Tax ID Number: 88-1621102

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached comment prepared by Chicago Women in Trades in opposition to the proposed rulemaking on the PLSF program.

Attachments 1

DeptEdu NPRM CWIT comment 9.16.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10084/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10084

**Tracking Number**

mfm-ryu3-zb40

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 16, 2025

Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [RIN 1801-AA28]

Dear Ms. Abernathy,

Chicago Women in Trades (CWIT), in addition to signing on to the joint comment prepared by the Legal Defense Fund, the Lawyers' Committee for Civil Rights Under the Law and the National Women's Law Center, is writing to strongly oppose the proposed changes to the William D. Ford Federal Direct Loan's program that would increase barriers to individuals working at nonprofit organizations from accessing the Public Service Loan Forgiveness program (PLSF) under Docked ID ED-2025-OPE-0016.

For over forty years, CWIT has focused on building wealth among women, particularly women of color, and other gender minorities by expanding their career choices to include high-wage, blue-collar occupations traditionally held by men. Though these jobs are desirable, and demand exists for qualified applicants, targeted intervention is needed to bridge women to nontraditional careers.

CWIT offers free direct services including pre-apprenticeship and welding training, supported by case management and placement assistance, to prepare aspiring tradeswomen for and connect them to employment in the construction and manufacturing sectors. As a pioneer, we are also a leading national entity advancing policy, conducting advocacy, and offering free curricula and technical assistance to provide practical strategies and applications to increase the number of women entering and being retained in union trade apprenticeships.

These services are provided by talented staff who are committed to the mission of CWIT and to providing opportunities for high-road career paths to underserved populations.

These staff have assisted hundreds of women access trade apprenticeship programs and advance their careers in metal fabrication and construction, as well as conducting outreach to and training for employers and training programs and advocating for improvements in the industry.

Half of CWIT's existing staff either hold current or have recently held debt from student loans, through which they attained the knowledge and skills needed to advance the organization's work of case management, training, career development, marketing, and policy analysis. With an increase in demand for our services, CWIT has been able to hire more staff in the past 3 years, doubling our staffing levels while also priding ourselves on the strong retention of existing personnel.

Our staff has been dedicated to the organization's mission of economic advancement for women and other gender minorities through trade career advancement, while themselves sacrificing increased economic opportunity in the private sector. Limited public budgets, accountability for public spending, and restrictions on funds result in the nonprofit sector often offering lower salaries than private companies. PLSF is a key benefit used to recruit and retain top talent to deliver public programs and human services, despite modest earnings potential.

The Department of Education's proposed rulemaking would make unlawful changes to the PLSF program under 34 C.F.R. 685.219, allowing the Department to have expanded powers beyond their statutory authority and punish organizations who are not aligned with the politics of the Administration.

Congress clearly defined "public service job" in the PLSF statute as a full-time job at a tax-exempt, 501(c)(3) organization, and that definition cannot be changed by the Department through rulemaking. In addition, the definitions of illegal activity are intentionally described broadly enough to target organizations based on an Administration's political agenda, which contradicts the spirit of the law.

In addition, there is no due process for organizations to appeal a decision of no longer qualifying as a workplace under PLSF, especially considering the potentially subjective nature of decisions made according to this rule. The Department has the sole responsibility to determine from a "preponderance of evidence" whether an organization is engaged in "illegal activities."

From recent indications, including in Attorney General Bondi's July memo titled "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination," the Trump Administration has shown its reliance on legally unsubstantiated and unsupported arguments to extend the definition of "illegal discrimination" to organizations addressing

2444 West 16th Street, 3E, Chicago, IL  60608    Phone: 312.942.1444    Fax:  312.942.1599

actual unlawful discrimination through proactive diversity, equity and inclusion work which it finds objectionable or not aligned to its ideology. Organizations addressing gender and racial inequities have been repeatedly targeted despite the precedence of the lawfulness of this work.

In addition, recent court cases, including CWIT's own suit again the US Department of Labor, have shown that asking organizations to certify that they are not participating in vaguely defined "illegal" activities is a violation of first amendment free speech protections.

Nonprofit organizations do more than administer programs and provide services, we improve the lives of our participants, resulting in new connections and stronger communities. Taking away the PSLF benefit for staff who are advancing these important missions to improve the lives and opportunities of those facing barriers and risk factors will hurt organizations' ability to provide their critical supports. CWIT strongly opposes this proposed rule and asks that the Department withdraw the change.

Sincerely,

Jayne Vellinga
Executive Director
Chicago Women in Trades

2444 West 16th Street, 3E, Chicago, IL 60608 Phone: 312.942.1444 Fax: 312.942.1599

10/10/25, 2:09 PM Regulations.gov

An official website of the United States Government. 

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

September 16, 2025

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program,
Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

As President of the Paradise, CA, branch of the American Association of University Women (AAUW), I wish to express the strong opposition of our board of directors to the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.
We understand that under this proposed rule, officials of the US Dept. Education would have authority to decide which nonprofits will be eligible to participate in the Public Service Loan Forgiveness (PSLF) program.
Further, the decision to disqualify a nonprofit would be based upon a determination that it is engaged in a "substantial illegal purpose." Yet the phrase "substantial illegal purpose" is not defined in the rule. This is an obvious opening for arbitrary and biassed disqualification of nonprofits based on political and ideological grounds.
In addition, the rule does not include any adequate method by which disqualified nonprofits could appeal the decision. This raises serious questions of lack of due process.
Then there are the "chilling" effects. Were this rule to go into effect, even if no action were taken to disqualify any nonprofit, the threat of such a decision could cause nonprofits to change their activities simply in fear of being found by a government employee to have engaged in a "substantial illegal purpose." And

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10089 1/3

ED_00138

the rule would discourage people who wish to pursue a career with a nonprofit from doing so, since they will be uncertain of their ability to afford to carry student loan debt if the organization is disqualified from PSLF.
But beyond the nonprofits and their employees are the people all over the country who would lose the services provided – medical, legal, education, and other areas - who would end up suffering the most were this rule to take effect.
Our board urges the Department of Education to withdraw the proposed rule and preserve PSLF eligibility for all qualifying nonprofits. Thank you for considering this comment.
Sincerely,
Nancy Wirtz
President
Paradise AAUW (California)
nancyrwirtz@gmail.com

**Comment ID**

ED-2025-OPE-0016-10089

**Tracking Number**

mfm-sak6-y3v7

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Give Feedback

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |

10/10/25, 2:09 PM Regulations.gov

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10089 3/3

ED_00140

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

To the U.S. Department of Education, Please see the attachment with my comments on the NPRM relating to Public Service Loan Forgiveness.

Attachments 1

Comments on Notice of Proposed Rulemaking

Download

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10092

**Tracking Number**

mfm-stou-lx81

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Comments on Notice of Proposed Rulemaking, 90 FR 40154 (Aug. 18, 2025)

I am an attorney with more than 30 years of experience in working on issues relating to student loans and the other programs authorized by the Higher Education Act of 1965 (HEA).

I have reviewed the Notice of Proposed Rulemaking (NPRM) relating to the Public Service Loan Forgiveness (PSLF) program published by the Department on August 18, 2025, 90 FR 40154. If finalized as proposed, the Department's regulations would violate the US Constitution, the HEA and other applicable laws and would be "arbitrary and capricious".

The proposed regulations are contrary to the Constitution

The Department's proposed rules would deny PSLF to borrowers who work for employers who the Department claims are engaged in unlawful activity. If adopted, these proposed regulations would violate the 1st Amendment of the Constitution.

Under the Department's proposed regulations it could deny PSLF to employees of any organization that it concludes has a "substantial illegal purpose". The term "substantial illegal purpose" includes "aiding or abetting" certain activities. To define "aiding or abetting" the Department proposes to adopt "the definition" of those terms in 18 USC 2. However, 18 USC 2 doesn't purport to provide a definition of "aiding or abetting." Instead, 18 USC 2 explains the conditions under which a party can be held criminally responsible as a principle for the actions of another. To the extent the Department views the term "aiding or abetting" as reaching speech by organizations or individuals on matters of public concern such as gender affirming care, the loss of PSLF eligibility would punish speech protected by the 1st Amendment. Even if this violation could somehow be supported as a general matter, the lack of a clear standard as to what makes such speech "illegal" would violate the 1st Amendment.

Moreover, the preamble to the proposed rule makes it clear that the Department views this rule as punishing organizations that take positions contrary to those held by the current Administration, including views on gender affirming care. The proposed rules clearly would not provide for the loss of PSLF eligibility for organizations which oppose gender affirming care. Thus, this proposal is not viewpoint neutral. The preamble fails to explain how such a rule could satisfy the 1st Amendment.

I also note that the restrictions proposed by the Department would apply to state and local government organizations as well as to organizations exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. The Department has no constitutional authority to sanction a state on the basis of its position on public issues such as gender affirming care which do not violate any substantive federal law. In doing so this proposed rule would violate the 10th Amendment to the Constitution and the state's sovereign immunity.

The proposed regulations are contrary to applicable statutes

PSLF is authorized by Section 455(m) of the HEA. As long reflected in the Department's regulations, that provision identifies two distinct types of employers whose employees can qualify for PSLF. The first are specifically defined categories of employers: entities which are tax exempt under Section 501(c)(3) of the Internal Revenue Code; U.S. based federal, state, local and tribal governments: public child and family service agencies; and Tribally Controlled Colleges. The second are entities outside these groups that provide certain identified public services. *See* 34 CFR 685.219(b)("qualifying employer"). The HEA does not provide and the NPRM does not cite any authority for the Department to add additional criteria for those entities which fall within the first group. Instead, in the preamble, the Department claims that it can adopt the "illegality doctrine" utilized by the Internal Revenue Service (IRS) in its consideration of applications for tax-exempt status. However, at the Federal level, there is no general illegality doctrine that can generally adopted by an agency and the Department's NPRM does not cite any legal authority applicable to the Department itself for applying this doctrine to the student financial aid programs generally or to PSLF in particular.

As authority for its proposed rules, the Department cites to its broad rulemaking authority for the Federal student financial aid programs. But that authority has to be used consistent with the Department's statutory authority. As noted above the statutory provisions establishing PSLF identify different groups of employers whose employees can qualify for PSLF. The HEA says that a "public service job" includes full-time employment in government, or at an "organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title". *See* Section 455(m)(3)(B) of the HEA. The HEA does not say that these entities have to meet other criteria established by the Secretary. Thus, it is the best reading of the statute that the Secretary does not have the authority to establish additional criteria for these entities. In fact, this is the first time since PSLF was enacted in 2007 that the Department has claimed such authority.

The proposed regulations also conflict with the HEA in treating the employer, rather than the Direct Loan borrower, as the affected party for purposes of responding to the Secretary's claim of an illegal purpose. PSLF is a statutory benefit for the borrower, not the employer. In *American Bar Association v. U.S. Department of Education*, 370 F.Supp.3d 1 (D.D.C. 2019), the U.S. District Court for the District of Columbia specifically rejected the ABA's claim that it had protectable rights under the PSLF program. Instead, the Court concluded that while eligible borrowers are entitled to debt relief under PSLF, employers do not have any property rights for loan forgiveness. *Id.* At 25, 36-37. Yet the proposed rules specifically deny the borrower any role in challenging the Secretary's decision. There is no legal basis for requiring the borrower to rely on a third party, the employer, to defend the borrower's eligibility to a statutory benefit.

The proposed rules are arbitrary and capricious and contrary to law

The proposed rules are also contrary to statute and arbitrary and capricious by relying on state laws to determine whether an employer has an illegal purpose. The Direct Loan Program is a federal program governed by federal law. The NPRM does not cite any authority for relying on state laws to determine an individual borrower's eligibility for loan forgiveness in this federal program. The proposed definition of "substantial illegal purpose" would incorporate state laws under three specific provisions. However, the proposed rules do not establish any basis for the Secretary to use in determining which state laws apply to a particular employer. In the preamble to the proposed rules, the Department seems to acknowledge this issue in regard to gender affirming care when it states that it "would not find a violation of the standard . . . if there is not a Federal or State law that prohibits sex transition treatments for minors in the state where the employer is located." However, that language is not included in the regulations themselves and the Department fails to define the term "located". Is a 501(c)(3) employer "located" in the state in which they are incorporated or in every state in which it may conduct activities under that state's rules for charitable organizations? Moreover, where is a Federal, state, local or tribal government entity "located" and what state laws apply to their activities?

The proposed rules are also arbitrary and capricious in denying loan forgiveness to borrowers based on the Secretary's determination that their employer has a "substantial illegal purpose" even if the borrower themselves are not involved or connected to the alleged activities on which the Secretary's decision is based.

The proposed rules are also arbitrary and capricious in adopting terms and definitions which are not rooted in federal law. Specifically: the Department claims to base its definition of "aiding or abetting" on 18 U.S.C. 2, which does not define those terms; the proposed rules adopt a definition of "chemical castration or mutilation" on Executive Order (EO) 14187, which is not law and which does not cite any law as support for the definition it adopts; and the Department uses a definition of "child or children" from EO 14187 which is not law and does not cite any legal basis for that definition. The rules would result in the exclusion of employers who "aid and abet" certain activities. The regulations would define "aid and abet" as defined in 18 U.S.C. 2, which relates to the treatment of criminal defendants for sentencing purposes. The cited statute however does not provide any definition for "aiding or abetting". The NPRM does not even try to suggest how this provision has any applicability to PSLF or in any other context outside of criminal sentencing. As noted, the proposed regulations also improperly rely on EO 14187 as authority for certain definitions included in the regulations. While an executive order can direct an agency to take certain action, it does not create or provide legal authority for defining certain terms. In this case, the EO itself does not cite any source or authority for the definitions it adopts. Thus, there is no basis for the Department's use or adoption of such definitions.

 the NPRM itself does not provide or cite to any evidence of any kind that employers whose employees are eligible for PSLF are engaged in the activities that the Department intends to punish. Thus, there is no problem to solve or any rational basis for this regulation.

Finally, I note that the NPRM does not actually any problem that it will solve or address. The preamble to the NPRM does not identify any entities whose employees now qualify for PSLF which are engaged in activities which the Secretary believes reflects an illegal purpose. In fact, while the Department claims that the proposed rules would save the Federal Government more than $1.5 billion, it doesn't provide any basis or support for that claim. Nor does the Department explain why, if it has evidence that an organization which is tax exempt under Section 501(c)(3) of the HEA it does not refer this matter to the IRS and/or law enforcement for investigation rather than independently punishing Direct Loan borrowers who are otherwise legally entitled to loan forgiveness.

Conclusion

The Department of Education's proposed rules for the PSLF program are contrary to law. The Department should withdraw the proposed rules.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached letter from American Bar Association President Michelle Behnke in opposition to the proposed rule.

Attachments 1

PSLF ABA Opposition to Proposed ED Rule re Employer Eligibility 16 Sept 2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10103/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10103

**Tracking Number**

mfm-tmzm-fqpu

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Michelle A. Behnke
President
321 N. Clark Street, Chicago, IL 60654-7598
abapresident@americanbar.org
americanbar.org

September 16, 2025

Submitted via www.regulations.gov

Ms. Linda McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Re: ABA Opposition to Proposed Rule Modifying Employer Eligibility for Public Service Loan Forgiveness; Docket No. ED–2025–OPE–0016**

Dear Secretary McMahon:

The American Bar Association ("ABA")[1] appreciates the opportunity to provide comments to the Department of Education ("Department") on the Department's notice of proposed rulemaking ("Proposed Rule") regarding proposed revisions to regulations governing the Public Service Loan Forgiveness Program ("PSLF"). As a long-time supporter of the PSLF program, and an organization whose employees qualify for PSLF, the ABA recognizes the crucial role PSLF plays in encouraging individuals to pursue careers that provide much-needed public services, including public defense services and pro bono legal representation to underrepresented communities such as senior citizens and veterans.

Under the PSLF program, established by Congress in 2007, the Department "shall cancel the balance of interest and principal due" on eligible loans of individuals who make monthly loan payments for ten years while employed in public service jobs.[2] Congress created the PSLF program with clear intent: to encourage skilled individuals to pursue careers in public service. Since its enactment, hundreds of thousands of individuals, many of whom would not have chosen public service careers but for the opportunities created through the PSLF, have devoted themselves long term to the public service.

[1] The American Bar Association is a private, not-for-profit 501(c)(6) membership organization; it and its charitable arm, the Fund for Justice and Education (FJE), which is a 501(c)(3) entity, funds sections, divisions, commissions, and other entities devoted to providing public service, including public interest legal services, public education, and services for children, the elderly, the disabled, veterans, victims of domestic and sexual violence and families recovering from natural disasters, among other services.

[2] 20 U.S.C. § 1087e(m)(1).

The ABA submits this comment letter in strong opposition to the Department's Proposed Rule. The Proposed Rule suffers from a number of statutory, constitutional, and other legal defects, and reflects an improper expansion of agency authority well beyond the bounds of the statute that created PSLF.[3] As such, the ABA respectfully requests that the Department withdraw the Proposed Rule. The Department should continue administering the PSLF program as set forth by Congress through 20 U.S.C. § 1087e(m).

## I. The Proposed Rule Exceeds the Department's Authority under the PSLF Statute and Contravenes the Scope of Authority that Congress Conferred on the Agency.

Executive agencies promulgating new rules must act in accordance with the underlying congressional statute authorizing the agency action. Specifically, the agency cannot use rulemaking to add limitations to statutory language. Executive Order 14235 Restoring Public Service Loan Forgiveness, referenced numerous times in the Proposed Rule's rationale, does not and cannot overrule this longstanding legal principle, which derives from the Constitution itself.[4] The Proposed Rule exceeds the Department's authority by disqualifying employers who would be qualified under the plain meaning of the statute based on particularized activities undertaken—a limitation the statute does not impose or delegate authority to the agency to create. Moreover, a proposed agency rule that would change the interpretation of a statute with deep political and economic significance, like PSLF, is impermissible absent clear congressional authority delegating the same. Congress did not make such a delegation within the PSLF statute.

### A. The PSLF Statute Does Not Allow Disqualification Based on Specific Activities.

The text of the PSLF statute is clear. Section 1087e(m) directs that the Secretary "shall cancel" a loan for a borrower who has made 120 monthly payments under certain repayment plans while employed "in a public service job."[5] Congress set forth clear, exhaustive criteria for what constitutes a "public service job," defining it as a "full-time job" in a number of areas, including, among other areas, "public health," "public education," "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)," "public service for individuals with disabilities," "public services for the elderly," or work "at an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title."[6]

---

[3] *See* 20 U.S.C. § 1087e(m).

[4] *See* Exec. Order No. 14235, § 3(b), 90 Fed. Reg. 11,885, 11,886 (Mar. 12, 2025) ("This order shall be implemented consistent with applicable law . . . .").

[5] 20 U.S.C. § 1087e(m)(1).

[6] *Id.* § 1087e(m)(3)(B).

These are the only conditions the statute sets forth for loan forgiveness: 120 monthly payments while enrolled in a qualifying repayment plan and employed in one of the enumerated jobs.[7] Noticeably absent: any conditions that limit or set conditions on which individuals who meet these criteria can obtain forgiveness. Importantly, Congress did *not* allow or otherwise contemplate excluding organizations that provide qualifying public service jobs based on specific *activities* in which a qualifying employer engages. Thus, the best reading of the statute is simple: as long as these conditions are met, an individual qualifies for public service loan forgiveness.[8] By adding a separate requirement, which is based on arbitrary and subjective conditions with no basis in law, that requires an individual's employer to certify it is not engaged in a so-called substantial illegal purpose, the Department thus seeks to modify, and potentially eliminate, the eligibility standard set forth in the statute. Even if the statute were not clear, any ambiguity in the statute does not create an "implicit delegation[] to agencies," nor does it "reflect a congressional intent that an agency, as opposed to a court, resolve the resulting interpretive question."[9]

Thus, the Department's authority to create regulations to implement the PSLF program is circumscribed by Congress's direction to the Secretary on how to administer the program, including in the statutorily enumerated eligibility criteria.[10] Unlike the Proposed Rule, the Department's prior practice in interpreting PSLF falls in line with its congressionally granted authority to certify PSLF-eligible employers providing the services included in the PSLF statute. Specifically, the Department developed the current regulation defining "qualified employers" to include, without further limits or preconditions to narrow the statute, certain types of employers providing jobs consistent with the statutory language. That longstanding practice provides additional evidence of the statute's original and ordinary meaning.

Far from merely implementing the statute, the Proposed Rule seeks to insert a requirement to the statute as to specific activities that are not permitted. This cannot be framed as a simple interpretive exercise, as the Proposed Rule creates an entirely new legal framework to evaluate, implement, and purportedly enforce its new standard. Neither of these changes has any basis in the PSLF statute. When statutory language on its face indicates Congress intended a statute to apply broadly, an agency cannot impose a limiting interpretation.[11] The PSLF statute lists a broad category of jobs that satisfy the definition of "public service job" without any additional limiting language.[12] Additionally, the PSLF statute only discusses eligible job *types*, not specific employer *activities,* as contemplated by the Proposed Rule. The PSLF statute certainly does not authorize the Department to engage in inquiries *sua sponte* using a novel "illegal purpose" standard—a phrase

[7] *Id.* § 1087e(m).

[8] *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 373 (2024).

[9] *Id.*

[10] 34 CFR § 685.219; 20 U.S.C. § 1087e(m).

[11] *See* Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 65.2 (7th ed. 2007) ("Limitations or conditions which depart from its plain meaning" may not be "read into" a statute.).

[12] 20 U.S.C. § 1087e(m)(3)(B).

which appears nowhere in the PSLF statute, and which the Department seeks to define for itself using inapposite law. The Proposed Rule reads a wholly new "substantial illegal purpose" limitation in Congress's clear definition of "public service job."[13] This is impermissible and contrary to the statute's plain language and the congressional intent it reflects. "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[14]

A bedrock principle of American government—rooted in the Constitution's separation of powers—is that executive agencies cannot unilaterally expand the scope of laws that Congress passes. To do so would be to evade the careful process of bicameralism and presentment created by the Framers to ensure political accountability, deliberation, and geographic representation. As an officer of the United States, the Secretary is bound by oath to support and defend the Constitution of the United States—including this bedrock principle that requires the Secretary to respect and uphold the statute as written by Congress. Neither the Proposed Rule nor any Executive Order it purports to implement can supersede this basic constitutional tenet.

**B. Congress Retains Authority to Determine Issues of Major Economic and Political Significance Unless It Expressly Delegates this Authority to Executive Agencies.**

Not only does the Proposed Rule contradict the PSLF statute's plain language, but the Proposed Rule also violates the principle that issues of major economic and political significance are wholly within Congress's authority to decide unless Congress *expressly* delegates that authority to an executive agency. When an agency's action or policy is of "deep 'economic and political significance,'" Congress is presumed *not* to have given authority to an agency to take an action unless the statute explicitly delegates this authority.[15] Without this delegated authority, the agency cannot act as executive agencies are creatures of Congress and derive their powers from congressional grants of authority. The Department does not provide an explicit statutory basis for its new interpretation in the Proposed Rule. It cannot because Congress did not explicitly delegate its interpretative authority within the PSLF statute.[16]

---

[13] The Department argues that since the statute does not define "public service," it has the authority to make amendments to this definition. The statutory definition of "public service job," however, is clear, and the Department cannot read a unique definition of "public service" into the statute in an attempt to narrow the scope of "public service jobs" Congress explicitly and broadly defined.

[14] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

[15] *Biden v. Nebraska*, 600 U.S. 477, 506, 522 (2023) (citation omitted) (holding that the Secretary lacked authority to cancel $430 billion of student loans despite Congress explicitly authorizing the Secretary to "waive or modify any statutory or regulatory provision" in the case of national emergency). Here, Congress delegated no such waiver or modification authority to the agency, making the Department's claim to authority for its action even weaker than its failed attempt in *Nebraska*.

[16] Nor could Congress delegate such authority as doing so would constitute viewpoint discrimination in violation of the First Amendment.

Issues affecting student financial assistance programs, including criteria for participation in and the scope of the PSLF, are matters of deep economic and political significance, as reflected in the Supreme Court decision in *Biden v. Nebraska.* There, the Supreme Court found that a statute authorizing the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs. . . in connection with a . . . national emergency" did not authorize the agency to cancel billions in student loan balances, because a decision of that magnitude is one "that Congress would likely have intended for itself." The Court held this despite specific, explicit statutory text authorizing the waiver or modification of "any statutory or regulatory provision."[17]

Here, the Department proposes a complete overhaul in how the Department administers and assesses eligibility of individuals and organizations for PSLF. The Proposed Rule does so without any indication that Congress intended to provide it such broad authority. Moreover, the Proposed Rule would remove a foundational pillar supporting the existence of thousands of public service jobs; talented candidates will seek alternative, often private, employment amidst the uncertainty the Proposed Rule would cause. The Proposed Rule's change to PSLF is a "major question" of "deep 'economic and political significance'" that Congress statutorily reserved for itself, as in *Nebraska.* Congress did not delegate authority to the Department to make such broad activity-based carveouts, particularly when this change could remove PSLF eligibility for organizations Congress explicitly and intentionally included in the PSLF statute like 501(c)(3) organizations or nonprofits providing public interest legal services. Because the Department points to no other extra-statutory source of authority, it lacks the power to act in the manner put forth in the Proposed Rule.

## II. The Department's Proposed "Substantial Illegal Purpose" Framework Violates Due Process Rights and Encroaches on the IRS's Domain.

Setting aside the fact that the Department's disqualification of an employer on the basis of "substantial illegal purpose" fundamentally exceeds the scope of authority provided by Congress in the PSLF statute and contravenes the statute's intent, the Proposed Rule also creates serious due process concerns. Under the Proposed Rule, the Department may disqualify an employer if that employer's activities have a "substantial illegal purpose." This is not an established concept in federal law outside of a narrow application in the context of I.R.C. 501(c)(3) organizations. Acknowledging this, the Department proposes creating a brand-new framework for determining whether an otherwise qualifying employer is engaging in activities that have a substantial illegal purpose, as determined by the Secretary in her sole discretion. This framework has no basis in federal law and infringes on crucial due process protections of the student loan borrowers. The end result is the denial of legal representation to thousands of individuals who would lose access to legal representation and attorneys who are providing critical public interest legal services simply because those attorneys' jobs were deemed politically unfavorable by the Secretary.

---

[17] *Id.*

The Proposed Rule would require the Department of Education to determine whether an organization has a "substantial illegal purpose," including whether it has aided or abetted violations of federal immigration law, supported terrorism, or engaged in other criminal conduct. This places the Department in the position of making criminal determinations. Congress did not grant the Department this authority, nor is the Department equipped to make criminal determinations. Due process requires that criminal liability and determinations of criminal conduct be made through established judicial processes, not by administrative agencies acting under vague or subjective standards, much less a mere "preponderance of the evidence" standard that the Proposed Rule seeks to adopt, a standard far below that required for criminal determinations. The Proposed Rule's approach risks arbitrary enforcement and the deprivation of rights without the procedural protections guaranteed by the Constitution.

Though the Department attempts to shoehorn IRS's "illegality doctrine" case law into the PSLF context, this comparison does not assuage due process concerns, nor does it justify creating an entirely new "substantial illegal purpose" framework in a different government agency. Further, challenges to whether the IRS has appropriately applied the law to the facts in any given case may be adjudicated in the independent United States Tax Court, which involves a complex, lengthy fact-finding and adjudicatory process governed by the Tax Court's own Rules of Practice and Procedure, and such disputes may be further appealed within the federal court system. A similar system of checks and balances is not included in the Proposed Rule.

The Department also attempts to blunt the due process risk by claiming that it will use final judgments from state and federal courts, guilty pleas, or court settlements that indicate an employer engaged in activities that have a "substantial illegal purpose" as evidence. Courts and similar proceedings, however, do not make findings of "substantial illegal purpose." The Department would be responsible for interpreting whether these final judgments, pleas, or settlements meet its novel "substantial illegal purpose" standard. In cases where there are no court judgments or decisions, the Department would appear to be able to make "illegal purpose" determinations subjectively on its own. The Department lacks the expertise, established procedure, and authority to make criminal determinations; allowing it to do so would be a fundamental violation of due process.[18]

Finally, the Proposed Rule would encroach on responsibilities Congress explicitly and exclusively delegated to the IRS. The language in the Proposed Rule would require the Department to assess the legality of 501(c)(3) organizations. Determining 501(c)(3) status, however, is the exclusive responsibility of the IRS, and permitting the Department to make determinations about

---

[18] The Proposed Rule would also require employers engaged in legal but unpopular activities to sign under penalty of law as to the legality of the services they provide based on an ambiguous standard that is subject to change based on where the political winds may be blowing, or otherwise risk losing many of its employees who rely on PSLF to provide crucial public services. The ambiguity of the "substantial illegal purpose" standard makes this particularly concerning and would chill participation in the PSLF for those engaged in law and constitutionally protected and legal but politically disfavored activities for fear that these legal activities could later be deemed to violate the agency's determination of what constitutes a "substantial illegal purpose."

"substantive illegality" could create conflicting outcomes between the Department—an entity with no expertise or delegated authority to make such determinations—and the IRS—the agency *with* expertise and delegated authority to determine whether organizations qualify as 501(c)(3) entities.

## III. The Proposed Rule is Arbitrary and Capricious.

Agency action is impermissible if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[19] To avoid making an arbitrary and capricious rule, an agency that is changing its policy must provide a reasoned explanation for the change, grounded in the factors laid out by Congress in the relevant statute, and consider all relevant factors, including reliance interests.[20] The Proposed Rule is arbitrary and capricious because its reasoning is wholly removed from the statutory directive and fails to consider reliance interests.

### A. The Proposed Rule Relies on Factors That Congress Did Not Intend for It to Consider.

Throughout the Proposed Rule, the Department makes clear that its newly proposed regulations are based on factors that Congress never intended the Department to consider in implementing PSLF. Courts have routinely and resoundingly rejected similar efforts as arbitrary and capricious. More than 40 years ago, in *State Farm*, the Supreme Court explained that an agency decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[21]

In PSLF's authorizing statute, Congress defines qualifying employment for loan forgiveness as full-time work for a government organization or a nonprofit organization described in section 501(c)(3) of the Internal Revenue Code, or another nonprofit organization that provides certain qualifying public services.[22] The plain language of the statute makes clear that the definition of "public service job" is intentionally broad. The only factor for the Department to consider in determining eligibility is whether an individual works in such a public service job. Nowhere in the statute does Congress authorize the Department to impose additional requirements on employers beyond those enumerated, nor does it contain any textual basis for applying any limitation other than job type. Consideration of extra-statutory criteria—such as disqualifying employers based on a "substantial illegal purpose" as in the Proposed Rule—thus improperly imports considerations outside the scope of the statute, making the Proposed Rule arbitrary and capricious.

---

[19] 5 U.S.C. § 706(2)(A).

[20] *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020).

[21] *State Farm*, 463 U.S. 43; *see also Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016).

[22] 34 C.F.R. § 685.219.

The Department indicates several times that the Proposed Rule was drafted to comply with Executive Order 14235. Compliance with the Administrative Procedure Act (APA), however, hinges on *congressionally* provided statutory authority, not executive branch authority. Because an Executive Order cannot change a federal statute, it cannot change the factors Congress made relevant under a federal statute for purposes of the APA analysis.[23] The Proposed Rule is so far removed from the PSLF statutory factors Congress intended the Department to consider that it would be considered arbitrary and capricious under the APA if enacted.

**B. The Proposed Rule's Procedure Failed to Adequately Consider Reliance Interests of Employers and Borrowers.**

In drafting the Proposed Rule, the Department violated another APA requirement: consideration of reliance interests. Before changing its interpretation of a statute, an agency must consider that longstanding policies may have "engendered serious reliance interests that must be taken into account."[24] Failure to do so renders the change arbitrary and capricious. For over a decade, both employers and borrowers have structured their employment relationships and career decisions based on the best reading of the PSLF statute and the Department's acquiescence in that reading of qualifying employment under PSLF. Many borrowers have made irreversible life choices—including taking on significant educational debt and subsequently accepting lower-paying public service jobs—on the understanding that their employment would count toward loan forgiveness. Employers, in turn, have structured their organizational models and recruited and retained talent by representing their organizations as PSLF-eligible. The Proposed Rule's introduction of a vague new "substantial illegal purpose" standard, coupled with an unprecedented investigative and punitive framework, will force individuals currently working for qualified employers providing lawful services (like legal representation) in fields targeted by the Proposed Rule (e.g., immigration) to seek new jobs for fear that their organizations will be removed from the program. It will also cause organizations that have structured their organizations around PSLF recruitment to cut employees and legal programs for fear that the Proposed Rule's preponderance of the evidence standard will cause them to lose their qualified employer status despite being engaged in entirely legal activities such as providing legal representation of underrepresented classes of individuals.

The Department does not address reliance interests even once in the entire Proposed Rule or accompanying rationale. If the Department now proposes to disqualify certain employers or impose new requirements not previously disclosed, it will disrupt these settled expectations of current PSLF recipients and their qualified employers. Per Supreme Court precedent, this makes the change arbitrary and capricious and, therefore, unlawful.[25]

---

[23] *See also* Exec. Order No. 14235, § 3(b), 90 Fed. Reg. 11,885, 11,886 (Mar. 12, 2025) ("This order shall be implemented consistent with applicable law.").

[24] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2012).

[25] *See id.*; *Regents*, 591 U.S. at 30.

## IV. The Proposed Rule Violates Constitutional Protections.

The Proposed Rule violates multiple constitutional rights. First, constitutional protections prohibit agencies from depriving individuals of settled property interests without due process. The Proposed Rule would violate constitutional due process by revoking borrowers' and organizations' longstanding reliance on PSLF funding. Second, the Proposed Rule's targeted nature against public services in certain sectors (e.g., immigration) will likely create a chilling effect on legal, protected speech, in violation of the First Amendment.

### A. The Proposed Rule Violates Borrowers' Legitimate Property Interests.

Borrowers who have relied on the Department's prior interpretation of the PSLF statute have developed legitimate property interests in the program's benefits. Certain government benefits, once conferred, can constitute property interests protected by the Due Process Clause. To remove any such property interests, the Department would have to follow procedural due process. The Proposed Rule fails to satisfy these due process requirements. The Proposed Rule mentions that an employer will be provided notice and an opportunity to respond if the Department determines that the employer is engaging in activities with a "substantial illegal purpose." This vague mention of notice, without any additional details regarding framework, rights, or timing an employer will be afforded, does not satisfy due process requirements. Indeed, the Proposed Rule specifically forbids such appeals: under the proposed § 685.219(g), "a borrower may not request reconsideration when the Secretary's determination was made based upon an organization's ineligibility as a qualifying employer due to engaging in activities that have a substantive illegal purpose." [26] The lack of any recourse for borrowers, even when an individual borrower has no knowledge or involvement in the conduct of the employer alleged to be illegal, ends due process before it begins.

### B. The Proposed Rule Violates First Amendment Rights by Punishing Disfavored Speech.

The Proposed Rule also raises serious First Amendment concerns. The Proposed Rule's targeting of specific public service sectors, such as immigration and transgender care, creates a chilling effect on legally provided services in these areas. Organizations that rely on PSLF funding may be forced to shut down portions of legal public services—such as education or legal services provided to immigrants, for example—for fear that the Department will determine that this constitutes "aiding and abetting" circumvention of immigration laws. Under the Proposed Rule, an organization that engages in legal advocacy for transgender rights on the one hand and provides free public services for veterans on the other may be forced to give up its First Amendment right to free speech and advocacy for fear of being penalized with loss of PSLF eligibility for its work with veterans.

---

[26] 90 Fed. Reg. 40,154, 40,163 (Aug. 18, 2025).

The government may not condition access to a public benefit, such as PSLF eligibility, on the surrender of First Amendment rights.[27] The Proposed Rule's approach threatens to chill protected speech and advocacy by making PSLF status contingent on organizational viewpoints or activities, in violation of the First Amendment. The Proposed Rule's disclaimer that it is not meant to target free speech does not negate the practical chilling effect it has on protected free speech, particularly in light of the breadth and vagueness of the Proposed Rule's definitions and the broad authority conferred on the Secretary to make determinations under the proposed regulations.

## V. Conclusion

The Proposed Rule is contrary to the plain language and clear congressional intent of the PSLF. If enacted, it would have severe ramifications for the PSLF program and the constitutional and legal rights of those who rely on it to provide crucial public services. The ABA therefore respectfully requests that the Department withdraw the Proposed Rule. The ABA stands ready to provide further input and urges the Department to preserve the integrity and accessibility of the PSLF program for all public service professionals and for the employers who rely on the program to recruit and retain staff to fill positions that service the public.

Sincerely,

Michelle Behnke, President
American Bar Association

[27] *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) (finding government cannot require recipients of federal funds to adopt or espouse the government's viewpoint as a condition of eligibility).

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Attached, in PDF format, are the comments of the CPAC Foundation's Center for Regulatory Freedom.

Attachments 1

CRF Comment Amendments to PSLF Regulations FINAL 091625

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10108/attachment_1.pdf)

Give Feedback

**Comment ID**
ED-2025-OPE-0016-10108

**Tracking Number**
mfm-uf2t-y92l

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 16, 2025

The Honorable Linda E. McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202
(Submitted Electronically)

***Re:*** ***Comments Regarding ED's Notice of Proposed Rulemaking Entitled, "William D. Ford Federal Direct Loan (Direct Loan) Program," Docket Number ED-2025-OPE-0016***

Below are comments of the American Conservative Union Foundation's (d/b/a. Conservative Political Action Coalition Foundation) (hereinafter "CPAC Foundation") Center for Regulatory Freedom (hereinafter "CRF") on the U.S. Department of Education's (ED) notice of proposed rulemaking entitled "William D. Ford Federal Direct Loan (Direct Loan) Program," Docket Number ED-2025-OPE-0016, published in the Federal Register on August 18, 2025.

CRF is a project of the CPAC Foundation, a non-profit, non-partisan 501(c)(3) research and education foundation. Our mission is to inject a common-sense perspective into the regulatory process, to ensure that the risks and costs of regulations are fully based on sound scientific and economic evidence, and to ensure that the voices, interests, and freedoms of Americans, and especially of small businesses, are fully represented in the regulatory process and debates. Finally, we work to ensure that regulatory proposals address real problems, that the proposals serve to ameliorate those problems, and, perhaps most importantly, that those proposals do not, in fact, make public policy problems worse.

On March 7, 2025, President Trump signed Executive Order 14235 ("Restoring Public Service Loan Forgiveness") to revise regulations governing the Public Service Loan Forgiveness (PSLF) program. In this executive order, President Trump directed the Secretary of Education (Secretary) to "propose revisions" to the program that "ensure the definition of 'public service' excludes organizations that engage in activities that have a substantial illegal purpose."[1] ED is carrying out the directives of Executive Order 14235 through this notice of proposed rulemaking and, more specifically, the proposed revisions to the PSLF framework in the Code of Federal Regulations.

**CRF supports ED's proposed revisions to PSLF program regulations, particularly those carrying out Executive Order 14235's exclusion of organizations engaging in activities that have a substantial illegal purpose from participating in the PSLF program. CRF approves each of the proposed revisions but has provided additional recommendations to further revise the definition of "trafficking" in ED's proposed rule.**

## Introduction

The Higher Education Act (HEA), originally enacted in 1965, was designed to expand access to and strengthen high education in the United States. The HEA focused its efforts primarily on growing opportunities for low- and middle-income families to pursue higher education, establishing financial aid scholarships and low-interest federal student loans to support its objectives. The HEA was later amended by the College Cost Reduction and Access Act of 2007 (CCRAA) to further increase the affordability of higher education, providing increased Pell Grants, reduced interest rates for federal student loans, and introduced the Income-Based Repayment (IBR) plan to determine monthly loan payments according to individual income and family size. The CCRAA's amendments to the HEA also established a 10-year loan forgiveness program for public service workers, known as the PSLF program. Section 455(m) of the HEA, as amended, reads as follows:

> "The Secretary shall cancel the balance of interest and principal due...on any eligible Federal Direct Loan not in default for a borrower who...is employed in a public service job during the period in which the borrower makes each of the 120 payments..."[2]

The above excerpt not only created the PSLF program but mandated that the Secretary engage in loan forgiveness under these terms, pursuant to the HEA, as amended. Following amendments to PSLF program regulations in 2020 and 2022, the PSLF program's working definition of a "public service" or "qualified employer" expanded to encompass a plethora of organizations and employers who engaged or provided funding for activities that have a substantial illegal purpose.

---

[1] Exec. Order No. 14235, 90 Fed. Reg. 11885 (Mar. 12, 2025).
[2] Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (Nov. 8, 1965), as amended through Pub. L. No. 119-21, July 4, 2025.

The primary purpose of ED's proposed revisions is to remedy this definitional error and realign PSLF program regulations to reflect current federal policy and the intent of the PSLF program.

**<u>Proposed Revisions</u>**

**Definition of "Chemical Castration or Mutilation" (34 C.F.R. § 685.219(b)(3))**

ED is proposing to codify the phrase "substantial illegal purpose" in PSLF program regulations to narrow eligibility based on an employer's engagement in activities that have a "substantial illegal purpose." Within that definition, ED is proposing to include another term: "chemical castration or mutilation," which the Department defines as the following:

> "...the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex and the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex."[3]

This definition aligns with the definition of "chemical castration or mutilation" provided in Executive Order 14187 ("Protecting Children From Chemical and Surgical Mutilation"), ensuring consistency across all federal agencies and adhering to statutory precedent. CRF approves of both the above definition for "chemical castration or mutilation" and ED's designation of activities falling under that definition as having a "substantial illegal purpose." Given Executive Order 14187's explicit prohibition of chemical castration or mutilation for minors, it logically follows that ED would extend that prohibition to PSLF program regulations. It is important to note, however, that ED "would not find a violation of the standard...if there is not a Federal or State law that prohibits sex transition for minors in the state where the employer is located,"[4] meaning that ED's compliance with Executive Order 14187 can only be applied to PSLF program eligibility according to federal and state laws. Still, CRF supports this revision, as ED's proposed definition implements Executive Order 14187 to the extent practicable in accordance with the principles of federalism.

**Definition of "Other Federal Immigration Laws" (34 C.F.R. § 685.219(b)(17))**

ED is also proposing to define "other Federal immigration laws" to mean "any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws." When discussing this proposed definition, ED stated that it chose "not to limit its authority to review a qualifying employer under the proposed standard...to the INA."[5] This revision is appropriate considering the breadth of Federal immigration law and policy that extends far

---

[3] William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 50461 (proposed Aug. 18, 2025).
[4] Id.
[5] Id.

beyond the provisions of the Immigration and Nationality Act (INA), and all such policies must be enforced to the same extent as the INA. ED's proposed definition of "other Federal immigration laws" encompasses all standing federal policies concerning immigration and ensures that ED will contribute to interagency cooperation in the enforcement of those laws. CRF supports this proposed definition, as the inclusion of all federal immigration laws will ensure that taxpayer dollars will not subsidize entities or persons engaging in illegal activities that threaten the national security of the United States.

**Definition of "Qualifying Employer" (34 C.F.R. § 685.219(b)(27))**

ED's proposed definition of "qualifying employer" is the most drastic change to PSLF program regulations thus far, as this definition excludes organizations that engage in activities that have a substantial illegal purpose, pursuant to the directives of Executive Order 14235. This revision is absolutely necessary because without it, the federal government would continue to subsidize organizations engaging in activities that have a substantial illegal purpose, indirectly subsidizing the illegal activity itself. ED echoes the same sentiment in its notice of proposed rulemaking, stating that, "The Department is concerned that the PSLF program has sent tax dollars to employees of organizations that are engaged in activities that are illegal, thereby subsidizing their employment."[6] Proposed § 685.219(b)(30) defines "substantial illegal purpose" as the following:

> "(30) *Substantial illegal purpose* means—
> (i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
> (ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;
> (iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;
> (iv) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law;
> (v) engaging in a pattern of aiding and abetting illegal discrimination; or
> (vi) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection."[7]

Each of the enumerated activities have a "substantial illegal purpose," and none of the crimes listed should have any connection to the disbursement or use of federal funds. CRF supports this proposed revision to PSLF program regulations, as it carries out the directives of Executive

[6] William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 50461 (proposed Aug. 18, 2025).
[7] Id.

Order 14235 and realigns implementation of the PSLF program with the intent of the HEA, as amended.

**Court Processes as the Basis for Eligibility Determinations (34 C.F.R. § 685.219(h))**

This proposed change, though seemingly minute, is especially important regarding ED's administrative mechanisms for verifying an employer's eligibility in the PSLF program. In its notice of proposed rulemaking, ED provided a list of what the Secretary would accept as conclusive evidence that an employer engaged in activities that have a substantial illegal purpose:

> "(1) A final judgement by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;
> (2) A plea of guilty or *nolo contendere,* whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in activities that have substantial illegal purpose; or
> (3) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose as described in subsection (h) of this section."[8]

It is important to note that each of the above examples of acceptable conclusive evidence is some sort of legal proceeding or judgement, meaning that investigations into potential PSLF program violations relating to activities with a substantial illegal purpose will not be conducted solely according to the discretion of the Secretary or ED. Instead, "the Department itself would not adjudicate whether the employer engaged in activities that have a substantial illegal purpose," but "rely on processes that took place in court to determine that the employer engaged in illegal activities that have a substantial illegal purpose."[9] This methodology ensures that each employer in the PSLF program is awarded due process and that the investigation is not confined to ED or the Secretary's administrative determinations alone. CRF supports this revision, as it aligns with the Supreme Court's ruling on administrative courts and proceedings in *SEC v. Jarkesy* and bases eligibility determinations according to legal facts and procedures.

**Recommendations**

CRF supports ED's revisions and finds that they succeed in both implementing Executive Order 14235 and ending the subsidization of entities engaging in illegal activities in the PSLF program. CRF also finds it prudent to recommend the following to be considered when drafting ED's final rule concerning PSLF program regulations:

---

[8] William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 50461 (proposed Aug. 18, 2025).
[9] Id.

**Definition of "Trafficking" (34 C.F.R. § 685.219(b)(33))**

Executive Order 14235, the primary statutory impetus for ED's proposed rule, explicitly addresses ending the subsidization of illegal activities in the PSLF program, including "human smuggling" and "child trafficking." Naturally, ED's proposed rule sought to incorporate those prohibitions, electing to define trafficking as "transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law."[10] According to ED, this definition was the necessary solution to a regulatory vacuum in which the term "trafficking" had not yet been defined by federal law. ED went on to state that it "researched existing Federal laws and statutes but did not find a statute that matched the context," because available definitions were "limited to situations of sex trafficking only."[11]

Understandably, ED wanted to align its definition of "trafficking" to best carry out the directives of Executive Order 14235, which did focus exclusively on the trafficking of children and minors. However, because the intent of the PSLF program is to support public service, the subsidization of entities participating in the trafficking of human beings of any age would fail to support that objective. To best carry out the provisions of the HEA, as amended, CRF recommends that ED further revise this definition to bar employers from participating in the PSLF if those employers engage in the trafficking of children or adults. CRF recommends that ED use the best available federal definition for "trafficking" from the Trafficking Victims Protection Act (TVPA), codified at 22 U.S.C. § 7102(11):

> "(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of 18; or
> (B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[12]

This definition is two-fold, providing a specific definition for both child sex trafficking and other forms of human trafficking (i.e., forced adult labor). Executive Order 14235's inclusion of "trafficking" as a prohibited activity sought to penalize employers in the PSLF program that facilitated the "trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents,"[13] but ED's implementation of this order fails to prohibit trafficking as a whole, regardless of whether the victim is a child or an adult. CRF recommends that ED carry out Executive Order 14235 by creating a separate category of an activity with a "substantial illegal purpose" to clarify that trafficking for the purposes of unlawful emancipation

---

[10] William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 50461 (proposed Aug. 18, 2025).
[11] Id.
[12] 22 U.S.C. § 7102(11).
[13] Exec. Order No. 14,235, 90 Fed. Reg. 14,207 (Mar. 12, 2025).

is separated definitionally from other forms of trafficking that victimize adults and should still not be subsidized through the PSLF program. Alternatively, ED could expand the definition of trafficking to apply to adults, designating all employers engaging in human trafficking, including those trafficking adult victims, as ineligible for participation in the PSLF program. Either way, aligning the ED's definition of "trafficking" with that of the TVPA would ensure uniformity across federal agencies and statutory consistency.

## Conclusion

Despite the PSLF program's best efforts, it has largely failed to deliver on its promise of procuring more public service employees in the most crucial public service industries. According to ED's own Office of the Chief Economist (OCE), 43% of borrowers who received PSLF forgiveness work in education and more than a quarter of those borrowers work in K-12 education.[14] Still, as of June 2025, roughly 1 in 8 of all teaching positions in the United States are either unfilled or filled by teachers not fully certified for their assignments.[15] Other key public service careers, such as those in healthcare or social work, still struggle with shortages despite the financial incentives and support offered by the PSLF program. Moving forward, CRF recommends that the incentive structure within the PSLF program be reevaluated, as its intent to bolster and promote public service has only contributed to higher attrition rates in those industries and a higher accumulation of personal debt at the individual level.

**CRF supports ED's proposed revisions to PSLF program regulations and applauds the Department's efforts in carrying out Executive Order 14235 and the broader policy objectives of the administration. CRF recommends that ED revisit its definition of "trafficking," and the overall success of the PSLF program in achieving growth in the public service sector.**

If you have any questions, do not hesitate to contact me at kmcleroy@conservative.org.

Thank you,

Kiley McLeroy

Kiley McLeroy
*Policy Analyst*
*CPAC Foundation Center for Regulatory Freedom*

---

[14] U.S. Dep't of Educ., Office of the Chief Economist, Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?, OCE Working Paper OCE2024-008 (Jan. 2025) (Julia Turner et al., authors).

[15] Learning Policy Institute, An Overview of Teacher Shortages: 2025 (June 2025), available at https://learningpolicyinstitute.org/product/overview-teacher-shortages-2025-factsheet.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 2

PSLF Comment Letter - YMCA of the USA

Download

PSLF Comment Letter - YMCA of the USA -

Download

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10118

**Tracking Number**

mfm-vhtn-16rq

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



FOR YOUTH DEVELOPMENT®
FOR HEALTHY LIVING
FOR SOCIAL RESPONSIBILITY

September 16, 2025

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Ave SW,
Washington, DC 20024
Re: Proposed PSLF Rule Changes - Docket ID: ED-2025-OPE-0016

Dear Ms. Abernathy,

On behalf of the YMCA of the USA (Y-USA), the national resource office for the nation's 2,600 YMCAs serving communities across all 50 states, we appreciate the opportunity to comment on the U.S. Department of Education's proposed rule regarding the Public Service Loan Forgiveness (PSLF) program.

The PSLF program is a vital tool that helps charitable nonprofit organizations like the YMCA attract and retain mission-driven professionals who are committed to serving their communities. Across the country, YMCAs employ more than 277,000 full and part-time staff and engage more than 350,000 volunteers to provide the vital services that are essential for communities to flourish. These Y staff and volunteers deliver programs that strengthen youth development, promote healthy living, and foster social responsibility. Many of our staff, particularly those working in early childhood education, afterschool, mental health, and chronic disease prevention programs rely on PSLF to make long-term careers in public service financially viable.

PSLF is not just a benefit to individual borrowers, it is a workforce development strategy that enables organizations like the Y to deliver critical services. From providing safe spaces for youth after school to supporting older adults with evidence-based health programs, our ability to recruit and retain qualified staff directly impacts our capacity to serve.

According to a 2023 study conducted by the National Council of Nonprofits, there is a growing nonprofit workforce shortage in the United States. This provides a clear indication that labor market economics are not working for the benefit of people served by charitable organizations throughout the country. Data shows that charitable nonprofits often cannot afford to pay wages and benefits that are commensurate with similar jobs in the for-profit and government sectors. The most direct impact frequently manifests in longer waiting lines and reduced services for individuals. Nonprofit workforce shortages, therefore, are not mere inconveniences, but challenges for all residents of the United States.[1]

Programs like PSLF go a long way to attract and incentivize young, talented individuals to pursue a career in public service regardless of potential disparities in salary and income, as compared to the private sector.

---

[1] National Council of Nonprofits, *2023 Nonprofit Workforce Survey Results*, August 30, 2023, https://www.councilofnonprofits.org/files/media/documents/2023/2023-nonprofit-workforce-survey-results.pdf.

**YMCA OF THE USA**
101 N Wacker Drive, Chicago IL 60606
**P** 800 872 9622 **F** 312 977 9063 ymca.net

We urge the Department to preserve the broad eligibility of 501(c)(3) nonprofit organizations under PSLF. The current framework ensures that all charitable nonprofits, regardless of mission area, can support employees in accessing this important benefit. Narrowing eligibility would risk destabilizing the nonprofit workforce at a time when many communities are facing growing needs.

Thank you for your continued support of public service professionals and for recognizing the essential role that nonprofit organizations play in building healthy communities.

Sincerely,

Jeffrey Britt
Senior Vice President and Chief Government Affairs Officer
YMCA of the USA



FOR YOUTH DEVELOPMENT®
FOR HEALTHY LIVING
FOR SOCIAL RESPONSIBILITY

September 16, 2025

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue, SW
Washington, DC 20024
Re: Proposed PSLF Rule Changes - Docket ID: ED-2025-OPE-0016

Dear Ms. Abernathy,

On behalf of the YMCA of the USA (Y-USA), the national resource office for the nation's 2,600 YMCAs serving communities across all 50 states, we appreciate the opportunity to comment on the U.S. Department of Education's proposed rule regarding the Public Service Loan Forgiveness (PSLF) program.

The PSLF program is a vital tool that helps charitable nonprofit organizations like the YMCA attract and retain mission-driven professionals who are committed to serving their communities. Across the country, YMCAs employ more than 277,000 full and part-time staff and engage more than 350,000 volunteers to provide the vital services that are essential for communities to flourish. These Y staff and volunteers deliver programs that strengthen youth development, promote healthy living, and foster social responsibility. Many of our staff, particularly those working in early childhood education, afterschool, mental health, and chronic disease prevention programs rely on PSLF to make long-term careers in public service financially viable.

PSLF is not just a benefit to individual borrowers, it is a workforce development strategy that enables organizations like the Y to deliver critical services. From providing safe spaces for youth after school to supporting older adults with evidence-based health programs, our ability to recruit and retain qualified staff directly impacts our capacity to serve.

According to a 2023 study conducted by the National Council of Nonprofits, there is a growing nonprofit workforce shortage in the United States. This provides a clear indication that labor market economics are not working for the benefit of people served by charitable organizations throughout the country. Data shows that charitable nonprofits often cannot afford to pay wages and benefits that are commensurate with similar jobs in the for-profit and government sectors. The most direct impact frequently manifests in longer waiting lines and reduced services for individuals. Nonprofit workforce shortages, therefore, are not mere inconveniences, but challenges for all residents of the United States.[1]

Programs like PSLF go a long way to attract and incentivize young, talented individuals to pursue a career in public service regardless of potential disparities in salary and income, as compared to the private sector.

---

[1] National Council of Nonprofits, *2023 Nonprofit Workforce Survey Results*, August 30, 2023, https://www.councilofnonprofits.org/files/media/documents/2023/2023-nonprofit-workforce-survey-results.pdf.

**YMCA OF THE USA**
101 N Wacker Drive, Chicago IL 60606
**P** 800 872 9622 **F** 312 977 9063 ymca.net

We urge the Department to preserve the broad eligibility of 501(c)(3) nonprofit organizations under PSLF. The current framework ensures that all charitable nonprofits, regardless of mission area, can support employees in accessing this important benefit. Narrowing eligibility would risk destabilizing the nonprofit workforce at a time when many communities are facing growing needs.

Thank you for your continued support of public service professionals and for recognizing the essential role that nonprofit organizations play in building healthy communities.

Sincerely,

Jeffrey Britt
Senior Vice President and Chief Government Affairs Officer
YMCA of the USA

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attachment.

Attachments 1

APA Services comments_Direct Loan-PSLF NPRM_ED-2025-OPE-0016

**Comment ID**

ED-2025-OPE-0016-10119

**Tracking Number**

mfm-vhym-4p9c

Give Feedback

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

 

September 17, 2025

The Honorable Linda McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

**RE: William D. Ford Federal Direct Loan (Direct Loan) Program – Docket No. ED-2025-OPE-0016**

Dear Secretary McMahon:

On behalf of the American Psychological Association (APA) and the American Psychological Association Services, Inc. (APA Services), I am writing to offer public comments to the Notice of Proposed Rulemaking (NPRM) on the *William D. Ford Federal Direct Loan (Direct Loan) Program*, published in the Federal Register by the Department of Education on August 18, 2025, Docket No. ED-2025-OPE-0016. APA Services is the companion organization of APA, which is the nation's largest scientific and professional nonprofit organization representing the discipline and profession of psychology, as well as 173,000 members and affiliates who are clinicians, researchers, educators, consultants, and students of psychological science.

While APA Services acknowledges that it is generally within the right of any administration to reprioritize how it administers the programs within its jurisdiction, that must be done within the confines of the authority granted in law to each individual department and agency, while also maintaining the underlying purposes of those programs. **As such, we are concerned with a number of the provisions in this NPRM as they pertain to the Public Service Loan Forgiveness (PSLF) Program and respectfully ask the Department to withdraw this proposed rule.**

Specifically, our comments will focus on:

- The proposed changes to employer eligibility being contrary to the statute that created PSLF.
- The potential harm to the effectiveness of PSLF.

PSLF is a critical program to the recruitment and retention of psychologists, many of whom are dedicated public servants working at the local, state, and federal government levels, as well as public hospitals, clinics, community health centers, and public schools, where they are on the frontlines in the fight against the opioid epidemic, working to prevent suicide, and addressing the youth mental health crisis. These highly trained professionals are working with children, the elderly, and veterans. In fact, the U.S. Department of Veterans Affairs is the single largest employer of psychologists nationwide. Additionally, the Federal Bureau of Prisons and the Indian Health Service are among the other top employers of health service psychologists in the nation. Psychologists, like others employed in public service who are enrolled in PSLF, are depending on the promise of the program for long-term financial stability, which will allow them to remain working in the public sector even after they qualify for PSLF.

*Proposed changes to employer eligibility contradict the law*

Congress created PSLF in 2007 through the bipartisan College Cost Reduction and Access Act, which very clearly established a definition of eligible employer to include any form of employment for any government (federal, state, local) or any 501(c)(3) non-profit organization. While the law grants the Department the narrow authority to alter this definition in the limited circumstances of jobs in high-need areas where shortages exist, it does not allow it to restrict eligibility under PSLF by removing employers, so long as they fall into those two categories of employment. By granting the Department the ability to revoke PSLF eligibility from a public service employer that otherwise meets the definition established in the law, the NPRM substantially expands the statutory authority given to the Department and likely sets a precedent for future administrations to unilaterally change eligibility for PSLF and potentially other programs.

APA Services certainly agrees that organizations proven by the courts to have violated the law should not be included as qualifying employers for PSLF eligibility purposes. However, if a 501(c)(3) organization is engaged in such activities, its nonprofit status should be formally revoked through long-established IRS procedures that determine whether it is abiding by relevant federal laws and regulations while also allowing for due process, including the opportunity to appeal. The NPRM does not provide either employers or borrowers with the option to request an appeal of the Department's decision to revoke qualifying employer status.

*Potential harm to the effectiveness and reach of PSLF*

PSLF encourages individuals to pursue public service by providing loan forgiveness on remaining debt from eligible federal loans after 10 years of payments. It continues the history of the federal government incentivizing talented individuals to enter public service. This includes in behavioral health fields, which is particularly necessary as the U.S. continues to experience nationwide shortages of behavioral health providers. Our nation's mental and behavioral health remains in a state of crisis, with a quarter of U.S. adults report alarming levels of stress and anxiety.[i] Predictably, psychologists report high demand for treatment for anxiety and depression, with practitioners seeing increased workloads and longer waitlists, which have contributed to higher levels of burnout within the profession.[ii]

It is estimated that 158 million U.S. residents—nearly half the population—live in a mental health workforce shortage area.[iii] In fact, nearly every county and district across the country has at least one federally designated Mental Health Professionals Shortage Area. Over the next decade, these shortages are projected to persist, with rural communities facing major challenges in recruiting licensed mental and behavioral health care professionals.[iv] [v] [vi] According to national workforce projections, even under current policy, the U.S. will only meet 55 percent of the need for psychologists by 2037.[vii] PSLF is working to close these gaps. Psychologists depending on PSLF have committed to staying in a nonprofit or government setting for a minimum of ten years.

APA Services strongly supports recent efforts that have improved the administration of the program, which have led to over 1 million public servants, including psychologists, receiving PSLF. A substantial improvement on the just about 1.2 percent that received loan forgiveness prior to the administrative changes that were implemented.[viii] However, we are concerned that the NPRM could set back this progress. The proposal could unintentionally undermine PSLF's role as a recruitment tool for employment in the public sector. This could create a chilling effect on employers' ability to hire qualified staff working in critical fields, including behavioral health, particularly in rural and other underserved communities.

Furthermore, the Department itself acknowledges that the proposed regulations may impose additional harm to borrowers, including potential delays in PSLF processing due to an employer losing qualifying status as well as potential misunderstandings of the new regulations leading to confusion and delays. The

Department also overestimates the ease with which borrowers can switch employers, which is often not an option for many, particularly depending on region and location. Lastly, implementing this NPRM will require substantial staff capacity. As such, we must note that since March 2025, the Department has seen a reduction in about a third of its workforce. Such significant staffing shortages will make it exceedingly difficult to both adequately administer and enforce the new policies this NPRM is proposing.

**Given the arguments laid out in our comments, APA Services again asks the Department to withdraw this rule and continue making improvements to PSLF so that it remains a pathway to meeting the growing public safety, health, education, and social services needs of communities nationwide.**

Thank you for the opportunity to provide comments. If APA Services can be of further assistance, please contact Kenneth Polishchuk, Deputy Chief for Education and Training Policy, at kpolishchuk@apa.org.

Sincerely,

Katherine B. McGuire
Chief Advocacy Officer

---

[i] American Psychological Association. (October 2024). Stress in America 2024 A nation in political turmoil. https://www.apa.org/pubs/reports/stress-in-america/2024.
[ii] American Psychological Association (December 2023). Psychologists reaching their limits as patients present with worsening symptoms year after year, 2023 Practitioner Pulse Survey. https://www.apa.org/pubs/reports/practitioner/2022-covid-psychologist-workload.
[iii] Kaiser Family Foundation. Mental Health Care Health Professional Shortage Areas (HPSAs). https://www.kff.org/other/state-indicator/mental-health-care-health-professional-shortage-areas-hpsas/.
[iv] U.S. Department of Labor, Bureau of Labor Statistics. Occupational Outlook Handbook, Psychologists. https://www.bls.gov/ooh/life-physical-and-social-science/psychologists.htm#tab-6.
[v] Health Resources and Services Administration. (2023). Behavioral Health Workforce Brief. U.S. Department of Health and Human Services. https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/Behavioral-Health-Workforce-Brief-2023.pdf
[vi] Rural Health Information Hub. (2021). *Rural Mental Health.* RHIhub. https://www.ruralhealthinfo.org/topics/mental-health
[vii] Health Resources and Services Administration. (n.d.). Workforce Projections. U.S. Department of Health and Human Services. https://data.hrsa.gov/topics/health-workforce/workforce-projections
[viii] U.S. Department of Education. Office of Federal Student Aid. Public Service Loan Forgiveness Data December 2019. https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached file.

Attachments 1

2025.09 NAIP Comment on ED-2025-OPE-0016-7221

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10122/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10122

**Tracking Number**

mfm-vnvp-qyyg

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



PO Box 2173
Syracuse NY 13220
www.iolta.org
info@iolta.org

September 16, 2024

Tamy Abernathy
Office of Postsecondary Education
Department of Education
400 Maryland Ave. SW
Washington, DC 20202
Via upload to www.regulations.gov

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy:

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

The National Association of IOLTA Programs (NAIP) is a nonprofit, non-partisan membership organization for funders of civil legal aid throughout all United States jurisdictions and the Canadian provinces and territories. Since 1986, NAIP has supported the growth and development of Interest on Lawyers Trust Account (IOLTA) programs to increase access to justice for all. A substantial portion of our US-based members, representing organizations from 46 states and territories, are themselves 501(c)(3) organizations or government entities, and all our members provide funding to nonprofit organizations engaged in civil legal services.

State- and territory-based IOLTA programs, as well as the civil legal assistance nonprofits they fund, are staffed by dedicated public service employees, including legal professionals who could draw a significantly higher income in the for-profit sector. These employees support everyday Americans who, often through no fault of their own, are facing dire legal situations that could result in loss of their home, job, children or physical safety. Legal support funders and providers help our neighbors achieve stability, lessening the burden on taxpayers for social safety net programs.

Legal service workers are often able to do this work because of PSLF, a program that has encouraged public service by reducing the burden of student loan debt. This paradigm is

especially true for attorneys, who face large amounts of law school debt but low salaries in the public or non-profit sectors. According to a recent survey, two-thirds of legal services and public defense executives called PSLF an important tool for both attracting new hires and retaining experienced staff.[1] NAIP opposes the proposed rule because it undermines the consistency and predictability of PSLF, harming the ability of legal services organizations to attract and retain their workforce.

Under the proposed § 685.219(h), the Secretary has tremendous discretion to revoke an employer's eligibility as a qualified employer. While the Secretary may consider actions such as court rulings, she or he is not required to do so, opening the door for rulings based on accusations or political animus. Even if the employer submits a corrective action plan, § 685.219(j)(2)(iii) grants the Secretary authority to impose terms and conditions for regaining eligibility without any guardrails on what those terms and conditions may be. A Secretary could, for example, require that an employer discontinue services offered to an audience disfavored by the Administration, even if those services are legal under State or Federal law.

Moreover, as administrations change, the authority proposed under this rule may be weaponized to target entities with missions deemed to be at cross purposes of a new Secretary's and President's policy goals. The potential for pendulum swings in enforcement will delegitimize PSLF and deter people from entering public service jobs.

NAIP also has concerns about due process rights under the proposed rule. First, the proposed rule explicitly denies borrowers a means of appealing a determination that their employer engages in activities that have a substantial illegal purpose. Second, the proposed rule applies a preponderance of the evidence standard to determine whether employers have engaged in such activities. This is a vastly lower burden of proof than the beyond a reasonable doubt standard used in criminal proceedings. Yet, the proposed rule authorizes the Secretary to impose serious consequences on employers and their workers based on these determinations. Given the grave consequences for employers that the Secretary rules disqualified from PSLF, the preponderance of the evidence standard is simply too low. Third, the rule provides no independent body to which an employer may appeal a ruling stripping its eligibility as a qualifying employer, leaving employers with no recourse in the event of an erroneous or incorrect determination.

The proposed rule would wrap PSLF in a fog of unpredictability. The program depends on workers having enough faith to complete 120 months—10 years if completed without interruption—of relatively low-paid public service before applying for loan forgiveness. If that faith is shaken, the program itself is at risk. If the public does not have faith in PSLF, civil legal service employers will struggle to find and keep employees, more Americans will

---

[1] https://www.americanbar.org/advocacy/governmental_legislative_work/priorities_policy/legaleducation/pslf-homepage/pslf-overview-and-purpose/



go without legal help when they need it, and the words "justice for all" will ring hollow every time we recite the pledge of allegiance.

Due to the unpredictability the proposed rule would create, the due process concerns, the potential for tremendous negative impact on the ability of nonprofits and governmental entities to attract and retain employees, and the threat to our shared value of justice for all, NAIP urges the Department to withdraw the proposed rule.

Thank you for considering this comment on the proposed rule.

Sincerely,

William Penn
President

Deborah Seltzer
Executive Director

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

To Whom It May Concern:

My name is Laura Riley and I am a member of the ABA Commission on Homelessness and Poverty, an academic administrator, former law professor and longtime public interest lawyer working in California. As an educator dedicated to advancing access to justice, and as a mentor to dozens of law students committed to public service careers, I have seen firsthand the essential role that the PSLF program plays in allowing talented attorneys to serve low-income and underserved communities.

PSLF has been instrumental in making it possible for law graduates—including many from rural and high-need regions—to pursue careers in legal aid, public defense, and nonprofit advocacy. Many current and former students accepted vital positions precisely because the promise of PSLF made such career paths financially viable. Our legal community depends on PSLF both to attract highly qualified attorneys and to retain experienced staff who otherwise could not afford to remain in public service roles.

I am deeply concerned that the proposed rule threatens to disqualify organizations from PSLF eligibility based on ambiguous standards regarding "substantial illegal purpose," rather than the current, clear criteria of nonprofit or government status. Introducing these new exclusions could create significant uncertainty for borrowers and employers alike, deterring graduates from entering public service and worsening existing justice gaps in already underserved communities. If institutions providing critical legal services lose PSLF eligibility, it will undoubtedly undermine our ability to recruit and retain dedicated law students and attorneys—and ultimately harm access to justice for our most vulnerable populations.

I respectfully urge the Department to withdraw or substantially revise the proposed rule to ensure the clarity, accessibility, and effectiveness of PSLF. Protecting PSLF's integrity by maintaining simple, reliable eligibility is essential to supporting the next generation of public service lawyers and to fulfilling the program's original Congressional intent.

Give Feedback

Thank you for considering this perspective. Please protect the future of public service by preserving PSLF eligibility for those serving the public good.

Sincerely,
Laura Riley

**Comment ID**

ED-2025-OPE-0016-10123

**Tracking Number**

mfm-voy9-8bc4

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Give Feedback

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached.

Attachments 1

PSLF comment letter 9_16

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10124/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10124

**Tracking Number**

mfm-vp5u-s34q

Give Feedback

**Comment Details** **Submitter Info**

10/10/25, 2:14 PM Regulations.gov

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10124 2/2

ED_00187

Amanda Prasuhn
Director of Public Interest Financial Support
UC Berkeley School of Law
Berkeley, CA 94720

September 16, 2025

Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Director Abernathy,

Thank you for the opportunity to comment on the Department of Education's (ED) notice of proposed rulemaking (NPRM) to amend the Public Service Loan Forgiveness (PSLF) regulations under 34 CFR Part 685. My name is Amanda Prasuhn and I'm the Director of Public Interest Financial Support at the University of California, Berkeley, School of Law. I manage Berkeley Law's Loan Repayment Assistance Program (LRAP), which provides law graduates working in public service with counseling on PSLF and funding for their Income-Driven Repayment (IDR) payments. Over the past seven years, I've counseled and educated over a thousand students who are pursuing PSLF and helped them navigate challenges with applications, payment counts, and changing policies. I am also a licensed attorney in California and a project and policy analyst. I'm submitting this comment in my individual capacity.

The Public Service Loan Forgiveness program has been a vital tool in supporting access to higher education and assisting public service workers. Given rising college costs, students have had to rely on increased loan borrowing. But with high interest rates and ballooning interest growth under the most affordable repayment plans, paying off a loan oftentimes becomes a sisyphean task. PSLF provides borrowers with a viable strategy for getting out of loan debt. In return, borrowers provide ten years of work serving the public in jobs like teaching, legal aid, civil service, and nursing.

The proposed changes to PSLF described in the NPRM are contrary to law and to the promise of PSLF. The Higher Education Act's (HEA) broad definition of "public service" means the program is inclusive, flexible, and reliable. After years of ED working to clarify the PSLF requirements, borrowers are now familiar with what qualifies: *any* 501(c)(3) nonprofit and *any* government job. The NPRM goes against the HEA's language and statutory authority, will create new confusion for borrowers, and will kick deserving public service workers out of the program. The impetus of the rule is unclear and unfounded; to my knowledge, there is not a swath of organizations doing "illegal activities" that are somehow allowed to keep operating and reaping the benefits of PSLF. ED should withdraw the proposed rule and continue working to fulfill the promise of PSLF.

**A. The NPRM is contrary to the Higher Education Act**

ED's proposed regulations are in clear violation of the law. The Higher Education Act of 1965 defines a qualifying public service job as one in government or a 501(c)(3) nonprofit, among others. (20 US Code § 1087e(m)(3)(B)(i).) The plain language of the statute grants ED no authority or discretion to carve out certain public service jobs based on the work of the organization; a feature of the program is that a borrower's job duties or an organization's practice area aren't a factor in determining whether that organization qualifies for PSLF. It is the type of employer that matters, not what the employer does. By their nature, all government agencies and offices and all 501(c)(3) nonprofits are "public service" employers. If these organizations no longer performed public service functions, they would no longer be registered or accredited by other regulatory bodies like the Internal Revenue Service (IRS).

In fact, the IRS has existing procedures–and the statutory authority–to revoke tax-exempt status from public service nonprofit organizations, with a robust findings, appeal, representation, and reinstatement process. (INTERNAL REVENUE SERV., IRS Publication 892, HOW TO APPEAL AN IRS DETERMINATION ON TAX-EXEMPT STATUS (Feb. 2017).) ED's proposed procedure for making these determinations lacks similar authority, clarity, and due process. (*See, e.g.*, 90 FR 40164.)

**B. The NPRM is an unlawful and arbitrary agency action**

ED's proposed changes to the PSLF regulations are also arbitrary and capricious under the Administrative Procedure Act. (*See* 5 US Code § 706(2).) ED lacks the discretion to make determinations about illegality or the classification of organizations under the tax

code. This function is not a part of ED's duties, and the HEA does not grant ED the authority to pick and choose which specific organizations don't meet the broad "public service" standard. The NPRM is an abuse of discretion and in excess of statutory authority.

ED's discretion to "modify" regulations under the Higher Education Act allows the Secretary to "make modest adjustments and additions to existing provisions, not transform them." (*Biden v. Nebraska*, 143 S.Ct. 2355 (2023).) Giving itself the broad authority to disqualify organizations that have qualified for PSLF since the program's inception–thereby rescinding access to forgiveness for up to hundreds of thousands of employees–is not a modest adjustment to the program. (*See* 90 FR 40171.)

Furthermore, ED presents no substantial evidence that it is "diver[ting] federal benefits to organizations engaged in illegal conduct." (*See* 90 FR 40155.) Nor does it explain how it came to hone in on the specified "illegal activities," and not, for instance, violations of environmental, copyright, or controlled substance laws. It's clear that ED's focus on the named "illegal activities" is political and not based in evidence, and therefore, arbitrary and capricious.

ED also fails to explain how it has determined that certain industries, such as "legal services, governance, social work, healthcare, K-12 education, and higher education" are more likely to be susceptible under the new rules. These are areas with a significant number of employees seeking PSLF, but so are the "religious," "military," and "law enforcement" subsectors. (*See* 90 FR 40171.) ED "assume[s] that Federal agencies will comply with the law," but doesn't extend the same courtesy to state and local governments and legal service organizations, who are also bound to uphold and execute the law. (*See* 90 FR 40170.) Again, ED fails to provide substantial evidence that the activities and organizations it seeks to target are specifically a problem.

**C. The NPRM is administratively infeasible**

It is well documented that ED has trouble administering PSLF and its other student loan programs in a timely or efficient manner. In its September status report in the *American Federation of Teachers v. US Department of Education* case, ED reported 1,076,266 outstanding IDR applications and 74,510 outstanding PSLF buyback applications. From ED's PSLF Application Data (last updated July 31, 2025), ED has 32,900 pending PSLF applications "undergoing employer eligibility assessment" and 3,000 pending applications for which

they are "assessing qualifying payment counts." One can only imagine processing times will slow as a result of the Administration's reduction-in-force order.

Adding new procedures for evaluating organizations' activities and disqualifying them from PSLF is administratively burdensome in this environment and will bring already-slow PSLF processing and forgiveness to a trickle. Even when fully staffed, ED has historically had trouble implementing new procedures. (*See, e.g.*, GOA, *Botched FAFSA Rollout Leaves Uncertainty for Students Seeking Financial Aid for College*, September 24, 2024.)

In my role working with borrowers and employers, I've seen repeated issues with PSLF processing times. Even when an employer is automatically certified via the PSLF Help Tool and a borrower has diligently updated their information yearly, finalizing qualifying payments and obtaining discharges can take months. To reduce inefficiencies, ED should automate *more* of its processes (like retrieving data from government employer records and shoring up a consistent list of qualifying employers recognized by the Help Tool), not introduce a new procedure that will require more time, money, and staffing.

I also foresee feasibility issues with regard to the blanket EIN issues ED addresses in the NPRM. When a swath of individual employers are covered under one EIN (for instance, a city government or a university system), ED gives itself the authority to separate distinct entities for the purpose of determining PSLF eligibility. However, it provides no explanation or procedures for undergoing such a process. It's likely that making these determinations will take even *more* time, especially when the organizations under review employ thousands of workers. ED's claims that the proposed regulations will "improve its efficiency" and "reduc[e] borrower confusion" are not based in reality and contrary to its history. (*See* 90 FR 40167, 40169.)

**D. The NPRM will have a negative impact on borrowers**

With rising student debt, more and more borrowers are relying on PSLF to manage their growing balances. In exchange for working at a public service organization, full-time, for 10 years, while making student loan payments, borrowers are promised forgiveness. During this time, many borrowers see their debt grow because of unpaid interest not covered by smaller income-driven payments. As each year ticks on and balances grow, borrowers become more reliant on PSLF.

The proposed regulations will have–and are already having–a negative impact on borrower school and career choice. In my role, I have held over 200 individual appointments with prospective, current, and graduated law students since the March Executive Order. Nearly every student has questions and concerns about the future of PSLF.

Prospective students feel they must attend a school that offers substantial gift aid, even if other schools offer better employment or licensing outcomes. Prospective students once committed to public interest careers are considering other options in light of PSLF insecurity.

Current students are already turning away from public service in search of private sector jobs that could help them pay off their loans faster. Students who were once dedicated to public service are interviewing with law firms. Students who continue to be dedicated to public service are in extreme emotional distress; more than one student has left an advising appointment crying about the uncertainty and the prospect that they may not be able to pursue the career they've trained and hoped for.

Graduates already in repayment are nervous their employer could be politically targeted and are job hunting elsewhere. Some of these borrowers are 9 years into PSLF, nearing forgiveness, afraid that an employer once deemed eligible will suddenly be targeted by ED, pulling the rug out from under them and forcing them to find a new employer in the final hour (or otherwise wait another 10 years for reinstatement).

Instead of making PSLF more efficient and accessible, the proposed regulations are having a chilling effect. If implemented, the regulations will further stifle career choice and reduce the number of borrowers who feel comfortable entering the public sector and relying on PSLF.

**E. The NPRM will have a negative impact on employers**

Public service employers, including the federal government, rely on PSLF as a recruiting tool. With generally lower salaries than private sector jobs, PSLF is a key selling point to get educated employees in the door. Under ED's proposed changes, public service organizations will no longer be able to definitively know whether they'll continue being classified as a PSLF-qualifying employer in the future. Additionally, moving from a simple EIN search to confirm employer eligibility to one based on ED's future determinations of

legality and separation of duties makes job searching and recruiting more complicated for both borrowers and employers. And again, the changes will lead to fewer borrowers working in valuable public service careers.

### F. Conclusion

The NPRM is contrary to the plain language and Congressional intent of the Higher Education Act, is arbitrary and not based in fact or law, is administratively infeasible, and will harm borrowers and public service employers. I urge ED to withdraw the rule and focus its resources on efficiently operating the existing program. The proposed regulations will have a drastic effect on the nation's public service workers, and subsequently, will harm the American public as a whole.

Sincerely,

Amanda Prasuhn
Director of Public Interest Financial Support
Berkeley Law

**Additional signatories**

Nasreen Zia, Director of Student Financial Services, University of California, Irvine, School of Law
Jennifer Terrazas, Assistant Director of Student Financial Services, University of California, Irvine, School of Law

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

On behalf of the Middle States Commission on Higher Education, the attached comment is being submitted in response to the United States Department of Education's proposal to amend the regulations on the Public Service Loan Forgiveness program under 34 CFR § 685.219. MSCHE thanks you for the opportunity to provide comment.

Attachments 1

2025-09-16 Public Comment Docket ID ED-2025-OPE-0016

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10130/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10130

**Tracking Number**

mfn-1qs6-s86b

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 16, 2025

James Bergeron, Acting Under Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202
*Via: Public Comment Portal - https://www.regulations.gov/document/ED-2025-OPE-0016-7221*

Dear James:

The Middle States Commission on Higher Education (MSCHE) appreciates the opportunity to provide comment on the United States Department of Education's (Department's) proposal to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR § 685.219, published in the Federal Register via Docket ID ED-2025-OPE-0016 on August 18, 2025. Our agency has also encouraged institutional representatives to submit comment in response to this request through one of our advocacy alerts.

As you are aware, MSCHE is a voluntary, non-governmental institutional accreditor that has been recognized by the United States Secretary of Education since 1952. We currently accredit over 500 institutions. As a member of the regulatory triad, the Commission remains a partner in efforts at strengthening institutional accountability and consumer protection and appreciates this opportunity to comment on this comprehensive regulatory proposal.

As a student-centered accreditor, we support any regulations that ensure efficient processes and integrity as part of the PSLF program for all student loans. The Department has proposed to amend 34 CFR § 685.219, provisions that seek to revise definitions and the process for disqualifying employers under the PSLF program based on a substantial illegal purpose. As public and not-for-profit entities, many of our institutions serve as qualified employers under the PSLF. While the Department is not seeking to change such qualifications, the Department is proposing to define broad circumstances under which institutions can lose their designation as a qualified employer and outlining the steps towards taking such action, triggering due process protections for institutions. Given that due process is a right afforded to all institutions under statutory law and its implementing regulatory provisions, it is critical that the regulations are fair, sufficiently detailed, and clear. As an institutional accreditor, we are required to ensure that institutions meet all legal and regulatory requirements, and we assist the triad in ensuring that. However, we also advocate for our institutions to meet any requirements without administrative or financial burdens so duplicative or onerous that they too significantly impact the ability to operate or fail to serve the students that all of us are here to support. Lack of fairness, specificity, and clarity will lead to appeals, challenges, and litigation, which do not serve to benefit anyone in this process.

We appreciate the opportunities to collaborate with the Department to ensure quality assurance, protection, and accountability for the benefits of all students, and the ability to provide comment on the PSLF regulations.

Please contact me if I can provide any further information.

Sincerely,

Heather F. Perfetti, J.D., Ed.D.
President

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

FINAL TNPA public comment on PSLF (September 2025)

Download

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10141

**Tracking Number**

mfn-278j-ot8p

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

The Nonprofit Alliance
Washington, DC 20004

September 16, 2025

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

The Nonprofit Alliance appreciates the opportunity to offer comments to inform the rulemaking regarding Public Service Loan Forgiveness (PSLF), specifically amending the regulations "*to exclude employers that engage in activities that have a substantial illegal purpose*" contrary to the PSLF enabling statute.

The Nonprofit Alliance (TNPA) is a unifying voice to promote, protect, and strengthen the nonprofit sector. Our membership includes more than 200 nonprofit organizations and 150 firms that work alongside nonprofits toward a shared purpose of public engagement and mission impact. On behalf of TNPA members and the broader charitable sector, we strongly oppose restricting or revoking eligibility for nonprofit organizations addressing issues that are not aligned with the Administration's policy priorities.

In 2007, Congress recognized the importance of recruiting and retaining highly qualified public service professionals when it enacted PSLF with bipartisan support during the George W. Bush Administration. Public Service Loan Forgiveness is a critical investment in our nation's public service workforce. The statute provides qualified eligibility to all 501(c)(3) charitable organizations. The nonprofit sector employs approximately 12.3 million Americans and contributes significantly to the national economy. The sector retains strong trust from Americans that would be undermined by this proposed rule. A Q4 2024 survey conducted by The Nonprofit Alliance found 69% of Americans trust (completely, moderately, or somewhat) nonprofits to operate effectively and act in the best interests of all stakeholders, including customers, donors, and community members.

The PSLF program represents a vital recruitment and retention tool for nonprofit organizations that typically cannot match private sector salaries. By promising loan forgiveness after 10 years of service and 120 qualifying payments, PSLF enables mission-driven professionals to pursue careers in the nonprofit sector despite carrying significant student debt.

The proposed rulemaking, if implemented, could shift greater burden to government agencies as nonprofits lose capacity and trigger a workforce crisis in the nonprofit sector. Moreover, it will curtail nonprofit employment in the future, with far-reaching negative consequences for communities nationwide that depend on nonprofit services for education, disaster response, healthcare, social services, and cultural enrichment.

One particular concern in the proposed amendments is language included around illegal discrimination, which raises significant questions of how that category may be defined and implemented. Secondly, some of the additional administrative responsibilities described could

make challenges more onerous for nonprofit organizations regarding decisions made on disqualifications for illegal discrimination or other categories.

The effectiveness of the PSLF program would be severely undermined if each new administration were permitted to alter its parameters. Many dedicated professionals have made significant career decisions based on the consistent application of this law, often accepting lower compensation offered by nonprofit sector employers with the understanding that their public service commitment would eventually be recognized through loan forgiveness. Subjecting PSLF to administrative reinterpretation creates uncertainty for these individuals and the organizations that employ them.

A nonprofit's bedrock strength lies in its ability to address community needs independent of political pressures. A reasonable and equitable approach is to preserve the current policy in which all 501(c)(3) organizations operating in compliance with established law remain eligible for participation. Creating categories of favored and disfavored charities based on shifting political priorities contradicts the program's fundamental purpose of broadly supporting public service.

On behalf of our members and in solidarity with other nonprofit and philanthropic stakeholders, The Nonprofit Alliance strongly urges the Department of Education to immediately withdraw the proposed rule in its entirety. At the same time, The Nonprofit Alliance is eager to discuss how the Administration can instead support nonprofits and their essential services by continuing to attract and retain an effective, skilled workforce.

If you have questions or need additional information, please contact Ann Hollingsworth, Vice President, Government Affairs of The Nonprofit Alliance at: ahollingsworth@tnpa.org.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Dance_NYC Public Comment -- DOE Proposed Rule Change to the PSLF

Download

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10142

**Tracking Number**

mfn-286g-omj8

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Melinda Wang
New York, NY
Dance/NYC
mwang@dance.nyc

Re: William D. Ford Federal Direct Loan Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016)

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. I am submitting this on behalf of Dance/NYC (Dance.NYC), a service organization that reaches over 6,000 individual dance artists, 1,700 dance entities, and the many for-profit dance businesses based in the metropolitan New York City area. Through its action-oriented research and advocacy, we seek to represent and advance the interests of the dance field.

Our *State of NYC Dance 2023* report found that 57% of dance organizations are 501(c)(3) nonprofits.[1] For these organizations, the Public Student Loan Forgiveness Program (PSLF) is a vital resource. The majority of the dance sector lives in financial precarity, with 56% of dance organizations having no savings and the average dance worker earning 15% below the NYC living wage. The PSLF is well-utilized at many of these organizations, including our own. It gives these cash-strapped workers some financial relief and allows them to continue their important work in the nonprofit dance sector.

With the added support that the PSLF provides, nonprofit dance workers are able to produce excellent programming that enriches our cultural landscape, contributes to

[1] State of NYC Dance 2023: Findings from the Dance Industry Census. https://hub.dance.nyc/wp-content/uploads/2023/12/State-of-NYC-Dance-2023-Report-FINAL-23_12_11_ACC.pdf

civic life, and advances education. 65% of dance organizations program in public space and 83% offer education-based programming, engaging audiences across parks, concert venues, houses of worship, and schools to engage in artistic expression and cultural dialogue.

The restrictions to the PSLF in the proposed rule change threaten the sustainability of this work. By allowing the Department of Education to include or exclude individual organizations at discretion without adequate due process, it undermines public trust in the PSLF. Recent graduates and professionals will not be able to rely on the program to make decisions on their career path, decreasing the amount of low- and middle-income students entering a career in dance and the arts. Nonprofit dance workers who have invested years into their organizations with the safety net of the PSLF will find themselves suddenly unsure if they will be able to sustain their careers in the arts. For already financially disadvantaged workers, changes to the PSLF threaten long-term security.

Moreover, the proposed changes present serious freedom of expression and First Amendment rights concerns for the dance field. Dance organizations may be fearful to produce programming that showcases immigrant experiences, fearful that it may be construed as “aiding or abetting violations of federal immigration law.” They may be fearful to hire LGBTQ+ dancers or produce educational programming in schools that have transgender students. Workers may choose not to work in organizations that serve marginalized communities and diverse neighborhoods, fearful that their federal loan support could be revoked. Organizations and workers must be allowed the freedom to produce diverse, creative, and relevant programming without fearing retaliation for their speech choices.

Our organization strongly opposes this rule change. There is already a process by which the IRS can remove 501(c)(3) status from organizations engaging in illegal activities. The rule change is redundant at best and discriminatory at worst, threatening the sustainability and artistic freedom of the nonprofit dance sector.

Thank you for considering this input as part of the rulemaking process. We hope you continue to support the needs of nonprofit dance workers and students seeking to enter the field.

Sincerely,
Melinda Wang
Research and Advocacy Manager
Dance/NYC

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached

Attachments 1

PLSF CAIR-NY Comment FINAL

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10144/attachment_1.pdf)

Give Feedback

**Comment ID**
ED-2025-OPE-0016-10144

**Tracking Number**
mfn-2d7m-1el5

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Council on American-Islamic Relations, New York
233 Broadway, 8th Floor
New York, New York 10279
www.cair-ny.org | legal@ny.cair.com | (646) 665-7599

**PUBLIC COMMENT**

September 16, 2025

**RE: Public Comment on Proposed Rule Concerning Public Service Loan Forgiveness (PSLF)**

To Whom It May Concern:

The Council on American-Islamic Relations, New York (CAIR-NY), strongly opposes the Department of Education's proposed amendments to the Public Service Loan Forgiveness (PSLF) program, particularly the provision disqualifying nonprofit employers deemed to have a "substantial purpose" that is "illegal."[1] This standard is dangerously vague, invites politicized enforcement, and poses a direct threat to core constitutional protections; including freedom of speech, association, and religion.

CAIR-NY is one of the busiest and most active chapters of the nation's largest Muslim civil rights and advocacy organization. For more than two decades, our mission has been to defend civil liberties, protect religious freedom, and combat discrimination through litigation, public education, and community empowerment. We serve nearly one million Muslims in the New York area, many of whom are recent immigrants, low-income, or face overlapping barriers to justice.

**Importance of PSLF for Civil Rights and Public Interest Work**

Like countless other nonprofits and government jobs, we depend on PSLF to recruit and retain highly skilled attorneys and professionals committed to public service.[2] Our attorneys forgo private-sector opportunities to instead represent victims of workplace discrimination, Islamophobic violence, housing injustice, and unconstitutional surveillance. Law school debt,

---

[1] *See "Restoring Public Service Loan Forgiveness." The White House, March 8, 2025. https://www.whitehouse.gov/presidential-actions/2025/03/restoring-public-service-loan-forgiveness/.* (Stating that, "the Secretary of Education shall propose revisions to 34 C.F.R. 685.219, Public Service Loan Forgiveness Program, in coordination with the Secretary of the Treasury as appropriate, that ensure the definition of "public service" excludes organizations that engage in activities that have a substantial illegal purpose").

[2] See *Public Service Loan Forgiveness and the Justice System,* available at https://www.nlada.org/pslf-and-justice ("Survey responses from borrowers currently working toward earning forgiveness, and from top executives at legal aid and public defender programs, suggest that PSLF has expanded access to justice by improving both the quality and availability of legal representation for low-income Americans").

which often exceeds $150,000, would make such work inaccessible without the promise of PSLF. Given nonprofit salaries in New York City that average between $60,000 to $80,000, PSLF is a lifeline not only for staff, but for the communities they serve.

**The Proposed Rule's Vague and Overbroad Standard**

The proposed rule grants the Secretary of Education broad authority to disqualify nonprofit organizations from PSLF eligibility if they are found to have a "substantial purpose or function" that is "illegal under Federal law." However, the regulation fails to provide a clear or objective process for making such determinations. According to the proposed 34 C.F.R. § 685.219(b)(1)(iv), the Secretary may consider "credible evidence" from any source, including criminal convictions, civil judgments, or government findings. Yet, the rule does not specify what constitutes a "substantial" purpose, establish a threshold for disqualification (e.g., percentage of budget, staff, or programming devoted to allegedly unlawful activity), or clarify how evidence will be weighed. Moreover, there is no formal mechanism for organizations to be notified in advance, to contest the determination, or to appeal a PSLF exclusion. This lack of procedural safeguards, including absence of notice-and-comment for individual determinations, evidentiary standards, or an administrative hearing process, raises serious concerns about due process, arbitrariness, and the risk of politicized enforcement.[3]

These procedural ambiguities violate basic principles of administrative law and create an unworkable compliance burden for both borrowers and nonprofit employers. Moreover, this framework would allow the executive branch, now or in the future, to characterize legitimate dissent, advocacy, or litigation as "illegal." In the past, we have witnessed how civil rights

[3] *See* 89 Fed. Reg. 43810, 43845 (May 17, 2024) (to be codified at 34 C.F.R. § 685.219).

organizations, including CAIR,[4] the NAACP,[5] Planned Parenthood,[6] and others[7] have been smeared by political opponents or targeted by government surveillance. Under the proposed rule, nonprofits challenging discriminatory policies, defending the rights of immigrants, or supporting social movements could be excluded from PSLF simply because their work is politically disfavored by the administration in power.

**Threat to Constitutional Rights and Civil Society**

This rule has the potential to chill constitutionally protected activity and further politicize the PSLF program. Public interest organizations, especially those engaged in impact litigation, protest rights, or policy reform, must be free to challenge injustice without risking financial punishment for their employees. CAIR-NY staff frequently represent clients whose legal claims push against the boundaries of current precedent. But the evolution of civil rights law depends on exactly this kind of advocacy. If the Department deems such efforts as aligned with an "illegal" purpose, PSLF would become an arbitrary and politicized cover to unleash increased government regulation and scrutiny impacting public and private institutions. It would also create more bureaucratic waste, usurping tax dollars on investigations of illegal activity legitimately examined elsewhere.

---

[4] *See Algemeiner, The. "US Sen. Tom Cotton Pushes IRS to Review CAIR's Nonprofit Status, Citing Ties to Terrorist Groups." Algemeiner.com. Accessed September 12, 2025. https://www.algemeiner.com/2025/08/06/us-sen-tom-cotton-pushes-irs-review-cairs-nonprofit-status-citing-ties-terrorist-groups/.* (Citing one example of US Sen. Tom Cotton (R-AR) urging the Internal Revenue Service (IRS) to launch an investigation into the Council on American-Islamic Relations (CAIR).

[5] *See* Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans (Book II), S. Rep. No. 94-755, at 4-5 (1976) (Church Committee Book111) *(*stating the NAACP was investigated for more than twenty-five years because it might have "had connections with" the Communists Party-despite the fact that nothing was ever found to rebut a report from the very first year of the investigation that the NAACP had a "strong tendency" to "steer clear of Communist activities").

[6] Carter Sherman, *Trump can block Medicaid funds to 'defund' Planned Parenthood, court rules.* The Guardian (Sept. 12, 2025), available at https://www.theguardian.com/us-news/2025/sep/12/planned-parenthood-medicaid-trump#:~:text=It%20is%20already%20illegal%20to,should%20be%20able%20to%20do.%E2%80%9D

[7] *See* Jason Wingard, *A Quiet War is Targeting America's Nonprofits—Most Don't See It Coming*, Forbes (July 24, 2025) available at https://www.forbes.com/sites/jasonwingard/2025/07/24/a-quiet-war-is-targeting-americas-nonprofits-most-dont-see-it-coming/; Erica Bryant, *Trump's War on Nonprofits Will Makke Us All Less Safe*, Vera Institute for Justice (June 10, 2025), available at https://www.vera.org/news/trumps-war-on-nonprofits-will-make-us-all-less-safe; Randi Weingarten and Amy Spitalnick, *By Targeting NGOs, Trump and His Allies Take Aim at Civil Society | Opinion*, Newsweek (June 9, 2025) available at https://www.newsweek.com/targeting-ngos-trump-his-allies-take-aim-civil-society-opinion-2082127

**Request**

      The Department of Education should not wield PSLF eligibility as a weapon to silence dissent or shape which causes are deemed acceptable for public service. Civil rights groups, including CAIR-NY, provide essential legal and advocacy services to some of the most vulnerable communities in the United States. Our work is lawful, constitutionally protected, and deeply aligned with the core goals of the PSLF program. We urge the Department to withdraw the proposed rule in its entirety. At minimum, the Department must eliminate the vague and harmful "illegal purpose" standard and adopt clear, viewpoint-neutral criteria for nonprofit PSLF eligibility. Anything less threatens to undermine both the integrity of the PSLF program and the democratic values it was created to support.

Respectfully submitted,

*/s/ Afaf Nasher*
Afaf Nasher, Executive Director
Council on American-Islamic Relations, New York (CAIR-NY)

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s). Thank you for your consideration.

Attachments 1

FDL Proposed Rulemaking - Youth Alliance

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10148/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10148

**Tracking Number**

mfn-3869-8gpp

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 16, 2025

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]**

ENGAGE • GROW • LEAD • TRANSFORM

Dear Ms. Abernathy,

Thank you for the opportunity to submit public comments on the U.S. Department of Education's Notice of Proposed Rulemaking to amend the Public Service Loan Forgiveness (PSLF) Program under 34 CFR 685.219.

My name is Diane Ortiz, and I am the Chief Executive Officer at Youth Alliance, a nonprofit organization based in Hollister, California. Youth Alliance provides critical youth development, education, and mental health services to underserved children and families in our rural region. Our organization employs approximately 200 dedicated staff members, many of whom are passionate public servants who have chosen nonprofit work over more lucrative private-sector opportunities — in large part because of programs like PSLF that help make their service sustainable.

**PSLF Supports Our Mission and Workforce**

The PSLF program has been a key support system for our organization. It allows us to recruit and retain highly qualified, mission-driven professionals — such as youth counselors, social workers, and mental health specialists — who otherwise might not be able to afford to work in the nonprofit sector while repaying their student loans. These staff members are the backbone of our services, working directly with vulnerable youth who would otherwise have little access to mentorship, intervention, and support.

In a rural area like the Central Coast, where resources are limited and social services are scarce, every single Youth Alliance employee plays a vital role. PSLF makes it possible for them to commit to long-term careers in public service. Without it, our staff turnover would increase, program continuity would suffer, and ultimately, the children and families we serve would lose access to trusted, life-changing support.

**Opposition to Exclusion Based on "Substantial Illegal Purpose"**

We are deeply concerned about the proposed change that would exclude employers from PSLF eligibility if they are deemed to have a "substantial illegal purpose." While we agree that organizations operating outside the bounds of the law should not benefit from federal programs, this language is **vague, subjective, and prone to overreach.** It introduces

ADMINISTRATIVE OFFICE
310 4TH STREET, SUITE 101
HOLLISTER, CA 95023
(831) 636.2853

GILROY OFFICE
7598 MONTEREY ROAD, SUITE 150
GILROY, CA 95023
(831) 636.2853

MAILING ADDRESS
P.O. BOX 1291
HOLLISTER, CA 95024

Youthall.org
youth4alliance youthall
youthallmedia youth4alliance youth-alliance



unnecessary ambiguity into eligibility criteria, which may disqualify well-meaning nonprofit organizations due to misinterpretations or isolated incidents unrelated to their primary mission. This change could also lead to **unintended consequences**, such as discouraging nonprofit innovation or advocacy efforts in areas like youth justice reform, immigration, or reproductive rights, fields where political or legal challenges often arise despite an organization's commitment to legality and public service.

**Recommendation: Clarify or Remove Vague Language**

We urge the Department to **remove or significantly clarify** the proposed "substantial illegal purpose" clause to ensure that legitimate nonprofit employers are not unjustly excluded from the PSLF program. The Department should instead focus on clear, objective eligibility criteria that do not punish employees for their employer's perceived status or activity — especially when those employees are faithfully serving the public and meeting all PSLF requirements.

**Additional Recommendations**

- **Streamline PSLF Application and Verification Process**
  Simplify and automate employment verification and payment tracking to reduce administrative burdens for nonprofits and their staff.
- **Create PSLF Flexibility for Small Nonprofits**
  Establish a "small nonprofit exemption" that offers technical assistance or simplified compliance for nonprofits with fewer than 500 employees.

**Final Thoughts**

PSLF is not a handout — it is a promise made to those who dedicate their careers to serving the public good. For Youth Alliance and our small-town community, PSLF is a lifeline that keeps highly trained professionals in roles that protect, heal, and uplift vulnerable children. We ask the Department to preserve this vital program and reconsider changes that would narrow access and add confusion to eligibility.

Thank you again for the opportunity to comment.

Sincerely,

Diane Ortiz, CEO

ENGAGE • GROW • LEAD • TRANSFORM

ADMINISTRATIVE OFFICE
310 4TH STREET, SUITE 101
HOLLISTER, CA 95023
(831) 636.2853

GILROY OFFICE
7598 MONTEREY ROAD, SUITE 150
GILROY, CA 95023
(831) 636.2853

MAILING ADDRESS
P.O. BOX 1291
HOLLISTER, CA 95024

Youthall.org
youth4alliance youthall
youthallmedia youth4alliance youth-alliance

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

CAA Public Comment_Re_ PSLF changes (1)

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10153/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10153

**Tracking Number**

mfn-3v5f-fuwd

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

CAA 華人權益促進會 CHINESE FOR AFFIRMATIVE ACTION

September 16, 2025

U.S. Department of Education
Attention: Office of Postsecondary Education
400 Maryland Ave. SW,
Washington, DC 20202

Submitted via Regulations.gov

**Re: Comment from Chinese for Affirmative Action on the Notice of Proposed Rulemaking "William D. Ford Federal Direct Loan (Direct Loan) Program" 34 CFR Part 685 [Docket ID ED-2025-OPE-0016] RIN 1801-AA28**

To US Department of Education:

Chinese for Affirmative Action (CAA) is a civil rights organization founded in 1969 that advocates for systemic change to advance equity, justice, and self-determination for Asian American and Pacific Islander (AAPI) communities. We appreciate the opportunity to provide comments on the proposed rule to amend the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219

Loan forgiveness is a critical issue for AAPI communities, many of whom face unique barriers to economic mobility including language access, immigration status, and racial discrimination. PSLF has helped tremendously in addressing these inequities, reducing the burden of student debt for those who dedicate their careers to serving the public, including in education, health care, and community-based nonprofits.

Recent research underscores the urgent need for loan forgiveness in AAPI communities.

- 63% of AAPI adults are **concerned about rising student loan debt** and its impact on intergenerational progress.[1]
- Asian, Native Hawaiian, and Pacific Islander students face **significantly higher unmet financial need** compared to white students.[2]
- At public four-year universities, low-income Asian American students face unmet need **$4,000 greater than the average low-income student**. [3]
- **90% of Native Hawaiian and Pacific Islander bachelor's degree earners borrow** to pay for college – well above the national average of 69%.[4]

[1] AP-NORC and AAPI Data (2025). *AAPI adults are concerned about changes to college landscape and intergenerational progress*.
[2] Institute for Higher Education Policy (2023). *College Affordability Still Out of Reach for Students with Lowest Incomes, Students of Color*.
[3] CLASP (2018). *When Financial Aid Falls Short*.
[4] U.S. Department of Education (2023). *National Postsecondary Student Aid Study (NPSAS:20)*.

These financial pressures do not end at graduation. Many AAPI borrowers go on to work in community-based nonprofits that serve immigrant, refugee, and low-income populations. These organizations are themselves deeply under-resourced, with AAPI-serving nonprofits receiving less than 0.2% of foundation philanthropic giving despite AAPIs making up 7% of the U.S. population.[5] These funding disparities make PSLF an essential tool for recruiting and retaining staff in our day-to-day operations.

We are concerned about the proposed language that would exclude nonprofit organizations who “engage in activities that have a substantial illegal purpose.” This phrasing is vague and subjective, and risks being misapplied in ways that could disproportionately harm marginalized communities by undermining organizations that fill important gaps in public service.

Respectfully, we urge the Department to withdraw the rule to amend PSLF. PSLF eligibility should not be narrowed or used to penalize advocacy or civil rights work. Thank you for considering our comments.

Sincerely,
Chinese for Affirmative Action

[5] AAPIP (2021). Seeking to Soar: Foundation Funding for Asian American and Pacific Islander Communities.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached PDF file

Attachments 1

Stanford Sierra Youth and Families PSLF Comment Letter

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10156/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10156

**Tracking Number**

mfn-43bk-vb4q

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Stanford Sierra Youth & Families

**Agency Contact Info:**
Laura Heintz
Sacramento, CA
Stanford Sierra Youth & Families
lheintz@ssyaf.org

September 5, 2025

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]**

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I serve as the CEO of Stanford Sierra Youth & Families (SSYAF), a nonprofit that has supported youth and families across California for 125 years. Founded in 1900, SSYAF has grown from a home for vulnerable youth into a leading provider of trauma-informed, community-based care. In the last fiscal year alone, we served 7,087 youth and families through foster care and adoption, behavioral health, substance use recovery, juvenile justice intervention, mentoring, and family preservation. Our mission is to empower youth and families to thrive at home, in school, and in the community.

The Public Service Loan Forgiveness Program has enabled SSYAF to recruit and retain skilled, passionate staff essential to delivering these services. Many of our employees have chosen nonprofit work over higher-paying opportunities because PSLF makes their career path sustainable. A large percentage of our staff have pursued higher education to better serve children and families, and with that commitment often comes student loan debt. Based on our internal review, 171 employees, which is two-thirds of our workforce, are in roles where higher education and student debt are most prevalent, making them directly impacted by changes to PSLF. PSLF is critical in making nonprofit careers financially viable and ensuring we can sustain a skilled, mission-driven workforce.

**We strongly oppose the proposed rule and the restrictions it would impose on which employers qualify for PSLF.** Limiting eligibility would unlawfully exclude charitable nonprofits, politicize the program, and destabilize professionals who rely on PSLF for career decisions. For SSYAF, this change would undermine our ability to attract and retain qualified staff who provide life-changing services. Ultimately, the proposed rule would harm not only nonprofit professionals but also the thousands of people and communities who depend on our programs.

We urge the Department to withdraw this proposed rule and uphold the current PSLF eligibility standards that include all charitable nonprofits, as intended by Congress. Thank you for considering this input as part of the rulemaking process.

Sincerely,

Laura Heintz

Laura Heintz
Chief Executive Officer

Administrative Office – 8912 Volunteer Lane, Sacramento, CA 95826 • (916) 344-0199 TFF 711 • SSYAF.ORG
Office Locations – Citrus Heights • Grass Valley • Napa • Placerville • Sacramento • Woodland

ED_00222

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

We appreciate the opportunity to comment on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

As President of our Greater Richmond American Association of University Women, I am representing the views of our membership and the board of the GRAAUW. We are celebrating over one hundred years of serving our community in a number of ways. We offer college scholarships to deserving young persons as well as work with other community organizations and schools to provide services to women and girls. Many of our members have had careers in service to the community and to local schools. We are an affiliate of our national organization, AAUW, whose employees benefit from PSLF. The ability of our employees to meet their daily expenses would be greatly impacted if they should lose their PSLF status, which in turn, would affect the quality of the support and leadership that we receive from our national organization.

We find the proposed change to include giving the Secretary of Education the authority to decide whether a 501(c)(3) organization is eligible as a qualified employer is contrary to the statute that authorizes PSLF and further injects political judgement into a non-partisan issue. This change would open the door to fluctuation of criteria and points of view and could change every four years under a new administration. Imagine when the opposing party wins the election and they change which 501(c)(3) organizations qualify for PSLF. There would be no stability for future employees in making their financial calculations. The end result would be the

Give Feedback

negation of PSLF. But then, perhaps, that is the end result that the administration is hoping for, to end PSLF without having to go to Congress to change the statute.

Our democracy is founded upon citizen participation. If we cannot reward and encourage young people to offer their talents to non-profit organizations that serve the citizenry, then we are chipping away at our democracy. Let's encourage contributions to our community and strengthen the ability of non-profits to offer quality employment to folks with the benefit of loan forgiveness. We need our young professionals engaged in our communities! Abandon the rule changes that inject politics into a non-partisan program!

We urge the Department of Education to withdraw the proposed rule and preserve PSLF eligibility for all qualifying nonprofits. Thank you for considering this comment.

Sincerely,

Carol L. Stephens
President of Greater Richmond American Association of University Women

**Comment ID**

ED-2025-OPE-0016-10171

**Tracking Number**

mfm-vetz-9l0s

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 16, 2025

Give Feedback

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

9-17-25 Tzedek DC Final PSLF Comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10179/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10179

**Tracking Number**

mfo-54xl-eihs

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



TZEDEK DC®
Legal Help for People in Debt

September 17, 2025

Tracey St. Pierre,

Director, Office of the Executive Secretariat

Office of the Secretary, U.S. Department of Education

400 Maryland Avenue SW, 5th Floor

Washington, DC 20202

*Submitted via regulations.gov*

**Re: Comments on "William D. Ford Federal Direct Loan (Direct Loan) Program" Notice of Proposed Rulemaking (Docket ED–2025–OPE–0016)**

Tzedek DC appreciates the opportunity to comment on the U.S. Department of Education's proposed changes to Public Service Loan Forgiveness (PSLF) regulations. Tzedek DC is an independent public interest center headquartered at the UDC David A. Clarke School of Law in the District of Columbia. Tzedek DC's mission is to safeguard the legal rights and financial health of DC residents with low incomes dealing with the often-devastating consequences of abusive debt collection practices and other consumer related issues. Our strategic approach combines three programs: (i) free direct services, including legal services for consumer-related issues and financial counseling, including our Medical Debt project, Disabilities Community Project, Returning Citizens Project, and victims of crime (frauds and scams) project; (ii) systemic change through coalition advocacy; and (iii) bilingual community education and outreach on debt collection, identity theft, and credit management, to support low- and moderate-income DC residents.

In line with its mission, Tzedek DC provides support to student loan borrowers. Our work gives us unique insight into the barriers borrowers face when taking advantage of critical financial aid programs, including PSLF participants. Tzedek DC opposes the proposed rule, which exceeds the Department's authority and would harm borrowers and the public interest.

## I. Student Loans in District of Columbia

Student loan debt has become a powerful force shaping the financial lives of millions of Americans. Nationally, federal student loan debt now exceeds $1.6 trillion, spread across more

A Center at the University of the District of Columbia David A. Clarke School of Law
4340 Connecticut Avenue NW, Suite 319 | Washington, DC 20008 | (202) 274-7386 | www.tzedekdc.org
ED_00228



than 42 million borrowers.[1] This mountain of debt comes with real costs: as of April 2025, approximately 5.8 million federal borrowers, or around 31 percent of those with payments due, were 90 days or more delinquent, marking the highest such rate ever recorded.[2] Meanwhile, the restart of repayment have triggered dramatic drops in credit scores.[3]

The situation is especially dire in Washington, D.C., where student borrowers carry the heaviest student loan burden in the country. D.C. leads the nation with an average student loan balance of about $54,800 per borrower, compared to a national average of about $36,200.[4] The consequences of this debt are stark. In D.C.'s majority-Black neighborhoods, already facing educational and economic inequities, rising student loan burdens closely correlate with declining homeownership among young borrowers. Homeownership rates for this group fell from 22.1 percent in 2010 to just 13.7 percent in 2022, a decline attributed in part to mounting student loan strain.[5]

## II. Background of the Program and Proposed Changes

The Public Service Loan Forgiveness program (PSLF) was established by Congress in 2007 through the College Cost Reduction and Access Act, codified at 20 U.S.C. § 1087e(m). The Department of Education regulations implementing the program are found in 34 CFR § 685.219. Federal law provides that individuals who make 120 qualifying payments while employed full time in public service jobs, including positions with government agencies and nonprofit organizations exempt under section 501(c)(3), may have the balance of their federal student loans forgiven. The law was designed to remove financial barriers that discourage highly educated professionals from entering or remaining in lower-paying but critically important public service fields such as teaching, nursing, firefighting, social work, and legal aid. Congress made the list of eligible employers deliberately broad, and the statute does not contain carve-outs among the types of employers listed.

On August 18, 2025, the Department of Education published a Notice of Proposed Rulemaking (NPRM) seeking to alter the regulatory definition of "qualifying employer" for PSLF (34 C.F.R. § 685.219) (90 Fed. Reg. 58822, Aug. 18, 2025). Under the proposed rule, organizations deemed by the Secretary of Education to have a "substantial illegal purpose" would be categorically excluded from PSLF eligibility. The proposed rule allows the Secretary to make such

---

[1] https://educationdata.org/student-loan-debt-statistics

[2] https://www.theguardian.com/money/2025/jun/24/student-loans-delinquency-default

[3] https://www.cnn.com/2025/09/16/economy/debt-credit-score-student-loans

[4] https://www.axios.com/local/washington-dc/2025/03/24/education-department-student-loans-dc-md-va

[5] https://www.epi.org/publication/student-debt-and-homeownership-barriers-in-d-c/



determinations by a "preponderance of the evidence," absent a court judgment. Employers could attempt to contest the designation, but they would bear the burden of disproving the Department's assertion. Once designated, an employer would remain ineligible for a period of ten years unless the Secretary approved a corrective action plan. For borrowers employed by an organization alleged to have a "substantial illegal purpose, any payments made after such a determination would not count toward the 120 required payments for forgiveness.

The Department has suggested that "fewer than ten employers" per year would be affected by the rule,[6] but this estimate, even if accurate, disregards the substantial downstream impact on thousands of individual borrowers whose eligibility for forgiveness could be revoked without warning.[7] Nonprofit leaders, including the National Council of Nonprofits[8] and the Institute for College Access & Success,[9] have already raised alarms that the proposal unlawfully narrows PSLF, undermines congressional intent, and risks weaponizing loan forgiveness against disfavored organizations.

**III. Unconstitutionality of the Changes**

The Department's proposal raises serious constitutional concerns, including concerns under the First, Fifth, and, Fourteenth Amendments and Articles I and II of the U.S. Constitution.

a. The Proposed Changes Violate the Separation of Powers Outlined in Articles I and II

Congress expressly created PSLF to apply broadly to all qualifying government and nonprofit employers. By carving out exclusions that Congress did not provide, the Department exceeds its statutory authority. In *Loper Bright Enterprises v. Raimondo*, the Supreme Court eliminated *Chevron* deference, holding that courts may not defer to agency interpretations where Congress has spoken clearly. 603 U.S. 369 (2024). Here, there is no ambiguity: Congress spoke clearly and unequivocally about the incentives it wanted to make available to dedicated public interest workers.

Congress established PSLF in 2007 to encourage individuals to pursue public interest roles by discharging federal student loans after 120 qualifying payments. Americans need doctors, lawyers, teachers, librarians, EMTs, and so much more. Practically speaking, these proposed changes could lead to shortages in critical infrastructure and staff that keep America, and DC,

---

6 https://apnews.com/article/student-loan-forgiveness-public-service-changes-trump-69243c5b83f3fe42c56744004a1a27fe

7 https://www.nasfaa.org/news-item/37030/ED_Publishes_Proposed_Rule_on_PSLF

8 https://www.councilofnonprofits.org/articles/department-education-proposes-unlawful-overhaul-public-service-loan-forgiveness

9 https://ticas.org/affordability-2/neg-reg-and-pslf-blog-july-2025/



running. The College Cost Reduction and Access Act of 2007 is incredibly clear in its definition of "public service jobs." There are no exceptions listed following the expansive list of eligible roles. The Department's proposed changes would be contrary to Congressional intent and statutory text.

During the negotiated rulemaking, the Department of Education asserted that it had the authority to interpret the statute how it saw fit so long as it is "not inconsistent" with the law. This is a misstatement of the law, even when *Chevron v. Natural Resources Defense Council, Inc.* was the law of the land. This assertion was most consistent with the holding in *Auer v. Robbins*, which held the Secretary of Labor could interpret the Department of Labor's own rules so long as it is not "plainly erroneous or inconsistent with the regulation." 519 U.S. 452, 461 (1997). However, this holding only pertains to the Department's interpretation of its own regulations. It does not provide agencies with the authority to interpret statutes and implement regulations however they see fit.

b. <u>The Proposed Changes Violate Due Process Protections Outlined in the Fifth and Fourteenth Amendments</u>

Further, the Department's assertion of power to declare an employer ineligible based on a "preponderance of the evidence" without a judicial finding raises serious due process concerns. Employers could be branded as having a "substantial illegal purpose" without a trial or conviction, and employees would bear the collateral consequence of losing earned credit toward forgiveness. This creates a regime of guilt by association, in violation of due process principles. Further, as the Supreme Court has emphasized, laws and regulations must provide "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Punishing employers who have a "substantial illegal purpose" does not meet this exacting standard. By leaving what constitutes a "substantial illegal purpose" up to interpretation by whichever administration is in power at the time, the NPRM is void for vagueness and unconstitutional under the Fifth Amendment's Due Process Clause.

c. <u>The Proposed Changes Violate Fundamental Free Speech and Association Protections Outlined in the First Amendment</u>

The proposed rule's vague criteria for excluding "qualifying employers," particularly the grant of authority to the Secretary of Education to determine that an employer has a "substantial illegal purpose," pose significant First Amendment risks. Many nonprofit organizations engage in expressive activity, including advocacy, policy work, and speech, on controversial social issues. By tying PSLF eligibility to whether the Secretary views an organization as engaging in unlawful or undesirable activity, the rule creates a strong incentive for organizations to restrict or modify their speech to avoid scrutiny.

TZEDEK DC®
Legal Help for People in Debt

Because the terms used in the NPRM are undefined and fluid, organizations cannot know in advance whether particular forms of speech or advocacy will later be deemed grounds for disqualification. That uncertainty creates a chilling effect. Employers may reduce expressive activities and avoid important areas of advocacy, not because those activities are unlawful, but because they fear the loss of PSLF eligibility for their staff. The loss of PSLF eligibility is not a minor consequence. Employees may have invested years of service based on the expectation of eventual forgiveness. Additionally, a nonprofit employer may use the opportunity for PSLF to attract and retain talent. To suddenly strip that benefit away because of their employer's expressive activities imposes a heavy penalty on both speech and association.

The danger is heightened because political and cultural norms change over time. What is considered a "disfavored" activity under one administration may be viewed differently under the next. The lack of clear statutory or regulatory standards means that PSLF eligibility could be wielded as a political tool by whichever party is in power, with entire categories of expressive organizations excluded based on prevailing political attitudes rather than any objective finding of illegality. Such a system risks turning PSLF into a weapon against lawful speech and advocacy, rather than a program designed to support public service.

**IV. Public Harm of the Changes**

The proposed rule threatens to undermine Congressional intent and the purpose of PSLF. Congress enacted PSLF to remove financial disincentives for graduates who choose careers in public service despite lower wages compared to the private sector. If borrowers cannot rely on their nonprofit or government employment remaining eligible, they will face significant uncertainty and may abandon or avoid public service altogether. This chilling effect risks leaving critical positions unfilled in areas such as teaching, public health, legal aid, and emergency response as the Institute for College Access & Success points out.[10]

The proposed changes would force public interest employers to choose between supporting, attracting, and retaining staff and providing critical services in line with their mission. The proposal also stands to harm borrowers, who may be saddled with thousands of dollars in student loan debt they cannot afford to pay because they made the noble decision to enter public service work. These vague changes would leave borrowers in a place of tremendous uncertainty, with no guarantees about their employer's eligibility at any given moment. A public servant may devote years of their career to qualifying employment only to later discover their employer has been retroactively deemed ineligible, wiping out years of progress toward forgiveness. The psychological burden of this uncertainty itself is harmful, discouraging continued public service and undermining trust in federal programs.

---

[10] https://ticas.org/affordability-2/neg-reg-and-pslf-blog-july-2025

 These issues will, no doubt, adversely affect the economy. The proposed rule is likely to produce immediate economic harms by shrinking the pool of individuals willing to take public service jobs, since reduced PSLF eligibility makes such positions less financially viable. In the short term, nonprofits are likely to face higher hiring costs, increased turnover, and a decline in workforce expansion: for example, one study found 96 percent of nonprofits with paid employees expanded their workforce after PSLF launched, and that nonprofits devoted more of their budgets to mission-related services once employees' student loans were being forgiven.[11]

Intermediately, employees who see their nonprofit employer excluded from PSLF eligibility will face higher and longer amounts of student loan debt than anticipated. These employees will subsequently have less money to spend to stimulate the economy. Additionally, reducing PSLF eligibility will mean fewer jobs available to individuals looking to join the public service sector. This will create higher competition for the remaining jobs and potentially decreased wages at the same time living costs are increasing.

Over the long term, reduced public service staffing will degrade government and nonprofit effectiveness, leading to lower productivity in essential sectors such as education, health, legal aid and social services. The ripple effects include reduced economic output, because a weakened nonprofit/public sector less efficiently serves communities and fewer public service workers means less demand in the broader local economies. Studies of PSLF show that nonprofit effectiveness (measured by mission ratio or service output) rose after PSLF implementation,[12] meaning that impairing PSLF undermines that positive impact.

The harms extend beyond the workforce pipeline. Nonprofit employers could face instability as staff members seek employment elsewhere to protect their PSLF eligibility. This is particularly troubling in the District of Columbia, where nonprofits represent more than one-quarter of the workforce.[13] Moreover, because the rule allows the Secretary to deem an organization ineligible without a court finding, advocacy groups serving in any controversial area of our culture will be looking over their shoulder to determine whether each new Secretary will rob them of the ability to operate and serve vulnerable or controversial groups with each administrative change. A chilling effect among nonprofits is likely to impact those most in need. The proposed rule will limit the talent available to nonprofits to complete necessary work and create an incentive for nonprofits not to serve communities deemed controversial or politically opposed to the administration in power.

---

[11] https://nonprofitquarterly.org/proposed-pslf-changes-would-undermine-nonprofits-and-public-service-careers/

[12] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4932656

[13] https://www.bls.gov/opub/mlr/2025/article/nonprofit-organizations-state-and-regional-employment-trends.htm



**V. Difficulty of Enforcement**

The proposed rule is also impracticable to administer. The Department has provided no clear standard for what constitutes a "substantial illegal purpose," leaving determinations to the subjective discretion of the Secretary. Without judicial findings, the Department would be forced to act as both investigator and adjudicator, assessing legality across a vast array of nonprofit and government employers. This is far beyond the Department's expertise and resources. The IRS already oversees nonprofit compliance with Section 501(c)(3) rules, and layering duplicative enforcement by the Department of Education only increases confusion and inefficiency.

Enforcement is further complicated for organizations with multiple units under one tax identification number. A large university, for example, may have one office accused of misconduct. The Department would then face the impossible task of parsing whether all employees at the university should lose PSLF eligibility or whether only certain units are implicated. While the Department has stated this would not be a concern, it has proposed no clear process for how such issues would be avoided.

The rule also risks significant litigation. Employers will likely sue over adverse determinations, arguing violations of the Administrative Procedure Act, due process, First Amendment, and statutory authority. Borrowers, too, may seek judicial relief if their PSLF credits are stripped away without notice or opportunity to be heard. This will mire the program in legal disputes, delaying relief for borrowers and diverting Department resources away from administering the program.

**VI. Conclusion**

Tzedek DC's unique mission and experience give us unique insight into the barriers borrowers face when taking advantage of critical financial aid programs, including PSLF participants. The proposed rule would affect Tzedek DC in both its capacity as a nonprofit legal service provider and as an employer. As a nonprofit, Tzedek DC prides itself on providing quality legal assistance to all individuals impacted by debt in the District of Columbia. If finalized, the proposed rule will require Tzedek DC attorneys and staff to worry that helping any one client might be misinterpreted by the Secretary or the Department of Education as constituting activities that have a substantial illegal purpose under the proposed rule.

PSLF is also a vital tool for Tzedek DC, as an employer, to attract and retain individuals to positions that may pay less than private sector jobs but are absolutely vital to our community. The need in the District of Columbia already outstrips the availability of civil legal aid organizations like Tzedek DC to provide assistance. The proposed rule would hit DC particularly hard as one in four District residents work for a nonprofit organization. The proposed rule would only further inhibit the ability of nonprofit organizations in the District of Columbia to maintain staffing levels and continue to provide the legal services needed.



The proposed PSLF rule is a double-edged sword that could allow any administration to attack otherwise lawful speech and association. Congress clearly defined PSLF eligibility in statute, and the Department lacks authority to override that judgment. By creating vague politically charged exclusion criteria, the NPRM raises serious due process and First Amendment concerns while potentially undermining the central purpose of PSLF to attract more talented individuals to take on honorable careers in public service. Borrowers who relied on PSLF when choosing careers will face crushing uncertainty, and nonprofits providing essential services will struggle to recruit and retain staff. Implementation would be fraught with administrative burdens and inevitable litigation.

For these reasons, the Department should withdraw the proposed rule in its entirety and preserve the rights and expectations of borrowers who entered public service in good faith under the statutory framework Congress enacted.

If you have any questions about this comment, please feel free to contact mm@tzedekdc.org.


Sincerely,

Tzedek DC

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Re: New York Lawyers Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016

Attachments 1

PSLF NYLPI Letter (Final)-09.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10185/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10185

**Tracking Number**

mfo-5rwq-pzn6

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

N Y L P I
JUSTICE THROUGH COMMUNITY POWER

**New York Lawyers for the Public Interest, Inc.**
151 West 30th Street, 11th Floor
New York, NY 10001-4017
Tel 212-244-4664 Fax 212-244-4570
www.nylpi.org

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Re: New York Lawyers for the Public Interest's Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon:

New York Lawyers for the Public Interest (NYLPI) appreciates the opportunity to submit comments on the Department of Education's proposed amendments to the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

NYLPI is a nonprofit civil rights law firm and advocacy organization based in New York City. We work at the intersection of racial justice, disability rights, health equity, and environmental justice. Our attorneys, advocates, and organizers dedicate their careers to serving marginalized communities, and the PSLF program is a critical tool that enables them to do so without being burdened by unmanageable student loan debt.

We are deeply concerned that the proposed rule would allow the Department to disqualify nonprofit employers from PSLF eligibility based on a vague and subjective determination of "substantial illegal purpose." This language risks politicizing the PSLF program, abrogating its clear statutory definitions, and undermining the statutory intent. Many nonprofit organizations engage in lawful advocacy and services that challenge unjust systems or support vulnerable populations—work that is essential to public service.

The proposed rule contradicts the Higher Education Act, which clearly defines qualifying employers to include all 501(c)(3) employers and work for "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)," among others. 20 U.S.C. § 1087e(m)(3)(B). The Secretary does not have the authority to override this clear and unambiguous definition. If an organization is engaging in illegal activity, existing mechanisms—such as revocation of tax-exempt status by the IRS—already provide appropriate remedies.

The proposed rule grants the Secretary broad and unprecedented discretion to determine employer eligibility based on a "preponderance of the evidence," without independent review or sufficient due process. The Department even acknowledges that the proposed rule will result in inconsistent treatment of employees engaged in the same activity in different jurisdictions, destabilizing the nonprofit sector. The lack of objective criteria, due process, and predictability will deter talented professionals from entering or remaining in public service roles, weakening



**New York Lawyers**
**for the Public Interest, Inc.**
151 West 30th Street, 11th Floor
New York, NY 10001-4017
Tel 212-244-4664 Fax 212-244-4570
www.nylpi.org

the infrastructure that supports underserved communities and directly undermining the hiring and retention goals of the program.

Moreover, employee borrowers – those most impacted by the proposed rule – cannot challenge a determination that their employer is not eligible for PSLF. An employer, if disqualified, can only become qualified again by waiting 10 years, or submitting a plan to the Department of Education to come into compliance and have it approved. The decision is entirely at the discretion of the Department of Education, and no appeal process is available.

Finally, the proposed rule will deter good-faith legal representation in a way that raises substantial constitutional questions by targeting disfavored activities involving issues of immigration, discrimination, protest, and transgender identity, among others. The proposed subjective authority, involving complicated questions of federal and state law outside the expertise of the Department, will create a chilling effect on legal and ethical duties of lawyers to represent clients seeking to enforce a range of important federal and state legal rights and anti-discrimination laws.

We urge the Department to withdraw this proposed rule and maintain its existing PSLF regulations. The PSLF program must remain a reliable and inclusive pathway for public servants to pursue careers that strengthen our communities. Any changes should be narrowly tailored, transparent, and consistent with the program's statutory mandate and purpose.

Thank you for considering our comments.

Sincerely,

McGregor Smyth
Executive Director
New York Lawyers for the Public Interest

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

FINAL AAMC_ED_2025_PSLF_Rulemaking

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10189/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10189

**Tracking Number**

mfo-7354-46yj

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Submitted at www.regulations.gov

September 17, 2025

The Honorable Linda McMahon
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

RE: Public comments on proposed regulations amending employer eligibility for Public Service Loan Forgiveness (PSLF); **Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon:

The Association of American Medical Colleges (AAMC)[1] appreciates the opportunity to provide comments in response to the Department of Education's proposed amendment of employer eligibility for the Public Service Loan Forgiveness (PSLF) program if engaged in activities with a "substantial illegal purpose." We oppose provisions in the proposed rule that could negatively affect medical residents and physicians, may undermine trust in the long-term viability of PSLF and run counter to Congressional intent when the program was established. However, we offer the following areas for clarification to inform the development of final regulations, preserve access and improve delivery of PSLF for medical school borrowers and the broader academic medicine community.

**PSLF Supports Access to Care in Underserved Communities**

The PSLF program is a vital federal policy that strengthens the health care workforce by supporting the service of medical professionals in communities with the greatest need. This includes rural, low-income, and medically underserved areas where recruiting and retaining physicians remains a persistent challenge. In its May 2025 communication to the Department, the AAMC reaffirmed its strong support for maintaining the existing definition of a qualifying employer under PSLF, consistent with Congressional intent to encompass a broad range of public service roles.

As outlined in 34 CFR § 685.219, nongovernmental public service includes work performed by employees of qualified employers, including the full scope of services provided by centers of academic

[1] The AAMC is a nonprofit association dedicated to improving the health of people everywhere through medical education, clinical care, biomedical research, and community collaborations. Its members are all 160 U.S. medical schools accredited by the Liaison Committee on Medical Education; 13 Canadian medical schools accredited by the Committee on Accreditation of Canadian Medical Schools; nearly 500 academic health systems and teaching hospitals, including Department of Veterans Affairs medical centers; and more than 70 academic societies. Through these institutions and organizations, the AAMC leads and serves America's medical schools, academic health systems and teaching hospitals, and the millions of individuals across academic medicine, including more than 210,000 full-time faculty members, 99,000 medical students, 162,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences. Through the Alliance of Academic Health Centers International, AAMC membership reaches more than 60 international academic health centers throughout five regional offices across the globe. Learn more at aamc.org.

medicine. These institutions are essential components of the public service infrastructure and play a critical role in training and deploying health professionals across the country. Any effort to narrow the eligibility criteria under PSLF risks undermining the program's effectiveness in supporting access to care, particularly in areas already facing health workforce shortages. Furthermore, we are concerned that the proposed regulatory framework may further erode confidence in the long-term stability of PSLF, and the financial security it offers, thereby reducing the likelihood of qualified health professionals taking roles in needy areas.

The AAMC projects a national shortage of up to 86,000 physicians by 2036, including significant gaps in both primary care and specialty fields.[i] PSLF is a key policy tool to help address this shortage by encouraging medical graduates to enter public service. According to the AAMC's 2025 Graduation Questionnaire, nearly 58 percent of graduating medical students indicated they plan to pursue PSLF, and over the last decade more than 84,000 indebted MD graduates have expressed interest in the program.[ii] For these future physicians, PSLF represents a meaningful commitment by the federal government to support their service at nonprofit hospitals, public health departments, community health centers, and other mission-driven institutions.

PSLF helps ensure that debt does not become a barrier to choosing where clinicians will practice. This support is especially important during the residency period, when physicians are gaining essential clinical training while earning an annual stipend. Preserving the current structure of PSLF maintains access to medical education, promotes patient care in high-need areas, and strengthens the health care workforce nationwide.

**Clarification on How Existing Law Shapes PSLF Employer Eligibility**
The proposed regulations indicate that determinations of "substantial illegal purpose" are ultimately governed by existing Federal and State law. For example, § 685.219(b)(3) and (b)(31) specify that a violation must be tied to Federal or State law, and § 685.219(h) outlines reliance on final judgments, pleas, or settlements as conclusive evidence. Taken together, these provisions suggest that the Secretary's definitions must operate within existing legal standards.

Under this interpretation, by way of example, we expect PSLF employer eligibility to be unaltered for hospitals solely due to their provision of gender-affirming care if the state in which the employer operates does not legally restrict (or explicitly protects) such care. We respectfully request that the Department provide additional clarity in the final regulations to confirm this interpretation. Clarification that determinations will be based on violations of established Federal or State law (as opposed to Department of Education policy), would help ensure consistency and transparency for both borrowers and employers.

**Provide Clear Definitions and Steps for Reconsideration of Eligibility for Impacted Employers**
It is critical for entities to appropriately understand the proposed regulatory framework for PSLF eligibility. We are concerned about the broad and vague nature of the "substantial illegal purpose" definition in the proposed rule. For example, it is unclear whether programs the Department deems associated with diversity, equity and inclusion could be swept in to "a pattern of aiding and abetting illegal discrimination."

To address these concerns, the final rule should clarify the criterion the Department would use to determine that an employer is engaging in activities with a substantial illegal purpose and the process for making such a determination. We recommend that the final rule tighten the determination standard subsection to replace subjective discretion by the Department with a discrete, exclusive set of final judgments in a court or by virtue of nolo contendere plea or settlement with admission – essentially

converting the examples of 'conclusive evidence' in 685.219(h)(1)(ii) to requirements, one of which must have occurred in order for 'qualifying employer' status to be lost.

Moreover, the Department should provide additional clarity regarding the process by which an institution will be notified that its activities have been deemed in violation. In addition, how affected borrowers will be informed and afforded sufficient notice as well as a grace period to explore and pursue options to protect their long-term PSLF eligibility. Further guidance is specifically needed on the nature, timeline and scope of communications and outreach to both institutions and borrowers to ensure transparency and due process. Timely communication will be critical to ensure that borrowers are not left unaware of potential changes to their employer's eligibility status. This is a key step, as borrowers' financial stability and long-term obligations could be directly impacted.

Furthermore, entities will also need clear information on the reconsideration process needed to appeal a determination or regain eligibility, including detailed expectations for a proposed corrective action plan that would require approval by the Secretary of Education. The final regulations should also provide a timeline or estimate for when affected employers would expect to hear from the Department in response to a submitted corrective action plan. This will be critical to mitigating uncertainty and disruption at the employer and borrower level. We appreciate that the proposed rule includes language to protect borrowers from being penalized while their employer's status is under review, while § 685.219(c)(4) clarifies that only payments made after the Secretary issues a final determination of ineligibility will stop counting toward PSLF.

**Establish Process for Borrower Feedback and Input on Eligibility Determinations**
We urge the Department to establish a transparent and accessible process that allows affected borrowers to provide feedback on eligibility determinations and the broader regulatory framework. Borrowers should have an opportunity to share perspectives on how determinations are made, communicated and applied. The absence of such a feedback mechanism leaves borrowers vulnerable to findings of substantial illegal activities.

This process has the potential to upend a borrower's debt repayment plan very suddenly. Without an individual's knowledge of a potential violation, the borrower may suffer serious financial consequences for actions largely outside of their own control.

**Clarification on Determining Employer Independence**

The proposed regulatory language (§ 685.219(i)(2)) provides that the Secretary of Education shall consider an organization to be separate if the employer operates "separately and distinctly", even when functioning under a single Employer Identification Number. While we appreciate inclusion of this language, additional clarity is needed regarding how determinations of employer independence will be assessed in the context of how activities of substantial illegal purpose may be applied, particularly with respect to branch or regional campuses, as well as varied departmental and organizational operating structures. Clear guidance on these applications will be critical to ensure consistent and equitable implementation.

**Impact of PSLF Ineligibility on Contract Employees**
We are particularly concerned about potential implications for contractually obligated trainees and employees who enter into employment contracts (like medical residents and physicians) who would remain bound by their contract obligations if their employer were to lose PSLF eligibility. This outcome not only places individual physicians at a disadvantage but also risks creating downstream effects for the health care workforce. The proposed regulatory framework therefore warrants careful consideration to

avoid unintended consequences that may destabilize physician training pipelines and health care delivery. It is essential to ensure that healthcare professionals are not held accountable for circumstances beyond their control.

**Ensure Continuity of Public Service Loan Forgiveness During Administrative Changes**
We urge the Department of Education to ensure that any internal administrative changes, including staffing transitions or system updates, do not disrupt the processing or administration of the PSLF program. Timely processing of PSLF-related documentation, including employment certifications and forgiveness applications, is essential for borrowers who have relied on the program to manage their student debt while serving in public interest roles.

Should there be delays in processing due to restructuring or changes in departmental operations, we urge the Department to implement a "hold harmless" provision. Borrowers who meet all program requirements should not be penalized for missed or delayed qualifying payments that occur solely because of administrative issues beyond their control. Ensuring that PSLF continues without interruption is critical to maintaining trust in the program and to supporting the public service workforce, including physicians and health professionals serving in high-need areas.

The AAMC appreciates your consideration of our comments in support of the development of final regulations and welcomes any opportunities to engage in dialogue with the Department to improve delivery of PSLF. Should you have any questions, please reach out to me at dturnipseed@aamc.org or contact my colleagues Kristen Earle (kearle@aamc.org) or Devan O'Toole (dotoole@aamc.org).

Sincerel ,

Danielle Turnipseed, JD, MHSA, MPP
Chief Public Policy Officer
Association of American Medical Colleges

Cc: David J. Skorton, MD,
President and CEO

---

[i] : GlobalData Plc. The Complexities of Physician Supply and Demand: Projections From 2021 to 2036. Washington, DC: AAMC; 2024.
[ii] AAMC Graduation Questionnaire (GQ), over these nine years, nearly 40K GQ respondents indicated PSLF plans, this rate extrapolated to all graduates results in an estimated 71,700 planning on PSLF.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached comments re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016].

Attachments 1

PSLF Comments September 2025_Trilogy

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10200/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10200

**Tracking Number**

mfo-ad31-9cig

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

1400 W Greenleaf Ave.
Chicago, IL 60626
773.508.6100
TrilogyInc.org

Susan Doig
Chicago, IL
CEO, Trilogy

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Susan Doig and I am the President and CEO of Trilogy, a community based mental health organization. At Trilogy, our mission is to enable people in mental health recovery to build meaningful and independent lives through comprehensive and integrated care. For over 50 years, we've worked specifically with clients living with serious mental illness, complex health and co-occurring substance use disorders, homelessness, and poverty. We have deep experience supporting recovery-oriented and community-based approaches to care.

Trilogy employs individuals who strive to serve the community as mental health practitioners. Without our dedicated and hard-working staff, we would not be able to serve over 3,000 clients in the community each year. Our employees utilize the Public Service Loan Forgiveness Program as a critical avenue to address the debt acquired in school. If non-profits were excluded from program eligibility, our staff would not be afforded this benefit, hiring and retention would be threatened, and our ability to serve the community in the capacity we do would be impacted. Further, utilizing this program allows non-profit agencies to compete with private sector employers offering higher salaries, giving those interested in working in this field the option to choose community based settings. It also attracts staff who in turn get the education and skills needed to provide quality treatment to the most vulnerable populations, and this treatment is critical in keeping people out of the hospital and more engaged in society.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. The mental health and substance use service needs in our community already outpace our capacity and this change would only make it harder to attract the workforce we need, contributing to longer waitlists for services.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Susan Doig

An official website of the United States Government. 

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Amanda Tyler
Washington, DC
Baptist Joint Committee for Religious Liberty
bjc@bjconline.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016-7221]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR § 685.219.

As Executive Director of the Baptist Joint Committee for Religious Liberty (BJC), I am deeply concerned about this proposed rule. BJC is an organization that works for faith freedom for all. Our mission is to extend and defend religious freedom for all, bringing a uniquely Baptist witness to the idea that religion must be free, neither advanced nor inhibited by the government.

We are a nonprofit organization with representation from 10 Baptist denominational bodies on our Board of Directors, along with ecumenical and interfaith representatives of the individuals that support our mission. Given that a significant number of nonprofit organizations across the country are faith-based, it is naturally a great relief to so many clergy, lay leaders, and other nonprofit staff nationwide that the Public Service Loan Forgiveness (PSLF) program is available to them. These public servants have often made great sacrifices, including in their paychecks, in order to be able to care for communities in need.

The organization I lead is specifically dedicated to ensuring faith freedom for all, including the right to free exercise of religion. For so many nonprofits, their public service is an expression of these deeply held

Give Feedback

values. Yet the proposed rule threatens to harm this fundamental right. While it claims to have the unobjectionable intention of removing eligibility from employers who are engaging in illegal activity, such organizations are already ineligible for PSLF. Instead, the proposed rule would give discretion to the political leadership of the U.S. Department of Education, to discern what they believe are “either explicit violations of State or Federal law or are otherwise in direct contravention of established public policy,” even in the absence of any actual criminal conviction or due process.

We are deeply concerned that this and any future Administration could thereby deny loan forgiveness to public servants working for nonprofits whose priorities or ideology differ from theirs. The staff at our faith-based and other nonprofits must have the right to serve their communities’ needs without fear of financial retribution for political aims.

The government must serve the needs of all, not just the needs of those who align with whomever currently holds political power.

The Baptist Joint Committee for Religious Liberty (BJC) therefore strongly opposes this proposed rule. We ask that you ensure all public servants have their First Amendment rights protected, and that no one is denied government benefits without due process.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Amanda Tyler
Baptist Joint Committee for Religious Liberty

**Comment ID**

ED-2025-OPE-0016-10206

**Tracking Number**

mfo-asji-d4mz

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Give Feedback



Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Hannah Young
Omaha, Nebraska
Nonprofit Association of the Midlands

Re: William D. Ford Federal Direct Loan (Direct Loan) Program – Notice of Proposed Rulemaking

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Hannah Young, and I represent the Nonprofit Association of the Midlands (NAM). NAM is the only membership organization in Nebraska dedicated exclusively to serving nonprofits in the Midlands, including western Iowa. By connecting organizations with information, education, advocacy, and collaboration, we help members focus their energy on the people and communities they serve.

Give Feedback

The Public Service Loan Forgiveness program has been instrumental in ensuring that organizations like mine can recruit and retain a talented workforce committed to strengthening our communities. PSLF makes it possible for professionals to remain in nonprofit careers despite financial barriers, ensuring that essential services reach the people who need them most.

We strongly oppose the proposed rule and the limitations it would impose on which employers qualify for PSLF. Restricting eligibility based on an organization's mission would politicize the program, undermine its proven success, and subject nonprofit professionals to the shifting priorities and ideologies of different administrations. Such uncertainty would make it difficult for nonprofit employees to plan their careers with confidence. As long as an employer is a qualifying 501(c)(3) organization, that status should remain sufficient for PSLF eligibility, as established in statute. Without that assurance, nonprofits will face workforce

instability, which in turn threatens their ability to meet community needs.

Thank you for considering these comments as part of the rulemaking process.

Sincerely,
Hannah Young

**Comment ID**

ED-2025-OPE-0016-10207

**Tracking Number**

mfo-b7fw-bqyk

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Give Feedback

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share ▾

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comment opposing this NPRM and arbitrary narrowing of the PSLF program.

Attachments 1

9.17.25 PSLF Final Comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10210/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10210

Give Feedback

**Tracking Number**

mfo-bbhq-8je6

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

907 Pine Street
Suite 500
Seattle, WA 98101

T 206-682-9552
F 206-682-9556

LegalVoice.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

*Submitted electronically via regulations.gov*

Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

Legal Voice is a 501(c)(3) nonprofit organization that advances gender equity through litigation, administrative and legislative advocacy, and public education. Legal Voice advocates and works across the Pacific Northwest, with a focus on Idaho, Montana, and Washington.

The Public Service Loan Forgiveness Program has enabled Legal Voice to serve our communities by allowing our employees, particularly attorneys, to work in public service and serve our communities. Our employees would not be able to commit to this work without the existence of a program like PSLF. Countless organizations like ours that provide essential services to our communities, such as domestic violence centers, legal service providers, and social service organizations, employ people with student loans who rely on PSLF to afford working for low salaries and serving those most in need.

The proposed rule changing the definition of qualifying employer creates significant uncertainty for non-profit organizations and their employees about how the PSLF program will be applied. The proposed exclusion is vague and broad, and risks misuse—organizations that do work that the Department disagrees with could be scrutinized and removed from the program under the overly broad exclusion. While we do not believe that this NPRM will directly impact Legal Voice or its employees, as we do not engage in the prohibited activities listed in the rule, its vagueness and risk of political targeting will affect employees' belief in the PSLF program and future workers' willingness to take on low-paying public service work. The rule will also impact the communities we serve and others with whom we partner. This would result in fewer people providing high quality services to those most impacted by systemic

discrimination, ultimately impacting Legal Voice's mission of advancing gender equity in the Pacific Northwest.

Legal Voice strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. Limiting employer eligibility based on vague and ideologically motivated exclusions politicizes a program meant to foster a spirit of public service and community connection. Nonprofits must be able to identify and meet local needs without political interference, fear of retribution, or arbitrary removal from a program designed to support their employees. Vital needs in our communities such as impact litigation, know your rights trainings, and legislative advocacy would go unmet because our staff could not financially sustain a long-term commitment to nonprofit work given the reality of debt from higher education institutions. The government should be expanding and streamlining the process of PSLF, not adding additional burdens and uncertainty.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Alizeh Bhojani *LLM, JD*
Policy Counsel, Legal Voice

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please find attached comments submitted on behalf of 64 nonprofit organizations that promote and protect civil and human rights for all people in the US. This proposed rule is unlawful and exceeds the authority of the Department of Education. We strongly urge you to withdraw it in its entirety.

Attachments 1

PSLF Coalition Sign On Comment (09-17-2025) FINAL

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10211/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10211

**Tracking Number**

mfo-b5xr-r7wq

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re:     William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [RIN 1801-AA28]**

Dear Tamy Abernathy:

On behalf of the undersigned 64 organizations that promote and protect civil and human rights for all people in the United States and dedicate our time and resources in service of the public, we offer these comments in opposition to the Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) (RIN 1801-AA28) published to the Federal Register on Monday, August 18, 2025, that would make unlawful changes to the Public Service Loan Forgiveness (PSLF) program under 34 C.F.R. § 685.219. The NPRM, if adopted, would allow the Secretary to determine an employer to be ineligible to participate in PSLF if it engages in activities that have a "substantial illegal purpose."  This NPRM attempts to unlawfully expand ED's power beyond its statutory authority and grants the Secretary broad discretion to weaponize the PSLF program in order to unconstitutionally target organizations which have viewpoints that diverge from the Administration's. **We strongly urge ED to withdraw this NPRM, which seeks to punish state and local governments and non-profit organizations and would harm hundreds of thousands of borrowers in the process.**

   I.     Congress established PSLF and its employer eligibility criteria, and ED has no authority to rewrite these statutory terms.

Congress established PSLF in 2007 to make a critical federal investment in organizations advancing work in the interest of the public, from local and state government employees working in education and social services to workers at advocacy groups defending civil rights. In order to provide this broad investment in public service, Congress defined eligible employers to include all local and state governments as well as all 501(c)(3) non-profits. The Trump Administration's proposed rule unlawfully usurps congressional authority to redefine PSLF and to weaponize it against those whose work does not fall in line with the Administration's political agenda or those who disagree with its policies. This illegal power grab will not only burden hundreds of thousands of borrowers with billions of dollars in debt, but it will also hurt state and local governments, non-profit organizations, and

communities across our nation. Those effects will be felt widely and will disproportionately harm marginalized people including Black, Brown, Indigenous, LGBTQ+, immigrant, low-income communities, and people with disabilities nationwide.

The proposed rule's insertion of ideology into the PSLF program opens the door for any administration to change program eligibility based on its preferred ideologies, something not intended by Congress. Non-profit organizations must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees. Without assurances that program rules will remain consistent over the long term, non-profit professionals cannot rely on the program to make important decisions about their career path.

ED has no statutory authority to redefine employer eligibility for PSLF. This NPRM subverts congressional will and intent by restricting the PSLF program and contorting it to advance an agenda that is itself adverse to the interest of the public. When Congress created the PSLF program through the College Cost Reduction and Access Act of 2007, it clearly defined what organizations are eligible to participate in the program and clearly did **not** provide the Secretary of Education with any power to restrict that definition. (College Cost Reduction and Access Act, Pub. L. No. 110-84, 121 Stat. 784, 801 (2007).) ED misrepresents its authority by stating that it is ensuring taxpayer funds do not go to organizations that violate the law. ED is ill-equipped to make such decisions, and appropriate mechanisms already exist to address such violations. The NPRM unlawfully grants the Secretary sweeping authority to make independent assessments regarding the legality of organizations' work on immigration, discrimination, healthcare, national security, and other areas totally outside the purview of the Department's expertise. That kind of discretion invites unconstitutional abuse.

II. The NPRM creates a significant risk of viewpoint discrimination in violation of the First Amendment.

The NPRM also creates a significant risk of unconstitutional viewpoint discrimination in violation of the First Amendment. In the NPRM, ED has only explicitly identified a small number of issues to target, each of which invites expansive examination of non-criminal and otherwise lawful activities. Unsurprisingly, these issues all come directly from the Administration's dangerous and harmful agenda. Under ED's proposed definition of "substantial illegal purpose," ED would be authorized to deem ineligible countless employers, including state and local governments and non-profit organizations that engage in work that the Administration disagrees with, such as helping immigrants, providing healthcare to transgender youth and adults, advancing equity in schools and workplaces

for underrepresented students, working with groups advocating against war, offering legal assistance to institutions on matters the Administration finds controversial, or participating in peaceful protest. ED states that it only seeks to prohibit such work to the extent it is illegal, but this restriction provides cold comfort where subsection (h) of the proposed rule vests sole authority in the Secretary, and not courts, in determining whether conduct is illegal. Determinations of criminality in this context are wildly outside of the authority and expertise of the Secretary. Further, ED has demonstrated an inability or lack of desire to correctly interpret even laws within its authority and expertise. (*See e.g., Am. Fed'n of Tchrs. v. Dep't of Educ*., No. CV SAG-25-628, 2025 WL 2374697, at 21,23 26, 27 (D. Md. Aug. 14, 2025) (holding that guidance issued by ED regarding diversity, equity, and inclusion practices in schools was textbook viewpoint discrimination, and indicating ED's interpretations of law lack factual bases, conflict with regulations and caselaw, exceed ED's authority, and are contrary to constitutional rights.)

The inclusion of "illegal discrimination" is particularly concerning because this Administration has made numerous efforts to re-interpret civil rights laws, accusing schools and organizations of unlawful activity under Title IX of the Education Amendments of 1972 (Title IX) and Title VI of the Civil Rights Act of 1964 (Title VI) without substantiation, legal support, or factual or legal explanation. Although the Administration does not have the authority to re-write federal statutes like Title VI and Title IX, and Executive Orders do not supersede the Constitution or federal law, the administration's ongoing efforts to re-interpret civil rights law by decree make it clear that inclusion of "illegal discrimination" in this NPRM is intended to target civil rights organizations that are engaged in lawful advocacy work.

III. ED is ill-equipped to implement this NPRM and doing so would have devastating consequences.

ED lacks the capacity and expertise to implement the proposed rule. Having recently fired half its staff and shuttered numerous ED offices, the Department currently has reduced capacity to do the work it is statutorily required to carry out, let alone intercede into issues and determinations far beyond its authority. Even if ED devoted already diminished staff resources to making these determinations, it has no relevant expertise to effectively carry out this proposed rule. The Secretary and her designees within the Department do not have the background or experience necessary to make legal findings in areas as disparate and unrelated to education as immigration, national security, and healthcare. Notably, a process already exists to remove eligibility from non-profit organizations that are engaging in illegal activity. In such circumstances, the Internal Revenue Service (IRS) may carry out removal of an organization's 501(c)(3) status for illegal activity, which would make them ineligible for PSLF. Of course, this process provides appropriate safeguards for the accused

organization, and federal law prohibits the president and other executive branch officials from directing such an audit. (26 U.S.C. § 7217.)

If allowed to proceed, this NPRM would have devastating consequences for this country and its people. ED would wield this authority as a cudgel to chill lawful activities of state and local governments and non-profit organizations. As a result, there will be a dramatic decrease in the provision of important services for marginalized communities including Black and other communities of color, LGBTQ+ youth, immigrants, people with disabilities, and low-income families. Public interest employers would face difficulties in recruiting new staff as the threat of losing student loan forgiveness looms large over the entire sector. Hundreds of thousands of borrowers will be further burdened by billions of dollars in student loan debt. Without access to PSLF many public servants—especially those in rural and underserved areas—would be unable to afford to work in public service and forced to abandon their jobs and the communities they serve for the private sector, where salaries are often higher. People rely on PSLF—an assurance made to public service workers to commit to 10 years (or more) of service while making 120 eligible student loan payments. For these public service workers to continue improving the lives of our communities, the federal government needs to invest in them and fulfill the promise that Congress made.

This program is not only essential, but effective. The program is a powerful tool for recruiting and retaining the best and brightest in public service, from educators and first responders to public defenders and medical professionals. PSLF provides pathways for those who are most interested in lifelong public service careers and supports everyone, regardless of political party affiliation or voting trends. It's a program for all public service professionals who serve a wide variety of communities. Each of the undersigned organizations, and similar organizations, stands to be negatively impacted by adoption of the NPRM. Non-profit professionals have been able to devote their careers to public service because of access to PSLF. Diminishment of access to the current program will severely weaken the pipeline of future professionals seeking to serve communities in furtherance of ensuring equity, justice, nondiscrimination, and constitutional protections. These changes are bad for communities, bad for racial justice, bad for gender justice, and bad for a society based on equality for all and the rule of law.

**We strongly urge ED to immediately withdraw this unlawful NPRM in its entirety. The NPRM represents an unconstitutional and unjust attack on organizations that advance important work in the public interest as well as on the borrowers that work for them. Further, many of our country's most vulnerable will suffer as a result of adoption of the proposed rule. Ultimately, the NPRM will harm the people and communities who rely**

**on non-profit organizations and the essential services they provide by making it harder to attract and retain an effective, skilled workforce.**

If you have any questions or need additional information, please contact Michael Pillera, Director of the Educational Opportunities Project at the Lawyers' Committee for Civil Rights Under Law, at MPillera@lawyerscommittee.org; Alison Gill, Director of Nominations & Democracy at the National Women's Law Center, at agill@nwlc.org; or Ray Li, Policy Counsel at the Legal Defense Fund, at rli@naacpldf.org.

Sincerely,

Legal Defense Fund

Lawyers' Committee for Civil Rights Under the Law

National Women's Law Center

Center for LGBTQ Economic Advancement & Research (CLEAR)

Equality California

Silver State Equality

Oasis Legal Services

Shriver Center on Poverty Law

Chicago Women in Trades

Coalition on Human Needs

NBJC

American Humanist Association

Freedom From Religion Foundation

Women Employed

Economic Policy Institute

National Employment Law Project

American Association of University Women (AAUW)

Equal Rights Advocates

**Comments in Opposition to William D. Ford Federal Direct Loan Program Notice of Proposed Rulemaking**

League of United Latin American Citizens (LULAC)

National LGBTQ Task Force Action Fund

National Action Network

Movement Advancement Project

Mental Health Transformation Alliance

National LGBTQ+ Bar Association

Japanese American Citizens League

NAACP

Autistic People of Color Fund

National Disabled Legal Professionals Association

Sur Legal Collaborative

Interfaith Center on Corporate Responsibility

The Advocates for Human Rights

LatinoJustice PRLDEF

United Church of Christ

Americans United for Separation of Church and State

Feminist Majority

Clearinghouse on Women's Issues

National Association of Social Workers

Southeast Asia Resource Action Center (SEARAC)

NETWORK Lobby for Catholic Social Justice

Lawyers for Good Government

American Civil Liberties Union

EdTrust

National Association of Social Workers

Center for Law and Social Policy (CLASP)

6

ED_00265

**Comments in Opposition to William D. Ford Federal Direct Loan Program Notice of Proposed Rulemaking**

Reproaction

National Health Law Program

Asian Americans Advancing Justice - AAJC

Brennan Center for Justice

Houston Immigration Legal Services Collaborative

Common Cause

National Immigration Law Center (NILC)

Center for Progressive Reform

National Partnership for Women & Families

UnidosUS

Institute for Women's Policy Research

Kids in Need of Defense (KIND)

Justice in Aging

Religious Action Center of Reform Judaism

Planned Parenthood Federation of America

Institute for Sustainable Diversity & Inclusion

National Institute for Reproductive Health

William E. Morris Institute for Justice

Autistic Self Advocacy Network

New York Lawyers for the Public Interest

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached comment from the District of Columbia Access to Justice Commission

Attachments 1

Attachment1_Comment on Docket ID ED-2025-OPE-0016 DC Access to Justice Commission

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10221/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10221

**Tracking Number**

mfo-t5hf-93ef

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



The District of Columbia

Access to Justice Commission

**COMMISSIONERS**

**Peter B. Edelman**
***Chair***

**James J. Sandman**
***Vice Chair***

Hon. Errol Arthur

Hon. Corinne Beckwith

Karen A. Newton Cole

Karen M. Dale

Elizabeth Dewey

Rebecca Goldfrank

Hon. Sharon E. Goodie

Susan M. Hoffman

Rhonda Cunningham Holmes

Sheldon Krantz

Paul S. Lee

Ariel Levinson-Waldman

Deborah P. Lindenberg

Hon. Carmen G. McLean

Beth Mellen

Kelli Neptune

Koube Ngaaje

Abel Nunez

Herbert Rouson, Jr.

Hon. Vanessa Ruiz

Prof. Jessica Steinberg

Aida Vindell

Katherine Zeisel

**Nancy Drane**
***Executive Director***

September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

*Submitted to the Department of Education through the Federal Rulemaking Portal, Regulations.gov*

We are writing on behalf of the District of Columbia Access to Justice Commission. The Commission was created by the D.C. Court of Appeals in 2005 to address the scarcity of civil legal services for low- and moderate-income District residents and to reduce the barriers these litigants face in navigating the civil justice system. Its members include representatives from D.C. tribunals; private bar leaders; private law firm pro bono counsel; legal services organizations; law schools; community-based organizations; and other local leaders.

We are submitting this comment in opposition to the Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) published to the Federal Register on Monday, August 18th that would make changes to the Public Service Loan Forgiveness (PSLF) program. The proposal would seriously undermine the ability of civil legal services employers to recruit dedicated talent by adding additional restrictions and uncertainty that could deter attorneys from this career path.

PSLF has long ensured that low- and moderate-income Americans have access to high quality legal help. This type of legal support is more critical than ever considering the access to justice crisis that plagues many communities in our country, both urban and rural.

This includes the District of Columbia, where most low- and moderate-income District residents who are eligible to access free legal services do so through a government or 501(c)3 nonprofit legal services organization – a critical service as there is no right to appointed counsel for civil legal matters. Attorneys employed by these organizations are on the front lines, helping the thousands of District residents who otherwise would be forced to navigate our District courts and tribunals without a lawyer. Percentages of litigants as high as 75-97% depending on case type currently appear without legal counsel here.

**District of Columbia Access to Justice Commission • c/o Sidley Austin LLP • 1501 K Street NW, Room 4.102 • Washington, DC 20005**
**202-736-8334 • nancy.drane@dcaccesstojustice.org • www.dcaccesstojustice.org**

ED_00269

Maintaining access to civil legal services is important for the overall health of the community. It promotes public safety and safe communities: preserving a roof over one's head; the stability of their families; personal safety from abuse; giving voice to crime victims; financial security; supporting children and youth; helping seniors pass along wealth to their heirs; and facilitating client access to a wide range of Federal and local government programs.

We are concerned that the proposed changes would significantly impair our ability to recruit and maintain a cadre of dedicated civil legal services and public interest attorneys to meet the huge scale of unmet civil legal need we experience in the District. If enacted, these changes could destabilize our civil legal services network by reducing the pool of talented, dedicated staff who are willing and able to take on these crucial jobs. Making it more difficult for organizations to recruit and retain high-quality staff would compromise the very fabric of our civil legal justice ecosystem.

PSLF is a crucial tool to ensure a dedicated, high-quality civil legal services network because it addresses the reality that civil legal services attorneys as a group are the lowest paid segment of the legal profession. The average salary of legal services attorneys employed by nonprofits enrolled in a District debt-assistance program is $73,378. Notably, these are lawyers at all levels of experience, not just at the entry level. Meanwhile the median entry level salary for first year associates at large, private law firms in Washington, D.C. is $225,000. Because of the high cost of living in the District, PSLF is an especially important recruitment tool for civil legal services attorneys in our jurisdiction.

The proposal would seriously undermine the ability of civil legal services employers to recruit dedicated talent by adding additional restrictions and uncertainty for attorneys. We are concerned that this will have a significant chilling effect on attorneys' ability to enter the civil legal services field at all. Legal career path decisions must often be made as early as the beginning of the second year of law school. The high cost of law school and its corresponding high debt load will force these students to be risk-averse when considering their futures, with potential obstacles or uncertainty serving as a deterrent to career entry.

The proposed discretion of the Department to remove any employer's statutory eligibility for PSLF without adequate due process may also have a chilling effect on legal services offered by employers, and it is unnecessary. The Public Service Loan Forgiveness statute clearly defines the types of employers categorically eligible for PSLF.  A process already exists to remove eligibility from organizations who are engaging in illegal activity. If an organization engages in substantial illegal activities, there is a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF under existing statute.

Compromising low- and moderate-income individuals' access to necessary legal help will create cascading problems for them as individuals and also for our community. We ask the Department to withdraw or revise the proposed rule to protect PSLF's integrity and accessibility in furtherance of our common mission to expand, not constrict, access to justice.

Sincerely,

Peter B. Edelman, Chair                           James. J. Sandman, Vice Chair

cc:     Nancy Drane, Executive Director

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The Office of the Public Defender for San Joaquin County wishes to express its most ardent opposition to the proposed amendment to 34 CFR 685.219. Please see the attached document.

Attachments 1

PSLF_Letter

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10226/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10226

**Tracking Number**

mfo-tssu-uhbe

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



*San Joaquin County*
# OFFICE OF THE PUBLIC DEFENDER

**JUDYANNE D. VALLADO**
*Public Defender*

**MICHAEL BULLARD**
*Assistant Public Defender*

September 17, 2025

Secretary Linda M. McMahon
U.S. Department of Education
Lyndon Baines Johnson Bldg.
400 Maryland Ave. SW
Washington, DC 20202

Re: Comments on Proposed Amendment to 34 CFR 685.219

The Office of the Public Defender for San Joaquin County wishes to express its most ardent opposition to the proposed amendment to 34 CFR 685.219. The stated purpose of the amendment is to "exclude employers that engage in activities that have a substantial illegal purpose" from the benefits of Public Service Loan Forgiveness. The shocking vagueness that permeates the proposed language is a strong indicator that, like many of the policy initiatives of this administration, it is a trojan horse of "public safety" that holds within it the mechanism by which they intend to further trample into complete impotence our most fundamental constitutional protections. The amended regulation will be used as a cudgel to bully and extort the indigent defense offices of this nation unto either their submission or their destruction.

*"Federal prosecutors, when they rise in court, represent the people of the United States. But so do defense lawyers – one at a time."*
*Kaley v. U.S.* (2014) 571 U.S. 320, 358 (Roberts, C.J., dissenting).

In 1963, the United States Supreme Court held that "[f]rom the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him."[1] In doing so, it recognized the

[1] *Gideon v. Wainwright* (1963) 372 U.S. 335, 344.

guarantee of court appointed counsel that has fueled the establishment and development of indigent defense offices all over the country, and there is no doubt that our justice system and our nation as a whole is a better place for having done so. Unfortunately, this indigent defense system that exemplifies the foundational principle that all are deserving of equality before the law is under existential threat by political forces that would see the best parts of our system of government consigned to the wastebin of history. But, as with the other services and programs targeted by this administration, the costs and savings that are reflected in an agency or program's ledger tell only a fraction of the story – the true fiscal impact is felt through a myriad of cost savings that are not readily identifiable in a superficial budget analysis. Concerns relating to fiscal austerity are specifically mentioned here in the hopeful assumption that the underlying and unstated motive behind the proposed regulation is born from fiscal concerns rather than something as reprehensible as the deliberate intent to deprive non-citizens of due process in opposition to the most basic principles of our founders.

The Public Service Loan Forgiveness ("PSLF") program "provides an incentive for talented individuals to enter and remain in the public service sector serving the needs of society. Moreover, PSLF provides fairness and access for underserved populations to enroll in academic programs of study that will lead to public service employment."[2] PSLF was enacted during a Republican presidential administration by a Democratic congress – a now unfathomable display of genuine bipartisan support – as part of the College Cost Reduction and Access Act ("CCRAA") on September 7, 2007, passing the Senate with a vote of 79-12 and the House 292-97.[3] President George W. Bush signed PSLF into law just 20 days later, on September 27th.[4]

For many years, PSLF made substantial progress in its stated goal of encouraging college graduates to endure the subpar compensation that comes with public service in exchange for the promise of loan forgiveness; but, upon entering office, the first Trump administration began working immediately to make the process for obtaining PSLF so byzantine and the threshold for

[2] National Association of Student Financial Aid Administrators, *NASFAA Task Force Report* (2014) at p. 6.
[3] 153 CONG. REC. S11,242-11,256 (daily ed. Sept. 7, 2007) (statement of Sen. Ted Kennedy).
[4] Press Release, White House, President Bush Signs H.R. 2669 and H.R. 3580 into Law (Sept. 27, 2007)

**Address:** 102 S. San Joaquin Street, Room 1 • P.O. Box 201030, Stockton, CA 95201-9030
**Phone:** (209) 468-2730 • **Fax:** (209) 468-2267

acceptance so insurmountable that rejection rates skyrocketed to an astonishing 99.66%.[5] The Chicago Sun Times noted at the time, "We have little doubt that the usual bureaucracy is part of the problem. But also we suspect something worse at work: The Trump administration and [Education Secretary] DeVos just don't give a damn…. An administration that cared about working people would cut through the bureaucracy and inefficiency and get that loan forgiveness to those whom the program is designed to assist."[6]

The data leaves little doubt as to both the importance of continuing to offer PSLF and the urgent need to expand it rather than further limit its availability for those willing to put their bar license to work in service to the public as a whole instead of merely those who can afford it. Among attorneys presently working in a public service role, 81% (n=1,811) stated that – in the absence of PSLF – they definitely or at least very likely would not have taken their current job.[7] That number remains unchanged when asked whether they would've taken any job at all in public service. Perhaps most disturbing is that – considering we are presently in the midst of a catastrophic attorney shortage in many regions throughout our state – 91% (n=2,107) of attorneys currently working in public service would leave their present position if PSLF were eliminated.[8] Vikram Swaruup, Executive Director of the Legal Aid Society of DC, confirms these concerns, stating that "Many of Legal Aid DC's staff and our colleagues across the legal services field use PSLF to pursue careers helping people facing legal crises…. Restricting the program's availability could undermine the ability of organizations like ours to serve people living in poverty."[9]

This shortage of available legal counsel is a crisis that is affecting every part of California, but its impacts are especially pronounced in rural areas. "Only 14% of rural individuals receive assistance for civil legal problems – a rate less than half of the national average… similarly, criminal defendants in rural Wisconsin are forced to wait as long as two months to be assigned a

---

[5] Robert Wu, *America's Unforgiving Forgiveness Program: Solutions for Public Service Loan Forgiveness* (2021) 72 Hastings L.J. 959, 966.
[6] Editorial, *Billionaire Betsy and Her Abandonment of Student Loan Relief for Teachers, Others,* Chicago Sun Times (Sept. 9, 2019).
[7] NLADA, *Public Service Loan Forgiveness and the Justice System* (2017) at p. 12.
[8] *Id.* at p. 13.
[9] American Bar Association, *PSLF: A Crucial Tool for Recruiting and Retaining Legal Professionals*, August 26, 2025.

public defender."[10] The nightmare that awaits us when restrictions on access to PSLF bring about the inevitable catastrophe looming on the horizon is not something we are relegating to merely conjecturing about; that nightmare is the living reality for those in tribal courts, "many of which cannot afford to provide public defenders…" and where "individuals are nearly always self-represented."[11] The most vulnerable populations most in need of the services of the public defender are vastly overrepresented in these rural areas: migrant farm workers, the elderly and disabled, veterans, and indigenous people.[12]

The devastating impacts of further reducing the availability of legal representation in rural areas are not confined to specifically legal consequences: "[i]f not resolved in an appropriately multifaceted way, legal needs compound existing health issues, and health needs impede access to justice." [13] This traps us in a dangerous and destructive feedback loop that will not only ruin lives – it will end them. "Without rural attorneys, health care professionals cannot refer patients to civil legal aid or an immigrant advocacy organization…. In rural legal deserts, there are fewer attorneys to advocate rural health at a policy level, either through local impact litigation or through systematic public health law."[14] Frequently, indigency and illness leave those suffering from addiction dependent on the criminal justice system to give them access to effective treatment options, but "treatment of chemical dependency is often delayed if a rural individual is involved in the criminal justice system and must wait for months to get a public defender."[15] "For rural health and justice systems that are under-resourced and over capacity… supports were already lacking. Without a meaningful recognition of such interrelated phenomena, justice gaps will continue to compound rural health inequities."[16]

---

[10] Michele Stats & Paul Termuhlen, *Rural Legal Deserts Are a Critical Health Determinant* (2020) AJPH Law & Ethics, vol. 110, no. 10, at p. 1519.
[11] *Ibid.*
[12] *Id.* at p. 1520.
[13] *Ibid.*
[14] *Ibid.*
[15] *Ibid.*
[16] *Id.* at p. 1521.

Here in California, so many of our citizens live in rural areas that their numbers dwarf the entire populations of some other states.[17] But 96% of California's 192,226 attorneys have addresses in urban areas and only one-fifth of one percent have addresses in "frontier" regions.[18] San Francisco County and San Joaquin County are relatively close in population at 829,072 and 701,050 respectively, but San Francisco has one attorney for every 41 of its citizens whereas in San Joaquin it is one attorney for every 708, amounting to 0.7 attorneys per square mile – for San Francisco it's 98.9 attorneys per square mile.[19] As depressing as those numbers may be, they are unfortunately deceptively high; for instance, in Sierra County, there are ostensibly five attorneys to provide legal services based on the data, but only one of the five – admitted to the bar in 1972 – is actually available to provide representation to members of the public.[20] PSLF provides an incredibly important incentive to those few attorneys providing legal services in these areas. The average tuition at a California law school in 2018 was $46,453 per year – a number that has only increased in the seven years since and student debt among California's law school graduates was 27% greater than the national average.[21] A program providing additional loan repayment assistance or forgiveness above and beyond that offered by PSLF has been repeatedly recommended by multiple advocacy and interest groups as being one of the most important steps in closing this gap in legal representation between rural and urban areas.[22] To eliminate what little incentive currently exists to take these jobs would have profound consequences in the lives of countless numbers of California's most vulnerable.

The same forces advocating for the elimination or restriction of PSLF in the name of austerity or – worse – based on a misguided belief that the indigent defense attorneys of our nation are somehow facilitating crime or helping those who commit crimes to escape responsibility are also likely to believe that the costs of legal representation and its unavailability for the indigent will simply be addressed by the miracle of the free market. After all, wouldn't everyone prefer to have their own private attorney anyway? This foolish assumption is a

[17] Lisa R. Pruitt, et al., *Legal Deserts: A Multi-State Perspective on Rural Access to Justice* (2018) 13 Harv. L. & Pol'y Rev. 15, 25.
[18] *Id.* at p. 30.
[19] *Ibid.*
[20] *Id.* at p. 31.
[21] *Id.* at p. 34.
[22] *Id.* at p. 35.

reflection of a litany of foolish assumptions made by a chorus of similarly misguided criminal defendants who "would rather have the most inept private counsel than the most skilled and capable public defender….

*Often, the arraigning judge appoints the public defender only to watch in silent horror as the defendant's family, having hocked the family jewels, hire a lawyer for him, sometimes a marginal misfit who is allowed to represent him only because of some ghastly mistake on the part of the Bar Examiners and the ruling of the Supreme Court…*
*People v. Huffman* (1977) 71 Cal.App.3d 63, 70, fn.2.

*Don't it always seem to go,*
*That you don't know what you've got 'til it's gone?*
Joni Mitchell

Sincerely,

Jesse E. Smith
Deputy Public Defender
Racial Justice Attorney
(209) 227-0505
jesmith@sjgov.org

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share ▾

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Our organization serves thousands of nonprofits across the state of Iowa, and we are very concerned about this proposed rule and oppose it entirely. It is critical for the well-being of our communities that we promote public service, and the Public Service Loan Forgiveness program is a valuable resource to make careers in the nonprofit and public sectors more appealing and feasible for college-educated individuals.

We oppose the narrowing of the criteria that determine eligible employers for the Public Service Loan Forgiveness program. Not only does the law not allow for such narrowing, but that also injects politics into the process by allowing the presidential administration - today under President Trump, but in a few years under another president - to change the eligibility criteria according to their political prerogatives.

In order for the Public Service Loan Forgiveness program to serve as an effective recruitment tool for nonprofits, prospective nonprofit employees need to have confidence that the program will be operated in a consistent manner over the long-term. Changing the terms of the program through this proposed rule undermine the intended effect of making nonprofit and public sector jobs more attractive because the program will not be seen as something that can be counted on.

We are also concerned that this rule does not allow for appropriate due process for nonprofit employers that are found to not be eligible employers. Furthermore, given that the IRS already has the authority to strip 501(c)(3) status from nonprofits engaging in substantial illegal activities, it does not make sense for this rule to attempt to establish a separate process to make a nonprofit ineligible.

Finally, the current capacity and expertise of the Department of Education are insufficient to effectively administer this rule.

Our organization opposes this proposed rule and believes it should not be enacted.

Give Feedback

10/10/25, 2:23 PM Regulations.gov

**Comment ID**

ED-2025-OPE-0016-10228

**Tracking Number**

mfo-txfd-uov9

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10228 2/2

ED_00281

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Attached is Maryland Legal Aid's comment to Docket ID: ED-2025-OPE-0016.

Attachments 1

Maryland Legal Aid Comment on NPRM ED-2025-OPE-0016

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10231/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10231

**Tracking Number**

mfo-cnui-gcgu

Give Feedback

**Comment Details** **Submitter Info**



**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback




September 17, 2025

U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

**Re: Notice of Proposed Rulemaking, William D. Ford Federal Direct Loan Program, 34 CFR Part 685; Docket ID: ED-2025-OPE-0016; RIN 1801-AA28**

Maryland Legal Aid is a 501(c)(3) nonprofit law firm that provides free civil legal services to low-income and vulnerable people. While Maryland Legal Aid has been and will continue to be a qualifying employer under the Public Service Loan Forgiveness (PSLF) program even if the proposed rule is finalized, we write to express our serious concerns about the lawfulness of this proposed rulemaking. We emphasize the chilling effect the proposed rule will have given the lack of clarity and due process protections around its implementation. In addition, we write to explain the importance of PSLF in our ability to continue to provide civil legal services to hard-working, low-income Marylanders. Regardless of ideology or opinion, PSLF benefits all members of Maryland Legal Aid's staff and the tens of thousands of Marylanders we serve in every single year and in all regions of our state.

**Maryland Legal Aid's 300+ staff of dedicated, passionate advocates depend on Public Service Loan Forgiveness to maintain their ability to meet the needs of Maryland's most vulnerable residents.**

Since 1911, Maryland Legal Aid has advocated with and for Marylanders experiencing poverty to provide high-quality legal services that address their most fundamental civil legal problems and empower them to overcome challenges, achieve stability and independence, and reach their goals. Maryland Legal Aid's core work includes eviction defense and homeownership preservation, family law and representation of domestic violence victims, ensuring children's rights and representing children and youth in the child welfare system, preserving economic stability and consumer protection, ensuring income supports and securing public benefits, representing vulnerable adults through advocacy around guardianships, nursing homes, and access to healthcare, and protecting worker's rights through addressing wage and hour violations, unsafe working conditions, and barriers to employment including criminal record expungement. Maryland Legal Aid advocates operate primarily through the courts, via individual representation of indigent clients, but also engage in impact litigation, public communication, and outreach. Through this holistic approach, Maryland Legal Aid serves to amplify the voices of tens of thousands of economically disadvantaged and vulnerable Marylanders each year so they can stabilize their situations and thrive.

Maryland Legal Aid covers every jurisdiction in Maryland, with twelve offices statewide. We advocate for Marylanders from urban, suburban, and rural areas. Maryland Legal Aid staff play an important role in ensuring that the legal playing field is leveled so that those most in need

United Way




achieve equal access to justice. Our 320 employees include both legal and non-legal staff who come from various educational, professional, and personal backgrounds, but who are united in their dedication to use their unique talents and skills to help Marylanders living in poverty across the state.

Jobs at Maryland Legal Aid fit clearly within the statutory definition of "public service job[s]" that qualify for the PSLF program. The statute defines "public service job" to include "a full-time job in . . . public interest law services (including . . . legal advocacy on behalf of low-income communities at a nonprofit organization)."[1] Countless members of Maryland Legal Aid's staff rely on and have benefitted from Public Service Loan Forgiveness.

The PSLF program is a critical investment in our nation's public service workforce. By ensuring student loan relief for those who commit their careers to serving our communities, PSLF strengthens America's schools, hospitals, law enforcement agencies and legal system, and military. From teachers and nurses to firefighters and military service members, PSLF ensures that essential workers can and will remain in their roles, strengthening the health, safety, and fabric of our communities. The staff of Maryland Legal Aid are equally essential – serving our constituents throughout the state, whose civil legal needs would be otherwise unmet. Without access to PSLF, critical shortages in education, healthcare, and public safety will worsen, impacting national security, public health, and community safety and increasing the overall costs to society.

**The proposed rule exceeds the statutory jurisdiction authorized by Congress.**

Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. The authorizing statute establishes a clear and unambiguous definition of what constitutes a "public service job" for purposes of PSLF.[2] The proposed rule attempts to reinterpret or narrow the statutory language, effectively redefining a term that Congress has already clearly defined. Specifically, the statute defines a "public service job" to include full-time employment at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title."[3] By this definition, all 501(c)(3) organizations qualify as eligible employers under PSLF. The Department of Education does not have the authority to further restrict eligibility under PSLF.

The Internal Revenue Service is already charged with determining whether a 501(c)(3) organization is abiding by relevant federal law and regulations to be eligible for tax-exempt status. Yet this proposed rule would empower the Secretary of Education to make a determination that an employer has engaged in an activity that has a "substantial illegal purpose".[4] However, were an organization to engage in such activities, its 501(c)(3) nonprofit status should have already been formally revoked by the IRS through long-established

---

[1] 20 U.S.C. § 1087e(m)(3)(B)(i).
[2] *Id.*
[3] *Id.*
[4] Public Service Loan Forgiveness (PSLF), 90 Fed. Reg. 40154, 40176 (Aug. 18, 2025) (to be codified at 34 C.F.R. pt. 685).

procedures that allow for due process.[5] Instead, the proposed rule sets up a system where the Secretary of Education can make a conflicting determination from one the IRS has made. Such a regulatory scheme is contrary to the clear intent of the underlying statute to allow any employer with a "public service job", including "at an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title,"[6] to fall under the PSLF program.

**The proposed rule lacks sufficient safeguards to ensure due process and will likely have a chilling effect.**

The proposed rule opens the door for any administration to change eligibility for the PSLF program based on policy priorities or ideology preferences in contravention of clear statutory language defining eligibility. It does so by awarding discretion to the Secretary of Education to determine whether an organization is engaging in activities that have a "substantial illegal purpose."[7]

This concern was raised in the negotiated rulemaking phase regarding the preponderance of the evidence standard proposed, in Section VII, Significant Proposed Regulations: "some of the negotiators expressed concern that the Department would use authority under this proposed standard to target qualifying employers that did not align with the current Administration's values." [8] The Department's response was to add in a materiality standard: "the materiality, meaning the significance, of the activities of the qualifying employer by gauging both frequency and severity of said activities, in deciding whether the activities amount to a substantial illegal purpose."[9] Yet the proposed rule provides no guidance on what level of materiality will rise to the level of "a substantial illegal purpose,"[10] which leaves concern that the Department's review of an employer's activities could be arbitrary.

Nor does the rule guarantee that a qualifying employer will receive due process beyond the vague statement that the Secretary of Education will make a determination "after notice and opportunity to respond."[11] Nowhere in the proposed rule does it address whether an employer will be allowed to present evidence, participate in a hearing, or be allowed any discovery into what evidence is being considered and evaluated under the preponderance of the evidence standard. The lack of guarantee of due process nonetheless carries with it severe consequences—an employer found to no longer qualify for the PSLF program has little recourse. The employer may only attempt to regain eligibility as a qualifying employer *ten years* after the Secretary of Education makes the determination of ineligibility or if the Secretary approves a corrective action plan that may include "any other terms or conditions imposed by the Secretary designed to

---

[5] Jeffrey Scott Tenenbaum, *How the IRS Can—and Cannot—Revoke Federal Tax Exempt Status*, AMERICAN BAR ASSOCIATION, BUSINESS LAW TODAY (May 6,2025),https://www.americanbar.org/groups/business_law/resources/business-law-today/2025-may/how-irs-revoke-federal-tax-exempt-status/#:~:text=All%20of%20this%20follows%20President,public%20nuisance)%2C%20among%20others.
[6] 20 U.S.C. § 1087e(m)(3)(B)(i).
[7] Public Service Loan Forgiveness (PSLF), 90 Fed. Reg. 40154, 40175 (Aug. 18, 2025) (to be codified at 34 C.F.R. pt. 685).
[8] *Id.* at 40164.
[9] *Id.*
[10] *Id.* at 40176.
[11] *Id.*

ensure that employers do not engage in actions or activities that have a substantial illegal purpose."[12] And the impacted employee—the student loan borrower employed by the previously qualified employer—has no recourse to challenge the Secretary's determination.[13]

The Department inserts varying standards throughout the Notice of Proposed Rulemaking. In one paragraph, it states that the changes are designed to ensure that "PSLF benefits are directed only to those borrowers who are employed by organizations that serve the public good and uphold public policy." In another section, it states that benefits are only to be granted "to those working for employers that genuinely contribute to the public good and comply with the law."[14] In yet another section of the Notice of Proposed Rulemaking, the Department states that "[i]n cases where an employer is deemed to have engaged in activities that breach federal or state law or established public policy, affected borrowers would no longer receive credit toward loan forgiveness for months worked after the effective date of ineligibility."[15]

Elsewhere in the Notice of Proposed Rulemaking, the agency states that it is revising the definition of qualifying employer because it "is concerned that the PSLF program has sent tax dollars to employees of organizations that are engaged in activities that are illegal, thereby subsidizing their employment."[16] The Department does not indicate on what evidence it is basing that concern; no evidence of widespread or isolated incidents of illegal activities is provided in the Notice of Proposed Rulemaking.

Moreover, with the lack of clarity around the standards the Secretary will use to make the determination and the potential lack of due process, the threat of losing access to the PSLF program may discourage student loan borrowers from entering into public service. The proposed rule, if finalized, could make it more difficult for Maryland Legal Aid and other legal service providers to attract new employees and to retain existing ones, because employees may fear losing the prospect of student loan forgiveness after making the requisite number of payments. Without sufficient staff, our ability to carry out critical organizational missions in the public interest would be jeopardized.

The concern the chilling effect this rule could have was mentioned in the Notice of Proposed Rulemaking but was summarily dismissed with the statement:

> The Department has taken steps to address the issues raised with the draft regulations and believes that the benefits of these proposed regulations outweigh concerns that have been raised. The modified definition would provide notice to borrowers about the qualifying employer requirements when applying for or certifying eligibility under the PSLF program. The modified definition would also provide clarity that an organization that participates in activities that have a

---

[12] *Id.* at 40165.
[13] *Id.* at 40163 ("[A] borrower may not request reconsideration when the Secretary's determination was made based upon an organization's ineligibility as a qualifying employer due to engaging in activities that have a substantial illegal purpose.")
[14] *Id.* at 40166.
[15] *Id.* at 40155.
[16] *Id.* at 40160.

substantial illegal purpose is explicitly excluded from the list of qualifying employers for purposes of determining eligibility under the program.[17]

As noted above, the proposed rule does not provide clarity around the standards used or what process will be afforded employers.

**The proposed rule fails to adequately address the reliance interests of millions of people, including Maryland Legal Aid and its 300+ staff, on the prior policy.**

Without assurances that the definition of qualifying employer will remain consistent over the long term, nonprofit professionals, like Maryland Legal Aid employees, cannot rely on the program to make important decisions about their career path.

Without PSLF, many public servants – especially those in rural and underserved areas – would be forced to leave public service for the private sector, where salaries are typically higher. This program is not only essential, but efficient. PSLF is a powerful tool for recruiting and retaining the best and brightest in public service. As a nonprofit civil legal aid provider, Maryland Legal Aid must keep salaries and costs low. PSLF enables our firm to recruit talent in our communities across the state and provide a viable career path that can compete with a private sector career.

The program incentivizes long-term commitment, ensuring that qualified professionals remain in key roles rather than seeking private-sector opportunities. Retaining skilled and experienced staff enables Maryland Legal Aid to provide high-quality, consistent, and reliable services to our community. It helps to lessen turnover, enhance expertise, and drive investment in public service.

PSLF is a contract – a deal that was made between public service workers to commit to 10 years (or more) of service while making 120 on-time loan repayments. For these public service workers to continue improving the lives of our communities, we need to invest in them and fulfill a promise made. Maryland Legal Aid staff depends on PSLF – and our communities depend on them. The proposed rule potentially substantively alters the terms of that contract that millions of student loan borrowers committed to public services have relied on in making crucial life decisions. Yet the proposed rule fails to seriously consider these reliance interests stating only that "the proposed changes to the program may slightly increase the time it takes borrowers to achieve forgiveness; however, long-term processes efficiencies are expected to be gained" and that there were "confusion and delays in PSLF application due to employer eligibility issues" in the past.[18] These conclusory statements fail to actually consider the reliance interests involved in changing the existing policy.[19] The Supreme Court has held that an agency's failure to consider reliance interests when changing existing policy is arbitrary and capricious in violation of the Administrative Procedure Act.[20]

---

[17] *Id.* at 40160.
[18] *Id.* at 40168.
[19] *See* Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 33 (2020) (holding that DHS was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.").
[20] *Id.*

Ultimately the proposed rule will potentially harm the people and communities that rely on Maryland Legal Aid and the essential services we provide by making it harder to attract and retain an effective, skilled workforce.

**Our communities are stronger because of Public Service Loan Forgiveness.**

The PSLF program strengthens communities, fills critical workforce shortages, and ensures that public service remains an accessible and attainable career path. It is a proven investment in America's workforce that should be safeguarded to ensure communities across the country receive the critical services public service professionals provide.

PSLF is a bargain for our country's taxpayers who benefit from vital public services. In 2023, Community Services Analysis LLC conducted a study on the economic impact and social return on investment of Maryland Legal Aid. It showed that for every $1 spent on the civil legal aid services Maryland Legal Aid provides, we return $6 of benefits. That year, the estimated value of the legal aid services Maryland Legal provided was $49.5 million, and the estimated economic impact of those services was approximately $200 million. Investing in public service employees through the PSLF program is an investment in communities.

Maryland Legal Aid's work saves taxpayers money through reduced healthcare, law enforcement, and social services costs. Our advocates secure millions in Social Security, disability, and unemployment benefits for residents previously denied, terminated, or reduced. We ensure access to healthcare, SNAP, and other essential assistance and ensure that government agencies abide by the rules of these programs. Maryland Legal Aid prevents evictions and foreclosures, reducing homelessness and associated government costs. We preserve and stabilize safe and healthy families and protect victims of domestic violence by obtaining protective orders and divorce decrees that secure child support and custody.

These community benefits illustrate the multiplying return on investment of PSLF. Maryland Legal Aid's work strengthens communities as well as individual constituents. For a single person in 2025, 125% of the federal poverty level is $18,825 annually, or $1,568.75 monthly. The clients we serve are truly living on the economic margin, the poorest of the poor, who desperately need our advocacy for needs-based resources. In some areas of the state, particularly the more rural ones, Maryland Legal Aid is the only legal services provider addressing particularly critical issues for low-income residents. Without PSLF, those individuals may not receive any support to address their civil legal aid needs, and the resultant community benefits would go unrealized.

Our clients who have lost their jobs need unemployment insurance to carry them through to another opportunity. Maryland Legal Aid's advocacy regularly results in administrative determinations that our clients are entitled to $430 in weekly benefits for 26 weeks, which can be the crucial factor in maintaining housing through an employment transition.

We help keep families together. A Maryland Legal Aid attorney represented a client in an Adult Guardianship matter. The client's guardian, without the court's authority, removed the client from her home and placed her in an Assisted Living Facility. Maryland Legal Aid objected, the court agreed, and the client was able to return to her home.

Last year, twenty tenants at a subsidized housing complex contacted Maryland Legal Aid about their landlord filing failure to pay rent cases in error. The problem was not that the tenants owed rent, but that the property managers incorrectly completed annual rectifications or lost track of tenant records. In all, the landlord filed eviction cases against 120 tenants at the property. We represented and made legal arguments on behalf of each of the 20 clients and reached out to the landlord's attorney to apprise him of the problem. After investigation, the landlord decided to dismiss all 120 filed failure to pay rent cases. In addition, he reassured us that they would not only work individually with each of our clients to resolve the situation but would also work with all the tenants residing at the property to correctly complete recertifications and make proper rent determinations.

These stories are made possible because our clients' advocates receive PSLF and can afford to work at Maryland Legal Aid. Without PSLF, we are likely to lose staff and this essential advocacy will be at risk because Maryland Legal Aid will face difficult decisions about which crisis a person experiencing poverty warrants an attorney instead of being able to assist the whole person so they can escape the cascading consequences.

**Public Service Loan Forgiveness is a non-political, bipartisan benefit for professionals who are dedicated to improving their communities; qualification for Public Service Loan Forgiveness should remain free of political ideology or affiliation.**

PSLF was signed into law by a Republican president and has bi-partisan legislative support. Republican Attorney Generals from seven states confirmed this support in their "Complaint for Declaratory and Injunctive Relief" against the Biden administration's "Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL Program)" ("Final Rule"). They argued that '[t]he Final Rule impairs the ability of public-service employers to recruit employees".[21] They cite to the importance of PSLF for recruiting, hiring, and retaining state and local government employees:

> For example, the Final Rule harms Missouri's interest in hiring and retaining employees across state and local government who use PSLF program for undergraduate and graduate student loans. Missouri relies upon a robust and dedicated public workforce. As a matter of statute, and the reality of public budgets, the State cannot always offer salaries on par with that of private employers around the state. To bridge the gap and make public employment more attractive, the State of Missouri and its political subdivisions, as employers, rely on the PSLF to recruit and retain employees who would otherwise seek private employment but for the benefits of the PSLF program.[22]

---

[21] Complaint for Declaratory and Injunctive Relief at 31, Missouri v. Biden, 738 F.Supp.3d 1113 (2024) (No. 4:24-cv-00520-JAR).

[22] *Id.* at 31-32; *see also id.* at 35 (describing PSLF as "an important recruitment and retention tool for Arkansas"); *see also id.* at 36-37 ("In general, Florida's state agencies do not offer compensation at the same level as private employers, and the prospect of public sector loan forgiveness is an important tool to recruit and retain qualified employees."); *see also id.* at 37 ("In general, Ohio state agencies do not always offer compensation at the same level as private employers, and the prospect of public sector loan forgiveness is an important tool to recruit and retain qualified employees.").

These seven Republican Attorney Generals also describe how their states "heavily emphasize PSLF when recruiting employees", categorize PSLF as "popular", and explain that public sector employees would "otherwise have left much sooner" if not for PSLF.[23] In the states of Ohio and Florida, "The availability of such programs [as PSLF] is particularly important for employees like lawyers who may have debt incurred from both graduate and undergraduate degrees."[24]

Failure to support PSLF has financial consequences for both red and blue states alike:

> Arkansas likewise faces financial harm. As detailed above, Arkansas currently relies upon the public sector student loan forgiveness program to attract and retain employees. Employees and potential employees consider that forgiveness in calculating overall compensation. Absent that financial incentive, Arkansas will have to increase other forms of compensation to attract and retain employees. Those additional expenses will reduce Arkansas's ability to fund other state expenses and programs.[25]

PSLF provides pathways for those who are most interested in lifelong public service careers and supports all districts, regardless of political party affiliation or voting trends. It is a program for all public service professionals, serving all communities. This has been our experience providing services in a politically diverse state, through our politically diverse staff. Regardless of ideology or opinion, PSLF benefits all members of Maryland Legal Aid's staff and all regions of our state. Public service providers must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees.

---

Thank you for the opportunity to provide feedback on the proposed rule regarding qualifying employer status in the Public Service Loan Forgiveness program. As stated in this comment, public service loan forgiveness is a critical benefit for those dedicated to public service and for vulnerable people nationwide. If you have questions, please contact Victoria Schultz, Executive Director, Maryland Legal Aid at vschultz@mdlab.org.

23 *Id. at* 32-33.
24 *Id.* at 37.
25 *Id.* at 36.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached letter with comments. Thank you.

Attachments 1

2025.09.17GLSPPSLFComments_

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10232/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10232

**Tracking Number**

mfo-cnw5-dzdk

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

CENTRAL OFFICE
104 MARIETTA STREET, NW
SUITE 250
ATLANTA, GA 30303
OFFICE: 404-206-5175
TOLL-FREE: 800-498-9469
FAX: 404-463-1623




STATEWIDE APPLICATION LINE: 833-457-7529
WWW.GLSP.ORG

SUSAN COPPEDGE
EXECUTIVE DIRECTOR

JULIA H. SULLIVAN
BOARD PRESIDENT

LISA J. KRISHER
SENIOR DIRECTOR
LITIGATION & ADVOCACY

September 17, 2025

U.S. Department of Education
Attn: Linda McMahon, Secretary
400 Maryland Avenue, SW
Washington, D.C. 20202

Submitted via https://www.regulations.gov/commenton/ED-2025-OPE-0016-7221

Dear Secretary McMahon:

Georgia Legal Services Program (GLSP) is a nonprofit law firm that for more than 50 years has provided free civil legal services to persons with low incomes living in the 154 counties in Georgia outside of metro Atlanta, creating access to justice and opportunities out of poverty. GLSP is a current public service employer under the federal Public Service Loan Forgiveness (PSLF) program under 20 U.S.C. §§ 1087a *et seq*. GLSP requests that the Secretary withdraw the proposed regulations that were published at 90 F.R. 40154 (August 18, 2025) and enforce the existing regulations.

The proposed regulation at Section 685.219 exceeds the Secretary of Education's authority. GLSP is concerned that the proposed regulation, inconsistent with the relevant statute and intent of Congress, will harm public service employers such as GLSP and current and future employees of employers that meet the current statutory definition. GLSP is concerned that attorneys and others will not apply for or maintain their employment with GLSP if the organization might not continue to qualify as a "public service employer" under the PSLF program. Also, as a law firm, GLSP is concerned about potentially being excluded from the PSLF program due to its representation of clients. The PSLF program is important to enable lawyers with student loans to work for GLSP despite our below private market salaries.

**The proposed regulation (b)(30) creates "Substantial illegal purpose" as a basis for excluding employers from participating as an employer which is not part of the statute, 20 U.S.C. § 1087e.**

An Executive Order, without citing specific legal authority, creates the "Substantial illegal purpose" concept. Executive Order 14235, 90 F.R. 11885 (March 7, 2025), "Restoring Public Service Loan Forgiveness." This Executive Order states that it is the "policy" of the current Administration. GLSP does not engage in illegal purposes. GLSP does not violate laws or support violating laws.

Georgia Legal Services Program is a 501(c)(3) nonprofit, EIN 58-1111590, whose mission is to provide civil legal services for persons with low incomes, creating equal access to justice and opportunities out of poverty.




*GLSP is funded in part by the Legal Services Corporation (LSC) and, as a condition of the funding it receives from LSC, it is restricted from engaging in certain activities in all of its legal work -- including work supported by other funding sources. GLSP may not expend any funds for any activity prohibited by the Legal Services Corporation Act, 42 U.S.C.2996 et seq. or by Public Law 104-134. Public Law 104-134 § 504 (d) requires that notice of these restrictions be given to all funders of programs funded by the Legal Services Corporation.*

Offices in Albany, Athens, Atlanta, Augusta, Brunswick, Columbus, Dalton, Gainesville, Macon, Piedmont, Savannah, and Farmworker Rights Division
**AN AFFIRMATIVE ACTION/EQUAL OPPORTUNITY EMPLOYER M/F/H/V**

There is no need to amend the existing regulation, particularly regarding lawyers who are representing clients. Lawyer conduct is already regulated by state supreme courts and/or bar organizations. In Georgia, the Supreme Court of Georgia and State Bar of Georgia regulate lawyer conduct.

**The Secretary does not have authority to regulate compliance with the statutes included in the "substantial illegal purposes."**

Even if the statute permits creation of "substantial illegal purposes," the six purposes also raise many specific issues. Two grounds in the proposed regulation are relevant to GLSP's operation as a law firm that employs lawyers who represent clients. Section 30(i) proscribes "aiding or abetting violations of 8 U.S.C. § 1325 [improper entry by immigrant] or other Federal immigration laws" is concerning for any attorney representing immigrants. Section 30(v) proscribes "engaging in a pattern of aiding and abetting illegal discrimination . . .."

Most concerning for GLSP is that its attorneys representing clients should not be considered to be violating laws. The proposed regulation at (h)(2) stating that "[n]othing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution" improves on the language first proposed by the Secretary. However, any final regulation that includes the "substantial illegal purpose" language must state specifically that attorneys or paralegals representing clients cannot be considered to be violating laws solely by virtue of their representation of their clients.

**The proposed regulation sets forth a definition of "public service employer" that conflicts with the statute.**

The statute at (3)(B)(i) defines "public service job" specifically including "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization) . . .."

Proposed Section 685.219 (b)(22) states that "*Public interest law* means legal services that are funded in whole or in part by a local, State, Federal, or Tribal government." While many "public interest law" firms receive government funding, the statute does not include these funding limitations. The statute's definition controls, not an agency's interpretation. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 400 (2024).

**The statute does not permit the proposed exclusions.**

There is nothing in the statute that authorizes the Secretary to deny loan forgiveness to borrowers on the grounds in the proposed regulation. The statute at 20 U.S.C. § 1087e(m)(1) states "[i]n general. The Secretary **shall** cancel the balance of interest and principal due, in accordance with paragraph (2), on any eligible Federal Direct Loan not in default for a borrower who—. . . (B)(i) is employed in a public service job at the time of such forgiveness; and (ii) has been employed in a public service job during the period in which the borrower makes each of the 120 payments described in subparagraph (A)." (emphasis in original)

**Any changes to the PSLF regulations must be prospective and not control loans created before the effective date of any changes.**

The proposed effective date of July 1, 2026 for regulatory changes, while initially appealing because of the notice period, does not address that the proposed regulation is retroactive on existing loans and thus illegal. The Secretary does not have the statutory authority to create the proposed regulatory changes and therefore would lack the statutory authority to apply to loans initiated before any regulatory changes are made. If changes to the PSLF regulations are made, there should be a twelve-month notice period to allow borrowers to more accurately determine whether a current or prospective employer will be considered a qualifying employer after the effective date of any changes.

**For the proposed regulation, it is unclear to what specifics that employers will need to meet to certify compliance.**

Under the proposed regulation, an employer's failure to certify is a ground for that employer's exclusion from the PSLF. The proposed regulation should have given specifics.

**Any action to remove employers from participation in the PSLF program must include specific notice and an opportunity to dispute the Secretary's contention that the employer is engaged in a "substantial illegal purpose."**

The proposed regulation at (h) "[c]reates a standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose." However, the proposed regulation at (i), most specifically (i)(1)(ii) is unclear what the process will be. The Secretary does not have the statutory authority to make such disqualifying determinations. If the Secretary amends Section 685.219, the regulation should include specifics of the process.

**The proposed regulation conflicts in several ways with the controlling statute and should be withdrawn.**

As shown above, the proposed regulation exceeds the authority of the Secretary. GLSP urges the Secretary to reconsider proposed regulation published in the Federal Register on August 18, 2025, and withdraw it from consideration.

Respectfully submitted,
/s/ Lisa J. Krisher
Lisa J. Krisher
Senior Director of Litigation and Advocacy

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file.

Attachments 1

CWLA PSLF Comments

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10234/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10234

**Tracking Number**

mfo-coy2-y3h4

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

The Child Welfare League of America (CWLA) submits these comments in opposition to the Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) published to the Federal Register on Monday, August 18th that would make changes to the Public Service Loan Forgiveness (PSLF) program.

CWLA is a coalition of hundreds of private and public child welfare agencies that since 1920 has worked to serve children and families who are vulnerable. Our expertise, leadership and innovation on policies, programs, and practices help improve the lives of millions of children across the country. Our impact is felt worldwide.

**Background**

The Child Welfare League of America is greatly concerned about the proposed changes to the William D. Ford Federal Direct Loan Forgiveness Program. This college loan forgiveness program encourages individuals to dedicate their careers to public service by helping families, children and communities. It is not a simple commitment: the nature of these public service jobs lends to stressful, difficult work and they typically offer lower salaries than other industries. In addition, the required commitment is not easy, ten years of work while making consistent payments before any relief is realized.

This program, established by the College Cost Reduction and Access Act of 2007 (CCRAA), despite being enacted by Congress nearly twenty years ago, is just starting to benefit some of

these dedicated workers. Significant changes, like those proposed in this notice, will set back the progress made in assisting our public service workforce.

**Negative Impact on the Child Welfare Workforce**

Throughout our history, CWLA has worked hard to raise attention to the need for a strong human service workforce. Child welfare workers address a range of vital services, from child abuse prevention and investigation, foster care placements and other forms of out-of-home care to permanence through reunification, adoption and kinship care.

A well-trained and well-staffed child welfare workforce is vital to the goals of the Administration, legislators and the broader community. All the reforms enacted by the White House and by Congress in recent years, including screening victims of sex trafficking, reducing group home care, expanding kinship care, finding more foster parents, enhanced foster and adoptive parent training, increasing legal permanency through adoptions and guardianships, more direct consulting with youth in foster care, addressing substance abuse and mental health needs within families, and entering new data are dependent on the competency and ability of the individual caseworker.

Child welfare work is labor-intensive and emotional, causing high turnover rates, secondary trauma, compassion fatigue, and burnout. Increased turnover rates and the resulting higher caseloads perpetuate the caseworker crisis. Studies have found that factors related to workloads such as emotional exhaustion and a lack of supervisory or administrative support also led to increased levels of turnover.

High caseworker turnover rates negatively impact children and families. A Government Accountability Office (GAO) analysis of 27 available Child and Family Services Reviews (CFSRs) in 2003 showed that staff shortages, high caseloads, and worker turnover were factors impeding progress toward the achievement of federal safety and permanency outcomes[1]. The report noted that staffing shortages and high caseloads disrupt case management by limiting their ability to establish and maintain relationships with children and families. Research in Milwaukee and Illinois suggests that children are more likely to achieve permanence if they are assigned fewer workers over the course of their stay in foster care.[2]

Strengthening the child workforce and ensuring caseworkers have manageable workloads would achieve a reduction in child abuse, reduce the number of children going into foster care, and

---

[1] HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff. Government Accountability Office. March 2003. Retrieved from https://www.gao.gov/assets/gao-03-357.pdf

[2] The Impact of Turnover on Families Involved in Child Welfare. National Child Welfare Workforce Institute. 2023. Retrieved from https://ncwwi.org/wp-content/uploads/2023/02/The-Impact-of-Turnover-on-Families-Involved-in-Child-Welfare.pdf

increase adoptions for children of all ages. A stronger workforce could also allow agencies to devote more resources to post-adoption and reunification services to strengthen permanency for children and families.

Supporting the workforce should be a top priority of the administration; instead, the proposed changes to PSLF threaten to weaken this student loan program at the very time when we should be expanding strategies to promote the knowledge and skills of entire human services workforce—a workforce that is resistant to foreign competition, job erosion, and other potential workforce challenges including the use of artificial intelligence. These changes will push well-qualified employees and candidates away from child welfare work and into other sectors, where loan forgiveness is more secure or where pay is significantly higher. The proposed rule, if finalized, will increase turnover and hiring challenges in child welfare agencies, and will ultimately put children at great risk of harm.

**Overreach of Authority of the Department of Education**

After nearly two decades since the creation of this program, new definitions are being created to instill in the Secretary of Education the power to selectively deny this workforce support to workers carrying out critical services as social workers, early childhood education workers, public agency workers serving the elderly and people with disabilities, public safety workers, public health and mental health workers to name some of the qualifying service sectors. The Department lacks both the expertise and jurisdiction to judge issues outside education, yet it will be given authority to police areas like public health, social services, and criminal law.

While the given rationale for these changes is an attempt to prevent taxpayer-funded loan benefits from being provided to individuals who are employed by organizations that are engaged in illegal activity, these new definitions, restrictions and extensive powers are being inserted into the law despite a lack of evidence that such changes are needed or are addressing a violation of the 2007 law. The statute clearly defines eligibility under PSLF and only Congress can make such changes. There is no ambiguity in the statute whatsoever, and the Department does not have the authority to make this change. **This particular proposed regulation is inconsistent with the statute, and therefore, should be rescinded.**

**Threat to Bipartisan Cooperation on Child Welfare Policy**

This regulation would instill an authority in the Secretary that could be manipulated to serve a political goal rather than a service priority. This manipulation could swing from one political viewpoint to the opposite depending on who was in office, meaning that future Administrations could have broad authority to change eligibility again, further destabilizing our workforce and child protection systems and creating confusion for public servants. There is an increased risk of political targeting: the Administration wants the power to penalize employers for activities it

disagrees with, even when those activities are allowed by law, using a lower legal standard than a court would require.

This approach is in direct contrast to how past administrations and Congress have approached child welfare policymaking, which has enjoyed strong bipartisan progress and support. In the last quarter century, we have seen the enactment of critical child welfare reform through the *Adoption and Safe Families Act* (Clinton, 1997), the *Fostering Connections to Success and Increasing Adoption Act* (Bush, 2008), the *Walorski Maternal and Child Home Visting Act* (Obama, 2010), the *Family First Prevention Services Act* (Trump, 2018), and the *Supporting America's Children and Families Act* (Biden, 2024). All of these improvements have been enacted on a bipartisan basis with broad support from the stakeholder community.

This bipartisanship has been reflected in past Congresses through the actions of Senators Chafee (R), Rockefeller (D), Grassley (R), Baucus (D), Snowe (R), Clinton (D), DeWine (R), and Wyden (D), as well as Members of Congress including Levin (D), Camp (R), Davis (D), LaHood (R), Bass (D), Weller (R), McDermott (D) and Herger (R). Members in both chambers and on both sides of the aisle have drafted and championed important legislation to protect and support children and families.

Giving the Department of Education and other offices in the Administration the ability to make critical policy decisions based on political opinions and campaign platforms threatens the long history of bipartisan agreement on child welfare policy. The proposed changes to the PSLF program will cause unnecessary damage to the workforce and will create setbacks in passing critical reforms to protect children. **For these reasons, CWLA opposes the new rule and urges the Administration to withdraw it.**

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The University of California wishes to submit the following comment letter as it relates to the proposed Public Service Loan Forgiveness regulations.

Attachments 1

09.17.25 UC Comment Letter_PSLF Program

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10239/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10239

**Tracking Number**

mfo-d0au-dwcv

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO

SANTA BARBARA • SANTA CRUZ

GRADUATE, UNDERGRADUATE AND EQUITY AFFAIRS

OFFICE OF THE PRESIDENT
1111 Franklin Street
Oakland, California 94607-5200

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

RE: Comments on Docket ID ED-2025-OPE-0016, William D. Ford Federal Direct Loan (Direct Loan) Program

Dear Ms. Abernathy:

The University of California (UC) welcomes the opportunity to comment on the Department of Education's proposed rule regarding amendments to the Public Service Loan Forgiveness (PSLF) program under 34 C.F.R. § 685.219. The University supports the Department's goal of ensuring the integrity of the PSLF program; however, as a public higher education institution of close to 300,000 students and with 2.5 million alumni, we have concerns about the proposed rule's potential impacts on both our graduates who are working in public service careers and current students who wish to pursue a career in the public sector.

**Federal Doctrines and Definitions**

The University shares the goal of ensuring that the PSLF program is operated with integrity consistent with its statutory and regulatory obligations. However, the proposed rule includes language and doctrinal references that are either vague in their application and/or insufficient in providing institutions, employers, and/or borrowers sufficient clarity. The proposed rule includes language to exclude employers that engage in activities with a "substantial illegal purpose" and proposes a vague standard that does not give employers fair notice of the conduct prohibited.

The Department cites *Iowaska Church of Healing* v. *Werfel* as an example of, and justification for, adjusting the definition; however, in that case the court upheld the IRS's denial of 501(c)(3) status because the organization's primary organizational and operational purpose was illegal on its face. Since the court's reasoning in *Iowaska* was fact-specific and involved facially illegal activity, it does not support the Department's proposed definition, which does not provide clarity on how the Department will determine that an employer is engaging in a "substantial illegal purpose."

Further, PSLF's primary purpose is to provide a financial benefit to individuals, not organizations. In *Iowaska*, the court upheld the IRS's focus on the organization's purpose and denial of a benefit (otherwise known as a tax exemption) to the organization itself. This contrasts with the Department proposing to deny a benefit (loan forgiveness) to an individual for the actions of their employer, an action not supported by the PSLF statute (20 U.S.C. § 1087e). Denying loan forgiveness to a deserving individual because of their employer's "alleged actions" is unfair and undermines the PSLF program's goal of promoting public service.

The University is also concerned with the proposed definitions for terms such as "aiding or abetting," "illegal discrimination," and "violating State law," all of which could be subject to interpretation on a state-by-state basis. For example, a court ruling or legal settlement against a large public employer poses the risk of arbitrarily and unfairly disqualifying an entire entity and its agencies, such as police and fire departments. While the Department may distinguish employers under a shared identification number, we are concerned that the default may be to disqualify the entire organization.

The Department references federal criminal code 18 U.S.C § 2 for the definition "aiding and abetting," where the standard for conviction requires proof beyond a reasonable doubt and where this applies to an individual. However, the Department proposes a lower standard of "preponderance of the evidence," and would apply this standard to employers. This approach is inconsistent with the referenced federal code and undermines the established purpose of both frameworks.

**Impact on Borrowers**

The proposed rule states that no payments would be credited as qualifying for any month after a determination that an employer engages in activities with a "substantial illegal purpose." However, borrowers may not be aware of such activities, as the notification process only occurs once an employer is at risk of or has lost its status. This creates a risk that a borrower makes payments for months that they believe are qualifying, only to find out that the payments they made do not count because of an employer's actions unknown to them. Historical issues with PSLF were tied to inadequate information on program requirements. The ambiguity of what would be determined "substantial illegal purpose" will require substantial training for front-line loan servicer staff and may still result in payment counting errors and delays in processing PSLF applications. The program could receive complaints reminiscent of previous criticisms of the program as a result of this change.

Finally, the proposed rule prohibits a borrower from requesting reconsideration of a final determination by the Secretary that an employer lost its qualifying status. This places the entire burden on the employer to challenge a determination, which may not happen, leaving borrowers with no recourse. Expecting borrowers to transition to other qualifying employers if their current employer is disqualified would be extremely disruptive to such borrowers' careers and it may be unrealistic for some borrowers, depriving them of obtaining loan forgiveness under PSLF. Withholding an individual benefit in this scenario is egregious and punitive, and any recourse is better addressed with the organization on any finding or error.

**Recommendations**

The University would like to offer some recommendations for consideration.

**The Secretary should rescind the proposed regulations:** The rule allows the Secretary to make a series of arbitrary judgments, such as using vague standards like "preponderance of evidence" or how "violating State law" would be, that have negative implications for federal student loan borrowers who have launched public service careers, as well as future graduates who would otherwise pursue careers in public service. These arbitrary judgments are not supported by the current statute (20 U.S.C. § 1087e) and exceed the Secretary's authority under existing law.

However, if the Department continues to move forward with finalizing and implementing this proposed rule, we recommend the following changes be made to mitigate the potential adverse impact this proposal may have on borrowers:

- **Provide a Clear and Consistent Standard**. We recommend providing greater specificity on how "materiality" will be considered in PSLF determinations and how the Department will apply the standard of a "preponderance of the evidence." Clear examples of what does and does not constitute a "substantial illegal purpose" could help both institutions and borrowers understand the new criteria.
- **Offer a Grace Period for Disqualified Employers**. The rule outlines a 10-year period for a disqualified employer to regain eligibility or for the employer to submit a corrective action plan. We recommend offering a grace period during which payments from borrowers would still count as qualifying while an employer is actively working with the Department to address the issues. This would allow employers to rectify issues without penalizing innocent borrowers who have made career choices based on their perceived eligibility for PSLF.
- **Enhance Borrower Notification and Appeals**. We urge the Department to establish a process for the Department to provide timely and proactive notification to borrowers when an employer is under review for a "substantial illegal purpose." Additionally, a clear and accessible borrower-initiated appeals process with the Department should be included. While we understand the Department's desire to streamline the process, an avenue for borrowers to present evidence of their lack of knowledge or involvement in illegal activities is crucial to ensure fairness.

Thank you for your consideration of these comments. If the proposed regulation is not rescinded, we hope that the changes we have suggested will strengthen the PSLF program and protect both taxpayer dollars and encourage individuals to pursue careers in public service.

Sincerely,

Shawn Brick, M.P.P.
Associate Vice Provost, Student Financial Support
University of California, Office of the President


cc:    Provost and Executive Vice President Katherine S. Newman, Academic Affairs
       Senior Vice President Meredith Turner, External Relations and Communications
       Associate Vice President Chris Harrington, Federal Governmental Relations

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached letter in opposition to the proposed amendments.

Attachments 1

UUA Comment on Proposed PSLF Amendments 9.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10283/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10283

**Tracking Number**

mfo-fywe-ywgd

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Rev. Sofía Betancourt, Ph.D.
Boston, MA
Unitarian Universalist Association, President
president@uua.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]; Attn: Tamy Abernathy

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Rev. Sofía Betancourt, and I serve as President to the Unitarian Universalist Association. On behalf of the Unitarian Universalist Association (UUA), I submit the following comment in opposition to the proposed amendment to the regulations on the PSLF program of the US Department of Education (USDOE). The UUA is the central religious organization of the Unitarian Universalist liberal religious tradition in the United States. We are recognized by the IRS as a 501(c)3 organization. Our 1000+ member congregations and communities, located across all 50 states and the District of Columbia, covenant to embrace shared religious values and practices. Many of our congregations have been worshipping since before the American Revolution, dating to the founding of this country. Unitarian Universalists have a deep, historic tradition of defending civil liberties and championing human rights, justice and equity for all. Our forebearer Unitarians and Universalists like Horace Greeley were some of the earliest advocates for public funding of education in the United States, as well.

The UUA unequivocally opposes the proposed amendments. They would seek to strip benefits from staff who work with organizations with whom the USDOE disagrees or dislikes, under the guise of a “substantial illegal purpose” with effectively no due process. These amendments are an improper attempt by the USDOE to coerce the actions of independent 501(c)3 organizations and give the Secretary unfettered authority to inappropriately adjudicate the activities of nonprofits.

The proposed amendments could affect not only the staff of the UUA, but also the eligibility of the thousands of religious professionals who work for our congregations and related UU organizations. Many of these staff have participated in the PSLF in the past, as they are entitled to do. It is a key program that makes religious leadership financially viable for many, who often took out loans to prepare for religious training with a fair expectation of loan forgiveness in exchange for public service. The politicization of the PSLF program, to potentially target a religious organization that the USDOE had unilaterally determined is no longer eligible, both violates the religious organization’s freedoms and could be financially catastrophic for countless religious employees.

Additionally, these amendments are in violation of the statute authorizing the PSLFs, which entitles staff who work at any 501(c)3 nonprofit organization recognized by the IRS to qualify for this benefit. The responsibility to ensure nonprofit organizations comply with the law, for the purpose of receiving Federal recognition and eligibility for programs including PSLF, in fact rests with the Internal Revenue Service. The IRS already has the authority to investigate illegal activity and revoke nonprofit status through a defined process with safeguards. The proposed amendments would run afoul of the court precedent and IRS requirements for recognition of churches. This would be contrary to IRS policy, which seeks to limit the administrative burden it imposes on churches as typically small and volunteer-heavy organizations, affirming these religious communities' Constitutionally protected role in American civic life.

Most damagingly, the proposed amendment clearly uses an ideological, politicized framework to drive the government's agenda which conflicts with our Constitutional rights. This amendment would undermine the fundamental protections that the UUA and its member congregations hold as a faith community, under the First Amendment and the Religious Freedom Restoration Act, for our free exercise of religion. USDOE has no authority to insert itself into our ecclesiastical decisions of our duly chosen religious leaders or our theological interpretation of our own religious tradition. The UUA will zealously protect our rights and those of our churches and faith communities.

We object to any characterization of our ministries, which uphold values of love, justice and generosity. Our congregations welcome all people based on these shared religious values, and we are compelled by our faith to work towards a freer and more equitable world.

In closing, we reiterate our opposition to this proposed amendment in the strongest possible terms.

Respectfully,

Rev. Sofía Betancourt, Ph.D.

UUA President

24 Farnsworth Street, Boston MA 02210 | P (617) 742-2100 | F (617) 367-3237
uua.org

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I am an attorney who works with people who need government assistance.

Over two dozen attorneys in my close law school cohort work for agencies serving Americans, including poor people, rural people, homeless people, disabled people, LGBTQ people, and children. Without access to PSLF, none of these attorneys could afford to work in public service, and the people and organizations they help would have to go without legal assistance they could not otherwise afford. Attorneys I know, working for non-profit organizations, have helped people get off the street, find housing, get work, get healthcare, and get the help they need with legal matters that negatively impact the aforementioned.
I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The proposed rule inserts politics and ideology into the non-partisan PSLF program. The proposed rule gives unprecedented discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene public policy.

As an initial matter, this rule is redundant. The IRS already has authority to rescind the 501-c-3 status of any nonprofit found to be engaging in illegal activities.

Further, this rule harms Americans who rely on non-profit organizations for their basic needs. Of particular concern is the leeway the Department would have to exclude nonprofit employers working, for example,

Give Feedback

with undocumented immigrants, supporting transgender children, or advancing racial and social equity, because those classes of people are seen as undeserving by this Administration. This proposed rule opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology; for example, a soup kitchen run by a Christian organization could be found ineligible due to the ideology of an Administration. This effect of the proposed rule undermines the country's economic and social stability. Nonprofit organizations of all stripes must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support them.

The proposed rule undermines the effectiveness of the PSLF program and would harm real Americans and their communities. My colleagues at non-profits organizations, who make less than 20% of what they could make in a big law firm, would not be able to work for a non-profit without PSLF. And the non-profits they serve would be unable to attract talented lawyers to serve their essential missions. Ultimately, the proposed rule will harm the American people and American communities that rely on nonprofit organizations and the essential services they provide. Legal help should not just be for the wealthy but should be accessible for all Americans. PSLF, as it stands now, allows lawyers to provide that help to needy Americans at a salary non-profits can afford.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
A concerned public interest attorney in Colorado

**Comment ID**

ED-2025-OPE-0016-10287

**Tracking Number**

mfo-uzwh-sogk

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Give Feedback

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government. 

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s) Opposition to the Department of Education Proposed Change on Public Service Loan Forgiveness

Attachments 1

Benson comment on Proposed Rule Altering Loan forgiveness

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10292/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10292

**Tracking Number**

mfo-vks3-0vjk

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

NEW YORK LAW SCHOOL

Professor Lenni B. Benson 185 West Broadway Room C 240 NY NY 10013 212-431-2336

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
400 Maryland Ave. SW
Washington, DC 20202

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program**

**Docket ID: ED-2025-OPE-0016**

To the Department of Education Staff Assigned to this Proposed Rulemaking:

Today, September 17, is Constitution Day. The Department's Notice of Proposed Rulemaking required that all comments were filed by the end of today. Perhaps you were aware of this special date. Your proposed rule indicates that at least some of the drafters of the rule are not fully versed in the structures and protections of the U.S. Constitution. I offer this comment in the hope that perhaps some of the proposals were not fully considered through the lens of the constitutional constraints on the Executive Branch. Today is dedicated to appreciation and study of the Constitution. Forgive the didactic tone. I am a law professor of many years and have taught Administrative Law, Constitutional Law, and Immigration law as some of my main courses, I offer this comment in my personal capacity and my written response is entirely my own and should not be attributed to my institutional home of New York Law School, nor to any of the organizations I support or serve in leadership capacities. These words are my own.

**Violation of First Amendment Freedoms**

The prosed rule would refuse loan forgiveness for employees of some nonprofit organizations and/or governmental employers based on the employer's petitioning the government for reforms, advocating for access to justice, training or supporting individuals who seek to vindicate their individual liberties. The rule, if unwisely adopted, will chill employment, reduce public participation in government, and decimate if not eliminate legal representation in many fields.

The Department's proposed additions to 34 C.F.R. § 685.219(h)–(i) are troubling because they would chill and potentially punish the exercise of constitutionally protected rights of speech, petition, and association. By empowering the Secretary to deem that a qualifying employer has engaged in "activities that have a substantial illegal purpose" based on a preponderance standard and without clear limits, the rule risks sweeping in core First Amendment activity. Advocacy organizations, educational institutions, and legal aid providers frequently engage in litigation, lobbying, or protest to seek changes in law or policy. Such efforts are not only lawful but constitutionally protected. The Supreme Court has long recognized that campaigns to influence legislation or regulatory policy lie at the heart of the Petition Clause. *Eeastern Railroad. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (Using antitrust enforcement to chill Truckers petitioning the government violated the First Amendment). Likewise, the Court has emphasized that access to courts and agencies for redress of grievances is "but one aspect of the right of petition." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)(Remanding to determine if the use of the tribunals was a sham pretense, yet articulating that the judicial and administrative tribunals are an area of protected action.)

Nor is protection confined to individuals seeking change on their own behalf. In *NAACP v. Button*, 371 U.S. 415 (1963), the Court invalidated restrictions on the NAACP's ability to organize and advise individuals to bring civil rights litigation, recognizing such collective advocacy as protected associational and petitioning activity. *Id.* at 429–31. In that case the Court wrote …[government]cannot foreclose the exercise of constitutional rights by mere labels. *Id.* Here the Department would label advocacy or work as have a "substantial illegal purpose." That label of illegality without a competent tribunal making an adjudicated and final determination is only a "label." But in the proposed rule a dangerous label that threatens the organizations and their employees with severe economic and reputational harms.

Similarly, the Court has invalidated restrictions on circulating ballot petitions, explaining that such activity "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). Conditioning loan forgiveness eligibility on whether an employer certifies that it has not engaged in undefined "activities that have a substantial illegal purpose" creates an impermissible risk that core advocacy, litigation, and petitioning will be treated as disqualifying conduct. Supposed a local level of government or nonprofit were working to expand voter registration or driving people to the polls, or advocating for mail-in ballots, under these proposed rules, the Department might decide those activities were aimed at an illegal purpose simply by allegation. That cannot be accepted as good policy nor is it constitutional. We cannot function in a society where labeling, shaming, and vilifying organizations and their employees is the same as have a "substantial illegal purpose."

Such a rule would chill protected speech by deterring employers from engaging in robust petitioning for fear that their advocacy could later be deemed "illegal" by the Department, thus jeopardizing employees' loan forgiveness. The Supreme Court has cautioned against government action that "penalize[s] an individual for exercising his constitutional rights." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)(Protecting a college professor's right to criticize a public

university). Here, the combination of vague standards and the high stakes of loan forgiveness could operate as precisely such a penalty. To avoid infringing the Petition Clause, the Department should narrowly tailor any disqualification criteria to exclude constitutionally protected advocacy and ensure that determinations rest only on adjudicated violations of law, not on protected efforts to seek legal or policy change.

In my own area of immigration law, the rule threatens those organization that have worked for the positive use of prosecutorial discretion and programs such as humanitarian parole, deferred departure, administrative closure of removal proceedings, and/or reopening of administrative immigration proceedings after an in absentia order because a Department of Education adjudicator might erroneously believe these legal actions, trainings, or advocacy were somehow "furthering a violation of U.S. immigration laws." This would be a gross mischaracterization of the work nonprofits and local governments perform to support immigrants living in the United States. Yet, the rule, as drafted, appears to give this misguided authority to the Department of Education. Attorneys, social workers, paralegals, grant writers, trainers, and many more categories of workers would risk enormous economic costs if their employer was disqualified from loan forgiveness. And the activities they were undertaken are protected actions as free speech, petitioning the government, and providing education. It is content-based regulation and not neutral or designed to adapt protected activities to fit a critical government interest. Attacking institutional employers and the workers with loss of loan forgiveness is not tailored to address any legitimate interest. If an employee or institution were actually engaged in a concerted effort to defraud or evade the immigration laws, there are tools available to the federal government to address those actors. But, as the Department is undoubtedly aware, those other tools offer due process protections also enshrined in the Constitution such as the guarantees of a right to counsel and the right to a jury if prosecuted for a criminal act. The purpose and design of this proposed rule is to strip our society of voices of advocacy for those areas of law that the Department of Education or other agencies within the federal government might disfavor and label criminal or illegal. This regulatory cudgel cannot survive Constitutional scrutiny and should be abandoned.

**The Proposed Rule is Ultra Vires**

Other commentators will undoubtedly fully describe the legislative history and clear text of the Public Service Loan Forgiveness legislation. The proposed rule contradicts the plain language of the statute and creates agency authority to reject loan forgiveness on speculation. A regulation that is generating a substantive exception unsupported by the statute goes too far and is outside the law, ultra vires. Further, the economic consequences for the host employers and the employees would undoubtedly have enormous economic impacts. The proposed rule diminished the economic impact in an effort to avoid the Supreme Court's major question doctrine. And yet, it was the Executive Branch implementation of loan forgiveness in 2022 under the Hero's Act that the Court struck down as presenting such a significant impact on the federal budget that the loan forgiveness program required a clear authority from Congress rather than allowing discretion in the Executive. *See Biden v Nebraska*, 600 U.S. 477 (2023). This newly created restraint on the Executive is characterized by the majority as one mandated by separation of

powers. Whether the Department believes this action is less economically significant or not, at a minimum it is not authorized by the Public Service Loan Forgiveness enabling statute and is simply ultra vires. But if the Department is honest, the economic impact, the cascade of consequences for the Public Service employers, employees, and their communities is enormous. Without loan forgiveness opportunities, these employers will have to dramatically raise wages to recruit workers, and those costs will be passed onto government and taxpayers. Stop this ill-advised disaster before the Department's actions lead to intensive and extensive litigation, litigation that will also have severe economic consequences for the government and the litigants. The Department is simply not authorized to move in this direction without clear Congressional authority. *See also West Virginia v. EPA*, 597 U.S. 697 (2022)(overreaching by agency without Congressional authority voided by the major questions doctrine as unconstitutional).

**The Proposed Rule Violates Fifth Amendment Guarantees and Sixth Amendment Protections**

Our founders and the communities that ratified the U.S. Constitution and the later amendments were greatly concerned with an overreach by federal central executive authority. Our government cannot simply point a finger and determine a person a criminal. Procedural and substantive safeguards are built into our Constitution. Most glaring is the audacity of the Department's proposal that it is qualified to adjudicate that an action was taken by an organization "primarily for an illegal purpose." The Department is not a prosecutor, it is not skilled in the judicious preparation of substantial evidence to meet the beyond a reasonable doubt standard required to prove criminality. Nowhere in the rule are there safeguards of a grand jury indictment nor of the ability of the accused to challenge the introduction of evidence or to cross examine and confront witnesses who allege "illegality". It is frankly legal incoherent and a mockery of U.S. constitutional protections.

**The Proposed Rule Violates Procedural Due Process Guarantees in the Fifth Amendment**

The proposed rule has many deficiencies but perhaps one of the plainest is the lack of adequate notice, opportunity to be heard by a neutral adjudicator, and the opportunity for development of a full record. Agencies are required to provide contextually appropriate procedural due process. *See Goldberg v. Kelly*, 397 U.S. 254 (1970), or *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)]. The proposed rule ignores all of the years of administrative law cases that strike down this type of truncated process that is a naked grab for power. Power to intimidate, to ruin, to disable governmental employers and nonprofit organizations. The proposals not only provide insufficient evidentiary standards to support a Department action stripping eligibility for loan forgiveness, it forbids reopening the adjudication without any consideration of circumstances that might warrant that reopening. It puts efficiency and expediency before fairness. That defiles due process.

**Conclusion**

I am completely opposed to the proposed rule and have only focused on some of the constitutional arguments that can be levied against this unfortunate rule. The Department has a noble mandate to incentivize and protect public service. Rethink. Reflect. Repent this ill-conceived approach.

Respectfully,

Lenni B. Benson
Distinguished Professor of Human Rights
and Immigration Law

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

NJCenterForNonprofits_ED-2025-OPE-0016-8107_PSLF_Comments_09172025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10297/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10297

**Tracking Number**

mfo-vqzt-4cc2

**Comment Details** **Submitter Info**

10/14/25, 9:02 AM Regulations.gov

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10297 2/2

ED_00324



NJ Center for Nonprofits
Amplifying Our Voices Together

September 17, 2025

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Ave. SW, 5th Floor
Washington, DC 202022

Submitted via www.regulations.gov

Re: Docket ID ED-2025-OPE-0016
Proposed Rulemaking –William D. Ford Federal Direct Loan Program

Dear Ms. Abernathy:

On behalf of the New Jersey Center for Nonprofits (the Center), thank you for the opportunity to submit comments in response to the Department of Education's Notice of Proposed Rulemaking, Docket ID ED-2025-OPE-0016.

The Center is New Jersey's statewide network of, and for, our state's charitable community, and is itself a 501(c)(3) publicly supported charity. We champion and serve our state's charitable nonprofits through public policy, education, research, management and compliance guidance, professional development, and other services.

We are also a member of the National Council of Nonprofits (NCN) network. Through this letter, we echo and endorse the comments submitted previously by NCN regarding these regulations, and wish to provide some insights specific to nonprofits in New Jersey.

We are deeply concerned that the proposed regulations run counter to existing law and Congressional intent by seeking to drastically and arbitrarily curtail the types of organizations whose employees would be eligible for public service loan forgiveness. The proposed changes would cause significant harm for hardworking employees and nonprofit organizations that provide vital services throughout the country.

The PSLF is Congressionally authorized and has long had widespread bipartisan support. The program has proven to be a vital way to lessen the crippling burdens of student loan debt, especially for economically disadvantaged students, and for nonprofits – for which demand for services has been steadily skyrocketing – to attract and retain employees

njnonprofits.org
Tel 732.227.0800 | Fax 732.227.0087 | 3635 Quakerbridge Road, Suite 35, Mercerville, NJ 08619
*New Jersey Center for Nonprofits is a New Jersey nonprofit corporation and a federally recognized 501(c)(3) public charity.*

ED_00325



NJ Center for Nonprofits
Amplifying Our Voices Together

needed to fulfill their missions. Nonprofits in New Jersey, like the rest of the nation, are experiencing severe workforce shortages and rising demand for their services, and are in dire need of relief.

According to our annual survey of nonprofits, conducted earlier this year and focused exclusively on New Jersey, nearly 40% of our survey respondents with at least one employee reported that they are experiencing staffing shortages, with an average vacancy rate of 17%. These workforce challenges hamper the ability of nonprofits to meet escalating needs. The PSLF program has proven an important way to encourage talented individuals to devote their careers to nonprofits.

Our concerns about the proposed regulations include the following:

- Under current federal statute, the definition of "public service job" clearly includes all full-time positions within 501(c)(3) nonprofits. By seeking to exclude large segments of the charitable community from eligibility, this proposal far exceeds the authority granted to the Department by Congress.

- Under the regulations, a wide array of activities would, without statutory basis, be defined as "illegal," thereby making the employer ineligible for the program and eliminating its workers' ability to qualify for loan forgiveness. The proposal seeks to create new Department interpretations that go far beyond existing statute and caselaw, putting what has been a widely supported and successful program at risk of the political and ideological variations of current and future administrations.

- Another problematic example is the new self-certification requirement, which would force organizations to attest that they are not engaged in activities that have a "substantial illegal purpose" – a term which is subject to wide interpretation – or be automatically excluded from the program. This provision places nonprofits in the impossible position of trying to anticipate what the Department might deem a "substantial illegal purpose" or risking punitive action on the part of the government.

The IRS already has the authority, reviewable by courts, to revoke a nonprofit's tax exemption if It is found to engage in illegal activity. Importantly, this procedure involves due process protection and an appeals path for organizations that seems to be missing from the proposed regulations.

The PSLF program has been a lifeline for many thousands of employees who have dedicated their careers to public service. As currently written, the proposed rules would cause

njnonprofits.org
Tel 732.227.0800 | Fax 732.227.0087 | 3635 Quakerbridge Road, Suite 35, Mercerville, NJ 08619
*New Jersey Center for Nonprofits is a New Jersey nonprofit corporation and a federally recognized 501(c)(3) public charity.* 2

ED_00326



NJ Center for Nonprofits
Amplifying Our Voices Together

substantial harm to nonprofit organizations and individuals in New Jersey and nationwide who have devoted years to the service of others. We urge you not to adopt this proposal, and instead preserve the PSLF program as Congress has supported for many years.

Thank you for your consideration.

Very truly yours,

Linda M. Czipo
President & CEO

njnonprofits.org

Tel 732.227.0800 | Fax 732.227.0087 | 3635 Quakerbridge Road, Suite 35, Mercerville, NJ 08619

*New Jersey Center for Nonprofits is a New Jersey nonprofit corporation and a federally recognized 501(c)(3) public charity.* 3

ED_00327

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

IFPTE comment on Ed NPRM

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10299/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10299

**Tracking Number**

mfo-vrrx-hu61

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



INTERNATIONAL FEDERATION OF
PROFESSIONAL & TECHNICAL ENGINEERS
AFL-CIO & CLC
513 C Street, NE, Washington, DC 20002
202-239-4880 • FAX 202-239-4881 • www.ifpte.org

**MATTHEW S. BIGGS**
President

**GAY HENSON**
Secretary-Treasurer

**AREA VICE PRESIDENTS**

**John Mader**
EXECUTIVE VICE PRESIDENT
WESTERN

**Katie Barrows**
SOUTHEAST

**Rebecca Caron**
CANADIAN

**Benjamin Emmel**
EASTERN FEDERAL

**John Dimas**
SPEEA

**Frances Hsieh**
WESTERN

**R Matthew Joyce**
SPEEA

**Joan Mah**
WESTERN

**Richard Mahé**
CANADIAN

**Sean P. McBride**
ATLANTIC

**Steven Pinto**
ATLANTIC

**Denise Robinson**
NORTHEAST

**Ryan Rule**
SPEEA

**Jamie Uyeunten**
WESTERN FEDERAL

**Julian Ware**
WESTERN

September 17, 2025

The Honorable Linda McMahon
Secretary of Education
U.S. Department of Education

**Re: RIN** 1801-AA28, **Docket ID** ED-2025-OPE-0016,

The International Federation of Professional and Technical Engineers (IFPTE), a labor union representing upwards of 90,000 employees, including 45,000 employees who work in federal, state, and local government, in healthcare settings, and in the nonprofit sector, submit this comment in opposition to the Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) published to the Federal Register on Monday, August 18th that would make unlawful changes to the Public Service Loan Forgiveness (PSLF) program.

Our members who work in public service fields are among the millions who undertook their careers in public service fields with the understanding that student loan forgiveness was promised by Congress. This proposed rule treats these employees and the organizations they work for as pawns in a politically and ideologically motivated effort to stifle and silence organizations that serve a public purpose.

This proposed rule is an unlawful attempt to grant the Office of the Secretary of Education the ability to weaponize the Public Service Loan Forgiveness (PSLF) program to intimidate and punish governments and non-profits whose work conflicts with a specific political agenda. When Congress created PSLF, it clearly defined eligible employers to include *any* government or 501(c)(3) non-profit organization.[1] However, this rule sets aside Congressional intent by granting the Secretary of Education the authority to disqualify these statutorily eligible employers based on ideological reasons.

The rule is also an unconstitutional violation of the freedom of speech and the freedom of association. Its criteria for excluding organizations based on a "substantial illegal purpose" are a clear attempt to target groups disfavored by the administration. Further, the Department of Education lacks the expertise or authority to make such tax or criminal legal determinations. The Internal Revenue Service already has an illegality doctrine and a process to revoke an organization's 501(c)(3) status if it engages in substantial illegal activity, thereby rendering an organization ineligible for PSLF. While the IRS provides due process through a right to appeal the IRS decision to revoke tax-exempt status through the agency and subsequently through federal court. In contrast, this rule grants

[1] See 20 U.S.C. § 1087e(m)(3)(B)(i).

the Secretary of Education the sole power to strip an organization's PSLF eligibility. This decision is final, with no opportunity for appeal to any independent or judicial authority. This unchecked power, based on a low evidentiary standard, denies organizations any meaningful due process.

We strongly urge the Department to reject this change. The PSLF program was created to support public service workers and strengthen communities; it must not be weaponized to punish organizations for missions or local laws that fall out of political favor. Nonprofits and public agencies must be able to rely on the stability of this program to serve their communities without the threat of their workforce losing eligibility due to shifting political winds.

We thank you for considering our comments.


Sincerely,


Matthew S. Biggs
IFPTE President

Gay Henson
IFPTE Secretary-Treasurer

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

LeadingAge Comments on Public Service Loan Forgiveness Proposed Rule_09.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10304/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10304

**Tracking Number**

mfo-g45g-92q2

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

*Submitted Electronically (www.regulations.gov)*

September 17, 2025

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

**Subject**: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket (ED-2025-OPE-0016)

Dear Ms. Abernathy:

LeadingAge represents more than 5,400 nonprofit aging services providers and other mission-driven organizations that touch millions of lives every day. Alongside our members and 36 partners in 41 states, we use advocacy, education, applied research, and community-building to make America a better place to grow old. Our membership encompasses the entire continuum of aging services, including skilled nursing, assisted living, memory care, affordable housing, retirement communities, adult day programs, community-based services, hospice, and home-based care including Medicare home health agencies. We bring together the most inventive minds in the field to lead and innovate solutions that support older adults wherever they call home.

On behalf of these members and partners, we write to express our concerns about the Department of Education's ("Department") Notice of Proposed Rulemaking ("NPRM") to revise the Public Service Loan Forgiveness ("PSLF") Program.

**BACKGROUND**

Congress established the PSLF program to provide incentives for students and graduates to seek and stay in jobs with qualifying employers that are challenging, rewarding and critically needed, even if they may not pay as much as other private sector opportunities. As the Department's NPRM notes, the PSLF program is a key to attracting and retaining individuals in such jobs, with significant research showing that public service employees cite "PSLF as a significant factor in their decision to pursue and remain in public service."[1]

LeadingAge has a strong interest in the PSLF because nonprofit aging services providers rely on the program as a tool to recruit and retain skilled and compassionate employees. These issues are vitally important, given that our members are facing critical workforce shortages across the country, and at a time when our nation's need for older adult services has never been greater.

It is from this perspective that we offer comments on the Department's proposal to amend PSLF regulations (34 CFR §685.219) with a rule disqualifying certain employers in order to "prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that engage in activities that have a substantial illegal purpose."[2]

[1] William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154, 40169 (Aug. 18, 2025)
[2] NPRM 90 Fed. Reg. 40154

2519 Connecticut Ave., NW | Washington, DC 20008-1520
P 202.783.2242 | F 202.783.2255 | LeadingAge.org

**SPECIFIC COMMENTS**

**1) The proposed rule is contrary to the statute that created the program.**

On March 7, 2025, President Trump issued an Executive Order[3] directing the Secretary of Education to propose revisions to PSLF regulations that ensure the definition of "public service" excludes organizations that engage in activities that have a substantial illegal purpose.

The program's authorizing statute, however, is straightforward. It states: "[T]he Secretary shall cancel the balance of interest and principle due…on any eligible Federal Direct Loan not in default for a borrower who – (B)(i) is employed in a public service job at the time of such forgiveness; and (ii) has been employed in a public service job during the period in which the borrower makes each of the 120 payments"[4]; and the statute's definition of "public service job" expressly includes jobs at "an organization that is described in section 501(c)(3) of title 26 [Internal Revenue Code] and exempt from taxation under section 501(a) of such title," without exception.[5]

We therefore respectfully suggest that the Department does not have the authority to define a qualifying employer in a way that would restrict or exclude certain 501(c)(3) organizations based on departmental determinations about the legality of those organizations' activities and purposes.

**2) A process is already in place to remove eligibility from organizations that engage in illegal activity.**

The authority of the Internal Revenue Service ("IRS") to oversee nonprofit organizations' compliance with the requirements of 501(c)(3) status already provides a tool to address concerns that underlie this proposed rule. Under established procedures, the IRS may examine and propose the revocation of the tax-exempt status of a nonprofit that is engaging in illegal activity. If an organization loses its tax-exempt status, it will not qualify as a PSLF-eligible employer under the statute quoted above. These existing procedures ensure that nonprofits engaged in illegal activity can already be excluded from the PSLF program, without the need for the Department to create a parallel investigation and enforcement mechanism.

Furthermore, the definitions of "substantial illegal purpose" and of the activities listed within that definition will require the Department to engage in fact-finding and the drawing of legal conclusions that we believe is outside of its jurisdiction and area of expertise. For example, the Department would determine if an employer has aided or abetted violations of federal immigration law, supported terrorism, engaged in a pattern of aiding and abetting illegal discrimination violating state laws.[6]

In short, we believe the proposed rule is unnecessary given IRS authority and that creation of the separate system the proposal contemplates will result in additional burden and confusion for employers and borrowers alike, which may undermine the purpose and promise of the PSLF program. Employers may hesitate to certify compliance in the way a final rule would require, based on uncertainty about the meaning of key regulatory language and how the Department will apply it; and borrowers may hesitate to seek or to remain in employment with certain organizations, out of uncertainty about whether those employers may suddenly be disqualified under the program.

---

[3] Executive Order 14235 Restoring Public Service Loan Forgiveness (90 FR 11885)

[4] 20 U.S.C. § 1087e(m)(1)

[5] 20 U.S.C. § 1087e(m)(3)(B)(i); see also 34 CFR 685.219(b) (defining "qualifying employer")

[6] NPRM 90 Fed. Reg. 40154 (proposed definition or "substantial illegal purpose")

LeadingAge agrees that appropriate oversight of the nonprofit sector is essential. If further action is needed to prevent illegal activity, however, we believe the IRS should lead those efforts, as the agency Congress has charged with oversight of tax-exempt organizations.

**3) The proposed rule does not offer adequate due process for employers.**

We are also concerned that there does not appear to be a mechanism for an employer to appeal after the Secretary determines that the employer is not "qualified" under the PSLF program. Prior to losing status as a qualified employer, the Department would notify the employer of an initiated action to determine if the employer engaged in activities that have a substantial illegal purpose. The NPRM states that "[t]his is the Department's attempt to outline the benchmarks that will be used in the determination and offer due process to a qualifying employer" and further explains as follows: If the employer chooses not to respond, then the Secretary may move forward with revoking qualified employer status, thus subsequent payments made by a borrower would no longer be counted towards PSLF unless certain conditions were met; and if the employer chooses to respond, the Secretary will decide on the qualified employer's status after the response has been submitted and reviewed by Department staff. Based on the response, the Secretary may choose to maintain or revoke the employer's qualifying status, using a preponderance of the evidence standard.[7] In summary, it appears an employer would have an opportunity to respond to a notice that departmental review is underway, but not to appeal the Department's ultimate determination to an independent authority, which we believe is unreasonable.

In contrast, for example, if the IRS were to make an adverse determination on tax-exempt status, the affected organization would have opportunities to appeal. An organization can protest a proposed adverse determination through an independent appeals office within the IRS. If that is not successful and the IRS issues a final determination letter denying tax-exempt status, the organization can petition the Tax Court, the U.S. Court of Federal Claims, or the U.S. District Court for the District of Columbia for a declaratory judgment.[8]

* * * * *

For the reasons set forth above, we urge the Department to preserve the clear statutory standard that all 501(c)(3) organizations are PSLF-eligible employers. Adding new and potentially subjective restrictions may undermine the goals the program is meant to support, to the detriment of participating borrowers, employers, and the individuals and communities they serve.

Sincerely,

*Jonathan Lips*

Jonathan Lips, Vice President Legal Affairs

***About LeadingAge****: We represent more than 5,400 nonprofit and mission-driven aging services providers and other organizations that touch millions of lives every day. Alongside our members and 36 partners in 41 states, we use applied research, advocacy, education, and community-building to make America a better place to grow old. Our membership encompasses the continuum of services for people as they age, including those with disabilities. We bring together the most inventive minds in the field to lead and innovate solutions that support older adults wherever they call home. For more information, visit leadingage.org.*

---

[7] NPRM 90 Fed. Reg. 40163

[8] See IRS Publication 892 (Rev. 2-2017)

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comments from the Minnesota Hospital Association.

Attachments 1

09.15.25_MHA_PSLF (1)

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10312/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10312

Tracking Number

mfo-gd0j-i9ru

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Minnesota Hospital Association

161 Rondo Ave., Ste. 1010
Saint Paul, MN 55103
www.mnhospitals.org

September 17, 2025

The Honorable Linda McMahon
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Ave SW
Washington, DC 20202

**Submitted electronically through www.regulations.gov**

**RE: Comments on Proposed Amendments to the Public Service Loan Forgiveness Program Regulations**

Dear Secretary McMahon,

The Minnesota Hospital Association (MHA) respectfully submits comments on the Department of Education's proposed rule amending regulations governing the Public Service Loan Forgiveness (PSLF) program. MHA represents hospitals and health systems across Minnesota that collectively employ thousands of healthcare workers, many of whom rely on PSLF to manage educational debt while serving our communities.

We are deeply concerned that the proposed rule, while intended to strengthen program integrity, could unintentionally undermine healthcare workforce recruitment and retention at a time when hospitals face historic staffing challenges. The proposed definitions and enforcement mechanisms introduce significant uncertainty that threatens workforce stability and, by extension, patient access to care.

Across the country, and here in Minnesota, hospitals and health systems are struggling with workforce shortages and difficulty recruiting qualified professionals across all specialties. PSLF has long served as a powerful incentive for individual nurses, therapists, social workers, and other clinical staff, to pursue and remain in hospital-based careers. Introducing ambiguity around PSLF employer eligibility risks deterring these professionals from entering or staying in the field, ultimately harming patient care in the communities we serve.

Our primary concern is the rule's broad definition of "substantial illegal purpose" and the reliance on a subjective "preponderance of the evidence" standard for determining organizational eligibility. This framework creates unacceptable uncertainty for hospitals that operate in good faith under complex regulatory environments.

Hospitals already operate under extensive federal and state oversight. Adding another layer of federal review, without clear standards, risks diverting critical administrative and financial resources away from patient care. The proposed 10-year waiting period for regaining eligibility is especially punitive. Even a temporary compliance issue unrelated to the delivery of care could irreparably damage a hospital's recruitment efforts and force healthcare workers who rely on PSLF to leave their positions, further destabilizing an already strained workforce.

We urge the Department to revise the proposed rule in several ways:

- **Narrow the scope** to focus only on organizations whose primary purpose is unlawful activity, not hospitals providing legitimate medical services.
- **Establish objective, transparent criteria** in place of subjective standards to provide clarity for both employers and employees.

- **Include healthcare-specific safeguards**, recognizing the essential public benefit hospitals provide and the acute workforce shortages they face.
- **Publish detailed guidance well in advance of the July 1, 2026 effective date**, including examples specific to healthcare employers and safe harbors for organizations in good-faith compliance.

Minnesota's hospitals and health systems are committed to integrity, accountability, and serving the health needs of their communities. However, the proposed framework introduces unnecessary risks that could destabilize the healthcare workforce without delivering meaningful improvements to PSLF program integrity. We encourage the Department to work closely with healthcare stakeholders to refine this rule in a way that protects the program while preserving access to affordable health care education

Thank you for your consideration of these comments. We stand ready to collaborate with the Department on solutions that strengthen both program integrity and the healthcare workforce.

Sincerely,

Becky Wifstrand
Director of Federal Policy and Regulatory Affairs
Minnesota Hospital Association

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Safe Passage Project comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10316/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10316

**Tracking Number**

mfo-gg4t-mnzz

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



185 West Broadway
New York, NY 10013
**t** 212-324-6558 | **f** 347.368.2213
**www.safepassageproject.org**

Tamy Abernathy
Office of Postsecondary Education
400 Maryland Ave. SW
Washington, DC 20202

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program**

**Docket ID: ED-2025-OPE-0016**

Dear Ms. Abernathy:

Safe Passage Project submits this comment to object in the strongest possible terms to the Department's proposed rule redefining what is a "qualified employer" for purposes of eligibility for the Public Service Loan Forgiveness (PSLF) Program.

PSLF was created to ensure that those who dedicate their careers to serving the public- teachers, nurses, legal aid lawyers, public defenders, and countless others- are not forced to choose between honoring their commitments to their communities and paying off insurmountable student debt. The proposed rule betrays that purpose. By introducing vague and politically malleable categories such as "substantial illegal purpose" and explicitly referencing "aiding and abetting violations of… Federal immigration laws," the Department's proposed rule threatens to punish public service immigration attorneys not because of misconduct, but because of the clients they legally represent.

For organizations like Safe Passage Project, which provides free legal services to immigration children facing deportation, the implications are dire. Our staff do not violate the law: they uphold it. They ensure that children as young as five are not forced to stand alone in an immigration court. To suggest that this work could disqualify them from PSLF is to invert the very meaning of "public service." It would mean that those who work daily to ensure fairness, dignity, and due process are cast out of the very program Congress designed to support them.

The proposed rule does more than move the goalposts- it undermines the field itself. It chills advocacy, destabilizes the legal services workforce that serves poor immigrants, and sends a menacing message: that loan forgiveness will be available only to those whose services aligns with the politics of the day. That is not neutrality. That is not stewardship. It is punishment, and it falls hardest on the lawyers and advocates who serve the most marginalized communities.

The Department should not adopt rules that could turn PSLF into a political weapon. We urge you to withdraw this proposal and reaffirm PSLF's original promise: that those who commit to serving the public, regardless of the administration in power, can rely on the government to honor its word.

Respectfully submitted,

Robin Jenkins

Ro in Jen ins
Interim Executive Director
Safe Passage Project
New York, New York
rjenkins@safepassageproject.org

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Comments included in the attachment.

Attachments 1

Comment on Reg ED-2025-OPE-0016-7221 - OneJustice

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10318/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10318

**Tracking Number**

mfo-ggy6-s54k

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

OneJustice

September 17, 2025

United States Department of Education
Submitted online via www.regulations.gov

**Re: Notice of Proposed Rulemaking to Amend the Regulations on the Public Service Loan Forgiveness Program**

To Whom It May Concern:

OneJustice writes to express strong opposition to the proposed changes to the regulations governing the Public Service Loan Forgiveness (PSLF) program under 34 C.F.R. Section 685.219.[1]

OneJustice is a legal nonprofit organization in California working to strengthen the legal services sector's expertise and capacity to advance justice and equity. We believe equal access to justice is a basic human right. OneJustice equips the legal services sector with the skills and tools needed to maximize its impact and champions a robust and reliable flow of resources to expand access to legal services for low-income Californians. In our work, OneJustice works with legal services organizations across the state of California, understanding the work that they do, the client communities that they serve, and the challenges they are currently facing.

The PSLF program has been instrumental in allowing compassionate, skilled, and dedicated advocates remain in nonprofit public interest legal work. Advocates who have benefited from the program have ensured that individuals living with disabilities have access to benefits to which they are entitled. They have ensured that victims of identity theft are able to protect themselves financially from unlawful collection activities. Advocates have ensured that survivors of intimate partner violence and their children find safety. So many of these advocates would not otherwise be able to work in legal services, either at all, or certainly not for as long as they have been able to develop substantial expertise and skill.

Although legal services organizations in California have increased salaries of legal program staff on average almost 20% in the last four years, the salaries are still substantially lower than those in the private sector. There simply is not enough funding, and not enough value given to the work, to compensate these tireless advocates at the same rate as private sector attorneys. Considering the high cost of both undergraduate and law school degrees, not to mention the high cost of living in many parts of California, these advocates could not make a reasoned financial decision to stay in a nonprofit legal services organization without PSLF.

At no time in our work have we seen legal services organizations engaging in "activities that have a substantial illegal purpose." We are not even sure how a 501(c)(3) organization, vetted by the Internal Revenue Service, could exist if it had a "substantial illegal purpose." Lawyers take oaths to uphold the Constitutions of the United States and of California, and to conduct themselves with dignity, courtesy, and integrity. Being employed at an organization with a "substantial illegal purpose" would directly violate the Oath required by the State Bar of California. It is inconceivable

[1] U.S. Dep't of Education, Notice of Proposed Rulemaking, 90 Fed. Reg. 40154 (Aug. 18, 2025), *available at* https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program.

OneJustice

that these dedicated advocates would risk not just their employment, but their professional licenses by working at an organization with a "substantial illegal purpose."

The current regulations require that a borrower makes qualifying payments if they are employed full-time by a qualifying employer. The Higher Education Act ("the Act") defines qualifying public service jobs for PSLF as work for nonprofit 501(c)(3) employers and work for "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization).[2] The regulations clearly state what constitutes a qualifying employer, including government organizations, agencies, or entities; a public child or family service agency; a 501(c)(3) organization; a tribal college or university; or a nonprofit organization that provides a non-governmental public service as attested by the employer.[3] The Act and the current regulations are sufficient to ensure that the organizations that are able to attest to qualifying employment are legitimate, upstanding organizations that are providing vital services to low-income Americans.

The proposed amendments that would prohibit payments from being considered qualifying if the employer is engaged in a "substantial illegal purpose" are vague and in contradiction to the law. The current definition of qualified employer includes employers that have been vetted. Even if the employer qualifies under (v) A nonprofit organization, that employer must attest to their nongovernmental public service, allowing the Secretary the opportunity to make a determination as to the accuracy of that statement.

Rather than encouraging employees with student loan debt to selflessly engage in public service employment, ensuring the least fortunate in our country have access to often life-saving services and resources, the regulations will ensure that the most vulnerable are put in even more danger, with fewer places to turn in times of crisis. There is already a substantial justice gap in this country, and specifically in California, where a recent study found that Californians do not receive any or enough legal help for 85% of their civil legal problems.[4] Improperly classifying civil legal assistance as "illegal activity" will reduce the number of advocates willing and able to work in civil legal services, which will only exacerbate the existing justice gap.

Civil legal aid is not political; clients are not asked which politicians they support or what initiatives are important to them; a client's political party is not part of the intake process. Clients are served because they are in need of assistance, whether that's a veteran in need of assistance with his benefits, a young mother in need of help with a landlord-tenant issue, or a family looking to adopt a relative's child when the relative can no longer care for that child. Implementing these PSLF regulations will mean that any of those clients may no longer be able to find help, leaving them at risk of homelessness, child abuse, and instability overall, ultimately costing the taxpayers more money. In fact, much of the funding of legal services is bipartisan; funding through the Legal Services Corporation is a bipartisan effort, and was specifically set up that way. Support for legal services under the Violence Against Women Act has also generally been bipartisan. The work being done by advocates at civil legal services organizations is not political or illegal, and the Department of Education should not have the ability to override the determinations of other federal agencies to say that, all of a sudden, the work is now considered "illegal."

We strongly oppose the Administration's proposed changes to the PSLF program, as we believe such a change is outside the Secretary's authority, contradicts the Act as enacted by Congress, and

---

[2] 20 U.S.C. § 1087e(m)(3)(B).
[3] 34 C.F.R. § 685.219.
[4] 2024 California Justice Gap Study, *available at* https://publications.calbar.ca.gov/justice-gap-study/.



will substantially harm the clients who benefit from the services of legal services organizations, because substantially fewer advocates will be available to provide the life-saving assistance.

Thank you for your consideration. For any questions regarding these comments, please reach out to Leigh Ferrin, lferrin@one-justice.org.

Sincerely,

ONEJUSTICE

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

2025_09_17_National Urban League PSLF Response

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10320/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10320

**Tracking Number**

mfo-gh8t-71x7

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Linda McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

VIA Regulations.gov

**Re: Opposition to Proposed Rule Undermining Public Student Loan Forgiveness (PSLF) and Public Service Careers (Docket ID ED-2025-OPE-0016)**

On behalf of the National Urban League, an organization with a 115-year history of advocating for policies that promote equitable access to high-quality education, we write in strong opposition to the U.S. Department of Education's proposed rule, which would make unlawful changes to the Public Service Loan Forgiveness (PSLF) program.

These proposed changes threaten the core benefits of the PSLF program. PSLF enables professionals with student debt to pursue lower-paying careers in service to the public – from teachers, nurses, social workers, and legal aid attorneys to first responders, public health experts, and nonprofit leaders – while also serving as a critical recruitment and retention tool for employers across education, healthcare, public safety, and other essential fields. Eliminating employer-based PSLF eligibility would have a chilling effect across the entire public service sector, weakening the workforce that millions of Americans depend on every day.

**Unlawful Overreach by the Department of Education**

For nearly two decades, the PSLF program has maintained strong bipartisan support, strengthened rural and urban communities alike, helped fill critical workforce shortages in education, healthcare, public safety, and national security, and delivered relief to more than 1 million public service workers.

Congress authorized the creation of the Public Service Loan Forgiveness program by passing the College Cost Reduction and Access Act of 2007. The law, codified at 20 U.S.C. § 1087e(m)[1], clearly defines qualifying PSLF employers to include any government employers at the federal, state, local, or tribal level, and nonprofit organization described in section 501(c)(3) of the Internal Revenue Code of 1986.[2]

Under the Department of Education's new proposed rule, the Secretary would be granted authority to revoke PSLF eligibility from a public service employer. This is a direct statutory conflict: Congress did not delegate to the Secretary discretion to redefine or revoke PSLF employer categories. Congress's use of the term "any" in § 1087e(m)(3)(B) reflects a broad and mandatory inclusion, not one conditioned on agency review of employer activities. The proposed rule oversteps this authority by placing eligibility determination in the hands of the Secretary, contrary to Congressional intent.

The proposal also raises major questions doctrine concerns. As the Supreme Court held in *West Virginia v. EPA*, agencies require "clear congressional authorization" before exercising powers of vast "economic and political significance."[3] PSLF eligibility affects more than one million borrowers and thousands of nonprofit and government employers. Reinterpreting the statute to allow case-by-case disqualification of employers is a major policy shift that Congress did not authorize.

This proposed rule directly contradicts the PSLF program as authorized in the Higher Education Act and raises serious constitutional concerns. In addition to conflicting with Congress's original intent and sole authority to determine employer PSLF eligibility, the Department's proposal to tie eligibility to an undefined "substantial illegal purpose" standard risks targeting organizations based on their viewpoints, in violation of the First Amendment right to free speech. Such a vague and arbitrary determination could serve as a pretext for the Administration to punish organizations whose protected activities do not align with its ideological agenda—for example, efforts to advance racial equity, LGBTQ+ rights, immigrants' rights, and other lawfully protected civil rights work. Courts have repeatedly held that government action targeting protected advocacy based on viewpoint is unconstitutional (*Rosenberger v. Rector &*

---

[1] College Cost Reduction and Access Act of 2007, Pub. L. 110-84, § 401, codified at 20 U.S.C. § 1087e(m).

[2] 20 U.S.C. § 1087e(m)(3)(B). See also Congressional Research Service, *The Public Service Loan Forgiveness Program* (R43571), at 4 (2018).

[3] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

*Visitors of the Univ. of Va.*, 515 U.S. 819 (1995); *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205 (2013)).[4] Targeting protected conduct in this manner is a clear violation of the First Amendment freedoms of speech and association and represent a deliberate attack on civil rights and civil liberties.

**Harmful to Nonprofit Workforce**

Since 1910, the National Urban League has supported underserved and under-resourced communities through a wide range of program areas, including education and job training, housing and community development, workforce development, and entrepreneurship. Our mission is made possible by the dedicated professionals who deliver hands-on support to millions of individuals across the country.

PSLF is a foundational workforce tool for nonprofit organizations like the National Urban League, enabling us to attract and retain individuals committed to meaningful careers in public service. PSLF is one of the few tools that levels the playing field against private-sector salaries. The Department's proposal threatens to jeopardize recruitment and retention efforts across nonprofit and government sectors, weakening access to the critical services that vulnerable communities across our country depend upon.

Granting the Secretary power to revoke employer eligibility without due process would force mid-career professionals to abandon their roles and seek employment elsewhere. Nonprofit direct service providers, hospitals, schools, legal aid centers, fire and police departments, and emergency response agencies – all of which rely on PSLF to staff vital positions – would struggle to fill roles where their services serve as a lifeline to community members. This would have a chilling effect not only on current staff, but also on prospective employees considering careers in public service. Ultimately, weaponizing PSLF in this way would strip communities of critical services, destabilize the public service workforce, and create an unnecessary workforce crisis at a time when Americans are already facing rising unemployment.

**Deepening Inequities for Minority Student Borrowers**

For many recent grads, crushing student loan debt restricts their ability to fully achieve the American dream. Black and minority students face even greater

---

[4] *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995); *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205 (2013).

challenges, as Black students are more likely to borrow—and to borrow at higher levels—than their white counterparts. On average, Black college graduates owe $52,000 in student loan debt, nearly $25,000 more debt than white college graduates.[5] Black graduates, who already carry the heaviest debt burdens, are also disproportionately represented in public service careers, making up 18.5% of the federal civilian workforce and at least one-fifth of the federal workforce in 15 states.[6] Programs like PSLF provide substantial relief to borrowers that want to pursue careers in public service that are often less lucrative than the private sector alternatives.

By threatening this relief, the Department's proposal would not only penalize those who have already dedicated their careers to serving their communities but also discourage future graduates—especially those with higher debt burdens—from entering or remaining in these critical roles. This weaponization of PSLF will exacerbate existing racial disparities, forcing many borrowers to either abandon public service careers or abruptly leave them, widening the racial wealth gap and limiting economic mobility for generations to come.

The Department's proposed rule exceeds statutory authority, raises serious constitutional concerns, and undermines the nonprofit and government workforce that sustains communities across the nation, especially our most vulnerable. Beyond the direct harm to borrowers, this proposal threatens the stability of critical public services, from education to healthcare to public safety and emergency response, on which all Americans rely. For these reasons, we strongly oppose the Department's attempt to undermine the PSLF program and the clear congressional intent behind it. We urge the Department to recognize the profound damage this proposal would cause to both individuals and society as a whole, and to withdraw the proposed rule in its entirety.

Sincerely,

Marc H. Morial
President and CEO
National Urban League

---

[5] Hanson, Melanie. "Student Loan Debt by Race" EducationData.org, February 18, 2025, https://educationdata.org/student-loan-debt-by-race

[6] Wilson, V. (2025, April 9). *Black federal workers by state*. Economic Policy Institute. https://www.epi.org/publication/black-federal-workers-by-state/

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share ▾

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Comment Ltr on Proposed PSLF Regulations 9.17.2025kb2

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10322/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10322

Give Feedback

**Tracking Number**

mfo-ghom-khpf

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

CATHERINE J. BLAKEMORE
*Chair*
Sacramento

HON. GAIL RUDERMAN FEUER
*Vice-Chair*
Court of Appeal, Second District

JANIS R. HIROHAMA
*Treasurer*
League of Women Voters

HON. LISA R. JASKOL
*Secretary*
Los Angeles County Superior Court

HON. LUCY ARMENDARIZ
Los Angeles County Superior Court

DIEGO CARTAGENA
Bet Tzedek, Los Angeles

DAVID R. DANIELS
Public Counsel

HON. TIMOTHY P. DILLON
Los Angeles County Superior Court

HON. KELLI EVANS
California Supreme Court

HON. ROSA M. FREGOSO
Los Angeles County Superior Court

LEORA GERSHENZON
Davis

AMOS E. HARTSTON
Los Angeles

HON. MARK A. JUHAS
*Immediate Past Chair*
Los Angeles County Superior Court

ANDREW F. KIRTLEY
Cotchett, Pitre & McCarthy

HON. VICTORIA S. KOLAKOWSKI
Alameda County Superior Court

SANDRA LEVIN
Los Angeles

JONATHAN D. LIBBY
Los Angeles

WILLIAM M. MARTICORENA
Rutan & Tucker, LLP

PROF. JAMES W. MEEKER
University of California, Irvine

CRYSTAL MILLER-O'BRIEN
APL Logistics, Ltd.

JOSÉ R. PADILLA
Bay Area

PABLO RAMIREZ
Legal Aid of San Bernardino

HON. KRISTIN ROSI
Alameda County Superior Court

PANIDA M. RZONCA
Thai Community Development Ctr.

JANICE SCHMIDT
Council of California County Law Librarians

JOHANNA VALLE SOBALVARRO
Interpreters Guild of America

TESSIE SOLORZANO
Inland Counties Legal Services

HON. JON A. STREETER
First District Court of Appeal

HON. MONICA WILEY
San Francisco County Superior Court

HON. ERICA R. YEW
Santa Clara County Superior Court

---

JACK W. LONDEN
Executive Director

KOLEEN BIEGACKI
Director of Administration

JASMINE KADDOURA
Coms and Program Manager

JESSICA RODRIGUEZ
Program Coordinator

**Mailing:** PO Box 645
Carmichael, CA 95609-0645
**Phone:** (510) 629-1264
**Email:** info@CalATJ.org
**Website:** www.CalATJ.org

[Submitted online]

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
400 Maryland Ave. SW
Washington, DC 20202

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]**

To the Office of Postsecondary Education:

For nearly 30 years, the California Access to Justice Commission (CalATJ) has worked to advance justice for Californians by expanding legal resources, removing barriers, and developing innovations. See California Gov. Code 68655.

Student debt imposes a significant barrier to recruiting and retaining attorneys and other staff working to advance access to justice in legal aid programs throughout California and the country. We published a 2022 report focused on Legal Aid Recruitment and Retention, https://calatj.org/publications/legal-aid-recruitment-retention-and-diversity, detailing the acute crisis facing many legal aid programs in California. High student debt along with low compensation are the primary reasons many people are not able to pursue public interest careers.

The Public Service Loan Forgiveness Program (PSLF), promising forgiveness of federal student loan obligations in exchange for devoting ten years to public service, helps address and reduce these barriers and launch public service careers helping disadvantaged Americans. From its beginning, PSLF earned bipartisan support. It has been administered fairly to avoid political considerations and support public interest careers. We are gravely concerned about the proposed rule changes and their impact on the ability of nonprofit legal aid programs, public defenders, rural prosecutors, and other state and local governmental entities to recruit and retain attorneys and other staff.

PSLF is regularly cited as a decisive factor in recruiting and retaining talented attorneys and others despite public interest salaries being below market rate. Most importantly, these changes will have a dire impact on the ability of low and modest means people to access the legal help they need.

Specifically, the proposed rules would have these flaws:

1. Qualifying employers would face significant uncertainty and risk that, at some future time, the Secretary of Education will invoke vague criteria to exclude them from the PSLF program. All of the listed exemplary criteria for exclusion turn on vague and uncertain terms (e.g., “violations of federal immigration laws” or “illegal discrimination”). This creates uncertainty that should by itself be a fatal flaw. Success of the PSLF program depends on public interest employers being able to rely on the PSLF program to recruit and retain employees with significant student debt. The uncertainty undermines the purposes and effectiveness of the program.

2. Employees and prospective employees who intend to seek PSLF also would be significantly and unfairly harmed by the proposed changes. The flaw of uncertain criteria is exacerbated by the fact that the Secretary could make the determination in response to an application for forgiveness after employees have spent up to ten years working for an apparently eligible employer. The Secretary could deny employees’ applications for loan forgiveness based on actions by their employer or another employee that the applicants reasonably believed to be within the parameters of the PSLF program, that they knew nothing about, or that did not occur until the after the applicants had worked for years while reasonably counting on obtaining PSLF.

3. Another significant concern is that the proposed rules would allow the Secretary of Education to exclude a public interest employer from the program and deny PSLF and its employees’ PSLF applications for that reason without a process to appeal the decision to a higher authority. The breadth and vagueness of the criteria and the absence of review would give a Secretary of Education close to unchecked discretion, unnecessarily politicizing the program and making it difficult or impossible for attorneys to rely on PSLF as they begin or continue their public interest careers.

4. Congress intended PSLF to affect prospective employees’ decisions by lowering a barrier to recruitment into public service. But the proposed rules will transform a career choice that relies on PSLF into a wager that the prospective employer and all of its other employees and agents have not, and never will, during the employee’s career, commit an act that a then-Secretary of Education may in the future deem to be a violation. This uncertainty about future events, in addition to the vagueness of the criteria, worsens the proposed rules’ deterrent effect on recruitment and retention -- directly contrary to the Congressional purpose in creating PSLF.

5. Legal aid organizations and public defender offices will face heightened, although unjustified, risk under the proposed rules. Lawyers are duty-bound to advocate for their clients' interests, which may require them to oppose the government and defend actions that the government accuses of being illegal. Sometimes the lawyers will take good faith positions that a court rejects, or that remain undecided if a dispute is settled or dropped. The proposed rules will involve the risk that a Secretary of Education could later second-guess lawyers' good-faith arguments on behalf of clients and disqualify a legal aid organization or public defender office from PSLF as a result. In short, the proposed rules create an even more serious risk for lawyers than for other types of employees that PSLF may be denied based on actions that those lawyers or others in the organization undertook conscientiously and as a professional duty.

6. The proposed rules are contrary to the federal law authorizing PSLF. That law is clear that PSLF eligibility applies to all charitable nonprofit organizations and governmental entities and not on a post-hoc administrative assessment of their missions or the conduct or positions of the communities they serve. The proposed rule would inject a new requirement for eligibility that is not in the statute: that no one in the nonprofit organization will be determined by a Secretary of Education to have committed misconduct. The Department of Education does not have any express or implied authority to restrict eligibility beyond the current definitions. Quite the opposite, Congress stated the intent to encourage employment in nonprofit organizations, whereas the proposed rules would explicitly discourage it. The words of the Supreme Court apply here: "The Secretary's assertion of administrative authority has 'conveniently enabled [her] to enact a program' that Congress has chosen not to enact itself. [citation omitted]". *Biden v. Nebraska*, 600 U.S. 477, (slip op. at 21) (invalidating changes to student loan forgiveness).

A fair justice system requires equal access to attorneys. PSLF is a critical and effective tool to address the justice gap and increase access to justice by supporting recruitment and retention of legal aid lawyers and staff. The proposed rules would weaken or eliminate that support. Because the Department of Education should promote the original purpose of the PSLF program, we oppose the proposed rule changes.

Sincerely

C. Blakemore

Catherine Blakemore
Chair

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The proposed changes to the Public Service Loan Forgiveness (PSLF) program undermine the program's statutory purpose and create uncertainty for thousands of attorneys and other public servants. PSLF was designed by Congress to enable graduates to pursue public interest work without being crushed by student debt. By conditioning eligibility on whether the Secretary of Education deems an employer's mission sufficiently aligned with current political preferences, the Department threatens to transform PSLF into a tool of partisan punishment rather than a neutral support for public service. This shift would not only deter law students from entering public interest careers but also destabilize nonprofit organizations, public defender offices, and municipal agencies that rely on them.

For immigration attorneys, civil rights lawyers, and other advocates, the proposed standard is dangerously vague. Labeling representation of clients or defense of local government policies as "aiding or abetting" illegal conduct misconstrues the role of counsel and risks penalizing core constitutional functions. Public service workers should not have their loan forgiveness contingent on the government's approval of the people or causes they serve. Restricting PSLF in this way will reduce access to justice for vulnerable communities, chill protected advocacy, and weaken the very public institutions the program was intended to strengthen. I urge the Department to withdraw this proposal.

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10323

**Tracking Number**

mfo-gjkk-s9a9

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

CRL PSLF Comment-Final

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10327/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10327

**Tracking Number**

mfo-grl2-kbx5

**Comment Details** **Submitter Info**



10/14/25, 11:03 AM Regulations.gov

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10327 2/2

ED_00363



**Via regulations.gov**

September 17, 2025

Secretary Linda McMahon
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Re: Docket ID ED-2025-OPE-0016, William D. Ford Federal Direct Loan (Direct Loan) Program/Public Service Loan Forgiveness

Dear Secretary McMahon:

The Center for Responsible Lending (CRL) appreciates the opportunity to comment on the Department of Education's Notice of Proposed Rulemaking (NPRM) concerning the Public Service Loan Forgiveness (PSLF) Program. We thank the Department for its ongoing commitment to administering programs that are essential to student borrowers and their families, and for its efforts to ensure federal loan programs remain a pathway to economic mobility and civic engagement.

CRL is a nonprofit, nonpartisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices. Our research has consistently shown that student loan debt disproportionately burdens borrowers of color, women, and low-income communities, threatening their ability to build wealth and fully participate in civic life.[1] The Public Service Loan Forgiveness (PSLF) program has been a critical safeguard, ensuring that those who dedicate their careers to public service can do so without carrying a lifetime of unmanageable debt.

We join the Student Borrower Protection Center (SBPC) and others in raising significant legal concerns about the Department's proposed rule but write separately to emphasize how the proposed rule's vague and ambiguous standards would undermine program integrity, create a dangerous precedent for future administrations, and harm borrowers and the communities they serve.

[1] Addo, F. R., Houle, J. N., & Simon, D. (2016). Young, Black, and (still) in the red: Parental wealth, race, and student loan debt. *Race and Social Problems, 8*(1), 64–76.



**Legal Concerns and Statutory Authority**

Congress  defined PSLF-qualifying employers when it created the program through the College Cost Reduction and Access Act of 2007.[2] The act defines "Qualifying Employer" to include any federal, state, local, or tribal government entity, inclusive of U.S. Armed Forces or National Guard, tribal colleges or universities, 501(c)(3) nonprofit organizations, and certain other employers that provide public services including child and family service agencies, public health, education and law enforcement, among others.[3] The proposed rule, however, rather than "clarify[ing] the definition of qualifying employer," limits it without authority. The proposed rule, if enacted, would grant the Secretary authority to exclude certain employers based on whether their activities are deemed to have a "substantial illegal purpose." The categories of wrongdoing under "substantial illegal purpose" are loosely defined and leave too much room for interpretation and error, to the great detriment of borrowers. This new standard is legally ambiguous and endows discretionary power that Congress never authorized to the Secretary of Education.

Such ambiguity creates significant legal and policy risks. It invites inconsistent interpretation and establishes a precedent whereby future administrations could disqualify otherwise eligible employers for reasons unrelated to the statute's plain text or congressional intent.[4] This kind of overreach not only violates the framework Congress established, but also threatens to politicize the PSLF program in ways that would undermine its clear Congressional intent.

**Program Stability and Borrower Equity**

PSLF is a promise. For nearly two decades, borrowers have entered careers in government and nonprofit service with the understanding that Congress guaranteed loan forgiveness after ten years of qualifying work. Introducing vague standards erodes confidence in this promise. Borrowers should not have to worry that their eligibility depends on shifting administrative interpretations.

Moreover, these risks are not evenly distributed. Communities already burdened by student debt—including Black and Brown borrowers, women, and first-generation college graduates—

---

[2] 20 U.S.C. § 1087e(m)(3)(B)(i) (2007). College Cost Reduction and Access Act.
[3] U.S. Department of Education. (2025). *34 C.F.R. § 685.219 - Public Service Loan Forgiveness Program*. In *Code of Federal Regulations* (Title 34, Education). Retrieved September 9, 2025, from https://www.ecfr.gov/current/title-34/subtitle-B/chapter-VI/part-685/subpart-B/section-685.219.
[4] Congressional Research Service. (2023). *Public Service Loan Forgiveness (PSLF): Program data and policy issues.* Washington, D.C.



stand to be most affected.[5] Ambiguous eligibility rules may discourage nonprofit and government service, reduce access to critical public services, and undermine the civic participation PSLF was designed to encourage. Stable and transparent rules are essential to ensuring PSLF remains a reliable pathway to economic security for all borrowers, particularly those serving marginalized communities.

**Recommendations**

CRL urges the Department to withdraw the rule or re-engage in the negotiated rulemaking process to develop a proposed rule that aligns with Congressional intent. The Department should reaffirm Congress's clear statutory definition of PSLF-qualifying employers and ensure that PSLF remains a stable, transparent, and equitable program. Borrowers deserve certainty that the rules will not shift based on administrative discretion or political climate.

We thank the Department for its leadership and for the opportunity to comment on this important rulemaking. CRL remains committed to advancing policies that strengthen borrower protections, safeguard equitable access to higher education, and ensure that programs like PSLF operate as Congress intended. We welcome continued engagement with the Department on this critical issue.

Sincerely,

Center for Responsible Lending

---

[5] Scott-Clayton, J. (2018). The looming student loan default crisis is worse than we thought. *Brookings Institution Report.*

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Attached is a comment from the City of New York regarding the Department of Education's August 18, 2025 Notice of Proposed Rulemaking on its Public Service Loan Forgiveness Program.

Attachments 1

City of New York Comment on PSLF_09.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10331/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10331

**Tracking Number**

mfo-gv5r-qikh

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



THE CITY OF NEW YORK
LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

MURIEL GOODE-TRUFANT
*Corporation Counsel*

Phone: (212) 356-0800
Fax: (212) 356-0809
mgoodetr@law.nyc.gov

September 17, 2025

**RE: Public Service Loan Forgiveness Program Notice of Proposed Rulemaking, Docket ID ED-2025-OPE-0016**

The City of New York (the City) submits this comment on the above-referenced Notice of proposed rulemaking on the Public Service Loan Forgiveness (PSLF) program issued by the U.S. Department of Education (ED). The PSLF program is a crucial resource for borrowers and directly supports the ability of our and other municipal governments to recruit and retain public sector workers, from police officers and firefighters, to health care and sanitation workers. This proposed rule would destabilize our public service workforce by creating administrative ambiguity, removing incentives for highly-qualified candidates to choose public sector roles, potentially increasing avoidable student loan debt among public servants, and discouraging young people from pursuing degrees, technical education or other career paths leading to public service. Accordingly, the City strongly urges ED to withdraw the proposed rule.

## I. Background

The College Cost Reduction and Access Act of 2007, which established the PSLF program, provides that outstanding federal student loans of borrowers with a public service job will be forgiven after ten years of qualifying payments. The statute prescribes, without exception, the eligible public service jobs, namely, jobs in government and 501(c)(3) nonprofit organizations, and certain other nonprofit organizations.[1] Under governing regulations, these public service jobs are provided by a "qualifying employer."[2]

The proposed rule seeks to confer on the ED Secretary the ability to exclude employers, who have otherwise already been identified by Congress as eligible, from the PSLF program. Under the proposed rule, any employer that fails to certify that it does not engage in "activities that have a substantial illegal purpose"—or is determined by the ED Secretary to have engaged in such activities—would be subject to removal as a qualifying employer under the PSLF program. "Substantial illegal purpose" is in turn defined in the proposed rule as:

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in

[1] U.S. Congress, House, *College Cost Reduction and Access Act,* H.R.2669, 110th (2007-2008). https://www.congress.gov/bill/110th-congress/house-bill/2669.

[2] 34 CFR § 685.219.

violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law;

(v) engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.[3]

The proposed rule further provides that an employer which the ED Secretary has determined to be ineligible may regain eligibility either in 10 years, or possibly sooner if the Secretary, in his or her discretion, approves a corrective action plan signed by the employer that includes the following: a certification that the employer is no longer engaging in such activities, a description of the employer's controls to prevent future engagement in such activities, and "any other terms or conditions imposed by the ED Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose."[4]

## II. Impact of the Proposed Rule on the City of New York

As of March of 2025, nearly one in seven New Yorkers had student loan debt, with an average balance of $41,000.[5] According to a 2021 survey, about half of student loan holders in the City indicated that student loan debt had delayed or prevented them from making at least one major life choice like saving for retirement or purchasing a home.[6] However, the PSLF program has provided borrowers with a critical avenue for loan reduction and relief. The City's Financial Empowerment Centers report that 70% of clients with successful loan reductions are enrolled in income-driven repayment plans under the PSLF program, with an average reduction of $94,600.

New York City employs one of the largest municipal workforces in the United States, with over 300,000 full-time employees and a total headcount of approximately 328,000 across full-time and full-time equivalent positions.[7] The PSLF program offers the City and our nonprofit partners

---

[3] William D. Ford Federal Direct Loan (Direct Loan) Program, Notice of proposed rulemaking, 90 Fed. Reg. 157, 40175 (August 18, 2025).

[4] *Id.* at 40176.

[5] New York City Comptroller, Student Loans and the High Cost of Higher Education, June 12, 2025, *available at* https://comptroller.nyc.gov/reports/student-loans-and-the-high-cost-of-higher-education/.

[6] New York City Department of Consumer and Worker Protection, Weighed Down: How Student Loan Debt Is Affecting Their Lives, City of New York, 2021. Accessed August 27, 2025. https://www.nyc.gov/assets/dca/downloads/pdf/partners/StudentLoanDebtSurvey-Report-2021.pdf.

[7] City of New York, Mayor's Office of Management and Budget, *Full-Time and Full-Time*

a critical incentive for recruiting and retaining skilled professionals for whom a career in public service would otherwise be a financial impossibility.

Proposed changes to the PSLF program risk discouraging students from pursuing public service careers in fields like teaching, nursing, social work and medicine. This could reduce enrollment at the City's higher education institutions, weaken the pipeline of skilled graduates, and make it harder for local agencies and nonprofits to recruit qualified talent.

If eligibility for PSLF were lost or significantly reduced, it could have far-reaching consequences for not only the city workers it affects, but New Yorkers at large. The City could face greater difficulty filling critical positions that directly affect the quality of life for millions of New Yorkers. Higher turnover and recruitment challenges could lead to increased costs for training and hiring and diminished institutional expertise.

The proposed rule also introduces uncertainty for agencies and employees engaged with the PSLF program by tying employer eligibility to ambiguous definitions of illegal conduct. City agencies will need to navigate the vagueness of the proposed rule, adding administrative strain on human resources departments. The notice accompanying the proposed rule also observes that critical fields that provide the most basic services to City residents, like K-12 education, healthcare and "governance," may be especially impacted.

Additionally, the City is comprised of multiple agencies sharing one employer identification number (EIN), and the proposed rule raises the question of whether a determination by the ED Secretary regarding activities conducted by one agency could restrict PSLF employer eligibility for employees of other agencies of the same government. While the proposed rule notes the possibility of considering agencies as "separate under one EIN," it does not detail how this would be operationalized, and notes that the "Secretary maintains ultimate authority" to consider City agencies as separate employers. Employers who lose their PSLF status will be able to regain eligibility after ten years or upon approval of a "corrective action plan," according to the proposed rule. However, the scope of the corrective action plan includes "any other terms or conditions imposed by the ED Secretary" designed to ensure compliance with the rule and raises concerns of whether an entity would be able to meet the requirements.

The City agrees that PSLF is a vital program that should be protected, and we acknowledge that operational reforms could improve efficiency and effectiveness for both ED and borrowers. But we urge reforms to focus on simplifying access for public servants, not creating more complexity and uncertainty. The existing complicated rules have resulted in only 2.3% of processed applications being accepted since November 2020.[8] ED also appears unable to process current applications in a timely manner, with a backlog of over 70,000 PSLF buyback requests as of August 2025.[9] With the recent reduction in staff at ED, we are concerned that even without this

---

*Equivalent Staffing Levels as of June 30, 2025,* Fiscal Years 2025 to 2029, available at: https://www.nyc.gov/assets/omb/downloads/pdf/adopt25/adopt25-stafflevels.pdf

[8] Melanie Hanson, "Student Loan Forgiveness Statistics [2024]: PSLF Data." Education Data Initiative, August 30, 2024. Accessed August 26, 2025. https://educationdata.org/student-loan-forgiveness-statistics.

[9] *American Federation of Teachers v. U.S. Department of Education, et al*, 1:25-cv-802-RB

proposed rule employee certification and application processing will be further burdened and delayed for borrowers.

## III. The Proposed Rule is Unlawful

### a. The Proposed Rule is Arbitrary and Capricious

The proposed rule violates the Administrative Procedure Act because it is arbitrary and capricious. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[10] An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."[11] Here, while stating that there is "a critical and urgent need" to reform the PSLF program, because "the current regulatory framework has exposed the PSLF program to potential misuse," ED has made no finding that any organizations that are eligible under the current rules are actually engaging in unlawful activity, or that the existent laws regarding the conduct targeted by the rule are insufficient in protecting the PSLF program and American taxpayer. For example, ED premises the rule on the illegality doctrine used by the Internal Revenue Service to deny or revoke an organization's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. Under this doctrine, if a non-profit is in fact organized for an illegal purpose, the IRS could revoke the tax-exempt status of the non-profit, thereby rendering it ineligible for the PSLF program. Similarly, the proposed rule seeks to prevent the indirect subsidization of employers who are purportedly engaging in conduct in violation of the Civil Rights Act of 1964. Under Title VI of that act, for example, the federal government can terminate federal funding of entities, including entities covered by this proposed rule, that engage in discrimination and thereby eliminate the direct subsidization of illegal activity.

There is also a mismatch between the certification required under the proposed rule and the employer eligibility determination to be made by the ED Secretary; an employer must certify that they are not engaged in activities with a substantial illegal purpose, while the ED Secretary would only find an employer ineligible if those activities are "material" or somehow significant based on the "frequency and the severity of said activities." The rule provides that an employer who fails to make the certification would be deemed ineligible, even though the purportedly illegal activities of the employer may not be material. Under this framework, the certification, which must be made under penalty of perjury, appears to be nothing more than an improper attempt to influence the lawful activities of a qualifying employer.

In its current form, the proposed rule could also render ineligible an entire city or state government. The rule apparently seeks to mitigate this concern by authorizing the ED Secretary to single out government agencies of a state or local government that engage in purportedly unlawful conduct. Far from allaying concerns, this approach confers even greater authority on the ED

D.D.C. Filed August 15, 2025. Accessed August 26, 2025. https://storage.courtlistener.com/recap/gov.uscourts.dcd.278527/gov.uscourts.dcd.278527.39.0.pdf.

[10] *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[11] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

Secretary to incentivize employment activities not only between state and local governments, but also within state and local governments. Although ED states that the proposed rule has no substantial effect on the distribution of power and responsibilities among the various level of governments, this type of meddling in the affairs of state and local governments suggests otherwise.

An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it.[12] An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision.[13] In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns."[14] ED has not taken into account that the proposed rule may undermine the purpose of its governing legislation by significantly hindering non-profits' and governments' ability to recruit highly-qualified public servants. Moreover, for nearly 20 years, PSLF employers and their employees have operated within and relied upon the framework of the College Cost Reduction and Access Act of 2007. Employers may suddenly find themselves ineligible for PSLF, when they had no prior indication that their conduct would now be considered illegal. And long-time employees may be forced to change jobs to benefit from loan cancelation. Nonprofits make up nearly 10 percent of the U.S. workforce – the proposed rule may result in job loss and potential gaps in much-needed services that New Yorkers rely on.

**a. The Proposed Rule is Contrary to Law**

In establishing the PSLF program, the College Cost Reduction and Access Act of 2007 provides, with no exceptions, that all government and 501(c)(3) nonprofit organizations, and certain other nonprofit organizations are PSLF-qualifying employers.[15] "Public service job" in the Act is defined in part as a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title" or a job at a domestic government entity. ED does not have the authority to restrict eligibility of these enumerated employers under PSLF, and doing so is unlikely to pass judicial review. Courts approach an agency's interpretation of a statute with "traditional tools of statutory construction" to "resolve statutory ambiguities" and "determine the best reading of the statute."[16] In determining the best reading, it is axiomatic that "[c]ourts may not engraft an unwritten … exception" onto a statute.[17]

---

[12] *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (citation omitted); *see also id.* at 30.

[13] *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015).

[14] *Regents*, 591 U.S. at 30, 33.

[15] U.S. Congress. House, *College Cost Reduction and Access Act,* H.R.2669, 110th (2007-2008). https://www.congress.gov/bill/110th-congress/house-bill/2669.

[16] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024).

[17] *Ross v. Blake*, 578 U.S. 632, 648 (2016).

The proposed rule also grants the ED Secretary impermissibly broad discretion to make the legal determination that an employer has engaged in an activity with a "substantial illegal purpose," despite ED lacking the expertise or even authority to do so. In rendering such determinations, ED would be acting far afield from its statutory powers and duties. The provisions that govern the ED Secretary's determination are also improperly vague, which will result in confusion and uncertainty on the application of the rule. It is not clear, for example, which or how many employees' actions are required for an employer itself to be considered engaged in an activity with a substantial illegal purpose.

## IV. Conclusion

With the last of the pandemic-era protections expiring, it is more urgent than ever to provide borrowers with a student loan system capable of delivering payment relief and debt forgiveness. According to a recent Federal Reserve Bank of New York report, 10.2% of aggregate student loan debt was 90 or more days delinquent and student loan balances amounted to $1.64 trillion in the second quarter of 2025, indicating significant burdens on Americans and the economy.[18] The City strongly urges ED to withdraw the proposed rule as it threatens to further burden borrowers, non-profits and local governments, is arbitrary and capricious, and contrary to law.

Sincerely,

Muriel Goode-Trufant

---

[18] *Household Debt and Credit Report (2025: Q2)*. 2025. Federal Reserve Bank of New York. https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2025Q2

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached letter

Attachments 1

CHLA PSLF Letter

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10336/attachment_1.pdf)

Give Feedback

**Comment ID**
ED-2025-OPE-0016-10336

Tracking Number
mfo-h1z8-hljj

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025



Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

The Honorable Linda McMahon
Secretary
U.S. Department of Education
400 Maryland Ave., SW
Washington, DC 20202

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Secretary McMahon:

On behalf of Children's Hospital Los Angeles Medical Group (CHLAMG) and Children's Hospital Los Angeles (CHLA), with more than 1,030 pediatric specialty providers, including physicians, surgeons, dentists, advanced practice providers, psychologists, and other clinicians, we appreciate the opportunity to comment on the Public Service Loan Forgiveness proposed rule under the William D. Ford Federal Direct Loan (Direct Loan) Program. CHLAMG is one of the nation's largest pediatric specialty medical groups, providing specialty access to high quality care for children and youth ages 0-21 years, including complex cardiac conditions, pediatric transplants, and oncologic treatments for the children from the Western U.S and around the world. Furthermore, at CHLA over 70 percent of patients are insured through Medi-Cal, California's Medicaid program, and the Children's Health Insurance Program (CHIP), with a few children insured through Medicare.

Graduate Medical Education has become increasingly costly, with in-state tuition and fees ranging from $40,000-$50,000 and out-of-state tuition ranging from $65,000-$80,000, not including cost of living expenses. Pediatric specialists have lower salaries than adult specialists because of the low Medicaid reimbursement rates, so pediatric medical professionals typically carry large amounts of student debt. The PSLF program provides a way for these mission-driven medical professionals to make 10 years of payments on their loans while working at nonprofits and then have the remainder of their student loans forgiven.

We urge you to withdraw the proposed rule, which would further limit pediatricians in training when there is already a profound shortage of pediatric providers nationwide. Federal law makes eligibility for the PSLF program apply to all charitable nonprofits, regardless of their missions or the communities they serve. Furthermore, nonprofits that are classified as 501(c)(3) organizations are automatically eligible under the law. Pediatric providers and children's hospitals will be adversely impacted by the proposed rule where demand already far exceeds supply.

At a time when there is a severe shortage of pediatric specialists in California and around the country, we cannot risk further eroding the pediatric workforce. According to the American Board of Pediatrics, 2024 data shows that in California alone, there is one board-certified Pediatric



Nephrologist for every 100,000 children ages 0-17 years. Losing access to PSLF will lead individuals in medical professional school to choose adult specialties further eroding the pediatric specialist pipeline.

We urge you to withdraw the proposed rule.

Sincerely,

Mona Patel
President
Children's Hospital Los Angeles Medical Group

Lindsey Berman
Associate Vice President, Health Policy
Children's Hospital Los Angeles

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

County of San Mateo - Docket ID ED-2025-OPE-0016

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10337/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10337

**Tracking Number**

mfo-h3v7-53ag

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

COUNTY OF SAN MATEO
COUNTY EXECUTIVE'S OFFICE

**Michael P. Callagy**
County Executive Officer /
Clerk of the Board

**County Government Center**
500 County Center, 5th Floor
Redwood City, CA 94063
650-363-4121 T

www.smcgov.org

September 17, 2025

Linda E. McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Re: Docket ID ED-2025-OPE-0016

Dear Secretary McMahon:

We are the County Executive and the County Attorney for the County of San Mateo, California. We write to convey that we strongly oppose the U.S. Department of Education's proposed rulemaking regarding the Public Service Loan Forgiveness ("PSLF") program, published in the Federal Register on August 18, 2025. The instant proposed rule would politicize and weaponize a critical federal benefit by targeting local and state governments based on ideological disagreement. We urge the Department of Education ("DOE") to withdraw this rule, which will create significant legal and administrative uncertainty, undermine the public service workforce, and increase taxpayer burden.

**PSLF is an Apolitical Program and These Changes Violate the Law and Undermine its Purpose.**

Established by Congress in 2007, the PSLF program was created to encourage careers in public service by offering student loan forgiveness to individuals who work for qualified public employers, remain in public service for 10 years, and stay current on their loan payments. The PSLF encourages individuals who might otherwise enter the private sector to take on long-term public service employment.[1] This method of improving the hiring and retention of highly skilled public employees has been found to be an "extraordinary value" to the American taxpayer.[2]

---

1 https://www.americanbar.org/advocacy/governmental_legislative_work/priorities_policy/legaleducation/pslf-homepage/
2 https://www.ed.gov/media/document/candidly-economic-analysis-cost-effectiveness-of-pslf-submitted-laurel-taylor-110311.pdf

COUNTY OF SAN MATEO CALIFORNIA

The proposed changes authorize the Secretary to disqualify certain employers from PSLF if they are deemed by the DOE, by a preponderance of the evidence, to engage in activities with a “substantial illegal purpose.” This standard is both vague and overly broad, creating significant uncertainty as to who it may be applied to. Moreover, the DOE does not have the authority to interpret the enabling statute in this way.

PSLF was established through the College Cost Reduction and Access Act, which, in relevant part, defines the term “public service job” as any “fulltime job in . . . government[.]”[3] The enabling statute clearly offers PSLF benefits to any government employee, and the statute does not allow for exceptions based on the employer’s conduct.

The DOE’s proposal to limit employer eligibility based on its own undefined criteria conflicts with the plain text of the statute and exceeds the DOE’s legal authority.

We are also concerned this rule change will be used to target local governments like the County on ideological grounds. The DOE explicitly signals that it intends to target employers engaged in “illegal” immigration-related activities. However, the supposed illegality of some immigration-related activities, particularly those in so-called “sanctuary jurisdictions,” is the subject of ongoing litigation challenging the Federal Government’s efforts to withhold funding from such jurisdictions.[4]

The County is concerned that the DOE will similarly weaponize PSLF to punish local governments for engaging in constitutionally-protected initiatives that the federal Administration opposes.

This concern is heightened by the fact that the proposed rule gives the Secretary of Education the sole discretion to determine if an employer has engaged in an activity with a “substantial illegal purpose.” Not only does the DOE lack the institutional competence to make such determinations, but the rule as proposed could lead to circumstances under which a federal court finds that a local agency has not engaged in illegal conduct, but the local agency employer is still barred from participating in the program based on the Secretary’s unilateral judgment.

Not only are these proposed changes illegal, but they undermine the very purpose of PSLF, harming the County, its employees, and its taxpayers.

Over the past five years alone, the County of San Mateo has received requests from nearly 400 employees for PSLF certification. These employees provide vital public services, and withdrawing PSLF eligibility could lead to increased turnover, and increased difficulty in filling essential roles. This not only disrupts the provision of essential services but also increases overall costs in hiring and training.

---

[3] 20 U.S.C. §1087e(m)(3)(B)(i)
[4] https://www.publicrightsproject.org/what-we-do/legal-advocacy/san-francisco-trump-feb-2025/

PSLF provides a cost-effective way for taxpayers to benefit from the skills of highly trained employees who might otherwise be lost to the private sector. Arbitrarily narrowing employer eligibility runs directly counter to the Department's stated goal of protecting taxpayer resources.

**The Department Must Withdraw this Proposal.**

Since its inception the PSLF program has embodied a bipartisan promise to support and sustain public service. The proposed changes threaten to politicize and undermine a program that was designed to be apolitical. We urge the Department to withdraw the proposed rule and preserve the integrity of PSLF as a workforce support program.

Respectfully,

Michael P. Callagy
County Executive Officer

John D. Nibbelin
County Attorney

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comments from the Transgender Law Center

Attachments 1

Transgender Law Center Comments to RIN 1801-AA28 PSLF

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10339/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10339

**Tracking Number**

mfo-h7i3-3nd8

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
Department of Education
400 Maryland Ave. SW,
Washington, DC 20202

*Submitted electronically at https://www.regulations.gov/document/ED-2025-OPE-0016-7221*.

**RE: RIN 1801-AA28**

To whom it may concern:

The Transgender Law Center writes to oppose the notice of proposed rulemaking RIN 1801-AA28, regarding the William D. Ford Federal Direct Loan (Direct Loan) Program, because gender affirming care is safe, effective, and evidence based; gender-affirming care should not be considered an illegal activity and the Department of Education lacks the authority to make it so; the proposed rule will harm the communities that support trans youth; the proposed rule will negatively impact borrowers across the public sector; and the proposed rule has no legitimate purpose and is rooted in anti-transgender animus.

Per the Federal Register, the "Secretary proposes to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a substantial illegal purpose." This term is dangerously vague at best, and the definition in the proposed regulations does not remedy its vagueness, failing to provide sufficient notice as to what could possibly be encompassed by its sweeping invocation of "federal and state law." This vagueness may allow the Department to deny loan forgiveness to otherwise eligible borrowers simply for working in sectors that the present Administration deems unworthy. This is clearly against the purpose of the PSLF program as set out in its own regulations, and well outside of the scope of responsibilities granted to the Department, which lacks authority to create law.

Transgender Law Center opposes the proposed rule as a whole, and particularly opposes the additions of § 685.219(b)(3) definition of "Chemical Castration or Mutilation," § 685.219(b)(4) definition of "Child or Children," § 685.219(b)(30) definition of "Substantial Illegal Purpose," and § 685.219(b)(31)) definition of "Surgical Castration or Mutilation." These sections target the providers of lifesaving gender-affirming health care for transgender and nonbinary youth.

# Transgender Law Center

We also write to condemn the sections of the proposed rule that target borrowers who are public defenders, who work in support of migrant communities, and those who work in support of genocides across the globe, including that in Palestine, as the Department lacks authority to do so and has proposed the instant regulations simply to further align with this current Administration's ongoing attacks against marginalized communities.

**Gender-affirming care is safe, effective, and evidence-based.**

Government-funded research has found unequivocally that gender-affirming care for youth reduces rates of depression and suicidal thoughts and has virtually no regret rate. In May 2025, the Utah Department of Health and Human Services received a report titled "Systematic Medical Evidence Review of Hormonal Transgender Treatment Report," commissioned by the Utah State Legislature to determine the efficacy and impact of bans on gender-affirming care. The report, one of the most comprehensive to date, reviewed over 230 studies on gender-affirming health care, concluding without doubt that such care is safe and effective.[1]

The study includes the following findings:

- Generally, rates of depression and suicidal thoughts/self-harm tended to be lower among hormonally treated transgender youth compared to untreated transgender individuals.[2]
- Starting hormone therapy earlier tended to have a neutral to positive effect on mental health outcomes.[3]
- Compared to untreated transgender individuals, those who received hormonal treatment tended to have improvements in body image satisfaction.[4]
- Generally, rates of suicidal thoughts/self-harm tended to be lower when followed up after treatment.[5]
- With regards to any misgivings that stakeholders may have about allowing pediatric patients to receive pharmacologic . . . treatments over concerns about future regret, we found . . . that there is virtually no regret associated with receiving the treatments, even in the very small percentages of patients who ultimately discontinued them.

---

[1] Utah State Legislature, 26B-1-239, Systematic Medical Evidence Review of Hormonal Transgender Treatment Report, May 2025, https://le.utah.gov/AgencyRP/reportingDetail.jsp?rid=636
[2] Id., p 77.
[3] Id.
[4] Id., p 78.
[5] Id., p. 82.



In conclusion, the study found that:

> Namely, the consensus of the evidence supports that the treatments are effective in terms of mental health, psychosocial outcomes, and the induction of body changes consistent with the affirmed gender in pediatric GD [gender dysphoria] patients. The evidence also supports that the treatments are safe in terms of changes to bone density, cardiovascular risk factors, metabolic changes, and cancer.[6]

This study-of-studies, one of the most comprehensive and up-to-date of our time, found unequivocally that gender-affirming health care is safe, effective, reduces thoughts of self-harm and suicide, and has virtually no regret rate, contrary to the mis- and disinformation promoted by anti-trans extremists and this Administration.

**Gender-affirming care should not be considered an illegal activity and the Department of Education lacks the authority to make it so.**

Given the evidence supporting the provision of gender-affirming care as safe and effective, the provision of such care should not be considered a "Substantial Illegal Purpose" for purposes of Public Service Loan Forgiveness (PSLF).

Despite state laws banning such care through various mechanisms, and federal policies attempting to do so, evidence such as the unbiased, government-funded Utah report cited above prove that these laws are political ploys only, based in mis- and disinformation spread by anti-trans extremists. By inserting its own current ideology into the proposed rule, the Department of Education (ED) undermines the very purpose of the PSLF program – to support workers at all charitable organizations, regardless of their mission or the communities they serve.

As pointed out by other commenters to this proposed rule, there already exists a mechanism by which organizations engaging in illegal activity are removed from PSLF: the IRS has authority to remove an organization's nonprofit status due to its engagement in illegal activity, making its employees ineligible for PSLF. The Department of Education has no such authority to make new law, nor should it, and medical consensus does not support this proposed regulation's attempts to make it such

**This proposed rule will harm the communities that supports trans youth.**

The potential impact of this proposed rule is staggering. PSLF is designed to encourage employees to enter the nonprofit workforce—a workforce that is important for the provision

[6] Id., p. 90.

of crucial goods and services to our populace. According to the National Council of Nonprofits:

> America's 1.3 million charitable nonprofits feed, heal, shelter, educate, inspire, enlighten, and nurture people of every age, gender, race, and socioeconomic status, from coast to coast, border to border, and beyond. They foster civic engagement and leadership, drive economic growth, and strengthen the fabric of our communities.[7]

It will have an enormous negative impact if Transgender Law Center staff could not access PSLF. Transgender Law Center (TLC) is the largest national trans-led organization advocating self-determination for all people. Since 2002 we've been organizing, assisting, informing and empowering thousands of individual community members towards a long-term, national, trans-led movement for liberation. Our advocacy and precedent-setting litigation victories—in areas including employment, prison conditions, education, immigration, and healthcare—protect and advance the rights of transgender and gender nonconforming people across the country. Through our organizing and movement-building programs, TLC assists, informs, and empowers thousands of individual community members a year and builds towards a long-term, national, trans-led movement for liberation.

Our highly-skilled staff rely on PSLF to be able to afford their specialized educations—in law as well as other areas. If PSLF were to be changed at the whims of the Department of Education, particularly if it were changed to prevent support workers for the transgender community from accessing loan forgiveness, we would have difficulty recruiting and retaining the best and brightest. As would organizations across the sector.

One staff member shared his story:

> PSLF made law school possible for me. I am 10 payments out of 120 away from being eligible to have my loans forgiven, but since law school have only worked at organizations that advocate for trans people, threatening to make me ineligible after years of repayment. I can't afford to pay off my student loans without it which are six figures.

Another staff member shared their story of success with PSLF:

---

[7] National Council of Nonprofits, Nonprofit Impact in Communities, https://www.councilofnonprofits.org/about-americas-nonprofits/nonprofit-impact-communities.

Transgender Law Center

> PSLF allowed me to start a family while working in the nonprofit sector. Without the cap on payments or loan forgiveness at 120 months of payment, I would not have been able to adopt my child or buy a home. Thanks in whole to PSLF, I was able to do both while also working to serve my community.

**This proposed rule will impact borrowers across the public sector**

Secondary and post-secondary education is increasingly expensive. According to the Education Data Initiative, "average cost of college tuition & fees at public 4-year institutions has risen 141.0% over the last 20 years. . . ."[8] For the 2022-2023 school year, the average cost for a year of education at a private school was $35,248.[9] This, despite wages stagnating and workers struggling to afford even basic necessities.[10] Fewer students are attending college and fewer are graduating.[11]

According to regulations, "The Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section."[12] If PSLF were amended the way the Department is recommending, even fewer students would be able to afford secondary or post-secondary education if their intent is to work in public service, clearly subverting the intent of the program as set forth by this very Department.

**The proposed rule has no legitimate purpose and is rooted in anti-transgender animus**

It is clear that the Department of Education has no legitimate reason to enact this rule, particularly when gender-affirming care is evidence-based, safe, and effective. Given the lack of legitimate reason, the proposed rule is patently motivated by anti-trans animus. This is not the first time that the Department under Secretary McMahon has espoused anti-trans animus. Secretary McMahon's own confirmation was condemned by organizations across sectors and communities, exemplified by a letter written by the Leadership

---

[8] Melanie Hanson, " Average Cost of College by Year," Education Data Initiative, Last Updated: September 9, 2024, https://educationdata.org/average-cost-of-college-by-year.

[9] Id.

[10] Bryan Robinson, "The Wage Crisis Of 2025: 73% Of Workers Struggling," Forbe, January 24, 2025, https://www.forbes.com/sites/bryanrobinson/2025/01/24/the-wage-crisis-of-2025-73-of-workers-struggling/.

[11] Jon Marcus, "A looming 'demographic cliff': Fewer college students and ultimately fewer graduates," NPR, January 8, 2025, https://www.npr.org/2025/01/08/nx-s1-5246200/demographic-cliff-fewer-college-students-mean-fewer-graduates.

[12] 34 CFR § 685.219 - Public Service Loan Forgiveness Program.



Conference on Civil and Human Rights and signed by dozens of local, state, and national organizations.[13]

In March, the Department hosted a meeting of anti-trans detransitioned people with the purpose of making it harder for youth to access supportive care at school.[14] The Department announced in April that it had created, along with the Department of Justice, a Title IX Special Investigations Team for the sole purpose of investigating schools that support their transgender and nonbinary students.[15] Under the auspices of the new Special Investigation Team, school districts and colleges have been investigated and threatened with defunding for their support for trans and nonbinary students.[16]

For the above reasons and for those shared by our partners, Transgender Law Center strongly opposes the proposed rules and urges the Department to withdraw them in their entirety. If you have any questions about this comment, please don't hesitate to reach out.

Heron Greenesmith
Deputy Director of Policy
Transgender Law Center
heron@transgenderlawcenter.org

---

[13] "Civil Rights Organizations Oppose the Confirmation of Linda McMahon for Secretary of Education," The Leadership Conference on Civil and Human Rights, February 19, 2025, https://civilrights.org/resource/civil-rights-organizations-oppose-the-confirmation-of-linda-mcmahon-for-secretary-of-education/.

[14] Press Release, " U.S. Department of Education Hosts Meeting with Detransitioners and Advocates on Detrans Awareness Day," U.S. Department of Education, March 13, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-hosts-meeting-detransitioners-and-advocates-detrans-awareness-day-1.

[15] Press Release, " U.S Department of Education and U.S. Department of Justice Announce Title IX Special Investigations Team," U.S. Department of Education, April 4, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-and-us-department-of-justice-announce-title-ix-special-investigations-team.

[16] See, eg., Anna Kaminski, "U.S. education department launches investigation into Kansas schools' gender identity policies," Kansas Reflector, August 14, 2025, https://kansasreflector.com/2025/08/14/u-s-education-department-launches-investigation-into-kansas-schools-gender-identity-policies/; Brooke Schultz, "Ed. Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies," Education Week, August 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08; Jessika Harkay, "U.S. Dept. of Education launches Title IX probe of Cromwell Public Schools," CT Mirror, May 30, 2025, https://ctmirror.org/2025/05/29/cromwell-public-schools-dept-of-ed-title-ix-trump/; Alexander MacDougall, "Smith faces federal complaint over trans admission policy," Daily Hampshire Gazette, June 27, 2025, https://gazettenet.com/2025/06/27/smith-receives-complaint-from-conservative-group-62041076/.

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

AACF Public Comment to PSLF Rule Change

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10341/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10341

**Tracking Number**

mfo-up57-tefw

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



ARKANSAS
ADVOCATES
FOR CHILDREN & FAMILIES

Nicole Carey
Little Rock, Arkansas
Arkansas Advocates for Children & Families
ncarey@aradvocates.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Nicole Carey, and I am the Education Policy Director at Arkansas Advocates for Children and Families. We are a non-partisan public policy and advocacy organization that is also a qualifying employer under 34 CFR § 685.219, specifically as an organization under section 501(c)(3) of the Internal Revenue Code of 1986. Our mission is to ensure children and their families have the resources and opportunities to lead healthy and productive lives and to realize their full potential, and we do that by focusing our policy work on several issue areas and engaging our communities.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by employing public servants over the years who have made great impacts. Our state has the worst maternal health in the nation, with the worst maternal mortality rate. In the last year, our employees have researched, proposed, and successfully changed Medicaid policy, through collaboration with our state agency and other partner organizations, to provide presumptive eligibility for pregnant mothers. We have engaged directly with mothers in different environments to hear their stories and then promoted their stories to highlight the difficulties moms face. We also have a concentrated Marshallese population, and we worked with our Marshallese and food security partners for changes so that the Marshallese community, with the highest rate of poverty in our state, had their eligibility for SNAP and other safety net benefits restored.

My organization strongly opposes the proposed rule and the limitations it would impose regarding which employers would be able to benefit from PSLF for their employees. Specifically, we object to the new paragraphs added at § 685.219(b)(12), (b)(27)(ii), and (b)(30). If an organization engages in substantial illegal activities, there is already a process through the Internal Revenue Service (IRS) to remove its 501(c)(3) status, which would make the organization ineligible for PSLF. Moreover, by giving the Secretary of Education broad discretion to determine whether an organization is engaging

Main Office: 1400 W. Markham St., Suite 306 | Little Rock, AR 72201 | 501-371-9678 | Fax: 501-371-9681
Northwest Office: 614 East Emma, Suite 235 | Springdale, AR 72764 | 479-927-9800 | Fax: 479-751-1110
www.aradvocates.org

ED_00394

in activities that are in violation of state or federal laws or contravene established public policy, the Department could seek to exclude nonprofit employers working with undocumented immigrants or advancing racial and social equity. This allows the Administration to change eligibility for the program based on political ideology. Nonprofit organizations need to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees.

As the Education Policy Director, I am also concerned about how this rule could be applied to exclude public school districts from being qualified employers. We already have a shortage of qualified teachers in our public schools and challenges with teacher recruitment and retention. We need more robust policies to support the teacher workforce instead of the changes proposed here to give broad discretion to the Administration to name activities as illegal to exclude certain employers from PSLF.

Thank you for considering this feedback as part of the rulemaking process.

Sincerely,

Nicole Carey

Main Office: 1400 W. Markham St., Suite 306 | Little Rock, AR 72201 | 501-371-9678 | Fax: 501-371-9681
Northwest Office: 614 East Emma, Suite 235 | Springdale, AR 72764 | 479-927-9800 | Fax: 479-751-1110
www.aradvocates.org

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

On behalf of our nearly 40,000 members, the American College of Emergency Physicians (ACEP) appreciates the opportunity to comment the proposed rule entitled “William D. Ford Federal Direct Loan (Direct Loan) Program.”

Attachments 1

ACEP Response Federal Direct Loan Proposed Rule

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10342/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10342

**Tracking Number**

mfo-h8dt-n3b7

10/14/25, 11:09 AM Regulations.gov

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10342 2/2

ED_00397



September 17, 2025 **RIN 1801-AA28**

The Honorable Linda E. McMahon
Secretary
Department of Education
400 Maryland Ave., SW
Washington, DC 20202

**RE: William D. Ford Federal Direct Loan (Direct Loan) Program**

Dear Secretary McMahon:

On behalf of our nearly 40,000 members, the American College of Emergency Physicians (ACEP) appreciates the opportunity to comment the proposed rule entitled "William D. Ford Federal Direct Loan (Direct Loan) Program." This proposed rule would amend the regulations on the Public Service Loan Forgiveness (PSLF) program to exclude employers that engage in activities that have a "substantial illegal purpose)."

ACEP understands the intent of the proposal and appreciates the need for efforts to prevent abuse or misuse of federal programs and taxpayer dollars, but we are deeply concerned about the impact that the proposed changes to redefine a "qualifying employer" under the PSLF program could have on physicians who rely on this longstanding program to repay their student loans, particularly for reasons that may be entirely outside of their control or unrelated to the care they provide to patients in their communities. We therefore urge the Administration to reconsider its approach.

**Public Service and Individual Eligibility**

Public service is a laudable cornerstone of our health system, and PSLF appropriately recognizes individuals who dedicate much of their careers to serving the public. That service should be judged by the care clinicians provide, not on who signs their paycheck. Outside of their immediate clinical responsibilities, physicians rarely control, direct, or even influence what their employer does. This is particularly true for trainees and those practicing in safety-net setting. Tying PSLF eligibility to an employer's unrelated policies or service lines would unfairly penalize clinicians for decisions they do not make and cannot control or change.

**Use Objective, Clinical Criteria**

PSLF credit for clinicians should be based on what the individual has actually done during their service: providing medical care to patients that meets recognized standards

WASHINGTON, DC OFFICE
901 New York Ave, NW
Suite 515E
Washington DC 20001-4432

202-728-0610
800-320-0610
www.acep.org

BOARD OF DIRECTORS
L. Anthony Cirillo, MD, FACEP
*President*
Ryan A. Stanton, MD, FACEP
*President-Elect*
Chadd K. Kraus, DO, DrPH, CPE, FACEP
*Chair of the Board*
Henry Z. Pitzele, MD, FACEP
*Vice President – Communications*
Heidi C. Knowles, MS, MD, FACEP
*Vice President – Membership*
Abhi Mehrotra, MD, MBA, FACEP
*Secretary-Treasurer*
Alison J. Haddock, MD, FACEP
*Immediate Past President*
Jennifer Casaletto, MD, FACEP
Dan Freess, MD, FACEP
Steven B. Kailes, MD, MPH, FACEP
C. Ryan Keay, MD, FACEP
Kristin B. McCabe-Kline, MD, FACEP
Diana B. Nordlund, DO, JD, FACEP
Bing S. Pao, MD, FACEP
James L. Shoemaker, Jr., MD, FACEP

COUNCIL OFFICERS
Michael J. McCrea, MD, FACEP
*Speaker*
Larisa M. Traill, MD, FACEP
*Vice Speaker*

INTERIM EXECUTIVE DIRECTOR
Sandra M. Schneider, MD, FACEP

of care as determined by their specialty. Those objective, specialty-driven criteria—rather than an employer's separate activities—are the appropriate measures for determining whether a participating physician's work constitutes qualifying public service.

**EMTALA Considerations**

In defining a "substantial illegal purpose," the proposed rule introduces a new definition of "aiding or abetting" under § 685.219(b)(1) that could possibly impact emergency physicians' ability to comply with the Emergency Medical Treatment & Labor Act (EMTALA). As physicians dedicated to providing emergency care to anyone, anytime, we are deeply concerned that the proposed definition of "aiding or abetting"—particularly the inclusion of immigration law violations—are ambiguous and risk capturing activities inherent to the provision of lawful, lifesaving medical care. EMTALA requires hospitals with dedicated emergency departments (EDs) to provide access to emergency services and stabilizing treatment for all individuals. It is possible—and indeed common—for undocumented immigrants to present to EDs and emergency physicians to provide them with stabilizing care, as federal law requires. Under the proposed definition, such lawful care could be construed as "aiding" undocumented individuals. If the provision of such medical care were indeed to fall within the definition of "aiding or abetting," nearly every hospital with an ED would be disqualified as PSLF employers. This would undermine the very purpose of PSLF by stripping eligibility from the clinicians most committed to caring for underserved populations.

We appreciate that this administration is a strong proponent of EMTALA. In the spirit of preserving this essential law, we urge the Department to clarify in the final rule that no policy or definition in the rule will impede the ability of physicians to carry out their obligation under EMTALA to stabilize all patients that come to the ED.

**Impacts on Physicians and Trainees**

Under the proposed policy, physicians who are employed by a PSLF-qualifying employer may find themselves in a situation where, through no fault of their own, they would lose their eligibility to the PSLF program. While some physicians could possibly change jobs to preserve their access to the PSLF program, that could be difficult or impossible in many circumstances, especially for emergency physicians who face unique employment dynamics compared to other specialties that often limit their ability to find new opportunities in their community. In addition, residents are not able to just "switch" residency programs. Once applicants match to a residency program, they are expected to complete their entire residency in that same position. Switching residency programs midstream (when even possible) often requires forfeiting prior training credit, repeating rotations, relocating on short notice, and in some cases jeopardizing visa status for international medical graduates—at a time when off-cycle positions are exceedingly scarce and contractual obligations limit flexibility. For those unable to switch, they can face career defining consequences including an inability to practice independently and an inability to become board certified.

Additionally, the closure of a residency program is a highly disruptive process for hospitals, residents, and the community. The demand for patient care does not diminish when a residency program ends, which means hospitals must adapt to continue delivering care. This often involves recruiting and onboarding new staff, a process that can take weeks or even months. While hospitals make every effort to maintain continuity, delays and disruptions can occur.

From the residents' perspective, a program closure is not just disruptive; it can be life-altering. Residency training is much more than a job or an educational program. In some cases, there may be only one program available in a specific geographic area, necessitating a move to a new town or city. This is only the beginning of the challenges faced. A major hurdle is finding a program that has the capacity and resources to accept the resident. For instance, residents in training need access to a certain number of cases and procedures, such as intubations, but these procedures may be limited.

Once a new program is identified, the resident must secure approval from the Accreditation Council for Graduate Medical Education (ACGME) to allow the program to increase their resident count. After the resident arrives at the new program, a new educational plan and schedule of rotations must be created. This curriculum may differ from what the resident experienced in their previous program, since the topics they covered might not align with the sequence of the new program.

For example, imagine switching schools where you were supposed to learn Spanish in the first year and French in the second. If your new school teaches French first and Spanish second, you would end up learning two years of Spanish while speaking French. In the context of residency, this could mean that you receive extensive training in trauma but none in cardiology.

Transferring residency programs midway often requires forfeiting previous training credits, repeating rotations, and relocating on short notice. For international medical graduates, this shift can jeopardize visa status. For those unable to transfer, there can be significant career consequences, such as an inability to practice independently or become board certified.

Recent data shows that the average medical school debt is nearly $235,000, and the average debt of medical school graduates with both medical school and premedical debt is nearly $265,000. In addition, a RAND report from April 2025 found that concerns about the high costs of medical school and the debt burden graduates are faced with (among others) were cited as factors that make it more difficult to recruit and retain a sufficient number of residents in emergency medicine. Our emergency physician members have often noted that the PSLF program has been their lifeline, and we believe that it must be preserved and even strengthened. Finalizing this proposal could wind up dissuading a new generation of physicians from pursuing emergency medicine and could jeopardize the pipeline of those willing to serve in these critical safety net roles. This is also especially true for many physicians pursuing careers in primary care in rural or underserved communities who may suddenly find their desired specialty, practice model, or practice location is simply not financially viable long-term. This will further exacerbate the already significant  barriers many patients face accessing primary care, and will in turn drive more patients to emergency departments (EDs), increasing the burden on our already-strained EDs throughout the country, thereby limiting access to lifesaving emergency care for our patients and worsening overall health outcomes.

We are also concerned about the impact this policy could have on the overall physician workforce. As the population in the United States continues to grow and age, demand is greater than ever for physicians in every corner of the country. Yet, according to a report from the Association of American Medical Colleges (AAMC), the United States will face a shortage of up to 86,000 physicians by 2036. To address this shortage, we must not only sustain but grow the number of students graduating from medical school. We fear that this policy could lead to a decline in medical school enrollment and exacerbate already painful shortages.

ACEP strongly urges the Department of Education to consider how its proposal could affect physicians and the patients they serve prior to finalizing any policy so that we can sustain a well-trained, dedicated, and robust physician workforce. The Department should ensure that medical students, residents, and physicians are not negatively impacted by these proposed changes and instead are provided with wide availability in terms of employers so that physicians can successfully enter and fulfill their obligations to the PSLF program. To safeguard the PSLF program's purpose while addressing program integrity, we urge the Department to consider:

1. Clarifying that no definitions or policies in the rule would limit hospitals' or clinicians' ability to fulfill all their EMTALA obligations.
2. Basing clinician eligibility on individual service that meets evidence-based, specialty-recognized standards of care, not on an employer's separate activities.
3. Including clear safe-harbor protections so that clinicians are not penalized for employer actions outside their control, including a non-retroactivity provision for previously accrued qualifying payments.
4. Providing transition flexibility for trainees and early-career physicians, recognizing the limited availability of off-cycle positions, contractual constraints, and immigration considerations.

Emergency physicians serve every community, every day, and often under the most difficult circumstances. ACEP supports the Administration's goal of a healthy America and is deeply concerned that jeopardizing support for physician training will only deepen access gaps, strain the health care system further, and endanger the health and safety of our nation as a whole.

We appreciate the opportunity to provide comments. If you have any questions, please contact Laura Wooster, ACEP's Associate Executive Director of Advocacy and Practice Affairs at lwooster@acep.org.

Sincerely,

L. Anthony Cirillo, MD, FACEP

L. Anthony Cirillo, MD, FACEP
President, American College of Emergency Physicians

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

BayCare Health System - PSLF Comment Letter 9.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10346/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10346

**Tracking Number**

mfo-h9na-et0g

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



2985 Drew St.
Clearwater, FL 33759

September 17th, 2025

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

*Submitted electronically via www.regulations.gov*

**Re: William D. Ford Federal Direct Loan Program Proposed Rule (FR Doc. 2025-15665)**

Dear Secretary McMahon,

BayCare Health System, Inc. (BayCare) appreciates the opportunity to submit comments on the Department of Education's proposed changes to the William D. Ford Federal Direct Loan Program, including provisions that may impact the Public Service Loan Forgiveness (PSLF) program.

BayCare is the largest not-for-profit academic health care system in West Central Florida, providing high-quality services through sixteen hospitals and more than 400 service locations, totaling nearly 4,000 beds. Our mission is to improve the health of all we serve through community-owned, not-for-profit health care services that set the standard for compassionate, high-quality care. Over 13,000 births and 676,000 emergency room visits were treated by BayCare last year. In 2024, BayCare provided $467 million in Community Benefit, which included traditional charity care, un-reimbursed Medicaid costs, means-tested programs, and unbilled community services. BayCare also operates the region's faith-based hospitals, St. Anthony's Hospital, St. Joseph's Hospitals (which consists of five locations), and South Florida Baptist Hospital. These hospitals were founded in the 1930's thanks to the commitment of the Franciscan Sisters of Allegany in serving their community.

We write today to express our general concerns pertaining to potential changes to the PSLF process that has the potential to undermine one of the most vital tools available to hospitals and health systems to recruit and retain the highly trained workforce our communities depend upon. PSLF is not just a financial program, it is an equalizer that enables not-for-profit health care providers like BayCare that serve as qualifying employers to compete with for-profit entities for physicians, nurses, therapists, and allied health professionals who often carry significant student debt burdens.

Healthcare, and hospitals specifically, serve as critical infrastructure for any community. Florida as a state has grappled with staffing challenges in healthcare due to exponential population



2985 Drew St.
Clearwater, FL 33759

growth, labor cost spikes, and provider burnout. This situation is projected to become exacerbated for key clinicians, with shortages of 59,100 nurses and 18,000 physicians expected by 2029 per a 2023 Workforce Analysis by the Florida Hospital Association. BayCare is answering this call by growing our graduate medical education program exponentially, a number that is set to reach 650 resident physicians by 2029, and a further 417 physician sponsored students as well as registered apprenticeship programs in nursing and surgical technology. Without PSLF, these workforce challenges will intensify. PSLF enables BayCare to remain competitive with job offers from for-profit entities that can offer much greater salaries in addition to student loan forgiveness benefits. In turn, BayCare provides far greater levels of care to Medicaid and charity care populations with a best-in-the-region financial assistance policy that ensures no one under 250% of the federal poverty level pays for hospital care. This includes patients in Health Resources and Services Administration (HRSA) designated Medically Underserved Areas, both Pasco and Pinellas counties.

At BayCare, PSLF is discussed in nearly every physician and nursing recruitment negotiation. For many candidates, the program is decisive in choosing to join and remaining in not-for-profit healthcare. In 2024 alone, BayCare supported 2,463 team members in the PSLF process, and more than 1,100 in 2025 so far. These team members are not limited to clinicians—they include counselors, technicians, dietitians, and support staff, all of whom contribute to safe, effective, and compassionate patient care. However, due to cost, we are unable to provide tuition forgiveness and rely on federal support of the PSLF program to ensure we are able to continue caring for our community.

Per the proposed rule, healthcare as an industry benefits the second most from PSLF behind only K-12 education as an industry. The average amount forgiven of $89,000 is second only behind the legal field. Research from the Education Data Initiative has shown that the average debt balance after concluding medical school is more than $216,000. **BayCare recognizes the significance of federal investments like the PSLF program and appreciates the administration's commitment to responsible management of taxpayer dollars. BayCare does not engage in any activity that conflicts with the proposed rule (and could result in loss of qualifying employer status) but has concerns around the vagueness of the statement within the rule "other actions that threaten our country" and would request that the Department provide greater clarity on its meaning and scope.**

BayCare invests heavily in tuition assistance and workforce development programs. We offer team members the ability to receive up to $5,250 annually towards their tuition expenses, which is the maximum amount allowed by law as tax free. This avoids further burdening team members with additional taxable wages on a program intended to serve as assistance. In 2024, our tuition support totaled at $4.9 million provided to team members. However, the scale of educational debt in healthcare professions is such that it cannot be addressed by hospitals alone. PSLF fills a critical gap, ensuring that individuals committed to public service, and serving the "public good"



2985 Drew St.
Clearwater, FL 33759

(as the program initially defined it) can pursue their calling without being forced out of the not-for-profit sector by overwhelming student loan obligations. **We urge the Department to ensure that any changes to the PSLF process preserve accessibility and certainty for healthcare professionals working at not-for-profit hospitals and health systems.**

BayCare supports thoughtful stewardship of federal programs but emphasizes that PSLF remains essential to the viability of not-for-profit healthcare providers. We ask that the Department carefully weigh the downstream consequences of modifications to PSLF eligibility or processes on the health and wellbeing of communities across the nation.

Thank you for considering our perspective.

Sincerely,

Nikki Daily

Nikki Daily
Chief Team Resources Officer BayCare
Health System

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

2025.09.17 LDF Comment Letter on PSLF

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10348/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10348

**Tracking Number**

mfo-hd1j-wjgl

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



Advancing racial justice since 1940

September 17, 2025

**Submitted via regulations.gov**

Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [RIN 1801-AA28]**

Dear Tamy Abernathy:

The NAACP Legal Defense and Educational Fund, Inc. (LDF) submits the following significant, adverse comment opposing the U.S. Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) [RIN 1801-AA28] published in the Federal Register on Monday, August 18, 2025, that would make unlawful changes to the Public Service Loan Forgiveness (PSLF) program under 34 C.F.R. 685.219. The proposed rule unlawfully attempts to subvert explicit Congressional will and expand ED's power beyond its statutory authority. The NPRM arbitrarily vests unbridled discretion with the Secretary to enforce new, unconstitutional restrictions on eligibility for PSLF targeting organizations which have viewpoints that differ from the Administration's preferences. ED and the Secretary lack the authority, capacity, and relevant expertise to make the types of determinations dictated by the NPRM. If finalized, these changes to PSLF will have devastating consequences for borrowers, non-profit organizations, and all the populations that non-profit organizations serve. Further, this NPRM will harm Black communities by burdening Black borrowers in public service jobs with more debt and punishing non-profit organizations that provide important services for marginalized people. **LDF strongly urges ED to withdraw this unlawful NPRM in its entirety.**

Founded in 1940 by Thurgood Marshall, LDF is the nation's oldest civil rights law organization.[1] LDF was launched at a time when America's aspirations for equality and due process of law were stifled by widespread state-sponsored racial inequality. LDF has long played an instrumental role in passing legislation, encouraging agency actions, and litigating to protect Black people from policies and practices that have unjustified discriminatory effects. For eighty-five years, LDF has worked to dismantle racial segregation and ensure equal educational opportunity for all students, most prominently in the groundbreaking case, *Brown v. Board of Education*.[2] LDF also has represented Black students and applicants, as parties and *amici curiae*,

---

[1] LDF has been fully separate from the National Association for the Advancement of Colored People (NAACP) since 1957.
[2] 347 U.S. 483 (1954).

40 Rector Street
5th Floor
New York, NY 10006

700 14th Street NW
Suite 600
Washington, DC 20005

260 Peachtree Street NW
Suite 2300
Atlanta, GA 30303

naacpldf.org
212-965-2200

in numerous cases regarding educational access and opportunity in education. LDF is a 501(c)(3) non-profit organization that has a decades long history of public service.

Non-profit organizations like LDF rely on PSLF for recruiting and retaining talented public servants. These employees forgo higher-paying opportunities in order to lend their talents in support of important societal needs like advocating for racial justice for Black communities and other marginalized communities. Without organizations like LDF, underserved communities that already struggle to access pathways to justice and opportunity will be further marginalized. If allowed to proceed, this NPRM would threaten many non-profit organizations and their ability to serve their communities by weaponizing a program meant to help relieve pressure for public servants who had no choice but to take on student debt to pursue higher education. This deeply misguided and wholly unlawful NPRM should be rescinded in full.

## I. Congress created PSLF to encourage public service, broadly defined to include all 501(c)(3) non-profit organizations.

In 2007, Congress passed the College Cost Reduction and Access Act of 2007 which was then signed into law by President George W. Bush.[3] This legislation established PSLF, which requires the Department to forgive eligible loans of borrowers who make monthly loan payments for ten years while employed in public service jobs. The statute defined "public service jobs" broadly to include:

> [A] full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, **or at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title**.

20 U.S.C. § 1087e(m)(3)(B) (emphasis added).

[3] Pub. L. No. 110-84, 121 Stat. 784.

This definition covers a wide range of professions from educators to public defenders to healthcare professionals. Notably, the definition included a catchall category of any "organization that is described in Section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title." This broad inclusion has long been understood to include all 501(c)(3) tax-exempt, non-profit organizations with no restrictions.[4] In ED's regulations implementing this statutory definition, ED has historically defined "qualifying employer" for the PSLF program to include any 501(c)(3) non-profit organization, and any U.S. based federal, state, and local government entity.[5]

In addition to the statutory language, the legislative history of the PSLF program indicates that Congress intended this program to broadly benefit employees in a wide variety of public service professions.[6] In discussing the need for this program, Congress recognized that growing student loan burdens made it prohibitively expensive for many borrowers to pursue jobs in public service. At the same time, these public service jobs remain critical for meeting national needs related to education, health, security, and well-being—needs not met by governmental entities. In the Committee Report associated with the PSLF legislation, Congress stated, "[d]ebt burdens are particularly troublesome for public servants who often earn low salaries for their work. The policies embodied in H.R. 2669 recognize the contributions and challenges of public service, and the Committee hopes to encourage participation in these careers."[7]

It is just as important now as when PSLF was originally created to support individuals that want to enter public service careers. The country is currently facing significant worker shortages in critical areas. For example, in education, recent studies have found that 1 in 8 teaching positions are either unfilled or filled by a teacher not fully certified for the role.[8] As a result, more than 6 million students nationally have been affected.[9] Black students bear the brunt of these teacher shortages as they are more likely to attend under-resourced schools with less experienced

---

[4] In fact, litigation around PSLF has largely focused on the extent to which organizations that do not qualify as 501(c)(3) organizations can still be included as eligible employers in PSLF. In those cases, it is taken as a fact that all 501(c)(3) organizations are eligible. *Cf. American Bar Association v. United States Department of Education*, 370 F. Supp. 3d 1 (D.D.C. 2019).
[5] 34 C.F.R. § 685.219.
[6] The Congressional Report associated with the PSLF legislation included a lengthy list of the types of professions worth targeting with federal investment, including, "first responders, law enforcement officers, firefighters, nurses, public defenders, prosecutors, early childhood educators, librarians, and other public sector employees." H. Rept. 110-210 – College Cost Reduction Act of 2007, https://www.congress.gov/committee-report/110th-congress/house-report/210/1?utm_source=chatgpt.com.
[7] *Id.*
[8] Learning Policy Institute, 2025 Update: Latest National Scan Shows Teacher Shortages Persist, (July 15, 2025) https://learningpolicyinstitute.org/blog/2025-update-latest-national-scan-shows-teacher-shortages-persist?utm_source=chatgpt.com.
[9] *Id.*



educators.[10] Similarly in healthcare, a recent study projected that there would be a national deficit of 200,000 to 450,000 registered nurses in 2025.[11] That same study found that to make up for this gap in registered nurses, nursing schools would need to more than double the number of new graduates entering and staying in the nursing workforce every year for the next three years.[12] Once again, these effects will be felt most directly in Black communities where nurse staffing have already struggled to meet the healthcare needs of these communities, including at non-profit and government hospitals that currently benefit from PSLF to recruit healthcare providers.[13]

**II. ED has no legal authority to create new restrictions on employer eligibility that go beyond the clear language of the statute.**

In this NPRM, ED proposes new restrictions on employer eligibility for PSLF that contradict the statute's plain language. The PSLF statute unambiguously defines "public service jobs" to include jobs "in government … or at an organization that is described in section 501(c)(3) of Title 26 and exempt from taxation under section 501(a) of such title."[14] The statute does not confer any authority on the Secretary to narrow the definitions outlined by Congress. Yet, this NPRM proposes to do that just that. In pertinent part, the NPRM amends 34 C.F.R. 685.219(c) to establish that borrower payments shall not be credited while they are employed at a qualifying employer that engages in activities that have a "substantial illegal purpose." In doing so, the NPRM proposes to give the Secretary wide discretion to pick and choose which government and non-profit organization employers qualify for PSLF. Congress clearly stated that PSLF should cover *any* government and 501(c)(3) organization employers, yet the Department now wants PSLF to cover only *some* government and 501(c)(3) organization employers. The Department has no legal authority to subvert Congressional will and contradict clearly defined statutory language.[15]

---

[10] EdTrust, *As Districts Face Teacher Shortages, Black and Latino Students Are More Likely to Have Novice Teachers Than Their White Peers* (Dec. 15, 2021), https://edtrust.org/press-release/as-districts-face-teacher-shortages-black-and-latino-students-are-more-likely-to-have-novice-teachers-than-their-white-peers/#:~:text=Not%20only%20do%20Black%20students,5%25%20first%2Dyear%20teachers.

[11] Gretchen Berlin, Meredith Lapoint, Mhoire Murphy, and Joanna Wexler, *Assessing the lingering impact of COVID-19 on the nursing workforce* (May 11, 2022), https://www.mckinsey.com/industries/healthcare/our-insights/assessing-the-lingering-impact-of-covid-19-on-the-nursing-workforce.

[12] *Id*.

[13] Eileen T. Lake, Christin Irogbu et. al, *Poorer Nurse Staffing in Black-Serving Hospitals* (Jan. 2025), https://pubmed.ncbi.nlm.nih.gov/39666469/.

[14] 20 U.S.C. § 1087e(m)(3)(B).

[15] *See Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (describing step one of the *Chevron* test which was not overruled by *Loper Bright v. Raimondo*, 603 U.S. 369 (2024)).



The NPRM attempts to insert a new eligibility restriction when the statute provides the agency no authorization to make such a limitation. In striking down other regulatory provisions that contradict unambiguous statutory text, courts have stated the governing rule clearly: "[w]here the text and structure of a statute unambiguously foreclose an agency's statutory interpretation, the intent of Congress is clear, and 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"[16] ED asserts that Congress "has granted the Secretary broad authority to promulgate regulations to administer the programs administered by the Department of Education and to carry out his or her duties."[17] However, this "authority" is "subject to limitations as may be otherwise imposed by law" and cannot be used to circumvent clear and unambiguous statutory language.

The text and structure of the PSLF statute unambiguously foreclose the agency's interpretation in this NPRM. The PSLF statute provides broad eligibility for loan forgiveness to borrowers in public service jobs. The definition of "public service job" includes some specific types of professions but also the two broad categories of (1) employees of governments and (2) employees of 501(c)(3) organizations. Nowhere in the statute does Congress defer to ED to further restrict this definition based on the activities that those employers engage in. Since ED has not been granted this power, the NPRM cannot proceed.

## III. The NPRM's framework for determining an employer ineligible is impossible to administer lawfully or effectively.

Even if Congress provided ED the authority to limit PSLF employer eligibility as contemplated by the NPRM, which it has not, then ED still could not limit participation by targeting viewpoints that the Administration disfavors. The NPRM here attempts to define categories of "substantial illegal purposes" to bar certain employers from participating in PSLF. Instead of carving out all illegal activity, ED has selected a small number of issues that align with the Administrations' ideological preferences. Even then, those select few issues are defined so poorly that they raise a bevy of constitutionality and practicability concerns. These infirmities are compounded by vesting the Secretary with sole discretion for determining whether illegal activity has occurred. As a result, the proposed framework proposes to have the Department make adjudications across wide-ranging areas of law outside the Department's expertise including on matters of immigration, national security, and healthcare. Not only is the Department ill-equipped to make such determinations, but providing the Secretary with this type of unbridled discretion invites unconstitutional abuse.

---

[16] *See Chamber of Commerce of United States of America v. United States Department of Labor*, 884 F.3d 360, 369 (5th Cir. 2018) (quoting *Chevron*).
[17] 90 FR 40154, 40156.



**A. The NPRM proposes definitions of "substantial illegal purpose" that are poorly defined and impossible to administer fairly and gives broad discretion to ED to make these determinations without ensuring proper due process.**

In this NPRM, ED contravenes clear statutory instructions from Congress regarding PSLF eligibility by creating an entirely novel and unsupportable framework for stripping eligibility for qualifying employers. ED proposes to do so by amending 34 C.F.R. 685.219(c) to remove eligibility for qualifying employers if they engage in activities with a "substantial illegal purpose." Specifically, ED outlines only the following activities as those that constitute a substantial illegal purpose:

(1) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
(2) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;
(3) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;
(4) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law,
(5) engaging in a pattern of aiding and abetting illegal discrimination; or
(6) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.

Proposed 34 C.F.R. 685.219(b)(30).

Instead of relying on courts or even the IRS to determine whether an employer has violated the law, this NPRM proposes to vest sole authority with the Secretary. Proposed 34 C.F.R. 685.219(h) outlines the following standard:

> (h) Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.
>
> (1) The Secretary determines by a **preponderance of the evidence**, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions. In making such a determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:



> (i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;
>
> (ii) A plea of guilty or nolo contendere, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or
>
> (iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in subsection (h) of this section.

> (2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution.

Proposed 34 C.F.R. 685.219(h) (emphasis added).

1. **The process outlined in proposed subsection (h) falls well short of appropriate due process for determinations of this significance.**

ED frames this entire NPRM under the false assertion that the PSLF program currently benefits too many organizations that violate the law. In particular, several of the substantial illegal purpose definitions directly cite criminal statutes. Yet, it remains a central tenet of the American legal system that the standard of proof in criminal cases is "beyond a reasonable doubt."[18] The preponderance standard employed here falls well short of the burden of proof normally used to determine whether an entity is culpable of a crime.

Not only is the burden of proof lower than what is necessary to sufficiently protect due process interests of organizations, but subsection (h) vests sole discretion for adjudications of criminal law with the Secretary and not with courts. ED is dramatically ill-equipped to determine whether employers have engaged in activities with a "substantial illegal purpose." The Secretary and her designees within the Department lack the relevant expertise, capacity, and impartiality to make determinations of law in such wide-ranging areas as national security and healthcare. While proposed subsection (h) notes that court findings would be conclusive evidence, the NPRM remains silent with regards to what other types of evidence the Secretary could consider in making her determination.

---

[18] *See In re Winship*, 397 U.S. 358 (1970).



The process outlined in subsection (h) pales in comparison to how adjudications of illegality are normally handled. For example, when courts adjudicate whether an entity has engaged in material support of terrorism in violation of 8 U.S.C. 1189, the government must prove its case beyond a reasonable doubt. In such a case, the accused would have the procedural protections inherent in a fair trial, the government would need to marshal evidence of various types (e.g. forensic accounting, witnesses, expert testimony, etc.) to meet its high burden, and a jury would need to come to a unanimous conclusion. Here, ED proposes to eschew those important due process protections. As a poor substitute, the NPRM would let the Secretary decide whether an organization has engaged in activities with a "substantial illegal purpose" based on whether she personally believes that it is more likely than not that an entity has violated the law. Subsection (h) fails to outline what type of evidence the Secretary would consider, what expertise ED has to assess the reliability and persuasiveness of such evidence, and what type of procedural protections there will be to ensure the determination is fair and impartial.

Exacerbating the situation is the fact that ED already has limited capacity to make fact-intensive legal determinations. Earlier this year, ED implemented Reductions in Force (RIFs) that resulted in around a 50% cut in staffing.[19] The short-staffed Department and its contractors already struggle to process PSLF applications effectively, with more than 72,000 borrowers awaiting forgiveness due to an application processing backlog.[20] Layering on this novel framework for determining whether an employer is eligible for PSLF will slow down an already unacceptably slow process. Even if ED was fully staffed, it is hard to imagine how the agency would even manage the eligibility process it proposes in this NPRM. To administer the rule fairly, ED would need to ensure that employers do not engage in any illegal activity as defined under this proposed rule. That would require ED to assess whether tens of thousands of employers are in compliance with laws related to immigration, national security, health care, anti-discrimination, and state torts. Such a task would be impossible for any agency to accomplish effectively. Alternatively, ED could rely on selective enforcement by targeting select employers, which itself invites unconstitutional abuse.

2. **The definitions of substantial illegal purposes are poorly defined and impossible to administer lawfully and fairly.**

Even if ED had the legal authority to remove eligibility from employers based on the commission of activities with a "substantial illegal purpose," the specific definitions outlined in 34 C.F.R. 685.219(b)(30) are poorly defined and would be impossible to administer lawfully and

[19] United States Department of Education, *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force.

[20] Annie Nova, *Student loan forgiveness program has a 72,730-person backlog. Here's what borrowers need to know* (Aug. 15, 2025), https://www.cnbc.com/2025/08/15/public-service-loan-forgiveness-buyback-has-a-72730-person-backlog.html.



fairly. It is clear that the selection of these specific categories of "substantial illegal purposes" is another attempt by this Administration to weaponize loose interpretations of the law to chill the lawful provision of services and advocacy that it disagrees with. In this instance, the NPRM targets organizations that work with immigrants, condemn wars abroad, provide gender affirming care, advocate for racial justice, and engage in peaceful protest.

The first four categories of "substantial illegal purpose" activities target areas of advocacy that the Administration disfavors. Again, while the NPRM claims that only *illegal* activity in these areas is being punished, the slippery process by which the Secretary can make these determinations of "illegality" invites abuse. Instead of curbing illegal behavior, what this NPRM will do in effect is chill lawful activity in these areas. As a result, pro bono legal organizations may hesitate to take on an asylum case for fear of being accused of aiding and abetting violations of immigration law or a university hospital may institute a policy that restricts certain hormone therapies for youth out of an abundance of caution. Many individuals in this country will lose out on life altering legal advocacy or lifesaving healthcare as a result. That chilling effect is amplified dramatically by the fact these decisions would not be made by courts or afford affected parties full due process protections. Instead, it would be the Secretary making these judgments under the lowered preponderance of the evidence standard in areas far outside the Department's expertise.

The fifth category of "substantial illegal purpose" would remove eligibility for any employer found to have "engaged in a pattern of aiding and abetting illegal discrimination." The NPRM defines "illegal discrimination" to include "a violation of any Federal discrimination law including, but not limited to the Civil Rights Act of 1964, Americans with Disabilities Act, and the Age Discrimination in Employment Act of 1967." The NPRM includes a definition of aiding and abetting in proposed 34 C.F.R. 685.219(b)(1) to mean the definition used in Title 18 of the United States Code in Section 2. This category of "substantial illegal purpose" is so ill-defined that it can be read to either include no employers or tens of thousands of employers. The definition of aiding and abetting used in the NPRM references the criminal legal standard for aiding and abetting: "whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."[21] This standard is wholly inapplicable to the federal anti-discrimination laws included in the definition of "illegal discrimination" since the federal anti-discrimination laws included in the regulation generally outline *civil* and not *criminal* law infractions. Since aiding and abetting is never an independent criminal charge, as there must be an underlying principal offense against the United States, a court would *never* find an entity to be guilty of aiding and abetting a violation of a

[21] 18 U.S.C. 2.



federal anti-discrimination civil law.[22] If this regulatory provision is meant to be read broadly and include all findings of discrimination under federal anti-discrimination law, then thousands if not all state and local government entities would be included due to violations of the Americans with Disabilities Act[23] (e.g. discrimination in provision of public accommodations) or Title VII of the Civil Rights Act of 1964 (e.g. discrimination in employment)[24]. As a result, tens if not hundreds of thousands of educators, sanitation workers, law enforcement officers, firefighters, and other government employees would lose access to PSLF. Additionally, racial justice organizations would be dissuaded from zealous advocacy for Black and other marginalized communities in fear that the Secretary would once again make an incorrect application of federal civil rights laws.[25]

The final category of "substantial illegal purpose" targets organizations that engage in peaceful protest. With this proposal, ED would use the PSLF program to punish those that protest against the Administration's policies. Once again, the NPRM attempts to frame this activity in the context of violations of laws. Yet the punishment here, ineligibility for PSLF, far outweighs the traditional punishments for violations of state laws related to trespass, disorderly conduct, and public nuisance. For example, state laws related to trespass are often considered tort violations or misdemeanor infractions. In many states, punishments for trespass amount to fines of a few hundred dollars.[26] This NPRM proposes to impose disproportionate consequences for minor violations. If an employer were to lose eligibility for PSLF, that could mean that thousands of employees would lose tens of thousands of dollars each in forgiveness benefits, a penalty far greater than the punishments contemplated by state legislatures when passing these laws. Furthermore, peaceful protests, including ones that may result in minor infractions of state law, are a cornerstone of our multiracial democracy. If allowed to proceed, this NPRM would weaponize the PSLF program to dissuade government entities and non-profit organizations from

---

[22] United States Department of Justice, *Criminal Resource Manual – 2476. 18 U.S.C. 2 Is Not An Independent Offense*, https://www.justice.gov/archives/jm/criminal-resource-manual-2476-18-usc-2-not-independent-offense.

[23] *See e.g.*, Agreement between United States of America and North Carolina Department of Adult Corrections, DJ No. 204-54-135, https://www.justice.gov/crt/media/1412321/dl; Letter from United States Department of Justice to the State of Alabama (Jan. 15, 2025), https://www.justice.gov/crt/case/state-alabama; and Agreement between United States of America and the Shelby County District Attorney General's Office, DJ No. 204-70-85, https://www.justice.gov/crt/media/1352376/dl.

[24] *See e.g.*, Consent Decree, *Michael J. McCullough v. Independent School District No. 89 of Oklahoma City*, No. Civ-24-544-R (W.D. Ok. 2025), https://www.justice.gov/crt/case-document/consent-decree-mccullough-v-oklahoma-city-public-schools; Consent Decree, *United States of America v. Cobb County, Georgia*, Civ. No. 1:24-cv-02010-WMR-JEM (N.D. Ga. 2024), https://www.justice.gov/crt/media/1351361/dl; and Settlement Agreement between United States of America and Tallahatchie County and the Tallahatchie County Sheriff, Civ. No. 3:21-cv0045NBB-RP (N.D. Miss. 2021), https://www.justice.gov/crt/media/1377946/dl.

[25] *See American Federation of Teachers v. U.S. Department of Education*, No. CV SAG-25-628, 2025 WL 2374697 (D. Md. 2025).

[26] *See e.g.*, Oklahoma, 21 OK Stat § 1835 (fine of not more than $250); West Virginia, WV Code §61-3B-3 (not less than $100 nor more than $500); and Vermont, 13 V.S.A. § 3705 (not more than $500).



doing important advocacy work on behalf of marginalized communities, including Black communities. This country will be worse off as a result.

**B. Defining "substantial illegal purpose" to only include the categories outlined in proposed 34 C.F.R. 685.219(b)(30) constitutes viewpoint discrimination in violation of the First Amendment.**

By weaponizing PSLF through this NPRM, ED is targeting non-profit organizations and government entities that provide critical services or advocate for causes adverse to the Administration's ideological agenda. ED attempts to justify this exclusion of qualifying employers by improperly borrowing a doctrine from tax law. The Internal Revenue Service (IRS) enforces the "illegality doctrine" when making determinations about whether organizations can receive or maintain 501(c)(3) status.[27] In its determinations, the IRS conducts careful inquiries assessing the substantiality of illegal activities, including conducting quantitative and qualitative tests to determine if an organization is on balance incompatible with the public interest.[28] The NPRM's version of this rule strips both the nuances and the general applicability of the IRS doctrine and implements a crude facsimile. While the IRS illegality doctrine broadly includes all illegal conduct, the NPRM proposes only a select few issues that align with the Administration's ideological agenda. In fact, many of the cases in which the IRS has actually determined that organizations have engaged in substantial illegal purposes relate to organizational violations of laws regarding fraud, gambling, and drug use.[29] None of those substantial illegal purposes appear in this NPRM.

Instead of broadly prohibiting illegal activities, this NPRM selectively outlines specific types of activities to target governments and non-profit organizations that engage in activities at odds with the Administration's ideological preferences. Coupled with the slippery burden of proof and deficient process for determining that an organization has engaged in one of these illegal activities, this framework invites unconstitutional abuse by ED. As proposed, these rule changes would give the Secretary discretion to target organizations that work towards supporting immigrants, advocating against war, providing healthcare to transgender individuals, promoting

[27] Internal Revenue Service, *Illegality and Public Policy Considerations*, https://www.irs.gov/pub/irs-tege/eotopicl94.pdf.
[28] *Id.*
[29] *See e.g., Church of Scientology of California v. Commission of Internal Revenue*, 823 F.2d 1310 (9th Cir. 1987) (revoking tax exempt status due to conspiracy to evade taxes); Internal Revenue Service, *Illegality and Public Policy Considerations*, https://www.irs.gov/pub/irs-tege/eotopicl94.pdf ("agents often encounter gambling operations that clearly violate state law.").

racial justice, and engaging in peaceful protest. Organizations working in these areas would be targeted for their viewpoints on these matters, in violation of the First Amendment.[30]

While ED defends its framework by emphasizing that only *illegal* activities would be prohibited, the structure of the proposal lacks sufficient protection to ensure First Amendment covered activity will remain undisturbed. Again, 34 C.F.R. 685.12(h) vests the authority to determine whether an organization has engaged in illegal activities with the Secretary, not with courts of law. The keystone of the illegality analysis is therefore not whether courts have concluded that an organization has violated the law, but whether the Secretary believes an organization has acted illegally. In criminal courts, the government has the burden of proving beyond a reasonable doubt that a law has been violated. Under proposed subsection (h), the Secretary would only need to meet the much lower burden of a preponderance of the evidence. At the same time, subsection (h) provides nearly no instruction on what type of evidence the Secretary should evaluate and how she should do so.

Even for matters that are traditionally within the Department's jurisdiction, such as civil rights in schools, ED has failed to interpret the law accurately and in accordance with the Constitution. Subsection (h) of the NPRM includes a lackluster promise that ED would not make enforcement decisions that run counter to the First Amendment. Such a promise provides cold comfort when this Administration has included similarly weak assertions in documents that courts have subsequently deemed to constitute viewpoint discrimination in violation of the First Amendment.[31] Allowing the Secretary to make determinations of law instead of courts creates a structure that does too little to prevent constitutional harm. These harms are particularly threatening to organizations that advocate for racial justice, as ED has now repeatedly tried to attack lawful strategies schools have taken to create racially inclusive schools for Black students prior to being overruled by courts.[32]

## IV. Conclusion

We strongly urge ED to withdraw the NPRM in its entirety and maintain the prior rules governing PSLF.

---

[30] *See Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) (overturning a restriction on eligibility for funding that prohibited legal services organizations from qualifying if they did work that advocated for changes to existing welfare law).

[31] *See e.g.*, *American Federation of Teachers v. U.S. Department of Education*, No. CV SAG-25-628, 2025 WL 2374697 (D. Md. 2025) (holding that guidance issued by ED regarding diversity, equity, and inclusion practices in schools was textbook viewpoint discrimination, and indicating ED's interpretations of law lack factual bases, conflict with regulations and caselaw, exceed ED's authority, and are contrary to constitutional rights).

[32] *See id. See also*, *Mid-Atlantic Equity Consortium, et al. v. U.S. Department of Education*, No. CV 25-1407 (D.D.C. 2025) (granting a preliminary injunction in favor of the Mid-Atlantic Equity Consortium in challenging ED's termination of the Equity Assistance Center grant program).





The proposed rule unlawfully subverts Congress's intent in creating the PSLF program. The statute, which authorizes the program, clearly includes all government and legally recognized 501(c)(3) organizations as eligible employers. The restrictions that ED proposes are unlawful; ED has no legal authority to add novel eligibility restrictions to this program. They are also impossible to administer. The eligibility restrictions target a select few issues that align with the Administration's ideological agenda. Furthermore, those issues are so poorly defined that they cannot be effectively implemented. Instead of deferring to courts, the NPRM proposes to grant the Secretary supreme authority to make determinations of law in areas far beyond the Department's expertise. In doing so, the NPRM creates numerous constitutional and other legal problems that cannot be cured with weakly stated promises that ED plans to follow the law.

This rule does not make the PSLF program stronger. This NPRM targets non-profit organizations and state and local governments that carry out important missions and activities. There is no confusion as to how this rule will negatively impact this country, from its institutions to its public servants to the people that rely on important services from the very entities that this rule seeks to punish. It is also no secret that marginalized communities, especially Black communities, will bear the brunt of these harms. ED must rescind this NPRM in its entirety.

Thank you for the opportunity to comment. If you have any questions, please contact Ashley Harrington, Senior Policy Counsel (aharrington@naacpldf.org) and Ray Li, Policy Counsel (rli@naacpldf.org).

Sincerely,

Ashley Harrington
Senior Policy Counsel
Legal Defense Fund

Ray Li
Policy Counsel
Legal Defense Fund

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached.

Attachments 1

25_09_17_NACHC_Comment Letter_PSLF_Proposed Rule

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10349/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10349

**Tracking Number**

mfo-hf5t-rze4

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

The Honorable Linda McMahon
Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**RE: Docket ID ED-2025-OPE-0016: William D. Ford Federal Direct Loan (Direct Loan) Program Proposed Rule (RIN 1801-AA28)**

Dear Secretary McMahon,

The National Association of Community Health Centers (NACHC) is the leading national membership organization dedicated to promoting Community Health Centers (CHCs) (also known as Federally Qualified Health Centers) as the Employer, Provider, and Partner of choice in all communities, as well as the foundation of the primary health care system in the United States.

For 60 years, CHCs have provided high-quality, affordable, comprehensive care – including primary, preventive, dental, behavioral health, pharmacy, vision, and other essential health services to at least 34 million people annually and as many as 52 million at over 17,000 locations across rural and nonrural communities. This includes over 10 million rural residents (at least 1 in 5 and up to 1 in 3), more than 20 million (at least 1 in 3) in poverty, and more than 6 million (at least 1 in 5) uninsured people. Powered by dedicated and committed staff (326,000 FTEs), CHCs serve at least 1 in 10 Americans and up to 1 in 7[1] yet account for only 1% of total U.S. healthcare spending, saving Medicaid and Medicare billions annually by reducing costly emergency, inpatient, and specialty care.[2] Research suggests that every dollar invested in primary care yields a 13-to-1 return in overall health system savings.[3]

In addition to medical services, CHCs provide dental, behavioral health, pharmacy services, and other "enabling" or support services that facilitate access to care for individuals and families in medically underserved communities, regardless of insurance status or ability to pay. NACHC maintains its role as the national voice for CHCs and believes that high-quality primary health care is essential in creating healthy communities. The collective mission and mandate of NACHC and the 1,512 CHCs around the country is to close the primary care gap and provide access to high-quality, cost-effective primary and preventative medical care.

---

[1] https://www.weitzmaninstitute.org/the-hidden-patient-base/

[2] Volerman A, Carlson B, Wan W, Murugesan M, Asfour N, Bolton J, Chin MH, Sripipatana A, Nocon RS. Utilization, quality,
and spending for pediatric Medicaid enrollees with primary care in health centers vs non-health centers. BMC Pediatr. 2024 Feb
8;24(1):100. doi: 10.1186/s12887-024-04547-y. PMID: 38331758; PMCID: PMC10851548.
https://pubmed.ncbi.nlm.nih.gov/38331758/

[3] https://www.oregon.gov/oha/HPA/dsi-pcpch/Documents/PCPCH-Program-Implementation-Report-Final-Sept-2016.pdf

We write to express our concerns about the Department of Education's proposed rule that would redefine "qualifying employer" under the Public Service Loan Forgiveness (PSLF) program. **Given the potential ramifications for CHCs, their employees, and their patients, NACHC requests that the Department consider our comments below on how to improve the implementation of the proposed rule's provisions to prevent any inadvertent disruption in PSLF eligibility for CHCs and their primary care workforce.**

**NACHC requests that the Department consider the potential chilling effect on employee recruitment and retention if this rule is finalized as proposed.** NACHC survey data showed that nearly two-thirds of CHCs experienced staff turnover rates of 5-25% in 2022.[4] Competition from other employers and better financial opportunities were cited as the top reasons staff were leaving. With the proposed changes to the PSLF, potential employees may be disincentivized from seeking CHC jobs if they feel there is uncertainty about whether such jobs would continue to be deemed PSLF eligible. Students and trainees seeking careers in the health professions may veer toward higher-paying specialized roles in the private sector over lower-paying primary care roles in the non-profit sector, driving up health care costs and decreasing access to preventive care.

The proposed rule could also disproportionately affect rural and underserved communities. CHCs provide care to nearly 10 million rural patients.[5] CHCs leverage programs like PSLF to retain the workforce in rural communities and maintain access to care. With 81 hospitals closing in rural U.S. counties between 2005 and 2024,[6] CHCs often become the only health care provider available, preserving healthcare access to millions.[7] A recent CMS study also suggested that an increase in primary care physicians and specialists helps rural hospitals retain patients and possibly avoid closures.[8] CHCs and their employees are embedded in their communities, and patients receive better care when workers do not fear losing necessary loan repayment benefits or having to move for a new job.

**NACHC is concerned about how this change may exacerbate the ongoing primary care workforce shortage.** With an estimated shortage of 87,150 full-time equivalent (FTE) primary care physicians by 2037,[9] there has been a growing emphasis on strengthening the pipeline of residents into primary and community-based care, as well as retaining physicians in these settings. Preserving opportunities for staff to remain in community-based organizations in rural, urban, island, frontier, and tribal underserved areas with limited access to care is crucial. In 2024 alone, CHCs provided care to 6.9 million dental health patients, 3.4 million behavioral patients, and over 28.7 million medical patients who might have otherwise not had access to primary care.[10] The PSLF is a vital program to the physicians and the rest of the staff at CHCs who are integral to providing health care access to nearly 34 million Americans. Once again, if workers cannot utilize

---

[4] https://www.nachc.org/wp-content/uploads/2022/03/NACHC-2022-Workforce-Survey-Full-Report-1.pdf
[5] https://www.nachc.org/nachc-content/uploads/2024/12/FlyIn_RuralCHCDataSheet_V7.pdf
[6] https://ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=110927
[7] https://www.nachc.org/how-community-health-centers-respond-to-rural-hospital-closures/
[8] https://www.cms.gov/files/document/examining-rural-hospital-bypass-outpatient-services.pdf
[9] https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/state-of-the-primary-care-workforce-report-2024.pdf
[10] 2024 UDS Data

PSLF to help them repay their student loans, they may leave the primary care workforce for better paying jobs, leaving patients with fewer physicians, technicians, and nurses.

CHCs and their staff serve everyone who walks through their doors, regardless of their ability to pay. If their staff leave, CHCs will incur higher operational costs for recruiting and training new staff. Recent data suggests that the median cash-on-hand for CHCs is 100 days, and a quarter of them have negative 4% operating margins. Furthermore, CHCs wrote off over $571 million in uncompensated care in 2024.[11] CHCs operate on razor-thin margins already, investing dollars into staff and services to benefit their patients. If they lose staff due to the loss of their PSLF eligibility, they may have to significantly roll back services or ultimately close their doors, leaving rural and underserved communities without access to care.

**NACHC encourages the Department to ensure employers in larger health systems working under one EIN are not treated as one entity for determining PSLF eligibility.** Larger health systems may include safety-net organizations such as CHCs within their networks. CHCs are non-profits led by patient-majority boards and follow all federal, state, and local laws and regulations. The Department should review scenarios in which CHC staff may have to use the larger health system's employer ID number when a non-CHC part of that system's eligibility as a qualifying PSLF employer is being reviewed. We urge the Department to provide CHCs and staff who work there with every opportunity to reassure them of continued eligibility for PSLF.

**NACHC urges the Department to clarify the notification and appeals process for determining a CHC as a qualified employer.** CHCs value the PSLF program to recruit staff to meet the needs of underserved communities, and it's an essential tool to retain our workforce. While we appreciate the opportunity for employers to maintain status through a corrective action plan, we remain concerned about the lack of clarity on how quickly a CHC will be notified of a potential violation or opportunity to correct it. To allow for a good-faith effort to come into compliance, CHCs should receive early and frequent notifications. Additionally, it is important that CHCs have enough time to appeal the determination or to develop and implement a corrective action plan. Ensuring CHCs can maintain their qualified status is vital to keeping their doors open and providing invaluable access to high-quality, affordable health care services. We encourage the Department to consider allowing rapid restoration of eligibility, as ten years of ineligibility for any employer is a long time.

**In conclusion, CHCs have a proven, strong track record of stewardship of federal funding. Additional duplicative regulatory requirements will only add to the administrative burden.** Serving millions of Medicaid, Medicare, and uninsured patients, CHCs are committed to working closely with the federal government to increase access to quality services and ensure that every dollar is reinvested into patient care. They already participate in accountability and transparency mechanisms, as seen through their annual data reporting through HRSA's Uniform Data System (UDS).

CHCs are also named as a key component in the Making America Health Again (MAHA) agenda to advance health care outcomes. Specifically, the FY26 Administration for a Healthy America

[11] 2024 UDS Data

(AHA) Budget Request highlighted our role: "Health centers are at the forefront of efforts to Make America Healthy Again through increasing access to chronic disease prevention and management (e.g. hypertension, diabetes), nutrition counseling and patient health education services, cancer screenings, and comprehensive primary health care services, including preventive services, mental health, and wellness activities".[12] We urge the Department to continue allowing CHCs and their staff to make America healthy without additional burdens to our strained workforce. The Department of Health and Human Services and Congressional Committees of jurisdiction already have strong oversight of CHCs. We understand the Department's interest in program integrity, and we urge the Department to rely on these existing oversight pathways instead.

We specifically urge the Department to consider the following changes:

- Remove provisions that allow employer disqualification without due process.
- Ensure that employees in larger health systems working under one EIN are not treated as one entity for determining PSLF eligibility.
- Establish a clear and fair appeals process for both employers and employees.

NACHC appreciates the opportunity to respond to proposed changes in the PSLF program and looks forward to continuing to engage with the Department of Education on workforce issues. If you have any questions, please contact Elizabeth Linderbaum, Deputy Director, Regulatory Affairs, at elinderbaum@nachc.org.

Sincerely,

Joe Dunn
Chief Policy Officer

[12] https://www.hhs.gov/sites/default/files/fy-2026-aha-cj.pdf

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

We, the Labor & Employment Committee of the National Lawyers Guild (NLG) are a national committee of the National Lawyers Guild that seeks to advance the interests of working people and organized labor through education and advocacy, support for their individual and collective actions, and any other efforts necessary and appropriate to the advancement of these interests, and we oppose the proposed changes to the Public Service Loan Forgiveness (PSLF) program.

The PSLF program was enacted by Congress almost 20 years ago as a way for public service workers to achieve student debt cancellation after working for ten years at a qualifying government agency, nonprofit, or entity. No exceptions. PSLF is a bipartisan program created by Congress, and it should not be up to the Department of Education to take it away from certain employers.

As an organization that is both an advocate for the interests of working people and partially comprised of attorneys, legal workers, and law students who are committed to public service, we are outraged by the Trump Administration's proposal to deny PSLF access to workers who serve vulnerable communities like immigrants, people of color, and transgender youth. Additionally, public sector workers, including teachers, firefighters, professors, sanitary workers, airport workers, and engineers who are integral parts of public sector unions represented by our attorney members, will be gravely impacted by these proposed changes to PSLF. We urge the Department of Education to eliminate this proposed rule.

Give Feedback

Public service workers are critically important across the board, but especially so in these underserved communities. Denying PSLF access to workers who serve these communities would both decrease the capacity of existing workers to serve these communities and reduce the ability and/or willingness of future workers to make the necessary career decisions to someday serve these communities. PSLF has provided many workers with enhanced opportunities to serve these underserved communities.

Furthermore, without PSLF, federal, state, local, and tribal government organizations, nonprofits, and other entities will be left with a declining pool of public service workers whom they can call upon to serve these

10/14/25, 11:11 AM Regulations.gov

communities. These changes will only serve to increase the vulnerability of these communities and put our nation in an increasingly precarious situation.

The Department of Education's proposed regulation is a gross misuse of power and an illegal attempt to deny PSLF to employers whose work does not align with the Trump Administration's agenda. If implemented, the regulation will cause harm to millions of borrowers who were promised student debt cancellation through PSLF, and who often made career choices based on this promise.

This proposal is illegal and blight on both working people and our communities.

We urge you to keep the promise that Congress made to Americans and eliminate this proposal immediately.

Sincerely,

The Labor & Employment Committee of the National Lawyers Guild

**Comment ID**

ED-2025-OPE-0016-10358

**Tracking Number**

mfo-u8qr-t2cp

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Give Feedback

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

https://www.regulations.gov/comment/ED-2025-OPE-0016-10358 2/3

ED_00429

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government. 

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share ▾

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

I am a criminal defense attorney, and I am deeply concerned that this proposed rule will be used to deny PSLF eligibility to public defenders. The ambiguity in the terms "aiding and abetting violations of state and federal law" as grounds for employer-ineligibility, and the low standard of preponderance of the evidence, would provide the possibility of bad-faith enforcement against public defender agencies—even though there is nothing illegal about the practice of criminal defense. Similarly, many public defenders will, from time to time, be appointed to represent undocumented clients with an affirmative duty to correctly advise those clients of the collateral immigration consequences of the criminal proceeding. Ambiguity in this rule will similarly disincentivize defenders from remaining in their roles—further exacerbating the resource gap in many jurisdictions between the prosecution and the defense. By the same token, it will encourage defenders to transition to prosecutorial positions that would seemingly be unaffected by the ambiguity herein. Finally, bad-faith enforcement of the rule against defender agencies would, through implementation of corrective action plans, allow any executive Administration to dictate defenders' practice of law—destroying the attorney-client relationship and risking the attorney being asked to violate their jurisdiction's Rules of Professional Conduct in order to avoid pecuniary loss. The rule should be amended to specifically exclude public defense agencies to avoid its misuse against the only lawyers required to exist by the U.S. Constitution.

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10359

**Tracking Number**

mfo-u8iz-0g7n

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share ▾

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

YI PSLF Comment Proposed Rule

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10361/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10361

**Tracking Number**

mfo-eajy-y5ly

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025
Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

Young Invincibles submits this comment in response to the Department of Education's notice of proposed rulemaking that makes changes to the Public Service Loan Forgiveness (PSLF) program, published on August 18, 2025 (Docket ID ED-2025-OPE-0016).

Young Invincibles (YI) is a national nonprofit organization committed to amplifying the voices of young adults in the political process and expanding their access to economic opportunity. Postsecondary education remains the most powerful tool for young people, especially those from historically marginalized or underrepresented backgrounds, to improve economic mobility and secure better career opportunities. YI advocates for legislation, policy, and regulations that ensure equitable and affordable access to higher education.

As the Department considers this proposed rule, it is imperative to recognize the harm it would cause student borrowers across the country. Student debt is a generational economic crisis, and both Congress and the Administration should be doing everything possible to address it. Instead, this rule would deepen the economic strain already felt by millions of borrowers.

The proposed rule allows the Secretary of Education, at their discretion, to revoke PSLF eligibility for employers engaged in "substantially illegal purposes." In practice, this would hand the Department broad authority to disqualify nonprofit and public service employers in ways that appear motivated by ideology, not borrower protection. The result would be to harm student borrowers who relied on PSLF when they chose careers in public service. These are real people who work as teachers, social workers, health care providers, and community leaders. They should not be used as pawns in a political battle.

**The Proposed Rule Lacks Legal Foundation**

The statute creating PSLF, the College Cost Reduction and Access Act of 2007, clearly defines eligible employment as work for government or 501(c)(3) nonprofit organizations.[1] The proposed rule contradicts the statute by giving the Department authority to revoke employer eligibility based on a vague "substantial illegal purpose" standard.

The rule cites a "preponderance of the evidence" threshold for revocation, but the evidence permitted is overly broad and risks arbitrary application.[2] For example, civil court rulings and settlements could be used to strip PSLF eligibility. This sets an alarmingly low bar, especially since state and federal laws vary significantly. In states with restrictive laws around reproductive health, LGBTQ+ rights, or immigrant support, nonprofits could face civil suits that then trigger PSLF disqualification. A single civil settlement could jeopardize the financial future of an entire group of civil servants who just want to help their communities.

**The Proposed Rule Raises First Amendment Concerns**

The sweeping definition of "substantial illegal purpose" creates clear risks of infringing on First Amendment rights. Many nonprofits engage in advocacy, speech, and association around politically charged issues. Under this rule, those activities could be unfairly targeted.

For instance, a nonprofit providing legal aid to undocumented individuals could be accused of "aiding and abetting" violations of immigration law, even though offering legal representation is lawful. The rule itself acknowledges these risks by noting potential First Amendment conflicts. If the Department must warn against constitutional issues in its own proposal, that should serve as a red flag about the legitimacy of the rule itself and raise questions about the true intentions of the Department of Education and Trump Administration, such as causing harm to political opponents and not actually stopping illegal activities.

**The Proposed Rule Will Harm Public Service and Borrowers**

PSLF was designed to support workers who dedicate their careers to serving their communities, often in lower-paying jobs. These careers include firefighters, nurses, teachers, community workers, mental health specialists, and more.[3] Civil service is the backbone of this country, and this rule threatens to undermine it.

Revoking PSLF eligibility for employers would make it harder to recruit and retain talent in critical community-serving roles. The burden would fall most heavily on borrowers from marginalized backgrounds who pursued higher education to bring skills back to their communities. They would face an impossible choice: remain in public service and risk losing loan forgiveness, or leave their chosen vocation to protect their financial futures. This is an unconscionable position for the Department to place on borrowers.

---

[1] *See* 20 U.S.C. § 1087e(m)(3)(B)(i)
[2] https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program
[3] https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/questions

Civil service is a cornerstone of American democracy. This proposed rule undermines that cornerstone and would create long-term disinvestment in public service careers. It is harmful to borrowers, harmful to communities, and harmful to the ideals of our nation.

For these reasons, Young Invincibles strongly urges the Department to withdraw this proposed rule.

Sincerely,

**Alexander Lundrigan**
Federal Policy Manager for Higher Education and Workforce
Young Invincibles

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

MASSCreative PSLF Letter

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10364/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10364

**Tracking Number**

mfo-ecs3-kw4w

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Emily Ruddock
Boston, MA
MASSCreative
eruddock@mass-creative.org

***Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]***

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Emily Ruddock and I am the Executive Director of MASSCreative. Since 2013, MASSCreative has served as a statewide arts and culture advocacy organization in Massachusetts for the purpose of organizing artists and creatives to become more civically engaged so the creative sector in our state will have the resources needed to remain strong and resilient. We envision a Commonwealth of Massachusetts where arts and culture are understood as a valued asset to every community and where artists can live, work, and thrive. We do this through public education, civic education programs, and coalition building across our respective regions.

As such, we represent the interests of the nearly 15,000 cultural organizations located within Massachusetts. 52% of those organizations are classified as nonprofits. The cultural sector in Massachusetts employs close to 135,000 individuals who contribute approximately 4% of our state's GDP. Our cultural organizations are cherished within our regional and local communities and generate critical revenues for local economies. The Arts and Economic Prosperity 6 Study published on FY22 data from the City of Springfield revealed that nonprofit arts and culture audiences spent an average of $31.85 per person on event-related items such as parking and dining when they lived within the county where the event was held. Audience members from outside counties spent an average of $51.83 per event.[1]

[1] https://springfieldculture.org/programs/aep6/

However, the median income of arts and culture workers in Massachusetts is $49,200, compared to the average Massachusetts living wage of $58,000.[2] Arts and culture nonprofit employers need additional tools to attract and retain talent and the Public Service Loan Forgiveness Program has historically been one of those dependable resources. Many in our workforce pursued opportunities in the nonprofit sector to perform mission-driven work in our communities while alleviating the burdens of student loans which, as you are aware, have only become more exorbitant in recent years.

This nonprofit workforce often contributes elsewhere to our communities and local economies by leading creative youth programs, teaching, and organizing opportunities for local convenings and festivals. If this long relied-upon program changes, we risk losing that talent and depleting the essential expertise and resources they contribute to our neighborhoods. Further, these workers often provide essential services to communities and support work that uplifts individuals from historically marginalized communities. The proposal allowing future decisions about who qualifies to be influenced by political or ideological considerations could jeopardize large portions of this workforce based on the inherent subjectivity in these rule changes.

MASSCreative and our membership strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. These changes would negatively impact a cultural nonprofit workforce that is already struggling to recover to its pre-COVID-19 pandemic levels of attendance and participation. This is a time in which we need to do more to support organizations and small businesses succeed, rather than rescind the very tools that support their success.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

---

2 https://massculturalcouncil.org/documents/2024_MA_Cultural_Asset_Inventory_State_1pager.pdf

Emily Ruddock
Executive Director, MASSCreative

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

I strongly oppose the proposed rule change. I am a public defender who took out student loans to attend law school. I took out loans based on the promise of student loan forgiveness through PSLF. If PSLF did not exist, I would have seriously considered not going to law school. If the government makes it more difficult for borrowers to attain forgiveness through PSLF, then public interest lawyers like myself, who have dedicated themselves to bettering our communities, will be strapped with much greater financial burdens. Additionally, if PSLF becomes more difficult to attain, then fewer lawyers will do the important public interest work that helps so many Americans.

**Comment ID**

ED-2025-OPE-0016-10372

**Tracking Number**

mfo-eiex-wd4o

Give Feedback

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

I write to echo the comments submitted by numerous civil legal service providers, and to highlight several concrete harms that the proposed changes to the Public Service Loan Forgiveness (PSLF) program would have on my work. Specifically, I write to uplift the extreme hardships that the proposed changes would place on dedicated and talented legal advocates who are committed to filling an extreme need in our communities: providing legal representation and services to people facing eviction from their homes. Changes to what makes an employer "qualified" for purposes of PSLF creates an unnecessary and unwise barrier to retaining and recruiting people who already make financial and personal sacrifices to do this work.

The advocates I work with serve people who struggle to make ends meet on a daily basis, and who are overwhelmingly overburdened by the rising costs of housing. More than 45.5% percent of renters in our state must devote more than 30% of their gross income to their housing costs. This is because the fair market rents in our state are high: $1,729 per month for a 1 bedroom, and $2,036 per month for a 2 bedroom. To afford a 1 bedroom, this means that renters either need to earn $33.24 per hour or work 89 hours per week at our $15 minimum wage. For a 2 bedroom, they need to earn $39.15 per hour or work 104 hours per week at minimum wage.

It is therefore both unfortunate and unsurprising that our state faces an enormous volume of eviction cases each year, around 400,000 total and of which around 395,000 are for failure to timely pay rent. Landlords are represented by counsel in approximately 90% of these cases, while renters are represented in less than 10%. Our state has made great strides in correcting that imbalance by passing a law guaranteeing access to counsel in evictions. Collectively, the civil legal service organizations in our state worked to provide representation in at least 9,100 cases last year through the Access to Counsel in Evictions (ACE) program alone.

In those ACE cases, 87% of renters had remaining in the property as their goal, and 88% of renters with that goal were able to do so at the conclusion of their case. Our advocates are effective at filling this great need. Moreover, their services provide an incredible benefit to our state as a whole: an estimated $3.04 in

Give Feedback

potential fiscal impacts and economic benefits for every $1 spent on the program. Our advocates are a shining example of public service, delivering concrete results to our clients and to our community.

Our team is dedicated to our clients and to this work. When surveyed, all of our responding staff members reported that the mission-driven nature of our work is very important to them. Advocates specifically stated that they pursue this work because they want to serve the public good, or to serve people in need.

While this work is rewarding, it is challenging. The legal services community, in general, grapples with staff burnout and retention. It is challenging to serve large numbers of people who are facing devastating consequences, like losing their housing, especially when we know we are only filling a small fraction of the need. Yet we chose this work so that we could do all we could, and we chose to do so knowing that public service means accepting lower pay than what is available in the private sector. The PSLF program is a contractual promise from our government, held out to make it more financially feasible to serve the public good. Our colleagues specifically note that they entered public service—or even law school—knowing about and relying on the promise of PSLF to make it work.

The proposed changes to the criteria for “qualified employers” would insert ambiguity into a system that requires clarity. A system that cannot clearly provide a fair process for knowing whether we qualify for PSLF will threaten our ability to do this work. If it is unclear whether our employer remains qualified for PSLF, 82.4% of staff surveyed report that they would have to significantly alter their future financial goals. Some noted they would have to alter life plans like where they live, or whether and when to have children. And over half report that they would have to consider leaving this work—and likely public service altogether.

The proposed changes would walk back a promise made to hardworking public servants and, in turn, threaten to force us out of work that we love. Our colleagues are heartbroken at this prospect. We are people committed to serving our neighbors in need. We want to do all we can to keep our clients and their families housed, but must remain able to pay our own rents and mortgages, to feed or choose to have our own children.

Thank you for the opportunity to provide comments on the proposed rule.

**Comment ID**

ED-2025-OPE-0016-10374

**Tracking Number**

mfo-scot-qbib

Give Feedback

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

2025 09 17 PC Comment Re Dept Ed Proposed PSLF Rule (Docket ID ED-2025-OPE-0016)

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10382/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10382

**Tracking Number**

mfo-ek25-pqee

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

EXECUTIVE LEADERSHIP
KATHRYN EIDMANN
President & CEO
Helen & Morgan Chu CEO Distinguished Chair
KARLA CHALIF
Vice President, Chief Operating Officer & General Counsel
STEVEN GODOY
Vice President, Chief Financial Officer
KRISTEN JACKSON
Vice President, Chief Advocacy Officer (Interim)
TRACY K. RICE
Vice President, Chief Development Officer
NISHA VYAS
Vice President, Chief Legal Officer

DIRECTORS
JOSHUA BUSCH
Communications
STEPHANIE CARROLL
Consumer Rights & Economic Justice
SHARON BALMER CARTAGENA
Child, Youth & Family
DAVID DANIELS
Pro Bono
RITU MAHAJAN ESTES
Community Development
TARA FORD
Opportunity Under Law (Interim)
SCOTT GIZICKI
Philanthropy
GIGI LAM
Homelessness Prevention
GINA AMATO LOUGH
Immigrants' Rights
SCOT MOORE
Information Systems/Facilities
DAPHNE PAIGE
Controller
JULIA SCALISE
Grants
RACHEL STEIN
Audrey Irmas Gender Justice
MARK ROSENBAUM
Strategic Litigation
ANA TORRES
Human Resources
JUDY VERDUZCO
Social Work

September 17, 2025

*Submitted via regulations.gov*
Secretary Linda McMahon
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon:

Public Counsel strongly opposes the Department's proposed rule redefining qualifying employers under the Public Service Loan Forgiveness (PSLF) program. The proposal is unlawful, exceeds the Department's statutory authority, and would harm our ability to recruit and retain the attorneys and social workers who enable us to serve communities in Los Angeles—and nationwide—who are otherwise denied equal access to our justice system.

This comment explains why PSLF is indispensable to Public Counsel's workforce, how the proposed rule exceeds the Department's statutory authority and violates constitutional protections, why the ten-year ineligibility bar would be especially harmful, how the rule would chill lawful and essential advocacy, and finally, what is at stake for Los Angeles and beyond if PSLF is undermined.

For these reasons, we urge the Department to withdraw the proposed rule in its entirety.

**PSLF Is Essential to Public Counsel's Workforce**

Public Counsel is a nonprofit law firm that advances civil rights and racial and economic justice. Our lawyers, social workers, and advocates work in deep partnerships with communities, providing free legal services while pursuing impact litigation and policy advocacy to fix unjust systems. The exorbitant cost of higher education and the resulting student loan debt have made it nearly impossible for most new attorneys and social workers to choose nonprofit careers without a reliable loan forgiveness program. Our ability to recruit and retain staff depends on PSLF. Because nonprofit salaries cannot compete with private-sector compensation, PSLF often determines whether highly trained professionals can commit to long-term service.

610 S. ARDMORE AVENUE
LOS ANGELES, CA 90005
TEL: 213-385-2977
PUBLICCOUNSEL.ORG

Currently, many Public Counsel attorneys and social workers are enrolled in or planning for PSLF. Absent PSLF, these professionals may be unable to afford to remain at Public Counsel, where the current starting attorney salary of $75,500 is lower than comparable government or private positions in Los Angeles. The loss of PSLF would likely force many of these staff members to leave for higher-paying jobs, undermining our ability to provide legal services to low-income communities.

**The Rule Exceeds Statutory Authority and Violates Constitutional Protections**

Congress created PSLF in 2007 to encourage public service careers by forgiving remaining student loan balances after ten years of qualifying work and payments. Congress deliberately defined PSLF-eligible employment to include government, all 501(c)(3) organizations, and "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)."[1] The Department's regulation has long mirrored that definition.[2]

The NPRM departs from this framework by empowering the Secretary to disqualify statutorily eligible employers if she finds they have engaged in activities with a "substantial illegal purpose." Congress never delegated such discretion, nor authorized the Department to supplant the courts or the IRS in adjudicating complex questions of immigration, tax, or criminal law.

The proposed rule also strips away procedural safeguards for this essential program. Employers who have long relied on their status as qualified employers could lose PSLF eligibility based on unilateral executive determinations without judicial findings.
Borrowers would be barred from appealing denials grounded in such determinations. The IRS already has authority to revoke 501(c)(3) status, subject to administrative and judicial review. By contrast, the NPRM creates a mechanism for arbitrary enforcement and unchecked executive power.

Finally, the proposal raises grave constitutional concerns. By conditioning PSLF eligibility on whether an employer engages in work disfavored by the current administration—such as immigration or LGBTQ+ advocacy—the rule risks viewpoint discrimination and violates the First Amendment rights of both organizations and employees. The absence of meaningful process also threatens due process rights when PSLF benefits, often determinative of career choice, are at stake.

**The Ten-Year Bar Creates Irreparable Harm**

The proposed rule would bar an employer found to have engaged in a "substantial illegal purpose" from PSLF eligibility for at least ten years—or until it completes a corrective action plan. That bar, combined with PSLF's own ten-year service requirement, makes it impossible for

---

[1] 20 U.S.C. § 1087e(m)(3)(B). Congress deliberately included all 501(c)(3) organizations, rejecting narrower proposals during consideration of the College Cost Reduction and Access Act of 2007.
[2] 34 C.F.R. § 685.219(b).

borrowers to plan their careers with confidence.

Borrowers in income-driven repayment plans often see their balances grow even after years of payments—27% of law graduates report higher balances than at graduation, and 71% of those cite income-driven repayment plan underpayments as the cause.[3] For these borrowers, PSLF is the only predictable path out of debt. If eligibility is uncertain, they may avoid nonprofit careers altogether, widening the justice gap.

**The Rule Threatens Essential, Lawful Services**

Public Counsel provides lawful representation in areas Congress has explicitly endorsed, including immigration, gender justice, and LGBTQ+ advocacy. Yet the NPRM's vague "substantial illegal purpose" label could mischaracterize this work. For example, assisting survivors of trafficking or domestic violence with visa applications could be miscast as unlawful if relief is denied. Moreover, language-access projects could be misconstrued as "aiding illegal discrimination" despite complying with federal civil-rights laws. Such vague and politically charged standards will chill essential advocacy and deter organizations from serving the very populations Congress intended to protect.

**Impact on Los Angeles and Beyond**

Los Angeles is at the epicenter of the nation's most urgent challenges—housing affordability, immigrant rights, and racial justice. Public Counsel's work has shaped outcomes locally and nationally. For example, we have engaged in litigation that returned Bruce's Beach to its rightful owners. We have also supported the enactment of the Commercial Tenant Protection Act, securing fair leasing protections for small businesses and nonprofits. We have expanded housing and health access for unhoused veterans, and we have defended Dreamers as well as families separated by federal immigration policies.

The stakes are especially high in California, where 72–75% of households in every income group experienced at least one civil legal problem in the past year (State Bar of California, 2024 California Justice Gap Study (Sept. 2024), *available at* https://www.calbar.ca.gov/Portals/0/documents/reports/2025/2024-CA-Justice-Gap-Study.pdf). Yet only 24% of California's legal market serves individuals, with most attorneys focused on corporate or institutional clients *Id*. Moreover, only 45% of California attorneys reported providing any pro bono services in 2022. *Id*. Weakening PSLF will worsen this justice gap and reduce services to tens of thousands who depend on organizations like Public Counsel.

* * *

[3] American Bar Association, Young Lawyers Division, *2024 Student Debt Survey Report* (Sept. 2024), available at https://www.americanbar.org/groups/young_lawyers/projects/student-loan-survey/

The NPRM conflicts with its governing statute, exceeds the Department's authority, violates constitutional protections of free speech and due process, and strips away critical safeguards. Congress created PSLF to allow nonprofit professionals to dedicate their careers to public service without being crushed by debt. The proposed rule turns that promise into uncertainty.

For these reasons, we urge the Department to withdraw the rule in its entirety.

Sincerely,

Kathryn Eidmann
President & CEO
Helen & Morgan Chu Distinguished Chair

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

CBF Public Comment PSLF Employer Eligibility Modifications 9.17.2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10383/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10383

**Tracking Number**

mfo-elyi-ozq8

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

The Chicago Bar Foundation
321 South Plymouth Court, Suite 3B
Chicago, IL 60604
(312) 554-1204
www.chicagobarfoundation.org

September 17, 2025

Secretary Linda McMahon
Department of Education
400 Maryland Ave SW
Washington, DC 20202
*Submitted via* www.regulations.gov

RE: CBF Opposition to Proposed Rule Modifying Employer Eligibility for Public Service Loan Forgiveness; Docket No. ED-2025-OPE-0016

Dear Secretary McMahon,

On behalf of The Chicago Bar Foundation (CBF), we write to express our opposition to the proposed rule modifying employer eligibility for the Public Service Loan Forgiveness (PSLF) program, which is critical to ensuring equal access to justice for all Americans.

Congress created PSLF to ensure that people with student debt would not be forced to forgo careers in public service because of their loans. By providing a clear and reliable path to forgiveness, PSLF has enabled dedicated professionals - including prosecutors, public defenders, law enforcement, legal aid attorneys, and others working on the front lines of our justice system - to pursue and sustain careers that serve the public good.

The proposed rule's restrictions on employer eligibility undermine that congressional purpose. Narrowing the scope of qualifying organizations creates uncertainty and instability for current and prospective public servants. This lack of clarity will discourage people from entering or remaining in public service careers at a time when communities across the country need them most.

PSLF is integral to ensuring access to fair and equal justice for all Americans, regardless of income. Individuals pursuing careers in public service, particularly those from lower- and middle-income backgrounds, are most likely to graduate with significant educational debt. By giving them the security of knowing that ten years of service and 120 loan repayments will lead to forgiveness of their remaining balances, PSLF creates the right incentives for highly talented and passionate individuals to enter and remain in public service careers over the long term.

We urge you to reconsider the proposed limitations and instead maintain a broad, stable, and predictable standard for employer eligibility under PSLF. Doing so will uphold Congress's intent, strengthen the public service workforce, and ultimately advance access to justice for all.

The Chicago Bar Foundation stands ready to work with you and other stakeholders to preserve and strengthen this vital program so that it can continue to attract and retain the talented professionals our communities rely on.

Roya Samarghandi
Chief Advocacy & Innovation Officer
The Chicago Bar Foundation
rsamarghandi@chicagobarfoundation.org

10/14/25, 11:16 AM Regulations.gov

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached pdf for full comment.

--
The County of Los Angeles ("County") Chief Executive Office respectfully submits this comment in opposition to the Department of Education's proposed amendments to the regulations governing the Public Service Loan Forgiveness ("PSLF") Program. For nearly two decades, the PSLF program has served as an essential recruitment and retention tool for public service employers. The program ensures that individuals who choose to serve in government, nonprofit organizations, and other public-serving roles—often at significantly lower salaries than in the private sector—can do so without being burdened by insurmountable student loan debt. Any regulatory change that jeopardizes access to PSLF threatens not only the financial well-being of these employees but also the ability of public institutions to deliver high-quality services to the communities they serve.

Like any federal, state, or local entity, the County relies on a stable pool of well-qualified public servants who have chosen to pursue careers in public service over higher-paying private sector jobs. The proposed rule risks undermining this workforce by introducing uncertainty into PSLF eligibility. The absence or erosion of PSLF will disincentivize careers in County government, leading to staffing shortages and reduced institutional capacity to deliver critical and essential services to its residents, including in the areas of health care, social services, public safety, and legal services (including district attorneys and public defenders).

Give Feedback

Attachments 1

https://www.regulations.gov/comment/ED-2025-OPE-0016-10384 1/2

ED_00458

County of LA CEO Response to Rulemaking on PSLF Program

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10384/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10384

**Tracking Number**

mfo-emml-9xd6

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Give Feedback

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

**BOARD OF SUPERVISORS**
Hilda L. Solis, First District
Holly J. Mitchell, Second District
Lindsey P. Horvath, Third District
Janice Hahn, Fourth District
Kathryn Barger, Fifth District

**COUNTY OF LOS ANGELES**
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, CA 90012
(213) 974-1101 ceo.lacounty.gov

**CHIEF EXECUTIVE OFFICER**
Fesia A. Davenport

September 17, 2025

To: **Department of Education**
34 CFR Part 685
[Docket ID ED-2025-OPE-0016]
RIN 1801-AA28

Tamy Abernathy
Office of Postsecondary Education
400 Maryland Ave. SW, Washington, DC 20202
Telephone: (202) 987-0385
Email: *Tamy.Abernathy@ed.gov*

Subject: **William D. Ford Federal Direct Loan (Direct Loan) Program**
A Proposed Rule by the Education Department on 08/18/2025

The County of Los Angeles ("County") Chief Executive Office respectfully submits this comment in opposition to the Department of Education's proposed amendments to the regulations governing the Public Service Loan Forgiveness ("PSLF") Program. For nearly two decades, the PSLF program has served as an essential recruitment and retention tool for public service employers. The program ensures that individuals who choose to serve in government, nonprofit organizations, and other public-serving roles—often at significantly lower salaries than in the private sector—can do so without being burdened by insurmountable student loan debt. Any regulatory change that jeopardizes access to PSLF threatens not only the financial well-being of these employees but also the ability of public institutions to deliver high-quality services to the communities they serve.

Like any federal, state, or local entity, the County relies on a stable pool of well-qualified public servants who have chosen to pursue careers in public service over higher-paying private sector jobs. The proposed rule risks undermining this workforce by introducing uncertainty into PSLF eligibility. The absence or erosion of PSLF will disincentivize careers in County government, leading to staffing shortages and reduced institutional capacity to deliver critical and essential services to its residents,

including in the areas of health care, social services, public safety, and legal services (including district attorneys and public defenders).

The proposed rule further raises serious legal and due process concerns because the definition of "substantial illegal purpose" appears to be overly broad and vulnerable to inconsistent interpretation, including with regard to disqualification decisions for "aiding and abetting illegal discrimination" and providing gender-affirming care to children in violation of "Federal *or* State law." (emphasis added). The proposed rule has the potential to empower the Secretary of Education to disqualify entire local governments from the PSLF program based on policy or programmatic decisions made by duly elected bodies that do not actually violate any established federal or state laws but are merely viewed as contrary to executive branch priorities or its interpretation of "public policy." This would lead to unfair outcomes for student loan borrowers who are employed with these public agencies. County employees should not lose eligibility for PSLF because their local government—consistent with federal, state, and local law—implements policies intended to prevent or remedy discrimination, provide equal opportunities, expand access to health care, or protect vulnerable populations.

The proposed rule also provides the Secretary with the "ultimate authority" to make decisions regarding whether a local government operating several departments under one Employer Identification Number (EIN), such as the County, will be separated by department for disqualification purposes. However, there are no clear standards or procedures relating to this process. Consequently, the proposed rule could potentially punish career public servants for any single policy decision or activity by their local government employer unrelated to the work of the employee's department, creating a chilling effect on entering public service. This is in direct contravention of the intent of the PSLF program, which is to reward and incentivize student loan borrowers to have careers serving the public.

The proposed rule also does not provide definitive processes for public employers to appeal the Secretary's determination of disqualification or regain eligibility status, including a lack of specific guidelines, procedures, and timelines for the approval of a corrective action plan. Moreover, a 10-year eligibility ban appears excessive and punitive in nature, especially in light of the Secretary's wide discretion in determining what constitutes activities that have a "substantial illegal purpose."

As referenced in the Federal Register notice, during the rulemaking process, negotiators expressed that Department staff "are not medical professionals" and do

not “have the expertise or authority to enforce other types of discrimination” outside educational settings. Yet the proposed rule requires the Department to make decisions on whether a local government's services and programs provided to its residents serve a "substantial illegal purpose." This would include gender-affirming care provided in conformance with the medical necessity standards established by respected organizations including the American Medical Association and the American Psychological Association. Such determinations also risk conflicting with federal and state law.

Should questions arise regarding the legality of local programs or policies, it would be far more appropriate for the federal government to rely on intergovernmental coordination and established legal processes rather than stripping PSLF eligibility from student loan borrowers who have demonstrated a commitment to public service. Mechanisms already exist for resolving discrepancies in law and policy. It is inappropriate for the PSLF program to be used or viewed as a punitive tool against jurisdictions at the expense of student loan borrowers. Accordingly, we urge the Department to withdraw or substantially revise this proposed rule. Undermining PSLF would cause irreparable harm to public institutions, destabilize the workforce, and penalize employees for serving their communities. We stand firmly with other jurisdictions in defending PSLF as a vital, nonpartisan program that sustains the promise of public service careers.

Should you have any questions concerning this comment, please contact D’Artagnan Scorza, Ph.D., Executive Director, at dscorza@ceo.lacounty.gov.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

PSLF

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10390/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10390

**Tracking Number**

mfo-erye-s1ls

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

ALAN R. SOLOT

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
400 Maryland Ave. SW
Washington, DC 20202.
Tamy.Abernathy@ed.gov

Submitted at https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program#open-comment

Re: Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy:

Thank you for the opportunity to provide this comment on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I am an attorney employed by Southern Arizona Legal Aid ("SALA"), one of 130 legal aid law firms funded by Legal Services Corporation. SALA provides legal services to individuals who qualify for services based on income. Qualifying income is strictly tied to the Federal poverty level. Legal aid law firms, like SALA, provide access to justice to millions of Americans who otherwise would lack representation critical legal matters. I personally assist clients in eviction court.

PSLF has enabled my employer to provide access to justice to thousands of Arizona indigent persons by permitting SALA employees to work for salaries that are affordable by SALA's limited resources since such employees are working towards student loan forgiveness through PSLF. Many of our attorneys simply could not afford to work at SALA but for PSLF.

Without assurances that program rules will remain consistent over the long term, nonprofit professionals or people considering employment with a nonprofit law firm like SALA cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled

*5262 E. Hawthorne Place, Tucson AZ 85711 • Telephone 520-577-4623 • arsolot@gmail.com*

workforce Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Current law requires all 501(c)(3) organizations to be eligible as a qualified employer under PSLF. The definition of "public service job" in the PSLF statute states that the term "public service" job means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The Department of Education does not have the authority to further restrict eligibility under PSLF. The IRS already has the legal authority to remove a nonprofit's 501(c)(3) status for illegal activity.

The rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. In doing so, the Department could seek to exclude nonprofit employers working with undocumented immigrants, supporting transgender children, or advancing racial and social equity. This opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology. Nonprofits must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees.

As a school child, I routinely began school with the Pledge of Allegiance. I would guess you did as well. The Pledge ends with these words: "*with liberty and justice for all.*" America's credo is based on the serious and significant concept that all are entitled to liberty and justice. Adopting the proposed rule will result in millions of people being deprived of access to justice when nonprofits law firms will not be able to hire and retain attorneys who rely on PSLF.

I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees.

Thank you for considering this comment as part of the rulemaking process.

Sincerely,
Alan Solot
Digitally signed by Alan Solot
Date: 2025.09.17 13:00:20 -07'00'
Alan R. Solot

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)



PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Doan ED comment on PSLF (Final version)

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10398/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10398

**Tracking Number**

mfo-evwa-9ykv

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**RE: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon:

This comment responds to the Department's notice of proposed rulemaking[1] to amend the Public Service Loan Forgiveness (PSLF) regulations under 34 CFR 685.219 to "prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that engage in activities that have a substantial illegal purpose."

1. Definition of "Illegal Discrimination"

   The proposed regulations would add new definitions, including aiding or abetting, chemical castration or mutilation, child or children, foreign terrorist organizations, illegal discrimination, other Federal Immigration laws, substantial illegal purpose, surgical castration or mutilation, terrorism, trafficking, violating State law, and violence for the purpose of obstructing or influencing Federal Government policy.

The Department defines "illegal discrimination" as a violation of any Federal discrimination law, "including, but not limited to, the Civil Rights Act of 1964, Americans with Disabilities Act, and the Age Discrimination in Employment Act of 1967."[2] The inclusion of these statutes is good policy, but the phrase "but not limited to" grants overly broad discretion to the Secretary and risks politicization in future administrations.

The Department should consider removing the phrase "but not limited to," and adopting the following language:

> "Illegal discrimination means a violation of any Federal discrimination law, including, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq*.), Americans with Disabilities Act (42 U.S.C. 12101 *et seq*.), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq*.)."

2. Reinstatement of Employer Eligibility

The proposed regulations would also allow an employer that loses PSLF eligibility to regain status after (1) ten years from the date the Secretary determines the employer engaged in activities that have a substantial illegal purpose, or (2) after the Secretary approves a corrective action plan.

The Department explains that an employer may regain eligibility if, after ten years, it certifies on a borrower's subsequent application that it is no longer engaged in such activities, or if it submits a

---

[1] "William D. Ford Federal Direct Loan (Direct Loan) Program," Federal Register, Docket ID: ED-2025-OPE-0016, https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program.

[2] Ibid.

corrective action plan. While the ten-year ineligibility period is sound policy, there are other concerns, such as:

- Employer self-certification after ten years is not sufficiently rigorous. The Department should require verifiable proof of compliance or evidence that violations have been resolved before reinstatement.
- Correction action plans should not serve as a substitute for the ten-year waiting period. Allowing immediate reinstatement through such plans undermines the seriousness of the violation.

The Department should consider requiring employers to (1) wait the full ten years before reapplying and (2) demonstrate compliance through documented evidence reviewed by the Department.

3. Broader Concerns

More broadly, while excluding employers engaged in activities with a substantial illegal purpose is good policy, expanding PSLF regulations necessarily expands federal authority. PSLF has already transferred nearly $80 billion[3] in student debt to taxpayers and incentivizes excessive borrowing, as students anticipate forgiveness. According to the Urban Institute, based on data reported by the Department of Education, the average balance as of 2023 forgiven under PSLF was $98,000, which "substantially [exceeds] the aggregate limit for undergraduate students and typical debt levels for bachelor's degrees."[4]

Ultimately, it is Congress that must impose limits on the amount of debt forgiven under PSLF or reconsider the program entirely. Additional regulations, though well-intentioned, risk institutionalizing PSLF even further, making it appear as a permanent, well-regulated entitlement program rather than a temporary or limited one.

Thank you for the opportunity to comment. I would be happy to answer any questions you may have about this comment.

/s/

Madison Marino Doan

Policy Analyst

Center for Education Policy

The Heritage Foundation

Madison.Marino@heritage.org

---

[3] Preston Cooper and Alexander Holt, "Turn Public Service Loan Forgiveness into a State Block Grant," April 17, 2025, https://www.aei.org/education/turn-public-service-loan-forgiveness-into-a-state-block-grant/.
[4] Jason Delisle, "Public Service Loan Forgiveness and the SAVE Plan for Federal Student Loans," Urban Institute, August 2023, https://www.urban.org/research/publication/public-service-loan-forgiveness-and-save-plan-federal-student-loans.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached comments from the National Association of Social Workers.

Attachments 1

09172025 PSLF Public Comment NASW

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10403/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10403

**Tracking Number**

mfo-ewsp-vwgw

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

*Submitted via regulations.gov*

**Re: Comments to Department of Education in response to the Proposed Rulemaking; Docket ID ED-2025-OPE-0016**

The National Association of Social Workers (NASW) appreciates the opportunity to submit this comment in response to the U.S. Department of Education's (ED) Notice of Proposed Rulemaking (NPRM)—which implements President Trump's Executive Order 14235[1] by limiting borrowers' ability to receive Public Service Loan Forgiveness (PSLF). In giving the Education Secretary the power to determine whether employers, including government agencies and nonprofits, are involved in activities that are deemed illegal or go against Administration policy, the Department improperly circumscribes the scope of the PSLF program from all 501(c)(3) nonprofit organizations or domestic government entities to only those organizations or entities who engage in activities the Executive Branch endorses.

Founded in 1955, NASW is the largest membership organization of professional social workers in the United States. NASW has 93,000 members and works to enhance the professional growth and development of its members, to create and maintain professional standards, and to advance sound social policies.

NASW objects to the proposed rule, which would allow the Secretary of Education to jeopardize the financial and professional lives of millions of borrowers, including many social workers. The proposed rule would expand the Secretary's control over borrowers' participation in the PSLF program far beyond the Secretary's expertise and congressional authorization.

The PSLF program is a crucial investment in the nation's public service workforce. The PSLF program enables borrowers, including NASW's members—many of whom otherwise carry unsustainable debt burdens—to enter public service careers and carry out critically important work for the public good. Federal student debt relief, including through the PSLF program, is essential to ensure a strong social work workforce and keep it financially accessible to individuals in the future. In the wake of a mental health crisis, social workers and other mental health professionals are needed now more than ever. Restricting the program would make it difficult for

---

[1] *See* White House Presidential Actions, *Restoring Public Service Loan Forgiveness* (March 2025), https://www.whitehouse.gov/presidential-actions/2025/03/restoring-public-service-loan-forgiveness/

NASW's members to provide important services to populations in need and for NASW itself to fulfill its mission.

*Social workers provide an essential public service.*

Social work is one of the fastest growing professions in the United States. There are over 700,000 professional social workers nationwide and that number is expected to grow to 800,000 by 2033. Without PSLF, the future growth of the social work profession as well as nursing, law, and teaching will be in jeopardy as this loan forgiveness program helps borrowers to take crucial jobs in high-need areas to provide critical services in communities. Social workers are one of the largest providers of mental, behavioral, and social care services in the United States, and many social workers are licensed and credentialed at the Bachelor's, Master's, Doctorate, and PhD levels. Roughly 250,000 are licensed clinical social workers, who are required to have a Master's degree and licensure to practice independently. Social workers help people cope with and solve a wide variety of problems in their everyday lives. They are found in every facet of community life, including schools, hospitals, behavioral health clinics, senior centers, prisons, child welfare and juvenile services, the military, corporations, courts, private practice, elected office, and in numerous public and private agencies.

Many social workers specialize in serving a particular population or working in a specific setting in non-profits and the public sector. Some examples include:

- *Aging:* Social workers link older adults with services that help them live independently and with dignity, thereby maximizing their quality of life and participation in society. The U.S. population of older adults grew five times faster than the total population over the last 100 years, according to the U.S. Census Bureau. People aged 65 and above represented 17.3% of the population in 2022.[2] Social work with older adults focuses on the physical, psychological, social, and economic aspects of daily living.

- *Child Welfare:* Child welfare social workers serve some of the most vulnerable children, youth, and families. Social workers specialize in building on the strengths of families and helping them to provide a safe and nurturing environment for children and youth. However, when families are unable to do this, social workers must intervene to reduce risk and protect children from harm. According to the Child Maltreatment report of 2023, 3,081,715 children received investigation or an alternative

[2] *See* Admin. for Community Living, U.S. Dep't of Health & Hum. Servs., *2023 Profile of Older Americans* 4 (May 2024), https://perma.cc/X7K2-MEYX.

response from child protective services.[3] Child welfare social workers ensure that children and youth who have experienced abuse or neglect are supported through a range of services.

- *Health Care:* Health care social workers help people deal with personal and social factors that affect health and wellness. Over 185,000 social workers work in hospitals, nursing care facilities, outpatient care centers, scientific research and development services, and more healthcare adjacent facilities. They also provide home health care services. In the health care setting, social workers may serve clients, conduct research, develop programs, and administer departments. Social workers look at individuals holistically, taking each part of their life into consideration. This means that the critical role social workers play meets a myriad of needs for each client.

- *Schools:* Social workers in schools provide mental health and behavioral health services to students and an array of other services that support student health, wellbeing, and academic achievement. These social workers often run groups, work on attendance issues, and address student hunger and homelessness. They may also assist students who have disabilities and or require Individual Education Plans. Social workers in schools assist students in maximizing their academic potential by meeting their social and emotional needs.

- *Mental Health and Substance Use Disorder Services:* Clinical social workers focus on assessment, diagnosis, treatment, and prevention of mental health and behavioral health conditions, including substance use disorders. Clinical social workers are essential to several client-centered settings and can be found in private practice, agencies, and other community-based settings. According to the Centers for Disease Control and Prevention[4], drug overdose deaths in the U.S. have decreased by nearly 30 percent, and that is projected to continue to drop. This decrease is due in large part to investment in mental health programs[5] that are facilitated by professionals–including social workers—who have the

---

[3] *See* Admin. on Children, Youth, and Families, Administration for Children and Families *Child Maltreatment 2023* Report (January 2025), https://acf.gov/cb/data-research/child-maltreatment

[4] *U.S. overdose deaths decrease almost 27% in 2024.* (2025, May 14). CDC National Center for Health Statistics. Retrieved August 25, 2025, from https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2025/20250514.htm

[5] Trust for America's Health. (2025, May 27). Deaths Due to Drug Overdose and Alcohol Are Down Nationally, But Progress is Uneven Across Population Groups and at Risk Due to Cuts in Federal Health Programs - TFAH. TFAH. https://www.tfah.org/article/deaths-due-to-drug-overdose-and-alcohol-are-down-nationally-but-progress-is-uneven-across-population-groups-and-at-risk-due-to-cuts-in-federal-health-programs/

requisite training and expertise to assist individuals with mental health and substance use disorders live their best lives.

*Student debt is a substantial barrier to entry for social workers who want to go into public service.*

Total outstanding federal student debt in the United States now exceeds $1.7 trillion[6] among more than 43 million borrowers.[7] Student loans are a tremendous barrier for people seeking employment in public service jobs, where salaries are persistently low compared to private sector jobs. That is true for social workers.

Social workers tend to have high student debt, but relatively low pay, making participation in the profession financially difficult, particularly in the non-profit and public sectors. The disparity between debt and compensation is exacerbated by the level of education required to practice in the field. While social workers can work in certain settings with a Bachelor's degree, a Master's of Social Work (MSW) is the terminal degree required to practice in many settings including independent clinical social work. Social workers who obtain a MSW carry a mean total student debt of $67,000,[8] but the mean starting salary for social workers with MSWs is just $47,100.[9]

**Disparities between student debt undertaken and salaries mean that many borrowers may forgo public service jobs altogether because they cannot otherwise cover all living expenses, including their student debt.** The result is severe workforce shortages in the nonprofit sector.[10] Indeed, nonprofit organizations consistently report that salary competition is the single largest factor harming their ability to attract and retain employees.[11] This trend, too, has played out in the social work profession.

[6] Melanie Hanson, *Student Loan Debt Statistics*, Education Data Initiative (updated Mar. 16, 2025), https://perma.cc/6TRR-RJ9U; *see also* Adam Looney & Constantine Yannelis, *What Went Wrong with Federal Student Loans?*, Brookings (2024), https://perma.cc/Z4KN-ZVXR (from 2000 to 2020, the number of borrowers with student debt went from 21 million to 45 million, and the total amount owed "quadrupled from $387 billion to $1.8 trillion").
[7] *Id.*
[8] Edward Salsberg et al., *The Social Work Profession: Findings from Three Years of Surveys of New Social Workers*, NASW 12 (Aug. 2020), https://perma.cc/5ZM2-QZ6L.
[9] *Id*.
[10] *See* Nat'l Council of Nonprofits, *2023 Nonprofit Workforce Survey Results: Communities Suffer as Nonprofit Workforce Shortage Crisis Continues* 3-4 (2023), https://perma.cc/7NDN-27LG; Ctr. For Effective Philanthropy, *State of Nonprofits in 2023: What Funders Need to Know* (2023), https://perma.cc/9KZB-856A.
[11] Nat'l Council of Nonprofits, *supra* note 5, at 10.

The demand for social workers is expected to increase substantially—by more than twice the average expected for all occupations—over the coming years.[12] Demand for all categories of social workers is expected to grow faster than average, with particularly rapid growth in the need for healthcare social workers and mental health and substance use disorder social workers.[13]

We are already facing a lack of qualified social workers.[14] For example, almost all child welfare programs struggle with recruiting and retaining qualified and effective child welfare staff, and turnover rates remain high.[15] Educational institutions are not on pace to meet the expected increase in need. While enrollment in social work education shows modest growth, this upward trend is insufficient to meet the corresponding anticipated increase in demand for qualified social workers.[16]

The consequences of attrition and difficulties recruiting can be dire for the populations for whom social workers provide care and services—reduction or elimination of services and longer waiting times mean that people in need have less access to healthcare, child welfare services, violence prevention, education assistance, and so much more, including for people with disabilities, LGBTQ+ people, people of color, and other vulnerable communities.[17] Individuals may be denied services that they so desperately need which means individuals, families, and communities lose access to the programs that keep them alive, families lose services from programs that work to keep them together, and communities are no longer protected from targeted interference from predatory private student loan companies or future government oversight.

Hence, federal investments in social work and social work education are critically needed to ensure that there is a sufficient supply of social workers to meet evolving demands.

---

[12] *See* Bureau of Labor Stats., U.S. Dep't of Labor, *Occupational Outlook Handbook—Social Workers*, https://www.bls.gov/ooh/community-and-social-service/social-workers.htm (last accessed April 30, 2025).

[13] *Id.*; *see also* Michael Rieley, U.S. Bureau of Labor Stats., *Beyond the Numbers: Projected Employment Growth for Community and Social Service Occupations, 2022-32* (Feb. 2024), https://www.bls.gov/opub/btn/volume-13/projected-employment-growth-for-community-and-social-service.htm (demand for healthcare social workers projected to grow 9.6% from 2022 to 2032).

[14] Columbia School of Social Work, *Bridging the Gap: The Urgent Need for Social Workers* (Sept. 29, 2023, https://socialwork.columbia.edu/news/bridging-gap-urgent-need-social-workers (reporting an expected deficit of 74,000 social workers annually over the next decade).

[15] Nat'l Child Welfare Workforce Inst., *Critical Workforce Needs* (Dec. 2020), https://perma.cc/TY6M-LS7W (noting turnover rates between 20 to 50 percent nationally).

[16] Ryan Bradshaw, Council on Social Work Educ., *Spring 2021 CSWE Member Pulse Survey Results* (2021), https://perma.cc/M4CR-FZPV.

[17] *See, e.g.*, Nat'l Council of Nonprofits, *supra* note 5, at 5-8.

*The PSLF program was designed to help people enter public service employment.*

Fortunately, Congress, with bipartisan support, enacted the PSLF program (as part of the College Cost Reduction and Access Act)[18] to encourage entry for a wide range of public service professions, including social work.

As the legislative history around the passage of the Act shows, the program was designed to support those who want "to work in a variety of areas that are extraordinarily important for our country and for our society,"[19] including those in "emergency management, public safety, . . . public education, early childhood education, childcare, public health and social work in public service agencies, public services for individuals with disabilities and the elderly, public interest legal services, public defenders, school librarians, school-based service providers, teaching full-time at a tribal college or university."[20] And that enumerated list of employers was "not exclusive, it is inclusive."[21] As Senator Edward Kennedy explained at the time, "we have made this as wide as we could in terms of trying to respond to the sense that is out there in our schools and colleges, . . . to say: Look, if you want to give something back, we are going to make it possible."[22]

Some argue that taxpayers should not have to take on the burden of another person's educational debt. PSLF is not a loan cancellation program. Participants in the program need to pay off their debt for at least 10 years before they can qualify for loan forgiveness. The PSLF program benefits communities by helping dedicated professionals use their educational background and training to meet the needs of their community.

As Congress envisioned, PSLF is a vitally important government program that eases the student debt burden for those who choose public service professions. Together with other federal financial assistance programs, the PSLF program helps to bridge the income gap between public service and private employment to make public service a feasible career path. As of October 2024, more than a million borrowers have had more than $70 billion in student debt discharged through the program.[23] And PSLF has proven to be an important recruitment and retention tool for public service employers, as the Department itself has recognized.[24]

---

18 *See* Pub. L. 110-84, 121 Stat. 784 (2007).

19 153 Cong. Rec. S9448 (daily ed. July 17, 2007) (statement of Sen. Bernie Sanders).

20 *Id.* at S9462 (statement of Sen. Edward Kennedy).

21 *Id.*

22 *See* 153 Cong. Rec. S9536 (daily ed. July 19, 2007) (statement of Sen. Edward Kennedy).

23 *See* Council of Econ. Advisors, *Making Public Service Loan Forgiveness Work for Borrowers and the American People*, White House (Oct. 17, 2024), https://perma.cc/L62V-GXEW.

24 *See* U.S. Dep't of Educ., Fed. Student Aid, *Tackling the Public Service Loan Forgiveness Form: Employer Tips*, https://perma.cc/DS3F-3RDM (accessed Apr. 24, 2025) (Department resource for employers instructing that, "While [PSLF] is a potentially life-changing benefit for your employee, it's also

*Granting broad authority to the Secretary of Education to revoke PSLF program eligibility from public service employers weaponizes a program meant to mutually benefit highly trained individuals and communities with great need.*

In bypassing Congress and flouting the Constitution, the NPRM would harm millions of borrowers across the country, as well as the communities of which they are a part. The concentration of decision-making power in the wake of the destabilization and understaffing of the Department of Education[25] is a continuation of the Administration's attempts to punish individuals who have relied on the federal government for financial support. This proposed rule intimidates organizations and agencies into abiding by the administration's agenda or risking losing the ability to support their communities. The NPRM provides pressure to abandon the work that conflicts with the President's agenda or lose the ability to support our most marginalized communities.

The rule could allow the Department to disqualify employers from PSLF solely for engaging in conduct that is contrary to the Administration preference. And the limited process that the NPRM contemplates for employers that the Department seeks to disqualify is woefully inadequate.

The Department could base its allegations or accusations of disqualifying activities on supposed violation of federal statutes or even base disqualification on other matters it does not identify or define, based on a weak "preponderance of evidence" standard.

Should NASW's members lose access to the program, many of them will not be able to afford to make their required monthly student loan payments while remaining in their current positions. And our members must grapple with that decision *now*, as they consider whether to seek or accept new employment, to apply for or enroll in an MSW program, or make any number of other decisions related to their education or employment.

The threat or actual loss of access to the PSLF program will frustrate NASW's ability to advance the profession by encouraging the sustainable growth of the profession and impede its ability to advocate for sound social policies. Ultimately,

---

an opportunity for you. You can use your eligibility as a qualifying employer for the PSLF . . . program[ ] as a recruitment tool to attract highly qualified employees to your organization); Julie Burrell, Coll. & Univ. Professional Ass'n for Human Resources, *Public Service Loan Forgiveness: Help Employees Achieve Their Financial Goals*, The Higher Ed Workplace Blog (Sept. 17, 2024), https://perma.cc/S9H6-E5BP (noting that human resources can use the PSLF program "as part of a retention and recruitment strategy" and that it is "an especially attractive benefit to potential employees").

[25] *See* Press Release from Dept. of Education *U.S. Department of Education Initiates Reduction in Force* (March 11,2025) https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force

those harms trickle down to the populations that NASW's members serve, including some of the most vulnerable members of society.

* * * * *

NASW strongly opposes this NPRM and the effort to provide the Secretary of the Department of Education with unilateral power to determine the eligibility of PSLF employers. Declaring an intent to undermine the PSLF program not only contradicts Congress's intent in establishing the program, but also creates chaos and confusion for the millions of borrowers participating in the program, and harms the symbiotic relationship between public service organizations that provide critical services to a myriad of people and the individuals who are able to serve thanks to this program.

Should you have any questions about this comment, please feel free to contact Dina Kastner, Public Policy and Advocacy Manager at NASW, at dkastner.nasw@socialworkers.org or (202) 336-8218.

Respectfully submitted,

Barbara Bedney, PhD, MSW
Chief of Programs
National Association of Social Workers

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Family Focus
Chicago, IL and surrounding areas
info@family-focus.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

Family Focus is a nonprofit that has worked for 175 years to nurture children by strengthening families. Through our eleven community centers, we provide early childhood education, after-school programs, parenting support, youth leadership development, and other support services. Each year, we serve more than 19,000 children and families in Chicago and surrounding areas.

The PSLF program has been essential to our work. Many of our staff members, including, early childhood educators, youth mentors, case managers, hold advanced degrees and carry significant student loan debt. PSLF makes it possible for them to dedicate their careers to serving families in our communities. Without the promise of loan forgiveness, many would be unable to remain in nonprofit service, limiting our ability to provide consistent, trusted programs for children and families.

We strongly oppose the proposed rule, which would limit which employers qualify for PSLF. This rule is contrary to federal law, which explicitly provides that all 501(c)(3) nonprofit organizations are eligible employers under PSLF.

In addition to being unlawful, the proposal inserts politics and ideology into a program that must remain neutral. By giving discretion to exclude nonprofits based on perceived violations of federal or state law, the Department risks targeting organizations that simply provide vital services to families and communities. This opens the door for any Administration to disqualify nonprofits based on shifting political priorities, creating instability and uncertainty across the entire nonprofit sector. Nonprofits must be able to meet community

Give Feedback

10/14/25, 12:55 PM Regulations.gov

needs without fear of any type of retribution.

Finally, there are already safeguards in place. If an organization engages in substantial illegal activity, the Internal Revenue Service has authority to revoke its 501(c)(3) status. Creating a duplicative, discretionary process at the Department of Education is unnecessary, burdensome, and beyond the Department's expertise or capacity to administer.

For all these reasons, Family Focus urges the Department to withdraw the proposed rule and maintain eligibility for all 501(c)(3) organizations under PSLF, as required by law.

If you have any further questions, feel free to email us at info@family-focus.org. Thank you for considering this input as part of the rulemaking process.

Best,

Family Focus Team

**Comment ID**

ED-2025-OPE-0016-10407

**Tracking Number**

mfo-f24u-48ss

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Give Feedback

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

https://www.regulations.gov/comment/ED-2025-OPE-0016-10407 2/3

ED_00482

10/14/25, 12:55 PM Regulations.gov

Support (/support)

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10407 3/3
ED_00483

10/14/25, 12:55 PM Regulations.gov

An official website of the United States Government. 

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Gabriel Davis
Cincinnati, OH
Ohio Justice & Policy Center
gdavis@ohiojpc.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.
My name is Gabe Davis, and I am CEO of Ohio Justice & Policy Center (OJPC). OJPC is a nonprofit law firm that offers a variety of free legal services, programs, and resources to help people navigate the complexities of our criminal justice system.
The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by working to protect the human rights of those in prison, remove barriers to employment and housing, and free over-punished incarcerated people. In 2024, we had 69 active cases and 10 individuals released from prison through our project Beyond Guilt, which works to free those who have been unfairly sentenced and have demonstrated rehabilitation within prison. We also represented 33 clients whose constitutional rights were violated while in prison, as well as 314 clients through our Second Chance program, which assists individuals after they are released from prison and rejoining their community, particularly in overcoming disadvantages due to having a criminal record.
My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The work that we do at OJPC relies upon having qualified attorneys and legal staff who can represent our clients. PSLF gives our legal staff the opportunity to serve the community without the financial concern of student loans.
We are concerned that this rule would give the Department of Education the discretion to exclude

Give Feedback

https://www.regulations.gov/comment/ED-2025-OPE-0016-10415 1/3

ED_00484

organizations such as ours that are working to advance racial and social equity, or work on issues involving detention and incarceration. The rule leaves room for those in the Department of Education who disagree ideologically or politically with the work OJPC is doing to exclude our employees from the PSLF program, despite federal law that declares employees of OJPC, as a nonprofit organization, eligible for loan forgiveness. If this rule is accepted, future administrations could change the eligibility of organizations based on ideological viewpoints, which destabilizes the PSLF program. Many of our current and potential employees rely on this program, and the proposed amendment could cause employees to lose confidence in the program and decide to follow a more certain career path. Our work depends on having qualified legal staff to represent our clients, and this rule could significantly impact the quality of our service within the community. We ask you to reconsider these proposed changes.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Gabe Davis, CEO

Attachments 1

PSLF Comment - 9.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10415/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10415

**Tracking Number**

mfo-f889-g1pd

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Give Feedback

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Gabriel Davis
Cincinnati, OH
Ohio Justice & Policy Center
gdavis@ohiojpc.org


Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed
Rulemaking [Docket ID ED-2025-OPE-0016]


Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the
regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Gabe Davis, and I am CEO of Ohio Justice & Policy Center (OJPC). OJPC is a
nonprofit law firm that offers a variety of free legal services, programs, and resources to help
people navigate the complexities of our criminal justice system.

The Public Service Loan Forgiveness Program has enabled my organization to serve our
communities by working to protect the human rights of those in prison, remove barriers to
employment and housing, and free over-punished incarcerated people. In 2024, we had 69 active
cases and 10 individuals released from prison through our project Beyond Guilt, which works to
free those who have been unfairly sentenced and have demonstrated rehabilitation within prison.
We also represented 33 clients whose constitutional rights were violated while in prison, as well
as 314 clients through our Second Chance program, which assists individuals after they are
released from prison and rejoining their community, particularly in overcoming disadvantages
due to having a criminal record.

My organization strongly opposes the proposed rule and the limitations it would impose on
which employers would be able to benefit from PSLF for their employees. The work that we do
at OJPC relies upon having qualified attorneys and legal staff who can represent our clients.
PSLF gives our legal staff the opportunity to serve the community without the financial concern
of student loans.

We are concerned that this rule would give the Department of Education the discretion to exclude
organizations such as ours that are working to advance racial and social equity, or work on issues
involving detention and incarceration. The rule leaves room for those in the Department of
Education who disagree ideologically or politically with the work OJPC is doing to exclude our
employees from the PSLF program, despite federal law that declares employees of OJPC, as a
nonprofit organization, eligible for loan forgiveness. If this rule is accepted, future
administrations could change the eligibility of organizations based on ideological viewpoints,
which destabilizes the PSLF program. Many of our current and potential employees rely on this

program, and the proposed amendment could cause employees to lose confidence in the program and decide to follow a more certain career path. Our work depends on having qualified legal staff to represent our clients, and this rule could significantly impact the quality of our service within the community. We ask you to reconsider these proposed changes.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Gabe Davis, CEO

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share ▾

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Attached please find comments from Robert F. Kennedy Human Rights.

Attachments 1

2025.09.17 - RFK Human Rights PSLF Comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10416/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10416

**Tracking Number**

mfo-f8e3-g3w9

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

VIA ELECTRONIC SUBMISSION:
www.regulations.gov

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW
Washington, DC 20202

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016**

Dear Ms. Abernathy:

Robert F. Kennedy Human Rights appreciates the opportunity to share comments on the above-referenced proposed rule that, in its current form, will have a significant and detrimental impact on the Public Service Loan Forgiveness ("PSLF") program. Robert F. Kennedy Human Rights is a 501(c)(3) that was founded in 1968 to realize Senator Kennedy's dream of a more just and peaceful world. We advocate for human rights issues and pursue strategic litigation to hold governments accountable at home and around the world. We foster a social good approach to business, celebrate agents of change, and to ensure change that lasts, we educate millions of students about human rights, training the next generation of leaders.

The statute creating and authorizing PSLF is a straightforward one. If a borrower with certain federal loans (1) works a full-time "public service job" for at least 120 months, (2) makes 120 qualifying monthly payments towards the loan while working at a "public service job," and (3) requests loan forgiveness while working at a "public service job," the Secretary of Education is required to forgive the borrower's remaining loan balance.[1] After deliberation and amendments, Congress enumerated more than 15 categories of public service jobs that were eligible for PSLF, expressly including "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title."[2]

The proposed rule would permit the Secretary of Education to disregard the PSLF statute and refuse to forgive the loan balance of—or credit the payments made by—otherwise eligible

---

[1] 20 U.S.C. § 1087e(m).
[2] *Id.* § 1087e(m)(3)(B).

borrowers who work at a 501(c)(3) if the Secretary determines that the organization engaged in activities with a "substantial illegal purpose," including "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws," and "engaging in a pattern of aiding and abetting illegal discrimination."[3] This is problematic for at least six reasons.

*First*, the proposal is contrary to the plain text of the Higher Education Act. The Act provides that the term "public service job" includes a full-time job at a 501(c)(3) organization that is exempt from taxation.[4] Excluding full-time employees of certain 501(c)(3) organizations from eligibility for PSLF directly contradicts the law.

*Second*, relatedly, Congress has not given the Secretary of Education the authority to exclude certain 501(c)(3) organizations from having their employees be eligible for PSLF. Likewise, Congress has not granted the Secretary the authority to conduct adjudications into whether 501(c)(3) organizations have aided and abetted the violation of immigration laws, supported terrorism, engaged in a pattern of violating state laws, or violated or aided and abetted the violation of other laws that the Secretary does not enforce and that fall outside the Secretary's areas of expertise.

*Third*, the regulatory language and structure of the proposed rule pose vagueness issues. Under the proposed rule, the Secretary of Education is the ultimate arbiter for "determining when an employer engaged in activities that have a substantial illegal purpose."[5] The proposed rule does not require a court finding of guilt or liability, the Secretary makes the determination by a preponderance of the evidence, the purposes deemed to be illegal include unsettled areas of law, and they include areas outside the Department's areas of expertise. Overall, the rule leaves a lot of uncertainty over what the Secretary will ultimately conclude constitutes engaging in an activity with a substantial illegal purpose within the rule's meaning. Because of the vagueness of what constitutes an activity with a substantial illegal purpose, the rule risks arbitrary and subjective enforcement based on the Secretary's policy preferences.

*Fourth*, the uncertainty created by this rule will impact employers' ability to recruit and retain employees. As the NPRM acknowledges, "[t]here is significant research, both academic and private sector, which documents that public service employees cited PSLF as a significant factor in their decision to pursue and remain in public service."[6] Part of what enables these employees to make the decision to work in public service is the certainty that PSLF provides. This rule eliminates that certainty, at least with respect to working for employers whom the current administration may deem to be ideologically at odds with its policies and priorities.[7] Because of the vagueness of the rule, current and potential employees lack the ability to determine, with any degree of certainty, whether the Secretary will deem their employer to have

---

[3] Proposed § 685.219(b)(30).
[4] 20 U.S.C. § 1087e(m)(3)(B).
[5] Proposed § 685.219(h).
[6] 90 Fed. Reg. 40154, 40169 (Aug. 18, 2025).
[7] The NPRM acknowledges that the proposed rule will impact certain areas of public service more than others. *See id*. at 40170 (identifying "legal services, governance, social work, healthcare, K–12 education, and higher education" as the areas most likely to be impacted).

engaged in activities with a substantial illegal purpose. The risk of an employee's disqualification for PSLF is likely to negatively affect recruitment and retention efforts.

*Fifth*, connecting both the vagueness and employee recruitment and retention concerns, the proposed rule threatens to chill employers' First Amendment speech and activities. Despite the proposed rule's inclusion of the disclaimer that "[n]othing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights,"[8] the rule will result in employers reducing the scope of their lawful activities and speech. Employers will make these reductions both (1) out of an abundance of caution to ensure that they are not engaging in activities that the Secretary might deem to be activities with a substantial illegal purpose (even if the curtailed activity or speech is plainly lawful), and (2) as a necessary signal to current and potential employees that they are a "safe" employer that is not at risk of being excluded from the PSLF program. The NPRM appears to acknowledge that certain organizations will experience a "deterrent effect on their activities,"[9] but it fails to acknowledge that this "deterrence" will include protected First Amendment activity.

*Sixth*, the NPRM states that the proposed rule "align[s] directly" with the "Illegality Doctrine, [through which] the IRS excludes organizations engaged in illegal purposes or purposes that are against established public policy from tax exemption under § 501(c)(3)."[10] But the rule focuses on the purpose of specific activities, rather than the purposes of the organizations. Moreover, the Department of Education's proposed rule specifically applies to organizations that *are* exempt from taxation under § 501(c)(3). That is, it denies PSLF participation to employees of organizations, based on the determinations of the non-expert Secretary of Education, where the agency responsible for determining whether an organization meets the standards for 501(c)(3) eligibility continues to recognize an organization's nonprofit status.

For the abovementioned reasons, Robert F. Kennedy Human Rights urges the Department of Education to withdraw this misguided rule.

Sincerely,

Anthony Enriquez
V˙ce Pres˙dent, U.S. Advocacy and Litigation

[8] Proposed § 685.219(h)(2).
[9] 90 Fed. Reg. at 40170.
[10] *Id*. at 40156.

An official website of the United States Government.

‹ Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comment by Human Rights First.

Attachments 1

Human Rights First's NPRM Comment 9.17.2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10418/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10418

**Tracking Number**

mfo-fckl-jz9g

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

**September 17, 2025**

*Submitted via: https://www.regulations.gov.*

Linda McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**Re: Human Rights First Comment on the Department of Education's Notice of Proposed Rulemaking, William D. Ford Federal Direct Loan (Direct Loan) Program, Docket No. ED-2025-OPE-0016**

Dear Secretary McMahon,

Human Rights First submits this comment in opposition to the Notice of Proposed Rulemaking promulgated by the Department of Education, Office of Postsecondary Education, titled William D. Ford Federal Direct Loan (Direct Loan) Program. The NPRM proposes to amend the federal regulations on the Public Service Loan Forgiveness (PSLF) program at 34 CFR 685.219. Human Rights First recommends that the proposed rule be withdrawn in its entirety.

## I. Overview

Human Rights First strongly opposes the Department of Education's proposed rule amending the regulations governing the PSLF program. The proposed rule targets nonprofit organizations that provide entirely lawful pro bono legal services to immigrants and other vulnerable populations. If implemented, the administration would likely attempt to use it to strip PSLF eligibility for people providing legal services to immigrants, which would deny immigrants the ability to access legal protections that they are entitled to under U.S. law, accelerate their unlawful detention and deportation, and prevent people from seeking remedies for harms caused by immigration agents.

The rule also threatens the broader, Constitutionally-protected work of human rights advocates, legal monitors, and public interest lawyers, many of whom rely on PSLF to sustain careers in the public interest, in service of vulnerable populations. For decades, Human Rights First has relied on PSLF to recruit and retain skilled attorneys committed to serving asylum-seekers and other vulnerable populations. Eliminating this pathway would jeopardize the financial stability of public interest lawyers with reliance interests in the program and drastically reduce the availability of qualified legal counsel, leaving countless immigrants without representation in

proceedings that have life-or-death consequences. The proposed rule should be withdrawn in its entirety.

## II.     Human Rights First's Interest in the Rule

For 47 years, Human Rights First has worked on a non-partisan basis in the United States and abroad to promote respect for human rights and the rule of law. Human Rights First provides pro bono legal representation to indigent asylum-seekers and engages in advocacy that aims to promote laws and policies that protect the universal freedoms of all individuals worldwide. Human Rights First grounds its work in the legal standards of the 1951 Refugee Convention, its 1967 Protocol, and other international human rights instruments, and advocates adherence to these standards in United States law and policy.

Human Rights First operates one of the largest and most successful pro bono asylum representation programs in the country. Working in partnership with volunteer attorneys, Human Rights First's Refugee Representation program has helped tens of thousands of asylum-seekers who came to the United States fleeing persecution and torture. We engage attorneys from law firms, corporations, and law school clinics across the country to provide pro bono representation to asylum-seekers who cannot otherwise afford high-quality legal representation. Because so many seek refuge in the United States, we embrace a model that enables us to do more with less. Our in-house attorneys—who have decades of experience combined—train and mentor those pro bono attorneys to ensure that our clients receive the highest-quality representation possible.

Human Rights First's extensive experience working directly with refugees seeking protection in the United States is the foundation for Human Rights First's advocacy and informs the observations that follow.

## III.     Proposed Rule is Part of the Administration's Broader Unrelenting Attack on Immigrants and the Attorneys Providing Legal Assistance to Them

Since entering office, the Trump administration has carried out a mass effort to detain and deport immigrants living in U.S. communities or arriving in the United States to seek protection, while stripping them of due process protections and endangering their lives. To carry out this campaign, it has promulgated a barrage of anti-immigrant executive orders, regulations, policies, and practices, many of which have been struck down as unlawful by federal courts.

The administration's policies and rhetoric make clear that its goal is to dehumanize and mistreat immigrants on a massive scale to scare people into relinquishing their rights and abandoning their immigration court cases. For instance, the administration has threatened immigrants that they would be "hunted down" and stated that immigrants in the United States could be

disappeared to the CECOT in El Salvador, Eswatini, or South Sudan – countries to which the administration has sent immigrants to suffer human rights abuses, including torture and incommunicado detention.[1] These actions are in line with the first Trump administration's anti-immigrant policies and President Trump's long history of racist and xenophobic statements against immigrants."[2]

Currently, the administration is jailing more people in immigration detention than at any known time in U.S. history[3] and carrying out mass deportations through a range of unprecedented and unlawful tactics. Immigration agents are sowing terror in U.S. communities, arresting immigrants at their homes, the streets, workplaces, and immigration court hearings, often while wearing plain clothes and masks, driving unmarked cars, and refusing to provide identification.[4] Immigration agents have used widespread racial profiling to carry out arrests,[5] including of U.S. citizens.[6]

In immigration detention, at least thirteen people have died under this administration while conditions continue to deteriorate, but the administration has callously responded that "people die in ICE custody."[7] Mass detention of immigrants, the vast majority of whom do not have a

---

[1] DHS, "Warning - International," (https://www.dhs.gov/medialibrary/assets/video/58917); DHS, "Inside the Action: Secretary Noem's visit to El Salvador," (https://www.dhs.gov/medialibrary/assets/video/59109); New York Times, "Man Who'd Served His Time in U.S. Is Deported to an African Prison," September 1, 2025 (https://www.nytimes.com/2025/09/01/world/africa/trump-deportations-prison-us-eswatini-africa-jamaica.html).
[2] Politico, "We watched 20 Trump rallies. His racist, anti-immigrant messaging is getting darker," October 12, 2024 (https://www.politico.com/news/2024/10/12/trump-racist-rhetoric-immigrants-00183537).
[3] New York Times, "Over 60,000 Are in Immigration Detention, a Modern High, Records Show," August 11, 2025 (https://www.nytimes.com/2025/08/11/us/politics/immigration-detention-numbers.html).
[4] CNN, "Masked ICE officers: The new calling card of the Trump administration's immigration crackdown," June 21, 2025 (https://www.cnn.com/us/ice-immigration-officers-face-masks); New York City Bar, "Statement on Wearing of Masks by ICE Agents," June 20, 2025 (https://www.nycbar.org/press-releases/statement-on-wearing-of-masks-by-ice-agents/); NBC News, "LAPD tells officers to 'keep the peace' when called to ICE arrests and confrontations," July 1, 2025 (https://www.nbcnews.com/news/latino/lapd-tells-officers-keep-peace-called-ice-arrests-confrontations-rcna216175)
[5] The Guardian, "Los Angeles on edge as agents threaten to 'flood the zone' with immigration raids," September 14, 2025 (https://www.theguardian.com/us-news/2025/sep/14/los-angeles-immigration-raids); Los Angeles Times, "ICE raids Latino community, racial profiling," June 27, 2025 (https://www.latimes.com/delos/newsletter/2025-06-27/ice-raids-latino-community-racial-profiling); New York Times, "Supreme Court allows ICE to use racial profiling in immigration enforcement," September 8, 2025 (https://www.nytimes.com/2025/09/08/us/politics/supreme-court-immigration-racial-profiling.html); UCLA Latino Policy & Politics Institute, "SCOTUS Opens Door to Racial Profiling in Immigration Enforcement," September 8, 2025 (https://latino.ucla.edu/scotus-ruling-opens-door-to-racial-profiling-in-immigration-enforcement/).
[6] The Atlantic, "A U.S. Citizen Detained by ICE for Three Days Tells His Story," September 10, 2025 (https://www.theatlantic.com/politics/archive/2025/09/george-retes-ice-detained-us-citizen/684152/); Los Angeles Times, "The ICE raids show what state-sponsored terror looks like," June 27, 2025 (https://www.latimes.com/delos/newsletter/2025-06-27/ice-raids-latino-community-racial-profiling); CBS News, "Video allegedly shows ICE agents detaining Hispanic U.S. citizen on Long Island," June 10, 2025 (https://www.cbsnews.com/newyork/news/ice-detains-us-citizen-long-island-video/); The Guardian, "Ice agents detain US citizen as LA immigration raids continue: 'It's racial profiling'," June 16, 2025.
[7] ICE, "Detainee Death Reporting," (https://www.ice.gov/detain/detainee-death-reporting); ICE, "Mexican national in ICE custody passes away at Central Arizona Correctional Complex," September 2, 2025 (https://www.ice.gov/news/releases/mexican-national-ice-custody-passes-away-central-arizona-correctional-comple

criminal record, has separated parents from their children and made people afraid to go to work, access healthcare, or send their children to school.[8]

Part of the administration's attack on immigrant communities and push for mass deportations without due process is an effort to deprive them of legal counsel and access to legal information. This effort has taken on many forms. The administration attempted to eliminate funding for legal orientation programs in detention, legal representation for unaccompanied children, and legal representation for people determined to be mentally "incompetent," making clear that it is seeking to deny legal information or services to adults, families, and children facing deportation proceedings.[9] These decisions are being litigated, with the government currently blocked from ending the latter two programs.[10] Posters in immigration courts with information about legal assistance to immigrants have been replaced with posters encouraging people to "self-deport."[11] The administration has refused to recognize a right to counsel when conducting certain protection screenings in detention of people arriving in the United States and failed to even include some attorneys of record in these screenings, which determine whether an asylum-seeker

---

x); Washington Post, "Immigrants forced to sleep on floors at overwhelmed ICE detention centers," April 20, 2025 (https://www.washingtonpost.com/business/2025/04/18/immigrant-detention-overcrowding-trump-crackdown/); The New Republic, "Trump Border Czar Has Gruesome Response to Man Dying in ICE Custody," June 30, 2025 (https://newrepublic.com/post/197451/donald-trump-border-czar-tom-homan-man-dying-ice-custody).

[8] NBC Philadelphia, "ICE detains Marine Corps veteran's wife who was still breastfeeding their baby," June 23, 2025 (https://www.nbcphiladelphia.com/news/national-international/marine-corps-veterans-wife-detained-breastfeeding/4216689/); ABC7 Eyewitness News, "Immigration agents detain mother in front of her children in Pasadena, video shows," July 1, 2025 (https://abc7.com/post/immigration-agents-detain-mother-in-front-of-her-children-pasadena/16895885/); The American Prospect, "A Fear Pandemic Grips Safety Net Hospitals and Their Patients," June 27, 2025 (https://prospect.org/justice/2025-06-27-immigration-ice-health-care-hospitals/); NY Times, "Immigration Raids Add to Absence Crisis for Schools," June 16, 2025 (https://www.nytimes.com/2025/06/16/us/immigration-raids-school-absences-deportation-fears.html).

[9] Acacia Center for Justice, "Acacia Center for Justice Statement on Termination of Critical Legal Access and Representation Programs," April 10, 2025 (https://acaciajustice.org/acacia-statement-on-termination-of-critical-legal-access-and-representation-programs/); Acacia Center for Justice, "Acacia Center for Justice Decries Administration's Termination of Representation for Unaccompanied Children," March 21, 2025 (https://acaciajustice.org/acacia-decries-administrations-termination-of-representation-for-unaccompanied-children/; NIJC, "American Gateways v. Department of Justice: Challenging Trump's Termination of the National Qualified Representative Program (NQRP)," (https://immigrantjustice.org/for-attorneys/cases/american-gateways-v-department-of-justice-challenging-trumpstermination-of-the-national-qualified-representative-program-nqrp/).

[10] *See* Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs., 780 F. Supp. 3d 897 (N.D. Cal. 2025) (granting Plaintiffs' motion for a preliminary injunction of the government's order to "immediately stop all work" on the contracts through which HHS and ORR provide[] funding for counsel for unaccompanied children in immigration proceedings and terminating funding for direct legal representation services); Am. Gateways v. U.S. Dep't of Just., No. CV 25-01370, 2025 WL 2029764, at *1 (D.D.C. July 21, 2025) (granting Plaintiffs' motion for a preliminary injunction of the government's decision to rescind the National Qualified Representative Program ("NQRP")).

[11] Los Angeles Times, "Legal help in immigration court fades as Trump administration ramps up arrests," July 23, 2025 (https://www.latimes.com/california/story/2025-07-23/legal-aid-cut).

will be denied a hearing and rapidly deported.[12] Immigration officials are increasingly disappearing people in U.S. detention centers, secret hotels, and abroad while refusing to disclose their location, which makes it impossible for attorneys to track or assist their clients.[13]

Another key feature of this effort to deny legal representation has been to intimidate and criminalize immigration attorneys for providing legal services to immigrants. In March 2025, President Trump issued a memorandum titled "Preventing Abuses of the Legal System and the Federal Court," which leveled sweeping accusations against immigration attorneys and law firms.[14] The memorandum claimed that immigration attorneys and law firms that take on cases pro bono "frequently coach clients to conceal their past or lie about their circumstances when asserting their asylum claim" and that attorneys and firms litigating against the federal government pursue "baseless partisan attacks." It directed the Attorney General and Secretary of Homeland Security to pursue sanctions and other discipline against attorneys and firms in a range of circumstances. This executive action is a blatant attempt to target attorneys providing legal assistance to immigrants, including pro bono or low-cost legal services for immigrants who cannot afford representation. A former immigration judge, Ilyce Shugall, noted that, "The language in the executive order was very threatening, that by helping someone apply for asylum we're violating our ethical rules as attorneys and that we will be investigated and could be charged and lose our licenses if we continue to help people seeking asylum."[15]

After the memorandum was issued, the Department of Justice appeared to escalate its targeting of immigration lawyers and send a message of intimidation to practitioners across the country when it requested that a federal judge impose "substantial monetary sanctions" on an attorney who filed a federal lawsuit to halt the deportation of his client, an immigrant from Laos whose case he was representing pro bono.[16] The administration's targeting of immigration lawyers is

---

[12] Human Rights First and Refugees International, "This is an Order from Trump," May 2025 (https://humanrightsfirst.org/wp-content/uploads/2025/05/ThisIsAnOrderFromTrumpReport_final1.pdf); "Refugee and Immigrant Center for Education and Legal Services v. Kristi Noem, U.S. Department of Homeland Security, et al.," April 7, 2025 (https://storage.courtlistener.com/recap/gov.uscourts.dcd.277039/gov.uscourts.dcd.277039.52.1.pdf).
[13] Coalition of non-governmental organizations, "Information Submitted to the UN Working Group on Enforced or Involuntary Disappearances Regarding Disappearances of Migrants and Asylum Seekers in the United States," April 25, 2025 (https://humanrightsfirst.org/wp-content/uploads/2025/04/Written-statement-for-WG-on-Enforced-and-Involuntary-Disappearances.pdf); The Intercept, "ICE held an NYC child Incommunicado at Secret Hotel, then Deported Him," August 18, 2025 (https://theintercept.com/2025/08/18/ice-children-hotel-detention-nyc-deported/).
[14] The White House, "Preventing Abuses of the Legal System and the Federal Court," March 22, 2025 (https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/).
[15] ABC7News, "'Valid fear': Immigration judges, lawyers say they're being targeted by Trump administration," August 18, 2025 (https://abc7news.com/post/more-100-immigration-judges-fired-trumps-inauguration-white-house-targets-lawyers/17503922/).
[16] Politico, "'This is sending a message': DOJ moves to sanction lawyer who took pro bono deportation case," August 6, 2025

consistent with its broader campaign to intimidate lawyers whose views or actions it does not agree with (including pursuing a criminal case against a lawyer who challenged a ban on gender-affirming care), as well as steps to pressure and coerce big law firms, fire immigration judges, violate court rulings including those protecting immigrants from unlawful deportations or expulsions, and make statements to undermine the legitimacy of the courts – in order to carry out its unlawful agenda while suppressing opposition.[17] When a federal judge issued an order blocking the administration from sending Venezuelan asylum-seekers and migrants to a notorious prison in El Salvador under a centuries-old wartime law, President Trump called for his impeachment and referred to him as a "radical left lunatic."[18]

The first Trump administration used similar tactics. It weaponized rhetoric about immigration lawyers encouraging clients to make false asylum claims, with the then-Attorney General using the phrase "dirty immigration lawyers."[19] In 2019, it was reported that the federal government had compiled a list of people, including activists and immigration attorneys, who were to be flagged for investigation if they crossed the U.S.-Mexico border.[20] Some immigration attorneys

---

(https://www.politico.com/news/2025/08/06/justice-department-sanctions-immigration-lawyer-00496886?nid=0000018f-3124-de07-a98f-3be4d1400000&nname=politico-toplines&nrid=2626bdac-090b-49e2-a5dd-7fc9eb90b7f9).

[17] Whistleblower Aid, "Whistleblower Aid Co-Founder Mark Zaid Files Lawsuit Challenging Trump's Revocation of His Security Clearance," May 5, 2025 (https://whistlebloweraid.org/whistleblower-aid-co-founder-mark-zaid-files-lawsuit-challenging-trumps-revocation-of-his-security-clearance/); Reuters, "LBGTQ rights lawyer indicted for lying during Alabama 'judge shopping' inquiry," September 9, 2025 (https://www.reuters.com/legal/government/lbgtq-rights-lawyer-indicted-lying-during-alabama-judge-shopping-inquiry-2025-09-09/); ABA, "American Bar Association files suit to halt government intimidation of lawyers and law firms," June 16, 2025 (https://www.americanbar.org/news/abanews/aba-news-archives/2025/06/aba-files-suit-to-halt-govt-intimidation/); ANC7News, "'Valid fear': Immigration judges, lawyers say they're being targeted by Trump administration," August 18, 2025 (https://abc7news.com/post/more-100-immigration-judges-fired-trumps-inauguration-white-house-targets-lawyers/17503922/); Truthout, "Trump Admin Refuses to Abide by 1 in 3 Court Rulings Against Its Policies," July 22, 2025 (https://truthout.org/articles/trump-white-house-refuses-to-abide-by-1-in-3-court-orders-made-against-them/); NPR, "Judge: 'Probable cause' to hold U.S. in contempt over Alien Enemies Act deportations," April 16, 2025 (https://www.npr.org/2025/04/16/g-s1-60696/judge-contempt-alien-enemies-act); Human Rights First, "D.V.D v. DHS," (https://humanrightsfirst.org/dvd-v-dhs/); Aljazeera, "'Lunatic': Trump's long history of abusing judges who oppose him," March 20, 2025 (https://www.aljazeera.com/news/2025/3/20/lunatic-trumps-long-history-of-abusing-judges-who-oppose-him); New York Times, "Judge Rules That Trump Administration Takeover of Institute of Peace Is Illegal," May 19, 2025 (https://www.nytimes.com/2025/05/19/us/politics/institute-of-peace-trump.html); New York Times, "Judge Blocks Trump Administration From Dismantling Education Department," May 22, 2025 (https://www.nytimes.com/2025/05/22/us/politics/judge-education-department.html).

[18] Aljazeera, "'Lunatic': Trump's long history of abusing judges who oppose him," March 20, 2025 (https://www.aljazeera.com/news/2025/3/20/lunatic-trumps-long-history-of-abusing-judges-who-oppose-him).

[19] DOJ, "Attorney General Jeff Sessions Delivers Remarks to the Executive Office for Immigration Review," October 12, 2017 (https://www.justice.gov/archives/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review).

[20] NBC News, "U.S. officials made list of reporters, lawyers, activists to question at border," March 6, 2019 (https://www.nbcnews.com/politics/immigration/u-s-officials-made-list-reporters-lawyers-activists-question-border-n980301).

were detained and questioned. Government records obtained in 2021 revealed that the Trump administration's targeting of immigration attorneys was broader than previously known, with attorneys being interrogated by a secretive government Tactical Terrorism Response Team.[21]

The proposed rule is yet another weapon in the Trump administration's campaign to scare or discourage immigration attorneys and other attorneys whose work it disagrees with from providing legal services to vulnerable populations. Targeting attorneys for representing people or pursuing litigation that the administration disfavors violates core U.S. constitutional and statutory protections – as well as international obligations – including due process, the right to counsel, the First Amendment, and the separation of powers.

Not only do these actions deprive people of legal counsel, but they also threaten the work of human rights monitors and other advocates seeking to document the government's abuses in immigration detention and other contexts (some of whom could be targeted due to this regulation as well). Consistent with this goal, the administration has attempted to eliminate independent oversight of its abusive practices, including gutting federal oversight bodies that investigated rights violations and detention conditions and denying access to immigration jails for human rights groups and members of Congress.[22]

Lastly, the administration's rhetoric demonizing and criminalizing immigration attorneys, other attorneys and advocates, and non-governmental organizations whose work it does not like puts these people and organizations at enormous risk to their lives and safety. Targeting of NGOs providing immigration legal services and humanitarian assistance by federal and state governments as well as Members of Congress fuels violence and threats against the organizations and their staff.[23]

---

[21] Propublica, "Documents Show Trump Officials Used Secret Terrorism Unit to Question Lawyers at the Border," May 14, 2021 (https://www.propublica.org/article/documents-show-trump-officials-used-secret-terrorism-unit-to-question-lawyers-at-the-border).
[22] Public Citizen, "Groups Sue Secretary Noem, DHS, for Shuttering of Civil Rights Offices," April 24, 2025 (https://www.citizen.org/news/groups-sue-secretary-noem-dhs-for-shuttering-of-civil-rights-offices/); Rep. Summer Lee, "Rep. Summer Lee, Human Rights First Advocate Denied Entry to Ice Detention Center During Oversight Visit," August 25, 2025 (https://summerlee.house.gov/newsroom/press-releases/rep-summer-lee-human-rights-first-advocate-denied-entry-to-ice-detention-center-during-oversight-visit); New York Times, "ICE Imposes New Rules on Congressional Visits," June 19, 2025 (https://www.nytimes.com/2025/06/19/us/politics/ice-congress.html?smid=fb-nytimes&smtyp=cur&fbclid=IwY2xjawLC-EpleHRuA2FlbQIxMQBicmlkETE3UkREU0twSWhrd2Q5Y052AR6GhGDeXDMU4QfP0nW5Nf2dr8p7FUJwYeZ8dWZd-ZVlnYmY5pyJr0FOa8GDMQ_aem_8mnYhkyPl_-_hBka363XTw).
[23] National Catholic Reporter, "Catholic Charities reacts to 'disturbing' online threats to staff over migration work," November 1, 2023 (https://www.ncronline.org/news/catholic-charities-reacts-disturbing-online-threats-staff-over-migration-work); New York Times, "Faith Based Groups that Assist Migrants Become Targets of Extremists," June 2, 2024 (https://www.nytimes.com/2024/06/02/us/migrants-charities-shelters-threats.html?unlocked_article_code=1.w00.x-49.3Hm7mw4k-JIB&smid=url-share).

## IV. The Rule Would Jeopardize Due Process Rights and Access to Counsel for Immigrants in the United States

Immigrants face a shortage of affordable legal representation nationwide. As of July 2025, only 39.7 percent of immigrants with pending immigration court cases have secured representation, a drop from 65 percent six years earlier.[24]

The proposed rule would discourage attorneys from pursuing careers in public interest, thereby exacerbating the lack of access to qualified legal services for millions of immigrants—most notably those who cannot afford private counsel. The proposed rule would also disproportionately impact rural and marginalized communities, who oftentimes rely on organizations who focus on serving vulnerable communities. For example, Human Rights First's Refugee Representation program staff includes attorneys primarily focused on serving two of the most marginalized immigrant communities: Black and Indigenous asylum-seekers. In recent years, Human Rights First attorneys have enhanced our existing model to focus on increasing services to Black refugees, with a particular concentration on the most vulnerable among them—detained Black asylum-seekers. Similarly, Human Rights First has focused on expanding access to asylum and dismantling language barriers that prevent access to legal services for Indigenous people of Central America.

In 2016, the American Immigration Council published a report finding that represented immigrants as compared to pro se immigrants are 11 times as likely to apply for relief from deportation if detained, and 5 times more likely if non- detained; and are twice as likely to obtain immigration relief if detained, and five times as likely if non-detained.[25]

Due process rights and access to counsel are so crucial to ensuring fundamental fairness in immigration proceedings that the right to counsel is enshrined in the Immigration and Nationality Act.[26] Similarly, the Executive Office for Immigration Review (EOIR) promotes pro bono representation by all of its adjudicatory components.[27]

---

[24] TRAC, "Pending Court Cases by Immigrant's Address," July 2025 (https://tracreports.org/phptools/immigration/addressrep/); TRAC, "Immigration Atty Representation Rates Dropped, Report Says," January 24, 2024 (https://tracreports.org/tracatwork/detail/A5623.html#:~:text=TRAC%20at%20Work&text=The%20average%20rate%20of%20immigration,percent%20down%20to%2030%20percent.%22).

[25] American Immigration Council, "Access to Counsel in Immigration Court," September 28, 2016 (https://www.americanimmigrationcouncil.org/report/access-counsel-immigration-court/).

[26] 8 U.S.C. § 1362

[27] PM 25-08 (https://www.justice.gov/eoir/media/1387486/dl?inline#:~:text=Page%201,Date:%20January%2029%2C%202025), reinstating PM 21-08 (https://www.justice.gov/eoir/media/1387501/dl?inline).

## V. The Rule Targets and Punishes People Providing Legal Services to Immigrants

Attorneys and support staff at Human Rights First have invested years in the Public Service Loan Forgiveness program, by relying on the program's promise of balance forgiveness following 120 qualifying payments. This rule means that such investment has been to their significant financial detriment. In a 2017 report published by the National Legal Aid & Defender Association (NLADA), survey responses from more than 3,000 borrowers currently working toward earning forgiveness through PSLF indicated that:[28]

- 81 percent of those surveyed were "significantly influenced" by PSLF and 51 percent "were not likely or certain not to have taken their positions had PSLF not existed."
- 87 percent of those surveyed indicated that PSLF eligibility "would make them much more likely to accept a particular opportunity in the future, and more than half would be very likely or certain to leave their jobs if PSLF did not exist."

Participation in the PSLF program begins, for the borrower, not at the time of the application for loan forgiveness, but ten to fifteen years earlier, when the borrower elects to pursue a career in public interest work, which promises, on average, significantly lower starting salaries and lower income growth over time. Participation in the program continues when the borrower begins to make payments under one of the qualifying income-contingent repayment (ICR) plans.

ICR repayment plans cause interest to capitalize while the borrower is in repayment, resulting in a balance increase over the course of the repayment period. Human Rights First staff selected these repayment plans, to their own financial detriment while in repayment, based directly and often exclusively on the Public Service Loan Forgiveness program criteria, which permit payments made under an ICR plan to count toward the 120 payment total. Repayment under an ICR plan is often the only affordable option available to borrowers engaged in public interest law services in light of the limited salary and compensation packages that qualifying nonprofit employers are able to offer.[29] Human Rights First staff relied upon the Agency's promulgation of the PSLF program and rules that have recognized non-profit organizations that provide legal, Constitutionally mandated services to non-citizens as qualifying employers since the origination of the program. Stripping away qualification for such employers, as this rule proposes to do, punishes Human Rights First staff currently working toward the 120-payment threshold. These staff members acted in good faith in relying on the existing terms of the PSLF as to qualifying

---

[28] NLADA, "Public Service Loan Forgiveness and the Justice System" (https://www.nlada.org/pslf-and-justice).
[29] NALP, "NALP's Public Service Attorney Salary Survey Shows Pay Remains Lowest at Civil Legal Services Organizations," May 2024 (https://www.nalp.org/0524research) ("[T]he median first-year associate salary at a law firm of 100 or fewer lawyers was $155,000 in 2023, more than double that of entry-level lawyers within public service organizations.").

employment and accrued, in some cases, tens of thousands of dollars in capitalized interest costs as a direct result.

## VI.    The Agency Does Not Have the Legal Authority to Issue This Rule

Pursuant to the Administrative Procedures Act, agencies lack the authority to promulgate rules that are not in accordance with law, are contrary to constitutional right, or are in excess of the agency's statutory jurisdiction, authority or limitations.[30] Congress enacted the APA in 1946, "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices."[31]

In 2007, Congress exercised its Constitutional authority in creating the Public Service Loan Forgiveness program by passing the College Cost Reduction and Access Act. The statute states that, "[t]he Secretary shall cancel the balance of interest and principal due, in accordance with paragraph (2) on any eligible Federal Direct Loan not in default for a borrower who has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007 . . . is employed in a public service job at the time of such forgiveness, and has been employed in a public service job during the period in which the borrower makes each of the 120 payments . . ."[32] The statute goes on to explicitly define "public service job" as including "public interest law services (including prosecution or public defense or legal advocacy in low-income communities at a nonprofit organization)."[33]

Nonprofit 501(c)(3) organizations, including Human Rights First, that are partially publicly funded, tax exempt and engaged in legal advocacy on behalf of low-income communities are explicitly included in the statutory definition of qualifying employers. There is no ambiguity in the statute whatsoever, and the Department does not have the authority to make this change. Furthermore, given that there is already a process by which the Internal Revenue Service may remove an entity's 501(c)(3) status if the entity engages in substantial illegal activities, it is clear that Congress, by including no comparative provision in the College Cost Reduction and Access Act, intended the IRS, not the Department of Education, to be charged with the disqualification of employers engaged in illegal activity. The Department therefore does not have the statutory authority to make these changes. This proposed regulation is inconsistent with the statute, and therefore, should be withdrawn.

---

[30] 5 U.S.C. §§ 701-706.
[31] *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).
[32] 20 U.S.C.  § 1087e (1)(A).
[33] 20 U.S.C.  § 1087e (1)(B).

## VII. Conclusion

The proposed rule amending the regulations governing PSLF targets the eligibility of nonprofit organizations that provide critical legal services to immigrants and other vulnerable populations who face harm from immigration enforcement. Targeting immigration legal service providers by limiting PSLF eligibility would have devastating consequences for Human Rights First and the vulnerable communities we serve. Specifically, if implemented, the amended regulations would jeopardize the financial stability of our attorneys and support staff— many of whom relied, and continue to rely, on PSLF when committing to careers in the public interest — and severely limit the availability of qualified legal counsel for asylum seekers and other vulnerable individuals who are entitled to vindicate their rights in the U.S. legal system.

Thank you for considering this input as part of the rulemaking process. We urge the Department to withdraw the rule in its entirety. Public interest attorneys and nonprofit organizations have long relied on the promise of PSLF when choosing public interest careers; undermining access to beneficial programs like PSLF would both destabilize their financial security and erode access to justice.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Docket ID ED-2025-OPE-0016

Please see attached public comment from the City of Albuquerque.

Attachments 1

City of Albuquerque PSLF Final Public Comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10419/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10419

**Tracking Number**

mfo-fdly-9i3d

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



# OFFICE OF THE CITY ATTORNEY

**Lauren Keefe, City Attorney**
**City of Albuquerque**

Timothy M. Keller, Mayor

P.O. Box 2248
Albuquerque, NM 87103
Telephone: (505) 768-4500
Fax: (505) 768-3158

**September 17, 2025**

**Via Federal eRulemaking Portal** (Regulations.gov)
Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

The City of Albuquerque ("Albuquerque" or "the City") strongly opposes the Department of Education's proposed rulemaking that would permit the Secretary to deem an otherwise-qualifying public employer ineligible for the Public Service Loan Forgiveness ("PSLF") program. The proposed rule relies on the amorphous standard of engaging in activities that have a "substantial illegal purpose." The proposal, as written, (1) threatens severe, concrete harm to municipal operations and workforce recruitment/retention; (2) uses vague, overlapping phrases that are impossible to apply predictably; (3) appears to treat common local-government functions and lawful protections as automatic disqualifiers; (4) risks chilling constitutionally protected assembly and speech; and (5) grants the Secretary effectively final, potentially politically driven authority over employer qualification. It also unlawfully limits eligibility as established under the College Cost Reduction and Access Act and could be construed as restricting constitutional protections.

For these reasons the City urges the Department withdraw this proposal, which will cause undue harm to thousands of public employees providing essential services to their communities.

## I. The proposed changes to the rule pose a risk of severe harm to local governments and their employees.

The City of Albuquerque employs more than 5,800 public employees, all of whom are dedicated to serving the people of Albuquerque. As a local government employer, the City has numerous employees who participate (and have participated) in the PSLF program. While the City does not internally track its employees that utilize PSLF, a recent survey conducted indicated that of 829 employee responses, 200 employees currently participate in PSLF (24.2%). Additionally, 337 (40.7%) employees indicated that their ability to participate in the PSLF program has an influence on their decision to continue working for the City. The City of Albuquerque hosts 24 different internal departments, all of which perform an essential function to keep New Mexico's largest city

a safe and enjoyable place to live. This includes police, fire rescue, animal welfare, planning, municipal development, transit, the City's airport, and far more; any loss of this benefit to the City's employees would directly harm the services and resources they provide to its residents.

For the City, PSLF is an essential recruiting and retention tool, particularly for lawyers, engineers, law enforcement, social workers, emergency technicians, and other roles requiring some education or advanced education. In the survey conducted of City employees, approximately 24.2% of responding employees indicated that their ability to join PSLF was a factor in joining the City. Excluding a municipal employer from PSLF puts existing employees' path to forgiveness at risk and will materially impair the City's ability to recruit and retain qualified personnel. This will increase turnover, reduce institutional knowledge, and, ultimately, degrade public services.

If the City were to lose PSLF eligibility, it would likely create an untenable staffing crisis due to employees moving to other eligible employers in Albuquerque, creating immediate staffing shortages and heightening downstream costs such as overtime, temporary staffing, and training. Even if an employer were to try to replace the PSLF benefit with pay increases, it is not a realistic option in tight municipal budgets. The rule therefore imposes real fiscal risk to local governments and residents who depend on those services.

Public service employees dedicate their time and talent to serving their communities, and they should not be penalized for alleged actions of their employer that might render the employer ineligible. The employees of the City of Albuquerque are indispensable to its operations, and they are entitled to the benefits promised in recognition of their public service.

**II. Prohibiting qualified employers from engaging in activities that have a "substantial illegal purpose" is vague and unworkable.**

This proposal empowers the Secretary to disqualify certain local government employers and non-profits from PSLF if they engage in certain conduct that the Department has deemed to have a "substantial illegal purpose." This introduces a level of uncertainty that is mired in discretionary interpretation, left to a politicized Department that is not qualified to make the legal determinations required under this rule.

The proposed rule provides broad categories, including "engaging in a pattern of aiding or abetting illegal discrimination," "violating state law," and "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws," but does not create a clear, administrable standard for when routine or contested activities become a "substantial illegal purpose." The central terms of "substantial," "purpose," and "pattern of aiding and abetting," lack limiting definitions that would allow municipalities to assess risk or cure conduct proactively. Administrative rules that leave regulated parties guessing about compliance are vulnerable to arbitrary enforcement and constitutional vagueness challenges. The proposed standard also elevates the Secretary to a largely discretionary fact-finder on complex issues of law and fact.

The rule's reliance on pronouncements like "preponderance of the evidence" for Secretary determinations compounds the problem: the Department would effectively be making quasi-judicial findings against employers without the procedural safeguards of courts or impartial

administrative adjudication. That combination of vague standards plus low evidentiary threshold creates a high risk of erroneous or politically motivated disqualification.

**a. The proposed rule essentially characterizes any findings against an employer of "illegal discrimination" as an automatic disqualifier, creating a chilling effect for governments and employees alike.**

The included definition of "illegal discrimination" expressly includes violations of federal civil-rights laws such as the Civil Rights Act of 1964, Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act of 1967, further noting this is a non-exhaustive list. The Department's text suggests that a finding of such a violation could be treated as evidence of a "substantial illegal purpose." But municipalities operate under complex statutory schemes and frequently litigate ADA and other civil-rights claims, often with mixed outcomes, settlements, or remediations. Treating any governmental finding or even alleged violation as an automatic or dispositive basis for PSLF disqualification would convert ordinary litigation risk into a severe deterrent to internal City risk-analysis and an employee's decision to even bring such a claim. Further, this Administration has indicated that promotion of DEI or racial justice is akin to illegal discrimination, which may be invoked to invalidate an employer under this proposal.[1]

**b. The inclusion of violations of "other federal immigration laws" as having "substantial illegal purpose" is another avenue for the Administration to seek to punish those governments that it has deemed to be "sanctuary jurisdictions," which is far beyond what is appropriate under this rule.**

The proposed rule lists violations of "other federal immigration laws" as a potential basis for deeming an employer to have a "substantial illegal purpose." This language is dangerously vague and there is a risk that this has been designed to target municipalities that have been labeled "sanctuary jurisdictions" by the federal government. Courts have consistently held that states and local governments retain broad discretion to set their own law-enforcement priorities and resource allocations, including limits on voluntary cooperation with federal immigration enforcement. Federal courts have also blocked prior attempts to condition federal funding on compliance with immigration-enforcement demands.

If the Department treats local immigrant-friendly policies as a basis for PSLF disqualification, the result is to penalize lawful local policy decisions that reflect community needs, public-safety considerations, and constitutional limits. This would chill municipal autonomy by coercing local governments to abandon duly enacted ordinances or policies in order to protect their employees' PSLF eligibility. In addition, the broad "immigration laws" language fails to differentiate between serious violations (e.g., harboring or trafficking) and ongoing contested federal-state preemption disputes. It leaves municipalities with no clear notice of what local practices would trigger disqualification, raising the same vagueness, due-process, and arbitrary-enforcement concerns described above.

[1] https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/

**c. "Violence for the purpose of obstructing or influencing Federal Government Policy" risks unlawful viewpoint-driven enforcement.**

The addition of language addressing "violence for the purpose of obstructing or influencing federal government policy" is phrased broadly and could be interpreted to encompass heated political rhetoric, nonviolent civil disobedience, or other protected expression if the Department equates certain protest activity with "violence" based on a contested or politically inflected standard. Recent public statements at the federal level illustrate how contested and politically charged the line between 'violent rhetoric' and protected protest activity and speech can be.[2] Relying on the Secretary's unilateral determination invites viewpoint-driven enforcement that penalizes municipalities whose policies or local political preferences diverge from the Department's political leadership, especially given the origins of this proposed rule change in the President's Executive Order.

**III. The proposed rule eliminates any reasonable determinative process that an employer be disqualified and imposes a disproportionate ban on re-application.**

The standard for determining when a qualifying employer has engaged in activities that have a "substantial illegal purpose" as outlined in the proposal is vague, limited, and discretionary, providing no real means for challenge or response. The Department Secretary may unilaterally determine, after notice and an opportunity to respond, whether or not she feels that there is a preponderance of the evidence that the employer has engaged in activities that have a substantial illegal purpose. The proposal purports that the Secretary would evaluate the "materiality" of the activities or actions by considering the "frequency or severity," but gives no actual quantifiable standard by which the Secretary must evaluate this criterion. As stated, the definitions of substantial illegal purpose are vague and broad, allowing for wide discretion that is not based in fact or merit.

The proposal provides that any employer that loses PSLF eligibility could regain its status after 10 years or after the Secretary approves a corrective action plan. While an employer could bring a federal court challenge to the Secretary's decision that its alleged conduct constituted a "substantial illegal purpose," the initial determination rests solely with the Secretary. The determination would be in effect unless stayed or set aside by a court. Further, any "corrective action plan" would likely push the employer to align with the policies and procedures being driven by the Department. The absence of a neutral, independent procedure to evaluate whether an employer has run afoul of the "substantial illegal purpose" standards, such as an administrative law judge or a multi-step administrative review, compounds the risk of politically motivated finality and denies municipalities a fair chance to contest erroneous findings.

This structure also creates long-term collateral damage: affected borrowers lose credit for qualifying payments they reasonably relied upon, employers suffer reputational harm and recruitment disadvantage, and municipalities face protracted uncertainty even if later exonerated. A 10-year block on regaining eligibility is an especially harsh remedy for conduct that may be disputed.

[2] https://www.nytimes.com/2025/09/15/us/politics/jd-vance-charlie-kirk-show.html; https://abcnews.go.com/Politics/republicans-blame-radical-left-kirk-shooting-democrats-reject/story?id=125562180

## IV. The proposed rule is unlawful and risks violations of constitutional rights.

In 2007, Congress established the College Cost Reduction and Access Act, which established loan forgiveness for public service employees. *See* College Cost Reduction and Access Act, Pub. L. No. 110-84, 121 Stat. 784 (2007). It states, "The Secretary **shall** cancel the balance of interest and principal due…on any eligible Federal Direct Loan not in default for a borrower who… **is employed in a public service job** at the time of such forgiveness; and has been employed in a public service job during the period in which the borrower makes each of the 120 payments…" 20 U.S.C. 1087e(m)(1)(B)(i)-(ii) (emphasis added). It further defines a "public service job" as

[A] full-time job in emergency management, **government**, military service, public safety, law enforcement, public health, public education (including early childhood education), social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy in low-income communities at a nonprofit organization), public child care, public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)93) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code.

*Id*. at (m)(3)(B)(i). The Act does not contain any exceptions to deem any government or non-profit ineligible for PSLF. Instead, it makes abundantly clear that its intent was to ensure all employees of the listed "public service jobs" were eligible for this program and instructs the Secretary's actions. The Department does not have the authority to make changes to this designation; it is overstepping its statutory authority and is a clear overreach by the executive branch into a program legislated by Congress, raising significant separation of powers concerns.

The proposed rule raises serious concerns that it violates due process rights for employers by allowing the Secretary to determine, based on a "preponderance of the evidence," that an employer is engaged in activities that have "substantial illegal purpose." There is no judicial oversight to this process; instead, the executive branch sidesteps the courts to unilaterally determine the loss of significant benefits for public servants. Additionally, the Secretary is empowered to make a legal determination of illegality and essentially engaging in a quasi-judicial process without a legal finding.

As addressed above, conditioning PSLF eligibility on whether a jurisdiction adopts or repeals certain policies that are prioritized by an administration impermissibly penalizes public employers (and by extension their employees) for engaging in political speech or adopting positions contrary to those of the federal government. Such conditioning has a chilling effect on both government policymaking and employee association with those governments, raising substantial First Amendment concerns. The broad interpretations of "illegal" activities gives the Department a wide berth to punish those it deems are not in line with its political priorities.

Finally, the proposed rule disrupts the balance between state and federal authority. PSLF is not an immigration, labor, or regulatory enforcement program; it is a higher education loan forgiveness program to encourage public service. Using PSLF as an indirect enforcement tool and a weapon

against political dissent risks expanding federal power into the core operations of state and local governments without clear congressional authorization.

**V.    Conclusion**.

Our public service employees deserve a student loan repayment program that is fair, affordable, and accessible. Congress designed PSLF to encourage public service by making loan forgiveness reliably available to employees of qualifying government and nonprofit employers. The proposed rule departs from that statutory purpose by delegating to the Secretary broad, subjective, and politically sensitive authority to disqualify employers. This approach not only raises serious administrative-law and constitutional concerns, but also threatens to destabilize municipal budgets, diminish public services, undermine public safety, and erode the vitality of local communities.

For the City of Albuquerque and local governments across the nation the stakes could not be higher. We urge the Department to withdraw this proposed rule and instead uphold Congress's intent to support and strengthen the public service workforce on which our communities depend.

Sincerely,

DEVON KING
Deputy City Attorney
City of Albuquerque

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

September 2025 PSLF Comments Mayotte

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10421/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10421

**Tracking Number**

mfo-rm1o-vp3g

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

*The Institute of Student Loan Advisors*

September 17, 2025 Via Email: www.regulations.gov

Ms. Tamy Abernathy
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

Re: Docket ID ED–2025–OPE–0016 – Response to the Public Service Loan Forgiveness Notice of Proposed Rulemaking

Dear Ms. Abernathy

Thank you for this opportunity to provide comments on the draft regulations concerning the forgiveness of federal student loans for public service employees.

As a negotiator on this committee, I was given the privilege and responsibility of representing consumer advocacy, legal aid and civil rights organizations. As someone who has a career of over 25 years in student loan compliance, advocacy and service, I have been a real time witness to the creation, implementation and evolution of the Public Service Loan Forgiveness program (PSLF) including the intent and effects of this program. My comments stem from all these experiences.

## The Secretary does not have the authority to promulgate these regulations

Article VI of the U.S. Constitution establishes that federal law is the "supreme law of the land" and while Congress has given agencies such as the Education Department (ED) authority to create regulations to implement these laws, they have not been given the authority to create regulations that contradict these laws. In fact, the courts determined as part of the Chevron decision that agencies have no particular authority in interpreting areas of federal law that are unclear. While the ED initiated this negotiated rulemaking session on the behest of an executive order issued by the President, Article 1 of the Constitution gives legislative authority only to Congress, meaning that the ED does not have the authority to implement an executive order that is contrary to federal law.

Section 455(m)(3)(B)(1) of the Higher Education Act of 1965 as amended defines eligible employment for the purpose of PSLF as follows (emphasis added):

*"(B) PUBLIC SERVICE JOB.—The term ''public service job'' means—*
*(i) a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals*

*engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, <u>or at an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code</u>;"*

The language above gives no other parameters for a government or 501(c)(3) non-profit employer to be considered eligible for PSLF purposes other than that be a government or 501(c)(3) entity. If Congress had intended to exclude certain activities or cohorts from these groups of eligible employers they would have added such parameters or given leeway for the ED to add such parameters, in the legislative language. In fact, they did so in the case of members of Congress, who are employees of a government organization. Therefore, excluding government or eligible non-profit organizations from PSLF eligibility due to the activities listed in this proposal would be in violation of the federal law that defines a PSLF eligible employer and the Secretary has no authority to take this action. This makes the entire proposed rule illegal and consequently it must be withdrawn.

## The proposal is arbitrary and beyond the scope of the Secretary's role.

Per the ED's website, the role of the Secretary is as follows:

"The Secretary is responsible for the overall direction, supervision, and coordination of all activities of the Department and is the principal adviser to the President on federal policies, programs, and activities related to education in the U.S."

What is not listed here is any role in areas of making a determination of whether an activity is illegal. The ED does not have a judiciary role or powers and proposing regulations that appear to give the Secretary such a role is troublesome at best, especially in areas outside of education policy. There is already a process and authorities in place, such as the courts in the case of determining whether an activity is illegal and the established IRS rules for determining 501(c)(3) eligibility, to ensure that such activities to not benefit from these programs and in a way that ensures proper due process. There is no need or value to taxpayers to create a duplicative process under an umbrella where the role and authority for such a process does not exist.

What's more, the proposed regulations arbitrarily choose what areas of "illegal activities" that will be judged by the Secretary. If the argument is that they are trying to prevent the spending of taxpayer dollars on a program that indirectly benefits employers that engage in illegal activities, why limit the list of such activities? Of course an entity that is engaged in illegal terrorism or trafficking should not benefit from such benefits. But shouldn't the same be said for entities that engage in activities that cause injury or death, or that commit fraud, or embezzle funds, or engage in sexual abuse? Under this premise, the U.S. Immigration and Customs Enforcement (ICE) should have their PSLF eligibility removed due to the illegal negligence that have caused the deaths of several dozen prisoners in the past years. The targeted areas of "illegal activities" appear to be purely arbitrary and an attempt to weaponize a particular political agenda. The fact that the ED issued a press release during the negotiations that accused Harvard University of violently violating discrimination laws appears to bolster this theory. Creating such a rule

with such an arbitrary list of “illegal activities” is not only in conflict of good public policy but is a precedent that could be changed by future administrations in a way that might be troublesome to the existing administration.

I strongly recommend that the Secretary remove the provision that would allow the ED to make the determination that substantial illegal activities occurred without one of the clauses i-iii under subsection (h)(1) of 685.219.

Thank you again for giving me the opportunity to comment.

Betsy Mayotte

President

The Institute of Student Loan Advisors

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

2025-09-17 PUBLIC COMMENT RE PSLF RULE (final version)

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10429/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10429

Tracking Number

mfo-hqmm-zjwl

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Docket ID (ED-2025-OPE-0016)


New Mexico Commission on Access to Justice

Public Comment on Proposed Rule to amend the Public Service Loan Forgiveness program under 34 CFR 685.219

"Equal justice under the law," as written on the façade of the Supreme Court of the United States, should not be an empty promise. It is not merely a decorative caption; it is a foundational American value.

The New Mexico Commission on Access to Justice ("Commission"), created by the New Mexico Supreme Court, was established to promote no-cost and low-cost civil legal assistance to make the courts more accessible and justice more attainable, regardless of one's economic status. Ensuring that our courts are accessible to everyone, regardless of economic status, is vital to the ongoing pursuit of justice. In this pursuit, the Commission supports non-profit, civil legal service providers who greatly benefit from the Public Service Loan Forgiveness (PSLF) program.

We therefore submit this public comment regarding the proposed amendments to Section 685.219 of Title 34 of the Code of Federal Regulations.

The PSLF program is one of the most important recruitment tools available for attracting talented employees to non-profit organizations like civil legal service providers. These organizations often face challenges in recruiting and retaining qualified staff. They are frequently compelled to offer lower salaries for various reasons. The low pay ranges are a result of inconsistent and unreliable funding that forces many civil legal service providers to operate with limited staff or with a slightly higher, but sorely underpaid staff.  The lack of competitive salary ranges makes it harder to attract and keep qualified professionals. Since salaries are considerably lower than those in the private sector, student loan forgiveness offers a crucial incentive for individuals to work for these organizations. As noted in the proposed rule, there is "significant research" showing that the PSLF program is a "significant factor in [the] decision to pursue and remain in public service."

Despite reassurances from the Department that "nothing in the standard would be construed to authorize the Secretary to determine an employer engaged in activities that have a substantial illegal purpose based on the employer or the employees exercising their protected First Amendment rights, or any other rights protected under the Constitution," the Secretary's discretionary power to deem an employer ineligible is highly consequential for non-profit entities and their employees. For example, subsection (h)(1) states, "The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions." Although presumptive conclusive evidence is described in subsections (h)(1)(i)-(iii), subsection (h) does not require that the Secretary's determination be based solely on the descriptions of conclusive evidence contained in subsections (h)(1)(i)-(iii). Moreover, subsection (i)(1)(i)-(ii) provides the process for

determining when an employer engaged in activities that have a substantial illegal purpose, but subsection (i) does not require that the Secretary must find a substantial illegal purpose only when the standards in (i)(1)(i) or (i)(1)(ii) have been met. Therefore, the Commission proposes that its concern would be addressed if the word "only" were added to subsection (i)(1) as follows: "The Secretary will determine that a qualifying employer violated the standard under subsection (h) of this section [only] when the Secretary...".

In support of our New Mexico civil legal service providers, we assert that providing legal advice and representing an individual in litigation could never be considered engaging in a "substantial illegal purpose" without violating the employer's or its employees' First Amendment or other protected rights under the United States Constitution. We suggest that the proposed rule could be clarified with the recommendation provided above.

Civil legal service providers play an essential role in creating a more fair and just society by offering legal representation to people whose voices and positions might otherwise go unheard, and whose rights might not otherwise be protected. Employees at civil legal service providers work tirelessly to help the poor with legal issues in important areas such as family law, housing, consumer affairs, employment, health, community issues, wills, and public benefits. These organizations deserve support, and their employees should be incentivized to help them fulfill the promise of equal justice under the law.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

My name is Demetria Carter, and I am a Financial Aid Administrator in Greensboro, NC. I am writing to express my opposition to the Department of Education's proposed changes to the Public Service Loan Forgiveness (PSLF) program, including points that would exclude certain nonprofit employers based on having a "substantial illegal purpose." I urge the Department to withdraw this proposal and instead focus on removing existing barriers that continue to prevent millions of public servants from receiving PSLF.
Congress already established eligibility for employees of 501(c)(3) nonprofit organizations and created parameters that limit other organizations from being qualified employers for PSLF. The Department does not have the authority to add vague or arbitrary exclusions that contradict the law. This proposal risks unfair, politically motivated decisions and creates uncertainty for the many North Carolinians who pursue public service careers with PSLF in mind.
Full-time in-state undergraduate tuition averaged $6,560 for a North Carolinian this year. Many public service roles require advanced degree. With minimum wage remaining $7.50, millions of students rely on loans to cover the cost of completing their education. Their hard work is met with modest salaries: the first-year pay for an NC teacher with an Advanced degree is $42,900. Yet students continue to pursue careers in public service, trusting that PSLF will allow them the means to repay federal loans. To arbitrarily change the rules for PSLF is a betrayal by the federal government to these citizens. PSLF is a crucial promise that makes public service career paths sustainable.
The proposed changes to the PSLF program have the whiff of respectability but in truth they stink. Under the current administration, nonprofit organizations serving vulnerable groups are more likely to face political scrutiny and be deemed to have "substantial illegal purposes." The administration has shown this in the past 8 months by withholding funds from universities and states that hurt his feelings, introducing policies that echo Jim Crow era laws and pushing measures aimed at removing basic human rights for women. By tying PSLF eligibility to the vague determinations of "illegal purpose" based on a narcissistic president's whim, the Department risks harming communities most in need of support and discouraging talented professionals from entering nonprofit work.
I have spent 14 years helping students afford and access higher education, and I have seen firsthand the sacrifices they make to serve others after graduation. The proposed changes to PSLF are unnecessary and

Give Feedback

10/14/25, 12:58 PM Regulations.gov

a waste of resources. If the Department is truly concerned about abuse or misuse of the program, there are less harmful ways to go about the process. I urge the Department to withdraw this rule and work to address the real issues already within the PSLF program.

**Comment ID**

ED-2025-OPE-0016-10430

**Tracking Number**

mfo-hrob-egc9

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Give Feedback

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

https://www.regulations.gov/comment/ED-2025-OPE-0016-10430 2/2

ED_00525

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The Federation of Protestant Welfare Agencies (FPWA) submits these comments in opposition of the Office of Postsecondary Education, Department of Education proposed rulemaking that amends the regulations to the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a substantial illegal purpose as determined by the Secretary.

FPWA is a leading anti-poverty, social policy and advocacy organization dedicated to strengthening faith institutions and human services organizations and advancing economic opportunity and justice for New Yorkers with low incomes. For more than 100 years, FPWA has driven groundbreaking policy reforms to better serve those in need and strengthened the capacity of human services agencies and faith institutions to serve the community. Our nearly 170 faith-based and human services agency members provide vital services to their communities ranging from childcare and early education to services for older adults and food pantries. Many roles within these organizations require a college degree. We appreciate the opportunity to comment on the proposed regulations.

The PSLF program supports the ability of individuals from low- and middle-income families to pursue careers in public service. The engagement of a talented and educated workforce benefits not only the organizations in which they work and communities they serve, it strengthens our economy and country as a whole. The proposed rule change could jeopardize the ability of individuals with student debt to provide this much-needed service to America.

Despite the necessary role faith-based and nonprofit organizations play in serving our communities, the organizations operate with tight budgets that constrain the wages they can provide. In a recent budget analysis, FPWA found that the median annual wages and benefits provided by our member organizations are 20 to 35 percent below comparable positions in the government and private sector. In 2019, two-thirds of full time human services workers earned below New York City's near poverty measure.

Given the need for higher education and the low wages of the sector, employees in social services have a

Give Feedback

high likelihood of carrying student debt, impacting their ability to provide for their families today and save for the future. The PSLF program opens the opportunity for individuals from low- and middle-income families to provide a much-needed service to the country by working with faith and nonprofit organizations. It has expanded the pool of available workers to include those from low- and middle-income backgrounds who may bring lived experience to the role, further enhancing the organizations in which they work, and students and workers have made life decisions based on the availability of the program. Enacting the proposed rule may discourage individuals with student debt from entering public service, harming our faith-based and social service organization members and, ultimately, harming the communities we serve and our country.

In addition to the chilling effect this may have on future workers, any changes to the rule may negatively impact current workers at faith-based and social service organizations. A recent report by the Urban Institute, commissioned by FPWA and Community Service Society of New York, found that 52 percent of American families are living below the True Cost of Economic Security. While college graduates with student loans have higher household incomes than non-college graduates, young graduates with loans report finding it difficult to get by. In a context where we have a cost-of-living crisis, the government should not be reducing eligibility to programs that can help alleviate economic insecurity.

Because the PSLF program creates opportunity for economic mobility for individuals from low- and middle-income backgrounds and supports our faith-based and social service organizations in doing vital work in our communities and for our country, we oppose the proposed rule change that may reduce the ability of low- and middle-income individuals from engaging in public service. We advise the Department of Education to withdraw the proposed rule.

Attachments 1

FPWA Comment on William D. Ford Federal Direct Loan (Direct Loan) Program

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10439/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10439

**Tracking Number**

mfo-ia2j-gquz

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

Give Feedback

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Linda E. McMahon,
Secretary of Education
United States Department of Education
400 Maryland Ave. SW,
Washington, DC 20202

**Comment on Notice of Proposed Rule Making on Changes to the William D. Ford Federal Direct Loan (Direct Loan) Program [Docket ID ED-2025-OPE-0016]**

Dear Secretary McMahon,

The Federation of Protestant Welfare Agencies (FPWA) submits these comments in opposition of the Office of Postsecondary Education, Department of Education proposed rulemaking that amends the regulations to the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a substantial illegal purpose as determined by the Secretary.

FPWA is a leading anti-poverty, social policy and advocacy organization dedicated to strengthening faith institutions and human services organizations and advancing economic opportunity and justice for New Yorkers with low incomes. For more than 100 years, FPWA has driven groundbreaking policy reforms to better serve those in need and strengthened the capacity of human services agencies and faith institutions to serve the community. Our nearly 170 faith-based and human services agency members provide vital services to their communities ranging from childcare and early education to services for older adults and food pantries. Many roles within these organizations require a college degree. We appreciate the opportunity to comment on the proposed regulations.

The PSLF program supports the ability of individuals from low- and middle-income families to pursue careers in public service. The engagement of a talented and educated workforce benefits not only the organizations in which they work and communities they serve, it strengthens our economy and country as a whole. The proposed rule change could jeopardize the ability of individuals with student debt to provide this much-needed service to America.

Despite the necessary role faith-based and nonprofit organizations play in serving our communities, the organizations operate with tight budgets that constrain the wages they can provide. In a recent budget analysis, FPWA found that the median annual wages and benefits provided by our member organizations are

20 to 35 percent below comparable positions in the government and private sector. In 2019, two-thirds of full time human services workers earned below New York City's near poverty measure.[1]

Given the need for higher education and the low wages of the sector, employees in social services have a high likelihood of carrying student debt, impacting their ability to provide for their families today and save for the future. The PSLF program opens the opportunity for individuals from low- and middle-income families to provide a much-needed service to the country by working with faith and nonprofit organizations. It has expanded the pool of available workers to include those from low- and middle-income backgrounds who may bring lived experience to the role, further enhancing the organizations in which they work, and students and workers have made life decisions based on the availability of the program. Enacting the proposed rule may discourage individuals with student debt from entering public service, harming our faith-based and social service organization members and, ultimately, harming the communities we serve and our country.

In addition to the chilling effect this may have on future workers, any changes to the rule may negatively impact current workers at faith-based and social service organizations. A recent report by the Urban Institute, commissioned by FPWA and Community Service Society of New York, found that 52 percent of American families are living below the True Cost of Economic Security.[2] While college graduates with student loans have higher household incomes than non-college graduates, young graduates with loans report finding it difficult to get by.[3] In a context where we have a cost-of-living crisis, the government should not be reducing eligibility to programs that can help alleviate economic insecurity.

Because the PSLF program creates opportunity for economic mobility for individuals from low- and middle-income backgrounds and supports our faith-based and social service organizations in doing vital work in our communities and for our country, we oppose the proposed rule change that may reduce the ability of low- and middle-income individuals from engaging in public service. We advise the Department of Education to withdraw the proposed rule.

Sincerely,
Madeline Neighly
Chief of Policy and Research

---

[1] Federation of Protestant Welfare Agencies. (2024). *FY 2025 NY budget analysis*. https://www.fpwa.org/fy25nycbudgetanalysis/#:~:text=Impact%20on%20contracted%20workforce,near%2Dpoverty%20threshold%20in%202019

[2] Acs, G., Dehry, I., Giannarelli, L., & Todd, M. (2024, November). *Measuring the true cost of economic security: What does it take to thrive, not just survive, in the US today?* Urban Institute. https://www.urban.org/sites/default/files/2024-11/Measuring-the-True-Cost-of-Economic-Security.pdf

[3] Fry, R., & Cilluffo, A. (2024, September 18). *5 facts about student loans.* Pew Research Center. https://www.pewresearch.org/short-reads/2024/09/18/facts-about-student-loans/

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached.

Attachments 1

NDI PSLF letter Sep.2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10454/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10454

**Tracking Number**

mfo-j25e-w85w

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



1701 K Street NW, Suite 1000
Washington, DC 20006
202.296.2040 (P) 202.296.2047 (F)
**NationalDisabilityInstitute.org**

ATTN: Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

**Re: Docket ID ED-2025-OPE-0016, RIN 1801-AA28**

National Disability Institute (NDI) is the first and only disability rights organization committed to building a better financial future for people with disabilities and their families by achieving financial security and independence. We support fair student loan practices and forgiveness programs as a means of increasing financial capability and achieving financial empowerment. NDI writes in opposition to the Department's proposed rule amending the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

Disabled people represent at least 20 percent of the U.S. population or more than 65 million people, although the real number is likely higher than current surveys indicate, especially accounting for people who have newly acquired disabilities due to long COVID.[1] Our community faces deep economic disparities that impact access to health care, with poverty[2] and unemployment[3] rates for people with disabilities about twice those of nondisabled people

[1] *See* Bonnielin K. Swenor, "A Need For Disability Data Justice," Health Affairs, Aug. 22, 2022, https://www.healthaffairs.org/content/forefront/need-disability-data-justice?ref=disabilitydebrief.org; Centers for Disease Control & Prevention, Disability and Health Data System, "Disability Impacts All of Us," Jul. 2024, https://www.cdc.gov/ncbddd/disabilityandhealth/infographic-disability-impacts-all.html (estimating close to 28%). *But see U*.S. Census Bureau, 2022 American Community Survey (ACS) Content Test report for Disability, Nov. 13, 2023, https://www.census.gov/content/dam/Census/library/working-papers/2023/acs/2023_Steinweg_01.pdf (noting current Census estimates at only 13.9% of the population and estimating drop to 8.1% if the Census altered its measurement of disability).

[2] Office of Disability Employment Policy, Spotlight on Women with Disabilities, U.S. Department of Labor, Mar. 2021, https://www.dol.gov/sites/dolgov/files/ODEP/pdf/Spotlight-on-Women-with-Disabilities-March-2021.pdf, based on 2019 data by gender, disability status, and using the official poverty measure for means-tested program eligibility and 2020 data from the Current Population Survey. 2020 Annual Social and Economic Supplement, U.S. Census Bureau, https://www.dol.gov/sites/dolgov/files/ODEP/pdf/Spotlight-on-Women-with-Disabilities-March-2021.pdf (as analyzed by NDI with Asset Funders Network)

[3] Bureau of Labor Statistics, U.S. Department of Labor, Persons with a Disability: Labor Force Characteristics–2022, Press Release, Feb. 23, 2023, https://www.bls.gov/news.release/pdf/disabl.pdf.



1701 K Street NW, Suite 1000
Washington, DC 20006
202.296.2040 (P) 202.296.2047 (F)
**NationalDisabilityInstitute.org**

along with higher rates of homelessness[4] and food insecurity.[5] Economic disparities in earnings, savings, banking, and wealth building are exacerbated for the many people with disabilities who are impacted by student loan debt, particularly those who currently work for a qualified employer. Disabled student loan borrowers are more likely to miss payments or leave the educational program for which the loan was taken out without graduating, and significantly more likely to default on their loans.[6] Additionally, at least 15% of all nonprofit employees and at least 10% of those in nonprofit leadership positions (e.g. employed as an executive director or chief executive officer) have a disability, and there are likely even greater numbers of workers with disabilities employed by nonprofits than captured in available data.[7]

NDI has concerns that the proposed rule will disproportionately harm disabled student loan borrowers in several crucial ways:

(a) The proposed rule will increase indebtedness and debt burden for impacted public service workers, many of whom are people with disabilities. Those who are working are by definition not eligible for total and permanent discharge due to disability, which means that impacted workers with disabilities will be penalized for choosing employment. As a result, the proposed rule will disproportionately burden disabled workers, who will experience diminished financial capability and prospects for future economic security, merely based on the work opportunity that presented for a member of an underemployed population.

---

[4] Jaboa Lake, Valerie Novack, & Mia Ives-Rublee, "Recognizing and Addressing Housing Insecurity for Disabled Renters," Center for American Progress, May 27, 2021, https://www.americanprogress.org/article/recognizing-addressing-housing-insecurity-disabled-renters; Pooja Paode (2020), "Housing for Adults with Autism And/or Intellectual and Developmental Disabilities: Shortcomings of Federal Programs," Daniel Jordan Fiddle Foundation Center for Public Policy. https://www.researchgate.net/profile/Pooja-Paode/publication/346041472_Housing_for_Adults_with_Autism_andor_Intellectual_and_Developmental_Disabilities_Shortcomings_of_Federal_Programs/links/5fb8202c92851c933f47f1eb/Housing-for-Adults-with-Autism-and-or-Intellectual-and-Developmental-Disabilities-Shortcomings-of-Federal-Programs.pdf.

[5] Coleman-Jensen, A. & Nord, N. (2013). Disability is an Important Risk Factor for Food Insecurity, United States Department of Agriculture, Economic Research Service. http://www.ers.usda.gov/amber-waves/2013-may/disability-is-an-important-risk-factor-for-food-insecurity.aspx#.Vt3GrPkrKUk.

[6] Nanette Goodman, Bonnie O'Day, & Michael Morris, (2017), Financial Capability of Adults with Disabilities: Findings from the National Financial Capability Study, National Disability Institute, https://www.nationaldisabilityinstitute.org/wp-content/uploads/2019/01/ndi-finra-report-2017.pdf; Lexi West, Ama Takyi-Laryea, and Ilan Levine, "Student Loan Borrowers With Certain Demographic Characteristics More Likely to Experience Default," Pew, Jan. 24, 2023, https://www.pew.org/en/research-and-analysis/articles/2023/01/24/student-loan-borrowers-with-certain-demographic-characteristics-more-likely-to-experience-default.

[7] Cathleen Clerkin, Mantin Diomande, Anna Koob, & Guy Mika, (2024), The State of Diversity in the U.S. Nonprofit Sector, Candid, https://www.issuelab.org/resources/43685/43685.pdf.



1701 K Street NW, Suite 1000
Washington, DC 20006
202.296.2040 (P) 202.296.2047 (F)
**NationalDisabilityInstitute.org**

(b) The proposed rule will disincentivize people with disabilities from working for issue-focused or values-aligned employers. The Department's definitions of "supporting terrorism" and "engaging in a pattern of aiding and abetting illegal discrimination" are sufficiently broad that they will capture activities that are not only legally permissible but constitutionally protected. For instance, nonprofit employers that express political opinions contrary to those of the current or any future administration may be described as "supporting terrorism" or "aiding and abetting illegal discrimination," as may any employer that has ever undertaken any work related to equity and inclusion.

Similarly, the proposed rule's explicit enumeration of entities serving immigrant and transgender communities will also chill free expression of the many nonprofit organizations that provide services to people in those groups. Furthermore, this enumeration could lead to further curtailment of any nonprofit organization's ability to serve or advocate for any other group that a future administration views unfavorably. There are also higher percentages of people with disabilities in both the immigrant and transgender populations, who want to work and build a financial future.

Taken altogether, this means that people who have the opportunity to work will be disincentivized from doing so, even if that employer would have otherwise qualified as a public service employer. Ultimately, narrowing the range of employment options for workers with disabilities will decrease disability employment numbers, suppress economic output, and prevent individual workers from working and earning income.

(c) The proposed rule will also punish all employees of targeted employers with both higher amounts of debt and longer periods of indebtedness, regardless of the nature or seniority of their role. Where actual unlawful activities are occurring, existing federal, state, and local laws permit the investigation and prosecution of individual and organizational unlawful activity; such investigation can already lead to the closure of a nonprofit organization found responsible for engaging in illegal activities as well as a revocation of tax-exempt status altogether.

For these reasons, NDI urges the Department to withdraw the proposed rule and preserve the Public Service Loan Forgiveness program as a nonpartisan program for student loan borrowers that incentivizes working and being employed by any qualifying employer, regardless of the qualifying employer's specific values or issue area focuses.



1701 K Street NW, Suite 1000
Washington, DC 20006
202.296.2040 (P) 202.296.2047 (F)
**NationalDisabilityInstitute.org**

If the Department has any further questions, NDI would be glad to provide additional information.

Sincerely,

Thomas Foley, J.D.
Executive Director

Ly Xīnzhèn M. Zhǎngsūn Brown, J.D.
Director of Public Policy

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

EPPC Scholars Comment on ED Student Loan Forgiveness Program

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10455/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10455

**Tracking Number**

mfo-rey1-k9zp

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



ETHICS
AND
PUBLIC
POLICY
CENTER

September 17, 2025

***Via Federal eRulemaking Portal***

Linda McMahon
Secretary
Department of Education
Office of Postsecondary Education
400 Maryland Ave. SW,
Washington, DC 20202

**Re: EPPC Scholars Comment on Department of Education Proposed Rule "William D. Ford Federal Direct Loan (Direct Loan) Program," Docket ID ED-2025-OPE-0016l, RIN 1801-AA28**

Dear Secretary McMahon:

We write in response to the Department of Education (ED) proposed rule "William D. Ford Federal Direct Loan (Direct Loan) Program,'[1] which would modify regulations related to student loan forgiveness under the federal Public Service Loan Forgiveness (PSLF) program.

Rachel Morrison is a Fellow at the Ethics and Public Policy Center (EPPC), director of EPPC's Administrative State Accountability Project, and a former attorney at the Equal Employment Opportunity Commission. Mary Rice Hasson is the Kate O'Beirne Senior Fellow at EPPC, an attorney, and co-founder of EPPC's Person and Identity Project, an initiative that equips parents and faith-based institutions to counter gender ideology and promote the truth of the human person.

We appreciate the Trump Administration's desire to protect children, recognize biology, and end government funding and support for sex-rejecting procedures.[2] We write to raise a few points for your consideration when finalizing this rule.

## A. Proposal

The PSLF program offers student loan forgiveness to borrowers who make qualifying payments on their federal student debt while working in eligible public service employment for at least ten years.[3]

---

[1] 90 Fed. Reg. 40154 (Aug. 18, 2025), https://www.federalregister.gov/d/2025-15665.

[2] For instance, the Trump Administration has taken bold actions to fight gender ideology. See, e.g., Exec. Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025), https://www.federalregister.gov/d/2025-02090; Exec. Order 14187, Protecting Children From Chemical and Surgical Mutilation, 90 Fed. Reg. 8771 (Jan. 28, 2025), https://www.federalregister.gov/d/2025-02194; Press Release, DOJ, The Department of Justice Proposes Legislation to Protect Children from Gender Mutilation, https://www.justice.gov/opa/pr/department-justice-proposes-legislationprotect-children-gender-mutilation (proposing "Victims of Chemical or Surgical Mutilation Act").

[3] 90 Fed. Reg. at 40155.

The Education Secretary is proposing to "exclude any organization that engages in activities that have a substantial illegal purpose from being a qualifying employer for the purposes of the PSLF program."[4] The rule would (among other proposals) clarify the definition of a qualifying employer and define activities that have a substantial illegal purpose.[5]

President Trump directed the Education Secretary to propose regulations that would ensure the definition of "public service" for the PSLF Program excludes organizations that engage in "activities that have a substantial illegal purpose," including "(c) child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law," and "(d) engaging in a pattern of aiding and abetting illegal discrimination"[6] In response, the Secretary of Education issued this proposed rule.

ED explains, "By excluding employers that engage in activities with a substantial illegal purpose, the rule aims to better align PSLF eligibility with the program's statutory intent—to reward public service. Furthermore, it ensures that the Department is not indirectly subsidizing employers who are engaging in activities that have a substantial illegal purpose."[7]

Proposed § 685.219(b)(30) would define "substantial illegal purpose" as engaging in certain actions, including in "the chemical and surgical castration or mutilation of children in violation of Federal or State law," "trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law," and "engaging in a pattern of aiding and abetting illegal discrimination."[8]

### B. Chemical and Surgical Castration or Mutilation

#### 1. Definition

The rule seeks to define "chemical and surgical castration or mutilation." Proposed § 685.219(b)(3) would define "chemical castration or mutilation" to mean:

> (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and
>
> (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.[9]

Proposed § 685.219(b)(31) would define "surgical castration or mutilation" as "surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or

---

[4] 90 Fed. Reg. at 40154.

[5] *Id.*

[6] Exec. Order 14235, Restoring Public Service Loan Forgiveness, 90 FR 11885 (Mar. 7, 2025) https://www.federalregister.gov/d/2025-04103.

[7] 90 Fed. Reg. at 40154-55.

[8] 90 Fed. Reg. at 40160.

[9] 90 Fed. Reg. at 40158.

her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions."[10]

These definitions are based on EO 14187, which states:

> *chemical and surgical mutilation* means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as *gender affirming care.*[11]

The Department explained during the negotiated rulemaking that using a "a pre-existing definition" would help ensure that "(1) that the Department's regulations align with other definitions across Federal agencies, (2) that the Department makes consistent determinations using established precedents regarding the status of a qualifying employer, and (3) that the public has clear expectations on how the Department interprets the term."[12] These arguments, which support the use of the pre-existing definition from the EO, are reasonable but do not take into account a "pre-existing" definition's known risks, including risks associated with legally under-inclusive and over-inclusive definitions.

A key aspect of the definition of "chemical and surgical mutilation" in President Trump's executive order is the phrase about altering a person's sexual organs to minimize or destroy their natural biological functions. This phrase is recognized in the definition of "surgical castration or mutilation" but is missing from the definition of "chemical castration or mutilation." Drugs used for sex-rejecting purposes, in some cases, are not intended to and do not have the effect of altering the individual's appearance (the purpose mentioned in the current proposed definition). Rather they are intended to disrupt or suppress natural sex-specific biological functions (e.g., menstruation or penile erections) to align the individual's self-perception with an identity that differs from his or her sex. To avoid this gap, **we urge ED to include reference to that purpose in the definition for drugs as follows**:

> (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and
>
> (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, <u>to disrupt or suppress natural sex-specific biological functions</u> to align an individual's <u>self-perception or</u> physical appearance with an identity that differs from his or her sex.

**2. Terminology**

We applaud and support the Trump Administration's decision not to use the ideological and misleading term "gender-affirming care." As Justice Thomas recognized in his *Skrmetti* concurrence, "gender-affirming care" is a "sanitized description" that "obscures the nature of the medical interventions

---

[10] 90 Fed. Reg. at 40161.

[11] 90 Fed. Reg. at 8771.

[12] 90 Fed. Reg. at 40159.

at issue."[13] The term implies that the dissonance between the transgender-identifying person's sex and asserted identity should be resolved by validating ("affirming") the person's asserted identity ("gender") and disregarding the significance of the person's body and sex. When packaged as "gender-affirming care," the implication is that disfiguring, disabling, and damaging pharmaceutical and surgical interventions are positive, justifiable, and beneficial. They are not. They are unethical and harmful.

Recognizing the need for a more accurate term than "gender-affirming care," some have proposed alternatives, such as "chemical and surgical mutilation," "sex-trait modification," and "sex-rejecting procedures." Although all of these terms are better than "gender-affirming care," we believe for reasons explained below that "sex-rejecting procedures" is the superior choice.

**a. There is no consistent terminology used across federal agencies.**

Federal agencies and the Trump Administration have yet to adopt consistent and uniform terminology for medical procedures connected with a so-called "gender transition."

For example, Executive Order 14235 and this rule use "chemical and surgical castration or mutilation,"[14] while Executive Order 14187 uses "chemical and surgical mutilation"[15] and legislation recently proposed by the Department of Justice is called the "Victims of Chemical and Surgical Mutilation Act."[16] "Chemical and surgical castration or mutilation" is rhetorically powerful, but it does not cover all "gender-affirming" medical interventions on its face. For instance, menstrual suppression and laser treatments would likely fall outside the definition of "castration" or "mutilation," underscoring the importance of including a definition (as ED proposes) regardless of the term used in the final rule.

Using different terminology, the Centers for Medicare & Medicaid Services (CMS) 2025 rule "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability" originally proposed to prohibit "sex-trait modifications" from coverage as an Essential Health Benefit (EHB).[17] When the rule was finalized in June, CMS used (and defined) the modified term "specified sex-trait modification procedures," recognizing that the term "sex trait modification" created "ambiguity" and "greater clarity" was needed.[18] A lawsuit filed in federal court in July 2025 challenges the EHB prohibition and its use of the term "sex-trait modification," described in the complaint as "unwieldy," "novel," and overinclusive ("could conceivably capture services in multiple EHB categories").[19]

The current titles of two forthcoming CMS proposed rules (under review at OIRA) use the term "sex trait modification procedures" without the qualifier "specified." Even with a qualifier, "specified sex-trait modification procedures" is a clunky and imprecise term on its face. "Sex-trait modification" has

---

[13] *United States v. Skrmetti*, 145 S. Ct. 1816, 1841 (2025) (Thomas, J., concurring).

[14] 90 Fed. Reg. 11885; 90 Fed. Reg. 40158.

[15] 90 Fed. Reg. 8771.

[16] Press Release, DOJ, The Department of Justice Proposes Legislation to Protect Children from Gender Mutilation, https://www.justice.gov/opa/pr/department-justice-proposes-legislation-protect-children-gender-mutilation (proposing "Victims of Chemical or Surgical Mutilation Act").

[17] 90 Fed. Reg. 12942 (Mar. 19, 2025), https://www.federalregister.gov/d/2025-04083.

[18] 90 Fed. Reg. 27074, 27158-59 (June 25, 2025), https://www.federalregister.gov/d/2025-11606.

[19] Complaint, *California v. Kennedy*, No. 25-12019 (D. Mass. July 17, 2025), https://oag.ca.gov/system/files/attachments/press-docs/CMS%20Rule%20Complaint.pdf.

failed to gain consensus and has many problems.[20] These problems are explained in detail in our May 2025 white paper "Terminology and Definition: Replacing 'Gender-Affirming Care' with 'Sex-Rejecting Procedures.'"[21]

Because a consistent term has not yet been adopted by federal agencies or the Trump Administration, ED has an opportunity to select a term that is not inherently problematic and which does not invite additional criticism or prove vulnerable in any litigation challenging the rule.

**b. We propose using the superior term "sex-rejecting procedures."**

**We propose the term "sex-rejecting procedures" (or "sex-rejecting drugs" or "sex-rejecting surgeries").** The term "sex-rejecting procedures" offers many advantages over "gender-affirming care," "sex-trait modification," and other variants.

- "Sex-rejecting procedures" clearly excludes non-problematic medical interventions on its face.
- "Sex-rejecting procedures" covers the full range of medical interventions on its face (not all procedures result in castration or "mutilation").
- "Sex-rejecting procedures" does not accept gender ideology's framing of the issue as about "gender" (versus "sex") and "affirmation" (versus harm).
- "Sex-rejecting procedures" does not use "affirming," "care," or "treatment," terms which carry positive connotations, and imply the interventions are ethical and beneficial.
- "Sex-rejecting procedures" more effectively communicates the unnatural and disruptive nature of the targeted procedures.
- "Sex-rejecting procedures" is clear, simple, and easily understood, a benefit for media and communications.
- "Sex-rejecting procedures" does not use charged language that could alienate some people (e.g., "mutilation").
- "Sex-rejecting procedures" references sex (communicates that procedures are different whether performed on a male or female and that these procedures affect the sexed body, not merely subjective self-perception of "gender").

Significantly, "sex-rejecting procedures" references the purpose (communicates that procedures performed to address gender dysphoria or help a patient reject his or her sex are fundamentally different than those performed to address other medical conditions). Terminology that evinces a clear purpose has proven significant to court rulings upholding state laws prohibiting children from receiving sex-rejecting procedures. For instance, in *United States v. Skrmetti*, the Supreme Court's decision hinged on the purpose of prohibition.[22] The law at issue classified based on age and medical use, not sex, allowing the law to easily be upheld under rational basis review.

---

[20] *See* EPPC Comment, EO 12866 Meeting, "Medicare and Medicaid Programs; Hospital Condition of Participation: Limiting Participation Based on the Performance of Sex Trait Modification Procedures on Children," RIN 0938-AV87, and "Medicaid Program; Prohibition on Federal Medicaid Funding for Sex Trait Modification Procedures Furnished to Children and Youth (CMS-2451)," RIN 0938-AV73 (Aug. 28, 2025), https://eppc.org/wp-content/uploads/2025/08/EPPC-Comment-for-EO-12866-Meeting-on-CMS-Proposed-Rules.pdf.

[21] Eric Kniffin, Mary Hasson, & Rachel N. Morrison, *Terminology and Definition: Replacing "Gender-Affirming Care" with "Sex-Rejecting Procedures"*, ETHICS & PUBLIC POLICY CENTER (May 2, 2025), https://eppc.org/wp-content/uploads/2025/05/Replacement-Term-for-GAC.pdf.

[22] *United States v. Skrmetti*, 145 S. Ct. 1816 (2025).

The term "sex-rejecting" is also advantageous because it aligns with the APA DSM-5-TR language, which states that the criteria for diagnosing "gender dysphoria" includes a "strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)."[23] A "strong desire to be rid of ... sex characteristics" is, in fact, "sex-rejecting." Thus, the DSM-5 provides a strong, straightforward basis for refuting any charge that the term "sex-rejecting procedures" is politically motivated or unscientific.

We note that some have employed variations of the term "sex-rejecting procedures," such as "sex-rejecting interventions." Others have used "sex-rejecting" to modify hormones or surgeries, as in "sex-rejecting hormones" or "sex-rejecting surgeries." These terms can also be appropriate in various contexts. We recommend using "procedures" when referring solely to medical interventions, such as prescribing hormones or performing surgery. This is because "interventions"—a broader term than "procedures"—could be interpreted to encompass social "gender transitions," counseling, and other mental health services, which could raise difficult challenges under the Free Speech Clause of the First Amendment.[24] There are situations when use of the term "interventions" would be appropriate to cover a broader range of actions than just medical interventions.

For purposes off this rule, it would be appropriate either to have one term "sex-rejecting procedures" to describe what the EO refers to as "chemical and surgical castration or mutilation" with one combined definition or to have two terms "sex-rejecting drugs" and "sex-rejecting surgeries" mirroring the current proposal of two terms and two definitions.

**c. A growing consensus is emerging around the term "sex-rejecting procedures."**

Consensus is growing around use of "sex-rejecting procedures" as a replacement for "gender-affirming care." The term "sex-rejecting" is supported by leading organizations, advocates, attorneys, medical professionals, parents, and policy experts seeking to protect children and others from gender ideology.[25] The term "sex-rejecting" has been used by individuals and organizations in various outlets

---

[23] *What Is Gender Dysphoria*, AMERICAN PSYCHIATRIC ASSOCIATION (July 2025), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

[24] For further discussion, see Eric Kniffin, Mary Hasson, & Rachel N. Morrison, *Terminology and Definition: Replacing "Gender-Affirming Care" with "Sex-Rejecting Procedures"*, ETHICS & PUBLIC POLICY CENTER (May 2, 2025), https://eppc.org/wp-content/uploads/2025/05/Replacement-Term-for-GAC.pdf, at 4.

[25] *See, e.g.*, ETHICS & PUBLIC POLICY CENTER, *id.* ("Replacing 'Gender-Affirming Care' with '**Sex-Rejecting Procedures**'"); *Gender Debrief*, MANHATTAN INSTITUTE (Aug. 23, 2025), https://manhattan.institute/article/rising-global-and-u-s-challenges-to-gender-care-for-minors ("This past Friday, Alaska's State Medical Board was scheduled to vote on a resolution to formally oppose **sex-rejecting procedures** for minors."); *Gender Debrief*, MANHATTAN INSTITUTE (Aug. 9, 2025), https://manhattan.institute/article/rising-global-and-u-s-challenges-to-gender-care-for-minors ("According to *National Review,* the Centers for Medicare and Medicaid Services are planning to announce a proposed federal rule banning Medicare and Medicaid reimbursements to hospitals that provide **sex-rejecting interventions** to minors for the treatment of gender dysphoria."); *Expose the Deceptive Practices of the Gender Industry*, HERITAGE ACTION FOR AMERICA, https://heritageaction.com/expose-the-deceptive-practices-of-the-gender-industry ("Despite these dangers, **sex-rejecting procedures** have grown into a billion-dollar industry, with many providers profiting directly from the same drugs and procedures they recommend."); *Biological Integrity*, AMERICAN COLLEGE OF PEDIATRICIANS, (June 11, 2025), https://biologicalintegrity.org/week-in-review-june-11-2025/ ("A federal judge has blocked President Trump's executive order aimed at halting **sex-rejecting procedures** in prisons, requiring the Bureau of Prisons to continue providing these interventions."); Dr. Jill Simons, *ACPeds Supports SCOTUS Ruling Affirming States' Right to Protect Gender-Dysphoric Youth*, AMERICAN COLLEGE OF PEDIATRICIANS (June 18, 2025), https://acpeds.org/acpeds-supports-scotus-ruling-affirming-states-right-to-protect-gender-dysphoric-youth/ ("The

from media and op-eds[26] to court briefs[27] to describe federal actions, Trump Administration policies, state laws, and court decisions involving the medical procedures.

ED's decision to use the term "sex-rejecting procedures" in this rule would be welcomed and would accelerate widespread use of this superior term as a replacement for "gender-affirming care.

**3. Two clarifications.**

First, the rule uses the term "sex transition treatments" several times.[28] We recognize this is the term that the Supreme Court used in *Skrmetti* and we appreciate the Department's efforts to avoid using "gender" (consistent with President Trump's direction[29]). However, the term "sex transition treatments" not only fails to communicate the harm of those interventions but also conveys a misleading message, i.e., that a person's sex can "transition" or change, when in fact it cannot. ("Transition" is a series of steps taken to align the person's appearance with his or her identity label.) In addition, "treatments" carries a positive connotation, suggesting that the interventions are conducive to health and improved wellbeing. For the same reasons as above, **we urge ED to instead use the term "sex-rejecting procedures"** (regardless of whether ED chooses to adopt and define the term "chemical and surgical castration or mutilation").

---

American College of Pediatricians was honored to support the state of Tennessee in this case by filing an amicus brief presenting scientific, evidence-based analysis on the risks of **sex-rejecting interventions** in minors."); Erin Friday, OUR DUTY, *Any Adult Can Claim Any Child in California, By Filling Out a Simple One Page Affidavit*, Substack (Aug. 7, 2025), https://ourduty.substack.com/p/any-adult-can-claim-any-child-in ("In addition to the grave danger of child trafficking, under AB 495, enterprising children and gender ideologues can use AB495 to circumvent a parent's opposition to **sex-rejecting interventions** such as hormones and surgery.").

[26] *See, e.g.*, Joe Figliolia, *The Wrong Way to Cover Trans Issues*, THE DISPATCH (Aug. 2, 2025), https://www.msn.com/en-us/news/opinion/the-wrong-way-to-cover-trans-issues/ar-AA1JLEiQ ("It has leaned into rhetoric that seems to confirm what many already believe about the animus driving opposition to **sex-rejecting procedures** for minors."); Laura Bryant Hanford, *California Assembly Looks to Hand Children to Traffickers and Gender Activists,* DAILY SIGNAL (July 10, 2025), https://www.dailysignal.com/2025/07/10/california-assembly-looks-to-hand-children-to-traffickers-and-gender-activists/ ("If the child is in the state to receive **sex-rejecting hormones or surgeries**, he or she will *not* be returned to the parent.").

[27] *See, e.g.*, Brief of Amici Curiae Mary Hasson, Eric Kniffin, Theresa Farnan, and Susan Selner-Wright, *Chiles v. Salazar* (No. 24-539), at 6, https://www.supremecourt.gov/DocketPDF/24/24-539/363139/20250613125802182_24-539%20Amicus%20Brief.pdf ("In that case, which involved a challenge to the Texas legislature's ban on **sex-rejecting procedures** for minors, Justice Blacklock identified the clash of two "irreconcilably conflicting visions" of the human person, the Transgender Vision and the Traditional Vision, as particularly relevant."); Brief of Amici Curiae Our Duty–USA and Colorado Principled Physicians, *Foote v. Ludlow School Committee* (No. 25-77), at 5 n.7, https://www.supremecourt.gov/DocketPDF/25/25-77/370402/20250821161619455_Foote%20Amicus%20Brief%20-%20Final.pdf (citing "*Kolstad v. Baillargeon*, No. 1:24-cv-00055-SPW (D. Mont. May 20, 2024) (transferring a non-affirming parents' child to state where **sex rejecting interventions** are legal)").

[28] 90 Fed. Reg. at 40159 ("In *United States* v. *Skremtti*, Attorney General and Reporter for Tennessee, et al., the U.S. Supreme Court upheld a Tennessee law restricting certain **sex transition treatments** for minors."); *id.* ("The Department would not find a violation of the standard (see discussion under § 685.219(h) and (i)) if there is not a Federal or State law that prohibits **sex transition treatments** for minors in the state where the employer is located."); *id* at 40161 ("In the *United States* v. *Skremtti*, Attorney General and Reporter for Tennessee, et al. the U.S. Supreme Court upheld a Tennessee law restricting certain **sex transition treatments** for minors and, as of June, 2025, there are 27 States that restrict certain medical procedures and treatments performed on minors related to assertions that minors' sexual, identity differs from their biological sex.").

[29] *See* Exec. Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 30, 2025), https://www.federalregister.gov/d/2025-02090.

Second, in what appears to be an oversight, the proposed rule states: "The Department clarifies that, in order for a qualifying employer to lose eligibility under this definition, there must be a violation of State law."[30] Under this language, an employer must have violated State law to lose eligibility. But earlier the rule stated: "The Department would not find a violation of the standard (see discussion under § 685.219(h) and (i)) if there is not a Federal ***or*** State law that prohibits sex transition treatments for minors in the state where the employer is located."[31] This is consistent with proposed § 685.219(b)(30), which states "the chemical and surgical castration or mutilation of children in violation of Federal ***or*** State law."[32] **We encourage ED to revisit this language** so that there is clarity and consistency about when an employer may lose funding if ED finds that it has violated either Federal or State law.

**C. Engaging in a Pattern of Aiding and Abetting Illegal Discrimination**

Proposed § 685.219(b)(12) would define "illegal discrimination" as "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*)."

We are concerned that defining "substantial illegal purpose" as including "engaging in a pattern of aiding and abetting illegal discrimination" could be misused and weaponized by future administrations to undermine this Administration's priorities and President Trump's executive orders on restoring biological truth, fighting gender ideology, protecting women and girls, and eradicating anti-Christian bias.[33]

For example, the Biden administration interpreted sex discrimination laws to prohibit discrimination based on sexual orientation, transgender status, and gender identity, and disability discrimination laws to prohibit discrimination based on gender dysphoria.[34] Many of these actions are documented in the initial report by the Task Force to Eradicate Anti-Christian Bias.[35]

Transgender status, gender identity, and gender dysphoria nondiscrimination obligations are often used to impose self-selected pronoun mandates and access to sex-specific opportunities and spaces based

---

[30] 90 Fed. Reg. at 40161.

[31] 90 Fed. Reg. at 40156 (emphasis added).

[32] 90 Fed. Reg. at 40175 (emphasis added).

[33] *See, e.g.*, Exec. Order 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 30, 2025), https://www.federalregister.gov/d/2025-02090; Exec. Order 14187, Protecting Children From Chemical and Surgical Mutilation, 90 Fed. Reg. 8771 (Feb. 3, 2025), https://www.federalregister.gov/d/2025-02194; Exec. Order 14190, Eradicating Anti-Christian Bias, 90 Fed. Reg. 9365 (Feb. 12, 2025), https://www.federalregister.gov/d/2025-02611.

[34] *See, e.g.*, EEOC, Enforcement Guidance on Harassment in the Workplace, Notice No. 915.064 (Apr. 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace, Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474 (Apr. 29, 2024), https://www.federalregister.gov/d/2024-07915. HHS, Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 40066 (May 9, 2024), https://www.federalregister.gov/d/2024-09237.

[35] *See* Office of Legal Policy & Civil Rights Division, DOJ, Eradicating Anti-Christian Bias within the Federal Government (revised Aug. 2025), *available at* https://static.foxnews.com/foxnews.com/content/uploads/2025/09/anti-christian-bias-report.pdf.

on identity, not biology.[36] Sex and disability discrimination laws have also been used to require insurance coverage of contraception, abortion, and sex-rejecting procedures.[37]

**D. Public Service for Individuals with Disabilities**

Proposed § 685.219(b)(25) would define "public service for individuals with disabilities" as "services performed for or to assist individuals with disabilities (as defined in the Americans with Disabilities Act (42 U.S.C. 12102)) that is provided to a person because of the person's status as an individual with a disability."

We have the same concerns as explained above about how this could be misused by future administrations or courts to promote gender ideology based on the (wrong) position that "gender dysphoria" is a qualifying disability under the ADA.[38]

**E. Protections for Religious Organizations**

Religious organizations have certain protections under the First Amendment, the federal Religious Freedom Restoration Act (RFRA),[39] and federal civil rights laws. These protections extend to religious employers of public service jobs.

In brief, the Free Exercise Clause of the First Amendment prohibits disqualifying eligible recipients from a public benefit (here, participation in the registered apprenticeship program) "solely because of their religious character."[40] Under RFRA, ED has an affirmative obligation to not ("Government shall not") "substantially burden a person's exercise of religion" when issuing its regulations.[41] Title VII likewise recognizes the right of religious organizations to make employment decisions based on religion.[42]

---

[36] *See supra* note 34.

[37] *See generally* Rachel N. Morrison*, Avoiding Pandora's Box: Why Federal Nondiscrimination Statutes Don't Prohibit Health-Insurance Coverage Exclusions of "Gender-Transition" Procedures*, 75 CATH. UNIV. L. R. __ (forthcoming 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5141509.

[38] *Cf. Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) (holding gender dysphoria can be a qualifying disability and does not fall under the ADA's exclusion of "gender identity disorders" from definition of qualifying disabilities); *see also* Gregory S. Baylor & Rachel N. Morrison, *Explainer Episode 82 – Is Gender Dysphoria a Protected Disability?*, FEDERALIST SOCIETY (Dec. 18, 2024) (podcast), https://fedsoc.org/commentary/podcasts/explainer-episode-82-is-gender-dysphoria-a-protected-disability (discussing status of whether gender dysphoria is a protected disability under statutes, regulations, and caselaw); EPPC Scholar's Comment Regarding "Discrimination on the Basis of Disability in Health and Human Service Programs or Activities," RIN 0945-AA15 (Nov. 13, 2023) at 10-16, https://eppc.org/wp-content/uploads/2023/11/EPPC-HHS-Disability-Pub-Comment-2023-11-13.pdf (demonstrating that Biden HHS's claim that Section 504 prohibits discrimination on the basis of "gender dysphoria" is arbitrary and capricious and not supported by law).

[39] 42 U.S.C. §§ 2000bb to 2000bb-4.

[40] *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 450 (2017) (holding Free Exercise Clause prohibits excluding applicant from a state grant program simply because of the applicant's religious nature); *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2244 (2020). *See also Fulton v. City of Philadelphia*, 93 U.S. 522 (2021).

[41] 42 U.S.C. § 2000bb-1.

[42] 42 U.S.C. § 2000e-1(a).

These religious protections exist regardless of whether they are recognized in agency regulations. But acknowledging these protections in agency rulemaking and regulations is important because it provides notice and clarity to regulated entities, many of whom may not be experts in religious liberty law.

Affirming these religious liberty protections in rulemaking is particularly important where nondiscrimination obligations extend (or could be interpreted in the future to extend) to sexual orientation, transgender status, gender identity, or gender dysphoria. For instance, the Biden administration's efforts to redefine sex discrimination to cover gender identity in employment, health care, education, and athletics created many religious liberty issues, especially for many Christians.[43] Affirmatively recognizing religious liberty protections is one way to remedy the anti-Christian bias of the prior administration consistent with President Trump's executive order on eradicating anti-Christian bias.[44] Recognizing these protections could also serve as a bullwork against a future administration that is less solicitous of religious liberty. For these reasons, **we ask ED to recognize protections for religious organizations in its final rule.**

**Conclusion**

Thank you for your consideration of these points as you finalize the rule.

Sincerely,

Rachel N. Morrison, J.D.
Fellow and Director
Administrative State Accountability Project
Ethics and Public Policy Center

Mary Rice Hasson, J.D.
Kate O'Beirne Senior Fellow and Director
Person and Identity Project
Ethics and Public Policy Center

[43] *See generally* Rachel N. Morrison, *Gender Identity Policy Under the Biden Administration*, 23 FEDERALIST SOC'Y REV. 85 (2022), https://ssrn.com/abstract=4104566 (documenting the Biden administration's gender identity policies in employment, healthcare, education, and athletics and their impact on religious liberty).

[44] Exec. Order 14190, Eradicating Anti-Christian Bias, 90 Fed. Reg. 9365 (Feb. 12, 2025), https://www.federalregister.gov/d/2025-02611.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

20250917 ALC Comment on PSLF Rule

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10460/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10460

**Tracking Number**

mfo-re0n-kp1g

**Comment Details** **Submitter Info**

Give Feedback

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



55 Columbus Ave
San Francisco, CA 94111
415.896.1701 | fax 415.896.1702
**asianlawcaucus.org**

September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

*Submitted via regulations.gov*

**RE: Comment on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

On behalf of Asian Law Caucus (ALC), the nation's oldest Asian-American civil rights organization and an organization committed to community lawyering, I write to urge you to withdraw the Notice of Proposed Rulemaking seeking to change the Public Service Loan Forgiveness program (PSLF). William D. Ford *Federal Direct Loan (Direct Loan) Program*, 90 Fed. Reg. 40,154 (proposed Aug. 18, 2025) (to be codified at 34 CFR Part 685).

The proposed changes would unnecessarily undermine the availability of legal and social services for vulnerable communities and interfere with protected association and speech activities. The certification requirement creates vagueness and an unnecessary trap and invitation for harassment, especially in light of the unclear criteria for disqualifying employers. Any one of these defects would be sufficient reason to abandon this rulemaking effort; together, they overwhelmingly demonstrate its flawed approach.

**The Proposed Changes Undermine the Stability and Predictability of PSLF, Which Have Allowed Attorneys to Choose to Serve Low-Income Communities**

Since its creation in 2007, PSLF has proven to be an essential resource for lawyers and other licensed service providers to bring their talents to low-income communities by working in the nonprofit sector. Amid exploding higher-education costs and corresponding student-loan burdens, predictability and security of PSLF allows lawyers to pursue careers representing low-income clients and communities.

At ALC, many of our attorneys grew up in low-income households themselves and sought to serve similar communities. One attorney, a first-generation college student, noted that PSLF had given them confidence not only to pursue law school, but also to take on the loans necessary for undergraduate education. Another ALC attorney would have potentially forgone law school if not for PSLF. The knowledge that they could repay their loans with the assistance of PSLF was

essential for their educational choices. Without clarity about the viability of PSLF payments, potential future attorneys may no longer be poised to pursue this career.

Public interest attorneys rely on predictable PSLF eligibility criteria to plan their careers. Several ALC attorneys noted that they could not continue working for an organization if it abruptly lost its eligibility for the program. For some, this would require a permanent shift out of the sector—a talent drain away from low-income communities.

The proposed changes to PSLF would destabilize this equilibrium. Because the standards for disqualifying an employer are vague and ill-defined, attorneys and other highly skilled workers could not trust that PSLF will remain available. Nor can they be sure that another job would be available—either at an eligible organization or with sufficient compensation to overcome the loss of PSLF.

Ultimately, this would likely discourage most attorneys from working in nonprofit legal services, exacerbating the crisis in legal representation for the poor. *See* Legal Services Corp., The Justice Gap: The Unmet Civil Legal Needs of Low-Income Americans 12 (April 2022) (noting that 92% of low-income households facing a significant legal problem received inadequate legal assistance or none at all). The proposed rule entirely fails to acknowledge this predictable harmful consequence.

**The Vague Proposed Grounds for Disqualification Would Improperly Discourage Essential Services and Civic Engagement**

There is a substantial risk that the proposed definitions of a "substantial illegal purpose" would lead to the disqualification of employers for engaging in lawful—and in fact laudable—activities. This is because the definitions draw on complex concepts of constitutional, criminal, and immigration law that would be challenging for courts to apply, let alone overburdened administrators whose expertise lies elsewhere.

Even if the courts ultimately undo a wrongful disqualification, that relief would come after years of uncertainty. Many organizations could not afford the significant time and money spent to remedy the error, let alone the intervening uncertainty for staff. Accordingly, we fear that many organizations will avoid activities that could be misconstrued as unlawful.

*First*, the proposal to disqualify organizations for "aiding and abetting" violations of immigration law threatens a wide range of legal services and other activities. Immigration attorneys have professional and ethical duties to zealously represent clients within the bounds of the law. Immigration attorneys at ALC and elsewhere regularly represent clients in statutorily authorized proceedings such as adjustment of status petitions, appeals of adverse decisions, and other relief explicitly provided under the Immigration and Nationality Act. While this representation is a manifestation of our professional responsibilities, the proposed rule's 'aiding and abetting' standard lacks the specificity required for organizations to determine compliance. Federal immigration law provides detailed procedures for legal representation, yet the rule offers no guidance on how legitimate advocacy within these procedures would be distinguished from prohibited conduct.

Beyond direct immigration representation, legal non-profit organizarions provide services that are both lawful and essential to community welfare. These other activities could be misconstrued as support for immigration-law violations. For example, ALC represents workers and tenants in pursuing their rights, without inquiring into their immigration status which is not relevant to the vindication of their legal rights. Congress has explicitly chosen not to condition protections under federal labor and housing statutes on immigration status, and many states have enacted similar protections or policies encouraging status-neutral service delivery. Such a status-neutral approach ensures that minimum standards protect everyone in the community and that the most vulnerable residents are not used to undermine the rights and protections provided to us all. Yet there is reason to fear that such advocacy for an undocumented person to remain in an apartment or garner wages earned could be mischaracterized as aiding or abetting immigration violations, despite being expressly contemplated by both federal and state law.

*Second,* the proposal to disqualify organizations for "engaging in a pattern of violating State laws as defined in [proposed § 685.219(a)(34)]" threatens a range of constitutionally protected expression. The proposal defines the violation of state laws to focus on "trespassing; disorderly conduct; public nuisance; vandalism; or obstruction of highways," as reflected in a "final, non-default judgment by a State court." Proposed § 685.219(a)(34). Notably, the proposal makes clear that it includes both civil and criminal judgments in these findings of liability; in fact, before negotiated rulemaking, this provision focused on tort-law violations. 90 Fed. Reg. at 40,162.

Public protest activities may often result in lawsuits and/or arrests on the bases outlined in the rule. In fact, the rule seems targeted to address common forms of picketing, marching, sidewalk chalk, and other public protest. Against this clear intent, it is difficult to credit the flat assertion that the proposed rule will not penalize organizations for "exercising their First Amendment protected rights, or any other rights protected under the Constitution." Proposed § 685.219(h)(2). There is little reason for a nonprofit organization to engage in a pattern of the identified activities *other* than in an effort to engage in speech, petition and expressive association. Yet the interaction of protected speech and generally applicable laws is complex. There is substantial risk that the Department of Education will undervalue First Amendment protections and penalize an organization for expressive activities.

This provision also carries due-process and ex post facto issues. The consequences for many of these convictions or liability findings may often be limited. Accordingly, organizations and individuals engaged in lawful conduct may have rationally decided to plead guilty to, e.g., misdemeanor disorderly conduct, with a consequence of probation, rather than pursue the expense of a full defense. Unless the rule expressly excludes judgments entered before its effective date, it would penalize organizations, without notice, for their disinclination to use limited judicial resources to vindicate their rights.

**The Certification Provision Creates A Trap for Employer Organizations, Without Any Benefit for the Education Department**

Amid its vague and confusing grounds to disqualify employing organizations from PSLF, the Proposed Rule introduces a new requirement for employers to certify "that it did not participate in activities that have a substantial illegal purpose." Proposed § 685.219(i)(1). This provision

serves no legitimate, rational purpose. As the Proposed Rule itself acknowledges, “we expect most employers to certify that they do not engage in activities with a substantially illegal purpose.” 90 Fed. Reg. at 40,171. It is hard to imagine why an employer would not do so.

While the certification will not uncover ineligible employers, it may serve either to discourage employers from participating in PSLF or discourage them from engaging in activities that could arguably meet the Proposed Rule’s vague disqualification criteria.

For those employers that continue participation in PSLF, the certification creates an unnecessary and unjustified risk of litigation exposure under the False Claims Act. 31 U.S.C. §§ 3729, *et seq*. The False Claims Act establishes a cause of action for either the United States or any private party to obtain penalties and treble damages for a materially false certification to the United States. While we have no reason to believe that an employer would falsely certify under this provision, few nonprofit employers can weather its unpredictability, due to broad *qui tam* standing and substantial penalties.

Because the certification provision serves no legitimate purpose while chilling lawful activity or threatening overwhelming litigation exposure, it has no rational place in administering PSLF.

*　　　*　　　*

For these reasons, we urge you to reconsider this deeply flawed and confusing rule and refrain from making any of these changes to PSLF.

Yours,

Aarti Kohli
Joshua Rosenthal

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

NLADA PSLF Comments 9.2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10462/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10462

**Tracking Number**

mfo-rbi7-ufuj

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Office of Postsecondary Education
United States Department of Education
400 Maryland Ave. SW
Washington, DC 20202

*Submitted electronically via* *http://www.regulations.gov*

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program**
**FR Doc. 2025-15665; Document ID: ED-2025-OPE-0016-7221**

The National Legal Aid & Defender Association (NLADA) respectfully submits this comment in response to the U.S. Department of Education's (Department) efforts to revise the Public Service Loan Forgiveness (PSLF) Program, enacted as part of the College Cost Reduction and Access Act of 2007 (CCRAA).

This comment specifically addresses proposed language that is intended to restrict qualifying employer status for purposes of PSLF even for entities classified as government or nonprofits. The sole purpose of legal services, both civil and criminal is to fulfill the American ideal of Equal Justice Under Law, etched into the façade of the United States Supreme Court. However, the proposed language has sent a chill throughout the NLADA community, described in detail below, and if adopted would be devastating for the millions of low-income Americans in *every county* of the country who rely on these services to live safe and stable lives.

## I. Statement of Interest and Significance of PSLF in Supporting American Communities

NLADA, founded in 1911, is America's oldest and largest national nonprofit organization dedicated to the excellence in the delivery of legal services for people who cannot afford to pay for counsel, devoting all of its resources to advocating for equal access to justice for all. NLADA champions effective legal assistance for people who cannot afford counsel, serves as a collective voice for both civil legal aid and public defense systems throughout the nation, and provides a wide range of services to support advocates for equal justice. NLADA has more than 700 organizations that collectively represent thousands of attorneys and advocates who provide civil legal aid and public defender services to low-income and underserved individuals in the 50 states, the District of Columbia, American Samoa, Micronesia, Puerto Rico, and the U.S. Virgin Islands. Notably, NLADA also counts among its members and in its governance structures representatives from the client communities served by these providers, and who are most impacted by the access to justice crisis in this country.

Civil legal aid ensures that regardless of how much money a person has, they have the same level of access to a fair adjudication of their civil legal problems as anyone else. They provide legal help that enables people to protect their livelihoods, their health, and their families. Public defenders fulfill the constitutional right to counsel; they are essential to due process and our concept of liberty. They protect the rights of defendants in criminal cases and work to ensure that case outcomes are fair and just.

Legal services is a fundamental public service. Taxpayers benefit from the availability of legal aid and public defense. Three out of every four low-income households experience at least one civil legal problem per year, including consumer issues, health care, housing, and income maintenance.[1] Fifty-five percent of low-income Americans who experienced a civil legal problem said these problems substantially impacted their lives, including by affecting their finances, mental and physical health, safety, and relationships.[2] Roughly 80 percent of people who are accused of crimes rely on public defenders because they cannot afford to pay private defense attorneys.[3]

PSLF makes it possible for civil legal aid and public defender programs with limited budgets to recruit and retain committed professionals, who can accept lower salaries even when the comparatively high cost of obtaining a law degree means many are graduating law school with significant debt. It also makes these jobs more accessible to students who otherwise may not have the means to afford the required education and training to enter the legal field, work in public service and provide stability for their families.

At its core, NLADA's community of legal advocates ensures that even the "little guy" has a fair chance, ardently pursuing all legal avenues on behalf of their clients. The proposed rule would significantly weaken both the availability and quality of legal representation in all regions of the country.

## II. Response to the Department's Proposed Revisions

NLADA's concerns and objections to the proposed language fall into three categories:

1. The substantial chilling effect on legal services created by the proposal to "exclude any organization that engages in activities that have a substantial illegal purpose from being a qualifying employer for the purposes of the PSLF program," and the ways in which the Department might determine the presence of a "substantial illegal purpose;"
2. The lack of meaningful due process in the Department's determination that an employer's activities have a "substantial illegal purpose" and for the affected employer to contest that determination; and most importantly,
3. The harm to the provision of civil legal aid and public defense service providers and the low-income communities across the country who need these services.

### *1. The proposed language creates a substantial chilling effect that undermines the provision of civil legal aid and public defense.*

Civil legal aid and public defenders protect the rights of low-income people when they are charged with crimes, and help secure basic necessities like safe housing, education, employment, health care, and safety from violence.

---

[1] LEGAL SERVS. CORP., THE JUSTICE GAP: THE UNMET CIVIL NEEDS OF LOW-INCOME AMERICANS 8 (2022), https://justicegap.lsc.gov/the-report.
[2] *Id*.
[3] Leonard Willis, *Access to Justice: Mitigating the Justice Gap*, AM. BAR ASS'N (Dec. 3, 2017), https://www.americanbar.org/groups/litigation/resources/newsletters/minority-trial/access-justice-mitigating-justice-gap; CAROLINE WOLF HARLOW, BUREAU OF JUST. STATS., OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST., NCJ 179023, DEFENSE COUNSEL IN CRIMINAL CASES 1 (2000), https://bjs.ojp.gov/content/pub/pdf/dccc.pdf.

To be clear, legal services providers are not engaged in illegal activity. Civil legal aid and public defenders provide legal representation and advocacy to ensure constitutional rights are provided to people even when they cannot afford to pay. These providers strive to ensure that the ideal of equal justice under law lives not only in the dream of our founding fathers, but nearly 250 years later, in reality, for millions of Americans.

The nature of providing ardent legal advocacy regularly requires civil legal aid and public defenders to challenge the actions of large corporations, government entities, and other powerful interests on behalf of everyday people. In so doing, they are truly the last line of defense for many people who have no other access to legal assistance.

Our communities deserve nothing less. Our Constitution demands nothing less. However, the proposed rule leaves open too large of a possibility that this type of advocacy could be found to have a "substantial illegal purpose," and will result in a drastic decrease in the availability of critical legal services to individuals most in need.

The proposes to include in the definition of "substantial illegal purpose:"

    a) "aiding or abetting violations of 8 U.S.C. 1325 or other Federal Immigration Laws;"

    b) "supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;"

    c) "engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law" and "engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law;"

    d) "engaging in a pattern of aiding and abetting illegal discrimination;" and

    e) "engaging in a pattern of violating State laws," which is then defined as a final non-default judgment by a state court of (i) trespassing, (ii) disorderly conduct, (iii) public nuisance, (iv) vandalism, or (v) obstruction of highways.

NLADA outlines below its overall concern regarding the vagueness and overbreadth of the proposed rule's prohibitions, as well as the substantive effect of each individual element.

***As currently drafted, these provisions are ill-defined, vague, overbroad, and risk undermining the very purpose of the PSLF program by discouraging or excluding essential public service professionals.***

The terms "illegal activity," "activities with a substantive illegal purpose," and "aiding and abetting" are left to be overly broad and subject to expansive interpretation. It is also unclear whether a "pattern" of violating state law might be found simply based on the actions of employees regardless of employer policy. NLADA and its members are concerned that absent clear limiting principles, these provisions could sweep in conduct that is an inherent part of legitimate and constitutionally protected legal work.

Public defenders represent individuals accused of crimes every day, and civil legal aid attorneys often advise or defend clients in matters arising from alleged violations of the law. They also work with



individuals who may be uncertain as to their immigration status or wish to contest their immigration status.

Moreover, and notably, legal advocates often advocate for changes in and different interpretations of existing law. This is a fundamental pillar of the American justice system – an adversarial process designed to uncover truth and advance fairness. Far from promoting unlawful purposes, this work is essential to ensuring the constitutional rights of due process and equal justice. The Sixth Amendment guarantees the right to counsel for those accused of crimes,[4] and civil legal aid is often the only access to representation available for low-income individuals facing eviction, domestic violence, or loss of public benefits. Any rule that penalizes such service runs directly contrary to these constitutional guarantees and American ideals.

However, the vague and overbroad nature of these provisions would have real and harmful consequences for access to justice, and the NLADA community already is experiencing fear and hesitation resulting from the proposed language.

PSLF is one of the few tools available to recruit and retain talented and passionate attorneys in these critically underfunded and overburdened sectors. Public defense systems nationwide already are in crisis: a 2022 report by the American Bar Association concluded that the United States has only 21% of the public defenders it needs to meet constitutional requirements.[5] Civil legal aid is similarly under-resourced, with the Legal Services Corporation reporting in 2022 that 92% of low-income Americans receive inadequate or no legal help for their civil legal problems.[6] Creating doubt about access to PSLF is exacerbating these shortages, leaving even more individuals and communities without access to justice.

Moreover, even those who choose to continue to deliver this critical public service are chilled in the level of advocacy they might provide. The rule as written creates uncertainty in both meritorious cases to pursue and legitimate legal arguments to make, for fear of running afoul of PSLF rules.

This point was raised to some extent among the negotiated rulemaking committee, as the Department acknowledges:

> Another negotiator stated that many legal aid organizations with 501(c)(3) status work with undocumented clients and feared losing qualifying employer status due to the Department's determination that they are aiding and abetting violations of Federal immigration laws.

As a result, the Department provides the following assurance (in subsection (h)(2)):

> Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees

---

[4] Gideon v. Wainwright, 372 U.S. 335 (1963).

[5] Am. Bar Ass'n Standing Cmtee. on Legal Aid & Indigent Def., The Public Defender Crisis in America (2022), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls-sclaid-defender-crisis.pdf.

[6] Legal Servs. Corp., The Justice Gap: The Unmet Civil Legal Needs of Low-Income Americans (2022), https://lsc.gov/our-work/publications/other-publications-reports/justice-gap-report.

exercising their First Amendment protected rights, or any other rights protected under the Constitution.

NLADA is greatly appreciative of the Department's intent to safeguard constitutional rights. However, the proffered language is inadequate in protecting the breadth of legal representation required to protect the ideals and ensure the fair operation of the American justice system. As noted above, providing legal assistance can require advocates to challenge legal doctrines and represent individuals who may be alleged to have engaged in unlawful behavior. In assisting, advising, and/or representing those individuals, these advocates are not aiding or abetting any alleged behavior but instead are helping to protect the critical constitutional right of due process.

PSLF was created to strengthen public service by supporting the recruitment and retention of professionals in roles that benefit the public good. Notably, public interest law services is explicitly enumerated in the CCRAA. Any final rule must make this clear and explicitly state that the provision of legal representation, advice, or advocacy in any instance shall not be used as a basis for revocation of employer's qualified status. Anything less would directly undermine the clear congressional intent of PSLF: to further our nation's ability to have a strong, sustainable public service workforce that meets the needs of communities across the country.

***Language permitting disqualification from PSLF for aiding or abetting violations of immigration laws inhibits and interferes with delivering lawful legal services.***

The rule's prohibition on "aid[ing] or abet[ting] violations of 8 U.S.C. § 1325 or other Federal immigration laws" is specifically concerning. The language is so broad that it risks being construed to cover the ordinary functions of legal representation, such as advising clients on the potential consequences of past conduct, ensuring they understand their rights, guiding them through proceedings arising from alleged unlawful acts, or simply pursuing legal avenues to adjust immigration status.

NLADA is concerned that the proposed language leaves open the possibility of an interpretation that conflates constitutionally protected legal representation with "aiding or abetting" unlawful conduct. To be clear, such an interpretation misapplies the term, but the proposed language makes such a misapplication all too easy. And in doing so, it has, even before any interpretation or application, created a harmful chilling effect on the ability of attorneys to fully and zealously represent their clients. Courts have long recognized that robust advocacy, even when on behalf of unpopular or accused individuals, is protected activity essential to the functioning of the American justice system.[7] The proposed rule undermines the essential activities of critical public defense and civil legal aid providers.

***The proposed rule's enumeration of "supporting terrorism" as a disqualifying activity is vague, overbroad, and chills lawful public defense and legal aid services.***

The proposed rule's framing of the prohibition on "supporting terrorism" also chills the provision of civil legal aid and public defense.

Both "supporting" and "terrorism" are ill-defined terms subject to broad interpretation that borrowers and their employers could reasonably infer would be subject to arbitrary determinations. The scope of

[7] NAACP v. Button, 371 U.S. 415 (1963).



the term "supporting" is not defined in the proposed rule. The language notes that "supporting terrorism" includes "facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy." The proposed rule's reference to the definition of "terrorism" in 18 U.S.C. § 2331 leaves the potential of interpretation very open to the Department's discretion, causing uncertainty among low-income legal services providers, and chilling their activities and services.

The term "terrorist" often has not been narrowly employed. It even has included a special prosecutor overseeing a criminal investigation.[8] Indeed, remarks by the Vice President and a senior White House official just this week imply that non-governmental organizations whose policies do not align with the current administration's policy likely would be designated as "terrorist" organizations.[9] Further, exercising First Amendment free speech rights also has been referred to as "support[ing] terrorism,"[10] as has been simply belonging to certain heritages. [11]

As a result, legal advocates understandably fear they may be labeled as "terrorists" with accompanying legal consequences, and uncertainty about which groups or countries that the federal government may designate as "terrorist," particularly in light of the lack of an appeals process for employer disqualification, is likely to have an even broader chilling effect on legal services.

Likewise, the vague reference to "supporting . . . violence for the purposes of obstructing or influencing Federal Government policy" hinders the provision of legal services. The rule leaves unclear the scope of the definition of "violence." As noted above, legal advocates often seek to change government policy to be more just and fair. In the course of legal representation, advocates may seek to protect the rights of a client who is subject to immigration enforcement or seek to mitigate the collateral effects of a Free Speech arrest. The proposed language leaves too open the possibility of arbitrary determinations of "violence."

***The proposed rule's prohibition on "illegal discrimination" hinders the provision of legal services and lawful practices in recruitment and retention.***

---

[8] Ewan Palmer, *Donald Trump Calls Special Counsel Investigating Him a 'Terrorist'*, Newsweek (Jan. 13, 2023, 4:34 PM PST), https://www.newsweek.com/donald-trump-special-counsel-jack-smith-terrorist-1773489.

[9] *See Vice President JD Vance Remembers Charlie Kirk*, The Charlie Kirk Show (Sep. 15, 2025), https://thecharliekirkshow.com/podcasts/the-charlie-kirk-show/vice-president-jd-vance-remembers-charlie-kirk; Joey Garrison, *Trump Officials Vow Crackdown on Left-Leaning Groups After Charlie Kirk Killing*, USA Today (Sep. 15, 2025), https://www.usatoday.com/story/news/politics/2025/09/15/trump-plans-crackdown-on-left-wing-groups-after-charlie-kirk-shooting/86166121007.

[10] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 12:05 PM), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782 ("We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here."); see also Anna Betts, *Trump Calls Arrest of Palestinian Activist Mahmoud Khalil 'First of Many to Come'*, Guardian (London) (Mar. 10, 2025, 2:12 PM EDT), https://www.theguardian.com/us-news/2025/mar/10/trump-arrest-palestinian-activist-mahmoud-khalil

[11] *See, e.g.*, Shayan Sardarizadeh, Merlyn Thomas, Jake Horton & Mike Wendling, *What We Know About Kilmar Abrego Garcia and MS-13 Allegations*, BBC (Apr. 30, 2025), https://www.bbc.com/news/articles/c1k4072e3nno.



Lack of clarity in the definition of "illegal discrimination" coupled with sanctions for engaging in "illegal discrimination" have created significant challenges to legal services providers and the proposed rule perpetuates this challenge. While Executive Orders 14151 and 14173, new federal grant terms and conditions, and a U.S. Department of Justice memo providing guidance on unlawful discrimination all make clear that efforts to hire and retain a diverse workforce consistent with Diversity, Equity, and Inclusion (DEI) principles may be considered unlawful by the executive branch, courts have not endorsed such a broad prohibition. Notably, legal services providers also are bound by rules of ethics prohibiting discrimination. As a result, employers sit with the dilemma of the law of the judicial branch contradicting the enforcement practices of the executive branch. This is a perilous and paralyzing place to be for an employer.

Civil legal aid and public defenders do not represent people based on identifying characteristics – they provide legal services based on strict income guidelines and a determination that an individual cannot afford to pay for a lawyer. They operate in every geographic area of this country, and their client population is as varied in demographic and geographic background as this country. As a result, civil legal aid, public defenders, and their clients recognize the value of working with people from different backgrounds, who bring different experience, and who can share different perspectives. These goals are not unlawful, but the uncertainty of whether this will disqualify them as eligible employers for PSLF is real.[12] Efforts by legal aid and public defender employers to address the real challenges delivering quality and trusted legal services risk being characterized as impermissible use of protected characteristics."[13] They are chilled both from delivering services to people in need, as well as hiring people to deliver those services.

***Proposed language setting forth "patterns of violating state laws" hinders the provision of lawful legal services.***

As noted above, civil legal aid and public defenders provide the ultimate public service – ensuring fairness and equal justice under law, regardless of how unpopular a client may be. The proposed language regarding patterns of violating state laws however is so broad and vague that it creates fear and uncertainty regarding the specialized representation of people who may be accused of the enumerated activities, and even individuals accused of similar crimes multiple times.

If the legal advocates committed to helping protect people's rights are afraid to do so because they risk losing the ability to work in a place that helps them satisfy their loans, they will stop doing so. Without public interest legal advocates working to protect individual rights to counsel and to due process, our communities lose the people who fight to secure access to safety, stability and justice.

***2. The proposed rule lacks meaningful due process protections for employers deemed to be "engaging in activities with a substantial illegal purpose."***

The proposed rule lacks sufficient due process protections both in the procedure that the Department undertakes for determining that an employer is ineligible under the proposed rule, as well as in the lack of opportunity for reviewing and reversing a determination that an organization is not eligible for PSLF.

---

[12] Memorandum from Pam Bondi, U.S. Atty. General, on Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025), https://www.justice.gov/ag/media/1409486/dl.
[13] *Id*.

The proposed rule sets low and unclear standards for how the Department decides that an employer has engaged in "activities with a substantial illegal purpose" and thus is ineligible to certify employment for the PSLF program. The language as written does not define the scope of what evidence can be held against an employer. Based on the framing of the proposed rule, employers reasonably fear that the Department could disqualify them from the PSLF program on the basis of an anonymous social media post or an unsubstantiated accusation.

Also of concern is the proposed "preponderance of the evidence" standard for the Department's decision, which is a low evidentiary standard beneath the more rigorous and longstanding "clear and convincing evidence" and "beyond a reasonable doubt" standards utilized in determining violations of law.[14]

This lack of clarity is particularly concerning given the lack of due process for employers to respond to a disqualification under the proposed rule. An employer found ineligible must either wait 10 years to be reconsidered, which would functionally shutter many low-income legal services providers given their dependence on PSLF to attract and retain attorneys and staff, or else submit to a "corrective action plan" dictated by the Department. The potential scope of a corrective action plan is unclear, as is the extent to which it may interfere with delivery of services. The proposed rule does not provide an alternate path for employers to reverse an adverse determination.

***3. The continued eligibility of civil legal aid and public defense service providers as PSLF-eligible employers is critical to these providers, their employees, and the communities they serve.***

The continued functioning of PSLF is critical to the ability of legal aid organizations and public defense service providers to do their jobs effectively and keep our court systems efficient and accountable. The PSLF program works, and it is essential to ensuring that people across the country – in rural, suburban, and urban areas alike – can access the justice system, enjoy the benefits they have earned, and protect their liberty. The PSLF program, which was signed into law by a Republican president and has bipartisan legislative support, strengthens communities in all parts of the country, especially in rural areas where civil legal aid organizations, public defender offices, and other public service entities rely on PSLF to recruit and retain staff. The climbing expenses of higher education, particularly law school and other graduate programs, would make it impossible for many to work lower-paying public service jobs in rural areas if not for PSLF making it financially feasible to serve more isolated communities.

Without a path to student loan forgiveness through PSLF with affordable payment options through Income-Driven Repayment (IDR), civil legal aid and public defense would not be financially viable career paths for many lawyers, social workers, and other support staff who are essential to the delivery of these services. Without PSLF and IDR, countless veterans, seniors, and wrongfully accused individuals would not have the legal assistance to navigate complex court systems, present their arguments in a concise and timely manner, and have a fair chance at limiting overreach by government entitlement programs, regulators, and prosecutors.

---

[14] *See, e.g.*, Ron Spears, *Burdens of Proof*, 95 Ill. Bar J. 604 (2007), https://www.isba.org/ibj/2007/11/burdensofproof.

***Civil legal aid and public defense providers bear the responsibility of helping individuals going through the hardest times of their lives to succeed against otherwise narrow odds, and for many, that service is only possible through PSLF***.

Given the role of PSLF in the ecosystem of low-income legal services, the chilling effect created by the proposed rule substantially disrupts and harms the nonprofit organizations and government entities that provide these services, the borrowers and others who are employed at these service providers, and the clients and communities who rely on these services.

Most notably,

- PSLF is critical to low-income legal services providers' attorney and staff recruitment and retention efforts;
- PSLF is essential for borrowers to pursue careers in low-income legal services;
- PSLF is important to the protection of constitutional rights; and
- The revocation of low-income legal services providers' PSLF eligibility would harm low-income clients and communities who receive and depend on these services.

Each of these components is discussed further below.

***PSLF is critical to recruitment and retention of committed staff to provide quality legal services.***

Civil legal aid and public defense providers rely on PSLF to attract personnel (including both attorneys and non-attorneys) to relatively low-paying positions. In 2017, NLADA published the results of a survey of over 3,000 individuals working in civil legal aid and public defense to understand better the importance of PSLF for provision of legal services to those who cannot afford counsel.[15] That survey found that 71 percent of respondents who were the top executive at their organization considered PSLF to be a highly important tool for retaining experienced staff, and almost two-thirds believed it was important for attracting new hires.[16]

One leader of a public defense service provider in Pennsylvania reported:

> *PSLF is not just about relieving individual debt—it is about ensuring that critical public institutions, such as public defense, can attract and retain the skilled professionals our communities depend on.*
>
> *Eliminating PSLF [eligibility] would devastate our ability to recruit and keep talented staff, especially as many positions already offer far lower pay compared to the private legal sector. For many public defenders PSLF is the only way to make a long-term commitment to public service possible while managing the crushing cost of higher education.*

***PSLF is central to student loan borrowers' ability to pursue careers in low-income legal services.***

[15] NLADA, PUBLIC SERVICE LOAN FORGIVENESS AND THE JUSTICE SYSTEM: HOW ELIMINATING PSLF WOULD HARM AMERICAN COMMUNITIES (2017), https://www.nlada.org/pslf-and-justice.
[16] *Id*.



A substantial portion of individuals working in low-income legal services would not be able to pursue careers in public service without PSLF. Experienced attorneys and staff would have less incentive to stay in these careers if their employers' eligibility for PSLF were revoked. NLADA's survey found that:

- 81 percent of respondents who were aware of PSLF at the time that they started their current position said that they were significantly influenced by the promise of loan forgiveness, and 51 percent indicated that they were not likely or certain not to have taken their positions if PSLF had not existed, with 30 percent saying they were only somewhat likely to have taken their positions.[17]
- More than half of respondents said they would be very likely or certain to leave their jobs if PSLF did not exist.[18]
- Many respondents indicated that PSLF is the only reason they can afford to remain in public service and also look forward to home ownership, starting a family, or saving for retirement.[19]

***The PSLF program plays a central role in the protection of constitutional rights.***

The continued availability of PSLF to those working in public defense roles is essential to the protection of constitutional rights. Public defense service providers are key to maintaining the Sixth Amendment right to counsel for people in criminal court who cannot afford to hire a private lawyer. Approximately nine out of every ten people accused of a crime cannot afford an attorney and rely on public defense services to protect their rights in court. Civil legal aid providers ensure that individuals and families across the country can live safe and stable lives, and are not stripped of basic necessities like education, employment, housing and safety from violence without due process. Indeed, judges, prosecutors, and opposing counsel agree that these servants ensure the fair administration of justice.

This is the penultimate public service, and offices and organizations that provide these services rely on PSLF to bring in and keep talented attorneys and staff. Providers across the country historically have been faced with steep challenges in attorney and staff recruitment and retention, especially in rural communities. PSLF is one of the few incentives these organizations can offer to compete with the private sector.

***The proposed rule will harm low-income communities nationwide.***

Low-income communities in every corner of the country depend on civil legal aid and public defense and will suffer needlessly if PSLF eligibility is restricted in the manner proposed. Millions of people each year have criminal or civil legal issues and need legal assistance to navigate the court system.[20] The proposed rule is instilling fear in public servants willing to provide these services, chilling them from serving in these roles, and, moreover, affecting the level of advocacy they might provide. This reduces both the availability and quality of services and severely undermines justice in this country.

---

[17] *Id.* at 5.
[18] *Id.*
[19] *Id.* at 6.
[20] *See Every Three Seconds: Emerging Findings*, Vera Inst. (2019), https://www.vera.org/publications/arrest-trends-every-three-seconds-landing/arrest-trends-every-three-seconds/findings (noting that there are approximately 10.5 million arrests every year, not accounting for demands on civil legal aid providers).

**Conclusion**

There is no doubt the proposed rule will make employment in public interest law less feasible for more people, thus exacerbating the already enormous gap between availability of civil legal aid and public defense services and low-income communities' demand for those services.

While this chilling effect created by the proposed rule affects both employers and employees, most importantly, it will hinder the availability and level of legal advocacy people are willing to provide and undermine the fair administration of justice, and this country's promise of equal justice, leaving millions to fend for themselves and slay goliath on their own, simply because they cannot afford an attorney.

As detailed above, the proposed rule creates substantial fear that nonprofit organizations and government entities that provide low-income legal services may be disqualified from PSLF eligibility. This is true regardless of specialization in any specific type of law or client population served. Indeed, the head of a veterans' civil legal aid program reported:

> *[We] provide free civil legal services to low-income veterans … Much of our work is done in partnership with VA Healthcare … as part of a medical-legal partnership to address the social determinants of health, and our practice areas include housing issues (eviction defense, conditions issues, fair rent commission hearings, and discrimination); consumer debt defense; child support enforcement; public benefits (SNAP, TANF, state administered general assistance); and assistance with VA benefits, including representation before the Veterans Benefits Administration adjudicators and Court of Appeals for Veterans Claims, and assistance with military discharge upgrade applications. In addition, we conduct research to investigate questions and concerns regarding systemic problems. Our clients are the low-income veteran population of Connecticut.*
>
> *[We] ha[ve] a staff of 23, including 13 attorneys and 10 support staff. Our annual budget is approximately $2.3 million dollars, which goes almost entirely to pay for staff. Our attorneys have specialized knowledge in veteran law, housing law, and public benefits law. All attorneys working … must have a JD from an accredited law school and be admitted to the State Bar. Most of our attorneys have practiced in excess of 15 years. Our paralegals have experience in assisting attorneys with cite checking, filing papers with the courts and the administrative hearing offices, collecting military and medical records, and other such duties. Additionally, we have a data analyst with a master's degree in political science and research techniques. Our staff includes 3 military veterans.*
>
> *At least 6 members of our staff have used or are currently enrolled in public service loan forgiveness (PSLF). Several of those currently enrolled have indicated that if it were not for PSLF, they are not sure they could have afforded to work for a legal services program. One young attorney whose spouse helped her pay for law school commented, "If I did not have the assets to pay my own way through law school in order to work in public interest, I would have had to rely on PSLF. The sole reason I went to law school was to serve as a public interest lawyer, so under the proposed rule and in circumstances where*

*I would need PSLF, I can confidently state I would not have gone to law school at all, as the risk of debt would be too high."*

***The vagueness of the definitions in the proposed rules have caused concern that even our program, which serves veterans and thus should be considered politically neutral, could be deemed ineligible for PSLF.*** *If [we] were to lose eligibility, I would not be surprised if some of those staff members who rely on PSLF look for work in the private sector. Some have even told me that would be their plan.*

*If the rule goes into effect, [we] may have difficulty finding sufficient staff to continue our current level and quantity of legal services to veterans in Connecticut.*
[Emphasis added]

NLADA is hopeful the Department will consider the chilling effect of the proposed language on the communities served by civil legal aid and public defenders, and the ways in which it undermines justice and fairness, as well as safety and stability for people in every corner of the country. NLADA urges the Department to preserve PSLF as it exists, without revision, and according to the employer definitions as set forth in the CCRAA.

We greatly appreciate your consideration of these comments and are happy to provide any additional information as you consider PSLF.

Respectfully submitted,

Radhika Singh

Radhika Singh
Vice President, Civil Legal Services & Strategic Policy Initiatives
r.singh@nlada.org | 202-452-0622

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

The Council on Foundations appreciates the opportunity to provide our input and comments to the Department of Education on the proposed rule to amend the Public Service Loan Forgiveness Program. Please see the attachments for our response.

Attachments 2

Attachment1_Council on Foundations Response to William D. Ford Federal Direct Loan (Direct Loan) Program NPRM

Download

Attachment2_Council on Foundations Response to William D. Ford Federal Direct Loan (Direct Loan) Program NPRM

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10465/attachment_2.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10465

**Tracking Number**

mfo-j7gx-w684

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support) Give Feedback



September 17, 2025

Tamy Abernathy
Director, Policy Coordination Group
Office of Postsecondary Education
United States Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking

Dear Director Abernathy,

The Council on Foundations (the Council) appreciates the opportunity to provide our input and comments to the Department of Education (the Department) on the proposed rule to amend the Public Service Loan Forgiveness Program (PSLF).

The Council is a nonprofit membership association that serves as a guide for philanthropies as they advance the greater good. Building on our 75-year history, the Council supports over 1000 member organizations in the United States and around the world to build trust in philanthropy, expand pathways to giving, engage broader perspectives, and co-create solutions that will lead to a better future for all.

The philanthropic and nonprofit sectors are a key source of support for everyday Americans. In the past year alone, charitable nonprofits have provided critical disaster relief in response to the flooding in Texas; stepped up their efforts to feed Americans at a time of economic uncertainty; and built homes for post-9/11 veterans injured in combat. To support this work, nonprofits employ about 12.5 million Americans in every community with a variety of missions, including education, health, human services, economic development, and arts and culture.

The PLSF is an important part of ensuring charitable nonprofits can continue to attract a skilled workforce. Due to this importance, any uncertainty about whether certain employers are qualifying employers will undermine these benefits.  Therefore, we urge the Department to reconsider the inclusion of the following section:

- Qualifying Employer (§ 685.219(b)(27)) The Department proposes modifying the existing definition of *qualifying employer* in § 685.219(b). At the direction of the Secretary and consistent with the guidance in E.O. 14235, the Department would revise the definition of *qualifying employer* to exclude organizations that engage in activities that have a substantial illegal purpose.

Current law provides that all section 501(c)(3) organizations are eligible as a qualified employer under PSLF. The statute (20 U.S.C. § 1087e(m)(3)(B)(i)) clearly defines eligibility under PSLF and only Congress can make such changes. The definition of "public service job" in the PSLF statute states that the term "public service" job means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The process for which an organization receives and maintains section 501(c)(3) status is extensive and includes a comprehensive review of the organization's charitable purposes and activities. There are already processes in place to penalize nonprofits and their employees for engaging in illegal behaviors, including revocation of tax-exempt status. Such processes live within the IRS, U.S. Department of the Treasury, and Department of Justice. If the Department of Education believes that any organization is engaging in illegal activities, there are also processes for them to refer those organizations to the Department of Justice and the IRS to investigate.

In creating an additional review or determination of a category of charitable organizations that will no longer be considered Qualifying Employers, this rule sets a concerning precedent, injecting uncertainty into a critical program for public service employees. The proposed rule would cause eligibility for PSLF to change with each successive presidential administration based on how the Department of Education determined substantial illegal purpose that would be completely separate from the IRS's determination and analysis.

Nonprofit employees are not only a key part of the overall workforce: they are also critical service providers. Americans in every community in the country rely on these public service employees to provide rural healthcare, feed the hungry, respond to disasters before anyone else, and perform religious services. These employees are often paid less than their private sector counterparts and choose nonprofits out of a commitment to service. According to Candidly, this especially holds for rural and underserved communities already struggling with professional staffing. For those communities, and as Congress recognized through its creation of the program, PSLF is an essential tool for competing with higher-paying urban and private sector roles.

Creating uncertainty and confusion around PSLF, a critical incentive for building and maintaining a skilled nonprofit workforce, would ultimately harm the hundreds of millions of Americans who rely on these nonprofit employees. We urge the Department to rescind this provision.

In addition, we urge the Department to reconsider the inclusion of the following sections within the proposed rule:

- 685.219(h) to establish that the Secretary would determine by the preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions. Also, the Secretary will deem certain actions as conclusive evidence that the employer engaged in activities that have a substantial illegal purpose.

- 685.219(i) to establish that the Secretary will determine that a qualifying employer engaged in activities that have a substantial illegal purpose when (1) the Secretary receives an application in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose, or (2) the Secretary otherwise determines that the qualifying employer engaged in such activities under the standard set forth in § 685.219(h).

Public charities must respect the rule of law. Charitable organizations engaging in illegal behavior are bad actors that hurt public trust in the integrity of the nonprofit sector. As the proposed rule states, organizations created for a substantial illegal purpose will rightfully be denied section 501(c)(3) status and are ineligible for continued tax-exempt status. There is an existing process within the IRS to strip a nonprofit of its 501(c) status if it is found to be engaging in illegal activities, which would remove the employer and its workers from PSLF eligibility. This is in addition to any prosecution a nonprofit and its employees might face for criminal or otherwise illegal behavior.

The proposed rule, which includes sections 685.219(h) and 685.219(i), is unnecessarily duplicative of the existing process and does not provide adequate due process for nonprofit qualified employers. The decision to strip the eligibility of an organization would be determined by a “preponderance of the evidence” and without the opportunity to appeal to an independent authority. The addition of sections 685.219(h) and 685.219(i) is duplicative, circumvents the existing process that has been set forth by Congress in the Internal Revenue Code to provide organizations due process protections, and causes an undue burden on nonprofit organizations, the millions of Americans employed by those nonprofits, and the hundreds of millions of Americans who rely every day on the services they deliver.

Thank you for considering this input as part of the rulemaking process. To discuss the Council's recommendations in further detail or to explore options of how to collaborate with the philanthropic sector at large, do not hesitate to contact me or our Vice President of Government Affairs and Legal Resources, Jenn Holcomb, at govt@cof.org.

Sincerely,

Kathleen Enright
President and CEO



Council on
Foundations
Shared purpose. Collective voice.
Greater impact.

September 17, 2025

Tamy Abernathy
Director, Policy Coordination Group
Office of Postsecondary Education
United States Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking

Dear Director Abernathy,

The Council on Foundations (the Council) appreciates the opportunity to provide our input and comments to the Department of Education (the Department) on the proposed rule to amend the Public Service Loan Forgiveness Program (PSLF).

The Council is a nonprofit membership association that serves as a guide for philanthropies as they advance the greater good. Building on our 75-year history, the Council supports over 1000 member organizations in the United States and around the world to build trust in philanthropy, expand pathways to giving, engage broader perspectives, and co-create solutions that will lead to a better future for all.

The philanthropic and nonprofit sectors are a key source of support for everyday Americans. In the past year alone, charitable nonprofits have provided critical disaster relief in response to the flooding in Texas; stepped up their efforts to feed Americans at a time of economic uncertainty; and built homes for post-9/11 veterans injured in combat. To support this work, nonprofits employ about 12.5 million Americans in every community with a variety of missions, including education, health, human services, economic development, and arts and culture.

The PLSF is an important part of ensuring charitable nonprofits can continue to attract a skilled workforce. Due to this importance, any uncertainty about whether certain employers are qualifying employers will undermine these benefits. Therefore, we urge the Department to reconsider the inclusion of the following section:

- Qualifying Employer (§ 685.219(b)(27)) The Department proposes modifying the existing definition of *qualifying employer* in § 685.219(b). At the direction of the Secretary and consistent with the guidance in E.O. 14235, the Department would revise the definition of *qualifying employer* to exclude organizations that engage in activities that have a substantial illegal purpose.

Current law provides that all section 501(c)(3) organizations are eligible as a qualified employer under PSLF. The statute (20 U.S.C. § 1087e(m)(3)(B)(i)) clearly defines eligibility under PSLF and only Congress can make such changes. The definition of "public service job" in the PSLF statute states that the term "public service" job means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The process for which an organization receives and maintains section 501(c)(3) status is extensive and includes a comprehensive review of the organization's charitable purposes and activities. There are already processes in place to penalize nonprofits and their employees for engaging in illegal behaviors, including revocation of tax-exempt status. Such processes live within the IRS, U.S. Department of the Treasury, and Department of Justice. If the Department of Education believes that any organization is engaging in illegal activities, there are also processes for them to refer those organizations to the Department of Justice and the IRS to investigate.

In creating an additional review or determination of a category of charitable organizations that will no longer be considered Qualifying Employers, this rule sets a concerning precedent, injecting uncertainty into a critical program for public service employees. The proposed rule would cause eligibility for PSLF to change with each successive presidential administration based on how the Department of Education determined substantial illegal purpose that would be completely separate from the IRS's determination and analysis.

Nonprofit employees are not only a key part of the overall workforce: they are also critical service providers. Americans in every community in the country rely on these public service employees to provide rural healthcare, feed the hungry, respond to disasters before anyone else, and perform religious services. These employees are often paid less than their private sector counterparts and choose nonprofits out of a commitment to service. According to Candidly, this especially holds for rural and underserved communities already struggling with professional staffing. For those communities, and as Congress recognized through its creation of the program, PSLF is an essential tool for competing with higher-paying urban and private sector roles.

Creating uncertainty and confusion around PSLF, a critical incentive for building and maintaining a skilled nonprofit workforce, would ultimately harm the hundreds of millions of Americans who rely on these nonprofit employees. We urge the Department to rescind this provision.

In addition, we urge the Department to reconsider the inclusion of the following sections within the proposed rule:

- 685.219(h) to establish that the Secretary would determine by the preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions. Also, the Secretary will deem certain actions as conclusive evidence that the employer engaged in activities that have a substantial illegal purpose.

- 685.219(i) to establish that the Secretary will determine that a qualifying employer engaged in activities that have a substantial illegal purpose when (1) the Secretary receives an application in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose, or (2) the Secretary otherwise determines that the qualifying employer engaged in such activities under the standard set forth in § 685.219(h).

Public charities must respect the rule of law. Charitable organizations engaging in illegal behavior are bad actors that hurt public trust in the integrity of the nonprofit sector. As the proposed rule states, organizations created for a substantial illegal purpose will rightfully be denied section 501(c)(3) status and are ineligible for continued tax-exempt status. There is an existing process within the IRS to strip a nonprofit of its 501(c) status if it is found to be engaging in illegal activities, which would remove the employer and its workers from PSLF eligibility. This is in addition to any prosecution a nonprofit and its employees might face for criminal or otherwise illegal behavior.

The proposed rule, which includes sections 685.219(h) and 685.219(i), is unnecessarily duplicative of the existing process and does not provide adequate due process for nonprofit qualified employers. The decision to strip the eligibility of an organization would be determined by a “preponderance of the evidence” and without the opportunity to appeal to an independent authority. The addition of sections 685.219(h) and 685.219(i) is duplicative, circumvents the existing process that has been set forth by Congress in the Internal Revenue Code to provide organizations due process protections, and causes an undue burden on nonprofit organizations, the millions of Americans employed by those nonprofits, and the hundreds of millions of Americans who rely every day on the services they deliver.

Thank you for considering this input as part of the rulemaking process. To discuss the Council's recommendations in further detail or to explore options of how to collaborate with the philanthropic sector at large, do not hesitate to contact me or our Vice President of Government Affairs and Legal Resources, Jenn Holcomb, at govt@cof.org.

Sincerely,

Kathleen Enright
President and CEO

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached comment letter.

Attachments 1

2025.09.17 PSLF comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10466/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10466

**Tracking Number**

mfo-r13s-apll

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Submitted via regulations.gov

**Re:    William D. Ford Federal Direct Loan (Direct Loan) Program, Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

I write on behalf of Public Law Center in response to the Department of Education's Notice of Proposed Rulemaking, published on August 18, 2025, proposing to modify regulations governing the Public Service Loan Forgiveness program. For the past 12 years, Public Law Center has maintained a dedicated veterans advocacy project to provide free legal services for former U.S. military servicemembers and their families. We write to address the impact the proposed rule will have on the provision of legal services for low-income veterans.
The proposed regulations will have the effect of decreasing certainty and reliability in the PSLF program, which will discourage talented attorneys from working for nonprofit legal aid firms. That, in turn, will have the foreseeable effect of reducing the availability of legal services for veterans and their families. For this reason, we urge the Department of Education to abandon the proposed regulations.

**PSLF Is Essential to the Recruitment and Retention of Nonprofit Legal Aid Staff**

Attorneys that choose a career in nonprofit legal aid understand that they are choosing a path with lower financial compensation in exchange for the opportunity to do meaningful work in the public interest. The median salary of a first year associate at a private law firm ($200,000) is approximately triple the median salary for a first-year lawyer in a public service job ($64,200 to $69,608).[1]

In a California State Bar survey of legal aid lawyers and government attorneys, about 75% responded that they have worked with the intention of applying for loan forgiveness through

---

[1] American Bar Association, Profile of the Legal Profession 2024 (Nov. 18, 2024), https://www.americanbar.org/news/profile-legal-profession/wages/.

Re: William D. Ford Federal Direct Loan (Direct Loan) Program, Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016

Page 2 of 4

PSLF.[2] Additionally, a national survey of 3000 respondents by the National Legal Aid & Defender Association yielded the following results:

- 81% of respondents who were aware of PSLF at the time they took their current job reported having been significantly influenced by the promise of PSLF, with 51% indicating they were not likely or certain not to have taken their positions had PSLF not existed.[3]
- 71% of respondents who are top executives at their program (Executive Director, Chief Public Defender, etc.) considered PSLF to be a highly important tool for retaining experienced staff, and almost two thirds believe it is important for attracting new hires.[4]
- 87% of respondents indicated that qualification for PSLF would make them much more likely to accept a particular opportunity in the future, and more than half would be very likely or certain to leave their jobs if PSLF did not exist.[5]

The proposed regulations will reduce the certainty and reliability in the PSLF program for law students and attorneys that are considering whether to embark on a career in public interest law. Because of the unique role that legal aid attorneys have in the provision of legal services for veterans, any disruption to the recruitment or retention of legal aid staff endangers legal services for veterans and their families.

**The proposed rule endangers access to legal assistance for veterans and their families regarding VA benefits.**

Nonprofit legal aid attorneys are a key source of legal services regarding VA benefits. To assist a veteran or other claimant with the preparation, presentation, and prosecution of a claim for VA benefits, an attorney must be accredited with the Department of Veterans Affairs.[6] In California, according to the VA's roster of accredited attorneys, there are 375 VA accredited attorneys. Of that number, 80 appear to be attorneys employed at non-profit organizations or public agencies. The attorneys at these nonprofit law firms not only assist veterans with VA benefits claims but are also the first, and often only, source of legal

---

[2] Cal. Access to Justice Comm'n, Legal Aid Recruitment, Retention, and Diversity: A Report to the State Bar of California, at 34 (Feb. 2022), https://calatj.org/publications/legal-aid-recruitment-retention-and-diversity.
[3] National Legal Aid & Defender Association, Public Service Loan Forgiveness and the Justice System, at 5, https://www.nlada.org/sites/default/files/PSLF and the Justice System.pdf.
[4] *Id.*
[5] *Id.*
[6] 38 C.F.R. § 14.629(b)(1).

601 Civic Center Drive West · Santa Ana, CA 92701-4002 · (714) 541-1010 · Fax (714) 541-5157

ED_00580

Re: William D. Ford Federal Direct Loan (Direct Loan) Program, Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016

Page 3 of 4

assistance for low-income veterans and their families regarding evictions, child custody and child support, domestic violence restraining orders, and debt collection, among other issues.

**The proposed rule endangers the provision of free legal services for veterans who are homeless or at risk of homelessness.**

Nationally, the proposed regulations threaten the provision of free legal assistance for veterans under the U.S. Department of Veterans Affairs Legal Services for Homeless Veterans and Veterans At-Risk for Homelessness Grant Program (LSV-H). This program was enacted by Congress as part of the Johnny Isakson and David P. Roe, M.D. Veterans Health Care and Benefits Improvement Act of 2020 and signed into law by President Donald Trump. The program funds 108 organizations across the country to provide free legal services for the most vulnerable veterans, those who are homeless or at risk of homelessness. Under the law, only a "public or nonprofit private entity" is eligible for funding.[7] Of the 108 current grantees, 85 appear to be general, nonprofit legal aid firms and four appear to be specifically veteran-serving nonprofit law firms. With these funds, public interest lawyers defend veterans and their families from eviction, appeal denials of service-connected disability and pension benefits, help veterans receive child support, provide estate planning documents, and much more. Because the proposed regulations inject uncertainty into whether a non-profit law firm will be deemed a qualifying employer, it jeopardizes the viability of the LSV-H program, which is a critical component of the nation’s strategy for addressing veteran homelessness.

**Conclusion**

Legal services for veterans are tied to nonprofit legal aid organizations. The attorneys at those firms are the ones doing the work to help veterans and their families get connected to VA benefits, stay housed, address family law matters, and much more. The proposed regulations threatens to discourage law students and attorneys from entering into this field, which would have a drastic impact on the availability and quality of these services. For this reason, we urge the Department of Education to abandon the proposed regulations.

Best regards,
PUBLIC LAW CENTER

/s/ Ryan Ueda

---

[7] 38 U.S.C. § 2022A(c)(1).

601 Civic Center Drive West · Santa Ana, CA 92701-4002 · (714) 541-1010 · Fax (714) 541-5157

ED_00581

Re: William D. Ford Federal Direct Loan (Direct Loan) Program, Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016

Page 4 of 4

Ryan Ueda, Esq.
Supervising Attorney
Veterans Advocacy Project
Phone: 657-272-8721
rueda@publiclawcenter.org

601 Civic Center Drive West · Santa Ana, CA 92701-4002 · (714) 541-1010 · Fax (714) 541-5157

ED_00582

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Comment submitted on behalf of Minority Veterans of America by Yale Law School Veterans Legal Services Clinic.

Attachments 1

PSLF NPRM MVA 9.17.25 Final

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10468/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10468

**Tracking Number**

mfo-qyx3-unws

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



P.O. Box 608403
Chicago, IL 60660

**PETER E. PERKOWSKI**
**Legal & Policy Director**
(*he/him*)
Email: pperkowski@minorityvets.org

September 17, 2025

**Submitted Electronically via regulations.gov**

Tamy Abernathy
Director, Policy Coordination Group
Office of Postsecondary Education
Department of Education
400 Maryland Avenue SW, 2C-232
Washington, DC 20202

**Re: Comment in Response to RIN 1801-AA28, Docket ID. ED-2025-OPE-0016**

Director Abernathy,

Minority Veterans of America (MVA) submits this comment in opposition to the U.S. Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) published on August 18, 2025 proposing to amend Public Service Loan Forgiveness (PSLF) regulations.

MVA is a nationwide nonprofit working to advance equity and justice for minority veterans and creating belonging among the minority veteran community. Our members number over 10 million and include women, people of color, LGBTQI+, and nonreligious/religious minority veterans. Many of our members have felt marginalized, unseen, or unheard both during and after their time in military service. We strive to be the most diverse, inclusive, and equitable veteran-serving organization in the country and believe that by creating an intersectional movement of minority veterans, we can build a collective voice capable of influencing critical change. MVA provides that voice in direct advocacy, before Congress, and agencies like ED on behalf of this intersectional movement.

MVA's work also includes efforts to improve veterans' lives by providing supportive resources and programs that foster social engagement, community connection, financial stability, and leadership development. This work puts us in contact with veterans—many from historically underserved populations—who have been harmed by this country's student loan system, are struggling with student debt, and/or rely on the PSLF Program.



The NPRM's proposed exclusion of qualifying employers from the PSLF program would result in acute harm to America's veterans, and particularly our community of minority veterans who already face heightened barriers to achieving the American dream. These harms are two-fold. First, a robust PSLF program is pivotal to supporting veterans as public service employees who carry heavy student loan debt. Many veterans return from service eager to continue serving through public service employment, yet are uniquely impacted by the student loan crisis. Second, the proposed revision would weaken the ability of public service employers—including nonprofit veteran-serving organizations (VSOs) like MVA—to fulfill their critical missions. Without the promise of PSLF, talented and public-service oriented people will have no choice but to look for work elsewhere or leave these organizations in order to meet the demands of crippling student loan debt. As a result, the work of VSOs will suffer, and veterans struggling with homelessness, mental health conditions, or facing discrimination or difficulty accessing VA healthcare and benefits will have fewer avenues open for help.

**A. The proposed rule would undermine the purpose of PSLF and harm those who provide the greatest public service: America's veterans.**

When Congress established the PSLF program in 2007, it did so "to encourage individuals to enter and continue in full-time public service employment."[1] By passing a federal public service loan forgiveness program, the government made a promise to all Americans: complete 10 years of public service while making payments on your student loans, and your remaining student loans will be forgiven. Americans have built their lives around this commitment, pursuing meaningful higher education to equip themselves to improve their communities, based on the government's promise that their dedication would one day leave them debt-free. As of 2024, over 1 million talented, dedicated, and ambitious public service workers—including veterans employed as teachers, firefighters, law enforcement officials, and nurses—have had their student loans forgiven through PSLF.[2] Moreover, public service nonprofit organizations, including VSOs, have relied on PSLF to recruit and retain talented and public-service minded employees who might otherwise be forced by lower public service salaries and heavy student loan debt burdens to seek employment in the private sector.

---

[1] 34 C.F.R. § 685.219(a).

[2] *FACT SHEET: President Biden Announces Over 1 Million Public Service Workers Have Received Student Debt Cancellation Under the Biden-Harris Administration*, U.S. WHITE HOUSE (Oct. 17, 2024), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/10/17/fact-sheet-president-biden-announces-over-1-million-public-service-workers-have-received-student-debt-cancellation-under-the-biden-harris-administration.

 These public service workers—who dedicate their lives to serving their communities at personal cost—are entitled to student debt relief under the law. This NPRM threatens to break the promise Congress made to Americans, including our veterans, by (1) significantly curtailing PSLF benefits and employment opportunities for veteran borrowers, (2) increasing the debt burden on veterans, and particularly minority veterans, and (3) gutting the recruiting prospects of nonprofit organizations currently providing crucial support services to veterans.

Veterans remain dedicated to serving the public after their military careers end: as of 2024, over 700,000 veterans worked in federal agencies and departments, making up a steady and sizeable share of the federal public service workforce.[3] Notably, many veterans with service-connected disabilities work in the public sector: as of August 2024, 35% of employed veterans with a service-connected disability worked in federal, state, or local government.[4] Not only are veterans called to public service, but government veteran hiring preferences further encourage the military-to-public-service transition. State and federal hiring preferences for veterans are a clear governmental expression of both the value veterans provide in these roles, as well as the government's desire to help veterans find meaningful jobs after their military service ends. PSLF is a continuation of this commitment and makes public sector employment possible for veterans with student loan debt.

1. ***The proposed changes threaten veterans' employment opportunities and ability to continue serving.***

The proposed changes to the PSLF Program[5] threaten employment opportunities for veterans by gutting PSLF for organizations for which veterans may be particularly interested in working as a means of continuing their service. The reach of the proposed changes would be broad; advocates have estimated that this rule, as written, could affect

---

[3] Drew Desilver, *What we know about veterans who work for the federal government*, PEW RSCH. CTR., (Apr. 10, 2025), https://www.pewresearch.org/short-reads/2025/04/10/what-we-know-about-veterans-who-work-for-the-federal-government/.

[4] Press Release, Employment Situation of Veterans—2024, Bureau of Labor Statistics, at 5 (Mar. 20, 2025).

[5] The proposed changes to the PSLF program focus on excluding organizations that engage in activities that have a "substantial illegal purpose." William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154 (proposed Aug. 18, 2025) (to be codified at 34 C.F.R. pt. 685) [hereinafter "PSLF Proposed Rule"]. The NPRM defines this as including the following: "(1) aiding or abetting violations of 8 U.S.C. [§] 1325 or other Federal immigration laws; (2) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. [§] 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy; (3) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law; (4) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law, (5) engaging in a pattern of aiding and abetting illegal discrimination; or (6) engaging in a pattern of violating State laws . . . ." *Id.*

 thousands—or even millions—of borrowers nationwide by targeting a wide range of organizations.[6] These organizations would be hamstrung in hiring the talent they need to provide critical services: entities that engage in diversity, equity, and inclusion (DEI) programs, offer services to undocumented immigrants, provide gender-affirming care to individuals younger than nineteen, support certain political movements, or provide access to reproductive care could be deemed "illegal."[7] This baseless targeting threatens to undermine organizations actively providing health services, education, legal aid, social work, or political advocacy. Interpreted broadly, these changes could affect entire states or cities who, for example, identify as "sanctuary cities." This would affect PSLF status for city and state governments, undermining their ability to recruit talent and provide vital services.[8] The harm to these organizations, and their ability to employ veterans, is particularly acute in light of recently-enacted federal grant restrictions and funding cuts that threaten their existence.[9]

Of particular concern to MVA is the proposed exclusion from PSLF of organizations that provide gender-affirming hormonal and surgical care (unfortunately referred to as "chemical castration or mutilation" in the NPRM) for minors.[10] Veterans—especially transgender veterans—may reasonably want to work for organizations that advocate for transgender rights or otherwise help to alleviate gender dysphoria, which is clinically-significant distress defined in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders (DSM V).[11] The expertise and the healing these veterans are equipped to provide will be lost if they cannot afford to work for these employers due to exclusion from the PSLF program.

MVA is also concerned with the exclusion from PSLF of organizations that participate in what the NRPM terms "illegal discrimination." The scope of what this term encompasses—particularly as related to racial and ethnic discrimination—is hotly debated and politically charged.[12] This broad phrasing could lead to the disqualification of organizations that are

---

[6] Jessica Blake, *New PSLF Rule Could Limit Debt Relief Access for Thousands*, INSIDE HIGHER ED. (Aug. 19, 2025), https://www.insidehighered.com/news/government/student-aid-policy/2025/08/19/new-dept-ed-rule-limits-public-service-loan.

[7] *Id.*

[8] *Id.*

[9] Laura Tomasko, *Government Funding Cuts Put Nonprofits at Risk across the Nation*, URBAN INSTITUTE (Feb. 21, 2025), https://www.urban.org/urban-wire/government-funding-cuts-put-nonprofits-risk-across-nation.

[10] PSLF Proposed Rule, *supra* note 5.

[11] AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

[12] Indeed, in the wake of the 2025 rollback of DEI policies, critics have reexamined the justifications for veterans preferences. Some argue that they are analogs to DEI preferences because they are a form of "affirmative action" aimed at giving "extra help" to veterans and their spouses, who often face challenges



not discriminating but are helping minority-race or impoverished children access higher education, advocating for voter registration within historically underrepresented communities, filing lawsuits challenging civil rights violations, championing women's rights, and more—merely because a political appointee may decide that such activities are illegal. Veterans, especially minority and underrepresented veterans, often desire to work for such organizations due to their prior experiences in public service and their professional callings to meaningful work.

Relatedly, the exclusion of organizations engaging in work in "violation of . . . Federal immigration laws" is problematic. There is a risk that this language could be weaponized against immigration-oriented nonprofits, such as organizations providing legal services or charities providing basic-needs support to migrants. For many veterans, including immigrant veterans, serving in these noble jobs is a way to continue protecting the American dream, and excluding such organizations from PSLF would worsen an already dire shortage of resources for vulnerable immigrant communities.[13] Moreover, veterans have founded, and continue to be highly involved in, organizations that represent and advocate for refugees who worked alongside U.S. servicemembers in Iraq and Afghanistan.[14] Veterans employed by these organizations will face challenges to continued public service if their employers no longer qualify for PSLF.

Moreover, MVA is concerned about the standard for finding that an organization has engaged in activities with a "substantial illegal purpose." According to the proposed language, the Secretary can determine that a nonprofit meets the definition by a preponderance of the evidence.[15] Individual veteran borrowers—employees of such a nonprofit—will not be permitted to challenge the determination of "substantial illegal purpose," potentially leaving those veterans unexpectedly saddled with debt for decades. And organizations found ineligible will not be able to reapply to regain PSLF status for ten years.[16] This opens a wide and difficult-to-close window for politically motivated abuse of discretion.

---

obtaining employment, rather than a benefit earned from service. Karla L. Miller, *Column | Work Advice: A Closer Look at DEI and Veterans' Preference*, WASH. POST (Mar. 3, 2025), https://www.washingtonpost.com/business/2025/03/03/dei-preference-veterans-military-families.

[13] *See, e.g.*, Fátima Khayar Cámara, *A Matter of Time: The Crisis of Legal Representation for Immigrant Children*, Acacia Center for Justice (Nov. 18, 2024), https://acaciajustice.org/blog-matter-of-time-legal-representation-unaccompanied-children/ (discussing a lack of resources for immigrant children).

[14] *See* Regan Morris*, The US Military Vets Helping Afghans Fight Deportation,* BBC (Aug. 19, 2025), https://www.bbc.com/news/articles/cq68zq24vg5o; *Battle Buddies*, #AFGHANEVAC, https://afghanevac.org/battle-buddies (last visited Sept. 16, 2025).

[15] PSLF Proposed Rule, *supra* note 5.

[16] Hugh T. Ferguson,  *ED Publishes Proposed Rule on PSLF*, NAT'L ASSN. OF STUDENT FIN. AID. ADMINISTRATORS (Aug. 19, 2025), https://www.nasfaa.org/news-item/37030/ED_Publishes_Proposed_Rule_on_PSLF.

 2. ***The proposed rule would have the perverse effect of hurting veterans with high student loan debt and minority veterans, in direct conflict with the federal government's commitment to supporting veterans.***

Debt forgiveness pathways like PSLF are of great personal import to veterans across the country who struggle with student loan debt that limits life milestones, such as buying a home, starting a new career, or having children.[17] Veterans, and minority veterans in particular, carry significant debt burdens and are uniquely impacted by the student loan crisis.[18] Government programs such as the GI Bill often fail to prevent student debt for veterans, and for-profit institutions (FPIs) have preyed upon veterans and saddled them with debt.[19] Veterans also default on their debts at alarming rates: 46% of student veterans default, compared to 29% of non-veteran students.[20]

First, despite the availability of U.S. Department of Veterans Affairs (VA) benefits that veterans earned through their service, veterans have educational debt—and lots of it. VA Educational Assistance Programs do not adequately alleviate student debt for veterans, making opportunities for loan forgiveness, such as PSLF, essential to veterans as they transition from military service and reenter society. The GI Bill is a central manifestation of the government's commitment to supporting veterans as they re-enter civilian life—in the GI Bill's case, by promoting their education. However, the GI Bill has fallen short of its aspirations: while many veterans rely on the GI Bill for educational funding, administrative complexities cause some veterans to take on student debt or lose some of their earned benefits. These complexities, paired with pervasive bureaucracy, trap veterans in a cycle of

---

[17] *See* VA Pamphlet 26-7, Revised Chapter 4: Credit Underwriting at 4-58; *id.* at 4-2 ("By law, VA may only guarantee a loan when it is possible to determine that the veteran: is a satisfactory credit risk, and has present and anticipated income that bears a proper relation to the contemplated terms of repayment."); *see also* at 38 C.F.R. § 36.4337 (VA underwriting standards); Jessica Silver-Greenberg, Stacy Cowley & Natalie Kitroeff, *When Unpaid Student Loan Bills Mean You Can No Longer Work*, N.Y. TIMES, (Nov. 18, 2017), https://www.nytimes.com/2017/11/18/business/student-loans-licenses.html ("Twenty states suspend people's professional or driver's licenses if they fall behind on loan payments.").

[18] Phillip Oliff, Ama Takyi-Laryea, Scott Brees, & Richa Bhattarai, *Veteran Student Loan Debt Draws New Attention*, PEW RSCH. CTR. (Sept. 13, 2021), https://www.pewtrusts.org/en/research-andanalysis/ articles/2021/09/13/veteran-student-loan-debt-draws-new-attention.

[19] Many veterans must navigate complex hurdles associated with VA's management of the GI Bill or other debt assistance programs, leading to significant default rates for veterans. These defaults also disproportionately affect veterans who rely on other VA benefits: student loans affect veterans' VA housing loan eligibility by altering their debt-to-income ratio, and missed student loan payments jeopardize employment opportunities. Christopher J. Salemme, *Unpatriotic Profit: How For-Profit College Target Veterans and What the Government Must Do to Stop Them*, 32 BYU J. PUB. L. 85, 89-90 (2017).

[20] Colleen Campbell, *The Forgotten Faces of Student Loan Default*, AMERICAN PROGRESS, Oct. 16, 2018, https://www.americanprogress.org/article/forgotten-faces-student-loan-default/.



student debt, which often results in lower credit scores and other financial hardships (such as being indebted to VA).[21] For some veterans, the GI Bill benefit does not cover the full cost of enrollment, housing, books, and supplies.[22] Thus, "27% of undergraduate student veterans took out federal or private student loans during the 2015-16 academic year, an unexpected amount given their access to VA education benefits."[23]

Importantly, minority veterans are disproportionately affected: while white veterans are more likely to use their full GI benefits, veterans of color are more likely to be denied their full subsidy.[24] Black veterans' higher education debts are not only attributable to more recent systemic failures, but also to a history of discrimination that prevented their use of GI Bill education benefits.[25] These realities have led to significant disparities in economic outcomes for veterans of color and their descendants throughout the history of the GI Bill program.[26] Debt relief programs like PSLF provide an indispensable route for veterans who find themselves saddled with such burdens.

Further, some FPIs prey upon veterans, leaving the targeted veterans drowning in debt but with no diploma to show for it.[27] Recent investigations into FPIs uncovered that, in a given year, most students who enroll in FPIs do not graduate and yet are more likely to have

---

[21] *See* U.S. Dep't of Veterans Affairs, *Information About GI Bill Overpayments and Debts*, https://www.benefits.va.gov/gibill/resources/education_resources/debt_info.asp.

[22] Education benefits are prorated based on service time. Post-9/11 GI Bill awards range from 50% to 100% of the full benefit; Montgomery GI Bill awards are stepped down for veterans who served more than two but less than three years. *How We Determine Your Percentage of Post-9/11 GI Bill Benefits,* U.S. DEP'T OF VETERAN AFFS., https://www.va.gov/resources/how-we-determine-your-percentage-of-post-911-gi-bill-benefits/; *Montgomery GI Bill Active Duty (Chapter 30) Rates*, U.S. DEP'T OF VETERAN AFFS., https://www.va.gov/education/benefit-rates/montgomery-active-duty-rates/.

[23] *Veteran Student Loan Debt Draws New Attention*, PEW RSCH. CTR. (Sep. 13, 2021), https://www.pew.org/en/research-and-analysis/articles/2021/09/13/veteran-student-loan-debt-draws-new-attention.

[24] *See* Samuel D. Museus, María C. Ledesma, & Tara L. Parker, "Systemic Racism in Higher Education," 42 RACISM AND RACIAL EQUITY IN HIGHER EDUCATION: AEHE NO. 1, at 51 (2015).

[25] All Things Considered, *Black Vets Were Excluded From GI Bill Benefits – A Bill in Congress Aims to Fix That*, NAT'L PUB. RADIO (Oct. 18, 2022), https://www.npr.org/2022/10/18/1129735948/black-vets-were-excluded-from-gi-bill-benefits-a-bill-in-congress-aims-to-fix-th (post-WWII local administration of the GI Bill allowed universities across 18 states to discriminate against Black veterans, leading to a benefit disparity equivalent to $180,000); Press Release, Clyburn, Moulton Reintroduce Legislation to Provide Black WWII Veterans and Their Descendants with Long Overdue G.I. Bill Benefits (describing stark disparities in education and homeownership resulting from historical racial discrimination in administration of G.I. Bill benefits), https://clyburn.house.gov/press-release/clyburn-moulton-reintroduce-legislation-provide-black-wwii-veterans-and-their; *see also* H.R. 1255, Sgt. Isaac Woodard, Jr. & Sgt. Joseph H. Maddox GI Bill Restoration Act of 2023 (118th Cong.).

[26] Museus, Ledesma & Parker, *supra* note 24, at 51.

[27] Salemme, *supra* note 19, at 89-90.

higher debt loads than students at other institutions.[28] Notably, veterans attend FPIs at a higher rate than non-veterans,[29] and student veterans at FPIs have higher average debt loads (between $6,000 to $8,000) than their counterparts at public four-year colleges.[30] Further, minority veterans are disproportionately harmed by FPIs: veterans of color are more likely to enroll in FPIs, less likely to attend community colleges, public four-year colleges, or nonprofit colleges, and more likely to withdraw from FPIs before receiving a degree than white veterans.[31] Veterans of color also, on average, assume over $30,000 in college debt at FPIs—whereas veterans of color attending public and nonprofit schools accumulated only $22,900 and $26,900 in debt, respectively.[32]

Access to a debt relief program, such as PSLF, is a truly life-changing prospect for veterans who are in educational debt and encountering these obstacles. Because debt forgiveness remains a pressing need for America's veterans, ensuring access and organizational eligibility for PSLF is necessary: both for relieving veterans of crushing student loan debt, as well as for providing veterans with a path to employment that serves the public good. While recent administrations from both parties have endeavored to tackle student debt relief—and have taken a particular interest in doing so for veterans—there is still work to be done. By reducing the number of organizations eligible for PSLF, this proposed revision ultimately reduces opportunities for veterans to reasonably pay off their student loans through public service employment.

**B. The proposed rule jeopardizes critical services to veterans.**

Changes to PSLF eligibility for employers would hurt their ability to provide public services to veteran communities, thereby compounding harms for already-vulnerable veteran populations. Empirical research reflects that PSLF is effective in enticing talent to serve in public service roles that would otherwise remain unfilled; once this incentive is removed,

---

[28] A Senate Committee Investigation in 2012 found that of the 1.1 million students enrolled in an FPI in the 2008-09 academic year, most did not graduate—over half withdrew by mid-2010. With a median debt load of $32,700 and a default rate of one in five, FPI students are more likely to have higher debt loads and less likely to receive a degree with which to pay their loans back. *See* Staff of S. Comm. on Health, Education, Labor and Pensions, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success Senate 14 (July 30, 2012) [hereinafter "Senate Committee Report"].

[29] *See* Veterans Educ. Success, *Postsecondary Outcomes for Undergraduate Veterans of Color*, at fig. 4 (May 2021), https://vetsedsuccess.org/postsecondary-outcomes-for-undergraduate-veterans-of-color/ [hereinafter "Veterans of Color Outcomes"] (citing National Postsecondary Student Aid Study (NPSAS), https://nces.ed.gov/surveys/npsas/).

[30] *See id.* at fig. 12.

[31] *See* Veterans of Color Outcomes, *supra* note 29, at fig. 3, 6 (citing NPSAS).

[32] *See id.* at fig. 12.



people tend to leave these jobs and migrate to higher-paying options.[33] Losing PSLF eligibility will hurt public service employers' ability to recruit and retain staff, undermining their ability to provide services that veterans desperately need.[34] As ED concedes, changes to the PSLF program will affect employers "by loss of eligibility, the deterrent effect on their activities, difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment."[35] ED predicts that these changes will predominantly affect public service provision in "legal services, governance, social work, healthcare, K-12 education, and higher education."[36] MVA is particularly concerned about the deleterious effects of these changes on the provision of pro bono legal services and advocacy, and public healthcare, all of which uniquely affect veterans, especially minority and low-income veterans.

One area of particular concern is legal representation. Many organizations that provide legal services to veterans also engage in advocacy, often on behalf of disfavored causes that the proposed rule could find disqualifying for PSLF, thus indirectly jeopardizing legal services as well. Veterans who depend on pro bono or rural legal services provided by nonprofits will suffer the consequences of staffing shortages. Many veterans across the country rely on legal organizations that provide essential services on uniquely veteran legal issues, such as VA claims and discharge upgrades.[37] Navigating the complexities of the VA and Department of Defense (DOD) systems alone, in pursuit of outcomes such as disability benefits, GI Bill benefits, or record corrections, is a daunting task for even law-savvy veterans, and volunteer attorneys and pro bono organizations are a critical pillar of veterans' legal services across the country.[38] Veterans are also highly likely to experience civil legal challenges, ranging from housing insecurity, to family law issues, to consumer

---

[33] Michael Dinerstein, Samuel Earnest, Dmitri K. Koustas & Constantine Yannelis, *NBER Working Paper Series: Student Loan Forgiveness* 6 (Nat'l Bureau of Econ. Rsch., Working Paper No. 33462), https://www.nber.org/system/files/working_papers/w33462/w33462.pdf.

[34] Rebecca Carballo, *PSLF Has Been a Lifeline to Public Sector Lawyers. That Might Change*, POLITICO (Aug. 4, 2025), https://www.politico.com/newsletters/weekly-education/2025/08/04/pslf-has-been-a-lifeline-to-public-sector-lawyers-that-might-change-00491488.

[35] *Id.*

[36] PSLF Proposed Rule, *supra* note 5.

[37] *Report of the Veterans Task Force*, LEGAL SERVS. CORP. 20 (2021), https://lsc live.app.box.com/s/buoeznt4t7284462luqxcvqg1p1lnatu.

[38] *See, e.g.*, *Board of Veterans' Appeals Annual Report Fiscal Year (FY) 2024*, DEP'T OF VETERANS AFFS. 46 (2025), https://department.va.gov/board-of-veterans-appeals/wp-content/uploads/sites/19/2025/04/2024_bva2024ar.pdf.

finance crises.[39] When veterans have adequate legal representation, their mental health and physical health also improve.[40]

Importantly, pro bono legal organizations have warned that PSLF is vital to their ability to compete for legal talent.[41] Studies from borrowers confirm the importance of PSLF in recruiting: 81% of employees at pro bono legal services providers who were aware of PSLF said that the program significantly influenced their choice to work for their employer, with over half indicating that they were certain, or almost certain, they would not have taken the job without PSLF.[42] PSLF is especially vital for under-resourced communities, such as rural "legal deserts," which rely heavily on PSLF to recruit legal talent.[43] Because more than one-quarter of veterans live in rural areas, the veteran community—and older veterans in particular—will face the consequences of degraded legal services.[44]

Losing lawyers in legal aid will slow down court systems and risks pushing the burden onto other social services, impacting veterans' ability to access necessary resources. For example, low-income individuals facing eviction can utilize pro bono legal services to avoid homelessness; in the absence of such aid, there will be a "spillover effect . . . putting an enormous amount of pressure on social services, on homeless services, and other services."[45] The "deterrent effect" on such public services may prove particularly detrimental to veterans. Veterans—and particularly low-income veterans—are highly likely to experience legal challenges: in 2021, more than three quarters of low-income veteran households reported a civil legal problem, and 44% experienced at least five civil legal problems.[46] These legal problems multiply for veterans from vulnerable and marginalized communities.[47] Veterans already face increased risks of homeless, suicide,

---

[39] *Id*. at 22-23.

[40] *See* Jack Tsai et al., *Medical-Legal Partnerships at Veterans Affairs Medical Centers Improved Housing and Psychosocial Outcomes for Vets,* 36 HEALTH AFFS. 2195 (2017).

[41] Carballo, *supra* note 34.

[42] *Public Service Loan Forgiveness and the Justice System*, NAT'L LEGAL AID & DEFENDER ASS'N, accessed Sep. 12, 2025, https://www.nlada.org/sites/default/files/PSLF%20and%20the%20Justice%20System.pdf.

[43] *How PSLF Works: A Lifeline for Legal Professionals in Public Service*, AM. BAR. ASS'N (Aug. 25, 2025), https://www.americanbar.org/advocacy/governmental_legislative_work/priorities_policy/legaleducation/pslf-homepage/how-pslf-works/.

[44] *See Rural Veterans and Access to Healthcare*, RURAL HEALTH INFO. HUB. (Mar. 17, 2025), https://www.ruralhealthinfo.org/topics/returning-soldier-and-veteran-health.

[45] Carballo, *supra* note 34.

[46] Off. for Access to Just., *Fact Sheet: Access to Justice is Access for Veterans*, U.S. DEP'T OF JUST. 1, accessed Sep. 9, 2025, https://web.archive.org/web/20241111202214/https://www.justice.gov/atj/media/1353941/dl (citing LEGAL SERVICES CORPORATION, THE JUSTICE GAP: THE UNMET CIVIL NEEDS OF LOW-INCOME AMERICANS 10, 41 (April 2022), https://lsc-live.app.box.com/s/xl2v2uraiotbbzrhuwtjlgi0emp3myz1).

[47] *Id.*



and incarceration, and the loss of pro bono legal resources will only exacerbate these risks.[48]

These PSLF changes would also harm veterans by disproportionately affecting healthcare providers who work in rural and community hospitals, VA clinics, and most nonprofit or academic medical institutions.[49] The proposed rule could disqualify from the PSLF program employers who provide gender-affirming care to minors if such care violates state or federal law.[50] At least 27 states have policies limiting some or all access to gender-affirming care for minors,[51] which can be enforced by a variety of penalties.[52] Barring hospitals, or hospital organizations, that provide transgender care from qualifying as PSLF employers will affect the quality of care available, further jeopardizing Americans who rely on PSLF-eligible healthcare providers. And veterans are particularly likely to rely on PSLF-eligible hospitals; for example, rural veterans already receive care at lower rates than urban veterans, a problem that would be exacerbated by staffing challenges.[53] This rule would harm not only transgender veterans, but all veterans trying to access healthcare.

Transgender veterans are increasingly reliant on providers outside of the VA system for healthcare. A 2021 study estimated that there are more than 15,500 currently-serving transgender servicemembers, and more than 134,000 transgender veterans; the percentage of transgender people who have served in the military is nearly double the percentage of transgender people in the U.S. population at large.[54] But VA has announced that they are "phas[ing] out" medical care treatment for "gender dysphoria." Effective March 17, 2025 VA purported to stop providing gender-affirming medical care to patients who had not already been receiving such care through VA or from military medical

---

[48] *Id.* (citing U.S. DEP'T OF JUST., *Memorandum for Heads of Department Components: Guarding the Rights of and Improving Access to Justice for Veterans, Servicemembers, and Military Families*, at 2 (Nov. 10, 2021), https://www.justice.gov/opa/page/file/1447636/download).

[49] Annalisa Merelli, *Changes in US Public Service Loan Forgiveness Program Worry Docs, Hospitals*, MEDSCAPE (May 23, 2025), https://www.medscape.com/viewarticle/changes-us-public-service-loan-forgiveness-program-worry-2025a1000d5f.

[50] PSLF Proposed Rule, *supra* note 5, at 40161.

[51] Lindsey Dawson & Jennifer Kates, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions*, KFF (Aug. 12, 2025), https://www.kff.org/lgbtq/gender-affirming-care-policy-tracker/.

[52] Attacks on Gender-Affirming and Transgender Health Care, AM. COLL. OF PHYSICIANS (Aug. 9, 2025), https://www.acponline.org/advocacy/state-health-policy/attacks-on-gender-affirming-and-transgender-health-care.

[53] *Why Health Care Is Harder to Access in Rural America*, GOV'T ACCOUNTABILITY OFF. (May 16, 2023), https://www.gao.gov/blog/why-health-care-harder-access-rural-america.

[54] *Report of the Veterans Task Force*, *supra* note 37, at 26.

providers.[55] This policy endangers the continued availability of gender-affirming care for veterans and pushes veterans out into the community to access care. And the proposed PSLF changes would compound this issue, further reducing veterans' ability to access care outside of VA. An estimated 73% of hospitals are currently PSLF-eligible employers.[56] To maintain eligibility, because they rely on the talent that PSLF attracts, hospitals may reduce or eliminate the gender-affirming care they provide.[57] Transgender veterans will be unable to access the medical care they need—even outside of the VA system.

Veterans who do *not* rely on gender-affirming care may also be affected by PSLF changes to employer eligibility, if hospitals that employ them are deemed ineligible as PSLF employers for choosing to continue providing gender-affirming care. There are significant concerns that entire hospital chains could be found to be involved in "substantially illegal" activity because one department provides gender-affirming care.[58] Borrowers reliant on the PSLF program may be forced to find alternative jobs, leaving the hospitals with staffing shortages and care inadequacies.[59] Moreover, uncertainty and contraction of the PSLF program may discourage future healthcare workers from entering the field,[60] exacerbating existing shortages of medical providers.[61] Because most veterans rely on healthcare provided by entities other than the DOD or VA,[62] veterans will feel the negative effects of reducing PSLF.

Women veterans are particularly likely to seek care outside of the VA system, making them vulnerable to changes in PSLF-eligibility. Studies show women veterans use VA care at

---

[55] *VA to Phase Out Treatment for Gender Dysphoria*, VA NEWS (Mar. 17, 2025), https://news.va.gov/press-room/va-to-phase-out-treatment-for-gender-dysphoria/.

[56] Courtney Nagle, *3 Myths About Student Loan Forgiveness for Physicians*, USA TODAY (Jan. 2, 2019), https://www.usnews.com/education/blogs/student-loan-ranger/articles/2019-01-02/3-myths-about-public-service-loan-forgiveness-for-physicians.

[57] Some hospitals have already begun reducing their gender-affirming care. *See* Mary Kekatos, *More US Hospitals are Ending Gender-Affirming Care for Minors. How This Could Impact Patients*, ABC NEWS (Aug. 23, 2025), https://abcnews.go.com/Health/us-hospitals-ending-gender-affirming-care-minors-impact/story?id=124889031.

[58] Collin Binkley, *Trump is Reshaping a Student Loan Forgiveness Program. Some Fear Politics Will Decide Who Qualifies*, KCRA (July 7, 2025), https://www.kcra.com/article/trump-student-loan-forgiveness-changes/65322778.

[59] *Id.*

[60] *See* Bridget Balch, *Proposed Changes to Federal Student Loans Could Worsen The Doctor Shortage*, AAMC (June 25, 2025), https://www.aamc.org/news/proposed-changes-federal-student-loans-could-worsen-doctor-shortage. More than 55% of graduating doctors plan to target the PSLF program for loan forgiveness.

[61] Laura Medford-Davis & Rupal Malani, *The Physician Shortage Isn't Going Anywhere*, MCKINSEY & CO (Sep. 10, 2024), https://www.mckinsey.com/industries/healthcare/our-insights/the-physician-shortage-isnt-going-anywhere.

[62] Sammy Cervantes, Jennifer Tolbert, Alice Burns & Robin Rudowitz, *5 Key Facts About Medicaid and Veterans,* KFF (June 30, 2025), https://www.kff.org/medicaid/5-key-facts-about-medicaid-and-veterans/.

lower rates than men, and avoid or delay seeking VA care due to factors such as the veteran's lack of knowledge about VA care, the veteran's history of military sexual trauma, and the perception that VA providers are not gender sensitive.[63] Women veterans who do use VA for primary care often use community providers for gender-specific services, like mammograms and reproductive care.[64] Some of these services are available at VA, but are often insufficient.[65] And other medical services are not covered by VA at all. Women seeking assisted reproductive treatments like IVF almost always have to seek outside medical care, at great expense, because VA requires veterans to show their infertility is service-connected in order to receive IVF coverage.[66] Abortion care is similarly restricted. Given that VA is in the process of instating a near-total ban on abortions and abortion counseling—including in cases of rape and incest—more women veterans will be forced to use community providers to access this form of vital, gender-related healthcare.[67] Women veterans have been forced into the community to find care because the VA has failed to meet their needs; they will now be uniquely likely to experience the negative effects of contracting PSLF eligibility.

* * *

For the above reasons, the proposed rule would cause acute harm to America's veterans. Veterans are both uniquely likely to return to public service, and uniquely likely to depend on student loan forgiveness programs. Contracting the PSLF program would thus disproportionately affect veterans, particularly veterans of color. Moreover, the proposed changes to PSLF would endanger public service organizations who provide vital services to veterans, undermining their ability to recruit and maintain staff, as a result, shrinking their ability to serve our nation's heroes.

---

[63] Donna L. Washington et al., *Access to Care for Women Veterans: Delayed Healthcare and Unmet Need*, 26 J. GEN. INTERN. MED .655 (2011).

[64] *Veterans' Access to Reproductive Healthcare*, VETERANS OF FOREIGN WARS (July 1, 2020), https://www.vfw.org/advocacy/national-legislative-service/congressional-testimony/2020/6/veterans-access-to-reproductive-healthcare.

[65] *Id.*

[66] *See* Dana Schultz et al., *Improving Support for Veteran Women: Veterans' Issues in Focus*, 10 RAND HEALTH Q 10 (2023).

[67] Reproductive Health Services, 90 Fed. Reg. 36415 (proposed on Aug. 4, 2025) (to be codified at 38 C.F.R. pt. 17).



Very respectfully,

Peter Perkowski

*Prepared by Counsel*

Maggie Baughman, Law Student Intern
Margo Darragh, Law Student Intern
Jesse Friedson, Law Student Intern
Ashley Anderson, Esq.
Rose Carmen Goldberg, Esq.
JEROME N. FRANK LEGAL SERVICES ORGANIZATION
YALE LAW SCHOOL[68]
P.O. Box 209090
New Haven, CT 06520
Tel: (203) 432-4800
rose.goldberg@ylsclinics.org

[68] The Jerome N. Frank Legal Services Organization does not represent the institutional views of Yale Law School, if any.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached letter from the Colorado Cross-Disability Coalition, providing its comments on the Department of Education's proposed rule modifying the PSLF program.

Attachments 1

2025.09.17 CCDC Comments re DOE PSLF

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10479/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10479

**Tracking Number**

mfo-jykc-vjk5

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



1385 S. Colorado Blvd.
Bldg. A, Suite 610
Denver, Colorado 80222
303.660.8254 (p) | 720.420.1390 (f)

September 17, 2025

**Via www.regulations.gov [Docket # ED-2025-OPE-0016]**

Tamy Abernathy
Office of Postsecondary Education
Department of Education
400 Maryland Avenue SW
Washington, DC 20202

Re: William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154 (Aug. 18, 2025) [ED-2025-OPE-0016]

Dear Ms. Abernathy:

On behalf of our over 7,000 members, please accept and consider these comments from the Colorado Cross-Disability Coalition (CCDC) on the Department of Education's Office of Postsecondary Education's proposed rule modifying the Public Service Loan Forgiveness (PSLF) program. CCDC's mission is to build the power and influence of the disability community. We advocate for social justice for people with all types of disabilities and break down barriers that fail to promote the full participation of people with disabilities. Breaking down barriers includes eliminating the physical barriers that preclude access to education, employment, and other opportunities.

Congress created the PSLF program nearly two decades ago to encourage more individuals to consider public service by offering loan forgiveness after ten years at a qualified employer. Without loan forgiveness, public service employment is not possible, and many employees of non-profits, educational institutions, and state and local governmental entities may have chosen—and been able to seek—these jobs in part, for the PSLF benefits. For example, Andrew Montoya, CCDC's Civil Rights Legal Program Director, learned of PSLF prior to attending law school and incorporated PSLF into his higher education plan. Mr. Montoya was able to attend law school and work with CCDC for well over a decade afterwards by taking advantage of PSLF, which he would have been unable to do had PSLF not been available or had he not been able to rely on his and CCDC's eligibility for the program and on the availability of due process protections to preserve their eligibility.

CCDC strongly opposes the proposed rule and the limitations and burdens it would impose on non-profit employers and both its actual and potential employees. CCDC is also concerned about the real and potential implications for burdens on speech imposed by the proposed rule.

## The proposed rule is contrary to federal law

The Department of Education claims that it can change the definition of a "qualifying employer" to exclude borrowers from obtaining PSLF if any part of their organization engages in a "substantial illegal purpose," at the sole determination of the Secretary of Education.

There is no clear statutory authority for the Department of Education (DOE) to promulgate this rule. Federal law makes clear that any borrower in a public service job is eligible for PSLF and that public service applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. *See* 20 U.S.C. § 1087e(m)(1)(B), (3)(B) (defining "public service job" as a "full-time job . . . at an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title"). Simply put, all 501(c)(3) organizations are by law eligible as a qualified employer under the PSLF program with no exceptions. The statute is not ambiguous, and the DOE does not have the statutory authority to further restrict eligibility under or for the PSLF program.

Furthermore, when it specified that 501(c)(3) organizations are eligible, Congress certainly knew that 501(c)(3) organizations may not—by law—have an illegal purpose and that the Internal Revenue Service (IRS) has a process to evaluate and, if necessary, remove an organization's 501(c)(3) status, making them ineligible for PSLF. Congress did not need to provide statutory authority to the DOE to determine whether an organization does not engage in "substantial illegal purpose" and is thus eligible for the PSLF program, so it did not.

## The proposed rule is unnecessary

"The Department is engaging in this rulemaking because organizations must not engage in substantial illegal activities to be a qualifying employer for purposes of the PSLF Program." 90 Fed. Reg. at 40156. The DOE, however, fails to explain why this rulemaking is necessary when the IRS already requires this of 501(c)(3) organizations. The proposed rule fails to explain why setting up a duplicative regulatory regime is consistent with administration priorities to reduce burdens on businesses and to avoid regulations that are not authorized "by clear statutory authority."[1]

[1] For example, the DOE's position here that the DOE has "broad rulemaking authority" is in stark contrast to its position in other rulemakings that seek to rescind regulations where the statute does not explicitly require the regulatory regime. *See, e.g.,* 90 Fed. Reg. 28494, 28495 (July 1, 2025) ("DOL will not impose new requirements for conducting the Section 503 analyses, as doing so would be contrary to E.O. 14219, which directs Federal agencies to implement deregulatory measures and reduce undue burden on businesses. *See* E.O. 14219, ''Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative,'' 90 FR 10583 (Feb. 25, 2025). DOL also notes that the self-identification and utilization analysis requirements are not required by the Section 503 statute. *See* 29 U.S.C. 793. By rescinding these burdensome requirements, DOL would be fulfilling E.O. 14219's mandate to rescind or modify regulations that are not authorized by clear statutory authority.").

## The proposed rule undermines the effectiveness of the PSLF program and harms nonprofit employees and their communities

This proposed rule affects CCDC's staff and the community we serve, because students with disabilities carry a higher-than-average school debt burden. PSLF is critical to breaking down barriers in education and employment.[2] In addition, for many years, CCDC was staffed entirely by unpaid volunteers. CCDC's ability to hire and retain attorneys and advocates depends in part on the PSLF program, as illustrated by Mr. Montoya's employment. Without assurances that program rules will remain consistent over the long term, borrowers seeking or considering employment with a nonprofit organization cannot rely on the program to make important, long-term decisions about their career path. Ultimately, the proposed rule will harm the people and vulnerable communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce. Because this program is intended to benefit both employers and borrowers, CCDC urges the DOE to support its "belief" that it expects the rule to affect less than ten employers annually and to discuss how many borrowers will be affected by this rule.

## The proposed rule does not provide adequate due process for employers and employees

The determination to strip the eligibility of an organization is determined by a "preponderance of the evidence" and without the opportunity to appeal to an independent authority. This standard is too low for a determination with a very harmful effect on borrowers, and the process does not allow the affected borrower to appeal.

## The DOE lacks the capacity and expertise to implement the proposed rule

The DOE has lost nearly half of its staff in the past few months. With these significant staff shortages, the DOE will not be able to bear the administrative burdens of making these determinations and enforcing the processes that would need to be put in place to implement it. They also do not have the expertise to make a determination of which organizations are engaging in illegal activities. Despite the DOE lacking the staff, expertise, and credibility to make such legal determinations, it would be able to render all employees of affected entities no longer eligible for PSLF.

[2] For more information, *see* David Weaver, *Educational Debt and Material Hardship: The Role of Disability* (August 8, 2021), available at https://ssrn.com/abstract=3901473; Kim Bullington et al., *Above-average student loan debt for students with disabilities attending postsecondary institutions,* 35 J. of Postsecondary Educ. and Disability 31-44 (2022).

Thank you for considering these comments. The PSLF program is very important to CCDC and its employees, and CCDC urges you to withdraw this proposed rulemaking and to administer the PSLF program as Congress intended.

Sincerely,

Kara Gillon
Paralegal & Legal Analyst

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached comment submitted by the Center on Race, Inequality, and the Law at NYU School of Law for Docket ID ED-2025-OPE-0016.

Attachments 1

PSLF Comment--CRIL--9-17-2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10484/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10484

**Tracking Number**

mfo-k4b9-bss1

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



THE CENTER ON
RACE
INEQUALITY
& THE LAW
NYU SCHOOL OF LAW

September 17, 2025

**Office of Postsecondary Education**
**Tamy Abernathy**
400 Maryland Ave. SW
Washington, DC 20202
Telephone: (202) 987-0385
Email: Tamy.Abernathy@ed.gov

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

The Center on Race, Inequality, and the Law at NYU School of Law uses research, advocacy, litigation, and public education to advance racial and social justice for all.[1] In keeping with that mission, we submit this comment in response to the Department of Education's ("DOE") proposed rule to amend to the regulations on organizational ineligibility for Public Service Loan Forgiveness ("PSLF") program under 34 CFR 685.219.

As an academic center that deploys the law to meet our mission, we recognize the immense role that non-profit organizations have always played to advance the public interest, including in the areas of racial and social justice. The PSLF is a catalyst to drive people to join organizations that are doing that work. It does so by forgiving student loan debt after a graduate has spent a decade engaged in public service work while paying down their student loan balance. Policies and practices that ensure equitable and consistent access to the PSLF program yield benefits for all. Here, the DOE's proposed rule undermines access to PSLF. We urge the DOE to withdraw it.

The DOE's proposed rule—in particular the draft amendments to §§ 685.219(b)-(j)—raise two interrelated concerns that should compel the DOE to withdraw it. First, the amendments invite the political weaponization of PSLF by advancing a definition of "substantial illegal

[1] This comment has been prepared by the Center on Race, Inequality, and the Law at NYU School of Law, but does not purport to present the school's institutional views, if any.

purpose" to disqualify organizations from PSLF participation. That definition is expansive, to the point that it captures legitimate, justice-focused work. That leaves the proposed definition vulnerable to abuse, because it can be employed to persecute organizations or practitioners engaged in public service who subscribe to politically disfavored viewpoints, or who provide services to racial, ethnic, religious, gender justice and immigrant groups.

Second, the proposed amendments vest the DOE Secretary with unfettered authority to determine which public service organizations may qualify for PSLF, and by extension which organizations are engaged in activities that have a "substantial illegal purpose". The unbounded discretion afforded the DOE Secretary pursuant to the proposed rule invites discriminatory, capricious, and politically motivated disqualification determinations by the government.

With these concerns as context, we believe that implementation of the proposed rule, if infused by the political biases of any administration enforcing the PSLF's restrictions, is of serious concern. That is because it could be used to disqualify public interest organizations from participating in the PSLF program, which in turn would diminish the capacity of organizations and individuals to provide key services to those who need the assistance of civil society non-profit organizations that work in the public interest. We respectfully request that the DOE withdraw the proposed rule in light of these considerations.

**The proposed amendment to consider and define "substantial illegal purpose" invites arbitrary and biased enforcement against disfavored organizations**

The proposed rule, by adding § 685.219(h), creates a new standard of PSLF eligibility review, whereby a public service organization will be removed from, or ineligible for, PSLF classification if the DOE Secretary has determined that the organization has engaged in activities considered to have a "substantial illegal purpose." The proposed rule then sets forth definitions of that phrase at § 685.219(b)(30). Those definitions are expansive and capacious, and are nested within provisions that reach immigration law, national security, and civil and human rights. They encompass activities that place a range of organizations at potential risk for designation, including those that support racial justice, gender justice, immigrant's rights, human rights, diversity and inclusion, and civil liberties.

The interplay between the newly crafted "substantial illegal purpose" and the proposed definition of "illegal discrimination" found at § 685.219(b)(12) is instructive. Under the proposed amendments, "substantial illegal purpose" includes what is termed "illegal discrimination." Pursuant to proposed § 685.219(b)(12), "illegal discrimination" is defined as, among other things, a violation of any federal discrimination law, including the Civil Rights Act of 1964. In a political environment where efforts to challenge the impact of racial discrimination can, on their own, be deemed as violative of anti-discrimination laws, groups that engage in racial justice work are at

risk of being deemed ineligible hosts for the dedicated public servants who participate in the PSLF program.[2]

The Secretary, pursuant to the proposed amendments to § 685.219(i), plays an outsized role in determining whether and when an organization has a substantial illegal purpose. The Secretary not only defines the category, but also the behaviors included in the category. And, by virtue of § 685.219(g), bars PSLF program applicants from seeking reconsideration of the Secretary's determination that an organization is ineligible to participate in the program. The definition encourages the DOE to enforce standards that can cut off PSLF eligibility in arbitrary ways, informed by the biases of the federal administration and ultimately infecting the PSLF decision-making process. Taken together, these rules afford the DOE Secretary—and by extension, the Executive Branch—immense power. They can arbitrarily decide which organizations, subject matters, issue areas, beliefs, or disenfranchised groups they find undesirable, unilaterally terminate access to the benefits under the PSLF program in light of that decision, and bar reconsideration of their initial designation.

The spirit and substance of the proposed rules are especially concerning in light of the constitutional concerns they raise. The First Amendment serves as a check against the persecution of organizations based on *who* they choose to serve and *what* community-based services they provide. The First Amendment protects the freedoms of association and assembly, the freedoms of expression and speech, and the freedom to petition the government for redress.[3] These protections are a guard against the government "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[4] Indeed, the government cannot discriminate on the basis of viewpoint, nor sanction an organization or its employees because they adhere to political beliefs the government deems unfavorable. This kind of action would be unconstitutional.

United States Supreme Court precedent is informative. Nearly six decades ago, the Court in *NAACP v. Button*, affirmed a civil rights organization's ability to engage in public interest litigation.[5] Resting on constitutional grounds, the Court explained in its ruling that "regulatory measures…no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights."[6] These proposed rules threaten to do

---

[2] Dana Goldstein, *Judge Halts White House Effort to Defund Schools with D.E.I. Programs*, N.Y. TIMES, Aug. 14, 2025, https://www.nytimes.com/2025/08/14/us/politics/trump-dei-schools.html.

[3] *See Bates v. City of Little Rock*, 361 U.S. 516, 522-523 (1960) ("Like freedom of speech and a free press, the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government- based upon the consent of an informed citizenry -- a government dedicated to the establishment of justice and the preservation of liberty. U.S. Const., Amend. I. And it is now beyond dispute that freedom of association for the purpose of advancing ideas and airing grievances is protected by the Due Process Clause of the Fourteenth Amendment from invasion by the States") (internal citations omitted).

[4] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding that a state statute compelling children to salute the American flag in public schools violated the First Amendment).

[5] *NAACP v. Button*, 371 U.S. 415 (1963).

[6] *Id.* at 439 (quoting *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 297).

just that. The attempt to define the activities that are considered presumptively disqualifying under § 685.219(b)(30), including 'aiding violations to immigration law' and "illegal discrimination," invites government discrimination. It also casts legal doubt on a swath of activities aimed at supporting those who may be disfavored[7] and who may need the community-based programs and services provided by organizations that fall within the purview of the proposed rule. In broadly targeting the "aiding or abetting" of activities with a "substantial illegal purpose," these rules could even be construed to apply to traditional legal aid and public defender services that represent people accused of crimes, threatening the Sixth Amendment right to assistance of counsel.[8] The proposed rules endanger the crucial work of public service public defenders across the country. These concerns warrant withdrawal of the proposed rule.

**Examples of government driven ideological persecution from America's past and present counsel against the adoption of the proposed rule.**

The concern we raise is more than theoretical or hypothetical. History provides several prominent examples of government persecution of organizations and individuals that it deemed politically disfavored. Time has rendered a harsh judgment against government repression of those past eras.[9] For example, for a period of over 22 years beginning in the 1920s, the Bureau of Investigation ("BOI") (the predecessor of the Federal Bureau of Investigation ("FBI")), subjected the newly-established American Civil Liberties Union ("ACLU") to an illegal surveillance campaign.[10] Under the command of J. Edgar Hoover, the BOI wielded its governmental authority to arbitrarily deem the efforts that the ACLU undertook to protect people from the government's repressive Red Scare tactics as "subversive activity."[11]

During the McCarthy era's persecution of political dissidents, the then-FBI Director Hoover ordered the FBI to target, surveil, harass, and raid the National Lawyers Guild ("NLG"),

---

[7] *See e.g.*, Sarah Mehta, *From Day One, Trump's Immigration Agenda Has Grown More Extreme*, ACLU (Jun. 6, 2025), https://www.aclu.org/news/immigrants-rights/from-day-one-trumps-immigration-agenda-has-grown-more-extreme; *see also e.g.* Mia Ives-Rublee and Casey Doherty, *The Trump Administration's War on Disability*, CENTER FOR AMERICAN PROGRESS (Jul. 28, 2025), https://www.americanprogress.org/article/the-trump-administrations-war-on-disability/; *see also e.g.* Areeba Haider, *20 Ways the Trump Administration Has Already Harmed Women and Families, National Partnership for Women & Families* (Mar. 4, 2025), https://nationalpartnership.org/20-ways-the-trump-administration-has-already-harmed-women-and-families/; *see also e.g. President Trump's First 100 Days: Attacks on Human Rights, Cruelty and Chaos, Amnesty International,* AMNESTY INTERNATIONAL (Apr 30, 2025), https://www.amnesty.org/en/latest/news/2025/04/president-trumps-first-100-days-attacks-on-human-rights/.

[8] *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) ("The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.")

[9] *Kelley Apologizes for F.B.I. Actions*, N.Y. TIMES (May 9, 1976), https://www.nytimes.com/1976/05/09/archives/kelley-apologizes-for-fbi-actions.html.

[10] Rob Warden and Bob Tamarkin, *FBI Dossiers Bare ACLU Infiltration*, WASH. POST (Jun 19, 1977), https://www.washingtonpost.com/archive/politics/1977/06/19/fbi-dossiers-bare-aclu-infiltration/c953930b-8120-4844-951f-14dbf6452cc5/.

[11] *Id*.

the first racially-integrated bar association in the nation.[12] The NLG had taken "strong positions in favor of unemployment insurance, model labor relations acts, and civil rights legislation, and in opposition to discrimination against women and African-Americans, the mandated registration of Communist organizations with the government, the role of detective agencies (such as the Pinkerton National Detective Agency), and the House of Un-American Activities Committee (HUAC) subpoena of legal professionals to name their beliefs and associations."[13] The Hooverled FBI found these viewpoints objectionable and, between the years of 1940 and 1971, attempted to stifle the organization, engaging in wiretapping, break-ins, informant infiltration, illegal searches, and propaganda campaigns. Government backed repression cost the NLG thousands of members within two years.

In 1956, Director Hoover launched COINTELPRO, an FBI program that surveilled, scrutinized, and infiltrated civil rights groups and organizations that he considered "Black Nationalist Hate Groups,"[14] such as the Black Panther Party, the NAACP, and the Nation of Islam. More recent social movements have been targeted for government repression, driving a consistent concern about the enforcement of the proposed rule.[15] Each of these examples serve as a warning against rules like those proposed by the DOE which encourage the government to arbitrarily define and label the causes or people it finds offensive and punish those who advocate on behalf of the disfavored in the name of political expediency.

**The proposed rule threatens public service organizations seeking to reform the law and jeopardizes the wellbeing of the populations those organizations serve**

The proposed rule undermines the effectiveness of public service organizations, not only harming them and their employees but the communities they serve. It empowers the Secretary, and by extension, the federal government, to discourage people from working at organizations that it finds unfavorable by eliminating the benefits of PSLF for prospective public service workers. One can easily imagine how the aforementioned risks of persecution could be disproportionately borne by already marginalized communities, including those for whom race, religion, gender, sexual orientation, economic circumstances or other vectors of their identity have rendered them targets for discriminatory treatment and marginalization. That is especially concerning at a time when many members of these communities experiencing pronounced

---

[12] Traci Yoder, Nat'l Law. Guild, *Breach of Privilege: Spying on Lawyers in the United States* at 2-3 (Apr. 2014), https://www.nlg.org/wp-content/uploads/2016/09/Breach-of-Privilege-COLOR_3.pdf.

[13] *Id.* at 6.

[14] Virgie Hoban, *'Discredit, Disrupt, and Destroy': FBI Records Acquired by the Library Reveal Violent Surveillance of Black Leaders, Civil Rights Organizations*, Berkeley Library (Jan. 18, 2021), https://www.lib.berkeley.edu/about/news/fbi.

[15] Mike German, *The FBI Targets a New Generation of Black Activists*, Brennan Center for Justice, June 26, 2020, https://www.brennancenter.org/our-work/analysis-opinion/fbi-targets-new-generation-black-activists; Noah Lanard, *Trump's Pick for Counterrorism Called for Arresting BLM Leaders as Terrorists*, Mother Jones, Feb. 4, 2025, https://www.motherjones.com/politics/2025/02/joe-kent-trump-blm-terrorism-counterterrorism-tulsi-gabbard-nomination.

persecution from local, state, and federal governments, as well as political violence.[16] They are navigating these forms of state-backed repression while also experiencing greater rates of incarceration, housing insecurity, job loss and unemployment,[17] lack of access to food, clean air and water,[18] and inadequate physical and mental health care. To the extent that the amendments flowing from the proposed rule encourage the targeting of organizations and individuals who support communities in opposing state-backed persecution and other forms of oppression, they do a deep disservice to those communities.

**Conclusion**

We respectfully ask that the DOE withdraw the proposed rule to amend the ineligibility standard for the PSLF program under 34 CFR 685.219. We hope our comment is taken into consideration.

Sincerely,

Tasleemah Lawal
Staff Attorney
Center on Race, Inequality, and the Law
NYU School of Law

[16] Tirana Hassan, *United States: Events of 2024*, https://www.hrw.org/world-report/2025/country-chapters/united-states (last visited Sept.16, 2025).
[17] Lucius Couloute, *Nowhere to Go: Homelessness Among Formerly Incarcerated People*, Prison Policy Initiative (Aug. 2018), https://www.prisonpolicy.org/reports/housing.html.
[18] *Climate Change and the Health of Socially Vulnerable People*, Environmental Protection Agency, https://www.epa.gov/climateimpacts/climate-change-and-health-socially-vulnerable-people (last visited Sept. 16, 2025).

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

2025.09.17 SIREN - Direct Loan Program Proposed Rulemaking (Oppose)

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10488/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10488

**Tracking Number**

mfo-qlh9-6ctf

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



SIREN
SERVICES, IMMIGRANT RIGHTS & EDUCATION NETWORK

Tamy Abernathy
Office of Postsecondary Education
400 Maryland Ave, SW
Washington, DC 20202

September 17, 2025

**Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]**

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Kimberly Woo, and I am a Community Organizer with **Services, Immigrant Rights and Education Network (SIREN)**. For over twenty-five years, SIREN has served our immigrant and refugee communities across the Bay Area and Central Valley through civic engagement, community education, policy advocacy, and legal assistance on immigration.

SIREN is proud to recruit, hire, and be represented by 100% directly impacted community members who have joined in our organization's pursuit for equity, empowerment, safety, and justice for all immigrant and refugee communities. The Public Service Loan Forgiveness Program (PSLF) has enabled my organization to serve our communities by giving our impacted employees the opportunity to provide direct legal services and advocate for long-term policy change – without the insurmountable barriers of financial and educational debt and with the freedom to pursue any career they desire. Services like the PSLF have created access for our employees to contribute back to the communities who have served them.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The proposed rule wrongfully inserts politics and ideology into the program. The rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. In doing so, the Department could seek to exclude nonprofit employers like SIREN who work with undocumented immigrants and advancing racial and social equity. This opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology. Nonprofits must be able to identify and meet local needs without political interference,

Bay Area Office
1769 Park Ave., Suite 200
San Jose, CA 95126
Phone: (408) 453-3003
Email: info@sirenimmigrantrights.org
Website: www.sirenimmigrantrights.org

Central Valley Office
2904 N. Blackstone, Suite 202
Fresno, CA 93703
Phone: (559) 840-0005
Email: centralvalley@sirenimmigrantrights.org
Website: www.sirenimmigrantrights.org

ED_00615

fear of retribution, or removal from a program designed to support their employees. With the federal administration's detrimental mass deportation agenda, the definition of "illegality" continues to shift to wrongfully criminalize our immigrant loved ones and separate our families. As the federal government threatens birthright citizenship, continues to detain lawfully present immigrants, and arrest our loved ones outside of their legally required immigration court hearings, the Administration wrongfully characterizes our immigrant neighbors as threats to the communities that they have lived in, contributed to, worked for, and taken care of for decades. Due to the Administration's harmful anti-immigrant rhetoric and actions, this proposed rule will negatively impact our organization by unethically deeming our work "illegal," undermining the effectiveness of our direct legal services, civic education, and community empowerment that we bring to serve our communities.

We at SIREN will never abandon our immigrant and refugee communities during this dire crisis between life and death, but this proposed rule would make our jobs much harder. With the hundreds of calls that our Santa Clara County's Rapid Response Network receives daily, SIREN and our partner organizations in this space deeply understand the overwhelming need for immigration legal services to defend our immigrant and refugee communities against the mass arrests, detentions, and deportations. Additionally, our months-long waitlist for naturalization and removal defense support consists of hundreds of individuals, seeking to apply for affirmative relief and stay with their families.

Similar to our fellow nonprofits in the Bay Area and Central Valley, we at SIREN are operating at our capacity while also facing limited staffing and a minimal budget. We simply do not have enough staff to meet this immense need for immigration legal services during this time, which has led to increased referrals to partner organizations on certain services and has caused us to stop supporting specific applications like SIJS due to our limited capacity. In fact, SIREN already struggles to fill certain roles because our budgetary constraints often do not give us the resources to offer a salary that will satisfy the expensive living costs around our offices. In a time when the Supreme Court has permitted racial profiling, when the federal administration weaponizes the National Guard against our people, and when ICE received a raise to $175 billion to perpetuate this anti-immigrant agenda, we need more funding for our immigrant-serving nonprofits – not less. The proposed rule's abrupt termination of loan forgiveness will force our employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthen the timeframe for being able to have their debt forgiven. We must protect and support our employees who have contributed to our organization's livelihood, advocacy work, community empowerment, and legal assistance for years.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Kimberly Woo

Community Organizer from Services, Immigrant Rights and Education Network (SIREN)
kimberly@sirenimmigrantrights.org

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached PDF.

Attachments 1

PSLF Public Comment CHIRLA

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10492/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10492

Tracking Number

mfo-qhvx-7j1d

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

VIA Regulations.gov

**Re: Docket ID ED-2025-OPE-0016, William D. Ford Federal Direct Loan (Direct Loan) Program**

To Whom It May Concern:

On behalf of the Coalition for Humane Immigrant Rights ("CHIRLA"), I write to express our strong opposition to the U.S. Department of Education ("ED")'s Notice of Proposed Rulemaking on the Public Service Loan Forgiveness ("PSLF") program. The proposed rule seeks to illegally weaponize the PSLF program, turning it into a political tool to threaten and punish local and state governments and nonprofit organizations with whom the Administration disagrees. We urge you to withdraw this proposal, which could cause great harm to our current





employees and make it difficult for organizations like ours to recruit and retain staff in the future.

CHIRLA was founded in 1986 to advance the human and civil rights of immigrants and refugees. CHIRLA became a place for organizations and people who support human rights to work together for policies that advance justice and full inclusion for all immigrants.

Our work is critical to help further the American story of providing shelter to the vulnerable, assisting in the integration of newcomers into our national fabric and ultimately, if eligible, to apply for naturalization and, if approved, to take the oath of U.S. citizenship. Indeed, on numerous occasions, CHIRLA has been awarded, and faithfully honored the terms of, federal grants by the United States Citizenship and Integration Services ("USCIS") to support this work.

If finalized, ED's proposal would empower the Secretary to disqualify certain government and non-profit employers from PSLF based on mere allegations of unlawful activity. Organizations like ours rely on PSLF to recruit and retain qualified staff, and limiting PSLF to certain organizations would have a chilling effect on the whole sector. As a nonprofit performing meaningful work for our community with limited resources, we cannot compete with the salaries of the private sector and





need PSLF to continue doing the work for marginalized people that we do every day.

Further, it would also be unduly burdensome for us to administer the proposed changes to PSLF. Currently, when an employee seeks to participate in PSLF, as their employer we merely have to sign a form confirming their employment and indicating whether we are a government or non-profit organization. There is no subjectivity, uncertainty, or legal analysis required. Under the proposal, however, we would need to certify that we have not engaged in activities with a substantial illegal purpose. The proposal does not clearly explain what activities will be considered to have a substantial illegal purpose, which introduces enormous uncertainty to an otherwise clear process. Signing off on our employees' PSLF forms would be a greater and potentially costly burden to us under this regulation.

Overall, CHIRLA is particularly concerned about the deficient due process and minimal evidentiary standard in the proposed rule. There appears to be no appeals process in case of adverse determinations of an employer's PSLF eligibility. This grievous injustice is compounded by the low burden of proof, a "preponderance of the evidence" standard reserved for civil matters, when the alleged activity is, in fact, supposedly criminal in



nature. Determinations based on scant evidence that cannot meaningly be appealed are not just devastating in the immediate term, but they risk harming an organization in the long term. This makes a mockery of due process.

While the due process issues are fatal to this proposed rule, we would be remiss if we did not point out that there are both statutory and Constitutional concerns with it. First, as is clear in the College Cost Reduction and Access Act of 2007 that created PSLF, only Congress can even attempt to redefine PSLF eligibility in such a radically different fashion. Second, the aim of this reform is a clear exercise in viewpoint discrimination – punishing organizations engaged in lawful activity – resulting in punishment that flies in the face of basic First Amendment jurisprudence.

Not only would the proposed rule harm the employees and prospective staff of organizations like ours, but it would also hurt the hundreds of people we serve every day, since we would be less able to provide quality services if our staff shrunk or we are unable to replace departing





personnel. The ripple effects of this proposed rule will be devastating for at-risk communities.

We object to the limited opportunity provided to comment on this proposed rule – a 30-day window is wholly insufficient – and we urge you to abandon this rulemaking, keeping the PSLF program available to all employees of the nonprofit sector, the exact way that Congress expressly intended as outlined in statute.


Sincerely,

Carl Bergquist

General Counsel, CHIRLA

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Final Comment re PSLF

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10502/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10502

**Tracking Number**

mfo-kqgp-zpqe

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

**Comment on Proposed Regulations concerning Public Service Loan Forgiveness**

We write to urge that the Department of Education refrain from implementing the proposed regulations modifying the Public Service Loan Forgiveness program ("PSLF"). As deans of laws schools that every year produce new lawyers who are eager work for the public good, we are concerned that the proposed regulations might mean that more indebted students would be financially unable to work for public interest organizations, government units, educational institutions, health care facilities, and other types of public service entities that they would like to join. This would be a tragedy for affected students and for the nation as a whole.

The relief afforded to borrowers under PSLF enables new lawyers to take jobs at a myriad of organizations that pay wages too low to enable repayment of the federal education loans taken out by many of our students to pay for law school. The promise of cancellation of debt after ten years of public service means that government and private nonprofit entities that share a commitment to the public good can compete to hire our excellent graduates despite low pay. Cancellation of indebtedness helps student loan borrowers who are committed to public service by enabling them to pursue careers that benefit us all.

It is difficult to overstate the impact that PSLF has had in the relatively short time that the program has existed. Some of our best students have pursued career choices and launched themselves on professional paths that otherwise they could not have taken.

Unfortunately, the proposed changes to the rules governing PSLF would undermine these benefits. The proposed overhaul appears designed to enable the Department to exclude certain nonprofit organizations from PSLF – those that express views and adopt positions that the Administration opposes. This would constitute textbook viewpoint discrimination and is prohibited by the First Amendment. The organizations potentially at risk of exclusion from PSLF may be dedicated to protecting the rights of members of disfavored, minoritized communities, or to expressing controversial ideas found by some or many to be objectionable. Expression on behalf of the disempowered and of ideas that are disfavored is precisely what the First Amendment protects.

As drafted, the proposed regulatory amendments are objectionable in several ways. First, the Department lacks the statutory authority to adopt these regulations to exclude particular programs from PSLF. Congress has specified those entities eligible to participate in PSLF and the Department is bound by the statute.

Second, if enacted, the regulations would facilitate viewpoint discrimination in violation of the right to free expression protected by the First Amendment by empowering the Secretary to exclude entities from PSLF based on their advocacy and on the Department's own interpretations of the law.

Third, the proposed regulations give little to no guidance to affected entities on what activities might result in ineligibility to participate in PSLF, and for that reason are unconstitutionally vague. The proposed regulations also provide virtually no guidance for entities potentially eligible to participate in PSLF on the process and criteria the Secretary would use to determine whether any of them have engaged in activities that require exclusion.

We strongly urge the Department to abandon this unnecessary and harmful regulatory initiative.

Erwin Chemerinsky
Dean and Jesse H. Choper
Distinguished Professor of Law
University of California, Berkeley
School of Law

Marisa Cianciarulo
Dean
Western State College of Law

Darby Dickerson
President & Dean
Southwestern Law School

Madeleine M.Landrieu
Dean
Loyola University New Orleans
College of Law

Melanie Leslie
Dean and Samuel Belkin Professor of
Law
Benjamin N. Cardozo School of Law,
Yeshiva University

James Soto McGrath
President and Dean
Cooleyt Law School

Alicia Ouellette
Jordan D. Schnitzer Dean
Lewis & Clark Law School

Jennifer Reynolds
Dean
University of Oregon School of Law

Ronald Weich
Dean and Professor of Law
Seton Hall University School of Law

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comment from Hispanic Federation, urging ED to withdraw the proposed rule, re: William D. Ford Federal Direct Loan Program, 34 CFR Part 685; Docket ID ED-2025-OPE-0016.

Attachments 1

Hispanic Federation Public Comment William D. Ford Federal Direct Loan Program 34 CFR Part 685 Docket ID ED-2025-OPE-0016

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10504/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10504

**Tracking Number**

mfo-kqz7-9ymi

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



WASHINGTON DC OFFICE
1001 G St NW
Suite 1120W
Washington, DC 20001

NATIONAL HEADQUARTERS
55 Exchange Place, 5th FL
New York, NY 10005
Phone: 212.233.8955
Hotline: 1.866.HF.AYUDA

Scott Prince
Senior Director
Office of Policy Development, Analysis & Accreditation Service
Department of Education

cc. Assistant Secretary Christopher McCaghren, Office of Postsecondary Education, Department of Education
Secretary Linda McMahon, Department of Education
The Honorable Mike Johnson, Speaker of the United States House of Representatives, U.S. House of Representatives
The Honorable Hakeem Jeffries, Minority Leader, U.S. House of Representatives
The Honorable John Thune, Majority Leader, United States Senate
The Honorable Charles Schumer, Minority Leader, United States Senate

9-17-25

**RE: Request to Provide Public Comment on the William D. Ford Federal Direct Loan Program, 34 CFR Part 685; Docket ID ED-2025-OPE-0016**

Dear Director Prince,

By notice issued on August 18, 2025, the Department of Education (ED) has published new rules (henceforth, "the Rule") modifying definitions of eligible employers and payment methods underpinning Direct Loan Repayments serviced through the Public Service Loan Forgiveness (PSLF) program, and accompanying request for comment on these proposals. **Hispanic Federation (HF)** respectfully submits the following comment in response to ED request for comment on the notice of public rulemaking, ED Docket ID ED-2025-OPE-0016; RIN 1801-AA28. Ultimately, we strongly encourage ED to withdraw the current rule as both disruptive and procedurally uncertain.

1. **Hispanic Federation Interest in Rule**

Hispanic Federation is a nonprofit membership and advocacy organization with a network of over 850 organizations across the country. HF is committed to empowering and advancing the Hispanic community, with a focus on low-income, marginalized, and immigrant Latines. With programs in 43 states and territories including Puerto Rico, the U.S. Virgin Islands, and the District of Columbia, HF's focus areas include immigration, economic empowerment, civic engagement, disaster relief, philanthropy, education, health, and the environment. HF also



maintains ongoing immigration advocacy and welcome campaigns and meets the organizational development needs of its member agencies through grant-making and capacity-building assistance.

Per ED invitation to interested parties to submit relevant written data, views, or arguments on the proposed Rule, we address here the Rule's potentially harmful consequences in proscribing PSLF eligibility, as well as potential legal and procedural challenges in its implementation. We also note foreseeable sectoral and economic disruptions that would stem from the implementation of the Rule as currently designed.

### 2. Successes and Salience of the PSLF Program

Since its inception in 2007, the PSLF program has facilitated the federal government to forgive approximately $60bn in student loan debt from nearly one million borrowers.[1] In exchange, these borrowers dedicate themselves to careers of public service whether in federal, state, or local government, or in one of the millions of service-based nonprofit organizations operating in communities across the country. A college degree remains one of the most reliable pathways for generational social mobility.[2] Even amid rising tuition costs, statistics from the St. Louis fed suggests that degrees maintain double-digit returns on investment.[3] Nonetheless, cost is routinely cited as the number one barrier between Latino undergraduate students and degree completion.[4] Thus, tuition assistance is vital for addressing ongoing gaps in higher educational attainment. Programs like PSLF offer a sensible, approachable avenue by which students of lesser means may choose to pursue higher education, with foreknowledge that committed public service to their governments or their communities for at least a decade may serve as a means of defraying the ballooning costs of college attendance.[5]

Nonprofit community-based organizations step in to fill vital service niches in their communities, and grant funds only facilitate that work. For instance, in 2024 alone, Hispanic Federation provided over 300,000 meals, dispersed over $700,000 in disaster relief grants, and distributed $35 million in income relief to food- and farmworkers via a USDA grant. Over the past few years, the nonprofit sector has contributed approximately $2 trillion to the GDP,

---

[1] William Cather, Erica Harris, and Miles Romney, "Your Tax Dollars at Work: The Effectiveness of the Public Service Loan Forgiveness Program," *Journal of the American Taxation Association* (2025) 47 (2): 7–22.
[2] https://www.ssa.gov/policy/docs/research-summaries/education-earnings.html (Accessed 9/16/25); https://www.stlouisfed.org/publications/regional-economist/2023/mar/return-investing-college-education#:~:text=Estimates%20of%20the%20returns%20on,35.9%25%20across%20six%20demographic%20groups (Accessed 9/16/25); https://unity.edu/articles/education-as-social-mobility/ (Accessed 9/16/25.)
[3] https://www.stlouisfed.org/publications/regional-economist/2023/mar/return-investing-college-education#:~:text=Estimates%20of%20the%20returns%20on,35.9%25%20across%20six%20demographic%20group (Accessed 9/16/25.)
[4] Laura I Rendon, Alicia C. Dowd and Amaury Nora, "Priced Out: A Closer Look at Postsecondary Affordability for Latinos," *Enriching America through the 21st Century: Increasing Latino Postsecondary Completion*, 2012; Kate Sablosky Elengold et al., "Dreams Interrupted: A Mixed-Methods Research Project Exploring Latino College Completion," *Carolina Law Scholarship Repository*, 2021; https://www.pewresearch.org/short-reads/2022/10/07/hispanic-enrollment-reaches-new-high-at-four-year-colleges-in-the-u-s-but-affordability-remains-an-obstacle/ (Accessed 9/16/25.)
[5] https://www.usnews.com/education/best-colleges/paying-for-college/articles/see-20-years-of-tuition-growth-at-national-universities (Accessed 9/16/25.)



providing essential services to their communities while mitigating strain on bureaucratic resources and taxpayer dollars.[6] Meanwhile, surveys routinely that Americans hold greater trust and faith in nonprofit and community-based organizations than they do government across all levels – federal, state, or local.[7] Nonprofits have earned this trust and reputation via a fierce commitment to their communities, work performed despite typically small operating budgets. Indeed, the vast majority of nonprofits operate on annual budgets of under $500,000, underscoring their mission-driven focus.[8] Nonprofits and their employees pay a price for this mission-driven work, however. On average, nonprofit employees earn less than their peers in similar roles in government and in the business sector.[9] Likewise, the costs of nonprofit's flexible and responsive programmatic-community positioning are legal, fiscal limitations and attenuation to difficult market conditions[10] that lead to delicate budgetary sensitivities.[11]

Moreover, nonprofit organizations are essential providers of health care, particularly in low-income communities that would otherwise face care deserts.[12] Many health care facilities, ranging from hospitals to federally qualified health clinics are either themselves 501(c)(3)'s or otherwise are nonprofits with health care-focused missions, rendering them qualified employers under the PSLF program.[13] Nonprofit health care providers not only offer lifesaving care but also irreplaceable culturally competent interlocution between best practice medical standards and the communities they serve. Meanwhile, the U.S. faces a growing postsecondary training cliff, with medical professions facing increasingly perilous shortages.[14] As such, care gaps in high needs communities will only grow, and with them the demand for the kind of culturally relevant that nonprofit health care providers offer. It is therefore vital that the U.S. finds a means to ensure that more Americans receive medical educations and training. As average student debt for physicians tops $200,000 and care deserts widen across the country, the PSLF program offers not only a sensible but also an essential tool to maintain and expand access to community-based health care.[15] With average rates of excess student rising[16] and the type of training and education

---

[6] https://www.councilofnonprofits.org/about-americas-nonprofits/economic-impact-nonprofits
[7] https://extension.unh.edu/resource/understanding-public-trust-local-level
[8] https://www.nonprofitimpactmatters.org/data/downloadable-charts/
[9] https://www.nonprofitpro.com/post/many-nonprofit-employees-dont-make-thriving-wage/ (Accessed 9/16/25.)
[10] https://libjournals.unca.edu/ncur/wp-content/uploads/2021/08/752-Lamberton.pdf; https://www.researchgate.net/profile/Felicia-Sullivan/publication/265216534_Nonprofit_Responses_to_Financial_Uncertainty_How_Does_Financial_Vulnerability_Shape_Nonprofit_Collaboration/links/544b03b40cf24b5d6c3ec42c/Nonprofit-Responses-to-Financial-Uncertainty-How-Does-Financial-Vulnerability-Shape-Nonprofit-Collaboration.pdf
[11] https://www.councilofnonprofits.org/files/media/documents/2023/2023-nonprofit-workforce-survey-results.pdf, 11-13.
[12] https://www.americanprogress.org/article/nonprofit-hospitals-can-support-communities-advance-public-health/ (Accessed 9/17/25.) https://www.get-carrot.com/blog/what-are-care-deserts (Accessed 9/17/25.) Underinvested communities are particularly vulnerable to maternal care deserts, further amplifying the need for nonprofit health care providers. https://www.marchofdimes.org/maternity-care-deserts-report (Accessed 9/17/25.)
[13] https://panaceafinancial.com/resources/public-service-loan-forgiveness-for-doctors/ (Accessed 9/17/25.)
[14] https://www.highereddive.com/news/us-faces-shortfall-of-53m-college-educated-workers-by-2032/760155/ (Accessed 9/17/25.)
[15] Davis, Caitlin S et al. "Impact of Service-Based Student Loan Repayment Program on the Primary Care Workforce." *Annals of family medicine* vol. 21,4 (2023): 327-331. doi:10.1370/afm.3002
[16] https://www.npr.org/2025/09/05/nx-s1-5521317/millions-of-student-loan-borrowers-are-at-risk-of-defaulting-data-shows (Accessed 9/16/25.)



offered by degree-granting programs essential for many nonprofit roles,[17] targeted, service-based debt relief programs like PSLF are vital for ensuring that America's nonprofit sector and its workers can continue to pursue its essential labor for generations to come.

3. **The definitions proposed under the Rule are imprecise and plausibly conflict with the statutory underpinnings of the PSLF Program**

When Congress created the PSLF in 2007, the underlying legislation clearly outlined the requirements for an employer to confer eligibility to employees for debt relief. Employers covered under the program explicitly include 501(c)(3) organizations, as well as other nonprofits that provide a "non-governmental public service," so long as that organization is not a partisan political organization or a labor union.[18] The realm of "non-governmental public service" was itself defined broadly to encapsulate industries ranging from public health to early childhood education to civilian support for the armed forces, reflecting the broad, societal aims of the underlying legislation. The definitions that would underpin enforcement proposed by the Rule are sweepingly imprecise, and offer little clarity as to their legal applicability to organizational activities. Furthermore, the definitions proposed by the Rule to do not adequately delineate how or why its proposals would align with the underlying statute of the PSLF. The underlying code, 34 CRF §685.219, does not provide the Secretary of Education (hence "the Secretary") with authority to exclude any organizations under its own determination, further muddying the underlying authority of the Rule. Administrative action cannot, of course, modify legislative statutes. Consequently, the Rule itself rests upon uncertain legal foundations at best, and should be withdrawn.

4. **Implementation of the Rule will require ED operate beyond its statutory remit in a law enforcement investigatory capacity**

The Rule proposes a process whereby the Secretary of Education would assess and notify employers of their running afoul of its new definitions of "substantive illegal purpose." The realms of potential violations of these definitions are sweeping, ranging from supporting terrorism to violation of state tort laws. The ED lacks any substantive history of law enforcement investigation outside the remit of educational civil rights legislation, and as such possesses inadequate capacity and potentially authority to conduct these sorts of law enforcement investigations. For example, assessment of state tort violations is, of course, primarily a question for state and local authorities. Meanwhile, it takes the efforts of the entirety of our nation's Intelligence Community and national security apparatus to effectively monitor and curtail the operations of terrorist organizations. The Rule offers little insight into how the ED plans to expand its expertise and operational capacity to facilitate the investigation, charging, and prosecution such violations. Without this clarity, the Rule is poised to create either a new, unfunded regulatory mandate or a laxly managed forest of red tape; either option runs deeply afoul of the Administration's commitment to the reduction of regulatory burdens. Likewise, the Internal Revenue Service (IRS) is the primary agency with oversight responsibility over tax-exempt status determinations and regulatory enforcement thereof; ED's overlapping authority

[17] https://borgenproject.org/10-college-degrees-nonprofit-jobs/ (Accessed 9/16/25.)
[18] 34 CFR § 685.219(iii/v)



with the IRS under the Rule is not adequately articulated or delineated. Consequently, the mechanism by which the Rule would be assessed and enforced is concerningly unclear; as such, the Rule should be withdrawn.

5. **Implementation of the Rule will create confusion and disruption within the nonprofit sector and among civically-minded students**

The combination of murky statutory foundations, uncertain enforcement guidelines, and imprecise definitions would contribute to a landscape in which the nation's approximately 2 million nonprofit organizations would face persistent legal uncertainty.[19] Rather than spending their time and resources supporting local communities, nonprofit organizations would instead be forced to devote capacity toward safeguarding themselves against vague and legally untested enforcement criteria. In turn, the Rule may reasonably be expected to disrupt the activities of hundreds of thousands of small entities, an impact the Administration has failed to assess, in potential violation of APA Rulemaking guidelines.

Likewise, the nonprofit sector comprises more than ten percent of total US private sector employment, accounting for upwards of fifteen million employees.[20] As proposed, the Rule would jeopardize an essential benefit for each of these workers, while leaving individual employees in the dark about how to indemnify themselves against legally uncertain enforcement actions brought against their employers. Under current statutory requirements, employees can reliably determine an employer's eligibility simply based upon their public tax status and/or their sector of employment. Conversely, the Rule as proposed would contribute to vast uncertainty for millions of employees across the country. These changes would impact teachers, veterans' workers, and medical providers operating in high needs communities. Physicians-in-training, for instance, increasingly count on debt relief like PSLF as a prerequisite to beginning medical school; the loss of this program would therefore result in a predictable and unacceptable decrease in the number of medical professionals entering American postsecondary programs. Both forms of confusion would severely disrupt essential nonprofit work across sectors ranging from education to military service; these predictable impacts have not received adequate accounting under the current rulemaking. Consequently, the Rule should be withdrawn.

6. **Hispanic Federation Serving Relevant Initiatives**

**Hispanic Federation** and its network have been supporting local communities through nonprofit, service-based work for decades across fields ranging from workforce development, health care support, and educational attainment programming. As an umbrella organization, Hispanic Federation has a proven track record of designing and launching national, state-wide, and locally focused nonprofit programs of precisely the type that the PSLF Program was intended to facilitate. Examples of Hispanic Federation's community-based work include:

---

[19] https://usafacts.org/articles/how-many-nonprofits-are-there-in-the-us/ (Accessed 9/16/25.)
[20] https://fred.stlouisfed.org/series/USPRIV (Accessed 9/16/25.)

 - *Campaign for Digital Equity:* In 2023, HF launched a national campaign to help Latino communities engage with state and national leaders to advance digital equity policies and programs such as Broadband Equity, Access, and Deployment Program; the Digital Equity Act Programs; and the Affordable Connectivity Program. This work includes connecting local nonprofit organizations and communities across the country to state and federal representatives and identifying areas where high-speed internet infrastructure will eventually be built.
- *CREAR Futuros*: While national Hispanic college enrollment and graduation numbers are higher today than ever before, Latino student college enrollment, retention, and graduation rates still lag behind white peers. Hispanic Federation has long considered post-secondary student success as a major focus of its Education Program. That's why we created CREAR (College Readiness, Achievement, and Retention) Futuros. This peer mentor-based initiative creates a community of care by connecting first year, sophomore, and transfer students in colleges across the country with trained upper-classmen who introduce them to important campus resources (such as financial aid, tutoring, and career counseling) while also providing time-management, stress reduction, and networking support.
- *Farm and Food Workers Relief Program:* In 2022, HF kickstarted the FFWR program that provides one-time relief payments of $600 to 62,900 qualifying farmworkers and meatpacking workers thanks to a two-year, $44.3 million grant administered by the U.S. Department of Agriculture's Agricultural Marketing Service. Workers who incurred pandemic-related health and safety costs in 19 states, Puerto Rico and the U.S. Virgin Islands are eligible for rewards through the grant.

7. **Conclusion**

For nearly two decades, the PSLF program has incentivized American students to dedicate themselves to careers in public service in exchange for eventual debt relief. As the costs of attending college mount, and existing debts prove increasingly burdensome, this program has proven a meaningful – and even essential – tool to boost the economic outlooks of individual Americans while simultaneously supporting the types of nonprofit service work upon which working families nationwide depend. Hispanic Federation is a long-time leader of nonprofit work supporting vulnerable communities across the country, informing our perspective on just how damaging the ED's proposals could be. Consequently, we strongly urge the ED to withdraw the Rule.

Sincerely,

Julietta Lopez
Vice President for Federal Advocacy and Network Mobilization
Hispanic Federation

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

2025-09-17 D. Ed. - CCSF Comments re PSLF

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10507/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10507

**Tracking Number**

mfo-l4o5-7ngx

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



CITY AND COUNTY OF SAN FRANCISCO

DAVID CHIU
City Attorney

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
Department of Education
400 Maryland Ave. SW,
Washington, DC 20202

*Submitted via regulations.gov in Docket ID ED-2025-OPE-0016*

Re: Docket ID ED-2025-OPE-0016, Proposal to Change Employer Eligibility for the William D. Ford Federal Direct Loan (Direct Loan) Program

Dear Ms. Abernathy,

The City and County of San Francisco, California ("San Francisco" or "the City") submits these comments in response to the Department of Education's proposal to transform the Public Service Loan Forgiveness ("PSLF") program to exclude employers that engage in activities that have a substantial illegal purpose (the "ED Proposal").

**SUMMARY**

As an eligible employer under the PSLF program, San Francisco relies on PSLF to recruit and retain talented workers. The ED Proposal creates a new eligibility requirement for borrowers to obtain loan forgiveness: their employer must avoid being disqualified by the Secretary of Education based on a range of activities deemed to have a substantially illegal purpose. The ED Proposal defines "substantial illegal purpose" to include vague concepts like "aiding or abetting . . . violations of Federal immigration laws" and "engaging in a pattern of aiding and abetting illegal discrimination." Department of Education, William D. Ford Federal Direct Loan Program, 90 Fed. Reg. 40154-01, 40175 (proposed August 18, 2025) (revisions to 34 C.F.R. § 685.219). This administration is on record taking expansive and unsupported positions regarding what it believes violates federal immigration and anti-discrimination laws. As such, and given the substantial discretion afforded to the Secretary of Education by the ED Proposal to decide whether to disqualify an employer, San Francisco is deeply concerned about these proposed changes to PSLF.

San Francisco submits these comments to alert the Department of Education (the "Department") that this proposal to disqualify employers based on vague criteria never authorized by Congress is overbroad, ambiguous, and unlawful. The proposed changes will harm San Francisco by threatening the City's eligibility for engaging in activities that are fully lawful—including activities that are required by state and local law. Because the Department lacks authorization from Congress to issue these rules at all, San Francisco urges the Department to withdraw the proposal in its entirety. If the Department refuses to rescind the proposal

completely, then in the alternative, San Francisco urges the Department to remove the proposed definitions of "substantial illegal purpose" for aiding and abetting immigration violations, engaging in a pattern of aiding and abetting discrimination, and engaging in a pattern of violating various enumerated state laws—proposed section 685.219(b)(30)(i), (v), and (vi), respectively—because those definitions are ambiguous, provide no benefits yet impose significant costs, invite arbitrary enforcement, and are arbitrary and capricious.

## COMMENTS BY SAN FRANCISCO

## I. San Francisco Will Be Harmed By the Department's Proposal

As both a city and county government, San Francisco performs a number of essential public functions—everything from law enforcement, to operating a safety net public hospital and trauma center, to running a world-class library system with nearly 30 neighborhood branches. Across its variety of functions and departments, San Francisco employs approximately 34,000 people and competes with the Bay Area's robust private sector to attract and retain workers. The Bay Area's high cost of living makes PSLF especially important to San Francisco because it makes government service more affordable for people with student debt. PSLF is an integral part of San Francisco's ability to compete with higher-paying private sector jobs and recruit talented and educated public servants. Other governments and non-profits in San Francisco and the greater Bay Area also rely on the PSLF program to recruit and retain workers, enriching our regional economy.

The PSLF program is popular in San Francisco, including among City employees. The City's Office of Financial Empowerment hosted a series of workshops about PSLF in 2023 and registered more than 2,100 public service employees (from the City and other eligible employers). Although the City does not centrally track the total number of its employees who utilize PSLF, we estimate that at least one thousand individuals have sought certification from the City for their PSLF participation in the past year. The total number of individuals who have benefitted already from PSLF or who are currently making qualifying payments is probably higher. Additionally, beyond the direct benefit to the City from employees who use PSLF, San Francisco benefits from *other* public service employees who live and work in San Francisco and, because of PSLF, are able to afford to live, eat, shop, attend events, and otherwise contribute to our City. San Francisco also benefits from the ripple effects created by PSLF in encouraging qualified individuals to pursue careers in public service, which strengthens the pipeline of public service employees for all kinds of roles in government. Given that the average federal student loan balance is approximately $40,000,[1] the minimum direct economic value of the PSLF program to San Francisco is an estimated $40 million, and is likely greater when taking indirect economic effects into account.

### A. The ED Proposal Targets "Sanctuary" Jurisdictions like San Francisco

San Francisco limits the use of local resources to assist with federal civil immigration enforcement. S.F. Admin. Code §§ 12H & 12I. San Francisco's so-called "sanctuary" laws pursue two goals: to improve trust between City government and the communities it serves and

---

[1] Melanie Hanson, *Student Loan Debt Statistics*, EducationData.org (August 8, 2025), https://educationdata.org/student-loan-debt-statistics.

to ensure that scarce local resources are used to benefit San Francisco communities. City lawmakers determined that San Francisco's policies were necessary "to foster respect and trust between law enforcement and residents, to protect limited local resources, [and] to encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees[.]" S.F. Admin. Code § 12I.1. Crucially, the City's ordinances are lawful under federal law. *City & Cnty. of San Francisco v. Barr* (*San Francisco v. Barr*), 965 F.3d 753, 764 (9th Cir. 2020) (holding that San Francisco's ordinances comply with 8 U.S.C. § 1373).

Nonetheless, the Trump administration has threatened San Francisco for maintaining these lawful policies. In his first administration, President Trump issued an executive order attempting to defund San Francisco and other "sanctuary" jurisdictions, and the Department of Justice attempted to condition the receipt of federal grants on cooperation with federal immigration enforcement. Both attempts were found unlawful and enjoined. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234–35 (9th Cir. 2018); *City & Cnty. of San Francisco v. Sessions*, 349 F.Supp. 3d 924 (N.D. Cal. 2018), *aff'd in part and vacated in part, San Francisco v. Barr*, 965 F.3d at 753. In the current administration, courts have repeatedly enjoined similar executive orders to withhold federal funds from "sanctuary" jurisdictions, including San Francisco, and similar attempts to condition grant funding on cooperation with federal immigration enforcement. *City & Cnty. of San Francisco v. Trump*, 779 F.Supp. 3d 1077, 1082 (N.D. Cal. 2025), *opinion clarified*, 782 F.Supp. 3d 830 (N.D. Cal. 2025); *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 2322763, at *2 (W.D. Wash., Aug. 12, 2025). Moreover, the Ninth Circuit has squarely held that policies, like San Francisco's, that limit local involvement with federal civil immigration enforcement are not preempted by federal law, but are instead a lawful exercise of state and local governments' Tenth Amendment right not to administer federal laws. *United States v. California*, 921 F.3d 865, 886–93 (9th Cir. 2019).

Yet, the Trump administration continues to press its view that "[t]he Supremacy Clause and other authorities require state and local actors to comply with the Executive Branch's immigration enforcement initiatives" and that states and localities violate federal law by "failing to comply with lawful immigration-related commands and requests." Memorandum from Acting Deputy Attorney General Emil Bove to all Department of Justice Employees, *Interim Policy Changes Regarding Charging, Sentencing, and Immigration Enforcement* (January 21, 2025), https://tinyurl.ee/EYUX [https://perma.cc/UB4X-LYZE]; *see also* Memorandum from Attorney General Pamela J. Bondi to all Department of Justice Employees, *Sanctuary Jurisdictions Directives* (Feb. 5, 2025) at p. 3, https://www.documentcloud.org/documents/25515718-ag-bondi-sanctuary-jurisdictions-memo/ [https://perma.cc/VHV8-JFBX] (stating that states and localities may not "fail to comply with lawful immigration-related directives pursuant to the President's Article II authority . . . ."). Indeed, as recently as August 5, 2025, the Department of Justice ("DOJ") issued a list of "sanctuary" jurisdictions that stand in "opposition to federal immigration enforcement" and against which the administration intends to bring enforcement actions. U.S. Department of Justice, *Justice Department Publishes List of Sanctuary Jurisdictions* (August 5, 2025), https://www.justice.g.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions [https://perma.cc/7PF3-TXML]. San Francisco appears twice on DOJ's list. *Id*. And the Attorney General sent a letter to San Francisco falsely asserting that its policies "facilitate violations of federal immigration law" and "thwart federal immigration enforcement to the detriment of the United States." Aug. 13, 2025 Letter from Attorney General Pamela Bondi to San Francisco Mayor Daniel Lurie.

In light of the administration's expansive (and incorrect) view of what federal law requires of local governments, San Francisco is deeply concerned about the ED Proposal's attempt to disqualify employers that "aid[] and abet[] violations of 8 U.S.C. § 1325 or other Federal immigration laws." 90 Fed. Reg. at 40175. Despite its lawful policies and practices, San Francisco is unquestionably a target under this administration, and therefore under this proposed PSLF regulation.

**B. The ED Proposal Also Threatens Employers That Fully Comply with Anti-Discrimination Laws**

Given the current administration's expansive and extralegal view of what activities violate federal anti-discrimination law, the ED Proposal's attempt to exclude employers that engage in a "pattern of aiding and abetting illegal discrimination" is of great concern to San Francisco, as well. In recent months, the Department of Justice announced an initiative to utilize the False Claims Act against entities that purportedly engage in "unlawful discrimination," such as allowing individuals to use the bathroom that aligns with their gender identity. Memo from Deputy U.S. Attorney General Blanche regarding Civil Rights Fraud Initiative (May 19, 2025), https://www.justice.gov/dag/media/1400826/dl?inline [https://perma.cc/K3CC-YCFX]. San Francisco complies with federal, state and local civil rights and anti-discrimination laws as those laws have been interpreted by courts and articulated in laws, statutes, and ordinances. And although San Francisco disagrees that it violates federal anti-discrimination law, it appears that the federal government is employing a different, unlawful definition. For this reason, the ED Proposal threatens San Francisco's eligibility as a PSLF employer based on fully lawful practices, including practices required by state and local law.

**C. The ED Proposal May Also Threaten San Francisco's Eligibility as a PSLF Employer Based on Other Unclear Criteria**

San Francisco may also be a target under other provisions of the proposed definition of "substantial illegal purpose," but the regulations are so poorly articulated that the City is not fairly on notice of what might disqualify it. For example, the proposed definition of "substantial illegal purpose" includes "engaging in a pattern" of trespassing, disorderly conduct, public nuisance, vandalism, or obstruction of highways, based on a final, non-default judgment by a state court. 90 Fed. Reg. at 40175 (proposed § 685.219(b)(30) & (34).) As discussed below, Section II.B.2, *infra*, this proposed change is riddled with issues—what constitutes a "pattern?" How does this definition apply to a large municipality like San Francisco, with dozens of departments and thousands of employees? Are the actions of individual employees attributed to the entire municipality under this provision? Depending on the answers to these and other questions, which the regulations do not clarify, San Francisco may be vulnerable to disqualification.

These and other concerns, coupled with San Francisco's reliance on PSLF to recruit and retain employees, motivate San Francisco's comments in opposition to the proposed rule change.

## II. The ED Proposal Is Unlawful

The ED Proposal is unlawful and the proposed regulations should be withdrawn in their entirety. The Department lacks statutory authorization to promulgate these rules at all because

they impose additional eligibility requirements on borrowers that Congress did not allow. In addition to being unlawful, the ED Proposal is fundamentally unfair: the proposal punishes innocent borrowers for the actions of their employer (or possibly, the actions of one employee, as noted in Section II.B.2 below). This directly contravenes Congress's purpose in enacting PSLF to encourage Americans to work in public service, and to forgive their federal education loans after ten years of such service. The ED Proposal is also arbitrary and capricious in a variety of ways, and the Department failed to consider less problematic alternatives.

**A. The Secretary of Education Lacks Authority to Impose Additional Eligibility Conditions on PSLF**

The ED Proposal attempts to add a new condition on the PSLF program that Congress did not authorize: disqualifying borrowers based on their otherwise eligible employer's activities. However, the Department lacks any statutory basis to impose these additional criteria on the PSLF program. The ED Proposal is unlawful because it exceeds the Department's statutory authority. 5 U.S.C. § 706(2)(C).

The statute that establishes PSLF has only two criteria for loan cancellation: the borrower (1) must make 120 monthly payments under a qualified payment plan and (2) must have been employed in a "public service job" during those 120 months and when requesting loan forgiveness. 20 U.S.C. § 1087e(m)(1). Once those criteria are met, the "Secretary [of Education] *shall* cancel the balance of interest and principal due." *Id*. (emphasis added); *see also* 20 U.S.C. § 1087e(m)(2) ("After the conclusion of the employment period described in paragraph (1), the Secretary *shall* cancel the obligation to repay the balance of principal and interest due.") (emphasis added). Congress specified only these criteria and, once satisfied, imposed a mandatory obligation by the Secretary of Education to cancel the borrower's loans. *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) (stating general rule that "shall" imposes a mandatory command). Congress did *not* say that borrowers receive forgiveness only if their public service employer refrains from engaging in activities disfavored by this administration, as the ED Proposal attempts to require. Congress did not authorize the Department to disqualify eligible employers at all. And Congress did not authorize the Department to punish eligible PSLF borrowers based on the conduct of their employers.

Additional statutory language makes clear that Congress did not authorize the ED Proposal. Congress made the focus of PSLF eligibility the job duties of the *borrower*. 20 U.S.C. § 1087e(m)(3)(B) (defining "public service job" to include "a full-time job in emergency management, government, . . . law enforcement, public health, . . . public education, . . . public interest law services," etc.) Congress did not include any additional requirements for employers in this definition. And while the definition includes a catch-all at the end for people who work full-time at 501(c)(3) non-profits (a more employer-focused aspect of the definition), there are already provisions of law that address lawbreaking by such entities: Congress authorized the IRS to revoke their 501(c)(3) status for certain activities.

Further, the purpose of the PSLF program is to encourage *borrowers* to work in public service jobs.[2] Even if a public service *employer* engages in some activity that the Secretary of

[2] *See, e.g.*, Report on H.R. 2669 by Committee on Education and Labor, U.S. House of Representatives, H.R. REP. No. 110-210 (June 25, 2007), 2007 WL 1840856 ("the Committee is concerned with the growing number of individuals who do not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans. Building on the Income-Based proposal mentioned above, H.R. 2669 [which became P.L. 110-84 and created

Education deems to reflect a "substantial illegal purpose," that does not mean the borrower did anything wrong, nor does it change the character of the borrower's public service employment. Indeed, the ED Proposal's new regime for disqualifying employers completely ignores borrowers' innocence (or, simply, non-involvement with the employer's objectionable conduct). Congress did not authorize the Department to penalize borrowers in this manner. To the contrary, the federal government already has tools to address lawbreaking by non-profit or government entities, without penalizing innocent employees who took on debt to pay for school.

In sum, the Department has no statutory authority to refuse to cancel a borrower's loan balance and repayment obligation based on criteria not authorized by Congress in the statute.

**B. The ED Proposal is Substantively Arbitrary and Capricious and Violates the APA**

The law requires reasoned and reasonable justifications for agency action. *Federal Communications Commission v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The ED Proposal fails this test in several independent ways.

**1. The Factual Record Does Not Support the Department's Conclusion That These Rules Are Necessary**

A "searching and careful" inquiry into the Department's factual record and justifications makes clear that there is no support for the imposition of these new rules to disqualify employers. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (APA arbitrary and capricious review must be "searching and careful" into factual record), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Instead, the agency blindly followed an executive order issued by President Trump directing the Secretary of Education to "propose revisions to 34 C.F.R. 685.219" to "exclude[] organizations that engage in activities that have a substantial illegal purpose[.]" *Executive Order 14235: Restoring Public Service Loan Forgiveness* (March 7, 2025), https://www.govinfo.gov/content/pkg/DCPD-202500340/html/DCPD-202500340.htm [https://perma.cc/7QN2-6MMG] (the "PSLF Executive Order"). The categories of "activities that have a substantial illegal purpose" in the PSLF Executive Order are almost identical to those included in the ED Proposal. *Compare id. with* 90 Fed. Reg. at 40175 (definition of "substantial illegal purpose").

A presidential order does not justify an agency's action that exceeds statutory authorization. Indeed, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring). It was therefore arbitrary and capricious, as well as contrary to the Constitution, for the Department to rely on the PSLF Executive Order as a basis for these changes. 5 U.S.C. § 706(2)(A) & (B).

The Department's other purported justifications for imposing these non-statutory eligibility criteria are unreasonable and unsound. The ED Proposal states that the new rules are "designed to protect the integrity of the PSLF program by ensuring that taxpayer funds are used to support borrowers working in public service roles with eligible employers." 90 Fed. Reg. at 40167. But this is circular, as Congress already defined eligible employers and did not include

PSLF] includes loan forgiveness for individuals serving the country in professions of national need.")

disqualification rules for supposed illegal purposes. A proposal that contradicts the statute therefore cannot "protect the integrity of the PSLF program;" instead, it undermines the program defined by Congress. Any assertion by the Department that the ED Proposal is necessary to protect the "integrity" of the program is an unreasonable basis for the rule change, and thus arbitrary and capricious. 5 U.S.C. § 706(2)(A).

Additional purported facts and rationales asserted by the Department are also unreasonable. For example, the ED Proposal states, "These reforms will help reduce administrative burdens on borrowers and institutions, promote fairness, and ensure that PSLF benefits are awarded only to those genuinely dedicated to serving the public good." 90 Fed. Reg. at 40167. But it is obvious that creating a new process to disqualify employers based on any criteria—let alone confusing and overbroad criteria—will increase rather than "reduce administrative burdens." The Department itself directly contradicts this purported justification by admitting that its proposal will increase administrative costs for the Department, employers, and borrowers. 90 Fed. Reg. at 40168. As for promoting "fairness," the proposal does anything but—borrowers will be punished for the actions of others, over which they have no control. Therefore, rather than "ensur[ing] that PSLF benefits are awarded only to those genuinely dedicated to serving the public good," 90 Fed. Reg. at 40167, the ED Proposal threatens PSLF benefits for innocent borrowers without regard to their dedication to public service. None of these rationales withstand scrutiny.

Moreover, the Department's assertion that "the current regulatory framework has exposed the PSLF program to potential misuse, with taxpayer dollars being allocated to borrowers working for organizations that do not align with the program's public service mission," 90 Fed. Reg. at 40166, is not a fact at all. "[E]xpos[ure]" to "potential misuse" is not a fact—it is carefully worded speculation. The Department did not identify a *single* dollar that was "allocated to borrowers working for organizations that do not align with the program's public service mission." *Id*. Nor did the Department identify any PSLF employers that would be guilty of activities having a "substantially illegal purpose," let alone identify employers that "do not align with the program's public service mission." The ED Proposal points to no evidence that any PSLF employers have substantially illegal purposes.

At a more fundamental level, it can never be reasonable to include state and local governments among the list of employers who could be found to have a "substantial illegal *purpose*." By their nature, state and local governments have a lawful purpose. They are sovereign states or subdivisions of those states; it is unintelligible to think about states or their subdivisions having an illegal *purpose*. This is yet another reason the ED Proposal—which makes no exception for state and local governments—is arbitrary and capricious.

### 2. The Various Definitions of Activities That Have a "Substantial Illegal Purpose" Are Arbitrary and Capricious

The immigration-related and discrimination-related definitions of "substantial illegal purpose" are arbitrary and capricious. Employers are not fairly on notice of what constitutes "aiding [and] abetting violations of . . . Federal immigration laws" or "engaging in a pattern of aiding and abetting illegal discrimination." As discussed above, this administration has an expansive and unsupported view—untethered to federal statutes and judicial precedent—of the activities in which local governments might engage that it believes violate federal immigration laws or anti-discrimination laws. *See* Section I.A & I.B, *supra*. Because under the ED Proposal, the Secretary of Education has the ultimate discretion to decide whether to disqualify an employer under these criteria, employers cannot be sure that their compliance with federal law will protect them from disqualification. The ambiguousness of this provision in light of the

administration's public positions and the discretion afforded the Secretary of Education invites arbitrary enforcement. It is arbitrary and capricious for an agency to issue a rule that fails to provide clear notice to regulated entities.

The discrimination-related definition of "substantial illegal purpose" is additionally vague, and therefore arbitrary, because the rules fail to define "engaging in a pattern" of discrimination. Local governments like San Francisco are left to speculate as to whether one court ruling deciding that one sub-agency violated the Americans with Disabilities Act (a statute included in the definition of "[i]llegal discrimination," 90 Fed. Reg. at 40174) on two occasions means that the entire local government is disqualified.[3] Other aspects of the ED Proposal only compound the confusion. The proposed rules direct the Secretary to "presume" that a single "final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose" is "conclusive evidence" for disqualification. 90 Fed. Reg. at 40176. This could mean that a single ruling that a City department failed to provide a reasonable accommodation to a single employee would disqualify every PSLF borrower in San Francisco, including those with no connection to the court case, from obtaining loan forgiveness. It is disproportionate, unfair, and substantively unreasonable to disqualify PSLF employees from a government employer based on a single court ruling.

The provisions disqualifying employers for violations like trespassing or obstruction of highways (proposed § 685.219(b)(30)(vi) & (34)) are similarly arbitrary and capricious. It is unfair to punish borrowers because their employer obstructed a highway or trespassed. Further, it appears that disqualification could be based on the actions of a single employee if that liability is imputed to the employer—for example, an employee who parks a City vehicle in a manner that negligently obstructs part of a highway. If this happened more than once, or on two occasions adjudicated in a single case, would it constitute "engaging in a pattern of violating [the enumerated] State laws?" Or does the ED Proposal require the *employer*—that is, the government agency itself—to have engaged in "vandalism," "trespassing," or the like (which makes little sense)?[4] As mentioned previously, the Department put forward no evidence that any PSLF employers are committing these crimes or being deemed liable for these actions in civil litigation. Thus, given the lack of any problem for these provisions to address, there can be no benefit to their existence. Instead, they yield only negative impacts, including the administrative costs conceded by the Department. 90 Fed. Reg. at 40168. Put simply, proposed sections 685.219(b)(30)(vi) and (34) are arbitrary and capricious.

---

[3] Other parts of the proposed regulations do not clarify this question, but instead provide yet another reason these rules are arbitrary and capricious. Proposed section 685.219(i)(2) states: "the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if the employer is operating separately and distinctly, for the purposes of determining whether an employer is eligible." But the Secretary gets to decide when a sub-agency of a municipality operates "separately and distinctly," only compounding the risk of inconsistent or arbitrary enforcement.

[4] The provisions raise still further questions: How does the requirement of a "pattern" interact with proposed section 685.219(h), which creates a presumption of disqualification based on a single state court judgment? Must whatever state court judgment the Secretary reviews have found a criminal or civil violation of the enumerated actions (e.g., trespassing), or can the Secretary decide a violation has occurred simply based on facts found in the judgment? The Department did not think through any of these questions, further emphasizing the lack of reasoned rulemaking. *See Ohio v. EPA*, 603 U.S. at 292.

The Department should withdraw these definitions of "substantial illegal purpose" for these reasons, and more.[5] Alternatively, if the Department (unlawfully) retains some version of these definitions, the Department should clarify that the actions of individual employees will not disqualify entire governments or their agencies from the PSLF program. Further, the Department should consider reasonable alternatives to these overbroad and confusing proposed definitions. The Department bears that burden and should begin by identifying evidence (if any) about genuinely illegal conduct by PSLF employers. The Department should construct appropriate and narrow definitions based on any legitimate issues identified in its evidence.

**3. Disqualifying an Employer Because of a Paperwork Error is Arbitrary and Capricious**

The ED Proposal appears to automatically disqualify an employer if the Department "[r]eceives an application" that "fails to certify that [the employer] did not participate in activities that have a substantial illegal purpose." Proposed § 685.219(i)(1)(i); 90 Fed. Reg. at 40176.[6] If the employer fails to certify the borrower's form, the Secretary "will determine that" the employer "violated the standard." Given the mandatory language ("will determine"), this provision appears to obviate the "notice and opportunity to respond" process outlined in proposed section 685.219(h)(1) and the need for the Secretary to make a determination based on the "preponderance of the evidence." *Id*. Given this harsh outcome from a failure to check a box, and the lack of any process for the employer or the borrower to contest the outcome, this proposed provision appears to violate several laws, including Constitutional Due Process protections and the APA. Moreover, the certification process itself will impose substantial costs for eligible employers, including San Francisco, who will need to expend resources to centralize PSLF form completion for all City departments, and carefully review the certification requirements. The Department should consider alternatives to this proposal—for example, not requiring certifications about a lack of activities with a "substantial illegal purpose." Instead, the Department should presume that employers are eligible based on the existing statutory criteria and only disqualify them based on the submission of evidence, upon the preponderance of that evidence, and after notice and an opportunity to be heard. The best alternative, however, would be complete rescission of the ED Proposal entirely.

**CONCLUSION**

For each of the reasons discussed above, and others, the Department should withdraw the ED Proposal entirely. Alternatively, San Francisco respectfully requests that the Department remove:

---

[5] San Francisco reserves the right to specify additional aspects of the ED Proposal that are unlawful. Given the limited time provided for public comment, San Francisco had limited time to compile these comments and as such, these comments are not exhaustive. For example, San Francisco takes issue with the ED Proposal's provisions related to gender-affirming care (proposed section 685.219(b)(30)(iii) and related definitions) and reserves the right to contest those and other provisions in the future.

[6] The proposed text reads: "(i) Process for determining when an employer engaged in activities that have a substantial illegal purpose. (1) The Secretary will determine that a qualifying employer violated the standard under subsection (h) of this section when the Secretary: (i) Receives an application as referenced under subsection (e) of this section in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose[.]"

CITY AND COUNTY OF SAN FRANCISCO

San Francisco's Comments in Response to Docket ID ED-2025-OPE-0016
Page 10
September 17, 2025

- proposed section 685.219(b)(30)(i), regarding aiding and abetting immigration violations;

- proposed section 685.219(b)(30)(v), regarding engaging in a pattern of aiding and abetting discrimination; and

- proposed section 685.219(b)(30)(vi), regarding engaging in a pattern of violating various enumerated state laws,

because of the many problems identified with those provisions. At minimum, if the Department fails to withdraw the proposal in its entirety, or remove these proposed definitions, the Department should withdraw the provision disqualifying employers for failing to check the correct certification box on applications.

Sincerely,

David Chiu

DAVID CHIU
City Attorney

ED_00648

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached comments from the American Association of University Women (AAUW).

Attachments 1

AAUW comment on ED-2025-OPE-0016 - Sept 25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10509/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10509

**Tracking Number**

mfo-qahn-2gqq

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



*Submitted                            to                            regulations.gov*

September 17, 2025

Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Ave. SW, 5th Floor
Washington, DC 202022

**Re:    Proposed Rule – William D. Ford Federal Direct Loan (Direct Loan) Program Docket ID ED-2025-OPE-0016**

Dear Ms. Abernathy,

The American Association of University Women (AAUW), founded in 1881, is one of the nation's oldest and largest gender equity organizations. Our mission is to advance equity for women and girls through research, education, and advocacy. We also administer millions of dollars annually in fellowships and grants, and we see firsthand how student debt shapes women's educational and professional opportunities.

AAUW's prior research found that women held about two-thirds of the nation's student-loan debt and that Black women were disproportionately burdened; since that time, aggregate student-loan debt has only increased, intensifying the stakes for programs like Public Service Loan Forgiveness (PSLF).

Because of these disparities, any change to PSLF is a gender and racial equity issue. PSLF has been a critical lifeline enabling women—particularly women of color—to pursue public service careers despite systemic pay inequities. AAUW strongly opposes the Department's proposed rule, which would unlawfully restrict PSLF eligibility, inject ideology into program administration, and undermine the very purpose Congress intended.

**PSLF Should Strengthen Public Service, Not Weaken It**

Congress created PSLF in 2007 through the bipartisan College Cost Reduction and Access Act to address the growing debt crisis while ensuring that communities had access to highly skilled professionals in education, health, and social service. Congress explicitly defined "public service job" to include all full-time work at 501(c)(3) nonprofit organizations. This categorical approach reflects a deliberate choice to keep PSLF broad, neutral, and dependable.

PSLF has delivered on that promise, forgiving more than $70 billion for over 1 million borrowers. These borrowers are teachers, nurses, librarians, and social workers—the backbone of our communities. PSLF has been especially important for women, who dominate nonprofit and public service professions while earning less on average than men.



The proposed rule, however, undermines that vision. By allowing the Secretary to exclude employers based on vague and ideologically loaded terms, it risks turning PSLF into a political weapon rather than a program of opportunity.

**Vague and Overbroad Definitions Invite Viewpoint Discrimination**

The proposed rule empowers the Secretary to disqualify employers if they engage in "activities that have a substantial illegal purpose." The notice lists examples, including:

- "Aiding or abetting violations of federal immigration laws."
- "Engaging in a pattern of aiding and abetting illegal discrimination."
- "Supporting terrorism."
- "Engaging in the chemical and surgical castration or mutilation of children in violation of federal or state laws."
- "Engaging in a pattern of violating state laws" such as trespassing, disorderly conduct, or public nuisance.

While framed as protecting program integrity, these terms are vague and politically charged. Unlike clear statutory categories such as tax-exempt status, these provisions invite discretionary judgments that can be shaped by political ideology rather than law.

For example, a reproductive health nonprofit in a restrictive state could be deemed to have a "substantial illegal purpose." An immigrant-rights group lawfully assisting clients could be accused of "aiding or abetting immigration violations." An LGBTQ+ youth center providing gender-affirming care could be targeted under the "mutilation of children" provision.

These categories do not safeguard PSLF—they open the door to viewpoint discrimination, where eligibility hinges on whether the current administration approves of an organization's mission. That undermines neutrality, contradicts congressional intent, and chills participation in public service.

**"Engaging in a Pattern of Aiding and Abetting Illegal Discrimination" Could Threaten Gender-Specific Support**

The provision disqualifying organizations for "engaging in a pattern of aiding and abetting illegal discrimination" (U.S. Department of Education, 2025, p. 55532) is particularly problematic.

On its face, the phrase suggests enforcement of civil rights laws. But in practice, its vagueness could be misinterpreted to threaten organizations that lawfully provide gender-specific support.

Women's shelters, mentoring programs for girls in STEM, or reproductive health providers may design programs tailored to women and girls. While these actions advance equity, a hostile administration could mischaracterize such targeted support as exclusionary or discriminatory.



Similarly, single-sex programs that are consistent with Title IX exemptions could nonetheless be swept up under this ambiguous rule.

For AAUW, this is not hypothetical. We fund and partner with gender-specific programs nationwide. Under the proposed rule, their PSLF eligibility—and by extension the financial stability of their staff—could be jeopardized simply because their services are tailored to address barriers women and girls face.

Such outcomes would harm both nonprofit employees and the communities they serve. Worse, they would create a chilling effect, discouraging organizations from offering gender-focused programming at all. This directly undermines PSLF's purpose as a neutral, broad-based incentive for public service.

**Flawed Certification and Enforcement Processes**

The rule also establishes an unfair and duplicative enforcement scheme. It requires nonprofits to certify they do not engage in prohibited activities—without clear definitions—and gives the Secretary unilateral authority to revoke PSLF eligibility based on a "preponderance of the evidence," with no independent appeal process.

This process is deeply flawed:

- **No due process:** Employers can lose PSLF status based solely on the Secretary's judgment. Borrowers may lose years of qualifying service with no recourse.
- **Duplicative authority:** The IRS already has the power to revoke 501(c)(3) status if a nonprofit engages in unlawful activities. Creating a separate Department process is unnecessary and risks conflict.
- **Punishing workers for employer actions:** Public service employees would lose forgiveness eligibility for decisions beyond their control, destabilizing entire sectors of the workforce.

Such provisions discourage participation in nonprofit work, punish borrowers for employer-level issues, and inject instability into a program designed to provide security.

**Disproportionate Harm to Women and People of Color**

Women make up two-thirds of the nonprofit workforce, and women of color are overrepresented in education, healthcare, and social services—sectors most dependent on PSLF. These same women hold higher debt loads and face systemic pay inequities. Weakening PSLF will:

- Discourage women from entering or staying in public service.
- Widen gender and racial wealth gaps.
- Reduce representation and diversity in vital fields.



Vague prohibitions in the proposed rule threaten the work of countless nonprofit organizations across the country that provide vital services to marginalized and underrepresented communities.

**A Dangerous Precedent**

If finalized, this rule would set a precedent for politicizing loan forgiveness programs. Today, reproductive health or immigrant-rights nonprofits may be excluded; tomorrow, a different administration could target climate groups, religious organizations, or others. This instability will erode borrower trust in PSLF, discourage participation, and risk spillover to other federal student aid programs.

**Conclusion**

Congress created PSLF to strengthen public service, not to weaken it. The Department's proposal undermines congressional intent, exceeds statutory authority, and threatens to politicize a neutral program. It would chill nonprofit advocacy, punish public servants, and disproportionately harm women and communities of color.

For these reasons, AAUW strongly urges the Department to withdraw this proposed rule in its entirety. PSLF should remain a dependable, inclusive program that keeps Congress's promise to those who serve.

Thank you for your consideration of our comments.

Sincerely,

Meghan Kissell

Meghan Kissell, MSW
Senior Director, Policy & Member Advocacy

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

City and County PSLF NPRM Comment Letter ED-2025-OPE-0016

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10516/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10516

**Tracking Number**

mfo-lxh2-or9l

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

The undersigned cities and counties write to express our strong opposition to the U.S. Department of Education (ED)'s Notice of Proposed Rulemaking on the Public Service Loan Forgiveness (PSLF) program. The proposed rule seeks to illegally weaponize the PSLF program, turning it into a political tool to threaten and punish local and state governments and nonprofit organizations with whom the Administration disagrees. We urge you to withdraw this harmful proposal, which would destabilize our public service workforce, increase local government costs, create legal and administrative ambiguity, and disrupt the delivery of essential services—while stripping critical debt relief from American workers, not because they have done anything wrong, but because of ideological grievances with their employers.

**PSLF was established by Congress to strengthen the public service sector**

Established by Congress and signed into law by President George W. Bush in 2007, the PSLF program was designed with a straightforward premise: those who dedicated themselves to 10 years of public service for a qualifying employer—including federal, state, and local governments as well as nonprofit organizations serving their communities—while staying on-track with their student loan payments would have their remaining student loan balance forgiven. Since public sector workers often face lower wages than their similarly trained colleagues in private sector jobs, PSLF provides an incentive to enter or continue in public service careers. In addition to conferring an important benefit to these workers as a reward for their service, the program is designed to serve a specific role in our economy by addressing a classic market failure: the under provision of public services and the undersupply of public service workers.

**The proposed rule poses severe harm to cities and counties**

If finalized, ED's proposal would empower the Secretary to disqualify certain government and 501(c)(3) non-profit employers from PSLF if they engage in certain conduct, thereby disqualifying current employees unless they change employment. The proposed prohibited conduct—activity with a "substantial illegal purpose"—is vague, but also appears to target lawful work in which local governments regularly engage.

The proposal would therefore particularly harm cities and counties like ours by stripping away vital debt relief for public servants, raising costs for working people, and undermining the ability

of local governments and nonprofits to fill urgently needed public sector jobs.[1] PSLF offers cities and counties, as well as our nonprofit partners, a critical incentive for recruiting and retaining skilled professionals—such as teachers, public health workers, planners, and first responders—who might otherwise pursue higher-paying private sector jobs. More than one million borrowers have already had remaining debt cancelled under PSLF, with many more in the pipeline. Narrowing PSLF eligibility could disincentivize public service careers, leading to staffing shortages and reduced institutional capacity.

The potential of current employees losing eligibility could lead to local governments facing higher turnover rates, which could create disruption in essential services and additional training and hiring costs. A recent analysis that was shared with ED during negotiated rulemaking found that PSLF represents "extraordinary taxpayer value" and that restricting employer eligibility would "eliminate this cost advantage and force significantly more expensive alternative approaches to maintain essential public service workforces."[2]

In addition, the proposed rule introduces uncertainty by tying eligibility to ambiguous and politically contested definitions of illegal conduct. Cities and counties may struggle to provide accurate guidance to our employees or may face legal claims if staff unexpectedly lose eligibility. Local agencies will need to navigate and interpret complex federal rules, adding administrative strain on already overextended human resources departments. Employers would also be required to annually certify that they are not engaging in prohibited activity, so a paperwork oversight or internal legal dispute could put every employee's PSLF status at risk.

The implications of the proposed rule are sweeping, and the consequences for borrowers as well as public service employers could be severe. As Alyssa Dobson, a member of the federal rulemaking panel, told ABC News following PSLF negotiated rulemaking in July, "I could see entire cities and civil structures being targeted."[3] Cities and counties that the Administration labels as so-called 'sanctuary jurisdictions' are likely to be targeted. Public schools and hospitals utilizing diversity, equity, and inclusion programs could be punished. Notably, an entire city or county could be disqualified as a PSLF employer—and with it, all of its employees—based on particular programs or departments.

Our fear that this rule would be used to target cities and counties is not mere speculation. In May, the Department of Homeland Security released a list of what it called "sanctuary jurisdictions" that it believed were "defying federal immigration laws."[4] The Small Business Administration announced the closure of multiple offices in cities "that do not comply" with ICE efforts,[5] and President Trump's border czar Tom Homan recently said that the Department of

---

[1] https://www.route-fifty.com/workforce/2024/03/can-student-debt-relief-attract-workers-state-and-local-government-jobs/394733/
[2] https://www.ed.gov/media/document/candidly-economic-analysis-cost-effectiveness-of-pslf-submitted-laurel-taylor-110311.pdf
[3] https://www.ksbw.com/article/trump-student-loan-forgiveness-changes/65322778
[4] https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law
[5] https://www.sba.gov/article/2025/03/06/administrator-loeffler-announces-sba-reforms-put-american-citizens-first

Homeland Security will "flood the zone" with ICE agents in New York City and other so-called 'sanctuary cities'. The Department of Justice has threatened to arrest public officials who accept federal funding on behalf of a city that has policies related to equity and diversity.[6] It is entirely reasonable to expect that ED will follow suit, using the proposed rule to target local governments.

**The proposed rule is blatantly illegal**

The College Cost Reduction and Access Act, through which Congress established PSLF, states explicitly that all government and nonprofit organizations are PSLF-qualifying employers, without including any exceptions, thereby making their employees eligible for PSLF. Any action by ED to limit eligibility for any employer based on its alleged conduct is a clear violation of the statute—and could also be construed as an unlawful restriction of First Amendment rights to free speech and association. In addition, the proposed rule grants the Secretary of Education sole determination over whether an organization has engaged in an activity with a so-called "substantial illegal purpose," despite the Department lacking the staff, expertise, and credibility—and statutory authority—to make such legal determinations. As proposed, the rule could result in the bizarre and unacceptable circumstance in which a court determines an employer has not engaged in illegal activity but the Secretary determines that the same conduct is "illegal" for PSLF purposes.

**ED must withdraw this proposal, which subverts a shared commitment to public service**

As local government leaders, we understand the importance of keeping public services strong. So we are deeply concerned that this proposed rule runs directly counter to this important and widely-shared goal. For nearly two decades, the PSLF program has symbolized a bipartisan commitment to public service. By tying eligibility to a contentious and politically charged ideological agenda, this rule threatens to erode that neutrality, and to renege on that commitment. Moreover, it represents a fundamental shift in how the federal government values and rewards civic labor. If implemented as proposed, it could not only deny forgiveness to deserving borrowers, but also fundamentally alter the meaning of public service in America.

Our teachers, social workers, firefighters, police officers, nurses, and all public service workers deserve better than this. What borrowers in our communities need right now is a student loan repayment system that is accessible, affordable, and fair—not a politically motivated attack on cities, counties, nonprofits, and public service workers. On behalf of our cities and counties, our public servants struggling with student loan debt, and our vital nonprofit workforce and partners, we urge you to withdraw this proposed rule.


Respectfully,

---

[6] https://www.wilmerhale.com/en/insights/client-alerts/20250613-doj-civil-division-issues-enforcement-priorities-memorandum

Quinton Lucas
Mayor, Kansas City (MO)

Michelle Wu
Mayor, City of Boston (MA)

Daniel Biss
Mayor, City of Evanston (IL)

Rex Richardson
Mayor, City of Long Beach (CA)

Mary B. Richardson-Lowry
Corporation Counsel, City of Chicago (IL)

Tony LoPresti
County Counsel, County of Santa Clara (CA)

Lyndsey M. Olson
City Attorney, City of Saint Paul (MN)

Eli Savit
Prosecuting Attorney, Washtenaw County
(MI)

Rebecca Maurer
Councilwoman, City of Cleveland (OH)

Molly Coleman
Councilmember, Ward Four, City of Saint
Paul (MN)

Hugo Soto-Martinez
Councilmember, City of Los Angeles (CA)

Timothy McGonigle
Commissioner, Mercer County (PA)

Chris Canales
Councilmember, City of El Paso (TX)

Regina Morrison Newman
Trustee, Shelby County (TN)

Justin M. Bibb
Mayor, City of Cleveland (OH)

Frank Scott, Jr.
Mayor, City of Little Rock (AR)

Ravinder Bhalla
Mayor, City of Hoboken (NJ)

Nancy Metayer Bowen
Vice Mayor, City of Coral Springs (FL)

Shannon Braddock
King County (WA) Executive

Ebony Thompson
Solicitor, City of Baltimore (MD)

Robert Taylor
City Attorney, City of Portland (OR)

Rosalyn Guy-McCorkle
Solicitor, Allegheny County (PA)

Delia Garza
Travis County (TX) Attorney

Rue Landau
Councilmember At-Large, Philadelphia (PA)

Brenda Gadd
Councilmember, City of Nashville (TN)

Roger Dickinson
Councilmember, District 2, City of
Sacramento (CA)

Nikki Fortunato Bas
Supervisor, Alameda County (CA) District 5

David Stout
Commissioner, Precinct 2, County of El Paso
(TX)

Alyshia M. Dyer
Sherriff, Washtenaw County (MI)

Robin Wilt
Councilmember, Town of Brighton (NY)

Ligia Andrade Zúñiga
Board Trustee, San Mateo (CA) Unified High
School District

Kristin McGuire
Board Trustee, Charter Oak Unified School
District, Covina (CA)

Christopher Jaramillo
School Board President, Norristown (PA)
Area School District

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see attached.

Attachments 1

PSLF NPRM

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10524/attachment_1.pdf)

**Comment ID**

ED-2025-OPE-0016-10524

Give Feedback

**Tracking Number**

mfo-pqc8-ecqf

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

Linda E. McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

*Submitted via regulations.gov*

**RE: Docket ID No. ED-2025-OPE-0016 William D. Ford Federal Direct Loan (Direct Loan) Program**

Dear Secretary McMahon,

We have an interest in Public Service Loan Forgiveness (PSLF). We appreciate the opportunity to comment on this important matter. We have grave concerns about multiple proposed changes to the regulations governing PSLF and how they may be applied to public service workers and workplaces. PSLF is important to us because there is a mismatch between the high cost of postsecondary education in America and budgets and wages at governmental and nonprofit entities. This has created a situation where people with professional credentials routinely take on more educational debt than it would be feasible to repay through public service work. Jobs in key fields like social work, education, and public interest law would be difficult to fill without PSLF bridging this gap. PSLF has allowed thousands of professionals to apply their expertise in governmental and nonprofit roles that benefit the public. It gives many Americans access to services and expertise they could never otherwise afford.[1] It props up essential services such as urban planning and child welfare in counties and towns.[2] Its only widely reported problems are borrower difficulties with student loan servicers.[3]

[1] *See, e.g.* National Legal Aid & Defender Association, The Critical Role of Public Service Loan Forgiveness in Access To Counsel and Equal Justice (2015).

[2] *See* American Bar Association, *PSLF: A Crucial Tool for Recruiting and Retaining Legal Professionals*, Aug. 26, 2025, https://www.americanbar.org/advocacy/governmental_legislative_work/priorities_policy/legaleducation/pslf-homepage/pslf-overview-and-purpose/ ("Without PSLF, these jobs often go unfilled, courts struggle to function, and vulnerable residents lose access to legal help."); *see also Mitch Paine*, 'Public Service Loan Forgiveness Gave Me that Extra Nudge to Focus My Job Opportunities on the Government Sector', Government Executive, Jun. 21, 2022, https://www.govexec.com/workforce/2022/06/public-service-loan-forgiveness-job-opportunities-government-sector/368254/ (A floodplain management specialist at FEMA who borrowed $65,000 for his graduate studies describes the importance of PSLF to his career trajectory); U.S. Dep't of Education, Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work? (2025) ("We can identify, however, that 12% of borrowers receiving PSLF forgiveness report having worked in a healthcare-related non-profit… the breakdown of the "government" group shows that state and local government employers make up the majority (nearly 70%) of employer occurrences in the government sector.").

[3] *See, e.g.* Cory Turner, Student loan borrowers are spending a lot of time on hold, says federal watchdog, NPR, Sept. 11, 2023, https://www.npr.org/2023/09/11/1198760888/student-loan-borrowers-are-spending-a-lot-of-time-on-hold-says-federal-watchdog.

Now, the Department of Education seeks to impose onerous and ambiguous additional requirements to PSLF, including for people who are already in repayment. This amounts to unilaterally changing borrowers' loan terms years after they took on educational debt. The Department has not provided a coherent or factually sound rationale for this choice. Its proposals would do more harm than good for borrowers, their employers, taxpayers, and society. For this reason, we call on the Department to rescind the proposed rule. Failing that, the Department should add language to the rule that limits its application to borrowers who sign their master promissory notes after its effective date and strengthen due process protections.

**The proposed rule is an unprovoked attack on public service workers and their employers.**

Thousands of Americans have signed master promissory notes containing PSLF as an option and planned their lives and careers around forgiveness after a decade of public service. The proposed rule is slated to be applied to people who have already taken out student loans for specific educational credentials and, in many cases, built careers working on particular subject matter.[4] It is not easy for people engaged in specialized professional work to make abrupt career pivots to different topics, employers, or states. This rule would consequently delay forgiveness for some borrowers and may prevent it altogether for others. This would have devastating consequences for public service workers and their dependents.[5]

It would also cause challenges for employers whose workforces rely on PSLF. At best, the growing uncertainty around PSLF risks driving well-qualified professionals into better-compensated, for-profit roles because that will seem like a more certain route out of student debt. This will hurt nonprofit and governmental hiring. Employers that become the target of enforcement actions will have few due process protections because the Department has chosen to set the bar for eligibility revocation at preponderance of the evidence and limited borrowers' right to challenge determinations that their employers are ineligible to participate in PSLF.[6]

Conceptual confusion and a needlessly punitive approach characterize the proposed rule. For example, the Department included text- in response to negotiators' concerns- preventing organizations from losing eligibility for engagement in constitutionally protected activity such as

---

[4] *See* William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154, 40154 (proposed Aug. 18, 2025) (to be codified at 34 C.F.R. pt. 685) (The proposed rule provides that "...on or after July 1, 2026, no payment made by a borrower shall be credited as a qualifying payment for PSLF for any month subsequent to a determination that a qualifying employer engages in activities that have a substantial illegal purpose." It makes no allowances for people who have earned specific degrees, gained specific professional experience, and lived in specific communities for years. Instead, the Department seeks to impose new terms on borrowers' loans after the fact.).

[5] Melanie Hanson, *Student Loan Forgiveness Statistics*, EducationData.org, Aug. 28, 2024, https://educationdata.org/student-loan-forgiveness-statistics#:~:text=24.6%25%20of%20denied%20claims%20are,%2Drepayment%20(IDR)%20plans. ("$96,343 is the average discharge amount for an approved PSLF applicant."

[6] *See* 90 Fed. Reg. 40154, 40154 ("...the Secretary would determine by the preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions. Also, the Secretary will deem certain actions as conclusive evidence that the employer engaged in activities that have a substantial illegal purpose."); *see also Id.* at 40176 ("...a borrower may not request reconsideration under this subsection (g) based on the Secretary's determination that the organization lost its status as a qualifying employer…").

speech and lawful assembly.[7] However, the Department also specifically lists trespassing- generally the charge for being swept up by police at a protest but not accused of anything worse than being present- as a reason organizations might lose PSLF eligibility.[8] It is unclear whether the Department intends to not punish trespassing except on the rare occasion that a covered entity's employee pleads guilty to or is convicted of it in their professional capacity and in circumstances unrelated to speech or assembly or whether it is treating all such legal outcomes as presumptively unprotected.

The proposed changes also risk disincentivizing the reporting of employment discrimination because an individual who does so may jeopardize their own or their colleagues' loan forgiveness.[9] People who are subjected to employment discrimination may be penalized along with those who victimized them. This proposed provision risks subjecting both borrowers and employers to a harsh form of group punishment for what may be the actions of a small percentage of staff at a public service employer. The Department's adversarial approach to borrowers throughout the proposed rule makes it difficult to trust that it will handle enforcement with care and restraint.

The provision related to terrorism is also concerning because what constitutes support for terrorist organizations is poorly defined. The Department has left itself significant leeway to connect conduct of which the Administration disapproves to terrorism in the course of enforcement actions.[10] It is possible that the application of this clause will far exceed punishing organizations that take a meaningful role in perpetrating acts of violence against persons or property. Likewise, the definition of discrimination is flexible enough, in the context of an administration that has often made questionable legal arguments to chill efforts to advance equity, to give advocates for causes

---

[7] *See Id.* at 40176 ("Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution."

[8] *See Id.* at 40162 (An entire organization could lose PSLF eligibility over a conviction for "trespassing[.]" This creates significant risk, for example, around organizations sending staff to permitted rallies to engage in arguably constitutionally-protected speech and assembly if the protest is broken up for spreading into other areas, something not always within speakers' control. Journalists and others at nonprofit organizations in the communications industry tasked with reporting developments at protests could be swept up by police, causing their entire offices to lose eligibility. Nothing in the proposed rule obviously prevents the same from happening in the event of the arrest of legal observers who are staff or even volunteers for nonprofit organizations. Organizations facing this situation may have to treat trespassing charges as serious threats to their operations and take on legal defense costs to address them.).

[9] *See Id.* at 40160 (The Department is well aware that this aspect of the proposed rule disincentivizes workers who rely on PSLF from reporting employment discrimination because a "...negotiator… expressed concern that a 'chilling effect" could exist in the reporting of discrimination… the employee would lose PSLF eligibility if the employer was found liable for engaging in illegal discrimination." More employment discrimination will go unreported and unaddressed if workers know they could disrupt PSLF eligibility worth tens of thousands of dollars for themselves and their colleagues by reporting it. If the Department were acting in good faith to reduce the incidence of employment discrimination, it would not go out of its way to create powerful incentives for workers to sweep this pernicious issue under the rug).

[10] *See Id.* at 40161 (The Department leaves itself the ability "to determine the nexus between a qualifying employer and whether that qualifying employer supported terrorism as defined in our regulations." Because of the abhorrent nature of truly terroristic activity, any assertion or accusation that a person or organization has provided support to it is a serious matter. While the Department has shown prudence in at least using an existing legal definition from 18 U.S.C. § 2331, the space it leaves itself to determine what conduct is sufficiently connected to terrorism for PSLF eligibility purposes risks chilling constitutionally protected activity and giving organizations insufficient notice of what conduct will result in enforcement actions.

such as racial justice reason for concern that their work may inherently risk enforcement action. *See Id.* at 40159.

Not all of the relevant harms, however, are future possibilities. This proposed rule, in and of itself, slanders public service workers and their employers because the Administration and the Department falsely assert that PSLF subsidizes widespread criminal activity. These changes brand anyone working on causes the Administration disfavors a criminal before ultimately conceding that the Department cannot punish borrowers who have not committed any legally cognizable crime.[11] The Department has not supported the accusations intrinsic to this proposed rule with facts because it is unable to do so. Public servants at all levels of government and nonprofit staff are not routinely engaging in unlawful conduct. This is as unjustified as the Administration's prior efforts to undermine workers in the public sector and diminish the independence of civil society.

**The proposed rule would waste taxpayer dollars on problems that are rare and addressed in other ways.**

Administering the processes described in the proposed rule will, by the Department's own admission, cost taxpayer dollars as well as imposing expenses on covered entities and borrowers.[12] These funds will be wasted because there are already legal procedures for dealing with covered entities and their employees engaging in unlawful activity. The relevant processes are time-tested, effective, and are less likely to make collateral damage of staff who had nothing to do with the alleged misconduct. Most public service employers are covered by antidiscrimination provisions enforced by the EEOC.[13] Doctors who ignore state bans on gender-affirming care for minors face consequences such as civil and criminal penalties and loss of medical licensure.[14] Facilitating immigration violations- as opposed to merely representing people in immigration proceedings or providing aid without demanding proof of immigration status- has criminal penalties. *See* 8 U.S.C. § 13242. So, too, does real support for acts of terrorism. *See* 18 U.S.C. § 2332. The Internal Revenue Service is empowered to strip nonprofits that engage in unlawful conduct of their tax-exempt status. *See Iowaska Church of Healing* v. *Werfel,* 105 F.4th 402 (D.C. Cir. 2024).

Where there is sufficient evidence to support civil or criminal penalties, the existing solutions work. Those responsible for carrying them out have expertise the Department lacks in enforcing criminal law or civil law outside the realm of education. Where there is insufficient evidence to support the application of existing penalties, imposing a severe financial penalty on student loan borrowers may raise due process questions. Any resulting litigation would waste more taxpayer funds.

---

[11] *See Id.* at 40157 ("All of the activities included within the definition of substantial illegal purpose 14 are either explicit violations of State or Federal law, and as such, are actions which do not serve the public good.").

[12] *See Id.* at 40168 ("The Department acknowledges that implementing the proposed regulations will incur costs.").

[13] *See, e.g.* 42 U.S.C. § 2000e; 42 USCS § 2000e.

[14] *See* Ark. Code Ann. § 20-9-1504 (Enforcement provisions for Arkansas's gender affirming care ban); Tenn. Code Ann. § 68-33-106 (b) ("The attorney general and reporter may bring an action against a healthcare provider or any person that knowingly violates this chapter, within twenty (20) years of the violation, to enjoin further violations, to disgorge any profits received due to the medical procedure, and to recover a civil penalty of twenty-five thousand dollars ($25,000) per violation."); Code of Ala. § 26-26-4 (c) ("A violation of this section is a Class C felony.").

**Conclusion**

These proposed changes will have no benefit. By making the path to PSLF more risky and uncertain for student loan borrowers, the Department risks disincentivising the pursuit of PSLF. Because there is no other realistic path out of student loans in many professional public service positions, this would make it harder for states, counties, towns, and nonprofit organizations to fill vital positions. It would undermine Americans' access to essential services that support the health, safety, and prosperity of our communities. It would also weaken the economy.[15] It does all of this in the name of solving a problem that is vanishingly rare and being more effectively addressed through other means.

The application of these additional restrictions is burdensome to all borrowers and their employers. Their application to people who are already in repayment or have enrolled in coursework counting on PSLF is particularly unjust. People are not always able to change employers easily. Doing so can be disruptive to the careers of spouses, the education of children, and eldercare responsibilities, particularly where relocation is involved. If the Department is determined to move forward with this inefficient attempt to solve a virtually nonexistent problem, it should exempt existing borrowers instead of trying to change their loan terms unilaterally and after the fact. We call on the Department to rescind or modify the proposed rule. Thank you for the opportunity to address this important matter.

Sincerely,

Autistic Self Advocacy Network
Debra Brinker
Meghan Hazer-Álvarez
R. Larkin Taylor-Parker
Sam Brinker

---

[15] William D. Cather, Erica E. Harris, and Miles A. Romney, *Your Tax Dollars at Work: The Effectiveness of the Public Service Loan Forgiveness Program*, 47 J. Am. Taxation Ass'n 2 (2025).

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Comments submitted on behalf of our members (and our thousands of federal student loan borrower clients) of the National Association of Student Loan Lawyers [NASLL] re changes to POSLF PROGRAM 9/17/25

Attachments 3

NASLL COMMENTS TO DoE FSA 9-17-2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10530/attachment_1.pdf)

NASLL EX. 1 PSLF NPRM Coalition Comment Letter September 2025

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10530/attachment_2.pdf)

NASLL EX. 2 LSNYC PSLF comments final

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10530/attachment_3.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10530

**Tracking Number**

mfo-vapn-dhg4

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Give Feedback

Support (/support)

**Comment on FR Doc # 2025-15665**

Comments submitted on behalf of our members (and our thousands of federal student loan borrower clients) of the National Association of Student Loan Lawyers [NASLL] to the U.S. Department of Education re:

**Proposed Regulations on the Department's intention to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219**

**Document ID ED-2025-OPE-0016-7221**
**Federal Register Number 2025-15665**

September 17, 2025

Comments submitted on behalf of clients of members of the NASLL:
**Officers: info@nasll.org**

**President: Joshua Cohen, Esq.**
**Vice President: Karen Cody-Hopkins, Esq.**
**Treasurer: Edward C. Boltz, Esq.**
**Secretary: Adam S. Minsky, Esq.**
**Director at Large: Stanley Tate, Esq.**

**Contact for more information:**
Karen Cody-Hopkins, Attorney
Cody-Hopkins Law Firm
4610 S. Ulster St # 150
Denver, CO 80237
T: 303-221-4666
E: karen@codyhopkinslaw.com

NASLL members represent student loan borrower clients of every age, school, race, generation, income level, geography, and every other demographic breakdown FSA recognizes and a few groups we never hear you discuss. Our members represent a broad spectrum of political

allegiances, not one, but we are concerned how the proposed changes will affect our clients. We write on their behalf.

NASLL, as representatives of hundreds of thousands of federal student borrowers, submits these comments to address the Department's proposed intent to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a "substantial illegal purpose."

The Department says the "These proposed changes are intended to improve the administration of the PSLF program and provide protection for taxpayers."

We call your attention to the arguments in our Exhibits 1 and 2 [Legal Services NYC] that the proposed PSLF changes are illegal. We believe that concern is valid.

We are very concerned the proposed changes are detrimental to the millions of student loan borrowers who will find the proposed changes confusing, and discriminatory. We believe the changes will deprive borrowers who may have made career, financial, and personal decisions for YEARS-- in reliance that the program was designed to help government and non-profit enterprises employees. How is it fair for an eight or nine- or almost ten-year employee to be told **now** that his or her employer qualified for years but now does not? Telling them – "just change your employer" is an unfair option. And to have the proposed changes to an essentially 10-year program take effect July 1, 2026 is especially unfair.

We think the proposal to "Add § 685.219(j) to establish that an employer that loses PSLF eligibility could regain qualifying employer status after (1) 10 years from the date the Secretary determines the employer engaged in activities that have a substantial illegal purpose, or (2) after the Secretary approves a corrective action plan..." is especially inappropriate. This leaves a long-term program open to whiplash changes every time administrations change. Plus we foresee an avalanche of uncertainty as student and employers bring litigation challenging the proposed rule changes.

The proposal talks about how "the rule introduces new administrative

responsibilities. These include reviewing court judgments and plea agreements for evidence of employer misconduct, issuing determinations, notifying borrowers of status changes, and overseeing corrective action plans. While these tasks will require the investment of staff time and system resources, the use of existing standards—such as definitions grounded in federal law and doctrines adopted by other agencies—will allow the Department to administer the regulations with efficiency and consistency." Given the vastly deleted Department of Education staff, and the current huge backlog of IDR applications, PSLF BUYBACK application, **AND** the expected processing that will likely be required to move all SAVE borrowers to other IDR plans **AND** the changes per the "Big Beautiful Bill" next July, we are concerned sufficient resources to serve borrowers will not be available.

We support that you take a long look at the attached comments in the attached letter comment from 254 organization representing millions of borrowers. See Ex. 1

We too urge the Department to withdraw this NPRM, which will have a negative effect on so many borrowers employed by federal, state, local governments and tribes and 501(c)(3) non-profit organizations that may not support the Trump Administration's political agenda.

**STOP ACT FAILURE TO GIVE ATTORNEYS' ACCESS TO FSA**

And finally, we must again raise the issue of FSA's failure to comply with the STOP Act [The Stop Student Debt Relief Scams Act of 2019 amending sections 141, 485B, and 490 of the Higher Education Act of 1965 as amended] and provide a lawful electronic access device or access method for borrower chosen attorneys and/or advocates to get timely information as to federal student loan borrowers FSA/NSLDS accounts.

At a time of monumental change in FSA's programs, it is critical that attorneys and advocates have timely access to a federal student borrowers' complete set of data. Often our clients cannot provide the timely & accurate data we need to help them. We deal with clients who have been scammed so we too want protection from scammers; but we as attorneys do have a "bona fide" need to know client's FSA data, especially as FSA is now publishing much more data – correspondence, PSLF & TPD stats updates and decisions – directly on studentaid.gov. The STOP Act recognizes that licensed attorneys should have FSA access via a separate point of access to best serve our clients.

**We and our clients have been waiting for too long for the Department to fulfill its legal obligation to borrowers and their attorneys to have approved access to studentaid.gov.**

**CONCLUSION**

We clearly see and applaud the FSA's many attempts to improve the broken FSA system. Trying

to repair and improve a system that has broken down over multiple Administrations -- on a finite budget -- is a daunting task, but succeeding is critical as the FSA System has become too complicated, nuanced, and confusing for most of the clients we counsel. **We repeat: Besides repayment, simplification, improved communications, timeliness and fairness of the FSA System should be top-line goals.**

*************.

**EXHIBIT 1 TO NASLL COMMENT ON**
**Document ID ED-2025-OPE-0016-7221**
**Federal Register Number 2025-15665**

September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

We, the undersigned 254 organizations representing millions of students, borrowers, healthcare workers, government workers, educators, people of color, veterans, women, immigrants, people with disabilities, and consumers crushed under the weight of student loan debt, write in opposition to the Department of Education's (ED) Notice of Proposed Rulemaking (NPRM) published to the Federal Register on Monday, August 18th that would make unlawful changes to the Public Service Loan Forgiveness (PSLF) program.

The proposed rule would grant the Secretary authority to revoke PSLF eligibility from a public service employer if the Secretary determines that the employer has engaged in activities with a "substantial illegal purpose," a novel legal concept this Administration is clearly using as a proxy for protected activity with which it ideologically disagrees, such as work advancing immigrants' rights, transgender persons' rights, racial equity and inclusion, and peaceful demonstrations. This is blatantly unconstitutional, illegal, and harmful to millions of borrowers across the country, including those working to support historically marginalized communities. The proposed rule would also impose a chilling effect on workers entering public service fields, which could deter those with postsecondary education from seeking employment with non-profit organizations, state and local governments, hospitals, and employers working on the frontlines addressing our nation's most critical challenges.

We urge the Department to withdraw this NPRM, which is a clear effort to intimidate and punish state and local governments and 501(c)(3) non-profit organizations that refuse to support the Trump Administration's political agenda.

**The Trump Administration's Proposal to Weaponize the PSLF Program is Illegal.**

This proposed rule is a clear, unlawful attempt to weaponize the PSLF program in an effort to intimidate and punish governments and 501(c)(3) non-profit organizations whose work does not fall in line with the Trump Administration's political agenda, such as organizations working to support immigrant communities, provide gender-affirming healthcare to minors, promote diversity and inclusion, engage in peaceful protest, and more. It both conflicts with the PSLF program as authorized in the Higher Education Act and violates the U.S. Constitution.

When Congress created the PSLF program through the College Cost Reduction and Access Act of 2007, it defined PSLF-eligible employers as including any kind of employment for any government or any 501(c)(3) non-profit organization. *See* 20 U.S.C. § 1087e(m)(3)(B)(i). However, ED's proposed rule seeks to usurp the plain letter of the law and Congress's authority to determine what constitutes a PSLF-qualifying employer. The proposed rule would grant the Secretary of Education authority to disqualify statutorily eligible employers—government and 501(c)(3) non-profit alike—based on whether the employer supports the Trump Administration's agenda. Congress has never given the Secretary the authority to exclude ***any*** government and 501(c)(3) non-profit organizations from PSLF for ***any*** reason, including the ideological reasons in the proposed rule. ED is seeking to unlawfully stretch the bounds of its authority and violate the plain text of the nearly twenty-year old PSLF statute.

The proposed rule is also unconstitutional. The criteria for activity with a "substantial illegal purpose" are a clear attempt to target certain groups performing work deemed anathema to the Trump Administration's political priorities. This language is borrowed from the Internal Revenue Service (IRS) and its process for assessing organizational tax obligations. ED does not possess the expertise or authority to make determinations of tax status separate from IRS, nor does it possess the expertise or authority to assess compliance with criminal codes. This proposed rule would also allow the Secretary of Education to be the judge and jury in declaring an organization has engaged in actions with a "substantial illegal purpose," clearly undercutting due process rights. Ideologically targeting protected conduct is a clear violation of the First Amendment freedoms of speech and association, and is a blatant attack on civil liberties and individual rights.

**The Proposed Rule Threatens Undeniable Harm to Hundreds of Thousands of Borrowers and Employers.**

The Trump Administration's proposed rule would harm public service workers, employers, and the communities that rely on them. The PSLF program helps millions of people, including nurses, educators, military service members, firefighters and other first responders, social workers, and legal aid attorneys, pursue careers in the public interest, knowing full well that they otherwise could not afford these occupations while burdened by crushing student debt. The proposed rule would have a chilling effect on employers' ability to recruit and retain qualified staff working in critical fields and with rural and other marginalized communities, including Black, Brown and Indigenous communities all over the country. Even worse, just the threat of crossing this administration and being dubbed ineligible will likely chill thousands of non-profit organizations and government agencies from engaging in mission-critical work to respond to the greatest needs of their communities. Wielding the federal government's role as a source of financial aid—a critical tool that allows students from all backgrounds to access postsecondary education—is a gross abuse of power. Weaponizing the PSLF program to advance this administration's ideological goals—many of which conflict with existing state and federal law—is anti-democratic and unlawful.

We urge you to immediately withdraw this blatantly illegal Notice of Proposed Rulemaking altogether and implement the Public Service Loan Forgiveness program as Congress intended. Millions of workers undertook their careers with the understanding that student loan forgiveness was promised by Congress in statute in exchange for their work in public service fields. These workers and the communities they serve deserve better than to be treated as pawns in this administration's campaign to chill and silence speech.

Sincerely,

**National Organizations**

Protect Borrowers
AACTE: American Association of Colleges for Teacher Education
Accountable.US
Advancement Project
Affordable Homeownership Foundation
AFL-CIO
AFT
Alliance for a Just Society
American Association of University Women (AAUW)
American Federation of State, County and Municipal Employees (AFSCME)
Appleseed Foundation
Arab American Institute (AAI)
Autistic Women & Nonbinary Network
Center for American Progress
Center for Law and Social Policy (CLASP)
Center for LGBTQ Economic Advancement & Research (CLEAR)
CenterLink: The Community of LGBTQ Centers
Clearinghouse on Women's Issues
Clinical Social Work Association
Coalition on Human Needs
Communications Workers of America (CWA)
Consumer Action
Consumer Reports
Council for Global Equality
Council on Social Work Education
Debt Collective
EdTrust
Empowering Pacific Islander Communities (EPIC)
Equal Justice Society
Equity Research Cooperative
Feminist Majority Foundation
Formerly Incarcerated College Graduates Network
Fosterus
Franciscan Action Network
GLBTQ Legal Advocates and Defenders (GLAD Law)
HBCU Collective
HEAL (Health, Environment, Agriculture, Labor) Food Alliance

Heartland Human Care Services
Hispanic Federation
Immigration Equality
Indivisible
International Federation of Professional and Technical Engineers (IFPTE)
International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)
KAIROS DEMOCRACY PROJECT
Lawyers for Good Government
League of United Latin American Citizens (LULAC)
MDC
Movement Advancement Project
MoveOn
MPower Change Action Fund
NAACP
National Action Network
National Association of Social Workers
National Center for Law and Economic Justice
National Center for LGBTQ Rights
National Council of Asian Pacific Islander Physicians
National Education Association (NEA)
National Employment Law Project
National Fair Housing Alliance
National Immigration Law Center (NILC)
National LGBTQ+ Bar Association
National Nurses United
National Organization of Legal Services Workers, UAW Local 2320
National Partnership for Women & Families
National Women's Law Center
NBJC
Nonprofit Professional Employees Union, IFPTE Local 70
People Power United
Project on Predatory Student Lending
Public Advocacy for Kids (PAK)
Public Counsel
RootsAction
Secular Student Alliance
Service Employees International Union (SEIU)
Southeast Asia Resource Action Center (SEARAC)
Student Debt Crisis Center
Swipe Out Hunger
Task Force for Democracy
The Cancer Network
The Institute for College Access & Success (TICAS)

The Institute for Health Research & Policy at Whitman-Walker
The Leadership Conference on Civil and Human Rights
URGE: Unite for Reproductive & Gender Equity
Voto Latino
Young Center for Immigrant Children's Rights
Young Invincibles

**State & Local Organizations**
10,000 Degrees
4Cs SEIU 1973
ACT-UAW Local 7902
Advanced Consulting, LLC
AFT- Oklahoma
Alliance for Girls
Arizona Student Association
Arkansas Community Organizations
Associated Students of the University of California (ASUC) External Affairs Office
Association of Legal Advocates and Attorneys/UAW 2325
Black Economic Council of Massachusetts, Inc.
BLU Educational Foundation
Cabrini Green Legal Aid
California Rural Legal Assistance, Inc.
CAMBA/ CAMBA Legal Services
Capital Area College Access Network, Lansing MI
CASH Campaign of Maryland
Center for Economic Integrity
Center for Elder law & Justice
Chase Brexton Health Care
Child Care Law Center
Church Women United in New York State
Civil Service Bar Association
College Now Greater Cleveland
Columbia Legal Services
Communities for Our Colleges
Community Legal Aid Society, Inc. (Delaware)
Community Service Society of New York
Connecticut Voices for Children
Consumer Federation of California
Convencion Bautista Hispana de Texas
Economic Action Maryland Fund
Education Forward Arizona
Education Minnesota
El Pueblo Unido of Atlantic City
Empire Justice Center

Equality California
Equality Illinois
Equality New Mexico
Erie County Bar Association Volunteer Lawyers Project
Family Counseling Services of the Finger Lakes
FCSFL
Florida Justice Institute
Georgia Budget & Policy Institute
Hawai'i State Teachers Association
Housing and Economic Rights Advocates
Illinois Stewardship Alliance
Jacksonville Area Legal Aid, Inc
Legacy Bridge CDC
Legal Aid Association of California
Legal Aid Bureau of Buffalo, Inc.
Long Beach Alliance for Clean Energy
Los Angeles LGBT Center
Lyon-Martin Community Health Services
Maryland Center for Collegiate Financial Wellness
Mazzoni Center
Mental Health Advocacy Services
Mobilization for Justice
Mountain State Justice
National Association of Social Workers DC Metro Chapter
National Association of Social Workers, Alabama Chapter
National Association of Social Workers, Alaska Chapter
National Association of Social Workers, Arizona Chapter
National Association of Social Workers, Arkansas Chapter
National Association of Social Workers, California Chapter
National Association of Social Workers, Colorado Chapter
National Association of Social Workers, Connecticut Chapter
National Association of Social Workers, Delaware Chapter
National Association of Social Workers, Florida Chapter
National Association of Social Workers, Georgia Chapter
National Association of Social Workers, Guam Chapter
National Association of Social Workers, Hawaii Chapter
National Association of Social Workers, Idaho Chapter
National Association of Social Workers, Illinois Chapter
National Association of Social Workers, Indiana Chapter
National Association of Social Workers, Iowa Chapter
National Association of Social Workers, Kansas Chapter
National Association of Social Workers, Kentucky Chapter
National Association of Social Workers, Louisiana Chapter
National Association of Social Workers, Maine Chapter

National Association of Social Workers, Maryland Chapter
National Association of Social Workers, Massachusetts Chapter
National Association of Social Workers, Michigan Chapter
National Association of Social Workers, Minnesota Chapter
National Association of Social Workers, Mississippi Chapter
National Association of Social Workers, Missouri Chapter
National Association of Social Workers, Montana Chapter
National Association of Social Workers, Nebraska Chapter
National Association of Social Workers, Nevada Chapter
National Association of Social Workers, New Hampshire Chapter
National Association of Social Workers, New Jersey Chapter
National Association of Social Workers, New Mexico Chapter
National Association of Social Workers, New York Chapter
National Association of Social Workers, North Carolina Chapter
National Association of Social Workers, North Dakota Chapter
National Association of Social Workers, Ohio Chapter
National Association of Social Workers, Oklahoma Chapter
National Association of Social Workers, Oregon Chapter
National Association of Social Workers, Pennsylvania Chapter
National Association of Social Workers, Puerto Rico Chapter
National Association of Social Workers, Rhode Island Chapter
National Association of Social Workers, South Carolina Chapter
National Association of Social Workers, South Dakota Chapter
National Association of Social Workers, Texas Chapter
National Association of Social Workers, Utah Chapter
National Association of Social Workers, Vermont Chapter
National Association of Social Workers, Virgin Islands Chapter
National Association of Social Workers, Virginia Chapter
National Association of Social Workers, Washington Chapter
National Association of Social Workers, West Virginia Chapter
National Association of Social Workers, Wisconsin Chapter
National Association of Social Workers, Wyoming Chapter
New Economy Project
New Era Colorado Action Fund
New Jersey Appleseed Public Interest Law Center
New Jersey Association of Mental Health and Addiction Agencies, Inc.
New Jersey Institute for Social Justice
NextGen California
NMIC
North Carolina Council of Churches
Northwest Justice Project
Nourish California
Oasis Legal Services
Ohio Student Association

On Point for College
Progress Virginia
Progressive Leadership Alliance of Nevada
Public Justice Center
Quiet Creek Herb Farm & School of Country Living
Renewing the Countryside
Safety Net Project - Urban Justice Center
SEIU Local 500
SEIU Local 509
Silver State Equality
South Carolina Appleseed Legal Justice Center
Southern California College Attainment Network
Step Forward
Student Loan Fund
Students Engaged in Advancing Texas (SEAT)
Students United
Texas American Federation of Teachers
Texas State Teachers Association
The Arizona Students' Association
The Center for Access to QDROs
The Collaborative NC
The Counseling Lounge, LLC
The Rebuild, Overcome, and Rise (ROAR) Center at the University of MD, Baltimore
The RP Group
UAW Local 259
UAW Region 9A
United University Professions
United Way of Southern Cameron County
Universal Health Care Foundation of Connecticut
University of California Student Association (UCSA)
University of Connecticut chapter of the American Association of University Professors
Urban Justice Center
Urban Tilth
Vermont-NEA
Volunteer Lawyers Project of CNY, Inc.
Washington Education Association
Washington State Office of the Student Loan Advocate
Washington Student Association (WSA)
West Virginia Citizen Action Group
Westchester residential opportunities
WI Appleseed
William E. Morris Institute for Justice
Wisconsin Education Association Council
Women Employed

**NASLL EXHIBIT 2**
**Document ID ED-2025-OPE-0016-7221**
**Federal Register Number 2025-15665**

LEGAL SERVICES NYC

September 17, 2025

U.S. Department of Education,
400 Maryland Ave., SW.,
Washington, DC 20202

Submitted electronically via: http://regulations.gov

**Re: Docket ID ED-2025-OPE-0016**

Legal Services NYC ("LSNYC") submits the following comments in response to the above-referenced request for comments by the U.S. Department of Education on Public Service Loan Forgiveness (PSLF) (Docket ID ED-2025-OPE-0016). LSNYC believes the proposed rules for PSLF will increase confusion among student loan borrowers and make loan repayment more burdensome and unfair.

## Who We Are

LSNYC is the largest civil legal services provider in the country, with offices throughout New York City. Our organization works to reduce poverty by challenging systemic injustice and helping clients meet basic needs in such areas as housing, employment, public benefits, health care and education.

In the student loan context, LSNYC represents a wide range of New Yorkers of low to moderate income, including police officers, social workers, nurses and teachers.[1] Many of our clients carry large student loan debts that would not be affordable given their moderate public service salaries without PSLF.

## PSLF and the Proposed Rule

PSLF is mandated by a federal statute that permits forgiving the remaining balance of an individual's student loan after they have had ten years of public service employment. When Congress created the PSLF program in 2007, it defined PSLF-eligible employers as any government employer (federal, state, city or tribal) or any 501(c)(3) non-profit organization. 20 U.S.C. § 1087e(m)(3)(B)(i).

[1] LSNYC is a member of the Education Debt Consumer Assistance Program (EDCAP). EDCAP receives funding from the State of New York that enables LSNYC to represent New Yorkers with incomes above 150% of the Federal Poverty level.

Demand Justice.

**Legal Services NYC** | 40 Worth Street, Suite 606, New York, NY 10013
Phone: 646-442-3600 | Fax: 646-442-3601 | www.LegalServicesNYC.org
**Shervon M. Small**, Executive Director | **Liza M. Velazquez,** Board Chair

LSC
America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

The Secretary of Education's (the Secretary's) proposed rule seeks to amend this definition of qualified employer to exclude employers who engage in activities with which the Secretary does not agree. For example, the rule disqualifies an employer who the Secretary believes "aids and abets" violations of federal immigration law; engages in providing gender affirming medical care for people under 19 years old; or engages in a pattern of aiding and abetting activity the Secretary determines constitutes illegal discrimination. 90 Fed. Reg. 40154, 40175 (Aug. 18, 2025) proposed amendment to 34 C.F.R § 685.219(b)(30). The proposed rule purports to comply with an Executive Order[2], not a statutory change in the PSLF statute. This substantial departure from the plain language of the statute makes the proposed rule likely unlawful and subject to legal challenges which will further delay debt forgiveness for otherwise eligible borrowers.

**Comments**

Legal Services NYC strongly opposes the implementation of the proposed rule because it is unlawful and will have catastrophic consequences for people struggling with student debt who have dedicated their lives and careers to the public service.

First, the rule makes it highly likely that many of our clients who work for the City of New York will lose their PSLF eligibility, including those of our clients who are police officers with the New York City Police Department (NYPD). On July 24, 2025, the U.S. Department of Justice sued the New York City Police Department and other New York City agencies based on allegations of obstructing Immigration and Custom Enforcement (ICE) activity[3], a claim that if proved would disqualify *all* NYPD officers from PSLF, punishing front line officers for the alleged bad acts of their superiors. The merits of the suit are questionable given recent case law[4], including a new case against the City of Chicago that was dismissed.[5]

However, the proposed rule does not require a court decision regarding illegality as a predicate to disqualify an employer from PSLF. Rather, under the proposed rule the Secretary needs only to put a police department on notice of its intent to disqualify it from PSLF, after which the city is allowed a written response. The Secretary then issues her decision. Thus,

---

2 90 Fed. Reg. at 40159.

3 Complaint, *United Sates vs. City of New York et al*., 25-cv-4084 (EDNY, July 24, 2025).

4 *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) ("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts."); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("[T]he Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement"); *Galarza v. Szalczyk*, 745 F.3d 634, 643-45 (3d Cir. 2014) ("[I]mmigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme").

5 *United States v. Illinois*, --- F.Supp.3d ----, 2025 WL 2098688 (ND IL, July 25, 2025)(Tenth Amendment protects state and city from federal coercion).

enormous discretion is left to the Secretary, and the proposed rule offers no recourse for those affected, the borrowers themselves.[6]

Moreover, the proposed rule lacks any proportionality test or clear criteria as to how much alleged impermissible behavior is sufficient for the Secretary to make a finding that a workplace is engaged in an impermissible "purpose." Thus, for example, the proposed rule would permit the Secretary to strip the police department of its public service status even if the only allegation -- failure of the NYPD to sufficiently cooperate with ICE -- constituted less than 0.1% of everyday police activity, as compared to crowd control, crime investigation, patrolling neighborhoods and public transportation hubs, responding to emergencies, etc..

Such a decision made by the Secretary would disqualify over 33,000 active NYC police officers from individually obtaining tens of thousands of dollars of loan forgiveness that had been promised to them by the federal government in exchange for their dedicated public service. And while one might hope this proposed rule will not be used in such a way, the numerous lawsuits against sanctuary cities filed by the federal administration suggest otherwise.[7]

Equally troubling is the impact of a single administrative law decision by the Secretary that a city agency violated one of her proposed prohibitions. New York City employs over 300,000 people[8] in a wide array of jobs (sanitation, education, firefighting, health care, welfare, etc.) that have nothing to do with its sanctuary city policies. Yet a finding that its police department violated a proposed rule could affect all NYC employees. This is because the PSLF program uses Employer Identification Numbers (EINs) to identify qualified and unqualified employers. New York City, like most cities, uses the same EIN for all its agencies. This means that disqualification of the NYPD would also have the effect of disqualifying other sub-agencies using the same EIN, such as the Board of Education (which employs 150,000 teachers and support staff). And while the Secretary recognized the existence of the single EIN problem in her rulemaking, she "maintains ultimate authority" on whether "innocent" sub-agencies will be disaggregated from the EIN number associated with the disqualified employer. 90 Fed. Reg. at 40165.

Our clients who work at 501(c)(3) non-profits are equally in jeopardy of losing PSLF for work that is completely legal. For example, some of our clients work at non-profit teaching hospitals that, until January 2025, provided gender affirming care including surgery to people

---

6 90 Fed. Reg. at 40163 (A borrower may not appeal the Secretary's finding that their employer is no longer "qualified" for PSLF.)

7 AP, *Trump administration targets Boston in latest sanctuary city lawsuit*, (Sept. 4, 2025)(listing nine sanctuary cities sued by Trump), available at https://apnews.com/article/trump-boston-sanctuary-city-immigration-ice-4c8acdc93681fee940d9214e7cdafd73

8 Citizens Budget Commission, NYC Employee Headcount, Nov. 19, 2024, available at https://cbcny.org/research/nyc-employee-headcount#:~:text=At%20the%20end%20of%20fiscal%20year%202024%2C,which%20are%20combined%20into%20equivalents%20of%20full%2Dtime

under 19, which is legal in New York.[9] In February 2025, many of these hospitals curtailed their services[10] in response to an executive order threatening the loss of federal aid to hospitals providing such care.[11] These teaching hospitals await legal guidance from federal courts[12] and state agencies[13] regarding the legality of the executive order and their non-discrimination obligations under New York law. Should the executive order be struck down and transgender services to youth resume in compliance with State law, PSLF could still be stripped from tens of thousands of employees for legal conduct if the Secretary decides such treatment violates the proposed rule. Such an administrative finding could strip 53,000 nurses, doctors, technicians, and social workers at NYU Langone Health from PSLF. And because NYU Langone uses the same EIN number as its parent, New York University, an additional 19,000 teachers, researchers, and support staff could also lose their PSLF eligibility.

In addition to hurting borrowers seeking PSLF, the proposed rule is harmful to the people LSNYC represents in general. When passing the PSLF law in 2007, Congress recognized the importance of public service work in maintaining and fostering a civil and equitable society. Aware that large student loans could deter graduates from entering public service, Congress created PSLF. Because the proposed rules create great uncertainty regarding the viability of managing one's debt through PSLF, recruiting and retaining employees in public service will be more difficult. Eventually, these shortfalls will impact the schools, police forces, social service agencies and hospitals that serve our clients.

The proposed rule would also hurt LSNYC's clients because it makes student loan repayment less manageable and more unpredictable. The proposed rule eliminates a clear path for repaying one's debt. Consequently, some of our clients will pause or stop making payments until a clearer path is provided. Such delays are bad for the borrower and the country.

Finally, the proposed rule places enormous numbers of public service employees at financial risk. It is not in anyone's interest to punish public servants simply because they live and work in states and cities that have different policies than the executive branch. Political scores

---

9 New York State Attorney General, Health care information for transgender, nonbinary, gender nonconforming, and intersex New Yorkers, last updated Jan. 31, 2025) available at https://ag.ny.gov/resources/individuals/health-care-insurance/transgender-nonbinary-intersex-health-care

10 Emily Witt, *Where Do Trans Kids Go from Here?* The New Yorker, (Feb. 19, 2025) available at https://www.newyorker.com/news/the-lede/where-do-trans-kids-go-from-here

11 Executive Order 14187—Protecting Children From Chemical and Surgical Mutilation, available at https://www.federalregister.gov/documents/2025/02/03/2025-02194/protecting-children-from-chemicalandsurgical-mutilation

12 E.g. Complaint, *Commonwealth of Massachusetts et. al. v. Trump*, 1:25-cv-12162 (D. Mass Aug. 1, 2025).

13 E.g. Complaint, *The New York City Commission on Human Rights v. NYU Langone*, M-P-AS-25-151777 (Feb. 28, 2025), available at https://www.nyc.gov/assets/cchr/downloads/pdf/NYU-Langone-Hospitals-Commission-Initiated.pdf

should be settled at the ballot box, not in the administration of student loans.

**For more information about these comments, please contact:**
**Johnson M. Tyler, Senior Staff Attorney, at 862-202-1850 or at jtyler@lsnyc.org.**

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

This rule is going to dissuade recent law grads from going into any kind of social work, because with the vague definitions in it, almost anything the current administration doesn't like they will call "illegal" and leave people with the crushing debt. You can see that this law is going to be used against immigrants, trans people, any LGBTQ people, probably, and frankly anyone who doesn't bow to the regime.

We need to encourage lawyers to work FOR society, not just for money. This rule makes that harder. Also, it's just gross.

**Comment ID**

ED-2025-OPE-0016-10534

**Tracking Number**

mfo-hlkn-wwnj

Give Feedback

**Comment Details** | **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025



About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

---

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached comment from 70+ legal services organizations that work on behalf of low-income people.

Attachments 1

Legal Aid PSLF Comments - Final 9.17.25

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10537/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10537

**Tracking Number**

mfo-j65c-k926

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

Linda McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

*Submitted via regulations.gov*

**RE: Legal Aid Comments on Proposed Changes to Public Service Loan Forgiveness Rules, Docket ID ED-2025-OPE-0016**

Dear Secretary McMahon,

We, the undersigned 70+ legal services organizations that work on behalf of low-income people, submit this comment in response to the Department of Education's request for comments on its proposed rule to add new restrictions to the definition of qualifying employers for the Public Service Loan Forgiveness (PSLF) program.[1]

The Higher Education Act defines qualifying public service jobs for PSLF as work for nonprofit 501(c)(3) employers and work for "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)," among others.[2] Despite this explicit statutory definition, the Department's proposed rule would redefine qualifying employers by placing new conditions on qualification and attempt to grant the Secretary novel new authority to revoke 501(c)(3) and legal services employers' qualifying status based on Secretarial findings that the employer engaged in certain types of activities disfavored by the President.[3] Because the Secretary lacks legal authority to depart from the clear definition of public service jobs provided in the Higher Education Act, because the proposed rule threatens the integrity and reliability of a program that nonprofit legal services organizations rely on to recruit and retain staff to provide legal assistance to low-income people, and because the proposed rule would threaten the freedom of legal services organizations and chill them from providing important services to all lawful clients, we urge the Department to withdraw the proposed rule and to maintain its existing PSLF regulations.

---

[1] U.S. Dep't of Education, Notice of Proposed Rulemaking, 90 Fed. Reg. 40154 (Aug. 18, 2025), *available at* https://www.federalregister.gov/documents/2025/08/18/2025-15665/william-d-ford-federal-direct-loan-direct-loan-program.
[2] 20 U.S.C. § 1087e(m)(3)(B).
[3] The proposed rule follows from President Trump's Executive Order "Restoring Public Service Loan Forgiveness," (May 7, 2025).

## I. Congress Defined Public Service Employment to Include Full-Time Work at All 501(c)(3) Nonprofits and Nonprofits that Provide Legal Services to Low-Income Communities, and the Secretary Lacks Authority to Revoke Such Qualification

PSLF was created in 2007 by a bipartisan act of Congress to encourage people to pursue public service work by forgiving the remaining balance of their federal student loans after they complete ten years of public service work while making required student loan payments.[4] To achieve this purpose, Congress defined "public service jobs" expansively, objectively, and politically neutrally. The authorizing PSLF legislation specifically defines "public service jobs" to include full-time work for government, nonprofit 501(c)(3) employers, and "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)," among others." 20 U.S.C. § 1087e(m)(3)(B). This statutory definition of public service jobs is clear and unambiguous.

The Department of Education's PSLF regulations have long been faithful to this statutory definition, with earlier versions of the regulations largely repeating the statutory language, and the current version defining a qualifying public service employer to be inclusive of any "United States-based Federal, State, local, or Tribal government organization, agency, or entity," any "organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code," as well as other non-501(c)(3) nonprofits that meet the statutory definition for public service jobs, including those providing "public interest law services." 34 C.F.R. § 685.219(b).[5] By remaining faithful to the objective definition for public service jobs established in statute, the regulations have made it a largely straightforward and nonpolitical matter for employers, borrowers, and the Department of Education alike to determine whether an employer qualifies for participation in the PSLF program. This is especially true for nonprofit 501(c)(3)s, which are automatically qualifying employers based on their 501(c)(3) status. The objective standards have provided borrowers and employers much needed predictability regarding ongoing qualification for a program that requires 10 years of qualifying public service work to result in any borrower benefit.

The proposed rule, in contrast, would break dramatically from the statutory definition of public service jobs by providing the Secretary of Education with unprecedented new authority to determine that government, legal services, and 501(c)(3) nonprofit employers are no longer "public service" employers if the Secretary deems that they have engaged in certain disfavored conduct. Under the Department's proposal, the Secretary could revoke the public service employer designation based on the Secretary's extra-judicial determination that the employer has engaged in activities with a "substantial illegal purpose" related to immigration, discrimination,

[4] Pub.L. 110-84 §401 (2007).

[5] The statutory and regulatory definitions are also inclusive of additional types of public service employment, but because legal assistance organizations typically qualify for PSLF under the 501(c)(3) or nonprofit public interest legal services provisions, we focus on those here.

transgender people, terrorism, or certain conduct associated with protest. Worryingly, in most instances, these determinations would be made solely by the U.S. Department of Education, without requiring the government to prove in court that the employer has in fact broken any law. To retain PSLF eligibility, the employer would then have to wait either ten years since the last Secretarial finding of engagement in such activities, or until the employer enters a corrective action plan with the Secretary for the cessation and correction of undesired activities.

The Department lacks authority to impose these new, politically-charged, subjective conditions on the definition of public service employment for the PSLF program. First, the plain language of the statute authorizing the PSLF program explicitly defines "public service jobs" for the purpose of PSLF eligibility to mean work for 501(c)(3) employers and nonprofit legal services organizations serving low-income communities, among others. That language is clear and unambiguous, leaving no room for the Secretary to substitute her own judgment. Second, nowhere in the authorizing statute does Congress grant express or implied authority to the Secretary to redefine public service jobs or to create and impose additional substantive restrictions like those in the proposed rule.

Finally, nothing in the authorizing PSLF statute, the Higher Education Act more broadly, or in any other statute cited by the Department authorizes the Secretary of Education to enforce and adjudicate immigration, anti-terrorism, or state healthcare laws that originate outside the Higher Education Act against organizations that operate outside the education sector. Yet that is precisely what the proposed rule purports to empower the Secretary of Education to do, by authorizing her to make her own legally- and economically- significant determinations as to whether employers are violating these disparate bodies of state and federal law, and punishing the employers and their employees with student debt based on such determinations. Because the proposed rule conflicts with authorizing statute and exceeds the Secretary's legal authority, the proposed rule is unlawful and should be withdrawn.

## II. If Finalized, the Proposed PSLF Restrictions Will Reduce Low-Income Families' Already Limited Access to Civil Justice by Reducing Recruitment and Retention of Legal Aid Attorneys

PSLF helps ensure that talented attorneys can afford to choose and remain in careers at civil legal aid organizations—which pay far less than the public and private legal sectors—without being burdened by long-term federal student debt. Civil legal aid is often critical to upholding legal rights and addressing a range of basic needs, from preventing homelessness caused by unlawful foreclosures, to recovering unpaid wages illegally withheld, to obtaining food and medicine for critically ill children, to enabling domestic violence survivors to reach safety and financial security. If implemented, the proposed rule will undermine a key financial support that is critical to attracting legal aid attorney applicants and retaining experienced staff, diminishing the already

stretched capacity of civil legal aid organizations to provide these and other vital legal services to low-income families and their communities.

By ensuring that talented attorneys can afford to work for civil legal aid organizations, PSLF indirectly supports a lifeline for millions of low-income families and individuals facing major health, safety, housing, and financial crises throughout the United States. The largest portion of the civil legal aid system—130 nonprofit organizations funded by the federal Legal Services Corporation (LSC)—assists over 5.2 million people with civil legal problems annually.[6] Over 550 non-LSC funded organizations provide additional civil legal aid to millions more.[7]

While legal aid programs serve millions of low-income people, there are presently more people in need than capacity. The civil legal aid system is struggling to meet the high demand for its services due to funding shortages. The Legal Services Corporation (LSC) reported that in 2021, three of four low-income households experienced one or more legal problems.[8] Among households under 125% of the federal poverty level, the following percentages reported having one or more legal problems: 70% of senior households, 76% of veteran households, 83% of households with children, 98% of households with recent domestic violence, and 77% of rural households.[9] Yet, despite the serious legal needs of low-income households, states have just 2.8 civil legal aid attorneys per 10,000 people in poverty.[10] In 2021, due to the lack of sufficient funding for the necessary legal aid staff, LSC-funded organizations were unable to provide any or enough legal help for an estimated 1.4 million civil legal problems for which low-income people sought their assistance.[11] That same year, 92% of low-income households with serious legal problems received no or insufficient legal assistance.[12]

The proposed PSLF rule will exacerbate this “justice gap” between the civil legal needs of low-income Americans and the resources available to meet those needs. Hiring and retaining lawyers is a major barrier to legal aid programs’ effectiveness. Legal aid organizations face serious difficulties in recruiting attorneys—job openings can stay unfilled for months—and retaining current staff.[13] Job turnover diverts resources to training new employees. Two primary reasons for the staffing challenges are low salaries and high educational debt, and PSLF is critical to help address these challenges.

---

[6] Legal Services Corp., LSC 101: Understanding Civil Legal Aid.
[7] Nat’l Center for Access to Justice, Justice Index, Attorney Access (2021).
[8] Legal Services Corp., The Justice Gap: The Unmet Civil Legal Needs of Low-Income Americans 8 (April 2022).
[9] *Id*. at p. 29.
[10] American Bar Ass’n, Profile of the Legal Profession 2023 9.
[11] The Justice Gap, *supra*, at p. 9. *See also* Legal Services Corp., 2026 FY Budget Request 9 (2025).
[12] *Id*. at p. 8.
[13] *See, e.g.*, Legal Aid Ass’n of Cal., Justice at Risk: More Support Needed for Legal Aid Attorneys in California (Jan. 2020); Matt Reynolds, *Civil legal aid lawyers are often the last line of defense. Why are there so few of them?*, americanbar.org (Apr. 1, 2024).

The number one obstacle to hiring and retaining legal aid lawyers is the financial pressure caused by low pay.[14] In California, for example, entry level California legal aid lawyers make $25,000 less than the low end of the range for government lawyers in the same community.[15] For experienced attorneys, the gap is even larger.[16] Low pay combined with the increasing costs of housing and other costs of living, such as supporting children, causes financial pressure on those pursuing legal aid careers.[17] Given these pressures, attorneys who are inclined to choose a career in civil legal aid are increasingly opting to work for the public or private sector, where they can earn substantially more.[18]

A second obstacle to hiring and retaining legal aid lawyers is the burden of student loans needed to afford the education and credentials to become an attorney.[19] One study, for example, reported that over 84% of entry-level legal aid lawyer candidates and over 75% of all legal aid lawyers in California have educational debt, with the median amount being between $125,000 and $149,000, and more than a third having $200,000 to $300,000 or more.[20] Given these large student loan balances, the PSLF program has been a decisive factor in legal aid organizations' ability to recruit and retain talented attorneys despite offering salaries far below market rate.

If the proposed regulation is implemented, employer qualification for PSLF will become much more unpredictable and harder to rely on. The uncertainty as to what conduct the Secretary will deem to have a "substantial illegal purpose," and the possibility that the Secretary's determinations may extend to conduct that has not been deemed unlawful by the courts – or may even change dramatically over short periods of time – may cause organizations to unintentionally run afoul of the regulation. And by giving the Secretary of Education substantial new discretion to revoke PSLF eligibility in the future for organizations that are currently eligible, the proposed rule undermines workers' ability to rely on the PSLF program in making career decisions. This will impact career decisions by potential and current legal aid attorneys, who must consider whether a career at a legal aid organization will provide the financial support necessary for long-term financial health.[21] Without assurance that a decade of employment in legal aid will reliably lead to student loan forgiveness, many are likely to choose employment elsewhere.

In short, legal aid organizations rely heavily on the PSLF program to recruit and retain adequate staff to meet the legal needs of low-income people. By reducing the reliability of the PSLF program, the proposed rule would lead to a reduction of essential civil legal aid services necessary to the long-term health and safety of low-income communities across the country.

---

[14] Cal. Access to Justice Comm'n, Legal Aid Recruitment, Retention, and Diversity: A Report to the State Bar of California 14-16 (Feb. 2022).
[15] Legal Aid Recruitment, *supra*, at p. 15.
[16] *Id*. at p. 16; Justice at Risk, *supra*, at pp. 21-31.
[17] Justice at Risk, *supra*, at pp. 21-24.
[18] Justice at Risk, *supra*, at pp. 24-28.
[19] *Id*. at pp. 31-30.
[20] *Id*. at pp. 31-32.
[21] *Id.* at pp. 30, 33-36.

## III. If Finalized, the Proposed Rule Will Deter Legal Services Organizations from Providing Essential, Lawful Civil Legal Aid to Immigrants and Other Vulnerable Populations

Civil legal aid work fundamentally involves disputes about what the law means and the scope and application to a particular client's factual circumstances. And more than most, attorneys understand that they cannot know for certain how a particular decisionmaker will interpret and apply a law. Legal services organizations thus understand that the proposed new restrictions on disfavored activities with "substantial illegal purpose" involving issues of immigration, terrorism, discrimination, protest, and transgender identity could easily be misapplied to punish valid, good faith, and legally permissible work on behalf of clients in extremely difficult circumstances. As a result, if finalized, the proposed rule will create a chilling effect on the willingness of legal service providers to operate and engage in certain areas of work that align with their mission and that are needed to enforce and vindicate a range of important federal laws, despite their operating in strict compliance with all state and federal governing regulations.

Civil legal aid organizations lawfully provide legal assistance in a wide variety of civil matters that we fear could be misinterpreted by the Secretary of Education to constitute activities that have a substantial illegal purpose under the proposed rule. For example, when assisting a non-citizen victim of human trafficking to apply for a T-Visa,[22] an attorney cannot know in advance whether the application will be approved or denied. The attorney can only prepare a case to the best of their ability based on the legal standards and individual facts, as is their ethical duty. While legal services organizations are confident that a court of law would not find the legal services attorney to have violated immigration laws simply because some clients are ultimately found ineligible for immigration relief, we are concerned that providing such immigration legal services could be deemed inconsistent with public service by the Secretary under the proposed rule and could threaten the organization's PSLF eligibility.

Similarly, we fear that assisting a non-citizen victim of domestic violence to obtain food or cash aid for which they are eligible while they apply, on their own or through another organization, for status under the Violence-Against-Women-Act or a U-Visa[23] could be wrongly viewed by the Secretary as aiding and abetting violations of federal immigration laws just because the client has not yet been approved for the immigration relief they are seeking. Despite confidence that the federal courts would find such services legal, a different determination by the Secretary of Education, who can come to a novel finding without full legal process, could cost the organization and its employees dearly.

---

[22] The T-Visa allows victims of human trafficking to remain in the United States to heal, stabilize, and assist law enforcement agencies in the detection, investigation, and prosecution of human trafficking cases.

[23] The U-visa is a nonimmigrant visa for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity.

As another example, when serving a community with one or more large groups of non-English speakers, legal aid organizations sometimes provide assistance through a Limited English Proficiency (LEP) project, which may include interpretation services and/or connection with an advocate who speaks their language. The languages covered are based on the needs of the particular communities present in the area served by the legal aid organization, balanced against available resources. Some legal aid organizations fear that the proposed definition of "substantial illegal purpose" as including "engaging in a pattern of aiding and abetting illegal discrimination" could be misapplied to revoke PSLF eligibility for legal aid organizations with LEP projects, either because they do provide specialized language assistance targeted to non-English speakers or because they do not provide language assistance for speakers of all foreign languages. Again, while legal aid organizations are confident in the lawfulness of these programs, we are concerned that the Secretary can make her own legal determinations and impose devastating consequences on legal aid organizations without obtaining a judicial decision first.

Notably, many of the types of legal services at risk of being chilled and deterred by the proposed rule are not just legally *permissible* services for nonprofits to provide, but are services that are important to enforcing the laws created by Congress and that Congress has even encouraged legal organizations to provide. For example, Congress passed the Trafficking Victims Act of 2000 to combat modern "slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."[24] Similarly, Congress passed the Violence Against Women Act to ensure that women who have been subjected to domestic violence, sexual assault, and other specified crimes can obtain the services they need to protect themselves and to improve law enforcement against perpetrators.[25] Congress recognized the importance of civil legal aid organizations to achieve the purposes of these laws and federal law explicitly permits such organizations to assist immigrant survivors (including children) of trafficking, sexual assault, domestic violence and other specified crimes.[26] If the proposed PSLF rule is implemented, it will undermine the purpose of these and other similar laws by causing a substantial reduction in legal assistance necessary to ensure the safety and long-term well-being of victims and their families.

## IV. The Proposed Rule Undermines the Legal Services Corporation Act

Finally, the proposed PSLF rule conflicts with the Legal Services Corporation Act. President Nixon and Congress created LSC in 1974 to fund high-quality civil legal assistance for people unable to afford private attorneys.[27] In creating LSC, Congress aimed to promote equal access to justice, improve economic opportunities for low-income people, and reaffirm faith in the legal system.[28] Congress specified that "attorneys providing legal assistance **must have full freedom**

[24] 22 U.S.C. § 7101(a).
[25] Pub.L. 109-162, § 104, 119 Stat. 2960 (2006).
[26] 22 U.S.C. § 7105(b)(1)(B); Pub.L. 109-162, § 104, 119 Stat. 2960 (2006) (currently 34 U.S.C. § 20121).
[27] *See* Pub.L. 93-555, § 2, July 25, 1974, 88 Stat. 378 (codified at 42 U.S.C. § 2996).
[28] 42 U.S.C. §§ 2996 (1), (3), (4).

**to protect the best interests of their clients** in keeping with the Code of Professional Responsibility, the Canons of Ethics, and the high standards of the legal profession."[29]

Civil legal aid organizations and attorneys should be able to assist the communities they serve without political interference and fear of retribution. Indeed, Congress recognized the importance of ensuring that political views do not interfere with civil legal aid when it explicitly structured LSC as a quasi-private, non-profit corporation, rather than a federal agency, to insulate it from the political winds of any given moment. The Legal Services Corporation Act states that, "to preserve its strength, the legal services program must be kept free from the influence or use by it of political pressure."[30] The proposed PSLF rule conflicts with the Legal Services Corporation Act by subjecting LSC organizations to new political pressures and threatening the freedom of legal aid attorneys to best serve all of their lawful clients.

The PSLF regulation is also unnecessary to ensure that civil legal aid attorneys do not engage in activities with an illegal purpose. LSC-funded civil legal aid organizations are strictly regulated by LSC.[31] They must comply with restrictions prohibiting specified political activities, limiting which immigrants they are allowed to assist, and restricting other activities in which they may engage.[32] They and non-LSC funded programs also often receive funding from interest on lawyers' trust accounts (IOLTA) programs and other government funding that impose state and other federal law restrictions. In addition, all civil legal aid attorneys are subject to the oversight and ethical requirements of state bar associations. All of these various oversight regimes already ensure that civil legal aid attorneys refrain from illegal activity through explicit restrictions and requirements, regular monitoring, oversight and enforcement by federal and/or state agencies. There is no reason for the Secretary of Education to layer on additional restrictions or oversight over LSC conduct to ensure that LSCs are providing public service, and Congress has not authorized the Secretary to do so.

***

Thank you for your consideration of these comments. If you have any questions about these comments, please contact Abby Shafroth (ashafroth@nclc.org) and Robyn Smith (rsmith@lafla.org).

Respectfully submitted,

National Consumer Law Center (on behalf of its low-income clients)
Legal Aid Foundation of Los Angeles

---

29 42 U.S.C. §§ 2996 (6) (emphasis added).
30 42 U.S.C. §§ 2996 (5).
31 *See* 42 U.S.C. §§ 2996, *et seq.*; 45 C.F.R. §§ 1600.1 to 1644.5.
32 42 U.S.C. § 2996f; 42 C.F.R. Parts 1604-1615, 1617, and 1626.

AIDS Law Project of Pennsylvania
Bay Area Legal Aid
Bet Tzedek Legal Services
Blue Ridge Legal Services, Inc.
California Center for Movement Legal Services
California Rural Legal Assistance, Inc.
CASA
CASH Campaign of Maryland
Center for Access to QDROs
Charlotte Center for Legal Advocacy
Colorado Legal Services
Communities Resist
Community Justice Project, Inc.
Community Legal Services in East Palo Alto
Consumer Bankruptcy Assistance Project
East Bay Community Law Center
Family Violence Appellate Project
HIAS Pennsylvania
Housing and Economic Rights Advocates
Idaho Legal Aid Services, Inc.
Indiana Legal Services, Inc.
Jacksonville Area Legal Aid, Inc.
Lakeshore Legal Aid
Land of Lincoln Legal Aid, Inc.
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
Learning Rights Law Center
Legal Aid Association of California
Legal Aid DC
Legal Aid Justice Center
Legal Aid of Nebraska
Legal Aid of Sonoma County
Legal Aid of the Bluegrass
Legal Aid Society of Northeastern New York (LASNNY)
Legal Aid Society of San Diego
Legal Aid Society of San Mateo County
Legal Aid Works
Legal Services NYC
Legal Services of Eastern Missouri, Inc.
Legal Services of New Jersey
Maryland Legal Aid

MetroWest Legal Services
Montana Legal Services Association
Mountain State Justice, Inc.
National Center for Law and Economic Justice
National Center for Medical-Legal Partnership
National Housing Law Project
National Legal Aid & Defender Association
Neighborhood Legal Services
Neighborhood Legal Services of Los Angeles County
New York Lawyers for the Public Interest
New York Legal Assistance Group (NYLAG)
Northwest Immigrant Rights Project
Ohio State Chair, National Association of Consumer Advocates
Pine Tree Legal Assistance
Prism Counseling & Advocacy
Public Advocates Inc.
Public Counsel
Public Justice Center
Senior Advocacy Network
Services, Immigrant Rights and Education Network (SIREN)
Skagit Legal Aid
Southern Arizona Legal Aid, Inc.
Step Forward
Survivor Justice Center
TeamChild
The Public Interest Law Project
The Rebuild, Overcome, and Rise (ROAR) Center of UMB
Tzedek DC
UnLocal
Virginia Poverty Law Center
Western Center on Law & Poverty
Western New York Law Center

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached public comment of the Consumer Law Advocates, Scholars & Students (CLASS) Network; the People's Parity Project; the National Plaintiffs' Law Association, and 246 law students and recent law school graduates from 23 law schools across the country in strident opposition to the proposed rule on the Public Service Loan Forgiveness program.

Attachments 2

image

Download

2025 PSLF Reg_Law Student Comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10538/attachment_2.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10538

**Tracking Number**

mfo-lolm-r4wd

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

Consumer Law Advocates, Scholars & Students (CLASS) Network; the People's Parity Project; the National Plaintiffs' Law Association, and 246 law students and recent law school grads from 23 law schools across the country write to express our strident opposition to the Department of Education's (ED) proposed rule on the Public Service Loan Forgiveness (PSLF) program.

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Comment_Jobs to Move America_ED-2025-OPE-0016_2025.09.17

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10553/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10553

**Tracking Number**

mfo-6ttf-q6os

**Comment Details** **Submitter Info**



**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

September 17, 2025

Tamy Abernathy
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Re: Department of Education
Office of Postsecondary Education
William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Ian Elder, and I am the national program director at Jobs to Move America. JMA works to promote a worker-centered economy where all have good jobs and healthy communities.

Thanks to the PSLF program, JMA has been able to attract the talent we need to succeed in our mission. We have been successful at forging partnerships between workers, community, and manufacturing employers so that U.S. workers have good jobs and employers have a highly skilled and dedicated workforce. Our work helps manufacturing succeed across the U.S. and ensures that workers and communities share in that success.

Our organization does not serve any illegal purpose or engage in illegal activities, including those highlighted by the proposed rule. However, we are deeply concerned about the proposal to introduce politics and ideology into PSLF. The law is unambiguous that all 501(c)(3) organizations be eligible as qualified public employers–and for good reason.

If each administration can determine PSLF eligibility on the basis of ideology, all public interest organizations will be at risk of exclusion eventually. PSLF cannot achieve its purpose under such conditions. Currently, public service employees must make qualifying payments for at least 10 years in order to receive loan forgiveness. During that time, an employee could face three different administrations, all with different ideological preferences.

On its face, the proposed rule would only exclude organizations undertaking illegal activities. If that is the intention of the rule, the proposed rule is redundant. The IRS already has the authority to investigate



organizations engaged in illegal activities and revoke their 501(c)(3) status, making them ineligible for PSLF. Furthermore, federal law expressly prohibits the President or other executive branch officials from conducting such taxpayer investigations or audits (26 U.S.C. § 7217). The Department lacks both the capacity and the expertise to implement the rule. Having recently eliminated a large share of its offices and workforce, the Department is already struggling to meet its existing statutory obligations. Devoting reduced staff to legal determinations outside the Department's authority would further strain its capacity, and the Secretary and her designees lack the background and qualifications to make findings in areas unrelated to education.

Per Executive Order 14219, the Department should "focus the executive branch's limited enforcement resources on regulations squarely authorized by constitutional Federal statutes, and to commence the deconstruction of the overbearing and burdensome administrative state."[1] The proposed rulemaking is expressly not authorized by federal statute, and it would increase the power of the administrative state by establishing a new rule that the Department is ill-equipped to implement.

Because the proposal does not provide adequate due process for employers, there is a significant risk that the rule will be misapplied in ways that harm nonprofit organizations and their employees. The proposal relies on a broad "preponderance of the evidence" standard and places sole decision-making authority with the Department, without providing for independent review or appeal. The absence of clear procedural safeguards creates the possibility that borrowers could lose credit for years of qualifying payments through a process that lacks transparency and predictability. Ensuring due process protections is essential to preserving the trust and stability that PSLF was designed to provide.

Therefore, JMA opposes the proposed rule and the chilling effect it would have on employees seeking public service employment.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Ian Elder
National Program Director

[1] Executive Order 14219 of February 19, 2025, "Ensuring Lawful Governance and Implementing the President's ''Department of Government Efficiency'' Deregulatory Initiative, Code of Federal Regulations, title 3 (2025): 10583-10585.

An official website of the United States Government.

< Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

Share

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016) / Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file.

Attachments 1

ED-2025-OPE-0016_Comment

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10554/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10554

**Tracking Number**

mfo-fgrl-jthp

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



OFFICE OF THE CITY ATTORNEY
LYNDSEY M. OLSON, CITY ATTORNEY

Civil Division, 15 Kellogg Blvd. West, 400 City Hall
Saint Paul, MN 55102
Tel: 651-266-8710 | Fax: 651-298-5619

**RE: ED-2025-OPE-0016, William D. Ford Federal Direct Loan Program, Public Student Loan Forgiveness; Interpretation of "Qualifying Employer" and Definition of "Substantial Illegal Purpose"**

To Secretary McMahon:

The City of Saint Paul opposes the Department of Education's ("DoE") proposed rule redefining "qualifying employer" and its definition of "substantial illegal purpose." The DoE's new interpretation of "qualifying employer" will not only harm the professionals who work in the public sector but is also likely to harm the individuals who have a need for the services provided by various "qualifying employers." The DoE's interpretation of "qualifying employer" and the DoE's reliance on the illegality doctrine as authority is arbitrary and capricious and is violation of the DoE's mission. The proposed regulations, including the definition of "substantial illegal purpose" introduced by the DoE is in excess of the DoE's statutory authority.

The DoE must withdraw the re-interpretation without implementation or enforcement for the foregoing reasons.

**1. The Department of Education's Re-Interpretation of "Qualifying Employer" Fails to Consider Unintended Consequences**

Local governments, including the City of Saint Paul, provide a wide range of essential services, directly and indirectly, including services that rely on federal and state funding to deliver Congressionally provided benefits to communities across the country. In total, the State of Minnesota houses approximately four hundred and sixty (460) 501(c)(3) nonprofit organizations, employing approximately 13% of Minnesota's workforce in 2023.[1] Included in the numerous 501(c)(3) organizations housed in the State of Minnesota are various programs designed for the benefit of

[1] *See Minnesota Nonprofit Economy Report: A Statewide and Regional Analysis*, MINNESOTA COUNCIL OF NONPROFITS, 2024, available at 2024-Minnesota-Nonprofit-Economy-Report.pdf.

The Saint Paul City Attorney's Office does not discriminate
based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status
in the delivery of services or employment practices

*Confidential and Attorney-Client Privileged Communication*

children: Boys and Girls Clubs of the Twin Cities; the Children's Hospital Association; Diaper Bank of Minnesota; Make-A-Wish Foundation of Minnesota; and, Violence Free Minnesota. These various programs are designated as a tax-exempt 501(c)(3) organizations in Minnesota aim to achieve the mission of the Department of Education: to promote student achievement by fostering educational excellence and ensuring equal access for students of all ages.[2] In fact, the most common sector among individuals who have receive forgiveness through the public student loan forgiveness program is education, representing 43% of all employers associated with the program.[3]

The DoE's re-interpretation of "qualifying employer" directed at 501(c)(3) organizations will have negative consequences. First, employers that were previously considered to be a "qualifying employer" are likely to lose meritorious employees who rely on the Public Student Loan Forgiveness Program ("PLSF"), resulting in staffing shortages at local governments and charitable organizations. Second, based on these staffing shortages, these organizations, previously considered a "qualifying employer", will experience a disruption in integral services required by many individuals. After all, over 50 percent of categorized financially active nonprofits in Minnesota deliver either human services or public and societal benefit activities.[4]

The DoE's re-interpretation of "qualifying employer" disregards the interdependence of local governments and nonprofit organizations in delivering essential public services. The DoE's attempt to abruptly narrow eligibility threatens to destabilize a workforce that is already under pressure, driving talent away from essential roles in government and nonprofit sectors while simultaneously jeopardizing public services that aligns with the DoE's own mission of promoting educational excellence and equal access. Such unintended consequences not only undermine the congressional intent behind the PLSF program, but also risk diminishing the capacity of communities nationwide to meet the needs of their most vulnerable populations. For these reasons, the DoE should withdraw or substantially revise its proposed reinterpretation to ensure that its policy objectives do not come at the expense of the very public interest the program was designed to serve.

---

[2] *Learn more about the Department of Education*, U.S. DEPARTMENT OF EDUCATION, March 19, 2025, available at https://www.ed.gov/about.

[3] Turner, et al., *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?*, U.S. DEPARTMENT OF EDUCATION, January 2025, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nea.org/sites/default/files/2025-03/where-do-borrowers-who-benefit-from-pslf-work.pdf.

[4] *Id.*

The Saint Paul City Attorney's Office does not discriminate
based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status
in the delivery of services or employment practices

**Confidential and Attorney-Client Privileged Communication**

**2. The Department of Education's Definition of "Substantial Illegal Purpose" Is Arbitrary and Capricious**

The DoE's proposed regulatory changes are arbitrary and capricious, as stated in 5 U.S.C. § 706(2)(A).[5] A proposed federal regulation may be invalidated if it lacks a rational connection to the agency's objectives or fails to consider relevant factors. Specifically, an agency action is considered arbitrary and capricious if it: (1) relies on factors not intended by the legislature; (2) entirely fails to consider important aspects of the problem; (3) offers an explanation that runs counter to the evidence; or, (4) is so implausible that it cannot be explained as a difference in view or the result of the agency's expertise.[6] The DoE's objective is education; not immigration enforcement. Therefore, the DoE lacks a rational basis in the proposed regulation. This action is arbitrary and capricious because it relies on factors not intended by the legislature; the legislature did not intend for the DoE to engage in federal immigration law enforcement. Additionally, the proposed regulation entirely fails to consider important aspects of the problem. The problem that PLSF is intended to address is twofold: first, to address the deterrent effect that is created by individuals' inability to repay student loans while employed for a local government or nonprofit. This inability to repay loans severely deters individuals from working with the government or a nonprofit, creating a workforce shortage in many professions for local governments and non profits. Second, if qualified individuals are deterred from working for a local government or nonprofit, the local government or nonprofit will not have sufficient qualified personnel to provide essential services. This regulation entirely fails to consider these purposes.

The Administrative Procedure Act ("APA") authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[7] An agency may not depart from a prior policy or simply disregard rules that are still on the books; to do so would be arbitrary and capricious.[8] An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained."[9] Thus, the agency must offer a "satisfactory explanation for its action, including a rational

---

[5] *See* 5 U.S.C. § 706(2)(A) ("[t]o the extent necessary to decision and when presented … [t]he reviewing court shall … (2) hold unlawful and set aside agency action, findings, and conclusions of law found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").
[6] *Artic Sole Seafoods v. Gutierrez*, 622 F.Supp.2d 1050 (W.D. Wash. 2008).
[7] 5 U.S.C. § 706(2)(A).
[8] *F.C.C. v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009).

[9] *Ohio v. Environmental Protection Agency*, 603 U.S. 279, 280 (2024) (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

The Saint Paul City Attorney's Office does not discriminate
based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status
in the delivery of services or employment practices

Confidential and Attorney-Client Privileged Communication

connection between the facts found and the choice made" and cannot simply ignore "an important aspect of the problem."[10]

Here, the Department of Education ignores many important aspects of the purposes behind the PLSF which can result in violating employers' due process rights. For example, the Secretary need only find a preponderance of the evidence that a qualifying employer has engaged in: aiding or abetting violations of 8 U.S.C. § 1325; facilitating funding to cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. § 1189; child abuse; engaging in a pattern of aiding and abetting illegal discrimination; or, engaging in a pattern of violating State tort laws.[11] The proposed regulations state that the Secretary may determine a violation exists based on the preponderance of the evidence standard.[12] However, the engaged actions listed above are criminal violations of federal statutes or violations of state tort laws, which can only be established through higher burdens of proof.[13] In any event, the term "substantial illegal purpose" and the citations to criminal statutes render the "preponderance of the evidence" standard inapplicable; instead, the "clear and convincing" standard or "beyond a reasonable doubt" standard must be used to avoid violating organizations' due process rights under the Fifth Amendment. The DoE's failure to cite a constitutional burden of proof by instead using the broad "preponderance of the evidence" standard is arbitrary and capricious because it relies on factors not intended by the legislature; entirely fails to consider important aspects of the problem, such as the constitutional requirements for burdens of proof; and, is so implausible that it cannot be explained as the result of the agency's expertise, because the DoE does not have the expertise to review these issues.

In sum, the DoE's definition of "substantial illegal purpose" and its reliance on a mere "preponderance of the evidence" standard cannot withstand scrutiny under the APA. Disregarding constitutional due process requirements, conflating administrative determinations with criminal adjudications, and failing to provide a rational connection between the chosen evidentiary burden and the gravity of the alleged conduct is arbitrary, capricious, and contrary to the law. Federal courts have consistently required agencies to provide reasoned explanations grounded in statutory authority and constitutional safeguards; here, the proposed regulation fails to do so. Accordingly, the proposed regulation should be withdrawn or substantially

---

[10] *Id.* (citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).
[11] ED-2025-OPE-0016, 34 CFR Part 685.219(h).
[12] *Id.*
[13] *See Nijhawan v. Holder*, 557 U.S. 29, 42 (2009) (citing 8 U.S.C. § 1229a(c)(3)(A)) (holding that the correct standard under the Immigrant and Nationality Act does not have to be beyond a reasonable doubt, "but the evidence must meet a 'clear and convincing' standard")

*The Saint Paul City Attorney's Office does not discriminate based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status in the delivery of services or employment practices*

***Confidential and Attorney-Client Privileged Communication***

revised to ensure compliance with the APA and the Fifth Amendment's due process protections.

**3. The Department of Education's Definition of "Substantial Illegal Purpose" is In Excess of Statutory Jurisdiction, Authority, or Limitations**

Through the proposed regulations, the DoE attempts to exceed their rulemaking authority. Although the DoE cites 20 U.S.C. § 1221e-3,[14] this reliance is misplaced. 20 U.S.C. § 1221e-3 authorizes the Secretary of Education to make, promulgate, issue, and rescind rules and regulations, "the first clause of the provision makes clear that Congress granted rulemaking power 'in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law.'"[15] In other words, the DoE may only make rules and regulations governing the applicable programs it administers; in any event, the Secretary is subject to limitations as may otherwise be imposed by law.[16]

The Internal Revenue Service is already charged with determining whether a 501(c)(3) organization is abiding by relevant federal law and regulations to be eligible for tax-exempt status. As a result, this proposed rule would wrongfully empower the Secretary of Education to second-guess the IRS and punish non-profit organizations she deems to be engaging in work that conflicts with this Administration's agenda.

The determination of whether a non-profit organization is engaging in a "substantial illegal purpose" is the role of the IRS.[17] In other words, the decision regarding the tax-exemption status belongs in the sole hands of the IRS, rather than the DoE, due to the complexity of the tax system. In any event, U.S. Courts have long recognized the "primary authority of the IRS and its predecessors in construing the Internal Revenue Code."[18] Regardless, a declaration that a given institution is not "charitable" and is thus not entitled to tax-exempt status should only be made where

[14] 20 U.S.C. § 1221e-3 provides: "[t]he Secretary, in order to carry out functions vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, is authorized to make, promulgate, issue, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."

[15] *Secular Student Alliance v. U.S. Dep't of Education*, 762 F.Supp.3d 24, 31 (D.D.C. 2025) (citing 20 U.S.C. § 1221e-3).

[16] 762 F.Supp.3d at 31.

[17] *See Bob Jones University v. United States*, 461 U.S. 574, 576 (1983) ("[i]n an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems").

[18] *Bob Jones University*, 461 U.S. at 596 (citing *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169 (1981); *United States v. Correll*, 389 U.S. 299, 306-07 (1967); *Boske v. Comingore*, 177 U.S. 459, 469-70 (1900)).

*The Saint Paul City Attorney's Office does not discriminate based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status in the delivery of services or employment practices*

***Confidential and Attorney-Client Privileged Communication***

there can be *no doubt* that the activity involved is contrary to fundamental public policy; a decision that must be made by the IRS on a clear and convincing or beyond reasonable doubt standard, rather than the DoE on a preponderance of the evidence standard.[19]

The DoE's reliance on the illegality doctrine further proves that their attempted actions are in excess of their statutory jurisdiction and authority; the illegality doctrine is a method used by the IRS to revoke an organization's 501(c)(3) status as a charity. The illegality doctrine is rooted in the principle that charitable organizations must serve a public benefit and not undermine public policy.[20] The operational test used for the illegality doctrine "makes plain that an organization will not be regarded as operating for exempt purposes 'if more than an insubstantial part of its activities' further a nonexempt purpose."[21] In so deciding, the Department of the Treasury created Treasury Regulation Section 1.501(c)(3)-1(d)(2), which clarifies that an organization "is not precluded from qualification under IRC Section 501(c)(3) if, in carrying out its primary purpose, the organization advocates for social or civil change or opines on controversial issues with the intent to mold public opinion or gain public acceptance so long as it is not an 'action organization.'"[22]

The DoE's misplaced reliance on the illegality doctrine is not only incorrect, as the doctrine applies to the IRS, but also incorrectly states the rule, undoubtedly surpassing the DoE's statutory authority, and treads on the IRS' exclusive statutory authority. Furthermore, the illegality doctrine is applicable only to non-profit organizations, ignoring a plethora of PLSF qualified employers who offer student loan forgiveness at the federal, state, and local government level. Although the DoE Secretary would not be allowed to remove an employer's tax-exempt status, the proposal would allow the Secretary to circumvent existing IRS processes to eliminate the PLSF benefit for which these employers are eligible under federal law. In so doing, the DoE violates 5 U.S.C.A. § 706(2)(c), as the DoE would exceed their statutory jurisdiction.

In conclusion, the DoE's proposed regulations would impermissibly expand its authority beyond the scope granted by Congress, in direct violation of 5 U.S.C. §

---

[19] *See Bob Jones University v. United States*, 461 U.S. 574, 592 (1983) (emphasis added).
[20] 26 USCA § 501. *See also Bob Jones University v. United States*, 461 U.S. 574, 579 (1983) (citing Revenue Ruling 71-447, 1971 Cum.Bull. 230 ("[a]ll charitable trusts ... are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy").
[21] *See The Illegality Doctrine and 501(c)(3) Organizations*, LIBRARY OF CONGRESS, Aug. 14, 2024, available at [The Illegality Doctrine and 501(c)(3) Organizations | Congress.gov | Library of Congress](The Illegality Doctrine and 501(c)(3) Organizations | Congress.gov | Library of Congress).
[22] *Id.*

*The Saint Paul City Attorney's Office does not discriminate based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status in the delivery of services or employment practices*

***Confidential and Attorney-Client Privileged Communication***

706(2)(C). By attempting to assume the IRS' exclusive role in applying the illegality doctrine and determining the compliance of 501(c)(3) organizations, the DoE disregards explicit statutory limits and longstanding recognition of the IRS' primary jurisdiction over tax-exempt status determinations. The DoE's reliance on 20 U.S.C. § 1221e-3 is misplaced, as that provision authorizes rulemaking authority only to carry out functions otherwise invested in the Secretary, not to intrude upon areas expressly delegated to other administrative agencies. In short, the proposal represents: an unlawful encroachment on the IRS' domain; threatens to destabilize the statutory framework governing charitable organizations; and, circumvents established federal processes for determining employer eligibility under PLSF. For these reasons, the proposed regulation must be set aside as exceeding the DoE's statutory authority.

## CONCLUSION

For the foregoing reasons, the City of Saint Paul respectfully urges the DoE to withdraw the proposed regulations in its entirety. The re-interpretation of "qualifying employer" fails to account for the unintended and destabilizing consequences on local and state governments, nonprofit organizations, and the communities they serve. The DoE's definition of "substantial illegal purpose" is arbitrary and capricious, in violation of the APA, and unlawfully disregards constitutional due process standards. Finally, by invoking the illegality doctrine and attempting to assume responsibilities expressly delegated to the IRS, the DoE exceeds its statutory jurisdiction and authority under 20 U.S.C. § 1221e-3. Collectively, these defects render the proposed regulation unlawful, unsound, and inconsistent with the DoE's own mission. The City of Saint Paul therefore requests that the Department decline to implement or enforce these regulations to preserve the integrity of the PLSF program and protect the essential public services on which communities across the nation rely.

*The Saint Paul City Attorney's Office does not discriminate based on race, color, national origin, religion, sex/gender, disability, sexual orientation, gender identity, age, or veteran status in the delivery of services or employment practices*

***Confidential and Attorney-Client Privileged Communication***

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

See attached file(s)

Attachments 1

Protect PSLF - Build Up Justice NYC comment_for_submission

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10559/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10559

**Tracking Number**

mfo-6z38-9y2y

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

Tamy Abernathy
400 Maryland Ave. SW
Washington, DC 20202

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Jessica Rose and I am the Executive Director of Build Up Justice NYC. We are a civil legal service nonprofit organization in New York City that defends tenants from eviction, protects homeowners from foreclosure, helps taxpayers solve disputes, supports small businesses and nonprofits, and serves domestic violence survivors.

More than two dozen past and present staff members have made use of The Public Service Loan Forgiveness Program. It has enabled our nonprofit to attract and retain talented staff. Mission-driven attorneys often feel forced to choose higher-paying positions in the for-profit sector in order to repay their hefty law school loans. PSLF has allowed Build Up Justice NYC to attract and retain dedicated lawyers, which means our team has more experience and skills to make greater impact on the communities we serve.

My organization strongly opposes the proposed rule (Docket ID ED-2025-OPE-0016) and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. Not only does the proposed rule contradict federal law, it is also redundant—there is already a process to remove eligibility for organizations that conduct purportedly illegal activity. Adding this rule would only deter motivated young people from valuable careers in nonprofit work, which, for organizations like ours and other civil legal service providers, would only add to the challenges we face with hiring and retention. This proposed rule injects politics into the PSLF program, which is contrary to the spirit of the PSLF program to encourage service-minded professionals to take on important work like civil legal services to underserved communities that lack access to this fundamental right.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Jessica Rose, Esq.

Jessica A. Rose Esq.
Executive Director

Thomas McC. Souther, Esq.
Board Chair

**Mailing Address** 260 Broadway, Suite 2, Brooklyn NY 11211  info@buj.org  (718) 487-2300 **www.buj.org**

An official website of the United States Government.

Back to Document Comments (/document/ED-2025-OPE-0016-7221/comment)

PUBLIC SUBMISSION

# Comment on FR Doc # 2025-15665

Posted by the **Department of Education** on Sep 19, 2025

Docket (/docket/ED-2025-OPE-0016)
/ Document (ED-2025-OPE-0016-7221) (/document/ED-2025-OPE-0016-7221) / Comment

Comment

Please see the attached comments from the National Association of Student Financial Aid Administrators (NASFAA).

Attachments 1

NASFAA_Comments_OB3_ED202OPE0016

Download (https://downloads.regulations.gov/ED-2025-OPE-0016-10562/attachment_1.pdf)

Give Feedback

**Comment ID**

ED-2025-OPE-0016-10562

**Tracking Number**

mfo-71b8-m1li

**Comment Details** **Submitter Info**

**Document Subtype**

Comment(s)

**Received Date**

Sep 17, 2025

Your Voice in Federal Decision Making

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (/dotreports) FAQ (/faq) Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback



September 17, 2025

U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

Docket ID ED-2025-OPE-0016

To whom it may concern:

On behalf of the National Association of Student Financial Aid Administrators (NASFAA) and our 3,000 member institutions, we respectfully submit to the U.S. Department of Education our comments on its notice of proposed rulemaking (NPRM) to amend the regulations of the Public Service Loan Forgiveness (PSLF) program (Docket ID ED-2025-OPE-0016).

NASFAA represents more than 29,000 financial aid professionals who serve 16 million students each year at colleges and universities in all sectors throughout the country. NASFAA member institutions serve nine out of every 10 undergraduates across the country.

The Department's proposed plan to narrow the definition of qualifying employers for Public Service Loan Forgiveness (PSLF) purposes undermines the bipartisan support of PSLF that has been in place for nearly two decades.

The PSLF program is vital for communities nationwide, incentivizing college graduates to enter essential public service fields, particularly in underserved areas. It helps attract and retain professionals like teachers, health care providers, and social workers. Borrowers make a significant 10-year commitment to public service, and foundational program rules should not be subject to frequent review and potential reversal. Altering the definition of a qualifying employer while individuals are actively pursuing qualification, or creating future ambiguity, is unfair and erodes confidence in the program's reliability.

The Department must maintain a consistent and objective definition of qualifying employers to ensure PSLF continues to strengthen communities by offering talented professionals a stable, predictable, and fair path to work in vital public service fields.

We disagree with the broad authority the proposed rule grants the Secretary to make "substantial illegal purpose" determinations based on a preponderance of the evidence. First, only the courts can determine what constitutes illegal activity. Second, those determinations must be based on actual law. ED admits in the NPRM that borrowers "as well as their employers will also benefit from the approach of using existing law, as doing so applies consistency, familiarity, and fairness." Yet, ED has not produced relevant law to support how it would make its determinations of illegal purpose, such as with trafficking. Giving

the Secretary of Education authority to determine an activity illegal, absent any laws prohibiting such activity, undermines the judicial process and will result in protracted legal uncertainty for borrowers and the communities they serve.

Separate from ED's authority to adjudicate these cases, we have concerns about the adjudication process and ED's ability to manage such a process. The process laid out in §685.219(h) lacks essential details, including time frames for ED to provide initial notice to employers, for employers to respond, and for ED to review such responses and make a final determination. We recommend ED follow due process procedures already established in other areas of regulation, such as the borrower defense to repayment rules at §685.206.

We also lack confidence that ED has the resources to manage such a process. ED's massive reduction in force last March, backlogs of 74,500 PSLF buyback requests and 1 million IDR forgiveness applications, and mounting complaints from financial aid offices[1] all point to an agency that is not equipped to take on new, complex, and time-consuming activities, especially where expertise lies elsewhere — in the courts.

We support the provision that would allow the Secretary to consider an organization operating under a shared identifier, such as a larger university system, as separate and distinct entities for the purposes of determining PSLF eligibility under this new rule. This, along with the provision that employers can provide more information about their organizational structure during the notice and response phase, provides essential protection for public service employees, ensuring that the actions of one department or campus do not unfairly penalize potentially thousands of uninvolved borrowers working in other parts of the same system. Like our concerns about due process above, however, the details of how ED would operationalize these provisions are missing from the proposal, and we fear that, in fact, entire organizations could lose eligibility due to the actions of a single area operating independently.

We appreciate the Department's decision to make the rule proactive and not deny borrowers' prior earned qualifying months of repayment in cases where their employer is later found ineligible. We believe ED should provide additional protections for individuals working at employers deemed ineligible during their tenure by adding a legacy provision to allow them to continue earning credit toward PSLF and denying only new employees hired after the date of determination. This protects not only borrowers, but the communities these individuals serve, since a mass exodus of public servants could leave significant gaps in critical fields, especially given the research ED cites in the NPRM that "public service employees cited PSLF as a significant factor in their decision to pursue and remain in public service," and that ED estimates the areas most likely to be impacted by the regulations will be "legal services, governance, social work, healthcare, K–12 education, and higher education." Smaller and rural communities will likely feel the impact when individuals providing these services pursue other employment due to their employer losing PSLF-eligible employer status.

The proposed rules include a provision that an employer deemed to have engaged in activities with a

[1] https://www.nasfaa.org/uploads/documents/Impact_ED_FSA_Cuts_on_FAOs_Results.pdf

substantial illegal purpose must wait 10 years before it can petition to regain its PSLF-eligible status. We are concerned that this 10-year ban is excessively punitive and counterproductive. This policy will primarily harm potential future, uninvolved employees by limiting their public service employment options. A five-year period is a more reasonable time frame for an organization to demonstrate it has met the department's conditions, striking a better balance between compliance and rehabilitation.

We support ED's proposal that employers maintain eligible status in cases where the Secretary approves a corrective action plan prior to issuing a final determination. However, we believe there is a drafting error in the regulatory text at (i)(1)(ii) which reads, "Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's final determination, the Secretary which includes the factors set forth in subsection (j)(2) of this section." The missing language appears to be (in italics), "Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's determination, *the Secretary approves a corrective action plan* which includes the factors set forth in subsection (j)(2) of this section.

We believe an important potential scenario was not covered in negotiations. In §685.219(j), ED does not address cases where illegal purpose is established by state law that is later rescinded or overturned. In such instances, ED should automatically restore eligible employer status to all organizations that lost eligibility based on such laws and retroactively approve payments borrowers made during the period of ineligibility. Further, if ED were to pursue future ineligibility for such employers, it should have to begin the process for determining when an employer engaged in activities that have a substantial illegal purpose anew.

We wish to note broadly that the proposed rule contains several contradictions, internal inconsistencies, and, worse, presents as statements of fact things that are simply not true. For instance, ED chooses to define illegal discrimination based solely on federal law because, "Limiting the scope to only Federal laws will help reduce the burden on the Department when assessing whether a qualifying employer engages in illegal discrimination as there are many State laws addressing discrimination," but invokes reliance on state law to define the medical treatments and "trafficking" the administration believes to be illegal. Why is ED concerned about the burden of reliance on variable state laws in some circumstances but not others?

Several arguments in the *Benefits of the Proposed Regulations* are unsupported. ED argues that the proposed regulations will "..streamline the PSLF process by providing more explicit eligibility criteria…" but the eligibility criteria are already explicit; these regulations only narrow the eligibility criteria. ED claims these changes will "...make it easier for borrowers to track their progress…" toward PSLF, but provides no evidence for improvements to the payment tracking process to support this claim. ED says in the NPRM that many borrowers cite confusion about employer eligibility for PSLF, per recent data from the Consumer Financial Protection Bureau. But, again, ED provides no evidence for its claims in the

NPRM that the rules make the process more "transparent" or "efficient" or how it would "result in faster processing of PSLF applications and fewer errors."

We ask ED to reconcile the seeming conflict between its statement, "The Department anticipates growth in public service recruitment and retention in the future," against its estimates that the proposed rule changes will result in more than $1.5 billion in savings from borrowers who will no longer receive PSLF.

We appreciate the opportunity to comment on the Department's proposed rules, but we maintain our fundamental position that the Department should not create a new process for determining employer ineligibility. Established legal and regulatory bodies, such as the Internal Revenue Service and the court system, already serve this function, and their findings should be the basis for any change in PSLF eligibility.

If you have any questions regarding these comments, please contact us or NASFAA's Senior Policy Analyst, Megan Walter.

Regards,

Melanie E Storey

Melanie Storey
President and CEO, NASFAA

NASFAA September 17, 2025

5

ED_00727

| Docket Comment Number | Reason | Duplicate Comment - Master Comment |
| --- | --- | --- |
| ED-2025-OPE-0016-DRAFT-7218 | Test comment | NA |
| ED-2025-OPE-0016-DRAFT-7796 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-7798 |
| ED-2025-OPE-0016-DRAFT-8470 | Duplicate Comment | ED-2025-OPE-0016-9419 |
| ED-2025-OPE-0016-DRAFT-8495 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-8496 |
| ED-2025-OPE-0016-DRAFT-8497 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-8496 |
| ED-2025-OPE-0016-DRAFT-8714 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-8713 |
| ED-2025-OPE-0016-DRAFT-8824 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-8825 |
| ED-2025-OPE-0016-DRAFT-9147 | Test comment | NA |
| ED-2025-OPE-0016-DRAFT-9228 | Test comment | NA |
| ED-2025-OPE-0016-DRAFT-11632 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-11631 |
| ED-2025-OPE-0016-DRAFT-12073 | Duplicate Comment | ED-2025-OPE-0016-9676 |
| ED-2025-OPE-0016-DRAFT-12670 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-12668 |
| ED-2025-OPE-0016-DRAFT-12823 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-12822 |
| ED-2025-OPE-0016-DRAFT-14097 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-7647 |
| ED-2025-OPE-0016-DRAFT-15262 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15263 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15264 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15265 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15266 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15267 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15269 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15270 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15271 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15272 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15273 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-15268 |
| ED-2025-OPE-0016-DRAFT-15382 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-14298 |
| ED-2025-OPE-0016-DRAFT-16149 | Duplicate Comment | ED-2025-OPE-0016-9907 |
| ED-2025-OPE-0016-DRAFT-17620 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-17011/ ED-2025-OPE-0016-8514 |
| ED-2025-OPE-0016-DRAFT-17713 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-17716 |
| ED-2025-OPE-0016-DRAFT-17778 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-17777 |
| ED-2025-OPE-0016-DRAFT-17787 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-17778 |
| ED-2025-OPE-0016-DRAFT-18121 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-18117/ED-2025-OPE-0016-9747 |
| ED-2025-OPE-0016-DRAFT-18230 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-18231/ ED-2025-OPE-0016-9365 |
| ED-2025-OPE-0016-DRAFT-19500 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-19513 |
| ED-2025-OPE-0016-DRAFT-19504 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-16427 |
| ED-2025-OPE-0016-DRAFT-19670 | Spam Comment | NA |
| ED-2025-OPE-0016-DRAFT-19694 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-19695 |
| ED-2025-OPE-0016-DRAFT-19888 | Submitter Request to Correct | ED-2025-OPE-0016-DRAFT-20006 |
| ED-2025-OPE-0016-DRAFT-19902 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-19850 |
| ED-2025-OPE-0016-DRAFT-19938 | Submitter Request to Correct | ED-2025-OPE-0016-DRAFT-20006 |
| ED-2025-OPE-0016-DRAFT-19940 | Submitter Request to Correct | ED-2025-OPE-0016-9758 |
| ED-2025-OPE-0016-DRAFT-20080 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-20079/ ED-2025-OPE-0016-8982 |

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

### Report Filters

Commenter Type *is equal to* "Government Agencies/Local/State/Federal" OR "Members of Congress" OR "Institutions of Higher Education or their Trade Associations" OR "Advocacy Groups/Other" OR "Attorneys General/ Other Attorneys" OR "Loan Servicers/Guaranty Agencies" OR "Media/Communications" OR "Financial Institutions" OR "Financial Aid Administrators or Associations"

# Comment Submission Detail Report

## PSLF NPRM 2025

### (ED-2025-OPE-0016)

**Comment ID:** ED-2025-OPE-0016-7272

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Senior Life Resources NW

**Received Date:** Aug 19, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Opposition to Proposed PSLF Rule Limiting Nonprofit Employer Eligibility.pdf

---

**Comment ID:** ED-2025-OPE-0016-7320

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Children's Rights

**Received Date:** Aug 20, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**

Susan Reeves
New York, NY
Children’s Rights
sreeves@childrensrights.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Susan Reeves, and I am the Director of Talent & Operations at Children’s Rights. Our organization holds government systems accountable for protecting kids and keeping families together. A few examples of our work include:

We are making significant progress in New York and Iowa to protect children’s rights to intensive community-based mental health services, addressing their unmet mental health needs and strengthening families.

We have brought class action lawsuits in three states to ensure effective oversight in administering potentially dangerous psychotropic drugs to children in foster systems and to stop the practice of overprescribing to sedate and control children’s behavior.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

The Public Service Loan Forgiveness (PSLF) Program is vital to our ability to serve communities. By easing the financial burden of student debt, PSLF allows talented professionals to choose public service over higher-paying private sector jobs. It makes a real difference by ensuring dedicated staff can commit their careers to improving the lives of children and strengthening our communities.

Authorizing the Secretary of Education to determine that an organization is no longer a qualifying employer may open the door to determinations based on politics and ideology. Additionally, a process is already in place to remove eligibility from organizations that engage in illegal activity. My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. Tying program eligibility to shifting political priorities creates instability for nonprofits and their employees. Clear, consistent standards — not ideology — must guide federal oversight.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Susan Reeves

**Attachments:**

1. CR comments.pdf

---

**Comment ID:** ED-2025-OPE-0016-7370

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** ChangeMatters

**Received Date:** Aug 20, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
The proposed rule inserts politics and ideology into the a program that encourages individuals to choose careers in service. This change, which violates Federal law, would allow the current and future Administrations to change the eligibility for this program based on _their_ priorities or ideology. Nonprofits must be able to prioritize and address needs without political interference, fear of retribution, or removal from a program that historically has been available to support their workforce and employees. College students who feel called to make a difference but also pressured by the heavy burden of the outsized cost of higher education can more easily choose to pursue their interests and serve in needed areas. I know of current law school students inspired to make a difference, who have planned their careers to work in service organizations rather than join corporate firms as most of their peers — the loan forgivness program is a key element to their plans. New, unnecessary, and unlawful restrictions on this program will reduce the pool of motivated and available candidates for jobs and careers that support so many areas of American life, perhaps especially at the local level. My consulting firm works directly with nonprofit organizations of different sizes and at local, regional, and national levels — not all use this program, but most leaders in this sector know about it, and appreciate its value .

**Attachments:** N/A

# Comment Submission Detail Report

## PSLF NPRM 2025

### (ED-2025-OPE-0016)

**Comment ID:** ED-2025-OPE-0016-7430

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Anonymous Anonymous **Organization:** N/A

**Received Date:** Aug 20, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**

I am the executive director of a small nonprofit organization. I'm writing to express concern about the Department of Education's Notice of Proposed Rulemaking to amend the Public Service Loan Forgiveness (PSLF) program. The PSLF program is one of our nation's best incentives for educated young people to commit to public service. The proposed rule would create uncertainty that would have significant negative impacts on the nonprofits throughout our country that are closing gaps and providing essential services, from access to food, housing, and healthcare to the people educating and mentoring future generations of American citizens, placing eligibility at the discretion of the Secretary of Education when a process already exists to remove eligibility from organizations who are engaging in illegal activity. This would be destructive to the fabric of a vital social safety net. Thank you for your consideration of this public comment.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7529

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Cassandra Sodergren **Organization:** N/A

**Received Date:** Aug 20, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**

Cassandra Sodergren
Austin, Texas
Go Austin Vamos Austin
csod92@gmail.com

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend o amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. My name is Cassandra Sodergren, and I work for Go Austin Vamos Austin (GAVA). GAVA mobilizes and builds community power to reduce barriers to healthy living while increasing institutional capacity to respond to the people most impacted by historic inequities.

I strongly oppose the proposed rule and the limitations it would impose on which employers would be

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

able to benefit from PSLF for their employees. While I appreciate the provision that requires the Department of Education to notify employees if their employer is determined to no longer be qualified and the fact that the payments made before the disqualification would still be counted, this is not sufficient to protect employees. Terminating the benefit to borrowers abruptly after a determination is made will put employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthen the timeframe for being able to have their debt forgiven. This proposed rule is contrary to federal law as federal law makes clear that eligibility for PSLF applies to all charitable nonprofit organizations. The proposed rule also inserts politics and ideology into the program. The proposed rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. In doing so, the Department could seek to exclude nonprofit employers working with undocumented immigrants, supporting transgender children, or advancing racial and social equity. This opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology. Nonprofits must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees. Lastly, a process already exists to remove eligibility from organizations that are engaging in illegal activity.

Nonprofit professionals are severely underpaid and provide a significant public good. We are stronger and more effective with a variety of skilled workers in the nonprofit field, which includes (but is not limited to) those with college degrees and student loans. Removing PSLF as an option will deter people with college degrees from entering this field.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Cassandra Sodergren

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7604

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Lad Lake, Inc.

**Received Date:** Aug 21, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
Laura Melvin
Dousman, WI
Lad Lake, Inc.

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

My name is Laura Melvin and I am the Director of Human Resources at Lad Lake, Inc. Lad Lake is a long-standing nonprofit in the Metro-Milwaukee community that helps children and their families reach their full potential.

Public Service Loan Forgiveness (PSLF) is a critical benefit for our organization and the broader nonprofit community. The work we do requires highly trained therapists, social workers, and professionals who are deeply committed to serving youth and families. Yet, these fields often come with significant educational debt and lower earning potential compared to private sector roles.

The ability to leverage PSLF as part of our recruitment and retention strategy has been invaluable. We have seen firsthand how it helps attract quality candidates who may otherwise be unable to pursue or sustain a career in nonprofit work due to financial barriers. Several of our employees have already benefited from PSLF, and their continued service has directly strengthened the care and support we provide to the community.

PSLF is not only an investment in our workforce but also in the stability and effectiveness of the nonprofit sector as a whole. Whether employees stay with us long-term or continue their careers with another mission-driven organization, the impact is the same: youth and families in our community receive the professional, consistent, and compassionate support they need.

In short, PSLF allows us to compete for top talent, reduce turnover, and ensure that those who feel called to serve can do so sustainably. It is a cornerstone benefit that strengthens both our organization and the entire nonprofit ecosystem.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Laura Melvin

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7607

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Peter Bagley **Organization:** N/A

**Received Date:** Aug 21, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
Comments on the propose PSLF rule change(s).

**Attachments:**

1. PSLF Rule Change Input Letter.pdf

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment ID:** ED-2025-OPE-0016-7613

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Western Native Voice, Inc.

**Received Date:** Aug 21, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**

U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Western Native Voice submits this comment in strong opposition to the Department of Education's proposed regulation to amend 34 CFR 685.219 to exclude employers deemed to have a "substantial illegal purpose" from qualifying under the Public Service Loan Forgiveness (PSLF) program.

While we recognize the Department's intent to protect taxpayers, this change is overly broad, vague, and deeply harmful to working-class people, especially those in rural communities and Native nations. The PSLF program has been a vital pathway to higher education and professional stability for first-generation students, public servants, and community-based employees who commit their careers to underserved areas. By narrowing eligibility in this way, the rule would disproportionately punish workers, not employers, who already face systemic barriers.

Impact on Rural and Native Communities

In many Native nations and rural towns, community organizations, nonprofits, and tribal entities are among the only employers available to those who wish to return home after completing higher education. Workers should not lose PSLF eligibility because of disputes or allegations against their employers that are outside their control.

Rural and Native communities already struggle to recruit and retain qualified teachers, health care providers, and public service professionals. Excluding entire categories of employers from PSLF risks driving away desperately needed workers and widening gaps in services.

Impact on the Working Class

PSLF was designed to give working-class Americans a fair shot at higher education by rewarding careers in public service. This proposed change undermines that promise by shifting accountability from organizations to individual workers.

Employees have little to no power over whether an organization is accused of a "substantial illegal purpose." Workers should not lose access to loan forgiveness because of decisions made at the highest levels of an employer's operations.

Vagueness and Risk of Misuse

The rule's reliance on the undefined standard of "substantial illegal purpose" creates uncertainty and the potential for politicization. Tribal governments, grassroots nonprofits, and other community-based organizations are often subject to complex legal and political challenges. This rule risks unfairly categorizing them and punishing the workers who choose to serve their communities.

We urge the Department to withdraw this proposal. Instead of punishing workers, the Department should continue strengthening PSLF so that the program can fulfill its original purpose: supporting public service careers, particularly in the most underserved communities.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Western Native Voice is committed to ensuring that working-class families, rural Montanans, and Native peoples are not left further behind in our pursuit of educational and economic equity. This proposed rule is a step backward.
Respectfully submitted,
/s/ Keaton Sunchild
Western Native Voice

**Attachments:**

1. Dept of Ed Commentary.pdf

---

**Comment ID:** ED-2025-OPE-0016-7733

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Timothy Kemball **Organization:** N/A

**Received Date:** Aug 23, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
I urge the Secretary to consider seriously the impact of this proposed rule on an already anticipated provider shortage that will become only more acute if implemented. The impact of these shortages will fall disproportionately on states that are already lowest in ranking for health: West Virginia, Mississippi, Alabama, Louisiana, and Kentucky, to name only the top five.

It also disrupts the education plans of thousands of recently graduated health care providers (see attached letter from the AAMC.) I draw your attention to one possible amendment proposed in on page two of the AAMC response that I urge you to consider: Moreover, we urge the Department to ensure that borrowers who have already indicated an interest in PSLF and submitted employment certification information, will continue to be eligible for forgiveness even in the event of any changes to the program. This action would go a long way toward ensuring stability for existing borrowers who have factored such eligibility into their career choices, as the program intended.

Respectfully. Mark Kemball

**Attachments:**

1. ocomm-ogr- 05 08 25 AAMC_ED_2025_OPE_0016.pdf

---

**Comment ID:** ED-2025-OPE-0016-7751

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Whitney Pratt **Organization:** N/A

**Received Date:** Aug 25, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
Whitney Pratt
Columbia Falls, Montana

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

Land to Hand
(Redacted PII)

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Whitney Pratt, and I work for a 501(c)(3) nonprofit, Land to Hand. We do food access and education work in Flathead County, Montana.

I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees.

While I appreciate the provision that requires the Department of Education to notify employees if their employer is determined to no longer be qualified and the fact that the payments made before the disqualification would still be counted, this is not sufficient to protect employees. Terminating the benefit to borrowers abruptly after a determination is made will put employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthen the timeframe for being able to have their debt forgiven.

Close
Thank you for considering this input as part of the rulemaking process.
Sincerely,
Whitney Pratt

**Attachments:**

1. image.pdf

---

**Comment ID:** ED-2025-OPE-0016-7755

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Diversability Inc.

**Received Date:** Aug 25, 2025 **Posted Date:** Aug 25, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Advocacy Letterhead docx.pdf

---

**Comment ID:** ED-2025-OPE-0016-7775

Find on Regulations.gov

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Center for Volunteer & Nonprofit Leadership

**Received Date:** Aug 25, 2025 **Posted Date:** Aug 26, 2025

**Comment Detail:**
See attachment.

**Attachments:**

1. CVNL Loan Program Letter 8 25 25.pdf

---

**Comment ID:** ED-2025-OPE-0016-7795

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** NHRC

**Received Date:** Aug 26, 2025 **Posted Date:** Aug 26, 2025

**Comment Detail:**
I am Laura Guzman, Executive Director of the National Harm Reduction Coalition, and live in San Leandro, California. I am writing in response to the William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy, Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. Introduce yourself and your organization. My name is Laura Guzman, and I am Executive Director of the National Harm Reduction Coalition (NHRC). NHRC is a capacity building and advocacy organization that supports the rights and access to health for people and communities impacted by substance use. As a non-profit provider, our staff deeply benefit from the PSLF program, and the PSLF has enabled my organization to hire and retain staff that can serve our communities and enhance their careers, by obtaining clinical and other degrees critical (social work, law, etc) to continue our key capacity building and technical assistance work in communities across the United States impacted by overdose deaths and lack of treatment and full health access.

The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce. My organization strongly opposes the proposed rule and the limitations it would impose on employers that benefit from PSLF for employee hiring and retention.

In addition, the proposed rule is contrary to federal law. Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Current law requires all 501(c)(3) organizations to be eligible as a qualified employer under PSLF. The definition of “public service job” in the PSLF statute states that the term “public service” job

means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The Department of Education does not have the authority to further restrict eligibility under PSLF.

Thank you in advance for considering this input as part of the rulemaking process.

Very Sincerely,

Laura Guzman

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7827

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** N/A

**Received Date:** Aug 27, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**
Aristea Saulsbury

McKinleyville Family Resource Center

1615 Heartwood Drive

McKinleyville, CA 95519
(PII redacted)

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Aristea Saulsbury, and I am Co Executive Director of McKinleyville Family Resource Center (MRFC). MFRC proudly serves the communities of Northern Humboldt County, California with case management, crisis intervention, and prevention programs targeted at issues such as substance use disorder, unemployment, child abuse, and intimate partner violence.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by enhancing the retention of dedicated employees, thus ensuring the community gets consistent and experienced support when accessing services. PSLF is a small benefit to employees who often accept lower wages and stressful work because they are passionate about community.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Point to a specific proposal from the previous page, explain how it affects you, why you oppose it, and what changes should be made.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and our communities. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about our career patsh. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce. Additionally, a process already exists to remove eligibility from organizations who are engaging in illegal activity. If an organization engages in substantial illegal activities, there is a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Aristea Saulsbury

Co Executive Director

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7828

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Michigan Indian Legal Services

**Received Date:** Aug 27, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**
Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Cameron Ann Fraser, and I am Executive Director of Michigan Indian Legal Services. We are a legal aid office that provides free legal assistance for 1) those that have a tribal or federal Indian law related legal issue; and 2) those that meet income and asset guidelines.

The Public Service Loan Forgiveness Program has enabled my organization to serve the poor in the State of Michigan. Over the years, many of my staff members have participated in student loan forgiveness programs. Because we serve indigent individuals living in rural areas, it is difficult for us to recruit qualified staff members and we cannot afford to pay at the same rate as large law firms. Because of the cost of education, many people graduate with tremendous student debt and they would not be able to work at an organization like MILS without this assistance.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

My organization is very concerned about the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The proposed amendments make the program fair less dependable - whether it is the lack of due process for employers to challenge administrative decisions or simply giving an administrative agency discretion to arbitrarily determine that an employer is excluded. Without assurances that program rules will remain consistent over the long term, graduates cannot rely on the program to make important decisions about their career path - which then hurts the millions of Americans who depend on services by those in the non-profit sector.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Cameron Fraser

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7829

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** THE MINORITY FREEDOM COMMUNITY FUND

**Received Date:** Aug 27, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**
Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

On behalf of the Minority Freedom Community Fund (MFCF), thank you for the opportunity to provide comments on the proposed rule amending the Public Service Loan Forgiveness (PSLF) program.

MFCF is a Detroit-based philanthropic intermediary dedicated to providing resources and capacity to underinvested groups working to improve neighborhoods across our city. By offering multi-year grants, technical assistance, and community-building support, we uplift local leaders who are the trusted backbone of their communities. Since our founding, we have invested in grassroots organizations addressing critical needs such as housing, education, youth development, wellness, and economic opportunity.

The Public Service Loan Forgiveness program has been a vital tool for organizations like ours and for the broader nonprofit sector. It enables us to recruit and retain talented staff who may otherwise be unable to afford long-term service in the nonprofit sector due to the weight of student loan debt. Our employees are deeply embedded in the communities they serve, many coming from the very neighborhoods most impacted by systemic underinvestment. Without PSLF, it would be difficult to maintain the highly skilled, culturally competent workforce that drives our mission forward.

We strongly oppose the proposed rule that would exclude certain nonprofit employers from qualifying under PSLF. Federal law already makes clear that eligibility applies to all 501(c)(3) organizations, and

the Department of Education does not have the authority to restrict this further. By introducing vague criteria such as "substantial illegal purpose," the rule invites political and ideological interference into a program that was designed to be neutral and supportive of all charitable organizations. This could jeopardize nonprofits that serve immigrant communities, transgender youth, or other marginalized groups—communities that MFCF and our partners often serve directly.

The proposed changes also undermine the stability and reliability of PSLF, making it harder for nonprofits like ours to plan for the future. Our staff must be able to trust that their years of service will count toward forgiveness, without fear that shifting political priorities could strip away their eligibility. If enacted, the rule will create barriers to entry for future nonprofit leaders, harm existing staff morale, and weaken our collective ability to deliver essential services to hundreds of thousands of Detroiters.

Finally, the existing oversight framework is sufficient. Organizations that engage in unlawful activities are already subject to revocation of their 501(c)(3) status through the IRS. Adding another duplicative and discretionary process within the Department of Education only creates confusion, administrative burden, and risk of inconsistent enforcement.

For these reasons, MFCF urges the Department to withdraw this proposed rule and preserve the current eligibility framework for PSLF. Protecting nonprofit employees' access to this program is essential to sustaining a strong, effective, and resilient charitable sector.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Minority Freedom Community Fund
Detroit, Michigan

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7831

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Marquette Regional History Center |
| **Received Date:** | Aug 27, 2025 | **Posted Date:** | Aug 27, 2025 |

**Comment Detail:**
I am the director of a small 501 (c) (3) nonprofit in the Upper Peninsula of Michigan. Our operating budget is $550,000. We have seven full-time staff. Our salaries are well under $50,000 a year. We do not offer health insurance to employees due to the cost. Three of the seven staff members are working to have their student loans forgiven through the public service loan forgiveness program. Please consider small nonprofits like ours before you cut this important benefit. If we lost the three staff members because they need to find a higher paying job, it would be a hardship. This public service loan forgiveness program is a much needed benefit for small non-profits to retain talented employees.

**Attachments:** N/A

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment ID:** ED-2025-OPE-0016-7833

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** ISET-International

**Received Date:** Aug 27, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**
Karen MacClune
ISET-International
Boulder, CO
Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]
Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.
My name is Karen MacClune and I am the Executive Director of ISET-International (ISET). ISET works both domestically and overseas supporting communities to build their resilience to extreme weather, including floods, hurricanes, and wildfires.
ISET relies on a small staff that work directly with community members and local governments. Many of the places we work are economically challenged, and consequently, much of the work we do is delivered on a financial shoestring. The PSLF is, for nearly one third of my US staff, a significant and valuable aspect of their overall compensation. Without it, I will be unlikely to retain them as staff; without them as staff, I would be unable to deliver the support and mentoring we extend to the communities and local governments that we work with.
I am deeply concerned about the proposed rule because of the fact that that it will be adjudicated without due process and by an agency without the expertise or staffing to deliver this role. The rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. However, the determination to strip the eligibility of an organization is determined by a “preponderance of the evidence” and without the opportunity to appeal to an independent authority, which is un-American. And, the Department of Education is facing significant staff shortages and will not be able to bear the administrative burdens of making these determinations and enforcing the processes that would need to be put in place to implement it. They also do not have the expertise to make a determination of which organizations are engaging in illegal activities. This makes the potential for mistaken determinations, or politically influenced determinations, quite significant.
These amendments are also unnecessary. A process already exists to remove eligibility from organizations who are engaging in illegal activity. If an organization engages in substantial illegal activities, there is a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.
For the above reasons, I and my organization strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. If they are passed, I will be at risk of losing core staff who are critical to the work my organization delivers to communities and local governments to make the more resilient to extreme weather.
Thank you for considering this input as part of the rulemaking process.

Sincerely, Karen MacClune, Executive Director, ISET-International

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7837

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Isabella Pori **Organization:** N/A

**Received Date:** Aug 20, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**
Isabella Pori
Brooklyn, NY

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]
Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Isabella Pori, and have spent my legal career working for reproductive rights nonprofits.

Explain how you have benefited or will benefit from PSLF.
The Public Service Loan Forgiveness Program has allowed me to work in nonprofits and pay back my educational debt for 7 years. I made the choice to attend law school partially because of the PSLF program, and it gave me such a sense of security to know that my service would be rewarded with loan forgiveness.

I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. I have been passionate about public service since childhood, and I wake up every day thrilled to use my law degree to help people grow their families on their own terms and access IVF care.

While I appreciate the provision that requires the Department of Education to notify employees if their employer is determined to no longer be qualified and the fact that the payments made before the disqualification would still be counted, this is not sufficient to protect employees. Terminating the benefit to borrowers abruptly after a determination is made will put employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthen the timeframe for being able to have their debt forgiven. While I plan to spend my career in nonprofits, the vagueness of this new regulation will make it more difficult to confidently apply for jobs, when I will not know how the administration will perceive the work of certain nonprofits. The provision about "engaging in a pattern of violating state laws" is particularly concerning. Many states, for example, have laws prohibiting sleeping on the street or handing out food to homeless people, and homeless services are a critical component of many nonprofits. Similarly, national nonprofits like mine, that work on policies that are legal in some states but illegal in others risk being swept into this prohibition.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

Isabella Pori

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7840

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Anonymous Anonymous **Organization:** N/A

**Received Date:** Aug 21, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**

Lisa Savero-Mooney
Taylor, Pennsylvania
Moses Taylor Foundation, Senior Program Officer
Lsaveromooney@gmail.com

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Lisa Savero-Mooney, and I work for Moses Taylor Foundation. Our Foundation's mission is to improve the health of people in Northeastern Pennsylvania. Our support extends to primary care, oral health, and mental health services, school-based health, and older adult health programs. We invest in organizations that share our commitment to enhancing service delivery, strengthening the care continuum, removing barriers to care, and integrating services.

I have been working in nonprofit organizations for the past 18 years. During that time, I worked full-time to support my family. When my children were preparing to attend college, the Public Service Loan Forgiveness Program was the only option that allowed me to continue serving my community and help cover some of my children's higher education expenses.

I strongly oppose the proposed rule and the limitations it would place on which employers can benefit from PSLF for their employees. Every day, I am grateful to see the positive impacts on the people in my community, fueled by the hardworking, often underpaid, employees of nonprofit organizations. I believe public service is a calling, and those who answer it help build the essential fabric of health and social support systems in our country.

While I appreciate the provision that requires the Department of Education to notify employees if their employer is determined to no longer be qualified and the fact that the payments made before the disqualification would still be counted, this is not sufficient to protect employees. Terminating the benefit to borrowers abruptly after a determination is made will put employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthening the timeframe for being able to have their debt forgiven. For someone like me, who is nearing the end of their career, a disruption in employment would have a devastating long-term financial impact on me.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Lisa Savero-Mooney

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7843

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Lorraine Murray **Organization:** N/A

**Received Date:** Aug 25, 2025 **Posted Date:** Aug 27, 2025

**Comment Detail:**
Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]
Dear Ms. Abernathy,
I am writing today to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.
My name is Lorraine Murray, and I am the Development Director for a 501(c)(3) nonprofit, Central Oregon LandWatch. We serve our community by working to create thriving, livable cities, protect rural lands for farming and ranching, and wild lands for wildlife habitat, forestry, and recreation.
The Public Service Loan Forgiveness Program has allowed me to work at LandWatch and pay back my educational debt for nearly 3 years. The option of PSLF made me consider a job in the nonprofit sector, and I am satisfied and happy in my career path as a result. Being a nonprofit employee allows me to feel like an integral part of my community, someone who gives back. I accepted this job at a lower salary than what I could find in the private sector because the work is meaningful. With PSLF, it was an additional incentive to devote my life's work to my community, rather than shareholder values.
The rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. In doing so, the Department could seek to exclude nonprofit employers working in any discipline they deem not in alignment with their personal beliefs and values. This opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology. Nonprofits must be able to identify and meet local needs without political interference, fear of retribution.
I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. I work for LandWatch because of the impactful work they do, and many talented, dedicated colleagues are here for the same reason. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce.
While I appreciate the provision that requires the Department of Education to notify employees if their employer is determined to no longer be qualified and the fact that the payments made before the disqualification would still be counted, this is not sufficient to protect employees. Terminating the benefit to borrowers abruptly after a determination is made will put employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthen the timeframe for being able to have their debt forgiven. This would be an enormous setback for those of us who relied on this option to provide loan relief someday, and potentially derail careers and organizations we love.
Lastly, the Department lacks the capacity and expertise to implement the proposed rule. The Department of Education is facing significant staff shortages and will not be able to bear the administrative burdens of making these determinations and enforcing the processes that would need to be put in place to implement it. They also do not have the expertise to make a determination of which organizations are engaging in illegal activities.

Thank you for considering this input as part of the rulemaking process.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Sincerely,
Lorraine Murray

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7854

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Linda Whitfield **Organization:** N/A

**Received Date:** Aug 27, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**
Please see attached comment related to Public Service Loan Forgiveness Program and 34 CFR 685.219 .

**Attachments:**

1. PSLFLetter_LW.docx

---

**Comment ID:** ED-2025-OPE-0016-7864

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Anonymous Anonymous **Organization:** N/A

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**
Narrowing the focus of PSLF – and especially making political decisions around who can qualify – will only make it harder for people to work in nonprofits. We already don't pay a lot, and the PSLF program is one of the few things we can point to that can help with recruitment and retention. Adding any barriers to it or making it more restrictive in any way will harm the nonprofit sector, our staff, and the people we support.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7865

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Bryan Blackwell **Organization:** N/A

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**
My name is Bryan Blackwell. I am an attorney in a rural part of Alabama. I serve on the board of Legal Services Alabama. There is a great need for attorneys to serve this area, much of which is underserved

by attorneys, also known as a "legal desert". Many of these young attorneys work for the state or public interest nonprofit law firms. They often have large student loan debts from seven or more years of college and law school. If their employer is determined to be involved in certain activities in advocating for the poor, the attorney may not be able to have their loan forgiven. This will make it increasingly difficult to recruit new or even established attorneys with student loan debt to serve the neediest members of our society. Please reconsider this broad undefined measure of legal services providers to ensure that legal services may be provided to the poor.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7866

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** mark mackin **Organization:** N/A

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**
PSLF is essential to maintaining legal assistance in rural states. Most of Montana qualifies as a legal desert. Montana is the fourth largest state in the nation and contains 8 Indian reserves. Missoula, Billings and Bozeman have sufficient attorneys but the far southwest, far east, and the Highway 2 corridor lack sufficient coverage. Specifically, the Montana office of public defender has had continual difficulty providing attorneys for court assigned clients in criminal and dependency cases. Without school loan relief many new attorneys literally cannot afford to work for the public defender.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7870

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Blue Mountain Community Foundation

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**
Kol Medina
Walla Walla, WA
President & CEO
Blue Mountain Community Foundation (BMCF)
kol@bluemountainfoundation.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket
ID ED-2025-OPE-0016]

Dear Ms. Abernathy:

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Kol Medina, and I am the President and CEO of the Blue Mountain Community Foundation, an organization that serves communities in the rural area of southeastern Washington and northeastern Oregon. Our organization provides our service area with millions of dollars in grants and scholarships every year, and we do it with a staff of only seven people, including myself.

Of the seven staff members, two are in the PSLF program; one who has completed the final three years of qualified employment with BMCF and who is working on finalizing the forgiveness process, and the other who is just starting the program and who is working on finalizing the composition of their loans in order to enter the program. As you know, President George W. Bush signed the legislation creating the Public Service Loan Forgiveness (PSLF) program in 2007 as part of the College Cost Reduction and Access Act, which passed Congress with broad bipartisan support. The program has played a critical role in building a more educated and knowledgeable nonprofit workforce. For our organization, it has meant the ability to hire two employees, nearly a third of our staff, who hold graduate degrees and are committed to serving our communities, rather than being driven to higher-paying jobs in the private sector.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees for several reasons:

First, as a rural community, we rely heavily on non-profit organizations to provide services that are often difficult to access in sparsely populated areas. The proposed rule will ultimately make it harder to attract and retain an educated, skilled workforce committed to serving our region. Over time, this will mean fewer young people returning after college to build their careers and raise their families here.

Second, the rule introduces politics and ideology into the program, opening the door for this and future Administrations to change eligibility based on shifting priorities. This undermines the program's stability and creates uncertainty for nonprofits, making it harder for them to meet local needs without concern over political interference, fear of retribution, or the risk of losing access to a program intended to support their employees.

Finally, a process already exists to address organizations engaging in illegal activity. If a nonprofit is found to be substantially involved in illegal activities, the Internal Revenue Service (IRS) can revoke its 501(c)(3) status, which automatically makes the organization ineligible for PSLF. The Department of Education seemingly has neither the capacity nor the expertise to implement the proposed rule. With significant staff shortages already straining operations, it seems highly unlikely that the Department can manage the additional administrative burdens of making eligibility determinations and enforcing new processes. Moreover, the Department likely lacks the expertise to assess whether organizations are engaging in illegal activities; and the I believe that the Department should not be tasked with functions unrelated to education. Shifting its focus in this way risks diminishing the Department's core mission of supporting education while diverting responsibility away from agencies better equipped to handle enforcement.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Kol Medina
Blue Mountain Community Foundation
President & CEO

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7873

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Encompass Community Services

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**

Linda Alves
Santa Cruz, CA
Encompass Community Services
linda.alves@encompasscs.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I am the Chief Operations Officer at Encompass Community Services, the largest nonprofit human services agency serving Santa Cruz County in California. Encompass offers mental health and substance use treatment, housing support, and Head Start to Medicaid beneficiaries.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by attracting talent to our organization. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. Encompass employs many staff members currently enrolled in the PSLF, and this proposed rule will likely result in a significant loss of talent for our agency.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Linda Alves, COO of Encompass Community Services

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7874

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Whitney Tu **Organization:** N/A

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 28, 2025

**Comment Detail:**

Subject: Public Comment Opposing Proposed PSLF Rule ((Docket ID ED-2025-OPE-0016), RIN 1801-AA28)

Dear Ms. Abernathy,

I write to oppose the Department's proposed changes to the William D. Ford Federal Direct Loan Program
regarding Public Service Loan Forgiveness (PSLF).

As a hiring manager for direct service attorneys in legal aid, I have seen firsthand how critical PSLF is in
supporting individuals who dedicate their careers to serving vulnerable communities. I work at Open Door
Legal, a 501 (c)(3) nonprofit organization. Open Door Legal provides free, quality legal representation to
community members who cannot afford it. This work allows these community members to stay in their homes--off the streets--contribute to society, and united and safe with their family members.

As the director of talent for our organization, I have hired every staff person at our org and the majority of
our organization utilize or have utilized the PSLF program. It is crucial this program continues to exist, and in fact, is even expanded, to allow for our incredible attorneys to continue to provide this much needed
service that fills a gap the government seems to be uninterested in filling or providing for its citizens.

I am particularly concerned about the following:

1. The lack of reliability in the PSLF program will result in fewer public interest workers.
2. Fewer well-qualified workers will be able to afford to apply for public interest positions.
3. The proposed rule inserts politics and ideology into a program. Nonprofits must be able to assist communities without political interference or fear of retribution.
4. The proposed changes are likely to impact the availability of legal services in Rural America.

I recommend that you withdraw the proposal.

In conclusion, while I appreciate the Department's stated goal of maintaining the integrity of PSLF, this proposal does not achieve that. Instead, it creates confusion, burdens borrowers, and risks destabilizing a
program that has been life-changing for public servants and the communities they support.

I urge the Department to withdraw this proposed rule and engage in further consultation to craft regulations that are clear, fair, and supportive of the public service workforce.

Sincerely,

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

Whitney Tu
Director of Talent & Culture
San Francisco, CA

**Attachments:**

1. Public Comment Opposing Proposed PSLF Rule Whitney Tu.docx

---

**Comment ID:** ED-2025-OPE-0016-7881

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Anonymous Anonymous **Organization:** N/A

**Received Date:** Aug 28, 2025 **Posted Date:** Aug 29, 2025

**Comment Detail:**
I write to strongly oppose the Department's proposed rule that would allow the Secretary to restrict nonprofit employer eligibility under the Public Service Loan Forgiveness (PSLF) program. This proposal exceeds the Department's legal authority, undermines the integrity of the PSLF program, and threatens the stability of the nonprofit workforce that millions of Americans rely on for essential services.

1. The proposed rule is contrary to federal law.
Congress has already spoken clearly on PSLF eligibility. Under 20 U.S.C. § 1087e(m)(3)(B), a "public service job" includes full-time work at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a)." Federal law requires all 501(c)(3) nonprofit organizations to be qualified employers, without limitation based on mission or constituency. The Department does not have authority to override or narrow this statutory definition.

2. The rule politicizes a nonpartisan program.
The proposed rule would grant the Secretary discretion to disqualify organizations if their work is deemed inconsistent with law or "established public policy." This vague standard opens the door for exclusion of nonprofits serving immigrants, supporting transgender youth, advancing racial equity, or engaging in other activities disfavored by a particular administration. PSLF must remain a stable, apolitical program, free from ideological interference.

3. The rule undermines PSLF's effectiveness and harms communities.
PSLF exists to attract and retain skilled professionals in nonprofit careers. If nonprofit eligibility can change at the whim of political leaders, employees cannot rely on the program to make long-term career and financial decisions. This will make it harder to recruit and retain nonprofit professionals, ultimately harming the vulnerable populations and communities that depend on nonprofit services.

4. The rule lacks adequate due process.
Eligibility determinations would be made based on a "preponderance of the evidence," without meaningful opportunity for independent review or appeal. Such a low bar creates uncertainty for both nonprofit employers and the employees whose financial futures depend on PSLF.

5. Existing safeguards already protect against misuse.

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

If a nonprofit organization engages in illegal activity, the Internal Revenue Service already has authority to revoke its 501(c)(3) status. Such revocation automatically disqualifies an organization from PSLF. Creating a duplicative and politically influenced process within the Department is unnecessary and harmful.

6. The Department lacks the capacity and expertise to administer this rule.
The Department is already experiencing significant staff shortages and administrative challenges in managing PSLF. It lacks the expertise to investigate nonprofit operations or adjudicate questions of legality. Expanding the Department's role in this way is unworkable and would further destabilize program administration.

Conclusion
For all of these reasons, I urge the Department to withdraw this proposed rule. PSLF was created by Congress to strengthen the nonprofit workforce and ensure that public service professionals can afford to dedicate their careers to serving their communities. The proposed rule undermines this congressional intent, destabilizes nonprofit employment, and introduces politics into a program that must remain neutral and consistent.

Thank you for considering these comments.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7882

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Bridges From School to Work

**Received Date:** Aug 30, 2025 **Posted Date:** Aug 31, 2025

**Comment Detail:**
Kelly Pavich
Director of Operations
Bethesda, MD
Bridges From School to Work
Kelly.Pavich@bridgestowork.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Kelly Pavich, and I am the Director of Operations for Bridges From School to Work. We serve young adults with disabilities find competitive, integrated employment in 11 urban markets across the country.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

by helping our associates with their student loans, which helps significantly when you are on a nonprofit salary.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The associates we hire are from the communities that we serve, and to ensure that we have culturally competent associates who can support our youth in finding and maintaining employment helps the entire community and economy. The loss of this benefit would greatly reduce the qualified associates that I have working in the field, as they would have to choose to find a higher paying job to support themselves vs. doing work that makes a social impact for us all.

Thank you for considering this input as part of the rulemaking process. Sincerely, Kelly Pavich

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7905

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** San Francisco AIDS Foundation

**Received Date:** Sep 2, 2025 **Posted Date:** Sep 2, 2025

**Comment Detail:**
Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Tyler TerMeer, PhD, and I am the CEO of San Francisco AIDS Foundation, a community-based organization established in 1982 to address the HIV and AIDS epidemic. We provide free HIV and health services to more than 20,000 community members and clients annually through effective, evidence-based programs.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by supporting staff members who have dedicated their careers to public service and public health. They provide substance use counseling services, health education, HIV services, and other community programming for San Francisco community members living with and affected by HIV.

We strongly oppose the proposed rule, as it inserts politics and ideology into the program. It is necessary for our organization to prioritize a number of communities through our work with equity-based approaches, in response to the disproportionate impact of HIV on these populations. We advance racial and gender equity, through tailored programming that prioritizes Black and Indigenous people of color, transgender and non-binary individuals, and other individuals who identify as LGBTQ+. The proposed rule would harm the people and communities that rely on SFAF as it would be more difficult to attract an effective and skilled workforce without these equity-based approaches.

Thank you for considering this input as part of the rulemaking process.

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. Sept 2025 - Loan forgiveness letter.pdf

---

**Comment ID:** ED-2025-OPE-0016-7911

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Rex Brown **Organization:** N/A

**Received Date:** Sep 2, 2025 **Posted Date:** Sep 2, 2025

**Comment Detail:**
Rex Brown
Seattle, Washington

Subject: Public Comment Opposing Proposed PSLF Rule ((Docket ID ED-2025-OPE-0016), RIN 1801-AA28)
Dear Ms. Abernathy,
I write to oppose the Department's proposed changes to the William D. Ford Federal Direct Loan Program regarding Public Service Loan Forgiveness (PSLF).
As a professional working at a legal aid nonprofit serving low income immigrants,, I have seen firsthand how critical PSLF is in supporting individuals who dedicate their careers to serving vulnerable communities. I work at Northwest Immigrant Rights Project, a 501c3 nonprofit organization. Our organization provides legal aid to immigrants in Washington state. We are the only nonprofit legal services provider serving immigrants detained in the Tacoma immigration detention facility, as well as to unaccompanied immigrant children. Public service nonprofits are important to any community, as they fill an essential role that government does not fill, in providing legal services as well as other important services for community members.
I am particularly concerned about the following:

1.The lack of reliability in the PSLF program will result in fewer public interest workers.
2.Fewer well-qualified workers will be able to afford to apply for public interest positions.
3.The proposed rule is contrary to federal law. The Department of Education is not authorized to restrict the definition of "public service job" articulated in the statute.
4.The proposed rule inserts politics and ideology into a program. Nonprofits must be able to assist communities without political interference or fear of retribution.
5.A process already exists to remove eligibility from organizations who are engaging in illegal activity with an existing independent appellate administrative procedure and cause of action in the courts.
6.The Department of Education lacks the capacity and expertise to implement the proposed rule.
7.The proposed changes are likely to impact the availability of legal services in Rural America.

I would not be able to work with such amazing colleagues if they weren't able to apply for public service loan forgiveness - they would need to work in private legal practices to be able to pay their law school loans. We would see brain drain from public service, which is a sector that makes a huge difference across the whole political and ideological spectrum.
I recommend that you withdraw the proposal.

In conclusion, while I appreciate the Department's stated goal of maintaining the integrity of PSLF, this proposal does not achieve that. Instead, it creates confusion, burdens borrowers, and risks destabilizing a program that has been life-changing for public servants and the communities they

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

support.
I urge the Department to withdraw this proposed rule and engage in further consultation to craft regulations that are clear, fair, and supportive of the public service workforce.
Sincerely,
Rex Brown
Development Manager
Seattle, Washington

**Attachments:**

1. Public Comment Opposing Proposed PSLF Rule Rex Brown.docx

---

**Comment ID:** ED-2025-OPE-0016-7915

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Legal Aid of Sonoma County

**Received Date:** Sep 2, 2025 **Posted Date:** Sep 2, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Notice of Proposed Rulemaking_Docket ID ED-2025-OPE-0016 Opposition Letter (LASC).pdf

---

**Comment ID:** ED-2025-OPE-0016-7916

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Rachel Farahbakhsh **Organization:** N/A

**Received Date:** Sep 2, 2025 **Posted Date:** Sep 2, 2025

**Comment Detail:**
Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.
My name is Rachel Farahbakhsh and I have worked for 501c3 organizations for over 20 years. While I was fortunate to obtain my degree without any debt many of my colleagues and friends have relied on The Public Service Loan Forgiveness Program to have meaningful and impactful careers in this important sector.
I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. While I appreciate the provision that requires the Department of Education to notify employees if their employer is determined to no longer be qualified and the fact that the payments made before the disqualification would still be counted, this is not sufficient to protect employees. Terminating the benefit to borrowers abruptly after a determination is made will put employees in a difficult position of no longer qualifying for forgiveness and either having to find another public service job or lengthen the timeframe for being able to have their debt forgiven. I

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

worry that this will impact my colleagues, friends, and my organization's ability to recruit younger talent in the very competitive San Francisco Bay Area labor market.
Thank you for considering this input as part of the rulemaking process.
Sincerely, Rachel Farahbakhsh

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7922

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Children's Home Association of Illinois

**Received Date:** Sep 3, 2025 **Posted Date:** Sep 3, 2025

**Comment Detail:**
I strongly oppose the Department of Education’s proposed amendments to the Public Service Loan Forgiveness (PSLF) program, as they not only undermine the very purpose of the program but also run contrary to federal law that established PSLF as a binding promise to public servants. These amendments unfairly shift the rules after individuals have already made career and financial decisions in reliance on the program, creating legal and ethical concerns. By restricting access and limiting forgiveness, the Department harms not only teachers, social workers, healthcare providers, and first responders, but also the communities they serve, which depend on their commitment and stability. Instead of eroding PSLF, the Department should honor both the letter and spirit of the law, ensuring that public servants receive the relief they were promised and that communities continue to benefit from their essential work.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7929

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** The Door - A Center of Alternatives, Inc.

**Received Date:** Sep 3, 2025 **Posted Date:** Sep 3, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. The Door - Comment on PSLF Program Rule - Aug 2025.pdf

---

**Comment ID:** ED-2025-OPE-0016-7932

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

Program)

**Submitted By:** N/A **Organization:** Amica Center for Immigrant Rights

**Received Date:** Sep 3, 2025 **Posted Date:** Sep 3, 2025

**Comment Detail:**
See attached file(s) - Amica Center for Immigrant Rights strongly opposes the changes to PSLF proposed by the Department of Education.

**Attachments:**

1. Amica Center Comment PSLF 9 25.pdf

---

**Comment ID:** ED-2025-OPE-0016-7963

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** PA Education Association

**Received Date:** Sep 4, 2025 **Posted Date:** Sep 4, 2025

**Comment Detail:**
Please see the attached comments.

**Attachments:**

1. PAEA PSLF Comment Letter.pdf

---

**Comment ID:** ED-2025-OPE-0016-7968

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** National Association for Law Placement

**Received Date:** Sep 4, 2025 **Posted Date:** Sep 4, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 09 04 - NALP Comments on PSLF Proposed Rulemaking.pdf

---

**Comment ID:** ED-2025-OPE-0016-7980

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Submitted By:** Johanna Bankston **Organization:** N/A

**Received Date:** Sep 4, 2025 **Posted Date:** Sep 4, 2025

**Comment Detail:**
Johanna Bankston
New York, New York
Artistic Freedom Initiative

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket
ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to submit comments on the proposed rule amending the regulations governing the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Johanna Bankston, and I serve as Senior Officer of Global Policy and Advocacy at Artistic Freedom Initiative, a non-profit organization dedicated to defending artistic freedom through pro bono legal and immigration services for artists who have experienced persecution or censorship.

I write to express my strong opposition to the Department's proposal to restrict PSLF eligibility for employees of certain non-profit organizations. This amendment is deeply troubling, not only for its immediate consequences but also for the dangerous precedent it would establish. By authorizing the Department of Education to exclude non-profit employees from PSLF on ideological grounds, the rule risks transforming a vital public program into a tool of political retaliation. Such a precedent would erode the integrity of public service programs and undermine trust in democratic governance.

Beyond its potential for arbitrary enforcement, the amendment would impose significant harm on civil society. Public servants—many of whom entered non-profit work with the good-faith understanding that PSLF would provide long-term relief from otherwise unmanageable student debt—would instead face ballooning interest and a lifetime of financial precarity. Confronted with untenable economic burdens, countless dedicated professionals will be forced to abandon careers in public service. The result will be widespread attrition across non-profit organizations, the closure of critical service providers, and irreparable harm to communities that depend on these institutions.

Finally, the amendment grants excessively broad discretion to administrative authorities while denying non-profit employers any meaningful avenue of appeal. This lack of procedural safeguards falls short of core American standards of fairness, transparency, and due process.

For these reasons, I urge the Department to reject this amendment in its entirety. Curtailing PSLF eligibility in this manner would undermine civil society, destabilize the non-profit sector, and compromise the fundamental principle that public programs must serve the public good without political interference.

Thank you for your careful consideration of these comments as part of the rulemaking process.

Sincerely,
Johanna Bankston

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-7988

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Kansas Academy of Family Physicians

**Received Date:** Sep 4, 2025 **Posted Date:** Sep 4, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Letter_KAFP_09012025.docx

---

**Comment ID:** ED-2025-OPE-0016-7989

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** North Carolina Academy of Family Physicians

**Received Date:** Sep 4, 2025 **Posted Date:** Sep 4, 2025

**Comment Detail:**
Please find attached comments from the NC Department of Family Physicians relevant to Docket ID ED-2025-OPE-0016: William D. Ford Federal Direct Loan (Direct Loan) Program Proposed Rule.

**Attachments:**

1. PSLF Letter from NCAFP to US Dept of Education.pdf
2. PSLF Letter from NCAFP to US Dept of Education-Final.pdf

---

**Comment ID:** ED-2025-OPE-0016-8005

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 5, 2025

**Comment Detail:**
Please see the attached correspondence regarding our comment on the proposed rule change.

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. September 5 2025 ILJNY Public Comment on PSLF Proposed Rule Change.docx

---

**Comment ID:** ED-2025-OPE-0016-8007

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Women's Fund of Rhode Island

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 5, 2025

**Comment Detail:**
The Women's Fund of Rhode Island (WFRI) respectfully submits this comment in strong opposition to the U.S. Department of Education's proposed rule, published on August 18, which seeks to narrow which charitable nonprofit organizations qualify as eligible employers under the Public Service Loan Forgiveness (PSLF) program.
PSLF was designed by Congress to open doors for talented professionals to pursue public service careers without being burdened by lifelong debt. For nonprofit employees, the program is often the deciding factor that makes it financially possible to choose service over higher pay in the private sector. At WFRI, members of our staff have benefited directly from PSLF, and that access has been critical to recruiting and retaining the skilled people we need to further our mission of expanding access to opportunity so women and families can thrive..
This proposed rule threatens to unravel the very foundation of the program:
It conflicts with the statute itself. Federal law clearly establishes that all 501(c)(3) organizations qualify under PSLF. Congress did not grant the Department the authority to pick and choose among nonprofits or impose additional restrictions.
It injects politics into a program that must remain neutral. By leaving room for officials to determine whether a nonprofit's work aligns with "public policy," the rule politicizes the program. It creates the possibility that organizations serving immigrants, LGBTQ+ youth, or marginalized communities could be excluded—not because they are unlawful, but because their missions are politically unpopular with certain administrations.
It weakens nonprofits' ability to serve their communities. Nonprofits rely on PSLF to remain competitive in recruiting staff. When employees cannot trust that the program will be available throughout their careers, they are less likely to commit to nonprofit work. That instability harms not just the workforce, but also the communities who depend on nonprofit services.
It creates a flawed enforcement system. Under the proposed rule, eligibility could be revoked with limited evidence and without meaningful recourse. At the same time, the Department lacks both the staffing capacity and the expertise to investigate nonprofit activities. These determinations are already handled by the IRS, which has the proper authority to revoke a nonprofit's tax-exempt status if it engages in unlawful behavior. Creating a duplicative process only adds confusion and risk.
Taken together, this rule undermines the purpose of PSLF, places nonprofit employees in a precarious position, and introduces instability that will ripple across communities. We urge the Department to withdraw the proposal and instead uphold the program's original intent: ensuring that all employees of charitable nonprofits can rely on PSLF as a fair, consistent, and lawful benefit for public service work.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8020

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Matthew Parham **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF rule cmt.pdf

---

**Comment ID:** ED-2025-OPE-0016-8021

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Liann Sabatini **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
Please see attached.

**Attachments:**

1. Public Comment Opposing Proposed PSLF Rule Liann Sabatini.docx
2. Public Comment Opposing Proposed PSLF Rule Liann Sabatini ED OCR ADOBE COPY.pdf

---

**Comment ID:** ED-2025-OPE-0016-8022

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Providers' Council

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
See attached file

**Attachments:**

1. PSLF Comments_Providers' Council final.pdf

---

**Comment ID:** ED-2025-OPE-0016-8023

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

# Comment Submission Detail Report
# PSLF NPRM 2025
**(ED-2025-OPE-0016)**

**Submitted By:** Alison Bermant **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**

Subject: Public Comment Opposing Proposed PSLF Rule ((Docket ID ED-2025-OPE-0016), RIN 1801-AA28)

Dear Ms. Abernathy,

I write to oppose the Department's proposed changes to the William D. Ford Federal Direct Loan Program regarding Public Service Loan Forgiveness (PSLF).

As a past public defender, I have seen firsthand how critical PSLF is in supporting individuals who dedicate their careers to serving vulnerable communities. I work as a self employed criminal defense attorney. I have worked as a full time or conflict public defender for the past 26 years. For the first 13 years of my career, I lived hand to mouth to afford my student loan payments, as no assistance was provided to public defenders to pay off loans like it was district attorneys when I first started working. The stress and anxiety I experienced over trying to decide if I should buy food or pay my student loans has had profound negative long term health effects on my life. Ensuring there are adequate non-profit attorneys and public defense attorneys is critical to the justice and fairness required by the Constitution.

I am particularly concerned about the following:

1.The lack of reliability in the PSLF program will result in fewer public interest workers.
2.Local economies will suffer as borrowers divert more money to student loan payments and nonprofits become less effective..
3.Fewer well-qualified workers will be able to afford to apply for public interest positions.
4.The proposed rule inserts politics and ideology into a program. Nonprofits must be able to assist communities without political interference or fear of retribution.

I recommend that you withdraw the proposal. Making it more difficult for lawyers to work in lower paying jobs hurts the entire country.

In conclusion, while I appreciate the Department's stated goal of maintaining the integrity of PSLF, this proposal does not achieve that. Instead, it creates confusion, burdens borrowers, and risks destabilizing a program that has been life-changing for public servants and the communities they support.

I urge the Department to withdraw this proposed rule and engage in further consultation to craft regulations that are clear, fair, and supportive of the public service workforce.

Sincerely,

Alison Bermant, Attorney at Law

Truckee, CA

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8035

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

**Submitted By:** Beile Lindner **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
My name is Beile Lindner, and I am an attorney who has devoted my entire career to addressing the devastating impacts of poverty and homelessness across the country. I only ever wanted to go into law to help people, not to make a lot of money - and I would not have been able to do so without the Public Service Loan Forgiveness (PSLF) program. I could not afford to pay the exorbitant cost of school out of pocket, and I knew that the kind of mission-driven work I was drawn to would never pay enough to free me from law school's crushing debt.

This is not a reflection on the value of the work that public interest attorneys do, but rather the reality of salaries for legal services attorneys who provide critical counsel for people in dire straits. We help correct the unjust imbalance in court cases where one side has all of the resources and the other has none. Without the PSLF program being widely available, people like me won't get the education required to aid our communities and neighbors in need, and the gap in access to justice will grow. Who will prevent the foreclosures? Who will appeal the health insurance denials? Who will be protect the interests of children in foster care? Who will defend the innocent against false allegations? Who will hold the line against abusive employers? Everyone should have an advocate in their darkest hour, regardless of their wealth.

I struggle to think of a single legitimate reason for limiting this program in the proposed fashion when it has only helped people achieve their dreams of having meaningful jobs that contribute to society. I therefore urge the Department to protect this vital program by revising or withdrawing the proposed rule.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8037

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Connor Sinclair **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Public Comment Opposing Proposed PSLF Rule Connor.docx
2. Public Comment Opposing Proposed PSLF Rule Connor ED OCR ADOBE COPY.pdf

---

**Comment ID:** ED-2025-OPE-0016-8039

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

**Submitted By:** Megan Casebeer **Organization:** N/A

**Received Date:** Sep 5, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Public Comment Opposing Proposed PSLF Rule Megan Casebeer.docx

---

**Comment ID:** ED-2025-OPE-0016-8054

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Counsel for Justice

**Received Date:** Sep 6, 2025 **Posted Date:** Sep 6, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 09 08 Counsel for Justice PLSF William D Ford Federal Direct Loan Program.pdf

---

**Comment ID:** ED-2025-OPE-0016-8068

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** National District Attorneys Association

**Received Date:** Sep 8, 2025 **Posted Date:** Sep 8, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. NDAA PSLF Comment Dep of ED.pdf

---

**Comment ID:** ED-2025-OPE-0016-8084

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Erin Mullaney **Organization:** N/A

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:** Sep 8, 2025 **Posted Date:** Sep 8, 2025

**Comment Detail:**
I write to express strong opposition to any proposed legislation or regulatory change that would make Oregon Health & Science University (OHSU) ineligible for the Public Service Loan Forgiveness (PSLF) program due to its provision of medical care for transgender youth.

OHSU is Oregon's only public academic health center and a nationally respected leader in medical research, education, and clinical care. As a public institution, OHSU is committed to serving the diverse needs of all Oregonians, including transgender youth, by adhering to the highest standards of evidence-based, ethical medical practice. Gender-affirming care provided at OHSU is grounded in decades of clinical research and is supported by every major medical association in the United States. To punish healthcare providers and institutions for delivering this care undermines both medical integrity and the public service mission of institutions like OHSU.

The PSLF program was designed to support professionals who dedicate their careers to serving the public good, often in high-need or underserved areas. Disqualifying OHSU or its employees from this program because they provide medically necessary care to a vulnerable population is a misuse of federal policy that politicizes healthcare and jeopardizes the wellbeing of patients.

OHSU's contributions to public health are profound and far-reaching. From training Oregon's future physicians to advancing life-saving research, OHSU exemplifies the values of public service and medical excellence. Punitive measures targeting gender-affirming care not only threaten the health of transgender youth—they also compromise the broader mission of public academic medicine and could deter future healthcare workers from entering the field.

I urge policymakers to uphold the core principles of the PSLF program and reject any attempt to tie loan forgiveness eligibility to politically motivated restrictions on lawful, evidence-based medical care.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8085

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Third Sector New England

**Received Date:** Sep 8, 2025 **Posted Date:** Sep 8, 2025

**Comment Detail:**
Third Sector New England, Inc. (TSNE) respectfully submits the attached comment letter in opposition to the Department of Education's proposed rule amending the Public Service Loan Forgiveness (PSLF) program (Docket ID ED-2025-OPE-0016).

In brief, TSNE urges the Department to withdraw the proposal because it:

Exceeds the Department's statutory authority by attempting to redefine PSLF eligibility beyond what Congress intended for all 501(c)(3) organizations.

Introduces politics and ideology into a program that must remain neutral, creating instability for

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

nonprofit employees and the communities they serve.

Establishes vague enforcement mechanisms without adequate due process, duplicating existing IRS authority.

Risks destabilizing the nonprofit workforce and weakening the sector's ability to meet critical community needs.

Please see the attached full letter for our complete analysis and recommendations.

**Attachments:**

1. TSNE Public Comment Letter PSLF Program Docket ID ED-2025-OPE-0016.pdf

---

**Comment ID:** ED-2025-OPE-0016-8091

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** N/A

**Received Date:** Sep 8, 2025 **Posted Date:** Sep 8, 2025

**Comment Detail:**

The Cook County State's Attorney's Office (CCSAO) is committed to upholding justice and public safety in Cook County by fairly, ethically, and effectively prosecuting crime, supporting victims, and protecting the rights of all residents. To support this mission, the CCSAO proudly offers eligibility for the Federal Public Service Loan Forgiveness (PSLF) program—a vital benefit that empowers talented attorneys to pursue careers in public service without the burden of long-term student debt. Established in 2007, PSLF encourages legal professionals to dedicate themselves to critical roles at the CCSAO by forgiving qualifying student loans after ten (10) years of service and payments. Continuing to offer PSLF, strengthens the CCSAO ability to attract and retain passionate, skilled attorneys who are driven to serve the public and uphold the principles of justice for every community in Cook County.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8095

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Greg Fishwick **Organization:** N/A

**Received Date:** Sep 9, 2025 **Posted Date:** Sep 9, 2025

**Comment Detail:**

Secretary McMahon,

I am directly impacted by the decisions being made in this rule making process, and I find the proposed rule attempting to amend regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 both unnecessary and illegal.

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

The IRS already has reliable legal means to strip nonprofits of their 501(c) status if they are found to be engaging in illegal activities. Such a finding removes both the employer and its workers from PSLF eligibility. Attempting to implement the proposed rule would circumvent IRS rules and waste taxpayer dollars on duplicative and unnecessary procedures during a time of unprecedented national debt. In addition, the Department does not have the statutory authority to make such changes, and inviting more court costs is another waste of taxpayer dollars.

Now in its 50th year, the Four Way Community Foundation has provided more than $10M in grants to hundreds of different local nonprofits, directly impacting public problems such as housing, drug addiction, and access to affordable health care. Just last week my Rotary club heard from five nonprofits it funded to benefit children and families with an accessible playground and early learning, after school, summer, and internship program opportunities.

Nonprofit organizations play a crucial role in providing essential services to communities, often with limited resources. The PSLF program is one of the few tools available to help attract and retain highly qualified staff. Adding bureaucratic barriers and duplicative oversight processes would burden nonprofits and result in little or no taxpayer benefit because PSLF rules require eligible employees to make all their student loan payments and work a full ten years before gaining any loan forgiveness. Ten years gives the IRS more than adequate time to continue its effective and legal means of rooting out any of the minuscule number of employees with student loans who may be working for any of the minuscule number of nonprofits engaging in illegal activities.

Thank you for considering this input as part of the rule making process. I expect the Department to ensure that the final rule reflects the needs of those most directly affected by these policies.

Sincerely,
Greg Fishwick
Grants Pass, OR

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8107

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** National Council of Nonprofits

**Received Date:** Sep 9, 2025 **Posted Date:** Sep 9, 2025

**Comment Detail:**
Please see the Public Comments from the National Council of Nonprofits.

**Attachments:**

1. ncn-comments-doed-proposed-rulemaking-9-9-2025.pdf

---

**Comment ID:** ED-2025-OPE-0016-8111

Find on Regulations.gov

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** California Dental Association

**Received Date:** Sep 9, 2025 **Posted Date:** Sep 9, 2025

**Comment Detail:**
See attached letter

**Attachments:**

1. 8 9 25 Federal PSLF Student Loan Public Comment Letter.pdf

---

**Comment ID:** ED-2025-OPE-0016-8114

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Elderly Services, Inc.

**Received Date:** Sep 9, 2025 **Posted Date:** Sep 9, 2025

**Comment Detail:**
Kristin Bolton, Executive Director
Middlebury, VT
Elderly Services, Inc.
kbolton@elderlyservices.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. I am the Director of Elderly Services, Inc., Vermont's leading elder services and advocacy organization. I strongly oppose the proposed rule and the efforts by the Department of Education to restrict which 501(c)(3) nonprofits are eligible employers under the program.

Elderly Services serves elders, caregivers, and their families in much of central Vermont. Our nationally recognized adult day program, Project Independence, cares for some of the most vulnerable members of our community, providing nursing oversight, social work support, care coordination, homemade hot meals, and therapeutic activities. We are unique as an elder-care program in providing transportation to our facility, without which our program would be inaccessible to many of our participants in this rural and mountainous region.

We have a dedicated staff who are skilled in meeting the wide ranging and sometimes challenging needs of people from a variety of backgrounds, experiences, and support systems, many of whom have dementia. They are highly skilled, creative, compassionate, and committed to our mission and our participants.

What they are not, is highly paid. Each of our employees must choose between work that they love and a more lucrative job that would better ease financial burdens, like the crushing student debt that most college graduates must undertake. We depend on programs like PSLF to enable us to recruit and retain high quality staff.
Non-profits like ours provide essential services. We allow elders to remain independent in their communities, maintaining their dignity, keeping families intact, and saving at least $120,000 per year in federal dollars for each participant who would otherwise require care in a nursing facility.

The proposed rule would arbitrarily limit the non-profits that can benefit from PSLF based on their mission and the communities they serve. This change would damage the programs that we most need, particularly in an era of government austerity, adding to the challenges we face in maintaining the high quality workforce we depend on. Imposing a political limitation on which organizations can participate in the program would make it impossible for graduates to count on loan forgiveness and for us to forecast workforce costs and growth.

Non-profit service organizations are a bedrock of a healthy civil society. Our communities depend on us to meet basic needs and for social engagement and cohesion. Our federal government should be encouraging our development and prosperity, not adding challenges to our continued survival.

Respectfully submitted,

Kristin Bolton

**Attachments:**

1. Elderly Services PSLF Docket ID ED-2025-OPE-0016 comments.docx

---

**Comment ID:** ED-2025-OPE-0016-8119

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Michelle Hernandez **Organization:** N/A

**Received Date:** Sep 9, 2025 **Posted Date:** Sep 9, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Comment on Changes to PLSF.docx

---

**Comment ID:** ED-2025-OPE-0016-8120

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** League of United Latin American Citizens (LULAC)

## Comment Submission Detail Report
## PSLF NPRM 2025
**(ED-2025-OPE-0016)**

**Received Date:** Sep 9, 2025 **Posted Date:** Sep 9, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. LULAC Letter Opposing PSLF Changes--Docket ID ED-2025-OPE-0016.pdf

---

**Comment ID:** ED-2025-OPE-0016-8141

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Volunteers of Legal Service

**Received Date:** Sep 10, 2025 **Posted Date:** Sep 10, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. VOLS PSLF Public Comment 9-25.pdf

---

**Comment ID:** ED-2025-OPE-0016-8144

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Pavithra Menon **Organization:** N/A

**Received Date:** Sep 10, 2025 **Posted Date:** Sep 10, 2025

**Comment Detail:**
This is a Public Comment opposing the Department of Education's Proposed PSLF Rule. Please find the comment in the attached document.

**Attachments:**

1. Public Comment Opposing Proposed PSLF Rule Pavithra Menon.docx

---

**Comment ID:** ED-2025-OPE-0016-8163

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** American Atheists

**Received Date:** Sep 11, 2025 **Posted Date:** Sep 11, 2025

**Comment Detail:**
See attached

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:**

1. 20250909 - PSLF NPRM (FINAL).pdf
2. 20250909 - PSLF NPRM 09 15 2025.pdf

---

**Comment ID:** ED-2025-OPE-0016-8165

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** American Atheists, Inc.

**Received Date:** Sep 11, 2025 **Posted Date:** Sep 11, 2025

**Comment Detail:**
See attached

**Attachments:**

1. 20250909 - PSLF NPRM (FINAL).pdf
2. 20250909 - PSLF NPRM FINAL ED OCR ADOBE COPY.pdf

---

**Comment ID:** ED-2025-OPE-0016-8192

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Cloud Cloth Education

**Received Date:** Aug 27, 2025 **Posted Date:** Sep 12, 2025

**Comment Detail:**
I am the Managing Director of Dreamline, a Philadelphia-based education nonprofit. I am writing to express opposition to the proposed changes in e Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. These proposed canges violate Federal laws and are, in principle, an attempt to take away the established power of the democratically elected government to determine and allot nonprofit status and its accordant benefits.

I blieve that unless each of us stands up to oppose such attempts to undermine our democratic form of government, none of us will be safe from tyrrany and no one will be spared in the end. Let's work together to serve the public and to enforce the process which supports fair and equal treatment of all people.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8197

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Catholic Charities of the

N/A | Diocese of Albany, NY

**Received Date:** Aug 28, 2025 **Posted Date:** Sep 12, 2025

**Comment Detail:**
I am writing as the CEO of a not for profit organization in NYS to strenuously oppose the changes proposed for Public Service Loan Forgiveness program for the following reasons:

Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Current law requires all 501(c)(3) organizations to be eligible as a qualified employer under PSLF.

The proposed rule attempts to disenfranchise communities when they are meeting the needs of their neighbors in need. It must not be about politics or ideology into the program.
Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. It is already extremely challenging to attract a professional and skilled workforce.
A process already exists to remove eligibility from organizations who are engaging in illegal activity. If an organization engages in substantial illegal activities, there is a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.
On behalf of the employees of Catholic Charities, I urge you to reject this rule change.
Thank you for your kind consideration.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8199

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** ANNE THIELING **Organization:** N/A

**Received Date:** Aug 29, 2025 **Posted Date:** Sep 12, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. William D Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking.pdf

---

**Comment ID:** ED-2025-OPE-0016-8230

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Nancy Wemer **Organization:** N/A

**Received Date:** Sep 11, 2025 **Posted Date:** Sep 12, 2025

**Comment Detail:**
Linda McMahon, Secretary

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

As Co-President of the Coastal Georgetown Delaware branch of American Association of University Women, I represent my organization in opposing the proposed rule to amend the regulations on the PSLF program under 34 CFR 685.219.
The Department of Education does not have the manpower capacity or expertise to investigate ALL non-profit organizations to determine if their activities fall under the category of "substantial illegal purpose", a vague term which is left open to interpretation and would foster eligibility decisions based on politicians' personal politics or ideology. We believe the Department of Education must focus its efforts on its core responsibility to protect students' civil rights and ensure equal educational opportunity for all.
Congress created PSLF to support dedicated public service workers and strengthen our work force. This proposal could negatively impact non-profits and their employees, making it more difficult to retain staff and provide the services so greatly needed in the Coastal Georgetown, Sussex County Delaware area. We are already facing shortages related to attracting and retaining physicians, daycare and preschool providers, educators, and public defenders. We are experiencing a severe affordable housing crisis and need to retain public servants who provide critical housing assistance.
We at the Coastal Georgetown Delaware branch of the American Association of University Women strongly request that you withdraw the proposed rule and preserve PSLF eligibility for all qualifying nonprofits. Thank you for your consideration.
Sincerely,
Nancy Wemer, Co-President
AAUWCG

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8234

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** AACTE: American Association of Colleges for Teacher Education

**Received Date:** Sep 12, 2025 **Posted Date:** Sep 13, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. AACTE Comments PSLF.pdf
2. AACTE Comments PSLF 9 15 2025.pdf

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment ID:** ED-2025-OPE-0016-8240

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** North Carolina Center for Nonprofits

**Received Date:** Sep 12, 2025 **Posted Date:** Sep 13, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. North Carolina Center for Nonprofits public comments on PSLF proposed rulemaking - 9-12-25.pdf
2. North Carolina Center for Nonprofits public comments on PSLF proposed rulemaking - 9-12-25.pdf

---

**Comment ID:** ED-2025-OPE-0016-8243

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Independent Sector

**Received Date:** Sep 12, 2025 **Posted Date:** Sep 13, 2025

**Comment Detail:**
Please find attached a comment submitted on behalf of Independent Sector.

**Attachments:**

1. IS PSLF comment final (9 12 25).pdf
2. IS PSLF comment final 9 12 25.pdf

---

**Comment ID:** ED-2025-OPE-0016-8245

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** New Pathways for Youth

**Received Date:** Sep 12, 2025 **Posted Date:** Sep 13, 2025

**Comment Detail:**
Karen D Johnson, Ph.D.
Phoenix, Arizona
President & CEO
New Pathways for Youth
kjohnson@npfy.org

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Karen Johnson, and I am the CEO of New Pathways for Youth. For over 35 years, we have served teens in Phoenix who are experiencing poverty and high levels of adversity through our Level Up program, which provides a caring adult 1:1 mentor and a personal development curriculum.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by supporting the professionals who work directly with our youth and families. Our organization is nonpartisan. Our work is not about politics or ideology; it is focused on helping young people set goals, make choices, gain support, and achieve their dreams. Our community includes people from across the political spectrum, and our work is critical to the economy of our city and state. The PSLF program allows us to recruit the most qualified and capable workforce to serve the needs of our constituents. This program is critical to nonprofit organizations being able to provide free, nonpartisan, economic impact programs for our community.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Karen Johnson

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8267

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Nancy Lemon **Organization:** N/A

**Received Date:** Sep 12, 2025 **Posted Date:** Sep 13, 2025

**Comment Detail:**
Ms. Nancy K D Lemon
Berkeley, CA

Subject: Public Comment Opposing Proposed PSLF Rule ((Docket ID ED-2025-OPE-0016), RIN 1801-AA28)

Dear Ms. Abernathy,

I write to oppose the Department's proposed changes to the William D. Ford Federal Direct Loan Program regarding Public Service Loan Forgiveness (PSLF).
As a founder, former Legal Director, and former Board member of a nonprofit legal organization serving survivors of domestic violence, I have seen firsthand how critical PSLF is in supporting individuals who dedicate their careers to serving vulnerable communities. I worked for 10 years at Family Violence Appellate Project, a 501(c)(3) nonprofit organization. FVAP represents survivors of domestic violence

who need to appeal dangerous and illegal court orders such as denying restraining orders or awarding custody to abusive parents.

FVAP has hired several attorneys who were able to work for the agency and earn nonprofit salaries only because their law student loans would be forgiven after enough years of employment.

I am particularly concerned about the following:
1.Fewer well-qualified workers will be able to afford to apply for public interest positions.
2.The proposed rule inserts politics and ideology into a program. Nonprofits must be able to assist communities without political interference or fear of retribution.
3.A process already exists to remove eligibility from organizations who are engaging in illegal activity with an existing independent appellate administrative procedure and cause of action in the courts.
4.The proposed changes will lead to increasing rates of domestic violence and deaths if the rules are interpreted as prohibiting representing undocumented people.

FVAP's work can save lives, both the lives of the clients and of their children. Some of the clients are undocumented and in grave danger from their abusers. In order to keep doing this work for free, FVAP needs to be able to hire attorneys for salaries that are much lower than many private firms are paying. Several attorneys have accepted positions with FVAP which they couldn't have afforded to do unless they knew their large law school student loans would be forgiven after a certain number of years. Their work with FVAP has been crucial to the success of the agency.

I recommend that you withdraw the proposal.

In conclusion, while I appreciate the Department’s stated goal of maintaining the integrity of PSLF, this proposal does not achieve that. Instead, it creates confusion, burdens borrowers, and risks destabilizing a program that has been life-changing for public servants and the communities they support.
I urge the Department to withdraw this proposed rule and engage in further consultation to craft regulations that are clear, fair, and supportive of the public service workforce.

Sincerely,

Ms. Nancy K. D. Lemon
Retired Director, Domestic Violence Practicum, UC Berkeley School of Law
and retired Legal Director, Family Violence Appellate Project
Berkeley, CA

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8274

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Soul Fire Farm Institute Inc

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Cheryl Whilby
Petersburgh, NY
Soul Fire Farm Institute, Inc.
love@soulfirefarm.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Cheryl Whilby, and I am Co-Executive Director of Communications & Development at Soul Fire Farm Institute, Inc., a nonprofit organization in New York's Capital Region that works to build a just and sustainable food system. We serve thousands of community members each year through farmer training, doorstep delivery of fresh food to households experiencing food insecurity, youth education, and organizing for land and food justice.

The Public Service Loan Forgiveness Program has enabled our organization to attract and retain dedicated staff who otherwise might not have been able to pursue or sustain nonprofit careers due to the burden of student debt. At present, five of our team members are utilizing or working toward PSLF. Their contributions are vital: from coordinating our Solidarity Share Program that distributes over 10,000 pounds of fresh produce annually, to supporting farmer training programs that equip hundreds of growers with skills and resources, to sustaining our outreach, communications, and development efforts that keep our mission thriving. Without PSLF, many of these staff members would face difficult financial choices that could pull them away from public service work, significantly weakening the capacity of our organization and the impact on the communities we serve.

The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract an effective, skilled workforce.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. If enacted, these provisions would jeopardize our ability to recruit and retain the staff needed to carry out essential food access and education programs. The result would be fewer families receiving food deliveries, fewer aspiring farmers accessing training and resources, and fewer young people experiencing the empowerment of reconnecting with the land. We urge you to maintain the PSLF program as it currently exists, ensuring stability and accessibility for nonprofit professionals who dedicate their careers to the public good.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Cheryl Whilby
Co-Executive Director of Communications & Development

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. Soul Fire Farm PSLF letter (1).pdf

---

**Comment ID:** ED-2025-OPE-0016-8276

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** American Academy of Family Physicians

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
On behalf of the American Academy of Family Physicians (AAFP), representing 128,300 family physicians, residents, and medical students across the country, I write in response to the Department of Education's William D. Ford Federal Direct Loan Program proposed rule. The AAFP appreciates the Department's desire and intent to preserve the integrity of the Public Service Loan Forgiveness (PSLF) program by ensuring that taxpayer-funded benefits are not extended to individuals employed by organizations engaged in illegal or unethical activities, and we support efforts to prevent abuse of federal programs. We urge the Department to consider the potential real-world impacts of this proposed regulation on America's health care system, and we remain committed to working with the Department and other stakeholders to advance student debt relief policies that will help bolster our health care workforce and advance access to high-quality primary care for every individual.

**Attachments:**

1. AAFP Letter to Department of Education on Federal Direct Loan Program Proposed Rule - September .pdf

---

**Comment ID:** ED-2025-OPE-0016-8278

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Lenox Hill Neighborhood House

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
Lenox Hill Neighborhood House submits a comment regarding the Public Service Loan Forgiveness program adjustments, targeting funding and accreditation for non-profit and education-based organizations.

**Attachments:**

1. PSLF Policy Change Response - Lenox Hill Neighborhood House.pdf

---

**Comment ID:** ED-2025-OPE-0016-8285

Find on Regulations.gov

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A     **Organization:**  Maryland School Psychologists' Association

**Received Date:**  Sep 15, 2025     **Posted Date:**  Sep 15, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Comments 9 5 25.pdf

---

**Comment ID:**  ED-2025-OPE-0016-8289

  Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A     **Organization:**  N/A

**Received Date:**  Sep 15, 2025     **Posted Date:**  Sep 15, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 25 09 12 DOE PLSF Comment.pdf

---

**Comment ID:**  ED-2025-OPE-0016-8293

  Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A     **Organization:**  Alliance of Rhode Island Southeast Asians for Education

**Received Date:**  Sep 15, 2025     **Posted Date:**  Sep 15, 2025

**Comment Detail:**
Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

On behalf of ARISE (Alliance of Rhode Island Southeast Asians for Education), I write in strong opposition to the Department of Education's proposed rule to amend the Public Service Loan Forgiveness (PSLF) program.

ARISE is a youth-centered, intergenerational nonprofit rooted in Providence, Rhode Island. For over a

decade, we have worked with Southeast Asian and BIPOC youth to fight for education justice and build collective power across schools, neighborhoods, and generations. Our staff and volunteers—many of whom are current or future PSLF participants—support young people and families through academic support, political education, and healing-centered programming.

The PSLF program is essential to sustaining this work. It allows nonprofit employees from working-class, immigrant, and first-generation backgrounds to commit to public service careers they might otherwise not be able to afford. At ARISE, PSLF has enabled us to retain educators, organizers, and mentors who would otherwise be forced into more lucrative sectors. These staff are not interchangeable: they are culturally responsive, linguistically accessible, and deeply rooted in the communities we serve. Losing them would irreparably harm our young people.

The proposed rule undermines this by granting the Secretary of Education broad discretion to exclude 501(c)(3) nonprofits from PSLF eligibility based on vague and politically charged criteria. Such a rule invites the targeting of organizations like ours—those that serve immigrant and refugee families, advocate for racial justice, or affirm transgender and queer youth. Inserting ideology into PSLF eligibility violates federal statute, which guarantees that all 501(c)(3) organizations qualify as eligible employers. It also destabilizes the program for nonprofit employees, who can no longer trust that their years of service will count toward forgiveness.

This rule also duplicates processes that already exist. If an organization is engaged in illegal activity, the IRS has authority to revoke its nonprofit status, which already makes it ineligible for PSLF. Adding an additional, politicized layer through the Department of Education is redundant, unnecessary, and harmful.
We urge the Department to withdraw this proposed rule in its entirety. Protecting the stability of PSLF is critical not only for nonprofit employees, but also for the communities—like Providence's Southeast Asian refugee and BIPOC youth—who depend on their leadership and service.
Thank you for considering this testimony.

Sincerely,
Alliance of Rhode Island Southeast Asians for Education (ARISE)
Providence, RI

See attached file(s)

**Attachments:**

1. ARISE Statement on Public Service Loan Forgiveness (PSLF) program.pdf

---

**Comment ID:** ED-2025-OPE-0016-8357

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** AccessLex Institute

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
See attached PDF

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:**

1. AccessLex Institute comments to ED re PSLF regulations - 9 15 25.pdf

---

**Comment ID:**       ED-2025-OPE-0016-8366

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A    **Organization:**  National Asian Pacific American Bar Association (NAPABA)

**Received Date:**  Sep 15, 2025    **Posted Date:**  Sep 15, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Comment to PSLF Proposed Rulemaking 09 15 2025.pdf

---

**Comment ID:**       ED-2025-OPE-0016-8376

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A    **Organization:**  Family Violence Appellate Project

**Received Date:**  Sep 15, 2025    **Posted Date:**  Sep 15, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Comment.pdf

---

**Comment ID:**       ED-2025-OPE-0016-8382

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A    **Organization:**  Disability Rights Pennsylvania

**Received Date:**  Sep 15, 2025    **Posted Date:**  Sep 15, 2025

**Comment Detail:**
Attached are comments from Disability Rights Pennsylvania.

**Attachments:**

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. DRP comments on eligibility to the PSLF.pdf

---

**Comment ID:** ED-2025-OPE-0016-8470

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Higher Education Loan Coalition

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Neg Reg Comment Letter (August 2025).pdf

---

**Comment ID:** ED-2025-OPE-0016-8492

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** United Way of Pennsylvania

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
This is official public comment on the Proposed Rule for the William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ED-2025-OPE-0016, from the United Way of Pennsylvania.

**Attachments:**

1. 2025 8 21 - ED-2025-OPE-0016 Comment Letter PSLF - United Way of Pennsylvania.pdf

---

**Comment ID:** ED-2025-OPE-0016-8494

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Legal Services of Northern California

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Comments of Legal Services of Northern Calif on Proposal to Amend PSLF Program Regulations 15

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. Se.pdf
2. ED-2025-OPE-0016-8494_attachment_1 09 16 2025.pdf

---

**Comment ID:** ED-2025-OPE-0016-8514

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Penny Briner Ewell **Organization:** N/A

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

On behalf of the American Association of University Women (AAUW) - Prescott, Arizona branch, we oppose the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. Under the proposal, the Department of Education would have authority to decide which nonprofit organizations are eligible to participate in the PSLF program, excluding those the Department deems to have an "illegal purpose." The use of such broad language could give officials authority to decide which nonprofit missions are "acceptable" based on political ideology.

Much of Arizona is made up of rural communities. These communities have difficulty recruiting public servants -- health care workers, teachers, government employees, nonprofit community service workers, public defenders -- due to lower wages, housing concerns, and transportation necessities. The PSLF program helps recruit these necessary employees to rural and low-income communities. If health care facilities, schools, veteran and social service organizations cannot guarantee their employees eligibility for the PSLF program, there is one less incentive for potential employees to serve these areas. We need inducements to keep the best candidates in the public sector and rural communities.

The Internal Revenue Service has oversight to remove an organization's 501(c)(3) status should an organization engage in illegal activity, thus making the organization ineligible for PSLF as well. This need not be complicated by the Department of Education whose mission "...is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access for students of all ages." (www.ed.gov) Whereas the administration of PSLF falls under the jurisdiction of the Department of Education, investigating tax exempt organizations for ill defined illegal activity seems outside the scope of the department's mission.

We urge the Department of Education to withdraw the proposed rule, ensuring that PSLF eligibility does not become one of political ideology, but rather one of serving our communities. Thank you for your thoughtful consideration of this matter.

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

Sincerely,
Board of Directors
AAUW-Prescott, Prescott, AZ

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8519

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Adelante Mujeres

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 15, 2025

**Comment Detail:**
Bridget Cooke
Forest Grove, OR
Adelante Mujeres
bcooke@adelantemujeres.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
I am the cofounder and Executive Director of Adelante Mujeres, a nonprofit in Washington County, OR that empowers Latine women and their families through holistic programming. The Public Service Loan Forgiveness Program is important for Adelante Mujeres because it allows us to employ professionals who are dedicated to helping their community. If implemented, the proposed rule change would limit the types of nonprofits that can serve as qualifying employers – an unlawful change to federal law that extends the program to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Ultimately, the proposed rule will harm our staff, future staff, and the communities that rely on nonprofit organizations like Adelante Mujeres and the essential services we provide. Adelante Mujeres strongly opposes the proposed rule because it would make it harder to attract an effective, skilled workforce. Thank you for considering this input as a part of the rulemaking process.

Sincerely,
Bridget Cooke

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8520

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Massachusetts School

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | N/A | | Psychologists Association (MSPA) |
|---|---|---|---|
| **Received Date:** | Sep 15, 2025 | **Posted Date:** | Sep 15, 2025 |

**Comment Detail:**
Massachusetts School Psychologists Association (MSPA)
9/16/2025
Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
On behalf of the Massachusetts School Psychologists Association (MSPA) and the students, families, and educators we serve, we are writing to share concerns regarding the proposed changes to the Public Service Loan Forgiveness (PSLF) program. These changes could significantly impact the ability of schools to recruit and retain qualified school psychologists, which in turn would affect student mental health supports.
School psychologists are essential members of the education team, providing direct mental health services, crisis intervention, behavioral support, and consultation to promote academic and emotional well-being. Today, student mental health needs are higher than ever. According to recent national data, one in five children experiences a mental health disorder, and schools remain the primary access point for these services. In many Massachusetts communities, particularly rural and high-need districts, the school setting is often the only source of mental health support available to children and families.
Despite these needs, there is a significant and persistent shortage of school psychologists. The National Association of School Psychologists (NASP) recommends a ratio of 1 school psychologist per 500 students, yet in Massachusetts, the current ratio is closer to 1 per 800–1,000 students, and in some districts, far higher. This shortage limits the ability of schools to meet the needs of all students, particularly those requiring intensive mental health or behavioral supports.
The PSLF program has been an important tool for encouraging highly trained professionals to work in public schools, where salaries are lower than in private practice or other settings. Most school psychologists earn a specialist or doctoral-level degrees, which often requires significant student loan debt. PSLF helps make a career in public education financially feasible, allowing school psychologists to remain in these critical roles long-term. If Local Education Agencies (LEAs) were to lose eligibility as qualifying employers, many school psychologists could face financial hardship, discouraging both current and future professionals from entering or staying in public education.
Access to mental health services in schools is vital for student success, school safety, and overall community well-being. Any changes to PSLF should maintain stability and clarity for professionals committed to serving in education and other public service roles. Sudden or unpredictable changes to employer eligibility criteria create uncertainty and make it more difficult for schools to attract and retain qualified staff to meet students' growing needs. We urge that the PSLF program continue to include school districts and other public education employers as qualifying organizations. Maintaining access to PSLF for school psychologists and other educators supports a strong, stable workforce that is essential for addressing the academic, social, and emotional needs of our students.
Thank you for considering this input as part of the rulemaking process, and for your continued support of public education and student mental health.

Massachusetts School Psychologists Association Board of Directors

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8534

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** New York Council of Nonprofits

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
Hello! I am writing to voice my concern with the Aug. 18 proposed new rule from the U.S. Department of Education to change which nonprofits qualify as eligible employers under the Public Service Loan Forgiveness Program.

I am writing on behalf of the New York Council of Nonprofits, a statewide organization (and nonprofit itself) that helps support other nonprofits. Most nonprofits in New York State have budgets of $1M or less, and most operate on tight margins, which means that nonprofits typically can't afford to pay competitive salaries. As I've heard many nonprofit leaders say, we are competing against Burger King and Burger King is winning. Consequently, programs like the PSLF are a great help for nonprofits, as they allow us to provide a benefit to employees that -- while it doesn't make up for lower salaries, does help nonprofit staff pay their household bills. We have had staff benefit from this program ourselves. Ending access to the program for some nonprofits is harmful to those nonprofits and their current staff in the short-term, and detrimental to those nonprofits' staff recruitment efforts in the long-term.

I understand that current federal leaders disagree with some types of nonprofits, including their missions and the communities they serve. But, these organizations all have 501c3 status, and it seems that enforcing such rules now sets a precedence for future leaders to make similar rule changes, which could negatively impact nonprofits current federal leaders support. Also, such changes from administration to administration makes it difficult for nonprofits (who are unsure if it may go away) to benefit from the program even if they are eligible, and even harder for their staff members who want to utilize the program. Consequently, I also encourage re-considering this proposed rule because it serves to inject politics into a program meant to help individuals and organizations helping communities all across the U.S.

Thank you for accepting comments about the proposed rule, and I strongly encourage the Department of Education to not implement the rule, to instead leave this much-needed support available to all nonprofits, as it has been historically.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8552

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Margin to Center Therapy

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
[Your Full Name] [City, State] [Organization/Affiliation] [Email]

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Dr. Sheila Addison
Seattle, Washington
Margin to Center Therapy, Executive Director
saddison@margintocenter.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Dr. Sheila Addison, and I am Executive Director of Margin to Center Therapy, a 501(c)3 nonprofit organization. Margin to Center serves the community by providing supervision, clinical training, mentoring, and business experience to pre-licensed psychotherapists who have graduated from advanced degree programs and are gaining hours toward licensure in California and Washington state.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by providing a benefit to full-time employees that they cannot claim in private practice or at a for-profit group practice. When Margin to Center therapists have developed a full-time caseload, they are eligible to apply toward earning PSLF; as a result, some choose to stay on after licensure as regular employees. Our therapists largely come from backgrounds that make it challenging to have the financial stability to develop and sustain a private practice. In fact, in the Bay Area, many sites for interns gaining hours toward licensure pay little or nothing, making it impossible for therapists like ours to complete their training. Many of them specialize in the skills necessary to provide sensitive, supportive therapy to clients from diverse backgrounds, clients who are often badly under-served by the mental health world.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. This rule inserts politics and ideology into the PSLF process, allowing the Department to potentially target non-profit organizations like ours who encourage employees to develop skills for serving a diverse client base. Forty-plus years of studies in mental health have shown that clients do best when they work with a therapist who understands their particular needs, rather than a therapist working from a generic view of people as "mostly the same."

Our attention to culture, race, gender, and other aspects of clients' and therapists' experience, which allows our employees to provide more effective mental health services, could be seen as grounds for targeting our participation in PSLF. This uncertainty makes it hard for employees to make informed decisions about where to work and will ultimately harm the people and communities that rely on nonprofit organizations like ours and the essential services we provide by making it harder to attract an effective, skilled workforce.
Thank you for considering this input as part of the rulemaking process.

Sincerely, Dr. Sheila Addison, Executive Director, Margin to Center Therapy

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. PSLF comment.pdf

---

**Comment ID:** ED-2025-OPE-0016-8555

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Anonymous Anonymous **Organization:** N/A

**Received Date:** Sep 15, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**

"My name is Jacob Steinmann. I am a juvenile public defender working in Worcester, Massachusetts. In my work, I represent youth from all over the county, including many youth in rural areas who otherwise do not have access to legal represenation. I rely on the Public Service Loan Forgiveness (PSLF) program to be able to continue to pursue my work in a financially viable manner, and many of my colleagues do the same. If the proposed rule is implemented, it would jeopardize not only my work, but the work of many attorneys like me who want to give back to our community by representing those without the ability to afford counsel. I urge the Department to protect this vital program by revising or withdrawing the proposed rule.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8694

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** California Primary Care Association

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**

See attached file(s): California Primary Care Association (CPCA) Comment Letter on Proposed Rule by Education Department on William D. Ford Federal Direct Loan (Direct Loan) Program. (PSLF)

**Attachments:**

1. CPCA Comment Letter on PSLF_Final_9 12 25_.pdf
2. CPCA Comment Letter on PSLF_Final_9 16 2025.pdf

---

**Comment ID:** ED-2025-OPE-0016-8696

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Brian Galle **Organization:** N/A

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
Please see the attached document.

**Attachments:**

1. Comment of Professors of Taxation and Nonprofit Law 9-15.pdf

---

**Comment ID:** ED-2025-OPE-0016-8700

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** N/A

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
The Immigrant Legal Advocacy Project respectfully submits the attached comments.

**Attachments:**

1. ILAP comment_William D Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemak.pdf

---

**Comment ID:** ED-2025-OPE-0016-8702

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Volunteer Lawyers for Justice

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. VLJ Comment on Proposal to Amend PSLF Program.pdf

---

**Comment ID:** ED-2025-OPE-0016-8707

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** American Federation of State, County and Municipal Employees (AFSCME)

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Attached

**Attachments:**

1. PSLF Comment Letter.pdf

---

**Comment ID:** ED-2025-OPE-0016-8709

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** N/A

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. ED PSLF Public Comment 2025 9 17.pdf

---

**Comment ID:** ED-2025-OPE-0016-8714

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Connecticut Voices for Children

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
See attached file(s) - Comment Re: Docket ID ED-2025-OPE-0016

**Attachments:**

1. Public Comment_Docket ID ED-2025-OPE-0016 (PSLF).pdf

---

**Comment ID:** ED-2025-OPE-0016-8726

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Michael Martin **Organization:** N/A

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
I strongly urge you not to exclude indigent defense offices and legal aid organizations from Public Service Loan Forgiveness (PSLF).

These attorneys and staff provide essential services that protect the rights of people who cannot afford a lawyer. They defend against wrongful convictions, help families stay in their homes, protect survivors of violence, and make sure vulnerable people can access the benefits they need. Without them, our communities would be left without a safety net in the justice system.

If legal aid and public defenders lose PSLF eligibility, it will be almost impossible to recruit and keep qualified staff. These jobs pay far less than private practice, and PSLF is often the only way professionals can afford to dedicate their careers to this work. Without them, entire communities will suffer.

PSLF was created to support public service professionals who dedicate themselves to helping others. Legal aid and indigent defense are at the heart of that mission. Please ensure they remain fully eligible.

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8727

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Rabbinical Assembly

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
Emily Jaeger
Wilmington, North Carolina
Rabbinical Assembly
ejaeger@rabbinicalassembly.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket
ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Emily Jaeger, and I am the Director of Public Policy for the Conservative Movement at the Rabbinical Assembly. The Rabbinical Assembly is the international association for Conservative Rabbis with over 1000 of our US-based members serving as clergy and executive directors in congregations, nonprofits, private schools, and on campus. Rabbinical Assembly members benefit personally from PSLF to continue to serve their communities and also to attract an effective, skilled workforce to staff their organizations.

My organization strongly opposes the proposed rule and the limitations it would impose on our rabbinic members being able to benefit from PSLF as well as their capacity to hire an effective, skilled workforce. Without the assurance of consistent, long-term rules for PSLF, our members cannot plan their careers with confidence. The proposal would weaken the nonprofit workforce making it harder for Conservative rabbis to serve congregations that need their spiritual guidance and pastoral care.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

The proposed rule also denies our members fair process as employers by allowing the Department of Education to revoke an organization's eligibility without an independent appeal. While the department of Education lacks the expertise to judge alleged illegal activity, the IRS already has an established process to remove 501(c)(3) status when an organization engages in illegal acts, which automatically makes it ineligible for PSLF. Our members are committed to following the highest ethical and legal standards in their work, however adding this duplicative and subjective process is unnecessary and potentially harmful.

For these reasons, we respectfully urge the Department to withdraw the proposed rule in its entirety.

Thank you for considering this input as part of the rule-making process.

Sincerely,
Emily Jaeger

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8731

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** The Home for Little Wanderers

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**

To Whom It May Concern:

On behalf of The Home for Little Wanderers, I am writing to express strong opposition to the U.S. Department of Education's proposed rule that would unlawfully restrict eligibility for the Public Service Loan Forgiveness (PSLF) program by limiting which charitable nonprofits qualify as eligible employers.

For more than 225 years, The Home for Little Wanderers has served children, youth, and families, providing critical services such as behavioral health, residential care, educational support, and housing for young people experiencing homelessness. Like many nonprofits, we depend on the talent, commitment, and expertise of professionals who dedicate their careers to public service.

The PSLF program is one of the most important tools available to recruit and retain this workforce. It provides nonprofit professionals with a measure of financial security and reassurance that their decision to serve vulnerable communities will not come at the cost of long-term financial hardship. Narrowing eligibility, or subjecting the program to shifting political priorities, undermines this vital promise.

The proposed rule will create unnecessary instability, making it harder for organizations like The Home for Little Wanderers to attract and retain the skilled staff we need to carry out our mission. Ultimately, this will harm the very children, youth, and families who rely on nonprofits every day.

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

We urge the Department to reject this proposed rule and preserve the PSLF program as Congress intended—available to all charitable nonprofits regardless of mission or focus area. Stability and fairness in PSLF are essential to ensuring that dedicated public service professionals continue to choose careers in the nonprofit sector.

Thank you for considering our comments and for protecting a program that is critical to the strength of our workforce and the well-being of the communities we serve.

Sincerely,
Lesli Suggs, LICSW
President & CEO
The Home for Little Wanderers

**Attachments:**

1. 09 16 2025 US DOE Proposed Changes to the Public Service Loan Forgiveness Program.pdf

---

**Comment ID:** ED-2025-OPE-0016-8734

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** American Medical Association

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
Please see the attached document for the complete comments from the American Medical Association.

**Attachments:**

1. 2025-9-16 Letter to McMahon re PSLF Rule Overview Illegal Purpose.pdf
2. 2025-9-16 Letter to McMahon re PSLF Rule Overview Illegal Purpose.pdf

---

**Comment ID:** ED-2025-OPE-0016-8744

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Oxfam America

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
I am the Chief Executive Officer of Oxfam America ("OA"). OA works every day to serve people in the United States and around the world impacted by humanitarian crises and to seek solutions to hunger, poverty and injustice.

The Public Service Loan Forgiveness Program has enabled my organization and our staff to serve our communities with distinction. Whether responding to and rebuilding from disasters like Hurricane Katrina in the US Gulf Coast, working with corporations to advise them on humane workforce and supply chain policies, or conducting research and analysis to end global poverty, our staff have relied

on loan forgiveness programs to enable them to serve while supporting their families.

The proposed rule risks politicizing the Public Service Loan Forgiveness program, making it a tool of partisan political squabbling rather than an investment in those who work tirelessly to serve their communities.

1.The proposed rule is contrary to federal law. Federal law makes clear that eligibility under PSLF applies to all charitable nonprofit organizations, regardless of their missions or the communities they serve. Current law requires all 501(c)(3) organizations to be eligible as a qualified employer under PSLF. The definition of "public service job" in the PSLF statute states that the term "public service" job means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The Department of Education does not have the authority to further restrict eligibility under PSLF.

2.The proposed rule inserts politics and ideology into the program. The rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws, or "contravene" established public policy. This creates ambiguity, unpredictability, and uncertainty with how Administrations determine eligibility for the program. This would severely impinge on the ability of organizations to pursue their charitable missions without fear that federal officials could target them for expressing views contrary to those of the sitting administration. Nonprofits must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees.

3.The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities. Without assurances that program rules will remain consistent over the long term, nonprofit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the people and communities that rely on nonprofit organizations and the essential services they provide by making it harder to attract and retain an effective, skilled workforce.

4.The proposed rule does not provide adequate due process for employers. The ability to strip the eligibility of an organization is determined by a "preponderance of the evidence" standard, without adequate due process, including the opportunity to appeal to an independent authority.

5.The proposed rule is redundant, as a process already exists to review and remove eligibility for organizations engaging in illegal activity. If an organization engages in substantial illegal activities, the Internal Revenue Service (IRS) can initiate a process to determine to remove its 501(c)(3) status, which would make it ineligible for PSLF.

6.The Department lacks the capacity and resources to implement the proposed rule. The Department of Education is already facing significant staff cuts and efforts are underway to transfer existing responsibilities to other agencies. President Trump's March 20th Executive Order and his stated intention to "shut down" the Department of Education is inconsistent with a plan to add new responsibilities without any infrastructure in place to be able to make these determinations and enforce the processes required for implementation. Staff will not have the resources or expertise to make accurate determinations of which organizations may be engaging in illegal activities.

OA strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees.

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

The uncertainty and unpredictability around how program eligibility would be determined, and the lack of due process associated with any such determinations by the Secretary of Education, create a disincentive for individuals to pursue critical public service jobs. This rule sets a dangerous precedent that risks transforming public service and charitable work into a tool of political control.

Thank you for considering this input as part of the rulemaking process; we would be eager to discuss our concerns with you at your convenience. We urge you to rescind the proposed rule in its entirety.

Abby Maxman

**Attachments:**

1. Public Service Loan Forgiveness Comment Oxfam America.pdf

---

**Comment ID:** ED-2025-OPE-0016-8749

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Sacramento LGBT Community Center

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**

The Sacramento LGBT Community Center opposes efforts to politicize the Public Service Loan Forgiveness Program (PSLF). These proposed changes would restrict which nonprofits qualify as eligible employers and, if implemented, could exclude organizations based not on their compliance or effectiveness, but on subjective judgments of their missions or perceived "values." This would set a troubling precedent where government officials could punish nonprofits, and even state or local governments, for providing service, creating/maintaining policies, or advocating in ways that conflict with a federal administration's ideology.

The consequences extend far beyond any single community. Under this proposal, the Department of Education could deny PSLF eligibility based on arbitrary determinations of whether an organization's work is deemed "illegal" or inconsistent with federal definitions of American values. Nonprofits and government agencies would have no meaningful way to defend their eligibility. This authority could be used to abruptly and arbitrarily exclude faith-based charities, public media, educational institutions, organizations serving immigrants, reproductive health providers, civil rights advocates, environmental groups, labor organizations, or public bodies that fall out of political favor.

At the Sacramento LGBT Community Center, PSLF has been essential to recruiting and retaining staff who provide critical services every day, including youth shelters, housing navigation, mental and sexual health care, basic needs assistance, and employment support. PSLF often offsets the compensation differential between the private and public sector and empowers employees to do this heart work. Without PSLF, the nonprofit workforce that sustains the nation's most vulnerable communities would be destabilized.

Nonprofit professionals and public servants in state and local governments build careers on the promise of PSLF. If eligibility becomes subject to shifting political agendas, fewer talented professionals will pursue public service careers, leaving communities underserved and workers unprotected.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

We urge the Department to reject this rule change. The PSLF program was established to strengthen communities by ensuring that those who devote their careers to public service are supported. It should never be repurposed as a political weapon against governments or organizations whose missions or local laws do not align with the priorities of a shifting federal administration. Nonprofits and public agencies must be able to respond to local needs without the threat of unexpectedly losing access to a program designed to sustain their workforce.

Sincerely,

David Heitstuman
Chief Executive Officer

**Attachments:** N/A

---

**Comment ID:** ED-2025-OPE-0016-8754

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Santa Barbara Foundation

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
September 16, 2025
Ms. Tamy Abernathy Director
Policy Coordination Group Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202
RE: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]
Dear Ms. Abernathy,
Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.
On behalf of the Santa Barbara Foundation (SBF), I am writing to express our support for the PSLF Program and our concern about proposed changes that would undermine its effectiveness. At SBF, we are committed to uplifting our community by investing in nonprofits, supporting essential services, fostering cross-sector collaboration, and guiding philanthropic efforts that reflect the values and priorities of Santa Barbara County. This vital work depends on a dedicated nonprofit workforce, many of whom rely on the PSLF Program to sustain their careers in public service. These professionals have enabled impactful initiatives in disaster response, food security, housing affordability, digital equity, health equity, and child care, among many others—efforts that have directly and measurably improved the well-being of our community.
The importance of PSLF cannot be overstated in our region. Nonprofits in Santa Barbara County employ nearly 8% of the working-age population, and yet 77% of local nonprofit organizations report difficulty hiring and retaining staff. PSLF addresses the economic disincentive created when student debt levels make public service careers financially challenging to sustain.
We are deeply concerned about proposed changes to the PSLF that would limit eligibility

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

requirements, increase payment thresholds, and reduce the scope of qualifying public service employment. Such changes could undermine the very purpose of PSLF and jeopardize the ability of nonprofits—already stretched thin—to meet increasing community needs in our county. Given the existing workforce challenges our sector faces, restricting access to loan forgiveness would only deepen this crisis, forcing talented individuals to abandon their commitment to public service in favor of higher-paying private sector opportunities.
We urge policymakers to preserve and strengthen PSLF, ensuring it remains accessible and responsive to the realities of nonprofit work in high-cost regions like ours, where the gap between nonprofit salaries and living expenses makes programs like PSLF not just beneficial, but essential for sustaining the workforce our community depends on.
Thank you for considering this input as part of the rulemaking process.
Sincerely,
Jacqueline M. Carrera
President & CEO

**Attachments:**

1. Public Comment PSLF -- Letterhead.pdf

---

**Comment ID:** ED-2025-OPE-0016-8758

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Public Service Promise

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**
See attached file(s)

Public Service PromiseSeptember 16, 2025
Washington, DC

Re: Public Service Loan Forgiveness Proposed Rulemaking

On behalf of Public Service Promise, we submit these comments in strong opposition to the Department of Education's proposed regulation regarding employer eligibility under the Public Service Loan Forgiveness (PSLF) program.

Public Service Promise exists to support public servants in applying for, and receiving, PSLF. The program is already complex and burdensome; the proposed rule would only make it more so. PSLF enables qualified individuals to pursue hard-to-staff roles that serve our country—even when those roles pay significantly less than opportunities in the private sector. Our collective priority should be to reduce backlogs and ensure that eligible borrowers receive the relief they have been promised by law.

The Higher Education Act and the statute governing PSLF clearly define program eligibility. Congress explicitly determined which types of public service employment qualify for PSLF, and the Department of Education does not have the authority to change those definitions by rulemaking. The proposed regulation is inconsistent with the statute and represents an unconstitutional overreach of executive power. Only Congress has the authority to redefine PSLF eligibility, and any attempt to do so by the

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

Department should be rescinded.

Further, the Department is attempting to use a legal theory borrowed from the IRS—designed for tax enforcement—to exclude employers from PSLF in ways that the courts have never recognized. This represents a jurisdictional overreach into areas of criminal law, public health, and nonprofit oversight where the Department lacks both expertise and authority.

There are already existing processes within the IRS and the courts to determine when a nonprofit or other employer is engaged in illegal activity. For example, the IRS has long had the authority to revoke a nonprofit's 501(c)(3) status, which would automatically disqualify that employer and its workers from PSLF. Courts already adjudicate criminal activity and impose penalties. Creating a duplicative Department-led process only increases confusion, inconsistency, and the risk of politically motivated targeting of certain employers.

The proposal's reliance on employer identification numbers (EINs) would create sweeping, unintended consequences. If one department or branch of a large university, hospital system, or government agency is accused of wrongdoing, the entire institution could lose PSLF eligibility—even when thousands of employees had no connection to the alleged activity. Such an approach unfairly penalizes individual public servants who made good-faith career and financial decisions based on the program's statutory eligibility rules.

Moreover, the Department of Education has long struggled with administrative backlogs in PSLF. Even under current rules, millions of borrowers have faced delays, errors, and denials due to capacity challenges. Shifting responsibility to the Department to investigate or adjudicate criminality or employer misconduct—roles reserved for the courts and IRS—will only worsen the program's performance and undermine public confidence in PSLF.

Public Service Loan Forgiveness was created by Congress to ensure that dedicated teachers, nurses, first responders, nonprofit workers, and other public servants could pursue careers in service without being burdened by lifelong student debt. The proposed regulation oversteps statutory authority, duplicates existing processes, and creates unworkable complexity that threatens the very promise of PSLF.
For these reasons, we strongly urge the Department to rescind the proposed rule.

Respectfully submitted,
Public Service Promise

**Attachments:**

1. PSLF Public Comments 9 16 25.pdf

---

**Comment ID:** ED-2025-OPE-0016-8765

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Fosterus

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

September 16, 2025

Fosterus

Submitted via Regulations.gov
Ms. Linda McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202
Re: Opposition to Proposed Rule on Employer Eligibility for Public Service Loan Forgiveness (PSLF), Docket No. ED–2025–OPE–0016
Dear Secretary McMahon:
Fosterus is a charitable organization dedicated to increasing access to quality healthcare, education, social, and legal services for disadvantaged communities. We recognize the vital importance of Public Service Loan Forgiveness (PSLF) and write to strongly oppose the Department of Education's proposed rule that would allow the Secretary to revoke PSLF qualifying status from employers whose work is declared to have a "substantial illegal purpose."
We ask the Secretary to withdraw the proposed rule, because it is not in accordance with law—the rule exceeds the statutory authority granted by Congress, contradicts the plain language of the statute, and violates the U.S. Constitution.
The PSLF statute clearly designates government entities and 501(c)(3) nonprofit organizations as eligible employers. Congress did not authorize the Department to impose additional requirements on employers, and no Executive Order can provide statutory authority.
The proposed "substantial illegal purpose" standard—undefined in statute—does not satisfy due process requirements, is arbitrary and vague, and risks politically motivated enforcement. Congress made no provision for excluding employers based on their activities.
Thousands of public service workers rely on PSLF and loan repayment assistance programs to enter and remain in service in underserved areas. Disqualifying employers would destabilize the ability of these individuals and organizations to recruit, retain, and serve.
For all these reasons, Fosterus urges the Department to withdraw the proposal in its entirety. We request that the Department continue administering PSLF consistent with Congress's clear mandate, without creating new conditions that would exclude statutorily qualifying employers or impair the ability of public service organizations to serve the vulnerable.
Respectfully submitted,
Fosterus

**Attachments:**

1. Fosterus PSLF comment in opposition.pdf

---

**Comment ID:** ED-2025-OPE-0016-8773

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A **Organization:** Candidly

**Received Date:** Sep 16, 2025 **Posted Date:** Sep 16, 2025

**Comment Detail:**