# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

See attached PDF

**Attachments:**

1. Candidly PSLF Public Comment with Proposed Regulatory Changes.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8774 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Legal Aid Association of California |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 16, 2025 |

**Comment Detail:**

See attachment for full comment. This is an excerpt within the character limit.

Thank you for the opportunity to provide comments.

LAAC is the statewide membership association of over 100 public interest law nonprofits that provide free civil legal services to low-income people and communities throughout California. LAAC member organizations provide legal assistance on a broad array of substantive issues, ranging from general poverty law to civil rights to immigration, and also serve a wide range of low-income and vulnerable populations.

The Public Service Loan Forgiveness Program (PSLF) has enabled legal aid organizations across California to attract and retain skilled attorneys and staff dedicated to providing essential legal services to communities facing eviction, domestic violence, consumer fraud, and other civil legal crises. Loan forgiveness is a key incentive in recruiting a diverse workforce able to commit their careers to public interest law—often at salaries well below those found in the private sector.

Our findings show that educational debt is a huge barrier to continuing in a career in nonprofit work.

By supporting nonprofit staff in repaying student loans, PSLF strengthens our shared ability to serve Californians who depend on legal aid's expertise to navigate the justice system. 84% of entry level candidates applying for legal aid positions have educational debt. Nearly one in five legal aid lawyers take on second jobs beyond their full-time work serving low-income Californians to supplement their income.

If the PSLF program is undermined, we anticipate fewer applicants to do this work, and worse retention statistics, harming working-class and low-income families. PSLF is considered the most important economic recruiting and retention tool for legal aid and public defender organizations in California. Without it, many organizations would struggle to retain attorneys due to low salaries and high student loan debt. It would likely also impact law students looking for jobs: There would likely be an increase in what is called "public interest draft," of law students moving away from public interest work to work in the private sector or government due to higher pay, if PSLF becomes even more unpredictable and unstable. Recruitment is already challenging for nonprofit and government employers, who must compete with the private market, and PSLF is an essential recruitment and retention tool to address students' and new lawyers' concerns about their ability to pay back their loans. Thus, any restriction on

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

this program is likely to significantly impact the number of attorneys in legal aid, exacerbating an already dire shortage of legal help for Californians with legal needs.

The situation is already dire in terms of access to justice in our state. For Californians who cannot access legal aid assistance, the top obstacle to getting help is cost, with 83% citing high legal fees as a barrier to help. Lack of knowledge of how to get legal help and access to attorneys (especially in rural attorney deserts) also drives the gap. California counties classified as "attorney deserts" grew to 16 in the last decade. Only about 24–25% of attorneys serve individual clients, with most working in the corporate sector. Hence, these issues make it even more difficult for people to find a free or low-cost lawyer to help them with their civil legal needs, and impeding PSLF will only make this worse.

Ultimately, there are just too few legal aid attorneys to serve everyone who needs help in our state. Seniors, veterans, and single parents seeking help cannot afford private attorneys, and legal aid attorneys are often the only thing standing between them and homelessness.

PSLF is one of the most critical recruitment and retention tools we have and. Consequently, this small cohort of legal aid workers addressing these challenges deserve a reliable, clear PSLF program to incentivize a career in public service and compensate them for forgoing more lucrative careers in the private sector.

Impact on California Legal Aid

If implemented, this rule could result in abrupt disqualification of legal aid employers, destabilizing the careers of dedicated public servants whose PSLF payments, made in good faith, would no longer count toward forgiveness. California's legal aid attorneys and staff—who provide lifeline legal help to millions annually—could be forced to pursue employment elsewhere, leaving vulnerable Californians without vital representation.

LAAC respectfully urges the Department to withdraw the proposed rule and reaffirm the eligibility of all 501(c)(3) nonprofit organizations, consistent with federal law and the vital public service mission of legal aid. PSLF must remain a stable, reliable program that supports access to justice for all Californians.

Sincerely,
Salena Copeland
Executive Director, Legal Aid Association of California

**Attachments:**

1. PSLF Public Comment_Final.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-8777 |
| --- | --- |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Alaska Legal Services Corporation |
| --- | --- | --- | --- |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
Please see attached file.

**Attachments:**

1. PSLF Comment.pdf

---

**Comment ID:**    ED-2025-OPE-0016-8792

Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025-09-16 - PSLF Rule Change.pdf

---

**Comment ID:**    ED-2025-OPE-0016-8795

Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Immigrant Defenders Law Center |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Comment to Public Service Loan Forgiveness Proposed Rule.pdf

---

**Comment ID:**    ED-2025-OPE-0016-8814

Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Legal Services NYC |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Please find the attached comment from Legal Services NYC in opposition to the proposed rule.

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. lsnyc PSLF comments final.pdf

---

**Comment ID:**        ED-2025-OPE-0016-8826

                       Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | California ChangeLawyers |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Comment 2025 09 16.pdf

---

**Comment ID:**        ED-2025-OPE-0016-8841

                       Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | Anonymous Anonymous | **Organization:** | N/A |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
I want you to think about every nurse who has cared for anyone you love. There is a very good chance that that nurse continues to serve in that job because of PSLF. PSLF was offered as a promise in my promissory note that I can do good work as a medical provider, do the right thing caring for vulnerable people, and not worry about sacrificing my salary and earning potential in order to keep doing the work that is necessary, thankless and yet so rewarding. This is an absolute abomination on free speech and represents a slide directly into fascism — brain drain is how it all starts. Punish any and all who don't agree with the Trump administration's views, and prevent more people from seeking education. This limitation of PSLF will damage our country in ways we cannot even begin to comprehend.

**Attachments:**      N/A

---

**Comment ID:**        ED-2025-OPE-0016-8842

                       Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | Anonymous Anonymous | **Organization:** | N/A |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
I vigorously reject this attempt to eliminate constitutional due process in this country by revoking entitlements to public defenders and legal aid attorneys. When those attorneys signed up to serve

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

underserved populations and enroll in law school, they did so with the agreement and understanding that they would be entitled to public service loan forgiveness. The federal government now seeks to renege on this promise to eliminate due process for the demographics served by public defenders and legal aid attorneys.

Every employee who has furthered this anti-constitutional proposal by our White House dictators should be ashamed of themselves. I vigorously reject this proposal and everything it stands for.

**Attachments:**     N/A

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8844 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | Network for Public Health Law |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
September 16, 2025

U.S. Department of Education
Office of Postsecondary Education
400 Maryland Ave. SW
Washington, DC 20202

VIA ELECTRONIC SUBMISSION

Re: William D. Ford Federal Direct Loan Program Notice of Proposed Rulemaking, Docket ID ED-2025-OPE-0016-7221

We submit this comment on behalf of the Network for Public Health Law (Network), a fiscally-sponsored nonprofit organization serving governmental public health agencies and other organizations across the country. Our organization provides capacity building support to hundreds of officials and practitioners at federal, state, Tribal, and local health agencies, as well as professionals at community-based organizations and health care institutions.

We respectfully oppose the Department of Education's proposed rule to change what Congress clearly established for the Public Service Loan Forgiveness (PSLF) program: that all full-time jobs at 501(c)(3) organizations and with the government (excluding time served as a member of Congress) qualify for the program.1 The Department of Education simply does not have the legal authority to alter the statutory definition of "public service job" by modifying the definition of "qualifying employer" through administrative rulemaking as proposed.

Restricting eligibility as proposed in the rule would be inconsistent with the congressional statute that created PSLF. Moreover, there are already processes in place to ensure that nonprofit organizations are meeting the criteria established for obtaining 501(c)(3) status. As such, the proposed rule will create unnecessary confusion and inconsistencies with laws governing nonprofit organizations.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

At the Network, we believe that PSLF plays a vital role in promoting health and the public good by supporting a strong public service workforce. Education should be a pathway to public service, not a barrier, and this is exactly why Congress created PSLF for individuals working in government and at all organizations that have 501(c)(3) status.

For these reasons, we urge the Department to withdraw the proposed rule and preserve PSLF as Congress intended: a stable, reliable pathway for government and nonprofit employees to pursue public service careers.

Quang Dang Ann Phi-Wendt
Executive DirectorExecutive Managing Director
Network for Public Health Law Network for Public Health Law

**Attachments:**

1. Network for Public Health Law Comment on PSLF Program.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-8855 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Disability Rights Education and Defense Fund |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Please see attached comment of Disability Rights Education and Defense Fund.

**Attachments:**

1. DREDF Oppose_NPRM PSLF (2).pdf

---

| **Comment ID:** | ED-2025-OPE-0016-8878 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | RedRover |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Katie Campbell, and I am the President and CEO of RedRover. We help animals and people in crisis and strengthen the human-animal bond through a variety of programming, including

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

disaster sheltering support, emergency veterinary care, grant funding for domesitc violence shelters, and humane education.

The Public Service Loan Forgiveness Program has enabled my organization (and many others) to serve our communities by supporting people to do what they love (their "passion work") rather than having to focus on the salary of for-profit employment - creating a network of people and organizations that serve the greater good of our country.

I strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Katie Campbell

| | |
|---|---|
| **Attachments:** | N/A |

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8882 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Legal Aid DC |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Comments of Legal Aid DC

**Attachments:**

1. Legal Aid_PSLF Rulemaking Comments.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8889 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | Megan DeKraker | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Thank you for the opportunity to provide comment on the public service loan forgiveness program.

**Attachments:**

1. NHA - PSLF Public Comments September 2025.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8891 |

ED_00807

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | The PSLF Coalition |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Coalition Comment - 9 16 25 UPDATED.pdf

---

**Comment ID:**    ED-2025-OPE-0016-8893

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | American Association of Colleges of Osteopathic Medicine |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. AACOM Comments on PSLF NPRM.pdf

---

**Comment ID:**    ED-2025-OPE-0016-8894

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | New Jersey Progressive Equitable Energy Coalition |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Milena Bimpong
Lawrence Township, New Jersey
New Jersey Progressive Equitable Energy Coalition
powerforall@njpeec.org | milena.bimpong@njlcv.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

---

ED_00808

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I sit on the steering committee of the New Jersey Progressive Equitable Energy Coalition, a statewide Black and Brown led collective of environmental and social justice leaders fighting for energy equity. Utilizing an "equity lens," we ensure that local communities are at the forefront of bold energy policy reforms and advocacy efforts.

Our first pillar is to actively create direct routes to a higher quality of life for traditionally exploited communities through evaluating and re-envisioning the status quo. The racial wealth gap is one specific example. According to the U.S. Department of Education, ~86% of Black students take out student loan debt and borrow an average of $39,500 in student loans, while ~68% of white students take out student loan debt and borrow an average of $29,900. Additionally, a December 2024 Pew Research Center report found that Black and Hispanic or Latino student loan borrowers face more difficulties in student loan repayments than their white counterparts. Overhauling PSLF will further contribute to the racial wealth gap, which directly impacts our coalition's racial and economic justice priorities.

We strongly oppose the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. As seen by recent federal efforts to censor nonprofit organizations, such as the Stop Terror-Financing and Tax Penalties on American Hostages Act, racial justice and equity work could potentially be classified as "substantial illegal activities." This would drastically affect our work as proud public servants who work closely with nonprofit organizations.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Milena Bimpong

| **Attachments:** | N/A | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8896 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Worker Justice Center of New York |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**
Please see attached file.

**Attachments:**

1. WJCNY PSLF Comments.pdf

| **Comment ID:** | ED-2025-OPE-0016-8901 |
|---|---|

ED_00809

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

| | | | |
|---|---|---|---|
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | California Rural Legal Assistance, Incorporated. |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 17, 2025 |

**Comment Detail:**

California Rural Legal Assistance, Inc. (CRLA) is a nonprofit law firm that serves California's rural residents priced out of the legal services market on issues such as housing, access to public benefits, education, and employment rights. CRLA submits these comments in response to the Proposed Rule.

**Attachments:**

1. 2025 09 14_CRLA_Cmmts_DOE_Prpsd_Rule_PSLF.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8907 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | California Medical Association |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Please see the attached letter from the California Medical Association

**Attachments:**

1. PSLF 2025 CMA ltr to Dept of ED regulations 9-25.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8909 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Loan Repayment Assistance Program of Minnesota |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Loan Repayment Assistance Program of Minnesota, Inc.
33 South Sixth Street, Suite 4540
Minneapolis, MN 55402


Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

[Docket ID ED-2025-OPE-0016]


Dear Ms. Abernathy,


We appreciate the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.


The Loan Repayment Assistance Program of Minnesota (LRAP Minnesota) helps legal aid attorneys make their student loan payments and achieve PSLF. PSLF makes it possible for legal aid attorneys to commit to careers in legal aid. In turn, the dedicated legal aid attorneys in our program provide civil legal aid across rural and urban Minnesota. They stabilize their local communities by helping their low-income neighbors meet basic needs like food, safety and shelter. Last year, our network of civil legal aid providers helped 114,593 Minnesotans in 47,708 households with their critical legal needs.


PSLF provides a light at the end of the tunnel. With the knowledge that their significant undergraduate and law school debt burden will be eliminated after ten years, Minnesota legal aid attorneys are able to dedicate themselves to careers they love helping low-income clients secure essential needs. This attorney retention stabilizes Minnesota's legal aid organizations. Not only can experienced attorneys serve more clients with more complex legal matters, but they can serve as mentors to the next generation of legal aid attorneys.


LRAP Minnesota opposes the proposed rule and the uncertainty it would create regarding qualifying employment. Legal aid attorneys rely on the promise of PSLF when they take and remain in relatively low-paying legal aid jobs. Without assurances that PSLF program rules will remain consistent over the long term, attorneys will be unable to risk pursuing legal aid careers. Lack of PSLF program consistency will especially harm recruitment and retention for rural legal aid providers in Minnesota who already face significant workforce challenges.


LRAP Minnesota urges the Department to preserve PSLF in its current form without changes to the regulations. Lack of reliability in program rules would make it even harder for Minnesota legal aid providers to keep the legal aid attorneys Minnesota needs to serve our local communities.


Sincerely,

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Dee BaskinDaniel Brown

Executive DirectorPresident, Board of Directors

**Attachments:**

1. [LRAPMinnesota_Comment.pdf](LRAPMinnesota_Comment.pdf)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8912 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | N/A |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

I am writing to express concern about the proposed rule allowing the Secretary of Education to disqualify employers from PSLF eligibility if they are deemed to have engaged in activities with a "substantial illegal purpose." This standard is vague and undefined, is an overreach of United States Department of Education (Department) authority, and its application could unintentionally undermine both the Office for Civil Rights' (OCR) mission and the PSLF program. I request your thoughtful consideration of three issues:

1. The Proposed Rules Impermissibly Grant Authority to the Secretary Not Provided in Statute, Resulting in Contradictions and Vagueness in Applying the "Substantial Illegal Purpose" Standard.

2. The Proposed Rule Could Discourage OCR Resolutions and Weaken Civil Rights Enforcement

3. The Proposed Rule Could Discourage Prospective Teachers and Other Individuals from Pursuing Public Service Careers

More detail about these three issues is included in the uploaded file.

**Attachments:**

1. [PSLF Public Comment.pdf](PSLF Public Comment.pdf)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8919 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Catholic Migration Services |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. My name is Emmie Glynn Ryan and I am the CEO of Catholic Migration Services. For over 50 years, Catholic

ED_00812

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Migration Services has provided high quality legal services to low-income New Yorkers. Our agency's mission is to welcome "the stranger in our midst" by providing high quality legal services and education to empower and advance equality and social justice. We offer legal services in three areas – immigration, housing, and employment – with offices in Brooklyn and Queens. We help low-income New Yorkers obtain work authorization, adjust their legal status, become naturalized citizens, fight eviction, seek housing repairs, recover unpaid wages, and combat workplace discrimination. Our services helped clients overcome obstacles to justice, such as language barriers and lack of familiarity with the U.S. legal system, through our free multilingual legal services, which includes brief advice, pro-se services, and full representation.

The proposed changes to the PSLF program would disqualify borrowers if they work for nonprofits engaged in activities disapproved of by the current administration — including "aiding or abetting [. . .] violations of immigration law," which is widely understood to refer to immigration legal services providers who represent asylum seekers who entered by crossing our southern border. This proposal, specifically, inserts politics and ideology into the Public Service Loan Forgiveness Program. By giving discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology. Nonprofits, like Catholic Migration Services, must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees.

Over the years, the Public Service Loan Forgiveness Program has enabled many experienced and dedicated Catholic Migration Services attorneys to pursue a noble career providing vital advocacy to low-income communities, including representation of asylum seekers, elderly legal permanent residents seeking to become citizens, workers who have not been paid the minimum wage, and families fighting eviction from their homes. Without access to the PSLF program these attorneys would have been forced to take on higher earning jobs at corporations or law firms to pay off the increasingly crushing high cost of a law school education. As a result, it will be much harder to recruit and retain skilled lawyers to do this critical work in our communities. Ultimately, the proposed rule will harm the people and communities that rely on non-profit legal services organizations, like Catholic Migration Services, and the essential services they provide. Catholic Migration Services strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. Thank you for considering this input as part of the rulemaking process.

**Attachments:**

1. PSLF letter (1).pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8920 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | American Association of Nurse Practitioners |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please see attached comments from the American Association of Nurse Practitioners

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:**

1. AANP Comment Letter- PSLF Eligible Employer Final.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8932 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Immigrant Justice Corps |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please see the attached comment by Immigrant Justice Corps.

**Attachments:**

1. Immigrant Justice Corps PSLF Comment.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8934 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | National College Attainment Network (NCAN) |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. NCAN_PSLF_Public Comment 9 17.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8939 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. City of Cincinnati Docket ID ED-2025-OPE-0016.pdf

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment ID:**    ED-2025-OPE-0016-8944

Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | NASPAA |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

I am writing on behalf of the Network of Schools of Public Policy, Affairs, and Administration (NASPAA) to provide comments on the proposed changes to the Public Service Loan Forgiveness (PSLF) program. NASPAA is the membership association of over 300 member schools that award degrees in public administration, public policy, public affairs, nonprofit management and related fields. NASPAA is the recognized accreditor of these degrees.

From our members, we know the PSLF program is a vital tool for encouraging and sustaining careers in public service. It has helped countless individuals pursue meaningful work in government, nonprofit, and education sectors without being burdened by unmanageable student debt.

For the 2023-2024 academic year, NASPAA-accredited master's-level programs in the U.S. received over 30,000 applications demonstrating a strong interest in public service education. PSLF has been a key factor in these applicants' decision to pursue these careers. Upon graduation, 71% of alumni secure employment in government and nonprofit organizations.

Qualified, well-trained public service professionals are essential to ensuring communities thrive. Investing in their education directly improves quality of life for residents by fostering healthier, safer, and more equitable communities. PSLF helps make these careers accessible and sustainable, ensuring talented professionals can continue serving the public.

I respectfully urge the Department to consider the following improvements to the PSLF program:
Simplify the application and certification process
Increase transparency around qualifying payments and employer eligibility
Ensure equitable access for all public service professionals, including adjunct faculty and nonprofit workers
Provide clearer guidance and support for borrowers navigating the program

Thank you for the opportunity to comment. I appreciate the Department's commitment to strengthening PSLF and ensuring it continues to serve those who dedicate their careers to public service.

Sincerely,

Martha Bohrt
Interim Executive Director
NASPAA
Washington, DC

**Attachments:**    N/A

---

**Comment ID:**    ED-2025-OPE-0016-8946

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | New Urban Arts |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Jannelle Codianni
Providence, RI
New Urban Arts

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]
Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Jannelle Codianni, and I serve as the Executive Director at New Urban Arts, a nationally recognized community arts studio for high school students located in Providence, Rhode Island. For over 25 years, New Urban Arts has supported thousands of young people, many of whom are low-income, first-generation college-bound, multilingual learners, or students of color, by providing free afterschool arts programming, mentorship, academic support, and a safe, creative community. In the 2024–25 school year alone, nearly 800 students enrolled in our programs. Of those who attended once or more per week, the majority qualified for free or reduced-price lunch, and well over half of our students lived in census tracts with poverty rates nearly double the national average.

Our work relies on the dedication of highly skilled staff and artist mentors—individuals who often choose, or are called to, careers in the nonprofit sector because of their passion for service. For many, the PSLF program provides the financial stability that makes this path possible. PSLF has been essential to our ability to recruit and retain talented professionals, community partners, and mentors. Many of our employees carry student debt and would otherwise be unable to commit long-term to this work. Because of PSLF, they can dedicate themselves fully to our students and families. This translates into tangible impact: last year, we guided 35 seniors through the college application process, 800 young people who built meaningful, trusting relationships with mentors and peers, and 800 families who had access to free, safe, and joyful out-of-school time. None of this would be possible without the stability PSLF provides to our staff.

The impact of PSLF extends beyond our organization. When students receive consistent mentorship from experienced adults, they are more likely to graduate, pursue higher education, and grow into confident, engaged members of their communities. Nonprofits are integral to the fabric of youth development, social services, education, and community wellness. With nonprofits making up nearly 10% of the U.S. workforce, this rule threatens a massive sector critical to the public good. By offering a viable pathway to loan forgiveness, PSLF strengthens the nonprofit sector and the broader community by allowing skilled professionals to build sustainable careers in public service. Without PSLF, the sustainability of this work is at risk.

We strongly oppose the proposed rule, which would impose new and discretionary limitations on nonprofit eligibility for PSLF. PSLF was designed to support all 501(c)(3) organizations, and narrowing eligibility based on political or discretionary criteria would undermine the original intent of the law,

ED_00816

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

destabilize the sector, interject ideology into a nonpartisan program, and set a dangerous precedent. If organizations like ours were excluded, the impact would be devastating: it would disrupt essential programs, reduce access to services, and harm the communities we serve. Terminating access to PSLF midway through an employee's career would place an unfair burden on borrowers who made life and career decisions based on PSLF eligibility. These changes would force nonprofit professionals into impossible choices—jeopardizing their careers or extending their debt timelines indefinitely.

We respectfully urge the Department to withdraw this proposed rule and maintain the eligibility of all 501(c)(3) nonprofit organizations under PSLF. Protecting the integrity of PSLF is essential to sustaining a skilled, committed nonprofit workforce and to ensuring that communities across the country continue to benefit from the services nonprofits provide.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

**Attachments:**

1. Re_ William D Ford Federal Direct Loan Program Notice of Proposed Rulemaking - Docket ID ED-2025.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-8948 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Network of Jewish Human Service Agencies |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please see the attached comment. Thank you for the opportunity to comment on this proposed rule.

**Attachments:**

1. PSLF Comment FINAL 9 17 25.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-8951 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | National Association of School Psychologists |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. NASP Comments on Proposed PSLF Rule_September 2025.pdf

---

**Comment ID:**          ED-2025-OPE-0016-8954

                         Find on Regulations.gov

**On Document ID:**      ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)
                         Program)

| **Submitted By:** | N/A | **Organization:** | Legal Aid Society of San Diego |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 9 17 25 PSLF Comment Letter.pdf

---

**Comment ID:**          ED-2025-OPE-0016-8962

                         Find on Regulations.gov

**On Document ID:**      ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)
                         Program)

| **Submitted By:** | N/A | **Organization:** | Council on Social Work Education |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please the attached document for the Council on Social Work Education's (CSWE) comments related
to the final proposed rules for the changes to the Public Service Loan Forgiveness Program.

**Attachments:**

1. CSWE_Public_Comments_on_PSLF_Proposed_Final_Rules_September_2025.pdf

---

**Comment ID:**          ED-2025-OPE-0016-8969

                         Find on Regulations.gov

**On Document ID:**      ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)
                         Program)

| **Submitted By:** | N/A | **Organization:** | San Francisco Unified School District |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached

**Attachments:**

---

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

1. [2025 09 17 Letter re Docket ID ED-2025-OPE-0016.pdf](#)

---

**Comment ID:**     ED-2025-OPE-0016-8972

     [Find on Regulations.gov](#)

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A     **Organization:**  Bay Area Legal Aid

**Received Date:**  Sep 17, 2025     **Posted Date:**  Sep 18, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. [PSLF BALA Comment - Final2.pdf](#)

---

**Comment ID:**     ED-2025-OPE-0016-8978

     [Find on Regulations.gov](#)

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A     **Organization:**  N/A

**Received Date:**  Sep 17, 2025     **Posted Date:**  Sep 18, 2025

**Comment Detail:**
We – the student loan ombudspersons and advocates of Oregon, California, Connecticut and Washington, appreciate the opportunity to respond to the U.S. Department of Education's (ED) notice of proposed rulemaking regarding the Public Service Loan Forgiveness (PSLF) program.

We do not support ED's notice of proposed rulemaking regarding the PSLF program. We do not see a need for PSLF rulemaking at this time and view the changes as an unnecessary obstacle to public servants pursuing forgiveness under the long-standing program. Past PSLF rulemakings solved known issues affecting borrowers, whereas these proposed regulations would result in burdensome and redundant administrative processes. We oppose the proposed regulation as it will limit access to PSLF, ultimately harming borrowers.
The "Summary" section of the notice indicates the intent of the proposed rule is to provide protection to taxpayers, but it fails to acknowledge that federal student loan borrowers and their families are taxpayers as well. Legal tax status is required to apply for federal student aid, and ED does not make loans to people without legal status. Undermining IRS and law enforcement discretion, by including or excluding certain entities based on something other than tax status, does not protect taxpayers; it further diffuses accountability. Public servants are U.S. taxpayers who often make major life decisions based on the benefits provided by PSLF. The proposed rules disregard their personal sacrifices for the public good and will unfairly block taxpaying public service workers from achieving PSLF forgiveness.
As stated in the notice's "Background" section (IV), PSLF was established by an act of Congress in 2007. PSLF rulemaking has been done in the interceding years to correct technical issues in the program. While the IRS can and does exercise discretion via the "illegality doctrine," ED does not have the staff, expertise, or resources to make determinations about public health, social services, and

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

criminal law. If the IRS decides an organization meets the "illegality" standard, it revokes the organization's 501(c)3 status. An additional layer of scrutiny by ED is redundant.

The "Qualifying Employer" definitional change section of the proposed rule states: "Department is concerned that the PSLF program has sent tax dollars to employees of organizations that are engaged in activities that are illegal, thereby subsidizing their employment." This wording appears to represent a lack of understanding how public servants receive the benefits of the PSLF program. Funds are not sent directly to organizations, nor to the public servant themself – rather, the remaining balance is canceled after 10 years of qualifying payments. This incentivizes public servants to make on-time monthly payments, which decreases default rates. At the same time, due to the process of negative amortization, the forgiven balances are often made up entirely of interest charged on interest, with the principal long since repaid to the government. In other words, tax dollars are never sent to employees or employers but applied mainly toward interest accrued while the public servant fulfills their 10-year obligation.

The "Discussion of Costs and Benefits" subsection of the "Regulatory Impact Analysis section (X)" states: "One of the immediate costs associated with these regulatory changes will be the need for the Department to update its systems, train staff, and implement new compliance and monitoring processes. The Department will need to track and verify employer eligibility more rigorously, and it will also need to enhance communication systems to notify employers and borrowers of any changes to their status in the PSLF program. These changes will require new investments in staffing, technology upgrades, and outreach programs."

Overall, the above-listed state ombudspersons and advocates oppose any regulations that seek to narrow the definition of a "Qualifying Employer" for the purpose of determining PSLF eligibility. PSLF rulemaking on employer eligibility is not needed at this time. Added definitions lead to unnecessary complexity, will cause confusion, and harm borrowers eligible for the program. Eligible employers must already have a specific tax or government status that is not available to criminal organizations; any concerns can be addressed by the courts and IRS.

Thank you for your attention to this area. The state ombudspersons and advocates appreciate the opportunity to comment on this important rulemaking.

Sincerely,
Lane Thompson
Student Loan Ombuds
Oregon Division of Financial Regulation

Celina Damian
Student Loan Servicing Ombudsperson
CA Department of Financial Protection and Innovation

Michelle Jarvis-Lettman
Student Loan Ombudsperson
Connecticut Department of Banking

Amber Hay
PSLF Advocate
Washington Office of the Student Loan Advocate

**Attachments:**

1. comments for PSLF proposed rule September 2025.pdf

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8980 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Southern Environmental Law Center |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Please see the attached comments of the Southern Environmental Law Center, the Natural Resources Defense Council, Earthjustice, and the Environmental Law and Policy Center of the Midwest. We appreciate the opportunity to share our insight on this important matter.

Respectfully submitted,

DJ Gerken
Southern Environmental Law Center

**Attachments:**

1. Comments of SELC_NRDC_Earthjustice_and ELPC on PSLF NPRM.pdf

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8981 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Maine Association of Nonprofits |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Thank you for the opportunity to provide these attached comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219

**Attachments:**

1. PSLF Public Comment September 2025.pdf

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-8984 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Land of Lincoln Legal Aid Inc. |
|---|---|---|---|

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:**   Sep 16, 2025          **Posted Date:**   Sep 18, 2025

**Comment Detail:**
Please see attached comments

**Attachments:**

1.  Comments_to_DOE_re_PSLF_16_Sept_2025.pdf

---

**Comment ID:**      ED-2025-OPE-0016-8985

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**   N/A                    **Organization:**   N/A

**Received Date:**   Sep 16, 2025          **Posted Date:**   Sep 18, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1.  09-16-2025 -- Letter to ED_PSLF Program NPRM.pdf

---

**Comment ID:**      ED-2025-OPE-0016-8986

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**   N/A                    **Organization:**   American Osteopathic Association

**Received Date:**   Sep 17, 2025          **Posted Date:**   Sep 18, 2025

**Comment Detail:**
The American Osteopathic Association (AOA), alongside 35 osteopathic specialty and state associations – collectively representing nearly 200,000 osteopathic physicians and medical students, appreciate this opportunity to submit comments and express our concern regarding the proposed changes to the Public Service Loan Forgiveness (PSLF) program. Please find our full comments in the attached letter.

**Attachments:**

1.  AOA Affiliate Sign-on - PSLF Proposed Rule - vSubmit.pdf

---

**Comment ID:**      ED-2025-OPE-0016-8987

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**   Rebecca Howard          **Organization:**   N/A

ED_00822

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 18, 2025

**Comment Detail:**
See attahed file(s)

**Attachments:**

1. 2025 09 17 PSLF Comment Letter.pdf

---

**Comment ID:** ED-2025-OPE-0016-8988

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A          **Organization:** American Dental Association, et al.

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 18, 2025

**Comment Detail:**
The American Dental Association, et al., are pleased to comment on the Education Department's proposal to remove 'qualified employers' from the PSLF program for engaging in activities with a 'substantial illegal purpose.' We offer these comments in response to your Federal Register notice of August 18, 2025 (90 FR 15665).

**Attachments:**

1. 250917_ed_pslf_coalition.pdf

---

**Comment ID:** ED-2025-OPE-0016-8989

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A          **Organization:** N/A

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 18, 2025

**Comment Detail:**
See attached file.

**Attachments:**

1. 2025 09 17 PSLF Comment Letter FINAL.pdf

---

**Comment ID:** ED-2025-OPE-0016-8990

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A          **Organization:** N/A

ED_00823

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:**    Sep 17, 2025                **Posted Date:**    Sep 18, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. CalHHS Comments on PSLF 9 17 25 FINAL.pdf

---

**Comment ID:**        ED-2025-OPE-0016-8991

                       Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    N/A                **Organization:**    GLBTQ Legal Advocates & Defenders (GLAD Law)

**Received Date:**    Sep 17, 2025            **Posted Date:**    Sep 18, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Comments 9-17 Final.pdf

---

**Comment ID:**        ED-2025-OPE-0016-9365

                       Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    N/A                **Organization:**    N/A

**Received Date:**    Sep 16, 2025            **Posted Date:**    Sep 18, 2025

**Comment Detail:**
Alameda County, California, submits the attached comments regarding the proposed changes to the Public Service Loan Forgiveness (PSLF) program.

**Attachments:**

1. PSLF Docket ID ED-2025-OPE-0016.pdf
2. PSLF Docket ID ED-2025-OPE-0016.pdf
3. PSLF Docket ID ED-2025-OPE-0016 09 18 2025.pdf

---

**Comment ID:**        ED-2025-OPE-0016-9403

                       Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    Nicholas Hartlep                **Organization:**    N/A

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:**    Aug 19, 2025          **Posted Date:**    Sep 18, 2025

**Comment Detail:**

Nicholas D. Hartlep, Ph.D.
Robert Charles Billings Endowed Chair in Education
Education Studies Department
Berea College
Berea, KY
hartlepn@berea.edu

August 19, 2025

U.S. Department of Education
[Published Document: 2025-15665 (90 FR 40154)]

Re: Opposition to Proposed Changes to the Public Service Loan Forgiveness (PSLF) Program

To Whom It May Concern:

My name is Dr. Nicholas D. Hartlep. I serve as the Robert Charles Billings Endowed Chair in Education at Berea College in Berea, Kentucky, where we prepare future K–12 teachers. I am writing to you while on a yearlong research sabbatical, and in the capacity of "Researcher-in-Residence" with the Branch Alliance for Educator Diversity, the only non-profit organization in the United States dedicated to strengthening, growing, and amplifying the impact of educator preparation at Minority Serving Institutions (MSIs).

At Berea College, every student receives a Tuition Promise Scholarship covering 100% of tuition, and through our Labor Program, students hold campus jobs to help cover other expenses. This unique model allows most of our graduates to leave with little or no student debt, making Berea a national leader in affordable higher education. Unfortunately, most American students do not have access to such an opportunity. Student debt weighs heavily on millions of borrowers, especially those entering public service careers like teaching, where salaries remain modest.

As both a researcher and a borrower, I have a deep personal and professional understanding of this crisis. I have written peer-reviewed books and articles on the negative impact of student debt on individuals and society. I also personally benefited from the Public Service Loan Forgiveness (PSLF) Program—my loans were forgiven under President Biden's Temporary Expanded PSLF (TEPSLF) Program just last year. PSLF was a promise that shaped my career choices, and I am living proof of the life-changing impact it can have.

For these reasons, I am gravely concerned by the Trump Administration's proposal to restrict PSLF eligibility in ways that would deny access to workers serving vulnerable communities—including immigrants, people of color, and transgender youth. Such a regulation is not only harmful, but a misuse of federal power. PSLF was enacted nearly two decades ago as a bipartisan initiative, signed into law by President George W. Bush, to ensure that those who commit to public service could achieve loan forgiveness after ten years of qualifying work. Congress made no exceptions, and it is not within the Department's authority to unilaterally narrow eligibility based on political or ideological grounds.

The Department should be working to strengthen and streamline PSLF, not weaken it. Data shows that far too few borrowers who entered PSLF have actually seen their loans forgiven. Complicated

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

recertification processes, poor communication from servicers such as MOHELA, and misleading guidance have left many borrowers making years of ineligible payments without realizing it. The solution is not to cut borrowers out of the program—it is to improve its administration, make annual recertification easier, and ensure transparency and accuracy in borrower communications.

This proposed rule is unnecessary, inequitable, and cruel. It undermines borrower reliance, destabilizes a bipartisan promise, and threatens to harm the very communities that public service workers are called to serve. I urge the Department of Education to eliminate this proposal immediately and to instead focus on preserving and strengthening PSLF and income-driven repayment programs.

Respectfully,

Nicholas D. Hartlep, Ph.D.
Robert Charles Billings Endowed Chair in Education
Education Studies Department
Berea College
Berea, KY
hartlepn@berea.edu

| **Attachments:** | N/A |
|---|---|

---

| **Comment ID:** | ED-2025-OPE-0016-9470 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | Oregon Health and Sciences University |
| **Received Date:** | Aug 26, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
The PSLF program exists to support professionals who dedicate their careers to serving the public. Excluding institutions like Oregon Health & Science University (OHSU)—a leader in medical education, research, and patient care—would punish thousands of clinicians who provide critical services in underserved communities. This undermines the very purpose of PSLF and creates a chilling effect on those who seek careers in public service medicine. The Constitution prohibits the federal government from enacting policies that target specific groups for unequal treatment. By excluding institutions that provide transgender care, this rule directly discriminates against transgender individuals and those who care for them. Healthcare providers at these institutions would be denied equal access to a federal benefit program based not on the quality of their public service, but on the populations they serve. Such government action is a clear violation of equal protection principles.

| **Attachments:** | N/A |
|---|---|

---

| **Comment ID:** | ED-2025-OPE-0016-9512 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

ED_00826

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Transcend Advisory Group |
| **Received Date:** | Aug 29, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Teresa Raetz
Suwanee, GA
Owner, Transcend Advisory Group
traetz@transcendadvisorygroup.com

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to comment on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. My name is Teresa Raetz, and I am the owner of Transcend Advisory Group, a nonprofit grant services business. I am also the former COO of a community nonprofit. My work supports nonprofits by providing grant services and strengthening their operational capacity, particularly around "grant readiness," which translates into strong organizational infrastructure.

My business depends on a healthy nonprofit sector. The PSLF program has been critical in enabling nonprofits to recruit and retain strong talent. Nonprofits compete for staff in a labor market where they generally pay less than businesses. PSLF helps level that playing field, making nonprofit service a viable career choice. Better talent leads to strong leadership, which leads to stronger programs, which in turn results in more effective use of grants and more impact in our communities. When nonprofits are weakened, unmet needs increase: more hungry children, more unstable families, and worse educational and employment outcomes. Those failures ripple out into the broader community, including directly impacting my business.

I also strongly oppose this proposed rule because it injects politics and ideology into the PSLF program. The rule would give any Secretary of Education broad discretion to decide whether an organization's work violates state or federal law or contravenes "established public policy." In practice, this opens the door to excluding nonprofits that serve vulnerable populations. Such discretion means that current and future Administrations could change eligibility for PSLF based on shifting political priorities, rather than clear, neutral standards. Nonprofits must be free to identify and meet local needs without fear of political interference, retribution, or removal from a program designed to support their employees.

For these reasons, my organization strongly opposes the proposed rule and the limitations it would impose on which employers are able to participate in PSLF.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Teresa Raetz

**Attachments:**     N/A

---

**Comment ID:**     ED-2025-OPE-0016-9519

Find on Regulations.gov

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A                    **Organization:** Montana Nonprofit Association

**Received Date:** Sep 11, 2025          **Posted Date:** Sep 18, 2025

**Comment Detail:**

Dear Ms. Abernathy,

On behalf of the Montana Nonprofit Association, we respectfully submit the following public comments on the Department of Education's Notice of Proposed Rulemaking on Public Service Loan Forgiveness (PSLF). Montana Nonprofit Association (MNA) is a statewide membership association, representing more than 750 charitable nonprofits across Montana. We strongly oppose the proposed rule, which seeks to restrict which 501(c)(3) nonprofits qualify as eligible employers under PSLF.

Nonprofits create vibrant and healthy communities across Montana by operating food banks, youth programs, senior services, cultural institutions, outdoor programs, and more. They are also critical economic drivers, employing more than one in nine Montana workers and contributing over $3.6 billion in wages annually to our state's economy. Yet, like many employers in our state, nonprofits face persistent workforce challenges that make it increasingly difficult to meet the needs of our communities.

PSLF is one of the few tools available to the nonprofit sector to help attract and retain a qualified workforce. The program gives college students and workers confidence that that they can pursue careers in public service without being burdened with a lifetime of student debt. For PSLF to be effective, it much be reliable and predictable. Students need to know they can count on the future of the program and the eligibility of their employer when making decisions about education and career paths. This proposed rule undermines the effectiveness of PSLF by allowing current and future administrations to redefine eligibility based on shifting political priorities rather than the law.

This proposed rule is in direct conflict with current statute, which clearly establishes that all 501(c)(3) organizations qualify as eligible employers. By creating vague standards and granting the Secretary of Education broad discretion to decide whether a nonprofit's work is "substantially illegal," the rule politicizes what should remain a neutral statutory framework. It also fails to provide sufficient due process, as nonprofits could lose PSLF eligibility without transparency or a meaningful opportunity to appeal the decision.

If a nonprofit is engaged in illegal activity, there is already a process in place through the IRS to revoke its 501(c)(3) status, making the organization automatically ineligible for PSLF. Creating a duplicative, discretionary process, as included in this rule, is unnecessary and risks harming the very organizations and workers the program is intended to serve.

If adopted, this rule would further undermine Montana's nonprofit workforce, reducing access to critical services and weakening local economies. When nonprofits cannot maintain an adequate workforce, communities across our state, rural and urban alike, feel the consequences.

For these reasons, we urge the Department to reject the proposed rule. PSLF must remain reliable, consistent, and in accordance with current law in order to support a robust public service workforce.

Thank you for your consideration,

ED_00828

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Adam Jespersen
Executive Director
Montana Nonprofit Association

**Attachments:**

1. PSLF_Public Comments_MNA_Final - PSLF_Public Comments_MNA_Final.pdf
2. PSLF_Public Comments_MNA_Final.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9522 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Equal Justice Society |
| **Received Date:** | Sep 12, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Secretary McMahon,

Thank you for the opportunity to provide comments on the proposed rule, which proposes to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I am the Legal Director of the Equal Justice Society, a national non-profit civil rights organization based in Oakland California. My organization will be directly impacted by the decisions being made in this rulemaking process.
The Department does not have the statutory authority to make these changes and we urge the Department to withdraw this proposed rule.

We are deeply concerned about any rulemaking that would narrow the definition of a "qualifying employer" or disqualify nonprofit organizations from participating in the PSLF program. We are a nonprofit on the frontlines enforcing fundamental civil rights in education, health, and the workplace. For example, my organization works every day to ensure that school children, especially those who belong to groups that have been historically discriminated against in school, including students of color and students with disabilities, receive a fair public education where they can learn alongside all their peers. Disqualifying organizations like ours would punish the very people doing the work promoting the public interest.

If our organization is disqualified under what we consider an unconstitutionally constraining definition of "illegal activities," we would face an aggressive ten-years of ineligibility thus threatening our ability to recruit and retain highly qualified, dedicated people who, because of student loan debt and payment would not be able to work with us. Further, colleagues and critical partners upon whom our work depends may ultimately be disqualified from receiving PSLF due to an "illegality" determination and thus may have to leave their public interest, public serving positions. This would cause us significant retention and operational problems-- the antithesis of the initial intent of Congress in creating this program.

We urge the Department to preserve the current PSLF structure and maintain an inclusive definition of

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

qualifying employers. The Department should not undermine a program that is working, and that enables organizations like ours to serve students and their families who otherwise have no recourse to enforce their fundamental civil rights when they are violated.

Thank you for your consideration.

Sincerely,
Mona Tawatao
Equal Justice Society

| **Attachments:** | N/A |
|---|---|

---

| **Comment ID:** | ED-2025-OPE-0016-9593 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Equality California |
|---|---|---|---|
| **Received Date:** | Sep 8, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. EQCA-public comments-PSLF Program-Sept 8 2025 docx.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-9642 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | United Way of Pennsylvania |
|---|---|---|---|
| **Received Date:** | Sep 11, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 8 21 - ED-2025-OPE-0016 Comment Letter PSLF - United Way of Pennsylvania.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-9691 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | United Action for Youth |
|---|---|---|---|
| **Received Date:** | Sep 4, 2025 | **Posted Date:** | Sep 18, 2025 |

ED_00830

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
Mason Koelm
Iowa City, Iowa
United Action for Youth
mason.koelm@unitedactionforyouth.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket
ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Mason Koelm and I am the Director of Development at United Action for Youth, a youth services organization in Iowa City. Each year, our organization serves thousands of young people and families through our team of advocates, counselors, and specialists across dozens of programs including music, art, crisis, advocacy, and mediation, residential programs, street outreach, health education, therapy, criminal diversion, youth engagement and more.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by incentivizing skilled workers to lend their talents to our mission of nurturing the potential for all young people to create, grow, and succeed. We rely on the Public Service Loan Forgiveness Program to remain competitive as an employer.

While the proposed rule seeks to reduce the risk of inappropriate government expenditures, the methods by which the proposed rule attempts to fulfill this goal are improper.

The proposed rule contradicts existing federal law. Currently, all charitable nonprofit organizations are eligible under PLSF, regardless of their mission. The authorizing statute passed by congress defines eligibility based upon the internal revenue code designation of an organization. Restricting the eligibility of nonprofit organizations is improper without modifying the Internal Revenue Code section 501(c)(3), which can only be properly done by an act of congress.

Additionally, the existing regulations already address the organizations which the proposed rule would exclude. The IRS has the ability to revoke the tax exempt status of an organization which violates Federal laws. The proposed rule is unnecessary in light of well-established procedures.

Furthermore, the proposed rule would have devastating economic effects on employees and employers. Employees enter the public service sector with the expectation that the well established Public Service Loan Forgiveness program would assist them. Employers rely on PSLF to attract and retain talented employees and remain competitive with for-profit employers. A shrinking pool of service workers and employers will place additional strains on the populations they serve. Maintaining the current PSLF rule would allow the public service sector to continue to grow and serve Americans. For example, without PSLF, we would not be able to staff our counseling program to meet the needs of our youth mental health crisis. The young people who most need the help we provide are often underinsured or uninsured, and could not be seen by providers elsewhere. For profit providers are able to turn away clients and ensure higher salaries. We don't have that luxury. PSLF allows us to provide a benefit to our therapists and in turn to provide young people with mental health care. In addition to

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

harming our staff, our leadership would have to take time away from better serving our community to stay up to date on the constant changes to the program for which this proposed rule opens the door.

Finally, the proposed rule would open the door to future administrations to restrict eligibility based upon ideology and politics. The discretion of whether an organization's employees should be eligible would be at the whim of all future administrations. Put together, the proposed rule defies existing acts of congress, established procedures for revocation, and the due process of tax exempt organizations.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Mason Koelm

| | |
|---|---|
| **Attachments:** | N/A |

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9706 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Nancy Wiltsek | **Organization:** | N/A |
| **Received Date:** | Sep 4, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Dear Ms. Abernathy,

I write to oppose the Department's proposed changes to the William D. Ford Federal Direct Loan Program regarding Public Service Loan Forgiveness (PSLF).

I serve as Executive Director of van Loben Sels/RembeRock Foundation, a grantmaking foundation that supports legal aid providers in Northern CA to ensure low-income and vulnerable people (including veterans, women, children, people with disabilities, people in rural areas, immigrants, etc.) have access to legal services to address a range of life problems such as those related to housing, access to benefits, healthcare, family law, consumer protection, immigration, etc. I have seen firsthand how critical PSLF is in supporting individuals who dedicate their careers to serving vulnerable communities. The legal aid sector as a whole has long held bi-partisan support because of the important work it does to serve our most vulnerable communities. Research has shown that legal services are a powerful strategy to alleviate poverty. The Foundation supports legal aid organizations to ensure legal services are provided to those who need them most. PSLF is a linchpin for recruitment and retention of high-quality staff, high quality services and organizational stability. For those with significant law school debt who wish to practice law in service to the community, the PSLF has been a godsend. Creating a litmus test for organizations' eligibility would politicize the good work of many legal aid providers and significantly jeopardize their ability to recruit and retain high quality staff.

I am particularly concerned about the following:

1. The existing regulations are in place in the tax code to jeopardize 501(c)3 status of the rare lawbreaking organizations.
2. Fewer well-qualified workers will be able to afford to apply for public interest positions.
3. The proposed rule inserts politics and ideology into a program. Nonprofits must be able to assist communities without political interference or fear of retribution.
4. A process already exists to remove eligibility from organizations who are engaging in illegal activity with an existing independent appellate administrative procedure and cause of action in the courts.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

5.The proposed changes are likely to impact the availability of legal services in Rural America.

6.The proposed changes may unintentionally decertify, even temporarily, organizations that serve veterans.

On a personal note, I have a friend who went to law school later in life with the goal of becoming a prosecutor. He graduated with significant debt but still took his dream job as a San Francisco Assistant District Attorney for a salary well below what he could have earned in the corporate sector. His spouse ended up mortgaging her home to pay off his law school debt. They were fortunate to have that option, but PSLF would have been hugely beneficial to them if it had existed at the time. I share their hope that others who sacrifice high salaries to work in the public sector will be able to benefit from this important program, that the rules that govern the program will not be changed, and that you will reconsider the proposal.

In conclusion, while I appreciate the Department's stated goal of maintaining the integrity of PSLF, this proposal does not achieve that goal. Instead, it creates confusion, limits opportunities, and risks destabilizing a program that has been life-changing for public servants and the communities they support.

I urge the Department to withdraw this proposed rule change and engage in further consultation to craft regulations that are clear, fair, and supportive of the public service workforce.

Sincerely,

Nancy Wiltsek, MNA
Executive Director, van Loben Sels/RembeRock Foundation
San Francisco, CA

**Attachments:**

1. [Public Comment Opposing Proposed PSLF Rule Nancy Wiltsek.pdf](#)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9758 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A |
| **Organization:** | American Council on Education |
| **Received Date:** | Sep 17, 2025 |
| **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Resending due to a typo in the previous letter. Please see the attached and use this as the final version from ACE. Thank you!

**Attachments:**

1. [09172025 ACE PSLF Modification Opposition Letter.pdf](#)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9761 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | National Education Association |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 09-17-2025_NEA Comment_ED-PSLF.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9762 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Impact Fund |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 Comment on NPRM Regarding Changes to PSLF_final.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9763 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Champion Col-EDGE Solutions and Constituents as Lead Negotiator for Proprietary Institutions |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please, see attached my public comments on the Public Service Loan Forgiveness proposed rules [Docket ID ED-2025-OPE-0016].

**Attachments:**

1. 20250916 Hammer Champion NPRM Comments - Docket ID ED-2025-OPE-0016.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9774 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |

ED_00834

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Submitted By:**   N/A                  **Organization:**   Education Leaders of Color

**Received Date:**   Sep 15, 2025         **Posted Date:**   Sep 18, 2025

**Comment Detail:**
September 15, 2025


The U.S. Department of Education

Office of Postsecondary Education

400 Maryland Avenue, SW

Washington, D.C. 20202


Re: Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

On behalf of Education Leaders of Color (EdLoC), we are writing in opposition to the Department of Education's Notice of Proposed Rulemaking (NPRM) that makes harmful changes to the Public Service Loan Forgiveness (PSLF) program that will limit opportunities for those who pursue employment in public service, decrease access to critical services, and harm our national and local economies.

Education Leaders of Color (EdLoC) is a membership network that harnesses the power of over 1,000 values-aligned changemakers across the country, to catalyze the cross-sector collaboration needed to ensure young people of color have the opportunities to build generational wealth and thrive. EdLoC believes that increased Federal investments and the enactment of policies centered around helping young people of color are essential factors in efforts to improve educational outcomes and economic advancement for all, promoting equity in every aspect of American life.

Congress created the PSLF program to address the concern that increasing student loan debt was a factor in individuals choosing higher paying jobs over those in the public sector, even as there were staffing shortages in many areas of public service work, including teaching. By offering loan forgiveness after ten years of service, the hope was to incentivize individuals to enter and remain in public service positions, to fill these critical staffing needs, and limit the debt burden on borrowers. The law spells out the types of full-time public service employment that qualify for PSLF: jobs in government, at organizations described in Section 501(c)(3) of the Internal Revenue Code (IRC) and exempt from taxation under IRC Section 501(a), and at private nonprofit organizations that provide such enumerated public services as emergency management, public safety, public interest law services, etc. What the law does not do is set any limitations, specifications, or requirements on the mission of eligible employers or the communities they serve.

The proposed rule overrules this Congressional intent and instead instills this Administration's own ideological bias in deciding which types of employment and work would make a borrower eligible for PSLF. The proposed changes to what constitute "substantial illegal purpose" blatantly target nonprofits that serve marginalized populations including immigrant communities, students of color, and

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

transgender individuals.

One of EdLoC's main priorities is to ensure that students of color have avenues to minimize their student debt and increase their access to higher education. Longstanding racial and economic inequities disproportionately leave borrowers of color with greater student debt, increased difficulty repaying student loans, and higher rates of default. The PSLF program has been a useful tool for students and borrowers of color, offering them a more accessible pathway to higher education and making it possible to serve in fulfilling roles where they are supporting the public interest. The proposed changes to the PSLF program may leave many of these borrowers without debt relief options if their employers are unjustly deemed ineligible. This means that many borrowers of color who have been working to repay their student loans through the PSLF program would no longer be able to make qualifying payments, thus putting their financial futures at risk.

This misguided policy undermines economic growth nationwide. This policy will dissuade students graduating with postsecondary degrees from choosing a career in public service including careers vital to our economic health and safety such as educators, social workers, public defenders, nurses, and first responders, since many students would not be able to afford those careers without the PSLF program. The proposed rule would also make it more difficult for employers to recruit and retain staff working in these fields. Both the loss of talent and the loss of critical work will be harmful to our national and local economies.

The proposed changes to PSLF in this proposed rule are detrimental to students, communities of color, and our national economy. We strongly urge the Department to withdraw this NPRM.

Sincerely,

Education Leaders of Color

**Attachments:**

1. image.pdf
2. PSLF Comment Docket ID ED-2025-OPE-0016.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9816 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Vermont Association of Conservation Districts |
|---|---|---|---|
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

The Vermont Association of Conservation Districts (VACD) opposes the proposed rule related to the Public Service Loan Forgiveness (PSLF) Program. The rule is contrary to current federal law and cannot be realistically administered. Moreover, this rule is unnecessary and risks imposing undue burdens on eligible program applicants and eligible employers.

1. The proposed rule is contrary to federal law. Current law requires that all 501(c)(3) organizations and local government entities be eligible to be qualified employers under PSLF. The Department of Education does not have the authority to unilaterally restrict eligibility under PSLF beyond what is established in federal law.

2. The proposed rule does not provide adequate due process. Under the proposed rule, determination to strip an organization of program eligibility is made by a "preponderance of the evidence" and without the opportunity to appeal to an independent authority. This is an inappropriate level of authority to be centralized within the Department of Education and an insufficient process to ensure the PSLF program itself operates within the bounds of federal law.

3. A process already exists to deal with organizations who are engaging in illegal activity. If an organization is engaged in substantial illegal activities, there is already a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF. Likewise, if a local government entity is engaged in substantial illegal activities, there are existing processes to hold those entities accountable under state and federal law. Because of this, the proposed rules are administratively redundant and unlikely to serve any meaningful purpose beyond the purely ideological. We encourage the Department of Education to work within existing processes to deal with any suspected substantial illegal activities. Not only would this be a more efficient use of Department of Education resources, but it would also more comprehensively address any illegal activity, should any exist.

4. The Department lacks the capacity and expertise to implement the proposed rule. Due to current staffing shortages, the Department of Education will not be able to bear the administrative burdens of making these determinations and enforcing the processes needed to implement it. They also do not have the necessary expertise to determine which organizations are engaging in substantive illegal activities.

VACD believes that PSLF is a deal already made with the American public. Any attempt to substantially modify the program risks eroding trust in federal institutions and hurts the very nonprofits and local government entities that the federal government relies on every day. The promise of PSLF is what enables nonprofits and local governments everywhere to sustain a skilled, professional workforce. Workforce shortages are a pressing issue faced by the local governments we represent, and we cannot support anything that makes it more difficult to meet local needs or to realize our values of local self-determination. Increased uncertainty, increased administrative burdens, and increased partisanship will only undermine our ability to get work done and increase the cost of operating and maintaining robust local governments capable of providing the services their constituents want and need.

Thank you for your consideration of these comments.

Sincerely,

The Vermont Association of Conservation Districts

**Attachments:**    N/A

---

**Comment ID:**    ED-2025-OPE-0016-9838

Find on Regulations.gov

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Autistic Women & Nonbinary Network |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**

Secretary McMahon
Department of Education
400 Maryland Ave. SW,
Washington, DC 20202

Comment on William D. Ford Federal Direct Loan (Direct Loan) Program Proposed Rule, Docket ID ED-2025-OPE-00165

Dear Secretary McMahon,

The Autistic Women & Nonbinary Network ("AWN") appreciates the opportunity to comment on the proposed rule change to the William D. Ford Federal Direct Loan Program. The Autistic Women & Nonbinary Network strongly opposes the proposed amendments to the Public Student Loan Forgiveness ("PSLF") Program, under the William D. Ford Federal Direct Loan Program.

AWN is a national nonprofit that supports autistic women, girls, transfeminine and transmasculine nonbinary people, and trans people of all genders. AWN directs policy research and community advocacy to advance healthy outcomes for disabled people, including high-quality and community-based services and supports, accessible housing and healthcare, integrated employment, and inclusive education.

This proposed rule will negatively impact nonprofits like AWN, which do vital work for underrepresented populations. The proposed rule opens organizations like AWN to politically motivated attacks, threatens their status, and discourages job candidates in a field that is already desperate for qualified workers. The Department of Education does not have the statutory authority to make this rule. This rule must be withdrawn immediately.

The proposed rule increases the risk of political targeting. This rule gives the Administration the unilateral ability to declare an organization's actions to be "substantially illegal," without due process. Suggesting that an organization which deals with "gender ideology" is committing criminal activity is outrageous–and flat out wrong. Such vague "definitions," backed by nothing, are ripe for political overreach. It is also far beyond the statutory authority of the Department of Education to make a criminal determination.

The IRS already has a process for stripping nonprofits of their 501(c) status, if they are found to be engaging in illegal activity. This process involves use of evidence and an ability to appeal. Neither of those options are provided in the proposed rule. Nor does the Department of Education have the statutory authority to take over an action already statutorily reserved for the IRS.

There is already a significant worker shortage in public health and the charitable sector. Creating an environment in which any nonprofit could be found to be engaged in illegal activity, without warning, discourages workers from even entering the field. What law or medical student, with six-figure school

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

loans, would risk their standing and future employment ability by working with a nonprofit that could be labeled "illegal" at any time? Our most vulnerable populations are being left without resources.

We urge the Department to maintain the current PSLF structure, with its inclusive definition of a qualifying employer. This proposed rule is legally dubious and morally wrong. It must be withdrawn immediately.

Sincerely,

The Autistic Women & Nonbinary Network

| Attachments: | N/A |
| --- | --- |

| Comment ID: | ED-2025-OPE-0016-9856 |
| --- | --- |
| | Find on Regulations.gov |
| On Document ID: | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| Submitted By: | N/A | Organization: | Bet Tzedek Legal Services |
| Received Date: | Sep 16, 2025 | Posted Date: | Sep 18, 2025 |

**Comment Detail:**
See attached file.

Thank you for the opportunity to provide comments on the Department of Education's Notice of Proposed Rulemaking regarding regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219. Bet Tzedek Legal Services ("Bet Tzedek") submits these comments in opposition to the proposed rule, attached. Bet Tzedek is deeply concerned about the impact of these proposed changes, particularly regarding the chilling effect these changes would very likely have on our mission and staff recruitment, as well as the decrease in viability of public interest careers for our staff members. We are also concerned with the language in the proposed rule, containing vague definitions and confusing criteria.

For over 50 years, Bet Tzedek Legal Services has provided free, comprehensive legal services for low-income individuals and families in Los Angeles, proving that access to justice makes a difference in people's lives. From humble beginnings as a small group of volunteer attorneys helping Holocaust survivors facing gentrification in the Fairfax District, Bet Tzedek has grown into a public interest law firm with a footprint across Los Angeles County and beyond, with practice area expertise focused on Economic Justice, Housing Justice, Elder Justice, and Justice for Children and Families.

**Attachments:**

1. 25 09 16 Public Comment PSLF Rule Bet Tzedek Final.pdf
2. Public Comment PSLF Rule Bet Tzedek Final.pdf

| Comment ID: | ED-2025-OPE-0016-9892 |
| --- | --- |
| | Find on Regulations.gov |
| On Document ID: | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 8, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. [Opposition to amend regulations on the Public Service Loan Forgiveness (PSLF) program.pdf](#)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9926 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | Julie Locascio | **Organization:** | N/A |
| **Received Date:** | Sep 15, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
I am writing today about Department of Education, 34 CFR Part 685 [Docket ID ED-2025-OPE-0016], RIN 1801-AA28, to wit: "The Secretary proposes to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a substantial illegal purpose. The proposed regulations would prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that engage in activities that have a substantial illegal purpose. These proposed changes are intended to improve the administration of the PSLF program and provide protection for taxpayers."

As an attorney, I fully support taking appropriate action in the face of illegal activity, but this is not that. Any organization or individual in the United States has Constitutional protections to be presumed innocent until proven guilty in a court of law. This proposed rule would enable this Secretary of Education--any any future Secretary of Education--to decide by fiat, outside of judicial processes, that an organization has a "substantial illegal purpose". There is no legal definition of "substantial illegal purpose", nor would a Secretary of Education be in any position to establish one or adjudicate one. We are presumed innocent unless convicted in court of a crime, which requires an indictment based on investigated facts followed by either a plea deal or a criminal trial where the state has the burden to prove guilt beyond a reasonable doubt. This is one of the most fundamental tenets of our Constitutional system. Therefore, this rule is on its face in direction violation of the Bill of Rights and would lead to extra-judicial determinations, which would be followed by a flurry of federal lawsuits further tying up our already overburdened federal courts with litigation that should never have had to be brought in the first place. You cannot use a smokescreen of "protecting taxpayers" to make extrajudicial decisions which will require overstretched Justice Department attorneys to into court to defend the indefensible.

Julie Locascio, Esq.

| | |
|---|---|
| **Attachments:** | N/A |

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9931 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Equitas Health |
| **Received Date:** | Sep 15, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please review the attached public comment from Equitas Health.

**Attachments:**

1. Equitas Health Public Comment William D Ford and PSLF_September 2025_Final.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-9983 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | UnidosUS |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Please see the attached corrected UnidosUS public comment, which reflects the most current version, and supersedes and corrects all previously submitted comments. (mfo-hw09-yjfj and mfo-govk-dxlj).

**Attachments:**

1. unidosus_publicstudentloanforgiveness_nprmcomment_91725.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10030 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 18, 2025 |

**Comment Detail:**
Linda McMahon
Acting Undersecretary James Bergeron
Office of Postsecondary Education
US Dept. of Education
Lyndon Baines Johnson Building
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

The Human Service Chamber of Franklin County is a membership organization supporting over 200 health and human service 501(c)(3) nonprofits that serve individuals and families in the Columbus

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

region. From our membership alone, health and human service nonprofits employ over 20,000 people in our community and provide services to hundreds of thousands. These organizations and the people who work at these organizations provide services that are critical to helping people survive and thrive.

As with nonprofits across the country, our members' employees are deeply committed to public service, yet face low compensation, high workloads, and systemic underinvestment in the health and human services sector.

For many, Public Service Loan Forgiveness ("PSLF") is an essential tool that makes it possible for people to remain in nonprofit careers. With a continuing nonprofit workforce shortage across the country, we believe it is paramount that broad access to PSLF should be preserved, not restricted.

We appreciate the opportunity to provide public feedback on these topics under negotiation:

The proposed rule is contrary to federal law.
When Congress established the PSLF Program in 2007 with broad, bipartisan support, its clear intent was to offer meaningful debt relief to those seeking to build long-term careers in public service. Lawmakers recognized that these roles, while vital, are often underpaid and offer fewer financial incentives than private-sector careers. Any narrowing of the definition of "qualifying employer" would undermine this legislative purpose.

The Department of Education does not have the authority to restrict eligibility under PSLF. We recommend that the Department of Education continue recognizing all 501(c)(3) organizations as qualifying employers under PSLF, without imposing additional criteria that reduce access or create complexity, confusion, and additional administrative burden.

The proposed rule inserts politics and ideology into the program.
This proposed rule is an attempt to impose politics and ideology on a program that millions of borrowers depend on. It replaces the clarity of law with the subjective, politically motivated criteria that would be confusing for most people to understand and navigate. This is an abuse of regulatory power and a betrayal of the public servants this program was designed to support. This proposed rule also opens the door for this and future administrations to change program eligibility based on their priorities or ideology. Nonprofits must be able to identify and meet needs in their communities without fear of political retribution.

The proposed rule undermines the effectiveness of the PSLF program, harming nonprofit employees and their communities.
Nonprofit workers who have devoted their lives to serving others could suddenly find their employment disqualified if this proposed rule goes into effect. It would upend years of service, destabilize the nonprofit workforce, and strip vital services from communities in need because of politics and ideology, which could change rapidly. Without consistent and clear rules, nonprofit professionals cannot rely on this program to make decisions about their career path. This will harm nonprofits, making it harder to attract a skilled workforce, and it will harm people and communities who rely on these services.

The PSLF program is a lifeline for those who choose public service over higher salaries in the private sector. This proposed rule is an attempt to harm underserved communities and the nonprofits and the nonprofit workers who serve them by undermining federal law and inserting politics and ideology into the PSLF program.

Thank you for your consideration of this input as part of the rulemaking process.

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Sincerely,
Bhumika Patel
Deputy Director
Human Service Chamber of Franklin County

**Attachments:**

1. Dept of Ed Public Comments.pdf
2. HSC PSLF Public Comments Dept of Ed 9 17 25.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10044 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Alyssa Meurer | **Organization:** | N/A |
| **Received Date:** | Sep 13, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

I am an attorney serving low-income individuals who otherwise would not be able to afford legal services. I entered law school and took out 6 figures of loans with the understanding that I could work at any nonprofit organization promoting free legal services for individuals. This new rule adds arbitrary, ill-defined criteria to restrict some legal service providers from accessing public service loan forgiveness. This is detrimental not only to those of us who feel passionate about providing universal legal services, but also our clients who rely on us to enforce their rights. These restrictions will prevent legal services from being accessible to many people because it de-incentivizes attorneys from pursuing public service work. It allows the Secretary of Education to have unfettered discretion to designate certain types of legal services as "illegal," a term not defined by the rule. Access to the courts and the law is a universal right, and we should be incentivizing free legal services, not creating more barriers for attorneys interested in public service work. This will also greatly lessen the pool of highly qualified attorneys who attended higher caliber law schools, since their tuition is higher. I for example attended a top 14 law school with the expectation that my six figures of student loans would be forgiven after 10 hard years of public service work. If this rule is passed, I may have to switch career paths to the detriment of my clients. This rule is ill-defined and misguided, and I am in strong opposition.

**Attachments:**    N/A

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10045 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Anonymous Anonymous | **Organization:** | N/A |
| **Received Date:** | Sep 13, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking

ED_00843

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

[Docket ID ED-2025-OPE-0016]

I am an attorney at a nonprofit legal aid organization in San Diego. I write in my individual capacity in strong opposition to the proposed changes to the Public Service Loan Forgiveness program.

I am a participant in PSLF and direct beneficiary of the PSLF program. I am terrified of losing my progress with PSLF and of no longer being able to work in public service if the program is altered so drastically.

I have seen first-hand how difficult it is to recruit and retain new attorneys. Law school debt is extremely high, and the nonprofit I work for cannot compete with the salaries offered in the private sector. The main way that many new attorneys, including myself, can work in nonprofits is through PSLF.

The proposed activities that could decertify an employer are vague and confusing. If a legal aid organization hires housing attorneys, but also advises immigrants on their rights, the hurt will not be limited to the immigration attorneys if that activity is deemed "illegal" - it will impact all the services we provide and will harm veterans and seniors who receive critical and free legal advice.

I personally cannot continue working in public service without the guarantee of forgiven loans in ten years due to the low nature of my salary and the high cost of living in San Diego. I know I'm not the only one. This proposed rule is a disservice to the public and indigent folks who can't afford legal representation. This will drive attorneys from the nonprofit sector, and leave low income Americans with even fewer options. All we do is provide free legal assistance to those who need it. Legal aid providers have no political agenda and serve no illegal purpose.

I urge you to withdraw these proposals and preserve this critical benefit for nonprofit workers.

| Attachments: | N/A |
|---|---|

---

| Comment ID: | ED-2025-OPE-0016-10062 |
|---|---|
| | Find on Regulations.gov |
| On Document ID: | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| Submitted By: | N/A | Organization: | Advocates for Children of New York |
| Received Date: | Sep 14, 2025 | Posted Date: | Sep 19, 2025 |

**Comment Detail:**
On behalf of Advocates for Children of New York (AFC), thank you for the opportunity to provide comments on the proposed rule to amend the regulations regarding the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

AFC is a 501(c)(3) non-profit organization that works to ensure a high-quality education for New York students who face barriers to academic success. Every year, we help thousands of individual families navigate New York City's complex education system. For example, we assist parents of students with disabilities in getting the special education services their children need.

Staff members, including advocates and attorneys, who work at AFC have relied on and benefited from the Public Service Loan Forgiveness program. In fact, we have had employees work at AFC who would

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

not have been able to accept the job without this program.

Given the importance of the PSLF program to our staff, AFC strongly opposes the proposed rule and the limitations it could impose on continued, reliable access to PSLF. Federal law makes clear that eligibility under PSLF applies to all charitable non-profit organizations, regardless of their missions or the communities they serve. Under current law, all 501(c)(3) organizations are eligible as qualified employers under PSLF. The definition of "public service job" in the PSLF statute states that the term means a full-time job at "an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title." The Department of Education does not have the authority to further restrict eligibility under PSLF.

The proposed rule gives discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene established public policy. We worry about the possibility of inappropriately excluding non-profit employers from this program. The rule opens the door to this Administration and future Administrations changing eligibility for the program based on their priorities or ideology. Non-profit organizations must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support their employees. Employees accepting a public service job at a non-profit organization should be able to rely on continued access to PSLF and not have to worry about the organization becoming ineligible for the program so long as the organization maintains its 501(c)(3) status. If an organization engages in substantial illegal activities, there is already a process through the Internal Revenue Service (IRS) to remove their 501(c)(3) status, which would make them ineligible for PSLF.

Without assurances that program rules will remain consistent over the long term, non-profit professionals cannot rely on the program to make important decisions about their career path. Ultimately, the proposed rule will harm the families and communities that rely on non-profit organizations and the essential services they provide by making it harder to recruit an effective, skilled workforce.

AFC strongly opposes the proposed rule and urges you not to move forward with the proposed changes. Thank you for considering our input.

**Attachments:**     N/A

---

**Comment ID:**      ED-2025-OPE-0016-10066

                     Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**  N/A          **Organization:**  American College of Physicians

**Received Date:**  Sep 16, 2025     **Posted Date:**  Sep 19, 2025

**Comment Detail:**
The American College of Physicians offers the attached comments on the proposed rule.

**Attachments:**

1. PSLF Proposed Rule.pdf

---

ED_00845

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment ID:**     ED-2025-OPE-0016-10076

Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | International Center for Not-for-Profit Law (ICNL) |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached comment of the U.S. Program of the International Center for Not-for-Profit Law - ICNL.

**Attachments:**

1.  ICNL Department Ed regulatory comment Sept 2025.pdf

---

**Comment ID:**     ED-2025-OPE-0016-10078

Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Barbara McDowell Social Justice Center |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
The Barbara McDowell Social Justice Center (the "Center") joins in the chorus of objections submitted in opposition to the Department of Education's (the "Department") proposed rule amending the Public Service Loan Forgiveness ("PSLF") program under 34 C.F.R. § 685.219. The Center's full comment submission is provided in the attached PDF file. The text below is a summary.

The Center respectfully urges the Department to withdraw its proposed changes to the PSLF program for the following reasons:

•By exceeding the Department's statutory authority, the proposed rule violates federal law by attempting to redefine PSLF eligibility beyond what Congress intended for all 501(c)(3) organizations.

•By introducing politics and ideology into a neutral-based program, the proposed rule violates fundamental First Amendment rights, disproportionately penalizes certain public service organizations, and causes a chilling effect on them and their employees.

•By shifting the burden of risk of PSLF ineligibility from the organization to the individual borrower, the proposed rule runs counter to the public policy goals of the PSLF program, risks destabilizing the nonprofit workforce, and weakens that sector's ability to meet critical community needs.

•By implementing vague and politically-charged definitions and failing to provide any meaningful avenues of review, the proposed rule denies employers and employees adequate due process.

•By ignoring existing IRS rules which already provide the reliable legal means to strip a nonprofit of its

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

501(c)(3) status and remove it and its employees from PSLF eligibility, the proposed rule circumvents IRS authority and wastes taxpayer dollars on duplicative and unnecessary procedures.

While the Center appreciates the Department's efforts to refine loan forgiveness programs, the proposed rule instead unlawfully restricts PSLF eligibility, distorts a bipartisan program into a political weapon, undermines the very goals of the PSLF program, and administratively bloats an already strained Department. We respectfully request that the Department withdraw this proposed rule and instead uphold PSLF's original bipartisan intent: to support public service. To do otherwise denies the ultimate beneficiaries of the PSLF program—vulnerable communities—the highly skilled services they need.

**Attachments:**

1. BMSJC Public Comments - 9 16 25.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10084 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Chicago Women in Trades |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

Please see attached comment prepared by Chicago Women in Trades in opposition to the proposed rulemaking on the PLSF program.

**Attachments:**

1. DeptEdu NPRM CWIT comment 9 16 25.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10089 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | Nancy Wirtz | **Organization:** | N/A |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

September 16, 2025

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program,
Docket ID ED-2025-OPE-0016

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Dear Secretary McMahon,

As President of the Paradise, CA, branch of the American Association of University Women (AAUW), I wish to express the strong opposition of our board of directors to the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

We understand that under this proposed rule, officials of the US Dept. Education would have authority to decide which nonprofits will be eligible to participate in the Public Service Loan Forgiveness (PSLF) program.

Further, the decision to disqualify a nonprofit would be based upon a determination that it is engaged in a "substantial illegal purpose." Yet the phrase "substantial illegal purpose" is not defined in the rule. This is an obvious opening for arbitrary and biassed disqualification of nonprofits based on political and ideological grounds.

In addition, the rule does not include any adequate method by which disqualified nonprofits could appeal the decision. This raises serious questions of lack of due process.

Then there are the "chilling" effects. Were this rule to go into effect, even if no action were taken to disqualify any nonprofit, the threat of such a decision could cause nonprofits to change their activities simply in fear of being found by a government employee to have engaged in a "substantial illegal purpose." And the rule would discourage people who wish to pursue a career with a nonprofit from doing so, since they will be uncertain of their ability to afford to carry student loan debt if the organization is disqualified from PSLF.

But beyond the nonprofits and their employees are the people all over the country who would lose the services provided – medical, legal, education, and other areas - who would end up suffering the most were this rule to take effect.

Our board urges the Department of Education to withdraw the proposed rule and preserve PSLF eligibility for all qualifying nonprofits. Thank you for considering this comment.

Sincerely,
Nancy Wirtz
President
Paradise AAUW (California)
nancyrwirtz@gmail.com

**Attachments:**    N/A

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10092 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Anonymous Anonymous **Organization:** N/A |
| **Received Date:** | Sep 16, 2025 **Posted Date:** Sep 19, 2025 |

**Comment Detail:**
To the U.S. Department of Education,  Please see the attachment with my comments on the NPRM relating to Public Service Loan Forgiveness.

**Attachments:**

1. Comments on Notice of Proposed Rulemaking.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10103

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

| | |
|---|---|
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | American Bar Association |
|---|---|---|---|
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached letter from American Bar Association President Michelle Behnke in opposition to the proposed rule.

**Attachments:**

1. PSLF ABA Opposition to Proposed ED Rule re Employer Eligibility 16 Sept 2025.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10108 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | CPAC Foundation's Center for Regulatory Freedom |
|---|---|---|---|
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Attached, in PDF format, are the comments of the CPAC Foundation's Center for Regulatory Freedom.

**Attachments:**

1. CRF Comment Amendments to PSLF Regulations FINAL 091625.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10118 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | YMCA of the USA |
|---|---|---|---|
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF Comment Letter - YMCA of the USA.pdf
2. PSLF Comment Letter - YMCA of the USA -.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10119 |
|---|---|
| | Find on Regulations.gov |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A

**Organization:** American Psychological Association Services

**Received Date:** Sep 16, 2025

**Posted Date:** Sep 19, 2025

**Comment Detail:**
Please see attachment.

**Attachments:**

1. APA Services comments_Direct Loan-PSLF NPRM_ED-2025-OPE-0016.pdf

---

**Comment ID:** ED-2025-OPE-0016-10122

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A

**Organization:** National Association of IOLTA Programs

**Received Date:** Sep 16, 2025

**Posted Date:** Sep 19, 2025

**Comment Detail:**
Please see the attached file.

**Attachments:**

1. 2025 09 NAIP Comment on ED-2025-OPE-0016-7221.pdf

---

**Comment ID:** ED-2025-OPE-0016-10123

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** Laura Riley

**Organization:** N/A

**Received Date:** Sep 16, 2025

**Posted Date:** Sep 19, 2025

**Comment Detail:**
To Whom It May Concern:

My name is Laura Riley and I am a member of the ABA Commission on Homelessness and Poverty, an academic administrator, former law professor and longtime public interest lawyer working in California. As an educator dedicated to advancing access to justice, and as a mentor to dozens of law students committed to public service careers, I have seen firsthand the essential role that the PSLF program plays in allowing talented attorneys to serve low-income and underserved communities.

PSLF has been instrumental in making it possible for law graduates—including many from rural and high-need regions—to pursue careers in legal aid, public defense, and nonprofit advocacy. Many current and former students accepted vital positions precisely because the promise of PSLF made such

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

career paths financially viable. Our legal community depends on PSLF both to attract highly qualified attorneys and to retain experienced staff who otherwise could not afford to remain in public service roles.

I am deeply concerned that the proposed rule threatens to disqualify organizations from PSLF eligibility based on ambiguous standards regarding "substantial illegal purpose," rather than the current, clear criteria of nonprofit or government status. Introducing these new exclusions could create significant uncertainty for borrowers and employers alike, deterring graduates from entering public service and worsening existing justice gaps in already underserved communities. If institutions providing critical legal services lose PSLF eligibility, it will undoubtedly undermine our ability to recruit and retain dedicated law students and attorneys—and ultimately harm access to justice for our most vulnerable populations.

I respectfully urge the Department to withdraw or substantially revise the proposed rule to ensure the clarity, accessibility, and effectiveness of PSLF. Protecting PSLF's integrity by maintaining simple, reliable eligibility is essential to supporting the next generation of public service lawyers and to fulfilling the program's original Congressional intent.

Thank you for considering this perspective. Please protect the future of public service by preserving PSLF eligibility for those serving the public good.

Sincerely,
Laura Riley

| **Attachments:** | N/A |
|---|---|

---

| **Comment ID:** | ED-2025-OPE-0016-10124 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Amanda Prasuhn | **Organization:** | N/A |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see attached.

**Attachments:**

1. PSLF comment letter 9_16.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10130 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | Middle States Commission on Higher Education |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

ED_00851

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
On behalf of the Middle States Commission on Higher Education, the attached comment is being submitted in response to the United States Department of Education's proposal to amend the regulations on the Public Service Loan Forgiveness program under 34 CFR § 685.219. MSCHE thanks you for the opportunity to provide comment.

**Attachments:**

1. 2025-09-16 Public Comment Docket ID ED-2025-OPE-0016.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10141 |
| | Find on Regulations.gov |

| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | The Nonprofit Alliance |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. FINAL TNPA public comment on PSLF (September 2025).pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10142 |
| | Find on Regulations.gov |

| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Dance/NYC |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Dance_NYC Public Comment -- DOE Proposed Rule Change to the PSLF.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10144 |
| | Find on Regulations.gov |

| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Council on American-Islamic Relations, New York |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

---

ED_00852

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
See attached

**Attachments:**

1. PLSF CAIR-NY Comment FINAL.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10148

        Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s). Thank you for your consideration.

**Attachments:**

1. FDL Proposed Rulemaking - Youth Alliance.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10153

        Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Chinese for Affirmative Action |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. CAA Public Comment_Re_ PSLF changes (1).pdf

---

**Comment ID:**    ED-2025-OPE-0016-10156

        Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Stanford Sierra Youth and Families |
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see attached PDF file

**Attachments:**

ED_00853

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. Stanford Sierra Youth and Families PSLF Comment Letter.pdf

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10171 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | Carol Stephens | **Organization:** | N/A |
|---|---|---|---|
| **Received Date:** | Sep 16, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

Linda McMahon, Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

RE: William D. Ford Federal Direct Loan (Direct Loan) Program, Docket ID ED-2025-OPE-0016

Dear Secretary McMahon,

We appreciate the opportunity to comment on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

As President of our Greater Richmond American Association of University Women, I am representing the views of our membership and the board of the GRAAUW. We are celebrating over one hundred years of serving our community in a number of ways. We offer college scholarships to deserving young persons as well as work with other community organizations and schools to provide services to women and girls. Many of our members have had careers in service to the community and to local schools. We are an affiliate of our national organization, AAUW, whose employees benefit from PSLF. The ability of our employees to meet their daily expenses would be greatly impacted if they should lose their PSLF status, which in turn, would affect the quality of the support and leadership that we receive from our national organization.

We find the proposed change to include giving the Secretary of Education the authority to decide whether a 501(c)(3) organization is eligible as a qualified employer is contrary to the statute that authorizes PSLF and further injects political judgement into a non-partisan issue. This change would open the door to fluctuation of criteria and points of view and could change every four years under a new administration. Imagine when the opposing party wins the election and they change which 501(c)(3) organizations qualify for PSLF. There would be no stability for future employees in making their financial calculations. The end result would be the negation of PSLF. But then, perhaps, that is the end result that the administration is hoping for, to end PSLF without having to go to Congress to change the statute.

Our democracy is founded upon citizen participation. If we cannot reward and encourage young people to offer their talents to non-profit organizations that serve the citizenry, then we are chipping away at our democracy. Let's encourage contributions to our community and strengthen the ability of non-profits to offer quality employment to folks with the benefit of loan forgiveness. We need our young professionals engaged in our communities! Abandon the rule changes that inject politics into a non-partisan program!

ED_00854

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

We urge the Department of Education to withdraw the proposed rule and preserve PSLF eligibility for all qualifying nonprofits. Thank you for considering this comment.

Sincerely,

Carol L. Stephens
President of Greater Richmond American Association of University Women

| | |
|---|---|
| **Attachments:** | N/A |

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10179 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | N/A |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 9-17-25 Tzedek DC Final PSLF Comment.pdf

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10185 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | New York Lawyers for the Public Interest |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Re: New York Lawyers Comments on Proposed Changes to Public Service LoanForgiveness Rules, Docket ID ED-2025-OPE-0016

**Attachments:**

1. PSLF NYLPI Letter (Final)-09 17 25.pdf

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10189 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Association of American Medical Colleges |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. FINAL AAMC_ED_2025_PSLF_Rulemaking.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10200 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Trilogy |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached comments re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016].

**Attachments:**

1. PSLF Comments September 2025_Trilogy.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10206 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Baptist Joint Committee for Religious Liberty |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Amanda Tyler
Washington, DC
Baptist Joint Committee for Religious Liberty
bjc@bjconline.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016-7221]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

the Public Service Loan Forgiveness (PSLF) program under 34 CFR § 685.219.

As Executive Director of the Baptist Joint Committee for Religious Liberty (BJC), I am deeply concerned about this proposed rule. BJC is an organization that works for faith freedom for all. Our mission is to extend and defend religious freedom for all, bringing a uniquely Baptist witness to the idea that religion must be free, neither advanced nor inhibited by the government.

We are a nonprofit organization with representation from 10 Baptist denominational bodies on our Board of Directors, along with ecumenical and interfaith representatives of the individuals that support our mission. Given that a significant number of nonprofit organizations across the country are faith-based, it is naturally a great relief to so many clergy, lay leaders, and other nonprofit staff nationwide that the Public Service Loan Forgiveness (PSLF) program is available to them. These public servants have often made great sacrifices, including in their paychecks, in order to be able to care for communities in need.

The organization I lead is specifically dedicated to ensuring faith freedom for all, including the right to free exercise of religion. For so many nonprofits, their public service is an expression of these deeply held values. Yet the proposed rule threatens to harm this fundamental right. While it claims to have the unobjectionable intention of removing eligibility from employers who are engaging in illegal activity, such organizations are already ineligible for PSLF. Instead, the proposed rule would give discretion to the political leadership of the U.S. Department of Education, to discern what they believe are "either explicit violations of State or Federal law or are otherwise in direct contravention of established public policy," even in the absence of any actual criminal conviction or due process.

We are deeply concerned that this and any future Administration could thereby deny loan forgiveness to public servants working for nonprofits whose priorities or ideology differ from theirs. The staff at our faith-based and other nonprofits must have the right to serve their communities' needs without fear of financial retribution for political aims.

The government must serve the needs of all, not just the needs of those who align with whomever currently holds political power.

The Baptist Joint Committee for Religious Liberty (BJC) therefore strongly opposes this proposed rule. We ask that you ensure all public servants have their First Amendment rights protected, and that no one is denied government benefits without due process.

Thank you for considering this input as part of the rulemaking process.

Sincerely,

Amanda Tyler
Baptist Joint Committee for Religious Liberty

**Attachments:**    N/A

---

**Comment ID:**    ED-2025-OPE-0016-10207

Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Hannah Young
Omaha, Nebraska
Nonprofit Association of the Midlands

Re: William D. Ford Federal Direct Loan (Direct Loan) Program – Notice of Proposed Rulemaking

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Hannah Young, and I represent the Nonprofit Association of the Midlands (NAM). NAM is the only membership organization in Nebraska dedicated exclusively to serving nonprofits in the Midlands, including western Iowa. By connecting organizations with information, education, advocacy, and collaboration, we help members focus their energy on the people and communities they serve.

The Public Service Loan Forgiveness program has been instrumental in ensuring that organizations like mine can recruit and retain a talented workforce committed to strengthening our communities. PSLF makes it possible for professionals to remain in nonprofit careers despite financial barriers, ensuring that essential services reach the people who need them most.

We strongly oppose the proposed rule and the limitations it would impose on which employers qualify for PSLF. Restricting eligibility based on an organization's mission would politicize the program, undermine its proven success, and subject nonprofit professionals to the shifting priorities and ideologies of different administrations. Such uncertainty would make it difficult for nonprofit employees to plan their careers with confidence. As long as an employer is a qualifying 501(c)(3) organization, that status should remain sufficient for PSLF eligibility, as established in statute. Without that assurance, nonprofits will face workforce instability, which in turn threatens their ability to meet community needs.

Thank you for considering these comments as part of the rulemaking process.

Sincerely,
Hannah Young

| | |
|---|---|
| **Attachments:** | N/A |

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10210 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

See attached comment opposing this NPRM and arbitrary narrowing of the PSLF program.

**Attachments:**

1. 9 17 25 PSLF Final Comment.pdf

---

**Comment ID:** ED-2025-OPE-0016-10211

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | National Women's Law Center |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please find attached comments submitted on behalf of 64 nonprofit organizations that promote and protect civil and human rights for all people in the US. This proposed rule is unlawful and exceeds the authority of the Department of Education. We strongly urge you to withdraw it in its entirety.

**Attachments:**

1. PSLF Coalition Sign On Comment (09-17-2025) FINAL.pdf

---

**Comment ID:** ED-2025-OPE-0016-10221

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | District of Columbia Access to Justice Commission |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see attached comment from the District of Columbia Access to Justice Commission

**Attachments:**

1. Attachment1_Comment on Docket ID ED-2025-OPE-0016 DC Access to Justice Commission.pdf

---

**Comment ID:** ED-2025-OPE-0016-10226

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
The Office of the Public Defender for San Joaquin County wishes to express its most ardent

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

opposition to the proposed amendment to 34 CFR 685.219. Please see the attached document.

**Attachments:**

1. PSLF_Letter.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10228 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Iowa Nonprofit Alliance |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

Our organization serves thousands of nonprofits across the state of Iowa, and we are very concerned about this proposed rule and oppose it entirely. It is critical for the well-being of our communities that we promote public service, and the Public Service Loan Forgiveness program is a valuable resource to make careers in the nonprofit and public sectors more appealing and feasible for college-educated individuals.

We oppose the narrowing of the criteria that determine eligible employers for the Public Service Loan Forgiveness program. Not only does the law not allow for such narrowing, but that also injects politics into the process by allowing the presidential administration - today under President Trump, but in a few years under another president - to change the eligibility criteria according to their political prerogatives.

In order for the Public Service Loan Forgiveness program to serve as an effective recruitment tool for nonprofits, prospective nonprofit employees need to have confidence that the program will be operated in a consistent manner over the long-term. Changing the terms of the program through this proposed rule undermine the intended effect of making nonprofit and public sector jobs more attractive because the program will not be seen as something that can be counted on.

We are also concerned that this rule does not allow for appropriate due process for nonprofit employers that are found to not be eligible employers. Furthermore, given that the IRS already has the authority to strip 501(c)(3) status from nonprofits engaging in substantial illegal activities, it does not make sense for this rule to attempt to establish a separate process to make a nonprofit ineligible.

Finally, the current capacity and expertise of the Department of Education are insufficient to effectively administer this rule.

Our organization opposes this proposed rule and believes it should not be enacted.

| **Attachments:** | N/A |
|---|---|

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10231 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Maryland Legal Aid |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 19, 2025

**Comment Detail:**
Attached is Maryland Legal Aid's comment to Docket ID: ED-2025-OPE-0016.

**Attachments:**

1. Maryland Legal Aid Comment on NPRM ED-2025-OPE-0016.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10232

                  Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A          **Organization:** Georgia Legal Services Program

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 19, 2025

**Comment Detail:**
See attached letter with comments. Thank you.

**Attachments:**

1. 2025 09 17GLSPPSLFComments_.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10234

                  Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A          **Organization:** Child Welfare League of America

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 19, 2025

**Comment Detail:**
See attached file.

**Attachments:**

1. CWLA PSLF Comments.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10239

                  Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A          **Organization:** N/A

**Received Date:** Sep 17, 2025          **Posted Date:** Sep 19, 2025

**Comment Detail:**

ED_00861

# Comment Submission Detail Report
# PSLF NPRM 2025
### (ED-2025-OPE-0016)

The University of California wishes to submit the following comment letter as it relates to the proposed Public Service Loan Forgiveness regulations.

**Attachments:**

1. 09 17 25 UC Comment Letter_PSLF Program.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10283 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Unitarian Universalist Association |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached letter in opposition to the proposed amendments.

**Attachments:**

1. UUA Comment on Proposed PSLF Amendments 9 17 25.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10287 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | Anonymous Anonymous | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

I am an attorney who works with people who need government assistance.

Over two dozen attorneys in my close law school cohort work for agencies serving Americans, including poor people, rural people, homeless people, disabled people, LGBTQ people, and children. Without access to PSLF, none of these attorneys could afford to work in public service, and the people and organizations they help have to go without legal assistance they could not otherwise afford. Attorneys I know, working for non-profit organizations, have helped people get off the street, find housing, get work, get healthcare, and get the help they need with legal matters that negatively impact the aforementioned.
I strongly oppose the proposed rule and the limitations it would impose on which employers would be

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

able to benefit from PSLF for their employees. The proposed rule inserts politics and ideology into the non-partisan PSLF program. The proposed rule gives unprecedented discretion to the Secretary of Education to determine whether an organization is engaging in activities that are in violation of state or federal laws or contravene public policy.

As an initial matter, this rule is redundant. The IRS already has authority to rescind the 501-c-3 status of any nonprofit found to be engaging in illegal activities.

Further, this rule harms Americans who rely on non-profit organizations for their basic needs. Of particular concern is the leeway the Department would have to exclude nonprofit employers working, for example, with undocumented immigrants, supporting transgender children, or advancing racial and social equity, because those classes of people are seen as undeserving by this Administration. This proposed rule opens the door to this and future Administrations changing eligibility for the program based on their priorities or ideology; for example, a soup kitchen run by a Christian organization could be found ineligible due to the ideology of an Administration. This effect of the proposed rule undermines the country's economic and social stability. Nonprofit organizations of all stripes must be able to identify and meet local needs without political interference, fear of retribution, or removal from a program designed to support them.

The proposed rule undermines the effectiveness of the PSLF program and would harm real Americans and their communities. My colleagues at non-profits organizations, who make less than 20% of what they could make in a big law firm, would not be able to work for a non-profit without PSLF. And the non-profits they serve would be unable to attract talented lawyers to serve their essential missions. Ultimately, the proposed rule will harm the American people and American communities that rely on nonprofit organizations and the essential services they provide. Legal help should not just be for the wealthy but should be accessible for all Americans. PSLF, as it stands now, allows lawyers to provide that help to needy Americans at a salary non-profits can afford.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
A concerned public interest attorney in Colorado

| **Attachments:** | N/A |
|---|---|

---

| **Comment ID:** | ED-2025-OPE-0016-10292 |
|---|---|
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Lenni Benson | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s) Opposition to the Department of Education Proposed Change on Public Service Loan Forgiveness

**Attachments:**

1. Benson comment on Proposed Rule Altering Loan forgiveness.pdf

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment ID:**   ED-2025-OPE-0016-10297

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | New Jersey Center for Nonprofits |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. NJCenterForNonprofits_ED-2025-OPE-0016-8107_PSLF_Comments_09172025.pdf

---

**Comment ID:**   ED-2025-OPE-0016-10299

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | International Federation of Professional and Technical Engineers |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. IFPTE comment on Ed NPRM.pdf

---

**Comment ID:**   ED-2025-OPE-0016-10304

Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | LeadingAge |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. LeadingAge Comments on Public Service Loan Forgiveness Proposed Rule_09 17 25.pdf

---

**Comment ID:**   ED-2025-OPE-0016-10312

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

| | |
|---|---|
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Minnesota Hospital Association |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached comments from the Minnesota Hospital Association.

**Attachments:**

1. 09 15 25_MHA_PSLF (1).pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10316 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Safe Passage Project |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Safe Passage Project comment.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10318 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | OneJustice |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Comments included in the attachment.

**Attachments:**

1. Comment on Reg ED-2025-OPE-0016-7221 - OneJustice.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10320 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | National Urban League |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025_09_17_National Urban League PSLF Response.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10322 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | California Access to Justice Commission |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Comment Ltr on Proposed PSLF Regulations 9 17 2025kb2.pdf

---

| | | | |
|---|---|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10323 | | |
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | The Law Office of Pavel Rozman |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
The proposed changes to the Public Service Loan Forgiveness (PSLF) program undermine the program's statutory purpose and create uncertainty for thousands of attorneys and other public servants. PSLF was designed by Congress to enable graduates to pursue public interest work without being crushed by student debt. By conditioning eligibility on whether the Secretary of Education deems an employer's mission sufficiently aligned with current political preferences, the Department threatens to transform PSLF into a tool of partisan punishment rather than a neutral support for public service. This shift would not only deter law students from entering public interest careers but also destabilize nonprofit organizations, public defender offices, and municipal agencies that rely on them.

For immigration attorneys, civil rights lawyers, and other advocates, the proposed standard is dangerously vague. Labeling representation of clients or defense of local government policies as "aiding or abetting" illegal conduct misconstrues the role of counsel and risks penalizing core

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

constitutional functions. Public service workers should not have their loan forgiveness contingent on the government's approval of the people or causes they serve. Restricting PSLF in this way will reduce access to justice for vulnerable communities, chill protected advocacy, and weaken the very public institutions the program was intended to strengthen. I urge the Department to withdraw this proposal.

**Attachments:** N/A

---

| **Comment ID:** | ED-2025-OPE-0016-10327 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Center for Responsible Lending |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. CRL PSLF Comment-Final.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10331 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Attached is a comment from the City of New York regarding the Department of Education's August 18, 2025 Notice of Proposed Rulemaking on its Public Service Loan Forgiveness Program.

**Attachments:**

1. City of New York Comment on PSLF_09 17 25.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10336 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Children's Hospital Los Angeles Medical Group and Children's Hospital Los Angeles |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
See attached letter

**Attachments:**

1. CHLA PSLF Letter.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10337 |
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. County of San Mateo - Docket ID ED-2025-OPE-0016.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10339 |
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Transgender Law Center |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached comments from the Transgender Law Center

**Attachments:**

1. Transgender Law Center Comments to RIN 1801-AA28 PSLF.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10341 |
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Arkansas Advocates for Children & Families |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. AACF Public Comment to PSLF Rule Change.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10342 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | American College of Emergency Physicians |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
On behalf of our nearly 40,000 members, the American College of Emergency Physicians (ACEP) appreciates the opportunity to comment the proposed rule entitled "William D. Ford Federal Direct Loan (Direct Loan) Program."

**Attachments:**

1. ACEP Response Federal Direct Loan Proposed Rule.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10346 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | BayCare Health System |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. BayCare Health System - PSLF Comment Letter 9 17 25.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10348 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | NAACP Legal Defense and Educational Fund, Inc. |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

1. 2025 09 17 LDF Comment Letter on PSLF.pdf

---

**Comment ID:** ED-2025-OPE-0016-10349

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | National Association of Community Health Centers |
|---|---|---|---|

**Received Date:** Sep 17, 2025    **Posted Date:** Sep 19, 2025

**Comment Detail:**
See attached.

**Attachments:**

1. 25_09_17_NACHC_Comment Letter_PSLF_Proposed Rule.pdf

---

**Comment ID:** ED-2025-OPE-0016-10358

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | The Labor & Employment Committee of the National Lawyers Guild |
|---|---|---|---|

**Received Date:** Sep 17, 2025    **Posted Date:** Sep 19, 2025

**Comment Detail:**
We, the Labor & Employment Committee of the National Lawyers Guild (NLG) are a national committee of the National Lawyers Guild that seeks to advance the interests of working people and organized labor through education and advocacy, support for their individual and collective actions, and any other efforts necessary and appropriate to the advancement of these interests, and we oppose the proposed changes to the Public Service Loan Forgiveness (PSLF) program.

The PSLF program was enacted by Congress almost 20 years ago as a way for public service workers to achieve student debt cancellation after working for ten years at a qualifying government agency, nonprofit, or entity. No exceptions. PSLF is a bipartisan program created by Congress, and it should not be up to the Department of Education to take it away from certain employers.

As an organization that is both an advocate for the interests of working people and partially comprised of attorneys, legal workers, and law students who are committed to public service, we are outraged by the Trump Administration's proposal to deny PSLF access to workers who serve vulnerable communities like immigrants, people of color, and transgender youth. Additionally, public sector workers, including teachers, firefighters, professors, sanitary workers, airport workers, and engineers who are integral parts of public sector unions represented by our attorney members, will be gravely impacted by these proposed changes to PSLF. We urge the Department of Education to eliminate this proposed rule.

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Public service workers are critically important across the board, but especially so in these underserved communities. Denying PSLF access to workers who serve these communities would both decrease the capacity of existing workers to serve these communities and reduce the ability and/or willingness of future workers to make the necessary career decisions to someday serve these communities. PSLF has provided many workers with enhanced opportunities to serve these underserved communities.

Furthermore, without PSLF, federal, state, local, and tribal government organizations, nonprofits, and other entities will be left with a declining pool of public service workers whom they can call upon to serve these communities. These changes will only serve to increase the vulnerability of these communities and put our nation in an increasingly precarious situation.

The Department of Education's proposed regulation is a gross misuse of power and an illegal attempt to deny PSLF to employers whose work does not align with the Trump Administration's agenda. If implemented, the regulation will cause harm to millions of borrowers who were promised student debt cancellation through PSLF, and who often made career choices based on this promise.

This proposal is illegal and blight on both working people and our communities.

We urge you to keep the promise that Congress made to Americans and eliminate this proposal immediately.

Sincerely,

The Labor & Employment Committee of the National Lawyers Guild

---

**Attachments:**       N/A

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10359 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | Andrew Calvert | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

I am a criminal defense attorney, and I am deeply concerned that this proposed rule will be used to deny PSLF eligibility to public defenders. The ambiguity in the terms "aiding and abetting violations of state and federal law" as grounds for employer-ineligibility, and the low standard of preponderance of the evidence, would provide the possibility of bad-faith enforcement against public defender agencies—even though there is nothing illegal about the practice of criminal defense. Similarly, many public defenders will, from time to time, be appointed to represent undocumented clients with an affirmative duty to correctly advise those clients of the collateral immigration consequences of the criminal proceeding. Ambiguity in this rule will similarly disincentivize defenders from remaining in their roles—further exacerbating the resource gap in many jurisdictions between the prosecution and the defense. By the same token, it will encourage defenders to transition to prosecutorial positions that would seemingly be unaffected by the ambiguity herein. Finally, bad-faith enforcement of the rule against defender agencies would, through implementation of corrective action plans, allow any executive Administration to dictate defenders' practice of law—destroying the attorney-client

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

risking the attorney being asked to violate their jurisdiction's Rules of Professional Conduct in order to avoid pecuniary loss. The rule should be amended to specifically exclude public defense agencies to avoid its misuse against the only lawyers required to exist by the U.S. Constitution.

**Attachments:**     N/A

---

| **Comment ID:** | ED-2025-OPE-0016-10361 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | Young Invincibles |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. YI PSLF Comment Proposed Rule.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10364 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | N/A | **Organization:** | MASSCreative, Inc |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. MASSCreative PSLF Letter.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10372 | | |
|---|---|---|---|
| | Find on Regulations.gov | | |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) | | |
| **Submitted By:** | Anonymous Anonymous | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

I strongly oppose the proposed rule change. I am a public defender who took out student loans to attend law school. I took out loans based on the promise of student loan forgiveness through PSLF. If PSLF did not exist, I would have seriously considered not going to law school. If the government makes it more difficult for borrowers to attain forgiveness through PSLF, then public interest lawyers like

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

myself, who have dedicated themselves to bettering our communities, will be strapped with much greater financial burdens. Additionally, if PSLF becomes more difficult to attain, then fewer lawyers will do the important public interest work that helps so many Americans.

| | |
|---|---|
| **Attachments:** | N/A |

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10374 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | LeighAnn Rosenberg | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

I write to echo the comments submitted by numerous civil legal service providers, and to highlight several concrete harms that the proposed changes to the Public Service Loan Forgiveness (PSLF) program would have on my work. Specifically, I write to uplift the extreme hardships that the proposed changes would place on dedicated and talented legal advocates who are committed to filling an extreme need in our communities: providing legal representation and services to people facing eviction from their homes. Changes to what makes an employer "qualified" for purposes of PSLF creates an unnecessary and unwise barrier to retaining and recruiting people who already make financial and personal sacrifices to do this work.

The advocates I work with serve people who struggle to make ends meet on a daily basis, and who are overwhelmingly overburdened by the rising costs of housing. More than 45.5% percent of renters in our state must devote more than 30% of their gross income to their housing costs. This is because the fair market rents in our state are high: $1,729 per month for a 1 bedroom, and $2,036 per month for a 2 bedroom. To afford a 1 bedroom, this means that renters either need to earn $33.24 per hour or work 89 hours per week at our $15 minimum wage. For a 2 bedroom, they need to earn $39.15 per hour or work 104 hours per week at minimum wage.

It is therefore both unfortunate and unsurprising that our state faces an enormous volume of eviction cases each year, around 400,000 total and of which around 395,000 are for failure to timely pay rent. Landlords are represented by counsel in approximately 90% of these cases, while renters are represented in less than 10%. Our state has made great strides in correcting that imbalance by passing a law guaranteeing access to counsel in evictions. Collectively, the civil legal service organizations in our state worked to provide representation in at least 9,100 cases last year through the Access to Counsel in Evictions (ACE) program alone.

In those ACE cases, 87% of renters had remaining in the property as their goal, and 88% of renters with that goal were able to do so at the conclusion of their case. Our advocates are effective at filling this great need. Moreover, their services provide an incredible benefit to our state as a whole: an estimated $3.04 in potential fiscal impacts and economic benefits for every $1 spent on the program. Our advocates are a shining example of public service, delivering concrete results to our clients and to our community.

Our team is dedicated to our clients and to this work. When surveyed, all of our responding staff members reported that the mission-driven nature of our work is very important to them. Advocates specifically stated that they pursue this work because they want to serve the public good, or to serve

# Comment Submission Detail Report
# PSLF NPRM 2025
## (ED-2025-OPE-0016)

people in need.

While this work is rewarding, it is challenging. The legal services community, in general, grapples with staff burnout and retention. It is challenging to serve large numbers of people who are facing devastating consequences, like losing their housing, especially when we know we are only filling a small fraction of the need. Yet we chose this work so that we could do all we could, and we chose to do so knowing that public service means accepting lower pay than what is available in the private sector. The PSLF program is a contractual promise from our government, held out to make it more financially feasible to serve the public good. Our colleagues specifically note that they entered public service—or even law school—knowing about and relying on the promise of PSLF to make it work.

The proposed changes to the criteria for "qualified employers" would insert ambiguity into a system that requires clarity. A system that cannot clearly provide a fair process for knowing whether we qualify for PSLF will threaten our ability to do this work. If it is unclear whether our employer remains qualified for PSLF, 82.4% of staff surveyed report that they would have to significantly alter their future financial goals. Some noted they would have to alter life plans like where they live, or whether and when to have children. And over half report that they would have to consider leaving this work—and likely public service altogether.

The proposed changes would walk back a promise made to hardworking public servants and, in turn, threaten to force us out of work that we love. Our colleagues are heartbroken at this prospect. We are people committed to serving our neighbors in need. We want to do all we can to keep our clients and their families housed, but must remain able to pay our own rents and mortgages, to feed or choose to have our own children.

Thank you for the opportunity to provide comments on the proposed rule.

| **Attachments:** | N/A |
| --- | --- |

| **Comment ID:** | ED-2025-OPE-0016-10382 |
| --- | --- |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | Public Counsel |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 09 17 PC Comment Re Dept Ed Proposed PSLF Rule (Docket ID ED-2025-OPE-0016).pdf

| **Comment ID:** | ED-2025-OPE-0016-10383 |
| --- | --- |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | The Chicago Bar Foundation |

ED_00874

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:**    Sep 17, 2025              **Posted Date:**    Sep 19, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1.  [CBF Public Comment PSLF Employer Eligibility Modifications 9 17 2025.pdf](#)

---

**Comment ID:**    ED-2025-OPE-0016-10384

                   Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    N/A              **Organization:**    N/A

**Received Date:**    Sep 17, 2025              **Posted Date:**    Sep 19, 2025

**Comment Detail:**
Please see the attached pdf for full comment.

--
The County of Los Angeles ("County") Chief Executive Office respectfully submits this comment in opposition to the Department of Education's proposed amendments to the regulations governing the Public Service Loan Forgiveness ("PSLF") Program. For nearly two decades, the PSLF program has served as an essential recruitment and retention tool for public service employers. The program ensures that individuals who choose to serve in government, nonprofit organizations, and other public-serving roles—often at significantly lower salaries than in the private sector—can do so without being burdened by insurmountable student loan debt. Any regulatory change that jeopardizes access to PSLF threatens not only the financial well-being of these employees but also the ability of public institutions to deliver high-quality services to the communities they serve.

Like any federal, state, or local entity, the County relies on a stable pool of well-qualified public servants who have chosen to pursue careers in public service over higher-paying private sector jobs. The proposed rule risks undermining this workforce by introducing uncertainty into PSLF eligibility. The absence or erosion of PSLF will disincentivize careers in County government, leading to staffing shortages and reduced institutional capacity to deliver critical and essential services to its residents, including in the areas of health care, social services, public safety, and legal services (including district attorneys and public defenders).

**Attachments:**

1.  [County of LA CEO Response to Rulemaking on PSLF Program.pdf](#)

---

**Comment ID:**    ED-2025-OPE-0016-10390

                   Find on Regulations.gov

**On Document ID:**    ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    Alan Solot              **Organization:**    N/A

**Received Date:**    Sep 17, 2025              **Posted Date:**    Sep 19, 2025

ED_00875

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10398

                      Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | Madison Marino Doan | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Doan ED comment on PSLF (Final version).pdf

---

**Comment ID:**       ED-2025-OPE-0016-10403

                      Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | National Association of Social Workers |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see attached comments from the National Association of Social Workers.

**Attachments:**

1. 09172025 PSLF Public Comment NASW.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10407

                      Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Family Focus
Chicago, IL and surrounding areas

ED_00876

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

info@family-focus.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

Family Focus is a nonprofit that has worked for 175 years to nurture children by strengthening families. Through our eleven community centers, we provide early childhood education, after-school programs, parenting support, youth leadership development, and other support services. Each year, we serve more than 19,000 children and families in Chicago and surrounding areas.

The PSLF program has been essential to our work. Many of our staff members, including, early childhood educators, youth mentors, case managers, hold advanced degrees and carry significant student loan debt. PSLF makes it possible for them to dedicate their careers to serving families in our communities. Without the promise of loan forgiveness, many would be unable to remain in nonprofit service, limiting our ability to provide consistent, trusted programs for children and families.

We strongly oppose the proposed rule, which would limit which employers qualify for PSLF. This rule is contrary to federal law, which explicitly provides that all 501(c)(3) nonprofit organizations are eligible employers under PSLF.

In addition to being unlawful, the proposal inserts politics and ideology into a program that must remain neutral. By giving discretion to exclude nonprofits based on perceived violations of federal or state law, the Department risks targeting organizations that simply provide vital services to families and communities. This opens the door for any Administration to disqualify nonprofits based on shifting political priorities, creating instability and uncertainty across the entire nonprofit sector. Nonprofits must be able to meet community needs without fear of any type of retribution.

Finally, there are already safeguards in place. If an organization engages in substantial illegal activity, the Internal Revenue Service has authority to revoke its 501(c)(3) status. Creating a duplicative, discretionary process at the Department of Education is unnecessary, burdensome, and beyond the Department's expertise or capacity to administer.

For all these reasons, Family Focus urges the Department to withdraw the proposed rule and maintain eligibility for all 501(c)(3) organizations under PSLF, as required by law.

If you have any further questions, feel free to email us at info@family-focus.org. Thank you for considering this input as part of the rulemaking process.

Best,
Family Focus Team

**Attachments:**      N/A

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10415 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Ohio Justice & Policy Center |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Gabriel Davis
Cincinnati, OH

ED_00877

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Ohio Justice & Policy Center
gdavis@ohiojpc.org

Re: William D. Ford Federal Direct Loan (Direct Loan) Program Notice of Proposed Rulemaking [Docket ID ED-2025-OPE-0016]

Dear Ms. Abernathy,

Thank you for the opportunity to provide comments on the proposed rule to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219.

My name is Gabe Davis, and I am CEO of Ohio Justice & Policy Center (OJPC). OJPC is a nonprofit law firm that offers a variety of free legal services, programs, and resources to help people navigate the complexities of our criminal justice system.

The Public Service Loan Forgiveness Program has enabled my organization to serve our communities by working to protect the human rights of those in prison, remove barriers to employment and housing, and free over-punished incarcerated people. In 2024, we had 69 active cases and 10 individuals released from prison through our project Beyond Guilt, which works to free those who have been unfairly sentenced and have demonstrated rehabilitation within prison. We also represented 33 clients whose constitutional rights were violated while in prison, as well as 314 clients through our Second Chance program, which assists individuals after they are released from prison and rejoining their community, particularly in overcoming disadvantages due to having a criminal record.

My organization strongly opposes the proposed rule and the limitations it would impose on which employers would be able to benefit from PSLF for their employees. The work that we do at OJPC relies upon having qualified attorneys and legal staff who can represent our clients. PSLF gives our legal staff the opportunity to serve the community without the financial concern of student loans.

We are concerned that this rule would give the Department of Education the discretion to exclude organizations such as ours that are working to advance racial and social equity, or work on issues involving detention and incarceration. The rule leaves room for those in the Department of Education who disagree ideologically or politically with the work OJPC is doing to exclude our employees from the PSLF program, despite federal law that declares employees of OJPC, as a nonprofit organization, eligible for loan forgiveness. If this rule is accepted, future administrations could change the eligibility of organizations based on ideological viewpoints, which destabilizes the PSLF program. Many of our current and potential employees rely on this program, and the proposed amendment could cause employees to lose confidence in the program and decide to follow a more certain career path. Our work depends on having qualified legal staff to represent our clients, and this rule could significantly impact the quality of our service within the community. We ask you to reconsider these proposed changes.

Thank you for considering this input as part of the rulemaking process.

Sincerely,
Gabe Davis, CEO

**Attachments:**

1. PSLF Comment - 9 17 25.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10416

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Robert F. Kennedy Human Rights |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Attached please find comments from Robert F. Kennedy Human Rights.

**Attachments:**

1. 2025 09 17 - RFK Human Rights PSLF Comment.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10418 |
|---|---|
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Human Rights First |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached comment by Human Rights First.

**Attachments:**

1. Human Rights First's NPRM Comment 9 17 2025.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10419 |
|---|---|
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Docket ID ED-2025-OPE-0016

Please see attached public comment from the City of Albuquerque.

**Attachments:**

1. City of Albuquerque PSLF Final Public Comment.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10421 |
|---|---|
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | The Institute of Student Loan Advisors |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:**   Sep 17, 2025          **Posted Date:**   Sep 19, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. September 2025 PSLF Comments Mayotte.pdf

---

**Comment ID:**   ED-2025-OPE-0016-10429

   Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**   N/A          **Organization:**   N/A

**Received Date:**   Sep 17, 2025          **Posted Date:**   Sep 19, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025-09-17 PUBLIC COMMENT RE PSLF RULE (final version).pdf

---

**Comment ID:**   ED-2025-OPE-0016-10430

   Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**   Demetria Carter          **Organization:**   N/A

**Received Date:**   Sep 17, 2025          **Posted Date:**   Sep 19, 2025

**Comment Detail:**
My name is Demetria Carter, and I am a Financial Aid Administrator in Greensboro, NC. I am writing to express my opposition to the Department of Education's proposed changes to the Public Service Loan Forgiveness (PSLF) program, including points that would exclude certain nonprofit employers based on having a "substantial illegal purpose." I urge the Department to withdraw this proposal and instead focus on removing existing barriers that continue to prevent millions of public servants from receiving PSLF.

Congress already established eligibility for employees of 501(c)(3) nonprofit organizations and created parameters that limit other organizations from being qualified employers for PSLF. The Department does not have the authority to add vague or arbitrary exclusions that contradict the law. This proposal risks unfair, politically motivated decisions and creates uncertainty for the many North Carolinians who pursue public service careers with PSLF in mind.

Full-time in-state undergraduate tuition averaged $6,560 for a North Carolinian this year. Many public service roles require advanced degree. With minimum wage remaining $7.50, millions of students rely on loans to cover the cost of completing their education. Their hard work is met with modest salaries: the first-year pay for an NC teacher with an Advanced degree is $42,900. Yet students continue to pursue careers in public service, trusting that PSLF will allow them the means to repay federal loans. To arbitrarily change the rules for PSLF is a betrayal by the federal government to these citizens. PSLF

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

is a crucial promise that makes public service career paths sustainable.

The proposed changes to the PSLF program have the whiff of respectability but in truth they stink. Under the current administration, nonprofit organizations serving vulnerable groups are more likely to face political scrutiny and be deemed to have "substantial illegal purposes." The administration has shown this in the past 8 months by withholding funds from universities and states that hurt his feelings, introducing policies that echo Jim Crow era laws and pushing measures aimed at removing basic human rights for women. By tying PSLF eligibility to the vague determinations of "illegal purpose" based on a narcissistic president's whim, the Department risks harming communities most in need of support and discouraging talented professionals from entering nonprofit work.

I have spent 14 years helping students afford and access higher education, and I have seen firsthand the sacrifices they make to serve others after graduation. The proposed changes to PSLF are unnecessary and a waste of resources. If the Department is truly concerned about abuse or misuse of the program, there are less harmful ways to go about the process. I urge the Department to withdraw this rule and work to address the real issues already within the PSLF program.

**Attachments:**     N/A

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10439 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | FPWA |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

The Federation of Protestant Welfare Agencies (FPWA) submits these comments in opposition of the Office of Postsecondary Education, Department of Education proposed rulemaking that amends the regulations to the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a substantial illegal purpose as determined by the Secretary.

FPWA is a leading anti-poverty, social policy and advocacy organization dedicated to strengthening faith institutions and human services organizations and advancing economic opportunity and justice for New Yorkers with low incomes. For more than 100 years, FPWA has driven groundbreaking policy reforms to better serve those in need and strengthened the capacity of human services agencies and faith institutions to serve the community. Our nearly 170 faith-based and human services agency members provide vital services to their communities ranging from childcare and early education to services for older adults and food pantries. Many roles within these organizations require a college degree. We appreciate the opportunity to comment on the proposed regulations.

The PSLF program supports the ability of individuals from low- and middle-income families to pursue careers in public service. The engagement of a talented and educated workforce benefits not only the organizations in which they work and communities they serve, it strengthens our economy and country as a whole. The proposed rule change could jeopardize the ability of individuals with student debt to provide this much-needed service to America.

Despite the necessary role faith-based and nonprofit organizations play in serving our communities, the organizations operate with tight budgets that constrain the wages they can provide. In a recent budget analysis, FPWA found that the median annual wages and benefits provided by our member

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

organizations are 20 to 35 percent below comparable positions in the government and private sector. In 2019, two-thirds of full time human services workers earned below New York City's near poverty measure.

Given the need for higher education and the low wages of the sector, employees in social services have a high likelihood of carrying student debt, impacting their ability to provide for their families today and save for the future. The PSLF program opens the opportunity for individuals from low- and middle-income families to provide a much-needed service to the country by working with faith and nonprofit organizations. It has expanded the pool of available workers to include those from low- and middle-income backgrounds who may bring lived experience to the role, further enhancing the organizations in which they work, and students and workers have made life decisions based on the availability of the program. Enacting the proposed rule may discourage individuals with student debt from entering public service, harming our faith-based and social service organization members and, ultimately, harming the communities we serve and our country.

In addition to the chilling effect this may have on future workers, any changes to the rule may negatively impact current workers at faith-based and social service organizations. A recent report by the Urban Institute, commissioned by FPWA and Community Service Society of New York, found that 52 percent of American families are living below the True Cost of Economic Security. While college graduates with student loans have higher household incomes than non-college graduates, young graduates with loans report finding it difficult to get by. In a context where we have a cost-of-living crisis, the government should not be reducing eligibility to programs that can help alleviate economic insecurity.

Because the PSLF program creates opportunity for economic mobility for individuals from low- and middle-income backgrounds and supports our faith-based and social service organizations in doing vital work in our communities and for our country, we oppose the proposed rule change that may reduce the ability of low- and middle-income individuals from engaging in public service. We advise the Department of Education to withdraw the proposed rule.

**Attachments:**

1. [FPWA Comment on William D Ford Federal Direct Loan (Direct Loan) Program.pdf](#)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10454 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | National Disability Institute |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see attached.

**Attachments:**

1. [NDI PSLF letter Sep 2025.pdf](#)

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10455 |
| | Find on Regulations.gov |

ED_00882

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Ethics and Public Policy Center |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. EPPC Scholars Comment on ED Student Loan Forgiveness Program.pdf

---

**Comment ID:** ED-2025-OPE-0016-10460

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Asian Law Caucus |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 20250917 ALC Comment on PSLF Rule.pdf

---

**Comment ID:** ED-2025-OPE-0016-10462

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | National Legal Aid & Defender Association |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. NLADA PSLF Comments 9 2025.pdf

---

**Comment ID:** ED-2025-OPE-0016-10465

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

ED_00883

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Council on Foundations |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

The Council on Foundations appreciates the opportunity to provide our input and comments to the Department of Education on the proposed rule to amend the Public Service Loan Forgiveness Program. Please see the attachments for our response.

**Attachments:**

1. Attachment1_Council on Foundations Response to William D Ford Federal Direct Loan (Direct Loan) .pdf
2. Attachment2_Council on Foundations Response to William D Ford Federal Direct Loan (Direct Loan) .pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10466 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Public Law Center |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

Please see the attached comment letter.

**Attachments:**

1. 2025 09 17 PSLF comment.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10468 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Minority Veterans of America |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

Comment submitted on behalf of Minority Veterans of America by Yale Law School Veterans Legal Services Clinic.

**Attachments:**

1. PSLF NPRM MVA 9 17 25 Final.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10479 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) |

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Colorado Cross-Disability Coalition |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached letter from the Colorado Cross-Disability Coalition, providing its comments on the Department of Education's proposed rule modifying the PSLF program.

**Attachments:**

1. 2025 09 17 CCDC Comments re DOE PSLF.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10484 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Center on Race, Inequality, and the Law at NYU School of Law |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached comment submitted by the Center on Race, Inequality, and the Law at NYU School of Law for Docket ID ED-2025-OPE-0016.

**Attachments:**

1. PSLF Comment--CRIL--9-17-2025.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10488 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Services, Immigrant Rights and Education Network (SIREN) |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 09 17 SIREN - Direct Loan Program Proposed Rulemaking (Oppose).pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10492 |

ED_00885

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Coalition for Humane Immigrant Rights (CHIRLA) |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached PDF.

**Attachments:**

1. PSLF Public Comment CHIRLA.pdf

---

**Comment ID:** ED-2025-OPE-0016-10502

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | Erwin Chemerinsky | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Final Comment re PSLF.pdf

---

**Comment ID:** ED-2025-OPE-0016-10504

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Hispanic Federation |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached comment from Hispanic Federation, urging ED to withdraw the proposed rule, re: William D. Ford Federal Direct Loan Program, 34 CFR Part 685; Docket ID ED-2025-OPE-0016.

**Attachments:**

1. Hispanic Federation Public Comment William D Ford Federal Direct Loan Program 34 CFR Part 685 Do.pdf

---

**Comment ID:** ED-2025-OPE-0016-10507

Find on Regulations.gov

ED_00886

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A                          **Organization:** N/A

**Received Date:** Sep 17, 2025               **Posted Date:** Sep 19, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025-09-17 D Ed - CCSF Comments re PSLF.pdf

---

**Comment ID:**         ED-2025-OPE-0016-10509

                        Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A                          **Organization:** American Association of University Women (AAUW)

**Received Date:** Sep 17, 2025               **Posted Date:** Sep 19, 2025

**Comment Detail:**
Please see attached comments from the American Association of University Women (AAUW).

**Attachments:**

1. AAUW comment on ED-2025-OPE-0016 - Sept 25.pdf

---

**Comment ID:**         ED-2025-OPE-0016-10516

                        Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** N/A                          **Organization:** N/A

**Received Date:** Sep 17, 2025               **Posted Date:** Sep 19, 2025

**Comment Detail:**
See attached file(s)

**Attachments:**

1. City and County PSLF NPRM Comment Letter ED-2025-OPE-0016.pdf

---

**Comment ID:**         ED-2025-OPE-0016-10524

                        Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:** R. Larkin Taylor-Parker     **Organization:** N/A

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Received Date:**    Sep 17, 2025          **Posted Date:**    Sep 19, 2025

**Comment Detail:**
Please see attached.

**Attachments:**

1. PSLF NPRM.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10530

                     Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    N/A                     **Organization:**   National Association of Student Loan Lawyers (NASLL)

**Received Date:**   Sep 17, 2025            **Posted Date:**    Sep 19, 2025

**Comment Detail:**
Comments submitted on behalf of our members (and our thousands of federal student loan borrower clients) of the National Association of Student Loan Lawyers [NASLL] re changes to POSLF PROGRAM  9/17/25

**Attachments:**

1. NASLL COMMENTS TO DoE FSA 9-17-2025.pdf
2. NASLL EX 1 PSLF NPRM Coalition Comment Letter September 2025.pdf
3. NASLL EX 2 LSNYC PSLF comments final.pdf

---

**Comment ID:**       ED-2025-OPE-0016-10534

                     Find on Regulations.gov

**On Document ID:**   ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

**Submitted By:**    Anonymous Anonymous      **Organization:**   N/A

**Received Date:**   Sep 17, 2025            **Posted Date:**    Sep 19, 2025

**Comment Detail:**
This rule is going to dissuade recent law grads from going into any kind of social work, because with the vague definitions in it, almost anything the current administration doesn't like they will call "illegal" and leave people with the crushing debt. You can see that this law is going to be used against immigrants, trans people, any LGBTQ people, probably, and frankly anyone who doesn't bow to the regime.

We need to encourage lawyers to work FOR society, not just for money. This rule makes that harder. Also, it's just gross.

**Attachments:**    N/A

---

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10537 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Legal Aid Organizations - Group Comment |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached comment from 70+ legal services organizations that work on behalf of low-income people.

**Attachments:**

1. Legal Aid PSLF Comments - Final 9 17 25.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10538 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Consumer Law Advocates, Scholars & Students Network et al. |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached public comment of the Consumer Law Advocates, Scholars & Students (CLASS) Network; the People's Parity Project; the National Plaintiffs' Law Association, and 246 law students and recent law school graduates from 23 law schools across the country in strident opposition to the proposed rule on the Public Service Loan Forgiveness program.

**Attachments:**

1. image.pdf
2. 2025 PSLF Reg_Law Student Comment.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10553 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| **Submitted By:** | N/A | **Organization:** | Jobs to Move America |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

**Attachments:**

1. Comment_Jobs to Move America_ED-2025-OPE-0016_2025 09 17.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10554 |
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | N/A |

| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file.

**Attachments:**

1. ED-2025-OPE-0016_Comment.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10559 |
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | Build Up Justice NYC |

| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. Protect PSLF - Build Up Justice NYC comment_for_submission.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10562 |
| | Find on Regulations.gov |

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | National Association of Student Financial Aid Administrators (NASFAA) |

| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached comments from the National Association of Student Financial Aid Administrators (NASFAA).

**Attachments:**

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

1. NASFAA_Comments_OB3_ED202OPE0016.pdf

---

**Comment ID:**     ED-2025-OPE-0016-10567

                    Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | Illinois Collaboration on Youth |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 2025 09 17_ICOY Comments on Proposed PSLF Regulations.pdf

---

**Comment ID:**     ED-2025-OPE-0016-10572

                    Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | The Volcker Alliance |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
The Volcker Alliance respectfully submits a comment objecting to finalization and implementation of this proposed rule. Please see attachment for our comment.

**Attachments:**

1. The Volcker Alliance PSLF Comment.pdf

---

**Comment ID:**     ED-2025-OPE-0016-10575

                    Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| **Submitted By:** | N/A | **Organization:** | Equal Rights Advocates |
|---|---|---|---|
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. 20250917_RIN 1801-AA28_AdverseComment_Equal Rights Advocates ERA.pdf

---

**Comment ID:**     ED-2025-OPE-0016-10582

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | AFT |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. AFT PSLF Comments 091725.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10588

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see the attached letter from The Public Interest Law Project strongly opposing the proposed changes to the Public Service Loan Forgiveness program, including sign-ons from supporting organizations.

**Attachments:**

1. PSLF Comment Letter 2025-09-17.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10591

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Protect Borrowers |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLF NPRM Coalition Comment Letter September 2025.pdf

---

**Comment ID:**    ED-2025-OPE-0016-10598

Find on Regulations.gov

**On Document ID:** ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)

ED_00892

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | AANMC |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**

RE: Public Service Loan Forgiveness Program – Exclusion of Certain Employers

Dear Deputy Under Secretary Bergeron and Members of the Rulemaking Committees,

On behalf of the Association of Accredited Naturopathic Medical Colleges (AANMC), thank you for the opportunity to provide comment on the Department's proposed rule regarding employer eligibility for the Public Service Loan Forgiveness (PSLF) program.

The proposed amendment to 34 CFR § 685.219, which seeks to exclude employers who "engage in activities that have a substantial illegal purpose," raises concerns due to its potential to broadly and ambiguously disqualify certain non-profit employers—particularly those working in emerging fields of integrative and complementary health.

As the national academic consortium representing accredited naturopathic medical schools, we advocate for equitable access to financial aid and loan forgiveness programs for all qualified graduates working in the public interest. We strongly support the continued inclusion of naturopathic doctors (NDs)—trained at U.S. Department of Education-recognized institutions—in PSLF eligibility when working for qualifying nonprofit, academic, or government employers. Many of our profession leaders have benefited from this program - our profession is stronger as a result of PSLF.

Naturopathic Medical Education: A Qualified and Regulated Profession
AANMC institutions offer rigorous doctoral-level education in naturopathic medicine, which includes intensive biomedical sciences, clinical training, and competency-based assessments. Programs are accredited by the Council on Naturopathic Medical Education (CNME)—a recognized accreditor by the U.S. Department of Education.

Graduates from CNME-accredited programs are licensed to practice in multiple states and jurisdictions and contribute directly to addressing health disparities, chronic disease management, and preventive care—all of which are explicitly aligned with federal public health priorities. These practitioners serve in community health centers, academic institutions, integrative care teams, and nonprofit clinical settings—many of which qualify under the current PSLF criteria.

Our Concerns with the Proposed Rule:
The language regarding "substantial illegal purpose" is vague, open to qualitative interpretation, and risks excluding fully legitimate employers or professions due to misperceptions of views about scope of practice or treatment modalities.
Without additional clarification, this proposed exclusion:
Could arbitrarily disqualify nonprofit employers who are fully compliant with state laws and operate under licensed healthcare models;

Introduces subjectivity into PSLF employer eligibility determinations;

Undermines the public interest goal of PSLF, which is to incentivize service in underserved or hard-to-

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

fill roles across health care;

Risks the chilling effect of discouraging participation in legal, accredited educational pathways.

Precedent in Other Health Professions:
We respectfully request that the Department follow the precedent set by other health professional accreditors and regulators, who:

- Ensure non-discrimination across accredited, licensed health professions, even in emerging or integrative disciplines;

- Preserve access to PSLF and other Title IV benefits based on programmatic accreditation and employer tax status—not subjective judgments about scope or modality.

AANMC Recommendations
Clarify that employers operating legally under state and federal law—including CNME-accredited institutions and affiliated nonprofits—remain eligible under PSLF.

Avoid language that allows for subjective interpretation of "substantial illegal purpose" without a clear and legally defensible standard.

Explicitly affirm that graduates from Department-recognized professional degree programs, such as CNME-accredited naturopathic programs, maintain access to PSLF when employed by qualifying organizations.

In Closing:
The PSLF program is a lifeline for graduates in service-oriented health professions, many of whom take lower-salaried positions in underserved communities. Excluding licensed, accredited naturopathic professionals from PSLF access—either directly or through indirect employer restrictions—would undermine public health equity and limit a robust integrative medicine workforce.

We urge the Department to uphold the principle of fairness and access by preserving eligibility for all health professionals serving the public, including naturopathic doctors.

We are happy to provide further information and remain ready to collaborate with the Department and the RISE Committee in advancing responsible, equitable student aid policy.

With appreciation for your leadership,
Sincerely,
The Board of Directors
Association of Accredited Naturopathic Medical Colleges (AANMC)
aanmc.org | info@aanmc.org

---

**Attachments:**     N/A

---

**Comment ID:**      ED-2025-OPE-0016-10608

                     Find on Regulations.gov

**On Document ID:**  ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan)

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

|  |  |  |  |
|---|---|---|---|
|  | Program) |  |  |
| **Submitted By:** | N/A | **Organization:** | American Association of Colleges of Nursing |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please find attached the American Association of Colleges of Nursing's comments on the William D. Ford Federal Direct Loan (Direct Loan) Program.

**Attachments:**

1. AACN PSLF Comment Letter Final.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10618 |
|---|---|
|  | Find on Regulations.gov |

| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
|---|---|

|  |  |  |  |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Neighborhood Defender Service submits the attached comments opposing the proposed regulations. We hope that every effort will be made to preserve this important lifeline for those who have committed to public service.

**Attachments:**

1. NDSPILFComments.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10623 |
|---|---|
|  | Find on Regulations.gov |

| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
|---|---|

|  |  |  |  |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Lawyers' Committee for Civil Rights Under Law |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
See attached file(s)

**Attachments:**

1. PSLFNPRMFinal.pdf

---

| **Comment ID:** | ED-2025-OPE-0016-10629 |
|---|---|
|  | Find on Regulations.gov |

| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) |
|---|---|

ED_00895

# Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Program)

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | Children's Hospital Association |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please accept these comments from the Children's Hospital Association on this proposed rule

**Attachments:**

1. CHA Comments on Proposed Rule on PSLF Program.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10630 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | The New York Legal Services Coalition |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Please see attached file.

**Attachments:**

1. NYLSC PSLF comments - Final.pdf

---

| | |
|---|---|
| **Comment ID:** | ED-2025-OPE-0016-10638 |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |

| | | | |
|---|---|---|---|
| **Submitted By:** | N/A | **Organization:** | N/A |
| **Received Date:** | Sep 17, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
Dear Secretary McMahon:

On behalf of the California State University, I write to provide comments in response to the U.S. Department of Education's (Department) Notice of Proposed Rule Making seeking to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219, published August 18, 2025. (Docket ID ED-2025-OPE-0016). CSU expresses our support of the PSLF program and respectfully urges the Department to not adopt the proposed amendments.

The CSU System

Created in 1960, the California State University system (CSU) is the nation's largest four-year public university system, consisting of 22 campuses located throughout the state of California. The CSU

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

enrolls more than 460,000 students and employs more than 63,000 faculty and staff. The California State University (CSU) system annually confers over 6,300 teaching credentials, positioning it as California's single largest producer of educators for the K–12 system. Over the past decade, CSU has prepared more of California's teachers than all other institutions combined, and has educated nearly 8% of the nation's teachers overall. Additionally, in 2022–23 alone, CSU awarded 6,390 teaching credentials—including multiple-subject, single-subject, and special education credentials—representing nearly half of all newly credentialed teachers in California and approximately 4% of teachers nationwide.

The PSLF Program Advances the Department's Educational Mission and Should be Preserved.

The stated mission of the Department is "to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access." The PSLF Program helps to advance this mission and is essential to sustaining the nation's education workforce. By reducing the financial burden of student debt, PSLF makes teaching a viable career path and attracts talented graduates into K–12 schools and universities.

According to a January 2025 Department report, 15 percent of PSLF participants work at colleges and universities and 28 percent in K–12 education. This underscores the importance of PSLF to sustaining the nation's education workforce.

The proposed amendment to the PSLF regulations may create unnecessary duplication and confusion. The "illegality doctrine" appears to overlap with authority already assigned to the Internal Revenue Service, which determines whether an organization complies with state and federal law for purposes of tax-exempt status. Congress explicitly tied PSLF eligibility for 501(c)(3) organizations to IRS determinations, and adding a separate Departmental review could unintentionally introduce uncertainty for both institutions and borrowers.

We respectfully urge the Department to withdraw this proposal and preserve the clarity and stability of the current PSLF framework.

Regards,

The California State University

| **Attachments:** | N/A |
| --- | --- |

---

| **Comment ID:** | ED-2025-OPE-0016-10645 |
| --- | --- |
| | Find on Regulations.gov |
| **On Document ID:** | ED-2025-OPE-0016-7221 (William D. Ford Federal Direct Loan (Direct Loan) Program) |
| **Submitted By:** | N/A | **Organization:** | Michigan Academy of Family Physicians |
| **Received Date:** | Sep 2, 2025 | **Posted Date:** | Sep 19, 2025 |

**Comment Detail:**
On behalf of Michigan Academy of Family Physicians (MAFP), which represents 4,200 family physicians and medical students across Michigan, we write to express our strong opposition to the Department of Education's proposed rule that would redefine "qualifying employer" under the Public

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

Service Loan Forgiveness (PSLF) program. We urge the Department to withdraw this proposed rule. If the Department will not withdraw it, we request that it be substantially revised to protect physicians — particularly family physicians — whose ability to serve patients in rural and underserved communities depends on PSLF eligibility.

The proposed rule would allow the Department to disqualify entire employers from PSLF based on vague and undefined standards of "substantial illegal purpose," even without a criminal conviction or due process. This would have a chilling effect on the health care workforce, especially in large health systems where a single office's alleged violation could jeopardize PSLF eligibility for thousands of physicians who had no involvement in the matter. Family physicians working in nonprofit hospitals, community health centers, and academic medical centers would be particularly vulnerable.

Physicians are the most likely professionals to carry student loan debt, with 81 percent of those with Doctor of Medicine degrees having graduate school debt and 80 percent owing due to undergraduate education. The high burden of medical education debt contributes to worsening physician shortages and puts medical education out of reach for many potential physicians, further undermining progress toward a robust health care workforce. Given that primary care is the only health care component where an increased supply is associated with better population health and improved patient outcomes, maintaining and expanding physicians' access to student debt relief programs is one essential step to improving our nation's health care system.

We want a healthier America, just as this administration does. A healthier America requires a robust and well-educated workforce being there to support patients. The PSLF program is a vital tool in recruiting and retaining family physicians in public service roles. Undermining it would worsen the already critical shortage of primary care physicians, projected to reach 40,000 by 2036. Without PSLF, many medical students already burdened with significant educational debt will choose higher-paying specialties or forgo studying medicine altogether. Studies show that more than 40% of physicians rely on PSLF, and family physicians are among the most reliant. That means fewer primary care physicians, fewer clinics, and fewer options for patients if this regulation is finalized as proposed.

The proposed rule would also disproportionately harm rural and underserved communities. Family physicians are often the only source of care in these areas, and we support programs and initiatives that ensure financial stability for physicians serving rural communities, which increases those communities' access to quality care for all populations. PSLF has enabled many primary care physicians to return to practice in their rural hometowns, choosing public service careers they love. Without it, many would have been forced to leave public service for the private sector, leaving critical health needs unmet. If employer eligibility for PSLF becomes uncertain or arbitrary, these communities will lose access to essential care.

Additionally, we are deeply concerned about the Department's legal authority to enact this rule. The Higher Education Act clearly defines PSLF eligibility, and only Congress has the power to change it. The Department's attempt to redefine "qualifying employer" based on subjective and politically influenced criteria exceeds its statutory authority and sets a dangerous precedent. While we understand the Department's interest in program integrity, there are already mechanisms in place to address employer misconduct, including IRS oversight of 501(c)(3) status.

If the Department proceeds with this rulemaking, we urge the following changes:
•Remove provisions that allow employer disqualification without due process;
•Narrow the definition of "substantial illegal purpose" to exclude vague criteria;
•Ensure PSLF eligibility is preserved for physicians working in nonprofit and government health

## Comment Submission Detail Report
## PSLF NPRM 2025
### (ED-2025-OPE-0016)

systems, regardless of unrelated actions by other departments within the same organization; and
•Establish a clear and fair appeals process for both employers and employees.
We appreciate the opportunity to comment and urge the Department to consider the real-world impact of this rule on America's health care system. Family physicians are committed to serving their communities, and PSLF is a vital support for that mission.

**Attachments:**    N/A

___

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:41 AM
**Received:** April 09, 2025
**Status:** DoNotPost
**Category:** Institution of Higher Education
**Tracking No.** m9a-8nd8-bpab
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0093
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am writing in reference to the IDR as well as the PSLF program. It's imperative these stay in place . I teach preschool at a nonprofit agency and have done so for 30 years. The only way I was able to send my children to college was by securing loans and finding out about the pslf program. I only recently signed up. It's imperative you keep teachers and other non profit agencies able to benefit from this program as well as keep payment options low for people who do not have a high income.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:42 AM
**Received:** April 11, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** m9c-yxf5-sduj
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0128
Comment on FR Doc # 2025-05825

---

# Submitter Information

**Name:** Tori Wells
**Address:**
   Panama City,  FL,  32409
**Email:** tori57@gmail.com

---

# General Comment

I am writing today out of deep concern for the possible elimination of affordable student loan repayment options and PSLF programs.

My husband has served in the United States Navy for more than 14 years. He has selflessly defended our freedom in dangerous places such as Afghanistan, Iraq and Somalia. We are so grateful that his service has earned loan forgiveness through the PSLF program.

While his sacrifice is certainly an honor, the military lifestyle presents unique challenges for families. Because of multiple deployments and frequent relocations, it has been difficult to sustain meaningful employment that would qualify for PSLF, all while raising a family.

I am fortunate to have a Masters degree in the field of Speech and Language Pathology. I have the joy of helping children with special needs communicate. We have never faulted on monthly student loan repayments. Now, I am placed in involuntary forbearance through the SAVE plan, with the threat of losing affordable repayment options and the hope of ever achieving PSLF.

I am respectfully asking for your consideration and advocacy of affordable student loan repayments options that recognize the unique sacrifices and challenges faced by military families.

Thank you for your time and honorable service to our country.

Tori Wells

ED_00901

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:47 AM
**Received:** April 11, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** m9c-yxg5-rjqi
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0129
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Tori Wells
**Address:**
    Panama City,  FL,  32409
**Email:** tori57@gmail.com
**Phone:** 9122245783

---

## General Comment

I am writing today out of deep concern for the possible elimination of affordable student loan repayment options and PSLF programs.

My husband has served in the United States Navy for more than 14 years. He has selflessly defended our freedom in dangerous places such as Afghanistan, Iraq and Somalia. We are so grateful that his service has earned loan forgiveness through the PSLF program.

While his sacrifice is certainly an honor, the military lifestyle presents unique challenges for families. Because of multiple deployments and frequent relocations, it has been difficult to sustain meaningful employment that would qualify for PSLF, all while raising a family.

I am fortunate to have a Masters degree in the field of Speech and Language Pathology. I have the joy of helping children with special needs communicate. We have never faulted on monthly student loan repayments. Now, I am placed in involuntary forbearance through the SAVE plan, with the threat of losing affordable repayment options and the hope of ever achieving PSLF.

I am respectfully asking for your consideration and advocacy of affordable student loan repayments options that recognize the unique sacrifices and challenges faced by military families.

Thank you for your time and honorable service to our country.

Tori Wells

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:47 AM
**Received:** April 11, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** m9e-9y7z-qsyw
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated
Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0211
Comment on FR Doc # 2025-05825

## Submitter Information

**Name:** Brandon Tom

## General Comment

Consider that many other hospital employees and healthcare professionals rely on PSLF beyond just
doctors. Nurses, MA's, physical therapists, mental health professionals, all work for hospitals and rely on
PSLF but do not make anywhere close to physician salaries. Please allow hospital workers to continue to
remain PSLF eligible employers.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:48 AM
**Received:** April 11, 2025
**Status:** DoNotPost
**Category:** Other
**Tracking No.** m9e-awr3-nt6c
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0213
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Evan Wittke
**Email:** ekttiwef91@gmail.com

---

## General Comment

I am a student loan borrower and I am currently employed by a qualifying employer. Changing the definition of a qualifying employer for PSLF may render certain organizations ineligible even though they provide a recognized public service. I current work at a nonprofit health care system as a primary care physician. If my employer is rendered ineligible by the proposed changes to PSLF qualified employers, there is a strong likelihood that I will need to seek employment in the for profit sector in order to meet the financial requirements of my substantial educations loans ($250,000 currently which I have been paying consistently since graduating medical school). Changing the definition of a qualified employer will make nonprofit employment position in general, but particularly in primary care, less attractive to qualified employees reducing the availability of this valuable and crucial public service as well as harming the public in the process. Redefining a qualifying employer using the March 7, 2025 executive order signed by President Trump will result in a vague definition subject to interpretation of this and future administrations. This will cause unnecessary uncertainty and confusion among employers and student loan borrowers alike. If the Department of Education does choose to redefine a qualifying employer, organizations and employees must be provided with judicial due process before a qualifying employer can be excluded.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:49 AM
**Received:** April 13, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** m9h-3nmf-evwg
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0317
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Alyssa Loshinskie
**Address:**
  Holland,  MI,
**Email:** alyssa.loshinskie@gmail.com

---

## General Comment

I am a healthcare worker. I, like many other healthcare workers like me, have taken on the burden of significant student loans to be able to then serve our communities, no matter who they are. I, like many other healthcare workers like me, have decided to work for non-profit institutions, many of which serve rural and/or low income communities.

These positions tend to offer less pay and less benefits due to the nature of them being a non-profit. That in itself turns away so many people from working at these locations. A huge draw for people to be able to work for non-profits without drowning in their loans is the ability to gain access to income-based payments and the promise of having loans forgiven after 10 years.

Personally my payments would be as much as my mortgage if I didn't have the option of income-based payments. I would not have been able to work where I do if these repayment options were not available to me and if in 6 years I would not be debt free.

We take an oath as healthcare workers to treat everyone, no matter who they are. This proposal spits in the face of every single health care worker (and non-profit workers everywhere) that show up to work every day with the drive to help the people they see no matter if they're undocumented or transgender.

At the end of the day this proposal is a cop out. It is not possible to get rid of the PSLF program so this proposal has been introduced as a way to make sure no employee of a non-profit is able to qualify for forgiveness under PSLF. Almost every single non-profit organization in existence violates some part of this proposal. It is sickening and every single last one of the writers of this proposal should be ashamed of themselves.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:49 AM
**Received:** April 13, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** m9h-3nmf-32me
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0318
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Alyssa Loshinskie
**Address:**
    Holland,  MI,
**Email:** alyssa.loshinskie@gmail.com

---

## General Comment

I am a healthcare worker. I, like many other healthcare workers like me, have taken on the burden of significant student loans to be able to then serve our communities, no matter who they are. I, like many other healthcare workers like me, have decided to work for non-profit institutions, many of which serve rural and/or low income communities.

These positions tend to offer less pay and less benefits due to the nature of them being a non-profit. That in itself turns away so many people from working at these locations. A huge draw for people to be able to work for non-profits without drowning in their loans is the ability to gain access to income-based payments and the promise of having loans forgiven after 10 years.

Personally my payments would be as much as my mortgage if I didn't have the option of income-based payments. I would not have been able to work where I do if these repayment options were not available to me and if in 6 years I would not be debt free.

We take an oath as healthcare workers to treat everyone, no matter who they are. This proposal spits in the face of every single health care worker (and non-profit workers everywhere) that show up to work every day with the drive to help the people they see no matter if they're undocumented or transgender.

At the end of the day this proposal is a cop out. It is not possible to get rid of the PSLF program so this proposal has been introduced as a way to make sure no employee of a non-profit is able to qualify for forgiveness under PSLF. Almost every single non-profit organization in existence violates some part of this proposal. It is sickening and every single last one of the writers of this proposal should be ashamed of themselves.

ED_00906

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:50 AM
**Received:** April 13, 2025
**Status:** DoNotPost
**Tracking No.** m9h-j3fe-vrbc
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0353
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Kathryn Cardwell
**Address:**
   OR,  97301
**Email:** nerdophiles.katie@gmail.com

---

## General Comment

The administration should stop trying to get around the law- if you want to change something, take it to the legislature. Pass a new bill. Trying to redefine a legally qualifying employer is a rug-pull for hundreds of thousands of borrowers who have been working toward PSLF since they've graduated. The statue states very clearly what qualifies as an employer. I would encourage the Department of Education to consider passing this issue back to congress instead of trying to poorly modify laws to fit their personal political agenda. As a tax paying American, I don't care about what organization has DEI policies, if a doctor helps someone with unknown immigration status, or any of this crap. I want the Department to serve the people, and the people elected representatives who passed a very clear law stating what it takes for PSLF to be fulfilled. Stop trying to mess with it and focus on other issues that are more important and well within the department's purview to modify or change. Leave the law alone. Hold up your end of the bargain for people who work public service jobs - often backed by government contracts to provide government required services. You've got more important things to worry about.

To that end, I believe SAVE was an absolute overreach and complete mess that has to be cleaned up. The current administration could increase voter confidence and earn a lot of credit for cleaning it up if they do so in a way that is fair, reasonable, and honors the longstanding agreement people have been working toward for years. I appreciate that you are opening up comments, because I believe that we need to (1) return to previously established income-based repayment plans that were eliminated when SAVE was instituted, (2) make the PSLF process clearer, and (3) hold contracted lenders managing these Dept. of Ed accountable for good service to tax payers.

I was forcibly moved onto SAVE without being asked. All I want is to be able to make my qualifying payments, achieve forgiveness, and move on with my life. Please don't make that more difficult for everyday Americans who want to do things like start families and own homes.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:51 AM
**Received:** April 16, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** m9j-ep4s-ygrc
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0416
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Jordan Guillen
**Address:**
    Brooklyn,  NY,  11233
**Email:** perrj808@gmail.com
**Phone:** 7164785220

---

## General Comment

This program is vital to those of us in the human service sector. We are not paid to the highest echelon, however, we knew this going into this work. We do this work because we want to serve our communities. Nonprofits serve as entities that assist the government in ways that the government cannot or will not provide. Please, continue to allow us to serve. The PSLF plan makes it feasible to do what we love and keep payments for our student loans at a doable cost with SAVE or other income driven plans.

Yes, the process of submitting paperwork could be better but it has gotten better. I am half way to the 120 payments and I pray this program stays open for those of us that took a path that is needed in this country.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/19/25, 7:12 AM |
| **Received:** April 16, 2025 |
| **Status:** DoNotPost |
| **Category:** Institutional and Loan Servicers |
| **Tracking No.** m9j-ep4v-w61h |
| **Comments Due:** May 08, 2025 |
| **Submission Type:** Web |

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0417
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Jordan Guillen
**Address:**
   Brooklyn,  NY,  11233
**Email:** perrj808@gmail.com
**Phone:** 7164785220

---

## General Comment

This program is vital to those of us in the human service sector. We are not paid to the highest echelon, however, we knew this going into this work. We do this work because we want to serve our communities. Nonprofits serve as entities that assist the government in ways that the government cannot or will not provide. Please, continue to allow us to serve. The PSLF plan makes it feasible to do what we love and keep payments for our student loans at a doable cost with SAVE or other income driven plans.

Yes, the process of submitting paperwork could be better but it has gotten better. I am half way to the 120 payments and I pray this program stays open for those of us that took a path that is needed in this country.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/19/25, 6:51 AM |
| **Received:** April 26, 2025 |
| **Status:** DoNotPost |
| **Tracking No.** m9y-wa47-kmhz |
| **Comments Due:** May 08, 2025 |
| **Submission Type:** API |

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0516
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Anonymous Anonymous
**Email:** tnieves2238@gmail.com

---

## General Comment

As an active and engaged voter, utilizing these programs, I implore the Department of Education align with the Trump administration's stance regarding federal judges in lower courts. Specifically, the position that judges—such as those on the United States Court of Appeals for the Eighth Circuit—should not impede the will of the Executive Branch or the American voters. For example, the more than 70 million voters who supported the Biden Administrations student loan policies just last year. With that in mind, I, along with at least eight million other Americans, demand that the SAVE program remain in its current form.

If the SAVE Income-Driven Repayment (IDR) program is abolished against the will of many Americans, the other IDR programs such as PAYE and ICR should remain available as pathways to debt forgiveness. Interest should be subsidized, as it is under the SAVE program, to prevent ballooning debt from compounding interest. Additionally, Public Service Loan Forgiveness (PSLF) eligibility should not be restricted. Spouses should not be included in the monthly payment calculation if they either have no student loans themselves or were married to the borrower after the loans were taken out.

I recommend to this committee that any future rule changes prioritize affordability for borrowers and address the predatory practices that have long plagued the student loan systems. For example, the standard 10-year repayment term could be extended to 20 or even 30 years for current and future borrowers. Furthermore, if interest rates cannot be subsidized and set to 0%, then they should be capped at 2%, a proposal that is currently being supported by a bipartisan legislative group. Lastly, loan servicers should be held accountable and measured on things such as customer service, support and enabling borrowers to tackle their student loan debt burden.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:52 AM
**Received:** April 26, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** m9y-wfi3-f3ui
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0519
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Anonymous Anonymous
**Email:** tnieves2238@gmail.com

---

## General Comment

As an active and engaged voter, utilizing these programs, I implore the Department of Education align with the Trump administration's stance regarding federal judges in lower courts. Specifically, the position that judges—such as those on the United States Court of Appeals for the Eighth Circuit—should not impede the will of the Executive Branch or the American voters. For example, the more than 70 million voters who supported the Biden Administrations student loan policies just last year. With that in mind, I, along with at least eight million other Americans, demand that the SAVE program remain in its current form.

If the SAVE Income-Driven Repayment (IDR) program is abolished against the will of many Americans, the other IDR programs such as PAYE and ICR should remain available as pathways to debt forgiveness. Interest should be subsidized, as it is under the SAVE program, to prevent ballooning debt from compounding interest. Additionally, Public Service Loan Forgiveness (PSLF) eligibility should not be restricted. Spouses should not be included in the monthly payment calculation if they either have no student loans themselves or were married to the borrower after the loans were taken out.

I recommend to this committee that any future rule changes prioritize affordability for borrowers and address the predatory practices that have long plagued the student loan systems. For example, the standard 10-year repayment term could be extended to 20 or even 30 years for current and future borrowers. Furthermore, if interest rates cannot be subsidized and set to 0%, then they should be capped at 2%, a proposal that is currently being supported by a bipartisan legislative group. Lastly, loan servicers should be held accountable and measured on things such as customer service, support and enabling borrowers to tackle their student loan debt burden.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:54 AM
**Received:** April 27, 2025
**Status:** DoNotPost
**Tracking No.** ma0-42gg-xzqw
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0582
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Alanna Ashrei
**Address:** United States,

---

## General Comment

I am about to graduate from medical school. My brother and I grew up in a single parent household making <$25k for the majority of our lives. My brother was able to get $40k of student loans to become a computer engineer. He paid off his loans using PAYE and working in good jobs. I went to community college and then when I reached the top level of my classes I transferred to a 4-year college and received about $40k of scholarship from the school. However, I still graduated with about $40k of undergraduate debt. Medical school education debt makes medical educations incredibly exclusionary to those who aren't born into physician families. I became a doctor to treat low-income families like I utilized growing up, ideally through Federally Qualified Health Clinics (FQHCs) for patients with Medicaid and Medicare. My debt is now ~$450k. A large majority of physicians who practice psychiatry don't accept insurance because the salaries are hundreds of thousands of dollars less than if you choose to do private practice. I want to make my medical education accessible to those without a lot of money. It shouldn't be a financial privilege to receive mental health treatment or preventative care. The only way I can work for low-income people is if I am able to pay back my $450k using income-based repayment because for the first 5 years of my career I will be in residency making close to minimum wage, unable to afford even basic necessities. PSLF will allow my debt to be erased after I work for 10 years for PUBLIC SERVICE. Limiting PSLF in any additional ways will limit the ability of people like me to actually support America's most vulnerable people.

I am calling my representatives and talking to everyone I know about how the proposed changes to PAYE and PSLF will result in worse quality care, more expensive care, and fewer available doctors in the USA.

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/19/25, 6:55 AM |
| **Received:** April 27, 2025 |
| **Status:** DoNotPost |
| **Tracking No.** ma0-6lqv-gxz0 |
| **Comments Due:** May 08, 2025 |
| **Submission Type:** API |

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0586
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Thomas Kleinau
**Address:**
    Jacksonville,  FL,  32222
**Email:** Thomas.kleinau@outlook.com
**Phone:** 9049942212

---

## General Comment

Student loan repayment needs reformed so that loan holders can make affordable payments. The SAVE plan was a godsend. PSLF is a major benefit to the government and people trying to repay their loans. Students and graduates need good, affordable plans. With unaffordable repayment plans, people will default.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:55 AM
**Received:** April 23, 2025
**Status:** DoNotPost
**Category:** State agency
**Tracking No.** m9u-7hfo-ap6c
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0658
Comment on FR Doc # 2025-05825

## Submitter Information

**Email:** lisacatalanotto@cpc.sc.gov
**Government Agency Type:** State
**Government Agency:** South Carolina Commission on Prosecution Coordination

## General Comment

My name is Lisa Catalanotto, and I am the Executive Director of the South Carolina Commission on Prosecution Coordination, a state agency in South Carolina. I am writing regarding the Department's solicitation for comments on and in support of continuing the Public Service Loan Forgiveness (PSLF) program.

I have also attached a letter from South Carolina's 11th Judicial Circuit Solicitor, Rick Hubbard, in his capacity as President of the South Carolina Solicitors' Association and on behalf of all sixteen (16) elected circuit solicitors in South Carolina, regarding the importance of the PSLF program.

The PSLF program is a vital tool for recruiting and retaining the best and brightest prosecutors, strengthening the justice system. Additionally, the PSLF program incentivizes long-term commitment, ensuring that qualified prosecutors remain in key roles rather than seeking private-sector opportunities.

33% of all attorneys currently employed by the South Carolina Offices of Circuit Solicitor and Office of the Attorney General either are currently participating in the PSLF program and expect to become eligible for student loan forgiveness upon working ten years in public service or have already received student loan forgiveness under the PSLF program.

I urge the Department to continue the PSLF program and specifically its availability for prosecutors and other essential non-attorney prosecution staff in South Carolina's Circuit Solicitors' and Attorney General's offices.

Without PSLF, critical shortages in prosecution will worsen, impacting community safety.

# Attachments

042325 SCSA Letter on PSLF Program (L. McMahon)



**South Carolina Solicitors' Association**
**Post Office Box 11251**
**Columbia, South Carolina 29211–1251**

April 23, 2025

David M. Pascoe, Jr.
First Judicial Circuit

Bill Weeks
Second Judicial Circuit

Ernest A. Finney III
Third Judicial Circuit

Paul M. Burch, Jr.
Fourth Judicial Circuit

Byron E. Gipson
Fifth Judicial Circuit

Randy E. Newman, Jr.
Sixth Judicial Circuit

Barry J. Barnette
Seventh Judicial Circuit

David M. Stumbo
Eighth Judicial Circuit

Scarlett A. Wilson
Ninth Judicial Circuit

Micah E. Black
Tenth Judicial Circuit

S. R. Hubbard III
Eleventh Judicial Circuit

E. L. Clements III
Twelfth Judicial Circuit

William W. Wilkins III
Thirteenth Judicial Circuit

Isaac McDuffie Stone III
Fourteenth Judicial Circuit

Jimmy A. Richardson II
Fifteenth Judicial Circuit

Kevin S. Brackett
Sixteenth Judicial Circuit

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

**Document Citation: 90 FR 14741; Document Number: 2025-05825; Docket ID: ED-2025-OPE-0016]**
**Re: Negotiated Rulemaking for the Higher Education Act: Public Service Loan Forgiveness**

Dear Secretary McMahon,

On behalf of South Carolina's sixteen elected Judicial Circuit Solicitors and in my capacity as President of the South Carolina Solicitors' Association, I am writing regarding the U.S. Department of Education's solicitation for comments about the Public Service Loan Forgiveness (PSLF) program.

Since 2007, the PSLF program has been an important and significant tool used to recruit and retain prosecutors and other non-attorney prosecution staff in South Carolina. Many prosecutors and other staff in South Carolina's Offices of Circuit Solicitor and the Office of the Attorney General rely on the PSLF program and, in fact, considered the value of loans forgiven through participation in the program when making career choices and specifically in accepting a lower salary as a public servant over a higher paying position in the private sector.

**33% of all attorneys currently employed by the South Carolina Offices of Circuit Solicitor and Office of the Attorney General either are currently participating in the PSLF program and expect to become eligible for student loan forgiveness upon working ten years in public service or have already received student loan forgiveness under the PSLF program.**

There is no doubt that the PSLF program has a significant impact on the ability to recruit highly qualified prosecutors and other public service professionals in South Carolina's Circuit Solicitors' and Attorney General's offices. 169 attorneys and 104 non-attorneys employed by these offices are currently participating in the PSLF program. The PSLF program also impacts the ability of these offices to retain these professionals. Although the program requires ten years of public service, many of those that have already received loan forgiveness under the program remain in their positions after serving ten years. 65 attorneys and 32 non-attorneys currently employed by South Carolina's Circuit Solicitors' and Attorney General's offices have already received student loan

**The Honorable Linda E. McMahon**
**April 23, 2025**
**Page 2 of 2**

forgiveness under the PSLF Program. Any efforts to potentially roll back or significantly alter the PSLF program would directly hurt recruitment and retention efforts by South Carolina's Offices of Circuit Solicitor and Office of the Attorney General as well as their ability to serve their communities. Such discussions create uncertainty surrounding the program and may cause potential public servants to lose trust that the program will be there for them in the future.

When local prosecutors and critical prosecution staff remain in their roles, they gain valuable experience that strengthens their ability to support victims of crime and combat violent crimes, which often result in complex cases. The experience also builds relationships with communities, a factor that is essential to investigating and prosecuting crime. The PSLF program is not only essential to our community's fabric, but it's also a vital tool for recruiting and retaining the best and brightest local prosecutors. Retaining local prosecutors is essential to fighting crime and the PSLF program is often a deciding factor when local prosecutors consider staying in public service.

I urge the Department to preserve the PSLF program as discussions around federal restructuring continue. Eliminating this vital assistance program available to local prosecutors, public service attorneys and critical non-attorney prosecution staff would have dire, long-lasting repercussions on public safety in South Carolina and the United States. Thank you for allowing me the opportunity to submit a comment on this important matter.

Very Truly Yours,

S. R. Hubbard III
President

**Attachment:** PSLF Participation in SC Circuit Solicitors' Offices
**CC:** The Honorable Lindsey Graham, U.S. Senator
The Honorable Tim Scott, U.S. Senator
The Honorable Sheri Biggs, U.S. Representative
The Honorable James Clyburn, U.S. Representative
The Honorable Russell Fry, U.S. Representative
The Honorable Nancy Mace, U.S. Representative
The Honorable Ralph Norman, U.S. Representative
The Honorable William Timmons, U.S. Representative
The Honorable Joe Wilson, U.S. Representative



**Public Service Loan Forgiveness Program**
**Participation in South Carolina's**
**Judicial Circuit Solicitors' Offices and Attorney General's Office**

**March 31, 2025**

| Circuit | # Staff that has not yet worked ten years in public service, but intend to and expect to become eligible for student loan forgiveness under the PSLF Program | | # Staff that have worked more than ten years and have already received student loan forgiveness under the PSLF Program | | Total Attorneys as of 1/1/2025 |
|---|---|---|---|---|---|
| | Prosecutors | Non-attorney Staff | Prosecutors | Non-attorney Staff | |
| 1st | 11 | 6 | 3 | 0 | 17 |
| 2nd | 3 | 0 | 4 | 0 | 15 |
| 3rd | 1 | 0 | 2 | 1 | 9 |
| 4th | 3 | 1 | 1 | 0 | 16 |
| 5th | 21 | 0 | 6 | 0 | 41 |
| 6th | 4 | 4 | 5 | 1 | 20 |
| 7th | 17 | 0 | 7 | 0 | 33 |
| 8th | 4 | 5 | 2 | 1 | 16 |
| 9th | 18 | 17 | 4 | 2 | 61 |
| 10th | 3 | 0 | 2 | 1 | 19 |
| 11th | 8 | 7 | 3 | 0 | 31 |
| 12th | 3 | 4 | 1 | 1 | 13 |
| 13th | 9 | 0 | 2 | 0 | 55 |
| 14th | 7 | 5 | 5 | 0 | 25 |
| 15th | 22 | 23 | 2 | 11 | 36 |
| 16th | 12 | 0 | 8 | 0 | 28 |
| AG | 23 | 32 | 8 | 14 | 84 |
| **TOTAL** | **169** | **104** | **65** | **32** | **519** |

ED_00918

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:57 AM
**Received:** April 22, 2025
**Status:** DoNotPost
**Category:** Other
**Tracking No.** m9u-ea49-cwki
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0703
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Christine Kieta
**Address:**
    HINSDALE,  IL,  60521
**Email:** christine.kieta@gmail.com
**Phone:** 6303839363

---

## General Comment

See attached file(s)

---

## Attachments

Comments Questions

**Comments & Questions**

I.     **Title IV's Student Aid Requirements & The Rising Cost of Education:**

**Does The Overall Structure Of Title IV Disincentive Colleges From Competitively Pricing Tuition & Cause Federally Backed Student Loans To Operate Like Subprime Mortgages?**

The National Center for Education Statistics (which publishes information colleges provide to the Department of Education pursuant to Title IV) indicates that as of the 2022-2023 school year 85% of first-time, full-time students received financial aid. (https://nces.ed.gov/ipeds/trendgenerator/app/answer/8/34). By way example, of the revenue collected by Thomas M. Cooley Law School for fiscal year 2023 80% of it came from tuition. (https://nces.ed.gov/ipeds/institution-profile/172477#finance). John Marshall Law School collected 99% of its revenue in fiscal year 2023 from tuition. (https://nces.ed.gov/ipeds/institution-profile/138929#finance).

Under Title IV, colleges have to generate 10% of their revenue from sources other than federal funds to stay eligible for federally funded loans. *See* 20 U.S.C. 1092 §668.28. If students are largely borrowing from the federal government to fund the tuition which can make up to 90% of the revenue (more so long as it doesn't happen more than 2 years in a row), then the natural cap on tuition seems to be how much the Department of Education will permit per student. Stated differently, colleges aren't really incentivized to support their operations with sources of revenue other than tuition.

As it relates to the loans that 85% of students are incurring, colleges have to provide potential student loan borrowers with financial assistance information. *See* 20 U.S.C. 1092 §668. This includes "a sample loan repayment schedule for sample loans." *See* 20 U.S.C. 1092 §668.42(c)(4). That's it. A similar lending pattern was for subprime mortgages leading to the financial collapse of 2008. The borrowers had low creditworthiness and — *most notably*— little to no income verification. (https://www.investopedia.com/articles/economics/09/subprime-market-2008.asp). Those borrowers and their lenders did not have examine *first* if the borrower ever could repay the loan. The borrowers ultimately ended up building debt instead of wealth borrowing against their equity with adjustable rates which, in turn, created future repayment challenges. (https://www.fdic.gov/bank/historical/crisis/chap1.pdf).

Within the focused context of complying with the requirements of Title IV to determine if it has any impact on the cost of tuition, how does providing "a sample loan repayment schedule for sample loans" use resources so massive that a college has no alternative but to off-set the loss through increased tuition?

Is this "sample loan" requirement so thin that these loans lead to borrowing decisions that operate off of an inexperienced borrower?

If these colleges are really just taxpayer funded entities but for 10% of their revenue should they be relieved of the requirements of Title IV?

Would reducing the amount that the Department of Education provides per borrower encourage colleges to develop other sources of revenue which would reduce their reliance on taxpayer funded loans?

Can colleges find other ways to fund their operations thereby relieving themselves of the requirements of Title IV or are taxpayer funded loans with zero risk of loss just simply too lucrative?

ED_00920

II.    **Public Student Loan Forgiveness, Pay As You Earn & Income-Contingent Repayment**

**Are There Latent Economic Effects Of These Long Term Repayment Programs On The U.S. Economy Separately From & In Addition To Subsidizing The Actual Student Loans?**

In 2023, the average graduate loan disbursement for Southwestern Law School was $188,164.  (https://www.lawhub.org/trends/debt-per-law-school?y1=2022).  A "sample loan repayment schedule for sample loans" of $188,164 at a modest 6% interest for 10 years calls for monthly payments of $2,089.01 per month with total interest of $62,516.74 over the life of the loan.  If paid over 25 years the monthly payment is $1,212.34 and total interest is $175,538.99.  If the loans are at 8% interest and paid over 25 years then monthly payment is $1,452.28 and the total interest is $257,520.08.

The total cost of the tuition for this law school is somewhere between $363,703.99 to $445,684.08.  The interest *alone* is a retirement account.  This is a serious financial investment.  And these amounts assume that there are *zero* problems with administering the repayment programs, *zero* accounting errors, *zero* litigation that affects them, *zero* undergraduate debt, and *zero* delays in annual recertification just to name a few.

If the student loan borrower realizes that he cannot afford several thousands of dollars a month to pay of just the graduate student loans in 10 years — *which assumes he has no undergraduate debt* — he is then forced to enter a repayment program.  To color the wider financial impact more fully, if a student loan borrower spends 4 years in undergraduate school, 3 years in graduate school, and then 20 or 25 years in a repayment program that is administered totally perfectly that borrower is affected financially for about **30 years**.  Not 2 years.  Not 10 years.  Not even 20 years.  And there may still even be a balance that the U.S. taxpayer pays or absorbs once the debt is "forgiven."  Now multiply this by millions of people.

The National Center for Health Statistics reports that as of April 25, 2024 birth rates for women between 20-39 *declined*.  Although many factors can affect the decision to have a family, the declining birth rate intersects with the time spent in college and the subsequent student loan repayment term.  It would be naive not to examine if *some* nexus exists between the cost of starting a family and the cost of paying off an education which, as it turns out, is principle equal to the price of a modest single family home *plus* a retirement account.  And this serious financial investment was incurred based off of a "sample loan repayment schedule" if that was even a requirement when the debt was incurred.

As this debt relates to society, once the student loan borrower participates in a repayment program he re-certifies his income annually.  Practically speaking, if an unanticipated expense arises a student loan borrower is often faced with the decision of how to manage that expense or avoid it within the time frame left to re-certify income since the monthly repayment amount can change.  This can affect anything from the decision to purchase a vehicle, make home improvements, or even fund an unexpected medical issue.  More simply put, this debt does not operate in a vacuum.

A serious question then becomes what are the wider effects of this debt on the U.S. economy?

Would just the interest be better in a retirement account accruing interest itself so that these student loan borrowers are not a responsibility of the U.S. taxpayer but at a later stage in life?

Does the long term nature of the debt disincentivize these student loan borrowers from adding people to the U.S. economy given the cost associated with children?

Should the colleges continue to enjoy what appears to be zero risk of loss related to the tuition given the likelihood of taxpayer subsidization?

ED_00921

# PUBLIC SUBMISSION

**As of:** 12/19/25, 6:59 AM
**Received:** April 22, 2025
**Status:** DoNotPost
**Tracking No.** m9u-gz7i-gvhr
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0723
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Government Agency Type:** State
**Government Agency:** x

---

## General Comment

.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:00 AM
**Received:** April 28, 2025
**Status:** DoNotPost
**Category:** Other
**Tracking No.** ma1-chqp-yezf
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-0916
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Taylor Morrison
**Address:**
    San Diego,  CA,  92101
**Email:** taylor.morrison@sdcda.org

---

## General Comment

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

Document Citation: 90 FR 14741;Document Number: 2025-05825; Docket ID: ED-2025-OPE-0016]
Re: Negotiated Rulemaking for the Higher Education Act: Public Service Loan Forgiveness

Dear Secretary McMahon,

My name is Taylor Morrison, and I am a Deputy District Attorney at the San Diego District Attorney's Office. I am writing in regard to the Department's solicitation for comments about the Public Service Loan Forgiveness (PSLF) program.

PSLF benefits me because my husband is a law enforcement officer and we have a modest shared income. I chose a role in public service because we need more prosecutors and law enforcement officers of color. I wanted my community to have more trust in the criminal justice system because they saw someone who looked like them, me. I chose a lower paying career to serve but also because I relied on the PSLF program to help bring relief to my loan balance which is $260,000.00. I need income-based payments to afford the monthly payback amount. With the discontinuation of the SAVE program, my payments will increase from $464.00 to approximately $2,000.00 per month. I cannot afford the new payment given my limited income as a prosecutor, childcare costs of $2,500.00, and mortgage payment of $6,054.00 per month.

ED_00923

I urge the Department to preserve the PSLF program and loan repayment plans as discussions around federal restructuring continue. Undermining or eliminating these vital assistance programs to local prosecutors would have dire, long-lasting repercussions on our nation's public safety. Thank you for allowing me the opportunity to submit a comment on this important matter.


Sincerely,


Taylor Morrison
Deputy District Attorney
San Diego County District Attorney's Office

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:01 AM
**Received:** April 29, 2025
**Status:** DoNotPost
**Category:** Federal Agency
**Tracking No.** ma2-p9f5-2jsr
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-1006
Comment on FR Doc # 2025-05825

## Submitter Information

**Name:** Natalie Wilkins
**Address:**
    Cedarville,  OH,  45314
**Email:** nwilkins@cedarville.edu
**Phone:** 9377667448

## General Comment

See attached file(s)

## Attachments

NegReg Comments - Submitted 04-29-25

April 29, 2005

U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202-1200
Submitted via regulations.gov                                    Docket ID ED-2025-OPE-
0016

I respectfully submit to the U.S. Department of Education (ED) my comments on its intent to receive public feedback for the development of proposed regulations and establish a negotiated rulemaking committee (Docket ID ED-2025-OPE-0016). I represent a private university where I work in the Financial Aid office.  I also write with personal concern about the PSLF and income-driven repayment plans, as my husband is in the PSLF program. He was only two payments away from forgiveness when the repayment plan was removed, and he can no longer make those qualifying payments.

1) Refining the Definition of a Qualifying Employer for Public Service Loan Forgiveness (PSLF)

We disagree with the Department's proposed plan to narrow the definition of which organizations are considered qualifying employers for PSLF purposes. PSLF requires borrowers to make a 10-year commitment to a public service career, a significant life and financial decision. Foundational program rules should not be subject to frequent review and potential reversal every few years. Altering the definition of a qualifying employer while individuals are actively pursuing qualification, or creating ambiguity about future eligibility, is unfair and reduces confidence in the reliability of the PSLF program.  Even if carefully implemented, we are concerned about the implications of setting a precedent that the PSLF rules could change with every new presidential administration, which will undermine this bipartisan program and discourage talented individuals from pursuing or staying in public service careers.  We have seen the negative impacts of constantly-changing regulations with borrower defense to repayment (BDR) regulations, which have been revised three times over the past decade as new presidential administrations rewrite the rules. Similar to what we saw with BDR, where multiple sets of rules operated concurrently, altering PSLF definitions in this way could lead to years of litigation and administrative chaos, with borrowers uncertain about which standards apply when they have multiple loans.

2) Pay As You Earn (PAYE) and Income-Contingent (ICR) Plans

Access to robust, easily accessible income-driven repayment plans within the federal student loan programs is not just beneficial — it is essential to keeping borrowers in repayment. Repayment plans that offer manageable monthly payments based on income and family size, coupled with a reasonable repayment term after which remaining loan balances are forgiven, provide borrowers with essential protection against overwhelming debt and default. Time-based forgiveness is a crucial element of any IDR plan as it saves borrowers from a lifetime of debt.  We encourage ED to take steps to create a single plan under the ICR umbrella that is easy to enroll in, includes fair

Docket ID ED-2025-OPE-0016                                                    April 29, 2025

terms and conditions, and maximizes benefits for borrowers, while sunsetting all others. Any viable IDR plan moving forward, whether it be a modified version of a current plan or a newly developed alternative, must incorporate the foundational elements of affordability and eventual forgiveness.

3)  Streamlining Current Federal Student Financial Assistance Program Regulations

We believe such efforts would be most impactful if focused on the following areas:
*Gainful Employment (GE)/Financial Value Transparency (FVT)*
    ED can streamline the GE/FVT regulations without sacrificing transparency by limiting FVT to the scope covered during negotiations, which required only program-level reporting. We continue to have significant concerns with ED's FVT regulations, specifically regarding the statutory authority for the extensive student-level data collection and the Department's failure to adequately engage stakeholders on this framework through negotiated rulemaking.  We are alarmed by the scope of student-level data reporting now required for non-gainful employment (GE) programs, a significant expansion beyond the limited program-level disclosures discussed during GE negotiations. It is inappropriate to apply short-term GE metrics to non-GE programs (like liberal arts) with different, often longer-term return on investment (ROI) profiles. Comparing fundamentally dissimilar GE and non-GE programs using these metrics offers little value. ED should revisit the FVT regulations to ensure proper consideration is given to this new framework, which was not adequately considered in the original negotiations.
*Return of Title IV Funds*
    We express significant concerns regarding the persistent complexity of the Return of Title IV Funds (R2T4) process. The sheer volume of governing text (nearly 200 regulatory paragraphs, 150 handbook pages), extensive supplemental guidance (ED's 63-question Q&A, NASFAA's 275+ specific articles), its status as the most-cited area needing regulatory relief, and its consistent presence among top audit findings underscore this excessive complexity. We strongly advocate for a fundamental overhaul of R2T4, prioritizing radical simplification. This requires a willingness to sacrifice undue precision — the source of much complexity — wherever possible without compromising core program integrity, thereby alleviating critical administrative burden and allowing staff to better serve students.
*Licensure Requirements*
    The current mandate requires institutions to definitively determine and document that programs meet licensure requirements in every state where enrolled distance education students are located. Streamlining this requirement by reverting to the previous standard — where institutions disclose whether a program meets requirements or if a determination cannot be made, coupled with student acknowledgement — would achieve the necessary transparency for students while substantially reducing the institutional burden associated with tracking and interpreting a multitude of state regulations. This simplification would free up valuable institutional resources currently consumed by this complex compliance task.

Docket ID ED-2025-OPE-0016                                        April 29, 2025

In closing, I encourage the Department to focus streamlining efforts on areas where complexity clearly outweighs the benefit, ensuring that changes improve efficiency without creating significant new risks for students or taxpayers. I appreciate the opportunity to comment on the Department's intent to develop proposed regulations and establish a negotiated rulemaking committee.

Regards,
Natalie Wilkins
Financial Aid Administrator, Cedarville University

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:02 AM
**Received:** April 29, 2025
**Status:** DoNotPost
**Category:** Academic/Think Tank
**Tracking No.** ma4-8ugo-7q8c
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-3818
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Rosario Inga
**Address:**
    Merced,  Peru,  95340
**Email:** rossett@alumni.com
**Phone:** 2099667770

---

## General Comment

Alumni.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:03 AM
**Received:** May 01, 2025
**Status:** DoNotPost
**Tracking No.** ma5-kmxr-c62z
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-4562
Comment on FR Doc # 2025-05825

## Submitter Information

**Email:** rheadebussy@equitashealth.com
**Organization:** Equitas Health

## General Comment

Please review the attached public comment from Equitas Health.

## Attachments

Equitas Health Public Comment DOE Negotiated Rulemaking_Final Copy



May 1, 2025

Submitted via [www.regulations.gov](http://www.regulations.gov)[1]

Secretary Linda McMahon
Acting Undersecretary James Bergeron
Office of Postsecondary Education
US Dept. of Education
Lyndon Baines Johnson Building
400 Maryland Avenue SW
Washington, DC 20202

**RE: Public Feedback for the Development of Proposed Regulations Under Negotiated Rulemaking (ATTN: ED-2025-OPE-0016-0001; 34 CFR Chapter IV; Federal Register Number 2025-05825)**

Dear Secretary McMahon and Undersecretary Bergeron,

Equitas Health is a federally qualified health center look-alike (FQHC look-alike) and one of the largest LGBTQ+ and HIV/AIDS serving healthcare organizations in the country.  Each year, we serve tens of thousands of patients in Ohio, Texas, Kentucky, and West Virginia, and since 1984, we have been working to advance "care for all."  Our mission is to be the gateway to good health for those at risk of or affected by HIV; for the lesbian, gay, bisexual, transgender, and queer/questioning (LGBTQ+) community; and for those seeking a welcoming healthcare home. In doing so, we offer primary and specialized medical care, pharmacy services, dentistry, mental health and recovery services, HIV/STI prevention and treatment services, Ryan White HIV case management, overall care navigation, and a number of community health initiatives.[2] We appreciate the opportunity to provide public feedback related to the Dept. of Education's management of Income Driven Repayment (IDR) plans for federal student loans and the Public Service Loan Forgiveness (PSLF) program.

**Facts About Income Driven Repayment (IDR) Plans and the Public Service Loan Forgiveness (PSLF) Program**

Given common misconceptions, it's important to underscore the facts about both Income Driven Repayment (IDR) plans and the Public Service Loan Forgiveness (PSLF) program. First introduced in the 1990s, IDR plans were introduced to increase access to education and to make the process

---

[1] Document prepared by Rhea Debussy, Ph.D. (she/her), Director of External Affairs with assistance from Asa Shorak (they/them), Outreach Specialist for Mozaic at Equitas Health. Document reviewed by Nico Schrenk (he/they), Gender Equity Policy Coordinator, and Adrianna Udinwe, Esq. (she/her), Associate General Counsel.

[2] [https://equitashealth.com/about-us/](https://equitashealth.com/about-us/)

ED_00931

of repaying student loans more affordable to borrowers.[3] Importantly, IDR plans calculate monthly payments at a specific rate of a borrower's discretionary income, and some IDR plans implement a payment cap.[4] For instance, the Pay As You Earn (PAYE) plan calculates payments at 10% of a borrower's discretionary income with a cap at the amount that the borrower would pay under a standard 10-year fixed payment plan.[5] And as noted by the Congressional Budget Office (CBO), borrowers on IDR plans default at much lower rates, compared to peers on standard repayment plans;[6] for instance, the CBO has previously analyzed data that suggests borrowers in IDR plans were actually half as likely to default on their payments.[7]

Under the Federal Credit Reform Act (FCRA) of 1990, costs of the federal student loan program are described as subsidies, where a positive subsidy is a loan's net cost and a negative subsidy is a loan's net gain respective to the federal budget.[8] In CBO's projections for the 2020s, loans repaid via IDR plans have an average subsidy rate of 16.9%, while loans repaid via standard repayment plans have a an average rate of -12.8%.[9] However, the CBO has estimated a balance to be struck between these competing rates, since the federal government can expect a positive subsidy of $82.9 billion and a negative subsidy of $72.2 billion this decade.[10] And finally, it is important to remember that any outstanding balance at the end of an IDR period (i.e. 20-25 years of monthly repayments) is forgiven, but importantly, the borrower is responsible for that tax burden, meaning that the federal government can expect a tax rate of 10 to 37% to apply on the outstanding balance.[11] In short, the "forgiven amount" still generates revenue for the federal government, as it is considering taxable income for that specific tax year.

Signed into law during the George W. Bush administration, the Public Service Loan Forgiveness (PSLF) program has enjoyed strong, bipartisan support.[12] After making regular payments during 10 years of qualifying public service (i.e. government, non-profit, and/or related work at the full-time level), borrowers are eligible for loan discharge and forgiveness.[13] As you know, this program was developed to encourage graduates to consider important but often less lucrative and undervalued careers in the public service sector, and as such, PSLF enrollees often work in government, education, healthcare, human service, and related positions across the country. This particular program is especially important for borrowers with specialized degrees and higher levels of student debt, since it incentivizes these graduates to pursue careers for the public good.

---

[3] *Income-Driven Repayment Plans for Student Loans: Budgetary Costs and Policy Options.* 2020. Congressional Budget Office (CBO). 1.

[4] See Table 1-1 from the aforementioned report, as attached in Appendix A to this document.

[5] Ibid, 8.

[6] Ibid, 1 and 15.

[7] Ibid, 15.

[8] Ibid, 19.

[9] Ibid, 21.

[10] Ibid, 2 and 19-26.

[11] Ibid, 2 and 23-26. See also "Federal Income Tax Rates and Brackets." Internal Revenue Service (IRS). Available at: https://www.irs.gov/filing/federal-income-tax-rates-and-brackets

[12] "PSLF Coalition Document." Available at: https://pslfcoalition.org/wp-content/uploads/sites/123/The-Story-of-the-PSLF-Coalition-Copy.pdf

[13] Ibid, 2. See also "Public Service Loan Forgiveness." Office of Federal Student Aid of the US Dept. of Education. Available at: https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service

ED_00932

**Importance of Income Driven Repayment (IDR) Plans for LGBTQ+ Borrowers**

As the largest LGBTQ+ serving healthcare organization in Ohio, we'd specifically like to emphasize the importance of IDR plans for LGBTQ+ borrowers, given that many of our patients may be impacted. According to the Williams Institute at the UCLA School of Law, roughly 2.9 million LGBTQ+ adults currently hold more than $93.2 billion in federal student loans. Based upon subgroups, roughly 51% of transgender adults, 36% of LBQ cisgender women, and 28% of GBQ men have federal students.[14] LGBTQ+ adults – aged 18 to 40 – are statistically more likely to have federal student loan debt (i.e. 35% versus 23%). Of these LGBTQ+ borrowers, 32% owe less than $10,000; 52% owe between $10,000 to $50,000; and 16% owe more than $50,000.[15] Additionally, it's important to note that LGBTQ+ people report higher poverty rates, compared to their cisgender and heterosexual peers. Further, LGBTQ+ people of color, queer women, transgender people, and LGBTQ+ adults with children are even more likely to report living at or below the poverty level.[16]

Given the higher rates of poverty within the LGBTQ+ community, access to IDR plans are of serious importance to this community, and this is of even greater importance, given the reality that many members of this community experience workplace discrimination and harassment (i.e. negative workplace experiences that can further impact earning potential).[17] Various organizations like the Williams Institute, the Center for American Progress, and others have examined the impacts of reduced access to IDR plans, and assuming the administration moved forward with the IDR plan options recommended in Project 2025, borrowers could expect an average payment increase by 1.3 to 2 times more per month.[18] This would have a detrimental impact on LGBTQ+ borrowers living in poverty and working families more generally, and we strongly encourage the Dept. of Education to avoid making any detrimental changes to eligibility and/or repayment criteria.

**Importance of the Public Service Loan Forgiveness (PSLF) Program to the Public Health Workforce**

Simply put, we – as one of the largest LGBTQ+ community health centers in the country – are deeply concerned with the White House's executive order, titled "Restoring Public Service Loan Forgiveness," and we are particularly troubled by Section 2(c), which claims that providing access to transition-related care is a form of "child abuse."[19] The inflammatory language used through portions of the executive order seem to indicate an intent to restrict this program – which was established by the US Congress and signed into law under the Bush administration in 2007 – to

---

[14] "Impact of Changes to Federal Student Loan Programs on LGBTQ Adults." 2025. Williams Institute at the UCLA School of Law. 1-2.

[15] Ibid, 2. See also "Federal Student Loan Debt Among LGBTQ People." 2021. Williams Institute at the UCLA School of Law. 2.

[16] Ibid, 3-4.

[17] "LGBTQ People's Experiences of Workplace Discrimination and Harassment. 2023. Williams Institute at the UCLA School of Law. Available at: https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf

[18] Ibid, 5-7. See also *Project 2025 Would Increase Costs, Block Debt Cancellation for Student Loan Borrowers*. 2024. Center for American Progress.

[19] "Restoring Public Service Loan Forgiveness." 2025. White House. Available at: https://www.whitehouse.gov/presidential-actions/2025/03/restoring-public-service-loan-forgiveness/

ED_00933

non-profit organizations that do not align with the administration's political agenda. Frankly, this sets a dangerous precedent, and tools to encourage public service should not be weaponized for political gains. Programs like PSLF are far too important, and this is especially true considering the needs of the health and human services workforce.

Regarding the importance of the PSLF program, the National Council of Nonprofits (NCN) recommends this program as an essential policy solution for the public workforce shortage. Specifically, they note that 74% of 1,600 non-profits surveyed report increasing job vacancies since the COVID-19 pandemic. This shortage of employees in the non-profit sector adds to reduced capacity and availability of services, longer wait times, and completely ends certain programs due to a lack of employees doing the work.[20] Further, the NCN's report cites the PSLF program as a powerful tool to incentivize existing employees to remain in the sector and to attract new talent.[21] Considering our status as a community health center, we'd specifically like to also emphasize the importance of the PSLF program to the health center workforce. As noted by the National Association of Community Health Centers (NACHC), severe workforce shortages – largely driven by burnout and salary gaps in the non-profit healthcare workforce – make it difficult for community health centers to retain and recruit staff, as they are often paid 11% less than their clinicians and staff at other primary care settings.[22] As such, the PSLF program is an important recruitment tool to attract qualified applicants into a career with a community health center, and this is especially important, given the fact that community health centers provide comprehensive, integrated to primary care to more than 32.5 million patients across 16,000 delivery sites nationwide.[23]

To help address this issue, we strongly encourage the Dept. of Education to ensure the continued application of the PSLF program – as previously authorized by Congress and with no new restrictions – given its importance to community health center employees. As detailed by the U.S. Bureau of Labor Statistics, staffing – in order to meet growing needs across the country by 2032 – will need to grow by 18.4% for substance abuse and behavioral health counselors, 14.1% for community health workers, and 14.9% for marriage and family therapists.[24][25]  Over the next 15 years, NACHC estimates that the nation will need over 68,000 primary care physicians, nearly 9,000 dentists, and over 100,000 psychiatrists, and all of these data points only further underscore the importance of protecting this important workforce recruitment, retention, and development tool.[26]

---

[20] "2023 Nonprofit Workforce Survey Results: Communities Suffer as Nonprofit Workforce Shortage Crisis Continues" 2023. National Council of Nonprofits. ii. Available at: https://www.councilofnonprofits.org/files/media/documents/2023/2023-nonprofit-workforce-survey-results.pdf

[21] Ibid, 28.

[22] "Support Measures to Strengthen the Healthcare Workforce Shortage" 2024. National Association of Community Health Centers. Available at: https://www.nachc.org/wp-content/uploads/2024/11/NACHCWorkforcePolicyPaper_Dec2024_FINAL.pdf

[23] Ibid

[24] "Projected Employment Growth for Community and Social Service Occupations, 2022–32." U.S. Bureau of Labor Statistics. Available at: https://www.bls.gov/opub/btn/volume-13/projected-employment-growth-for-community-and-social-service.htm

[25] See Table 1 from the aforementioned report, as attached in Appendix B to this document.

[26] Ibid.

4

**Overall Policy Recommendations**

With this in mind, Equitas Health recommends the following policy actions to the US Dept. of Education:

1) Continue to offer the existing portfolio of Income Driven Repayment (IDR) plans – including Income Based Repayment (IBR), Pay As You Earn (PAYE), Revised Pay As You Earn (REPAYE), and [if permitted by the judiciary] the Saving on a Valuable Education (SAVE) plans – to provide a variety of repayment options for borrowers;

2) Implement a revised definition of "discretionary income" that is defined at 300% of the federal poverty (FPL) (i.e. $46,950 for a household of one) to help ease the financial burden on lower-income borrowers; and

3) Continue the Public Service Loan Forgiveness (PSLF) program, as authorized by Congress and with no new restrictions to borrowers.

**Concluding Remarks**

We greatly appreciate the opportunity to provide public feedback related to the US Dept. of Education's management of Income Driven Repayment (IDR) plans for federal student loans and the Public Service Loan Forgiveness (PSLF) program. Should you have any questions about our comments, please feel free to Rhea Debussy, Ph.D. (she/her), Director of External Affairs at Equitas Health via email at info@equitashealth.com or via phone at (833)-378-4827.

ED_00935

**Appendix A**

**Table 1-1.**

**Income-Driven Repayment Plans**

| Repayment Plan | Introduction | Monthly Payment | Time Until Loan Forgiveness[a] | Eligible Borrowers |
|---|---|---|---|---|
| Income-Contingent Repayment | July 1994 | 20 percent of discretionary income, up to a cap based on the borrower's earnings and marital status and the amount he or she would pay under a 12-year fixed-payment plan[b] | 25 years | Borrowers with direct subsidized or unsubsidized loans, direct PLUS loans for students, or PLUS loans made to parents if consolidated |
| **Income-Based Repayment** | | | | |
| Original plan for new borrowers before July 1, 2014 | July 2009 | 15 percent of discretionary income, up to the amount the borrower would pay in a 10-year fixed-payment plan[c] | 25 years | Borrowers with direct or FFEL subsidized or unsubsidized loans, direct or FFEL PLUS loans for students, or direct or guaranteed consolidation loans that do not include PLUS loans made to parents |
| Updated plan for new borrowers on or after July 1, 2014 | July 2014 | 10 percent of discretionary income, up to the amount the borrower would pay in a 10-year fixed-payment plan[c] | 20 years | Same as in the original plan |
| Pay as You Earn | December 2012 | 10 percent of discretionary income, up to the amount the borrower would pay in a 10-year fixed-payment plan[c] | 20 years | New borrowers on or after October 1, 2007, who received a disbursement of any of the following loans on or after October 1, 2011: direct subsidized or unsubsidized loans, direct PLUS loans for students, or direct consolidation loans that do not include PLUS loans made to parents |
| Revised Pay as You Earn | December 2015 | 10 percent of discretionary income[c] | 20 years if all loans being repaid were for undergraduate study; 25 years if any loans being repaid were for graduate or professional study | Borrowers with direct subsidized or unsubsidized loans, direct PLUS loans for students, or direct consolidation loans that do not include PLUS loans made to parents |

Source: Congressional Budget Office, using information from the Department of Education.

FFEL = Federal Family Education Loan program.

a. Borrowers participating in the Public Service Loan Forgiveness program may have their loans forgiven in as little as 10 years.

b. Discretionary income is defined as income above the federal poverty guideline.

c. Discretionary income is defined as income above 150 percent of the federal poverty guideline.

ED_00936

**Appendix B**

**Table 1. Projected employment change of community and social service occupations, 2022–32**

| 2022 National Employment Matrix title | 2022 National Employment Matrix code | Employment, 2022 | Employment, 2032 | Employment change, numeric, 2022–32 | Employment change, percent, 2022–32 |
|---|---|---|---|---|---|
| Total, all occupations | 00-0000 | 164,482.6 | 169,148.1 | 4,665.5 | 2.8 |
| Community and social service occupations | 21-0000 | 2,936.5 | 3,164.2 | 227.7 | 7.8 |
| Substance abuse, behavioral disorder, and mental health counselors | 21-1018 | 388.2 | 459.6 | 71.5 | 18.4 |
| Marriage and family therapists | 21-1013 | 71.2 | 81.8 | 10.6 | 14.9 |
| Community health workers | 21-1094 | 67.2 | 76.6 | 9.4 | 14.1 |
| Mental health and substance abuse social workers | 21-1023 | 113.5 | 125.5 | 12.0 | 10.6 |
| Healthcare social workers | 21-1022 | 191.4 | 209.8 | 18.4 | 9.6 |
| Social and human service assistants | 21-1093 | 415.1 | 450.6 | 35.6 | 8.6 |
| Health education specialists | 21-1091 | 60.4 | 64.8 | 4.4 | 7.2 |
| Educational, guidance, and career counselors and advisors | 21-1012 | 342.4 | 360.8 | 18.4 | 5.4 |
| Child, family, and school social workers | 21-1021 | 355.3 | 374.3 | 18.9 | 5.3 |

Note: Employment numbers in thousands.
Source: U.S. Bureau of Labor Statistics.

7

ED_00937

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:04 AM
**Received:** May 01, 2025
**Status:** DoNotPost
**Category:** Financial Aid Administrator
**Tracking No.** ma5-o9ug-p2e1
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-4606
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Brooks Harbison
**Email:** brooks.r.harbison@gmail.com

---

## General Comment

I am a post-doctoral fellow in psychology at an R-1 medical school where I work with clinically with cancer patients and their caregivers, individuals who are vastly underserved in the mental health marketplace not only in terms of numbers of available providers, but in terms of people who are competent to work with their specific issues. I am here today because I have self-supported through my doctorate using federal student loans. My educational journey spanned a total of around 10 years in graduate school across a master's and doctoral program and four and a half during undergraduate to complete and honor's degree (and therefore become competitive for doctoral programs in psychology). During this time, I was repeatedly promised by the US government that, because I was planning to enter into civil service in a clinical and research capacity in my career, I would not only be able to meaningfully contribute to society, I would also have the support of public service loan forgiveness. To be frank, this is an incredibly expensive training path -- one that my colleagues in law and medicine will understand intimately. If I did not have the promise of public service loan forgiveness, I would absolutely have not taken the loans as I was not independently wealthy enough to afford the privilege of this education. It is mind-boggling to me that we are even considering de facto selling our professionally trained graduate students into de facto indentured servitude after making promises far to the opposite. I cannot imagine a scenario wherein a parallel loan process, such as an auto or home loan, could be unilaterally changed by the lender.

Moreover, I am going to argue that we should absolutely have a committee formed to discuss loans; however, the express intention should be the EXPANSION of public service loan options, reduction of the years required, and incentives with specific income-based payment plans with lower monthly contributions to further encourage enrollment in civil service. With a pandemic of deaths of despairs (for example, overdoses and suicide) occurring across the US, we need MORE people entering into civil service to protect vulnerable population, not fewer. Additionally, we need more opportunities for citizens to pursue higher education, not fewer, as higher educational achievement is a protective factor when it

comes to many mental and physical health concerns (including cancer). By creating income-driven repayment plans that establish a viable path to repayment with 5-10% of monthly discretionary income and zeroing interest rates while in repayment, most citizens would be willing to contribute towards repayment in long-term plans (similar to mortgages). However, the notion that citizens want to get rid of income-driven repayments and opt into quicker resolution of their debts is foolhardy at best, deceptive at worst. few can afford standard repayment plans as it is. I have been waiting since graduation last summer to get approved on an IBR, and the standard plan they originally placed me on wanted $3K/month in repayments and will ultimately lead to repayment of three times the worth of my familial home. I would NEVER have pursued this career path had I known IBR/IDR would not have been an option because it just isn't feasible to make work. Unfortunately, had I not pursued it, that would have meant one fewer specialized mental health provider, which is the reality we will face in the future if these pathways are under-utilized or removed. We will face a massive bottleneck in clinical and legal services in the US if that happens, and the providers will all come from independently wealthy backgrounds. Ultimately, we will see a proliferation of deaths of despair, loss of productivity, and lowered quality of life across the US if we undercut these service domains.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:05 AM
**Received:** May 01, 2025
**Status:** DoNotPost
**Tracking No.** ma6-9guv-ph2x
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-4776
Comment on FR Doc # 2025-05825

## Submitter Information

**Name:** Andrea Balthazar
**Address:**
  TX,  77024-
**Email:** abalth1@gmail.com

## General Comment

Secretary of Education Linda McMahon,

Dear Secretary McMahon,


As the first person in my family to graduate from college and attend medical school, my path into medicine was paved by hard work, sacrifice, and the support of essential federal programs like grants, scholarships, and student loans. I come from a low-income background, and without these opportunities, especially Public Service Loan Forgiveness (PSLF), a career in medicine would have remained out of reach.


After over a decade of rigorous training, including college, medical school, residency, and fellowship, I became a surgeon. I chose a career in public service, dedicating myself to caring for vulnerable patients, including children, in underserved communities. These jobs often come with long hours, emotional demands, and salaries that are significantly lower than those in the private sector. I did not choose this path for financial gain—I chose it because I believe in the power of medicine to serve, heal, and uplift.


The PSLF program recognizes this commitment by supporting professionals like me who work in nonprofit hospitals, public health institutions, and federally qualified health centers. It is a promise: that if

you dedicate your career to serving the public, your country will support you in return. For many of us from modest means, PSLF is not a bonus—it is a lifeline. It enables people from all backgrounds to pursue careers in medicine, teaching, social work, and other vital fields without being burdened by insurmountable debt.

Eliminating or weakening PSLF would disproportionately harm those who come from underrepresented and disadvantaged backgrounds. It would also discourage future generations from entering public service. I am living proof that these programs work. They helped me rise from a low-income family to become a surgeon who serves others.

We must protect and strengthe

ED_00941

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:06 AM
**Received:** April 22, 2025
**Status:** DoNotPost
**Tracking No.** m9u-45ik-79bu
**Comments Due:** May 08, 2025
**Submission Type:** API

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-4967
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

test

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:06 AM
**Received:** May 04, 2025
**Status:** DoNotPost
**Category:** Institutional and Loan Servicers
**Tracking No.** ma9-v02z-uyja
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-6757
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Name:** Michael Rodriguez
**Address:** United States,
**Email:** michael.vincent24@gmail.com

---

## General Comment

I am a public school teacher who has been consistent with 90+ PSLF payments. My expected end date was originally the autumn of 2025. Due to the lawsuits and payment plan uncertainty. I'm unsure when, and if, I'll be able to take this financial speed bump off of my back. I have done nothing but maintain my financial good standing to achieve this financial relief that was promised to me and other public servants around the country. Please ensure people like us are able to build and grow into a future we were all promised.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:06 AM
**Received:** May 05, 2025
**Status:** DoNotPost
**Category:** Association/Organization
**Tracking No.** mab-k2x4-lhos
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated
Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-6960
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Email:** dkastner.nasw@socialworkers.org
**Organization:** National Association of Social Workers

---

## General Comment

See attached file.

---

## Attachments

PSLF Neg Reg Comment - NASW - FINAL

750 First Street NE, Suite 800, Washington, DC 20002-4241
202.408.8600 » SocialWorkers.org



May 5, 2025

Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

*Submitted via regulations.gov*

**Re: Comments to Department of Education in response to Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee; Docket ID ED-2025-OPE-0016**

The National Association of Social Workers appreciates the opportunity to comment in response to the Department of Education's announcement of its intent to establish a negotiated-rulemaking process to make changes to, among other programs, the Public Service Loan Forgiveness program.

Founded in 1955, NASW is the largest membership organization of professional social workers in the United States. NASW has 102,000 members and works to enhance the professional growth and development of its members, to create and maintain professional standards, and to advance sound social policies.

NASW objects to any regulations that would narrow the definition of a "qualifying employer" for the purpose of determining PSLF eligibility. The PSLF program enables borrowers, including NASW's members—many of whom otherwise carry unsustainable debt burdens—to enter public service careers and carry out critically important work for the public good. Meaningful student debt relief, including through access to the PSLF program, is essential to ensure a strong and plentiful social work workforce and to keep the profession financially accessible. Restricting the program would make it difficult for NASW's members to provide important services to populations in need and for NASW itself to fulfill its mission.

### 1. *Social workers provide an essential public service.*

There are over 700,000 professional social workers nationwide and they are one of the largest providers of mental, behavioral, and social care services in the United

1

ED_00945

States. Social workers are licensed and credentialed at the Bachelor's, Master's, Doctorate, and PhD levels. Roughly 250,000 are licensed clinical social workers, who are required to have a Master's degree and licensure to practice independently. Social workers help people cope with and solve a wide variety of problems in their everyday lives. They are found in every facet of community life, including schools, hospitals, behavioral health clinics, senior centers, prisons, child welfare and juvenile services, the military, corporations, courts, private practice, elected office, and in numerous public and private agencies. Social workers provide urgently needed mental health and behavioral health services and help clients who have a disability or face a life-threatening disease or a social problem, such as inadequate housing or unemployment. Social workers serve on crisis response teams and assist victims of violence. They also assist families that have serious domestic conflicts, involving child abuse and neglect and or spousal abuse. They work with immigrant populations and LGBTQ+ people. Social workers conduct research, advocate for improved services, engage in systems design, manage non-profits, or are involved in planning or policy development. Social workers provide these critically needed services to millions of Americans every day.

Many social workers specialize in serving a particular population or working in a specific setting in non-profits and the public sector. Some examples include:

- *Aging:* Social workers link older adults with services that help them live independently and with dignity, thereby maximizing their quality of life and participation in society. In 2022, 31.9 million women and 25.9 million men were age 65 and above. People aged 65 and above represented 17.3% of the population in 2022.[1] Social work with older adults focuses on the physical, psychological, social, and economic aspects of daily living.

- *Child Welfare:* Child welfare social workers serve some of the most vulnerable children, youth, and families. Social workers specialize in building on the strengths of families and helping them to provide a safe and nurturing environment for children and youth. However, when families are unable to do this, social workers must intervene to reduce risk and protect children from harm. An estimated 558,899 children (unique incidents) were victims of abuse and neglect in the U.S. in 2022.[2] Child welfare social workers ensure that children and youth who have experienced abuse or neglect are supported through a range of services.

- *Health Care:* Health care social workers help people deal with personal and social factors that affect health and wellness. Some health care social

---

[1] *See* Admin. for Community Living, U.S. Dep't of Health & Hum. Servs., *2023 Profile of Older Americans* 4 (May 2024), https://perma.cc/X7K2-MEYX.

[2] *See* Nat'l Children's All., *National Statistics on Child Abuse,* https://perma.cc/4Q22-HKYF (last accessed May 1, 2025).

ED_00946

workers are in direct services and concentrate on individuals, families, and small groups. Others work in settings where the focus is on planning, administration, and policy. In the health care setting, social workers may conduct research, develop programs, and administer departments. Social workers are critical to meeting the needs of social determinants of health.

- *Schools:* Social workers in schools provide mental health and behavioral health services to students and an array of other services that support student health, wellbeing and academic achievement. These social workers often run groups, work on attendance issues, address student hunger and homelessness. They may also assist with students who have disabilities and or require Individual Education Plans. Social workers in schools assist students in maximizing their academic potential by meeting their social and emotional needs.

- *Mental Health and Substance Use Disorder Services:* Clinical social workers focus on assessment, diagnosis, treatment and prevention of mental health and behavioral health conditions, including substance use disorders. Clinical social workers are essential to a number of client-centered settings and can be found in private practice, agencies and other community-based settings. Social workers have the requisite training and expertise to assist individuals with mental health and substance use disorders live their best lives.

## 2. *Student debt is a substantial barrier to entry for social workers who want to go into public service.*

Total outstanding federal student debt in the United States now exceeds $1.7 trillion[3] among more than 42 million borrowers.[4] Student loans are a tremendous barrier for people seeking employment in public service jobs, where salaries are persistently low compared to private sector jobs. That is true for social workers.

Social workers tend to have high student debt, but relatively low pay, making participation in the profession financially difficult, particularly in the non-profit and public sectors. The disparity between debt and compensation is exacerbated by the level of education required to practice in the field. While social workers can work in certain settings with a Bachelor's degree, a Master's of Social Work (MSW) is the terminal degree required to practice in many settings including independent clinical

---

[3] Melanie Hanson, *Student Loan Debt Statistics*, Education Data Initiative (updated Mar. 16, 2025), https://perma.cc/6TRR-RJ9U; *see also* Adam Looney & Constantine Yannelis, *What Went Wrong with Federal Student Loans?*, Brookings (2024), https://perma.cc/Z4KN-ZVXR (from 2000 to 2020, the number of borrowers with student debt went from 21 million to 45 million, and the total amount owed "quadrupled from $387 billion to $1.8 trillion").
[4] *Id.*

ED_00947

social work. Social workers who obtain a MSW carry a mean total student debt of $67,000,[5] but the mean starting salary for social workers with MSWs is just $47,100.[6]

Disparities between student debt undertaken and salaries mean that many borrowers may forgo public service jobs altogether because they cannot otherwise cover all living expenses, including their student debt. The result is severe workforce shortages in the nonprofit sector.[7] Indeed, nonprofit organizations consistently report that salary competition is the single largest factor harming their ability to attract and retain employees.[8] This trend, too, has played out in the social work profession.

The demand for social workers is expected to increase substantially—by more than twice the average expected for all occupations—over the coming years.[9] Demand for all categories of social workers are expected to grow faster than average, with particularly rapid growth in the need for healthcare social workers and mental health and substance use disorder social workers.[10]

We are already facing a lack of qualified social workers.[11] For example, almost all child welfare programs struggle with recruiting and retaining qualified and effective child welfare staff, and turnover rates remain high.[12] Educational institutions are not on pace to meet the expected increase in need. While enrollment in social work

---

[5] Edward Salsberg et al., *The Social Work Profession: Findings from Three Years of Surveys of New Social Workers*, NASW 12 (Aug. 2020), https://perma.cc/5ZM2-QZ6L.

[6] *Id.*

[7] *See* Nat'l Council of Nonprofits, *2023 Nonprofit Workforce Survey Results: Communities Suffer as Nonprofit Workforce Shortage Crisis Continues* 3-4 (2023), https://perma.cc/7NDN-27LG; Ctr. For Effective Philanthropy, *State of Nonprofits in 2023: What Funders Need to Know* (2023), https://perma.cc/9KZB-856A.

[8] Nat'l Council of Nonprofits, *supra* note 5, at 10.

[9] *See* Bureau of Labor Stats., U.S. Dep't of Labor, *Occupational Outlook Handbook—Social Workers*, https://www.bls.gov/ooh/community-and-social-service/social-workers.htm (last accessed April 30, 2025).

[10] *Id.*; *see also* Michael Rieley, U.S. Bureau of Labor Stats., *Beyond the Numbers: Projected Employment Growth for Community and Social Service Occupations, 2022-32* (Feb. 2024), https://www.bls.gov/opub/btn/volume-13/projected-employment-growth-for-community-and-social-service.htm (demand for healthcare social workers projected to grow 9.6% from 2022 to 2032).

[11] Columbia School of Social Work, *Bridging the Gap: The Urgent Need for Social Workers* (Sept. 29, 2023, https://socialwork.columbia.edu/news/bridging-gap-urgent-need-social-workers (reporting an expected deficit of 74,000 social workers annually over the next decade).

[12] Nat'l Child Welfare Workforce Inst., *Critical Workforce Needs* (Dec. 2020), https://perma.cc/TY6M-LS7W (noting turnover rates between 20 to 50 percent nationally).

ED_00948

education shows modest growth, this upward trend is insufficient to meet the corresponding anticipated increase in demand for qualified social workers.[13]

The consequences of attrition and difficulties recruiting can be dire for the populations for whom social workers provide care and services—reduction or elimination of services and longer waiting times mean that people in need have less access to healthcare, child welfare services, violence prevention, education assistance, and so much more, including for people with disabilities, LGBTQ+ people, people of color, and other vulnerable communities.[14] Individuals may be denied services that they so desperately need.

Hence, federal investments in social work and social work education are critically needed to ensure that there is a sufficient supply of social workers to meet evolving demands.

### 3. *The PSLF program was designed to help people enter public service employment.*

Fortunately, Congress, with bipartisan support, enacted the PSLF program (as part of the College Cost Reduction and Access Act)[15] to encourage entry for a wide range of public service professions, including social work.

As the legislative history around the passage of the Act shows, the program was designed to support those who want "to work in a variety of areas that are extraordinarily important for our country and for our society,"[16] including those in "emergency management, public safety, . . . public education, early childhood education, childcare, public health and social work in public service agencies, public services for individuals with disabilities and the elderly, public interest legal services, public defenders, school librarians, school-based service providers, teaching full-time at a tribal college or university."[17] And that enumerated list of employers was "not exclusive, it is inclusive."[18] As Senator Edward Kennedy explained at the time, "we have made this as wide as we could in terms of trying to respond to the sense that is out there in our schools and colleges, . . . to say: Look, if you want to give something back, we are going to make it possible."[19]

Some argue that taxpayers should not have to take on the burden of another person's educational debt. PSLF is not a loan cancellation program. Participants in

---

[13] Ryan Bradshaw, Council on Social Work Educ., *Spring 2021 CSWE Member Pulse Survey Results* (2021), https://perma.cc/M4CR-FZPV.

[14] *See, e.g.*, Nat'l Council of Nonprofits, *supra* note 5, at 5-8.

[15] *See* Pub. L. 110-84, 121 Stat. 784 (2007).

[16] 153 Cong. Rec. S9448 (daily ed. July 17, 2007) (statement of Sen. Bernie Sanders).

[17] *Id.* at S9462 (statement of Sen. Edward Kennedy).

[18] *Id.*

[19] *See* 153 Cong. Rec. S9536 (daily ed. July 19, 2007) (statement of Sen. Edward Kennedy).

ED_00949

the program need to pay off their debt for at least 10 years before they can qualify for loan forgiveness. The PSLF program benefits communities by helping dedicated professionals use their educational background and training to meet the needs of their community.

As Congress envisioned, PSLF is a vitally important government program that eases the student debt burden for those who choose public service professions. Together with other federal financial assistance programs, the PSLF program helps to bridge the income gap between public service and private employment to make public service a feasible career path. As of October 2024, more than a million borrowers have had more than $70 billion in student debt discharged through the program.[20] And PSLF has proven to be an important recruitment and retention tool for public service employers, as the Department itself has recognized.[21]

### 4. *Losing access to the PSLF program would harm NASW, its members, and the people and communities they serve.*

NASW's members are employed in jobs that qualify them for participation in the PSLF program. Many of NASW's members provide services—or work for healthcare providers, hospitals, schools, governmental entities, or other employers that provide services—related to a number of the topics targeted in President Trump's recent executive for disqualifying individuals and employers from participation in PSLF, "Restoring Public Service Loan Forgiveness."[22] Social workers, for example, provide therapy services, diagnoses of gender dysphoria, and approvals needed for hormone therapy, including therapy for minors. They offer diversity support programs. And they provide counseling, case management, and other services for immigrant populations. The threat of or actual loss of PSLF eligibility as a result of carrying out, or working for an employer who carries out, activities that fall under the topics referenced in the executive order would cause immediate, serious, and lasting harm to communities, social workers, and the agencies they work for.

---

[20] *See* Council of Econ. Advisors, *Making Public Service Loan Forgiveness Work for Borrowers and the American People*, White House (Oct. 17, 2024), https://perma.cc/L62V-GXEW.

[21] *See* U.S. Dep't of Educ., Fed. Student Aid, *Tackling the Public Service Loan Forgiveness Form: Employer Tips*, https://perma.cc/DS3F-3RDM (accessed Apr. 24, 2025) (Department resource for employers instructing that, "While [PSLF] is a potentially life-changing benefit for your employee, it's also an opportunity for you. You can use your eligibility as a qualifying employer for the PSLF . . . program[ ] as a recruitment tool to attract highly qualified employees to your organization); Julie Burrell, Coll. & Univ. Professional Ass'n for Human Resources, *Public Service Loan Forgiveness: Help Employees Achieve Their Financial Goals*, The Higher Ed Workplace Blog (Sept. 17, 2024), https://perma.cc/S9H6-E5BP (noting that human resources can use the PSLF program "as part of a retention and recruitment strategy" and that it is "an especially attractive benefit to potential employees").

[22] Executive Order 14,235, "Restoring Public Service Loan Forgiveness," 90 Fed. Reg. 11,885 (Mar. 7, 2025).

ED_00950

As described above, sustainable careers in social work depend on access to the PSLF program. Should NASW's members lose access to the program, many of them will not be able to afford to make their required monthly student loan payments while remaining in their current positions. And our members must grapple with that decision *now*, as they consider whether to seek or accept new employment, to apply for or enroll in an MSW program, or make any number of other decisions related to their education or employment.

The threat or actual loss of the PSLF program will frustrate NASW's ability to advance the profession by encouraging the sustainable growth of the profession and impede its ability to advocate for sound social policies. Ultimately, those harms trickle down to the populations that NASW's members serve, including some of the most vulnerable members of society.

*       *       *       *       *

NASW strongly opposes any effort by the Department to undermine the PSLF program. Such attempts would contravene Congress's intent in establishing the program, sow chaos and confusion for the millions of borrowers participating in the program—not to mention the millions more relying on its continued existence as they make decisions regarding higher education enrollment and employment—and, ultimately, harm the public service organizations that provide critical services for the benefit of the American people.

Should you have any questions about this comment, please feel free to contact Dina Kastner, Public Policy and Advocacy Manager at NASW, at dkastner.nasw@socialworkers.org or (202) 336-8218.

Respectfully submitted,

Barbara Bedney, PhD, MSW
Chief of Programs
National Association of Social Workers

7

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/19/25, 7:08 AM |
| **Received:** May 05, 2025 |
| **Status:** DoNotPost |
| **Category:** Community Organization |
| **Tracking No.** mab-ot1e-o24i |
| **Comments Due:** May 08, 2025 |
| **Submission Type:** Web |

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-6990
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Email:** alexander.lundrigan@younginvincibles.org
**Organization:** Young Invincibles

---

## General Comment

Please see attached for public comment regarding Docket ID ED-2025-OPE-0016. Thank you for the opportunity to provide public comment.

Best regards,

Alexander Lundrigan | Young Invincibles.

---

## Attachments

Young Invincibles Public Comment Docket ID ED-2025-OPE-0016



May 5th, 2025
James P. Bergeron, Acting Under Secretary
U.S. Department of Education
Office of Postsecondary Education, Department of Education
400 Maryland Avenue
S.W. Washington, DC 20202

**RE: Docket ID ED–2025–OPE–0016 - Intent To Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee**

Dear Mr. Bergeron,

Young Invincibles respectfully submits these comments in response to the Department of Education's request for public input (Docket ID ED–2025–OPE–0016) regarding the development of proposed regulations and the establishment of a Negotiated Rulemaking Committee.

Young Invincibles (YI) is a national nonprofit organization committed to amplifying the voices of young adults in the political process and expanding their access to economic opportunity. Postsecondary education remains one of the most powerful tools young people—especially those from historically marginalized and low-income backgrounds—can access to build strong careers and achieve upward economic mobility. YI advocates for policies, regulations, and legislation ensuring the cost of college does not block students who want to earn a college degree.

As the Department begins the process of revisiting and potentially revising regulations under Title IV of the Higher Education Act—including but not limited to Public Service Loan Forgiveness (PSLF), Income-Driven Repayment (IDR) plans, and federal student aid–we strongly urge a steadfast commitment to promote access and opportunity for all young adults. Any regulatory changes must prioritize expanding access to higher education, rather than restricting or dismantling the very programs that empower students and strengthen our nation's economy.

We stand firm in support for accessible higher education and strong pathways to student debt relief. We strongly reject any regulatory changes to IDR, PSLF, or federal student aid that would exacerbate the student debt crisis or create new barriers to accessing higher education.

**Student Debt is a Generational Economic Crisis Uniquely Affecting Young Adults**

PSLF and IDR plans are essential tools in addressing the disproportionate burden of student debt on young adults. This is not a vague economic issue, it is a defining financial crisis for the younger generations. Millennials hold 39 percent of the student loan portfolio, followed closely by Generation Z at 28 percent.[1] This debt burden has real economic consequences on young adults: the average age of a first time homebuyer has risen to 35 up from 30 in 2010, and many are postponing major life milestones like starting a family or investing in retirement. What links all of these? Financial insecurity, and student debt is a significant contributing factor to that instability.

Broad-based student debt cancellation is the catalyst that could slow the growth of this economic crisis, and set many of those affected back on the path to financial stability. However, pending a broad-based student debt relief plan, PSLF and IDR plans are tools that provide hope and flexibility. These programs offer borrowers the opportunity to align their student loan payments with their financial realities, whether that means reducing their monthly payments or making progress towards loan forgiveness. The SAVE plan provided substantial relief for borrowers by cutting monthly payments in half, preventing balances from ballooning, and speeding the path to forgiveness. Expanding and strengthening  repayment options like the SAVE plan is essential. It provides critical immediate relief while we continue working towards broad-based forgiveness. Any regulations the Department of Education suggest during this negotiated rulemaking should focus entirely on building upon the success of SAVE, ensuring more robust and accessible income-driven repayment options for borrowers. Regulations should not diminish existing IDR plan options or restrict access and eligibility for borrowers.

**Public Service Loan Forgiveness Promotes Civil Service and Strengthens Our Communities.**

PSLF isn't simply loan forgiveness; it's a vital workforce policy, created by Congress with bipartisan support. It incentivizes public service careers – from firefighters and first responders to teacher, social workers and congressional staffers – by forgiving remaining balances after 120 qualifying payments. PSLF recognizes and rewards the choice to work in the nonprofit or public sector, in lieu of taking a higher salary in the private sector, enabling people to pursue lower-paying value-driven careers without the financial burden of overwhelming student debt. This program should be expanded and supported through rulemaking, not undermined or weakened.

Attempts to politicize PSLF, particularly the Trump Administration's executive order to restrict PSLF eligibility based on an organization's politics or missions, will severely damage public sector recruitment and harm communities across the country, both rural and urban. This attack is a blatant abuse of presidential authority by threatening to withhold loan forgiveness from vital public servants, like nurses, fire fighters, and police officers, based on political disagreement.

---

[1] https://educationdata.org/student-loan-debt-by-generation

Many young adults want to enter careers that serve their communities and depend on PSLF to make those careers sustainable. Targeting this program based on political bias undermines our civic institutions and weakens the public sector pipeline, particularly in underserved and rural areas.

Sincerely,

Young Invincibles.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:08 AM
**Received:** May 05, 2025
**Status:** DoNotPost
**Category:** Individual
**Tracking No.** mab-wyzj-3qo7
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated
Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-7021
Comment on FR Doc # 2025-05825

## Submitter Information

**Name:** Matthew Suggs
**Address:**
   El Cajon,  CA,  92020
**Email:** dr.suggs.psych@gmail.com
**Phone:** 6192445179

## General Comment

My name is Dr. Matthew Suggs, D.O., and I am a board-certified psychiatrist serving on the front lines of
community mental health. I am also a husband, a father, and the first person in my family to attend
college. I'm writing to share my story, not for sympathy, but to ask you to honor the promise that made
my journey possible, Public Service Loan Forgiveness (PSLF) and Income-Driven Repayment (IDR)
programs. My father grew up in the foster care system after losing both his parents at a young age. My
grandmother died when he was just seven years old, and my grandfather, battling alcoholism, died shortly
thereafter. With no stable home, my father was passed from one foster family to another. Against all odds,
he earned his high school diploma. My mother was a teenage parent who, to my knowledge, earned her
GED. I grew up watching her work at a grocery store and my father labor six days a week as a butcher.
They didn't have much, but they were proud. They were proud of their work, and proud of me. They
wanted a better life for me than what they had endured. That dream became reality, but only because of
the support of programs like PSLF and IDR. I worked as a janitor to save money while attending a local
community college, then transferred to a state university to earn my bachelor's degree. The idea of
becoming a doctor seemed impossible financially, but I believed in the promise that if I dedicated my
career to public service, there would be a path forward. So I made the leap. I went to medical school. I
pursued psychiatry, not because it would make me wealthy, but because I wanted to serve people like my
parents. People battling trauma, addiction, mental illness, and systemic disadvantage. I knew I would take
on significant debt, but I believed in the value of giving back, and I trusted the federal programs that made
that vision attainable. Today, I care for patients with depression, psychosis, PTSD, substance use
disorders, and other serious psychiatric illnesses. I SERVE the underserved, the uninsured, and the
forgotten. I do this work proudly, but at great personal cost. I am still in substantial debt. I do not own a
home. I have a two-year-old son who I want to give the same opportunities my parents once dreamed of

ED_00956

for me. If PSLF or IDR are taken away, it will be a devastating betrayal, not just to me, but to every person who made life choices based on the promise of public service support. If I had known those promises would be broken, I would not have pursued this path. And if I hadn't, there are hundreds, maybe thousands, of patients whose lives might be worse off today. This is not just about debt. It's about equity. It's about access. It's about the kind of country we want to be. We need more doctors, more social workers, more teachers willing to serve…not fewer. Please don't close the door behind those of us who walked through it in good faith. Honor the promise. Keep PSLF and IDR intact. Sincerely, Dr. Matthew Suggs, D.O.

ED_00957

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 12/19/25, 7:09 AM |
| **Received:** May 06, 2025 |
| **Status:** DoNotPost |
| **Category:** Federal Agency |
| **Tracking No.** mac-jgy2-ijmk |
| **Comments Due:** May 08, 2025 |
| **Submission Type:** Web |

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-7041
Comment on FR Doc # 2025-05825

## Submitter Information

**Name:** Opal Dyson
**Address:** United States,
**Email:** opaldyson@gmail.com

## General Comment

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

I am a clinical social worker with $101,146 in student loans. I currently work in a psychiatric facility, but I have dedicated my profession towards helping populations who are vulnerable and/or underserved to include hospice care, outpatient mental health care, and child abuse/neglect. I have been in the Public Service Loan Forgiveness program since 2015 and have been diligent about complying with the terms of the program and submitting the necessary paperwork each year.

In regard to student loan repayment, I realized that my payments were significantly impacting my ability to save money for other areas of my life; thus, I switched my repayment plan to the SAVE plan, which lowered my monthly payments to be more manageable. However, my loans have been in forbearance for 8 months now due to the SAVE plan facing elimination.

In February 2025, I submitted a "Buy Back" request so that I can make payments for the months that my loans have been in forbearance, as my current employment qualifies for loan forgiveness. However, I have heard nothing regarding the request I've submitted.

It is disheartening knowing that my loans should have been forgiven three months ago. This issue is currently impacting my ability to move forward with my life, as this delays me buying a home and starting a family.

ED_00958

I strongly urge the Department of Education to protect existing qualifying employment categories, guarantee the PSLF Buy Back program with clear guidance, and uphold payment plans that are manageable for borrowers' incomes.

When those who work in public service cannot rely on promised loan forgiveness, it discourages brilliant individuals from pursuing essential careers in public service. It further hinders them from building families and investing in their futures. The Department must uphold its commitment to the PSLF program —a legally binding contract--and ensure its continued accessibility and efficacy for those who serve their communities and the country.

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:10 AM
**Received:** May 07, 2025
**Status:** DoNotPost
**Tracking No.** mae-mcq1-j2zp
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-7087
Comment on FR Doc # 2025-05825

---

## Submitter Information

**Organization:** GEM CITY ACTION

---

## General Comment

See attached file(s)

---

## Attachments

GCA Public Comment DOE Negotiated Rulemaking for IDR Plans and PSLF Program.docx



May 1, 2025

Submitted via https://www.regulations.gov/document/ED-2025-OPE-0016-0001

Secretary Linda McMahon
Acting Undersecretary James Bergeron
Office of Postsecondary Education
US Dept. of Education
Lyndon Baines Johnson Building
400 Maryland Avenue SW
Washington, DC 20202

**RE: Public Feedback for the Development of Proposed Regulations Under Negotiated Rulemaking (ATTN: ED-2025-OPE-0016-0001; 34 CFR Chapter IV; Federal Register Number 2025-05825)**

Dear Secretary McMahon and Undersecretary Bergeron,

Gem City Action is dedicated to building a more inclusive and equitable Dayton by advocating for human rights, supporting marginalized groups, and promoting social justice. Our mission is to create safe spaces, uplift underrepresented voices, and engage in grassroots activism to build a stronger, more connected community.

We appreciate the opportunity to provide public feedback related to the Dept. of Education's management of Income Driven Repayment (IDR) plans for federal student loans and the Public Service Loan Forgiveness (PSLF) program.

**Facts About Income Driven Repayment (IDR) Plans and the Public Service Loan Forgiveness (PSLF) Program**

Given common misconceptions, it's important to underscore the facts about both Income Driven Repayment (IDR) plans and the Public Service Loan Forgiveness (PSLF) program. First introduced in the 1990s, IDR plans were introduced to increase access to education and to make the process of repaying student loans more affordable to borrowers.[1] Importantly, IDR plans calculate monthly payments at a specific rate of a

---

[1] *Income-Driven Repayment Plans for Student Loans: Budgetary Costs and Policy Options.* 2020. Congressional Budget Office (CBO). 1.

borrower's discretionary income, and some IDR plans implement a payment cap.[2] For instance, the Pay As You Earn (PAYE) plan calculates payments at 10% of a borrower's discretionary income with a cap at the amount that the borrower would pay under a standard 10-year fixed payment plan.[3] And as noted by the Congressional Budget Office (CBO), borrowers on IDR plans default at much lower rates, compared to peers on standard repayment plans;[4] for instance, the CBO has previously analyzed data that suggests borrowers in IDR plans were actually half as likely to default on their payments.[5]

Under the Federal Credit Reform Act (FCRA) of 1990, costs of the federal student loan program are described as subsidies, where a positive subsidy is a loan's net cost and a negative subsidy is a loan's net gain respective to the federal budget.[6] In CBO's projections for the 2020s, loans repaid via IDR plans have an average subsidy rate of 16.9%, while loans repaid via standard repayment plans have a an average rate of -12.8%.[7] However, the CBO has estimated a balance to be struck between these competing rates, since the federal government can expect a positive subsidy of $82.9 billion and a negative subsidy of $72.2 billion this decade.[8] And finally, it is important to remember that any outstanding balance at the end of an IDR period (i.e. 20-25 years of monthly repayments) is forgiven, but importantly, the borrower is responsible for that tax burden, meaning that the federal government can expect a tax rate of 10 to 37% to apply on the outstanding balance.[9] In short, the "forgiven amount" still generates revenue for the federal government, as it is considering taxable income for that specific tax year.

Regarding Public Service Loan Forgiveness (PSLF), this important program – which was signed into law during the George W. Bush administration – has enjoyed bipartisan support. After making regular payments during 10 years of qualifying public service (i.e. government, non-profit, and/or related work at the full-time level), borrowers are eligible for loan discharge and forgiveness.[10] As you know, this program was developed to encourage graduates to consider important but often less lucrative and undervalued careers in the public service sector, and as such, PSLF enrollees often work in government, education, healthcare, human service, and related positions across the country. This particular program is especially important for borrowers with specialized degrees and higher levels of student debt, since it incentivizes these graduates to pursue careers for the public good.

---

[2] See Table 1-1 from the aforementioned report, as attached in Appendix A to this document.
[3] Ibid, 8.
[4] Ibid, 1 and 15.
[5] Ibid, 15.
[6] Ibid, 19.
[7] Ibid, 21.
[8] Ibid, 2 and 19-26.
[9] Ibid, 2 and 23-26. See also "Federal Income Tax Rates and Brackets." Internal Revenue Service (IRS). Available at: https://www.irs.gov/filing/federal-income-tax-rates-and-brackets
[10] Ibid, 2. See also "Public Service Loan Forgiveness." Office of Federal Student Aid of the US Dept. of Education. Available at: https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service

<u>Importance of Income Driven Repayment (IDR) Plans for over 100 Borrowers</u>

Given the scope of our organization, we'd specifically like to emphasize the importance of IDR plans for low, middle and working class borrowers, given that many of our community members may be impacted.

Given these realities, access to IDR plans is of serious importance to this community. Organizations like the Center for American Progress and others have examined the impacts of reduced access to IDR plans, and assuming the administration moved forward with the IDR plan options recommended in Project 2025, borrowers could expect an average payment increase by 1.3 to 2 times more per month.[11] This would have a detrimental impact on borrowers living in poverty and working families more generally, and we strongly encourage the Dept. of Education to avoid making any detrimental changes to eligibility and/or repayment criteria.

<u>Importance of the Public Service Loan Forgiveness (PSLF) Program to the Community & Service Facing Workforce</u>

We are also deeply concerned with the White House's executive order, titled "Restoring Public Service Loan Forgiveness."[12] The language used through portions of the executive order seem to indicate an intent to restrict this program – which was established by the US Congress and signed into law under the Bush administration in 2007 – from non-profit organizations that do not align with the administration's political agenda. Frankly, this sets a dangerous precedent, and tools to encourage public service should not be weaponized for political gains. Programs like PSLF are far too important, and this is especially true considering the needs of the social services & educational workforce.

Regarding the importance of the PSLF program, the National Council of Nonprofits (NCN) recommends this program as an essential policy solution for the public workforce shortage. Specifically, they note that 74% of 1,600 non-profits surveyed report increasing job vacancies since the COVID-19 pandemic. This shortage of employees in the non-profit sector adds to reduced capacity and availability of services, longer wait times, and completely ends certain programs due to a lack of employees doing the

---

[11] Ibid, 5-7. See also *Project 2025 Would Increase Costs, Block Debt Cancellation for Student Loan Borrowers*. 2024. Center for American Progress.
[12] "Restoring Public Service Loan Forgiveness." 2025. White House. Available at: https://www.whitehouse.gov/presidential-actions/2025/03/restoring-public-service-loan-forgiveness/

ED_00963

work.[13] Further, the NCN's report cites the PSLF program as a powerful tool to incentivize existing employees to remain in the sector and to attract new talent.[14]

Considering our focus area, we'd specifically like to also emphasize the importance of the PSLF program to our workforce. As such, the PSLF program is an important recruitment tool to attract qualified applicants into a career in our sector.

To help address this issue, we strongly encourage the Dept. of Education to ensure the continued application of the PSLF program – as previously authorized by Congress and with no new restrictions – given its importance to employees at our organization and throughout our sector.

<u>Overall Policy Recommendations</u>

With this in mind, Gem City Action recommends the following policy actions to the US Dept. of Education:
1) Continue to offer the existing portfolio of Income Driven Repayment (IDR) plans – including Income Based Repayment (IBR), Pay As You Earn (PAYE), Revised Pay As You Earn (REPAYE), and [if permitted by the judiciary] the Saving on a Valuable Education (SAVE) plans – to provide a variety of repayment options for borrowers;
2) Implement a revised definition of "discretionary income" that is defined at 300% of the federal poverty (FPL) (i.e. $46,950 for a household of one) to help ease the financial burden on lower-income borrowers; and
3) Continue the Public Service Loan Forgiveness (PSLF) program, as authorized by Congress and with no new restrictions to borrowers.

<u>Concluding Remarks</u>

We greatly appreciate the opportunity to provide public feedback related to the US Dept. of Education's management of Income Driven Repayment (IDR) plans for federal student loans and the Public Service Loan Forgiveness (PSLF) program. Should you have any questions about our comments, please feel free to Michelle Ricica at Gemcityaction@gmail.com

---

[13] "2023 Nonprofit Workforce Survey Results: Communities Suffer as Nonprofit Workforce Shortage Crisis Continues" 2023. National Council of Nonprofits. ii. Available at: https://www.councilofnonprofits.org/files/media/documents/2023/2023-nonprofit-workforce-survey-results.pdf
[14] Ibid, 28.

ED_00964

## Appendix A

Table 1-1.

### Income-Driven Repayment Plans

| Repayment Plan | Introduction | Monthly Payment | Time Until Loan Forgiveness[a] | Eligible Borrowers |
|---|---|---|---|---|
| Income-Contingent Repayment | July 1994 | 20 percent of discretionary income, up to a cap based on the borrower's earnings and marital status and the amount he or she would pay under a 12-year fixed-payment plan[b] | 25 years | Borrowers with direct subsidized or unsubsidized loans, direct PLUS loans for students, or PLUS loans made to parents if consolidated |
| **Income-Based Repayment** | | | | |
| Original plan for new borrowers before July 1, 2014 | July 2009 | 15 percent of discretionary income, up to the amount the borrower would pay in a 10-year fixed-payment plan[c] | 25 years | Borrowers with direct or FFEL subsidized or unsubsidized loans, direct or FFEL PLUS loans for students, or direct or guaranteed consolidation loans that do not include PLUS loans made to parents |
| Updated plan for new borrowers on or after July 1, 2014 | July 2014 | 10 percent of discretionary income, up to the amount the borrower would pay in a 10-year fixed-payment plan[c] | 20 years | Same as in the original plan |
| Pay as You Earn | December 2012 | 10 percent of discretionary income, up to the amount the borrower would pay in a 10-year fixed-payment plan[c] | 20 years | New borrowers on or after October 1, 2007, who received a disbursement of any of the following loans on or after October 1, 2011: direct subsidized or unsubsidized loans, direct PLUS loans for students, or direct consolidation loans that do not include PLUS loans made to parents |
| Revised Pay as You Earn | December 2015 | 10 percent of discretionary income[c] | 20 years if all loans being repaid were for undergraduate study; 25 years if any loans being repaid were for graduate or professional study | Borrowers with direct subsidized or unsubsidized loans, direct PLUS loans for students, or direct consolidation loans that do not include PLUS loans made to parents |

Source: Congressional Budget Office, using information from the Department of Education.

FFEL = Federal Family Education Loan program.

a. Borrowers participating in the Public Service Loan Forgiveness program may have their loans forgiven in as little as 10 years.

b. Discretionary income is defined as income above the federal poverty guideline.

c. Discretionary income is defined as income above 150 percent of the federal poverty guideline.

ED_00965

# PUBLIC SUBMISSION

**As of:** 12/19/25, 7:11 AM
**Received:** May 08, 2025
**Status:** DoNotPost
**Tracking No.** mag-5i4x-pyj7
**Comments Due:** May 08, 2025
**Submission Type:** Web

**Docket:** ED-2025-OPE-0016
2025 Negotiated Rulemaking; William D. Ford Federal Direct Loan (Direct Loan) Program

**Comment On:** ED-2025-OPE-0016-0001
Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**Document:** ED-2025-OPE-0016-DRAFT-7181
Comment on FR Doc # 2025-05825

## Submitter Information

**Name:** Heather M. Twombly
**Address:**
    NH,
**Email:** htwombly48@gmail.com

## General Comment

I am writing to urge the U.S. Department of Education to implement essential regulatory reforms to the Public Service Loan Forgiveness (PSLF) program and related repayment systems as part of the 2025–2026 Negotiated Rulemaking process. The PSLF program was designed to relieve the student debt burden for those who dedicate their careers to serving the public, yet in practice, the program continues to fail many qualified and committed borrowers.

My path to public service was not easy. I was a high school dropout who held on to the dream of returning to school someday and making a difference in my community. That dream became a reality through years of dedication and sacrifice. I spent over 25 years working as an Adult Foster Care provider, offering hands-on care to some of our most vulnerable populations.

After raising my daughter—who pursued her own path in higher education and went on to become a veterinarian—her determination and success inspired me to return to school myself. I earned my GED, then went on to complete a Bachelor's degree in Psychology and a Master's degree in Clinical Mental Health Counseling. I took on student loan debt with the clear understanding that my work for a nonprofit agency would make me eligible for PSLF—a trade-off that felt fair given my lifelong commitment to service.

For the past five years, I have worked full-time as a licensed child and adolescent therapist at a community mental health center, providing critical mental health support to young people and their families. Despite meeting the eligibility criteria for PSLF, I am currently stuck in SAVE forbearance, and the payments I continue to make are not being counted toward forgiveness. This gap in policy and servicing is deeply unfair to those of us who have remained in public service through significant personal and financial sacrifice.

ED_00966

Additionally, I want to highlight the importance of income-driven repayment (IDR) plans and the need for PSLF reform that truly addresses the crushing impact of compounding interest. While IDR plans are intended to ensure payments are affordable based on income, many borrowers still find themselves buried in debt due to excessive interest accrual—even after years of consistent payments. For those of us in public service careers with modest salaries, this accumulation of interest can make forgiveness feel unattainable.

I strongly urge the Department to consider the following regulatory improvements:

Count payments made under SAVE forbearance and all qualifying IDR plans toward PSLF, especially when the borrower is employed full-time in an eligible nonprofit or public service role.

Cap or eliminate interest accumulation for borrowers in IDR and PSLF programs to prevent ballooning debt balances.

Offer earlier forgiveness options, particularly for long-term public service workers or those with low-to-moderate incomes. Ten years is too long for many who have already spent decades in service.

Public Service Loan Forgiveness should not be a rigid, one-size-fits-all program that ignores the real financial pressures faced by those who devote their lives to care work, mental health, and community well-being. I urge the Department to center fairness, accessibility, and lived experience in these regulatory changes.

Thank you for considering my comment and for working to make PSLF a program that truly serves the public and honors those who serve.



Regulations.gov

An official website of the United States Government.

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on Apr 7, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

Comment

Comment on FR Doc # 2025-05825

Attachments  1

File
Default
Icon

Intent To Receive Public Feedback for the Development of Proposed Regulations and
Establish Negotiated Rulemaking Committee

**Comment ID**
ED-2025-OPE-0016-0037

Shape  **Tracking Number**
m97-gfca-xtnh

Regulations.gov



| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Comment(s)

**Received Date**
Apr 6, 2025



About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |                    Support
API Requests    |    FOIA

ED_00969

My wife and I both serve as a pediatric psychologists for children with developmental disabilities. We are commenting on the Department of Education's request for feedback on refining definitions of a qualifying employer for the purposes of determining eligibility for the Public Service Loan Forgiveness program. We committed to 5 years of a doctoral program and 2 years of postdoctoral training to provide top-tier care for families affected by disabilities. We specifically chose not to go into private business to ensure that children and families who could not afford for-profit costs for assessment and treatment services would have access to gold-standard healthcare. We also chose this setting to be able to continue to the cycle for training next-generation clinicians with skills to provide similar excellence in care.  We made many sacrifices along the way financially and personally for this aim and were PSLF not part of the package, we would have had to make other choices at the expense of the services to our community. Our services to our community, most often comprising of hard working, rural and metro, under-represented American families would not have been possible without the support of PSLF program. I would caution our government leaders to abandon amendment of definitions of a qualifying employer for the purposes of determining eligibility PSLF. This is not a problem, nor has anyone of the families we have served ever identified that the current scope of healthcare organizations being a qualifying employer for PSLF is a problem. It would appear that this issue isn't an issue at all for the American voter given that the program benefits every voter of each demographic represented across the country. I would recommend optimizing the availability and functioning of the PSLF program rather than cutting or further circumscribing the scope of qualifying employers. The winner in PSLF is the average US citizen, instead of prioritizing the elite who can always afford expensive care.  Current and future families who have less means, but who are severely affected by their loved one's disability or illness have the most at stake. In particular, we would encourage the continued support of hospitals and healthcare organizations as PSLF qualifying employers for these reasons:

 **Public Health Contribution**: Hospitals play a crucial role in maintaining public health, providing essential services that benefit the entire community. By including hospitals in the PSLF program, the federal government shows they recognize and support the critical public health services that hospitals provide, especially in underserved or rural areas where healthcare is most needed.

 **Healthcare Worker Retention**: The healthcare sector often faces significant challenges in staffing, particularly in specialized and high-need areas. Student loan forgiveness can serve as a powerful incentive for healthcare professionals to work in hospital settings, helping to address critical staffing shortages and ensuring that all communities have access to quality healthcare.

 **Encouraging Specialization**: Like the case of myself and my wife, any positions in hospitals require advanced degrees and specialized training, which can be expensive and lead to substantial student debt. Including hospitals in the PSLF program helps mitigate the financial barriers associated with advanced healthcare education and encourages professionals to pursue specialties that are vital to public health instead of pursuing capital interests to only those more financially well off.

 **Economic Relief**: Healthcare professionals like myself often graduate with considerable debt, which can hinder their economic stability and career choices. By qualifying for PSLF, individuals working in hospitals can achieve debt relief faster, which improves their financial health and allows them to contribute more effectively to the community, both as consumers and as healthcare providers.

 **Alignment with Public Service Goals**: The fundamental aim of the PSLF program is to encourage highly skilled professionals to enter fields that serve the public good. Hospitals epitomize this goal by providing critical medical services, conducting life-saving research, and serving as training grounds for future healthcare providers.

 **Support during Crises**: Hospitals are on the front lines during public health crises, such as pandemics and natural disasters. Workers in these institutions often face increased risks and workload

during such times. Recognizing hospitals as qualifying employers under PSLF acknowledges and supports the sacrifices these workers make.

☐ **Promoting Equity in Healthcare Access**: By making hospital employment more financially appealing, the PSLF program can help ensure that talented healthcare professionals are more evenly distributed across different geographic areas, including underprivileged and underserved communities, thus promoting equity in healthcare access.

Regulations.gov



An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on Apr 20, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

Comment

See attached file(s)

Attachments  1

File 3.28.2025 COPLAC Letter to Secretary McMahon (2)
PDF
Icon                    Download Icon  Download

**Comment ID**
ED-2025-OPE-0016-0211

Shape  **Tracking Number**
m9r-73jx-9sos

file:///C/...chs/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ed-2025-ope-0016-0211_Comments.html[5/23/2025 2:57:19 PM]



Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
Apr 20, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                    Support
API Requests   |   FOIA

COPLAC | COUNCIL OF PUBLIC LIBERAL ARTS COLLEGES

220 Campus Drive | CPO 1100 | Asheville | North Carolina 28804 | 828.258.7879 | www.coplac.org

March 28, 2025

The Honorable Linda McMahon
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

Dear Secretary McMahon:

We are writing on behalf of the Council of Public Liberal Arts Colleges (COPLAC) to express our deep concern regarding the March 20 executive order by President Trump to dismantle the U.S. Department of Education (ED). COPLAC member institutions serve 79% of the nation's public arts and sciences college students. Dismantling the Department of Education could severely impact our member institutions' students and millions of students who depend on federal aid, including Pell Grants, Federal Student Loans, and civil rights protections. While some assurances have been made that these federal programs will be maintained, the elimination of hundreds of staff members and contracts poses a threat to the efficient operation of these programs. We believe that the ability to ensure equitable access to higher education could be jeopardized.

The Federal Student Loan program is essential to providing access to higher education for students, particularly those from low-income backgrounds who our member institutions serve. Transferring the $1.6 trillion student loan portfolio to the Small Business Administration (SBA) will likely complicate the administration of these loans, increase costs for borrowers, and reduce accountability. With the SBA already facing substantial cuts to its workforce, it is unclear whether this agency has the capacity to manage such a complex and critical program, especially when it is already struggling with a recent 40% reduction in staff.

Similarly, the Pell Grant program, which is already projected to face a $2.7 billion shortfall next fiscal year, could see this gap widen to $10 billion by 2026-2027 without prompt intervention. Pell Grants provide crucial financial support to over 30% of U.S. college students from low-income families. Reductions in Pell funding would disproportionately hinder these students' ability to pursue higher education and reach their full potential. Additionally, if Pell Grants are shifted to block grants managed by state governments, as it has been suggested in Project 2025, we are concerned that states may prioritize funding for their flagship institutions. This could leave smaller public colleges and universities, like many of our members, unable to fully support their most financially vulnerable students.

The Department of Education's Office for Civil Rights (OCR) enforces Title VI and Title IX protections, which are essential in preventing discrimination in education. Title VI prohibits discrimination based on race, color, or national origin in programs receiving federal funds, while Title IX ensures that no one is discriminated against on the basis of sex, including in athletics, admissions, and scholarship opportunities. OCR provides policy guidance and resources to help schools comply with these protections and to inform students and applicants of their rights under these laws. The dismantling of the ED could severely weaken the enforcement of these protections, leaving students vulnerable to discrimination.

ED_00974



COPLAC | COUNCIL OF PUBLIC LIBERAL ARTS COLLEGES

220 Campus Drive | CPO 1100 | Asheville | North Carolina 28804 | 828.258.7879 | www.coplac.org

We urge you to take immediate action to preserve the Department of Education's critical functions, including the management of Pell Grants, Federal Student Loans, and the enforcement of civil rights protections. Ensuring that vulnerable students continue to receive the financial aid and protections they need is essential for maintaining educational equity and opportunity in our nation. Our nation's future depends on the education and fair treatment of all students, and we trust that you will champion their rights and support their continued access to vital resources.

Thank you for your attention to this urgent matter.

Sincerely,

Jeanine B. Went, Ph.D.
*Executive Director, COPLAC*

Tuajuanda Jordan, Ph.D.
*President, COPLAC*
*President, St. Mary's College of Maryland*

James Birge, Ph.D.
*President Elect, COPLAC*
*President, Massachusetts College of Liberal Arts*

ED_00975

Regulations.gov



An official website of the United States Government.

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 1, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

Please review the attached public comment regarding the U.S. Department of Education's intent to develop a negotiated rulemaking.

| Attachments  1 |
| --- |

| File Default Icon | WCET and SAN Public Comment 2025 Rulemaking |
| --- | --- |

| Comment ID |
| --- |
| ED-2025-OPE-0016-0239 |

| Shape | Tracking Number |
| --- | --- |
| | ma0-ygxt-968n |

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**

Comment(s)

**Received Date**

Apr 27, 2025



About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |    Support
API Requests    |    FOIA

ED_00977

 

WICHE Cooperative for Educational Technologies

STATE AUTHORIZATION NETWORK
a network of WCET

April 28, 2025

The Honorable Linda McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW 2nd Floor
Washington, DC 20202

RE:  Docket IDED-2025-OPE-0016; Intent To Receive Public Feedback for the Development of Proposed
Regulations and Establish Negotiated Rulemaking Committee

Dear Secretary McMahon,

This comment is on behalf of the members of WCET (the WICHE Cooperative for Educational
Technologies) and SAN (the State Authorization Network). As nationwide organizations housed within
the Western Interstate Commission for Higher Education (WICHE), we are dedicated to serving our
postsecondary institution members by providing guidance, support, and facilitation of member
collaboration to understand and apply state and federal regulatory requirements when serving students
participating in digital learning. Our members, representing postsecondary institutions as well as
organizations, corporations, and state agencies from across the United States, support the development
of efficient and effective educational opportunities to advance learner access and success.

We appreciate this opportunity to provide public comment as the U.S. Department of Education
embarks on the development of one or more negotiated rulemaking committees to develop proposed
regulations as described in the April 4, 2025, Federal Register announcement. The announcement
indicated the rulemaking "topics will focus on how Title IV regulations have impacted institutions,
States, and other partners and if their implementation may be inhibiting innovation and contributing to
rising college costs." The negotiated rulemaking process is key to providing balanced and rational
regulations when the expertise of affected stakeholders, including other members of the Triad, are
included and appropriately acknowledged.

Our comments relate specifically to the third bullet in the Federal Register announcement, indicating an
open call to *"potential topics that would streamline current federal student financial assistance program
regulations while maintaining or improving program integrity and institutional quality."*

We recommend that the Department convene a separate rulemaking process that addresses issues
outside of the financial assistance programs listed in the April 4, 2025, Federal Register announcement.
Such a rulemaking should be subject to a second and separate notice and comment period. A separate
notice for comment proposing a rulemaking process to address specific program integrity and
institutional quality issues, such as accreditation, state authorization, gainful employment, and distance
education, should be clear to the public. Transparency of these nuanced issues will ensure that
stakeholders are aware of the Department's intent and allow for potential negotiators and key
stakeholders to respond more precisely and constructively. We believe that it is critical to involve

ED_00978

 

stakeholders in the large and nuanced program integrity and institutional quality issues from the first step in the rulemaking process. Finally, we urge the Department to ensure that the Office of Federal Student Aid (FSA) is able to provide clear guidance and enforcement in order to assist institutions in compliance. It is critical to remove all ambiguity so that new and revised regulations fulfill their intended purpose.

We thank the U.S. Department of Education for this opportunity to share our comments on behalf of WCET and SAN members. WCET and SAN member institutions wish to provide quality learning opportunities, support students, and be in compliance with all Federal and State requirements when serving students.

WCET and SAN intend to provide communication, guidance, and support in this Department of Education regulatory process. We would be very pleased to offer further assistance to the Department of Education and to assist with communications to institutions.

Van L. Davis, Ph.D.
Executive Director, WCET
Vice President, Digital Learning, WICHE
512-740-5333
vdavis@wiche.edu

Cheryl Dowd
Senior Director, SAN & WCET Policy Innovations
*(303)541-0305*
*cdowd@wiche.edu*

ED_00979

Regulations.gov



An official website of the United States Government.

## Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 1, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

Comment

See attached file(s)

Attachments  1

File
Default
Icon    President-National District Attorneys Assoc-San Diego DA

**Comment ID**
ED-2025-OPE-0016-0292

Shape  **Tracking Number**
ma2-qts6-qccx

ED_00980

Regulations.gov



| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Comment(s)

**Received Date**
Apr 28, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                Support
API Requests   |   FOIA

ED_00981

# NATIONAL DISTRICT ATTORNEYS ASSOCIATION
## THE VOICE OF AMERICA'S PROSECUTORS

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

Re: Negotiated Rulemaking for Higher Education 2025-2026 - Public Service Loan Forgiveness

Dear Secretary McMahon,

On behalf of the National District Attorneys Association (NDAA), the oldest and largest national organization representing over 6,000 state and local prosecutors for over 75 years, and as District Attorney for San Diego County, California, I thank you for the opportunity to comment on the Department's proposed rulemaking for higher education and student loan repayment. We strongly support preserving the Public Service Loan Forgiveness (PSLF) program and Income-Driven Repayment (IDR) plans, as these programs directly impact public safety by helping sustain a qualified and dedicated prosecutorial workforce nationwide.

We understand that many federal student loan programs have become a point of political and fiscal debate. However, PSLF and IDRs are fundamentally different. These are not broad loan cancellation policies – they are targeted, earned benefits that require a decade of public service and consistent, on-time loan repayment. These vital programs were created with strong bipartisan support to recruit and retain professionals in essential public roles, including prosecution and law enforcement. PSLF has stood since 2007 as a cornerstone of our country's public service workforce strategy. It represents a simple, yet powerful promise: if you serve your community for the public good – often at a personal and financial cost – your community will support you in return.

Prosecutors play a critical role in protecting public safety, seeking justice for victims, and upholding the rule of law in the legal system. Despite this essential work, prosecutorial offices are increasingly struggling to recruit and retain talented attorneys due to the widening financial disparities between public service positions and private sector opportunities. A recent study by William & Mary Law School, *The Prosecutor Vacancy Crisis*, documented the significant financial barriers and heavy workloads facing shrinking prosecutor teams nationwide. Similarly, NDAA's 2024 National Prosecutor Retention Survey found that financial pressure is a leading reason attorneys leave public service. However, the top reasons they stay are mission-driven: a desire to serve their communities and uphold justice. PSLF and IDRs reinforce this commitment, allowing talented attorneys to build careers in prosecution without being punished financially for answering the call to public service.

These programs also support long-term workforce continuity. When prosecutors stay in their communities for a decade or more, they gain critical experience, build trust with law enforcement and the courts, and ensure victims and defendants alike are treated fairly and consistently. Without these tools, many offices, especially in rural and high-crime areas, will face continued high turnover, increased vacancy rates, and a decline in the quality of justice delivered.

This is not a hypothetical problem. Prosecutor shortages are already forcing difficult decisions: cases dismissed due to lack of resources, delayed justice for victims, and reduced prosecution of serious crimes. In this context, eliminating or significantly altering PSLF or IDRs would only worsen the strain and create long-term instability within the justice system.

Maintaining these programs is fiscally responsible, as it reduces the costly churn associated with onboarding and training new staff. They also prevent the ripple effects of understaffed offices, such as delays in charging decisions, case dismissals, and increased burdens on law enforcement and the courts.

We fully support the Department's goal of ensuring student loan programs are transparent, accountable, and sustainable. PSLF and IDRs already meet these standards. They are conditional, performance-based programs that support the backbone of public service, without which core community functions like law enforcement and prosecution suffer.

As the Department moves forward with designating negotiators for this rulemaking process, NDAA stands ready to serve in that capacity and provide valuable insight from our extensive experience representing prosecutors nationwide. We welcome the opportunity for continued dialogue and collaboration to ensure PSLF and IDRs effectively support our nation's justice system.

Thank you for considering this perspective. I would welcome the opportunity for a representative from NDAA to speak further about how PSLF and IDRs serve a critical role in keeping communities across this nation safe. In my role as NDAA President and the elected DA for the fifth largest county in the nation, I'm hearing first-hand from dedicated prosecutors who have chosen this noble profession but are forced to consider leaving their chosen profession as they do not believe they can pay their bills and maintain financial stability if their loan payments balloon. The impact of losing qualified prosecutors directly impacts the ability of law enforcement to hold dangerous murderers, rapists, human traffickers, child and elder abusers accountable.

Thank you,

Summer Stephan
President, National District Attorneys Association
District Attorney for San Diego County, California

ED_00983

Regulations.gov



An official website of the United States Government.

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 1, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

See attached file(s)

| Attachments  1 |
| --- |

| File<br>Default<br>Icon | Frederick District Attorney C.Smith PSLF |
| --- | --- |

| **Comment ID** |
| --- |
| ED-2025-OPE-0016-0293 |

| Shape | **Tracking Number** |
| --- | --- |
| | ma2-r7cu-e79b |

ED_00984

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
Apr 28, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                    Support
API Requests   |   FOIA

file:///C/...s/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ED-2025-OPE-0016-0293_Comments.html[5/23/2025 3:03:12 PM]

ED_00985



NATIONAL DISTRICT
ATTORNEYS ASSOCIATION
THE VOICE OF AMERICA'S PROSECUTORS

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

Re: Negotiated Rulemaking for Higher Education 2025-2026 - Public Service Loan Forgiveness

Dear Secretary McMahon,

The National District Attorneys Association (NDAA) represents the unified voice of America's prosecutors, with its members consisting of elected and appointed district attorneys and their staff in jurisdictions across the country. I am writing on behalf of NDAA to express our strong support for the Public Service Loan Forgiveness program (PSLF) and Income Driven Repayment (IDR) plans. These programs are not just about financial relief – they are critical tools that help protect the safety, stability, and prosperity of America communities by supporting those who serve them every day.

As the nation's oldest and largest organization representing state and local prosecutors across the country, NDAA speaks for more than 6,000 frontline attorneys – public servants dedicated to upholding the rule of law. Many of these prosecutors, particularly young attorneys in rural and high-crime areas, rely on PSLF and IDRs to make long-term public service careers possible.

I also write as the elected State's Attorney for Frederick County, Maryland, currently the longest serving State's Attorney in Maryland. With my time in the criminal justice system, as a prosecutor, employer, and as NDAA's current Chair of the Board, I can attest that judicial systems across the country heavily rely on loan forgiveness and income contingent repayment plans as important tools to recruit and retain valuable attorneys. Without these tools, our already depleted applicant pools would shrink further, and the erosion of our criminal justice system would be accelerated.

We respect the Department's responsibility to review and refine federal programs. At the same time, we urge you to preserve PSLF and IDRs as intentional, results-drive investments in our public safety infrastructure. Prosecutors are not interchangeable. It takes years to develop the legal skill, discretion, and judgement necessary to manage serious cases – homicide, child abuse, human trafficking, and fentanyl trafficking. Without PSLF and IDRs, prosecutors' offices will face increasing difficulty in maintaining staffing levels, especially in hard-to-fill jurisdictions.

This is not theoretical. Offices are already losing qualified attorneys. Delayed prosecutions, dismissed charges, and stalled justice are becoming more common – not for lack of commitment, but for lack of capacity. If prosecutors continue to leave at current rates and recruitment continues to stall, the result will be felt in every community: more violent offenders on the streets, fewer victims receiving justice, and a diminished rule of law.

ED_00986



Programs like PSLF and IDRs were designed, with bipartisan support, to attract and retain skilled professionals in essential, lower-paying public service roles. They do not offer blanket forgiveness. Instead, they require 10 years of service and 120 on-time payments. They reward commitment, consistency, and a willingness to serve where the private sector often does not. PSLF has celebrated almost two decades as a stalwart program for our nation's public service workforce. It represents a simple, yet powerful promise: if you serve your community for the public good – often at a personal and financial cost – your community will support you in return. For prosecutors, they help ensure that mission-driven professionals stay where they're needed most – in the courtroom, standing up for victims, enforcing the law, and keeping our neighborhoods safe.

Citizens directly benefit from this structure by having a prosecutor consistently in their community for 10 years. In that decade, a prosecutor creates a strong bond with their community leaders, court personnel, and fellow citizens, resulting in a healthy and approachable criminal justice system. Not to mention the wealth of experience prosecuting will provide the attorney to hone their craft, their understanding of the local laws, and ensure they best service their community.

NDAA's 2024 retention survey, completed by more than 4,500 prosecutors, found that most chose their careers out of a deep desire to serve their communities. However, the top reasons they consider leaving are financial strain and burnout. PSLF and IDRs are working as intended: they allow highly trained professionals to remain in public service, not for personal gain, but because they believe in the mission of justice.

We understand and share your goal of ensuring that federal programs are effective and fiscally responsible. PSLF and IDRs meet that standard. Undermining these programs would come at a much greater cost – one measured in missed prosecutions, unresolved crimes, and weakened public trust in the justice system.

We urge the Department to preserve these vital programs. They are not only a wise investment in the justice system, but in the security and stability of every community across this nation.

Thank you for the opportunity to submit this comment. I would welcome the chance to speak further on the role these programs play in sustaining our prosecutorial workforce and protecting the American public.

Thank you,

J. Charles (Charlie) Smith III
Board Chair, National District Attorneys Association
State's Attorney for Frederick County, Maryland

Regulations.gov



An official website of the United States Government. 🇺🇸

## Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 11, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

| Comment |
| --- |

Comments submitted on behalf of the Association for Career and Technical Education (ACTE) and Advance CTE.

| Attachments 1 |
| --- |

File    ACTE-Advance CTE ED RFI Comments_Final
PDF
Icon

Download Icon  Download

**Comment ID**
ED-2025-OPE-0016-0538

Shape  **Tracking Number**
mab-fx33-idsi

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                   Support
API Requests   |   FOIA

ED_00989




May 5, 2025

James Bergeron
Acting Under Secretary
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20024

> ***In re: Intent To Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee [Docket ID ED-2025-OPE-0016]***

Dear Acting Under Secretary Bergeron,

On behalf of Advance CTE, the nation's longest-standing not-for-profit representing State Directors and leaders responsible for secondary, postsecondary and adult Career Technical Education (CTE) across all 50 states and U.S. territories and the Association for Career and Technical Education (ACTE), the nation's largest not-for-profit association committed to the advancement of education that prepares youth and adults for career success, we are writing in response to the Federal Register notice released by the Department on April 4 titled, "Intent To Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee."
We appreciate the opportunity to provide comments on potential topics to be considered under negotiated rulemaking, including topics that would streamline current federal student financial assistance program regulations, as requested in the notice.

As organizations focused on ensuring all learners have opportunities to pursue high-quality CTE programs, federal financial assistance programs are crucial to our respective membership's work. In recent years, there have been changes to these programs that we are concerned will limit opportunities for students in postsecondary CTE programs. We recognize the importance of striking the right balance between ensuring education and training quality with the need to minimize burden on postsecondary institutions seeking to provide these opportunities to learners. We are mindful that overregulation runs the risk of limiting student access to postsecondary education. Specific measures currently embedded within the gainful employment regulatory framework are an example of this potential imbalance.

As you are aware, for more than a decade successive administrations have sought to define gainful employment (GE) in the context of the Higher Education Act (HEA) for the purposes of determining programmatic eligibility for federal student aid funds from Title IV of the legislation. Any effort to define GE in this context must necessarily recognize the changing nature of the learner populations enrolling in postsecondary education and the wide variety of pathways learners pursue to realize their goals. For example, post-traditional learners—a group that includes individuals who are typically already employed but lack a postsecondary credential, are often older, and tend to have multiple life responsibilities such as minor or elderly dependents—are now the largest segment of all postsecondary undergraduate enrollments.[2] These learner populations often have unique needs and frequently have different motivations for pursuing postsecondary education.

In particular, the high school earnings metric included in the final GE rule, and being lifted up in several other high-education related policy conversations, is particularly problematic, and we would appreciate

further review of this approach to measuring postsecondary value. While we understand that there are some current proposals that may eliminate GE altogether in the future, we still want to raise concerns about this high school earnings metric as it could be applied in other policy contexts.

Fundamentally, we agree that a postsecondary education experience should leave students better off than if they had not enrolled in a program in the first place. However, the high school earnings measure does not fully account for the value that many non-degree certificate programs provide to learners.

**High School Earnings Measure Reduces Opportunity**
Using a premium over average high school earnings of a broad population group—one that may be quite different in age and location than the individual students being served by a specific program–has the potential to discount the value that many learners gain from non-degree programs, particularly for learner populations most in need of support. For example, if a learner has relatively low earnings, or no earnings at all, prior to enrolling in a program, completes the program, and ends up earning more than they were before (but less than a high school graduate with significant work experience in their state) this outcome would, under the current proposal, negatively count against the program for GE purposes. This could lead institutions to discontinue programs that have a positive impact in helping high-need individuals enter postsecondary education and the workforce and obtain employment.

This approach to measuring graduates' earnings also does not take into consideration the wider circumstances many of these students face. The career and economic opportunities available in a given state or community, with which a GE program is most immediately connected, can vary considerably as described elsewhere in this comment.

For instance, states with higher GE earning thresholds typically have economies dominated by male-centered occupations that predominantly employ high school graduates.[5] This rule would consequently penalize programs for graduates' earnings based on elements that GE programs cannot control, such as characteristics of the state and local economy, the wages that are ultimately paid by employers, and how society views the value of different occupations. Implementation of this rule, as currently constructed, would therefore reduce, rather than increase, the subsequent employment options that will be available to learners.

An increase in earnings necessarily leaves a student materially better off than if they had not enrolled in the program at all because they are now earning more than they did before. Yet, the current GE rule's high school earnings measure does not factor in the importance of wage progression for individuals. This is especially important given many of the learners who enroll in these programs may already have work experience, making a measure of earnings growth a much more meaningful way to assess the true impact a program has on an individual's career and life trajectory. Significantly, there is already an existing precedent for this approach to measuring postsecondary education—in California, through the state's "Salary Surfer" tool, prospective students are provided with straightforward data regarding potential earnings two and five years after program completion.[6]

Put more simply, as currently constructed the GE rule's high school wage imposes a standard so rigid that it disqualifies programs that are meaningfully serving learners.

**High School Earnings Measure is Complicated By Geographic Variations:**
The earnings premium measure does not account for significant geographical variation among and within states. For instance, based on the 2024 threshold data published by the Department, the median earnings for a high school graduate in Wyoming is $36,480 per year while this same income threshold for those with the same level of educational attainment is $27,362 in Mississippi. These significant variations in earnings levels can be even starker *within* states. For example, the average per capita personal income in

the Stockton-Lodi Metropolitan Statistical Area (MSA) is less than half that in the directly neighboring San Francisco MSA.[7]

**Lack of Reliable Data**

We also remain concerned regarding the availability of wage record and earnings data necessary to make this calculation on an ongoing and timely basis. The rule makes note of potentially using American Community Survey data from the U.S. Census Bureau in the future but does not clearly delineate a source for these data, leaving this decision up to the Department to determine at a later date. These concerns are compounded by recent actions taken to eliminate and diminish critical data collection functions overseen by the Department.

This uncertainty regarding the rule's potential impact is also true with regards to the dataset the Department made available as part of earlier rulemaking, given it uses a two-year cohort to estimate potential programmatic impacts. Despite the two-year time limitation of the existing data, the GE rule would allow for up to a four-year cohort to reach the minimum n-size needed to apply all of the metrics envisioned by this new GE rule. In practical terms, this means that there is a high likelihood that far more programs will fall under the purview of this GE rule than the Department originally estimated in the original rulemaking.

**High School Earnings Measure Does Not Fully Account for Postsecondary Value**

Programs covered by this rule vary considerably in length and duration and recognizing this diversity is crucial to ensuring that all learner populations are not unduly barred from participating in programs that can provide an immediate economic benefit. Equally as important, exclusively focusing on earnings discourages institutions from offering shorter-term programs entirely. In these instances, individuals may simply decide not to pursue postsecondary education at all. Each of these scenarios runs counter to the goals of protecting student borrowers and taxpayers, and increasing participation in quality postsecondary educational opportunities.

A narrow focus on high school earnings also unnecessarily penalizes programs, through no fault of their own, that prepare learners for careers in important sectors like medical assisting and early childhood development. Preventing federal aid access to support these pathways will simply further reduce access and options for some of the most vulnerable populations across the nation.
In addition, a narrow focus on earnings as the sole indicator of value obscures benefits such as skill development, employment, career advancement and further education and training opportunities available through credit transfer agreements and stackable, portable credentials.

**An Alternative Approach to Measuring Earnings**

To address these many challenges, we suggest reconsidering the high school earnings metric portion of the gainful employment rule and replacing it with a measure that gauges the increase in earnings an individual learner realizes from pre-enrollment to post-program completion. This approach would more accurately assess the true value of GE programs and would ensure that these options remain available for more learners.

Thank you for the opportunity to provide comments on these critically important issues. We would welcome the opportunity to discuss these ideas with you further at your convenience. Should you wish to do so, please contact Steve Voytek, Advance CTE's Federal Policy Advisor (svoytek@careertech.org) or Alisha Hyslop, ACTE's Senior Director for Public Policy (ahyslop@acteonline.org).

Regulations.gov



An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 11, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

Comment

See attached file(s)

Attachments  1

File     Public Comment on Title IV Neg-Reg from MD and AK
PDF
Icon                       Download Icon  Download

Comment ID
ED-2025-OPE-0016-0548

Shape    **Tracking Number**
mab-gzc5-5t87

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                Support
API Requests   |   FOIA

May 5, 2025

The Honorable Linda E. McMahon
Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

RE: Docket ID: ED-2025-OPE-0016

Dear Secretary McMahon:

This is a comment on the Department of Education's request for comment regarding possible "proposed regulations pertaining to title IV regulations that have impacted institutions, States, and other partners and if their implementation may be inhibiting innovation and contributing to rising college costs," Docket ID ED-2025-OPE-0016. We address the following proposed topics: public service loan forgiveness (PSLF), pay as you earn (PAYE), income-contingent Repayment (ICR), and other topics related to accreditation and streamlining current federal student financial assistance programs.

In broad terms, the Biden administration's Title IV changes, both through the rulemaking process and through dictate, often implicated the Major Questions Doctrine and went beyond the Department of Education's authority. Supreme Court decisions limiting the interpretive power of the administrative state further warrant a systemic, careful review and reform of the Department of Education's Title IV regulations and guidance documents across all elements of Title IV.

(1) Refining definitions of a qualifying employer for the purposes of determining eligibility for the Public Service Loan Forgiveness program.

Regarding the definitions of a qualifying employer to determine eligibility for the Public Service Loan Forgiveness program, we believe the government should not privilege certain kinds of workers at the expense of others. At least, the Department should reconsider and narrow the definition of "public service" and limit PSLF eligibility to organizations (including 501(c)(3)s) whose primary purpose is providing direct public services, thereby excluding the following types of organizations: think tanks, public policy and lobbying organizations, research-only nonprofits, grantmaking foundations, professional associations or trade groups, and other organizations not engaging face-to-face with service populations. Such types of organizations generally do not provide direct provision of services.

We also ask the Department to regulate other elements of PSLF.

First established under the *College Cost Reduction and Access Act of 2007,* PSLF was designed to cancel federal Direct Loan balances after 10 years of full-time work in qualifying public service jobs.[1] Since the establishment of the program, only 7,000 borrowers had received debt cancellation through PSLF before the Biden administration assumed office. However, after assuming office, the Biden administration made several changes to PSLF that exacerbated its cost and scope. By the time they left office, it was estimated

---

[1] Alexandra Hegji, "The Public Service Loan Forgiveness Program: Selected Issues," October 19, 2018, https://sgp.fas.org/crs/misc/R45389.pdf.

that the Biden administration had approved relief for 1,069,000 borrowers, amounting to approximately $78.46 billion in loan cancellation.[2]

Not only do loan cancellation programs including PSLF transfer large amounts of student debt onto the backs of taxpayers, but they also encourage excessive borrowing on the part of students, confident that after a certain number of years, their loans will be eliminated. A recent report from the Urban Institute highlights the large balances that students have accrued under PSLF; based on data reported from the Department of Education, the average balance forgiven through PSLF as of 2023 was $98,000, which "substantially [exceeds] the aggregate limit for undergraduate students and typical debt levels for bachelor's degrees."[3] Under PSLF, there are currently no caps on how much debt can be canceled, so, for example, borrowers with Direct PLUS loans for graduate and professional students, which have no aggregate borrowing caps, can qualify for cancellation.

Some changes made by the Biden administration to PSLF include instituting a temporary waiver in October 2021 that allowed borrowers with any loan type and repayment plan to gain credit toward PSLF.[4] This waiver enabled previously ineligible borrowers, such as those with high incomes, to become eligible for loan cancellation.[5] The Biden administration's efforts to create a new income-driven repayment plan in January 2023 called "Saving on a Valuable Education" were also problematic, as this plan significantly increased the cost of PSLF by lowering borrowers' payments, resulting in a higher amount of loans being canceled. The Urban Institute noted that with this change, for example, borrowers with a bachelor's degree in social work who are enrolled in SAVE would only repay about 15 percent of their initial balance if they qualified for PSLF.[6]

In addition to those reforms, the Biden administration also published rules pertaining to PSLF that implemented a one-time account adjustment toward repayment for actions that previously did not count as a qualifying payment including: time in forbearance (12 or more consecutive months, or 36 or more cumulative months), deferment before 2013 (excluding in-school), any time in repayment on any plan, and/or time before consolidation counts, which was previously lost. In addition to those one-time adjustments, the rule, which went into effect in July 2023, made two significant and permanent changes to PSLF, including: "allowing borrowers to obtain credit for late, partial, and lump sum payments if the borrower also certifies qualifying employment; or awarding credit for certain months in deferment or forbearance, such as those tied to military service or deferments for economic hardship or cancer treatment if the borrower also certifies qualifying employment."[7]

---

[2] "Biden-Harris Administration Surpasses 5 Million Borrowers Approved for Student Loan Forgiveness," US Department of Education, January 14, 2025, https://edprepmatters.aacte.org/biden-harris-administration-surpasses-5-million-borrowers-approved-for-student-loan-forgiveness/#:~:text=New%20PSLF%20Approvals&text=The%20Department%20approved%20relief%20for,of%20the%20Biden%2DHarris%20Administration.

[3] Jason Delisle, "Public Service Loan Forgiveness and the SAVE Plan for Federal Student Loans," Urban Institute, August 2023, https://www.urban.org/sites/default/files/2023-08/Public%20Service%20Loan%20Forgiveness%20and%20the%20SAVE%20Plan%20for%20Federal%20Student%20Loans.pdf.

[4] Preston Cooper, "The student debt cancellation cheat sheet," FREOPP, April 2, 2024, https://freopp.org/oppblog/the-student-debt-cancellation-cheat-sheet/.

[5] Ibid.

[6] "Public Service Loan Forgiveness and the SAVE Plan for Federal Student Loans."

[7] "Education Department Announces Permanent Improvements to the Public Service Loan Forgiveness Program and One-time payment Count Adjustment to Bring Borrowers Closer to Forgiveness," U.S. Department of

The Department therefore should consider the following additional reforms to PSLF to ensure taxpayers are shielded from paying for future debt forgiveness: The Department should rescind the 2023 changes to PSLF as part of the negotiated rulemaking process. It should reinstate strict on-time, full payment requirements, exclude payments made during periods of deferment or forbearance, and bar any retroactive credit for previously non-qualifying payments. The changes under the Biden administration allowed borrowers to obtain credit for late or partial payments and awarded credit for certain months in deferment or forbearance, all to meet a campaign promise of loan cancellation rather than substantially considering the economic effects on the vast majority of American taxpayers, the national debt, and the American economy generally. The Department should also codify that waivers cannot override regulatory definitions, even temporarily, and should bar future Secretaries of Education from using similar flexibilities without full negotiated rulemaking.

(2)  Regarding Pay As You Earn (PAYE) and Income Contingent Repayment (ICR) repayment plans

The first Income Contingent Repayment (ICR) plan was promulgated in 1995, with terms being that monthly payments are the lesser of 20 percent of the borrower's discretionary income or what the borrower would pay on a 12-year fixed repayment plan.[8] Then in 2012, under the same statutory authority for an income-contingent repayment plan, the Department of Education promulgated a new ICR plan named Pay As You Earn (PAYE), which required borrowers to make monthly payments at 10 percent of discretionary income, providing debt cancellation after 20 years of qualifying payments.[9]

Three years later, the Department of Education once again issued regulations to create a third type of ICR plan called Revised Pay As You Earn (REPAYE) without a partial financial hardship[10] to make monthly payments equal to 10 percent of their discretionary income.[11] The maximum repayment timeline for borrowers with undergraduate debt is 20 years; for borrowers with graduate debt, it is increased to 25 years. For PAYE and REPAYE, in instances "where a borrower's required monthly payment amount is insufficient to pay all of the monthly interest that accrued on the borrower's Subsidized Loans or the subsidized component of a Direct Consolidation Loan, 100 percent of the unpaid accrued interest is not charged for a period of up to three years from the date the borrower first began repaying according to the plan."[12] REPAYE also gives borrowers an additional interest subsidy. After the three years described above, the borrower is "not charged 50 percent of the portion of the unpaid accrued interest."[13]

---

Education, October 25, 2022, https://www.einpresswire.com/article/597739764/education-department-announces-permanent-improvements-to-the-public-service-loan-forgiveness-program-and-one-time-payment-count-adjustment-to-bring.

[8] Rita Zota, Alexandra Hegji, and Kyle Shohfi, "The Department of Education's Notice of Proposed Rulemaking on Improving Income Driven Repayment for the Direct Loan Program: Frequently Asked Questions," February 9, 2023, https://www.congress.gov/crs-product/R47418.

[9] Ibid.

[10] CRS defines a partial financial hardship as "the circumstance in which a borrower's annual amount due on all of their qualifying federal student loans as calculated under the standard 10-year repayment plan is greater than 15% of their discretionary income."

[11] "The Department of Education's Notice of Proposed Rulemaking on Improving Income Driven Repayment for the Direct Loan Program: Frequently Asked Questions."

[12] Ibid.

[13] Ibid.

The Biden administration exceeded its authority in this area by creating a new plan called the SAVE plan, as described by our colleague E.J. Antoni in 2024:

> When the Eighth Circuit Court of Appeals blocked the Biden-Harris administration's latest student loan bailout scheme, it potentially saved American taxpayers nearly half a trillion dollars.
>
> Now the Supreme Court has spoken. By unanimously rejecting the administration's request to lift the lower court's injunction, it effectively blocked this loan cancellation gambit while underlying litigation proceeds—and prevented Americans from footing the bill for an Ivy League bailout.
>
> The seven-state lawsuit challenged the Saving on a Valuable Education (SAVE) plan, which the states argued was just another version of the bailout scheme that the Supreme Court struck down last summer. The Eighth Circuit apparently agreed, even scolding the administration for flouting previous rulings and directing it to put further attempts at "forgiveness" on ice.
>
> To be clear, so-called forgiveness is just a euphemism for foisting these student loans onto the backs of taxpayers. The administration's SAVE plan aimed to do just that for millions of borrowers, who would have their loans "forgiven" after 10 years, without paying a single dime toward either principal or interest. In many cases, interest wouldn't even accrue.
> But by the time this latest injunction was handed down, the Biden-Harris administration had already used the SAVE plan to conduct $5.5 billion in student loan bailouts.[14]

The Department of Education should consider phasing out all existing income-driven repayment plans for new borrowers and promulgating one new income-driven repayment plan, consistent with the law, that would exempt income up to 100 percent of the poverty line and raise payments to 15 percent of non-exempt income, or similar negotiated amounts. Ideally, no debt cancellation would be possible after a certain number of payments, but if not, existing law may require canceling any remaining balance after 25 years.

(3) Potential topics that would streamline current federal student financial assistance program regulations while maintaining or improving program integrity and institutional quality.

(a) We recommend reform of regulations regarding accreditation (implementing 20 U.S. Code Chapter 28, Part H) and of "financial responsibility" and "administrative capability" regulations (34 CFR 668) to conform to the law and to improve program integrity and institutional quality.

Since accreditors are generally failing to ensure program integrity and institutional quality (see below), regulatory intervention is warranted at both the accreditor level and the institutional level. Higher-quality accreditors are needed urgently, which means that the Department should streamline the approval process and should streamline the reapproval process for accreditors that have shown good stewardship of their responsibilities so that they can focus on accreditation instead of costly and wasteful paperwork.

In particular, accreditors generally are not substantially complying with their responsibilities under 20 U.S.C. § 1099b(a), which states, in relevant part, that "[n]o accrediting agency or association may be

---

[14] E.J. Antoni, "Federal Court to Biden on the Student Loan Bailout—It's (Still) Illegal," August 30, 2024, https://www.heritage.org/courts/commentary/federal-court-biden-the-student-loan-bailout-its-still-illegal.

determined by the Secretary [of Education] to be a reliable authority as to the quality of education or training offered for the purposes of this chapter or for other Federal purposes, unless the agency or association meets criteria established by the Secretary pursuant to this section. … Such criteria shall include an appropriate measure or measures of student achievement."

Stig Leschly and Yazmin Guzmin found, using extensive evidence from the Department of Education's Database of Accredited Postsecondary Institutions and Programs (DAPIP), the following with regard to accreditors recognized by the Department:

> Of the 31,699 accreditor actions that we analyze, all of which occurred between 2012 and 2021, only 2.7% were ones in which an accreditor disciplined or sanctioned a college for inadequate student outcomes or low-quality academic programming. The other 97.3% of formal oversight activity by accreditors was supportive of colleges or focused on non-academic matters (governance, finances, general compliance, etc.).

> Low graduation rates, high loan default rates, and low median student earnings did not increase the likelihood that an accreditor would take disciplinary action towards a college.

> Only 564 (11%) of the 5,195 colleges in our sample experienced one or more disciplinary actions related to student outcomes or academic program quality from an accreditor. Sixty-four percent (64%) of these institutions were small certificate-granting institutions, mainly beauty and barber schools, overseen by national accreditors.[15]

Additionally, regarding student outcomes as a measure of program and institutional quality—graduation rates and alumni return on investment—one of us (Kissel) wrote in March of this year:

> Accreditors (formally known as "accrediting agencies") also used to be reliable indicators of college quality. But their role in quality assurance has become something of a farce.[16] Accreditors rarely sanction an institution on academic grounds, despite many accredited colleges and universities having extremely poor graduation rates and financial outcomes for those who do graduate.

> Take, for example, the graduation rates of a few colleges accredited by a [formerly] "regional" accreditor, the Southern Association of Colleges and Schools Commission on Colleges (SACSCOC). According to the American Council of Trustees and Alumni's database, which uses public sources, the four-year graduation rate at Southern University at New Orleans (SUNO) is eight percent.

---

[15] Stig Leschly and Yazmin Guzmin, "Oversight of Academic Quality and Student Outcomes by Accreditors of US Higher Education: Evidence from the Database of Accredited Postsecondary Institutions and Programs," Harvard Business School (College101), Spring 2022, https://postsecondarycommission.org/wp-content/uploads/2022/06/College101-Accreditor-College-Quality-Report-FINAL-062822.pdf.

[16] Andrew Gillen, "Should College Accreditation Be Replaced or Reformed?," Defense of Freedom Institute, February 2025, https://dfipolicy.org/wp-content/uploads/2025/02/Should_College_Accreditation_Be_Replaced_or_Reformed_Gillen_Andrew_2_25_2025.pdf.

Allen University in South Carolina, accredited by SACSCOC, is at nine percent. Georgia Gwinnett College, accredited by SACSCOC, is at four percent. Four. Percent. There are many more such examples at the bottom. […]

If you think four-year rates are unfair, check out six-year graduation rates. These also are ugly at the bottom. Depending on the source, Georgia Gwinnett College's six-year rate is published at 20–28 percent.

Look to your right, they used to say at the first freshman convocation, and look to your left. One of you won't be here next year. At many colleges today, the reality is: Look anywhere you want, and look at yourself; chances are, you'll be looking at somebody who will have debt but no degree.

Yet where is SACSCOC?

As for financial outcomes, a program-by-program report calculating return on investment (ROI) by the Foundation for Research on Equal Opportunity shows many colleges and universities with extremely poor outcomes for many programs. Brevard College in North Carolina, with SACSCOC accreditation, has a psychology bachelor's program with a negative ROI to the tune of -$118,912. Western Carolina University's bachelor's degree in psychology, which is "one of the largest undergraduate majors at the university," is similarly poor at -$66,570 for those who graduate.[17]

Yet where is SACSCOC?[18]

Existing accreditors should do their core job of quality assurance, yet they usually are not doing it. The Department accordingly should open negotiated rulemaking with regard to accreditors and institutions to improve student outcomes, which should include streamlining review processes for new and existing accreditors at the Department where warranted—and holding accreditors to their statutory responsibilities where warranted.

In particular, new accreditors should only have to demonstrate one year, not two years, of accreditation experience in order to be approved by the Department.

Finally, having new entrants in the accreditation ecosystem, along with other possible reforms to improve accreditor competition, would improve accreditor quality even in areas where the Department is prohibited by law from regulating.

(b) The Department of Education should consider implementing risk-sharing elements via program participation agreements (PPAs). PPAs are essentially contracts between institutions of higher education

---

[17] Preston Cooper, "Is College Worth It?," Foundation for Research on Equal Opportunity, n.d., https://freopp.org/roi-undergraduate; Cooper, "Does College Pay Off? A Comprehensive Return On Investment Analysis," May 8, 2024, https://freopp.org/whitepapers/does-college-pay-off-a-comprehensive-return-on-investment-analysis; Western Carolina University, "Psychology," 2025, https://www.wcu.edu/learn/departments-schools-colleges/ceap/psydept.

[18] Adam Kissel, "End the Unjust Stratification of Accreditors," James G. Martin Center for Academic Renewal, March 10, 2025, https://jamesgmartin.center/2025/03/end-the-unjust-stratification-of-accreditors.

and the Department, required for schools to participate in federal Title IV student aid programs.[19] The Department has historically used PPAs to impose additional oversight on high-risk institutions, especially for-profit colleges. The Department can use negotiated rulemaking to modify or expand the role of PPAs (under Section 487 of the Higher Education Act) to tie Title IV eligibility to performance (regarding default rates, graduation rates, or repayment success), and/or require "skin-in-the-game" commitments for schools with poor outcomes, such as introducing performance improvement plans or risk mitigation strategies for schools with high cohort default rates or low repayment metrics.

The Department should also consider implementing transparency requirements for institutional outcomes via negotiated rulemaking. These measures could include requiring public disclosure of metrics such as graduation and retention rates, median student debt, post-graduation earnings, and loan repayment rates; and mandating timely updating and accurate information via the College Scorecard.

We urge the Department to completely abandon the Biden-era and Obama-era method of going beyond the Department's authority in promulgating "gainful employment" regulations and "borrower defense to repayment" regulations. Such regulations have fallen in litigation and should be rescinded even if they are unenforceable due to judiciary actions.

Instead, we ask the Department to consider tying transparency obligations to PPAs as part of compliance expectations. The Department should have the authority to do this under Sections 132 and 485 of the Higher Education Act, and Title IV eligibility regulations require certain outcome disclosures as a condition of institutional participation. Disclosures, assurances, and certifications can be powerful tools for compliance within the law. Including such measures will give students and families more data points to make better and better-informed decisions. Such measures should require colleges to be more transparent with the public about their graduation outcomes, median student debt, and similar outcomes that impact not only student resources but also state and federal resources.

Finally, the Department of Education should consider inviting the following organizations and groups to negotiated rulemaking committees, as any changes made to the topics mentioned above would substantially impact them. At the least, such categories of stakeholders should be represented. We note that they have often been underrepresented or completely unrepresented in the Department's previous rulemaking.

- Loan servicers and holders:
  - MOHELA
  - Nelnet
  - Aidvantage
- For-Profit Institutions and Associations:
  - Career Education Colleges and Universities (CECU)
- Faith-based Institutions and Associations:
  - Council for Christian Colleges and Universities (CCCU)
  - Association of Christian Schools International (ACSI)
- Taxpayer Advocacy Organizations:
  - Committee for a Responsible Federal Budget

---

[19] Alexandra Hegji, "Eligibility for Participation in Title IV Student Financial Aid Programs," October 16, 2024, https://www.congress.gov/crs-product/R43159#:~:text=By%20signing%20a%20PPA%2C%20an,eligibility%20for%20such%20funds%2C%20and.

ED_01001

8

- Public Interest Law and Legal Groups:
  - New Civil Liberties Alliance
  - Pacific Legal Foundation

Our identification and contact information appears below. We would be delighted to answer any questions. Thank you for the opportunity to comment.

Sincerely,

/s/

Madison Marino Doan
Policy Analyst
Center for Education Policy, The Heritage Foundation
214 Massachusetts Ave NE, Washington, DC 20002
Madison.Marino@heritage.org
202-603-9236

/s/

Adam Kissel
Visiting Fellow, Higher Education Reform
Center for Education Policy, The Heritage Foundation
2308 Washington St. East, Charleston, WV 25311
adamkissel@gmail.com
302-668-8219

Regulations.gov

An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

As Oklahoma's district attorneys and Attorney General, we benefit from talented attorneys and other professional staff who often forgo higher paying wages to serve our citizens. These lawyers, law enforcement agents, analysts, and paralegals protect the public by investigating and prosecuting serious violent crimes.

The Public Service Loan Forgiveness Program (PSLF) has served as a key tool for recruiting and retaining members of our staff. PSLF is critical for recruiting the next generation of law students to public service, as many of them have student loan debt from college and law school. Without PSLF, we also fear that we will lose prosecutors who joined our offices expecting that their student loans would be forgiven after ten years of service to Oklahoma's citizens.

We have grave concerns about fulfilling our duty to investigate and prosecute crimes, as our most talented staff may opt to leave our offices to secure higher-paying private sector jobs if the promise of loan forgiveness is broken. While we understand that certain adjustments to the program may be necessary to comply with a recent Executive Order, our staff who benefit from the PSLF investigate and prosecute those who commit offenses like ███████████ smuggling—a serious offense singled out as critical by the Executive Order. Therefore, we ask that current state and local government staff in the program be permitted to continue on the path promised by the PSLF.

Ensuring that the next generation of attorneys see public service as a viable career option is critical for public safety. The PSLFP is a critical investment in public protection, and we ask that it continue to be available to our offices, and to other law enforcement and government agencies in Oklahoma.

| Attachments  1 |
| --- |

Regulations.gov

| File Default Icon | Oklahoma PSLF AGO DA joint letter |
|---|---|
| | |

| **Comment ID** |
|---|
| ED-2025-OPE-0016-0803 |

| Shape | **Tracking Number** |
|---|---|
| | ma1-fvtu-twat |

**Comment Details**                    **Submitter Info**

**Document Subtype**
Comment(s)

**Received Date**
Apr 27, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                   Support
API Requests   |   FOIA

file:///C/...s/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ED-2025-OPE-0016-0803_Comments.html[5/23/2025 3:07:38 PM]

ED_01004




**OFFICE OF THE**
**OKLAHOMA ATTORNEY GENERAL**

**STATE OF OKLAHOMA**
**DISTRICT ATTORNEYS COUNCIL**

April 28, 2025

*__Via Email__*

The Honorable Timothy Walberg
Chair
Committee on Education and the Workforce
U.S. House of Representatives
Washington, D.C. 20515
amy.jones@mail.house.gov

The Honorable William Cassidy
Chair
Committee on Health, Education, Labor, and
Pensions
U.S. Senate
Washington, D.C. 20510
alaura_ervin@help.senate.gov

The Honorable Robert Scott
Ranking Member
Committee on Education and the Workforce
U.S. House of Representatives
Washington, D.C. 20515
rashage.green@mail.house.gov

The Honorable Bernard Sanders
Ranking Member
Committee on Health, Education, Labor, and
Pensions
U.S. Senate
Washington, D.C. 20510
Leila_Schochet@help.senate.gov

**RE:  Preserving the Public Service Loan Forgiveness Program**

As Oklahoma's district attorneys and Attorney General, we benefit from talented attorneys and other professional staff who often forgo higher paying wages to serve our citizens. These lawyers, law enforcement agents, analysts, and paralegals protect the public by investigating and prosecuting serious violent crimes.

The Public Service Loan Forgiveness Program (PSLF) has served as a key tool for recruiting and retaining members of our staff. PSLF is critical for recruiting the next generation of law students to public service, as many of them have student loan debt from college and law school. Without PSLF, we also fear that we will lose prosecutors who joined our offices expecting that their student loans would be forgiven after ten years of service to Oklahoma's citizens. We have grave concerns about fulfilling our duty to investigate and prosecute crimes, as our most talented staff may opt to leave our offices to secure higher-paying private sector jobs if the promise of loan forgiveness is broken. While we understand that certain adjustments to the program may be necessary to comply with a recent Executive Order,[1] our staff who benefit from the PSLF

---

[1] Exec. Order No. 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/restoring-public-service-loan-forgiveness/.

ED_01005

investigate and prosecute those who commit offenses like human smuggling—a serious offense singled out as critical by the Executive Order. Therefore, we ask that current state and local government staff in the program be permitted to continue on the path promised by the PSLF.

Ensuring that the next generation of attorneys see public service as a viable career option is critical for public safety. The PSLFP is a critical investment in public protection, and we ask that it continue to be available to our offices, and to other law enforcement and government agencies in Oklahoma.

Respectfully,

GENTNER DRUMMOND
*Oklahoma Attorney General*

GEORGE "BUDDY" LEACH
*District Attorney, First District*
*Beaver, Cimarron, Harper, and Texas Counties*

ANGELA MARSEE
*District Attorney, Second District*
*Beckham, Custer, Ellis, Roger Mills, and Washita Counties*

DAN JACOBSMA
*District Attorney, Third District*
*Greer, Harmon, Jackson, Kiowa, and Tillman Counties*

TOMMY HUMPHRIES
*District Attorney, Fourth District*
*Blaine, Canadian, Garfield, Grant, and Kingfisher Counties*

KYLE CABELKA
*District Attorney, Fifth District*
*Comanche and Cotton Counties*

JASON HICKS
*District Attorney, Sixth District*
*Caddo, Grady, Jefferson, and Stephens Counties*

VICKI ZEMP BEHENNA
*District Attorney, Seventh District*
*Oklahoma County*

BRIAN HERMANSON
*District Attorney, Eighth District*
*Kay and Noble Counties*

LAURA AUSTIN THOMAS
*District Attorney, Ninth District*
*Logan and Payne Counties*

MIKE FISHER
*District Attorney, Tenth District*
*Osage and Pawnee Counties*

WILL DRAKE
*District Attorney, Eleventh District*
*Nowata and Washington Counties*

MATT BALLARD
*District Attorney, Twelfth District*
*Craig, Mayes, and Rogers Counties*

DOUGLAS S. PEWITT
*District Attorney, Thirteenth District*
*Delaware and Ottawa Counties*

STEVE KUNZWEILER
*District Attorney, Fourteenth District*
*Tulsa County*

LARRY EDWARDS
*District Attorney, Fifteenth District*
*Muskogee County*

KEVIN MERRITT
*District Attorney, Sixteenth District*
*Latimer and LeFlore Counties*

MARK MATLOFF
*District Attorney, Seventeenth District*
*Choctaw, McCurtain, and Pushmataha Counties*

CHUCK SULLIVAN
*District Attorney, Eighteenth District*
*Haskell and Pittsburg Counties*

ED_01007

TIM R. WEBSTER
*District Attorney, Nineteenth District*
*Atoka, Bryan, and Coal Counties*

MELISSA HANDKE
*District Attorney, Twentieth District*
*Carter, Johnston, Love, Marshall,*
*and Murray Counties*

JENNIFER AUSTIN
*District Attorney, Twenty-First District*
*Cleveland, Garvin, and McClain Counties*

ERIK JOHNSON
*District Attorney, Twenty-Second District*
*Hughes, Pontotoc, and Seminole*
*Counties*

ADAM PANTER
*District Attorney, Twenty-Third District*
*Lincoln and Pottawatomie Counties*

MAX COOK
*District Attorney, Twenty-Fourth District*
*Creek and Okfuskee Counties*

CAROL ISKI
*District Attorney, Twenty-Fifth District*
*Okmulgee and McIntosh Counties*

CHRISTOPHER BORING
*District Attorney, Twenty-Sixth District*
*Alfalfa, Dewey, Major, Woods, and*
*Woodward Counties*

JACK THORP
*District Attorney, Twenty-Seventh District*
*Adair, Cherokee, Sequoyah,*
*and Wagoner Counties*

KATHRYN BOYLE BREWER
*Executive Coordinator*
*District Attorneys Council*

ED_01008

An official website of the United States Government. 🇺🇸

‹ Back to Document Comments (/document/ED-2025-OPE-0016-0001/comment)

Share ▾

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

---

Docket (/docket/ED-2025-OPE-0016)
 / Document (ED-2025-OPE-0016-0001) (/document/ED-2025-OPE-0016-0001)  / Comment

| Comment |
| --- |

See attached file(s)

| Attachments ( 1 ) |
| --- |

📄 Coalition Neg Reg Response IDR_PSLF

⬇ Download  (https://downloads.regulations.gov/ED-2025-OPE-0016-0808/attachment_1.pdf)

Give Feedback

| **Comment ID** |
| --- |
| ED-2025-OPE-0016-0808 |

| ◎ | **Tracking Number** |
| --- | --- |
| | maa-58hv-1k43 |

| **Comment Details** | **Submitter Info** |
| --- | --- |

ED_01009

**Document Subtype**

Comment(s)

**Received Date**

May 3, 2025



About      Bulk Data Download      Agencies      Learn      Reports      FAQ      Commenting Guidance

(/about)          (/bulkdownload)      (/agencies)    (/learn)    (/dotreports)    (/faq)    (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

ED_01010

May 5, 2025

James P. Bergeron
Acting Under Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC, 20202

RE: Docket ID ED-2025-OPE-0016

We, the undersigned 186 organizations representing millions of students, borrowers, workers, people of color, veterans, women, people with disabilities, and consumers crushed under the weight of student loan debt, write in response to the Trump Administration's announcement of intent to establish a negotiated rulemaking process to make changes to the Pay As You Earn (PAYE) and Income-Contingent Repayment (ICR) repayment plans, Public Service Loan Forgiveness (PSLF) and other topics that would streamline current federal financial assistance programs.

Today, more than 40 million Americans owe more than $1.6 trillion in student loan debt and millions are struggling to stay on track with their student loans while also keeping up with the rising costs of everyday goods like food, rent, childcare, and medication. Making matters even worse, over the last several months, instead of working to bring down costs and make college more affordable for working families, across the federal government entire agencies have been dismantled and more than 24,000 workers have been purged from their public service jobs—threatening the economic security of thousands of Americans directly affected, as well as the millions more across the nation that rely on the swift administration of critical government benefits and services.

We write in strong opposition to the Trump Administration's attempts to implement Project 2025, which calls for gutting Income-Driven Repayment (IDR) options and ultimately eliminating PSLF, which will only push borrowers further into debt and relief further out of reach. We voice this opposition alongside our ongoing opposition to any efforts, including through the regulatory process, to weaken protections for students against high-cost, low-quality programs that engage in waste, fraud, and abuse of the financial aid programs upon which millions of students rely; defrauded borrowers; and students whose institutions close. The Administration should move to enact policies that better protect student borrowers, rather than pursue misguided policies that will drive up costs and weaken protections.

1

**As millions of American families are forced to navigate today's unpredictable economic climate, a strong student loan safety net has never been more critical**.

Over the last three decades, policymakers have created several IDR plans in recognition of the need for more affordable repayment options that allow borrowers to tie their monthly bills to their income, reduce the likelihood of delinquency and default and protect borrowers from a lifetime of debt. However, for too long, existing IDR options served as a debt trap—allowing balances to balloon and failing to provide the true financial relief distressed borrowers needed. Many of these historic failures ultimately led to the Biden Administration creating the Saving on a Valuable Education (SAVE) plan, which would have cut monthly payments in half for certain borrowers, protected borrowers from runaway balances, and expedited debt relief. Over 8 million borrowers jumped at the chance to enroll in SAVE before it was blocked by partisan lawsuits. Recent data show that student loan delinquencies have now skyrocketed with roughly four million Americans behind on their student loan payments. Instead of the Trump Administration working to defend this program in the courts and ensuring that borrowers are able to access the most affordable repayment options, this Administration has forced millions to remain in economic limbo and pushed IDR options out of reach for millions. Millions of borrowers are desperately trying to repay their student loan debt, however government mismanagement and student loan industry abuses have made it nearly impossible.

As millions of borrowers now face a looming default cliff, this Administration's announced plans to make further changes to the IDR system will have massive economic ramifications. Therefore, we strongly oppose any efforts that would force working families to have to pay even more on their monthly student loan bills, remove critical protections from runaway balances driven by interest, and deprive borrowers of critical time-based cancellation.

**Efforts to limit access to or weaponize PSLF will threaten critical public service fields and harm our most vulnerable communities.**

Congress created PSLF in 2007 to provide public service workers with student loan debt relief in exchange for a decade of service to their communities. Since its creation, the program has enjoyed strong bipartisan support, strengthened rural, suburban, and urban communities alike, helped fill critical workforce shortages in education, healthcare, public safety, and national security, and delivered relief to more than 1 million public service workers. The PSLF program has provided a critical incentive for Americans interested in serving our country and local communities regardless of their political affiliation.

We were incredibly troubled to see President Trump's executive order aimed at limiting access to PSLF for public service workers employed at organizations engaging in work that is not in line with President Trump's agenda. The Department's efforts to engage in rulemaking to make

2

unlawful changes to PSLF eligibility are directly related to the goals of this executive order, exceed the Administration's authority outright, and have already had a chilling effect on public service organizations doing necessary work on behalf of our most vulnerable communities. The Higher Education Act is crystal clear that a "public service job" includes any employment in government or at a 501(c)(3). We strongly oppose any effort by the Trump Administration to limit PSLF eligibility to cherry pick organizations that they may not agree with.

Sincerely,

Student Borrower Protection Center
Democracy Forward

**National Organizations**

20/20 Vision
Adasina Social Capital
Affordable Homeownership Foundation Inc
AFL-CIO
AFT, AFL-CIO
American Association of University Professors
American Association of University Women (AAUW)
American Federation of State, County & Municipal Employees
Americans for Financial Reform Education Fund (AFREF)
Asian Americans Advancing Justice | AAJC
Autistic Women & Nonbinary Network
Center for Law and Social Policy (CLASP)
Center for Responsible Lending
CenterLink: The Community of LGBTQ Centers
Clearinghouse on Women's Issues
Communications Workers of America (CWA)
Consumer Action
Council on Social Work Education
Debt Collective
EdTrust
Equal Rights Advocates
Faith in Action Network
Feminist Majority Foundation
Fosterus
HBCU Collective
HEAL (Health, Environment, Agriculture, Labor) Food Alliance

3

Hispanic Federation
Immigration Equality
Independent Staff Union (of NTEU employees)
International Federation of Professional and Technical Engineers (IFPTE)
International Union, United Automobile, Aerospace and Agricultural Implement Workers of
America (UAW)
MDC
Minority Veterans of America
Movement Advancement Project
NAACP
National Association for College Admission Counseling
National Association of Social Workers
National Association of Student Loan Lawyers
National Council of Asian Pacific Americans (NCAPA)
National Education Association
National Employment Law Project
National Nurses United
National Women's Law Center
Project on Predatory Student Lending
Public Counsel
Public Good Law Center
Quiet Creek Herb Farm & School of Country Living
RootsAction
Secular Student Alliance
Service Employees International Union (SEIU)
Southeast Asia Resource Action Center (SEARAC)
Student Debt Crisis Center
Sugar Law Center for Economic & Social Justice
Swipe Out Hunger
The Century Foundation Higher Education Team
The Institute for College Access and Success
The Shalom Center
UnidosUS
United States Student Association
We the 45 Million
Young Invincibles

**State & Local Organizations**

AFT New Mexico

ED_01014

AFT-Oklahoma
Albuquerque Teachers Federation
Alliance for a Better Community
Alliance of Rhode Island Southeast Asians for Education (ARISE)
Arizona Students' Association
Associated Students of Portland Community College
Cal State Student Association
CASH Campaign of Maryland
CFPB Union NTEU 335
Church Women United in New York State
Citizen Action of Wisconsin
Civil Service Bar Association
Community Legal Aid Society Inc. (Delaware)
Community Service Society of New York
Consumer Federation of California
Convencion Bautista Hispana de Texas
Directly Impacted Educational Consulting
Economic Action Maryland Fund
Education Minnesota
Equality North Carolina
Faith Action For All
Fayetteville Police Accountability Community Taskforce
Freedom BLOC
GenerationUp
Georgia Budget & Policy Institute
Hawai'i State Teachers Association
HIAS Pennsylvania
Hildreth Institute
Housing and Economic Rights Advocates
La Raza Centro Legal, SF
Long Beach Alliance for Clean Energy
Miami Valley Fair Housing Center,  Inc.
Missouri Faith Voices
Mountain State Justice, Inc.
National Association of Social Workers DC Metro Chapter
National Association of Social Workers, Alabama Chapter
National Association of Social Workers, Alaska Chapter
National Association of Social Workers, Arizona Chapter
National Association of Social Workers, Arkansas Chapter
National Association of Social Workers, California Chapter

5

National Association of Social Workers, Colorado Chapter
National Association of Social Workers, Connecticut Chapter
National Association of Social Workers, Delaware Chapter
National Association of Social Workers, Florida Chapter
National Association of Social Workers, Georgia Chapter
National Association of Social Workers, Guam Chapter
National Association of Social Workers, Hawaii Chapter
National Association of Social Workers, Idaho Chapter
National Association of Social Workers, Illinois Chapter
National Association of Social Workers, Indiana Chapter
National Association of Social Workers, Iowa Chapter
National Association of Social Workers, Kansas Chapter
National Association of Social Workers, Kentucky Chapter
National Association of Social Workers, Louisiana Chapter
National Association of Social Workers, Maine Chapter
National Association of Social Workers, Maryland Chapter
National Association of Social Workers, Massachusetts Chapter
National Association of Social Workers, Michigan Chapter
National Association of Social Workers, Minnesota Chapter
National Association of Social Workers, Mississippi Chapter
National Association of Social Workers, Missouri Chapter
National Association of Social Workers, Montana Chapter
National Association of Social Workers, Nebraska Chapter
National Association of Social Workers, Nevada Chapter
National Association of Social Workers, New Hampshire Chapter
National Association of Social Workers, New Jersey Chapter
National Association of Social Workers, New Mexico Chapter
National Association of Social Workers, New York City Chapter
National Association of Social Workers, New York State Chapter
National Association of Social Workers, North Carolina Chapter
National Association of Social Workers, North Dakota Chapter
National Association of Social Workers, Ohio Chapter
National Association of Social Workers, Oklahoma Chapter
National Association of Social Workers, Oregon Chapter
National Association of Social Workers, Pennsylvania Chapter
National Association of Social Workers, Puerto Rico Chapter
National Association of Social Workers, Rhode Island Chapter
National Association of Social Workers, South Carolina Chapter
National Association of Social Workers, South Dakota Chapter
National Association of Social Workers, Tennessee Chapter

6

National Association of Social Workers, Texas Chapter
National Association of Social Workers, Utah Chapter
National Association of Social Workers, Vermont Chapter
National Association of Social Workers, Virgin Islands Chapter
National Association of Social Workers, Virginia Chapter
National Association of Social Workers, Washington Chapter
National Association of Social Workers, West Virginia Chapter
National Association of Social Workers, Wisconsin Chapter
National Association of Social Workers, Wyoming Chapter
New Jersey Citizen Action
New Jersey Institute for Social Justice
New York Legal Assistance Group (NYLAG)
NextGen California
NJ Communities United
Northeast Organic Farming Association of New Hampshire (NOFA-NH)
OCA Greater Chicago
Ohio Student Association
Olive Hill Community Economic Development Corporation, Inc
OneJustice
Partners Against eXploitation
San Francisco Rising
SEIU Local 500
Southern California College Attainment Network
Student Loan Fund (SLF)
Students Engaged in Advancing Texas
Students United
Texas State Teachers Association
The Academy of Financial Education
The Counseling Lounge
Tzedek DC
UAW Local 2325/Association of Legal Advocates and Attorneys
UC-AFT Local 1474
UIC United Faculty, AFT-AAUP Local 6456
United University Professions/AFT 2190
University of California Student Association (UCSA)
University of Washington Graduate and Professional Student Senate
Vermont-NEA
Virginia Poverty Law Center
Washington Office of the Student Loan Advocate
Washington Student Association

7

ED_01017

Wisconsin Education Association Council
Women Employed

ED_01018

Regulations.gov



An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

Comment from members of the UVA Law student and alumni body on changes to the Public Service Loan
Forgiveness program. Please see the attached document.

| Attachments  1 |
| --- |

File  UVA Law_PSLF Comment
PDF
Icon                                    Download Icon  Download

| Comment ID |
| --- |
| ED-2025-OPE-0016-0809 |

| Shape  **Tracking Number** |
| --- |
| maa-foiw-emj7 |

Regulations.gov



| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Comment(s)

**Received Date**
May 3, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                    Support
API Requests   |   FOIA

May 4, 2025

The Honorable Linda E. McMahon
Secretary of Education
U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

RE: Public Service Loan Forgiveness Impact on Public Interest Law Students and Alumni

Dear Secretary McMahon:

We, the undersigned members of the University Virginia School of Law ("UVA Law") student and alumni body, write to express our concerns about changes to the Public Service Loan Forgiveness ("PSLF") program that would restrict employer eligibility as contemplated by the March 7, 2025 Executive Order ("the EO")[1] and now considered by the Department of Education ("ED") pursuant to its authority under Title IV of the Higher Education Act of 1965.[2]

As UVA Law students who either anticipate going into public service work or who support our classmates and alumni doing public service work,[3] we have a significant interest in the PSLF program. Over the past three years, UVA Law has sent nearly one hundred students directly into full-time employment in the public interest and government sectors upon graduation.[4] This number does not account for alumni who entered public service after completing a clerkship or leaving a position at a law firm. In 2024, the median income for newly graduated UVA Law public sector and public interest employees was $73,939 per year.[5] On this salary, the PSLF program is an invaluable tool for students who take out loans to fulfill their calling to serve the United States and their fellow citizens. UVA Law alumni work as civil legal aid and nonprofit attorneys, government attorneys, prosecutors, and public defenders. Many would not be able to continue their career in service without the financial relief provided by the PSLF program.

Potential changes to the program arising from the EO would have a devastating and immediate impact on UVA Law students and alumni who plan to pursue or have entered a career in public service. Interpreted broadly, the EO suggests that lawyers who work at organizations that advocate on behalf of institutions that promote diversity programs, or represent migrants alleged to have violated immigration laws, minors seeking gender-affirming care, and/or individuals exercising their First Amendment right to protest will be stripped of their PSLF eligibility.[6] But these eligibility restrictions ignore the reality that many, if not most, public interest advocacy institutions operate pursuant to the higher ideals that undergird the legal profession, rather than an

---

[1] Exec. Order No. 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025).
[2] Higher Education Act of 1965 § 492(a), 20 U.S.C. § 1098a.
[3] Under the College Cost Reduction and Access Act of 2007, "public interest law services (including prosecution or public defense or legal advocacy in low-income communities at a nonprofit organization)" qualify as "public service job[s]" eligible for loan forgiveness. 20 U.S.C. 1087e(m)(1).
[4] Employment Data for Recent Graduates, UNIV. VA., https://www.law.virginia.edu/career-services/careers/employment-data (last visited Apr. 24, 2025).
[5] Id.
[6] Exec. Order No. 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025).

administrative agenda. These ideals include the prospect that every American should have access to courts of law, and vigorous advocacy to protect their interests, regardless of their income. Implementing the EO's directives to the fullest extent would mean that lawyers employed by institutions across the legal field may be at risk of termination from the PSLF program if their employer engages in just a single matter that falls under the broad and ambiguous categories articled in the EO. In the face of that uncertainty, young lawyers will be deterred from entering public service. The loss of that pipeline will fall most heavily on those who cannot afford private representation.

The ED must also consider the interests of law students and alumni who have relied on the PSLF program as it currently exists. Furthermore, the ED should take note that restricting federal assistance on the bases outlined in the EO may amount to impermissible viewpoint discrimination under the First Amendment.

### *The ED Must Justify Changes to the PSLF in Light of Substantial Reliance Interests*

The PSLF program as it exists today has been in effect since it was signed into law in 2007.[7] In reliance on the idea that there exists substantial federal loan forgiveness, public interest-minded students have (1) decided to attend law school; (2) attended UVA Law to obtain one of the most prestigious legal educations in the country, instead of a more affordable option; (3) signed a loan agreement; and (4) pursued a public interest course of study.

If the ED were now to restrict PSLF availability, UVA Law alumni and current students who rely on the program and whose employers fall outside of eligibility would suddenly find themselves saddled with up to hundreds of thousands of dollars of debt. In *Encino Motorcars,* the Supreme Court held that a "decades" old industry reliance on administrative policy was enough to overcome an inadequately reasoned policy change.[8] Given the reliance by UVA Law and alumni on PSLF as it exists today, the ED must show that it has considered the interests of these individuals and provide "good reasons" for eliminating their eligibility.[9] When the ED proposes new rules related to the PSLF, the Department is obligated to "provide a more detailed justification" to those who have acted in reliance on the program as to why "the agency believes [them] to be better" than the pre-existing PSLF policy.[10] Furthermore, "a reasoned explanation [will be] needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."[11]

---

[7] *Public Service Loan Forgiveness Archived Reports*, FED. STUDENT AID, https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data/archived-reports (last visited Apr. 24, 2025).
[8] *Encino*, 579 U.S. at 218.
[9] FDA v. Wages & White Lion Invs., LLC, No. 23-1038, slip op. at 35 (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (internal quotation marks omitted)). The Administrative Procedure Act requires that courts strike down agency action that they find "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To avoid an arbitrary and capricious finding on a changing rule, an agency must "provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests*." FDA v. Wages & White Lion*, No. 23-1038, at 34 (quoting Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221–22 (2016) (internal citation and quotation marks omitted)).
[10] *FCC v. Fox Television Stations*, 556 U.S. at 515.
[11] *Id*. at 516.

The PSLF program was created pursuant to the College Cost Reduction and Access Act of 2007.[12] A report by the House Committee on Education and Labor noted that PSLF was needed to address "the growing number of individuals who do not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans."[13] By creating the PSLF program, the Committee believed that Congress was "recogniz[ing] the contributions and challenges of public service . . . and hope[d] to encourage participation in these careers."[14] Members of the Senate were in agreement with the Committee on the intended purpose of the law: "More and more students avoid critically important career paths . . . . These are some of the most important professions in our country, but lower starting salaries are a distressingly powerful disincentive."[15] Sen. Harkin addressed the importance of public interest lawyers specifically, saying that "[s]o many low-income families need assistance, just legal assistance with debts, housing, divorces, family problems . . . . [Legal aid lawyers] get the cases no one else wants. You will get the cases people have given up on."[16]

At least as it pertained to young lawyers, Congress clearly hoped that providing PSLF would incentivize graduates to enter careers where they would assist low-income individuals, regardless of the exact need. By restricting eligibility on the basis of legal issue, the EO undermines that purpose by diminishing the incentive and introducing a new goal of the program: to cut off all legal services to specific causes. This addition goes further than undermining the purpose of the College Cost Reduction and Access Act: it fractures the spirit of the law. When justifying changes to the PSLF program as required by the Administrative Procedure Act, the ED should be prepared to explain why the underlying facts, including mounting higher education costs and the burden faced by public interest employees, have been disregarded.

### Changes to the PSLF Program Contemplated by the EO Implicate the First Amendment

The EO asserts that legal representation of certain populations amounts to "subsidization of illegal activities."[17] But representing an individual accused of a crime is not, nor ever has been, legally considered abetment of those illicit activities. Indeed, the Supreme Court has held that governments are *required* to provide counsel for criminal defendants charged with a felony[18] or punished with actual imprisonment.[19] It would defy common sense to think that a public defender required by law to represent their client is aiding him or her in execution of their crime. So too with the rest of the public interest legal field. Representing a person is not an adoption of their activities or ideas, but a fulfillment of the moral duty of a public interest lawyer to provide their services to those that cannot afford an attorney.

That duty is deeply rooted in the history of our Nation. Before he served as the United States' second President, John Adams defended the British soldiers who perpetrated the 1770 Boston

---

[12] College Cost Reduction and Access Act of 2007 § 401, 20 U.S.C. § 1087e.
[13] H.R. REP. NO. 110-210, at 48 (2007).
[14] *Id*. at 49.
[15] 153 CONG. REC. 23870 (2007).
[16] 153 CONG. REC. 19678 (2007).
[17] Exec. Order No. 14235, 90 Fed. Reg. 11885 (Mar. 7, 2025).
[18] Gideon v. Wainwright, 372 U.S. 335, 343–45 (1963).
[19] Argersinger v. Hamlin, 407 U.S. 25, 37 (1972); Scott v. Illinois, 440 U.S. 367, 369 (1979).

Massacre on the eve of the American Revolution and at the height of anti-British sentiment.[20] Later, he wrote: "I was throwing away as bright prospects [as] any Man ever had before him: and had devoted myself to endless labor and Anxiety if not to infamy and death, and that for nothing, except, what indeed was and ought to be all in all, a sense of duty."[21]

In the shadow of this legal tradition, the President will greatly struggle to convince a court of law that representation amounts to abetment of criminal activity. What is clear instead is that he dislikes the legal theories advanced by representation of migrants alleged to have violated immigration laws, adolescents seeking gender-affirming care, and protesters of certain causes. The President, and everyone, is entitled to their point of view. But the Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."[22] When "the limited public forum [in which the speech occurs] is one of its own creation," then [t]he State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' nor may it discriminat[e] against speech on the basis of viewpoint."[23] Congress enacted the PSLF "to encourage individuals to enter and continue in full-time public service employment."[24] Although the Government may disagree with the viewpoints advanced by lawyers when advocating for their clients' interests, implementation of the EO would certainly and unlawfully "violate viewpoint neutrality in the Government's provision of financial benefits."[25]

<div align="center">

*Conclusion*

</div>

For the above-stated reasons, we the undersigned of the UVA Law student and alumni body implore the Department of Education to reject changes to the Public Service Loan Forgiveness program that would severely and erroneously restrict the ability for public service students and alumni to fulfill their calling to serve.


Signed:


| Ida Abhari | *Class of 2022* | Alexandra Hough | *Class of 2025* |
|---|---|---|---|
| Darius Adel | *Class of 2024* | Morgan Hughes | *Class of 2027* |
| Grace Allaman | *Class of 2024* | Shreya Hurli | *Class of 2027* |
| Carolyn Allen | *Class of 2025* | Amelia Isaacs | *Class of 2026* |
| Dana Almberg | *Class of 2025* | Noa Jett | *Class of 2025* |
| Kaylee Alvarado | *Class of 2027* | Ashanti Jones | *Class of 2026* |

---

[20] Boston Massacre Trial, NAT'L PARK SERV., https://www.nps.gov/articles/000/boston-massacre-trial.htm (last visited Apr. 19, 2025).

[21] John Adams, [1770], *in* THE ADAMS PAPERS, DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS, VOL. 3, DIARY, 1782–1804; AUTOBIOGRAPHY, PART ONE (TO OCTOBER 1776), 291–96 (L.H. Butterfield ed., Harvard Univ. Press 1961).

[22] Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

[23] *Id.* (quoting Cornelius v. NAACP Legal Def. Fund & Educ. Fund, Inc., 473 U.S. 788, 804–806 (1985)).

[24] 34 CFR § 685.219.

[25] *Rosenberger*, 515 U.S. at 834.

| | | | |
|---|---|---|---|
| Ashley Anumba | *Class of 2025* | Io Jones | *Class of 2024* |
| Alfie Arun | *Class of 2026* | Geoffrey Mearns, Jr. | *Class of 2027* |
| David Baik | *Class of 2027* | Charlotte Karlsen | *Class of 2026* |
| Kevin Baker | *Class of 2026* | Joseph Keys | *Class of 2027* |
| Cheryl Bond | *Class of 2025* | Laura Grace King | *Class of 2027* |
| Hannah Melissa Borja | *Class of 2026* | Kevin Kissinger | *Class of 2026* |
| Camille Bosshard | *Class of 2027* | Emily Kostanecki | *Class of 2026* |
| Preston Bowden | *Class of 2026* | Laura Kun | *Class of 2027* |
| Katelyn Brunson | *Class of 2027* | Leah Lee | *Class of 2027* |
| Isaac Buckley | *Class of 2023* | Jocelyn Lee | *Class of 2025* |
| Abigail Caldwell | *Class of 2027* | Aldebaron Levin | *Class of 2026* |
| Julia Calland | *Class of 2027* | Natalie Little | *Class of 2026* |
| Ryan Carp | *Class of 2025* | Emily Liu | *Class of 2026* |
| John Cary | *Class of 2025* | Azalea Lopez | *Class of 2025* |
| Marie Ceske | *Class of 2025* | Hannah Lu | *Class of 2026* |
| Kaitlyn Chalker | *Class of 2027* | Indiyah Mabry | *Class of 2027* |
| Chloe Chiles | *Class of 2025* | Jack Magner | *Class of 2027* |
| Hennessey Chism | *Class of 2027* | Kathleen Malloy | *Class of 2026* |
| Eric Choi | *Class of 2025* | Jackson Martingayle | *Class of 2026* |
| Francesca Clemente | *Class of 2027* | Joshua McKinney | *Class of 2026* |
| Derek Omar Collins | *Class of 2027* | Gregory McKnight | *Class of 2026* |
| Sarah Concepcion | *Class of 2027* | Olena Melnyk | *Class of 2026* |
| Miles Zuhayr Cooper | *Class of 2026* | Ella Missan | *Class of 2026* |
| Allegra D'Virgilio | *Class of 2027* | Margaret Moran | *Class of 2027* |
| Simeon Daferede | *Class of 2025* | Jamie Newton | *Class of 2027* |
| Mason Davenport | *Class of 2025* | Tran K. Nguyen | *Class of 2026* |
| Allison Dayton | *Class of 2027* | Elle Ondeck | *Class of 2025* |
| Michaela Drucker | *Class of 2026* | Regan Osborn | *Class of 2025* |
| Grace Elman | *Class of 2027* | Emmy Pilant | *Class of 2027* |
| Carter Farnsworth | *Class of 2026* | Lena Popkin | *Class of 2027* |
| Henry Farnum | *Class of 2027* | Katherine Poppiti | *Class of 2024* |
| Audrey Felton | *Class of 2027* | Ashley Ramsay | *Class of 2026* |
| Anna Figueroa | *Class of 2026* | Hayley Richbart | *Class of 2026* |
| Jake Flansburg | *Class of 2025* | Kathleen Samuelson | *Class of 2026* |
| Jamison Fletcher | *Class of 2023* | Megan Schaefer | *Class of 2027* |
| Patrick Flynn | *Class of 2027* | Kelly Scrivner | *Class of 2026* |
| Logan Ford | *Class of 2027* | Monica Sebastian | *Class of 2027* |
| Anna Fortunato | *Class of 2026* | Hunter Sentner | *Class of 2023* |
| Margaret Fox | *Class of 2026* | Patrick Shayer | *Class of 2027* |
| Tessa Fries | *Class of 2027* | Jordan Simpson | *Class of 2027* |

| | | | |
|---|---|---|---|
| Elizabeth Gaccione | *Class of 2026* | Eli Sinai | *Class of 2026* |
| Amalia Garcia-Pretelt | *Class of 2023* | Ariana Smith | *Class of 2023* |
| Myrabel Gbe | *Class of 2026* | Delaney Sniffen | *Class of 2026* |
| Elizabeth Gilbert | *Class of 2026* | Jennifer Song | *Class of 2027* |
| Pablo Gómez García | *Class of 2027* | Kaleigh Spires | *Class of 2026* |
| Mia Gordon | *Class of 2027* | Jeff Stautberg | *Class of 2025* |
| Trey Gray | *Class of 2025* | Matthew Steelberg | *Class of 2025* |
| Chase Gunter | *Class of 2023* | Holly Stephens | *Class of 2027* |
| Catherine Haddad | *Class of 2025* | Malia Takei | *Class of 2025* |
| Marilyn Hajj | *Class of 2026* | Julia Tayloe | *Class of 2026* |
| Madeline Hall | *Class of 2025* | Kyle Trotman | *Class of 2026* |
| Micheal Hamilton | *Class of 2027* | Delaney Tubbs | *Class of 2025* |
| Alex Hanna | *Class of 2026* | John Henry Vansant | *Class of 2025* |
| Kate Harrell | *Class of 2027* | Marissa Varnado | *Class of 2026* |
| Luci Harris | *Class of 2025* | Ariel Vasser | *Class of 2026* |
| Jalen Harrison | *Class of 2027* | Emma Verges | *Class of 2027* |
| Madeleine Hart | *Class of 2023* | Sophia Weglarz | *Class of 2027* |
| Anna Harvey | *Class of 2025* | Megan Willburn | *Class of 2027* |
| Abigail Hauer | *Class of 2024* | Shelby Wolfe | *Class of 2025* |
| Spencer Haydary | *Class of 2023* | Kirk Wolff | *Class of 2026* |
| Philip Hedden | *Class of 2026* | C. Colby Woodis | *Class of 2025* |
| Shannon Hicks | *Class of 2027* | Edward Zhang | *Class of 2027* |
| Emily Hockett | *Class of 2022* | Nikita "Nikki" Zinzuwadia | *Class of 2027* |
| Nicholas Hoffman | *Class of 2025* | Grace Zipperer | *Class of 2024* |

ED_01026

Regulations.gov



An official website of the United States Government.

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

| Comment |
| --- |

Please see attached on the Department's proposed rulemaking agenda from Third Way.

| Attachments  1 |
| --- |

File PDF Icon  Third Way Comments on Negotiated Rulemaking Agenda for Higher Education_Docket ID ED-2025-OPE-0016

Download Icon  Download

| **Comment ID** |
| --- |
| ED-2025-OPE-0016-0810 |

| Shape  **Tracking Number** |
| --- |
| mab-70q5-vfwp |

Regulations.gov



| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |        Support
API Requests    |    FOIA

ED_01028

# ✴ THIRD WAY

May 5, 2025

The Honorable James P. Bergeron
Acting Under Secretary
US Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Docket ID: ED-2025-OPE-0016

Dear Acting Under Secretary Bergeron,

Thank you for the opportunity to offer comment on the Department of Education's proposed negotiated rulemaking agenda. Third Way is grateful for the Department's attention to key issues under Title IV of the *Higher Education Act* that directly impact students, borrowers, and taxpayers. This written submission reflects and briefly expands upon the oral comments presented on behalf of Third Way during the Department's public hearings on May 1, 2025.

The regulatory issues on which the Department has expressed intent to establish negotiated rulemaking committees cover a broad range of topics for which sound federal policies are essential to provide appropriate protections for borrowers within the student loan portfolio while ensuring accountability and transparency for institutions participating in the Title IV program. As the Department prepares to propose potential changes to the Public Service Loan Forgiveness (PSLF) program, Pay As You Earn (PAYE) and Income Contingent Repayment (ICR) plans, and other regulatory issues that promote program integrity and institutional quality, Third Way urges the Department to prioritize clarity and consistency for student loan borrowers while adhering closely to Congressional intent for these programs. Third Way also strongly supports and encourages the Department to implement the current Gainful Employment (GE) and Financial Value Transparency (FVT) regulations as swiftly as practicable.

The Department has indicated interest in developing regulatory proposals related to qualifying employers for eligibility for the Public Service Loan Forgiveness program, which was established by Congress and signed into law by President George W. Bush in 2007. The statutory framework of the program includes stringent and intentional definitions of eligible public service employers for the purposes of PSLF; specifically, non-profit organizations with 501(c)(3) status or that provide certain qualifying public services.[1] These parameters provide a meaningful employer recruitment and retention benefit while elevating the appeal of critical public service jobs, and are well-designed to provide a targeted benefit: as of October 2024, approximately one million of the more than 43 million federal student loan borrowers, roughly 2.3%, had earned PSLF relief. It is incumbent on the Department to, at a minimum, ensure continuity of employer eligibility for current borrowers and uphold Congressional intent for the program to lead to earned forgiveness for borrowers serving their communities in careers like law enforcement, firefighting, military service, nursing, or teaching.

A critical component of ensuring the functioning of the federal student loan program is bringing

---

[1] "What not-for-profit organizations qualify as eligible employers for Public Service Loan Forgiveness (PSLF)?" US Department of Education, Federal Student Aid, https://studentaid.gov/help-center/answers/article/what-not-for-profits-eligible-employers-for-pslf.

ED_01029

borrowers back into effective repayment following the pauses precipitated by the COVID-19 pandemic. Income-driven repayment plans, including PAYE and ICR, provide practical and vital options for borrowers to ensure an affordable monthly payment while providing the Department with mechanisms to help prevent student loan default. Today, ensuring consistency and clarity around IDR plans that borrowers have had access to for decades and implementing policies that prevent default and increase repayment are critically important. In any new proposed IDR plan or revisions to existing plans, Third Way urges the Department to prioritize ensuring that available options contain necessary and reasonable protections for student loan borrowers that help prevent delinquency and default, including: auto-enrollment into IDR for student loan borrowers once they reach delinquency and access to IDR and/or reasonable monthly payments when a borrower is in default. Such options would benefit borrowers, lower costs for the Department and student loan servicers during a low-resource period, and minimize the need for intensive technological and outreach material changes by FSA and loan servicers.

Given the Department's commitment to improving program integrity and institutional quality, it should prioritize fully and promptly implementing the Gainful Employment (GE) rule. By prioritizing program-level data, the GE rule provides a valuable accountability tool to weed out underperforming programs at otherwise high-performing schools. Additionally, the GE rule includes common-sense and intuitive calculations for measuring postgraduate outcomes. The debt-to-earnings rates and earnings premium measures allow for a meaningful indicator of return on investment for students and taxpayers and offer clear insight into the financial value of individual programs.

The expanded data made available through the Financial Value Transparency (FVT) framework will apply to all schools, and the transparency these data will create will strengthen decision-making power for students and their families to determine whether, where, and in which higher education program they choose to invest their time and resources. FVT data includes completion and withdrawal rates, median earnings post-graduation, and estimated expenses over the course of a program. Such data will equip students with useful and relevant information to help them decide which college program best fits their needs and goals and allow them to compare price and outcomes information before they apply to college. Third Way urges the Department to maintain all required data components in the final framework and ensure institutional compliance and data accuracy. Additionally, the Department should prioritize and allocate appropriate resources to support the development of the website or platform required to house FVT data so that it can be implemented and made publicly available promptly following the reporting deadline.

We commend the Department for its desire to improve program integrity and institutional quality in its upcoming regulatory agenda. Third Way encourages the Department to prioritize clarity and consistency for student loan borrowers and swiftly implement the GE and FVT final rules in the best interest of federal student loan borrowers, students, and taxpayers. We thank you for your time and the opportunity to contribute to the Department's proposed negotiated rulemaking agenda. Please do not hesitate to contact us should you have any questions.

Sincerely,

Ben Cecil                                     Michelle Dimino
Senior Education Policy Advisor               Director of Education
Third Way                                     Third Way
bcecil@thirdway.org                           mdimino@thirdway.org

ED_01030

Regulations.gov



An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

| Comment |
| --- |

Attached please find comments from the Postsecondary Education & Economics Research (PEER) Center (peer-center.org) on a potential topic that would improve program integrity and institutional quality: Financial Value Transparency (FVT).

| Attachments  1 |
| --- |

File 05052025 PEER Center Comments - Docket ID ED-2025-OPE-0016
PDF
Icon                                    Download Icon  Download

| Comment ID |
| --- |
| ED-2025-OPE-0016-0811 |

| Shape  **Tracking Number** |
| --- |
| mab-74ve-yzw1 |

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |    Support
API Requests    |    FOIA

ED_01032



Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202
negregNPRMhelp@ed.gov

May 5, 2025

To Whom It May Concern:

Thank you for the opportunity to submit comments on the Department's recent announcement of public hearings that will initiate a rulemaking process [Docket ID ED-2025-OPE-0016]. The Postsecondary Education & Economics Research (PEER) Center (peer-center.org) generates actionable research to drive policy improvements in postsecondary education. We are pleased to provide comments, as requested, on a potential topic that would improve program integrity and institutional quality: Financial Value Transparency (FVT). We offer our strong support for incorporating FVT reporting that is at least as robust as in the original regulations through any new rules designed to enhance efficiency and accountability in higher education.

The Financial Value Transparency rules currently in effect with implementation already underway, will provide unprecedented new information to students, institutions, and policymakers about the return on investment of postsecondary education, and we urge the Department not to remove the rules or weaken these provisions (including by eliminating any of the required reporting elements). Under the FVT rules, all colleges, across all sectors, will report data needed to calculate whether each of their programs leaves the typical graduate with high debt or low earnings enabling students and their families to make informed decisions about whether and where to enroll in school and what to study, consistent with their goals and interests.[1]

The goals of Financial Value Transparency are not only broadly consistent with the ideals of policymakers across party lines; they are also a direct extension of President Trump's past efforts. In 2019, pursuant to an Executive Order issued by President Trump, the Education Department released the first-ever program-level data on the debt and post-college labor market outcomes for every Title IV-participating program in the country – an unprecedented trove of information designed to inform students' choices and increase accountability for low-value programs. Complete information is a

---

[1] The Gainful Employment rules will further require all non-degree programs, as well as degree programs offered by proprietary institutions, to meet these standards in order to continue receiving federal financial aid dollars. Members of Congress have proposed adopting similar standards, and broadening them to apply across sectors. We strongly support maintaining these strong gainful employment rules, in addition to preserving the FVT rules that are the focus of this comment.

necessity for a well-functioning competitive market, and FVT reporting begins to close the informational gaps that generate inefficiency in U.S. higher education.

We are aware that many institutions continue to argue that the data reporting requirements are too burdensome. While we appreciate that any change to federal requirements requires adjustments to institutional workflows, it is worth reiterating that many of these reporting requirements are not new. The 2014 gainful employment rules – through which nearly half of private nonprofit colleges and almost nine in 10 public colleges reported data for at least one program – included similar reporting requirements; and approximately 2,000 institutions are regularly asked to provide data about their costs and financial aid for the National Postsecondary Student Aid Study. Moreover, these rules were published in October 2023, meaning colleges have already had 18 months to prepare for the reporting; with the Department's already-granted extension to the end of September 2025, reporting deadlines will have been substantially delayed; in fact, it will have been nearly two years since the rules were finalized.

The Trump Administration now has the opportunity to take the next step in designing rich federal data and getting that information into the hands of students and their families. Already, the Education Department has taken key steps to establish data reporting systems and build the necessary infrastructure to assess performance for every institution and each of their programs. We encourage the Department to move quickly to produce those data, dedicating the necessary staff and resources to the task, and to ensure the data reach the students who need them and generate the transparency needed for a well-functioning market.


**Maintain Ongoing FVT Reporting**

As the Department continues moving forward implementation of the FVT regulations, we particularly urge the Administration to continue to collect rich, robust data about the debt borrowers take on, the costs students pay to complete a program, and the programs in which students enroll. Maintaining the reporting structures that have already been established is the most efficient way to measure programs' performance.

In particular, the data that the Department is already collecting from schools will be of significant added value, both to students and to policymakers. As Americans' concern about the costs of college continues to grow, the information collected via the FVT reporting will provide unprecedented new information about what students *actually* pay to earn their credentials at different institutions and programs. The new data will include the total amount students were charged (both for tuition and fees and for living costs and other expenses), the amount of financial aid provided to students, and the amounts of loans those students took on. These data could provide important insights into the net prices students pay (including at different income levels/Student Aid Indices), how institutions use their aid dollars, and how federal funding could be reallocated more efficiently to ensure higher education remains accessible, affordable, and efficient.

This information is critical for students and their families, and a significant gap in the existing data infrastructure. Outside of the FVT data, there is no way for students to compare what they would pay at different institutions throughout their entire education, with fluctuating tuition and changing grant aid. Because FVT data include information on the net prices paid by each student, the information could enable the Administration to provide radical price transparency: presenting aggregated information to students, for instance, that details what other students at a similar level of federal aid eligibility paid in each year of their studies and how much aid they received..

Policymakers have indicated their desire for this information, as well. The *College Cost Reduction Act* introduced in Congress last year by Rep. Virginia Foxx (R-NC), for example, explicitly retained the data reporting requirements under the Gainful Employment and FVT regulations. It would also use the data reported under that provision for an accountability framework, which would require the Education Department to calculate the total price students are typically charged for a program – the total tuition and fees, less grant and scholarship aid – and the typical earnings of students who completed the program. These data are collected under FVT, but are otherwise not available from any existing data source. At the same time, the *Lowering Education Costs and Debt Act* introduced by Sen. Bill Cassidy (R-LA) would create an earnings test for programs that looks very similar to the earnings premium measure under FVT. If the Department were to discontinue or alter the data reporting under FVT, it would not only undermine students' access to high-quality information about the prices and value of their programs, but also set back the feasibility of these and other legislative efforts to increase accountability for higher education. The data could also be used to inform important policy questions, like assessing the extent to which increases in federal financial aid like Pell Grants enable students to pay less or whether expansions in aid incentivize colleges to charge higher prices.

These critical use cases for FVT reporting demonstrate the shortcomings of past data transparency efforts that rely exclusively on federally held administrative data, like the College Scorecard. While the Department (including under the Trump Administration) has been able to produce new information for consumers about the post-college outcomes of higher education programs, the government collects shockingly little information about the prices students pay using their federal financial aid.

Without FVT data, the Department will see both logistical and strategic challenges to its goals of driving down the costs of college. Operationally, the FVT data allow the Department to measure and hold institutions accountable for borrowing for direct costs – tuition, fees, books, and supplies – rather than for living costs; without these data, many high-cost and low-value institutions across all sectors will continue to operate unchecked. The larger ambition of this transparency, though, is to enable the market forces needed to put pressure on colleges' prices and outcomes. New FVT data are the lynchpin to that system: By publishing data that will allow students to easily compare college prices – particularly relative to their earnings outcomes – students will, for the first time, realistically be able to vote with their feet, driving down prices and improving value in college education.

**Ensure Students Have Access to Key Data**

Under the FVT regulations, the Department committed not only to producing this high-quality information, but also ensuring it gets into the hands of students and families to help them make informed choices. We urge the Department to move forward with those efforts in a timely manner.

More specifically, by July 1, 2026, the FVT rules clarify that the Department will establish and maintain a website – ideally, informed by consumer testing – to house the cost, earnings, and other data relevant to students' college choices. Institutions will be required to share the site directly via email communication with both prospective and enrolled students. Students will be able to use this information to inform their choices of programs and colleges, as well as in deciding how best to finance their education. For certain high-debt programs, a direct acknowledgement that prospective students are aware of their potential program's returns will ensure students have understood the potential risks of unfavorable outcomes. Direct engagement with students is critical for ensuring that students use these data to inform their decision-making and ameliorate information gaps in the market.

We encourage the Department to begin this student-facing work in the near term, even as it continues to implement the underlying data reporting and infrastructure. Providing these key data elements to students will equip them to make more informed choices about where to spend their time and money in higher education and ultimately lead to improved efficiency and taxpayer savings over the longer term.


**Final Considerations**

As the Department embarks on a rulemaking process and simultaneously continues to implement the FVT regulations, the Postsecondary Education & Economics Research (PEER) Center remains available and committed to providing useful and actionable research and policy design insights to help inform an efficient, accountable higher education system that supports strong outcomes for students. If you have questions about these comments or wish to discuss them further, please contact Clare McCann at cmccann@american.edu.

Sincerely,


Stephanie Cellini                                    Jordan Matsudaira
Co-Director                                          Co-Director
PEER Center                                          PEER Center

Clare McCann
Managing Director, Policy and Operations
PEER Center

Regulations.gov



Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

The American Dental Association is pleased to comment on the Department of Education's request for feedback about the Public Service Loan Forgiveness program, various income-driven student loan repayment plans, and other topics that would help streamline current federal student financial assistance programs.



| Attachments  1 |
| --- |

File 250505_education_title-IV_neg-reg_sig
PDF
Icon                                    Download Icon  Download

| Comment ID |
| --- |
| ED-2025-OPE-0016-0812 |

| Shape | Tracking Number |
| --- | --- |
|  | mab-b4q4-vu20 |

Regulations.gov







1111 14th Street, N.W.          T 202.898.2400
Suite 1200                      F 202.898.2437
Washington, DC 20005           www.ada.org

May 5, 2025

Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Re: Docket No. ED-2025-OPE-0016—Proposal to Develop Regulations and Establish
    Negotiated Rulemaking Committee

To Whom It May Concern:

As the leading authority on oral health in the United States, the American Dental Association
(ADA), representing over 159,000 dentists across the country, writes to respond to your
request for feedback about the Public Service Loan Forgiveness program, various income-
driven student loan repayment plans, and other topics that would help streamline current
federal student financial assistance programs. We offer these comments in response to your
Federal Register notice of April 4, 2025 (90 FR 14741).

The Department of Education is proposing to establish a negotiated rulemaking committee
to consider whether and how Title IV regulations are impacting institutions of higher
education, states, and other partners. The Department is also seeking to establish whether
existing regulations may inhibit innovation and contribute to rising college costs.

Today, over three quarters (78 percent) of dental school graduates with educational debt
are starting their careers owing over $312,000 in student loans.[1] Eighty-five percent use
federal Direct Unsubsidized Stafford Loans, and more than three quarters (79 percent) use
federal Grad PLUS Loans—either as a stand-alone financing mechanism or to supplement
what the Direct Loan did not cover.[1] And the interest on these loans can be as high as 9.5 or
10.5 percent, depending on the type of loan and market conditions.[2]

The ADA's comments, which are enclosed, may be summarized as follows.

- Expand the number of income-based repayment options for educational loans.

- Eliminate all non-statutory "capitalizing events" that cause unpaid interest to become
  part of the principal balance of the borrower's student loan.

- Allow accreditors to continue their oversight of institutions of higher education and
  ensure that federal student loans can be used only for accredited programs.

- Simplify the application process, clarify the eligibility and qualification criteria, and
  refine the definition of "qualifying employers" in the Public Service Loan Forgiveness
  Program.[3]

Office of Postsecondary Education
U.S. Department of Education
May 5, 2025
Page 2

- Appoint individuals to the negotiated rulemaking committee who have intimate knowledge of what is driving *postgraduate* borrowing, not just undergraduate borrowing.

Thank you for providing the opportunity to comment. These changes will not eliminate the debt hardship for early career dentists, but they will help offset the unprecedented financial challenges these essential health care providers face at graduation.

If you have any questions or would like to talk further, please contact Mr. Robert J. Burns at 202-789-5176 or burnsr@ada.org.

Sincerely,

Brett Kessler, D.D.S.
President

Elizabeth Shapiro, D.D.S., J.D., C.A.E.
Interim Executive Director

BHK:EAS:rjb
Enclosure

---

[1] Istrate EC, Samanta A, Booker CL, West KP. Dentists of Tomorrow 2024: An Analysis of the Results from the ADEA 2024 Survey of U.S. Dental School Seniors. American Dental Education Association (ADEA) Education Research Series. Issue 7, December 2024.

[2] 20 U.S.C. § 1087e

[3] 34 CFR 685.219

ED_01040

# ADA American Dental Association®

May 5, 2025

The ADA offers the following detailed comments for consideration by the Department of Education's Negotiated Rulemaking Committee, which has been asked to consider whether or how Title IV regulations are impacting institutions of higher education, states, and other partners. The Committee is also seeking to establish whether existing regulations may be inhibiting innovation and contributing to rising college costs.

***Expand income-based loan repayment.*** The ADA urges the Department to use its discretionary authority to expand the number of income-based repayment options for educational loans. In 1993, Congress authorized the Department to offer a variety of these plans with exceptionally broad criteria for their design and selection.[1] This authority enables the Department to find creative ways of using income-contingent repayment plans to curb the accumulation of principal and interest on educational loans.

For example, the Department might consider an option that uses a smaller portion of a borrower's adjusted gross income to calculate their monthly student loan payment. This would prevent a borrower's balance from growing due to unpaid interest—by eliminating any remaining monthly interest after the borrower makes each full scheduled payment.

***Curtail interest capitalization.*** The ADA urges the Department to use its discretionary authority to eliminate non-statutory "capitalizing events" in the GRAD Plus loan program, which causes unpaid interest to be rolled into the principal balance of the borrower's student loan, often without their knowledge.[2] Interest capitalization is triggered whenever a separation or grace period ends, at the end of forbearance or deferment, when voluntarily changing repayment plans, and by other events.[3]

Interest capitalization increases the loan's principal, the amount of interest that accrues, and typically the monthly payments. Eliminating non-statutory events that trigger it could yield tens of thousands of dollars in savings for early career dentists and those experiencing serious financial hardship.

The ADA applauds the Department for eliminating interest capitalization on Direct Loans where such capitalization is not required by statute.[4] The Association hopes the Department will take the same action for GRAD Plus loans.

***Ensure accreditation remains intact.*** Accrediting agencies—including the Commission on Dental Accreditation (CODA)—are an independent mechanism to hold institutions of higher education accountable for the quality, integrity, and financial stability. Accreditation helps protect students from fraudulent actors and, more important, graduate with the highest level of knowledge and skills to succeed in their professions.

In any major reform of Title IV student loan programs—such as moving federal student loan programs to another federal agency—the ADA urges that accreditors be allowed to continue their oversight of institutions of higher education and that federal student loans can be used only for accredited programs.

***Reform the Public Service Loan Forgiveness program.*** The ADA urges the Department to simplify the application process, clarify the eligibility and qualification criteria, and refine the definition of "qualifying employers" for the Public Service Loan Forgiveness Program.[5] The

- 1 -

PSLF program forgives any remaining federal educational debt after ten years of qualifying public service.[6]

PSLF reform has the potential to alleviate the oral health needs of the vulnerable and underserved by encouraging dentists to practice in underserved areas. We urge the Department to automatically qualify Health Centers[*] and federally qualified health centers (or FQHCs)[†] as "qualifying employers."

Health Centers and FQHCs are certified by the Health Resources and Services Administration (HRSA) and the Centers for Medicare and Medicaid Services (CMS), respectively. These facilities serve patients with limited incomes and/or who live in health professional shortage areas. Granting automatic "qualified employer" status would simplify the Department's efforts to ensure the PSLF program is fulfilling its purpose.

Data is also needed to help policy makers determine what public needs the PSLF program is (and is not) fulfilling. For example, the Department is not currently tracking the numbers of DDS- or DMD-degreed dentists participating in the program. Knowing whether and how the PSLF program is driving dentists to practice in underserved areas would help policy makers adjust the program to meet the most vital public health needs.

***Select negotiators with significant postgraduate financing expertise.*** The Department has stated its intent "select negotiators from nominees of the organizations and groups that represent the interests significantly affected by the proposed regulations." We strongly urge that the Department select individuals with intimate knowledge of how postgraduate students use Title IV programs to finance their education, which far surpasses a new dentist's undergraduate debt.

For example, the undergraduate debt of most dental school graduates in 2024 was reportedly $14,900. Comparatively, their dental school debt was reportedly $297,800.[7] This cost disparity suggests that the drivers of postgraduate educational costs are distinct from the drivers of undergraduate tuition. Borrowing trends would necessarily track these cost disparities.

---

[*] "Health Center" is a designation administered by HRSA. Health Centers receive capacity grants under Section 330 of the Public Health Service Act. Section 330-funded facilities provide care for uninsured and underserved individuals residing in health professional shortage areas. There are also Health Center Look-Alikes that provide the same services to the same populations, but without Section 330 grants.

[†] "Federally Qualified Health Center" (FQHC) is a designation administered by the Centers for Medicare and Medicaid Services (CMS). FQHCs must provide a full range of care to medically underserved patients, regardless of their ability to pay—including primary medical care, emergency medical services, dental care, mental health and substance abuse treatment, and more.

ED_01042

**ENDNOTES**

[1] 20 U.S.C. § 1087e

[2] 20 USC §§ 1087e(e)(5), 1087e(f)(1)(B), and 1087e(f)(4)(A)(ii)

[3] 34 CFR § 685.202, 685.203, 685.204, 685.205, 685.207, 685.209, and 685.219

[4] 87 FR 65904

[5] 34 CFR 685.219

[6] 20 U.S.C. § 1087e(m)

[7] Istrate EC, Samanta A, Booker CL, West KP. Dentists of Tomorrow 2024: An Analysis of the Results from the ADEA 2024 Survey of U.S. Dental School Seniors. American Dental Education Association (ADEA) Education Research Series. Issue 7, December 2024.

ED_01043

Regulations.gov

An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

| Comment |
| --- |

On behalf of the American Association of Colleges of Osteopathic Medicine (AACOM) and American Osteopathic Association (AOA), thank you for the opportunity to comment on the U.S. Department of Education's Public Service Loan Forgiveness (PSLF) Program, the Pay As You Earn (PAYE) Repayment Plan and the Income-Contingent Repayment (ICR) Plan and the intent to conduct negotiated rulemaking.

AACOM represents all 42 colleges of osteopathic medicine (COMs). Our schools educate more than 38,000 future physicians—close to 30 percent of all U.S. medical students—at 69 teaching locations in 36 US states. AACOM also represents osteopathic graduate medical education professionals and trainees at U.S. medical centers, hospitals, clinics, and health systems. The AOA represents more than 197,000 osteopathic physicians (DOs) and medical students, promotes public health, encourages scientific research, and serves as the primary certifying body for DOs.

AACOM and the AOA urges the Department to preserve and strengthen the PSLF Program, PAYE Repayment Plan, ICR programs, and other federal student aid programs so that the next generation of osteopathic can obtain student loan forgiveness and affordable repayment options and continue to reduce healthcare workforce shortages across the nation. Osteopathic physicians play a critical role in our healthcare system, as they are more likely to practice in primary care and serve rural and underserved areas. Many of our students rely on these programs to finance their education and pursue careers serving their communities, and without them, there is the risk of a major healthcare workforce gap.

The attached PDF includes specific details on why these programs and policies are important to the osteopathic community and the patients we serve.

ED_01044

Regulations.gov



Attachments  1

File PDF Icon  AACOM-AOA Negotiated Rulemaking Comments on PSLF PAYE and ICR 5-5-2025

Download Icon  Download

**Comment ID**
ED-2025-OPE-0016-0813

Shape  **Tracking Number**
mab-dxfy-211n

Comment Details                    Submitter Info

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |   Support
API Requests   |   FOIA

ED_01045





The Honorable Linda McMahon
Secretary of Education
US Department of Education
400 Maryland Ave, SW
Washington, DC 20202

**Re: 2025-2026 Negotiated Rulemaking, ED-2025-OPE-0016-0001, regarding PSLF, PAYE and ICR**

Dear Secretary McMahon,

On behalf of the American Association of Colleges of Osteopathic Medicine (AACOM) and American Osteopathic Association (AOA), thank you for the opportunity to comment on the U.S. Department of Education's Public Service Loan Forgiveness (PSLF) Program, the Pay As You Earn (PAYE) Repayment Plan and the Income-Contingent Repayment (ICR) Plan and the intent to conduct negotiated rulemaking.

AACOM represents all 42 colleges of osteopathic medicine (COMs). Our schools educate more than 38,000 future physicians—close to 30 percent of all U.S. medical students—at 69 teaching locations in 36 US states. AACOM also represents osteopathic graduate medical education professionals and trainees at U.S. medical centers, hospitals, clinics, and health systems.  The AOA represents more than 197,000 osteopathic physicians (DOs) and medical students, promotes public health, encourages scientific research, and serves as the primary certifying body for DOs.

**AACOM and the AOA urges the Department to preserve and strengthen the PSLF Program, PAYE Repayment Plan, ICR programs, and other federal student aid programs so that the next generation of osteopathic physicians can obtain student loan forgiveness and affordable repayment options and continue to reduce healthcare workforce shortages across the nation. Osteopathic physicians play a critical role in our healthcare system, as they are more likely to practice in primary care and serve rural and underserved areas. Many of our students rely on these programs to finance their education and pursue careers serving their communities, and without them, there is the risk of a major healthcare workforce gap.**

One of the fastest growing medical fields in the U.S, osteopathic medicine emphasizes helping each person achieve optimal wellness through a whole-person approach to care that emphasizes health promotion and disease prevention. The number of osteopathic physicians (DOs) in the U.S. has increased by more than 70 percent in the past ten years, addressing health professional shortages and expanding access to care, especially in rural and underserved areas. COMs consistently receive national recognition for their role in tackling the U.S. physician shortage crisis, particularly in primary care and in underserved and rural communities. In fact, more than half of DOs practice in the primary

 

care specialties of family medicine, internal medicine, and pediatrics. Fifty-six percent of COMs are located in Health Professional Shortage Areas (HPSAs), 64 percent require their students to go on clinical rotations in rural and underserved areas, reflecting a commitment across COMs to prepare their students to practice in these settings. We know that the setting in which physicians train influences where they practice, and in 2025, COMs accounted for five of the top 10 schools with the greatest share of graduates practicing in HPSAs. Additionally, osteopathic physicians tend to fill the primary care needs of rural communities at a rate 2.3 to 2.5 times higher than allopathic physicians.

Osteopathic medical students often participate in the PSLF Program, which provides student loan relief for those who commit their careers to serving others in communities of need. It is a competitive recruiting tool, especially in medically underserved areas, that has successfully encouraged physicians and other healthcare professionals to work in full-time public service positions in exchange for partial forgiveness after 10 years of consecutive payments.

The U.S. is facing a significant shortage of primary care physicians, with projections indicating a shortage of 87,150 full-time equivalent primary care physicians by 2037, which will be particularly acute in nonmetro areas. Thankfully, many osteopathic medical students actively pursue careers in primary care – 57 percent of seniors in 2024 – strengthening the backbone of our nation's healthcare system. Importantly, osteopathic medical graduates are more likely to choose primary care over other specialties when accessing loan forgiveness programs such as PSLF. In the 2023-2024 academic year, 34 percent of graduating medical students with debt indicated a plan to pursue the PSLF Program. Additionally, PSLF recipients are more likely to be graduates of osteopathic schools. It is critical to preserve this program for osteopathic physicians and future borrowers.

These Title IV programs strengthen the nation's hospitals, communities and overall public health. More than 80 percent of clinicians who get such scholarships or loan repayments continue to practice in shortage areas beyond their obligation of several years. Without PSLF, many public servants would be disincentivized from working in rural and underserved areas and instead enter the private sector, where salaries are often higher. This would worsen existing healthcare disparities in underserved communities and threaten the overall health of our country. **Instead of eliminating the PSLF program, we recommend strengthening it by adopting the following recommendations to improve its transparency and effectiveness.**

- Preserve eligibility for healthcare practitioners at public or nonprofit hospitals who, due to state laws, cannot be directly employed by those facilities. We reject any regulations that narrow the definition of a "qualifying employer" for the purpose of determining PSLF eligibility.
- Ensure medical residents' time in residency training programs qualifies as public service work for PSLF.





- Maintain administrative improvements, such as the streamlined application process and PSLF Help Tool.
- Automate employment certification through payroll systems to reduce administrative burden.
- Provide a registry of certified public service employers.
- Allow loan consolidation without loss of prior qualifying payments.
- Establish a fair appeals process for eligibility disputes.
- Require annual, proactive borrower communication about PSLF progress and requirements.
- Provide greater transparency to borrowers whose applications are denied, including the requirement to provide specific reasons why employment certifications were denied.

**Additionally, we urge the department to adopt the following proposals to the PAYE and ICR programs:**

- Preserve ICR as an important safety net option, particularly for borrowers with Parent PLUS loans who have fewer repayment alternatives.
- Maintain the 10 percent discretionary income cap for monthly payments under PAYE to ensure affordability for low- and moderate-income borrowers.
- Retain PAYE's 20-year forgiveness timeline for borrowers who maintain good standing and consider reducing the 25-year forgiveness timeline to 20 years.
- Allow Parent PLUS borrowers to directly enroll in a modernized ICR plan without the additional step of consolidating loans.

Thank you for the opportunity to share our views. We look forward to working with the Department to strengthen programs and policies that support the educational pathway of the future healthcare workforce. If you have any questions or require further information, please contact David Bergman, JD, Senior Vice President of Government Relations and Affairs, at (301) 968-4174 or dbergman@aacom.org; or John-Michael Villarama, MA, AOA Vice President of Federal Affairs and Public Policy, at (202) 349-8748 or jvillarama@osteopathic.org.

Respectfully,

Robert A. Cain, DO, FACOI, FAODME
AACOM President and CEO

Teresa A. Hubka, DO, FACOOG (dist.)
AOA President

ED_01048

Regulations.gov



An official website of the United States Government. 🇺🇸

## Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

Comment

See attached file(s)

Attachments  1

File  NLADA_PSLF Comment 5.5.25
PDF
Icon              Download Icon  Download

**Comment ID**
ED-2025-OPE-0016-0814

Shape  **Tracking Number**
mab-gv5v-8w41

ED_01049

Regulations.gov



**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



file:///C/...s/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ED-2025-OPE-0016-0814_Comments.html[5/23/2025 3:13:09 PM]

ED_01050



May 5, 2025

Office of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202
*Submitted electronically via regulations.gov*

> **Re:** **Comments in response to Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee (Federal Register Document 2025-05825; Docket ID ED-2025-OPE-0016)**

The National Legal Aid & Defender Association (NLADA) respectfully submits these comments in response to the Department of Education's announcement of its intent to establish a negotiated rulemaking process to make changes to, among other programs, Public Service Loan Forgiveness.

**NLADA urges the Department to maintain the PSLF program and continue to make IDR plans accessible and available to borrowers working toward PSLF.**

NLADA is America's oldest and largest nonprofit association devoted to excellence in the delivery of legal services to those who cannot afford counsel. We represent over 700 organizations, comprised of thousands of attorneys and legal workers, that provide civil legal aid and public defense services. For more than a century, we have connected and supported people across the country committed to justice for all, and count among our membership representatives from the low-income communities most impacted by the access to justice crisis in this country (those who cannot afford counsel). We are active in national discussions with our civil legal aid and public defender membership, peer organizations, government agencies, and client communities, which work every day to ensure safety and stability for people in every area of the country.

**PSLF is essential and effective.**

NLADA objects to any action to narrow the definition of "qualifying employer" in determining PSLF eligibility. The PSLF program works, and it is essential to ensuring that people across the country – in rural, suburban, and urban areas alike – can access quality legal services, which lay the foundation for safe and stable lives, and protect liberty. The PSLF program was created with and continues to enjoy bipartisan support in Congress because it strengthens communities in all parts of the country, especially in rural areas where civil legal aid organizations, public defender offices, local governments, and other public service entities rely on PSLF to recruit and retain staff.



ED_01051

Without PSLF, the expenses of higher education, particularly graduate programs, which are required for many professions, including law and social work, would make it impossible for many of these essential providers to enter and remain in lower-paying public service jobs in rural areas.

**PSLF works because repayment plans are affordable and accessible.**

Accessible and affordable payment options through IDR plans make it feasible for public servants to pay down their loans (based on income), while working toward forgiveness. Civil legal aid and public defense would not be financially viable career paths for many lawyers, social workers, and other support staff who are essential to the delivery of these services.

**The continued functioning of PSLF is critical to the ability of legal aid organizations and public defense service providers to do their jobs effectively and keep our court systems efficient and accountable.**

In 2017, NLADA conducted a survey of over 3,000 individuals working in civil legal aid and public defense to understand better the importance of PSLF for provision of legal services to those who cannot afford counsel.[1] Findings include:

- **81 percent** of respondents who were aware of PSLF at the time that they started their current position said that they were significantly influenced by the promise of loan forgiveness, and **51 percent** indicated that they were not likely or certain not to have taken their positions if PSLF had not existed, with 30 percent saying they were only somewhat likely to have taken their positions.[2]
- **71 percent** of respondents who were the top executive at their organization considered PSLF to be a highly important tool for retaining experienced staff, and almost two thirds believed it was important for attracting new hires.[3]
- **More than half of respondents said they would be very likely or certain to leave their jobs if PSLF did not exist.**[4]
- Many respondents indicated that PSLF is the only reason they can afford to remain in public service and also look forward to home ownership, starting a family, or saving for retirement.[5]

Without PSLF and IDR, countless veterans, seniors, and wrongfully accused individuals would not have the legal assistance to help them navigate complex systems that affect basic aspects of life, including employment, shelter, and liberty. They simply would not have a fair chance understanding complex government regulation, avoiding eviction by large corporate landlords, or facing criminal prosecution. Civil legal aid and public defense providers bear the responsibility of helping individuals going through the hardest times of their lives to succeed against otherwise narrow odds, and for many, that service is only possible through PSLF.

**PSLF makes our communities stronger by ensuring the availability of legal aid and public defense.**

Three out of every four low-income households experience at least one civil legal problem per year, including consumer issues, health care, housing, and income maintenance.[6] 55 percent of low-income Americans who experienced a civil legal problem said these problems substantially impacted their lives, including by affecting their finances, mental and physical health, safety, and relationships.[7] Roughly 80 percent of people who are accused of crimes rely on public defenders because they cannot afford to pay private defense attorneys.[8]



ED_01052

**In summary, we urge the Department to continue the PSLF program and the IDR payment options that make payments affordable.**

People in communities across America rely on the civil legal aid and public defense services that PSLF makes possible.

Thank you for your consideration of our comments. Please reach out to Radhika Singh (r.singh@nlada.org), Vice President, with any questions about this comment. We welcome the opportunity to further discuss the role of PSLF in ensuring safety and stability in America.

Respectfully submitted,

Radhika Singh
Vice President, Civil Legal Services
& Strategic Policy Initiatives

Michael Mrozinski
Chief, Community-Focused Initiatives & Policy

---

[1] NLADA, PUBLIC SERVICE LOAN FORGIVENESS AND THE JUSTICE SYSTEM: HOW ELIMINATING PSLF WOULD HARM AMERICAN COMMUNITIES (2017), https://www.nlada.org/pslf-and-justice.
[2] *Id.* at 5.
[3] *Id.*
[4] *Id.*
[5] *Id.* at 6.
[6] LEGAL SERVS. CORP., THE JUSTICE GAP: THE UNMET CIVIL NEEDS OF LOW-INCOME AMERICANS 8 (2022), https://justicegap.lsc.gov/the-report.
[7] *Id.*
[8] Leonard Willis, *Access to Justice: Mitigating the Justice Gap*, AM. BAR ASS'N (Dec. 3, 2017), https://www.americanbar.org/groups/litigation/resources/newsletters/minority-trial/access-justice-mitigating-justice-gap; CAROLINE WOLF HARLOW, BUREAU OF JUST. STATS., OFF. OF JUST. PROGRAMS, U.S. DEP'T OF JUST., NCJ 179023, DEFENSE COUNSEL IN CRIMINAL CASES 1 (2000), https://bjs.ojp.gov/content/pub/pdf/dccc.pdf.



ED_01053



ED_01054



Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Document Subtype**

Comment(s)

**Received Date**

May 4, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                    Support
API Requests   |   FOIA



Monday, May 5, 2025

James P. Bergeron
Acting Under Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC, 20202
*Via Regulations.gov*

Re: **Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee, Docket ID ED-2025-OPE-0016**

Dear Acting Under Secretary Bergeron:

Community Legal Services of Philadelphia, on behalf of its low-income clients, submits this comment in response to the Department of Education's announced intention to establish negotiated rulemaking committees on regulations under Title IV of the Higher Education Act, especially pertaining to critical federal student loan repayment and discharge options, including Public Service Loan Forgiveness (PSLF) and Income-Driven Repayment (IDR) programs. Based on our decades of experience defending thousands of low-income consumers each year, we urge the Department of Education to maintain the PSLF and IDR programs.

> **I.    CLS offers this letter based on our experience representing thousands of low-income consumers facing barriers to financial security.**

Community Legal Services (CLS) of Philadelphia provides legal representation to about 10,000 people every year when they are facing some of their most difficult life circumstances, such as the threat of losing their home, income, healthcare, and in some instances even their families. CLS was founded in 1966 by the Philadelphia Bar Association. Since its inception, CLS has provided free civil legal assistance to more than one million low-income Philadelphians. This letter urging the Department of Education to maintain PSLF and IDR programs is rooted in our client work and our commitment to removing inequitable barriers to financial security for the communities that we serve.

> **II.   CLS strongly urges the Department of Education to maintain all critical federal student loan repayment and discharge options, including Public Service Loan Forgiveness (PSLF) and Income-Driven Repayment (IDR) programs.**

Our country is in the midst of a student loan crisis. Over the past several decades, public investment in higher education through funding directly to institutions has steadily declined, replaced by a system that shifts the burden of rising costs directly on students and their families



through federal student loans. Students continue to seek higher education as a critical pathway to opportunity but are too often met with the crushing burden of student loan debt that leaves families in deep financial hardship. The Department of Education's own projection is that 25% of the federal student loan portfolio will be in default by later this year,[1] putting millions of families at risk of economic hardship through wage garnishment, tax offset, and social security offset, all without a court order. In our experience representing low-income borrowers, repayment programs authorized under Title IV, including IDR and PSLF, are critical to avoiding default and offering a path to financial security.

In the city we serve, about 310,000 Philadelphians owe $11.6 billion in student loan debt, and prior to the moratorium on student loan collections during the COVID-19 pandemic, about one in five adult Philadelphians were either delinquent or in default on their student loan debts.[2] IDR programs, including ICR and PAYE, as well as PSLF for public service workers, are a critical yet underutilized lifeline for thousands of low-income Philadelphians who are saddled with unaffordable student loan debt. The IDR and PSLF programs play a critical role in helping Philadelphian families avoid and get out of delinquency and default.

Prior to the pause on student loan payments, CLS would routinely see clients in deep financial distress—unable to afford food, medication, or rent—because their limited Social Security benefits, wages, or tax refunds were garnished due to defaulted federal student loan debt. In those situations, CLS' advocacy helping clients enroll in IDR programs and PSLF for public service workers provided a lifeline for long-term affordability.  CLS clients, most of whom are under 187% of the federal poverty line, typically qualify for income-driven monthly payments of $0-$25 and loan discharge after 20 to 25 years under IDR plans, or 10 years under PSLF.

The federal student loan system is difficult to navigate, especially for first-generation college students and their families. Too often, borrowers who are eligible for IDR and PSLF are left with unaffordable monthly payments because they were not made aware of their right to enroll in these programs and were instead steered into short-term forbearances that did nothing to address long-term affordability. However, with help from a CLS advocate, our clients typically have been able to navigate the system, enroll in affordable payment plans, and obtain relief. Their stories show both the devastating consequences of lack of access to IDR and PSLF and the transformative impact of these programs for American families:

---

[1] *U.S. Department of Education to Begin Federal Student Loan Collections, Other Actions to Help Borrowers Get Back into Repayment*, U.S. Department of Education (April 21, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-begin-federal-student-loan-collections-other-actions-help-borrowers-get-back-repayment.
[2] Anna Tranfaglia, *Student Loan Debt in Philadelphia*, Federal Reserve Bank of Philadelphia (May 2020), https://www.philadelphiafed.org/-/media/FRBP/Assets/Community-Development/Reports/Student-Loan-Debt-in-Philadelphia.pdf.



- Ms. J.R. came to CLS at the age of 57. She had been struggling with the student loan debt that she took out to attend a trade school that closed a few years after she left the program. The school had a track record of student complaints about the quality of their program. Like so many borrowers, Ms. J.R. had the debt but not the degree. For years, she had informed her loan servicer that she was struggling to make her payments. Instead of enrolling her in an income-driven repayment plan, her servicer placed her in a series of temporary payment forbearances causing her loan balances to increase dramatically. Her CLS advocate helped her enroll in an IDR plan, and she later qualified for complete loan forgiveness under the IDR plan. She described the relief as transformative: "I feel like a weight has lifted from my chest. I can finally exhale. I prayed for relief, and I am so glad I finally found it."

- Mr. D. sought legal help from CLS because he had approximately $50,000 in Parent PLUS loans in his name that he took out to help his child become the first in their low-income family to graduate from college. Like many parents, Mr. D. takes great pride in helping his child receive the higher education necessary to obtain economic opportunities that he did not have himself. However, he is now saddled with debt that he cannot afford to pay on his very limited income. Without access to the option to apply for ICR—the only repayment plan available for Parent PLUS borrowers—as was the case for much of February and March of this year, Mr. D. will fall into default, leaving him without income sufficient to meet his basic needs.

- Ms. R.R. sought legal help in saving her family home from foreclosure. Her mother had passed away and a reverse mortgage remained on the home. Ms. R.R. could not qualify for her own mortgage because of her high monthly student loan payments. While she had worked for years in public service, she was not on the most affordable repayment plan and had not been able to successfully apply for Public Service Loan Forgiveness. With the help of CLS, Ms. R.R. enrolled in an IDR plan, completed the required PSLF paperwork, and obtained forgiveness of her federal student loans because she had worked for non-profit organizations for over ten years while making student loan payments. As a result, she was able to qualify for a mortgage and keep her family home, securing both housing and financial stability.

As these clients' stories illustrate, IDR and PSLF programs are promised pathways to managing student loan debt that can transform lives. We urge the Department to retain the existing IDR and PSLF programs and to take steps to ensure that loan servicers are effectively managing these programs, including correctly advising borrowers about their options and enrolling them in the plans that meet their needs.

While the current IDR and PSLF regulations are complex, they establish a workable and transparent framework consistent with Congress' design. For more than 30 years, student loan borrowers have been promised access to IDR plans that allow them to repay their loans based on



their income and household size with any remaining balance to be forgiven after 20- 25 years. In addition, public service workers qualify for forgiveness under a shorter 10-year repayment period for PSLF. These assurances were made not only by statute and regulations but also the loan contracts themselves. These promises must be kept.

IDR and PSLF programs also are critical for honoring the promise of higher education being a path to opportunity and financial security for all. We know that the student loan debt burden is not carried equally. Pennsylvanians between the ages of 50 and 61 owe the most per borrower of any age group.[3] And in Philadelphia, as across the United States, poor, Black and Brown, non-traditional student, and parent borrowers are most likely to suffer the most punishing consequences of delinquency and default.[4] Retaining the availability of IDR and PSLF programs can help reduce the disparities in student loan delinquency and default and ensure access to basic life-affirming necessities, like food, medical care, and housing.

### III.    Conclusion

We urge the Department of Education to maintain the current scope of the IDR and PSLF programs. Any steps to reduce the scope or eliminate IDR and PSLF will financially destabilize millions of families across the United States. As advocates who work with families experiencing poverty in Philadelphia every day, we know that crushing debt loads, including federal student loans, are a major social determinant of health; these programs save lives. We appreciate this opportunity to share our expertise and are available for further conversation.


Respectfully submitted,

Tamar Hoffman
Staff Attorney
Community Legal Services
thoffman@clsphila.org
(267) 443-2675

Kerry Smith
Divisional Supervising Attorney
Community Legal Services
ksmith@clsphila.org
(215) 981-3724

---

[3] Federal Student Loan Portfolio, available at https://studentaid.gov/data-center/student/portfolio.
[4] Tranfaglia, *Student Loan Debt in Philadelphia*.

Regulations.gov



ED_01060

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                      Support
API Requests   |   FOIA

ED_01061



May 5, 2025

Mr. James Kvaal
Assistant Secretary for Postsecondary Education
U.S. Department of Education                    Docket ID: ED-2025-OPE-0016
Office of Postsecondary Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

Dear Mr. Kvaal,

Thank you for the opportunity to provide comments about possible changes to Title IV of the Higher Education Act and the establishment of a negotiated rulemaking committee.

The Association of Schools and Colleges of Optometry (ASCO) is the academic leadership organization committed to advancing optometric education and research to enhance the health and well-being of the public. Since 1941, ASCO has pursued this mission by representing the interests of institutions of optometric education and by enhancing the efforts of these institutions as they prepare highly qualified graduates for entrance into the profession of optometry in order to best serve the public's eye and vision needs. ASCO proudly represents all accredited schools and colleges of optometry in the United State, serving all students pursuing a career in optometry.

We offer the following perspectives for consideration by the Department and by the participants in the negotiated rulemaking:

**Uniqueness of health professions education**
The ecosystem of higher education consists of many different programs, institutions, and missions. For the members of ASCO, the primary goal is to recruit the best and brightest possible students to a program that will properly educate them to become competent and caring health care professionals who will enhance the eye and vision health of their patients.

Every day, doctors of optometry serve as primary care physicians who diagnose and treat their patients for a wide range of systemic medical conditions such as glaucoma, diabetes, macular degeneration, dry eye, and high blood pressure, among others, in addition to helping millions to see better by prescribing ophthalmic glasses and contact lenses. Vision is the number one sense that patients fear losing the most, so doctors of optometry add substantially to quality of life for those suffering from myopia, presbyopia, and other conditions of the eye.

Like many other health professions, the practice of optometry requires substantial, doctoral-level education and clinical experience over four years post-baccalaureate before a candidate qualifies for licensure. Some optometry students also choose to pursue a one-year residency to further their clinical skills, often in areas of further specialization, and to conduct research to further the

**Association of Schools and Colleges of Optometry**
**May 5, 2025**
**Page two**

body of medical knowledge in the field. Despite its length, the program is quite intensive, leaving little or no time for other revenue-generating activities.

Offering this highly specialized education requires large investments in clinical and educational facilities, technology, equipment, qualified faculty, and other infrastructure. The average cost of education runs from a low of $37,519 per year for in-state tuition to public institutions up to $53,146 per year for out-of-state students for each of the four years of training. It represents a large investment by students in both money and time (time that could be otherwise spent starting another career and producing income for the family). In fact, the average indebtedness for professional and graduate schooling of those optometry students with debt in 2023-2024 was $198,824. Still, thousands choose to invest their time because the profession meets their desire to serve humanity and meet an important societal need, while promising a lucrative return on the investment. Studies done by the American Optometric Association have shown that the average doctor of optometry earns $168,193 per year. Graduates are highly employable due to practitioner shortages in many parts of the country, particularly in rural areas. Starting salaries for those graduates going to work for an already-established practice or entity have increased substantially in the last 5 years, and it is not unusual for signing bonuses and other incentives to be offered along with a regular salary.

Thus, optometry graduates are relatively well-paid for their financial investments in continued schooling and their forbearance of income-producing years. To our knowledge, the healthy pay scale for new optometry graduates results in a very minimal loan default rate.

There are some graduates, however, who choose to pursue special practice modalities or working environments where the pay scale isn't quite as generous. For those graduates who opt to dedicate all or some of their professional life to conducting research to improve patient care, to work in academia to educate the next generation of practitioners, or to work in non-profit clinical settings serving typically-underserved patients, the ability to repay their student loans may become a financial hardship, preventing them from investing in the typical life experiences such as buying a home, starting a family, or opening up a new practice. For these graduates, programs like the Public Service Loan Forgiveness program are safety nets that make their career choices much more sustainable.

The choices we describe here are not unique among students pursuing a career in most health professions. Like all health care, the profession of optometry is worried about from where future eye care practitioners will come. Couple the already-existing shortage of optometrists across the country with an increasing need for care by an aging population, the anticipated cliff in undergraduate enrollment, and the increasing challenges facing international students interested in taking their training and working in the U.S. post-graduation, and our nation is at a tipping point for a substantial downturn in accessibility to important life-saving health care that supports the country's productivity and well-being.

ED_01063

**Association of Schools and Colleges of Optometry**
**May 5, 2025**
**Page three**

## Impacts of recent policy considerations

The decreasing number of students pursuing and completing their four-year undergraduate degrees isn't the only hurdle the health professions face when it comes to supplying the nation's cadre of top-notch health care practitioners.

The many discussions in the public arena about the challenges of student loan debt, the possibility of program cancellation, and general economic uncertainties are giving students pause about making the commitment to pursue a healthcare career.

Those students who remain dedicated to this career path are hesitant to make plans based on government-supported financial aid programs that may not be available when it comes time for them to use them.

Students in the middle of their studies are concerned about lack of sufficient funding to enable them to finish their education.

Graduates already committed to working in non-profit positions in the field who felt comfortable doing so because the PSLF program promised to help them pay down their loans are now fearful that the decisions they made were based on promises that the federal government no longer plans to fulfill.

Many prospective students are opting out of degrees that require longer training times, and some are going so far as to postpone or forego an undergraduate degree, a necessary precursor to a career in optometry and many health professions.

The impact of a smaller student body in the optometry profession will mean an increasing number of Americans will have access to critical eye and vision care.

## Committing to a Simplified Financial Aid Program
ASCO supports the goal of simplifying the nation's federal financial aid system with the intent of serving students with a consistent and well-managed set of expectations and processes by reducing administrative burdens and promoting innovation without compromising important safeguards. The current menu of programs has developed over time to produce a wide variety of eligibility requirements, payment calculations, and forgiveness timelines, causing confusion for students and parents.

The process of simplifying the department's programs must come with a commitment to meet the obligations already made to current students, who have made life-changing decisions about their education and intended careers based on current program promises. Changing the rules mid-stream for these students will not only carry huge repercussions for these students' ability to continue their course of study and their career plans, but will also demonstrate to younger generations whether they can trust that these programs will be available to them in the future.

ED_01064

**Association of Schools and Colleges of Optometry**
**May 5, 2025**
**Page four**

**The Public Service Loan Forgiveness (PSLF) program**

The PSLF program benefits students, graduates, and communities across the country by providing graduates a path forward for funding their education while pursuing a career goal that will eventually provide important service to society but offers lower compensation than jobs in the private sector. A well-functioning PSLF program is a lifeline that is helpful in attracting and retaining needed professionals — such as teachers, health care providers, and social workers, especially in underserved areas like rural communities that face challenges filling these roles.

The PSLF program requires graduates to make a minimum 10-year commitment to a public service career, a significant decision both financially and career-wise. Changing the program rules, such as the definition of a qualifying employer, will have devastating impacts on borrowers actively pursuing qualification and will discourage students from pursuing careers in these fields that are so critically important to society. It is only fair that PSLF program rules remain consistent and not subject to frequent changes.

Similarly, the Department should maintain a consistent and objective definition of qualifying employers, protected from swaying political opinions, to enable PSLF to continue to achieve its goals without discouraging talented individuals from pursuing or staying public service careers. Laws and processes already exist that provide sufficient mechanisms for determining whether organization exists for an illegal purpose; this is not something the Department needs to attempt to duplicate or modify through the PSLF program.

There are severe negative repercussions to constantly-changing regulations, such as years of litigation, confusion about program requirements, and reluctance by students to continue their professional education. None of these are outcomes the Department should foster.

**Graduate PLUS Loans**

The Graduate PLUS Loan Program provides the necessary access to funding for approximately half of the students pursuing a career as a doctor of optometry. Without the availability of funding made available through the Graduate PLUS Loan Program, this education would not be feasible. Given the shortages that already exist in the workforce, sustaining and strengthening this program is essential to ensuring the capacity of our country's healthcare system, and in fact, the program was developed in 2006 to provide a cost-effective strategic investment in building and sustaining the healthcare workforce from among our own citizenry. The health of our nation's populace depends upon every aspiring doctor of optometry getting a fair chance at the necessary education – regardless of their economic background. Eliminating or restricting this critical loan program would undermine patients' ability to get the care they need. Instead, our country should be looking for ways to address shortages within the healthcare workforce by expanding access to practitioner education. By doing so, the government also supports a highly trained workforce that contributes more to the federal treasury through higher income taxes over the course of the practitioner's lifetime and provides higher interest payments to the treasury over the lifetime of repayment (as compared with undergraduate educational loans).

**Association of Schools and Colleges of Optometry**
**May 5, 2025**
**Page five**

**Pay As You Earn (PAYE) and Income-Contingent (ICR) Plans**
Keeping borrowers in repayment – an important goal for federal student loans – means addressing the unforeseen. Graduates anticipate being able to pay their loans back according to prescribed schedule, but sometimes life circumstances will get in the way – whether they happen to be caused by health challenges, unanticipated unemployment, economic downturns, etc.

Income-contingent repayment plans within the federal student loan programs are both beneficial and essential, as they offer manageable monthly payments based on income and family size, coupled with a reasonable repayment term after which remaining loan balances are forgiven, providing borrowers with essential protection against overwhelming lifetime debt and potential default.

Plans for revising IDR plans should incorporate these core elements of affordability and eventual forgiveness.

**Gainful Employment (GE)/Financial Value Transparency (FVT)**
The Department should streamline the GE/FVT regulations to lessen the administrative burden to optometry schools and colleges for providing student level detail without sacrificing transparency. ASCO supports the goals of increasing transparency about the value of higher education but believes the level of granularity in the data reporting called for in the regulations causes undue hardship on educational institutions and greater risk around student data privacy.

**Summary**
ASCO member institutions are grateful for the opportunity to share our thoughts on the current Title IV programs and the Department's intent to review and propose new regulations with the support of a negotiated rulemaking committee. We stand ready to provide any additional comments or information, should you have any questions.

Sincerely,

Fraser Horn, OD, FAAO                          Dawn Mancuso, MAM, CAE, FASAE
President                                       Executive Vice President & CEO

Regulations.gov



An official website of the United States Government.

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

| Comment |
| --- |

Please see comment letter attached.

| Attachments ⓵ |
| --- |

File
PDF
Icon — City and County Comment - Docket ID ED-2025-OPE-0016

Download Icon  Download

| Comment ID |
| --- |
| ED-2025-OPE-0016-0817 |

| Shape | **Tracking Number** |
| --- | --- |
|  | mab-t1k4-pccy |

file:///C/.../s/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ED-2025-OPE-0016-0817_Comments.html[5/23/2025 3:16:52 PM]

ED_01067

Regulations.gov



| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Comment(s)

**Received Date**
May 4, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |                              Support
API Requests    |    FOIA

ED_01068

May 5, 2025

James P. Bergeron
Acting Under Secretary, U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re: Docket ID ED-2025-OPE-0016**

The undersigned cities and counties write in response to the U.S. Department of Education (ED)'s intent to begin a negotiated rulemaking process to propose changes to student aid regulations, including those governing Public Service Loan Forgiveness (PSLF) and Income-Driven Repayment (IDR). These programs are crucial resources for borrowers in our communities, and directly support the ability of cities and counties to recruit and retain public service workers. We urge ED not to limit access to debt relief options for public service workers and raise payments for low-income borrowers, which would deal a punishing blow to millions of families, destabilizing local economies and increasing demand for public benefits and services.

Nationally, 43 million borrowers owe $1.6 trillion in student loan debt. This crisis has reached every city, town, and neighborhood across the country, hurting local economies and labor markets. Student debt is driving shortages in critical professions, including teachers, nurses, and other public servants who make our cities work. Postsecondary success is crucial to support economic mobility and strong local economies where our communities can thrive. Yet far too many student loan borrowers struggle with their debt.

At this moment, in the midst of economic turmoil, our residents with student debt need access to a student loan repayment system that is accessible, affordable, and fair. On behalf of our residents with student loan debt, their families, and our communities, we submit the following comments:

1.     **Any efforts to restrict PSLF would harm workers and public service employers, including local governments facing workforce shortages – and any such changes would require congressional action.**

We were troubled to see President Trump's March 7th Executive Order directing ED to issue new regulations aimed at restricting eligibility for PSLF from employers engaging in work that the Administration disagrees with.[1] We are particularly concerned that the President's overly broad executive order and ED's announced intent to begin the rulemaking process could result in millions of public service borrowers – including local and state government workers as well as nonprofit workers who are a lifeline for many in our communities – losing access to PSLF or being disincentivized from working in public service. Congress authorized the PSLF program in 2007 and established clear eligibility requirements in the Higher Education Act. Any effort to

---

[1] https://www.whitehouse.gov/presidential-actions/2025/03/restoring-public-service-loan-forgiveness/

narrow eligibility requirements to penalize organizations based on their activities, mission, or associations is a clear violation of the statute and could also be construed as an unlawful restriction of speech or association under the First Amendment of the U.S. Constitution.

Our teachers, social workers, firefighters, police officers, nurses, and all public service workers deserve better than this. PSLF is based on the idea that borrowers who make 10 years of loan payments, and who often forgo higher wages in the private sector, can avoid a lifelong debt sentence. Stripping away this vital debt relief would be cruel and harmful, raising costs for working people and undermining the ability of local governments and nonprofits to fill urgently-needed public sector jobs.[2]

2. **Weakening Income Driven Repayment Options could increase monthly payments for millions of borrowers, potentially trapping them in a lifetime of debt.**

For more than 30 years, student loan borrowers have had the right under the Higher Education Act to tie their monthly student loan payment to their income, and to have their remaining debt forgiven after an extended period of repayment. Congress explicitly authorized these critical protections recognizing the affordability crisis facing millions of borrowers with student loan debt. Today, more than 13 million Americans are enrolled in an IDR plan and rely on this key safety net program to affordably repay their student loans.[3]

Eliminating or dramatically reshaping IDR plans, specifically the Pay as You Earn (PAYE) and Income Contingent Repayment (ICR), by altering payment formulas and eliminating interest subsidies would significantly increase monthly payments for American families already struggling to cover the rising costs of other everyday goods in our communities. Further, any effort to eliminate the time window for loan forgiveness could trap many of our lowest income residents in a lifetime of debt. This would be broadly harmful for borrowers and for our local economies.

3. **Millions of student loan borrowers are headed towards a default cliff. The Department must strengthen the student loan safety net and ensure that debt relief remains accessible.**

For the first time in four-and-a-half years, millions of student loan borrowers will soon feel the harmful economic penalties of student loan default once again. According to federal data, more than 5.5 million borrowers are in line to begin receiving collection notices at any moment,[4] and

---

[2] https://www.route-fifty.com/workforce/2024/03/can-student-debt-relief-attract-workers-state-and-local-government-jobs/394733/

[3] https://studentaid.gov/data-center/student/portfolio

[4] https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls

nearly 10 million additional borrowers are at least 30 days past due on their payments.[5] Student loan defaults are extremely costly and damaging for borrowers, and have a ripple effect on local communities, which can cause lasting damage to the economy as a whole.

We urge ED not to make any changes that could limit access to affordable repayment options or make repaying student loans more expensive. Student loan borrowers are already confused, scared, and don't know where to turn for help.  Our communities cannot afford to have the federal government turn a blind eye to this suffering; we must provide fair, affordable, and accessible relief to student loan borrowers.

With the last of the pandemic-era protections set to expire over the next six months, it is more urgent than ever before to provide borrowers with a student loan system capable of delivering payment relief and debt forgiveness. For the sake of our communities, we urge you to protect PSLF and IDR repayment plans like PAYE and ICR – and we strongly oppose any reforms that would undermine these vital, and lawful, protections.

Respectfully,

Quinton D. Lucas
Mayor
City of Kansas City, MO

Rue Landau
Councilmember-At-Large
City of Philadelphia

Michelle Wu
Mayor
City of Boston, MA

Tiffany Cabán
Council Member, District 22
New York City

José Cisneros
Treasurer
City and County of San Francisco, CA

Danny Cage
Director
Multnomah County Education Service District

Orlando Rendon
Executive Director
City of Philadelphia
Office of Community Empowerment and
Opportunity

Delia Garza
Travis County Attorney on behalf of Travis County, TX

---

[5] https://libertystreeteconomics.newyorkfed.org/2025/03/credit-score-impacts-from-past-due-student-loan-payments/

Regulations.gov



An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

| Comment |
| --- |

On behalf of the Council of Regional Accrediting Commissions (C-RAC), please find the attached comments on the Negotiated Rulemaking for Higher Education 2025-2026.

| Attachments 1 |
| --- |

File 2025-05-05 C-RAC Negotiated Rulemaking Public Hearing Comment.docx - Google Docs
PDF
Icon                Download Icon  Download

| Comment ID |
| --- |
| ED-2025-OPE-0016-0819 |

| Shape | Tracking Number |
| --- | --- |
| | mae-h7l7-m24v |

ED_01072

Regulations.gov



| Comment Details | Submitter Info |
|---|---|

**Document Subtype**
Comment(s)

**Received Date**
May 6, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                    Support
API Requests   |   FOIA

ED_01073

# Council of
# Regional Accrediting Commissions

May 7, 2025

James Bergeron, Acting Under Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Dear James:

The Council of Regional Accrediting Commissions (C-RAC) submits these comments in response to the invitation for public feedback on the Department's intent to establish negotiated rulemaking to prepare proposed regulations on various programs authorized under title IV of the Higher Education Act of 1965, as amended (HEA) (title IV, HEA programs). Dr. Heather F. Perfetti, Chair of C-RAC, delivered comments on our behalf at the public hearing on April 29, 2025.

As you know, C-RAC's seven federally recognized institutional accrediting commissions are responsible for accrediting almost 2,800 postsecondary, degree-granting colleges and universities in the United States. These include over 1,500 public, 1,100 private non-profits, and nearly 100 private for-profit institutions. Accrediting commissions are private, nonprofit organizations and provide oversight and accountability of diverse institutions, including faith-based institutions, minority-serving institutions (MSI), community colleges, research universities, and tribal colleges, among others. The commissions and peer evaluation teams at the heart of the accrediting enterprise are made up of volunteers, and at least one of every seven commissioners is a representative of the public.

Members of C-RAC include the Accrediting Commission for Community and Junior Colleges (ACCJC), Higher Learning Commission (HLC), Middle States Commission on Higher Education (MSCHE), New England Commission of Higher Education (NECHE), Northwest Commission on Colleges and Universities (NWCCU), Southern Association of Colleges and Schools Commission on Colleges (SACSCOC), and WASC Senior College and University Commission (WSCUC).

The Department's intent to establish negotiated rulemaking including topics which aim to "streamline current federal student financial assistance program regulations while maintaining or improving program integrity and institutional quality" fall squarely in the realm of accreditation under Part H of Title IV of the Higher Education Act. We look forward to being part of discussions which examine how current regulations may be inhibiting innovation and contributing to rising college costs. We have long noted that too often regulations have been promulgated without full consideration of their cost to relative benefit. C-RAC has much to offer in ways to address these and other issues by streamlining or eliminating unnecessary regulatory processes that are not otherwise required by law.

While regulatory changes are welcome and necessary, we want to highlight that innovation is flourishing at institutions across our nation. In fact, accreditors consistently encourage and

facilitate innovative ideas, with more recent examples including the leveraging of Artificial Intelligence to improve the ability of students to transfer credits, supporting 3-year degrees, and working with institutions to embed workforce-driven micro credentials into their programs.

Nonetheless, institutions and accreditors would benefit from reduced regulatory burden in some areas to both allow for more innovation while also addressing issues of cost. We want to draw attention to several specific areas as examples:

1. **The recognition and renewal process of accreditors**. Aspects of current regulations could be streamlined to facilitate the recognition of new accreditors while holding all accreditors to the same standards and expectations. Reviewing the current process of renewal could also result in a more streamlined and efficient system.
2. **Institutions changing accreditors**. The Higher Education Act has for decades allowed institutions to move from one accreditor to another. However, recent regulations as well as sub-regulatory guidance have led to confusion and at times lengthy delays in this process. We appreciate that the Department has reviewed existing policies and actions to better streamline this process, and we issued a statement in support of the Dear Colleague Letter released on May 1, 2025, which you can find here.
3. **Re-examining definitions.** Definitions of "distance education," "competency-based education," and "credit-hour" should be reexamined to determine the extent to which current regulations inhibit innovation in any of these areas.
4. **Providing increased flexibility regarding substantive change.** Current regulations require accreditors to approve a wide variety of actions considered as "substantive changes." Accreditors should be provided more flexibility to determine when such approvals are actually necessary to prevent superfluous and costly reviews.

As in past negotiated rulemaking efforts, C-RAC welcomes the opportunity to participate in a full review of current regulations to ensure consistency with the Higher Education Act. We appreciate the opportunity to share our input and help the Department drive quality, ensure accountability, and protect students through sound federal policy. We look forward to working with the Department to address these and other issues, and we thank you for the opportunity to share the position of C-RAC.

Please contact the Chair of C-RAC, Dr. Heather F. Perfetti, by phone at (267) 284-5026 or by email at hperfetti@msche.org if we can provide additional information.

Sincerely,

Dr. Heather F. Perfetti
C-RAC Chair
President, Middles States Commission on Higher
Education (MSCHE)

Dr. Jeff Fox, Interim President
Northwest Commission on Colleges and
Universities (NWCCU)

ED_01075

Dr. Mac Powell
C-RAC Vice-Chair
President, Accrediting Commission for Community
and Junior Colleges (ACCJC)

Dr. Barbara Gellman-Danley, President
Higher Learning Commission (HLC)

Dr. Lawrence M. Schall, President
New England Commission of Higher Education
(NECHE)

Dr. Belle Wheelan, President
Southern Association of Colleges and Schools
Commission on Colleges (SACSCOC)

Dr. Maria Toyoda, President
WASC Senior College and University
Commission (WSCUC)

3

ED_01076

Regulations.gov



An official website of the United States Government.

## Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

Comment

On behalf of the borrowers and families we serve, thank you for the opportunity to provide the attached initial comments specific to student loan repayment plans.

Sincerely,

CBA, EFC, NASLA, NCHER, SLSA

Attachments 1

File Negotiated Rulemaking Public Comments CBA EFC NASLA NCHER SLSA May 7 2025
PDF
Icon
Download Icon  Download

Comment ID
ED-2025-OPE-0016-0821

file:///C/...s/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ED-2025-OPE-0016-0821_Comments.html[5/23/2025 3:18:35 PM]

ED_01077

Regulations.gov



Shape  **Tracking Number**
mae-kqxi-n5s1

**Comment Details**     **Submitter Info**

**Document Subtype**
Comment(s)

**Received Date**
May 6, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                    Support
API Requests   |   FOIA

ED_01078

  

 

May 7, 2025                                    Via Email: www.regulations.gov

Mr. James P. Bergeron
Acting Under Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

Re:  DOCKET ID ED-2025-OPE-0016 – Response to the Intent to Receive Public Feedback for the
Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

Dear Mr. Bergeron:

As the trade associations representing the lenders, servicers, and/or guaranty agencies in the
Federal Family Education Loan (FFEL) program, thank you for the opportunity to provide initial
comments to the Department of Education's intent for the development of proposed
regulations and the establishment of a negotiated rulemaking committee(s). Our comments are
specific to student loan repayment plans.

CBA, EFC, NASLA, NCHER and SLSA continue to support the streamlining of student loan
repayment plans in the Direct Loan program. Consistent with past public comments, we
recommend reducing the number of income-driven repayment (IDR) plans available to
borrowers. Importantly, this must be done in accordance with the specific terms and conditions
that are supported by the Higher Education Act (HEA) of 1965 as amended. Most importantly,
the available IDR plans must be designed with borrowers in mind.

With the April 21, 2025, return to repayment announcement by the Department, borrowers
must be able to understand their repayment plans and know they can rely on the promised
terms and conditions. Borrowers also need to know there are tools available to help them
successfully repay without the risk of legal challenges that result in implementation delays and
the complete undoing of repayment plans. This is especially critical as the Department resumes
federal student loan collections and other actions to help borrowers get back in repayment. The
FFEL community stands ready to help struggling borrowers understand how to successfully
navigate student loan repayment, avoid delinquency, and recover from default.

Thank you for the opportunity to provide our initial comments. On behalf of the borrowers and families we serve, the FFEL community looks forward to participating in the upcoming loan repayment negotiated rulemaking committee process as we have done in the past.

Sincerely,

Consumer Bankers Association (CBA)
Education Finance Council (EFC)
National Association of Student Loan Administrators (NASLA)
National Council of Higher Education Resources (NCHER)
Student Loan Servicing Alliance (SLSA)

2

Regulations.gov

An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket / Document (ED-2025-OPE-0016-0001) / Comment

Comment

May 8, 2025
Linda E. McMahon, Secretary
U.S. Department of Education

Via regulations.gov

RE: Docket ID No. ED-2025-OPE-0016

On behalf of the Acupuncture and Herbal Medicine Coalition, a collaborative alliance of major national acupuncture organizations including the Accreditation Commission for Acupuncture and Herbal Medicine (ACAHM), the American Society of Acupuncturists (ASA), the Council of Colleges of Acupuncture and Herbal Medicine (CCAHM), and the National Certification Commission of Acupuncture and Oriental Medicine (NCCAOM), we appreciate the opportunity to provide feedback on the Department's negotiated rulemaking process addressing Title IV regulations.

Our organizations oversee the accreditation, certification, and professional development of thousands of licensed acupuncturists and herbal medicine practitioners, as well as a majority of the institutions that educate them. Many of these institutions participate in Title IV federal student aid programs and serve students who rely on Public Service Loan Forgiveness (PSLF) and income-driven repayment (IDR) plans, including Pay As You Earn (PAYE) and Income-Contingent Repayment (ICR), to make their education affordable.

We respectfully request the Department to consider the following:

1. Preserve and Strengthen Public Service Loan Forgiveness (PSLF) Eligibility
We recommend that the Department explicitly include licensed acupuncturists and herbal medicine practitioners

working in integrative healthcare settings within the refined definitions of qualifying employers for PSLF eligibility. The current ambiguity has prevented many qualified practitioners from accessing loan forgiveness despite providing essential healthcare services in underserved communities, community health centers, and academic institutions. Removing or narrowing definitions of qualifying employment risks cutting off debt relief for vital health professionals who play critical roles in nonprofit community health centers, integrative medical practices, and rural health clinics, directly supporting public health.

2. Maintain Access to Affordable Repayment Income-Driven Repayment Plans

Acupuncture students often pursue advanced degrees (Master's or Doctorate). Graduates may begin their careers carrying meaningful student debt, while providing essential but sometimes modestly compensated healthcare services. We emphasize the importance of robust, fair, and accessible income-driven repayment plans to support practitioner retention and public access to these services. We encourage modifications to PAYE and ICR programs to better accommodate the unique career trajectory of acupuncture and herbal medicine (AHM) professionals, who often:
-Face high initial education costs ($50,000-90,000)
-Experience a gradual income build as they obtain certification and licensure and establish their practices
-Work in mixed employment/self-employment arrangements

3. Include Institutional Accountability for Small, Specialized Schools

Many ACAHM-accredited schools are small, specialized institutions serving under 500 students with historically low cohort default rates. We ask the Department to ensure that any regulatory streamlining or institutional quality rules recognize the unique size, mission, and scope of specialized health institutions. Applying large-scale university metrics without adjustment risks disproportionately burdening small schools, ultimately harming student access and possibly limiting patient access to essential healthcare services.

4. Ensure Educational Program Accessibility

To address the Department's concern about regulations potentially "inhibiting innovation and contributing to rising college costs," we recommend:
Creating pathways for specialized healthcare programs like AHM to access Title IV funding without unnecessary administrative burdens
Developing financial aid structures that recognize the unique nature of specialized healthcare education

Conclusion

As acupuncture and herbal medicine gain increased recognition from major healthcare institutions and insurance providers, addressing these financial barriers to education and early career sustainability is essential to meet growing demand. The Bureau of Labor Statistics projects continued growth in this field, but educational debt burdens threaten to limit workforce development.

We welcome the Department's focus on improving program integrity and reducing unnecessary regulatory burden. AHMC stands ready to provide input and serve as a resource to ensure that future regulations reflect the realities and needs of complementary and integrative health education. For further communication, please contact Kristin Richeimer, CAE, Executive Director, CCAHM.

Respectfully submitted,

The AHM Coalition

Regulations.gov

Kristin Richeimer Executive Director, CCAHM
Olivia Hsu Friedman, DACM, L.Ac. Dipl.OM, Chair, ASA
Mina Larson Chief Executive Officer, NCCAOM
Mark McKenzie Executive Director, ACAHM



Attachments (1)

File
PDF
Icon   Public Comment DOE May 2025 from The AHM Coalition

Download Icon  Download

**Comment ID**
ED-2025-OPE-0016-0822

Shape   **Tracking Number**
maf-lgmp-746j

**Comment Details**                              **Submitter Info**

**Document Subtype**
Comment(s)

**Received Date**
May 7, 2025



About  Bulk Data Download  Agencies  Learn  Reports  FAQ  Commenting Guidance

Regulations.gov

ED_01084



1

May 8, 2025

Linda E. McMahon, Secretary
U.S. Department of Education

Via regulations.gov

***RE: Docket ID No. ED-2025-OPE-0016***

Dear Secretary McMahon:

On behalf of the Acupuncture and Herbal Medicine Coalition, a collaborative alliance of major national acupuncture organizations including the Accreditation Commission for Acupuncture and Herbal Medicine (ACAHM), the American Society of Acupuncturists (ASA), the Council of Colleges of Acupuncture and Herbal Medicine (CCAHM), and the National Certification Commission of Acupuncture and Oriental Medicine (NCCAOM), we appreciate the opportunity to provide feedback on the Department's negotiated rulemaking process addressing Title IV regulations.

Our organizations oversee the accreditation, certification, and professional development of thousands of licensed acupuncturists and herbal medicine practitioners, as well as a majority of the institutions that educate them. Many of these institutions participate in Title IV federal student aid programs and serve students who rely on Public Service Loan Forgiveness (PSLF) and income-driven repayment (IDR) plans, including Pay As You Earn (PAYE) and Income-Contingent Repayment (ICR), to make their education affordable.

We respectfully request the Department to consider the following:

1. Preserve and Strengthen Public Service Loan Forgiveness (PSLF) Eligibility

We recommend that the Department explicitly include licensed acupuncturists and herbal medicine practitioners working in integrative healthcare settings within the refined definitions of qualifying employers for PSLF eligibility. The current ambiguity has prevented many qualified practitioners from accessing loan forgiveness despite providing essential healthcare services in underserved communities, community health centers, and academic institutions. Removing or narrowing definitions of qualifying employment risks cutting off debt relief for vital health professionals who play critical roles in nonprofit community health centers, integrative medical practices, and rural health clinics, directly supporting public health.

2. Maintain Access to Affordable Repayment Income-Driven Repayment Plans

Acupuncture students often pursue advanced degrees (Master's or Doctorate). Graduates may begin their careers carrying meaningful student debt, while providing essential but sometimes modestly compensated healthcare services. We emphasize the importance of robust, fair, and accessible income-driven repayment plans to support practitioner retention and public access to these services.

2

We encourage modifications to PAYE and ICR programs to better accommodate the unique career trajectory of acupuncture and herbal medicine (AHM) professionals, who often:

- Face high initial education costs ($50,000-90,000)
- Experience a gradual income build as they obtain certification and licensure and establish their practices
- Work in mixed employment/self-employment arrangements

3. Include Institutional Accountability for Small, Specialized Schools

Many ACAHM-accredited schools are small, specialized institutions serving under 500 students with historically low cohort default rates. We ask the Department to ensure that any regulatory streamlining or institutional quality rules recognize the unique size, mission, and scope of specialized health institutions. Applying large-scale university metrics without adjustment risks disproportionately burdening small schools, ultimately harming student access and possibly limiting patient access to essential healthcare services.

4. Ensure Educational Program Accessibility

To address the Department's concern about regulations potentially "inhibiting innovation and contributing to rising college costs," we recommend:

- Creating pathways for specialized healthcare programs like AHM to access Title IV funding without unnecessary administrative burdens
- Developing financial aid structures that recognize the unique nature of specialized healthcare education

Conclusion

As acupuncture and herbal medicine gain increased recognition from major healthcare institutions and insurance providers, addressing these financial barriers to education and early career sustainability is essential to meet growing demand. The Bureau of Labor Statistics projects continued growth in this field, but educational debt burdens threaten to limit workforce development.

We welcome the Department's focus on improving program integrity and reducing unnecessary regulatory burden. AHMC stands ready to provide input and serve as a resource to ensure that future regulations reflect the realities and needs of complementary and integrative health education. For further communication, please contact Kristin Richeimer, CAE, Executive Director, CCAHM.

Respectfully submitted,

The AHM Coalition

Kristin Richeimer, CAE
Executive Director, Council of Colleges of Acupuncture and Herbal Medicine

Olivia Hsu Friedman, DACM, L.Ac. Dipl.OM
Chair, American Society of Acupuncturists

ED_01086

3

Mina Larson, M.S., MBA, CAE
Chief Executive Officer, National Certification Commission of Acupuncture and Oriental Medicine

Mark McKenzie, LAc, PhD (China), MSOM
Executive Director, Accreditation Commission of Acupuncture and Herbal Medicine

ED_01087

Regulations.gov



An official website of the United States Government.

## Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 12, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

Comment

Please find attached to this message a letter from ACE President Ted Mitchell on behalf of six higher education organizations offering our comments.

Attachments  1

File   Community Rulemaking Topics Letter 5-8-25
PDF
Icon                          Download Icon  Download

**Comment ID**
ED-2025-OPE-0016-0824

Shape   **Tracking Number**
maf-qaqv-xwmh

Regulations.gov



| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**

Comment(s)

**Received Date**

May 7, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                Support
API Requests   |   FOIA

file:///C/...s/OneDrive%20-%20U.S.%20Department%20of%20Education/Documents/Comments/ED-2025-OPE-0016-0824_Comments.html[5/23/2025 3:20:03 PM]

ED_01089



Tamy Abernathy
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue SW, 5th Floor
Washington, DC 20202

Dear Ms. Abernathy,

I write on behalf of the undersigned higher education organizations in response to the notice (Docket ID ED-2025-OPE-0016) by the U.S. Department of Education (Department) announcing the possible formation of negotiated rulemaking committees. As the representatives of the full spectrum of American higher education, we appreciate the opportunity to provide feedback on the topics the Department has proposed as well as to offer new topics for consideration.

We are also encouraged by the Department's intention to focus greater scrutiny on areas of concern while providing for expedited review where institutions have consistently demonstrated compliance and where the risk to students and taxpayers is low. Similarly, we welcome efforts to address the regulatory swing back and forth between different administrations that has caused significant cost and confusion as campuses attempt to repeatedly understand and implement radical shifts in regulatory requirements within a space of only a few years' time.

With those broad considerations in mind, we offer our response to the Department's proposed topics as well as additional suggestions for items to consider below.

**Pay As You Earn (PAYE) and Income Contingent Repayment (ICR) repayment plans -** We have long supported efforts to simplify and streamline the existing repayment options available to borrowers to ensure that they have a clear understanding of their obligations and have access to repayment options that reflect their individual financial circumstances.

As we have stated in prior comments to the Department regarding repayment options, our preference is that Congress address student loan repayment through a long-overdue reauthorization of the Higher Education Act. This would ensure that all elements of our financial aid system can be considered as a whole, rather than through the piecemeal legislative and regulatory manner of the last 17 years.

**Refining definitions of a qualifying employer for the purposes of determining eligibility for the Public Service Loan Forgiveness program -** We would have concerns with efforts to implement elements of the March 7, 2025 "Restoring Public Service Loan Forgiveness" Executive Order that would deny eligibility for Public Service Loan Forgiveness (PSLF) to employees of nonprofit organizations solely because they support views or policies that the Administration disagrees with.

One Dupont Circle NW    |    Washington, DC 20036    |    202-939-9300    |    acenet.edu

ED_01090

not need, and it would be inappropriate, to create a differentiation of organizations based on differing viewpoints.

**Reporting Requirements Under Section 117 of the HEA -** We share Congress and the Administration's concerns with ensuring accurate reporting of foreign gifts and contracts as required under Section 117 of the Higher Education Act. Institutions take their obligations in this area seriously and seek clear definitions and functional reporting systems to ensure they are both understanding and meeting their reporting requirements. For that reason, we would welcome a negotiated rulemaking on this subject in order to convene stakeholders for this purpose in a public and transparent manner.

**Gainful Employment and Financial Value Transparency (GE/FVT) -** Our institutions appreciate the Department's efforts to work with us to address numerous concerns about meeting the GE/FVT reporting and other deadlines set by the previous administration coupled with efforts to ensure that the administrative burden associated with this rule is minimized.

We have previously expressed a number of serious concerns with the rule. While the new administration has moved quickly to provide institutions more time to address the numerous technical and definitional issues with reporting under GE/FVT, there is still significant burden and uncertainty on college campuses related to this rule. For these reasons, we would encourage the Department to include the full scope of the GE/FVT rule in any future rulemaking.

**Bundled Services Guidance -** The last administration proposed to significantly revise guidance dating back to the Obama administration that allowed institutions to contract with third parties to manage the provision of services and handling of administrative functions. The proposals offered would have had a massive negative impact on institutional operations and would have been particularly harmful to existing innovative practices that institutions have relied on to provide better service at lower cost for students. This was only possible because the bundled services exceptions are only provided through guidance, and not regulation. We would encourage the Department to consider formally codifying this guidance into regulation.

**Financial Responsibility Standards -** While numerous prior efforts have been made to revise the existing Financial Responsibility Standards (FRS) to bring them in line with modern accounting and auditing practice, those changes have been insufficient to address the fundamental remaining problems. Private institutions continue to be penalized under the existing FRS rules for making sound financial decisions such as refinancing existing debt at lower rates.

Exacerbating the situation, the new regulations imposition of mandatory triggers and minimal thresholds for institutions to secure expensive and onerous letters of credit have been financially punitive and forcing greater costs onto students. Additionally, the new regulations under FRS related to changes in ownership have resulted in a variety of negative consequences, including requiring members of nonprofit boards to publicly disclose sensitive personal information. Most problematic has been the impact on institutions seeking to merge with, or acquire, other

institutions. The result has been to make the process extraordinarily protracted and difficult, causing substantial cost and uncertainty to institutions navigating these transitions.

**Administrative Capability -** The changes in regulations finalized under the last administration placed a number of new requirements on institutions to participate in Title IV. While we support the intent of many of these provisions, the regulations themselves are often unclear or duplicative, and additional rulemaking to better target and clarify requirements in this area is necessary. In particular, new requirements on institutions to provide: adequate financial aid counseling; adequate career services; and accessible clinical or externship opportunities that are related to, and required by, the program that the students are enrolled in; among other new requirements add significant complexity to institutional operations and would benefit from revision.

**Certification Procedures -** The new requirements imposed by the last administration around certification procedures covered a number of areas that pose significant complexity for institutions, often due to ambiguity as to what compliance entails. Of particular concern are new rules for managing transcript policies and new requirements on institutions to meet state licensing requirements in all states where students are enrolled or intend to work, while simultaneously negating existing reciprocity under NC-SARA for institutions in certain circumstances.

Additionally, requirements on institutions to meet state licensure requirements for every state in which they enroll students will be immensely difficult to manage for any program with a distance education component. These provisions, along with several others, represent a problematic expansion of federal regulations in a way that run contrary to innovative distance education offerings that have grown substantially over the last decade.

We appreciate your attention to these comments and look forward to supporting any effort to appropriately calibrate regulations to meet the needs of students, institutions, and borrowers.

Sincerely,

Ted Mitchell
President

On behalf of:

American Association of Community Colleges
American Association of State Colleges and Universities
American Council on Education
Association of American Universities
Association of Public and Land-grant Universities
National Association of Independent Colleges and Universities

ED_01092

Regulations.gov

An official website of the United States Government. 🇺🇸

## Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 14, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

We, the 1,772 members of PSLF Defense, respectfully submit this comment to emphasize the critical importance of robust Public Service Loan Forgiveness provisions, accessible income-driven repayment plans, and meaningful servicer accountability measures. We appreciate the opportunity to participate in this process and remain committed to collaborating with negotiators to develop regulations that best serve the interests of all student loan borrowers. Please see the attached materials for our comments, in full.

| Attachments  1 |
| --- |

| File PDF Icon | PSLF Defense Public Comment 2025 05 08 | | Download Icon  Download | |

| Comment ID |
| --- |
| ED-2025-OPE-0016-1179 |

| Shape  **Tracking Number** |
| --- |

ED_01093

Regulations.gov



maf-t8g7-npgm

**Comment Details**                    **Submitter Info**

**Document Subtype**
Comment(s)

**Received Date**
May 7, 2025



About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement              Support
API Requests    |    FOIA

ED_01094



May 8, 2025

Linda E. McMahon,
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

*Submitted via regulations.gov*

## RE: Docket ID No. ED-2025-OPE-0016 Intent to Receive Public Feedback for the Development of Proposed Regulations and Established Negotiated Rulemaking Committee.

Dear Secretary McMahon,

We are a group of nearly 2,000 student loan borrowers working toward Public Service Loan Forgiveness (PSLF). Our group formed organically in response to the uncertainty and chaos into which we've been thrust. Between injunctions trapping us in certain payment plans, executive orders threatening to shrink PSLF eligibility, rhetoric from the current administration, and incompetence from our loan servicers, we organized to protect and support each other. We seek to ensure that the Department of Education (the Department) fulfills the agreement we made when we signed our promissory notes; if we serve the public for 120 months, our loans will be discharged.

As part of our mission, we conducted a survey of our members. Nearly 40% of us are healthcare workers such as doctors, nurses, and other medical professionals who help save the lives of their fellow Americans. Most of these members chose lesser-paying opportunities in poorly served, rural areas in order to do the most good. A further 27% work in education. They represent the professors, teachers, and student aides who help raise the next generation of Americans to ensure our country does not fall behind on the world stage. Around 10% of us work in legal fields ensuring that we maintain the rule of law and ensuring our communities remain safe. Another 9% are social workers across many practice areas who help members of the public endure difficult times in their life. 3% of us are current or former armed service members. We include police and firefighters, park workers and public administrators, environmental and community developers. In sum, we represent the professionals who keep America healthy, safe, and functioning.

Across the fields in which we work, 45% of us have been working in public service for over 10 years. 83% of us have been working in public service for at least 5 years. And



yet, just 1% of us have had any portion of our loans discharged through PSLF.  PSLF was approved by Congress and signed into law under President George W. Bush in 2007.  It is now 2025 and 18 years later.

When we were students, we chose to take on student loan debt because of PSLF.  We pursued our careers because of PSLF.  We have structured our lives around PSLF.  Whether we can have children or own a home depends on PSLF.  We are a generation of professionals who dedicated our lives to serving our fellow Americans, and we did so trusting the Department to honor its end of the agreement.

We thus submit this comment in a unified voice.


## Lack of Accountability for Servicers

Student loan servicers have largely failed borrowers seeking PSLF. Our internal survey found that nearly 90% of our network has experienced problems with a servicer at some point in the repayment process. Servicers frequently provide inaccurate or conflicting information when we can reach them at all. Long hold times have been widespread in recent months, especially at MOHELA. Servicers routinely make harmful errors and fail to process paperwork correctly.

88.4% of our survey respondents report servicer misconduct, including incorrect calculation of IDR payment amounts, contradictory communications, failure to bill on time, inaccurately capitalized interest, and failure to process forms. Nearly half say they have experienced incorrect reporting from servicers to the Department of Education or to credit bureaus, resulting in lowered credit scores. Almost everyone who responded to the survey has contended with servicing failures such as inability to reach customer service representatives, incredibly long wait times (6+ hours), and inaccurate information. This is why a number of our members report that they have held qualifying employment for well over 120 months without receiving loan forgiveness. The person responding to our survey who reported the longest period of qualifying employment claimed 200 months.

Delayed forgiveness due to problems with servicers has real consequences. It may postpone milestones such as having children or buying a house by keeping borrowers in repayment longer. Student loan payments that continue past the date when the debt should be retired are also a drag on individuals' and families' ability to save for long-range goals like retirement or a child's education.



Current and future public service workers pursuing PSLF would benefit from the federal government holding servicers accountable for their consistently poor customer service. Servicers unable to answer calls with reasonable wait times, answer questions correctly, and process paperwork efficiently and without errors should lose their contracts. Future contracts with servicers should make these factors into metrics with corresponding incentives and penalties.

## Affordable Repayment Plans

Many of us are experiencing substantial stress because of the uncertainty around IDR plans. Combined with PSLF, IDR makes it possible for people to take socially useful jobs for wages that would otherwise be financially impossible. For example, an entry-level attorney at a civil legal services organization making $65,000 per year is unlikely to be able to cover basic expenses without IDR. Because the average juris doctor degree originates nearly $120,000 in student debt, if someone in this situation is forced into ten-year standard repayment, they may find that there is not enough money left in their paycheck after the monthly student loan payment to cover food and rent. Our network consistently reports that current repayment calculations fail to reflect the economic realities we face. The formula for determining discretionary income does not adequately account for the cost of essentials including housing and healthcare that have dramatically increased in recent years..

There are many measures the federal government could take to decrease this burden. Increasing the discretionary income threshold to at least 225% of the federal poverty line for the Pay As You Earn and Income Contingent Repayment plans would better account for recent increases in the cost of living, allowing us to more feasibly support ourselves and our dependents at a modest but dignified standard of living. Ensuring that future repayment options continue to cap payments at no more than 10% of a realistically calculated discretionary income would also help to achieve this end. We also call on the federal government to allow people in existing plans to continue with them even if those plans are eliminated for new borrowers, as many of us have based our financial decisions on these plans. While no one enters public service expecting a lavish lifestyle, grinding poverty should not be the reward for using an advanced degree to help others instead of selling one's services at fair market value.



## Mitigate the SAVE Chaos and Other Forbearances Beyond Our Control

Many of us have remained in qualifying employment through the SAVE injunction and the period when applications for other plans were closed. Those months do not count toward PSLF because we were not permitted to make payments. Some of our members have similarly lost out on months here and there when our loans were transferred between servicers without our input. For these reasons, the federal government should ensure that buybacks of months of qualifying employment for which we were not permitted to make payments are seamless.When political machinations and servicer failures delay forgiveness, buybacks  make borrowers whole and ensure that every month of public service counts. This option should be available to borrowers at any time in our years of repayment, not just when the buyback months and the months for which we have paid would add up to 120 or more, to avoid even further administrative barriers.

## Keeping the Promise to Public Service Workers

Thousands of Americans have built our lives on the promise of PSLF because we wanted to build a better society and trusted our fellow citizens to keep their word. We ask you to take all necessary steps to ensure that PSLF remains a viable option bolstered by manageable payments through IDR plans. Failure to do so would inflict financial calamity on us because we decided to serve others. It would inflict completely avoidable misery on our spouses, children, and other dependents. It would also create recruiting challenges for critical roles in communities across the country. No matter the strength of one's passion for public service, it would be difficult to become a high school principal, an urban planner working for a city, an attorney for a municipality, or a public health worker if that results in student loans being one's largest monthly expense.

So long as the United States is a country where higher education is costly and public service undercompensated, we will require measures to make jobs society needs financially viable. There is no other way to ensure that the nation continues to have the services and infrastructure generally expected in a wealthy country. Although few Americans earn graduate or professional degrees, virtually all need the services of those who do at some point in our lives. PSLF affects all Americans. Its preservation and efficient operation should transcend politics and ideology.



In closing, we urge the Department to recognize the critical importance of these interconnected issues as you convene the negotiated rulemaking committees. Thank you for the opportunity to submit comments on this important matter. We stand ready to continue to support the development of fair, flexible student loan policy that respects the agreements made between borrowers and the Department of Education and strengthens PSLF for current and future generations of public servants. We look forward to future public comment opportunities as these policies continue to take shape.

Respectfully submitted,

The Members of PSLF Defense

| | |
|---|---|
| Abby Fyfe | Anesia Groves |
| Adam Lisewski | Anna Gilmour |
| Adam Schiffmacher | Anna Lincoln |
| Akeria Timothy | Anthony Cirincione |
| Alex Pelecky | Anthony DeFilippo |
| Alex Schin | Ashley Gallup |
| Alexandra Ninneman | Ashley Gary |
| Alicia Baker | Ashley Sneesby |
| Alisha D. Berry, MD, MCR | Bonnylin Covey Van Winkle |
| Alison Guzardo | Breanna Kosmicki |
| Amanda Dijanic Zeidman | Brian Z |
| Amitai Schwartz | Brittany Armstrong Sowle |
| Amy J. Anderson | Brooke Jordan |
| Amy L. van Saun | Brooke Lamparello |
| Amy Williams | Bryant D |
| Andrew Kim | Caitlin Olive |
| Andrew Swanson | Caleb Rossin |
| Andrew Tiemann | Cameron Kilpatrick, MD, MPH |



| | |
|---|---|
| Caraline Canning | Danielle Burns |
| Carolyn Geraci, MD | Danielle Nathanson |
| Cassandra Duarte | Danny |
| Catherine Griffith | David Lucero |
| Charlotte Powers | David Sacco |
| Chelsea Darter | David W Harris |
| Chelsea Spencer | Debra L Brinker |
| Chris Odom | Deegant Adhvaryu |
| Christina Delgado | Derek Shivley, PT, DPT |
| Christine White | Devon Pace, MD, MPH |
| Christopher J. Dylla | Diana C Husanu |
| Christy Irrgang | Diana Marginean |
| Chychy Smith | Dominique Bertrand, PhD |
| Claire DeWind | Dr. Brianna N. Kousin |
| Clarissa Marks | Dr. Cody Horn |
| Clay Bavender | Dr. Connor Shadish, PT, DPT |
| Clyde W. Henry III | Dr. Keisha Allen |
| Cody Thress | Dr. Megan M. Stowe |
| Colby Neukum | Dr. Nina Ashford |
| Cornelia J Taylor | Dr. Rebecca Hartog |
| Cuong Nguyen | E.Ata |
| Daisy Brzezinska | Elece Madison Smith |
| Dane Daumer | Elizabeth Schmermund |
| Daniel Parsons-Moss MD | Elizabeth Yetter |
| Daniel S Hanson | Ellie Keene |
| Danielle A. Espinoza, M.D. | Emily Ferrari |



| | |
|---|---|
| Emily McCabe | Ivan A. Serrano Santiago |
| Eric Kline | Jami (Siddle) McIntyre |
| Eric M. Mort | Jeffery Estep |
| Erica Parrotta, DO | Jennifer Berry |
| Erika Maynard | Jennifer Cullin-Hetrick |
| Erin Karl, MD, MEHP | Jennifer Romanowicz |
| Ethan Hines | Jennifer Sundook |
| Farhan Chowdhury D.O | Jeremy Carlson |
| Gabrielle Gannon | Jessica Smith |
| Grant Smith | Joel Love |
| Grant Chambers | Jonathan Tietz |
| Greenlee Brown | Jordan Garbayo |
| Gregory Kirby | Jordan M. Hendrickson |
| Griffin Laker | Joseph Bielecki DO |
| Hailey Koop | Joshua Johnson |
| Haley Harrison | Julia Coltri |
| Haley Rua | Julia Napier |
| Hannah King | Julia Shaida |
| Haylee Veazey, MD | Julie Campbell, MD MHA |
| Hayley Wood | Kaitlyn L. |
| Heather Greenfield | Kate Kollars, MD, MPH |
| Heidi W. Bunyab | Katherine Blazek |
| Hillary K | Katherine Calleo, MD |
| Holli Burns | Katherine Livingston |
| Holly D Lucas | Katherine Profeta |
| Isaac Purton | Kathleen Shadish |

ED_01101



| | |
|---|---|
| Kathryn Pauls | Logan Willhite |
| Katie Alexa Rogers Helms | Lucy Monreal |
| Katya Shcherbakova | MacPherson Worobec |
| Keith Lara | Mallory Youngstrom |
| Kelley Brinsky | Marisa Peterson |
| Kelley Carey | Marissa Smith |
| Kelly Charapich | Mark Hammons |
| Kelly M | Matthew DeFeo |
| Kelly Tatarka | Matthew Ingram |
| Kenya Nelson | Matthew McBatra, MD |
| Kerry M. O'Sullivan | Matthew Palumbo |
| Kevin C Bradley | Maya Herzig MD |
| Kevin Green M.D | Meeka Gandhi |
| Kevin Pustz | Megan Elizabeth Cobb, MS |
| Kim Cao | Megan Foster |
| Kimberlee LaSalle | Megan Martin, LPC |
| Kimberly L Satia | Megan Walraven |
| Kurrinn Abrams | Meghan Groves |
| Lacey A Fulton | Melissa Gallagher |
| Larissa A. Cason | Melissa Newcomb |
| Laura J. Adams | Meredith Franklin |
| Lee A Pfaff, MD | Meredith Rose |
| Leighanna Mixter, Esq. | Merrily Newcomb |
| Leslie Allison | Michael Metzmaker |
| Lina Parekh | Michael Miller |
| Lindsey Lakas | Michael Rodriguez |



Miles Horton

Misty Schreiner

Monet Baxter

Monique Robertson

Morgan Lockhart

Nancy H. Brinson

Natalie DeQuarto

Natalie Pettigrew

Natasha Germain

Nathan Foster

Nathaniel Janick

Nicholas Palombo

Nichole M-W

Nichole Scheerer

Nick Minaudo

Nicole Simmons

Nora E Kratz

Paula L. Berry

Peter Staiano

Quentin Lewis

R. Emmett Murphy, Esq

R. Larkin Taylor-Parker

Rachel Hynes

Rachel Young

Raul Alvarez

Robert Dahlhausen

Robin Alexander Matthew Lesko

Rose Beranek

Ryan Clodfelter

Ryan Lee

Ryan Stafford

Sabrina McGee, MSW

Salena Levy

Samantha Sliwa

Samuel S Brinker

Sara Paul

Sarah Einstein

Sarah F. Pedonti

Sarah McKenna, DO

Sarah Prolo

Sarah Riley MD

Sarah Souder, Esq.

Seth Robinson

Shakia Jackson

Shakira Carter

Shane Fiust-Klink

Shelby Dahlson

Shelby Glaser

Shelby Schwing

Shelley Thiebeau

Sherri Bowden

Shiva Stella



| | |
|---|---|
| Skinner Myers | Tiffany M. Walker |
| Sophia Jayanty | Travis |
| Spencer Meyers | Trent Conyers |
| Stephanie Bozella | Trevor Pettigrew |
| Stephanie Corrente | Trina Westerman |
| Stephanie Rosario Rodriguez | Troy Coughlin |
| Susan Banks | Valida Bajrovic |
| Susan Stone | Vivian Seguro |
| Tameka Byrd | Wendy Holmes |
| Tanya Gonzalez | Yekaterina Shcherbakova |
| Tanya Karg, AuD | Zach Pino |
| Thomas Carroll | Zohra Ayub |
| Tiffany Christian MD | |

Regulations.gov

An official website of the United States Government. 🇺🇸

Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 15, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
| --- |

My name is Lisa Catalanotto, and I am the Executive Director of the South Carolina Commission on Prosecution Coordination, a state agency in South Carolina.

I am writing regarding the Department's solicitation for comments on and in support of continuing the Public Service Loan Forgiveness (PSLF) program.
I have also attached a letter from South Carolina's 11th Judicial Circuit Solicitor, Rick Hubbard, in his capacity as President of the South Carolina Solicitors' Association and on behalf of all sixteen (16) elected circuit solicitors in South Carolina, regarding the importance of the PSLF program.

The PSLF program is a vital tool for recruiting and retaining the best and brightest prosecutors, strengthening the justice system. Additionally, the PSLF program incentivizes long-term commitment, ensuring that qualified prosecutors remain in key roles rather than seeking private-sector opportunities.

33% of all attorneys currently employed by the South Carolina Offices of Circuit Solicitor and Office of ███████ General either are currently participating in the PSLF program and expect to become eligible for student loan forgiveness upon working ten years in public service or have already received student loan forgiveness under the PSLF program.

I urge the Department to continue the PSLF program and specifically its availability for prosecutors and other essential non-attorney prosecution staff in South Carolina's Circuit Solicitors' and Attorney General's offices.

| Attachments  1 |
| --- |

ED_01105

Regulations.gov

File 042325 SCSA Letter on PSLF Program (L. McMahon)
PDF
Icon
| Download Icon  Download |
| --- |

**Comment ID**
ED-2025-OPE-0016-1206

Shape   **Tracking Number**
m9u-89ow-o4fe

| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Comment(s)

**Received Date**
Apr 21, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice   |   User Notice   |   Accessibility Statement   |                 Support
API Requests   |   FOIA

**South Carolina Solicitors' Association**
Post Office Box 11251
Columbia, South Carolina 29211–1251

April 23, 2025

David M. Pascoe, Jr.
First Judicial Circuit

Bill Weeks
Second Judicial Circuit

Ernest A. Finney III
Third Judicial Circuit

Paul M. Burch, Jr.
Fourth Judicial Circuit

Byron E. Gipson
Fifth Judicial Circuit

Randy E. Newman, Jr.
Sixth Judicial Circuit

Barry J. Barnette
Seventh Judicial Circuit

David M. Stumbo
Eighth Judicial Circuit

Scarlett A. Wilson
Ninth Judicial Circuit

Micah E. Black
Tenth Judicial Circuit

S. R. Hubbard III
Eleventh Judicial Circuit

E. L. Clements III
Twelfth Judicial Circuit

William W. Wilkins III
Thirteenth Judicial Circuit

Isaac McDuffie Stone III
Fourteenth Judicial Circuit

Jimmy A. Richardson II
Fifteenth Judicial Circuit

Kevin S. Brackett
Sixteenth Judicial Circuit

The Honorable Linda E. McMahon
Secretary
U.S. Department of Education
400 Maryland Ave SW, Washington, DC 20202

**Document Citation: 90 FR 14741; Document Number: 2025-05825; Docket ID: ED-2025-OPE-0016]**
**Re: Negotiated Rulemaking for the Higher Education Act: Public Service Loan Forgiveness**

Dear Secretary McMahon,

On behalf of South Carolina's sixteen elected Judicial Circuit Solicitors and in my capacity as President of the South Carolina Solicitors' Association, I am writing regarding the U.S. Department of Education's solicitation for comments about the Public Service Loan Forgiveness (PSLF) program.

Since 2007, the PSLF program has been an important and significant tool used to recruit and retain prosecutors and other non-attorney prosecution staff in South Carolina. Many prosecutors and other staff in South Carolina's Offices of Circuit Solicitor and the Office of the Attorney General rely on the PSLF program and, in fact, considered the value of loans forgiven through participation in the program when making career choices and specifically in accepting a lower salary as a public servant over a higher paying position in the private sector.

**33% of all attorneys currently employed by the South Carolina Offices of Circuit Solicitor and Office of the Attorney General either are currently participating in the PSLF program and expect to become eligible for student loan forgiveness upon working ten years in public service or have already received student loan forgiveness under the PSLF program.**

There is no doubt that the PSLF program has a significant impact on the ability to recruit highly qualified prosecutors and other public service professionals in South Carolina's Circuit Solicitors' and Attorney General's offices. 169 attorneys and 104 non-attorneys employed by these offices are currently participating in the PSLF program. The PSLF program also impacts the ability of these offices to retain these professionals. Although the program requires ten years of public service, many of those that have already received loan forgiveness under the program remain in their positions after serving ten years. 65 attorneys and 32 non-attorneys currently employed by South Carolina's Circuit Solicitors' and Attorney General's offices have already received student loan

ED_01107

**The Honorable Linda E. McMahon**
**April 23, 2025**
**Page 2 of 2**

forgiveness under the PSLF Program.  Any efforts to potentially roll back or significantly alter the PSLF program would directly hurt recruitment and retention efforts by South Carolina's Offices of Circuit Solicitor and Office of the Attorney General as well as their ability to serve their communities.  Such discussions create uncertainty surrounding the program and may cause potential public servants to lose trust that the program will be there for them in the future.

When local prosecutors and critical prosecution staff remain in their roles, they gain valuable experience that strengthens their ability to support victims of crime and combat violent crimes, which often result in complex cases. The experience also builds relationships with communities, a factor that is essential to investigating and prosecuting crime. The PSLF program is not only essential to our community's fabric, but it's also a vital tool for recruiting and retaining the best and brightest local prosecutors. Retaining local prosecutors is essential to fighting crime and the PSLF program is often a deciding factor when local prosecutors consider staying in public service.

I urge the Department to preserve the PSLF program as discussions around federal restructuring continue. Eliminating this vital assistance program available to local prosecutors, public service attorneys and critical non-attorney prosecution staff would have dire, long-lasting repercussions on public safety in South Carolina and the United States. Thank you for allowing me the opportunity to submit a comment on this important matter.

Very Truly Yours,

S. R. Hubbard III
President

**Attachment:**  PSLF Participation in SC Circuit Solicitors' Offices
**CC:**    The Honorable Lindsey Graham, U.S. Senator
The Honorable Tim Scott, U.S. Senator
The Honorable Sheri Biggs, U.S. Representative
The Honorable James Clyburn, U.S. Representative
The Honorable Russell Fry, U.S. Representative
The Honorable Nancy Mace, U.S. Representative
The Honorable Ralph Norman, U.S. Representative
The Honorable William Timmons, U.S. Representative
The Honorable Joe Wilson, U.S. Representative



**SCCPC**
South Carolina Commission
on Prosecution Coordination

## Public Service Loan Forgiveness Program
## Participation in South Carolina's
## Judicial Circuit Solicitors' Offices and Attorney General's Office

### March 31, 2025

| Circuit | # Staff that has not yet worked ten years in public service, but intend to and expect to become eligible for student loan forgiveness under the PSLF Program | | # Staff that have worked more than ten years and have already received student loan forgiveness under the PSLF Program | | Total Attorneys as of 1/1/2025 |
|---|---|---|---|---|---|
| | Prosecutors | Non-attorney Staff | Prosecutors | Non-attorney Staff | |
| 1st | 11 | 6 | 3 | 0 | 17 |
| 2nd | 3 | 0 | 4 | 0 | 15 |
| 3rd | 1 | 0 | 2 | 1 | 9 |
| 4th | 3 | 1 | 1 | 0 | 16 |
| 5th | 21 | 0 | 6 | 0 | 41 |
| 6th | 4 | 4 | 5 | 1 | 20 |
| 7th | 17 | 0 | 7 | 0 | 33 |
| 8th | 4 | 5 | 2 | 1 | 16 |
| 9th | 18 | 17 | 4 | 2 | 61 |
| 10th | 3 | 0 | 2 | 1 | 19 |
| 11th | 8 | 7 | 3 | 0 | 31 |
| 12th | 3 | 4 | 1 | 1 | 13 |
| 13th | 9 | 0 | 2 | 0 | 55 |
| 14th | 7 | 5 | 5 | 0 | 25 |
| 15th | 22 | 23 | 2 | 11 | 36 |
| 16th | 12 | 0 | 8 | 0 | 28 |
| AG | 23 | 32 | 8 | 14 | 84 |
| TOTAL | 169 | 104 | 65 | 32 | 519 |

Regulations.gov

An official website of the United States Government. 🇺🇸

### Regulations.gov Branding

SUPPORT

Back to Document Comments

Comment Icon
**PUBLIC SUBMISSION**

# Comment on FR Doc # 2025-05825

Posted by the **Department of Education** on May 19, 2025

Docket  /  Document (ED-2025-OPE-0016-0001)  /  Comment

| Comment |
|---|

This comment represents the experiences of over 200,000 Public Service Loan Forgiveness seekers who have united to navigate a system that has repeatedly failed them despite their fulfillment of service commitments. Please see the attached file for our detailed comment which includes specific policy recommendations and personal stories demonstrating the human cost of the current system's shortcomings.

| Attachments 1 |
|---|

File PSLF FB Group Public Comment 2025 05 08
PDF
Icon            Download Icon  Download

| Comment ID |
|---|
| ED-2025-OPE-0016-2211 |

| Shape | **Tracking Number** |
|---|---|
| | maf-vh0y-es8f |

Regulations.gov



**Comment Details**                    Submitter Info

**Document Subtype**
Comment(s)

**Received Date**
May 7, 2025



About   Bulk Data Download   Agencies   Learn   Reports   FAQ   Commenting Guidance

Privacy & Security Notice    |    User Notice    |    Accessibility Statement    |                    Support
API Requests    |    FOIA

ED_01111

May 8, 2025

Linda E. McMahon,
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

*Submitted via regulations.gov*

## RE: Docket ID No. ED-2025-OPE-0016 Intent to Receive Public Feedback for the Development of Proposed Regulations and Established Negotiated Rulemaking Committee.

Dear Secretary McMahon,

Thank you for the opportunity to provide feedback on the proposed negotiated rulemaking for federal student financial assistance programs. We submit this comment to advocate on behalf of our group of over 200,000 Public Service Loan Forgiveness (PSLF) seekers who have united to navigate a system that has too often failed them.

## The Human Cost of Policy Shortcomings

Our community emerged as a vital lifeline when official support systems failed. What began as a small group of borrowers helping each other has grown exponentially since 2020, when policy shifts revealed the enormous gap between what borrowers need and what the Department and servicers provide.

Today, our volunteer moderators devote countless hours each week deciphering complex policy announcements, interpreting contradictory guidance, and supporting desperate borrowers who would otherwise wait on hold for hours or receive incorrect information. Through this work, we've witnessed the devastating human consequences of broken systems:

- An educator with over 30 years of classroom service who made payments faithfully throughout her career, only to discover at retirement that forgiveness was impossible because no one ever explained she needed to consolidate her FFEL loans, an opportunity now permanently closed to her.

- A public service worker and mother forced to choose between her child's cancer treatments and maintaining her PSLF eligibility, as she struggles to meet the 30-hour threshold while attending critical medical appointments - with no flexibility from a system that doesn't allow her to be there for her family while still making progress toward forgiveness.

- A firefighter who served our country first in the military and now in his community, who received completely different information with each call to Federal Student Aid, eventually giving up on both forgiveness and income-driven repayment after being overwhelmed by contradictory guidance.

While these stories might seem exceptional, the truth is that even "ordinary" borrowers following every rule face insurmountable obstacles:

- A borrower who submitted her income-driven repayment application early in 2024 remains trapped in standard repayment nearly a year later because her application sits unprocessed. She spends hours on bimonthly calls to MOHELA begging for temporary forbearances that should be automatic, while paying thousands more than required to avoid erroneous impacts to her credit and financial health.

- A conscientious borrower who never missed deadlines and submitted her PAYE recertification exactly as instructed now finds herself locked in an unwanted forbearance that she shouldn't be in in the first place, according to policy. Despite four separate attempts spanning more than 20 hours on hold to resume making payments, the system refuses her money while potentially extending her time to forgiveness.

- A public servant who did everything right—certified employment, made timely payments, and was automatically enrolled in SAVE in 2023—met all requirements for forgiveness in July 2024. Yet nearly a year later, her loans remain unforgiven due to lawsuit-related processing freezes, despite her fulfilling every obligation.

The painful reality is that personal responsibility no longer guarantees success. Even the most financially literate, diligent, and informed borrowers cannot overcome systemic failures, servicing errors, policy inconsistencies, and administrative breakdowns. The student loan system has become functionally impossible to navigate without encountering significant harm.

These experiences reflect the reality for hundreds of thousands of public servants nationwide who honored their commitments while watching the system repeatedly break its promises. The toll extends beyond finances as borrowers routinely postpone

marriages, home purchases, children, and essential medical care due to the perpetual uncertainty surrounding their debt.

As you consider regulatory changes, remember that each policy decision impacts real people who chose careers serving others, often at significant financial sacrifice. Our community shouldn't need to exist, yet we grow larger every day as more borrowers discover they cannot succeed without peer support to navigate a fundamentally broken system.

As administrators and moderators of this community, we ask the Negotiators to consider the below requests during this upcoming session:

## Preserve PSLF Qualifying Employer Definitions

We strongly urge the Department to maintain the current standard definition of PSLF-qualifying employers, which includes federal, state, local, and tribal government organizations; 501(c)(3) nonprofit organizations; certain other nonprofits providing qualifying public services; and AmeriCorps and Peace Corps volunteer positions.

Any refinements should only expand - never reduce - eligibility for the program. Narrowing these definitions would betray the public service commitment made to thousands of dedicated individuals who structured their careers around this promise, including public interest lawyers, healthcare workers, educators, nonprofit professionals, and government employees who provide essential services to our communities.

## Ensure Truly Affordable Payments Based on Realistic Discretionary Income

We strongly urge the Department to prioritize keeping payments affordable for all borrowers by preserving existing Income-Driven Repayment options and use a realistic calculation of discretionary income. Specifically:

1. Maintain income-driven repayment plans (PAYE, IBR and ICR) that calculate monthly payments as a reasonable percentage of discretionary income.

2. Update discretionary income formulas from 150% to at least 225% of the federal poverty level to account for the current economic environment where many borrowers live paycheck to paycheck due to high costs of housing, healthcare, childcare, and other essential expenses.

ED_01114

3. Implement regular reviews of the discretionary income calculation to ensure it remains responsive to economic changes and regional cost-of-living differences.

4. Consider additional protections for borrowers experiencing temporary economic hardship, including expanded deferment and forbearance options that do not penalize progress toward forgiveness for those who continue to work the minimum hours required by qualifying employers.

## Hold Borrowers Harmless for Servicer Misconduct and Policy Changes

The historical challenges with PSLF administration have left many borrowers in difficult positions through no fault of their own, and sometimes even despite their responsible planning and actions. We urge the Department to:

1. Make permanent the opportunity for borrowers to "buy back" periods of deferment, forbearance, or non-qualifying payments for periods of forced, administrative, processing, or otherwise non-borrower-initiated reasons.

2. Implement clear standards for documenting and addressing inaccuracies, with streamlined processes for borrowers to receive credit for qualifying payments that were not properly counted.

3. Apply policy improvements retroactively where appropriate to ensure that borrowers who began their public service under previous policy interpretations are not disadvantaged.

## Hold Servicers Accountable for Effective Processing and Misconduct

To ensure PSLF functions as intended by Congress, we recommend:

1. Establishing clear performance metrics for PSLF servicers with meaningful consequences for non-compliance, including financial penalties tied to specific failures such as payment miscounting, application processing delays, or providing incorrect information to borrowers.

2. Creating a transparent and timely appeals process for borrowers who believe their applications have been wrongfully denied or their payment counts are incorrect - having the same servicers that enact the misconduct serve as Business Processing Operations for reconsideration requests should be a clear enough conflict of interest.

3. Investing meaningfully into training, staffing budgets, and technological systems that servicers or departments will need in order to provide borrowers with accurate information and reasonable processing times 100% of the time.

4. Developing more robust training requirements for servicer and Department of Education representatives handling PSLF inquiries to reduce misinformation.

## Conclusion

PSLF represents a vital commitment to the dedicated individuals who choose careers in public service, and we see first-hand the joy and relief that comes from earned forgiveness. The vast majority of recipients of PSLF are not urban elites with unnecessary degrees, but regular people who chose the education they knew they needed in order to serve their communities, based on a promise they thought they could trust from their government. The over 200,000 PSLF seekers we represent have structured their careers and financial lives around this promise. As the Department considers regulatory changes, we urge you to prioritize borrower protection, program accessibility, and servicer accountability.

We appreciate your consideration of these recommendations and would welcome the opportunity to provide additional input throughout the negotiated rulemaking process.

Respectfully submitted,

Erica Skidmore

Gen Olucha

Sabrina McGee

Shana Lee

*As the Administrators and Moderators of the Public Service Loan Forgiveness (PSLF) Program Support Group*

| Docket Comment Number | Reason | Duplicate Comment - Master Comment |
|---|---|---|
| ED-2025-OPE-0016-DRAFT-0093 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0092<br>ED-2025-OPE-0016-0073 |
| ED-2025-OPE-0016-DRAFT-0128 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0127<br>ED-2025-OPE-0016-0099 |
| ED-2025-OPE-0016-DRAFT-0129 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0127<br>ED-2025-OPE-0016-0099 |
| ED-2025-OPE-0016-DRAFT-0211 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0212, ED-2025-OPE-0016-0121 |
| ED-2025-OPE-0016-DRAFT-0213 | Duplicate Comment | ED-2025-OPE-0016-1117 |
| ED-2025-OPE-0016-DRAFT-0317 | Duplicate Comment | ED-2025-OPE-0016-1203 |
| ED-2025-OPE-0016-DRAFT-0318 | Duplicate Comment | ED-2025-OPE-0016-1203 |
| ED-2025-OPE-0016-DRAFT-0353 | Duplicate Comment | ED-2025-OPE-0016-1104 |
| ED-20205-OPE-0016-DRAFT-0416 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0415, ED-2025-OPE-0016-0172 |
| ED-20205-OPE-0016-DRAFT-0417 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0415, ED-2025-OPE-0016-0172 |
| ED-2025-OPE-0016-DRAFT-0516 | Duplicate Comment | ED-2025-OPE-0016-0914 |
| ED-2025-OPE-0016-DRAFT-0519 | Duplicate Comment | ED-2025-OPE-0016-0914 |
| ED-2025-OPE-0016-DRAFT-0582 | Duplicate Comment | ED-2025-OPE-0016-1072 |
| ED-2025-OPE-0016-DRAFT-0586 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0587 |
| ED-2025-OPE-0016-DRAFT-0658 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0666 |
| ED-2025-OPE-0016-DRAFT-0703 | Duplicate Comment | ED-2025-OPE-0016-1106 |
| ED-2025-OPE-0016-DRAFT-0723 | No content | NA |
| ED-2025-OPE-0016-DRAFT-0916 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-0915 |
| ED-2025-OPE-0016-DRAFT-1006 | Duplicate Comment | ED-2025-OPE-0016-1081 |
| ED-2025-OPE-0016-DRAFT-3818 | One word; No context | NA |
| ED-2025-OPE-0016-DRAFT-4562 | Duplicate Comment | ED-2025-OPE-0016-1174 |
| ED-2025-OPE-0016-DRAFT-4606 | Duplicate Comment | ED-2025-OPE-0016-1129 |
| ED-2025-OPE-0016-DRAFT-4776 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-4777 |
| ED-2025-OPE-0016-DRAFT-4967 | Test comment | NA |
| ED-2025-OPE-0016-DRAFT-6757 | Duplicate Comment | ED-2025-OPE-0016-DRAFT-6756 |
| ED-2025-OPE-0016-DRAFT-6960 | Duplicate Comment | ED-2025-OPE-0016-1080 |
| ED-2025-OPE-0016-DRAFT-6990 | Duplicate Comment | ED-2025-OPE-0016-0912 |
| ED-2025-OPE-0016-DRAFT-7021 | Duplicate Comment | ED-2025-OPE-0016-1078 |
| ED-2025-OPE-0016-DRAFT-7041 | Duplicate Comment | ED-2025-OPE-0016-0381 |
| ED-2025-OPE-0016-DRAFT-7087 | Duplicate Comment | ED-2025-OPE-0016-1174 |
| ED-2025-OPE-0016-DRAFT-7181 | Duplicate Comment | ED-2025-OPE-0016-1079 |



# CONGRESS.GOV

## The Illegality Doctrine and 501(c)(3) Organizations

| | |
|---|---|
| **CRS Product Type:** | In Focus |
| **CRS Product Number:** | IF12739 |
| **Topics:** | Budget, Public Finance & Taxation; Justice & Law Enforcement; Law, Constitution & Civil Liberties |
| **Publication Date:** | 08/14/2024 |
| **Author:** | Ball, Milan N. |

Download PDF (399KB)

☰　🔊 Listen　▶

Courts and the Internal Revenue Service (IRS) have long recognized an implied requirement that organizations exempt from taxation under Internal Revenue Code (IRC) Section 501(c)(3) must not have an illegal purpose. As explained by the Supreme Court in *Bob Jones University v. United States*, 461 U.S. 574 (1983), the origins of this illegality doctrine emanate from the law of charitable trusts. Loss of government revenues from tax exemption is often justified on the grounds that tax-exempt organizations serve desirable public purposes and lessen the government's costs and burdens. As a corollary to this public benefit principle, tax exemption is not justified when an organization has an illegal purpose because the organization does not serve a public purpose and the organization increases the government's costs and burdens. The illegality doctrine helps ensure that the government is not subsidizing activity that it aims to prevent. When an organization provides some public benefit but engages in substantial illegal activity, the IRS principally relies on the statutory text of IRC Section 501(c)(3)—requiring organizations to be organized and operated exclusively for one or more enumerated exempt purposes—to deny 501(c)(3) status.

This In Focus examines how and when courts and the IRS have used the illegality doctrine to deny organizations 501(c)(3) status.

## Illegal Purpose

To qualify for tax exemption under IRC Section 501(c)(3), an organization must be organized and operated exclusively for religious, educational, scientific, charitable, or other enumerated purposes. As explained by the Supreme Court in *Better Business Bureau of Washington, D.C., Inc. v. United States*, 326 U.S. 279 (1945), in which the Court interpreted a provision akin to IRC Section 501(c)(3), "the presence of a single [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes." In general, when a

taxpayer challenges the IRS's denial of tax-exempt status, the taxpayer bears the burden of proof to show that it is entitled to tax exemption.

In *Church of Scientology of California v. Commissioner*, 83 T.C. 381 (1984), the Tax Court held that a church did not qualify as a 501(c)(3) for certain tax years on several grounds, including an illegal purpose. The Tax Court found that the church conspired to impede the IRS in investigating, assessing, and collecting taxes from the church and affiliated churches. The church "filed false tax returns, burglarized IRS offices, stole IRS documents, and harassed, delayed, and obstructed IRS agents who tried to audit the Church's records." The Tax Court determined that the church's course of conduct constituted a conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and demonstrated that the church had a "substantial illegal purpose."

The church argued that there were less restrictive ways for the government to purge misconduct than withholding its tax exemption. It claimed criminal prosecution of specific church officials could have vindicated the government's interest with less intrusion into its church members' First Amendment associational and free exercise rights. The Tax Court concluded neither the First Amendment nor charitable trust principles limited the government's remedy to criminal prosecution. The Tax Court remarked:

> [T]he Government's interest in ferreting out crime is not the only interest at stake here. The Government also has an interest in not subsidizing criminal activity. Were we to sustain [the church's] exemption, we would in effect be sanctioning [its] right to conspire to thwart the IRS at taxpayer's [sic] expense. We think such paradoxes are best left to Gilbert and Sullivan.

## Engaging in Illegal Activities

The "operational test" in Treasury Regulation Section 1.501(c)(3)-1, which some courts have embraced, makes plain that an organization will not be regarded as operating for exempt purposes "if more than an insubstantial part of its activities" further a nonexempt purpose. The IRS has applied the operational test to stress that even an organization with a legal purpose will not qualify for tax exemption under IRC Section 501(c)(3) if it engages in substantial illegal activity.

Treasury Regulation Section 1.501(c)(3)-1(d)(2) clarifies that an organization is not precluded from qualification under IRC Section 501(c)(3) if, in carrying out its primary purpose, the organization advocates for social or civil change or opines on controversial issues with the intent to mold public opinion or gain public acceptance so long as it is not an "action organization." In general, an organization is an action organization if (1) a substantial part of its activities is attempting to influence legislation; (2) it participates or intervenes in a political campaign on behalf of or in opposition to a candidate for public office; or (3) its main or primary objective or objectives can only be accomplished by legislation or a defeat of proposed legislation and it advocates or campaigns for the attainment of that objective.

In *Mysteryboy, Inc. v. Commissioner*, T.C. Memo 2010-13, the Tax Court held that an organization did not qualify as a 501(c)(3), in part, because it found that the organization's proposed activities caused the organization not to be operated exclusively for a tax-exempt purpose. The organization's

proposed activities included activities to (1) legalize sex between adults and children, (2) change child pornography laws, (3) observe sexual behavior between adults and "underagers", and (4) promote the artistic use of human nudity "YOUNG AND OLD[.]"

The Tax Court explained,

we find that petitioner proposes to operate in a manner that promotes activities which are prohibited by Federal and State laws, violate public policy as reflected in those laws, and tend to promote illegal activities.

The Tax Court also determined that the organization failed to carry its burden of proving that it was not an action organization.

# Application of Illegality Doctrine

The varied, and sometimes overlapping, considerations that factor into courts' and the IRS's application of the illegality doctrine are exhibited in *Iowaska Church of Healing v. Werfel*, No. 23-5122 (D.C. Cir. June 21, 2024). In *Iowaska Church of Healing*, an organization whose members' sincerely held religious beliefs involved the consumption of a hallucinogenic drug regulated by the Controlled Substances Act (CSA) challenged the IRS's denial of its application for 501(c)(3) status. While the organization's application was pending, the organization distributed Ayahuasca, a tea that contained the controlled substance dimethyltryptamine (DMT), to its members at religious ceremonies without a religious exemption from the CSA. The IRS denied the organization's application because (1) the organization was formed in part for the illegal purpose of distributing a controlled substance; and (2) a substantial part of the organization's activities was in furtherance of that illegal purpose.

The organization sued the government in the U.S. District Court for the District of Columbia to challenge the IRS's determination. In a memorandum opinion on a motion for summary judgment, the district court held that the IRS correctly determined that the organization was not entitled to 501(c)(3) status. The district court concluded that

until [the organization] obtains a CSA exemption, its promotion and use of Ayahuasca remains illegal under federal law, and [the organization] is neither organized nor operated exclusively for public purposes.

On appeal, citing *Bob Jones*, the D.C. Circuit assessed that the organization's illegal purpose foreclosed eligibility for tax exemption under IRC Section 501(c)(3). The D.C. Circuit held:

The Church's primary organizational and operational purpose—Ayahuasca use and ceremony—is illegal on its face without a CSA exemption and the Church did not prove otherwise to either the IRS or the District Court.

The IRS has issued a variety of materials that provide insight into when the IRS considers illegal activities to be grounds for disqualification. The IRS has conveyed that the quality of illegal activities is just as important as the quantity of illegal activities when determining whether an organization is engaging in substantial illegal activity. The quantitative test considers the amount of time and attention an organization spends on the illegal activities, such as the ratio illegal activities bear to activities in furtherance of the organization's tax-exempt purpose. The qualitative test considers the seriousness of the illegal activities involved and the extent those activities are attributable to the organization based on the involvement of the organization's officers and directors or ratification by

the organization's governing body. In an IRS Office of Chief Counsel legal memorandum, General Counsel Memorandum 34631 (Oct. 4, 1971), the IRS explained:

> A great many violations of local pollution regulations relating to a sizable percentage of an organization's operations would be required to disqualify it from 501(c)(3) exemption. Yet, if only .01% of its activities were directed to robbing banks, it would not be exempt. This is an example of an act having a substantial non-exempt quality, while lacking substantiality of amount. A very little planned violence or terrorism would constitute "substantial" activities not in furtherance of exempt purpose.

In practice, the IRS has issued several rulings denying 501(c)(3) status to organizations that engage in criminal acts or induce or encourage the commission of criminal acts by planning or sponsoring illegal activities. For example, the IRS regularly issues private letter rulings denying exemption under IRC Section 501(c)(3) to organizations that distribute or encourage the use of controlled substances, including marijuana. The IRS has also denied 501(c)(3) status to organizations based on illegal activities involving civil disobedience, polygamy, and animal cruelty.

## Considerations for Congress

The reach of the illegality doctrine is uncertain due to limited illegality doctrine jurisprudence and IRS materials delineating the types and level of illegal activities that could constitute grounds for denial of 501(c)(3) status. Even cautious 501(c)(3)s that seek out tax advice before engaging in activities that are conceivably in furtherance of their charitable goals, but could also be viewed as illegal, may be ill-prepared for potential risks. To clarify the scope of the illegality doctrine, Congress could draft legislation codifying the illegality doctrine and demarcating the doctrine's limits. Alternatively, Congress could draft legislation partially codifying the illegality doctrine by listing specific activities that can lead to loss of 501(c)(3) status. To the extent such activities involve speech or expressive conduct, Congress may wish to consider whether they involve protected or unprotected speech, and whether the nature of the restriction would implicate the free speech or free exercise interests of the taxpayer.

Disclaimer:
These documents were prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# L. ILLEGALITY AND PUBLIC POLICY CONSIDERATIONS[1]
### by
### Jean Wright and Jay H. Rotz

## 1. Overview

The recent increase in the use of gambling by exempt organizations to raise money, the release of GCM 39862 (November 22, 1991) discussing Medicare and Medicaid fraud, and other factors, have intensified interest among some commentators, practitioners and Service personnel in the possibility that organizations may be denied exemption under Internal Revenue Code 501 or have their exempt status revoked on the basis of illegal behavior. This article explains why tax exempt organizations may jeopardize their exempt status if they engage in illegal activity, and describes the implications of various types of illegal activity for different types of exempt organizations.

It is important to emphasize that, in most cases, if an organization has engaged in substantial illegal activity, it has also run afoul of other basic principles of tax exemption and may be subject to revocation on those grounds, independent of the illegality issues. For example, where a hospital violates the Medicare and Medicaid Anti-Fraud and Abuse statutes by giving kickbacks to staff doctors who refer patients to the hospital, it may have also violated the proscription against private inurement. In other situations, issues of substantial amounts of private benefit or insufficient community benefit may be raised.

However, where the conduct does not create inurement and the private benefit is not substantial enough to cause revocation when the benefit is weighed against the community benefit, illegality may be the only remaining revocation issue. Since an illegality question often raises difficult issues of proof, administrative jurisdiction, and substantiality as discussed below, any other issues present in the case such as inurement or private benefit should be thoroughly considered in addition to an illegality argument.

## 2. Historical Background

### A. Evolution from Trust Law

---

[1] The Exempt Organization Continuing Professional Education Technical Instruction Program for 1985 discusses illegal activity by exempt organizations in detail at pages 109-124.

All organizations seeking exemption under 501(c)(3) must conform to certain fundamental legal principles applicable to all charitable organizations. Treas. Reg. 1.501(c)(3)-1(d)(2); Rev. Rul. 67-325, 1967-2 C.B. 113, 116-7. <u>See also</u> Rev. Rul. 71-447, 1971-2 C.B. 230; Rev. Rul. 75-231, 1975-1 C.B. 158. One of these basic charitable principles is that charitable organizations may not engage in behavior that is illegal or violates public policy.

The illegality doctrine derives from English charitable trust law, the legal foundation on which 501(c)(3) was built. Under charitable trust law, trusts violating law or public policy cannot qualify for charitable status. Restatement <u>Trusts</u> (Second), 377, Comment <u>c</u> (1959); IVA A. Scott, <u>The Law of Trusts,</u> 377 (4th Ed. 1989). Thus, the "illegality doctrine" encompasses illegal activity as well as activity in violation of public policy. <u>See</u>, <u>infra</u> Section 4.A.

The Service views illegality as one of the criteria by which an organization's activities are evaluated. Rev. Rul. 80-278, 1980-2 C.B. 175, established a three-part test to determine whether an organization's activities will be considered permissible under 501(c)(3): (1) the purpose of the organization is charitable; (2) the activities are not illegal, contrary to a clearly defined and established public policy, or in conflict with express statutory restrictions; and (3) the activities are in furtherance of the organization's exempt purpose and are reasonably related to the accomplishment of the purpose.

B. <u>Tax Policy Basis for Doctrine</u>

Tax exemption for charitable organizations is often justified on the grounds that charitable organizations lessen the burdens of government by providing benefits to the public which would otherwise have to be furnished by the government. H.R. Rep. No. 1820, 75th Cong., 3d Sess. 19 (1930). <u>Trinidad v. Sagrada Orden</u>, 263 U.S. 578, 581 (1924); <u>Jackson v. Statler Foundation</u>, 496 F. 2d 623, 634 (2d Cir. 1974); <u>St. Louis Union Trust Co. v. United States</u>, 374 F. 2d 427, 432 (8th Cir. 1967); <u>Duffy v. Birmingham</u>, 190 F. 2d 738, 740 (8th Cir. 1951); <u>Walz v. Tax Commission</u>, 397 U.S. 664, 680, 687 (1970) (Brennan, J., concurring).

Because benefit to the public is an underlying justification for charitable tax benefits, organizations which increase governmental burdens cannot justify tax exemption. Organizations engaged in illegal activity increase the governmental burden of law enforcement, while activities that are inconsistent with public policy

obviously increase, rather than reduce, governmental costs and burdens, and are inconsistent with the basic requirement that exempt organizations serve a public purpose. The Supreme Court has said:

> ...[I]t would be anomalous for the Executive, Legislative and Judicial Branches to reach conclusions that add up to a firm public policy ..., and at the same time have the IRS blissfully ignore what all three branches of the Federal Government had declared.

Bob Jones University v. United States, 461 U.S. 574 (1983) at 598.

The illegality doctrine acts as a check to assure that the federal government does not support through tax exemption an organization engaged in behavior the government is charged with preventing. As a district court noted in an oft-quoted passage, if it were not for the limits of the illegality doctrine, "...Fagan's school for pickpockets would qualify for a charitable trust." Green v. Connally, 330 F. Supp. 1150 (D.C.D.C. 1971) (three judge panel), aff'd per curiam sub nom., Coit v. Green, 404 U.S. 997 (1971). The government has an interest in not subsidizing criminal activity. The Tax Court noted in Church of Scientology of California v. Commissioner, 83 T.C. 382, 506 (1984) that, "Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense. We think such paradoxes are best left to Gilbert and Sullivan."

C. Bob Jones and other Racial Discrimination Cases

The most celebrated application of the charitable trust law principle that organizations violating law or public policy are not charitable occurred in Bob Jones University v. United States, supra. Until 1970, the Service granted tax exempt status to private schools without regard to the schools' racial policies. In that year, a District Court issued a preliminary injunction prohibiting the Service from recognizing tax exempt status of private schools in Mississippi that discriminated as to admissions on the basis of race. Green v. Kennedy, 309 F. Supp. 1127, appeal dism'd sub nom., Cannon v. Green, 398 U.S. 956 (1970).

After that decision, the Service announced it would no longer allow tax exempt status for discriminatory schools. The Service's change in position was ratified in Green v. Connally, supra, which enjoined the Service from approving tax exempt status for any school in Mississippi that did not publicly maintain a policy of nondiscrimination.

ED_01124

The Service set out its new position in Rev. Rul. 71-447, 1971-2 C.B. 230, stating:

> Both the courts and the Internal Revenue Service have long recognized that the statutory requirement of being `organized and operated exclusively for religious, charitable,...or educational purposes' was intended to express the basic common law concept [of `charity']....All charitable trusts, educational or otherwise, are subject to the requirement that the purpose of the trust may not be illegal or contrary to public policy.

The national policy against racial discrimination was reflected in the Civil Rights Act of 1964, Brown v. Board of Education, 347 U.S. 483, 500 (1954), and other court cases.

The Service eventually revoked Bob Jones University's exempt status. After numerous appeals and remands, the University's case made its way to the Supreme Court, along with that of Goldsboro Christian Schools, Inc v. U.S., 436 F. Supp. 1314 (E.D. N.C., 1977), whose exempt status had also been revoked because of racial discrimination. The Supreme Court decided both cases in Bob Jones University, supra, citing charitable trust law and its application in over one hundred years of legal precedent and Congressional history to support the Court's position that charitable organizations may not violate the law or public policy.

While the Bob Jones case has prompted much discussion about whether the illegality doctrine could be applied to organizations involved in gender or other types of discrimination, it has so far not been applied beyond its original sphere of racial discrimination. See Section 4.A. infra.

D. Anti-war Protests and Confrontational Activity

Another area in which the illegality doctrine has been applied concerns organizations involved in protests. An organization whose primary activity is sponsoring protest demonstrations at which participants are urged to deliberately block vehicles and pedestrians, disrupt the work of government, and prevent the movement of supplies is not exempt under 501(c)(3). Rev. Rul. 75-384, 1975-2 C.B. 204. In that ruling, the organization's activities violated local ordinances and constituted "breaches of public order." They demonstrated an illegal purpose inconsistent with charitable ends, and increased the burdens of local government.

Compare Rev. Rul. 80-278, 1980-2 C.B. 175, in which the confrontations were accomplished through the courts and were clearly not illegal.

3. <u>Substantiality Requirement</u>

    A. <u>Importance of Substantiality</u>

    If an organization has an illegal purpose, it will not qualify for exemption. In <u>Church of Scientology of California v. Commissioner</u>, <u>supra</u>, the court did not need to address the issue of substantiality because it found that one of the organization's purposes was criminal tax fraud.

    However, assuming that an organization's purposes are legal, the substantiality of the illegal activities will determine whether the exempt status is jeopardized. An organization will not qualify for exempt status if it engages in substantial illegal activity.

    Substantiality must be considered <u>quantitatively</u> as well as <u>qualitatively</u>. The quantitative test focuses on the time and attention the organization gives to the illegal activity. No exempt organization may engage in a substantial amount of activity that does not further exempt purposes. Treas. Reg. $1.501(c)(3)-1(c)$. Therefore, substantial activity that does not further exempt purposes is inconsistent with exempt status, regardless of its illegality.

    The qualitative test focuses on the seriousness of the illegality involved, and the extent to which the activity can be attributed to the organization by virtue of the involvement of directors or officers or through clear ratification of the organization's governing body. <u>See</u> Section 6. The illegal activity may be so serious that even an isolated incident would outweigh the organization's other activities and be a basis for revocation or denial of exemption, regardless of the nature and extent of its exempt activities.

    B. <u>Measuring Substantiality</u>

    The Supreme Court has not considered the issue of how to weigh illegal activity against activity that does further exempt purposes. It concluded in <u>Bob Jones</u> that racially discriminatory private schools could not be said to confer a benefit on the public, so it did not need to address the issue of whether illegal activity <u>per se</u>, regardless of its substantiality, can justify revocation of a $501(c)(3)$ organization's exempt status. The Court expressly reserved judgment on the issue

of whether an organization providing a public benefit and otherwise meeting the requirements of 501(c)(3) could be denied exempt status if certain of its activities violated a law or public policy. <u>Bob Jones</u> at 596.

The question of substantiality of illegal activity was considered in GCM 34631 (October 4, 1971). That memorandum concerned an association alleged to be involved with organized crime, which was said to have used force and violence to silence a newspaper opposed to the organization.

The GCM states that it is insufficient to consider only the quantitative basis for determining substantiality. The nature of the acts is as important as the ratio that illegal activities bear to activities that further exempt purposes.

A great many violations of local pollution regulations relating to a sizable percentage of an organization's operations would be required to disqualify it from 501(c)(3) exemption. Yet, if only .01% of its activities were directed to robbing banks, it would not be exempt. This is an example of an act having a substantial non-exempt quality, while lacking substantiality of amount. A very little planned violence or terrorism would constitute `substantial' activities not in furtherance of exempt purposes.

GCM 39862, which addresses a hospital's sale of its net revenue stream, cited GCM 34631 in relation to the possibility that the arrangement at issue violated the anti-kickback rules of Medicare and Medicaid. GCM 39862 at 30. <u>See</u> . VII(B) <u>infra</u> for a detailed discussed of these laws. The memorandum did not attempt to resolve whether the possible violations of the fraud and abuse laws by the hospital at issue were substantial under the GCM 34631 standards.

GCM 39862 concluded that the substantiality of illegality varies according to the character and nonexempt quality of the activity, and notes several factors that it deemed important to a resolution of the substantiality issue in the case. The factors supporting a finding that the non-exempt conduct of financially inducing doctors to make referrals was substantial were: 1) the public policy violation was authorized by the tax-exempt organization's directors and most senior managers, who had knowledge of the risk that the organization's activity might violate public policy; 2) the public policy violation was central to the activities through which the organization accomplished its exempt purposes; and 3) the public policy violation was potentially harmful to the charitable class that the organization serves. GCM 39862 at 30, fn. 16.

The potential illegality of the activity made it more serious, and thus lent weight to the qualitative part of the substantiality analysis. It should be noted that GCM 34631's analysis assumes illegality. In most situations involving exempt organizations, including the one described in GCM 39862, no authority has determined that the specific alleged behavior was illegal. GCM 39862 did not have to resolve the issue of substantiality since the arrangement created private inurement and substantial private benefit.

## C. Violations Allegedly in Furtherance of Exempt Purposes

GCM 34631 addressed the issue of whether violating the law could further exempt purposes, citing an example of a situation where illegally obtained funds are used to finance a charity. GCM 34631 at 6. The GCM flatly states that since exempt purposes may generally be equated with the public good, and violations of law are "the antithesis of public good," illegal activity does not further exempt purposes. It adds that since illegality increases the government's crime fighting burden, an organization engaged in such activity harms rather than promotes social welfare.

Recently, GCM 39862 reaffirmed this position and clarified that a hospital does not further its exempt purposes by inducing or rewarding patient referrals in violation of federal law. Id. at 34. The memorandum did allow for the possibility that a hospital's participation in a joint venture or other economic arrangement with physicians could seemingly benefit the community and further charitable purposes, while at the same time possibly have an intention to induce or reward referrals. Id. at 35, n. 16.

GCM 39862 suggests conditioning the hospital's ruling on the arrangement not violating the Medicare and Medicaid anti-kickback statute. Thus, even where the Service has approved of a hospital's proposed joint venture, a finding by HHS that the activity violated the anti-kickback statute would probably cause revocation of the ruling and possibly cause loss of exempt status for the period in which the violations occurred.

In the example posed by GCM 39862, the hospital's practice may or may not violate the Medicare and Medicaid Anti-Fraud and Abuse statutes. However, the safe-harbor regulations published in 1991 by the Department of Health and Human Services do not cover a hospital's purchase of a physician's practice which may be proscribed under the broad language of the Anti-kickback Statute. The

issue of activity that ostensibly furthers exempt purposes while possibly violating the fraud and abuse laws arises commonly in integrated delivery system rulings. In those cases, the Service conditions the ruling on the entity not violating the anti-kickback restrictions. See, "Integrated Delivery Systems," this volume, at Section 2(B).

Another example of activity that may violate the fraud and abuse statute even though it arguably otherwise furthers charitable purposes is a medical office building lease arrangement between a hospital and a doctor at fair market value. Rev. Rul. 69-463, 1969-2 C.B. 121. Having doctors nearby may be convenient for patients and improve access to doctors, but the lease may violate the Fraud and Abuse statutes unless it is an executed written agreement for a term of not less than one year, specifies the premises covered by the lease, and sets out the rent in advance at fair rental value without regard to the volume or value of any business generated between the lessor and lessee Fed. Reg. 35,952, 35,985 (July 29, 1991).

Caveating ruling letters partially resolves this dilemma since it puts the parties on notice that they should not rely on the ruling if a violation is found by the governmental body with the authority to do so. It follows that where an exempt organization has been found to violate a statute that reflects an important public policy, it should be aware that the violation is inconsistent with exempt status and may jeopardize exemption for the period in which the violations occurred.

4. Importance of the Underlying Public Policy

    A. Public Policy Requirement

The illegality doctrine contains two distinct parts. According to the Supreme Court in Bob Jones, supra, it prohibits both illegal activities and those that, while not necessarily illegal, are contrary to a fundamental public policy. Bob Jones at 592 (emphasis added). Bob Jones is the only case to date in which an organization was alleged only to have violated public policy and not any specific law. In most situations, the activity in question has violated a law, so the underlying public policy simply lends weight to the illegality argument rather than having to stand alone.

The more important the public policy furthered by a particular law, the more likely that a violation of that law will be considered substantial enough to warrant revocation. For example, the public policy implications of hospitals giving kickbacks for patient referrals have been discussed at length in Congressional

hearings. See 7.A. infra. A number of statutes have been enacted and strengthened over the years. The Department of Health and Human Services has a special office charged with enforcing these statutes. Therefore, violations of the anti-kickback statute would probably weigh heavily in Service assessments of a hospital's charitability. See GCM 39862 at 29-36.

B. Sources of Public Policy

Deciding a case on the basis of public policy rather than a specific law is difficult because it requires discerning what the public policy involved really is. The Supreme Court in Bob Jones looked to federal legislation and executive orders to ascertain the public policy in that case. Bob Jones at 594-5. The Court emphasized that had Congress disagreed with the Service's interpretation of public policy in the Bob Jones case, it could have legislatively reversed the decision to revoke exemption. Because Congress had not done so in the 11 years between the initial decision to revoke the University's exemption and the time the case reached the Supreme Court, there was "an unusually strong case of legislative acquiescence" in the Service's interpretation of public policy. Bob Jones at 599. In those 11 years, there had been 13 bills introduced in Congress to overturn the Service's interpretation of 501(c)(3) as forbidding racial discrimination. All of them died in committee. More importantly, Congress enacted 501(i) forbidding racial discrimination by private social clubs on the same rationale the Service used in Rev. Rul. 71-447. Bob Jones at 601-2.

The focus on public policy in the illegality cases, particularly in the only Supreme Court case on the subject, Bob Jones, suggests the possibility that an organization's exempt status may change in response to changes in public policy. Just as the public policy changed over many years to prohibit racial discrimination which had previously been allowed, public policy could change in other areas as well.

For example, for many years, the Service had not taken notice of the possibility that hospitals were violating the Medicare and Medicaid anti-fraud and abuse laws, and the implications of those violations for exempt status. GCM 39862 changed that situation, at least in part because of the increasing importance the Congress and HHS have placed on the enforcement of the anti-fraud and abuse laws in the last several years. Just as the Service responded to public outrage over racial discrimination in education in Bob Jones and to possible kickbacks in GCM 39862, the Service can be expected to re-evaluate positions in other areas as the public policy considerations become more clearly focused because of

Congressional action, decisions of the Executive Branch, or court actions.

### C. State or Federal Law

Several General Counsel Memoranda have considered alleged violations of state and local law and concluded that the Service must recognize any Constitutionally valid law, not merely federal ones. This question sometimes arises where an organization allegedly has violated state and local gambling laws.

GCM 34631 concerned an association said to be involved with organized crime. The organization's alleged acts of intimidation and violence allegedly violated state law. The memorandum stated that:

> ...violation of any constitutionally valid laws is inconsistent with exemption under section 501(c)(3)...[citing GCM 617795 (Aug. 14, 1959)]. That memorandum bases its conclusion upon the rationale that contravening state laws (1) is not in furtherance of exempt purposes, and (2) is contrary to public policy.

GCM 34631 at 6. See also Rev. Rul. 75-384, 1975-2 C.B. 204 (anti-war protest organization's violations of local law warranted revocation of 501(c)(3) status).

It is theoretically possible that a state or local law could contravene a fundamental federal policy. In that case, Service revocation of exempt status on the basis of a violation of that statute arguably would be inappropriate. To date, no such case has arisen.

### 5. When Should the Service Take Action?

A difficulty in applying the illegality doctrine is that it may not always be easy to determine whether the activity in question was actually illegal. This is particularly true where the statute in question is outside the Service's jurisdiction. Where the activity does not violate tax laws, the Service must either rely on another governmental body's determination of illegality or make its own. Each of these situations poses problems.

### A. Uncontested Violations

In some situations the illegal activity is so blatant as to demand action by the Service. For example, agents often encounter gambling operations that clearly

violate state law, but which will not likely be aggressively prosecuted because the state does not have the resources to enforce the gambling laws. Sometimes, the organization may not even deny that its operations violate the law. In cases where the illegality is uncontested, the Service may pursue the possibility of revocation on the basis of those activities without a specific determination of illegality by state authorities.

B.    Where Agency with Enforcement Responsibility Has Not Taken Action

Generally, the Service should not rush to unilaterally declare activity illegal unless it is clearly within the Service's jurisdiction to do so. GCM 37111 (May 4, 1977) stated that an activity has to have been judicially determined to be in violation of a provision of law before the Service will revoke exemption on the basis of illegal activity. According to GCM 37111:

> The Internal Revenue Service is not in a position to make determinations as to the illegality of an act under a provision of law other than the Internal Revenue Code. The Constitution of the United States provides for separation of powers, and a determination of illegality in such cases is within the province of the judiciary. From an administrative standpoint alone, such a task would be impossible for the Internal Revenue Service to undertake. From a legal standpoint, moreover, the onus which attaches to a determination of illegality is such that it would be improper to delegate such a determination to an administrative body without the procedural and substantive due process protection provided through the judicial process.

GCM 37111 at 11.

An example of a situation in which the Service declined to declare activity illegal arose in GCM 37741 (Nov. 9, 1978). That GCM concerned the issue of whether an organization's activity of contacting and encouraging others to contact foreign government officials violated U.S. law governing contact between U.S. citizens and foreign governments. The memorandum concluded that the Treasury Department was not qualified to make the assessment, and recommended that the Treasury department coordinate with the State and Defense Departments to determine whether the activity was illegal.

GCM 39862 also made this point in connection with the Medicare and Medicaid Anti-Fraud and Abuse Statutes. Where the courts and the administrative agency responsible for administering a nontax statute have not found it applicable to a particular arrangement, the IRS should not rush to do so unnecessarily. GCM 39862 at 37.

It is important to note that all of these statements concern situations where the Service is evaluating the impact of illegality per se on the organization's exemption. If the Service determines on audit that an organization is not primarily engaged in activities that further its exempt purposes, its exemption may be revoked on that basis alone.

### C. Pre-conviction settlement

In some cases, an organization may enter into an agreement with a federal agency to halt the activity in question without ever having been found guilty of any improper behavior by a court. This is a common scenario in cases involving hospitals and the Anti-Fraud and Abuse statutes. While a conviction for illegal behavior virtually demands that the Service take the activity into account in considering qualification for exemption, a settlement prior to conviction may be slightly less compelling. Where the settlement takes into consideration such things as inadvertence, vagueness of the law, restitution, discontinuation of the practice, or other factors tending to indicate compliance for the future, the arguments for revocation or denial may be less compelling.

### 6. Attribution Issues

An exempt organization often engages in activity through its members or officers without documentation to clearly show whether the individual was acting for the organization or on his or her own. Thus, questions of attribution will often arise in connection with activity that may jeopardize exemption, particularly where those acts may also be illegal.

### A. Officers and Employees

Chief counsel has concluded that the Service will hold an organization responsible for its officers' and employees' actions when: 1) the organization's officials act under actual or purported authority to act for the organization; 2) agents for the organization act within their authority to act; or 3) acts are ratified by the organization. GCM 34631 at 10.

For example, if an officer of an organization encourages illegal activity in an organization's newsletter or at a conference, the statements will be attributable to the organization itself unless the organization provides sufficient evidence that the acts were unauthorized at the time and not later condoned or encouraged through the organization's inaction.

B. <u>Members</u>

An organization will not generally be held accountable for unauthorized activities of its members. Rev. Rul. 75-384, 1975-2 C.B. 204. If the illegal activity is minor in a quantitative sense, the Service will require clearer proof of authorization or ratification of the members' acts before attributing the activity to the organization. G.C.M. 32651 (Aug. 29, 1963)(organization exhorted members to follow their own consciences regarding military service, but did not knowingly counsel, aid or abet others to refuse or evade registration or service.)

In GCM 38415 (June 20, 1980), an environmental group used confrontational tactics against foreign commercial interests in an attempt to stop hunting of endangered animals. The U.S. government had condemned the hunting on a number of occasions. The organization did not advocate any illegal action, although there were "incidental brushes by [organization] members with the legal authorities in various jurisdictions... We found no evidence that any potentially illegal activity engaged in by ...[the organization's] members was authorized or condoned by ...[the organization]."

The organization itself was found not to have authorized or condoned illegal activity. Furthermore, there was evidence that the organization had removed from its Board of Directors and from membership in the organization a person who had been involved in several illegal acts at legal demonstrations sponsored by the organization.

Where an organization urges its members to commit illegal acts, the organization's exempt status will be affected by the members' actions. Rev. Rul. 75-384, 1975-2 C.B. 204, concerned an organization formed to promote world peace. It planned and sponsored a protest demonstration at which members were urged to commit acts of civil disobedience. The Service ruled that the organization did not qualify for section 501(c)(3) or (4) status because its members' activities were attributed to the organization that had encouraged the action.

ED_01134

7. Potential Applications of Illegality Doctrine in Health Care

    A. Medicare and Medicaid Fraud and Abuse

Several federal statutes have been enacted to address fraud and abuse in the Medicare and Medicaid programs.

      1. Anti-kickback Statute

        a. Provisions of the Statute

The anti-kickback statute, U.S.C. 1320a-7b(1) and (2), prohibits kickbacks for referring a person to a particular provider for any item or service or for purchasing or inducing the purchase of any good, facility, or item for which payment may be made under Medicare or Medicaid.

Hospitals, clinics and other health care institutions may be on either side of a kickback: 1) making payments to doctors to induce referrals; or 2) requiring payments by hospital-based physicians to the hospital as a condition of using hospital facilities. Joint ventures to own and operate clinical diagnostic laboratory services, durable medical equipment, and other services are examples of arrangements that could violate the anti-kickback provisions, depending on the structure of the arrangement and the intent of the parties involved. See Office of the Inspector General, Department of Health and Human Services, FRAUD ALERT: Joint Venture Arrangements (1992).

The anti-kickback statute is a criminal provision, punishable by fines of up to $25,000 or imprisonment for up to five years, or both. In addition, violators may be excluded from Medicare and Medicaid participation through a civil proceeding.

The anti-kickback provision casts a very wide net, and has been interpreted to include payments in part for legitimate services and in part intended to induce referrals. In United States v. Greber, 760 F.2d 68 (3d Cir.), cert. den., 474 U.S. 988 (1985), the court held that if one purpose of a payment is to induce referrals, then the statute has been violated, even if the parties also had other permissible motives. Greber's broad reading of the statute has been adopted either wholly or partially by two other circuits. United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Bay State Ambulance and Hosptial Rental Serv. Inc., 874 F.2d 20 (1st Cir. 1989).

In 1991, the Office of the Inspector General ("OIG") of the Department of Health and Human Services published regulations designed to define "safe harbors" for 10 commercial arrangements that are technically covered by the broad provisions of the Anti-kickback statute, but which will not be subject to criminal or civil sanctions. These include interests in certain investments, employment relationships, personal service and management contracts, medical practice sales, space and equipment rental agreements, discounts, group purchasing organizations, waivers of coinsurance and deductibles, referral services and warranties.

## b. Implications for Exemption

Hospitals, more than most exempt organizations, are subject to a wide variety of criminal and civil sanctions designed to require them to provide specific services in a particular manner. These requirements tend to overlap a hospital's stated charitable purpose. Therefore, failure to abide by the requirements often affects a hospital's exempt status, regardless of whether the hospital's activities are illegal per se. In those situations, the analysis of the activity's effect on the hospital's exempt status should proceed in basically the same manner as would the analysis of any other non-exempt activity.

GCM 39862 discusses at length the effect of a possible violation of the fraud and abuse laws on the participating hospital's exempt status. The memorandum cites many of the same sources to which this article refers for the proposition that illegal activity undermines exemption, e.g., Scott on Trusts and Rev. Rul. 75-384. GCM 39862 at 29-30.

This line of reasoning assumes an adjudication that the conduct in issue is, in fact, illegal. The memorandum notes, however, that it is impossible to determine whether the conduct is illegal in advance, and that the Departments of Justice and Health and Human Services, not the Service, are responsible for its enforcement.

The Service will normally confront potential fraud and abuse violations in an advance ruling situation or on audit. Usually, neither the Departments of Justice nor Health and Human Services will have taken any position on the conduct's illegality. Thus, the illegality of the conduct will not usually be the basis for adverse action.

However, even if the facts of a particular situation do not allow for the use of the illegality doctrine, the underlying conduct of paying doctors to induce

referrals undermines a hospital's charitable purposes and may be questioned under a community benefit analysis or possibly private benefit or inurement. The legislative history of the anti-fraud and abuse laws describes a number of the ways in which paying for referrals harms the community's health and society generally. Payments for referrals can increase governmental burdens by creating incentives for unnecessary use of hospital services at government expense. Patients could be subjected to unnecessary procedures, or the selection of their treatment facilities could be based upon monetary rather than medical concerns. Referral payments undercut honest competition among health care providers based on quality or price, and may lead to an increase in prices or a decrease in service quality. Finally, referral payments may divert resources that the hospital might otherwise use to further exempt purposes. H.R. Rep. No. 231, 92nd Cong., 1st Sess. 107, reprinted in 1972 U.S. Code Cong. and Ad. News 4989, 5093; H.R. Rep. No. 393 (II), 95th Cong. 1st Sess. 48, reprinted in 1977 U.S. Code Cong. and Ad. News 3039, 3050. For all of these reasons, payments to induce referrals may be inconsistent with exempt status even if they have not been declared illegal by a court.

### 2. False Claims

#### a. Provisions of the Statute

In addition to the anti-kickback statute, there are also federal laws prohibiting submission of a false claim to the Medicare program. Violators may be subject to criminal, civil, or administrative liability for making false statements and/or submitting false claims to the government. 18 U.S.C. 287 & 1001; 31 U.S.C. 3729; 42 U.S.C. 1320a-7a. Penalties can include imprisonment, criminal fines, civil damages and forfeitures, civil monetary penalties, and exclusion from Medicare and Medicaid.

An example of the misstatement of claims is the routine waiver of patients' deductibles and copayments by health care providers, practitioners, and suppliers of health care items and services paid on the basis of charges. See Office of Inspector General, Department of Health and Human Services, FRAUD ALERT: Routine Waiver of Copayments or Deductibles Under Medicare Part B (1992). The Fraud Alert contains numerous examples of indications of improper waiver of deductibles and copayments.

#### b. Impact on Exempt Status

Improper waiver of copayments and deductibles hurt the Medicare program by increasing unnecessary utilization. Studies show that requiring patients to pay even a small portion of the costs of their care causes them to select items or services because they are medically needed, rather than simply because they are free. Also, increasing Medicare costs for services or encouraging unnecessary services costs money that could be used to pay for needed care. Fraud Alert at 3.

The reasoning set forth above regarding anti-kickback violations applies here as well. If a hospital is found by a competent authority to have violated the law, the organization would be subject to revocation, depending on the substantiality of the activity. If the activity has not been determined to be illegal, it may still be grounds for revocation because the activity itself so undermines the hospital's exempt purposes.

### 3. State Statutes

Most state health care laws include anti-kickback statutes that may not be identical to the federal laws. As discussed in Section 4.C., the fact that a law is state or local is not determinative as to whether the Service should take its violation into account in determining exempt status. Therefore, the reasoning discussed above concerning federal anti-kickback statutes applies here.

### B. Patient Dumping

"Patient dumping", the practice of refusing to treat indigent patients or referring them to other hospitals in medically inappropriate situations, is an example of overlap between requirements imposed on hospitals by tax law and the Medicare and Medicaid statutes. The practice is proscribed at 42 U.S.C. 1395dd. It has also been addressed by the Service. If a hospital has turned indigent patients away from its emergency room on a regular basis, it will have a difficult time showing that it qualifies for exemption under Rev. Rul. 69-545, 1969-2 C.B 117. That ruling holds that a hospital generally must provide emergency room services to all persons requiring health care irrespective of their ability to pay, and that it must participate in the Medicaid and Medicare programs. The fact that the ruling was written in 1969, thus predating the anti-patient dumping statutes by 17 years, underscores the fact that the impact of the practice on exemption does not depend on its illegality.

It could be argued that the fact of illegality should be considered when determining the substantiality of the activity. If an activity is illegal or violates

public policy, GCM 39862 provides guidance as to how this fact affects the substantiality analysis. Although GCM 39862 concerned violations of the Medicare and Medicaid Anti-Fraud and Abuse statutes, its reasoning might apply to patient dumping as well.

C. Anti-trust

Tax exempt organizations may be charged with violations of anti-trust and fair trade legislation. For example, the Federal Trade Commission ("FTC") has been aggressively seeking injunctions against hospitals on grounds of alleged violations of the Clayton Antitrust Act and the Federal Trade Commission Act, which prohibit unfair methods of competition. Wherever a hospital that is dominant in a market, or would be dominant after the acquisition, attempts to buy out its competition, the hospital could be in violation of antitrust statutes. 15 U.S.C. Sec. 18 provides that acquisitions and mergers which "may... substantially... lessen competition" or which will "tend to create a monopoly" in any area of commerce and in any section of the country are illegal.

One case involving an exempt hospital concerns the acquisition of a California hospital by Catholic Healthcare West ("CHW") and Dominican Santa Cruz Hospital ("Dominican") in 1990. The FTC charged that the acquisition substantially reduced competition in acute-care hospital services in the Santa Cruz County, California area, disadvantaging patients, physicians and purchasers of health care coverage. News Release, Federal Trade Commission, March 10, 1993. The market share of CHW and Dominican, already the largest providers of acute-care hospital services in Santa Cruz County, increased from 62 percent to 76 percent due to the acquisition. As a result, charged the FTC, competition for acute care services has decreased; CHW and Dominican have obtained a dominant position in the market; the likelihood of collusion has increased; and the benefits of free and open competition based on price, quality and service may be denied to patients, physicians and purchasers of health care insurance.

The FTC and the hospital systems have signed an agreement to settle the charges that would require the hospital system to obtain FTC prior approval before acquiring all or any significant part of an acute care hospital in Santa Cruz County within the next ten years.

Another case concerning an exempt hospital is FTC v. University Health, 1991-2 Trade Cases para. 69,508 (11th Cir. 7/26/91). There, a proposed asset acquisition involving two nonprofit hospitals was covered by 7 of the Clayton Act,

despite the hospitals' charitable status. The transaction allegedly would lessen competition in the provision of inpatient services by acute-care hospitals in the area. The court noted that the hospitals did not show that greater efficiency would result. The market area concentration would be exacerbated by the proposed transaction.

Anti-trust violations pose some unique challenges in exempt organization law. An underlying principle of the anti-trust laws is that increased numbers of competitors are always good. Therefore, following the reasoning outlined in connection with the anti-kickback and false claims statutes, violation of the anti-trust laws harms society, and must be weighed against an organization's exempt status.

If the exempt organization has actually been found guilty of anti-trust violations by a court, the issue must be confronted, and would be weighed under a GCM 34631 substantiality analysis.

8. Church Illegality Issues

The principles involved in these cases do not differ from the general principles applicable to all 501(c)(3) cases discussed above. In Church of Scientology of California v. Commissioner, supra, the court rejected the organization's claim that Bob Jones did not apply to churches. The court in Scientology of California stated that the Bob Jones court limited its application to churches only on the issue of whether the particular fundamental interest in eradicating racial discrimination was applicable to them.

The organization in Scientology of California was involved in a conspiracy to commit tax fraud. In addition to Scientology of California, another case dealing with illegal acts committed by an organization purporting to be a church was Synanon Church v. U.S., 579 F. Supp. 967 (D.C.D.C. 1984). That organization was tied to a number of beatings and acts of physical violence, including putting a rattlesnake in the mailbox of two dissenting members' attorney.

9. Illegality Issues Involving Non- 501(c)(3) Organizations

    A. Basis for Application of the Doctrine

Because these organizations' exempt status is not based on the common law concept of charitability, the prohibition against illegal activity must arise out of

some basis other than charitable trust law. The purpose of the particular exemption at issue and the nature of the illegal act must be considered in determining whether substantial illegal activity will lead to revocation.

Because 501(c)(4) organizations promote social welfare, the illegality doctrine's application may not be very different from the case of 501(c)(3) organizations' illegal activity. In Rev. Rul. 75-384, supra, an anti-war organization that could not qualify under 501(c)(3) due to illegal activity at protests also could not qualify under 501(c)(4) because the illegal activities were "contrary to the common good and the general welfare of the people." The basis for the application of the illegality doctrine to organizations not seeking exempt status under either 501(c)(3) or (4) must rest on some ground related to the purpose of the particular exemption provision at issue. Applications of the illegality doctrine to social clubs, veterans' organizations and business leagues are discussed below.

B. Gambling and 501(c)(7)

Gambling operations, while sometimes carried on by 501(c)(3) organizations, are also carried on extensively by non- 501(c)(3) organizations such as social clubs and veterans' organizations. The most important ruling in the non-501(c)(3) gambling area is Rev. Rul. 69-68, 1969-1 C.B. 153. This ruling held that a social club's exempt status was not threatened by illegal gambling operations. The ruling reasoned that the gambling for members furthered the organization's exempt recreational purposes. The ruling stated that:

> Although gambling on the part of the participants may be accompanied by a desire for financial gain, it also supplies those elements of diversion that are commonly accepted as pleasure and recreation. Maintenance of gaming devices for members and guests of a club is an activity for their pleasure and recreation within the meaning of 501(c)(7) of the Code.

Id. (citing Country Club, Inc. v. Commissioner, 21 T.C. 807 (1954), acquiescence, 1954-2 C.B. 3.

The ruling provides two explicit boundaries for the type and extent of illegal activity in which social clubs may engage, and one limitation that is somewhat more amorphous. The first explicit limitation is that the illegal activity must further the organization's exempt purpose. In this case, the gambling the particular organization was conducting was recreational for the members. The type of

gambling involved could affect a determination of whether the gambling was recreational such as an activity that requires no commingling. In any event, the rationale that the activity is recreational would not apply where an organization's exemption rests on some non-recreational purpose such as promoting the common business interest.

The second express limitation set out in the ruling is that the gambling must be limited to members. It is unclear how many non-members would have to participate before the organization was engaged in a substantial non-exempt activity, but a social club's receipts from nonmembers may not exceed 15% of total receipts. H. Rep. No. 94-1353, 94th Cong., 2d Sess. (1976) at 4; S. Rep. No. 94-1318, 94th Cong., 2d Sess. (1976) at 4.

An implicit limitation found in Rev. Rul. 69-68 is that its holding is limited to the particular facts of that case. It does not provide carte blanche approval for all illegal gambling. The ruling states that "... the operation of gaming devices under the circumstances described does not affect the status of the club..." (emphasis added). The ruling does not set any limits on the amount or type of illegal gambling permitted.

The ruling's lack of explicit limits on allowable illegal gambling is particularly important in light of the fact that the only precedent the ruling cites for allowing illegal gambling is Aviation Country Club, Inc. v. Commissioner, 21 T.C. 807. However, the facts of Aviation Country Club were very different from those in Rev. Rul. 69-68. In Aviation Country Club, the club leased its facilities from a for-profit club. The for-profit club had sought out a non-profit club to lease its space so that it could install slot machines. The machines were illegal, but operated in virtually all private clubs in the Denver area in the years at issue "with full knowledge and acquiescence of the law enforcement officials." Aviation Country Club at 813.

The Aviation Country Club itself was, according to the opinion, "not especially interested in slot machines." Id. It had numerous activities that had nothing to do with gambling, and it continued with all these activities, even after the slot machines were removed. The opinion does not discuss the issue of the slot machines, apparently because the club had so many other activities that their operation by the club's lessor was insignificant. The opinion focuses instead on whether there was undue private benefit to the members from the physical improvements made to the club.

The facts of Aviation Club appear to limit its applicability to clubs engaged in insignificant amounts of gambling activity. In Aviation Club, the club was not established to conduct gambling. The slot machines were owned by the lessor company. They were removed after two years of operation, and the club continued to have the same varied program of activities it had maintained since its inception. Because Rev. Rul. 69-68 was based on Aviation Country Club, it should be read narrowly.

C. Antitrust and 501(c)(6)

The anti-trust issues discussed above with 501(c)(3) organizations also arise in the non-(c)(3) context, particularly with business leagues. A business league will lose its exempt status for engaging in illegal antitrust activity if the following conditions are present: 1) the activity has been judicially determined to be in violation of a provision of law; 2) the unlawful activity is carried on to such an extent and in such magnitude that it can properly be said to be the principal activity, or one of the principal activities of the organization; 3) the illegal activity must be of such a nature that it can be said to be harmful to the general business of the organization; and 4) the unlawful activity must be imputable to the membership of the organization. GCM 37111 (May 4, 1977). The memorandum's rationale is based on United States v. Omaha Live Stock Traders Exchange, 366 F.2d 749 (8th Cir. 1966), which held that a business league may not lose its exemption merely on the ground that it has been convicted of having engaged in trade practices that are illegal, discriminatory and restrictive of free competition.

GCM 37111 concerns a section 501(c)(6) organization that had been convicted of Sherman Anti-trust Act pricing violations. It states that an organization that is primarily engaged in promoting the common business interest of its members and otherwise has and retains the essential characteristics of a business league within the meaning of 501(c)(6) should not be denied exemption solely because it engaged in an illegal act that has been judicially determined to be a violation of a substantive provision of federal, state or local law. GCM 37111 limited the Omaha decision by focusing on the organization's primary activity. The memorandum cautioned, however, that if illegal activity becomes the principal activity, or one of the principal activities, of an organization, the organization will no longer qualify under section 501(c)(6), because illegal activity does not further any exempt purposes. The association had been found guilty of preparing and distributing a suggested pricing list to its members.

The conclusions of the GCM are based in part on the need for consistency in

the Service's treatment of 501(c) organizations other than (c)(3) organizations. The GCM cites Rev. Rul. 69-68, <u>supra</u>, and several GCMs concerning labor unions and illegality, and suggests that the effect of illegality on exempt status of 501(c)(5) and (c)(6) organizations should be the same. <u>See, e.g.,</u> GCM 31619 (June 6, 1960). While GCM 37111 states generally that non-(c)(3) exempt organizations should be treated similarly concerning illegal activity, it emphasizes that there is an important difference between social clubs and business leagues. Illegal activity such as the gambling in Rev. Rul. 69-68 could conceivably further a social club's exempt purposes. Illegal restraints on trade <u>cannot</u> be said to improve business conditions or promote common business interests. GCM 37111 at 14.

**PUBLIC INSPECTION DOCUMENT**

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

**PUBLIC INSPECTION DOCUMENT**

# Protecting Children From Chemical and Surgical Mutilation

A Presidential Document by the Executive Office of the President on 02/03/2025

**PUBLISHED CONTENT - DOCUMENT DETAILS**

**Agency:** Executive Office of the President
**Document Citation:** 90 FR 8771
**Document Number:** 2025-02194
**Document Type:** Presidential Document
**Presidential Document Type:** Executive Order
**EO Citation:** EO 14187
**Pages:** 8771-8773 (3 pages)
**Publication Date:** 02/03/2025

**READER AIDS**

Executive order notes are compiled and maintained by the Office of the Federal Register editors.

**EO Citation:** EO 14187
**President:** Donald J. Trump
**Signing Date:** January 28, 2025

PUBLISHED DOCUMENT

(⬚ printed page 8771)

Executive Order 14187 (/executive-order/14187) of January 28, 2025

# Protecting Children From Chemical and Surgical Mutilation

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1** . *Policy and Purpose.* Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end.

Countless children soon regret that they have been mutilated and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

**Sec. 2** . *Definitions.* For the purposes of this order:

(a) The term "child" or "children" means an individual or individuals under 19 years of age.

(b) The term "pediatric" means relating to the medical care of a child.

(c) The phrase "chemical and surgical mutilation" means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to

ED_01146

align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

**Sec. 3** . *Ending Reliance on Junk Science.* (a) The blatant harm done to children by chemical and surgical mutilation cloaks itself in medical necessity, spurred by guidance from the World Professional Association for Transgender Health (WPATH), which lacks scientific integrity. In light of the scientific concerns with the WPATH guidance:

(i) agencies shall rescind or amend all policies that rely on WPATH guidance, including WPATH's "Standards of Care Version 8"; and

(ii) within 90 days of the date of this order, the Secretary of Health and Human Services (HHS) shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion.

(b) The Secretary of HHS, as appropriate and consistent with applicable law, shall use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation.
(⬚ printed page 8772)

**Sec. 4** . *Defunding Chemical and Surgical Mutilation.* The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

**Sec. 5** . *Additional Directives to the Secretary of HHS.* (a) The Secretary of HHS shall, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

(i) Medicare or Medicaid conditions of participation or conditions for coverage;

(ii) clinical-abuse or inappropriate-use assessments relevant to State Medicaid programs;

(iii) mandatory drug use reviews;

(iv) section 1557 of the Patient Protection and Affordable Care Act;

(v) quality, safety, and oversight memoranda;

(vi) essential health benefits requirements; and

(vii) the Eleventh Revision of the International Classification of Diseases and other federally funded manuals, including the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

(b) The Secretary of HHS shall promptly withdraw HHS's March 2, 2022, guidance document titled "HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy" and, in consultation with the Attorney General, issue new guidance protecting whistleblowers who take action related to ensuring compliance with this order.

**Sec. 6** . *TRICARE.* The Department of Defense provides health insurance, through TRICARE, to nearly 2 million individuals under the age of 18. As appropriate and consistent with applicable law, the Secretary of Defense shall commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children.

**Sec. 7** . *Requirements for Insurance Carriers.* The Director of the Office of Personnel Management, as appropriate and consistent with applicable law, shall:

(a) include provisions in the Federal Employee Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs call letter for the 2026 Plan Year specifying that eligible carriers, including the Foreign Service Benefit Plan, will exclude coverage for pediatric transgender surgeries or hormone treatments; and

(b) negotiate to obtain appropriate corresponding reductions in FEHB and PSHB premiums.

**Sec. 8** . *Directives to the Department of Justice.* The Attorney General shall:

(a) review Department of Justice enforcement of section 116 of title 18, United States Code (https://www.govinfo.gov/link/uscode/18/116), and prioritize enforcement of protections against female genital mutilation;

(b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories;

(c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation; (⎙ printed page 8773)

(d) in consultation with the Congress, work to draft, propose, and promote legislation to enact a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations; and

(e) prioritize investigations and take appropriate action to end child-abusive practices by so-called sanctuary States that facilitate stripping custody from parents who support the healthy development of their own children, including by considering the application of the Parental Kidnaping Prevention Act and recognized constitutional rights.

**Sec. 9** . *Enforcing Adequate Progress.* Within 60 days of the date of this order, the heads of agencies with responsibilities under this order shall submit a single, combined report to the Assistant to the President for Domestic Policy, detailing progress in implementing this order and a timeline for future action. The Assistant to the President for Domestic Policy shall regularly convene the heads of agencies with responsibilities under this order (or their designees) to coordinate and prepare for this submission.

**Sec. 10** . *Severability.* If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of any of its other provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 11** . *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

 (i) the authority granted by law to an executive department or agency, or the head thereof; or

 (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(https://img.federalregister.gov/TRUMP/TRUMP_original_size.png)

THE WHITE HOUSE,
January 28, 2025.

[FR Doc. 2025-02194 (/d/2025-02194)
Filed 1-31-25; 8:45 am]

Billing code 3395-F4-P

**PUBLISHED DOCUMENT**

ED_01150

ED_01151

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 23–477.   Argued December 4, 2024—Decided June 18, 2025

In 2023, Tennessee joined the growing number of States restricting sex transition treatments for minors by enacting the Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity, Senate Bill 1 (SB1).  SB1 prohibits healthcare providers from prescribing, administering, or dispensing puberty blockers or hormones to any minor for the purpose of (1) enabling the minor to identify with, or live as, a purported identity inconsistent with the minor's biological sex, or (2) treating purported discomfort or distress from a discordance between the minor's biological sex and asserted identity.  At the same time, SB1 permits a healthcare provider to administer puberty blockers or hormones to treat a minor's congenital defect, precocious puberty, disease, or physical injury.

Three transgender minors, their parents, and a doctor challenged SB1 under the Equal Protection Clause of the Fourteenth Amendment. The District Court partially enjoined SB1, finding that transgender individuals constitute a quasi-suspect class, that SB1 discriminates on the basis of sex and transgender status, and that SB1 was unlikely to survive intermediate scrutiny.  The Sixth Circuit reversed, holding that the law did not trigger heightened scrutiny and satisfied rational basis review.  This Court granted certiorari to decide whether SB1 violates the Equal Protection Clause.

*Held*: Tennessee's law prohibiting certain medical treatments for transgender minors is not subject to heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment and satisfies rational basis review.  Pp. 8–24.

(a) SB1 is not subject to heightened scrutiny because it does not classify on any bases that warrant heightened review.  Pp. 9–21.

ED_01152

2                 UNITED STATES *v.* SKRMETTI

Syllabus

(1) On its face, SB1 incorporates two classifications: one based on age (allowing certain medical treatments for adults but not minors) and another based on medical use (permitting puberty blockers and hormones for minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence). Classifications based on age or medical use are subject to only rational basis review. See *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307 (*per curiam*); *Vacco* v. *Quill*, 521 U. S. 793.

The plaintiffs argue that SB1 warrants heightened scrutiny because it relies on sex-based classifications. But neither of the above classifications turns on sex. Rather, SB1 prohibits healthcare providers from administering puberty blockers or hormones to *minors* for certain *medical uses*, regardless of a minor's sex. While SB1's prohibitions reference sex, the Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny. And such an approach would be especially inappropriate in the medical context, where some treatments and procedures are uniquely bound up in sex.

The application of SB1, moreover, does not turn on sex. The law does not prohibit certain medical treatments for minors of one sex while allowing those same treatments for minors of the opposite sex. SB1 prohibits healthcare providers from administering puberty blockers or hormones to any minor to treat gender dysphoria, gender identity disorder, or gender incongruence, regardless of the minor's sex; it permits providers to administer puberty blockers and hormones to minors of any sex for other purposes. And, while a State may not circumvent the Equal Protection Clause by writing in abstract terms, SB1 does not mask sex-based classifications.

Finally, the Court rejects the plaintiffs' argument that, by design, SB1 enforces a government preference that people conform to expectations about their sex. To start, any allegations of sex stereotyping are misplaced. True, a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes. But where a law's classifications are neither covertly nor overtly based on sex, the law does not trigger heightened review unless it was motivated by an invidious discriminatory purpose. No such argument has been raised here. And regardless, the statutory findings on which SB1 is premised do not themselves evince sex-based stereotyping. Pp. 9–16.

(2) SB1 also does not classify on the basis of transgender status. The Court has explained that a State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination. In *Geduldig* v. *Aiello*, 417 U. S. 484, the Court held

ED_01153

that a California insurance program that excluded from coverage certain disabilities resulting from pregnancy did not discriminate on the basis of sex. See *id.*, at 486, 492–497. In reaching that holding, the Court explained that the program did not exclude any individual from benefit eligibility because of the individual's sex but rather "remove[d] one physical condition—pregnancy—from the list of compensable disabilities." *Id.*, at 496, n. 20. The California insurance program, the Court explained, divided potential recipients into two groups: "pregnant women and nonpregnant persons." *Ibid.* Because women fell into both groups, the Court reasoned, the program did not discriminate against women as a class. See *id.*, at 496, and n. 20. The Court concluded that, even though only biological women can become pregnant, not every legislative classification concerning pregnancy is a sex-based classification. *Id.*, at 496, n. 20. As such, "[a]bsent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation . . . on any reasonable basis, just as with respect to any other physical condition." *Id.*, at 496–497, n. 20.

By the same token, SB1 does not exclude any individual from medical treatments on the basis of transgender status. Rather, it removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions. SB1 divides minors into two groups: those seeking puberty blockers or hormones to treat the excluded diagnoses, and those seeking puberty blockers or hormones to treat other conditions. While the first group includes only transgender individuals, the second encompasses both transgender and nontransgender individuals. Thus, although only transgender individuals seek treatment for gender dysphoria, gender identity disorder, and gender incongruence—just as only biological women can become pregnant—there is a "lack of identity" between transgender status and the excluded diagnoses. Absent a showing that SB1's prohibitions are pretexts designed to effect invidious discrimination against transgender individuals, the law does not classify on the basis of transgender status. Pp. 16–18.

(3) Finally, *Bostock* v. *Clayton County*, 590 U. S. 644, does not alter the Court's analysis. In *Bostock*, the Court held that an employer who fires an employee for being gay or transgender violates Title VII's prohibition on discharging an individual "because of" their sex. See *id.*, at 650–652, 654–659. The Court reasoned that Title VII's "because of" test incorporates the traditional but-for causation standard, which directs courts "to change one thing at a time and see if the outcome changes." *Id.*, at 656. Applying that test, the Court held that, "[f]or an employer to discriminate against employees for being homosexual or

Syllabus

transgender, the employer must intentionally discriminate against individual men and women in part because of sex." *Id.*, at 662. In such a case, the employer has penalized a member of one sex for a trait or action that it tolerates in members of the other.

The Court declines to address whether *Bostock*'s reasoning reaches beyond the Title VII context—unlike the employment discrimination at issue in *Bostock*, changing a minor's sex or transgender status does not alter the application of SB1. If a transgender boy seeks testosterone to treat gender dysphoria, SB1 prevents a healthcare provider from administering it to him. If his biological sex were changed from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis. The transgender boy could receive testosterone only if he had a permissible diagnosis (like a congenital defect). And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. Under the reasoning of *Bostock*, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone. Pp. 18–21.

(b) SB1 satisfies rational basis review. Under that standard, the Court will uphold a statutory classification so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313. SB1 clearly meets that standard of review. Tennessee determined that administering puberty blockers or hormones to minors to treat gender dysphoria, gender identity disorder, or gender incongruence carries risks, including irreversible sterility, increased risk of disease and illness, and adverse psychological consequences. The legislature found that minors lack the maturity to fully understand these consequences, that many individuals have expressed regret for undergoing such treatments as minors, and that the full effects of such treatments may not yet be known. At the same time, the State noted evidence that discordance between sex and gender can be resolved through less invasive approaches. SB1's age- and diagnosis-based classifications are rationally related to these findings and the State's objective of protecting minors' health and welfare.

The Court also declines the plaintiffs' invitation to second-guess the lines that SB1 draws. States have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales* v. *Carhart*, 550 U. S. 124, 163. Recent developments demonstrate the open questions that exist regarding basic factual issues before medical authorities and regulatory bodies in this area, underscoring the need for legislative flexibility. Pp. 21–24.

(c) This case carries with it the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field. The Equal Protection Clause does not resolve

Syllabus

these disagreements.  The Court's role is not "to judge the wisdom, fairness, or logic" of SB1, *Beach Communications*, 508 U. S., at 313, but only to ensure that the law does not violate equal protection guarantees.  It does not.  Questions regarding the law's policy are thus appropriately left to the people, their elected representatives, and the democratic process.  P. 24.

83 F. 4th 460, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined, and in which ALITO, J., joined as to Parts I and II–B.  THOMAS, J., filed a concurring opinion.  BARRETT, J., filed a concurring opinion, in which THOMAS, J., joined.  ALITO, J., filed an opinion concurring in part and concurring in the judgment.  SOTOMAYOR, J., filed a dissenting opinion, in which JACKSON, J., joined in full, and in which KAGAN, J., joined as to Parts I–IV.  KAGAN, J., filed a dissenting opinion.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–477

_____

## UNITED STATES, PETITIONER v. JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 18, 2025]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In this case, we consider whether a Tennessee law banning certain medical care for transgender minors violates the Equal Protection Clause of the Fourteenth Amendment.

I

A

An estimated 1.6 million Americans over the age of 13 identify as transgender, meaning that their gender identity does not align with their biological sex. See 1 App. 257–259; 2 *id.*, at 827. Some transgender individuals suffer from gender dysphoria, a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex. Left untreated, gender dysphoria may result in severe physical and psychological harms. In 1979, the World Professional Association for Transgender Health (WPATH) (then known as the Harry Benjamin International Gender Dysphoria Association)

ED_01157

Opinion of the Court

published one of the first sets of clinical guidelines for treating gender dysphoria with sex transition treatments.  See P. Walker et al., Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons (1979), reprinted in 14 Archives of Sexual Behavior 79 (1985).  The standards addressed two treatments in particular: hormonal sex reassignment (the use of hormones to induce the development of physical characteristics of the opposite sex) and surgical sex reassignment (surgery of the genitalia and/or chest to approximate the physical appearance of the opposite sex).  See *id.*, at 81, §§3.2–3.3.  They recognized the extensive and sometimes irreversible consequences of hormonal therapy and sex reassignment surgery and acknowledged that some individuals who undergo reassignment procedures later regret their decision to do so.  See *id.*, at 83, 85–86, §§4.1.1–4.1.3, 4.4.2–4.4.3, 4.5.1.  Among other things, the standards of care provided that hormonal and surgical sex reassignment treatments should be administered only to adults.  See *id.*, at 89, §4.14.4.

In 1998, WPATH revised its standards of care to permit healthcare professionals to administer puberty blockers (designed to delay the development of physical sex characteristics) and hormones to minors in "rar[e]" circumstances.  S. Levine et al., The Standards of Care for Gender Identity Disorders (5th ed. 1998), reprinted in 11 J. Psychology & Human Sexuality 1, 20 (1999).  Today, the standards discuss a range of factors regarding the provision of such treatments to minors.  E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. Transgender Health S1, S65–S66 (2022).  The current standards recognize known risks associated with the provision of sex transition treatments to adolescents, including potential adverse effects on fertility and the possibility that an adolescent will later wish to detransition.  See *id.*, at S47, S57, S61–S62.  They further state that there is "limited data on the optimal timing" of sex

transition treatments or "the long-term physical, psycho-
logical, and neurodevelopmental outcomes in youth," *id.*, at
S65, and note that "[o]ur understanding of gender identity
development in adolescence is continuing to evolve," *id.*, at
S44.

In recent years, the number of minors requesting sex
transition treatments has increased. See 2 App. 644, 827–
828. This increase has corresponded with rising debates
regarding the relative risks and benefits of such treat-
ments. Compare, *e.g.*, Brief for State of California et al. as
*Amici Curiae* 1–13, with Brief for Alabama as *Amicus Cu-
riae* 1–9. In the last three years, more than 20 States have
enacted laws banning the provision of sex transition treat-
ments to minors, while two have enacted near total bans.

Meanwhile, health authorities in a number of European
countries have raised significant concerns regarding the po-
tential harms associated with using puberty blockers and
hormones to treat transgender minors. In 2020, Finland's
Council for Choices in Health Care found that "gender re-
assignment of minors is an experimental practice" and that
"the reliability of the existing studies" is "highly uncertain."
2 App. 583–584 (alterations omitted); see *id.*, at 715–722,
727–729. That same year, England's National Institute for
Health and Care Excellence published reports finding that
the evidence for using puberty blockers to treat transgender
adolescents is of "very low certainty" and that the long-term
risks associated with using hormones to treat adolescents
with gender dysphoria are "largely unknown." *Id.*, at 588–
589. In 2022, Sweden's National Board of Health and Wel-
fare found that "the evidence on treatment efficacy and
safety is still insufficient and inconclusive" and that the
"risks" of puberty blockers and hormones "currently out-
weigh the possible benefits." 1 *id.*, at 339–340; see 2 *id.*, at
584–587. And in 2023, the Norwegian Healthcare Investi-
gation Board concluded that the "research-based

ED_01159

knowledge" for hormonal sex transition treatments for mi-
nors is "insufficient," while the "long-term effects are little
known." 1 *id.*, at 341–342.

## B

In March 2023, Tennessee joined the growing number of
States restricting sex transition treatments for minors by
enacting the Prohibition on Medical Procedures Performed
on Minors Related to Sexual Identity, S. B. 1, 113th Gen.
Assem., 1st Extra. Sess.; Tenn. Code Ann. §68–33–101
*et seq.* (SB1). While the State's legislature acknowledged
that discordance between a minor's gender identity and bi-
ological sex can cause "discomfort or distress," §68–33–
101(c), it identified concerns regarding the use of puberty
blockers and hormones to treat gender dysphoria in minors.
In particular, the legislature found that such treatments
"can lead to the minor becoming irreversibly sterile, having
increased risk of disease and illness, or suffering from ad-
verse and sometimes fatal psychological consequences,"
§68–33–101(b), and that minors "lack the maturity to fully
understand and appreciate" these consequences and may
later regret undergoing the treatments, §68–33–101(h).
The legislature further found that sex transition treat-
ments were "being performed on and administered to mi-
nors in th[e] state with rapidly increasing frequency," §68–
33–101(g), notwithstanding the fact that the full range of
harmful effects associated with the treatments were likely
not yet known, see §68–33–101(b). The legislature also
noted that guidelines regarding sex transition treatments
for minors had "changed substantially in recent years,"
§68–33–101(g), and that health authorities in Sweden, Fin-
land, and the United Kingdom had "placed severe re-
strictions" on such treatments after determining that there
was "no evidence" that their benefits outweigh their risks,
§68–33–101(e); see *supra*, at 3. Finally, the legislature de-
termined that there is evidence that gender dysphoria "can

Opinion of the Court

be resolved by less invasive approaches that are likely to result in better outcomes."  §68–33–101(c).

SB1 responds to these concerns by banning the use of certain medical procedures for treating transgender minors. In particular, the law prohibits a healthcare provider from "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being," or "[p]rescribing, administering, or dispensing any puberty blocker or hormone," §68–33–102(5), for the purpose of (1) "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or (2) "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity," §68–33–103(a)(1).  Among other things, these prohibitions are intended to "protec[t] minors from physical and emotional harm" by "encouraging minors to appreciate," rather than "become disdainful of," their sex.  §68–33–101(m).

SB1 is limited in two relevant ways.  First, SB1 does not restrict the administration of puberty blockers or hormones to individuals 18 and over.  §68–33–102(6).  Second, SB1 does not ban fully the administration of such drugs to minors.  A healthcare provider may administer puberty blockers or hormones to treat a minor's congenital defect, precocious (or early) puberty, disease, or physical injury.  §68–33–103(b)(1)(A).  The law defines the term "[c]ongenital defect" to include an "abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex," §68–33–102(1), but excludes from the definitions of "[c]ongenital defect" and "disease" "gender dysphoria, gender identity disorder, [and] gender incongruence," §§68–33–102(1), 68–33–103(b)(2).

SB1 contains three primary enforcement mechanisms. The law authorizes Tennessee's attorney general to bring against any person who knowingly violates SB1 an action "to enjoin further violations, to disgorge any profits received due to the medical procedure, and to recover a civil penalty

Opinion of the Court

of [$25,000] per violation." §68–33–106(b). SB1 further permits the relevant state regulatory authorities to discipline healthcare providers who violate the law's prohibitions. §68–33–107. Finally, SB1 creates a private right of action that enables an injured minor or nonconsenting parent of an injured minor to sue a healthcare provider for violating the law. §68–33–105.

### C

Three transgender minors, their parents, and a doctor (plaintiffs) brought a pre-enforcement challenge to SB1. Among other things, the plaintiffs asserted that SB1 violates the Equal Protection Clause of the Fourteenth Amendment. They moved for a preliminary injunction preventing the law's bans on sex transition treatments for minors from going into effect. The United States intervened under 42 U. S. C. §2000h–2, which authorizes the Federal Government to intervene in a private equal protection suit "if the Attorney General certifies that the case is of general public importance." See Memorandum Opinion and Order in No. 23–cv–00376 (MD Tenn., May 16, 2023), ECF Doc. 108.

The District Court partially enjoined enforcement of SB1's prohibitions. See *L. W.* v. *Skrmetti*, 679 F. Supp. 3d 668, 677 (MD Tenn. 2023). The court concluded that the plaintiffs lacked standing to challenge the law's ban on sex transition surgery for minors. *Id.*, at 681–682. But the court held, as relevant, that the United States and plaintiffs were likely to succeed on their equal protection challenge to the law's prohibitions on puberty blockers and hormones. *Id.*, at 682–712. The court found that transgender individuals constitute a quasi-suspect class, that SB1 discriminates on the basis of sex and transgender status, and that SB1 was unlikely to survive intermediate scrutiny. *Id.*, at 686–687, 698, 712. Having concluded that SB1 was likely unconstitutional on its face, the District Court issued a

Opinion of the Court

statewide injunction enjoining enforcement of all provisions of SB1 except for the private right of action and the law's ban on sex transition surgery. See *id.*, at 680–681, 716–718. Tennessee appealed, and the Sixth Circuit stayed the preliminary injunction pending appeal. *L. W.* v. *Skrmetti*, 83 F. 4th 460, 469 (CA6 2023).

The Sixth Circuit reversed. As relevant, the Sixth Circuit held that the United States and plaintiffs were unlikely to succeed on the merits of their equal protection claim. See *id.*, at 479–489. The court first found that SB1 does not classify on the basis of sex because the law "regulate[s] sex-transition treatments for all minors, regardless of sex," by prohibiting all minors from "receiv[ing] puberty blockers or hormones or surgery in order to transition from one sex to another." *Id.*, at 480. The court next declined to recognize transgender individuals as a suspect class, finding that transgender individuals are neither politically powerless nor a discrete group defined by obvious, immutable, or distinguishing characteristics. *Id.*, at 486–487. Finally, the court concluded that the United States and plaintiffs had failed to establish that animus toward transgender individuals as a class was the operative force behind SB1. See *id.*, at 487–488. The Sixth Circuit held that SB1 was subject to and survived rational basis review, finding that Tennessee had offered "considerable evidence" regarding the risks associated with the banned medical treatments and the flaws in existing research. *Id.*, at 489.

Judge White dissented. Judge White would have held that the United States and plaintiffs were likely to succeed on the merits of their equal protection claim. *Id.*, at 498. In her view, SB1 triggered heightened scrutiny because it "facially discriminate[s] based on a minor's sex as assigned at birth and on a minor's failure to conform with societal expectations concerning that sex." *Ibid.* Judge White would have held that Tennessee had failed to "show an exceeding[ly] persuasive justification or close means-ends fit" for

Opinion of the Court

the law's sex-based classifications.  *Ibid.*

We granted certiorari to decide whether SB1 violates the Equal Protection Clause of the Fourteenth Amendment.[1] 602 U. S. ___ (2024).

## II

The Fourteenth Amendment's command that no State shall "deny to any person within its jurisdiction the equal protection of the laws," U. S. Const., Amdt. 14, §1, "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons," *Romer* v. *Evans*, 517 U. S. 620, 631 (1996).  We have reconciled the principle of equal protection with the reality of legislative classification by holding that, "if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end."  *Ibid.*  We generally afford such laws "wide latitude" under this rational basis review, acknowledging that "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."  *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440 (1985).

Certain legislative classifications, however, prompt heightened review.  For example, laws that classify on the basis of race, alienage, or national origin trigger strict scrutiny and will pass constitutional muster "only if they are suitably tailored to serve a compelling state interest."  *Ibid.*  We have similarly held that sex-based classifications warrant heightened scrutiny.  See *United States* v. *Virginia*,

---

[1] Following oral argument, the United States submitted a letter to the Court representing that the United States "has now determined that SB1 does not deny equal protection on account of sex or any other characteristic" but "believes that the confluence of several factors counsels against seeking to dismiss its case in this Court."  Letter from C. Gannon, Deputy Solicitor General, to S. Harris, Clerk of Court (Feb. 7, 2025).  The plaintiffs remain adverse to the state respondents.

518 U. S. 515, 533 (1996). While our precedent does not make sex a "proscribed classification," *ibid.*, we have explained that sex "generally provides no sensible ground for differential treatment," *Cleburne*, 473 U. S., at 440, and that sex-based lines too often reflect stereotypes or overbroad generalizations about the differences between men and women, see *Sessions* v. *Morales-Santana*, 582 U. S. 47, 62 (2017). We accordingly subject laws containing sex-based classifications to intermediate scrutiny, under which the State must show that the "classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U. S., at 533 (internal quotation marks omitted).

### A

We are asked to decide whether SB1 is subject to heightened scrutiny under the Equal Protection Clause. We hold it is not. SB1 does not classify on any bases that warrant heightened review.

### 1

On its face, SB1 incorporates two classifications. First, SB1 classifies on the basis of age. Healthcare providers may administer certain medical treatments to individuals ages 18 and older but not to minors. Second, SB1 classifies on the basis of medical use. Healthcare providers may administer puberty blockers or hormones to minors to treat certain conditions but not to treat gender dysphoria, gender identity disorder, or gender incongruence. Classifications that turn on age or medical use are subject to only rational basis review. See *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 312–314 (1976) (*per curiam*) (rational basis review applies to age-based classification); *Vacco* v. *Quill*, 521 U. S. 793, 799–808 (1997) (state laws outlawing assisted suicide "neither infringe fundamental rights nor

ED_01165

involve suspect classifications").

The plaintiffs argue that SB1 warrants heightened scrutiny because it relies on sex-based classifications. See Brief for Respondents in Support of Petitioner 20–37. We disagree.

Neither of the above classifications turns on sex. Rather, SB1 prohibits healthcare providers from administering puberty blockers and hormones to *minors* for certain *medical uses*, regardless of a minor's sex. Cf. *Vacco*, 521 U. S., at 800 ("On their faces, neither New York's ban on assisting suicide nor its statutes permitting patients to refuse medical treatment treat anyone differently from anyone else or draw any distinctions between persons. *Everyone*, regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment; *no one* is permitted to assist a suicide.").

The plaintiffs resist this conclusion, arguing that SB1 creates facial sex-based classifications by defining the prohibited medical care based on the patient's sex. See Brief for Respondents in Support of Petitioner 22. This argument takes two forms. At times, the plaintiffs suggest that SB1 classifies on the basis of sex because its prohibitions reference sex. Alternatively, the plaintiffs contend that SB1 works a sex-based classification because application of the law turns on sex. Neither argument is persuasive.

This Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny. See, *e.g.*, *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 64 (2001) ("The issue is not the use of gender specific terms instead of neutral ones. Just as neutral terms can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction."). Such an approach, moreover, would be especially inappropriate in the medical context. Some medical treatments and procedures are uniquely bound up in sex. The Food and Drug Administration itself recognizes that "[r]esearch has shown that biological differences between

Opinion of the Court

men and women (differences due to sex chromosome or sex hormones) may contribute to variations seen in the safety and efficacy of drugs, biologics, and medical devices." FDA, Sex as a Biological Variable (Jan. 30, 2025) (online source archived at https://www.supremecourt.gov).  Indeed, the agency frequently approves drugs for use by only one sex. See, *e.g.*, FDA, FDA in Brief: FDA Encourages Inclusion of Male Patients in Breast Cancer Clinical Trials (Aug. 26, 2019) (online source archived at https://www.supremecourt .gov) ("many" breast cancer treatments approved for women only); FDA, FDA Approves Second Drug To Prevent HIV Infection as Part of Ongoing Efforts To End the HIV Epidemic (Oct. 3, 2019) (online source archived at https://www.supremecourt.gov) (drug to prevent HIV not approved for women).  In the medical context, the mere use of sex-based language does not sweep a statute within the reach of heightened scrutiny.

We also reject the argument that the application of SB1 turns on sex.  The plaintiffs and the dissent contend that an adolescent whose biological sex is female cannot receive puberty blockers or testosterone to live and present as a male, but an adolescent whose biological sex is male can, while an adolescent whose biological sex is male cannot receive puberty blockers or estrogen to live and present as a female, but an adolescent whose biological sex is female can.  See Brief for Respondents in Support of Petitioner 22; *post*, at 10–15 (SOTOMAYOR, J., dissenting).  So conceived, they argue, SB1 prohibits certain treatments for minors of one sex while allowing those same treatments for minors of the opposite sex.

The plaintiffs and the dissent, however, contort the meaning of the term "medical treatment."  Notably absent from their framing is a key aspect of any medical treatment: the underlying medical concern the treatment is intended to address.  The Food and Drug Administration approves

ED_01167

Opinion of the Court

drugs and requires that they be labeled for particular indi-
cations—the diseases or conditions that they treat, prevent,
mitigate, diagnose, or cure.  See 21 CFR §§201.57(c)(2),
314.50(a)(1) (2024).  Different drugs can be used to treat the
same thing (would you like Advil or Tylenol for your head-
ache?), and the same drug can treat different things (take
DayQuil to ease your cough, fever, sore throat, and/or minor
aches and pains).  For the term "medical treatment" to
make sense of these various combinations, it must neces-
sarily encompass both a given drug and the specific indica-
tion for which it is being administered.  See Brief for Re-
spondents in Support of Petitioner 5 (noting that
"*treatments*" for adolescents with gender dysphoria include
"puberty-delaying medication and hormone therapy" (em-
phasis added)).

When properly understood from the perspective of the in-
dications that puberty blockers and hormones treat, SB1
clearly does not classify on the basis of sex.  Both puberty
blockers and hormones can be used to treat certain overlap-
ping indications (such as gender dysphoria), and each can
be used to treat a range of other conditions.  *Id.*, at 6–7.
These combinations of drugs and indications give rise to
various medical treatments.   When, for example, a
transgender boy (whose biological sex is female) takes pu-
berty blockers to treat his gender incongruence, he receives
a different medical treatment than a boy whose biological
sex is male who takes puberty blockers to treat his preco-
cious puberty.[2]  SB1, in turn, restricts which of these medi-
cal treatments are available to minors: Under SB1, a
healthcare provider may administer puberty blockers or
hormones to any minor to treat a congenital defect, preco-
cious puberty, disease, or physical injury, Tenn. Code Ann.

_____

[2]We use "transgender boy" to refer to an individual whose biological
sex is female but who identifies as male, and "transgender girl" to refer
to an individual whose biological sex is male but who identifies as female.

§68–33–103(b)(1)(A); a healthcare provider may not administer puberty blockers or hormones to any minor to treat gender dysphoria, gender identity disorder, or gender incongruence, see §§68–33–102(1), 68–33–103(a)(1), (b)(2). The application of that prohibition does not turn on sex.

Of course, a State may not circumvent the Equal Protection Clause by writing in abstract terms. See *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 274 (1979) (explaining that both overt and covert sex-based classifications are subject to heightened review). The antimiscegenation law that this Court struck down in *Loving* v. *Virginia*, 388 U. S. 1 (1967), would not have shed its race-based classification had it, for example, prohibited "*any* person from marrying an individual of a different race." Such a law would still have turned on a race-based classification: It would have prohibited Mildred Jeter (a black woman) from marrying Richard Loving (a white man), while permitting a white woman to do so. The law, in other words, would still "proscribe generally accepted conduct if engaged in by members of different races." *Id.*, at 11.

Here, however, SB1 does not mask sex-based classifications. For reasons we have explained, the law does not prohibit conduct for one sex that it permits for the other. Under SB1, *no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of *any* sex may be administered puberty blockers or hormones for other purposes.

Nor are we persuaded that SB1's prohibition on the prescription of puberty blockers and hormones to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or to "[t]rea[t] purported discomfort or distress from a discordance between the minor's sex and asserted identity," Tenn. Code Ann. §68–33–103(a), reflects a sex-based classification, contra, *post*, at 10–15 (opinion of SOTOMAYOR, J.). In the dissent's view,

this language "plainly classifies on the basis of sex" because it "turns on inconsistency with a protected characteristic." *Post*, at 11. The dissent analogizes to a hypothetical law that "prohibit[s] minors from attending any services, rituals, or assemblies if done for the purpose of allowing the minor to identify with a purported identity inconsistent with the minor's religion." *Ibid.* (internal quotation marks omitted; emphasis deleted). Such a law, the dissent argues, would plainly classify on the basis of religion. "Whether the law prohibits a minor from attending any particular religious service turns on the minor's religion: A Jewish child can visit a synagogue but not a church, while a Christian child can attend church but not the synagogue." *Ibid.*

But a prohibition on the prescription of puberty blockers and hormones to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," Tenn. Code Ann. §68–33–103(a)(1), is simply a prohibition on the prescription of puberty blockers and hormones to treat gender dysphoria, gender identity disorder, or gender incongruence. A law prohibiting attendance at a religious service "inconsistent with" the attendee's religion may trigger heightened scrutiny. A law prohibiting the administration of specific drugs for particular medical uses does not. See *Vacco*, 521 U. S., at 799–808.

Finally, we reject the plaintiffs' argument that, "by design, SB1 enforces a government preference that people conform to expectations about their sex." Brief for Respondents in Support of Petitioner 23. The plaintiffs note that SB1's statutory findings state that Tennessee has a compelling interest in "encouraging minors to appreciate their sex" and in prohibiting medical care "that might encourage minors to become disdainful of their sex." *Ibid.* (quoting Tenn. Code Ann. §68–33–101(m)). They argue that these findings reveal that the law operates to force conformity with sex. See Brief for Respondents in Support of Petitioner 23; see also *id.*, at 52 ("SB1's purpose is . . . to force . . . boys and

Opinion of the Court

girls to *look* and *live* like boys and girls." (internal quotation marks omitted)).

To start, the plaintiffs' allegations of sex stereotyping are misplaced. True, a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes. See *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 139, n. 11 (1994). But where a law's classifications are neither covertly nor overtly based on sex, contrast, *e.g.*, *post*, at 12–13, n. 8 (opinion of SOTOMAYOR, J.) (referencing a hypothetical requirement that all children wear "sex-consistent clothing"), we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose, see *Personnel Administrator of Mass.*, 442 U. S., at 271–274; *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 264–266 (1977). No such argument has been raised here. See Tr. of Oral Arg. 57–59.

Regardless, the statutory findings to which the plaintiffs point do not themselves evince sex-based stereotyping. The plaintiffs fail to note that Tennessee also proclaimed a "legitimate, substantial, and compelling interest in protecting minors from physical and emotional harm." Tenn. Code Ann. §68–33–101(m). And they similarly fail to acknowledge that Tennessee found that the prohibited medical treatments are experimental, can lead to later regret, and are associated with harmful—and sometimes irreversible—risks. §§68–33–101(b)–(e), (h). Tennessee's stated interests in "encouraging minors to appreciate their sex" and in prohibiting medical care "that might encourage minors to become disdainful of their sex," §68–33–101(m), simply reflect the State's concerns regarding the use of puberty blockers and hormones to treat gender dysphoria, gender identity disorder, and gender incongruence, see Brief for Respondents 26–27 ("Given high desistance rates among youth and the tragic 'regret' of detransitioners, it

ED_01171

Opinion of the Court

was not improper to conclude that kids benefit from additional time to 'appreciate their sex' before embarking on body-altering paths. Nor is it improper for the State to protect minors from procedures that 'encourage them to *become* disdainful of their sex'—and thus at risk for serious psychiatric conditions." (citations and alterations omitted)); *L. W.*, 83 F. 4th, at 485 ("A concern about potentially irreversible medical procedures for a child is not a form of stereotyping.").

### 2

The plaintiffs separately argue that SB1 warrants heightened scrutiny because it discriminates against transgender individuals, who the plaintiffs assert constitute a quasi-suspect class. See Brief for Respondents in Support of Petitioner 37–38. This Court has not previously held that transgender individuals are a suspect or quasi-suspect class. And this case, in any event, does not raise that question because SB1 does not classify on the basis of transgender status. As we have explained, SB1 includes only two classifications: healthcare providers may not administer puberty blockers or hormones to minors (a classification based on age) to treat gender dysphoria, gender identity disorder, or gender incongruence (a classification based on medical use). The plaintiffs do not argue that the first classification turns on transgender status, and our case law forecloses any such argument as to the second.

We have explained that a State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination. In *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), for example, we held that a California insurance program that excluded from coverage certain disabilities resulting from pregnancy did not discriminate on the basis of sex. See *id.*, at 486, 492–497. In reaching that holding, we explained that the

Opinion of the Court

program did not exclude any individual from benefit eligibility because of the individual's sex but rather "remove[d] one physical condition—pregnancy—from the list of compensable disabilities." *Id.*, at 496, n. 20. We observed that the "lack of identity" between sex and the excluded pregnancy-related disabilities became "clear upon the most cursory analysis." *Id.*, at 497, n. 20. The California insurance program, we explained, divided potential recipients into two groups: "pregnant women and nonpregnant persons." *Ibid.* Because women fell into both groups, the program did not discriminate against women as a class. See *id.*, at 496, and n. 20. We thus concluded that, even though only biological women can become pregnant, not every legislative classification concerning pregnancy is a sex-based classification. *Id.*, at 496, n. 20. As such, "[a]bsent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation . . . on any reasonable basis, just as with respect to any other physical condition." *Id.*, at 496–497, n. 20.

By the same token, SB1 does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions. SB1 divides minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to treat other conditions. See Tenn. Code Ann. §68–33–103. Because only transgender individuals seek puberty blockers and hormones for the excluded diagnoses, the first group includes only transgender individuals; the second group, in contrast, encompasses both transgender and nontransgender individuals. Thus, although only transgender individuals seek

Opinion of the Court

treatment for gender dysphoria, gender identity disorder, and gender incongruence—just as only biological women can become pregnant—there is a "lack of identity" between transgender status and the excluded medical diagnoses. The plaintiffs, moreover, have not argued that SB1's prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals. Under these circumstances, we decline to find that SB1's prohibitions on the use of puberty blockers and hormones exclude any individuals on the basis of transgender status.[3]

### 3

Finally, *Bostock* v. *Clayton County*, 590 U. S. 644 (2020), does not alter our analysis. In *Bostock*, we held that an employer who fires an employee for being gay or transgender violates Title VII's prohibition on discharging an individual "because of" their sex. See *id.*, at 650–652, 654–659. We reasoned that Title VII's "because of" test incorporates the traditional but-for causation standard, which "directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.*, at 656. Applying that test, we held that, "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex."

_____

[3]The dissent argues that our analysis "may well suggest that a law depriving all individuals who 'have ever, or may someday, menstruate' of access to health insurance would be sex neutral merely because not all women menstruate." *Post*, at 23–24 (opinion of SOTOMAYOR, J.). But such a law is different from both SB1 and the law at issue in *Geduldig*. As we have explained, SB1 regulates certain medical treatments, see Tenn. Code Ann. §68–33–103(a)(1); *Geduldig* involved a state disability insurance system that excluded certain pregnancy-related disabilities from coverage, see 417 U. S., at 487–489. The dissent's hypothetical law, in contrast, does not regulate a class of treatments or conditions. Rather, it regulates a class of *persons* identified on the basis of a specified characteristic. Neither our analysis nor *Geduldig* speaks to a law that classifies on such a basis.

Opinion of the Court

*Id.*, at 662. In such a case, the employer has penalized a member of one sex for a trait or action that it tolerates in members of the other. *Ibid.*

The plaintiffs urge us to apply *Bostock*'s reasoning to this case. In their view, SB1 violates the Equal Protection Clause because it prohibits a minor whose biological sex is female from receiving testosterone to live as a male but allows a minor whose biological sex is male to receive testosterone for the same purposes (and vice versa). Applying *Bostock*'s reasoning, they argue that SB1 discriminates on the basis of sex because it intentionally penalizes members of one sex for traits and actions that it tolerates in another. See Brief for Respondents in Support of Petitioner 24–25.

We have not yet considered whether *Bostock*'s reasoning reaches beyond the Title VII context, and we need not do so here. For reasons we have already explained, changing a minor's sex or transgender status does not alter the application of SB1. If a transgender boy seeks testosterone to treat his gender dysphoria, SB1 prevents a healthcare provider from administering it to him. See Tenn. Code Ann. §68–33–103(a). If you change his biological sex from female to male, SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury. The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex or transgender status. Under the reasoning of *Bostock*, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone.

The dissent counters that, whatever causal factors are at play, sex is at least one but-for cause of SB1's operation. See *post*, at 19–20 (opinion of SOTOMAYOR, J.). To illustrate this argument, the dissent posits a minor girl with facial hair inconsistent with her sex. Under SB1, the dissent

20              UNITED STATES *v.* SKRMETTI

Opinion of the Court

notes, a healthcare provider can prescribe puberty blockers or hormones to the minor to suppress her hair growth. *Ibid.* Change the minor's sex to male, the dissent reasons, and SB1 prevents the minor from obtaining the same drugs for the same purpose. *Ibid.* Any corresponding change in diagnosis, the dissent concludes, simply reveals that both sex and diagnosis are causal factors at "'play.'" *Post*, at 20 (quoting *Bostock*, 590 U. S., at 661).

The dissent's reasoning overlooks a key distinction between the operation of SB1 and the logic of *Bostock*. Under *Bostock*'s reasoning, an employer who fires a homosexual male employee for being attracted to men while retaining the employee's straight female colleague has discriminated on the basis of sex because it has penalized the male employee for a trait (attraction to men) that it tolerates in the female employee. See *id.*, at 660. *Bostock* held that, in such a circumstance, sex is the but-for cause of the employer's decision—change the homosexual male employee's sex and he becomes a straight female whose attraction to men the employer tolerates.

Not so with SB1. Consider again the minor girl with unwanted facial hair inconsistent with her sex. If she has a diagnosis of hirsutism (male-pattern hair growth), a healthcare provider may, consistent with SB1, prescribe her puberty blockers or hormones. But changing the minor's sex to male does not automatically change the operation of SB1. If hirsutism is replaced with gender dysphoria, the now-male minor may not receive puberty blockers or hormones; but if hirsutism is replaced with precocious puberty, SB1 does not bar either treatment. Unlike the homosexual male employee whose sexuality automatically switches to straight when his sex is changed from male to female, there is no reason why a female minor's diagnosis of hirsutism automatically changes to gender dysphoria when her sex is changed from female to male. Under the logic of *Bostock*, then, sex is simply not a but-for cause of

Opinion of the Court

SB1's operation.

B

The rational basis inquiry "employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Massachusetts Bd. of Retirement*, 427 U. S., at 314. Under this standard, we will uphold a statutory classification so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993). Where there exist "plausible reasons" for the relevant government action, "our inquiry is at an end." *Id.*, at 313–314 (internal quotation marks omitted).

SB1 clearly meets this standard. Tennessee determined that administering puberty blockers or hormones to a minor to treat gender dysphoria, gender identity disorder, or gender incongruence "can lead to the minor becoming irreversibly sterile, having increased risk of disease and illness, or suffering from adverse and sometimes fatal psychological consequences." Tenn. Code Ann. §68–33–101(b). It further found that it was "likely that not all harmful effects associated with these types of medical procedures when performed on a minor are yet fully known, as many of these procedures, when performed on a minor for such purposes, are experimental in nature and not supported by high-quality, long-term medical studies." *Ibid.* Tennessee determined that "minors lack the maturity to fully understand and appreciate the life-altering consequences of such procedures and that many individuals have expressed regret for medical procedures that were performed on or administered to them for such purposes when they were minors." §68–33–101(h). At the same time, Tennessee noted evidence that discordance between sex and gender "can be resolved

Opinion of the Court

by less invasive approaches that are likely to result in better outcomes for the minor." §68–33–101(c). SB1's age- and diagnosis-based classifications are plainly rationally related to these findings and the State's objective of protecting minors' health and welfare. §68–33–101(a).

The plaintiffs argue that SB1 fails even rational basis review because the law's classifications are "so far removed from [Tennessee's] asserted justifications that it is impossible to credit those interests." Brief for Respondents in Support of Petitioner 51 (internal quotation marks and alterations omitted). In their view, Tennessee has failed to explain why it has banned access to puberty blockers and hormones "*only* where they would allow a transgender minor to 'identify' or 'live' in a way 'inconsistent' with their 'sex.'" *Id.*, at 52.

This argument fails. As we have explained, there is a rational basis for SB1's classifications. Tennessee concluded that there is an ongoing debate among medical experts regarding the risks and benefits associated with administering puberty blockers and hormones to treat gender dysphoria, gender identity disorder, and gender incongruence. SB1's ban on such treatments responds directly to that uncertainty. Contrast *Cleburne*, 473 U. S., at 448 (record did not reveal "any rational basis" for city zoning ordinance); *Romer*, 517 U. S., at 632 ("sheer breadth" of law was "so discontinuous with the reasons offered for it that the [law] seem[ed] inexplicable by anything but animus toward the class it affect[ed]").

We also decline the plaintiffs' invitation to second-guess the lines that SB1 draws. It may be true, as the plaintiffs contend, that puberty blockers and hormones carry comparable risks for minors no matter the purposes for which they are administered. But it may also be true, as Tennessee determined, that those drugs carry greater risks when administered to treat gender dysphoria, gender identity disorder, and gender incongruence. We afford States "wide

Opinion of the Court

discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales* v. *Carhart*, 550 U. S. 124, 163 (2007). "[T]he fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 179 (1980); see *Dandridge* v. *Williams*, 397 U. S. 471, 485 (1970) ("In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect."); *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78 (1911) ("A classification having some reasonable basis does not offend against [the Equal Protection Clause] merely because it is not made with mathematical nicety or because in practice it results in some inequality.").

Recent developments only underscore the need for legislative flexibility in this area. After Tennessee enacted SB1, a report commissioned by England's National Health Service (NHS England) characterized the evidence concerning the use of puberty blockers and hormones to treat transgender minors as "remarkably weak," concluding that there is "no good evidence on the long-term outcomes of interventions to manage gender-related distress." H. Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report 13 (Apr. 2024). The report cautioned that "results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint," *ibid.*, and concluded that the "current understanding of the long-term health impacts of hormone interventions is limited and needs to be better understood," *id.*, at 22. In response to the report, NHS England enacted prohibitions on the administration of puberty blockers to new patients under the age of 18 outside of research settings and instituted a process for reviewing referrals for hormones for adolescents under the age of 16. See NHS England, Children and Young People's Gender Services:

Opinion of the Court

Implementing the Cass Review Recommendations 6–7 (Aug. 2024); Tr. of Oral Arg. 14–18.

We cite this report and NHS England's response not for guidance they might provide on the ultimate question of United States law, see *Schriro* v. *Summerlin*, 542 U. S. 348, 356 (2004) (contemporary foreign practice is "irrelevant" to constitutional interpretation), but to demonstrate the open questions regarding basic factual issues before medical authorities and other regulatory bodies. Such uncertainty "afford[s] little basis for judicial responses in absolute terms." *Marshall* v. *United States*, 414 U. S. 417, 427 (1974). And "[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Personnel Administrator of Mass.*, 442 U. S., at 272.

\*          \*          \*

This case carries with it the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field. The voices in these debates raise sincere concerns; the implications for all are profound. The Equal Protection Clause does not resolve these disagreements. Nor does it afford us license to decide them as we see best. Our role is not "to judge the wisdom, fairness, or logic" of the law before us, *Beach Communications*, 508 U. S., at 313, but only to ensure that it does not violate the equal protection guarantee of the Fourteenth Amendment. Having concluded it does not, we leave questions regarding its policy to the people, their elected representatives, and the democratic process.

The judgment of the United States Court of Appeals for the Sixth Circuit is affirmed.

*It is so ordered.*

Cite as: 605 U. S. ____ (2025)    1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

No. 23–477

———————

## UNITED STATES, PETITIONER *v.* JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 18, 2025]

JUSTICE THOMAS, concurring.

A Tennessee law prevents children from receiving certain medical interventions if administered to treat gender dysphoria. See Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity, S. B. 1, 113th Gen. Assem., 1st Extra. Sess.; Tenn. Code Ann. §68–33–101 *et seq.* (2023) (SB1). The United States and private plaintiffs challenged the law on Equal Protection Clause grounds, arguing that it discriminates based on sex and fails heightened scrutiny. Today, the Court correctly concludes that SB1 does not classify on the basis of sex and thus is subject only to rational-basis review. I join the Court's opinion in full. I write separately to address some additional arguments made in defense of Tennessee's law.

I

Before this Court, the United States and the private plaintiffs asserted that, under the reasoning of *Bostock* v. *Clayton County*, 590 U. S. 644 (2020), SB1 discriminates on the basis of sex. See Brief for United States 22, 27–28;[1] Brief for Respondents in Support of Petitioner 18, 24–25. In *Bostock*, the Court held that, in the context of Title VII

———————

[1] The United States changed its position following oral argument, but it neither withdrew its briefs nor sought to dismiss the case.

ED_01181

of the Civil Rights Act of 1964, "homosexuality and transgender status are inextricably bound up with sex," such that discriminating on the basis of either characteristic amounts to discrimination "because of" sex under that statute. 590 U. S., at 660–661, 665. The United States and the private plaintiffs have argued that *Bostock*'s "fundamental insight about the nature of sex discrimination applies in the equal-protection context" too. Brief for United States 27. I would reject that argument for several reasons.

While I continue to think that the *Bostock* majority's logic "fails on its own terms," see 590 U. S., at 689–699 (ALITO, J., dissenting), I see in any event no reason to import *Bostock*'s Title VII analysis into the Equal Protection Clause. The *Bostock* Court recognized that "other federal . . . laws that prohibit sex discrimination" were not before it, *id.*, at 681 (majority opinion), and thus rested its analysis on what it took to be the ordinary meaning of the relevant statutory terms—"'because of,'" "'otherwise . . . discriminate against,'" and "individual"—within the context of Title VII, *id.*, at 656–659; see 42 U. S. C. §2000e–2(a)(1).

The Equal Protection Clause includes none of this language. See Amdt. 14, §1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws"). "That such differently worded provisions should mean the same thing is implausible on its face." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 308 (2023) (GORSUCH, J., concurring); cf. *Department of Ed.* v. *Louisiana*, 603 U. S. 866, 867 (2024) (*per curiam*) (unanimously holding that "preliminary injunctive relief" was warranted to enjoin a rule extending *Bostock*'s reasoning to Title IX of the Education Amendments of 1972).[2]

---

[2] JUSTICE SOTOMAYOR acknowledges that "the Equal Protection Clause and Title VII use different words," but deems this an irrelevant "difference in wording" because the Court's equal protection precedents and Ti-

THOMAS, J., concurring

Extending the *Bostock* framework here would depart dramatically from this Court's Equal Protection Clause jurisprudence. We have faced sexual-orientation claims in the equal protection context for decades. See, *e.g.*, *Obergefell* v. *Hodges*, 576 U. S. 644 (2015); *United States* v. *Windsor*, 570 U. S. 744 (2013); *Romer* v. *Evans*, 517 U. S. 620 (1996). "But in those cases, the Court never suggested that sexual orientation discrimination is just a form of sex discrimination" warranting heightened constitutional scrutiny. *Bostock*, 590 U. S., at 797 (KAVANAUGH, J., dissenting). For example, while pregnancy is undeniably "bound up with sex," *id.*, at 661 (majority opinion), the Court has rejected the contention that the exclusion of pregnancy-related conditions from disability benefits violates the Equal Protection Clause, see *Geduldig* v. *Aiello*, 417 U. S. 484, 494 (1974); see also *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 236 (2022) ("[T]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny").

Applying *Bostock*'s reasoning to the Equal Protection Clause would also invite sweeping consequences. Many statutes "regulate medical procedures defined by sex." *L. W.* v. *Skrmetti*, 83 F. 4th 460, 482 (CA6 2023) (collecting examples, including laws referencing testicular and prostate cancer). If heightened scrutiny applied to such laws, then "[a]ny person with standing to challenge" such a decision could "haul the State into federal court and compel it to establish by evidence (presumably in the form of expert

––––––––––
tle VII both prohibit sex discrimination. *Post*, at 14, n. 9 (dissenting opinion). An abstract similarity between the purposes of the Constitution and a statute is not a license to import the statute's interpretation into the Constitution, much less to ignore the Constitution's text. Accord, *e.g.*, A. Scalia, A Matter of Interpretation 38 (1997) ("What I look for in the Constitution is precisely what I look for in a statute: the original meaning of the text").

4                    UNITED STATES *v.* SKRMETTI

THOMAS, J., concurring

testimony) that there is an 'exceedingly persuasive justification' for the classification." *United States* v. *Virginia*, 518 U. S. 515, 597 (1996) (Scalia, J., dissenting). Given the ensuing potential for "high-cost, high-risk lawsuit[s]," *ibid.*, States might simply decline to adopt or enforce sex-based medical laws or regulations, even where such rules would be best medical practice. The burden of skeptical judicial review is therefore far from the "modest step" of requiring a State to "show its work" that the dissent posits. *Post*, at 31 (opinion of SOTOMAYOR, J.).[3]

And, if *Bostock*'s reasoning applies to sex, it is difficult to see why it would not apply to other protected characteristics. Race presumably would be a but-for cause of—or, at least, "inextricably bound up with," 590 U. S., at 660–661—a university's decision to credit "an applicant's discussion of how race affected his or her life," *Students for Fair Admissions, Inc.*, 600 U. S., at 230. Under *Bostock*'s reasoning, such an essay is permissible only if it can survive our "daunting" strict-scrutiny standard. 600 U. S., at 206; but see, *e.g.*, *Washington* v. *Davis*, 426 U. S. 229, 239 (1976) (noting that the Court has "never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII").

The Constitution compels none of this. While the majority concludes that SB1 does not discriminate based on sex

——————

[3] I assume for purposes of this opinion that government-sponsored sex discrimination triggers heightened scrutiny under the Equal Protection Clause. As I have noted elsewhere, however, "[i]t is possible that the Equal Protection Clause does not prohibit discriminatory legislative classifications" at all. *United States* v. *Vaello Madero*, 596 U. S. 159, 178, n. 4 (2022) (concurring opinion). And, even if it does, the Court "routinely applied rational-basis review" to sex-discrimination claims "until the 1970's," *Virginia*, 518 U. S., at 575 (Scalia, J., dissenting), which might suggest that the application of heightened scrutiny to such claims is a departure from the Fourteenth Amendment's original understanding. But, the parties have not briefed the issue, so I do not pass upon it here.

THOMAS, J., concurring

even under *Bostock*'s incorrect reasoning, see *ante*, at 18–19, I would make clear that, in constitutional challenges, courts need not engage *Bostock* at all.

## II

The Court rightly rejects efforts by the United States and the private plaintiffs to accord outsized credit to claims about medical consensus and expertise. The United States asserted that "the medical community and the nation's leading hospitals overwhelmingly agree" with the Government's position that the treatments outlawed by SB1 can be medically necessary. Brief for United States 35; see also Brief for Respondents in Support of Petitioner 5 (asserting that "[e]very major medical association in the United States" supports this position). The implication of these arguments is that courts should defer to so-called expert consensus.

There are several problems with appealing and deferring to the authority of the expert class. *First*, so-called experts have no license to countermand the "wisdom, fairness, or logic of legislative choices." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993). *Second*, contrary to the representations of the United States and the private plaintiffs, there is no medical consensus on how best to treat gender dysphoria in children. *Third*, notwithstanding the alleged experts' view that young children can provide informed consent to irreversible sex-transition treatments, whether such consent is possible is a question of medical ethics that States must decide for themselves. *Fourth*, there are particularly good reasons to question the expert class here, as recent revelations suggest that leading voices in this area have relied on questionable evidence, and have allowed ideology to influence their medical guidance.

Taken together, this case serves as a useful reminder that the American people and their representatives are en-

ED_01185

THOMAS, J., concurring

titled to disagree with those who hold themselves out as experts, and that courts may not "sit as a super-legislature to weigh the wisdom of legislation." *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U. S. 421, 423 (1952). By correctly concluding that SB1 warrants the "paradigm of judicial restraint," *Beach Communications*, 508 U. S., at 314, the Court reserves to the people of Tennessee the right to decide for themselves.

### A

The views of self-proclaimed experts do not "shed light on the meaning of the Constitution." *Dobbs*, 597 U. S., at 272–273. Thus, whether "major medical organizations" agree with the result of Tennessee's democratic process is irrelevant. *Post*, at 5, n. 5 (opinion of SOTOMAYOR, J.). To hold otherwise would permit elite sentiment to distort and stifle democratic debate under the guise of scientific judgment, and would reduce judges to mere "spectators . . . in construing our Constitution." 83 F. 4th, at 479.

Just a few Terms ago, this Court acknowledged the importance of reserving to the democratic process the right to decide controversial medical questions. In *Dobbs*, the respondents sought to invoke the authority of "overwhelming medical consensus" and "numerous major medical organizations" to dispatch with Mississippi's asserted interest in minimizing pain for the unborn. Brief for Respondents, O. T. 2021, No. 19–1932, pp. 31–32. The Court pointedly rejected the notion that a consensus among popular expert groups could remove "the mitigation of fetal pain" from the "legitimate interests" of the people. 597 U. S., at 301.

Rational-basis review is critical to safeguarding these legitimate interests. Under this level of review, courts ask only whether a law is "rationally related to a legitimate governmental interest." *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 533 (1973). That deferential standard is not

THOMAS, J., concurring

only legally compelled in this case, but is practically essential for preserving "the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies." *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963).  When legislation does not cross constitutional lines, States must have leeway to effect the judgment of their citizens—no matter whether experts disagree.  And, when this Court has nonetheless given exalted status to expert opinion, it has been to our detriment: Past deference to expertise provided the theory of eugenics "added legitimacy and considerable momentum," with "[t]his Court thr[owing] its prestige behind the eugenics movement in its 1927 decision upholding the constitutionality of Virginia's forced-sterilization law."  *Box* v. *Planned Parenthood of Ind. and Ky., Inc.*, 587 U. S. 490, 499–500 (2019) (THOMAS, J., concurring) (citing *Buck* v. *Bell*, 274 U. S. 200 (1927)).  Fortunately, we do not repeat that mistake today.

## B

Before this Court, the United States asserted that "overwhelming evidence" supports the use of puberty blockers and cross-sex hormones for treating pediatric gender dysphoria, and that this view represents "the overwhelming consensus of the medical community."  Pet. for Cert. 2, 7.  These claims are untenable.  "[T]he concept of gender dysphoria as a medical condition is relatively new and the use of drug treatments that change or modify a child's sex characteristics is even more recent."  83 F. 4th, at 472.  The treatments at issue are subject to a rapidly evolving debate that demonstrates a lack of medical consensus over their risks and benefits.  Under these conditions, it is imperative that courts treat state legislation with "a strong presumption of validity," *Beach Communications*, 508 U. S., at 314, and in turn protect States' ability to enact "high-stakes medical policies, in which compassion for the child points in

THOMAS, J., concurring

both directions," 83 F. 4th, at 472.

1

SB1 prohibits puberty blockers, cross-sex hormones, and surgery for the purpose of treating gender dysphoria in children. See Tenn. Code Ann. §§68–33–102(5)(A)–(B), 68–33–103(a). The United States and the dissent have described these medications and procedures as "gender-affirming care." Brief for United States 2; *post*, at 4 (opinion of SOTOMAYOR, J.). But, that "sanitized description" obscures the nature of the medical interventions at issue. *Stenberg* v. *Carhart*, 530 U. S. 914, 983 (2000) (THOMAS, J., dissenting). I therefore begin with an overview of the treatments regulated under SB1.

*Puberty Blockers.* Puberty blockers are powerful synthetic drugs "designed to slow the development of male and female physical features." 83 F. 4th, at 467. The Food and Drug Administration (FDA) initially approved these drugs "to treat prostate cancer; endometriosis, a painful disease that causes uterine tissue to grow elsewhere in the body; and the unusually early onset of puberty," also known as "precocious puberty." M. Twohey & C. Jewett, Pressing Pause on Puberty, N. Y. Times, Nov. 14, 2022, pp. A14–A15 (Twohey 2022).

For purposes of treating gender dysphoria, however, puberty blockers generally are administered "off-label," meaning without FDA authorization for the specific use. See 2 App. 838–839; 83 F. 4th, at 478. Although it is neither unusual nor unlawful for drugs to be used off-label, the FDA has recognized that "just because a drug has been approved for one class of patients doesn't mean it's safe for another." Twohey 2022, at A15. That admonition is important here: To treat precocious puberty, puberty blockers are administered until the age appropriate for puberty; to treat gender dysphoria, however, puberty blockers are administered to stop puberty throughout the years it would normally occur.

ED_01188

See 2 App. 677. The "use of drugs to suppress normal puberty has multiple organ system effects whose long-term consequences have not been investigated." *Ibid.*

This absence of evidence is a "major drawback" in assessing the effects of puberty blockers on children with gender dysphoria. G. Betsi, P. Goulia, S. Sandhu, & P. Xekouki, Puberty Suppression in Adolescents With Gender Dysphoria: An Emerging Issue With Multiple Implications, Frontiers in Endocrinology 16 (2024). "The existing studies are limited in number, of small sample size, uncontrolled, observational, usually short-term, [and] potentially subject to bias." *Ibid.*; see also, *e.g.*, C. Terhune, R. Respaut, & M. Conlin, As More Transgender Children Seek Medical Care, Families Confront Many Unknowns, Reuters (Oct. 6, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-care ("No clinical trials have established [puberty blockers'] safety for such off-label use").

It is undisputed, however, that these treatments carry risks. Research suggests that, aside from interrupting a child's normal pubertal development, puberty blockers may lead to decreased bone density and impacts on brain development. See, *e.g.*, 2 App. 678–680; M. Cretella, Gender Dysphoria in Children, 32 Issues in L. & Med. 287, 297 (2017). And, "[d]espite widespread assertions that puberty blockers are 'fully reversible,'" it is unclear whether "patients ever develop normal levels of fertility if puberty blockers are terminated after a 'prolonged delay of puberty.'" 2 App. 678. At bottom, "[t]here remains considerable uncertainty regarding the effects of puberty blockers in individuals experiencing" gender dysphoria. A. Miroshnychenko et al., Puberty Blockers for Gender Dysphoria in Youth: A Systematic Review and Meta-Analysis, Online First, Archives of Disease in Childhood (Jan. 24, 2025) (draft, at 1), https://adc.bmj.com/content/110/6/429.[4]

──────────

[4]While the United States addressed the risks of puberty blockers "in

THOMAS, J., concurring

*Cross-sex hormones.* Following puberty blockers, the next stage of sex-transition treatments for children involves cross-sex hormones. This treatment is also typically "off-label," 2 App. 780, and requires "very high doses" of hormones of the opposite sex, *id.*, at 769. For example, one of the organizations that sets standards for pediatric sex-transition treatment recommends raising transitioning females' levels of testosterone "6 to 100 times higher than native female testosterone levels." *Id.*, at 774. For males seeking to transition into females, the organization recommends raising levels of estradiol, a type of estrogen, to "2 to 43 times above the normal range." *Id.*, at 780.

Prescribing such high doses of testosterone to girls induces "hyperandrogenism," which can cause increased cardiovascular risk, "irreversible changes to the vocal cords," "clitoromegaly and atrophy of the lining of the uterus and vagina," as well as "ovarian and breast cancer." *Id.*, at 772–779. Giving high doses of estrogen to boys induces "hyperestrogenemia," which can produce similarly severe side effects including, among other things, increased cardiovascular risk, breast cancer, and sexual dysfunction. *Id.*, at 779–781. And, for girls and boys alike, "it is generally accepted, even by advocates of transgender hormone therapy, that hormonal treatment impairs fertility, which may be irreversible." *Id.*, at 520–521; accord, W. Hembree et al., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline, 102 J. Clinical Endocrinology & Metabolism 3869, 3882 (2017) (ES Guidelines).

———————

and of themselves," Tr. of Oral Arg. 46, the vast majority of gender dysphoric children treated with puberty blockers progress to cross-sex-hormone treatment. See, *e.g.*, 2 App. 554 (citing study in which "98% of those who started puberty suppression progressed to cross-sex hormone therapy"). A discussion of puberty blockers' risks therefore should not exclude the risks presented by cross-sex hormones.

THOMAS, J., concurring

*Surgery*. SB1 also bans "[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs" as a treatment for gender dysphoria. Tenn. Code Ann. §68–33–102(5)(A). The District Court concluded that the plaintiffs lacked standing to challenge SB1's ban on sex-transition surgery for minors, see *ante*, at 6, and the parties do not address this provision's constitutionality here. But, the United States has taken the position that "surgery is essential and medically necessary to alleviate gender dysphoria." Amended Complaint in Intervention in *Boe* v. *Marshall*, No. 2:22–cv–00184 (MD Ala., May 4, 2022), ECF Doc. 92, p. 9, ¶39. The practice therefore warrants brief discussion.

Sex-transitioning surgeries for girls include "the surgical removal of the breasts" and "phalloplasty," that is, an "attemp[t] to create a pseudo-penis" by transplanting "a roll of skin and subcutaneous tissue" from another area of the body "to the pelvis." 2 App. 784–785; see also *Lange* v. *Houston Cty.*, 101 F. 4th 793, 802 (CA11) (Brasher, J., dissenting) ("[A] natal woman's phalloplasty 'involves removal of the uterus, ovaries, and vagina, and creation of a neophallu[s] and scrotum with scrotal prostheses,' which 'is a multistage reconstructive procedure'"), vacated and reh'g en banc granted, 110 F. 4th 1254 (CA11 2024). For boys, surgical interventions include "removal of the testicles alone to permanently lower testosterone levels," as well as an "attempt to create a pseudo-vagina" by "surgically open[ing]" the boy's penis, removing "erectile tissue," and then "clos[ing] and invert[ing] the penis] into a newly created cavity in order to simulate a vagina." 2 App. 784. These surgical interventions are irreversible, entail significant complications, and, in some cases, result in permanent infertility. *Id.*, at 782–786; see also ES Guidelines 3893.

2

The ongoing debate over the efficacy of sex-transition

THOMAS, J., concurring

treatments for children confirms that medical and regulatory authorities are not of one mind about the treatments' risks and benefits. These conditions illustrate why States may rightly be skeptical of groups or advocates claiming that expert consensus supports their position, and why courts must exercise restraint in reviewing state legislatures' decisions in this area. Accord, *e.g.*, *Beach Communications*, 508 U. S., at 314.

The treatments now referred to as "gender-affirming care" were "not available for minors until just before the millennium." 83 F. 4th, at 467. These treatments originated with Dutch healthcare workers in the 1990s, who first "began using puberty blockers . . . to treat gender dysphoria in minors." *Ibid.* The so-called "Dutch Protocol" "permitted puberty blockers for minors during the early stages of puberty, allowed hormone therapy at 16, and allowed genital surgery at 18." *Ibid.* (internal quotation marks omitted).

In 1998, the World Professional Association for Transgender Health (WPATH)—which is regarded by some as "the leading association of medical professionals treating transgender individuals," Brief for United States 3—revised its treatment standards to "endorse the Dutch Protocol." 83 F. 4th, at 467. Originally, WPATH's guidelines permitted puberty blockers at the onset of puberty, cross-sex hormones for those 16 or older, and sex-change surgery only for adults. *Ibid.* WPATH relaxed its recommendations in 2012, and began permitting cross-sex hormones for children under the age of 16. *Ibid.* WPATH further relaxed its recommendations when it published the eighth (and current) version of its standards of care in 2022. See E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. Transgender Health (2022) (WPATH 2022 Guidelines or Guidelines). These Guidelines endorse using puberty blockers and cross-sex hormones at the onset of puberty and allowing children

Thomas, J., concurring

to receive many surgical treatments previously reserved for adults. See *id*., at S64–S66. "On the whole, the standards of care for minors 'have become less restrictive over the course of time.'" 83 F. 4th, at 468.

At the same time, the number of children identifying as transgender has surged, and medical professionals have increasingly expressed doubts over the quality of evidence supporting the use of puberty blockers, cross-sex hormones, and surgery to treat them. See *ante*, at 3. Over the past several years, public health authorities in different countries have concluded that these sex-transition treatments are experimental in practice, and that the evidence supporting their use is of "'very low certainty,'" "'insufficient,'" and "'inconclusive.'" *Ibid*. "In countries like Sweden, Norway, France, the Netherlands and Britain—long considered exemplars of gender progress—medical professionals have recognized that early research on medical interventions for childhood gender dysphoria was either faulty or incomplete." P. Paul, Gender Dysphoric Kids Deserve Better Care, N. Y. Times, Feb. 4, 2024, p. 9 (Paul 2024); accord, Tenn. Code Ann. §68–33–101(e) ("The legislature finds that health authorities in Sweden, Finland, and the United Kingdom . . . have found no evidence that the benefits of these procedures outweigh the risks"); 1 App. 332–342 (describing countries' skepticism over the use of puberty blockers and cross-sex hormones as treatments).[5]

—————

[5]JUSTICE SOTOMAYOR suggests that the restrictions on gender-dysphoria treatments imposed in Norway, Sweden, and England are inapposite because those countries still permit some treatments where "medically necessary," whereas Tennessee's SB1 does not. *Post*, at 5, n. 4 (dissenting opinion). But, States might reasonably question whether any of the banned treatments are "medically necessary," as the supposed experts in the field have adopted an exceptionally broad understanding of that concept. Consider the Guidelines' chapter on "those who identify as eunuchs," a group that includes "individuals . . . assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals,

The Cass Review, published in April 2024, offers an influential example of the degree to which the debate over pediatric sex-transition treatments remains unsettled. See H. Cass, Independent Review of Gender Identity Services for Children and Young People: Final Report (Cass Review). After witnessing a 40-fold increase in the number of referrals to its centralized clinic for sex-transitioning services, the United Kingdom's National Health Service (NHS) commissioned this report to conduct a "thorough independent review of the use of puberty blockers and cross-sex hormones" to treat children with gender dysphoria. 1 App. 333–334. The report concludes that "we have no good evidence on the long-term outcomes of interventions to manage gender-related distress," and highlights the lack of reliable evidence to support the use of puberty blockers and cross-sex hormones in treating transgender kids. Cass Review 13, 32–33 (observing "insufficient/inconsistent evidence about the effects of puberty suppression," and "'a lack of high-quality research assessing the outcomes of hormone interventions in adolescents with gender dysphoria/incongruence'"); see also *ante*, at 23. Among other things, the

_____

or genital functioning." WPATH 2022 Guidelines S88. During a deposition, an author of the Guidelines confirmed that "WPATH's official position" is that castration may be "medically necessary" even where a male who identifies as a eunuch and seeks castration has "no recognized mental health conditions" and where "no finding is made that he's actually at high risk of self-castration." *Boe* v. *Marshall*, No. 2:22–cv–00184 (MD Ala., Oct. 9, 2024), ECF Doc. 700–3, p. 52. This expansive understanding of medical necessity would seem to justify any medical intervention so long as it might help individuals "better align their bodies with their gender identity," WPATH 2022 Guidelines S88, and presumably animates WPATH's conclusion that surgical interventions can constitute "medically necessary gender-affirming medical treatment[s] in adolescents," *id.*, at S66. Given that the limits of "medical necessity" in this context are debatable, States might reasonably decline to provide exceptions for it—particularly where, as here, they have reached the conclusion that specific procedures for children are "experimental in nature" and may carry unknown "harmful effects." Tenn. Code Ann. §68–33–101(b).

Cass Review determined that the "evidence [the researchers] found did not support th[e] conclusion" that "hormone treatment reduces the elevated risk of death by suicide" among children suffering from gender dysphoria.  Cass Review 33; see also *id.*, at 187 ("[T]he evidence does not adequately support the claim that gender-affirming treatment reduces suicide risk").

This shifting scientific landscape has forced governments to act quickly under conditions of uncertainty.  In the months following the Cass Review's publication, for example, NHS imposed new restrictions on the use of puberty blockers and cross-sex hormones for sex-transition treatments.  See *ante*, at 23.  And, just a week after oral argument in this case, the United Kingdom indefinitely banned new prescriptions of puberty blockers to treat children with gender dysphoria, except in clinical trials.  See S. Castle, Ban on Puberty Blockers for U. K. Teens Is Settled, N. Y. Times Int'l, Dec. 13, 2024, p. A11.  In areas with this much "medical and scientific uncertainty," courts must afford States "wide discretion."  *Gonzales* v. *Carhart*, 550 U. S. 124, 163 (2007).

C

Setting aside whether sex-transition treatments for children are *effective*, States may legitimately question whether they are *ethical*.  States have a legitimate interest "in protecting the integrity and ethics of the medical profession." *Washington* v. *Glucksberg*, 521 U. S. 702, 731 (1997). And, as the United States has acknowledged, "the 'general ethical principles' governing pediatric care" require the patient's informed consent.  Brief for United States 5.  Mounting evidence gives States reason to question whether children are capable of providing informed consent to irreversible sex-transition treatments, and thus whether these treatments can be ethically administered.

ED_01195

THOMAS, J., concurring

1

States could reasonably conclude that the level of young children's cognitive and emotional development inhibits their ability to consent to sex-transition treatments. Consistent with WPATH's recommendation that puberty blockers be available from the onset of puberty, see WPATH 2022 Guidelines S111, S256, "[m]any physicians in the United States and elsewhere" now "prescrib[e] blockers to patients at the first stage of puberty—as early as age 8." Twohey 2022, at A14.

There is no dispute, however, that the "decision-making capacity" of adolescents "is developing, but not yet complete." 2 App. 895. This Court has recognized as much in other contexts, explaining that children's "lack of maturity" and "underdeveloped sense of responsibility" often lead to "impetuous and ill-considered actions and decisions." *Roper* v. *Simmons*, 543 U. S. 551, 569 (2005) (internal quotation marks omitted). It is therefore unsurprising that "[t]he risks associated with puberty blockers and cross-sex hormones are difficult for adolescents to comprehend and appreciate," as the "near certainty of infertility . . . is likely to not be appreciated until the age during which most individuals consider having children." 2 App. 894.

But, these are precisely the risks to which children who receive these treatments are required to consent. Consider the contents of a consent form obtained from a gender clinic in Alabama. After providing a long list of potential risks and side effects, many of which are discussed above, see *supra*, at 7–10, the form requires both the child and parent to initial their consent to various statements. Among these are acknowledgments that "the side effects and safety of these medicines are not completely known," that the proposed treatment "may affect my sex life in different ways and future ability to cause a pregnancy," and that the treatments may lead to permanent infertility. See *Boe*, ECF Doc. 78–41, pp. 3–4, 10. The capacity to knowingly consent

Thomas, J., concurring

to these medical interventions requires a level of compre-
hension about science, sex, and fertility that state legisla-
tures could determine a child is unlikely to possess.  See 2
App. 893–895; Tenn. Code Ann. §68–33–101(h) (finding
that "minors lack the maturity to fully understand and ap-
preciate the life-altering consequences" of the treatments at
issue).[6]

2

The voices of "detransitioners"—individuals who have
undergone sex-transition treatments but no longer view
themselves as transgender—provide States with an addi-
tional reason to question whether children are providing in-
formed consent to the medical interventions described
above.  See, *e.g.*, Brief for Larger Detransitioners Commu-
nity as *Amici Curiae* 24–28; Brief for Partners for Ethical
Care et al. as *Amici Curiae* 17–38.

A recurring theme in discussions of detransitioners is
that doctors have responded to the "skyrocketing" "number
of adolescents requesting [sex-transitioning] medical care"
by "hastily dispensing medicine or recommending medical
doctors prescribe it."  L. Edwards-Leeper & E. Anderson,
The Mental Health Establishment Is Failing Trans Kids,
Washington Post, Nov. 24, 2021, pp. B1–B2.  In many cases,
evidence suggests that children "are being rushed toward"

───────────

[6] Parents also may have difficulty providing informed consent to their
children's sex-transition treatments.  Reports suggest that, in medical
consultations, "[p]arents are routinely warned that to pursue any path
outside of agreeing with a child's self-declared gender identity is to put a
gender dysphoric youth at risk for suicide, which feels to many people
like emotional blackmail."  Paul 2024, at 8; see also *Eknes-Tucker* v. *Gov-
ernor of Ala.*, 114 F. 4th 1241, 1268 (CA11 2024) (Lagoa, J., concurring
in denial of rehearing en banc) (acknowledging "testimony from nine par-
ents who said that doctors, therapists, and other practitioners pressured
them to start their children on cross-sex hormones and puberty blockers
or otherwise circumvented their wishes").  States might reasonably ques-
tion whether, under such conditions, parents' consent is valid and con-
sistent with ethical principles.

18                UNITED STATES *v.* SKRMETTI

THOMAS, J., concurring

medical treatment "[w]ithout proper assessment," and "the rising number of detransitioners that clinicians report seeing . . . indicates that this approach can backfire." *Id.*, at B2; accord, *e.g.*, *Eknes-Tucker* v. *Governor of Ala.*, 114 F. 4th 1241, 1267 (CA11 2024) (opinion of Lagoa, J.) ("Alabama presented evidence from many detransitioners who uniformly testified that they were not aware of the long-term impacts of the treatments they underwent"); Brief for Respondents 12–13 (explaining that, before enacting SB1, the Tennessee Legislature heard testimony "from a detransitioner who explained that she was not 'capable of making informed lifelong decisions' as a teenager" but nevertheless received transition treatments).[7]

States have an interest in ensuring that minor patients have the time and capacity to fully understand the irreversible treatments they may undergo. Cf. *Gonzales*, 550 U. S., at 159 (identifying State's "legitimate concern" regarding "lack of information" provided by abortionists). And, despite the supposed expert consensus that young

—————

[7] The United States has asserted that "all of the available evidence shows that" detransitioners constitute "a very small number" of individuals receiving sex-transition treatments. Tr. of Oral Arg. 49. But, "those who abandon a transition are likely to stop talking to their doctors, and so disappear from the figures." Trans Substantiation, The Economist, Apr. 8, 2023, p. 18; see also 2 App. 653 ("A significant majority (76%) [of detransitioners in one study] did not inform their clinicians of their detransition"). Thus, "[t]he number of people who detransition or discontinue gender treatments is not precisely known." A. Ghorayshi, Youth Gender Clinic Lands in a Political Storm, N. Y. Times, Aug. 26, 2023, p. A12. And, because "[i]t is quite possible that low reported rates of detransition and regret" among earlier groups of patients "will no longer apply" to the increasingly large number of children seeking these treatments, "there is reason to believe that that the numbers of detransitioners may increase." M. Irwig, Detransition Among Transgender and Gender-Diverse People—An Increasing and Increasingly Complex Phenomenon, 107 J. Clinical Endocrinology & Metabolism e4261, e4262 (2022).

children can consent to irreversible sex-transition treatments, States have good reasons to disagree; as "any parent knows," children's comprehension is limited, *Roper*, 543 U. S., at 569, and the growing number of detransitioners illustrates the risks of assuming otherwise.

## D

Recent revelations suggest that WPATH, long considered a standard bearer in treating pediatric gender dysphoria, see Brief for United States 3, bases its guidance on insufficient evidence and allows politics to influence its medical conclusions. Beyond the lack of consensus over the efficacy and ethics of pediatric sex-transition treatments, these developments provide States even stronger bases for treating supposed authorities in this area with skepticism.

WPATH itself recognizes that evidence supporting the efficacy of puberty blockers, cross-sex hormones, and surgical intervention for treating gender dysphoria in children is lacking. In its most recent Guidelines, for example, the group notes that "[a] key challenge in adolescent transgender care is *the quality of evidence* evaluating the effectiveness of medically necessary gender-affirming medical and surgical treatments . . . over time." WPATH 2022 Guidelines S45–S46 (emphasis added). A contributor to the Guidelines underscored this challenge, explaining that, "'[o]ur concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.'" *Eknes-Tucker*, 114 F. 4th, at 1261 (opinion of Lagoa, J.).

Nevertheless, WPATH publicly represents that "[g]ender-affirming interventions are based on decades of clinical experience and research," and are "safe and effective" treatments. Guidelines S18. WPATH appears to rest this conclusion on self-referencing consensus rather than evidence-based research, which may help explain the

THOMAS, J., concurring

group's confidence in the face of concededly inadequate evidence. See Cass Review 130. In its analysis of several "guidelines" for transgender medicine—including not only the WPATH 2022 Guidelines, but also those from groups like the Endocrine Society—the Cass Review notes that "most of the guidelines described insufficient evidence about the risks and benefits of medical treatment in adolescents," but nevertheless "went on to cite this same evidence to recommend medical treatments," or to base their recommendations on "*other* guidelines" prescribing the same course of action. *Ibid.* (emphasis added). This approach was particularly pronounced in the WPATH 2022 Guidelines, which "cited many of the other national and regional guidelines to support some of its recommendations, despite these guidelines having been considerably influenced by WPATH 7," the prior version of WPATH's Standards of Care. Cass Review 130.

States would also have good reason to question whether WPATH has a basis for believing that children can provide informed consent to sex-transition treatments. "[I]n a leaked recording of a WPATH Panel," for example, an endocrinologist acknowledged the difficulty of explaining cross-sex hormones and puberty blockers to children, noting that "'the thing you have to remember about kids is that we're often explaining these sorts of things to people who haven't even had biology in high school yet.'" *Eknes-Tucker*, 114 F. 4th, at 1268–1269 (opinion of Lagoa, J.). "'[I]t's always a good theory that you talk about fertility preservation with a 14 year old,'" the endocrinologist continued, "'but I know I'm talking to a blank wall.'" *Id.*, at 1269. Analogizing a teenage patient's comprehension to that of a blank wall should raise serious concerns regarding the patient's ability to provide informed consent. Given WPATH's recognition that "[c]onsent requires the cognitive capacity to understand the risks and benefits of a treat-

ment," Guidelines S38, States thus might reasonably question whether WPATH could be "genuine in its claim that these treatments are safe, effective, and well understood, particularly for minors," *Eknes-Tucker*, 114 F. 4th, at 1268 (opinion of Lagoa, J.).

Other "recent revelations" might reinforce the conclusion that "WPATH's lodestar is ideology, not science." *Id.*, at 1261. For example, newly released documents suggest that WPATH tailored its Standards of Care in part to achieve legal and political objectives. In one instance, the chair of WPATH's guidelines committee testified that it was "ethically justifiable" for the authors of the WPATH 2022 Guidelines to "advocate for language changes [in these Guidelines] to strengthen [their] position in court." *Boe*, ECF Doc. 700–3, p. 42. One of the Guidelines' contributors was more direct: "My hope with these [Guidelines] is that they land in such a way as to have serious effect in . . . law and policy settings." ECF Doc. 700–13, p. 25; see also Brief for State of Alabama as *Amicus Curiae* 11–15 (Alabama Brief) (describing similar statements from other WPATH contributors).

Worse, recent reporting has exposed that WPATH changed its medical guidance to accommodate external political pressure. See Brief for Respondents 9–11; Alabama Brief 15–23. Unsealed documents reveal that a senior official in the Biden administration "pressed [WPATH] to remove age limits for adolescent surgeries from guidelines for care of transgender minors" on the theory that "'specific listings of ages, under 18, will result in devastating legislation for trans care." A. Ghorayshi, Biden Officials Pushed To Remove Age Limits for Trans Surgery, N. Y. Times, June 27, 2024, p. A17. Despite some internal disagreement, WPATH acceded and "removed the age minimums in

22          UNITED STATES *v.* SKRMETTI

THOMAS, J., concurring

its eighth edition of the standards of care." *Ibid.*; see Alabama Brief 17–20.[8]

Over a decade ago, one of WPATH's contributors explained that "'WPATH aspires to be both a scientific organization and an advocacy group for the transgendered,'" and admitted that WPATH's Standards of Care "'is not a politically neutral document.'" *Kosilek* v. *Spencer*, 774 F. 3d 63, 78 (CA1 2014). WPATH's apparent willingness to let political interests influence its medical conclusions highlights this reality. States are never required to substitute expert opinion for their legislative judgment, and, when the experts appear to have compromised their credibility, it makes good sense to chart a different course.[9]

*          *          *

This case carries a simple lesson: In politically contentious debates over matters shrouded in scientific uncertainty, courts should not assume that self-described experts are correct.

Deference to legislatures, not experts, is particularly critical here. Many prominent medical professionals have declared a consensus around the efficacy of treating children's gender dysphoria with puberty blockers, cross-sex hor-

───────────

[8]After its influence became public, the Government backtracked and announced that it "opposed gender-affirming surgery for minors." R. Rabin, T. Rosenbluth, & N. Weiland, Biden Opposes Surgery for Transgender Minors, N. Y. Times, June 30, 2024, p. 22.

[9]WPATH's deference to political pressure is not the only high-profile example of ideology influencing medical conclusions in this area. Recently, "[a]n influential doctor and advocate of adolescent gender treatments" declined to publish "a long-awaited study of puberty-blocking drugs" that suggested her initial hypothesis about the drugs' efficacy had not "borne out." A. Ghorayshi, Doctor, Fearing Outrage, Slows a Gender Study, N. Y. Times, Oct. 24, 2024, pp. A1, A23. The doctor explained that she feared "the findings might fuel the kind of political attacks that have led to bans of the youth gender treatments in more than 20 states, one of which will soon be considered by the Supreme Court." *Id.*, at A23.

ED_01202

THOMAS, J., concurring

mones, and surgical interventions, despite mounting evidence to the contrary. They have dismissed grave problems undercutting the assumption that young children can consent to irreversible treatments that may deprive them of their ability to eventually produce children of their own. They have built their medical determinations on concededly weak evidence. And, they have surreptitiously compromised their medical recommendations to achieve political ends.

The Court today reserves "to the people, their elected representatives, and the democratic process" the power to decide how best to address an area of medical uncertainty and extraordinary importance. *Ante*, at 24. That sovereign prerogative does not bow to "major medical organizations." *Post*, at 5, n. 5 (opinion of SOTOMAYOR, J.). "[E]xperts and elites have been wrong before—and they may prove to be wrong again." *Students for Fair Admissions, Inc.*, 600 U. S., at 268 (THOMAS, J., concurring).

# SUPREME COURT OF THE UNITED STATES

———————

No. 23–477

———————

## UNITED STATES, PETITIONER *v.* JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 18, 2025]

JUSTICE BARRETT, with whom JUSTICE THOMAS joins, concurring.

Because the Court concludes that Tennessee's Senate Bill 1 does not classify on the basis of transgender status, it does not resolve whether transgender status constitutes a suspect class. *Ante*, at 16–18; see *Geduldig* v. *Aiello*, 417 U. S. 484, 496 (1974). I write separately to explain why, in my view, it does not.

I

As a "practical necessity," "most legislation classifies for one purpose or another." *Romer* v. *Evans*, 517 U. S. 620, 631 (1996). Laws distribute benefits that advantage particular groups (like in-state tuition for residents), draw lines that might seem arbitrary (like income thresholds for means-tested benefits), and set rules for specific categories of people (like a particular profession or age group). Such classifications do not usually render a law unconstitutional. Instead, as a general matter, laws are presumed to be constitutionally valid, and a legislative classification will be upheld "so long as it bears a rational relation to some legitimate end." *Ibid.*

There are only a few exceptions to this rule: classifications based on race, sex, and alienage. Racial and ethnic

ED_01204

BARRETT, J., concurring

classifications receive strict scrutiny; to survive a constitu-
tional challenge, they must be "'narrowly tailored'" to serve
"'compelling governmental interests.'"  *Students for Fair
Admissions, Inc.* v. *President and Fellows of Harvard Col-
lege*, 600 U. S. 181, 206–207 (2023); see also *Regents of
Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 292 (1978) (opinion of
Powell, J.) (observing that the Equal Protection Clause ap-
plies "to all ethnic groups seeking protection from official
discrimination").  Classifications based on alienage are sub-
ject to similarly close scrutiny.[1]  *Nyquist* v. *Mauclet*, 432
U. S. 1, 7 (1977).  And laws distinguishing between men and
women receive intermediate scrutiny; to survive a constitu-
tional challenge, they must be "'"substantially related"'" to
achieving an "'"important governmental objectiv[e]."'"
*United States* v. *Virginia*, 518 U. S. 515, 533 (1996).

Beyond these categories, the set has remained virtually
closed.  Indeed, this Court "has not recognized any new con-
stitutionally protected classes in over four decades, and in-
stead has repeatedly declined to do so."  *Ondo* v. *Cleveland*,
795 F. 3d 597, 609 (CA6 2015).  So in urging us to recognize
transgender status as a suspect classification, the plaintiffs
face a high bar.[2]

---

[1] Alienage is a unique category.  Because of Congress's broad authority
over immigration, we have treated it as a suspect class only vis-à-vis the
States.  See, *e.g., Takahashi* v. *Fish and Game Comm'n*, 334 U. S. 410,
418–419 (1948).  For the same reason, we have grounded our scrutiny of
state laws as much in the Supremacy Clause as in the Equal Protection
Clause.  See, *e.g., Toll* v. *Moreno*, 458 U. S. 1, 9–10 (1982) (holding that
a state policy precluding certain aliens from acquiring in-state status for
the purpose of university tuition violated the Supremacy Clause and de-
clining to consider equal protection arguments); *Takahashi*, 334 U. S., at
419 ("State laws which impose discriminatory burdens upon the entrance
or residence of aliens lawfully within the United States conflict with [the]
constitutionally derived federal power to regulate immigration, and have
accordingly been held invalid").  See also *Graham* v. *Richardson*, 403
U. S. 365, 376–380 (1971).

[2] Because the plaintiffs contend that intermediate scrutiny rather than

BARRETT, J., concurring

To determine whether a group constitutes a "suspect class" akin to the canonical examples of race and sex, we apply a test derived from the famous footnote 4 in *United States* v. *Carolene Products Co.* See 304 U. S. 144, 152–153, n. 4 (1938) (suggesting that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry"). We consider whether members of the group in question "exhibit obvious, immutable or distinguishing characteristics that define them as a discrete group," whether the group has, "[a]s a historical matter, . . . been subjected to discrimination," and whether the group is "a minority or politically powerless." *Lyng* v. *Castillo*, 477 U. S. 635, 638 (1986). The test is strict, as evidenced by the failure of even vulnerable groups to satisfy it: We have held that the mentally disabled, the elderly, and the poor are not suspect classes. See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 442 (1985) (mental disability); *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 313–314 (1976) (*per curiam*) (age); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973) (poverty). In fact, as far as I can tell, we have *never* embraced a new suspect class under this test. Our restraint reflects the

———————

strict scrutiny is the correct standard, they refer to transgender status as a "quasi-suspect" class. *E.g.,* Brief for Respondents in Support of Petitioner 37; see *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 437–438 (1985) (using the phrase "quasi-suspect classification" to refer to classifications that trigger "intermediate-level scrutiny"). As any form of heightened review departs from the presumption that legislative classifications are constitutional, I follow the Sixth Circuit in using the phrase "suspect class" or "suspect classification" to refer generically to all classifications that trigger more than rational-basis review. See *L. W.* v. *Skrmetti*, 83 F. 4th 460, 486 (2023).

BARRETT, J., concurring

principle that "[w]hen social or economic legislation is at is-
sue, the Equal Protection Clause allows the States wide lat-
itude, and the Constitution presumes that even improvi-
dent decisions will eventually be rectified by the democratic
processes." *Cleburne*, 473 U. S., at 440 (citation omitted).

## II

The Sixth Circuit held that transgender individuals do
not constitute a suspect class, and it was right to do so.[3] To
begin, transgender status is not marked by the same sort of
"'obvious, immutable, or distinguishing characteristics'" as
race or sex. *L. W.* v. *Skrmetti*, 83 F. 4th 460, 487 (2023)
(quoting *Bowen* v. *Gilliard*, 483 U. S. 587, 602 (1987)); see
*Lyng*, 477 U. S., at 638. In particular, it is not defined by a
trait that is "'definitively ascertainable at the moment of
birth.'" 83 F. 4th, at 487 (quoting *Ondo*, 795 F. 3d, at 609).
The plaintiffs here, for instance, began to experience gender
dysphoria at varying ages—some from a young age, others
not until the onset of puberty. See Brief for Respondents in
Support of Petitioner 8–12. Meanwhile, the plaintiffs
acknowledge that some transgender individuals "detransi-
tion" later in life—in other words, they begin to identify
again with the gender that corresponds to their biological
sex. See Tr. of Oral Arg. 49, 108. Accordingly, transgender
status does not turn on an "immutable . . . characteristi[c]."
*Lyng*, 477 U. S., at 638.

Nor is the transgender population a "discrete group," as
our cases require. *Ibid.* Instead, like classes we have de-
clined to recognize as suspect, the category of transgender
individuals is "large, diverse, and amorphous." *Rodriguez*,
411 U. S., at 28. The World Professional Association for
Transgender Health states that the term "'transgender' can

---

[3] JUSTICE ALITO would likewise hold that transgender persons do not
qualify as a suspect or quasi-suspect class. See *post*, at 10 (opinion con-
curring in part and concurring in judgment). Though his analysis differs
in emphasis, see *ibid.*, n. 6, I understand it to be consistent with mine.

BARRETT, J., concurring

describe 'a huge variety of gender identities and expressions.'" 83 F. 4th, at 487 (quoting Standards of Care for the Health of Transgender and Gender Diverse People S15 (8th ed. 2022)). The American Psychological Association similarly uses the phrase "'transgender youth'" as an "umbrella term" "to describe . . . varied groups" with "many diverse gender experiences." Brief for American Psychological Association et al. as *Amici Curiae* 6, n. 7. Underscoring the point, plaintiffs' counsel acknowledged at oral argument that "there are people who fall within a transgender identity who may not fit into a binary identity." Tr. of Oral Arg. 100. The boundaries of the group, in other words, are not defined by an easily ascertainable characteristic that is fixed and consistent across the group.

Finally, holding that transgender people constitute a suspect class would require courts to oversee all manner of policy choices normally committed to legislative discretion. The parties agree that the States have a legitimate interest in regulating health care. They also agree that transgender status implicates physical and mental health—indeed, this case is about the medical treatment of children with gender dysphoria, which is "clinically significant distress resulting from the incongruence between . . . gender identity and . . . sex assigned at birth," and which "can result in severe anxiety, depression, self-harm, and even suicide." Brief for Respondents in Support of Petitioner 4–5. The question of how to regulate a medical condition such as gender dysphoria involves a host of policy judgments that legislatures, not courts, are best equipped to make. See *Cleburne*, 473 U. S., at 441–442 (declining to recognize a suspect class when the "distinguishing characteristics" of the proposed class are "relevant to interests the State has the authority to implement").

Consider just a few: What are the relevant risks and benefits to children of puberty blockers and hormone treatments? What is the age at which these treatments become

BARRETT, J., concurring

appropriate? 15? 16? 18? What about surgeries? Expert disagreements highlight the difficulty of such choices. As the Court recounts, England, Finland, Norway, and Sweden have raised concerns about using puberty blockers or hormone treatments on juveniles with gender dysphoria and have limited such treatments, in some cases by allowing them to go forward only in a research setting. See 1 App. 332–342, 409–411; 2 *id.*, at 726–727; *ante*, at 3–4. By contrast, the guidelines promulgated by the Endocrine Society, upon which the plaintiffs rely, broadly recommend treatment for adolescents with sustained gender dysphoria and the capacity to give informed consent. App. to Pet. for Cert. 256a–259a. As we have emphasized before, "state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales* v. *Carhart*, 550 U. S. 124, 163 (2007). The prospect of courts second-guessing legislative choices in this area should set off alarm bells. Cf. *Lochner* v. *New York*, 198 U. S. 45, 72 (1905) (Harlan, J., dissenting) ("What the precise facts are it may be difficult to say. It is enough for . . . this court to know . . . that the question is one about which there is room for debate and for an honest difference of opinion").

Beyond the treatment of gender dysphoria, transgender status implicates several other areas of legitimate regulatory policy—ranging from access to restrooms to eligibility for boys' and girls' sports teams. If laws that classify based on transgender status necessarily trigger heightened scrutiny, then the courts will inevitably be in the business of "closely scrutiniz[ing] legislative choices" in all these domains. *Cleburne*, 473 U. S., at 441–442. To be sure, an individual law "'inexplicable by anything but animus'" is unconstitutional. *Trump* v. *Hawaii*, 585 U. S. 667, 706 (2018). But legislatures have many valid reasons to make policy in these areas, and so long as a statute is a rational means of pursuing a legitimate end, the Equal Protection Clause is

BARRETT, J., concurring

satisfied.

### III

The conclusion that transgender individuals do not share the "obvious, immutable, or distinguishing characteristics" of "a discrete group" is enough to demonstrate that transgender status does not define a suspect class. *Lyng*, 477 U. S., at 638. But the second factor—whether the group has, "[a]s a historical matter, . . . been subjected to discrimination," *ibid.*—also poses a problem for the plaintiffs' argument.

In addressing this factor, the plaintiffs assume that a history of private discrimination may satisfy this condition. For instance, the plaintiffs argue that "it is undeniable that transgender individuals, as a class, have 'historically been subject to discrimination including in education, employment, housing, and access to healthcare.'" Brief for United States 29; Brief for Respondents in Support of Petitioner 37 (adopting the arguments made by the United States).[4] The Solicitor General confirmed at oral argument that this argument did not turn on "discrimination . . . reflected in the laws." Tr. of Oral Arg. 60. The District Court also assumed that a history of private discrimination could suffice to establish that a group comprises a suspect class. See *L. W.* v. *Skrmetti*, 679 F. Supp. 3d 668, 690 (MD Tenn. 2023).

This assumption is mistaken. For purposes of the Fourteenth Amendment, the relevant question is whether the group has been subject to a longstanding pattern of discrimination *in the law*. In other words, we ask whether the group has suffered a history of *de jure* discrimination.

Existing suspect classes had such a history. Most obviously, "[t]he clear and central purpose of the Fourteenth

---

[4]As the Court explains, the Department of Justice has reconsidered the Government's position in this case following the change in administration. *Ante*, at 8, n. 1. The private plaintiffs, however, have maintained the same position throughout.

BARRETT, J., concurring

Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Loving* v. *Virginia*, 388 U. S. 1, 10 (1967). We have made that point "repeatedly." *Students for Fair Admissions, Inc.*, 600 U. S., at 206 (gathering cases). In recognizing sex as a suspect class, we similarly emphasized that women faced more than a century's worth of discrimination in the law: "[N]ot until 1920 did women gain a constitutional right to the franchise. And for a half century thereafter, it remained the prevailing doctrine that government, both federal and state, could withhold from women opportunities accorded men so long as any 'basis in reason' could be conceived for the discrimination." *Virginia*, 518 U. S., at 531 (citation omitted); see also *Frontiero* v. *Richardson*, 411 U. S. 677, 684–685 (1973) (plurality opinion) ("As a result of notions such as these, our statute books gradually became laden with gross, stereotyped distinctions between the sexes"). And in protecting alienage, we underscored the many state laws that discriminated on that ground, typically by targeting individuals of a particular national origin. See, *e.g.*, *Takahashi* v. *Fish and Game Comm'n*, 334 U. S. 410, 427 (1948) (Murphy, J., concurring) (discussing a state law "directed in spirit and in effect solely against aliens of Japanese birth"); *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373–374 (1886) (identifying ordinances that discriminated against Chinese nationals). Indeed, Congress criminalized discrimination on the basis of alienage by state actors in 1870, "in response to California legislation restricting the rights of Chinese immigrants." *Rajaram* v. *Meta Platforms, Inc.*, 105 F. 4th 1179, 1183–1184 (CA9 2024); see 16 Stat. 144 (codified, as amended, 18 U. S. C. §242).

The distinction between *de jure* discrimination and private animus is consistent with the Fourteenth Amendment's text and purpose. Most fundamentally, the Fourteenth Amendment constrains state action, not private

conduct. See *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U. S. 179, 191 (1988). And state actors are entitled to a presumption that their actions turn on constitutionally legitimate motivations rather than impermissible animus. *Schilb* v. *Kuebel*, 404 U. S. 357, 364 (1971). Of course, this presumption can be defeated, and a widespread history of state action that reflects animus or stereotyping gives courts good reason to be suspicious of the government's motives. But because we presume that state actors abide by the Constitution, the fact of private discrimination—which is not itself unconstitutional, even if morally blameworthy—does not provide a basis for inferring that state actors are also likely to discriminate and thereby violate the Constitution.

This focus on *de jure* discrimination is not only theoretically sound—it is also judicially manageable. Courts are ill suited to conduct an open-ended inquiry into whether the volume of private discrimination exceeds some indeterminate threshold. By contrast, they are well equipped to analyze whether there is a history of legislation that has discriminated against the group in question.

Focusing the inquiry on *de jure* state action would also clarify the test for political powerlessness, which is another factor we have used to determine whether a classification is suspect. *Carolene Products*, the source of the "discrete and insular minority" test, equates political powerlessness with laws burdening those who lacked a vote. See 304 U. S., at 152–153, n. 4 (citing *McCulloch* v. *Maryland*, 4 Wheat. 316, 428 (1819) (a State regulating the Federal Government); *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.*, 303 U. S. 177, 184, n. 2 (1938) (a State regulating out-of-state corporations)). This kind of "political powerlessness," which leaves the affected persons altogether unable to protect themselves in the political process, tracks the experience of the existing suspect classes.

ED_01212

BARRETT, J., concurring

We have said little, however, about what "political powerlessness" means for our recognition of *new* suspect classes. See *Lyng*, 477 U. S., at 638 (stating without elaboration that close relatives are not "politically powerless"); *Murgia*, 427 U. S., at 313 (same for the elderly). And in the absence of clear guidance from us, lower courts have resorted to considering evidence like whether the group has drawn the support of powerful interest groups, achieved equal representation in government, or obtained affirmative statutory protection from discrimination in the private sector. See, *e.g.*, 83 F. 4th, at 487 (evaluating whether transgender litigants are supported by "major medical organizations" and "large law firms"); 679 F. Supp. 3d, at 691 (suggesting that the analysis turns on whether the group has "achiev[ed] relatively equal representation in political bodies"); *Grimm* v. *Gloucester Cty. School Bd.*, 972 F. 3d 586, 613 (CA4 2020) (concluding that transgender people are politically powerless because of a "dearth of openly transgender persons serving in the executive and legislative branches" or in the judiciary). These markers reflect sociological intuitions about a group's relative political power; they do not constitute an objective, legally grounded standard that courts can apply consistently. A legacy of *de jure* discrimination, by contrast, more precisely (and objectively) captures the interests that lie at the heart of the Equal Protection Clause.

Because the litigants assumed that evidence of private discrimination could suffice for the suspect-class inquiry, they did not thoroughly discuss whether transgender individuals have suffered a history of *de jure* discrimination as a class. And because the group of transgender individuals

BARRETT, J., concurring

is an insufficiently discrete and insular minority, the question is largely academic.[5]  In future cases, however, I would not recognize a new suspect class absent a demonstrated history of *de jure* discrimination.

*          *          *

The Equal Protection Clause does not demand heightened judicial scrutiny of laws that classify based on transgender status.  Rational-basis review applies, which means that courts must give legislatures flexibility to make policy in this area.

---

[5]The evidence that is before this Court is sparse but suggestive of relatively little *de jure* discrimination.  When asked at oral argument, the Solicitor General acknowledged that "historical discrimination against transgender people may not have been reflected in the laws."  Tr. of Oral Arg. 60.  Counsel for the private plaintiffs, however, suggested that bans on military service for transgender individuals and on cross-dressing might qualify as *de jure* discrimination.  See *id.*, at 110; see also *post*, at 25–26 (SOTOMAYOR, J., dissenting).  Because the issue was unbriefed, I take no position on whether there is a longstanding history of *de jure* discrimination with respect to the relevant characteristic of transgender status.

Opinion of ALITO, J.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–477

_____

## UNITED STATES, PETITIONER *v.* JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 18, 2025]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I concur in the judgment and join Parts I and II–B of the opinion of the Court. I agree with much of the discussion in Part II–A–1, which holds that Tennessee's Senate Bill 1 (SB1) does not classify on the basis of "sex," but I set out my own analysis of this issue in Part I of this opinion. I do not join Part II–A–2 of the opinion of the Court, which concludes that SB1 does not classify on the basis of "transgender status." There is a strong argument that SB1 does classify on that ground, but I find it unnecessary to decide that question. I would assume for the sake of argument that the law classifies based on transgender status, but I would nevertheless sustain the law because such a classification does not warrant heightened scrutiny. I also do not join Part II–A–3 of the Court's opinion because I do not believe that the reasoning employed in *Bostock* v. *Clayton County*, 590 U. S. 644 (2020), is applicable when determining whether a law classifies based on sex for Equal Protection Clause purposes.

ED_01215

Opinion of ALITO, J.

## I

## A

To begin, I agree with the Court that SB1 does not classify on the basis of "sex" within the meaning of our equal protection precedents. What those cases have always meant by "sex" is the status of having the genes of a male or female. That was the common understanding of the term in 1971 when the Court, in *Reed* v. *Reed*, 404 U. S. 71, 74, first held that a law that discriminated against women violated the Equal Protection Clause. See, *e.g.*, Random House Dictionary of the English Language 1307 (1966) (defining "sex" as "the fact or character of being either male or female"); Webster's Third New International Dictionary 2081 (1966) (defining "sex" as "one of the two divisions of . . . human beings respectively designated male or female"). And all the Court's subsequent cases in this line have shared that understanding.

In *Frontiero* v. *Richardson*, 411 U. S. 677 (1973), which was handed down in the next Term after *Reed*, a plurality referred to "sex" as "an immutable characteristic determined solely by the accident of birth." 411 U. S., at 686. Twenty-five years later, Justice Ginsburg's landmark opinion for the Court in *United States* v. *Virginia*, 518 U. S. 515 (1996) (*VMI*), exhibited the same understanding. The opinion observed that the "[p]hysical differences between men and women . . . are enduring" and that the "'[i]nherent differences' between men and women" are "cause for celebration." *Id.*, at 533.

While the earliest cases in this line referred solely to discrimination on the basis of "sex," see, *e.g.*, *Reed*, 404 U. S., at 75–77; *Frontiero*, 411 U. S., at 682–688 (plurality opinion), later equal protection cases referred to classifications based on "gender," see *Craig* v. *Boren*, 429 U. S. 190, 192 (1976). But it is clear that these cases used "gender" as a synonym for "sex." See, *e.g.*, *id.*, at 199 (using "sex" and "gender" interchangeably). In employing the term "gender"

Opinion of ALITO, J.

in this way, our opinions tracked a change in usage in ordinary speech.  As the Oxford English Dictionary explains, "as *sex* came increasingly to mean sexual intercourse . . . , *gender* began to replace it . . . as the usual word for the biological grouping of males and females."  Oxford English Dictionary (3d ed., June 2011), https://doi.org/10.1093/OED/8610510183.  Thus, our use of the term "gender" had no substantive significance.  None of our equal protection decisions has used "gender" in the sense in which it is now sometimes used, *i.e.*, to denote "a group of people in a society who share particular qualities or ways of behaving which that society associates with being male, female, or another identity."[1]

For these reasons a party claiming that a law violates the Equal Protection Clause because it classifies on the basis of sex cannot prevail simply by showing that the law draws a distinction on the basis of "gender identity."  See, *e.g.*, Merriam-Webster's Collegiate Dictionary 520 (11th ed. 2020) (defining "gender identity").  Rather, such a plaintiff must show that the challenged law differentiates between the two biological sexes: male and female.

### B
### 1

What, then, does it mean for a law to "classify" based on sex?  The succinct answer is that a law classifies based on sex for equal protection purposes when it "[p]rescrib[es] one rule for [women], [and] another for [men]."  *Sessions* v. *Morales-Santana*, 582 U. S. 47, 58 (2017).  And as we have explained, the general rule is that a law meets this test if it employs an "overt gender criterion."  *Craig*, 429 U. S., at 198.

A few examples illustrate the point.  A law setting one

_____

[1] See Cambridge English Dictionary (2025), https://dictionary.cambridge.org/us/dictionary/english/gender.

drinking age for women and another for men is a sex clas-
sification. *Id.*, at 191–192, 197–199. A college policy grant-
ing admission to women but not to men (or vice versa) is a
sex classification. *Mississippi Univ. for Women* v. *Hogan*,
458 U. S. 718, 720–723 (1982); *VMI*, 518 U. S., at 530–531.
A law imposing different citizenship requirements for chil-
dren with citizen fathers compared to children with citizen
mothers is a sex classification. *Tuan Anh Nguyen* v. *INS*,
533 U. S. 53, 59–62 (2001).

What is apparent in each of these cases is that sex serves
as an explicit "criterion," dictating that a particular legal
standard applies to one sex but not the other. See also
*Weinberger* v. *Wiesenfeld*, 420 U. S. 636 (1975) (different
rules for husbands and wives); *Stanton* v. *Stanton*, 421
U. S. 7 (1975) (different rule for men and women); *Califano*
v. *Goldfarb*, 430 U. S. 199 (1977) (different rules for widows
and widowers); *Califano* v. *Webster*, 430 U. S. 313 (1977)
(*per curiam*) (different rule for men and women); *Orr* v. *Orr*,
440 U. S. 268 (1979) (different rule for husbands and
wives); *Caban* v. *Mohammed*, 441 U. S. 380 (1979) (differ-
ent rule for unwed mothers and unwed fathers); *Wengler* v.
*Druggists Mut. Ins. Co.*, 446 U. S. 142 (1980) (different
rules for widows and widowers); *Kirchberg* v. *Feenstra*, 450
U. S. 455 (1981) (different rule for husbands and wives);
*Morales-Santana*, 582 U. S. 47 (different rules for unwed
mothers and unwed fathers).

In contrast to what our cases have demanded, we have
"never suggested that mere reference to sex is sufficient to
trigger heightened scrutiny." *Ante,* at 10 (citing *Nguyen*,
533 U. S., at 64); see also *Dobbs* v. *Jackson Women's Health
Organization*, 597 U. S. 215, 236–237 (2022) (holding that
rational basis review applied to a prohibition on abortion,
despite the fact that the law in question mentioned "the
physical health of the mother").

We have also explicitly rejected the proposition that a law

Opinion of ALITO, J.

classifies based on sex when it employs a non-sex classification that correlates with differential treatment of men and women. In *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), for example, we considered a California insurance program that "exclude[d] from coverage certain disabilities resulting from pregnancy." *Id.,* at 486. Although we recognized that "only women can become pregnant," we explained that "it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.*, at 496, n. 20. In the absence of a showing that the pregnancy classification at issue was being used as a "mere pretex[t] designed to effect an invidious discrimination against the members of one sex or the other," we were unwilling to conclude that it was a proxy for a sex classification. *Id.*, at 496–497, n. 20.

We applied a similar principle in *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979). There, we considered a Massachusetts policy that conferred an "absolute advantage" on veterans who applied for state civil service positions. *Id.*, at 264. At the time of the lawsuit, "over 98% of the veterans in Massachusetts were male," and we acknowledged that "[t]he impact of the veterans' preference law upon the public employment opportunities of women has thus been severe." *Id.*, at 270–271. Even so, such "severe" disparate impact did not make the law a sex classification. The distinction made by the law was "quite simply between veterans and nonveterans, not between men and women." *Id.*, at 275. And such a classification was not a sex classification unless it could be "shown that a gender-based discriminatory purpose has, at least in some measure, shaped the Massachusetts veterans' preference legislation." *Id.*, at 276.

The upshot of all these prior equal protection cases is that we will *generally* not find that a law classifies on the basis of sex unless it does so overtly, but that a challenger may escape this general rule by showing that a purportedly sex-

Opinion of ALITO, J.

neutral classification has been used as a "mere pretex[t] designed to effect an invidious discrimination against the members of one sex or the other." *Geduldig*, 417 U. S., at 496–497, n. 20.[2]

2

When these principles are applied to Tennessee's SB1, it is clear that the law is not a sex classification. As the Court notes, SB1 classifies based on the purpose for which a minor seeks the covered medical treatments. Specifically, it restricts those treatments if they are sought either for the purpose of "[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or for the purpose of "[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §§68–33–103(a)(1)(A), (a)(1)(B) (2023). This scheme certainly refers to sex and may be seen as indirectly related to sex, but it is clearly not the sort of discrimination between males and females that our cases have treated as sex discrimination. It does not lay down one rule for males and another for females. Instead, it classifies based on something quite different: a minor's reason

---

[2] Contrary to the suggestion of JUSTICE SOTOMAYOR, this approach is fully consistent with our decision in *Loving* v. *Virginia*, 388 U. S. 1 (1967). See *post*, at 16, n. 10 (dissenting opinion). In *Loving*, the Court confronted a Virginia law that was plainly a "measur[e] designed to maintain White Supremacy" and that could be justified by "no legitimate overriding purpose independent of invidious racial discrimination." 388 U. S., at 11. The Court correctly concluded that such a law was a race classification, and that it "rest[ed] solely upon distinctions drawn according to race." *Ibid.* It made no difference whether the law had "'equal application'" between the races because the Equal Protection Clause "requires the consideration of whether the classifications drawn by any statute constitute an arbitrary and invidious discrimination." *Id.*, at 10.

As I have explained, the same is true regarding sex classifications. When a law employs any classification for the purpose of invidious sex discrimination, that classification is rightly treated as a sex classification.

for seeking particular treatment.

This classification scheme is also not a "mere pretex[t] designed to effect an invidious discrimination against the members of one sex or the other." *Geduldig*, 417 U. S., at 496–497, n. 20. The law begins with a panoply of legislative findings that make clear that the legislature's purpose was to "protect the health and welfare of minors." §68–33–101(a). The legislature concluded that the prohibited medical procedures were "experimental in nature and not supported by high-quality, long-term medical studies," and that often "a minor's discordance can be resolved by less invasive approaches that are likely to result in better outcomes." §§68–33–101(b), (c).

These findings are consistent with those made by other respected bodies that cannot be charged with hostility to minors experiencing gender dysphoria or to transgender people in general. See *ante*, at 3–4. And the limited scope of SB1 strongly supports the conclusion that the legislature's true purpose was exactly the one set out in the statutory findings. SB1 targets only the experimental medical procedures that the legislature found to be unsupported and dangerous. It does not regulate any other behavior in which minors might engage for the purpose of expressing their gender identity. It says nothing at all about names, pronouns, hair styles, attire, recreational activities or hobbies, or career interests. And the law's restrictions apply only to the treatment available to *minors*. Once individuals reach the age at which they are able to make informed decisions about medical care, the law imposes no restrictions.

### 3

In an effort to show that SB1 classifies based on sex, the plaintiffs, the dissent, and some of the plaintiffs' *amici* rely on what they understand to be the Court's reasoning in *Bostock*, 590 U. S. 644. See Brief for Respondents in Support

ED_01221

Opinion of ALITO, J.

of Petitioner 24–32; *post*, at 14–15 (SOTOMAYOR, J., dissenting); Brief for State of California et al. as *Amici Curiae* 14–16; Brief for Kentucky Plaintiffs et al. as *Amici Curiae* 10–16. This argument is misguided. The decision in *Bostock* was based on the conclusion that the specific language employed in Title VII of the Civil Rights Act of 1964 prohibits an adverse employment action if sex is a "but-for cause" of that action. 590 U. S., at 656–660. And in fleshing out what this means, the Court engaged in a controversial form of counterfactual reasoning.[3] I dissented in *Bostock*, but I accept the decision as a precedent that is entitled to the staunch protection we give statutory interpretation decisions. See *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 456 (2015) (citing *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989)). But there is no reason to apply *Bostock*'s methodology here.

The Equal Protection Clause does not contain the same wording as Title VII, and our cases have never held that *Bostock*'s methodology applies in cases in which a law is challenged as an unconstitutional sex classification. On the contrary, as I have explained, our cases have adopted an entirely different methodology. I would follow those precedents.

II

My main point of disagreement with the Court concerns its analysis of the plaintiffs' argument that SB1 unconstitutionally discriminates on the basis of transgender status. See Brief for Respondents in Support of Petitioner 37–38. The Court holds that the law does not classify on this ground, and the Court therefore applies rational basis review. *Ante*, at 16–18. I am uneasy with that analysis and

---

[3] Compare M. Berman & G. Krishnamurthi, *Bostock* was Bogus: Textualism, Pluralism, and Title VII, 97 Notre Dame L. Rev. 67, 98–116 (2021), with A. Koppelman, *Bostock* and Textualism: A Response to Berman and Krishnamurthi, 98 Notre Dame L. Rev. 89, 105–110 (2023).

Opinion of ALITO, J.

would reject the plaintiffs' argument for a different reason: because neither transgender status nor gender identity should be treated as a suspect or "quasi-suspect" class.

A

I will not dwell on the question whether SB1 classifies on the basis of transgender status or gender identity because, in the end, I do not think that the answer to that question has any effect on the outcome of this case. But the argument that SB1 classifies on those grounds cannot easily be dismissed. As noted, the law prohibits medical procedures that are intended either to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or to "[t]rea[t] purported discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §§68–33–103(a)(1)(A), (a)(1)(B). Therefore, the underlying basis for the classification is a minor's intent to express a gender identity different from the minor's biological sex. If being "transgender" is defined as "hav[ing] a gender identity that differs from . . . sex," see Brief for Respondents in Support of Petitioner 4, then the intent to "identify with, or live as, a purported identity inconsistent with" one's sex would appear to be the natural result or consequence of being transgender.

The Court nonetheless concludes that SB1 does not classify based on transgender status, and in doing so, it relies chiefly on our decision in *Geduldig*, 417 U. S. 484. *Ante*, at 16–17. The dissent responds by denigrating *Geduldig* and contending that the decision should be discarded.[4] *Post*, at 23–24 (opinion of SOTOMAYOR, J.).

I would not enter into this debate about SB1's classification scheme. I would assume for the sake of argument that SB1 classifies on the basis of transgender status and move

───────────

[4]But see *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 236 (2022) (reaffirming *Geduldig*); *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 271 (1993) (same).

Opinion of ALITO, J.

on to the question whether such a classification is either suspect or "quasi-suspect" and thus warrants some form of heightened scrutiny. That important question has divided the Courts of Appeals,[5] and if we do not confront it now, we will almost certainly be required to do so very soon.

### B

In my view, transgender status does not qualify under our precedents as a suspect or "quasi-suspect" class.[6] We have never set out a hard-and-fast test that can be used to identify such classes, but, as I explain in more detail below, our decisions have identified certain key factors that transgender individuals do not share with members of suspect and "quasi-suspect" classes. Transgender status is not "immutable," and as a result, persons can and do move into and out of the class. Members of the class differ widely among themselves, and it is often difficult for others to determine whether a person is a member of the class. And transgender individuals have not been subjected to a history of discrimination that is comparable to past discrimination against the groups we have classified as suspect or "quasi-suspect."

---

[5] Compare *Grimm* v. *Gloucester Cty. School Bd.*, 972 F. 3d 586, 610 (CA4 2020) ("[T]ransgender people constitute at least a quasi-suspect class"); *Hecox* v. *Little*, 104 F. 4th 1061, 1079 (CA9 2024) ("[G]ender identity is at least a 'quasi-suspect class'" (quoting *Karnoski* v. *Trump*, 926 F. 3d 1180, 1200–1201 (CA9 2019))), with *L. W.* v. *Skrmetti*, 83 F. 4th 460, 486 (CA6 2023) ("[N]either the Supreme Court nor this Court has recognized transgender status as a suspect class"); *Adams* v. *School Bd. of St. Johns Cty.*, 57 F. 4th 791, 803, n. 5 (CA11 2022) (en banc) ("[W]e have grave 'doubt' that transgender persons constitute a quasi-suspect class").

[6] JUSTICE BARRETT sets forth a different analysis of the question whether transgender persons qualify as a suspect or "quasi-suspect" class. See *ante,* at 1–11 (concurring opinion). Although our approaches to that question emphasize different points, I do not see them as incompatible.

Opinion of ALITO, J.

1

In order to understand why transgender status should not be treated as either a suspect or "quasi-suspect" class, it is helpful to recall the path that led the Court to identify those groups and afford their members heightened protection.  As the Court notes, *ante*, at 8, laws routinely confer benefits or impose burdens on particular classes of individuals, and we have long held that equal protection principles permit such classifications so long as they "bea[r] some fair relationship to a legitimate public purpose," *Plyler* v. *Doe*, 457 U. S. 202, 216 (1982).

We first developed that standard during the New Deal era, when the Court was frequently called upon to decide whether economic legislation was consistent with the Constitution.  In response to those challenges, the Court adopted the principle that "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless . . . it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators." *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 (1938).

At the same time that the Court developed this "rational basis" standard, however, it suggested that some laws should be afforded a "narrower" presumption of constitutionality and should therefore receive "more exacting judicial scrutiny." *Ibid.*, n. 4.  The Court opined that a different standard of review might apply to legislation "directed at particular religious, or national, or racial minorities." *Id.,* at 153, n. 4 (citations omitted).  It reasoned that a "more searching judicial inquiry" might be required for such legislation because "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities." *Ibid.*

Consistent with that discussion, the Court soon held that

"[c]lassifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect." *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954). Such classifications, the Court later noted, "must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964).

The discrimination that the Court had chiefly in mind was discrimination against blacks, who undoubtedly constituted a "discrete and insular minorit[y]" that was denied equal participation in the political process. *Carolene Products*, 304 U. S., at 153, n. 4. As our cases from the period plainly illustrate, blacks faced widespread discrimination not only in fact but also in law. State and local authorities enforced a regime of official segregation in transportation, see *Plessy* v. *Ferguson*, 163 U. S. 537, 540 (1896), schools, see *Brown* v. *Board of Education*, 347 U. S. 483, 487–488 (1954), and all manner of public accommodations, see *Watson* v. *Memphis*, 373 U. S. 526, 528 (1963) (concerning the segregation of "municipal parks and other city owned or operated recreational facilities").

Blacks were also widely impeded from participation in the political process. For example, several States enacted "literacy tests for voter registration" that were "designed to prevent African-Americans from voting." *Shelby County* v. *Holder*, 570 U. S. 529, 536 (2013) (citing *South Carolina* v. *Katzenbach*, 383 U. S. 301, 310 (1966)). States also devised methods for excluding or impeding black citizens from serving in public office. See, *e.g.*, *Nixon* v. *Herndon*, 273 U. S. 536, 541 (1927) (holding unconstitutional a law that excluded black citizens from "tak[ing] part in a primary election"); *Anderson* v. *Martin*, 375 U. S. 399, 400 (1964) (holding unconstitutional a law that required ballots to "designate the race of candidates for elective office").

Opinion of ALITO, J.

Given this history of pervasive discrimination and the fact that "the central purpose of the Fourteenth Amendment was to eliminate racial discrimination," the Court concluded that racial classifications are "constitutionally suspect, and subject to the most rigid scrutiny." *McLaughlin*, 379 U. S., at 192 (citation and internal quotation marks omitted). And at around the same time, the Court also treated national origin and ancestry as suspect classes, largely because of their proximal relationship to race. See, *e.g.*, *Oyama* v. *California*, 332 U. S. 633, 646 (1948); *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944), overruled by *Trump* v. *Hawaii*, 585 U. S. 677 (2018).[7]

The Court has also suggested that religion is a suspect class. See *Carolene Products*, 304 U. S., at 152, n. 4. That determination follows from the First Amendment, which prohibits any impairment of the "free exercise" of "religion." But because this right is expressly protected by that provision, questions of religious discrimination have generally been decided on First Amendment grounds. See, *e.g.*, *Fulton* v. *Philadelphia*, 593 U. S. 522, 532 (2021); *Espinoza* v.

———————

[7]The Court has also sometimes referred to "alienage" as a suspect class. See *Nyquist* v. *Mauclet*, 432 U. S. 1, 7 (1977). Alienage, however, is quite unlike the other suspect classes the Court has identified. Our cases make clear that constitutional scrutiny only applies to state (not federal) laws that classify based on alienage. See *Examining Bd. of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 602 (1976). And it applies to only those state laws that discriminate against aliens who are "lawfully admitted." *Ibid.*; see also *Plyler* v. *Doe*, 457 U. S. 202, 219, n. 19 (1982) ("We reject the claim that 'illegal aliens' are a 'suspect class'"). The Court applies such scrutiny not because state laws classifying based on alienage are inherently problematic, but rather because the Federal Government has "primary responsibility in the field of immigration and naturalization." *Flores de Otero*, 426 U. S., at 602. The identification of alienage as a suspect class is therefore less a result of historical discrimination based on immutable characteristics and more a result of the Supremacy Clause. See *Takahashi* v. *Fish and Game Comm'n*, 334 U. S. 410, 415–417 (1948); *Truax* v. *Raich*, 239 U. S. 33, 41–42 (1915).

Opinion of ALITO, J.

*Montana Dept. of Revenue*, 591 U. S. 464, 473–474 (2020); *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S. 617, 638 (2018).

With this history in mind, it is apparent that the circumstances that led to the identification of race and national origin as suspect classes were truly extraordinary.  As the Court subsequently explained, the designation of a suspect class is reserved for those classes "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."  *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973).  And entitlement to "suspect class" status is largely reserved for those groups whose members tend to "carry an obvious badge" of their membership in the suspect class, which in part explains "the severity or pervasiveness of the historic legal and political discrimination against" the group. *Mathews* v. *Lucas*, 427 U. S. 495, 506 (1976).  Suspect class status is therefore generally inappropriate for "large, diverse, and amorphous" groups, *Rodriguez*, 411 U. S., at 28, that do not share "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng* v. *Castillo*, 477 U. S. 635, 638 (1986).  See also *Mathews*, 427 U. S., at 506; *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 442–443, 445 (1985).

No one can doubt that race satisfies all these criteria.  Racial minorities experienced a long history of invidious discrimination and lack of political power.  Race, as that concept was long understood in this society, is an immutable characteristic that often coincides with a visible and distinguishable "badge" of membership in the group.  *Mathews*, 427 U. S., at 506.  And both our Constitution and our "traditions" provide that discrimination based on race is proscribed in all but the narrowest circumstances.  *Bolling*, 347 U. S., at 499.  We have therefore viewed, and continue to

view, racial classifications as "inherently suspect." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 209 (2023) (internal quotation marks omitted). And since *Brown* v. *Board of Education*, 347 U. S. 483, we have struck down nearly every race- or national-origin-based classification that has come before us; our now-overruled affirmative action decisions were the exception to the rule. *Students for Fair Admissions*, 600 U. S., at 211–214, 224–225 (overruling *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978), and *Grutter* v. *Bollinger*, 539 U. S. 306 (2003)); see also 600 U. S., at 287 (THOMAS, J., concurring) ("The Court's opinion rightly makes clear that *Grutter* is, for all intents and purposes, overruled").

2

This Court has never "equat[ed]" classifications based on sex with classifications based on race or national origin for Equal Protection Clause purposes, *VMI*, 518 U. S., at 532, and thus has never held that sex-based classifications are "suspect." But since the 1970s, the Court has recognized that such classifications warrant more careful inspection than is provided by ordinary "rational basis" review. See *ibid.*; *Craig*, 429 U. S., at 198. We often refer to this as "heightened scrutiny" (or "intermediate scrutiny"), and we have used the term "quasi-suspect" to describe groups that qualify for this form of heightened review. See, *e.g.*, *Cleburne*, 473 U. S., at 442. Under heightened or intermediate scrutiny, it must be shown that a sex-based classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Morales-Santana*, 582 U. S., at 59 (internal quotation marks omitted).

This "heightened scrutiny" standard was developed in recognition of the fact that classifications based on sex share many features with classifications based on race.

ED_01229

Opinion of ALITO, J.

Early on, the lead opinion in *Frontiero* v. *Richardson* observed that "our Nation has had a long and unfortunate history of sex discrimination" that resulted in "statute books . . . laden with gross, stereotyped distinctions between the sexes." 411 U. S., at 684–685. Although the opinion acknowledged "that the position of women in America ha[d] improved markedly," it noted that "women still face[d] pervasive, although at times more subtle, discrimination." *Id.*, at 685–686. That pervasive discrimination against women could be explained "in part because of the high visibility of the sex characteristic." *Id.*, at 686. And such sex-discrimination was particularly unfair, the opinion reasoned, because "sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Ibid.*

On these bases, the *Frontiero* plurality opined that classifications based on sex should be treated as "inherently suspect," just like classifications based on race. *Id.*, at 688. Although the full Court never adopted that position, it has justified the imposition of "heightened scrutiny" on largely the same grounds. As the Court later noted in *Craig*, a whole range of laws still on the books reflected "archaic and overbroad generalizations" and "increasingly outdated misconceptions concerning the role of females." 429 U. S., at 198–199 (internal quotation marks omitted). The Court has further observed that women, like blacks and other racial minorities, tend to "carry an obvious badge" of their membership in the disadvantaged class, and the Court saw this as a partial explanation for "the severity or pervasiveness" of the discrimination experienced by both groups. *Mathews*, 427 U. S., at 506. And women, like blacks, had long been excluded, either by law or prejudice, from equal participation in the political process. See *VMI*, 518 U. S., at 531.

Thus, the application of "heightened scrutiny" to sex classifications can be explained in large part by the fact that

Opinion of ALITO, J.

sex discrimination shares many characteristics with racial discrimination: it was historically entrenched and pervasive; it was based on identifiable and immutable characteristics; and it included barriers to full participation in the political process.

Despite all this, however, the Court has not perfectly equated these two forms of discrimination. See *id.*, at 532. We have acknowledged that the "[p]hysical differences between men and women . . . are enduring" and "remain cause for celebration." *Id.*, at 533. For this reason, sex is not a categorically "proscribed classification." *Ibid.* "Principles of equal protection do not require" legislators to "ignore th[e] reality" that there are real differences between men and women that may sometimes justify legislation that classifies based on sex. *Nguyen*, 533 U. S., at 66. And classifications based on sex have occasionally been upheld. See, *e.g., Michael M.* v. *Superior Court, Sonoma Cty.*, 450 U. S. 464, 475–476 (1981) (plurality opinion); *Nguyen*, 533 U. S., at 73.

3

Although the Court has held that classifications based on race, national origin, and sex call for a higher level of scrutiny, it has frequently refused to apply such scrutiny to other classifications. And it has done so even when those classifications share some characteristics with race, national origin, and sex. A few examples are sufficient to illustrate the Court's general approach. Despite the fact that poor people have often been subjected to harsh and disrespectful treatment, a class defined by poverty is too "large, diverse, and amorphous" to qualify as suspect or "quasi-suspect." *Rodriguez*, 411 U. S., at 28. Although age is an immutable characteristic, "the aged . . . have not experienced" the "'history of purposeful unequal treatment'" that is needed to justify a higher level of scrutiny. *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 313 (1976)

(*per curiam*) (quoting *Rodriguez*, 411 U. S., at 28). Presence in this country in violation of the immigration laws, although sometimes associated with social stigma, cannot define membership in a protected class because that status is not "an absolutely immutable characteristic" and may be relevant to "proper legislative goal[s]." *Plyler*, 457 U. S., at 220. Family relational status is likewise not entitled to elevated scrutiny because "[c]lose relatives . . . have not been subjected to discrimination" and "do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Lyng*, 477 U. S., at 638.

Even in close cases, the Court has been notably reluctant to apply an elevated level of scrutiny. This is particularly striking in the case of persons with disabilities. In *Cleburne*, the Court considered whether it should apply "[h]eightened scrutiny" to laws that classify based on intellectual disability. 473 U. S., at 442–443. The Court acknowledged that the intellectually disabled are "immutably" different and that "there have been and there will continue to be instances of discrimination against [them] that are in fact invidious." *Id.*, at 442, 446. Nonetheless, the Court found that "the States' interest in dealing with and providing for [these individuals] is plainly a legitimate one," *id.*, at 442, and that "lawmakers have been addressing their difficulties in a manner that belies a continuing antipathy or prejudice," *id.*, at 443. The Court further recognized that the intellectually disabled are a "large and diversified group" and are not "all cut from the same pattern." *Id.*, at 442. In light of all these facts, the Court was reluctant to identify a new suspect or "quasi-suspect" class based on the existence of "immutable disabilities" and "some degree of prejudice from at least part of the public at large." *Id.*, at 445.

Overall, our decisions refusing to identify new suspect and "quasi-suspect" classes exhibit two salient features. First, the identification of a suspect or "quasi-suspect" class

Opinion of ALITO, J.

has been exceedingly rare. Such status has been denied to groups, like persons with disabilities and the aged, who were found by Congress to need special legislation to protect them from widespread discrimination. See, *e.g.*, Rehabilitation Act of 1973, 29 U. S. C. §701 *et seq.*; Americans with Disabilities Act of 1990, 42 U. S. C. §12101 *et seq.*; Individuals with Disabilities Education Act, 20 U. S. C. §1400 *et seq.*; Age Discrimination in Employment Act of 1967, 29 U. S. C. §621 *et seq.* Accordingly, the Court's reluctance to apply a special level of scrutiny to a proposed class should not be taken as a denial of the fact that the class has suffered from harmful discrimination or a lack of political power.

Second, no single characteristic is independently sufficient to qualify a proposed class as suspect or "quasi-suspect"; instead, in the rare instances in which the Court has identified a suspect or "quasi-suspect" class, it has done so based on a strong showing of multiple relevant criteria: a history of widespread and conspicuous discrimination, *de facto* or *de jure* exclusion from equal participation in the political process, and an immutable characteristic that tends to serve as an obvious badge of membership in a clearly defined and readily identifiable group.

4

With this background in mind, I do not think that transgender status is sufficiently similar to race, national origin, or sex to warrant a higher level of scrutiny.

Although transgender persons have undoubtedly experienced discrimination, the plaintiffs and their many *amici* have not been able to show a history of widespread and conspicuous discrimination that is similar to that experienced by racial minorities or women. Instead, they provide little more than conclusory statements. See, *e.g.*, Brief for United States 29; Brief for Respondents in Support of Petitioner 37.

Opinion of ALITO, J.

But as we explained in *Cleburne*, heightened scrutiny cannot be justified on the ground that a proposed class has suffered from "some degree of prejudice from at least part of the public at large." 472 U. S., at 445. Rather, a higher level of scrutiny is reserved for those groups, like racial minorities and women, who have suffered from a long history of discrimination that is both severe and pervasive. See *Frontiero*, 411 U. S., at 684 (plurality opinion) ("[O]ur Nation has had a long and unfortunate history of sex discrimination"); *Mathews*, 427 U. S., at 506 (characterizing the historic discrimination faced by women and blacks as "sever[e] and pervasiv[e]").

Furthermore, there is no evidence that transgender individuals, like racial minorities and women, have been excluded from participation in the political process. It is certainly true that the very small size of the transgender population means that the members of this group cannot wield much political clout simply by casting their votes. But that is true of "a variety of other groups . . . who cannot themselves mandate the desired legislative responses." *Cleburne*, 473 U. S., at 445. And despite the small size of the transgender population, the members of this group have had notable success in convincing many lawmakers to address their problems. See Brief for Respondents 47 (citing Cal. Educ. Code Ann. §221.5(f) (West 2021); Va. Code Ann. §38.2–3449.1 (2020); Wash. Rev. Code Ann. §28A.642.080 (2024)); see also *Cleburne*, 473 U. S., at 443 (arguing that the "distinctive legislative response" to the problems of the intellectually disabled "belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary").

The parties in this case also admit that transgender status is not an immutable characteristic. See Tr. of Oral Arg. 97–98. Instead, a person's gender identity may "shif[t]," and a person who is transgender now may not be transgender later. *Id.*, at 98; see also Brief for Society for

Opinion of ALITO, J.

Evidence-Based Gender Medicine as *Amicus Curiae* 19–25 (discussing the rates of desistance among transgender youth). Moreover, transgender status, unlike race and sex, is often not accompanied by visibly identifiable characteristics. A person's "gender identity" is an "internal sense," Merriam-Webster's Collegiate Dictionary, at 520, and transgender persons as a class do not uniformly "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Lyng*, 477 U. S., at 638. Nor do they necessarily tend to "carry an obvious badge" of their membership in the class that might serve to exacerbate discrimination. *Mathews*, 427 U. S., at 506.

Finally, the definition of transgender status that we have been given reveals that transgender people make up a "diverse" and "amorphous class." *Rodriguez*, 411 U. S., at 28. Individuals are regarded as transgender whenever "they have a gender identity that differs from the sex they were assigned at birth." Brief for Respondents in Support of Petitioner 4. That definition encompasses not just biological men who permanently identify as women and biological women who permanently identify as men, but also individuals who might identify with a particular gender at a particular point in time and individuals who identify permanently or temporarily with both sexes, neither sex, or some other identity. See Brief for American Psychological Association et al. as *Amici Curiae* 6, and n. 7 (describing "transgender youth" as an "umbrella term" that can refer to minors who are "gender diverse" or "nonbinary"). We have previously refused to apply a higher level of scrutiny to such "amorphous" classes for good practical reasons. See, *e.g.*, *Rodriguez*, 411 U. S., at 28; *Cleburne*, 473 U. S., at 442–443. Since such classes are not rigidly defined, it is hard to pin down whether they share the relevant characteristics that make closer scrutiny warranted. And it is difficult for both courts and legislatures to identify the outer bounds of such groups.

ED_01235

22              UNITED STATES *v.* SKRMETTI

Opinion of ALITO, J.

In light of all the above, I am unwilling to conclude that transgender status, like race, national origin, and sex, is entitled to a higher level of scrutiny than ordinary rational basis review. That conclusion, however, should not be taken as a denial of the discrimination that transgender people have faced. Nor should it be taken as an evaluation of any specific legislative action concerning transgender persons. It simply means that transgender persons, like members of other disadvantaged groups—the poor, the aged, the disabled, etc.—have not made the extraordinary showing that they are entitled to a higher level of constitutional scrutiny.

### III

Because transgender status is not a suspect or "quasi-suspect" class, even if Tennessee's SB1 classifies on that ground, it must be sustained so long as it "bears some fair relationship to a legitimate public purpose." *Plyler*, 457 U. S., at 216. As the Court notes, SB1 easily satisfies that standard. *Ante,* at 21–24.

I therefore agree with the Court that the judgment of the United States Court of Appeals for the Sixth Circuit should be affirmed.

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–477

_____

## UNITED STATES, PETITIONER *v.* JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 18, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, and with whom JUSTICE KAGAN joins as to all but Part V, dissenting.

To give meaning to our Constitution's bedrock equal protection guarantee, this Court has long subjected to heightened judicial scrutiny any law that treats people differently based on sex.  See *United States* v. *Virginia*, 518 U. S. 515, 533 (1996).  If a State seeks to differentiate on that basis, it must show that the sex classification "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Ibid.* (internal quotation marks omitted).  Such review (known as intermediate scrutiny) allows courts to ascertain whether the State has a sound, evidence-based reason to distinguish on the basis of sex or whether it does so in reliance on impermissible stereotypes about the sexes.

Today, the Court considers a Tennessee law that categorically prohibits doctors from prescribing certain medications to adolescents if (and only if) they will help a patient "identify with, or live as, a purported identity inconsistent with the minor's sex."  Tenn. Code Ann. §68–33–103(a)(1)(A) (2023).  In addition to discriminating against transgender adolescents, who by definition "identify with"

an identity "inconsistent" with their sex, that law condi-
tions the availability of medications on a patient's sex.
Male (but not female) adolescents can receive medicines
that help them look like boys, and female (but not male)
adolescents can receive medicines that help them look like
girls.

Tennessee's law expressly classifies on the basis of sex
and transgender status, so the Constitution and settled
precedent require the Court to subject it to intermediate
scrutiny. The majority contorts logic and precedent to say
otherwise, inexplicably declaring it must uphold Tennes-
see's categorical ban on lifesaving medical treatment so
long as "'any reasonably conceivable state of facts'" might
justify it. *Ante,* at 21. Thus, the majority subjects a law
that plainly discriminates on the basis of sex to mere ra-
tional-basis review. By retreating from meaningful judicial
review exactly where it matters most, the Court abandons
transgender children and their families to political whims.
In sadness, I dissent.

## I
## A

Begin with the medical context in which Tennessee's law
operates. See Tenn. Code Ann. §68–33–101 *et seq.*; see also
S. B. 1, 113th Gen. Assem., 1st Extra. Sess. (2023) (SB1).
Doctors in the United States prescribe hormones and pu-
berty inhibitors to treat a range of medical conditions. Of-
ten, they are administered to help minors conform to the
typical appearance associated with their sex identified at
birth. Children who start experiencing puberty at a prem-
ature age (precocious puberty), for example, have long re-
ceived puberty-delaying medications to stave off puberty
until adolescence. See App. 22. Adolescent boys might also
receive the hormone testosterone to initiate puberty de-
layed beyond its typical start. App. to Pet. for Cert. 266a.
Without testosterone, puberty would "eventually initiate

SOTOMAYOR, J., dissenting

naturally" in most patients, but medication "is often prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers." *Ibid.* Adolescent females with delayed puberty may receive the hormone estrogen for the same reason. *Ibid.*

After puberty begins, doctors may prescribe these same medicines to adolescents whose physical appearance does not align with what one might expect from their sex identified at birth. An adolescent female, for example, might receive testosterone suppressors and hormonal birth control to reduce the growth of unwanted hair on her face or body (sometimes called male-pattern hair growth or hirsutism). See *ibid.*; see also App. 100 ("[M]edications that are used to suppress testosterone can be used to address symptoms of polycystic ovarian syndrome, which can include unwanted facial hair and body hair, excessive sweating, and body odor"); Brief for Experts on Gender Affirming Care as *Amici Curiae* 12 (describing the prevalence of hirsutism in people identified as female at birth).[1] An adolescent male may also receive hormones to address a benign but atypical increase in breast gland tissue (known as gynecomastia), sometimes resulting from below-average testosterone levels. See, *e.g.*, G. Kanakis et al., EAA Clinical Practice Guidelines—Gynecomastia Evaluation and Management, 7 Andrology 778, 779–780 (2019). Like any medical treatment, hormones and puberty blockers come with the potential for side effects. See, *e.g.*, App. to Pet. for Cert. 266a–267a; App. 970–974; Brief for United States 45–46. Yet patients and their parents may decide to proceed with treatment on the advice of a physician, despite the accompanying medical risks.

Physicians prescribe these same medications to transgender adolescents, whose gender identity is incon-

_____

[1] See also W. Hafsi & J. Kaur, Hirsutism, StatPearls (May 3, 2023), https://www.ncbi.nlm.nih.gov/books/NBK470417/.

SOTOMAYOR, J., dissenting

sistent with their sex identified at birth. Hormones and puberty blockers help align transgender adolescents' physical appearance with their gender identity, as they do when prescribed to adolescents who want to align their appearances with their sex identified at birth. The same puberty suppressants prescribed to pause the onset of precocious puberty can pause puberty for transgender adolescents, giving them "time to further understand their gender identity." App. to Pet. for Cert. 256a.

Hormone therapy later allows transgender teens to initiate puberty consistent with their gender identity. That typically involves testosterone for adolescent transgender boys (who were identified as female at birth) and testosterone suppression and estrogen for adolescent transgender girls (who were identified as male at birth). Such treatments help adolescents identified as female at birth look more masculine and those identified as male at birth look more feminine. As is true for most medical treatment for minors, puberty blockers and hormones should be administered only after a comprehensive and individualized risk-benefit assessment, and with parental consent. See American Medical Association, Code of Medical Ethics, 2.2.1 Pediatric Decision Making (2022); E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. Transgender Health S1, S58 (2022).[2]

Transgender adolescents' access to hormones and puberty blockers (known as gender-affirming care) is not a matter of mere cosmetic preference. To the contrary, access to care can be a question of life or death. Some transgender adolescents suffer from gender dysphoria, a medical condition characterized by clinically significant and persistent

_____

[2] The use of surgery to treat gender dysphoria, which JUSTICE THOMAS addresses in some detail, see *ante,* at 11 (concurring opinion), is not at issue in this case.

SOTOMAYOR, J., dissenting

distress resulting from incongruence between a person's gender identity and sex identified at birth. App. to Pet. for Cert. 251a–252a. If left untreated, gender dysphoria can lead to severe anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality. See, *e.g.*, Coleman, 23 Int'l J. Transgender Health, at S62. Suicide, in particular, is a major concern for parents of transgender teenagers, as the lifetime prevalence of suicide attempts among transgender individuals may be as high as 40%. App. to Pet. for Cert. 264a. Tragically, studies suggest that as many as one-third of transgender high school students attempt suicide in any given year.[3]

When provided in appropriate cases, gender-affirming medical care can meaningfully improve the health and well-being of transgender adolescents, reducing anxiety, depression, suicidal ideation, and (for some patients) the need for more invasive surgical treatments later in life.[4] That is why the American Academy of Pediatrics, American Medical Association, American Psychiatric Association, American Psychological Association, and American Academy of Child Adolescent Psychiatry all agree that hormones and puberty blockers are "appropriate and medically necessary" to treat gender dysphoria when clinically indicated. *Id.*, at 285a.[5]

---

[3] See M. Johns et al., Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students, 68 Morbidity and Mortality Weekly Rep. 67, 70 (2019).

[4] The majority and JUSTICE THOMAS make much of recent changes to the routine provision of gender-affirming care to minors in Norway, Sweden, and England. *Ante,* at 3–4, 23; *ante,* at 13–14 (concurring opinion). While all three countries have committed to researching further the risks and benefits of prescribing puberty blockers and hormones to adolescents, none has categorically banned doctors from providing patients with all gender-affirming care where medically necessary. See Brief for Foreign Non-Profit Organizations as *Amici Curiae* 4–13.

[5] Far from signaling that "self-proclaimed experts" can determine "'the meaning of the Constitution,'" *ante,* at 6 (opinion of THOMAS, J.), this reference to the positions of major medical organizations is simply one piece

ED_01241

B

Tennessee has taken a different tack. The State enacted SB1 to categorically prohibit physicians from prescribing puberty blockers and hormone therapy for the purpose of treating gender dysphoria in minors. Tennessee's blanket ban applies only when hormones and puberty blockers are prescribed to "[e]nabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or to alleviate "discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §68–33–103(a)(1). SB1 leaves untouched the use of the same drugs to treat any other medical condition, including delayed (or early) puberty and any other "physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex." §68–33–102(1). In other words, SB1 allows physicians to help align adolescents' physical appearance with their gender identity (despite associated risks) if it is consistent with their sex identified at birth, but not if inconsistent. Indeed, Tennessee's stated interests in SB1 include "encouraging minors to appreciate their sex." §68–33–101(m).

C

Tennessee's ban applies no matter what the minor's parents and doctors think, with no regard for the severity of the minor's mental health conditions or the extent to which treatment is medically necessary for an individual child. The stories of the plaintiffs in this case reflect the stakes of

_____

of factual context relevant to the Court's assessment of whether SB1 is substantially related to the achievement of an important government interest. See *infra*, at 10 (describing the intermediate scrutiny standard). Indeed, even JUSTICE THOMAS seems to recognize that some scientific and medical evidence (at least that which is consistent with his view of the merits) is relevant to the questions this case presents. See *ante*, at 9, 10, 14, 15, 20 (referencing the Cass Review and various peer-reviewed medical journals).

that harsh reality.

Ryan Roe, now 16, felt as early as elementary school that he "was a boy." App. to Pet. for Cert. 234a. Before puberty, Ryan thought "there wasn't that much of a difference between boys and girls" and that he "could manage existing in the middle." *Ibid.* As puberty approached, however, Ryan grew increasingly anxious about the impending changes to his body. He started throwing up every morning before school. As his voice changed, Ryan contemplated going mute. *Id.*, at 235a. Eventually, after two years of psychotherapy and extensive consultations with his parents and doctors, Ryan's physicians prescribed him testosterone. Ryan began to find his voice again. He started raising his hand in class, participating in school, and looking at himself in the mirror. Ryan attests that "[g]ender-affirming health care saved [his] life." *Id.*, at 234a. For Ryan's parents, "[i]t is simply not an option to cut [him] off from this care." *Id.*, at 246a. "I worry about his ability to survive," Ryan's mother attests. "[L]osing him would break me." *Ibid.*

L. W., too, began to question her gender as early as fourth grade. At the time, she felt like she was "drowning" and "trapped in the wrong body," often sick at school because she "did not feel comfortable using the boy's bathroom." *Id.*, at 223a. At age 13, L. W. and her parents sought out medical treatment. Puberty blockers and estrogen, prescribed to L. W. after consultation with her parents and doctors, changed her life. "We have a confident, happy daughter now, who is free to be herself," her mom explains. App. 85. "As a mother, I could not bear watching my child go through physical changes that would destroy her well-being and cause her life-long pain." *Id.*, at 86.

Echoing a similar refrain, John Doe and his family attest that John felt from an early age he was a boy. He chose a male name for himself around the age of three. As puberty approached, John grew terrified of undergoing what he saw as "the wrong puberty," recognizing that "some of those

SOTOMAYOR, J., dissenting

changes could be permanent." App. to Pet. for Cert. 232a. After years of psychotherapy, he began taking puberty-delaying medication. His mother, who "shed many tears during the first year" of this process, acknowledges that "John's gender transition has not been easy." App. 95. Yet she attests that John's access to medical treatment is "the one thing" that gives her hope that he can "have a fulfilling life." *Id.*, at 94.

D

Faced with the choice between leaving Tennessee in search of treatment and risking their children's lives, Ryan, John, L. W., and their parents sued to enjoin SB1. The United States intervened in support.[6] Together, they argued that SB1 unconstitutionally discriminates on the basis of sex and transgender status. After review of the factual record, the District Court agreed, holding that the law would likely fail intermediate scrutiny because its targeted ban on promoting inconsistency with sex was not substantially related to Tennessee's asserted interest in protecting minors from dangerous medical procedures. *L. W.* v. *Skrmetti*, 679 F. Supp. 3d 668, 710 (MD Tenn. 2023).

A divided panel of the Sixth Circuit reversed. All three judges appeared to "accept the premise" that "the statut[e] treat[s] minors differently based on sex." *L. W.* v. *Skrmetti*, 83 F. 4th 460, 481 (2023); see also *id.*, at 484 ("[T]he necessity of heightened review . . . will not be present every time that sex factors into a government decision"). Yet the majority refused to apply intermediate scrutiny because it believed that the law did not necessarily "disadvantage 'persons' based on their sex." *Id.*, at 483. Because the Sixth

―――――――――
[6]Although the United States submitted a letter to this Court changing its position on the equal protection question after the completion of oral argument, see *ante,* at 8, n. 1 (majority opinion), the United States has neither withdrawn its briefs nor sought to dismiss this case. The United States therefore remains the petitioner in this case.

SOTOMAYOR, J., dissenting

Circuit never applied intermediate scrutiny to SB1, the only question this Court must decide is whether the Constitution required it to do so.

## II

### A

The level of constitutional scrutiny courts apply in reviewing state action is enormously consequential. Where a state law neither "proceeds along suspect lines nor infringes fundamental constitutional rights," reviewing courts generally uphold a challenged law under the Equal Protection Clause so long as "any reasonably conceivable state of facts . . . could provide a rational basis for the classification." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993). That lenient standard, which the majority erroneously applies today, demands hardly more than a cursory glance at the State's reasons for legislating.

This Court has long recognized, however, that a more "searching" judicial review is warranted when the rights of "discrete and insular minorities" are at stake. *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938). Because such minorities often face systemic barriers to vindicating their interests through the political process, courts have a comparative advantage over the elected branches in safeguarding their rights. *Ibid.* Such judicial scrutiny is at its apex in reviewing laws that classify on the basis of race and national origin. States may not enact laws that classify on those bases unless they can pass through the "daunting two-step examination known in our cases as 'strict scrutiny.'" *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 206 (2023); see *id.*, at 206–207 ("Under that standard we ask . . . whether the racial classification is used to 'further compelling governmental interests'" and then "whether the government's use of race is 'narrowly tailored—meaning 'necessary'—to achieve that interest").

SOTOMAYOR, J., dissenting

For nearly half a century, the Court has applied a different standard, known as intermediate scrutiny, to all "statutory classifications that distinguish between males and females." *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 728 (2003); see *Craig* v. *Boren*, 429 U. S. 190, 197–199 (1976). States can differentiate on the basis of sex only to "'serv[e] important governmental objectives'" and only if the sex classification is "'substantially related to the achievement of those objectives.'" *Hibbs*, 538 U. S., at 728. The standard is an intermediate one because it strikes an important balance. On the one hand, there are some genuine "[p]hysical differences between men and women," so not all sex-based legislation is discriminatory or constitutionally proscribed. *Virginia*, 518 U. S., at 533. On the other hand, sex-based legislation always presents a serious risk of invidious discrimination that relies on "overbroad generalizations about the different talents, capacities, or preferences of males or females." *Ibid.* Intermediate scrutiny is the core judicial tool to differentiate innocuous sex-based laws from discriminatory ones.

B

SB1 plainly classifies on the basis of sex, so the Constitution demands intermediate scrutiny. Recall that SB1 prohibits the prescription of hormone therapy and puberty blockers only if done to "enable a minor to identify with, or live as, a purported identity inconsistent with the minor's sex" or to alleviate "discomfort or distress from a discordance between the minor's sex and asserted identity." Tenn. Code Ann. §68–33–103(a)(1). Use of the same drugs to treat any other "'disease'" is unaffected. §68–33–103(b)(1)(A). Physicians may continue, for example, to prescribe hormones and puberty blockers to treat any "physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex." §68–33–102(1).

SOTOMAYOR, J., dissenting

What does that mean in practice? Simply that sex determines access to the covered medication. Physicians in Tennessee can prescribe hormones and puberty blockers to help a male child, but not a female child, look more like a boy; and to help a female child, but not a male child, look more like a girl. Put in the statute's own terms, doctors can facilitate consistency between an adolescent's physical appearance and the "normal development" of her sex identified at birth, but they may not use the same medications to facilitate "inconsisten[cy]" with sex. All this, the State openly admits, in service of "encouraging minors to appreciate their sex." §68–33–101(m).

Like any other statute that turns on inconsistency with a protected characteristic, SB1 plainly classifies on the basis of sex. A simple analogy illustrates the point. Suppose Tennessee prohibited minors from attending "'any services, rituals, or assemblies if done for the purpose of allowing the minor to identify with a purported identity *inconsistent* with the minor's religion.'" Brief for Yale Philosophers as *Amici Curiae* 10. No one would seriously dispute that such a rule classifies on the basis of religion. Whether the law prohibits a minor from attending any particular religious service turns on the minor's religion: A Jewish child can visit a synagogue but not a church, while a Christian child can attend church but not the synagogue.

SB1 operates in the same way. Consider the mother who contacts a Tennessee doctor, concerned that her adolescent child has begun growing unwanted facial hair. This hair growth, the mother reports, has spurred significant distress because it makes her child look unduly masculine. The doctor's next step depends on the adolescent's sex. If the patient was identified as female at birth, SB1 allows the physician to alleviate her distress with testosterone suppressants. See App. to Pet. for Cert. 266a (describing such treatments); App. 100 (same). What if the adolescent was identified male at birth, however? SB1 precludes the

patient from receiving the same medicine.

Now consider the parents who tell a Tennessee pediatrician that their teenage child has been experiencing an unwanted (but medically benign) buildup of breast gland tissue. See *supra*, at 3. Again, the pediatrician's next move depends on the patient's sex. Identified male at birth? SB1 allows the physician to prescribe hormones to reduce the buildup of such tissue. Yet a child identified as female at birth experiencing the same (or more) distress must be denied the same prescription. In both scenarios, SB1 "provides that different treatment be accorded to [persons] on the basis of their sex," and therefore necessarily "establishes a classification subject to scrutiny under the Equal Protection Clause." *Reed* v. *Reed*, 404 U. S. 71, 75 (1971).[7] The Sixth Circuit apparently agreed. 83 F. 4th, at 481 (accepting the premise that "the statut[e] treat[s] minors differently based on sex").

Tennessee, too, essentially concedes the point. It admits that a prohibition on wearing clothing "'inconsistent with'" the wearer's sex would trigger intermediate scrutiny, as would a law prohibiting professionals from working in jobs "'inconsistent with'" their sex. Brief for Respondents 25. That is because for some jobs and some outfits, "a male can have the job" or wear the outfit, "and a female cannot." *Ibid.* SB1 draws exactly the same kind of sex-based line: For some treatments that help adolescents look and feel more masculine, a male minor can have the treatment, and a female minor cannot.[8]

_____

[7] JUSTICE ALITO insists that the words "sex" and "gender" in our equal protection precedents refer to an "'immutable characteristic determined solely by the accident of birth.'" *Ante,* at 2 (opinion concurring in part and concurring in judgment) (quoting *Frontiero* v. *Richardson*, 411 U. S. 677, 686 (1973)). SB1 discriminates along those very lines: Adolescents displaying male "characteristic[s]" at birth are precluded from accessing the same medications those with female characteristics can freely receive. *Id.*, at 686.

[8] The majority dismisses out of hand the United States' assertion that

SOTOMAYOR, J., dissenting

That SB1 conditions a patient's access to treatment even in part on her sex is enough to trigger intermediate scrutiny. This Court's equal protection precedents ask only whether a law "differentiates on the basis of gender." *Sessions* v. *Morales-Santana*, 582 U. S. 47, 58 (2017). If so, the law "attract[s] heightened review under the Constitution's equal protection guarantee." *Ibid.* A long line of this Court's equal protection precedents confirms that much. See *Hibbs*, 538 U. S., at 728 ("[S]tatutory classifications that distinguish between males and females are subject to heightened scrutiny"); *Virginia*, 518 U. S., at 531 ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action"); *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 136 (1994) ("[A]ll gender-based classifications today" "warran[t] . . . heightened scrutiny"). That is why an Alabama statute that "authoriz[es] the imposition of alimony obligations on husbands, but not on wives," "'establishes a classification subject to scrutiny under the Equal Protection Clause'": The plaintiff, "Mr. Orr[,] bears a burden he would not bear were he female." *Orr* v. *Orr*, 440 U. S. 268, 273, 278 (1979).

This Court's decision in *Bostock* v. *Clayton County*, 590 U. S. 644 (2020), confirms the classification on SB1's face.

_____

SB1 is designed to "force boys and girls to *look* and *live* like boys and girls," Brief for United States 23, urging that any suggestion of sex stereotyping is relevant only to whether a law that classifies on the basis of sex fails intermediate scrutiny. *Ante,* at 15. That argument ignores that a law policing a sex stereotype, like the hypothetical requirement that all children wear "sex-consistent clothing," can itself qualify as sex-based government action that triggers intermediate scrutiny. See *United States* v. *Virginia*, 518 U. S. 515, 531 (1996); *Bostock* v. *Clayton County*, 590 U. S. 644, 660 (2020). The clothing law would tolerate from a female minor at least some behavior (wearing a skirt, for example) that it proscribes for male minors and thereby treat minors differently on the basis of sex. In any event, the United States need not rest on a theory of sex stereotyping here because SB1 classifies by sex on its face.

14 UNITED STATES *v.* SKRMETTI

SOTOMAYOR, J., dissenting

As *Bostock* explained in the context of Title VII's prohibition on employment discrimination, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.*, at 660. In deciding that discrimination based on incongruence between sex and gender identity was discrimination "because of sex," *Bostock* asked the very same question our equal protection precedents do: whether "changing the employee's sex would have yielded a different choice by the employer." *Id.*, at 659–660; cf. *Students for Fair Admissions, Inc.*, 600 U. S., at 231 (applying strict scrutiny to government actions that treat people differently "on the basis of race").[9] The answer was clearly yes, for the simple reason that discrimination against transgender employees necessarily "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified

_____

[9] JUSTICE THOMAS and JUSTICE ALITO observe, correctly, that the Equal Protection Clause and Title VII use different words. *Ante,* at 8 (opinion of ALITO, J.); *ante,* at 2 (opinion of THOMAS, J.). Yet that difference in wording does not change that this Court's equal protection precedents have always required courts to ask the same question this Court considered in *Bostock*: that is, whether a law "differentiate[s] on the basis of gender." *Sessions* v. *Morales-Santana*, 582 U. S. 47, 58 (2017).

To be sure, the constitutional analysis diverges from Title VII once a court identifies a law or policy that differentiates on the basis of sex. That is because the Constitution tolerates governmental differentiation on that basis if it survives intermediate scrutiny. *Virginia*, 518 U. S., at 533. Title VII offers employers no similar opportunity to justify sex discrimination, so the inquiry largely concludes once an employee establishes that she was treated worse because of sex or another protected trait. See *Muldrow* v. *St. Louis*, 601 U. S. 346, 354 (2024). There is no reason to think, however, that a facial classification like SB1 could simultaneously be sex based under Title VII and sex neutral under the Equal Protection Clause. See *General Elec. Co.* v. *Gilbert*, 429 U. S. 125, 133 (1976) ("Particularly in the case of defining the term 'discrimination,' which Congress has nowhere in Title VII defined, [equal protection] cases afford an existing body of law analyzing and discussing that term in a legal context not wholly dissimilar to the concerns which Congress manifested in enacting Title VII").

SOTOMAYOR, J., dissenting

as female at birth." *Bostock*, 590 U. S., at 660. Nor was it a defense to liability that the discrimination might apply equally to both sexes: "[A]n employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine" in both cases "fires an individual in part because of sex." *Id.*, at 659. The same is true of SB1. By depriving adolescents of hormones and puberty blockers only when such treatment is "inconsistent with" a minor's sex, the law necessarily deprives minors identified as male at birth of the same treatment it tolerates for an adolescent identified as female at birth (and vice versa).

## III

Notwithstanding that SB1 distinguishes between males and females in the medical treatments it authorizes, the Sixth Circuit declined to apply intermediate scrutiny. It believed SB1's treatment of both sexes to be "even-hande[d]," 83 F. 4th, at 479, meaning (in the panel's judgment) the classifications were not "invidious" or "unfai[r]." *Id.*, at 483–484. Intermediate scrutiny, of course, is how this Court determines whether a particular sex-based classification is invidious or unfair. See, *e.g.*, *Virginia*, 518 U. S., at 531. The Sixth Circuit thus effectively held that intermediate scrutiny did not apply to SB1 because it thought SB1 might well pass such scrutiny. Even the majority today does not endorse this circular approach.[10]

_____

[10] JUSTICE ALITO, for his part, suggests that a law does not "classify" on the basis of sex unless it explicitly creates one rule for the class of all women and another for the class of all men. *Ante,* at 3–6. The Fourteenth Amendment, however, "protect[s] *persons*, not *groups*." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995). "'[A]t the heart of the Constitution's guarantee of equal protection,'" this Court has said, "'lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 223 (2023) (quoting *Miller* v.

SOTOMAYOR, J., dissenting

Though it skirts the Sixth Circuit's error, the majority rests its conclusion on an equally implausible ground: that SB1's prohibition on treatments "inconsistent with [a] minor's sex" contains no sex classification at all. Tenn. Code Ann. §68–33–103(a)(1). As the statute's text itself makes clear, that conclusion is indefensible.

### A

How does the majority wriggle itself (and the Sixth Circuit) free of any obligation to take a closer look? It abstracts away the sex classification on SB1's face, asserting that the law classifies based only on "age" and "medical purpose." The theory, apparently, is that SB1 is sex neutral because it simply allows doctors to "administer puberty blockers or hormones to minors to treat certain conditions but not to treat gender dysphoria." *Ante,* at 9. Unlike a law that prohibits attendance at a religious service "inconsistent with" the attendee's religion, the majority says, "[a] law prohibiting the administration of specific drugs for particular medical uses" simply does not trigger heightened scrutiny. *Ante,* at 14.

The problem with the majority's argument is that the very "medical purpose" SB1 prohibits is defined by reference to the patient's sex. Key to whether a minor may receive puberty blockers or hormones is whether the treatment facilitates the "medical purpose" of helping the minor live or appear "inconsistent with" the minor's sex. That is why changing a patient's sex yields different outcomes under SB1. Again, take the adolescent distressed by newly developing facial hair. Was the patient identified female at

_____

*Johnson,* 515 U. S. 900, 911 (1995)). That SB1 imposes sex-based classifications on Tennessee boys as well as girls does not resolve the equal protection problem: If anything, it exacerbates it. See *Loving* v. *Virginia,* 388 U. S. 1, 8 (1967) ("[W]e reject the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminatio[n] . . . ").

SOTOMAYOR, J., dissenting

birth? SB1 authorizes the prescription of medication. Male at birth? SB1 prohibits it.

For truly sex-neutral laws, it is impossible to imagine a single scenario where changing a patient's sex yields a different result. To borrow from the majority's catalog of apparently benign medical-use distinctions, imagine Tennessee allowed consumption of DayQuil to ease coughs, but not minor aches and pains. See *ante,* at 12. The regulated medical purposes (treatment of coughs, aches, and pains) are unrelated to sex, so a patient's sex will never determine whether she can consume DayQuil. All that matters is whether the patient has a cough.

So too for New York's ban on assisted suicide, which the majority equates to SB1. *Ante,* at 10. In *Vacco* v. *Quill,* 521 U. S. 793 (1997), this Court subjected the assisted-suicide ban to rational-basis review because it neither "treat[ed] anyone differently from anyone else" nor "dr[ew] any distinctions between persons." *Id.*, at 800. In New York, the Court explained, "*[e]veryone*" can "refuse unwanted lifesaving medical treatment" and "*no one* is permitted to assist a suicide." *Ibid*. Yet unlike for SB1, neither sex nor any other protected characteristic distinguished the terminally ill patient who could permissibly "'hasten death'" from another prohibited from doing so. *Id.*, at 800–801. All that mattered was the patient's existing connection to life-support systems: Those connected could lawfully hasten death by discontinuing treatment, while others (who required a prescription for lethal medication to do so) could not. The patient's sex (or race, or national origin) would never decide the outcome. SB1, by contrast, renders every treatment decision it regulates dependent on two things: a minor's sex identified at birth, and the consistency of the requested treatment with that sex.

That the majority finds a way to recast SB1 in sex-neutral terms is no evidence that SB1 is sex neutral in the

SOTOMAYOR, J., dissenting

way hypothetical prohibitions on DayQuil or assisted sui-
cide would be. Contra, *ante,* at 14. The majority empha-
sizes that, in Tennessee, "*no* minor may be administered
puberty blockers or hormones to treat gender dysphoria,"
while "minors of *any* sex may be administered puberty
blockers or hormones for other purposes." *Ante,* at 13. But
nearly every discriminatory law is susceptible to a similarly
race- or sex-neutral characterization. A prohibition on in-
terracial marriage, for example, allows *no* person to marry
someone outside of her race, while allowing persons of *any*
race to marry within their races. See *Loving* v. *Virginia*,
388 U. S. 1, 9 (1967).[11] The same is true of a hypothetical
law prohibiting attendance at services "inconsistent with"
a child's religion, while allowing all children to attend reli-
gion-consistent services. See *supra*, at 11. Indeed, the ma-
jority itself seems to recognize that laws prohibiting profes-
sions "inconsistent" with a person's sex, marriages
"inconsistent" with a person's race, or religious services "in-
consistent" with a person's faith must be subject to height-
ened review, even if rewritten as ostensibly neutral prohi-
bitions on sex-, race-, and faith-inconsistent behavior. See
*ante*, at 13–14. And although the majority insists that its
logic would not apply to the hypothetical religion-consistent
services law, *ante,* at 14, it offers no principled reason to
differentiate that law from SB1's prohibition on promoting

—————

[11] JUSTICE ALITO takes the position that this Court scrutinized and in-
validated Virginia's antimiscegenation law because of its impermissible
purpose "'to maintain White Supremacy'" and not simply because it clas-
sified on the basis of race. *Ante,* at 6, n. 2. Of course, that is not what
*Loving* said. See 388 U. S., at 11 ("[T]he Equal Protection Clause de-
mands that racial classifications . . . be subjected to the 'most rigid scru-
tiny'"); see also *ante,* at 13 (majority opinion). In any event, the notion
that some category of laws employing sex classifications should be scru-
tinized only if the purpose is "invidious sex discrimination," *ante,* at 6,
n. 2 (opinion of ALITO, J.), flips the equal protection inquiry on its head.
The whole purpose, after all, of intermediate scrutiny is to separate in-
vidious sex classifications from permissible ones.

SOTOMAYOR, J., dissenting

"inconsisten[cy] with" the patient's sex.

### B

Recognizing, perhaps, that this Court already decided in *Bostock* that discrimination based on incongruence between sex and gender identity was itself discrimination "because of sex," the majority seeks to distinguish *Bostock* away.  Unlike in *Bostock*, the majority urges, "changing a minor's sex or transgender status does not alter the application of SB1." *Ante,* at 19.  Again, it emphasizes that no "medical treatment" under SB1 is actually doled out on the basis of sex, because (it says) medical "treatment" necessarily encompasses "both a given drug and the specific indication for which it is being administered." *Ante*, at 12–13, 18–19.  The majority's logic is as follows: "If a transgender boy [who was identified as female at birth] seeks testosterone to treat his gender dysphoria, SB1 prevents a healthcare provider from administering it to him." *Ante*, at 19.  "If you change his biological sex from female to male," the majority says, "SB1 would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone— such as a congenital defect, precocious puberty, disease, or physical injury." *Ibid.*

As should be abundantly clear by this point, the majority's recharacterization of SB1 is impossible to reconcile with the statute's plain terms.  SB1 allows physicians to prescribe hormones and puberty blockers to treat not just some defined category of cancers and rashes, but any "physical or chemical abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex." §68–33–102(1).  If a minor has some physical "abnormality" (say, medically benign facial hair) typically perceived as "inconsistent" with her sex identified at birth (female), SB1 deems it a "congenital defect" that physicians can treat.  Change the patient's sex from female to male, and the law now forbids providing the same drugs

to rid the minor of the same facial hair. In other words, SB1 makes explicit that the very reason why a doctor can treat an adolescent female for "hirsutism (male-pattern hair growth)," but not gender dysphoria is that the former will promote consistency with sex, while the latter does the opposite. Cf. *ante,* at 20 (majority opinion). As was true in *Bostock,* then, the law deprives minors of medical treatment based, in part, on sex.

To be sure, when the hypothetical minor is male, not female, the patient's diagnosis may well change too: The female adolescent distressed by facial hair might receive a diagnosis of hirsutism while the male adolescent may be diagnosed with gender dysphoria. See *supra,* at 3, 11; see also *ante,* at 20 (majority opinion). The same, however, was true in *Bostock.* When an employer fires an employee because she is transgender, the Court explained, "two causal factors may be in play": the individual's sex and the sex "with which the individual identifies." 590 U. S., at 661. Yet so long as the plaintiff's sex is "one but-for cause of that decision," the employer discriminates on the basis of sex. *Id.,* at 656. So too with SB1. Sex and diagnosis may both "be in play." *Id.,* at 661. As long as sex is one of the law's distinguishing features, however, the law classifies on the basis of sex, and the Equal Protection Clause requires application of intermediate scrutiny.

### C

In a final bid to avoid applying our equal protection precedents, the majority asserts that "mere reference to sex" is insufficient to trigger intermediate scrutiny, especially in the "medical context." *Ante,* at 10. Of course, not every legislative mention of sex triggers intermediate scrutiny. A law mandating that no person, "regardless of sex," can consume a dangerous drug, for example, would be subject to rational-basis review. Yet SB1 does not just mention sex. It defines an entire category of prohibited conduct based on

SOTOMAYOR, J., dissenting

inconsistency with sex. And it is hard to imagine a law that prohibits conduct "inconsistent with" sex that could avoid intermediate scrutiny.

Nor does the fact that SB1 concerns the "medical context" change the relevant analysis. *Ibid.* No one disputes that "[s]ome medical treatments and procedures are uniquely bound up in sex" or that there are "biological differences between men and women." *Ibid.* That there are such physical differences is, after all, one of the reasons why sex is not altogether a proscribed classification. See *Virginia,* 518 U. S., at 533. A law that allowed only women to receive certain breast cancer treatments, for example, might well be consistent with the Constitution's equal protection mandate if the State establishes that the relevant treatments are suited to women's (and not men's) bodies. Cf. *ante,* at 11 (noting "'many' breast cancer treatments [are] approved for women only"). Laws that differentiate based on biological distinctions between men and women are precisely the sort that States might successfully defend under intermediate scrutiny. Biological differences between the sexes, however, are no reason to skirt such scrutiny altogether.

Fashioning a medical-context-only exception also runs counter to decades of equal protection precedents. This Court has clarified that, although not every sex-based distinction is "marked by misconception and prejudice," *Tuan Anh Nguyen* v. *INS,* 533 U. S. 53, 73 (2001), every sex-based distinction does warrant intermediate scrutiny. See *J. E. B.,* 511 U. S., at 136 ("*[A]ll* gender-based classifications today" "warran[t] . . . heightened scrutiny" (emphasis added)).

Take, for example, *Tuan Anh Nguyen,* where this Court assessed the constitutionality of a law imposing one set of citizenship-acquisition requirements on children born abroad out of wedlock to U. S. citizen mothers and another on those born of U. S. citizen fathers. 533 U. S., at 60. The Court ultimately decided that the "different set of rules" for

fathers and mothers was "neither surprising nor trouble-some from a constitutional perspective" because "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Id.*, at 63. We reached that conclusion, however, only after demanding of the Government an explanation for why that sex classification "'serve[d] "important governmental objectives"'" and how "'"the discriminatory means employed" [were] "substantially related to the achievement of those objectives."'" *Id.*, at 60 (quoting *Virginia*, 518 U. S., at 533). In no sense did the biological differences between the sexes relieve courts of the obligation to examine the sex classification with a careful constitutional eye. Nor is any medical-context exception necessary because intermediate scrutiny itself allows the State to maintain classifications where justified by biology.

## IV

Having blithely dispensed with the notion that SB1 classifies on the basis of sex, the majority next asserts that "SB1 does not classify on the basis of transgender status." *Ante,* at 16. That too is contrary to the statute's text and plainly wrong.

SB1 prohibits Tennessee physicians from offering hormones and puberty blockers to allow a minor to "identify with" a gender identity inconsistent with her sex. Tenn. Code Ann. §68–33–103(a)(1)(A). Desiring to "identify with" a gender identity inconsistent with sex is, of course, exactly what it means to be transgender. The two are wholly coextensive. See Oxford English Dictionary (3d ed., Dec. 2023), https://www.oed.com/dictionary/transgender_adj (Transgender, when used as an adjective, means "a person whose sense of personal identity and gender does not correspond to that person's sex at birth . . . "). That is why it would defy common sense to suggest an employer's policy of firing all

persons identifying with or living as an identity incon-
sistent with their sex does not discriminate on the basis of
transgender status.

Left with nowhere else to turn, the Court hinges its con-
clusion to the contrary on the by-now infamous footnote 20
of *Geduldig* v. *Aiello*, 417 U. S. 484 (1974), which declared
that discrimination on the basis of pregnancy is not discrim-
ination on the basis of sex. See *id*., at 496–497, n. 20. The
footnote reasoned that, although "only women can become
pregnant," "[n]ormal pregnancy is an objectively identifia-
ble physical condition with unique characteristics" and
"lawmakers are constitutionally free to include or exclude
pregnancy from the coverage of legislation . . . on any rea-
sonable basis, just as with respect to any other physical con-
dition." *Ibid*. The takeaway, according to the majority, is
that "not . . . every legislative classification concerning
pregnancy is a sex-based classification," and so (apparently)
not every legislative classification concerning "gender in-
congruence" (at least in the context of medical treatments)
classifies on the basis of transgender status. *Id*., at 496,
n. 20.

*Geduldig* was "egregiously wrong" when it was decided,
both "[b]ecause pregnancy discrimination is inevitably sex
discrimination" and because discrimination against women
is so "tightly interwoven with society's beliefs about preg-
nancy and motherhood." *Coleman* v. *Court of Appeals of
Md.*, 566 U. S. 30, 56–57 (2012) (Ginsburg, J., dissenting).
That the majority must resuscitate so unpersuasive a
source, widely rejected as indefensible even 40 years ago, is
itself a telling sign of the weakness of its position. See S.
Law, Rethinking Sex and the Constitution, 132
U. Pa. L. Rev. 955, 983 (1984) ("Criticizing *Geduldig* has
. . . become a cottage industry"). That the Court today ex-
tends *Geduldig*'s logic for the first time beyond pregnancy
and abortion is more troubling still. Divorced from its fact-
specific context, *Geduldig*'s reasoning may well suggest

SOTOMAYOR, J., dissenting

that a law depriving all individuals who "have ever, or may someday, menstruate" of access to health insurance would be sex neutral merely because not all women menstruate.

In any event, even *Geduldig*'s faulty reasoning cannot save the majority's conclusion that SB1 is innocent of transgender discrimination. Unlike pregnancy, a desire to "identify with, or live as, a purported identity inconsistent with [one's] sex," Tenn. Code Ann. §68–33–103(a)(1)(A), is not some "objectively identifiable physical condition" that legislatures can target without reference to sex or transgender status, *Geduldig*, 417 U. S., at 496, n. 20. And while not all women are pregnant, *ibid.*, all transgender people, by definition, "identify with, or live as, a purported identity inconsistent with [their] sex," Tenn. Code Ann. §68–33–103(a)(1)(A). So, unlike the classes of pregnant persons and women, the class of minors potentially affected by SB1 and transgender minors are one and the same.

That SB1 discriminates on the basis of transgender status is yet another reason it must be subject to heightened scrutiny. For one, this Court already decided in *Bostock* that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," 590 U. S., at 660, and sex discrimination is of course subject to heightened scrutiny. Nor should there be serious dispute that transgender persons bear the hallmarks of a quasi-suspect class.[12] See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 441 (1985)

─────────

[12] Myriad courts across the country have reached the same conclusion. See, *e.g.*, *Grimm* v. *Gloucester Cty. School Bd.*, 972 F. 3d 586, 610–613 (CA4 2020); *Karnoski* v. *Trump*, 926 F. 3d 1180, 1200–1201 (CA9 2019) (*per curiam*); *Evancho* v. *Pine-Richland School Dist.*, 237 F. Supp. 3d 267, 288–289 (WD Pa. 2017); *Adkins* v. *New York*, 143 F. Supp. 3d 134, 139 (SDNY 2015); *Flack* v. *Wisconsin Dept. of Health Servs.*, 328 F. Supp. 3d 931, 951–953 (WD Wis. 2018); *F. V.* v. *Barron*, 286 F. Supp. 3d 1131, 1145 (Idaho 2018); *M. A. B.* v. *Board of Ed. of Talbot Cty.*, 286 F. Supp. 3d 704, 719–722 (Md. 2018); *Norsworthy* v. *Beard*, 87 F. Supp. 3d 1104, 1119 (ND Cal. 2015).

SOTOMAYOR, J., dissenting

(describing the standard).

Transgender people have long been subject to discrimination in healthcare, employment, and housing, and to rampant harassment and physical violence. See *Grimm* v. *Gloucester Cty. School Bd.*, 972 F. 3d 586, 611 (CA4 2020) (detailing that history); see also K. Barry, B. Farrell, J. Levi, & N. Vanguri, A Bare Desire To Harm: Transgender People and the Equal Protection Clause, 57 B. C. L. Rev. 507, 556–557 (2016) (describing Congress's exclusion of transgender people from the Fair Housing Act, Americans with Disabilities Act, and Rehabilitation Act). Individuals whose gender identity diverges from their sex identified at birth (whether labeled as "transgender" at the time or not), moreover, have been subject to a lengthy history of *de jure* discrimination in the form of cross-dressing bans, police brutality, and anti-sodomy laws. See, *e.g.*, K. Redburn, Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement, 1963–86, 40 L. and Hist. Rev. 679, 685, 687 (2022); A. Lvovsky, Vice Patrol 29, 108 (2021); W. Eskridge, GayLaw: Challenging the Apartheid of the Closet 328–337 (1999) (cataloging state consensual sodomy laws, 1610–1988). Beginning in 1843, cities ranging from "major metropolitan centers such as Chicago and Los Angeles to small cities and towns including Cheyenne, Wyoming and Vermillion, South Dakota" enacted ordinances that (most commonly) criminalized any person "'appear[ing] upon any public street or other public place . . . in a dress not belonging to his or her sex.'" Redburn, 40 L. and Hist. Rev., at 687. In any event, those searching for more evidence of *de jure* discrimination against transgender individuals, see *ante,* at 7–9 (BARRETT, J., concurring), need look no further than the present. The Federal Government, for example, has started expelling transgender servicemembers from the military and threatening to withdraw funding from schools and nonprofits that

SOTOMAYOR, J., dissenting

espouse support for transgender individuals.[13]

Transgender persons, moreover, have a defining characteristic (incongruence between sex and gender identity) that plainly "'bears no relation to [the individual's] ability to perform or contribute to society.'" *Cleburne*, 473 U. S., at 441. As a group, the class is no more "'large, diverse, and amorphous,'" *ante,* at 4 (opinion of BARRETT, J.); *ante,* at 14 (ALITO, J., concurring in part and concurring in judgment), than most races or ethnic groups, many of which similarly include individuals with "'a huge variety'" of identities and experiences, *ante,* at 5 (opinion of BARRETT, J.). (Not all racial, ethnic, or religious minorities, for example, "'carry an obvious badge' of their membership in the disadvantaged class." Cf. *ante,* at 16 (opinion of ALITO, J.).)[14] As evidenced by the recent rise in discriminatory state and federal policies and the fact that transgender people "are underrepresented in every branch of government," *Grimm*, 972 F. 3d, at 611–613, moreover, the class lacks the political power to vindicate its interests before the very legislatures and executive agents actively singling them out for discriminatory treatment. See *Lyng* v. *Castillo*, 477 U. S. 635, 638 (1986). In refusing to say as much, the Court today renders transgender Americans doubly vulnerable to state-sanctioned discrimination.[15]

---

[13] See Order, *United States* v. *Shilling*, No. 24A1030 (2025); see also Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615 (2025).

[14] See, *e.g.*, L. Noe-Bustamante, A. Gonzalez-Barrera, K. Edwards, L. Mora, & M. Hugo Lopez, Measuring the Racial Identity of Latinos, Pew Research Center, https://www.pewresearch.org/race-and-ethnicity/2021/11/04/measuring-the-racial-identity-of-latinos/ (highlighting the range of self-reported skin color among people who identify as Latino).

[15] Of course, regardless of whether transgender persons constitute a suspect class, courts must strike down any law that reflects the kind of "irrational prejudice" that this Court has recognized as an illegitimate

SOTOMAYOR, J., dissenting

## V

SB1's classifications by sex and transgender status clearly require the application of intermediate scrutiny. The majority's choice instead to subject SB1 to rational-basis review, the most cursory form of constitutional review, is not only indefensible as a matter of precedent but also extraordinarily consequential. Instead of scrutinizing the legislature's classifications with an eye towards ferreting out unconstitutional discrimination, the majority declares it will uphold Tennessee's ban as long as there is "'*any* reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Ante,* at 21 (quoting *Beach Communications, Inc.*, 508 U. S., at 313; emphasis added). That marks the first time in 50 years that this Court has applied such deferential review, normally employed to assess run-of-the-mill economic regulations, to legislation that explicitly differentiates on the basis of sex. As a result, the Court never even asks whether Tennessee's sex-based classification imposes the sort of invidious discrimination that the Equal Protection Clause prohibits.

The majority says that it does not want to "second-guess the lines that SB1 draws," *ante,* at 22, or to "resolve" disagreements about the safety and efficacy of "medical treatments in an evolving field," *ante,* at 24. The concurrences, too, warn that applying intermediate scrutiny in this case may "require courts to oversee all manner of policy choices normally committed to legislative discretion," including in "areas of legitimate regulatory policy . . . ranging from access to restrooms to eligibility for boys' and girls' sports teams." *Ante,* at 5, 6 (opinion of BARRETT, J.); see also *ante,* at 4 (THOMAS, J., concurring) (highlighting the potential for

_____

basis for government action. *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 450 (1985); see also *ante,* at 6 (opinion of BARRETT, J.) (recognizing that "an individual law 'inexplicable by anything but animus' is unconstitutional").

SOTOMAYOR, J., dissenting

"'high-cost, high-risk lawsuit[s]'").  Looking carefully at a legislature's proffered reasons for acting, as our equal protection precedents demand, is neither needless "second-guess[ing]," *ante,* at 22 (majority opinion), nor judicial encroachment on "areas of legitimate regulatory policy," *ante,* at 6 (opinion of BARRETT, J.).  After all, "'closely scrutiniz[ing] legislative choices'" is exactly how courts distinguish "legitimate regulatory polic[ies]" from discriminatory ones.  *Ibid.*

Indeed, judicial scrutiny has long played an essential role in guarding against legislative efforts to impose upon individuals the State's views about how people of a particular sex (or race) should live or look or act.  Women, it was once thought, were not suited to attend military schools with men.  *Virginia,* 518 U. S., at 520–523, 540–541.  Men and women, others said, should not marry those of a different race.  *Loving,* 388 U. S., at 4.  Those laws, too, posed politically fraught and contested questions about race, sex, and biology.  In a passage that sounds hauntingly familiar to readers of Tennessee's brief, Virginia argued in *Loving* that, should this Court intervene, it would find itself in a "bog of conflicting scientific opinion upon the effects of interracial marriage, and the desirability of preventing such alliances, from the physical, biological, genetic, anthropological, cultural, psychological, and sociological point of view."  Brief for Appellee in *Loving* v. *Virginia,* O. T. 1966, No. 395, p. 7.  "In such a situation," Virginia continued, "it is the exclusive province of the Legislature of each State to make the determination for its citizens as to the desirability of a policy of permitting or preventing such [interracial] alliances—a province which the judiciary may not constitutionally invade."  *Id.,* at 7–8.

This Court, famously, rejected the States' invitation in *Loving* to "defer to the wisdom of the state legislature" based on assertions that "the scientific evidence is substan-

SOTOMAYOR, J., dissenting

tially in doubt." 388 U. S., at 8. In considering the constitutionality of Virginia's male-only military academy, too, the Court itself assessed the "opinions of Virginia's expert witnesses" that "'[m]ales tend to need an atmosphere of adversativeness,'" while "'[f]emales tend to thrive in a cooperative atmosphere.'" 518 U. S., at 541. What the Court once recognized as an imperative check against discrimination, it today abandons.

Yet the task of ascertaining SB1's constitutionality is a familiar one. Tennessee has proffered an undoubtedly important interest in "protect[ing] the health and welfare of minors" by prohibiting medical procedures that carry "risks and harms." Tenn. Code Ann. §§68–33–101(a), (b)–(e); see *New York* v. *Ferber*, 458 U. S. 747, 756–757 (1982) (States' "interest in 'safeguarding the physical and psychological well-being of a minor'" is "'compelling'"). All, including the Solicitor General, agree that the State may strictly regulate access to cross-sex hormones and puberty blockers to achieve that purpose. See Tr. of Oral Arg. 39–40, 152–153 (agreeing that West Virginia's more tailored limitations on gender-affirming care would likely survive intermediate scrutiny). It may well be, too, that "[d]eference to legislatures" is "particularly critical" in this context, where the provision of medical care to minors is at issue. *Ante,* at 22 (opinion of THOMAS, J.). But that does not change the Court's obligation, as mandated by our precedents, to determine whether the challenged sex classification in SB1's categorical ban is tailored to protecting minors' health and welfare, or instead rests on unlawful stereotypes about how boys and girls should look and act. See *Virginia*, 518 U. S., at 533. Infusing that antecedent legal question with a host of evidence relevant only to the subsequent application of judicial scrutiny, as JUSTICE THOMAS would have us do, see *ante,* at 7–22, simply puts the cart before the horse.

The present record offers reason to question (as the District Court did) whether Tennessee's categorical ban on

treating gender dysphoria bears the "requisite direct, substantial relationship" to its interest in protecting minors' health. *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 725 (1982). Tennessee has offered little evidence, for example, that it is more dangerous to receive puberty blockers to "identify with, or live as, a purported identity inconsistent with the minor's sex" than to treat other conditions like precocious puberty.[16] Why, then, does SB1 proscribe the regulated medications to treat gender dysphoria, while leaving them available for myriad other purposes? So too is it difficult to ignore that Tennessee professes concern with protecting the health of minors while categorically banning gender-affirming care for even those minors exhibiting the most severe mental-health conditions, including suicidality.

The majority's choice to avoid applying intermediate scrutiny is all the more puzzling, however, because this Court need not itself resolve these questions or wade into what it dubs the "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Ante,* at 24. The Sixth Circuit never even asked whether the challenged sex classification in SB1 "serves 'important governmental objectives'" or is "'substantially related to the achievement of those objectives.'" *Virginia,* 518 U. S., at 533. All the United States requested of this Court was confirmation that intermediate scrutiny applied. Brief for United States 32. On remand, the courts

_____

[16]JUSTICE THOMAS urges that "[a] discussion of puberty blockers' risks . . . should not exclude the risks presented by cross-sex hormones" because, at present, many "gender dysphoric children treated with puberty blockers progress to cross-sex hormone treatment." *Ante,* at 9–10, n. 4. But the fact that many transgender adolescents currently receive both puberty blockers and cross-sex hormones does not preclude States from regulating access to cross-sex hormones more stringently than access to puberty blockers. Nor does it excuse the State from its obligation to establish that its categorical ban on each type of medication is, in fact, tailored to protecting minors' health and welfare.

SOTOMAYOR, J., dissenting

could have taken due account of the "[r]ecent developments" that (according to the majority) "underscore the need for legislative flexibility in this area," including a recent report from England's National Health Service on the use of puberty blockers and hormones to treat transgender minors. *Ante,* at 23. Yet the majority inexplicably refuses to take even the modest step of requiring Tennessee to show its work before the lower courts.

\*    \*    \*

This case presents an easy question: whether SB1's ban on certain medications, applicable only if used in a manner "inconsistent with . . . sex," contains a sex classification. Because sex determines access to the covered medications, it clearly does. Yet the majority refuses to call a spade a spade. Instead, it obfuscates a sex classification that is plain on the face of this statute, all to avoid the mere possibility that a different court could strike down SB1, or categorical healthcare bans like it. The Court's willingness to do so here does irrevocable damage to the Equal Protection Clause and invites legislatures to engage in discrimination by hiding blatant sex classifications in plain sight. It also authorizes, without second thought, untold harm to transgender children and the parents and families who love them. Because there is no constitutional justification for that result, I dissent.

Cite as: 605 U. S. ____ (2025)    1

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 23–477

———————

## UNITED STATES, PETITIONER *v.* JONATHAN SKRMETTI, ATTORNEY GENERAL AND REPORTER FOR TENNESSEE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 18, 2025]

JUSTICE KAGAN, dissenting.

For all the reasons JUSTICE SOTOMAYOR gives, Tennessee's SB1 warrants heightened judicial scrutiny. See *ante,* at 9–27 (dissenting opinion). That means the law survives if, but only if, its sex-based classifications are "substantially related to the achievement" of "important governmental objectives." *United States* v. *Virginia*, 518 U. S. 515, 533 (1996). As JUSTICE SOTOMAYOR notes, the point of applying that test is to smoke out "invidious" or otherwise unfounded discrimination. *Ante*, at 10; *Michael M.* v. *Superior Court, Sonoma Cty.*, 450 U. S. 464, 469 (1981) (plurality opinion). More concretely put, heightened scrutiny reveals whether a law is based on "overbroad generalizations," stereotypes, or prejudices, or is instead based on legitimate state interests, such as the one here asserted in protecting minors' health. *Virginia*, 518 U. S., at 533. Because the Court is wrong in not subjecting SB1 to that kind of examination, I join Parts I through IV of JUSTICE SOTOMAYOR's dissent.

I take no view on how SB1 would fare under heightened scrutiny, and therefore do not join Part V. The record evidence here is extensive, complex, and disputed, and the Court of Appeals (because it applied only rational-basis review) never addressed the relevant issues. Still more, both the plaintiffs and the Government asked this Court not to

2                        UNITED STATES *v.* SKRMETTI

Kagan, J., dissenting

itself apply heightened scrutiny, but only to remand that inquiry to the lower courts.  So I would both start and stop at the question of what test SB1 must satisfy.  As Justice Sotomayor shows, it is heightened scrutiny.  I respectfully dissent.

ED_01269

# 27 States Have Restricted Gender-Transition Treatments for Minors Since 2021

Harmon, Amy . Harmon, Amy.

🔗 ProQuest document link

## FULL TEXT

Transgender minors and their parents, guardians and doctors have challenged bans in 19 states, with mixed results.

The Supreme Court's decision upholding a Tennessee law that denies puberty blockers and hormone therapies to transgender youth traces its roots to the spring of 2021. That's when Arkansas became the first state to pass a law prohibiting gender-transition treatments for minors.

Alabama followed in 2022. Tennessee's ban was part of a coordinated deluge: Twenty-five states have now enacted laws that restrict doctors from providing puberty blockers, hormone therapies or surgery to transgender minors. Two more, New Hampshire and Arizona, ban only surgeries.

The Supreme Court's ruling in United States v. Skrmetti, the challenge to Tennessee's ban, will affect how lower courts handle the challenges to similar statutes in states across the country. But legal experts said the outcome will not be universal.

Over a dozen challenges to bans in other states remain underway. Some are in state courts, and others are advancing claims in federal courts that are different from the equal protection claim that the Supreme Court considered in Skrmetti.

The court's decision will not directly affect states where bans are not in place.

"There's a reason why we advanced exclusively state constitutional claims," said Alex Rate, the legal director of A.C.L.U. of Montana, which is representing transgender plaintiffs in a case that has, for now, blocked the Montana ban. "And that's because our constitution grants more rights than the federal counterpart."

Several challenges in federal courts argue that the laws violate parents' right to control their children's medical care. The Eight Circuit Court of Appeals is considering that argument in the appeal of a lower court's 2023 decision striking down Arkansas' ban.

And in striking down Florida's ban, a federal judge found the law unconstitutional because some of the state's lawmakers acted with "discriminatory animus." The Eleventh Circuit Court of Appeals has allowed the law to go into effect there while it considers the state's appeal.

## DETAILS

| | |
|---|---|
| Subject: | Bans; Minors; Federal court decisions; Puberty; State laws; Transgender persons |
| Location: | Arkansas; Tennessee; Montana; United States--US |
| Identifier / keyword: | Transgender; Supreme Court (US); United States Politics and Government; Teenagers and Adolescence; Parental Rights Movement |
| Publication title: | New York Times (Online); New York |



ED_01270

| | |
|---|---|
| Publication year: | 2025 |
| Publication date: | Jun 18, 2025 |
| Section: | us |
| Publisher: | New York Times Company |
| Place of publication: | New York |
| Country of publication: | United States |
| Publication subject: | General Interest Periodicals--United States |
| e-ISSN: | 15538095 |
| Source type: | Blog, Podcast, or Website |
| Language of publication: | English |
| Document type: | News |
| ProQuest document ID: | 3219825194 |
| Document URL: | https://www.proquest.com/globalnews/blogs-podcasts-websites/27-states-have-restricted-gender-transition/docview/3219825194/sem-2?accountid=27030 |
| Copyright: | Copyright 2025 The New York Times Company |
| Last updated: | 2025-06-18 |
| Database: | Global Newsstream Collection |

## LINKS

Linking Service

Database copyright © 2025 ProQuest LLC. All rights reserved.

Terms and Conditions    Contact ProQuest



ED_01271

An official website of the United States Government <u>Here's how you know</u>



Home  >  ...  > Foreign Terrorist Organizations

# Foreign Terrorist Organizations

**BUREAU OF COUNTERTERRORISM**

Foreign Terrorist Organizations (FTOs) are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

## Designated Foreign Terrorist Organizations

| Date Designated | Name |
| --- | --- |
| December 17, 2025 | Clan del Golfo |
| November 24, 2025 | Cartel de los Soles |
| November 20, 2025 | Antifa Ost, aka Hammerbande |
| November 20, 2025 | Informal Anarchist Federation/International Revolutionary Front (FAI/FRI) |
| November 20, 2025 | Armed Proletarian Justice |
| November 20, 2025 | Revolutionary Class Self-Defense |

ED_01272

| Date Designated | Name |
|---|---|
| September 24, 2025 | Barrio 18 |
| September 18, 2025 | Harakat al-Nujaba (HAN) |
| September 18, 2025 | Kata'ib Sayyid al-Shuhada (KSS) |
| September 18, 2025 | Harakat Ansar Allah al-Awfiya (HAAA) |
| September 18, 2025 | Kata'ib al-Imam Ali (KIA) |
| September 5, 2025 | Los Choneros |
| September 5, 2025 | Los Lobos |
| August 12, 2025 | Balochistan Liberation Army (BLA) |
| May 5, 2025 | Viv Ansanm |
| May 5, 2025 | Gran Grif |
| March 5, 2025 | Ansarallah |
| February 20, 2025 | Cartel de Sinaloa |
| February 20, 2025 | Cartel de Jalisco Nueva Generacion (CJNG) |
| February 20, 2025 | Cartel del Noreste |
| February 20, 2025 | La Nueva Familia Michoacana |
| February 20, 2025 | Cartel del Golfo (Gulf Cartel) |
| February 20, 2025 | Carteles Unidos |
| February 20, 2025 | Tren de Aragua |
| February 20, 2025 | Mara Salvatrucha (MS-13) |

| Date Designated | Name |
|---|---|
| December 1, 2021 | Segunda Marquetalia |
| December 1, 2021 | Revolutionary Armed Forces of Colombia – People's Army (FARC-EP) |
| March 11, 2021 | ISIS-DRC |
| March 11, 2021 | ISIS-Mozambique |
| January 14, 2021 | Harakat Sawa'd Misr (HASM) |
| January 10, 2020 | Asa'ib Ahl al-Haq (AAH) |
| April 15, 2019 | Islamic Revolutionary Guard Corps (IRGC) |
| September 6, 2018 | Jama'at Nusrat al-Islam wal-Muslimin (JNIM) |
| July 11, 2018 | al-Ashtar Brigades |
| May 23, 2018 | ISIS in the Greater Sahara (ISIS-GS) |
| February 28, 2018 | ISIS-West Africa |
| February 28, 2018 | ISIS-Philippines |
| February 28, 2018 | ISIS-Bangladesh |
| August 17, 2017 | Hizbul Mujahideen (HM) |
| July 1, 2016 | al-Qa'ida in the Indian Subcontinent (AQIS) |
| May 20, 2016 | ISIS-Libya |
| January 14, 2016 | Islamic State's Khorasan Province (ISIS-K) |
| September 30, 2015 | Jaysh Rijal al-Tariq al Naqshabandi (JRTN) |
| April 10, 2014 | ISIS-Sinai Province (formerly Ansar Bayt al-Maqdis) — ISIL Sinai Province Amendment (September 30, 2015) |
| January 13, 2014 | Ansar al-Shari'a in Benghazi |

| Date Designated | Name |
|---|---|
| January 13, 2014 | Ansar al-Shari'a in Darnah |
| January 13, 2014 | Ansar al-Shari'a in Tunisia |
| December 19, 2013 | al-Mulathamun Battalion, aka al-Murabitoun |
| November 14, 2013 | Ansaru |
| November 14, 2013 | Boko Haram |
| March 22, 2013 | Ansar al-Dine (AAD) |
| September 19, 2012 | Haqqani Network (HQN) |
| May 30, 2012 | Abdallah Azzam Brigades<br>— Marwan Hadid Brigades Amendment (November 2, 2017) |
| March 13, 2012 | Jemaah Anshorut Tauhid (JAT) |
| September 19, 2011 | Indian Mujahedeen (IM) |
| May 23, 2011 | Army of Islam (AOI) |
| November 4, 2010 | Jaysh al-Adl (formerly Jundallah)<br>— Jaysh al-Adl Amendment (July 2, 2019) |
| September 1, 2010 | Tehrik-e Taliban Pakistan (TTP) |
| August 6, 2010 | Harakat ul-Jihad-i-Islami (HUJI) |
| January 19, 2010 | al-Qa'ida in the Arabian Peninsula (AQAP)<br>— Ansar al-Shari'a Amendment (October 5, 2012) |
| July 2, 2009 | Kata'ib Hizballah (KH) |
| May 18, 2009 | Revolutionary Struggle (RS) |
| March 18, 2008 | al-Shabaab<br>— al-Hijra Amendment (August 1, 2018) |
| March 5, 2008 | Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) |
| June 17, 2005 | Islamic Jihad Union (IJU) |

| Date Designated | Name |
|---|---|
| December 17, 2004 | ISIS (formerly al-Qa'ida in Iraq)<br>— Islamic State of Iraq Amendment (January 26, 2012)<br>— al-Hayat Media Center and Amaq News Agency Amendments (March 22, 2019) |
| July 13, 2004 | Continuity Irish Republican Army (CIRA) |
| March 22, 2004 | Ansar al-Islam (AAI) |
| January 30, 2003 | Lashkar i Jhangvi (LJ) |
| October 23, 2002 | Jemaah Islamiya (JI) |
| August 9, 2002 | Communist Party of the Philippines/New People's Army (CPP/NPA) |
| March 27, 2002 | al-Qa'ida in the Islamic Maghreb (formerly Salafist Group for Call and Combat)<br>— AQIM Amendment (February 20, 2008) |
| March 27, 2002 | Asbat al-Ansar (AAA) |
| March 27, 2002 | Al-Aqsa Martyrs Brigade (AAMB) |
| December 26, 2001 | Lashkar-e-Tayyiba (LeT)<br>— Tehrik-e-Tahafuz Qibla Awwal, Tehrik-e-Hurmat-e-Rasool, and Al-Anfal Trust Amendments (June 26, 2014)<br>— Al Muhammadia Students Amendment (December 30, 2016)<br>— Tehreek-e-Azadi-e-Kashmir and Milli Muslim League Amendments (April 4, 2018)<br>— The Resistance Front Amendment (July 18, 2025) |
| December 26, 2001 | Jaish-e-Mohammed (JEM) |
| May 16, 2001 | New Irish Republican Army (formerly Real IRA)<br>— New IRA Amendment (June 30, 2023) |
| September 25, 2000 | Islamic Movement of Uzbekistan (IMU) |
| October 8, 1999 | al-Qa'ida (AQ) |
| October 8, 1997 | Abu Sayyaf Group (ASG) |
| October 8, 1997 | HAMAS |
| October 8, 1997 | Harakat ul-Mujahidin (HUM)<br>— Ansar ul-Ummah Amendment (August 8, 2014) |
| October 8, 1997 | Hizballah |

| Date Designated | Name |
|---|---|
| October 8, 1997 | Kurdistan Workers Party (PKK) |
| October 8, 1997 | Liberation Tigers of Tamil Eelam (LTTE) |
| October 8, 1997 | National Liberation Army (ELN) |
| October 8, 1997 | Palestine Liberation Front (PLF) |
| October 8, 1997 | Palestine Islamic Jihad (PIJ) |
| October 8, 1997 | Popular Front for the Liberation of Palestine (PFLP) |
| October 8, 1997 | PFLP-General Command (PFLP-GC) |
| October 8, 1997 | Revolutionary People's Liberation Party/Front (DHKP/C) |
| October 8, 1997 | Shining Path (Sendero Luminoso, SL) |

# Delisted Foreign Terrorist Organizations

| Date Removed | Name | Date Originally Designated |
|---|---|---|
| July 8, 2025 | al-Nusrah Front, aka Hay'at Tahrir al-Sham (ANF/HTS) | May 15, 2014 |
| May 20, 2022 | Aum Shinrikyo (AUM) | October 8, 1997 |
| May 20, 2022 | Basque Fatherland and Liberty (ETA) | October 8, 1997 |
| May 20, 2022 | Gama'a al-Islamiyya (Islamic Group – IG) | October 8, 1997 |
| May 20, 2022 | Kahane Chai (Kach) | October 8, 1997 |
| May 20, 2022 | Mujahidin Shura Council in the Environs of Jerusalem (MSC) | August 20, 2014 |
| December 1, 2021 | Revolutionary Armed Forces of Colombia (FARC) | October 8, 1997 |
| February 16, 2021 | Ansarallah | January 19, 2021 |
| June 1, 2017 | Abu Nidal Organization (ANO) | October 8, 1997 |
| December 9, 2015 | Libyan Islamic Fighting Group (LIFG) | December 17, 2004 |

| Date Removed | Name | Date Originally Designated |
|---|---|---|
| September 3, 2015 | Revolutionary Organization 17 November (17N) | October 8, 1997 |
| July 15, 2014 | United Self Defense Forces of Colombia | September 10, 2001 |
| May 28, 2013 | Moroccan Islamic Combatant Group (GICM) | October 11, 2005 |
| September 28, 2012 | Mujahedin-e Khalq Organization (MEK) | October 8, 1997 |
| October 15, 2010 | Armed Islamic Group (GIA) | October 8, 1997 |
| May 18, 2009 | Revolutionary Nuclei | October 8, 1997 |
| October 8, 2001 | Tupac Amaru Revolution Movement | October 8, 1997 |
| October 8, 2001 | Japanese Red Army | October 8, 1997 |
| October 8, 1999 | Manuel Rodriguez Patriotic Front Dissidents | October 8, 1997 |
| October 8, 1999 | Khmer Rouge | October 8, 1997 |
| October 8, 1999 | Democratic Front for the Liberation of Palestine -Hawatmeh Faction | October 8, 1997 |

# Identification

The Bureau of Counterterrorism in the State Department (CT) continually monitors the activities of terrorist groups active around the world to identify potential targets for designation. When reviewing potential targets, CT looks not only at the actual terrorist attacks that a group has carried out, but also at whether the group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

# Designation

Once a target is identified, CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied.

If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. Upon the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the Federal Register, at which point the designation takes effect. By law an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit not later than 30 days after the designation is published in the Federal Register.

Until recently the INA provided that FTOs must be redesignated every 2 years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the redesignation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its designation date (or in the case of redesignated FTOs, its most recent redesignation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a 5 year period with respect to a designation, then the Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

# Legal Criteria for Designation under Section 219 of the INA as amended

1. It must be a foreign organization.

2. The organization must engage in terrorist activity, as defined in **section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B))**, or terrorism, as defined in **section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2))**, or retain the capability and intent to engage in terrorist activity or terrorism.

3. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

# Legal Ramifications of Designation

1. It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."

2. Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).

3. Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

# Other Effects of Designation

1. Supports our efforts to curb terrorism financing and to encourage other nations to do the same.

2. Stigmatizes and isolates designated terrorist organizations internationally.

3. Deters donations or contributions to and economic transactions with named organizations.

4. Heightens public awareness and knowledge of terrorist organizations.

5. Signals to other governments our concern about named organizations.

# Revocations of Foreign Terrorist Organizations

The Immigration and Nationality Act sets out three possible basis for revoking a Foreign Terrorist Organization designation:

1. The Secretary of State must revoke a designation if the Secretary finds that the circumstances that were the basis of the designation have changed in such a manner as to warrant a revocation;

2. The Secretary of State must revoke a designation if the Secretary finds that the national security of the United States warrants a revocation;

3. The Secretary of State may revoke a designation at any time.

Any revocation shall take effect on the date specified in the revocation or upon publication in the Federal Register if no effective date is specified. The revocation of a designation shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation.

**TAGS**

Bureau of Counterterrorism    Combating Violent Extremism    Counterterrorism

**Sanctions and Designations**

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Freedom 250



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# CONGRESS.GOV

## Primer on U.S. Immigration Policy

| | |
|---|---|
| **CRS Product Type:** | Reports |
| **CRS Product Number:** | R45020 |
| **Topics:** | Appropriations; Homeland Security & Emergency Management; Immigration |
| **Publication Date:** | 03/31/2025 |
| **Author:** | Straut-Eppsteiner, Holly |

Download PDF (987KB) | PDF Version History

 Listen ▶

<div style="display:flex">

<div>

# Summary

U.S. immigration policy is governed largely by the Immigration and Nationality Act (INA), which was first codified in 1952 and has been amended significantly several times since. U.S. immigration policy contains two major aspects. One facilitates migration flows of foreign nationals into the United States; another focuses on immigration enforcement and removal. Immigration functions authorized by Congress in the INA and other laws are carried out by several executive branch departments and agencies.

The United States has long distinguished permanent from temporary immigration. The INA's permanent immigration categories reflect principles of admission that are based upon national interest, including family reunification, U.S. labor market contribution, origin-country diversity, and humanitarian assistance. The INA provides lawful permanent resident (LPR) status through family and employer-sponsored categories, the diversity immigrant visa, and grants of refugee status and asylum, among others. LPRs may choose to naturalize, or become U.S. citizens, upon meeting requirements specified in the INA. Temporary immigration occurs through the admission of foreign nationals for specific purposes and limited periods of time, and encompasses two dozen categories that include foreign tourists, students, temporary workers, and diplomats.

</div>

<div>

# Contents

- Introduction
- Immigration Inflows and Related Topics
  - Visa Issuance and Security
  - Permanent Immigration
    - Requirements for Prospective Immigrants
    - Family-Sponsored Immigration
    - Employment-Based Immigration
    - Diversity Immigrant Visa
    - Refugees and Asylees
    - Other Pathways to LPR Status
  - Naturalization
  - Temporary Immigration

</div>

</div>

ED_01283

The executive branch may exercise statutory or executive authority to allow certain noncitizens to enter or remain in the United States on a time-limited basis, including those who have not been admitted through permanent or temporary pathways under the INA and might otherwise be subject to removal. These include Temporary Protected Status (TPS), immigration parole, and Deferred Action for Childhood Arrivals (DACA).

The INA also provides authority for immigration enforcement, including restricting entry to and removing persons from the United States who lack authorization to be in the country or who have such authorization but have committed acts that make them subject to removal. Immigration enforcement functions include border enforcement, interior enforcement, detention, and removal. Some individuals subject to removal may be repatriated; others may be eligible for forms of permanent relief or temporary protection from removal.

- Discretionary Permissions to Enter or Remain in the United States
  - Temporary Protected Status
  - Deferred Enforced Departure
  - Immigration Parole
  - Deferred Action for Childhood Arrivals
- Immigration Enforcement
  - Border Enforcement at Ports of Entry
  - Border Enforcement Between Ports of Entry
  - Interior Immigration Enforcement
  - Detention and Case Management
  - Removal Processes
    - Defenses Against Removal

## Tables

- Table 1. Family-Sponsored Immigrant Categories
- Table 2. Employment-Based Immigrant Categories

## Introduction

U.S. immigration policy is governed largely by the Immigration and Nationality Act (INA), which was first codified in 1952 and has been amended significantly several times since.[1] Implementation of the provisions in the INA and other laws, including the Homeland Security Act of 2002 (HSA; P.L. 107-296.), is carried out by executive branch agencies. The Department of Homeland Security (DHS), established under the HSA, has primary responsibility for immigration functions through its component agencies: U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE). The Department of State (DOS) issues visas to foreign nationals overseas through its Bureau of Consular Affairs and manages the U.S. Refugee Admissions Program through its Bureau of Population, Refugees, and Migration. The Department of Justice (DOJ) operates immigration courts through its Executive Office for Immigration Review (EOIR). Immigration courts adjudicate immigration hearings, including removal proceedings. The Department of Health and Human Services' (HHS') Office of Refugee Resettlement (ORR) oversees refugee resettlement and is responsible for the care and custody of unaccompanied children. The Department of Labor (DOL) operates a foreign labor certification program to enforce laws intended to ensure

ED_01284

that foreign workers do not displace or adversely affect wages or working conditions of U.S. workers.

This report provides a broad overview of U.S. immigration policy. The first section addresses laws and policies governing how foreign nationals (*aliens*[2]) may enter the United States to either reside permanently or stay temporarily. Related topics within this section include visa issuance and security, naturalization (i.e., the process of obtaining U.S. citizenship), and discretionary permissions to enter or remain in the United States. The second section discusses enforcement policies for excluding certain foreign nationals from admission into the United States and for detaining and removing those who enter the country unlawfully or who enter lawfully but are charged with one of the INA's *grounds of deportability*. While intended to be comprehensive, this primer may omit some immigration-related topics.

## Immigration Inflows and Related Topics

### Visa Issuance and Security

In general, nonresident foreign nationals who wish to come to the United States—either as *lawful permanent residents* (LPRs) through permanent family-sponsored, employment-based, and diversity categories; or as *nonimmigrants* through temporary pathways—must obtain a visa from a U.S. consulate.[3] *Immigrant visas* provide for permanent residence; *nonimmigrant visas* provide for temporary stays. A visa permits a foreign national to travel to a U.S. port of entry and request permission from CBP to enter the country (i.e., apply for admission). In addition, to obtain a visa a foreign national must establish that he/she meets the requirements for the specific visa classification. Consular officers can deny visas under three main INA provisions:

1. insufficient information under INA Section 221(g),

2. grounds of inadmissibility under INA Section 212(a), and

3. for nonimmigrant applicants, the INA Section 214(b) presumption of seeking permanent residence.

A visa denial under INA Section 221(g) indicates that the DOS consular officer abroad lacks sufficient information to determine if a foreign national is eligible to receive a visa. A consular officer may also disqualify a visa applicant if (1) he/she knows or has reason to believe the alien is inadmissible under INA Section 212(a) (described below) or any other provision of law, or (2) the application fails to comply with INA provisions or regulations. A visa denial under INA Section 214(b) indicates that the foreign national was unable to demonstrate to the consular officer that he/she had sufficient ties to his/her home country to return home.[4] This is the most common reason that DOS denies nonimmigrant visas.

Consular officers must decide whether a foreign national may be denied admission to the United States under the grounds in INA Section 212(a), which include the following:

- health-related grounds,
- criminal grounds,[5]
- security and terrorist concerns,
- public charge risk (e.g., indigence),[6]
- seeking to work without proper labor certification,
- lacking valid entry documents,
- previous illegal U.S. entry and U.S. immigration law violations,[7]
- ineligibility for U.S. citizenship, and
- having been previously removed from the United States.[8]

The INA describes procedures for making and reviewing an inadmissibility determination and specifies conditions under which some of these provisions may be waived.

All visa applicants are required to submit their photograph, fingerprints, and biographic information. Visa applicants are checked against multiple databases and information sources for security purposes. All prospective LPRs and certain prospective nonimmigrants must also submit to physical and mental examinations. Visa applicants generally must be interviewed by a consular officer in person to determine whether they are qualified to receive a visa.[9] Consular officers' decisions on whether or not to grant foreign nationals a visa are not subject to judicial appeals. Visa applicants who were denied a visa for a particular ineligibility and meet certain conditions may apply to DHS for a waiver of that ineligibility and apply again for a visa.

The INA has civil enforcement provisions, distinct from removal or inadmissibility proceedings, to prosecute individuals and entities that engage in immigration document fraud.[10] Apart from the INA, the U.S. Criminal Code classifies knowingly producing or using fraudulent immigration documents (e.g., visas, border crossing cards) as criminal offenses.[11]

## Permanent Immigration[12]

The permanent immigration system provides foreign nationals with LPR status (commonly, a green card).[13] Four major principles underlie the current system of permanent immigration: family reunification, U.S. labor market contribution, origin-country diversity, and humanitarian assistance. These principles are reflected in the different categories that provide LPR status under the INA. Family reunification occurs primarily through family-sponsored immigration. U.S. labor market contribution occurs through employment-based immigration. Origin-country diversity is addressed through the diversity immigrant visa. Humanitarian assistance occurs primarily through the U.S. refugee program and asylum. These permanent immigration pathways are discussed further below.

The INA limits worldwide permanent immigration to 675,000 persons annually: 480,000 *family-sponsored immigrants,* made up of immediate relatives of U.S. citizens, and a set of ordered family-sponsored preference immigrants (preference immigrants); 140,000 e*mployment-based*

*immigrants*; and 55,000 *diversity visa immigrants*.[14] These numerical limits include spouses and children who accompany the principal immigrants.

This worldwide limit, however, is referred to as a *permeable cap* because immediate relatives are exempt from numerical limits that are placed on family-sponsored immigration (described below) and thereby represent the flexible component of the 675,000 worldwide limit. In addition, the annual number of refugees is determined not by statute but by the President in consultation with Congress. Applications for asylum are adjudicated on a case-by-case basis without a statutorily mandated limit (see the "Refugees and Asylees" section). Consequently, the actual total number of persons who receive LPR status annually has exceeded 1 million in all but 3 of the past 20 fiscal years.

To ensure that foreign nationals from only a few countries do not dominate permanent immigration flows, the INA further specifies a 7% *per-country limit* on the number of family-sponsored preference immigrants and employment-based immigrants.[15]

## Requirements for Prospective Immigrants

To obtain LPR status, prospective immigrants undergo a multistep process through several federal departments and agencies.[16] If they are present in the United States, they apply for LPR status by *adjusting status*, typically from certain *nonimmigrant* (temporary) statuses to LPR status. If they are outside the United States, they apply for an immigrant visa at a U.S. consulate. All family-based immigrants and most employment-based immigrants require a relative or an employer, respectively, to petition on their behalf. Petitions are submitted to and adjudicated by USCIS. Petitions filed on behalf of a visa applicant outside the United States are first adjudicated by USCIS and then forwarded to DOS's Bureau of Consular Affairs in the prospective immigrant's home country for immigrant visa processing. Most immigration petitions and applications require fees.[17]

For all prospective immigrants, the USCIS adjudicator (when the alien is adjusting status within the United States) or USCIS and the consular officer (when the alien lives abroad) must be satisfied that prospective immigrants are entitled to LPR status and are not ineligible under the INA's grounds of inadmissibility (see the "Visa Issuance and Security" section).[18]

The number of foreign nationals seeking to acquire LPR status each year through family-sponsored and employment-based preference categories typically exceeds the INA-mandated numerical limits for these pathways. Apart from the numerical limits that apply to prospective immigrants from all countries, the 7% per-country cap primarily affects foreign nationals from countries that send relatively large numbers of immigrants to the United States (e.g., Mexico, China, India, the Philippines). As a result, many foreign nationals who qualify for LPR status may have to wait years before a numerically limited green card becomes available.

DOS manages the numerical control of green cards according to the INA's limitations.[19] When a numerically limited green card becomes available, an approved prospective immigrant may

apply for an immigrant visa to travel to the United States and, if admitted at a U.S. port of entry by a CBP immigration officer, receive LPR status. If the approved prospective immigrant already resides in the United States as a temporary nonimmigrant, the availability of a green card allows him/her to adjust to LPR status without having to return to his/her country of origin to complete visa processing at a DOS consulate.

## Family-Sponsored Immigration

Family-sponsored immigration comprises two groups (**Table 1**). *Immediate relatives* include spouses and minor unmarried children of U.S. citizens and parents of adult (ages 21+) U.S. citizens. Immediate relatives are not subject to annual numerical limits and can acquire LPR status if they meet the standard eligibility criteria required of all immigrants. *Preference immigrants* are numerically limited to 226,000 per year and, unlike immediate relatives, are also bounded by the 7% per-country limit.[20] From FY2014 to FY2023, family-sponsored immigrants accounted for 64% of all persons receiving LPR status.[21]

**Table 1. Family-Sponsored Immigrant Categories**

| Category | Individuals in Category | Numerical Limit |
|---|---|---|
| **Immediate Relatives** | | |
| | Spouses and unmarried minor children of U.S. citizens, and parents of adult U.S. citizens | Unlimited |
| **Preference Immigrants** | | 226,000 (floor) |
| *1st Preference* | Unmarried adult children of U.S. citizens | 23,400 plus unused 4th preference visas |
| *2nd Preference* | (A) Spouses and minor children of LPRs<br><br>(B) Unmarried adult children of LPRs | 114,200 plus unused 1st preference visas (with at least 77% reserved for 2nd [A] subgroup) |
| *3rd Preference* | Married adult children of U.S. citizens | 23,400 plus unused 1st or 2nd preference visas |
| *4th Preference* | Siblings of adult U.S. citizens | 65,000 plus unused 1st, 2nd, or 3rd preference visas |

**Source:** INA §§201(b), 203(a); 8 U.S.C. §§1151(b),1153(a).

**Note:** LPR = lawful permanent resident.

## Employment-Based Immigration

Employment-based immigration occurs through five numerically limited preference categories (**Table 2**), the first three of which are based on professional accomplishment and ability. The fourth preference category includes various *special immigrants*.[22] The fifth preference category is for immigrant investors, a category created in 1990 to benefit the U.S. economy through employment creation and capital investment.[23] Employment-based immigrants are limited to 140,000 annually, including accompanying spouses and children, and are subject to the same 7% per-country limit for each preference category as family-sponsored preference immigrants.[24]

**Table 2. Employment-Based Immigrant Categories**

| Category | Individuals in Category | Numerical Limit |
|---|---|---|
| *1st Preference* | Priority workers: persons of extraordinary ability in the arts, sciences, education, business, or athletics; outstanding professors and researchers; and certain multinational executives and managers | 28.6% of total EB limit (40,040) plus unused 4th and 5th preference visas |
| *2nd Preference* | Members of the professions holding advanced degrees or persons of exceptional ability in the sciences, arts, or business | 28.6% of total EB limit (40,040) plus unused 1st preference visas |
| *3rd Preference* | Skilled shortage workers with at least two years training or experience, and professionals with baccalaureate degrees; and "other (unskilled shortage) workers" | 28.6% of total EB limit (40,040) plus unused 1st or 2nd preference visas; "other workers" limited to 10,000. |
| *4th Preference* | Special immigrants, including ministers of religion, religious workers other than ministers, certain employees of the U.S. government abroad, and others | 7.1% of worldwide limit (9,940); religious workers limited to 5,000 and broadcasters limited to 100.[a] |
| *5th Preference* | Employment creation investors who invest at least $1.05 million ($800,000 in rural areas, areas of high unemployment, or infrastructure projects) and create/preserve at least 10 U.S. jobs | 7.1% of total limit (9,940); 3,000 *minimum* reserved for investors in rural or high unemployment areas |

**Source:** INA §203(b), 8 U.S.C. §1153(b).

a. Congress has made available additional visas in this category to certain employees of the U.S. government abroad for whom visas are not immediately available by offsetting the

number of diversity visas. See footnote [14] and CRS Report R47164, *U.S. Employment-Based Immigration Policy*.

## Diversity Immigrant Visa

The diversity immigrant visa fosters legal immigration from countries that send relatively few immigrants to the United States.[25] Each year, 55,000 visas are made available to nationals of countries from which immigrant admissions totaled less than 50,000 over the preceding five years. Since the visa's inception in the early 1990s, the regional distribution of diversity immigrants has shifted from Western European to African, Eastern European, and Asian countries.[26]

To be eligible for a diversity immigrant visa, foreign nationals must have a high school education or two years of work experience within the past five years in an occupation that requires at least two years of training or experience. Because the demand for diversity visas is much higher than the supply, a lottery is used to randomly select who may apply for one. To receive a diversity visa, lottery selectees must successfully complete the application process (including security and medical screenings and in-person interviews) by the end of the fiscal year for which they registered for the lottery; otherwise, they lose their eligibility.[27]

## Refugees and Asylees

Refugees are processed and admitted to the United States from abroad. A *refugee* is a person who is typically outside their country and is unable or unwilling to return because of persecution, or a well-founded fear of persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion.[28] DOS's Bureau of Population, Refugees, and Migration coordinates and manages the U.S. Refugee Admissions Program; USCIS interviews applicants and makes final eligibility determinations. DOS sets annual refugee priorities in collaboration with other agencies.[29]

Refugee status is granted within numerical limits. Refugee admissions differ from other immigrant admissions because they have no statutory numerical limitations. The INA authorizes the President, in consultation with Congress, to set an annual "refugee ceiling." Refugee ceilings and admissions have varied over time.[30] Examining the last 10 fiscal years, the refugee ceiling ranged between 15,000 in FY2021[31] (the lowest on record) and 125,000 in FY2025.[32] During that period, refugee admissions ranged between a low of 11,411 in FY2021 to a high of 100,034 in FY2024.[33] After one year in refugee status, refugees are required to adjust to LPR status.[34] There are no numerical limits on status adjustments for refugees.

An *asylee* is a person who meets the definition of a refugee in terms of persecution or a well-founded fear of persecution but is present in the United States or at a land border or port of entry to the United States.[35] Under the INA, aliens who are physically present in the United States or who arrive in the United States may apply for asylum regardless of their immigration

status, subject to certain restrictions.[36] A person who is not in removal proceedings may apply for *affirmative asylum* with USCIS.[37] Persons in removal proceedings may apply for *defensive asylum* (i.e., asylum as a defense against removal) in immigration court (within DOJ's EOIR).[38] Grants of asylum are not numerically limited. Asylees may apply for LPR status one year after being granted asylum. [39] There are no numerical limits on status adjustments for asylees.

## Other Pathways to LPR Status

In addition to the primary components of permanent immigration discussed above, the INA contains several other pathways to LPR status, though they account for relatively few immigrants each year. The most prominent among these are *cancellation of removal, U nonimmigrant visas,* and *T nonimmigrant status.*[40]

*Cancellation of removal* is a discretionary form of relief granted by an immigration judge to aliens in removal proceedings and is available to certain LPRs and non-LPRs.[41] Non-LPRs granted cancellation of removal are granted LPR status. To qualify for cancellation of removal and adjustment of status, a non-LPR must have been continuously physically present in the United States for at least 10 years, have been a person of good moral character, have not been convicted of certain enumerated criminal offenses, and establish that their removal would result in exceptional and extremely unusual hardship to a U.S. citizen or LPR parent, spouse, or child. Non-LPR grants of cancellation of removal are limited to 4,000 per year.[42]

*U nonimmigrant status* may be granted to certain victims who help law enforcement agencies investigate and prosecute domestic violence, sexual assault, human trafficking, and certain other crimes.[43] To qualify for U status, a foreign national must file a petition and establish that he/she (1) suffered substantial physical or mental abuse as a result of having been a victim of qualifying crimes that violated the laws of the United States or occurred in the United States; (2) possesses information about the criminal activity involved as certified by a law enforcement or immigration official; and (3) has been, is being, or is likely to be helpful in the investigation and prosecution of the crime(s) by federal, state, or local law enforcement authorities. U status recipients, as well as their immediate family members, can apply for LPR status after three years. The INA limits U status to 10,000 principal applicants annually; there are no annual numerical limits on the number of individuals with U status who can adjust to LPR status.[44]

*T nonimmigrant status* may be granted to victims of severe forms of human trafficking.[45] To qualify for T status, trafficking victims must (1) demonstrate that they are victims of a severe form of trafficking in persons; (2) be physically present in the United States, its territories, or a U.S. port of entry either because of such trafficking or because they will participate in related investigations or prosecutions; (3) have complied with requests to assist law enforcement investigating or prosecuting trafficking acts;[46] and (4) be likely to suffer unusual and severe harm upon removal. Such aliens must also be admissible to the United States or obtain a waiver of inadmissibility (see the "Visa Issuance and Security" section). T status recipients may remain in the United States for four years and apply for LPR status after three years. The INA limits T

ED_01291

status to 5,000 principal applicants annually and adjustment to LPR status by individuals with T status to 5,000 principal aliens annually.[47]

# Naturalization

Under the INA, eligible LPRs may become U.S. citizens through the naturalization process.[48] With some exceptions,[49] naturalization applicants must have resided continuously in the United States as LPRs for five years (three years for the spouses of U.S. citizens[50]) and demonstrate good moral character during the statutory period.

An individual may apply to naturalize by filing an application with USCIS and completing a biometric-based background check. Applicants then undergo an interview with USCIS during which they answer questions about their application and background and take English and civics tests. Those whose applications are approved become U.S. citizens after taking the Oath of Allegiance in a naturalization ceremony.

There are no numerical limits on naturalizations. In FY2024, USCIS naturalized 818,500 U.S. citizens.[51] In 2023, an estimated 25 million naturalized citizens resided in the United States, comprising 52% of the estimated 47.8 million foreign-born U.S. residents.[52] As of January 2024, an estimated 8.7 million LPRs were potentially able to naturalize based on having met age and residency requirements.[53]

A naturalized citizen may have his/her citizenship revoked on the basis that the citizenship was procured illegally, by concealment of material fact, or by willful misrepresentation.[54]

# Temporary Immigration

*Nonimmigrants* are foreign nationals admitted to the United States for a specified purpose and temporary period, including tourists, diplomats, students, temporary workers, and exchange visitors, among others.[55] Each year, the United States admits millions of nonimmigrants. DOS issues specific types of nonimmigrant visas within 24 major nonimmigrant visa categories. Categories are often referred to by the letter and numeral denoting the related subsection within INA Section 101(a)(15) (e.g., B-2 tourists, F-1 foreign students, H-2A temporary agricultural workers).[56] The INA and federal regulations set terms for nonimmigrant lengths of stay in the United States, which typically include foreign residency requirements and often limit what aliens are permitted to do while in the country (e.g., work, enroll in school).

Foreign nationals who apply for temporary admission must demonstrate, both to DOS consular officers at the time they apply for a visa abroad, as well as to CBP officers when they apply for admission upon arrival in the United States, that they are eligible for both nonimmigrant status generally and the specific nonimmigrant status for which they are applying. In addition, because the INA presumes that all aliens seeking admission to the United States are coming to live permanently, nonimmigrant applicants must demonstrate that they intend to depart the United States by the time their authorized period of stay expires (see the "Visa Issuance and Security"

section).[57] Some nonimmigrants are permitted to work in the United States (e.g., temporary workers, students pursuing optional practical training).

Some nonimmigrant categories have annual numerical limits; others do not.[58] In FY2023, DOS issued 10.4 million nonimmigrant visas, with the largest number of visa issuances to B-1 business visitors and B-2 tourists (57%); border crossing card (BCC) holders (17%); H-2A, H-2B, and H-1B temporary workers (7%); F-1 foreign students (4%); C-1/D transit/crew members (3%); and J-1 cultural exchange visitors (3%).[59]

In addition to nonimmigrant visas, BCCs allow Mexican citizens who live in Mexico and are admissible as B-1 business or B-2 tourist visitors to briefly enter certain regions of the United States.[60] In FY2023, DOS issued approximately 1.8 million border crossing cards to Mexican nationals.[61] The BCC may be used for multiple entries and is usually valid for 10 years. Current regulations limit BCC holders to visits of up to 30 days within a zone of 25 miles along the border in Texas and California, 55 miles along the New Mexico border, and 75 miles along the Arizona border.[62]

The Visa Waiver Program (VWP) allows citizens of 42 participating countries (or jurisdictions)—which must meet a number of qualifying criteria—to enter the United States as temporary visitors for business or pleasure without visas.[63] In FY2023, roughly 15.4 million pleasure and 2 million business visitors entered the United States using the VWP.[64]

Nonimmigrants must depart the United States before their authorized period of admission ends unless they obtain an extension of stay or change of status that permits them to remain in the country. On average, between 1% and 2% of nonimmigrant admissions result in an *overstay* each year.[65] Individuals who overstay are subject to removal from the United States (see the "Immigration Enforcement" section).

## Discretionary Permissions to Enter or Remain in the United States

The executive branch may exercise statutory or executive authority to allow certain noncitizens to enter or remain in the United States. These noncitizens may include individuals who were not legally admitted into the country or who may be subject to removal from the country. These discretionary permissions include Temporary Protected Status (TPS), deferred enforced departure, immigration parole, and Deferred Action for Childhood Arrivals (DACA). They are granted for a temporary period by DHS and do not provide a dedicated pathway to permanent status. Other categories that allow persons to remain in the United States regardless of immigration status, including withholding of removal and deferred action, are described in later sections of this report.

### Temporary Protected Status

When extraordinary conditions such as civil unrest, violence, or natural disasters occur in foreign countries, foreign nationals from those places who are present in the United States may not be able to return home safely. The INA allows the DHS Secretary to designate countries for TPS for periods of 6, 12, or 18 months at a time.[66] Congress has also provided TPS legislatively. As of September 2024, there were approximately 1.1 million individuals in the United States with TPS.[67] As of the cover date of this report, 17 countries were designated for TPS: Afghanistan, Burma, Cameroon, El Salvador, Ethiopia, Haiti, Honduras, Lebanon, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, Ukraine, Venezuela, and Yemen.

Nationals of designated countries already present in the United States may apply for TPS. Individuals granted TPS are eligible for employment authorization, cannot be detained on the basis of their immigration status, and are not subject to removal while they retain TPS. TPS does not provide a recipient with a designated pathway to LPR status; however, a TPS recipient is not barred from acquiring a lawful immigration status (e.g., asylum, nonimmigrant status, LPR status) if he/she meets the requirements.

Applicants apply for TPS with USCIS according to deadlines set in the *Federal Register* notices that announce each TPS designation or extension. These notices specify the dates by which individuals must have continuously resided in the United States in order to qualify. Foreign nationals outside the United States are not eligible for TPS.

## Deferred Enforced Departure

DED may be authorized by the President based on the executive branch's independent constitutional authority rather than any specific statutory authority. It provides a temporary, discretionary, administrative stay of removal to foreign nationals from designated areas. The Administration may use its discretion when applying DED to a particular area by balancing foreign policy, humanitarian, and immigration concerns. DED grants are announced for set periods of time at the President's discretion and may be extended. As of the cover date of this report, certain Palestinians, Lebanese, Liberians, and residents of Hong Kong living in the United States maintain protection under DED. [68] Covered individuals may apply for work authorization but they are not required to apply for DED; DED is triggered during removal proceedings.

## Immigration Parole

The INA authorizes DHS, on a case-by-case basis, to *parole* an alien into the United States for urgent humanitarian reasons or significant public benefit at its discretion.[69] Foreign nationals may request parole inside or outside the United States. Parole is granted for a specified period and does not constitute formal admission to the United States. A parole grant generally does not provide a dedicated path to LPR status.[70] Persons granted parole (parolees) may obtain employment authorization. Those granted parole must depart the United States when the parole expires or, if eligible, be admitted in a lawful status. Parolees may also apply for re-parole.[71]

In recent years, the use of parole processes for specific populations (e.g., special processes set up during the Biden Administration for nationals of Ukraine, Cuba, Haiti, Nicaragua, and Venezuela) have been subject to debate. As of the cover date of this report, many of these processes have been terminated or paused by the Trump Administration.[72]

## Deferred Action for Childhood Arrivals

Under the DACA initiative, established by executive action in 2012, certain individuals without a lawful immigration status who were brought to the United States as children and meet other criteria have been granted deferred action for two years, subject to renewal. DACA eligibility is based on requirements related to age, U.S. residence, education, and criminal history as established in a June 15, 2012, DHS memorandum.[73] Deferred action is "a type of prosecutorial discretion that allows an individual to remain in the United States for a set period of time."[74]

To qualify for DACA, an individual must have been under age 31 as of June 15, 2007 (the issue date of the memorandum), physically present in the United States, entered the United States no later than five years before the memorandum's issue date, and have been continuously resident since then. In addition, the individual must have been under age 16 at the time of initial entry. As of the end of FY2024, there were 537,730 active DACA recipients.[75]

Like those covered by TPS, DED, and granted parole, DACA recipients can apply for employment authorization but have no dedicated path to LPR status. DACA has been subject to ongoing litigation challenging its legality but remains in effect as of the cover date of this report.[76] Currently, USCIS processes only DACA renewal applications and accompanying applications for employment authorization; it does not process initial DACA requests from individuals who have never had DACA.[77]

# Immigration Enforcement

Immigration enforcement involves the identification, investigation, apprehension, detention, prosecution, and removal (deportation) of foreign nationals who are inadmissible and/or become removable. Immigration enforcement encompasses enforcement of the INA's civil provisions (e.g., violations of admission requirements) as well as its criminal provisions (e.g., improper entry, marriage fraud, alien smuggling).

Two DHS agencies are primarily responsible for immigration enforcement. CBP is responsible for border security where foreign nationals enter at U.S. land, air, and sea ports of entry (POEs) and along U.S. borders between POEs.[78] ICE is responsible for enforcing immigration laws in the U.S. interior, including worksite enforcement; ICE also oversees immigration detention. Both agencies effectuate removals and returns of foreign nationals.

## Border Enforcement at Ports of Entry

Foreign nationals may arrive in the United States at 328 land, air, and sea POEs, which are managed by CBP's Office of Field Operations (OFO). OFO had 26,030 officers on staff at the end of FY2023.[79] OFO has the dual responsibility for facilitating the flow of lawful travel and trade while providing security at POEs against inadmissible persons and unlawful goods (e.g., unlawful firearms, imports, narcotics).

This includes screening at multiple points in the immigration process. DHS uses screening tools to distinguish low-risk travelers who may be eligible for expedited admissions processing from lesser-known, higher-risk travelers who are usually subject to more extensive secondary inspections.[80] Possession of a visa by a foreign national does not guarantee U.S. admission; a CBP officer may find the individual inadmissible.[81]

DHS is responsible for implementing an automated entry-exit system at POEs, a task Congress mandated in 1996.[82] Congress added a biometric requirement in 2001.[83] While CBP collects a portion of the requisite biographic and biometric data from noncitizens at various stages of their entry to and exit from the United States, the implementation of a fully automated biometric system has proven to be challenging.[84] DHS has fully implemented the biometric entry system at all U.S. ports of entry. Reportedly, the biometric exit system currently captures information on about 80% of foreign nationals aged 14-79 departing the United States via participating commercial air carriers. The biographic and biometric exit system is at various stages of completion for air, sea, and land POEs.[85]

## Border Enforcement Between Ports of Entry

Border enforcement between POEs protects against unauthorized land border entry into the United States. CBP's U.S. Border Patrol (USBP) works to prevent the unlawful entry of persons and contraband into the country between POEs at U.S. southern and northern land borders (approximately 6,000 miles) and coastal borders (2,000 miles). USBP's objectives include predicting, detecting, and identifying threats to national security; deploying personnel, equipment, and intelligence to secure the border; and classifying, prioritizing, and mitigating known threats.[86]

DHS reported in 2021 that since receiving authorization from Congress in 1996, approximately 701 miles of primary barriers have been built along the U.S.-Mexico border, which spans nearly 2,000 miles.[87] The second Trump Administration has announced plans to construct additional miles of border wall.[88] Tactical infrastructure also includes roads, gates, bridges, and lighting designed to support border enforcement and disrupt and impede illicit activity. Surveillance technology assists CBP in the detection, identification, and apprehension of individuals illegally entering the United States between POEs. Ground technology includes sensors, cameras, and radar tailored to fit specific terrain and population densities. Manned and unmanned aerial and marine surveillance vessels patrol regions inaccessible by motor vehicle.[89] At the end of FY2023, according to CBP data, there were approximately 19,000 U.S. Border Patrol agents on staff.[90]

In recent years, CBP has had record-high levels of enforcement encounters at the Southwest border. Encounters have reflected a diverse array of national origins and a relatively high rate of children and families, many seeking asylum.[91] Border enforcement encounters began to slow at the end of FY2024.[92]

Although CBP is primarily responsible for border enforcement, other agencies also play a role; including ICE, which provides transportation support and detention space and carries out removals; and ORR, which is responsible for the care and custody of unaccompanied alien children apprehended at the border.[93]

## Interior Immigration Enforcement

ICE's Enforcement and Removal Operations (ERO) is responsible for interior immigration enforcement, which involves the identification, apprehension, detention, supervision, transportation, and removal of aliens who violate U.S. immigration laws. These may include aliens who entered the United States without inspection, overstayed a nonimmigrant visa, or otherwise violated the terms of a lawful admission. DHS has prosecutorial discretion to set civil immigration enforcement priorities, which may vary over time and across Administrations.[94]

ERO operates programs to identify criminal and other removable aliens, including the Criminal Alien Program (CAP),[95] which "identifies, locates and arrests noncitizens in the custody of other law enforcement agencies, as well as those noncitizens released from other law enforcement agencies who were arrested for criminal activity."[96] CAP includes a data sharing infrastructure, or interoperability, between DHS and DOJ that screens for both immigration and criminal violations when individuals are booked into prisons or jails that participate in the program. To pursue known at-large criminal aliens and fugitive aliens outside of controlled settings (i.e., administrative offices or custodial settings), ICE uses the National Fugitive Operations Program. ICE's Section 287(g) program allows DHS to delegate certain immigration enforcement functions to specially trained state and local law enforcement officers, under federal supervision.[97]

ICE's interior enforcement responsibility includes worksite enforcement, which is conducted by ICE's Homeland Security Investigations (HSI) directorate. The INA prohibits an employer from knowingly hiring, recruiting or referring for a fee, or continuing to employ an alien who lacks work authorization.[98] Employers who violate prohibitions on unauthorized employment may be subject to civil monetary penalties and/or criminal penalties.

## Detention and Case Management

ICE's ERO is responsible for the nation's civil immigration detention system. The INA authorizes —and in some cases requires—DHS to detain foreign nationals who are subject to removal from the United States. Detention statutes are multifaceted and depend on several factors, such as whether the individual is seeking admission or has been lawfully admitted into the country,

has engaged in certain proscribed conduct, and has been issued a final order of removal. Four INA provisions provide a framework for immigration detention:

- INA Section 236(a) generally *authorizes* the detention of aliens pending a decision on whether the alien is to be removed from the United States and permits those who are not subject to mandatory detention to be released on bond or their own recognizance;

- INA Section 236(c) generally *requires* the detention of aliens who are removable because of specified criminal activity or terrorism-related grounds;

- INA Section 235(b) generally *requires* the detention of applicants for admission who appear subject to removal, including aliens arriving at a POE and certain other aliens who have not been admitted or paroled into the United States; and

- INA Section 241(a) generally *requires* an alien subject to a final order of removal to be held during the 90-day period when the alien's removal is effectuated. DHS may detain an alien beyond 90 days if the agency cannot effectuate removal and the alien falls within certain categories.[99]

In FY2024, apprehended aliens were held in 129 ERO detention facilities.[100] That year, ERO primarily detained aliens apprehended by CBP at the Southwest border and transferred to ICE custody, and aliens with criminal histories apprehended by ERO in the U.S. interior. ICE detained 37,684 persons at the end of FY2024.[101] Detention capacity is controlled largely through funding made available in congressional appropriations. Because detention capacity is limited, ICE may prioritize detaining certain populations (e.g., those subject to mandatory detention under the INA, those considered public safety or national security threats, and flight risks).[102]

ICE also manages a *non-detained docket* of individuals released from custody who are awaiting removal proceedings or subject to final orders of removal. At the end of FY2024, there were 7.6 million people on the non-detained docket, a nearly 25% increase from FY2023.[103] Some individuals on the non-detained docket are supervised under ERO's Alternatives to Detention (ATD) program. This program allows ICE to monitor certain aliens subject to removal who have been released into the United States, using technology (e.g., mobile applications, ankle monitors) and case management options (e.g., home visits, virtual check-ins).[104] ICE reported 179,000 ATD participants as of the end of FY2024.[105]

## Removal Processes

Removing foreign nationals who violate U.S. immigration and other laws is central to immigration enforcement, and the INA provides broad authority to DHS and DOJ to remove certain foreign nationals from the country. These persons include unauthorized aliens as well as lawfully present aliens who commit certain acts that make them removable. Any foreign national found to be inadmissible (either before or after U.S. entry; see the "Visa Issuance and Security"

section for information on grounds of inadmissibility) or deportable under grounds specified in the INA may be ordered removed.

Grounds of deportability specified in INA Section 237(a) include the following:

- being inadmissible at the time of entry[106] or violating one's immigration status;

- committing certain criminal offenses, including crimes of "moral turpitude," aggravated felonies, alien smuggling, and high-speed flight from an immigration checkpoint;[107]

- failing to register with DHS (if required) or committing document fraud;

- being a security risk (including violating any law relating to espionage, engaging in criminal activity that endangers public safety, partaking in terrorist activities, or assisting in Nazi persecution or genocide);

- becoming a public charge within five years of entry; or

- voting unlawfully.

Absent other factors, unlawful presence in the United States is a civil violation, not a criminal offense, and removal and its associated administrative processes are civil proceedings. The INA provides for multiple types of removal processes. DHS may commence *formal removal proceedings* by issuing a foreign national a Notice to Appear charging document and filing it with an immigration court within DOJ's EOIR.[108] Formal removal proceedings typically consist of multiple hearings before an EOIR immigration judge.[109] At the conclusion of proceedings, an immigration judge determines whether a foreign national is removable as charged. The immigration judge may grant certain forms of relief or protection (e.g., asylum, cancellation of removal) for which the alien has applied.

Under streamlined removal procedures, including *expedited removal* and *reinstatement of removal* (i.e., when DHS reinstates a removal order for an individual previously removed),[110] opportunities for relief and review are generally limited. Expedited removal allows DHS to remove an alien without a formal hearing under certain statutory conditions.[111] However, individuals subject to expedited removal may have an opportunity to pursue applications for asylum and other forms of protection from removal.[112]

Aliens with a final removal order must generally be removed by DHS within 90 days, during which time they may be detained.[113] Individuals with a final order of removal may be repatriated by DHS to their country of citizenship or to a third country. This process requires cooperation from the country designated for removal, which must confirm the individual's nationality, issue travel documents, and accept their physical return. Under a 2001 Supreme Court decision (*Zadvydas v. Davis*), detained aliens subject to removal orders but for whom there is "no significant likelihood of removal in the reasonably foreseeable future" must be released into the United States after six months, with limited exceptions.[114] DHS considers countries that refuse or delay the repatriation of their citizens to be *recalcitrant* or *uncooperative*.[115] Foreign nationals

who have been removed generally are ineligible to return to the United States for a minimum of five years.[116]

In other instances, foreign nationals may be repatriated through *returns,* including *voluntary returns*, *voluntary departure*, and *withdrawal of petition for admission*. Returns require foreign nationals to leave the United States promptly but exempt them from certain penalties associated with removal.

## Defenses Against Removal

INA provisions permit certain removable aliens to remain in the United States, either permanently or temporarily. Some of these options have already been described in previous sections of this report. Options that provide permanent relief by conferring or leading to LPR status include cancellation of removal (see the "Other Pathways to LPR Status" section) and defensive asylum applied for during removal proceedings (see the "Refugees and Asylees" section).[117] Individuals may also obtain temporary protection from removal through TPS, DED, and DACA (see the "Discretionary Permissions to Enter or Remain in the United States" section). Additional options that provide temporary relief from removal include withholding of removal, Convention Against Torture (CAT) protection, and deferred action.

Withholding of removal may be granted to foreign nationals who can demonstrate that it is more likely than not that if removed to their home country they would be persecuted on account of their race, religion, nationality, membership in a particular social group, or political opinion. Like asylum, withholding of removal protects people from removal to a country where they fear persecution. Withholding of removal is granted by an EOIR immigration judge. Unlike asylum, an immigration judge has no discretion and must grant withholding of removal to applicants who meet the requirements.[118] In addition, to be granted withholding of removal, applicants must prove that it is "more likely than not" that they will be persecuted based on a protected ground.[119]

CAT protection may be granted by an immigration judge to individuals who fear torture in their home country. To qualify, applicants must demonstrate that it is more likely than not that they will be tortured directly by or with the acquiescence of the government of their country of origin.[120] Withholding of removal and CAT protection provide no path to LPR status and allow for possible removal to a third country.[121]

Deferred action is a form of prosecutorial discretion exercised by DHS that temporarily defers removal against a covered individual.[122] Examples of deferred action may include DHS terminating removal proceedings, declining to initiate removal proceedings, or declining to execute a final order of removal. DACA is one type of deferred action (see the "Deferred Action for Childhood Arrivals" section). DHS has also implemented policies to provide deferred action to workers cooperating in employment and labor standards investigations, certain relatives of U.S. servicemembers and veterans, and crime victims awaiting adjudication of a petition for U nonimmigrant status.[123]

# Footnotes

[1]. The Immigration and Nationality Act (INA, P.L. 82-414) is codified, as amended, at 8 U.S.C. §§1101 et seq.

[2]. The INA defines "alien" as a person who is not a citizen or a national of the United States. INA §101(a)(3); 8 U.S.C. §1101(a)(3). In this report, the terms *alien*, *foreign national*, and *noncitizen* are synonymous.

[3]. Exceptions include citizens or nationals of the (currently) 42 Visa Waiver Program (VWP) designated countries, Canadian USMCA Professional Workers, and citizens of Canada and Bermuda; 8 C.F.R. §212.1. For more information, see CRS Report RL32221, *Visa Waiver Program*; and DOS, "Travel Without A Visa," https://travel.state.gov/content/travel/en/us-visas/tourism-visit/travel-without-a-visa.html.

[4]. Some nonimmigrant visas, including those for *H-1B specialty occupation workers*, *L intracompany transferees*, *K fiancés*, and *V accompanying family members* allow visa holders to simultaneously seek LPR status.

[5]. For more information, see CRS Report R45151, *Immigration Consequences of Criminal Activity*.

[6]. For more information, see CRS In Focus IF11467, *Immigration: Public Charge*; and CRS Legal Sidebar LSB10341, *DHS Final Rule on Public Charge: Overview and Considerations for Congress*.

[7]. With certain exceptions, persons who depart the United States after being unlawfully present for more than 180 days but less than one year are subject to a 3-year bar on admission; those who depart after being unlawfully present for at least one year are subject to a 10-year bar. INA §212(a)(9)(B); 8 U.S.C. §1182(a)(9)(B).

[8]. For more information, see CRS In Focus IF12662, *Immigration: Grounds of Inadmissibility*.

[9]. See INA §222(h), 8 U.S.C. §1202(h) and 22 C.F.R. §41.102 (requirements for nonimmigrant interviews), and 22 C.F.R. §42.62 and DOS, "Immigrant Visa Process," https://travel.state.gov/content/travel/en/us-visas/immigrate/the-immigrant-visa-process/step-10-prepare-for-the-interview/step-11-applicant-interview.html (requirements for immigrant visas).

[10]. INA §274C; 8 U.S.C. §1324c.

[11]. 18 U.S.C. §1546.

[12]. In this report, the term *admissions* broadly refers to the entry of aliens into the United States, either permanently or temporarily. Technically, aliens who immigrate permanently do so either *by being admitted* as LPRs (if arriving from abroad) or *by adjusting status* from a temporary status to LPR status (if residing in the United States). For more information on

permanent immigration, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*.

13. In this report, the terms *immigrant*, *lawful permanent resident*, and *green card-holder* are synonymous.

14. See, respectively, INA §201(c), INA §201(d), and INA §201(e). While the diversity visa category has not been directly amended since its enactment, the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA; P.L. 105-100) temporarily reduced the 55,000 annual ceiling beginning in FY1999 by up to 5,000 annually to offset immigrant numbers made available to certain unsuccessful asylum seekers from El Salvador, Guatemala, and formerly communist countries in Europe. In addition, the National Defense Authorization Act for Fiscal Year 2024 (P.L. 118-31) makes additional *special immigrant* EB-4 visas available for current or former employees of the U.S. government abroad who have at least 15 years of service (up to 3,500 in FY2024 and 3,000 in subsequent years). To ensure that no immigrant visas are issued beyond current total INA limits, the bill reduces the number of diversity visas available each year by the same number of EB-4 visas issued under this provision.

15. This means that the total number of (numerically limited) family-sponsored preference immigrants and employment-based immigrants from a single country each year is limited by this provision to 7% of the total (226,000 plus 140,000) or 25,620. For more background, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*.

16. For more information, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*.

17. USCIS, which processes and adjudicates most immigration-related applications and petitions, operates largely on fee revenue. A fee schedule for all applications and petitions can be found at https://www.uscis.gov/g-1055. For background information, see CRS Report R48021, *U.S. Citizenship and Immigration Services (USCIS): Operations and Issues for Congress*.

18. For more information, see CRS In Focus IF12662, *Immigration: Grounds of Inadmissibility*.

19. For more information, see DOS, "The Operation of the Immigrant Numerical Control System," https://travel.state.gov/content/dam/visas/Immigrant%20Visa%20Control%20System_operation%20of.pdf.

20. When the demand for such visas exceeds 226,000, the 226,000 limit also acts as a floor, below which the number of family preference immigrants cannot fall. More than 226,000 family preference immigrants can be admitted under current law only if the number of immediate relatives admitted, less the number of any unused employment-based preference numbers from the prior year as well as any immigrant visas issued to several other relatively minor groups, is fewer than 254,000 (the difference between 480,000 and

ED_01302

226,000). However, annual admissions of immediate relatives less unused employment-based preference numbers from the prior year have exceeded 254,000 every year since 2001. For instance, in FY2023 immediate relatives totaled 551,590. Under these statutory constraints, family-sponsored preference category immigrants are effectively limited to 226,000 per year.

[21]. For more information, see CRS Report R43145, _U.S. Family-Based Immigration Policy_.

[22]. For a complete list of special immigrant categories, see USCIS, "Employment-Based Immigration: Fourth Preference EB-4," at https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fourth-preference-eb-4.

[23]. The EB-5 visa was created through the Immigration Act of 1990 (P.L. 101-649). For more background, see CRS Report R44475, _EB-5 Immigrant Investor Program_.

[24]. For more information, see CRS Report R42866, _Permanent Legal Immigration to the United States: Policy Overview_.

[25]. INA §203(c); 8 U.S.C. §1153(c). For more information about diversity visas, see CRS Report R45973, _The Diversity Immigrant Visa Program_.

[26]. See archived CRS Report R45102, _Diversity Immigrants' Regions and Countries of Origin: Fact Sheet_ and DHS Office of Homeland Security Statistics, _2023 Yearbook of Immigration Statistics_.

[27]. Such individuals may register for the lottery again in subsequent years.

[28]. INA §101(a)(42); 8 U.S.C. §1101(a)(42). While persons seeking refugee status often reside in a second country that is neither their home country nor the United States, some reside in their home countries in certain circumstances. See §101(a)(42)(B); 8 U.S.C. §1101(a)(42)(B).

[29]. For more information about refugee admissions, see CRS Report R47399, _U.S. Refugee Admissions Program_.

[30]. For annual refugee ceilings and admissions from FY1981 through FY2022, see Appendix A in CRS Report R47399, _U.S. Refugee Admissions Program_.

[31]. The White House, "Presidential Determination on Refugee Admissions for Fiscal Year 2021," 85 _Federal Register_ 71219-71221, November 6, 2020. In May 2021, President Biden issued an emergency presidential determination to raise the FY2021 refugee ceiling to 62,500. See The White House, "Memorandum for the Secretary of State on the Emergency Presidential Determination on Refugee Admissions for Fiscal Year 2021," May 3, 2021.

[32]. The White House, "Presidential Determination on Refugee Admissions for Fiscal Year 2025," 89 _Federal Register_ 83767, September 30, 2024.

[33]. DOS, Bureau of Population, Refugees, and Migration, "Summary of Refugee Admissions as of October 31, 2024," https://www.wrapsnet.org/admissions-and-arrivals/.

34. INA §209(a); 8 U.S.C. §1159(a).

35. INA §208(a)(1); 8 U.S.C. §1158(a)(1).

36. INA §208; 8 U.S.C. §1158. For information on statutory bars on applying for asylum, see CRS Legal Sidebar LSB10815, *An Overview of the Statutory Bars to Asylum: Limitations on Applying for Asylum (Part One)*.

37. For more information about affirmative asylum, see CRS Report R48249, *What Is Affirmative Asylum?*.

38. For more information about defensive asylum, see CRS Report R47504, *Asylum Process in Immigration Courts and Selected Trends*.

39. INA §209(b); 8 U.S.C. §1159(b).

40. For a detailed and complete list of categories of foreign nationals receiving LPR status, see DHS, Office of Homeland Security Statistics, *2023 Yearbook of Immigration Statistics*, Table 7.

41. INA §240A; 8 U.S.C. §1229b.

42. INA §240A(e); 8 U.S.C. §1229b(e).

43. INA §101(a)(15)(U); 8 U.S.C. §1101(a)(15)(U).

44. INA §214(p)(2); 8 U.S.C. §1184(p)(2). There is no limit for family members who derive U status or T status from the principal applicant, such as spouses, children, or other eligible family members. For more information, see CRS Report R47404, *Immigration Relief for Noncitizen Crime Victims*.

45. INA §101(a)(15)(T); 8 U.S.C. §1101(a)(15)(T). For more information, see CRS Report R46584, *Immigration Relief for Victims of Trafficking* and CRS Report R47404, *Immigration Relief for Noncitizen Crime Victims*.

46. Exceptions may be granted to individuals who are unable to cooperate with a request for assistance due to physical or psychological trauma or because they are under age 18. INA §101(a)(15)(T)(i)(III); 8 U.S.C. §1101 (a)(15)(T)(i)(III).

47. INA §214(o)(2), 8 U.S.C. §1184(o)(2); INA §245(l)(4)(A), 8 U.S.C. §1255(l)(4)(A).

48. INA §316; 8 U.S.C. §1427. For more information, see CRS Report R43366, *U.S. Naturalization Policy* and CRS In Focus IF12322, *Naturalization: Policy Overview and Selected Trends*.

49. The INA contains provisions for expedited naturalization through qualifying military service, INA §§328, 329; 8 U.S.C. §§1439, 1440. For more information, see CRS Report R48163, *Foreign Nationals in the U.S. Armed Forces: Immigration Issues*.

50. INA §319; 8 U.S.C. §1429.

51. USCIS, "Naturalization Statistics," https://www.uscis.gov/citizenship-resource-center/naturalization-statistics, January 24, 2025.

52. U.S. Census Bureau, 2023 American Community Survey data, 1-year estimates.

ED_01304

53. Sarah Miller, *Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2024 and Revised 2023*, DHS Office of Homeland Security Statistics, September 2024.

54. INA §340(a); 8 U.S.C. §1451(a).

55. INA §101(a)(15); 8 U.S.C. §1101(a)(15).

56. For more information, see CRS Report R45040, *Immigration: Nonimmigrant (Temporary) Admissions to the United States*.

57. INA §214(b); 8 U.S.C. §1184(b). Many temporary visa holders eventually are able to adjust their status to LPR status after they have been admitted to the United States as nonimmigrants. In FY2023, for example, of the 1,172,910 foreign nationals who were granted LPR status, 564,660 (48%) were new arrivals from abroad and 608,260 (52%) adjusted status from a nonimmigrant status while residing in the United States. Data to show the nonimmigrant categories that foreign nationals adjust status from are unavailable. See DHS *2023 Yearbook of Immigration Statistics*, Table 6.

58. For a list of nonimmigrant categories and annual numerical limits, see CRS Report R45938, *Nonimmigrant and Immigrant Visa Categories: Data Brief*.

59. See CRS Report R45938, *Nonimmigrant and Immigrant Visa Categories: Data Brief* and DOS, Bureau of Consular Affairs, *Report of the Visa Office 2023.*

60. 8 C.F.R. §212.6

61. DOS, Bureau of Consular Affairs, *Report of the Visa Office 2023,* Table XVI.

62. 8 C.F.R. §235.1.

63. For more information, see CRS Report RL32221, *Visa Waiver Program*.

64. See DHS Office of Homeland Security Statistics, *2023 Yearbook of Immigration Statistics*, Table 25.

65. For more information, see CRS Report R47848, *Nonimmigrant Overstays: Overview and Policy Issues*.

66. INA §244, 8 U.S.C. §1254a. For more information, see CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*.

67. For more information, see CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*.

68. For more information, see CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*.

69. INA §212(d)(5); 8 U.S.C. §1182(d)(5).

70. Cubans are an exception because Congress established a special pathway to LPR status for Cuban parolees under the Cuban Adjustment Act of 1966 (P.L. 89-732).

71. For more information, see CRS Report R46570, *Immigration Parole*.

72. See, for example, DHS, "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 *Federal Register* 56, March 25, 2025. For more information on Biden Adminstration-era special parole processes, see CRS Report R47654, *Immigration Options for Immigration Parolees*; for information on legal debates and changes under the second Trump Administration, see CRS Legal Sidebar LSB11102, *Humanitarian Parole Authority: A Legal Overview and Recent Developments* and CRS Legal Sidebar LSB11265, *Recent White House Actions on Immigration*.

73. For more information, see CRS Report R46764, *Deferred Action for Childhood Arrivals (DACA): By the Numbers*.

74. USCIS, "Glossary," https://www.uscis.gov/tools/glossary.

75. At that time, DACA recipients' average age was 30.6. USCIS, "Count of Active DACA Recipients as of September 30, 2024," available from USCIS, "Immigration and Citizenship Data," https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

76. For more information, see CRS Legal Sidebar LSB10625, *The Legality of DACA: Recent Litigation Developments*.

77. USCIS, "Consideration of Deferred Action for Childhood Arrivals," https://www.uscis.gov/DACA, January 24, 2025.

78. This report does not cover immigration enforcement along U.S. coastal waters, which the U.S. Coast Guard, Alien Migrant Interdiction Operations oversees. For more information, see DHS, Office of Homeland Security Statistics, *U.S. Coast Guard Maritime Response Activities Fiscal Year 2020-2023*.

79. U.S. Government Accountability Office (GAO), *U.S. Customs and Border Protection: Efforts to Improve Recruitment, Hiring, and Retention of Law Enforcement Personnel*, GAO-24-107029, September 2024.

80. For more information, see CRS Report R46783, *Trusted Traveler Programs*.

81. INA §221(h); 8 U.S.C. §1201(h).

82. This requirement was enacted in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA, P.L. 104-208), Section 110.

83. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act, P.L. 107-56), Section 414.

84. For more information, see CRS Report R47541, *Immigration: The U.S. Entry-Exit System*.

85. For more information, see CRS Report R47541, *Immigration: The U.S. Entry-Exit System*.

86. USBP, *2024-2028 Strategy,* March 2024.

87. CBP and U.S. Army Corps of Engineers, "Border Wall Status – January 8, 2021." For more information, see CRS Report R45888, *DHS Border Barrier Funding Through FY2021* and U.S. Government Accountability Office, *Southwest Border Security: Additional Actions Needed to Better Assess Fencing's Contributions to and Operations and Provide Guidance*

for Identifying Capability Gaps, GAO-17-331, February 2017. During the Biden Administration, wall construction was largely halted; however, some projects were approved to complete gaps in existing border barriers. See DHS, "DHS to Address Life, Safety, and Operational Requirements in the U.S. Border Patrol's Yuma Sector," July 28, 2022, and CRS Report R47979, _DHS Border Barrier Funding Developments: FY2021-FY2024_.

88. For example, in March 2025 CBP announced plans to complete seven miles of new border wall in the USBP's Rio Grande Valley Sector with FY2021 funds. CBP, "CBP awards first border wall contract of President Trump's second term," March 15, 2025.

89. See archived CRS Insight IN11040, _Border Security Between Ports of Entry: Homeland Security Issues in the 116th Congress_.

90. GAO, _U.S. Customs and Border Protection: Efforts to Improve Recruitment, Hiring, and Retention of Law Enforcement Personnel_, GAO-24-107029, September 2024.

91. Among all CBP encounters at the Southwest border, the proportion with children and family units was 41% in FY2025 through February, 43% in FY2024, 39% in FY2023, and 30% in FY2022. CBP, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters. See also Figure 2 in archived CRS Report R47556, _U.S. Border Patrol Encounters at the Southwest Border: Fact Sheet_.

92. CBP, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters.

93. Unaccompanied alien children are children who are under age 18, lack lawful immigration status in the United States, and do not have a parent or legal guardian in the United States, or a parent or legal guardian who is available to provide care and physical custody. For more information, see CRS Report R43599, _Unaccompanied Alien Children: An Overview_.

94. For more information, see CRS Legal Sidebar LSB10578, _The Biden Administration's Immigration Enforcement Priorities: Background and Legal Considerations_ and CRS Legal Sidebar LSB10362, _Immigration Arrests in the Interior of the United States: A Primer_.

95. The program has also been referred to as the Criminal Apprehension Program. An ICE website, https://www.ice.gov/identify-and-arrest/criminal-alien-program, updated January 27, 2025, refers to this program as the Criminal Alien Program; its FY2024 annual report uses Criminal Apprehension Program; ICE, _ICE Annual Report FY2024_, p. 93.

96. ICE, _ICE Annual Report FY2024_, p. 15.

97. For background information, see CRS In Focus IF11898, _The 287(g) Program: State and Local Immigration Enforcement_.

98. INA §274A; 8 U.S.C. §1324a.

99. This material is adapted from CRS In Focus IF11343, _The Law of Immigration Detention: A Brief Introduction_. For more information on standards and criteria for making detention decisions, see also CRS Report R45915, _Immigration Detention: A Legal Overview_.

ED_01307

100. This number includes facilities owned and operated by ICE, a state or local entity, or a contractor and excludes "hold rooms, hospital, and juvenile facilities." ICE, *Annual Report Fiscal Year 2024,* p. 22. See also ICE, "Detention Management," https://www.ice.gov/detain/detention-management.

101. ICE, *Annual Report Fiscal Year 2024*, p. 23.

102. See ICE, *Annual Report Fiscal Year 2024*, p. 22 and CRS Report R45915, *Immigration Detention: A Legal Overview*.

103. ICE, *Annual Report Fiscal Year 2024*, p. 27.

104. See ICE, "Alternatives to Detention," https://www.ice.gov/features/atd.

105. ICE, *Annual Report Fiscal Year 2024*, p. 29.

106. Grounds of inadmissibility are outlined in INA Section 212; 8 U.S.C. §1182. If individuals are removed because they were inadmissible at the time of entry, they are removed under INA Section 212, not INA Section 237. For more information, see CRS In Focus IF12662, *Immigration: Grounds of Inadmissibility*.

107. C*rimes of moral turpitude* are determined by case law. For more information, see CRS Report R45151, *Immigration Consequences of Criminal Activity*.

108. INA §239; 8 U.S.C. §1229. For more information on immigration courts, see CRS Report R47077, *U.S. Immigration Courts and the Pending Cases Backlog*.

109. INA §240; 8 U.S.C. §1229a. For more information about formal removal proceedings, see CRS In Focus IF11536, *Formal Removal Proceedings: An Introduction*.

110. For more information about reinstatement of removal, see CRS In Focus IF11736, *Reinstatement of Removal Orders: An Introduction*.

111. INA §235(b)(1); 8 U.S.C. §1225. For more information about expedited removal, see CRS In Focus IF11357, *Expedited Removal of Aliens: An Introduction*.

112. For more information, see CRS Report R48078, *Credible Fear and Defensive Asylum Processes: Frequently Asked Questions*.

113. INA §241(a); 8 U.S.C. §1231(a).

114. For more information, see CRS Report R45915, *Immigration Detention: A Legal Overview*.

115. For more information, see CRS In Focus IF11025, *Immigration: "Recalcitrant" Countries and the Use of Visa Sanctions to Encourage Cooperation with Alien Removals*.

116. INA §212(a)(9)(A); 8 U.S.C. §1182(a)(9)(A). For more information, see CRS In Focus IF12484, *The Statutory Bars to Reentry into the United States*.

117. If an individual is subject to removal but has not been placed in removal proceedings, they may apply for affirmative asylum.

118. For more information, see CRS Report R48078, *Credible Fear and Defensive Asylum Processes: Frequently Asked Questions*.

119. INA §241(b)(3)(A); 8 U.S.C. §1231(b)(3)(A), INS v. Stevic, 467 U.S. 407, 424, 429–30 (1984) (explaining that an application for withholding of removal must "be supported by evidence establishing that it is more likely than not that the alien would be subject to persecution on one of the specified grounds."). For more information, see CRS Report R48078, *Credible Fear and Defensive Asylum Processes: Frequently Asked Questions*.

120. See archived CRS Report RL32276, *The U.N. Convention Against Torture: Overview of U.S. Implementation Policy Concerning the Removal of Aliens* (available to congressional clients upon request to CRS).

121. For more information, see "Asylum and Related Forms of Relief" in CRS Report R48078, *Credible Fear and Defensive Asylum Processes: Frequently Asked Questions*.

122. According to DHS, "Although deferred action does not confer lawful status or excuse any past or future periods of unlawful presence, a noncitizen granted deferred action is considered lawfully present in the United States for certain limited purposes, while the deferred action is in effect." DHS, "DHS Support of the Enforcement of Labor and Employment Laws," January 6, 2025.

123. See USCIS, "DHS Support of the Enforcement of Labor and Employment Laws," last updated January 24, 2025.

Disclaimer:
These documents were prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

**PUBLIC INSPECTION DOCUMENT**

This site displays a prototype of a "Web 2.0" version of the daily Federal Register. It is not an official legal edition of the Federal Register, and does not replace the official print version or the official electronic version on GPO's govinfo.gov.

The documents posted on this site are XML renditions of published Federal Register documents. Each document posted on the site includes a link to the corresponding official PDF file on govinfo.gov. This prototype edition of the daily Federal Register on FederalRegister.gov will remain an unofficial informational resource until the Administrative Committee of the Federal Register (ACFR) issues a regulation granting it official legal status. For complete information about, and access to, our official publications and services, go to About the Federal Register on NARA's archives.gov.

The OFR/GPO partnership is committed to presenting accurate and reliable regulatory information on FederalRegister.gov with the objective of establishing the XML-based Federal Register as an ACFR-sanctioned publication in the future. While every effort has been made to ensure that the material on FederalRegister.gov is accurately displayed, consistent with the official SGML-based PDF version on govinfo.gov, those relying on it for legal research should verify their results against an official edition of the Federal Register. Until the ACFR grants it official status, the XML rendition of the daily Federal Register on FederalRegister.gov does not provide legal notice to the public or judicial notice to the courts.

**PUBLIC INSPECTION DOCUMENT**

# Restoring Public Service Loan Forgiveness

A Presidential Document by the Executive Office of the President on 03/12/2025

**PUBLISHED CONTENT - DOCUMENT DETAILS**

**Agency:** Executive Office of the President
**Document Citation:** 90 FR 11885
**Document Number:** 2025-04103
**Document Type:** Presidential Document
**Presidential Document Type:** Executive Order
**EO Citation:** EO 14235
**Pages:** 11885-11886 (2 pages)
**Publication Date:** 03/12/2025

**READER AIDS**

Executive order notes are compiled and maintained by the Office of the Federal Register editors.

**EO Citation:** EO 14235
**President:** Donald J. Trump
**Signing Date:** March 7, 2025

ED_01310

**PUBLISHED DOCUMENT**

(⬜ printed page 11885)

Executive Order 14235 (/executive-order/14235) of March 7, 2025

# Restoring Public Service Loan Forgiveness

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1** . *Purpose*. In 2007, the Congress established the Public Service Loan Forgiveness (PSLF) Program to encourage Americans to enter the public service sector by promising to forgive their remaining student loans after they completed 10 years of service in those jobs while making 10 years of minimum payments.

The prior administration abused the PSLF Program through a waiver process, using taxpayer funds to pay off loans for employees still years away from the statutorily required number of payments. Moreover, instead of alleviating worker shortages in necessary occupations, the PSLF Program has misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values, sometimes through criminal means. The PSLF Program also creates perverse incentives that can increase the cost of tuition, can load students in low-need majors with unsustainable debt, and may push students into organizations that hide under the umbrella of a non-profit designation and degrade our national interest, thus requiring additional Federal funding to correct the negative societal effects caused by these organizations' federally subsidized wrongdoing.

As President of the United States, I have a duty to protect, preserve, and defend the Constitution and our national security, which includes ending the subsidization of illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and disruption of the public order, which threaten the security and stability of the United States. Accordingly, it is the policy of my Administration that individuals employed by organizations whose activities have a substantial illegal purpose shall not be eligible for public service loan forgiveness.

ED_01311

**Sec. 2** . *Restoring Public Service Loan Forgiveness.* The Secretary of Education shall propose revisions to 34 CFR 685.219 (https://www.ecfr.gov/current/title-34/section-685.219), Public Service Loan Forgiveness Program, in coordination with the Secretary of the Treasury as appropriate, that ensure the definition of "public service" excludes organizations that engage in activities that have a substantial illegal purpose, including:

(a) aiding or abetting violations of 8 U.S.C. 1325 (https://www.govinfo.gov/link/uscode/8/1325) or other Federal immigration laws;

(b) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189 (https://www.govinfo.gov/link/uscode/8/1189), or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(c) child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law;

(d) engaging in a pattern of aiding and abetting illegal discrimination; or

(e) engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways. (⬚ printed page 11886)

**Sec. 3** . *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(https://img.federalregister.gov/TRUMP/TRUMP_original_size.png)

THE WHITE HOUSE,
March 7, 2025.

[FR Doc. 2025-04103 (/d/2025-04103)
Filed 3-11-25; 11:15 am]

Billing code 3395-F4-P

**PUBLISHED DOCUMENT**

Home › Manage Loans › Student Loan Forgiveness › Public Service Loan Forgiveness

# Public Service Loan Forgiveness (PSLF)



**On This Page**

Qualifying for PSLF

Qualifying Employment

Full-time Employment

Eligible Loans

Qualifying Payments

Qualifying Repayment Plans

PSLF Process

How to Submit the PSLF Form

The U.S. Department of Education published its final PSLF program regulations that will be effective on July 1, 2026. The program is not changing today, and borrowers do not need to take any action.

If you're employed by a government or not-for-profit organization, you might be eligible for the PSLF Program. The PSLF Program forgives the remaining balance on your Direct Loans

- after you've made the equivalent of 120 qualifying monthly payments under an accepted repayment plan, and
- while working full-time for an eligible employer.

**How to Apply for PSLF**

To be considered for PSLF, you only need to submit a PSLF form. The easiest way to do this is by using the PSLF Help Tool. The PSLF Help Tool allows you to:

1. Check to see if your employer is already in our employer database.

2. Request that your employer's eligibility be reviewed if it is not already in our database or has not yet had its eligibility determined.

3. Prepare and sign your PSLF form, and request certification and signature from your employer—all electronically.

4. Generate your PSLF form for manual signature and submission.

Top tip: Certify your employment every year and any time you change employers. This lets you confirm you're on track toward forgiveness.

PSLF Resources

PSLF Help Tool

PSLF Employer Search

PSLF Frequently Asked Questions

Public Service Loan Forgiveness (PSLF) & Temporary Expanded PSLF (TEPSLF) Certification & Application



Submit a PSLF Reconsideration Request

Public Service Loan Forgiveness (PSLF) Buyback

## Qualifying for PSLF

To qualify for PSLF, you must

- be employed by a U.S. federal, state, local, or tribal government or qualifying not-for-profit organization (federal service includes U.S. military service);

- work full-time for that agency or organization;

- have Direct Loans (or consolidate other federal student loans into a Direct Loan);

- repay your loans under an income-driven repayment plan or a 10-year Standard Repayment Plan; and

- make a total of 120 qualifying monthly payments that need not be consecutive.

Note: Upon reaching 120 qualifying payments while preparing your final PSLF form certifying your employment, make sure that the employment period is checked as "still employed" or certified (signed) by your employer in the same month as your employment end date.

## Qualifying Employment

Qualifying employment for PSLF isn't about the specific job that you do for your employer—it's about who you work for. Use our employer search tool to see if your employer qualifies for PSLF.

### Which Employer Types Are Eligible

| Eligible | Ineligible |
|---|---|
| <ul><li>U.S.-based government organizations at any level (federal, state, local, or tribal) – this includes the U.S. military</li><li>Not-for-profit organizations that are tax-exempt under Section 501(c)(3) of the Internal Revenue Code</li><li>Other not-for-profit organizations that devote a majority of their full-time equivalent employees to providing certain qualifying public services</li></ul> | <ul><li>For-profit organizations, including for-profit contracted organizations</li><li>Labor unions</li><li>Partisan political organizations</li></ul> |

**Note:** Serving as a full-time AmeriCorps or Peace Corps volunteer also counts as qualifying employment for the PSLF Program.

What is a Professional Employer Organization (PEO)? And how does employment with a PEO affect eligibility for PSLF? ⌄

Am I eligible for PSLF if I'm a contractor? ⌄

What do I do if my employer has closed or is unable or unwilling to certify my employment? ⌄

### A Message for Employers

Have you received a request to certify and digitally sign an employee's PSLF form? Borrowers seeking to benefit from PSLF are required to submit a PSLF form that verifies their employer and the dates of employment. Support your employee(s): learn how to complete the certification and signature process.

Hi! Need help?

## Full-time Employment

For PSLF, full-time employment is working for a qualifying employer(s) for a weekly average, alone or when combined, equal to at least 30 hours:

- during the period being certified;

- throughout a contractual or employment period of at least 8 months in a year, such as elementary and secondary school teachers, in which case the borrower is deemed to have worked full time for the entire year; or

- determined by multiplying each credit or contact hour taught per week by at least 3.35 in non-tenure track employment at an institution of higher education.

Routine paid vacation or paid leave time provided by an employer, and leave taken under the *Family and Medical Leave Act of 1993* (29 U.S.C. 2612(a)(1)) is to be included when determining if you are working full-time.

Time spent on religious instruction, worship services, or any form of proselytizing as a part of your job responsibilities should be included when determining if you are working full-time.

However, time spent providing volunteer work or services for which you are not paid should not be included when determining if you are working full-time.

## Eligible Loans

Any loan received under the William D. Ford Federal Direct Loan (Direct Loan) Program qualifies for PSLF.

| Eligible | Ineligible |
|---|---|
| • Direct Subsidized Loans<br>• Direct Unsubsidized Loans<br>• Direct PLUS Loans<br>• Direct Consolidation Loans | • Federal Family Education Loan (FFEL)<br>• Federal Perkins Loan (Perkins Loan)<br>• Student loans from private lenders |

While a Direct PLUS loan made to a parent borrower is eligible for PSLF, it cannot be paid via a qualifying repayment plan (other than the 10-year standard repayment plan or a plan where the payment is equal or greater than the 10-year standard plan) unless it is first consolidated into a Direct Consolidation Loan.

FFEL and Perkins loans may become eligible if you consolidate them into a Direct Consolidation Loan.

**Payment Credits on Consolidation Loans**

If you consolidate your loans on or after September 1, 2024, the qualifying payments made on the Direct Loans (other loan types will not be considered) included in your consolidation loan will be credited to your consolidation loan using a weighted average of those payments. Borrowers are strongly encouraged to certify all their qualifying employment applicable to the loans before they are consolidated to ensure that weighted average is correctly applied.

For example, a borrower with 60 qualifying payments on a Direct Loan with a balance of $30,000 who consolidates their loan with another Direct Loan with a balance of $30,000 with zero qualifying payments will have a new qualifying payment count of 30 payments credited to the new consolidation loan.

As part of the payment count adjustment, ED will allow qualifying payments from all loans included in a Direct Consolidation Loan, including FFEL Program and Perkins loans, to contribute toward the qualifying payment count on the Direct Consolidation Loan. The payment count adjustment will not use a weighted average. See the payment count adjustment for additional details.

Because of recent changes to the law, borrowers will be able to separate joint consolidation loans. We're working on implementing these changes and will provide updates on our Joint Consolidation Loan Separation News page.

## Qualifying Payments

A qualifying monthly payment is one you make while employed full-time by a qualifying employer (after October 1, 2007) at any time during that month

- while under a qualifying repayment plan, and

- for the full amount due as shown on your bill; or



- when you are in one of the accepted types of deferments or forbearance at any time during that month.

Note: as a result of the CARES Act, months that you were in repayment while the requirement to make a payment was paused, count as qualifying payments if you also certify your employment for the same period of time.

Your 120 qualifying monthly payments don't need to be consecutive. For example, if you have a period of employment with a nonqualifying employer, you will not lose the payment counts for prior qualifying payments you made.

The best way to ensure that you are making on-time, complete payments is to sign up for automatic debit with your loan servicer.

| | |
|---|---|
| Which deferments and forbearances count as qualifying payments? | ⌄ |

| | |
|---|---|
| What types of qualifying payments will be allowed for the payment count adjustment? | ⌄ |

| | |
|---|---|
| Can I make a qualifying payment while in a period of forbearance, deferment, or in a grace period? | ⌄ |

## Qualifying Repayment Plans

Qualifying repayment plans include all income-driven repayment (IDR) plans (plans that base your monthly payment on your income and household size) and the 10-year Standard Repayment Plan.

There are several IDR plans:

- Income-Based Repayment (IBR) Plan
- Income-Contingent (ICR) Plan
- Pay As You Earn (PAYE) Plan
- Saving on a Valuable Education (SAVE) Plan

While payments made under the 10-year Standard Repayment Plan are qualifying payments, you might have to change to an IDR plan to benefit from PSLF. Under the 10-year Standard Repayment Plan, generally your loans will be paid in full once you have made 120 qualifying PSLF payments so there would be no balance left to forgive unless periods of qualifying deferments or forbearances are included in your 120 qualifying payments.

Not all borrowers qualify for every IDR plan. Your monthly payment amount could increase under these plans, depending on your income. You could pay off your loan before qualifying for forgiveness depending on the amount that you owe. Use the Loan Simulator to review your options.

The following repayment plans do not qualify for PSLF:

Standard Repayment Plan for Direct Consolidation Loans

Graduated Repayment Plan

Extended Repayment Plan

While these plans do not qualify under PSLF, these plans are eligible for the Temporary Expanded PSLF (TEPSLF) opportunity.

## PSLF Process

Because you have to make 120 qualifying monthly payments, it will take at least 10 years before you can qualify for PSLF.

*Important*: You must still be working for a qualifying employer at the time you submit your form for forgiveness.



Whether you have made 120 qualifying payments, or not, you should fill out and submit the <u>PSLF form</u> annually or whenever you change employers. Otherwise, you'll have to submit PSLF forms for each employer you worked for all at once. It could become difficult to contact those employers after such a long time or you could discover that some of your employers do not qualify.

Either way, we'll use the information you provide on the form to let you know if you are making qualifying PSLF payments. This will help you determine if you're on the right track as early as possible.

### PSLF Form Process and Contact Info

We will process your PSLF form and determine how many qualifying payments you made during the employment period on your form and you'll receive a letter telling you the number of qualifying payments you have made. Log in to <u>StudentAid.gov</u> and go to My Aid in your Dashboard to see your PSLF progress.

The number of qualifying payments you have made will be updated **only** when you submit another PSLF form that documents a new period of qualifying employment.

Once your cumulative total of qualifying payments reaches 120, we will confirm your eligibility and work with your servicer to forgive your remaining balance.

## How to Submit the PSLF Form

You can submit the PSLF form digitally through the PSLF Help Tool or manually, using a paper form. Open the sections below to read more.

| Digital Signatures With the PSLF Help Tool | ⌄ |
|---|---|

| Manual PSLF form | ⌄ |
|---|---|

### Additional Links

Repayment Plans

Income-Driven Repayment Plans

Student Loan Consolidation

Public Service Loan Forgiveness (PSLF) Help Tool

Public Service Loan Forgiveness FAQs

Public Service Loan Forgiveness Application

Was this page helpful? *

👍   👎

Submit

🦉 Hi! Need help?



Published on National Council of Nonprofits (https://www.councilofnonprofits.org)

Original URL: https://www.councilofnonprofits.org/reports/nonprofit-workforce-shortages-crisis-affects-everyone

# Nonprofit Workforce Shortages: A Crisis That Affects Everyone

Charitable nonprofits around the country are reporting significant difficulties retaining staff and filling vacancies. What was initially considered a challenge has now become a workforce crisis in need of immediate remedy and commitment to overcome longstanding problems exacerbated by the COVID-19 pandemic. While job vacancies in the government and business sectors may cause disappointment and lost profits, the lack of adequate nonprofit staffing means the public suffers delayed or complete loss of needed services.

**Latest data on this issue**: in April 2023, the networks of the National Council of Nonprofits conducted a new nationwide survey to secure the latest, comprehensive information about the nonprofit workforce. See the results .

## Why It Matters

When organizations dedicated to serving the public good can't secure the workforce to provide vital services, their communities suffer. While staffing shortages in delivery services result in longer times to receive a package, staffing shortages in direct-care services mean that families and individuals cannot access life-saving support. When a nonprofit closes, the ripple effects cannot be ignored: communities lose access to food, shelter, mental health care, and other vital services. Nonprofits are doing their part to raise **awareness** of the challenge to whole communities, to collect and **analyze** data to identify the problem and solutions, and take **action** to protect our communities.

> "At this stage in the pandemic, more assistance is clearly needed ... One such new challenge, the nonprofit workforce shortage, demands your immediate attention."

-Nonprofit Community Letter, Updated June 13, 2022

## The Scope and Impact of Nonprofit Workforce Shortages

In the fall of 2021, the networks of the National Council of Nonprofits posted an online survey to gauge the scope of the workforce shortage problems for charitable organizations and determine the impact on their abilities to advance their missions. The analysis, benefitting from responses from more than 1,000 nonprofits from all 50 states, presented a picture of the adverse consequences of workforce shortages. The analysis utilizes responses and comments from nonprofits nationwide to explain the causes and impacts of the nonprofit workforce shortage and propose solutions to pursue in upcoming legislative sessions.

# Nonprofit Workforce Shortages: A Crisis that Affects Everyone

Since the publication of the special report in December 2021, governments at all levels have taken some actions to alleviate workforce shortages. However, the crisis continues to grow, which hurts individuals when organizations do not have enough employees to meet the public's needs. Now it the time for public officials to commit to advancing policy solutions at the local, state and federal levels to eliminate a crisis that affects everyone.

# July 2022 Update

## The Challenges Continue

Organizations without adequate levels of personnel cannot deliver the same volume of services, much less respond to growing demands. The labor market is active: more than 11 million jobs were posted in May 2020 and roughly 4.3 million workers quit or changed jobs that month, according to the Bureau of Labor Statistics. That agency does not specify nonprofit jobs, so nonprofits are forced to rely on anecdotal evidence to determine whether job applicants are taking work in the for-profit or governmental sectors, and which subsectors, if any, are close to their pre-pandemic employment levels.

**Government Policies Hurt the Financial Sustainability of Nonprofits**

Nearly four out of five (79%) nonprofits responding to the National Council of Nonprofits' survey reported that **salary competition** impacted their ability to hire. Yet too often nonprofits cannot raise wages or change their compensation packages because they lack the financial capacity to do so. Frustratingly, government policies continue to exacerbate the lack of resources.

- Expired Charitable Giving Incentives: Congress allowed the universal charitable deduction to expire at the end of 2021, depriving charitable nonprofits of this meaningful source of revenues when it was most needed to address workforce and service needs.
- Retroactive Repeal of the Employee Retention Tax Credit (ERTC): The premature repeal of the law meant that organizations were denied resources to keep people on the job and perhaps pay a little more to retain and attract staff.
- Government Grants and Contract Challenges: Recurring flaws include failing to adjust reimbursement rates to reflect real costs. Another hindrance occurs when governments restrict the hourly rates they will reimburse the nonprofits they hire to provide services to the public on behalf of government.
- Increased Costs - Wages, Inflation, Gasoline: Unlike for-profit businesses that can raise the costs they charge, government policies and economic realities prevent nonprofits from doing the same.
- Increased Volumes of Work: The rising volume of work by people seeking services at understaffed nonprofits often faced waiting lists for services or outright denial of services when organizations could no longer accept new clients or referrals.

ED_01320

## Solutions Identified by Frontline Nonprofits

So far in 2022, nonprofits are seeing some progress in the exploration of policy solutions, but additional policy changes and wider adoption of proven approaches need to be implemented as quickly as possible to protect the public.

- All Governments - Prioritize Equity from the Outset: Intentionally seek out solutions identified by marginalized and under-resourced communities that would overcome barriers blocking access to services and support for providing services.
- Congress - Reinstate and Extend Expired Tax Provisions: The expiration of the Employee Retention Tax Credit and the Universal Charitable Deduction deprive charitable nonprofits of the resources they need to overcome the workforce shortages adversely affecting the public. Attention must also be given to additional **disaster-relief giving incentives** that expired on December 31, 2021 - the provision permitting individuals who itemize to deduct charitable donations up to 100% of their adjusted gross income and the measure allowing corporations to deduct charitable donations up to 25% of taxable income.
- States - Promote Affordable Child Care: Another challenge to employee recruitment and retention is the inability of prospective and current employees to find affordable child care.
- State & Local Governments - Cost of Living Adjustments (COLAs): Just as governments increase their own spending to reflect costs of providing services, they must also annually adjust their grants and contracts with nonprofit service providers to cover rising costs of living and actual costs that the nonprofits incur doing work for those governments.
- State & Local Governments - Payment of Indirect Costs: Reimburse charitable nonprofits their actual indirect cost rates, as required under federal regulations, which state and local governments should adopt when using their own funds to provide efficiencies and consistency across governmental agencies.

In addition, to help nonprofits grappling with the operational aspects of the workforce shortages, we published a series of articles describing creative approaches that can elevate equity, address burnout and stress, and discover, nurture, and develop talent in nontraditional ways.

# December 2021 Report Highlights

## Scope of the Problem

The core question the survey explored was, "What is your nonprofit's current job vacancy rate?"

- Nearly one quarter (24.2%) reported vacancies of fewer than 9 percent
- One in three nonprofits (33.5%) shared job vacancy rates of between 10 percent and 19 percent
- A troubling 26.2% responded that they had job openings for 20 percent to 29 percent of their positions.
- Another 16.1% percent reported vacancies greater than 30 percent.

## Waiting List and Reduction in Services

- 26% of responding organizations reported having a waiting list that is more than a month long.
- 21% of respondents acknowledged that they do not have a waiting list, but they clarified that it is because they are unable to accept new clients or referrals.

## Factors Affecting a Nonprofit's Ability to Recruit and Retain Staff

- An estimated eight out of ten (79%) nonprofits identified **salary competition** as a factor preventing them from filling job openings.
- Nearly a quarter (23%) of respondents stated that the **inability to find child care** affected recruitment and retention.
- **Vaccination policies** affect nearly one in five (19.2%) nonprofits.
- Comments from respondents identified additional causes including stress and burnout.



**United States Government Accountability Office**

## Report to Congressional Requesters

**September 2018**

# PUBLIC SERVICE LOAN FORGIVENESS

# Education Needs to Provide Better Information for the Loan Servicer and Borrowers

Accessible Version

ED_01323



# GAO Highlights

Highlights of GAO-18-547, a report to congressional requesters

September 2018

## PUBLIC SERVICE LOAN FORGIVENESS

### Education Needs to Provide Better Information for the Loan Servicer and Borrowers

## Why GAO Did This Study

Starting in September 2017, the first borrowers became eligible and began applying to have their loans forgiven through the PSLF program. GAO was asked to review the PSLF program.

This report examines the (1) number of borrowers pursuing PSLF and the extent to which Education has conducted outreach to increase borrower awareness of program eligibility requirements, and (2) extent to which Education has provided key information to the PSLF servicer and borrowers. GAO analyzed data from the PSLF servicer on employment and loan certifications and loan forgiveness applications as of April 2018; reviewed Education's guidance and instructions for the PSLF servicer; assessed the information used by Education and the PSLF servicer and communicated to borrowers against federal internal control standards; and interviewed officials from Education and the four largest loan servicers, including the PSLF servicer.

## What GAO Recommends

GAO recommends that Education (1) develop a timeline for issuing a comprehensive guidance and instructions document for the PSLF servicer, (2) provide the PSLF servicer and borrowers with additional information about qualifying employers, (3) standardize payment information other loan servicers provide to the PSLF servicer, and (4) ensure borrowers receive sufficiently detailed information to help identify potential payment counting errors. Education agreed with GAO's recommendations.

View GAO-18-547. For more information, contact Melissa Emrey-Arras at (617) 788-0534 or emreyarrasm@gao.gov.

## What GAO Found

As of April 2018, over a million borrowers had taken steps to pursue Public Loan Service Forgiveness (PSLF) from the Department of Education (Education), but few borrowers have been granted loan forgiveness to date. The PSLF program, established by statute in 2007, forgives borrowers' federal student loans after they make at least 10 years of qualifying payments while working for certain public service employers and meeting other requirements. Over 890,000 borrowers have passed a first step towards potentially qualifying for PSLF by voluntarily having their employment and loans certified as eligible for PSLF as of April 2018, according to data from Education's PSLF loan servicer. While borrowers first became eligible to apply for loan forgiveness in September 2017, few applicants had met all requirements as of April 2018, with 55 borrowers having received loan forgiveness (see figure). Education has used various outreach methods to inform borrowers about PSLF, but the large number of denied borrowers suggests that many are still confused by the program requirements. A recently enacted law requires Education to conduct additional outreach to help borrowers understand how to meet program requirements.



PSLF Certification Requests and Forgiveness Applications, as of April 2018

Source: GAO analysis of data from the Public Service Loan Forgiveness (PSLF) servicer.  |  GAO-18-547

Education does not provide key information to the PSLF servicer and borrowers.

- **Guidance and instructions:** Education provides piecemeal guidance and instructions to the PSLF servicer it contracts with to process certification requests and loan forgiveness applications. This information is fragmented across the servicing contract, contract updates, and hundreds of emails. As a result, PSLF servicer officials said their staff are sometimes unaware of important policy clarifications. Education officials said they plan to create a comprehensive PSLF servicing manual but have no timeline for doing so.
- **Qualifying employers:** Education has not provided the PSLF servicer and borrowers with a definitive source of information for determining which employers qualify a borrower for loan forgiveness, making it difficult for the servicer to determine whether certain employers qualify and for borrowers to make informed employment decisions.
- **Qualifying loan payments:** Education does not ensure the PSLF servicer receives consistent information on borrowers' prior loan payments from the eight other federal loan servicers, which could increase the risk of miscounting qualifying payments. Borrowers also lack sufficiently detailed information to easily identify potential payment counting errors that could affect their eligibility for loan forgiveness.

These weaknesses are contrary to federal internal control standards for using and communicating quality information, creating uncertainty for borrowers and raising the risk some may be improperly granted or denied loan forgiveness.

_____ **United States Government Accountability Office**

ED_01324

# Contents

| | |
|---|---|
| Letter | 1 |
| Background | 3 |
| Many Borrowers Are Pursuing Public Service Loan Forgiveness, and Recent Legislation Requires Education to Conduct Additional Outreach to Borrowers | 9 |
| Education Could Provide More Comprehensive Information to Improve Program Administration and Qualifying Employment and Loan Payment Determinations | 16 |
| Conclusions | 24 |
| Recommendations for Executive Action | 25 |
| Agency Comments and Our Evaluation | 25 |
| Appendix I: Comments from the U.S. Department of Education | 27 |
| Appendix II: GAO Contact and Staff Acknowledgments | 29 |
| Appendix III: Accessible Data | 30 |
| Data Tables | 30 |
| Agency Comment Letter | 32 |

Figures

| | |
|---|---|
| Figure 1: Education's Voluntary Process for Certifying Employment and Loans as Eligible for PSLF | 6 |
| Figure 2: PSLF Application Process | 8 |
| Figure 3: PSLF Certification Requests: Selected Outcomes for Borrowers Who Requested to Have Their Employment and Loans Certified as Eligible for Loan Forgiveness, as of April 2018 | 10 |
| Figure 4: Cumulative Number of Borrowers Who Had Their Employment and Loans Certified as Eligible for PSLF, January 2012 to April 2018, by Quarter | 10 |
| Figure 5: Loan Forgiveness Applications: Selected Outcomes for Borrowers Who Applied for Loan Forgiveness, as of April 2018 | 11 |
| Figure 6: Certification and Denial Outcomes for Borrowers Who Requested to Have Their Employment and Loans | |

ED_01325

Certified as Eligible for Loan Forgiveness, as of April 2018    13

Figure 7: Hypothetical Example of the PSLF Servicer's Payment Counting Process and Information Shared with Borrowers    23

**Abbreviations**

| | |
|---|---|
| Direct Loan | William D. Ford Federal Direct Loan |
| Education | U.S. Department of Education |
| PSLF | Public Service Loan Forgiveness |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

ED_01326

 U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC 20548**

September 5, 2018

The Honorable Robert C. "Bobby" Scott
Ranking Member
Committee on Education and the Workforce
House of Representatives

The Honorable Susan A. Davis
Ranking Member
Subcommittee on Higher Education and Workforce Development
Committee on Education and the Workforce
House of Representatives

Starting in September 2017, borrowers began applying to have their federal student loans forgiven through the Public Service Loan Forgiveness (PSLF) program. This program, established by law in 2007, is intended to encourage individuals to enter and continue careers in public service by forgiving borrowers' remaining federal student loan balances after they have made at least 10 years of loan payments while working in public service and meeting other requirements.[1] Only loans provided through the William D. Ford Federal Direct Loan (Direct Loan) program qualify for forgiveness. The Department of Education (Education) manages the PSLF program and contracts with a single loan servicer to handle day-to-day activities associated with the program, which include responding to borrower inquiries, making preliminary determinations about whether borrowers' employment and loans qualify for PSLF, and processing loan forgiveness applications.[2]

Although borrowers are now applying for loan forgiveness through the program, little is known about the processes for assessing borrower eligibility and whether these processes ensure consistent services to borrowers and safeguard taxpayer funds. In light of these issues, you asked us to review the PSLF program.

---

[1] The PSLF program was established by the College Cost Reduction and Access Act, Pub. L. No. 110-84, § 401, 121 Stat. 784, 800 (2007), as amended by the Higher Education Opportunity Act, Pub. L. No. 110-315, § 451(b), 122 Stat. 3078, 3262 (2008) (codified at 20 U.S.C. § 1087e(m)).

[2] The Pennsylvania Higher Education Assistance Agency's FedLoan Servicing unit is the exclusive servicer for borrowers pursuing PSLF.

ED_01327

**Letter**

This report examines (1) the number of borrowers pursuing PSLF and the extent to which Education has conducted outreach to increase borrower awareness of program eligibility requirements, and (2) the extent to which Education has provided key information to the PSLF servicer and borrowers.

To address these questions, we conducted our review of the PSLF program using the following approaches:

- To examine the number of borrowers pursuing PSLF, we analyzed the most recent available data from the PSLF servicer on the volume of borrower requests to have their employment and loans certified as eligible and loan forgiveness applications, including approvals, going back to when these processes were established by Education. Specifically, we analyzed data on employment and loan certification requests from January 2012 through April 2018, and data on loan forgiveness applications from September 2017 through April 2018. We also analyzed data on the reasons why borrowers were denied certification and loan forgiveness. We assessed the reliability of these data by reviewing data system documentation from the PSLF servicer and interviewing knowledgeable officials, and we determined that the data were sufficiently reliable for our reporting purposes. To assess Education's outreach to borrowers about eligibility requirements, we reviewed the program documents and information that Education and the PSLF servicer provide to borrowers, and interviewed Education officials. To identify common questions borrowers have about these requirements, we interviewed officials from the four largest federal student loan servicers, including officials and frontline staff from the PSLF servicer. We examined a 2017 Consumer Financial Protection Bureau report on borrower complaints, including those related to the PSLF program. We assessed Education's outreach efforts against the department's objective in its strategic plan for fiscal years 2018 through 2022 to improve the quality of service for customers across the entire student aid life cycle.

- To examine key information Education has provided to the PSLF servicer and borrowers, we reviewed Education's processes for providing and sharing information and assessed them against federal internal control standards for communicating with external parties and using quality information. We reviewed the various methods Education uses to provide guidance and instructions to the PSLF servicer, including the servicing contract, contract updates, and emails. We examined the main information sources used by the servicer to evaluate employer eligibility and reviewed its process for

ED_01328

obtaining prior loan payment information from other loan servicers. We also reviewed the information that Education and the PSLF servicer provided to borrowers about qualifying employers and payments. We interviewed Education officials and the PSLF loan servicer's management and frontline staff. We reviewed Education's monitoring reports on the PSLF servicer's operations and the PSLF servicer's internal handbook for processing employment and loan certifications and forgiveness applications.

For both objectives, we also reviewed relevant federal laws and regulations. In addition, at the time of our review, there was ongoing state and federal litigation related to the administration of the PSLF program.[3] Therefore, we scoped our study to minimize overlap with issues pending in litigation. For example, we did not assess any individual borrower eligibility determinations or qualifying loan payment counts made by the PSLF servicer. As a result of this approach, our findings do not draw any conclusions about how individual borrowers or employers may have been affected by any of the program administration issues addressed in this report.

We conducted this performance audit from August 2017 to September 2018 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

Education administers federal student aid programs, including the Direct Loan program, through the Office of Federal Student Aid. Under the Direct Loan program, Education issues and oversees the loans while contractors service them. Education currently contracts with nine loan servicers that each handle the billing and other services for a portion of the over $1 trillion in outstanding student loans provided through the

---

[3] Among others, see Commonwealth v. Pa. Higher Educ. Assistance Agency, No. 1784-2682 (Mass. Super. Ct. filed Aug. 23, 2017); Am. Bar Ass'n v. U.S. Dep't of Educ., No. 16-2476 (D.D.C. filed Mar. 23, 2017); Morris v. Pa. Higher Educ. Assistance Agency, No. 18-31 (E.D. Pa. filed Jan. 8, 2018). These lawsuits were still pending as of August 15, 2018.

ED_01329

Direct Loan program.[4] These servicers track and manage day-to-day servicing activities, and they report key information on the status of each loan to Education's central student loan database. In 2011, Education contracted with one of its existing loan servicers to become the single servicer for borrowers pursuing PSLF. The PSLF servicer is responsible for processing certification requests and forgiveness applications, as well as servicing the loans of borrowers who have met basic PSLF eligibility requirements.

The PSLF program provides eligible borrowers with forgiveness on the remaining balance of their Direct Loans after they have met program requirements.[5] To receive forgiveness for a loan, borrowers are required to be employed by a qualifying employer when making 120 qualifying payments, at the time they apply for forgiveness, and at the time they receive forgiveness for their loans.[6] Specifically, borrowers are required to:

- Work full-time for a public service organization, such as[7]

  - a government organization, agency, or entity at any level (federal, state, local, or tribal);

  - a nonprofit, tax exempt organization (under section 501(c)(3) of the Internal Revenue Code); or

---

[4] Prior to 2009, Education used a single contractor to handle all loan servicing. This company is no longer servicing federal loans, and its loan portfolio has been redistributed among the current loan servicers.

[5] All types of Direct Loans are eligible for forgiveness, including Direct Subsidized Loans, Direct Unsubsidized Loans, Direct Graduate PLUS Loans, and Direct Consolidation Loans. Parent PLUS Loans are also eligible for forgiveness, but cannot be repaid under any of the income-driven repayment plans unless these loans are consolidated into a new Direct Consolidation Loan. Borrowers may also consolidate certain federal loans that are not eligible for PSLF, such as loans under the Federal Family Education Loan program and Perkins loans, into a single Direct Consolidation Loan to qualify for PSLF. However, only the post-consolidation payments count toward the 120 payments required for PSLF.

[6] See 34 C.F.R. § 685.219 for the regulations governing the PSLF program.

[7] For purposes of this report, we refer to these organizations as "qualifying employers" or "qualifying employment." Serving in a full-time AmeriCorps or Peace Corps position also counts as qualifying employment for the PSLF program. Certain types of employment are not eligible for PSLF; for example, work as a member of Congress, work for labor unions, work for partisan political organizations, and some activities performed for religious organizations. Borrowers working part-time for more than one qualifying employer at the same time are considered full-time for PSLF purposes as long as their combined work hours average at least 30 hours per week.

ED_01330

- another private nonprofit organization that provides certain public services.

- Not be in default and be repaying their loans through an income-driven repayment plan (in which borrowers' monthly payments are based on their income and family size); the 10-year Standard repayment plan; or another plan if the monthly payment amounts equal or exceed the amount the borrower would have paid under the 10-year Standard repayment plan.[8] Although the 10-year Standard repayment plan qualifies for PSLF, borrowers in this plan will pay off their loans before they are eligible for forgiveness unless they change to an income-driven repayment plan that leaves them with a balance remaining to be forgiven after 120 payments.[9]

- Make 120 on-time monthly loan payments for the full amount due on their bill after October 1, 2007. These monthly payments do not need to be consecutive.

In January 2012, Education began offering a voluntary process to certify borrowers' public service employment and loans as eligible for PSLF. Borrowers can request to have their employment and loans certified at any time to make sure they are meeting basic program requirements and are on track towards qualifying for loan forgiveness (see fig. 1). Once a borrower submits a request, the PSLF servicer reviews the borrower's employment and loans to determine if they qualify, and if so, counts how many qualifying payments the borrower has made.[10]

---

[8] Education offers five income-driven repayment plans to eligible borrowers: Pay As You Earn, Revised Pay As You Earn, two Income-Based Repayment plans, and Income-Contingent Repayment.

[9] Borrowers who make 120 monthly payments under the 10-year Standard repayment plan will have completely paid off their loans, and therefore would have no remaining balance left to be forgiven under PSLF. However, a borrower that was initially in a 10-year Standard repayment plan and later changed to an income-driven repayment plan would be able to count payments made under the Standard plan towards their 120 required monthly payments.

[10] Education recommends that borrowers submit new requests to certify their employment and loans both annually and when they switch employers.

ED_01331

Letter

**Figure 1: Education's Voluntary Process for Certifying Employment and Loans as Eligible for PSLF**



PSLF= Public Service Loan Forgiveness

Source: GAO analysis of Department of Education (Education) documents. | GAO-18-547

In September 2017, 10 years after the PSLF program was established, Education began accepting loan forgiveness applications from borrowers. The application is similar to the form borrowers use to request certification of their employment and loans for PSLF, but is intended for borrowers that have already made 120 qualifying payments (see fig. 2). The PSLF servicer reviews a borrower's application and incorporates information from any previously approved certification forms to determine if the borrower's employment and loans qualify and if they have made 120 qualifying payments. If the borrower meets all of these requirements, the

ED_01332

**Letter**

PSLF servicer forwards the application to Education for final review.[11] If Education determines the borrower has met all eligibility requirements, it directs the PSLF servicer to forgive the remaining balance on the borrower's loans.

---

[11] Unless a borrower requests otherwise on their application, the PSLF servicer places eligible loans in forbearance while the application is being reviewed by Education. However, if Education determines that the borrower is not eligible for forgiveness, the forbearance ends and any unpaid interest that accrued during this period may be added to the loan principal balance.

ED_01333

Letter

## Figure 2: PSLF Application Process



Source: GAO analysis of Department of Education (Education) documents.  |  GAO-18-547

ED_01334

# Many Borrowers Are Pursuing Public Service Loan Forgiveness, and Recent Legislation Requires Education to Conduct Additional Outreach to Borrowers

## Over 890,000 Borrowers Took an Initial Step Towards Qualifying for PSLF by Having Their Employment and Loans Certified, and 55 Have Received Loan Forgiveness

Over 890,000 borrowers have taken an initial step towards qualifying for the PSLF program by voluntarily having their employment and loans certified as eligible for PSLF, according to data from the PSLF servicer as of April 2018.[12] Of these, over 520,000 borrowers had recorded at least one qualifying payment that counted towards the 120 required to be eligible for loan forgiveness (see fig. 3). In total, almost 1.2 million borrowers requested to have their employment and loans certified but over 280,000 were denied, primarily due to missing information on the form, or because they did not have qualifying federal loans or work for a qualifying employer, according to data from the PSLF servicer.

---

[12] For the purposes of this report, we consider borrowers to have certified employment and loans when they have submitted at least one approved certification form.

ED_01335

Letter

**Figure 3: PSLF Certification Requests: Selected Outcomes for Borrowers Who Requested to Have Their Employment and Loans Certified as Eligible for Loan Forgiveness, as of April 2018**



**1,173,420**
Requested to certify their employment and loans as eligible for PSLF

**890,516**
Had their employment and loans certified as eligible

**520,267**
Recorded at least one qualifying payment

Source: GAO analysis of data from the Public Service Loan Forgiveness (PSLF) servicer. | GAO-18-547

Note: Of borrowers that had their employment and loans certified as eligible for PSLF, 58 percent had recorded at least one qualifying payment.

The number of new borrowers whose employment and loans have been certified as eligible for PSLF has increased in each of the past 6 years, according to PSLF servicer data (see fig. 4). Officials with the PSLF servicer said they anticipated that the volume would continue to increase as the program gains visibility.

**Figure 4: Cumulative Number of Borrowers Who Had Their Employment and Loans Certified as Eligible for PSLF, January 2012 to April 2018, by Quarter**



Cumulative number of borrowers

Calendar year (by quarters)

Source: GAO analysis of data from the Public Service Loan Forgiveness (PSLF) servicer. | GAO-18-547

Note: These borrowers voluntarily had their employment and loans certified as eligible for PSLF as an initial step towards applying for loan forgiveness.

ED_01336

**Letter**

In the first 8 months that borrowers were able to apply for loan forgiveness (September 2017 through April 2018), Education had approved 55 borrowers and forgiven a total of almost $3.2 million in outstanding student loan balances, an average of almost $58,000 per borrower. The amount of loan forgiveness for individual borrowers ranged from almost $800 to almost $290,000. Over 19,300 borrowers had submitted loan forgiveness applications as of April 2018 (see fig. 5). Of the almost 17,000 borrowers with applications that had been processed, over 40 percent had qualifying loans and employment but were denied because they had not yet made 120 qualifying payments. The other most common reasons borrowers were denied included missing information on the application or because the borrower did not have qualifying federal loans. Education officials estimated that about 700 borrowers will be approved for loan forgiveness by September 30, 2018.

**Figure 5: Loan Forgiveness Applications: Selected Outcomes for Borrowers Who Applied for Loan Forgiveness, as of April 2018**



Source: GAO analysis of data from the Public Service Loan Forgiveness (PSLF) servicer. | GAO-18-547

[a]One hundred twenty-nine of these borrowers were still awaiting final approval from Education as of April 30, 2018. Education had not denied any of the applications recommended for approval by the PSLF servicer, according to PSLF servicer officials.

## Borrower Confusion about PSLF Requirements Persists, and Recent Legislation Requires Education to Conduct Additional Outreach

Although Education has conducted some outreach to communicate PSLF program requirements to borrowers, the large number of borrowers whose certification requests and forgiveness applications were denied suggests that many borrowers do not understand or are not aware of these requirements. For example, over half of borrowers that requested to have their employment and loans certified as of April 2018 either did not meet basic eligibility requirements or had yet to make any qualifying loan payments. This includes over 150,000 borrowers who requested to have

ED_01337

**Letter**

their employment and loans certified despite not having qualifying federal loans, which suggests these borrowers either did not know which types of loans they had or which types qualified for the program.[13] Borrowers who had qualifying loans also may have been confused about requirements related to making qualifying payments. Over 370,000 borrowers that had their employment and loans certified as of April 2018 had not made any qualifying payments at the time of certification because they were not on qualifying repayment plans, had loans in a deferment or forbearance, were still in the grace period before starting repayment, or had recently consolidated their loans, among other reasons, according to PSLF servicer data (see fig. 6).[14] Although some of these borrowers may have understood how prior choices they made regarding repayment of their loans would affect their ability to make qualifying payments, other borrowers may not have.

---

[13] Similarly, many borrowers submitting forgiveness applications also did not meet certain eligibility requirements, suggesting they may not have understood or were not aware of these requirements. For example, about 20 percent of borrowers who applied for loan forgiveness did not have any qualifying federal loans.

[14] Because the number of borrowers' qualifying payments is calculated based on the information included on their certification request forms, it is possible that some additional borrowers have made payments that will be counted as qualifying payments once they submit new certification forms. Deferment and forbearance allow borrowers to temporarily stop making loan payments or temporarily reduce the payment amount under certain circumstances, but any payments made while in deferment or forbearance status do not count towards PSLF. When borrowers consolidate loans, their qualifying payment count resets to zero, and any prior payments they made no longer qualify towards the required 120 payments. The grace period is a set period of time after borrowers graduate, leave school, or drop below half-time enrollment before they must begin repaying certain federal loans. Payments made during the grace period do not count towards PSLF.

ED_01338

**Letter**

**Figure 6: Certification and Denial Outcomes for Borrowers Who Requested to Have Their Employment and Loans Certified as Eligible for Loan Forgiveness, as of April 2018**



Source: GAO analysis of data from the Public Service Loan Forgiveness (PSLF) servicer.  |  GAO-18-547

Note: Other reasons for denial include borrowers who submitted incomplete information on the form or did not have qualifying employment, according to PSLF servicer officials.

Officials with the PSLF servicer said borrowers were frequently confused by program requirements related to qualifying loans, employment, repayment plans, and payments. For example, PSLF servicer officials said that borrowers were sometimes unaware that they were not on a qualifying repayment plan or that forbearance, deferment, and loan consolidation would affect their qualifying payments. PSLF servicer frontline customer service staff also said they frequently received calls from borrowers who were confused about whether their loans qualified for PSLF and other program requirements. Two other loan servicers we spoke to identified the same general areas of confusion among borrowers who call with questions about PSLF. In addition, borrower complaints reported by the Consumer Financial Protection Bureau indicate confusion with PSLF requirements related to qualifying loans and payments.[15]

Education uses several methods to conduct outreach to inform borrowers about PSLF requirements, but denial data suggest and PSLF servicer officials confirmed that borrower confusion persists. Education currently provides information on its website about PSLF requirements and links to an online portal where borrowers can check what types of loans they have and identify their loan servicer.[16] When the PSLF servicer notifies

---

[15] Consumer Financial Protection Bureau, *Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities* (Washington, D.C.: June 2017).

[16] See https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service.

ED_01339

borrowers that their certification requests or forgiveness applications were denied, the notification letter includes information on program requirements and explains why the borrower did not qualify for the program. Education has also adopted other methods to raise awareness of the program among borrowers, such as webinars and outreach to schools, in response to a recommendation in our previous report.[17] Education also instructs borrowers who have additional questions about PSLF to contact the PSLF servicer. However, officials with the PSLF servicer said they can provide more details about the program but cannot answer certain eligibility questions, such as whether a particular borrower has qualifying employment or is on a qualifying repayment plan, until the borrower submits a form to request certification.[18] Officials with three other loan servicers we spoke with also said it is their general policy not to answer specific questions about an individual borrower's eligibility for PSLF due to the complexity of program requirements, and they instead direct the borrower to contact the PSLF servicer. Although this approach may help avoid the risk of other servicers providing borrowers with incorrect advice, it highlights the need for Education to provide borrowers with clear and sufficient information about how to qualify for the program. It is essential for borrowers to understand eligibility requirements because the retrospective nature of the program requires borrowers to make decisions about their loans and employment months or years before they submit a PSLF certification request or apply for loan forgiveness. For example, the Consumer Financial Protection Bureau reported that borrowers have complained of spending years making payments, believing they were making progress towards PSLF loan forgiveness, and then learning that they were not eligible.[19]

Recent legislation requires Education to conduct additional outreach. The consolidated appropriations act enacted in March 2018 appropriated $350

---

[17] GAO, *Federal Student Loans: Education Could Do More to Help Ensure Borrowers Are Aware of Repayment and Forgiveness Options*, GAO-15-663 (Washington, D.C.: August 25, 2015). In addition, Education officials said they developed toolkits for employers and schools and required student loan servicers to provide borrowers with information about PSLF when they expressed interest in the program.

[18] In some cases, this is because another loan servicer is servicing the borrower's loans, and the PSLF servicer cannot access information about the borrower until it processes the certification request form.

[19] Consumer Financial Protection Bureau, *Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities* (Washington, D.C.: June 2017).

ED_01340

Letter

million to forgive the loans of borrowers who otherwise would qualify for PSLF had they not selected a non-qualifying repayment plan.[20] In addition to these funds, the act directed that $2.3 million of Education's appropriation for administering student aid be used to conduct outreach to borrowers about PSLF, to help ensure borrowers are meeting program requirements.[21] The act specifically requires Education to communicate PSLF program requirements to all Direct Loan borrowers and improve PSLF outreach and information through calls, electronic communications, and other methods. Once implemented, these provisions could reduce confusion about PSLF requirements and help Education provide better service to borrowers.

[20] Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 315, 132 Stat. 348. The funds are available until expended, on a first-come, first-serve basis, to forgive the loans of borrowers who were repaying their Direct Loans through certain non-qualifying repayment plans, such as Graduated or Extended repayment plans, provided they meet certain additional requirements. According to Education, this temporarily expanded opportunity for loan forgiveness is only available to borrowers who previously submitted a PSLF application that was denied solely because some or all payments were not made under a qualifying repayment plan, who have at least 10 years of qualifying employment, and who have made 120 qualifying payments under the requirements for the temporary program.

[21] Pub. L. No. 115-141, § 316, 132 Stat. 348.

ED_01341

# Education Could Provide More Comprehensive Information to Improve Program Administration and Qualifying Employment and Loan Payment Determinations

## Education's Piecemeal Guidance and Instructions to the PSLF Loan Servicer Create Challenges for Program Administration

Education does not have a comprehensive document or manual to provide the PSLF servicer guidance and instructions, which PSLF servicer officials said makes it difficult to effectively administer the program and provide consistent service to borrowers. Instead, Education's guidance and instructions to the PSLF servicer are dispersed in a piecemeal manner across multiple documents, including Education's original contract with the servicer, multiple updates to the contract, and hundreds of emails. According to PSLF servicer officials, administering the program based on this fragmented collection of guidance and instructions creates a risk that relevant information may be overlooked.

Education's use of email to communicate key guidance and instructions to the PSLF servicer is particularly problematic because this important information is not disseminated to relevant individuals at Education and the PSLF servicer in the same standard fashion as official changes to the servicing contract. Various individuals at Education have sent emails with guidance and instructions to different staff at the PSLF servicer. As a result, all the relevant parties may not be aware of important policy changes or clarifications provided in these emails, according to PSLF servicer officials and Education's monitoring reports. In one instance, for example, Education staff incorrectly identified what they thought was an error in how the servicer was certifying borrowers that were employed part-time because they were not aware of the most recent guidance that other staff at Education had emailed the servicer on the topic. Similarly, PSLF servicer officials said their staff are sometimes unaware of relevant guidance and instructions in emails provided by Education, which creates a risk that some policy updates will be overlooked and not consistently implemented. Education has also used email to communicate certain policy clarifications involving employer eligibility and payment counting that, according to the PSLF servicer, have affected hundreds of borrowers and set precedents for future eligibility decisions.

ED_01342

Gaps in Education's guidance and instructions have also left the PSLF servicer uncertain about how to administer key aspects of the program. For example, PSLF servicer officials said that from 2016 to 2018 they were awaiting additional clarifications from Education about how to account for loan payments when borrowers pay more than the amount due or submit a payment several weeks before the due date. How overpayments and prepayments are accounted for can affect whether the borrower's subsequent payments qualify for PSLF because borrowers can only receive credit for one payment per month and only when a payment is due. While Education provided a clarification about how to address this issue in May 2018, current guidance from Education on other topics is still unclear or incomplete, according to PSLF servicer officials.

The absence of a central, authoritative source of PSLF guidance and instructions creates a risk of differing interpretations and inconsistent implementation. The PSLF servicer has developed its own internal processing handbook based on Education's guidance and instructions, which PSLF servicer officials said is useful for helping staff process certifications and forgiveness applications. However, Education has reviewed sections of this processing handbook and identified places where the handbook does not accurately reflect PSLF requirements and could result in borrowers' certification requests being improperly approved or denied. The PSLF servicer has made updates to its processing handbook to address certain issues that Education identified, but Education has not conducted a comprehensive review of this handbook. As a result, there is a risk that the PSLF servicer may still be applying Education's guidance and instructions differently from how the agency intended. PSLF servicer officials said it would be helpful if Education created a centralized manual of PSLF guidance and instructions. The lack of a central guidance document also makes it difficult to maintain program continuity in the event of staff turnover or if Education decides to contract with a new servicer to administer the PSLF program. Federal internal control standards state that agencies should communicate information to those who need it, in a form that enables them to carry out their responsibilities.[22] Education has recently taken some steps to provide clearer guidance and instructions, such as holding meetings with PSLF servicer officials every 2 weeks to discuss any administrative issues. Education officials also told us they plan to develop a comprehensive

---

[22] GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 10, 2014).

ED_01343

PSLF servicing manual, but they do not have a timeline for completing it. They are currently drafting an initial section of the manual focusing on payment counting. The current lack of a definitive and comprehensive source of guidance and instructions for the PSLF servicer creates the risk of inconsistent interpretations that could potentially result in borrowers being improperly denied loan forgiveness since Education does not currently review loan forgiveness applications that are denied by the PSLF servicer.

## Additional Information from Education Could Improve the PSLF Servicer's and Borrowers' Ability to Determine Whether Borrowers' Employment Qualifies for Loan Forgiveness

Education has provided the PSLF servicer and borrowers with limited information that could help them determine which employers qualify for PSLF, creating uncertainty for borrowers and increasing the risk that the PSLF servicer may improperly certify or deny certification to some borrowers. Education has not provided the PSLF servicer with a definitive source of information for determining which employers qualify a borrower for loan forgiveness. Instead, Education has identified some data sources the PSLF servicer can use to determine whether borrowers are working for qualifying employers. However, these sources are not comprehensive, and PSLF servicer officials said they sometimes have to consult other sources that have significant limitations. For example, Education directs the PSLF servicer to review the Internal Revenue Service's public list of 501(c)(3) organizations to identify qualifying nonprofit employers. Since this list does not capture all potentially qualifying nonprofits, the PSLF servicer supplements this with other sources that have not been fully reviewed or assessed for accuracy by Education. For example, PSLF servicer officials told us they use an online directory of nursing home facilities to help determine if certain nursing homes are nonprofit employers. However, this website explicitly states that it does not guarantee that the information it provides is accurate or current. PSLF servicer officials also said they sometimes use state government websites to research organizations' nonprofit status, but they only have access to the relevant information from states that provide it for free. For assessing government employers, Education directs the servicer to www.usa.gov, an official federal government website that describes government agencies and services, but this source provides limited information on state and local government employers. In addition, PSLF servicer officials said it is particularly difficult to assess certain types of employers, such as

quasi-governmental entities and charter schools. PSLF servicer officials said that when they are uncertain whether an employer qualifies, they elevate the assessment to Education, but they generally try to resolve as many employer determinations as possible by using supplemental sources to research employers.[23] However, the reliability of some of these supplemental sources is unclear.

PSLF servicer officials said that having additional information would help them assess employers more quickly and minimize the risk of inaccurate decisions. One way to provide this information would be for Education to develop an official, comprehensive list of qualifying employers, which would help the PSLF servicer assess employers and help borrowers determine whether they are eligible for PSLF, according to PSLF servicer officials. Education officials said they are considering creating their own list of qualifying employers and are investigating how to leverage information from other federal government agencies that could be useful for categorizing employers. In particular, Education officials said they have reached out to the Internal Revenue Service to explore the feasibility of obtaining relevant data on employers. Education could also expand and improve on a database that the PSLF servicer created based on its prior assessments of employers. Education staff that conducted a spot check on the PSLF servicer's database expressed concerns about using it as a sole source for assessing employers, according to an Education monitoring report, but Education officials said it could provide a foundation for Education to build on.

Borrowers would also benefit from additional information about qualifying employers, according to PSLF servicer officials. Education currently provides borrowers with basic information on the types of employers that qualify for PSLF, but not sufficient details to reliably determine whether specific employers qualify. When borrowers contact their loan servicer with questions about their employer's eligibility, officials with the PSLF servicer and other loan servicers we spoke with said they generally do not provide borrowers with information about whether a specific employer qualifies, due to the complexities involved in assessing qualifying employers. Instead, borrowers are encouraged to submit an employment certification form once they are working for an employer in order to find out if the employer qualifies. PSLF servicer officials said that providing

---

[23] With the exception of employment decisions the PSLF servicer elevates, Education generally does not asses the PSLF servicer's employment determinations until borrowers are approaching final loan forgiveness, according to Education officials.

ED_01345

borrowers with access to additional information about qualifying employers, such as an official list, would reduce uncertainty for borrowers and reduce the number of borrowers who submit certification requests and forgiveness applications despite working for non-qualifying employers.[24] In addition, making this information readily available to borrowers could help them to make better informed employment decisions rather than having to wait to submit a certification request after they have started a job to find out if their employer qualifies.

Federal internal control standards state that agencies should communicate the necessary quality information to those who need it in order to achieve the agencies' objectives.[25] Unless Education provides additional information to help the PSLF servicer make employer assessments, it will remain difficult to determine whether employers qualify for the program, raising the risk that borrowers' certification requests will be improperly approved or denied. Moreover, without access to sufficient information about qualifying employers, borrowers will not be able to reliably determine whether certain employers qualify for PSLF. This creates uncertainty for borrowers as to which jobs and careers to pursue and leaves them to make important employment decisions without knowing until after the fact how these decisions affect their future eligibility for PSLF.

## Education Could Improve the Information Provided to the PSLF Servicer and Borrowers about Whether Borrowers' Payments Qualify for Loan Forgiveness

### Collecting Consistent Payment Information

Education does not ensure the PSLF servicer receives consistent information on borrowers' prior loan payments from other loan servicers, which could raise the risk of qualifying payments being miscounted. In order to process certification requests and loan forgiveness applications, the PSLF servicer has to examine the borrower's prior loan payment information to determine which prior payments count towards the 120 needed to qualify for loan forgiveness. This is relatively easy in cases

---

[24] Out of over 1 million borrowers who submitted PSLF certification requests as of January 2018, almost 84,000 borrowers had at least one request denied for having non-qualifying employment.

[25] GAO-14-704G.

ED_01346

**Letter**

where the PSLF servicer was servicing the borrower's loans during the entire period he or she was pursuing PSLF because the servicer already has the necessary information on their prior payments, according to PSLF servicer officials. However, the PSLF servicer does not have the same information readily available for loans that are serviced by one of Education's eight other loan servicers. For these loans, Education established a process for servicers to use in transferring loan and prior payment information to the PSLF servicer.[26] The servicers transfer most information through standardized templates that Education developed. However, despite the use of standardized templates, the PSLF servicer does not receive consistent and reliable information from other servicers, according to PSLF servicer officials. For example, PSLF servicer officials said the lack of standard definitions and terminology among loan servicers leads servicers to interpret some data fields differently, resulting in inconsistencies in the data other loan servicers report to the PSLF servicer. Comparable data and standardized terminology is particularly important given the need for loan servicers with different systems and practices to communicate key payment information with one another. PSLF servicer officials said inconsistencies in the information provided by other loan servicers make it challenging to determine whether borrowers are on qualifying repayment plans or making qualifying payments. For example, when a borrower has multiple loans, PSLF servicer officials said they assess PSLF eligibility and payments separately for each individual loan. Officials added that some servicers only report total monthly payments for the borrower's combined loans, and not how these payments were allocated among each loan. This makes it difficult for the PSLF servicer to determine whether the borrower paid the full monthly payment amount due on each loan, which it needs to know in order to determine whether the payment qualifies for PSLF.

Officials with Education and the PSLF servicer said that inconsistencies in the information obtained from other loan servicers increase the risk of miscounting qualifying payments. Education officials said they have started to track these data consistency problems and coordinate discussions among the PSLF servicer and the three other loan servicers that together provide the data systems used by all nine servicers. However, these efforts are in the early stages. Federal internal control

---

[26] PSLF servicer officials said they request the transfer of loans and prior payment information from other servicers after the borrower has submitted a certification request or loan forgiveness application and the PSLF servicer has determined that the borrower's loans and employment qualify as eligible for PSLF.

ED_01347

standards state that agencies should use quality information to achieve their objectives.[27] Standardizing the prior payment information transferred among servicers could improve the PSLF servicer's ability to determine qualifying payment counts for borrowers transferring from other servicers.

Communicating Information to Borrowers

Although Education and PSLF servicer officials acknowledge the risk of miscounting qualifying payments, the PSLF servicer does not provide borrowers with sufficient information to easily catch errors. In addition to the risks caused by inconsistent prior payment information from other loan servicers, the payment counting process is also vulnerable to errors in instances when the PSLF servicer has to manually review payment information from other servicers, according to PSLF servicer officials and an Education monitoring report.[28] Borrowers whose loans were transferred to the PSLF servicer from other loan servicers have complained about inaccurate qualifying payment counts, according to a Consumer Financial Protection Bureau report.[29] Officials with the PSLF servicer said they rely on borrowers to catch any payment counting errors resulting from issues with information provided by other loan servicers. However, the PSLF servicer provides borrowers with aggregate counts of qualifying payments, which are useful for helping borrowers track their progress, but do not provide borrowers with enough detail to check the servicer's counts and identify prior payments that the servicer may have missed (see fig. 7). Borrowers have several options for disputing payment counts or other aspects of the eligibility determination process, including contacting the PSLF servicer or filing an official complaint with Education's Federal Student Aid Ombudsman Group or through the

---

[27] GAO-14-704G.

[28] For example, when a borrower's prior loan servicer is no longer servicing Direct Loans, or if the borrower has had more than one prior loan servicer, the borrower's payment history is provided to the PSLF servicer in a series of original loan servicing documents rather than the standard templates. The PSLF servicer has to review these documents to manually identify relevant payment information. In some cases, PSLF servicer officials said they must review dozens, or even hundreds of pages of loan servicing documents, and reconcile conflicting payment information as needed.

[29] Consumer Financial Protection Bureau, *Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities* (Washington, D.C.: June 2017).

ED_01348

Letter

Federal Student Aid Feedback System.[30] However, the lack of detailed information on qualifying payment counts makes it difficult for borrowers to determine whether the count is correct or not.

**Figure 7: Hypothetical Example of the PSLF Servicer's Payment Counting Process and Information Shared with Borrowers**



Source: GAO analysis of documents from the Department of Education and the Public Service Loan Forgiveness (PSLF) Servicer.  |  GAO-18-547

Education officials said they have not considered requiring the PSLF servicer to provide more detailed information to borrowers on which prior payments were approved or denied. Officials noted that there would be a cost associated with providing this information to borrowers, although they have not produced a cost estimate. Also, officials said that providing too much information may confuse borrowers, and they must consider how to meet borrowers' need for detailed information without overwhelming borrowers with payment counting complexities. Officials with the PSLF servicer said providing this information to borrowers could be helpful but would require time to confirm the information was correct and would only be done at the direction of Education. Federal internal control standards state that agencies should communicate necessary quality information to external parties.[31] While providing too much

---

[30] Education's Federal Student Aid Ombudsman Group is dedicated to helping resolve disputes related to the federal student aid programs. Education's Federal Student Aid Feedback System is an online portal that allows federal student aid customers to submit complaints, provide positive feedback, and report allegations of suspicious activity regarding their experience with federal student aid programs.

[31] GAO-14-704G.

information could prove counterproductive, borrowers could benefit from receiving greater detail about their qualifying payments beyond the aggregate counts of qualifying payments that they currently receive. Without clearer and more detailed information on qualifying payments, borrowers may not detect any errors in payment counts, which could ultimately affect borrowers' eligibility for loan forgiveness.

# Conclusions

Education is responsible for establishing the administrative structure necessary to fulfill the PSLF program's goal of encouraging individuals to enter and continue in public service employment by providing loan forgiveness to eligible borrowers who meet program requirements. However, Education has not provided the PSLF servicer with a comprehensive source of guidance and instructions on how to operate the program, raising the risk that the PSLF servicer may improperly approve or deny borrowers' certification requests and forgiveness applications. Education officials told us they have plans for creating a comprehensive PSLF servicing manual, but no timeline for doing so.

Working for a qualifying employer is one of the key requirements of the PSLF program; however, Education has not provided the PSLF servicer and borrowers with sufficient information for determining whether employers qualify. This makes the PSLF servicer's employer assessments vulnerable to inconsistencies and fosters uncertainty for borrowers as to whether or not their employment will eventually qualify them for loan forgiveness.

Similarly, inconsistencies in the information used for counting borrowers' qualifying loan payments raise the risk of errors. Borrowers should be confident that their loan payments will be accurately counted regardless of who their servicer is. However, Education has not ensured the PSLF servicer is receiving consistent loan payment history information from other loan servicers, increasing the risk of inaccurate qualifying payment counts. The chance that these and any other payment counting errors will go undetected is compounded by the fact that Education does not require the PSLF servicer to provide borrowers with details on which payments qualified and which did not. This makes it difficult for borrowers to detect erroneous counts that could ultimately affect their eligibility for loan forgiveness. Consequently, some borrowers may be required to make more payments than necessary before receiving loan forgiveness, while others may be improperly approved for forgiveness.

ED_01350

**Letter**

# Recommendations for Executive Action

We are making the following four recommendations to Education's Office of Federal Student Aid:

The Chief Operating Officer of the Office of Federal Student Aid should develop a timeline for issuing a comprehensive guidance and instructions document for PSLF servicing. This could involve developing a new servicing manual or expanding upon the PSLF servicer's existing processing handbook. (Recommendation 1)

The Chief Operating Officer of the Office of Federal Student Aid should provide additional information to the PSLF servicer and borrowers to enhance their ability to determine which employers qualify for PSLF. This could involve Education developing an authoritative list of qualifying employers or improving the PSLF servicer's existing database, and making this information available to borrowers. (Recommendation 2)

The Chief Operating Officer of the Office of Federal Student Aid should standardize the information the PSLF servicer receives from other loan servicers to ensure the PSLF servicer obtains more consistent and accurate payment information for borrowers pursuing PSLF. (Recommendation 3)

The Chief Operating Officer of the Office of Federal Student Aid should ensure that borrowers receive sufficiently detailed information from the PSLF servicer to be able to identify any errors in the servicer's counts of qualifying payments, including information on whether or not each payment qualified toward forgiveness. (Recommendation 4)

# Agency Comments and Our Evaluation

We provided a draft of this report to Education for its review and comment. In its comments, reproduced in appendix I, Education concurred with each of our recommendations and identified steps it plans to take to implement them. To improve guidance and instructions for PSLF servicing, Education stated it is documenting PSLF requirements and guidelines and plans to incorporate them into a comprehensive guide. Regarding our recommendation to provide additional information on qualifying employers to the PSLF servicer and borrowers, Education stated that it is reviewing options for developing an online help tool that

ED_01351

**Letter**

would be expanded to incorporate qualifying employer information. To standardize the information other loan servicers provide to the PSLF servicer, Education stated it will continue its efforts to address data definition issues related to the data exchanged between servicers. To ensure borrowers receive sufficiently detailed information on counts of qualifying payments, Education stated it will review the letters the PSLF servicer sends to borrowers to determine how to better communicate regarding qualifying payment counts, program requirements, and employer eligibility. We also provided relevant report sections to the PSLF servicer and the three other loan servicers included in our review for technical comments. The PSLF servicer provided technical comments, which we incorporated as appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Secretary of Education, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (617) 788-0534 or emreyarrasm@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix II.

*Melissa Emrey-Arras*

Melissa Emrey-Arras, Director
Education, Workforce, and Income Security

ED_01352

# Appendix I: Comments from the U.S. Department of Education



August 10, 2018

Ms. Melissa Emrey-Arras
Director, Education, Workforce,
    and Income Security Issues
United States Government Accountability Office
Washington, D.C.  20548

Dear Ms. Emrey-Arras:

I am pleased to write on behalf of the U.S. Department of Education (Department) in response to the statements and recommendations made in the Government Accountability Office (GAO) draft report, *"Public Service Loan Forgiveness (PSLF): Education Needs to Provide Better Information for the Loan Servicer and Borrowers" (GAO-18-547).*

We appreciate the opportunity to respond to this GAO draft report.  The Department agrees that student borrowers and those entities that work to administer their loans require as much information as possible to understand and administer current program requirements. Our response to each of the four recommendations in the GAO draft report is set forth below.

**Recommendation 1:**  The Chief Operating Officer of the Office of Federal Student Aid should develop a timeline for issuing a comprehensive guidance and instructions document for PSLF servicing.  This could involve developing a new servicing manual or expanding upon the PSLF servicer's existing processing handbook.

<u>Response</u>:  FSA concurs with the recommendation for development of a comprehensive guidance document for PSLF servicing.  We continue to focus on the development of processes and procedures to streamline and improve the overall PSLF servicing.  In conjunction with these efforts, FSA is documenting requirements and guidelines that will be incorporated into a comprehensive guide.

**Recommendation 2:**  The Chief Operating Officer of the Office of Federal Student Aid should provide additional information to the PSLF servicer and borrowers to enhance their ability to determine which employers qualify for PSLF.  This could involve Education developing an authoritative list of qualifying employers or improving the PSLF servicer's existing database, and making this information available to borrowers.

<u>Response</u>:  FSA concurs with the recommendation to provide additional information to the PSLF servicer and borrowers to enhance their ability to determine which employers qualify for PSLF, and we are examining ways to best implement a solution.  As identified in the report, there are numerous complexities to establishing and maintaining a comprehensive database of qualifying employers, including the need for multiple data sources for such information, changes



830 First St. N.E., Washington, DC 20202

ED_01353

Page 2

in an employer's tax status and timing differences, etc. However, FSA is reviewing options for improvements to the PSLF Employment Certification and Application process, including development of an online help tool, which would be expanded to incorporate qualifying employer information.

**Recommendation 3:** The Chief Operating Officer of the Office of Federal Student Aid should standardize the information the PSLF servicer receives from other loan servicers to ensure the PSLF servicer obtains more consistent and accurate information for borrowers pursuing PSLF.

**Response:** FSA concurs with the recommendation to standardize loan transfer information for the PSLF servicer. Efforts are underway to address the data definition issues related to correcting the data exchanged between servicers.

**Recommendation 4:** The Chief Operating Officer of the Office of Federal Student Aid should ensure that borrowers receive sufficiently detailed information from the PSLF servicer to be able to identify any errors in the servicer's counts of qualifying payments, including information on whether or not each payment qualified toward forgiveness.

**Response:** FSA concurs with the recommendation to ensure borrowers are receiving sufficiently detailed but simplified information to allow borrowers to better understand and, if appropriate, contest the Department's determination of the number of qualifying payments they have made. Current efforts to review PSLF processes to improve overall servicing and reduce borrower confusion will also include a review of the PSLF letters to determine how to better communicate to borrowers regarding qualifying payment counts, overall program requirements, and employer eligibility.

I appreciate your highlighting the importance of the Department's role in implementing requirements associated with public loan service forgiveness.

Sincerely,

James F. Manning
Acting Chief Operating Officer

ED_01354

# Appendix II: GAO Contact and Staff Acknowledgments

## GAO Contact

Melissa Emrey-Arras, (617) 788-0534 or emreyarrasm@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Debra Prescott (Assistant Director), William Colvin (Analyst-in-Charge), and Linda Collins made key contributions to this report. Additional assistance was provided by James Bennett, Deborah Bland, Alicia Cackley, Sarah Cornetto, Hedieh Fusfield, Kirsten Lauber, Sheila R. McCoy, Jeffrey G. Miller, Jessica Orr, Ellen Phelps Ranen, and Paul Wright.

ED_01355

# Appendix III: Accessible Data

## Data Tables

**Data Table for Figure 4: Cumulative Number of Borrowers Who Had Their Employment and Loans Certified as Eligible for PSLF, January 2012 to April 2018, by Quarter**

| Calendar Year | Quarters | Cumulative Number of Borrowers |
|---|---|---|
| 2012 | Q1 | 2761 |
| | Q2 | 8990 |
| | Q3 | 16058 |
| | Q4 | 24222 |
| 2013 | Q1 | 33667 |
| | Q2 | 45169 |
| | Q3 | 58994 |
| | Q4 | 77479 |
| 2014 | Q1 | 97034 |
| | Q2 | 122036 |
| | Q3 | 149559 |
| | Q4 | 179507 |
| 2015 | Q1 | 208848 |
| | Q2 | 242640 |
| | Q3 | 278720 |
| | Q4 | 317800 |
| 2016 | Q1 | 361129 |
| | Q2 | 412530 |
| | Q3 | 473657 |
| | Q4 | 534248 |
| 2017 | Q1 | 595345 |
| | Q2 | 655179 |
| | Q3 | 726993 |
| | Q4 | 789484 |
| 2018 | Q1 | 865729 |
| | Q2 (As of April) | 890516 |

ED_01356

**Appendix III: Accessible Data**

**Figure 6: Certification and Denial Outcomes for Borrowers Who Requested to Have Their Employment and Loans Certified as Eligible for Loan Forgiveness, as of April 2018**

Of the 1,173,420 borrowers...

| Borrowers | Percentage of total | Number of borrowers |
|---|---|---|
| Certified borrowers with 1 or more qualifying payments | 44% | 520,267 |
| Borrowers who requested to have their employment and loans certified were denied or had yet to record a qualifying payment | 56% | |
| Certified borrowers with no qualifying payments | 32% | 370,249 |
| Borrowers denied for having no qualifying loans | 13% | 154,875 |
| Borrowers denied for other reasons | 11% | 127,573 |

ED_01357

**Data Table for Figure 7: Hypothetical Example of the PSLF Servicer's Payment Counting Process and Information Shared with Borrowers**

Borrower's Loan Payment History from 1/1/2016-6/1/2017.

| Date | Amount | Determination | Qualified |
|------|--------|---------------|-----------|
| 1/1/2016 | $250 | Payment preceded employment period | No |
| 2/1/2016 | $250 | | Yes (1) |
| 3/1/2016 | $250 | | Yes (2) |
| 4/18/2016 | $250 | Late payment | No |
| 5/1/2016 | $250 | | Yes (3) |
| 6/1/2016 | $250 | Potential payment counting error | No |
| 7/1/2016 | $250 | | Yes (4) |
| 8/1/2016 | $200 | Payment not for full amount | No |
| 9/1/2016 | $300 | Covered previous month's underpayment | Yes (5) |
| 10/1/2016 | $250 | | Yes (6) |
| 11/1/2016 | $50 | Loan placed in forbearance | No |
| 12/1/2016 | $50 | Loan placed in forbearance | No |
| 1/1/2017 | $250 | | Yes (7) |
| 2/1/2017 | $750 | | Yes (8) |
| 3/1/2017 | $0 | Bill was prepaid on 2/1/2017 | No |
| 4/1/2017 | $0 | Bill was prepaid on 2/1/2017 | No |
| 5/1/2017 | $250 | Payment preceded employment period | Yes (9) |
| 6/1/2017 | $250 | | Yes (10) |

# Agency Comment Letter

## Text of Appendix I: Comments from the U.S. Department of Education

Page 1

Dear Ms. Emrey-Arras:

I am pleased to write on behalf of the U.S. Department of Education (Department) in response to the statements and recommendations made in the Government Accountability Office (GAO) draft report, "Public

Service Loan Forgiveness (PSLF): Education Needs to Provide Better Information/or the Loan Servicer and Borrowers" (GAO-18-547).

We appreciate the opportunity to respond to this GAO draft report. The Department agrees that student borrowers and those entities that work to administer their loans require as much information as possible to understand and administer current program requirements.

Our response to each of the four recommendations in the GAO draft report is set forth below.

**Recommendation 1:**

The Chief Operating Officer of the Office of Federal Student Aid should develop a timeline for issuing a comprehensive guidance and instructions document for PSLF servicing. This could involve developing a new servicing manual or expanding upon the PSLF servicer's existing processing handbook.

**Response:**

FSA concurs with the recommendation for development of a comprehensive guidance document for PSLF servicing. We continue to focus on the development of processes and procedures to streamline and improve the overall PSLF servicing. In conjunction with these efforts, FSA is documenting requirements and guidelines that will be incorporated into a comprehensive guide.

**Recommendation 2:**

The Chief Operating Officer of the Office of Federal Student Aid should provide additional information to the PSLF servicer and borrowers to enhance their ability to determine which employers qualify for PSLF. This could involve Education developing an authoritative list of qualifying employers or improving the PSLF servicer's existing database, and making this information available to borrowers.

**Response:**

FSA concurs with the recommendation to provide additional information to the PSLF servicer and borrowers to enhance their ability to determine which employers qualify for PSLF, and we are examining ways to best implement a solution. As identified in the report, there are numerous

ED_01359

complexities to establishing and maintaining a comprehensive database of qualifying employers, including the need for multiple data sources for such information, changes in an employer's tax status and timing differences, etc. However, FSA is reviewing options for improvements to the PSLF Employment Certification and Application process, including development of an online help tool, which would be expanded to incorporate qualifying employer information.

Page 2

**Recommendation 3:**

The Chief Operating Officer of the Office of Federal Student Aid should standardize the information the PSLF servicer receives from other loan servicers to ensure the PSLF servicer obtains more consistent and accurate information for borrowers pursuing PSLF.

**Response:**

FSA concurs with the recommendation to standardize loan transfer information for the PSLF servicer. Efforts are underway to address the data definition issues related to correcting the data exchanged between servicers.

**Recommendation 4:**

The Chief Operating Officer of the Office of Federal Student Aid should ensure that borrowers receive sufficiently detailed information from the PSLF servicer to be able to identify any errors in the servicer's counts of qualifying payments, including information on whether or not each payment qualified toward forgiveness.

**Response:**

FSA concurs with the recommendation to ensure borrowers are receiving sufficiently detailed but simplified information to allow borrowers to better understand and, if appropriate, con test the Department's determination of the number of qualifying payments they have made. Current efforts to review PSLF processes to improve overall servicing and reduce borrower confusion will also include a review of the PSLF letters to determine how to better communicate to borrowers regarding qualifying payment counts, overall program requirements, and employer eligibility.

ED_01360

**Appendix III: Accessible Data**

I appreciate your highlighting the importance of the Department's role in implementing requirements associated with public loan service forgiveness.

Sincerely,

James F. Manning
Acting Chief Operating Officer

## GAO's Mission

The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates."

### Order by Phone

The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information.

## Connect with GAO

Connect with GAO on Facebook, Flickr, Twitter, and YouTube.
Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts.
Visit GAO on the web at https://www.gao.gov.

ED_01362

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Website: https://www.gao.gov/fraudnet/fraudnet.htm

Automated answering system: (800) 424-5454 or (202) 512-7700

## Congressional Relations

Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548

## Strategic Planning and External Liaison

James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548





# BROKEN PROMISES

## Employer Certification ~~Form~~ **Failure**

August 2020



ED_01364

# Table of Contents

Executive Summary ..................................................... 3

About this Report ..................................................... 6

Introduction ..................................................... 7

Certifying the Right Type of Employment ..................................................... 8

How the U.S. Department of Education
Tracks Eligible Employers ..................................................... 12

Recommendations for the U.S. Department of
Education and the Student Loan Industry ..................................................... 14

Conclusion ..................................................... 16

Appendix: Responsive Records ..................................................... 17

ED_01365

# Executive Summary

- The Public Service Loan Forgiveness Program was created by Congress in 2007 to provide public service workers with student loan debt relief in exchange for a decade of service in their communities. Unfortunately, since its inception, the program has been mishandled and undermined by the Department of Education and its contracted loan servicers. According to the Department of Education, the Public Service Loan Forgiveness program continues to have a nearly 99 percent denial rate.

- In December 2018, the American Federation of Teachers (AFT) and the Student Borrower Protection Center (SBPC) launched a top-to-bottom investigation of Public Service Loan Forgiveness (PSLF), issuing dozens of requests under federal and state open records laws for documents and records related to the widespread government mismanagement and industry abuses that have caused public service workers to forfeit their rights under this critical protection. As part of this investigation, AFT and SBPC scrutinized the policies and practices surrounding the process for approving "public service organizations" as qualifying employers.

- To receive loan forgiveness through PSLF, borrowers must be employed in a public service job. Since 2012, the Department of Education has administered an "employment certification" process. In that time, the borrowers have been told by the Department of Education more than 50,000 times that their employer was "ineligible" for PSLF.

- More than 50 million Americans have lost their jobs since the coronavirus pandemic began in March 2020. These job losses include millions of public service workers, particularly those employed by state and local governments. Recently unemployed public service workers with student debt, whether eventually rehired by their prior employer or whether pursuing a new public service position, will now need to navigate the "employment certification" process again.

- To manage this process, the Department of Education hired the Pennsylvania Higher Education Assistance Agency (PHEAA) to serve as its principal PSLF loan servicer. In this role, PHEAA evaluates information provided by borrowers who submit an Employment Certification Form (ECF) and determines whether a borrower's employer qualifies under PSLF.

- More than 9,000 pages of documents and records obtained by AFT and SBPC reveal an "employment certification" process in disarray—exposing routine errors, poor recordkeeping, and conflicting policies throughout the process for determining whether borrowers' employers qualify for federal loan forgiveness. These breakdowns can confuse or deter PSLF applicants and deny borrowers their right to relief. As described in the following report, the investigation reveals:

  - **Borrowers whose employment had been certified as eligible for PSLF were later reconsidered and rejected.** In some cases, borrowers spent years working toward loan forgiveness only to have the Education Department later reject the same employer, damaging borrowers' financial lives. These findings offer evidence that the allegations made in the recently settled ABA lawsuit affected more borrowers than previously acknowledged.

ED_01366

- **Borrowers employed by the same organization receive different answers when seeking to certify their employment.** Records produced by the Department of Education reveal that PHEAA employees made inconsistent determinations when evaluating employers' eligibility for PSLF, particularly where an organization was not a 501(c)(3) nonprofit or a government agency. In some cases, borrowers working for the same organizations received conflicting correspondence. For example, evidence uncovered in this investigation suggests that multiple borrowers submitting ECFs from the same organizations, including borrowers working at AARP and Fair Elections Legal Network, received different determinations upon submitting their documentation.

- **There is no rigorous, standardized process for certifying employers.** New evidence obtained by AFT and SBPC suggests that personnel at PHEAA and the Education Department lack a rigorous, standardized process for determining whether a given employer qualifies as eligible for employees to receive PSLF. Instead, employees at PHEAA and ED make inconsistent and subjective determinations about the nature of public service work. In several cases, individual servicer employees were granted wide latitude to make qualitative judgments about the nature of nonprofits' missions and to deny certifications to these nonprofits on an ad hoc basis.

- **The PSLF program is plagued by poor recordkeeping.** The investigation reveals that the federal government never possessed a comprehensive dataset of employers certified as eligible public service organizations for PSLF, leaving the public without the benefit of a registry of these organizations and leaving PHEAA and ED staff without access to critical data to track decisions and do their jobs effectively. A purportedly comprehensive list was compiled only in response to this investigation in June 2019. Records produced by the Department of Education reveal that an initial list was created in 2016, but this document was error-ridden and demonstrates that the Education Department once approved organizations it would later reject as unqualified.

- **Borrowers lack a clear process or a formal right to appeal if their employer is rejected.** Borrowers' employment is routinely rejected by the Department of Education. However, borrowers have no formal process to appeal rejections if they believe such a decision was made in error. Documents and correspondence produced by the Department of Education confirm that such errors do occur and raise questions about whether the absence of such a process has deterred or derailed access to loan forgiveness for an unknown number of public service workers.

- These findings indicate widespread failures by both the Department of Education and PHEAA. The report includes a list of recommendations to the Education Department and its student loan servicers to address these breakdowns:

  - **Issue new rules to simplify and expand the definitions of "public service," "public service job," and "public service organization."** Findings suggest that current regulations are implemented arbitrarily and would benefit from an immediate overhaul. The Department of Education should initiate a rulemaking to ensure all borrowers, federal employees, contractors, and other stakeholders have rules of the road consistent with Congress' intent when establishing a broad-based right to loan forgiveness.

  - **Provide transparency to borrowers around employment certification denials.** Borrowers are routinely left in the dark on why an employer may have been rejected. The Department of Education should provide each borrower with a clear, plain language explanation of the basis for any denial, modeled on the requirements currently in place when banks and other lenders deny consumers access to credit.

4

- **Establish a straightforward appeals process that all borrowers and organizations can access when a public service organization is rejected.** The Department of Education should issue public guidance to establish a fair, consistent, and transparent appeals process and ensure final decisions are made by federal employees.

- **Publish a registry of certified public service organizations.** For the benefit of its staff, contractors, and the public, the Department of Education should regularly collect and publish a list of employers considered under PSLF, indicating eligible employers, denied employers, and those pending determination. For newly unemployed public service workers, access to a registry of previously approved public service employers can ensure those with student debt can remain on track for PSLF.

- Contemporaneous with the publication of this report, AFT and SBPC have released a trove of new records obtained through federal and state open records laws. As watchdogs, researchers, and the public continue to scrutinize the widespread failures across PSLF, these records can offer new insight into what went wrong and who is responsible.

- The records being made publicly available include over 9,000 pages of correspondence and records featuring deliberations between the Department of Education and PHEAA concerning the eligibility of applicants for PSLF. Records also include the first purportedly "comprehensive" list of approved and denied employers, as described in more detail in this report.

ED_01368

# About this Report

The Public Service Loan Forgiveness (PSLF) program was created in 2007 as part of the bipartisan College Cost Reduction and Access Act (CCRAA) to support America's public service workers facing financial struggles stemming from student loan debt.[1] The PSLF program is premised on the notion that public service workers with student debt should be entitled to student loan forgiveness in exchange for a decade of public service work. This loan forgiveness is necessary because, while public service is a vital public good, workers are not compensated commensurately to their private sector counterparts.[2] Loan forgiveness can help ensure the economic pressures of student debt do not deter or delay these borrowers from achieving other life milestones, such as purchasing a home, buying a car, retiring, or starting a family.[3] PSLF was designed to support people working in a wide range of high-demand public service careers, from servicemembers and teachers to social workers and nurses.[4]

This report is informed by a joint investigation conducted by the American Federation of Teachers (AFT) and the Student Borrower Protection Center (SBPC). This report is the latest in a series of publications examining the administration of the PSLF program by the government and its contractors since the program's inception, in an effort to expose the widespread mismanagement and abuse that has denied or delayed millions of public service workers' access to this critical protection.

The following analysis and commentary are informed by more than 9,000 pages of documents and records produced by the U.S. Department of Education (ED) and state-backed student loan companies that serve as federal contractors, participants in the legacy Federal Family Education Loan Program, or both. These documents and records were produced in response to two dozen requests made by the AFT and the SBPC under the Freedom of Information Act and state open records laws. This report was also informed by court filings, government reports, academic research, government data, and complaints submitted by individual student loan borrowers and published in the Consumer Financial Protection Bureau's (CFPB) public complaint database. Taken together, these sources of information reveal a deeply dysfunctional system created by the federal government's failure to faithfully execute the law as written and industry's efforts to maximize profits at the expense of borrowers' rights.

ED_01369

# Introduction

In December 2018, the Student Borrower Protection Center and the American Federation of Teachers partnered to launch a first-of-its-kind investigation into breakdowns plaguing the Public Service Loan Forgiveness program by both the student loan industry and the Department of Education.[5] This comprehensive effort sought to demand answers and give a voice to the public service workers with student debt who have been denied the benefit of this key protection.

> **Borrowers must satisfy four requirements to earn loan forgiveness through the PSLF program. To qualify, they must have:**
>
> **1) The right type of loan**
>
> **2) The right type of payment plan**
>
> **3) The right number of qualifying payments**
>
> **4) The right type of employer[6]**

Since the launch of this investigation, we have obtained thousands of pages of communications that document breakdowns related to the eligibility requirements for PSLF. In the following report, we highlight a portion of this production specifically related to the fourth requirement: certifying the right type of employment. This report takes a detailed look at the government's decision-making process related to certifying employers as "public service organizations."[7]

Since the Department of Education established a process for certifying employer eligibility in 2012, the government has released very little public information about how this process works. However, based on public data released by the Department of Education, we do know that borrowers have been told more than 50,000 times over this period that their employer was "ineligible" for PSLF.[8]

More than 50 million Americans have lost their jobs since the coronavirus pandemic began in March 2020.[9] These job losses include millions of public service workers, particularly those employed by state and local governments.[10] Recently unemployed public service workers with student debt, whether eventually rehired by their prior employer or pursuing a new public service position, will now need to navigate the "employment certification" process again.

As described in detail below, we have uncovered new evidence that the administrative processes and practices at the Department of Education and the Pennsylvania Higher Education Assistance Agency (PHEAA)—the primary student loan servicer contracted to administer the PSLF program—have combined to unduly deny or deter borrowers seeking to certify employment for the purpose of pursuing PSLF.

ED_01370

# Certifying the Right Type of Employment

When the PSLF program was created by Congress in 2007, the Department of Education was granted the authority to issue regulations establishing eligibility criteria for the program.[11] Additionally, Congress tasked the Education Department with governing the conduct of the student loan companies paid to help borrowers navigate this system.[12]

The Higher Education Act requires that borrowers pursuing PSLF be "employed in a public service job during the period in which the borrower makes each of the 120 payments."[13] This law offers borrowers a definition of "public service job":

> The term "public service job" means—
>
> (i) a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title; or
>
> (ii) teaching as a full-time faculty member at a Tribal College or University as defined in section 1059c(b) of this title and other faculty teaching in high-needs subject areas or areas of shortage (including nurse faculty, foreign language faculty, and part-time faculty at community colleges), as determined by the Secretary.[14]

In 2008, the Department of Education under the Bush Administration issued rules to establish a secondary test. In October 2008, the agency wrote a definition of "public service organization" to determine whether a borrower was engaged in a "public service job."[15]

Specifically, the rules set forth that any borrower who worked full-time in any job function for a federal, state, local, or tribal government agency; a public child or family service agency; a tribal college or university; or a 501(c)(3) nonprofit organization would automatically be considered to be working in a "public service job."[16] These regulations also established criteria for borrowers working for a private nonprofit organization that was organized under a different section of the tax code, where such an organization provided one of a specific set of "public services."[17]

However, years after the program was created and its rules were finalized, student loan borrowers continue to face uncertainty about their employers' eligibility under the program. This uncertainty is driven, in part, by the

ED_01371

approach to regulation, program administration, and contractor oversight by staff at the Department of Education spanning the Bush, Obama, and Trump administrations.

**Years after the program was created and rules were finalized, student loan borrowers continue to face uncertainty about their employers' eligibility under the program.**

While borrowers were eligible to make qualifying payments toward PSLF immediately upon its enactment in 2007, it took the Department of Education nearly five years—until January 2012—to establish a process for student loan borrowers to verify that they had the right type of employment.[18] This process—triggered by submitting a government-issued form known as an Employment Certification Form, or ECF—purported to offer borrowers reassurance that they had secured qualifying employment and were in fact on track to earn loan forgiveness.[19]

As of March 2020, the Department of Education has received more than four million Employment Certification Forms submitted by borrowers declaring their intent to pursue PSLF.[20] However, until now, the public has had little insight into the process by which ED determines whether individual employers qualify as a "public service organization," as defined by federal rules.[21]

## Background

The process for certifying qualified employment has been the subject of significant scrutiny in recent years. Borrowers and public service organizations have raised concerns about the lack of transparency available to those seeking clarity though this process.[22] Additionally, law enforcement officials have issued warnings about a system that leaves borrowers vulnerable to the whims of student loan servicing personnel and Education Department staff, with little recourse when borrowers encounter trouble.[23]

For example, the American Bar Association (ABA), a non-501(c)(3) nonprofit (or private nonprofit), sued ED in 2016 for approving the organization as a "public service organization" for multiple employees, and then, years later, reversing that decision.[24] In early 2019, a judge called the Department's decision-making process related to employer certification "arbitrary and capricious."[25] When the Department argued that these retroactive ECF denials did not have "immediate or significant" impact on individual borrowers, the judge dismissed the argument as "nonsense."[26]

## Findings and Analysis

The issues identified in court filings in *American Bar Association v. United States Department of Education* offer evidence of mismanagement and abuse in the employment certification process.[27] As discussed below in detail, our investigation offers new evidence that suggests the issues identified in the ABA's lawsuit were not limited to a single organization. Rather, it appears these issues may be pervasive and widespread.

ED_01372

**Records and documents obtained by the SPBC and the AFT reveal:**

- **Borrowers employed by the same organization received different answers when seeking to certify their employment.** Our investigation found that servicer personnel struggled to make determinations of nonprofit status when evaluating private nonprofit employers, a function of the ad hoc nature of the process underpinning these determinations. In some cases, borrowers working for the same legal arm of the same organization received different determinations. For example, we know from court filings in the ABA's lawsuit that borrowers working at both the ABA and Vietnam Veterans of America were originally told their employers were eligible for PSLF but later had those decisions retracted after a reversal by ED's Office of Federal Student Aid (FSA). Our investigation uncovered additional communications that suggest the issues exposed in the ABA's litigation were not isolated. In one example, records offer conflicting answers about whether the private nonprofit organization AARP was considered a qualifying employer under PSLF, suggesting multiple borrowers received conflicting determinations from FSA.[28] (See Appendix, Document 1). In another example, a borrower submitting an ECF in 2016 from a private nonprofit organization, Fair Elections Legal Network, appears to have been rejected, even though FSA had previously approved a certification in March 2012 for a different borrower working for that organization. (See Appendix, Document 2).

> **The issues identified in the American Bar Association's lawsuit were not limited to a single organization. It appears these issues were pervasive and widespread.**

- **Personnel at PHEAA and FSA made subjective determinations about the nature of "public service" work.** Our investigation found that in several cases individual employees were granted wide latitude to make qualitative judgments about the nature of nonprofits' missions and to deny certifications to these nonprofits on an ad hoc basis. For example, in communications between PHEAA and FSA officials, a nonprofit employer was deemed ineligible for PSLF despite providing direct services for the elderly, described on the organization's website as "care for Holocaust victims by providing vital services."[29] In assessing the nature of the service provided by this organization, the PHEAA employee failed to articulate an objective rationale to justify a decision yet denied the request and noted vaguely, "I don't see their efforts as being for the public. . . ." (See Appendix, Document 3). Based on the correspondence produced in response to our investigation, it remains unclear how widespread this practice is or what, if any, controls are currently in place to ensure that all borrowers benefit from a rigorous and objective decision-making process.

- **Personnel at PHEAA relied on Wikipedia and search engines to make determinations about employer eligibility.** Correspondence between federal employees at FSA and contractors at PHEAA reveal that PHEAA personnel often "researched" the status of employers identified on ECF forms. This research, intended to support decision-making around employer eligibility, appeared to follow no established process and, in some cases, relied on unverified websites, including Wikipedia entries describing the employer under review. For example, in an email from a PHEAA representative sent to an FSA official, the PHEAA employee stated, "Wikipedia definition of Charter School – one thing that surprised me – it says that a

> **In several cases individual employees were granted wide latitude to make qualitative judgments about the nature of nonprofits' missions and to deny certifications to these nonprofits on an ad hoc basis.**

public school can be managed by a for profit – is that correct?" (See Appendix, Documents 4, 5).

- **Borrowers do not have access to a clear process or a formal right to appeal if their employer is rejected.** In some cases, borrowers whose employers were wrongly rejected have successfully reversed this decision, but any complaint intake process is poorly defined and not publicized or not easily accessible. Records reveal that, in at least a dozen cases, borrowers were able to successfully reverse an initial ECF rejection. After review by either senior PHEAA employees or review by Education Department officials, these employers were certified as public service organizations (See, for example, Appendix, Document 6). Based on the documents reviewed, it is unclear how borrowers learn about the opportunity to escalate a denial. In fact, employer certification denial notices specifically tell borrowers they can reapply only if they have additional information to prove their employer qualifies.[30] However, these notices never mention a formal appeals process or identify the steps a borrower can take to escalate issues if their employer is wrongly denied certification. It is possible that FSA's failure to formalize and consistently offer an appeals process drives borrowers away from PSLF before they can escalate a denial.

---

### Example of Wikipedia being used to determine employer eligibility by PHEAA representative

**From:** Kimberly A Myers [mailto:kmyers@pheaa.org] **On Behalf Of** FedLoan PSLF
**Sent:** Friday, April 15, 2016 2:04 PM
**To:** [redacted]
**Subject:** Kla-Mo-Ya Casino
Hi Taneka! We have another casino for you.

This casino is part of the Klamath Tribe in Oregon. We found one website that listed it as an enterprise of the tribe (Enterprise of Tribe document). Another site (ODAIR Draft document) appears to list the casino as a department. We also located the tribe's Constitution, which states, on page 4, that "...sovereign powers, authority and jurisdiction of the Klamath Tribes extends to all the territory which 'formerly constituted the Klamath Reservation, and to all property, airspace, natural resources, cultural resources and such other lands or interests...". This suggests that the casino would be considered part of the tribe and therefore would qualify as governmental.

Though we know that Wikipedia isn't the most reliable source of information, it also states that the casino is a tribally-owned gambling establishment and that the casino disburses payments to the tribal members.

As always we appreciate your guidance! Password to follow.

Thanks!

"Though we know that Wikipedia isn't the most reliable source of information, it also states that the casino is a tribally-owned gambling establishment and that the casino disburses payments to the tribal members."

(See Appendix, Document 5.)

ED_01374

# How the U.S. Department of Education Tracks Eligible Employers

As described above, FSA empowered individual personnel at both FSA and at PHEAA to adjudicate decisions about qualifying employers on a case-by-case basis, leading to variations in outcomes across employers. In addition to demanding documents exposing breakdowns in this process, the SBPC and the AFT sought to determine whether the government maintained a comprehensive list of employers that were successfully certified as public service organizations since PSLF's inception in 2007 (presumably a key tool as part of any responsible, effective approach to program administration).

The investigation uncovered that no such comprehensive list was ever created by either PHEAA or FSA. In effect, for more than a decade, the thousands of federal employees and government contractors who processed paperwork, answered borrowers' questions, and performed other administrative functions with respect to the PSLF program lacked

**Records reveal that, in at least a dozen cases, borrowers were able to successfully reverse an initial ECF rejection. . . . It is unclear how borrowers learn about the opportunity to escalate a denial.**



**Example of retraction letter being sent for prior denial of PSLF**

> 
> From:   (b)(5)        (b)(5)
> To:    FedLoan PSLF <FedLoanPSLF@pheaa.org>
> Cc:    "Johnson, Debbe" <Debbe.Johnson@ed.gov>, "Foss, Ian"
>        <Ian.Foss@ed.gov>, "Battle, Cynthia" <Cynthia.Battle@ed.gov>,
>        (b)(5)        (b)(5)
> Date:   11/05/2015 05:15 PM
> Subject:   [external]DC 37 Health and Security Plan update
> 
> 
> 
> Hi Diane,
> 
> DC 37 Health and Security Plan sent in an updated Public Service Loan
> Forgiveness (PSLF) escalation directly to FSA. In the appeal DC 37
> provided additional information on what the organization does and how
> the legal services provided are not just for union members (see
> attached). FSA forwarded the appeal to the Office of General Counsel
> (OGC) for a final decision and based on the new information received,
> OGC determined that DC
> 37 Health and Security Plan should be considered as a qualifying
> employer for the purposes of PSLF.
> 
> Can FedLoan send the borrower a retraction letter for the prior denial?

**". . . Based on the new information received, OGC determined that DC 37 Health and Security Plan should be considered a qualifying employer for the purposes of PSLF. Can FedLoan send the borrower a retraction letter for the prior denial?"**

-FSA correspondence

ED_01375

the capacity to quickly determine whether an employer had been previously certified as a public service organization. Further, it appears that both FSA and PHEAA lacked any internal controls to oversee or audit this process. Despite this significant oversight, ED was willing to create this list in response to the inquiry from the AFT and the SBPC. This list was released to the public in conjunction with the publication of this report.[31]

## Background

Beginning in January 2012 with the public release of the Employer Certification Form, borrowers began to certify their intent to pursue Public Service Loan Forgiveness. To date, more than 4.29 million ECFs have been submitted by borrowers seeking to confirm their employer's eligibility for the program.[32] As described below, the investigation revealed that thousands of these determinations were made, but FSA was not appropriately keeping track of previously approved employers.

This investigation has produced the only list ever compiled of employers certified and denied via ECF as of June 2019—a list that purports to be comprehensive, according to ED officials.[33]

## Findings and Analysis

As the SBPC negotiated with FSA for document production, two important facts emerged that raised flags about FSA's record-keeping process. Records obtained by the SPBC and the AFT reveal:

- **The federal government never possessed a comprehensive list of employers certified as eligible public service employers. Such a list was compiled only in response to a request from this investigation.** When establishing a process to verify PSLF-eligible employers, FSA relied on PHEAA to track employer eligibility and maintain records. In the more than seven years since the form's creation, FSA failed to maintain its own comprehensive list of employers—a critical tool to administer the program effectively. When the investigation requested this list, ED instructed PHEAA to compile an updated, comprehensive list of employers because FSA lacked the technical capacity to generate such a list on its own. (See Appendix, Document 7).

- **Initial iterations of the list of certified employers produced by FSA failed to include numerous public service employers that the SBPC independently verified were certified by PHEAA in prior years.** Upon receipt of the first purportedly "comprehensive" list of employers, large, high-profile public service employers—including the U.S. Department of Education and the Consumer Financial Protection Bureau—were missing. These omissions, in particular, offer additional evidence of flaws in a record-keeping system that potentially affects millions of public service workers. The omission of these two employers was especially noteworthy because, in 2014, then-Education Secretary Arne Duncan joined then-CFPB Director Richard Cordray in publicly pledging to distribute ECFs to ED and CFPB employees and assist employees when seeking to certify their intent to pursue PSLF.[34] The SBPC raised concerns about these omissions with ED officials, who subsequently ordered PHEAA to produce a new "comprehensive" list of employers.[35] (See Appendix, Document 8).

> **To date, more than 4.29 million ECFs have been submitted by borrowers seeking to confirm their employer's eligibility for the program.**

# Recommendations for the U.S. Department of Education and the Student Loan Industry

The employer certification process is a necessary component of a functioning PSLF program and is key to ensuring public service workers with student debt have access to a secure financial future. Yet, as documents obtained by the SPBC and the AFT indicate, the program remains plagued by administrative failures at the Department of Education and harmful practices by the student loan industry. ED and industry can each take important steps to address the challenges pervading this process, in part by ensuring that PHEAA, the student loan company managing this program, delivers timely, accurate, and consistent service to borrowers. These steps should be accompanied by ED increasing transparency and standardizing requirements for the program itself.

- **Simplify and expand the definitions of "public service," "public service job," and "public service organization," through new rulemaking.** As detailed above, borrowers encounter an inconsistent and error-prone process when seeking to determine whether their employer qualifies as a public service organization, particularly if their employer is a private nonprofit organization that is not organized under section 501(c)(3) of the Internal Revenue Code. In some cases, multiple borrowers working for the same organization have received conflicting answers from PHEAA or FSA when seeking a determination on employment eligibility, suggesting that the current regulations have been implemented arbitrarily and would benefit from revision. ED should promulgate new rules to simplify and expand the definition of "public service job" and "public service organization" to ensure that all stakeholders, including individual borrowers, organizations, FSA employees, government contractors, and market participants, have clear direction when pursuing or administering PSLF. When writing new rules, ED should also focus on clarifying the definition of "public service" as it relates to the evaluation of private nonprofit organizations that are not organized under section 501(c)(3) of the Internal Revenue Code.

- **Provide transparency to borrowers when denying employment certifications.** As the preceding report describes, borrowers are routinely left in the dark when seeking to determine why a public service organization was rejected and the specific justification for such a denial. FSA should regularly provide accurate, precise information to borrowers about all denials. This should include a clear, plain language explanation of the specific grounds for such a denial. When considering how to deliver such a notice, FSA should model its approach after its existing regulatory requirement to deliver "adverse action notices" under the Fair Credit Reporting Act and the Equal Credit Opportunity Act—an obligation that guarantees all borrowers an explanation for the basis of any denial contained in a timely, plain-language written communication.[36]

- **Establish a fair, consistent, and transparent appeals process that all borrowers and organizations can access when a public service organization is rejected.** Correspondence between PHEAA and FSA related to the process for escalating employer certification denials shows that attempts to escalate by borrowers are handled inconsistently and that the opportunity to seek a review is limited and not well publicized or understood. Further, there is no process for organizations to work directly with FSA or

ED_01377

PHEAA when similarly situated employees receive different treatment from FSA. FSA should immediately issue public guidance establishing a fair, consistent, and transparent appeals process that can be accessed by both individual borrowers and by public service organizations. FSA should also ensure that final decisions on employer certification made via appeals are made by federal employees.

- **Publish a comprehensive, up-to-date registry of public service organizations that have been certified as qualifying employers under PSLF.** As discussed above, our investigation revealed that FSA employees did not have access to a complete record of employers that had previously been certified as public service organizations—revealing not only that the public has never benefited from such a registry, but also that the staff administering the program lacked critical data to do their jobs effectively. For newly unemployed public service workers, access to a registry of previously approved public service employers is critical to ensure those with student debt can remain on track for PSLF. To address the serious deficiencies described above, FSA should, on a quarterly basis, collect and publish a registry of employers, including each organization's federal Employer Identification Number (EIN), the location of each employer, and the category of qualifying employment.[i] This registry should indicate all eligible employers, all denied employers, and all employers where determinations are still being made. This registry should be searchable and responsive so borrowers and organizations can quickly identify whether the employer has been certified by FSA. This recommendation is particularly important as FSA makes significant changes to the role that PHEAA plays as the Public Service Loan Forgiveness servicer. It would also empower public service employers to better understand and communicate the benefits of PSLF to public service workers and assist those with student debt in navigating the process for pursuing loan forgiveness.

---

[i] In June 2020, shortly before the publication of this report, the Department of Education's Office of Federal Student Aid introduced a feature to its "PSLF Help Tool" that appears to permit certain borrowers to query an unpublished list of previously certified employers. The purpose of this feature is to permit certain borrowers to preliminarily validate public service employment as part of a streamlined process for pre-populating the Employment Certification Form. Readers should note that this tool, which is limited to Direct Loan borrowers and requires user authentication to access, does not provide all borrowers, employers, or the public with access to necessary information and is inadequate to address the issues identified in this recommendation. *See PSLF Help Tool*, U.S. Dep't of Educ. Office of Fed. Student Aid, https://studentaid.gov/app/pslfFlow.action#!/pslf/launch (last accessed on July 3, 2020).

# Conclusion

The joint investigation between the AFT and the SBPC continues to uncover repeated breakdowns by both ED and the student loan industry that span the PSLF program. Haphazard or inconsistent determinations about employer eligibility by the government or its contractor affect past, present, and future borrowers seeking to access loan forgiveness. A sound process to certify employment is a critical function, and the failure to offer such a process has jeopardized the financial futures of tens of thousands of borrowers across the country.

As the AFT and the SBPC continue to build on the work of regulators, law enforcement officials, government watchdogs, and private litigants, this investigation seeks to expand understanding of the failures in the PSLF program and to determine who is responsible for those failures. In the months ahead, the AFT and the SBPC will continue to release new data and documents demonstrating that mismanagement by the government and abuse by the student loan industry have harmed millions of teachers, nurses, first responders, and other dedicated public service workers who simply sought to invoke their right to loan forgiveness guaranteed under federal law.

ED_01379

# Appendix: Responsive Records

This appendix references specific communications between PHEAA and FSA officials referenced in the report. The comprehensive production of records to FOIA request 19-00571-F can be found at: www.protectborrowers.org/ecf-docs.

Document 1: AARP ..................................................................................................Page 18

Document 2: Fair Elections Legal Network ....................................................Page 22

Document 3: Conference on Jewish Material Claims Against Germany.......................Page 25

Document 4: North Star Academy Charter School.........................................Page 26

Document 5: Kla-Mo-Ya Casino ....................................................................Page 27

Document 6: DC 37 Health and Security Plan................................................Page 28

Document 7: FSA Email Correspondence on
Recordkeeping of Employer Eligibility 1 ........................................................Page 33

Document 8: FSA Email Correspondence on
Recordkeeping of Employer Eligibility 2 ........................................................Page 36

ED_01380

## Document 1: AARP

ECFs submitted for the nonprofit organization AARP are considered by PHEAA and FSA staff in a manner that demonstrates there is not a clear process for review, authorization, or recordkeeping of approved entities. Correspondence reveals internal confusion and staff not knowing how to make a determination for the term, "public service for the elderly," which appears in the statutory definition of "public service work." Despite staff indicating that AARP is not an eligible employer, AARP appears under different statuses on various lists provided by ED for this investigation.

**From:** Tiongquico, Rene
**Sent:** Tuesday, September 13, 2016 1:45 PM
**To:** FSA.PLI
**Cc:** Kane, Rachel; Utz, Jon
**Subject:** FW: AARP

Another PSLF loans issue for our PLI-OPE call.

AARP is claiming they are a public service organization. Although they are not a 501(c)(3)—they are a (c)(4)—they are claiming to provide public service for the elderly. "Public service for the elderly" is not a term defined under regulations.

(b)(5)

**From:** (b)(5)
**Sent:** Thursday, September 08, 2016 2:33 PM
**To:** FedLoan PSLF; (b)(5)

ED_01381

**Cc:** Battle, Cynthia; Tiongquico, Rene
**Subject:** RE: AARP

Hi Kim,

Rene would like to escalate this to the Office of General Counsel (OGC). We will keep you posted on a response.

Thanks,

Taneka

**From:** Kimberly A Myers [mailto:kmyers@pheaa.org] **On Behalf Of** FedLoan PSLF
**Sent:** Tuesday, September 06, 2016 9:41 PM
**To:** (b)(5)
**Subject:** Fw: AARP

Hi Taneka!  Although you probably have this decision saved in your records, I just wanted to forward the historical exchange for easy reference.  Based on Ian's prior decision, it was determined that this organization doesn't qualify.  Although we agree, we now received correspondence disputing the denial and requesting approval of this organization.

They claimed that they are 501(c)(3) - which they are not, they are actually 501(c)(4).  They also claimed that they provide 7 public services for the elderly (which they didn't specifically call out in their correspondence).  They attached their organizing documents as well as some other documents.  We still don't believe they qualify, but due to the escalation, we wanted to forward for your review.

Thanks!

Kimberly A Myers
Compliance Services
kmyers@pheaa.org
(717) 720-2630

----- Forwarded by Kimberly A Myers/PHEAA on 09/06/2016 09:33 PM -----

From:    (b)(5)        (b)(5)
To:      "FedLoan PSLF" <FedLoanPSLF@pheaa.org>, (b)(5)        <publicservice@ed.gov>
Cc:      "Sipple-Asher, Bessie" <Bessie.Ke.SippleAsher@ed.gov>, "Johnson, Debbe" <Debbe.Johnson@ed.gov>, "Ninemire, Sandra"
<Sandra.Ninemire@ed.gov>
Date:    04/25/2013 11:06 AM
Subject:    RE: AARP

After further review, I cannot find any evidence that the organization
provides a qualifying service.  So, unless the borrower presents additional
evidence, I don't think it qualifies.

-----Original Message-----
From: Diane Freundel [mailto:dfreunde3@pheaa.org] On Behalf Of FedLoan PSLF
Sent: Thursday, April 11, 2013 8:50 AM
To: (b)(5)

ED_01382

Cc: Sipple-Asher, Bessie; Johnson, Debbe; FedLoan PSLF; Foss, Ian; Ninemire, Sandra
Subject: Re: AARP

We have not sent this approval yet.  We'll hold it.  Thanks

Diane


From:            [(b)(5)]        [(b)(5)]
To:              [(b)(5)]        [(b)(5)]                    "FedLoan PSLF"
                 <FedLoanPSLF@phaa.org>
Cc:                    "Foss, Ian" <Ian.Foss@ed.gov>, "Ninemire, Sandra"
                 <Sandra.Ninemire@ed.gov>, "Sipple-Asher, Bessie
                 <BessieXo.SippleAsher@ed.gov>, "Johnson, Debbe"
                 <Debbe.Johnson@ed.gov>
Date:                  04/10/2013 12:18 PM
Subject:               Re: AARP


Diane,

Actually, we need to walk this one back.  I found out that the Legal Counsel
for the Elderly is an independent offshoot of the AARP.  It is a 501(c)(3),
but we cannot attribute its activities to the (c)(4) that applied.

So, I'm going to research some more.  Have we sent the approval yet?

Ian


On 4/5/13 12:09 , [(b)(5)]          [(b)(5)]                    wrote:

>Diane,
[(b)(5)]

>Ian
>
>-----Original Message-----
>From: Diane Freundel [mailto:dfreunde@phaa.org] On Behalf Of FedLoan
>PSLF
>Sent: Monday, March 18, 2013 2:49 PM
>To: [(b)(5)]
>Subject: AARP
>
>
[(b)(5)]

>
>(See attached file: AARP.zip)
>
>Diane Freundel
>Compliance Services
>(717) 720-3267
>fax- (717) 720-3911

ED_01383

```
>dfreunde@pheaa.org
>This message contains privileged and confidential information intended
>for the above addressees only.  If you receive this message in error
>please delete or destroy this message and/or attachments.
>
>The sender of this message will fully cooperate in the civil and
>criminal prosecution of any individual engaging in the unauthorized use
>of this message.
```

```
This message contains privileged and confidential information intended for
the above addressees only.  If you receive this message in error please
delete or destroy this message and/or attachments.

The sender of this message will fully cooperate in the civil and criminal
prosecution of any individual engaging in the unauthorized use of this
message.
```

This message contains privileged and confidential information intended for the above addressees only. If you receive this message in error please delete or destroy this message and/or attachments.

The sender of this message will fully cooperate in the civil and criminal prosecution of any individual engaging in the unauthorized use of this message.

Code:PHEAA

ED_01384

## Document 2: Fair Elections Legal Network

Correspondence show confusion around the determination of ECF eligibility for borrowers from nonprofit organization Fair Elections Legal Network. PHEAA and FSA staff discuss whether to reverse determinations for a borrower that was already approved four years prior. Despite this discussion, Fair Elections Legal Network is listed as a certified employer in the list created by ED for this investigation. Additional documentation indicates instances of Fair Elections Legal Network employees being denied on the basis of an ineligible employer.

Can you tell me if the authorized official for the Fair Elections Legal Network ever submitted an ECF as providing Public Interest Law Services. The ECF that was attached for the borrower in 2015 is certified under Public Education.

Thanks,

Taneka

**From:** Kimberly A Myers <kmyers@pheaa.org> on behalf of FedLoan PSLF <FedLoanPSLF@pheaa.org>
**Sent:** Monday, November 21, 2016 6:44:52 AM
**To:** (b)(6)
**Cc:** Battle, Cynthia; FedLoan PSLF; Tiongquico, Rene
**Subject:** Re: Re: Re: Fair Elections Legal Network

Hi Taneka!  Just wanted to follow-up on this one as well.  Thanks!

Kimberly A Myers
Compliance Services
kmyers@pheaa.org
(717) 720-2630

From:     (b)(6)         (b)(6)
To:       FedLoan PSLF <FedLoanPSLF@pheaa.org>
Cc:       "Battle, Cynthia" <Cynthia.Battle@ed.gov>, "Tiongquico, Rene" <Rene.Tiongquico@ed.gov>
Date:     10/07/2016 03:35 PM
Subject:  [external]Re: Re: Fair Elections Legal Network

Thanks Kim.

Have a good weekend!

**From:** Kimberly A Myers <kmyers@pheaa.org> on behalf of FedLoan PSLF <FedLoanPSLF@pheaa.org>
**Sent:** Friday, October 7, 2016 2:10:02 PM
**To:** (b)(6)
**Cc:** Battle, Cynthia; FedLoan PSLF; Tiongquico, Rene
**Subject:** Re: Re: Fair Elections Legal Network

ED_01385

Hi Taneka! We only have record of this one borrower being approved under the Fair Elections Legal Network, and it was approved on 3/5/12. Thanks!

Kimberly A Myers
Compliance Services
kmyers@pheaa.org
(717) 720-2630

From:      (b)(5)        <publicservice@ed.gov>
To:        FedLoan PSLF <FedLoanPSLF@pheaa.org>
Cc:        (b)(5)    (b)(5)              "Tiongquico, Rene" <Rene.Tiongquico@ed.gov>, "Battle, Cynthia" <Cynthia.Battle@ed.gov>
Date:      10/07/2016 01:09 PM
Subject:   [external]Re: Fair Elections Legal Network

Hi Kim,

(b)(5)

Thanks,

Taneka

**From:** Kimberly A Myers <kmyers@pheaa.org> on behalf of FedLoan PSLF <FedLoanPSLF@pheaa.org>
**Sent:** Friday, September 16, 2016 12:42:34 PM
**To:** (b)(5)
**Subject:** Fair Elections Legal Network

Hi Taneka. This employer was last reviewed in March 2012 (during the beginning stages of our PSLF reviews). We had escalated this one and Ian approved as private not-for-profit, and we categorized it under public interest legal services.

We now received a recent escalation of this employer. Now knowing more on the public interest legal services category, we don't believe this employer should qualify. We wanted to escalate to you for a decision. I included our original research as well as our email exchange with Ian.

ED_01386

Your guidance is appreciated.  Password to follow.


Thanks!

Kimberly A Myers
Compliance Services
kmyers@pheaa.org
(717) 720-2630


This message contains privileged and confidential information intended for the above
addressees only. If you receive this message in error please delete or destroy this message
and/or attachments.

The sender of this message will fully cooperate in the civil and criminal prosecution of any
individual engaging in the unauthorized use of this message.

Code:PHEAA

ED_01387

## Document 3: Conference on Jewish Material Claims Against Germany

Communications between PHEAA and FSA officials show a nonprofit employer deemed ineligible for PSLF despite providing direct services for the elderly. In assessing the nature of the service provided by this organization, the PHEAA employee denied the request in an ad hoc manner, noting subjectively, "I don't see their efforts as being for the public." The organization continues to be listed as a denied employer in the list provided by ED for this investigation.

| | |
|---|---|
| **From:** | (b)(5) |
| **Sent:** | 26 Feb 2013 09:34:33 -0600 |
| **To:** | FedLoan PSLF |
| **Cc:** | (b)(5)           Ian;Johnson, Debbe;Sipple-Asher, Bessie;Ninemire, Sandra |
| **Subject:** | Re: Conference on Jewish Material Claims Against Germany |

Hi Diane,

We agree that this organization does not qualify for PSLF. They don't provide anything that would traditionally be considered legal services, and they do not have clients, as such.

Thanks,

Ian

On 12/27/12 20:48 , "FedLoan PSLF" <FedLoanPSLF@pheaa.org> wrote:

>
>Hi Ian. This is another one that I'm hesitant to deny, but I don't think
>they provide a qualifying "public" service. They are a 501(c)(4) - their
>mission is to secure a small measure of justice for Jewish victims of Nazi
>persecution through a combination of negotiations, disbursing funds to
>individuals and organizations, and seeking the return of Jewish property
>lost during the Holocaust.   I don't see their efforts as being for the
>public, instead they benefit a select group of people. We appreciate your
>thoughts.
>
>Password to follow. I got an error message when creating zip file, but
>didn't have any problems opening the documents. Let me know if you do.
>Thanks
>
>(See attached file: Conference on Jewish Material Claims Against
>Germany.zip)
>
>
>Diane Freundel
>Compliance Services
>(717) 720-3267
>fax- (717) 720-3911
>dfreunde@pheaa.org
>This message contains privileged and confidential information intended
>for the above addressees only. If you
>receive this message in error please delete or destroy this message
>and/or attachments.
>
>The sender of this message will fully cooperate in the civil and criminal
>prosecution of any individual engaging
>in the unauthorized use of this message.

ED_01388

## Document 4: North Star Academy Charter School

Communications between PHEAA and FSA show reliance on secondary sources, including Wikipedia, to vet a charter school for ECF eligibility. Correspondence indicates a lack of a clear approval process or recordkeeping. The organization was ultimately approved but the emails shows that the PHEAA official recommended approval for certain employers despite being unable to appropriately categorize them.

| | |
|---|---|
| **From:** | Foss, Ian |
| **Sent:** | 17 Jul 2012 20:27:00 +0000 |
| **To:** | 'Diane Freundel' |
| **Cc:** | Sipple-Asher, Bessie;Battle, Cynthia;Johnson, Debbe;Ninemire, |
| (b)(6) | |
| **Subject:** | RE: PSLF - Charter Schools |

Diane,

Thanks again for going back and checking. After discussing this with others, we would feel more comfortable if we took an approach to charter schools whereby whatever organization that holds the charter/employs the borrower must independently demonstrate that that organization qualify.

Thus, in the case of an organization that is tax-exempt under 501(c)(3) of the tax code, they would qualify, but not as government. The same holds true for other non-profits providing public education. This would have the effect of saying that no charter school would qualify under the government category, and if the borrower is employed by a for-profit that either holds a charter or runs a charter school, it is not a PSLF-qualifying employer.

Ian

-----Original Message-----
From: Diane Freundel [mailto:dfreunde@pheaa.org]
Sent: Monday, July 16, 2012 9:39 AM
To: Foss, Ian
Cc: Sipple-Asher, Bessie; Battle, Cynthia; Johnson, Debbe; Ninemire, Sandra
Subject: RE: PSLF - Charter Schools

Hi Ian, I reviewed 10 that we approved. I'm confident that they are all eligible, but I'm not sure about the type of organization under which we approved them.

The attached file contains the following:

1. Wikipedia definition of Charter School - one thing surprised me - it says that a public school can be managed by a for profit - is that correct?

2. Information from Sandpoint Charter School's website - what is a charter school - authorized by Title 33 of the Idaho Code - a nonprofit publicly funded and nonsectarian entity.

3. Information from North Star Academy's Wikipedia entry - lists the "authority" as Uncommon Schools, Inc (which I verified is a private nonprofit) and the NJ Comm. of Education. We approved this one as government - I think it should be private non-profit.

4. Two items about Desert Sands Charter School - from their website - CA legislature passed the Charter School's Act in 1992. And from the CA state website - info about the school stating it is "directly funded". We approved as government - they certified as private non-profit.

File is zipped so I could send one folder - no password as I didn't include an borrower data. If you'd like to see any of the ECFs for EINs let me know. Thanks.

(See attached file: Charter Schools.zip)

Diane Freundel

ED_01389

## Document 5: Kla-Mo-Ya Casino

Correspondence between PHEAA and FSA highlight their reliance on secondary sources such as Wikipedia to make employer determinations. In this document, a PHEAA official acknowledges that Wikipedia "is not the most reliable source of information." The entity is listed as a certified employer in the list provided by ED for this investigation.

| | |
|---|---|
| **From:** | (b)(6) |
| **Sent:** | 19 May 2016 19:42:42 +0000 |
| **To:** | FedLoan PSLF |
| **Cc:** | (b)(6) Cynthia |
| **Subject:** | RE: Kla-Mo-Ya Casino |
| **Attachments:** | KMYC Application Form 01.18.13.pdf |

Hi Kim,

We were able to pull up employment information for Kla-Mo-Ya Casino that suggests that it may be separately organized from the tribe. The certification and agreement section of the employment application for Kla-Ma-Ya, states that, "it is understood however, that Kla-Mo-Ya Casino as an enterprise of The Klamath Tribes does adhere to a policy of Indian Preference..." and "I understand and consent that if considered for employment and as a condition for that employment, that I must apply for and obtain a gaming license from the Klamath Tribal Gaming Regulatory Commission KTGRC, a separate regulatory agency, of the Klamath Tribes."

Based on those clauses we would suggest denying the casino and requesting that they provide additional information to show that they are in fact governmental .

Thanks,

Taneka

**From:** Kimberly A Myers [mailto:kmyers@pheaa.org] **On Behalf Of** FedLoan PSLF
**Sent:** Friday, April 15, 2016 2:04 PM
**To:** (b)(6)
**Subject:** Kla-Mo-Ya Casino

Hi Taneka! We have another casino for you.

This casino is part of the Klamath Tribe in Oregon. We found one website that listed it as an enterprise of the tribe (Enterprise of Tribe document). Another site (ODAIR Draft document) appears to list the casino as a department. We also located the tribe's Constitution, which states, on page 4, that "...sovereign powers, authority and jurisdiction of the Klamath Tribes extends to all the territory which formerly constituted the Klamath Reservation, and to all property, airspace, natural resources, cultural resources and such other lands or interests...". This suggests that the casino would be considered part of the tribe and therefore would qualify as governmental.

Though we know that Wikipedia isn't the most reliable source of information, it also states that the casino is a tribally-owned gambling establishment and that the casino disburses payments to the tribal members.

As always we appreciate your guidance! Password to follow.

Thanks!

Kimberly A Myers
Compliance Services
kmyers@pheaa.org
(717) 720-2630

This message contains privileged and confidential information intended for the above addressees only. If you receive this message in error please delete or destroy this message and/or attachments.

BROKEN PROMISES                                                                 2020

## Document 6: DC 37 Health and Security Plan

Correspondence between PHEAA and FSA officials detail a case where a borrower disputed a denial and was given the opportunity to provide additional information in order for the employer to be reconsidered for eligibility. After being denied again by OGC, the borrower was able again to dispute the determination, where FSA and PHEAA eventually retracted the denial. It is unclear how borrowers learn about the opportunity to escalate a denial and whether there is a formal process. The organization is approved for employer eligibility in the list provided by ED for this investigation.

From:        (b)(5)
Sent:        9 Nov 2015 14:08:54 +0000
To:          Foss, Ian
Subject:     RE: DC 37 Health and Security Plan update

Thanks for responding! :)

- Taneka

-----Original Message-----
From: Foss, Ian
Sent: Friday, November 06, 2015 4:42 PM
To: FedLoan PSLF
Cc: (b)(5)     Battle, Cynthia; Johnson, Debbe
Subject: Re: DC 37 Health and Security Plan update

They are a non-(c)(3) not-for-profit providing public interest legal services.

> On Nov 6, 2015, at 15:15, FedLoan PSLF <FedLoanPSLF@pheaa.org> wrote:
>
> Hi Taneka. Yes, we'll take care of this. What type of organization
> should we approve them under? Their letter seems to infer they are government.
> Please let us know.
>
> Thanks and have a great weekend!
>
> Diane
>
>
>
> From:    (b)(5)       (b)(5)
> To:      FedLoan PSLF <FedLoanPSLF@pheaa.org>,
> Cc:      "Johnson, Debbe" <Debbe.Johnson@ed.gov>, "Foss, Ian"
>          <Ian.Foss@ed.gov>, "Battle, Cynthia" <Cynthia.Battle@ed.gov>,
>          (b)(5)          (b)(5)
> Date:    11/05/2015 05:15 PM
> Subject:   [external]DC 37 Health and Security Plan update
>
>
>
> Hi Diane,
>
> DC 37 Health and Security Plan sent in an updated Public Service Loan
> Forgiveness (PSLF) escalation directly to FSA. In the appeal DC 37
> provided additional information on what the organization does and how
> the legal services provided are not just for union members (see
> attached). FSA forwarded the appeal to the Office of General Counsel
> (OGC) for a final decision and based on the new information received,
> OGC determined that DC
> 37 Health and Security Plan should be considered as a qualifying
> employer for the purposes of PSLF.
>
> Can FedLoan send the borrower a retraction letter for the prior denial?
> Also attached is the response that Ian provided to Ms. Jarvis with an
> explanation that the approval does not mean that FSA completely agreed

> with the ?rationale or statutory/regulatory interpretation that was
> provided by the organization?s counsel.?
>
> Below are a few ?highlights? from the letter if you are interested:
> DC 37 provides services nearly identify to those provided by legal aid
> offices, at no cost to the individual represented. By case volume, DC
> 37?s legal services department is primarily involved in representing
> this population in housing cases (nearly 3,000 over the past year),
> helping to keep public servants in their homes. But DC 37 also
> provides representation for bankruptcy or other debt issues, parental
> rights cases, consumer protection cases, cases to help individuals
> secure entitlements like food stamps and social security, cases
> assisting with citizenship or immigration issues, and cases involving securing services for public utilities.
> [ * * * ]
> The population served by DC 37 is made up largely of economic and
> demographic groups known to face significant barriers in accessing
> adequate legal representation and health services. Economically, the
> public servants who receive public services from DC 37 are among the
> lowest paid of city workers, many of whom struggle just to make ends
> meet (some actually live in shelters and are on public assistance)
> while contending with remarkably high cost of living in the region.
> [ * * * ]
> Finally, DC 37 does not only provide services to union members. DC 37
> services are provided to all NYC public servants (and their families)
> working in or retired from specific job titles, and union membership
> is not a criterion for eligibility for services.
>
> If you have any concerns or questions please let me know.
>
> Thanks,
>
> Taneka
>
> (See attached file: PSLF H&S.pdf)
>
> ----- Message from "Foss, Ian" <Ian.Foss@ed.gov> on Thu, 5 Nov 2015
> 17:20:21 +0000 -----
>
>     To: Heather Jarvis
>         <heatherwellsjarvis@gmail.com>
>
> Subject: RE: PSLF employment certification
>
>
>
> Hi Heather,
>
> Good news. After considering the fact that the organization does not
> only provide legal assistance as a benefit of union membership, we are
> satisfied that the organization qualifies.
>
> FedLoan Servicing will be sending a letter to the borrower retracting
> the prior denial.
>
> Note that our determination that this organization is a qualifying
> organization does not mean that we necessarily agree with the

> rationale or statutory/regulatory interpretation that was provided by
> the organization?s counsel.
>
> Also, understand that, while I am happy to serve as a recipient of
> inquiries like these if you think that FedLoan Servicing is not being
> responsive or is reaching incorrect conclusions about employers (I
> think it?s good to have an independent check), I am confident that, if
> the organization had provided either of its letters to FedLoan
> Servicing instead of me, that FedLoan Servicing would have escalated
> the employer again, and we would have reached the same decision.
>
> Ian
>
> From: Heather Jarvis [mailto:heatherwellsjarvis@gmail.com]
> Sent: Wednesday, November 04, 2015 5:58 PM
> To: Foss, Ian
> Subject: PSLF employment certification
>
> Ian,
>
> Thanks again for your careful attention to these important issues.
> Please find attached a letter including information relevant to the
> Department's analysis of H&S as a public interest organization.
>
> We will look forward to hearing back as your schedule permits. Don't
> hesitate to be in touch if questions arise or any additional
> information is needed.
>
> All my best,
> Heather
>
> ===================================================================
> This message contains privileged and confidential information intended for the above addressees only.  If
you receive this message in error please delete or destroy this message and/or attachments.
>
> The sender of this message will fully cooperate in the civil and criminal prosecution of any individual
engaging in the unauthorized use of this message.
>
> Code:PHEAA
> <PSLF H&S.pdf>

| From: | (b)(5) |
|---|---|
| Sent: | 28 May 2015 07:03:54 -0500 |
| To: | FedLoan PSLF |
| Cc: | Battle, Cynthia;Johnson, (b)(5) |
| Subject: | RE: DC 37 Health and Security Plan |

Hi Diane,

OGC came back with a response. The DC 37 Health and Security Plan is denied for the purposes of PSLF. Basically the organization is not providing public services but is providing benefits to union members as part of the benefits of union membership. On the medical side, it is not providing medical services but is acting as an insurer. On the legal services side, it is not practicing public interest law but is providing basic legal services to union members or relatives.

Thanks,

Taneka

-----Original Message-----
From: (b)(5)
Sent: Monday, April 27, 2015 8:04 AM
To: FedLoan PSLF
Cc: (b)(5)   Battle, Cynthia; Johnson, Debbe
Subject: RE: DC 37 Health and Security Plan

Hi Diane,

I just wanted to let you know that Ian and I, escalated the DC 37 Health and Security Plan to OGC. The DC 37 Health and Security Plan Trust does not qualify for the basis of providing public health services since it contracts these services to for-profit professional corporations.

There is an outstanding question, however, if the employer provides, "public interest legal services". Attorneys of the plan work with members to prepare contracts, real estate transaction documents, and estate planning documents. It would seem that, because they are funded in part by New York City, that they may provide public interest legal services.

We are specifically checking with OGC for an opinion to determine if these services are in fact provided to "the public" (member-based organizations are not necessarily disqualified) and if they are "free" since the cost is included into the insurance premiums that members of the plan pay.

I'll update you when a decision is made.

Thanks,

Taneka
-----Original Message-----
From: Diane Freundel [mailto:dfreunde@pheaa.org] On Behalf Of FedLoan PSLF
Sent: Monday, March 23, 2015 2:13 PM
To: (b)(5)
Subject: DC 37 Health and Security Plan


Hi Taneka,    We may have incorrectly denied this employer.  It is a 501
(c)(9) entity that seems to be a part of the DC 37 - New York City's
largest Public Employee Union.  I denied due to being a labor union.   The

borrower has disputed the denial via a letter from the DC 37 Municipal Employees Legal Services.

Can you please review?   If they potentially qualify as a health plan, we
need to determine if they employ any acceptable positions under the Standard Occupational Classifications
System and whether those employees provide any qualifying services.  Based on our review, we can't find
any job postings.  Not sure if you could find anything.

Password to follow.   Thanks!

(See attached file: DC37 Health and Security Plan.zip)

Diane Freundel
Compliance Services
(717) 720-3267
dfreunde@pheaa.org
This message contains privileged and confidential information intended for the above addressees only.  If
you receive this message in error please delete or destroy this message and/or attachments.

The sender of this message will fully cooperate in the civil and criminal prosecution of any individual
engaging in the unauthorized use of this message.

ED_01395

BROKEN PROMISES                                                    2020

## Document 7: FSA Email Correspondence on Recordkeeping of Employer Eligibility 1

Email correspondence from FSA acknowledging that it did not possess a comprehensive list of employers that had been certified as ECF eligible and that its contractor, PHEAA, would have to be compensated in order to produce such a comprehensive list.

2/9/2020                        Student Borrower Protection Center Mail - RE: Cost Estimate Element 4 19-00567-F

                                Tariq Habash <tariq@protectborrowers.org>

**RE: Cost Estimate Element 4 19-00567-F**

**Wilson, Nathan** <Nathan.Wilson@ed.gov>                    Tue, May 14, 2019 at 8:56 AM
To: Tariq Habash <tariq@protectborrowers.org>
Cc: "Pedersen, AnnMarie" <AnnMarie.Pedersen@ed.gov>

Good morning Tariq,

This is about the cost estimate for Element 4 of 19-00567-F. I have attached the estimate from PHEAA here for each sub-element with some additional details about how they will be creating the document requested.

I also wanted to let you know in case you hadn't discovered it yourself that FSA has published a new PSLF report with a much greater level of detail here: https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/pslf-data

Hopefully you find that information helpful. Please let us know if you have any questions or would like to discuss. Thank you!

Sincerely,

Nate Wilson

Office of Communications and Outreach

Federal Student Aid

U.S. Department of Education

830 First Street, NE, Room 22C1

Washington, DC 20202-5361

Phone: (202) 377-4479

Nathan.wilson@ed.gov

**From:** Wilson, Nathan
**Sent:** Friday, April 5, 2019 11:24 AM
**To:** Tariq Habash <tariq@protectborrowers.org>
**Cc:** Pedersen, AnnMarie <AnnMarie.Pedersen@ed.gov>
**Subject:** RE: Meeting

https://mail.google.com/mail/u/1?ik=24ceb969ac&view=pt&search=all&permmsgid=msg-f%3A1633512182084907402&simpl=msg-f%3A1633512182084907402     1/3

33

ED_01396

BROKEN PROMISES                                                                          2020

2/9/2020                          Student Borrower Protection Center Mail - RE: Cost Estimate Element 4 19-00567-F

Tariq,

I will need to consult with our SMEs about whether that information can be included. Additionally, wanted to give you a heads up that we have received a cost estimate from the servicer for Element 4 of 19-00567-F but we need to research that one a little further with our SMEs. I will have more for you as soon as I have additional information on either issue. Thank you for your patience.

-Nate

**From:** Tariq Habash [mailto:tariq@protectborrowers.org]
**Sent:** Friday, April 05, 2019 10:50 AM
**To:** Wilson, Nathan
**Cc:** Pedersen, AnnMarie
**Subject:** Re: Meeting

Nathan,

Per my conversation yesterday with AnnMarie, I think we had a few questions about what else would be included in the comprehensive list. Specifically, I am wondering if the following will also be possible to include

- The number of unique times each specific employer shows up on an ECF
- The number of unique borrowers that have submitted a specific employer on at least 1 ECF
- For employers who have both approved and denied ECFs, the number of approved versus the number denied

Let me know if any of these are possible to include. Thanks.

Tariq

On Wed, Mar 27, 2019 at 2:52 PM Wilson, Nathan (Contractor) <Nathan.Wilson@ed.gov> wrote:

> Tariq,
>
> This message is to summarize our telephone meeting this afternoon about the ECF employer list. As Ann Marie stated in the meeting, the list we provided is not a comprehensive list. Rather, it is the list of all the employers that were escalated for additional research by PHEAA and shared with the Department.
>
> A comprehensive list of all ECF employers would need to be created by PHEAA which estimated a cost to Department of $600-$900 to generate. You stated you would have to do some research into whether your organization would be willing to cover those costs. As it stands, you will follow-up with us on that question. We also briefly discussed a tentative timeline for conducting the administrative searches required for many of the PSLF requests. Please let me know if there is anything to add or if you have any additional questions or concerns. Thank you!

34

ED_01397

2/9/2020                          Student Borrower Protection Center Mail - RE: Cost Estimate Element 4 19-00567-F

Sincerely,

Nate Wilson

Office of Communications and Outreach

Federal Student Aid

U.S. Department of Education

830 First Street, NE, Room 22C5

Washington, DC 20202-5361

Phone: (202) 377-4479

Nathan.wilson@ed.gov

**PHEAA estimates on FIOA 19-00567-F Item  4.pdf**
265K

ED_01398

## Document 8: FSA Email Correspondence on Recordkeeping of Employer Eligibility 2

Email correspondence with FSA raising concerns about the omission of employers from a document designated as a complete list of employers that had been certified as ECF eligible by PHEAA and FSA. Following this communication, FSA asked PHEAA to produce a more complete list, which can be found at www.protectborrowers.org/ecf-docs.



Tariq Habash <tariq@protectborrowers.org>

**Second interim response FOIA requests 19-00565-F and 19-00571-F**

Pedersen, AnnMarie <AnnMarie.Pedersen@ed.gov>                                 Wed, Mar 20, 2019 at 2:46 PM
To: Tariq Habash <tariq@protectborrowers.org>, "Wilson, Nathan (Contractor)" <Nathan.Wilson@ed.gov>

We will look into it and get back with you.

**From:** Tariq Habash [mailto:tariq@protectborrowers.org]
**Sent:** Wednesday, March 20, 2019 2:32 PM
**To:** Wilson, Nathan (Contractor)
**Cc:** Pedersen, AnnMarie
**Subject:** Re: Second interim response FOIA requests 19-00565-F and 19-00571-F

Just following up. I have serious concerns about this list being comprehensive. Specifically, there are a number of employers excluded from this list that I have a hard time believing would not have had employees submit ECFs. Among them are:

-U.S. Department of Education (ED)

-Consumer Financial Protection Bureau (CFPB)

-The Century Foundation (my former employer, which I have submitted multiple ECFs for, is not listed)

-New America (a partner organization with employees I can confirm have submitted ECFs)

Can you please explain this discrepancy, I think it is one certainly worth noting.

-Tariq

On Wed, Mar 20, 2019 at 2:24 PM Wilson, Nathan (Contractor) <Nathan.Wilson@ed.gov> wrote:

Tariq,

Per our SMEs, yes, it is the comprehensive list provided by PHEAA as of March 12, 2019.

Also, per our phone call this afternoon, I have reached out to our subject matter experts about your clarifying questions related to the employer review list. We will follow up with you as soon as we get a response from them. Please let us know if you have any additional questions. Thanks!

Sincerely,

ED_01399

BROKEN PROMISES                                                          2020

2/9/2020                    Student Borrower Protection Center Mail - Second interim response FOIA requests 19-00565-F and 19-00571-F

Nate Wilson

Office of Communications and Outreach

Federal Student Aid

U.S. Department of Education

830 First Street, NE, Room 22C5

Washington, DC 20202-5361

Phone: (202) 377-4479

Nathan.wilson@ed.gov

**From:** Tariq Habash [mailto:tariq@protectborrowers.org]
**Sent:** Wednesday, March 20, 2019 1:56 PM
**To:** Wilson, Nathan (Contractor)
**Cc:** Pedersen, AnnMarie
**Subject:** Re: Second interim response FOIA requests 19-00565-F and 19-00571-F

Thanks Nathan and AnnMarie.

I just want to confirm that the attached employer reviews list is the most up-to-date, comprehensive list of employers received from borrower submitted ECFs from PHEAA.

On Wed, Mar 20, 2019 at 12:08 PM Wilson, Nathan (Contractor) <Nathan.Wilson@ed.gov> wrote:

Tariq,

Good afternoon. I have finished preparing a second interim response to some of the seven requests you submitted on December 19, 2018. This response is for elements of 19-00565-F; 19-00566-F; and 19-00571-F. The bulk of this response is being processed through the Department's FOIA Service Center. However, this message includes some documents we can send you directly as they are being released to you in full.

Attached is the current ECF employer list with columns for state, employer type, and approval status. This document should fully satisfy elements 1-3 of 19-00571-F. Please note that with the exception of columns 5-8, the information on this document is as provided by the borrowers on their ECF forms. In our previous interim release we provided documents responsive to element 4 from 2012-June 2017. Through our FOIA service center, we will also be providing communications from June 2017-Present responsive to element 4 which is the remainder of documents responsive to this element of 19-00571-F.

Additionally, we have prepared a response to 19-00566-F that will be processed through the FOIA Service Center this week.

ED_01400

BROKEN PROMISES                                                                    2020

Finally, I have attached an updated version of the tracking spreadsheet for your requests which reflects the elements and documents we are providing in this second release. We will continue to provide responsive records to the remaining elements of your requests on a rolling basis as they become available. Please reach out if you have any additional questions or concern. Thank you!


Sincerely,


Nate Wilson

Office of Communications and Outreach

Federal Student Aid

U.S. Department of Education

830 First Street, NE, Room 22C5

Washington, DC 20202-5361

Phone: (202) 377-4479

Nathan.wilson@ed.gov

# Endnotes

1.  *See* College Cost Reduction and Access Act, Pub. L. No. 110-84 (2007); *see also* 20 U.S.C. § 1087e(m).

2.  *See, e.g.,* Keith A. Bender & John S. Heywood, *Out of Balance? Comparing Public and Private Sector Compensation over 20 Years,* Nat'l Inst. On Ret. Sec. (Apr. 2010), *available at* www.slge.org/wpcontent/uploads/2011/12/Out-of-Balance_FINAL-REPORT_10-183.pdf (finding that on average, public sector jobs require much more education than those in the private sector, and wages and salaries of state and local employees are lower than those for private sector workers with comparable earnings determinants); Memorandum on Level of Comparability Payments for January 2018 and Other Matters Pertaining to the Locality Pay Program, Fed. Salary Council (Dec. 14, 2016), *available at* https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/federal-salary-council/recommendation16.pdf.

3.  *See Public Service and Student Debt,* Consumer Fin. Prot. Bureau (Aug. 2013), https://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf; *Staying on track while giving back: The cost of student loan servicing breakdowns for people serving their communities,* Consumer Fin. Prot. Bureau (June 2017), https://files.consumerfinance.gov/f/documents/201706_cfpb_PSLF-midyear-report.pdf.

4.  *See* 153 Cong. Rec. S9536 (daily ed. July 19, 2007), *available at* https://www.congress.gov/crec/2007/07/19/CREC-2007-07-19-pt1-PgS9534.pdf ("Mr. Kennedy: . . . . So we have made this as wide as we could in terms of trying to respond to that sense that is out there in our schools and colleges, in all parts of our country, urban areas and rural areas, to say: Look, if you want to give something back, we are going to make it possible. We are going to give you a greater opportunity for you to go to college, particularly if you are from working families and low-income. We are going to give you a better opportunity to do that."); *see also, e.g.,* Dep't of Def. Info. Paper, HR4508, the Promoting Real Opportunity, Success, and Prosperity through Education Reform (PROSPER Act), U.S. Dep't of Def. (Jan. *2018), available at* https://www.insidehighered.com/sites/default/server_files/media/Department-of-Defense-on-PROSPER-Act.pdf.

5.  *See Keeping the Promise of Public Service Loan Forgiveness,* Student Borrower Prot. Ctr. (Dec. 2018), https://protectborrowers.org/wp-content/uploads/2018/12/SBPC-AFT-PSLF-Investigation.pdf.

6.  *Id.*

7.  *See* 34 C.F.R. § 685.219 (2015).

ED_01402

8.  *See Data Center: Public Service Loan Forgiveness Data May 2020 PSLF Report,* Fed. Student Aid (May 31, 2020), https://studentaid.gov/data-center/student/loan-forgiveness/pslf-data.

9.  *See News Release: Unemployment Insurance Weekly Claims*, U.S. Dep't of Labor (June 23, 2020), https://www.dol.gov/ui/data.pdf; *see also* Anneken Tappe, *Nearly 43 Million Americans Have Filed for Unemployment Benefits During the Pandemic*, CNN (June 4, 2020), https://www.cnn.com/2020/06/04/economy/unemployment-benefits-coronavirus/index.html.

10. *See* Megan Cassella & Eleanor Mueller, *"The Last Thing We Need Right Now": States, Cities Hemorrhage Jobs*, Politico (June 10, 2020), https://www.politico.com/news/2020/06/10/states-cities-losing-jobs-economic-aid-311600.

11. *See* College Cost Reduction and Access Act, Pub. L. No. 110-84 (2007).

12. 20 U.S.C. § 1087f; *see also 2007-2008 Negotiated Rulemaking for Higher Education – Loan Team Title IV Loan Provisions in the College Cost Reduction and Access Act of 2007,* U.S. Dept. of Educ. (Oct. 2008), https://www2.ed.gov/policy/highered/reg/hearulemaking/2008/loans.html.

13. 20 U.S.C. § 1087e(m) (2007).

14. 20 U.S.C. § 1087e(m)(3)(B) (2007).

15. 34 C.F.R. § 685.219 (2015).

16. *See* 34 C.F.R. § 685.219(b) (2015).

17. *Id.* Readers should also note that as of the publication of this report, the ED's Office of Federal Student Aid counsels borrowers that employers qualifying under this classification are rarely approved. *See Public Service Loan Forgiveness*, U.S. Dept. of Educ., Office of Fed. Student Aid, https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service (last accessed February 26, 2020) ("Other types of not-for-profit organizations: If you work for a not-for-profit organization that is not tax-exempt under Section 501(c)(3) of the Internal Revenue Code, it can still be considered a qualifying employer if its primary purpose is to provide certain types of qualifying public services. *However, in our experience, few organizations meet these criteria.*") (emphasis added).

18. *See Dear Colleague Letter: Employment Certification for Public Service Loan Forgiveness Form*, U.S. Dep't of Educ., Fed. Student Aid (Jan. 2012), https://ifap.ed.gov/dear-colleague-letters/01-31-2012-gen-12-02-subject-employment-certification-public-service-loan.

19. *See Why and When to Submit the Employment Certification Form,* U.S. Dep't of Educ., Fed. Student Aid, https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service/employment-certification-form (last accessed June 10, 2020).

20. *See supra* note 8.

ED_01403

21.  *See* 34 C.F.R. § 685.219 (2015).

22.  *See, e.g., Letter to Senate Health, Education, Labor, and Pensions Committee,* Am. Bar Ass'n. (Feb. 2018), https://www.americanbar.org/advocacy/governmental_legislative_work/aba-day/resources/pslf/.

23.  *See* Press Release, Attorney General Becerra: Education Secretary DeVos Abandons Promise to Americans Who Dedicate Their Careers Serving the Public (Oct. 5, 2018), https://oag.ca.gov/news/press-releases/attorney-general-becerra-education-secretary-devos-abandons-promise-americans-0.

24.  *See* Complaint, *Am. Bar Ass'n v. Dep't of Educ.,* No. 1:16-cv-02476 (D.D.C. Dec. 20, 2016), *available at* https://www.courtlistener.com/recap/gov.uscourts.dcd.183424.1.0.pdf.

25.  *See Am. Bar Ass'n v. Dep't of Educ.,* 370 F. Supp. 3d 1 (D.D.C. 2019).

26.  *Id.*

27.  *Id.*

28.  Readers should note that three different sets of records offer convincing evidence that AARP in particular was handled inconsistently by FSA. In addition to the correspondence included in the Appendix of this report, the SBPC and AFT received records including a list of "public service organizations" compiled by FSA, on which AARP appears to be identified as a "Government," a "Non-Profit," and a "Private Non-Profit" employer in different places within these records. AARP Foundation, which is a 501(c)3 nonprofit, is also separately identified in this correspondence as a "Non-Profit." *See Preliminary List of Public Service Organizations Produced by Federal Student Aid on February 6, 2019 Part 1 of 2* (2020), Am. Fed'n of Teachers and Student Borrower Prot. Center, https://bit.ly/2VrFdKi. Further, AFT and the SBPC released, contemporaneous with the publication of this report, an updated list of employers identified across Employer Certification Forms produced by FSA that purports to be "comprehensive" and on which AARP does not appear to be approved. *See infra* note 31.

29.  *See What We Do,* Claims Conference on Jewish Material Claims Against Germany, http://www.claimscon.org/what-we-do/ (last accessed Jan. 2019).

30.  *See* Exhibit D to the Complaint, *Am. Bar Ass'n v. Dep't of Educ.,* No. 1:16-cv-02476 (D.D.C. Dec. 20, 2016), *available at* https://www.courtlistener.com/recap/gov.uscourts.dcd.183424/gov.uscourts.dcd.183424.1.4.pdf ("Based on what you submitted, your employer does not appear to qualify for PSLF. We included a list of eligibility requirements for PSLF employment below, in the section titled EMPLOYMENT ELIGIBILITY. Please review the employment requirements and reapply if you can provide additional information to show that your employment qualifies.").

31.  A copy of this comprehensive database of certified employers is available at www.protectborrowers.org/ecf-docs.

32.  *See supra* note 8.

ED_01404

33.  Earliest iteration of the employer list was provided by FSA officials on March 20, 2019 as the "current ECF employer list." Upon further investigation, it was clear that the list was incomplete. The investigation followed up about the nature of the list, at which point FSA officials confirmed that according to "subject matter experts" at FSA, this was a comprehensive list provided by PHEAA. After pointing out the omission of high-profile employers, FSA officials went back to PHEAA. We are not making public the earlier version of the list. More than two months later, on May 30, 2019, FSA produced the "comprehensive ECF employer list requested" in six parts. This list is available for download. *See supra* note 31.

34.  *See The HBCU Value Proposition*, U.S. Dep't of Educ. (Sept. 2014), https://www.ed.gov/news/speeches/hbcu-value-proposition ("We've all agreed to commit to the Public Service Loan Forgiveness pledge, created by the Consumer Financial Protection Bureau. That means we have pledged to talk to our employees about their options for student loan forgiveness, to help them document that they work for a public service organization, and to check in annually with employees to make sure they stay on track.").

35.  The authors of this report remain skeptical that the list subsequently produced by ED is truly "comprehensive." Contemporaneous with the publication of this report, SBPC and AFT released this data to the public, encouraging the public, including advocates, public service employers, and borrowers who have submitted or certified employment through an Employer Certification Form prior to June 2019, to search for known public service employers and confirm that the employer is in fact included in this list. If you find that your employer is omitted and you have documentation to show that you have submitted an ECF, please reach out to investigations@protectborrowers.org.

36.  *See, e.g.*, 12 C.F.R. § 1002.9 (2011) ("Content of notification when adverse action is taken. A notification given to an applicant when adverse action is taken shall be in writing and shall contain a statement of the action taken; the name and address of the creditor; a statement of the provisions of section 701(a) of the Act; the name and address of the Federal agency that administers compliance with respect to the creditor; and either: (i) A statement of specific reasons for the action taken; or (ii) A disclosure of the applicant's right to a statement of specific reasons within 30 days, if the statement is requested within 60 days of the creditor's notification. The disclosure shall include the name, address, and telephone number of the person or office from which the statement of reasons can be obtained. If the creditor chooses to provide the reasons orally, the creditor shall also disclose the applicant's right to have them confirmed in writing within 30 days of receiving the applicant's written request for confirmation.").

ED_01405



PROTECTBORROWERS.ORG                                    AFT.ORG

© 2020 by Student Borrower Protection Center & American Federation of Teachers

June 2017

# Staying on track while giving back

The cost of student loan servicing breakdowns for people serving their communities



# Message from the CFPB Student Loan Ombudsman

In September 2013, the Consumer Financial Protection Bureau (the Bureau) released "Public Service and Student Debt," a report that examined how a range of existing protections and benefits offered the promise of debt relief to an important segment of student loan borrowers—those who pursue careers serving in their communities.[1] At the time, the Bureau estimated that 1-in-4 U.S. workers were employed by a "public service organization," as defined by the federal Public Service Loan Forgiveness (PSLF) program.[2]  Evidence suggests that many professions in this segment of the workforce typically require advanced levels of education,[3] and that education requirements in many of these fields have increased over time. These requirements are put in place through federal or state law,[4] often as recommended by individual public service organizations or by professional associations.[5]

---

[1]  *See* Consumer Financial Protection Bureau (CFPB), *Public Service & Student Debt* (2013), http://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf. Additionally, that same year, the Bureau launched a workplace financial fitness initiative to empower public service employers to help their employees reduce their student debt – the CFPB Public Service Pledge on Student Debt. *See* CFPB, *Take the pledge* (accessed Feb. 3, 2017), http://www.consumerfinance.gov/pledge/. For more than three years, the Bureau has provided organizations that take the Public Service Pledge with resources and toolkits to help employees stay on track as they manage their student loan debt.

[2]  *See* 34 C.F.R. § 685.219 (defining public service as work in the following fields: federal, state, local, or tribal government; public child or family service agency; non-profit organization under 501(c)(3) of the Internal Revenue Code; tribal college or university; or a non-profit private organization that provides certain public services, including emergency management, military service, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities, public health, public education, public library services, school library or other school-based services.); *see also* CFPB, *Public Service & Student Debt*, *supra* note 1.

[3]  *See, e.g*., Keith A. Bender & John S. Heywood, *Out of Balance? Comparing Public and Private Sector Compensation over 20 Years*, National Institute on Retirement Security (Apr. 2010), slge.org/wp-content/uploads/2011/12/Out-of-Balance_FINAL-REPORT_10-183.pdf ("Public and private workforces differ in important ways. For instance, jobs in the public sector require much more education on average than those in the private sector.").

[4]  *See, e.g*., 10 U.S.C. § 12205(a) (requiring a bachelor's degree for promotion beyond a first lieutenant for certain branches of the military); 8 Va. Admin. Code § 20-22-40 (2017) (requiring prospective teachers to hold a bachelor's degree before applying for a teaching license in Virginia); *see also* U.S. Army Officer Program, *Officer: Frequently*

1

ED_01408

Communities across the country have continued to prioritize higher education for public service professions by establishing new credential or degree requirements for a broad range of public service workers, including classroom teachers,[6] first responders,[7] clinical social workers,[8] and early childhood education providers.[9] In each instance, the public broadly shares the benefits of a highly educated professional workforce serving in their communities. Yet, too often, the financial costs of these new credentials fall on individuals in careers with limited opportunity for wage growth to offset these costs. New credentialing initiatives continue to be enacted for those entering public service professions amid growing concerns by researchers,[10] regulators,[11] and

---

*Asked Questions* (accessed May 30, 2017), www.goarmy.com/careers-and-jobs/become-an-officer/army-officer-faqs.html#college (stating that individuals are required to have a bachelor's degree before being commissioned as an officer).

[5] *See, e.g.*, Assoc. of State and Provincial Psychology Boards, *ASPPB Model Act for Licensure and Registration of Psychologists* (Oct. 2010), asppb.site-ym.com/resource/resmgr/guidelines/final_approved_mlra_november.pdf; Nat. Assoc. of Social Workers, *Social Work Credentials* (accessed May 30, 2017), naswdc.org/credentials/default.asp.

[6] *See, e.g.*, 16 Ky. Admin. Regs. 2:101 (2017) (Requiring individuals hold a bachelor's degree with a minimum grade point average to be eligible for a teaching certificate).

[7] *See, e.g.*, Cal. Code Regs. tit. 19, § 2530 (2017) (requiring state certified hazardous materials technicians to have at least a bachelor of science). The Bureau of Labor Statistics (BLS) notes that first responders with college degrees, including firefighters and police officers, have the best job prospects and opportunities for promotion. *See, e.g.*, BLS, *Firefighters: Job Outlook* (Dec. 17, 2015), bls.gov/ooh/protective-service/firefighters.htm#tab-6; BLS, *Police and Detectives: Job Outlook* (Dec. 17, 2015), bls.gov/ooh/protective-service/police-and-detectives.htm#tab-6.

[8] *See, e.g.*, 172 Neb. Admin. Code 94 § 005 (2017) (Requiring certified social workers to "have a master's or doctorate degree in social work from an approved education program approved by the Council on Social Work Education (CSWE) showing receipt of either the master's or doctorate degree in social work.").

[9] *See, e.g.*, Minn. R. 8710.3000 (2017) ("A candidate for licensure in early childhood education for teaching young children . . . shall . . . hold a baccalaureate degree from a college or university . . .).

[10] *See, e.g.*, Robert Hiltonsmith, *At what cost? How student debt reduces lifetime wealth*, Demos (Aug. 2013), www.demos.org/what-cost-how-student-debt-reduces-lifetime-wealth; Mathieu R. Despard, et al., *Student Debt and Hardship: Evidence from a Large Sample of Low- and Moderate-Income Households*, Children and Youth Services Review, Vol. 70 Issue C; Fed. Res. Bank of Bos. *Student Loan Debt and Economic Outcomes* (2014), bostonfed.org/publications/current-policy-perspectives/2014/student-loan-debt-and-economic-outcomes.aspx.

[11] *See* Conn. Dept. of Banking, *Public Comment on Request for Information on Student Loan Servicing* (Jul. 13, 2015), https://www.regulations.gov/document?D=CFPB-2015-0021-0381 ("Student loan servicing, a largely unregulated financial market and opaque industry, cries out for transparency and consumer-focused regulation. . . estimates show alarmingly high and consistently rising default rates. Delinquencies are a harrowing bellwether: as the Bureau notes, the Department of Education estimates that 3 million borrowers are at least 30 days or more past due,

2

ED_01409

policymakers[12] about the potential spillover effects of mounting student indebtedness, particularly where student loan borrowers do not realize robust economic benefits from a higher education.

This raises serious questions about whether individual public service workers are caught between two economic cross currents – a growing need for higher education to pursue careers in this segment of the workforce, and the rising costs, and debt, associated with this education. These concerns may be even greater in fields where wage growth has been more limited over time, such as public education.[13]  Furthermore, when these borrowers struggle to access critical protections designed to mitigate the burden of student debt, it raises significant concerns about the economic effects of this debt on a large segment of the workforce, including potential declines in homeownership,[14] retirement security,[15] asset formation,[16] and access to a strong

---

comprising over $58 billion in balances. This is not deja vu. We *have* been here before."); Washington State, Office of the Attorney General, *AG Ferguson files suit against Sallie Mae offshoot Navient Corp., announces student loan bill of rights legislation* (Jan 18, 2017), atg.wa.gov/news/news-releases/ag-ferguson-files-suit-against-sallie-mae-offshoot-navient-corp-announces-student; *see also* CFPB, *Student Loan Affordability: Analysis of Public Input on Impact and Solutions* (May 8, 2013), files.consumerfinance.gov/f/201305_cfpb_rfi-report_student-loans.pdf.

[12] *See, e.g.*, Financial Stability Oversight Council, *2013 Annual Report* (2013), treasury.gov/initiatives/fsoc/studies-reports/Pages/2013-Annual-Report.aspx; U.S. Dept. of the Treasury, *Remarks by Deputy Secretary Sarah Bloom Raskin at the Rappaport Center for Law and Public Policy Conference on the Student Debt Crisis* (Mar. 18, 2016), www.treasury.gov/press-center/press-releases/Pages/jl0389.aspx.

[13] *See, e.g.*, Ed Hurley, *Teacher Pay 1940 – 2000: Losing Group, Losing Status* (Dec. 12, 2013), http://www.nea.org/home/14052.htm ("An analysis of decennial Census data clearly shows that over the past 60 years the annual pay teachers receive has fallen sharply in relation to the annual pay of other workers with college degrees. . .  Throughout the nation the average earnings of workers with at least four years of college are now over 50 percent higher than the average earnings of a teacher. At no other time since a college degree was required to teach has this wage gap been so wide."). Furthermore, research shows that real wage growth for individuals aged 25-34 with bachelor's degrees has been stagnant over the last decade. Over the same period, the cost of healthcare, housing, and childcare has outpaced inflation. *See* U.S. Census Bureau, *Current Population Survey Annual Social and Economic Supplement* (2005 - 2015), https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-03.html#.html; Fed. Res. Bank of NY, *The Labor Market for Recent College Graduates* (Jan. 11, 2017), https://www.newyorkfed.org/research/college-labor-market/college-labor-market_wages.html; U.S. BLS, *Consumer Price Index* (2005 – 2015), https://www.bls.gov/cpi/cpi_dr.htm.

[14] *See, e.g.*, Alvaro Mezza et al., *On the Effect of Student Loans on Access to Home Ownership*, Fed. Res. Board (Nov. 2015), www.federalreserve.gov/econresdata/feds/2016/files/2016010pap.pdf (finding that an increase in student loan debt causes a drop in homeownership rates for student loan borrowers during the first five years out of school).

ED_01410

financial future.[17]

The current federal programs described in our 2013 report were designed to protect borrowers from the long-term economic consequences of the rising student indebtedness shouldered by many who pursue careers in public service. In effect, these protections were intended to ensure that nurses, teachers, first responders, and other public servants can serve their communities without it being to their long-term financial detriment, particularly as college costs continue to rise and advanced education requirements expand.

Unfortunately, too often this is not the case. As described in detail in the following report, many borrowers attempting to invoke their rights under federal law to these protections point to a range of student loan industry practices that delay, defer, or deny access to critical consumer protections. The Bureau is committed to monitoring the industry for key issues and illegal practices affecting borrowers who are trying to access key consumer protections so they can continue to give back to their communities.

Sincerely,

Seth Frotman
Assistant Director and Student Loan Ombudsman
Consumer Financial Protection Bureau

---

[15] *See, e.g.*, Alicia H. Munnell, et al., *Will the Explosion of Student Debt Widen the Retirement Security Gap?*, Ctr. for Retirement Res., B. C. (Feb. 2016), crr.bc.edu/briefs/will-the-explosion-of-student-debt-widen-the-retirement-security-gap/ (finding that an increase in student debt would raise the share of households at risk in retirement).

[16] *See, e.g.*, William Elliot & Melinda Lewis, *Student Loans are Widening the Wealth Gap: Time to Focus on Equity*, Univ. of Kan. (Nov. 7, 2013), aedi.ku.edu/sites/aedi.ku.edu/files/docs/publication/CD/reports/R1.pdf (finding that households with student loans have less assets and home equity than households without student loans).

[17] *See, e.g.*, Hiltonsmith, *supra* note 10; *see also* CFPB, *Prepared Remarks of Seth Frotman, Hearing Before the CA Senate Comm. on Banking and Financial Institutions* (Mar. 22, 2017), files.consumerfinance.gov/f/documents/201703_cfpb_Frotman-Testimony-CA-Senate-Banking-Committee.pdf.

4

ED_01411

# Table of contents

**Executive summary** ................................................................................................ **6**

**1.  About this report** ............................................................................................ **9**

**2.  Midyear update on student loan complaints** ................................................ **10**

    2.1  Federal student loan complaint data ............................................................ 11

    2.2  Private student loan complaint data ............................................................ 14

    2.3  Debt collection complaint data .................................................................. 15

**3.  Issues faced by borrowers** .......................................................................... **17**

    3.1  Overview of student loan complaints ........................................................ 17

    3.2  Public service & student debt ................................................................... 19

**4.  Recommendations** ...................................................................................... **44**

**5.  Contact information** .................................................................................... **49**

**Appendix A: Tagging definitions** ...................................................................... **50**

ED_01412

# Executive summary

- This report analyzes complaints submitted by consumers from March 1, 2016 through February 28, 2017. During this period, the Bureau handled approximately 7,500 private student loan complaints, and also handled 2,200 debt collection complaints related to private and federal student loans. Prior to this period, the Bureau also began handling complaints about problems managing or repaying federal student loans, and handled approximately 11,500 federal student loan servicing complaints during this reporting period. All figures are current as of April 1, 2017.

- Over the past 12 months, the Bureau saw a 325 percent increase in student loan complaints, in which consumers identified a range of problems with payment processing, billing, customer service, borrower communications, and income-driven repayment (IDR) plan enrollment. These consumers submitted complaints about over 320 companies, including student loan servicers, debt collectors, private student lenders, and companies marketing student loan "debt relief." The Bureau's analysis of these complaints suggests that borrowers assigned to the largest student loan servicers report encountering widespread problems, whether these borrowers are trying to get ahead or struggling to keep up with their student debt. Over this period, borrowers with federal student loans continue to report substantial challenges with accessing basic information about repayment options, including income-driven repayment plans, particularly when these borrowers are experiencing financial distress.

- This report highlights complaints from student loan borrowers seeking existing federal protections for workers pursuing careers in public service, including those who pursue debt relief under the Public Service Loan Forgiveness (PSLF) program. For nearly four years, the Bureau has highlighted a range of student loan servicing practices that may inhibit borrowers seeking to exercise their rights under federal law to a range of different benefits and consumer protections, including programs designed to protect active duty

6

ED_01413

servicemembers, veterans, teachers, nurses, first responders, and other student loan borrowers working in public service.

- Beginning in October 2017, the Department of Education will begin accepting applications from borrowers seeking loan forgiveness pursuant to PSLF.  As this report details, borrowers have identified a range of student loan industry practices that delay, defer, or deny access to expected debt relief. Consequently, borrowers report that they are not on track to qualify for PSLF.

- The PSLF program was designed to encourage people to enter into public service careers, despite increasing levels of student loan debt. These careers, including teaching, social work, law enforcement, and public health, traditionally feature more modest wages, relative to many private sector fields that require comparable levels of advanced education. Nearly two-thirds of student loan borrowers engaged in public service who have certified interest in PSLF make less than $50,000 per year.

- To qualify for PSLF, borrowers must meet four requirements: the borrower (1) must have a qualifying loan, (2) must be enrolled in a qualifying repayment plan, and (3) while the borrower is working for a qualified public service employer, he or she must (4) make 120 on-time, qualified payments. Student loan servicers are responsible for administering each of these requirements. This report highlights how a range of servicing problems that are reported by student loan borrowers serving in their communities can impede borrowers' ability to obtain these key protections.

- This report also offers recommendations to policymakers and student loan industry participants as they work to ensure borrowers have full access to the range of protections guaranteed under federal law, including those offered through the PSLF program.

  - As policymakers reviewing this report note how servicing breakdowns can delay or derail progress towards PSLF, those seeking to assist these borrowers should consider whether additional flexibility is necessary to ensure that borrowers who received inaccurate information about program requirements provided by their student loan servicer will still be able to secure these benefits. This review process can be modeled after a previous effort by the Department of Education in 2010 to mitigate the harm caused to hundreds of borrowers who were advised by their servicer to enroll in an ineligible repayment plan.

7

ED_01414

❑ Servicers may wish to consider earlier engagement with borrowers about the availability and benefits of IDR. Borrowers who reach out to their servicer to express financial distress would benefit from having more information on IDR. Servicers can also engage borrowers to determine potential eligibility for PSLF and explain how enrollment in an income-driven plan is a first step towards loan forgiveness.

❑ Student loan borrowers who submit timely recertification applications for IDR plans should be granted the full extent of protections provided by federal law. Pursuant to these laws, if a servicer cannot process a timely recertification application before the expiration of the borrower's current IDR, the borrower should be entitled to continue making qualifying payments at their current payment level until the servicer can fully process the recertification application. These interim payments, like other IDR payments, should count towards loan forgiveness.

❑ Borrowers would be well served by uniform, clear, periodic, plain language reminders, including directly from servicing personnel, of the need to recertify income and family size to remain enrolled in an IDR plan. Reminder notices could clearly identify the date by which the borrower must submit the recertification application, and the consequences of failing to recertify.

ED_01415

# 1. About this report

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Act) established a Student Loan Ombudsman within the Bureau. Pursuant to the Act, the Ombudsman shall compile and analyze data on private student loan complaints and make appropriate recommendations to the Secretary of the Treasury, the Director of the Consumer Financial Protection Bureau, the Secretary of Education, and Congress.

This report analyzes approximately 7,500 private student loan complaints, 11,500 federal student loan servicing complaints, and approximately 2,200 debt collection complaints related to private or federal student loan debt handled between March 1, 2016 and February 28, 2017. Figures are current as of April 1, 2017.

9

ED_01416

# 2. Midyear update on student loan complaints

Information about consumer complaints, including information about federal student loan, private student loan, and debt collection complaints, is available to the public through the CFPB's Consumer Complaint Database.[18]

The database contains anonymized complaint data provided by consumers, including the type of complaint, the date of submission, the consumer's zip code, and the company that the complaint concerns. The database also includes information about the actions taken by a company in response to a complaint: whether the company's response was timely, how the company responded, and whether the consumer disputed the company's response. The database does not include consumers' personal information. The database includes web-based features such as the ability to filter data based on specific search criteria; and to aggregate data in various ways, such as by complaint type, company, location, date, or any combination of available variables. The database also provides the option to review consumer complaints narratives for consumers who have submitted complaints and consented to share their narratives so others can learn from their experience.

---

[18] *See* CFPB, *Consumer Complaint Database*, http://www.consumerfinance.gov/complaintdatabase/. The database lists complaints where the companies have had the opportunity to provide a response or after the companies have had the complaint for 15 calendar days –whichever comes first. The publication criteria are available at CFPB, *Disclosure of Consumer Complaint Data* (2012), http://files.consumerfinance.gov/f/201303_cfpb_Final-Policy-Statement-Disclosure-of-Consumer-Complaint-Data.pdf. We do not verify the facts alleged in these complaints, but we take steps to confirm a commercial relationship between the consumer and the company.

ED_01417

The following tables are based on complaints handled from March 1, 2016, through February 28, 2017, as exported from the public Consumer Complaint Database as of April 1, 2017.[19] These tables are not indexed for market share.[20]

# 2.1　Federal student loan complaint data

This section provides an analysis of a sample of 8,494 federal student loan complaints against companies. For each complaint, the Bureau assigned an "Issue Tag" identifying the root of the consumer's complaint based on the consumer's complaint narrative and the company's response.[21]  This section reports the results of our review.

---

[19] Not all complaints handled by the Bureau are published in the public Consumer Complaint Database. Therefore the number of complaints published in the database may be fewer than the total number of complaints handled by the Bureau. For example, complaints that do not meet the publication criteria, such as those where the entity complained about indicates that there is no customer relationship, may be removed from the database.

[20] Compared to other large markets of consumer financial products, such as residential mortgages and credit cards, availability of market data is quite limited for private student loans, which grew rapidly in the years leading up to the financial crisis. *See* CFPB and U.S. Dept. of Education, *Private Student Loans* (2012), http://www.consumerfinance.gov/reports/private-student-loans-report/. In early 2017, the Bureau announced a proposed information collection in accordance with the Paperwork Reduction Act, in which the Bureau seeks to collect market monitoring data on the largest federal and private student loan servicers. *See* CFPB, *Increasing transparency in the student loan servicing market* (Feb. 16, 2017), https://www.consumerfinance.gov/about-us/blog/increasing-transparency-student-loan-servicing-market/.

[21] The Bureau reviewed a sample of 8,494 federal student loan servicing complaints submitted between March 1, 2016 and February 28, 2017. Issue tags were assigned based on an independent review of each complaint by subject matter experts. Consumer narratives and company responses were analyzed to determine the root cause of the consumer's complaint. For example, if the consumer complained about derogatory credit reporting by the servicer because the servicer failed to accurately apply forbearance, the complaint would be tagged as "forbearance."  Note that issue tags are distinct from consumer-selected issues provided in the public complaint database. *See* Appendix A for more information on issue tag definitions.

**FIGURE 1:**   TOP TEN ISSUES IDENTIFIED IN FEDERAL STUDENT LOAN COMPLAINTS [22]



**TABLE 1:**   COMPANIES WITH THE MOST FEDERAL STUDENT LOAN COMPLAINTS RANKED BY VOLUME [23]

| Company | Mar. 2016 – Feb. 2017 |
| --- | --- |
| Navient | 4,638 |
| AES/PHEAA | 1,296 |
| Nelnet | 610 |
| Great Lakes | 345 |
| ACS Education Services | 226 |

[22] This chart reflects the top ten issues identified in federal student loan servicing complaint sample. Percentages are rounded and therefore may add up to more than 100 percent.

[23] This table reflects complaints where (1) the consumer identified the sub-product as "federal student loan servicing" and (2) the identified company responded to the complaint, confirming a relationship with the consumer. The Bureau also initiated an enforcement action against a large student loan servicer during the time period covered by this report.

ED_01419

**FIGURE 2:** PERCENTAGE OF COMPLAINTS AGAINST TOP FIVE COMPANIES BY SELECT ISSUE TAG [24]



---

[24] This chart shows the relative percentage of complaints received about selected issues for the top five companies by complaint volume. Issue tags featured in this chart were chosen based on consumer harms identified in the Bureau's 2015 *Student Loan Servicing* report. *See* CFPB, *Student Loan Servicing* (Sept. 2015), files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

ED_01420

## 2.2    Private student loan complaint data

**FIGURE 3:**    PRIVATE STUDENT LOAN ISSUES REPORTED BY CONSUMERS FROM MARCH 1, 2016
THROUGH FEBRUARY 28, 2017[25]



**TABLE 2:**    COMPANIES WITH THE MOST PRIVATE STUDENT LOAN COMPLAINTS RANKED BY VOLUME[26]

| Company | Mar. 2015 – Feb. 2016 | Mar. 2016 – Feb. 2017 |
|---|---|---|
| Navient | 1,686 | 3,176 |
| AES/PHEAA | 465 | 464 |
| Sallie Mae | 261 | 339 |
| Wells Fargo | 274 | 279 |
| Discover | 153 | 184 |

[25] Consumers submitting student loan complaints can select from the following three types of complaint categories:
"Getting a loan," "Can't pay my loan," and "Dealing with my lender or servicer." This figure reflects the categories
consumers selected when submitting a complaint.

[26] This table reflects complaints where (1) the consumer identified the sub-product as a non-federal student loan and
(2) the identified company responded to the complaint, confirming a relationship with the consumer.

ED_01421

## 2.3   Debt collection complaint data

From March 1, 2016 through February 28, 2017, the CFPB handled approximately 2,200 debt collection complaints related to private or federal student loans.

**TABLE 3:**   TOP RECIPIENTS OF STUDENT LOAN DEBT COLLECTION COMPLAINTS FROM MARCH 1, 2016 THROUGH FEBRUARY 28, 2017[27]

| Federal Student Loans | Number of Complaints | Private Student Loans | Number of Complaints |
|---|---|---|---|
| Navient | 166 | Navient | 153 |
| AES/PHEAA | 58 | AES/PHEAA | 53 |
| ECMC Group, Inc. | 40 | Transworld Systems Inc. | 35 |
| Great Lakes | 32 | Sallie Mae | 20 |
| Account Control Technology, Inc. | 22 | Weltman, Weinberg, & Reis | 20 |
| Transworld Systems Inc. | 22 | National Enterprise Systems, Inc. | 18 |

---

[27] This table reflects debt collection complaints where (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table also reflects aggregated complaints of subsidiary debt collection companies that operate under their respective parent companies.

ED_01422

**FIGURE 4:**  DISTRIBUTION OF LOAN TYPE FOR STUDENT LOAN DEBT COLLECTION COMPLAINTS BY
COMPANY FROM MARCH 1, 2016 THROUGH FEBRUARY 28, 2017[28]



---

[28] This table reflects debt collection complaints where (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table was not adjusted to reflect each company's relative market share. This table reflects the top companies by complaint volume. This table also reflects aggregated complaints of subsidiary debt collection companies under the parent company.

16

ED_01423

# 3. Issues faced by borrowers

## Sources of information

To identify the range of issues faced by student loan borrowers, this report relies on complaints handled by the Bureau. We also reviewed other information, such as comments submitted by the public in response to requests for information, submissions to the "Tell Your Story" feature on the Bureau's website, and input from discussions with consumers, regulators, law enforcement agencies, and market participants.

## Limitations

Readers should note that this report does not suggest the prevalence of the issues described as they relate to the entire student loan market. The information provided by borrowers helps to illustrate where there may be a mismatch between borrower expectations and actual service delivered. Representatives from industry and borrower assistance organizations will likely find the inventory of borrower issues helpful in further understanding the diversity of customer experience in the market.

# 3.1   Overview of student loan complaints

Between March 1, 2016 and February 28, 2017, consumers with student loans identified a range of payment processing, billing, customer service, borrower communications, and income-driven repayment (IDR) plan enrollment problems.  These consumers submitted complaints against more than 320 companies, including student loan servicers, debt collectors, private student lenders, and companies marketing student loan "debt relief."

17

As the figures in the preceding section illustrate, borrowers reported a broad range of servicing problems from each of the largest student loan servicers. The Bureau's analysis of these complaints suggests that borrowers assigned to the largest student loan servicers may report encountering widespread problems, whether they are trying to get ahead of or struggling to keep up with their student debt.

The Bureau continues to receive complaints from borrowers related to a range of servicing problems, including problems enrolling in and recertifying income under IDR plans, and problems related to payment processing and allocation for borrowers with multiple loans. Additionally, the Bureau continues to hear from struggling borrowers who are delinquent on their student loans and report that they are unable to get access to accurate and actionable information from their servicer to avoid default. As the remainder of this report highlights in detail, consumers also report a range of problems related to certain borrower protections, including the Public Service Loan Forgiveness program.

In addition to complaints about federal student loans, private student loan borrowers continued to submit complaints about co-signer issues, including a lack of information surrounding co-signer release requirements and co-signers' ability to allocate payments to only co-signed loans on borrowers' accounts. Additionally, borrowers continued to submit complaints regarding their inability to obtain flexible repayment options for their private student loans during times of financial distress. Complaints indicate that borrowers may be told there are flexible repayment options available, but when they seek to apply for such options, they are told that they are either ineligible or the repayment plan is unavailable.

18

## 3.2   Public service & student debt

A college degree has become a prerequisite to enter or advance in many public service careers.[29] However, research suggests that the prospect of several decades of student loan payments often deters people from pursuing careers in public service.[30]

For many student loan borrowers working in public service, the financial consequences of student debt can be substantial. Consider, for example, a preschool teacher at a public or non-profit preschool program during his first two years of employment.  He earns $22,440 per year—in line with the typical starting salaries for early childhood educators—while carrying an average student debt balance for a borrower with a four-year degree.[31] Under a standard, 10-

---

[29] *See* BLS, *Should I get a master's degree?* (Sept. 2015), https://www.bls.gov/careeroutlook/2015/article/should-i-get-a-masters-degree.htm ("In some occupations, you're likely to need a master's degree to qualify for entry-level jobs. In others, a master's degree may not be required, but having one might lead to advancement or higher pay."); Bender & Heywood, *Out of Balance?*, *supra* note 3; s*ee also* Ala. Code 1975 § 34-30-22 (requiring social workers in Alabama to have at least a "baccalaureate degree from an accredited college or university including completion of a social work program."); 105 Ill. Comp. Stat. 5/21B-20 (2017) (requiring teachers in Illinois to hold at least a bachelor's degree); 21 N.C. Admin. Code 36.0803 (2017) (requiring nurse practitioners in North Carolina to hold at least a Master's degree).

[30] See, e.g., Nat'l Ass'n of Social Workers, In the Red: Social Works and Educational Debt (2008), workforce.socialworkers.org/whatsnew/swanddebt.pdf; Pew Charitable Trusts, Student Debt Means Many New Graduates Can't Afford to be Teachers or Social Workers (Apr. 5, 2006), Project on Student Debt, http://www.pewtrusts.org/en/about/news-room/press-releases/2006/04/05/student-debt-means-many-new-graduates-cant-afford-to-be-teachers-or-social-workers; The State PIRGs' Higher Education Project, Paying Back, Not Giving Back: Student debt's negative impact on public service career opportunities (Apr. 5, 2006), http://www.pirg.org/highered/payingback.pdf.

[31] Many states require a postsecondary degree for those seeking to work in early childhood education. *See* BLS, *Occupational Outlook Handbook: How to Become a Preschool Teacher* (accessed Feb. 21, 2017), https://www.bls.gov/ooh/education-training-and-library/preschool-teachers.htm - tab-4. For this example, we used the average student loan balance, $26,946, and interest rate, 3.9 percent, for graduates of four-year public institutions. *See* U.S. Dept. of Education, *Repayment Estimator* (accessed Feb. 13, 2017), https://studentloans.gov/myDirectLoan/mobile/repayment/repaymentEstimator.action. We also assumed a recent graduate with an entry-level salary of $22,440. *See* U.S. News & World Report, *Preschool Teacher: Salary Details* (accessed Feb. 13, 2017), http://money.usnews.com/careers/best-jobs/preschool-teacher/salary. The Department of Education's Repayment Estimator assumes a five percent annual increase in salary when projecting repayment estimates.

ED_01426

year repayment plan, it would be nearly impossible for him to make his $272 payment each month, which would consume over 75 percent of his discretionary income.[32]

Fortunately, millions of teachers, nurses, first responders, servicemembers, and other public servants have access to a range of protections under federal law designed to ensure that student loan debt does not deter borrowers from entering or pursuing careers in public service occupations.[33]  For example, the preschool teacher noted above could make payments limited to 10 percent of his discretionary income (less than $40 per month, if he is single and has no dependents), and after 10 years, earn loan forgiveness under the Public Service Loan Forgiveness (PSLF) program.[34]

This framework may be particularly important for workers in professions where credentials are required under federal or state law, as part of professional licensure requirements, or by employer prerequisites. These borrowers may have little control over education or credential requirements required of them, yet the financial costs of these credentials fall on the individuals – particularly those where limited opportunity for wage growth may limit borrowers' ability to offset these costs.

---

[32] *See* U.S. Dept. of Education, *Repayment Estimator*, *supra* note 31.

[33] In 2007, Congress passed into law the College Cost Reduction and Access Act, which authorized the Public Service Loan Forgiveness program. The program is designed to encourage people to pursue careers in public service professions in spite of increasing levels of student loan debt. *See* Pub. L. 110-84 (2007); *see also* 34 C.F.R. § 685.219 (defining public service as work in the following fields: federal, state, local, or tribal government; public child or family service agency; non-profit organization under 501(c)(3) of the Internal Revenue Code; tribal college or university; or a non-profit private organization that provides certain public services, including emergency management, military service, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities, public health, public education, public library services, school library or other school-based services).

[34] By the end of 2016, more than 32 million borrowers were repaying loans that are potentially eligible for PSLF. Of these borrowers, more than 500,000 people have certified their intent to pursue loan forgiveness under PSLF. *See* U.S. Dept. of Education, *Federal Student Aid Overview* (accessed on May 28, 2017), https://studentaid.ed.gov/sa/about/data-center/student/portfolio. Beginning in October 2017, the first student loan borrowers are expected to complete the requirements of the program and be eligible to apply for PSLF.

20

ED_01427

## 3.2.1   The Public Service Loan Forgiveness program

Student loan borrowers leaving school can choose between pursuing careers in the public or private sectors. Many choose careers in public service – seeking to give back to their country or community through teaching, nursing, military, or other service.  Because many public service fields traditionally offer lower wages, individuals with average student loan debt and entry-level salaries in these fields are likely to face financial hardship when making their standard, 10-year payment amount, as illustrated in the example above.  PSLF was created to protect public service workers against the prospect of this financial hardship and provide a pathway to satisfy their student loan obligation over a "standard" period of time (10 years).[35]

Recent data released by the Department of Education show that low-to-moderate income student loan borrowers comprise the largest share of borrowers expected to benefit from this program.[36] As of 2016, nearly two thirds (62 percent) of borrowers who have certified intent to pursue PSLF reported earning less than $ 50,000 per year.[37] The vast majority of borrowers (86 percent) earned less than $75,000 per year.[38]

---

[35] Additionally, borrowers who obtain loan forgiveness under the PSLF program do not incur the tax consequences they would otherwise face if they received loan forgiveness after 20-25 years under an IDR plan without PSLF. For many borrowers, this could mean relief from thousands of dollars in tax liability. *See* I.R.C. § 108(f)(1); *see also* Internal Revenue Service (IRS), *Student Loan Cancellations and Repayment Assistance* (accessed Mar. 1, 2017), https://www.irs.gov/publications/p970/ch05.html. Borrowers who receive loan forgiveness after 20 to 25 years of payments under an IDR plan may be taxed on the discharged loan balance. *See* 34 C.F.R. §§ 685.215(g)(1)(iii), 685.209 (a)(6) (v)(A)(3), (b)(3)(iii)(D)(3), (c)(5)(vii)(A)(3); I.R.C. § 108(f)(1); *see also* IRS, *Student Loan Cancellations and Repayment Assistance* (accessed Mar. 1, 2017), https://www.irs.gov/publications/p970/ch05.html.

[36] *See* U.S. Dept. of Education, *Direct Loan Public Service Loan Forgiveness* (July 2016), http://fsaconferences.ed.gov/conferences/library/2016/NASFAA/2016NASFAADirectLoanPSLF.pdf.

[37] *See* U.S. Dept. of Education, *2016 FSA Training Conference for Financial Aid Professionals* (Nov. 2016), http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConfSession18.ppt.

[38] *Id.*

ED_01428

## Ensuring public service workers can repay student debt over the "standard" period of time (10 years).

The current federal framework for student loan repayment assumes that a typical student loan borrower will be able to make a series of level monthly payments over 10 years in order to satisfy his or her obligation in full.[39] All student loan borrowers who exit school and enter repayment are assigned a monthly payment amount on this payment schedule.[40]  In 2007, Congress recognized that this standard payment schedule may present substantial financial hardship for certain borrowers working in public service and designed the Public Service Loan Forgiveness program to ensure public service workers could also satisfy their student debt over the "standard" period of time.[41]

The following examples illustrate this dynamic for two types of public service workers:

- **Public service careers with no private sector equivalent.** For many public sector careers, like teaching or military service, there are few, if any, private-sector equivalents. For example, the average clinical social worker with a master's degree owes $40,000 in student loan debt, but is likely to earn approximately $28,800 in her first years of social work.[42] Under a standard 10-year repayment plan, she will owe approximately $416 per month, consuming nearly half of her discretionary income.[43] In contrast, under an IDR

---

[39] *See* 20 U.S.C. §§ 1078(a)(9)(A), 1087e(d).

[40] Borrowers also have the option of consolidating their federal student loans, which may extend the standard repayment period depending on the balance of the loan. However, when borrowers exit school, the default repayment plan is a standard, ten year term. *See* U.S. Dept. of Education, *Loan Consolidation* (accessed June 1, 2017), https://studentaid.ed.gov/sa/repay-loans/consolidation.

[41] *See* Pub. L. 110-84 (2007); *see also* 34 C.F.R. §§ 685.208(b)(1), 685.219(c)(iv)(C).

[42] All clinical social workers are required to have master's degrees to become licensed in their state. *See* BLS, *Social Workers* (Dec. 17, 2015), https://www.bls.gov/ooh/community-and-social-service/social-workers.htm. The Annual Survey of the Council of Social Work Education (CSWE) reports that 80 percent of all people who earn a Masters of Social Work (MSW) graduate with student loan debt. *See* CSWE, *Annual Statistics on Social Education in the United States* (2015), https://www.cswe.org/getattachment/992f629c-57cf-4a74-8201-1db7a6fa4667/2015-Statistics-on-Social-Work-Education.aspx.

[43] A student loan borrower earning $28,800 per year with $40,000 in student loan debt at a weighted average interest rate of 4.52 percent would pay $416 under a standard 10 year payment. Based on the same federal formula to determine "discretionary income" under the most widely available income-driven repayment plans, this

ED_01429

plan, the average social worker would pay $89 per month as she made payments that count towards PSLF.[44]

- **Public service careers that pay less than a comparable private sector position.** Alternatively, some individuals may pursue careers in which there are similar positions in both the private and public sectors. Depending on the career, a public sector position may offer lower wages than the private sector alternative.[45] Consider, for example, the especially large wage disparity between two borrowers with degrees from the same accounting program, owing the same amount of student loan debt. One may choose to work for state government as an entry-level auditor and earn approximately $33,000 per year, while the other may choose to work for a private accounting firm, where the national average is more than double that amount.[46] After graduation, both student loan borrowers would have the option of making the standard, 10-year payment

---

consumer would need to devote approximately 46.6 percent of her discretionary income to her student loan payments. *See* U.S. Dept. of Education, *Repayment Estimator* (accessed June 1, 2017); CWSE, *Annual Statistics on Social Work Education in the United States* (2015), Table 15, https://www.cswe.org/getattachment/992f629c-57cf-4a74-8201-1db7a6fa4667/2015-Statistics-on-Social-Work-Education.aspx; U.S. Dept. of Education, *Interest Rates and Fees* (accessed June 1, 2017), https://studentaid.ed.gov/sa/types/loans/interest-rates#rates.

[44] *See* U.S. Dept. of Education, *Repayment Estimator*, *supra* note 31.

[45] *See, e.g.*, Bender & Heywood, *Out of Balance? supra* note 3 (finding that on average, public sector jobs require much more education than those in the private sector, and wages and salaries of state and local employees are lower than those for private sector workers with comparable earnings determinants); Federal Salary Council, *Memorandum on Level of Comparability Payments for January 2018 and Other Matters Pertaining to the Locality Pay Program* (Dec. 14, 2016), https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/federal-salary-council/recommendation16.pdf; *see also* Congressional Budget Office, *Comparing the Compensation of Federal and Private Sector Employees* (Jan. 2012). These public-sector positions may also offer more generous non-wage compensation than their private sector alternatives, but this form of compensation generally does not aid in the repayment of student loans.

[46] *See* Tenn. Dept. of Human Resources, *Alpha Compensation Plan* (June 1, 2017), http://www.tn.gov/dohr/class_comp/pdf/alpha_comp_plan.pdf; BLS, *Accountants and Auditors* (accessed Mar. 10, 2017), https://www.bls.gov/ooh/business-and-financial/accountants-and-auditors.htm#tab-5.

ED_01430

of $272; but, for the public sector accountant, that payment amount would consume three times the share of his disposable income versus the private sector accountant.[47]

As this example illustrates, while otherwise similarly situated borrowers may graduate with the same level of student loan debt, those entering public service may be less able to afford their standard 10-year payment amount.[48] In contrast, under certain IDR plans, the accountant working for state government would have payments set at 10 percent of his discretionary income – $124 per month – comparable to the share of discretionary income a private sector accountant would devote to loan repayment under the standard 10 year repayment plan.[49]

Through a combination of Public Service Loan Forgiveness and IDR plan, public service borrowers can make the same number of payments as a typical borrower would under a standard payment plan (120 months or 10 years of qualifying payments), but with a monthly payment amount that is manageable relative to their salary.

---

[47] Estimates are based on average loan balances for a four-year public institution, as provided by the Department of Education. *See* U.S. Dept. of Education, *Repayment Estimator* (accessed Feb. 13, 2017), https://studentloans.gov/myDirectLoan/mobile/repayment/repaymentEstimator.action.

[48] Research shows that public sector careers typically require more education than many private sector careers. *See*, *e.g*., Bender & Heywood, *Out of Balance? supra* note 3.Without additional student loan protections for borrowers working in public service, student loan borrowers may be prevented from pursuing public service careers. *See* Eric Dunlop Velez & Jennie H. Woo, *The Debt Burden of Bachelor's Degree Recipients*, National Center for Education Statistics (Apr. 20 2017), https://nces.ed.gov/pubs2017/2017436.pdf (stating that, "As of 2012, about three-quarters (72 percent) of 2007-2008 bachelor's degree recipients had taken out federal or private student loans to finance their undergraduate and subsequent education."); *see also* CFPB, *Public Service & Student Debt*, *supra* note 1.

[49] Note that the private accountant would not benefit from an IDR plan as his monthly payment would exceed the standard 10 year payment. *See* U.S. Dept. of Education, *Repayment Estimator* (accessed Feb. 13, 2017), https://studentloans.gov/myDirectLoan/mobile/repayment/repaymentEstimator.action.

ED_01431

## Without Public Service Loan Forgiveness, prolonged periods of income-driven payment would present unique challenges for workers in public service.

Income-driven plans were designed to allow borrowers to secure payment relief in the immediate-term while still making progress toward satisfying their student loan debt.[50] Because borrowers' monthly payments increase as their income increases, the Department of Education estimates that, over the lifetime of a loan, a typical borrower who makes payments based on his or her income will repay more than her initial principal balance.[51] In contrast, public service borrowers may not have this same opportunity because they earn lower starting wages but may not realize equivalent future income gains. As a consequence, many public service borrowers will continue to make lower income-driven payments over a comparatively longer period of time, prolonging the length of their repayment obligation by a decade or more.[52]

As a result, absent PSLF, these public service borrowers may pay comparatively more toward their student debt in total than typical borrowers in IDR plans – a result of accruing interest charges over a prolonged repayment term.[53]  In this key respect, PSLF offers a path forward for public service borrowers that IDR alone does not – PSLF ensures that both the total loan costs and the repayment term for these borrowers remain manageable over the long term.

Consider, as an illustration, the social worker identified in the previous example, if she was unable to access to PSLF. Under the newest IDR plan, Revised Pay As You Earn (REPAYE), and

---

[50] All borrowers enrolled in IDR have access to a range of short-term and long term protections designed to ensure that a typical borrower will be able to satisfy their obligation, either through payoff or loan forgiveness, in a maximum of 20 or 25 years.  For further discussion, see CFPB, *Student Loan Servicing*, *supra* note 24.

[51] *See* U.S. Dept. of Education, *Congressional Budget Justifications FY2018: Student Loans Overview*, Q-6, Q-7 (2017), https://www2.ed.gov/about/overview/budget/budget18/justifications/q-sloverview.pdf  (estimating that, for the vast majority of borrowers under nearly all available repayment arrangements, total expected lifetime student loan payments will range from 107 percent to 176 percent of initial principal balance. For borrowers enrolled in Pay As You Earn who earn less than $70,000 and owe more than $25,000, the Department of Education estimates that 90 percent of initial principal balance will be repaid).

[52] As compared to an expected loan term of 120 months under the standard, 10 year repayment plan.

[53] In contrast to a typical borrower using IDR, many public service borrowers may see more modest increases in their income-driven payments year-after-year, over the course of their decade of service—a direct result of lower starting salaries and more limited opportunities for wage growth in many public service fields.

ED_01432

absent PSLF, this borrower can expect to pay nearly $20,000 more over the lifetime of her loan than she would under the standard 10 year repayment plan (Figure 5).[54] Rather than reducing the total cost of his student debt, REPAYE would, in effect, provide this borrower with a term extension—permitting payment flexibility in the short term but ultimately requiring this borrower to devote a greater share of lifetime earnings to repaying her student debt.

**FIGURE 5:**    TOTAL LIFETIME PRINCIPAL AND INTEREST (P&I) PAYMENTS, ABSENT PSLF [55]



Recent projections made by the Department of Education indicate that this effect is even more pronounced when comparing a public service borrower, absent PSLF, to a typical borrower enrolled in REPAYE.[56]  The Department of Education estimated that, in general, borrowers who

---

54 *See* U.S. Dept. of Education, *Repayment Estimator*, *supra* note 31. In this example, we assumed that this hypothetical borrower had the same debt and income characteristics as described in the social worker example.

55 *See* U.S. Dept. of Education, *Congressional Budget Justifications FY2018: Student Loans Overview*, Q-6, Q-7 (2017), https://www2.ed.gov/about/overview/budget/budget18/justifications/q-sloverview.pdf

56 *See id.* Readers should also note that, as part of the most recent budget proposal, the U.S. Department of Education recommended that Congress eliminate access to the Public Service Loan Forgiveness program for new borrowers, beginning on July 1, 2018.

ED_01433

earn less than $70,000 per year and owe more than $25,000 in student debt would repay approximately 107 percent of their initial principal balance over the lifetime of their loans.[57]

In contrast, the social worker in this example, absent PSLF, could expect to repay more than 170 percent of her initial principal balance – nearly $70,000 in principal and interest charges – due to his low starting salary.[58] In order to satisfy this debt, this borrower would make steadily increasing payments for more than 23 years, paying more than $25,000 over-and-above the total costs projected for a typical REPAYE borrower with similar characteristics.[59]

The prospect of substantially higher lifetime costs under IDR present a large economic hurdle for borrowers working in public service. As researchers continue to raise concerns that student loan debt may inhibit progress toward important financial milestones, this illustration suggests that PSLF can help protect public service borrowers from the considerable and detrimental effects of high debts and low wages in a way that IDR alone cannot.[60]

## 3.2.2   How servicing of borrowers pursuing PSLF works (and doesn't yet work) for student loan borrowers

As illustrated above, PSLF can offer powerful protection for borrowers committing to careers in public service. However, complaints from student loan borrowers reveal that a series of obstacles may cause delays or dead ends that can cost them thousands of dollars. The problems highlighted below can trigger extra payments and interest charges, or render a borrower's loans entirely ineligible for PSLF, even after a decade of qualifying public service.

---

[57] *See id* (estimating that a borrower who earns, on average, less than or equal to $70,000 throughout his or her full repayment period, and owes more than $25,000 will repay, on average, 107 percent of initial principal balance under REPAYE).

[58] S*ee* U.S. Dept. of Education, *Repayment Estimator, supra* note 31. In this example, we assumed that this hypothetical borrower had the same debt and income characteristics as described in the social worker example.

[59] *See id.*

[60] *See, e.g.,* Hiltonsmith, supra note 10; see also CFPB, Prepared Remarks of Seth Frotman, Hearing Before the CA Senate Comm. on Banking and Financial Institutions (Mar. 22, 2017), http://files.consumerfinance.gov/f/documents/201703_cfpb_Frotman-Testimony-CA-Senate-Banking-Committee.pdf.

ED_01434

**Student loan servicers are contracted and compensated for helping consumers navigate the process of qualifying for PSLF.** Lenders or loan holders, including the Department of Education, generally contract with private companies to administer all aspects of federal student loan repayment, including answering borrowers' questions about the repayment of federal student loans and about available loan forgiveness programs.[61] Additionally, borrowers who express interest in PSLF rely on their servicers to have the necessary information to help them stay on track with their repayment plans.[62] While the Department of Education contracts with several private companies to service federal student loans, one servicer is specifically designated to service loans for borrowers pursuing PSLF, the Pennsylvania Higher Education Assistance Agency or PHEAA, operating under the FedLoan Servicing brand. In the rest of this report, we refer to this entity as the PSLF servicer.[63]

To be eligible for PSLF, borrowers must meet four basic requirements:

- The borrower must have one or more Direct Loans;
- The borrower must make 120 qualifying payments;
- The borrower must be enrolled in a qualifying repayment plan; and
- The borrower must work full-time for a qualified employer.

---

[61] The student loan market is comprised primarily of three types of student loans: (1) federally guaranteed loans made through the Federal Family Education Loan Program (FFELP) by private-sector lenders; (2) federal loans made directly to borrowers by the Department of Education through the William D. Ford Direct Loan Program (Direct Loans); and (3) private student loans. Only Direct Loans are eligible for PSLF. *See* CFPB, *Student Loan Servicing* (Sept. 2015), files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf. FFELP loans are only eligible for PSLF after being consolidated into a Direct Consolidation Loan. *See* U.S. Dept. of Education, *Public Service Loan Forgiveness* (accessed June 6, 2017), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service - eligible-loans.

[62] *See* U.S. Dept. of Education, *Public Service Loan Forgiveness* (accessed May 5, 2017), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service (directing borrowers to contact their federal student loan servicer with questions about PSLF).

[63] Borrowers may earn credit toward PSLF while their Direct Loans are serviced by any federal student loan servicer. A borrower's loans are only transferred to the designated PSLF servicer once the borrower successfully certifies that he or she works for a qualified employer by completing the Department of Education's Employment Certification Form. *See ECF, infra* note 87. While only one servicer is contracted to service accounts of borrowers who certify interest in PSLF, borrowers can remain eligible for and make qualifying payments towards PSLF prior to submitting an ECF. As such, all federal student loan servicers are integral in assisting borrowers seeking to navigate the PSLF process.

28

ED_01435

Servicers are the primary point of contact for all borrower questions related to repayment matters, including PSLF requirements. However, borrowers report that servicing obstacles affecting each requirement of the PSLF program have obstructed their ability to successfully make progress towards the loan forgiveness that would support their sustained public service.

## Borrower must have one or more Direct Loans

Only loans made under the William D. Ford Direct Loan Program are eligible to be forgiven under PSLF.[64] Borrowers with other types of federal loans, such as Federal Family Education Loan Program (FFELP) Loans or Perkins Loans, are not eligible for PSLF, but student loan borrowers may consolidate these loans into a Direct Consolidation Loan in order to become eligible.[65] When federal student loan borrowers express interest in loan forgiveness while working in public service, they expect their servicer to inform them of how to get on track, including whether they need to consolidate their otherwise ineligible loans.[66] However, borrowers complain that servicers withhold essential information about eligibility for PSLF.

**Borrowers report spending years making payments, believing they were making progress towards PSLF, before servicers explain that their loans do not qualify for PSLF.** Borrowers with FFELP or Perkins Loans complain to the Bureau that despite informing their servicer that they work in public service, or specifically mentioning that they are pursuing

---

[64] *See* 34 C.F.R. § 685.219(c)(1)(iii).

[65] *See* U.S. Dept. of Education, *Public Service Loan Forgiveness* (accessed Feb. 1, 2017), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service.

[66] Some individual public service organizations, school districts and government agencies now provide information about PSLF to their employees as part of existing workplace financial education. *See, e.g.*, American Federation of Teachers, *Sharing simple solutions with student loan debtors* (2015), https://www.aft.org/periodical/aft-campus/fall-2015/pay-it; U.S. Dept. of Education, *Remarks of U.S. Secretary of Education Arne Duncan to the 2014 National HBCU Conference, HBCUs: Innovators for Future Success* (Sept. 2014), https://www.ed.gov/news/speeches/hbcu-value-proposition ("We've all agreed to . . . talk to our employees about their options for student loan forgiveness, to help them document that they work for a public service organization, and to check in annually with employees to make sure they stay on track."). Additionally, acknowledging the crucial protections offered by the PSLF program, several states require or are considering legislation to require that state government employees receive periodic information about PSLF. *See, e.g.*, Mo. Rev. Stat. § 105.1445 (requiring that the Missouri Department of Higher Education create guidance regarding public employees' eligibility for PSLF).

ED_01436

PSLF, their servicer never advised them that their student loans were not eligible loans. As a result, these borrowers make years of payments that do not count towards PSLF.[67] For example, one consumer states:

> *I started working for a public school and learned about the loan forgiveness program. I called [my servicer] to consolidate my loans to qualify for loan forgiveness. They said that their income based loan would qualify me for the loan forgiveness program. I consolidated my loans, and AGAIN asked "does this qualify me for loan forgiveness program?" They told me, "I was all set!" They also stated that there was no form to submit for loan forgiveness until I completed 120 payments over 10 years so I did not follow up sooner. Recently, I called to check in around this, and was informed that I WAS NOT in the loan forgiveness program, and that I needed to consolidate my loans [into a Direct Loan]. . . I have been paying for 4 years and was misled by this company completely . . . Now I have consolidated my loans [into a] a direct loan, and have ONE payment toward my 10 years.*

For certain populations of borrowers, servicers are aware that they work in public service, yet borrowers complain that servicers do not proactively inform them of their eligibility for PSLF. In particular, complaints from military borrowers indicate they may not be receiving information about PSLF at a time when they can be making substantial progress towards the qualified payment requirement. For example, one borrower reported that his servicer did not explain that his loans were not eligible for PSLF until after years of military service. The borrower was only informed that he needed to consolidate his loans to become eligible for PSLF after he left the military due to a service-related injury.

> *I was told that none of my active military service, including deployments to Afghanistan, would count for PSLF purposes. This is a slap in the face to all Veterans. PSLF is supposed to provide reward those who serve the public. . . . [M]y military service, in which my leg function was sacrificed, did not count for*

---

[67] Additionally, if these borrowers choose to consolidate, they will lose any prior progress made towards loan forgiveness through 20 or 25 years of payments under an IDR plan. *See* 34 C.F.R. § 682.215(f).

ED_01437

*anything [toward PSLF]. This is contrary to the alleged policy for which the*
*PSLF program was created and it is insulting.*[68]

Recent changes to industry practices for handling military borrowers should ensure that servicers have a clear understanding of which customers are pursuing active duty military service, which would be employment potentially eligible for PSLF.[69] Each month, the largest student loan servicers use the Department of Defense's Manpower Database (DMDC) to proactively identify their military customers, in order to automatically administer other military specific protections relating to student loans.[70]

**Borrowers identify delays and defects in the loan consolidation process that can increase costs and disrupt progress toward loan forgiveness.** In order to consolidate FFELP loans into a Direct Consolidation Loan, a borrower must complete a new federal Direct Consolidation Loan application. Borrowers consolidating for purposes of PSLF must choose the designated PSLF servicer.[71] After an application is submitted, the PSLF servicer works with the

---

[68] https://www.regulations.gov/document?D=CFPB-2015-0021-0499.

[69] In 2014, the Department of Education announced that it had directed its servicers to "check the names of borrowers against the DMDC." U.S. Dept. of Education, *Improved Administration of the Servicemembers Civil Relief Act for Borrowers under the William D. Ford Direct Loan and Federal Family Education Loan Programs* (Aug. 25, 2014), https://ifap.ed.gov/dpcletters/GEN1416.html. As of July 1, 2016, all FFEL program loan holders were required to "apply the SCRA interest limitation without a request and based on a data match with the DMDC." U.S. Dept. of Education, *Approval of Servicemember Civil Relief Act (SCRA) Interest Rate Limitation Request for Direct Loan and FFEL Programs* (May 5, 2016), https://ifap.ed.gov/dpcletters/GEN1608.html. This data match would alert the servicer to the borrower's active duty status, also indicating that the borrower would be eligible for PSLF if he or she consolidated his or her FFELP loans into a Direct Consolidation Loan.

[70] See U.S. Dept. of Education, Approval of Servicemember Civil Relief Act (SCRA) Interest Rate Limitation Request for Direct Loan and FFEL Programs, supra note 69; see also Govt. Accountability Office (GAO), Student Loans: Oversight of Servicemembers' Interest Rate Cap Could Be Strengthened, GAO-17-4 (Nov. 18, 2016), https://www.gao.gov/products/GAO-17-4. For a further discussion of the unique challenges servicemembers face when seeking to navigate the range of available protections and benefits, see CFPB, Public Service & Student Debt, supra note 1.

[71] *See* U.S. Dept. of Education, Federal Student Aid, *Loan Consolidation* (accessed Feb. 2, 2017), *https://studentaid.ed.gov/sa/repay-loans/consolidation - how-apply*.

ED_01438

borrower's current servicer to obtain loan information, including the remaining loan balance, in order to pay off the original, non-eligible loans and disburse the consolidation loan.[72]

Generally, this process should take no more than 30 days,[73] but borrowers report that the consolidation process can take more than six months to complete because their original servicer does not provide the necessary account information required to complete the consolidation.[74] Additionally, some borrowers complain that the consolidation process is stymied when their servicer incorrectly reports their outstanding balance to the PSLF servicer. Without an accurate balance reported, the PSLF servicer cannot originate the consolidation loan. Other borrowers complain that servicing errors result in some individual loans being left out of the consolidation, preventing borrowers from making qualified payments on all of their loans. Each of these servicing errors can prevent borrowers from making qualifying payments, and ultimately add years and potentially thousands of dollars to repayment.

## Borrower must be enrolled in a qualifying repayment plan

To be eligible for PSLF, borrowers must be enrolled in a qualifying repayment plan.[75] Qualifying repayment plans primarily consist of income-driven repayment plans.[76] Graduated and

---

[72] *See, e.g.*, U.S. Dept. of Education, *Federal Consolidation Loan Verification Certificate*, OMB No. 1845-0036 (2010), https://ifap.ed.gov/dpcletters/attachments/FP0705AttECORRECTEDLVC.pdf.

[73] *See* U.S. Dept. of Education, *Transcript for New Direct Consolidation Loan Process Conference Call* (Mar. 25, 2014), ifap.ed.edgekey.net/media/podcasts/NewDirectConsolidationLoanProcessWebinarTranscript.doc.

[74] The GAO, in response to a request from Congress, reported, "Because servicers are not compensated for their loss when a loan is transferred, in effect, they are paid less than if they were able to keep all of their assigned loans. Education officials acknowledged that the lack of compensation for transferred loans could be a disincentive for servicers to counsel borrowers about loan consolidation and PSLF. [The Department of Education] said that [it] believes [its] oversight efforts discourage servicers from acting on this potential disincentive." GAO, *Federal Student Loans: Education Could Improve Direct Loan Program Customer Service and Oversight* (May 2016), GAO-16-523, http://www.gao.gov/products/GAO-16-523.

[75] *See* 34 C.F.R. § 685.219(c)(1)(iv); *see also* U.S. Dept. of Education, Federal Student Aid, *Public Service Loan Forgiveness: What is a qualifying repayment plan?* (accessed Feb. 2, 2017), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service - qualifying-repayment-plan.

[76] *See* 34 C.F.R. § 685.219(c)(1)(iv). While standard repayment is a qualifying repayment plan, a borrower would pay off his or her loan after ten years, the same time he or she became eligible for loan forgiveness under PSLF.

ED_01439

extended repayment plans generally do not qualify.[77] Any payments made while in a non-qualifying repayment plan will not count towards PSLF. Federal student loan borrowers rely on their servicer to ensure their repayment plan keeps them on track for PSLF.[78]

**Borrowers complain that servicers may enroll them into non-qualifying repayment plans, despite borrowers expressing interest in PSLF.** Some borrowers complain to the Bureau that despite telling their servicer that they work in public service, their servicer never informs them about PSLF, or the necessary requirements to become eligible for PSLF. Other borrowers complain that their servicer did not enroll them into a qualifying repayment plan, despite expressly telling their servicer that they are pursuing PSLF.[79] Instead, their servicer enrolled them into a non-qualifying plan, like a graduated or extended repayment plan with payments that are too low to be considered qualifying payments. Other borrowers complain that after submitting all required materials to be enrolled into a qualifying IDR plan, their servicer did not accept the applications. In these cases, borrowers reported that servicers either incorrectly denied their applications, or failed to give borrowers a chance to correct any

---

[77] Payments made under extended or graduated repayment plans may qualify if "the monthly payment amount is not less than what would have been paid under the Direct Loan standard, 10-year repayment plan described in [the fixed, standard 10 year plan provision]." 34 C.F.R. § 685.219(c)(1)(iv)(D).

[78] *See* CFPB, *Student Loan* Servicing, *supra* note 24. The Bureau has previously reported on how servicers may not be consistently assisting borrowers seeking to enroll in IDR plans. Instead, servicers may be enrolling borrowers in "quick fixes," like forbearance or graduated repayment plans. For borrowers pursuing PSLF, these "quick fixes" prevent them from making qualifying payments for purposes of PSLF, and cause borrowers to accrue unnecessary interest. *See* CFPB, *Student Loan Servicing* 25-27 (Sept. 2015), files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf (paraphrasing comments received in response to a public Request for Information as stating, "the student loan servicing business model rewards companies that minimize the length and complexity of customer contacts . . . when borrowers are trying to find the right option for their needs, servicing personnel may not explain how these benefits work or how the selection of a repayment plan can affect borrowers' long-term financial circumstances.").

[79] In 2010, the PSLF servicer received several accounts in which borrowers with Direct Consolidation Loans were advised by their previous servicer to enroll in a graduated repayment plan, rather than an IDR plan. The PSLF servicer requested and was granted approval from the Department of Education's Office of Federal Student Aid for a "one-time override" of the PSLF qualifying payment counter for borrowers who were misinformed by the previous servicer. *See* Pennsylvania Higher Education Assistance Agency, *Letter to the Committee on Health, Education, Labor, and Pensions from PHEAA* (May 19, 2014) (responding to a request from the committee for information about a large transfer event that identified servicing anomalies).

33

deficiencies in their applications before issuing a denial.[80] In particular, the Bureau continues to hear from borrowers who struggle to enroll in IDR plans using alternative documentation, and complain that these servicing breakdowns prevent them from enrolling in a qualifying repayment plan, meaning they cannot make progress towards PSLF.[81]

**Borrowers who return to school complain that servicers may prevent them from remaining in a qualified repayment plan.** Many borrowers who return to school for graduate-level education may still carry debt incurred from undergraduate education. Some of these borrowers choose to attend school while working in public service full-time. As long as these borrowers remain working in public service full-time, and the loans remain in repayment, they can earn credit for payments towards PSLF for their undergraduate loans.[82]

Student loan servicers automatically determine the status of a loan (*e.g.*, in-school, grace, active repayment, etc.) based on the borrower's enrollment status.[83] When a borrower goes to school, all federal loans, including loans for a prior degree or coursework, may be placed into an in-school deferment.[84] For example, a borrower may take out federal student loans for an

---

[80] As the Bureau previously reported, half of all borrowers in IDR plans use alternative documentation to certify their income. *See* CFPB, *Midyear update on student loan complaints* 14 (Aug. 2016), files.consumerfinance.gov/f/documents/201608_cfpb_StudentLoanOmbudsmanMidYearReport.pdf (reporting that student loan servicers may delay processing IDR applications and wrongfully reject borrowers seeking to enroll in IDR, resulting in increased interest charges and lost eligibility for certain federal benefits and protections).

[81] *See* National Consumer Law Center (NCLC), *Letter from Persis Yu to CFPB Student Loan Ombudsman Seth Frotman and FSA Chief Operating Officer James Runcie* (April 14, 2017), http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/letter-cfpb-ed-retrieval-tool.pdf; CFPB, *Response Letter from Student Loan Ombudsman Seth Frotman to NCLC Director Persis Yu* (May 2, 2017), http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/cfpb-idf-drt-response-letter.pdf.

[82] Borrowers also have the ability to consolidate any FFELP loans that are in grace or have already entered repayment, into a Direct Consolidation Loan; borrowers who are enrolled at least half-time can elect to keep their Direct Consolidation loans in repayment rather than placing them into deferment.

[83] For more information on enrollment status issues, see CFPB, *Student data & student debt: How student enrollment status problems can make student loans more expensive* (Feb. 2017), https://www.consumerfinance.gov/documents/2640/201702_cfpb_Enrollment-Status-Student-Loan-Report.pdf.

[84] When borrowers return to school at least half time, all of their existing federal student loans that have already entered repayment (for example, Stafford loans that have exhausted their six-month grace period) are eligible for in-school deferment, regardless of when the loans were originated. *See* 34 C.F.R. §§ 674.32(b)(1)(i), 682.210, 685.204(b)(1). A servicer may place the borrower's loans into in-school deferment if the borrower provides proof of

34

undergraduate degree, graduate and enter repayment, and then go back to school for a graduate degree several years later. The borrower has the option of placing her undergraduate loans into in-school deferment when the borrower begins graduate school. The servicer would verify the borrower's enrollment status automatically, and adjust her repayment status accordingly.

However, a borrower also has the option to waive the in-school deferment option on the undergraduate loans and continue to make PSLF-qualifying payments on their student loans at any time, including while they are in school or in grace.[85] Borrowers have the option of keeping their loans in repayment by simply notifying their servicer and providing instructions to maintain their current loan status.

Despite providing instructions to keep their loans in repayment while attending school, borrowers report that upon returning to school, their servicer will automatically place their loans into in-school deferment, preventing borrowers who work in public service while attending school from making qualifying payments under PSLF. Some borrowers note that their loans are repeatedly placed back into in-school deferment, even after advising the servicer that they wish to remain on an income-driven repayment plan while in school. Borrowers complain that it can take months to get their loans back into an IDR plan, resulting in unnecessary accrued interest and missed qualifying payments.

## Borrower must work for a qualified employer

The PSLF program's definition of eligible public service employment includes working for a federal, state, local, or tribal government; a not-for-profit organization that is tax exempt under Section 501(c)(3) of the Internal Revenue Code; or other not-for-profit entities that provide

---

enrollment, the borrower takes out a new federal student loan to attend school, or the servicer receives information regarding the borrower's enrollment status through a third party source. *See* 34 C.F.R. § 685.204(b)(2); *see also id.* The borrower retains the option to cancel the deferment and continue making payments at any time. *See* 34 C.F.R. § 685.204(b)(3).

[85] *See, e.g.*, U.S. Dept. of Education, *Master Promissory Note; Direct Subsidized Loans and Direct Unsubsidized Loans*; William D. Ford Federal Direct Loan Program, OMB No. 1845-0007, https://studentloans.gov/myDirectLoan/subUnsubHTMLPreview.action.

ED_01442

certain public safety, legal, health, or education services.[86] Borrowers can determine whether their employer is a qualified employer for purposes of PSLF by submitting an Employer Certification Form (ECF) to the Department of Education's designated PSLF student loan servicer.[87]

In 2016, the Department of Education began publishing data relating to ECFs submitted by federal student loan borrowers.[88] This data shows that approximately 533,000 student loan

---

[86] *See* 34 C.F.R. § 685.219(b). Private not-for-profit organizations that provide the following public services may be considered a qualified employer: "emergency management, military service, public safety, law enforcement, public interest law services, early childhood education . . . public service for individuals with disabilities and the elderly, public health . . . public education, public library services, school library or other school-based services." 34 C.F.R. § 685.219(b)(5)(i). The organization cannot be "a labor union, a partisan political organization, or an organization engaged in religious activities, unless the qualifying activities are unrelated to religious instruction, worship services, or any form of proselytizing." 34 C.F.R, § 685.219(b)(5)(ii).

[87] In January 2012, the Department of Education introduced the ECF to allow borrowers to voluntarily certify interest in PSLF. Failure to submit an ECF does not negate a borrower's ability to apply for PSLF. ECF approval is designed to 1) transfer a borrower's loans to the designated PSLF student loan servicer, and 2) confirm the number of qualifying payments a borrower has made. *See* U.S. Department of Education, *Public Service Loan Forgiveness (PSLF): Employment Certification Form*, OMB No. 1845-0110, https://studentaid.ed.gov/sites/default/files/public-service-employment-certification-form.pdf [hereinafter *ECF*]. *See also* U.S. Dept. of Education, *Public Service Loan Forgiveness* (accessed May 5, 2017), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service (stating, "To help you determine if you are on the right track as early as possible, we have created an Employment Certification for Public Service Loan Forgiveness form (Employment Certification form) that you can submit periodically while you are working toward meeting the PSLF eligibility requirements. We will use the information you provide on the form to let you know if you are making qualifying PSLF payments."); *see also* U.S. Dept. of Education, *Public Service Loan Forgiveness*, Federal Student Aid Training Conf. for Financial Aid Professionals (Dec. 2015), http://fsaconferences.ed.gov/conferences/library/2015/2015FSAConfSession5.ppt [hereinafter *FSA 2015*].The Bureau and the Department of Education recommend borrowers submit the ECF for approval each time they change employers, and at least every year, in order to keep track of qualifying payments. *See* U.S. Dept. of Education, *Public Service Loan Forgiveness* (accessed May 15, 2017), https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service (stating, "Although you are not required to do so, we encourage you to submit the Employment Certification form annually or whenever you change jobs, so that we can help you track your progress toward meeting the PSLF eligibility requirements."); CFPB, *Ask CFPB: What is Public Service Loan Forgiveness?* (accessed May 15, 2017), https://www.consumerfinance.gov/askcfpb/641/what-public-service-loan-forgiveness.html (stating, "Each year, you should resubmit the Employment Certification for Public Service Loan Forgiveness form so that you can keep track of your qualifying payments and make sure you stay on the road toward loan forgiveness.").

[88] *See* U.S. Dept. of Education, Federal Student Aid Data Center, *Student Aid Data: Loan Forgiveness Reports* (accessed Mar. 14, 2017), https://studentaid.ed.gov/sa/about/data-center/student.

ED_01443

borrowers had approved ECFs on file with the Department of Education by the end of 2016.[89] The data also shows that each year, approximately one-third of borrowers are denied employer certification, most commonly due to errors on the submitted form.[90]

**Borrowers complain that student loan servicers may be slow to provide accurate guidance to assist borrowers in completing their ECF.** The Department of Education contracts with the designated PSLF servicer to assist borrowers in completing the ECF.[91] When borrowers seek to complete the ECF, they often rely on their own servicer to answer any questions regarding completing the form. Borrowers seeking to complete their ECF complain that their servicer can take months to respond to questions about their ECF, creating uncertainty with regard to whether the payments being made in the meantime will count toward the 120-payment requirement.

**Borrowers complain that when their ECF is denied, their servicer does not provide enough information to understand the reason for denial.** Borrowers who believe their employment qualifies for PSLF report that their servicer may deny their ECF without enough information about the reason for the denial so that the borrower may take action. Borrowers report being unsure on whether there was an error on the application, an inability of the servicer to confirm borrowers' employment information, or a servicer error in processing the application. For example, one borrower explained that his ECF was denied because his servicer determined his employer was not qualified, but a week later, his coworker's ECF was approved.

---

[89] *Id.*

[90] FSA reports that in 2016, of the ECFs denied, 47 percent were denied for missing or incorrect information, 32 percent were denied for ineligible loans, and 21 percent were denied for not having a qualified employer. *See* U.S. Dept. of Education, *2016 FSA Training Conference for Financial Aid Professionals* (Nov. 2016), http://fsaconferences.ed.gov/conferences/library/2016/2016FSAConfSession18.ppt.

[91] *See ECF*, *supra* note 87 (stating "For help completing this form, call the PSLF servicer.").

ED_01444

## Borrower must make 120 qualifying payments

Borrowers must make a series of 120 qualifying payments in order to earn loan forgiveness under the PSLF program.[92] The payments do not need to be consecutive, allowing borrowers who temporarily leave the public sector or who experience periods of unemployment the opportunity to maintain their progress towards the 10 year payment requirement.[93] The payments must be in-full and timely, making accurate payment processing and recordkeeping critical servicing functions for borrowers working towards PSLF.[94]

**Borrowers complain that servicers do not inform them that if they consolidate their loans, all previous qualified payments will be lost.** If a borrower consolidates his or her individual Direct Loans into a consolidation loan, any payments made towards PSLF will be lost.[95] While a borrower may want to consolidate to allow for a simpler monthly payment, if he or she has already made qualifying payments, consolidation may not be the best option.[96] Borrowers report that when discussing the option of consolidating their student loans, servicers do not explain that doing so will reset their count towards 120-payments, causing them to lose any progress they have already made towards loan forgiveness. Borrowers complain that had their servicer informed them that consolidation would restart the payment clock, they would have consolidated their loans earlier, or not at all, in order to preserve their qualified payment history.

---

[92] A payment counts toward the 120-month counter if the payment is made (1) after October 1, 2007; (2) during a month when the borrower was working full time for an eligible employer; and (3) on time - no later than 15 days after the scheduled due date. *See* 34 C.F.R. § 685.219(c)(1)(iii).

[93] See FSA 2015, supra note 87.

[94] To be considered timely, payments must be made within 15 days of the due date. *See* U.S. Dept. of Education, *Public Service Loan Forgiveness: Questions and Answers for Federal Student Loan Borrowers* (Dec. 2015), https://studentaid.ed.gov/sa/sites/default/files/public-service-loan-forgiveness-common-questions.pdf. For more information regarding servicing breakdowns related to payment processing, see CFPB, *Student Loan Servicing*, *supra* note 24.

[95] *See* U.S. Dept. of Education, *Federal Direct Consolidation Loan Application and Promissory Note*, OMB No. 1845-0053 (2016), https://static.studentloans.gov/images/ApplicationAndPromissoryNote.pdf.

[96] *See* CFPB, *Ask CFPB: Should I consolidate my federal loans?* (accessed Feb. 22, 2017), https://www.consumerfinance.gov/askcfpb/603/should-i-consolidate-my-federal-loans.html.

38

**Borrowers complain that upon submitting their ECF, their servicer provides inaccurate counts of qualified payments made by borrowers.** If an ECF submitted by a borrower is approved for qualified employment, the servicer will then review the account to provide an up-to-date count of qualified payments made for purposes of PSLF.[97] This review allows borrowers to monitor their progress towards PSLF, and if necessary, alert their servicer to issues related to their qualified payments prior to applying for PSLF.[98] Borrowers complain that when their servicer reports a qualified payment count that borrowers believe to be inaccurate, borrowers struggle to get their servicer to correct the error or explain why payments were not qualified.

**Borrowers complain that when servicers fail to process IDR recertification paperwork on time, they remove the borrower's loans from IDR, which delays qualifying payments and increases payments and interest.** If a borrower is enrolled in an IDR plan, he or she must "recertify" income and family size every year.[99] To do so, the borrower should submit recertification paperwork no later than 25 days before the end of each annual period.[100] Servicers are then expected to process the paperwork and determine the borrower's payment amount for the next year before the next annual period begins.[101] When servicers fail to process the paperwork on time, the Department of Education has created a framework to protect consumers– the servicer must keep the borrower at the same payment

---

[97] *See FSA 2015, supra* note 87; *ECF supra* note 87.

[98] *See* CFPB, *Ask CFPB: What Is Public Service Loan Forgiveness?* (accessed Feb. 22, 2016), https://www.consumerfinance.gov/askcfpb/641/what-public-service-loan-forgiveness.html (stating, "Each year, you should resubmit the Employment Certification for Public Service Loan Forgiveness form so that you can keep track of your qualifying payments and make sure you stay on the road toward loan forgiveness.").

[99] *See* 34 C.F.R. §§ 682.215(e), 685.209(a)(5), (b)(1)(v), (c)(4); *see also* CFPB, *When you make student loan payments on an income-driven plan, you might be in for a payment shock* (Aug. 17, 2015), https://www.consumerfinance.gov/about-us/blog/when-you-make-student-loan-payments-on-an-income-driven-plan-you-might-be-in-for-a-payment-shock.

[100] Servicers that receive IDR recertification applications more than 10 days after the annual repayment period ends are required to revert the borrower's payment amount back to his or her standard 10 year payment amount, and capitalize any accrued interest. *See* 34 C.F.R. §§ 682.215(e)(3)(i)-(ii), 685.209(a)(5)(iii)(A)-(B), (b)(3)(vi)(B)(1)-(2), (c)(4)(iii)(A)-(B).

[101] *See* 34 C.F.R. §§ 682.215(e)(3)(i), 685.209(a)(5)(iii)(A), (b)(3)(vi)(B)(1), (c)(4)(iii)(A).

ED_01446

level until it is able to process the paperwork for the next year.[102] These payments, like other IDR payments, would count towards PSLF.[103]  However, borrowers have complained that when their servicers are unable to process timely recertification paperwork before the annual period ends, instead of keeping borrowers in IDR, servicers are either placing the borrower back in standard 10-year payments or placing borrowers in forbearance. Borrowers in this situation cannot afford their standard 10 year payment amount, so they must often opt for forbearance. As these borrowers' loans sit in forbearance, needless interest accrues and progress towards PSLF is slowed.

**Military borrowers complain that they struggle to access basic protections designed to ease the burden of recertification.** The strains of military life may make the necessary annual requirements to remain on track for PSLF through enrollment in IDR particularly burdensome. As a result, many military borrowers struggle to obtain the key protections tied to IDR. The Bureau estimates that each year, nearly 6,000 servicemembers suffer direct economic hardship driven by IDR recertification obstacles.[104] Military borrowers can be hit especially hard when their payments snap back to their standard monthly payment. Unaffordable payments can impact the borrower's credit, which plays a critical role in obtaining and maintaining a security clearance; or the borrower can spend months or years in military deferment, causing him or her to miss out on interest subsidies and progress toward loan forgiveness.

**After a servicing transfer, borrowers report that their previous qualifying payments may not be reflected in the payment histories maintained by the new servicer.** When a borrower submits an ECF that triggers a servicing transfer, the designated PSLF servicer will conduct a review of the borrower's payment history to provide a total count of qualified payments towards PSLF.[105] Generally, loan holders, including the Department of

---

[102] *See* 34 C.F.R. §§ 685.209(a)(5)(viii)(A), (b)(3)(vi)(E), (c)(4)(viii)(A), 685.221(e)(8)(i), (ii).

[103] *See* 34 C.F.R. §§ 685.209(a)(5)(viii)(A)(3), (b)(3)(vi)(E)(1)(iii), (c)(4)(viii)(A)(3), 685.221(e)(8)(i)(C).

[104] See CFPB, Prepared Remarks of Seth Frotman, Assistant Director and Student Loan Ombudsman, at the Judge Advocate General's Legal Center and School (Oct. 18, 2016), http://files.consumerfinance.gov/f/documents/201610_cfpb_Frotman-Remarks-JAG-School.pdf.

[105] See FSA 2015, supra note 87.

40

Education, require servicers to track payments through servicing transfers, so that the receiving servicer has an accurate record of all payments made during the life of the loan. Borrowers, particularly those whose loans went through multiple servicing transfers, complain that when the PSLF servicer conducts the review of payments, qualified payments at previous servicers are not counted. Other borrowers complain that their loans were removed from their IDR plan upon transfer and without notice, and so when borrowers continued to submit the same payment amount, the payments were considered non-qualifying partial payments, rather than qualifying IDR payments.

**Borrowers complain that servicing breakdowns may delay enrollment in an IDR plan, in turn hindering their ability to make progress towards PSLF.** The Bureau has previously discussed the harm a borrower faces when servicers are slow to enroll the borrower in an IDR plan.[106] Borrowers continue to complain to the Bureau about how these delays inhibit their ability to obtain affordable monthly payments, forcing them to cease progress towards PSLF until the servicing errors can be corrected.[107] Borrowers explain that these delays inhibit their ability to make qualified payments driven by their income, or borrowers can end up making dozens of unnecessary payments, costing them thousands of dollars that they might otherwise never have had to pay.

**Borrowers who receive third-party payment assistance, including employer repayment assistance, complain that when their monthly benefit is more than their monthly payment, the servicer may advance their monthly payments, rendering all future payments as non-qualifying payments.** Many borrowers may choose to work for employers that offer student loan repayment assistance in the form of a monthly stipend that is automatically put towards his or her student loan payment. Borrowers tell us that if this amount exceeds the monthly payment amount due under their IDR plan,

---

[106] See CFPB, *Midyear update on student loan complaints*, *supra* note 80; CFPB, *Student Loan Servicing*, *supra* note 24; CFPB, *Supervisory Highlights: Issue 13, Fall 2016* (Oct. 2016), http://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_13__Final_10.31.16.pdf.

[107] The payments made under a standard, ten year repayment plan can be counted towards the 120 month payment requirement for PSLF. However, as previously discussed, these payments are usually not affordable for borrowers working in public service. *See also* CFPB, *Midyear update on student loan complaints supra* note 80 at 21.

ED_01448

servicers may apply the extra funds to future payments.[108] When the payment is advanced such that no monthly payment is due, borrowers complain that even when they continue to make monthly payments (that are both on time and in an amount equal to a qualified payment amount), their payments may not be considered qualifying payments.[109]

Borrowers complain that after providing payment instructions to their servicer indicating that excess payments should not advance the due date, their servicer will still advance the due date. Other borrowers, particularly those with automatically debited payments, complain that they do not realize their advanced payments are not qualifying payments until years later, when they learn that several months or years of previous payments will not count towards PSLF. As one borrower explains:

> *I am a nurse and have worked full time since 2012 aside from maternity leave. I was fortunate to qualify for [employer-based loan repayment assistance], which helps me make payments for 3 years, providing me more money each month than I am required to pay to [my servicer]. Recently I submitted my Public Service Loan Forgiveness (PSLF) certification but was shocked to see that I have only made 14 qualifying payments in the 4 years that I have been working at my [employer]. [My servicer's] justification is that the extra money that I paid on top of what was due, automatically was put towards the next month, disqualifying ALL of those payments from PSLF. . . . I find it outrageous and disheartening that by default, overpaying your bill each month would result in "Paid Ahead" disqualifying payments from the PSLF program, unless I had taken additional steps to personally request that the money not be put towards the following month. I feel like the last 3 years of my payments have*

---

[108] *See* CFPB, *Ask CFPB: Can I make additional payments on my student loan?* (accessed Mar. 10, 2017), https://www.consumerfinance.gov/askcfpb/607/can-i-make-additional-payments-my-student-loan.html.

[109] *See* U.S. Dept. of Education, *Public Service Loan Forgiveness* (accessed Mar. 9, 2017), studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/public-service ("If you make a monthly payment for more than the amount you are required to pay, you should keep in mind that you can receive credit for only one payment per month, no matter how much you pay. You can't qualify for PSLF faster by making larger payments. However, if you do want to pay more than your required monthly payment amount, you should contact your servicer and ask that the extra amount not be applied to cover future payments. Otherwise, you may end up being paid ahead, and you can't receive credit for a qualifying PSLF payment during a month when no payment is due.").

42

ED_01449

*been wasted, and my [employer-based loan repayment assistance] program actually extended my PSLF months. This results in 3 years of additional payments, which is real money.*

43

# 4. Recommendations

As the issues described in this report highlight, inaccurate or inadequate information provided to borrowers and the inconsistent administration of program requirements suggest that many consumers who may expect to receive loan forgiveness in the coming months could learn that they are ineligible or have not met the requirements of the program. Many borrowers may learn that they have additional months or even years of repayment ahead of them, while others could discover that they are not on track for loan forgiveness at all and are unable to get credit for the entirety of their prior public service.

The Department of Education has sought public comment in connection with developing a process to assist borrowers when applying for loan forgiveness under the PSLF program.[110] As awareness of PSLF grows, borrowers will increasingly look to their servicers for information regarding all aspects of this program. Policymakers and student loan industry participants may wish to consider the following recommendations as they work to ensure borrowers have full access to the range of benefits and protections guaranteed under federal law, including those offered through the PSLF program.

- **Review process for borrowers provided with inaccurate information.** In 2010, after several hundred borrowers indicated intent to pursue PSLF and were advised by their servicer to enroll in an ineligible repayment plan, the Department of Education approved a one-time waiver to allow these borrowers to receive credit towards PSLF for payments made while enrolled in an extended repayment plan, which otherwise would

---

[110] The Department of Education sought public comment on its proposed information collection related to borrowers seeking PSLF. *See* U.S. Dept. of Education, *Application and Employment Certification for Public Service Loan Forgiveness* (Dec. 15, 2016), https://www.regulations.gov/document?D=ED-2016-ICCD-0144-0001.

ED_01451

have been ineligible. Consequently, the harm these borrowers experienced as a result of inaccurate information from their servicer was reversed. However, for other borrowers outside of this narrow cohort who are enrolled in ineligible repayment plans but attempting to pursue PSLF, the harm resulting from inaccurate information is currently irreversible. Policymakers seeking to assist these borrowers should consider whether additional flexibility is necessary to ensure borrowers are able to secure these benefits, where borrowers received inaccurate information provided by their student loan servicer.

▪ **Strengthened servicing standards for all borrowers helps those working in public service.** In 2015, the Bureau received over 30,000 public comments in response to a request for information describing specific student loan servicing practices that may be contributing to student debt stress.[111]  Many of these comments related to struggles that borrowers experienced when trying to enter and stay in an IDR plan.  Since that time, the Bureau has taken supervisory and enforcement actions to address illegal student loan servicing practices related to the administration of IDR.[112]

As a necessary requisite of PSLF, any servicing problem borrowers face related to IDR is also a problem borrowers face related to PSLF. Policymakers and industry participants that are looking to improve the student loan servicing market for borrowers working in public service may wish to consider the following recommendations.

---

[111] *See* CFPB, *Request for Information Regarding Student Loan Servicing* (May 21, 2015), https://www.consumerfinance.gov/students/request-for-information-on-student-loan-servicing/.

[112] *See also* CFPB, *CFPB Sues Nation's Largest Student Loan Company Navient for Failing Borrowers at Every Stage of Repayment* (Jan. 18, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-nations-largest-student-loan-company-navient-failing-borrowers-every-stage-repayment ("When borrowers run into trouble repaying their federal student loans, they have a right under federal law to apply for repayment plans that allow for a lower monthly payment. But the Bureau believes that Navient steers many borrowers into forbearance. From January 2010 to March 2015, the company added up to $4 billion in interest charges to the principal balances of borrowers who were enrolled in multiple, consecutive forbearances. The Bureau believes that a large portion of these charges could have been avoided had Navient followed the law."); CFPB, *Supervisory Highlights, Issue No. 13 (Fall 2016)*, https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-issue-no-13-fall-2016/; CFPB, *Supervisory Highlights: Issue 10, Winter 2016* (Mar. 2016), http://files.consumerfinance.gov/f/201603_cfpb_supervisory-highlights.pdf.

ED_01452

▪ **Early servicer engagement on the availability and benefits of IDR**. Borrowers who contact their servicer to express financial distress would be well-served if they were first advised about the availability of IDR and the associated benefits, such as PSLF. Borrowers would benefit from early and active servicer engagement to help determine if they are eligible for PSLF, and understand how enrollment in an IDR plan is a first step towards loan forgiveness.

▪ **Protection from negative consequences caused by processing delays.** Borrowers who submit their recertification application by the stated deadline are permitted under federal law to continue making qualifying payments at their current payment level until the servicer can fully process the recertification application.[113] However, as complaints described in this report indicate, borrowers who submit timely recertification applications may still spend months in forbearance waiting for servicers to recalculate their monthly IDR payment. For recertifying borrowers who submit their paperwork on-time, if a servicer fails to process the paperwork on-time, servicers should keep the borrower at the same payment level until it is able to process the paperwork for the next year, as required under federal law.[114] These interim payments, like other IDR payments, should count towards loan forgiveness.[115]

▪ **Timely and actionable reminders of upcoming recertification requirements.** Borrowers would be well-served by uniform, clear, periodic, plain language reminders, including proactive outreach by servicing personnel, about the need to recertify income and family size to remain enrolled in an IDR plan. Reminder notices should clearly identify the date by which the borrower must submit the recertification application, and the consequences of failing to recertify. Borrowers pursuing PSLF would benefit from a clear understanding that failure to recertify will prevent them from making progress towards PSLF.

---

[113] *See* 34 C.F.R. §§ 685.209(a)(5)(viii)(A), (b)(3)(vi)(E), (c)(4)(viii)(A), 685.221(e)(8)(i), (ii).

[114] *See* 34 C.F.R. §§ 685.209(a)(5)(viii)(A), (b)(3)(vi)(E), (c)(4)(viii)(A), 685.221(e)(8)(i), (ii).

[115] *See* 34 C.F.R. §§ 685.209(a)(5)(viii)(A), (b)(3)(vi)(E), (c)(4)(viii)(A), 685.221(e)(8)(i), (ii).

ED_01453

- **Assistance with recertifying income and family size, if needed.** Borrowers would be well-served by easy access to servicing staff to assist them with the completion of their recertification applications. Borrowers who fail to recertify on time should benefit from receiving additional communications explaining how to recertify, and the benefits of income-driven repayment.

- **Accurate and accessible tracking of payments and progress towards PSLF.** Borrowers report finding years of payment history are lost when they are assigned a new servicer. Additionally, transferee servicers may be unable to adequately assist borrowers if they have not received the entirety of the borrowers' account history.[116] Borrowers and servicers would be well-served by retaining records of a borrower's entire account history for the life of the loan, from origination to payoff. Borrowers would benefit from being able to request the entirety of their payment histories from their current servicer, regardless of how many previous companies serviced the account. Servicers would benefit from having the same access and having records of all documents submitted by a borrower, regardless of the identity of the servicer to which the documents were submitted. Finally, borrowers would benefit from receiving robust notices from the transferor and transferee servicer. These notices could be sent before and after a servicing transfer and include detailed account information, as well as information on how to contact servicing personnel if the borrower has questions about his or her account. Student loan servicers may look to these new standards when considering options to improve customer service and address some of the problems identified in this report.

---

[116]One servicer, after receiving a transfer of student loan accounts that did not have accurate account history files, stated "borrowers may have experienced undue hardship as a result . . . or been forced to reapply [for deferment, forbearance, or repayment schedule changes] unnecessarily." *See* Pennsylvania Higher Education Assistance Agency, *Letter to the Committee on Health, Education, Labor, and Pensions from PHEAA* (May 19, 2014) (responding to a request from the committee for information about a large transfer event that identified servicing anomalies).

47

ED_01454

## Conclusion

The Bureau has received hundreds of federal student loan servicing complaints from borrowers struggling to navigate the PSLF program. The Bureau will continue to monitor these complaints as it oversees market participants administering the PSLF program, and to engage in activities to encourage compliance with legal obligations by participants in this market. Additionally, the Bureau released updated education loan examination procedures specific to the servicing of student loans of borrowers pursuing PSLF to guide its examiners in identifying noncompliant conduct and other risks to consumers across the student loan market.[117] The Bureau is committed to monitoring the industry for key issues and illegal practices affecting borrowers who are trying to access key consumer protections so they can continue to give back to their communities.

---

[117] *See* CFPB, *Education loan examination procedures* (June 22, 2017), http://content.consumerfinance.gov/policy-compliance/guidance/supervision-examinations/education-loan-examination-procedures/.

ED_01455

# 5.   Contact information

## To reach the CFPB's Student Loan Ombudsman:

**By email**        students@cfpb.gov

**By mail**        Consumer Financial Protection Bureau
                1700 G Street NW
                Washington, DC 20552

## To submit a complaint:

**Online**        consumerfinance.gov/complaint

**By phone**        180+ languages, M-F 8am-8pm EST
                Toll-Free: (855) 411-CFPB (2372)
                TTY/TDD: (855) 729-CFPB (2372)

**By mail**        Consumer Financial Protection Bureau
                PO Box 4503
                Iowa City, Iowa 52244

**By fax**        (855) 237-2392

## Additional resources to assist student loan borrowers

**Public Service Pledge**
https://www.consumerfinance.gov/pledge/

**Repay Student Debt web tool**
http://www.consumerfinance.gov/paying-for-college/repay-student-debt

**Paying for College suite of tools**
www.consumerfinance.gov/paying-for-college/

49

ED_01456

APPENDIX A:

# Tagging definitions

| Issue tag | Definition |
|---|---|
| Billing Statement | Consumer complained of issues relating to receipt of or information included on a billing statement. |
| Borrower Communications | Consumer complained of issues relating to the availability of alternative repayment options when the standard payment is not affordable, but did not expressly indicate intent or efforts to enroll in an IDR plan. |
| Collection Activity | Consumer complained of issues relating to collection tactics and/or treatment of defaulted loans. |
| Credit Reporting | Consumer complained of issues relating solely to the way student loans are reported to credit bureaus, when the cause for any derogatory reporting is not at issue. |
| Educational Institution | Consumer complained of issues relating to the institution for which the consumer received student loans. |
| IDR Plan Enrollment | Consumer complained of issues relating to initial enrollment in an income-driven plan, including receiving information about the availability of IDR plans and submitting an application to the servicer. |
| Payment Allocation | Consumer complained of issues relating to the allocation of a payment, either across multiple loans or to principal and interest for a single loan. |
| Payment Processing | Consumer complained of issues relating to the processing of his or her payment. |
| Payoff | Consumer complained of issues relating to final payoff of his or her student loan (refinancing, payoff statement, etc.). |
| Public Service Loan Forgiveness | Consumer complained of issues relating to Public Service Loan Forgiveness, including issues related to eligibility and qualifying payments. |

ED_01457

February 2025

# The Ripple Effect of Student Debt: Shaping Careers, Financial Choices, and Well-Being in Public and Private Sectors







## Acknowledgements

This report was co-authored by Thomas Korankye, PhD, CFP®, Assistant Professor of Personal and Family Financial Planning at the University of Arizona, and Zhikun Liu, PhD, CFP®, Vice President, Head of MissionSquare Research Institute at MissionSquare Retirement. The authors gratefully acknowledge the insights and expertise of Gerald Young, Senior Researcher at MissionSquare Research Institute, and John Saeli, Vice President, Research & Innovation at MissionSquare Retirement, for their collaboration on this research.

## Table of Contents

Executive Summary.................................................................................................................................... 3

    Key Findings .......................................................................................................................................... 3

Introduction.................................................................................................................................................. 4

1. The Effect of Student Loan Debt on the Employment Decisions of Employees in the
Private and Public Sectors................................................................................................................... 5

    Job Acceptance .................................................................................................................................... 5

    Job Retention ....................................................................................................................................... 6

    Career Advancement........................................................................................................................... 6

    Morale Regarding Work ..................................................................................................................... 7

    Professional Development Goals....................................................................................................... 8

    Conclusion ............................................................................................................................................ 8

2. The Effect of Student Debt on Employees' Financial Planning Horizons,
Investment Approaches, and Retirement Savings........................................................................... 9

    Impact on Investment Approaches.................................................................................................... 9

    Effect on Financial Planning Horizons ........................................................................................... 10

    Perceptions of Retirement Savings Adequacy ............................................................................. 11

    Conclusion .......................................................................................................................................... 12

3. Overall Key Takeaways for Both Topics 1 and 2............................................................................ 13

Appendix..................................................................................................................................................... 14

References................................................................................................................................................... 15

## Executive Summary

The research report investigates how student debt influences various financial and employment decisions or perceptions among U.S. public and private sector employees. Examples of the decisions and perceptions examined include employee choices with respect to investment approaches; decision making concerning job acceptance; morale regarding work; career advancement; and professional development goals. Additional aspects explored are employees' perceptions of retirement savings adequacy and their financial planning horizons.

The report uses a proprietary survey data set collected by MissionSquare Research Institute in 2024 (N=2,036) and employs descriptive statistics and regression techniques in the analysis. Overall, the findings provide a comprehensive understanding of the multifaceted ways student debt shapes financial behaviors and career decisions/perceptions, offering valuable insights for employers to consider regarding the financial well-being of their employees.

### Key Findings

 **Job Acceptance Decisions**: A significant proportion of employees consider their student loan debt before accepting job offers, with 56% of public sector employees and 62% of private sector employees reporting this influence.

 **Job Retention**: Student loan debt negatively affects employee retention, as debt holders are less likely to remain with their current employer compared to employees without student debt (39% vs. 61%), with a more pronounced impact in the public sector.

 **Career Advancement**: Employees with student debt perceive the debt as a barrier to their career advancement, with 35% of females and 31% of males in the public sector, and 28% of females and 43% of males in the private sector, reporting limited career progression due to their debt.

 **Work Morale**: Student loan debt is associated with a higher likelihood of reporting a negative work morale, particularly in the public sector, where 23% of employees with student debt report negative work morale compared to 18% of their peers without such debt.

 **Professional Development**: Employees with student loan debt are more likely to pursue professional development goals, particularly those that lead to new skills, supervisory/managerial roles, additional education or certifications, and increased responsibility, compared to those without student debt.

 **Investment Approach**: Many student debt holders across sectors do not invest at all, and those who do are more likely to choose short-term investment options.

 **Financial Planning Horizons**: Employees with student debt tend to have shorter financial planning horizons than those without student debt.

 **Perception of Retirement Savings Adequacy**: Compared to their peers without student debt, employees with student debt in the public and private sectors are more likely to perceive their retirement savings as inadequate, with public sector employees being 14% more likely and private sector employees 9% more likely to strongly agree. Key barriers to saving more for retirement among employees with student debt include affordability (73% in public sector and 70% in the private sector) and excessive debt (54% in the public sector and 47% in the private sector).

**4** | The Ripple Effect of Student Debt: Shaping Careers, Financial Choices, and Well-Being in Public and Private Sectors

## Introduction

Student loan debt is a major source of financing for postsecondary education in the United States among financially constrained individuals. Although taking on this type of debt provides opportunities for degree attainment, enhanced career opportunities, and higher future income, its adverse effects on the financial behavior and well-being of households have been well documented, triggering policy actions such as student loan forgiveness (Dinerstein et al., 2024; Korankye & Kalenkoski, 2021; Yannelis & Tracey, 2022).

This white paper uses data collected by MissionSquare Research Institute through Greenwald Research from April to May 2024 to examine the influence of student loan debt on the personal financial and career decisions/perceptions of employees in the public and private sectors. The survey focused on 2,036 employees aged 18 to 49 across the United States. Survey weights are applied to reflect the general population on the basis of gender, income, race, and industry.

As student loan forgiveness and forbearance dominate student loan discussions, continuously examining how student debt affects employees' decisions and perceptions is essential. Knowing how the effects differ between the public and private sectors could pave the way for developing tailored interventions. This is particularly important given that earlier reports show that student loan debt is considered a major source of economic stress among employees in both public and private sectors (MissionSquare Research Institute, 2024a).

This report is divided into two sections. The first section focuses on employment decisions and perceptions, while the second section examines various aspects of employees' financial decision making.

## 1. The Effect of Student Loan Debt on the Employment Decisions of Employees in the Private and Public Sectors

This section examines how student loan debt relates to key employment decisions among public and private sector employees. The focus areas include job acceptance and retention, career advancement, work morale, and professional development goals. The findings highlight the continuous effects of student debt on career trajectories, influencing employee behavior and motivation across the public and private employment sectors. These data-driven insights seek to inform policymakers and employers on providing targeted interventions that could support employees in balancing student debt and career aspirations.

### Job Acceptance

Accepting a job offer is ultimately the applicant's prerogative, a decision that can be influenced by various factors, including financial circumstances. The survey aimed to determine the extent to which student loan debt influenced respondents' decisions to accept their current employment. The response options were "major factor," "minor factor," and "not a factor." Figure 1 combines the first two responses in showing the results for student debt holders in the public and private sectors. Among public sector employees with student debt, 56% reported considering the presence of student debt on their balance sheets when making job acceptance decisions. This percentage rises to 62% among those in the private sector. Figures 2 and 3 extend the analysis to examine differences by gender and race/ethnicity, respectively. Across all groups and sectors, a significant percentage of employees with student debt indicated that the debt was a factor in their decision to accept their current job. Groups that appear more likely to base their job acceptance decisions on their student loan status include private sector employees, male employees in both sectors, and Hispanic and African American employees in both sectors.



Figure 1 **Percentage of student debt holders citing debt as a factor in their job acceptance decisions by sector**

Public sector          56%
Private sector          62%

■ Debt was a factor

Note: Figure 1 reveals that majority of employees with student loan debt in both public and private sectors consider student debt to be a factor in job acceptance decisions.



Figure 2 **Percentage of student debt holders citing debt as a factor in their job acceptance decisions, by gender and section**

Note: Figure 2 reveals that, across sectors, the majority of male and female employees with student loan debt consider it a factor in their job acceptance decisions, with male employees more likely than female employees.



Figure 3 **Percentage of student debt holders citing debt as a factor in their job acceptance decisions, by race/ethnicity and sector**

Note: Figure 3 reveals that, across sectors, the majority of Hispanic, African American, and White employees with student loan debt consider it a factor in their job acceptance decisions, with a higher proportion of Hispanic employees citing it as a factor, followed by African American employees.

## Job Retention

Job retention, described in this report as the likelihood of staying with one's current employer, is important for business health and efficiency. Organizations that experience higher labor turnover stand to lose critical expertise for sustained business competitiveness and are likely to incur substantial hiring and training costs, all of which could be detrimental to success over time. To understand the role of student debt in influencing job retention, the survey asked respondents to describe their feelings about their current employer and job, that is, whether they would like to stay with the same employer either in the current role or a different role. The findings from a regression analysis (see Table 1 in the Appendix) show that holders of student debt are more likely to change

employers than those without student debt, particularly in the public sector. Specifically, student debt holders are 29% less likely to remain with the same employer in the public sector sample. Figure 4 provides further details across employment sectors. Among public sector employees who prefer to stay with their employer, 39% have student debt, while 61% do not. In the private sector, the figures are 34% for those with student debt and 66% for those without it.

## Career Advancement

The survey also asked respondents whether they believe student loan debt has limited their career advancement opportunities. Overall, approximately 34% of respondents with student debt across the public and private sectors

reported that their debt hindered their career progression. Regarding gender, Figure 5 shows that 35% of female respondents with student debt in the public sector (and 28% in the private sector) indicated that their career advancement had been constrained by their debt. In comparison, 31% of male respondents with student debt in the public sector and 43% in the private sector reported similar limitations.

These findings suggest that gender-specific factors such as differing societal expectations and sector-based differences in salary structures, job flexibility, and availability of career development opportunities could influence how student debt impacts career progression. For instance, public sector jobs may have lower salaries and fewer growth opportunities, which could make it more challenging for debtholders to overcome the financial burden associated with student debt. In the private sector, employees may have higher-paying jobs. However, the likelihood of a more competitive and fast-paced working environment may place more pressure on career advancement.

**Morale Regarding Work**

Work morale, which includes how positive, enthusiastic, and motivated employees feel at their workplace, is essential for employee productivity and job satisfaction. When morale is low, employees may perform their work unenthusiastically, which could make them less loyal, less focused, and psychologically burdened. To understand how student debt influences employee morale, the study compares the effect of student loan debt on work morale among employees in the public and private sectors. From a regression analysis (see Table 2 in the Appendix), there is evidence that public sector workers with student debt are more likely to experience negative morale regarding work than



Figure 4 **Respondents who would like to stay with their current employer, by student debt status and sector**

Public sector (n=1001)
- Have student loan: 39%
- No student loan: 61%

Private sector (N=1035)
- Have student loan: 34%
- No student loan: 66%

Note: Figure 4 shows that student debt holders are less likely to remain with their current employer than non-holders of the debt, with the public sector more susceptible to retention challenges.

Figure 5 **Perception that student debt has limited one's career advancement by gender**

Limited Career Advancement (Yes)

Female
- Public sector: 35%
- Private sector: 28%

Male
- Public sector: 31%
- Private sector: 43%

Note: Figure 5 indicates that both male and female student debt holders perceive their debt as limiting their career advancement opportunities, with females in the public sector and males in the private sector being particularly affected.

their counterparts without student debt. Figure 6 below provides further details, showing that 23% of public sector employees with student debt perceive their work morale to be negative, compared with 14% in the private sector. Overall, the presence of student debt on a person's balance sheet may serve as a contributory factor to morale at the workplace, with public sector employees experiencing lower morale than their counterparts in the private sector, where a statistically significant difference is not found between those with student debt and those without.

## Professional Development Goals

Engaging in lifelong learning is essential for skill development and growth in productivity while also providing higher income opportunities. In addition, employees with career development opportunities appear to stay longer with their employers (Parker & Horowitz, 2022). As such, the study explored the professional development goals of employees in the public and private sectors and how student loan debt could influence these goals. The specific professional development goals examined include acquiring new skills, pursuing supervisory or management roles, obtaining additional education or certification, taking on new or different assignments, and assuming more responsibility. The respondents could also select options such as "Don't know" or "I have no professional development goals/I have achieved my goals."

The findings through a regression analysis (see Table 3 in the Appendix) show that student loan debt is positively associated with many of these professional development goals. Specifically, student debt holders are 29%, 23%, 54%, and 24% more likely to aim for new skills acquisition,

supervisory or management roles, additional education or certification, and roles with more responsibilities, respectively, than those without student debt. Conversely, student debt holders are 37% less likely to have no professional development goals or to have already achieved their goals. These findings indicate a correlation between student loan debt and a quest to pursue professional growth through various pathways, potentially increasing prospects for higher future income and improving financial stability. The findings are relatively similar for employees in the public and private sectors. Since motivated employees looking to advance their skills are key to a stable and developing workforce, employers may want to prioritize educational benefits that encourage those employees to remain with the organization.

## Conclusion

Overall, the findings show that student debt influences employment decisions regarding job acceptance and retention, especially in the public sector, where student debt holders are more likely to consider changing employers. Additional findings about the perception that student loan debt lowers work morale and hinders opportunities for career advancement compound this challenge. Putting aside these adverse outcomes, the findings reveal that student debt is positively correlated with the desire to pursue professional development goals to enhance one's income potential. These results suggest potential benefits for employers to absorb or subsidize skill development costs with changes to compensation based on enhanced abilities, productivity, and responsibilities. Another recommendation is for employers to consider offering financial wellness programs, opportunities for internal advancement, and student loan assistance programs.



Figure 6  **Percentage of employees reporting negative work morale by student debt status and sector**

| 23% | 18% | | 14% | 12% |

Have student loan    No student loan    Have student loan    No student loan
**Public sector (n=1001)**                **Private sector (N=1035)**

Note: Figure 6 illustrates the relationship between student debt and work morale, with a statistically significant effect found in the public sector. Specifically, public sector employees with student debt are more likely to report negative work morale than their counterparts without the debt.

## 2. The Effect of Student Debt on Employees' Financial Planning Horizons, Investment Approaches, and Retirement Savings

This section examines how student loan debt relates to various personal financial behaviors, including financial planning horizons, investment approaches, and retirement savings among employees in the public and private sectors. These financial behaviors are crucial for achieving short- and long-term financial well-being, particularly as they could affect wealth accumulation and overall financial security.

The findings from MissionSquare Research Institute's survey generally show that student debt continues to hinder borrowers' ability to focus on long-term planning and wealth building through long-term investments. Borrowers are also less likely to participate in defined contribution plans or hold individual retirement accounts, even though they yearn to save more toward their retirement. These findings reinforce the need for policies that support individuals with student loan debt.

### Impact on Investment Approaches

Investments are essential for meeting future financial needs, and those who invest in the stock market can benefit from the long-term returns it has historically provided. While short-term investments provide greater liquidity and lower risk, they have historically offered minimal returns to investors.

In this survey, student loan holders were asked to characterize the impact of student debt on their investments. The response options included:

- Because of my current debt level, I am more focused on long-term, equity investments.

- Because of my current debt level, I am more focused on short-term, cash/fixed income investments.

- My student loan debt does not impact my approach to investing.

- I am not investing at this time.

The results in Figure 7 illustrate the significant impact of student loan debt on the investment preferences of employees in the public and private sectors. For instance, many student debt holders in both sectors do not invest at all (34% in the public sector and 26% in the private sector). Even for those who invest, many prefer short-term securities (29% in the public sector and 36% in the private sector). Only a small percentage of student debt holders invest in long-term equities (18% in the public sector and 19% in the private sector).

The need for liquidity could drive this investment behavior (Faig & Shum, 2002; Korankye & Guillemette, 2021).



Figure 7 **Impact of student debt on investment approach by sector**

Note: Figure 7 shows the impact of student loan debt on the investment approach preferences among employees with student debt in the public and private sectors. Many student debt holders do not invest at all, especially in the public sector. Among those who invest, many prefer short-term investments. The total for each sector may not equal 100% due to rounding.

Although the preference for short-term investments is contrary to the long-term wealth-building potential of these debt holders, an even greater concern is that several student debt holders are not investing at all. This phenomenon could be detrimental to their future accumulated wealth and further exacerbate wealth inequalities.

### Effect on Financial Planning Horizons

A financial planning horizon is foundational for several financial decisions that could influence well-being, including retirement savings, budgeting, and investing (Liu et al., 2023). The survey asked participants to determine the periods that best describe their financial planning horizon. The response options included the next few months, next year, next few years, 5-10 years, and longer than 10 years.

The findings show that student debt holders are more likely to have shorter financial planning horizons focused on the next few months than those without student debt (Figure 8). Conversely, they are less likely to have financial planning horizons that focus on 5-10 years and longer than 10 years. In short, student debt makes individuals more likely to shift their perspective on planning horizons toward the short-term, focusing on immediate needs over long-term perspectives.



Figure 8 **Student debt's effect on financial planning horizon for full sample**

Note: Figure 8 illustrates the effect of student debt on the financial planning horizons of student debt holders compared with those without student debt. Having student debt is associated positively with short-term financial planning horizons (next few months and next year) and negatively with long-term planning horizons (next few years, 5-10 years, and longer than 10 years).

ED_01467

## Perceptions of Retirement Savings Adequacy

Retirement savings significantly contribute to the long-term wealth accumulation needed to optimize post-employment income replacement. In an era of increasing life expectancy and a shift toward defined contribution retirement plans, the fear of outliving one's resources in retirement has grown. This makes it essential for employees to contribute more toward their retirement to increase their prospects of having sufficient resources for their golden years (MissionSquare Research Institute, 2024b). For employees with student debt, this could be more challenging because they are expected to balance repayment obligations with the need to save for retirement.

To explore employees' perceptions on their retirement saving adequacy, the study asked respondents to share their views on the extent that they agree or disagree with the statement, "I should be saving more for retirement than I currently do." Findings in Figure 9 through a regression analysis show that, compared to non-student debt holders, employees with student debt across the public and private employment sectors are more likely to strongly agree that their current savings are inadequate and that they should

be saving more for retirement. Specifically, employees with student debt in the public sector are 14% more likely, and those in the private sector are 9% more likely, to strongly agree with this statement compared to their counterparts without student debt.

To explore the factors contributing to employees' perceptions of retirement savings inadequacy, the survey further asked employees to identify reasons why they are unable to save more for retirement. The ten-answer options included statements such as "I can't afford to save/save more," "I have too much debt, "and "I have other saving priorities." Figure 10 shows that public sector employees with student debt primarily cited "I can't afford to save/save more" (73%) and "I have too much debt" (54%) as major barriers. In contrast, the corresponding percentages for public sector employees without student debt are 60% and 27%, respectively. Figure 11 highlights similar trends in the private sector, although the challenges appear more pronounced among public sector employees.



Figure 9 **The extent that student debt holders agree on the need to save more for retirement by sector**

Note: Figure 9 indicates that a significant number of employees with student debt strongly agree they should be saving more for retirement than they currently are, a perspective that is more pronounced among employees in the public sector than those in the private sector.



Figure 10 **Reasons for perceived retirement savings inadequacy among public sector employees**

Note: Figure 10 reveals that most employees in the public sector cited lack of resources and excessive debt as reasons for perceived retirement savings inadequacy. The survey allowed respondents to select multiple responses.

Figure 11 **Reasons for perceived retirement savings inadequacy among private sector employees**

Note: Figure 11 reveals that most employees in the private sector cited lack of resources and excessive debt as reasons for perceived retirement savings inadequacy. The survey allowed respondents to select multiple responses.

## Conclusion

Findings from the survey data show the adverse impacts of student loan debt on investment decisions, planning horizons, and the perceived ability to save more for retirement persist. The emphasis on short-term planning, short-term investment, or not investing at all restricts student debt holders' opportunities to benefit from investment compounding, hindering their ability to accumulate wealth. This finding highlights the need for financial planning strategies that consider the burden of debt and its corresponding influences on short- and long-term financial goals.

ED_01469

**13** | **The Ripple Effect of Student Debt: Shaping Careers, Financial Choices, and Well-Being in Public and Private Sectors**

## 3. Overall Key Takeaways for Both Topics 1 and 2

Student loan debt negatively impacts employment decisions concerning job acceptance and retention, particularly for those in the public sector. In addition, some employees believe that their student debt has limited their career advancement opportunities. Employees with student debt are also more likely to report lower work morale compared to those without it. Conversely, student loan debt positively correlates with the pursuit of professional development goals.

Student loan debt influences employees' personal financial decisions across employment sectors, often resulting in short-term financial planning horizons, lack of savings/investment, short-term investing by younger workers, and a reduced likelihood of sufficient saving for retirement.

Public sector employers could adopt strategies that support student debt holders and enhance their employment decisions and financial wellness. Employers could consider:

- Absorbing or subsidizing skill development costs.

- Adjusting wages to dovetail with enhanced abilities, productivity, and responsibilities.

- Offering financial wellness programs, opportunities for employees to advance and increase their earnings, and student loan assistance programs.

- Providing targeted financial education programs that include topics on budgeting and investments, with opportunities for student debt holders to visualize their financial futures and make informed decisions.

## Appendix

Table 1 **Logistic Regression Results of the Effect of Student Loan Debt on Job Retention**

| Model | Sector/Sample | Key Explanatory Variable | Odds Ratio | P-Value |
|---|---|---|---|---|
| 1 | Public | Student debt | 0.71 | 0.024 |
| 2 | Private | Student debt | 0.83 | 0.223 |

Note: Each module includes control variables relating to demographic and socioeconomic indicators. N: 1,001 (Module 1) and 1,033 (Module 2).

Table 2 **Ordered Logit Regression Results of the Effect of Student Loan Debt on Work Morale Among Public Sector Employees**

| Perceived Work Morale (Dependent Variable) | Key Explanatory Variable | Marginal Effects | P-Value |
|---|---|---|---|
| Strongly negative | Student debt | 0.01 | 0.08 |
| Somewhat negative | Student debt | 0.02 | 0.07 |
| Neutral | Student debt | 0.01 | 0.07 |
| Somewhat positive | Student debt | -0.02 | 0.08 |
| Very positive | Student debt | -0.03 | 0.07 |

Note: Each module includes control variables relating to demographic and socioeconomic indicators. N is 1,001

Table 3 **Logistic Regression Results of the Effect of Student Debt on Professional Development Goals**

| Model | Professional Development Goals | Odds Ratio | P-Value | N |
|---|---|---|---|---|
| 1 | New skills | 1.29 | 0.014 | 2036 |
| 2 | Supervisory or management roles | 1.23 | 0.067 | 2021 |
| 3 | Additional education or certification | 1.54 | 0.000 | 2036 |
| 4 | New and different assignments | 1.00 | 0.998 | 2036 |
| 5 | More responsibility | 1.24 | 0.040 | 2036 |
| 6 | Other | 1.29 | 0.708 | 1889 |
| 7 | I have no professional development goals/I have achieved my goals | 0.63 | 0.014 | 2036 |
| 8 | Don't know | 0.70 | 0.269 | 2013 |

Note: Each module includes control variables relating to demographic and socioeconomic indicators.

**15** | The Ripple Effect of Student Debt: Shaping Careers, Financial Choices, and Well-Being in Public and Private Sectors

## References

Dinerstein, M., Koustas, D., Yannelis, C., & Earnest, S. (2024). Student Loan Forgiveness. Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4899176

Faig, M., & Shum, P. (2002). Portfolio choice in the presence of personal illiquid projects. *The Journal of Finance, 57*(1), 303-328.

Korankye, T., & Guillemette, M. (2021). Student debt and stock-ownership decisions of US households. Applied Economics Letters, 28(5), 387-390.

Korankye, T., & Kalenkoski, C. M. (2021). The effect of households' student debt on life satisfaction. *Journal of Family and Economic Issues, 42*(4), 757-772.

Liu, Z., James III, R., & Sun, Q. (2023). Financial planning time horizon and end-of-life mortality expectations. *Financial Services Review, 31*(2/3), 107-120.

MissionSquare Research Institute (2024a). "Student debt impacts on public and private sector employees."

MissionSquare Retirement. Retrieved from https://research.missionsq.org/posts/workforce/student-debt-impacts-on-public-and-private-sector-employees

MissionSquare Research Institute (2024b). "Infographic: public service employees' financial and retirement security." MissionSquare Retirement. Retrieved from https://research.missionsq.org/posts/retirement/infographic-public-service-employees-financial-and-retirement-security

Parker, K. & Horowitz, J. M. (2022). "Majority of workers who quit a job in 2021 cite low pay, no opportunities for advancement, feeling disrespected." Pew Research Center. https://www.pewresearch.org/short-reads/2022/03/09/majority-of-workers-who-quit-a-job-in-2021-cite-low-pay-no-opportunities-for-advancement-feeling-disrespected/

Yannelis, C., & Tracey, G. (2022). Student loans and borrower outcomes. *Annual Review of Financial Economics, 14*(1), 167-186.

**MissionSquare Research Institute** (formerly the Center for State and Local Government Excellence at ICMA-RC) promotes excellence in state and local government and other public service organizations so they can attract and retain talented employees. The organization identifies leading practices and conducts research on retirement plans, health and wellness benefits, workforce demographics and skill set needs, labor force development, and topics facing the nonprofit industry and the education sector. MissionSquare Research Institute brings leaders together with respected researchers. For more information and to access research and publications, visit **research.missionsq.org** and follow on **LinkedIn**.



**MissionSquare Research Institute** 777 N. Capitol Street, NE, Washington, DC 20002-4240
research.missionsq.org

113146-0225

ED_01473

OCE Working Paper – OCE2024-008

# U.S. Department of Education

# Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?



## Office of the Chief Economist

Julia Turner, Kathryn Blanchard, and Rajeev Darolia

January 2025

The OCE Working Papers Series presents original research by staff in the Office of the Chief Economist. This paper is intended to promote the exchange of ideas among researchers and policy makers and contains resources that are provided for the reader's convenience. The inclusion of these materials is not intended to reflect its importance, nor is it intended to endorse any views expressed or products or services offered. These materials may contain the views and recommendations of various subject matter experts as well as hypertext links, contact addresses, and websites to information created and maintained by other public and private organizations. The views and opinions expressed in the papers are entirely those of the authors and do not necessarily reflect the positions or policy of the US Department of Education. Authors accept responsibility for errors. The U.S. Department of Education does not control or guarantee the accuracy, relevance, timeliness, or completeness of any outside information included in these materials. OCE Working Papers are often preliminary and subject to revision and are intended to engender constructive feedback and discussion. Comments and suggestions for improvement are welcome and should be directed to the authors. OCE Working Papers may be quoted with attribution but without additional permission.

ED_01474

# OCE Working Paper – OCE2024-008

Established by Congress in 2007, the Public Service Loan Forgiveness program was designed with a straightforward premise: those who dedicated themselves to public service—in this case 10 years of full-time work for a qualifying employer—while staying on-track with their student loan payments would have their remaining student loan balance forgiven. Since public sector workers often face lower wages than their similarly trained colleagues in private sector jobs, PSLF could provide an incentive to enter or continue in public service careers.

In this report, we explore which public sectors are most commonly represented among individuals who have benefitted, or are on track to benefit, from the PSLF program. Specifically, we present new data detailing which sectors borrowers have most commonly worked in to be eligible for PSLF. We show that the most common sector among those who have received forgiveness through PSLF is education, representing 43% of all employers associated with the program. The majority of these employers in the education sector are K-12 education systems, representing 28% of all employer occurrences in the data. Other common employer subsectors among borrowers who have received PSLF are state and local governments and healthcare organizations. Among the most frequent individual employers are those related to military service including the Department of Defense, Department of Veterans Affairs, and the branches of the U.S. military.

## Program Details

The PSLF program requires borrowers to make 120 qualifying monthly payments on their Direct federal student loans while working full-time for an eligible employer. Eligible employers can include government organizations, 501(c)(3) nonprofits, and certain other nonprofit organizations that provide qualifying public services.[1] To pursue PSLF, the borrower must go through an employment verification process. Borrowers are encouraged but not required to submit the PSLF Employment Certification Form annually, which requires both the borrower's information and certification on the part of the employer. Importantly, employment need not be continuous to be counted toward PSLF eligibility; borrowers can move between qualifying employers or take breaks in employment.[2]

Significant changes have streamlined these requirements and processes. Through a one-time Limited PSLF waiver[3] and subsequent permanent adjustments ([Department of Education, 2022](#)), borrowers received credit for past payments that would not have previously counted toward their eligibility, including payments made under non-IDR plans. Documentation requirements are also simpler, with a single combined form for both employment certification and forgiveness application replacing the separate forms previously required.[4] Recently, data-sharing agreements have also been proposed across

---

[1] To meet eligibility requirements, borrowers must work at least 30 hours per week and make payments under an income-driven repayment plan, a 10-year Standard Repayment Plan, or the equivalent of a 10-year Standard Repayment Plan. Only Direct Loans are eligible for PSLF; other federally held loans such as FFEL or Perkins must first be consolidated into a Direct Consolidated Loan to be eligible.

[2] The Department encourages borrowers to submit this form annually, or at least whenever changing employers to maintain current records. Payments made during non-qualifying employment periods will not count towards the required 120 payments.

[3] The PSLF limited waiver allowed borrowers to receive credit towards PSLF for past periods of repayment that wouldn't normally qualify, including payments made on non-Direct federal loans, payments made under any repayment plan, and payments made on loans before consolidation (among others) (see [Department of Education, 2021](#)).

[4] The combined form was released in November 2020.

ED_01475

OCE Working Paper – OCE2024-008

the Federal government to automatically identify qualifying federal employees and military service members, reducing the burden of documentation for many.[5]

The program faced initial challenges, however, with low approval rates that persisted until recently. Key obstacles included borrower confusion around qualifying employers and eligible payment plans and loan types, and complex paperwork requirements that led to high rates of technical rejection. Since 2021, several administrative fixes to the PSLF program have substantially increased the number of borrowers who had met eligibility requirements to receive forgiveness, many of whom have had long careers in public service that span well beyond the 10-year requirement for PSLF.

In Figure 1, we show the cumulative PSLF forgiveness since 2021. Prior to January 2021, roughly 7,000 borrowers had received PSLF forgiveness. In November of 2024, the Department of Education granted PSLF forgiveness to its millionth borrower.

**Figure 1. Cumulative Public Service Loan Forgiveness**



**Notes**: Figure shows cumulative public service loan forgiveness posted between January 1, 2021, and November 1, 2024. Total forgiveness is given in billions of dollars. Data come from Federal Student Aid.

**Employment Sectors of PSLF-Eligible Borrowers**

The PSLF program aims to support individuals working in public service careers, including in federal, state, and local governments as well as nonprofit organizations serving their communities. Below we present data on the types of industries in which PSLF-eligible employees have worked and reported to the Department.

---

[5] Examples include agreements with the Department of Defense as well as the Office of Personnel Management. See Federal Register, Vol 87, No 73 (DoD) and Federal Register, Vol 88, No. 158 (OPM).

OCE Working Paper – OCE2024-008

Our data capture all eligible employers listed on an employer certification form or otherwise verified as eligible for PSLF forgiveness since 2018.[6] As individual borrowers can list multiple employers toward PSLF eligibility *and* are encouraged to re-certify the same employer annually, we report results for what we term "employer occurrences." Specifically, we adjust the data such that each borrower can be associated with multiple employers, but that each employer only appears once in an individual borrower's record.[7]

In what follows, we present results for two groups of borrowers: those who have already received forgiveness as of November 1, 2024, and those who have certified their employment at least once but have not received forgiveness by November 1, 2024. The latter group includes those who could eventually qualify for PSLF based on record of an existing spell of eligible employment.[8]

We first group employers into three broad sectors: education, government, and nonprofits, and then within those subsectors we classify employers into subsectors. There is no data element that cleanly identifies the sector and subsector of employers. Therefore, for the purposes of this analysis, we categorize employers primarily through a taxonomy of keyword searches based on the employers' recorded organization name. We built this taxonomy based on commonly observed naming practices in the data. In addition, we used data from a small share of employers who self-identify as a government organization; these cases are always counted in the government sector, and we then use keyword searches to identify subsectors. Not all government employers self-identify, so for those who do not, we identify them using keyword searches for employer names such as "City of X" or "State of Y", which are commonly reported state and local government organization names. We rely solely on keywords to identify Education sector employers. For example, employer strings that contain "University" or "School District" are categorized in the education sector. The education sector includes public education systems (for example, school districts) and nonprofits (for example, non-profit, private universities) where they could be identified.[9] All other employers that are not government employers and do not include education-related strings are categorized as nonprofits. Where possible, we then further categorize into specific subsectors: K-12 and higher education within the education sector, healthcare within the nonprofit sector, and local, state, federal, and military within the government sector. We again rely on employer strings to make these distinctions.[10] See Appendix Table 1 for an example of employer names and their categorization processes.

---

[6] 2018 marks the implementation of the Department of Education's employer database. Before this year, borrowers and employers were able to certify employment through a servicer-specific process.

[7] To demonstrate our use of the borrower occurrences measure, take the following example: A borrower spends 3 years working in Cincinnati Public Schools, then moves to spend 2 years working in Dayton Public Schools before returning to Cincinnati Public Schools for 5 more years. We code this borrower as having two Education-related employer occurrences–with Cincinnati Public Schools and Dayton Public Schools–despite working for Cincinnati Public Schools for two different periods. The average borrower who has received forgiveness in our sample is associated with 1.8 employers. We are missing employer data for about 190,000 of those forgiven under the PSLF waiver.

[8] These are most often individuals who—at some point in their career—have submitted an employment verification for a qualifying employer and thus appear in our data.  It is likely that many of these borrowers will not perform public service work for the required amount of time to receive PSLF.

[9] While the names of the organizations may indicate the sector, the Department of Education does not collect data on borrower's roles or capacities. Education sector employment can encompass roles beyond teachers.

[10] Note that employers that have conflicting subsector categorizations after an initial keyword search are considered individually or moved to the "not classified" subsector. We implemented multiple rounds of keyword searching, drawing and testing keywords from the remaining uncategorized group and spot-checking for reasonable categorization after each iteration.

ED_01477

OCE Working Paper – OCE2024-008

In Figure 2, we show employer occurrences broken into our three major sectors: Education, Government, and Nonprofits. Education is the most common sector among borrowers who have received forgiveness, representing with over 600,000 Education-related employer occurrences or 43% of the sample.[11] It is likely this number is an underestimate and an even larger share of borrowers work in education given inconsistencies in the way that employers are categorized across locations. For example, in New York City, public school teachers are reported as working for "the City of New York" instead of New York City Public Schools. Additionally, education-related nonprofits that do not directly reference education in the name of the employer, such as City Year or the YMCA, are categorized under non-profits.

We also find that among those borrowers who have not received forgiveness, non-profits are the most common sector: over 2.5 million employer occurrences are associated with a non-profit employer which represents 42% of the sample.

### Figure 2. PSLF Employment Types by Forgiveness Status
*Total PSLF employment spells*



**Notes:** Plot represents the number of times a type of employer appears in PSLF employment verification data. Each employer appears only once per individual. Data are from the Department of Education as of Dec 1, 2024.

We next present data on more specific employer subsectors within the three major employer sectors borrowers who have already received forgiveness in Figure 3. We find that K-12 schools are the most common subsector, comprising 28% of all employer occurrences. Institutions of higher education and healthcare nonprofits represent the second and third most common subsectors at 15% and 12%, respectively.

---

[11] Note that this report does not take into account forgiveness received through the Teacher Loan Forgiveness (TLF) program, which offers up to $17,500 in student loan forgiveness to eligible teachers who work full-time for five consecutive years at a qualifying school or educational service agency. Borrowers cannot receive credit toward TLF and PSLF for the same period of service. In FY2020, approximately 32,700 teachers received forgiveness with an average balance discharged of nearly $10,000 (Department of Education, 2022).

OCE Working Paper – OCE2024-008

The nonprofits group is the most difficult to identify subsectors within, as many of these organizations have non-descriptive names. We can identify, however, that 12% of borrowers receiving PSLF forgiveness report having worked in a healthcare-related non-profit. Common examples of healthcare nonprofits include hospitals and not-for-profit elder-care facilities as well as community health clinics.[12] Similarly, the breakdown of the "government" group shows that state and local government employers make up the majority (nearly 70%) of employer occurrences in the government sector. Non-military federal government employers make up less than 1% of employer occurrences, although recent actions to streamline PSLF eligibility across the Federal government has the potential to smooth the path to forgiveness for this group.

One type of employer whose employees commonly benefit from PSLF are U.S. military branches.[13] Employers such as the U.S. Army, Navy, Air Force, and Marines occur nearly 3 times as often as other federal employers in our data, and the U.S. Army and Air Force employers are among the largest single employers for those borrowers who have received forgiveness through PSLF. Although any single employer makes up only a small share of total employer occurrences, the largest single employers tend to be federal agencies such as the Department of Veterans Affairs and the Department of Defense, which together are associated with roughly 23,000 borrowers who received PSLF forgiveness.[14]

---

[12] Healthcare-related nonprofits and other specific categories listed in Figure 3 were identified using the same keyword search method as described above. In the case of overlapping categories such as a Veteran's Affairs Hospital that could count as both Federal and Healthcare, we aimed to let the more descriptive subsector dominate (i.e., Veterans Affairs Hospital would be counted in the healthcare category.) Beyond common cases such as this one, conflicting categorizations are moved to the "not classified" subsector.

[13] In Figure 3 below, we also include state-based national guard employment occurrences in the military category. Military service can include civilian service, active military service, and reserve military service.

[14] Some of this commonality of federal employers can be attributed to common naming practices. Employer certification is more likely to be uniform across federal agencies and sources than at the state or local level. States and cities that have common naming practices, such as the City and State of New York, appear in the top employer list, and even though we do some data cleaning to standardize names, it's possible that we systematically undercount employers who more commonly exhibit slight variation in naming practices (for example, City of Chicago Public Schools versus CPS may be counted separately). Note however that given the size of the military employers, they are likely to represent several of the largest single employers regardless of data cleaning.

OCE Working Paper – OCE2024-008

**Figure 3. Total PSLF Employment Types Among PSLF Forgiveness Recipients**



Notes: Plot represents the number of times a type of employer appears in PSLF employment verification data for borrowers who have recieved PSLF forgiveness. Each employer appears only once per individual, but each individual can have multiple employers associated with their forgiveness record (if, for example, the individual worked in more than one public service position.) Data are from the Department of Education as of December 1, 2024.

| Table 1. Share of Employer Occurrences by Subsector | | |
|---|---|---|
| | Occurrences (1) | Share (2) |
| K12 Education | 418,650 | 28% |
| Higher Education | 222,194 | 15% |
| Healthcare | 179,105 | 12% |
| Local Government | 137,907 | 9% |
| State Government | 141,018 | 9% |
| Military | 46,809 | 3% |
| Federal Government | 17,776 | 1% |
| Nonprofit (Not Classified) | 257,561 | 17% |
| Government (Not Classified) | 71,943 | 5% |

Notes: Table shows the number of times a subsector appears in PSLF employment verification data for borrowers who have received PSLF forgiveness. Each employer appears only once per individual, but each individual can have multiple employers associated with their forgiveness record. Data are from the Department of Education as of December 1, 2024.

In Figure 3, we show that roughly 43% of the employer occurrences among borrowers who have received forgiveness are associated with the Education sector; accordingly, 41% of borrowers who have received forgiveness have at some point been employed in the education sector.

OCE Working Paper – OCE2024-008

**Case Study - Texas**

Because of differences in naming conventions across states, we narrow-in on borrowers in a single state to better understand the composition of employers whose employees benefit from PSLF. We use Texas in this example because the naming of government entities at the state and local levels are relative consistent for this state. The same keyword identification strategy is used to categorize employers in this example. Texas provides a large, relatively representative sample of forgiven borrowers. It should not be used to generalize to the national population, but instead seen as a case study for the given exercise. In Table 1, we report the occurrences across subsectors for borrowers who lived in Texas at the time of their forgiveness. The majority of PSLF recipients in Texas have, at some point, worked in education (55% of total employer occurrences are in Education). As we saw above, there are a large share of employers who are "uncategorized" or "general," either because they are a general local, state, or federal government employer (i.e., the City of San Antonio), or because they are a non-profit whose function is not immediately obvious from the employer's name (i.e., Safe Haven).[15] Table 1 presents examples of each category to better understand the subsectors included.

Other industries like Philanthropy and the Arts or Law Enforcement and Fire and Rescue account are also represented. Having more transparent and accessible ways of identifying employers that could be PSLF qualifying is one potential way to improve take up of PSLF.

---

[15] One potential way to improve this process in the future would be to match employer names or identification numbers with data that identify the associated industry (NAICS code). This type of data is collected in tax records and survey data such as the Quarterly Census of Employment and Wages (QCEW) but is not currently publicly available.

OCE Working Paper – OCE2024-008

**Table 1. Employer Subsectors Among Forgiven Borrowers Living in Texas at Time of Forgiveness**

|  | Employer Spells (1) | Share of Total (2) |
|---|---|---|
| K-12 Education | 28,266 | 38.9% |
| *Roanoke City Public Schools, Plano Independent School District* | | |
| Higher Education | 11,724 | 16.1% |
| *Amarillo Community College, University of Texas at El Paso* | | |
| Uncategorized Government | 9,815 | 13.5% |
| *City of San Antonio, Texas Workforce Commission, Atascosa County* | | |
| Healthcare | 7,508 | 10.3% |
| *Memorial Hermann Health System, East Texas Medical Center* | | |
| Uncategorized Nonprofits | 5,074 | 7.0% |
| *LifeSteps Texas, Mas Cultura, Safe Haven* | | |
| Social Services | 2,619 | 3.6% |
| *Galveston Children's Museum, Frisco Family Services Center, Benbrook Library* | | |
| Law Enforcement, Fire and Rescue, and Legal | 2,508 | 3.5% |
| *Houston Police Department, Texas Department of Public Safety, Dallas Fire and Rescue* | | |
| Military | 2,340 | 3.2% |
| *U.S. Army, U.S. Navy, U.S. Air Force* | | |
| Religious Non-Profits | 968 | 1.3% |
| *Archdiocese of San Antonio, Lakewood Church, Shalom Austin* | | |
| Housing, Utilities, and Infrastructure | 713 | 1.0% |
| *Dallas Area Rapid Transit, Corpus Christi Housing Authority, San Antonio Water System* | | |
| Research and Science | 562 | 0.8% |
| *Texas Cardiac Arrythmia Research Foundation, National Science Foundation* | | |
| Philanthropy and the Arts | 598 | 0.8% |
| *Dallas Museum of Art, Greater Austin Performing Arts Center, Texas Trees Foundation* | | |
| Total | 72,695 | |

**Notes**: Table shows employer subsectors using broad classifications for borrowers from Texas. Employer occurrence counts capture any employment verification with a given employer subsector. Employers are counted only once per borrower. Borrowers can be associated with multiple employers. Examples represent illustrative cases from each category.

**Conclusion**

Bringing data to questions of what types of borrowers are receiving forgiveness is an important and still largely unexplored task. PSLF especially serves a unique subset of borrowers who have dedicated 10 years or more to public service. This report highlights the success of PSLF thus far in awarding forgiveness to a broad range of public service workers, especially those who serve their communities through education. The prevalence of K-12 employers among PSLF forgiveness recipients highlights that PSLF is supporting borrowers who face high education requirements and less-competitive wages than their private-sector peers. Beyond education, these borrowers also serve in local, state, and federal

ED_01482

OCE Working Paper – OCE2024-008

government roles, as health care workers, as first responders, and in smaller sectors such as social services and the arts. PSLF operates to ensure that the decision to serve others through public-sector work is not overshadowed by the burden of loans.

While this report advances new information about PSLF, the coarse groupings used to describe the borrowers in this report still mask significant heterogeneity in the roles of PSLF-eligible employers and the roles of their employees. Future work from the Department hopes to further clean and categorize the function of these employers in service of understanding the important work of PSLF recipients as well as encouraging equal take-up and access to the program across sectors, industries, and geographies.

Efforts to automatically identify PSLF-eligible borrowers using tax return and other administrative data are promising in their ability to encourage take-up of the program and accelerate borrowers' path to forgiveness by ensuring borrowers are meeting administrative requirements. State and local governments can model the administrative data matching efforts proposed across federal government agencies and work with local nonprofits using business-level administrative data to identify eligible 501(c)3 or other eligible employers.

*Acknowledgements: We are grateful to Matthew Kraft, Council of Economic Advisors, who made important contributions to this work.*

OCE Working Paper – OCE2024-008

**Appendix Table 1. Keyword Categorization Examples**

| Employer Example | Self-Identified Government? | Keyword Found | Sector : Subsector |
|---|---|---|---|
| State of California | Yes | "State of" | Government : State Government |
| City of Caddo Valley | Yes | "City of" | Government : Local Government |
| Town of Stockton Springs | No | "Town of" | Government : Local Government |
| Houston County Health Department | Yes | "Health" | Government : Healthcare |
| Ephrata Community Hospital | No | "Hospital" | Non-Profit : Healthcare |
| Shasta College | No | "College" | Education : Higher Education |
| Attala County School District | Yes | "Schools" | Education : K-12 Education |
| U.S. Army | Yes | "U.S. Army" | Government : Military |
| U.S. Department of Agriculture | No | "U.S. Department of" | Government : Federal Government |
| Panhandle Support | No | -- | Nonprofit : Not Classified |
| Burke Center | No | -- | Nonprofit : Not Classified |

**Notes**: Table gives examples of the categorization process in the order in which it occurs. We first sort on the self-identified government variable. We then use a keyword search to identify sector and subsector. Conflicting or otherwise complicated cases are considered on an individual basis or categorized as "not classified."

ED_01484

**PSLF NPRM Footnotes**

1. 63 FR 31885 (June 1, 1998).

2. See 73 FR 63232-01 (Oct. 23, 2008).

3. See 74 FR 56005 (Oct. 29, 2009); 77 FR 76414 (Dec. 28, 2012); 80 FR 67242 (Oct. 30, 2015); 85 FR 49821 (Aug. 14, 2020); 87 FR 66063 (Nov. 1, 2022); 88 FR 43065 (July 6, 2023); 88 FR 43905 (July 10, 2023).

4. See 20 U.S.C. 1221e-3, *see* also 20 U.S.C. 1082, 3441, 3474, 3471.

5. 20 U.S.C. 1221e-3.

6. See HEA § 455(m)(3)(B).

7. PUBLIC SERVICE, Black's Law Dictionary (12th ed. 2024).

8. 26 U.S.C. 501(c)(3) exempts the following from taxation: Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which insures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

9. The Illegality Doctrine and 501(c)(3) Organizations (2025), *https://www.congress.gov/crs-product/IF12739*.

10. *See Iowaska Church of Healing,* 105 F.4th 402, 406, 407.

11. *Id.* at 414.

12. See Jean Wright and Jay H. Rotz, *Illegality and Public Policy Considerations, in* IRS Exempt Organizations Continuing Professional Education Technical Instruction Program Textbook, 17th Ed. (IRS Exempt Organizations Technical Division, ed. 1993).

13. See 34 CFR 685.219(a).

14. See "Substantial Illegal Purpose (§ 685.219(b)(30)) for the list of activities.

15. *See Church of Scientology of California* v. *Comm'r of Internal Revenue,* 83 T.C. 381, 507 (1984), aff'd sub nom. *Church of Scientology of California* v. *Comm'r,* 823 F.2d 1310 (9th Cir. 1987) ( *stating* "The Government also has an interest in not subsidizing criminal activity. Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense. We think such paradoxes are best left for Gilbert and Sullivan").

16. Executive Order 14187—Protecting Children From Chemical and Surgical Mutilation— *https://www.federalregister.gov/documents/2025/02/03/2025-02194/protecting-children-from-chemical-and-surgical-mutilation*.

17. United States v. Skremtti, Attorney General and Reporter for Tennessee, et al.— *https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf*.

18. Amy Herron, *These 27 States Have Restricted Gender-Transition Treatments for Minors Since 2021,* N.Y. Times, June 18, 2025 (available at *https://www.nytimes.com/2025/06/18/us/politics/states-trans-treatments-scotus.html*).

19. List of foreign terrorist organizations designated by the State Department: *https://www.state.gov/foreign-terrorist-organizations/*.

20. Primer on U.S. Immigration Policy— *https://www.congress.gov/crs-product/R45020*.

21. Restoring Public Service Loan Forgiveness— *https://www.federalregister.gov/documents/2025/03/12/2025-04103/restoring-public-service-loan-forgiveness*.

23. *United States* v. *Skremtti*, Attorney General and Reporter for Tennessee, et al.— *https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf*.

24. Amy Herron, These 27 States Have Restricted Gender-Transition Treatments for Minors Since 2021, N.Y. Times, June 18, 2025 (available at *https://www.nytimes.com/2025/06/18/us/politics/states-trans-treatments-scotus.html*). *https://www.nytimes.com/2024/12/04/us/gender-transition-bans-states.html*.

25. *https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service*.

26. *https://www.councilofnonprofits.org/reports/nonprofit-workforce-shortages-crisis-affects-everyone*.

27. *https://www.gao.gov/assets/700/694506.pdf*.

28. *https://protectborrowers.org/wp-content/uploads/2020/08/ECF-Failures.pdf*.

29. Consumer Financial Protection Bureau, Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities (Washington, DC: June 2017).

30. Liu, Z., Korankye, T. (February 2025). *The Ripple Effect of Student Debt: Shaping Careers, Financial Choices, and Well-Being in Public and Private Sectors*. Mission Square Research Institute.

31. Turner, J., Blanchard, K., & Darolia, R. (2025, January). *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?*. NEA. *https://www.nea.org/sites/default/files/2025-03/where-do-borrowers-who-benefit-from-pslf-work.pdf*.



**BLOG POST**

# TURN PUBLIC SERVICE LOAN FORGIVENESS INTO A STATE BLOCK GRANT

*AEIdeas*

April 17, 2025

**By Preston Cooper | Alexander Holt**

As Congress negotiates a bill to overhaul the federal budget, lawmakers looking to save money should note $30 billion in potential savings hiding in plain sight. The Public Service Loan Forgiveness (PSLF) program, which fully discharges the student loans of borrowers who work for the government or a nonprofit for 10 years, is one of the most expensive features of the federal role in higher education. Fortunately, there's a way to rein in PSLF's cost, preserve incentives for young people to pursue careers in public service, and devolve power back to the states.

**How the cost of PSLF exploded**

PSLF has **discharged** nearly $80 billion in student loans for 1.1 million borrowers. Another 2.4 million people are working towards PSLF with an aggregate balance of $214 billion, or around one-eighth of the entire federal student loan portfolio. The average PSLF borrower has $74,000 forgiven, and that number appears to be headed upwards.

PSLF's "jackpot" structure—those who qualify have their debts forgiven in full, regardless of how much they borrowed—creates incentives for overborrowing. PSLF mainly benefits graduate borrowers, who can borrow effectively unlimited amounts from the federal government. If a student knows he will receive PSLF, every marginal dollar borrowed simply gets **added** to the balance that's eventually forgiven.

Colleges have **gotten in on the scheme**. PSLF encourages schools to raise tuition for programs like social work, and set up new graduate programs of questionable financial value to capture more federal student loan dollars. Some institutions have **actively encouraged** students to maximize their borrowing in order to squeeze more money out of PSLF.

Moreover, the heavy subsidy PSLF offers to public-service-oriented fields enables states to add or maintain unnecessary degree requirements for licensed public-service occupations. Middle-class workers in government or nonprofit jobs are **far likelier** to need master's degrees than their counterparts in the private sector. These licensing requirements are more often about **protecting** professionals in the field from competition than truly improving standards.

While proponents argue that PSLF encourages graduates to choose careers in public service, the incentives are more complex. Only individuals with significant debt benefit from PSLF, and the subsidy is tied to the cost of their degrees rather than the social value of their chosen career. Early-career public-service workers, who face the lowest pay, see no immediate monetary benefit from PSLF. The

distant promise of forgiveness may not convince a recent graduate with only modest debt to choose a lower-paid job in public service.

**A better way to support public servants**

PSLF is expected to cost **$30 billion** for new borrowers over the coming decade. Eliminating the program entirely would simplify the student loan program and reduce incentives for overborrowing. Since lawmakers still desire to support public servants, they could replace PSLF with something that incentivizes public service immediately and empowers states to target funds to urgent areas of need.

Recruitment and retention for in-demand public service jobs is **more about pay**, including sign-up bonuses, than it is about loan forgiveness. Congress could therefore replace PSLF (for new borrowers) with a new flexible block-grant program that allows states to target funding to public service jobs where staff shortages are most dire.

Not every state has the same immediate public-service needs. California may need more firefighters, Florida more teachers. And those needs may change from year to year.

Rather than a blanket public-service benefit shoehorned into the student loan program, Congress could make funds available to states to increase compensation for their most urgent public-sector workforce needs. States could use these funds to pay workers more, offer sign-up bonuses, or improve job benefits. States could even use the money to provide loan repayment assistance, if they so choose.

We propose spending $15 billion over 10 years, distributed through the Department of Labor as a block grant to states proportional to their populations. This investment could, for instance, fund $10,000 sign-up bonuses for 1.5 million

ED_01490

public service jobs. It would also save $15 billion relative to the current PSLF program.

Importantly, the block grant would be agnostic as to beneficiaries' education levels. Classic public-service occupations—teachers, early childhood educators, firefighters—shouldn't need expensive master's degrees to do their jobs. Reimagining PSLF as a block grant would allow states to support public servants regardless of what sort of degree they have or how much tuition their university charged.

The federal student loan program is slated to cost taxpayers **around $200 billion** over the next 10 years, in no small part due to PSLF. By transforming PSLF into a state block grant, Congress can rein in those costs and fix the program's perverse incentives in one stroke. President Trump has often expressed a desire to devolve federal power from the Education Department to the states. For PSLF in particular, Congress has an excellent opportunity to advance that goal.

SIGN UP FOR OUR
NEWSLETTER

ED_01491

First Name*

First Name

Last Name*

Last Name

Email*

Email

The American Enterprise Institute needs the contact information you provide to us to contact you about our products and services. You may unsubscribe from these communications at any time. For information on how to unsubscribe, as well as our privacy practices and commitment to protecting your privacy, please review our Privacy Policy.

**SIGN UP**

COSM is a project of the American Enterprise Institute. The American Enterprise Institute is a public policy think tank dedicated to defending human dignity, expanding human potential, and building a freer and safer world.



ABOUT    OUR TEAM    WORK WITH US    SOURCES

**CONTACT**

Requests for information can be
directed to COSM@AEI.org

**PRESS**

For media requests, please contact
James.Desio@AEI.org

© 2025 American Enterprise Institute. | Privacy Policy



≡  🔍  **Money**                                                    **Sign In**

We may earn a fee if you click on the links below. Compensation does not determine ranking. Not all brands are included.
Learn more.

Loans  ›  Student Loans                                      ⌃ Share

# It Just Got a Lot Easier to Qualify for Public Service Loan Forgiveness

**By:** Kaitlin Mulhere
**Published:** Oct 6, 2021 1:34 p.m. EDT | **8 min read**



*Money; Getty Images*

The U.S. Department of Education is streamlining its most criticized loan forgiveness program, making it easier for more than half a million borrowers who work in public sector jobs to have their loans canceled.

ED_01494

≡    **Money**

Education Department said in a **news release** announcing the changes. Most of the improvements stem from a temporary waiver running through October 2022 that expands what is considered a payment that counts toward forgiveness.

The department said that the actions announced Wednesday "will restore the promise of PSLF."

Related searches

How to Get Student Loans Forgiven

Who Qualifies for Loan Forgiveness

Debt Relief Programs

How Can i Get Out of My Student Loans

Public Service Loan Forgiveness, often called PSLF, was created to offer loan relief for borrowers who spend at least a decade working in often low-paying government or non-profit jobs. Borrowers have to make 120 qualifying monthly payments before getting their **loans canceled**.

Yet four years after the first group of borrowers would have been eligible for forgiveness, the program is notorious for its **low rate of approved applications**.

Altogether, the Education Department estimates the changes announced Wednesday will help at least 550,00 borrowers automatically qualify for forgiveness faster, including some 22,000 who will be immediately eligible to have a combined $1.4 billion in loans canceled. The government also estimates there are about 27,000 borrowers who could see roughly $2.8 billion forgiven if they can show they were employed in an eligible job.

Those numbers might sound small, given that millions of borrowers work in public sector jobs. But they represent a significant expansion in who has been able to

ED_01495

Plus, a larger count of borrowers will benefit from other parts of the announced changes. Here's a breakdown of how the biggest changes will work:

## These changes apply to student borrowers only

The changes apply to every type of student loan, including FFEL, Perkins, Direct/Stafford and Graduate Plus loans. But they do not apply to Parent PLUS loans.

Parent borrowers can access PSLF, if they first consolidate their loans, then enroll in a repayment plan called income-contingent repayment. It's the only income-based plan that parent borrowers are eligible for. But the changes announced Wednesday will not help parent borrowers working toward PSLF.

## The department will count payments that were previously considered ineligible

Borrowers seeking forgiveness via PSLF have to work in a non-profit or public sector job, have a certain type of loan, and have to make 120 payments through the correct type of repayment plan to have their loans forgiven. The second two steps having the correct type of loan and correct payment plan    have blocked thousands of people who otherwise would have qualified from accessing loan forgiveness.

But now, for a limited time, the government will count any prior payments made regardless of the loan type or repayment plan. You simply need to have made the payments while working for a qualifying employer.

More specifically: payments that were made on Federal Family Education Loans or Perkins loans will count toward the required 120 payments as long as the loan is consolidated into the **Direct Loan program** before Oct. 31, 2022. (All federal loans issued after July 1, 2010 are Direct loans. If you have older student loans, then they are likely FFEL loans, which need to be consolidated before you start making progress toward PSLF.)

☰    **Money**

Loan program and have certified their employment for PSLF. Borrowers who have
not yet consolidated their loans or certified their employment need to do so in the
next year to take advantage of the waiver.

The department says updating borrower account information to reflect the new
payment counts may take several months.

## Payments that were slightly short or late will count toward forgiveness

In some cases, borrowers have missed out on credit toward PSLF forgiveness
because their payments were off by a couple pennies or late by only a few days.

Under the new changes, borrowers affected by this issue will see their payment
count updated to include those payments that were slightly off. The department
says it will automatically adjust PSLF payment counts for payments made on or
before Oct. 31, 2021 for borrowers who have already certified some employment
for PSLF. Borrowers who have not yet applied for PSLF forgiveness or certified
employment but do so by Oct. 31, 2022 will also benefit from this change.

The department did not say how late or how short the payments can be to be
counted.

NEWSLETTER

**Make smarter money decisions in just a few minutes every day**

*Subscribe to Daily Money to get more of the latest personal finance news, stories, and analysis delivered everyday to your inbox.*

| Email Address | SIGN UP ❯ |

*By clicking "Sign Up", I agree to receive newsletters and promotions from Money and its partners. I also agree to Money's* *Terms of Use* *and* *Privacy Notice* *and consent to the processing of my personal information.*

≡    **Money**

applications

One of the most publicized aspects of PSLF has been the program's atrocious rates of approval for **borrowers applying for forgiveness**. Since the first borrowers have been eligible for forgiveness in the fall of 2017, about 98% of applications have been rejected.

The Education Department has said that, in most cases, the applications weren't eligible for forgiveness because borrowers hadn't made enough qualifying payments, often because some or all of their payments were made on the wrong type of loan or in the wrong repayment plan. Those problems should be helped by the waiver announced Wednesday.

Still, there have been other reasons why borrowers face delayed forgiveness. A 2017 **report** by the Consumer Financial Protection Bureau, for example, found a wide range of problems with how loan servicers handle PSLF cases, including incorrectly processed payments.

More recently, the Student Borrower Protection Center **found** that thousands of borrowers were denied forgiveness because of minor servicing errors or paperwork issues.

The department says it will now review all of the applications for PSLF that have been denied and ultimately offer a temporary process of reconsideration for borrowers who believe their application was rejected because of processing errors. It's unclear currently what steps borrowers will have to take to have their application reconsidered.

## Most of these changes are temporary

Most of these changes are a limited-time offer, because the Education Department **says** it is using special flexibilities granted to it during the COVID-19 national emergency.

☰   **Money**

representing a variety of stakeholders consider new higher education rules. One of the topics up for discussion are permanent changes to improve Public Service Loan Forgiveness.

The department's regulatory proposal includes changes that would make it easier for borrowers to make progress toward forgiveness, including simplifying qualifying payment rules and allowing certain types of deferments and forbearances to count as progress toward PSLF. But any changes that come as a result of the negotiated rule-making sessions wouldn't take effect until next year at the earliest.

For more information on the changes announced Wednesday, borrowers can go to: StudentAid.gov/PSLFWaiver

## More from Money:

**A Technicality Is Holding up Student Loan Forgiveness for More Than 67,000 Borrowers**

**What if Federal Student Loan Interest Rates Just Stayed at 0% Forever?**

**Borrowers Eligible for Public Service Loan Forgiveness Face Massive Delays on Student Debt Relief**

**CATEGORIES**

Current Mortgage Rates

Best Mortgage Lenders

How Much Home Can You Afford

**BEST OF**

Best Student Loans

Best Student Loan Refinance

Best Credit Repair

**RESOURCES**

Newsletters

Best Banks

Best Colleges

Best Hospitals

Best Places to Live

**MONEY**

About

Contact

Team

Privacy Policy

Terms of Use

**CONNECT**

**PHYSICAL ADDRESS**

Money Group, LLC

Distrito T-

☰    **Money**

| | | | Information | Convention Blvd |
|---|---|---|---|---|
| Everything About Reverse Mortgages | Best Auto Insurance | Best Travel Insurance | Your California Privacy Rights | San Juan, PR 00907 |
| Best Credit Cards | Cheapest Car Insurance | Best Pet Insurance | Licenses & Disclosures | **MAILING ADDRESS** |
| Best Banks | Best Home Insurance | | Advertising | Metro Office Park |
| Best Savings Accounts | Best Life Insurance | | Sitemap | 7 calle 1, Suite 204 |
| Best Moving Companies | Best Home Warranties | | Careers | Guaynabo, PR 00968 |

**BBB Rating A+**

© Copyright 2026 Money Group, LLC . All Rights Reserved. Terms of Use | Privacy Policy Money is an independent, advertiser-supported website and may receive compensation for some links to products and services throughout this website.

Opinions expressed on this site are the author's alone, not those of a third-party entity, and have not been reviewed, approved, or otherwise endorsed.

Offers may be subject to change without notice. For more information, please read our full disclaimer.

Invitations for insurance applications on services we own and operate are made through Money Group Ins, LLC, an insurance agent/producer, only where licensed. All license numbers are available here.

ED_01500



# Public Service Loan Forgiveness and the Justice System

*How eliminating PSLF would harm American communities*

**NLADA**
National Legal Aid &
Defender Association

ED_01501

## Acknowledgements

NLADA is grateful to the 3,369 individuals from across the justice system who took the time to respond to this survey, and to our partner organizations who assisted in its distribution. The responses and many personal stories received make clear how important PSLF has been in expanding access to quality representation and improving the American justice system.

# Public Service Loan Forgiveness and the Justice System

Executive Summary     4

**Part One: Current Borrowers**     8

Respondent Profile     9

Impact on Career Decisions     12

Salary & Loans     16

Impact on Clients & Communities     19

Cultivating Future Generations of Public Interest Lawyers     22

**Part Two: Program Executives**     23

Recruitment & Retention     24

Impact on Program Resources     27

ED_01503

# Executive Summary

America relies on a host of dedicated public servants to ensure that people in our country have access to essential services like health care, education, and fairness in our justice system. This is made possible in many areas by the Public Service Loan Forgiveness (PSLF) program, which makes it possible for graduates to devote their careers to addressing the most pressing needs of their communities.

In 2007, a bipartisan Congress created PSLF and President George W. Bush signed the program into law to ensure that talented and committed individuals are not prevented from entering public service because of the debt associated with their degree. PSLF is a promise of basic financial security, allowing talented professionals to enter many essential but often low-paying careers such as teaching, nursing, veterinary services, and legal services.

Often these professions require graduate degrees, which require many students to take on significant debt. Recognizing the need to overcome the barrier of high student debt in order to build cadres of public servants in these fields[1], PSLF allows individuals to earn forgiveness after at least 10 years of service at a qualifying employer and 120 monthly payments on an income-driven repayment (IDR) plan. After repaying at least 10 percent of their income for at least 10 years, public servants can apply to have the balance of their federal loans forgiven.

When individuals earn forgiveness, it is our communities that benefit. Public defenders, prosecutors, civil legal aid attorneys and court personnel are indispensable components of the administration of justice in our country. Their work helps protect Americans from injustice and strengthens the rule of law in our democracy; it is an integral part of our constitutional system.

This report is based on survey responses from more than 3,000 individuals. It helps explain the impact of PSLF on civil legal aid and public defender programs and the communities they serve. **Civil legal aid** ensures that regardless of how much money a person has, they have the same level of access to a fair adjudication of their civil legal problems as anyone else. They provide legal help that enables people to protect their livelihoods, their health, and their families. **Public defenders** fulfill the constitutional right to counsel; they are essential to due process and our concept of liberty. They protect the rights of defendants in criminal cases and work to ensure that case outcomes are fair and just.

---

**1** *34 CFR § 685.219 (a) ("The Public Service Loan Forgiveness Program is intended to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this session.").*

4

PSLF makes it possible for civil legal aid and public defender programs with limited budgets to recruit and retain these committed professionals, who are able to accept lower salaries even when the comparatively high cost of obtaining a law degree means many are graduating law school with significant debt. It also makes these jobs more accessible to students who otherwise may not have the means to afford the required education and training to enter the legal field, work in public service and provide stability for their families.

Opponents of PSLF are critical of its cost, but limited available data makes current estimates speculative and unreliable[2]. What is clear, however, is that the investment in PSLF drives stronger economies, safer communities, and the fulfillment of the fundamental American promise of justice for all.

Survey responses from borrowers currently working toward earning forgiveness, and from top executives at legal aid and public defender programs, suggest that PSLF has expanded access to justice by improving both the quality and availability of legal representation for low-income Americans. It enables these programs to attract talented lawyers from a range of backgrounds and to prevent those lawyers from leaving because of the debts they face. The survey revealed that:

> • **81 percent** of respondents who were aware of PSLF at the time they took their current job reported having been significantly influenced by the program's promise, with 51 percent indicating they were not likely or certain not to have taken their positions had PSLF not existed, and an additional 30 percent indicating they were only somewhat likely to have taken their positions.

> • **71 percent** of respondents who are top executives at their program (Executive Director, Chief Public Defender, etc.) consider PSLF to be a highly important tool for retaining experienced staff, and almost two thirds believe it is important for attracting new hires.

> • **87 percent** of respondents indicated that qualification for PSLF would make them much more likely to accept a particular opportunity in the future, and **more than half** would be very likely or certain to leave their jobs if PSLF did not exist.

---

*2 See GAO-17-22, "FEDERAL STUDENT LOANS, Education Needs to Improve Its Income-Driven Repayment Plan Budget Estimates," United States Government Accountability Office Report to the Chairman, Committee on the Budget, U.S. Senate, Nov. 2016 at 48 (Stressing the importance for the U.S. Department of Education to conduct sensitivity analyses on major assumptions, monitor assumptions carefully, and adjust assumptions as necessary to ensure reliability, and concluding that without doing so, estimates could result in costs being vastly over or understated).*

ED_01505

• A typical respondent on an income-driven plan **would accrue more interest than their payments would cover**. As a result, much of what they would end up owing after years of payments is not the principal that was borrowed. This means that income-driven repayment plans help keep monthly payments affordable but they are insufficient without an attached promise of loan forgiveness for individuals earning public sector salaries.

The survey included an opportunity for respondents to provide supplemental written information about their experience with PSLF. These qualitative responses explain the impact of the program on borrowers, the programs at which they work, and the people and communities they serve. Key themes reported by respondents include:

• **Student loan obligations can make basic life milestones unattainable without PSLF.** Many respondents reported that PSLF is the only reason they can afford to remain in public service and also look forward to home ownership, starting a family, or saving for retirement.

• **PSLF improves the quality of legal assistance.** It enables lawyers to remain in public service long enough to gain the knowledge and experience they need to be more effective advocates for their clients. It has expanded access to legal education for talented individuals of limited means, and incentivized top performing law students to select a role in public service.

• **PSLF expands the availability of legal assistance** by allowing more attorneys to seek public service jobs. This is particularly critical in severely underserved communities, where a single individual can be the only available legal resource for vulnerable clients. It also enables programs to serve more people in total, because when lawyers can afford to accept lower salaries, their organizations can invest in additional staff.

Access to quality representation in the American justice system can be the difference between opportunity and poverty, liberty and incarceration, and even life and death. The impact of eliminating PSLF would be devastating for communities across America who rely on dedicated public servants at civil legal aid and public defender programs.

ED_01506

This report is divided into two parts. Part one includes only responses from individuals who are currently in repayment and expecting to earn forgiveness at some point in the future, and part two includes only responses from top executives at civil legal aid and public defender programs. Both parts report aggregate responses to multiple choice questions, with interpretation supplemented by explanatory comments that were provided in response to an open ended question asking for more details about their experience with PSLF.

## Methodology

A link to the web-based survey was distributed via email to NLADA members and other individuals affiliated with the organization. The survey was open from November 9, 2017 to December 14, 2017. A total of 3,369 individuals from 46 states, the District of Columbia, and three U.S. territories responded to the survey, of whom 2,866 had federal student loans and 2,302 were enrolled working for an employer that would qualify them for public service loan forgiveness at some point in the future. It is not possible to report a response rate because recipients were encouraged to further distribute the survey to their colleagues. The survey contained questions related to demographics, financial circumstances, and the impact of PSLF on their career choices. It also contained a small number of questions directed only at the top executives at civil legal aid and public defender programs, and 91 of these individuals responded. 885 respondents provided written comments, in response to the open ended question that provided unlimited space for respondents to provide any additional information about their experience with PSLF.

## About NLADA

The National Legal Aid & Defender Association (NLADA), founded in 1911, is America's oldest and largest nonprofit association devoted to excellence in the delivery of legal services to those who cannot afford counsel. NLADA provides leadership, information, training, and technical assistance to members of the equal justice community to support their work to meet the needs of low-income clients and communities. NLADA provides guidance and advice to employers and employees at civil legal aid and public defender offices about programs designed to increase access to public service careers, and NLADA has advocated about the creation of such programs including Public Service Loan Forgiveness, the Civil Legal Assistance Attorney Student Loan Repayment Program, and the John R. Justice Student Loan Repayment Program.

**7**



# Part One:
# Current Borrowers

*Responses from Individuals Currently in Repayment and Expecting to Earn Forgiveness*

ED_01508

# Respondent Profile

## TYPE OF ORGANIZATION

*n = 2,188*

NLADA's members consist primarily of attorneys and staff at civil legal aid and public defender programs, but a small number of related individuals in the broader justice community also responded to the survey. The "other" category includes court employees, government workers, and staff at other nonprofits providing services to individual clients or particular types of clients.



Public Defender — 33%
Civil Legal Aid — 54%
Other — 13%

## What is your gender?

*n = 2,089*



Female — 74%
Male — 26%
Prefer to self-identify — <1%

9

## What is your ethnicity?

*n = 2,052*



| | |
|---|---|
| Asian | 4% |
| Black/African American | 9% |
| Caucasian | 70% |
| Hispanic/Latinx | 9% |
| Native American | <1% |
| Pacific Islander | <1% |
| Multi-racial (more than one) | 5% |
| Other (self-reported) | 2% |

## Age

*n = 2,061*



*Age in years*

10

## TALENT PIPELINE

The relative youth of respondents mirrors the objective of PSLF to cultivate a new generation of career public servants by encouraging young attorneys to take entry-level legal services jobs and deepen their expertise and commitment over time. Older borrowers who took out loans prior to the enactment of PSLF may have already exited public service in search of positions paying higher salaries or chosen not to change repayment plan.

## DIVERSITY IN THE LEGAL PROFESSION

In 2017, just 35 percent of lawyers in the U.S. were women and only 15 percent were an ethnicity other than Caucasian[3]. The lack of diversity in gender and ethnicity in the legal profession reflects the exclusion of talented lawyers with a different range of perspectives. This disparity adversely impacts the quality of legal services available. Not only should the profession be accessible to people from different backgrounds, but when public servants are representative of their communities, they are better able to understand the unique issues affecting their clients and to advocate for realistic and effective solutions. Respondents working toward earning forgiveness were significantly more diverse than the legal profession overall: 74 percent were women and 30 percent were not singularly Caucasian.



**I am a woman of color who grew up poor in [my area] and was determined to become a lawyer and return to the community I'm from to provide legal assistance. The difficulty and expense that the poor must endure to achieve the goal of becoming lawyers not only ensures that the shortage of diversity continues in the legal profession, but it also ensures that poor people of color continue to have few representatives who understand firsthand the issues and concerns that these communities need assistance addressing.**

*– Civil legal aid lawyer who serves homeless clients and low-income people with disabilities in California*

---

**3** *ABA National Lawyer Population Survey: 10-Year Trend in Lawyer Demographics, (2017) American Bar Association; Chicago, IL*

ED_01511

# Impact on Career Decisions

**Were you aware of the PSLF program when you took your current job?**    *n = 2,107*



**If PSLF did not exist, what is the likelihood that you would have taken your current job?** [4]    *n = 1,881*



**If PSLF did not exist, what is the likelihood that you would have taken ANY job in public service?**    *n = 1,881*



**12**

ED_01512

**Would qualification for PSLF make you more likely to accept a particular job opportunity in the future?**                    *n = 2,107*



**If PSLF did not exist, what is the likelihood that you would leave your current job?**                    *n = 2,107*



The data reveals how effectively PSLF incentivized respondents to enter public service. More than half of those who were aware of the program when they took their current job indicated they were not likely or certain not to have taken their current job without it. Only slightly fewer said the same about the likelihood they would have taken ANY job in public service. On both questions, less than one in five respondents believed it was very likely or certain. Significantly, 87 percent of respondents revealed that qualification for PSLF would make them <u>much</u> more likely to accept a job in the future.

---

**4** *Only respondents who reported being aware of PSLF at the time they took their current job were included in the analysis of questions about how PSLF influenced their past decisions.*

ED_01513

Respondents explained the reasons why PSLF has been effective at enabling them to accept and remain in their jobs. Some of these responses referred to the income-driven repayment (IDR) plans associated with the PSLF program that cap monthly payments at a rate of 10-15 percent of all income above 150% of the federal poverty level.



**PSLF is the difference between burning out and maintaining a sustainable work/life balance. Without PSLF I would be living paycheck-to-paycheck with no margin for simple self-care (i.e. a day off, healthier food, reliable transportation). The stress of living paycheck-to-paycheck compounded by the stress of working with underserved and under-resourced populations would not be sustainable. PSLF allows me to make a long-term (i.e. 30 year) commitment to serving vulnerable populations.**

*– Civil legal aid lawyer providing services to children in North Carolina*

IDR is a vital component of the public service incentive, but it is also available to borrowers of federal loans regardless of type of employment (or whether they are earning a public sector salary). The unique long-term impact of PSLF is that it provides a realistic expectation that the borrower will see a day in which they no longer have to make payments and can begin working toward attaining basic life milestones. Eighty-one percent of respondents revealed they would be at least somewhat likely to leave their job if PSLF did not exist, with more than half very likely or certain to leave. Many of these respondents explained PSLF would enable them to eventually start a family, purchase their first home, or start saving for retirement but that without the program, they would need to leave public service to do so.



**I was considering moving out of public service when the PSLF program was initiated 10 years ago.  With this benefit in mind I stayed with public service and have helped hundreds, if not over a thousand, disadvantaged clients with a multitude of legal problems. I have assisted clients to avoid losing their homes, their children, their benefits and even their life.  I have relied on and anticipated the forgiveness of my student loans for 8 years now. The $950 per month payment has limited my ability to save for retirement so it is my plan once the loan is forgiven to apply all the savings to try and build a retirement fund in the less than 10 years I have left to work.**

*– Civil legal aid lawyer who serves elderly Americans and people with disabilities at risk of abuse in Missouri*

14



> **The PSLF program made it possible for me to work in public service. I served 22 years in the military and by the time I went to law school, my education benefits from the military timed out. Thankfully, I was able to qualify for a huge scholarship. But I still ended up with student loans -- and the PSLF program made it possible for me to continue to serve -- and I am serving my fellow veterans who are less fortunate than me. We all appreciate this opportunity.**
>
> *– Civil legal aid lawyer serving veterans in Indiana*



> **As I grow older, plan to start a family, and take on greater financial responsibility, my ability to stay in public service depends on the continuing existence of PSLF. At my current salary (which increases each year at a rate lower than inflation), I can only afford to pay the interest on my loans and have made no progress towards reducing the principal. Without PSLF, if I want to be able to support a family I will eventually be forced to move to the private sector. In that sense, PSLF serves the vital role of enabling non-profit legal organizations to retain experienced attorneys (even though they cannot compete with law firm salaries) and therefore provide higher quality legal services to their communities.**
>
> *– Public defender who serves low income and indigent immigrants, trauma survivors, and mentally ill individuals in New York*

15

# Salary & Loans

## What is your salary?

*n = 2,049*



## What is your monthly repayment amount on your federal student loan?

*n = 2,107*



16

## What is the total balance of your student loans?     *n = 2,107*



## What is the balance of your federal student loan?     *n = 2,107*



ED_01517

The responses received in this section demonstrate why public service careers can be unaffordable for many law school graduates and young lawyers. A "typical" respondent at the median makes between $50,000 and $59,999[5] per year, whereas even entry-level salaries in the private sector can reach more than three times that. This salary disparity between the private and public sectors widens further as attorneys gain seniority and experience.

This "typical" respondent is likely to be enrolled in an income-driven repayment plan, which keeps monthly payments high, but generally affordable at between $250 and $499 per month. However, their level of debt is between $175,000 and $199,999, and this is highly disproportionate to their ability to repay on a typical salary. In the case of this "typical" borrower, the total amount they owe would actually grow significantly over time even if they make all payments on time and in full because the interest rate on federal graduate student loans offsets some or all of their monthly payment. Consequently, legal services lawyers on IDR alone, without the potential for earning forgiveness through PSLF, would face an uphill battle to become free from debt should they remain in the public sector.



> My interest has compounded so much in the time that I have been working as a public defender that I have an extra $50,000 in loans due to the interest than when I began this job. I have a husband and children and cannot sustain this work without the PSLF program, and I know that most if not all of my colleagues who have 0 to 10 years of experience in my office and the local DA's office are in exactly the same situation. Our fairly small, mostly rural community would lose a lot if the PSLF program were to disappear because it brought many people from other places to this town. Public safety and the quality and competence of our justice system would be seriously at risk.

> *– Public Defender in North Carolina*

---

**5** *The median for respondents from civil legal aid programs was $40,000-$49,000. Slightly higher salaries at public defender programs and an even higher median within the "other" category account for the overall median reaching the $50,000-$59,999 range.*

18

# Impact on Clients and Communities

This section reports on additional themes that appeared frequently within written comments but that did not correspond directly to the multiple choice questions[6].

In their comments, many respondents explained how PSLF has improved both the quality and amount of legal representation available for low-income communities. This section discusses these themes using illustrative examples.

## PSLF IMPROVES *AVAILABILITY* OF LEGAL SERVICES.

The results of this survey suggest that without PSLF, far fewer people would choose to enter legal services careers, which would reduce the total number of lawyers available to represent low income Americans. In some locations, single individuals with unique expertise are the only resource for a particular population, and PSLF is enabling those individuals to work in areas otherwise entirely devoid of service. In other locations, PSLF is helping legal services programs do more with less by enabling staff to accept lower salaries, enabling programs to invest in additional employees.



**PSLF allows me to bring top-notch legal skills to coal miners and their families in Appalachian Kentucky. PSLF was part of why I considered it feasible to attend an Ivy League law school even though I knew I wanted to do public interest work in Appalachia. I have spent the past five years doing such work, but if PSLF were taken away, then I would have to change jobs to be able to make my student loan payments. This would harm my clients and the economy of the coalfields because I provide help [to] people [to] obtain federal black lung benefits through a complex federal system that few private sector attorneys want to be involved in. Without PSLF, many of these coal miners and widows would not have an attorney and would be at risk of being denied the benefits that they deserve and depend on.**

*– Civil legal aid lawyer who serves coal miners and black lung widows in Kentucky*

---

[6] *Few individuals expressed concern about the future of their own loans. This is likely to be because during the period in which the survey was open, legislation that would eliminate PSLF for future borrowers only was passed by the U.S. House Committee on Education and the Workforce. This followed a similar recommendation by the White House Office of Management and Budget (OMB) that was widely covered by the national media in May 2017.*

ED_01519



> **Without PSLF it would be very difficult to attract qualified and competent attorneys to do this work. I know I am not even making the interest payments on my federal loans right now, since I am on an income based repayment plan. Either our organization would be forced to pay more, meaning we could help fewer people, or face higher turnover with a less qualified staff.**
>
> *– Civil legal aid lawyer who represents survivors of domestic violence and child abuse in Wisconsin*



> **I am the only recourse in my area for victims of domestic violence who are seeking protection from their abusive spouses or partners and who cannot afford an attorney. It is frightening to think how different their legal outcomes on things like protective orders and custody orders would be if they could not obtain counsel. I tailored my legal education and internships on the premise that I wanted to serve the public good, and that it would be financially feasible (not luxurious, just feasible) to do so thanks to PSLF.**
>
> *– Domestic violence advocate in Connecticut*

## PSLF IMPROVES THE *QUALITY* OF LEGAL SERVICES.

The impact of PSLF on the quality of legal services is evident at every stage of an attorney's career. The promise of financial security promotes competition for public service jobs by attracting a greater number of high quality candidates. Once employed, the ability to rely on forgiveness enables attorneys to focus fully on their service rather than become distracted by financial anxiety or take an additional job to supplement their income, as some respondents to NLADA's 2015 survey revealed they had done[7].

---

**7** *The Critical Role of Public Service Loan Forgiveness in Access To Counsel and Equal Justice (2015) National Legal Aid & Defender Association, Washington, DC*

**20**

ED_01520

 **PSLF has enabled me to follow my dream of serving the less privileged. I did not need to choose between living a life of minimum comforts (a reliable car, owning a home) and serving the greater good. Had it not been for PSLF, I would have to work 2 jobs and probably not have the energy I need to serve my clients. I do not anticipate leaving public service once my loans have ended - I will use my years of experience to be even more valuable to my employer.**

*– Public defender representing defendants in capital cases in Kentucky*

As these lawyers work toward earning forgiveness, they build experience and institutional knowledge that enables them to provide higher quality services to the communities in which they work. At the point they earn forgiveness, they have become established advocates for low-income people having further developed their commitment and expertise, which will enable them to continue to serve their communities effectively for years to come.

 **I consider myself a good attorney. I've been awarded for my work, helped make major changes to state systems, and served thousands of people who would not have any other options for help if my organization did not exist. I enjoy my work very much and feel that it is very valuable for my community, but I would have left years ago and gone into private practice if it were not for PSLF.**

*- Civil legal aid lawyer in Georgia*

 **Clients greatly benefit when lawyers stay in public interest. They don't have to change lawyers as often and organizations don't lose the institutional knowledge gained by their attorneys. Without this program, I could not afford to live in the city or do public interest. Any time I look at changing jobs, I make sure I would still qualify for the program.**

*– Civil legal aid lawyer in the District of Columbia*

21

## Cultivating Future Generations
## of Public Service Lawyers

Despite the fact that none of the multiple choice questions addressed how PSLF affected academic choices such as whether to even attend law school, many respondents used the open-ended question to address this issue. Some indicated that they would not have gone to law school without PSLF, with many explaining this is because their career intention was only ever to work in public service, but that they never could have afforded to do so without PSLF. A smaller number explained that they would not have been able to go to as high a quality law school without it. This suggests that PSLF is having a significant impact in expanding the pool of highly qualified and dedicated advocates from which legal aid and public defender programs across the country can recruit. The following comments are indicative examples:



> The question you forgot to ask is whether I would have gone to law school in the first place. The answer to that question is no. Absolutely not. I went to law school because I knew I wanted to work in public service... And PSLF made me confident that I could afford to get a law degree so I could make an even bigger impact. I grew up in poverty. My mother struggled to put food on the table and keep the lights on after we fled from my abusive step father. But I am the American dream. I worked very hard in school, and put myself through college working 40+ hours a week as a waitress. I knew from the start I wanted to help others like me to achieve the same heights.

*- Civil legal aid lawyer serving low-income families in Pennsylvania*



> I went to law school specifically with the intention of going into public service and took out student loans based on a calculation that public service loan forgiveness would be available. I know that I am not alone in that position and if it weren't for the availability of PSLF I may not have gone to law school at all because the debt proposition would not have made sense to me otherwise. PSLF is a key element in my ability to work in an economically depressed rural area for a wage much lower than I would make in private practice in an urban area. I believe that other rural legal aid providers are mostly in a similar situation.

*– Civil legal aid lawyer serving victims of crime in Washington*

22



# Part Two:
# Program Executives

*Responses from top executives at civil legal aid and public defender programs*

ED_01523

# Recruitment & Retention

This portion of the survey was open only to top executives at public defender and civil legal aid programs, specifically chief public defenders, executive directors, and equivalent individuals. Their perspectives help explain the impact of PSLF at the organizational level, and provide insight into the potential consequences for the effective functioning of programs if PSLF were eliminated. Their responses mirror the data provided by borrowers. Program leaders indicated awareness that PSLF provides their employees with a promise of financial security that they could not offer without imposing a significant strain on their already limited budgets.

 **Our lawyers can't afford to work at legal aid, pay their student loans, and buy a home. Loan forgiveness allows them the hope of home ownership some day.**

*– Civil legal aid program executive*

**To what extent does PSLF improve your ability to recruit qualified employees?**
*n = 91*



ED_01524

**To what extent does PSLF improve your ability to
retain your current employees?**                    *n = 91*



Written comments reveal concern that if there were changes to PSLF, programs would experience greater difficulty hiring new attorneys, including in rural areas where certain skills are in short supply and where recruiting new staff can be particularly challenging. Further, without PSLF, executives anticipate investing time and resources training and supporting the professional development of newer attorneys, only to see them quickly leave for the private sector, which would deprive clients of the benefits of their expertise and require the program to invest additional resources in training a replacement.



Without PSLF agencies will revert to training PD's and prosecutors as "baby lawyers" and then seeing them grow up and do something else.  PSLF has caused a sea change of lawyers interested in staying in public service as a career instead of for 1-3 years for training before moving onto a higher level firm position.  The clients served in this area deserve quality representation - both prosecution and defense - and we can't eliminate a huge factor in encouraging quality lawyers to stay.

*– Chief public defender*

25



"

**Our state is mostly rural with two metropolitan areas.  Without the ability to look forward to possible loan forgiveness, we would not be able to recruit as many attorneys to work in the rural parts of our state.  They would need to stay in the cities with the larger firms or government agency offices.**

*– Chief public defender*





**Legal aid salaries are low, so keeping attorneys on board with us after they've gotten experience under their belts is a constant challenge.**

*– Civil legal aid program executive*

26

ED_01526

## Impact on Program Resources

Executives foresee significant negative consequences for their organizations if PSLF is eliminated, as programs could be forced to alter their salary structures in order to compensate for the withdrawal of the forgiveness incentive. This would either reduce the resources available to invest in additional staff, decreasing the number of people the program is able to serve or leading to salary compression, making it more difficult to retain more experienced staff.



**Just the threat of elimination is forcing us to consider increasing salaries and other compensation immediately, because new grads are assuming the program will be eliminated and are planning accordingly.**

*- Civil legal aid program executive*





**Our salaries are at the bottom of government/ NPO organizations.  We cannot increase the bottom end without dealing with salary compression and deficit spending, especially in light of the federal budget situation. The PSLF program is the most important economic recruiting tool we have.  If it goes away, then we are placed in very difficult straits.**

*– Civil legal aid program executive*

27





NLADA
National Legal Aid &
Defender Association

1901 PENNSYLVANIA AVE, NW SUITE 500
WASHINGTON, DC 20006

ED_01528

## GCM 34631 (IRS GCM), 1971 WL 28756

Internal Revenue Service (I.R.S.)
General Counsel Memorandum

IN RE: ***

October 4, 1971

Section 501 -- Exemption From Tax on Corporations, Certain Trusts, etc. (Exempt v. Not Exempt)

501.00-00 Exemption From Tax on Corporations, Certain Trusts, etc. (Exempt v. Not Exempt)

501.03-00 Religious, Charitable, etc., Institutions and Community Chest

501.03-07 Civil Rights Groups

501.03-25 Social Welfare Groups (See also 0501.04-00)

501.04-00 Civic Leagues and Social Welfare Groups (See also 0501.03-25)

501.04-02 Prepaid Medical Care Association (See also 0501.03-10)

**CC:I:I-4111**

**Br.5:MBW**
HAROLD T. SWARTZ

Assistant Commissioner (Technical)

Attention: <u>Director, Miscellaneous and Special Provisions Tax Division</u>

Your memorandum (T:MS:EO:R:3), dated March 31, 1971, requested our comments on issues raised in this case. That memorandum contained allegations by the Brooklyn Strike Force, about activities of the *** (hereinafter referred to as the League). We cannot determine from the case file whether certain of these allegations are true, but will assume they can be proved in suggesting answers to your questions.

### FACTS

The League is a New York corporation created pursuant to Article II of the Membership Corporation Law of that state. The League's relevant stated purposes are as follows:
(a) ***

In an amendment to its charter, the League classified itself as a type B Corporation under Section 201(b) of New York's Not for Profit Corporation Law. That statute describes the organization and operation of type B corporations as follows:

> A not-for-profit corporation of this type may be formed for any one or more of the following non-business purposes: charitable, educational, religious, scientific, literary, cultural or for the prevention of cruelty to children or animals.

The amendment further states that the League will 'accomplish such purposes in a charitable manner as shall qualify under 501(c) of the Internal Revenue Code'.

The League holds membership meetings at which prominent guests speak to the members on topics of general community interest. League officers appear on radio and television to present the League's position concerning ethnic discrimination. An 'Educational Committee' informs *** of job opportunities and speaks to civic groups about the League's operations. Press releases are issued prior to the start of newsworthy activities, in the hope that the League's position will be passed on to the public. Other League activities include meetings with law enforcement officials to better police-community relations, maintenance of youth guidance and anti-drug abuse programs, and holiday distributions of food to the poor and needy.

At mass demonstrations sponsored by the League, opposition to those accused of ethnic discrimination is expressed through picketing and speeches delivered over loud speakers. The F.B.I. *** and two newspapers have been the targets of such demonstrations. The picketing is generally peaceful and orderly, although it is reported that injuries were sustained by two employees of a picketed newspaper at one demonstration. Picketing is frequently carried on near offices of the target organization. It is alleged that (1) members and officers of the League have threatened the lives of those investigating that organization; (2) the League is supported by and serves the interest of organized crime; and (3) the League used force and violence to silence a newspaper opposed to the League. The last three assertions are not established facts, but for the purpose of your request will be treated as though they were.

 **2**  The League has applied for exemption as a charitable organization described in § 501(c)(3) of the Internal Revenue Code of 1954.

## ANALYSIS

Section 501(c)(3) of the Code describes organizations exempt from Federal income taxation by section 501(a) as being those which are organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals. Regs. 1.501(c)(3)-1(c)(1) states that an organization will not be regarded as operated 'exclusively' for the above purposes if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. While section 501(c)(3) imposes other requirements, organizations must have purposes falling within one of the above classifications to be exempt. Regs. 1.501(c)(3)-1(d)(2) defines the term 'charitable' to include:

> advancement of education * * *; lessening of the burdens of government, and promotion of social welfare by organizations designed * * * (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law, * * *.

That section of the Regulations further states that an organization, in carrying out its primary purpose, may advocate social or civic changes or present opinions on controversial issues with an intent to mold public opinion or gain public acceptance of its views, yet still qualify under section 501(c)(3) if not an action organization.

We believe that changes in the organization's charter should be required if you ultimately decide to issue a favorable ruling. Neither the charter nor the state statute it incorporates by reference expressly limit the League's purposes or activities to those set forth in section 501(c)(3). Although it might be contended that the present charter provisions meet the organizational test of Regs. 1.501(c)(3)-1(b), it is our opinion, especially in a case of this type where it has been alleged that questionable activities have been engaged in, that charter changes should be required. The charter changes should unqualifiedly establish the presence

ED_01530

of the necessary element of intent to create a charity and afford an adequate basis for the Service and the state to predict the limits of the organization's activities. G.C.M. 34426, *** I-3522 (Feb. 8, 1971; Supp. July 19, 1971).

If charter changes are to be made they can be worked out with the organization and representatives of this office will gladly assist. The purpose clause might be changed to read in pertinent part as follows:
SECOND: Said corporation is organized exclusively for charitable and educational purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code of 1954.

The particular objects for which said membership corporation is to be formed are the following:
(a) to foster and instill a feeling of fraternity toward all *** people and to aid them in that they may be respected citizens of the United States of America, and to promote the general welfare of all *** people and,

**\*3**  (b) to protect and defend the civil rights of all *** people.

As indicated in the Sample Articles of Organization on page 7 of IRS Publication 557 (6-71) the charter should also clearly prohibit the inurement of net earnings to members or others, and it should contain a statement limiting its activities to those properly engaged in by organizations exempt under section 501(c)(3).

Your inquiry is primarily concerned with the organization's operation. On the assumption that the Strike Force is able to establish the allegations that have been made, you request our comments on the following technical questions.
1. Would demonstrations, including picketing against government agencies with a view to educating the public and coercing the agency into some act, be a basis for denial of exemption under section 501(c)(3)?

The necessary answer to this question is that some picketing of public agencies would disqualify an organization from exempt status. Picketing is an extremely general term, representing acts both legal and illegal, peaceful and violent, praiseworthy and deplorable.

Violation of constitutionally valid laws is inconsistent with exemption under section 501(c)(3). G.C.M. 31376 *** A-617795 (Aug. 14, 1959). That memorandum bases its conclusion upon the rationale that contravening state laws (1) is not in furtherance of exempt purposes, and (2) is contrary to public policy.

In a narrow sense, violating the law could be said to further exempt purposes (as where illegally obtained funds are used to finance a charity). However, since exempt purposes may be generally equated with the public good, and violations of law are the antithesis of public good, these violations are not in furtherance of exempt purposes . Finally, since illegal acts increase the burdens of government, crime works against the charitable goals listed in the Regulations. Particularly when an organization claims exemption as a body that promotes social welfare, the public benefit or detriment of its activities must weigh heavily.

This position was adopted in a similar case by G.C.M. 31550 *** A-631512 (March 21, 1960). There a private school sought exemption under section 501(c)(3). Because public schools in the area were closed, parents sent their children to the private school, paid tuition, and applied to the state for tuition grants. It was feared this system would violate the 14th Amendment prohibition against state supported segregation. We considered the effect of unconstitutional activities on tax exemption and concluded:

The Internal Revenue Code contemplates that organizations which are granted exemption by section 501(c)(3) are not carrying on operations which are in violation of the United States Constitution; that the Service should not give an exemption ruling to an organization which is violating the Constitution; and that although it is possible the courts may hold that _illegality_ or unconstitutionality of operations are immaterial to the requirements of section 501(c)(3), until it is conclusively so held it should be the policy of the Service to withhold exemption rulings from organizations which are organized or operated in violation of the Constitution. [Emphasis supplied] [a1]

**\*4** Rev. Rul. 71-447, IRB 1971-40 P. ___, which involves the tax status of private segregated schools, also states that the purpose of a charitable trust may not be illegal or contrary to public policy.

Therefore, if picketing government agencies in violation of state or federal law were a substantial part of an organization's activities, it would not qualify for exemption under section 501(c)(3). Legal picketing however, would have none of the objectionable qualities of illegal acts.

Your question implies that even legal picketing might coerce government officials and thus would be non-exempt activity. However, state and federal governments are designed to be responsive to all legal expressions of public opinion. Picketing informs government of matters concerning the governed. In this way it relieves the information gathering burdens of government and is affirmatively charitable. Regs. 501(c)(3)-1(d)(2). The only government agency picketing which we would find objectionable, therefore, would be that which (1) is illegal, (2) attempts to influence legislation, (3) intervenes or participates in a political campaign on behalf of a candidate for public office, or (4) is not in furtherance of an exempt purpose.
2. Would demonstrations, including picketing, against private businesses with a view toward educating the public and coercing the business into some act, be a basis for denial of exemption?

Once again, illegal acts that make up a substantial part of an organization's activities will disqualify it from exemption under section 501(c)(3) of the Code. As in question one, we are left with the problem of legal picketing and its effect on exemption. Legal picketing of private businesses sometimes forces owners to choose between continued economic loss and compliance with picketers' demands. Economic loss may result because customers and employees fear personal harm. It may also stem from customer's displeasure upon learning the truth about the businesses' practices.

To the extent that picketing is used as an instrument of fear and intimidation, it is inconsistent with the goal of promoting social welfare. Where legal activities (such as picketing) impede progress toward exempt goals, they militate against exemption.

When picketing is used to reveal truths that are relevant to an educational program, the applicant organization should not be made to suffer because an individual sustains economic loss. It is beyond doubt that some qualified exempt activities harm individuals. An educational and testing organization that reveals certain foods are contaminated, furthers the cause of public safety at the expense of those who produce such foods. An exempt public interest law firm might seek to enjoin the dangerous distribution of sample razor blades with Sunday newspapers, helping the public, hurting the advertiser. In such cases, Congress and the Service have decided that public interests are served by activities harmful to individual interests. In this case, truthful statements that a newspaper's stories are slanted against Italians would help eliminate discrimination at the newspaper's expense .

**\*5** As long as picketing is not used as an instrument of intimidation, but rather as a means of educating the public, it should not weigh against the organization's exemption. G.C.M. 33969, *** I-2493 (Nov. 23, 1969). Where picketing is designed to

IN RE: \*\*\*, GCM 34631 (1971)

produce both fear and some educational benefit, and it is a substantial part of an organization's activities, we would be justified in denying exemption.

3. If it could be established that an organization seeking exemption under section 501(c)(3) of the Code engaged, to any significant extent, in violence and terrorism to accomplish its goals and/or the goals of those who found and control it, is that a sufficient basis for denial of exemption?

The discussion in question one concerning illegal activities explains our position on this matter. If an organization carries on substantial illegal activities, it cannot qualify for exemption under section 501(c)(3) of the Code.

To determine when disqualifying activities are present to a 'significant extent' (that is, when they become 'substantial'), more must be considered than the ratio they bear to activities in furtherance of exempt purposes. The quality of such acts is as important as their quantity. A great many violations of local pollution regulations relating to a sizable percentage of an organization's operations would be required to disqualify it from 501(c)(3) exemption. Yet, if only .01% of its activities were directed to robbing banks, it would not be exempt. This is an example of an act having a substantial non-exempt quality, while lacking substantiality of amount. A very little planned violence or terrorism would constitute 'substantial' activities not in furtherance of exempt purposes.

We caution, however, that actions of League members and officers do not always reflect on the organization. Only (1) acts by League officials under actual or purported authority to act for the organization, (2) acts by agents of the organization within their authority to act, or (3) acts ratified by the organization, should be considered as activities 'of the organization'. See G.C.M. 34523, \*\*\* I-4103 (June 11, 1971).

4. If it could be established that an organization applying for exemption under section 501(c)(3) of the Code has received funds that can be traced directly from illegal activities and such funds constitute a substantial portion of an organization's support, may exemption be denied on that basis?

We have concluded that illegal activities by the organization will militate against exemption. The Service does not look to the source of an organization's contributions for purposes of granting exemption. The Code and Regulations limit our inquiry to purposes and activities of the organization itself. If the organization does not commit criminal acts, but simply receives contributions from those who do, this would not be grounds for denying it an exemption.

Our attention has been directed to the Organized Crime Control Act of 1970 (P.L. 91-452 Oct. 15, 1970, 84 Stat. 94) [hereinafter referred to as the Act], relevant portions of which are presently codified in 18 U.S.C. 1961 et seq. As with other criminal statutes, violations by an organization of these provisions militate against recognizing its exemption. The fact that the Act deals with organized crime, and that for purposes of this memorandum we are assuming members of organized crime support the League, does not allow us to reach a conclusion on this point. The Act prohibits certain activities, such as the investment of proceeds from a pattern of racketeering activity in enterprises whose activities affect interstate commerce. Your allegations, and those in the accompanying file do not suggest that such investments have been made. We therefore believe that the Act has no bearing on this case at present.

\*6  5. Would denial of exemption be justified if the organization is controlled by organized crime even though its efforts on behalf of reputed crime figures are strictly legal and charitable?

We cannot answer this question because it is broad in scope and not associated with any narrowing set of facts. What is 'organized crime'? Congress specifically legislated against it in 1970 (The Organized Crime Control Act of 1970, supra) yet in the words of three Congressmen:

ED_01533

IN RE: ***, GCM 34631 (1971)

> * * * [O]ne searches the bill in vain for a definition of 'organized crime'. In a criminal statute where the term 'organized crime' is an operative device, it is not defined. When asked about the ommission, the drafters explained that it was impossible to define, but everybody knew what it was. 1970 U.S. Code Cong. & Adm. News 4789.

Your question relies heavily on the term, and until a definition can be found, we are helpless to answer it. What you mean by 'control' is also unclear. At this juncture we can only reiterate that illegal activity, attributable to the organization and constituting a substantial part of its activities, will disqualify an organization from exempt status.

It is not our purpose in this memorandum to suggest that the League receive a favorable or an unfavorable ruling, because we do not have a full factual development. When the facts are fully developed, we will be glad to comment further on this case, should you request that we do so.

K. MARTIN WORTHY
Chief Counsel
Internal Revenue Service

Attachment:

Adm. file

This document is not to be relied upon or otherwise cited as precedent by taxpayers.

---

### Footnotes

a1    This caveat probably refers to the isolated case of Faulkner v . Commissioner 122 F.2d 987, 992 (1st Cir. 1940) where activities of a tax exempt Birth Control League, undertaken in good faith on advice of counsel, later turned out to be violations of local criminal law. The First Circuit held that gifts to the organization in that year were fully deductible despite the illegal activities. No other cases support this view, and the Service should continue to oppose it.

#### GCM 34631 (IRS GCM), 1971 WL 28756

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

ED_01534

**Department of Education**

**STUDENT AID OVERVIEW**

**Fiscal Year 2025 Budget Proposal**

**CONTENTS**

**Page**

Federal Student Aid Programs................................................................................1
FY 2025 Budget Proposal......................................................................................2
Student Aid Reform Proposals..............................................................................2
Student Aid Programs Output Measures ..............................................................3
Program Performance Information.........................................................................5

ED_01535

# FEDERAL STUDENT AID PROGRAMS

(Higher Education Act of 1965, Title IV)

(dollars in thousands)

FY 2025 Authorization: Indefinite

Budget Authority[1]:

| | 2024 Annualized CR | 2025 Request | Change |
|---|---:|---:|---:|
| **Grants and Work Study:** | | | |
| Pell Grants | | | |
|     Discretionary funding | $22,475,352 | $24,576,352 | $2,101,000 |
|     Mandatory funding[2] | 6,724,000 | 9,898,000 | +3,174,000 |
|     Subtotal, Pell Grants | 29,199,352 | 34,474,352 | +5,275,000 |
| Federal Supplemental Educational Opportunity Grants | 910,000 | 910,000 | 0 |
| Federal Work Study | 1,230,000 | 1,230,000 | 0 |
| Iraq and Afghanistan Service Grants | 530 | 30 | -500 |
| TEACH Grants[3] | 46,238 | 39,188 | -7,050 |
|     Total, Grants and Work-Study | 31,386,120 | 36,653,570 | +5,267,450 |
| **Net Loan Subsidy, Loans:[4]** | | | |
| Federal Family Education Loans (FFEL)[5] | 9,637,242 | 0 | -9,637,242 |
| Federal Direct Student Loans[6] | 97,146,641 | 42,266,917 | -54,879,723 |

---

[1] Table reflects discretionary and mandatory funding.

[2] Amounts appropriated for Pell Grants for 2024 and 2025 include mandatory funding provided in the Higher Education Act, as amended, to fund both the base maximum award and add-on award.

[3] TEACH Grants is operated as a credit program. Amounts reflect the new loan subsidy, or the net present value of estimated future costs. The FY 2024 amount includes a net upward reestimate of $7.3 million.

[4] Total net subsidy in any fiscal year reflects the estimated net cost of the loan program for that fiscal year. It includes both positive and negative subsidies and upward and downward impacts of reestimates and modifications of existing loans. A negative subsidy occurs when the present value of cash inflows to the Government is estimated to exceed the present value of cash outflows. Negative subsidy is reported (as negative outlays) to a negative subsidy receipt account.

[5] Budget authority for FFEL does not include the FFEL Liquidating account. This amount also includes reestimates related to the Ensuring Continued Access to Student Loans Act (ECASLA).

[6] Amount for 2023 includes a net upward reestimate of $64.2 billion.

ED_01536

# FY 2025 BUDGET PROPOSAL

The Federal student aid programs provide grant, loan, and work-study assistance to help students afford a postsecondary education, find employment in today's workforce, and realize the lifelong benefits of a higher education. As part of the Administration's priority to ensure all students have an accessible and affordable path to a certificate or degree, the Budget sets a maximum Pell award of $8,145 for the 2025-2026 award year as a significant step in the President's commitment to double the Pell Grant. The fiscal year 2025 proposal makes available $135 billion in new Federal student aid in fiscal year 2025, including more than $39 billion in Pell Grants and $93 billion in student loans (excluding consolidation loans). The resources proposed would help more than 9 million students in their efforts to complete postsecondary education.

This overview discusses the Administration's proposed package of initiatives and reforms that will not only better target aid to students but will also improve student success. Current student aid programs are described in detail under the **Student Financial Assistance** account, the **TEACH Grants** account, and the **Student Loans Overview**. The costs and reforms associated with administering the student aid programs are presented in the **Student Aid Administration** account.

## STUDENT AID REFORM PROPOSALS

### Doubling Pell Grants

Pell Grants have been the foundation of low- and moderate-income students' financial aid for decades; however, the value has diminished as college costs continue to rise. The Administration's fiscal year 2025 budget would set a maximum award of $8,145 for award year 2025-2026, an increase of $750 over the 2024-2025 award year. This includes a $100 increase in the maximum award in discretionary funding and a $650 increase to the mandatory add-on. Students attending public and non-profit institutions will be eligible to receive the increased mandatory add-on. The maximum award for students at proprietary institutions will be $7,495. The Administration continues to prioritize doubling the maximum award by 2029 to ensure college is accessible and affordable and provides additional mandatory funding to create a path to achieving this, in combination with continued discretionary increases. The Administration also intends to work with Congress to ensure access to student financial aid for students who are Dreamers.

### Student Loan Policies

The fiscal year 2025 budget proposes to eliminate origination fees. Origination fees were originally created to offset the costs of federal student loans in the FFEL program, which ended in 2010. Before a federal student loan is disbursed, an origination fee is calculated, increasing the overall borrower loan cost. The origination fee is subsequently deducted from the amount actually received by borrower. Borrowers are expected to pay that dollar amount back, with interest. Eliminating these fees would be a step in the direction of lowering the cost of higher

ED_01537

**STUDENT AID OVERVIEW**

education. Additionally, as part of the 2025 request, the Administration intends to work with Congress to ensure access to student financial aid for students who are Dreamers.

## STUDENT AID PROGRAMS OUTPUT MEASURES

### Aid Available to Students
(dollars in millions)

| Output Measures[1] | 2023 | 2024 | 2025 |
|---|---|---|---|
| Pell Grants | $31,264 | $35,463 | $39,284 |
| Supplemental Educational Opportunity Grants | 1,294 | 1,294 | 1,294 |
| Federal Work Study | 1,248 | 1,248 | 1,248 |
| Iraq and Afghanistan Service Grants | 0.679 | 0 | 0 |
| Subtotal, New Grant Aid | 33,806 | 38,004 | 41,826 |
| New Student Loans: | | | |
| Stafford Loans | 16,329 | 16,867 | 16,995 |
| Unsubsidized Stafford Loans | 45,555 | 47,229 | 47,672 |
| Parent PLUS Loans | 12,218 | 12,836 | 13,443 |
| Grad PLUS Loans | 14,280 | 14,648 | 14,990 |
| TEACH Grants[2] | 71 | 72 | 73 |
| Subtotal, New Student Loans[3] | 88,453 | 91,652 | 93,173 |
| Total | 122,259 | 129,656 | 134,999 |

---

[1]Table shows total aid generated by Department programs, including institutional matching funds generated by the SEOG and Work-Study programs. Aid available may differ from appropriated amounts for a given fiscal year. Detail may not add to total aid available due to rounding.

[2]For budget and financial management purposes, this program is operated as a loan program under the Federal Credit Reform Act of 1990.

[3]Excludes loans issued to consolidate existing loans (Consolidation Loans), which total $40.8 billion in 2023, $42.1 billion in 2024, and $41.5 billion in 2025.

ED_01538

**STUDENT AID OVERVIEW**

---

**Number of Student Aid Awards**
(in thousands)

| Output Measures[1] | 2023 | 2024 | 2025 |
|---|---|---|---|
| Pell Grants | 6,471 | 7,033 | 7,153 |
| Supplemental Educational Opportunity Grants | 1,615 | 1,615 | 1,615 |
| Federal Work-Study | 630 | 630 | 630 |
| Iraq and Afghanistan Service Grants[2] | N/A | 0 | 0 |
| Subtotal, New Grant Aid | 8,716 | 9,278 | 9,398 |
| New Student Loans: | | | |
| Stafford Loans | 4,673 | 4,834 | 4,856 |
| Unsubsidized Stafford Loans | 6,557 | 6,813 | 6,847 |
| Parent PLUS Loans | 713 | 733 | 753 |
| Grad PLUS Loans | 647 | 663 | 660 |
| TEACH Grants | 23 | 24 | 24 |
| Subtotal, New Student Loans[3] | 12,613 | 13,067 | 13,140 |
| Total | 21,329 | 22,345 | 22,538 |

**Number of Postsecondary Students Aided by Federal Student Aid Programs**

| | 2023 | 2024 | 2025 |
|---|---|---|---|
| Unduplicated Count (in thousands) | 8,766 | 9,224 | 9,307 |

---

[1] Detail may not add to total due to rounding.
[2] N/A denotes number of recipients will not exceed 500.
[3] Excludes loans issued to consolidate existing loans.

4

ED_01539

# PROGRAM PERFORMANCE INFORMATION

**Performance Measures**

This section presents selected program performance information, including, for example, program goals, objectives, measures, and performance targets and data. Achievement of program results is based on the cumulative effect of the Federal resources provided for the program as well as the resources and efforts invested by those served by the program.

Because Federal student assistance grant and loan programs rely on the same program data, performance indicators and strategies that apply to these programs are grouped here in the Student Aid Overview and are not repeated in justifications for the **Student Financial Assistance** program account or in the **Student Loans Overview.**

**Goal: To help ensure access to high-quality postsecondary education by providing financial aid in the form of grants, loans, and work-study in an efficient, financially sound, and customer-responsive manner.**

*Objective:* Ensure that low- and moderate-income students will have the same access to postsecondary education that high-income students do.

**Measure:** College enrollment rates: Postsecondary education enrollment rates will increase each year for all students, while the enrollment gap between low- and high-income students and students of color and White students graduating high school will decrease each year.

| Year | Target: Total Percentage Enrolled | Actual: Total Percentage Enrolled |
|---|---|---|
| 2020 | 68% | 62.7% |
| 2021 | 68 | 61.8 |
| 2022 | 68 | 62.0 |
| 2023 | 68 | |
| 2024 | 68 | |
| 2025 | 68 | |

| Year | Target: Percentage point difference between White and Black high school graduates ages 16-24 enrolling immediately in college | Actual: Percentage point difference between White and Black high school graduates ages 16-24 enrolling immediately in college |
|---|---|---|
| 2020 | 5.00% | 7.60% |
| 2021 | 5.00 | 3.00 |
| 2022 | 5.00 | 3.10 |
| 2023 | 5.00 | |
| 2024 | 5.00 | |
| 2025 | 5.00 | |

ED_01540

## STUDENT AID OVERVIEW

| Year | Target: Percentage point difference between White and Hispanic high school graduates ages 16-24 enrolling immediately in college | Actual: Percentage point difference between White and Hispanic high school graduates ages 16-24 enrolling immediately in college |
|---|---|---|
| 2020 | 7.00% | 8.80% |
| 2021 | 7.00 | 3.70 |
| 2022 | 7.00 | 6.00 |
| 2023 | 7.00 | |
| 2024 | 7.00 | |
| 2025 | 7.00 | |

**Additional information:** The overall enrollment rate in postsecondary education following high school fell below the target of 68 percent in 2021. The Department believes its commitment to the Student Financial Assistance programs and proposed reforms in the Administration's fiscal year 2025 Budget will continue to encourage and allow more low-income students to enroll in postsecondary education programs — and provide them the means to remain in school — than would be the case in the absence of the Federal student financial assistance programs.

The gap between White and Black high school graduates enrolling in college immediately after high school increased very slightly to 3.10 percentage points in 2022, still below the target of 5.00 percentage points.

The metric that measures the gap between White and non-White Hispanic high school graduates who enroll immediately in college increased to 6.00 percentage points in 2022, which remains below its target. The Department remains committed to furthering equal educational opportunity and will continue to pursue policies to support this important goal.

Data for the measures above are taken from the Digest of Education Statistics[1] (Digest), published annually by the National Center for Education Statistics (NCES). Refer to the technical information provided in the Digest by NCES when interpreting year-to-year changes in the data. Fiscal year 2023 performance data is expected to be available in August 2024 and will be included in the fiscal year 2026 Congressional Justification.

---

[1] https://nces.ed.gov/programs/digest/

ED_01541

**STUDENT AID OVERVIEW**

*Objective: Ensure that more students will persist in postsecondary education and attain degrees and certificates.*

**Measure:** Graduation rate: Graduation rates for all full-time, degree-seeking students in 4-year and less than 4-year programs will improve, while the gap in graduation rates between students of color and White students will decrease, as will the gap between students receiving Pell and those not receiving need-based Title IV aid.

| Year | Target: Students graduating with a 4-year degree within 150 percent of the normal time required | Actual: Students graduating with a 4-year degree within 150 percent of the normal time required |
|---|---|---|
| 2020 | 66% | 64.0% |
| 2021 | 66 | 64.6 |
| 2022 | 66 | 64.6 |
| 2023 | 66 | |
| 2024 | 66 | |
| 2025 | 66 | |

| Year | Target: Students graduating with a less-than-4-year degree within 150 percent of the normal time required | Actual: Students graduating with a less-than-4-year degree within 150 percent of the normal time required |
|---|---|---|
| 2020 | 46% | 35.9% |
| 2021 | 46 | 36.3 |
| 2022 | 46 | 35.5 |
| 2023 | 46 | |
| 2024 | 46 | |
| 2025 | 46 | |

| Year | Target: Percentage point difference between White and Black first-time, full-time students graduating with a 4-year degree within 150 percent of the normal time required | Actual: Percentage point difference between White and Black first-time, full-time students graduating with a 4-year degree within 150 percent of the normal time required |
|---|---|---|
| 2020 | 15.6% | 22.4% |
| 2021 | 15.6 | 22.2 |
| 2022 | 15.6 | 22.0 |
| 2023 | 15.6 | |
| 2024 | 15.6 | |
| 2025 | 15.6 | |

7

ED_01542

## STUDENT AID OVERVIEW

| Year | Target: Percentage point difference between White and Hispanic first-time, full-time students graduating with a 4-year degree within 150 percent of the normal time required | Actual: Percentage point difference between White and Hispanic first-time, full-time students graduating with a 4-year degree within 150 percent of the normal time required |
|---|---|---|
| 2020 | 8.5% | 8.7% |
| 2021 | 8.5 | 8.7 |
| 2022 | 8.5 | 8.7 |
| 2023 | 8.5 | |
| 2024 | 8.5 | |
| 2025 | 8.5 | |

| Year | Target: Percentage point difference between White and Black first-time, full-time students graduating with a less-than-4-year degree within 150 percent of the normal time required | Actual: Percentage point difference between White and Black first-time, full-time students graduating with a less-than-4-year degree within 150 percent of the normal time required |
|---|---|---|
| 2020 | 5.1% | 10.8% |
| 2021 | 5.1 | 10.6 |
| 2022 | 5.1 | 12.2 |
| 2023 | 5.1 | |
| 2024 | 5.1 | |
| 2025 | 5.1 | |

| Year | Target: Percentage point difference between White and Hispanic first-time, full-time students graduating with a less-than-4-year degree within 150 percent of the normal time required | Actual: Percentage point difference between White and Hispanic first-time, full-time students graduating with a less-than-4-year degree within 150 percent of the normal time required |
|---|---|---|
| 2020 | 0.7% | 4.5% |
| 2021 | 0.7 | 5.8 |
| 2022 | 0.7 | 6.8 |
| 2023 | 0.7 | |
| 2024 | 0.7 | |
| 2025 | 0.7 | |

8

## STUDENT AID OVERVIEW

| Year | Target: Percentage point difference between first-time, full-time students graduating with a 4-year degree within 150 percent of the normal time required who received a Pell Grant and those who did not | Actual: Percentage point difference between first-time, full-time students graduating with a 4-year degree within 150 percent of the normal time required who received a Pell Grant and those who did not |
|---|---|---|
| 2020 | | 18.1% |
| 2021 | | 17.8 |
| 2022 | | 17.6 |
| 2023 | TBD | |
| 2024 | TBD | |
| 2025 | TBD | |

| Year | Target: Percentage point difference between first-time, full-time students graduating with a less-than-4-year degree within 150 percent of the normal time required who received a Pell Grant and those who did not | Actual: Percentage point difference between first-time, full-time students graduating with a less-than-4-year degree within 150 percent of the normal time required who received a Pell Grant and those who did not |
|---|---|---|
| 2020 | | 3.6% |
| 2021 | | 2.1 |
| 2022 | | 4.2 |
| 2023 | TBD | |
| 2024 | TBD | |
| 2025 | TBD | |

**Additional Information:** The percentage of first-time, full-time degree-seeking students graduating with a 4-year within 150 percent of the normal time remained steady at 64.6 percent. The percentage of students completing a less-than-4-year degree decreased from 36.3 percent in 2021 to 35.5 percent in 2022. The graduation rates for both 2- and 4-year degree levels observed in 2022 were below the targets established for this measure, 46 percent, and 66 percent, respectively.

The completion gap between White and Black students who were enrolled in 4-year degree programs decreased very slightly from 2021 to 2022 (22.2 percentage points to 22.0 percentage points). The gap observed in 2022 remains larger than the targets established in 2022 and future years. The completion gap between Pell recipients and non-Pell recipients decreased slightly from 2021 to 2022 (from 17.8 percentage points to 17.6). The overall 150 percent completion rate for students receiving Pell grants who were enrolled in 4-year degree programs was 53.2 percent in 2022.

From 2021 to 2022, the difference between the percentages of White and Black students graduating from less-than-4-year degree programs within 150 percent of the normal time increased slightly (from 10.6 to 12.2 percentage points) — still outside of the goal of 5.1 percentage points. In 2022, Hispanic students graduated within 150 percent of the normal time at less-than-4-year programs at a lower rate than White non-Hispanic students with a gap of 6.8 percentage points. From 2021 to 2022, the difference between the percentages of Pell

9

**STUDENT AID OVERVIEW**

recipients and non-Pell recipients graduating from less-than-4-year degree programs within 150 percent of the normal time increased from 2.1% to 4.2%. The overall 150 percent completion rate for students receiving Pell grants who were enrolled in less-than-4-year degree programs was 33.7 percent in 2022.

Data for the measures supporting this objective are collected through the Graduation Rate Survey conducted as part of the annual Integrated Postsecondary Student Aid Study (IPEDS). Fiscal year 2023 performance data is expected to be available in December 2024 and will be included in the fiscal year 2026 Congressional Justification. The Pell graduation rate is a new measure, and the Department plans to establish targets in the near future. The Department will continue to evaluate current performance measures and, where appropriate, revise these measures and goals.

**Program Improvement Efforts**

The Department is exploring ways to gather detailed program and student outcome data for program-specific measures that will provide reliable indicators of program effectiveness.

**Efficiency Measures**

The Department is reassessing the efficiency measures for the individual student financial aid programs. The results of this reassessment will reflect proposed program changes and be incorporated into future budget requests.

ED_01545



# Master Promissory Note (MPN)
## Direct Subsidized Loans and Direct Unsubsidized Loans
### William D. Ford Federal Direct Loan Program

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form or any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

**BEFORE YOU BEGIN**

Before you begin, read the Instructions on page 14 of this MPN.

**BORROWER INFORMATION**

**1.** Name and Permanent Address (see Instructions)

**2.** Social Security Number

**3.** Date of Birth (mm-dd-yyyy)

**4.** Driver's License State and Number

**5.** Email Address (optional)

**6.** Area Code/Telephone Number

**REFERENCE INFORMATION**

List two persons with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian.

**7.** First Name: _____ Middle Initial: _____ Last Name: _____

Permanent Address (Street, City, State, Zip Code):

_____

Email Address (optional): _____

Area Code/Telephone Number: _____

Relationship to You: _____

**8.** First Name: _____ Middle Initial: _____ Last Name: _____

Permanent Address (Street, City, State, Zip Code):

_____

Email Address (optional): _____

Area Code/Telephone Number: _____

Relationship to You: _____

**SCHOOL INFORMATION – TO BE COMPLETED BY THE SCHOOL**

**9.** School Name and Address

**10.** School Code/Branch

**11.** Identification No.

*11/2019*

ED_01546

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

Borrower's Name: _____    Social Security Number: _____

## BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS

**12.** I request a total amount of Direct Subsidized Loans and/or Direct Unsubsidized Loans under this Master Promissory Note (MPN) that cannot be more than the maximum amounts I am eligible to receive, as provided under federal law and explained in the MPN Terms and Conditions and in the Borrower's Rights and Responsibilities Statement that accompanies this MPN.

**13.** Under penalty of perjury, I certify that:

**A.** The information I provide on this MPN and that I update from time to time is true, complete, and correct to the best of my knowledge and belief.

**B.** I will use the loan money I receive only to pay for my authorized educational expenses for attendance at the school that determined I was eligible to receive the loan, and I will immediately repay any loan money that is not used for that purpose.

**C.** If I owe an overpayment on a Federal Perkins Loan or on a grant made under the federal student aid programs (as defined in the MPN Terms and Conditions), I have made satisfactory arrangements to repay the amount owed.

**D.** If I am in default on a federal student loan, I have made satisfactory repayment arrangements with the loan holder to repay the amount owed.

**E.** If I have been convicted of, or if I have pled *nolo contendere* (no contest) or guilty to, a crime involving fraud in obtaining federal student aid funds, I have fully repaid those funds.

**14.** For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN, I authorize:

**A.** My schools, the U.S. Department of Education (ED), and their agents and contractors to release information about my loan to the references I provide and to my immediate family members unless I submit written directions otherwise or as otherwise permitted by law.

**B.** My schools, ED, and their agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at any cellular telephone number I provide now or in the future using automated dialing equipment or artificial or prerecorded voice or text messages.

**15.** I understand that:

**A.** My school is authorized to credit my loan money to my account at the school and to pay to ED any refund that may be due up to the full amount of the loan.

**B.** I have the option of paying the interest that accrues on my loans during grace, in-school, deferment (including in-school deferment), forbearance, and certain other periods, but if I do not do so, ED may add unpaid interest that accrues on my loans to the principal balance of those loans at the end of the grace, deferment, forbearance, or other period. This is called "capitalization." Capitalization will increase the principal amount owed on the loan and the total amount of interest I must pay.

**C.** ED has the authority to verify information reported on this MPN with other federal agencies and to report information about my loan status to persons and organizations permitted by law to receive that information.

**D.** My school will notify me of the type of loan and loan amount that I am eligible to borrow.

**E.** Within certain timeframes, I may cancel a loan or request a lower amount by contacting my school, or by refusing to accept or returning all or a portion of a loan disbursement that is made to me.

**F.** More than one loan may be made to me under this MPN for the same or different loan periods.

**G.** I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement.

## PROMISES

**16.** I promise to pay to ED the full amount of all loans that I receive under this MPN in accordance with the terms of the MPN, plus interest and any other charges and fees that I may be required to pay under the terms of the MPN.

**17.** If I do not make a payment on a loan made under this MPN when it is due, I promise to pay reasonable collection costs, including but not limited to attorney fees, court costs, and other fees.

**18.** I promise that I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it.

**19.** By signing this MPN, whether electronically or on a paper copy, I promise that I have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings, the MPN Terms and Conditions, and the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

**20. Borrower's Signature** _____

**21. Today's Date (mm-dd-yyyy)** _____

*11/2019*

ED_01547

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**MPN TERMS AND CONDITIONS**

This section summarizes some of the major terms and conditions of your loans. You can find more detailed information about the terms and conditions of your loans in the Borrower's Rights and Responsibilities Statement (BRR) that accompanies the MPN. Each topic covered in this section of the MPN is followed by the number of the item in the BRR that provides additional information about that topic. The BRR is considered to be part of the MPN. Whenever we refer to the MPN, the term "MPN" includes the BRR.

We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with information about how to contact us or our servicers after your school disburses (pays out) your loan. It is important to keep in contact with your servicer.

The words "we," "us," and "our" refer to the U.S. Department of Education or our servicers. The word "loan" refers to one or more loans made under the MPN.

The term "federal student aid" refers to aid awarded under the following programs: the Federal Pell Grant Program; the Federal Supplemental Educational Opportunity Grant (FSEOG) Program; the Federal Work-Study (FWS) Program; the Leveraging Educational Assistance Partnership Grant Program; the Teacher Education Assistance for College and Higher Education (TEACH) Grant Program; the William D. Ford Federal Direct Loan (Direct Loan) Program; the Federal Family Education Loan (FFEL) Program; and the Federal Perkins Loan Program.

**LAWS THAT APPLY TO THIS MPN AND OTHER LEGAL INFORMATION (BRR Item 1)**

The terms of this MPN are determined in accordance with the Higher Education Act of 1965, as amended (the HEA), our regulations, and other federal laws and regulations. Throughout this MPN, we refer to these laws and regulations as "the Act."

Any notice we are required to send you about your loans, even if you do not receive the notice, will be effective if it is sent by first-class mail to the most recent address that we have for you, emailed to an email address you have provided, or sent by any other method of notification that is permitted or required by the Act. You must immediately notify your servicer of a change in your contact information or status (see BRR Item 14).

If we do not enforce a term of this MPN, that does not waive any of our rights to enforce that term or any other term in the future. No term of your loan may be modified or waived, unless we do so in writing. If any term of your loan is determined to be unenforceable, the remaining terms remain in force.

**TYPES OF LOANS YOU CAN RECEIVE UNDER THIS MPN (BRR Item 3)**

This MPN is used to make Direct Subsidized Loans and Direct Unsubsidized Loans. Only undergraduate students with financial need are eligible to receive Direct Subsidized Loans. Both undergraduate and graduate or professional students can receive Direct Unsubsidized Loans.

**TIME LIMITATION ON YOUR ELIGIBILITY TO RECEIVE DIRECT SUBSIDIZED LOAN IF YOU ARE A FIRST-TIME BORROWER ON OR AFTER JULY 1, 2013 (BRR Item 4)**

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time for which you can receive Direct Subsidized Loans (this is called your "maximum eligibility period"), and under some circumstances you may become responsible for paying interest on those loans during all periods.

**USE OF THE MPN TO MAKE MORE THAN ONE LOAN (BRR Item 5)**

This MPN can be used to make multiple loans to you to pay your educational expenses over a period of up to 10 years. If you do not want to receive more than one loan under this MPN, you must notify your school or your servicer in writing.

Each loan you receive under this MPN is separately enforceable. At or before the time of the first disbursement of each loan, we will send you a disclosure statement that tells you the amount of the loan and additional terms of the loan. Any disclosure statement we send to you in connection with a loan made under this MPN is considered to be part of the MPN. You can also find information about the amount of your loan and the disbursement dates in the National Student Loan Data System (NSLDS).

**AMOUNT YOU MAY BORROW (BRR Item 6)**

There are annual loan limits (the maximum loan amount you can borrow each academic year) and aggregate loan limits (the maximum loan amount you can borrow for undergraduate and graduate or professional study) under this MPN. The annual and aggregate limits vary depending on your academic level (first-year, second-year, etc.) and, for undergraduate students, whether you are a dependent or independent student.

**INTEREST RATE (BRR Item 7)**

Unless we notify you in writing that a different rate will apply, the interest rate for any loan you receive under this MPN is a fixed rate (meaning that your interest rate will never change) that is calculated each year. When the rate is calculated, it applies to Direct Subsidized Loans and Direct Unsubsidized Loans with first disbursements made during the period beginning on July 1 of one year and ending on June 30 of the following year. This means that different loans you receive under this MPN may have different interest rates.

The calculated interest rate cannot be more than the maximum rate set by the Act. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%.

If you are in the military and the interest rate on your loan is greater than 6%, you may qualify to have the rate limited to 6% during any period of active duty service or other qualifying periods.

**PERIODS WHEN WE CHARGE INTEREST (BRR Item 8)**

Generally, we do not charge interest on Direct Subsidized Loans while you are enrolled at an eligible school on at least a half-time basis, during your 6-month grace period, during deferment periods, or during certain periods of repayment under certain repayment plans that base your monthly payment amount on your income. Generally, we charge interest on Direct Subsidized Loans during all other periods, starting on the day after your grace period ends.

Generally, we charge interest on Direct Unsubsidized Loans during all periods (including while you are in school and during your grace period), starting when your loan is first disbursed.

You are responsible for paying all interest that we charge on your Direct Loans. If you do not pay this interest, we may capitalize the interest (add it to the principal balance of your loan).

**LOAN FEE (BRR Item 9)**

We charge a loan fee for each loan you receive. The loan fee is a percentage of the loan amount and will reduce the amount of money you receive to pay for your educational expenses. However, you are required to pay the full amount of the loan, including the amount that was taken for the loan fee. The specific loan fee you are charged will be shown on disclosure statements that will be sent to you.

*11/2019*

ED_01548

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**MPN TERMS AND CONDITIONS (CONTINUED)**

**LATE CHARGES AND COLLECTION COSTS (BRR Item 10)**

If you do not make your full monthly loan payment within 30 days of your due date, we may require you to pay a late charge of not more than six cents for each dollar of each late payment.

We may also require you to pay any other charges and fees that are permitted by the Act related to the collection of your loan. If you default on a loan, you must pay reasonable collection costs, plus any court costs and attorney fees.

**YOUR RIGHT TO CANCEL ALL OR PART OF A LOAN (BRR Item 11)**

Before your loan money is disbursed, you may cancel all or part of the loan at any time by notifying your school. After your loan money is disbursed, you may cancel all or part of the loan within certain timeframes set by the Act. These timeframes and the procedures for cancelling all or part of your loan will be explained in a notice that will be sent to you at the time of each loan disbursement.

**HOW YOU WILL RECEIVE YOUR LOAN MONEY (BRR Item 12)**

Generally, your school will pay out your loan money in more than one installment (called a "disbursement") according to a schedule determined by your school. In most cases, the loan money will be applied to your school account to pay for tuition, room and board, and authorized school fees. If there is money left after those charges are paid, the school will give the excess amount (this is called a "credit balance") to you directly, unless you authorize the school to hold the credit balance.

**GRACE PERIOD (BRR Item 15)**

You will receive a 6-month grace period on repayment of your loan. The grace period begins the day after you cease to be enrolled at least half-time at an eligible school.

You are not required to make any payments on your loan during the grace period. However, we charge interest during the grace period on Direct Unsubsidized Loans and, in some cases, on Direct Subsidized Loans, and this interest will be capitalized at the end of the grace period if you do not pay it.

**REPAYING YOUR LOAN (BRR Item 16)**

You must repay each loan you receive under the MPN in monthly installments during a repayment period that begins on the day immediately following your 6-month grace period on that loan. You have a choice of several repayment plans, including plans that base your required monthly payment amount on your income.

If you are temporarily unable to make your monthly loan payments, you can request a deferment or forbearance that allows you to temporarily stop making payments or to temporarily make a smaller payment amount (see BRR Item 20). In some cases, we may grant you a forbearance without a request.

You may prepay all or any part of your loan at any time without penalty.

After you have fully repaid a loan, we will send you a notice telling you that you have paid off your loan. You may fully repay different loans made under this MPN at different times.

**DEFAULTING ON YOUR LOAN (BRR Item 17)**

You will be considered in default on your loan if:

- You do not make your monthly loan payments for a total of at least 270 days;
- You do not comply with other terms of the loan, and we determine that you do not intend to repay your loan; or
- We accelerate your loan (see "CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN") and you do not pay the amount due.

If you default, we may:

- Capitalize all outstanding interest, which will increase the principal amount due on the loan and the total amount of interest you will pay;
- Report the default to nationwide consumer reporting agencies (credit bureaus), which will significantly and negatively affect your credit history;
- Demand that you immediately repay the loan in full;
- Order administrative wage garnishment (AWG) of your wages;
- Take (offset) your federal income tax refund or Social Security Administration payments or any other payment authorized for offset under federal law and use that amount to pay off part of your loan;
- File a lawsuit against you to collect on the loan; and
- Require you to pay collection costs, which will increase the total amount you must pay on your loan.

**CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN (BRR Item 18)**

We may require you to immediately repay the entire unpaid balance of your loan (this is called "acceleration") if you:

- Receive loan money, but do not begin attendance in any classes at the school that determined you were eligible to receive the loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;
- Make a false statement that causes you to receive a loan that you are not eligible for; or
- Default on your loan (see "DEFAULTING ON YOUR LOAN").

**INFORMATION WE REPORT ABOUT YOUR LOAN (BRR Item 19)**

We will report information about your loan to nationwide consumer reporting agencies (credit bureaus) and the National Student Loan Data System (NSLDS) on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). If you default on a loan, we will report this to nationwide consumer reporting agencies. Your loan will be identified as an education loan. Schools may access information in NSLDS for specific purposes that we authorize.

*11/2019*

ED_01549

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**IMPORTANT NOTICES**

**GRAMM-LEACH-BLILEY ACT NOTICE**

The Gramm-Leach-Bliley Act (Public Law 106-102) requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

**PRIVACY ACT NOTICE**

The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:

The authority for collecting the requested information from and about you is §451 *et seq.* of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state

agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

**FINANCIAL PRIVACY ACT NOTICE**

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program, and also to the financial records of any account at a financial institution used to disburse Direct Loan funds to you.

**PAPERWORK REDUCTION NOTICE**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless the collection displays a valid OMB control number. The valid OMB control number for this information collection is 1845-0007. Public reporting burden for this collection of information is estimated to average 30 minutes (0.5 hours) per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain a benefit in accordance with 34 CFR 685.201. If you have comments or concerns regarding the status of your individual submission of this form, write to:

U.S. Department of Education
Federal Student Aid Information Center
4255 W HWY 90
Monticello, KY 42633

*11/2019*

ED_01550

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

**ABOUT THE BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT (BRR)**

This BRR provides additional information about the terms and conditions of the loans you receive under the accompanying Master Promissory Note (MPN) for Direct Subsidized Loans and Direct Unsubsidized Loans. Please keep this BRR for your records. You may request another copy of the BRR at any time by contacting your loan servicer. You can also obtain a complete copy of the MPN that you signed, including the BRR, on StudentAid.gov.

Throughout this BRR, the words "we," "us," and "our" refer to the U.S. Department of Education or our servicers. The word "loan" refers to one or more loans made under the accompanying MPN.

**1. LAWS THAT APPLY TO THIS MPN AND OTHER LEGAL INFORMATION**

The terms and conditions of loans made under this MPN are determined by the Higher Education Act of 1965, as amended (the HEA), and other federal laws and regulations. We refer to these laws and regulations as "the Act" throughout this BRR. Under applicable state law (unless federal law preempts a state law), you may have certain borrower rights, remedies, and defenses in addition to those stated in the MPN and this BRR.

Any notice we are required to send you related to a loan made under this MPN, even if you do not receive the notice, will be effective if it is sent by first-class mail to the most recent address that we have for you, sent by electronic means to an email address you have provided, or sent by any other method of notification that is permitted or required by the Act. You must immediately notify your servicer of a change in your contact information or status (see BRR Item 14).

If we do not enforce a term of this MPN, that does not waive our right to enforce that term or any other term in the future. No term of this MPN may be modified or waived, unless we do so in writing. If any term of this MPN is determined to be unenforceable, the remaining terms remain in force.

**NOTE: Amendments to the Act may change the terms of this MPN. Any amendment to the Act that changes the terms of this MPN will be applied to your loans in accordance with the effective date of the amendment. Depending on the effective date of the amendment, amendments to the Act may modify or remove a benefit that existed at the time that you signed this MPN.**

**2. THE WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM**

The Direct Loan Program (formally known as the William D. Ford Federal Direct Loan Program) includes the following types of loans, known collectively as "Direct Loans":

- Direct Subsidized Loans (formally known as Federal Direct Stafford/Ford Loans)
- Direct Unsubsidized Loans (formally known as Federal Direct Unsubsidized Stafford/Ford Loans)
- Direct PLUS Loans (formally known as Federal Direct PLUS Loans)
- Direct Consolidation Loans (formally known as Federal Direct Consolidation Loans)

Direct Loans are made by the U.S. Department of Education. We contract with servicers to process Direct Loan payments, deferment and forbearance requests, and other transactions, and to answer questions about Direct Loans. We will provide you with information about how to contact us or our servicers after your school notifies us that the first disbursement of your loan has been made. It is important to keep in contact with your servicer.

If we transfer one or all of your loans to a new servicer, we will notify you of who your new servicer is, how to contact your new servicer, and when your loans will be transferred. A transfer of the servicing of your loan does not affect any of your rights and responsibilities under that loan. You can find the name of your servicer in the National Student Loan Data System (NSLDS) (see BRR Item 19).

**3. DIRECT SUBSIDIZED LOANS AND DIRECT UNSUBSIDIZED LOANS**

Direct Subsidized Loans and Direct Unsubsidized Loans are made to students to help pay for the cost of education beyond high school.

Direct Subsidized Loans are available only to undergraduate students. Direct Unsubsidized Loans are available to both undergraduate students and graduate or professional students.

To receive a Direct Subsidized Loan, you must have financial need. Except as explained in BRR Item 8, we do not charge interest on Direct Subsidized Loans while you are in school on at least a half-time basis, during the grace period, during deferment periods, and during certain periods of repayment under the Revised Pay As You Earn Repayment Plan (REPAYE Plan), the Pay As You Earn Repayment Plan (PAYE Plan), and the Income-Based Repayment Plan (IBR Plan).

You can receive a Direct Unsubsidized Loan without showing that you have financial need. Except during certain periods of repayment under the REPAYE Plan, we charge interest on Direct Unsubsidized Loans during all periods. For more information on periods when we charge interest, see BRR Item 8.

**4. TIME LIMITATION ON DIRECT SUBSIDIZED LOAN ELIGIBILITY FOR FIRST-TIME BORROWERS ON OR AFTER JULY 1, 2013**

If you are a first-time borrower on or after July 1, 2013, there is a limit on the maximum period of time (measured in academic years) that you can receive Direct Subsidized Loans.

You are a first-time borrower on or after July 1, 2013 if you had no outstanding balance on a Direct Loan or on a Federal Family Education Loan Program (FFEL Program) loan on July 1, 2013, or if you have no outstanding balance on a Direct Loan or FFEL program loan on the date you obtain a Direct Loan after July 1, 2013.

In general, if you are a first-time borrower on or after July 1, 2013 you may not receive Direct Subsidized Loans for more than 150% of the published length of your program of study. This is called your "maximum eligibility period." For example, if you are enrolled in a 4- year bachelor's degree program, the maximum period for which you can receive Direct Subsidized Loans is 6 years (150% of 4 years is 6 years).

Your maximum eligibility period is based on the published length of the program in which you are currently enrolled. This means that your maximum eligibility period can change if you change programs. If you receive Direct Subsidized Loans for one program and then change to a different program, the period of time for which you received Direct Subsidized Loans for the earlier program will generally count against your new maximum eligibility period.

After you have received Direct Subsidized Loans for your maximum eligibility period, you are no longer eligible to receive additional Direct Subsidized Loans, and if you are enrolled in school, you may become responsible for paying interest on your Direct Subsidized Loans. You may continue to receive Direct Unsubsidized Loans.

With certain exceptions as provided under the Act (for example, if you graduate from your program of study before or at the time you receive Direct Subsidized Loans for your maximum eligibility period), we will charge interest on your Direct Subsidized Loans during all periods if you —

- Continue to be enrolled in any undergraduate program after you have received Direct Subsidized Loans for your maximum eligibility period, or

*11/2019*

ED_01551

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- Enroll in another undergraduate program that is the same length as or shorter than your previous program.

If either of the above events occurs, we will charge interest during all periods, beginning on the date of the enrollment that causes you to become responsible for paying the interest. You will become responsible for paying all of the interest that accrues on your Direct Subsidized Loans based solely on your enrollment as described above, regardless of whether you apply for, request, or receive federal student financial aid. We will notify you if you become responsible for paying all of the interest that accrues on your Direct Subsidized Loans.

Additional information about the limitation on Direct Subsidized Loan eligibility for first-time borrowers on or after July 1, 2013 will be provided to you during entrance counseling (see BRR Item 12). You may also obtain additional information from your school's financial aid office, or at StudentAid.gov.

**5. USE OF THE MPN TO MAKE MORE THAN ONE LOAN**

You may receive more than one loan under this MPN over a period of up to 10 years to pay for your educational costs, as long as the school you are attending is authorized to use the MPN in this way and chooses to do so. At any school, you can receive more than one loan for the same academic year under this MPN.

If your school is not authorized to use the MPN for multiple loans or chooses not to do so, or if you do not want to receive more than one loan under this MPN, you must sign a new MPN each time you receive a loan for a new academic year. If you do not want to receive more than one loan under this MPN, you must notify your school or your servicer in writing.

If the school you are attending is authorized to use the MPN for multiple loans and chooses to do so, no additional loans will be made under this MPN after the earliest of the following dates:

- The date we or your school receive your written notice that you do not want to receive any additional loans under the MPN;
- One year after the date you sign the MPN or the date we receive the MPN, if no loan disbursements have been made under the MPN; or
- Ten years after the date you sign the MPN or the date we receive the MPN.

**6. AMOUNT YOU MAY BORROW**

The charts that follow show the maximum amounts of Direct Subsidized Loans and Direct Unsubsidized Loans that you may borrow for a single academic year (annual loan limits), and the maximum amounts that you may borrow in total for undergraduate and graduate study (aggregate loan limits). The actual amount you are eligible to borrow for an academic year may be less than the maximum annual amounts shown in the charts.

If you are enrolled in a program that is less than a full academic year in length, or if the remaining portion of the program you are enrolled in is less than a full academic year in length, the annual loan limits may be lower than those shown in the chart.

If you are enrolled in certain graduate level health professions programs, you may qualify for higher annual and aggregate limits on Direct Unsubsidized Loans.

Your school will determine the actual loan amount you are eligible to receive based on your academic level, dependency status, and other factors such as:

- Your cost of attendance;
- Your Expected Family Contribution;
- Other financial aid you receive; and

- Your remaining eligibility under the annual or aggregate loan limits.

The amount of Direct Subsidized Loans and Direct Unsubsidized Loans you are eligible to receive may increase or decrease based on changes in your financial circumstances. Your school will notify you of any changes in your eligibility.

**ANNUAL LOAN LIMITS**

| Dependent Undergraduate Students (unless your parent is unable to obtain a Direct PLUS Loan) | |
|---|---|
| First Year Total | $5,500 (not more than $3,500 can be subsidized) |
| Second Year Total | $6,500 (not more than $4,500 can be subsidized) |
| Third Year & Beyond (Total Each Year) | $7,500 (not more than $5,500 can be subsidized) |
| **Independent Undergraduate Students (and dependent students, if your parent is unable to obtain a Direct PLUS Loan)** | |
| First Year Total | $9,500 (not more than $3,500 can be subsidized) |
| Second Year Total | $10,500 (not more than $4,500 can be subsidized) |
| Third Year & Beyond (Total Each Year) | $12,500 (not more than $5,500 can be subsidized) |
| **Graduate and Professional Students** | |
| Total Amount (Each Year) | $20,500 (unsubsidized only) |

**AGGREGATE LOAN LIMITS**

| Dependent Undergraduate Students (unless your parent is unable to obtain a Direct PLUS Loan) | |
|---|---|
| Total Amount Cumulative | $31,000 (not more than $23,000 can be subsidized) |
| **Independent Undergraduate Students (and dependent students, if your parent is unable to obtain a Direct PLUS Loan)** | |
| Total Amount Cumulative | $57,500 (not more than $23,000 can be subsidized) |
| **Graduate and Professional Students** | |
| Total Amount Cumulative | $138,500 (not more than $65,500 can be subsidized; includes subsidized and unsubsidized loans received for undergraduate study) |

**7. INTEREST RATE**

The interest rate on Direct Subsidized Loans and Direct Unsubsidized Loans is a fixed rate (meaning that the rate for each loan you receive will never change). The rate is determined according to a formula specified in the Act, and is calculated each year. When the rate is calculated, it applies to all Direct Subsidized Loans and Direct Unsubsidized Loans that have a first disbursement date during the period beginning on July 1 of one year and ending on June 30 of the following year. If you receive more than one loan under this MPN, each loan may have a different fixed interest rate,

11/2019

ED_01552

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

depending on when the loan is first disbursed, and whether you are an undergraduate student or a graduate or professional student when the loan is made.

The interest rate for any loan you receive under this MPN cannot be more than the maximum rate set by the Act. The maximum interest rate for Direct Subsidized Loans and Direct Unsubsidized Loans made to undergraduate students is 8.25%. The maximum interest rate for Direct Unsubsidized Loans made to graduate or professional students is 9.5%. We will notify you of the interest rate for each loan you receive in a disclosure statement that we send to you.

**Servicemembers Civil Relief Act**

**If you are in military service, you may qualify for a lower interest rate on your loans.**

Under the Servicemembers Civil Relief Act, the interest rate on loans you received before you began your military service may be limited to 6% during your military service. We will determine if you are eligible for this benefit based on information from the U.S. Department of Defense. If you are eligible and have qualifying loans with an interest rate greater than 6%, we will automatically reduce the interest rate on those loans to 6% during your military service. If you think you qualify for the 6% interest rate but have not received it, contact your servicer.

**Interest rate reduction for automatic withdrawal of payments**

You will receive a 0.25% reduction in the interest rate on your loan if you choose to repay the loan under the automatic withdrawal option. Under the automatic withdrawal option, we automatically deduct your monthly loan payment from your checking or savings account. In addition to lowering your interest rate, automatic withdrawal ensures that your payments are made on time. We will provide you with information about the automatic withdrawal option.

**8. PERIODS WHEN WE CHARGE INTEREST**

In general, we do not charge interest on Direct Subsidized Loans during certain periods, but we charge interest on Direct Unsubsidized Loans during all periods, as explained below.

**Direct Subsidized Loans**

We **charge interest** on Direct Subsidized Loans—

- During most periods when you are repaying your loans;
- During forbearance periods; and
- During all periods, if you become responsible for paying all interest on your Direct Subsidized Loans (see BRR Item 4).

We **do not charge interest** on Direct Subsidized Loans—

- While you are enrolled in school at least half-time;
- During your grace period;
- During deferment periods;
- During some periods of repayment under the REPAYE, PAYE, and IBR plans; and
- During periods of active duty military service that qualify you for the no accrual of interest benefit for active duty service members (see below).

**Direct Unsubsidized Loans**

We **charge interest** on Direct Unsubsidized Loans, starting on the date of the first disbursement—

- While you are enrolled in school at least half-time;
- During your grace period;
- During most periods when you are repaying your loans;

- During most deferment periods; and
- During forbearance periods.

You will pay more interest on a Direct Unsubsidized Loan than on a Direct Subsidized Loan.

We **do not charge** interest on Direct Unsubsidized Loans—

- During some periods of repayment under the REPAYE Plan;
- During periods of active duty military service that qualify you for the no accrual of interest benefit for active duty service members (see below); and
- During periods of deferment for cancer treatment (see BRR Item 20).

**No accrual of interest benefit for active duty service members**

We do not charge interest on any type of Direct Loan Program loan first disbursed on or after October 1, 2008 during periods while you are on qualifying active military duty in an area of hostilities where your service qualifies you for special pay (for up to 60 months).

**Interest capitalization**

If you do not pay the interest as it accrues on either a Direct Subsidized Loan or a Direct Unsubsidized Loan, we will add the accrued interest to the unpaid principal balance of your loan. This is called "capitalization." Capitalization increases the principal amount you owe on the loan and the total amount of interest you will pay. We capitalize unpaid interest when your grace period ends and when you start making payments again after periods of deferment or forbearance. We may also capitalize unpaid interest that has accrued since the first disbursement of a Direct Unsubsidized Loan when you enter repayment for the first time.

The chart below shows the difference in the total amount you would repay if you pay the interest as it accrues during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized at the end of the deferment or forbearance period. The example illustrated in the chart assumes the following—

- You owed $30,000 in Direct Unsubsidized Loans when your loans entered repayment at the end of the 6-month grace period;
- The interest rate on your loans is 6%;
- You are repaying your loans under the Standard Repayment Plan; and
- You received a 12-month deferment or forbearance that began on the day after your grace period ended.

|  | If you pay the interest as it accrues... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan principal amount owed at beginning of deferment or forbearance | $30,000 | $30,000 |
| Interest for 12 months at an annual interest rate of 6% | $1,800 (paid as accrued) | $1,800 (unpaid and capitalized) |
| Loan principal amount to be repaid at end of deferment or forbearance | $30,000 | $31,800 |
| Monthly payment | $333 | $353 |
| Number of payments | 120 | 120 |
| Total repaid | $41,767* | $42,365 |

*The total repaid includes $1,800 in interest that was repaid as it accrued during the 12-month deferment or forbearance period.

11/2019

ED_01553

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

In this example, you would pay $20 less per month and $598 less altogether if you pay the interest as it accrues during the 12-month deferment or forbearance period.

**Federal income tax deduction for student loan interest payments**

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, available at https://irs.gov/publications/p970.

**9. LOAN FEE**

For each Direct Subsidized Loan or Direct Unsubsidized Loan you receive under this MPN, we charge a loan fee that is a percentage of the amount you initially borrowed. The loan fee will be subtracted from each disbursement of your loan. This means that the actual disbursement amount you receive will be less than the disbursement amount you must repay. However, you are required to pay the full amount of the loan, including the amount that was taken for the loan fee.

The amount of the loan fee may be different for different loans you receive under the MPN, depending on when the loans are first disbursed. The specific loan fee you are charged will be shown on a disclosure statement that we will send to you.

**10. LATE CHARGES AND COLLECTION COSTS**

If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than 6% of each late payment. We may also require you to pay other charges and fees involved in collecting your loan.

**11. YOUR RIGHT TO CANCEL ALL OR PART OF A LOAN**

Before your loan money is disbursed, you may cancel all or part of your loan at any time by notifying your school. After your loan money is disbursed, there are two ways to cancel all or part of your loan:

- **Within certain timeframes you may notify your school that you want to cancel all or part of your loan.** The timeframes for notifying your school are different depending on whether your school requires you to confirm in writing the types and amounts of loans you want to receive. These timeframes range from 14 days to 30 days after your school notifies you of your right to cancel all or part of your loan. Your school will tell you the specific cancellation timeframe that applies to you. If you tell the school that you want to cancel all or part of your loan within the applicable timeframe, your school is required to process your cancellation request.

  If you ask your school to cancel all or part of your loan outside the applicable timeframe, your school may process your cancellation request, but it is not required to do so.

- **You may return all or part of your loan to us.** Within 120 days of the date your school disbursed your loan money, you may cancel all or part of your loan by returning all or part of the loan money to us. Contact your servicer for instructions on how and where to return your loan money.

You do not have to pay interest or the loan fee on the part of your loan that is cancelled or returned within the timeframes described above. We will adjust your loan amount to eliminate any interest and loan fee that applies to the amount of the loan that is cancelled or returned.

**12. HOW YOU WILL RECEIVE YOUR LOAN MONEY**

Generally, your school will disburse (pay out) your loan money in more than one installment. Each installment is called a disbursement.

If your school uses academic terms (for example, semesters or quarters), it will usually pay a loan disbursement at the beginning of each academic term.

If your school does not use academic terms or does not have academic terms that meet certain requirements, it will generally pay out your loan in at least two disbursements, one at the beginning of the period of study for which you are receiving the loan, and one at the midpoint of that period of study. Your school determines the schedule for disbursing your loan money in accordance with the Act.

In most cases, if the Direct Subsidized Loan or Direct Unsubsidized Loan that you are receiving is your first student loan under the Direct Loan Program, you must complete entrance counseling before your school can make the first disbursement of your loan. Your school will tell you if entrance counseling is required, and will provide instructions for completing entrance counseling.

Your school may disburse your loan money by crediting it to your account at the school, or may give some or all of it to you directly by check or other means. We will notify you in writing each time the school disburses part of your loan money.

If your school credits your loan money to your account and the amount credited is more than the amount of your tuition and fees, room and board, and other authorized charges, the excess amount is called a credit balance. Unless you authorize your school to hold the credit balance for you, your school must give you the credit balance within 14 days after the credit balance occurred or 14 days after classes began, whichever is later.

**13. USE OF YOUR LOAN MONEY**

You may use the loan money you receive only to pay for your authorized educational expenses for attendance at the school that determined you were eligible to receive the loan. Authorized expenses include the following:

- Tuition
- Room
- Board
- Institutional fees
- Books
- Supplies
- Equipment
- Dependent care expenses
- Transportation
- Commuting expenses
- Rental or purchase of a personal computer
- Loan fees
- Other documented, authorized costs

**14. INFORMATION YOU MUST REPORT TO US AFTER YOU RECEIVE YOUR LOAN**

You must notify your servicer and/or the financial aid office at your school about certain changes.

While you are still in school, you must notify your school's financial aid office if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Do not enroll at least half-time for the period of study that your loan is intended to pay for;
- Do not enroll at the school that determined you were eligible to receive your loan;
- Stop attending school or drop below half-time enrollment;
- Transfer from one school to another school; or

*11/2019*

ED_01554

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- Graduate.

At any time after you receive your loan, you must notify your servicer if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name); or
- Have any other change in status that would affect your loan (for example, if you receive a deferment while you are unemployed, but you find a job and therefore no longer meet the eligibility requirements for the deferment).

**15. GRACE PERIOD**

You do not need to begin making payments on your loan until 6 months after you stop attending school or drop below half-time enrollment. This 6-month period is called your grace period.

If you are a member of a reserve component of the U.S. Armed Forces and you are called to active duty for more than 30 days while you are enrolled in school on at least a half-time basis or during your grace period, the period of your active duty service and the time necessary for you to re-enroll in school after your active duty ends (up to a maximum of three years) are not counted as part of your grace period. We can provide more information about this benefit.

**16. REPAYING YOUR LOAN**

The repayment period for each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive begins on the day after your grace period ends. We will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice.

You must repay the principal amount of your loan, plus any interest charged on the loan in accordance with the Act. The principal amount that you owe, and are required to repay, is the total of all loan disbursements that are made (except for any disbursements that you reduce or cancel), plus any unpaid interest that is capitalized and added to the principal balance, as authorized under the Act.

You must generally repay all of your Direct Loans under the same repayment plan.

There are two types of repayment plans: traditional repayment plans and income-driven repayment plans. We will ask you to choose a repayment plan before your loans enter repayment. If you do not choose a repayment plan, we will place you on the Standard Repayment Plan, which may require you to make a higher monthly payment than other repayment plans.

If you choose a repayment plan that reduces your monthly payment amount by extending the period of time you have to repay your loans or by basing your payment on your income, you will likely pay more in interest over time than you would pay on another repayment plan.

**TRADITIONAL REPAYMENT PLANS**

Under a traditional repayment plan, your required monthly payment amount is based on the loan amount that you owe, the interest rate on your loans, and the length of the repayment period.

**Standard Repayment Plan**

Under the Standard Repayment Plan, you will make fixed monthly payments and repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your payments must be at least $50 a month, and will be more, if necessary, to repay the loan within the required time period.

**Graduated Repayment Plan**

Under the Graduated Repayment Plan, you will make lower payments at first, and your payments will gradually increase over time. You will repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your scheduled monthly payment must at least be equal to the amount of interest that accrues each month. No single scheduled payment will be more than three times greater than any other payment.

**Extended Repayment Plan**

You are eligible for the Extended Repayment Plan only if **(1)** you have an outstanding balance on Direct Loans that exceeds $30,000, and **(2)** you did not have an outstanding balance on a Direct Loan as of October 7, 1998 or on the date you obtained a Direct Loan on or after October 7, 1998.

Under this plan, you will repay your loan in full over a period not to exceed 25 years (not including periods of deferment or forbearance) from the date the loan entered repayment. You may choose to make fixed monthly payments or graduated monthly payments that start out lower and gradually increase over time. If you make fixed monthly payments, your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period. If you make graduated payments, your scheduled monthly payment must at least be equal to the amount of interest that accrues each month. No single scheduled payment under the graduated option will be more than three times greater than any other payment.

**INCOME DRIVEN REPAYMENT PLANS**

Under an income-driven repayment plan, your required monthly payment amount is based on your income and family size, instead of being based on your loan debt, interest rate, and repayment period, as under a traditional repayment plan. Changes in your income or family size will result in changes to your monthly payment amount. If you choose an income-driven plan, you must certify your family size and provide documentation of your income (and, if you are married, your spouse's income) each year so that we can recalculate your payment amount.

Your required monthly payment amount under an income-driven repayment plan is generally a percentage of your discretionary income. For all of the income-driven repayment plans except for the Income-Contingent Repayment Plan, discretionary income is defined as the difference between your adjusted gross income and 150% of the poverty guideline amount for your state of residence and family size, divided by 12. For the Income-Contingent Repayment Plan, discretionary income is defined as the difference between your adjusted gross income and the poverty guideline amount for your state of residence and family size, divided by 12.

**Revised Pay As You Earn Repayment Plan (REPAYE Plan)**

Under the REPAYE Plan, your monthly payment amount is generally 10% of your discretionary income.

If you are married, the income used to determine your REPAYE Plan payment amount will generally be the combined income of you and your spouse, regardless of whether you file a joint or separate federal income tax return. However, your payment amount will be reduced if your spouse also has federal student loans.

Under the REPAYE Plan, any remaining loan amount will be forgiven after you have made the equivalent of either 20 years of qualifying monthly payments over a period of at least 20 years (if all of the loans you are repaying under the plan were obtained for undergraduate study) or 25 years of qualifying payments over a period of at least 25 years (if any of the loans you are repaying under the plan were obtained for graduate or professional study). You may have to pay federal income tax on the loan amount that is forgiven.

*11/2019*

ED_01555

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

### Pay As You Earn Repayment Plan (PAYE Plan)

Under the PAYE Plan, your monthly payment amount is generally 10% of your discretionary income, but it will never be more than the Standard Repayment Plan amount.

If you are married and file a joint federal income tax return, the income used to determine your PAYE Plan payment amount will be the combined adjusted gross income of you and your spouse, but your payment amount will be reduced if your spouse also has federal student loans.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your PAYE Plan payment amount.

To initially qualify for the PAYE Plan, the monthly amount you would be required to pay under this plan, based on your income and family size, must be less than the amount you would have to pay under the Standard Repayment Plan.

Under the PAYE Plan, if your loan is not repaid in full after you have made the equivalent of 20 years of qualifying monthly payments over a period of at least 20 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Income-Based Repayment Plan (IBR Plan)

Under the IBR Plan, your monthly payment amount is generally 15% of your discretionary income, but it will never be more than the Standard Repayment Plan amount.

If you are married and file a joint federal income tax return, the income used to determine your IBR Plan payment amount will be the combined adjusted gross income of you and your spouse, but your payment amount will be reduced if your spouse also has federal student loans.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your IBR Plan payment amount.

To initially qualify for the IBR Plan, the monthly amount you would be required to pay under this plan, based on your income and family size, must be less than the amount you would have to pay under the Standard Repayment Plan.

Under the IBR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments over a period of at least 25 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Income Contingent Repayment Plan (ICR Plan)

Under the ICR Plan, your monthly payment amount will be **the lesser of** —

- 20% of your discretionary income, or
- A percentage of what you would repay under a Standard Repayment Plan with a 12-year repayment period.

If you are married and file a joint federal income tax return, the income used to determine your ICR Plan payment amount will be the combined adjusted gross income of you and your spouse.

If you are married and file a separate federal income tax return from your spouse, only your individual adjusted gross income will be used to determine your ICR Plan payment amount.

Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that accrues monthly on your loan unless you request a forbearance.

Under the ICR Plan, if your loan is not repaid in full after you have made the equivalent of 25 years of qualifying monthly payments over a period of at least 25 years, any remaining loan amount will be forgiven. You may have to pay federal income tax on the loan amount that is forgiven.

### Additional repayment information

Under each plan, the number or amount of payments may need to be adjusted to reflect capitalized interest and/or new loans made to you. We may also adjust payment dates on your loans or may grant you a forbearance (see BRR Item 20) to eliminate a past delinquency that remains even though you are making your scheduled monthly payments.

If you can show to our satisfaction that the terms and conditions of the repayment plans described above are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

You can use the Loan Simulator at StudentAid.gov/Loan-Simulator to evaluate your eligibility for the PAYE and IBR plans and to estimate your monthly and total payment amounts under all of the repayment plans. The Loan Simulator is for informational purposes only. We will make the official determination of your eligibility and payment amount.

Generally, you may change from your current repayment plan to any other repayment plan you qualify for at any time after you have begun repaying your loan.

Unless you are required to pay late charges or collection costs, when you make a payment on your loan, we apply the payment first to outstanding interest. If the payment amount is more than the amount of outstanding interest, we apply the remainder of your payment to your loan principal.

If you are required to pay late charges or collection costs, we apply your payment differently depending on your repayment plan. If you are repaying under a traditional repayment plan or the ICR Plan, we apply your payment first to late charges and collection costs, then to outstanding interest, and then to loan principal. If you are repaying under any income-driven repayment plan other than the ICR Plan, we apply your payment first to outstanding interest, then to late charges and collection costs, and then to loan principal.

You can prepay your loans (that is, make loan payments before they are due, or pay more than the amount due in a month) at any time without penalty. We apply any prepayments in accordance with the Act. Your servicer can provide more information about how prepayments are applied.

When you have repaid a loan in full, your servicer will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

### 17. DEFAULTING ON YOUR LOAN

Default (failing to repay your loan) is defined in detail in the Terms and Conditions section of your MPN. If you default:

- We will require you to immediately repay the entire unpaid amount of your loan (this is called "acceleration").
- We may sue you, take all or part of your federal and state tax refunds and other federal or state payments as authorized by law, and/or administratively garnish your wages so that your employer is required to send us part of your salary to pay off your loan.
- You will have to pay reasonable collection fees and costs, plus court costs and attorney fees in addition to the amount of your loan.
- You will lose eligibility for other federal student financial aid and for assistance under most federal benefit programs.
- You will lose eligibility for loan deferments, forbearances, and repayment plans.

*11/2019*

ED_01556

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

- We will report your default to nationwide consumer reporting agencies (see BRR Item 19). This will harm your credit history and may make it difficult for you to obtain credit cards, home or car loans, or other forms of consumer credit.

If you default on your loan, you will not be charged collection costs if you respond within 60 days to the initial notice of default that we send to you, and you enter into a repayment agreement with us, including a loan rehabilitation agreement, and fulfill that agreement.

**18. CONDITIONS WHEN WE MAY REQUIRE YOU TO IMMEDIATELY REPAY THE FULL AMOUNT OF YOUR LOAN**

We may require you to immediately repay the entire unpaid amount of your loan (this is called "acceleration") if you:

- Receive loan money, but do not begin attendance in any classes at the school that determined you were eligible to receive the loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;
- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan (see BRR Item 17).

**19. INFORMATION WE REPORT ABOUT YOUR LOAN**

We will report information about your loan to nationwide consumer reporting agencies (commonly known as "credit bureaus") and to the National Student Loan Data System (NSLDS) on a regular basis. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). The information in NSLDS will also identify the servicer of your loan. Your loan will be identified as an education loan. Schools may access information in NSLDS for specific purposes that we authorize.

If you default on a loan, we will report this to nationwide consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days of the date of the notice. You will be given a chance to ask for a review of the debt before we report a default.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the agency with a prompt response. We respond to objections submitted to consumer reporting agencies using the methods established by those agencies.

**20. DEFERMENT AND FORBEARANCE (POSTPONING PAYMENTS)**

**General**

If you meet certain requirements, you may receive a **deferment** that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a **forbearance**. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You may receive a deferment:

- While you are enrolled at least half-time at an eligible school;
- While you are in a full-time course of study in a graduate fellowship program;
- While you are in an approved full-time rehabilitation program for individuals with disabilities;

- While you are unemployed and seeking work (for a maximum of three years);
- While you are experiencing an economic hardship, including serving in the Peace Corps (for a maximum of three years);
- While you are serving on active duty or performing qualifying National Guard duty during a war or other military operation or national emergency and for an additional 180-day period following the demobilization date for your qualifying service;
- For a maximum of 13 months following your active duty service, if you are a current or retired member of the National Guard or reserve component of the U.S. Armed Forces and you are called or ordered to active duty while you are enrolled at least half-time at an eligible school or during your grace period; or
- For Direct Loans that were first disbursed on or after September 28, 2018, or for Direct Loans first disbursed before that date that entered repayment on or before September 28, 2018, while you are receiving treatment for cancer and for an additional 6 months after your treatment has ended.

In most cases, you will automatically receive a deferment based on your enrollment in school on at least a half-time basis based on information that we receive from the school you are attending.

If we process a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active duty military service or National Guard duty, a representative acting on your behalf) must submit a deferment request to your servicer, along with documentation of your eligibility for the deferment.

**Forbearance**

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

You may also receive a forbearance if:

- You are serving in a qualifying medical or dental internship or residency program;
- The total amount you owe each month for all of your federal student loans is 20% or more of your total monthly gross income (for a maximum of three years);
- You are serving in an AmeriCorps position;
- You are performing service that would qualify you for loan forgiveness under the Teacher Loan Forgiveness program (see BRR Item 21);
- You qualify for partial repayment of your loans under a student loan repayment program administered by the Department of Defense; or
- You are called to active duty in the U.S. Armed Forces.

To request a forbearance, contact your servicer.

Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation (for example, while we are determining your eligibility for a loan discharge, or during periods when you are affected by a local or national emergency).

**21. DISCHARGE (HAVING YOUR LOAN FORGIVEN)**

**General**

If you meet certain conditions as described below, we may discharge (forgive) some or all of your loans.

For a discharge based on your death, a family member must contact your servicer. To request a loan discharge based on one of the other conditions

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

**William D. Ford Federal Direct Loan Program**
**Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement**

described below (except for a discharge due to bankruptcy), you must complete a loan discharge or forgiveness application and send it to your servicer. Your servicer can tell you how to apply.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You cannot have your loan discharged solely because you do not complete the education paid for with your loan, are unable to obtain employment in the field of study for which your school provided training, or are dissatisfied with, or do not receive, the education you paid for with your loan.

**Death, total and permanent disability, and bankruptcy**

We will discharge (forgive) your loan if:

- You die. We must receive acceptable documentation (as defined in the Act) of your death;
- You become totally and permanently disabled; or
- Your loan is discharged in bankruptcy after you have proven to the bankruptcy court that repaying the loan would cause undue hardship.

**School closure, false certification, identity theft, and unpaid refund**

We may also discharge all or a portion of your loan if:

- You could not complete a program of study because your school closed;
- Your loan eligibility was falsely certified by the school;
- A loan in your name was falsely certified as a result of a crime of identity theft; or
- The school did not pay a refund of your loan money that it was required to pay under the Act.

**Teacher Loan Forgiveness**

We may forgive a portion of eligible student loans you received under the Direct Loan Program if you teach full time for five consecutive years in certain low-income elementary or secondary schools, or for certain low-income educational service agencies, and meet certain other qualifications.

Eligible teachers of math, science, or special education may receive up to $17,500 in loan forgiveness. Other teachers may receive up to $5,000 in loan forgiveness.

**Public Service Loan Forgiveness**

A Public Service Loan Forgiveness (PSLF) program is also available. Under this program, we will forgive the remaining balance due on your Direct Loans after you have made 120 payments (after October 1, 2007) on those loans under certain repayment plans while you are employed full-time by a qualifying employer. The required 120 payments do not have to be consecutive. Qualifying repayment plans include the REPAYE Plan, the PAYE Plan, the IBR Plan, the ICR Plan, and the Standard Repayment Plan with a 10-year repayment period.

**Note:** Although the Standard Repayment Plan with a 10-year repayment period is a qualifying repayment plan for PSLF, to receive any loan forgiveness under this program you must enter the REPAYE Plan, the PAYE Plan, the IBR Plan, or the ICR Plan, and make the majority of the 120 payments under one of those plans.

**Borrower defense to repayment**

We may discharge all or a portion of your loan if your school did something or failed to do something related to your loan or to the educational services that the loan was intended to pay for.

The specific requirements to qualify for a borrower defense to repayment discharge vary depending on when you received your loan. Contact your servicer for more information.

**22. LOAN CONSOLIDATION**

A Direct Consolidation Loan Program is available that allows you to combine one or more of your eligible federal education loans into a new loan with a single monthly payment, and may allow you to extend the period of time that you have to repay your loans. This may make it easier for you to repay your loans.

If you have loans that were made under the FFEL Program, consolidating those loans into the Direct Loan Program can make them eligible for benefits that are only available for Direct Loans, such as Public Service Loan Forgiveness and certain repayment plans.

Although consolidation can provide certain benefits, it can also cause you to lose benefits on the loans that you consolidate. Contact your servicer for more information about loan consolidation and for help determining whether consolidation is a good option for you.

**END OF BORROWER'S RIGHTS AND RESPONSIBILITIES STATEMENT**

11/2019

ED_01558

OMB No. 1845-0007
Form Approved
Exp. Date 07/31/2022

# INSTRUCTIONS
## MASTER PROMISSORY NOTE FOR DIRECT SUBSIDIZED LOANS AND DIRECT UNSUBSIDIZED LOANS

### GENERAL INSTRUCTIONS AND INFORMATION

Type or print using blue or black ink. Do not use pencil. Enter all dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: January 31, 2019 = 01-31-2019.

Throughout the Master Promissory Note (MPN) and the accompanying Borrower's Rights and Responsibilities Statement (BRR), the words "we," "us," "our," and "ED" refer to the U.S. Department of Education and our servicers.

### BORROWER INFORMATION

**Note:** Some of the items in this section may have been completed for you. If so, review these items carefully to make sure that the information is correct. Cross out any information that is incorrect and enter the correct information. Put your initials next to any information that you change.

**Item 1.** Enter your first name, then your middle initial and last name. Enter your **permanent address** (number, street, apartment number, or rural route number and box number, then city, state, zip code). If your mailing address is different from your permanent address, you must list **both** addresses. A temporary school address is not acceptable.

**Item 2.** Enter your nine-digit Social Security Number.

**Item 3.** Enter your date of birth.

**Item 4.** Enter the two-letter abbreviation for the state that issued your current driver's license, followed by your driver's license number. If you do not have a driver's license, enter N/A.

**Item 5.** Enter your preferred email address for receiving communications. You are not required to provide this information. If you do, we may use your email address to communicate with you. If you do not have an email address or do not wish to provide one, enter N/A.

**Item 6.** Enter the area code and telephone number at which you can most easily be reached. If you do not have a telephone, enter N/A.

### REFERENCE INFORMATION

**Items 7 and 8.** Enter the requested information for two adults with different U.S. addresses who have known you for at least three years and who will be able to help us contact you in the future if we are unable to reach you. References are used only for this purpose and are never required to repay your loan. The first reference should be a parent or legal guardian. References who live outside the United States are not acceptable. Providing an email address for a reference is optional. If you provide an email address for a reference, we may use it to communicate with the reference. If a reference does not have a telephone number or email address, or does not wish to provide an email address, enter N/A.

### SCHOOL INFORMATION

This section will be completed by the school that determines your eligibility to receive the loan.

### BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS

**Top of Page 2.** Enter your name and Social Security Number.

**Items 12, 13, 14, and 15.** Read these items carefully.

### PROMISES

**Items 16, 17, 18, and 19.** Read these items carefully.

**Items 20 and 21.** Sign your full legal name, in blue or black ink, and enter the date you signed this MPN.

By signing this MPN, you **(1)** acknowledge that you have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understandings and the accompanying BRR; and **(2)** agree to repay in full all loans made under this MPN according to the terms and conditions of the MPN.

*11/2019*

ED_01559

OCE Working Paper – OCE2024-008

# U.S. Department of Education

# Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?



## Office of the Chief Economist

Julia Turner, Kathryn Blanchard, and Rajeev Darolia

January 2025

The OCE Working Papers Series presents original research by staff in the Office of the Chief Economist. This paper is intended to promote the exchange of ideas among researchers and policy makers and contains resources that are provided for the reader's convenience. The inclusion of these materials is not intended to reflect its importance, nor is it intended to endorse any views expressed or products or services offered. These materials may contain the views and recommendations of various subject matter experts as well as hypertext links, contact addresses, and websites to information created and maintained by other public and private organizations. The views and opinions expressed in the papers are entirely those of the authors and do not necessarily reflect the positions or policy of the US Department of Education. Authors accept responsibility for errors. The U.S. Department of Education does not control or guarantee the accuracy, relevance, timeliness, or completeness of any outside information included in these materials. OCE Working Papers are often preliminary and subject to revision and are intended to engender constructive feedback and discussion. Comments and suggestions for improvement are welcome and should be directed to the authors. OCE Working Papers may be quoted with attribution but without additional permission.

# OCE Working Paper – OCE2024-008

Established by Congress in 2007, the Public Service Loan Forgiveness program was designed with a straightforward premise: those who dedicated themselves to public service—in this case 10 years of full-time work for a qualifying employer—while staying on-track with their student loan payments would have their remaining student loan balance forgiven. Since public sector workers often face lower wages than their similarly trained colleagues in private sector jobs, PSLF could provide an incentive to enter or continue in public service careers.

In this report, we explore which public sectors are most commonly represented among individuals who have benefitted, or are on track to benefit, from the PSLF program. Specifically, we present new data detailing which sectors borrowers have most commonly worked in to be eligible for PSLF. We show that the most common sector among those who have received forgiveness through PSLF is education, representing 43% of all employers associated with the program. The majority of these employers in the education sector are K-12 education systems, representing 28% of all employer occurrences in the data. Other common employer subsectors among borrowers who have received PSLF are state and local governments and healthcare organizations. Among the most frequent individual employers are those related to military service including the Department of Defense, Department of Veterans Affairs, and the branches of the U.S. military.

**Program Details**

The PSLF program requires borrowers to make 120 qualifying monthly payments on their Direct federal student loans while working full-time for an eligible employer. Eligible employers can include government organizations, 501(c)(3) nonprofits, and certain other nonprofit organizations that provide qualifying public services.[1] To pursue PSLF, the borrower must go through an employment verification process. Borrowers are encouraged but not required to submit the PSLF Employment Certification Form annually, which requires both the borrower's information and certification on the part of the employer. Importantly, employment need not be continuous to be counted toward PSLF eligibility; borrowers can move between qualifying employers or take breaks in employment.[2]

Significant changes have streamlined these requirements and processes. Through a one-time Limited PSLF waiver[3] and subsequent permanent adjustments ([Department of Education, 2022](#)), borrowers received credit for past payments that would not have previously counted toward their eligibility, including payments made under non-IDR plans. Documentation requirements are also simpler, with a single combined form for both employment certification and forgiveness application replacing the separate forms previously required.[4] Recently, data-sharing agreements have also been proposed across

---

[1] To meet eligibility requirements, borrowers must work at least 30 hours per week and make payments under an income-driven repayment plan, a 10-year Standard Repayment Plan, or the equivalent of a 10-year Standard Repayment Plan. Only Direct Loans are eligible for PSLF; other federally held loans such as FFEL or Perkins must first be consolidated into a Direct Consolidated Loan to be eligible.

[2] The Department encourages borrowers to submit this form annually, or at least whenever changing employers to maintain current records. Payments made during non-qualifying employment periods will not count towards the required 120 payments.

[3] The PSLF limited waiver allowed borrowers to receive credit towards PSLF for past periods of repayment that wouldn't normally qualify, including payments made on non-Direct federal loans, payments made under any repayment plan, and payments made on loans before consolidation (among others) (see [Department of Education, 2021](#)).

[4] The combined form was released in November 2020.

OCE Working Paper – OCE2024-008

the Federal government to automatically identify qualifying federal employees and military service members, reducing the burden of documentation for many.[5]

The program faced initial challenges, however, with low approval rates that persisted until recently. Key obstacles included borrower confusion around qualifying employers and eligible payment plans and loan types, and complex paperwork requirements that led to high rates of technical rejection. Since 2021, several administrative fixes to the PSLF program have substantially increased the number of borrowers who had met eligibility requirements to receive forgiveness, many of whom have had long careers in public service that span well beyond the 10-year requirement for PSLF.

In Figure 1, we show the cumulative PSLF forgiveness since 2021. Prior to January 2021, roughly 7,000 borrowers had received PSLF forgiveness. In November of 2024, the Department of Education granted PSLF forgiveness to its millionth borrower.

**Figure 1. Cumulative Public Service Loan Forgiveness**



**Notes**: Figure shows cumulative public service loan forgiveness posted between January 1, 2021, and November 1, 2024. Total forgiveness is given in billions of dollars. Data come from Federal Student Aid.

**Employment Sectors of PSLF-Eligible Borrowers**

The PSLF program aims to support individuals working in public service careers, including in federal, state, and local governments as well as nonprofit organizations serving their communities. Below we present data on the types of industries in which PSLF-eligible employees have worked and reported to the Department.

---

[5] Examples include agreements with the Department of Defense as well as the Office of Personnel Management. See Federal Register, Vol 87, No 73 (DoD) and Federal Register, Vol 88, No. 158 (OPM).

ED_01562

OCE Working Paper – OCE2024-008

Our data capture all eligible employers listed on an employer certification form or otherwise verified as eligible for PSLF forgiveness since 2018.[6] As individual borrowers can list multiple employers toward PSLF eligibility *and* are encouraged to re-certify the same employer annually, we report results for what we term "employer occurrences." Specifically, we adjust the data such that each borrower can be associated with multiple employers, but that each employer only appears once in an individual borrower's record.[7]

In what follows, we present results for two groups of borrowers: those who have already received forgiveness as of November 1, 2024, and those who have certified their employment at least once but have not received forgiveness by November 1, 2024. The latter group includes those who could eventually qualify for PSLF based on record of an existing spell of eligible employment.[8]

We first group employers into three broad sectors: education, government, and nonprofits, and then within those subsectors we classify employers into subsectors. There is no data element that cleanly identifies the sector and subsector of employers. Therefore, for the purposes of this analysis, we categorize employers primarily through a taxonomy of keyword searches based on the employers' recorded organization name. We built this taxonomy based on commonly observed naming practices in the data. In addition, we used data from a small share of employers who self-identify as a government organization; these cases are always counted in the government sector, and we then use keyword searches to identify subsectors. Not all government employers self-identify, so for those who do not, we identify them using keyword searches for employer names such as "City of X" or "State of Y", which are commonly reported state and local government organization names. We rely solely on keywords to identify Education sector employers. For example, employer strings that contain "University" or "School District" are categorized in the education sector. The education sector includes public education systems (for example, school districts) and nonprofits (for example, non-profit, private universities) where they could be identified.[9] All other employers that are not government employers and do not include education-related strings are categorized as nonprofits. Where possible, we then further categorize into specific subsectors: K-12 and higher education within the education sector, healthcare within the nonprofit sector, and local, state, federal, and military within the government sector. We again rely on employer strings to make these distinctions.[10] See Appendix Table 1 for an example of employer names and their categorization processes.

---

[6] 2018 marks the implementation of the Department of Education's employer database. Before this year, borrowers and employers were able to certify employment through a servicer-specific process.

[7] To demonstrate our use of the borrower occurrences measure, take the following example: A borrower spends 3 years working in Cincinnati Public Schools, then moves to spend 2 years working in Dayton Public Schools before returning to Cincinnati Public Schools for 5 more years. We code this borrower as having two Education-related employer occurrences–with Cincinnati Public Schools and Dayton Public Schools–despite working for Cincinnati Public Schools for two different periods. The average borrower who has received forgiveness in our sample is associated with 1.8 employers. We are missing employer data for about 190,000 of those forgiven under the PSLF waiver.

[8] These are most often individuals who—at some point in their career—have submitted an employment verification for a qualifying employer and thus appear in our data.  It is likely that many of these borrowers will not perform public service work for the required amount of time to receive PSLF.

[9] While the names of the organizations may indicate the sector, the Department of Education does not collect data on borrower's roles or capacities. Education sector employment can encompass roles beyond teachers.

[10] Note that employers that have conflicting subsector categorizations after an initial keyword search are considered individually or moved to the "not classified" subsector. We implemented multiple rounds of keyword searching, drawing and testing keywords from the remaining uncategorized group and spot-checking for reasonable categorization after each iteration.

OCE Working Paper – OCE2024-008

In Figure 2, we show employer occurrences broken into our three major sectors: Education, Government, and Nonprofits. Education is the most common sector among borrowers who have received forgiveness, representing with over 600,000 Education-related employer occurrences or 43% of the sample.[11] It is likely this number is an underestimate and an even larger share of borrowers work in education given inconsistencies in the way that employers are categorized across locations. For example, in New York City, public school teachers are reported as working for "the City of New York" instead of New York City Public Schools. Additionally, education-related nonprofits that do not directly reference education in the name of the employer, such as City Year or the YMCA, are categorized under non-profits.

We also find that among those borrowers who have not received forgiveness, non-profits are the most common sector: over 2.5 million employer occurrences are associated with a non-profit employer which represents 42% of the sample.

### Figure 2. PSLF Employment Types by Forgiveness Status
*Total PSLF employment spells*



**Notes:** Plot represents the number of times a type of employer appears in PSLF employment verification data. Each employer appears only once per individual. Data are from the Department of Education as of Dec 1, 2024.

We next present data on more specific employer subsectors within the three major employer sectors borrowers who have already received forgiveness in Figure 3. We find that K-12 schools are the most common subsector, comprising 28% of all employer occurrences. Institutions of higher education and healthcare nonprofits represent the second and third most common subsectors at 15% and 12%, respectively.

---

[11] Note that this report does not take into account forgiveness received through the Teacher Loan Forgiveness (TLF) program, which offers up to $17,500 in student loan forgiveness to eligible teachers who work full-time for five consecutive years at a qualifying school or educational service agency. Borrowers cannot receive credit toward TLF and PSLF for the same period of service. In FY2020, approximately 32,700 teachers received forgiveness with an average balance discharged of nearly $10,000 (Department of Education, 2022).

OCE Working Paper – OCE2024-008

The nonprofits group is the most difficult to identify subsectors within, as many of these organizations have non-descriptive names. We can identify, however, that 12% of borrowers receiving PSLF forgiveness report having worked in a healthcare-related non-profit. Common examples of healthcare nonprofits include hospitals and not-for-profit elder-care facilities as well as community health clinics.[12] Similarly, the breakdown of the "government" group shows that state and local government employers make up the majority (nearly 70%) of employer occurrences in the government sector. Non-military federal government employers make up less than 1% of employer occurrences, although recent actions to streamline PSLF eligibility across the Federal government has the potential to smooth the path to forgiveness for this group.

One type of employer whose employees commonly benefit from PSLF are U.S. military branches.[13] Employers such as the U.S. Army, Navy, Air Force, and Marines occur nearly 3 times as often as other federal employers in our data, and the U.S. Army and Air Force employers are among the largest single employers for those borrowers who have received forgiveness through PSLF. Although any single employer makes up only a small share of total employer occurrences, the largest single employers tend to be federal agencies such as the Department of Veterans Affairs and the Department of Defense, which together are associated with roughly 23,000 borrowers who received PSLF forgiveness.[14]

---

[12] Healthcare-related nonprofits and other specific categories listed in Figure 3 were identified using the same keyword search method as described above. In the case of overlapping categories such as a Veteran's Affairs Hospital that could count as both Federal and Healthcare, we aimed to let the more descriptive subsector dominate (i.e., Veterans Affairs Hospital would be counted in the healthcare category.) Beyond common cases such as this one, conflicting categorizations are moved to the "not classified" subsector.

[13] In Figure 3 below, we also include state-based national guard employment occurrences in the military category. Military service can include civilian service, active military service, and reserve military service.

[14] Some of this commonality of federal employers can be attributed to common naming practices. Employer certification is more likely to be uniform across federal agencies and sources than at the state or local level. States and cities that have common naming practices, such as the City and State of New York, appear in the top employer list, and even though we do some data cleaning to standardize names, it's possible that we systematically undercount employers who more commonly exhibit slight variation in naming practices (for example, City of Chicago Public Schools versus CPS may be counted separately). Note however that given the size of the military employers, they are likely to represent several of the largest single employers regardless of data cleaning.

OCE Working Paper – OCE2024-008

**Figure 3. Total PSLF Employment Types Among PSLF Forgiveness Recipients**



**Notes**: Plot represents the number of times a type of employer appears in PSLF employment verification data for borrowers who have recieved PSLF forgiveness. Each employer appears only once per individual, but each individual can have multiple employers associated with their forgiveness record (if, for example, the individual worked in more than one public service position.) Data are from the Department of Education as of December 1, 2024.

| Table 1. Share of Employer Occurrences by Subsector | Occurrences (1) | Share (2) |
|---|---|---|
| K12 Education | 418,650 | 28% |
| Higher Education | 222,194 | 15% |
| Healthcare | 179,105 | 12% |
| Local Government | 137,907 | 9% |
| State Government | 141,018 | 9% |
| Military | 46,809 | 3% |
| Federal Government | 17,776 | 1% |
| Nonprofit (Not Classified) | 257,561 | 17% |
| Government (Not Classified) | 71,943 | 5% |

**Notes**: Table shows the number of times a subsector appears in PSLF employment verification data for borrowers who have received PSLF forgiveness. Each employer appears only once per individual, but each individual can have multiple employers associated with their forgiveness record. Data are from the Department of Education as of December 1, 2024.

In Figure 3, we show that roughly 43% of the employer occurrences among borrowers who have received forgiveness are associated with the Education sector; accordingly, 41% of borrowers who have received forgiveness have at some point been employed in the education sector.

OCE Working Paper – OCE2024-008

**Case Study - Texas**

Because of differences in naming conventions across states, we narrow-in on borrowers in a single state to better understand the composition of employers whose employees benefit from PSLF. We use Texas in this example because the naming of government entities at the state and local levels are relative consistent for this state. The same keyword identification strategy is used to categorize employers in this example. Texas provides a large, relatively representative sample of forgiven borrowers. It should not be used to generalize to the national population, but instead seen as a case study for the given exercise. In Table 1, we report the occurrences across subsectors for borrowers who lived in Texas at the time of their forgiveness. The majority of PSLF recipients in Texas have, at some point, worked in education (55% of total employer occurrences are in Education). As we saw above, there are a large share of employers who are "uncategorized" or "general," either because they are a general local, state, or federal government employer (i.e., the City of San Antonio), or because they are a non-profit whose function is not immediately obvious from the employer's name (i.e., Safe Haven).[15] Table 1 presents examples of each category to better understand the subsectors included.

Other industries like Philanthropy and the Arts or Law Enforcement and Fire and Rescue account are also represented. Having more transparent and accessible ways of identifying employers that could be PSLF qualifying is one potential way to improve take up of PSLF.

---

[15] One potential way to improve this process in the future would be to match employer names or identification numbers with data that identify the associated industry (NAICS code). This type of data is collected in tax records and survey data such as the Quarterly Census of Employment and Wages (QCEW) but is not currently publicly available.

OCE Working Paper – OCE2024-008

**Table 1. Employer Subsectors Among Forgiven Borrowers Living in Texas at Time of Forgiveness**

|  | Employer Spells (1) | Share of Total (2) |
|---|---|---|
| K-12 Education | 28,266 | 38.9% |
| *Roanoke City Public Schools, Plano Independent School District* | | |
| Higher Education | 11,724 | 16.1% |
| *Amarillo Community College, University of Texas at El Paso* | | |
| Uncategorized Government | 9,815 | 13.5% |
| *City of San Antonio, Texas Workforce Commission, Atascosa County* | | |
| Healthcare | 7,508 | 10.3% |
| *Memorial Hermann Health System, East Texas Medical Center* | | |
| Uncategorized Nonprofits | 5,074 | 7.0% |
| *LifeSteps Texas, Mas Cultura, Safe Haven* | | |
| Social Services | 2,619 | 3.6% |
| *Galveston Children's Museum, Frisco Family Services Center, Benbrook Library* | | |
| Law Enforcement, Fire and Rescue, and Legal | 2,508 | 3.5% |
| *Houston Police Department, Texas Department of Public Safety, Dallas Fire and Rescue* | | |
| Military | 2,340 | 3.2% |
| *U.S. Army, U.S. Navy, U.S. Air Force* | | |
| Religious Non-Profits | 968 | 1.3% |
| *Archdiocese of San Antonio, Lakewood Church, Shalom Austin* | | |
| Housing, Utilities, and Infrastructure | 713 | 1.0% |
| *Dallas Area Rapid Transit, Corpus Christi Housing Authority, San Antonio Water System* | | |
| Research and Science | 562 | 0.8% |
| *Texas Cardiac Arrythmia Research Foundation, National Science Foundation* | | |
| Philanthropy and the Arts | 598 | 0.8% |
| *Dallas Museum of Art, Greater Austin Performing Arts Center, Texas Trees Foundation* | | |
| Total | 72,695 | |

**Notes**: Table shows employer subsectors using broad classifications for borrowers from Texas. Employer occurrence counts capture any employment verification with a given employer subsector. Employers are counted only once per borrower. Borrowers can be associated with multiple employers. Examples represent illustrative cases from each category.

**Conclusion**

Bringing data to questions of what types of borrowers are receiving forgiveness is an important and still largely unexplored task. PSLF especially serves a unique subset of borrowers who have dedicated 10 years or more to public service. This report highlights the success of PSLF thus far in awarding forgiveness to a broad range of public service workers, especially those who serve their communities through education. The prevalence of K-12 employers among PSLF forgiveness recipients highlights that PSLF is supporting borrowers who face high education requirements and less-competitive wages than their private-sector peers. Beyond education, these borrowers also serve in local, state, and federal

OCE Working Paper – OCE2024-008

government roles, as health care workers, as first responders, and in smaller sectors such as social services and the arts. PSLF operates to ensure that the decision to serve others through public-sector work is not overshadowed by the burden of loans.

While this report advances new information about PSLF, the coarse groupings used to describe the borrowers in this report still mask significant heterogeneity in the roles of PSLF-eligible employers and the roles of their employees. Future work from the Department hopes to further clean and categorize the function of these employers in service of understanding the important work of PSLF recipients as well as encouraging equal take-up and access to the program across sectors, industries, and geographies.

Efforts to automatically identify PSLF-eligible borrowers using tax return and other administrative data are promising in their ability to encourage take-up of the program and accelerate borrowers' path to forgiveness by ensuring borrowers are meeting administrative requirements. State and local governments can model the administrative data matching efforts proposed across federal government agencies and work with local nonprofits using business-level administrative data to identify eligible 501(c)3 or other eligible employers.

*Acknowledgements: We are grateful to Matthew Kraft, Council of Economic Advisors, who made important contributions to this work.*

OCE Working Paper – OCE2024-008

**Appendix Table 1. Keyword Categorization Examples**

| Employer Example | Self-Identified Government? | Keyword Found | Sector : Subsector |
|---|---|---|---|
| State of California | Yes | "State of" | Government : State Government |
| City of Caddo Valley | Yes | "City of" | Government : Local Government |
| Town of Stockton Springs | No | "Town of" | Government : Local Government |
| Houston County Health Department | Yes | "Health" | Government : Healthcare |
| Ephrata Community Hospital | No | "Hospital" | Non-Profit : Healthcare |
| Shasta College | No | "College" | Education : Higher Education |
| Attala County School District | Yes | "Schools" | Education : K-12 Education |
| U.S. Army | Yes | "U.S. Army" | Government : Military |
| U.S. Department of Agriculture | No | "U.S. Department of" | Government : Federal Government |
| Panhandle Support | No | -- | Nonprofit : Not Classified |
| Burke Center | No | -- | Nonprofit : Not Classified |

**Notes**: Table gives examples of the categorization process in the order in which it occurs. We first sort on the self-identified government variable. We then use a keyword search to identify sector and subsector. Conflicting or otherwise complicated cases are considered on an individual basis or categorized as "not classified."

ED_01570

## PSLF Final Rule Footnotes

1. Preston Cooper & Alexander Holt, *Turn Public Service Loan Forgiveness into a State Block Grant,* Ctr. on Opportunity and Soc. Mobility: AEIdeas (Apr. 17, 2025), *https://cosm.aei.org/turn-public-service-loan-forgiveness-into-a-state-block-grant/*.

2. Kaitlin Mulhere, *It Just Got a Lot Easier to Qualify for Public Service Loan Forgiveness,* Money (Oct. 6, 2024), *https://money.com/public-service-loan-forgiveness-changes-waiver/*.

3. National Legal Aid & Defender Association (NLADA), Public Service Loan Forgiveness and the Justice System (Mar. 2025), *https://www.nlada.org/pslf-and-justice*.

4. *Bob Jones University* is frequently invoked when discussing the so-called "public policy doctrine," under which an organization's Section 501(c)(3) tax-exempt status may be revoked for engaging in conduct that is not specifically illegal. This occurs where there "can be no doubt that the activity involved is contrary to a fundamental public policy." *Bob Jones Univ.,* 461 U.S. at 592. In *Bob Jones University,* the Court determined that this standard was met, because the organizations' actions ( *i.e.,* the maintenance of racially discriminatory admissions policies) ran contrary to "every pronouncement of this Court and myriad Acts of Congress and Executive Orders." *Id.* at 593. Although the public policy doctrine is similar to (and often discussed alongside) the illegality doctrine, the evidentiary bar set in *Bob Jones University* is different and applicable when revocation of an organization's tax-exempt status is based on conduct which is not explicitly illegal. *Id.* at 591 ("A corollary to the public benefit principle is the requirement, long recognized in the law of trusts, that the purpose of a charitable trust may not be illegal or *violate established public policy.*") ( *emphasis added*). By contrast, the bar for revoking an organization's Section 501(c)(3) tax-exempt status for engaging in or encouraging illegal activity is different, because actions that violate laws are inherently contrary to public policy in that the political branches (legislative and executive branches through bicameralism and presentment) have created positive law to counter the conduct at issue. *See I.R.S. Gen. Couns. Mem.* 34631 (Oct. 4, 1971) ( *citing I.R.S. Gen. Couns. Mem.* 31376 (Aug. 14, 1959)).

5. FY25 Department of Education Justifications of Appropriation Estimates to the Congress, Volume II, Student Loans Overview, page 9.

6. The Department understands and acknowledges that IRS General Counsel Memoranda ("GCMs") do not represent binding precedent. However, because GCMs demonstrate the way the IRS approached a discrete situation, they include persuasive legal analysis which

may be applicable in analogous situations. The GCMs cited within this final rule are cited only as examples that the Department looked to while crafting this rule.

7. Master Promissory Note (MPN) Direct Subsidized Loans and Direct Unsubsidized Loans William D. Ford Federal Direct Loan Program, OMB No. 1845-0007 (retrieved Oct. 22, 2025), available at *https://studentaid.gov/mpn/subunsub/preview*.

8. Turner, J., Blanchard, K., & Darolia, R. (2025, January). *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?* NEA. *https://www.nea.org/sites/default/files/2025-03/where-do-borrowers-who-benefit-from-pslf-work.pdf*.

DOCUMENT PRODUCED IN
NATIVE FORMAT:
PSLF Bulk Download Excel

```
               DEPARTMENT OF EDUCATION

         OFFICE OF POSTSECONDARY EDUCATION

       NEGOTIATED RULEMAKING PUBLIC HEARING

           SESSION 1, DAY 1, MORNING

               APRIL 29, 2025
```

```
         On the 29th day of April, 2025, the

following meeting was held in person, from 9:00 a.m.

to 12:00 p.m., before Jamie Young, Shorthand Reporter

in the state of New Jersey.
```

2025 Negotiated Rulemaking Public Hearing - 4/29/25

2

P R O C E E D I N G S

MS. ABERNATHY: Good morning,
everyone. Now let's try that one more time. Good morning,
everyone. That is a much better greeting. It's nice to
have you in person today and thank you to those watching
via livestream. On behalf of the United States Department
of Education, we welcome you and look forward to hearing
your comments and your feedback. My name is Tamy
Abernathy, and I have the distinct honor of introducing
you to Mr. James Bergeron, who currently serves as the
Deputy Undersecretary of Education and Acting
Undersecretary. Now you've heard of a jack of all trades
and master of none. Well, we have a James of all trades
and master of many. Okay, come on. That was funny. Come
on. All right. The Office of the Undersecretary
coordinates policies, programs, and activities related to
the Office of Postsecondary Education, the Office of
Career Technical Education, Career Technical Adult
Education, and Federal Student Aid, and is charged with
planning and policy responsibilities to implement the
present higher education agenda. Prior to joining the
Department, James served as President and Chief
Operating- Chief Executive Officer- I'm going to give him
a new title before the day is up, Chief Executive Officer
of the National Council of Higher Education Resources, or

NCHER, which represents state, nonprofit and private higher education finance organizations that provide a holistic approach to student success. From administering 529 saving plans to operating state-funded grant, loan, scholarship, and college and success programs for first-generation low-income students. Prior to 2014, James worked as the director of Education and Human Services Policy for the House Committee on Education and Workforce, where he developed and managed the committee's legislative agenda in all areas of education and human services policy, including the reauthorization of the Higher Education Act, Carl D. Perkins Career and Technical Education Act, Elementary and Secondary Education Act, No Child Left Behind, Individuals with Disabilities Education Act, Education Sciences Reform Act, Workforce Investment Act, Workforce Innovation Opportunity Act, Assistive Technology Act, Head Start Act, and other Federal laws governing preschool, elementary, secondary, and postsecondary education. He received a Bachelor of Arts in Political Science from the University of Louisiana at Lafayette. Now you see why I said we have a master of many. We are in excellent hands and will benefit greatly from Mr. Bergeron's wealth of knowledge and previous experiences. Please join me in welcoming to the podium Deputy Undersecretary of

Education and Acting Secretary, Undersecretary, James
Bergeron.

MR. BERGERON: Good morning, everyone.
Thank you for being here. On behalf of Education
Secretary Linda McMahon, I'm pleased to welcome you to
this public hearing to kick off the launch of Negotiated
Rulemaking here at the Department. I'm joined today by
other Department officials, Tamy Abernathy and Jeff
Andrade from the Office of Postsecondary Education, and
Sue Lin from the Office of General Counsel. This is the
first of two public hearings that we are convening to
gather comments on potential topics regarding regulations
that govern Title IV as authorized under Title IV of the
Higher Education Act of 1965, as amended. The second
hearing will be held virtually on Thursday, this
Thursday, May 1st. Please refer to our Negotiated
Rulemaking website for additional details about this
hearing and other information related to the process.
I'll talk a little bit about some housekeeping issues at
the end. But first, want to give you guys a little
background about kind of the Department's higher
education agenda and the purpose of this neg-reg session.
Two months ago, Secretary McMahon tasked the Department
and its leaders with bringing back common-sense solutions
to postsecondary education and leveraging innovation to

reduce college costs. As a businesswoman, the Secretary understands that higher education must lead to a well-paying career and that students and families should have a measurable return on investment. Unlike most commercial industries, where new startups regularly disrupt legacy companies and competition creates an ecosystem of innovation to better serve customers, today's higher education system has become overregulated and a little unfocused. At the heart of these problems, Federal regulations, red tape that forces institutions to take on large administrative and personnel costs and therefore hike their tuition. Students are customers for colleges, but they're rarely treated that way. Rather, colleges and universities are forced to prioritize compliance with Government regulations over serving students. And that's why you're here today as stakeholders who care about students and institutions, to make your voices heard through the public comment period and tell us about your experiences dealing with these regulatory burdens. To that end, the Department is soliciting feedback on ways to streamline Federal financial aid assistance that will maintain or improve program integrity and institutional quality. We're also looking for feedback on several regulatory proposals to align Federal student aid programs with the administration's priorities and clarify

language on repayment plans impacted by recent legal
challenges. On Public Service Loan Forgiveness, or PSLF,
the Department is interested in ensuring that motivated
public servants who have dedicated their careers to
critical services and Government and nonprofit work are
able to continue to participate in these programs through
qualifying employers who are not engaged in illegal
activities. We are especially interested in feedback on
how to best amend the definition of a qualifying employer
to exclude those employers who engage in or perform any
activity with a "substantial illegal purpose." The
Department also seeks to clarify the terms mentioned in
the executive order for the purposes of determining PSLF
eligibility. On repayment plans, the Department would
like to discuss those improvements included in the final
rule establishing the Save Plan that is the securing
affordable -- actually saving on valuable -- affordable
valuable education plan around family size and other
provisions. Those provisions were enjoined by the US
Court of Appeals for the Eighth Circuit, as well as the
US District Court for the Eastern District of Missouri,
though they were not the subject of the initial suit. We
also seek feedback on further ideas for better aligning
Income Contingent Repayment as well as the Pay As You
Earn repayment plan with the requirements of the law.

Finally, as I mentioned, the Department is interested in exploring ways to streamline Federal regulations to foster innovation and reduce college costs while maintaining institutional integrity and quality. The Department, in conjunction with the administration and Secretary McMahon's priorities, is eager to increase affordability and accessibility across the P-16 education system. In postsecondary education, the Department aims to empower states and colleges, and universities to reduce barriers to entry and completion. We also are interested in controlling, or better yet, reducing the cost burden of postsecondary education in the United States. The Department welcomes public input and innovative ideas on this important topic. In summary, we welcome ideas from all stakeholders on how best to improve your experience or how to better improve program management. For example, borrowers. What changes can we make to repayment plans that impact you financially? How do they shape your decisions after graduating college? College leaders, what accreditation challenges do you face? Financial aid administrators, are there any improvements that we can make to rules around financial responsibility or changing ownership to simplify the process? State officials, how can we support and empower you to make the college system in your state world class?

How can we reduce those barriers. And taxpayer and public interest groups, how should we reform the PSLF program to align with the President's promises? And all of this, your engagement will be essential. Over two days this week, everyone who wants to be able to contribute to this process and provide comments will be able to do so. And our agency staff is going to be here to listen until the end of the day. With so many effective, it's appropriate that this process is fully collaborative. Together, we can build a higher education system that's cost-effective, innovative, and inclusive, supporting all learners, whether those who are pursuing traditional degrees or those taking alternative postsecondary pathways. Once the public comment period is complete, the Department will publish a notice in the Federal Register bringing these issues and others that might be added at the public suggestion for a Negotiated Rulemaking committee. We also seek nominees -- we will also seek nominations for that committee for some of the committee members. We hope that you and your colleagues will consider serving in this capacity at that time. During the in-person negotiation process, the Department will provide issue papers on subjects that will be covered and will provide draft regulatory language for discussion, which will serve as a basis for proposed in final rules.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

9

Just like today, all stakeholders will be invited to contribute to this process. It's important to keep in mind that the Department anticipates creating multiple negotiating rulemaking committees over the next year so that there will be ample opportunities for participation by the higher education community and the public. Today, we open this public comment period as a first step in crafting rules that will reduce compliance burdens, lower college costs, and foster innovation. Yes, we're heading into a somewhat slow and convoluted maze. This rulemaking process will require hard work and careful thought. But on a happier note, we know how impactful this process will be for students when we reach the end. The final rule or rules will advance educational opportunity for millions of students and their families, begin to reverse the ongoing problem of rising college costs, and provide a path for institutions to truly innovate without the heavy hand of the Federal Government looking over your shoulder. Thank you for your commitment. I look forward to your insights and to forge a brighter path for American postsecondary education. Before I turn it over to Tamy, we've got some housekeeping issues. As I said, if you wish to provide a public comment but have not signed up yet, we still have availability. Please see our education staff at the front desk to sign up for a time.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

10

We have also extended the written public comment period through May 8th. With respect to the logistics for today's hearing, for those who have already signed up to provide public comment, Tamy will call your name. Please come to the microphone in the front of the room. Please provide your name and affiliation before speaking. Tamy will let you know when to begin speaking. Speakers are asked to limit their remarks to three minutes. Speakers, please draw your attention to the timer in front of the head table, as it provides you with the countdown. At the end of your three minutes, Tamy will ask you to wrap up if you're still speaking, and we ask that you do so within 20 seconds. Thank you in advance for your cooperation. At the same time, we respectfully ask you to refrain from interrupting commenters while they are speaking or disrupting the hearing with unwarranted behavior. This hearing is being transcribed, and the transcription will be posted on our website in a few weeks. The Department will also have an audio recording of the hearing, which will be posted on our website when it becomes available. We have three scheduled breaks today, one from 10:30 to 10:45, another during lunch from 12 to 1, and then from 2:30 until 2:45. So we've got two 15-minute breaks. Breaks may be extended if we do not have scheduled commenters. The restrooms are located to

the left and right after you exit the auditorium. If you leave the building, please allow for adequate time to go back through security. In consideration of others, we ask that you silence your cell phones and any other noise-making devices you may have with you today. Any calls, please feel free to make them out in the lobby. So, with that, we look forward to hearing your comments. Thank you for your time and for sharing your information with us. We look forward to a productive day. I'll turn it over to you now, Tamy.

MS. ABERNATHY: Thank you, James. For those who do not know me, I have worked with the Federal Student Aid and Loan Program since 1986, 39 years. I'm the director of the Policy Coordination Group in the Office of Postsecondary Education, and my team works on policy matters related to the Federal Student Aid Loan Programs. Sue Lin from our Office of General Counsel is sitting with James and me at the table today. Without further delay, we will get started with our first public commenter. As James mentioned, please come up to the microphone on the floor at the front table when I call your name, and please introduce yourself and your affiliation if applicable, and you have three minutes. I'm going to ask our first commenter listening to come on up and be prepared. We're going to test your microphone

to make sure that it's ready. And then we'll give you the go sign to start your comment.

          MS. KING: Yep. Is the mic working?

          MS. ABERNATHY: Yep. You have three minutes.

          MS. KING: My name is Liz King, and I'm the Senior Director of the Education Equity Program at the Leadership Conference on Civil and Human Rights in Washington, DC. We are a coalition charged by our diverse membership of more than 240 national organizations to promote and protect the civil and human rights of all persons in the United States. As the Department begins the process of considering changes to the regulations implementing the Higher Education Act of 1965, a law created during the height of the Civil Rights Movement and at the demand of those communities. Black, Latino, Native American, Asian American, and LGBTQ people, Women, religious minorities, and people with disabilities who were shut out of higher education and the pathway it created to full participation in the social, political, and economic life of the country. I would like to remind the Department that while much has changed in the past 99 days, two very important things remain the same. First, what students need and deserve to grow and thrive in school is unchanged. Students need strong preparation

ED_01585

from safe, welcoming, and well-resourced K-12 systems.
They need support in pursuing postsecondary options that
enable them to reach their goals. They need affordable
access to high quality education. They need robust
guardrails that protect them from exploitation by shady,
for-profit actors and unscrupulous lenders. They need
positive campus climates that support their persistence
to graduation, and they need meaningful paths to debt
cancellation after they graduate. Second, our laws have
not changed. Our civil rights laws that prohibit
discrimination on the basis of race, color, national
origin, sex, including sexual orientation and gender
identity, and disability have not changed. And our higher
education laws that provide financial aid, consumer
protections, and loan forgiveness, including for those
who pursue public service, have not changed. The prospect
of considering amending the regulations that govern
implementation of the HEA in an environment in which
access to higher education is under a relentless,
unlawful, and baseless attack is alarming. The ideas that
have been put forward in the last 99 days of what else
the administration might seek to change are even more
alarming. We are seeing a world turned on its head where
responsible institutional leaders are extorted for their
efforts to pursue the national imperatives of diversity

and racial equity, while high-cost, low-quality actors are promised unfettered access to the pockets of students and taxpayers alike. The critically important work of public servants, first responders, and other helpers in our communities is called into question through vague policies that make their distinctions based on the viewpoint of those involved. The role of regulation is to fulfill the intent of Congress. No regulation or any executive action can change the Constitution or any law. I implore this Department and the negotiators to come to hold true to their responsibility to advance equity, protect students from discrimination, and fulfill the promise of higher education and its most important Federal law. Thank you.

MS. ABERNATHY: Thank you for your comment. Jill Desjean? I may have pronounced that wrong. I apologize in advance if I massacre anyone's name today. You have three minutes.

MS. DESJEAN: Good morning. I'm Jill Desjean, Director of Policy Analysis at the National Association of Student Financial Aid Administrators, representing 29,000 financial aid professionals at nearly 3000 colleges and career schools across the country. Thank you for this opportunity to share NASFAA's thoughts on the topics the Department is considering for its

upcoming rulemaking session. Starting with refining the
definition of a qualifying employer for Public Service
Loan Forgiveness, NASFAA disagrees with the Department's
proposed plan to narrow the definition of which
organizations' employees would qualify for this program.
The President's executive order prompting this rulemaking
seeks to exclude organizations engaged in illegal
activities from PSLF eligibility. NASFAA agrees that
organizations proven by the courts to have violated the
law should not be PSLF qualifying employers. However, if
an organization were engaged in such activities, their
nonprofit status should be formally revoked through long-
established procedures that allow for due process.
(inaudible) negotiators to identify illegal activity
without legal finding is not only an ineffective approach
but is dangerously subjective. It risks empowering
negotiators to target organizations based on
disagreements with their mission or services, rather than
on objective, proven legal decisions. With respect to the
Income Contingent and Pay As You Earn student loan
repayment plans, we remind the Department that a strong
safety net is essential for student loan borrowers who
take their obligation to repay their loans seriously,
that cannot be due to unanticipated challenges like
economic downturns or health challenges. Any viable IDR

2025 Negotiated Rulemaking Public Hearing - 4/29/25

Plan moving forward must incorporate the foundational elements of affordable monthly payments and protection from a lifetime of debt. Finally, NASFAA supports the Department's goal of streamlining the Title IV regulations. We believe such efforts would be impactful, focused on three key areas. Financial value transparency, return to Title IV funds, and state licensure requirement determinations. NASFAA supports transparency about college costs and outcomes. However, it is inappropriate to apply short term metrics designed for programs leading to gainful employment to non-GE programs that deliver a longer term return on investment and should revisit the Financial Value Transparency regulations to ensure proper consideration is given to this new framework that was not adequately considered in the original negotiations. With respect to return of Title IV funds or R2T4, NASFAA appreciates recent attempts to make R2T4 more fair to students while reducing institutional burden. However, these efforts ultimately compounded an already excessively burdensome system. We strongly advocate for a fundamental overhaul of R2T4, prioritizing radical simplification. Lastly, Title IV regulations requiring schools to navigate complex and often unclear state level licensure rules create significant operational complexity and administrative burden. Streamlining this requirement

by reverting to the previous standard would achieve the necessary transparency for students while substantially reducing institutional burden. We look forward to working with the Department throughout this rulemaking process and will also be submitting written comments. Thank you.

MS. ABERNATHY: Thank you for your comment. Lauren Releford? Lauren Releford? I hope I'm not pronouncing that wrong. Nicole Hochsprung? Amy, are you trying to flag me for something? Oh. All right, well, then we'll just keep moving, shall we? Lindsey Clark?

MS. CLARK: Hello.

MS. ABERNATHY: You have three minutes.

MS. CLARK: Okay. Thank you. Well, thank you for the opportunity to provide public comment on topics for Negotiated Rulemaking. My name is Lindsay Clark, and I'm the Chief Borrower Advocate for SAVI. In this role, I serve, protect, and empower all borrowers towards better student debt outcomes. SAVI is an industry leader in student loan and education benefits that help people figure out their loan repayment and forgiveness options through its AI-driven platform and one on one expert support. We work through employers and membership organizations to provide our services as a benefit. Since our founding, SAVI has helped employees find 4.5 billion

in student loan savings, including through programs like PSLF, across 10,000 plus employers, member groups and associations, local and state Governments, and financial institutions. This combination, working with both the organization and borrower, allows SAVI to have a unique perspective in the student loan space as we interact with borrowers, employers, and student loan servicers on a daily basis. Years of student loan scams and shady practices by bad actors have made it seem, at times, like there were no good resources outside of the Department itself. Today, however, employers are increasingly playing a role as financial health sponsors to both do the right thing for their employees and to reap the related benefits, such as increased retention and productivity. As the new administration embarks on the Negotiated Rulemaking process covering topics including PSLF and IDR, we offer recommendations that are informed by the fact that borrowers will continue to face complex program rules, nuanced financial choices, and administrative burden. The Department should encourage the development of public-private partnerships that will help mitigate negative risks and capitalize on these opportunities, particularly third parties that work through employers. The Department should invest in APIs to make development of student loan navigation features

easier. Studentaid.gov is one of the few Federal websites at this scale that does not have a robust API option. APIs are what allow developers and third-party websites to innovate on top of the Federal platform, providing a smoother user experience and increased uptake and utilization of the Federal programs. The Department should also work to establish rules governing Federal student loan personal data access. A user permission approach has become the standard used by banks and financial applications in the banking, consumer finance, retirement, and investing worlds. It is a ubiquitous experience for customers to link their financial data with a third-party application by sharing their financial account credentials, which are then stored securely. Lastly, the Department should engage and encourage additional employer based - additional employer-based innovation. Employer adoption of student loan related benefits is fast growing and changing. There's a danger that some well-intentioned benefit programs will actually harm borrowers because of the difficulty of keeping track and complex changes. Finally, any entity that interfaces with borrowers, student loan servicers, and Government agencies, we believe it's important for borrowers' employers to be directly represented on the Negotiated Rulemaking committee. Thank you. Thanks.

MS. ABERNATHY: Samer Hassan?

MR. HASSAN: Hi. Can you hear me?

MS. ABERNATHY: Yes. Please remember to say your name and any affiliation, should you have one. Thank you.

MR. HASSAN: Okay. My name is Samer Hassan. Excuse me. My name is Samer Hassan, and I'm with Young Invincibles. I'm here to talk about PSLF and IDR plan, and why they not only need to be maintained but also expanded. My family fled violence and occupation in Palestine. We sought a new life in the United States and grew up with the notion that a college degree was a means to a better future. All my life, I was told that going to college would open up more opportunities for economic gain. Neither of my parents ever finished freshman year of high school, and I went on to graduate a student Government president of the Community Colleges of Chicago, then an Ivy League graduate of Columbia University, and after that, a class representative in master's degree, graduate of the University of Chicago Harris School of Public Policy. However, my accomplishments wouldn't have been possible without the aid of Federal student loans. But I wasn't worried because I knew I was serving my community. I knew that what I wanted to do was work with other people who were

determined to create a better life than the one they entered. I believed in my community, and I thought the Government would support me in supporting it. I was wrong. It was the availability of programs like financial aid and PSLF that assuaged my fears about entering these deeply unequal institutions in the first place, because they gave me a fighting chance, a chance to gain the knowledge needed to support my community while allowing me to survive while I was at school. At certain points during my higher education journey, I had three different jobs while attending school full time. This isn't a case about lazy students not knowing what they want to study, it's a case of systems change and setting up Government infrastructure to support students and their efforts to create a better America. I still needed to take out loans in addition to the three jobs I worked while in school. So far, while my education has opened up new opportunities, the debt that accompanied it is too burdensome. I have 125K in student debt, which hampers my ability to buy a home, and programs like PSLF and IDR allow me to set money aside to make those dreams a reality one day. Higher education is the most viable pathway to lifelong higher earnings. While my education has expanded my earning opportunities, the debt and inaccessibility of forgiveness or affordable repayment

options will continue to stifle my economic opportunities. Student debt forgiveness is a pathway to economic security and putting up unnecessary burdens not only harms borrowers but also this country's competitiveness around the world. This Government wants us to lead the world in innovation. How are we supposed to innovate with many of us just simply trying to survive? We must provide students with a pathway out of student debt because we need to invest in the future of this country. A country that promised a higher education degree would lead to economic security. The Department must not only protect the PSLF and IDR but also expand them. Thank you.

MS. ABERNATHY: Thank you for your comment. Donna Stelling-Gurnett. You have three minutes.

MS. STELLING-GURNETT: Three minutes?

MS. ABERNATHY: Yes.

MS. STELLING-GURNETT: Good morning. Thank you for the opportunity to testify today on behalf of the Association of Private Colleges. My name is Donna Stelling-Gurnett, and I am the president of APC. Our association represents 12 degree-granting, family-founded, and family led institutions that educate more than 22,000 students across New York State. On average, these institutions have served their community for over

90 years. They maintain strong ties to their local economies and industries are highly student-focused and consistently deliver strong student outcomes. While each APC institution is unique, they are united in their commitment to educational excellence, access, and affordability. Today, I'd like to focus my remarks on the Gainful Employment and Financial Value Transparency regulations. On October 10th and 2023, the US Department released its final GE and Financial Value Transparency rule. APC was dismayed to see that once again, the Department had moved forward with regulations that disproportionately targeted for-profit institutions under the guise of protecting students. We firmly believe that Gainful Employment regulations should apply equally to all sectors of higher education. Student debt burdens and weak graduation outcomes, particularly for minority and low-income students, are challenges that exist across the entire education system. Our clear, consistent policy guidance and strong enforcement across all sectors are the best way to improve outcomes and protect American taxpayers. When the Department released its proposed rules in May of 2023, it also published a database of program outcomes. APC's independent analysis uncovered two major concerns. Of the more than 150,000 programs listed, 82% lacked enough data to be evaluated under the

new metrics, raising serious questions about the
reliability of the underlying data. As well, more than
half, or 56%, of the programs that failed under the
Department's own standards were from public and nonprofit
institutions. Yet students at these institutions remain
unprotected. APC has long supported strong fare
regulations that protect students across public, private,
nonprofit, and proprietary institutions. However, the
current GE rule is fundamentally flawed. We respectfully
urge the administration to reconsider and abandon it. The
Financial Value Transparency regulation, by contrast, is
a step in the right direction because FVT disclosures
apply to all Title IV programs. They would provide
students with clear, comparable debt to earnings data
across the entire higher education landscape. APC
recommends that the Department move forward with
Financial Value Transparency disclosures based on debt to
earnings rates, while ensuring an appropriate appeals
process and reasonable transition period are included.
Thank you for your time today and for the opportunity to
share our perspectives. Thank you.

        MS. ABERNATHY: Thank you.

        MS. STELLING-GURNETT: You're welcome.

        MS. ABERNATHY: Dr. Sara Partridge?
You have three minutes.

DR. PARTRIDGE: Thank you for the opportunity to speak here today. My name is Dr. Sara Partridge, and I am the associate director for higher education policy at the Center for American Progress, or CAP. CAP is an independent, nonpartisan policy institute which works towards building an affordable and high-quality postsecondary education system that promotes economic mobility, racial equity, and a strong democracy. In this rulemaking process, CAP urges the Department to honor its commitments to current and future student loan borrowers, to focus on the real and urgent problems borrowers are facing, and to take steps to improve the repayment system to ensure it works for everyone. About 3 in 10 or 12.5 million student loan borrowers are currently enrolled in an Income Driven Repayment or IDR plan. IDR Plans make it possible for student loan borrowers who cannot afford the standard monthly payments to pay based on income, allowing them to afford basic necessities such as food, rent, medical care, and child care. The first IDR Plan was established by bipartisan legislation over three decades ago. Since then, policymakers across the political spectrum have recognized the need for these types of plans. IDR Plans should be improved so they are easier to enroll and stay enrolled in, navigate, and more effectively prevent

borrowers from defaulting on their loans, making
regulatory changes that would increase payments for
borrowers, increase repayment timelines, or otherwise
increase the burden on borrowers would further squeeze
everyday people who are already struggling. In addition,
we believe that future borrowers deserve the same
opportunities to repay their loans through public service
that previous generations of borrowers had. We urge the
Department to take steps to simplify the process of
qualifying for PSLF, and we strongly oppose any
limitations on eligibility, particularly if they serve a
political agenda. Together, these programs put
postsecondary education within reach for students from
all backgrounds and help bolster the nation's workforce
of teachers, nurses, police officers, social workers, and
military service members. PSLF and IDR should be
strengthened through improved oversight, modernized
technical systems, and borrower-focused policies that put
the well-being of students and those repaying their
student loans first. To accomplish this, the Department
requires, at a bare minimum, adequate staffing. The
recent elimination of fully half of Department staff,
including nonpolitical career staff with deep technical
expertise and a commitment to education, is a deep
disservice to the nearly 50 million P-12 students, 15

million postsecondary students, and 43 million student loan borrowers who rely on Department services. Therefore, we urge you to reinstate the staff who conduct critical operational and oversight activities to ensure that the Federal financial aid system functions and to provide the educational services that students and families across the country rely on. Thank you.

MS. ABERNATHY: Thank you. Graham Walcott. Test that microphone.

MR. WALCOTT: Can you hear me? Morning. Okay.

MS. ABERNATHY: You have three minutes.

MR. WALCOTT: Good morning and thank you for the opportunity to speak today. My name is Graham Walcott, and I'll be your pilot for this short flight.

MS. ABERNATHY: Excuse me, Graham, could you speak a little louder? Get closer to the microphone for us.

MR. WALCOTT: You got me.

MS. ABERNATHY: And we'll restart your three minutes, if we may.

MR. WALCOTT: Okay.

MS. ABERNATHY: Ready?

MR. WALCOTT: Yeah.