MS. ABERNATHY: Yeah. Thank you.

MR. WALCOTT: So, my name is Graham
Walcott, and I come before you as a concerned citizen and
not just as a borrower, but as a caregiver, a public
servant of someone caught in a storm of student debt. At
university, I earned my degree in aeronautics and my
private pilot wings. I thought I would fly, but student
debt kept me chained. So, I stayed close to my dream and
found work as a dispatcher. That includes my current role
as a flight coordinator for Guardian Flight, the GMR
solution. As you can see, I'm very proud of my work. We
coordinate missions with hospitals, fire Departments,
state agencies, and law enforcement across the nation.
When a child is airlifted, when a stroke or accident
victim needs rapid transport, even when disaster hits, we
are part of the team behind a life saved. Yet our work
doesn't count towards PSLF. The efforts of my fellow
dispatchers, operators, pilots, nurses, and paramedics
all because we are employed by a private corporation.
Meanwhile, our partners in Government, public hospitals,
and nonprofits remain eligible for the same mission, same
outcome, unequal treatment. That's one contradiction I
urge you to fix. And I'm not speaking in policy terms.
I'm speaking from personal crisis. I've been working full
time for many years, and I find myself on the brink of

collapse. My family is caring for my father, who's
fighting cancer, and we're trying to hold on to our home
of 32 years. I've paid tens of thousands of dollars into
student loans and Federal student loans, and due to
hardship, interest, and compounding, my balance has only
grown, and my debt-to-income ratio disqualifies me from
homeownership, and my loan servicer providers refuse to
settle even as we experienced a hardship. I'm told we do
not settle. I don't qualify for PSLF. I don't qualify for
relief, even in bankruptcy. And so, the weight grows, and
the chains tighten, and we cannot fly. No, no, no, today
I say help loosen these chains and emancipate us from
this financial slavery. Public Service Loan Forgiveness
must include EMS aviation professionals, those who work
alongside Government, delivering the same public service
but left behind by rigid eligibility rules. IDR must be
fixed so that borrowers can actually see their balances
shrink and not income - and not balloon from interest.
When they're financially crushed must have a path
forward. Settlements even after bankruptcy must become
regulation, not just guidance. I'm a small representation
of thousands of aviation professionals who do lifesaving
work, yet we're viewed as private sector and Federal
policy. We're not private sector. We are public safety,
first responders. PSLF is not a handout. It is a second

chance through service. This debt erodes mental health,
(inaudible) families. Education was supposed to lift us
instead it's become the great anchor. So, I encourage you
and those with the power on Capitol Hill, emancipate us -
emancipate those we work with every day. Help us to live
free and to fly. Thank you for taking some time with me
today and thank you all for choosing the American Dream.

        MS. ABERNATHY: Thank you for your
comment. Clare McCann?

        MS. MCCANN: Thank you.

        MS. ABERNATHY: You have three
minutes.

        MS. MCCANN: Thank you. My name is
Clare McCann. I'm the managing director of policy and
operations with the Postsecondary Education and Economics
Research Center. The PEER Center generates actionable
research to drive policy improvements in postsecondary
education. And we are pleased to provide comments today
on the importance of the Financial Value Transparency
rules in improving program integrity and institutional
quality. The Financial Value Transparency rules,
currently in effect and for which implementation is
already underway, will provide unprecedented new
information to students, institutions, and policymakers
about the return on investment of postsecondary

education. The goals of FVT are consistent with the ideals of policymakers across party lines. Rich, robust data about the costs students pay to complete a program, the debt that borrowers take on, and the payoff of programs in which students enroll. Those are the kinds of data that schools will report under the rules, and the Department will help to communicate to students directly. Those are necessary for a well-functioning market that will constrain college costs and improve the value of college credentials. Policymakers have indicated their desire for this information as well. Legislation proposed by the chair of the Senate Education Committee would create an earnings test, much like the one in the Financial Value Transparency rules. And later this morning, members of the House of Representatives will mark up proposed legislation that relies on reporting about college prices and post-graduation earnings similar to that in the FVT rules. So, to support increased transparency in higher education, we have two specific recommendations for the Department. First, we urge the Department to maintain the data reporting and metrics under the Financial Value Transparency rules without eliminating any of the required reporting elements to provide the robust information that students and their families need to make informed decisions in going to

college. And second, we urge the Department to ensure
these data get into the hands of students directly. The
regulations require the Department to maintain a website,
ideally informed by consumer testing, to house the cost,
earnings, and other information I mentioned. And to
ensure that prospective and current students have that
website in hand to inform their choices of programs and
colleges, as well as to decide how best to finance their
education. These steps should be undertaken with urgency
and focus, and the Financial Value Transparency rules
must continue to be implemented without further delay.

      MS. ABERNATHY: 20 seconds.

      MS. MCCANN: As the Department embarks
on a rulemaking process and continues to implement the
FVT regulations, the PEER Center looks forward to
continuing to provide research and policy insights that
will help inform an efficient, accountable higher
education system that supports strong outcomes for
students. We appreciate this opportunity to comment
today. Thank you.

      MS. ABERNATHY: Thank you for your
comment. Sabrina (inaudible)? Emeka Oguh? I'm so sorry.
Please correct me.

      MR. OGUH: Emeka Oguh.

      MS. ABERNATHY: Thank you. You have

2025 Negotiated Rulemaking Public Hearing - 4/29/25

three minutes.

MR. OGUH: Thank you. Good morning, James, Tamy, and Sue. My name is Emeka Oguh, CEO of PeopleJoy. We help employers address workforce shortages through student loan repayment assistance and Public Service Loan Forgiveness guidance for their employees. Today, I'd like to discuss Public Service Loan Forgiveness, Pay As You Earn, the Income Contingent Repayment Plan, and how changes to these programs could impact taxpayers. PSLF was created to strengthen public institutions, attract civic-minded talent, and provide targeted debt relief. Expanding eligibility has helped fill critical workforce gaps in healthcare, education, and social work. However, narrowing the definition of qualifying employers and eliminating pay in ICR would reduce the number of civil servants eligible for PSLF, creating real risk for taxpayers. (inaudible) healthcare. The US faces a projected shortfall of 86,000 physicians and 336,000 registered nurses by 2036. Already, 86% of VA facilities report shortages. Staffing gaps drive up health care costs for taxpayers through longer wait times, costlier treatments, and reliance on expensive, temporary staff. Our research shows health care professionals enrolled in PSLF are significantly more likely to stay in their roles. Second, K-12 education.

Over 400,000 teaching positions are vacant or uncertified. Charter schools are often more cost effective for taxpayers, rely on PSLF to retain teachers. Eliminating ICR would disqualify many, including a nonprofit charter schoolteacher that we work with who holds nearly $1 million in Parent Plus Loans, only forgivable through the ICR Plan. Clergy. Clergy and religious workers now PSLF eligible, provide essential services that reduce reliance on taxpayer funded programs like public mental health clinics and emergency housing. Preserving multiple IDR Plans and current public service definitions will help avoid billions in additional taxpayer spending across healthcare, education, and public services. Now, for borrowers outside civic service, we recommend extending and increasing employer sponsored loan repayment limits under section 127, shifting more loan forgiveness to the private sector. Thank you for your time and consideration today. Let's strengthen our promise to public servants and protect taxpayers by investing in solutions that work. Thank you.

MS. ABERNATHY: Thank you for your comment. (inaudible)? Rebecca Stanley? Good morning. You have three minutes.

MS. STANLEY: Good morning. Thank you for your time today and for your dedication to improving

our student loan system. My name is Rebecca Stanley. I'm the accountant and the student loan advisor for the 15th Judicial Circuit, that's in Conway, South Carolina. I am representing PSLF borrowers in the nonprofit and in the Government sector. Today, I want to speak briefly about four key areas. Public Service Loan Forgiveness, the Pay As You Earn, and the Income Contingent Repayment Plan, and the need to streamline our Federal student loan system. First off, PSLF. I learned about this program firsthand when my own children, who are now both public servants, graduated with significant student loan debt. Debt that we could not afford to help pay for them. PSLF had a 99% failure rate at that time, and I had to research it myself, because much of the information that we got from Studentaid.gov and from their loan servicers was incorrect on how they needed to qualify for this program. Because of that research, I'm now able to guide hundreds of nonprofit and Government borrowers through this complicated process. This program doesn't just impact our office; it impacts our state as well. Our South Carolina Solicitor's office has over 169 lawyers and 104 non-attorney staff that are now enrolled in the Public Service Loan Forgiveness Program, and this program is a valuable tool to retain and recruit public service professionals. Secondly, Pay As You Earn and Income

2025 Negotiated Rulemaking Public Hearing - 4/29/25

Contingent Repayment Plan, PSLF program, and the IBR
forgiveness program. They both depend on affordable,
Income Driven Repayment Plans. Without those plans, you
do not qualify for that forgiveness. At that time when
those plans were created, the average student loan debt
was 20 to $60,000. Today, even in our office alone, the
average debt is 100 to $300,000. It does not compare as
the Department considers replacing the SAVE Plan. I
support the shift, but only if the formula for
calculating discretionary income is revised. The original
Pay As You Earn and Income Contingent Repayment formulas
no longer reflect today's financial pressures. Without
adjustment, borrowers will struggle to make payments,
risking higher default rates. Lastly, streamlining the
system. Right now, due to SAVE litigation, consolidation
and IDR applications are stalled on Studentaid.gov. This
is creating a huge backlog. Many of the people that I
counsel are stuck in a forced forbearance. Many have high
payments they cannot afford and are unable to earn
forgiveness right now. Announcing an aggressive
collection of those in default is not only going to cause
additional backlog, but it defeats the purpose of an
improved, streamlined process. I agree with collecting on
defaulted loans, but to do so now will worsen the process
and will also harm borrowers who are now in good

standing. This administration has a real opportunity by revising Pay As You Earn, reforming Income Contingent Repayment Plans, and simplifying the forgiveness process, you can offer real, timely relief. Thank you.

    MS. ABERNATHY: Thank you for your comment. Josef Ayala? Clinton Durham?

    MR. DURHAM: Good morning.

    MS. ABERNATHY: You have three minutes.

    MR. DURHAM: My name is Clinton Durham. I am representing myself as a student.

    MS. ABERNATHY: (inaudible) I'm so sorry. Are we ready? Now you have three minutes.

    MR. DURHAM: My name's Clinton Durham. I'm representing myself as a student loan borrower who was struggling. I understand that changes are inevitable. We encounter them in all aspects of our life. But those changes should never cause the inability to provide basic necessities for our families, student loan borrowers, and all individuals who went to a higher education institution with the sole purpose to advance their career opportunities to provide a better life for their family. Yet now, with these changes, SAVE programs saved me. I work with the Department of Commerce in North Carolina. That gave me a chance to have those months count toward

Public Service Loan Forgiveness when that went away. I'm in limbo. These months that I've been waiting for something to happen that I can afford, I've lost those. How do I get that time back? I've been working in the same job for nearly ten years. I should be getting close to my Public Service Loan Forgiveness to go away. I'm still looking at $150,000 in student loan debt because I went to graduate school eight years after undergrad, because I had children, and I was looking for a better opportunity for them to advance down their- in their future. My wife, who is here with me, would love to be able to work. She has chronic diseases that inhibit her from having a normal ability to hold a job. She does what she can, and we struggle every month. It shouldn't be that hard when I've worked and I've done as well as I have in my career. But yet when I log on to my account, I still see that giant number. I will not ever own a home, and I know that. And that's okay, because I've given my sons, who are now in college, the ability to have not been fearful of my financial burdens because I didn't share that with them. Make sure that when you reevaluate these (inaudible seconds) repayment programs that you consider the people like me, because there's not just me, there's millions of (inaudible) that need your help and support. Don't forget us because we're working hard to

pay these off. We're not lazy. If- that is not what this
is about, don't forget us.

MS. ABERNATHY: Thank you for your
comment. Charlie Smith?

MR. SMITH: Good morning.

MS. ABERNATHY: Can you adjust that
mic up?

MR. SMITH: Sure can. A little taller
than the past speaker, I guess. Yeah.

MS. ABERNATHY: Just a little bit.
We'd like to hear you.

MR. SMITH: All right. Can you hear
me?

MS. ABERNATHY: Yes, sir.

MR. SMITH: Wonderful.

MS. ABERNATHY: You have three
minutes.

MR. SMITH: Thank you so much. Good
morning and thank you for the opportunity to speak to you
all today, and for you to listen to all of us speakers.
My name is Charlie Smith, and I'm the elected state's
attorney in Frederick County, Maryland. I've been elected
up there since 2007 and have seen numerous prosecutors
benefit from the Public Service Loan Forgiveness Program.
I'm also proud to serve as the chair of the board of the

National District Attorneys Association, which represents
about 6,000 prosecutors nationwide across the country who
are truly dedicated to upholding the rule of law. So, I'm
here today, of course, to express our strong support for
the Public Service Loan Forgiveness and the Income Driven
Repayment Programs. These aren't simply about financial
relief. They really are essential to protecting public
safety. These programs help ensure that experienced,
committed prosecutors can continue to serve their
communities without being driven out of public service by
financial strain. So let me be clear. PSLF and the IDRs
are not the same as large-scale loan forgiveness or
cancelation programs. They are not the same. Rather,
these are programs that are conditional, long-term
commitments by prosecutors in the public service sector.
Prosecutors that qualify for loan forgiveness must serve
ten years in their offices and make 120 on-time payments
to qualify. So PSLF represents a simple yet powerful
promise to these people. If you serve your community for
the public good, often at personal and financial costs,
your community will support you in return. So, across the
country, prosecutors' offices are facing an unprecedented
retention crisis. There are vacancies in the majority of
offices across the United States. Standing vacancies. We
cannot get prosecutors in our offices. In rural areas,

some of these offices have just one or two attorneys
handling hundreds of serious cases. Prosecutors are
walking away. They really are. And not because they lost
their passion, but because they can no longer afford to
stay in public service. Their loans are just too great.
This means that fewer cases are filed, longer delays, and
in some communities, crimes are going unprosecuted
entirely. So, without programs like PSLF and IDRs, these
trends will simply accelerate. And let's be honest, even
the best police investigation means nothing (30 seconds)
without a prosecutor to bring the case to court. So,
we're not just talking about paperwork delays, we're
talking about real public safety risks. Fewer
prosecutions for fentanyl trafficking, backlogs in
violent crime, victims left waiting for justice. So,
these are essential to keeping skilled attorneys in place
and prosecutors serving because they believe in justice.
The belief can only be carried on so far when weighed
down by debt. So, I urge this body to protect and
preserve these two critical programs, not just for the
benefit of prosecutors, but for the benefit of public
safety and the stability of our communities. So, let's
invest in those who protect the rule of law and so they
can continue to invest in us. And thank you for your time
today.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

             MS. ABERNATHY: Thank you for your

comment.

             MR. SMITH: You're very welcome.

             MS. ABERNATHY: Ashley Harrington?

Linh Taylor? Good morning.

             DR. TAYLOR: Morning.

             MS. ABERNATHY: (inaudible) three

minutes.

             DR. TAYLOR: I am Dr. Linh Taylor. I

am here today representing the American College of

Physicians, the largest medical specialty organizations,

and the second largest physician membership society in

the United States. ACP members include 161,000 internal

medicine physicians, related subspecialists, and medical

students. I am a second-year internal medicine resident

in Portland, Oregon, and I am here today to urge that

PSLF must remain an option for current and future

physicians for the following two reasons. One, PSLF is

the way to incentivize physicians to practice primary

care, including internal medicine, a specialty that

historically pays less than others. The US is already

facing a primary care physician shortage, expected 80,000

primary care physicians by 2037. Eliminating one of the

few ways to incentivize physicians to go into primary

care will only add to the burden that shortage will cause

to the nation's healthcare system. Two, PSLF and Income Driven Repayment Plan is the only way resident doctors can afford payment during training. For context, all doctors in the United States must go through residency training after finishing medical school. In internal medicine, that can range between 3 and 7 years. And the average resident salary is only about $66,000 in 2024. Without Income Driven Repayment Plan, many of us couldn't afford to make our loan payments during residency. An average loan of $300,000 by the time we finish medical school with interest incurring the moment we take out the loan. I have seen many of my peers struggle to balance loans with the cost of housing, childcare, and other expenses. I, myself included, am a mother of one child. It is also vitally important that participation in this loan program is not subjected to political (inaudible) test, which would significantly deepen our nation's health workforce issues. I want to thank you for the chance to provide testimony today. We need to preserve the vital Public Service Loan Forgiveness Program and Income Driven Repayment Plans to help us support our nation's future health workforce, specifically primary care workforce. Please also consider including an internal medicine physician on the Negotiated Rulemaking committee to ensure that this important perspective is

represented. I thank you for your time.

MS. ABERNATHY: Thank you for your comment. Amanda Collman? Amanda, let's make sure that mic's at the right level for you.

MS. COLLMAN: I appreciate that. Thank you.

MS. ABERNATHY: Is that the right level? You can test it one more time.

MS. COLLMAN: Test? Okay.

MS. ABERNATHY: You have three minutes.

MS. COLLMAN: Thank you. My name is Amanda Collman, and I'm commenting on behalf of Adtalem Global Education, which is the leading provider of healthcare education in the US, shaping the future of healthcare by providing a practice-ready workforce with high-quality academic programs at our five institutions. Thank you for the opportunity to comment at this hearing. Our comment pertains to potential topics that would streamline current Federal student financial aid program regulations, one of which is financial responsibility. We believe that updating the composite score will provide the Department with a more effective tool to predict school closures, protect students and the American taxpayer, and curtail delays to students entering

industries and geographies with critical workforce shortages. As a brief overview, to participate in Title IV student aid programs, institutions must demonstrate they're financially responsible. The Department established the composite score in 1997 to help evaluate institutions' financial responsibility, and the formula has remained largely unchanged despite the GAO recommending it be updated. The composite score is significant because the Department uses it as a basis for requiring additional oversight and financial assurances from institutions, and also to limit, suspend, or terminate those institutions' participation in the Federal Student Aid program. In addition, an increasing number of states are relying on the Federal score, despite its flaws, as a bright line measure of financial health. Over the years, the composite score has become increasingly critiqued as antiquated and a poor predictor of school closures. In fact, the GAO found the composite score only predicted half of school closures in a six-year period. One shortcoming is the score unfairly penalizes education institutions that specialize in distance education, particularly if they're subject to acquisition. This is because under the current regulation, the underlying ratios exclude intangible assets such as goodwill and copyrights and trademarks.

This negative treatment could create a score below the cutoff for financially responsible. Despite the fact the school is financially stable with significant financial reserves, the calculation should be modernized at this time by adding intangible assets to the components of the financial ratios, and this can be done by simply revising the regulation to eliminate the intangible asset exclusion. By modernizing the composite score formula, the Department would be aligning with today's higher education environment, which is continuously innovating and employing new digital learning methods. The Department would also be streamlining its regulatory processes to eliminate some of the unnecessary obstacles to innovation. These obstacles unnecessarily hinder institutions from educating students for today's workforce, and are often ineffective in accomplishing their goal, which is the prevention of school closures. In summary, we're asking the Department to modernize the score to better protect students while allowing financially stable, successful institutions that specialize in higher education and distance education to innovate to address significant workforce shortages. Thank you.

            MS. ABERNATHY: Thank you for your comment. Josef Ayala? Can you make sure that mic is

adjusted up a little bit so we can hear you? You just
turn the mic part up. Yeah.

        MR. AYALA: (inaudible)

        MS. ABERNATHY: Okay. You have three
minutes.

        MR. AYALA: Yes. Thank you. Good
morning. And thank you for this opportunity to speak. My
name is Josef Javier Ayala, and I'm, you know, here to
speak for myself. But really, on behalf of a lot of other
student loan borrowers who, you know, put faith in the
system and promise- under the promise of fairness and,
and honor and, and are still waiting forgiveness. I
completed over ten years of public service, making
payments in good faith, under the clear understanding
that this commitment would lead to loan forgiveness. Yet
today, after doing what was asked of me and many others
in the same, I feel trapped by loan servicer
manipulation, bureaucratic neglect, and shifting
standards. Servicers, I feel like weaponize confusion,
causing borrowers precious years of their lives and
thousands of dollars they can never get back. Public
servants do not make these sacrifices because we love
debt. They do it because they believe in public service,
professional growth, and giving back to their community.
And the promises made by our Government to allow these

promises to be broken now is not just unfair, it's immoral. The so-called reforms that have been proposed do nothing to correct this injustice. Instead, they double down on the damage, raising payments while wages stay stagnant, offering no real lifetime to- lifeline to the very workers who keep this country running. What message are we sending to the future students? That education is a trap? That hard work and service lead to betrayal, not opportunity? So, I ask you directly, will the Department honor its commitments? Finally release the borrowers who play by these rules to continue treating human lives as numbers in a ledger, prioritizing portfolio growth over public trust. I might be out of line. Borrowers are not seeking charity. We are demanding the respect we're promised, the respect that should come from fulfilling our obligations and expecting the same from our Government. Future generations deserve better. They deserve a higher education system that is clear, affordable, and just, one where institutions are held responsible for their promises. One where Borrower Defense protections are real, not theoretical. One where hard work and school actually builds a life worth living and not a lifetime of financial struggle. If we fail to correct the mistakes of the past, we may very well destroy the future of higher education in this country.

We would only have ourselves to blame. Thank you for your time and for your responsibility to do better for those who trust in you. Thank you.

        MS. ABERNATHY: Thank you for your comment. Olivia Sawyer?

        MS. SAWYER: Can you hear me?

        MS. ABERNATHY: Yes.

        MS. SAWYER: Okay, perfect.

        MS. ABERNATHY: You have three minutes.

        MS. SAWYER: My name is Olivia Sawyer, and I'm a program associate with the higher education team at New America, a nonpartisan think tank. Thank you for the opportunity to comment today. My comments will focus on ensuring borrowers have easy access to affordable repayment plans, protection against default, and maintaining institutional integrity through the Gainful Employment and Financial Value Transparency regulations. As of September 2024, almost 43 million people have held Federal Student Loans. Among those with federally managed loans and repayment, more than 13 million were enrolled in an Income Driven plan. Income Driven Repayment Plans, including Income Contingent and Pay as You Earn, provide an affordable alternative from standard repayment options. It's critical these

alternatives are maintained and enrollment expanded to those most in need. Currently, many vulnerable borrowers are not accessing these plans. In addition to allowing borrowers to opt in to using their (inaudible) info to enroll and recertify for IDR plans, the Department should allow, with borrower permission, delinquent borrowers to be automatically enrolled in IDR plans. This would simplify and streamline the system for borrowers, servicers, and the Department and prevent unnecessary defaults. It has bipartisan support via Republican introduced bill and regulations from the previous administration. Now, I'd like to discuss the importance of maintaining the financial value transparency, and gainful employment regulations. You will likely hear from institutions today who will say that gainful employment and Financial Value Transparency regulations are too burdensome. But the reality is, if you want to address runaway debt and cost and hold institutions accountable for poor outcomes, these regulations will accomplish just that. Gainful employment will protect students enrolled at private, for-profit institutions and in certificate programs from bad jobs by ensuring these programs prepare students for gainful employment after completing. The financial value transparency would require institutions to report the price of attendance, non-federal aid, and

typical borrowing amounts to the Department, informing students, family, and the Department which institutions provide a high return on investment. Both Republicans and Democrats agree that colleges should be held accountable for unaffordable debt that students cannot repay. Work from the American Enterprise Institute recognized the importance of FVT and called for not only strengthening the regulation, but also for further strengthening- or for not only maintaining the regulation, but for further strengthening it. By enforcing costs and job market transparency and accountability, GE and FVT could lead students and families to more informed decision making, responsible borrowing, repayment of student loans, and overall better utilization of taxpayer dollars. Since many students continue to have to take out loans to access higher education, it's critical the Department ensure that repayment system is affordable, accessible, and borrower-centered, while also holding institutions accountable for cost and job market outcomes. Thank you for the opportunity to provide comments.

        MS. ABERNATHY: Thank you for your comment. Harini Shah? Can you turn that- ?

        DR. SHAH: Can you hear me?

        MS. ABERNATHY: Yes. Three minutes.

        DR. SHAH: Thank you. Thank you for

the opportunity to provide comments at today's public hearing. My name is Dr. Harini Shah, and I'm an internal medicine resident at UCLA Health in California. I'm also a proud member of the American College of Physicians, similar to my colleague previously. My co-residents and I graduated from medical school in 2024 with over $250,000 in federal student debt, debt we took on because we believed in the promise of the Public Service Loan Forgiveness Program. Like many new physicians, we fully intended to enter an Income Driven Repayment Plan and begin making qualifying payments towards PSLF from our first month as interns. But because the SAVE program was blocked just as we graduated, we have been legally unable to enroll in IDR. Unable to make qualifying payments despite working full-time at a nonprofit hospital. Through no fault of our own, nearly a full year of service towards PSLF is at risk of being lost. Every month, we show up for 80-hour work weeks at the hospital, managing ICU patients, responding to codes, and providing critical care while earning about $4,400 a month after taxes. After rent, groceries, health insurance, transportation, and basic bills, there's little to nothing left over. Under current policies, our option to make up for the lost PSLF funds would be to retroactively pay off months that we could not have paid during the

injunction, an option that is honestly unrealistic for residents who are living paycheck to paycheck, like myself. Even more frustrating, the process to regain credit depends on navigating complex waivers and account adjustments, creating another layer of confusion for us and a burden on new graduates who are already stretched thin. We have literally done everything right; committed to public service, accepted the financial risk of medical education, and continue to show up for our patients every single day. Yet we are still falling behind because the system has no solution for those of us caught in the timing of the SAVE injunction. I respectfully urge the Department to take two critical actions. First, automatically count months during the SAVE injunction towards PSLF for borrowers otherwise meeting qualifying employment requirements without requiring retroactive lump sum payments. Second, please eliminate unnecessary barriers that force residents and new graduates to navigate complex buyback or waiver processes for credit. PSLF eligibility should honestly not depend on navigating red tape during a once-in-a-generation disruption. I and many of my colleagues would also welcome any opportunity to work with the Department and provide input as you design practical, borrower-centered solutions to these urgent challenges. Thank you again for the opportunity to

testify.

MS. ABERNATHY: Thank you for your comment. Christine Kieta?

MS. KIETA: Good morning.

MS. ABERNATHY: Can you lift that mic up just a little bit? Just tilt it up a little.

MS. KIETA: Is this better?

MS. ABERNATHY: Yes.

MS. KIETA: Okay. As an initial matter, I submitted my comments about a week ago to the public website. And they've not been submitted- they've not been approved. I have three additional copies, and I would like to know if I can tender them to you, which has my tracking number and everything on it.

MS. ABERNATHY: You can, and we'll confirm- I'll have somebody confirm that the- just a second. If I could get somebody to come up and take this-

MS. KIETA: Thank you.

MS. ABERNATHY: -and review it. You have three minutes.

MS. KIETA: Thank you. My name is Christine Kieta. I'm a private attorney in the suburbs of Chicago, and I am here in my private capacity. I do have student loans, and I see student loans that affect people in their personal lives as well as their professional

lives. My question, though, is, does the structure of
Title IV actually disincentivize colleges from
competitively price- pricing their tuition and cause
federally backed student loans to operate like subprime
mortgages? The National Center for Education Statistics,
which publishes information colleges have to provide to
the Department of Education pursuant to Title IV,
indicates that as of the 2022-2023 school year, 85% of
first-time full-time students received financial aid. By
way of example, Thomas M. Cooley Law School for fiscal
year 2023 collected 80% of its tuition from student- 80%
of its revenue from tuition. John Marshall Law School
collected 99% of its revenue from tuition. Under Title
IV, colleges have to generate 10% of their revenue from
sources other than federal funds to stay eligible for
federally-funded student loans. If students are largely
borrowing from the Federal Government to fund the
tuition, which can make up to 90% of the revenue, then
the national cap on tuition seems to be how much the
Department will permit per student. Stated differently,
are colleges really incentivized to support their
operation with sources of revenue other than tuition? As
it relates to the 85% of student loan- 85% of students-
as it relates to the loans that 85% of students are
incurring, colleges have to provide potential student

loan borrowers with financial assistance information, which includes a, quote, sample repayment schedule for sample loans. That's it. A similar lending pattern was for subprime mortgages, leading to the financial collapse of 2008. Those borrowers had low creditworthiness and most notably, little to no income verification. Those borrowers and their lenders did not have to examine first if the borrower ever could repay the loan. Within the focus of- focused context of complying with the requirements of Title IV to determine if it has any impact on the cost of tuition, how does providing a sample loan repayment schedule for sample loans use resources so massive that a college has no alternative but to offset the costs through increased tuition? Is this sample loan requirement so thin that these loans lead to borrowing decisions that operate off of an inexperienced, inexperienced borrower? And if these colleges are really just taxpayer-funded entities, but for 10% of their revenue, should they really be relieved of the requirement to Title IV which tells us what they're doing with Government money? And would reducing the amount that the Department provides per borrower encourage these colleges to develop other sources of revenue, which would reduce their reliance on taxpayer-funded loans? If college- if colleges can find- can

2025 Negotiated Rulemaking Public Hearing - 4/29/25

57

colleges find other ways to fund their operations,
thereby voluntarily relieving themselves of the
requirements of Title IV? Or are taxpayer-funded loans
with zero risk of loss simply too lucrative? Thank you.

        MS. ABERNATHY: Thank you for your
comment. Christine, if you'll see Margo. Would you raise
your hand, Margo? Over there around the, the- yep. Thank
you. Tracey Schnieder. Good morning.

        MS. SCHNIEDER: Can you hear me?

        MS. ABERNATHY: Lift it up just a
little bit more. There you go. It should work (inaudible)

        MS. SCHNIEDER: Better?

        MS. ABERNATHY: Yes. Okay. You have
three minutes.

        MS. SCHNIEDER: I'm Tracey Schnieder,
on behalf of the Middle States Commission on Higher
Education. I'm pleased to share these comments with the
Department for Negotiated Rulemaking Committees to
develop proposed regulations. As you are aware, our
agency is a voluntary, non-governmental institutional
accreditor that has been recognized by the United States
Secretary of Education since 1952. As a member of the
regulatory triad, the Commission remains a partner in
efforts at strengthening institutional accountability and
consumer protection. We currently accredit over 500

institutions of higher education. Any reconsideration of
program integrity rules must include careful attention to
how the regulations will be enforced, with as much
clarity provided around implementation. It is where we've
seen the most significant impacts and barriers to
innovation due to regulatory burdens that become more so
once implemented. The first area I want to address is a
change in ownership or control related to 34 CFR 600.31.
We have experienced an increasing number of transactions
involving changes in ownership and institutions of higher
education. The Department issued guidance in September
2022, initiating a new two-step process for certain
changes in ownership transaction. The process has proven
to be burdensome and inefficient. Institutions sit in
limbo, often for more than two years, not because of the
accreditor, but because of the lengthy Department
process. We are interested in ensuring our institutions
can enter into transactions that support institutional
strategy and mission, unencumbered by complicated
regulatory requirements. Because the requirements related
to changes in ownership are of significant interest to
all members of the regulatory triad, it's essential that
institutional accreditors and state agencies be included
in these negotiations. The second area pertains to 34 CFR
668.21 and .22, where we generally support a streamlined

and efficient process for the return of Title IV funds.
We believe our institutions would benefit from clarity in
these processes. Our commission as a Title IV gatekeeper
is required to ensure that institutions meet all Title IV
regulatory requirements. If processes are unclear,
institutions are unable to ensure compliance and our role
as a member of the regulatory triad becomes challenging.
These regulations were part of the last Negotiated
Rulemaking session, but no proposals were adopted. We
recommend they be revisited. With regard to 34 CFR 602,
we support continued refinement of the regulations
impacting accreditors. Recently, we were notified of a
focused review process that directed accreditors to focus
on certain requirements, presumably the ones the
Department feels most critical. We support this refined
process to gain efficiencies and focus on critical areas
of review. We look forward to the Negotiated Rulemaking
process where some of these efficiencies could be
incorporated into the regulations, while other, less
significant regulations are removed. Additionally, we
encourage exploration of incorporating regulatory
processes that welcome new accreditors while holding us
all consistently to the same standards and focused
regulatory requirements. I thank you for your time today.

                    MS. ABERNATHY: Thank you for your

2025 Negotiated Rulemaking Public Hearing - 4/29/25

comment. At this time we are going to take a break. We will resume at 10:45. Welcome back, friends. Joining us at the table now is Jeff Andre. And I'm going to get it right (inaudible) yesterday, so forgive me. Andre is the new Deputy Assistant Secretary for Policy and Innovation in the Office of Secondary Education. He comes to the administration with 40 years of experience in Federal education and workforce development policy, in both the public and private sector. From his initial start as a student advocate for improvements in the Higher Education Act, Jeff has worked at the Department as a career civil servant, working his way up from entry-level policy analyst to senior budget analyst, responsible for student financial assistance. On Capitol Hill, the Senior Republican staffer on the House Education and Workforce Committee, successfully reauthorizing the Higher Education Act, Workforce Investment Act and other important legislation to assist people with disabilities. He also drafted landmark legislation which created the Federal Government's first performance-based organization, the United States Department's very own Federal Student Aid office. In addition to having served previously as Deputy Assistant Secretary, he has also served in other Federal executive roles, including director of the fund for the Improvement of Postsecondary

Education, Special Assistant to the Deputy Secretary of Education, and Associate Administrator for Entrepreneurial Development at the US Small Business Administration, where he managed programs that provide training and business counseling for over 2.4 million small business clients. More recently, Jeff has worked in the private sector as an outside consultant and an in-house- and in-house roles with schools, colleges, and universities in all sectors, lenders, as well as other corporate and nonprofit clients. A first-generation American originally from New Bedford, Massachusetts, Jeff was the first in his family to graduate from college with the help of Pell Grants, Federal loans, campus-based aid, and institutional scholarship. He holds a bachelor's degree with honors in political science from the American University in Washington, D.C., and resides in Anne Arundel County, Maryland with his wife, Kathy, and 11-year-old son. (inaudible). Heather Perfetti? Lift the mic up just a little bit for me. Just tilt it up. There you go. Heather, you have three minutes. Thank you.

DR. PERFETTI: My name is Dr. Heather Perfetti, and I currently serve as President of the Middle States Commission on Higher Education and as chair of the council of Regional Accrediting Commissions, also known as C-RAC. I am here today on behalf of C-RAC to

discuss the Department's intent to establish Negotiated Rulemaking. We look forward to being part of discussions which examine how current regulations may be inhibiting innovation and contributing to rising college costs. C-RAC has always offered ways to address these and other issues by streamlining or eliminating unnecessary regulatory processes that are not otherwise required by law. Institutions and accreditors would benefit from reduced regulatory burden in some areas to both allow for more innovation while also addressing issues of cost. We want to draw attention to several specific areas as examples. First, the recognition and renewal process of accreditors. Aspects of current regulations could be streamlined to facilitate the recognition of new accreditors, while holding all accreditors to the same standards and expectations. Reviewing the current process of renewal could also result in a more streamlined and efficient system. Second, the process for institutions changing accreditors. The Higher Education Act has for decades allowed institutions to move from one accreditor to another. However, recent regulations as well as sub-regulatory guidance have led to confusion and at times, lengthy delays in the process. Reviewing existing policies and actions can help better streamline this process. Third, reexamining definitions. Definitions of

2025 Negotiated Rulemaking Public Hearing - 4/29/25

63

distance education, competency-based education, and
credit hours should be reexamined to determine the extent
to which current regulations inhibit innovation in any of
these areas. Fourth, providing increased flexibility
regarding substantive change. Current regulations require
accreditors to approve a wide variety of actions
considered substantive changes. Accreditors should be
provided more flexibility to determine when such
approvals are actually needed to prevent unnecessary and
costly reviews. As in past Negotiated Rulemaking efforts,
C-RAC welcomes the opportunity to participate in a full
review of current regulations to ensure consistency with
the Higher Education Act. We appreciate the opportunity
to share our input and help the Department drive quality,
ensure accountability, and protect students through
Federal policy. We look forward to working with the
Department to address these and other issues, and I thank
you for the opportunity to be here today.

MS. ABERNATHY: Thank you for your
comment. Rachel Dubreuil? I'm sorry if I massacred your
name. Please correct me. You have three minutes.

MS. DUBREUIL: Thank you. Good
morning. My name is Rachel Dubreuil and I'm a social
studies teacher from the Connecticut Technical High
School system and a proud SVFT union member. I also carry

2025 Negotiated Rulemaking Public Hearing - 4/29/25

roughly $88,000 in Federal Student Loan debt. Back in 2010, while working at Fitchburg State University, I started tracking my qualifying payments toward PSLF. This was before my loan servicer even acknowledged that PSLF existed. I was quietly doing the work, trusting in the promise our Government had made me. Never would I have imagined that 15 years later, I'd be here fighting for the survival of these programs. And the truth is, programs like PSLF and IDR are more than policies. They're lifelines for millions of Americans, including me. I don't use the word lifeline lightly. These programs really are the difference between financially surviving and drowning. It's because of PSLF and IDR that I was able to return to school to get my Masters of Arts in teaching to become a teacher. I made that choice because I wanted to serve and give back to the community. And without the promise of PSLF and IDR, I wouldn't have been able to do that. Public servants, teachers, nurses, first responders, law enforcement. We accept lower pay, longer hours and the emotional toll that comes with our work because we believe in something bigger than ourselves. PSLF was meant to recognize that serving the public often requires advanced degrees, but comes- excuse me, but rarely comes with the salaries to support them. PSLF and IDR were created to acknowledge that reality to level the

playing field. For my family, the- that promise shaped our most personal decision. For example, my husband and I chose to have our funny and fierce daughter Penny when we did because we believed there was a light at the end of the tunnel for this debt. But now I worry that student loan debt will be generational in my family, because I can't begin saving for her education until I have finished paying for mine. $78,000 worth of my loan should have been forgiven months ago. And instead, the rug was pulled out from under me with no answers. My family's future is now stuck in limbo, and it's been a nightmare. I have honored every part of my agreement. I have played by the rules, and now I'm stuck waiting and hoping. This isn't just financial, it's emotional and it's soul-crushing. Because the truth is, if PSLF and IDR go away, I don't know what I'll do. And I don't know what millions of us will do. PSLF and IDR are more than just a promise. They're a legal agreement. We need these programs to survive, not just for ourselves, but for the next generation of public servants who deserve to dream without fear of financial ruin. Thank you so much.

　　　　　MS. ABERNATHY: Thank you for your comment. Christopher Schorr? You have three minutes.

　　　　　DR. SCHORR: Thank you. Good morning. My name is Dr. Christopher Schorr. I serve as director of

higher education at the American Policy Institute. My comments today concern data reporting to the National Center for Education Statistics. The Department can help institutions of higher education to combat grade inflation by using its data reporting authorities to require Title IV schools to report average standardized test scores for students. Under this proposal, Title IV schools would report mean SAT and ACT scores at the course or Department level- and Department level. The Department would then make these data available through the IPEDS database. Public access to these data would enable education researchers to better measure academic rigor. Absent these data, grade point average comparisons between departments cannot account for non-comparable student populations. If, for example, students enrolled in critical disability studies and biomedical engineering earned comparable GPAs, it's not obvious that the two fields are equally rigorous. Accounting for student aptitude would enable universities to craft better-calibrated remedies for grade inflation. For example, a course or department-level cap on the proportion of A grades could be adjusted by Department or over time. Without such adjustments, across the board caps could discourage students from majoring in more demanding fields. Paradoxically, this would exacerbate known causes

of grade inflation, students shifting to less rigorous disciplines. Grade inflation must be addressed because current trends are unsustainable. Graders, for example, professors and grad students have strong incentives to treat students like customers, happy. Lax grading not only makes life easier, it also contributes to more favorable ratings from students and for professors these ratings factor into tenure and promotion decisions. Grades communicate information about student aptitude, including subject matter mastery, diligence, skill, grade inflation impedes the ability of grades to communicate this information, rendering excellent students indistinguishable from merely competent students. Due to grade inflation, graduate admissions officers and employers are now forced to evaluate applicants by other and often less useful (inaudible). Research has also linked grade inflation to reduced student learning and achievement. The proposed regulation relies on existing statutory authorities, and it is minimally burdensome. It does not risk student privacy because no individual test scores could be inferred from a course or Department average. Importantly, this proposal does not prescribe any solutions for grade inflation or preempt universities in any way. What it would do is provide information to help (30 seconds) researchers and ultimately

universities, to develop more effective (inaudible). Thank you.

MS. ABERNATHY: Thank you for your comment. Mandar Jadhav? Forgive me if I've massacred your name.

MR. JADHAV: You got it perfectly right. So, thank you very much.

MS. ABERNATHY: You have three minutes.

MR. JADHAV: Thanks. Good morning. My name is Mandar Jadhav. I'm a pediatric psychiatrist and a former Republican policy advisor to the Senate Committee on health, education, labor, and pensions. Thank you for the opportunity to speak today. These views are my personal opinions and not of any organizations or employers. This is a very timely hearing because Congress is working on a bill right now that could have lasting impact on the Public Service Loan Forgiveness program and Direct Loans. PSLF is what has enabled me to commit to serving my fellow Americans throughout my career. I put myself through college using merit-based scholarships and work-study programs, but I could not have gone to medical school without direct loans and PSLF. Upon graduating, I was left $400,000 in debt, and through my ten years of public service, I have never been paid well enough to pay

that debt back without PSLF. What PSLF has let me do is take care of hundreds of children, teenagers, seniors, parents in rural communities and urban areas. PSLF has also let me contribute to passing legislation that has expanded access to behavioral health services across America. And today, I work for a nonprofit that advocates for primary care access for all, something that also saves taxpayer dollars. So, in short, Direct Loans, Income Driven Repayment, and PSLF have allowed me to pursue my passion and not chase a paycheck. If in 2026 I get PSLF forgiveness, I would be able to finally buy a house, get married, and start a family. So, I ask the Department to take four steps to protect and stabilize Direct Loans, IDR, and PSLF. Number one, transition folks like me that have been stuck in SAVE forbearance involuntarily for over a year into an eligible Income Driven Repayment Plan. Two, ensure that this SAVE forbearance counts towards PSLF through the buyback process, which allows us to pay back more of what we owe. Three, ensure that people that have dedicated their whole careers to working in public service, in nonprofits, in Government, in safety net clinics, and other essential services can retain their eligibility for PSLF. And four, for those of us who sometimes get our income through 1099 payments instead of a W-2 while working in public

service, please consider allowing those payments and those months of employment to also be eligible for PSLF. Thank you very much for listening to me today, and I'm happy to follow up with any information and answer any questions that you may have. Thank you.

       MS. ABERNATHY: Thank you for your comment. Sandy Saens?

       MS. SAENS: Hi. Good morning. Thank you for the opportunity to speak. My name is (inaudible) Saens, and I'm a first-generation college student. I'm currently a fourth-year student at the University of California, Davis. I represent or I currently serve as my university's external affairs vice president, which means I represent the 32,000 undergraduate students at UC Davis to local, state, and federal levels. On a broader level, I'm also a part of the UC Student Association, which represents 232,000 students across the state of California. And I come today- I come to you today as a student who knows what it means to work hard for education. And I know how much that chance depends on fair, accessible, and reliable student debt relief programs like the public loans- like the Public Service Loan Forgiveness and Income Driven Repayment Plans. For students like me, these programs aren't just a policy, but they're a promise, a promise that education will be a

pathway to opportunity and not a sentence to decades of
financial insecurity. They are a promise that public
service is not just valued in words, but also in
practice. What's being proposed now is not reform. It's a
calculated step towards dismantling the very protections
that allow low and middle-income Americans to dream,
plan, and serve. Gutting PSLF and narrowing Income Driven
Repayment Plans would push millions into higher payments
for longer periods and stripping them of the relief that
they were promised. It's more than a rollback. It's a
betrayal of public trust and an attack on the working
people, especially those of us who are trying to break
generational cycles through education. We know that these
programs aren't perfect. The student loan system has
failed many for too long. But the answer isn't to take
away what's already been promised. It's to honor the
commitments that have already been made and to ensure
that students today and tomorrow are not punished for
pursuing an education. As a first-generation student, I
carry the hopes of my family and my community and those
who never had a chance to stand where I'm standing here
today. I urge you to protect PSLF and ICR not just for
current borrowers, but for all future borrowers. Thank
you for your time.

        MS. ABERNATHY: Thank you for your

comment. Esther Mejia? Aditi Harihan? And Esther one more
time. Joseph Anastacio? Test that mic for me quick. Your
voice.

                MR. ANASTACIO: Hello, I'm sorry.

                MS. ABERNATHY: Three minutes.

                MR. ANASTACIO: Thank you. My name is
Joseph Anastacio, and I'm a student at the University of
California, Riverside. I'm also the son of a single
immigrant mother who spent her life teaching in Head
Start classrooms, fighting to make sure low-income
children had access to the education they deserved. I'm
here today because student debt should never be a life
sentence. Any attempt to gut the Public Service Loan
Forgiveness, Pay As You Earn, or Income Contingent
Repayment Plan is an attack on the working-class families
this system was meant to serve. Let's be clear. What's
being proposed isn't reform. It's retaliation. It's part
of a larger agenda to punish low-income borrowers, strip
public servants of promise relief, and force millions
into unaffordable monthly payments. These changes would
break the promise made to teachers, nurses, veterans, and
public defenders, people who have given years of their
lives and service to this country, expecting fairness in
return. I wouldn't be in college without Income Driven
Repayment Programs, and I know I'm not alone. 8 million

2025 Negotiated Rulemaking Public Hearing - 4/29/25

73

people enrolled in SAVE because it gave them a real path
to financial stability. (inaudible) these programs now
would be devastating. This Department must reject any
rule change that- rule changes that narrow access to
PSLF, PAYE, or ICR. Instead, we must expand protections,
cancel debt for its promise, and fix the broken system
that got us here in the first place. Our futures are not
bargaining chips. We need a student loan system that
works for borrowers, not for loan servicers- services or
political agendas. Thank you.

          MS. ABERNATHY: Thank you for your
comments. Raigan Johnson? Raigan Johnson? Isabella Anaya?
You have three minutes.

          MS. ANAYA: Thank you. Hello,
everyone. My name is Isabella Anaya, and I'm a current
second-year student at UCLA. And I also work for the UCLA
School of Law as a legal translator for the Family
Immigration Clinic. I'm speaking today not just as
someone concerned about student loan policy, but as
someone who knows what's at stake for our generation.
These aren't just policy names. They're promises made to
teachers, nurses, social workers, and graduates who have
dedicated themselves to education, the protections for
borrowers who are told that their debt would never be a
lifelong burden. As someone from an immigrant family and

as a first-generation student raised by a single mother, financial aid accessibility is the reason I can go to college and pursue a future with higher education. Gutting these programs will trap millions in debt and will hinder economic mobility to grow our futures, purchase homes, and start families. If we let this happen, we'll be punishing the very people who keep our communities running; public service workers, graduates, and borrowers from all walks of life, many of whom are already counting on the debt relief they've worked for. Please allow us to protect what we were promised and ensure the future that we deserve. Thank you.

MS. ABERNATHY: Thank you for your comment. Aditi Harihan? Please correct me if I've mispronounced your name. Will you tilt that mic down for me? Make sure you can-

MS. HARIHAN: Hello? Did it work? Hi. Thank you so much (inaudible). Okay. Hi, my name is Aditi Harihan. And thank you so much for allowing me the space here to speak today. Trump's plan to change PSLF and ICR is an attempt to implement Project 2025's (inaudible) to increase student debt bills and remove borrower protections. Students can already not afford to go to school with the prices of food, housing, transportation, textbook materials and more increasing constantly. As the

UC Student Association President this year representing
all UC undergraduates, which is over 135,000 students, as
well as a student at UC Davis myself, I have been able to
see firsthand the large numbers of basic needs insecurity
on campus, almost making up half of the UC student
populace. College prices are already too high and
inaccessible, and this move by the Federal Government
works to further reduce the number of people who can
access higher education. Students do not want to go to
school if they know that they will be stuck with high
loan repayment for the rest of their lives. That is a
significant barrier to students being able to access
higher education, because people don't want to be trapped
in debt and high payments. Students oppose this move, the
community opposes this move, and it's important that the
Federal Government affirms the necessity of education as
a basic right, because education is already a huge
financial investment, and it's important that a majority
of people can access this. Thank you.

          MS. ABERNATHY: Thank you for your
comment. Esther Mejia?

          MS. MEJIA: Hello.

          MS. ABERNATHY: Can you turn it down
just- tilt it down just a little bit more. Just tilt it.

          MS. MEJIA: Perfect.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

                    MS. ABERNATHY: Yes. You have three
minutes. Thank you.

                    MS. MEJIA: Good morning. My name is
Esther Mejia. I'm a fourth-year at the University of
California Santa Barbara, and I also serve as the
Government Relations chair for the UC Student
Association. I'm not only a product of Pell Grant and
Federal Work Study, but I'm a product of free and reduced
school lunch, and I'm a product of Title I Funding. I'm
here today to advocate for the protection of Public
Service Loan Forgiveness programs and income-based
student debt relief programs. This topic is more than a
public comment to me. It is personal. I got into
Georgetown School of Foreign Service for graduate school.
As a first-generation student who dreamed of getting a
bachelor's degree, having the opportunity to get my
master's degree was beyond my wildest dreams, and that of
my parents. With no financial aid to fall back on, in
seven days, I have to make a decision on whether or not
to commit to going to graduate school and commit to
getting into over $100,000 in debt. The decision that you
make here in this room makes an impact on the rest of my
life. I've worked tirelessly throughout my undergrad to
get into grad school, and now your decision on this
matter and people's ability to get debt relief programs

is not only a decision that is going to affect me, but it's going to affect millions of Americans across the country. If you eliminate or narrow program PSLF, PAYE, and ICR, American borrowers will be trapped in debt with higher payments for longer times. Destroying PSLF would mean millions who earned relief through public service and made decades of payments in good faith would be cheated out of their right to cancellation. The decision that you make on PSLF- on PSLF will impact students' decisions and ability to go to college. And in the long run, it will stop us from creating an educated and competitive workforce on the international level. If we want to bring jobs back to America, we need to give people the opportunity to be eligible and access those jobs. That tool of accessibility can only be received through education. Thank you.

          MS. ABERNATHY: Thank you for your comment. Jared Castaneda?

          MR. CASTANEDA: Hello.

          MS. ABERNATHY: Three minutes.

          MR. CASTANEDA: Sounds good. Hi, my name is Jared Castaneda, and I serve as the Government Relations Aide for the Associated Students of UC Irvine in California. Go Eaters. Today, many students have given their stories today not just to highlight the proposed

economic malpractice, but to stand up to the modern-day
disenfranchisement of students and public service
workers. Today, the same people who gained their
Government positions through campaigning for the working
class have proposed pushing out this country's next
generation of public service leaders. This administration
superficially champions working-class rhetoric, while
simultaneously decreasing the financial well-being of
working-class families and increasing money into
corporate loan entities and interests. We did see where
serving similar corporate interests landed us in 2008,
and oftentimes I wonder when these policies will trickle
down money to mine and other low-income people's pockets.
Today, borrowers already are burdened by an economy
characterized by unaffordability. Cuts and limits to
PSLF, PAYE, and ICR will have irreversible effects on
people's credit, rent money, and their ability to live
and have their basic needs met. Actually, people will
generally be required to have higher payments for a
longer amount of time than current timelines. I cannot
see how this allegedly will serve the working class, the
same working class that works hard tirelessly to
subsidize this country's highest earners. Concurrently,
members across the entire political spectrum have failed
to deliver accountability for deceiving loaning

practices, and so our futures are left with uncertainty.
As someone who aspires to go into public service, these
proposals on loan repayments discourage and punish my
peers for working for the community. We deserve to
contribute to our communities without the burden of
lifelong debt, and we cannot retire the same people who
dedicate their lives to uplifting the public into
poverty. Furthermore, establishing limits and dismantling
specific loan repayment programs will deprive me and
thousands of other students who aspire to serve their
communities the opportunity to enter the public sector.
Lastly, I do not understand why my education and access
to loans are being politicized. Across the country,
academic freedom and dissent is being silenced and
policies disenfranchising our education are being
implemented while those same people acknowledged that
teachers, nurses, and other careers are facing shortages.
Yet, the politicization of education is nothing new.
Universities used to be nearly a public good, but
following the civil rights movement, the cost of college
spiked during the Reagan Administrations. Similarly, as
our communities face and have fought against massive
injustice, especially through students and higher
education, higher education is becoming more
inaccessible. We need to safeguard the hopes and dreams

of the next generation of public service leaders, and we
need to continue these programs that serve as a
foundation for people who want to serve their
communities. Retaliation against the working class is not
and will never be the answer. Thank you.

   MS. ABERNATHY: Thank you for your
comment. Ashley Ann Reich?

   MS. REICH: Hello.

   MS. ABERNATHY: You have three
minutes.

   MS. REICH: Thank you. My name is
Ashley Reich. I'm the senior vice president of University
Compliance representing Liberty University. Thank you for
the opportunity to speak on these important issues
surrounding student loan repayment plans, as well as
other regulations that have had a profound impact on our
over 100,000 students. As a nonprofit institution of
higher education, Liberty's employees have been the
beneficiaries of Public Service Loan Forgiveness. I am
one of those employees that has been able to qualify and
benefit from this program. Additionally, we have many of
our students that qualify for this program as public
service. Liberty supports the continued inclusion of the
institutions of higher education as a qualified employer,
assisting our employees who are serving students and

2025 Negotiated Rulemaking Public Hearing - 4/29/25

communities to reach educational goals, develop a better quality of life and achieve academic success. Currently, the process is cumbersome and there has been confusion around the buyback program and delays in processing. This program should be streamlined to ensure timely processing, especially as individuals become eligible for forgiveness. Regarding PAYE and ICR, Liberty frequently receives comments from students that have confusion surrounding the complexities of the repayment plans. There are too many options, too many steps, and information overload that often leaves students paralyzed and unable to choose or maintain a repayment plan that fits their financial circumstances. As someone that has spent over 18 years in higher education and most of my time administering student loan programs, I've counseled countless students on how to navigate this process. I encourage the Department to prioritize simplicity and streamlining repayment programs. The need for straightforward options, minimal application processes, and auto-reenrollment each year are essential for students to maintain payments and prevent loan default, which would be a win-win for the students and the institutions. We have been supportive over the years of (inaudible) income-based repayment plan, one standard plan, and the continued opportunity for PSLF options with

appropriate guardrails for eligible students. I'd also like to take the opportunity to talk about a few additional Title IV regulations to consider. We support the rollback of gainful employment and Financial Value Transparency, as well as borrower defense to repayment regulations. At a minimum, we would ask the Department to reconsider the metrics being used and systems being created to house the data collected. One really important issue for our institution is state authorization. State authorization for institutions providing distance education has evolved multiple times over the years. Our institution has been knee-deep in regulations due to the fact that we have students across state lines and many licensure programs. These regulations require all programs that are designed and advertised to meet licensure requirements and have become incredibly burdensome. All in all, these additional requirements add significant burden for institutions and reduce creativity and thought for developing academic programs as a complex system of state requirements, prohibitive. Thank you for the opportunity to present today. We've also submitted detailed suggestions in our written comments. Thank you.

     MS. ABERNATHY: Thank you for your comments. Raigan Johnson?

     MS. JOHNSON: Hello? Hello? Better?

2025 Negotiated Rulemaking Public Hearing - 4/29/25

83

                    MS. ABERNATHY: Yes.

                    MS. JOHNSON: Thank you. My name is
Raigan Johnson. I'm a third-year student at UC San Diego
studying public health and graduating this year. As a
first-generation student from a working background and
single-income family, I am no stranger to student loans
and financial aid. I have worked through high school and
all through college in order to afford my tuition, rent,
and basic needs. And yet, I have still taken out student
loans and will have to pay off my debt. This is not
uncommon to hear that a student cannot attend university
without the help of Federal Aid, myself amongst them. It
has become normal for students to struggle to pay back
their loan debt. What is not normal is the fact that this
administration does not seem to care and intends on
cutting programs that directly impact the lives of
millions of students and families across the country.
Students, myself, obviously support time-based debt
relief, Income Driven Loan Repayment, and expanding the
Pell. Without these resources, some of us are likely to
spend the rest of our lives repaying our loans,
especially those of us seeking to attend graduate or
professional schools. It is also evident that the general
public supports these initiatives, as polls show that 60%
of voters, including a majority of Republicans, oppose

eliminating Income Driven Repayment options. So how can
it be that legislators elected by us and for us, attempt
to cut funds that their constituents need? We urge you to
help us keep them accountable. Killing Pay As You Earn
and Income Contingent Repayment Plans would jack up
monthly bills, especially for borrowers who earn too much
for Income-Based Repayment but too little to pay off
their loans, graduates struggling to pay for rent and
basic needs, and not able to contribute to the economy in
the way that they should. With less jobs everywhere due
to Government budget cuts and erroneous executive orders,
how are we meant to pay back our loans at all, let alone
at a higher monthly price? With inflation out of control
despite promises to lower it, how are we meant to afford
food, clothes, or transportation? This attack on student
borrowers is not just an attempt to cut corners on
funding, but an attempt to limit accessibility of higher
education. With these cuts, struggling to pay for loans
will become a privilege (inaudible) reduced to folks not
even able to think about attending university due to the
cost. These proposals are not reform; they are attacks
against the working people and we are not blind to that.
Students urge you to remember that the effects of these
funding cuts will be catastrophic to the system. We
deserve access to higher education and the ability to

change our life trajectories. College should not only be
for the wealthy. Thank you.

MS. ABERNATHY: Thank you for your
comment.

MR. ANDRE: I just want to jump in and
just clarify. This rulemaking that we're talking about,
there are no proposed budget cuts. There's no proposed
elimination of PSLF. So, to- just to keep the facts on
the table and the narrative, we're talking about this
proposed rulemaking type of thing that we do to get rid
of PSLF requires legislative changes. We're dealing with
what we can do under statutory authorities. And so, I
just wanted to set the record. And this has nothing to do
with budget cuts. Thank you.

MS. ABERNATHY: Ben Bartlett?

MR. BARTLETT: Hi. Can you hear me
okay?

MS. ABERNATHY: Perhaps you should
hold the mic for this.

MR. BARTLETT: Yeah, I'll hold-

MS. ABERNATHY: Can you do that?

MR. BARTLETT: Okay. How's this?

MS. ABERNATHY: Great. You have three
minutes.

MR. BARTLETT: Hi, my name is Ben

2025 Negotiated Rulemaking Public Hearing - 4/29/25

Bartlett, and I'm a student at the University of
California, Berkeley in the Federal Government Deputy
Director. I finished my degree two years early, and I'm
taking this year to complete my thesis in HIV and AIDS.
But, yeah, I'm so overwhelmed with that. I stand before
you today as not only a student of one of the world's
most prestigious public institutions, but as the son of a
single mother who works tirelessly to keep our family
afloat in the San Bernardino Valley. I speak today not
from theory or abstraction, but from lived experiences,
because these proposed changes to PSLF, PAYE, and ICR
aren't policy tweaks, they are sure threats to families
like mine. My mother works full-time, often picking up
extra shifts to provide for me and my disabled younger
brother. She does this while carrying the weight of a
household alone. She's never asked for anything but a
chance, just the opportunity for her children to rise
above the limitations that poverty seeks to impose. And I
believe that education was the path. So, I studied, I
sacrificed and enrolled at UC Berkeley. But make no
mistake, I did this alone. I did not (inaudible). I did
it through loans, Federal Aid Programs that promise not
just access to education, but the hope of a future not
crushed under the weight of debt and working three jobs,
one of which is work study. Now I prepare for graduate

school knowing I will have to take on more loans because
of my NIH grant research and environmental microbiology
being cut at prospective graduate schools. Instead of
focusing on my research, my fieldwork, my service, I now
spend sleepless nights wondering if the very programs
that made this journey even remotely possible will still
exist. The Department of Education's intent to overhaul
these programs under the guise of procedural reform is
not neutral. It's a move (inaudible) an ideology acquired
by devastating rollback of borrower protections designed
to entrench inequity. These are not repayment plans.
These are lifelines. And if you sever them, you don't
just increase payments, you bury people. The elimination
of these programs would be a betrayal of millions of
borrowers, especially those from marginalized and
working-class backgrounds. The Public Service Loan
Forgiveness Program is not a loophole; it's a moral
contract. It says that every teacher and nurse, social
worker and public defender through service matters. This
is that we recognize the value we give to our society,
even when the work isn't lucrative. Removing it tells us
that we are disposable. PAYE and ICR exist because income
should determine your ability to pay, and predatory
interest rates are arbitrary timelines. These programs
recognize that a degree should not be a change to a

lifetime of financial precarity for people like me, who (inaudible), these plans are what stand between dignity and despair. Let me be clear. These changes are not about fiscal responsibility. They are ideological punishment retaliation against working-class students, students of color, first-generation college graduates, and anyone who dared to believe in the promise of upward mobility through education. The (inaudible) now of the pandemic revealed the fragility of so many Americans financial (inaudible) is unconscionable. It's not reform. It's erasure. Erasure of progress, of equity, of faith in the American dream. I urge the Department and the decision makers involved in the Negotiated Rulemaking process to not abandon us. Do not sacrifice millions- futures of millions (inaudible). We're not asking for a handout. We're asking for a fair shot.

MS. ABERNATHY: (inaudible). Valeria, Valeria Velasco? I'm sorry if I mispronounced that. Test the mic for me to make sure you can-.

MS. VELASCO: Hello? Hello. Good?

MS. ABERNATHY: Just make sure you stand close to it.

MS. VELASCO: Is this better? Okay.

MS. ABERNATHY: You have three minutes.

MS. VELASCO: Thank you. Hi. Good
morning. My name is Maria Velasco. I'm a fourth-year
international relations student at UC Davis, and I also
work as a student supervisor at the Financial Aid Office,
where I assist students and families with questions and
concerns related to financial aid. I'm here today to
speak out against the proposed changes of the Public
Service Loan Forgiveness Program, Pay As You Earn, and
Income Driven Repayment Plans. As a student supervisor, I
talk to families and students directly about their
financial aid options, and one thing that I consistently
notice is how hesitant and worried they are when it comes
to student loans. Many students come- sorry, many
students are anxious about the ability to manage debt and
the long-term burden that it will create. However, when I
explain the available relief options such as PSLF, PAYE,
and ICR, they feel more confident in pursuing higher
education. These programs help students take the first
step towards their academic and career goals without the
overwhelming fear of unmanageable debt. These programs
are essential in making higher education accessible. They
allow students to attend their dream schools and to start
the path in achieving their American dreams. If these
programs are scaled back, it will only serve to
discourage students from pursuing higher education. It

will close doors for motivated, talented individuals who
are working hard to improve their futures and to
contribute to their communities. With the current decline
in college enrollment, these changes have had devastating
effects on the future workforce and particularly in high-
skilled job sectors. We need to support these programs to
ensure that students are not pushed away from education
because of the looming burden of debt. I firsthand have
seen the effect of these programs and how it has affected
my peers. I've witnessed students who are unsure about
pursuing their degrees due to the financial barriers, and
once they learn about these programs and the potential
loan forgiveness they are- they feel more empowered, and
they want to continue their education. For these
students, PSLF, PAYE, and IDR are more than just loan
programs. They request a real opportunity to invest in
their futures without, without drowning in debt. I urge
for the protection of student loan borrowers and the
programs that assist them. These programs are vital for
ensuring that students can pursue their education without
the fear of lifetime debt. Cutting or eliminating or
limiting- sorry, these programs will only discourage
students from attending college, ultimately harming our
economy and workforce. Please consider the long-term
impacts of these changes and listen to the voices of the

students who rely on these protections. Thank you for your time and consideration and the needs of the students across the country. I hope that you will choose to protect these vital programs and ensure that all students have the opportunity to succeed. Thank you.

MS. ABERNATHY: Thank you for your comment. Javier Nunez-Verdugo.

MR. NUNEZ-VERDUGO: Hello. Hello. Okay.

MS. ABERNATHY: You have three minutes.

MR. NUNEZ-VERDUGO: Good morning. My name is Javier Nunez-Verdugo, and I am a UCLA student serving as their external vice president, representing the interests of tens of thousands of undergraduate students to university administration, local, state, and Federal Government. I also serve alongside the UC Students Association, like many of my peers, representing over 230,000 students from a variety of backgrounds. Today, I am advocating for the existence and maintenance of Income Driven Repayment Plans and Public Service Loan Forgiveness program. As a first-generation low-income student, a child of immigrants, financial programs that support the inclusion of students from diverse backgrounds like these are crucial to closing equity gaps

in higher education. Without access to Federal financial aid programs like the Pell and student loans, I not only would not be here today in my capacity as a student advocate, I would also would not be able to receive lifesaving medical care for my disability. For others, IDR and PSLF means economic stability and opportunity for not just themselves, but their families, both biological and (inaudible). (inaudible) education and work (inaudible) to life. (inaudible) gutting these financial programs like IDR and PSLF will not only stunt the economic growth of millions of Americans but is an intent to kill because being forced to pay exorbitant amounts of debt rather than providing for their basic needs like food, rent, and even necessary medical expenses is deadly. An intent to cut access to millions unable to earn their right to an education is inherently against the people and principles of democracy that I have learned since 22 years of my life, I've been living in this country. I call upon the Department to protect access to (inaudible) programs like IDR and PSLF (inaudible) for the students like me across the country today to address the Board. (inaudible) generations of youth that will continue to (inaudible) the dreams that can be skyrocketed to their highest potential through receiving a college degree. Thank you.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

MS. ABERNATHY: Thank you for your comment. We're going to take a slight break. (inaudible) difficulty with the mic. So, if you would, please make sure you speak into it so that we can hear you, that would be really helpful. Joe Smith, would you please come?

MR. SMITH: Can you all hear me well? Good. All right, good morning.

MS. ABERNATHY: Three minutes.

MR. SMITH: My name is Joe Smith. I am a 26-year veteran of the Department, recently retired from FSA's Institutional Oversight Program. The Financial Composite Score is in need of reform, but you should refrain from amending it during this rulemaking. Instead, you should be preparing reform by engaging an independent financial firm to first identify industry best practices, alternative conceptual designs, and legal obstacles to implementing improved methodology. Then, consistent with section 426 of the Department's Organization Act, report your findings to Congress along with any statutory changes recommended by the study. Once the law has been amended, begin a new rulemaking. Second, modernization of financial information collection requirements and increased transparency will help you, states, accreditors, and others better identify and mitigate

school closure risks and avoid huge costs to taxpayers
and students. To this end, Title IV program participants
should report quarterly unaudited financial statements
and footnotes in addition to audited annual filings as a
condition of participation. Financial statements, data,
and other information should be reported in Extensible
Business Reporting Language to enable computerized
analysis. The recent abolishment of FSA's Financial
Analysis Division heightens the need for major upgrades
to financial data, information collections, and for
unrestricted public access to the Department's data
assets covering the financial responsibility and
condition of participating entities. Third, the era of
ever-changing gainful employment rule must end. Partner
with Congress to enact lasting accountability reforms,
while allowing the courts to judge whether the latest GE
rules will survive (inaudible) scrutiny. Related to GE,
strike 668.16t and rely solely on 668.171 B2 iii, which
itself should be amended an index to an operating
(inaudible). Fourth, the Stop Campus Hazing Act contains
conflicting implementation (inaudible). Issue interim
final rules clarifying when the new law should be
implemented by schools. Fifth, the Administrative
Capability Rule should be reorganized around its implied
categories of organizational structure and staffing,

counseling, administrative competency, and institutional
integrity. Sixth, as documented by the GAO and others,
students transferring between Title IV participating
institutions can experience needless loss of academic
credit. Receiving institutions frequently have residency
requirements that waste students' time and cause them to
repeat substantially similar courses previously passed
and paid for with Federal funds at their prior school.
Consider carrots and sticks for institutions and their
accrediting agencies to minimize stranded academic
credits, to promote timely degree completion by transfer
students, and to disallow wasteful spending on (20
seconds) (inaudible). Since the Department has diminished
its oversight capacity, work with Congress to finalize
the wind-down of your legacy student loan programs such
as the Federal Perkins Loan Program. Finally, encourage
Congress to renew the Advisory Committee on Student
Financial Assistance to assist the Secretary with the
work for which today's hearing has been convened. Thank
you for the time today.

       MS. ABERNATHY: Thank you for your
comment. Maleeyah Frazier?

       MS. FRAZIER: Can you hear me? Okay.

       MS. ABERNATHY: You have three
minutes.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

                    MS. FRAZIER: Okay. Good afternoon. My
name is Maleeyah Frazier. I'm a first-generation low-
income college student at UCLA. I'm a product of public
education, and I'm speaking today as a student of the
University of California system. On behalf of countless
students, alumni, parents, and future borrowers across
the country, I am as well deeply concerned about the
proposals currently being considered during this
Negotiated Rulemaking process. If enacted, these changes
would not only devastate millions of borrowers, they
would also fundamentally harm the future of higher
education access for students, public service, and
economic mobility in this country. Limiting access to
Public Service Loan Forgiveness would directly,
disproportionately punish those who have committed their
careers to teaching, public service, government work, and
nonprofit service, these professions, these professions
which are critical to our futures, to our communities.
People are always preaching that the, that the youth are
the leaders of tomorrow. We are, in fact, the leaders of
today. Communities already face serious staffing
shortages in education. Making loan forgiveness even
harder to attain will not only deepen the crisis and send
chilling messages that serving public good is not valued.
Eliminating time-based debt relief would essentially turn

student debt into a life sentence. No one should spend decades trapped under the weight of loans for seeking education, especially when education is supposed to be a public good and not a private burden. Finally, increasing average monthly payments from $98 to nearly $300 would force many borrowers, particularly low-income, first-generation college students and people of color, causing them financial instability. At a time where cost of living is already skyrocketing, this change will push more people into default, deepening wealth inequality and erode trust in higher education systems. Everyone can agree that the cost of living is extremely high, but the Pell Grant and Cal Grant have not kept up with those moving expenses. We urge the Department and this current administration to protect existing programs like PSLF, maintain pathways for first-time-based loan forgiveness, and prioritize policies that make education more affordable, attainable, and not policies that punish borrowers who are simply trying to invest into their futures. Thank you.

      MS. ABERNATHY: Thank you for your comment. Sheryl Samala?

      MS. SAMALA: Hello.

      MS. ABERNATHY: You have three minutes.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

MS. SAMALA: Hi, my name is Sheryl Samala. I'm a second-year studying public affairs and labor study at UCLA. I'm here on behalf of not just only myself as an individual student, but of the thousands of students across California who face barriers to higher education. I was brought here by my student government, the external vice president office at UCLA, and the University of California Student Association, to represent our collective voice. I'm a first-generation low-income student. I received financial aid, the Pell Grant and Work Study. And with all of that, the rising cost of tuition, housing, and food make it difficult going through college. But for undocumented students and students from racially targeted communities, their barriers are even deeper. They face additional systemic obstacles and fewer protections, making it even harder to achieve their educational dreams. I'm here to urge you to protect Income Driven Repayment Plans like PSLF, Pay As You Earn, and Income, Income Contingent Repayment. These programs matter. Without them, so many low-income and middle-income students would be left behind. And that includes students like me who want to go to college, who want to serve our community but are afraid of being buried in debt for the rest of our lives. What's being proposed not only makes student debt worse, these changes

would force borrowers to make higher payments for longer, and take away the options that give us a fair shot at financial stability. And it sends a message that our goals and our futures don't matter. But investing in students is investing in the future of this country. We're going to be the next generation of public service workers, educators, social workers, healthcare workers and leaders. If we make college more expensive and harder to- harder to repay loans, we're not just hurting students, we're hurting the country's workforce and long-term success. I'm grateful to be speaking here today, and I'm speaking on behalf of so many students who don't get the chance to be here, students who are already discouraged from pursuing higher education because they can't afford it and are scared of going into long life-lifelong debt. We need policies that support students, not ones that push us away. Please protect PSLF, PAYE, and ICR to ensure that higher education remains accessible for all. Thank you.

            MS. ABERNATHY: Thank you for your comment. Alexa Arredondo Aguilar?

            MS. ARREDONDO AGUILAR: Good morning. My name is Alexa Arredondo Aguilar. I want to start off by saying thank you for allowing me the space to speak with you today. I'm a first-generation university student

invited by the University of California Student Association to act as a delegate to represent the needs of our thousands of students in the UC system right now. About 32% of students at UC take out loans, and I'm one of them. Within my first year, I believe I racked up about $8,000 in loans. And after four years, you know, I've taken up two jobs consistently. I've had those jobs for four years, and I am not even near close to repaying these loans. I am not even about halfway through paying these loans. And I'm super grateful for my family and the opportunity to go to college in general, and to represent the needs of the Mexican immigrant community as a Mexican immigrant myself, who has established citizenship and opportunity that many people in my community don't even consider as an option. So, I'm urging you to please, please do your best to protect programs and income repayment programs like IDR and PSLF. Thank you for your time. I'm just one voice, but- and I may not be very tall, or I may not be like the voice you see every day, but I really, really hope that my voice carries some weight in your consideration. Thank you so much.

            MS. ABERNATHY: Thank you for your comment. Jake Garcia-Ducich. I hope I didn't massacre that. Ducich. Thank you.

            MR. GARCIA-DUCICH: Hello. Okay.

                    MS. ABERNATHY: You have three
minutes.

                    MR. GARCIA-DUCICH: Thank you. Hi, I'm
Jake. I'm a student at UC Davis. I'm a third-year
transfer student and political science student. And I
just wanted to clarify that the narrative that this is-
you know, that this can only be eliminated legislatively.
I think it's misleading because the reality is that
shelling out these- you know, the changing the
qualification criteria or whatever it may be, drastically
reducing these programs is extremely harmful to all of
the students that have come here and that- all of us that
need to take out loans need to continue to rely on
support from the Government. And the reality is that this
is not- I want to reverse the narrative that this, this
aid is some sort of, you know, handout, that it's
something that the Government needs to give to students.
The reality is that college has become increasingly
unaffordable, that this is something that has not kept up
with decades past, and that students are needed, that we
are the future of the economy and that we will construct
and continue the institutions that operate now. And the
narrative that this is just something that, you know,
it's optional. I want to stress that it is not optional.
And you know, the forgiveness that is being given, the

forgiveness that is being implemented, these driven repayment, repayment plans are the complete- they're a perfect example of, you know, the, the narrowness of the whole self-reliance idea because people are fighting already, they have jobs, we're studying, we're relying on the little- you know, a lot of students are food insecure. I think it's 30 to 40% of all university students. And this is a fight that we are continuing and to have to have any forgiveness that we have taken away on top of the fight that we are currently waging to support the systems that exist now to create you know, prosperity for everyone, this is our goal, is- I think it's just insulting, honestly and, and shortsighted because the reality is we need to promote stability long-term and we need to think in long-term with a long-term vision. And if we support, if we invest in students, if we create a robust system for the promotion of public service workers- I mean, these are systems that are vital that, that, you know, let our country be alive. And without that support, without the incentivization, we, we lose students, we lose education, we lose the basis for the continuation of our country and the, the, the prosperity of our people. And I just want to understand that this mindset of, of- the short-sighted mindset of not abundance, but scarcity- it creates scarcity long-

term.

MS. ABERNATHY: (30 seconds)

MR. GARCIA-DUCICH: And if we create a culture of abundance, and we promote learning just for the sake of learning and truly support these educators, these people working for public service, we will get this in return. It is an investment that comes back. So that's all I wanted to say. Thank you.

MS. ABERNATHY: Thank you for your comments. Christine Kieta?

MS. KIETA: Christine Kieta and-

MS. ABERNATHY: Three minutes.

MS. KIETA: Three minutes. I am a private attorney, as you all may know, and I do have a small practice in the suburbs of Chicago. So, I do see the different repayment programs in different capacities. And my comments really on those specifically related to the rise in the cost of education are what are the latent economic effects of these long-term repayment programs, just generally on the US economy, separately from and in addition to subsidizing the actual student loans. In 2023, the average graduate loan disbursement for Southwestern Law School was $188,164. A sample loan repayment schedule for sample loans for $188,164, at 6% paid over 25 years, generated interest of $175,538.99.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

But because it's graduate student loans, if it's at 8% interest, then the interest over 25 years is $257,520.08. The total cost of tuition for that school is somewhere between $363,703.99 to $445,684.08. The interest alone is a retirement account. This is a serious financial investment. And these amounts that I just gave you assume that there are zero problems administering these repayment programs. Zero accounting errors, zero litigation that affects them, zero delays in annual recertification, to name a few. Just to color the financial impact more fully, if somebody spends four years undergraduate school, three years in graduate school, and then 20 or 25 years in one of these repayment programs, that's administered totally perfectly, that person is affected for 30 years financially, not 2, not 10, not 20, 30 years financially. Multiply that by millions of people across the US economy. The National Center for Education for Health Statistics reported as of April 25, 2024, birth rates for women between 20 and 39 declined. As this stat relates to society, a serious question then becomes, what are the wider effects of this debt on the health of the US economy? Would just the interest be better in a retirement account, accruing interest itself with these student loan borrowers are not a responsibility of the US taxpayer, but at a later stage

2025 Negotiated Rulemaking Public Hearing - 4/29/25

in life? Does the long-term nature of this debt disincentivize these student loan borrowers from adding people to the US economy?

MS. ABERNATHY: 20 seconds.

MS. KIETA: And should these colleges continue to enjoy what appears to be zero risk of loss related to the tuition, given the very obvious likelihood of taxpayer subsidization? Thank you.

MS. ABERNATHY: Thank you for your comment. Erin Karl? You have three minutes.

DR. KARL: Hello. My name is Dr. Erin Karl, and I'm an emergency medicine physician at Hennepin County Medical Center in Minneapolis. And yes, if you hear emergency medicine and you think of The Pitt on HBO, it's exactly like that, but more on that later. In regard to PSLF, qualifying employers for healthcare workers, this should, of course, continue to include nonprofit hospitals, but I would also recommend counting payments made while working at nonprofit hospitals yet while being paid directly through a contract management group via 1099. At the end of the day, a physician who is paid by a CMG at a nonprofit hospital is still putting in 120 months of payments that would otherwise be qualifying if it wasn't for a 1099 and CMGs taking over emergency medicine contracts. It's also essential that payments

made while training at a qualified hospital during residency are counted. Resident physicians work over- up to, and sometimes over 80 hours per week during residency, and to not count these payments would be insulting. In talking with my friends who are both physicians and active-duty military, not counting payments during residency would be like not counting months deployed towards the total year served in the military. Next, those of us currently on SAVE were changed to this plan without consent or a new contract, and thus we should be allowed to buy back these months that we're currently in a forced forbearance. Many of us have tried to switch to PAYE or IDR yet have been stuck in the void for months. We want to pay. We want to have these months count. Again, we want to pay these months. I'm speaking of ways to pay. Remember that those of us pursuing PSLF want to stimulate the economy once we've reached our 120 qualifying payments. There are thousands of us on PSLF, even physicians who cannot afford to buy a house and have children until their loans are forgiven. I cannot, as a physician, both buy a house right now and have a child. I have to decide between those two right now. Back to SAVE. Please transfer those of us currently on SAVE to the new plan, while honoring the timeline for recertification of our income that we all received

official notice of earlier this year. Many of us are getting delayed for our recertification for the year. One of the last things I want to leave you with is while I work at an urban teaching hospital, I was raised in rural Minnesota, and rural medicine in America relies heavily on PSLF as a means to recruit primary care physicians to practice in communities that they might not have otherwise considered. Even our residents, who are currently rotating in rural emergency departments, have now signed contracts with those areas, and they would not be able to do that if they could not get their loans forgiven. Finally, I want to leave you with this. If you haven't yet seen The Pitt, I want you to watch the first episode tonight. Then ask yourself, how do you feel? Are you emotional? Do you wonder who would choose to do this? Well, EM docs like me, who clearly did not go into this for the money, that's for sure.

            MS. ABERNATHY: 20 seconds.

            DR. KARL: Someone who believes that even while working harder yet making well over $100,000 less per year than my co-residents who work for private groups, I want to do my part to make healthcare in America better for each and every one of my patients. Just like on The Pitt, when we walk into a shift through the crowd of more than 40 patients, we do this to save

lives. So why make this harder for us? Please, please, please support common sense regulations for PSLF. And by the way, support me and my fellow public healthcare service workers. Thank you so much for your time and consideration.

                MS. ABERNATHY: Thank you for your comment. Mizuni Reese?

                MS. REESE: Hi. Hello? Okay, cool.

                MS. ABERNATHY: Stand close to it. Three minutes.

                MS. REESE: Got it. So, hi, I'm Mizuni Reese. I am a third-year student at UC Davis, double majoring in both political science and African American studies. And I'm here on behalf of my school and my UCSA Association, of course, but I'm also here to speak on behalf of the students on Pell Grant, Cal Grant A and B, as well as a merit-based scholarship. As a student, I am grateful to be here and of course, grateful for the opportunity for education. But I am firstly a first-generation student from a single-parent household who grew up in Marin County on Section 8. With two younger siblings, I'm here to build a legacy for my family and develop an understanding of the value of education. And without the Pell Grant and Cal Grant A and B, as well as merit-based scholarship, I wouldn't be able to do the

advocacy I do today. I wouldn't be able to participate in
the research that I've conducted through both University
of California Center at Sacramento, the Transformative
Justice Through Education Program at UC Davis, as well as
the Aggie Scholar Research Initiative. I'm on my third
round of research contributing to the social sciences and
political science community because I value education so
much. My research is based on equity in education, and
all of my findings have supported my reasons for being
here again. Again, as a first-generation student, I
understand the necessity for these financial aid- for
these financial aid resources. Without these things, I
couldn't afford my education, let alone the living
expenses that allowed for me to be at this institution.
Republicans have always insisted upon limiting government
aid to Americans like myself, who have fallen victim to
the disparities we've seen in inequality of wealth and
education. I'm here to really resolve those issues, but
without the educational financial aid that you guys
provide, I would not be able to do so. I have a friend
from Chicago who's here on out of state, out of state
tuition, who's doing research at UC Davis Medical School
under Dr. Wang, making breakthroughs in Alzheimer's
research, yet she has thousands of dollars in student
debt while still being on the Pell Grant. With

2025 Negotiated Rulemaking Public Hearing - 4/29/25

aspirations to work in healthcare, the PSLF is essential to her success and her continuation of her education. How do you expect American students to pursue careers essential to a modern society, such as healthcare, law, and education if they can barely afford undergraduate degrees, let alone additional education necessary to pursue those careers? These practices are predatory, attacking working-class Americans who seek to educate themselves and embody the meritocracy Republicans to credit for their own success despite clear socioeconomic disparities between classes that make this impossible. Continuing student loan debt is already debilitating, and without financial aid and assistance such as Pell Grant, we will be unable to produce enough educated and capable Americans to create the robust domestic economy Republicans seek to foster through their aggressive, isolating policy practices we see today. I implore you to defend our student population, protecting them from exorbitant loan payments and denial of education due to financial barriers. These policies are the antithesis of American values, making education only attainable to those with the financial means, directly juxtaposing American foundations of equality of opportunity. Without the financial assistance we currently have, students like myself would no longer be able to contribute their

2025 Negotiated Rulemaking Public Hearing - 4/29/25

experiences, research, and educational value to the institutions I represent today. So again, I implore you to support our students and protect us from these violent and aggressive policies that would no longer make it able for someone like myself to be here in front of you today. Thank you for your time.

MS. ABERNATHY: Thank you for your comments. We're going to break for lunch. We will see you back at 1:00.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING PUBLIC HEARING

SESSION 1, DAY 1, AFTERNOON

APRIL 29, 2025

2025 Negotiated Rulemaking Public Hearing - 4/29/25

2

P R O C E E D I N G S

MS. ABERNATHY: Welcome back from lunch. We'll get right started with our next comment. As a reminder, please come up to the podium, give your name, your affiliation, and then I'll let you know you have three minutes. Persis. Persis Yu.  is it on?

MS. YU: There we go.

MS. ABERNATHY: Okay. You have three minutes.

MS. YU: Thank you. Good afternoon. My name is Persis Yu, and I'm the deputy executive director and managing counsel of the Student Borrower Protection Center. We stand in strong opposition to the Trump Administration's attempt to implement Project 2025, which calls for gutting Income Driven Repayment options and eliminating Public Service Loan Forgiveness. Let's be clear. The Trump Administration's assault on IDR and PSLF isn't reform, it's retaliation. These actions would force nurses, teachers, veterans, and others who have dedicated their careers to serve our communities, to choose between paying their monthly student loan bills and putting food on their table. Borrowers everywhere would be taken further into debt while relief is pushed further out of reach. Congress passed the Income Contingent Repayment statute with a clear goal to prevent student debt from

ED_01686

becoming a life sentence. Despite attempts by right wing groups to rewrite history, it is clear that Congress intended ICR to include cancellation after no more than 25 years. For 30 years, administrations of both parties have refined protections to keep borrowers out of delinquency, default, and a lifetime of debt. But for too long, government mismanagement and student loan industry abuses made existing IDR options more of a debt trap, allowing balances to balloon and failing to provide the financial relief borrowers need. These historic failures led the Biden Administration to create the saving on a valuable education plan. I proudly served as a primary legal aid negotiator on the rulemaking committee, which created the SAVE Plan. During these negotiations, borrowers provided heartbreaking testimony about the inability to afford their rent, pay for critical medical care, and cover other basic necessities. The resulting SAVE Plan, which proponents of Project 2025 claim is too generous, was pegged to the amount that would reduce food insecurity. It would have cut monthly payments in half for many borrowers, protecting borrowers from runaway balances and expedited debt relief for borrowers with low balances. Student loan delinquencies are now skyrocketing, with nearly four million borrowers behind on their student loan payments. But instead of defending

affordable repayment options, this Administration has
forced millions  to remain in economic limbo. As
borrowers face a looming default cliff, this
administration plans to start ripping vital Social
Security benefits from millions of seniors and borrowers
with disabilities. Instead of helping millions of
borrowers who have been failed by this broken student
loan system, it's eliminating what few safeguards exist
to help them. Instead of strengthening Public Service
Loan Forgiveness and ensuring public service workers get
the relief they are entitled to, this Administration
plans to illegally weaponize PSLF in order to punish
public service workers employed at organizations engaged
in work that is not in line with President Trump's
agenda. These efforts will ultimately threaten critical
public service fields and harm our most vulnerable
communities.

                MS. ABERNATHY: 20 seconds.

                MS. YU: For these reasons, we
strongly oppose any efforts that would force working
families to pay even more on their monthly student loan
bills and deprive borrowers of critical cancellation.
Thank you.

                MS. ABERNATHY: Thank you for your
comment. Daniel Carter?

MR. CARTER: Good afternoon.

MS. ABERNATHY: You have three minutes.

MR. CARTER: Good afternoon. My name is S. Daniel Carter, President of Safe Campuses LLC, a campus safety consultant from Georgia. With three decades of experience in campus safety and security, I am grateful for the opportunity to speak today about the Clery Act regulations and their vital role in protecting students and ensuring institutional accountability. For context, the Clery Act is a Federal Law under Title IV of the Higher Education Act that requires colleges and universities to report campus crime data, maintain security policies, and alert the campus community about ongoing threats. This includes issuing annual security reports, keeping a daily crime log, and providing timely warnings, measures that promote transparency and safety on campuses nationwide, and protect taxpayer investment. The Clery Act regulations provide critical clarity that enable institutions to meet their statutory obligations effectively. For instance, they define key terms like campus security authority, interpretations that are not arbitrary but necessary to implement the statute's broad mandates. They also detail how to compile crime statistics and maintain logs, ensuring consistent,

accurate reporting across institutions. If the Department
is considering evaluating these regulations, I urge
caution. The regulations are essential tools for
compliance carefully aligned with the statute's purpose.
It would be prudent to defer any evaluation until it can
receive the thorough, thoughtful attention it deserves.
Campus safety is a nuanced and dynamic issue and rushed
changes could create confusion. Finally, if the
Department opts for Negotiated Rulemaking on Clery Act
issues, I strongly recommend including relevant
practitioners and experts as nonfederal negotiators.
Campus safety professionals, compliance officers, and
victim advocates bring invaluable real-world insights.
Having served as a non-federal negotiator three times,
1999, 2009, 2014, I can attest that this collaborative
process, mandated by the Higher Education Act,
encourages, ensures regulations are practical, effective,
and responsive to institutional challenges. In closing,
the Clery Act regulations are indispensable tools for
compliance and safety. They are not mere additions, but
necessary implementations of the statute's framework
developed through a collaborative, expert-informed
process. Any review should be measured, prioritizing
clarity, caution, and collaboration to preserve their
effectiveness. I encourage the Department to uphold these

principles in addressing these critical issues. Thank you for your time. And one last note I would second the request of the gentleman earlier outside the Negotiated Rulemaking process for some clarity on the timelines for the Stop Campus Hazing Act. Thank you.

MS. ABERNATHY: Thank you for your comment. Elizabeth Tang. You have three minutes.

MS. TANG: Hi, my name is Elizabeth Tang and I'm here to ask you not to make any changes that undermine or cancel critical programs like Public Service Loan Forgiveness and Income Driven Repayment, including Pay as You Earn. I'm a child of immigrants. I was lucky enough to receive both merit and need-based scholarships to attend college. After college, I spent two years working at a nonprofit advocating against gender-based violence in India, earning a salary of $15,000 in total over those two years. When I returned to the US and started a dual degree program, including a law degree, I had to take out more than $300,000 in federal loans to pay for it. Since graduating, I've been practicing as a civil rights attorney at a nonprofit organization advocating on behalf of survivors of gender-based violence. My work has included educating students and workers about their rights, advocating for stronger laws and regulations against gender-based violence, including

2025 Negotiated Rulemaking Public Hearing - 4/29/25

here at the Department and litigating against schools and government bodies that violate those rights. I could not have done any of this work without IDR and the promise of PSLF. When I started my career, my salary was $50,000 a year despite having three degrees, including two advanced degrees. IDR was what allowed me to afford to live in DC at all. Today, I've made nearly 90 payments toward the 120 payments required for loan cancellation under PSLF, yet my total balance remains over $300,000 and in fact has only increased. There is simply no way I could ever pay this off without IDR. My economic security and that of my future child, who is due in July, depends critically on the continued existence of IDR and PSLF. Now it is true I could switch to a corporate law job with an astronomically higher salary, helping a corporation accumulate more profit, but I have no desire to do so. I know that my lifelong passion is fighting systemic injustice for people who live at the margins of society. At the same time, I know the stark reality is that if the Department or Congress chooses to gut IDR, I will not be able to afford to pay 50% or 70%-75% of my take-home pay toward my student loans. And if you or Congress decides to gut PSLF, I will be locked in a catastrophic lifetime cycle of debt that will drastically limit and foreclose choices and possibilities not only for me, but also for

my future child. And this is the case for millions of
students across the country. I remember in college how
billion-dollar corporations avidly recruited on campus.
I, too, explored but ultimately rejected one of these
high-paying jobs. But today, a full 50% of my college's
graduating class will take lucrative careers in finance,
consulting, and technology. And 74% of my law school will
take a lucrative career at a corporate law firm. Less
than 11% of my law school will choose public interest.
That number will only plummet further if you take away
IDR and PSLF. IDR and PSLF are not just programs that
support the livelihood of public interest workers like
myself. They are also investments in our nation's public
interest programs, public education, life-saving
healthcare, pro-bono legal services, and other vital
programs that serve millions of people across (30
seconds). Preserving IDR and PSLF is far bigger than the
people testifying in this room today. It is about
investing in the future sustainability and vitality of
this country. It is undeniably a moral decision, and I
hope you make the right one. Thank you.

                MS. ABERNATHY: Thank you for your
comments. Clinton Walls?

                DR. WALLS: Hi, my name is Clinton
Walls.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

                    MS. ABERNATHY: You have three

minutes.

                    DR. WALLS: Thanks. I'm Dr. Clinton

Walls. I have no fancy affiliation aside from just being

a student loan borrower who has over half-a-million

dollars in student loan debt and nine years and eight

months into the PSLF program. So, if we look back at this

in 1965, the original AGA passed and out of that, we got

GBL, which in the 90s evolved into FFEL, which was then

scrapped for the FDLP. And under all these repayment

programs, we got IBR and then we got the broader-based

IDR, which had PAYE and then had REPAYE and has ICR and

then SAVE REPAYE turned into SAVE and now SAVE doesn't

exist basically. And anyway, we got this alphabet soup

and my idea or my opinion on all of this is that the

student loan system has become very fragmented. And I

can, as a physician who works in hospitals and I'm used

to age caps and HIPAA and EMTALA and all of the alphabet

soup of that world, I appreciate the effort to try to

reform this and streamline things. I kind of feel like if

we look at this whole situation here, after six decades

ofthis process, we've come to a pretty good program in

the 2010s. PAYE was working well the powers that be that

could have challenged the repayment terms under PAYE did

not choose to do so. And actually, that's now passed the

statute of limitations. REPAYE was created just to backfill in an arbitrary cutoff date that was created under PAYE and essentially had very similar terms; 90% of the terms were similar. And that was kind of trucking along fine until prior administration decided to rock the boat. And I'm not here to talk about the prior administration rocking the boat, but I feel like moving forward, you're looking for solutions. I feel like if we look at what was previously created, there's an opportunity here to create a unified repayment plan that would apply to everyone that takes the best of the terms of PAYE and REPAYE that were not challenged a 10% cap on discretionary income for the payment amount. You could look at what Congress passed with IDR that said that a 25-year repayment term would be the max, combine those things, make it apply to all borrowers, and you'd have a very simple, straightforward, every borrower knows what they're getting themselves into, every borrower is eligible for the same kind of program, which hopefully is what you're looking to do. The only other thing I would say is Public Service Loan Forgiveness, if I'm being honest, I think it should be outside the scope of what's being considered right now, because it was created by an act of Congress and by being created by an act of Congress, executive action, and the action of the

Department should not be able to modify that. And a lot of people have been relying on that for a decade of their lives, like myself. Thank you for your time.

MS. ABERNATHY: Thank you for your comments. Latianna Nichols-Badu? Mary Lyn Hammer? You have three minutes.

MS. HAMMER: Thank you. My name is Mary Lyn Hammer, and I'm the president and CEO of Champion College Solutions, Champion Empowerment Institute, and Champion for Success. And my passion for this industry comes from growing up in an abusive home in Montana where it was pretty rough, and I figured out early on that education was my ticket to freedom. And so, I enrolled in advanced classes early on. And I graduated from college when I was 19 years old. And that allowed me to break away from the generations of abuse that had gone on in my family. And in 1988, January, I was hired as the first full-time default manager in the history of the country. The first language about default management was Appendix D, and that was written by me with some of the Department officials. And that was mandatory language from 1989 to 1996. When it was rewritten into subpart M and subpart N, I was one of the negotiators. I've negotiated many times, and I've helped to contribute to every higher education law since 1988, so I have

2025 Negotiated Rulemaking Public Hearing - 4/29/25

extensive knowledge of the business. My oldest company is 35 years old, and we've been doing default management for 35 years. So, during that time, what I have discovered is that there's basically three categories of people who either pay or default. There's a percentage that will always pay. There's a percentage that will never pay. And then there's a big bucket in between. And those are the people where we can make a difference. Those are the people that just need some extra handholding. And based on the criteria for qualifying for these loans, the more you qualify, the lower the income. And they often come from welfare recipient backgrounds where nobody's ever had a checking account. And so, what's happened over the years is complexity is the enemy of execution. And it's become way too complex for most of the people who qualify for the biggest amounts of loans. So that's something that I feel that we can address. The solutions and repayment should reduce the debt, which has been a huge problem. It should support higher education, and it should empower people who otherwise would never have a chance to build a credit portfolio. So, it can truly change somebody's life, not just in student loans, but in what it can do for them down the road when they have a credit file. So, the components of it that are important are that it must be affordable. And that's the most

2025 Negotiated Rulemaking Public Hearing - 4/29/25

14

complex part of this is, what is affordable? So, you have
to take into consideration-

                    MS. ABERNATHY: 20 seconds.

                    MS. HAMMER: -if the payments are
affordable, if it pays down the principle, and if the
loan forgiveness is affordable. And so, I think through a
combination of changing what we have, incorporating more
of the standard repayment program where it's predictable,
we can get there.

                    MS. ABERNATHY: Time.

                    MS. HAMMER: Thank you.

                    MS. ABERNATHY: Thank you for your
comments. Melissa Byrne?

                    MS. BYRNE: Hi. My name is Melissa-
Byrne with We the 45 Million. I am a borrower and I'm
here today because there's a bunch of billionaires in
America, including Linda, who is at this agency who lied
to everybody about a golden age in America, but really,
they just want to bring back a gilded age in America.
We're not here today because you guys actually want to
help borrowers. You're here because people like James
care more about the loan companies and the people that
are profiting off us. You don't care about the fact that
they've been defunding higher education for the last 40,
50 years so that way we have a loan-based system as

opposed to a free higher education system that's public.
So, we're here because you guys want to hurt borrowers.
You want to hurt future students. And I think that's
despicable. There's nothing American about coming here
and saying, we're going to hurt you and we're going to
harm you. The best you guys could do for student loan
borrowers for the next three and a half years is nothing.
If you just kept things as status quo, we can hopefully
in four years be able to clean up the mess that you and
your DOGE Bros are doing to people. And it's disgusting
and it's horrible.  Right now, you fired the people that
could actually help student loan borrowers. And for some
reason, you've kept around other people who don't want to
actually help borrowers. And people like James and on the
outside who are on the outside the last four years, you
brought it all the way to the Supreme Court over the
contract for MOHELA to harm borrowers, and all of a
sudden now you just slashed contracts every single day as
if there's nothing to do with contracts. So, let's be
clear. What you guys' care about today is hurting
borrowers. It's burning down the American Dream because
you would rather kids who are born poor and middle class
wipe the shoes of people that are born affluent, wipe the
rings of Linda McMahon. It is time for these billionaires
just to go float on their yachts in the Mediterranean and

2025 Negotiated Rulemaking Public Hearing - 4/29/25

leave the workings of America to people who actually care about each other. And it is shameful. And anybody here who works to hurt student loan borrowers, shame on you. Shame on everybody who wants to hurt borrowers, hurt students, hurt families. And I hope every single day of your lives you feel guilt and shame for hurting everybody. And you have a chance today to leave here after listening to borrowers and say, you know what? The DOGE Bros, Elon, Trump, they're all full of (inaudible) and I'm going to turn my life around and I'm going to help borrowers. I'm going to help students. Or you can choose to say (inaudible) Americans, we're just going to help the few become super wealthier than they already are. Maybe you all can just get on a rocket ship with Elon and go to Mars. (30 seconds) And so in closing, literally just do nothing for the next three and a half years. That's the best you can do for borrowers. Otherwise, just know (inaudible)

                MS. ABERNATHY: Thank you for your comments. Amelia Mercado? Three minutes.

                MS. MERCADO: My name is Amelia Mercado. I am a third-year medical student at Baylor College of Medicine in Houston, currently interning with the American College of Physicians in DC. Thank you for this opportunity to speak about PSLF today. Like many

students, I researched financial aid options before curriculum or faculty-to-student ratios when applying to medical school, and this approach helped me secure a full tuition scholarship at Baylor to also graduate with debt from living expenses. I am incredibly lucky, though. Many of my classmates from undergrad had to accept their only admission offer from medical schools charging over $70,000 annually, accumulating over $280,000 in tuition debt alone. And these costs are unfortunately changing medicine. A 2023 survey found that 1 in 4 medical students consider quitting, and 61% plan to pursue careers that do not involve patient care. For those that remain, many choose lucrative specialties or wealthy areas just to manage debt, avoiding public institutions entirely. Rural families, working-class communities, and veterans suffer as a result. But PSLF provides that critical bridge, allowing physicians to serve vulnerable populations while maintaining financial stability. During my clinical rotations, I've witnessed firsthand that public service hospitals are where we help America's most vulnerable. I've seen the best and worst of humanity in Houston's beloved Ben Taub, our community safety net hospital where no one is turned away. I will never forget caring for an incarcerated woman giving birth completely alone. With no family or support allowed, I held her hand

throughout her delivery and when the nurse asked for the baby's name, my patient turned to me, looked at my badge, and quietly read my first name, Amelia. And this wasn't gratitude. It simply revealed how little kindness she had experienced in her life and the simple act of holding her hand, the most basic form of human compassion, prompted her to name her baby after me. And it shows how really she had been treated with basic dignity. This moment shows what public service medicine offers the opportunity to be present for society's most marginalized, treating them with the humanity everyone deserves. Student debt should not force physicians away from these essential settings towards higher-paying private facilities, serving only those who can afford care. PSLF provides a clear, compact, committed decade to serving your community and receive student debt relief. It upholds service and responsibility, which are values that transcend political divides and unite us as Americans. I urge you to strengthen and protect this vital program that represents the best of who we are as a nation. Thank you.

          MS. ABERNATHY: Thank you for your comments. Kathyrn Gimborys. I apologize if I've massacred that name. You have three minutes.

          MS. GIMBORYS: Good afternoon. My name

is Kathryn Gimborys, and I'm the government relations
manager at the American Association of Community
Colleges. AACC will submit detailed comments on the
rulemaking process next week. But today, we would like to
highlight four key areas that we urge the Department to
look at as you put together your rulemaking agenda.
First, we share the Department's goal of streamlining and
improving existing Title IV processes to promote
innovation in student success. To that end, we encourage
the Department to revisit the regulations around return
of Title IV funds. While the rules were improved during
the last round of Negotiated Rulemaking, they remained
needlessly complicated, burdensome, and time-consuming.
We believe that they can be further simplified. Second,
our member colleges continue to tell us that approval of
program participation agreements, recertification, and
program review procedures are extremely burdensome and
time intensive. Collectively, they stifle the ability of
community colleges to be nimble and to adapt to changing
workforce and student needs.  we urge the Department,
rather, to systematically review the regulatory framework
in these areas to decrease institutional burden, in part
by reducing overlap. Next, we ask the Department's help
in combating fraudulent students who used stolen
identities to access and steal financial aid refunds.

2025 Negotiated Rulemaking Public Hearing - 4/29/25

This is an issue that greatly impacts community colleges because of our low tuitions. Our colleges continue to devote significant resources to identifying fraudulent students, often partnering with expensive vendors, and to date, they have received very little material or technical support from the Department. They are then left on the hook for any stolen funds as part of R2T4. We urge you to consider this problem during Negotiated Rulemaking. Excuse me. Finally, as the Department weighs changes to existing Income Driven Repayment plans, we urge you to craft policies that consider the experiences of low balance community college borrowers by only 12% of our students borrow, and they borrow significantly lower amounts than other types of students. They are more likely to be low-income and face greater obstacles to repayment. To that end, we ask the Department to consider a shorter timeline to forgiveness under IDR for small balance borrowers. Thank you for the opportunity to share these topics, and we look forward to working with you on these and other issues throughout the rulemaking process.

            MS. ABERNATHY: Thank you for your comments. Did Latianna Nichols-Badu show up? No? At this time, are there any of you in the audience who have not already spoken that would like to come up and make a public comment? Going once, going twice. Once again, I'd

ED_01704

like to acknowledge and thank the wonderful team members we have who have worked tirelessly behind the scenes to make this hearing happen. Conference team, event planners, technical assistance, logistics, our staff in the Office of Postsecondary Education. There were a number of logistic and technical, issues that needed attention and monitoring. Thank you to all who coordinated and organized, tested, confirmed, and assisted in every way with the many details needed to host this event. Without your efforts, this would not be possible. On behalf of Deputy Undersecretary and Assistant Secretary James Bergeron, we thank you, team, for your hard work and dedication to make this event successful. And from the bottom of my heart and our hearts, we appreciate you. And to you, and our virtual public, on behalf of the entire Department of Education team, we thank you for your comments and joining us today. Thank you for your feedback.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING PUBLIC HEARING

SESSION 1, DAY 2, MORNING

May 1, 2025

On the 1st day of May 2025, the following meeting was held virtually, from 9:00 a.m. to 12:00 p.m., before Jamie Young, Shorthand Reporter in the state of New Jersey.

PROCEEDINGS

MS. ABERNATHY: Good morning, everyone. Welcome to the Virtual Hearing for Negotiated Rulemaking. On behalf of the United States Department of Education, we welcome you and look forward to hearing your comments and feedback. My name is Tamy Abernathy, and I have the honor of introducing you to Mr. James Bergeron, who currently serves as the Deputy Undersecretary of Education and Acting Undersecretary. Now you've heard of a jack of all trades and master of none. We have a James of all trades and master of many. The office of the Undersecretary coordinates policies, programs, and activities related to the Office of Postsecondary Education, the Office of Career Technical Education, Adult Education, and Federal Student Aid, and is charged with planning and policy responsibilities to implement the President's higher education agenda. Prior to joining the Department, James served as President and Chief Executive Officer of the National Council of Higher Education Resources and Share, which represents state, nonprofit, and private higher education finance organizations that provide a holistic approach to student success from administering 529 College Savings Plans to operating state-funded grant, loan, scholarship, and college access and success programs for first-generation

low-income students. Prior to 2014, James worked as the
Director of Education and Human Services Policy for the
House Committee on Education and Workforce, where he
developed and managed the committee's legislative agenda
in all areas of education and human services policy,
including the reauthorization of the Higher Education
Act, Carl D. Perkins Career and Technical Education Act,
Elementary and Secondary Education Act, No Child Left
Behind, individuals with Disabilities Education Act,
Education Sciences Reform act, Workforce Investment Act,
Workforce Innovation and Opportunity Act, Assistive
Technology Act, Head Start Act, and other Federal laws
governing preschool, elementary, secondary, and
postsecondary education. He received a Bachelor of Arts
in Political Science from the University of Louisiana at
Lafayette. Now, we certainly will benefit greatly from
your wealth of knowledge and experiences, sir. Please
join me in welcoming Deputy Undersecretary of Education
and Acting Undersecretary James Bergeron to the podium.

       MR. BERGERON: Thanks, Tamy. Good
morning, everyone. Thank you for joining us today. On
behalf of Secretary Linda McMahon, I am pleased to
welcome you to this public hearing on Negotiated
Rulemaking for the Department. I'm joined today by other
Department officials, as you guys know, Tamy Abernathy,

as well as Jeff Andre from the Office of Postsecondary
Education, and Karen Bauer from the Office of General
Counsel. This is the second public hearing that we're
convening to gather comments on potential topics
regarding regulations that govern Title IV programs, as
authorized under Title IV of the Higher Education Act of
1965, as amended. Please refer to our Negotiated
Rulemaking website for additional details about this
hearing and other information related to the process. Two
months ago, Secretary McMahon tasked the Department and
its leaders with bringing back common-sense solutions to
postsecondary education and leveraging innovation to
reduce college costs. As a businesswoman, the Secretary
understands that higher education must lead to a well-
paying career and that students and families should have
a measurable return on investment. Unlike most commercial
industries, where new startups regularly disrupt legacy
companies, and competition creates an ecosystem of
innovation to better serve students, today's higher
education system has become overregulated and a little
unfocused. At the heart of these problems are Federal
regulations, red tape that force institutions to take on
large administrative and personnel costs and hike
tuition. Students are customers for colleges, no doubt,
but they're rarely treated that way. Rather, colleges and

universities are forced to prioritize compliance with
government regulations. That's why you're all here today
as stakeholders who care about students and institutions,
to make your voices heard through public comment and tell
us about your experiences dealing with these regulatory
burdens. To that end, the Department is soliciting
feedback- specific feedback on ways to streamline Federal
financial aid assistance that will maintain or improve
program integrity and institutional quality. We're also
looking for feedback on several regulatory proposals to
align Federal student aid programs with the
administration's priorities and clarify language on
repayment plans impacted by recent legal decisions. On
Public Service Loan Forgiveness, the Department is
interested in ensuring that motivated public servants,
who have dedicated their careers to critical services in
government or nonprofit work, are able to continue to
participate in these programs through qualifying
employers who are not engaged in illegal activities. We
are especially interested in feedback on how to best
amend the definition of a qualified employer, to exclude
those employers who engage in, perform any activity with
the substantial illegal purpose. The Department also
seeks to clarify the terms mentioned in the executive
order for the purposes of determining PSLF eligibility.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

6

On repayment plans, the Department would like to discuss
those improvements included in the final rule
establishing the SAVE or Saving on a Valuable Education
repayment plan, around family size and other provisions.
Those provisions were struck down by the US Court of
Appeals for the Eighth Circuit and recently upheld by the
US District Court for the Eastern District of Missouri,
though they were not the subject of the suit. We also
seek further feedback on further ideas for better
aligning Income Contingent Repayment and Pay As You Earn
repayment with the requirements of the law. Finally, the
Department is interested in exploring ways to streamline
Federal regulations to foster innovation and reduce
college costs while maintaining institutional integrity
and quality. The Department, in conjunction with the
administration and Secretary McMahon's priorities, is
eager to increase affordability and accessibility across
the P-16 education system. In postsecondary education,
the Department aims to empower states and institutions to
reduce barriers to entry and completion and control, or
better yet, reduce the cost burden of postsecondary
education in the United States. The Department welcomes
public input and innovative ideas on this important
topic. In addition, we welcome ideas from all
stakeholders on how to best improve your experience and

2025 Negotiated Rulemaking Public Hearing - 5/1/25

better improve affordability. For example, borrowers, what changes can we make to repayment plans that impacts you financially? How do they shape your decisions after graduating college? College leaders, what accreditation challenges do you face? Financial aid administrators, are there any improvements that we could make to rules around financial responsibility or change in ownership to simplify the process while maintaining program integrity? State officials, how can we best support and empower you to make the college system in your state world class? How can we reduce barriers? And taxpayer and public interest groups, how should we reform the Public Service Loan Forgiveness program to align with the President's promises? In all of this, your engagement will be essential. Today, everyone who wants to be able to contribute and provide comments will be able to do so, and our agency staff will be here to listen. With so many affected, it's appropriate that this process is fully collaborative. Together, we can build a higher education system that's cost effective, innovative, and inclusive, supporting all learners, whether those are pursuing traditional degrees or taking alternative postsecondary pathways. So once the public comment period is complete, the Department will publish a notice in the Federal Register bringing these issues and others that might be

added at the public suggestion before Negotiated
Rulemaking committee. And we will also seek nominations
for a committee, and we hope that you and your colleagues
will consider serving in that capacity at that time.
During the in-person negotiation process, the Department
will provide issue papers on subjects that will be
covered and will provide draft regulatory language for
discussion, which will serve as the basis for proposed
and final rules. Just like today, stakeholders will be
invited to contribute to the process. It's important to
keep in mind that the Department anticipates creating
multiple regulatory committees over the next year, so
there will be ample opportunities for participation by
the higher education community and the public. Today, we
continue this public comment period, building off
Tuesday's public hearing as the first step in crafting
rules that will reduce compliance burdens, lower college
costs, and foster innovation. Yes, we're heading into
what can become a slow, bureaucratic maze. This rule
making process will require hard work and careful
thought. But on a happier note, we know how impactful
this process will be for students when we reach the end.
The final rules or rules will advance educational
opportunity for millions of students, and their families,
begin to reverse the ongoing problem of rising college

2025 Negotiated Rulemaking Public Hearing - 5/1/25

9

costs, and provide a path for institutions to truly
innovate without the heavy hand of the Federal government
looking over your shoulder. Thank you for your commitment
to this process. I look forward to your insights and to
forge a brighter path for American education. So, before
I turn it over to Tamy, I want to go over the logistics
for the speakers for today's hearing. Tamy will call your
name. When it is your time to speak, please begin by
providing your name and your affiliation. You will have
three minutes. She will provide a 20-second warning and
inform you when the three minutes has ended. If you
exceed your time, we may mute you. You may turn on your
camera when presenting if you wish. We do ask that you
turn off the sound for the public meeting site, because
there is a few second delay on the public meeting, and
the public may have difficulty hearing you. When you're
speaking, you may not initially hear yourself, but after
a few seconds you will hear yourself on a delay. This
hearing is being transcribed, and we'll post a transcript
on our website within the next few weeks. We'll also
provide a recording of the hearing that will include
audio and video. Closed captioning is also available in
real time during the hearing. This is a public hearing,
and it's possible that a member of the public may record
your remarks and post edited clips of them before or

after the Department posts the full unedited hearing. And just a few more housekeeping items, we've extended the written public comment through May 8th. We have three scheduled breaks today, one at 10:30 to 10:45, another during lunch from 12 to 1, and then from 2:30 to 2:45. Breaks may be extended if we do not have commenters scheduled. So, with that, we'll look forward to hearing your comments. Thank you for your time and for sharing your information with us, and we look forward to a productive day. With that, I'll turn it over to Tamy.

MS. ABERNATHY: Thank you, James. As he mentioned, I'm Tamy Abernathy. I've worked with Federal student aid and loan programs since 1986, 39 years, and I'm the director of the Policy Coordination Group team in the Office of Postsecondary Education. And my team works on policy matters related to the Federal Student Loan programs. On behalf of the Department, we thank you again for joining us today. This concludes our introduction. Our first speaker is Adaku Onyeka-Crawford. And if I have mispronounced your name, my sincerest apologies. If you had read it yourself, and let me know when you're ready, we'll start the clock.

MS. ONYEKA-CRAWFORD: Hello. Good morning and thank you for allowing-

MS. ABERNATHY: You have three

minutes.

                    MS. ONYEKA-CRAWFORD: Okay, great.
Thank you. Good morning. My name is Adaku Onyeka-
Crawford, and I'm here to testify in support of programs
that encourage college graduates to pursue careers in the
public interest, including broad Income Based Loan
Repayment plans and Public Service Loan Forgiveness. And
full transparency, I participated and benefited from both
these programs, and during my nearly 15 years in public
service, I connected working-class Americans to job
training and educational programs to build their self-
sufficiency and break the cycle of generational poverty.
I've also represented students who have been
discriminated against because of their race or sex,
including a pregnant student who had been kicked out of
school, and a high school student who was expelled for
telling administrators she was forced to engage in sexual
conduct on campus. These are not lucrative cases to take
on, but they're vitally important to ensure that every
student has access to equal educational opportunities and
that folks who have been historically marginalized have
opportunities to succeed and thrive in meet the American
Dream. At the same time, the Public Service Loan
Forgiveness Program allows individuals to participate
tohave families, buy homes, and even fully participate in

American life outside of work. And so, these programs are
vitally important. They serve the public good while also
allowing college graduates to also have economic
opportunity. And I would just urge the Department to
think broadly about what nonprofit status is and what
programs can participate in the Public Service Loan
Forgiveness Program, and not to target certain
organizations because of the work that they do. Students,
workers, many people, continue to be historically
marginalized and currently marginalized, and there's
still more work to do to lift people out of their
disadvantaged status. And that is something that should
be rewarded and not penalized because of the way that
they do it. And that is all that I have prepared to talk
about. And I just hope that this Negotiated Rulemaking
process is broad and encompasses all the views of a
diversity of stakeholders, including people who represent
civil rights organizations, people who represent worker
rights organizations, people who represent individuals
who have been historically marginalized, because those
are people who have lacked access to opportunity. And
those are the people who benefit from these public good
programs. And with that, that's all I have for my
remarks. Thank you.

                MS. ABERNATHY: Thank you for your

comments. Tamara Murphy?

                    MS. MURPHY: Good morning. Thank you
for the opportunity to come and address you today. My
name is Tamara Murphy. I am a special education teacher.
I was late to becoming a teacher. Prior to that, I was an
army wife, three young children, and I was the FRG leader
for my husband's unit. My husband then got hurt after
serving for almost ten years, and he was medically
discharged from the Army. So, I taught preschool for a
little while in a Head Start classroom to try and help
support my family during my husband's recovery. My Head
Start classroom was blended and co-taught with an
intervention specialist and special education. I
discovered that I loved it, I was not making enough money
doing Head Start and preschool and decided to return to
school under the promise of Public Service Loan
Forgiveness. I should be eligible for loan forgiveness in
August, after having taught special education in self-
contained classrooms for some of our most significantly
support meeting students for nearly ten years now. But
instead, I'm caught in limbo because of having been
forced into the Save Plan and all the things going on.
Loan forgiveness was the reason that I returned to
school, and now, if I do not get my forgiveness soon, I'm
going to be struggling to help my own children as they

2025 Negotiated Rulemaking Public Hearing - 5/1/25

are now entering college. I do feel that we should consider having the saved time that we've all been stuck in limbo count towards forgiveness. In the last ten years, I have been making my payments, but at this point, my balance is still more than I originally borrowed because of some of the interest compounding and what my payment was set at based on Income Based Repayment because our family was low income. I chose to go into special education because my family has always been a type of family to serve. My husband in the army, my son is looking at enlisting when he graduates, it's the type of family we are. But I could have picked a degree that would have paid a lot more. My student loans are more than I make per year. If I did not have my husband's VA money in our income, we would have been below the poverty guidelines for a family our size, even on a teacher's salary. Teaching is not a lucrative field, and I think we all know that. But that's not the reason that we go into it. After ten years, I do feel that my forgiveness should go through. And I'm hoping that the board continues to champion these programs as they (20 seconds) recruit- as it is a good recruitment tool to get people into these fields with shorted pay. I feel it's like my husband's GI Bill. It allows me to do service even though I'm not physically capable of serving our country in the same

2025 Negotiated Rulemaking Public Hearing - 5/1/25

capacity he did. Given the current teacher shortage, I hope you will continue this program and thank you so much for your time.

MS. ABERNATHY: Thank you for your comment. Can you turn your camera off? Thank you. Rachel Patrick? Rachel Patrick? Christopher Laureano?

MR. LAUREANO: Hi. Can everyone hear me, okay?

MS. ABERNATHY: Yes, sir. You have three minutes.

MR. LAUREANO: Thank you. My name is Christopher Laureano, and I work as the director for a training and internship program at Baco Human Services in Boston, Massachusetts. I would like to bring up a few points regarding the usage of the Higher Education Act to make improvements on PSLF and increase its efficiency. I would like to start by bringing briefly up my experience with enrolling in PSLF. I had graduated from college with a bachelor's degree in 2015, and I remember knowing a little bit about this program, but not having a full understanding about how it works. It wasn't something that was brought up to me by anyone from high school or college. It was something that I vaguely bumped into online when I was looking for resources on student loan repayment plans after college graduation. I finally

enrolled in PSLF in September of 2017 based on my full-
time job, but I never felt like I fully understood what I
was supposed to do to have my payment counts updated. So,
I left it alone. However, it wasn't until the limited
waiver occurred in 2021 that I fully realized how PSLF
operates, and how important it was for me to catch up on
my payment counts through one time form submissions for
all my employment. To me, I felt like this was a Godsend
that I needed to be closer to getting my life back on
track. And I'm forever grateful and thankful for this
assistance I received. However, I've seen over the past
few years, multiple reports online and on the news
regarding continued funding for the Department being
reduced and stalled during the previous administration
because of various congressional budget reconciliation
bills that were voted on. Additionally, I've experienced
various issues with Federal Student Aid, including the
help tool not working and being told that there was
missing information on my PSLF forms when this was not
the case. When comparing all these issues that I brought
up with what the current administration is proposing for
PSLF, it's very clear to me that these events occurred
with purpose and intention, and that the idea of
improving efficiency for PSLF is really another code
phrase for saying that it should be restricted in some

2025 Negotiated Rulemaking Public Hearing - 5/1/25

way or eliminated entirely. What was proposed for the
executive order for this program is to restrict
eligibility, so that it aligns with what the
administration wants, based on their harmful rhetoric.
This is in addition to the executive orders to gut both
the Department and any programmatic assistance in dealing
with issues like mine. At this point, I'm thinking of not
only myself, but those who are going for loan forgiveness
to make student loan payments work for our budgets, and
how much we will be struggling if this option is ripped
apart from us. This is exactly what will happen if we
change PSLF to the degree that it becomes inaccessible
for so many of us, because of harmful rhetoric being
spewed by an administration that is advocating for more
pain and suffering. So, if we truly want to talk about
improving efficiency for the program, I suggest we talk
about ways to expand education nationally on loan
forgiveness programs and to provide more support for
resources and entities that can help make PSLF run more
smoothly. I'll be more than happy to be a part of this
effort, because to do this is to truly embody the
definition of efficiency. Thank you for your time.

            MS. ABERNATHY: Thank you for your
comments. Allie Wegner?

            MS. WEGNER: Good morning, everybody.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

MS. ABERNATHY: You have three minutes.

MS. WEGNER: Thank you very much. I join you here today to express my strong support of the PSLF program in the Income Driven Repayment Programs that make it possible. My name is Allie Wegner. I'm a policy researcher, public program evaluator, and current PhD student. And I'm also someone who's tried to do everything right as a student and financially. For my undergraduate degree, I moved almost a thousand miles away from my hometown to the University of Oklahoma, where I could have a scholarship that would cover my expenses instead of staying closer to home and going to a more prestigious institution. While there, I got my undergraduate degree in mathematics, which I chose because it was a highly employable field, led me to a passion for public service. I joined Teach for America. I moved to Kansas City, Missouri, where I was a Head Start educator. And in that time realized that my students and families deserve more than I could give them in the classroom alone. So, I did what a lot of teachers do. I took on personal expense to make sure my kids and families had what they needed. I paid out of pocket to go to my get my master's in education policy at an Ivy League institution, because that's where I knew I could

2025 Negotiated Rulemaking Public Hearing - 5/1/25

make the most impact, learn the most, make the kind of connections that would enable me to make a difference. Since then, I have worked in education research. In fact, my current role is as a program evaluator, working with government agencies to ensure that we are efficiently using our resources. And one of the most important resources that we can be leveraging is our young people, our bright people, our students who are working their best to put all that effort back into public service. I will keep it brief and leave it there. But just want to say that I urge us to continue this important program and to enable all these great people to continue working toward this collective future.

         MS. ABERNATHY: Thank you for your comments. Alyse Hammonds. Alyse Hammonds, you have three minutes.

         MS. HAMMONDS: Hi, yes. Thank you. Good morning, everyone. I came to talk about student loan debt. As a Community Action Council member for the Project on Predatory Student Lending, I am privileged to have lived through predatory student lending and overcome it. We all know that higher education has become so expensive. The average family simply can't afford it without taking on serious debt. Scholarships, grants, work study, and yes, loans are now the normal path. But

this system assumes every school is playing fair. And I'm here to tell you, many aren't. In fact, many schools have learned how to profit from the system not by educating, but by exploiting. I was accepted into a law school program in Phoenix, Arizona, with what I thought was a relocation scholarship. I'd already earned a full tuition scholarship for undergrad, and I believe the offer was legitimate. But once I enrolled, that scholarship turned into a loan, and not long after that, the school lost its accreditation. The courses I spent over $200,000 on became worthless and nontransferable. That school later declared bankruptcy, but my debt ballooned to over $300,000. For over 12 years, I kept my loans out of default, using Pay As You Earn Plan. I was also pursuing Public Service Loan Forgiveness as a local government employee. I experienced homelessness, I was underemployed, I couldn't qualify to buy a home, and my dream of becoming a lawyer, a dream I worked so hard for, was stolen from me. In 2020, I became part of the Sweet V Cardona class action. Through Borrower Defense, my debt was finally cleared in July 2024, 12 years after leaving law school. In September 2024, I purchased my first home. But now that lifeline is under threat. If we eliminate PSLF, PAYE, ICR, and Borrower Defense, future borrowers won't have the options I did. They'll be trapped often by

2025 Negotiated Rulemaking Public Hearing - 5/1/25

predatory schools that exploit the system for profit.
Let's be clear, these programs aren't handouts. They're
safeguards. They hold institutions accountable when they
mislead or defraud students. In every other industry, if
a product fails, the company is responsible. Why should
education be any different? We need to protect these
programs, not just for those already in debt, but for
every future student chasing a better life. Education
should lift people up, not lock them into lifelong debt.
Thank you.

        MS. ABERNATHY: Thank you for your
comments. Jenna Wyatt. Jenna Wyatt.

        MS. WYATT: Good morning.

        MS. ABERNATHY: Good morning. You have
three minutes.

        MS. WYATT: I'm here to speak on the
PSLF program definitions. I'm an assistant professor at a
community college and have been teaching for ten years.
Educators do not see the raises the way folks do in the
private sector. Our institutions largely rely on the
funding received through the state, and in fact, my
institution has offered food banks to its faculty in the
last few years because they would not give us a raise. A
food bank doesn't pay my student loan bill. The average
cost of a one-bedroom apartment in South Florida is over

$2,000. An assistant professor's base salary cannot cover their basic needs and live in a one-bedroom apartment. Instead, I teach extra pay classes every semester that's beyond my workload, and in the summer, to make ends meet. Between skyrocketing costs and several years in between minimal raises, programs like PSLF ensure that educational institutions have faculty. Community colleges give back to their local communities, and we educate students and prepare them for the workforce at an affordable cost. But who sacrifices? It's the faculty. My institution has lost several professors due to the low wages and high cost of living. As of April 15th, I am six payments away from attaining Public Service Loan Forgiveness. Six. I requested to switch back to the Income Based Repayment Plan in January because the SAVE Program is caught up in the courts, and I am still five months later, waiting for MOHELA to process my application. MOHELA blames the nearly half-year wait on being "backlogged." And I'm not the only one in this situation. The waiting game adds undue stress to hardworking Americans who qualify for this program. But now, with the two vague executive orders, even professors are at risk of being removed from this program. What if a student whose brain isn't even fully developed yet decides to peacefully protest on our campus? Will the

faculty be punished and removed from PSLF? I urge the
Department to keep professors and educators on the Public
Service Loan Forgiveness program, and to accelerate their
applications. When we educate our communities, we all
thrive. Let's help the very ones who propel people to
succeed in their careers. Lastly, I sincerely believe
that this nation was founded on Christian principles, and
I'm reminded of the parable that Jesus told in Matthew
18. A servant had his debts forgiven and went after a man
who owed less than him when he had been forgiven. Now the
forgiven man had the one with fewer debts thrown in jail.
When the master found out, he threw the wicked man in
jail for his lack of forgiveness. When politicians in our
country have filed bankruptcy and seek to prey on those
second loans and public service, we have lost sight of a
Godly principle. We have lost sight of serving the
American people. Thank you.

           MS. ABERNATHY: Thank you for your
comment.

           MS. WYATT: Thank you.

           MS. ABERNATHY: Betsy Mayotte? Sorry
if I mispronounced that. Betsy Mayotte?

           MS. MAYOTTE: You did well.

           MS. ABERNATHY: Oh, thank you. You
have three minutes.

MS. MAYOTTE: Thank you. My name is
Betsy Mayotte, and I'm the president of the Institute of
Student Loan Advisors, a nonprofit whose mission is to
provide free student loan advice and dispute resolution
to all consumers. I've been working in the student loan
industry in a compliance or advocacy role for over 25
years and have worked with thousands of borrowers who
struggle with their education debt. Over the last several
years, student loan borrowers have experienced and
continue to experience the most chaotic and confusing
period in the history of the Federal Student Loan
programs. One of the consequences of this chaos is
borrowers finding that they are losing months that should
count towards either PSLF or IDR loan forgiveness due to
events out of their control. While the promise of buyback
has been made, these borrowers must go through an arduous
process to request this buyback and wait months to see a
possible result. I'm requesting that for any period where
a borrower is put in an administrative forbearance, that
these months count towards loan forgiveness.
Alternatively, I'm requesting that these borrowers
receive an immediate buyback offer at the end of these
forbearance periods without the need for the borrower's
request. If the borrower was already an active repayment
and on an eligible plan, the servicer should have the

data they need to quickly make such an offer. And as the
borrower would have normally been due for payments, the
borrower should have the funds to fulfill the offer if
they should choose to. This change would stop the harm to
borrowers and reduce the administrative burden for both
borrowers and servicers. In addition, if borrowers choose
to make their regular payments during these
administrative forbearances, it should be treated as a
buyback already fulfilled, and the month should be
counted towards both PSLF and IDR forgiveness. I'm also
requesting that this neg-reg session adjust the loan
rehabilitation requirements to make the eligible payments
equal to whatever the lowest payment option amount that
would be available to borrower post rehab. In 2015, good
intentions changes allowed for rehab payments to reduce
the payment based on the borrower's income and expenses.
As reducing payments based on expenses is not a feature
of any repayment option, we have set these borrowers up
for defaulting on their loans, as they can't get a
payment as low as their rehab payment once out of
default. As rehab can only be done once, and collection
costs can be added every time, we are harming rather than
helping borrowers in this situation. By tying rehab
payments to the lowest payment available post rehab, we
are setting the borrower up for success, as well as

2025 Negotiated Rulemaking Public Hearing - 5/1/25

getting them into the habit of making this payment in this amount. My third request applies to Perkins Loans. But the wind down, I am seeing an alarming number of borrowers who have not received bills on their Perkins for decades, only to receive a bill recently. In some cases, the borrower's loans have been paid off or forgiven under the Perkins program many years before. One borrower we worked with received a bill for over $1 million after having their loans forgiven for teaching in the late 90s. Schools should have penalties, much like FFEL lenders do when they fail to perform due diligence on Perkins loans. Borrowers should not be held liable for these loans in these situations, much less the interest and fees during this period. Finally, I ask that you take this opportunity to codify the requirements for both the cancer treatment deferments and the joint consolidation separation process. Thank you for your time and the privilege of being able to submit comments on these important issues.

        MS. ABERNATHY: Thank you.

        MS. RIFFLE: Are you ready for me?

        MS. ABERNATHY: Yes, I am. Thank you so much. If you'll give me one second, however, I'm having a bit of a difficulty trying to get my screen to load. So, hold on.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

                MS. RIFFLE: Okay, I was worried my
speakers were muted.

                MS. ABERNATHY: All right, Ms.
Rachelle, thank you for your patience. You have three
minutes.

                MS. RIFFLE: Thank you. And I
appreciate being here. My name is Rachelle Riffle. I'm
from Salt Lake City, Utah, and I'm here today to comment
on Public Service Loan Forgiveness and the Income Based
Repayment Plans. I feel it's important to remind
lawmakers of the human stories behind the changes they
are proposing. And to be honest, I'm very angry. I'm
angry at you. I'm angry at Congress, and I'm angry at
those who have been content to hang us out to dry but are
happy to benefit from what we contribute to our
communities. I'm angry that we are the near constant
strawman and easily blamed scapegoat in any argument
about government assistance programs. I'm angry that no
one has taken any time to put their biases aside and
consider what would benefit us, and continue to benefit,
and allow us to continue to serve our communities. For
the last nine years, I've worked a thankless public job
assuring that the rights, safety, and welfare of
participants in clinical trials are protected. However,
the messaging from the current administration is that

that is not enough, that I and countless others like me
have not given enough. The purpose of Public Service Loan
Forgiveness is to attract new graduates to lower paying
jobs in the public sector by providing a way for them to
repay their loans, both monetarily and through their
services rendered to the public. So much of the discourse
around student loans and forgiveness from our own
Congress members has been what it costs the taxpayer.
Now, I know we are a capitalist community and a
capitalist country, but services rendered do still have
value. And for the sake of the taxpayer, I broke down
some numbers. Since 2007, $46.8 billion have been
forgiven under PSLF. And from 2022 to 2023, $755 billion
in PPP loans were forgiven. That's 16 times the amount
forgiven under PSLF. If broken down per borrower, the
average amount that's been forgiven through Federal
programs is just over $1,000 per student, compared to the
average $72,000 per PPP loan. It's objectively false to
claim that any concern about Public Service Loan
Forgiveness is merely a concern for the US taxpayer. We
need public servants, and we should make it easier for
public servants to qualify for Public Service Loan
Forgiveness. Lastly, the new proposed student loan
repayment overhaul put forth by Republicans this week is,
to be frank, offensive and cruel. Not only have most of

us been in an involuntary forbearance that does not count towards our PSLF, now we're having nearly all our repayment options stripped from us. The fact of the matter is, the SAVE Plan offered the most reasonable repayment plan for those of us in these lower paying jobs. We've been dragged through the mud due to this political infighting. (20 seconds) . And if the point is to reduce the burden on the taxpayer, then our burdens should be the priority. Since, like I demonstrated, we the borrowers, are the ones shouldering the burden of repayment and always have been. Thank you.

        MS. ABERNATHY: Thank you for your comment. Ron Reed?

        MR. REED: Hi, good morning.

        MS. ABERNATHY: You have three minutes, sir.

        MR. REED: Okay, thank you. Good morning and thank you for the opportunity to speak. Again, my name is Ron Reed. I am from Pleasant View, Tennessee, and I'm a veteran of the United States Navy and a registered nurse who has spent over 27 years caring for our communities, including more than two decades at Vanderbilt Medical Center and Vanderbilt Children's Hospital. My career has been dedicated to helping others. I'm not here to ask for a free ride. I'm just here to ask

ED_01735

for fairness, for a repayment system that allows
borrowers to repay their loans without being buried under
compound interest. I want to acknowledge that student
loan reform is evolving. Policy rules, forgiveness
criteria seem to change almost daily. If I mention
something no longer applies or has since been updated, I
sincerely apologize. My intention is to not mistake the
facts, but to share my experience and the frustration
that comes from trying to navigate a system that feels
like it's constantly shifting under our feet. When I
graduated, my student loan balance was $54,000. Today,
despite making payments, my balance has grown to over
$72,000. And that's not because I borrowed more. It's
because of the years of interest accumulation and
deferments. Recently, I started making payments back in
November of 2024 to Nelnet, my student loan provider, and
have paid nearly $3,000, and not a single dollar has gone
towards principal. Every penny has gone to interest.
That's not repayment, that's entrapment. This is
financially and emotionally draining. Sometimes I get a
little choked up talking about it. I've dedicated my life
to service, yet I feel like I'm being penalized for
trying to further my education. And I'm not far from
alone. Many of us are in the same cycle, working hard,
making payments, and watching the balance climb. I

2025 Negotiated Rulemaking Public Hearing - 5/1/25

respectfully ask, why is the government profiting off
student loan interest, not just from veterans or
healthcare workers, but from anyone who sought to better
themselves through education? Interest shouldn't be a
tool for a profit. It turns opportunity into a lifetime
burden. To be clear, I am not opposed to student loan
forgiveness. I would love for myself. I too support
efforts that help people that truly need it. But I also
believe we need a system reform that make repayments
possible for us who want to pay what we owe. I owe my
debt. I want to pay it back. But I need a system that
doesn't make that impossible. I was even denied Public
Service Loan Forgiveness. Not because I didn't owe, but
because. Let me skip over. I'll just go to respectfully
ask the Department to consider these changes. Stop
charging interest that prevents borrowers from touching
the principal. Explore removing interest entirely from
Federal Student Loans. Structure loans so monthly
payments reduce what the borrower's borrowed.

               MS. ABERNATHY: Time.

               MR. REED: Oh, okay. Thank you.

               MS. ABERNATHY: I'd like to remind
everyone that you are still able to submit written
comments. So, if you do run out of time and you feel it
is important, please make sure that you submit a written

comment before the 8th of May. Donna Gurnett? Donna, you
have three minutes.

                    MS. GURNETT: Thank you. Good morning
and thank you for the opportunity to testify today on
behalf of the Coalition of Higher Education Assistance
Organizations. My name is Donna Gurnett, and I'm the
executive director of COHEAO. COHEAO represents a
partnership of colleges, universities, and organizations
dedicated to promoting student friendly, campus-based
loans, tuition payment programs, sound regulation of
student financial service operations, and best practices
in campus accounts receivable management. We appreciate
the opportunity to respond to the Department's request
for topics and ideas that would streamline current
Federal student financial assistance programs. COHEAO
will be submitting full written remarks outlining our
ideas and suggestions. So, in the interest of time, I'll
limit my remarks today on just a few of our ideas. First,
we'd like to commend the Department's recent announcement
on resuming collections on Federal direct student loans.
Resuming collections after a five-year pause is a
difficult but necessary step to preserving the integrity
of the Title IV Student Aid program. This will require
creative and forward-thinking solutions and partnerships.
COHEAO encourages you to look at all available tools to

2025 Negotiated Rulemaking Public Hearing - 5/1/25

support this massive effort, including regulatory relief,
as it will take an all-hands on deck approach if the
return to repayment is to be successful. For instance,
COHEAO urges the Department to reconsider the two-year
mandatory assignment policy for outstanding Perkins
Loans. This mandate creates administrative challenges for
some institutions and negatively impacts student
borrowers by disrupting established servicing
relationships. We recommend an approach allowing
institutional discretion in assignments, especially for
loans less than ten years in repayment, as they remain
highly collectible. Also, while the prohibition on
transcript withholding aims to safeguard student access
to academic records, it can also create unintended
financial burdens for institutions and hinder effective
debt recovery efforts. Students who fall behind on
tuition payments are often at greater risk of defaulting
on their loans after graduation. Institutions are deeply
committed to student success and actively promotes
financial literacy to reduce student debt and minimize
defaults. Ongoing communication is critical to this
effort. The ability to temporarily withhold transcripts
as previously allowed often prompted students to engage
with their institutions, seek assistance, and establish
payment arrangements. In closing, COHEAO stands ready to

work with the Department to develop policies that both
protect students and provide institutions with tools
necessary to support student success. We appreciate your
consideration of these recommendations and your continued
commitment to improving higher education outcomes. Thank
you again for the opportunity to share our perspectives
today.

          MS. ABERNATHY: Thank you for your
comment. Kristin Tremmel?

          MS. TREMMEL: Good morning.

          MS. ABERNATHY: You have three
minutes.

          MS. TREMMEL: Thank you. Good morning.
My name is Kristin Tremmel. I am a nurse in a very large
501(c)(3) nonprofit healthcare organization. I have
tailored my career around the privilege of public
service. I dearly love what I do, and I am privileged to
care for those less fortunate than myself. I have also
tailored major financial decisions, such as purchasing a
home around the existence of PSLF. The nonspecific threat
of the removal of this designation really concerns me. I
have nearly come to the end of my obligation and, like
many others, am caught up in this mess of litigation and
squabbling that have ground to a halt those of us who are
almost at the end. PSLF and the coexisting Income Related

2025 Negotiated Rulemaking Public Hearing - 5/1/25

Repayment Plans present opportunities for many people to
pursue professions like nursing and medicine, who might
otherwise not be able to afford them. PSLF encourages
people like me to use that education and give back to the
public good in the form of not only reasonable loan
payments, but also in the service to our fellow
Americans. There's noise out there that says we do not
want to repay our loans, or that the taxpayers should not
be on the hook for these loans. Nothing could be further
from the truth. Many folks have been paying on these
loans to the point where they have paid back more than
what they borrowed. And yet, due to the predatory nature
of the structure of these loans, they still owe appalling
amounts of interest. Income Related Repayment Plans are a
light at the end of the tunnel for us. As I stated
before, there is a large swath of people who have been
pursuing PSLF and are so very close to the end, myself
included. We are held in what has colloquially been known
as- come to be known as SAVE purgatory due to the mess of
litigation that is in play. I signed a promissory note
that stated that if I made 120 qualifying payments while
working for a qualifying employer, the balance of my loan
would be forgiven. I have done this and more. My record
shows 112 payments, with the remainder being tied up in
the unrequested unqualified forbearance placed on my

account as a record of the ongoing litigation. I have
never wanted to give money to anyone so badly. (20
seconds) I realized that changes must be made. The cost
of college must be reined in, but it should not be done
on the backs of people who have already given so much,
only to have the metaphorical rug pulled out from under
us. Millions of me- millions like me, have held up our
end of the bargain. It's time for the government to do
theirs. Thank you.

           MS. ABERNATHY: Thank you for your
comments. John Foor? John Foor?

           MR. FOOR: Good morning.

           MS. ABERNATHY: Good morning. You have
three minutes.

           MR. FOOR: Thank you. Good morning. My
name is John Foor, and I'm speaking on my own behalf.
Thank you for the opportunity. There are likely members
of many stakeholder categories present today. I offer my
comments as a member of what I believe to be the most
important of those categories, which is borrowers
themselves. Student loan borrowers are a vulnerable
population. To be sure, we all have committed to the
terms of master promissory notes, but other stakeholders
in this system have far more power than we do in
dictating the execution of those terms in practice. I

speak primarily of the Federal government and of the for-profit and quasi-governmental debt collectors with whom it contracts. Under multiple administrations, Democratic and Republican, we have been made promises about our loan repayment options and have seen those promises broken. At nearly every turn, we have been given information about our obligations by those managing our debt that has been inconsistent or, in the worst cases, simply untrue. For years, millions of borrowers like me have attempted time and again to proactively communicate with the Department and its servicers about our debts, only to be met with contradictory instructions or no response at all to our inquiries. These problems are now being exacerbated by an administration that treats vulnerable populations like student borrowers with contempt. Many borrowers are members of multiple vulnerable populations, compounding their legitimate fear of interacting with the government. All the while, our options for affordable repayment arrangements continue to dwindle, and borrower protections are rescinded. In considering any rule changes, the Department and other stakeholder groups represented here today have an ethical and indeed a moral obligation to protect borrowers and aid them in their repayment. Contrary to the lazy yet pernicious trope of the irresponsible borrower that so many are eager to

perpetuate, most borrowers in delinquency or default are
not intentionally shirking their obligations. They are
confused by and afraid of interacting with the system
that has failed them so profoundly for so long. More
affordable, more affordable repayment options and more
borrower protections, not fewer, is the answer to this
question. Clearer and more consistent guidance from the
government and its contractors, including better staffed
and better supervised customer support, is also the
answer. I end with a special comment about Public Service
Loan Forgiveness. PSLF is not a courtesy that the Federal
government extends to borrowers. PSLF is a guarantee that
the government made to us. A guarantee borrowers like me
took into consideration when deciding to assume our debt
in the first place, and subsequently, around which we
have constructed our entire professional lives and
livelihoods. Borrowers like me have upheld our end of the
bargain by working in underpaid and underappreciated
occupations for years in service to our fellow Americans.
It is now the government's responsibility to uphold its
end of the bargain by honoring its guarantee. Meaning
making PSLF more accessible, not less, to those who have
earned it. Thank you very much.

     MS. ABERNATHY: Thank you for your
comments. Michael Smiley? Michael Smiley?

                    MR. SMILEY: Can you hear me now?

                    MS. ABERNATHY: Yes. You have three
minutes.

                    MR. SMILEY: Alrighty. When does that
start? This second?

                    MS. ABERNATHY: Right now.

                    MR. SMILEY: Okay. All right, start
talking? Sure.

                    MS. ABERNATHY: Yes, please.

                    MR. SMILEY: Hi, I'm Mike Smiley, and
I'm here today to speak in support of the Public Service
Loan Forgiveness Program. After earning my bachelor's
degree in 2001, I attended medical school at Saint Louis
University and earned my MD in 2005. After my first year
of medical school, I commissioned in the Navy as part of
a scholarship program. However, I had preexisting loans
from my first year of medical school and undergraduate
degrees. Despite the military scholarship did not cover
all necessary expenses to attend. My wife was also in
graduate school during this time, pursuing her master's
in social work. After med school graduation, I served in
active duty for the Navy for 14 years from 2005 to 2019,
and joined the Air Force Reserves, where I continue to
serve. Throughout my entire time in the Navy, my wife and
I were trying to figure out how to manage our student

loan debt with a growing family. She had to give up her
career due to our frequent moves. We (inaudible) eight
times from 2005 to 2019. I first learned about PSLF
around 2014. When I inquired about the program, my loan
servicer told me I couldn't utilize it because I had what
was called FFEL loans. Every time I reached out to ask
questions, it was never explained to me that I could
consolidate these loans into Direct Loans to make use of
the program. They just said I didn't have the right type
of loans to be eligible. This deceitful practice by the
student loan servicers has been well documented and
reported on, so I won't go into that anymore. In early
2021, I heard a story driving to work on NPR that
informed me I could qualify for forgiveness through the
waiver. After well over ten years of qualifying
employment, I did consolidate my loans, and I applied for
forgiveness through PSLF. Unfortunately, I ran into
challenges getting my military service counted correctly,
as the Department was not accepting the standard DD214 as
proof of military employment. I was very persistent and
ultimately was able to get my employment certification
approved. In March of 22, after many check-ins and help
from the Department Ombudsman, I was notified I was
receiving forgiveness. During this time, I joined a
Facebook group for people who are working towards PSLF

2025 Negotiated Rulemaking Public Hearing - 5/1/25

41

forgiveness. I learned of many veterans who were having
similar issues getting their military service counted. I
worry that people who lack the rank that I had were less
persistent or informed than I was, would be unable to
fulfill the requirements. Since then, I've helped
numerous fellow veterans navigate the PSLF program to get
the loan discharge they're entitled to. And they've told
me how important this program has been for their families
to get away from education debt. I also currently work as
a pediatric residency director at Children's Hospital.
There's a national shortage of pediatricians, which is
multifactorial. A combination of medical school debt and
being in a lower paying field are major contributors,
though. The PSLF program has been cited by many residents
as a factor in their decision to pursue pediatrics and
taking away this program would further exacerbate the
pediatric shortage our country is experiencing. So, I got
cut a little short but thank you for your time. And
obviously the PSLF program has been a huge benefit to me
and many other veterans and future pediatricians.

             MS. ABERNATHY: Thank you for your
comments.

             MR. SMILEY: Thank you.

             MS. ABERNATHY: Sabrina Calazans?

             MS. CALAZANS: Good morning. My name

is Sabrina Calazans.

MS. ABERNATHY: You have three
minutes.

MS. CALAZANS: Okay. Thank you. My
name is Sabrina Calazans, and I'm the executive director
of the Student Debt Crisis Center. Student Debt Crisis
Center is a national advocacy organization with 2 million
supporters calling for fundamental reforms to student
loan policies and an end to the student debt crisis. At
SDCC, we receive emails and stories from borrowers every
day who are panicked by the latest proposals to limit
access to public service, loan forgiveness, and Income
Driven Repayment Plans. The people being impacted by this
crisis are everyday Americans, their individuals and
families who sought a better life through higher
education. They're farmers, like Lisa, who took out a
Parent Plus Loan to put her daughter through college but
is now behind on her payments. They're single parents,
like Michelle, a single mother of two trying to support
her family. They're teachers like Michael, who is still
waiting for his loan forgiveness application to be
processed. They are firefighters like Joseph, who risk
their lives every day, but whose loans from the 90s still
haven't been forgiven. There are small business owners
like Elise, who attended a predatory for-profit school

who is struggling to meet her basic needs. And they are older Americans like Angela, who's 84 years old and must put off retirement because of her loans. Now, this is just a snapshot of what it looks like to struggle under the burden of student loans. These same folks are now wondering how they're going to afford their monthly payments and invest in their futures if these repayment plans and forgiveness programs are taken away. Attempts to gut these programs and any forgiveness aspect tied to them will effectively increase monthly payments and plunge millions more into default by pulling the rug out from under them. What will happen to these folks? Many are already behind on payments and delinquent. 5 million are already in default, and 5 million more are on the verge of defaulting and being subject to collections. How will removing repayment plans and garnishing people's paychecks and Social Security help Americans? This will only make matters worse, especially for the most vulnerable individuals who are already struggling to stay afloat. We need to make it easier to get out and stay out of default, not more difficult. We need to improve programs and make them accessible to all, not gut them or limit them to only certain individuals. The deal was that if you worked in public service for ten years for a qualifying employer and you made your monthly payments,

your loans would be forgiven through Public Service Loan
Forgiveness. The other option was if you paid on your
loans for 20-25 years and made the 240 or 300 payments,
your loans would be forgiven through IDR forgiveness.
Millions of Americans are enrolled in these programs and
count on them to this day. Many have had their loans
forgiven, but millions more await their turn. We are
keeping up our end of the bargain, and now it's time for
the government to keep up its end, too. Thank you.

          MS. ABERNATHY: Thank you for your
comments. Nicholas Dunn? Nicholas Dunn?

          MR. DUNN: Hello.

          MS. ABERNATHY: Hi, Nicholas. You have
three minutes.

          MR. DUNN: Okay. I'm James Dunn, but
yes, I'm under the other email.

          MS. ABERNATHY: You have three
minutes.

          MR. DUNN: Okay. Am I ready to go now?

          MS. ABERNATHY: You have three
minutes. Yes, sir.

          MR. DUNN: Okay. Thank you. I just
wanted to come on and say I have the Income Based
Repayment Plans, and it's very important to me because I
have two college degrees, but I don't make enough to

fully pay it right now. I am against the student loan
forgiveness because I don't think loans should be
forgiven because that's not the way it should be. And I
just want to thank President Trump for everything he's
doing. I think the cuts to DOGE are necessary. But I have
a family of five. I have three children. And the Income
Based Repayment Plans- our household income is about
$50,000, so we can't afford the increase. I just
encourage everyone with Linda McMahon, who I worked on
her Senate campaign, to keep that in place, because it is
very important., At the rate of the income we make it's
very hard to take on the challenge of a new, of a new
payment. And my wife is also in student loan debt. I got
a degree in business management, with about $80,000-
$100,000 in debt. And my wife hasaround $20,000 with a
degree in psychology. I would just encourage all the
lawmakers and my great Congressman, Pat Harrigan, to do
what they can to try to keep that in place. I don't have
much else to say, but I just want to thank President
Trump. I think he's doing an amazing job, and I know he's
going to do what's right for the American people. Thanks
for giving me the chance to share this.

          MS. ABERNATHY: Thank you for your
comment. Betsy Vogt-Lundeen, or excuse me, Becky Vogt-
Lundeen.

MS. VOGT-LUNDEEN: Yes.

MS. ABERNATHY: You have three minutes.

MS. VOGT-LUNDEEN: Becky Vogt-Lundeen here. Good morning. I'm a certified financial planner that works with healthcare professionals. My husband is a resident physician working about 80 hours a week, saving lives, making about $70,000 a year, and, of course, carrying about half a million of student loan debt. And unfortunately, he isn't alone. Many healthcare professionals who we rely on every single day are in the same boat. This Negotiated Rulemaking is a part of a coordinated political strategy framed as fiscal responsibility. But it's just proposing corporate tax breaks while harming student loan borrowers and increasing the deficit. The 2017 Tax Cuts and Jobs Act alone is projected to add over $1.5 trillion to the debt or deficit. Republicans are using the budget reconciliation to fast-track Federal spending, but under the Byrd Rule, they cannot push unrelated policy changes like altering statutory programs such as IBR. These programs are grounded in law, and changes must go through Congress and not forced through rulemaking. Borrowers structured their lives, careers, families around these plans. They are reasonably relied on, and these legal

2025 Negotiated Rulemaking Public Hearing - 5/1/25

promises are made through their master promissory notes.
To change the rules now is unethical and grounds for
litigation through reasonable reliance. Even Linda
McMahon previously acknowledged that she would uphold
congressionally authorized plans like IBR, which includes
a payment cap with the standard repayment plan. But
today, that promise is being broken, and it's a betrayal
of public trust. This budget reconciliation is not about
reducing deficits. It's about slashing social safety nets
to tax, to have pay cuts for tax cuts, for benefiting
corporations. And while they try to cut corners and
rewrite these plans, they're allowing for-profit colleges
to continue siphoning billions in Federal aid. So, let's
be clear, changing Pay As You Earn and ICR to the
proposed budget reconciliation without congressional
approval is illegal, right? They have not passed anything
yet. And using that budget reconciliation to fulfill your
political wish list breaks the Byrd Rule through the
merely incidental test. And lastly, taking away those
repayment plans that borrowers have relied on is
unethical and potentially illegal under reasonable
reliance. I am asking you to grandfather, in these
repayment plans, such as Pay As You Earn, and do not
attempt to make changes through this process. As we know,
most of the things that this administration is doing and

the way that it's been done is illegal. And the American people will sue, as we've seen with the American Federation of Teachers. Thanks.

MS. ABERNATHY: Thank you for your comments. Syed Ahmed? Syed Ahmed?

MR. AHMED: Hi. Good morning.

MS. ABERNATHY: You have three minutes.

MR. AHMED: My name is Syed Ahmad, and I'm an internal medicine resident in West Virginia. I wanted to highlight the impact the Department's decision to stop supporting Income Driven Repayment Plans would have on medical residents, such as me, and across the country. For my family, we were financially stable for most of my early life. Things started getting difficult for us during college when my parents had to pay for my college education out of pocket. With two siblings also in college and a combined family of seven, we all lived frugally and worked part-time jobs during college. I made it out of undergraduate without loans, but during medical school the tuition doubled, and had to take loans. As of today, I am more than $150,000 in debt, which is much less than the national average for a resident. Using a standard loan repayment, I'd be paying $1,400-$1,500 per month. With an Income Based Plan, this could be $500 or

2025 Negotiated Rulemaking Public Hearing - 5/1/25

$600 a month, which is way more doable. With our resident's salary averaging $12 per hour for the 70 to 80 hours we work in a week, and after rent, I am left with $1,500 for food, necessities, gasand clothing. So, a standard loan payment of $1400 or $1500 is impossible. My friend in my residency program, pays $900 per month just for daycare. I have another friend who has two kids who he must send to elementary school, and another friend who walked for two weeks as he waited for his next paycheck to come in because he couldn't pay the repairs for his car. We have countless stories of residents who are working the most at 70 to 80 hours a week but struggling to make ends meet with the current payments that we're getting. The road to becoming a doctor is 11 to 16 years, with average debt way above $200,000 for graduates. We have rising tuition costs and tight budgets for 5 to 10 years of our lives during residency. The current system is making it increasingly challenging to become a doctor, especially for those from low-income backgrounds. For medical residents, Income Based Repayment Plans aren't a luxury. They're a lifeline. They don't erase the debt. They make it more manageable, and it acknowledges the reality that students are increasingly avoiding becoming a physician (20 seconds) due to the financial barriers in place. If we start losing doctors before they even become

working in the hospital and clinics, this has significant
negative consequences for the healthcare system in the
future, I strongly urge the Department to reconsider
their decision to stop the repayment program. Without
this program, we're pushing out passionate, altruistic
people simply because they can't afford this calling.
Thank you.

                MS. ABERNATHY: Thank you for your
comments. Ben Cecil?

                MR. CECIL: Good morning.

                MS. ABERNATHY: Good morning. You have
three minutes.

                MR. CECIL: Thank you. Thank you for
the opportunity to comment today on the Department's
proposed rulemaking agenda. My name is Ben Cecil. I'm a
senior education policy advisor with Third Way, and we're
a national public policy think tank based in Washington,
DC. The regulatory issues raised for consideration by the
Department cover a range of topics for which sound
Federal regulation is essential to ensuring programmatic
and institutional quality, while promoting transparency
and accountability for students' and taxpayers'
investments in higher education. The Department has shown
interest in developing regulatory proposals related to
the Public Service Loan Forgiveness Program and Income

Driven Repayment Plans, including the Pay as You Earn and Income Contingent Repayment Plans. Third Way urges the Department to prioritize clarity and consistency for student loan borrowers while adhering closely to these programs' established aims. The Department should ensure continuity and uphold intent for the Public Service Loan Forgiveness Program, a congressionally mandated program or a congressionally established program that provides targeted and earned relief to borrowers serving their communities in careers like law enforcement, firefighting, military service, nursing, or teaching working at approved public service employers as outlined in the PSLF statutory framework. A key challenge as well for the Department is ensuring the continued functioning of the Federal Student Loan Program and bringing borrowers back into repayment. Income Driven Repayment Plans like PAYE and ICR provide practical and vital repayment options for borrowers to ensure an affordable monthly payment, while providing the Department with mechanisms to help prevent student loan default. Additionally, Third Way urges the Department to prioritize auto enrollment of struggling student loan borrowers into IDR programs like PAYE and ICR and implement rules like preventing interest capitalization to keep more student loan borrowers in good financial

standing. Relatedly, we strongly urge the Department to prioritize and implement the gainful employment and financial value transparency frameworks. Prioritizing program level data and common-sense measures for assessing ROI provides a valuable accountability tool to weed out underperforming programs that otherwise high performing schools. The expanded data that will be made available through FBT in the transparency it mandates, gives students and families the decision-making power to pursue college and the ability to compare price and outcome information before they even apply. Third Way urges the Department to maintain all required data components in the final framework and ensure compliance and accuracy. Additionally, the Department should prioritize and allocate appropriate resources to support the website or platform required to house FBT data so that it can be implemented and made publicly available promptly following the reporting deadline. Thank you for your time and consideration of these comments.

          MS. ABERNATHY: Thank you for your comments. Cory Nash?

          MR. NASH: All right. I am ready whenever you guys are.

          MS. ABERNATHY: Three minutes, please.

          MR. NASH: All right. Good morning,

2025 Negotiated Rulemaking Public Hearing - 5/1/25

everyone, and thank you for this opportunity to speak to you all about this important topic. My name is Cory Nash, and I'm a graduate who is currently paying back their student loans. I want to speak to you today about how changing the definition of a qualifying employer could have an impact on American citizens who are relying on, or will be relying on, Public Service Loan Forgiveness. I'm a pathologist assistant, and the pathologist assistant profession is a niche field of medicine, but as a very simple overview, we have two main responsibilities. One is to dissect tissue to look for things like tumors and diseases, how well patients responded to treatments, but then we also help perform autopsies to kind of give closures to families. Now, the reason I mention this is that approximately 27% of pathologist assistants work in teaching hospitals, and the majority of those are not-for-profit. In a teaching hospital, you have your doctors and your nurses and your pathologist assistants, but you also have many residents. These residents, they enter their program with a very basic understanding of medicine as a whole. But it's during their residency that they become experts in their field and in pathology when it comes to learning about how to dissect and do autopsies, it's the pathologists assistants who are responsible for teaching them these

ED_01759

things. So, if changes are made to the definition of a
qualifying employer, I have two concerns and two
scenarios that might arise. One is that when medical
professionals graduate, they have a variety of settings
in which they can practice. One of them being teaching
hospitals, but they could also work in a private group.
Now, private groups are usually for-profit, and so they
don't qualify for Public Service Loan Forgiveness, but
they do tend to offer higher salaries to kind of offset
that. So, if changes are made to the definition of a
qualifying employer, my concern is that more medical
professionals would opt to work in a private group and
get that higher salary, knowing that, knowing that they
don't qualify for PSLF rather than a teaching hospital.
It's going to create a mass exodus of medical
professionals away from teaching hospitals, and it's
going to create a workforce shortage. The second scenario
I worry about, and this is kind of more directly related
to the first, is that if more medical professionals work
in these private groups, there will also be fewer medical
professionals to teach residents. Residents aren't going
to get the adequate training they deserve, and in turn,
patients won't be able to get the proper diagnosis and
treatments that they very much well deserve. These
examples are obviously more focused on the medical field,

2025 Negotiated Rulemaking Public Hearing - 5/1/25

but this topic and these ideas could obviously be broadly applied to any field of study or work. Just in closing, I just want everyone to kind of keep in mind that the citizens who take out student loans and started working at a not-for-profit organization, don't do it for any political reasons. They don't have any say over any initiatives that their organization may or may not be involved in. Instead, they take out these jobs in a not for-profit because they want to own a home, raise a family, and have a comfortable life without the stress of student loans hanging over their heads. If you change the definition of a qualifying employer, it doesn't hurt just one single US citizen. It hurts the American dream. Thank you, everyone, for this opportunity to speak today. I really appreciate it.

MS. ABERNATHY: Thank you for your comments. Heather Jarvis?

MS. JARVIS: Good morning. Thank you for the opportunity.

MS. ABERNATHY: Three minutes, Heather.

MS. JARVIS: Thank you, and thanks for the opportunity to speak with you today. In too many areas, schools are struggling to fill vacancies. Clinics are short on doctors. Mental health services are

stretched beyond capacity. These aren't just gaps. They are threats to the health, the safety, and the future of entire communities. And public service loan forgiveness is about keeping nurses in these rural hospitals, keeping teachers in remote classrooms, and mental health providers in isolated communities. This program helps close these gaps by giving public service professionals a reason to stay. When someone with a specialized education is choosing where to live and work, the program can make the difference between settling in a rural town or moving to a city where the pay is higher. PSLF allows passionate and qualified professionals to put roots down where they are needed most, without being forced out by financial pressure. This program works. It makes rural schools more competitive in hiring. It helps community health centers attract skilled providers. It brings stability to the people and the places that form the backbone of America. The office of the Republican Attorney General of Missouri emphasized this point last April, calling PSLF a tremendous asset to achieving their goals of protecting the public from criminals, preserving state tax dollars, and improving the quality of life for Missouri citizens. And PSLF works because of Income Driven Repayment. Income Driven Repayment ensures that someone working in a modest salary public service job can afford to make their

2025 Negotiated Rulemaking Public Hearing - 5/1/25

57

payments without leaving the job or the town that depends
on them. The program is not a giveaway. It has
unprecedented and unrivaled work and repayment
requirements. Diminishing the scope of PSLF and IDR risks
more school vacancies, more unstaffed clinics, and more
burnout among those trying to do it all. This is not
about politics. It's about real people and real places,
your neighbors, your schools, and your first responders.
My name is Heather Jarvis. I spoke today on behalf of
acoalition of more than 100 nonprofit public service
organizations. We urge you to protect PSLF, strengthen
it, let it continue to do what it does best, giving our
communities a fighting chance to recruit and keep the
public servants that rely on it every day.

       MS. ABERNATHY: Thank you for your
comments. Tim Powers?

       MR. POWERS: Good morning and thank
you for the opportunity.

       MS. ABERNATHY: Three minutes, please.

       MR. POWERS: Thank you so much, Tamy.
Good morning and thank you for the opportunity to address
the Department through this Negotiated Rulemaking
process. My name is Tim Powers, and I serve as vice
president of government relations and policy development
at the National Association of Independent Colleges and

Universities, or NAICU. I have the privilege of speaking today on behalf of our nation's 1700 private nonprofit, or independent colleges and universities from across the nation. Institutions that have long been community anchors of access, innovation, and excellence in American higher education. Our schools serve a wide array of students, often with fewer public resources, but with a deep commitment to mission, character formation, and academic excellence. Nearly 40% of all students attending a private, nonprofit college or university at the undergraduate level receive a Pell Grant. We welcome the Department's stated focus on streamlining regulations, cutting unnecessary red tape, and improving Federal programs. And we stand ready to work together in the public interest. First, we urge the Department to prioritize clear and reliable communication around Public Service Loan Forgiveness. Graduates of our institutions serve as teachers, nurses, nonprofit leaders, and public servants across the country. Yet too many encounter confusion and administrative hurdles that undercut the program's very promise. Borrowers and the institutions that support them need stable, transparent guidance to ensure that PSLF is a tangible reality and not a moving target. Second, we strongly support simplifying the repayment program, particularly the Pay As You Earn and

Income Contingent Repayment Plans. For many students, loan repayment can be a maze of options, terms, and shifting rules. We believe that a clearer, more predictable framework is essential, one that allows borrowers to focus on their careers and communities rather than on deciphering bureaucracy. But beyond these program specific reforms, we respectfully also urge the Department to address structural challenges that burden independent institutions without advancing educational quality. Rules intended to ensure integrity must not inadvertently penalize well-governed nonprofit institutions or stifle the very innovation that has made American higher education the global gold standard. To that end, we recommend a few potential ideas. First, clarifying that nonprofit board members who are not owners under Federal financial responsibility standards. Second, correcting financial calculations that punish prudent fiscal management. Third, protecting faith-based institutions religious identities without imposing disproportionate financial liabilities. Repealing or reforming flawed financial value transparency and gainful employment regulations. Streamlining the merger and acquisition processes to perverse educational opportunity and eliminating redundant invasive disclosure requirements. Thank you for your time and for your

commitment to strengthening our nation's future through thoughtful policymaking.

MS. ABERNATHY: Thank you for your comment. Lucinda Sanchez?

MS. SANCHEZ: Hello.

MS. ABERNATHY: You have three minutes.

MS. SANCHEZ: Okay, thank you. My name is Lucinda Sanchez, and I live in Lombard, Illinois. I'm a student borrower and a member of the Project on Predatory Student Lending, Community Action Council. I believe in the power of education. I believed that if I invested my time, my money, and my dreams, this system would invest in me too. As a first-generation college student from a low-income household, I knew I had to be smart about money. So, after graduating from Quincy Senior High School, I earned as many credits from community college as I could. When it was time to transfer, a friend recommended DeVry University because she had seen multiple advertisements and heard that they were a lower-cost option, and I needed online courses to accommodate my work schedule. It seemed like a great fit. Immediately upon contacting DeVry, I was bombarded with phone calls and emails. They made me feel like they saw my potential despite my rough background, both

financially and educationally. In reality, they saw me as an easy target. As soon as I completed enrollment and began classes, everything started to fall apart. My professors seemed haphazard and not easy to reach. It was obvious that there were no standards set for students. As I neared the end of my degree program, I was informed that I wasn't eligible to take out any more Federal Student Loans. My only option to continue to have my education Federally funded would be for one of my parents to take out a Parent Plus Loan. I was infuriated that I had to pull my family into my financial choices. I felt like I'd already sunk so much into getting this degree. I couldn't turn back. Those loans burdened my parents and impacted their financial decisions as well. After graduation, reality hit as to what I just wasted my hard-earned money and time on. As I started interviewing for jobs, I realized how underprepared I was. It was clear that nobody took my degree from DeVry seriously. I felt stupid and cheated, but when the system failed me, Borrower Defense is what kept me from being stuck paying for a scam. No one deserves to be penalized and taken advantage of when attempting to better their education. Higher education institutions must do better. Our government must do better. Protections like Borrower Defense exist for a reason, and we need to make sure they

remain in place. Programs like Income Driven Repayment and PSLF are essential for borrowers like me who are just trying to stay afloat. Having access to an affordable repayment plan can help borrowers stay out of default. Instead of working to end these critical protections, the Department and Congress should be working to shore them up and make sure (20 seconds) they have the resources to carry these out effectively. For example, they should be expanding IDR to Parent Plus borrowers repaying these loans with (inaudible) not just by my parents, but by me as well. And it was that much harder with fewer repayment options. We need our federal government to look out for us, not schools and servicers. Thank you.

      MS. ABERNATHY: Thank you for your comments. Victoria Jackson? Elizabeth Bell? Elizabeth Bell. We are going to take a break. We'll be back at 1045. Thank you so much. Welcome back, friends. Joining us at the table now is Jeff Andre. He is the new Deputy Assistant Secretary for Policy, Planning, and Innovation in the Office of Postsecondary Education. He comes to the administration with nearly 40 years of experience in Federal education and workforce development policy, in both the public and private sector. From his initial start as a student advocate pushing for improvements in the Higher Education Act, Jeff first worked at the

Department as a career civil servant, working his way up
from entry level policy analyst to senior budget analyst
responsible for student financial assistance. On Capitol
Hill, he was a senior Republican staffer on the House
Education and Workforce Committee, successfully
reauthorizing the Higher Education Act, Workforce
Investment Act, and other important legislation to assist
people with disabilities. He also drafted Landmark
Legislation which created the Federal government's first
performance-based organization, the Department's Federal
Student Aid, or FSA office. In addition to having served
previously as Deputy Assistant Secretary, he has also
served in other Federal executive roles, including
Director of the Fund for Improvement of Postsecondary
Education, Special Assistant to the Deputy Secretary of
Education, and Associate Administrator for
Entrepreneurial Development at the US Small Business
Administration, where he managed programs that provide
training and business counseling for over 2.4 million
small business clients. Most recently, Jeff worked in the
private sector as an outside consultant and in house
roles with schools, colleges, and universities in all
sectors, lenders, as well as other corporate and
nonprofit clients. A first-generation American originally
from New Bedford, Massachusetts, Jeff was the first in

his family to graduate from college with the help from
Pell Grants, Federal loans, campus-based aid, and
institutional scholarships. He holds a bachelor's degree
with honors in political science from the American
University in Washington, D.C., and resides in Anne
Arundel County, Maryland, with his wife, Kathy, and 11-
year-old son, Anthony.

              MR. ANDRE: Thanks, Tamy. I look
forward to everyone's testimony today.

              MS. ABERNATHY: Carolina Rodriguez?
Carolina Rodriguez? Carolina?

              MS. RODRIGUEZ: Yes.

              MS. ABERNATHY: You have three
minutes.

              MS. RODRIGUEZ: Thank you for the
opportunity to provide testimony today. My name is
Carolina Rodriguez, and I serve as the director of the
Education Debt Consumer Assistance Program, or EDCAP, at
the Community Service Society of New York. We are proud
to be the first program of its kind in the nation,
offering free, unbiased, one-on-one assistance to student
loan borrowers across New York State who are navigating
repayment, default forgiveness and everything in between.
We've directly assisted thousands of borrowers, giving us
a deep understanding of how Federal Student Loan policies

impact real people's lives. Let me be clear, proposals to eliminate Income Driven Repayment Plans like SAVE, PAYE, or ICR, or to restrict the type of employers eligible under the Public Service Loan Forgiveness program, would cause significant harm and push struggling borrowers further into financial distress. We recently conducted national research to better understand borrower repayment challenges. What we found was stark. The high cost of everyday living and immediate expenses are the top barriers to repaying student loans, not a lack of willingness or responsibility. Many borrowers are juggling multiple types of debt payday loans, credit cards, back rent and reported this scary, more immediate stress and consequences than student loans. In New York City, or Unheard Third survey, at an even deeper layer, nearly half of households with student loan debt reported experiencing housing hardship and 40% reported food insecurity. Among low-income borrowers, 60% experienced three or more economic hardships from healthcare issues to childcare barriers to reduced wages. And this is not just a low-income issue. Even moderate and high-income households with student loan debt reported multiple financial strains. These findings are a clear warning. Eliminating IDR plans will not increase repayment. It will increase default for many borrowers, including

Parent Plus Loan borrowers who consistently are left struggling. Affordable repayment plans are the only viable path to staying in good standing while covering basic needs. PSLF is equally critical. It has taken over 17 years to make the program work as intended. Restricting access to PSLF would have far-reaching consequences not just for borrowers but for the public. Critical fields like healthcare and education are already facing severe workforce shortages. Making loan forgiveness harder to access would only deepen these challenges. No American wants to be told that they must wait weeks or months to see a doctor, or that their child is sitting in an overcrowded classroom because we made it harder for public servants to afford staying in their jobs. In closing, I urge the Department to protect and strengthen, not dismantle IDR and PSLF. These are lifelines and not loopholes. And I will say it again, eliminating IDR plans will not increase repayment. It will increase default. Thank you.

MS. ABERNATHY: Thank you for your public comment. Anya Clark? Anya Clark?

MS. CLARK: Good morning, everyone. Can you hear me?

MS. ABERNATHY: Yes. You have three minutes.

MS. CLARK: Thank you so kindly. Good morning. Thank you all for allowing me the opportunity to speak today. I'm very honored to be here, to speak to something that's very important to me. My name is Anya Clark. I am a single mother from the South Side of Chicago, but I'm also a college graduate, and my pathway to get to college was not that easy. And my pathway out of college has been just as hard. When we are talking about something like Negotiated Rulemaking, it's very important to me because my path, like so many Americans, is not necessarily linear. I graduated right at the end of Covid, and of course, our loans went into forbearance. But as we move further in life, I'm very, very afraid of what's going to happen when those loans become due. Due to a lot of the instability in our economy, it's been very difficult to keep and maintain jobs that pay adequate to the amount that I paid for my student loans, and right now, the estimated cost of my student loans, when it comes time to repay, will be around $833 a month. Now, unfortunately for me, as a single mother, I don't have that much disposable income. But that's why this conversation is so important today. My income yearly does not look the same as a one-person income as those who have more disposable income or less children. And that's why it's so important for people like me and people

ED_01773

2025 Negotiated Rulemaking Public Hearing - 5/1/25

68

across this country to have a stake in creating the rules
that will govern ourselves. We know the nuances that it
takes to live life in America. We know what we can and
cannot do. And when we uplift voices, we can make sure
that whatever policies we create are equitable. We don't
have to go after folks and garnish their wages if we put
them at the table in the forefront of that rulemaking to
begin with. I'm not going to take up too much of your
time, but I would encourage everyone to move forward with
this idea of allowing those of us who are burdened with
student debt to be the solution to paying it back. Thank
you so much for your time.

        MS. ABERNATHY: Thank you, Anya.
Michele Zampini?

        MS. ZAMPINI: Good morning. My name is
Michele Zampini, and I'm the senior-

        MS. ABERNATHY: Michele, three
minutes.

        MS. ZAMPINI: Thank you. Good morning.
My name is Michele Zampini. I'm the senior director of
college affordability at the Institute for College Access
and Success. I appreciate the opportunity to provide
these comments today. We strongly urge the Department to
uphold its responsibility to students and student loan
borrowers, and caution against any efforts to roll back

2025 Negotiated Rulemaking Public Hearing - 5/1/25

affordable, Income Based Repayment options or to gut the Public Service Loan Forgiveness program. Under our current higher education financing system, millions of students face an affordability gap between college costs and financial aid, and the Federal Student Loan Program serves as a critical access tool. Without it, millions of students cannot afford to enroll in college at all. In turn, the Income Driven Repayment system was created more than three decades ago in response to the growing problem of many borrowers who are unable to afford their monthly payments under standard repayment plans. IDR plans adjust a borrower's monthly payment by their income and family size to enable them to stay current on their loans and avoid the devastation of default, even in times of financial hardship. Borrowers enrolled in income-based plans default at much lower rates than those in non-income-based plans, and there are currently more than 13 million Americans who are enrolled in these plans. Without access to a truly affordable Income Based Repayment option, millions more student loan borrowers will likely default on their loans. Therefore, we strongly urge this administration to work on behalf of these borrowers and to uphold its statutory responsibilities to the 44 million Americans who hold Federal Student Loan debt by ensuring these borrowers

have continued access to affordable repayment options
that do not sentence them to a lifetime of debt. Thank
you.

              MS. ABERNATHY: Thank you for your
comment. Brian Garrett? Brian Garrett? Khoa Nguyen?
Forgive me if I've mispronounced that. You have three
minutes. Khoa Nguyen, you have three minutes.

              MR. NGUYEN: Alrighty. Okay. Hi,
everyone. Thank you, members of the Negotiated Rulemaking
Committee. My name is Khoa Nguyen, and I'm here to
discuss PSLF, the IDR plans and what needs to be
maintained and expanded. And when you hear the words
American dream, what do they mean to you? Because for
some, this could mean owning a home or raising a family,
and for others it means starting a business or finding
success in their careers. The United States of America
has long been a pillar and bastion of pushing boundaries
in education, societal advancement, providing every
American the opportunity to work towards their goals and
dreams. In our current society, as the workforce becomes
increasingly specialized and technically competent and
industries undergo rapid changes, education remains a
steadfast option for many students, families, and young
professionals to achieve economic gain. This country has
always emphasized the idea of pursuing higher education

2025 Negotiated Rulemaking Public Hearing - 5/1/25

to become competitive in this existing workforce. Growing
up, I was told that going to university and college would
open up more opportunities for economic gain in the
future. However, even in my pursuit of education and my
career building, I've had to make sacrifices and choose
specific programs and opportunities over others due to
the high cost of education, and so far, I've only seen my
debt increase. I currently have over $150,000 in student
debt from choosing to pursue a career dedicated to
helping others, and this is the more cost-affordable path
to obtaining a medical license. This debt hampers my
ability to buy a home in the future, raise a family, and
take care of my loved ones. And I think about my student
debt daily and how I will manage it in mine and my
family's future. Without programs such as PSLF and IDR
and PAYE, really, all those programs, students and young
professionals may be forced into a difficult position
where they must delay or defer their goals and achieve
their dreams, rather more so focusing on attempting to
address student debt. Higher education should be
affordable and accessible for everyone. And student debt
forgiveness is a path to economic opportunity, and
imposing unnecessary barriers not only harms borrowers,
but also hinders the future of our economy and nation.
The United States Department should protect PSLF and IDR

and work to expand them. We must ensure that future
generations have the opportunity to pursue meaningful and
fulfilling careers. Thank you, and I'm happy to answer
any questions.

MS. ABERNATHY: Thank you for your
comments. Lovisha Williams?

MS. WILLIAMS: Hi. Good morning.

MS. ABERNATHY: Hi. You have three
minutes.

MS. WILLIAMS: Okay. My name is
Lovisha J. Williams. I am a student borrower and a member
of the Community Action Council of Project on Predatory
Student Lending. Unfortunately, my story reflects the
experience of many others who were misled and harmed by
ITT and other predatorial institute. In 2009, fueled by
the hope of a brighter future and leveraging my father's
hard-earned G.I. Bill benefits earned through (inaudible)
service, the US Marine (inaudible), I enrolled at ITT
Technical Institute, Torrance, California, pursuing an
associate in science in Criminal Justice. I subsequently
continued my education there at Culver City campus,
completing a Bachelor of Science in project management
and business administration in 2012. Instead of this
pursuit of higher education, intended to be a
steppingstone to stable and fulfill careers, plunged into

a deep financial crisis. ITT Tech's deceptive practices were insidious. Despite repeat assurances that my GI Bill benefits would cover tuition, I relentlessly pressured to take out (inaudible) additional loans, both federal and private. These loans incurred in my father's name and mine to continue a crushing burden severely impacting our, our- severely impacting our credit score overall to this day. The education itself proved to be utterly worthless. The degree I received from ITT Technical Institute is not accredited nor recognized by other educational institutions or employers. Eight years of my life dedicated to pursuing higher education have been relentlessly, (inaudible) fruitfulness, a profound waste of time and resources. I was left with ten $10,000 of debt and (inaudible) student loans I accrued necessity until enrollment of IDR plans to ensure manageable monthly payments. This personal experience underscores the urgent need for more accessibility and affordable student loan repayment programs to support borrowers. Many borrowers across the country struggle and will likely default without programs like Income Driven such as SAVE, PAYE, PSL and Borrower Defense. The Department should be working on improving programs, not shutting them down or limiting access. (20 seconds) Beyond the financial devastation emotional tolls has been amidst the

stress and anxiety and the betrayal has been
overwhelming. I am grateful for assisting- having
assistance and having received from PPSL and navigating
the aftermath of ITT Technical Institute fraudulent,
fraudulent actions. They must be held accountable for
their deceptive practices. Thank you.

                MS. ABERNATHY: Thank you for your
comment.

                MS. WILLIAMS: Thank you.

                MS. ABERNATHY: Elizabeth Bell?

                DR. BELL: Good morning. I'm Dr.
Elizabeth Bell. Can you hear me?

                MS. ABERNATHY: Three minutes.

                DR. BELL: Great. And I'm a professor
of higher education policy at the University of Texas at
Austin's LBJ school. And it's thanks to Title IV aid,
including Parent Plus Loans and subsidized loans, that my
family was able to access higher education, allowing us
to serve our community and strengthen the American
economy. I decided to pursue a PhD a decade ago to find
out what works and what doesn't work when it comes to
providing effective, efficient, and fair policies that
expand college access and affordability for families like
that, like mine, weren't born into wealth, but were
willing to work hard to achieve success. Over this

2025 Negotiated Rulemaking Public Hearing - 5/1/25

decade, I've come to realize that we agree, our college financing system is broken and is far too complex. I'm here today to advocate for streamlining administrative processes and making it clear how efforts to change student loan repayment plans and any cuts to the PSLF program, the Parent Plus program, and subsidized student loan programs would impact our economy. I know I'm extremely limited on time and thank you so much for your time today. I'll focus the content of my testimony on two main points based on my research and expertise. First, any attempt to dismantle the PSLF program is an assault on our cops, teachers, counselors, and other public servants who keep our country safe. I agree wholeheartedly with the notion that the PSLF program should be simplified, and there are ways to accomplish this using existing data that can be shared across agencies that would reduce unnecessary bureaucratic inefficiency and administrative burden in the process. I encourage the Department to investigate opportunities for automatic eligibility verification for PSLF, and this would save us valuable taxpayer money by reducing the verification burden on Department employees and save citizens time, and maybe even restore trust and faith in government, something that my research shows are desperately needed at this time. Second, the Income

Driven Repayment Plans allow citizens to pay back their
loans at a pace that doesn't cripple them. If this option
was not available or is cut, many citizens wouldn't be
able to pay for their homes, their cars, or food for
their children. In addition, without Parent Plus and
subsidized student loans, many families like mine would
not be able to access higher education. These risks
making higher education a private commodity that only
wealthy families can access. Together, taking these
programs away from citizens will skyrocket default rates
and plummet our economy into economic ruin. (20 seconds)
More than just the economic catastrophe, though, this
move would also undermine trust in government, which
would not serve this administration well in the long run.
Moving forward, wrapping up, I hope the Department does
not move forward with plans to get rid of the IDR payment
plans and PSLF program, and I look forward to engaging
with you moving forward on how we can create policy
that's both fair, efficient, and effective. Thank you.

       MS. ABERNATHY: Thank you for your
comment. Nicholas Hartlep?

       DR. HARTLEP: Hi, my name is Nicholas.

       MS. ABERNATHY: Three minutes, sir.

       DR. HARTLEP: Okay. Hi. My name is Dr.
Nicholas D. Hartlep. I hold the Robert Charles Billings

2025 Negotiated Rulemaking Public Hearing - 5/1/25

Endowed Chair in Education and chair the education studies Department at Berea College in Berea, Kentucky, where we train future K-12 teachers. At Berea College, every student receives a Tuition Promise Scholarship that covers 100% of tuition. And through our labor program, students work campus jobs to help offset other expenses. Our model allows most graduates to leave with little or no student loan debt, making Berea a national leader in affordable higher education. However, most students across the country do not have this opportunity. Student loan debt weighs heavily on borrowers, particularly those entering public service professions like teaching, where salaries are low. As a former public-school teacher and now teacher educator, I have studied and researched student loan debt. I have published peer-reviewed books and articles on the negative impact that student loan debt has on individuals in our society. I also personally benefited from the Public Student Loan Forgiveness PSLF program, having my student loans forgiven this past year under President Biden's temporary expanded PSLF, or TEPSLF program. I'm here to urge the US Department to preserve and strengthen Income Driven payment plans and the PSLF program. PSLF was signed into law by a Republican president and has bipartisan legislative support. I'm concerned by data that shows that very few

Americans enrolled in the PSLF program have had their student loans forgiven. The Department should make it easier to recertify employment annually and improve communication with borrowers to make sure they understand eligibility requirements. Vendors like MOHELA haven't made this process very easy. MOHELA often gave incorrect or misleading advice, leading borrowers to make ineligible payments. Moreover, many borrowers were unaware their loans or repayment plans didn't qualify. We must streamline and safeguard these programs, not make them harder to access. Thank you for your time and for your commitment to improving these critical programs.

MS. ABERNATHY: Thank you for your comment.

DR. HARTLEP: Thank you.

MS. ABERNATHY: Dr. Jennifer Brull?

DR. BRULL: Good morning. My name is-

MS. ABERNATHY: You have three minutes.

DR. BRULL: Okay. Good morning. My name is Dr. Jen Brull. I'm a family physician in Fort Collins, Colorado, and the current president of the American Academy of Family Physicians, representing 128,300 physicians and medical students across the country. Thank you for the opportunity to provide

testimony today. Family physicians are at the heart of our communities. We care for patients across their lifespan. Preventing chronic illness, managing complex conditions, and increasingly supporting mental health. Our work improves lives and strengthens communities, especially in rural and underserved areas. Yet, the high burden of medical education debt continues to limit who can become a physician and where they can afford to practice. Physicians are the most likely professionals to carry student loan debt, with nearly 80% burdened by debt. And while the cost of medical education is the same, whether a doctor enters a primary care or a non-primary care specialty, primary care specialists, including family physicians, typically earn far less than their peers. That gap makes programs like Public Service Loan Forgiveness critical for family physicians, not just for personal financial stability, but for sustaining access to care in rural and underserved communities. Loan forgiveness programs directly influence the choice to enter family medicine. They also offer economic benefits to communities. A rural primary care physician generates an estimated $1.4 million in annual economic activity and supports more than 26 local jobs. Supporting debt relief for family physicians doesn't just strengthen our healthcare system, it boosts entire local economies. The

Public Service Loan Forgiveness program has been especially important for family physicians. In a recent AAFP survey, more than 75% of respondents said they were either currently or had previously been enrolled in PSLF. Many shared stories of returning to practice in their rural hometowns, choosing public service careers they love because PSLF made it possible. Without it, many would have been forced to leave the public service for the private sector, leaving critical health needs unmet. In closing, the AAFP urges the Department to advance policies that provide meaningful debt relief for physicians and medical students. Addressing medical education debt will help tackle our country's chronic disease crisis, strengthen rural health, and give patients and physicians alike the autonomy to choose the path that best serves their community. (20 seconds) Thank you again for the opportunity to testify today. The AAFP stands ready to assist the Department in advancing policies that support a strong, resilient healthcare workforce. If we can be a further assistance, please reach out to the AAFP Government Relations staff.

        MS. ABERNATHY: Thank you for your comment.

        DR. BRULL: Thank you.

        MS. ABERNATHY: Holly Adams? Holly

Adams?

                    MS. ADAMS: Hello. My name-

                    MS. ABERNATHY: You have three

minutes.

                    MS. ADAMS: Hello, my name is Holly

Adams and thank you for the opportunity to speak today.

I'm here to express my deepest concerns and strong

opposition to the administration's proposed changes to

the Public Student Loan Forgiveness program. These

changes aren't just bureaucratic. They're deeply

personal. They threaten financial stability and futures

of thousands of Americans like me, who chose purpose over

profit and service over salary. To date, I've made 113

qualifying payments toward the Public Student Loan

Forgiveness, only seven shy of the 120 required. I've

dedicated myself to serving the public and have been

diligent about making monthly payments. Over the nine and

a half years, I've spent countless hours on the phone

with my lone survivor to ensure compliance with the

rules. I was looking forward to 2025, the year my Public

Student Loan Forgiveness program would be concluded. Now

I feel the promise of support is at risk, impacting my

livelihood and my sense of security. Public Student Loan

Forgiveness is not about rewarding debt, as some critics

would say. It's about ensuring that critical public

2025 Negotiated Rulemaking Public Hearing - 5/1/25

service roles remain accessible to those who can't afford to take on low-paying jobs and shoulder the crushing burden of student loans. To say that the Public Student Loan Forgiveness program is unfair because it doesn't help everyone is like saying food stamps are unfair because they don't feed the wealthy. Equity does not mean every person gets the same benefit. It means we tailor support to meet people where they are, especially when they're doing critical work and services all society relies on. Without Public Student Loan Forgiveness, entire sectors, public education, community healthcare, social work, environmental advocacy are being at risk of being gutted. Many of these roles require advanced degrees yet offer salaries that do not match the cost of that education. Loan forgiveness is one way our society helps balance that gap. I don't own a house. I don't have any children. I don't own my own car. Not because I'm irresponsible. Because I can't afford to do so with a full-time job. Public Student Loan Forgiveness allows people like me to live with dignity- do matter- do work that matters and contribute meaningfully to the communities without being crushed by debt. (20 seconds) It's not unfair. It's essential. The proposed rollbacks would break promises. It would break people. Public servants are not looking for special treatment. We're

asking the government to honor its commitment and invest in the very people that hold our society together. Please protect the Public Student Loan Forgiveness program. Please protect those who have already sacrificed. And please protect the future of public service in this country. Thank you.

MS. ABERNATHY: Thank you for your comment. Andrew Gillen?

MR. GILLEN: Hello. Can you hear me?

MS. ABERNATHY: Yes. You have three minutes.

MR. GILLEN: Great. Thank you. So, I'm Andrew Gillen, I'm an analyst with the Cato Institute. And I'd like to talk about the three sections that were highlighted in the announcement. So, for public sector loan forgiveness, the current eligibility criteria result in a lot of nonsensical results. So, for example, you could have a nurse working at a nonprofit hospital eligible for PSLF. That same nurse moves to a for-profit hospital doing the exact same job is no longer eligible. And this is, a flaw of PSLF. One of the ways you could address this flaw is by using the Bureau of Labor Statistics' standard occupational classification codes. For example, the code for nurses is 29.1141. Anybody with a job with that, with that classification code could then

be eligible. That would help address the disparity
betweenthe nurses. Alternatively, you could also look at
the tax status of the organizations. For example, there's
organizations called 501(c)(13). These are cemetery
companies. I have nothing against cemetery companies, but
I don't see a compelling reason why they should have
preferential treatment when it comes to student loans
compared to everyone else. And you could limit
eligibility based on, on the tax status of these various
groups. Regarding the IDR plans, so, so particularly for
the PAYE plan, there were a couple of changes that the
Obama Administration's REPAYE reforms made that I thought
were good. One was increasing the years of repayment,
particularly for grad students from 20 to 25 years. I
think that's an appropriate change. And we should look to
do the same thing for PAYE. The other thing they did was
they closed the married filing separately loophole where
families could strategically choose their tax filing
status to minimize payments. I view that as a loophole.
And REPAYE closed it, but it's still open in PAYE. A
couple of things that REPAYE did not do that I think
would be worth doing as well is dropping the interest
subsidy and eliminating the monthly payment cap. And then
finally, something that I think would also make a lot of
sense is removing the partial hardship requirement. This

should just be an option; a repayment plan that folks can
choose if they want. We don't need to have an income test
for them. Regarding the last one, improving program- (20
seconds) for accreditation, the Department could issue
regulations to encourage accreditors to increase
transparency or to use their flexibility to move away
from such binary decisions. And then finally on quality
assurance. Section 454 of the Higher Education Act
requires the Secretary of Education to establish quality
assurance system. We don't have one. We should have one.
And it should really focus on repayment rates where
schools where students fail to repay their loans, lose
eligibility to participate in the program. Thank you so
much.

            MS. ABERNATHY: Thank you for your
comment. Jarrod? I'm sorry, that was- Jarrod Wall is
next. Jarrod? Frederick Engram? Frederick Engram?

            DR. ENGRAM: Good morning.

            MS. ABERNATHY: You have three
minutes, sir.

            DR. ENGRAM: Good morning. I would
like to first thank the Department, the Association for
the Study of Higher Education and Scholar Strategy
Network for the invitation to speak today. My name is Dr.
Frederick Engram Junior, and I'm an assistant professor

2025 Negotiated Rulemaking Public Hearing - 5/1/25

of higher education at Fairleigh Dickinson University. At Fairleigh Dickinson University, I teach a course titled The History of Higher Education, among others. This makes me an expert on this subject matter, directly impacted by the decisions of this government entity and the current administration. I come before you today to speak directly to you regarding the student debt crisis, PSLF, and the anti-Black racism inherent within the system of higher education and the loan borrowing process. In his quintessential text regarding the creation of the American Higher Education Complex, Professor John R. Thielen pointed out a single fact that shapes higher education. That fact? Who higher education was intended for. Higher education at its inception and even now was intended for wealthy, white, cisgender, heterosexual males. This specific identifier excludes everyone else who does not fit its criteria. It is the same criteria that the current administration of this country and the white supremacists associated with it, are attempting to drive higher education backwards to. From the lawsuits aimed at upending former President Biden's student forgiveness plans to the overturning of Roe v Wade and affirmative action. Each of these actions aimed at destabilizing the most marginalized among us. Public college was free until the administration of former

President Ronald Reagan, who intended to determine who
could attend college. His tax bills and pulling public
support from higher education is what forced student
borrowing to become essential for the non-wealthy. The
intent was to weaken the middle and lower-middle class,
read as people of color and women specifically. Public
Service Loan forgiveness was supposed to provide an
opportunity for college-going folks to receive relief
after meeting the outlined qualifications. However, the
PSLF system is not without flaws and has helped to add an
additional layer of stress to already overburdened
people. Black women carry a disproportionate amount of
the $1.7 trillion debt, and this is solely because of
anti-Black racism. Anti-Blackness is what drove Reagan's
agenda, and it is what is driving Trump's agenda. The
debt should be canceled just as the PPP loans were for
elected officials. But in the meantime, reimagine the
PSLF process so that it is intentionally equitable and
not performatively so. Consider the fact that attending
college is essential to fill the professional manual and
alternative modes of employment, and that, just maybe (20
seconds) people should not be forced into lifelong debt
to achieve any degree. This ask is not outside the scope
of possibilities. It just needs to be made a priority for
people more concerned about being labeled racist than

they are about not actually being racist. Thank you for
your time.

MS. ABERNATHY: Thank you for your
comment. Megan Sanchez? Megan Sanchez? Megan?

MR. SANCHEZ: Yeah. Magin, yes.

MS. ABERNATHY: Oh, I'm so sorry.
Excuse me. You have three minutes.

MR. SANCHEZ: Thank you. Good morning.
My name is Magin Sanchez, and I'm a higher education
policy analyst at UnidosUS, the nation's largest Hispanic
civil rights and advocacy organization. We strongly
oppose the Department's efforts to restrict nonprofit
employer eligibility to Public Service Loan Forgiveness
as outlined in the recent executive order. PSLF was
created as a vital investment in our country's future,
empowering talented graduates to serve the very
foundation of our democracy through public service. This
critical program not only addresses the severe nonprofit
staffing shortages, but one that serves the public
interest. Like many Americans, Latinos are being crushed
by student loan debt, making it impossible to plan for
the future. When these professionals, teachers,
librarians, firefighters commit to giving back through
public service careers, they're often less lucrative than
in a private sector. We have both a moral obligation and

an economic incentive to honor that commitment through
loan forgiveness. Assessing public service careers should
be based on merit and not limited to those born with
wealth. The law clearly established statutory authority
for broad-based eligibility 401(c)(3) tax exempt
organizations, and we reject politically motivated
attempts to narrow this eligibility and break the long-
standing commitment made to borrowers who have faithfully
been making payments for years. Such organizations should
not have to check their admissions at the door so that
their employees can access PSLF. This includes missions
that ban so-called illegal DEI, even though the
administration has yet to define what it considers as
illegal DEI. This sets a dangerous precedent that any
administration can eliminate PSLF for any ideology it
disagrees with. In addition to protecting PSLF, we
strongly urge the Department to prioritize including
time-based forgiveness as part of any Income Driven
Repayment plan. A shocking 40% of Latinos student loan
borrowers have already defaulted. This is not their
fault, though. These students are more likely to come
from low-income backgrounds, be the first in their family
to graduate college, and have limited resources and
guidance. A poorly designed repayment policy that leads
to default would undoubtedly keep Latinos and other

underserved communities in poverty. Having a group of
Americans who can fully participate in the economy
through home ownership and entrepreneurship hurts us all.
Lastly, to have an honest and productive rulemaking
process needs to ensure that a range of representative
voices are at the table. Those most directly impacted
students and borrowers. We strongly urge the Department
to ensure the interests of these groups, including a seat
for the long-standing members of the civil rights
community and additional seats for students at the
negotiating table to represent students of color and
other underserved communities. Failure to do so will then
accurately capture the voices of all stakeholders
impacted by these proposed regulations. (20 seconds) For
these reasons, we strongly oppose the Department's
proposed changes. Thank you.

            MS. ABERNATHY: Thank you for your
comments. Brian Garrett?

            MR. GARRETT: Good morning. Good
morning.

            MS. ABERNATHY: Good morning. You have
three minutes.

            MR. GARRETT: Thank you. My name is
Brian Garrett, and I'm here today to talk about why
Public Service Loan Forgiveness, often paired with Income

Driven Repayment Plans, not only needs to be protected, but expanded. All my life, I was told that going to college would open a door to opportunity and economic freedom. But instead of finding stability, I watched my student debt grow while my financial prospects shrink in this economy. As a graduate of a small college, Medgar Evers College, CUNY, luckily, I was not as impacted by student loan debt as many of my recent graduate peers. In 2022, Medgar Evers College, 98% of students, think about that for a moment, 98% of students receive some form of tuition assistance, for without these services, most, including myself, would waive that financial burden on ourselves and ultimately our futures. Student debt makes it harder to buy a home, invest in the future, or even think seriously about starting a business, something many of us have only dreamed of. Programs like PSLF and IDR give graduates the chance to serve communities, whether in education, public health, or government, without sacrificing one's financial well-being. They acknowledge that public service matters, and that borrowers shouldn't be punished for choosing to invest in their education. We were told on student loans was an investment in ourselves and our country. But that promise has fallen flat for too many. Higher education should be affordable and accessible. Student debt forgiveness is not just a

financial issue, it's a socioeconomic issue. When we put up unnecessary barriers to forgiveness, we're holding back our country and the next generation of a future leaders. - It's more than about individual debt. It's about building a shared universal education state and implementing an infrastructure sound enough for societal progression, one where education is treated as a public good and not a private burden, one that invests in people because we believe in every student, regardless of their income. By protecting and expanding programs like PSLF and IDR, we're not just helping individual borrowers, we're affirming an American commitment to a shared opportunity and the idea that education should uplift and not entrap. We need policies that reflect our American values and prioritize the well-being of those who serve. We must provide a real pathway out of student debt, not just for today's borrowers, but for the future of our country. The Department must not only protect PSLF and IDR, but they must also expand them. If we want a society built on a shared opportunity- (20 seconds). We must invest in a universal education state, as students and public servants can no longer afford to wait. Thank you for your time.

            MS. ABERNATHY: Thank you for your comment.

MR. GARRETT: Thank you.

MS. ABERNATHY: Dr. Arielle Kuperberg?
Dr. Kuperberg? You have three minutes.

DR. KUPERBERG: Hello. My name is
Arielle Kuperberg, PhD. I'm an associate professor of
sociology at the University of Maryland, Baltimore
County. And I've been doing research on student loans for
around ten years. This research has included analysis of
national data sets, along with surveys and interviews of
college graduates with and without loans, who my
collaborators and I have followed over time for up to
eight years past graduation. I've published five peer-
reviewed articles and numerous additional works focused
on the non-financial consequences of student debt for
college graduates with loans, including family, housing,
and physical and mental health. If the Department wants
to streamline and improve student aid programs, my
research suggests four key actions. One, the Department
should reduce administrative barriers, such as
simplifying the Public Student Loan Forgiveness program
process. Two, they should shorten repayment periods in
Income Driven Repayment Plans. Three, they should reduce
or eliminate interest on loans. And finally, the
Department should maintain strong borrower protections,
including being able to discount spousal income and

Income Driven Repayments. Eliminating this protection
would further discourage loan holders from getting
married. My research has found that loans expand access
to higher education, to those who don't have family money
to pay for college up front, leading to large gains in
lifetime income for the average borrower. However,
despite increases to average income, those who graduate
college with loans are less likely than college grads
without loans to get married or have children. They have
worse self-rated health and mental health and are more
likely to delay healthcare or reduce the amount of
prescribed medication they take to save money. These
healthcare delays also result in more major medical
problems in the long term. My research has determined
that these outcomes result in large part from a strong
sense of financial responsibility when it comes to paying
down debt before getting married, having children, or
paying for other expenses. Many borrowers have reduced
disposable income from high loan payments and compounding
interest, which makes them feel they will never be able
to pay off their debt. These negative outcomes for those
with student debt demonstrate the importance of debt
relief programs. Reducing or eliminating compounding
interest would allow those with loans to make meaningful
progress on paying off their debt, expanding access to

Income Driven Repayment and PSLF, and reducing the time
to which debt is paid off in full on these plans would
allow those with loans to move forward with family
formation and would improve health and mental health.
Finally, (30 seconds) I would add that the uncertainty
and constantly changing programs and policies related to
student loans are worsening the problem. Borrowers
struggle to plan long term, especially when it comes to
decisions such as starting a family in the face of
unclear or shifting policies. Thank you for your time.

   MS. ABERNATHY: Thank you for your
comment. Payton Cole?

   MS. COLE: Hello.

   MS. ABERNATHY: Hi. You have three
minutes.

   MS. COLE: Thank you. Good morning. My
name is Payton Cole, and I am a deputy prosecutor from
Indiana, who is approximately four and a half years of
payments into the ten years necessary to receive Public
Student Loan Forgiveness. I have been working at the
prosecutor's office for eight and a half years, and as a
deputy prosecutor for over five years. I specialize in
special victims' crimes, meaning sex crimes, domestic
violence crimes, and crimes against children. I'm in a
supervisory position in our Special Victims Division. I'm

2025 Negotiated Rulemaking Public Hearing - 5/1/25

also a wife and a mom, and I work extremely hard to balance providing for my family, while also giving everything I can to victims of violence in our community. It's no secret that the state and county government simply cannot pay their attorneys the same amount that private practice can. Because of that, it is imperative that these government entities be able to provide other benefits that allow for talented attorneys to choose to spend their careers in the public sector. PSLF is the benefit that I hear talked about more than any other, because typically our law school debt is the financial burden that is holding us back. To be clear, the attorneys that I work with are very passionate about the work that we do for the people of our community, and they want to be doing that work. But the simple fact is, if they're spending a third of their monthly salary on student loans, it just isn't maintainable. The only way to properly serve our communities, meaning getting dangerous individuals off of our streets and holding them accountable for the harm that they do is to make sure that our deputy prosecutors that we are hiring, are passionate about their work, are able to stay in that position over time to gain the necessary knowledge and skill to be effective, and to do it without the constant stress that our families are going to go without, so that

2025 Negotiated Rulemaking Public Hearing - 5/1/25

we can do the job that we feel is our calling. I grew up
with parents who have always worked very hard to provide
for me and my three siblings. They did everything they
could to provide for us financially, but there's no way
they could pay for all four of us to pursue higher
education, especially something as expensive as law
school. So, when I made the choice to go to law school, I
did it with the specific intention to become a deputy
prosecutor. I met with financial advisers to talk about
my options, and the only option I had was to take on
extreme amounts of debt. But I was told about the PSLF
program and the Income Driven Repayment Plans. If it
hadn't been for the promise of PSLF and the IDR plans, I
would not have gone to law school. When I made the
decision, I made it knowing that the government was
making me a promise. If I worked for them for the
betterment of our community, they would make sure that I
was okay financially and I believed that promise. Now, as
the SAVE Plan was stripped away from us, my monthly
payments went from $113 to being estimated to be over
$500 per month. If PSLF and Income Driven Repayment Plans
cease being an option, I will be paying over $1,000 a
month for the next 25 years to pay off my loans. I don't
have an extra $1,000 a month at my disposal, so that
means that I'll have to decide if I take that money away

from my son's education or plans to buy a home in the
next few years, or my retirement. (20 seconds) Likely,
all those things will be affected. What I'm asking is
simple. Keep the promise that you made to me, and others
like me. I give you my time, my experience, my heart, and
my very best every single day that I walk into my office.
I can't imagine doing anything else, and I need these
programs to be able to continue this work. Thank you for
your time.

          MS. ABERNATHY: Thank you for your
comment.

          MS. ABERNATHY: Stephanie Aguilar-
Smith? Stephanie Aguilar-Smith? Hi. You have three
minutes.

          MS. AGUILAR-SMITH: Perfect. Thank
you. I'm a higher education scholar whose research
broadly focuses on federal policies' impact on minority
serving institutions, particularly Hispanic serving
institutions, or HSIs and their students, most of whom
identify as Latino. And some of my work examines
administrative burdens and the racialized consequences.
These burdens include complex rules and processes that
limit access to and the use of public benefits like
federal student financial assistance programs. And one
key burden is learning costs, and the time and effort

2025 Negotiated Rulemaking Public Hearing - 5/1/25

99

required to understand a policy, its benefits, eligibility, and how to apply. Research, including a 2018 GAO report, shows that the Public Service Loan Forgiveness, or PSLF program, is riddled with learning costs due to its confusing criteria, and thus many eligible beneficiaries miss out on this critical debt relief. But while deregulation of PSLF and related programs may be warranted, changes could also bring serious unintended consequences. Borrowers and program implementers must relearn new regulations, likely causing confusion and missteps, and students may also make different college and career decisions in response, changes that are tricky to predict, right? For instance, modifying PSLF could deter people from public or not-for-profit work. I'm also unclear about the direction of possible changes amid the current political pressures. The administration's March 7th executive order alleges that PSLF misuses taxpayer dollars and seeks to cancel these benefits to borrowers of activist organizations. And so, compliance here will add more regulatory hoops to an already encumbered process. Rather than streamlining access, it would restrict it, harming those who pursue generally lower paying public and not-for-profit careers essential to our democracy. Moreover, barriers to these programs don't equally affect all borrowers. Wealth and

student debt are unequally distributed, and students of color, particularly black students, carry more debt, which limits economic mobility and opportunities like homeownership. Latino students are also disproportionately impacted. Research shows they're often driven by a desire to give back to their communities, and thus often gravitate towards public and nonprofit sector work. And they also tend to be averse, limiting their participation in higher education despite these programs and HSI's generally affordable price points. Ultimately, additional hurdles to debt relief, including ones inadvertently resulting from these deregulatory efforts, may counterproductively suppress- (20 seconds) (inaudible) to college and debt relief for many Americans. To close, I strongly urge including diverse voices in this rulemaking process, especially Black, Indigenous, and Latino borrowers and representatives from HSIs and MSIs. Their perspectives are essential to improving these programs. Thank you.

       MS. ABERNATHY: Thank you for your comment.

       MS. AGUILAR-SMITH: Thank you.

       MS. ABERNATHY: Zera Kwende?

       MS. KWENDE: Yes. Can you hear me?

       MS. ABERNATHY: Yes. You have three

2025 Negotiated Rulemaking Public Hearing - 5/1/25

minutes.

MS. KWENDE: Sure. Good afternoon and
thank you for organizing this. I'm Zera. I'm a federal
worker and a beneficiary of the Public Loan Service
Forgiveness. I've been doing further work for about maybe
nine and a half years already, and I was due for
forgiveness, or I am due for forgiveness in August. But
like many others, we are stuck in the SAVE forbearance,
forbearance bucket where we don't know what it is. And
I'm just coming on here to sort of either ask you to
consider the time, which we have no control over being
stuck in that plan or in that forbearance to count toward
forgiveness as this is important and this is something
we've been working towards for over almost a decade, or
at least have the program for the buyback, which was an
excellent option to be more practical because at this
time that is on paper what is supposed to be. But based
on our efforts on what the research shows, the buyback is
something which is not working the way it's intended to
work. I would like for that program to be investigated
and to see how more efficient it can be to get most of us
out of limbo. And given our work in the public serviceto
get this goal that we've been striving to do, because
this affects other decisions in our lives in terms of not
knowing if this thing is going to be over with this year

or next year. And there's a lot of other things
financially which families deal with, education and
planning for the future financially. This is a hold on
us. I would plead for the buyback program specifically to
be more efficient, and either stick with the 45-day or
give more options that we have. Just being stuck in limbo
is the most frustrating thing for us as borrowers or for
me, particularly as a borrower. Either the best scenario
is having our time and forbearance count towards our
forgiveness, or at least get the buyback more effective
so we get results and contracts on time to get this (20
seconds) (inaudible) and just looking forward to seeing
what, what we do hopefully soon. But thank you for the
opportunity. That's all I got.

                  MS. ABERNATHY: Thank you.

                  MS. KWENDE: Thank you.

                  MS. ABERNATHY: Caryn Jeffries?

                  MS. JEFFRIES: Hello.

                  MS. ABERNATHY: Hi, Caryn. You have
three minutes.

                  MS. JEFFRIES: Yes. Thank you for your
time, everybody. My name is Caryn Jeffries, and I am
currently more than halfway through my PSLF and IDR
plans. I am a born and grown American. I went through the
college experience. I am almost finished. Literally next

2025 Negotiated Rulemaking Public Hearing - 5/1/25

weekend, graduating with my second master's degree. And
the way that the debt has shaped the economic experience,
I am unable to buy a house. I am so highly educated and
doing public service has been an opportunity to interact
with the community in unique ways, but also acknowledge
until this loan option is taken off our backs, that I
can't have my American dream of buying a home. My family,
recently welcomed in a special needs child into our
family and with that, my job options have been limited
and moving forward, the main thing I look for, it doesn't
even matter what the job is, is that it's a PSLF
qualifier. This feature is so important to working hard
American families. Breaking this, I fear, and eliminating
these programs would break the agreements that have been
made for years to so many genuinely hard-working folks
and would be truly devastating to both the economy and
the middle class who are trying to move up through
educational opportunities. It's heartbreaking that we can
be so close to making this work and being able to buy a
house and it all be stripped away. My consumer debt is
very low. My consumer debt shows I can buy a house. But
the way that it looks at for home purchasing and student
loans, I cannot. I am hoping and praying that I can be an
actual adult making these big steps. But if these
programs are eliminated, what's the point? Instead of

using my actual graduate degree, I might as well be
working at McDonald's. So, there are so many hard-working
families who are using opportunities for PSLF and IDR and
removing it would literally strip us of every opportunity
to change the way the debt is viewed, no longer be able
to pursue home ownership or any other type of
consumerism. And these changes are inducing a lot of
fear. (20 seconds) Thank you, everybody, for our time.
This is a big problem if this goes away, and people have
been working hard for a long time to make it right from
their loans and take that responsibility. But if the
agreements are taken away, then no one's responsible.
Thank you.

          MS. ABERNATHY: Thank you for your
comment. Daniel Collier?

          DR. COLLIER: Are we good?

          MS. ABERNATHY: Yes. You have three
minutes.

          DR. COLLIER: Very good. Greetings. My
name is Dr. Daniel Anthony Collier. I'm an assistant
professor of higher and adult education at the University
of Memphis, and nationally recognized expert on Income
Driven Repayment and Public Service Loan Forgiveness
programs. Millions of working and middle-class Americans
pursue higher education and advance their socioeconomic

standing, contribute to a more educated workforce and society, but also incur debt that cannot be repaid under traditional mortgage-like repayments. Income Driven Repayment Plans provide critical relief adjusting payments based on income and family size. These plans are a lifeline for borrowers with significant debts and moderate incomes, including graduate students, women, and persons of color, two groups who are disproportionately affected by systemic wage and employment inequities. However, IDR remains problematic. Borrowers often face negative amortization causing balances to grow, which increases financial burden and drives psychological distress, even suicidal ideation, as borrowers feel trapped. Moreover, individuals cannot control wider economic shocks such as those we are currently experiencing. Although the prices of goods might be on the rise due to inflation and/or trade-related scarcity, IDR policies are not responsive to those shocks, only income. In certain and uncertain economic times, current policies force borrowers to choose between loan repayment and basic needs, worsening hardship for families on the financial edge. This concern drove the Trump Administration's decision to pause student loan repayment during Covid and several extensions beyond. The lack of clear communication from loan servicers leaves borrowers

confused and dependent on online communities. Scaling
back tools like the IDR Visual Tracker has further eroded
trust and increased uncertainty. Public Service Loan
Forgiveness has faced administrative challenge, and low
approval rates. Restricting who might be eligible right
now would upend the lives of millions of borrowers and
students planning on this benefit. Any redesign or future
policy must consider factors associated with well-being.
It's not merely about balancing financial inputs and
outputs. This issue is- deeply affects broader factors
like family planning, workplace productivity, ultimately,
imposing significant financial and non-financial costs on
society. Borrowers suggest that addressing negative
amortization and offering incremental forgiveness could
help reduce their distress. Current policy grants
forgiveness only after decades of repayment. Implementing
this approach would reduce loan balances over time while
maintaining the same degree of forgiveness, easing both
financial and emotional burdens. Another valuable pathway
forward is to treat borrowers IDRs as if they were paying
taxes. Remove loan balances from credit reports and
structure repayments as a percentage of income over a set
amount of years, like Milton Friedman's original proposal
for student loans. Such a policy would bolster the
ability or borrowers' abilities to buy durable goods, and

likely help ease financial and mental distress, as the
balance is truly abstract, translating into lower
financial and non-financial costs more widely, as I
previously pointed out. (20 seconds) In conclusion, IDR
and Public Service Loan Forgiveness offer pathways to
manage and alleviate student loan debt. Systemic reforms
are necessary to address shortcomings beyond those we
have already imagined. Thank you.

       MS. ABERNATHY: Thank you for your
comments. Rhea DeBussy? Or Rhea DeBussy?

       DR. DEBUSSY: Yeah, Rhea DeBussy.

       MS. ABERNATHY: Rhea, you have three
minutes. Sorry about that.

       DR. DEBUSSY: No problem. So, hi
there. My name is Dr. Rhea DeBussy, and I'm the director
of external affairs at Equitas Health, which is a
federally qualified health center look alike. And each
year, we serve tens of thousands of patients across Ohio.
We appreciate the opportunity to provide feedback related
to the Department's management of Income Driven Repayment
Plans and the Public Service Loan Forgiveness Program. As
the largest LGBTQ+ serving healthcare organization in
Ohio, we'd like to emphasize the importance of IDR plans
for LGBTQ+ borrowers, given that many of our patients may
be impacted. Roughly 2.9 million LGBTQ adults currently

hold more than $93 billion in Federal Student Loans, and
LGBTQ+ adults are statistically more likely to have
Federal Student Loan debt. Additionally, it's important
to note that LGBTQ+ people report higher poverty rates
compared to their peers. Further, LGBTQ+ People of Color,
queer women, transgender people, and LGBTQ adults with
children are even more likely to be- to report living at
or below the poverty level. As such, access to IDR plans
is of serious importance to this community, and this is
underscored by the fact that many LGBTQ+ adults also
experience workplace discrimination and harassment, which
further impacts their earning potential. Assuming the
administration moves forward with the IDR plan options
recommended in Project 2025, borrowers could expect an
average payment cost to double. This would have a
detrimental impact on borrowers living in poverty and
working families more generally, and we strongly
encourage the Department to avoid making such detrimental
changes. Regarding the importance of the PSLF program,
the National Council of Nonprofits recommends that this
program is an essential policy solution for the public
workforce shortage. As a community health center, we'd
also like to emphasize the importance of the PSLF program
to the health center workforce as, as noted by the
National Association of Community Health Centers,

2025 Negotiated Rulemaking Public Hearing - 5/1/25

workforce shortages are largely driven by burnout and salary gaps in the nonprofit healthcare workforce. The PSLF program is an important recruitment tool to attract qualified applicants into a career in nonprofit healthcare, and as community health centers provide integrated primary care to more than 32 million patients across 16,000 delivery sites nationwide, protecting this program helps to advance the administration's goal to make America healthy again. To help address this issue, we strongly encourage the Department to ensure continued application of the PSLF program as strongly authorized by Congress and with no new restrictions. With this in mind, we recommend the following policy solutions. One, continue to offer the existing portfolio of Income Driven Repayment Plans to provide a variety of repayment options for borrowers. Two, implement a revised definition of discretionary income that is defined at 300% of the Federal poverty level, i.e., $46,950 for a household of one to help ease the financial burden on lower income borrowers. And three, continue the Public Service Loan Forgiveness Program as authorized by Congress and with no new restrictions to borrowers. We greatly appreciate the opportunity to provide public feedback to the Department, and we're available to answer any questions that you may have at this time. Thank you so much.

MS. ABERNATHY: Thank you for your comment.

DR. DEBUSSY: Thank you.

MS. ABERNATHY: R. Emmett Murphy?

MR. MURPHY: Hello. Can you hear me?

MS. ABERNATHY: Yes. You have three minutes.

MR. MURPHY: Thank you. Good morning. My name is Emmett Murphy. I speak here today on behalf of PSLF Defense. PSLF Defense is an organization of nearly 2,000 public servants. We include doctors and lawyers, teachers and nurses, professors, government personnel and nonprofit workers. All of us and thousands more across the country made a covenant with the Department when we took our student loans that after ten years of serving the American people, our student loans would be discharged. We are holding up our end of the deal, and we expect the Department to do the same. The promise of PSLF shapes the entire lives of those who pursue it. We plan our careers around it. We turn down more lucrative jobs because of it. Our abilities to have children or to own a home depend on it. Now, PSLF is for the moment, enshrined in statute. However, the regulatory changes the Department makes can easily rob us of the loan discharge we've been working towards. Our anxiety over PSLF is

2025 Negotiated Rulemaking Public Hearing - 5/1/25

based in part on harm we have already suffered due to
unprocessed applications and mistakes by loan servicers.
For these reasons, we implore the Department to provide
for the following. First, ensure that any changes to the
definition of qualifying employer do not apply to current
borrowers if their employer previously qualified. Second,
ensure that there exists for current borrowers at least
one IDR plan that results in monthly payments at least as
affordable as under current plans. Third, give borrowers
credit for all months during which they have performed
qualifying employment, including those months in which
the Department or a loan servicer could not or would not
accept a payment. And fourth, ensure that any borrower
who applies for PSLF after making 120 qualifying payments
receives prompt discharge of their loans, regardless of
who their employer is at the time they apply. While there
are many more considerations, we would like the
Department to account for, such as how PSLF eligibility
should be expanded to combat the shortages of doctors,
teachers, prosecutors, and public defenders, I am using
my three minutes here to speak for the professionals who
have already been serving the public in their careers. No
matter what regulatory changes you make, do not pull the
rug out from under us. Fulfill your end of the deal and
do not punish good deeds. We are public servants. We are

not indentured servants. Thank you.

MS. ABERNATHY: Thank you for your comments. Diana Marginean? I'm so sorry.

MS. MARGINEAN: Yes. Can you see me?

MS. ABERNATHY: Yes. Can you mute?

MS. MARGINEAN: Yes.

MS. ABERNATHY: Can you test one more time for me?

MS. MARGINEAN: Yes. Hello.

MS. ABERNATHY: Yes. You have three minutes.

MS. MARGINEAN: Okay. Thank you so much. I appreciate the time to speak here. My name is Diana Marginean, and I work as an assistant director for research at the Five Colleges Consortium in Massachusetts. Prior to that, I taught for 14 years in higher education. Today, I want to share a little bit about my background and how instrumental PSLF has been for me. I am a product of brain drain. I left Romania after the end of the dictatorship in 1989. My parents were farmers. My father was a foreman who was never promoted because he refused to be a member of the Communist Party. God made it possible for a poor kid like me to move to the US, study, become a citizen, and eventually continue to work here. Access to student loans

was fundamental for me and helped me finish my
dissertation. After graduation from my PhD program, I
could have worked in a lucrative position in a private
sector. I only continued to teach because of PSLF. To
date, I taught more than 2,000 students, and yet my
starting salary as a full college professor was $55,000
and the highest, I earned was $73,000. Without PSLF, I
simply would not have been able to teach. The math just
doesn't compute. I understood PSLF as a law that
guarantees that the Federal Government will support
public servants like myself as they deliver public
service value that could never be earned in any other
way. And I trusted the government to keep its side of the
deal, while I kept mine for the past nine years as a PSLF
enrollee. The past few months have been extremely
stressful and anxiety-producing to the point that I've
lost sleep, and honestly, it's affected my productivity.
I watched the constantly shifting opinions around PSLF
and it scares me profoundly. With a reduced access to
PSLF and without IDR options, I fear that I will be
profoundly in debt and honestly worse off than my
grandparents. So today, I beseech the government to
consider the following simple recommendations that are
based on my personal experience. First, the Department
should keep its promise. Please keep people enrolled in

their current IDR programs and PSLF as was designed by
Congress and respect the rules of the original contracts
that we signed. Second, work on improving the
implementation of PSLF. Make the application repayment
process more transparent. Work with the IRS to certify
taxes and qualifying employment on the back end. Hire
staff so they can process backlogs and move borrowers
through the system. (20 seconds) Third, please scale up
the buyback program so that we can earn back the months
held in the SAVE litigation. Fourth, let research data
lead the way to change. Run a cost-benefit analysis on
the return of investment for PSLF. Fifth, and finally, a
cautionary tale. Please beware of the brain drain from
public sector work toward the private sector. This is a
real threat, and I believe it's going to consequently
change the landscape of the education and public sector
work. Thank you for listening to me.

       MS. ABERNATHY: Thank you. Alexandra
Farrell? Alexandra Farrell? Excuse me.

       MS. FARRELL: Can you hear me?

       MS. ABERNATHY: Yes. You have three
minutes.

       MS. FARRELL: Thank you for the
opportunity to comment today. My name is Alexandra
Farrell and I'm a lawyer working at an environmental

nonprofit. I have been pursuing PSLF since I graduated
law school in 2019, and I have been trying to get out of
the SAVE forbearance since last summer. I'd like to speak
today about issues affecting PSLF, including the
definition of qualifying employer, the treatment of
spousal income for married borrowers, and issues with
Income Driven Repayment Plans. First, I ask that as you
consider making changes to PSLF and underlying
regulations, you bear in mind the millions of current
borrowers who have made significant life decisions in
reliance on that program. I would not have gone to law
school without PSLF. I always knew that I wanted to work
in public service, even though those jobs generally pay
less. I also knew that law school would be expensive,
even with the generous scholarship I ended up receiving.
I felt comfortable taking on student loans and planning
to work in public service only because of the guarantee
of making income-contingent payments and only for ten
years. The definition of qualifying employer is one
aspect of PSLF upon which borrowers like me have relied.
I fill out a verification form every year to ensure that
I have qualifying employment. For almost six years now I
have, first as a federal law clerk, now as an employee of
a 501C3 nonprofit. But to read and listen to official
executive statements about withholding PSLF relief from

employees of organizations deemed "not good" raises
concerns about singling out individuals for disfavored
treatment when their expression does not align with
administrative priorities. I urge the Department to do
better, ensuring respect for settled law and
constitutional principles, as well as the settled
expectations of current borrowers. With respect to
spousal income, the Department recently set off
shockwaves by suggesting that it would begin to account
for spousal income in determining the monthly payment for
married borrowers, regardless of tax filing status. I
understand that the Department later changed its
position, but I bring this up to emphasize how important
accurate information is when the Department's decisions
may affect the payments of millions of borrowers. Also,
the timing of these statements was particularly
unfortunate. The Department did not submit what it terms
a corrected declaration until the Federal tax filing
deadline, when many borrowers had already decided how to
file their 2024 taxes. I was one of them. My husband and
I file our taxes as married filing separately because it
is the only way to make my monthly student loan payment
manageable. I am solely responsible for making that
payment. My husband is a public-school teacher in North
Carolina, so his income isn't enough to cover our shared

bills with my student loan payment on top. I ask that the
Department continue to allow married borrowers to exclude
spousal income when they file taxes separately. I'd like
to conclude with some thoughts about IDR plans generally.
I've spent almost a year unsuccessfully trying to switch
IDR plans and resume making monthly student loan
payments. I am unable to reap the sole benefit (20
seconds) from filing separately tax status, while I'm
prevented from making PSLF qualifying payments during the
SAVE forbearance. If the Department creates incentives or
disincentives for certain IDR plans, it should expect to
receive many IDR applications and facilitate their
processing in a reasonable time with adequate staffing,
funding, and direction to servicers. If it decides to
simplify the qualifications for IDR plans, it must ensure
that current borrowers do not fall through the cracks.
Every borrower currently eligible should remain eligible
under any new proposal. Thank you.

      MS. ABERNATHY: Thank you for your
comments. Jarrod Wall? Jarrod Wall?

      MR. WALL: Yes. Hi. Good morning.

      MS. ABERNATHY: Three minutes, sir.

      MR. WALL: Thank you. First, I want to
thank you for the opportunity to speak in this public
hearing. My name is Jarrod Wall. I'm a PhD student at

2025 Negotiated Rulemaking Public Hearing - 5/1/25

118

Tulane University in New Orleans, and I'm also a student loan recipient with debt. While I just want to speak for all borrowers, I want to particularly speak for formerly incarcerated individuals who are borrowers. We talk about the wealth gap or disparities. I literally came out of prison and my only wealth was a trash bag on my back. Many of us had debt before entering prison, and many of us wanting to increase our life opportunities just like anyone else accrued student debt after we were out. When I was in school, I attempted to borrow responsibly. Some of it was for tuition and some for daily living. You must understand, when I was first out, I was living on my mother's couch. But I borrowed on a certain set of assumptions that are being challenged now. I borrowed on the assumptions that I would be able to pay as I earn, that I'd be able to pay according to the level of my earnings, and that I would be able to receive loan forgiveness after serving ten years at a non-for-profit that aligned with my values, my ethics, and my beliefs. But now all these assumptions, the facts that I signed the dotted line on are, are at stake or, or, you know, being challenged, might be revoked. Now, with the- if these are revoked and they are challenged, then I'm looking at, it'll be more likely that I'll have to pay longer on my student loans and a greater amount. I

2025 Negotiated Rulemaking Public Hearing - 5/1/25

already owe 40- over $42,000, of which 17% is interest. Unfortunately, those of us who are formerly incarcerated are not playing on the same field, you know, on the same playing field as others, the general population. We are like many students of color, race, disparities in employment and earnings. Now, with the student loan debt myself, I must wonderwill I or when will I be able to afford a car again? Will homeownership ever be an option for me? Will I even be able to afford to have children? In closing, I believe if successful, these attacks on Pay As You Earn on Income Contingent Repayment Plans, Public Service Loan Forgiveness will undermine our long-held American narratives of class mobility, of hard work paying off, and of education being the great equalizer of future opportunities. Thank you.

MS. ABERNATHY: Thank you for your comment. Currently, this concludes our morning session. We will break for lunch. We'll see you back at 1:00.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING PUBLIC HEARING

SESSION 1, DAY 2, AFTERNOON

MAY 1, 2025

On the 1st day of May 2025, the following
meeting was held virtually, from 1:00 p.m. to 4:00
p.m., before Jamie Young, Shorthand Reporter in the
state of New Jersey.

P R O C E E D I N G S

MS. ABERNATHY: Welcome back. We hope you had a nice break and lunch. For those who have just joined us and are providing public comment today, you may turn your camera on when presenting if you wish. We do ask that you turn off the sound for the public meeting site, because there is a few-second delay, and the public may have difficulty hearing you otherwise. When you are speaking, you may not initially hear yourself, but after a few seconds, you will hear yourself on delay. Joining us on screen this afternoon from our Office of General Counsel is Jacob Lallo. And Mr. Bergeron, our deputy Undersecretary and Acting Undersecretary, is back at the table with us today. Without further delay, I'd like to ask Amanda Prasuhn to get ready to provide comments. Please let me know when you're ready and I'll start the clock. Amanda?

MS. PRASUHN: Hi. I just got in the room. I'm ready when you are.

MS. ABERNATHY: Three minutes, please. Thank you.

MS. PRASUHN: Thanks. Hi. Thank you for having me. My name is Amanda Prasuhn, and I am the director of public interest financial support at the University of California Berkeley School of Law. But I'm

here today. In my individual capacity, I manage Berkeley
Law's loan repayment assistance program for law graduates
working in public service jobs. And in this role, I work
with hundreds of students and lawyers using Income Driven
Repayment and pursuing Public Service Loan Forgiveness.
Helping borrowers navigate their Federal Student Loan
repayment system has shown me two things: that borrowers
face tremendous hurdles accessing these programs, and
that these programs are vital for keeping payments
affordable and ensuring we have dedicated public servants
in our workforce. Maintaining affordable IDR options and
broadening access to PSLF are of the utmost importance.
Without these programs, our economy would be in a
tailspin. Millions of borrowers would go into default,
while millions of others would be forced to leave lower-
paying public interest and public service careers like
teaching legal aid and firefighting to work for corporate
interests. I'm asking the Department to preserve and
expand IDR and PSLF, and I have three suggestions today.
First, to decline to implement President Trump's illegal
executive order asking the Department to limit PSLF
access for certain public interest employees. We know the
Higher Education Act defines a public service job as one
in government or at a 501C3 nonprofit, and there's no
room for the Department to carve out exceptions like the

ED_01828

president is attempting to do. It's clear the president's emphasis on illegal activities is targeted not based in fact, and not subject to the Department's or the negotiators' discretion. Second, I'm asking the Department to preserve an IDR plan alternative to Income Based Repayment, which is unaffordable for older borrowers from before 2014. If SAVE and then subsequently PAYE and ICR are overturned, the Department should propose a new, more affordable repayment plan that's in alignment with the Higher Education Act. These plans should provide an affordable path to forgiveness within a reasonable timeframe for borrowers who have high loan debts and low incomes, not saddle them with loan debt until their retirement age. And then third, I'm asking the Department to continue to work toward making PSLF easier to access for a broad swath of public interest workers. Innovations like the PSLF help Tool and the PSLF tracker on Studentaid.gov help borrowers understand what they need to do to qualify for PSLF and track their forgiveness. More effort should be made to make this process as easy as possible, like moving forward with automatically pulling employment and income records. I urge you to not only protect PSLF and IDR as they are now, but to continue to expand access to these programs as was done in previous Negotiated Rulemaking sessions.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

**5**

With the cost of college only rising (20 seconds)
programs ensure that our students and workforce can make
their loan payments. Thank you.

            MS. ABERNATHY: Thank you for your
comments. Bob Carey? Please let me know when you're
ready. I'll start the clock.

            MR. CAREY: I'm ready.

            MS. ABERNATHY: You have three
minutes.

            MR. CAREY: Thank you very much. I'm
sorry that I'm doing this from on the street, but I'm
going into the dentist right after this, and, well,
anything to delay going to the dentist, , even testifying
before a Negotiated Rulemaking committee. But let me say
(inaudible) first, we believe- National Defense Committee
is a veteran-serving organization that focuses on
constitutional and legal rights of veterans. Our concern
is that forgiveness of debts for anything other than
fraud on the part of the educator or some significant
problem by the Department in issuing the loan is
fundamentally wrong. No one was forced to sign these
loans. They knew what they were getting into. This is the
same as forgiving someone's car loan. And frankly, you
know, a lot of us in the military, a lot of us veterans,
feel like we are gomers for signing on for six more years

2025 Negotiated Rulemaking Public Hearing - 5/1/25

to get GI Bill, when in fact, we could have simply gone and gotten ourselves a big loan and, and then gotten it forgiven. It's fundamentally unfair, especially to those that serve their nation in order to be able to get the GI Bill. Second, on three of the regulations, 90/10, gainful employment, and financial transparency, we strongly recommend- we- one of the things that you asked for is how to make the regulatory process more streamlined. All three of these regulations are unnecessary, are, are contrary to the ability of especially veterans and military personnel to be able to choose their education of choice and are unfairly targeted only against nontraditional education. One of the things that we have a great difficulty figuring out is while I'm on active duty, America trusts its sons and daughters lives to me. But once I become a veteran, they no longer trust me to make any of my own decisions. And that is fundamentally unfair. I know what I'm getting into when I go to a non-traditional or an online-only school. I'm currently a doctoral student in an online-only school, and I'm pleased with that. And for the Department to try to figure out where I can and cannot go to school with my earned educational benefits is fundamentally wrong. Last thing is, the Department has consistently failed to have a diverse participation in its Negotiated Rulemaking

committees for too many times in a row. Over the last 4
or 5 years, the Department has consistently chosen as its
veterans and military representative, either Mr.
Nassirian (20 seconds) from Veterans Education Success or
another member of Veterans Education Success. And this is
contrary to the type of diversity that a Negotiated
Rulemaking committee needs to have. Thank you very much.

        MS. ABERNATHY: Thank you for your
comments. Abby Shafroth? Excuse me again if I have
mispronounced your name. Abby Shafroth?

        MS. SHAFROTH: Yes. Shafroth. That's
correct.

        MS. ABERNATHY: Oh. All right. Three
minutes.

        MS. SHAFROTH: Thank you. And good
afternoon. My name is Abby Shafroth, and I'm the director
of the Student Loan Borrower Assistance Project at the
National Consumer Law Center. Our project provides
analysis and public education on the student loan program
and support to legal aid attorneys across the country who
work with low-income people on navigating their student
loans. We also participate as a member on the 2021 IDR
Rule Making Committee. I have two recommendations as the
Department considers changing the rules on IDR yet again
this year. First, the Department should reconsider its

timing. Student loan borrowers have been through unprecedented change and disruption over the past year as IDR plans have been removed, the terms of remaining plans changed, applications abruptly pulled down, and roughly a million borrowers been left in a backlog waiting for their IDR applications to be processed. We are hearing from borrowers across the country that they are incredibly confused and stressed about navigating these changes, affording their bills, and avoiding default. And more changes on the way. A House Committee advanced legislation just this week that would dramatically change repayment options next year and eliminate the Pay as You earn and ICR plans entirely. Changing these rules on borrowers now while Congress is pursuing changes that would change things yet again next year, threatens to create unnecessary disruption and stress for borrowers. Instead, the Department should wait and see if Congress enacts changes to repayment options and only then proceed from there. Second, if the Department does move forward with the rulemaking on repayment, it should focus on two things. First, keeping its promise to borrowers as reflected in their loan contracts to allow borrowers to cap payments at no more than 10% of disposable income, and to have any remaining balance canceled after no more than 20 to 25 years. That is in borrowers' contracts and

2025 Negotiated Rulemaking Public Hearing - 5/1/25

9

the government should honor its commitments. Two,
providing access to affordable payments and addressing
the default crisis. Prior to the payment pause, roughly 1
million borrowers defaulted every year, mostly from low-
income and working-class families and with devastating
consequences for their finances, their families, and the
broader economy. The SAVE Plan was designed to improve
repayment and reduce defaults, but with the SAVE Plan
currently blocked and the cost of living much higher than
it was in 2019, there are now some 4 million borrowers
behind on their loans and on track to default this year.
The Department can stem the default tide and help low-
income people successfully manage their loans by
restoring and implementing key reforms included in the
SAVE regulations, including automatic enrollment (30
seconds) and IDR for borrowers who fall behind on
payments, automatic recertification using data matching,
affordable payments for all, and $0 payments for
borrowers whose low incomes leave them vulnerable to food
insecurity, so borrowers and their kids don't go hungry
because of student loans. Thank you.

       MS. ABERNATHY: Thank you for your
comment. Toma Bartlett? Please let me know when you're
ready. I'll start the clock.

       MR. BARTLETT: Yeah. I'm ready.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

MS. ABERNATHY: Okay. Three minutes.

MR. BARTLETT: Sure. Absolutely. Good afternoon. My name is Toma Bartlett, and I wanted to start off by saying how honored I am to be recognized as an advocate for our veterans. I am a 12-year Coast Guard veteran, and I'm also one of the tens of thousands of veterans or dependents that were grossly misled by for-profit universities. The University of Phoenix used misleading and false information to recruit, retain, and absorb as much financial gain for me as possible. In addition to using my entire GI Bill, I was also prompted to take out additional financing to help support my family while I was attending school. In the end, I spent more than $72,000 and held a degree that was rendered useless in the job market. Additionally, I was promised two things: guaranteed job placement and a mid-level management position. The University of Phoenix, along with numerous other for-profits, had and continues to have a poor reputation as a quality leader in education. Of all the classes I attended, there was only one class that challenged me, and I was forced to open a book. For all others, mere online posts and meaningless team-written papers were adequate to receive a 3.8 GPA. Often, the team participation meant that only one or two students in a group would actually participate, while the

others lacked any meaningful feedback or contributions. When these issues were brought forward to the facilitator, they were, they were dismissive and failed to hold others accountable. I graduated with a bachelor's degree in healthcare administration, but I didn't receive any benefit from my degree. It has taken me more than 12 years since receiving my degree to finally be relieved of my student debt due to the Borrower Defense and Sweet settlement. My wife and I, Dr. Nicole Bartlett, have been successful in building our own private mental health practices, of which we are able to serve a large veteran population. Many of these veterans suffer from depression, and a common denominator leading to depression is financial uncertainty. Just imagine being an energetic and driven member of the military wanting to receive a higher education because you want to better yourself and provide for your family, and in the end, dig yourself deeper in debt, have a meaningless degree, and have to settle for a mediocre job just to get by. How can that not send a vendor into a downward spiral of depression? Although there's no exact number of veterans who commit suicide solely based on financial hardships, I know firsthand that it is real. It is not well addressed and just shouldn't happen. Veterans deserve affordable repayment options- (20 seconds) -when they repay their

2025 Negotiated Rulemaking Public Hearing - 5/1/25

student loans, especially when their degree does not lead
to jobs and salaries that allow them to repay those
loans. They also deserve better oversight and
accountability. It is my fear that as the Department,
Department of Veterans Affairs continue to be dismantled,
that all the work that I've done with the support of the
Veterans Ed Success and many others will fade away.

          MS. ABERNATHY: Time.

          MR. BARTLETT: Yep. I just want to
thank you for taking the time.

          MS. ABERNATHY: Thank you for your
comment. Nadine Greene-Hicks?

          MS. GREENE-HICKS: Hi.

          MS. ABERNATHY: Hi. Nadine, can you
speak up a little bit to make sure we can hear you?

          MS. GREENE-HICKS: Yes. Can you hear
me?

          MS. ABERNATHY: You're very low. Can
you speak up a little higher or turn your volume up just
a bit?

          MS. GREENE-HICKS: Yes. Can you hear
me better now?

          MS. ABERNATHY: Slightly.

          MS. GREENE-HICKS: Oh, gosh.

          MS. ABERNATHY: Can I ask you to yell

2025 Negotiated Rulemaking Public Hearing - 5/1/25

13

at us today so that we can hear you?

MS. GREENE-HICKS: Yeah. How about now?

MS. ABERNATHY: It's a little better. We'll do our best. How about you got three minutes?

MS. GREENE-HICKS: Sorry. Okay, so I just wanted to say that PSLF is not about student loans. It's about the people who show up for all Americans: firefighters, social workers, mental health professionals, doctors, nurses, corrections officers, and more. We don't serve just Republican or Democrat Americans, not just white, Black, Hispanic, or Asian Americans. We serve everyone. That is what public service is. My story isn't different from a lot of people. I grew up in the foster care system and was adopted at 14. My adoptive family did not have the money to send me off to college. I had to apply for scholarships as well as being awarded some of the Pell that we qualified for. My dad was on Social Security and my mom was an LPN. They didn't really make that much money, but in the eyes of the Government and based on the rules, they had. I chose Human Services because I wanted to give back to youth and families just like those who supported me. I worked in juvenile corrections while in college, making 30K before taxes. My first job out of college in 2017 was in Child

Protective Services, earning $27,000 and only taking home about $24,000. Today, I'm grateful to make more money, but it doesn't feel like it. My mortgage is $1,400, daycare is $600, groceries $600, utilities, car payments, insurance, all necessary, and rising. I bring home about $3,000 a month and under the new IBR plan that I'd have to apply under, I'd owe about $400 a month towards student loans. That's a big leap from the previous payment plan I was on. And like many Americans, our household recently took a hit. My husband, a good, strong man who cares deeply for his family, was laid off from work. Not a federal job, this was last year around Christmas. That loss of income put a serious strain on our finances. He found new employment, but it pays significantly, significantly less than what he had made before. He was recently hired into a better-paying role, but we're still recouping from the lost wages. And where family debt lives below our means, we budget, we plan, we do the best we can with what we have. My debt started at $45,000, and that's not even counting the $10,000 I had to pay towards my university because they allowed me to enroll while still carrying a balance. Public service workers like me don't do this work for the money. We pay with our hearts and our souls. Meanwhile, we've all seen government waste in other areas go unchecked. To those

2025 Negotiated Rulemaking Public Hearing - 5/1/25

opposed to PSLF, (20 seconds) with you for what shall a man profit if he shall gain the whole world and lose his own soul? You want to be selective about where your tax money goes? Fine. But consider this, PSLF isn't a loss, it's a moral investment. It's a chance to stand behind the people who stand for everyone else. Let's make America better by keeping our promises to those who serve. Thank you.

MS. ABERNATHY: Thank you for your comment. Michael Blackstone? Michael Blackstone?

MS. MCKAY: Hello.

MS. ABERNATHY: Janna McKay.

MS. MCKAY: Thank you. Good afternoon. My name is-

MS. ABERNATHY: You have three minutes.

MS. MCKAY: Okay. Thank you. My name is Janna McKay, an accredited financial counselor and director of educational debt counseling and financial wellness at Oregon Health and Science University. I've spent the past 20 years in higher education, helping students, alumni, faculty, and staff navigate federal loan repayment and forgiveness programs. In my current role, I've had the privilege of helping the OHSU community secure over $15 million in loan forgiveness

through the PSLF program. I've seen firsthand how
transformative PSLF can be, not just for individual
borrowers, but for the communities they serve. PSLF is
more than financial relief. It's a social contract that
ensures those who commit their careers to public service
aren't burdened with lifelong debt for answering that
call. PSLF and Income Driven Repayment support people in
essential, often underpaid roles; teachers, healthcare
workers, social workers, first responders, and others.
Weakening or narrowing the definition of a qualified
employer would create barriers for individuals to enter
or remain in these essential professions that serve our
communities. At OHSU, over 70% of our medical students
who borrow Federal Student Loans depend on IDR and PSLF
to make their career paths financially viable, from
residency and fellowship through to practice. Students
and alumni from our schools of dentistry, nursing, and
public health also rely on these programs. PSLF plays a
key role in shaping where they choose to train and
ultimately where they serve. The same is true for our
faculty and staff. PSLF affirms the value of their
service by providing a path to financial stability, while
supporting the broader mission of service-driven
healthcare and education. Most importantly, they all rely
on the original bipartisan definition of a qualified

2025 Negotiated Rulemaking Public Hearing - 5/1/25

employer, unchanged since the program's creation in 2007 as a stable and trusted foundation for their career and financial planning. PSLF is also essential for workforce stability in fields already facing staffing shortages. It is one of the most effective tools we have for attracting and retaining qualified professionals. Undermining PSLF puts public service and every one of our communities that rely on it at risk. Regarding IDR, I specifically want to call out ICR as any changes to or elimination of this plan could disrupt or completely stop borrowers' progress toward IDR or PSLF forgiveness. Many long-term borrowers consolidated their loans during the one-time account adjustment, and ICR is now their only eligible payment plan to reach forgiveness, since it does not require proof of partial financial hardship. These programs aren't perfect. They require ongoing oversight, simplification, and more effective outreach. But the answer isn't to restrict or dismantle them. We must strengthen and protect them, so they fulfill their promise to public servants and preserve trust in our higher education system. From first responders to healthcare workers, (20 seconds), these (inaudible) are the backbone of our nation's resilience and vital to every community. I urge the Committee to protect PSLF and IDR as critical investments in our public workforce, the

243 of 800

communities they serve, and the promise of a more
equitable future for all Americans. Thank you for your
time and consideration.

        MS. ABERNATHY: Thank you for your
comment. Aisha Baruni?

        MS. BARUNI: Hello. Good afternoon.

        MS. ABERNATHY: You have three
minutes.

        MS. BARUNI: Thank you. My name is
Aisha Baruni. Thank you for the opportunity to speak. I'm
a staff attorney with Legal Services NYC, the largest
provider of free civil legal services in the country.
Every day, we help low-income clients with their student
loans. Many of our clients are disabled or work low-wage
jobs. The vast majority want to repay their loans but
need an affordable monthly payment plan that they can
easily enroll in and remain eligible for. Right now,
there are two types of repayment plans: standard and
income driven. Standard plans pay off the student loan
debt over a fixed period and don't consider household
income. These plans can be extremely unaffordable. For
example- I think numbers are good- a single borrower with
no dependents with $38,000 of Federal Student Loan debt,
that's the national average, would have to pay
approximately $439 a month for their student loans on a

2025 Negotiated Rulemaking Public Hearing - 5/1/25

ten-year standard repayment plan. Unless you have a good job, this is going to be very difficult. That's why Income Driven Repayment Plans, IDR Plans that consider a borrower's income and household size, are so critical. Imagine that same hypothetical borrower has only $30,000 a year of income. Under an Income Based Repayment Plan, IBR Plan, she would pay only $62 a month, rather than be required to pay $439 a month. But the promise of an affordable monthly payment plan vanishes for many parents who take out student loans for their child's undergraduate education. The IDR plan for Parent Plus borrowers available after they consolidate their loans is the Income Contingent Repayment Plan, the ICR Plan. Under an ICR Plan, our hypothetical borrower with $30,000 of income has to pay $249 a month. That $249 ICR payment, yes, is significantly lower than the $439 standard plan payment, but it's still likely unaffordable for a borrower with only $30,000 of annual income. And it is much higher than the $62 payment under IBR that would be available to a non-Parent Plus borrower. IDR plans are a lifeline for many borrowers, and borrowers and IDR plans have a lower rate of default than borrowers in other plans. But low-income Parent Plus borrowers often have no good repayment options, which increases the chance of delinquency and default. With these complicated options,

our clients need reliable information from their loan
servicers to help them choose and enroll in the best
repayment plan. Instead, borrowers receive inaccurate or
generic servicer notices that only frighten and confuse
them. Many borrowers cannot reach their servicers by
phone, particularly (20 seconds) when borrowers can get
through, they receive information that conflicts with the
notices or is just wrong. This is an ineffective and
inefficient system. Servicers need to be adequately
staffed, properly trained, and more user-friendly.
Finally, my clients, many of whom are seniors, are
challenged by the yearly process to manually recertify
their income for IDR plans. This process threatens
borrower ability to stay on a plan.

                  MS. ABERNATHY: Time.

                  MS. BARUNI: Thank you.

                  MS. ABERNATHY: Thank you for your
comments. Michael Blackstone? Excuse me. Michael
Blackstone? Let me know when you're on, I'll give you
your time. Dolores Niccolai, please let me know when
you're on. Dolores Niccolai? Do we have Spencer Dixon?

                  MS. NICCOLAI: Dolores is here.

                  MS. ABERNATHY: Dolores, welcome. You
have three minutes.

                  MS. NICCOLAI: Alrighty. So, thank you

for the opportunity to comment today on Public Service
Loan Forgiveness or PSLF. I am Dolores Niccolai,
principal loan and contract analyst and student financial
support at the University of California Office of the
President. The University of California enrolls close to
300,000 students and has 2.5 million alumni. You see both
prepare students for careers in public service and
employee's public servants. Economically, you see
operations support 529,000 jobs in California and
contribute $55.8 billion to the state's gross product. As
someone who is committed to public service, I urge you to
preserve the current structure and employment eligibility
criteria for the PSLF program. PSLF is a pathway for
students and employees to serve in roles that are vital
to the health, education, and welfare of the communities
we live in and serve. Any change that refines or narrows
the scope of PSLF employment undermines the statutory
purpose of attracting students in public service roles.
This also increases risk that presents eligible, eligible
employers will lose highly qualified current talent to
the private sector, as many valued public service roles
cannot compete with private sector wages. In a 2024 study
published in the Journal of American Taxation
Association, the PSLF program promoted nonprofit
employment and increased organizational effectiveness

2025 Negotiated Rulemaking Public Hearing - 5/1/25

across the nonprofit sector, with employee output
exceeding the average PSLF forgiveness amount for 94% of
nonprofits. Additionally, the communities served would
bear the brunt of these changes. Reducing access to PSLF
threatens the availability of qualified teachers,
doctors, nurses, and other public service professionals
in essential service settings.  It risks creating service
gaps and areas already facing workforce shortages. For
example, the UC Berkeley Labor Center found that many
public service occupations such as nursing, policing, and
teaching had shortages that predated the pandemic and
that those shortages have increased since then. These
shortages have short and long-term impacts on the
community's safety and prosperity. PSLF is an investment
in the communities where people serve. I strongly urge
the Department to maintain the current employment
eligibility criteria and uphold the original intent of
this essential program. Thank you again for the
opportunity to provide comments today.

          MS. ABERNATHY: Thank you for your
comments. Michael Blackstone?

          MR. BLACKSTONE: There we got it.

          MS. ABERNATHY: All right. You have
three minutes.

          MR. BLACKSTONE: I am joining as a

2025 Negotiated Rulemaking Public Hearing - 5/1/25

veteran. I served Marines in the Army. I'm 61 years old
this month, and I have over $100,000 in student debt
currently. I went to college later. That's the main
reason for that. And my concerns for Income Driven come
from a lot of places. But for one, a lot of people enter
college, and they don't know what the final cost is. And
my analogy is you don't buy a car and then find out a
year later, well, now it's $10,000 more. You need a
second loan, and in the third year, it's $20,000 more. I
actually ended up with 15 different loans. And when they
hit my credit, that reported 15 times delinquent. I went
from a low 800 score to a 515 literally overnight. Some
other concerns, just on the education side itself, for
new familiesnot in my scope, but college people that want
to start families, they have to weigh- that's a big topic
now, having babies. You can't weigh- you have to make a
choice. You're going to pay your student loans, or you're
going to start a family or buy a house. We really need an
Income Driven Plan that also takes discretionary income
based on what, maybe zip code, something like that. They
cost somebody in California a lot more to live on the
same income as it does in another state. I thought
national security was part of it. You need people that
are educated to hold the jobs here instead of bringing H-
1b visa people to hold those jobs just because we don't

have people to do it. And then cost of living changes
over time. What makes sense for like, a fixed payment
today is not going to be any good ten years from now.
Some things I did look at where the Income Driven plan
had a higher payback rate compared to other plans. I
think it was 6% default rate where other plans were 15%
default rate. Some of the suggestions I have for an
Income Driven were- however they do the formula, what
they call discretionary income, really needs to be- (20
seconds). I would like to see a 1:1 tax credit or amounts
actually paid to your student loans. I think that would
encourage repayment ahead of schedule.

                MS. ABERNATHY: Time. Thank you for
your comments. Spencer Dixon?

                MR. DIXON: I'm sorry. One second. All
right.

                MS. ABERNATHY: You have three
minutes.

                MR. DIXON: Okay. Thank you for the
opportunity to provide comment. My name is Spencer Dixon.
I'm a former student debt advocate, current student loan
borrower and current state employee pursuing PSLF. In its
April 4th posting announcing its intention to form a
Negotiated Rulemaking committee, the Department
identified changes to the PSLF, ICR, and PAYE programs.

For PSLF, I think it's important to look at what the law
says. 20 US code section 1087e defines a public service
job as a job for "an organization that is described in
section 501(c)(3) of Title 26 and exempt from taxation
under section 501A of such title," in addition to listing
specific public sector jobs, The law is clear. If an
organization meets these requirements, full-time wage
employees are eligible for PSLF. Full stop. There exists
no authority for the Department to make additional
arbitrary determinations of which organizations may
qualify. There is already an extensive nonprofit status
review process at the IRS that ensures PSLF-eligible
organizations are serving the public interest. It's
disheartening to have to say this, but this should not be
an invitation for this administration to abuse its power
and politicize the nonprofit review process at the IRS.
On March 7th, the White House released an executive order
that calls on this Department and Treasury to restrict
eligibility for PSLF to organizations for seemingly
innocuous reasons like aiding or abetting violations of
immigration laws and supporting terrorism. Without taking
into account the previous actions of this administration,
these restrictions seem like common-sense safeguards. But
the American people are not stupid. They know that, like
the unprecedented actions of deporting lawful residents

based on their nonviolent political speech or the
rescinding of funding to public schools based on their
support for transgender students or their promotion of
diversity, equity and inclusion, these restrictions will
be used to abuse power and punish people and institutions
this administration disagrees with. As numerous courts
have found, these actions are unlawful. And let's be very
clear, an unlawful policy does not magically become
lawful just because it goes through a formal regulatory
process. That's not even to mention that this EO breaks a
promise to millions of borrowers who already work or plan
to work for affected nonprofits' (20 seconds) public
interest. As for changes to ICR and PAYE, the law is
similarly clear that payments are required for no longer
than 25 years. Any change to extend repayment periods
beyond that range would be unlawful. In the interest of
time, I will end there. Thank you.

        MS. ABERNATHY: Thank you for your
comments. Kristie LaSalle? Kristie, let me know when
you're on so I can tell you your time.

        MS. LASALLE: I'm on, I believe. I
believe I'm on now.

        MS. ABERNATHY: Three minutes. Three
minutes. Yes.

        MS. LASALLE: My name is Kristie

2025 Negotiated Rulemaking Public Hearing - 5/1/25

LaSalle. I'm a lawyer, so I need to say that I'm here today in my personal capacity. Unlike many speakers today, I have no student debt. I've been lucky enough to pay back my loans in full, and I often hear that affordable student loan payments and Public Service Loan Forgiveness is a slap in my face, that because I paid my debts, PSLF is unfair to me. Let's talk about fairness. A while back, I loaned a friend money to start a house painting business, and he couldn't have gotten his business off the ground without that loan. And we made a deal. If he painted my house green every year for ten years, I'd forgive his debt. He agreed, even though that meant he had to pass up on other higher-paying gigs over the years in order to make good on that promise. And he's done a fantastic job for the past nine years. But this year I decided I'd rather paint my house blue. So, I told him our deal was off and that he owes me the full amount plus interest. Was that unfair? Is it cruel? It's both. And don't worry, my story is completely made up. But for thousands of Americans, that situation is very real. The government promised borrowers that serve their community for ten years and made affordable income-driven payments while they did, that their remaining debt would be discharged. But now the agency is contemplating defying that contractual promise. My sister works in a public

school and it's the middle of the school day, so she
can't be here, and that means she can't stop me from
bragging about her a little bit. She followed her dream
of becoming a school psychologist, even though that would
require advanced degrees for a very small salary. But
because of Public Service Loan Forgiveness, and the
promise that was written into her lending documents, she
could make it work. So, she's been painting your house
for nine years. She has made every payment on time. She
has navigated the utter negligence of servicers like
MOHELA, and she's been stuck in limbo for almost a year,
because some attorneys general thought it was unfair to
me that she should be able to afford her payments. And
now, to hear that the agency is considering reneging on
its contractual promise after she's already performed 90%
of her obligations, that is what is unfair. Our public
servants deserve a repayment and loan discharge program
that is strengthened, not diminished. Income Based
Repayment plans should have updated discretionary income
tolerances that take into account inflation and the cost
of living. Protect the buyback program that remedies the
months that borrowers have been forced into involuntary
forbearances, even while continuing to perform qualifying
service. Public servants should have their remaining
balance discharged after they've held up their end of the

2025 Negotiated Rulemaking Public Hearing - 5/1/25

bargain. Our public servants deserve (20 seconds) that they have earned. Thank you.

            MS. ABERNATHY: Thank you for your comment. Denisa Gandara, please let me know when you're ready.

            MS. GANDARA: Hello. I'm ready.

            MS. ABERNATHY: Three minutes, please.

            MS. GANDARA: Good afternoon. My name is Denisa Gandara, and I'm an associate professor of educational leadership and policy at the University of Texas at Austin. I applaud the Department for taking steps to streamline Federal Financial Aid programs in ways that reduce burdens on both students and higher education institutions. First, I want to underscore the importance of not only maintaining but expanding access to postsecondary education as a driver of our nation's economic well-being. This includes four-year and advanced degrees, which are essential as well as associate degrees and shorter-term credentials. Our knowledge economy is central to America's global competitiveness, and that hinges on access to education for everyone, regardless of economic circumstances. Second, I want to offer a few suggestions for reducing the administrative burdens that students face in accessing federal financial aid, particularly through Income Driven Repayment plans. I

agree with the premise that simplifying repayment by streamlining IDR options into a single plan can reduce confusion and enhance transparency for borrowers. But simplification should not come at the cost of affordability or access. To truly support borrowers, the new plan should include strong protections such as a low-income repayment threshold, ideally 5%, and interest subsidies that prevent balances from growing when payments are too low. The new plan should also offer forgiveness after a reasonable period, ideally between 10 and 20 years, and to reduce informational barriers which are significant when it comes to Income Driven Repayment. The new plan should be paired with loan counseling and communication tools, and this is one area where AI could be leveraged to deliver personalized, accessible guidance. One word of caution here is that data protection and privacy should be prioritized. The new plan should also grandfather in existing borrowers and avoid forcing transitions into the new plan, which could disrupt the lives of those who made financial and life decisions based on current repayment terms. Crucially, any changes should preserve the Public Service Loan Forgiveness program. While refinements to improve access and clarify eligibility are welcome, changes shouldn't reduce benefits for public servants or discourage

talented individuals from entering public service. As
we've heard throughout the day, teachers, nurses, public
defenders rely on PSLF to sustain their livelihoods and
to plan for the future. Finally, I urge the Department to
put in place a plan to evaluate the effects of any
changes made through this rulemaking process, including
on borrower outcomes. In closing, students and borrowers
are watching. As we've heard today, and as research
confirms, loan uncertainty affects not just their (20
seconds) -but also their mental and physical health,
their career paths, their workplace productivity, home
ownership, and their family planning decisions. I hope
this process results in reforms that make college more
affordable, not less affordable for people seeking higher
education and a better life. Thank you.

                MS. ABERNATHY: Thank you for your
comment. Rita Jones? Please let me know when you're
ready.

                DR. JONES: Hello. I'm ready.

                MS. ABERNATHY: Three minutes.

                DR. JONES: Hi. My name is Dr. Rita
Jones. I am a student borrower and a member of the
Community Action Council of the Project on Predatory
Student Lending. My experience with predatory lending and
deceptive practices in higher education has been both

deeply frustrating and disheartening. I attended Grand Canyon University to pursue a master's degree in counseling. Initially, the program seemed promising. However, as I neared graduation, I learned that many states require CACREP-accredited degrees for professional counseling leisure, something my program did not have. Without this accreditation, my job opportunities were severely limited. By the time I realized the limitations of my degree, I was drowning in debt without a lucrative career. Trying to pivot, I pursued a doctorate in healthcare administration at Capella University. The school advertised through my employer, which led to believe it was a solid investment. Once again, I was disappointed as my institution's reputation hindered advancement. Today, despite holding two advanced degrees, I'm burdened with overwhelming student loan debt and stuck in a career far removed from my original aspirations. The emotional and financial toll has been devastating, and that's- even more heartbreaking is knowing that my story is far from unique. Colleagues who attended similar programs face the same barriers resulting in underemployment and massive debt. Now, the situation is poised to become even worse for borrowers like me. President Trump's plan to change Public Service, Public Service Loan Forgiveness, Income Contingent

2025 Negotiated Rulemaking Public Hearing - 5/1/25

Repayment programs, and Borrower Defense represents a direct threat to already vulnerable borrowers. If you eliminate or narrow these programs, you will effectively trap millions of borrowers in debt with higher payments for longer periods. These programs are often the only safeguards preventing low and middle-income borrowers from being crushed under unaffordable monthly payment, default, and lifetime debt. For those of us who were cheated by predatory schools, it is especially devastating because instead of a degree that would advance our careers, we got a lifetime of predatory loans that never should have been made in the first place. Poll after polls show Americans from both parties overwhelmingly oppose gutting student loan debt repayments like IDR. Voters are also overwhelmingly agreed that defrauded borrowers should be eligible for discharge of their loans. We need tighter oversight of both educational institutions, lenders, and servicers to prioritize student success over profit, not less. Thank you.

      MS. ABERNATHY: Thank you for your comment. Amy Wiesbrock? Let me know when you're ready. I'll start the clock. Amy Wiesbrock?

      MS. WIESBROCK: Hi.

      MS. ABERNATHY: Hi. Three minutes.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

                    MS. WIESBROCK: I'm here to speak
about the need to continue the important Public Loan
Forgiveness program. It is critical to help our overall
community to have nurses, doctors, public prosecutors,
public defenders, social workers, and more. I want to
state that the cost of college has significantly
increased over the past 40 years. I graduated higher
education over 20 years ago and enjoyed much lower
education costs as well as a low interest rate when I
graduated. I was lucky. The cost of higher education has
increased in multiples of inflation, and the interest
rates have also increased at the same time. This has made
the Public Loan Forgiveness program and other income-
based programs even more important. The New York Times
podcast, The Daily, had an interesting podcast ten days
ago, on April 21st, that went through the history of what
occurred, and I feel that this would be a good source for
all of you to look at. I am highly concerned on the
millions of people who are currently stuck through no
fault of their own, in the same forbearance, forbearance
due to the current lawsuit, and I am concerned that the
millions of students who have recently graduated and are
about to graduate, with the stress of the discussions and
potential risks to the Public Loan Forgiveness programs.
Please, the one thing I ask you is do no harm. I have

worked in the nonprofit field for almost two decades, most in the housing, unhoused, and the eviction prevention areas. One thing that I do know is that preventing an eviction is 10% of the cost of helping those once they become homeless. We need to make sure that those loan forgiveness programs are more robust and not less. Otherwise, we are going to have a significant number of our community members who come even closer to the brink of losing their homes. Thank you for your time.

        MS. ABERNATHY: Thank you for your comment. Jennifer Poole? Please let me know when you're ready. Jennifer Poole?

        DR. POOLE: Hi.

        MS. ABERNATHY: Hi. Three minutes.

        DR. POOLE: All right. Sounds good. Hi, everyone. My name is Dr. Jennifer Poole, and I conduct research and coaching for higher ed and workforce development organizations. I urge the Department to do the following in writing the rules for PSLF and financial aid, both for undergraduate and graduate borrowers. First, implement an Income Driven Repayment plan that truly meets people where they are. I was originally on REPAYE. I didn't ask to be moved, but the Government transitioned me to SAVE. However, both plans offered manageable payments based on real-life income. I

2025 Negotiated Rulemaking Public Hearing - 5/1/25

appreciate the goal of simplification, but not if
simplification just raises the payments across the board.
We don't need fewer plans if they leave borrowers behind.
Second, use take-home pay, not gross income to calculate
the loan repayment and cap PSLF payments at no more than
5% for undergraduate and graduate loans. Gross income
overstates what borrowers actually have to live on. Many
graduate borrowers work in lower-paid public service
roles and should not be expected to pay more than others.
A single 5% cap based on take-home pay is clearer,
fairer, and more sustainable. Third, protect borrowers
with high debt burdens from being penalized. According to
Dr. Daniel Collier at University of Memphis, those most
likely to be in IDR plans are borrowers with high
balances, middle earners, women, and minorities. The
exact groups that PSLF and IDR are intended to support.
Now, graduate school wasn't what I was told it would be
in terms of cost. My fully funded program didn't cover
basic living expenses for a 32-year-old adult with work
experience. I worked nights at a bar, made coffee, and
rented a single room in a family's home across the hall
from their five-year-old. I made it work because PSLF and
IDR gave me hope that my service would be recognized, and
my payments would be affordable. I went on to complete an
award-winning dissertation that brought undergraduate

women together to share their experiences with MeToo on campus. One day, I hope to launch a nonprofit that focuses on this and other intractable problems in education and workforce development, solutions that empower learners and workers and create meaningful change. But today, I spend hours navigating PSLF paperwork and uncertainty, time and energy I would rather spend building the public good. Now I owe $165,000. I can handle whatever the Department throws at me, but not everyone can. I'll also have to make sacrifices to do it. Possibly the last years of my fertility and the chance to start a family. I share this not to ask for special treatment, but to show what it costs to stay in public service, especially if these rules are not written in a way that meets people where they're at. I'm asking that you please write the PSLF and IDR rules in a way that truly meets people where they are, keeping opportunity open for future generations and fighting back against a brain drain that is, I'm afraid, potentially coming soon. Thank you.

              MS. ABERNATHY: Thank you for your comment. Dr. Asmara Hoo-Cardial?

              DR. HOO-CARDIEL: Hello?

              MS. ABERNATHY: Hi. You have three minutes.

DR. HOO-CARDIEL: Thank you. My name is Dr. Asmara Hoo-Cardiel, and I'm a physician and training graduating fellow in child and adolescent psychiatry. I've been in training for ten years, medical school for four years, psychiatry residency for four years, and subspecialty training in child and adolescent psychiatry for another two years. I'm also a daughter of immigrants, a daughter of a single mother, a mother myself to a 14-month-old, a wife, a sister, a friend, an aunt, and niece. And I am the first in my family to become a physician. I'm here today to advocate for PSLF and strongly oppose changes to the Student Loan Forgiveness programs. And like so many other medical trainees, I pursued a life in medicine because I wanted to help people. It was in high school when I was first inspired by my pediatrician to become a physician. I later committed to this school after finding out about the PSLF program during my first year of college, as I knew it would require a significant amount of financial resources. I attended a local state university, and upon college graduation, I worked as a middle school math and science teacher for two years to save for application fees. You can imagine how I felt upon my first acceptance to medical school. It was life changing and I knew it would change the course of my family for years to come.

ED_01863

2025 Negotiated Rulemaking Public Hearing - 5/1/25

Like the majority of medical students, I needed student
loans to finance my way through medical school. The
average medical student has over $240,000 in student loan
debt. My tuition alone in total was about $200,000, and
this doesn't include costs for board exams, prep courses,
residency applications, and living expenses. After all
this time invested, I have seven and a half years' worth
of eligible payments towards PSLF to date. Shifting
gears, without the promise of PSLF, I worry about what
this means for the impending workforce shortages in
healthcare. Healthcare workers might be forced to
consider higher-paying jobs in the private sector, which
could lead to a reduced workforce and community mental
health centers, federally qualified health centers, and
other safety net hospitals. I worry about less physicians
pursuing lower-paying specialties, such as in pediatrics
and primary care. I worry about what this means for
access to services for patients. Even now, it's not
uncommon for patients to wait six months to over a year
to see a psychiatric provider or therapist. I worry about
what this means for ongoing burnout in physicians of all
specialties and sustaining the future of the healthcare
workforce. Because of this, I'm advocating for the
following: one, investing more resources into the PSLF
program so applications, inquiries, submissions can be

processed within a reasonable amount of time so that
service representatives can be reached to answer
questions borrowers may have about their account. Two,
(20 seconds) maintaining affordable, Income Driven
Repayment plans, including how minimum monthly payments
are calculated when filing taxes separately from a
spouse. Three, continue to count payments during medical
training for doctors and dentists because without this,
it would disincentivize those pursuing the medical field.
And lastly, four, maintaining tax-exempt status for
nonprofit hospitals and healthcare agencies, which allow
not only doctors to qualify for PSLF, but nurses, social
workers, therapists, medical technicians, speech
pathologists, physical therapists, dietitians and
administrators, and more.

                    MS. ABERNATHY: Time.

                    DR. HOO-CARDIEL: Thank you for this
opportunity for my personal testimony today.

                    MS. ABERNATHY: Thank you for your
comment. Lewis Derrick? Please let me know when you're
ready. I'll start the timer.

                    MR. LEWIS: Hey, can everyone hear me?

                    MS. ABERNATHY: Yes.

                    MR. LEWIS: Hey, good afternoon. My
name is Derrick Lewis, II. I'm from a small town by the

name of Lamar, Texas. But currently reside in
Hyattsville, Maryland. I serve as the interim national
director for the NAACP Youth and College (inaudible),
representing over 28,000 youth members that make up 700
college chapters, youth councils, and (inaudible) across
the United States. The Public Service Loan Forgiveness
Program was created to honor those who dedicate their
lives to serving others, but for far too long it has been
broken promises more than benefit. While reform is long
overdue, today's proposed changes do not move us forward.
They drag us backwards. Let's be clear, the
Administration is (inaudible) the historic and legal use
of waivers that helped correct years of failure. That
temporary relief didn't abuse the program and honor
public servants who had already done the work and were
wrongly denied forgiveness. Walking back that relief or
threatening to revoke earned forgiveness would be a cruel
and unjust behavior to Americans, and we cannot allow
that practice of this process to become an excuse to
punish borrowers retroactively. No one should have to
fear losing their relief that they've already been
promised, especially those who've stepped up during the
national crisis. We have an opportunity now to expand,
not restrict, the PSLF program. So finally, ensure that
all public servants, regardless of race, occupation,

2025 Negotiated Rulemaking Public Hearing - 5/1/25

background, can access this program. Teachers, organizers, healthcare workers, city employees and nonprofit staff all keep this country working. The work that they do is public service-

MS. ABERNATHY: Mr. Lewis?

MR. LEWIS: Correct.

MS. ABERNATHY: Mr. Lewis?

MR. LEWIS: Hello? Can you hear me?

MS. ABERNATHY: Yes, I stopped your time. Please continue.

MR. LEWIS: Thank you. The work they do in public service is not- is their debt- should not be- - the work they do in public service and their debt should not be a life sentence. We must also stop sharing the idea that some jobs are worthier than others. Black borrowers in particular are disproportionately represented in roles that sustain communities, yet they've received (inaudible) little relief. This isn't just a flaw in administration systematic injustice. The PSLF, the PSLF program must work not just for today's workforce, but for future generations who should not inherit a system designed to fail them. Let me be clear, the NAACP supports the meaningful PSLF reform, not political attacks, colloquial language for fake forgiveness already granted must be protected, and

expansion must reflect the real lives, real jobs, and real service of the people this program was built for. We can fix the Public Service Loan Forgiveness program, but only if we choose justice over politics and people over prejudice. Thank you for your time today.

MS. ABERNATHY: Thank you for your comment. Kulwa Apara? Kulwa Apara? If you will let me know when you're ready so I can start the timer.

MS. APARA: Greetings.

MS. ABERNATHY: Ready?

MS. APARA: Yes, I'm ready.

MS. ABERNATHY: Three minutes.

MS. APARA: Good afternoon, everyone. My name is Kulwa (inaudible) Apara. It's a pleasure to be here. I was very excited when I received the email and I said, I have to speak if I am able to, as an American citizen. I am a millennial. I'm actually the first of my family's generation. I mean, of my family's bloodline. Me and my twin sister and our younger sister to be born post-civil rights, meaning all of my parents and all of my grandparents were born either under legal segregation or some type of legal, sanctioned oppression or systemic injustice. I am the first of my generation to really kind of come off or get a start on a- somewhat of a fair footing. I come from a social worker mom and a bilingual

schoolteacher dad. I do not come from any type of
generational wealth. Everything that I have gained has
been through hard work. I am a product of public schools,
including the University of California at Berkeley. And
for graduate school I went into considerable debt,
including a medical school program that I had to not
finish because the loans were just enormous. It was an
overseas Caribbean but accredited university. And I want
to say that we have a lot of foreign-trained physicians,
because it's actually more affordable to attend a medical
school in a different country and come here and pass the
boards. I would say that a lot of working-class Americans
like myself deserve access to equitable loan forgiveness.
I am in so much debt at this moment and it is unbearable.
I live in the Bay Area where we already have $3,000 rent,
and people like me who dedicate their life to the public
service sector, we deserve a fair chance. Because I work
for a nonprofit that does DEI work, now, it has been said
that my loan forgiveness (20 seconds) will not be
honored. Please have a heart and thank you all for your
time.

            MS. ABERNATHY: Thank you for your
comment.

            MS. APARA: Thank you, Tamy.

            MS. ABERNATHY: Julie Tanguay? Julia,

2025 Negotiated Rulemaking Public Hearing - 5/1/25

excuse me. Julia Tanguay?

DR. TANGUAY: Yes. Hi. How are you?

MS. ABERNATHY: Hi. You have three minutes.

DR. TANGUAY: Thank you. My name is Dr. Julia Tanguay, and I'm a pediatrician. I've been a general pediatrician now for five and a half years, not including my residency. I did my training in Ohio and then worked in the emergency department for two and a half years before I moved back to Colorado to do primary care in Colorado Springs. I am here today to talk about and give testimony about my professional service and how I've worked in the public sector now at nonprofit organizations since 2016. This has included my residency and all the places I've worked since then. I will be due for forgiveness, if it hadn't been for the SAVE injunction in December of 2026, and I'm restarting payments with Income Based Repayment this month. I'm not sure if the members of this hearing are aware of this fact, but pediatricians are the lowest paid medical specialty, and knowing that I wanted to do pediatrics, I worked throughout my undergraduate studies and worked service jobs. I also lived with my parents at home for two years to save money and to try to take out less loans than- as much as- least amount of loans as I could. And I

also went into pediatrics because I wanted to help
children who cannot always advocate for themselves. When
George W. Bush signed the bipartisan Public Service Loan
Forgiveness program into law, I was in shock. I didn't
know that this was real or if it was legitimate. When I
learned more about it, I knew that this would be my path
to become the pediatrician that I am now, and what I do
today. I currently have $345,000 in student loan debt,
even after paying for seven years on my loans. I want to
briefly shift to talk about the patients that I serve. My
specific panel is about 700 patients right now. Forty-two
percent of my patients use Medicaid. 23% of my patients
use Tricare, which is the military insurance, and the
remainder use commercial insurance and self-pay, which is
about 28% and 1%, respectively. With this breakdown, the
majority of my patients are either children with
disabilities, foster children that rely on Medicaid, and
other under-resourced families that utilize Medicaid, or
military families that are on Tricare. In my region,
there's a scarcity of pediatrics. It's very difficult to
find someone, and I can only do what I do because of
Income Based Repayment and the Public Service Loan
Forgiveness program. I recently heard that the House
Education and Workforce Committee has plans to take away
(30 seconds) -for dental and medical professionals to

pursue public service while in training. This will be
detrimental to pediatricians like myself and future
medical students from pursuing care for children. I want
you to know that it will make payments unaffordable, and
people won't be able to be physicians, and we're facing
180,000-.

          MS. ABERNATHY: Time.

          DR. TANGUAY: Thank you.

          MS. ABERNATHY: Thank you for your
comment.

          MS. STANLEY: Hi. Good afternoon.

          MS. ABERNATHY: Hold on one second.

          MS. STANLEY: Okay.

          MS. ABERNATHY: I need to make sure I
get your time straight. Just a second. Hello, Alexis
Stanley.

          MS. STANLEY: Yes.

          MS. ABERNATHY: One second.

          MS. STANLEY: No problem.

          MS. ABERNATHY: You have three
minutes.

          MS. STANLEY: Thank you. Good
afternoon. My name is Alexis Stanley. Thank you to the
Department for the opportunity to provide public comment.
I am a student borrower and a member of the Community

Action Council of the Project on Predatory Student
Lending. Today, I speak not only as an advocate for
stronger loan repayment and relief options, but also as
someone who has personally experienced the devastating
impact when protections for student borrowers fail. In
2008, I enrolled at Florida Coastal School of Law, a for-
profit institution that aggressively marketed itself as
an affordable, ABA-accredited path towards a successful
legal career. They promised bar passage support, job
placement assistance, and strong career prospects, none
of which matched the reality. Years later, the Department
determined that Florida Coastal had defrauded students
through deceptive marketing and misrepresentations about
employment outcomes, bar passage rates, and accreditation
status. To fund my legal education, I took out
substantial federal loans based on these false promises.
Although I eventually graduated from a different law
school and built a career, I'm proud of today, the debt I
incurred at Florida Coastal continues to haunt me. It has
impacted my ability to save, build wealth, and plan for
the future, and it represents a burden I never should
have had to carry. I filed a Borrower Defense application
seeking relief, but the process has been slow, confusing,
and quite honestly, disheartening. There have been long
periods of silence, changing guidance, and no clear

timeline for resolution. Even after institutional misconduct is confirmed, borrowers are left in limbo, emotionally and financially. This isn't just an administrative failure. It's a failure of justice. I urge the Department to act boldly to fulfill its commitment to borrowers. Specifically, first ensure that repayment plans are truly affordable by creating structures that do not trap people in perpetual debt. Loan repayments should reflect a borrower's reality, not punish them for pursuing higher education. Second, create clear and attainable pathways out of student debt, including streamlined and automatic forgiveness, where appropriate. The system should not require borrowers to relive their trauma through endless paperwork and procedural delays. Third, hold institutions accountable when they defraud or mislead students with relief that is automatic once misconduct is confirmed. Borrowers should not be required to fight for years to receive justice after being wronged. No borrowers should need legal (20 seconds) representation. Media coverage or political advocacy just to access protections the law already guarantees. Thank you again for your time and for your commitment to reforming a system that must do better for current borrowers, for future students, and for the integrity of higher education. Thank you.

MS. ABERNATHY: Thank you for your comment. Preston Cooper? Please let me know when you're ready.

MR. COOPER: I'm ready. Thank you.

MS. ABERNATHY: Three minutes.

MR. COOPER: Good afternoon, everybody, and thank you so much for the opportunity to provide a public comment today. My name is Preston Cooper. I'm a senior fellow at the American Enterprise Institute, where I focus on federal higher education policy. My comments represent my own views. I'm pleased that the Department will convene a Negotiated Rulemaking committee on several topics related to the Title IV programs. The Department has stated its interest in potential topics that would streamline current Federal Student Financial Assistance Program regulations while maintaining or improving program integrity and institutional quality. As Secretary Linda McMahon wrote in a recent op-ed for The Wall Street Journal, colleges and universities have profited massively off the federal subsidy of loans. Meanwhile, quote, many of the degree-granting programs that qualify for student loans are worthless on the job market, but colleges continue to accept students to these programs and encourage them to borrow to pay for them. Secretary McMahon noted her

commitment to preventing colleges from, quote, creating such massive liability for students and their families, jeopardizing their ability to achieve the American Dream. Fortunately, the Secretary has the authority to hold colleges accountable for poor student outcomes. She may exercise this authority by promulgating a regulation through the Negotiated Rulemaking process, to implement a quality assurance system for institutions that participate in the federal direct Loan program. The Higher Education Act states that an agreement with an institution of higher education for participation in the Direct Student Loan Program shall provide for the implementation of a quality assurance system as established by the Secretary, to ensure that the institution is complying with program requirements and meeting program objectives. The Department could invoke this clause to develop a system of quality assurance to ensure that the roughly 4,800 institutions, which received over $83 billion in Direct Loans last year, are meeting the objectives of the loan program. These objectives include ensuring that aided students enjoy economic mobility and that taxpayers are repaid in full. Thank you for the opportunity to provide public comment today and for taking under consideration my suggestion to include establishing a quality assurance system as a

topic in the Department's upcoming Negotiated Rulemaking convenings. This concludes my remarks.

MS. ABERNATHY: Thank you for your comment. At this time, we're going to take a ten-minute break. We will resume back, we'll just say 11 minutes so that we can come back at 2:20. Welcome back, everyone. Carron Johnson, if you would ready yourself and let me know when you are ready, I'll give you three minutes.

MS. JOHNSON: Hi, it's Carron, and I am ready.

MS. ABERNATHY: Carron, thank you for correcting me. I appreciate that, I apologize.

MS. JOHNSON: No problem.

MS. ABERNATHY: Three minutes.

MS. JOHNSON: Hi, I'm Carron Johnson, a paraprofessional for Saint Louis Public Schools. I'm vice president of the paraprofessionals for AFT Saint Louis Local 420, and I am also the president of the AFT for the state of Missouri. But please call me CJ. Thanks again for the opportunity to be present and to be heard. I deeply appreciate the opportunity to share my story about the importance of PSLF, and why it must be preserved as it is. I've been in and out of school for some time, not because I didn't want to succeed, but because the system has made it hard for people like me to

2025 Negotiated Rulemaking Public Hearing - 5/1/25

push forward. Our college programs often go under-supported, and educators aren't always paid enough to stick around. That lack of stability and encouragement affects us, affects us as students. It's tough to stay motivated when the support just isn't there. When I first heard about PSLF, I'll be honest, I was skeptical. I didn't believe it because in roles like being a paraprofessional, we're often overlooked for those programs that are designed to relieve burdens and build futures. Most of the time, teachers often have those access to the grants and other support systems, but we rarely see those opportunities. Once again, when I heard about it, I was like, this can't be real. But I took the chance. I went through the process myself, and it worked. I received $12,000 in forgiveness, which directly supported my previous journey, earning a degree in automotive technology, as I'm still in school right now for secondary English. That changed a lot for me. I was so moved by the impact that I asked to be trained to help others access that same opportunity. Since then, I've had countless people reach out to me thanking me. Some even took me out to lunch because they saw money return to their accounts. I'm grateful not just for myself, but for the ripple effect it has created in my community. While my entire loan wasn't forgiven, that $12,000 lifted a

2025 Negotiated Rulemaking Public Hearing - 5/1/25

massive weight off my shoulders. I was a single parent,
working low wages and still trying to stay in school.
Still in school now. And even though I graduate this
year, I plan on- to keep going until I become Dr. CJ.
This journey just isn't about me. It's about paving the
way for those who come after me. Many of us can't afford
to send our children to college, based on our bank
accounts, especially me. I have an 18-year-old. Some of
our parents never had the chance to attend college
themselves. And yet here we are, paying thousands of
dollars just to serve the world through community and
education work. I didn't choose education and union work
because it pays well. I chose it because I believe in
making a difference and I know I'm not alone. Let's keep
working together to create access, breaking down
barriers, and uplift the next generation. Our children
deserve more and (20 seconds) we can be the ones to make
sure they get it. Thank you all so much, and I am
finished.

       MS. ABERNATHY: Thank you for your
comment. Bryan Brown? If you'll let me know when you're
ready, I'll start the timer.

       MR. BROWN: I am ready. Can you hear
me?

       MS. ABERNATHY: Yes, sir. Three

minutes.

          MR. BROWN: All right. Good afternoon.
My name is Bryan Brown, and I'm a resident of Riverton,
Wyoming. I'm also a schoolteacher for Fremont County
School District number 24 in Shoshoni, Wyoming. In July
of 2024, my student loans, which I paid under the SAVE
Income Based Repayment Plan, was put in administrative
forbearance. At the time, I was 29 payments away from the
Public Service loan forgiveness, but due to this
administrative forbearance, those months of credited
payments are no longer accruing. A month later, in August
of 2024, I was diagnosed with renal cell carcinoma, which
has since metastasized and progressed to stage four. The
median life expectancy of someone with stage four RCC is
22.5 months, making it statistically likely my student
loans will be discharged by my death before they are
officially forgiven through the PSLF program. If the
Department denies loan forgiveness and strips away the
SAVE and PAYE programs, many Americans will share my
likely fate. They will be crushed under the weight of
increased payments. Under the SAVE plan, it is possible
for my wife and I to make student loan payments- my
student loan payments and pay for my cancer treatment.
Should that plan go away permanently, we will have to
make a choice between the two. And I don't have to tell

you what choice we will make. In the media and in the
current administration, there is a narrative that those
who have benefited from the SAVE program are freeloaders,
but in fact, many Americans under that program share the
same circumstances as me. Like me, through no fault of
their own, they are stricken with a disease that limits
their earning ability, or they are the caregivers of one
of those people, or they are simply the victims of a
shifting economy where their role in a post-AI world is
as in question. Either way, the SAVE and PAYE plan
provide Americans with a pathway towards continued health
and productivity. Furthermore, significantly increasing
student loan payments for borrowers, borrowers who were
often in the prime of their lives and looking to marry
and start families will have an adverse effect on the
already declining birth rates in this country. Who can
bother to have a family and still pay 15% of their
discretionary income to the government, with no end in
sight? Both Elon Musk and Vice President Vance have gone
on record about their concern over the declining birth
rate in the United States. And yet, this policy change
would prohibit the outcomes they favor. I would like to
close this testimony to the committee with the- with a
final plea. Please remember that decisions that you make
have human consequences. This is not an abstract decision

with nebulous far-flung effects. My own circumstance is just one of many. The policies decided here will immediately and directly affect (20 seconds) the daily lives of millions of Americans. (inaudible)

MS. ABERNATHY: Thank you for your comment.

MR. BROWN: Thank you.

MS. ABERNATHY: Amber Hay? Amber, if you let me know when you're ready, I'll start the timer.

MS. HAY: I'm ready.

MS. ABERNATHY: Three minutes.

MS. HAY: My name is Amber Hay, and I serve as the Public Service Loan Forgiveness advocate in the Washington State Office of the Student Loan Advocate. Our office works directly with borrowers every day to help them resolve challenges in navigating the complexity of the Federal Student Loan system. My focus on working with borrowers pursuing PSLF has given me unique insights into how changes to the PSLF program and Income Driven Repayment options may impact borrowers. Thousands of Washingtonians have made the decision to serve our state through public service, counting on the promise of forgiveness after ten years. To date, over 22,000 Washingtonians have earned that PSLF forgiveness. That translates to over 200,000 years of collective work

dedicated to helping individuals and communities, often at great personal sacrifice. This exemplifies the success of the PSLF program in its original intent to incentivize long-term commitments to public service, fulfilling critical shortages in areas such as education, healthcare, and community safety. Any action taken to reduce the number of employers eligible for PSLF will harm Washingtonians by potentially intensifying public workforce shortages. Employer eligibility criteria should be consistent, predictable, and not subject to change each election cycle. The criteria should reflect Congress's intention to support those who provide critical services to communities across the country. If the Department seeks to review employer eligibility for PSLF, it should be in an effort to expand and simplify criteria, not reduce it, politicize it, or make it more complex. Many public servants work in chronically low-wage sectors with the promise of access to PSLF and affordable monthly payments through Income Driven Repayment plans. The success of the PSLF program is therefore reliant on access to affordable IDR plans. Reducing access to IDR plans like PAYE and ICR may force borrowers into other repayment options that do not qualify for PSLF. In turn, borrowers may have to turn away from vital public service careers, which means less

2025 Negotiated Rulemaking Public Hearing - 5/1/25

nurses, teachers, first responders, and other critical public service workers available to support our local communities. Rather than reducing or eliminating affordable IDR plans, the Department should instead turn their attention to student loan servicer oversight. Delays in processing and communications, mistakes in managing borrower accounts, and lack of customer service availability continue to do irreparable harm to borrowers. The Department has an inherent responsibility to protect student loan borrowers and decreasing access to or eliminating IDR and PSLF should not be an option. In closing, I urge and encourage the inclusion of dissenting voices in the Negotiated Rulemaking process, including folks (20 seconds) that may disagree with the ideas espoused by the current administration. Several states across the country employ state student loan advocates and ombudsmen who are on the ground working with borrowers every day. We see the real-world impact that policy changes have on borrowers and can provide perspectives essential to balanced decision-making. Thank you for your time.

        MS. ABERNATHY: Thank you for your comments. Anna? Confirming that we're still live, everyone?

        MS. KUAN-CELARIER: Hello.

MS. ABERNATHY: Anna, if you'll give
me just a second, I want to check with the team that
we're still live. I've gotten a few messages on my screen
that says we're not live anymore. All right, we have the
all clear. Anna, you have three minutes.

MS. KUAN-CELARIER: Thank you. And
thank you for the opportunity to speak today. My name is
Anna Kuan-Celarier, and I am a gynecologic oncologist, a
specialist in cancers of the female reproductive system.
I'm just about as specialized as you can get in the
medical field, and it took me 35 years of nearly
continuous education and medical training to get here. I
just started my first big girl job at the age of 36. I
love my job as an academic GYN oncologist. I'm passionate
about research. My research focuses on how to make cancer
treatment less toxic for older adults. I also love being
involved in educating the next generation of OB/GYNs and
cancer specialists. To be able to do cancer research and
to train junior doctors, I have to practice at an
academic medical center, where I make about 50 to 60% of
what I can make in private practice. But it is worth it
to me because I know that I am using the knowledge and
skills I've gained through my education and training to
make the most important contributions to science and
medicine. At age 36, a lot changed in my financial life.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

After nine years of secondary education where I wasn't making any money and seven years of medical residency and fellowship where I was making just enough to live on, I was finally able to start doing things like saving money for retirement and down payments for a house. At age 36, I also became financially responsible for two new people. I gave birth to my first child, and I became the caretaker for my mother, who has Parkinson's disease. My partner, who is a research scientist, contributes to our household, but I am financially the family breadwinner and primarily support all four of us. I'm certain that anybody who has been a member of the sandwich generation can relate to what this responsibility feels like. At age 36, I also had to start making serious payments towards my $670,000 in student loans from undergraduate studies, a master's degree, and medical school. With compounding interest, my loans have essentially doubled every nine years over the 16 years of my education and training. The Income Driven Repayment programs and the Public Service Loan Forgiveness program were the only way I felt I could accept a job in academic medicine and still be able to support my family and avoid a future of destitution in retirement. These programs offer assistance to members of our society who deserve it the most. Those who serve the public, like doctors and teachers, those who work hard to

2025 Negotiated Rulemaking Public Hearing - 5/1/25

support their families, and those who want to build a
better future for America. University education in
America is significantly more expensive than in any other
country in the world, but high rates of secondary
education have helped contribute to our economic, not to
mention intellectual, success to date. Programs like
Income Driven Repayment and Public Service Loan
Forgiveness are critical to continuing to promote
economic and intellectual growth and excellence in our
countries. (30 seconds) Thank you.

        MS. ABERNATHY: Thank you for your
comments. At this time, we will take a break until 2:45.
Welcome back, everyone. At this time, I would like to
know if Chris Moody is ready? If you'll let me know when
you're ready, I'll start the timer for three minutes.
Chris Moody?

        MR. MOODY: Yes. Good afternoon.

        MS. ABERNATHY: Good afternoon. You
have three minutes, sir.

        MR. MOODY: Thank you. My name is
Chris Moody, and I serve as the executive director of
ACPA College Student Educators International. I want to
thank you for this opportunity to speak about a matter at
the very heart of ACPA's mission, ensuring that every
student, regardless of their background and previous

opportunities, has access to higher education through
robust student financial assistance programs. In ACPA,
our work centers affordability, accessibility, and the
incredible transformational power of education. We know
that financial support is not just about dollars and
cents. It's about opening doors. It's about allowing
students to imagine and pursue futures that would
otherwise be out of reach. Programs like Pell Grants,
TRIO, GEAR UP, the graduate assistance in areas of
national need, and the Public Service Loan Forgiveness
are not optional. They are essential. These initiatives
ensure that talented individuals from all walks of life
have the chance to enroll, persist, and thrive in
college. Research repeatedly shows that not all K-12
schools receive equal funding and resources, with
districts serving higher proportions of low-income and
minority students often receiving fewer resources. This
resource inequity is evident in areas like per student
spending, student teacher ratios, class sizes, teacher
experience, and teacher qualifications. Without
continuing to support college impact programs, our
nation's future workforce and leadership will suffer from
a diminishing supply of talent. By 2033, the Bureau of
Labor Statistics projects 4.6 million new jobs will
require a postsecondary credential. To meet that demand,

2025 Negotiated Rulemaking Public Hearing - 5/1/25

we must invest in students today. College graduates don't just earn more over their lifetime, they also contribute more. They are more likely to be employed, to innovate, and to even pay it forward, often by returning to serve their local communities. This is especially true when talking about public service and Public Loan Forgiveness programs. These pathways empower graduates to pursue careers in education, healthcare, social work, and beyond. Careers that are essential to the well-being of our society but often come with lower salaries. Without financial assistance, many of these students would feel forced into private sector jobs just to make ends meet, leaving local communities continually under-resourced and unsupported. Today, I'd like to remind us, access to financial assistance is access to opportunity for individuals (20 seconds) for families, and for societies. I ask that we never forget that if we remove financial barriers, we don't support individual students and their families, we strengthen local communities as well as our national economy. Thank you for your time and consideration.

                MS. ABERNATHY: Thank you for your comments. Jerry Whitmore. If you'll let me know when you're ready, I'll start the timer.

                DR. WHITMORE: I'm ready. Thank you.

Good afternoon, and thanks for the opportunity to speak.
My name is Dr. Jerry Whitmore, Jr., Assistant Professor
of Higher Education at Boston University's Wheelock
College of Education and Human Development, and a board
member of a local education nonprofit. I grew up in a
single-parent household in rural Tennessee. My mother
worked in a factory to put food on the table to keep
three boys out of trouble. She earned her GED later on in
life, and college wasn't something I was sure even meant
for someone like me. Coming from a low-income background,
the PSLF program was a lifeline. It helped me break a
cycle of generational poverty. Because of PSLF, as a
first-generation college student, I was able to pursue a
career in education, not just to teach the next
generation, but also to research how we can make
education more effective. Today. I support my family,
give back to my parents, the community, and the state.
That's the promise of PSLF. We must be mindful not to
build policy around false narratives. The people served
by PSLF, public school teachers, early childhood
educators, healthcare workers, public defenders, and
others are not a threat to society. They are the backbone
of local economies and thriving democracy. The executive
order issued on March 7th suggested excluding
organizations that allegedly have a substantial illegal

purpose, a vague and politically charged criterion that
threatens to disqualify legitimate nonprofit entities
providing vital public services. PSLF was never about
politics. It was about service sustainability, ensuring
that people from all walks of life could afford to give
back, undermining that now risk not just careers, but
entire communities losing the public servants they depend
on. And let's be clear, any effort to also eliminate
Student Loan Forgiveness programs under ICR and PAYE
would directly attack working-class Americans who have
played by the rules. These programs are not giveaways.
They are carefully designed to promote personal
responsibility while recognizing that borrowers should
not be punished for choosing service-oriented or modest-
paying careers. To ensure legal clarity and long-term
sustainability, the Department should codify longstanding
forgiveness provisions and maintain borrower
accountability through sustained payment requirements.
Preserving these programs aligns neatly with the
administrative rewarding work, promoting personal
responsibility and upholding the Federal Government's
word to its citizens. And finally, streamlining Title IV
regulations can encourage innovation in higher education,
but changes must be targeted and transparent to avoid
waste and fraud while reducing red tape is essential for

career-connected education and meeting the needs of adult
learners. We must be cautious of deregulation that
enables predatory practices, especially in low-quality
online programs. This administration has a chance to
support accountable innovation that enhances workforce
development and economic mobility. But it must protect
students and taxpayer investments for exploitation. In
sum, (20 seconds) I support efforts that streamline-
Thank you so much for the time.

                MS. ABERNATHY: Thank you for your
comment. Monnica Chan, if you'll let me know when you're
ready, I'll start the timer.

                MS. CHAN: Great. Thank you. I'll
start a timer of my own as well.

                MS. ABERNATHY: Ready?

                MS. CHAN: Yep.

                MS. ABERNATHY: Three minutes.

                MS. CHAN: Thank you so much. Thank
you. Hi, everyone. Good afternoon. Thanks for the
opportunity to comment today. My name is Monnica Chan.
I'm an assistant professor at the University of
Massachusetts Boston, where I study the impact and
interaction of State and Federal Financial Aid programs,
including loan repayment. In ongoing work, colleagues and
I have documented how the recent instability in loan

repayment program availability is stressful and confusing to borrowers. We heard from multiple borrowers in our study thatbetween the changes with the SAVE Plan proposal and the recent changes to the IDR applications that they would have liked to sign up for an Income Driven Repayment plan, but they were confused by the quick and frequent changes both in program and application availability. The back and forth of whether or not a program is available or not exacerbates the challenges that borrowers face in seeking and selecting an appropriate repayment plan. And for borrowers that are grappling with other life events and transitions, this complexity and evolution of all of the different Federal Student Loan repayment plans is just sort of an additional layer to what borrowers have described as a stressful and heavy responsibility that they want to fulfill. In my work, I've also found that entering repayment coincides with other important milestones in emerging adulthood for recent college graduates. So multiple participants in our study experienced life events outside of their control. These were things like work-related injuries, flare-ups from a chronic health condition, looking for a job and then being only able to secure a per diem job, things like that. And for those individuals navigating loan repayment became an increased

burden that ended up exacerbating their feelings of
stress, and it also ended up fostering distrust and
disappointment and anger towards important offices and
institutions like the President's office, Congress, the
Education Department, and even borrower facing entities
like loan servicers and higher education institutions.
Knowing that there were repayment plans that included the
option for loan forgiveness, like PSLF or the IDR plans,
really helped ease anxiety for borrowers in our study
that we spoke with, because it provided them an option
that helped everything seem manageable. If I could just
close by offering two principles that I've learned from
borrowers in these studies and the rich body of academic
scholarship in this area to guide the work of the
committee, I think the first thing I would say is that
loan repayment is a longer term process that occurs
simultaneously with big and small life changes for
borrowers. Having options like PSLF and ICR is an
important middle option for those for whom the standard
and graduate repayment plans, and the deferment and
forbearance options might be insufficient. I would also
concur with recommendations to remove interest
capitalization wherever possible. (20 seconds) The second
thing that I'd share is that more information is better,
but it's not enough. The complex processes involved can

2025 Negotiated Rulemaking Public Hearing - 5/1/25

lead to frustration and importantly, disengagement. I think automating and simplifying eligibility and verification processes, as well as small changes to messaging, could really go far in addressing the well-documented administrative and behavioral challenges to navigating repayment. Thanks.

MS. ABERNATHY: Thank you. Ashley Osia. If you'll let me know when you're ready.

MS. OSIA: Yes.

MS. ABERNATHY: Okay. Three minutes.

MS. OSIA: Hi. Good afternoon. I am honored to speak today and hope my experience can aid in your discussion. My name is Ashley Osia, and I'm a development director for an environmental nonprofit in Northern California. I have dedicated my career to working in the nonprofit sector, specifically serving 501(C)(3) organizations that focus on preserving our planet and saving endangered species. I want to address the ongoing issues surrounding the Public Service Loan Forgiveness Program, PSLF, which I have been committed to for over a decade. As a first-generation college student, I chose to dedicate my life to public service, often accepting a lower pay to make a positive impact. I was just months away from achieving loan forgiveness when I was forced into forbearance as part of the 8 million

borrowers affected by the Biden Administration's SAVE
Plan, which is now pending litigation. This plan had made
it more affordable for me to pay my student loan payments
on a non-profit salary. I was informed that I could not
make payments during this forced forbearance period, and
any payments made would not count toward my overall PSLF
count. This has left me in a state of uncertainty,
continuing my nonprofit work without the financial relief
I had anticipated and planned for over a decade. It's
incredibly disheartening to be so close to forgiveness
after years of commitment, only to have my efforts
stalled by bureaucratic challenges and lawsuits.
Additionally, I'm concerned about discussions regarding
the definition of what constitutes an approved employer
for PSLF. The current criteria states that any 501(c)(3)
organization qualifies for forgiveness, providing vital
support for those of us who choose to work in this
sector. However, the prospect of reevaluating these
definitions based on subjective interpretations of legal
activities for nonprofits is alarming. As a nonprofit
worker dedicated to mitigating climate change and
addressing impending sea level rise within our community,
I worry that my 501(C)(3) could be unfairly classified as
a non-counting entity due to the beliefs of the current
administration. The integrity of the PSLF program is

paramount, and it is essential that we uphold the law as
it stands to protect all non-profits engaged in critical
work for our communities and planet. I urge the
Department to consider the real-world impact of these
regulatory changes on individuals who have devoted their
lives to public service. It is essential to protect and
enhance programs like PSLF to ensure that they continue
to support those of us who choose (20 seconds) in service
of the greater good. Thank you for your time and for the
opportunity to share my experience and concerns regarding
the PSLF program. I truly appreciate it.

            MS. ABERNATHY: Thank you for your
comments. Robert Moran? Moran? Robert Moran? If you'll
let me know when you're ready.

            MR. MORAN: I am ready, thank you.
Thanks, Tamy.

            MS. ABERNATHY: Three minutes.

            MR. MORAN: Good afternoon. My name is
Bob Moran, and I'm speaking today in my role as executive
director of the International Education Council. The IEC
is a nonprofit association comprised of over 80 colleges
and universities located in 14 countries, participating
in the Title IV program for the benefit of their degree-
seeking American students. Comprehensive foreign school
rulemaking was last conducted in 2010, 15 years ago. Much

2025 Negotiated Rulemaking Public Hearing - 5/1/25

has changed in the landscape of higher education and its delivery. Therefore, we request the Department consider the following topics: Updating regulations affecting foreign medical schools, specifically those centered on the US medical licensing exam, revising financial auditing and reporting requirements, and reinterpreting contradictory language in the HEA that prevents US students from receiving any of the programmatic coursework in an online fashion. I will briefly speak to each of these. To ensure a level of quality, the HEA requires that foreign medical schools meet a 75% pass rate for all students taking the USMLE. The USMLE is offered in steps, currently step one and step two. When the Department updated the regulations, it applied the 75% threshold to each step, arguably going beyond the law. Foreign medical schools have low numbers of USMLE test takers, and thus one student not passing can have a significant impact on their pass rate. IEC would suggest using the aggregate of all test takers returning to how it was done prior to the last change, and better aligning with the HEA. Members of the IEC are some of the oldest institutions in the world. Many are public and all are subject to strict auditing criteria by their home countries. The HEA requires that foreign school audits be comparable to US standards. In 2020, auditing changes

required that foreign institutions submit an additional supplemental schedule with their annual financial audit. The schedule burdens schools to alter their country's auditing standards to be identical with US auditing standards. In addition, there is a similar burden on institutions with more than 3 million in direct loan volume. Finally, the HEA contains contradictory language on educational delivery. The Department has taken the most restrictive approach by restricting any online delivery for American students pursuing their degrees overseas. Schools around the world are utilizing technological advancements to enrich and supplement their educational offerings, and this interpretation prevents American students from enjoying these enhancements, such as a guest lecturer. Our comment letter will further detail these burdensome and unnecessary regulations that sorely need updating. Title IV aid is provided to allow students to choose where they pursue (20 seconds) -losing the ability of American students to choose some of the finest and oldest institutions in the world would be a shame. The regulatory burden on foreign schools far outweighs the percentage of American students enrolled at that institution. We urge the Department to reexamine these outdated regulations. Thank you for this opportunity and your time.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

                MS. ABERNATHY: Thank you for your
comment. Garry Van Genderen, will you please let me know
when you're ready?

                DR. VAN GENDEREN: I am ready.

                MS. ABERNATHY: Hold on one second. My
computer did something crazy. You have three minutes.

                DR. VAN GENDEREN: Hi, my name is Dr.
Garry Van Genderen. I'm a general dentist in Los Angeles,
California, and today I'm representing the Alliance of
Independent Dentists. The Alliance of Independent
Dentists is a not-for-profit organization representing
private practice dentists and dental associates. Dental
education in the United States is among the most
expensive in the world. It is not uncommon for recent
dental graduates to carry over $500,000 in Federal
Student Loan debt, while dental specialists may owe over
$1 million. Negotiated Rulemaking impacts not only future
borrowers who might base their career decisions on
student loan debt burdens, but also existing borrowers
who made the irreversible choices based on repayment
plans available to them at the time, such as PAYE and
Income Contingent Repayment. These options were
instrumental in helping students justify the debt
required to attend dental school. Additionally, many
borrowers entered Public Service Loan Forgiveness and

went into public service jobs, which offered students loan forgiveness after ten years of service at a government or 501(c)(3) not-for-profit, despite earning significantly lower salaries compared to private practice. These programs were emphasized by dental school financial aid offices, included in assigned master promissory note and supported by both major political parties from George W. Bush signing Public Service Loan Forgiveness into law in 2007 to Barack Obama, establishing pay through Negotiated Rulemaking in 2011. Dentists play a critical role in public health, offering both preventative and emergency care. In times of severe pain, patients depend on dentists for themselves and their family to regain comfort and productivity. If access to programs like ICR, PAYE, and PSLF is changed for current dental professionals or students, many may no longer be able to absorb the financial losses from accepting Medicaid, insurance-reduced fees, or offering pro bono work. This would likely lead to increased out-of-pocket costs for patients, reducing access to care and overcrowding emergency rooms ill-equipped to handle dental crises, straining the entire health care system. We strongly urge the committee to honor the written commitments made to existing Federal Student Loan borrowers. This includes grandfathering current borrowers

into their original repayment programs, ICR, PAYE, PSLF, and reinstating the ICR modified REPAYE. Any changes to these programs should be optional for existing borrowers. Altering terms retroactively undermines the government's credibility and could create broad legal and economic repercussions, impacting trust and- trust and functionality across federal programs. Such regulations would likely fail in court, rendering the committee's efforts ineffective. Thank you for your time.

                MS. ABERNATHY: 20 seconds. Perfect timing. Thank you for your comment. Joan Mazlo? I apologize if I massacred that. I'm so sorry.

                DR. MAZELIS: That's okay. Thank you so much. It's-

                MS. ABERNATHY: You have three minutes.

                DR. MAZELIS: Thank you. Thank you for the opportunity to speak with you today. I'm Dr. Joan Maya Mazelis, and I'm an associate professor of sociology at Rutgers University, Camden. I've been researching student loan debt and its consequences for the lives of college graduates with loans for nearly a decade. My work has focused primarily on longitudinal, in-depth interviews with college graduates who took out student loans, who I interviewed as many as seven times over an

2025 Negotiated Rulemaking Public Hearing - 5/1/25

eight-year period as they transitioned to their post-
college adult lives. If the Department seeks to
streamline and improve student aid programs, the best way
to accomplish this is to simplify and expand these
programs. First, the Department should reduce barriers to
access by making it more straightforward for those who
qualify to apply for Public Service Loan Forgiveness.
Second, the Department should allow all those who need
Income Based Repayment plans to enroll in such plans,
enabling them to pay off their debt in full, a widely
shared aim that most people think is fair. Third, student
loans should be interest-free. All of those I interviewed
want to pay back their loans, but it's not sustainable to
have borrowers pay back more than they borrow. People I
interviewed, some of whom worked as nurses during the
height of Covid, and others who worked in other public
service jobs, struggled to navigate the system to qualify
for Public Service Loan Forgiveness. Making it easier for
those who deserve access to this program would streamline
and improve student aid. Such programs should encourage
people to get the necessary training to do difficult and
important jobs, like those of frontline healthcare
workers. Without access to Public Service Loan
Forgiveness, opt instead for higher-paying private sector
careers. And if the system isn't fixed, people like them

2025 Negotiated Rulemaking Public Hearing - 5/1/25

may not even bother with college in the future. With an aging population needing more healthcare, we need more nurses and others in healthcare, not fewer such workers. I want to highlight the only person in my research who was able to successfully get their loans forgiven. A young woman who worked as a social worker with vulnerable children. Her student debt was forgiven only because she became permanently disabled with brain cancer and then had her loans discharged. She soon passed away. People shouldn't have to die to overcome the crushing debt of student loans. Government used to fund higher education at greater levels, and students could attain a college degree with the use of grants, having reasonable out-of-pocket costs. But things are different now. The cost of college is out of reach for most people. People take out loans to attend college because they want to have a chance at upward mobility and the American dream. They want to pay back their loans, but some have paid for so long they've paid more than they borrowed, and they still owe. College should be accessible to all, and Income Driven Repayment and Public Service Loan Forgiveness is part of what makes that possible. Without it, college would only be (20 seconds) for the wealthy or those who choose the most lucrative careers, and some of the most important jobs would remain vacant. Thank you for your

time, and again, thank you for the opportunity to speak
with you today.

            MS. ABERNATHY: Thank you for your
comment. Barbara Correa, if you will, let me know when
you're ready so that I can start the timer?

            MS. CORREA: Oh, yeah, I am ready if
you can hear me.

            MS. ABERNATHY: Yes, ma'am. I can hear
you. Three minutes.

            MS. CORREA: Hello. I'll just be short
and quick. My name is Barbara Correa. I lost my job in
the recession in 2008 and decided to get retrained. And
so, in my 40s, I went back to school, got my master's and
started working for a nonprofit. We develop and manage
faculty and staff housing for the University of
California, Irvine. I enrolled in the Public Service Loan
Forgiveness program at that time in 2017, with the
impression that if I made 120 payments, those loans would
be forgiven. I have been making payments since then. I'm
about three-quarters of the way through that schedule. I
received a letter about a week ago from my loan servicer
saying that my monthly payment would triple next month,
and also laying out a schedule through the 2050s showing
that I would be paying $275,000 by the time I paid this
all off, at which time I'd be, I think 82. No mention of

the program, and no mention of the 120 payments that I had agreed to, or any write off. I'm assuming from that letter that the program is in jeopardy. I haven't heard anything about current people who have been in the program and paying into it for years. I don't know where that stands, and I'm very concerned about it. I can absolutely not afford my payments to triple next year. I'm happy to make my monthly payments now. I can afford them now. And like I said, I'm 58 so I was expecting to have to pay anotherfive years or so and then have those loans written off. I have not made a lot of dent in the loans because of- interest has always accrued. And so that's my story.

MS. ABERNATHY: Thank you for your comment.

MS. CORREA: Thank you. Okay.

MS. ABERNATHY: Thank you for your comment.

MS. CORREA: Will, will this be made public at all or? Okay.

MS. ABERNATHY: It is public, Barbara. It was public while you were speaking. So as a matter of fact, it is public, yes.

MS. CORREA: Okay, well. Thank you.

MS. ABERNATHY: Thank you. Stephanie

Novenario?

            MS. NOVENARIO: Hello.

            MS. ABERNATHY: Hi. You have three minutes.

            MS. NOVENARIO: Thank you. Hello, I'm Stephanie Novenario. Over ten years ago, I graduated from law school with over $200,000 in student loan debt. I turned to PSLF and dedicated my career to public service, and in doing so, I said goodbye to the prestige of working in big law and the high salary that would have accompanied a private career. To put into perspective the types of salaries we're talking about in public service, in 2014, when I graduated from law school, my starting salary as an assistant state attorney prosecuting alleged criminals was $40,000. Now, ten years later, I work for the Florida Commission on Ethics, and I make $81,000. And in the coming year, when my third child is born, I will pay $43,200 per year in daycare costs. That's over half my salary gone to childcare expenses so I can maintain the career I initially took the loans out to obtain. This leaves me $37,800 per year to contribute to the economy by paying for my monthly mortgage, my car payment, utilities, bills, groceries, health insurance, and any other miscellaneous expenses that are sure to arise when you're low on funds. Under the proposed Income Based

Repayment Assistance Program, of that $37,800 per year, I
would be paying $6,480 annually in an attempt to pay off
my student loans over a 25-year period. I think at that
point it would make more sense for me to stop working,
and I think it would make more sense for a lot of other
people to just stop working, too. I urge you to hear me
when I say that the PSLF program is a key reason why
public service positions across the United States are
filled, and that if PSLF were to be greatly amended or
even obliterated, the employees filling those positions
would have no other choice but to find higher paying jobs
outside of public service. As a side note, my loans
should have been forgiven in January of this year, but
unfortunately, I'm caught up in the SAVE debacle and have
been waiting since July of 2024, nearly one year, for my
Income Based Repayment applications to be processed so
that I can resume making payments. I've also been waiting
since December of 2024, six months, for my buyback
request to be processed by Student Aid. Student Aid has
provided no timeline for this or for how they are
actually calculating the buyback amounts, and many of us
are left wondering, are any forms being processed right
now? Is buyback a convenient but unrealistic mirage? I
believe PSLF is a worthwhile program that pays for itself
by enticing young, bright employees to careers in public

service. (20 seconds) Thank you for your time.

MS. ABERNATHY: Thank you for your comments. Karen Cody-Hopkins, if you'll let me know when you're on screen, I'll start the timer.

MS. CODY-HOPKINS: I think I'm on.

MS. ABERNATHY: You are. You have three minutes.

MS. CODY-HOPKINS: Good morning. Excuse me. Good afternoon. My name is Karen Cody-Hopkins. I'm a student loan lawyer in Denver, Colorado. And I'm the vice president of the National Association of Student Loan Lawyers, NASLL. NASLL will be submitting written comments on the three topics listed, especially PSLF and IDR. But I want to focus on your other topic, the potential topics that would streamline. Today I'm going to give you personal comments. I've been doing student loan work since 2006. I cannot tell you the level of panic and confusion I am seeing right now. My phones are ringing off the hook. The Facebook and other online things that I see, people are panicked. Please slow down. Hold off on Negotiated Rulemaking sessions a little bit because the systems had started to repair some of the problems, but then the lawsuits have caused you folks a lot of issues. And I would say, please do not rush to try to fix problems until you fix some of the systematic

things. The cuts in staff, taking away the stakeholder
department means we have nobody to call to try to fix
problems. The studentaid.gov is so dysfunctional because
it's trying to do too many things and doesn't do enough,
enough for people. It confuses them. For example, this
week you took down the IDR recount tracker. Nobody knows
why. Nobody knows what you're doing about it. Nobody
understands unless their lawyers, the interplay of the
lawsuits and their impacts on what the Department's
doing. My first simple request is, please slow down.
Please set up some working groups to set up some dialogs
between staff and some of the many advocacy groups and
lawyers out there who can give you some input into what
we're seeing. So often the Department's input has been
too limited, and the Negotiated Rulemaking sessions are a
very formalistic, necessary process. But I really
strongly believe if you had some working group calls, if
you had some Zoom sessions with some of the stakeholders,
we would be able to- (20 seconds). And I honestly say the
other thing is the other audience you have, 13% of the US
population has Federal Student Loans. The other people
have no clue of the complexity. And I think you also have
to do a better job of communicating to the people who
don't-

                    MS. ABERNATHY: Time.

2025 Negotiated Rulemaking Public Hearing - 5/1/25

MS. CODY-HOPKINS: Thank you. Appreciate it.

MS. ABERNATHY: Thank you for your comments. Guinevere Perry? If you'll let me know when you're ready on screen. Are you ready?

MS. PERRY: Yes, I am.

MS. ABERNATHY: You have three minutes.

MS. PERRY: So, I wanted to say that I'm one of the individuals who does the Income Driven Repayment program. And one of the things that I wanted to note is that I'm concerned that when you do the algorithms or you make the equations for how much we have to repay, that it's skewed against individuals who are single, where we're growing number of individuals. We have a higher tax bracket. We have a lot more that we have to contribute to, especially with the economy. And I understand that the way it's currently reviewed is based on whether you're married, you're single, and how many children you have in a household. My thought is, is that maybe that could be reviewed? There are so many other incentives and tax brackets, tax breaks for individuals who are married and with children that it does force single people, it's a constant increase in cost. And I think you would have a lot more people who are able to

2025 Negotiated Rulemaking Public Hearing - 5/1/25

make their repayments and stay committed to repaying
their loans if that were something that we could
consider. So, I mean, I myself volunteer quite a bit in
my community and I'm active and I live in Florida right
now under Representative Byron Donald's district and I
volunteer with the City. I'm on the committee board for
active adult in my community. But yeah, I would hope that
would be something - you would consider. Is that
something that's a rule that's being considered?

                MS. ABERNATHY: This venue is for
comments only.

                MS. PERRY: Okay.

                MS. ABERNATHY: Yes, ma'am.

                MS. PERRY: I tried to review your
policies. Is that something that's published later or is
that the comments?

                MS. ABERNATHY: This is a public
hearing to solicit comments from the- comments, from our
public feedback for potential rulemaking. As Mr. Bergeron
stated earlier, perhaps you didn't hear it, we are
intending to, to send out a notice requesting
negotiators- nominees for negotiators sometime in the
near future. I would encourage you to continue watching
Regulations.gov and look for those- that information and
see if that's something that would interest you or get

more information about what the negotiations are. Once we are in that process and we have negotiations and we publish an NPRM, there's also a time for public comment to be written in. And you can also during this time do a written comment and those are looked at as well.

MS. PERRY: Okay. I did also submit a written comment. All right. Well thank you so much.

MS. ABERNATHY: Thank you so much. Sierra Rodriguez, if you'll let me know when you're on screen, I'll start the timer. Sierra?

MS. RODRIGUEZ: Hi, there.

MS. ABERNATHY: Hi. You have three minutes.

MS. RODRIGUEZ: Great. Thank you. My name is Sierra Rodriguez, and I'm here to speak today about a vital component of financial planning for students and graduates, the income contingent repayment plans. As a graduate from American University and a current master's student at the University of Colorado Boulder, I have had to navigate the challenges posed by significant tuition costs. Nationally, tuition and fees at private universities have surged approximately 41% since 2005, adjusted for inflation, according to the US News and World Report. Despite receiving $10,000 annually scholarships during my undergraduate studies, I myself

have significant outstanding private and Federal Student
Loans. As a loan borrower who is planning to pay back
every cent, the necessity of ICR plans cannot be
overstated. These plans tailor my monthly payment or my
monthly federal loan payments to my income, making it
feasible to manage my substantial student debt while
pursuing further education and contributing to my
community. Presently, as funding cuts threatened to erase
my education costs further at CU Boulder, ICR plans
become even more crucial. Without these plans, my ability
to manage my financial obligations would be severely
compromised, jeopardizing my financial stability and
future. ICR plans are essential for ensuring that
graduates like myself, can meet our commitments to repay
our education investments without falling into financial
ruin. They are more than just financial tools. They are
vital lifelines for millions of Americans like myself.
Therefore, I strongly advocate for the preservation and
expansion of ICR plans. It is critical that we not only
maintain these essential programs, but also enhance them
to meet the evolving needs of students and graduates,
making them more inclusive and accessible as tuition
costs continue to rise unchecked. Diminishing the support
provided by ICR plans would undermine the efforts of
countless students who are committed to repaying their

loans. We must continue to support a practical pathway
for loan repayment through robust ICR plans. Thank you
for your attention on this issue, and for supporting
policies that empower students and graduates to
confidently and responsibly invest in their education.

        MS. ABERNATHY: Thank you for your
comment.

        MS. RODRIGUEZ: Thank you.

        MS. ABERNATHY: Julia Johnson? If
you'll let me know when you're on screen and ready to go.

        MS. JOHNSON: I'm here.

        MS. ABERNATHY: You have three
minutes.

        MS. JOHNSON: Hi, my name is Julia
Johnson. I am wanting to comment on the Public Service
Loan Forgiveness program, just as a personal story and as
an advocate for first-generation, income-eligible
students in Tennessee. My personal story started with
being a first-generation college student. The amount of
loans that we had to take out to pursue a college
education was a necessity and a need, not something that
we took out just to make ends meet or try to grift on. I
personally paid back my student loans. I had student
loans that were ineligible for PSLF with the updates from
the previous administration's Department. I was allowed

to update and consolidate my loans and continue on my
PSLF journey. With completing that journey, I continued
to advocate for students and make sure they understood
the consequences of taking out student loans, but also
the benefits to your future education if you use them as
a tool for future education and wealth building. I wanted
to make sure that all of our students in Tennessee, also
in- across the country, know that we have an opportunity
to use this, and we are not abusing the system. With
possible regulations and rules, wanting to limit who is
qualified to receive PSLF as a qualified employer or
extending those payments, it does not make sense for the
American borrower. We need to make sure that we have
streamlined services and accurate information on our
websites, and have our students have access to this
information as they become adults in this world. We want
them to be responsible, but we also want to hold our
administration to the same standards we want to hold our
borrowers to. Please keep in mind that we are responsible
borrowers, and also, we want to make sure that our future
is not in the hands of a shifting political climate. We
want to make sure these rules are solidified across the
board and throughout time. We want to make sure the
updates that we're making to these rules are equitable to
everyone, but also easy to understand and easy to make

sure we have for the future. So that is my personal

story. PSLF works, but also make sure we have the tools

and the things that we need to actually make them work

for borrowers in the future. We want to make sure they're

standardized and equitable across the board. But that's

what I wanted to say.

MS. ABERNATHY: Thank you so much for

your comment.

MS. JOHNSON: Thank you.

MS. ABERNATHY: Caroline Cress, if

you'll let me know when you're on screen, I'll start the

timer.

MS. CRESS: Hi there.

MS. ABERNATHY: You have three

minutes.

MS. CRESS: Great. Thank you so much

for the opportunity to comment today. My name is Caroline

Cress, and I am an attorney for a nonprofit organization

in North Carolina. For nearly the past decade, I served

as a state employee, first as a law clerk and then as an

assistant attorney general. I've been pursuing

forgiveness through the PSLF program since I graduated

law school in 2014, and I've been trying to get out of

the SAVE forbearance now since last summer, almost a

year. I thought I did everything right. I went to public

2025 Negotiated Rulemaking Public Hearing - 5/1/25

schools my whole life, including college and law school.
I knew that I wasn't going to law school to make a lot of
money. I wanted to serve the public, and so I turned down
a partial scholarship from Duke and their law school to
take advantage of a full ride I got from a state school.
I borrowed only as much as I needed for living expenses
and textbooks, $20,000 a year. I graduated with $60,000
in federal student debt. And nearly 11 years later, I've
never missed a single loan payment. But thanks to
interest, I now owe more than $83,000, over $23,000 more
than I borrowed. This morning, literally, I submitted
what theoretically should be my final employment
certification for PSLF. I've completed ten full years of
public service employment and I, like I said, I've never
missed a loan payment. As of today, I should be eligible
to have my student debt forgiven. And yet I find myself
nowhere near that finish line, thanks to the forced
forbearance that I've been in since last summer. I
submitted a request to switch into a different repayment
program in December of last year, but my loan servicer,
MOHELA, still hasn't even begun processing my application
from what I can tell. I've spent hours on the phone
trying to get an answer and haven't gotten anything.
There's really no light at the end of that tunnel. I
don't know when I'm going to be able to start making

2025 Negotiated Rulemaking Public Hearing - 5/1/25

payments again, so I'm planning to submit a buyback
request so that I can undo that damage that's been caused
by the SAVE forbearance and my loan servicer's inability
to process the IDR application. But I have little faith,
honestly, that that will get processed any quicker based
on what I'm hearing from colleagues and former classmates
that have done the same thing and have been waiting for
months to hear back. I'm finding myself now in this
endless financial limbo, just as I'm trying to buy a
house because I just moved across the country for a new
job. My request is simple. Please don't betray people
like me who have planned their education and careers
around a promise that the Federal Government made to us
over a decade ago that if you work hard and you get a
degree and you forgo the hefty salary that you could get
working in the private sector, and you make all of your
payments on time, that after ten years, any remaining
student debt will be forgiven. I and many others made
huge life decisions (20 seconds) in that promise. In
particular, please do not repeal or amend the rule
provisions that allow borrowers like me to buy back the
months that we've been in SAVE forbearance. Thank you.

            MS. ABERNATHY: Thank you for your
comment. Dear public, many of you provided comments
during both of our hearings, and a lot more have tuned in

2025 Negotiated Rulemaking Public Hearing - 5/1/25

to hear people's experiences. On behalf of the
Department, we hear you. You shared your experiences with
candor, personal stories, stories from associates,
stories from the agencies that you represent. And we
thank you for joining us. And for those who provided
comments, we appreciate you taking the time to share
these comments with us. You've given the Department so
very much to think about as we consider your feedback and
concerns for next steps. We simply appreciate the last
two days where we've been able to engage with you on
this. I would also like to acknowledge the wonderful team
members who have worked tirelessly behind the scenes to
make this virtual hearing a success. Of course, we have
the conference team, event planners, technical
assistance, logistics, our staff, and OPE. On behalf of
Deputy Undersecretary and Acting Undersecretary Bergeron,
Deputy Assistant Secretary Andre, Karen, Jacob, and
myself, we give you a big thank-you to all who
coordinated, organized, tested, confirmed, and assisted
with the many details required to host this event, for
without your efforts today would not have happened and we
would not have been able to hear from our public. We
appreciate your hard work, dedication that made this
event successful. This concludes our virtual hearing.
Have a good evening. Thank you very much.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING

SESSION 1, DAY 1, MORNING

JUNE 30, 2025

On the 30th day of June 2025, the following meeting was held in-person, from 9:00 a.m. to 12:00 p.m.

P R O C E E D I N G S

MS. WEISMAN: Good morning, everyone,
again. Welcome to our negotiated rulemaking session on
Public Service Loan Forgiveness or PSLF. This process is
sometimes referred to as neg reg. And occasionally, if
you're about my age or older, reg neg. It's outlined in
section 492 of the Higher Education Act of 1965, as
amended. My name is Annmarie Weisman, and I am your
facilitator for the next three days. I will try to guide
you and occasionally provide a bit of a sense of humor.
You can laugh and smile. My role really is to help
structure the conversation and help to manage time and
help to ensure that all committee members have a fair and
respectful opportunity to be heard. I'm not here to
advocate for any policy position or any proposal. I don't
have a stake in the outcome, other than my goal is to be
the cheerleader for consensus. And we've all talked about
that. I've met with each of the negotiators in advance. I
really enjoyed those conversations, and I want to thank
you again for taking the time to do that as part of your
preparation. Remember working toward consensus. I'll be
mentioning that many, many times as we go on, and I think
some of your fellow negotiators will as well. There are
green comment cards at your stations if you want to
speak, if you can put those up vertically as opposed to

horizontally. I will do my very best to call on you in the order in which you raise those cards. If I don't, you may want to give me grace if I get one behind. If I get a couple behind, you might want to flag me down and say, hey, don't forget about me. I promise I won't be offended. Please try to make new points when you're talking. So, make points that have not already been raised by someone else. If you want to add on to something that someone says, you don't need to repeat the entire discussion that we've already discussed. But again, give people enough context so they know where you're going. Some people have circulated alternative language and proposals, and we'll go over those as time allows. But definitely, if you have not read those, you may want to take a look on a break and get familiar with what your colleagues may be proposing at the table. When speaking, you will have up to three minutes. I will give you a verbal cue when you have 30 seconds left, and I will let you know when time is up. There are also these nice lights around, and there is a green light when your time begins, there is a yellow light when you have 30 seconds left, and you have a red light when your time is up. So, at that point, if you have not finished, please make your final point, and we will go on to the next person. As I mentioned to you on the phone, we will take

polls and informal, tentative agreement kind of discussions as needed. I expect that anybody at that point who has a strong opposition to something discussed would raise that point. And as I told you as well, keep in mind, if you don't have the idea for what to do, instead, you can call on your fellow colleagues around the table. If you don't have an idea, maybe one of them will. Remember, too, when we get to the check for consensus. Once we've done a check for consensus, we don't go back and relitigate after that. So that is our- that is generally our ending point unless something new arises. And generally, we do those toward the end of the last day. So, it's, it's pretty unlikely. So, we're going to do introductions in just a minute. But I do want to start by introducing the Department's negotiator, Tamy Abernathy.

           MS. ABERNATHY: Thank you, Annmarie. Welcome to the 2025 Negotiated Rulemaking session, held today through July 2nd. It's very nice to see all of you. Some of you I just saw last week, and you experienced the same nightmare of travel that I did. So, I'm really glad to see everybody here healthy and well. As Annmarie stated, I'm Tamy Abernathy. I'm the director of the Policy Coordination Group in the Division of Policy, Planning and Innovation, Office of Postsecondary

Education, otherwise, OPE. My team's focus is on Federal
Student Loan policy. I was a first-generation student
that worked three jobs, including work study. I received
Pell Grants and borrowed Federal Student Loans to pay for
my education. Mine were FFEL loans, if that tells you how
old I am. And now, 38 years later, I'm still working in
the Federal Student Aid industry. The last 13 of those 38
years have been at the Department, first in the Federal
Student Aid Office of Policy Liaison Implementation under
Jeff Baker and now at OPE in the Policy Coordination
Group under Jeff Andrade. Apparently, I like working for
men named Jeff. For these negotiations, I am serving as
the Federal negotiator. One little housekeeping item, as
you send in your proposals through today, the Department
plans on meeting later this afternoon after the session
concludes to discuss those proposals. So please keep
putting them in. We are not necessarily going to discuss
them today because we have a packed agenda to get
through, but we do want some time to take that back and
review them in the time that we have, so that we can make
sure that we're addressing everything that you've sent
in. Joining me today is Jeff Andre, the deputy assistant
Secretary for policy planning, and innovation in the
Office of Postsecondary Education. Mr. Andre will be
addressing the committee a bit later this morning. Also

joining us is Jacob Lallo, general attorney from our
Office of General Counsel. And while not at the table
with us, we have a number of our PPI, or Policy, Planning
and Innovation team in the room, as well as other staff
across the Department, including other general counsel,
either in the room or virtually. Without these
individuals, these negotiations would not have been
possible. Thank you, team. It is my distinct privilege to
introduce Mr. James Bergeron, acting Undersecretary of
Education at the U.S. Department of Education. Prior to
joining the Department, James served as president and
chief officer of the National Council of Higher Education
Resources, or NCHER, which represents state, nonprofit,
and private higher education finance organizations that
provide a holistic approach to student success from
administering 529 college savings plans to operating
state funded grant, loan, scholarship, and college access
and success programs for first-generation low-income
students. Prior to 2014, James worked as the Director of
Education and Human Services Policy for the House
Committee on Education and Workforce, where he developed
and managed the committee's legislative agenda in all
areas of education and human services policy. While there
are a number of other accomplishments Mr. Bergeron brings
to the table, and the essence of time, we are just

capturing some of the major highlights. Please join me in inviting Deputy Undersecretary of Education, Acting Under Secretary James Bergeron, and chief operating officer of the Office of Federal Student Aid to address the committee.

MR. BERGERON: Good morning, everyone. I'm a loud talker. Just so you guys know. On behalf of Education Secretary Linda McMahon, I'm pleased to welcome everyone to the opening day of the administration's first negotiated rulemaking committee. It's good to see many of you in person. I think we haven't had an in-person neg reg session in quite some time, so there may be some bugs here over the next few days. But I'm confident that everyone here will make sure that we get to the right side of where we need to go. This committee is the first of multiple negotiated rulemaking committees that we will be convening after having obtained advice and recommendations from the general public and specific stakeholders on ways to improve Federal regulations around postsecondary education. Back in May, the Department held two public hearings, one in person, which I'm seeing some friendly faces and some familiar faces here, here in this room and the other online to reach a national audience. We also issued a formal call for public comments through the Federal Register, which

ED_01927

produced over 7200 comments and suggestions. The Trump administration is committed to common-sense solutions to our Federal Student Aid programs, and today's proposal on restoring Public Service Loan Forgiveness is one of those. The changes being proposed here would restore the focus of the program to its true purpose, public service, and away from activities that advance unlawful activities such as illegal immigration, terrorism, child abuse, and discrimination. This proposal would realign taxpayer funds with PSLF, will realign taxpayer funds spent on PSLF with the public interest, a central tenet on what the administration is pursuing across the Federal Government. The individuals assembled here to consider the Department's proposal were selected from nominations by groups representing key stakeholders and industry participants involved with the Federal Direct Loan Program. Everyone selected, demonstrated expertise, or has experience in the Federal Student Loan Program, and particularly PSLF. They reflect the rich diversity of industry participants and beneficiaries of the program, including those from both large and small organizations. They each bring their own unique insights and perspectives to the task we are discussing today. And last but not least, they are strongly supportive of our goal to reach consensus. The meetings over the next few

days are just one part of a larger regulatory effort that
will involve the development and publication of a
proposed rule for public comment, and a final rule for
implementation next July. The process will require hard
work and careful thought, we know that. Those of you that
have been involved in this before, you know the amount of
work that takes place and will take place over the next
three days. When final, however, these regulations, as
well as other regulatory changes that we'll propose in
the future, will be impactful, they will make a
difference, and they will advance opportunities. They'll
foster innovation as well, and they will address
persistent as well as emerging challenges like the ones
we're dealing with today boldly and head-on. So, in
closing, I would like to thank all the negotiators on the
committee for coming here to Washington this week to
share their time and expertise. I wish you all a
productive day, and for the duration of the meetings over
the next three days. So, thank you guys. Back to Tamy.
Annmarie.

          MS. WEISMAN: Thank you. So now I want
to make sure that we do our other introductions. I'd like
to start with the rest of the Department staff, and then
we'll move around the table to primaries, and then we'll
go to the row behind them with alternates. If you could

please say your name, and you can certainly mention any
affiliation that you have now with any position that
you're in. But also, if you could clearly state the
constituency that you're representing. That's what we
really want to make sure we emphasize here at the table.
So, Jacob, we'll go to you first.

                  MR. LALLO: I apologize. Sorry, I was
a little distracted. What would you like me to do?

                  MS. WEISMAN: If you could please
introduce yourself and who you are, and why you're here
at the table assisting the Department.

                  MR. LALLO: Yeah. I'm an attorney with
the Department. I work with the Division of Postsecondary
Education. Primarily, I focus on changes in ownership and
PSLF. As the general attorney, though, I do a little bit
of everything. And so, as you know, the PSLF subject
matter expert, I'm here to help out with this.

                  MR. ANDRADE: I'm Jeff Andrade. I'm
the deputy assistant secretary, and we'll be chatting in
a little bit after the introductions.

                  MR. BUCHANAN: Hey. Good morning, I'm
Scott Buchanan. I'm the executive director of the Student
Loan Servicing Alliance, and I'm the primary negotiator
for the Federal family education loan lenders and/or
guaranty agencies constituency.

            MR. JONES: I'm Todd Jones. I'm
president and general counsel of the Association of
Independent Colleges and Universities of Ohio. And let me
take a deep breath. I represent the private, nonprofit
institutions of higher education, including historically
black colleges and universities, tribal colleges and
universities, and minority serving institutions.
Institutions of higher education eligible to receive
Federal assistance under Title III, parts A and F, and
Title V of HEA.

            MR. IRELAND: Good morning. I'm Tracy
Ireland, associate vice chancellor, enrollment management
and student affairs at the University System of Georgia.
I'm representing public colleges and universities. It's a
pleasure to be here.

            MS. DOBSON: Morning. My name is
Alyssa Dobson, and I'm the primary negotiator for
financial aid administrators at postsecondary
institutions. I am currently the director of financial
aid at Slippery Rock University.

            MS. HAMMER: Good morning, everyone.
I'm Mary Lyn Hammer. I'm the president and CEO of
Champion College Services, and I've been doing this for
37 years. I helped write Appendix D. It was based on my
original (inaudible) management program. So, we've been

doing this a long time, and it can be excruciating and a lot of fun. And I am representing the proprietary institutions.

MS. STANLEY: Good morning. My name is Rebecca Stanley. I'm the accountant and student loan advisor for the Fifteenth Judicial Circuit Horry County Solicitor's Office. I'm representing state officials, including state higher education, executive officers, state authorizing agencies, and state attorneys general.

MR. AIELLO: Good morning. I'm Tom Aiello, I'm the senior director of government affairs at the National Taxpayers Union. And I will be representing the taxpayer free market constituency.

MR. CAREY: Bob Carey with the National Defense Committee, also co-chair of the National Military Veterans Alliance, a group of 46 of the smaller, more niche-oriented military and veteran advocacy groups. I am representing the U.S. military service members, veterans, or group representing them. I have also received a couple of texts from members of my community who said they have registered for the online but have not received the link yet for the online capability. And if you want me to put out any word, I'll be happy to do so.

MS. WEISMAN: Thank you. I have someone from the staff looking into that.

            MS. MAYOTTE: I'm Betsy Mayotte, I'm
the president and founder of The Institute of Student
Loan Advisors, or TISLA. And I'm here representing civil
rights organizations, consumer advocates, and legal
assistance organizations that represent students and
borrowers.

            MR. OGUH: I am Emeka Oguh. I think I
have everybody on the most confusing name here. So, I put
a little flashcard together. So just Emeka Oguh. So, if
you get stumped at some point, I gave it to Tamy as well.
Founder and CEO of a company called PeopleJoy. We're a
for-profit entity that worked with employers to address
workforce shortages through programs like PSLF
assistance, student loan repayment assistance, tuition
reimbursement, college financial planning, so on and so
forth. My wife and I started the company back in 2016.
Between school for myself and my wife, we had over
$400,000 in student loans. So, I represent the borrowers,
if that you couldn't tell. Happy to be here. And again,
I'm Emeka Oguh.

            MS. WEISMAN: Thank you. So that
finishes off all of our primary negotiators, and everyone
is in attendance. So, I thank you for that. If we could
start back over here and go with the row of alternates
and go around. And again, if you could state your name,

any affiliation that you have, and then your
constituency, please.

MS. ABERNATHY: Excuse me, Annmarie.
Is there any way that we could get them mic'd, or could
they yell really loudly so we could all hear?

MS. WEISMAN: I think they're going to
need to come up to the primary's mic.

MS. ABERNATHY: Musical chairs,
everybody. Way to be adaptable and flexible. Thank you.
Look at that, we already got consensus just by switching
chairs, I like it.

MR. RICCI: Hello, everybody. My name
is Alex Ricci. I'm the president of the National Council
of Higher Education Resources, and my constituency is the
Federal Family Education Loan lenders and/or guaranty
agencies. Thanks so much.

MS. BOUTELL: Good morning, everybody.
My name is Heather Boutell. I am the director of
financial aid at Vanderbilt University School of
Medicine, and I am the alternate for private
institutions.

MS. MCNEILL: Good morning, all. I'm
Kaity McNeill. That's like mighty with a K, and I am from
the University of North Carolina system. I'm the
assistant VP for Regulatory Affairs. I am here

representing public institutions, including HBCUs, tribal institutions, and other minority serving institutions.

MS. FAITH: Hi, I'm Helen Faith, associate vice (inaudible) for enrollment and student financial services at the University of Virginia. And also, today is my last official day as past national chair of the National Association of Student Financial Administrators. I am here as the alternate for financial aid administrators at postsecondary institutions.

MS. BOYD: Hi. I'm April Boyd. I'm the vice president of financial aid at the College of Healthcare Professions, and I represent the proprietary institutions.

MS. TAYLOR: Good morning. My name is Laurel Taylor. I'm the founder and CEO of Candidly. I'm here representing public interest and taxpayer perspective. At Candidly, we're the category leader as the private sector offering a workplace benefit that automates the ability for hardworking Americans to take advantage and access the amazing Federal programs that you all have worked so hard to create. From Income Driven Repayment programs to PSLF and we've generated $2 billion of impact to date, always free to the borrower, paid for by the employer as a workplace benefit.

MR. SULMAN: Good morning. My name is

Faisal Sulman. I am with Student Veterans of America where I serve as a legal fellow. I'm also a licensed attorney out of North Carolina. I represent United States military service members, veterans, or groups representing them. And thank you all for having me here today.

            MS. SHAFROTH: Good morning. My name is Abby Shafroth. I'm a managing director of advocacy and director of the Student Loan Borrower Assistance Project at the National Consumer Law Center. I am an alternate today representing legal aid organizations that work with low-income student borrowers, as well as consumer advocacy organizations. And NCLC provides, provides training and support to legal aid organizations across the country that work with low-income borrowers on managing their student loans. And I'm also the lead author of our legal treatise on student loan law. Thanks.

            MS. DORAN: Good morning, everyone. My name is Sarah Doran. I am an early childhood special education teacher with the Saint Vrain Valley School District in Longmont, Colorado. I am here as an alternate representing student loan borrowers and repayment. Thank you for having me.

            MS. WEISMAN: Thank you all very much. That means we have all of our primaries and all of our

alternates. Thank you very much for the introductions. If you could make sure when you're back at the table that your tent card with your name is visible to me. I'm going to try to get the names. I know Tamy needs to see the names as well. We'll share. Okay. I think, Todd, you are the only one whose name is a little bit hidden from me. But now that I've said it out loud, I'll probably remember. Let's see. Okay. A couple of quick scheduling items. We are meeting for three days from 9 to 4. We anticipate a ten-minute break in the morning and a ten-minute break at lunchtime, I'm sorry, at afternoon. Along with an hour, a 60-minute break for lunch. You're all awake. Very nice. Very good. We will be a bit flexible on that, based on the expressions I see on your face and the looks of I need food, I need coffee. Again, feel free to give me that feedback. I will be watching for it. We will have public comment at the end of today. And at the end of tomorrow. We will begin at 3:30 so that we can have a hard stop at 4:00. I know many of you are meeting with constituents and with each other, and we want to make sure that we honor that time. There will not be public comment on the last day, as at that point, the committee will have concluded its work. When we begin working on an area or a section, the Department will present the proposed language and discuss what the goals are. They

will invite clarifying questions, and then the committee
will engage in structured discussion. As we near the end
of a discussion on those issues, as I mentioned earlier,
we'll do some informal polling just to get a sense of
where you are. Those will get more detailed as our time
together goes on. But remember, they are a pulse check or
a poll. They are not final. You may change your mind. You
may get feedback from others. And so, we invite you to
talk with others, again, other negotiators, others in
your constituency, to help form the best opinion. I've
mentioned consensus probably three times already, so it's
time for the fourth. Just remember that consensus checks
are not votes per se. It is not a majority wins for
consensus to be given; it means that no one has blocked
consensus. If you abstain, you are not considered to have
blocked, but you may abstain. The goal for consensus is
to identify agreement or general agreement. So, you may
indicate that you will go with consensus on something,
even if it's not your favorite thing, but you feel it's
something you can live with. The goal here is to get a
proposed rule out that meets at least most of your needs,
if not all of them. And my feeling on getting consensus
at the table is that it's a wonderful thing, and that the
whole is greater than the sum of its parts. So together,
collectively, the committee will come up with something,

generally speaking, that is better than if any one of us
had written it. I talked to each member in advance of the
committee about negotiating in good faith. I felt like we
had really good conversations. I felt like everybody is
coming with a great spirit and a great approach. And so
again, I just appreciate the respect and the enthusiasm
that I saw and heard from so many people. And I think
that already gets us closer to consensus than we walked
in the door. All right. Tamy, do you have anything else
that you need to cover before we get started?

MS. ABERNATHY: No, I simply want to
say thank you to all of you for being here, for your
willingness to serve alongside the Department in
furthering the restoration of the Public Service Loan
Forgiveness program. We're excited, and I look forward to
the next few days of getting to know you better and again
working on behalf of the Department. Thanks again for
coming and joining with us and agreeing to serve. For
without you, we cannot do this. Thank you.

MS. WEISMAN: Thank you. Do we have
any questions before we start anything that we need to
cover before we get into the first item? Betsy.

MS. MAYOTTE: I'd like to request
another seat at the table specifically for and separately
for civil rights organizations. I think Abby might have

some additional language around that.

            MS. WEISMAN: I think we can do this
now.

            MS. SHAFROTH: Thank you, everyone.
So, as Betsy mentioned, we're proposing to add an
additional member to represent civil rights organizations
and to make that a separate seat at the table, separate
and distinct from the consumer advocate and legal
assistance organization seat that Betsy and I are
filling. While I'm really sensitive to the need to keep
this committee size manageable to make sure everyone can
be heard, I also believe that given the substance of this
rulemaking, in particular, with its stated focus on
limiting PSLF eligibility based on violations of anti-
discrimination and immigration law, that it's important
to have a negotiator at the table to specifically
represent the civil rights community. We don't have that
right now. I therefore propose that we add Chavis Jones
and Jalen Herbin as alternate to represent civil rights
groups. If you guys, too, would like to waive or stand
up. As you can see, they are present, willing, and ready
to join the committee and to participate in the next
three days of meetings in good faith. To be clear, while
the seat that Betsy and I have been asked to fill is
titled Civil Rights organizations, consumer advocates,

and Legal Aid Organizations, Betsy was nominated to
represent consumer advocates, and I was nominated by the
legal aid community to represent legal aid organizations.
Neither of us was nominated by civil rights groups, but-
and the legal assistance groups that did nominate me
wrote in their letter that they believed we should have a
separate seat for civil rights organizations. And I agree
with that. Fortunately, there are nominees from the civil
rights community. The Leadership Conference on Civil and
Human Rights previously nominated Chavis and Jalen to
serve on the committee. Chavis is from the Lawyers
Committee for Civil Rights Under Law. Jalen is from the
center for Responsible Lending. I have a paper copy of
the nomination letter that I can circulate around, or I'm
happy to email to Annmarie their nomination letter that
she can send off, if that's helpful to anyone. You can
let us know how it's best to proceed from here.

            MS. WEISMAN: If you could do paper
just in the interest of time. Thank you.

            MS. SHAFROTH: Interest of time. It's
only- I don't have 30 copies, I have one.

            MS. ABERNATHY: You can just give that
to me. We'll take care of it.

            MS. SHAFROTH: Probably, yes. Good
point.

2025 Negotiated Rulemaking - 6/30/25

MS. ABERNATHY: Annmarie, I'd like to ask Ms. Abby to repeat those names. I could not hear exactly who she was saying, and I would like to make sure that I have that.

MS. SHAFROTH: Yes. The names are Chavis Jones and Jalen Herbin.

MS. ABERNATHY: Thank you.

MS. WEISMAN: Tamy.

MS. ABERNATHY: Are there any other constituencies that the primary or alternate negotiators would like to recommend we consider before we discuss this? Laurel?

MS. WEISMAN: If you could come to the microphone.

MS. TAYLOR: When, thank you for the bravery, first, just like to comment. One question. As we were going around and presenting who we are representing. I noticed that Thomas is representing taxpayer. I did not hear public interest. Are you representing public interest?

MR. AIELLO: Taxpayer and public interest.

MS. TAYLOR: Perfect. Thank you. I no longer have a question. Thank you.

MS. WEISMAN: I see no other hands or

cards raised regarding adding constituents. Jeff?

MR. ANDRADE: Because the nominees are
from a constituency that was identified as a single
constituency. The Department objects to adding and
splitting up the constituency group.

MS. WEISMAN: So, since we have an
objection that would need to come from the Department's
negotiator. Tamy, are you objecting?

MS. ABERNATHY: Yes.

MS. WEISMAN: Okay. So, in this event,
we do not have consensus, and the constituencies will
remain combined as we began. I thank you, Abby and Betsy,
for raising the issue. So, our list will remain as it is.
Does anyone else have questions before we get started on
content? Bob.

MR. CAREY: Any progress on getting
the link out?

MS. WEISMAN: The link is up.

MR. CAREY: Where?

MS. ABERNATHY: It is on our website.

MR. CAREY: Okay.

MS. ABERNATHY: It was repaired this
morning relatively early, so hopefully anyone who's been
accessing it now will not have the same difficulty as
they did last night and earlier this morning.

MS. WEISMAN: Also, I was just informed that the Department sent a new email this morning with a fresh link, so that it should be at the top of their inboxes or pretty close to the top.

MS. ABERNATHY: Annmarie. Could we get that link to the negotiator so that they could send it out to their constituencies? Because the people accessing the links that were not able to do that may need to hear from the negotiators, so that they know that they can access the link, now. If it's a new link, we want to make sure everyone's been aware. Oh, it's the same link. So.

MS. WEISMAN: If they had an earlier email, it would now work.

MR. CAREY: I have constituents who said they never received an email.

MS. ABERNATHY: Okay.

MR. CAREY: Who had registered for the meeting?

MS. ABERNATHY: Can we take that back? Let us do some research on that and we'll get back to you, Bob. Thank you.

MR. CAREY: Thank you.

MS. WEISMAN: So, I'm told that if they register in person, they would not get a link, but if they register for virtual, they would get a link right

2025 Negotiated Rulemaking - 6/30/25

away. They may need to check their spam folders, junk mail folders kind of thing. But we will work on getting that link as well.

        MR. CAREY: And as soon as we get it, I'll put it up to my constituency on social media as well.

        MS. WEISMAN: Appreciate that. Thank you. Other questions before we get started? Other questions from negotiators? Okay. Then I'm going to turn it over to Tamy to walk through our first part of our content.

        MS. ABERNATHY: Actually, I believe that we are punting to Mr. Jeff, who is going to give us an overview of the executive order restoring Public Service Loan Forgiveness. Are you ready, sir? If you would let Michael share the screen with that executive order so that he could get that up and ready for us, please?

        MR. ANDRADE: Sure. While Michael's doing that, I'll just give you a just a brief intro. My name's Jeff Andrade. Thank you to everybody for coming in. I'm the deputy assistant Secretary for policy planning and innovation here in the office of postsecondary education. Our office is responsible for policy and regulations impacting the Federal Student Aid

programs and the recognition of accrediting agencies.
I've been involved with the student aid programs and the
rulemaking process here at the Department for nearly 40
years. Like Tamy, I'm a first-generation college
graduate. I'm also a Pell Grant recipient and a loan
recipient as well. Worked both inside and outside the
Department, and I think I'm probably one of the few
people in town that's been a Federal negotiator and a
non-Federal negotiator. As well as sitting out in the
studio audience and at home playing neg reg bingo. I
wanted to say the first neg reg I did, Ms. Hammer and I
were actually across the table. That's how we met one
another. And I think we've been arguing ever since. So,
you will- be careful how you deal with your fellow
negotiators. Because you may meet them in the future
somewhere. So, we have the Public Service Loan
Forgiveness executive order up. And I wanted to start
talking about how that fits in with the Public Service
Loan program. The Public Service Loan program was enacted
in 2007, and its purpose is to forgive the remaining loan
balance for those who have worked in public service jobs
for at least ten years, have made 120 monthly payments
under a qualifying repayment plan. Congress has granted
the Secretary broad authority to promulgate regulations
to administer the Department's programs. And in fact,

this proposed rule that we're about to consider here will
be the eighth time that the Department has amended the
regulations on the PSLF program. One of the primary
purposes for this set of proposed rules is to implement
Executive Order 14235. Restoring Public Service Loan
Forgiveness, which was signed by President Trump on March
7th, 2025. This executive order directs the Secretary to
amend 34 CFR section 219 specifically to exclude
organizations that have a substantial illegal purpose and
directs us to amend the current definition of qualifying
employer to exclude those organizations. Guided by
President Trump and Secretary McMahon's vision, the
proposed regulations that we're about to discuss is a
common-sense proposal. It realigns the PSLF program in
the best interest of the American people, and it will
ensure that PSLF benefits are received only by those who
are working for the public good and not against it.
Specifically, the Public Service Loan Forgiveness would
exclude from the PSLF program, employers that have been
found to have a substantial illegal purpose, including
those who have been found to have aiding and abetting
illegal immigration, those supporting foreign terrorist
organizations designated by the Secretary of State such
as Hamas, ISIS, and illegal cartels such as Tren de
Aragua. Those who have abused healthy children through

mutilating and irreversible surgical procedures, powerful
chemicals and drugs, or have trafficked children away
from their parents out of their home state to have such
procedures done. Those who have engaged in a pattern of
aiding and abetting illegal discrimination against our
fellow Americans. And finally, organizations engaged in a
pattern of violating State Tort Laws, such as vandalism,
disorderly conduct, trespassing, public nuisance, and
blocking of highways. Now, Congress empowered the
Department and the public to come together in this
process to review and revise the regulations that govern
the student aid programs. This process encourages and
requires collaboration, requires give and take between
everyone around this table as the Department moves
forward with implementing these proposed changes. As a
member of the committee, as Annmarie has pointed out, and
this, will be the fifth time, the objective is to reach
consensus. Over the last few months, there have been
countless meetings here at the Department and across
government to put together a draft regulatory language.
The proposal that you have before you, which will
ultimately go for the Secretary's consideration, is
reasonable by design. It is legally sound and it's
operationally feasible. But we know, having done this
many times before, there's always room for improvement

and to fine-tune the proposal. So, with that in mind, we urge you to take full advantage of this opportunity to share your unique insights and be part of the policy making process. We are here and we stand ready to answer your questions, listen to your concerns, and discuss your ideas. And with that, I'll turn it back to you, Annmarie.

MS. WEISMAN: Does anyone have any questions about Jeff's remarks? Betsy? We're trying to keep the table to the primaries and have the alternate give information to have the alternate give information to the primary so that we can keep the table manageable. Yeah. Okay. Thank you. Other questions? Emeka?

MR. OGUH: Thank you. If we submitted comments in advance, I guess, is there a point in the proceeding where I'll be able to kind of address some of the fine-tuning that was discussed?

MS. WEISMAN: If you're- if what you submitted pertains to what Jeff just said and you want to raise those issues now, you can certainly do that.

MR. OGUH: Sure. Yeah. So, just you know, alluding to what Jeff mentioned, just looking at the proposals, I just want to make sure that we understand the impact that it's going to have in terms of workforce shortages and increasing taxpayer costs. Can everybody hear me? Perfect. So, a lot of our constituents

that we represent are health care workers, educators, and clergy, all of whom are eligible for Public Service Loan forgiveness. And I think we all around the room know that the U.S. is projected to face a shortage of 86,000 doctors and 338,000 nurses by 2036. A lot of what we do that's unique to our organization is in addition to submitting IDR forms and PSLF forms for these individuals to help them navigate PSLF at no cost as an employer of benefit, we also have dedicated coaches that help them on a daily basis, sort of course correct. Because as Jeff mentioned, those eight Department amendments to PSLF, comes with a lot of confusion for borrowers. A lot of them are relying on PSLF to remain in those areas. These are underserved areas, inner city. These are rural areas where they're relying on PSLF for employee retention. I can't tell you the number of times our coaches have talked a nurse from leaving a nonprofit entity to work for a for-profit or a traveling nurse because that PSLF was at anchor. Right? 70,000. 80,000 in loan forgiveness. And so, to make it more difficult for folks, let's say, for no fault of their own, their employer is considered ineligible, they may try to leave, right? If they leave, a lot of them can't leave because they have some non-competes in place where they can't work within, let's say, a 25-mile radius with another competitor of theirs.

So, what this may create are essentially gaps where people don't have access to high-quality healthcare. Right? Because nurses and physicians are essentially leaving that area because they don't have access to PSLF. So one of the things I wanted to suggest is that we give folks who have non-competes in place or don't have the opportunity to get with a qualified sort of PSLF provider in the same area, give them an opportunity to essentially appeal and say to no fault of my own, I understand that my employer did something illegal, but I don't have other options, and to do so would remove that caregiver from the workplace. Just imagine if, hypothetically, Children's National here were found to do something illegal, and now all their employees are no longer eligible for PSLF. Imagine if someone's child doesn't have access to a level three trauma center for delivery, right? Just imagine the impact that that would have.

        MS. WEISMAN: You have 30 seconds left.

        MR. OGUH: So that's just the one issue I wanted to raise. Thank you.

        MR. ANDRADE: Well, thank you for bringing that up Emeka, and thank you for the proposal. As Tamy said earlier, we are looking at all of the proposals this evening, and we will come back in terms of

what we can do. While I appreciate your raising the issue
with regard to non-compete, I'm not sure I can fully
agree with the potential impacts that may have. Again,
the purpose here, we went to very great lengths to make
sure that we were not taking away credit for folks for
the work and for the payments that they made prior to the
Secretary's determination of a loss of eligibility of an
employer. So that is one key feature there. As I said and
I know a number of the proposals that have come in
revolve around the ability for organizations to be
reinstated if they change their policies. We also built
in a significant amount of due process to give employers
the ability to rebut any information that we may have
before the Secretary makes a final determination. So,
we've gone through great lengths to avoid not having it.
But there is a fundamental principle here of not
rewarding organizations that are working against the
public good. And to the extent that we can help encourage
beneficiaries and potential beneficiaries of PSLF to go
work for organizations that are doing that. We are
obviously welcome to do that. But your issue of the non-
compete agreements is something that we are looking at.
Thank you.

           MS. WEISMAN: We'll go back to Betsy.

           MS. MAYOTTE: As part of the overall

2025 Negotiated Rulemaking - 6/30/25

commitment to negotiating in good faith, does the Federal
negotiator, Tamy, have the Department's support to depart
from the basic approach laid out in the executive order
in proposing rules and specifically to depart from the
adoption of those five enumerated areas of prohibited
conduct set forth here, or is the Department negotiator
limited to just fine tuning? In other words, tinkering
around the edges?

                MS. ABERNATHY: We are definitely
engaged in conversation around the table. While I am the
Federal negotiator and I do present the Department, the
administration's position, this is a negotiated
rulemaking, and we are going to talk about things. We are
going to look at things. We are going to hear from you.
We are going to hear from the alternates where
appropriate. And we will take things back in the evening.
And if there is, there are amendments to our proposed
regulatory text that we give you, then we will adjust
those, and we'll come back and discuss that with you
again. We're a little bit ahead of the game because we
haven't started talking about our issue paper and laid
the foundation for what we've actually done. We've kind
of talked about the executive order, and this is what
we've been directed to do, and we have been directed by
Secretary McMahon to promulgate rules on restoring Public

Service Loan forgiveness. But our task for the next three days is to work collectively with each other. We've proposed rules. You see that in the discussion paper, but we are going to discuss, and we're going to look at these, and we're going to engage in good faith. And we will continue to do that until our very last day.

    MS. WEISMAN: Alyssa.

    MS. DOBSON: I was just curious. I've been at this table before where we've discussed protocols. I guess that's not on the agenda today, but it has worked pretty well historically where the primary and alternate are a team and I was wondering if there was a chance to maybe change the way that it is structured currently, where it's sort of the primary running the show. Is there space to adjust those protocols?

    MS. WEISMAN: So, part of agreeing to serve as a negotiator is that you agreed to the protocols. And I think for me as a facilitator, it's much easier to manage the table when it's primaries at the table and alternates coming in the absence of the primary. I have seen negotiated rulemaking where that was not the case. And with due respect, it does look a little bit like musical chairs sometimes. And I think that the conversation tends to get repetitive. When I met with each of the negotiators, both alternate and primaries,

one of the things I tried to stress was the idea of coming together as a negotiation team, that you are representing your constituency as a team. And that would mean conversations between the two of you, and that in some cases, you wouldn't agree on what you wanted to take to the table. So then that means you bring both. That you say some of our constituents feel this way, others of our constituents feel that way. We can certainly talk at a break or at lunch if there are more questions that you didn't want to ask at the table or you need assistance in working with another negotiator. But I think we felt pretty clear that this was the right way to run this table. Tamy?

          MS. ABERNATHY: Thank you, Alyssa, for saying that. And thank you, Annmarie. The Department's position, as Annmarie mentioned, we don't want a lot of flip-flopping. But we will allow alternates to come to the table for a topic if the primary feels it is important for that alternate to come to the table. What we don't want is this topic and then flip-flopping back and forth several different times. We do need to contain that, but we are very amenable to listening and engaging in a team effort, with a primary being the primary and an alternate being the alternate. I hope that provides additional clarification and allows you a little bit more

satisfaction with that response.

    MS. WEISMAN: Emeka?

    MR. OGUH: And I just appreciate your comments, Jeff. I just want to go back so I understand what you were saying about non-competes. Just from an impact perspective, I wanted to just get a sense of what the Department, sort of had any estimates on the impact from our side when we would work with our clients, typically, 20 to 25% of their employees have student loans. When we look at educators, K through 12, both charter and public, that can go as high as 60%. So, it's a much wider impact. And let's say they don't have non-competes. We still have folks who may be limited, constrained geographically on where they can work. And so has the Department given any consideration to somebody who may be forced to just, there's no other opportunity to get loan forgiveness in the area. And is there any flexibility as far as allowing borrowers to push back, if that, if that is the case? Because that's what we've seen with our constituents. We have white papers that show that folks would leave if their employer didn't have PSLF eligibility. I know that may be part of the intent, but again, if there's no place within a 25-mile radius, is there an opportunity to sort of look at that?

    MR. ANDRADE: As I said, we've looked

at as muchas we can. The majority of PSLF borrowers or borrowers that are using the PSLF benefits are using them at state and local government or governmental groups, or in organizations. So, we don't see the majority in particular, even in the health care sector as you, as you described, when we look at the entire universe of who's received the benefit. But again, more than willing to look at giving the organizations that are employing these individuals, a chance to, make changes and to come in compliance as you and others have proposed. But I think any type of situation where an organization can continue to have their employees receive the benefit after they've been found to be engaged in substantial legal activity would be unfair to other organizations and would not be an equal treatment under the law.

                MS. WEISMAN: Jacob?

                MR. LALLO: Just in response to that, with the way qualifying employers currently drawn. If an employer suddenly became a for-profit that was a qualifying nonprofit, they would lose their status immediately. And we're just drawing in within those lines currently.

                MR. ANDRADE: But I would say again that I think Jacob does point out a scenario where you have in the healthcare sector, the possibility of

currently nonprofit employers losing eligibility. So, I
think that that already happened. That scenario can
already happen under the current regulations.

MS. WEISMAN: Other questions about
the executive order. Rebecca?

MS. STANLEY: One of the questions
that was brought up by someone in my constituency was, it
says the way subsection H is worded, subsections H one,
two and three are not the only ways an entity can be
deemed as having engaged in activities that have a
substantial illegal purpose, and the Secretary is
appointed as the person that would make that
determination. Their question is, should there instead be
a definitive, comprehensive list of conclusive evidence
that the employer engaged in such activities, which might
include a determination by the U.S. Attorney General's
office or someone else? Or should one, two, and three be
left as it is, and instead, the Secretary making the
determination in H, the U.S. Attorney General, or someone
else would be responsible for making this determination?

MR. ANDRADE: I think once we get into
the issue paper and start walking through our logic and
our thinking on that, will become very apparent very
quickly in terms of how the Secretary will make their
decision. If you guys are willing to sort of hang on

there with us when we get there, I think we'll address
that point.

MS. WEISMAN: We're going to take a
short ten-minute break a little early, just so people can
interact with their constituents real quickly as we get
ready to move into our first topic. Before we turn it
over to Tamy. I just want to clarify. There seems to be
some confusion about primaries and alternates. We are
doing things by topic, not by issue, in this rulemaking.
So, Public Service Loan Forgiveness is the issue. Tamy
will break down different topics within that issue, and
she will clearly announce those at the beginning before
walking through that language. We will give you time at
that point to decide if you want someone else to come to
the table. So that's where those primary alternate
switches would occur. We don't want during a topic to
have both people speaking on the same topic, because
generally speaking, the feeling is that we want you to
speak on behalf of your constituency. We know that many
of you are representing large constituencies. But the
other thing I can't stress enough is, this conversation
is the opening conversation. We will revisit each of the
topics throughout the three days. We will go back to
them, and we will continue to discuss and revise. I do
believe there will be adequate opportunity to be heard.

And I think that this will work well. Betsy?

MS. MAYOTTE: I'm picking up what you're putting down. I'm still very uncomfortable with this because even within a single issue, the alternative primary can have very different areas of expertise. I do, and when I say I'm picking up what you're putting down, I get that you don't want repetitive things. We have a very short amount of time to do a lot of stuff. So, I'd like to suggest that as a committee, we commit to not repeating each other's points, that the Department be open to traditional andallowing the negotiators to police themselves as far as when it's appropriate for the alternate to be at the table.

MS. ABERNATHY: We absolutely will fulfill that commitment if you will all agree that it can be amenable and manageable, and at the start of a topic, then yes. We are more than willing to hear- if the primary feels the alternate should be at the table, we just ask that it be done at the top of it, or maybe right at the discussion, because it is very difficult to facilitate everything going on around. And we want to be fair to you, and we also want the conversation to continue. So yes, I think we could do that without hesitation. Thank you, Betsy. Yes.

MS. WEISMAN: Are you ready to move

into the first topic?

       MS. ABERNATHY: I am.

       MS. WEISMAN: And I promised you would name it as well as give the section number.

       MS. ABERNATHY: I most certainly will.

       MS. WEISMAN: Thank you.

       MS. ABERNATHY: So, what we want to do right now, I had good afternoon, but we haven't made it to the afternoon yet, so good morning again. We want to start with the discussion draft. What we would like to do to set the stage for our very robust discussions throughout the rest of these negotiations is to look at holistically what we're doing first. We will take it by section. We will talk about this section at the end of that section. We'll give you guys time to engage in conversation if at that time there is something from your proposal that directly impacts what we've just discussed. Please feel free to bring that up at that time. Otherwise, all proposals. We need time to look at them. We have not had them. We would be doing you all a disservice if we did not give them the time that we need to look very thoroughly at them and come up with a plan to discuss them later. So, if you would allow us to do things that way, that would be super helpful for us. I'm going to set the stage. We're going to go through the

overview of the discussion draft. We're going to talk about proposed regulatory text in sections, which will allow us to set a foundation for the rest of our discussions. What we want to do is kind of backtrack just a little bit. So, we've heard about the executive order. Now let's talk about what we've put together. You've seen it. Let's get it out there. Let's start negotiating on bits and pieces of it, now. How's that sound? Oh, you guys are a quiet group. How's that sound? All right, let's get started. So, the very first thing that we are going to do is a high-level walkthrough of our discussion paper. And you will see that we have used the guidance provided to us in the executive order published on March 7th, 2025, to define terms and create proposed amendatory text. You've also heard from Jeff, or others, that section 455M of the Higher Education Act, as amended, establish the Public Service Loan Forgiveness Program, under which the Secretary cancels outstanding balances on eligible direct loans for borrowers who are employed full time in a public service job after they make 120 monthly payments under a qualifying repayment plan. The Secretary, in coordination with the Secretary of the Treasury, proposes to amend the Public Service Loan Forgiveness regulations in section 685 219 to ensure that the definition of a qualifying employer excludes

organizations that engage in activities that have a substantial illegal purpose. Specifically, we will revise the definition of qualifying employer. We will revise the definition to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers. We will define activities that have a substantial illegal purpose, and we will try to provide clear definitions for determining whether an organization is a qualifying employer under the Public Service Loan Forgiveness program. We would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer, and to the extent possible, the Department proposes to adopt definitions that are already established in Federal or state law. The Department proposes adding definitions for aiding and abetting other Federal Immigration Laws, terrorism, foreign terrorist organizations, chemical castration or mutilation, surgical castration or mutilation, illegal discrimination, and violating State Tort Laws, among others. We want to establish when a qualifying employer has engaged in activities that have a substantial legal purpose. We propose to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have

a substantial illegal purpose, and therefore no longer
qualifies as a qualifying employer for the purposes of
the Public Service Loan Forgiveness program. We further
want to address the impact on borrower's eligibility for
forgiveness under the PSLF program. We propose that
effective on or after July 1st, 2026, and based on an
evidentiary standard as defined in our proposed
regulations, no payment, I am sorry, but this is a very
sensitive mic, no payment by the borrower for any month
the Secretary determines that the qualifying employer,
engaged in activities that have a substantial illegal
purpose, would count toward the borrower's eligibility
for cancellation for PSLF. Employers will have an
opportunity for notice and ability to respond. The
Department proposes to provide notice to employers and
the ability to respond to any Department findings
relating to whether the employer has engaged in an
activity that has a substantial illegal purpose. A final
judgment by a state or Federal court, plea of guilty or
nolo contendere, or settlement that includes admission by
the organization that it engaged in activities that have
a substantial illegal purpose, would constitute
conclusive evidence of engaging in activities that have a
substantial illegal purpose. This ensures that employers
have the ability to challenge and present evidence prior

to the Department making a final decision. We want to amend existing terms, create new terms, and restructure subsection B into regulatory paragraph structure. What I mean by that is if you look at B current regulations in 685 219, you'll see B as definitions. And then what we do is we list definitions in alphabetical order. What we want to do and in there is the definition of qualifying employer that was put into some regulatory paragraph structure. So, what we needed to do was completely go into paragraph B, subsection paragraph- subsection B, and put all of the definitions into regulatory paragraph structure. We'll talk a little bit more in depth about that. But I kind of want to set the stage for what you're going to see when my colleagues start sharing the screen, and why you'll see that. We also want to clarify in C borrower eligibility by proposing the exception to what will be considered having made a monthly payment and specify what is proposed to not be considered a payment. In subsection G, borrower reconsideration process. We propose that a borrower cannot request reconsideration when they have been denied Public Service Loan Forgiveness due to the denial of their employer as a qualifying employer, one of the requirements to meet Public Service Loan Forgiveness. Remember, one of the standards are that the employer verification form that is

completed by the employer, indicates whether or not they are participating in substantial illegal activity. So, it is a self-certification by the agency. We want to create, again, a standard for determining qualifying employer engaged in activities that have a substantial illegal purpose in subsection H, which we will discuss in depth when we begin our review of the proposed amendatory text. We want to develop the process for determining when an employer engaged in activities that have a substantial illegal purpose in subsection I. We plan to articulate what the Secretary would use to determine that a qualifying employer violated the standard under paragraph H, subsection H, of this section. So now we're going to move into the actual 685219B definition section. Do we have any questions on that before I go on? Okay.

        MR. CAREY: So, are you asking for questions on the overall issue and the overall discussion, or are you asking, are you asking for questions on the definitions?

        MS. ABERNATHY: We haven't gone through all of the definitions yet, so it's just basically setting the foundation for the rest of the discussion at this point.

        MR. CAREY: So, because in looking at the proposal and the background I have an overall concern

that the terminology that's being used in the proposal
and the background is too generic and is oftentimes
internally contradictory, such as in one place we use
disruption of public order and another we use threat to
national security, and another we use threat to social
and economic stability. We make a statement that someone
is not providing a public service and instead is engaged
in activities that are a threat to public order,
substantial illegal purpose. And then I'm concerned that
we're mixing tort and criminal activity in a way that
wouldn't necessarily follow what I understand to be basic
constitutional law. And then again, and then there seems
to be some mixing in of things that are not necessarily
illegal. While it may not be desirable for this
administration for parents to provide transgender health
care for their underage children, it's not illegal in
many states.

              MS. ABERNATHY: Remember, Bob, this is
about the employer and not about the activity. So, hold
on.

              MR. CAREY: Substantial illegal
activity.

              MS. ABERNATHY: That's right. Of the
agency, not a parent.

              MR. CAREY: Okay. So, if an

organization is helping a parent receive legal health care in that state, how would that be substantial illegal activity?

MS. ABERNATHY: As we navigate through these definitions, we hope that you'll be able to see some of the ways that we've used existing definitions codified in other agencies code that establishes definitionsfor us. And if any of those definitions have a term where this is in violation of or this is not permissible in that definition, more of this will come to light as we navigate through. I believe many of the questions or many of the concerns that you're raising and establishing them, and how we plan to utilize them for the purposes of substantiating an illegal purpose or activity. It might be better suited during the definition discussion to kind of get that out there. Is that okay?

MR. CAREY: It is. I mean, my alternate, Faisal Sulman, from Student Veterans of America, has raised separately the issue of is the Department the proper agency to be trying to figure out whether organizations are engaged in illegal or criminal activity. I'd like to have that discussion during that time. I thought that now is the appropriate time to have that discussion, but I'm happy to have it when we're doing the definitions.

MS. ABERNATHY: Yes. For that particular piece. Let's get back to that. And and definitely hold us accountable and bring it back up, and we can have that conversation.

MS. HAMMER: Jacob.

MR. LALLO: Yeah, I just want to articulate putting aside the issue of the actual definition. We have broad rulemaking authority in this area. It's a program that's administered by the Department. So, the Secretary has the authority to promulgate regulations related to the administration of those procedures and the regulations governing the procedures related to those programs. So, it's still the proper form insofar as we're the ones running this show. If you want to put it that way. And we make the regulations for PSLF. The definitional stuff we can get into separately, but it falls within the purview of the Department to regulate a program that is explicitly delegated to the Department by Congress.

MS. WEISMAN: Jeff. And then Bob again.

MR. ANDRADE: Bob, to your point that you raised, probably when we get to the definition that deals with State Tort Laws and when we get to the standard itself, which is subpart H, the best places to

have those two discussions.

            MR. CAREY: I'm not a lawyer, although
I used to write bad law as a staffer, but I would say
that the broad regulatory authority is still proscribed
by the limits of the authorizing legislation in the
underlying programs that the Congress then delegates such
authority to the Department. That the underlying law upon
which we'reusing that ability to negotiate a rule is
still prescribed in and of itself. The way this comes
across is that the Department is arguing that it can
basically make new programs out of whole cloth. And I
don't think that's what this Department or this
administration would be trying to say.

            MS. WEISMAN: Jacob, do you want to
respond to that? And then we'll go to Thomas.

            MR. LALLO: Yeah. Joe, in response to
that, I'd say that we do have broad rulemaking authority.
We routinely and frequently amend program regulations for
the purpose of administrating them more effectively. PSLF
has been amended seven times since it was codified. Two
of those have fundamentally changed the way that we
address what is a qualifying employer and what is
qualifying employment. In particular, in 2023, we moved
directly away from the language that was lifted directly
from the statute of what constitutes a public service

job. The reason that was done was to make this more
efficient and to more effectivelyeffectuate the intent of
Congress. And we see this is a continuing evolution of
that. We are bringing this in line with the intent of
Congress. We are working to ensure that this only applies
to people who are within public service, and that is very
much within the remand of the Department from a legal
standpoint.

MR. CAREY: I would argue that the
stuff that happened in 2023 was clearly exceeded the
ability- the congressional authority given to the
Department, and that in and of itself, many of those
things exceeded the authority of any government agency,
especially in light of the setting aside (inaudible).

MS. WEISMAN: We're going to move next
to Thomas.

MR. AIELLO: I would just echo some of
the words that Bob mentioned. From our perspective, we
have concerns that you're going after a few unsavory
groups now, but what happens a few years from now when we
rewrite the next administration, rewrites the law and
goes after groups that support educational choice or
school choice or lower taxes for everybody. Is there a
point in which we come to that we are just going to go
after a handful of groups at a time, make the process

more convoluted and complex, and at the end of the day is
not best serving of taxpayers. And look, I think what the
executive order does from a broad perspective is good. We
want fewer people to take advantage of PSLF because that
is better for taxpayers. That's my opinion. My
constituency might disagree with that. But at the end of
the day, how do we get to a point where it's even across
the board and we're not just going after a handful of
organizations that is broadly defined.

          MS. WEISMAN: Jacob?

          MR. LALLO: So, in response to that,
I'd say while you're right, policy is sometimes shifting
sands. The goal with this was to set up broad clear
categories of what is and isn't within a substantially
illegal activity. Again, we'll discuss definitions when
we get there, but we modeled this off of the procedures
that other agencies use. In part, we looked very heavily
to the way the IRS approaches illegality doctrine and
public policy doctrine. Specifically, in regard to
illegality if your organization is involved in illegal
activities in any substantial aspect, you lose your
501(c)(3). And public policy is a broader thing that
mostly has been employed in the realm of racial
discrimination but has been used more broadly as well.
Which basically states that as long as something is, or

an organization that you know is acting in a way that is
contrary to established public policy, does not deserve
the benefit of a tax exemption. And we tried to follow
that logic through. We think that that effectuated the
intent of Congress with public service, that it's
supposed to be providing a public benefit to the
communities in which they operate, and that an
organization that is either engaging in illegal activity
or is operating a counter to established public policy is
not, by definition, engaging in public service. And we've
tried to work very clearly around that. We've set up an
evidentiary standard. You have a an opportunity to
respond. There's a preponderance of evidence standard.
And we've established three buckets that are conclusive
evidence that basically an organization has admitted that
they have done something that violates one of those
standards. Otherwise, they and even in those cases, have
an opportunity to respond, opportunity to offer
mitigating circumstances or explain the situation away,
but we think that the way it's drafted is basically
designed to be as clear-cut and content-neutral as
possible.

          MS. ABERNATHY: So, moving along, this
is a very informative conversation. So, thank you very
much for bringing up these points. As I mentioned just a

few minutes ago, we talked about amending the structure
of the definitions to put it into regulatory paragraph
structure. So, at this time, I would like for my
colleague Michael to share and project a screen so that
we can look at the actual terms that we're talking about
and look at section B at this time. So, we'll give him
just a second to navigate there. Okay. So here we're not
necessarily talking about the individual terms. Okay?
We're talking about the numbering the paragraph where B
is definitions, and one is aiding and abetting, and two
is AmeriCorps service, and three is what three is. So,
what we're trying to do here is proposing the numbering
changes to add paragraph organization, creating
uniformity in this section just like other regulatory
provisions. We want to add structure to the definition
section prior to proposing adding new definitions.
Therefore, we propose adding before each discrete
determination- each discrete term defined under section
685219B an Arabic number 1, 2 or 3. And what that means
is under each term under section B would have a
corresponding number at the paragraph level. So, if you
look at AmeriCorps service, it would be 685219B2. Whereas
previously, the term was only cited under 685219B. As you
can imagine, adding a bunch more definitions under
section B would be slightly problematic, even if it was

ED_01974

in alphabetical order. So, every definition is still in
alphabetical order; it's just a different way to identify
and keeping it in line with regulatory paragraph
structuring. So, throughout these negotiations, we're
also proposing to add additional terms under paragraph
subsection B. We believe the definition section as
proposed would be organized to- for easier following
along and easier to navigate when looking for these
specific definitions. While these changes are largely
technical, this does set up a framework for new
definitions, which we will be discussing later today. I
point your attention to the screen, and you'll see the
red colored font, red means new amendatory text. So red
doesn't mean stop here, it means new amendatory text. So,
the new definitions are terms we are adding are in red
colored font as well as the new restructuring numerals.
The 24 existing terms are in black colored font, with a
new red colored Arabic numeral before the term. The terms
that have both red colored and black colored font are
existing terms that we are proposing amending. This
paragraph restructuring would be minor, and we seek the
committee's feedback on these proposed technical changes.
So, at this time, I'd like to turn it over to our
facilitator to open discussion regarding the proposed
change paragraph restructuring under subsection B.

Annmarie?

      MS. WEISMAN: So far, I see no cards. Okay. Mary Lyn?

      MS. HAMMER: This is more of a technical question, but there's not consistency also in the use of whatever that sign is called, the little squiggly one that goes before the-

      MS. ABERNATHY: The section symbol?

      MS. HAMMER: Yeah. In some of the regulations, it's there, some of them it's not. I personally think it's easier to read with it. That's just a personal preference. Is this the new way of not using it?

      MS. ABERNATHY: No. Sometimes we can use the word section. So, if it's the start of a sentence we would say section. If we use the section symbol to denote if we're doing 34 CFR section symbol 685219. That's just saying. This is the section of the Public Service Loan Forgiveness in the regulations that we are focusing on. So, we try to be consistent. But I will tell you, we have two different policy teams. And so sometimes one policy team does something this way. And usually, what we try to do is have uniformity. So, what I can tell you is that we will look at that and try to be more consistent going forward. I don't think there's a hard

pass one way or the other that's right, in my opinion.
I'm not for sure, but we will confirm that in whatever
way we are supposed to do it will be the way that we do
that. But I do know that if it's the start of a sentence,
we do spell it out. So that is the one thing that I do
know we do. But other than that, you're probably right.
There are probably some inconsistencies. But overall,
whether it's the section symbol or we say section, it
means the same thing. So, thank you.

     MS. WEISMAN: Bob?

     MR. CAREY: We're looking at
definitions under all of section B, correct? You're
asking for questions under section B in its entirety.

     MS. ABERNATHY: What I'm looking for
is the paragraph restructuring, which is the numbering
under B. So, it's the one, two. Not quite- you're almost
there, Bob. I promise you we're going to get to these
definitions.

     MR. CAREY: Some of it's technical, so
I just want-

     MS. ABERNATHY: Yeah, this is a very
technical piece. It's only the numbering that goes in
front of the term. And I wanted to say the red because
it's new. We had to put it in there so that you could see
that it was a new definition that's being proposed with

the number one. It would look kind of odd just starting
with number two. So, what we try to do there is list all
of the definitions that would be in propose those
definitions for this section. So that's what you see by
the red. But number two, you'll see the two is red and
AmeriCorps service because that's already an existing
definition in the Public Service Loan Forgiveness
regulation. So, there's no reason to change that. The
purpose of this lovely, very sensitive microphone and I
are not getting along, the purpose of this particular
section is to just show you we're numbering one, two,
three, four, five, six, seven to like 37 or 39. Any other
questions?

            MS. WEISMAN: Bob, your card is still
up. Do you have a question?

            MR. CAREY: Just FYI. You have a blank
in 27- Arabic 27, roman numeral one. Did you intend to
not have a title for roman numeral one?

            MS. ABERNATHY: So, what I was showing
here was simply just the change of adding the Arabic
numeral. And so, one is not blank. But for the purposes
of what you're looking at is just the paragraph
restructuring, not any of the words with roman Ette
number one. So, I promise you, when we get to qualifying
employer, which is 27, it will have lots of things

underneath there. We'll have roman Ette one and other
things for your consideration. The reason I didn't
include all of that in there is because throughout the
rest of that 27, there are other additional changes to be
in aligned with the paragraph restructuring. It got
really confusing, and I thought, if we were going to test
you all on this stuff, I wanted you to be able to pass.
So, you're all passing with A's right now. Thank you very
much. Now, the time that Bob was waiting for is here, we
are going to discuss two particular definitions. One is
qualifying employer under .27 and substantial illegal
purpose under 30. Okay. So again, let's just do-

        MR. CAREY: Just really quick, a
technical thing under B1 18 U.S.C. number two, only
applies to crimes against the United States. I don't know
if you wanted it to be that specific.

        MS. ABERNATHY: If we could table that
until we get to the actual definition where we talk about
number one, that would be really helpful. We are on just
B, we're just B with the numbers. Don't look at any of
the terms. Just look at the numbers. How about that? Will
that help? Okay. Are we good so far? You're still getting
an A, everybody. All right. Let's do a quick primer so
that we do understand PSLF. And I know all of you have
experience with PSLF, but the reason I'm going through

2025 Negotiated Rulemaking - 6/30/25

these things is because it's very specific as to what
qualifies for PSLF. And that is eligible for Federal
direct loans, including direct consolidation loans, full-
time employment, a minimum of 30 hours a week during the
period or the months being certified. Qualifying
employer. United States based Federal, state, local, or
tribal governments 501(c)(3) and other not-for-profit
organizations that devote the majority of their full-time
employees to providing qualifying public service. An
example. Early childhood education. Public safety.
Emergency management. We lost our screen. And then a
qualifying repayment plan. That is payments made in full
each month under an Income Driven Repayment Plan or a
ten-year standard plan. These are the provisions that are
requirements for Public Service Loan Forgiveness
addressed in our current regulations. So, what has this
committee been charged to do? We have been charged to
work together to promulgate specific rules for the PSLF
program. We've heard from the Deputy Assistant Secretary,
Jeff, why we have been charged to promulgate these rules.
The Secretary, under the authority of the HEA, has
directed us to promulgate rules and comply with the
guidance in the executive order. Now we're going to
discuss how we do that, how we do what we have been
directed to do. In the discussion draft, we outlined how

the Department believes we could best structure the
regulations to stay aligned with the intent of the
Secretary's direction. We're discussing two fundamental
key terms. Definition for qualifying employer and
proposed new definition for substantial illegal purpose.
We specifically propose to revise the definition of
qualifying employer under section 685219B27, to ensure
that organizations that engage in activities that have a
substantial illegal purpose are not considered qualifying
employers. And we also propose to add a definition under
section 685219B30 that will identify specific activities
as having a substantial illegal purpose. And those
activities or terms are separated into five clauses and
must also be defined to the extent possible and as
previously mentioned, the Department is proposing to
adopt three existing definitions that are already
established in Federal or state law. While we propose
adding definitions, we will reserve our discussion on
those terms for later. Let's begin with the amendments to
the existing definition of qualifying employer and B27,
and I'll ask Michael to share his screen for B27, please.
Okay. You will see here, a qualifying employer means
Roman Ette one capital A, a United States based Federal,
state, local or tribal government organization, agency or
entity including the U.S. Armed Forces or the National

ED_01981

2025 Negotiated Rulemaking - 6/30/25

Guard. B, a public child or family service agency. C, an organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501A of the Internal Revenue Code. D, a tribal college or university, or E, a nonprofit organization that 1, provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary. And 2 is not a business organized for-profit, a labor union, or partisan public organization. And in roman Ette two is what we propose to add. Everything else that we just talked about has already been defined as a qualifying employer in our current regulations. So, we propose to add and Roman Ette 2 does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section. In order for us to establish what a qualifying employer doesn't include, we have to add this to our regulations. So, the EO directive is clear here. Employers who engage in activities defined to have a substantial illegal purpose, which as you know, we're going to get there. That's definition 30. We're getting there. Those do not qualify as an eligible employer for Public Service Loan Forgiveness. So, the revised definition ensures that organizations that engage in these activities that will be defined and considered a

substantial illegal purpose are not considered to be qualifying employers. That is a fundamental piece of PSLF. You have to have a qualifying employer. It seems simple enough; except we have to understand what substantial illegal purpose is. So, let's pause. Talk about this definition before we delve into defining substantial illegal activity, which is a little bit more complicated. And so. Reminder that the focus here is on a qualifying employer. We're looking at the characteristics of the employer right now. And that's what we're doing here. We know what we're supposed to do. We're supposed to promulgate rules. And the very first thing that we've decided to do is to say, what does not, any agency that engages in these activities is not going to be a qualifying employer. So, I would like to turn this over to Annmarie for discussion, please.

                MS. WEISMAN: Mary Lyn?

                MS. HAMMER: Sorry about that. On paragraph two, I think we need to add a reference in there. So, in the second, or it's not the second sentence, but the bottom line of that after defined in and before this section, to add the language Paragraph B 30 of this section.

                MS. ABERNATHY: Hold on one second, let me look at that.

MS. HAMMER: So, the last part of the sentence would read as defined in paragraph B 30 of this section.

MS. ABERNATHY: We're going to take that back because I want to make sure that we're not talking about the whole section of 685219, and we're just specifically here talking about this. So, thank you for that recommendation. We will circle back with you on that.

MS. WEISMAN: Thomas?

MR. AIELLO: Some of my taxpayer community would like to eliminate everything after A. So, eliminating B, C, D, and E, and only including that eligibility is for Federal, state, local, or tribal governments.

MS. ABERNATHY: We appreciate that. Laurel, can you hold on one second? Well. Go ahead. I'm sorry. Annmarie, you are in charge of that part.

MS. WEISMAN: Can you pass something to him? So, I thought we had agreed that we were going to go topic by topic.

MR. AIELLO: I did clarify that it was just some in my constituency that didn't represent everybody's view.

MS. WEISMAN: Okay. Jacob?

2025 Negotiated Rulemaking - 6/30/25

MR. LALLO: Yeah. In response to that, the authorizing statute for this program doesn't allow us to limit it to just government employers. It's very clear that it's to extend beyond that to nonprofits and a large, enumerated group as well. So, while we can put, limitations on some of the definitions, we cannot wholesale remove entire classifications from participation.

MR. AIELLO: Thank you. I was just making clear that, that was some feedback that I heard.

MS. ABERNATHY: I would like to hear what Laurel has to say, please.

MS. HAMMER: Thank you for the opportunity to speak, Tamy and Annmarie. So, I wanted to talk a little bit about, I think, the opening discussion as well, and the definition, because I did hear that the primary employer base and employee population benefiting from the PSLF eligibility today is governmental. As we move into the definition of qualifying employer. I think it's incredibly important contextually that we do give voice to the constituencies that represent taxpayer and public interest as it relates to definition. So, from a data perspective, I did want to present outside of government that there are approximately 1.5 million 501(c)(3) organizations that are not considered

governmental. That does employ one third of the employees
who are pursuing Public Service Loan Forgiveness. So,
these are not to repeat comments that have already been
made, but these are in public service for health care
education, and other professions. So, I think it's
important to give voice outside of it. Sounds like the
government and, and Thomas reinforcing government
qualifying as a qualifying employer. As an alternate,
what we've heard from constituencies over the past week
in health care and education is significant fear and
worry about losing that definitional ability to qualify
as an eligible employer. For, I think the comments that
Bob made previously, a period of time in which activity
may not be legally illegal but may be out of favor. And
so, I just wanted to present the voice that, again, about
12.8 million workers today pursuing the Public Service
Loan Forgiveness that currently qualify, are fearful that
that could be at risk. And thank you for the opportunity
to speak.

          MS. ABERNATHY: One of the things that
I want to- thank you, Laurel, for that. That was very
helpful information. We are not proposing to change the
definition in any other way of the Public Service Loan
Forgiveness program. All we are proposing to do is
saying, hey, if you are an agency that participates in a

substantial illegal activity. And what you're not seeing
yet is- you may have seen it in your read of the
discussion paper, but what you haven't seen is the
standard by which we've established that. And the way
that we said, you have to be doing an illegal activity,
you have to be found guilty agency of that illegal
activity, not that it's just randomly up in the air and
we're going to pull it down and grab it and apply it to
these situations. That is not what we are proposing to
do. What we are proposing to do is a very fixed, narrow
way to look and identify what a substantial illegal
activity is. And then we are going to apply a standard by
which we would assess, or the agency would assess whether
or not they meet that standard. Have they pled guilty?
Have they certified that they participate in illegal
activities? It's self-certification by the agency. Have
they reached a settlement? Yes, we participated in this.
We are not going to do this again. And we've also heard,
I think, one of the proposals talked about, ineligible
employer regain or non-qualifying eligible employer
regaining eligibility. So, there are some things that we
really want to get to. We are not looking at waiving
wholesale cloths, right, and making these things- this is
where the standard establishes what we will look at, what
factors have to be met. It's not just about doing an

activity. It's about the conviction of the final judgment, that nolo contendere, reaching a settlement. And we'll get to that point. So, it's important distinction. It's not just about, just defining these terms and not- and thinking that an agency is going to lose their qualifying employer status. That's not exactly what is being proposed here. Does that help clarify? Okay. Jacob?

MR. LALLO: Yeah. And just to further tag onto that, because I feel like there's been some confusion on this. We define the term substantial illegal activity. We didn't leave it in its broad, undefined context. There are fixed definitions under there, as Tamy pointed out. And, regardless of, whether something is quote unquote illegal or not illegal, the fact that that term is defined there, we're not leaving the term illegal up in the air. Anything that is underneath that is the substantial illegal activity for the purposes of this statute or this regulation, rather. We're not leaving anything to the plain meaning here.

MS. WEISMAN: Other questions or comments. I see no other cards. Tamy, do you want to continue? I take that back, I now see, Betsy. Abby.

MS. ABERNATHY: Betsy. If you'd stay seated. Abby. We're going to have a microphone come to

you so we don't have- so that we can minimize the back
and forth with the table. Well, you can stand up if you
want to. Okay. All right. Well, if you want to go take a
walk around. I'm just kidding. Mine is saying that too,
but I'm ignoring it.

MS. SHAFROTH: Thank you. I appreciate
it. So, I had a clarifying question, and then a possible
follow-up. The clarifying question is, I just want to
confirm my read of this proposal, that they would, that
you would apply the new section two, which excludes
organizations that engage in certain activities from the
definition of a qualifying employer. But because of the
and there that that applies to all of the types of
employers identified in section, including local
government, Federal government, and 501(c)(3).

MS. ABERNATHY: Yes, that is correct.

MS. SHAFROTH: Okay. So then, thank
you for that clarification. I want to point out that that
seems to directly conflict with the Higher Education Act
language that specifically defines public service as
including government work at state, local, Federal, and
tribal levels with the sole exemption. The sole exemption
is exempting time served as a member of Congress and
defines public service as a service at a 501(c)(3)
organization. Congress didn't provide for any carve outs

2025 Negotiated Rulemaking - 6/30/25

there. It specifically defined that. And I think for this
committee to attempt to break from congressional
definition and to carve out new ways to redefine public
service that could exclude military, local governments,
public schools, any number of, of bodies of government
from public service is pretty, pretty clearly illegal and
exceeds statutory authority.

              MS. WEISMAN: Jacob?

              MR. LALLO: Yeah. I think in response
to that, as I mentioned previously, our goal here is to
be as flatly neutral as possible. We apply it to
everybody included in the program the same way. I
understand your point about state and local government. I
think it's also unlikely that they are likely to be found
to have violated some of the things that are included in
there. It's pretty rare that you have a state and local
government that's violating State Tort Law and their own
law in the process. I understand the overarching concern,
but I think the basis that we've established here that
basically something cannot be in the public service, but
also in violation of law stands willing to take a look
more closely at the actual definitions within it. But I
think the basic premise is we want this to apply as
neutrally as possible to all programs within this.

              MS. WEISMAN: Aaron, can we get the

microphone? I see Abby with a card out.

               MS. SHAFROTH: Yeah. Thank you for that. It sounds like the position is that if a government or a nonprofit engages in any of these activities defined below that, that are sometimes illegal, that would therefore mean definitionally, that they're no longer providing public service. But I can't see how that could be the case. You could imagine our army fights to protect and defend our country. And sometimes it might be found to discriminate. That has happened before. That's the thing that can happen that I don't think any of us would say that that means the Army is no longer providing an incredibly valuable public service. A rural public school might provide a critical public service to its community and the students there in educating them. And it might violate the Americans with Disabilities Act by not having the proper ramps. There are plenty of ways consistent with this proposal that governments, nonprofits, and other organizations that provide incredibly important public services, might sometimes make mistakes. They might sometimes engage in activities that are out of step with current political favor. They might sometimes break the law, but that in and of itself doesn't negate the fact that they're providing a public service, and that Congress has defined them as providing a public service.

2025 Negotiated Rulemaking - 6/30/25

So, I don't think it would be consistent with our authority or humility here to second guess versus definition that way.

              MS. WEISMAN: Jacob?

              MR. LALLO: Yeah. Just in response to that. We've set up, and we'll get into this later, but there are standards for evidentiary hearings. There is an opportunity to respond to this. But everybody involved has the ability to respond. There's a preponderance of evidence standard. We're not just basically going to go out and remove people's eligibility without a chance to actually respond to this, engage with us, and work on this. The intent with this is to remove bad actors from the program and not effectively provide a subsidy and benefit to organizations that are not complying with the broad concept of public service. I think your point is well taken. Governments make mistakes, laws are broken. That's the purpose of the evidentiary hearing. That's the purpose of working with the Secretary.

              MS. WEISMAN: You have 30 seconds, Jacob.

              MR. LALLO: Okay. But while we understand the point, we cannot make a broad exception for one and expect everybody to be treated fairly under the same rule set.

MS. WEISMAN: Jeff and then Tamy.

MR. ANDRADE: I will just point out in the example that you provided with regard to discrimination. On that particular definition, it refers to not just an incident but engaging in a pattern of aiding and abetting illegal discrimination, which is much different than the example that you provided.

MS. ABERNATHY: And I also want to make sure that we're not speculating on any kind of violations by any government agency. Right? We're not speculating on that. We can't simply do that. One of the other things I want to mention is substantial legal purpose has five clauses in it. These clauses are very contained, very specific, and is of these particular clauses that would substantiate the illegal activity should the agency be found under our standards to have violated the substantial, the non-substantial stuff. Right? So, let's get into the meat of this so that we can clarify further. Are we ready to go to the next?

MS. WEISMAN: I see no cards.

MS. ABERNATHY: Okay, so substantial illegal purpose definition is proposed under paragraph B 30. And I would like for Michael to put this up on the screen for us, please. These two definitions are entwined. So, we're going to be in a better position to

have a robust discussion after we have looked at the
existing definitions for the five terms. You will see the
US code as cited in the term. You were given a list of
links to those codes so that you could click on those and
see exactly what that coded definition was in its
entirety. So aiding or abetting violations of 8 U.S.C.
code 1325 or other Federal Immigration Laws. Roman Ette
two, supporting terrorism, including by facilitating
funding to, or the operations of cartels designed as
foreign terrorist organizations consistent with 8 U.S.C.
code 1189, or by engaging in violence for the purpose of
obstructing or influencing Federal government policy.
Roman Ette three. Engaging in the chemical and surgical
castration or mutilation of children, or the trafficking
of children to states for the purposes of emancipation
from their lawful parents in violation of applicable law.
Roman Ette four. Engaging in a pattern of aiding and
abetting illegal discrimination or roman Ette five,
engaging in a pattern of violating State Tort Laws,
including laws against trespassing, disorderly conduct,
public nuisance, vandalism, and obstruction of highways.
More than likely, either this afternoon or early
tomorrow, we will go over the specific clauses in the
definitions of these five clauses that comprise
substantial illegal purpose. Our goal for today was to

discuss the issue paper, make sure we had a clear understanding of a qualifying employer, clear understanding of substantial illegal purpose. So, when we come back this afternoon after lunch, we'll have other things that we will pivot too as well. But for right now, let's discuss. We'll turn this over to Annmarie to gather your feedback. And if you have other definitions that may be better suited to meet our needs, we encourage you to send them to us for us to consider or bring them up at the table. So, at this time, I'll turn this over to Annmarie for discussion.

MS. WEISMAN: So first we have Thomas, and then Alyssa, and then Emeka.

MR. AIELLO: Just a point on numbers one and two. I believe both of those things, if you're found guilty of, would put you out of compliance with the Internal Revenue Code and would therefore you would lose your tax-exempt status, which would obviously, therefore make you not eligible for as a qualifying employer. So, I really have no issues with one and two.

MS. WEISMAN: Alyssa?

MS. DOBSON: It just seems a little bit confusing to me, and how I would try to explain this to somebody who's entering repayment. Who is determining this? Would it be possible to put something in here as

found guilty by a court of law, or something, who is
making this determination?

        MS. ABERNATHY: Our standard that we
will discuss later will make that perfectly clear. I
promise. If not, you can tell us what isn't perfectly
clear. Deal? I do want to speak to Thomas or just Tommy,
as you, you stated we could call you Tommy, correct? But
I lost my train of thought about what you said. Oh, we
are not touching a tax status. So, if the IRS determines
something, that is the IRS. So, for the purposes of this
qualifying employer, we have provided you with proposed
qualifying employer amendatory text and substantial
illegal purpose. But we are not touching a tax status.
So, like any other 501(c)(3), should we get notified from
the IRS they are no longer considered a 501(c)(3),
therefore not an eligible qualifying employer under
501(c)(3). Maybe they, they morphed into something else,
and they still qualify. But that is something that we are
not determining. So just so you know, we're not looking
to go out and collect this information. If it comes to
us, that's one thing. But right now, we are not touching-
we don't have the power or the authority to touch the tax
status. So, we're not touching that.

        MS. WEISMAN: I believe Tommy had a
follow-up, and then we'll go to Emeka.

MR. AIELLO: Yeah. Just a point of clarification. Yeah, that was what I was trying to say is I think the IRS would already take into account one and two. So, therefore, they would change the tax-exempt status, and they would let you know. So, I mean, is point one and two sort of moot if the IRS is already doing that?

MS. ABERNATHY: We still need to define it in our regulations. But you are exactly correct. And that's one of the reasons why we chose to codify our regulations based on other proposed- other codified definitions already, because it takes into account the very things that you're talking about. So, if that activity is considered substantial illegal purpose and it's already considered that by the IRS, and you're exactly right, you've already drawn the lines exactly where we were hoping that they would land. So, thank you, Tommy.

MS. WEISMAN: Emeka?

MR. OGUH: Thank you. So, at PeopleJoy, some of our constituents that we work with are these PSLF eligible agencies that represent a portion of the 12.8 million borrowers that we discussed were eligible for Public Service Loan Forgiveness, many of these do not have the financial resources to fight any of

these accusations in court, because I think we all said
court is where we're going to settle these. For example,
we have to explain to our constituents, whether they run
(inaudible) of Federal Immigration Law. So, if I'm a
teacher and there's an undocumented student in my class,
do I violate section one? If I'm doing a peaceful protest
and someone throws, I don't know, there's violence, no
fault of my own. Am I obstructing or influencing Federal
government policy? I think more importantly, one of the
things that we've seen is that substantial legal purpose
is applied consistently, inconsistently. So, some
sections require a pattern of illegal activity while
others do not. And so, my proposal is for consistency and
fairness. All sections should use the phrase a pattern of
and then that term should be clearly defined in the
definitions. And I offered a suggestion of how to define
a pattern of. So specifically for section 30, I guess 31,
including a pattern of aiding or abetting violations, is
my recommendation. And then again, for 32 section
(inaudible), a pattern of supporting terrorism. Thank
you.

        MS. ABERNATHY: Thank you for that.

        MS. WEISMAN: Tamy?

        MS. ABERNATHY: Thank you for that.

        MS. WEISMAN: Oh. You're welcome.

MS. ABERNATHY: You're welcome too.

MS. WEISMAN: Bob?

MR. CAREY: Okay. Sorry, I'm not following along. If we're going to discuss section 30 in detail this afternoon. What is the question right now?

MS. ABERNATHY: I don't have a question. We are simply discussing 27 and 30. So it's not that we're discussing-

MR. CAREY: We're going to go through 30 in detail later on.

MS. ABERNATHY: We're going through 30 now. And what will happen because 30 is separated into five clauses that substantiate an illegal activity or a legal purpose. Those clauses will also need to be those terms. And those clauses will also be defined, some of them later. But for the purposes of what constitutes a substantial illegal activity, it is one of these five clauses. Holistically.

MS. WEISMAN: Jacob?

MR. LALLO: Yeah. I want to just briefly respond to-

MS. ABERNATHY: I'm sorry. Bob, Jeff thinks that you are confusing this with the standard, which is in H. So, we want to talk about that. Because we're having so many concerns about the standard, we're

probably going to change. Instead of going through the rest of the definitions this afternoon, we're going to switch and go to H and talk about our standard this afternoon after lunch, because we need to set the foundation of understanding and it will make more sense if we can establish what the standard is, so that these terms are not just dangling out there and you don't know what to do with the terms, that might help a little bit. We're going to try.

MR. CAREY: I'm relatively new to the process, so I'll shut up now.

MS. ABERNATHY: I can't say thank you to that. Sorry.

MS. WEISMAN: Jacob, did you have anything to add?

MR. LALLO: I actually wanted to respond to Emeka and Thomas's comments briefly. So, the reason we want to include these, while they are duplicative of things that are included in the (inaudible), we are making this determination separately. Public service is set out in PSLF so it still falls to us to make this determination. Our regs in several places overlap with the IRS. They are making determinations on things that we also make determinations on. The reason for this is in some ways, it provides a belt and

suspenders approach. We have similar concerns over
certain areas, and we are very aware of the challenges
administrative agencies face in terms of actually having
the time and energy to address things. And we often
depend very heavily on things that are being reported by
the institutions and organizations themselves. And so,
one may not necessarily catch something. And so, we rely
on each other (inaudible) that, but we also like to be
able to check it. In response to Emeka's comment about
applying the concept of a pattern across the board, I
think the reason we took this approach with some of these
is that we view some of these activities as much more
aggressive than others and much more problematic. It's
not that they're all problematic by their inclusion, but
there's a difference between an organization engaging in
an instance of trespass and an institution engaging in
aiding and abetting terrorism. They're qualitatively like
separate. And I think they merit being included under
slightly separate standards.

   MS. WEISMAN: Betsy and then Emeka.

   MS. MAYOTTE: My comment is related to
the discussion that Bob and Tamy were having. I think
it's difficult for us to really evaluate and comment, and
on 30, until we go into the definitions. I don't think we
can do those as separate pieces. I think they have to be

done as a package.

MS. WEISMAN: Emeka then Jeff.

MR. OGUH: Yeah. And Jacob, I appreciate your comments, and I understand your standpoint of different priorities. You also said earlier about shifting stance. And part of what we want to do is provide a layer of consistency because another administration could come in and say something else no longer requires a frequency and sort of changes. So, I think one of the opportunities we have here as a negotiation committee is to provide that consistency where it's two or more. Right? And just apply that across the board. I think that'll give a level of clarity for everybody involved going forward. Thank you.

MS. WEISMAN: Jeff.

MR. ANDRADE: Yeah, I think in some conversations that I've had with folks, I've found that if we talk about the standard before we get into the specific definitions, it might be easier for everyone to understand the impact of that definition when you understand the standard by which it's going to be determined. So, our proposal here is to talk about substantial legal purpose first, then to talk about the standard, and then to get into the definitions. And hopefully that will make things go smoother.

MS. WEISMAN: Tommy.

MR. AIELLO: Can I ask a question? If, as is the definitions where we accept, do you know about how many borrowers or qualifying employers this would actually impact?

MS. ABERNATHY: We do not, because we do not have any final determinations of these illegal activities based on our standard. So, there would be no way that we could assess whether or not an employer has, or unless they certify themselves on the employer verification form, that they are participating in a substantial legal purpose as defined. So no, we do not have the number at this point because these rules are not even- it's not even effective yet, and it won't be effective until July 1st of 2026. We have no way of knowing what employers would violate or commit what would be considered a substantial illegal purpose and meet our standard. So, it's not just about doing something, it's about the standard that we will discuss that establishes the violation of that solidifies that substantial illegal purposes that would remove that employer from being a qualifying employer. So, it's a both and it's not an either or. Here's the term. But if you don't meet the standard that we've set before you, then we would not know whether or not the agency did or did not violate

that.

MS. WEISMAN: Mary Lyn?

MS. HAMMER: I don't know if anybody
else looked at the data behind this. I'm a data freak so,
I dove into it. So about 60 to 70% of the approved PSLF
forgiveness is government, and the rest of it is the
private sector. Just to put it in perspective. That
doesn't make sense to me based on what I know of number
of workers and all of those different categories, it
seems like it should be higher in the private sector. And
then the ineligible or non-qualifying employers, a lot of
times, is that they never complete the application
properly. They're part of it. And about 40% of those that
are not approved yet are waiting on the employer to
certify that they are a qualified employer. So there's a
hiccup that's not necessarily anything that we're going
to address in regulatory language. It's more of a process
issue. And looking at the data, there are issues, but
they're not anything we can address here.

MR. AIELLO: I wasn't looking to
address it. I was just curious if the Department had an
estimate for is it, ten employers? Is it 10,000? Is it a
million, which I don't think we would anticipate it to be
anywhere close to a million.

MS. ABERNATHY: Well, if it helps, we

only have about 2000 employers that are right? 2000? Is
Eric Hardy here?

                MS. WEISMAN: Yes. Can we get a
microphone for Eric? Eric is a member of the Department
staff.

                MS. ABERNATHY: And Eric is our data
guy.

                MR. HARDY: I need to confirm the
exact number of players. I'll have it in about ten
minutes.

                MS. ABERNATHY: Yeah. So, we'll come
back to that. But no, Tommy, at this point, it's too
early for us to even render an educated guess. We
wouldn't want to do that because I would hope we would be
wrong.

                MS. WEISMAN: Emeka?

                MR. OGUH: I mean, just
hypothetically, you have about 5000 nonprofit hospitals,
about 3000 academic universities. So just 8000 entities
just right there. And this is like we're talking like
2000 employees. And when you start going into smaller
nonprofits, ten or more employees, I think somebody
mentioned something in the millions. The reason to your
point, Mary Lyn, I'm a data junkie, too, I would wonder
if the reason why it's so low on the private sector side

is that complexity that you talked about. And a lot of
that is what we help with. Because like you said, not
only is it a qualifying employer, which is what we're
here to discuss today, is making a qualifying payment.
And the definition of a qualifying payment has changed
administration to administration, even year to year in
some respects. And so, I agree that's a separate
conversation. And there's a lot of talk around that. But
I don't want to seem that because it's low, it means that
there's not a need there. I think it's low because of
these inefficiencies that we talked about. And so, I
think that number is going to be a lot bigger going
forward on the nonprofit non-government side, which again
goes back to that, a pattern of which is why I think
there's some importance to having that consistency across
all the five definitions we discussed.

      MS. WEISMAN: Jacob and then Mary Lyn.

      MR. LALLO: Yeah. This is just a broad
comment about the numbers, generally.  The Department
plans to address aspects and get the overall impact in
the (inaudible), and then we'll work to get more numbers
as soon as possible. But as Tamy said, as we don't have
the finalized rule yet, we can't necessarily address the
numbers just yet.

      MS. WEISMAN: Mary Lyn?

MS. HAMMER: This is just a little bit
more data behind it. But from all of the applications
that were submitted, which was around the 4 to 5 million
range, from 2020 to 2023, 53% were processed. And in
2024, it was like six months of processing, and it was
51%. So, so it's a relatively low number. I mean, that's
not acceptable. I don't think by anybody's standards. So
again, it's more procedural than definition at this
point. So, I'm sure they'll be putting together
committees or asking for input on the application itself,
which is not a regulatory issue.

MS. WEISMAN: Laurel?

MS. HAMMER: Thank you. As we're
moving through the definition of qualifying PSLF employer
and the question of the number of employers, which is
about 1.5 million and a third of what you shared. I do
want to, and this may not be the right time, but from a
procedural perspective, the downstream implication. There
was a document socialized last night, if the
administrator who is responsible for signing the employer
certification form, if that administrator is, or let me
pose this as a question. Is there any exposure that an
individual working for a critical service provider, a
health care system, an education system, are they
exposing themselves to any legal action if they attest

that there's no substantial legal activity, they are not aware of illegal activity? So again, from a procedural perspective. Even fear around potential exposure could have a massive impact on the volume and throughput, and success of the program. Is there any legal exposure to the administrator signing the PSLF form?

    MS. ABERNATHY: No. We do, I believe, and I'm getting clarification whether or not on the form, we indicate what we constitute the certifying official, if there's a definition of the certifying official. And what we would expect is whomever the agency deems as a certifying official. Again, remember, this agency has to meet the standard. It has to be found failing the standard to be able to be a non-qualifying employer. So, it's the agency, not a specific individual.

    MS. HAMMER: Thank you for that clarification.

    MS. ABERNATHY: But we are going to get clarification later today on the PSLF form, if we define who can sign it.

    MS. WEISMAN: So, we have Betsy and then Scott, and then Emeka.

    MS. MAYOTTE: I got an email from my constituency, specifically the hearing impaired, that when we're having discussion, and I hope I'm

understanding the issue correctly, that we take that
stuff down so they can see the negotiators talking. So, I
don't know what the people online can see, but I'm
getting a sense that all they can see is that screen.
They can't see those screens, and it's causing an issue
for the hearing-impaired.

            MS. WEISMAN: We'll take care of that.
Thank you for letting us know. Scott?

            MR. BUCHANAN: Yeah, I would just
point out on that topic we've had for many years in
servicing of total and permanent disability applications,
the requirement physicians fill out that information and
certify. So that might be one cognitive area to look at.
And as I'm aware of no situations under which the doctors
were pursued regarding their certification. So, I think
if you're looking for sort of an analogous process, then
that is one to look at.

            MS. WEISMAN: Emeka?

            MR. OGUH: So, I had raised that
concern in my comments that I sent out yesterday. So, as
we all know, a borrower needs a signature from an
authorized official, that's usually an HR administrator.
These staff members typically just confirm employment
date and employer identification number. They're not
legal experts and may be unwilling to certify that their

employer has not engaged in illegal activity. Some may refer the form to a legal counsel, which is going to cause long delays, and millions of borrowers can be affected across the board. So, one of the things we did look through that PSLF employment verification form, specifically section 5 B, and we added some commentary around if your employer is unwilling to sign section 5 A due to concerns about the legal attestation now required giving employees and other alternatives essentially to get that verification to their employers and willing to sign again. Going back to the context that we work with dozens of employers, and these HR admins are not going to attest. They're not going to be comfortable signing that. And so, it's just going to lead to long delays. So, just a point that I wanted to address.

MS. WEISMAN: Tamy and then Jeff and then Rebecca.

MS. ABERNATHY: We do have a process in place right now for employers that do not sign the form. So, we will take that back and look at that as well. But currently we do have the ability to look at that.

MR. OGUH: Because it says if you're unable to have this form completed by an authorized official because the organization has closed, or you are

2025 Negotiated Rulemaking - 6/30/25

unable to contact your employer to obtain an acceptable
signature. Would this fall under? Or you are unable to
contact your employer to obtain an acceptable signature?

        MS. ABERNATHY: We're going to take
that back to define and confirm that before we answer
that. If that's okay. We want to talk about it a little
bit, but we will look at this.

        MR. OGUH: Thank you.

        MS. WEISMAN: Jeff?

        MR. ANDRADE: I just wanted to
announce that the issue for the hearing impaired has been
addressed. The interpreter now appears on the stream to
the left of the screen, and the rest of the video is just
reduced to include the interpreter.

        MS. WEISMAN: Rebecca has withdrawn
hers, so we'll go to Jacob next. And then Tamy. We'll go
to Jacob next, and then we'll look for other cards.

        MR. LALLO: Yeah. I wanted to address
the question about who signs the PSLF form on behalf of
the employer. The current language just says an
authorized official of the organization. That's anybody
who, therefore, has the authorization delegated to them.
It does include a currently a perjury statement. Anyone
who signs it and is making a representation improperly
could be subject to a violation of Federal law for

perjury. That being said, in terms of having an authorized official signing it and delegating it, I understand the concerns about it, but I think there are quite a few of forms that fall under that basis. Accountants file tax forms all the time. People, contracting officers sign forms with attestations. It's very much the same thing.

MS. WEISMAN: Laurel. We can bring you a microphone if that's easier.

MS. HAMMER: That would be fantastic.

MS. WEISMAN: Aaron, can you bring me over the mic? Thank you.

MS. HAMMER: So. As we're moving through the definition of employer, we're also recognizing the process issue and the throughput issue. I do want to highlight, I think that the exposure of potentially being under perjury is- will have a massive impact on the success of the program. We're also Mary Lyn, you as a fellow data, well, I'll call myself a data nerd, we socialized last night. Thank you, Annmarie, the economic impact of the PSLF program. As it relates to the definition of a qualifying employer, we do see a 20 to 1 cost efficiency ratio for employers who are considered qualifying employers. So, I think that there was a question around kind of how many employers are we talking

2025 Negotiated Rulemaking - 6/30/25

about, and what would the economic impact be of narrowing that definition? So, the current program costs, we understand about 10 to 15 billion annually, 90% of the costs, 110 billion of the program, we understand has been realized in the last four years. So, it was a very atypical four-year period because of the PSLF waiver and other anomalies during that period. When we look at the value of delivering recruitment and retention to the 1.5 million employers we've spoken to, that is equivalent to $302 billion in salary increases from the private sector and the private sector, of course, non-profits not for-profits. These are individuals that are working below market. So, there isn't the $302 billion for these private sector employers to provide. So, as we are discussing the narrowing of the definition, what the purpose of what I'm trying to highlight is that restricting qualifying employers could impact the efficiency of the program and could impact that 20 to 1 ratio, which would then more than likely increase the rate of delinquency and default, which currently at 31% delinquency and default, including prime and super prime. So, as we're having the discussion about qualifying employer, I just think it's really important that that larger economic picture is part of the consideration. Thank you.

2025 Negotiated Rulemaking - 6/30/25

MS. WEISMAN: We're going to go to
Jacob and then Tamy.

MR. LALLO: Yeah. I want to respond
briefly and narrowly to the perjury aspect that you
brought up. So, the statute referenced in the PSLF form
is 20 US code 1097. It requires knowing and willful
violation. So, an organization that is unaware that it
has done something here is not knowingly and willfully
violating, especially the HR person who's signing the
form is not. It, it requires an intentional, hiding the
ball, if you will. So, we're not overly concerned about
the impact of that aspect.

MS. WEISMAN: Tamy and then Todd.

MS. ABERNATHY: For any of you around
the table, and I believe Rebecca, you specifically
certify forms. What are your thoughts about this
particular aspect of providing the authorizing official
signature for these PSLF applicants?

MS. STANLEY: I did have one concern
come up when you were talking about it, because some of
the things that changed during the waiver, there were
contract times allowed. They might not have been an
employee that was actually employed with the government,
meaning they weren't a county or state employee, but they
were contracted, and that time was allowed during the

waiver process to be accepted as qualifying PSLF service if they were full-time. And I was thinking, if you shift that and change it to an HR doing it that contract time may not show up versus allowing a department supervisor or the person that's over HR or the accounting in there to sign up that knows that they have that qualifying time. So that is something that sort of concerns me a little bit if that changes. I think, like you said, that there was already a statute in there that's listed that, you know, that you're signing it anyway. I mean, this hasn't changed it for me. I knew that I had to be very accurate in the time that was being reported. And I better have good backup because if they're questioned about it, then they need to have the backup that showed that they had that time. So, it didn't change it. And I haven't seen it for, and I counsel hundreds of government and nonprofit employees. I'm not really seeing them being afraid of signing on the time, just they want to be accurate with what they're given.

          MS. ABERNATHY: Absolutely. Thank you so much for that. Anyone else want to share their experience?

          MS. WEISMAN: I have cards up already from Betsy, Mary Lyn, and Alyssa.

          MS. MAYOTTE: I have significant

concerns about this new (inaudible) check box. I mean, I think whether it's someone in HR or a supervisor or some other authorizing official, I think anyone from the general public can look at, at timesheets or time records and say, yeah, I'm willing to say under penalty of perjury that this person worked from X to Y for this many hours, but I think there will be a lot of concern about checking a box that essentially you're almost requiring these people to have a professional degree, and maybe the associated six figures in student loan debt to help them define for themselves whether they're engaging in substantial gainful activity. And I get the, I didn't know about it, so I'll be okay. But it's not even whether they knew about it or not. It's whether they're- we're having a hard time figuring out the definition. And we want these people that in the past just have to say whether you worked 30 hours or not to make this determination.

          MS. WEISMAN: Jacob, I saw your card up. Is it about a new issue or in response to that? Okay, then go ahead.

          MR. LALLO: No, I understand your concern there. I think it's not like a just blanket, "I don't know. So, I can't get in trouble", standard. That's not how perjury works. But again, perjury attestations

are very common on these forms. We are not going to hold
an HR person who certifies the form accountable for this,
unless we know that they've been specifically directed to
do this, or they personally had knowledge that something
else was going on. This is not a standard that requires
them to actually go dig through and basically determine
what their organization is doing. It only goes to their
basic knowledge of it. Or if they have been specifically
directed by their employer, at which point it would be
the employer is liable for perjury themselves by
directing the HR person to do it. And then they would be
with, as you know, aiding and abetting within that. But
yeah. A basic concept, an HR person checking this box is
not going to get hung up on perjury if they didn't dig
through all their organization's records to determine
what's happening. It's defined in statute as knowingly
and willingly, willfully. We can consider adding some
clarification. We can take that back. But that doesn't
really fall within the purview of whether or not the
perjury issue applies.

      MS. ABERNATHY: Betsy, we would
address this in the NPRM very clearly. We would also in
sub regulatory guidance, we would be able to do such on
the website, and things like that. So, there would be
clear-cut information that would provide more details for

this respective section. It's a sub regulatory guidance
thing. It doesn't have to be in the regulations, but we
would want to address it, and we would address that in
the NPRM and elsewhere on the form and the corresponding
instructions, and information on the form and website as
well.

          MS. WEISMAN: Thank you for your
patience, Mary Lyn. You're up.

          MS. HAMMER: I just want to point out
that the perjury statement is consistent through all of
the documents used by the Department. The loan
application, all the Departments, and forbearance, this
is nothing new. And just using unemployment deferment as
an example, there's mistakes made on that form all the
time. And about 30% of the defaults on student loans are
technical defaults that never should have happened. So,
mistakes are going to happen. There's no way that we can
regulate that everything is going to be done exactly
right. And I think that making an assumption that all
these employees are going to go away, because we're
asking them to make as accurate statements as they
possibly can on these forms, is not an overstretch. And
there's a lot of employees. You can tell by the numbers
that there's a lot of employers that are simply not
participating in this program. And I think that's a

tragedy. And I think that's a totally different issue
that, again, is not regulatory. I think this is something
that could be promoted at the nonprofits where if they
understand it better they could offer it as an employment
benefit. And it's not being done like that right now. So
just by the numbers, there's other things going on. But I
don't think we're going to see a mass exodus of
employers. It doesn't make sense.

                MS. WEISMAN: Alyssa.

                MS. DOBSON: So my students already
routinely experience resistance to filling out the form
without this extra onus of now another layer of
certification. So, it is concerning to the borrowers who
are trying to get the form filled out.

                MS. WEISMAN: Rebecca.

                MS. STANLEY: Well, I may be on the
opposite spectrum. Because I'm finding that the form is
actually improved somewhat. I do agree with you that
there is so many organizations that are not participating
that should be. Not just nonprofit. It's government as
well. When I was reaching out to different
constituencies, and I mentioned it to Thomas, they were,
what was at the state higher education and approving
agencies. Do you know how many of them didn't know how to
participate in PSLF? I have two Webex's scheduled to

counsel their employees, one's a deputy director, did not
know that they qualified for PSLF or Parent Plus Loans.
30-year employee. So, it's not just that level. I do
think there needs to be a lot of education regarding it
and the benefit for state and nonprofit. I do believe
what Tamy had mentioned would be important to me with
signing PSLF form is to make sure that it does somehow
state on the form, like Betsy stated, that you're, to the
best of your ability, are stating that this organization
is not participating in something like that. You're not
certifying that it's not, or you're not signing that it's
not. Because that would concern me. But stating that to
the best of my knowledge or, you know, that would make me
more comfortable in signing a form.

       MS. ABERNATHY: I'm going to ask my
team to make sure that they have that down as an official
recommendation, please. I've got it down, but my notes
are a little harried right now. Thank you for that. And I
do appreciate you saying that the form has improved. We
really have been trying desperately to improve all
aspects of our forward-facing materials for our borrowers
and those agencies. I do have the numbers. If Betsy,
would it be okay if I read the numbers on the employers?
Okay. I love the thumbs up. She's very animated. I like
that. We have 1,945,568 eligible PSLF employers. I knew

it was 2 something, but clearly 2000 was wrong.

MS. WEISMAN: Okay. Betsy, back to
you.

MS. MAYOTTE: This is in response to
Jacob and Marilyn. I just want to make sure I'm clear.
I'm not asking to get rid of the perjury statement.
That's like a long tradition. That's like not having a
tree on Christmas, if that's what you celebrate. We don't
have a perjury statement. I'm asking to get rid of the
box. We don't need the box to be checked, saying we don't
do the bad things. If you have this other definition
where you're defining how you're deciding whether someone
has done the bad things. So again, perjury statement.
Keep it. Box-

MS. WEISMAN: Tamy.

MS. ABERNATHY: We appreciate that
suggestion. We certainly will take that back. However, we
are looking at an agency self-certifying that they are
not participating in substantial illegal activities. So,
we can take it back. We will take your concern and
address that. But at this point our proposal is to have
the agency have some skin in the game. But let us take
that back and let us look at it, and let us talk about
your concern, and we can go from there. So, thank you. We
appreciate that.

                MS. WEISMAN: We have about ten
minutes before lunch. So that would be time for three
more comments if we have them. Laurel?

                MS. HAMMER: Tamy, thank you for your
receptiveness around the agency and the self-
certification process. Just to pull on that thread a bit
further, I'm curious if there would be an opportunity to
have an interval in which the agency provided that self-
certification or attestation, rather than on every form
that is submitted, out of concern for a chilling effect.
As an individual who may be fearful of the ongoing
attestation required. If there are developments, for
example, that have occurred so more of an employer
specific process that may be batched rather than on every
individual form. If the goal is maximum uptake of the
benefit, but again, ensuring that the agency is not
conducting illegal substantial activity.

                MS. ABERNATHY: Based on how we exist-
how we currently do things, I'm not sure how that would
work. So let us take it back and let us talk through with
Eric and others in our operational division. No promises,
but we can at least engage in conversation and see what,
if anything, we can do around that. I don't know that
we'll have the ability to do that today or tomorrow, but
they are in the room, so they have heard it and they are

very good at telling me yes or no, we can do something.
So, I feel certain that if it's a possibility, we can
talk about it. If it's not, then we can let you know
that, too as well. Thank you for that suggestion.

MS. WEISMAN: Next up, we have Abby.
Aaron, could you bring over a mic?

MS. SHAFROTH: Thank you so much. As I
think it sounds like we're wrapping up the discussion of
this (inaudible), and then we'll go line by line into the
different ones. Am I correct on that plan procedure?

MS. ABERNATHY: One point of
clarification. I was planning on going to the standard
and talking about C, H, and I after lunch. Unless you all
would rather stay with the definitions, speak now or in
the next couple of minutes before we break for lunch, and
we'll, we'll go from there. Okay?

MR. CAREY: Going back to my original
question then, we're not, we're not taking a consensus
poll on the standards right now, correct? In section 30.

MS. WEISMAN: No.

MS. ABERNATHY: Section 30 is the
substantial illegal purpose. The standard is an H. So, we
haven't even discussed H yet. No, sir. We're not taking-
today is discussion. Yes, sir. Exactly right.

MS. WEISMAN: Abby, do you want to

continue?

MS. SHAFROTH: So, it sounds like we'll go through different sections then, because I think we'll want to discuss.

MS. ABERNATHY: Absolutely. Each one of those clauses we will discuss as part of the definitions. Some variations thereof. But yes, we're going to switch gears and talk about our standard, and then we'll come back. More than likely, I have a feeling we're going to be talking about the standard and all the different provisions for a little while this afternoon. So, let's say maybe tomorrow morning, mid-morning, we'll get back to the definitions again. But it's very important for us to change how we're presenting this information to you so that there is a clear path of what we're doing, and we want to make it as painless- it's not easy to sit here and talk about definitions and how they impact, and oh, there's a standard really, where is it? we want to talk about it. So, we're hoping that by putting that in there, we can pull all the pieces together and then go backward and look at the definitions that would therefore give you a foundational knowledge of this is what we mean by, and this is why this is okay, or this is why this may or may not work.

MS. SHAFROTH: Thank you. So, then I

just wanted to sort of wrap up on this bigger picture.
First, I wanted to respond to Jacob's earlier suggestion.
When I raised concerns about the legality of carving out
501(c)(3)'s and government actors from the definition of
public service when Congress defined them as public
service organizations. Jacob seemed to suggest that we
will talk later about the process, the standards and
process for excluding those. But my point is that it
doesn't matter what the standards or process for
excluding them is if Congress never gave the Secretary or
this committee the authority to exclude any government
agencies or any 501(c)(3)'s, as approved by the IRS, from
the Public Service Loan Forgiveness. So, I don't think
that the process is necessarily relevant to that
question, though I understand we'll discuss that later.
My other point just on the big picture of definition 30
is that it strikes me, as prizing that all out of all of
the various laws that the Department may be concerned
with organizations breaking including Federal laws
prohibiting fraud, corruption, medical laws that that
prohibit hospitals from turning away people for inability
to pay or lack of insurance, that these are the five laws
that we've decided to focus on here today including small
potatoes, things like state trespassing law. So, I wanted
to point out that that feels unusual and sort of

2025 Negotiated Rulemaking - 6/30/25

inconsistent with my sense of what we should be doing.

        MS. WEISMAN: Emeka?

        MR. OGUH: Is there a process whereby we don't have to have this attestation on each form? I think back in 2020 faith-based organizations were made to be PSLF eligible. There was an adjudication process where these entities, who at one point were not listed in that dropdown for PSLF entities, were included. And so, you had to submit some documentation. A one-time process, but it took a while, and we helped dozens of faith-based organizations get PSLF eligible. I'm wondering if maybe that form could include something like this. And maybe there's a reeducation process for employers. So, as I mentioned earlier, it's a one-time thing versus having to be every single time. Just a thought.

        MS. ABERNATHY: We'll be happy to take that back. At this point, how we look at employers is holistically, right? But this eligibility part we're going to have to look at that and see what we are able to do as part of our own systems. And I don't have answers to that. I'm not on the operational side any longer, so I don't want to speak to it. But we do hear you, and we will take that back, and we will discuss this and hopefully be able to provide some additional clarity before we conclude our sessions Wednesday.

MS. WEISMAN: The last comment before
lunch is Rebecca.

MS. STANLEY: Just expanding a little
bit on what Emeka said was the fact that when you do the
PSLF form, and it says eligible ineligible. So that's
pulled from IRS data this time, is that correct? Like
501(c)(3). So, if that, if the standard is it's already
been determined that they're participating in those
things. If it could be, then you have eligible
ineligible, maybe they're in a red flag status or
something, and their form is differentiated.

MS. ABERNATHY: So, one of the ways I
know that, however, we finalize and promulgate our rules,
the way right now, that we have a database of eligible
and ineligible employers already. So, if we were to
receive notice for whatever reason, separate and apart
from this particular rule making, that an employer is no
longer an eligible employer for whatever reason, maybe
they lost their status, or maybe they're no longer
nonprofit, they're for-profit or whatever the case may
be, we would adjust our database accordingly. So, we
already have a mechanism in place to identify borrower,
excuse me, employers in that employer database. But
specific to what we're doing and how, there is already an
employer verification form that exists for borrowers to

submit to their employers or to do so online. That is the
process and the constraints by which we operate in and
that we will continue to operate in. So how we get
through this, I don't have those answers yet, but we will
go back, and we will talk about it, and we'll have to
rely on our operational team to give us the best
scenarios for what we're trying to accomplish here. And
there in the room, so they've heard you as well, and I
just want to make sure we've heard everything, and we're
going to try our best to come up with an amenable
solution. I don't have any idea what that is, but we're
going to talk about it and get back to you guys.

          MS. WEISMAN: That concludes our
morning session. Thank you all for the great discussion.
We will resume here at 1:00 Eastern time. Thank you all
very much for your flexibility and for, again, the great
cooperation. We'll see you in an hour.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING

SESSION 1, DAY 1, AFTERNOON

JUNE 30, 2025

On the 30th day of June, 2025, the following
meeting was held in-person, from 1:00 p.m. to 4:00
p.m.

2025 Negotiated Rulemaking - 6/30/25

P R O C E E D I N G S

MS. WEISMAN: Good afternoon, everyone. It's time to start our afternoon session. We made a lot of really good progress this morning and I appreciate the discussion. I do want to make one clarification. I've been asked by a couple of people to explain whether we were going to cover this content again. And the answer is yes. So, everything that we go over, we will be discussing at least one more time, but likely more than one more time. I think that we are trying to do an overview, a high-level walkthrough of some of these things, get some initial thoughts that people have. But clearly, negotiators, whether primary or alternate, will need to get back in touch with constituents and get feedback on what they've heard, what you've heard, and come back to the table tomorrow and Wednesday so that we can discuss those things. Does that make sense? You're welcome. Asked that by more than one person, so it's not all on Betsy. Just a reminder, we will have public comment starting at 3:30 and then a hard stop at 4:00, so if you do have negotiators, if you do have meetings with each other or constituents, that'll be a good time to do that. We will have that hard stop at 4:00. Any other questions before we get back into discussion? Jeff.

MR. ANDRADE: Just one quick update
for you all. First, congratulations, because we had a
very spirited and lively policy and legal discussion at
lunch, so congratulations on putting those in. But in all
seriousness, thank you for some of those speaking. It got
us rolling. It gave us enough time to start, to start
thinking about this and doing research so that we can
come back to you tomorrow on a few things. So, thanks
again. I just wanted to this morning's discussion, I
think, was fruitful from our perspective.

MS. WEISMAN: Okay, then I'll turn it
back over to Tamy for a more lively discussion.

MS. ABERNATHY: Yes, let's have more
lively discussion. I do want to- I was supposed to tell-
I will get back to you on this- I had a note to clarify
something that was said earlier that was not entirely
what happened operationally, but I (inaudible) ways to
let me get back to you on that. I certainly don't want to
misspeak. Alright, we're getting ready for the fun stuff,
friends. Here we go. Okay, so, Mr. Michael, if you'd be
so kind as to share 685219C on the screen for me. And
please make sure that you guys have your copy of this,
because after we get done discussing it, we're going to
take it down so that the viewing public- my goodness,
this mic and I are having issues- the viewing public can

see our discussion, see our faces as we're having those discussions. So, I just want to make sure you have it close at hand in case you need it. Alright, borrower eligibility for forgiveness under the PSLF program. The Department seeks to propose a standard by which a qualifying employer would become ineligible as a qualifying employer for the purposes of the PSLF program. We propose that the Secretary begin removing PSLF qualifying status from an employer for activity that takes place on or after July 1, 2026. Determinations will be prospective, meaning that a borrower will not lose qualifying payments retroactively if an employer is no longer a qualifying employer.

        MS. ABERNATHY: However, on or after a date, the Secretary removes qualifying status from the employer, the borrower payments made while employed at the non-qualifying organization would not count toward Public Service Loan Forgiveness. So, the text in C outlines borrower eligibility criteria. And generally, our borrowers have to meet the criteria for PSLF qualifying employment, qualifying payments, qualifying full-time employment, qualifying loans. And so, where we propose employment with an employer would become ineligible on or after the date that a qualifying employer is determined to have engaged in activities that

have a substantial illegal purpose. Okay? We would amend paragraph (c)(2) to include an exception clause to when a borrower would be considered to have made a qualifying monthly payment for PSLF purposes. Second, we would add a fourth subparagraph to reflect the effective date for regulatory changes that may impact borrower eligibility. Effective on or after July 1, 2026, through a standard we will discuss shortly, no payment would be considered creditable for PSLF purposes for any month subsequent to a determination that the qualifying employer engaged in those illegal activities. To that end, the entirety of proposed paragraph C reads, borrower eligibility. And number two is, except as provided in paragraph (c)(4) of this section, a borrower will be considered to have made monthly payments under (c)(1)(iii) of this section by and then effective on or after July 1, 2026, through a standard as described in paragraph H of this section. No payment shall be credited as a qualifying payment for any month subsequent to determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section. We believe these changes are necessary to make clear any final regulations impacting borrower eligibility for the PSLF program are effective on or after July 1, 2026. They are not retroactive. What that means is we will be looking at

it from the date prospectively forward. We will not
remove any borrower eligibility that they received up
until July 1, 2026, on or after July 1, 2026, even if the
borrower has waited all ten years before submitting their
complete employment history for consideration for PSLF.
Now, they don't have to do that. They can submit it on
months- six months, whatever they want to do, they can do
it monthly. They have a choice to wait till the end or do
it incrementally all the way through. So, in this
particular instance, we wanted to protect our borrowers
as best we could so that if their employer does lose
eligibility as a qualifying employer, what they've
already done is protected. What they haven't paid or
payments after that time will not be counted. So, I'm
going to turn it over to Annemarie for lively discussion.

                    MS. WEISMAN: We have Alyssa up first.

                    MS. DOBSON: So, I struggle to see how
punitive action toward an individual, because they could
have made 119 payments as of July 1, potentially. I
struggle to see how punitive action towards an individual
gets at changing the behavior of the entity. I would like
to suggest adding some language that would protect
borrowers who are currently working towards forgiveness
at an employer. I submitted some language right during
lunchtime if you wanted to share that. But you know, it

makes sense to close off that opportunity for new
borrowers entering the system. But to make somebody
change employers who's already accumulated many months of
qualifying payments seems harsh.

MS. WEISMAN: Betsy, and then Tamy.

MS. ABERNATHY: I can wait. Thank you,
Betsy.

MS. MAYOTTE: Thank you, Alyssa. That
was half of what I was going to say, almost word for
word. So, thank you for that. So, I think I understand
what you're saying about retroactivity, Tamy, but I want
to give a specific example and see if I'm right. Okay?
January 1st, the employer does bad things that fall under
the definition of this regulation. February 1st, the
court goes, they did bad things. March 1st, the
Department finds out about the court decision and says,
yep, they did bad things. April 1st, the borrower submits
an employer certification form that goes back to January
1st. June 1st, they submit a buyback request for that
same period. My understanding is that the borrower would
get credit for everything up until- the way it's proposed
right now, up until March 1st.

MS. WEISMAN: Jacob?

MR. LALLO: Yeah, the borrower will
get credit until the point that the Secretary has issued

a determination on the subject.

                  MS. MAYOTTE: (inaudible) timeline (inaudible)

                  MR. LALLO: Yes. Yes.

                  MS. ABERNATHY: Yes.

                  MR. ANDRADE: (inaudible) July 1st of 2027.

                  MS. MAYOTTE: Right.

                  MR. ANDRADE: Yeah. Okay.

                  MS. ABERNATHY: Right, 2020- yeah, we're assuming you're talking about 2026. Yeah, let's go with that. Or it would be 2027 because it does- not effective till July 21, 26. Yeah. Alright. Let's do that. Yes. So, the key here is as we move through these definitions and we get to that final standard- so in this case, the key right there was the Secretary said on March 1, 2027, that at that point she agreed, because of the court case and the findings, this agency did participate in a substantial illegal activity and therefore they no longer qualify as a qualifying employer. So yes, that's the trigger date.

                  MS. MAYOTTE: Thank you.

                  MS. ABERNATHY: So, Alyssa, I understand your concern about being punitive because it's the one year. Punitive- we're not taking the 119 away.

So, at the date that the Secretary determines that employer has met that standard, it's from that day forward.

MS. WEISMAN: Rebecca, do you have something new or is it okay if Alyssa-? Okay, Alyssa, and then Rebecca.

MS. DOBSON: So, I disagree politely. To make somebody change an employer for a handful of payments or more, they're going to be giving up potentially retirement benefits, time served, vacation time accrued, all sorts of different things for something that they may potentially not even participated in.

MS. WEISMAN: Rebecca? And Tamy, your mic is open.

MS. STANLEY: I just want to verify. So, on that March date, using that hypothetical situation, that's when the status like, say, a new hire was looking at that employer, is that when the status on the PSLF- you know, you can go in, and you can check, see if your employer is an eligible employer? Is that when the status would change to ineligible? Okay. Because-

MS. ABERNATHY: Yes.

MS. STANLEY: -(inaudible) the courts made that decision.

MS. ABERNATHY: No.

2025 Negotiated Rulemaking - 6/30/25

MS. STANLEY: Okay. Just so for future employees too, to protect them, that would be helpful as well.

MS. ABERNATHY: No. Let me clarify something. If the Secretary receives information, the Secretary gets to determine the date. We're saying prospectively, right, we want to go forward. So, if it's before July 1, 2026, it's not effective. So, it would have to be after July 1, 2026. But if the Secretary is looking at this and the court case was finalized, it could be that date. But more than likely it's going to be a date in the future, not a date in the past, because the way we're working this is to go forward so that borrowers are not harmed as much as possible. Make sense? But if there's an egregious part and the Secretary chooses, I want to protect the Secretary's discretion here, but mostly it's going forward. It would be the date- on that date that she determines that substantial illegal activity did happen, even if it was in the past, she's choosing from this day forward for it to hit.

MS. WEISMAN: Jeff?

MR. ANDRADE: I just wanted to address Alyssa's point. Right now, the situation is if an employer ceases to be a qualifying employer, the number of payments that a particular borrower has made are

immaterial to whether or not they get forgiveness. So, if
they lose eligibility, if they close, if they go, it's a
bad deal for the borrower, we're being consistent with
how things have been in the program since it's been
enacted with regard to loss of eligibility.

MS. WEISMAN: Tamy?

MS. ABERNATHY: This also encourages
employees to encourage good behavior by their employers
as well. And so, to your point, they would have to be
found in violation of this standard. And all of those
pieces and parts would have had to have fallen into place
before the eligibility for qualifying employer stopped
their eligibility for qualifying employer.

MS. WEISMAN: Rebecca? Can you put on
your microphone?

MS. STANLEY: Sorry.

MS. WEISMAN: Thank you.

MS. STANLEY: Say they reached 120
payments and then they were found ineligible. Right now,
don't you have to be employed by a qualifying employer at
the time of forgiveness?

MS. ABERNATHY: At the time you apply.

MS. STANLEY: At the time you apply.

MS. ABERNATHY: Mm-hmm. So, at the
time you apply, that was changed in the 22-23 rule. Well,

from the 21-22 negotiations be and we understood that
there were times that borrowers had to stay employed for
a considerable amount of time until their PSLF
forgiveness discharge was fully processed. So, the words
in the regs are at the time you apply for PSLF, at the
time you apply. So, say for instance, you're submitting
your last employer verification form, right? Your last
certification of employment. And you have six months and
this particular form covers those six months, at the time
that you've submitted it, you were still employed, so
you're covered.

          MS. WEISMAN: Okay. Seems like a good
time for a very quick commercial. Alyssa had mentioned
sending language out this afternoon. So, I just send that
to your mailboxes at 1:16. So I did get that out. You
probably did not see that since we were all speaking.
Also, just a reminder, please use your microphones
because the live stream will only pick it up if you're on
mic. Commercial over. Now back to our regularly scheduled
programming as soon as we see a card. Alyssa?

          MS. DOBSON: I- just a point and then
maybe a clarifying question, but I think that you think
that employees have a lot more control over their
employer than they do. I think it's going to be difficult
for them to inject any sort of behavioral change in this

space. I fully understand that they get to retain any
payments that have already been made. It's the thought of
them having to, again, change employers. I can imagine a
space where somebody does these bad things but retains
their 501(c)(3) classification, or they're still a state
agency or whatever, so the potential to continue working
for them would still be there. And in the event that they
did close or somehow lose their status, that in itself
would be an action that wouldn't even be necessary to
have all of these things written in place. So, I think
that it does impose a sincere punitive action against the
individual.

           MS. WEISMAN: Mary Lyn?

           MS. HAMMER: I'd like to go back to
what you were saying a little bit ago, Tamy, where, where
the employee needs to be working at a qualified employer
at the time of the application because if they lose
eligibility, but they've already fulfilled the 120 months
of employment at a qualified employer, then I think
that's also not fair to the student because, you know,
like, say, if it's the IRS that takes action against
them, that's an immediate action and the borrowers
wouldn't have time to even apply for the- you know, by
the time everything goes down, they go to work, the doors
are locked. What are they going to do? Then they lose all

those benefits. So, I really don't think that's fair. And it's not part of the language you have today. I know we're addressing that first, but I think that's something worth adding to our agenda.

MS. ABERNATHY: Clarify for me where you think we would add that, and I just want to make sure I'm understanding. I hear what you're saying, but maybe it's because it's after lunch. I'm having a little bit of a hard time pulling those pieces together. So, can you kind of show me where you would think that would fall?

MS. HAMMER: I would have to look it up, because it's not the language that I concentrated on, because-

MS. ABERNATHY: (inaudible) why (inaudible)

MS. HAMMER: But I would have to go back and look it up, but it would be in the same section where it was changed last time to be that there would be have to be some kind of process to get that certification done by the employer, even if they're out of business.

MS. ABERNATHY: So, there is a process for that already. So, if an employer closes or an employer is unable to certify that verification form, there is a process by which we already permit borrowers to submit their documentation to us for adjudication.

MS. HAMMER: So, would that be the section where we would add that if the employer is no longer qualified, but the borrower has fulfilled the 120 months of employment?

MS. ABERNATHY: Prior to the qualifying employer losing their eligibility, then yes, I would say that would be what we would want. But we're not a- see, this is about an agency losing their qualifying employer status. And so, we don't want borrowers resubmitting a request, right? Filing another review of the file. But if there are cases where a borrower has met 120 qualifying payments under a qualifying repayment plan, under the right loans, was working full-time, qualifying employer, all of those conditions are met, and the borrower just has not submitted their form, and then the employer closes, we would have a way to look at that, in addition to whether or not the date of the employer's loss of qualifying employer status, right? So, say it's after and, and all of the employment is before that date, that employer meets the standard or fails to meet the standard and then therefore they're no longer qualified, that borrower would get their forgiveness.

MS. HAMMER: Well, I think that's the intention.

MS. ABERNATHY: Yes.

2025 Negotiated Rulemaking - 6/30/25

MS. HAMMER: However, the word- the date of the application, that particular wording, it's problematic.

MS. ABERNATHY: No, what's supposed to happen is they have to still be working.

MS. HAMMER: (inaudible). That they have to be working at a qualified employer on the date of the application. That's problematic. So that's what I would take a look at, and I would have to look it up.

MS. ABERNATHY: Right. Let us take a look at that.

MS. WEISMAN: Next, we have Emeka and then Bob.

MR. OGUH: I just want to piggyback off some of the comments that were made. So, Jeff, Tamy, and Jacob, let's say- you mentioned, you know already it exists that someone can, if a nonprofit is going bankrupt or is getting acquired by a for-profit entity, the same rules apply. Typically, in those instances, there's a time period your company's going to be acquired. Your company's going bankrupt. There's a three-to-six-month period, some sort of grace period. Is there a way to mirror that situation where if I know that my company has done something wrong, I've done everything I possibly can to make a change, I can't do it, powers that be, I want

to leave, can we give some sort of grace period, if you
will? Because it sounds like, kind of to the point that
Betsy made earlier, there's some arbitrary if they were
found guilty in February, that could be the shot clock
period when it starts. Is there an opportunity to maybe
extend that to at least six months after the date of-
just again, to mirror what already exists? No one sort of
just announces, hey, we're bankrupt and shut the doors.
Typically, there's a time period before that happens. And
during that time period I am eligible for PSLF, so just
wondering. Thank you.

               MS. WEISMAN: Bob?

               MR. CAREY: Maybe this is a subsection
H discussion, but on section 30 sub 5, and then, you
know, going back to the issue of termination of a
qualifying employer, how would things like Federal Tort
Claims Act claims, or Camp Lejeune Injustice Act or
medical malpractice claims against the military not
expose the Department of Defense to be found in violation
of State Tort Law or Federal Tort Law, and thereby lose
their status as a qualifying employer?

               MS. WEISMAN: Jacob?

               MR. LALLO: Yeah, so there's a
definition for that. 34 defines what violating State Tort
Law means. We're not talking about torts in the civil

sense of I hit you with my car and then you sue me.
There's a defined set of standards for what we mean when
we say violating State Tort Law. And those would be five
acts within that.

           MR. CAREY: Only the five in 34 are
qualifying as violating State Tort Law.

           MR. LALLO: That's correct.
Definitionally, those are the only five things that we
mean when we say violating State Tort Law. So,
trespassing, disorderly conduct, public nuisance,
vandalism, or obstruction of highways.

           MR. CAREY: But on public nuisance
like the tobacco cases and the opioid cases were based
upon a public nuisance concept, and I could see where
Governor Newsom would apply a public nuisance application
against the federalization of his National Guard or the
deployment of the Marines.

           MS. WEISMAN: Do you have a follow-up,
Jacob?

           MR. LALLO: Yeah, just in response, we
don't want to speculate on what a state might or might
not do here. So, we don't want to get into that.

           MR. CAREY: If the state were to raise
a public nuisance case against the Federal Government for
the misutilization of government resources, that would

then qualify as a public nuisance under 34.3.

               MS. ABERNATHY: Only if they were found guilty. Or nolo contendere (inaudible). And Bob, it's also engaging in a pattern of. So that particular definition requires more than just one single.

               MR. CAREY: Where's that?

               MR. ANDRADE: Thirty, 35. 30, romanette five.

               MS. ABERNATHY: Thirty, romanette five.

               MR. ANDRADE: Bottom of page- top of page seven.

               MR. CAREY: And what defines pattern?

               MR. LALLO: Yeah, I think the plain language is there. It's got to be more than one thing. You can't have a pattern with more than one.

               MR. CAREY: So, two would be sufficient to be a pattern?

               MR. LALLO: If it looks like a pattern, I think it is a pattern in this case, like not to be overly vague about it. I think the plain language of the term pattern works here. I don't think it serves us right now to get into hypotheticals of how a public nuisance law could be applied to intentionally trigger this, to block somebody from qualifying.

2025 Negotiated Rulemaking - 6/30/25

            MR. CAREY: The whole evaluation of
this prospective regulation is conjecture. We are
evaluating this in terms of what we think may happen.
Originally, I was worried that the International Criminal
Court could come in and bring charges against military
personnel for their actions overseas and the United
States- and that would be sufficient to say that the
United States military is no longer a qualifying
employee. But what I'm worried about right now is that
there are a lot of states that don't like what the
Federal Government is doing, and they may very well bring
case and they may very well win, in which case all or
some of the Federal Government may no longer be a
qualifying employer.

            MS. WEISMAN: Does the Department want
to respond to that, or should we move on? We have a lot
of cards up.

            MS. ABERNATHY: We can move on. we'll
need to take that back.

            MS. WEISMAN: Okay.

            MR. ANDRADE: I do have a response to
Emeka with regard to the timetable. So built into the way
we've approached this is a final determination, final
judgment. So analogous to the situation of a company
going bankrupt there's a legal process. There's an

appeals process. And that, in our view, gives us a
significant amount of time to the employees that the
employer is currently in either litigation or some
pending action is happening.

                    MS. WEISMAN: We have Scott next.

                    MR. BUCHANAN: Yeah. I just want to go
back to the section we've been talking about here. I
think it's on the table right now. And I understand sort
of the Department is taking steps to make sure that
payments not counted in a prospective manner after the
determination by the Secretary that the qualifying
employer is no longer a qualifying employer. But Tamy, I
think you made one comment that I just would want to
highlight. And I don't know if you need to deal with this
in the rulemaking proper. It could be done on sub-
regulatory level, but you raised the possibility of the
Secretary determining that a previously qualified
employer was no longer because they had met the standard
as described in the rulemaking here for being kicked out,
that that could be a date prior to the date of
announcement of the fact that they were no longer
qualifying employer. I just want to clarify that because
I just want to make sure that not only on the farer side
were being prospective, but also because otherwise it
would be very difficult if the Secretary announced a

month ago, an employer lost their qualified status.

MS. ABERNATHY: This is- number one, it's not effective till July 1, 2026. But no, we would not. What I mean by that date is it's going to fall on a date that she chooses. It's going to be after the court cases, after whatever the, the pieces of the standard that have to still be met, settlement, nolo contendere. It's going to be after that point. But say, for instance, it takes a really long time, and she chooses to say, okay, on March 1st, she wants it to be February 28th. She could say that because the court case was done at that point in time, it's after the court case is done. More often than not, we're expecting her to, to decide what that date is going to be, because typically we thought that we'd be getting these from the forms coming in, right? The form notifying us of this agency no longer- you know, they've participated in this illegal activity, and now they no longer meet. So, she's going to have to look at that and say, okay, it's effective this date, like going forward. So that's what we're thinking about on that. Now all of that changes when we're looking now at our conversation from before in the form. So, we have to kind of look at those things. But no, you're exactly right. She's not going to pick some way date in the back to do that. Not at all. It's going to be- and I think

that it is in here somewhere, I don't think we've gotten
to it yet, but it talks about the timing for her.

    MR. BUCHANAN: Yeah. And I just want
to highlight, I think it would be challenging
operationally if the date was even, not even way back,
but even a day or two before where you have a window of
someone on the Department website, as well as guidance to
servicers would think they have a qualified employer, and
the Secretary retroactively makes that change. So, I like
that.

    MS. ABERNATHY: Yes. That's a very
good point. And also, typically when an employer loses
status, say it's in the middle of a month, it's not
effective that month where we're going to go backwards
and take that month away. It would start the next month.
So that's even another way our normal practice is that
already. So, we would hold true to that normal practice.
So, if it was the 15th of the month, the effective date
would be the first of the subsequent month. It would not
be the 15th. And therefore, losing that, that current
month of eligibility, it would be that next month's
eligibility. We would start fresh on a month. Make sense?
Thank you, Scott.

    MS. WEISMAN: Betsy?

    MS. MAYOTTE: Thanks. Going back to

2025 Negotiated Rulemaking - 6/30/25

the discussion that Bob and Jacob were having and
understanding that you don't think it's productive right
now to deal in the world of hypotheticals, would you give
me a real-life example of an employer that today would
fall under this proposed status that would not already be
an ineligible employer under current PSLF rules?

                MS. WEISMAN: Jacob?

                MR. LALLO: I can't. I'm sure that
there are some that fit into that. But because these are
not rules that we fixed, we haven't gone out and looked
at  the entire world of PSLF qualified employers. Yeah.

                MS. MAYOTTE: What problem are we
trying to solve?

                MR. LALLO: Because this problem is
being solved prospectively, we're not going out and
digging this up. If we were doing that would be
effectively ex parte. But you know, we can't just pick
employers. We're not targeting specific employers. We're
targeting a specific set of actions. And we're concerned
with basically ensuring that employers who are
participating in the Public Service Loan Forgiveness
program are actually acting in a way that promotes public
service. And so that is a prospective look at things.
We're not going back and picking particular employers and
drafting regulations that are designed to remove certain

people from the program.

MS. WEISMAN: Betsy, did you have a
follow-up before we go to Laurel?

MS. MAYOTTE: You know, historically-
so I've been around this since the Earth cooled. And you
know, any time I've been involved in a regulatory
process, there's always sort of a we're doing this
because of this. This is the problem we're trying to
solve. I'm concerned about this in general, and I'm
really concerned to hear speaking of not wanting to do
hypotheticals, it feels like if you don't even have one
single employer that you had in mind when you were
writing this, it feels like you're drafting a regulation
based on a hypothetical.

MR. LALLO: I would say in response to
that, I'm not comfortable answering that in the capacity
as a member of the Office of General Counsel. We're not
looking at specific employers in this. Policy may have
specific behaviors in mind or specific concerns, and I'm
sure they have done substantial research into what they
are concerned about. But again, we are looking
prospectively, we're not targeting specific employers or
organizations. And we are instead trying to coalesce
around the idea of, again, promoting public service as a
service to the public rather than something that may have

a detrimental effect.

          MS. WEISMAN: Let's get Laurel in here.

          MS. TAYLOR: Thank you. The central theme of conversation that we're having about how to implement the definition of qualifying employer, I'd like to go back to a comment that Alyssa was making, and I feel responsible for bringing in direct quotes from borrowers who, as an alternate, we had offered to represent as part of public interest. My loans are overwhelming. PSLF is what makes paying them possible. Without PSLF, I couldn't serve and provide for my family. I'm concerned I won't be able to provide for my children if PSLF has changed. It's a lifeline for many of us. Our financial situations are already precarious, and this program helps reduce some of the uncertainty we face. So just to put a more specific ask on Emeka's comment as well. It's worrisome to think about a healthcare giver or someone working in the education system who may be somewhere in that process of 120 qualifying payments if they find employment is more difficult. Depending on where we are in a macroeconomic cycle, depending on where they are in age, depending on where they are in, in experiencing discrimination in the workplace. If there could be some sort of predefined period of the amount of

time that that employee could continue to make payments
as a qualifying payment to PSLF, particularly at a time
where if there if this individual finds it difficult to
seek employment and other PSLF-eligible institutions.
From a taxpayer perspective, the other constituency, my
worry is delinquency and default. So, if someone is in
that period, they're in the process of pursuing
forgiveness. They then lose hope that they may not be
able to find employment again. They're already going to
be struggling or employment with an alternative provider.
They may already be struggling to make those payments,
but I think that's a big part of why people are making
payments. So just to bring that, that direct borrower
perspective into the discussion as well, some sort of on-
ramp period, grace period. Thank you.

    MS. WEISMAN: I see no other cards.
Any last thoughts on this issue? Oh, I'm sorry, Mary Lyn?

    MS. HAMMER: I found the section. It
is little c2B, and I think the whole section could be
removed, and that would take care of the problem.

    MS. ABERNATHY: Thank you. Let us take
that back. Thank you so much.

    MS. WEISMAN: No other cards. Oh, I
see we do have one. And it is Kaity.

    MS. MCNEILL: I just had a question

2025 Negotiated Rulemaking - 6/30/25

about the process for disqualifying an employer. At any
point will there be an opportunity for a back and forth
between that qualified employer and what that process
might look like, and how that might impact the timing as
well? And what notification that borrowers might have
that this is sort of happening where they might not
normally get that information.

MS. ABERNATHY: So, through the rest
of our proposed standard and what we're going to continue
to discuss, yes, there is a notice and comment. So,
before we finalize the action and remove a qualifying
employer, we notify them. And then if they engage in
conversation with us, that's when the Secretary would
determine the date. Either we agree with the evidence
that the qualifying employer or the employer has
submitted to us and it's like, yes we understand this
really isn't a violation of substantial illegal activity,
so therefore you don't have to lose your qualifying
status. we would engage in notice and comment back and
forth between the agency and the Secretary. That is part
of the process that we're talking about. We've also heard
around the table a potential of an employer regaining
eligibility. We would like to take that back and look at
some of the proposals that were on the table, and also
look to see if we can't come up with some regulatory

language about regaining an employer, regaining their eligibility. We're not sure what that's going to look like, but- excuse me, one second, sir. Yes. Heidi, do you have a suggestion of what you would consider an adequate notice and the notice and comment back and forth, the timeframe? And you don't have to jump and tell us right the second, but if you do, could you think about that and get back to us on that? Thank you.

MS. WEISMAN: Next, we have Todd and then Rebecca.

MR. JONES: Since you raised the issue that you're considering having a time frame for regaining, I think it would be a better structure to avoid years- let's say this is enforced for many years to have years and years of nonprofit organizations, public entities that are no longer eligible to simply have a fixed date, that regardless of what is transpired, seven years, six years, ten years, what- you come up with a number, we'll debate a number. that there be some fixed term that just by operation of law, you now are no longer an ineligible employer.

MS. ABERNATHY: Thank you. That's helpful. We'll take that back.

MS. WEISMAN: Rebecca?

MS. STANLEY: Is there a way to

include the notification to include the borrower? And I
think that would be good if the borrowers were notified
as well as the employer, because then that gives them a
heads up. Hey, you may want to be on alert. You're at
118, whatever payments are.

MS. ABERNATHY: So, I see it two ways
where that's important. I'm not sure that we would do
that until after a decision, a final decision has been
made. So, if we're in the process of engaging in these
conversations back and forth with the employer, and we're
looking at a preponderance of evidence and they're coming
back and they're saying, no, that this is wrong and
here's why and we're still engaged in discussion, we
would not want to inform that borrower that they are
losing their qualifying employer status, right, at their
agency. So, at some point, the borrower would most
definitely be informed. It would be the agency's
responsibility. We're expecting the agency to notify the
borrower that they've lost their status.

MS. STANLEY: But if the standard said
that they had to be found guilty, the state or federal
court that engaged in activities that have a substantial
legal purpose, I feel like they have a right to be
informed that they're being investigated.

MS. ABERNATHY: Yes. So, you were-

you're proposing a warning?

MS. STANLEY: Yes, I think that-

MS. ABERNATHY: Okay.

MS. STANLEY: -the borrower.

MS. ABERNATHY: We can take that back.

MS. STANLEY: -is entitled to that.

MS. ABERNATHY: Got it. Thank you.

MS. WEISMAN: Scott?

MR. BUCHANAN: Yeah, I certainly agree. You know, having borrower notification. I would highlight, though, that that in the current structure of the application process for PSLF, that's going to create borrowers who get notified and borrowers who do not get notified because they have not filed the paperwork necessary. And so, I think the Department needs to consider- again, I think notifying borrowers that this is probably a good thing to do, but today, probably the Department does not have an apparatus to notify all of those borrowers. And you'd have to consider equity issues of treatment and communication with people about that matter.

MS. ABERNATHY: And I do know one of the ways that we plan to build this out is on the qualifying employer database, where we would indicate the loss of eligibility. And so we are, as an agency, looking

2025 Negotiated Rulemaking - 6/30/25

to make sure that we're clearly and conspicuously
communicating this information in the most timely way on
the website for the qualifying database. So, this is all
good stuff. Everything that you're saying, we want to
take that back and we kind of want to massage this around
a little bit and come back with (inaudible)

                    MS. WEISMAN: Jeff, and then Jacob.

                    MR. ANDRADE: To Scott's point, before
we go back on that, I just wanted to ask a question
whether or not people felt the employer could make that
notification once they had been given notice by the
Department.

                    MS. WEISMAN: Alissa, and then Laurel.

                    MS. DOBSON: Maybe if the employee had
submitted some paperwork in the past. But remember, an
employee can wait up until they've completely served all
of their time and made their payments before even
submitting something. So again, to- I believe it was your
point, it's going to be very hard to identify who to
notify and when. And so, what also- and also what would
happen if somebody certifies an employee submits a form
because they are completely unaware that their
institution is now on the naughty list. And so, they
submit a form to their employer. And the employer is,
whoever the certifying official is, is brand new, and

2025 Negotiated Rulemaking - 6/30/25

they submit the form as if it is legitimate and it is
not. What happens in that space?

MR. ANDRADE: Before I answer the
question of me, let me throw one question back, which is
the employer could notify all employees by email, for
example, or publish a notice.

MS. DOBSON: Which would then maybe
educate them that they're eligible and then they could
apply. But now their certifying official has to falsely
certify a form. Because if you receive a form that says
we have engaged in substantially illegal activity,
because now they have been found to have done that, how
can a certifying official submit that form for them even
though they're eligible?

MS. ABERNATHY: So, I think that goes
back to what Jacob was saying with knowingly and
willfully, right? That's not knowingly and willfully. I
mean, they're not- they haven't been notified yet that
they are a non- that they have, violated the standard
for-

MS. DOBSON: I thought that's what we
were talking about was notifying the employees that
they're no longer eligible?

MS. ABERNATHY: Yeah.

MR. LALLO: So, I think we were mixing

a couple of things. So, if we're talking about notify- I
think what we're saying when we're talking about
notifying borrowers is after an employer has basically
received notice that we think you've done this thing and
we're going to basically give you the opportunity to
submit evidence to state your case- so I think the reason
that we very much take the point that we want to protect
borrowers here and want them to know about it, we also
have to balance the interest of the employer. And I would
say a good employer should notify their employees and
warn them about this. But we also want to be careful that
we are not violating their due process that we've set up
here by telling their employees prospectively, you're
going to lose your PSLF status, or your employer is under
investigation for this because that would have a definite
chilling effect on the employer before we've completed,
you know, the evidentiary process.

        MS. DOBSON: So, what are we notifying
people of then?

        MS. ABERNATHY: It was suggested that
they receive a warning, and we suggested that the
employer provide their employees the information that it
is a possibility.

        MS. DOBSON: Within that warning,
would you be willing to say something like, you can still

certify applications?

         MS. ABERNATHY: It is not our warning;
it is the agency.

         MS. DOBSON: So, when you tell the
employer that they're being investigated for these
things, how is that person in HR going to know that they
can still submit eligible forms?

         MS. ABERNATHY: Because they have not
been found in violation of the standard.

         MS. DOBSON: Okay.

         MS. ABERNATHY: So, if you meet the
criteria under the standard, you'll know when you and the
Secretary chooses that date, your agency will know. It's
not an arbitrary date, right? It's going to be you
violated the standard, but we're going to give you a way
to come back to us and engage in conversation about it
and then, okay, alright, we've listened to you. No, you
really have violated the standard. You really are
participating in a substantial illegal purpose. As of
this date, you no longer qualify as a qualifying
employer. If it's in the middle of the month, it's going
to be the, the very next first of the subsequent month.

         MS. DOBSON: So, then the warning
period would serve as hey, hurry up and get your
applications in.

MS. ABERNATHY: You know, I can't
speak to what it would or would not do for a borrower. If
it were me, I wouldn't be waiting until the last minute
to fill out my form in the first place. So I can't speak
to what a borrower's behavior is, nor can we draft our
rules, anticipating every single way that this impacts.
What we can do is expect our agencies that are
participating in the PSLF program, filling out forms for
these borrowers to give as much notice to their borrowers
as possible. And we would ask them to do that, and we
would put the stand our view is, yes, we expect you to do
this as good faith to your employees. And I would think
that any agency would want to do that in anticipation of
a potential loss.

MS. WEISMAN: Laurel?

MS. TAYLOR: Jacob, your comment on
due process, I think, is so important. Tamy, and when
that final ruling is made as the final decision date. So,
we serve about 1,500 employers, and although we have not
spoken with them about this particular issue leading up
to today, the, the voice that I hear in my head is
because of the chilling effect. They would want to work
the issue really hard to evidence that they are not
engaged in substantial illegal activity and were to avoid
the significant- for those who have agency and choice of

other employers that are also PSLF eligible institutions,
I think there would be a significant impact on the
retention of that organization if under investigation.
And then the employer can choose, to your point, how they
communicate. But I think they would very much want to
have that agency to communicate across their population.
Thank you.

MS. WEISMAN: Emeka?

MR. OGUH: I just have more of a
clarifying question. I just want to understand. So, if
they've violated the standard and there's a way to come
back and I'm assuming there's going to be like 90 days,
120 days from when the Secretary- whatever, we pick that
number. And then the Secretary comes back and says, we
listened to you, and we still see that you violated the
standard. Is it on that date that they would become PSLF
ineligible? Because otherwise, then I don't understand
the purpose of giving a heads up if it's still going to
be-

MS. ABERNATHY: No. So, when it's a
final case, when the Secretary has rendered the decision,
and this is after the back and forth and all of this and
the reconsideration or whatever the case may be, I don't
know what the regaining the eligibility component is
going to look like yet. But I would assume that this is

well before they're regaining eligibility, because you
actually have to complete a time frame of ineligibility
before you can regain eligibility. And if you didn't
violate, then you would never lose eligibility. So, you
wouldn't apply for re-eligibility. So, you would want to
make sure that it's that final date. We are driving
everything on the final date of determination. If it
takes ten years in a court, that's not a final
determination. I'm sorry. We are not going to penalize an
employer for a what-if, maybe. It is you have to have
violated this standard. You have to be an employer that
is participating in a substantial illegal purpose for you
to no longer be a qualifying employer. It's not an
arbitrary thing. It's a finite yes, here it is. We've
collected the evidence. If it's back and forth, we're
rendering our decision. Here we go.

            MS. WEISMAN: Betsy?

            MS. MAYOTTE: So, if you're notifying
a state or city or local employer that they did bad
things, but let's say it was the Boston Health Department
that did the bad thing. But the Boston public school
system didn't do a bad thing, and the mayor's office
didn't do a bad thing. And my understanding is that
everything with PSLF processing is hinged on EIN. My
understanding is also that at least states, cities,

localities, maybe even tribals all share an EIN. How's
that going to work? And my question started off as- using
my example, if the health department is the one that did
the bad thing, are you going to notify all of the city of
Boston that they all did a bad thing, and now they're all
going to lose eligibility?

          MS. WEISMAN: Do you want to respond
to that, Tamy?

          MS. ABERNATHY: I do. The way we
currently have it designed, yes, that would happen.
However, we have already been thinking about the way in
which we would mitigate circumstances for these states
that use one EIN. There are additional codes that come in
on the EIN, and we would label them, and it would be
specific to I'm speaking in hypotheticals. I know we're
looking at this and I know that we're going to do it. Can
I speak to exactly how? I cannot. I just know we know
this was identified early on as an issue, and we have
found a way to look at our systems. For those- we only
want employers- the employer that is participating in
that substantial illegal activity. And because of these
states that use one EIN, there are ways for extensions to
be put on that EIN for those that are qualifying and
those that are not qualifying. And that's the extent of
my knowledge. So, I know it can be done. We are looking

2025 Negotiated Rulemaking - 6/30/25

at doing that and it's, it's just another extension. I
think it's either a two or three-digit extension on the
employer identification number. That would allow us to
determine whether or not that agency would still qualify.
I would not know the answer to that question. Jacob said
it's up to Treasury how granular that is. I do not know
what we're going to build in our systems yet. So, I would
suggest that as we draft the NPRM and we explain how we
will do certain things, that should you think of
something or you think of something now that would help
us as we're crafting how we're going to do these things,
that you get that information to us.

            MS. MAYOTTE: Thank you. I sort of
have a like new fear-unlocked feeling on this whole thing
now. If there's any way, we could get an example of what
you just described by day three, so we could see it, that
would be awesome.

            MS. ABERNATHY: I can try. I will do
my best. I don't know if Eric is still in the room.

            MS. WEISMAN: Yes.

            MS. ABERNATHY: Okay. I'll get with
Eric after today, and we'll see what we can do to
accommodate that request. I don't know the answer to that
question, but we'll try.

            MS. WEISMAN: Alright. We've got a few

waiting. Mary Lyn, thank you for your patience. You're up next.

MS. HAMMER: You're welcome. There's two things. One is the document that was sent out earlier that had my suggestions. One of them was notifying the borrowers, and I had suggested seven days from the date of determination that the employer notifies their employees that they're no longer eligible. And it also included language around making sure that the data that's available to borrowers includes the dates of eligibility. So, if there's any gaps, they know exactly which months or years or whatever the employer was not eligible. So that's one thing. And that was sent out earlier today. And then the other thing is I must have been having a lunch fog also. So, I just sent the suggested language, and the reference is actually (c)(1)(ii)(B). Two little Is. Yeah, B. Capital B. And I sent that out, Annmarie.

MS. WEISMAN: I have language that I'll be sending you in just a minute from Mary Lyn, as well as from Tracy. We'll go next to Rebecca.

MS. STANLEY: One thing that you had mentioned, Alyssa was about, like, if an HR person signed it, they weren't aware that they were in a bad situation. One of the things that I think could help that is if-right now you can submit a PSLF form manually or by using

the help tool. And I think if we stuck with the help
tool, then when they go to try to submit it, it's going
to automatically show it's an eligible employer. So,
versus accidentally getting the date and not realizing
they were ineligible at that time because sometimes an
employee holds their form and then somebody will get it.
But I think if you stuck with the help tool- and
hopefully the help tool is being refined and you're
seeing that it's helping in a lot of situations, maybe
you just get better and better and stick with one thing
so we don't get- and also, I think that will hopefully-
because that new fear is unlocked for me as well. I mean,
because the county operates off of an EIN that's so many
departments and I see it with state employees too. So, if
the help tool is the only way doing it, then that too
would help a little bit more- being a little bit more
specific than a manual and somebody writes (inaudible)
county but doesn't say solicitor's office or whatever.

          MS. WEISMAN: Todd?

          MR. JONES: Well, since we got into
the discussion of different ways to (inaudible) what's an
employer, I'm going to raise three issues related to the
nonprofit sector. And I'm thinking particularly of
colleges, but it certainly could apply in other contexts.
One is evolving structures of what higher education looks

like. For example, in my state, I have an institution that, as of January 1, will be a separate campus under a university in Erie, which already has an institution in Florida. Now, if something happened at the Florida institution, and that brought the consequence for anyone who's getting Public Service Loan Forgiveness at the other two institutions that that's certainly not an equitable kind of operation- an equitable kind of remedy, but it's also one that it may have because of the different manners of control and independence of other subsidiary entities creates complications. What does it do in the case of acquisitions? I mean, we know that institutions are going to be closing or merging. If we have an institution that is already barred from Public Service Loan Forgiveness, and they are in financial trouble and they're being acquired by another institution, does the acquiring institution acquire the problematic, the problematic status under the statute? And now all of their individuals are going to lose Public Service Loan Forgiveness, or the reverse. You have- let's say you have an institution that's been found to have engaged in inappropriate activities. They are financially strong. They identify a smaller institution to do an inverse acquisition, where they merge into a smaller organization, take over its taxpayer ID number, take over

its board, take over its operations, fund them with some
large sum of money to make the sweetener happen, and all
of a sudden, they have cleansed themselves of this
problematic behavior for purposes of the statute. And
then the other example is least employees. There are
plenty of nonprofits or higher ed institutions, who will
have an affiliated nonprofit entity with its own
501(c)(3) number and its own board of directors, but the
employees are all EIN of the parent university, and
they're leased to the other nonprofit, yet the other
nonprofit board controls them. And so, the consequence of
bad behavior by that small board, either it opens the
question of how do you get out at them, or those are
employees who are now tainting because they are EIN for
the larger entity. They're-

        MS. WEISMAN: You have 15 seconds
left.

        MR. JONES: -they're tainting the
larger entity. How do you deal with that from an EIN
perspective?

        MS. WEISMAN: Jeff?

        MR. ANDRADE: So, in the first case
with the evolving structures and mergers and
acquisitions, as long as the entities remain eligible
employers, does it matter that they are the same eligible

employer? I mean, it's analogous to transferring to go
from one, one college to another. The (inaudible) of the
Bard Institution, I think, is problematic. And we had
that issue with default rates and, and so I think that's,
that's something I think we can definitely take back. The
least employees I would say is very similar to the first
instance where does it matter if they're working for
another eligible employer.

MS. WEISMAN: Jacob?

MR. JONES: Can I respond to his
question? Because it was a question.

MS. WEISMAN: Sure.

MR. JONES: So, the question of- its
who they work for, but they are not under the control of
that parent institution. What you do is you contract to
allow other people to control your own employees. They
obviously you're now outraged by what they do. You end
the arrangement, but your employees engage in the action.
I employ 100 people. I have four who are under the
control of somebody completely outside of my board's
control. They do things they shouldn't have done. We
sever the relationship with that board, but they're still
employed by my organization. Or even if we fire them,
we're now in the situation that we've lost our
eligibility because of the actions of people we didn't at

the time control.

MR. LALLO: To clarify, are you suggesting that the employees who are leased- so organization A leases employees to organization B and then Organization A's leased employees engage in illegal activities for organization B?

MR. JONES: At the direction of organization B. Let me give you a more concrete example. I have an environmental justice center where the leadership decides, it's great that we're going to vandalize- spike trees and vandalize road graders, and they go out and do so. That might qualify for vandalism tort here. But they were not under the control of the university. They were under the control of this little board and followed their directions and did so. Yet they're technically employees of the larger university. Why should the larger university, upon discovering this, that people they didn't control actually engaged in behavior and they were technically their employees?

MS. WEISMAN: Jacob, and then Heather.

MR. LALLO: Yeah. I think you're getting at a more complicated issue of agency and control overall. I don't think least- like the hypothetical of least employees being directed to destroy bulldozers is going to affect organization A's qualification for PSLF.

You have a broader issue of whether your employer can direct you to engage in illegal activity regardless, because you're talking straight common law destruction of property. So, I think that it's an interesting hypothetical, but I think it would probably not affect organization A, because presumably these employees are at the very least operating under the control of another organization. And two, it's not organization A directing the behavior. And so, it's not Organization A's behavior because they would not be found responsible for it criminally because they didn't direct it, unless they did it with the knowing consent of organization A, who effectively implicitly allowed the conduct.

            MR. JONES: Some language to that effect might be nice.

            MR. LALLO: I mean, it's a narrow situation, though. I don't disagree with you. I understand your principle, but like, we're getting into very arcane issues of agency law at that point. So, do you have proposed language that you would like to submit to us? Because I think it would be useful to see it. I think your point is well taken, but I would like to see how that would be written out and explained.

            MR. JONES: In response to it, I would like to say no, I am a lawyer and I, having worked here,

noticed that there are a lot of them here, and maybe in developing this language they could come up with something.

        MS. WEISMAN: Do you want to respond to that?

        MR. LALLO: Point well taken. We could. I just didn't know if you had anything in mind already. I do want to respond to your other point previously, though, about mergers and acquisitions within colleges. So, tying it to the EIN structure, I think is useful. As Tamy noted, there might be some capacity to split EINs. That's going to depend a little bit on the ownership structure of universities and who signs the paycheck, right? It depends on who the owner is and who's actually paying the employees. If you have a structure where you have entity A that owns three locations and the employees at- or, it's the organization itself that gets in trouble, not the institution. So that would probably apply across the board. I think with your other hypothetical where you're discussing a college taking over another college, if the surviving entity has the tainted EIN, then yeah, they wouldn't qualify because it's that organization's employees. If another organization comes in and purchases that one, and the surviving EIN is a clean EIN, I think they would be fine,

at least under our current structure.

          MS. WEISMAN: Let's move on to Heather.

          MS. BOUTELL: I was really pleased to hear the response to Betsy's question about how the City of Boston is huge, and how it could be one entity of Boston that is breaking the law. And so that entity would be the entity punished. So, I'm just thinking in terms of not-for-profit institutions or public institutions of higher education, where there could be one aspect of one small department on campus like Todd mentioned, a specific area, whereas across campus that's not happening at all. So, we're not thinking of getting into the granularity of EINs for institutions, but just governments.

          MS. ABERNATHY: Let me get back to you on that, because I don't know.

          MS. BOUTELL: Yeah, I think that's many of our worry is that there are going to be certain aspects of campus that could possibly commit one of these acts, and other aspects of campus have nothing to do with it. And so, I never thought of the fact that it wouldn't be the whole campus punished. But in this case, when you mentioned the government, I thought I should ask at least.

2025 Negotiated Rulemaking - 6/30/25

MS. ABERNATHY: Well, Heather, we can always count on you to give us something to think about. Let us take that back. I don't know. I just simply don't have the answer for that right now.

MS. WEISMAN: It's about 2:15. I don't see any other cards up right now. How would we feel about a ten-minute break?

MS. ABERNATHY: We would feel fabulous.

MS. WEISMAN: Ten-minute break, it is. See you all at 2:25. Welcome back, everyone. Thank you for returning from the break promptly. We had some really good discussion beforehand, and I just want to remind everybody that we are going to have a little bit more, about another hour, and then we'll break for public comment. I'll do a quick intro for public comments. We'll finish out about 25 after 3:00. We'll do public comment from 3:30 to 4:00, and then you will be finished for the day. They were thinking it. That was the inside the head voice. I do not see any cards yet. But that is your invitation.

MS. ABERNATHY: If it's okay, we're going to move to the next point, unless you all have further discussion from what we were discussing earlier before the break.

2025 Negotiated Rulemaking - 6/30/25

MS. WEISMAN: We have one from Rebecca and then we'll move on.

MS. ABERNATHY: Okay.

MS. STANLEY: One quick question, and probably just clarification. And this is- I'm a new negotiator. So, no matter what we do in this process, we're not changing things. This is going forward to our best, and this is, from my own perspective, the best thing that we can do then is say, hey, some scary stuff has come up in verbiage or whatever, you know, that you brought up, brought out about the EIN numbers maybe being associated with the whole county and the whole state or whatever. So, if we're not going to stop it, then the best thing that we can do to reach a consensus is to say, what can we put in place to protect us as best as possible with the way that it's moving forward? I just want to make sure I'm understanding it correctly so I can be productive, because it isn't like we can, we can make you change your mind because you have to do it. And, and then it's in our best bet to say, okay, based on that, then let's all get busy on some revision ideas or whatever. I just want to make sure I'm understanding.

MS. ABERNATHY: Well, first of all, thank you for saying that because you said it probably better than any of us could. What we are doing is we've

2025 Negotiated Rulemaking - 6/30/25

come to the table now with proposed regulations. We're
walking through the discussion paper, you're giving us
proposals, you're giving us things to think about. We're
going to go back to the table. We're going to evaluate
our proposed language. You're going to continue
throughout our discussions to give us more things to
think about. And then at some point, we are going to come
to you close to the end of all of our additional
discussions with another set of proposed regulatory texts
that you as a committee, the primary negotiators, will
review and decide when the facilitator says, let's do a
consensus check or a final consensus on whether or not
you agree with our proposed regulatory text, and we can
either reach consensus or you- we don't reach consensus.
That's kind of how this process works. What we did is
propose the language. You're exactly right, though. We,
we are doing this is still being negotiated, but we are
promulgating rules for this particular purpose. So yes,
we are doing that. But we're hoping that by all of the
robust conversations and all of the many ways that you
guys are trying to play stump the fed, we are going to
come to the table with modified proposed regulatory text
for consideration as we move through these negotiations.
So, we're taking all of your proposals, which is why
we're not discussing them in depth, because we haven't

had a chance to look at them. So, you have us at a
disadvantage, right? You've all- you've seen them. You
know what you want to do. We've got to take a look at
them. So, this afternoon, when you all go home or do
whatever, we're going to go back up to our huddle room
and start looking through proposals and start talking
through things that came about, just like we did during
lunch. So, we'll continue to meet during negotiations so
that we can continue to have the robust conversations and
eventually come to the table with the final set of
proposed regulatory changes for your consideration. Make
sense? Is that better?

          MR. ANDRADE: And to add to what Tamy
just said, because I know your new ones. This is the
stage before we actually even issue a notice of proposed
rulemaking, which is the way most agencies normally do
it. So, there's also another opportunity that- but our
hope is that we iron out as many of the wrinkles. So,
when it comes to issue the notice of proposed rulemaking,
there's a lot fewer issues and a lot fewer problems that
people see. But there will be another opportunity to
comment on the proposed regulations before they become
final.

          MS. WEISMAN: Tamy, are you ready to
move on to a new topic? And if you could announce what

the topic is in case anybody wants to change seats?

MS. ABERNATHY: Yes, ma'am. So here you thought we would just jump right on into H. Because I know you're just burning to have us discuss H. But we've decided actually, that's what we're doing. We're not going to G. We're going to H. I was all excited to trick you, but I failed in that delivery. But we have talked about C, so we will talk about H. Then we will talk about I. And so we're a little bit out of order. But we do know how to go through the alphabet, I promise. So, if my colleague will share section 685 219(h), we will go ahead and start navigating through subsection H. The standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose. The Department proposes a new paragraph. Excuse me, a new subsection H, to set standards for determining if an organization engages in activities that have a substantial illegal purpose. The Department believes it needs a consistent way to determine when a qualifying employer engaged in these activities. The Secretary of the Department has broad authority to promulgate regulations to administer the direct loan program. As stated in the PSLF discussion draft, the executive order tasked the Department with ensuring that employers that engage in substantial illegal activity are excluded under

the PSLF program. The Department will ensure transparency throughout the entire process. The Department will make consistent determinations based on the preponderance of evidence and will notify employers of this determination. All employers will have the ability to contest a finding by the Department that it engaged in substantial illegal activity on or after July 1, 2026. In crafting options for proposed subsection H, the Department explored judgments and legal proceedings in a state or federal court or tribunal of competent jurisdiction. Judgments and legal proceedings in a tribunal would reduce the burden on the Department, since the Department itself would not adjudicate whether the organization engaged in these illegal activities. Instead, we would rely on processes that took place in court to determine that the employer engaged in illegal activities that have a substantial illegal purpose. To that end, the full proposed text at paragraph at subsection H reads: The Secretary determines by a preponderance of evidence and after notice and opportunity to respond that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial

illegal purpose. (1) A final judgment by a state or federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose. (2) A plea of guilty or nolo contendere, whereby the employer admits to have engaged in activities that have a substantial illegal purpose, or pleads no low contendere to allegations that the employer engaged in activities that have a substantial illegal purpose, or, (3) A settlement that includes admission by the employer that engaged in activities that have a substantial illegal purpose, as described in subsection H of this section. We're going to go on to romanette I.

MS. WEISMAN: Mary Lyn.

MS. HAMMER: Sorry about that. In number three, does that include civil?

MS. ABERNATHY: Yes, it does. So, let's go on to I, and then we'll discuss both H and I. Oh my goodness. Could we- thank you, Michael. Proposed paragraph I describes the process for determining when an employer engaged in activities that have a substantial illegal purpose. The Secretary will determine that a qualifying employer violated the standard under paragraph H of this section when the Secretary receives an application as reference under subsection E of this section and paragraph E outlines the PSLF application

process- the current PSLF application process which the
employer does not certify that it did not participate in
activities that have a substantial illegal purpose, or
determines that the qualifying employer engaged in
activities that have a substantial illegal purpose under
subsection H. Paragraph I means that the employer will
lose eligibility at the time the Department removes
eligibility after weighing all the information and
evidence. Now we are discussing some changes to the
certification part. So, we're proposing this, but we
heard all of the conversation from before about the
certification and all your concerns. So, we've got that.
We are looking at- but for right now, we were prepared to
just discuss this as our proposed language, and we hope
to have something additional for you to consider
tomorrow. So, at this time, I'd like to turn it over to
Annmarie. We invite your thoughts on this proposed
framework for our standard.

          MS. WEISMAN: Alyssa, and then Todd.

          MS. DOBSON: So, I know we talked a
little bit about how an institution or an entity would
regain eligibility. And I think this is the space with
which to address that. Maybe some sort of time frame and
appeal process, because it seems right now the way this
is worded is once this happens to you, it's forever.

                    MS. ABERNATHY: May I respond to that,
Annemarie?

                    MS. WEISMAN: Sure.

                    MS. ABERNATHY: As you, you may or may
not know. We don't have that language ready yet. We just
have heard from you that you would like to see an
eligibility, a regaining an employer have a reinstatement
of considering qualifying- being qualifying. We're going
to need some time to get that language for you. So yes,
we will have something to share as soon as possible. It
will not be today, but as soon as we get that, we'll get
that to you. But yes, we are considering that. Thank you
for those suggestions. We've heard you. See, we do
listen.

                    MS. WEISMAN: Todd?

                    MR. JONES: My concern is related to
the bootstrapping of privately engaged tort litigation
towards non-profit colleges versus the publics. The
public entities are in various ways, not going to be
subject to the same risk of tort lawsuit because of
limitations on the ability to sue state governments that
nonprofits are. But to take it a step further, if the
standard here is that you're engaging in a pattern of
behavior that is tortious, and let's say that it is
discrimination. A series of Title IX suits against a

higher ed institution would constitute a pattern. It may
be only part of a campaign to leverage some other end for
a college that lacks resources and the ability to respond
to these lawsuits. And I gave Title IX as an example.
Believe me, there are a whole host of other examples.
That institution would then, if they settle, saying we
did this just to get the litigation over with, has now
engaged in a pattern of discriminatory behavior based on
tort suits brought by private individuals. How- a) that's
not going to happen to a public institution for the most
partor the same extent, and b) how do you deal with that
issue?

                MS. WEISMAN: Jacob, did you want to
respond to that?

                MR. LALLO: Yeah. So yeah, that's
where I was going.

                MS. ABERNATHY: Okay.

                MR. LALLO: Yeah. So, in regard to
state tort suits, , like I said, we discussed previously
what violating State Tort Law means within this context.
I think your point with the issue of you could target an
institution with a large amount of complaints or
seemingly the purpose of forcing them out of PSLF or be
difficult. I think that's where really that preponderance
of evidence standard comes in. We would look at that. If

it just- they're just a bunch of complaints that haven't
been substantiated, there's nothing there. If we had
conclusive evidence that there's an admission of guilt in
a settlement that you discriminated, that's conclusive.
And I think that's significant because you mentioned
you're an attorney. You know as well as I do that most of
the time when you enter into a settlement agreement,
there is no admission of guilt. An admission of guilt in
a settlement agreement is significant in of itself. And I
think otherwise. We're talking about a proof of
discrimination of some kind in this hypothetical in state
court or some other conclusive statement by the entity
itself, which that's what a settlement agreement where
you admit guilt would be. It's conclusive evidence
against you. And I think it's a narrow issue.

                    MR. JONES: First of all, as we know,
it's not guilt, in a civil case, it's an admission of
liability. Am I on? Yes. It's an admission liability. And
in fact, those do go on especially the ability to bring
legal expertise and resources to bear against smaller
colleges. I'm not going to do it here publicly, but I
know numerous nonprofit colleges around the nation who
are being actively attacked right now from the right. I
also know of a significant number of institutions, and
you've read in the papers who were being attacked from

the left just a few years ago. It swings, not surprisingly, with the nature of who's running this building. Okay? And my concern remains that if the choice is institutional survival and loss of public sector loan forgiveness or litigating and risking the entire enterprise, they'll write whatever they can to get out from that wave of litigation, which can be undertaken as a political pursuit. And if we're- anyone here-

MS. WEISMAN: Thirty seconds left.

MR. JONES: -from the left and right, you know, in the modern era, we're kidding ourselves.

MR. LALLO: So, to respond first, I apologize for (inaudible) guilt and, you know, liability. You're correct. That being said, it's still a statement against interest. You're admitting that you did a thing that we said that you can't do and participate in the program. And I think that alone is enough to put you out of it. I understand your point that you could have politically motivated complaints and people can bring suits very easily against institutions. But at the end of the day, that is a statement against interest. And I would think that a university that's concerned about this is going to weigh the balance of benefits in admitting to something if they genuinely believe they didn't do it. And I mean it's part of what would go into the concept of

making a settlement. You have to weigh the balance of
harms.

               MS. WEISMAN: Betsy, and then Tommy.

               MS. MAYOTTE: Thanks. So, I want to
talk about the word substantial. I think it's in the
wrong place. Taking aside that this whole section H just
brings back the whole discussion we had, my concerns
about the EINs and different departments. But say you
have a let's call it a public service university and
they're huge, they have a thousand employees and their
history department they've been studying history too
much. And because of that, they've gone back to medieval
times. They have a bunch of lawsuits against them for
discrimination, and they've agreed to multiple
settlements of it, but they're the only part of that
university that falls under that. So, under this
definition, that whole university, my understanding,
would lose their eligibility. I question all of this, but
shouldn't we be mimicking the existing definition for an
eligible employer under PSLF? So, if you think about non-
501(c)(3) nonprofits, in order for them to qualify, their
primary reason for being, the substantial activities that
that nonprofit performs has to fall under one of the
categories. So why doesn't this say that the substantial
amount of activities that the entity does has to be

illegal in order for it to lose eligibility? Rather than the example I gave, which maybe not clearly or only a tiny part of it was doing the bad thing and the rest of it wasn't? Did I make any sense at all?

MR. LALLO: So, you're suggesting that we near the 501(c)(3) Organizational and Operational Test Effect, or the Operational Test Language?

MS. MAYOTTE: (inaudible) your 501(c)(3) eligible today. Full stop. No ifs, ands, or buts.

MR. LALLO: No, I understand that. But you're talking about the test the IRS implies in terms of substantiality.

MS. MAYOTTE: I'm talking about the test you that you have. So, for non 501 C3 nonprofits, the example I like to use-

MR. LALLO: So yeah, no, I get what you're saying. You're talking about the substantiality of conduct within the thing.

MS. MAYOTTE: That's right.

MR. LALLO: Yeah. Okay. That's what I was getting at with the IRS thing. So, we have looked at that issue. We're taking that into account, and we will probably make some revisions and propose some new language with that soon. We've been workshopping some

changes to it, but we were considering the materiality of conduct and how much it should affect the whole. So, point taken, and we are looking at that. Yep.

MS. WEISMAN: Abby, is your card up? Then you're next. Aaron will bring you a microphone if you like.

ABBY: Now it's on.

MS. WEISMAN: Now it's on.

ABBY: Thanks. On subsection H, I just wanted to make sure that we're all very clear and confirm with the Department. I think earlier in the rulemaking, there was sometimes a suggestion that institutions would only be deemed to no longer be qualifying employers if there were a judgment in court or a settlement with an admission or a guilty plea. But my read of subsection H is that that yes, all of those things are conclusive evidence, but that the Secretary, even in the absence of such conclusive evidence, can still determine that an organization or a government agency has engaged in activities with a substantial illegal purpose by using a preponderance of the evidence standard and looking at other evidence that is inconclusive. And so, I wanted to confirm that that's correct, and then raise some questions about how the Secretary would be in a good position to adjudicate potential violations of terrorism

law, potential violations of immigration law, potential
violations of state medical treatment laws, etc.

　　　　　　MS. WEISMAN: Tamy, do you want to
respond to that, or do you want to get to some of the
other comments first?

　　　　　　MS. ABERNATHY: I want to respond just
to some of that. First of all, it is not just a
preponderance of evidence. So, if you have one of these
three, one, two, or three, right? It is conclusive
evidence that the employer engaged in activities that
have a substantial illegal purpose, a final judgment, a
plea, a settlement. Those are conclusive. If there is
additional evidence, then the Secretary would determine
by a preponderance of evidence after notice and
opportunity to respond, that they have engaged in a
substantial illegal purpose. So, when it says here the
second part of that, the following is conclusive
evidence. So, we don't need the preponderance of evidence
at that point because this is inconclusive evidence, one,
two, and three. So that clarifies your- no, the Secretary
is just not going to determine any of those things. If
one, two, or three are done, whether it's final
settlement, a plea or- I'm sorry, a final judgment in
state or federal, those things are conclusive. Okay? So,
then they don't have to- she doesn't have to engage in

the preponderance of evidence review.

ABBY: Maybe my question was unclear. I apologize. My question was, in the absence of such conclusive evidence, in a case where there's no final judgment, in the case where there's no guilty plea, in the case where there's no settlement, this language would still permit the Secretary to nonetheless declare that an employer is no longer a qualifying employer, because of the Secretary's opinion. The Secretary's preponderance of the evidence determination that organization has violated terrorism law, immigration law, state tort. One of these other categories, maybe it doesn't apply to state tort, but the other categories it would seem to apply. So, I want to clarify.

MS. ABERNATHY: After notice and comment, notice is an opportunity to respond. Right? So, it's not just the Secretary is going to say it's done. There's going to be a conversation about it. Do you want to add something, Jacob?

MR. LALLO: Yeah, so you're specifically referencing one and two violations of federal immigration laws or terrorism laws.

ABBY: Or discrimination law.

MR. LALLO: Well, I would say discrimination law already falls within the Department's

purview to some extent. Several of the programs that we
administer involve considering issues of racial
discrimination. I think within the first two, because
we've referenced directly to other aspects of the U.S.
code, and those are specifically enumerated federal
offenses, we would not be making those determinations on
our own. The Secretary would not be determining if
somebody had committed acts of terrorism. The Secretary
would be looking to whether DOJ has brought a prosecution
for that. I think in the other cases there are- where
there's not specifically enumerated offenses, that's
something that can be weighed by the Secretary under the
preponderance of evidence standard. But the other- those
two in particular is because they're tied directly to
offenses, we're going to rely on DOJ and then ultimately
the courts before there's any determination made on that.

           ABBY: Could I do one thought?

           MR. LALLO: Sure.

           ABBY: Thank you for that point. I
just want to say that none of that's in the language. So
as written, I don't think necessarily the public can have
confidence that, that the Secretary would limit her
discretion in that way. She wouldn't be bound by these
regulations to limit her discretion in that way. I would
also add that while absolutely, the Department does a lot

2025 Negotiated Rulemaking - 6/30/25

68

of work on anti-discrimination in the context of education, the Department is not normally in the habit of policing discrimination in non-educational settings. We have other branches of government, the Department of Labor, the EOC that manage employment discrimination, for instance. So, this would be still the Department getting involved in new areas of law and enforcing bodies of law that we've generally and that Congress has generally given other agencies the power and the responsibility to enforce.

MS. WEISMAN: Over to Tommy.

TOMMY: Thank you. Just a couple of questions about the timeline. (inaudible) a final judgment. That means after you've exhausted all your appeals, correct?

MR. LALLO: It would be- yes.

TOMMY: Okay. And then can you help me understand when an employer would be notified and when the Secretary makes their determination that yes, this entity is engaged in illegal activities, we will no longer count their employees' payments. Does that start at the final conviction, or the final judgment, or does that start after the Secretary says, okay, on X date, anything up to that you are not able to count as part of your payments.

MS. ABERNATHY: It would be the date
the Secretary determines, and it's not that they would
not be able to count up to that. They are able to count
up to that date. They cannot count prospectively going
forward, but they can count. So until that date is final
and, and the Secretary says as of this date, you are no
longer a qualifying employer, up until that date, they
would be considered a qualifying employer.

TOMMY: And then you guys are
currently working on language that will narrow the
definition of when the Secretary is able to put in that
next date?

MS. ABERNATHY: Well, I will tell you,
having just had it surface right now, I have a note that
says, tell Abby we're going to take this back. Thank you
very much. And so, we do have some additional brand
spanking new language that we would like to share with
you in just a second. But we are going to take some of
the things that have been mentioned here back and
discuss. But I do want to share the new language with you
so that we can kind of- we've heard you already, and this
is how we work. We just kind of really come together and
try to hear what you're saying and mitigate some of the
concerns that you're presenting. So, what you're doing is
working, and we'd like to share some hot off the press

2025 Negotiated Rulemaking - 6/30/25

with you, and we'll go from there.

MS. WEISMAN: Can someone send me that
text? I've been sending out messages with updated
language as I've received them, and I know we have some
people who are struggling to see the monitor, so.

MS. ABERNATHY: I'm sure they'll send
that to you. Now that you've mentioned it.

MS. WEISMAN: Thank you. Next, we have
Rebecca.

MS. STANLEY: I have a question if-
and I hope I'm not speaking on an appropriate topic at
this time. But when we're talking about standard for
determining a qualifying employer engaged in activities,
it's very hard to eliminate any of the verbiage in there
that you're required to have. For instance, all those
things that it said, what was illegal activities. What if
instead we could to protect our borrowers and to protect
using the county as an example, one department from the
other department that's doing something incorrect, what
if we just fine-tuned what a qualifying employer is?
Because when you look at that verbiage, it's very broad
and it's a United States-based federal, state, local, or
tribal government organization, agency or entity,
including the US Armed Forces of the National Guard. Or,
like you were saying, universities being held liable for

2025 Negotiated Rulemaking - 6/30/25

some of their subcontracting or leasing to. If we could
somehow fine-tune what a qualifying employer is, that
might be easier to control so the rest of us could be
protected from the bad guys.

                MS. ABERNATHY: So, what I would say
to that is if you have proposed amendatory text that you
would like to share with us, we would welcome that.
Cannot commit us to anything at the moment, but we would
certainly be interested in seeing any proposed language
you have for defining qualifying employer differently
than we have.

                MS. WEISMAN: Bob?

                MR. CAREY: Two questions. One, does
the opportunity to respond also include judicial appeals,
or does the first conviction start the clock? The first
judgment.

                MR. LALLO: Opportunity to respond or-
I think we're conflating two things. If we're talking
about the court case against an organization, that the
opportunity to respond would be after that is finalized,
assuming I think the Secretary moved very quickly after
there was a district court case. If we- or they were put
on notice at that point, that would be stayed until all
appeals were exhausted, and that moved up. And then the
determination could not be made until it's finalized.

MR. CAREY: Thanks. Okay. And then the second thing is, how would a gender transition medical treatment be found to be a substantially illegal activity if there's no judgment, if it's in a state where there's no prohibition.

MR. LALLO: Yeah. So, our perspective on that is that it fits within the broad concept of public policy doctrine as articulated by the IRS. There's an established public policy against supporting these kinds of activities that's been articulated by the Federal Government and by states. Twenty-six states have passed laws related to this kind of care. The President has issued eight executive orders, all dealing with this in some capacity. And we recently had a Supreme Court case which upheld a Tennessee Law related to this kind of care. So, we understand the overarching point that you're making. But we have considered that within the public policy doctrine. So, while it may not be strictly illegal in terms of there is a crime on the criminal books that says it, we think it fits within the larger concept of public policy and policy that has been- or is contrary to public policy, as has been espoused by the Federal Government and the states at this point.

MR. CAREY: So, then that would be determined under the first sentence in section H of the

2025 Negotiated Rulemaking - 6/30/25

Secretary determining by preponderance of the evidence?

MR. LALLO: Not inherently. In states where there are laws on the books related to it, those things are there, and you can still have a settlement agreement in which an organization admits to it.

MR. CAREY: No, my question was with regards to states where there was no prohibition.

MR. LALLO: Yeah. In that case, it would mostly it would be either preponderance of the evidence or admission in some other capacity of liability of whether or not they were liable for that precisely. But in a settlement agreement or some other admission against interest, otherwise we're talking about it wouldn't be under the conclusive standard, it would be under the preponderance of evidence standard.

MR. CAREY: Thank you.

MS. WEISMAN: So, I just sent some revised language, including from the Department. You should have that in your email boxes now. We have about 25 minutes left before we begin the public comments. Tamy?

MS. ABERNATHY: If I could ask my colleague Michael to share the new H. Todd, is this something you want to wait to discuss or? Okay. So, Annmarie, we would like to look at the new H, but I'm

going to need it up on the screen, please. It's so new. I
have yet to see it all. How's that for new? Oh, my. Is
this the new stuff? Yes? Michael? Okay. Alright. New H,
standard for determining a qualifying employer engaged in
activities that have a substantial legal purpose. The
Secretary determines by preponderance of the evidence and
after notice and opportunity to respond, that a
qualifying employer has engaged on or after July 1, 2026,
in activities that have a substantial illegal purpose, by
considering the materiality of any illegal activities or
actions, by gauging both frequency or severity, and will
not find that the organization has a substantial illegal
purpose if it has only engaged in illegal activities or
actions that are minor or purely technical. In making
such determination, the Secretary shall presume that any
of the following is conclusive evidence that the employer
engaged in activities that have a substantial illegal
purpose. And I believe the three of those have stayed the
same. So, it is only that leading paragraph of H. And
it's the materiality. Hold on, I can't find it.
Materiality of any illegal activities or actions by
gauging both frequency or severity and will not find that
the organization has a substantial illegal purpose if it
has only engaged in illegal activities or actions that
are minor or purely technical. Period.

2025 Negotiated Rulemaking - 6/30/25

MS. WEISMAN: Laurel? We've got a
microphone on the way for you.

MS. TAYLOR: Thank you for so quickly
surfacing that language. So, materiality, when we go back
to the example that Betsy raised, just to ensure that I'm
understanding that correctly, if it is one small group of
people versus multiple organizations across the state, as
an example, I think the problem we're trying to solve
here is not penalizing the whole by adding the
materiality language. From a definition perspective, can
we talk a little bit about the difference between
substantial and materiality, in terms of what materiality
lends to the assessment around illegal activity being
conducted? Where's the bright line between substantial
shawl and material?

MS. WEISMAN: Jeff?

MR. ANDRADE: So, what we heard with
regard to this discussion and the need for materiality
was really not penalizing organizations for the one-off
occurrence. And also, not penalizing organizations for
violations that were generally technical or minor. So,
this looks at both the severity- because in in the
instance of- let's give the example, probably the worst
example, which is terrorism, supporting a terrorist
organization. From our perspective, and I think Jacob's

talked about this from the qualitative perspective, that is at such a level that even one instance is too much. As opposed to let's say maybe the state tort violations, which are more as a pattern of violations. So, we're looking at both frequency and severity in the standard.

MS. WEISMAN: Tommy.

TOMMY: So, I work at a nonprofit, whereas my side is a C4 (inaudible) the advocacy side. We also have a C3 side. And it's a little bit separate. We don't always comment on the work that they do, but, they have those intellectual principles that are important and they put out. So, as I'm reading, you guys will look at, if it's something minor or purely technical, if there is a nonprofit that is called the Transgender Advancement Institute, they comment on why transgenderism is good. We encourage lawmakers in states to promote this type of policy. Would the Department look at those writings, whether it's a white paper or an op ed, if it's a series of them, and that would not count?

MS. WEISMAN: Jacob.

MR. LALLO: Yeah. So, I think that's a separate thing. I think the definitions of which are the actual items outlined as substantially illegal activities are more narrow than that. We're not talking about statements against or in interest of one thing or

ED_02104

another. That's a separate ball of wax entirely. We're
not looking at limiting speech. We're looking at trying
to curb behaviors that are either illegal or against
public policy. Advancing a certain viewpoint in a
peaceable legally permissible manner certainly does not
fall within that. I think, and this kind of goes back to
Laurel's point as well the purpose of adding in the
materiality qualifier is if something becomes substantial
at the point it becomes material, or if it's material, it
becomes substantial. So those two things are
intrinsically tied together here. And I think that that's
really where the technical compliance comes in. Small
things where an organization isn't really aware of what's
going on or it's something very small, that's not going
to knock you out. We are looking for stuff where you are
willingly and actively engaging in illegal activity or
activity that is clearly against public policy.

                MS. WEISMAN: Tommy.

                TOMMY: Gotcha. Thank you for the
clarification, and I'm very happy for it, because
obviously we don't want to penalize people based on
things they write or what organizations put out. So,
thank you for the clarification.

                MS. WEISMAN: Tamy?

                MS. ABERNATHY: I also would like to

add this is not about a personal opinion. This is about what activities the employer engages in and if those activities based on this standard, are material. And so just keep the distinction. We're not saying whether or not someone with transgender beliefs- we're not going to the person. We're talking about the employer activities. I just want to make sure that we all understand it's the activity for which we are looking at for the employer, which I know what you're saying, it was about a topic, but that is not the employer per se. Right? That's just an opinion piece. But that's not committing substantial illegal activity.

TOMMY: Sure. I think my broader point was, if you have an organization whose mission is to promote illegal immigration or promote transgenderism or some of these things that we're talking about, would they be penalized for putting out writings that support those sorts of things, even if they're not directly engaging in illegal activities themselves, like helping people across the border or doing some of these surgical things. But if they're talking into the ether about why we should encourage those types of things, would that be penalized?

MS. WEISMAN: Jacob?

MR. LALLO: Yeah. I think you're addressing a kind of interesting issue that falls under,

where- I apologize, I put a Lifesaver in- what isn't
protected speech. Again, the goal of this is not to limit
speech, it's to limit activities. I think if you're just
talking into the ether about why something should or
shouldn't be illegal, that's a completely different thing
than actively engaging in that activity. I think
obviously there's some lines that you could draw if
you're encouraging people to commit acts of terrorism,
that doesn't really fall within protected speech, period.
So that's a little bit of a different issue. But I think
within your broad concept that, yes, you have
organizations that have perspectives that they're
advancing again, legally, peaceably, and within
established channels, we're fine.

                    MS. WEISMAN: Laurel?

                    MS. TAYLOR: Just one more question,
because we've had a number of employers just write in
this morning. Is providing patient care to illegal
immigrants considered illegal activity?

                    MR. LALLO: So, the language that, as
written in 30, is aiding and abetting violations of
immigration laws, it's only illegal activity if it's
violating that specific section or other federal
immigration laws. So, unless that care somehow fits
within one of those buckets and would somehow violate

federal immigration law, no.

MS. TAYLOR: That may be helpful just as a takeaway for those in Texas and California. This is emerging as a very strong trend around fear. Additional language to clarify, just to give those, those agencies comfort around that definition and consideration. Thank you.

MS. WEISMAN: Tamy, did you want to respond to that?

MS. ABERNATHY: I do want to respond to one piece of it. That is exactly what I was supposed to clarify earlier about qualifying employer. The definition that we changed in 21-22 was to include contractor work in the case where you get a 1099 because the state has a prohibition of hiring you as a full-time employee, like the state of California and Texas does. They do not hire the doctors and the nurses. They are considered contract workers. So, it is only when you mentioned, Laurel, the contract workers. It's a very rare instance. It's when the state has a prohibition of hiring them as a full-time employee. And the only way they can work in those, those healthcare positions is to be a contract worker. They do not have them hired as full-time employees of that hospital or agency.

MS. WEISMAN: Betsy, and then Tommy,

and then Heather.

          MS. MAYOTTE: I just want to make sure
I understand this edit. So, I know you figured out I love
my analogies. So, say you have Arizona State University.
They have 18,500 employees. Their School of
Interdisciplinary Studies is the smallest of the entire
employer. They have 30 employees. Those are real numbers.
That school ends up signing a settlement where they
agreed that they performed illegal discrimination against
a former team member. Under the new draft that you just
supplied, does that mean the entire Arizona State
University system is now excluded as considered an
ineligible employer from PSLF? Should that be considered
minor?

          MR. LALLO: So, I think there's a
couple of issues there. First off, it is the school
independent of the university or are they the same EIN?

          MS. MAYOTTE: (inaudible)

          MR. LALLO: Okay. So, then we're still
talking about these same organization. It's an aspect of
that organization. But that's equivalent to me saying
that our HR department is a functionally different
employer. That's different than I think than when we're
talking about a county that's segmented into completely
different divisions, which are functionally completely

distinct from each other. That being said the materiality
part does come into that. That's where that gets weighed.
And previously we talked about a pattern of
discrimination and how that is one incident, a pattern.
And the materiality qualifier is designed to address
that. It lets us look at exactly what's happening and
determine whether or not it fits within that. And it lets
the Secretary weigh rather both the qualitative and
quantitative aspects of it.

        MS. MAYOTTE: (inaudible)

        MR. LALLO: But the definition of
substantial legal purpose also says engaging in a pattern
of aiding and abetting illegal discrimination. So we have
that flexibility. What's a pattern? And that's where the
materiality qualifier comes in. So yes, you have a
statement that there's conclusive evidence that you did
this thing. But there's still that materiality qualifier.
And there's still the room to explore that.

        MS. WEISMAN: Heather, and then Abby.
Aaron, could you come over to Heather first? Thank you.

        MS. BOUTELL: Thank you for clarifying
that question about healthcare workers treating illegal
immigrants. I would just like to ask the question; would
it be the same answer for teachers teaching illegal
immigrant students in their classrooms?

MR. LALLO: Yeah, I think it would be the same. Again, the standard is not, I don't think there's a federal law against providing healthcare to somebody or teaching somebody in a school. There are federal immigration laws and there is one specific enumerated one, and then there are other federal immigration laws. So, if that teacher in this hypothetical scenario is actively violating those immigration laws at the behest of her employer, then they lose eligibility. If she's just teaching a kid in a school and there's no violation of an immigration law, then no, there would be no issue.

MS. WEISMAN: And then over to Abby.

ABBY: Thank you. And thank you for iterating on this language. I appreciate that there have been some additions in terms of trying to cap in the type of conduct that would render an employer non-qualifying by adding the materiality provision, engaging frequency and severity. I would say that that still doesn't really address the broader concern about how much discretion is still provided to the Secretary to make these determinations on areas far outside of the Secretary's expertise. And without a federal court finding. Normally determinations again about immigration law, anti-terrorism law, medical law, etc. would be left to other

agencies to determine, courts to determine. And I'm not
sure why we would give the Secretary the authority to
determine whether or not a nonprofit or New York City or
any branch of government is violating these laws that
have nothing to do with education. And then having the
Secretary use her own judgment to decide sort of how
severe is this violation of this body of law? That is not
my body of law, that is outside of my expertise. So, it
doesn't really resolve that concern. And I would say as
an example, and I also don't think the pattern or
practice quite addresses that, many discrimination cases,
for example, are brought on the basis of pattern or
practice of discrimination. So, for example, New York
City Fire Departments were sued for many years and they
resulted in settlements for gender discrimination. There
were findings, patterns of practices of gender
discrimination. I don't think that even people who are
very concerned about gender discrimination, would
consider that a severe violation, would think that that
should result in all firefighters, including all the
women firefighters who are the ones who raise these
concerns, should be punished as a result and lose their
public service, and should no longer be treated by the
government as people engaged in a public service.

                MS. WEISMAN: We'll go to Jeff and

then Tamy, and then we'll go for public comment.

                    MR. ANDRADE: Okay. Where do I start on this? Let me start with just making sure everyone understands on the education of students who are here who are not citizens, who are here and not under a green card that there's the Plyler vs Doe Supreme Court case so that they are able to receive a free and appropriate public education, and they have a right to that. So that, that issue- and I believe there's also sort of similar federal law with regard to emergency healthcare as well. So, I want to get both of those on the record. With regard to- what was the- help me out here on the topic. So, some of the other ones that we had here just to address them. Oh, Secretary's discretion. The issue there is we cannot prejudge the case. So, we couldn't say Secretary determines only based on this information. So that's why we have the language in there about preponderance of evidence, that we're looking at a number of things. But again, we're signaling that these activities, unless they are effectively rebutted, our activities that will result in, there's no intention on our part with regard to having the term preponderance of evidence that we're looking for additional information. In fact, we don't have a term, any other information in there. By preponderance of evidence, we're essentially just making

2025 Negotiated Rulemaking - 6/30/25

the statement that we are going to look at it on its
merits and not prejudge based solely on the three
criteria that we have in the regulation.

MS. WEISMAN: Jacob?

MR. LALLO: Yeah. I just wanted to add
also because Jeff pointed this out. With undocumented
immigrants and medicine that's established in federal law
at the Emergency Medical Treatment and Labor Act, which
provides right to emergency medical treatment as a matter
of cause for everybody. So that's a matter of settled
law.

MS. WEISMAN: Jeff? Okay.

MS. WEISMAN: Why don't we take just a
brief five-minute break? Please try not to leave the
room. We've got public comment coming, and I want to be
respectful of people's time and start on time. I'll have
just a little intro before that, but I think we could all
just use a quick stretch break. We'll now move on to the
public comment portion of the day. For those who are
commenting, each speaker will have up to three minutes.
I'll call your name when it is your turn. If someone is
not here when it is their turn, I'll move on to the next
person and then circle back to see if that person
arrives. Comments will be recorded as part of the public
record, so please say your name and any affiliation that

you'd like to mention at the start of your comment.
Again, you'll have up to three minutes. There is a series
of a set of lights that are sitting here over on my
table. The light will start out green when you begin. The
yellow light will shine when you have 30 seconds left,
and the light will go to red when your time is up. I will
also give you a verbal cue that you have 30 seconds left
so you can wrap up. Lastly, I would ask that those
providing a public comment please speak and act in a way
that is professional and courteous. I do reserve the
right and the discretion to mute the microphone of a
speaker who uses foul language, acts unprofessionally, or
refuses to stop speaking when their time is up. Our first
speaker is Jennifer Turner from Institute for Women's
Policy Research.

           DR. TURNER: Good afternoon. Good
afternoon.

           MS. WEISMAN: We'll send someone up
for you, hold on.

           DR. TURNER: Thank you.

           DR. TURNER: Okay. Good afternoon. My
name is Dr. Jennifer Turner, and I'm a senior research
associate at the Institute for Women's Policy Research.
Thank you for the opportunity to provide comments today.
Research shows that college education plays a crucial

role in driving economic mobility. As you know, however,
rising college costs have outpaced inflation and income
growth, widening the gap between the financial aid
students receive and the full cost of attendance. The
high cost of college means many students rely on loans to
pay for college, and as a result, 1 in 4 adults in the
United States has student loan debt. As of June 2024,
federal data shows that about 42 million borrowers
collectively owed just over $1.6 trillion in federal
student loans. In general, analysis shows that two-thirds
of these debt holders are women. IWPR research shows that
black women hold the highest average student loan debt,
followed by white women and subsequently Latino women.
According to data published by the Federal Reserve, about
16% of borrowers reported in 2023 that they were behind
on payments or in collection for a student loan. And
those with lower income levels are most likely to be
behind on payments. There is also evidence that some
groups of borrowers, specifically Black, Native American
and lower-income student borrowers, make slower progress,
paying down the original principal amount of their
student loan obligations than do other borrowers.
Finally, IWPR's research has highlighted that student
parents face unique challenges around student debt. They
are more likely to take out educational loans and have

2025 Negotiated Rulemaking - 6/30/25

greater difficulty paying them off than students without
children. All of these factors have negative long-term
impacts on the financial decision-making, security, and
stability of all borrowers and their families. For these
reasons, we need policies and regulations in place to
make higher education accessible and affordable for all,
including addressing existing student debt obligations.
As this committee continues to prepare to propose new
regulations for the Federal Student Aid programs
authorized under Title IV of the Higher Education Act of
1965, IWPR strongly encourages the committee to explore
ways to expand debt cancellation, particularly for
individuals experiencing financial hardship and
instability. Further, rather than diminishing the public
service-

          MS. WEISMAN: You have 30 seconds
left.

          DR. TURNER: Thank you. Rather than
diminishing or- diminishing the Public Service Loan
Forgiveness Program or PSLF, IWPR would encourage this
committee to seek proposals to bolster PSLF and identify
improvements to the program, to ensure that it is able to
fully utilize- to be fully utilized by all eligible
workers. So, thank you for your time, attention, and
commitment to this process.

2025 Negotiated Rulemaking - 6/30/25

                    MS. WEISMAN: Thank you. Next, we have
Blake Stilwell, Student Veteran.

                    MR. STILWELL: Hi everyone. My name is
Blake Stilwell. I served in the Air Force as a combat
photojournalist between 2001 to 2007. While I was in the
Air Force, I enrolled at American Intercontinental
University online for graphic design, and one of the
reasons I chose that program was for the web design
component of the school. I paid the substantial tuition
with student loans and tuition assistance from the Air
Force. But as soon as I joined up, the school told me it
had limited web design from the program entirely. I got
bait and switched but at the time, I didn't know any
better. On top of this, there was a series of problems
with my education. Professors always gave the same
grades, regardless of the quality of my work. They were
unapproachable, and all of my instructional materials
were found at Barnes and Noble for cheaper prices. I got
nothing out of my classes, and the promise of a career in
the design world of the future certainly wasn't part of
what I got. The quality of the education made me wonder
how the school was even accredited. When I left the
school with a Bachelor of Fine Arts in graphic design,
but not with any real skills. My diploma was nothing more
than a useless piece of paper. When I got out of the

military, I didn't know that this degree would never help me work in graphic design, and that I was woefully unprepared for that career. I completed a master's degree from Syracuse University in media and eventually kickstarted my civilian career, but that's how I learned that my AIU degree was useless, as Syracuse showed me the power of a school that delivers on its promises and reinforce the problems with low-quality schools like AIU. All of this is to say that I believe that dismantling the Department's gatekeeping puts veterans at risk. The VA depends on its oversight mechanisms, especially accreditation, to facilitate GI Bill school approval. I'm concerned there won't be adequate protections to keep veterans from becoming targets of predatory, predatory schools. Most military personnel leave the service after one or two enlistments, and many expect to use their GI Bill. But we don't know what we don't know when we're young. And there needs to be oversight to help impressionable young vets entering the civilian world for the first time as adults. Also, the Department needs to continue to provide loan discharge programs and affordable loan repayment options for students who never see the promised benefits of their degree. I'm speaking out so other veterans don't end up trapped in debt or misled by schools that take advantage of those who serve.

Above all, I believe it's important to realize that
employment trouble and financial issues are one of the
top drivers of veteran suicide, an epidemic that we have
only recently begun to turn around. You may have heard
this statistic of 22 veterans taking their lives every
day. But thanks to the hard work by our community and the
government agencies like yourselves, that number-

          MS. WEISMAN: You have 30 seconds
left.

          MR. STILWELL: That number is down to
17 per day. And we must continue to build on that
success. Rejoining civilian life is hard enough for young
troops, and even the smallest protections can have an
outsized impact on our futures. Thank you for your time
and consideration.

          MS. WEISMAN: Thank you.

          MR. ANDRADE: Annmarie, can we remind
folks that we're here to talk about PSLF and try to keep-
at least give us some feedback on the regs that are
before us?

          MS. WEISMAN: Yes. Keep in mind that
this committee can only work on the proposals that are in
front of them. So, while we're not restricting your
public comments, we would ask that ideally you speak to
things that they can actually do, and they're not able to

add other content to their negotiations. Next, we have
Michelle Poitier, who is also a student veteran.

                    MS. POITIER: Good afternoon. My name
is Michelle Poitier. I'm a US Navy veteran who served
faithfully for 13 years. In the intelligence community,
and after separating from the military, I stepped into
what I believe would be a path of purpose enrolling into
the University of Phoenix to pursue a business management
degree using my VA benefits. But instead of opportunity,
I encountered deception. I was told that none of my prior
credits were transferable after registration and
enrollment, forcing me to retake courses that drain both
my time and my benefits. I did graduate in 2010, but
despite my diligence, I didn't secure a job in my field.
I couldn't even get an interview. The promises Phoenix
made about job placement and success were empty promises.
Their degree became a paperweight. It was not power, and
it was not my pathway forward. I later discovered that I
had student loans that I never knowingly agreed to. I was
told my VA benefits would cover everything, but buried in
the mountain of paperwork I was rushed to sign were
documents enrolling me into loans that I never asked for.
I didn't learn about the $30,000 debt until I applied for
a home loan and was denied. I enrolled with dreams of
obtaining a six-figure future, only to graduate in the

same struggle that I started with, including crushing
debt. Fourteen years later, I finally received relief
through the TPD discharge program, but the trauma
lingers. The challenges linger. I encountered challenges
with mental health and a silent weight, other weights
that I've carried daily. My experience with the
University of Phoenix shook every aspect of my life, my
quality of life. I battled for over a decade for freedom
from debt that I never chose. And while I desire to
return to school, that fear of being entrapped again,
it's still a challenge. I share this testimony as a
warning and a war cry. No student veteran should be
deceived or defrauded under the flag they once served.
I've seen fellow veterans lose homes, marriages, even
their will to try, and some have lost their lives because
of situations like this. The recent staffing cuts at the
Department don't just shrink a budget. They shrink
access. They shrink equity and they shrink an opportunity
for our veterans. Education is a lifeline for those
transitioning from service to civilian life, and we must
ensure that that pathway is protected, not paved over.
Because this isn't just policy, it's personal. We fought
for this country and now we fight for the right to
rebuild in it. Thank you for your time and for hearing
not just my story, but for our collective cry for

justice. Thank you.

　　　　　　　MS. WEISMAN: Next, we have Winston
Berkman-Breen, the legal director from Protect Borrowers.

　　　　　　　MR. BERKMAN-BREEN: Good afternoon. My
name is Winston Berkman-Breen, and I'm the legal director
of the Student Borrower Protection Center, a nonprofit
organization focused on eliminating the burden of student
debt. I'm providing public comment today to highlight the
ways in which the administration's proposal is unlawful
and represents a gross overreach on behalf of the
Secretary to wide-sweeping, protected, and intimate
aspects of our lives. To be clear, if implemented, this
proposal would allow the Secretary to disqualify from
PSLF any employees of school systems that accurately
teach the US's history of slavery, of healthcare
providers who offer gender-affirming care, and of legal
aid organizations that represent individuals against
unlawful deportations or the entire public workforce of a
sanctuary city. Borrowers who believe in the promise of
Public Service Loan Forgiveness and committed to working
towards the public good will be penalized and saddled
with debt just because the Trump administration has a
different opinion of what the public good is. The
proposal is unlawful because it violates the
constitutional right to free expression and association

by targeting and penalizing public service workers and
organizations who take a stance at odds with this
administration's policies. The categories of so-called
substantial illegal activity are clearly being used as
proxies for the legal and protected rights to disagree
with the government, to demand due process, and to
gender, sexual, and racial equality. This was true in the
president's executive order on (inaudible) in March, and
it is true of the Department's proposal now. It is also
unlawful because the Secretary does not have the
statutory authority to exclude government and nonprofit
employers from the PSLF program. When a bipartisan
Congress created PSLF in 2007, it provided in statute
that qualified employment for the program included anyone
working at any government employer or at any 501(c)(3)
employer. Full stop. Congress did not empower the
Secretary to subdivide these employers into eligible and
ineligible for any reason. The executive branch does not
have the authority to rewrite the PSLF statute for-
through regulation. One of the negotiators raised this
twice today and twice the Department did not respond. I
want to conclude by stressing that although this is not a
serious proposal, it is a dangerous one. If the
administration has true concerns about whether employers
across the country are engaged in unlawful activity, its

law enforcement officers should conduct investigations
and then allow courts to determine the merits of those
allegations. Instead, it is proposed letting the
Secretary police American Society on topics ranging from
immigration rights to gender-affirming care to the right
to peaceful protest.

MS. WEISMAN: You have 30 seconds
left.

MR. BERKMAN-BREEN: I urge the
committee members to recognize that they've been roped
into a sham proceeding meant to validate a clearly
unlawful proposal, and to vote against this attempt to
weaponize PSLF to further the Trump Administration's
illegal culture war. Thank you.

MS. WEISMAN: Next, we have Tiffany
Gourley Carter from the National Council of Nonprofits.

MS. GOURLEY CARTER: Good afternoon.
My name is Tiffany Gourley Carter. I'm the public policy
director and counsel at the National Council of
Nonprofits. Thank you for the opportunity to speak today
on the importance of PSLF to the charitable nonprofit
sector and most importantly, to the people who dedicate
their careers to public service. For more than 30 years,
NCN has championed, connected, and informed the nonprofit
sector. We and our more than 30,000 nonprofit members

strongly oppose any efforts by the Department to
unlawfully restrict which 501(c)(3) nonprofits are
eligible employers under the program. The proposal to
limit nonprofits based on their missions and who they
serve exceeds the Department's legal authority.
Nonprofits make up approximately 10% of the workforce,
employing more people than the construction, finance, and
manufacturing industries, and we are unique in that
nonprofit employees are dedicated to public service.
That's why charitable nonprofits are the second largest
category of eligible employers, with PSLF second only to
service in government. Charitable nonprofits rely on PSLF
to attract and retain the high-performing workforce
needed to address the pressing needs of everyday life.
Nonprofits run local food banks. We serve veterans. We
assist domestic violence survivors, deliver meals to
seniors, provide faith-based services, teach kids after
school, and much more. Nonprofits are woven into the
fabric of every community in America, and they must be
able to identify and meet those needs without political
interference, fear of retribution, or removal from a
program designed to support their employees. The PSLF
authorizing statute clearly states that the term public
service job includes full-time work at 501(c)(3)
organizations. The bipartisan law states that an eligible

employer is an organization that is described in section 501(c)(3), quote, but simply the Department does not have the legal authority to restrict which 501(c)(3) organizations do or do not qualify under the law. In addition, this proposal risks politicizing the nonpartisan work of nonprofits. It would allow each administration, regardless of political party, to decide what counts as an allowable employer under PSLF without an objective set of criteria. Non-profits are the most transparent sector in civil society, with strong oversight at the federal and state levels. Moreover, the Department's proposal is rendered moot because the IRS has- already has a process to determine 501(c)(3) status. The Department is required to cover these organizations that meet those rigorous standards. PSLF is designed to make-

MS. BOUTELL: You have 30 seconds left.

MS. GOURLEY CARTER: -(inaudible) who choose this career path, despite often lower paying jobs. It allows them to contribute to society and the economy by giving back to others without having to worry about the overwhelming burdens of educational debt. Preserving the current definition of employer without limitations serves the best interest of nonprofit employees, recent

grads pursuing work in public service, and taxpayers who
depend on a strong, community-based solution. Thank you.

MS. WEISMAN: Next, we have Melissa
Byrne from We the 45 Million.

MS. BYRNE: Hello. I'm sad to be here
today because I wish we didn't have to be here today
dealing with this mess. Jeff said I had to use nice
words, so I asked Saint Francis for some help. He said,
Lord, make me an instrument of your peace. Where there is
hatred, let me sow love. Where there is injury, pardon.
Where there is doubt, faith. Where there is despair,
hope. Where there is darkness, light. Where there is
sadness, joy. What this administration is doing here is
the opposite of the prayer of Saint Francis. It's sowing
hatred against people that are transgender. It's sowing
hatred against people that are immigrants. It's sowing
hatred against people who disagree with Donald Trump and
with the Secretary, who is a billionaire. What this is
doing, it's telling kids that are poor, who were born
poor, who were born working class that it's not just good
enough for you to do well in school and go to college.
You must agree with all of these other people's ideas of
what it means to be American and how it is to present, or
you're not going to get support. And so, what I really
want to do is ask each of you on the committee and remind

you that you always have a choice. You always have power.
And sometimes the most important thing you can do for
democracy is a simple word of no. A simple thumbs down in
the honor of our hero, John McCain. And that is the most
important thing that you can do to tell everybody else in
our country, and to tell people globally that our
democracy is going to survive this blip that we're going
through. And by saying no to this proposal, that is about
authoritarianism, not about democracy, not about rules,
not about rule of law. And that's your way to be a hero
right now. You're sitting in a building with leadership
that illegally fired 1,300 people and has illegally
refused to let them get back to work, despite a court
order. Those are the people that actually help borrowers.
They're all being paid to do nothing, which is like the
opposite of efficient, as in the words of DOGE. So, I'm
just here today because as a borrower, I don't qualify
for PSLF because I don't do the C3 work, that you have
the power to say no. And saying no is an affirmation of
democracy. It's an affirmation of the dignity of the
people. And it's a way to show that love will win.

            MS. WEISMAN: You have 30 seconds
left.

            MS. BYRNE: That love will win in the
midst of all this hatred. And you guys can go home after

saying no and know that advocates and other people will pick up where you left off. And we will fight for the dignity of everybody. And that even means for me, it means people that work for MOHELA, who did the lawsuit, who helped with the lawsuit to block student loan relief, they deserve loan relief as PSLF even though I hate what they did to student loan borrowers two years ago today. But-

        MS. WEISMAN: Your time is up.

        MS. BYRNE: -it's not about politics. It's about dignity and love.

        MS. WEISMAN: Next, we have Tracey Blake representing herself.

        MS. BLAKE: Thank you. My name is Tracey Blake. I'm coming to you today to speak about my experiences as a student loan borrower and public servant. I currently live in Maryland, but I grew up in Iowa. My husband is from rural Vermont and is the first in his family to graduate college. Together, we have more than $240,000 in student debt. Because of the promise of PSLF and the flexibility of IDR plans, we were able to scrape by with low salaries early in our career, and we recently bought a house. I am now two years away from receiving PSLF, assuming the buyback program remains intact, but I am terrified that the rug is going to be

pulled out from under me with today's proposed regulatory changes. Congress decided years ago that borrowers who worked at public institutions and 501(c)(3) nonprofits provided an important public service. What we do is often underpaid and underappreciated, and we are owed what Congress promised. Full stop. I made choices for myself and my family. Major choices. Trusting in the assurances that the PSLF program would continue to exist in its current form. Moving away from recognizing all 501(c)(3) nonprofits by picking and choosing who deserves forgiveness is unfair, and would have families like mine get left in the lurch? My first job out of college was working in a large nonprofit hospital supporting doctors, treating cancer patients, and investigating possible cures. I hope we can all agree that that is noble and necessary work. Should I have lost PSLF eligibility because other parts of the hospital provided medical care in a way that a small minority of Americans didn't like? My current role is at a nonprofit policy research organization that works with a wide range of federal agencies, delivering policy analysis that they commission. I personally work as a financial administrator on projects for the homeland security community, projects that this administration needs to meet its goals. Should I lose PSLF eligibility because of

subjective new standards for the eligibility of nonprofit organizations? The proposed regulations will harm more borrowers who are already struggling to keep pace with all the other regulatory changes over the past few years, creating a new minefield of eligible and ineligible nonprofit employees will cause an even bigger-

MS. WEISMAN: You have 30 seconds left.

MS. BLAKE: Thank you. -an even bigger paperwork nightmare on top of thousands and thousands of PSLF borrowers already waiting in line, waiting in line for FSA's help to resolve past servicing issues. I urge the negotiators not to leave huge numbers of public servants like me out as you work to make sure the Department delivers on the promise of PSLF. Thank you.

MS. WEISMAN: Next, we have Marissa Ditkowsky, a staff attorney from Disabilities Community Project, TZEDEK DC.

MS. DITKOWSKY: My name is Marissa Ditkowsky. I'm a staff attorney at TZEDEK DC. TZEDEK DC appreciates the opportunity to provide feedback on the Department's 2025 Negotiated Rulemaking on PSLF, a critical program for borrowers, employers, the economy, and the American people. We urge the negotiated rulemaking committee not to move forward with any changes

to the definition of what is a qualifying employer, and,
by implication, what counts as public service. TZEDEK DC
is an independent public interest center in DC whose
mission is to safeguard the legal rights and financial
health of DC residents with low incomes, dealing with the
often-devastating consequences of abusive debt collection
practices and other consumer issues. We provide support
to student loan borrowers, including PSLF participants.
The district currently averages about $54,945 in student
loans per borrower, with an overall student loan total of
$6.5 billion, putting it above all 50 states in debt per
borrower. DC also has a significant number of employees
in public service. DC nonprofits employ about 134,591
individuals, about 26% of DC's workforce. A number of
these public servants are eligible for TZEDEK DC services
and PSLF. District residents and all Americans need
doctors, lawyers, teachers, librarians, EMTs, and more.
Without meaningful PSLF, people with low to moderate
incomes will not be able to repay loans, and only those
who can afford higher education without support will be
able to access it. This is contrary to the purpose of the
College Affordability Act. Aside from the Department's
lack of authority under this act to implement these
changes to the definition of qualified employer, these
proposed changes could lead to shortages in critical

infrastructure and staff that keep America and DC
running. The Department's vague proposed changes would
introduce tremendous uncertainty for borrowers and
employers, and extreme implementation difficulty for
servicers and the Department. They would leave borrowers,
including employees who are currently eligible and relied
on this program in their employer choice, saddled with
thousands of dollars in student debt they can't afford to
pay and deter graduates from making the choice to do
public interest work. The cost of higher education has
increased astronomically, and PSLF serves as an important
incentive to enter the workforce in public interest,
including work to support those living in or near
poverty. The proposed changes would force public interest
employers to make a known choice between attracting and
retaining staff and providing critical services in line
with their mission. The confusion and uncertainty will
also lead to constant staff turnover.

            MS. WEISMAN: You have 30 seconds
left.

            MS. DITKOWSKY: TZEDEK DC opposes any
regulatory changes that would reduce the number of
approved employers and create inconsistent status for
nonprofit employers within the PSLF program. Thank you.

            MS. WEISMAN: And our last public

commenter for today is Jill Pezza, representing herself.

MS. PEZZA: Hi, my name is Jill Pezza, and I'm a parent that relies on Income-Based Repayments and Public Service Loan Forgiveness. As a single parent whose children had chronic medical conditions, having access to Income-Based Repayments was the only way my three children could attend college. I was outraged that the Senate tried to bury a clause in the reform bill that would have prevented current Parent PLUS borrowers from accessing Income-Based Repayment unless they were currently on an ICR plan on the day before enactment. I thank God for the Byrd ruling that found it to be unlawful. Had the bill gone through as worded last week, I would have been stuck on a $1,200 a month standard payment since my ICR requests had not been processed yet. Not only would my repayment have been unmanageable, but it would have disqualified me from PSLF. The Byrd ruling has protected my eligibility for a $230 a month IBR payment and allows me to continue to pursue PSLF. The Senate Parliamentarian is my hero. Although the final bill has not passed yet, it appears that I will not have to worry about how I will buy groceries and pay rent, doctor's bills, and living expenses. My youngest daughter is entering her last year of college as she pursues a career to teach high school English. We were able to fund

her college education because the cost of attendance was covered by Parent PLUS loans, and as a public servant, I had a pathway to loan forgiveness. We are fortunate that the new loan limits will not apply to us. My heart breaks for the millions of students and their parents, whose access to loans that cover cost of attendance with income-based payments is being ripped away by the bill being pushed through Congress. These students may either have to forgo a college education or rely on predatory private lenders. I may be fortunate, the new proposal from the Senate seems to have my interests protected. Since I work for a school district, I am optimistic my employer will continue to qualify for PSLF. I am fearful for my fellow Americans who have devoted their careers to serving marginalized populations who are no longer deemed worthy of recognition. The lack of humanity being shown to our immigrant, migrant, transgender, and LGBTQ+ communities and those who serve them is mind-boggling. Americans should have their public service recognized no matter what populations they serve. I'm also concerned about what the restrictions on funding of professional loans will do to the future doctors and lawyers this country desperately needs, especially those who serve our neediest populations. These new limits will make it prohibitive for a majority of students to enter medical

2025 Negotiated Rulemaking - 6/30/25

and legal careers. My-

                MS. WEISMAN: You have 30 seconds
left.

                MS. PEZZA: Thank you. My eldest
daughter is a second-year medical student who would not
be enrolled today if I didn't have a pathway to help fund
her undergraduate studies with Income-Based Repayments
and PSLF, and she didn't have the same pathway to fund
her medical studies. We are on the verge of an
educational crisis and need to keep the pipeline open for
future teachers, doctors and other public servants. I ask
that you continue to provide PSLF for public servants and
ensure that regulations don't rob parents of the
opportunity to provide a better education for their
children. Thank you for the opportunity to speak today.

                MS. WEISMAN: Thanks to you and to all
of our public commenters. I just have a couple of items
for the committee before you go. I first want to thank
each of you for your participation. We truly have covered
a lot of ground, and it's clear that you've all prepared
really well for this and for the discussions. I
appreciate especially the language suggestions that
people have submitted. I forwarded all of those that I've
seen. I will continue to monitor messages tonight and
send you anything that I receive. We'll do the same in

the morning. The Department has asked that you submit any proposals no later than noon tomorrow, so that they have time to review and discuss your suggestions. Don't forget, as you're preparing for tomorrow, review any updated materials, bring any questions, and any constituent feedback that you have for the morning. Before we go, do you have any questions? Any final words, Tamy, Jeff, Jacob?

MS. ABERNATHY: We certainly have had an enjoyable day with lots to think about. I don't know whether to say thank you or I'm really, really tired and we're never going to sleep tonight. Thank you so much. Annmarie said it best when she said you really came prepared to have these very robust discussions and engage with us on this rule. Thank you so much for what you're doing. We look forward to another very good day tomorrow.

MS. WEISMAN: As a housekeeping item, you can leave your name tents where they are. You- please take any trash that you have with you. We will start again promptly tomorrow morning at 9:00. And again, I will send out any proposals that I receive tonight, and we'll do, again, the same in the morning. Thank you all so much. And I know that you have lots of work that you're going to be doing, but I hope that you can have a restful evening as well.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING

SESSION 1, DAY 2, MORNING

JULY 1, 2025

On the 1st day of July 2025, the following
meeting was held in-person, from 9:00 a.m. to 12:00
p.m.

P R O C E E D I N G S

MS. WEISMAN: Good morning again and welcome back. Yesterday we had a quite lively conversation and laid a really strong foundation for the work that we're trying to do here. The Department heard a lot of very helpful feedback on their initial language, and I circulated a proposal last night with some new language, which we'll discuss more today. We will later in the day use some polls to gauge where you are on that new language. Remember our goal is for consensus. I told you yesterday I'd be the consensus cheerleader. Nobody brought pompoms. But just a reminder, that is our goal. And also to just remind you that this is not a vote. When we go for consensus, it's not a winner take all mentality. It is about identifying shared positions and whether the group can support moving forward with proposals and language. It may be that you don't like something that's in there, but you choose not to block it because you like the rest of what's in the proposal. So, keep that in mind, and we'll talk about that more as we get closer. One housekeeping item at lunchtime today, when we break, we are going to have staff bring in tables for the alternates. And so your seats may shift just a little bit, but that will give you space to use your laptops and have some of your materials out, and

hopefully make it a little bit easier to see and be seen.
At this point, I'd like to just go around the table
quickly so that I can take attendance. And I see the
Department staff are all here. So, if we can start up at
the top of the table with Scott. And if you can just give
your name and your constituency, and then we'll go around
and do the alternates.

MR. BUCHANAN: Yes, good morning,
Scott Buchanan, FFEL lenders and guaranty agencies.

MR. JONES: Todd Jones, nonprofit
institutions of higher education.

MR. IRELAND: Good morning, Tracy
Ireland, public institutions, tribal institutions, and
HBCUs.

MS. DOBSON: Alyssa Dobson, financial
aid administrators at postsecondary institutions.

MS. HAMMER: Mary Lyn Hammer, Champion
College Solutions, proprietary institutions.

MS. STANLEY: Rebecca Stanley, state
officials, including state higher education executive
officers, state authorizing agencies, and state attorneys
general.

MR. AIELLO: Good morning, Thomas
Aiello, representing taxpayers in the public interest.

MR. SULMAN: Good morning, everyone,

Faisal Sulman with Student Veterans of America, US military service members, veterans, and groups representing them. I am the alternate also for Student Veterans of America.

MS. MAYOTTE: Betsy Mayotte, consumer advocates, legal aid, and civil rights attorneys.

MR. OGUH: Good morning, Emeka Oguh, PeopleJoy, representing student loan borrowers and repayment.

MS. WEISMAN: We want to go this way for the alternates, please.

MS. DORAN: Sarah Doran, representing student loan borrowers and repayment.

MS. SHAFROTH: Abby Shafroth, representing legal aid organizations and consumer advocates.

MS. TAYLOR: Laurel Taylor, founder and CEO of Candidly, representing taxpayer and public interest.

MR. RICCI: Alex Ricci, with the FFEL lenders and guaranty agencies.

MS. BOUTELL: Heather Boutell, representing nonprofit institutions.

MS. MCNEILL: Kaity McNeill, representing public institutions, including tribal

institutions, HBCUs, and historically minority-serving
institutions.

MS. WEISMAN: One more.

MS. FAITH: Helen Faith, representing
financial aid administrators at postsecondary
institutions.

MS. BOYD: April Boyd, proprietary
institutions.

MS. WEISMAN: Thank you all so much.
Does anyone have any questions before we get started, any
housekeeping kind of things? Schedule? Like yesterday, we
are going to go from 9:00 to 4:00. We'll do a mid-morning
break, an afternoon break, and a lunch break at around
noon, and will break for public comment so that they can
start at 3:30. Alright then, Tamy, are you ready to dive
back into content?

MS. ABERNATHY: She was like a bad
waitress, waited just until I took that sip of coffee to
ask me a question. Sure. Good morning, everybody. Oh, no.
Let's try that again. Good morning, everybody. I like
that, that's much better. Thank you so much for making us
work really late last evening to review all of the
proposals and revised amendatory text that you gave us.
We are going to, at a later time, go through the
revisions that we've made because of your proposals, and

we'll talk through a little bit of the narrative now and on the things that we weren't able to accept. But we did draft a new regaining eligibility provision, subsection (j), because of you. So give yourselves a hand. Come on. This is how this works. Come on. And so, we're very thankful that you took your role very seriously to help us promulgate regulations on behalf of the Secretary and to further the mission of restoring Public Service Loan Forgiveness. So, thank you. As we go through some old business today, we received nine proposals last night or by last night. We received another one from Rebecca this morning that we will be tabling until we get all the rest of the proposals by noon today. And then we will look at those and we will make decisions either this afternoon or again tomorrow morning. So, if there's additional things that change, we will of course circulate that material for you to consider this evening at some point. I'm not going to go over the reg text changes, but I'm just going to say, you know, were we able to honor some of the things that you suggested or not? Just so you know, that we have really reviewed each and every one of them. We did receive suggested text from Tracy Ireland on substantial legal purpose definition. Tracy, when we go through that later today, you'll see that we did make some changes that were a result of some of what you

started and then the rest of us discussing it, so stay
tuned for that. This is one from Miss Mary Lyn. A lot of
what Mary Lyn was saying for us, we do- the flexibility
with payments and things like that, we're kind of locked
into some statutory provisions, but we do satisfy payment
advances and the due date and, and those do catch up, so
we feel like we have addressed that already in our
current regulations, and so we were not able to accept
any of the other proposals attached to this particular
one. But we are still looking at other things around the
things that you pointed out, so thank you for taking time
to give that to us. Again, I still have my little note,
Emeka Oguh, I want to make sure I pronounce his name
correctly. Some of what he suggested for us resulted in
us, you know, capturing (j) and looking at additional
changes in the reg text as we go through that, so thank
you. Betsy, we're still looking at this. We're not quite
ready to take action on your proposal. We are still
evaluating it. We have servicing systems, and so that
kind of stuff is not in the regulations. We don't
regulate ourselves. So, we are trying to look at this and
evaluate your proposal. So be patient with us. We're
still looking at it. Thank you. Oh another one from Miss
Mary Lyn. She had a suggestion for notice to the
employers. We have looked at this. We have created a way

to do this. We have a new sub section (e) as a result of
your request and others around the table. So, thank you
for jumping in and allowing us to navigate through that.
Let's see, Tracy gave us another consideration for
(c)(4). Tracy, this is already kind of duplicative
already, so we did not accept that reg language, but
thank you so much. Another borrower eligibility from Mary
Lyn Hammer. We're constricted a bit with legal reasons in
the Higher Education Act. So, we were not able to look at
the borrower eligibility provision under (c)(1) romanette
(2)(b). But thank you for putting that forward for us.
Alyssa, Helen, Tracy, and Kaity, we think that this is
contrary to the objectives and the regulations and the
type of relief that you're seeking can be addressed in
regaining the eligibility provision in (j). So, what we
did is we took what you asked us to look at, and it
helped form (j), the regaining eligibility or
reinstatement, so thank you. Laurel, thank you so much
for your proposed amendatory text. I think this was just
an analysis for us to look at, correct? Okay. I'm like,
there's nothing here that we did, so I can't remember.
Yes, thank you for providing this for us. It's not
necessarily a proposal, but it was an economic analysis
for us to consider. We did take a look at that, so thank
you. Any questions, comments, or concerns about the

proposals? Are you guys quiet today? Or are we just doing such a great job because we gave you tables and now-? Just kidding.

MS. WEISMAN: We have a card up from Mary Lyn.

MS. HAMMER: I just wanted clarification on the date the application is made if the employer is already found ineligible. So, does the Secretary have discretion to override that somewhere?

MS. ABERNATHY: We are still looking at some of that. But right now, the statute is very specific as to when the application is submitted, the statute specifically states they're supposed to be working and how we massage that is saying that at the time of the application. So, we really are locked into some very finite language right there. So, we are still looking at that. I wouldn't say that we have discretion over what the Higher Education Act requires us to do, but as we have the ability to look at this from an operational standpoint and from subregulatory guidance, that may be where we address that concern instead of regulatorily.

MS. HAMMER: May I respond? I just wanted to ask if we can stay in touch on that issue, because if it's something that needs to happen in

statute, I'd like to know so that I can request that.

MS. ABERNATHY: Absolutely.

MS. HAMMER: You know, I just feel like that's a sticking point of, of borrowers possibly being denied. And they're the exact borrowers we're supposed to be protecting in this language. So that's where my concern is around it.

MS. ABERNATHY: Absolutely. So the way that we have designed this regulation is not to be punitive to our borrowers. So, we will still consider that going forward, we will look at ways in which we can adapt that. But when it's fixed in statute that they are to be working at a qualifying employer when at the time that they receive forgiveness, we've got to look at that, and we've got to weigh out all of those pieces and craft the regulations and the operational pieces for that in line with the statute as well as the regs. So, we are very mindful of your concern, and we are doing everything we can to look at that from a subregulatory level to make sure that we have all of our I's dotted and our T's crossed. So yes, we can keep in touch. If you don't have my contact information, I'll be sure to share that with you. And I'll be more than happy to keep in touch with you and keep you apprised of things that are going on.

MS. HAMMER: Thank you.

MS. WEISMAN: Over to Bob.

MR. CAREY: So, I was watching vote-a-rama last night on the Senate floor, so point of parliamentary inquiry. Do we have like a regular order for the consideration of all these changes? Do we, like, make a motion and then will we vote on it, or will we go into informal session and get out some butcher paper and start writing? Or how's that work? I didn't see that in the protocol.

MS. ABERNATHY: So, what we do is exactly what we did last night. You submit the proposals. We would like your proposals by noon today. As you can well imagine, it takes a village of us to go through the material that you give us. We need to read it. We need to know what you're asking us to do. We need to discuss it. We need to vet it all the way up. And so, it takes us a while to make sure that we're looking at everything and giving everything the eagle eyes that it deserves to have. And so we're sitting around the table looking at every single word because, you know, in regulations, every word matters, right? We want to get it right. We're taking what you're giving us. You have the ability to caucus. And so that is something if you would like to do that, that is your right as negotiators to caucus and you can have discussion at that point. We are not at the

2025 Negotiated Rulemaking - 7/1/25

12

point where we are still going over our discussion draft
and still going over now new changes that you presented
last night. We have two new sections that we want to
mention today. We're not to the point where we're saying,
okay, let's take a consensus. We're not doing that until
later tomorrow. We might do some poll checks or some
pulse checks, but right now, what we're trying to do is
still establish what we've done in the regulations
through all of the regulatory subsections and additional
language that we put forth for you to review. So, we're
still kind of in the review stage. Does that answer your
question? I don't think it did?

MR. CAREY: No. So, what I'm not
seeing is where the rulemaking committee determines what
language they want between our submission and you guys
crafting it and presenting it to us. That's step one. And
then step two seems to be going right to consensus.

MS. ABERNATHY: No, we're going to
discuss it.

MR. CAREY: Okay. So there'll be a
process for us to further wordsmith the language in
between you guys presenting us language and the consensus
portion?

MR. ANDRADE: Let me try it another
way, Bob. So, we're working through section by section.

2025 Negotiated Rulemaking - 7/1/25

You know, so we're calling them topics in this case or-
and as you have brought us issues, we have gone back to
sort of our strawman document and made edits to that. We
pushed those back to you guys, but we will go back and
continue to go through section by section. If that
section has been amended, you'll see where that section
has been amended with the changes from folks here. At
that time, they'll still be additional discussion on it.
But Annmarie will make several passes, and Annmarie will
ask for consensus on each section. And hopefully what we
will be doing is at least locking down or not locking
down but putting a pin in where we have tentative
agreement on some sections. So, at the end of the
process, all we're really looking at are the sections
that we don't have tentative agreement on. Is that a fair
way to describe the process, Annmarie?

                MS. WEISMAN: Very, very close. The
only thing I would say is we're not going to do consensus
checks initially. We'll be doing kind of like a pulse
check so that the the consensus check is usually at the
end. And the difference is when we're looking for more
tentative agreement, you may change your mind. We're
still discussing. By the time we get to the consensus
check, that's where we say we're not going to go back and
keep renegotiating. We're going to keep asking people, do

you think we can get to consensus now? How about now?
What about now? The goal is to do those pulse checks, do
a poll, figure out where people are, what might need to
be fine-tuned, and where the Department feels it can move
on those issues so that you've had the discussion, you've
heard what's going on, and you can react to those
proposals.

            MR. CAREY: And we have not done any
pulse checks or consensus checks today.

            MS. WEISMAN: No.

            MR. CAREY: Okay.

            MS. WEISMAN: So, there's lots more to
do, lots more to discuss. And I would imagine we would
start to get to the pulse checks later this morning, but
we'll play that by ear and kind of see how you feel about
the language you see. Jeff?

            MR. ANDRADE: And I think what we
tried to do is on the sections where a lot of people had
concerns, we tried to get those up early so we could
rework some language. And we appreciate that you all
submitted language to us early as well so we could start,
start looking at that. So, as I said, as we go through
this, the list of disagreements should get narrower and
narrower.

            MS. WEISMAN: I see no cards up. So,

Tamy, do you want to start to go over some of those
revisions?

            MS. ABERNATHY: I most certainly do.
Thank you, Annmarie, I thought you would never ask. Let's
start with (j). If my wonderful colleague would put the
screen share up, and I need to get to my notes. Give me
just a second. There we go. We are calling this the
Employer Reinstatement Option for the Public Service Loan
Forgiveness. And these are our proposed regulatory
amendments. And it would be a new subsection (j),
regaining eligibility as a qualifying employer. So, let's
just go ahead for the sake of- when we went back last
night, we wanted to show a good faith effort in hearing
you. A lot of times it's hard to make sure that you know
that we are hearing you. We are listening. Every word
that you're saying to us is extremely important. And as a
result of such, here is amendatory text, because we've
done that. So, an issue came up yesterday about
negotiating in good faith. And that is exactly what we're
doing. And we're talking and we're getting to results
here. So as a direct result of everything that happened
yesterday, we're sitting here with this new subsection.
And so I'm going to read it so that we can all be on the
same page. Regaining eligibility as a qualifying
employer. An organization that loses eligibility for

failure to meet the conditions of paragraph (b)(27) of
this section is qualifying employer, may regain
eligibility to become a qualifying employer after (1)
Five years from the date the Secretary determines the
organization engaged in activities that have a
substantial illegal purpose in accordance with
subparagraph- subsection (h) of this section. If at or
after that time, the organization certifies on a
borrower's subsequent application that the organization
is no longer engaged in activities that have a
substantial illegal purpose, as defined in paragraph
(b)(30) of this section or, (2) The Secretary approves a
corrective action plan signed by the employer that
includes a certification that the employer is no longer
engaging in activities that have a substantial illegal
purpose, as defined in paragraph (b)(30) of the section,
a plan describing the employer's compliance controls that
are designed, that are designed to ensure that the
employer will not engage in activities that have a
substantial illegal purpose, as defined in subparagraph
(b)(30) of this section in the future and (iii) any other
terms or conditions imposed by the Secretary designed to
ensure that employers do not engage in activities,
actions or activities that have a substantial illegal
purpose. So, the employer would lose eligibility for five

years. They would automatically regain eligibility
thereafter. As soon as the first borrower from the
previously disqualified employer submits a PSLF form, an
income verification form that confirmed- I don't believe
we're going to continue- we're still massaging the
language around the confirming whether or not they're
participating in illegal activities, so we're going to
change this slightly once we finalize that. But
basically, we need to make sure they're not continuing to
participate in those activities. And then the qualifying
payments would be backdated for the borrower to when the
employer completed their five years. So, if the borrower
continues to make payments for the five years that the
employer is not considered, you could look at that after
the five years- after the punishment has been- it's not
punishment, but after the five-year period of time has
been completed. If the employer did not want to wait five
years, it could submit a corrective action plan and
statement that it is no longer engaged in a substantial
illegal activity. The Department does not intend to
regulate here on the process for that corrective action
or the signed statement. So, in other words, if they
don't want to wait five years, they submit a corrective
action plan to us in a process to be determined
subregulatorily, then they regain their eligibility. So,

we had concerns yesterday about what do we do if the
borrower is one or two or three payments shy of meeting
Public Service Loan Forgiveness, 120 qualifying monthly
payments? So, in those instances, we are trying our very
best to mitigate and give every available ability for the
employer to regain their eligibility and for us to
continue honoring those borrowers who are serving in our
public service fields. At this time, I'd like to turn it
over to Annmarie for discussion.

                    MS. WEISMAN: Emeka?

                    MR. OGUH: Tamy, Jeff, and Jacob,
thank you for taking the time to consider and incorporate
our feedback. Your recent revisions give me confidence in
the integrity and responsiveness of the negotiated
rulemaking process, so thank you. I did ask for one year,
you gave five. But I know there's a compromise here. I
believe there's an opportunity-

                    MR. ANDRADE: I was at ten, so.

                    MR. OGUH: We split the difference.
So, I believe there's an opportunity to further
strengthen the proposed rule by both encouraging employer
compliance and preventing unnecessary interruptions in
the PSLF eligibility for borrowers. Specifically, we are
recommending that if an employer is actively
participating in a good-faith corrective action plan, the

Secretary allow affected borrowers to continue earning PSLF credit retroactively from the start date of that employer's active participation, obviously pending final reinstatement approval. This approach would preserve borrower trust and continuity of service while maintaining accountability for employers. So, thank you again, and just wanted to recommend that. Thank you.

MS. TAYLOR: Rebecca?

MS. STANLEY: I like what you proposed. And I think that just a step off of that is when we were looking at the liability if the EINs are attached to other organizations that are not under investigation, that it be very clear that they do not lose their opportunity to do a PSLF buyback or to go retroactively as well. I think if they're not under investigation- it'd be one way for us to appease counties and states that could have impact from one organization causing the whole shutdown and everybody to be out of PSLF is to offer the opportunity for them to be able to buy it back. That is not the simplest solution, that is complicated, but it may be what you were suggesting the retroactive going back and allowing them to have it after. So, I do think that would be a good idea.

MS. WEISMAN: Tamy, did you want to respond to that?

MS. ABERNATHY: Thank you for both of those suggestions. We, of course, are going to need to take that back and look at that a little bit more, but we do appreciate if you do have any proposed language, please feel free to get that to us so that we can take a look at that. Again, this is a new subsection. So, we expect to see some, some of your brilliant minds at work here. Thank you.

MS. WEISMAN: We'll go next to Tommy and then to Laurel and then to Kaity.

MR. AIELLO: I just want to thank you guys again for taking our feedback yesterday and incorporating this section. I very much like the five-year proposal that you guys have. It's obviously extremely- it can be onerous for the qualified employers, but I think that's the point. We want to encourage employers to change some of their behavior and find corrective measures. So, I think that's very important. And in order to achieve that, you need to have some strong teeth and forcing mechanism. I just have two questions as it relates to the process by which an employer submits their plan, and the Secretary can approve or decline it. If an employer submits their plan and the Secretary decides this is not up to par, we're going to reject it, are they able to submit another plan

or is it a one-and-done situation? Then- I'll deal with
that first question and then I'll go to my second one.

MS. WEISMAN: Jacob?

MR. LALLO: So we don't plan on
defining this piece in regulation. We view this very
similarly, the way you would negotiate a settlement.
These will be case-by-case basis. It may be articulated
at some point in guidance, but we want to preserve that
flexibility because we recognize that each one of these
situations may be unique. And, as we've already explained
with the materiality clause that we added into the
language for (h), we're very interested in looking at the
frequency and severity. And so we want to take that into
account when we craft a corrective action plan for an
organization.

MR. AIELLO: Then my second question
would be, can you go into a little bit more detail? You,
you said that a borrower may still have their payments
counted. Is that even during that five-year period or
you're still checking them, that they're still paying,
but they're not counting? Is that they are once again
counted once the corrective measure is taken or after the
five years ends? But you're not counting those, 5 times
12, 60 payments?

MS. ABERNATHY: At this point with

this with this particular proposal, there would be a gap.
So, we are hearing you. We are looking at Rebecca's
proposal. And Rebecca, we want to make sure that we get
this right. So, if you could just kind of articulate and
send that to us to make sure that we have exactly what
you were looking at, we want to make sure that we vet
that thoroughly for you. We know you want the buyback, so
it's more of a retroactive looking back. And that may be
one thing that the Department can consider, given that
this is pretty fixed on a qualifying employer and that
status, but the ability to perhaps do that, I want to
make sure that I get with my colleagues on that before I
stick my neck out and say, sure, we can do that. So,
thank you for bringing those suggestions up. We are
hearing you, and we hope to circle back with some
positive information later.

          MS. WEISMAN: Next, we'll go to
Laurel.

          MS. TAYLOR: I'd like to echo the
feedback. Thank you so much for the responsiveness and
the sincere intent of really hearing our voice and
providing feedback immediately. A couple of comments and
then a question for the primaries as well. So, as we look
at that five-year period of time and the ability to
remediate. And I'm hearing that there is a program and a

design to help the agency, or the employer remediate action prior to that five-year period of time. Up leveling a bit, as we are working to refine and restore Public Service Loan Forgiveness, and the purpose of the economic analysis was really to underscore the value of the PSLF program and the uptake of that program and its efficacy, the 20 to 1 efficacy for that participating employer. The concern that I have is losing that status, the discussion around the ability to immediately engage in a remediation because many of the 13 million borrowers that work for an employer that are not governmental, they will not have the 9 to $13,000 average to provide to their employee population to retain them. I understand the design of the intent is to encourage non-material, substantial illegal activity. One of the concerns I have that surfaced yesterday and Rebecca, you made this comment. So, a question I have is, can we caucus so that we can provide you all- and I'm not sure as an alternate, that I can ask for a caucus. I think one of the most important work products that we can provide to you all in the next two days is a work product that further defines the action that should be taken for an agency or activity engaged in substantial illegal purposes, and compartmentalize that punitive treatment to that particular organization. As we look at the 70% that work

for governmental employers, if at a state level, everyone
within the state- let's imagine it's 2,000 employers-
loses their PSLF status where the activity conducted by
one, that is a massive failure of the PSLF program or the
design of encouraging civilians to go into public service
work. And I'm really concerned we're going to see a huge
increase in delinquency and default. And those-

                    MS. WEISMAN: You have 30 seconds
left.

                    MS. TAYLOR: -no longer working for
those who offer Public Service Loan Forgiveness, because
the risk is too high to devote ten years when the ability
to pursue the program can be lost. I think buyback is
very helpful. It's super complicated. So, unless you have
access to Rebecca or Candidly or others, you're probably
not going to get into that program. So can we caucus to
present an alternative that would enable
compartmentalization to address substantial legal
activity, but not infect the whole of an entire system?

                    MS. WEISMAN: Your time is up. So,
let's get a sense. We have at least five, six cards up on
the table. I know some have come up and back and then
back up again. We have a call for a caucus. Does the
group feel that it would be helpful to hear the other
cards that are out there now? I think there's some value

in that just so you have a sense of what all you want to
caucus over. If you want a caucus, keep in mind, you tell
me who you want in the caucus. If the caucus is all
negotiators, everyone else leaves the room. If the caucus
is a subset, we have some rooms that you can go to in
smaller groups, if that's your preference. So be thinking
about that. But I do want to go next to Kaity, who's been
waiting very patiently.

          MS. MCNEILL: Thanks again for the
reinstatement language. I know that Emeka mentioned that
he was shooting for one year, and I think, Jeff, you said
that ten years is on the table, and I just wanted to get
more information about the rationale of the five years.
Is that sort of like a standard time frame for other
things that happen? And then the second thing I wanted to
ask us to consider after you answer that question, in
terms of that review of the corrective plan, could we
have a timeline to keep that process moving? Considering
maybe that review could take two or three years, if we
could discuss including a timeline in that?

          MS. WEISMAN: Jacob, did you want to
respond to that for the Department?

          MR. LALLO: Yes, please. So, two
things. On the five years, we looked at the way that
losses of eligibility of other types are handled across

the government. There's a lot of case law that uses six
years as a reasonable time frame. Five is a round number,
and it is less than six. And we thought it was fair to be
both punitive to an organization that is non-compliant,
but not so aggressive as to penalize them indefinitely.
And we do want to be sensitive to the fact that an
organization will change over time even on its own.
Within the corrective action plan, we actually think that
we could start negotiations almost immediately. Even
really prior to a decision being issued about the
organization's ineligibility, that would be very similar
to the way we handle issues with schools where we
approach potential audit findings or program
determinations and work out a deal ahead of time with the
school to avoid an adverse impact. So, in such cases, we
would probably immediately start negotiating with the
qualifying employer and generally we'd like to make an
offer of these are the changes we'd like to see. If this
correction action plan is put into place, we won't have
to remove qualifying employer status. So, we would like
to do that immediately. In terms of actually baking in a
timeline, we can take that back and consider it. But I
think in general, we would like to start that approach
prior to the loss of qualifying employer status
(inaudible) take effect.

MS. WEISMAN: Next, we'll go to Scott.

MR. BUCHANAN: Thank you. Just a couple of observations on sort of administration since that's primarily on regulation. It's great to talk about. It's the question of how can you do it? So, I would highlight I think this is something that the Department as well as the rulemaking committee needs to consider here, is that under statute, if an employer is not a qualified employer during that period of time, payments are not eligible. And so, therefore, discussion of buyback, discussion of retroactive consideration, that would be in conflict with the statute. And so that's something that needs to be carefully thought about here. And so the rule cannot sustain itself, as I pointed out last neg reg, and was not listened to on some of these fronts, that it must comport with statute. Secondly, I would just make some observation. Again, I'm not sure that it's at the rulemaking level here but thinking about sort of the notification process here. I certainly appreciate the desire to create sort of a framework for employers to get back as quickly as they can under this rule into being a qualified employer. But we're also introducing sort of an unknown, right, for borrowers or employees. The question of when will my employer become eligible again? The question becomes, we don't know.

Because either it's five years or sometime earlier. That is unknown. And I think we need to think about how to administratively handle that in terms of communicating that. And also, I would point out here in the trigger on the five-year process is a borrower submits an application, right? And I want to be very clear that sort of would be a challenge in the sense of the employer's eligibility date needs to be determined by the Department on a five-year window. That would need to be communicated to servicers or others in the Department to know exactly what that date is. And then the challenge becomes, also, if you receive an application a day or two before that date, it will be rejected. And if you receive it afterwards, then we have a short window of time. So, there's a lot of communication issues I think that would be very challenging. I think it would be frustrating for borrowers to think, oh, my employer has been five years. It's been in application, they're a day or two off, and then we're rejecting all of those. So anyway, and that only highlights given some consideration to what is on the operational side, how would you handle that? Would there be sort of a grace period of if the application is for-

          MS. WEISMAN: You have 30 seconds left.

MR. BUCHANAN: -a future period of time? Anyway, I think those are things that just need to be thought about. Again, I'm not sure it rises to the regulatory discussion here, but operationally, just everyone needs to think about these things because they have to actually be done.

MS. WEISMAN: Tamy?

MS. ABERNATHY: Just so happens we have been thinking about them. We are working with our operational team. One of the ways in which this would mitigate some of your concerns is the fact that on our employer eligibility database, it indicates or we're hoping that it would indicate the date that they would regain the eligibility. So, it would be communicated on that. And I believe- I hope I'm saying this right. And Eric Hardy, if I am not, please jump in. If the employer isn't eligible, if they try to submit it online, they can't. So, if it's too early for them to submit that, they're not going to be able to do that. Aaron, can we get Eric the microphone, please? I want to make sure that our operational team has addressed as many of the things that they can address for us.

MR. HARDY: Sure. Tamy, pretty much what you explained is the nuts and bolts of how we would accomplish it. You're absolutely right. We would display

these employers when the borrower goes in to submit a
certification, we would display them as ineligible. We
would not allow the certification to go through. If they
were to apply they wouldn't be able to apply using the
online flow. They would also have the ability to do a
paper form. If they do a paper form and the employer is
still in their ineligible period, then the paper form
would be denied, and we would indicate why it was denied
to the borrower. We had not talked about displaying
future dates quite yet, so that's something that we
probably shouldn't commit to. There are some other
considerations that we need to have operationally around
what we display there. But that's it by and large.

          MS. ABERNATHY: I guess I dreamt that
part. My wish list.

          MS. WEISMAN: Next up, we have Betsy.

          MS. ABERNATHY: Thank you, Eric.

          MS. MAYOTTE: Thanks. Tim and Eric
addressed one of the two questions I was going to ask,
which is, well, it wasn't a question, it was like if the
PSLF was not going to work, the employer is showing
ineligible. So well done you. I am thinking about the
current process of how a new employer gets approved, and
we know that doesn't happen fast. In my experience
working with borrowers, it takes sometimes often as much

as a year for a new employer to get approved. So, yes, my concern is this effective date. So, for an employer that submits a corrective action plan to get your approval to get back on the wagon, so to speak, I'm concerned that due to bandwidth reasons, there may also be significant delays in that. So, my request for this language is that the effective date of the employer's re-eligibility be the date that they implemented your approved corrective action. So, if they implemented their corrective action on January 1st, but you ended up not approving it until June 1st, that the effective date of the employers eligibility would be January 1st.

MS. WEISMAN: Jacob, did you have a response to that?

MR. LALLO: Yeah, I think we need to take that back and see how it will work exactly in practice. Scott raised a very valid statutory point. We have to make sure that those two things can interplay together. So, it might take some kind of creative structuring to make that work properly. But like I said, we anticipate the corrective action plan process being part and parcel of the notice to employer that they've lost eligibility and worked in with that process. You know, the evidentiary process in there, we're not talking about, like, an appeal to an administrative body. The

Secretary is issuing a letter basically saying that
they're not qualifying and then giving the employer a
chance to respond. That is already inviting an
interactive process. And so we very much anticipate that
the corrective action plans will generally be worked out
as part of that. And they could be worked out at a later
time at the option of the employer. But because that
window of communication is already open, we would hope
that most of them can be worked out very early on, and
there's not much of a gap of eligibility to even have to
address that.

          MS. WEISMAN: Up next, we have Emeka,
followed by Mary Lyn, and then Alyssa.

          MR. OGUH: So, I just want to
piggyback off of some of the questions that- or concerns
that Scott raised around operational challenges. And I
appreciate Eric from the IT team coming up and explaining
the process. As a software engineer and the CEO of a SaaS
company, I always feel like the IT team is always under-
appreciated, so, Eric, I appreciate you.

          MS. ABERNATHY: Not here.

          MR. OGUH: One question I specifically
had logistically, if in that dropdown, that employer is
shown ineligible- so let's say I've been with my
nonprofit employer for ten years, nine years, five of

which they were eligible, four of which they weren't,
which a lot of folks are. A lot of folks fail to certify
their employment history until year ten. It's going to
show my employer as ineligible, so I won't be able to
certify the six years of eligibility. That seems like a
big bottleneck and a potential challenge. I just don't
know if-

       MS. ABERNATHY: So, we'll take that
one back, because I believe if they submit a paper
application for those (inaudible). I don't want to commit
to that. I can't commit my FSA partners on the
operational details at the moment, but what we can do is
take that back to see if in those instances, we would
want a borrower to complete- I mean, we normally don't
want them to complete the paper, but we'll have to look
at that. So let us take that one back and we'll ask our
operations team for some feedback and then get back to
you on that. Thank you so much.

       MS. WEISMAN: Mary Lyn?

       MS. HAMMER: Thank you. This is
probably an operational question but say somebody at nine
years of eligibility and their employer becomes
ineligible, and they don't have an approved corrective
action, they go to work for a different employer and
complete that final year. Does the application in the new

qualified employer cover all of the time for the one
that's no longer qualified?

          MS. ABERNATHY: Annmarie, can I
answer? So, as we designed yesterday, this is a
prospective approach. Any years that a borrower has
submitted, or not submitted, has completed their Public
Service Loan Forgiveness and meets all of the
qualifications, they would get credit for that. It's from
on or effective July 1, 2026, forward, if the employer is
deemed an unqualifying employer, the payments during that
period of time would not qualify. If the borrower
switched agencies and they had already submitted their
form and they already got credit for those nine years,
they would continue to get that credit for nine years. We
are not taking things away from borrowers. So, they work
another year, they get the 12 months, they certify,
that's ten years, 120 qualifying payments under a
qualifying repayment plan, under a qualifying employer,
under qualifying loans, they get their loans forgiven.

          MS. HAMMER: Okay, so I'm asking
because of something that Eric said about if they apply
too early. So, what-

          MS. ABERNATHY: That's conflating two
particular issues. If, a borrower is applying and they
have yet to complete 120 payments, then they're applying

ED_02172

too early. They can apply and they can get the
certifications in. And we can look at that and say, okay,
you are qualifying employer qualifying payment,
qualifying eligible repayment plan. All of those bells,
all of those checklists are marked, yes. So, for all
intents and purposes, you have nine of those ten years of
qualifying payments under the right eligibility criteria,
you get that. You don't lose that because your current
agency is no longer a qualifying employer. You retain all
that you've earned, but you will not get any more at that
agency until that agency either regains eligibility as a
qualifying employer, or you decide to go to another
agency to fulfill one year worth of time under all of the
other eligibility criteria as well, to get that
forgiveness.

          MS. HAMMER: So, the Secretary- in
that case, would be allowed to accept the months of
payments and the months of employment where they were at
the employer that's no longer qualified.

          MS. ABERNATHY: We already have that
in the regulations. It's a prospective approach from July
1, 2026, forward. We are not taking any eligibility that
a borrower has earned at all away from them, even at the
time that they worked for that eligible employer prior to
July 1, 2026, they are eligible to keep those.

MS. HAMMER: Yeah, that wasn't really my question. My question was more around how it's documented and verified.

MS. ABERNATHY: We already had that process in place. There's nothing different now than if a borrower only has nine years and they leave Federal employment, they only get nine years credit. If they don't come back for that last year, they don't get that. We do not do incremental forgiveness. It is a complete 120 months before forgiveness is applied to a borrower. So, while they have earned those nine years, they cannot get those nine years of forgiveness. We don't do incremental forgiveness. It's after 120 qualifying payments.

MS. HAMMER: That wasn't my question. My question was, if you're- like, say, the last year is a new employer that is qualified and that's where the application is made. They would-

MS. ABERNATHY: They would fill in a documentation for the prior nine years at the other qualifying employer.

MS. HAMMER: So, is that two applications?

MS. ABERNATHY: Yes.

MS. HAMMER: Okay. That's-

MS. ABERNATHY: Yes.

MS. HAMMER: (inaudible) wanted. Thank you.

MS. WEISMAN: Next, we have Alyssa. Tamy, did you have something else you wanted to respond to? Okay. So next we have Alyssa followed by Abby and then Rebecca.

MS. DOBSON: So, during these conversations, I'm hearing a lot about denying the student's application. And it's concerning to me that there's not an appeal process outlined for the student, given the amount of confusion that we're all having surrounding this. I would imagine that there will be some applications that are erroneously submitted, erroneously certified, and so on. I think it would be really important to have some sort of process for the student to appeal a status, should they maybe be trying to get those nine years approved. And for whatever reason it comes, it comes back as denied. And I'm just not seeing a process for that outlined here anywhere.

MS. WEISMAN: Tamy, do you want to respond?

MS. ABERNATHY: I do. So, Alyssa, we already have in place a reconsideration process for borrowers who fall into those categories, right? So, we

have already in our existing regulations a
reconsideration process for borrowers. Now what we will
not allow- because if you look at the criteria for Public
Service Loan Forgiveness, qualifying employer, eligible
loan, all of those pieces, we're not allowing a borrower
to petition, but my employer is a qualifying employer. We
cannot allow that because that is a determination that is
based either on the verification form or through some
corrective action or through some mechanism. So, because
that is a key component of the Public Service Loan
Forgiveness eligibility criteria, that falls out of the
purview of the borrower initiating because the activity
has to come from the agency.

          MS. DOBSON: So just quickly then, I
foresee a situation where they're erroneously denied,
where it is stated to them that it's not a qualifying
employer, but it was and they're just trying to get those
years for for what it was.

          MS. ABERNATHY: We would look at a
case-by-case basis. In those situations, if a borrower is
eligible and for some reason there is a mistake because
we would never make any mistakes, right? We will look at
that. I cannot tell- we're not going to regulate
ourselves, however, as to, being able to say we're going
to fit in this kind of a box, but because we already have

infrastructure in place for reconsideration, that's where I probably would look at that and say, okay, reconsideration. But if we have got something wrong in the qualifying employer, I'm pretty sure it's going to bubble to the top, and that's going to get looked at by a lot of different people to make sure that we get that right. This is a premise of what we're doing here to restore Public Service Loan Forgiveness. It's our obligation to you to make sure we get it right. And if for some reason we've classified somebody incorrectly, we will remedy that situation as quickly as possible.

            MS. WEISMAN: Jacob, do you have a follow-up to that or a new issue? Because I want to make sure we get back over to Abby.

            MR. LALLO: A quick follow-up. Yeah, I think any case-by-case basis for borrowers, we want a remedy. We try to do that as well as we can already. What we want to do explicitly is not allow borrowers to request reconsideration on behalf of the qualifying employer, that we've already provided a separate process for qualifying employers to work through an evidentiary hearing with us and present their own evidence, and we view disqualification under this is between us and the employer, and then the employer and the borrower. And we don't want to create an incredible amount of paperwork of

borrowers requesting reconsideration for their employers.

MS. WEISMAN: Thank you for your patience, Abby.

MS. SHAFROTH: Thank you. Just a few points. First on the refusing to allow borrowers to challenge the determination that their employer was non-qualifying, I hear the point that you think this is between the employer and the Department to resolve. I can imagine situations where an employer has been accused of illegal conduct and has been forced out of the PSLF program, and the employer disappears, right? In these sorts of situations, it's often the organization, especially if it's not a government, if it's a nonprofit, it goes bottom up and then the employer is no longer in a position to be sort of fighting battles on behalf of its former employees with the Department. So, I do think we should take seriously that borrowers will be left without anyone fighting for them and standing up for them in those situations. I also wanted to sort of separately go back to the point that Mary Lyn was, I think, making today, and that Alyssa raised yesterday about making sure that we're not penalizing borrowers retroactively. So, I hear the Department saying that for time that the borrowers already worked prior to their employer becoming non-qualifying, that they wouldn't lose any of that time.

But what's a little unclear to me is what happens in the case of borrowers who, who have worked for years at an employer that was at the time considered non-qualifying, but who don't annually submit their ECF forms, who wait until later. And if they then submit their ECF form after the employer has been deemed non-qualifying, how can that employer then certify that they are a qualifying employer and that they have not engaged in any illegal conduct? Does the borrower lose all of that time retroactively when they were performing public service? One last thing. Just because who knows when I'll get another chance, is, I did want to sort of resurface Laurel's request for a caucus, and I think it wasn't totally clear what the process is by which to call for one. So, I just wanted to make sure that doesn't get lost.

MS. WEISMAN: Okay. Let's go to Tamy for a response. And one other quick note. When I'm calling people out in terms of responding, part of the goal is to get your name on the transcript. So, it may seem overly formal, but that is the purpose behind it. So, Tamy, if you want to respond, we'll go over to Todd after that. I'm sorry, to Rebecca and then Todd, and then we can discuss whether there's a desire to do a caucus, and I can explain the process.

MS. ABERNATHY: Thank you, Abby. We

already have in our process, in our regs already and on
the form, if a borrower is unable to obtain an employer
certification, there is a process for the borrower to
submit that information already. And so, we will look at
those. We are not going to penalize these borrowers if
they are nonprofit or somebody goes your words belly up.
We know at that particular point- we're going to look at
that. And if the borrower has completed their
requirements of fulfilling qualifying payments under a
qualifying repayment plan for eligible loans for that
period of time, they will get credit for that. That
already happens today, where we are not able to ascertain
or an employer refuses to sign a verification form. We
already have a process in place for that, that is working
effectively already. And so that process would continue
with these new rules as well. Does that help? And so,
we're not going to penalize a borrower. If a borrower has
worked, and all of those eligibility criteria are met,
they will not lose their eligibility for those periods of
time that they met all of the requirements to receive it.
It is only at the time, effective July 1, 2026, forward,
that working at a non-qualifying employer, those payments
would not count. So, everything prior to that period of
time would count. It saves, it preserves the earning of
time toward forgiveness for those borrowers. They will

not lose that. If they were eligible before, they're eligible now for that period of time, but not going forward. And that's what we say in our proposed regulations. It's prospective. It's going forward. There is no retroactivity in these regulations. We do not want to take away what was earned, rightfully for our borrowers. Does that help?

MS. SHAFROTH: So just to clarify, in a case where a borrower has worked for a qualifying employer that subsequently becomes or is determined to be non-qualifying, the borrower has not yet submitted ECF paperwork for the prior time. They would have a separate workaround process to then get credit for that prior time with the Department? And would borrowers know about this? Would it be easy for them to access?

MS. ABERNATHY: So, we have a reconsideration process already in place. Now, what we do not want is borrowers to do that. We are going to look at these, like we said, on a case-by-case basis. Should there be a situation where a borrower is in a conundrum of oops, I didn't certify. And now, effective July 1, 2026, and forward, they are working at a non-qualifying employer, that is going to have to be looked at. And so, everything that we have in place, the infrastructure is already there, the communication is already there. We

will absolutely update the form. We will update anything
required to be updated for borrowers to understand what's
happening. That's part of any time we do a rule. Anytime
we publish a new rule, we look to our operational team to
manifest every piece and part that they have to put in
place for the borrowers, or, if it's just students in
general to understand. All of that, they will communicate
with the servicers. The servicers will understand what is
expected. So, we will do our very best to quickly make
sure all of the pieces and parts are collectively
communicated out, so that the borrowers clearly
understand they're not losing a benefit here. The other
thing is borrowers may want to start certifying now and
certifying early and not waiting for ten years. You know,
there's no requirement that they wait ten years to file a
certification form. That is a borrower's choice. There's
no requirement, they can do it any time they want. So,
it's their choice to choose how they want to get credit
for that time that they've worked and met the eligibility
criteria for the PSLF program. We don't plan to change
any of that.

            MS. WEISMAN: Okay. So, we're going to
Rebecca, followed by Todd. Then we'll have a brief chat
about caucuses and a break.

            MS. STANLEY: A couple of issues. One,

you mentioned not wanting to have a bunch of reconsideration requests, and I'm just curious because of the way the PSLF form is set up now, the help tool, which is wonderful, is, if we couldn't utilize that in this instance because I'm afraid if you put eligible and ineligible, the PSLF form is only as good up to the date that it's signed. And that's what a lot of people get confused by. Would be helpful if that was on the website, maybe somewhere big, because that's one reason they wait to do that? Because they think, why is my payment count not going up? They don't understand that it was only good until the date it was signed previously, because they could have quit and got another job in a non-qualifying institution after that. But if they go to that PSLF help tool, and they found out their employer now is not qualified, they're going to click on ineligible and they won't be able to do the PSLF form. So, it might be something that we could have three statuses or eligible until.

                MS. ABERNATHY: We will have to take that back to our operations team to look at. We hear you. And it's a valid concern. We have not had a chance to discuss that, so I can't speak to that right now, nor do I want to put my operational partners on the spot to try to come up with a solution before we're able to get that

back, but we do have that on the list. It is something
that we will look at and we will try to- if we're able to
circle back with a solution, we certainly will, but it is
something that we will look at.

          MS. STANLEY: It just might minimize
the reconsideration idea, you know, because they won't
have any other option, otherwise.

          MS. ABERNATHY: There will be a lot of
communication that we will have to provide to borrowers
related to this. You know, and I think Alyssa said it
best, we're confused. But I mean, this is financial aid,
friends. I mean, how many times is there not confusion
around some of the things that we do? So, we know that we
will work toward the goal of clear, concise, conspicuous
information providing the right steps for borrowers,
making sure they understand when a reconsideration
request is appropriate and needed, and when there is not
a reconsideration request. If they are trying to prove
qualifying employment previous, we know that will be a
reconsideration request if they're unable to do it on, on
a case-by-case basis. But I'm not sure what we'll be able
to do to mitigate some of those concerns. But we know
that they are our concerns as well. So, thank you.

          MS. STANLEY: And the only other thing
I wanted to say was I have helped people actually, that

have had that situation in a totally different situation
from this. The nursing home they work for went for-profit
instead of non-profit. And we were able to prove that
they had that time and they got credit for that time. So,
I'm just reassuring you with that, they do have a system
in place. It was cumbersome to some extent, and maybe we
can prevent that if we could somehow get into that help
tool. But I have seen it work in the past.

        MS. ABERNATHY: Thank you for sharing
that. That's positive. That's a positive note. Thank you.

        MS. WEISMAN: Over to Todd.

        MR. JONES: Yeah, I wanted to wait
until that conversation finished. I want to acknowledge
dropping the former 30 for the state tort piece. That was
helpful and I think appropriate.

        MS. ABERNATHY: We haven't gotten
there yet, Todd. We're going to get there, I promise.

        MR. JONES: Just looking ahead.

        MS. ABERNATHY: Thank you.

        MS. WEISMAN: Laurel?

        MS. TAYLOR: Just one more comment
before I think you're going to comment on the caucus
period. From a data perspective, what we see in the data
is that 67% of PSLF-eligible employees, their first-time
application is after 6.7 years working for their

employer, and the average forgiveness is $76,000. So, I share that as we have a discussion about potentially moving to a caucus, about how to compartmentalize the damage that is done to the entity that has material, substantial illegal activity. Because even when it's clear and easy- and I think, Tamy, you mentioned this point yesterday of really encouraging borrowers to apply and not waiting ten years to apply, which I absolutely think is essential and mission critical, fully agree with, what we're seeing in the field in practice, is that 6.7 years is the time that employees work for their qualifying institution today, and it is largely two-fold an awareness issue. And, Tamy, you spoke about the communication and making conspicuous communication. It's communication, it's awareness, and it is an operational technology and experience issue in the ease in which employees- and there's been significant progress. What we're seeing is that it's complicated. And so, there are challenges. And Rebecca, you're speaking to really providing that guidance and hand-holding and the incredible services that you offer. But that 6.7 years was often accompanied with heavy coaching to help employees discover, select, and apply for these programs. So again, I hope I'm not being disruptive. As we're moving through these discussions, I think simplicity is

so important to achieve the desired effect that we've
been called to problem solve for today while enabling for
those who are going into public service, that we get them
into the program and not penalize the whole or the bad
actions of a unit somewhere.

        MS. WEISMAN: Todd, is your card up
from before? Okay. So, I think it's the time to talk
about break and caucus. It is 10:11. Let's do caucus
first because that might impact how you want to do the
break. So, according to the protocols, the primary member
can call for a caucus. That member would state the
purpose and the expected amount of time that they think
that they will need for the caucus, as well as which
negotiators representing which constituencies would be
invited to the caucus. During the caucus, the live stream
stops. If the caucus is the entire group, then everybody
else leaves. If the caucus is a subset of the committee,
then we have smaller rooms where you'll be able to go.
So, you can have one caucus and other people will hang
out. You can have four different caucuses. Is it caucuses
or cauci? I think it's caucuses. So, do I have any- and
again, you're listing the expected duration, so that
could go into the break if you wish. And some of that
depends on whether you have everybody or a subset. So, do
I have a primary member who would like to call for a

caucus? The other option is we could take a short break.
And then after the break, if somebody would like to call
for a caucus then, you might have a better sense over the
break of who you would like to converse with. You'll have
something to drink, maybe a snack, and all will be well.
But first, we have a question from Bob.

MR. CAREY: How about we make it a 20
or 30-minute break, which would probably have the same
effect as a caucus.

MS. WEISMAN: So, we're not able to do
that, first of all, because we need to hear who all will
be invited for the record. And I think we have some
people who feel they need a break before they're ready to
get there.

MR. CAREY: There's not a motion for
caucus anyway, right?

MS. WEISMAN: Not at this time. So,
when we come back from the break, if somebody at that
time wants to call for a caucus, then we will do that.
So, at this point, we will break until 10:25. Thank you
all. Thank you all for coming back after our short break.
I was hearing rumblings of an interest in a caucus. Is
there any member who wanted to propose a caucus at this
time? Betsy?

MS. MAYOTTE: I would like to propose

a caucus. All the non-Federal negotiators and their
alternates, please. We need a half an hour. Have I
checked all the boxes? Oh, the purpose is- I suppose I
can't get away with talk about neg reg? No, the purpose
is to discuss the issue that came up yesterday around
organizations that share an EIN.

                    MS. ABERNATHY: Annmarie, how about 20
minutes?

                    MS. MAYOTTE: How about 24.5?

                    MS. ABERNATHY: How about 20 minutes?

                    MS. MAYOTTE: Twenty- we were going to
ask for an hour.

                    MS. ABERNATHY: Twenty minutes?

                    MS. MAYOTTE: Half an hour?

                    MS. ABERNATHY: Twenty minutes.

                    MS. WEISMAN: Let's go with 25 to be-

                    MS. ABERNATHY: Let's go-

                    MS. WEISMAN: Let's go 25 minutes.

                    MS. ABERNATHY: Twenty-five minutes.

                    MS. WEISMAN: We will clear the room.

                    MS. ABERNATHY: If you have to have
another caucus later, then we can discuss it. But 25
minutes. We really need to be mindful of the viewing
public and keeping things moving. Yeah, 25 minutes.

                    MS. WEISMAN: Let's go with 25. And

the question is then, since you're doing all of the non-Federal negotiators and primaries, we assume that we will clear the rest of the room. Would you like me to be there to assist, to facilitate, or no? Okay.

MS. MAYOTTE: (inaudible) after lunch.

MS. WEISMAN: Directly after lunch. Okay. Alyssa?

MS. DOBSON: There were a few other topics, too, which it's another reason that we asked for the longer time. We also wanted to talk about buyback and, and reinstatement or regaining eligibility. I would still like to have the half an hour, but those are additional topics that we'll be discussing as well.

MS. WEISMAN: Tamy, do you have a comment on the half an hour at this point?

MS. ABERNATHY: A half an hour.

MS. WEISMAN: Sold on a half an hour immediately following lunch, I'll reiterate that.

MS. ABERNATHY: But we have to come back from lunch and then officially start it, correct?

MS. WEISMAN: Yes.

MS. ABERNATHY: Okay. I'm just making sure for the order of service.

MS. WEISMAN: Yes. And that's kind of where I was going next. The production team in the back

does need to stay in the room. However, they will not be broadcasting anything. And they will also assist in coming to get me if you finish early. So, if you do finish that 30 minutes early and you've covered everything and you want people to come back, I can start to try to bring people back over and the live stream will start once I start speaking again after that. Tamy, do you have anything that you want to cover now? I don't see any cards up.

MS. ABERNATHY: Yes, ma'am. Thank you. Let me get my bearings about what I want to cover.

MS. WEISMAN: While you do that. I do have two proposals that came to me by email that I am going to send out right now.

MS. ABERNATHY: We are going to focus our attention on (g). I was supposed to say welcome back and acknowledge you and thank you for all your dedication and commitment. You know, all jokes aside, we do appreciate all of the conversation, all of the ways in which you are helping us promulgate rules and get to a good space. The reconsideration process for borrowers. I don't think we made any changes there. Michael, if you'd be able to share your screen for subsection (g) for us. So, while Michael's getting ready, we've discussed this several times yesterday and several times today as you

prepare for your caucus, some of the things that I want
to remind you of. Our proposed standard for determining a
qualifying employer that is engaged in a substantial
illegal activity would impact the borrower's eligibility,
and this determination is based solely on the qualifying
employer's activities. So, the addition to paragraph (g)
would limit the ability of borrowers to request the
reconsideration. We've been talking about this in ways to
mitigate that. That is what (g) is on the screen. That's
not on the screen yet. But we've talked about it enough
where I think- there we go, (g). So, we know that
borrowers have a reconsideration process for other
things, for all of the other ways in which they can
request reconsideration. We are not proposing to allow
them to have a reconsideration process for qualifying
employer. As Jacob mentioned, that's between the
qualifying employer and the Department. Okay. So, I don't
know if there's any additional conversation on that. We
can continue to talk about that, or I can move on to the
other definitions that we had prior to yesterday
switching, going to (c), (h), and (i). There were other
definitions that we still needed to get to address, in
subsection (b). Thoughts? Do you guys want to have an
additional discussion on the reconsideration or are we
okay to move on? Okay. So, we're going to shift gears to

subsection (b). And we are going to jump around to
formally get through all of what is considered
substantial illegal activity definitions. Okay? Making
sure I have my notes in front of me. We have proposed-
Michael, if you would share (b)(30) for me, which is
substantial illegal activity. We proposed amendatory text
to exclude an agency from becoming a qualifying employer
when they participate in a substantial illegal purpose.
So, there were issues related to Federal immigration,
terrorism, chemical and surgical castration and
mutilation in cases where it violates applicable law,
engaging in illegal discrimination, and violating certain
State tort laws. So, you can see on the screen, I
promised you that we would talk about the proposals that
you had and where we made changes. You will see, Tracy,
your suggestion to us about the State tort laws in five.
You had a little bit different of a recommendation for
us, but in reviewing it, we decided to change that so
what you see marked out and highlighted in yellow is a
result of the proposals that we received. So aiding and
abetting violations of 8 U.S.C. 1325 or other Federal
immigration laws; supporting terrorism, including by
facilitating funding to or the operations of cartels
defined as foreign terrorist organizations consistent
with 8 U.S.C. code 1189, or by engaging in violence for

the purposes of obstructing or influencing Federal
government policy. Engaging in the chemical and surgical
castration or mutilation of children, or the trafficking
of children to states for purposes of emancipation from
their lawful parents in violation of applicable law.
Engaging in a pattern of aiding and abetting illegal
discrimination or engaging in a pattern of violating
State, State laws against trespassing, disorderly
conduct, public nuisance, vandalism, and obstruction of
highways. So, we've leveraged, where possible, the U.S.
code. You see that U.S. Code in actual citation of our
definitions. Please refer to the document with the links
to the U.S. Code that we are using for further
information on that U.S. Code. We're going to provide
definitions now to the key terms. So substantial illegal
purpose in 685.219(b)(30)(i), Federal Immigration
Definitions. Michael, I think you're already there
(b)(30)(i). The first clause establishes the term of
aiding and or abetting violations of 8 U.S.C. 1325 or
other Federal immigration laws. This would exclude an
agency who participates in a substantial illegal activity
and has met the standard as defined in this subsection,
from being a qualifying employer. The term aiding and
abetting in (b)(1) has its own definition. Under (i)-
(b)(30)(i), we're defining the violation of aiding and

abetting that would warn a substantial illegal purpose. So, in (b)(1), at the top of (b), we, we define aiding and abetting. But for the purposes of establishing a substantial illegal purpose, we are defining the action, the violation of aiding and abetting, which is why it's a different code. So, section two-in our proposed definition of (b)(1), that's where we use 18 U.S.C. Code two, and that is section two of the Crimes and Criminal Procedures Act, which addresses the principles of aiding and abetting that are punishable. The principles of aiding and abetting are whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal, and, (b), whoever willfully causes an act to be done which, if directly performed by him or another, would be an offense against the United States, is punishable as a principal. So, these two aiding and abetting there is already defined as punishable as a principal through the definition of aiding and abetting. So, A and B are these offenses of- or acts against the United States. The Department does not need to define the next part of the clause, Violations of 8 U.S.C. 1325, because it is a direct statutory reference to the Immigration and Nationality Act. Section 1325 outlines existing penalties for aliens

who enter or attempt to enter the United States illegally
by false misrepresentation, concealment of material fact,
eluding, examination, or inspection by an immigration
officer, marriage fraud, or fraud related to
entrepreneurship. So, this part of the definition already
outlines existing penalties. Let us consider the final
part of the clause in (b)(30) romanette, other Federal
immigration laws. So, Michael is going to share (b)(17)
at this point. We propose to define other Federal
immigration laws under (b)(17) as any violation of the
Immigration and Nationality Act, 8 U.S.C. code 1105, 1105
et seq. Et seq means and the following. In parentheses,
you will see a technical reference to the Immigration and
Nationality Act. The Immigration and Nationality Act is a
comprehensive U.S. Federal Law that governs immigration,
nationality, naturalization. Because the phrase other
immigration laws are broad. We believe that using the
words any violation of the Immigration and Nationality
Act is the most appropriate definition. Again, these
terms we propose to define are using definitions that are
already in code that already carry what the penalties
are. We do not have to define those. At this point, we
would like to make sure that you provide us any kind of
discussion on the best reference available for the
Immigration and Nationality Act, because the first clause

in which aiding and abetting under 8, 1325 or other
Federal immigration laws establishes one activity under
substantial illegal purpose, and that would make an
organization eligible for PSLF, an unqualifying employer.
So, Annmarie, we can turn it over to you at this point in
time to discuss romanette one, aiding and abetting
violations under 8 U.S.C. 1325 or other Federal
immigration laws under (b)(17). Thank you.

       MS. WEISMAN: We'll start with Bob and
then go to Todd.

       MR. CAREY: So, in general, my concern
is that we have too many definitions and that we have too
much cross-referencing when it doesn't appear we need to
do that. In general, I would say on (b)(1), aiding or
abetting has the same meaning as defined under 18 U.S.C.
2. That is only for a crime against the United States.
So, by using the definition of aiding and abetting of-
meaning, 18 U.S.C. 2, anywhere else we use aiding and
abetting, it can only be for a crime against the United
States. It can't be for a crime against someone else or
an individual or another organization. And I don't know
if you necessarily want to limit yourself that badly. But
right now, that's how I would read it. And then we were-
down in 30, so if we're going to say or other Federal
immigration laws, but we define other Federal immigration

laws as the Immigration and Nationality Act, well, why
not just put that in there and then you can get rid of
the definition of other Federal immigration laws because
it makes it section 30 sub 1 makes it look far too broad,
when in fact, you can just put in that and you can get
rid of the other one. Same thing with subsection 30 sub
4, aiding or abetting illegal discrimination. Now, this
is an area where the underlying definition is, I think,
too broad. Because means a violation of any Federal
discrimination law, including, but not limited to. Who
knows what a court will determine to be discriminatory?
And, and again, I worry that for military and veteran
students, someone will say, oh, the fact that you don't
let someone enlist after the age of 42 because they can't
get 20 years of military service before they get out,
that's discriminatory. And now the United States military
is no longer a qualifying employer. I worry in general
that you have too many cross-references to definitions
and some of those definitions are overly broad, and you
need to be more prescriptive as to what that means.

           MS. WEISMAN: Todd?

           MR. JONES: I'm going to wait for the
Department to comment on those comments before I comment.
I just had one simple inquiry. Can you put 30 back up on
the screen? Substantial legal purpose. It's just a

technical question. I'm not sure you need the comma after laws, and it makes it confusing draftsmanship. That's all. I'll wait on my comments on the other pieces.

MS. WEISMAN: Jacob, did you want to comment first on what was already- or Tamy?

MS. ABERNATHY: We can fix the technical correction on 30. Thanks for pointing that out. I think it was just a carry forward when we edited. Thank you.

MR. LALLO: Thanks. This is the point of negotiated rulemaking. Fixing typos as a group. Yeah, Bob, I think just to respond to your comment, I think within aiding and abetting, I think it's the appropriate use of the definition for the purposes of 30 small romanette (i), when we're talking about the Immigration and Nationality Act, we're talking about a crime against the United States. So, I think it is appropriate to reference it there. You may have a point regarding its usage in legal discrimination, but I think it still fits within the definition, given that we are talking about Federal Law and I think adopting that definition is appropriate there. Broadly, I just want to respond to the overarching point about cross-referencing. The reason we took that approach is we don't want to be making new law or taking the appearance of making new law. We want to

adopt as many definitions that are already in Federal Law as possible. We want to be very conscious of what we are and aren't adding to regulation, and where we don't have to break new ground, we don't want to.

MS. WEISMAN: Tamy, did you have something else? Okay, then we'll go over to Sarah.

MS. DORAN: I just had a quick question and a comment about 30 substantial legal purpose. My general question is I'm just curious, what's the Department's reasoning on these specific illegal criminal acts when there are so many criminal and illegal acts that could occur or happen that could potentially disqualify an employer? And why are these the specific five that have been outlined to be disqualifiers? Thank you.

MS. ABERNATHY: Annmarie?

MS. WEISMAN: You want to respond?

MS. ABERNATHY: Yes. As you'll recall, Mr. Jeff talked about the executive order yesterday and went over what was articulated in that executive order. These are the very provisions that created a substantial illegal purpose from that executive order. So, the reason we are patterning our regulations after that under the Secretary's authority is because those are the very things that were already addressed as a substantial

illegal purpose. And we want to restore Public Service
Loan Forgiveness in that manner.

MR. ANDRADE: And to clarify, these
were identified and so we have adopted ones that were
identified in there, it's not a cross-reference to the
executive order. We're adopting the activities identified
in the executive order.

MS. WEISMAN: Did you need to respond
to that?

MR. LALLO: Just following on to that.
You know as we discussed our ability to promulgate rules
and engage in this is separate and apart from the
executive order. The president, in his capacity as chief
executive officer, is tasked with upholding the laws. And
these are the ones that have been identified as, you
know, high-risk currently. We have taken that as a policy
consideration in our capacity as subordinates within the
executive branch, are carrying that out. But we are still
doing that within the realm of our remand to administer
the Public Service Loan Forgiveness program and carry out
rulemaking separately to provide the regulations
necessary to do that. So, there are some small
differences from the executive order to ensure that we
carry it out effectively and in accordance with the HEA.

MS. WEISMAN: Next, over to Faisal.

2025 Negotiated Rulemaking - 7/1/25

64

MR. SULMAN: Thank you. One, I applaud the consistency of at least using the definitions and make sure they're referenced properly, despite any grammar issues. We have that happen. But in subsection five here, when you said engaging in a pattern of violating State laws, and I saw that you also made the change in subpart 34, eliminating court laws there, just changing to State. But how is the Department reconciling the differences of the different states and their own- like Virginia, they operate on the Commonwealth and they have a different set of laws, you know, defining what it means to trespass versus North Carolina, how is the Department reconciling these differences across state lines that operate on different like, subcategories of what it means to be State Law in these five things?

MS. WEISMAN: Jacob, did you want to respond?

MR. LALLO: Yeah. So, you know, I made that point earlier about where we've cross-referenced. There's a reason we don't cross-reference to State law. There's a lot of them. We want to basically preserve some degree of flexibility there. We're aware that those laws are different. That's why we chose phrases that are basically baked into the common law and have analogs across the board. But moreover, this kind of goes back to

that substantial or the materiality qualifier. You know,
as you said, some states have different laws. They may
have a tighter or looser standard. And we don't want to
knock organizations out who are just technically non-
compliant or have gotten in trouble for something very
minor that we think can be remedied. And again, that
might not be legal in one state but is in another. We
need to take all that stuff into consideration. So, I
think that's addressed in the materiality qualifier. And
frankly, we just don't have a good way to handle it in
precisely in regulation.

        MS. WEISMAN: Jeff, did you have
something? Then we'll go next to April over here.

        MS. BOYD: I'm just curious because we
do Clery Reporting, which is campus crime, and I'm
curious if that is going to be reviewed as part of this
process, so schools could lose their eligibility if they
do have a little bit of campus crime, because sometimes
you can't control the parameters around you. So that's my
curiosity.

        MS. WEISMAN: Tamy?

        MS. ABERNATHY: April, that is a
complete and separate process, not associated with this.
So, the answer would be no.

        MS. BOYD: (inaudible) and the school

staff.

MS. WEISMAN: Jacob, did you want to
respond?

MR. LALLO: April, that's a separate
issue. We're talking about Title IV participation at that
point, not participation in PSLF. That's not affecting
their status as a qualifying employer. While it
definitely would have an impact on the students and their
staff, it definitely would not involve the qualifying
employer for the purposes of PSLF, because clarity is not
tied in with that.

MS. BOYD: Right. But if they have to
report a public nuisance, right, following the State
Laws, wouldn't that essentially flow into that? That's my
curiosity. I mean, if it doesn't, then it doesn't.
However, speaking on the campus crime and I actually have
a hand in that, that just caused me a little concern.

MR. LALLO: I mean, reporting a public
nuisance is one thing, but reporting public nuisance that
has occurred on a campus is different than a public
nuisance against violations by the organization itself.
So, if a college is actually being charged with violating
state public nuisance laws, that's again, a very
different circumstance than just campus crime reporting.
Those aren't going to count against a college or

ED_02204

university. It does have to be reported under Clery for
the purposes of Title IV, but it wouldn't, for this,
trigger a loss of qualifying employer status.

                MS. WEISMAN: Emeka?

                MR. OGUH: Yeah, I guess a clarifying
question just building upon with Faisal and April
discussed. So, by saying that an employer violates State
Laws as opposed to State Tort Laws, is that casting a
potentially wider and harsher net than just citing State
Tort Laws? I guess it's just more my understanding
because, obviously it feels like we were more focused on
civil behavior with State Tort. But does tort fall within
State Laws, like are we seeing tort now, plus expanding
to other broad areas, if that makes sense?

                MS. WEISMAN: Jacob, did you want to
respond?

                MR. LALLO: Yeah. So, part of what we
took back and the reason we knocked tort out is we really
want to remove any ambiguity there. Some states classify
violations of laws like public nuisance or they use the
term tort within their code even to refer to criminal
law. And because that can be a little convoluted and
confusing, that's why we knocked out the references to
tort. We want to make it very clear that we're talking
about violations of State Law, not a neighbor suing

another neighbor for making too much noise.

MR. OGUH: So civil law is not-

MR. LALLO: Civil Law can come into play for the purposes of discussing settlement agreements and if it would otherwise fit within a substantial legal purpose. But for the purposes of 30 small romanette five, we're very specifically talking about state criminal law. So, we wanted to remove it from that, to clarify that it's those enumerated common law offenses that we're talking about.

MR. OGUH: Okay. So, I guess- is it bigger than it was yesterday? As far as tort (inaudible)?

MR. LALLO: No, it's tighter. It's tighter. We're restricting functionally, we don't think we really changed anything in the sense that we're really just making a definitional change, but we wanted to make sure that it appears or it clearly is restricted to a very narrow universe.

MS. WEISMAN: Over to Abby.

MS. SHAFROTH: Thank you. I want to follow up on this point about the new language on State laws. First, Jacob, if I'm hearing you correctly, you're saying no, in fact, you want to limit on only to violations of State Criminal Law? Is that correct, what you just said?

MR. LALLO: I think in this regard,
yeah. Jeff, correct me if I'm wrong. Okay. Just wanted to
make sure. Yeah. We are restricting to just criminal law
here. We also struck the definition we had added at 34
for violation of State Tort Law, because we really do
just want it to be narrowly defined to these five issues
or six. We don't really feel the need to go beyond that.
And yeah, we didn't want any confusion that we're talking
about civil law in this regard.

MS. SHAFROTH: Okay. Thank you. So, I
would suggest that if your intent is for it to only apply
to State Criminal Law, that you say that in the
regulation as written. It doesn't, and so it could
certainly be interpreted to apply to, to non-criminal
laws regarding public nuisance, disorderly conduct, etc.
So that's a small recommendation. I also wanted to
respond to the suggestion that the new amendments have
made the language tighter and more limiting on the types
of conduct that the Department would penalize. I'm
concerned that by striking the definition of violation of
State Tort Laws, which previously defined it as only
final non-default judgments, you've eliminated that. So
the new language could capture much more conduct, because
it is not just what a court has found to be a violation
of State Law, but it is anything that the Department, in

its discretion, determines is a violation of State Law under the revised version of the language, which is much broader and gives the Department new authority to adjudicate issues of State Law. That is something that the Department has really shied away from in the past. The Borrower Defense context, for example, the Department was very against any definitions that would require it to adjudicate State Laws and said that it didn't have that capability to adjudicate State Law. So, I'm concerned about this change.

            MR. LALLO: So, we'll take that under consideration. I don't think there's any interest on the Department's side to enforce State Law. It's a separation of powers issue, for one. And two, it, frankly, is beyond our purview to get involved at that level. I think the intent is very clear that these are cases that have been adjudicated by a state court and they have found evidence enough to support a conviction or liability in some capacity. We're not going to be going in and determining that somebody has violated a state trespassing law. So, I think we can definitely consider how we want to adjust the language there.

            MS. WEISMAN: Speaking of language, I just want to call to your attention that I sent three emails to you just a short time ago at 10:34, 10:36, and

10:44, with some new language from some of your
colleagues around the table. If you haven't seen that
yet, I just wanted to call that to your attention. Next,
we'll go over to Faisal.

MR. SULMAN: Thank you. So, two really
quick questions. First one, hypothetical. Say, for
example, you have a public institution, and they allow
their students to operate, have their First Amendment
right to gather protests and whatnot, and everyone's
doing it peacefully. And some persons bring suit against
the university. And again, hypothetical, the university
is found to be complicit in disorderly conduct. And those
protests, even though they were civil, in the case they
were charged with that. Would everyone at that university
lose then access to be ineligible to the Public Service
Loan Forgiveness, one?

MS. WEISMAN: Did you want to respond?

MR. LALLO: Yeah, I do. So, that would
still fall under- it's a final judgment against the
university in some capacity. Yeah, the university itself
would lose access to PSLF or whatever the organization
that controls it would. Because it's still been
adjudicated to have been involved in that conduct. You
know, regardless of whether or not it was a broadly
peaceful activity, the fact that there has been either

some kind of criminal determination made against the university of guilt or, they've otherwise entered into a settlement agreement. Yeah. There would still be something there. But, you know, that's where we built in that language about a pattern. And then again, we had the materiality qualifier. It has to rise to a certain level for us to get involved with it. If it's an incidental or technical finding against the university in this hypothetical, there shouldn't be an issue. Again, we don't want to enforce unnecessarily. This is not meant to be a bludgeon. It's meant to basically curb bad behavior. So again, we don't want to punish organizations that are only technically involved with something. We are looking for patterns of bad behavior. Particularly when we were talking about State Tort Law and severe or material conduct. So, I think in that hypothetical, assuming the university is really only technically involved in some capacity, they probably are fine. But if there is the- I think depending on how it's constructed, if they are found liable or guilty, if we're talking about criminal conduct, there is some degree of materiality. And we do still have to consider how that works in.

          MR. SULMAN: So, just following up on that. Okay, so with like the massive school protests that happened in the last several years regarding the

Palestine issue, obviously not to speculate or anything.
So, if we're going down this route, I kind of foresee
this as a slippery slope of like universities, such as
University of North Carolina, Chapel Hill or any of the
major universities that allowed these protests to happen
to be disqualified from Public Service Loan Forgiveness.

MR. LALLO: Yeah. So, you know, I see
your point there. I think it's well taken. We again, are
not in any way interested in curbing free speech rights.
We discussed that yesterday a little bit. Organizations
who are exercising their free speech rights peaceably and
in connection with their First Amendment rights to do so,
that's fine. I think what we're talking about here, and
in particular with five, is engaging in patterns of
violations of State Law. And I can't think of a case with
those universities where they were charged or directly
found criminally responsible for any violations of State
Tort Law in those cases. So, I don't really see that
hypothetical applying to this situation precisely.
Certainly, individual people were charged with things,
but again, those aren't the employer themselves. And
unless the employer was directing that conduct, they're
not going to be included within that.

MR. SULMAN: And just a very small
second question just regarding the preponderance of the

evidence like standard. And typically, that's usually
seen in like civil cases of sorts. But if we're limiting
the language in subsection five to the only State
Criminal Law, shouldn't the burden of proof be lifted
higher to beyond a reasonable doubt?

                MR. LALLO: So, I don't think that's
necessary for us, because beyond a reasonable doubt is
already implied by that. If they've been found guilty in
a criminal setting, that beyond the reasonable doubt
standard has already been applied by a State court. We're
applying the preponderance of evidence standard as a
separate thing on top of that, and we're just taking that
into account. Also, I want to make the clarification,
because I think we're possibly getting a little lost with
the details of when it's the conduct of an employer
versus the conduct of students or employees. In general,
institutions are not vicariously liable for the actions
of non-employees such as students, and they may not even
be vicariously liable for the actions of an employee,
assuming those actions are not sanctioned or known by the
employer. So, this is not a situation where a student at
a university goes out and throws a rock at a protest and
the entire university loses its ability to participate in
PSLF. This is a completely separate issue. We're just
looking at the conduct of the organization itself.

MS. WEISMAN: Tamy, did you want to respond to that, or should we go over to Abby next?

MS. ABERNATHY: No, I do want to respond to something. We have not made it through our changes in subsection (h). But I did want to point out something that we added in the standard because it's important here. Nothing in this subsection will be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights. So, we have seen where we wanted to strengthen this standard to make sure that First Amendment rights were protected for both the employee and the employer. So, I believe, Faisal, that may help alleviate some of the hypothetical concerns you shared with us. Thank you.

MS. WEISMAN: Okay. Let's go over to Abby.

MS. SHAFROTH: So, I share Faisal's concerns, and my concerns are not alleviated by what Tamy has just shared. We have real-world examples of universities being targeted and penalized by the Federal Government right now for the conduct of their students. Just yesterday, it was reported widely in the news that the current Federal Administration is going after Harvard

University and treating them as in violation of Federal
Anti-Discrimination Law based on student protests
regarding Gaza and the university's attempts to deal with
those protests and to provide an educational environment
for all of their students. Under the proposed language
that we've seen today, the Secretary could also use this
new power as additional leverage to attempt to coerce
Harvard University to adopt the various settlement
conditions that the Trump Administration is proposing for
that university, including new conditions that would
require university to change how it hires and admits
students to create political diversity and viewpoint
diversity as espoused by the administration. So, I think
we just need to address the elephant in the room here
that this language is not really about protecting the
Public Service Loan forgiveness program, but what this
language would actually do is provide the Federal
Government with increased leverage to coerce
universities, other nonprofit 501(c)(3), and state and
local governments to fall into line with its political
goals and desires. And that, the language has written,
does not require findings by any impartial courts,
Federal judges of illegal conduct. It allows the
Secretary to make those own determinations
administratively.

MS. WEISMAN: Jeff.

MR. JONES: Well, that's just not true on about 20 different levels. But let's start off with the general prospect of whether or not institutions are liable for the actions of their non-students. And that's a pretty well-known concept within case law that they're not. Now, what you're talking about is the Department's enforcement of Title VI of the Civil Rights Act. And that's an entirely different concept. And the actions that we are taking are in compliance. And we're exercising every right to make sure that institutions are not discriminating against students that are not violating Title VI. So, you're conflating two concepts. These proposed regulations throughout rely on the decisions primarily or use as conclusive evidence of decisions of other third-party fact finders. And that is a principle throughout. And in no instance do we have a situation where the Secretary is making decisions and doing findings of facts out of whole cloth. So, I would take exception, and I would take strong exception to your motive, because institutions like Harvard are a blip within the eligible students that are receiving benefits under PSLF. And these regulations are looking at the program in whole and not looking at any university in particular.

MS. WEISMAN: Tommy?

MR. AIELLO: Can I just follow up with
one thing? You said- I was going to ask that question,
but I put my card down. But just to clarify, the report
that the Department put out yesterday, they allege that
Harvard did these things. Harvard can say, no, we didn't
do those things. Would they be forced or would they still
have to check the box that they're engaging in illegal
activities, even though they did not- weren't convicted
by a court or any other things? Just because the
Department said so.

MS. WEISMAN: Jacob, did you want to
respond?

MR. LALLO: I don't think they would
necessarily have to self-identify unless they believe
that they fit within one of those buckets. Otherwise, I
mean, obviously, it would be something that we would
identify for them at some point, if it came up in an
investigation or was otherwise identified to us because
it came to our attention through a court filing or
through the IRS or something similar. You know, we
generally I think would like organizations to self-
identify when they're violating laws because we would
like this to be something that, we can work through with
them. You know, we've established that corrective action

plan process. We want to be able to work with organizations and not push them out of PSLF. We don't want to hurt borrowers if we can make positive changes to the structure of a organization or an employer writ large. However, we are realistic that people will not always self-identify, sometimes accidentally and sometimes through concealing it. And so, I think we need to be realistic that an organization may sincerely believe that they are not violating a law at that point. And then later on a determination will be made that they are by looking at the pieces of evidence that we've outlined here. But I don't think that if it's a sincere belief that we're going to penalize them for not checking a box.

MS. WEISMAN: Tommy, do you have a follow-up?

MR. AIELLO: Yeah, just a follow-up. So, if this report had come out next year, say, July 2nd of 2026, after the regulation is finalized, Harvard says they didn't do this, you say that they did do this, and they're in violation of substantial illegal activities. How quickly would the Department have to say you're out of compliance? Because I think my concern is if Harvard says no or any institution says no, we're not breaking the law. The Department says, maybe you are breaking the

law. You are breaking the law. But there's no judicial
process to determine that is the case how quickly is that
resolved? And two, would borrowers be stuck in a limbo
where they don't know if their payments are qualifying?

                    MS. WEISMAN: Jacob, would you like to
respond?

                    MR. LALLO: Yeah. So, I think in the
general thing I think hypotheticals are important, but we
don't really want to address any pending issue before the
Department right now. You know, obviously there's a lot
of moving pieces, and we don't want to comment on
anything that we're not positioned to comment on. But I
think it's going to depend, right? That stuff is not
always going to come to light immediately. It's possible.
Like I said, we may get flagged by something by the IRS.
There may be a court case that we're watching that's
particularly interesting to us or has become notable. I
think that's very common within Title IV writ large,
which is obviously distinct from PSLF. But the things
that flag an issue for us can come from reports made by
students. It can come from interested parties. It can
come from an institution itself, or it can come from,
news stories that get flagged and then it flags OIG's
interest to go look at something. I think the analogy
with that- within PSLF, and with this most clearly is

that we don't necessarily know. Again, we would like
organizations to self-report so that we can work with
them to fix an issue. But again, we're realistic that,
that might not always happen. And so, it's hard to nail
down an exact timeline for when we would be finding
issues and you know how we're going to handle them. It's
going to be very much on a case-by-case basis.

MS. WEISMAN: I see no other cards.
Tamy, I'll turn it back to you. While you're doing that,
though, one quick announcement. I did send another
message to your email, negotiators, with language at
11:12. That was the last one that I sent.

MS. ABERNATHY: Thank you. Annmarie, I
would like to mention that we are more than likely unable
to get to review those proposals until after negotiations
conclude today, so that we can give it the attention that
it deserves. We'll do our best. We will try during your
caucus to look at some of these things. But I don't want
to promise we'll be able to look at all of them until
after negotiations conclude today. But we'll do our best
just to kind of level set expectations. So, we're going
to dive into the second clause of the proposed definition
for substantial illegal purpose. And my colleague will
share subsection (b)(30)(ii), proposed paragraph that
says- and while he's pulling it up, I'll go ahead and

start reading. Supporting terrorism, including by
facilitating funding to, or the operations of cartels
designed as foreign terrorist organizations consistent
with 8 U.S.C. 1189, or by engaging in violence for the
purposes of obstructing or influences government policy.
We propose cross-referencing to a preexisting Federal
definition of terrorism found in Title 18 of U.S. Code,
section 2331. And you will see that under section 2331,
terrorism includes acts of international or domestic
terrorism and involves violent acts or acts dangerous to
human life that are illegal and appear to be intended to
intimidate, coerce the civil populations, or the
government. The second part of the proposed clause, which
generally states that employers cannot support foreign
terrorist organizations in (b)(10). I'm sorry, that other
part was (b)(32). Forgive me for not jumping there. The
US Code 2331 was (b)(32). Now we're going to go to
(b)(10) that states the definition of foreign terrorist
organizations, and that means organizations that are
published on the list under paragraph (a)(2)(A)(ii) under
the Immigration and Nationality Act of 8 U.S.C. Code
1189. The list is published by the US Department of
State. As of June 2025, prior to these negotiations,
there were over 70 entities that are considered foreign
terrorist organizations. We seek to utilize this

preexisting definition to ensure that we are aligned
across Federal agencies and believe we found it here.
We're going to go to the last part of the proposed
clause, which is violence, for the purpose of obstructing
or influencing Federal Government policy in (b)(35), if
Michael would navigate there. Thank you. Violating any
part of 18 U.S. Code 1501 et seq., by committing a crime
of violence as defined under 18 U.S. Code 16. And
remember that et seq just means and the following. Here
we tried to find an appropriate cross-reference to
violence in Federal statute. And we found crime of
violence within 18 U.S.C. Code 16. In the interest of
time, we will not be reading through the entire
definition. But remember, negotiators, that you have the
links to the statutory text for the cross references for
which we have put into each one of these definitions. In
general, a crime of violence involves attempted,
threatened, or physical force against a person or
property of another. Secondly, committing that offense
would have to violate any of the obstructions of justice
as provided in Title 18 of the U.S. Code. Again, in the
interest of time, we will not be reading through the
entire definition and scope of obstruction of justice,
and I refer you again to those links. Obstruction of
justice could include obstruction of court orders,

criminal investigations, or obstruction of a Federal
audit. At this point, we invite the committee to share
their thoughts on these existing statutory references to
terrorism, foreign terrorist organizations, crime of
violence, and obstruction of justice, in defining
violence and, if needed, suggest a more appropriate
statutory definition. Annmarie?

                    MS. WEISMAN: First up, we have Bob.

                    MR. CAREY: So, 18 U.S.C. 1501 only is
about process servers. It's assault on process servers.
So, I don't know if that's sufficient. And then 18 U.S.C.
16, is this a generic one about crimes of violence. I'm
not trying to say don't get rid of violence but violence
for trying to disrupt or influence Federal Government
processes, but I don't think these are sufficiently
detailed. And I think you also need to define disrupt or
disruptor influence Federal Government policy.

                    MR. LALLO: Annmarie?

                    MS. WEISMAN: Jacob?

                    MR. LALLO: So in regard to the first
point, 1501 et sequence, 1501 is assault on process
servers. The entire chapter describes obstruction of
justice and other crimes. So, I think that we do need
that broad definition there. And 16, again, we were just
trying to define crimes of violence. So, we want, again,

that broad definition because, again, we recognize that
violence takes different forms. And there are many
different criminal statutes related to that. We don't
want to tie ourselves to one in particular, because that
would be both restrictive for us, but also reductive as
to the harms that might be carried out by an
organization.

            MS. WEISMAN: Bob, did you have a
follow-up?

            MR. CAREY: I don't know how the rest
of the committee feels, but in general, being the agent
of violence legally, in my past life, I think most
military students would be deeply concerned with the
Federal Government giving itself more power to determine
what is and is not substantially illegal activity, and
that it should be prescribed more. For most of the
military and veteran students I know, they fear more
unlimited Federal power.

            MS. WEISMAN: Jacob, did you want to
respond?

            MR. LALLO: Yeah, Bob, your point is
well taken. But I think in regard to the military, we're
talking- the UCMJ is a completely separate thing from the
United States Code in this regard. We're talking about
crimes of violence committed under the guise of the US

code. So, while I understand your point, and you know how
that could be a valid concern for the military, I don't
think that we're directly concerned about how that would
apply in this case.

MS. WEISMAN: Jacob, did you want to
expand?

MR. LALLO: Yeah, I wanted to actually
just make a general point. So, I know that a couple of
specific cases have been brought up today. You know,
we're very okay with exploring hypotheticals, but the law
is very clear. There's a Supreme Court case in the matter
that we can't comment on any pending or potential
adjudicatory matter before the Department. So, I want to
just level set and say that we are not going to discuss
any particular case and the facts of that case or
anything related to it. We appreciate hypotheticals and,
you know, people raising very valid points about how
certain things could interplay in terms of actions with
free speech issues and stuff like that. And we want to be
very cognizant of those concerns and hear you out on
them. But we also have to respect the due process of
anyone who's got a pending matter before us. So, we got
to be careful there. Thanks.

MS. WEISMAN: Abby?

MS. SHAFROTH: Thank you. I wanted to

raise, on behalf of the legal aid constituents, that a
number of legal aid organizations that we spoke with
since this proposal was released raised concerns about
the potential for legal aid and other legal organizations
that represent people who are accused of crimes that may
represent people in immigration-related proceedings, may
represent people who have been accused of being gang
members. And now many of these domestic gangs have
recently been added to the terrorism list that they could
inadvertently or perhaps not inadvertently, but that
these new restrictions could mean that those sorts of
attorneys, legal aid attorneys, could feel chilled in
that they're no longer able to represent people in these
sorts of legal proceedings despite right to counsel out
of fear that the Department might deem their work as work
supporting terrorism or work aiding and abetting unlawful
entry or unlawful immigration. I realize that the
Department has said during this rulemaking that is not
its intention, that it intends to only apply these
restrictions to organizations if they have been found
guilty of violating these laws or have admitted in a
settlement agreement to violating these laws. But the
language currently in section (h), by my read, doesn't
limit in it in that way. So, I know we'll return
hopefully to section (h) later. I would like to hear more

from the Department about how it can assure legal aid
organizations and others that these public servants won't
be at risk of losing their public service eligibility on
the basis of doing work legal work.

                    MS. WEISMAN: Jacob, did you want to
respond to that?

                    MR. LALLO: Yeah, I do. You know,
there is a general and longstanding precedent that
representing individuals in courts and other legal
contexts is considered legal under the law. You are not
your clients and you are not directly tied to them. That
being said, violation of immigration law as a broader
concept, if there are activities that attorneys take on
behalf of or their clients, or in connection with their
clients that violate those laws separate and apart from
their representative capacity, that would possibly cause
them to lose qualifying employer status. That being said,
simply representing people who have violated a particular
Federal Law would never cause somebody to lose their
status because they're operating in a representative
capacity in a criminal procedure. And that is a right
that has been well protected by the Supreme Court. I know
we got into it briefly with the issue of teachers and
doctors yesterday. Those rights have been enumerated in
either Federal statute or in court. And, you know, I

think both the case law and professional ethics dictated to lawyers establishes where that representation ends and where criminal activity begins. And as you know as well as I do, that while we are given a lot of power to work on behalf of our clients, we're never given the power to act or commit crimes on their behalf or involve ourselves in criminal activity. And there are very clear delineations that have been made by that, by each state bar association in regard to their professional responsibility standards and in the courts.

      MS. WEISMAN: Abby, did you have any follow-up?

      MS. SHAFROTH: I think my main follow-up is although there's certainly, I agree, lots of good court precedent limiting liability or criminal liability for teaching, for lawyering, for providing medical services to immigrant families or to people accused of crimes, that the current language still provides a lot of discretion to the Secretary to make her own independent determinations without it having to be adjudicated in a court of law and subject to all of the case law that you've spoken about. And so, to the extent that we are not requiring a legal finding in a court of law of a violation, that I still think that many organizations are concerned and that there could be a chilling effect on

entering these sorts of public service fields that are really important to our communities.

MS. WEISMAN: Laurel?

MS. TAYLOR: I just wanted to quickly, from a public interest perspective, represent- I have a long email in front of me which I promised I will not read out. Bob, it actually is a kind of double click into some of the concerns that you expressed. I had a conversation on Friday with a constituent and for military medical providers who are both physicians and dentists. The concern that was raised in the event that PSLF status is potentially threatened, that from a business perspective of deploying soldiers that the medical providers, dental providers are critical in assuming readiness to be deployed. So just Jacob, I think you've provided great assurance to the concern that Bob expressed from a constituent perspective of the employer as an agency. The downstream implication for potentially losing that status could mean the inability to deploy soldiers in the speed and pace in which is expected today of the military.

MS. WEISMAN: I see no other cards at this point. Tamy, do you want to move along to a new topic or are you still thinking?

MS. ABERNATHY: I'm good, we'll move

on. I'm always thinking, though. So, we would like to
focus our attention on section 685 219 (b)(30)(iii),
defining child children, chemical and surgical castration
and trafficking. Michael, would you please share the
screen for (b)(30)(iii)? This is the third clause of the
proposed definition for substantial illegal purpose. And
I'll just start when Michael- there it is. An
organization that engages in chemical and surgical
castration or mutilation of children, or the trafficking
of children for purposes of emancipation from their
lawful parents in violation of applicable law, are not
qualifying employers. Continuing with the theme of
breaking down each clause, let's discuss what we propose
for the definition of child or children. We propose in
our regulations under paragraph (b)(4), and Michael can
jump all the way up to (b)(4) for us, that the term child
or children means an individual or individuals under 19
years of age. Next, we'll ask Michael to go all the way
down to (b)(3), and then we'll go to (b)(31) as we
propose definitions for chemical castration or mutilation
and surgical castration or mutilation. Chemical
castration or mutilation found in proposed paragraph
(b)(3) has the meaning of romanette one, the use of
puberty blockers, including GnRH agonists, and other
interventions to delay the onset or progression of

normally timed puberty in an individual who does not
identify as his or her sex, and (ii), the use of sex
hormones such as androgen blockers, estrogen,
progesterone, or testosterone to align an individual's
physical appearance with an identity that differs from
his or her sex. Surgical castration or mutilation found
in paragraph (b), subparagraph (b)(31, has the meaning,
surgical procedures that attempt to transform an
individual's physical appearance to align with an
identity that differs from his or her sex, or that
attempt to alter or remove an individual's sexual organs
to minimize or destroy their natural biological
functions. In the Department's research, we worked to
find definitions that could inform these terms. We looked
at other agency definitions. We looked at other executive
orders, and we encourage the committee to share feedback
during your discussion time on the most appropriate
definitions. The third clause, under (b)(33)(iii), also
includes the term trafficking. We propose to define
trafficking as transporting a child or children, as
defined in this subsection, from their state or legal
residence to another state, without permission or legal
consent from the parent or legal guardian for the
purposes of emancipation from their lawful parents or
legal guardian in violation of applicable law. We opted

to use our own definition that was context-specific to prevent organizations that engage in the transportation of children for the purposes of emancipation from being a PSLF-qualifying employer. We now seek feedback on the breakdown of this entire clause. Annmarie?

MS. WEISMAN: Alyssa, and then Tommy.

MS. DOBSON: I know some language was just sent from my colleague Tracy over here, but we are wondering where 19 came from with regard to your definitions. And why not just the traditional 18-year-old?

MS. WEISMAN: Jacob, would you like to respond?

MR. LALLO: Yeah. The age of 19 is used throughout Federal Law. The Social Security Act uses it in several places. I know it's used in regard to visas in several places, and I believe the IRS uses it for anyone under 19, generally when defining a dependent. In some cases I know within Social Security they have exceptions that allow the state to define it and it can go up to 21. But we put a fixed age of 19 because that's the baseline that's typically used by SSA.

MS. WEISMAN: Helen?

MS. FAITH: To clarify, is that traditionally used by the IRS and SSN because a young

person can turn 19 during that calendar year, and so
that's inclusive of the time before they turned 18?

MS. WEISMAN: Jacob, would you like to
respond?

MR. LALLO: Yeah. I'm sorry. Can you
repeat that? We were cross-talking.

FEMALE SPEAKER: I'm just trying to
figure out the logic for using 19 in these other
contexts. Right? Because in general, we all know the age
of majority is 18. You can serve in the military at 18,
you can vote at 18. You should be able to conduct
yourself as an adult at 18. Right? So fundamentally,
that's the principle. So, I'm curious as to when 19 is
used in these other contexts, what is the purpose of
that? And is it meant to reflect that during a calendar
year somebody might be under- I don't know, I'm just
trying to figure out why is that, and why are we choosing
this particular number in this context? What's the
resemblance between these two issues?

MR. LALLO: Okay. Yeah, that was
helpful. So, I think it's a couple of different things.
Right? You know, 19 is fixed in other parts of Federal
Law. I agree that 18 is generally viewed as age majority,
but some states don't treat it that way. In some, it's
19, some it's 21. But because it's fixed in Federal Law

for Social Security and the IRS at 19, for the purposes
of consistency throughout, and again, as you mentioned,
in recognizance of the position of somebody who's 18 is
kind of ambiguous in some ways. You're finishing high
school typically, you're still living with your parents,
generally speaking. While you can certainly do things
like join the military right at 18, it is still somewhat
of a transitional period, and I think the SSA definition
reflects that. Ultimately, that's a policy choice. But we
fixed it at 19 because it's under 19. So, 18 is
incorporated, the moment you turned 19, you're out
basically. So, I understand that it seems to be like we
just picked the number, but it's fixed in Federal Law,
and we have to tie it to something. And we really just
want to be as clear with that as possible.

           MS. WEISMAN: Tamy?

           MS. ABERNATHY: However, if there's
proposed regulatory text you'd like us to take a look at,
please feel free to circulate that.

           MS. WEISMAN: I believe that already
went out this morning.

           MS. ABERNATHY: If you have any
additional proposed regulatory texts, please feel free to
circulate that.

           MS. WEISMAN: Thank you. I see no more

cards at the moment. Oh, I'm sorry, Abby.

MS. SHAFROTH: I was just hoping that the Department could clarify under this provision whether they would consider it to be a substantial legal purpose if a hospital or other medical group provides gender-affirming care to minors in a state where such care is lawful.

MS. WEISMAN: Jeff, did you want to respond to that?

MR. ANDRADE: Sure will. I mean, I think at this point, because there are pending cases and with similar fact patterns, we're not going to opine on a hypothetical at that level.

MS. SHAFROTH: Okay. I'll rephrase then so it doesn't come across as a hypothetical. The provision has a little bit of sort of tricky punctuation to understand. So, I just want to make sure that I am reading the language correctly. The language says engaging in these medical practices or trafficking children in- and then comma, in violation of applicable law. So, I'm trying to understand if the in violation of applicable law applies to the first clause about engaging in certain medical treatments.

MS. WEISMAN: Jacob, would you like to respond?

MR. LALLO: Yeah, I just wanted to make sure we were clarifying intent because as you said, punctuation is tricky. Yeah, this would be in violation of State Law for both parts. So yeah, just wanted to make sure that we were correct across the board, but that is the intent so this would be based on the law of whatever state is applying it.

MS. SHAFROTH: Okay. So, in a state where it is not a violation of State Law to provide gender-affirming care to trans kids, it would not be determined by the Department to have a substantial legal purpose?

MR. LALLO: Yeah, that, that would not trigger that currently.

MR. ANDRADE: We'll go back and reconfirm that, but I believe that was the original structure of it, in terms of the comment that the comment was (inaudible) I mean, the applicable State Law was applying in both situations.

MS. WEISMAN: We're going to go next to Heather, on this side.

MS. BOUTELL: I just wanted to make a comment about the age 18 as an adult. I believe there are three exceptions across the country, Alabama and Nebraska have set the age of 19. Mississippi has set the age at

21. So, the far majority of the states in this country establish an 18-year-old is an adult. And it just concerns me, if we're going state by state with transgender issues, that we would state in states that deem 18 as a legal adult, that those 18-year-olds wouldn't be able to make decisions about their own sexual health.

MS. WEISMAN: Jacob, did you want to respond?

MR. LALLO: Yeah. As we said, send us proposed regulatory language. We're happy to look at it. We were working again off of the SSA definition of adult. So, we're happy to consider other standards, but until those are defined by you, we've got to find something in Federal Law. So, thank you.

MS. WEISMAN: We're going to come over here next to Helen.

MS. FAITH: Thank you, Jacob, for clarifying where those references were found. In a quick search, it appears that when that reference to under 19 is used, it's used specifically to note students who are still in high school and being claimed as dependents, and students receiving Social Security, again, who are still in high school. So again, I would assert that 19 is not the appropriate age to be listed here.

MS. WEISMAN: Rebecca?

MS. STANLEY: I do have a question on number 31. I just want and I understand that this is probably not the intention of anyone, but it doesn't ever say anything in there about when medically necessary or a medical choice, say you have an elective surgery or a mastectomy, that's just a little concerning when I read that in case it's interpreted by someone else as not necessary, it could be an elective operation. I don't see anything on there about medical.

MS. ABERNATHY: I think those choices for that, and correct me if I'm wrong, Jake- we're not going to- let us just take that back, because before I start sticking my foot in my mouth, I want to make sure that I understand exactly what you're saying, because we do not speak to that here. And there could be numerous instances such as cancer and things of those nature. We certainly would not want to penalize anyone in a case where it is a decision, but it's a decision based on a medical condition that could warrant some, some slippery slope. So, let's take that back and we'll review that, and we'll come back with a much better position on that. Thank you for bringing that to our attention.

MS. STANLEY: A medical situation that may not have a diagnosis (inaudible)

MS. WEISMAN: Jacob, if you want to follow up on that. And then we're going to go over to Abby.

MR. LALLO: Yeah. As Tamy said, we're going to take it back and hammer out this part a little bit better and give you some clearer answers. But I think your concern is generally addressed by the language that says differs from his or her own sex in the definition. I understand you're concerned about, like, a mastectomy or whatever, but I don't think that is radically considered, in any way transitioning within the purpose of a medically necessary procedure or something that's done within, like cancer care. So, like Tamy said, we will take it back and talk this through a little bit and figure out a clearer answer for you. But I think we generally encapsulated that with that.

MS. WEISMAN: Over to Abby.

MS. SHAFROTH: I noticed that for most of these types of violations, the Department has sort of very intentionally cross-referenced to existing Federal definitions of the violations, but that doesn't appear to be the case for chemical and surgical castration or mutilation, which we're going to be asked to vote upon those definitions. So, I was wondering if this is the first time that those terms would be defined in Federal

Law through this rulemaking?

MS. WEISMAN: Jeff, did you want to respond?

MR. ANDRADE: Yeah, I mean we're aware that HHS and other agencies are also looking at this. And we work in conjunction with them.

MS. SHAFROTH: So, they're working on it, but they don't yet have a definition in Federal Law?

MR. ANDRADE: I think what you will see if they're the first out in (inaudible), I think what we're striving for is a consistent application across the agencies.

MS. SHAFROTH: Thank you. I would just reflect that I do not have medical expertise. I don't think that the folks assembled to be part of this rulemaking were assembled for their medical expertise. I think we're here with student loan expertise. And so, I would feel very uncomfortable setting a new legal definition for these medical terms.

MS. WEISMAN: I see no other cards. Does the Department feel they have enough feedback in this area?

MS. ABERNATHY: Yes, ma'am.

MS. WEISMAN: Okay.

MS. ABERNATHY: May I continue?

MS. WEISMAN: Please.

MS. ABERNATHY: Alright. If my
colleague would put up (b)(12). So now that we've
completed our third review of the clause, we're going to
move into the fourth clause of the proposed definition of
substantial illegal purpose. This part is engaging in a
pattern of aiding and abetting illegal discrimination.
We're only going to focus on one part of the clause,
which is illegal discrimination, because we've already
defined aiding and abetting earlier. Illegal
discrimination is a violation of any Federal Anti-
Discrimination Law, including, but not limited to, the
Civil Rights Act of 1964, Americans with Disabilities
Act, and the Age Discrimination in Employment Act of
1967. We iterate that this clause is in reference to
Federal Anti-Discrimination Laws and not state Anti-
Discrimination Laws. We reference several major Federal
Anti-Discrimination Laws in the proposed regulatory text
to further clarify the point. We believe that any
employers that violate Federal Anti-Discrimination Laws
would be excluded from consideration as an eligible
employer for the purposes of defining PSLF eligibility.
We seek your feedback if there is a more appropriate
statutory definition that the Department may use for
defining illegal discrimination. And if you do have

something like that, if you would please include a
proposal with that proposed amendatory text so that we
may consider that. We'll turn it over to Annmarie for
discussion.

            MS. WEISMAN: Abby, if we can get Abby
a microphone. Thank you.

            MS. SHAFROTH: Thank you. I mentioned
before that I think we should be approaching this
exercise with humility and recognition of what we do have
expertise in and what we don't have expertise in. I think
this discrimination point is an example of that. While
the Department does have a lot of expertise in
adjudicating and setting regulations regarding
discrimination in education, it does not have that same
expertise and authority regarding various other types of
discrimination, including how best to enforce employment
discrimination law. I think that this proposal here could
actually have the effect of supporting discrimination and
increasing the amount of employment discrimination in
nonprofits in the public sector rather than reducing it
by penalizing employees if their employer is found to
engage in discrimination. If an employee who might be
experiencing age discrimination, might be experiencing
disability discrimination, gender discrimination knows
that reporting that discrimination could result in a

2025 Negotiated Rulemaking - 7/1/25

finding that their employer is engaged in illegal
discrimination and therefore loses PSLF eligibility, that
employee themselves would be punished on the basis of
their employer's discrimination. I think that's a very
big issue in employment discrimination. I think it can be
an issue in other types of discrimination as well,
because the employees are often in the best position to
identify and to alert authorities to illegal conduct,
including discrimination by their employer. And if they
know that they will be punished financially if their
employer is found liable, then they're going to be much
less likely to speak out or to serve as a whistleblower.

            MS. WEISMAN: Jacob?

            MR. LALLO: I think your point is well
taken, and I think we do understand that there is the
potential for some chilling effect there. But I think the
same point could be made of anything that the employer
does that's improper, not just under this statute or this
regulation, rather, but writ large under the Criminal
Code. If you know your employer is engaging in tax fraud
and you report your employer for it, your employer is
going to be fined and you might shut down. That
inherently has the same chilling effect on reporting
crimes committed by your employer in general. So, I think
you're kind of asking us to prove a negative in this

case. You know if we can't enforce rules that prevent illegal discrimination because we're afraid that it will result in more discrimination because people might report the discrimination, the logic just becomes circular. And there's really no way for us to step in and enforce.

MS. WEISMAN: Abby, did you have a follow-up?

MS. SHAFROTH: Yeah, I think that sort of overstates the arguments. There are lots of ways that governments can enforce their laws that do not rely upon the penalty being a loss of employee benefits. And that's what this is all about. It is about attempting to enforce laws unrelated to the student loan program by threatening that employees will lose benefits as a result. It's not about doing something surgical and targeted, addressed to the wrongdoer and requiring the wrongdoer to take accountability. The punishment here is directly on the employees. That's different from other ways that Federal Law is enforced where there could be incidental effects on the employees, but here it's actually directly targeting employees.

MS. WEISMAN: Emeka?

MR. OGUH: Yeah, just to piggyback off of what Abby is saying. I know we're not using hypotheticals, but just looking here. There was a

ED_02243

2025 Negotiated Rulemaking - 7/1/25

settlement in Prince George's County a few years ago
brought by officers of color who alleged racial
discrimination. After a two and a half year battle, $17
million settlement taxpayer dollars. Now, in this case,
they didn't say that they were guilty, right? So, I guess
it (inaudible). But let's just say they did, right?
Because of this police department, the entire PG County
would be ineligible. So that police officer may say, hey,
I have a spouse or I have a family member, another part
of PG County, because I'm not eligible for loan
forgiveness because I would basically decimate the entire
county by bringing this forward, I'm just not going to.
And so, I do think that this is an example, again, in
this case, the settlement did not result in an admission
of guilt. But if it did, let's just say there was a
beating or some sort where they did find guilty, like the
entire county would essentially not- and so they may be
reluctant to bring that in. So I do think this is an
example of that. Thank you.

          MS. WEISMAN: Jacob, did you want to
respond?

          MR. LALLO: Yeah, I think the point
again, it's well taken. I think this falls within the
broader discussion of segmenting out certain employers
and different parts of things. And we're going to review

that language at lunch that you all have submitted about
that- or whenever it's submitted. But I think that
broadly falls within that larger discussion rather than
just the chilling effect of the discrimination, it's
reporting itself.

          MS. WEISMAN: Betsy, did you have
something? (inaudible) I am a parent of one.

          MS. MAYOTTE: But you're not a parent
of me.

          MS. WEISMAN: No, ma'am. I was not
here when (inaudible)

          MS. MAYOTTE: I want to make sure-

          MS. WEISMAN: I was still warm.

          MS. MAYOTTE: -on the record that that
was spooky as hell.

          MS. WEISMAN: Sorry. I'll never do it
again.

          MS. MAYOTTE: Now, I don't know what I
was going to say. What was I going to say, Annmarie?

          MS. WEISMAN: I don't go quite that
far. I don't go that deep.

          MS. MAYOTTE: Let me know when I think
of it.

          MS. WEISMAN: We have time for one
more comment before lunch if anybody- Betsy? There you

go.

MS. MAYOTTE: This isn't what-I don't think- you let me know, if this is what I was going to say. I have a question about post-lunch, the schedule. So, I know we have set ourselves up for a 29-minute, 37-second caucus to not go above that time. But then, what are we doing? Like, what's the agenda? Like, what are we covering? What section (inaudible) at the beginning or-?

MS. ABERNATHY: Actually, I think I might have that because we have gone through a lot of what we've discussed already. So, if you want to go and then I can fill in the blanks.

MS. WEISMAN: Okay. So, what I have from before is that lunch will be from 12:00 to 1:00. The caucus will be 1:00 to no later than 1:30. Non-Federal negotiators, both primaries and alternates, to discuss issues regarding the shared EIN, buyback, reinstatement and regaining eligibility, that no facilitation was requested, and no added staff would be involved. Did I get that right?

FEMALE SPEAKER: Yes, ma'am.

MS. ABERNATHY: And then?

MS. WEISMAN: And then-

MS. ABERNATHY: Then what we are going to do is during your lunch and 30-minute caucus, we are

going to look at as many proposals as possible. We're
going to take a look at our language. We're going to take
back some of the concerns that you've presented to us
today. We'll have discussion with our operational team.
We may or may not be able to answer anything along the
operational side. I'm certainly not going to put them on
the hot seat for that, but we're going to try to circle
back to you with some of the concerns that you've raised,
either through proposed amendatory text or through just
additional discussion or answers to some of those
questions. We are then going to do a slow walk through
the regulations again, not giving narratives around them,
but looking through the regulatory text so that you can
see now what we have proposed, changes from yesterday
that are already there. If we have any additional
proposed changes, we'll identify them as well. We'll
recirculate things to you as we have them prepared. So
that's what we intend to do this afternoon, is to really
take this slow walk through our regulatory amendatory
text that we've prepared, including many of the changes
through the proposals that you've already submitted, and
if possible, any of the new stuff, if we can get it in
there.

            MS. MAYOTTE: And I remembered the
other thing. So in regard to this new deadline for

proposals, which I get and I'm not asking for extensions, so don't be nervous. What do you consider the difference between a proposal and a suggested amended language change?

MS. ABERNATHY: So, a suggested amendatory change is simply just the regulatory language. A proposal is something that you would want us to consider that we haven't considered before, or you would want to provide additional clarification to that proposed amendatory text. So, you're proposing new text, but if there's other things that you want the Department to consider, that also could be a proposal, for instance.

MS. MAYOTTE: Could you give me a hypothetical, please?

MS. ABERNATHY: No, but I can give you an actual. How about that? We actually had Laurel provide us with a paper of data for our consideration, for our awareness. We had others like Emeka- I'm not going to pronounce it wrong, I promise. Emeka provided us with several different proposed reg text changes and other things to consider. So, it doesn't really matter if it's proposed or a proposal. We want the language. We want you to give us what you have, and we want to consider it. If there's additional information, then it's kind of a proposal. Make sense?

MS. MAYOTTE: We'll see.

MS. ABERNATHY: Okay.

MS. MAYOTTE: I asked because specifically with this caucus I've drafted some language to jump into our caucus so we can get it done in time. We're not going to give it to you until after the caucus, which is after noon.

MS. ABERNATHY: That's okay.

MS. MAYOTTE: But, the language is not around like any non-sequiturs to anything that we've discussed.

MS. ABERNATHY: So, level setting expectations. We clearly feel like this afternoon we're going to hopefully get into some of the nitty gritty processes of amendatory text live at the table. We're ready for that. We've gone through what we've wanted to do with setting the stage with our issue paper, and the foundational information that we wanted to provide to you is why we're doing this, how we're doing it, what we're doing. The what, how, and the why is already out there. And so now it's time for us to get down to negotiations with the actual amendatory text. We are fine with that. So do not think that you have violated any missed deadline. What we don't want are these large proposals, there's no way that we can get through that, materialize

that, get it back to you, and be ready for tomorrow and be ready to finalize seeing as the last day in our session is tomorrow. So, we want to put a timeline on it.

MS. MAYOTTE: The last thing is a request that when we go back in to start, just start at the top and let's get to these punctuation marks and words, is there any way that we could get all the people here and our alternates, a paper copy of what we're jumping off from? Please, just to start us off fresh.

MS. ABERNATHY: We are going to try to do that. I think that we don't have the capability of printing in color right now wholesale.

MS. MAYOTTE: Printing and underlined. It doesn't have to be (inaudible)

MS. ABERNATHY: Yeah. We're going to try. I can't promise that. We're going to try. We will have it on the screen. But you do have- hold on. You do have it in the issue paper right now. Not the issue paper. Excuse me. Well, this is fresh. If, we do something else, we will try. But I don't know that we have the capacity to do that. So, I don't want to promise that. We will give it to you electronically. I'll try.

MS. MAYOTTE: If you can even just get one.

MS. ABERNATHY: Jeff says we should be

able to. So, if Jeff says we should be- no, we're not
going to do that. We're going to do something for you.
Thank you, Betsy.

       MR. CAREY: Just real quick, about
what time did you send that version of the red line?

       MS. ABERNATHY: Last night sometime.

       MR. CAREY: Last night? Okay, thanks.

       MS. WEISMAN: Okay. I also had a
question last night and again this morning about when
links will be posted regarding the video from yesterday
and different papers that are coming in. The video links
will not be available today. And I know some people had
expressed the idea that they wanted to go back and review
some of those from the first day to help inform what
they're doing on today and the final day. But
unfortunately, they will not be ready. And links with
documents are going up as quickly as possible. As a
reminder, we're going to do an hour for lunch, so we will
be back here at 1:05. At that point, I will review the
caucus instructions again, confirm that everything is
correct. And at that point, then we will clear this room
other than those who are part of that caucus. And again,
production team will be in the back, but no live
streaming. Any questions before we break? Have a nice
lunch. Thank you.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING

SESSION 1, DAY 2, AFTERNOON

JULY 1, 2025

On the 1st day of July 2025, the following
meeting was held in-person, from 1:00 p.m. to 4:00
p.m.

P R O C E E D I N G S

MS. WEISMAN: Good afternoon. Thank
you for joining us again for the afternoon session. As a
reminder, we are going to be going into caucus for half
an hour. I'm going to recap the parameters around the
caucus. The caucus will include non-Federal negotiators,
primary, and alternates. It will last for 30 minutes.
Discussion issues include organizations that share an
employer identification number or an EIN. We'll also
cover buybacks, reinstatement, and regaining eligibility.
No facilitation was requested for the caucus, and no ED
staff will be part of the caucus. As a reminder, we will
have some production staff in the back who are not
participating in the policy discussions that will still
be in the room but will again not be working on the
caucus. The live stream will be stopped during the caucus
and will resume once we're all back to the room and
reassembled. Any questions before we clear the room?
Because a reminder the caucus participants will stay in
this room, given the size of the caucus. All of the rest
of us will, will step outside for the half an hour. So,
if we can all be back here. Oh, I'm sorry. Scott has a
question.

MR. BUCHANAN: Yeah, just a quick
reminder. I mean, I think from a protocol perspective,

obviously, this has all been in public meetings with the caucuses or private and confidential discussions.

MS. WEISMAN: Correct. No live stream, no members of the public. And again, in this case, no ED staff. It will be non-Federal negotiators only. So we will come back here at 1:40. We do have a question really quickly from Laurel. So the question was whether a subject matter expert could join the caucus. We did not stipulate that in the protocol. So we would ask that it only be the non-Federal negotiators as outlined both primaries and alternates.

MS. ABERNATHY: (inaudible) I can't move the chair. I wasn't mad about going to the microphone. I couldn't move the chair. Excuse me. As Annmarie stated, the protocols don't speak to it, and the only subject matter experts that would be available are Department staff, which we need to stay separate and apart from this. And also, you know, what you've been submitting to us already has been in regulatory paragraph structure. So I think you do have a good handle with the people around the room that understand regulatory paragraph structure enough to get you through, to give us something to look at.

MS. WEISMAN: Alright, you all, I tried to get you an extra three minutes, but we'll be

back at 1:40. Good afternoon, everyone. Thank you for returning promptly. We are going to start back up for the afternoon following the non-Federal negotiator caucus. Tamy, do you have anything you'd like to start with before we hear a report out from the caucus? If the non-Federal negotiators would like to do one.

> MS. ABERNATHY: Can we just do the report out?

> MS. WEISMAN: Yes.

> MS. ABERNATHY: Thank you.

> MS. WEISMAN: Betsy, are you going to do the report out?

> MS. MAYOTTE: Yes.

> MS. WEISMAN: Thank you very much.

> MS. MAYOTTE: With some help- with a little help from my friends. So the, the primary topic that we spent our 25 minutes and 37 seconds on was the significant concern we have about a large entity like the City of Boston or the State of Massachusetts, where there is a party that did bad things and then a division- the rest of the divisions or rest of the parties didn't do bad things, and they become collateral damage. So what we all agreed on was that the language that has already been submitted to the Department by Rebecca, be implemented with an additional clause that we did not have time to

draft in our 25 minutes and 37 seconds. That gives the
incorrectly maligned entity the ability to appeal. And
we're happy to work on crafting that additional clause.
But we just didn't have time to do it during, during the
caucus. And then we solved all the world's problems on
one thing because of an oar. Alyssa, if you want to share
that.

MS. DOBSON: Yeah. Actually, before
caucuses, we, a small group of us was reviewing our
concern with reinstatement- eligible reinstatement
because or is there with the five years or, you know by
working with the Department and submitting a corrective
action plan is a non-issue. So. Our original, yep, one of
our original concerns for caucus was employee eligibility
for Public Service Loan Forgiveness reinstatement. We
were concerned initially with the five-year timeframe as
we took a deeper dive into what the verbiage actually is
now. Because there is the or so they, they could either
wait the five years or work with the Department and
submit a corrective action plan. It's actually a non-
issue for us. Yeah.

MS. WEISMAN: Anything else from the
caucus that anyone wants to raise? Rebecca?

MS. STANLEY: Just clarifying, since I
did submit several things, that it was the submission on

qualifying employer the differentiation.

MS. WEISMAN: Emeka? Oh, your comment card was up. Okay. Seeing no other cards. Tamy, do you want to move into some additional content?

MS. ABERNATHY: Thank you for the proposals. We were able to look at them, even the additional ones that came in. And so, let's just go ahead and start looking at the red text. And we're going to just- I'm not going to read it because you are all wonderfully intelligent individuals. And we are going to pass out copy in color. Now, see, isn't that a great way to start our afternoon? Tables, I mean, a podium for our commenters for our comments from the alternates, and now reg text. That has the majority of all of the proposals that we received to date. The few that we received at the end, we'll talk about those in a couple of minutes. They are hot off the presses. Michael, would you share your screen? Annmarie, are we ready to start? Okay. We're not going to go over every word because you guys can read and you have it in front of you now, and you're freshly made hot off the press copies. B is definitions. We talk about the following definitions. We haven't changed anything in definition one. I'll just remind everybody about the paragraph restructuring, which is part of these negotiations. I don't think it's a pain point, but the

paragraph restructuring, the numbering is there.
Currently, we are going to- chemical castration
mutilation stays the same. Number four, the definition of
child or children for the sole and specific purpose of
this section means an individual or individuals under the
age of 19. We appreciate the proposals from Tracy, and I
think that was the only one on the age. We received two
from Tracy about the age. We are going to keep that the
same. We feel like there's a long history of states and
Federal regulatory behavior identifying individuals under
the age of 19 as adults, or excuse me, identifying them
up to 21. And so we feel like ours under the age of 19
complies with that as well. And applicable to other
standards, we still think that, that is a very fair age
to set for the purposes of these regulations. And we just
thank you all, you know, for providing this information,
but we're going to respectfully decline and keep the age
at under 19. Okay? So that is the first part and the two
proposals that we received regarding that. So you look at
10, foreign terrorist organizations, no changes. No
changes to illegal discrimination in 12. Point your
attention to number 17. I apologize for the blue over the
blue, red line. It looks a little prettier on the screen
if you want to point your attention there. But otherwise
strain your eyes and try to see blue on blue. And if you

all pass, you get an A. So other Federal immigration laws mean any violation of the Immigration and Nationality Act, 8 U.S.C. 1105, et sequence or any other Federal immigration laws. So we heard from the proposed, from the proposed Amendatory text that we received in the proposals, that, and what was around the table, from I believe it was Bob, we added this language to clarify exactly what we mean there. Jeff did some research, and we were able to amend that regulation to address your concerns.

MS. WEISMAN: Bob, did you have a comment?

MR. CAREY: Yeah, I was actually saying it should be the exact opposite, that you should only, you should only site-specific laws. The term other, any other Federal immigration law was too broad. And so what I submitted was to get rid of the any other Federal immigration law and only have specific immigration laws cited.

MR. ANDRADE: Can I speak to it? Okay. Yeah, so we took a look at it, Bob. In terms of what other immigration laws were out there, and that we wanted this to apply to. So there are other laws within Title VIII of the U.S. Code that are outside of the Immigration and Nationality Act of 65. There are also a number of

laws that have been passed with regard to border security and national security post-9/11. There are references in Title XVIII, Title VI, and Title XXII. So we wanted to capture those because- to get, to get the full, the full breadth of, of immigration law violations, we did not want to limit it solely to the INA.

MR. CAREY: I'm not saying a limit solely to the INA, I'm saying specify the other laws. If you have other laws that you think need to be included, cite them by Title and code.

MR. ANDRADE: And that would also fix us at the current place and would not leave additional- and again, because these deals- these deal in more recent times with national security and border security, we did not want to fix it at a- at this particular place in time by referencing just those particular sections.

MS. WEISMAN: If I can just note for the alternates, and then we'll go to you. Scott. Alex, over on this side of the table, and Faisal, over on this side of the table, now that the tables are up for you all. I don't have a clear sightline on you. So if you are putting your cards up, if you could just be extra careful, you may need to wave them in the air like you just don't care. I will be watching for you as best I can, but I really- I don't want to slight anyone. I don't

want to miss anyone. So if, if the two of you could just be particularly aware of that. The other thing is, I would say if an alternate were going to speak if you could please go to the podium for this afternoon, and we'll see how that works rather than having someone come to you. If for some reason you're not able to do that again, just flag me down. Scott?

MR. BUCHANAN: And I apologize. I asked for a little bit of grace, but I have to step away from the table. But I just want to make one comment about one you haven't gotten to yet. Before I leave, but just- I think it's more technical in nature, on page eight, the application process about putting in or notifying borrowers about a corrective action plan. Keep in mind, I certainly get the goal, but this would not be practically possible. Because you're talking about an application which is coming in at one time. And so I think the intent of this is to notify the borrower who maybe who has applied in the past that corrective action is being taken or something like that. But I'm happy to work with- I think Mary Lyn was the one who submitted this. But to talk about alternate viewing of, because I think that practically would not achieve much of anything in terms of- because the app comes in, (inaudible) moment in time, are they in corrective action or not, as opposed to

what's their actual status, which is sort of irrelevant
to the application process. But, Mary Lyn, maybe we can
talk about that because I think maybe we could put it
elsewhere.

        MS. ABERNATHY: Yeah. So when we get
there, we'll have a conversation about that. And if
there's something that you would like to propose
additional amendatory text, if you could get that as
early as possible to us this evening, that would be
great. Thank you, Scott.

        MR. BUCHANAN: Yep.

        MS. ABERNATHY: Thank you. I just want
to make sure you heard me. I don't want to- alright.
Going on? Annmarie, are we ready to go on? All set?

        MS. WEISMAN: Alex, I was just going
to ask if you could put your card over there? Thank you
very much.

        MS. ABERNATHY: So we have not made
any additional changes to any of the other definitions,
18, 19, 20, all of those, you get down to qualifying
employer, and we didn't make any changes there.
Qualifying repayment plan, library services. Thirty, we
have made- I'm sorry. Was that not already there? It's
not flagged. It was already there. Correct, Renee?

        RENEE: That's correct.

MS. ABERNATHY: Okay. Alright. Oh, you scared me for a minute. Hot seat. Alright, let's go to 30. Substantial illegal purpose.

MS. WEISMAN: Tamy, can you hold on for just a minute? I think we need- we have a clarifying question that we need from Betsy.

MS. MAYOTTE: So we talked a little bit about this yesterday, and I was taking the- so let me just back up a little bit. There's a lot of lawyers in this room. I am not one of those. So I hope people have a little bit of patience and forbearance with what I'm about to ask or talk about. When I go and read the statute of PSLF, I don't see where the Secretary has the authority to remove employer eligibility definition from a 501(c)(3) organization or a government entity. And Jacob's snapping at the bit on this one but hear me out. You know, I can see where there might be some wiggle room about non-government entities and non-501(c)(3)s. But my understanding of regulations and executive orders is that they cannot be contrary to the statute. And there are no ifs, ands, buts, maybes, or semicolons or otherwise under government and 501(c)(3)s.

MS. WEISMAN: Jacob, did you want to respond?

MR. LALLO: Yeah. So I know you've

gotten tired of me hearing this or saying this, but there
is broad rulemaking power for the Secretary to promulgate
regulations that interpret statutes. That is a long-
standing part of American agency and administrative law.
And moreover, I think while your point is well taken that
the statute does clearly lay out different categories of
public service jobs. The reason that these have to be
broken out further and are broken out further in these
regs and in previous ones, is you can't just apply a
common sense read to all of them. You know, again, in the
most ridiculous example you can make is the fact that it
says military, but it doesn't explicitly say United
States military. Obviously, we would not want to consider
joining another military as a public service employer.
The point I'm trying to make with that is we're allowed
to interpret within those, and we are still effectuating
the intent of Congress by pushing for reform the public
service writ large. And moreover, within the bounds of
the illegality and public policy doctrines articulated by
the IRS, which we're using as a basis for this. And I
think just beyond that fact that it says, you know, it
articulates categories in there, unless it's naming
something explicitly and saying that we have no authority
to regulate over it. We're allowed to work on this as
long as we're not operating directly contrary to statute

and by, you know, providing standards by which
501(c)(3)'s can participate and become qualifying
employers, or rather be removed as qualifying employers,
that is not taking away from the statute, which just
defines them as a category of public service job.

    MS. MAYOTTE: Can I respond?

    MS. WEISMAN: Yes, please.

    MS. MAYOTTE: I agree that the IRS has
the authority to remove the status of a 501(c)(3) if
they're not complying with the definition of a 501(c)(3).
So why aren't we in that room? Why is that in this room?
And just, I'm old and I lose my train of thought really
easy, Jacob. I'm sorry. Speaking of congressional intent,
because, you know, my social life is so full, when I
heard this neg reg, I went back and read all, I believe,
with 207 pages of the Congressional Record for when PSLF
was written into law. Spoiler alert. So they, they talk a
lot about what their intent about what PSLF was. And one
of- and so starting with page one of the 207 pages. No?
Alright. One of the few quotes I want to bring out is, we
want to encourage more young people to go into public
service. Our policy should respect that choice, not
denigrate it. Under the loan forgiveness program, the
remaining loan balance and a loan forgiven for a borrower
who has been employed in a public sector job and making

payments on the loan for ten years. These jobs are
essential to the communities that they serve. So the
intent of Congress was not to narrow the eligibility. It
was to, to make it as expansive as possible under the
statute that they wrote. Going back to what you said is
about the statute list and categories of jobs. The
statute specifically lists 501(c)(3). What are the job
responsibilities of a 501(c)(3)?

                    MS. WEISMAN: Jacob, do you want to
respond?

                    MR. LALLO: So two things. First off,
so first off, the reason we're not in the room with the
IRS is that's still a separate issue. While the IRS does
have the authority to, you know, grant and revoke
501(c)(3) status. Our- we're working off a basis that
they've, you know, articulated because they have a
certain amount of expertise here in terms of determining
what constitutes a 501(c)(3). And we are applying that
writ large over the concept of public service. Because
those two things are very much related and I think very,
very compatible, especially when we're talking about, you
know, behaving in a way that furthers public policy,
which is the intent of PSLF. Now, that being said, and I
don't want to, you know, question the validity of the
Congressional record. I think it's important to consider,

you know, the intent of Congress at all times. But the
Congressional record is not, you know, the red-letter
text that dictates what the statute says. The statute is
what the statute says. And I think, you know, we've had
this conversation when we've gone back to the room,
there's a lot basically within PSLF. And that is a short
section of the regs. And we have to really interpret and
work within that to make PSLF work properly. I think
we've heard from multiple people who've commented about
just how many 501(c)(3) organizations there are. They
provide a lot of services and a lot of different things.
I would challenge that a 501(c)(3) is not a true public
service job on its own here. It is a classification of
different types of organizations, and we can't take all
1.3 million 501(c)(3)'s and put them all into one box.
It's practically impossible, and it's reductive as to,
you know, the nature of 501(c)(3)'s. I think to say that
they're all basically the same for this purpose.

             MS. MAYOTTE: Okay. So I feel like
I've put on my chaos pajamas now. So, and maybe I
misheard you, but a minute ago I heard you say we're
following congressional intent. And then just now we read
out congressional intent, we say, well, congressional
intent is not always congressional intent. And then also,
when we started this conversation, you said that the

statute is just listing jobs, but then you said that it's
not just listing- I mean, if Congress intended for it to
just be a list of jobs, why would they have specifically
included the term 501(c)(3)?

MS. WEISMAN: Alright. Let's let Tamy
respond to that. And then, Jacob, if you have something
else, we can go back to you.

MS. ABERNATHY: So we are not
negotiating what is or is not a 501(c)(3). Right? We're
not negotiating whether or not a 501(c)(3) is a
qualifying employer. We already know that, that is right
now as it stands. We met with the IRS. There were no
changes to the IRS code that would change a 501(c)(3)
employer from being a 501(c)(3). We do not have the
authority to change an employer from a 501(c)(3) status.
That is not what we are doing. So while the statute does
speak to the fact that a 501(c)(3) is an eligible
employer for the purposes of PSLF, we now have subsequent
rules that are going to go into place, proposed rules
right now, that amend and say an agency participating in
a substantial illegal activity for the purposes of PSLF
will not be an eligible qualifying employer. We are
permitted to do that under the Secretary's authority. And
that is why we're here today. We are not changing that
employer's status. But for the purposes of PSLF, if an

agency government wide or a private agency, nonprofit
agency, non-government, participates in substantial
illegal activity, they no longer get to be a qualifying
employer.

               MS. WEISMAN: Jeff?

               MR. ANDRADE: So what we're doing here
is we're not defining 5- we're defining a 501(c)(3),
we're defining what is public service. And if you want to
be a strict constructionist and go back to the statute
and go back to congressional, the congressional record,
then things like buyback of payments and some of the
other things that have been done in the seven times this,
this regulation has been opened up. We're now here at the
eighth time. Then you would say all those things, you
know, should, should go back because they weren't
mentioned in the statute. And so we, you know, if you
remember when this was originally promulgated, the term
was public service organization. It wasn't qualifying
employer, and qualifying employer had been- has been
broadened through the regulatory process, has been
regulated through that process. So but what we're, what,
what we're defining here is, focuses around whether or
not this is public service, not whether or not this is a
501(c)(3).

               MS. WEISMAN: Betsy, did you have

another comment? And then Abby, after that.

MS. MAYOTTE: Yeah. So first to
respond to, to Tamy and Jacob, and then to Jeff because I
don't want them to feel left out. I do understand that
you are not trying to change the definition of 503 C3. I
understand that completely. I'm saying that if, if the
concern is that a 501(c)(3) is performing an illegal
activity, let the IRS do their job and remove the
501(c)(3) status. So I'm clear on that aspect. And to
respond to Jeff, you're right, buyback is not in the
statute. But with that argument, I would take it in a
similar direction, an adjacent path, so to speak, and say
if memory serves, the statute also doesn't specifically
exclude a for-profit so therefore we should be expanding
the definition of eligible employer to anybody who works
one of the jobs that are listed in the statute,
regardless of whether it's for a nonprofit or for-profit
or a government or whoever.

MS. WEISMAN: I'm hearing areas of
agreement.

MR. ANDRADE: I mean, we're violent,
we're a violent (inaudible). I think it goes back. But
again, it goes down to the job. Is the job public
service? And that's really, and that's really what we
are, what we are focused on. And we've tried to make the

case and to show that in these instances, the work is
actually going against the public good and not for, for
public service.

　　　　　MS. WEISMAN: Jacob, do you want to
comment?

　　　　　MR. LALLO: Yeah, just to your initial
point there. I want to clarify the reason we're doing
this and not the IRS, is there are several processes
where we work closely with Treasury, we have overlapping
jurisdiction of some things. It's not really that like
we're regulating the same things, but what we're doing
sometimes bumps into each other a little bit. While we
recognize that they could revoke, you know, a 501(c)(3)
of an organization for illegal activity, they're not
going to catch everything. And this is a program that is
under the administration of the Department. And so it
falls to us to administer it. And if that results in some
degree of overlapping jurisdiction between us and the
IRS, so be it. But we, at least in those cases, serve as
a second check and a second line of defense. And in cases
where it's not necessarily under the purview of the IRS,
as Jeff and Tamy mentioned, with state governments or
other organizations, that is only really under our
purview. And so it's necessary for us to step in here and
cover this.

MS. MAYOTTE: So why not continue your interagency cooperation and, you know, throw them an elbow, hey, you should go look at this guy. They have a process. They have an appeal process, and I'm not- I you have not convinced my non-law degree brain yet that the Secretary actually has the authority to do what you're proposing to do. So, again, going back to something I asked yesterday, what problem are we trying to solve? You've articulated the problem you're trying to solve quite well, but I argue that there's already a solution in place that's already been done through the IRS.

MS. WEISMAN: So I'm going to go to Tamy. But really quickly, one thing I would ask, and again, I'm going to start getting a little more assertive here to challenge some positions and to try to get you to think in ways that are different than the ways you've already been thinking. Is it possible that while this wouldn't be your first pick, and I'm not asking you to answer right now, I'm asking you to think about it. Betsy, is it possible that although you don't agree with that way of doing it, that you say this would still be an acceptable way? Perhaps your preference would be to have the IRS do this. You've outlined that, I think very well, but is it possible that there is that other way that you could live with? So as we start to look for agreement,

hopefully not too violent, that, you know, we really do
look for ways that we can say, okay, I can live with it.
Again, not asking for a response, just for thoughts.
Tamy?

              MS. ABERNATHY: We met with the IRS,
and we discussed this, and the very thing the IRS said to
us was, you don't have the authority to do anything with
a five- with a status, with an employer's status. And we
said 100% correct. We're not trying to do that. They do
not have any directive that is going to change the
501(c)(3) status at this point. There's been nothing that
tells an agency at this point to change a status for a
501(c)(3) if you have participated in a substantial
illegal activity. So absent the IRS getting their own
directives, which we do not dictate to another agency
what they should or should not do, nor do they dictate to
us. In these instances, we worked with Treasury. We
worked with every agency that would work with us on these
definitions. We went to HHS, we went to the IRS. We went
everywhere we could to go across agencies to clearly work
collectively to make sure we got it as air quotes, right
as possible. And in this case, we're stuck where we are
here. It is what it is. We understand, Betsy, where
you're coming from, we appreciate you coming to us and
saying these things. This is basically a moot point, and

I think we need to move on past this because we're not
going to be able to do anything more with that. I'm
sorry.

MS. MAYOTTE: The last thing I'll say
for now is that in response to your explanation, which I
appreciate, is that I, I feel like that executive order
was requesting an outcome, not a path. And I'm suggesting
that the path that you are taking, you don't have the
authority to take.

MS. ABERNATHY: Thank you.

MS. WEISMAN: So as we all start to
think about what's been proposed, there may be others who
feel that way too. And I guess what I would ask is, in
some cases, you have to let the Department decide where
it feels that there is risk versus not risk. So if the
Department feels that it has the authority and has a
legal argument and position to make, can you get behind
the proposal that assumes that is there? Again, just food
for thought. Trying to find some agreement. I don't see
any cards up, Tamy. Do you want to move on then?

MS. ABERNATHY: I do, thank you. I
believe we are on 30. Substantial illegal purpose means.
Do we agree on that? Okay. I'm knowledge checking myself
here. Yes? Okay, good. Alright, so you'll see in
romanette three, the pretty blue, where we've removed the

semi or we, we've removed the or the, and we've added in
violation of Federal or state law. Thank you, Michael. I
don't have that note on here to make sure he's screen
sharing, so thank you. In violation of the, thank you,
Jeff. In violation of Federal or state law, we have added
under romanette three, engaging in the chemical and
surgical castration or mutilation of children. Romanette
four, engaging in the trafficking of children to states
for purposes of emancipation from their lawful parents,
in violation of Federal or state law. We have removed, in
violation of applicable law. Because what we determined
and what it should have been, was it did apply to both of
those things. And the way that we wrote it did not
necessarily do that. So we have remedied that. Four has
now become five. And engaging in a pattern, and I'm
sorry, what we did was we, we changed three to be two
subparts instead of just one. So we added, we added it as
four. So now we have a five engaging in a pattern of
aiding and abetting illegal discrimination or and then
six engaging in a pattern of violating state laws against
trespassing. And again the, the edits that are in yellow,
I believe, Tracy, this was from your proposal from the
night before. So the stuff in yellow are the proposed
languages from yesterday. The stuff in blue is what we've
come up with based on our discussions, based on your

proposals, and based on other- if there's anything else that we've based it on. You'll see going all the way down to 34. Thank you, Michael, we have removed the old 34, which is violating state tort laws and all that compiled underneath. And now 35 became 34, violence for the purposes of obstructing or influencing Federal government policy. So we've had yet another paragraph restructuring. Yes. Sidebar. Abby? We could play- we, we heard your concern about removing the non-default judgment and making it more than what we wanted it to be. And while we have struck out 34, we're willing to go back. Unfortunately, we didn't realize that we were willing to go back until right this second because we missed it during our conversation. So we're going to- it wasn't on the list, so we apologize. But we'd like to go back if you feel very strongly about making sure that language gets in there. Let us go rework- we've tried to do some of that elsewhere, but we did not put in there about the non, sorry my glasses aren't- non default judgment. So we're going to go back and do that. I just wanted to make a mention of that because you did bring that up. And I apologize that it was- we missed a lot during lunch. We didn't miss a lot; we missed that one during lunch. Thank you.

            MR. ANDRADE: And I think what we

would do is we could strike out tort, the word tort in
there, to make it a corresponding change to the other
section. And then just keep it as, as we had in. We took
it out because we thought it was redundant to the change
that we made. And but, you know, but you have a point
that the language that we wanted to put in there, which
was final default judgment by, by state court, needed to
stay in there. And it doesn't fit in the other section
very elegantly, so.

          MS. ABERNATHY: So we may go back to
having a 34? Just kidding. We're not changing it. No, we
may go back to that, but we'll give you final tomorrow.
But I just want to tell you, if you see that coming back
to the table, that's why we're going to make that change,
to make sure that we have final non-default judgment in
there somewhere to clarify based on our legal aid
concerns. Pretty important. Okay? Alright. Borrower
eligibility. Let's move on to the application process E.
The application process under subsection E is not new.
What is added, 9, 10, and now brand spanking new 11 has
been added. We know that there's some practical,
practical issues with 11 that, that we'll look at. But
right now, 9 are changes from yesterday and 10 are
changes from yesterday. And then 11 is what's changed
from today. If the Secretary approves a correction action

plan under J2, the Secretary notifies the borrower of the
employer's status. We're going to review that again based
on Scott's concern. So stay tuned. You'll probably see
some additional language and some additional
justification on that particular point.

            MS. WEISMAN: Alex?

            MR. LALLO: To follow up there, I
think you heard Scott say this earlier, and to provide
more clarity for people watching on the live stream, and
folks around the table, as currently constructed in the
application process, it's unclear if this is the best
spot in the process in which to notify borrowers that
there is a successful corrective action plan. It- upon
initial reading here, it looks like it might make more
sense in the reconsideration process. And so we will be
taking that language and offering suggestions for where
best to place it in the reconsideration borrower
reconsideration process so that it's operational.

            MS. ABERNATHY: I would just caution
that we are trying not to have borrowers apply for
reconsideration for qualifying employer, because that is
not something that they can get reconsideration for. So
while we appreciate that, please keep that part in mind
as you're trying to craft some regulations around this.

            MS. WEISMAN: Tommy?

MR. AIELLO: Just a quick question. We might have already touched on this already, so please forgive me, but why don't we include a timeline for how quickly the Department, or the Secretary has to let a borrower know if either their employer might not be-might be ineligible, and then subsequently, if they are finally no longer the qualified employer?

MS. WEISMAN: Jacob?

MR. LALLO: I think if you have proposed regulatory language on that, give it to us, let us know. I think it was flagged yesterday by Tamy as something that we would like input on. So if you have proposed numbers, please send them to us.

MS. WEISMAN: I see no other cards at this time. Tamy, do you want to continue?

MS. ABERNATHY: Yes, ma'am. Thank you.

MS. WEISMAN: And then I think after this next little grouping, we should take a break.

MS. ABERNATHY: Okay. You tell me when. Standard for determining qualifying employer in H. We have added 1, where it will now be H1. The Secretary determines by preponderance of evidence through everything. We talked about substantial legal purpose by considering the materiality of an illegal activity, of any illegal activities or actions, by gauging both

frequency and severity. We renumbered final judgment to
romanette one. A plea of guilty. Paragraph two romanette
two. Romanette three is a settlement. We've added number
2. Nothing in this subsection shall be construed to
authorize the Secretary to determine an employer has a
substantial illegal purpose based on the employer or its
employees exercising its First Amendment protected
rights. We talked about this a little earlier today.
We'll jump, jump down to I. Process for determining when
an employer engaged in activities that have a substantial
illegal purpose. We have changed number 2 to determines
that the qualifying employer engaged in activities that
have a substantial illegal purpose under subsection H of
this section, unless prior to the issuance of the
Secretary's determination, the Secretary approves a
corrective action plan, which includes the factors set
forth in subsection J2 of this section. We heard you, and
this is our attempt at remedying the concern that you
presented to us about this. Jeff says it's basically a
settlement that we've put it here, memorialized the
language here for your consideration. Any discussion?
I'll turn it over to Annmarie.

                    MS. WEISMAN: Faisal?

                    MR. SULMAN: Just a dumb question. So
in the correction action plan. That's something that the

employer is the one that who creates and submits that to
the Department. And then. If so, would there- is there
ever a possibility where the correction of action plan
takes longer than five years? And if so, would it just
default to the five years being the lesser of the two?

MS. WEISMAN: Jacob?

MR. LALLO: Yeah. So the corrective
action plan if entered into before the final
determination. So, you know, we set up this process by
which, you know, the employer has given notice of a
preliminary determination that they have engaged in this
activity and then has the opportunity to respond. So we
anticipate within that, and you know, what we were
building in here is that, especially in some instances,
you know, a corrective action plan is really the best way
to fix this. We want to curb bad behavior and encourage
good behavior. And especially, you know, again, we built
in the materiality qualifier because we want to basically
take more minor issues and just address them rather than
push anybody out of the program. So with that, we
anticipate that this is just going to be negotiated as
part of the process. There- there's no five years yet,
because that wouldn't kick in until a final determination
is issued. So once that final- the, the clock starts
running on that five years once that final determination

is issued. So if the employer submits a corrective action
plan and we go back and forth for a while, and it, you
know, never gets approved, they've never lost eligibility
during that time. So as long as there hasn't been a final
determination- now, this doesn't technically bind the
Secretary. And so far as we could move forward without a
corrective action plan. And as we've discussed, you know,
there are some forms of conduct that we think are far
more material than others. And, you know, again, going to
the extreme, engaging in terrorism doesn't mandate a
corrective action plan. But everything else might. So
this basically lets that process, you know, play out
there. And then in terms of corrective action plans
afterwards, you know, if they do still lose eligibility,
an employer can still come in and submit a corrective
action plan and work through that process with the
Secretary. But if that's happened, they've lost their
qualifying employer status at that point, and then they
regain it at the point that it's approved. But assuming
that it's done within this process, they never actually
lose their qualifying employer status.

                MR. SULMAN: And the date of effect is
still July 1, 2026, that's assuming. But okay, say, for
example, I guess someone loses, an employer loses, their
eligibility a month or two before they go through the

correct action plan process, and the Secretary determines
then and there that, you know, like, I don't know, June
of 2026 that's- they lose their eligibility then. But
like, there- do you see my confusion?

MS. ABERNATHY: They would lose
eligibility in June. They can only lose eligibility
beginning July 1, 2026.

MS. WEISMAN: Jeff, did you want to
make a comment?

MR. ANDRADE: So, so what we're trying
to do here is avoid the situation of having to make a
determination and then have them come back in, and then
there's a gap where the borrowers are not eligible. If
the, if the employer admits that they, you know, didn't,
didn't do something the right way, we're trying to give
an opportunity for them to correct it before we make the
determination. And I'll yield to Jacob.

MR. LALLO: I just want to add a quick
clarifying point. You said this, of June of next year.
This is for engaging in substantial illegal activity
after July 1st. So the June issue wouldn't come into
that. No determination can be made on activities that
happened before July 1, 26.

MS. WEISMAN: Tommy.

MR. AIELLO: I'm a small government

guy. I really don't like when we give a lot of power to one person, whether it's Secretary McMahon, Cardona, or whoever might be the next Education Secretary four years or ten years from now. Is there a way to address that, the Secretary having all of this power- because the last administration, the way they treated schools like Grand Canyon University or Liberty University, I thought was very unfair. I'm concerned that we could be bringing that same precedent this time around. If a school or an institution says, this is my corrective plan, we're doing all of these things. The Secretary says, no, it's not enough; we need more. Is there a way to alleviate some of those concerns, whether it's a multi-person panel or some other constituency aside from just one person? Or is it in the statute that it only has to be one person?

            MS. WEISMAN: Jeff?

            MR. ANDRADE: Where we're going on this is we're- the rules don't change. We're just trying- we're changing the timing. Right? So, if somebody was going to lose- was going to have a determination go against them, the facts of that don't change. If somebody was going to do a corrective action plan after that determination, the facts don't change. So what we're, what we're really trying to do is to protect the borrower and to make- and to combine the two processes together.

So we're not changing, we're not changing what happens within the two processes that we had, had laid out. What we're changing is the timing of the two, and Jacob, did you have anything to add to that?

MR. LALLO: I think that's a pretty good summation. I think that's you know, that's the risk, I suppose, a qualifying employer runs by agreeing to enter into a corrective action plan. But the standard for what gets you tossed for being a qualifying employer, you know, engaging that activity, is already there. So we're offering a mitigation. And so that may include, you know, different- that they have to impose certain standards. But that's the benefit they get to come back, or they get the benefit of coming back in early if they do that.

MS. WEISMAN: Laurel?

MS. TAYLOR: I just wanted to thank you for this, this change. I think from aligning incentives and incentives driving behavior. I think it also addresses some of the concerns around whistleblowing and encouraging once an employer becomes aware of an issue to work it fast and hard, and the corrective action plan protects the borrower, minimizes damage, provides employer with an opportunity to respond. So, thank you. I think this was really thoughtful.

MS. WEISMAN: We're getting to break

time. But I also recognize that there's not too much more
to go. We have Kaity with a comment.

          MS. MCNEILL: I just wanted
clarification on something you said earlier. I know, like
that topic of terrorism is sort of a touchy one, but were
you just sort of clarifying that if that is sort of what,
what the issue is, that in no case will they receive a
corrective action plan if that is the accusation?

          MR. LALLO: I was just referencing
that as the kind of most extreme example. I know, every
time that's been brought up, it's been kind of used as
the outlier for the most severe thing on that list.
Obviously, we can't speak to how we would behave in any
particular future incident. Everything would be
considered on a case-by-case basis. But I think, you
know, it's just been a useful proxy for the worst thing
on the list throughout.

          MS. WEISMAN: Kaity, did you have a
follow-up up or are you okay?

          MS. MCNEILL: Categorizing things that
way.

          MS. WEISMAN: Okay. Thank you. We
ready for a break or? Betsy?

          MS. MAYOTTE: Are we still going to
talk about H? Or should we talk about H now?

MS. ABERNATHY: Didn't we talk about
H? I'm sorry, did we?

MR. ANDRADE: We didn't make any
changes.

MS. ABERNATHY: We didn't- we- wait, I
don't have glasses on. Give me one second. We did not
make any changes to H. We talked about it. I went through
it. We- the only change we made was putting in a number 1
and putting it into paragraph structure. There were no
other additional changes. We talked about- all the stuff
in yellow was from yesterday, so we did discuss H.

MS. WEISMAN: Abby?

MS. ABERNATHY: Now, I have not gotten
to your proposals yet.

MS. SHAFROTH: Okay.

MS. ABERNATHY: Going through that, if
that's what you're looking for, remember we got some of
that really late. And so we did that during lunch. This
was what we had finalized. And then after we finalized
this, we looked at where we could include things and
where we couldn't. So after our break, I'm happy to go
through very quickly what we've received so far, and our
rationale for whether we accept it or did not accept your
recommendations for proposals.

MS. SHAFROTH: Okay. Yeah. I knew that

there was a proposal on H specifically that I was hoping we would have an opportunity to discuss, so I can, I can wait if there will be that opportunity later.

　　　　　MS. WEISMAN: So let's do that after the break. I do see that Bob has his card up, so let's do Bob and then the break.

　　　　　MR. CAREY: I just want to say that's very helpful to know, because when you first came back in, it sounded like you had gone through all the proposals received by the lunch break and that you had incorporated where you guys wanted to, those proposals that had, that had been received by the lunch break, so.

　　　　　MS. ABERNATHY: That is true.

　　　　　MR. CAREY: So, if there's any possibility of knowing what proposals that have been submitted by what time.

　　　　　MS. ABERNATHY: We'll discuss that after the break.

　　　　　MR. CAREY: Okay, great. Thanks.

　　　　　MS. WEISMAN: So if we could come back at 2:50, please. That gives you just over ten minutes. Welcome back. As a reminder, we have a little bit more time for our discussion, and then we are going to stop at 3:25. I'll do a short intro and instructions for public commenters. Public comment will be from 3:30 until 4, and

then we will be finished for today. We'll give more instructions as we get closer as to what we think tomorrow will look like. I know there was some discussion about walking through H again. Tamy, did you want to start with that, or did you have another path?

              MS. ABERNATHY: I have another path. We're going to go through the proposals so that you all know that, that we've looked at them. I'm going to ask my colleagues to help me. Some of them did not have who they were from, so my apologies. I mean no disrespect to not address the right person. Please feel free to correct me if this is your proposal, but this is one that came in about the Higher Education Act 27, qualifying employer means and E, a nonprofit organization, seem to have changes done to that. So I'm not sure which one of you put this through. This is- oh look, there it is right there. Excuse me. To the negotiators for consumer advocates and legal aid organizations. I looked all over for that twice. We are not able to take the changes to qualifying employer because we are remaining neutral, neutral across the board for Public Service Job and Higher Education Act lumps into one bucket. It doesn't take it out of different buckets. So we're going to keep it in those- that one bucket. We're not going to carve out a separate path for nonprofits. We don't believe that

is in the intent under the Higher Education Act. So we do appreciate the thought process that went into suggesting this proposed language. But the Department is not going to accept that language. We have accepted suggested text, excuse me, from Mary Lyn, that borrowers should also be notified when the employer is approved for corrective action plan was reinstated. What we did was we, we took 11- I believe we added 11, but we took out some of the text. So it is just if the Secretary approves a corrective action plan under J2, the Secretary notifies the borrower of the employer status. So we did take a modified version of your recommendation, Mary Lyn. Thank you. Bob, you proposed- you articulated your concern and your proposed language to include State or Federal law for chemical castration and mutilation. And what we chose to do in lieu of that was to change B30 instead, and confirmed that, that is the intent of the policy that in violation applies to both. So we changed, if you'll remember, when we went over- or you may not have been here, so I- I'm sorry (inaudible) not 34. Oh, you mean romanette four?

                    MR. LALLO: And three.

                    MS. ABERNATHY: Yep. Three and, three and four. We, we changed from one romanette into two. And we added in violation of Federal or State Law to both of

those clauses. We, however, are not going to change the
definition of child or children. We've addressed that
already numerous times. We're going to retain the
definition that we have currently in number four. Bob,
you also had another proposal regarding the standard in
H, where you changed the language in H and one, two, and
three. We appreciate that. I believe- my notes here are a
little vague, so I may ask Jake to- Jake or Jeff to
support a little bit on, on the rationale. Something
(inaudible) State or Federal Court. We cannot make the
State or Federal Court tell us anything. So there's no
way that we can make these changes where you're saying a
criminal law by a State or Federal Court. We're not able
to engage in that particular aspect of your
recommendation, because we have no control over a State
or Federal Court communicating anything to us. Jake, did
you want to add something or is that good? But thank you,
Bob. Additionally, we have Emeka. Did I get it right?
Yes. Alright. Stuck the landing. First time I've ever
heard that. We appreciate your change or your, your
recommendation, but under the statute 1087E, we cannot go
back retroactive. The way the statute is written, we're
not able to look backwards. It has to be at a point going
forward. So we're not able to do the particular when the
corrective action plan is delayed, and you wanted us to

be able to go back and count those payments. We're not able to do that because- sir?

                    MR. LALLO: Can I (inaudible)?

                    MS. ABERNATHY: You certainly may.

                    MR. LALLO: We can't go backwards and for- or, you know, entertain reconsideration or retroactive, you know, qualifying employer status because for a payment to count, it has to be made to a qualifying employer pursuant to 1087E, and any time that they've lost eligibility, they're no longer a qualifying employer. So we can't work backwards and then allow them to make payments then and basically determine that those payments counted, because we've already made a determination that they're not a qualifying employer for those times.

                    MR. OGUH: I guess what I was really trying to mitigate was- let's say I have this good faith corrective action plan. I pass it to the Secretary, and it sits on her desk for a year, right? So, so being able to say if and when she does get a chance to look at it, I know she's busy, she's got other things she's working on. It's sort of approved for when that corrective act- like that's what- how, how can we mitigate that situation where it's just sitting on someone's desk for like a year?

MR. LALLO: Got it. And we can get into this more as we actually discuss the role. But I think this kind of goes back to the point that was made earlier about, you know, when a loss of eligibility- or a loss of qualifying status actually happens here. And so I think if that's submitted, you know, after notice that a, you know, a preliminary determination about substantial illegal activities has been made. If that's in discussion, there's no loss of that status until a final determination has been made. So this would really only apply if you knew the correction- corrective action plan is submitted afterwards. Yeah.

MS. WEISMAN: Emeka, your card is still up. Do you have a follow-up? Okay. Tamy, did you have- ?

MS. ABERNATHY: Yes, ma'am. We did in number two under I, for the process for determining when an employer engaged in activities that have a substantial illegal purpose, we added language to try to mitigate that very concern. Because the point here is, if they are under a corrective action plan and they have done this before getting a final determination, there is- they are still a qualifying employer. The payments borrowers would make while still going through this process until a final determination is made, they've met that standard of

losing qualifying employer eligibility. They still
qualify. Those payments still come. So we, we heard you.
We weren't able to accept your proposed language, but we
tried to work in other language that would mitigate that
concern as best we could within the parameters that we
can operate in. (inaudible) turning that off. Alright.
Tracy, you indicated- you- excuse me, you provided a
recommendation for change to item four, child and
children. We've spoken to this a couple times, but we
are, and even though you have a list of, of laws that
support those changes, we're going to hold to our
particular change. I think we've addressed that already,
but I wanted to just circle back to you. Bob, you also
put in a recommendation for 12, illegal discrimination
means a violation of. And we are trying- the, the edit
here that you put in seems to make it less inclusive, and
we wanted it to be more inclusive. So we are not going to
make any changes to that. Again, Tracy's second proposal
to support his- the definition of changing the child.
Heidi, you put in a change in regaining eligibility as-
excuse me, you put in a proposed recommendation for
retaining- regaining eligibility as a qualifying
employer. You added a three, the Secretary shall
acknowledge receipt of the corrective plan within 60
days, and employer reinstatement is effective on the date

of acknowledgment of receipt of a corrective plan. So one
of the things we wanted to mention is we may not agree
with that corrective action plan. So we certainly could
not take action or take that date as the actual date,
because it might not be a fully executable correction or
corrective action plan. That is something that we may
still be engaging in discussion with the qualifying
employer. So we're not able to take point number three.
And employer reinstatement, what we tried to do here is
if they're in, in the process of completing a corrective
action plan prior to getting a final notification,
although under this section, this is regaining
eligibility, so they would have been notified already,
we're not able, we're not able to have a respective
acknowledgment of the receipt of the corrective action
plan by the Secretary. So we're not able to take your,
your recommendations, but thank you. I am unaware of who
put in the revised language to be added to protect those
sharing an EIN with an employer who is awaiting
reinstatement. We are still- although, who- do we know
who put that in? Thank you, Miss Rebecca. Somebody told
me that and I forgot to write it down. My team told me,
and I just didn't get it down. Thank you. We're going to
hold this one. We need to do additional thinking on this
and come back tomorrow with a response because we are

still investigating and exploring the ways in which we
can remedy the very points that you brought up that we
are considering. We just didn't- we ran out of time to
come out with a final, but we do expect to, to have
something to share with you all tomorrow in hopes that
that might mitigate some of the concerns about the EINs
and how we determine right now a loss of- well, how we
would propose to determine a loss of eligibility for a
qualifying employer that has one EIN, that uses one EIN.
So we are looking at that. We've heard you and we intend
to discuss some more this evening and circle back.

            MS. WEISMAN: Rebecca, did you want to
make a comment?

            MS. STANLEY: I just want to make sure
that you got the proposal that was sent last night at
7:48. It was about the qualifying employer definition
revision because it would have correlated with that as
well.

            MS. ABERNATHY: Hold on one second
while I check, please. Rebecca. My apologies. Thanks for
flagging. I did not get that one. Or if I did, I- we did
not go over it. So I beg your forgiveness and let us take
this back. But let us look at it quick and see if there's
anything that we can do.

            MR. LALLO: (inaudible)

MS. ABERNATHY: We're going to take it back. We are going to take this back because it goes along with the other one that we're looking at. Thank you for your patience. You're fine. If it's our oversight, it's our oversight. We own it. Well, just this one time. Where it doesn't really matter, so I can't get myself in trouble? Oh, yes. Thank you for bringing that to our attention. We'll get right on that. Thank you.

MS. WEISMAN: Laurel? Can you go to a mic?

MS. TAYLOR: On the topic of the EIN number that was part of our (inaudible) for today, I think we did also discuss having additional language that we would be providing working from Rebecca's work. We continue that discussion for caucus. So we may also have additional language coming to you all this evening.

MS. ABERNATHY: I'm sorry, would you repeat that? I was- I did find your proposal. I filed it so I would remember to look at it because we got it this morning, so we did get it. Please repeat yourself.

MS. TAYLOR: Thank you again for the sensitivity to this particular issue. So working from Rebecca's Foundation, this was the- one of the primary tenets behind the caucus. I think we may also, leveraging Rebecca's work, have another iteration to you this

evening.

MS. ABERNATHY: When this evening? And
not that I- so let me- it's not that- we typically break-
if we have all business discussed, then we're going to
break, and we won't resume until in the morning. So if
you're going to need time tonight to do that, and we have
no other business other than the few little things that
we have to, to touch point on, then we'll break and then
we'll resume earlier in the morning if you can get it to
us. Sorry- if, if you can't get it to us until later this
evening, we can break and then discuss it earlier
tomorrow morning. We can meet a little bit earlier in the
morning if we have to, to come up with- not to come up
with, to review it and decide as a team. So if you can
get it to us in a reasonable amount of time, that's
great. If you're going to need tonight to flesh it out,
that's fine. We just need to know approximately when you
could get it to us so that we can start to look at it and
engage in conversations to make sure that we're ready by
9:00 tomorrow morning.

MS. TAYLOR: Thank you very much.

MS. WEISMAN: Rebecca?

MS. STANLEY: I think the concern
would be, since you haven't had time to review it because
it was accidentally left out, is that if you said we

would accept it with additional revisions. We're not
really having the opportunity to make those revisions.
And so is that-

MS. ABERNATHY: No. You have, you have
the opportunity.

MS. STANLEY: Okay. (inaudible)

MS. ABERNATHY: Here's the question.
We plan on discussing this tonight. If you need time to
give us another iteration of that, that's fine, we'll do
that. We just need to know your timing.

MS. STANLEY: Yeah, and I don't want
to speak for everyone.

MS. ABERNATHY: And don't feel put on
the spot. You can communicate with Annmarie. Annmarie
will get to us.

MS. STANLEY: Yeah, because I believe
we can submit it like it is. But then if, if it's
something that you would consider, then we would like the
opportunity to provide revisions and change it as needed.
Is that correct, from what we had in the caucus? I don't
know if that's-

MS. ABERNATHY: We have, we have- I
believe we'll have time tomorrow. What I would suggest,
perhaps, is if you have ideas of the things that you, in
addition to what you've already put out here, you know,

tomorrow morning, one of the things that we can start
with is this. Because we've gone through the issue
papers, we've gone through the proposals that we've
received so far. We've gone through and explained to you
what we are keeping, what we are not keeping, and what we
can do at this point is start here tomorrow. And if
there's- if the changes that you are proposing are
amenable to the Department, and we need to flesh out
additional language changes live on the screen, we can do
that as well tomorrow morning. So don't feel like you're
locked into any kind of time. We got it. And we did get
it in enough time to look at it at lunch. And it's
completely my oversight, so forgive me. They gave it to
me, and it just (inaudible) went in there. But thank you,
Rebecca, my South Carolina friend. Thank you.

     MS. WEISMAN: No cards at this time.

     MS. ABERNATHY: Well, let's hurry up
and break, then. I'm just kidding. We're here for you
guys. Kind of.

     MS. WEISMAN: We have about 15 minutes
before we need to go to introduce public comment.
Heather?

     MS. BOUTELL: Tamy, I don't have a
number for you. I just, I just have a question, okay? So
we have- a lot of us have talked about our borrowers who

may get jobs, and they will be in jobs, and then suddenly that employer will be deemed ineligible. And those borrowers, those payments will no longer count. That's what you all are saying. And I'm just asking again, for the people who have signed contracts, perhaps my future doctors who have signed a seven-year contract for residency, that they're not able to leave, they really aren't. There is- there's no relief. And that's just one example. I know there are other examples of rural places or people that have signed contracts. There's just no flexibility with that whatsoever. I just want to confirm that. I think we've all talked about it, but it's a very important issue for me as we think about this legislation.

        MS. ABERNATHY: So I think at this point, Heather, let us go back and have a conversation about this. Yes, that is our position right now. But when you, as a negotiator, present something to us, it deserves us taking the time to discuss it again. And so I can't promise that anything is going to change. But we will certainly take a look at this and hope that that will assuage your concern at this moment. Thank you for bringing that up. We know that this is important. Thank you.

        MS. WEISMAN: Sarah?

MS. DORAN: Thank you. I just wanted to kind of bounce off what Heather was saying. And I have had from a large swath of my own constituents, as I am an educator, I am a part of the PSLF constituency as well as I am a member of the program myself. What she mentioned about people not being able to move, not being able to transfer positions and things like that, as a teacher, a lot of us are locked into our contracts, and if we have to leave, say, for example, our employers are no longer eligible and things like that, we have to pay to get out of those contracts. Often thousands and thousands of dollars just to cancel those out. And a lot of times in rural areas and underserved areas, that's just not possible for a lot of people to either move or even pay the funds to get out of those contractual obligations. So I just wanted to mention that and comment that in regard to myself and my constituents. Thank you.

MS. ABERNATHY: Thank you, Sarah. Again, we will take this back. We hear you. I cannot promise that there will be anything that we can do about it, but I- we do hear you. We do care. And we will at least discuss it again this evening.

MR. ANDRADE: Jeff?

MR. ANDRADE: Yeah, and to Heather and in particular, you know, you mentioned sudden loss. And

ED_02302

we've taken, I think, a number of steps here to try to prevent a sudden loss and to give the employer every chance to come into compliance. So we're addressing that part of it. I'm not sure we can address the contractual part. I do think there are a lot of restrictions in terms of how, how tight employers can make non-compete agreements with regard to geography and, and other restrictions. They can't make them overly restrictive. So I think some of those are in some ways red herrings in the discussion. But we have done everything we can to try to prevent a sudden loss, including setting up a mechanism where we can work with the employer without having a break in eligibility. So I think you need to look at your concerns in light of the change- the other changes that we've made at the table.

MS. WEISMAN: Betsy and then Abby, and then Emeka and Kaity.

MS. MAYOTTE: I actually want to push back a little on- and I hope you don't mind, Emeka's proposal about the response about the Department being unable to provide eligibility retroactively. I disagree, you do it all the time. For example, at the simplest level, if I got a new employee at the Institute of Student Loan Advisors, which is a 501(c)(3) that decided to pursue PSLF, and we've never had such an employee

before, but they didn't submit us as a new employer for
five years. When you approved it, you would approve it
back for however many months they worked for us. When a
borrower is ineligible for Title IV Aid because they've
defaulted on their loan, let's say it's for the 24-25
academic year. If they do loan rehabilitation and make
their six on-time payments, and the letter goes out
within that school period, you will award them
retroactive aid back to the beginning of that loan- that
academic period. So I think there is a lot of precedents
and logic to- if an, an employer submits what ends up
being an approved plan of action, that at least be
effective the day that, that employer implemented that
plan of action.

MS. ABERNATHY: I believe the way that
we have crafted these regulations is we mitigate some of
that. When we are looking at not issuing a final
determination, when they are engaging in that corrective
plan action, they are still a qualifying employer. And
yes, while there are times that we would do retroactive
things for students and borrowers, that is a little bit
different than meeting the requirement of a qualifying
employer, which is a fundamental requirement for PSLF.
And so, yes, we hear you that, yes, there are ways that
the Department has looked at other statutory things and

provided retroactivity, but in this instance, we can't make some an employer who is ineligible, retroactive. If, if the person working, the borrower working for that employer at a time that, that employer is ineligible, we cannot make that employer eligible. They can regain their eligibility. They can agree to a settlement. They can- we can go back, and we can look at it. But unfortunately for that particular period, the statute is quite clear that you must be employed at a qualifying employer, making payments, 120 payments, satisfying 120 payments. And that's kind of where we are locked into at this point. With that, we have tried to have as much grace around that as we possibly can. But at the end of the day, if you are not a qualifying employer, you do not qualify for- that borrower working for that employer would not qualify for PSLF first out of the gate because they are not working for a qualifying employer.

            MS. WEISMAN: Okay, so at this point we've got a few minutes left. We have comments ready for Abby, Emeka, and Kaity. And I see now, Jacob, your tent is up, and Tamy. Okay, Betsy, why don't you respond and then we'll go to Abby next?

            MS. MAYOTTE: I understand that you can't get credit if you're not working for a qualifying employer. I'm arguing that if that- the moment that the

employer implements the, the at some point accepted corrective action plan, they are eligible. It's no different to me. Then, again, let's look at TISLA. The, the day TISLA became approved by the IRS as a 501(c)(3) nonprofit is a very different moment in time than the day that, hypothetically, the Secretary approves TISLA as an eligible employer. However, in that scenario, the borrower would get credit back to the day that we became a 501(c)(3). I don't see this as a- let me put it a different way. Explain to me how it's different.

MR. LALLO: Yeah. So the difference is, it's- we're not- it's not about the implementation date of the corrective action plan. It's about the approval date of the corrective action plan. You could work prospectively. They could be passing ideas back and forth with us and not have, you know, implemented the plan until the point that it's approved. So we need to tie it to the approval date rather than the implementation date, because it's not practical, one, for us to track down when something's been implemented, but also the determination as to whether or not somebody is eligible and a qualifying employer under this is based on our determination that they weren't. So for them to regain that, we have to approve it because they have to hit that approval date. And I think just a further push

back at your previous statement about, you know, when a
PSLF form is submitted by an employer and that being a
retroactive thing. It's not really retroactive. You are
still a qualifying employer for all that time, you just
hadn't filled the form out.

MS. ABERNATHY: Correct.

MR. LALLO: So it's not a retroactive
statement. This though, if you lose eligibility as a
qualifying employer and then we, you know, we tied this
to the approval date of the plan, you weren't a
qualifying employer during that time. And so that would
be a retroactive change which would go against the
statute.

MS. WEISMAN: Okay. Let's move to
Abby. Did you have something you need to add, Tamy?

MS. ABERNATHY: Yes. We look at it
from the standpoint Betsy, that that employer was
qualified. If we did not finish our activities to, to
make sure that they're up on the website and all of that
is working, it did not- they were already qualified at
that date. So while once they become a qualifying
employer and we get caught up to our activities
operationally, because sometimes it does take us a little
bit, we would look at they were eligible at that time. In
this case, they're ineligible. And the minute they become

ineligible that subsequent month, it starts their
ineligibility for qualifying employment from- as long as
it's July 1, 2026, and forward.

            MS. WEISMAN: Okay. Let's- Betsy,
could I- could you say that in the microphone? I couldn't
hear that. Yeah. Okay. Thank you. Let's go to Abby.

            MS. SHAFROTH: Thank you. I was hoping
we could talk about subsection H, which is about how the
Secretary makes a determination of substantial legal
activity. And I heard the Department reject Bob's
proposal which I thought was a very important proposal,
which identified the fact that having the Secretary make
an independent determination of whether an employer has
engaged in substantial legal activity by a preponderance
of the evidence standard essentially makes the Secretary-
gives Secretary the authority to, to adjudicate
immigration laws, to adjudicate anti-terrorism law, to
adjudicate employment discrimination law. And that, that
is, you know, not an authority that Congress has granted,
but as a policy matter, something that we might be
reasonably- be concerned about and would allow the
Secretary to remove PSLF eligibility from state and local
governments and nonprofits in the absence of a finding by
a court that they've actually broken the law. Bob's
proposal was to remove that, that authority and to

instead limit the Secretary's authority to determine that
an organization is engaged in substantial illegal
activity, two instances where there is either a court
determination, a settlement with admission, or a guilty
plea. And I heard the Department rejected on the basis
that courts- the language used was the court notifies and
the Department said, well, the courts don't notify, so we
can't use this. I think, I think that's sort of like a
nit and not a substantive disagreement with the proposal.
And so I would like us to, to hear a rationale for why
the Department would not limit itself to finding
substantial illegal activity to only those instances
where there is a court finding, an admission, or a guilty
plea.

         MS. WEISMAN: Did you want to respond
to that quickly? I'd like to still try to get to Kaity if
we can.

         MR. ANDRADE: Okay. Quickly, I think
you misinterpreted the reason why we rejected it. It was
on the basis of the court doesn't- courts don't notify.
That was the language that we took exception to. So- and
we're, and we're still having discussions with folks.

         MS. WEISMAN: Kaity? And then, and
then we'll move to public comment.

         MS. MCNEILL: I wanted to offer that

in terms of the actions that the Secretary can take,
including making a determination and then being
disqualified and waiting five years or making a
determination and then there being an action plan, is
making a determination and then a warning is provided.
And one of the things that is- we see happening in North
Carolina and other places is that- places is that there
are activist organizations whose express purpose is to
push- if you give them the opportunity to put something
in civil court to push against, this is their express
purpose to do that. And we've seen that happen with some
of the DEI stuff that's happened in North Carolina,
undercover work to put people in a spot for that purpose
of snatching away that Public Service Loan Forgiveness.
So even though it might not be the Department's intent to
be overly punitive, if that stick is lying around, some
other organization is going to pick it up and use that
and say, well, here it is. We've got this civil judgment.
And then that's how that could happen. So just in terms
of- like I said, in addition to what we have, just
putting on the table, that there's also the option of,
yes, we have found a determination and due to the nature
of it, this is a warning.

          MS. WEISMAN: Jacob, if you could
respond quickly so we can move on.

            MR. LALLO: Yeah. I mean, there's a
couple of things that are at play here. We hear what
you're saying. That's why we built in a notice and
opportunity to respond. We want the evidence to be
weighed out. And, you know, basically, I think the
thoughts have been raised a few times that there might
be, you know, targeted lawsuits and stuff like that for
the purpose of trying to trigger PSLF. Again, we're aware
of that. So we want the Secretary to be able to weigh
that and, you know, the organization to provide evidence
against it. I think within the warning system, I don't
think we necessarily feel that we need that. If it's not
material or we don't feel it rises to a level
materiality, the need for a warning wouldn't be
necessitated in the first place. And if it does, you know
that may fall under something that could be remedied
through a corrective action plan. And if it doesn't, it
was material enough that it needed to actually result in
a loss of eligibility. That's a different thing entirely.
So really, you know, this is something that's handled
with the notice and opportunity to respond.

            MS. WEISMAN: Okay. I don't want to
cut off conversation on this. I want to be very clear
that despite the fact that we're finishing for right now,
we can revisit this in the morning, we can continue that

conversation. But we do need to get to public comment. So
I don't want to cut off- Kaity, if you wanted to do some
follow-up there or if others want to join in this
conversation, I do want to make that very clear that we
can go there in the morning. I know Tamy has some other
things that we said we would do in the morning. So we did
not go to any pulse checks today. I anticipate we'll do
those tomorrow morning as well, and then the call for
consensus in the afternoon.

            MS. ABERNATHY: Yes, ma'am. Whatever
you want tomorrow.

            MS. WEISMAN: Okay. I'm told that we
need just a very short break before we start. Five
minutes or less? Two minutes. So we will get started in
two minutes. If everyone could just stay where they are
for now. Thank you for your patience. We are now going to
move into public comment. We know we have some people who
are here today who were not here yesterday. So I just
want to review our process for public comments. All
comments will be part of the public record. So please, if
you are a public commenter, say your name and any
affiliation at the start of your comment, I will attempt
to do the same. But I may not pronounce your name
correctly. And so, please again, you will be on the live
stream, you will be recorded, and part of the transcript.

Public commenters will have up to three minutes. There is a set of lights here to my left, your right if you're standing at the podium. The light will start out green when you begin. The yellow light will shine when you have 30 seconds remaining, and I will also give you a verbal cue when you have 30 seconds remaining. The red light will come on when your time is completely up. I will also advise you verbally to wrap it up if you haven't already. Ideally, your comments will address material related to Public Service Loan Forgiveness, which is the only topic on the agenda for this committee. I would also ask that those providing public comment please speak and act in a way that is professional and courteous. I do reserve the discretion to mute the microphone of a speaker who is using foul language, attacking people, acting unprofessionally, or refusing to stop speaking when the time is up. Our first speaker is Tania Valenzia from Leadership Conference on Civil and Human Rights. If you could please come up to the podium and you will need to turn the microphone on.

          MS. VALENZIA: Do I start the timer over here? It starts on its own? My name is Tania Valenzia, and I am the higher education senior program manager at the Leadership Conference on Civil and Human Rights, which is based in Washington, DC. We are a

coalition charged by our diverse membership of more than
240 national organizations to promote and protect the
civil and human rights of all persons in the United
States. As a first-generation American, first-generation
college student, military spouse, and former teacher, my
story is proof that the American Dream is not a myth. And
what higher education has offered me is a testament to
that. Although I grew up in poverty, my education offered
me career opportunities and economic mobility never
before experienced within my family's history. I knew I
could pay it forward through public service, including my
time as a fourth-grade teacher just a few blocks away. I
did so because education is a promise we have made to
generations of families, and a promise worth keeping. The
unlawful proposals you have discussed to restrict
eligibility of employers for Public Service Loan
Forgiveness by engaging in viewpoint discrimination would
harm our family, potentially leaving us in crippling
debt, and would make it so much harder for us to keep
food on the table. As the Department begins the process
of considering changes to the regulations implementing
the Higher Education Act of 1965, a law created during
the height of the Civil Rights movement and at the demand
of those communities Black, Latino, Native American,
Asian American and LGBTQ+ people, women, religious

minorities, and people with disabilities who were shut out of higher education, and the pathway to full participation in the social, political, and economic life of the country. I would like to remind the Department that while much has changed in the past few months, two very important things remain the same. First, what students need and deserve to grow and thrive in school is unchanged. Students need strong preparation from safe, welcoming, and well-resourced K-12 systems. They need robust guardrails that will protect them from exploitation by shady, for-profit actors and unscrupulous lenders. And second, our laws have not changed. Our civil rights laws that prohibit discrimination on the basis of race, color, national origin, sex, including sexual orientation and gender identity, and disability have not changed. And our higher education laws that provide financial aid, consumer protections, and loan forgiveness, including for those who pursue public service, have not changed. Most importantly, our Constitution and its First Amendment remain the same. The Department does not have the authority to exclude employers, based on their participation, in disfavored speech and activities. Every major civil rights advancement, from the desegregation of schools to marriage equality, began as a viewpoint that challenged

existing power structures. When the government can pick and choose which perspectives deserve protection, it predictably suppresses the voices of marginalized communities. Not only is the underlying proposal unlawfully seeking to abridge the free speech rights of employers, the absence of a dedicated negotiator to represent the perspectives and interests of the civil rights community is inexcusable. The role of regulation is to fulfill the intent of Congress, and no regulation or any executive action can change the Constitution or law. I implore this Department and the state negotiators to hold true to their responsibility to advance equity and fulfill the promise of higher education and its most important Federal Law.

MS. WEISMAN: Thank you. Next, we have Sabrina McGhee from Rural Prosperity and Investment.

MS. MCGEE: Good afternoon. My name is Sabrina McGee, and I'm a social worker, a nonprofit professional, a student loan borrower, and an advocate for Public Service Loan Forgiveness. I serve rural communities in North Carolina and all across the South and my organization, MDC, stands for meaning, dignity and community, for all. That's a vision that to be realized depends on public servants of all kinds. When Congress wrote PSLF into law with bipartisan support in 2007, they

specifically designed- designated 501(c)(3) nonprofits as eligible employers. They deferred to the IRS definition because the IRS already had an established, nonpartisan framework for determining public benefit organizations. Congress understood that letting an education agency make objective determinations about which public services are worthy enough would inevitably lead to political interference and mission creep. For the Department to now claim that authority represents a dangerous overreach. I work every week for dozens of hours offering support to Federal Student Loan borrowers. I saw through hundreds, sometimes thousands, of questions from overwhelmed borrowers confused by announcements. People are paralyzed by anxiety because rules keep shifting. Borrowers organized entire careers around this promise, and now they live in constant fear of the next change. The currently proposed barriers will do little to stop wrongdoing but will create enormous administrative burden. Servicers and the Department already struggle to keep up with the administrative demands of this program. Proposals from this negotiation session suggest putting more burdens onto employers. That, despite yesterday's conversation, my experience says will mean withheld signatures either out of fear or simple confusion. This ignores the reality that employers already fail at basic

PSLF tasks, and often don't even inform their employees they're eligible to begin with. Employers will make mistakes. Employees will lose eligibility through no fault of their own, and confusion will multiply, and we'll fix it if we mess up isn't good enough for borrowers who are stuck in limbo. Every new barrier creates new implementation challenges. Every change creates anxiety for people overwhelmed by a broken system. These are teachers, social workers, nonprofit employees who shouldn't need to become Federal student loan policy experts to access a program Congress designed specifically for them regardless of whether we personally like the public they serve.

            MS. WEISMAN: You have 30 seconds left.

            MS. MCGEE: Thank you.

            MS. WEISMAN: Thank you. Next, we have Matt Clark from the American Federation of State, County and Municipal Employees.

            MR. CLARK: Good afternoon. My name is Matt Clark, and I'm a senior policy advocate with the American Federation of State, County and Municipal Employees. We represent public service workers around the country and a wide variety of job classifications across state and local government, as well as non-profits. This

proposal is fundamentally unserious and a slap in the face for our members and public service workers everywhere. Punishing public service workers for the perceived ideological crimes of their employers by removing workers' eligibility for PSLF is both absurd and arbitrary. Our members faithfully and dutifully serve the public every day. They are carrying out the will of duly elected and appointed state legislatures, executive and judicial branch officials, county and city councils, and others, as well as the missions of the 501(c)(3) nonprofits they work for. There are any number of appropriate venues and methods for any administration to pursue legal recourse against actions that states or other public service employers undertake. There will always be a give and take in our Federal system between the values and the priorities of different levels of government, but the Department is simply not the appropriate arbiter of what constitutes a substantial illegal purpose. Further, should the Department of Justice take legal action and successfully halt an act of a public service employer, the appropriate remedy is not to remove eligibility for what is, in essence, an employee benefit that is a key tool in supporting the recruitment and retention of public service workers, who are often capable of obtaining higher pay in the private

sector. This proposal is an insult to all our members, including those who work across the criminal justice system and public administration in roles ranging from law enforcement to prosecutors, public defenders, and mental health professionals. They would not take kindly the assertion that they are not serving the public. Even if none of these other issues were in play, the simple fact remains that the Department does not have the authority to issue this rule. Congress created PSLF in 2007, and it was signed into law by a Republican president. Congress envisioned no such restrictions, and under the plain meaning of this law, the Department does not have the authority to issue anything remotely resembling this proposal. The Department itself has said, quote, the PSLF program was created to encourage individuals to enter lower-paying but vitally important public sector jobs such as military service, law enforcement, public education, and public health professions. End quote.

          MS. WEISMAN: You have 30 seconds left.

          MR. CLARK: The proposed changes would have the opposite effect, discouraging a generation of talented and dedicated professionals from pursuing a career in public service. This proposal should be

discarded in its entirety.

MS. WEISMAN: Next, we have Magin Sanchez from UNIDOS US.

MR. SANCHEZ: Good afternoon. My name is Magin Sanchez, and I'm the higher education policy analyst at UNIDOS US. We're the nation's largest Hispanic civil rights and advocacy organization. We were disappointed by the decision to dilute the voices of students of color and underrepresented communities by not including the seat, an individual seat for the civil rights community. The failure to do so indicates a process that, from the onset, willfully fails to capture the voices of all stakeholders impacted by these proposed regulations, undercutting their legitimacy. We also strongly oppose the Department's efforts to engage in viewpoint discrimination by restricting employer eligibility for Public Service Loan Forgiveness, as outlined in the recent executive order. UCEF was created as a vital investment in our country's future, empowering talented graduates to strengthen the very foundation of our democracy through public service. This critical program not only addresses severe staffing shortages in essential sectors like education and public safety, but also ensures access to careers without the threat of crushing debt. And for Latinos, like too many Americans

who are currently unable to meet their basic needs due to the burden of that, when borrowers dedicate themselves to years of public service as teachers, librarians, and firefighters, we have both a moral obligation and an economic incentive to honor that commitment through loan forgiveness. And this ain't it. As currently proposed, these changes represent politically motivated attempts to narrow this eligibility and break the long-standing commitment (inaudible) borrowers that we- who have been faithfully making payments for years. The expectation of eventual loan forgiveness. We reject efforts targeting nonprofits and local governments that serve the local communities. Point out to the clearly established statutory authority of Congress through the Higher Education Act, which provides broad-based eligibility for 501 (c)(3) organizations. Any limits to that broad eligibility must be exceedingly narrow and based in law. The Department's proposal is vague, overbroad, and would threaten the constitutionally protected rights of free speech and assembly. The administration actions only seek to confuse and frighten Americans pursuing careers in public service. It will stop doctors and firefighters from pursuing high-impact service work, out of fear of inadvertently losing PSLF eligibility for helping communities disfavored by this administration. This

completely (inaudible)-

          MS. WEISMAN: You have 30 seconds left.

          MR. SANCHEZ: -(inaudible) the bipartisan PSLF program was created as a tool to incentivize highly-skilled Americans to pursue public service, serving underserved communities, and recognize their decades-long dedication to it. For these reasons, we strongly oppose the (inaudible) proposed changes.

          MS. WEISMAN: Next, we have Satra Taylor from P&J Flo Consulting.

          MS. TAYLOR: Greetings. I am Satra D. Taylor, a current doctor- doctoral student and one of the many nominees who hoped to be part of this rulemaking as a negotiator. However, I was not selected. My experiences as a first-generation college student, a Black woman from a working-class background, and a public servant advocating for accessible and affordable higher education, would have provided critical perspectives that this administration, administration refuses to hear. I am disheartened and frustrated by what I have witnessed over the last two days of this negotiated rulemaking. It has become clear that this administration is intent on reversing the necessary and hard-fought policy developments in higher education, making college once

again exclusive to white, male, and wealthy individuals. These political attacks disguised as rulemaking are inequitable and target communities from historically marginalized backgrounds. To be clear, Congress established a Public Service Loan Forgiveness program in 2007 to offer public service workers student loan debt relief in exchange for a decade of service to their communities. Since its inception, the program has enjoyed strong bipartisan support, strengthening rural, suburban and urban communities alike, feeling critical workforce shortages and education, healthcare, public safety, and national security, and delivering relief for more than 1 million public service workers. The PSLF program has provided a vital incentive for Americans interested in serving our country and local communities, regardless of their political affiliation. The Department's efforts to engage in rulemaking and to change PSLF eligibility are directly related to the goal of Trump's executive order and exceed the administration's authority. The Higher Education Act clearly states that a public service job includes any employment in government or at a 501(c)(3) organization, and I strongly oppose any effort by the administration to limit PSLF eligibility to selectively chosen organizations that they may disagree with. I would like to leave you, ED staff and negotiators, with a few

critical questions to consider as representatives of
various constituents. Why didn't the Department include
anyone who would be most affected by these policy changes
in the negotiating process? Not a single civil rights
advocate, first responder, social worker, student or
teacher. How will history remember this moment when the
chips fall and the American people suffer at the hands of
billionaires and policymakers focused on swelling their
pockets, than ensuring individuals and families can make
a living? These individuals and families are not abstract
data points. They are human beings doing the best they
can with what they have. Take a moment and think about
that. Thank you.

          MS. WEISMAN: Next, we have Javi
Ayala.

          MR. AYALA: Hi. I'm Javi Ayala. I'm
standing here as a private citizen academician. My
comments today respond to a June 26th article from Inside
Higher Ed on a leaked draft proposal, proposal for
changes to Public Service Loan Forgiveness. The
Department appears to be taking the law into its own
hands, proposing to redefine qualified employers, dictate
vague standards for legal activity, and (inaudible)
borrowers' due process. These moves are overreaching,
undemocratic, and deeply troubling. Let's be clear. PSLF

has a contract. Borrowers took jobs and made life
decisions based on the terms and conditions of that
contract. Now the Secretary wants to unilaterally shift
the goalposts. That's not reform. It's unscrupulous
behavior in the face of responsibility. The idea that one
person can redefine eligibility as a broad assumption of
power. And what's worse, these new standards target
individuals based on speech, immigration advocacy, or
political views, none of which align with the intent of
the Higher Education Act of 1965. Personally, I've made
116 payments over more than ten years of public service
and yet I'm still navigating bureaucratic hoops with
MOHELA, waiting for a buyback request to be processed,
hoping that I don't have to spend another four hours
talking to them. It should not be this hard to get a loan
servicer to accept payment on a Federal loan. The system
isn't just broken, it's absurdly cruel. Baffling. The
realities of high-interest student debt and stagnant
salaries are no longer mythology. It's a divisive problem
that has been documented for the last 20 years. The
burden of student loan debt has crushed an entire
generation. Young professionals are delaying starting
families, buying homes, or saving for the future, not
because they're irresponsible, but because they're
trapped in a system that's designed for them to fail. As

an academician, I'm already worried about the future of higher ed enrollment. I'm not for delinquency and payments or outstanding debt accruing interest at breakneck speeds, but we need real solutions and a crisis of conscience to bring all sides of this problem back to the table. Flipping the table is not a good deal or a solution. If you need a good starting point, I would point you to Congressman Joe Courtney's Simplifying and Strengthening PSLF Act, which has already gotten support from nationwide nonprofit organizations such as the American Federation of Teachers and National Association of Social, The National Association of Social Workers. We need changes that have alignment with reality of, you know, being a college student trying to contribute to the economy. We need a path forward that include a legacy clause for those in repayment, appeals process for borrowers impacted by rejected ECS buyback requests, etc., a warning system for borrowers. I know we said we wouldn't do that, but I still think it's a good idea. And I think we should also include- (30 seconds). I think we should also include active duty military, Peace Corps, and Parent PLUS borrowers, all people who can be public servants. And with that, I ask this Department to talk to higher ed institutions about how they price their product. Keep your clients, the students informed and

remember your role in protecting the American dream, not undermining it. Thank you for your time.

MS. WEISMAN: Next, we have Adaku Onyeka-Crawford, representing herself.

MS. ONYEKA-CRAWFORD: Good afternoon. My name is Adaku Onyeka-Crawford, and I am here to comment in opposition to the draft language proposing changes to the Public Service Loan Forgiveness program. This language would constitute illegal viewpoint discrimination and violate the Constitution in several ways. Specifically, it's targeted at organizations that are charitable organizations that provide equal opportunity to historically marginalized communities that this administration has targeted. Specifically, it would defund based on the viewpoints of immigrants deserving to have equal opportunity and go after organizations that advise and advocate for laws that make our country safe and welcoming for immigrant communities. It would also target hospitals that provide life-saving, gender-affirming care for patients of all ages. It would also target organizations that engage in civil disobedience that have been instrumental in, in advancing civil rights laws. And I want to add that all these things, these activities that these, that these proposed changes would target are currently legal. And so this would constitute

illegal viewpoint discrimination based on this current
administration's opposition to those viewpoints. They
also raise other constitutional concerns, specifically
around targeting organizations that advocate or provide
gender-affirming care. I want to highlight that last
week, the Supreme Court decided the decision, Skrmetti,
the Supreme Court decision Skrmetti, which while I
disagree with that decision, did say that states can
decide whether or not gender-affirming care is legal. But
this change to Public Service Loan Forgiveness would
implicate 10th Amendment concerns by taking the place of
decisions that the state has made. I want to add that
these- I want to emphasize that these are activities that
are currently legal under Federal law. It would also
deprive borrowers of due process by not allowing them an
avenue to challenge any determination that the Secretary
has made that an employer is (30 seconds). And as someone
who has qualified and benefited from Public Service Loan
Forgiveness, it is bad policy to create restrictions and
dissuade individuals from pursuing careers in charitable
organizations that benefit the public good, that benefit
historically marginalized communities. And I urge that
the committee take these comments into account.

          MS. WEISMAN: Next, we have Jaylon
Herbin from Center for Responsible Lending.

              MR. HERBIN: Good afternoon. My name
is Jaylon Herbin, Director of Federal Campaigns at the
Center for Responsible Lending, or CRL. We are a
nonpartisan, nonprofit research and policy organization
dedicated to protecting homeownership, advancing economic
justice, and ending abusive financial practices,
particularly for Communities of Color and low-wealth
families. CRL has long-championed their fair lending and
consumer protections in the student loan marketplace. I'm
proud to speak to you today on behalf of the consumer
advocate and civil rights constituencies. Also, a proud
graduate of Winston-Salem State University and a current
MPA student at Wake Forest Law, which is ironic. I just
completed my public law class with an A, and here we are
talking about the same thing we just talked about last
week. So I come here with a clear message. The rulemaking
process has gone off course. Let me begin with this. Many
of us in the room feel the same way, that this session
has been rushed, compressed into just three days. It
failed to center the needs of those that- it failed to
center to the needs of the very people PSLF was created
to serve, the borrowers. I've listened to you all debate
more- more and more on who qualifies or employees that
qualify, then focus on how to improve the programs for
teachers, nurses, social workers, faith leaders, clergy,

and public defenders, people who serve their communities
while drowning in debt. Let's be honest about what
borrowers are really up against. Nearly 8 million
borrowers or excuse me, nearly 8 million Federal Student
Loan borrowers are in default. Another 2 million are in
long-term, long-term forbearance, and many of them are
public servants lost in the system that was built- that
wasn't built to support them. And according to the
Department's own report, over 49,000 PSLF buyback
applications remain pending, while fewer than 1,500 were
processed as of April 2025. These delays compound years
of broken promises, and according to the (inaudible)
study, 63% of borrowers in Income Driven Repayment during
the COVID pause now owe more than they originally owed.
Despite these years of repayment, that is not just
administrative failure, but that is also betrayal. Yet
instead of addressing these real systemic issues, the
proposed rule introduces new barriers, disqualifying
employers based on vague policy- excuse me, vague
politicized definitions of illegal purpose, purpose,
including immigration aid, protest-related activities,
and gender-affirming healthcare. It risks punishing
people not for wrongdoing, but for doing good in ways
that some disagree with. What is this? This is viewpoint
discrimination. Let me be clear. If someone works at a

2025 Negotiated Rulemaking - 7/1/25

food pantry, a community clinic, or a legal aid
organization, that is public service. Unless their work
poses a direct threat to society, like acts of terrorism,
who are we to tell them that they do not deserve relief?
Public service does not have to be political (inaudible)-

        MS. WEISMAN: You have 30 seconds
left.

        MR. HERBIN: -it must be purposeful
and legal. This rule will not- this rule will narrow
Public Service Loan Forgiveness to the point where
becoming ideological. It sends a dangerous message.
Unless you serve- unless your service aligns with our
beliefs, your forgiveness doesn't count. If you truly
want to strengthen PSLF, let's adopt a clear, nonpartisan
definition of qualifying public service, free from
political or ideological tests. The IRS should continue
to determine which organizations are legitimate
nonprofits. Issues involving political illegal
violations, including criminal activity or terrorism,
should remain under the jurisdiction of the Department of
Justice or DOD-

        MS. WEISMAN: Your time is up.

        MR. HERBIN: -(inaudible) the promise
of PSLF, the Department must move forward to automatic
payments, tracking, and employer verification, using

existing government data to spare problems with
paperwork.

                    MS. WEISMAN: Your time is up.

                    MR. HERBIN: Thank you.

                    MS. WEISMAN: Next, we have Ray Li
from Legal Defense Fund.

                    MR. LI: On behalf of the NAACP Legal
Defense and Educational Fund, my name is Ray Li, and I am
commenting to share strong concerns about the proposed
changes to the regulations governing PSLF. Founded in
1940 by Thurgood Marshall, LDEF is the nation's premier
racial justice organization. Nonprofit organizations play
a critical role in our democracy, whether by protecting
constitutional rights or providing direct legal services
to those who cannot afford a lawyer. Organizations like
LDEF expand access to justice for all. As Congress
recognized in the creation of PSLF, these nonprofit
organizations are undoubtedly in the service of the
public. But this proposed rule by ED attempts to subvert
Congress's will and intent by establishing new
restrictions on eligibility. ED has tried to misrepresent
these restrictions as ways to keep taxpayer funds from
going to organizations that violate the law. But in
reality, the proposed language is another way for the
administration to punish those who do not fall in line

with its political agenda or those that protest its
policies. At the heart of the proposed regulations are
clear and troubling missives to discriminate based on
viewpoint. In particular, the substantial legal purpose
definitions sweep so broadly, it is no doubt that they-
that invite unconstitutional abuse by the Department. For
example, proposed subpart 30 romanette four would kick
organizations that engage in a pattern of aiding and
abetting illegal discrimination out of PSLF. This
language is novel, imprecise, and impossible to
administer. Nonprofit organizations like LDEF commit to
ensuring that Federal Civil Rights Laws are enforced
justly, but reliance on the Department to determine what
constitutes illegal discrimination would be ill-advised,
given Ed's recent actions. This administration's OCR
promulgated several guidance documents advancing warped
and demonstrably incorrect interpretations of Title VI.
LDEF and partners promptly sued, and Federal judges
across the country summarily enjoined these documents as
likely unconstitutional. If Ed intends to rely on court
determinations of illegal discrimination, the proposed
language still sweeps too broadly. The inclusion of the
aiding and abetting standard is nonsensical. Not only is
the definition of aiding and abetting a criminal law
standard overlaid on a civil law determination of

discrimination, but one would be strained to think of any other instance in which the consequences of the violation of civil rights laws flow to actors not found to be discriminatory themselves. ED should similarly strike subpart romanette five, which-

MS. WEISMAN: You have 30 seconds left.

MR. LI: -which seeks to punish those that engage in a pattern of violating State Tort Laws, including laws against trespassing. This language nakedly attempts to punish peaceful protesters. LDEF's founder, Thurgood Marshall, famously represented individuals accused of trespassing in Boynton v Virginia and Bell v Maryland. In those cases, Black students dared to violate State Tort Laws by sitting in whites-only sections of restaurants. If ED refuses to remove this language from the proposed regulation, it will be clear what side of history it chooses to fall on.

MS. WEISMAN: And our last public commenter of today is Chavis Jones, representing himself.

MR. JONES: Hello everyone! My name is Chavis Jones. I work at the Lawyers Committee for Civil Rights Under Law. I begin with a quote. Cowardice asked the question, is it safe? Expediency asked the question, is it politic? Vanity asked the question, is it popular?

But conscience? Conscience asks the question, is it
right? And there comes a time in one's life where they
must do what is neither safe nor politic, nor popular,
but they must take a stance because it is right. Martin
Luther King Jr. Yesterday, my colleague Jaylon and I were
denied a seat at the negotiation table after being duly
nominated by the civil rights community. And although we
were disappointed, we recognized that we stand in good
company, for MLK himself likely would not have been
seated for his work with the Southern Christian
Leadership Conference, as he worked throughout America to
ensure the rights and freedoms of democracy for all. Nor
would he have received Public Service Loan Forgiveness
for all of his public service, despite his education at
Morehouse, Crosier, and Boston University. He engaged in
substantially illegal conduct. He engaged in protest. He
was arrested numerous, numerous times, and he was often
deemed a public nuisance by the powers of his day. Before
him were Dorothy Day and Susan B. Anthony, and a host of
women's suffragists who fought for the rights of women to
work and to exist in public and to engage meaningfully in
our society. They would not have been seated, nor would
they receive Public Service Loan Forgiveness for their
work. Before them were Frederick Douglass and William
Lloyd Garrison, Harriet Tubman, and so many of the

abolitionists who engaged in the act of aiding and
abetting fugitives who were then known as slaves. These
forced immigrants to our country, they would not have
been seated, nor would they receive Public Service Loan
Forgiveness for all of their work to make America better.
Before them, the founders, the founders of this nation,
engaged in civil disobedience. They engaged in dissent
against the powers that be. They engaged in the right for
all of us posterity, to have the right to disagree with
the powers that be, to resist tyranny, fascism, a
kingdom, a patriarchy. They fought for the right for us
to disagree. They wouldn't be seated, nor would they
receive PSLF. This country, at its best, is diametrically
opposed to the type of viewpoint discrimination that is
happening through book bans, bans on history of Black
people and LGBTQIA folks, bans on the right to dissent,
and the type of rule being proposed here. (30 seconds)
(inaudible) dissent and made better by generations of
protests. And our best, we are a bastion of difference,
tolerance, and civil disobedience. At our worst, we
succumb to the worst behaviors of every fascist regime,
like Nazi Germany and apartheid South Africa. As we
finish up, know that we are not the only ones watching.
The live stream is not the only thing watching, but
history is watching. Your children, your grandchildren,

and generations yet unborn will ask the question of what their ancestors did in this strange moment. How will you respond? Thank you.

MS. WEISMAN: Thank you very much to all of the public commenters. We really appreciate you coming, spending some time with us today, and sharing your views. I'd like to thank the committee as well. It's been a very busy day as, as yesterday was. We covered a lot of ground, and I know that we didn't get to do the pulse checks that we had hoped to get to, but I think that we had very meaningful discussion, and we will have those tomorrow. I think it's been very helpful that you've submitted so many proposals to give the Department something to look at, to respond to. That has been invaluable. So again, I want to thank you. You've all been very busy doing your homework, and it's clear to me that you have a little bit more that you're planning to do tonight. I will forward anything. I know that I have a few in my box now that I will forward before I leave. I will forward anything that I receive tonight. I will check again in the morning before I leave to come here. But I just- again, I, I thank you very, very much for all of your hard work. I want to remind you that you can leave your table tents. Please do take any trash with you. And if there are any questions before we break, I'd

be happy to take them. I'm getting thumbs up. Tamy, do
you have anything to add?

MS. ABERNATHY: I do. First of all,
Annmarie, thank you for keeping us straight, on track. It
is a tough job to herd all of us, isn't it? But you've
done it well. Thank you so much for all that you're doing
for us here today.

MS. WEISMAN: Thank you all. You all
make it much easier than it would have been, trust me.
You've been a great committee.

MS. ABERNATHY: And to our
negotiators, I cannot say that I look forward to any of
you putting on your chaos pajamas this evening, because
we have to come back tomorrow morning. But I promise you,
it has been an entertaining and a very good day to hear
not only from you, but also our public. Thank you for
showing up and sharing your comments with us today. Have
a wonderful evening. I look forward to day three
tomorrow.

MS. WEISMAN: Just a reminder, we will
begin tomorrow at 9:00 a.m. The room will open at 8:00,
if you would like to come in early. Thank you again. Have
a great night.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING

SESSION 1, DAY 3, MORNING

July 2, 2025

On the 2nd day of July 2025, the following meeting was held in-person, from 9:00 a.m. to 12:00 p.m.

P R O C E E D I N G S

MS. WEISMAN: Good morning, everyone.
Welcome back to day three. Today is our final day
together, with our goal to finish our discussion, take a
series of pulse checks, revisit any unresolved points,
raise any issues of concern, and conduct consensus checks
on proposals. As a reminder, there is no public comment
this afternoon. The point of the public comment is to
inform the committee, and at that point, the committee's
work will have been concluded. So we'll use the full time
for deliberation and documenting our outcomes. Do we have
any questions before we get started? Tamy, I believe you
had said that you had someone who wanted to do a data
presentation. Is that first thing or- ?

MS. ABERNATHY: The way that we plan
to do that is, as we're going through the proposal-
(inaudible)- as we're going through the proposals, I'll
ask Eric from our operations team to come up and address
the rationale for why or why not for the proposals that
we've received, and provide additional information on
what we currently do and what the system is able to, you
know, to handle so that there's a little bit more content
about the what and, and what we're doing and what we're
not going to do, so we'll do it as part of that.

MS. WEISMAN: Okay. Thank you. Yes,

ma'am. So I have a new document that I just received from
the Department that I will be circulating to you in just
about a minute. And I do see that Mary Lyn has her card
up, so we will dive right in.

MS. HAMMER: I wanted to make sure
that was (inaudible). Good morning, everybody. First, I
would like to thank the Department for all of the work
that you've done and the language that you came out with
and what we received last night, and we really appreciate
that. I would like to ask for a ten-minute caucus of the
non-federal negotiators just to discuss the negotiated
rulemaking consensus and a little bit about that process
so that we all get in the right mindset to get consensus
today.

MS. ABERNATHY: Annmarie?

MS. WEISMAN: So you want the non-
federal negotiators for a caucus. For what duration?

MS. HAMMER: Ten minutes.

MS. WEISMAN: Ten minutes. Okay, so
what we will do then- Tamy?

MS. ABERNATHY: We would like, if
possible, negotiators, if you would allow us to go
through the proposed- the proposals and where we landed
with those with some of the amendatory text. If we could
do that first, Mary Lyn, I think that would help frame

some of your conversations as well, because we've actually made changes from last night that we want to point out. We're not going to go through the whole red text, but there's certain things that we would like to point out and have Eric give a- give his- give the information to you guys before you caucus, if that is okay. Would that be all right, Committee? Thank you.

      MS. WEISMAN: Okay then, Tamy, you can take it away.

      MS. ABERNATHY: Good morning, everyone. Forgive me. We- I'm trying to get all of my pages in the right order. While we go through this and find all of the proposals that are somewhere in my stack of information. So I would like to open today up with saying that we are very happy to present the red text to you that we just circulated. It is a compilation of our initial proposed language, with all of the many changes that we've made based on our discussions, based on your proposals, based on your recommendations, where we could make the changes. We feel like what we are providing you is the very best that we can provide you. We have looked and massaged and gone back, discussed with our leadership, and we are proud to present what we have to share with you. I guess in the- if you don't have it yet, you will have it in just a few minutes. In doing so, one

of- we're going to go back to some of these proposals. Rebecca, you had submitted proposals to us and one of them we said we were still considering it. And what we want to do is let Eric come up, and Eric is going to talk about two different things. One is about Thomas's proposal, about the section E, and we're going to try to do that through a preamble. But we want Eric to explain to you what those notifications look like, how that- you know, all of that process. And then we are still looking at the lovely qualifying employer and that employer identification number issue. And so I would point our attention to Eric, who's at the podium, because he's going to share both of the- so we have adjusted the language on qualifying employer. We've adjusted it and it's on 27. And so what we've done is how we've taken what you've wanted and what you've needed in a very important aspect of this whole package. And looking at employers overall, and this is the language that we've come up with. And so Eric, if you would discuss either E first or the other one first, whichever one. Thank you, Eric.

ERIC: Can you hear me now? Okay. Thank you. First time at the mic that wasn't the pass-around mic. So in all likelihood, and I've asked Tamy and company if I start veering into the policy side just to

kind of correct me. Some of this is difficult to discuss
without- from a purely operational perspective,
especially once we get to the EIN discussion, this piece
is a little more straightforward. In all likelihood, the
way that we would solution this through the system, and
this actually complements the way the system currently
works, once a- an employer is notified that they are
potentially ineligible, we will immediately place- for
now, I'm just going to call it a conditional status
within the employer database. And what that means is when
the borrower pulls up that employer to submit their form,
it will, it will tell the borrower, hey, this employer is
in conversations with this employer or whatever the
appropriate language is. And then that would- however, it
would not stop the certification from going through. We
would still- the borrower could still certify. It would
just be some warning language. Hey, we're, we're in
conversations with this employer. They might be
ineligible in the future. We'll let you know. The same
will happen on- and that would be immediate upon
decision. The second piece on determining that an
employer is no longer a qualifying employer- and this
kind of goes along, along the lines with some of the
other conversations we've had. Once that determination is
made, right now the potential solution would be that we

email every borrower that has certified with that EIN. It
may or may not be a shared EIN. However, as part of this
process where we're working with the service- or I'm
sorry, with the employer to determine their eligibility,
we are going to ask the employer to identify if it's a
shared EIN. So then in the employer database, and this
will take us to the EIN conversation in a minute, but we
will be able to (inaudible) the employer database to
break those, those subcomponents of the EIN out. It's
already broken out if you're- for instance, if you pulled
up the Department today, you'd see about 40 employers
because we share an EIN with a number of other agencies.
But it will- it would be a blast either to everybody
associated with that EIN or if we make a determination
that only one subcomponent, if we can identify those
borrowers in the past, that's not necessarily possible,
since we would not have all of the same breakouts of
subcomponents in the past, we would, we will send out the
appropriate email notification letting them know that
it's been immediately suspended. Let me just get the last
one, and I'll jump over to you. The same with the
corrective action plan. As soon as that determination is
made, we would update the employer database. The- that
conditional status would go away if they had already been
conditional. If they were ineligible and then regain

eligibility, that will be date-driven based upon the date
that the Secretary determines that the employer is now an
eligible employer. That Secretary's date gives us some
flexibility where if we need to- for instance, in, in
number ten, if we need to push that eligibility out for a
month, because let's say, let's say, for instance, that
the employee- we reach out to the employer- so they hit
number nine where they're conditional and then we reach
out to the employer and they say, nope, we're not
interested, we don't need to have discussions. That would
move us to number ten now where we would put, put the
denial within the employer database. If we so choose,
right, and this is where I think we have a much- an
elegant solution here with the Secretary's determination
date, we could say, okay, this is going to be 30 days in
the future so that we give that an additional 30 days of
the conditional display, if that's what's appropriate. So
sorry, Laurel. What can I answer for you? Oh, Annmarie,
sorry.

          MS. ABERNATHY: I just want to make
sure that everyone understands this is not a new status.

          ERIC: Ineligible status is not new.
And we already have-

          MS. ABERNATHY: Right.

          ERIC: The employer database already

has a concept where an employer is only eligible for a certain amount of time. They could lose eligibility and then regain eligibility.

MALE SPEAKER: I also just want to clarify really quick that being conditional wouldn't limit employees from PSLF credit.

ERIC: Right.

MS. TAYLOR: Thank you, Eric. Question for you. First, I want to start with gratitude. Tamy, thank you, and Eric, for starting with when the rubber hits the road pragmatically how this would be experienced by borrowers, really focusing on simplification of execution and supporting the borrower. This is a fantastic conversation. Thank you. A question for you because there's so much weight placed on this from a caucus perspective yesterday of trying to solve the problem that I think you just articulated from a current system perspective could be supported. So if we have a number of employers that share the same EIN as you shared within the selection that the, the eligible employee would be pulling from so today, I think what I just wanted to clarify today there is the ability to segment within an EIN shared by multiple employers, the specific entity qualifying entity that, that employee is working for, whether they're in active status or whether that

status is conditional or actually been revoked at any
period of time. Appreciating some of this doesn't- like
depending on may not (inaudible) existing status in the
system, potentially. But the core question is, from
segmentation, it sounds like the system today does have
the ability to identify sub-employers to a parent.

ERIC: It does. So for instance, if
you pull up Department, you'll see 40 other agencies in a
random- and some of them are even in the legislative
branch because we share an EIN, our payroll processor
processes for all those agencies. Today, when an employer
certifies within- I'm sorry, when, when the employer-
when the borrower comes in, we don't necessarily track
which sub-EIN- subcomponent of the EIN that the, that the
borrower certifying under outside of the display name.
And that's where it gets really interesting, where in the
past the initial population and the employer database was
based on what a borrower would write on a form, and then
we would approve and that would create- then that- the
employer as listed on the form gets into the database.
Now we've gone through and cleaned up a fair amount where
like you might see FSA associated with one EIN versus
we're actually the Department, FSA, and the Department
are the same, same organization. So we've gone through to
try to clean those up as much as possible. But right now-

and that's why I'm saying in the past, it might not- we
might not be able to identify, especially the distant
past, which subcomponent of the EIN the borrower was
certified under.

    MS. WEISMAN: We have a number of
questions.

    MR. ANDRADE: Sorry. When we get to
the next part of this, which is on page nine, I think
that will become clearer how the- how that's going to
work, what we're, what we're talking about. Do you want
to, do you want to flip to that or, or do you want to
stay on this?

    ERIC: I can go either. Whatever the-
whatever is preferred. All right. Great. Thank you. I
think it's a little further down. Oh, no. Sorry.

    MS. ABERNATHY: Number two, right?

    ERIC: Yep, thank you. So not, not,
notwithstanding subsection I1, the Secretary may in the
event an employer is operating under a shared
identification number or other unique identifier,
consider the organization to be separate for the purposes
of determining whether an employer is eligible. So to
that point, we, we wanted to also list just both the, the
employer identification number as well as the other
unique identifier, knowing that eventually we might have

to start breaking, breaking these employers out into
their subcomponents. And we didn't want to be restricted
to only doing that on the EIN. And so basically we're
kind of future proofing as well that if we need to, to
utilize a separate identifier, although we're still going
to need the EIN because the, the borrower needs to match
up there, their W-2 with, with, with the listing and the
employer database, but we would create a process within
that corrective action plan where we would be notified
and could then split those employers out officially. The,
the other consideration, and this kind of bleeds in as
well, is, for instance, you know, we might have put in
both the Department and FSA might be listed within the
employer database, and that's where the decision is made.
Are those the same organizations or not? And this piece
will allow us to determine- based working with the
employer, which components are specific to that employer
that we're either excluding or including as eligible.
Does that help?

            MS. ABERNATHY: Are there any
additional questions for Eric?

            MS. WEISMAN: Emeka?

            MR. OGUH: Eric, thank you for that
explanation. I always love talking about the nuts and
bolts in operations, and it was helpful for us to see,

you know, how the Department is thinking about
implementation. I know Scott brought up some comments
yesterday about wanting this to be efficient, and you
know you know, expensive for the taxpayer. My question
specifically for those employers that today don't have
these sub-EINs broken out, at what point during that
process will, will those be introduced? Will it be during
the review process where they will be able to break out
that separate EIN? I'm just trying to understand at what
point, because if the Secretary goes in and it doesn't
exist at that point, I'm assuming then she'll just treat
it as one. So any-

       ERIC: Right. So within- when- within
that correction- corrective action plan process where
we're working with the employer, that's where we would,
we would reach out to the- that specific employer and ask
them if they are a shared EIN, we- and we have a number
of ways that we could potentially do that, whether it's
listing everybody that we have already in the database in
a letter and saying, hey, check a box. But we have, we
have flexibility there to address that.

       MS. ABERNATHY: And so we're not going
to prescribe, we're not going to prescribe that in the
regs, though, because we don't want to lock us into, you
know, like Eric said, we want to future-proof. So you're

not going to see everything in the regs. But we have the
ability and the infrastructure to do what you guys
brought to, to the table. And so this is why we wanted
Eric to, to share that some of this is already existing.
And now we will be able to use this with the process,
with the regulations that we're, you know, promulgating
through this process.

MS. WEISMAN: Next question is from
Mary Lyn, and then we have Scott.

MS. HAMMER: Thank you. Sorry, I can't
look at you.

ERIC: That's okay.

MS. HAMMER: So when they go into the
tool and they put in the OP- or sorry, I keep saying OP-
the EIN, will that direct them to the subset in the
future?

ERIC: Potentially, yeah. We're still
going to have to list out all of the organizations. And
you know, you would see- terrible example, but FSA is not
valid. Department is valid. The borrower still has to
select the appropriate employer. And then upon
certification like let's just say the borrower sent it to
an employer that they're not truly employed at, then it
would be up to the employer to not certify because the
borrower doesn't work for that organization.

MS. HAMMER: Thank you.

ERIC: Yep.

MS. WEISMAN: Scott?

MR. BUCHANAN: Yeah. Thank you. I appreciate this and I appreciate the Department sort of considering especially- some of the notification processes here. You know, we submitted some comments about this, and I appreciate sort of the inclusion of making sure that in the database that most of us rely upon the PSLF help tool, the- that these statuses would be updated. I think that's a great addition. And also, though I do want to ask about- you know, part of my recommendation was also striking in the application process, so E11, just because, and I expressed this in my communication to the, to the rulemaking committee, but I do worry about sort of these bespoke communications. And I just wanted, you know, some thoughts from the Department. I realize this may be creating some belts and suspenders, which is probably always a good thing, additional notifications, but any of your thoughts about sort of the operational nature of how that would work? I just- one of the concerns I did have is we're going to have people who've applied or have gone through the certification process, and we can capture those, right? So the Department has that contact information. But then

ED_02354

there are others who mainly just look up the employer
eligibility, and we won't know them, right? So that's
something that's going to be an area, and I want to make
sure that when we're communicating with borrowers, we're
clear about where to go to find this out and not to rely
upon notification, because the proactive notification may
not capture everyone who's interested in this world. So I
just wonder if you could offer some thoughts about how
that would, how that would happen. And I worry about
relying upon saying, oh, if something changes, you're
going to get notified, when not everyone may be notified
because we can't capture them. Anyway, just interested in
your thoughts on that.

        MS. ABERNATHY: Eric, may I take that?

        ERIC: Please.

        MS. ABERNATHY: You indicated a
proposal-

        FEMALE SPEAKER: Yes, I was going to-

        MS. ABERNATHY: Oh, you guys are good.
My goodness, mind meld here, or did you have something to
do with that? We received a proposal last evening from
Scott that- exactly what he just mentioned, striking
number 11 on- I'm sorry, I don't have everything in front
of me, so what would it be, I? E, yes, E11, and adding K,
borrower notification of regained eligibility. We took

most of Scott's recommendation. We did not say once an organization, we said if an employee regains eligibility under paragraph J of this section, the Secretary shall update within 30 days of the qualifying- 30 days, the Qualifying Employer List, which is accessible to borrowers for the purposes of certification or application. So there's your 30 days that this- the, the database will be updated. So that will allow exactly- I think that will alleviate the concerns, Scott, that you presented to us about relying on a notification and still pointing our borrowers where they need to be to that PSLF help tool. That is their best source of information. That is the best way for them to submit their certification and their- you know, if it's an initial or whether it's a recertification, all of the current information and the processes and the belts and suspenders that we have will be there through that process. So we again, are notifying, we're not changing, the fact that, you know, there is notification there, but we're also saying within 30 days, the very tool that assists our borrowers with this process will indeed be updated to reflect.

ERIC: Yeah, and can I- ? And to your point, Scott, the- it would be both the, the searchable database that you don't log in under as well as within the login where the borrower is looking up their specific

circumstance. Also, to note, right, we will potentially have split eligibility as Mary Lyn was flagging yesterday where the borrower's certifying for a period of time at which they were eligible, that it was an eligible employer in the past, and the system already handles that today. We direct- we tell the borrower, hey, this is a split employment situation. Here's what that means. Here are the dates that are applicable to each employer or to the employer where they were eligible versus ineligible. And we would treat these ineligible organizations that are ineligible due to this reason, the same way where we would have a separate ineligible status. So we can say, hey, this is not something you can open a case on, because this is an organization that we have deemed ineligible due to what we're negotiating this week.

          MS. WEISMAN: Scott, your card is still up. Does that finish your concern? And then, Tamy, the same with you.

          MS. ABERNATHY: Actually, I need to follow up, okay? Please forgive our oversight. When we discussed this this morning, we did not- we have since changed it, but on the email that was sent to you, number 11 under E will- was not deleted. Was not marked for deletion. We are proposing to remove that and add K. And so we did not adequately present that in the materials

that you have. But what we have on the screen is what we
are expecting you guys to look at. So the one change that
we failed to do is to make sure to draw attention to 11
that has been since deleted, because we've replaced it
with K with a new subsection. Okay.

ERIC: Thank you for that.

MS. WEISMAN: So we have a question
next from Rebecca, and then to Mary Lyn.

MS. STANLEY: I have two questions,
and you probably will be able to answer it. So right now,
if I put in an employee for the state of South Carolina,
multiple South Carolina agencies come up. But it just
says state of South Carolina, usually. State of South
Carolina, no address on file. State of South Carolina,
state of South Carolina. Sometimes it'll have SCDNR or
something like that. If by chance they can- if there
would be an option where they could click on one- when
you do, and it says no address on file, you go to that
next field and you fill in the employer's address. Is
that somewhere that they could then specify what
department they're in? If that could be something that's
already existing, it might be a helpful way to
differentiate what department you're in.

ERIC: I guess my, my follow-up
question is, do you mean just overall for any employer or

employers that we- ?

        MS. STANLEY: For the employers that we're discussing with a shared EIN in that situation. Because my fear is like what you're saying, they're going to be put out there to- for you all to sort through and find out which ones are with the wrong organization. But if they didn't know and they just put State of South Carolina, then that's going to be very hard for y'all to differentiate, you know? So maybe if that next field where the address goes in, I don't know if that's somewhere that they could differentiate what department underneath, if it says this is a shared EIN.

        ERIC: From, from a technical perspective, generally keying off address is not a great approach because you know, you might- borrower might type in Ninth Street, S-T-R-E-E_T, or Nine S-T. Although, you know, we- I know we have better technical tools than we did probably when I was still working in DB2. I- we could take a look. That's something we could take a look at.

        MS. STANLEY: Yeah, I definitely don't think it should be differentiated by address.

        ERIC: Yeah, we'll- we're going to- definitely once we have final rules, we'll, we'll take a look at what exactly makes sense.

        MS. STANLEY: I just worry a little

bit about them getting still bogged into that unqualified
employer and then having to do what you guys are trying
to prevent them from doing is asking for a
reconsideration or, you know, creating a backlog.

ERIC: Yeah. I mean, certainly if they
choose and one of the employers that's not qualified,
they could recertify with a qualifying employer instead
of doing it.

MS. ABERNATHY: I would say that would
be a correction and not a reconsideration. Yes. So I
mean, if they've submitted it under the wrong EIN-

MS. STANLEY: No, no, no.

MS. ABERNATHY: Or the wrong- well, if
they've submitted it. And that is, in my opinion, that is
more of a correction than it would be requesting us a
reconsideration for a qualifying employer, which we are
not planning on doing. So they would submit.

MS. STANLEY: Yeah, I don't think I'm
express- saying it clearly then, because the way it's set
up now, if that was a shared EIN and one of the persons
with that EIN are ineligible, then when I put it in there
under that shared EIN, it's just going to go to your
bucket of ineligible. How are you going to sort out and
know that, that is somebody that's in an eligible
department under that shared EIN?

ERIC: I am sorry, I- maybe I glanced over this too quickly. Within that process where we're working with the, with the employer on the corrective action plan, that's where we would be working with that specific employer if they are a shared EIN, so that we could break that employer out appropriately. Yeah.

MS. WEISMAN: We have Mary Lyn, and then Laurel.

MS. HAMMER: Thank you. I wanted to thank Scott for, for providing that language. I think it's important to have timely updates to the data. And I just want to say that I think that if borrowers are getting individual notifications of ineligibility, that it's equally important that we have a follow-up individual notification that it's been resolved because they may miss that and leave the employer based on the- that they still think there's a problem. And so I just wanted to say, I think it's equally important for the borrowers to have that follow-up, specifically.

MS. ABERNATHY: We would look at that sub-regulatory. We would not put that in the regulations. And so we will take that back and see what we can do to mitigate that. That's not something that we're going to put into the regulations.

MS. WEISMAN: Laurel?

MS. TAYLOR: So in the last, just from
yesterday and today, we have received an outpouring of
constituencies on the employer and on the employee side
of public interest. And so I want to be really explicit
about a throughline that we're having in the discussion
here, which is, I think, obvious. But for those who are
participating remotely, this may sound fairly technical,
like we're very much in the technical detail of solving
problems, operationalizing, solutioning, as we're also
talking about commas and periods and language, that this
is really in service of improving the borrower experience
and borrower outcome. So we have part of the, the
feedback that we've been given is- that I would like to
address, is that it's sounding a little tone deaf the way
that we're having the discussion, because it is more
technical in orientation as we're here to solve problems
together. And again, just making that explicit
throughline that we are acknowledging, I believe
acknowledging, the complexity of the systems and the
deployment and the ease in which we can execute to reach
these borrowers at a current 31% default rate. This is
where part of this feedback is coming in, that it's so
difficult today to understand what's happening. And part
of that has been because of the nine-time boy who cried
wolf. Right? Not having to enter into repayment for nine

2025 Negotiated Rulemaking - 7/2/25

periods and the 90-day sequence. And then also the
volatility of Income Driven Repayment plans that have
been taken on and off the shelf, and then waivers and
different statuses and treatments. So I want to be of
service to the constituencies that we're representing an
employer and employee, to explicitly acknowledge that
this is- the work of solutioning now, is to address that
complexity and confusion, and attempt to simplify the
process. I just want to make sure that, that does not get
lost in the work that we're doing here at the table, for
those who are remote or listening in to the discussion.
So, thank you for the opportunity to address that.

              MS. WEISMAN: Alyssa?

              MS. DOBSON: I just want to say I
appreciate this, this solution. I think it could
potentially work well for borrowers who have maybe
already submitted some, some years of service. My concern
still lies with those individuals who- I imagine these
events are going to be a little bit louder than, than
Public Service Loan Forgiveness initially. And so I
expect some borrowers to want to certify their years of
service when they were eligible, and they haven't yet.
And it's my understanding that this won't help them
because they won't be able to submit the form because now
they're in an ineligible status, that a paper form would

be their only recourse. It would- I would like to suggest perhaps a specific paper form for that purpose for, for prior years of eligible service.

                MS. ABERNATHY: Eric has his hand up. We'll let him address that.

                ERIC: Mike, can you pull up the first screenshot I provided to you? I'm going to show you how- what it looks like today. If a- when an employer has split eligibility, we do not prevent the certification from going through, we, we just will only- we will only request certification for the dates in which it was ineligible employer. So here- you can go ahead and just scroll down a little bit, Mike and then we're- we can see- first we're going to display the employer as split. So we- that we know that this particular employer has been- has some, some dates that are eligible, some dates that aren't eligible. Mike, if you could pull up the second from that same email. So then we display why is the employer split. And then a little further down, we- that's where we actually display the dates. And then we'll allow the borrower to proceed with the certification. In this situation, only for the second row. The first row, this is because- this is today, not how ineligible employers will work in the future. The second row then would potentially open up a case, if

appropriate, to determine if the employer dates are incorrect. But the- we don't prevent that certification from going through.

MS. ABERNATHY: Thank you. Eric.

MS. WEISMAN: Betsy?

MS. MAYOTTE: Quick PSA. I'm getting a bunch of messages from people saying they never got a link to today's recording. I mean, today's live feed. Some of them have figured out that yesterday's link works, but you may want to send the email out because apparently it didn't go out.

MS. ABERNATHY: Val, did you hear that? Margo heard it. We're good. Thank you.

MS. WEISMAN: Next, we have Laurel.

MS. TAYLOR: Thank you so much. I wanted to make a quick comment in response to the type of form that submitted a paper form or otherwise. As the Department continues to solve through systems technology, as a technology operator, I think it is absolutely essential that borrowers have access to the most modern systems available. The rest of the financial services industry is applying AI to automate and personalize to radically improve borrower outcomes, and particularly at the employer from a public private partnership perspective, there are providers like Candidly, that are

working with that employer to operationalize down to the
employer and employee level, which is part of that 67%
that we're recognizing that have not yet discovered the
ability to get into the program. So I think it is very
important that there is the opportunity for the private
sector with zero taxpayer dollars to help reach and serve
borrowers, and that we avoid trying to impose a specific
form, paper form. Really, it's the outcome that we are
optimizing for, which is to help the borrower get into
these programs and to help the employer continue to
retain their employees in public service as a result of
the ability to return those outcomes. Thank you.

         MS. WEISMAN: Tamy?

         MS. ABERNATHY: Thank you for the
continued suggestions about improvements and solution
managing and things like that. We're going to circle back
to this particular negotiations and focus more on some of
the additional things that we need to get through on the
red text today. Are there any other questions about the
process or what we plan to do for the shared
identification number for Eric, before we excuse him from
the hot seat? Thank you, Eric, we appreciate you coming
up and mitigating. It was excellent. See how great we
work together as a team? So, Annmarie, I can go on with
the proposals, if that's okay. So, Bob had submitted a

proposal. And in doing such, we've rejected the proposal that Bob submitted. But I do want to point your attention to the language in the standard on H, if my colleagues would share the screen, please. Because our color printer didn't work, I want to make sure that I get the exact what- we've changed from the first time we presented this to what we- what we're changing now. So the change from yesterday is that we have removed a preponderance of the evidence to a clear and convincing- to clear and convincing evidence. So we increased the burden of proof in H from that preponderance of evidence to clear and convincing. And that means the evidence is highly and substantially more likely to be true and untrue. This is substantially greater than a preponderance of evidence standard, which simply means that evidence is more likely to be true than not. I think I said and untrue, but- this burden of proof precedent in the Department as it is currently used- this is a burden of proof precedent that we currently use in our civil rights office already, so that it's not unrealistic that we would apply that particular standard here of evidence clear and convincing. So the change that we made in reference to Bob's proposal, rejecting his proposal but upping the clear and convincing burden of proof evidence here.

                    MS. WEISMAN: We have a question from

Kaity.

        MS. MCNEILL: Just had a quick question about the use of clear and convincing evidence versus at the bottom of the paragraph where it says conclusive evidence. Is that sort of saying the same thing, or do we need to say clear and convincing and- in both (inaudible)?

        MS. ABERNATHY: No. Those are two separate things. The conclusive evidence, if you will see enumerated by the romanettes one, two, and three, those are three things that are conclusive evidence that the employer engaged in a substantial illegal activity, whereas the Secretary determines in clear and convincing evidence after notice of comment, it's kind of- and of course, we also went on to say in activities that have a substantial illegal purpose, the materiality of the illegal activities or actions, and Jacob is going to rescue me with his lawyer-ease here. And I appreciate that. Yes, it is two different things, but he's going to explain it a lot better than I could.

        MS. MCNEILL: Thank you.

        MS. ABERNATHY: Thank God.

        MR. LALLO: So yeah, the difference here is effectively this is a standard with two standards, I guess you could phrase it as. The conclusive

evidence effectively functions. That is a rebuttable
presumption. If there is one of those enumerated things
that basically gives us, in absence of proof that there's
not something mitigating a judgment, a plea of guilt or
an admission and a settlement that an organization or
entity is engaged in an activity with a substantial legal
purpose, that on its own would be enough evidence to
surpass the clear and convincing bar. But if enough
evidence can be produced, you know, in the alternative to
show that something hadn't happened, that presumption can
be rebutted by the organization. The clear and convincing
evidence basically just increases the standard. We heard,
you know, many comments that were concerned that
basically we could be pulling in evidence that could just
push it over a preponderance standard. The idea with
clear and convincing is that we were raising that to a
much higher level. I know that, like in some ways, you
know, just looking at that, the change from preponderance
to clear and convincing might not seem a particularly
substantive change, but it has great legal meaning. You
know, we usually describe it as, in shorthand, as, you
know, 51% guilt or liability is a preponderance standard.
Clear and convincing is more like 75 or 80. It's just shy
of effectively a criminal standard, which is 95%. It's
the same standard that's used for things like wills and

probate and conservatorships. It's used for things that are much more serious than just a civil matter. And while we think preponderance still works technically because this does fall within our civil administrative world, and we do use it in other things, we recognize the concerns here and, you know, want to be responsive to that. And we think that we can still accomplish our goals of, you know, administering this effectively within the clear and convincing standard and then with the rebuttable presumption. So we only now have that one standard. And I think that we should be really clear about how that works. And it's effectively clear and convincing. There's a rebuttable presumption that if there's conclusive evidence that in absence of anything else, those three things would demonstrate that there's a substantial legal purpose. But if an organization can provide mitigating evidence, it could push it below that bar, and then the organization would still be qualified.

MS. ABERNATHY: The only thing I would add, Kaity, is that this was a second proposal by Helen, Alyssa, Mary Lyn, April, and Sarah. And so what we've done is we've obviously changed to clear and convincing. So I just wanted to address the proposal that you submitted. Thank you.

MS. WEISMAN: Any further discussion?

I see no cards. Abby?

MS. SHAFROTH: Thank you. I just wanted to, to note that while clear and convincing standard is preferable to a preponderance of the evidence standard, it still doesn't address the concern that, that Bob raised and his proposal circulated last night that, that this still leaves the Secretary of Education to be determining whether a local or state government or nonprofit has violated immigration law, terrorism law, state medical laws, or a variety of other laws that the Secretary of Education doesn't have expertise in and hasn't been specifically authorized by Congress to adjudicate. It also leaves room for what I think a lot of our constituencies are concerned about, which is that the Secretary of Education might pursue novel legal theories for violations of law. So, for example, we know that the administration recently released a list of over 500 cities that they described as sanctuary cities and asserted a new theory that those cities are aiding and abetting violation of immigration law. No court has found that to be the case. And so it's not, not necessarily true that those, those cities are violating immigration law, but by giving the Secretary of Education authority to determine that they are, without a court finding, this would be dramatically expanding the power of the Federal

Government to, to make determinations of law and enforce
penalties against states and local governments without
court order.

                 MS. WEISMAN: Next, we have Bob.

                 MR. CAREY: So I appreciate the, the
Department taking into consideration my various
proposals. I'm, I'm relatively satisfied with, with, with
this and addressing my concerns. I mean, the clear,
convincing standard is pretty high. And I think while,
you know, while any federal agency can try to bring forth
novel legal standards in order to be able to adjudicate
various issues, that's the process of government. And
that's the process of policy. And, and the courts can
adjudicate that. But a clear, convincing standard, I
think, gives a lot of opportunity to currently qualifying
employers to be able to push back and push back
effectively. So- and this coupled with the other elements
that you know, specifically state that it has to be a
violation of law, state or federal law also, you know,
alleviates a lot of my concerns. I mean, look, I don't
understand why the Department has an Office of Civil
Rights. You know, that's what the Department of Justice
does, not the Department of Education. I- you know, from
the logic of expanding their, expanding their power. I'd
say get rid of that office, also. But, but then I'm a

ED_02372

pretty strict federalist, and I believe the states have
ultimate authority to determine what is and is not
constitutional by nullification or interposition. So, so-
but, but I do appreciate the Department doing this, and
it satisfied most of my concerns.

MS. WEISMAN: Jacob?

MR. LALLO: Yeah. Bob kind of hit on
the point there at the end that I was going to make. But,
you know, this is not a situation where the Secretary is
suddenly in a position to make lasting final statements
about everything. Yes, we do have the ability to
determine certain things under, again, the broad
rulemaking power delegated to the Secretary, but as an
agency, any decision that we make is technically subject
to judicial review. This is not a position where the
Secretary can just use a bully pulpit to exclude
organizations based on, you know, hypothetical novel
legal theories. You know, indefinitely any organization
that, you know, felt that it was unfairly excluded for
one reason or another would still have its opportunity to
challenge that decision in Federal Court. So I think it's
important that we recognize that, like that is built into
the Constitution, and it's just part of the procedure.
And every- it accounts for every agency decision made by
every other agency within the limits provided.

2025 Negotiated Rulemaking - 7/2/25

MS. WEISMAN: Mary Lyn?

MS. HAMMER: I just wanted to point
out that some of the new language that we have to look at
today includes, and you can correct me if I'm wrong, but
it includes the intention of the Secretary to get an
approved correction plan approved without any gap of
eligibility. And I think that right- you know, that
process is where evidence can be given to the Secretary
to avoid those concerns. So I think you did a fabulous- I
was so happy to see that, I just have to say. So I think
that our concerns have been addressed.

MS. WEISMAN: Betsy?

MS. MAYOTTE: You know, it wouldn't be
a neg reg if the word triad wasn't brought up. So for
those of you playing neg reg Bingo, I'm giving you your
triad. But no, it's- I'm not just bringing it up for- to
get a cheap laugh. It's relevant here. Just like, you
know, relying on the triad of oversight to determine
whether an institution is eligible. I think we need to
rely on a different sort of triad to ensure that
employers are not doing bad things. And I don't think-
you know, I think the Department of Education has a lot
of experience and purview and authority to determine
things under the broad higher education umbrella. I still
remain very skeptical and concerned, especially with the

arbitrary aspect of it, but also because we're dealing with non-higher education things, like terrorism, and you know, the child trafficking and so on. So you know, I think the bullet points, you know romanettes one, two, and three, where the entities that do typically make those decisions are the ones making those decisions in a, in a non-arbitrary way, and in a way where there is a clear due process is appropriate. So I'm still very uncomfortable with each one.

MS. WEISMAN: And if I can just insert in there, for those who are not familiar with the triad, we may have some people watching who are not. It is the cooperation between the Federal Government, the state agency, as well as the accrediting agency. So I know Betsy has been playing neg reg bingo, and a lot of these themes come up many, many times. But I do want to acknowledge that there are people who may not be as familiar. And maybe Jacob, I stole your question. So you're up.

MR. LALLO: Noted. No, I actually just wanted to respond overall. You know, I think that's why-one, why we put the conclusive evidence in there. We feel that, you know, the clear and convincing evidence bar does increase it quite a bit. I would bristle a little bit at the characterization of any decisions made under

that as arbitrary. It's a very specific term with under-
litigation under the APA that we've provided an
opportunity for due process of consideration of evidence,
and we've given far greater weight to, you know,
decisions made by courts, tribunals, or again, in
settlement agreements where an organization is making a
statement against their own interest. Those- we put those
bars in there, again, to ensure that, you know, those
concerns are met and that this is not a black box
procedure by which the Secretary can just knock
organizations out. There's an opportunity to respond. All
of that information that would be provided in there is
inherently going to be, you know, (inaudible). It will be
part of a public record. It's findable. This is not
something that's going to be completely hidden from
anybody, much less the organizations at play, who will
have an opportunity to engage with us to rebut evidence,
including evidence that has been put as of a- you know,
guilty plea of a settlement or anything else. Yeah, and
no loss of eligibility will occur until that procedure is
completed. And as was pointed out, our goal is to not
ever even get to that point. We would like to work with
organizations through a corrective action plan. We'd like
to fix this before- I mean, that's how the Department
works in everything. I know, you know, we've talked about

how we use the clear and convincing standard in OCR, and
I think when we were discussing this yesterday, I think
it was mentioned that OCR has taken one case all the way
through because it's almost always worked out in a
settlement process, and that's really the way we like to
work. It's why we're doing neg reg today. We want to work
collaboratively with everybody involved, and we don't
anticipate this process being any different.

MS. WEISMAN: Betsy, did you have a
follow up?

MS. MAYOTTE: I just wanted to
clarify, I didn't, I didn't- and if I said it this way, I
didn't intend to, that the decision would be arbitrary,
but the choice of which employers would be looked at. You
know, and I'm dovetailing on Abby's prior comment about
the- you know, the list of cities that have come out. And
the clear and convincing, I still argue that if it's not
under the higher umbrella, it's not the Department of
Education's expertise to be making a decision about
things like terrorism and so on, which is why, you know,
romanettes one, two, and three, I can live with that. To
put it maybe a little crassly, I think you're a little
out of your sandbox with those.

MS. WEISMAN: Jacob?

MR. LALLO: Just in a quick response,

2025 Negotiated Rulemaking - 7/2/25

you know, I the reason we do it the way we do it, or
we're proposing to do it the way we do it is because, you
know, under the APA and, you know, the way agencies work
in general, we are, you know, delegated power by
Congress. We can't delegate that to third parties. So we
still have to have, you know, our own procedures and
operations. We can't just look at a court's finding of
things and- you know, again, this falls under our broad
rulemaking power. It's a program that we administer. And
while we acknowledge the importance of other procedures
or other tribunals and their expertise over these issues,
we are reliant on those as evidence, and we are taking
that into account within the process that we have.

      MS. WEISMAN: Tamy? I think- we do
have- I'm sorry, Abby has her card up.

      MS. SHAFROTH: Thank you. So I, I
totally understand and appreciate the point that an
employer can, can challenge in court, can bring suit
against the Department. Based on the, the Department's
determination that they've violated state law on medical
treatment or immigration, immigration or terrorism law,
etc. Employers can, can do that, but it's expensive. Not
every employer is, is able to, to muster the resources
to, to sue the Federal Government. It's slow. Litigation
is slow and takes time. And in the meantime, the damage

is often already done, because this is an instance where
the Department punishes first, and then we have a court
decision later. You can imagine, again, taking an example
of City of Boston. The Department determines that its
sanctuary city policies violate state immigration law and
makes it a non-qualifying employer. All of the thousands
of teachers, police officers, sanitation workers, civil
engineers, etc. across the City of Boston lose their PSLF
status. And as a result, employees leave and new
potential employees, new teachers, new police officers.
They take jobs in the neighboring suburbs that haven't
lost their PSLF status, because it essentially means that
they're making something like $6,000 a year more. So
that's already dramatically damaged, not just the, the
employees and the City of Boston, but the people of that
city. You know, the students in those schools, the people
living in the communities who don't have a fully staffed
police force or fire department. There's a lot of
potential damage and danger in this proposal. And that's
why I don't feel sort of my, my concerns are not put to
rest by the fact that there can be subsequent litigation
by the employer, because the damage at that point is
often already done.

          MS. WEISMAN: I see no other cards.
Tamy, do you have remarks or would you like to move to

pulse check?

MS. ABERNATHY: Oh, I don't have any remarks. I think we need to go to the caucus. I believe what we said we would do is to just get through the proposals. The one other thing that I want to mention is, Heather, I want to go back to your question yesterday or your comment. We obviously- there is not one thing we can do when the statute dictates that a qualifying employer is necessary for PSLF. But I thought about it, and I thought the only thing that we could offer and it's completely out of our purview, but perhaps it would be an interest of Vanderbilt and other institutions that have relationships with these hospitals to explain to these hospitals what is going on, that these are new rules that are being promulgated by the Department of Education. There's a possibility that should- again, it would have to be a finding, a court finding would have to be all that we've discussed under, under the standard at this point. But maybe we could, could ask those entities to reevaluate current contracts, or at least going forward, have language put into the contract that says should the employer lose eligibility as a qualifying employer, we'd be able to either renegotiate the contract or have a contract termination so that the student, the doctor, could at least have some out in those instances. Because

it's beyond our purview, we can't dictate anything like
that. But I did not want you to think that we did not go
back and try every way possible. But we are held to the
statute that they have to be a qualifying employer. So
that's not- that's the best answer we could give you.
Thank you.

            MS. WEISMAN: Okay. So to move to our
caucus. Oh, I'm sorry, Emeka.

            MR. OGUH: So Tamy, Jeff, and Jacob,
really appreciate again, you're hearing our arguments and
the flexibility in the in the policy documents. I did
have a question specifically because this was something
that we had caucused yesterday about around the EIN, and
I saw the language in here, and we appreciate that. Just
particularly, it says the Secretary may, in the event an
employer's operating under a shared identification number
or unique identifier, consider the organization to be
separate for the purposes of determining whether an
employer is eligible. I just want to talk about that word
may, right? And obviously there's a- Jacob, you brought
some language before about 51% versus 75%. Obviously, may
gives, you know, a little bit of subjectivity to it. Is
there an opportunity there to strengthen that a little
bit, to talk about the spirit of what we all discussed
here, which is you know, expected to should, you know,

sort of change may to that? Because that's the intent,
right? We know that there are going to be some situations
where she may not. But is there a chance to upgrade that
word may to is expected to? Which is, I think the
expectation of all of us in the room is that in that
multiple EIN situation, they will look at that separately
and there won't be situations where it's subjective here
versus not so. Thank you.

        MS. ABERNATHY: We would like to talk
about that when we go back. So thank you for bringing
that up. We will look at that while you all are
caucusing. Thank you.

        MS. WEISMAN: And now I'm seeing no
card. We have a card? Helen?

        MS. FAITH: So before we caucus, I
wonder if we could just briefly, especially since we have
a lot of new folks around the table, just briefly walk
through what the consensus process looks like. Sort of
step by step that we'll be going through, I think that
might help us as well.

        MS. WEISMAN: Sure. Since Mary Lyn had
asked for the caucus, would you like to do that caucus
first, or would you, would you be okay with me outlining
that first?

        MS. HAMMER: That was part of what I

was going to talk about in the caucus.

MS. WEISMAN: Would you rather have me walk through that though first, or would you rather have your discussion in advance?

MS. ABERNATHY: I think it would be appropriate to go to the caucus. And then as we get closer to- after we've gone through and done pulse checks, because we haven't even done that yet, as part of that, maybe the pulse checks, you can kind of explain the difference between the pulse check and then what will happen when we are going for consensus.

MS. WEISMAN: I'm trying to, to bridge the gap here and make sure I'm meeting the needs of Helen and Mary Lyn, and that we're doing this in a way that makes sense, uses the time well. Mary Lyn, you asked for the caucus originally. So I want to make sure we're, we're getting in what you were asking for.

MS. HAMMER: Yeah. I mean, if, if people still have questions about it after the caucus-

MS. WEISMAN: Okay.

MS. HAMMER: -then- I just want to get us together as a team.

MS. WEISMAN: Okay. Helen, does that work for you? Okay. Thank you very much. Just to confirm, the caucus is the non-Federal negotiators, which means

that non-Federal negotiators will stay here in this room.
The production team will stop the live stream, but remain
in the room in the back, not participate in the
discussion. All others in the room will leave. And you
said you wanted ten minutes? We'll send someone back in
just to make sure you're- you've wrapped it up. If you
need a couple more minutes, that's fine, but let us know.
And I would expect we'd be back then in 10 to 15 at the
most.

MR. ANDRADE: Mary Lyn, do you want
Annmarie to stay here as a resource?

MS. HAMMER: Yeah. I would love for
her to stay here.

MS. WEISMAN: Okay. Welcome back. We
have concluded the non-Federal negotiator caucus. We
covered some good ground, and we'll have a report on that
shortly. The team has asked for a break. We've been going
strong this morning and the caucus was, was certainly not
a break. We did some good work there. Right now it is
10:35. So let's aim to come back at 10:45. Welcome back
from our break, everyone. As we had discussed, we would
like to do a report out from the caucus. If I could get a
volunteer to do that. Mary Lyn?

MS. HAMMER: So we- I believe we had a
successful caucus and, and just we, we covered the whole

process of negotiated rulemaking when it started and, and why it was brought about and the focus of what we were supposed to do during the negotiations. And, and then defining what, you know, the, the ultimate outcome is that we all want while also maintaining our proper representation of whoever nominated us to be here. And so I think just having a greater understanding, especially for those who haven't gone through this process before, was super important. And so I appreciate being given the opportunity for us to talk through that as, as negotiators. So, thank you.

MS. WEISMAN: So I'd like to do the pulse check, seeing no other cards. Tamy, did you have anything you wanted to review before we start those?

MS. ABERNATHY: The only thing I would like to say is, we did take Emeka's suggestion and we'll get to that language. We tweaked it slightly for clarity purposes as well. So we are changing the word may to shall. And we are- we just tweaked it slightly to make it a bit more understandable. The other thing is we've had 14 substantive changes since we started- when, when we started with this proposed regulatory language. Because of the activity around the table, the conversations we've heard you, 14 substantive changes. I think that is something for us to give each other a hand on. So as we

go through the subsections, prepare, you know, the, the
lowercase alphas, we're going to start with, with that,
and Annmarie will walk us through all of that. But thank
you for allowing us to present our language and working
with us to get to where we are. We feel like we have
presented the best possible outcome to this committee for
review on pulse checks, and we look forward to seeing the
rest of what's going to happen in the next few minutes.
So, thank you.

      MS. WEISMAN: So just a reminder,
these are pulse checks. So, on a pulse check, we are
trying to get a sense of tentative agreement. This does
not mean that this is your final way to speak on this
topic. We will have a consensus check, I would anticipate
later this afternoon. But for right now, we'd like to see
where we have some basic agreement, where we may still
need work to tweak language, where people might still
have suggestions or points of disagreement. So the way
we're going to do these is there will be three options.
The first option is if you can support the proposal. And
again, it's just going to be by piece. So Tamy will
announce each item just to make it really clear which one
we are taking this pulse check on. You can either have
your thumb up to say that you support it. And when I say
you, this would be the primary members, or in the case

that your primary is absent, then it would be the alternate. Thumbs up, you support it. Thumb to the side, you're not sure or you're kind of lukewarm on it. Thumb down, you disagree. And if it were a proposal that we were looking at for consensus, you would at that- you would be saying your intention is to block. Is that clear? Okay, Tamy, let's start with our first one. Also, I would just let you know that I'm going to be recording each response. So it may take me just a little bit to type them in. If you're wondering why we're waiting. It's likely that you'll be waiting for me. Yes, Betsy?

       MS. MAYOTTE: I think I know the answer, but one never wants to assume because it's been different at every neg reg. Is this an all-or-nothing consensus, or is it possible for a partial consensus?

       MS. WEISMAN: This is an all-or-nothing. So when we do the consensus check- no, it's an excellent question. I was going to cover that later. But yes, it is all or nothing. When we do the consensus check, we'll be really clear about that as well, that here for the pulse checks we're going section by section. But at that time, it will, it will really be one consensus check we're looking for, do you agree on the package? Thank you. Tamy?

       MS. ABERNATHY: There are 35

definitions. So in subsection B definitions, there are 35 of them. I would hope we don't have to sit here and read every single one of them. But what we can do is make sure that had there been any changes- this is just about the definitions and the paragraph restructuring. So we're not really going to spend a lot of time on that. We're going to dive into the actual subsections C, D, E, and all of that. So any- Annmarie, I think you should just go ahead and do the pulse check on that.

MS. WEISMAN: I'm just- I need to make a couple of notes. We have two alternates at the table, so I need to make sure I have their names recorded.

MS. ABERNATHY: Absolutely. And I would point out while you're doing that, on 17, you'll see yesterday where we added to that or any other Federal Immigration Laws at your, at your request or your recommendation.

MS. WEISMAN: Okay then let's begin our pulse check on B definitions. Again, if I can see thumbs up, thumbs to the middle, or thumbs down. And I'm going to be looking going in this direction and around. We have a question first from Alyssa.

MS. DOBSON: I'm just questioning what all that includes under B. Yeah. Yeah.

MS. ABERNATHY: So each provision with

its discrete number. So it would be all of the definitions. Or do we just want to say the definitions restructuring? No, it's all of the definitions. So every term- discrete term that has a number beside it is its discrete definition. All the romanettes underneath it and everything.

           MR. ANDRADE: So, B1 through 35.

           MS. ABERNATHY: B1 through 35.

           MS. WEISMAN: Robert has a question.

           MR. ANDRADE: We can, we can go through it slower.

           MS. ABERNATHY: I mean, we can go through-

           MR. CAREY: I think you'll get more consensus on more of the sub definitions if you, if you let people talk about specific sub definitions, having all-

           MS. ABERNATHY: I mean, I can go through it one by one if you want.

           MR. CAREY: (inaudible)

           MS. ABERNATHY: All right.

           MR. CAREY: Just, just let people do it by, by exception. Like, you know.

           MS. ABERNATHY: We'll do it. We'll do it in order. B definitions. The following definitions

apply to this section. One, aiding or abetting has the
same meaning as defined under 18 U.S.C. Code 2. Do we
have to talk about every single one, or are we going to-?

            MS. WEISMAN: Only by exception if
people-

            MS. ABERNATHY: Got it. Two,
AmeriCorps. All we're doing is a paragraph restructuring
there. New definition on number three. Chemical
castration or mutilation means romanettes one the use of
puberty blockers, including GnRH agonists and other
interventions to delay the onset of progression of
normally-timed puberty in an individual who does not
identify as his or her sex. And romanettes two the use of
sex hormones such as androgen blockers, estrogen,
progesterone, or testosterone to align an individual's
physical appearance with an identity that differs from
his or her sex. Four, child or children, for the sole and
specific purpose of this section-

            MS. WEISMAN: Okay. I think there was
a little confusion. Right now we're just reading through
these. We're not taking individual checks on each one,
it's just to get through them. If you would like to do
individual checks on each item, each definition, we can
do that once she reads through all of them.

            MS. ABERNATHY: Child or children, for

the sole and specific purpose of this section means an
individual or individuals under 19 years of age. Nothing
to five, nothing to six, nothing to seven, nothing to
eight, nine. Ten, foreign terrorist organizations mean,
mean organizations on the list published under paragraph
(a)(2) capital A romanettes two under the Immigration and
Nationality Act of 8 U.S.C. Code 1189. Give me a second.
My cursor jumped. (inaudible) time. No definition.
Twelve, illegal discrimination means a violation of any
federal discrimination law, including, but not limited
to, the Civil Rights Act of 1964 42 U.S.C. 1981 et
sequence Americans with Disabilities Act, 42 U.S.C. 12
101 et sequence, and the Age Discrimination and
Employment Act of 1967 29 U.S.C. Code 621 et sequence.
Thirteen, law enforcement no change, no change to 14,
military service. Fifteen, non-governmental public
service 16, non-tenure track employment. Seventeen, other
Federal Immigration Laws mean any violation of the
Immigration and Nationality Act, 8 U.S.C. Code 1105 et
sequence, or any other Federal Immigration Laws.
Eighteen, other school-based service. Nineteen, Peace
Corps position. Twenty, public education service. Twenty-
one, public health. Twenty-two, Public Interest Law.
Twenty-three, public library service. Twenty-four, public
safety service. Twenty-five, public service for

individuals with disabilities. Twenty-six, public service
for the elderly. Twenty-seven, qualifying employer means
romanettes one capital A, a United States-based Federal,
state, local or tribal government organization, agency or
entity including- I don't think I have to read all of
that because none of that- all of, all of the qualifying
employer stays the same until and romanettes two. This
does not include organizations that engage in activities
that have a substantial illegal purpose, as defined in
the section. Twenty-eight, Qualifying Repayment Plan.
Twenty-nine, school library services. Thirty, substantial
illegal purpose means one romanettes one aiding or
abetting violations of U.S.C. Code 1325 or other Federal
Immigration Laws. Romanettes two, supporting terrorism,
including by facilitating funding to, or the operations
of cartels designated as foreign terrorist organizations
consistent with 8 U.S.C. 1189, or by engaging in violence
for the purposes of obstructing or influencing Federal
Government policy. Romanettes three, engaging in the
chemical and surgical castration or mutilation of
children in violation of Federal or State Law. Romanettes
four, engaging in the trafficking of children to states
for purposes of emancipation from their lawful parents,
in violation of Federal or State Law. Romanettes five,
engaging in a pattern of aiding and abetting illegal

discrimination or engaging in a pattern of violating
state laws, as defined in paragraph 34 of this
subsection. Thirty-one, surgical castration or mutilation
means surgical procedures that attempt to transform an
individual's physical appearance to align with an
identity that differs from his or her sex, or that
attempt to alter or remove an individual's sexual organs
to minimize or destroy their natural biological
functions. Thirty-two, terrorism is defined under the
Crimes and Criminal Procedure 18 U.S.C. Code 2331.
Trafficking means supporting a child or children from
their state of legal residence to another state without
permission or legal consent from the parent or legal
guardian for the purposes of emancipation from their
lawful parents or legal guardian in violation of
applicable law. Thirty-four, violating state law means a
final non-default judgment by a state court of romanettes
one, trespassing, romanettes two, disorderly conduct,
romanettes three, public nuisance, romanettes four,
vandalism, or romanettes five, obstruction of highways.
And 35, violence for the purpose of obstructing or
influencing Federal Government policy means violating any
part of 18 U.S.C.- U.S.C. Code 1501 (inaudible) sequence
by committing a crime of violence as defined under 18
U.S.C. Code 16.

MS. WEISMAN: Okay. What I'd like to
do is to start broad and then go narrow. So if we can
broadly say just to get the pulse check on where we are
with all of the definitions combined in there, in their
totality, if I could see thumbs, either thumbs up, in the
middle, or down. Keep those thumbs up for me, please.
Okay. Thank you very much. For anyone who had their thumb
down, and I believe that was just Alyssa, do you have
anything that you can share to say what you'd prefer to
see?

MS. DOBSON: Sure. So I really only
have one issue, and that is number four, defining
children as under 19 years of age. For my constituents,
that, that removes too much agency for my folks who have
reached the age of majority. I think an easy fix would be
maybe we don't even need to define child if we
substituted the word minor wherever a child or children
is used. You know, I just, I think it's just- it's too
much for me to agree to.

MS. WEISMAN: Does the Department have
a response? Jeff?

MR. ANDRADE: I think we have to keep
in mind on this standard as compared to maybe other
instances where the age or age limits are used, that this
is a standard that is designed to protect children with

regard to medical procedures. And when you look at other instances in the healthcare field, for instance, the Affordable Care Act, keeps individuals on their parents' health care plans until age 26. Tobacco products can only be purchased by people over the age of 21 and over. So these are instances- again, this is, this is designed to protect children from irreversible medical procedures and very strong drugs and chemicals.

MS. WEISMAN: For those who had their thumbs in the middle. Is there anything that you'd like to mention that you'd like to see different that would put your thumb up? Or are you comfortably in the middle? Betsy?

MS. MAYOTTE: So, we had three that made us (makes sound) instead of (makes sound) or (makes sound). One is Alyssa, and I won't re-articulate it. Pretty much exactly what she said. The other is under 27, we maintain that the definitions should at best include only non- 501(c)(3) nonprofits. So if it were- if that definition were to exclude government or 501(c)(3)s, we would- the thumb would tick. And then under 30, as Abby has articulated previously, we remain very concerned about the fact that discrimination is listed under 30. We find that very problematic for several reasons, and I won't rehash her entire argument that she gave before,

but, you know, it seems counterproductive and unfair. I mean an organization can be- you know, have instances of discrimination but still be providing a public service. For example, I'll use the example of a fire department. You know, ideally they would not be engaging in discriminatory practices, but they're providing arguably one of, the one of the most important public services, which is to, you know, save people and property from fires. So those are our three why we're in the middle.

                    MS. WEISMAN: Does the Department have a response to any of that? Not required, just- okay.

                    MS. ABERNATHY: No.

                    MS. WEISMAN: Anyone else who had their thumb in the middle that has a different issue that had not been expressed? Faisal?

                    MR. SULMAN: I just want to say same reason, same sections that Betsy mentioned. Although slightly understand the Department's rationale regarding section 30 in that, like, you have this rebuttable presumption or rebuttable argument by the courts and further fleshing out the process, but still qualms exist.

                    MS. WEISMAN: Betsy, just for awareness, your mic is open. Anything else on definitions before we move on? Then we'll go to C for borrower eligibility. Tamy, do you want to give just a very quick

recap of C?

MS. ABERNATHY: We have added except
as provided in paragraph C4 of this section, a borrower
will be considered to have made monthly payments under
paragraph (c)(1)(iii) of this section by. So basically
the recap is we're clarifying what would count as a
qualifying payment when an agency or the employer has
been deemed unqualifying. So we're just clarifying that
there.

MS. WEISMAN: Any questions about C
before we do a pulse check? Okay, then let's see thumbs.
Up, side, or down. Alex, it looks like you're the only
one that is at the side. Is there anything that you would
like to mention that would make you support this proposal
more strongly? Okay. Thank you. I believe there's no D.
So we are then on to E, application process.

MS. ABERNATHY: Forgive me, Committee.
I forgot four under that as well. So four was under, I
just missed it. So excuse me. Under C, we added what we
added in two. And then in number four, we talked about
effectuating on- effective on or after July 1, 2026,
through a standard as described in section- in subsection
H of this section, no payment shall be credited as a
qualifying payment for any month subsequent to the
determination that a qualifying employer engaged in

activities that have a substantial illegal purpose, as described in this section. So I'm sorry, I think we have to redo that. I apologize. Sorry, Committee.

MS. WEISMAN: Okay. Given the addition that Tamy just made, we're going to look at C again. If we could please do thumbs up, to the side, or down. So we're looking at all of C, not just four. This is a- we'll just say this is a redo. Okay, we have tentative agreement on borrower eligibility. I believe next we have E, application process. Tamy, would you go through that?

MS. ABERNATHY: Subsection E, application process. We've added a 9, a 10, and we've removed 11. And we've made a subsection K on that, that we'll get to later. If the Secretary has notified the employer that they may be an ineligible employer under subsection H of this section, the Secretary notifies the borrower of the employer's status. Ten, if the Secretary has determined that the employer is no longer a qualifying employer under subsection H of this section, the Secretary notifies the borrower of the employer's status.

MS. WEISMAN: I don't see any questions. Emeka?

MS. ABERNATHY: I did say that earlier. I'm sorry if it's not on your written word. It

is showing on my screen, which is what should be up on
the screen here. So for the purposes of the consent pulse
checks, please make sure you're referring to the screen
share so that you're seeing the latest. But yeah it, it
is struck out. I'm sorry if that- because we added
subsection K.

          MS. WEISMAN: Emeka, if you could make
sure you use your microphone so they can hear you.

          MR. OGUH: Yeah. Just- you said you
moved to another subsection. Okay.

          MS. ABERNATHY: We took Scott's
language in his proposal and made it its separate
subsection K, tweaking it slightly.

          MR. OGUH: Thank you.

          MS. ABERNATHY: Yes, sir.

          MS. WEISMAN: Okay. So let's do a
check for borrower process, E. So we have Emeka in the
middle. Is there anything we could do that would change
that to a thumb up?

          MR. OGUH: Yeah, I think I just need
to- just more time to digest this thing. I don't have any
questions right now.

          MS. WEISMAN: So I believe there is no
F and that we go right to G, borrower reconsideration
process. Tamy, do you want to outline those changes?

2025 Negotiated Rulemaking - 7/2/25

MS. ABERNATHY: In G, borrower reconsideration process we've added seven, notwithstanding, paragraph (g)(1) of this section, a borrower may not request reconsideration under this subsection G based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in subsection H of this section.

MS. WEISMAN: I don't see any questions, so let's go ahead with the pulse check for G borrower reconsideration. Okay, I see two with thumbs to the side. If either of you have anything you'd like to share that would shift that to a more positive for you, you're welcome to do so. Not required, but welcome to. Alyssa?

MS. DOBSON: I'm not saying that I wouldn't give consensus. It's just I think it's tied too closely to age. I mean, it references age- that it's hard for me to give any determination without also considering that.

MS. WEISMAN: Okay, let's move on to H. H is the standard for determining a qualified employer engaged in activities that have a substantial illegal purpose. Tamy, do you want to outline that?