**62**

MS. ABERNATHY: Yes. Let me adjust my screen slightly so I can (inaudible). H is the standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose. One, the Secretary determines by a- by clear and convincing evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions, by gauging both frequency or severity, and will not find that the organization has, has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose. One, final judgment by a State or Federal Court, whereby the employer is found to have engaged in activities that have substantial illegal purpose. Romanette two, a plea of guilty or nolo contendere, whereby the employer admits to have engaged in activities that have substantial illegal purpose, or pleads nolo contendere to allegations that the employer engaged in activities that have a substantial illegal purpose, or a settlement that includes admission by the

ED_02401

employer that it engaged in activities that have a substantial illegal purpose, described in subsection, subsection H of this section, and, two, nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights. I would like to state here that if you look at number one, we have changed to clear and convincing. We have made sure that we have provided notice and opportunity to respond. We have indicated that the qualifying employer is a prospective approach, meaning it is on or after July 1, 2026. We have stated that the illegal substantial purpose is by considering materiality or any other illegal activities. And we're gauging both frequency and severity, and we will not find the organization has a substantial illegal purpose if it is only engaged in illegal activities or actions that are minor or purely technical. So the reason I bring those points out is we have made considerable efforts to capture the discussions around the table to give ultimate deference to exactly what you guys have wanted us to do, and this is what we have come up with. We further made sure that we protected the First Amendment rights to not violate any agency in that regard.

MS. WEISMAN: I see no questions. So let's do the pulse check for H. Okay, I see only one thumb down. That is Betsy. Betsy, would you like to talk about what you would prefer to see here?

MS. MAYOTTE: Yes. Thank you. So I'm not going to rehash everything that I've said over the past couple of days. I know, disappointed. But, you know, the two primary concerns are, while we appreciate that you clarified that it would, you know, be on- or it would not be retroactive, what it doesn't clarify is that the actions or evidence that's being used isn't from- you know, it could be from 20 years ago. But again, the primary issue here is number one, we, we, we remain steadfast in that we don't- we think it is out of the Secretary's wheelhouse to be determining if an entity has been engaged in illegal, substantial illegal activities under the, the definitions that we- that are listed.

MS. ABERNATHY: So, Betsy, to your first point, we are looking at a qualifying employer who has engaged in activity on or after July 1. Nothing prior to July 1, 2026, is considered. So to mitigate your first concern, that is how- while it isn't retroactive, we're also not looking back at 20 years ago. This is a new provision of qualifying employer that we're looking day forward, from July 1, 2026, forward, if the employer at

that point engages in a substantial illegal activity. So just want to point that out in case that does clarify that for you. Additionally, I forgot the other thing I was going to say. We are going to say again that we do have a basis and authority to do what we are doing here and by, by doing such, and by the way that we have crafted this to where we are not looking at minor or technical infarctions or anything like that, we are looking at when an employer has committed an illegal, substantive, illegal activity purpose. We're looking first to make sure that there is either a final judgment, that the State or the Federal Court- there has to be something that they have done with that- they have been a- final information on that. If we don't have that, and there's clear and convincing evidence as- and you've heard us talk about that earlier, we're also giving a notice and comment. We're also engaging with the employer to see what we can do to make sure that that eligibility- that we don't have a final determination. So we're doing everything we can up to the point of making a final determination to give that employer a way to say, okay, we're not going to do that, we have a corrective action plan. Borrowers are not penalized when this is going on. We're looking for final determination as the outcome. But we have to give the Secretary- we have to have the

ability to do what we are doing here. And the only way that we can do it- we've gone as far as we can go with this, and this is the best that we can offer the committee.

MS. MAYOTTE: I would just respond that I think you can still do those things but allow a judicial body to actually be able to make the decision. We- I can live with romanettes one, two, and three. And, you know, to be clear- I am going to stop right now. I'll leave it at that. But I- you know, I won't repeat myself anymore.

MR. ANDRADE: All right. I'll let Jacob jump in on this. Again, I think we said we can't delegate our decision-making authority to someone else. In this case, I think the law, the case law is pretty clear. And I know you're going to say you don't, you don't agree, and that's, and that's fine. That's the position. But I will reiterate, you know, we, we spent a lot of time before we came into this trying to propose something that was going to be viewed as reasonable and negotiable. This- and I'll reiterate what Tamy just said, this is the best and final offer on this. You will not see this deal again on this. And so if you want to abstain on it, I mean, we- we've, we've worked very hard, but we can't go any further on this. We can't go from we

believe we have the authority, and we clearly have a disagreement on, on that, but we can't go any further on this. This deal goes away if we don't reach consensus.

MR. LALLO: Just to respond to your point about delegation, and I think that was- it wasn't on the record. So I'll just clarify on the record we were discussing about how debarment is handled and how that- the Department of Education plays into that. And the delegation of authority within that. Debarment lives in a completely separate bucket from everything else. The entire government handles debarment kind of in a pool. We name people to be debarred, and then they report people who've been debarred to us. It's not really a true delegation of power. It's all just kind of a circular thing that the entire government processes and, and moreover, it's very clearly spelled out in statute how debarment works and how it is utilized. The APA is very clear that we only have the powers that are granted to us by Congress, which include regulation and administration of the PSLF program. We do not have the authority to delegate to another agency, or to a court, or any third party, unless specifically laid out by statute. And so it's necessary for us to retain some form of independent judgment- or judgment-making inside the Department of Education to let the Secretary who's entrusted again with

overseeing and administering this program, to handle this process internally. And while we can consider evidence that's produced by other agencies, and we really want to put heavy weight on that. Again, that's why we created this rebuttable presumption. We want to, in most cases and really when at all possible, use the information that's produced and adjudicated in courts which, you know, I think provides a very clear basis for things. We do still need to retain some independent decision-making process. You know, in recognition of the concerns expressed by the committee and in the public comment, we've increased the bar to a clear and convincing bar that's a much higher standard than a preponderance standard. And I think, as Jeff said, this is a pretty good deal as far as we're concerned.

MS. WEISMAN: Faisal, you had a comment.

MR. LALLO: Yeah, just a question. I understand the whole not being able to delegate and looking internally and having the Secretary do it, but would, would a, would a middle ground of, of the two thoughts between the Department and Betsy be like something of an internal tribunal composed of the Secretary, maybe like an internal council of sorts? Or you're just, just floating the thought of you still

keeping the-

MR. ANDRADE: The Secretary is the tribunal, as- I mean, in any adjudication we make, it's either a designated Federal official or the Secretary, depending on how the appeal process works on that. So you know, I, I think it accomplishes the same, the same thing. Because generally speaking, the Secretary is, is looking at the case and the facts as laid out by department staff, you know, along with, along with the recommendation typically, so.

MS. WEISMAN: Mary Lyn, and then Betsy.

MS. HAMMER: I just want to point out that there is the process of an approved correction plan, and that is where the negotiation happens for the employers to get past this. So, you know, if you're only looking at this without considering that, I understand where you're coming from, but there are processes for them to get through this without having any gaps in eligibility.

MS. WEISMAN: Betsy?

MS. MAYOTTE: I'm hearing- picking up what you're putting down. And so I think it just might be- just so everybody understands the, the entire decision here. We remain firmly convinced that the

proposal as a whole and the ability of the Department of Education to exclude specifically government and 501(c)(3) is unlawful. But, you know, this is not my first neg reg. I love neg reg. And I appreciate a good compromise, and I'm not- I know I'm sounding flippant, and I do not intend to. I take this very seriously. And so I thought long and hard about this and talked robustly with my constituency and our compromise, which would, would be a very big concession on our part, because we don't believe the thing is lawful to begin with, would be if H1 was excluded, which is what you just said was a (inaudible) but maybe I just changed your mind. So that, that is- that's sort of where we're at. We would consider that an enormous concession. And to respond to your explanation about why you feel you need this, I think you- the Secretary, still has the ability to, you know, properly administer the program with romanettes one, two, and three. You know, if you find evidence that you feel an employer is, is engaging in illegal activities, you can certainly pick up the phone and call somebody to investigate it outside of your agency. And if there's a settlement or, you know, other type of agreement then, you know, you still have romanettes one, two, and three, you can exclude them from PSLF. But anyway, bottom line is, in the interest of compromise, we would be willing to

2025 Negotiated Rulemaking - 7/2/25

**71**

come to consensus, despite the fact that we feel very strongly that the proposal is unlawful if H1 was struck. And in all our other things that we've already listed, we would also be willing to concede on those.

MS. WEISMAN: Jacob, and then Jeff.

MR. LALLO: So I'm not going to presuppose the decisions of policy, so I just respond to a couple of the points here. So all the romanettes are directly tied to H1. There's no separating them as currently written. The romanettes are, by definition, subordinate to H1. I think to your point that we could just pick up the phone and call somebody else. I don't think that's within our (inaudible). We are charged with administering the program. I think, you know, we have to do that efficiently and effectively. And as we've stated repeatedly, you know, while there is sometimes, you know, overlapping jurisdiction, and so far as the IRS is looking at their own thing, 501(c)(3), which again, very separate from what we're doing. And while that does interplay with us a little bit, you know, they have their own processes. It takes a long time, and they have a lot of stuff to do as well. We need the ability to act, and we want to be able to work with organizations to, you know, come to a corrective action plan with us. If, by your proposal, we would just tell the IRS and hope the

ED_02410

IRS kicks them out of 501(c)(3), then they're not a qualifying employer. There's no way to bring them back in line. And we want to do this in a way that doesn't harm them or, you know- it allows them and the borrowers to stay within the program. But there's not a corrective action plan process.

MS. WEISMAN: Jeff, Mary Lyn, and then Tamy. Tamy, would you like to take Jeff's space?

MS. ABERNATHY: We would like to call a caucus with Mary Lyn, Betsy, and Alyssa, please. And Tracy, excuse me. School people. That's fine.

MS. WEISMAN: Okay, so we've got, again-

MALE SPEAKER: We'll do it in the, in the green room.

MS. ABERNATHY: Mary Lyn, Alyssa, Tracy, Betsy. So it would be Abby, it would be April, it would be Helen, and, and Jeff, you also want Heather and Todd, correct?

MR. ANDRADE: Yeah, I'm sorry.

MS. ABERNATHY: And Heather and Todd. And Kaity.

MS. WEISMAN: I have eight people, so I think I'm missing some.

MS. ABERNATHY: Okay, y'all stand up.

2025 Negotiated Rulemaking - 7/2/25

73

Hold your hands who's coming to the caucus. Ready? We have Kaity, Heather, Todd, Tracy, Alyssa, Helen, April, Mary Lyn, Abby, and Betsy.

MS. WEISMAN: And from the Department?

MS. ABERNATHY: Myself, Jacob, and Jeff. And John Houston, will you be joining us? John Houston. Do we need a facilitator? We do not need your wonderful expertise, Annmarie. Thank you.

MS. WEISMAN: And you'll be in the green room for how long, approximately?

MS. ABERNATHY: 15 minutes. Please bring your computers in case you need them. I don't know if you will or not. And I'm sorry, we're going to need one other staff member. Either Renee or Michael, one of you will need to join us. Renee.

MS. WEISMAN: Okay.

MS. ABERNATHY: John (inaudible) will join us to, to make sure-

MS. WEISMAN: Just keep in mind we're getting close to the lunch hour, so if you- another different conference room. Okay. So we'll expect 15 minutes. If it's going to go a little longer, if you can just let me know. Thank you. Thank you for joining us. We need to let everyone on the live stream know what our plan is. If you want to go ahead and announce your, your

ED_02412

**74**

group again. Is it the same group for caucus?

MS. ABERNATHY: After lunch?

MS. WEISMAN: Yes.

MS. ABERNATHY: Yes, it will be the same individuals. Kaity, Todd. Heather, Tracy-

MS. WEISMAN: I have the list.

MS. ABERNATHY: Them.

MS. WEISMAN: Good.

MS. ABERNATHY: I thought I had to say it for the people. Somebody just tells me what to do. Like every other day of my life. Sir?

MALE SPEAKER: Do the people in the caucus want a short lunch to 30 minutes and then start the caucus 30 minutes before?

MS. ABERNATHY: People- oh, blessed Jesus, people on the caucus, would you agree to a shortened lunch to 30 minutes, and would start the caucus at 12:30 so that we could be finished, finished by 1:00? Everybody agrees, raise your hand.

FEMALE SPEAKER: (inaudible)

MS. ABERNATHY: I like the way you said that. I hope I hear that again. Oh, I'm sorry. I liked the other- I was going with you on that. I do too.

MS. WEISMAN: Okay, so just to confirm, it is the Department staff, Tamy, Jeff, Jacob,

along with-

MS. ABERNATHY: John and Michael.

MS. WEISMAN: -John and Michael. We'll have Betsy, Alyssa, Mary Lyn, Tracy. We'll have Abby, April, Helen, Todd, Kaity, and Heather.

MS. ABERNATHY: Correct.

MS. WEISMAN: We'll all be returning, whether from lunch or from lunch and caucus at 1:05.

MS. ABERNATHY: Yes. Now, for the purpose, for the purpose- blessed be the Lord above. For the purposes of getting you guys into the room for the 12:30 caucus, one of the staff, one of- Jeff will be out there. You have to be escorted in there, so we will wait. If you all could gather about five minutes before so that we can all get there and then get in at one time, we can start right at 12:30. Okay?

MS. WEISMAN: So just a reminder, we will reconvene in this room, 1:05 p.m. Thank you all.

DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NEGOTIATED RULEMAKING

SESSION 1, DAY 3, AFTERNOON

JULY 2, 2025

ED_02415

2025 Negotiated Rulemaking - 7/2/25

2

P R O C E E D I N G S

MS. WEISMAN: Thank you all for your patience. Tamy, would you like to give a report out of the caucus?

MS. ABERNATHY: We are waiting for Betsy and Abby to come back. I think we have everyone else. Two minutes and we'll start. Ms. facilitator, we thank you so much for your patience.

MS. WEISMAN: Welcome back to the afternoon session. We're going to start right back in with Tamy from the Department and an update on the caucus.

MS. ABERNATHY: Thank you, Annmarie. We apologize to our viewing public. We apologize to our negotiators. It did take us a little longer, but I am pleased to announce that we have 15 substantive changes now, instead of 14. I will- sir? Fifteen offered substantive changes instead of 14 offered substantive changes. I would ask my colleague to please share the screen so that I could go over this with the negotiators. Wow, that is a bright color, isn't it? Here we are in H, our standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose. One, the Secretary determines by clear and convincing evidence and after notice and opportunity to

ED_02416

respond, that a qualifying employer has engaged on or after July 1, 2026 in activities that have a substantial illegal purpose, by considering the materiality of any illegal activities or actions, by gauging both frequency or severity, and will not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical. The Secretary will only use evidence not included in the subclause romanette one through romanette three. In instances where those activities or actions of a qualifying employer which have a substantial illegal purpose are severe and pervasive. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose: a final judgment by a State or Federal Court whereby the employer is found to have engaged in activities that have a substantial illegal purpose, a plea of guilty or nolo contendere, whereby the employer admits to have engaged in activities that have a substantial illegal purpose, or pleads nolo contendere to allegations that the employer engaged in activities that have a substantial illegal purpose, or a settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose.

ED_02417

2025 Negotiated Rulemaking - 7/2/25

**4**

Described in subsection H of this section. Number two. Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution. We have added in that very bright color two different provisions that are new to you. At this time, we'll turn it over to Annmarie to take a pulse check.

MS. WEISMAN: So we're doing a pulse check on H, the text that Tamy just read. As a reminder, you can have a thumb up, thumb in the middle, or thumb down. And I'll be recording each of those, so if you could please keep your thumbs up until I get your attention again. Thank you. Okay, I see Betsy and Scott with thumbs in the middle. Is there anything that either of you would like to mention? Alyssa, were you middle? Okay, I apologize. So, for the three of you, do you have anything that you could recommend that might get you to a thumb up? Not required. Just asking. Betsy?

MS. MAYOTTE: We would possibly go to- if they- not necessarily a thumb up, but maybe something else if there was language added that said that these provisions wouldn't be used in cases of sanctuary cities, states, universities, and possibly churches. And we would

2025 Negotiated Rulemaking - 7/2/25

**5**

even be willing to consider that language, while preferably in the regulation, in the preamble.

MS. WEISMAN: Tamy, did you want to respond?

MS. ABERNATHY: We could withdraw this section altogether.

MR. ANDRADE: No, wait. Just the addition.

MS. ABERNATHY: The addition. Not the whole section. The- in red.

MR. ANDRADE: The first one (inaudible)

MS. ABERNATHY: The first one, we'd keep the second one. So the end of the paragraph where we talk about other rights protected under the Constitution we would retain, otherwise we're going to remove this particular section in red right there that starts with the Secretary will only use evidence not included in subclauses romanette one through three, in instances where those activities or actions of the qualifying employer which have a substantial legal purpose or severe and pervasive. So that would be what we will remove.

MS. WEISMAN: Betsy, would that address your issue?

MS. MAYOTTE: (inaudible)

2025 Negotiated Rulemaking - 7/2/25

**6**

MS. WEISMAN: I thought so.

MR. ANDRADE: Just a quick- what does this mean in terms of consensus? (inaudible) No, I know, but what is it-

MS. WEISMAN: You need to use the microphone, please.

MS. MAYOTTE: With respect, I don't think it's appropriate for you to ask me that question right now because she's asking for a pulse check, not for consensus. You're asking me for my vote (inaudible)

MS. ABERNATHY: So what that means, Jeff, is she said she would- it could change her pulse check to an up or down if we were to change and add language about the sanctuary states, which we have already discussed that is not going to be added. And our response is we're not going to add anything more. We would remove this section altogether, this one sentence. Now we're not going to remove that sentence altogether. Just kidding. Oh no, it's so much better than that. It's chaos (inaudible)

MR. ANDRADE: Do you think it's a goat rodeo?

MS. ABERNATHY: No. We're good. We're, we're good.

MR. ANDRADE: Okay.

ED_02420

MS. ABERNATHY: Y'all are killing me here. Jacob is going to interject to keep us all back on track.

MR. LALLO: Yeah, to go back to the boring details. I think the reason we have to approach this way, we, we said we can't do carve-outs for any particular organization of any type, we want this to be flatly neutral, but in particular with items like churches and specific types of cities, it runs counter to the way a qualifying employer is organized under the reg. It- the entire way we do this is so we don't have to spell out every single job and type of employer. They're laid out all under one grouping. And to add carve-outs in there for specific types of organizations, which, you know, we've heard a lot of argument about 501(c)(3)s and how they are supposed to be read broadly, you're asking us to carve them out into an even more narrow chunk. And I don't think we can do that.

MS. MAYOTTE: That's a good point. I'm not asking you to exclude cities, states, universities, churches. I'm asking- and I am open to language suggestions. My concern is that the addition of severe and pervasive. The way the general public understands when we say sanctuary city or sanctuary university, that the Department wouldn't, for want of a better phrase, go

2025 Negotiated Rulemaking - 7/2/25

**8**

after a city, a state university, a church, or being a sanctuary city and exclude them because they are a sanctuary city, state church, university, goat rodeo.

MS. WEISMAN: Bob?

MS. MAYOTTE: And I apologize if I didn't make-

MR. CAREY: Would taking out the words are severe and pervasive resolve that?

MS. MAYOTTE: No (inaudible)

MR. CAREY: Okay. Okay. I'm just- I'm not fully-

MS. MAYOTTE: Picking up what I'm putting down.

MR. CAREY: Right. So I'm just trying to figure out what your objection to this language is.

MS. MAYOTTE: I have no objection to that language.

MR. CAREY: Okay.

MS. WEISMAN: Betsy, what I'm hearing you saying-

MS. MAYOTTE: I have no objection to the language. My fear is that the language that they added, which I'm grateful for, does not go far enough to protect a particular target that I think is being considered with this overall proposal.

ED_02422

2025 Negotiated Rulemaking - 7/2/25

9

MS. WEISMAN: Jacob?

MR. LALLO: I think you know, I- while I understand your concern, you're asking us to read not only- like even if we put this into the preamble to effectively make promises as to how this reg will be applied and beyond the fact that I think that that's, you know, really not something that we're entitled to do, I think that it's fundamentally unfair to everyone else who's considered a qualifying employer to basically promise that it won't be applied to certain organizations, but it will be applied to everybody else.

MS. MAYOTTE: I'm not asking you to not apply it to certain organizations. If the City of Boston you find that there is severe and pervasive terrorist activities, then I- it's reasonable that that would be applied. Again, I'm not asking for a specific type of entity to be excluded, and I do apologize for not making that clear. I'm asking that the fact of one of these entities being considered a so-called sanctuary, whatever, is not that these rules will not be used in that scenario. So I'm asking for a scenario to be excluded, not an entity, an entity type.

MS. WEISMAN: Jeff?

MR. ANDRADE: As I said, the terms sanctuary city, sanctuary states aren't defined terms.

ED_02423

2025 Negotiated Rulemaking - 7/2/25

10

They're used differently depending on who is talking about them and where they're being talked about. And that introduces yet another level of ambiguity. Again, we're not focused on particular entities. Everybody is a qualifying employer. We're looking at the actions that are being performed by those qualifying employers without regard to what type of organization or what they call themselves or what other people call themselves.

MS. WEISMAN: Does the Department have what it needs then from H? There were, I made the offer if they wanted to mention anything that would help get them there. I didn't see any cards, but you're certainly welcome to do that. Scott?

MR. BUCHANAN: Sure. I mean, just as a reminder, I think in general on the totality involves policy, I represent FFEL lenders and guarantors. And as a constituency where PSLF is not available, we leave that to the other negotiators to determine whether they wish to reach consensus. And so my sideways vote is do not deny consensus if there is among the other negotiators, because this is an area outside of, you know, our constituency. But we appreciate the opportunity to provide some technical assistance and support throughout this, and certainly will continue to support some of the operational provisions that I- that we have voted in

favor for.

MS. WEISMAN: Any further comments? Then let's move on to I. Tamy, would you like to walk through I?

MS. ABERNATHY: Yes, ma'am.

MS. WEISMAN: Thank you.

MS. ABERNATHY: I, process for determining when an employer engaged in activities that have a substantial illegal purpose. One, the Secretary will determine that a qualifying employer violated the standard under subsection H of this section when the Secretary: romanette one, receives an application as referenced under subsection E of this section, which the employer does not certify that it did not participate in activities that have a substantial illegal purpose or determines that the- romanette two, determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection H of this section, unless prior to the issuance of the Secretary's determination, the Secretary approves a corrective action plan, which includes the factors set forth in subsection J2 of the section. Notwithstanding subsection I1, the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if

the employer is operating separately and distinctly for the purposes of determining whether an employer is eligible.

MS. WEISMAN: If we can see those thumbs. We have one to the side and that's Scott.

MR. BUCHANAN: Same issue as before. This is a matter of policy that relates to the direct loan program.

MS. WEISMAN: Thank you. Then let's move on to J for regaining eligibility.

MS. ABERNATHY: J, regaining eligibility as a qualifying employer. An organization that loses eligibility for failure to meet the conditions of paragraph B27 of this section may regain eligibility to become a qualifying employer after five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose, in accordance with subsection H of this section. If at or other- if at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose, as defined in paragraph B30 of this section, or two, the Secretary approves a corrective action plan signed by the employer that includes romanette one, a certification that the employer

is no longer engaging in activities that have a substantial illegal purpose, as defined in paragraph B30 of this section. Romanette two, a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose, as defined in paragraph B30 of this section in the future, and any other, any other terms or conditions imposed by the Secretary designed to ensure that the- that employers do not engage in actions or activities that have a substantial illegal purpose.

MS. WEISMAN: If we could do a pulse check with thumbs, please. So the only thumb I see to the middle is Scott. Same reason. Okay. Thank you very much. Definitely sensing a theme. So that takes care of J. If we could then move on, Tamy, to K, the newer section.

MS. ABERNATHY: K, borrower notification of regained eligibility. If an employer regains eligibility under subsection J of this section, the Secretary shall update within 30 days the Qualifying Employer List, which is accessible to borrowers for purposes of certification or application.

MS. WEISMAN: And if we could see a pulse check on that with thumbs. And on K, we have tentative agreement. Congratulations. We have a question

from Kaity.

MS. MCNEILL: I just wanted to give a reminder about the preamble language that we discussed in caucus concerning definitions and state concerning a child.

MS. ABERNATHY: During our caucus, we also discussed the definition of child. And we've had an official request to make sure that in our preamble language that we include, and I'm sure I'm supposed to remember all that this is right now, but I'm sorry, I do not. So Kaity, would you please be so kind as to remind me what I'm supposed to say so that we can, that we can make sure that we get it right? And I'm sorry, I did not write it down, so forgive me. I only wrote down some of it. My apologies.

MS. BOUTELL: Yes, we have the definition of a child is 19, but state law, many states have the definition of a child as 18. And so there was a concern that college campuses that offer any sort of student health services to 18-year-olds would be in violation. And we were told in our caucus that that would not be the case, that applicable state law would apply so that 18-year-olds could receive that care. And so the Department mentioned that they would include that information in the preamble, just so that there wouldn't

ED_02428

**15**

be concerns and worries.

MS. WEISMAN: Thank you, Heather.

MS. ABERNATHY: Yes, thank you, Heather.

MS. WEISMAN: So we have tentative agreement on a couple of areas. We did have a couple thumbs down in a couple of areas. I think we've heard the reasons for the thumbs down. If anybody wants to bring up other issues that they didn't feel that they've expressed, I think this is the time to do that. And then we need to kind of discuss where we go in terms of checking for consensus. Has the Department- does the Department feel that it's heard enough to be able to go to a consensus check, or is there more you want to discuss?

MS. ABERNATHY: We've heard enough. Thank you.

MS. WEISMAN: Okay. Do any of the negotiators feel that there's anything that they wanted to ask the Department? Bob?

MR. CAREY: I- since we're talking about preambulatory language, there was, as I understand, there was recently Department action to remove preamble, preamble language from another regulation. And I know that my organization, National Defense Committee, we've,

we've supported such. Is there any concern that preamble language is- has no effect since it is preamble and that we- if we want to resolve something, it needs to be within the text of the regulation?

MR. ANDRADE: I think the question came up with regard to explaining the interaction of the language that we had with applicable state law. And this is again, just to explain the impact.

MS. WEISMAN: I'd like to recognize Jonathan Houston from the Department's Office of General Counsel.

MR. HOUSTON: Hi, everyone. Preamble language is best construed as an interpretive rule. It's not a legislative rule, any- anything in a preamble. So it's not binding on the public or the agency, but it informs the public how we might think about a particular issue. The preamble language that accompanies a regulatory or legislative rule is that it's just interpretive language, not part of the actual text.

MR. CAREY: Okay.

MS. WEISMAN: Would the Department like a few minutes to confer?

MS. ABERNATHY: No.

MS. WEISMAN: Are you ready for a consensus check?

ED_02430

MS. ABERNATHY: We are.

MS. WEISMAN: Okay. As a reminder, the consensus check will be on all of the topics that we've discovered or discussed. If the Department has consensus, the Department will use that consensus language as part as its regulatory language in the Notice of Proposed Rulemaking or the NPRM. There would be the ability to make only minor technical changes, things like renumbering, subject-verb agreement, very minor editorial kinds of changes. Otherwise, it will use the language that is the consensus language. If consensus is not reached, the Department will write its own notice of proposed rulemaking, informed by the conversation here, but may write what it wishes. Are there any questions about consensus? With consensus, we're asking you for a thumb up, a thumb down, or you may abstain. Remember that abstaining is not blocking consensus. I also remind people that consensus is not a vote, so it's not a majority rules. We need to have all thumbs up in order to have consensus or abstentions. Any thumb down is a block. Any questions on that? Okay. This is your call for consensus. We have Scott abstaining and we have Betsy with a thumbs down. Did I miss anyone else? Okay, I'll record that. Does the Department have any final words to say to the group?

2025 Negotiated Rulemaking - 7/2/25

**18**

MS. ABERNATHY: I do, or we do. While we did not reach consensus on the proposed amendatory text, the work done here will have long long-lasting impact on restoring the Public Service Loan Forgiveness program as directed by the Secretary. No consensus means that there was a dissent by a member or members of the negotiating committee. And because, as Annmarie stated earlier, final consensus was not achieved, the language in the notice of proposed rulemaking may not mirror what you saw here today. We are not bound to using any language or tentative agreements developed over the last three days. The Department may publish an NPRM that looks significantly different from our discussions here. We will, of course, respond to every unique public comment made during the Notice of Proposed Rulemaking comment period, and consider each of them when crafting our final rule. I want to thank you, Committee. You've given us a lot of solid ideas which will assist us in the coming months as we prepare the draft rule. In addition, we appreciate your time and engagement. It's our first negotiated rulemaking back in person, so it's taken time to get some of the problems ironed out. We appreciate your patience and your willingness to dedicate time to this important endeavor. I do want to say one of the quotes that I like to use with my team is never doubt

that a small group of thoughtful, committed people can change the world. Indeed- it is the only thing that ever has. And that's from Margaret Mead. It has been a privilege working alongside you in developing these rules on restoring Public Service Loan Forgiveness. We've enjoyed the formidable and spirited conversations and new terms that we will now use forever and ever. We've learned a lot from you. On behalf of Secretary McMahon, Deputy Undersecretary James Bergeron, and the Federal team, Deputy Assistant Secretary Jeff Andrade, and Jacob Lallo, we thank you, Committee, for serving with us during these negotiations. And thank you to our public for participating. Additionally, we want to give a hearty thank you and extend the deepest appreciation for the considerable work done by our conference and event management team, the technical staff, the staff in the Office of the General Counsel, the staff in the Policy, Planning, and Innovation Division, including the Administrative and Auxiliary Services Team and the Policy Coordination Group, which is my team, along with many others across the Department who have worked tirelessly to coordinate efforts and deliverables for these negotiated rulemaking activities. We want to extend the heartiest of thank-yous to our facilitator, who did her very best to keep us on track and keep us aligned, and

worked very hard throughout these last three days. We could not have done this without you. So, thank you for your commitment to this process, to the Department, to the service, thank you. Next steps. My team starts drafting the notice of proposed rulemaking, which will reflect some of the discussions and the decisions made here the last three days. Please still monitor the negotiated rulemaking website for updates. Safe travels. Thank you again for your work during this session and for your commitment to the cause. We appreciate your service, and I appreciate working alongside you these last three days.

MS. WEISMAN: Thank you, Tamy. I just want to echo my thank-you to all of the negotiators, to the Department staff, and other department officials who made this negotiated rulemaking happen. It is the first one in person in about five years, six years, I guess. Your time and your dedication, and your energy has been beyond exceptional from the time that I spoke with each of you on the phone to do the orientation calls, it was very clear to me that we had a really great group of people to work with. And I feel honored as well to have worked with you. And I thank you for your patience in working with me. We've heard a range of perspectives. We've heard a lot of good ideas, and I'm sure the

**21**

Department will use those as they're drafting and keep those things in mind. And I hope that you see an NPRM soon that, that you feel you can also make a comment on. This is my shameless plug for- it's really important that US negotiators, whether alternate or primary, as well as members of the public who followed this discussion, continue to follow through and engage on this rule. And don't forget, you are part of the public. So make that public comment. And again, just my thanks. It's been great to have you and great to work with you. Safe trip home.



Federal Register / Vol. 90, No. 64 / Friday, April 4, 2025 / Proposed Rules    14741

### TABLE 1 TO § 100.1101

| * | * | * | * | * |
| --- | --- | --- | --- | --- |

| * | * | * | * | * | * | * |
| --- | --- | --- | --- | --- | --- | --- |

**3. San Diego Crew Classic**

| | |
| --- | --- |
| Sponsor | San Diego Crew Classic. |
| Event Description | Competitive rowing race. |
| Date | A weekend in March or April. |
| Location | Mission Bay, San Diego, CA. |
| Regulated Area | The waters of Mission Bay to include South Pacific Passage, Fiesta Bay, and the waters around Vacation Isle. |

| * | * | * | * | * | * | * |
| --- | --- | --- | --- | --- | --- | --- |

**7. San Diego Sharkfest Swim**

| | |
| --- | --- |
| Sponsor | Enviro-Sports Productions Inc. |
| Event Description | Swim race. |
| Date | A weekend in September or October. |
| Location | San Diego Bay, CA. |
| Regulated Area | The waters of San Diego Bay, CA, from Seaport Village to Coronado Ferry Landing. |

| * | * | * | * | * | * | * |
| --- | --- | --- | --- | --- | --- | --- |

**17. San Diego Fleet Week Veterans Day Boat Parade**

| | |
| --- | --- |
| Sponsor | San Diego Fleet Week Foundation. |
| Event Description | SS Boat parade. |
| Date | One day in November on or around Veterans Day. |
| Location | San Diego Bay, CA. |
| Regulated Area | All waters of San Diego Bay, from surface to bottom, beginning at Shelter Island, proceeding northeast to Harbor Island, proceeding southeast along the shoreline to Tenth Avenue Marine Terminal, crossing the Federal navigable channel prior to the Coronado Bridge, then northwest along the shoreline of Coronado Island to the Coronado Ferry Landing. |

**P.C. Dill,**
*Captain, U.S. Coast Guard, Captain of the Port Sector San Diego.*
[FR Doc. 2025–05865 Filed 4–3–25; 8:45 am]
**BILLING CODE 9110–04–P**

---

## DEPARTMENT OF EDUCATION

### 34 CFR Chapter VI

[Docket ID ED–2025–OPE–0016]

### Intent To Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Intent to negotiate.

**SUMMARY:** We announce our intention to host public hearings and establish one or more negotiated rulemaking committees to prepare proposed regulations on various programs authorized under title IV of the Higher Education Act of 1965, as amended (HEA) (title IV, HEA programs). The Department invites public feedback, especially addressing topics which may include Public Service Loan Forgiveness (PSLF), Pay As You Earn (PAYE), Income-Contingent Repayment (ICR), or other topics that would streamline current federal student financial assistance programs.

**DATES:**

*Comments due:* We must receive written comments on the topics suggested by the Department and additional topics that may be considered on or before May 5, 2025.

*Hearing dates:* The dates, times, and locations for the public hearings are listed under the **SUPPLEMENTARY INFORMATION** section of this document.

**ADDRESSES:** Comments must be submitted through the Federal eRulemaking Portal at *regulations.gov.* Information on using *Regulations.gov,* including instructions for submitting comments, is available on the site under "FAQ." If you require an accommodation or cannot otherwise submit your comments via *Regulations.gov,* please contact *regulationshelpdesk@gsa.gov* or by phone at 1–866–498–2945. If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

The Department will not accept comments submitted by fax or by email or comments submitted after the comment period closes. To ensure that we do not receive duplicate copies, please submit your comments only once. Additionally, please include the Docket ID at the top of your comments.

**FOR FURTHER INFORMATION CONTACT:** For information about negotiated rulemaking, see the Frequently Asked Questions Section of the Negotiated Rulemaking Process for title IV regulations website at: *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/negotiated-rulemaking-process-title-iv-regulations-frequently-asked-questions.*

For information about the public hearings, or for additional information about negotiated rulemaking, *contact:* Tamy Abernathy, U.S. Department of Education, Office of Postsecondary Education, 400 Maryland Avenue SW, 5th Floor, Washington, DC 20202. *Telephone:* (202) 245–4595. *Email: NegRegNPRMHelp@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:** Section 492 of the HEA (20 U.S.C. 1098a) requires that, before publishing any proposed regulations to implement programs authorized under title IV of the HEA, the Secretary must obtain public involvement in the development of the proposed regulations. After

obtaining advice and recommendations from the public, the Secretary conducts negotiated rulemaking to develop the proposed regulations. We announce our intent to develop proposed title IV regulations by following the negotiated rulemaking procedures in section 492 of the HEA (20 U.S.C. 1098a). These topics will focus on how title IV regulations have impacted institutions, States, and other partners and if their implementation may be inhibiting innovation and contributing to rising college costs. We believe any rulemaking effort should provide the opportunity to streamline or eliminate unnecessary regulatory processes that are not otherwise required by law. The feedback can be received during two public hearings, including one in-person hearing and one virtual hearing, at which interested parties may comment on the topics suggested by the Department and may suggest additional topics that should be considered for action. Additionally, the Department will accept written comments on the topics suggested by the Department and suggestions for additional topics that should be considered for action. Finally, any negotiating committees will include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations.

We intend to select negotiators from nominees of the organizations and groups that represent the interests significantly affected by the proposed regulations. To the extent possible, we will select individual negotiators from the nominees who reflect a wide variety of experts among program participants, in accordance with section 492(b)(1) of the HEA (20 U.S.C. 1098a).

**Regulatory Issues**

We intend to convene one or more negotiated rulemaking committees to develop proposed regulations pertaining to title IV regulations that have impacted institutions, States, and other partners and if their implementation may be inhibiting innovation and contributing to rising college costs. Some proposed topics for negotiation would include:

1. Refining definitions of a qualifying employer for the purposes of determining eligibility for the Public Service Loan Forgiveness program.

2. Pay As You Earn (PAYE) and Income Contingent Repayment (ICR) repayment plans.

3. Potential topics that would streamline current federal student financial assistance program regulations while maintaining or improving program integrity and institutional quality.

We will publish a notice in the **Federal Register** announcing the topics of PSLF, PAYE, ICR, or other topics related to current federal student financial assistance programs. This notice will solicit nominations for individual negotiators who represent the communities of interest significantly affected by the proposed regulations. This notice will also be posted on the Department's website at: *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

**Public Hearings**

For interested parties who want to discuss the rulemaking agenda, the Department will hold two public hearings, including one in-person hearing at the U.S. Department of Education located at 400 Maryland Ave. SW, Barnard Auditorium, Washington, DC 20202 and one virtual hearing. The in-person public hearing will be held on April 29, 2025, from 9:00 a.m. to 12:00 p.m. with a lunch break from 12:00 p.m. to 1:00 p.m., and from 1:00 p.m. to 4:00 p.m. Eastern Time. The virtual public hearing will be held from 9 a.m. to noon and 1 p.m. to 4 p.m., Eastern time, on May 1, 2025. Additional information on the public hearings is available at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

Individuals who would like to present comments at the public hearing must register by sending an email message to *negreghearing@ed.gov* no later than noon, Eastern time, on the business day prior to the public hearing. The message should include the name of the presenter, the general topic(s) the individual would like to address, and one or more dates and times during which the individual would be available to speak. We will attempt to accommodate each speaker's preference, but, if we are unable to do so, we will select speakers on a first-come, first-served basis, based on the date and time we received the message. We will limit each participant to three minutes. For those who need a reasonable modification in order to provide a live comment during the hearing, please see the "Reasonable Modifications" section below for information about how to make such a request.

The Department will notify registrants of the date and time slot reserved for them and, for the virtual hearing, will provide information on how to log in to the hearing as a speaker. An individual may make only one presentation at the public hearings. If we receive more registrations than we are able to accommodate, the Department reserves the right to reject the registration of an entity or individual that is affiliated with an entity or individual that is already scheduled to present comments, and to select among registrants to ensure that a broad range of entities and individuals is allowed to present. We will accept registrations for any remaining time slots on a first-come, first-served basis, beginning at 8 a.m. on the day of the public hearing at the Department's on-site registration table (or at *negreghearing@ed.gov* for the virtual hearing).

*Reasonable Modifications:* The hearings will be accessible to individuals with disabilities. Information for contacting the Department to request auxiliary aids or services to provide a live comment will be included in the registration process for providing a live comment at the hearing. If you will need an auxiliary aid or service to provide your comment, please notify the person listed under **FOR FURTHER INFORMATION CONTACT** in this notice at least two weeks before the scheduled meeting date.

Registration is not required to observe the in-person public hearings; however, space may be limited. Registration is required to view the virtual public hearing. American Sign Language translation will be provided to all who attend the hearings, and closed captioning will be provided for the virtual public hearing. We will post links for attendees who wish to observe on our website at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.* The Department will also post transcripts of all hearings on that site.

The Department will accept written comments via the Federal eRulemaking portal through May 5, 2025. See the **ADDRESSES** section of this document for submission information.

*Privacy Note:* The Department's policy is to generally make comments received from members of the public available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available. Commenters should not include in their comments any information that identifies other individuals or that permits readers to

ED_02437

identify other individuals. The Department reserves the right to redact at any time any information in comments that identifies other individuals, includes information that would allow readers to identify other individuals, or includes threats of harm to another person. This may include comments where the commenter refers to a third-party individual without using their name if the Department determines that the comment provides enough detail that could allow one or more readers to link the information to the third-party individual. If your comment refers to a third-party individual, please refer to the third-party individual anonymously to reduce the chance that information in your comment could be linked to the third party. For example, ''a former student with a graduate level degree'' does not provide information that identifies a third-party individual as opposed to ''my sister, Jane Doe, had this experience while attending University X,'' which does provide enough information to identify a specific third-party individual. For privacy reasons, the Department reserves the right to not make available on *Regulations.gov* any information in comments that identifies other individuals, includes information that would allow readers to identify other individuals, or includes threats of harm to another person or to oneself.

**Schedule for Negotiations**

The dates and locations of negotiated rulemaking meetings will be published in a subsequent **Federal Register** document and posted online at: *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov.* At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or portable document format (PDF).

To use PDF, you must have Adobe Acrobat Reader, which is available for free on the site. You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

*Program Authority:* 20 U.S.C. 1098a.

**James P. Bergeron,**
*Acting Under Secretary.*
[FR Doc. 2025–05825 Filed 4–3–25; 8:45 am]
**BILLING CODE 4000–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 721**

**[EPA–HQ–OPPT–2024–0332; FRL–12563–01–OCSPP]**

**RIN 2070–AB27**

**Significant New Use Rules on Certain Chemical Substances (24–4.5e)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing significant new use rules (SNURs) under the Toxic Substances Control Act (TSCA) for certain chemical substances that were the subject of premanufacture notices (PMNs) and are also subject to an Order issued by EPA pursuant to TSCA. The SNURs require persons who intend to manufacture (defined by statute to include import) or process any of these chemical substances for an activity that is proposed as a significant new use by this rulemaking to notify EPA at least 90 days before commencing that activity. The required notification initiates EPA's evaluation of the conditions of that use for that chemical substance. In addition, the manufacture or processing for the significant new use may not commence until EPA has conducted a review of the required notification, made an appropriate determination regarding that notification, and taken such actions as required by that determination.

**DATES:** Comments must be received on or before May 5, 2025.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPPT–2024–0332 at *https://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI)

or other information whose disclosure is restricted by statute. Additional instructions on commenting and visiting the docket, along with more information about dockets generally, is available at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:**
*For technical information:* Ira L. Lyons, New Chemicals Division (7405M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; telephone number: (202) 566–1481; email address: *lyons.ira@epa.gov.*

*For general information on SNURs:* William Wysong, New Chemicals Division (7405M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; telephone number: (202) 564–4163; email address: *wysong.william@epa.gov.*

*For general information on TSCA:* The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554–1404; email address: *TSCA-Hotline@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

*A. What is the Agency's authority for taking this action?*

TSCA section 5(a)(2) (15 U.S.C. 2604(a)(2)) authorizes EPA to determine that a use of a chemical substance is a ''significant new use.'' EPA must make this determination by rule after considering all relevant factors, including the factors in TSCA section 5(a)(2) (see also the discussion in Unit II.).

*B. What action is the Agency taking?*

EPA is proposing SNURs for the chemical substances discussed in Unit III. These SNURs, if finalized as proposed, would require persons who intend to manufacture or process any of these chemical substances for an activity that is designated as a significant new use to notify EPA at least 90 days before commencing that activity.

*C. Does this action apply to me?*

1. General Applicability

This action applies to you if you manufacture, process, or use the chemical substances identified in Unit III. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

**20142**    Federal Register / Vol. 90, No. 90 / Monday, May 12, 2025 / Proposed Rules

Official patrol vessels mean any Coast Guard, Coast Guard Auxiliary, state, or local law enforcement vessels assigned or approved by the COTP to enforce this section.

*Participant* means all persons and vessels registered with the event sponsor as participants in the parade.

(c) *Regulations.* (1) All non-participants are prohibited from entering, transiting through, anchoring in, or remaining within the regulated area described in paragraph (a) of this section unless authorized by the COTP or the COTP's designated representative.

(2) Any person or vessel permitted to enter the regulated area shall comply with the directions and orders of the COTP or the COTP's designated representative. Any vessel that is granted permission to enter or remain in the regulated area by the COTP or the COTP's designated representative must proceed through the area with caution and operate at a speed no faster than that speed necessary to maintain a safe course, unless otherwise required by the Inland Navigation Rules as set forth in 33 CFR chapter I, subchapter E.

(3) To seek permission to enter the regulated area, contact the COTP or the COTP's representative by VHF Channel 13 or 16, or through the Marine Safety Unit Pittsburgh at 206–815–6624.

(d) *Enforcement period.* The regulated area in paragraph (a) of this section is in effect from June 7, 2025, through June 8, 2025. The regulated area will be enforced for approximately 14 hours each day of the event, between the hours of 5 a.m. and 7 p.m. The COTP, or a designated representative, will inform the public through written Local Notice to Mariners, and Broadcast Notice to Mariners via VHF–FM marine channel 13 or 16, of the enforcement period of the regulated area.

Dated: March 31, 2025.

**Justin R. Jolley,**
*Commander, U.S. Coast Guard, Captain of the Port, MSU Pittsburgh.*

[FR Doc. 2025–08193 Filed 5–9–25; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF EDUCATION

### 34 CFR Chapter VI

[Docket ID ED–2025–OPE–0016]

### Negotiated Rulemaking Committee; Negotiator Nominations and Schedule of Committee Meetings

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Intent to establish rulemaking committee.

**SUMMARY:** We announce our intention to establish a negotiated rulemaking committee to prepare proposed regulations for the Federal Student Aid programs authorized under title IV of the Higher Education Act of 1965, as amended (HEA). The committee will include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations. We request nominations for individual negotiators who represent key stakeholder constituencies for the issues to be negotiated to serve on the committee.

**DATES:** We must receive your nominations for negotiators to serve on the committee on or before June 2, 2025. The dates and times of the committee meetings are set out in the *Schedule for Negotiations* in the **SUPPLEMENTARY INFORMATION** section.

**ADDRESSES:** Please email your nominations for negotiators to *negregnominations@ed.gov.* If you are unable to email your nomination, please contact Vanessa Gomez, U.S. Department of Education, Office of Postsecondary Education, 400 Maryland Avenue SW, 5th Floor, Washington, DC 20202. Telephone: (202) 987–0378. Email: *NegRegnominations@ed.gov.*

**FOR FURTHER INFORMATION CONTACT:** For information about negotiated rulemaking, see "The Negotiated Rulemaking Process for Title IV Regulations—Frequently Asked Questions" at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/frequently-asked-questions-negotiated-rulemaking-process-title-iv-regulations.* For information about the content of this document, including additional information about the negotiated rulemaking process, please contact Tamy Abernathy, U.S. Department of Education (Department), Office of Postsecondary Education, 400 Maryland Avenue SW, 5th Floor, Washington, DC 20202. Telephone: (202) 245–4595. Email: *NegRegNPRMHelp@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 4, 2025, we published in the **Federal Register** 90 FR 14741 an announcement of our intent to establish a negotiated rulemaking committee addressing topics which may include Public Service Loan Forgiveness (PSLF), Pay As You Earn (PAYE), Income-Contingent Repayment (ICR), or other topics that would streamline and improve federal student financial assistance programs and related regulations. We also announced public hearings at which interested parties could comment on the topics for negotiation suggested by the Department and suggest additional topics for consideration for action by one or more negotiated rulemaking committees. Those hearings were held on April 29 and May 1, 2025.

You may view written comments submitted in response to the aforementioned **Federal Register** document through the Federal eRulemaking Portal at *www.regulations.gov.* The Department is still receiving comments through May 8, 2025, and will consider suggested additional topics for future negotiations. Instructions for finding comments are available on the site under "FAQ." Enter Docket ID ED–2025–OPE–0016 in the search box to locate the appropriate docket.

### Committee Topics

After considering the information received at the public hearing and the written comments, we have decided to establish the Student Loans and Affordability Committee (Committee) to address the following topics:

1. Refining definitions of a qualifying employer for the purposes of determining eligibility for the Public Service Loan Forgiveness program.

2. Revisiting family size, restructuring repayment plan provisions, including the alternative repayment plan, and certain other provisions of the July 10, 2023 rule.

We intend to select negotiators for the Committee who represent the interests of those significantly affected by the topics proposed for negotiation. In so doing, we will comply with the requirement in section 492(b)(1) of the HEA (20 U.S.C. 1098a) that the individuals selected must have demonstrated expertise or experience in the relevant topics proposed for negotiations. Our goal is to establish a committee that will allow significantly affected parties to be represented while keeping the size manageable.

We generally select a primary and alternate negotiator for each constituency represented on a committee. The primary negotiator participates for the purpose of determining consensus. The alternate participates for the purpose of determining consensus in the absence of the primary negotiator. The Department will provide more detailed information to both primary and alternate negotiators selected to participate on the

ED_02439

Committee about the logistics and protocols of the meetings.

**Constituencies for Negotiator Nominations**

We have identified the following constituencies as having interests that are significantly affected by the topics proposed for negotiation. We plan to include negotiators who represent these constituencies. Nominations should include evidence of the nominee's specific knowledge of the issues listed under the Committee Topics heading earlier in this document. The Department strongly encourages nominees to list all constituencies under which they would like to be considered. The Department reserves the discretion to place a nominee in a constituency based upon their background and experience even if the individual was not nominated for that specific category.

Constituencies for the Committee are:
• Civil rights organizations, consumer advocates, and legal assistance organizations that represent students and/or borrowers.
• State officials, including State higher education executive officers, State authorizing agencies and State attorneys general. Student loan borrowers in repayment.
• U.S. military service members, veterans, or groups representing them.
• Public institutions of higher education, including Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority-serving institutions (institutions of higher education eligible to receive Federal assistance under title III, parts A and F, and title V of the HEA).
• Private nonprofit institutions of higher education including Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority-serving institutions (institutions of higher education eligible to receive Federal assistance under title III, parts A and F, and title V of the HEA).
• Proprietary institutions of higher education.
• Financial aid administrators at postsecondary institutions.
• Organizations representing taxpayers and the public interest.
• Federal Family Education Loan Lenders and/or Guaranty Agencies.

**Advisor**

The Department also invites nominations for an advisor. The advisor will not be a member of the committee and will not impact the consensus vote; however, we will consult with the advisor, who will serve as a resource to the committee for the purposes of expanding the definition of qualifying

employment under the Public Service Loan Forgiveness program. We seek an advisor who has the knowledge of Federal immigration laws and laws that prohibit illegal discrimination and curtail domestic support of terrorism. We also seek assistance in defining terms such as, illegal immigration, human smuggling, child trafficking, and other terms mentioned in the March 7, 2025, Presidential Executive Order directing the Secretary to revise 34 CFR 685.219, specifically activities that would exclude an agency from being a qualifying employer. The advisor will be expected to be available throughout the duration of the Student Loans and Affordability Committee meetings, specifically when the committee is discussing issues related to Public Service Loan Forgiveness. The Department will work with the committee and the advisor to determine additional dates and times that the advisor must be present before, in-between, and after committee meetings. The advisor may also offer recommendations to the committee on regulatory language.

The goal of the committee is to develop proposed regulations that reflect a final consensus of the committee. Consensus means that there is no dissent by any member of a negotiating committee, including the committee member representing the Department.

A negotiator is expected to represent the interests of their constituency and to participate in the negotiations in a manner consistent with the goal of developing proposed regulations on which the committee will reach consensus.

**Nominations**

We request that nominations include the information described in this section.
(1) The name of the nominee;
(2) The name of the constituency (or constituencies) for which the nominee is being nominated (see *Constituencies for Negotiator Nominations*);
(3) The nominee's place of employment or institution at which they are or were enrolled and, if different, the organization the nominee represents;
(4) A resume or evidence of the nominee's expertise and experience in the topics proposed for negotiations; and
(5) The nominee's contact information, including email address, telephone number, and mailing address.

Please see the **ADDRESSES** section for submission information. We will confirm receipt of nominations to the submitter. The Department will provide

additional information to those we select to serve as negotiators. Once complete, a list of negotiators will be posted here: *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026*. The Department will also provide information about how any committee vacancies can be filled at the beginning of the first committee meeting.

**Schedule for Negotiations**

The Committee will meet in-person at the Department in Washington, DC for one session on the following dates:
Session 1: June 30–July 2, 2025

Session times will be from 9:00 a.m. to 12:00 p.m. and 1:00 p.m. to 4:00 p.m., with a public comment period from approximately 3:30 p.m. to 4:00 p.m., Eastern time.

The session will be conducted in person and is available for the public to view via livestream. The Department is willing to add another session if needed. Registration is requested to observe the in-person or livestream. Space may be limited. We will post a registration link on our website at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026* closer to the start of negotiations. Please note any in-person visitors to the Department must present a Driver's License (DL) or Identification (ID) that is compliant with the REAL ID Act; a current military ID; or a valid passport. Those persons not in possession of a DL/ID that is REAL ID compliant, a current military ID or a valid passport, will not be allowed to gain entrance into the Department. The Department will also post recordings and transcripts of the meetings on the site listed above

At the end of each day (except for the final day of the final session), the Department will reserve 30 minutes for in-person public comment at the Department in Washington, DC. We will attempt to accommodate each speaker's preference, but, if we are unable to do so, we will select speakers on a first-come, first-served basis, based on the date and time we received the message. We will limit each participant to three minutes. We will provide information on how to request time to speak on our website at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026*. For those who need a reasonable modification in order to provide a live comment during the

negotiations, please see the ''Reasonable Modifications'' section below for information about how to make such a request.

Individuals who would like to present comments must register by sending an email message to *negreghearing@ed.gov* no later than noon, Eastern time, on the business day prior to the committee hearing in which they would like to speak. The message should include the name of the presenter and one or more dates and times during which the individual would be available to speak. The Department will notify registrants of the date and time slot reserved for them to speak. An individual may make only one presentation at the committee meetings. If we receive more registrations than we are able to accommodate, the Department reserves the right to reject the registration of an entity or individual that is affiliated with an entity or individual that is already scheduled to present comments, and to select among registrants to ensure that a broad range of entities and individuals is allowed to present. We will accept registrations for any remaining time slots on a first-come,

first-served basis, beginning at 8 a.m., at the Department's on-site registration table.

*Accessible Format:* On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format. American Sign Language translation will be provided to all who attend the negotiations and closed captioning will be provided for the negotiations.

*Reasonable Modifications:* The hearings will be accessible to individuals with disabilities. Information for contacting the Department to request auxiliary aids or services to provide a live comment will be included in the registration process for providing a live comment at the hearing. If you will need an auxiliary aid or service to provide your comment, please notify the person listed under **FOR FURTHER INFORMATION CONTACT** in

this document at least two weeks before the scheduled meeting date.

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site. You may also access the documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

*Program Authority:* 20 U.S.C. 1098a.

**James P. Bergeron,**
*Acting Under Secretary.*
[FR Doc. 2025–08157 Filed 5–9–25; 8:45 am]
**BILLING CODE 4000–01–P**



**40154**        Federal Register / Vol. 90, No. 157 / Monday, August 18, 2025 / Proposed Rules

## DEPARTMENT OF EDUCATION

### 34 CFR Part 685

[Docket ID ED–2025–OPE–0016]

RIN 1801–AA28

### William D. Ford Federal Direct Loan (Direct Loan) Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to amend the regulations on the Public Service Loan Forgiveness (PSLF) program under 34 CFR 685.219 to exclude employers that engage in activities that have a substantial illegal purpose. The proposed regulations would prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that engage in activities that have a substantial illegal purpose. These proposed changes are intended to improve the administration of the PSLF program and provide protection for taxpayers.

**DATES:** We must receive your comments on or before September 17, 2025.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal at *www.regulations.gov.* The Department will not accept comments submitted by fax or by email or comments submitted after the comment period closes. To ensure that the Department does not receive duplicate copies, please submit your comment only once. Additionally, please include the Docket ID at the top of your comments.

Information on using *Regulations.gov,* including instructions for submitting comments, is available on the site under "FAQ." If you require an accommodation or cannot otherwise submit your comments via *Regulations.gov,* please contact *regulationshelpdesk@gsa.gov* or by phone at 1–866–498–2945. If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should include in their comments only information that they wish to make publicly available. Additionally, commenters should not include in their comments any personally identifiable information (PII) in comments about other individuals.

For example, if your comment describes an experience of someone other than yourself, please do not identify that individual or include any personal information that identifies that individual. The Department reserves the right to redact a portion of a comment or the entire comment at any time if any PII about other individuals is included.

**FOR FURTHER INFORMATION CONTACT:** Tamy Abernathy, Office of Postsecondary Education, 400 Maryland Ave. SW, Washington, DC 20202. Telephone: (202) 987–0385. Email: *Tamy.Abernathy@ed.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

The Department has a broad interest in ensuring that its programs do not contribute to or help support individuals or organizations that engage in unlawful activity.

To prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that are engaged in activities that are unlawful, the Secretary proposes to exclude any organization that engages in activities that have a substantial illegal purpose from being a qualifying employer for the purposes of the PSLF program.

The proposed rule would clarify the definition of a qualifying employer, define activities that have a substantial illegal purpose, address the impact on borrower eligibility, and ensure employers are given notice and the opportunity to respond to an adverse finding.

A brief summary of these proposed regulations is available at *https:// www.regulations.gov/document/ED-2025-OPE-0016-0001.*

## II. Summary of the Major Provisions of This Regulatory Action

These proposed regulations would:
* Amend § 685.219(b) to modify the existing structure of the subsection into regulatory paragraph structure.
* Amend § 685.219(b) to add definitions for: aiding or abetting, chemical castration or mutilation, child or children, foreign terrorist organizations, illegal discrimination, other Federal Immigration laws, substantial illegal purpose, surgical castration or mutilation, terrorism, trafficking, violating State law, and violence for the purpose of obstructing or influencing Federal Government policy.
* Amend § 685.219(c) to establish that on or after July 1, 2026, no payment made by a borrower shall be credited as a qualifying payment for PSLF for any

month subsequent to a determination that a qualifying employer engages in activities that have a substantial illegal purpose.
* Amend § 685.219(e) to require the Secretary notify borrowers employed by a qualifying employer of the employer's status if the employer is at risk of becoming or becomes ineligible for the PSLF Program.
* Amend § 685.219(g) to clarify that a borrower may not request reconsideration of a final determination by the Secretary that the employer lost status as a qualifying employer.
* Add § 685.219(h) to establish that the Secretary would determine by the preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions. Also, the Secretary will deem certain actions as conclusive evidence that the employer engaged in activities that have a substantial illegal purpose.
* Add § 685.219(i) to establish that the Secretary will determine that a qualifying employer engaged in activities that have a substantial illegal purpose when (1) the Secretary receives an application in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose, or (2) the Secretary otherwise determines that the qualifying employer engaged in such activities under the standard set forth in § 685.219(h).
* Add § 685.219(j) to establish that an employer that loses PSLF eligibility could regain qualifying employer status after (1) 10 years from the date the Secretary determines the employer engaged in activities that have a substantial illegal purpose, or (2) after the Secretary approves a corrective action plan.
* Add § 685.219(k) to require that if an employer regains eligibility, the Secretary will update, within 30 days, the qualifying employer list.

*Cost and Benefits:* As further detailed in the Regulatory Impact Analysis (RIA), the proposed changes would have meaningful implications for borrowers, taxpayers, and the Department. The regulatory changes outlined in this rule are designed to preserve the integrity of the PSLF program by ensuring that only borrowers employed by organizations engaged in lawful public service remain eligible for forgiveness. By excluding employers that engage in activities with a substantial illegal purpose, the rule aims to better align PSLF eligibility with the program's statutory intent—to

ED_02442

reward public service. Furthermore, it ensures that the Department is not indirectly subsidizing employers who are engaging in activities that have a substantial illegal purpose.

For borrowers, the proposed rule may alter eligibility for PSLF if they are employed by organizations that no longer qualify under the revised criteria. In cases where an employer is deemed to have engaged in activities that breach federal or state law or established public policy, affected borrowers would no longer receive credit toward loan forgiveness for months worked after the effective date of ineligibility. While this may delay or prevent forgiveness for a subset of borrowers, the overall design of the regulations—including advance notice, transparency around determinations, and employer recertification pathways—helps mitigate unexpected harm. These borrowers would retain the ability to pursue PSLF through eligible employment elsewhere, thereby preserving the program's incentive structure.

For taxpayers, the proposed rule reduces the risk of inappropriate government expenditures by ensuring that loan forgiveness is granted only in circumstances where individuals are engaged in public service. Employers that engage in unlawful activity are not serving the public interest because their actions harm, rather than help, the public good. By limiting PSLF eligibility to borrowers employed by organizations that do not engage in unlawful conduct, the rule reinforces appropriate stewardship of federal funds. While the exact budgetary impact will depend on the number and type of employers determined to fall outside the clarified definition, the proposal is expected to reduce PSLF-related discharges in cases where forgiveness would otherwise have gone to borrowers employed at organizations acting illegally.

For the Department, the rule introduces new administrative responsibilities. These include reviewing court judgments and plea agreements for evidence of employer misconduct, issuing determinations, notifying borrowers of status changes, and overseeing corrective action plans. While these tasks will require the investment of staff time and system resources, the use of existing standards—such as definitions grounded in federal law and doctrines adopted by other agencies—will allow the Department to administer the regulations with efficiency and consistency. The rule also codifies a clear evidentiary framework, such as relying on court judgments or plea

agreements, which limits the need for new investigative processes.

Taken together, the Department believes these regulations represent a necessary improvement to PSLF implementation. The costs associated with employer review and administration are modest compared to the significant benefits gained, including increased transparency, program integrity, and taxpayer protection. Most importantly, the rule preserves the fundamental promise of PSLF—to support borrowers who dedicate their careers to serving the public—while guarding against the diversion of federal benefits to organizations engaged in illegal conduct.

### III. Invitation To Comment

We invite you to submit comments regarding these proposed regulations. Please clearly identify the specific section or sections of the proposed regulations that each of your comments addresses and arrange your comments in the same order as the proposed regulations. The Department will not accept comments submitted after the comment period closes.

We invite you to assist us in complying with the requirements of Executive Orders 12866 and 13563 and their overall requirement of reducing the regulatory burden that might result from these proposed regulations. Please let us know of ways we could reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect public comments about these proposed regulations by accessing *Regulations.gov.*

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for these proposed regulations. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the Information Technology Accessibility Program Help Desk at *ITAPSupport@ ed.gov* to help facilitate.

### Clarity of the Regulations

Executive Order 12866 and the Presidential memorandum "Plain Language in Government Writing" [1] require each agency to write regulations

that are easy to understand. The Secretary invites comments on how to make the regulation easier to understand, including answers to questions such as the following:

* Are the requirements in the proposed regulations clearly stated?

* Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

* Does the format of the proposed regulations (grouping and order of sections, use of headings, paragraphing) aid or reduce its clarity?

* Would the proposed regulations be easier to understand if we divided them into additional (but shorter) sections? (A "section" is preceded by the symbol "§" and a numbered heading; for example, § 668.2 General definitions.)

* Could the description of the proposed regulations in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the proposed regulations easier to understand? If so, how?

* What else could we do to make the proposed regulation easier to understand?

To send any comments that concern how the Department could make these proposed regulations easier to understand, see the instructions in the **ADDRESSES** section.

### IV. Background

The PSLF program was established by the College Cost Reduction and Access Act of 2007 (CCRAA), Public Law 110–84, 121 Stat. 84. In particular, the CCRAA amended section 455(m) of the Higher Education Act of 1965, as amended, to allow for cancellation of remaining loan balances for eligible Direct Loan borrowers after they have made 120 monthly payments under a qualifying repayment plan while working at a qualifying public service or nonprofit employer.

Following the enactment of the CCRAA, the Department promulgated PSLF regulations at 34 CFR 685.219, which became effective on July 1, 2009.[2] Since its original promulgation, 34 CFR 685.219 has been amended seven times.[3] Of these amendments, two, promulgated in 2020 and 2022, respectively, have substantively changed the criteria for qualifying employment for the purposes of participation in PSLF—

1. In 2020, the definition of "public service organization" was substantively

---

[1] 63 FR 31885 (June 1, 1998).

[2] *See* 73 FR 63232–01 (Oct. 23, 2008).

[3] *See* 74 FR 56005 (Oct. 29, 2009); 77 FR 76414 (Dec. 28, 2012); 80 FR 67242 (Oct. 30, 2015); 85 FR 49821 (Aug. 14, 2020); 87 FR 66063 (Nov. 1, 2022); 88 FR 43065 (July 6, 2023); 88 FR 43905 (July 10, 2023).

changed to allow employees of organizations engaged in religious activities (regardless of whether the borrower's duties included religious instruction, worship services, or any form of proselytizing) to be eligible for PSLF; and

2. In 2022, the Department changed the term "public service organization" to the term "qualifying employer" which substantively changed the definition. Subsection (v)(A) of the definition of qualifying employer referenced another term "non-governmental public service." Notably, while previous iterations of 34 CFR 685.219 relied on definitions provided by the Bureau of Labor Statistics in regard to specific professions that were considered to be a form of public service (or left such terms undefined), the 2022 rule instead defined those terms within the section.

The Department is engaging in this rulemaking because organizations must not engage in substantial illegal activities to be a qualifying employer for purposes of the PSLF Program. Indeed, organizations that have a substantial illegal purpose are acting in contravention with the public good.

Below, we address the Secretary's broad authority to engage in rulemaking on this topic and provide a brief discussion of the relevant statutory authority regarding what organization constitutes a qualifying employer for the purposes of PSLF, the implementation of that authority, and relevant changes to 34 CFR 685.219 since its original promulgation. Additionally, we discuss the illegality doctrine utilized by the Internal Revenue Service (IRS) as a basis for the Department to promulgate regulations excluding organizations that have engaged in certain illegal activities from the definition of qualifying employers.

## V. Authority for This Regulatory Action

Congress has granted the Secretary broad authority to promulgate regulations to administer the programs administered by the Department of Education and to carry out his or her duties.[4] In order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, the Secretary is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing applicable programs administered by and the manner of operation of, the

Department.[5] These programs include the financial assistance programs authorized pursuant to title IV of the Higher Education Act authorized by HEA § 455 *et seq.*

### Legal Basis for Denying Certain Organizations' Qualifying Employer Status

While HEA § 455(m)(3) contains a definition of the term *public service job* (setting forth categories of employment that provide a public service),[6] it does not define the term *public service.* As a result of this, from the time the Department first promulgated 34 CFR 685.219(a), it has been necessary to expound upon what constitutes *public service*—a term which has the plain meaning of "any work that serves the public good"[7]—and the Department has repeatedly promulgated amendments to 34 CFR 685.219 to further define its meaning. The proposed change is a continuation of these efforts, as an organization that engages in activities that have a substantial illegal purpose is not providing a public service because it does not serve the public interest to engage in illegal activities. Therefore, these employers should not be considered a *qualifying employer* for the purpose of PSLF.

The Department has based its approach in this matter, in part, on the so-called "illegality doctrine" utilized when determining whether organizations qualify for tax-exempt status under Internal Revenue Code § 501(c)(3) (a requirement for non-governmental organizations to be considered a *qualifying employer* for the purposes of the PSLF program). The Department considered this doctrine because it is a tested approach taken by another executive agency to avoid subsidizing employers engaged in unlawful conduct.[8]

---

[5] 20 U.S.C. 1221e–3.

[6] *See* HEA § 455(m)(3)(B).

[7] PUBLIC SERVICE, Black's Law Dictionary (12th ed. 2024).

[8] 26 U.S.C. 501(c)(3) exempts the following from taxation: Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which insures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

*Background of the Illegality Doctrine*

The "illegality doctrine" imposes an implied requirement that organizations exempt from taxation under § 501(c)(3) must not have a substantial illegal purpose. This doctrine arises from a common-sense principle:

Loss of government revenues from tax exemption is often justified on the grounds that tax-exempt organizations serve desirable public purposes and lessen the government's costs and burdens. As a corollary to this public benefit principle, tax exemption is not justified when an organization has an illegal purpose because the organization does not serve a public purpose, and the organization increases the government's costs and burdens. The illegality doctrine helps ensure that the government is not subsidizing activity that it aims to prevent.[9]

A recent example of the application of the illegality doctrine, and a review of said application by a Federal court, is found in *Iowaska Church of Healing* v. *Werfel,* 105 F.4th 402 (D.C. Cir. 2024). In this case, the IRS denied an application for 501(c)(3) tax exempt status to an organization whose members' sincerely held religious beliefs involved the consumption of a hallucinogenic drug regulated by the Controlled Substances Act ("CSA"), because it determined that (1) the organization was formed in part for the illegal purpose of distributing a controlled substance; and (2) a substantial part of the organization's activities was in furtherance of that illegal purpose.[10] The D.C. Circuit upheld this decision on the basis that, regardless of the sincerity of its beliefs, until the organization obtained an exemption from the CSA, its primary organizational and operational purpose was facially illegal.[11]

*The Department's Proposed Changes to the Definition of Qualifying Employer Aligns With, and Are Justified on the Same Basis as, the IRS's Use of the Illegality Doctrine*

Through the Illegality Doctrine, the IRS excludes organizations engaged in illegal purposes or purposes that are against established public policy from tax exemption under § 501(c)(3) on the basis that they do not serve a public purpose. The Department's proposed changes to the definition of *qualifying employer* align directly with this approach by excluding organizations engaged in activities with a *substantially illegal purpose* from being

---

[9] The Illegality Doctrine and 501(c)(3) Organizations (2025), *https://www.congress.gov/crs-product/IF12739.*

[10] *See Iowaska Church of Healing,* 105 F.4th 402, 406, 407.

[11] *Id.* at 414.

---

[4] *See* 20 U.S.C. 1221e–3, *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

included in the definition of *qualifying employer,* on the basis that such organizations are engaged in activities that are either explicit violations of State or Federal law or are otherwise in direct contravention of established public policy.

Just as benefit to the public is an underlying justification for tax exemption,[12] the purpose of the PSLF program is to encourage individuals to enter and continue in full-time public service employment.[13] All of the activities included within the definition of *substantial illegal purpose*[14] are either explicit violations of State or Federal law, and as such, are actions which do not serve the public good. Indeed, violations of law may increase government costs and burdens, which has the opposite effect of actions that actually promote the public good. To maintain internal coherence across the statutes at large, we presume that Congress would not have the Department subsidize activity through the PSLF program that Congress also aims to prevent in other statutes. Indeed, Congress appropriates significant public funds to combat illegal behavior, and it would frustrate the purpose of those appropriations if the Department were also subsidizing illegal behavior in the PSLF program with public funds. Therefore, the Department's exclusion of organizations engaging in such activities from the definition of *qualifying employer* is justified on the same basis that the IRS is justified in using the Illegality Doctrine to deny or revoke tax exempt status granted under § 501(c)(3): it would be paradoxical for the Department to allow organizations and borrowers to be employed by organizations that are acting against the public good in order to benefit from a program premised on encouraging individuals to enter and continue in full-time public service employment.[15]

------

[12] *See* Jean Wright and Jay H. Rotz, *Illegality and Public Policy Considerations, in* IRS Exempt Organizations Continuing Professional Education Technical Instruction Program Textbook, 17th Ed. (IRS Exempt Organizations Technical Division, ed. 1993).

[13] *See* 34 CFR 685.219(a).

[14] *See* "Substantial Illegal Purpose (§ 685.219(b)(30)) for the list of activities.

[15] *See Church of Scientology of California* v. *Comm'r of Internal Revenue,* 83 T.C. 381, 507 (1984), aff'd sub nom. *Church of Scientology of California* v. *Comm'r,* 823 F.2d 1310 (9th Cir. 1987) (*stating* "The Government also has an interest in not subsidizing criminal activity. Were we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense. We think such paradoxes are best left for Gilbert and Sullivan").

## VI. Public Participation

Section 492 of the HEA, 20 U.S.C. 1098a, requires the Secretary to obtain public involvement in the development of proposed regulations affecting programs authorized by the title IV, HEA programs. Prior to developing this NPRM, we significantly engaged with the public to obtain advice and recommendations from individuals and representatives of groups involved in the title IV, HEA programs. This engagement included a 30-day public comment period, two days of public hearings, and three days of negotiated rulemaking.

On April 4, 2025, we published in the **Federal Register** (90 FR 14741) a notice of our intent to hold public hearings and to establish a negotiated rulemaking committee addressing topics such as PSLF, Pay As You Earn (PAYE), Income-Contingent Repayment (ICR), or other topics that would streamline and improve Federal student financial assistance programs and related regulations.

### Public Comments and Hearings

We received 7,929 written comments in response to the **Federal Register** notice. Additionally, public hearings were held on April 29 and on May 1, 2025. A total of 137 individuals testified at the hearings. We also received written comments on possible regulatory provisions that were submitted directly to the Department by interested parties and organizations.

You may view the written comments submitted in response to the April 4, 2025, **Federal Register** notice on the Federal eRulemaking Portal at *Regulations.gov*, within docket ID ED–2023–OPE–0151. Instructions for finding comments are also available on the site under "FAQ."

Transcripts of the public hearings can be accessed at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

### Negotiated Rulemaking

After obtaining this extensive advice and recommendations from the public, the Secretary, by section 492 of the HEA, 20 U.S.C. 1098a, prepared draft regulations and submitted them to a negotiated rulemaking process. Further information on the negotiated rulemaking process can be found at: *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

On May 12, 2025, we published a notice in the **Federal Register** (90 FR 20142) announcing our intent to establish a committee to prepare these proposed regulations. The notice set forth a schedule for committee meetings and requested nominations for individual negotiators to serve on the negotiated rulemaking committee. In the notice, we also announced the topics that the committee would address.

We chose members of the negotiated rulemaking committee from individuals nominated by groups involved in the title IV, HEA programs. We selected individuals with demonstrated expertise or experience with the PSLF program. The negotiated rulemaking committee included the following members, representing their respective constituencies:

* Civil rights organizations, consumer advocates, and legal assistance organizations that represent students and/or borrowers: Betsy Mayotte, The Institute of Student Loan Advisors, and Abby Shafroth (alternate), Student Loan Borrower Assistance Project.

* State officials, including State higher education executive officers, State authorizing agencies and State attorneys general: Rebecca Stanley, Fifteenth Judicial Circuit Solicitor's Office, and J. Charles Smith III (alternate), Frederick County State's Attorney's Office.

* Student loan borrowers in repayment: Emeka Oguh, PeopleJoy, and Sarah Doran (alternate), St. Vrain Valley Schools.

* U.S. military service members, veterans, or groups representing them: Robert H. Carey, Jr., National Defense Committee, and Faisal Sulman (alternate), Student Veterans of America.

* Public institutions of higher education, including Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority-serving institutions (institutions of higher education eligible to receive Federal assistance under title III, parts A and F, and title V of the HEA): Tracy A. Ireland, The Board of Regents of the University System of Georgia, and Kaity McNeill (alternate), The University of North Carolina System Office.

* Private nonprofit institutions of higher education including Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority-serving institutions (institutions of higher education eligible to receive Federal assistance under title III, parts A and F, and title V of the HEA): C. Todd Jones, Association of Independent Colleges and Universities of Ohio, and

Heather Boutell (alternate), Vanderbilt University.

* Proprietary institutions of higher education: Mary Lyn Hammer, Champion College Solutions, and April Boyd (alternate), The College of Health Care Professionals.

* Financial aid administrators at postsecondary institutions: Alyssa Dobson, Slippery Rock University, and Helen Faith (alternate), University of Virginia.

* Organizations representing taxpayers and the public interest: Thomas John Aiello, National Taxpayers Union, and Laurel Taylor (alternate), Candidly.

* Federal Family Education Loan Lenders and/or Guaranty Agencies: Scott Buchanan, Student Loan Servicing Alliance, and Alex Ricci (alternate), National Council of Higher Education Resources.

The committee discussion was led by Tamy Abernathy of the Department and supported by the Department's Office of General Counsel and Office of Postsecondary Education, with Annmarie Weisman of Federal Student Aid serving as facilitator for the committee.

The negotiated rulemaking committee for these proposed regulations met from June 30 to July 2, 2025. The committee reviewed and discussed draft regulations prepared by the Department, as well as alternative language and suggestions proposed by committee members. The Department provided opportunities for public comment at the end of the first two days of negotiations. Additionally, during each negotiated rulemaking session, non-Federal negotiators obtained feedback from stakeholders that they shared with the negotiating committee.

Under the organizational protocols for negotiated rulemaking, if the committee reaches consensus on the proposed regulations, we agree to publish, without substantive alteration, a defined group of regulations on which the negotiators reached consensus—unless the Secretary reopens the process or provides a written explanation to the participants stating why he or she has decided to depart from the agreement reached during negotiations. In this instance, consensus is considered to be the absence of dissent by any member of the negotiated rulemaking committee (abstaining members are not considered to be dissenting from the proposal).

At the conclusion of the meetings on July 2, 2025, the negotiator representing civil rights organizations dissented from the draft regulations and therefore the committee did not reach consensus. For more information on the proceedings of these meetings please visit: *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

## VII. Significant Proposed Regulations

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect.

### Definitions General (§ 685.219(b))

*Current Regulations:* Section 685.219(b) contains 23 definitions of key terms as they relate to the PSLF program.

*Proposed Regulations:* We are proposing to restructure subsection (b) of § 685.219 to make each definition its own paragraph. The paragraphs would include the 23 current definitions and add 13 new definitions in these proposed rules.

*Reasons:* Due to the proposed addition of 13 new definitions the Department believes restructuring subsection (b) in this manner will greatly aid with readability of the regulation. For ease of reference, the definitions in subsection (b) would continue to be listed in alphabetical order.

### Aiding or Abetting (§ 685.219(b)(1))

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219 would define aiding or abetting and use the same definition that is already in current law under Title 18, United States Code, Section 2.
*Reasons:* The term aiding or abetting can be found in two places in the proposed definition of *substantial illegal purpose* under § 685.219(b)(30): (1) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws, and (2) engaging in a pattern of aiding and abetting illegal discrimination. Under the proposed rule, a qualifying employer that engages in activities that have a substantial illegal purpose would lose its qualifying employer status if certain conditions were met (*see* discussion of proposed § 685.219(h) and (i)). The principles under 18 U.S.C. 2 state:

(1) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(2) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The Department would adopt the definition of aiding and abetting as defined in Title 18 of the United States Code, a Federal statute. As the Department expressed during negotiated rulemaking, utilizing a pre-existing definition in Federal law would help ensure: (1) the Department's regulations align with other definitions across Federal agencies, (2) the Department is able to make consistent determinations using established criteria regarding the status of a qualifying employer, and (3) the public understands how the Department interprets the phrase.

### Chemical Castration or Mutilation (§ 685.219(b)(3))

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219(b)(3) would define chemical castration or mutilation to mean the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex and the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.
*Reasons:* The term chemical castration or mutilation can be found in the proposed definition of substantial illegal purpose under § 685.219(b)(30): engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law. Under this proposed rule, a qualifying employer that engages in activities that have a substantial illegal purpose may lose its qualifying employer status if certain conditions are met.

The Department searched for the most appropriate definition of chemical castration or mutilation and located Executive Order 14187, Protecting Children From Chemical and Surgical Mutilation,[16] which provides the basis for the proposed definition. E.O. 14187 states:

*. . . chemical and surgical mutilation* means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical

---

[16] Executive Order 14187—Protecting Children From Chemical and Surgical Mutilation—*https://www.federalregister.gov/documents/2025/02/03/2025-02194/protecting-children-from-chemical-and-surgical-mutilation.*

appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as *gender affirming care.*

As the Department expressed during negotiated rulemaking, utilizing a pre-existing definition elsewhere in guidance would help ensure: (1) that the Department's regulations align with other definitions across Federal agencies, (2) that the Department makes consistent determinations using established precedents regarding the status of a qualifying employer, and (3) that the public has clear expectations on how the Department interprets the term.

During negotiated rulemaking, one negotiator expressed concern that the Department staff are not medical professionals and do not have the expertise to define chemical castration or mutilation. The Department clarified that in order for a qualifying employer to lose eligibility under this definition there must be a violation of Federal or State law. In *United States* v. *Skremtti,* Attorney General and Reporter for Tennessee, et al.,[17] the U.S. Supreme Court upheld a Tennessee law restricting certain sex transition treatments for minors. Also, there are 27 States that restrict medical procedures and treatments performed on minors related to assertion that minor's sexual identity differs from their biological sex, either in part of in full.[18]

The Department would not find a violation of the standard (see discussion under § 685.219(h) and (i)) if there is not a Federal or State law that prohibits sex transition treatments for minors in the state where the employer is located.

### Child or Children (§ 685.219(b)(4))

*Current Regulations:* None.
*Proposed Regulations:* The Department proposes that for the sole and specific purpose of the PSLF Program the term "child" or "children" means an individual or individuals under 19 years of age.

*Reasons:* The term child or children can be found in the proposed definition of substantial illegal purpose under § 685.219(b)(30): engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law. The Department believes that it is necessary to define the

term for the purposes of the PSLF program.

The Department searched for the most appropriate definition of child or children and located guidance in Executive Order 14187, Protecting Children From Chemical and Surgical Mutilation, which provides the basis for the proposed definition. Executive Order 14817 states——

"The term "child" or "children" means an individual or individuals under 19 years of age."

During rulemaking, a few negotiators raised concerns that the age of majority in many States is 18 years of age. The negotiators believed that the Department's proposed definition could penalize a qualifying employer that performed certain medical procedures that were banned for minors to an individual that a State considered to be a legal adult. To address this concern, the Department clarified that the entire clause under proposed § 685.219(b)(30) must be considered. The illegal activities in which the organization is engaging—specifically the chemical and surgical castration or mutilation of children must be in violation of Federal or State law of the state where the employer is located (*see also* the discussion of proposed § 685.219(b)(4), above, and § 685.219 (b)(31)), below.

### Foreign Terrorist Organizations (§ 685.219(b)(10))

*Current Regulations:* None.
*Proposed Regulations:* Under proposed 685.219(b)(10), the Department would define the term *foreign terrorist organizations* to mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

*Reasons:* The Department proposes to adopt the definition of foreign terrorist organizations as defined in the Immigration and Nationality Act, a Federal statute. As the Department expressed during negotiated rulemaking, utilizing a pre-existing definition elsewhere in Federal law helps to ensure that the Department's regulations align with other definitions across Federal agencies. As we explained during negotiated rulemaking, as of June 2025, there were over 70 foreign terrorist organizations designated by the United States Department of State.[19]

To help the Department determine whether a qualifying employer or organization is engaging in activities

with a substantial illegal purpose—including supporting terrorism, the Department would need a definition for foreign terrorist organizations. The Department believes utilizing an existing definition of foreign terrorist organizations would ensure consistency and clarity for the community. The Department would then be able to determine the nexus between a qualifying employer and whether that qualifying employer met the conditions of engaging in a substantially illegal purpose.

### Illegal Discrimination (§ 685.219(b)(12))

*Current Regulations:* None.
*Proposed Regulations:* Under proposed 685.219(b)(12), the Department would define the term "illegal discrimination" to mean a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

*Reasons:* The Department proposes to enumerate a non-exhaustive list of Federal anti-discrimination laws in the definition of illegal discrimination. These Federal laws are some of the chief anti-discrimination laws that we believe capture the intent of the PSLF Executive Order which keeps qualifying employers accountable to not engage in illegal discrimination.

The definition of illegal discrimination is limited to only Federal discrimination laws rather than State discrimination laws. Limiting the scope to only Federal laws will help reduce the burden on the Department when assessing whether a qualifying employer engages in illegal discrimination as there are many State laws addressing discrimination. Furthermore, the Department would leverage its existing relationship with other Federal partners to assist in determining if a qualifying employer engages in illegal discrimination in the context of Federal laws. The Department believes the listed Federal laws in paragraph (b)(12) should cover most of the illegal discrimination employers could be involved in and help ensure that the Department is consistent and uniform in addressing issues of illegal discrimination to a narrow set of Federal laws.

The Department notes that we reserved the Secretary's authority to include other Federal anti-discrimination laws in this definition that are not enumerated by including the phrase "including but not limited to." In crafting the definition of illegal discrimination, we balanced the need to

---

[17] United States v. Skremtti, Attorney General and Reporter for Tennessee, et al.—*https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf.*

[18] Amy Herron, *These 27 States Have Restricted Gender-Transition Treatments for Minors Since 2021,* N.Y. Times, June 18, 2025 (available at *https://www.nytimes.com/2025/06/18/us/politics/states-trans-treatments-scotus.html*).

[19] List of foreign terrorist organizations designated by the State Department: *https://www.state.gov/foreign-terrorist-organizations/.*

outline specific laws to give qualifying employers clear expectations to curb illegal discrimination with the need to also cover other forms of illegal discrimination that are not enumerated that could be a cause of concern in the future.

During negotiated rulemaking sessions, a negotiator acknowledged that, while the Department has expertise in helping ensure that discrimination does not exist in educational settings, it does not have the expertise or authority to enforce other types of discrimination, including employment discrimination law. The negotiator also expressed concern that a "chilling effect" could exist in the reporting of discrimination. In turn, the employee would lose PSLF eligibility if the employer was found liable for engaging in illegal discrimination. In response, the Department pointed out the circular nature of the argument if the Department cannot enforce the rules preventing illegal discrimination due to the fear of the "chilling effect." Therefore, we reiterate that we have an interest in helping ensure that PSLF qualifying employers do not engage in illegal discrimination.

*Other Federal Immigration Laws (§ 685.219(b)(17))*

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219(b)(17) would define *other Federal Immigration laws* to mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

*Reasons:* The term *other Federal immigration laws* can be found in the proposed definition of substantial illegal purpose under § 685.219(b)(30)(i): aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws. The Department believes that it is necessary to define the term for the purpose of determining whether a qualifying employer engaged in activities that would restrict participation in the PSLF program.

U.S. immigration policy is governed largely by the Immigration and Nationality Act (INA), which was first codified in 1952 and has been amended significantly several times since. U.S. immigration policy contains two major aspects. One facilitates migration flows of foreign nationals into the United States; another focuses on immigration enforcement and removal. Immigration functions authorized by Congress under the INA and other laws are carried out by several executive branch agencies.[20]

---

[20] Primer on U.S. Immigration Policy—*https://www.congress.gov/crs-product/R45020.*

While the INA is the main Federal statute governing U.S. immigration policy, there are other immigration statutes that are not part of the INA. The Department chooses not to limit its authority to review a qualifying employer under the proposed standard (*see* proposed § 685.219(h) and (i)) to the INA. As such we included the phrase "or any other Federal immigration laws" as part of the definition.

*Qualifying Employer (§ 685.219(b)(27))*

*Current Regulations:* Current § 685.219(b) contains definitions of key terms, including the definition of *qualifying employer.* Under the current regulations, the term *qualifying employer* generally includes Federal, State, local, and Tribal Government agencies; public child or family service agencies; nonprofit organizations that are described in section 501(c)(3) of the Internal Revenue Code and exempt from taxation under section 501(a) of the Internal Revenue Code; and other organizations that provide certain specific public services listed in § 455(m)(3)(B) of the HEA, other than a business organized for profit, a labor union, or a partisan political organization.

*Proposed Regulations:* The Department proposes modifying the existing definition of *qualifying employer* in § 685.219(b). At the direction of the Secretary and consistent with the guidance in E.O. 14235,[21] the Department would revise the definition of *qualifying employer* to exclude organizations that engage in activities that have a substantial illegal purpose.

*Reasons:* The proposed modified definition of *qualifying employer* would align with the policy in E.O. 14235 to protect the integrity of the PSLF program by ensuring that loan cancellation under the program does not subsidize organizations that engage in activities that have a substantial illegal purpose.

The Department is concerned that the PSLF program has sent tax dollars to employees of organizations that are engaged in activities that are illegal, thereby subsidizing their employment.

The proposed changes to the definition would benefit taxpayers by ending support for organizations that engage in illegal activities such as aiding and abetting illegal immigration, human trafficking, damage to government property, and other actions

---

[21] Restoring Public Service Loan Forgiveness— *https://www.federalregister.gov/documents/2025/03/12/2025-04103/restoring-public-service-loan-forgiveness.*

that threaten our country. The proposed definition would also benefit student loan borrowers by redirecting them to employment with organizations that serve the public good.

During the negotiated rulemaking meetings, the Department proposed a refined definition of *qualifying employer* as a method to protect the objectives and efficacy of the PSLF program. Negotiators and public commenters expressed concerns that such an approach might create a "chilling effect" that could discourage borrowers from entering certain career fields in public service. The Department has taken steps to address the issues raised with the draft regulations and believes that the benefits of these proposed regulations outweigh concerns that have been raised. The modified definition would provide notice to borrowers about the qualifying employer requirements when applying for or certifying eligibility under the PSLF program. The modified definition would also provide clarity that an organization that participates in activities that have a substantial illegal purpose is explicitly excluded from the list of qualifying employers for purposes of determining eligibility under the program.

*Substantial Illegal Purpose (§ 685.219(b)(30))*

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219(b)(30) would define substantial illegal purpose as:

(1) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(2) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(3) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(4) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law,

(5) engaging in a pattern of aiding and abetting illegal discrimination; or

(6) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.

*Reasons:* Illegal activities, including illegal immigration, as well as activities which are against established public policy, are a threat to our national security and to the social and economic

stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct. Further, the President has a constitutional duty of ensuring that laws be faithfully executed. On March 7, 2025, President Trump signed E.O. 14235, directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the PSLF Program excludes organizations that engage in activities that have a substantial illegal purpose and identifying certain activities which are illegal or contrary to public policy. The Department has chosen to use its statutory authority to codify the guidance outlining activities that have a substantial illegal purpose in E.O. 14235 in regulation.

*Surgical Castration or Mutilation (§ 685.219(b)(31))*

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219(b)(31) would define surgical castration or mutilation as surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her biological sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy his or her natural biological functions.
*Reasons:* The term surgical castration or mutilation can be found in the proposed definition of substantial illegal purpose under § 685.219(b)(30): engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law. Under this proposed rule a qualifying employer that engages in activities that have a substantial illegal purpose may lose its qualifying employer status if certain conditions are met.
The Department searched for the most appropriate definition of surgical castration or mutilation and located Executive Order 14187, which provides the rationale for the proposed definition. Executive Order 14187 states:

. . . *chemical and surgical mutilation* means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural

biological functions. This phrase sometimes is referred to as *gender affirming care.*

As the Department expressed during negotiated rulemaking, utilizing a pre-existing definition elsewhere in guidance would help ensure: (1) that the Department's regulations align with other definitions across Federal agencies, (2) that the Department is able to make consistent determinations using established precedent regarding the status of a qualifying employer, and (3) that the public is aware how the Department interprets the phrase.
During negotiated rulemaking, one negotiator expressed concern that the Department staff are not medical professionals and do not have the expertise to define surgical castration or mutilation. The Department clarifies that, in order for a qualifying employer to lose eligibility under this definition, there must be a violation of State law. In the *United States* v. *Skremtti,* Attorney General and Reporter for Tennessee, et al.[23] the U.S. Supreme Court upheld a Tennessee law restricting certain sex transition treatments for minors and, as of June, 2025,[24] there are 27 States that restrict certain medical procedures and treatments performed on minors related to assertions that minors' sexual, identity differs from their biological sex.
The Department would not find a violation of the standard (*see* discussion under § 685.219(h) and (i)) if there is not a Federal or State law in the state where the employer is located that prohibits surgical castration or mutilation of minors. In other words, if those types of procedures are legal in the state where the employer resides and the employer participates or supports such activities, there would be no violation.

*Terrorism (§ 685.219(b)(32))*

*Current Regulations:* None.
*Proposed Regulations:* Proposed 685.219(b)(32), would adopt the definition of ''terrorism'' used in Title 18, United States Code, Section 2331 (18 U.S.C. 2331).
*Reasons:* The Department proposes to adopt the definition of terrorism as defined in the criminal code. As we explained during negotiated rulemaking, utilizing a pre-existing

---

[23] *United States* v. *Skremtti*, Attorney General and Reporter for Tennessee, et al.—*https://www.supremecourt.gov/opinions/24pdf/23-477_2cp3.pdf.*
[24] Amy Herron, These 27 States Have Restricted Gender-Transition Treatments for Minors Since 2021, N.Y. Times, June 18, 2025 (available at *https://www.nytimes.com/2025/06/18/us/politics/states-trans-treatments-scotus.html*).*https://www.nytimes.com/2024/12/04/us/gender-transition-bans-states.html.*

definition elsewhere in Federal law would help ensure that the Department's regulations align with other definitions across Federal agencies. To that end, we propose to use the definition of terrorism in 18 U.S.C. 2331. Under Federal law, terrorism includes acts of international and domestic terrorism that involve violated acts or acts dangerous to human life that are illegal and appear to be intended to intimidate or coerce civilians or the Government.
To help the Department determine whether a qualifying employer or organization is engaging in activities with a substantial illegal purpose, including supporting terrorism, the Department requires a definition for terrorism. The Department would then be able to determine the nexus between a qualifying employer and whether that qualifying employer supported terrorism as defined in our regulations.

*Trafficking (§ 685.219(b)(33))*

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219(b)(33) would add a new definition for *trafficking,* which is a key term under the broader *substantial illegal purpose* definition.
*Reasons:* The proposed definition at § 685.219(b)(33) is necessary to bring clarity to the specific activities that constitute having a substantial illegal purpose. Because trafficking is a key term listed under the broader *substantial illegal purpose* definition, the Department must provide a definition for the term. Additionally, proposed § 685.219(b)(33) provides greater specificity for the Secretary, in his or her authority under the HEA, to make the determination if an organization has engaged in illegal activities, for the purposes of determining eligibility under the PSLF program.
The Department researched existing Federal laws and statutes but did not find a statute that matched the context. For example, current regulatory text at 28 CFR 1100.25 provides a definition for ''severe forms of trafficking,'' however the definition was limited to situations of sex trafficking only. In the absence of an appropriate definition under existing law, the Department chose to develop its own proposed definition to better align with the intent of Executive Order 14187 to specifically protect children from illegal transportation across State lines for the purposes of emancipation from their lawful parents or guardian. The Department believes the proposed definition will effectively serve the purpose of preventing organizations

from engaging in these types of trafficking activities.

*Violating State Law (§ 685.219(b)(34))*

*Current Regulations:* None.
*Proposed Regulations:* Under proposed 685.219(b)(34), *violating S State law* would mean a final, non-default judgment by a State court of: (i) trespassing; (ii) disorderly conduct; (iii) public nuisance; (iv) vandalism; or (v) obstruction of highways.

*Reasons:* The Department believes we must create a definition to establish a clear and consistent framework for evaluating violations of State law. The proposed definition would provide an exhaustive list of State law violations that would amount to activity that has a substantial illegal purpose. Qualifying employers would have the ability to recognize actions or activities that have a substantial illegal purpose and either avoid or resolve them prior to losing eligibility.

The Department originally proposed ''Violating State Tort Law'' as the title for the definition. However, during negotiated rulemaking, negotiators commented that the listed violations were a combination of both civil and criminal offenses; therefore, the Department removed the reference to ''tort''.

Additionally, because of negotiations, the Department proposed to remove the definition of *violating State laws* given we believed it was defined adequately under the definition of substantial illegal purpose. However, a negotiator noted that we inadvertently removed the condition that the State law violation must be confirmed as a final, non-default judgment. The Department reintroduced the language into the proposed definition as we believed it ensured an employer, suspected of having violated State law under this proposed rule, was provided consistency and fairness when deciding to rely upon a decision made by court or tribunal. The Department believes a non-default judgment clarifies this standard by relying upon a court decision made after a full trial or hearing.

*Violence for the Purpose of Obstructing or Influencing Federal Government Policy (§ 685.219(b)(35))*

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 685.219(b)(35) would define *violence for the purpose of obstructing or influencing Federal Government policy,* which is one of the activities explicitly mentioned in the broader *substantial illegal purpose* definition. Section 685.219(b)(35) leverages an existing

statutory definition for *crime of violence,* as found under 18 U.S.C. 16.

*Reasons:* The proposed definition at § 685.219(b)(35) is necessary to bring clarity to the specific activities that constitute having a substantial illegal purpose. Additionally, § 685.219(b)(35) provides greater specificity for the Secretary, in his or her authority under the HEA, to make the determination if an organization has engaged in illegal activities, for the purposes of determining eligibility under the PSLF program. In defining *violence for the purpose of obstructing or influencing Federal Government policy,* the Department sought an appropriate reference to violence in existing Federal laws. A *crime of violence* within 18 U.S.C. 16, generally involves attempted, threatened, or physical force against a person or property of another. The Department believes this existing reference is appropriate for use in our proposed definition and simplifies the determination process for the Department by leveraging existing law. Borrowers as well as their employers will also benefit from the approach of using existing law as doing so applies consistency, familiarity, and fairness.

*Borrower Eligibility (§ 685.219(c))*

*Current Regulations:* Section 685.219(c) provides the borrower eligibility requirements for purposes of PSLF. Specifically, § 685.219(c)(2) outlines the conditions when a borrower would have been considered to have made a qualifying monthly payment under § 685.219(c)(1)(iii).

*Proposed Regulations:* Under proposed § 685.219(c)(2), the Secretary would add a new condition under paragraph (c)(4) under which a borrower would not have been considered to have made a qualifying payment under paragraph (c)(1).

Under proposed § 685.219(c)(4), effective on or after July 1, 2026, through a standard described in § 685.219(h), no payment would be creditable as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose.

*Reasons:* Under the PSLF program, borrowers must meet the following criteria: be employed by a qualifying employer such as a Federal, State, local, or Tribal government or qualifying not-for-profit organization; work full-time for that agency or organization; have Direct Loans (or consolidate other Federal student loans into a Direct Loan); repay their loans under a qualifying repayment plan; and make a total of 120 qualifying monthly

payments that need not be consecutive.[25] The proposed rules in 685.219(c) are twofold. First, the Department adds an exception clause in paragraph (c)(2) that states a borrower would not be considered to have made a PSLF-qualifying payment during a period or periods subsequent to which the qualifying employer has been determined to have engaged in substantial illegal activity. Second, by adding a new paragraph (c)(4), the Department makes certain the effective date of these regulations that impact a borrower's eligibility. The Department believes that addressing the impact these regulations have on a borrower's eligibility with an effective date of July 1, 2026, only allows for prospective adjudications. By selecting a date that impacts a borrower's eligibility for PSLF, borrowers have clarity as to when their payments would be considered qualifying payments.

*Application Process (§ 685.219(e))*

*Current Regulations:* Section 685.219(e) outlines a process for a borrower to apply for loan forgiveness under the PSLF program. Specifically, the process directs that a borrower may request loan forgiveness by filing an application approved by the Secretary, and then directs the Secretary to, among other things, make determinations and notify the borrower of forgiveness if sufficient information is available. If there is insufficient information available, the Secretary may request that the borrower provide additional information in order to make a determination of qualifying employment or eligible payments based on other documentation provided by the borrower. Upon the Secretary's determination that a borrower meets forgiveness eligibility requirements, the Secretary will notify the borrower and forgive the outstanding balance of the eligible loans.

*Proposed Regulations:* Proposed § 685.219(e)(9) would modify the current process to require the Secretary to notify the borrower when an employer may become an ineligible employer under subsection (h) of this section. Proposed § 685.219(e)(10) would provide that, if the Secretary has determined that the employer is no longer a qualifying employer, the Secretary would notify that borrower of the employer's status.

*Reasons:* Modifying § 685.219(e) is necessary to conform with the Department's proposed regulatory amendment at subsection (h) within the

---

[25] *https://studentaid.gov/manage-loans/forgiveness-cancellation/public-service.*

same section. Whereas subsections (h) and (i) provide the standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose and the process for making such determinations, subsection (e) clarifies the application process by directing the Secretary to notify borrowers when an employer may become ineligible or is no longer considered a qualifying employer for purposes of the PSLF program as it relates to the proposed standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose. The proposed borrower notification process provides transparency and insight regarding current or former employers that may become ineligible or are ineligible as a result of the proposed subsection (h). Should a borrower be employed by an affected employer, such notifications may assist a borrower in making informed decisions about their employment should they wish to continue making qualifying PSLF payments while employed at a qualifying employer.

*Borrower Reconsideration Process (§ 685.219(g))*

*Current Regulations:* Section 685.219(g) outlines a process for the reconsideration of a student loan borrower's eligibility under the PSLF program. Specifically, current § 685.219(g) outlines the conditions for a borrower to request that the Secretary reconsider whether the borrower's employer or any payment on their qualifying loan meets the requirements for credit toward loan forgiveness under the program.

*Proposed Regulations:* Proposed § 685.219(g) would modify the current process for requesting reconsideration by adding an additional subparagraph that states a borrower may not request reconsideration when the Secretary's determination was made based upon an organization's ineligibility as a qualifying employer due to engaging in activities that have a substantial illegal purpose.

*Reasons:* Modifying § 685.219(g) is necessary to conform with the Department's proposed regulatory amendment at subsection (h) within the same section. Proposed subsection (h) describes the standard the Secretary would use to determine when a qualifying employer has engaged in substantial illegal activities that would impact a borrower's eligibility under the PSLF program. If an organization has been determined to be ineligible as a qualifying employer under the standard at proposed subsection (h), it would

follow that there would be no recourse for a borrower as the employer, not the borrower, is the entity that has not met the eligibility requirements for the PSLF program. It is therefore necessary to modify the regulatory text at subsection (g) to align the reconsideration process with the proposed addition at subsection (h).

During negotiated rulemaking, negotiators expressed concerns that borrowers would have no recourse to contest an employer's loss of qualifying status. The Department noted that, under the standard outlined in subsection (h), the employer itself will have the opportunity to respond to the Department's assertion of the employer having engaged in activities that have a substantial illegal purpose. Also, the Department added subsection (j) that would prescribe the process for regaining eligibility as a qualifying employer if qualifying status were ultimately revoked by the Department.

*Standard for Determining When a Qualifying Employer Has Engaged in Activities That Have a Substantial Illegal Purpose (§ 685.219(h))*

*Current Regulations:* None.
*Proposed Regulations:* Under § 685.219(h), the Department would create a standard for determining that a qualifying employer engaged in activities that have a substantial illegal purpose.

The Secretary would determine by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and would not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities. In making such a determination, the Secretary would accept the following as conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

(1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

(2) A plea of guilty or *nolo contendere,* whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in activities that have substantial illegal purpose; or

(3) A settlement that includes admission by the employer that it engaged in activities that have a

substantial illegal purpose as described in subsection (h) of this section.

Finally, nothing in this proposed standard shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their protected First Amendment rights, or any other rights protected under the Constitution.

*Reasons:* The Secretary seeks to establish a clear and consistent framework for how the Department would determine that a qualified employer engaged in activities that have a substantial illegal purpose. First, the Department would use the preponderance that it receives from sources specified in regulation (*see* discussion under proposed § 685.219(i)). The Department arrived at this standard because the preponderance of the evidence typically means that something is more likely true than not true. On the final day of negotiated rulemaking, the Department offered using a clear and convincing standard to negotiate in good faith due to negotiators' concerns that the preponderance of evidence was not a high enough standard; however, the committee did not reach consensus. With this proposed rule we have returned to the preponderance of evidence standard. The Department believes that the preponderance of evidence is the most appropriate standard of proof because of the severity of the activities that have a substantial illegal purpose. Prior to losing status as a qualified employer, the Department would notify the employer of an initiated action to determine if the employer engaged in activities that have a substantial illegal purpose. This is the Department's attempt to outline the benchmarks that will be used in the determination and offer due process to a qualifying employer.

During this time, payments made by employees of the qualifying employer would still be counted towards PSLF. If the employer chooses not to respond, then the Secretary may move forward with revoking qualified employer status, thus subsequent payments made by a borrower would no longer be counted towards PSLF unless certain conditions were met (*see* discussion of proposed subsections (i) and (j)).

If the employer chooses to respond, the Secretary will decide on the qualified employer's status after the response has been submitted and reviewed by Department staff. Based on the response, the Secretary may choose to maintain or revoke the employer's qualifying status.

The activities that have a substantial illegal purpose would occur on or after July 1, 2026. This means that activities that have a substantial illegal purpose that took place and ended prior to July 1, 2026, would not be considered in the Secretary's review under this standard.

During rulemaking, some of the negotiators expressed concern that the Department would use authority under this proposed standard to target qualifying employers that did not align with the current Administration's values. Negotiators expressed concerns because the language provided to negotiators prior to the committee meetings stated: "The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose." In order to allay concerns, the Department added language that the Secretary would also consider the materiality, meaning the significance, of the activities of the qualifying employer by gauging both frequency and the severity of said activities, in deciding whether the activities amount to a substantial illegal purpose. As stated in the text of the regulation, this is because the Department does not intend to penalize a qualifying employer prior to the proposed effective date of the regulations.

The Secretary would presume that the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose, thus revoking qualifying employer status: (1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose, (2) A plea of guilty or *nolo contendere,* whereby the employer admits they engaged in activities that have a substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in activities that have a substantial illegal purpose; or (3) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose. In crafting options for the proposed standard, the Department explored judgments and legal proceedings in a State or Federal court or tribunal of competent jurisdiction. Reliance on judgments and legal proceedings in any tribunal would reduce the burden on the Department since, in this instance, the Department itself would not adjudicate whether the employer engaged in activities that have a substantial illegal purpose. Instead, we would rely on processes that took place in court to determine that the employer

engaged in illegal activities that have a substantial illegal purpose.

During rulemaking, some of the negotiators expressed concern that the Department would use authority under this proposed standard to target free speech. For example, one negotiator stated that, if an employer releases information in support of transgender rights but does not engage in the chemical or surgical castration or mutilation of a child or children in violation of a State or Federal law, that the Department may revoke qualifying employer status. Another negotiator stated that many legal aid organizations with 501(c)(3) status work with undocumented clients and feared losing qualifying employer status due to the Department's determination that they are aiding and abetting violations of Federal immigration laws. Therefore, the Department clarified that nothing in the standard would be construed to authorize the Secretary to determine an employer engaged in activities that have a substantial illegal purpose based upon the employer or the employees exercising their protected First Amendment rights, or any other rights protected under the Constitution.

*Process for Determining When an Employer Engaged in Activities That Have a Substantial Illegal Purpose (§ 685.219(i))*

*Current Regulations:* None.
*Proposed Regulations:* The Department would create a standard for determining when a qualifying employer is engaged in activities that have a substantial illegal purpose. The Department would determine that a qualifying employer violated the standard when the Secretary receives an application in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose; or would determine that the qualifying employer engaged in activities that have a substantial illegal purpose, unless, prior to the issuance of the Secretary's final determination, the Secretary approves a corrective action plan (*see* discussion in § 685.219(j)).

*Reasons:* The Department intends to determine in regulations when a qualifying employer could lose qualifying status for the PSLF program to make clear to borrowers and qualifying employers the effective date of loss of qualifying status for purposes of qualifying employment for PSLF. First, the Department would amend the PSLF Form to allow a qualifying employer to self-certify that it has not engaged in activity that has a substantial illegal purpose. Upon receiving that non-certification, the Secretary would

remove the employer from the qualifying employer list, because the employer is affirming that it engaged in activities that have a substantial illegal purpose.

Second, the Secretary would determine that a qualifying employer engaged in activity that has a substantial illegal purpose, resulting in the eligible employer losing qualifying status. This is because not all signatories will correctly acknowledge on the PSLF form—either through an inadvertent mistake, unknowingly, or knowingly and willfully concealing those facts—whether the employer engaged in activities that have a substantial illegal purpose.

During negotiated rulemaking, the Department heard a concern that there could be a lapse in qualifying status for an employer that was ultimately found by the Department to have engaged in activities that have a substantial illegal purpose and attempted to regain eligibility status via a corrective action plan. While under proposed § 685.219(j) an employer can submit a corrective action plan to regain qualifying status, the process may take time for approval which would leave employees without access to PSLF for an undefined length of time. Therefore, the Department proposes to add that the employer may maintain qualifying status if, prior to the issuance of the Secretary's final determination, the Secretary approves a corrective action plan. If the corrective action plan is approved prior to the Secretary's final decision of a violation of the standard, there will be no lapses in the qualifying employer's status.

*Current Regulations:* None.
*Proposed Regulations:* The Department also would propose a new paragraph (i)(2). If an employer is operating under a shared identification number or other unique identifier, the Secretary shall consider the organization to be separate if the employer is operating separately and distinctly, for the purposes of determining whether an employer is eligible.

*Reasons:* During rulemaking, there was a significant discussion regarding shared Federal employer identification numbers (EIN). The EIN is a unique Federal tax identification number issued by the IRS for businesses, tax-exempt organizations, and other entities. The Department requests the EIN on the PSLF form and matches the EIN with the IRS' publicly available listing of tax-exempt organizations and other entities to ensure that the employer is a qualifying employer for PSLF purposes. Negotiators noted that there are examples of entire city governments that

share an EIN. If a qualifying employer is determined by the Secretary to have engaged in activities that have a substantial illegal purpose, entire city governments, including police and fire departments, could lose eligibility for PSLF. While the Department believes the Secretary already has the authority to consider agencies as separate under one EIN, we added a provision in the regulations that allow the Secretary to separate employers that are under one EIN, should an agency with a shared EIN lose qualifying employer status. In the regulations, we do not refer directly to the EIN but instead use the phrase ''shared identification number or other unique identifier'' to safeguard against changes or renaming of the EIN to another term in the future.

A qualifying employer could also choose to provide more information about the structure of the organization during the notice and response phase under the standard in subsection (h). The Secretary maintains ultimate authority to make decisions regarding separation of agencies under a single EIN.

*Regaining Eligibility as a Qualifying Employer (§ 685.219(j))*

*Current Regulations:* None.
*Proposed Regulations:* The proposed addition of § 685.219(j) describes a process for an employer who has lost eligibility due to engaging in activities that have a substantial illegal purpose, to regain eligibility, and become a qualifying employer again. An employer who has lost eligibility may regain eligibility after:

(1) ten (10) years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose if, at, or after that time the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose; or

(2) the Secretary approves a corrective action plan that is signed by the employer that includes: a certification that the employer is no longer engaging in activities that have a substantial illegal purpose; a report describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose in the future; and any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

*Reasons:* During negotiations, several negotiators expressed that an employer that lost its qualifying status under

PSLF would have several negative consequences including that it would permanently ban employers from PSLF that may no longer be engaged in activities that have a substantial illegal purpose. Negotiators mentioned that borrowers often make major life decisions about employment based on access to PSLF.

As noted above, the initial draft regulations did not contain provisions for employers to regain eligibility as a qualifying employer. In an attempt to negotiate in good-faith to address the concerns mentioned by negotiators and to reach consensus on the draft regulations, the Department offered two changes whereby an employer may regain eligibility ten years from the date of determination, or, if the employer did not want to wait the ten-year period, then the employer would have the ability to submit a corrective action plan and statement to the Department that it is no longer engaged in activity that has a substantial illegal purpose. While there were tentative agreements on these two changes, one negotiator dissented on approving the draft regulations, and the negotiated rulemaking committee failed to reach consensus. Therefore, in proposing these regulations, the Department continues to agree in principle that providing an employer with a process to regain qualifying status is an important component. However, the agreement to allow reinstatement within five years was a major compromise offered by the Department in the negotiated rulemaking to gain support from committee members on other provisions in the draft regulations. In proposing these regulations, the Department believes that a period of 10 years would better ensure that employers do not continue to engage in behavior that has a substantial illegal purpose.

*Borrower Notification of Regained Eligibility (§ 685.219(k))*

*Current Regulations:* None.
*Proposed Regulations:* The proposed addition of § 685.219(k) describes a process under which the Department would notify student loan borrowers if an organization regained eligibility as a qualifying employer, based upon the standards outlined in proposed subsection (j) of the same section, for the purpose of correctly certifying or applying for loan cancellation under the PSLF program.

*Reasons:* During the negotiated rulemaking session, negotiators raised concerns about the importance of notifying borrowers, who may become eligible to apply or re-eligible after initial certification, when and if their

employer regained eligibility as a qualifying employer. Although operational procedures for the Department are not commonly outlined in regulatory text, we agreed with the committee's recommendation to incorporate a general borrower notification requirement into the proposed rules for PSLF to reflect the Department's commitment to increase transparency and efficiency in our administration of the Federal student loan programs.

## X. Regulatory Impact Analysis

*Executive Orders 12866 and 13563*

Under E.O. 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is ''significant'' and, therefore, subject to the requirements of the E.O. and subject to review by OMB. Section 3(f) of E.O. 12866 defines a ''significant regulatory action'' as an action likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the E.O.

The Department estimates the net budgetary impacts to be $-\$1.537$ billion from increased transfers from borrowers who no longer receive PSLF to the Federal Government. Quantified economic impacts include annualized transfers of $-\$167$ million at 3 percent discounting and $173 million at 7 percent discounting, and annual quantified costs related to compliance costs and administrative updates to Government systems. Therefore, based on our estimates, OIRA has determined that this final action is ''economically significant'' under section 3(f)(1) of Executive Order 12866 and subject to OMB review3(f)(1).

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent

ED_02453

permitted by law, Executive Order 13563 requires that an agency:

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and considering, among other things and to the extent practicable, the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives, such as user fees or marketable permits, to encourage the desired behavior, or provide information that enables the public to make choices.

E.O. 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." OIRA has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

As required by OMB Circular A–4, we compare the proposed regulations to the current regulations. In this regulatory impact analysis (RIA), we discussed the need for regulatory action, potential costs and benefits, net budget impacts, and the regulatory alternatives we considered.

Elsewhere in this section under the *Paperwork Reduction Act of 1995,* we identify and explain burdens specifically associated with information collection requirements.

1. Need for Regulatory Action

The Department has identified a critical and urgent need for comprehensive regulatory reform within the PSLF program. The PSLF program was established to encourage public service careers by offering loan forgiveness to eligible borrowers. Despite the program's intent, the current regulatory framework has exposed the PSLF program to potential misuse, with taxpayer dollars being allocated to borrowers working for organizations

that do not align with the program's public service mission.

In response to these challenges, the Department proposed a series of regulatory changes designed to ensure the program's integrity by limiting benefits to borrowers employed by organizations that meet the established public service criteria. The proposed regulations will exercise the Secretary's authority under title IV of the HEA, specifically 20 U.S.C. 1087e(m), 20 U.S.C. 1221e–3, and implemented in 34 CFR 685.219, to refine the requirements for qualifying employers and ensure that PSLF benefits are distributed only to those working for organizations that provide public service, aligned with the goals of the HEA.

Clarifying the Secretary's Broad Authority and Defining Public Service Employment

The Secretary's authority to establish rules and regulations for the administration of the Direct Loan Program, including the PSLF program, is grounded in the HEA, particularly under Section 455(m)(3), which empowers the Secretary to define and regulate the parameters for public service employment under the program. This broad regulatory authority provides the foundation for the proposed rules to refine the criteria governing PSLF eligibility. Specifically, these changes will focus on ensuring that PSLF benefits are directed only to those borrowers who are employed by organizations that serve the public good and uphold public policy, while eliminating the risk of improper payments to those working for organizations engaged in illegal activities. By exercising this authority, the Department aims to protect public funds and guarantee that PSLF benefits fulfill their intended purpose by rewarding individuals dedicated to public service careers.

Exclusion of Employers Engaged in Substantial Illegal Activities

One of the most significant challenges faced by the PSLF program has been the inclusion of employers whose activities are at odds with the program's core mission of supporting public service. To address this, the Department proposes a new regulation to exclude employers that engage in activities with a "substantial illegal purpose" from the list of organizations that qualify for PSLF. This exclusion is necessary to protect taxpayers from funding loan forgiveness for individuals employed by organizations that operate in a manner harmful to the public good.

The proposed rules will specifically identify activities that qualify as having a "substantial illegal purpose," including violations of Federal and State laws, involvement in trafficking, terrorism, violence aimed at obstructing Federal policy, and other illegal actions. Organizations engaging in such activities will be disqualified from participating in the PSLF program, and their employees will no longer be eligible to receive qualifying payments that lead to loan forgiveness under PSLF.

The inclusion of this provision in the regulations aligns with the Department's responsibility to administer Federal student aid programs in a manner that is transparent, equitable, and consistent with public policy. By establishing clear criteria for what constitutes a "substantial illegal purpose," the Department will ensure that PSLF benefits are only granted to those working for employers that genuinely contribute to the public good and comply with the law. The proposed definition of "substantial illegal purpose" will be codified in 34 CFR 685.219(b)(30), providing clarity for both employers and borrowers.

Addressing Borrower Eligibility and Ensuring Due Process

In implementing the new regulations, the Department is also mindful of the need to protect borrowers from losing eligibility due to their employer's actions. Borrowers working for organizations engaged in activities that disqualify them from PSLF will no longer be able to accrue qualifying monthly payments toward loan forgiveness while remaining at that employer. However, the proposed regulations include safeguards to ensure that borrowers are not unfairly penalized. When an employer is found to have engaged in disqualifying activities, borrowers will be promptly notified. This ensures that their employer's status does not unduly harm borrowers and that they have the opportunity to continue making progress toward loan forgiveness.

To further protect the rights of borrowers, the regulations will provide a process by which employers who are at risk of losing PSLF eligibility due to illegal activities will be notified and allowed to respond. The proposed regulations at 34 CFR 685.219(h) will specify that employers will be afforded a period to respond to the findings before any final determination regarding their eligibility is made. This process aligns with principles of due process and transparency, ensuring that employers have a fair opportunity to

maintain their status and that borrowers are not left uninformed.

Reaffirming Transparency and Employer Accountability

Transparency and accountability are central to these proposed regulatory changes. By providing clear guidelines for employers regarding their obligations under PSLF, the Department will help ensure that both employers and borrowers understand the eligibility criteria. Employers found to be engaged in disqualifying activities will be given a reasonable opportunity to contest the findings and take corrective action if necessary. If an employer loses eligibility, the proposed regulations will establish a process for regaining eligibility after 10 years or after the employer has implemented a corrective action plan. This will be codified in 34 CFR 685.219(j).

The regulations also require that, once an employer regains eligibility, the Secretary shall update the qualifying employer list, which is accessible to borrowers for purposes of certification or application. This helps ensure that borrowers have up-to-date information about which employers are eligible for PSLF, facilitating a more streamlined and transparent process for all stakeholders.

The proposed regulatory changes are designed to protect the integrity of the PSLF program by ensuring that taxpayer funds are used to support borrowers working in public service roles with eligible employers. By excluding employers engaged in illegal activities, defining ''substantial illegal purpose,'' and providing clear guidelines for borrower eligibility and employer accountability, the Department aims to create a more efficient, transparent, and fair PSLF program. These reforms will help reduce administrative burdens on borrowers and institutions, promote fairness, and ensure that PSLF benefits are awarded only to those genuinely dedicated to serving the public good. Through these changes, the Department will fulfill its responsibility to safeguard taxpayer funds while enhancing the effectiveness of the PSLF program in supporting individuals committed to public service careers.

2. Summary

The Department proposes to make several significant changes to PSLF based on discussions during the negotiations.

TABLE 2.1—SUMMARY OF KEY CHANGES IN THE PROPOSED REGULATIONS

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| **Public Service Loan Forgiveness** | | |
| Definitions ................................................ | 685.219(b) ........ | Would add definitions of ''aiding or abetting''; ''chemical castration or mutilation''; ''child or children''; ''foreign terrorist organizations''; ''illegal discrimination''; ''other Federal immigration laws''; ''substantial illegal purpose''; ''surgical castration or mutilation''; ''terrorism''; ''trafficking''; ''violating State law''; and ''violence for the purpose of obstructing or influencing Federal Government policy''. Would revise the definition of ''qualifying employer''. |
| Borrower Eligibility .................................... | 685.219(c) ........ | Would exclude from a credit as a qualifying payment any month that a qualifying employer engaged in activities that have a substantial illegal purpose. |
| Application Process .................................. | 685.219(e) ........ | Would create a borrower notification of employers that are at-risk of or have lost PSLF qualifying status. |
| Borrower reconsideration process ............ | 685.219(g) ........ | Would prohibit a borrower from requesting reconsideration if their employer lost eligibility due to engaging in activity that has a substantial illegal purpose. |
| Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose. | 685.219(h) ........ | Would create a standard by which the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose, including but not limited to reviewing the preponderance of the evidence and basing decisions on materially of the activities that have a substantial illegal purpose. Also, would provide the employer an opportunity to respond except in cases where there was conclusive evidence (see discussion or regulatory language for more information) that the employer engaged in activities that have a substantial illegal purpose. |
| Process for determining when an employer engaged in activities that have a substantial illegal purpose. | 685.219(i) ......... | Would establish that the Secretary determinates that a qualifying employer engaged in substantial illegal activities when the Secretary receives that self-certified information on the PSLF form or makes his or her own determination, unless a corrective action plan is submitted prior to issuance of the final determination. We would also note the Secretary's authority to separate employers operating under on identification number. |
| Regaining eligibility .................................. | 685.219(j) ......... | Would allow a qualifying employer to regain eligibility after 10 years from the date(s) that it engaged in activity that had a substantial illegal purpose or when the Secretary approves a corrective action plan signed by the employer. |
| Borrower notification ................................ | 685.219(k) ........ | Would require the Secretary to update the qualifying employer list, which is accessible to borrowers for purposes of certification or application, if an employer regains eligibility. |

3. Discussion of Costs and Benefits

The PSLF program is a component of Federal student loan policy, designed to encourage individuals to enter and continue in public service employment by offering cancellation of remaining Direct student loan balances after 120 qualifying monthly payments and 10 years of full-time employment in a public service job. However, over time, the program has faced significant challenges, including confusion about qualifying employers, and the disbursement of benefits to borrowers employed by organizations whose activities do not align with the program's public service objectives. To address these issues, the Department has proposed a series of regulatory changes. These proposed regulations aim to enhance the program's integrity, improve its efficiency, and ensure that taxpayer funds are allocated appropriately. While these changes are

expected to incur certain costs, the long-term benefits are substantial, making the program more effective, transparent, and equitable. Below is an analysis of both the costs and benefits of these proposed regulations.

*Costs of the Proposed Regulations:*

The Department acknowledges that implementing the proposed regulations will incur costs. These costs primarily fall into three categories: Department administrative costs, compliance costs for employers, and potential disruptions for borrowers. However, these costs must be viewed in the context of the long-term benefits that the regulations will bring.

One of the immediate costs associated with these regulatory changes will be the need for the Department to update its systems, train staff, and implement new compliance and monitoring processes. The Department will need to track and verify employer eligibility more rigorously, and it will also need to enhance communication systems to notify employers and borrowers of any changes to their status in the PSLF program. These changes will require new investments in staffing, technology upgrades, and outreach programs.

Initial estimates suggest that the administrative costs for the Department will range from $1.5 million to $3 million annually during the first two years of implementation. These funds will be used to ensure that the Department can effectively manage the new employer eligibility determination process, update systems, and conduct necessary training for staff and stakeholders. Using information from prior implementation and of income-driven repayment and PSLF program changes, the Department spent an estimated $2.5 million annually for similar updates. Given the complexity of these new regulations, it is reasonable to expect similar administrative expenditures in the short term.

Employers will need to ensure that they meet the new eligibility criteria under the proposed regulations. This will involve reviewing their activities to ensure they are not engaged in any actions that would disqualify them from participating in the PSLF program. For many employers, especially smaller organizations or those with limited resources, this process may necessitate consultations with legal counsel, operational adjustments, and revisions to their hiring practices.

Compliance costs for employers are expected to vary per organization, depending on the organization's size and complexity. Larger organizations, such as hospitals or universities, may incur higher costs as they assess their practices and make any necessary changes to align with the new rules. A 2021 survey by the National Council of Nonprofits found that a significant percentage of nonprofit organizations may face challenges in meeting changing eligibility standards.[26] These costs primarily result from the costs of legal counsel, restructuring efforts, and changes to the organization's documentation processes. At the same time, many organizations are accustomed to attesting to the fact that they are not violating State and Federal law as a condition to participating in other government or nongovernmental programs. As such, in some circumstances, organizations may not need to exert any more than a *de minimis* amount of additional resources in order make attestations under the proposed regulations. Rather, such organizations will rely on the work already done within the organization that supports their ability to attest they are in compliance with Federal and State law for other purposes.

The most significant impacts on borrowers may stem from: (1) potential delays in loan forgiveness processing during the transition to the new regulations that may stem from changes in employer eligibility databases or open employer eligibility reviews; and (2) potential misunderstandings of the new regulations that lead to borrower confusion that delays application of the forgiveness benefit. Borrowers who are employed by organizations disqualified under the new rules may experience a temporary disruption in their progress toward loan forgiveness. These borrowers will need to transition to qualifying employers to continue receiving credit for their payments. Borrowers who misunderstand the new rules may apply for forgiveness without knowing or understanding the implications of the new rule on their former or current employer as they may no longer be a qualifying employer.

The transition and any misunderstanding of the proposed

changes to the program may slightly increase the time it takes borrowers to achieve forgiveness; however, long-term processing efficiencies are expected to be gained. Borrowers frequently encountered confusion and delays in PSLF application due to employer eligibility issues. A 2018 Government Accountability Office (GAO) audit found that over 370,000 certified borrowers had still made zero qualifying payments, suggesting misunderstandings about eligibility criteria or documentation.[27] A 2020 joint investigation by the American Federation of Teachers (AFT) and the Student Borrower Protection Center (SBPC) revealed that the PSLF process had rejected employer eligibility more than 50,000 times, even inconsistently for employees at the same institution.[28] GAO further warned that the absence of clear guidance for loan servicers significantly increases the risk of improper denials. While the Department is taking steps to minimize these delays and inform borrowers of these changes to standard marketing and communication channels, borrowers may experience disruptions as the new regulatory framework is implemented.

*Benefits of the Proposed Regulations:*

Despite the initial costs, the long-term benefits of the proposed regulations far outweigh the short-term expenditures. These benefits are significant and include increased program integrity, improved efficiency, reduced borrower confusion, and long-term savings for taxpayers.

The most significant benefit of the proposed regulations is the improvement in the integrity of the PSLF program. By excluding employers engaged in substantial illegal activities from the program, the Department ensures that taxpayer dollars are only used to support borrowers working for organizations that are not engaged in activities that have a substantial illegal purpose. This change will directly address concerns about improper disbursements and misuse of Federal funds. This change also addresses concerns that the Department is indirectly subsidizing illegal activities that the government broadly aims to prevent.

---

[26] *https://www.councilofnonprofits.org/reports/ nonprofit-workforce-shortages-crisis-affects- everyone.*

[27] *https://www.gao.gov/assets/700/694506.pdf.*

[28] *https://protectborrowers.org/wp-content/ uploads/2020/08/ECF-Failures.pdf.*

The proposed regulations will also streamline the PSLF process by providing more explicit eligibility criteria and verification process. This will make it easier for borrowers to track their progress and ensure that they meet the requirements for loan forgiveness. Additionally, employers will benefit from more straightforward guidelines regarding their obligations under the PSLF program.

Recent data from the Consumer Financial Protection Bureau (CFPB) found that a significant fraction of borrowers experienced confusion regarding their employer's eligibility for PSLF.[29] With the new rules in place, the Department anticipates reducing borrower confusion through making the process more transparent and efficient, especially over the long term. This will likely result in faster processing of PSLF applications and fewer errors, as both borrowers and institutions will have a clearer understanding of the program's requirements.

By helping ensure that PSLF benefits are directed only to borrowers working for legitimate public service employers, the proposed regulations will help strengthen public service careers. The PSLF program has been a key factor in attracting and retaining individuals in public service, and these changes will make the program more accessible and reliable.

There is significant research, both academic and private sector, which documents that public service employees cited PSLF as a significant factor in their decision to pursue and remain in public service. Recently, a 2025 student by Mission Square Research Institute, found that 56% of public sector employees and 62% of private sector employees may job decisions based on their student loan debt levels.[30] As the program becomes more transparent and efficient, the Department anticipates growth in public service recruitment and retention in the future. One of the most important benefits of the proposed regulations will be the long-term savings for taxpayers. By eliminating improper payments, the Department estimates that these regulations will save taxpayers a significant amount of money over the next ten years. These savings will result from a reduction in wasteful disbursements. The expected reduction in improper payments will ensure that taxpayer dollars are spent more efficiently and effectively.

The proposed regulatory changes for the PSLF program aim to enhance the program's efficiency and integrity. Although there will be initial costs associated with administrative updates and compliance efforts, the long-term benefits far outweigh these expenditures. The regulations will help reduce improper payments, streamline processing times, reduce borrower confusion, and ensure that the program supports individuals employed by organizations that genuinely contribute to the public good. With these changes, the PSLF program will become more transparent, efficient, and practical, fulfilling its original mission of rewarding public service careers while safeguarding taxpayer funds.

### 4. Net Budget Impact

Table 4.1 provides an estimate of the net Federal budgetary impact of these proposed regulations that are summarized in Table 2.1 of this RIA. This includes both the effects of a modification to existing loan cohorts and costs for loan cohorts from 2026 to 2035. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. The baseline for estimating the cost of these final regulations is the President's Budget for 2026 (PB2026).

TABLE 4.1—ESTIMATED BUDGET IMPACT OF THE NPRM

[$ in millions]

| Section | Description | Modification score (1994–2025) | Outyear score (2026–2035) | Total (1994–2035) |
|---|---|---|---|---|
| § 685.219(h) ................................................... | Amended definition of qualifying employer .... | −$640 | −$897 | −$1,537 |

As noted in the *Need for Regulatory Action* section of this RIA, the proposed regulations define several terms related to qualifying employment for PSLF and amend the definition of a qualified employer to exclude organizations that engage in activities that have a substantial illegal purpose. This is consistent with E.O. 14235, signed March 7, 2025. As proposed in subsection § 685.219(h), the Secretary will determine based on a preponderance of the evidence, and after notice and opportunity to respond, that employers have engaged in activities with a substantial illegal purpose on or after July 1, 2026, by considering the materiality of any illegal activities or actions. The Department will presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

1. A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

2. A plea of guilty or *nolo contendere,* whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in activities that have substantial illegal purpose; or

3. A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in subsection (h) of this section.

Employer qualification will be linked to the EIN used for reporting to the IRS so employees in one area or agency may be affected by the activities of employees in other organizations under the same EIN. For example, the County of Los Angeles has a single EIN covering various departments including the Los Angeles County Public Defender, Los Angeles County Department of Children and Family Services, Harbor-UCLA Medical Center, and the County of Los Angeles Fire Department. Government agencies in particular may have many service areas under a single EIN.

The PSLF application data includes variables that distinguish non-profit

---

[29] Consumer Financial Protection Bureau, Staying on Track While Giving Back: The Cost of Student Loan Servicing Breakdowns for People Serving Their Communities (Washington, DC: June 2017).

[30] Liu, Z., Korankye, T. (February 2025). *The Ripple Effect of Student Debt: Shaping Careers, Financial Choices, and Well-Being in Public and Private Sectors.* Mission Square Research Institute.

ED_02457

employers and government employers, as well as the level of government employers. Table 4.2 summarizes the split between borrowers receiving PSLF whose greatest time in qualifying employment was with government or non-profit organizations.

TABLE 4.2—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY EMPLOYMENT SECTOR

| Employment sector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Government | 677,500 | $ 73,000 |
| Nonprofit | 296,600 | 82,100 |
| Total | 974,100 | 75,800 |

**Note:** The total number of borrowers who have received forgiveness may be less than most recent Department estimates due to timing, data availability, and data cleaning. Borrowers are sorted into the sector with the maximum time working towards forgiveness. The numbers of borrowers and average forgiveness amounts are rounded to the nearest hundred.

Table 4.3 splits the government category into Federal, State, and local levels. We assume that Federal agencies will comply with the law. Therefore, we do not expect a reduction in forgiveness for Federal employees.

TABLE 4.3—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY GOVERNMENT SUBSECTOR

| Government subsector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Federal Government | 97,800 | $71,900 |
| Local Government | 415,300 | 71,200 |
| State Government | 161,900 | 78,400 |
| Unknown | 2,500 | 75,000 |
| Total | 677,500 | 73,000 |

**Note:** The total number of borrowers who have received forgiveness may be less than most recent Department estimates due to timing, data availability, and data cleaning. Borrowers are sorted into the sector with the maximum time working towards forgiveness. The numbers of borrowers and average forgiveness amounts are rounded to the nearest hundred.

Based on the activities identified in the E.O. 14235 it is likely that organizations in some fields are more likely to be affected than others, either by loss of eligibility, the deterrent effect on their activities, difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment. Regardless of the type of employer, service areas that could be most affected by the proposed regulation include, but are not limited to, legal services, governance, social work, healthcare, K–12 education, and higher education.

Existing data on employers of borrowers who received forgiveness does not include a service category and names do not always indicate what an organization does, but the Department analyzed this data to estimate what share of borrowers who have achieved forgiveness fall into certain service areas and their average forgiveness.[31] This was done by matching keywords from various subsectors to employer names. For example, for healthcare, the keywords included ''hospital'', ''health'', ''medical'', and ''clinic''.

A portion of employers cannot be classified because some employer names give no indication to their service area, contain misspellings, or have names that do not contain any of the keywords matched. These EINs are categorized as ''Other''. Approximately 91 percent of borrowers who have received PSLF were categorized into a subsector category, leaving 9 percent in the ''Other'' category. In this analysis, we assume that the distribution of borrowers and subsectors in the future will reflect that of those who have received forgiveness. Table 4.4 summarizes the results by service area.

TABLE 4.4—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY EMPLOYMENT SUBSECTOR

| Employment subsector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Agriculture | 3,300 | $ 64,900 |
| Arts | 2,900 | 61,600 |
| Early Childhood | 1,400 | 63,000 |

[31] Turner, J., Blanchard, K., & Darolia, R. (2025, January). *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?*. NEA. https://www.nea.org/sites/default/files/2025-03/ where-do-borrowers-who-benefit-from-pslf-work.pdf.

ED_02458

TABLE 4.4—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY EMPLOYMENT SUBSECTOR— Continued

| Employment subsector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Environmental | 2,600 | 61,100 |
| Fire Rescue | 1,200 | 52,400 |
| Governance | 156,200 | 67,200 |
| Healthcare | 158,600 | 89,200 |
| Higher Education | 105,400 | 84,200 |
| International | 1,200 | 75,500 |
| K12 Education | 296,600 | 72,500 |
| Law Enforcement | 20,100 | 66,500 |
| Legal | 13,800 | 108,500 |
| Military | 48,400 | 70,200 |
| Other | 82,900 | 72,200 |
| Philanthropy | 5,300 | 73,500 |
| Religious | 14,000 | 69,500 |
| Research | 1,500 | 65,300 |
| Social Services | 47,500 | 75,300 |
| Transportation | 5,500 | 61,400 |
| Utilities & Infrastructure | 2,500 | 60,700 |
| Workforce & Labor | 3,000 | 80,200 |
| All Employment Subsectors | 974,100 | 75,800 |

**Note:** The total number of borrowers who have received forgiveness may be less than most recent Department estimates due to timing, data availability, and data cleaning. Borrowers are sorted into the sector with the maximum time working towards forgiveness. The numbers of borrowers and average forgiveness amounts are rounded to the nearest hundred.

As we expect most employers to certify that they do not engage in activities with a substantially illegal purpose, the information in Table 4.4 informed our estimates of potential reductions in qualified employers for PSLF but does not directly translate to the percentage of borrowers assigned to achieve forgiveness in our assumptions for the proposed regulation. We also recognize that employers in other employment subsectors could engage in activity that results in a loss of eligibility but estimate that these will be anomalies or very small percentages. Therefore, we have included a percentage for all other categories and some sensitivity runs that are described in the *Methodology for Budget Impact* section of this analysis.

Methodology for Budgetary Impact

The Department estimated the budgetary impact of the proposed provisions in this NPRM through changes to the PSLF assignment within the Department's income-driven repayment (IDR) assumption. PSLF is randomly assigned to borrowers in our IDR model sample based on percentages that vary by the cohort range in which they enter repayment and highest education level as presented in Table 4.5.

TABLE 4.5—CHANGE IN ASSIGNMENT OF PSLF FOR PROPOSED REGULATION

| Percentage of Borrowers Assigned PSLF | | | |
|---|---|---|---|
| Enter repayment cohort range | 2-year | 4-year | Graduate |
| **PB2026 Baseline Scenario** | | | |
| 2016 to 2020 | 10.46 | 18.05 | 21.96 |
| 2021 and later | 14.65 | 28.88 | 30.74 |
| **Proposed Regulatory Scenario** | | | |
| 2016 to 2020 | 10.25 | 17.69 | 21.52 |
| 2021 and later | 14.35 | 28.30 | 30.13 |
| **Alternate Regulatory Scenario** | | | |
| 2016 to 2020 | 9.83 | 16.96 | 20.64 |
| 2021 and later | 13.77 | 27.14 | 28.90 |

As we expect the proposed regulations to have more of a deterrent effect reducing the likelihood of qualifying employers engaging in illegal activities and borrowers have the option of shifting employers to complete their 120 months of qualifying payments even if on a delayed basis, we do not expect a significant reduction in the percentage of borrowers achieving PSLF forgiveness. We have not increased the effect for future cohorts of loans

ED_02459

because, while potential ineligibility starts with the July 1, 2026, effective date, employers' ability to appeal and get reinstated and employees' ability to shift positions means the pattern is not necessarily a continued increase in ineligibility.

The changes made in Table 4.5 were derived from applying reductions between 0–5 percent to the employment subsectors identified in Table 4.4 as being most likely to be affected by the proposed regulation (legal, healthcare, social work, higher education, K–12 education, and governance). This results in an estimated total reduction of approximately 0–2 percent.

As explained in the *Paperwork Reduction Act* section, the Department believes that there would be less than 10 employers affected annually. Given the uncertainties of employer and employee response noted for the primary estimate, we considered an alternative approach that evaluated the maximum impact consistent with the PRA analysis. Within the universe of borrowers who have received forgiveness, approximately 6 percent were employed for their longest time toward forgiveness in the top 10 EINs by forgiven borrower count, excluding federal employers who are assumed to comply. Therefore, we also ran a high-impact alternative that bumped the reductions up to 6 percent.

The combined effect of the changes to the percentages in Table 4.5 reduces the number of borrowers achieving PSLF in our IDR assumption and results in the cost savings presented in Table 4.6. The Department welcomes comments on the assumptions related to the reduction in future qualified employer eligibility and will consider any substantive comments or information presented in estimating the effects of the proposed rule.

TABLE 4.6—NET BUDGET IMPACT OF PROPOSED CHANGES TO PSLF

| $ mns | PSLF primary | PSLF alternate |
|---|---|---|
| Modification | −$640 | −$1,765 |
| Outlays for Cohorts 2026–2035 | −897 | −2,520 |
| Total | −1,537 | −4,285 |

*Accounting Statement:*
As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these proposed regulations. Table 4.7 provides our best estimate of the changes in annual monetized transfers that may result from these proposed regulations. Expenditures are classified as transfers from the Federal government to affected student loan borrowers.

TABLE 4.7—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED EXPENDITURES

[In millions]

| Category | Benefits | |
|---|---|---|
| Reduction in taxpayer costs supporting loan forgiveness of those at organizations engaging in activities with a substantial illegal purpose. | Not quantified. | |
| Deterrence of activities with a substantial illegal purpose done by non-profit or governmental organizations. | Not quantified. | |
| **Category** | **Costs** | |
| | 3% | 7% |
| Costs of compliance with paperwork requirements | $0 | $0. |
| Costs incurred by organizations to ensure compliance with proposed regulations. | Not quantified | Not quantified. |
| Administrative costs to Federal government to update systems and contracts to implement the proposed regulations. | $0.3 | $0.4. |
| **Category** | **Transfers** | |
| | 3% | 7% |
| Increased transfers from borrowers due to reductions in borrowers achieving PSLF forgiveness: | −$167 | −$173. |

## 5. Alternatives Considered

The Department considered many alternatives.

Part of the development of these regulations, the Department engaged in a negotiated rulemaking process in which we received comments and proposals from non-Federal negotiators representing numerous impacted constituencies on a variety of issues. The proposals were submitted from the following constituencies: proprietary institutions of higher education, civil rights organizations, consumer advocates, and legal assistance organizations that represent students and/or borrowers, student loan borrowers in repayment, organizations representing taxpayers and the public interest, public institutions of higher education, financial aid administrators, accrediting agencies, and State officials, U.S. Military service members. Information about these proposals is available on our rulemaking website at *https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2025-2026.*

ED_02460

The Department worked with the negotiators and continued to provide additional proposed regulatory text for consideration. Despite these efforts, the negotiators did not reach consensus on the proposed regulations in this NPRM, the Department was not bound to incorporating any of the negotiators' submitted proposals in the drafting of this NPRM.

## Regulatory Flexibility Act

The Secretary certifies, under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), that this final regulatory action would not have a significant economic impact on a substantial number of "small entities."

These regulations will not have a significant impact on a substantial number of small entities because they are focused on arrangements between the borrower and the Department. They do not affect institutions of higher education in any way, and these entities are typically the focus of the Regulatory Flexibility Act analysis. As noted in the *Paperwork Reduction Act* section, the burden related to the final regulations will be assessed in a separate information collection process and that burden is expected to involve individuals more than institutions of any size.

## Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the *Paperwork Reduction Act* of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Section 685.219(i) of these proposed regulatory changes would require an update to the currently approved Public Service Loan Forgiveness Certification and Application, OMB # 1845–0110. The Department would amend the PSLF form to include the ability for a qualifying employer to certify that it has not engaged in activity that has a substantial illegal purpose. We do not believe the proposed changes will significantly change the amount of time currently assessed for the borrower to complete the form. This form update will be completed and made available

for comment through a full public clearance package before being made available for use by the effective date of the regulations. The proposed amendments to the regulation may reduce the number of respondents or responses for individuals submitting Employee Certification forms. This is due in part to the reduction in the number of qualifying employers. As mentioned previously, the Department anticipates a 10 percent reduction in the number of individuals submitting Employee Certification Forms because their employer is no longer eligible for participation. Any burden changes will be assessed to OMB # 1845–0110, Application and Employment Certification for Public Service Loan Forgiveness. Section 685.219 (j) of the proposed regulation would allow an employer to re-establish or maintain eligibility for PSLF if the Secretary approves a corrective action plan. The Department believes that annually there would be less than 10 employers responding to the Department's notice of an initiated action and/or seeking approval of a corrective action plan. No additional burden has been assessed based on these proposed rules as the anticipated number of annual respondents falls below the minimum required for OMB approval.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number.

In the final regulations we will display the control number numbers assigned by OMB to any information collection requirements proposed in this NPRM and adopted in the final regulations.

If you wish to review and comment on the Information Collection Requests, please follow the instructions in the **ADDRESSES** section of this notification. Note: The Office of Information and Regulatory Affairs in OMB and the Department review all comments posted at *www.regulations.gov*. We consider your comments on these proposed collections of information in—

* Deciding whether the proposed collections are necessary for the proper performance of our functions, including whether the information will have practical use.

* Evaluating the accuracy of our estimate of the burden of the proposed collections, including the validity of our methodology and assumptions.

* Enhancing the quality, usefulness, and clarity of the information we collect; and

* Minimizing the burden on those who must respond. Consistent with 5 CFR 1320.8(d), the Department is soliciting comments on the information collection through this document. Between 30 and 60 days after publication of this document in the **Federal Register**, OMB is required to make a decision concerning the collection of information contained in these proposed priorities, requirements, definitions, and selection criteria. Therefore, to ensure that OMB gives your comments full consideration, it is important that OMB receives your comments on these Information Collection Requests by September 17, 2025.

## Intergovernmental Review

This program is subject to E.O. 12372 and the regulations in 34 CFR part 79. One of the objectives of the E.O. is to foster an intergovernmental partnership and strengthened Federalism. The E.O. relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for this program.

## Assessment of Education Impact

In accordance with section 411 of the General Education Provisions Act, 20 U.S.C. 1221e–4, the Secretary requests comments on whether these final regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

## Federalism

E.O. 13132 requires us to provide meaningful and timely input by State and local elected officials in the development of regulatory policies that have Federalism implications. "Federalism implications" means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The proposed regulations do not have Federalism implications.

*Accessible Format:* On request to the program contact person(s) listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain

**40174** Federal Register / Vol. 90, No. 157 / Monday, August 18, 2025 / Proposed Rules

this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

### List of Subjects in 34 CFR Part 685

Administrative practice and procedure, Colleges and universities, Education, Loan programs-education, Reporting and recordkeeping requirements, Student aid, Vocational education.

### Signing Authority

This document of the U.S. Department of Education was signed on August 14, 2025, by Linda McMahon, Secretary of Education. That document with the original signature and date is maintained by the U.S. Department of Education. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned has been authorized to sign the document in electronic format for publication, as an official document of the U.S. Department of Education. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Tracey St. Pierre,**
*Director, Office of the Executive Secretariat, Office of the Secretary, U.S. Department of Education.*

For the reasons discussed in the preamble, the Secretary of Education proposes to amend part 685 of title 34 of the Code of Federal Regulations as follows:

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 1. The authority citation for part 685 is revised to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.
■ 2. Amend § 685.219 by:
■ a. Adding paragraphs markers to (b);
■ b. Adding new subsections (h),(i), (j) and (k).
■ c. Adding new paragraphs (b)(1), (b)(3), (b)(4),(b)(10),(b)(12), (b)(17), (b)(30), (b)(31), (b)(32), (b)(33), (b)(34), (b)(35), (c)(4), (e)(9),(e)(10), (g)(7); (; and
■ c. Amending paragraphs b (27), (c)(2), and (g).
■ 2. The revisions and additions read as follows:

### § 685.219 Public Service Loan Forgiveness Program (PSLF).

(b) * * *
(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.
(2) *AmeriCorps service* means service in a position approved by the Corporation for National and Community Service under section 123 of the National and Community Service Act of 1990 (42 U.S.C. 12573).
(3) *Chemical castration or mutilation* means—
(i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and
(ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.
(4) *Child or children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.
(5) *Civilian service to the military* means providing services to or on behalf of members, veterans, or the families or survivors of deceased members of the U.S. Armed Forces or the National Guard that is provided to a person because of the person's status in one of those groups.
(6) *Early childhood education program* means an early childhood education program as defined in section 103(8) of the Act (20 U.S.C. 1003).
(7) *Eligible Direct Loan* means a Direct Subsidized Loan, a Direct Unsubsidized Loan, a Direct PLUS Loan, or a Direct Consolidation Loan.
(8) *Emergency management* means services that help remediate, lessen, or eliminate the effects or potential effects of emergencies that threaten human life or health, or real property.

(9) *Employee or employed* means an individual—
(i) To whom an organization issues an IRS Form W–2;
(ii) Who receives an IRS Form W–2 from an organization that has contracted with a qualifying employer to provide payroll or similar services for the qualifying employer, and which provides the Form W–2 under that contract;
(iii) who works as a contracted employee for a qualifying employer in a position or providing services which, under applicable state law, cannot be filled or provided by a direct employee of the qualifying employer.
(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).
(11) *Full-time* means:
(i) Working in qualifying employment in one or more jobs—
(A) A minimum average of 30 hours per week during the period being certified.
(B) A minimum of 30 hours per week throughout a contractual or employment period of at least 8 months in a 12-month period, such as elementary and secondary school teachers and professors and instructors, in higher education, in which case the borrower is deemed to have worked full time; or
(C) The equivalent of 30 hours per week as determined by multiplying each credit or contact hour taught per week by at least 3.35 in non-tenure track employment at an institution of higher education.
(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).
(13) *Law enforcement* means service that is publicly funded and whose principal activities pertain to crime prevention, control or reduction of crime, or the enforcement of criminal law.
(14) *Military service* means ''active duty'' service or ''full-time National Guard duty'' as defined in section 101(d)(1) and (d)(5) of title 10 in the United States Code and does not include active duty for training or attendance at a service school.
(15) *Non-governmental public service* means services provided by employees of a non-governmental qualified employer where the employer has devoted a majority of its full-time equivalent employees to working in at

least one of the following areas (as defined in this section): emergency management, civilian service to military personnel, military service, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities or the elderly, public health, public education, public library services, school library, or other school-based services. Service as a member of the U.S. Congress is not qualifying public service employment for purposes of this section.

(16) *Non-tenure track employment* means work performed by adjunct, contingent or part time faculty, teachers, or lecturers who are paid based on the credit hours they teach at institutions of higher education.

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

(18) *Other school-based service* means the provision of services to schools or students in a school or a school-like setting that are not public education services, such as school health services and school nurse services, social work services in schools, and parent counseling and training.

(19) *Peace Corps position* means a full-time assignment under the Peace Corps Act as provided for under 22 U.S.C. 2504.

(20) *Public education service* means the provision of educational enrichment or support to students in a public school or a public school-like setting, including teaching.

(21) *Public health* means those engaged in the following occupations (as those terms are defined by the Bureau of Labor Statistics): physicians, nurse practitioners, nurses in a clinical setting, health care practitioners, health care support, counselors, social workers, and other community and social service specialists.

(22) *Public interest law* means legal services that are funded in whole or in part by a local, State, Federal, or Tribal government.

(23) *Public library service* means the operation of public libraries or services that support their operation.

(24) *Public safety service* means services that seek to prevent the need for emergency management services.

(25) *Public service for individuals with disabilities* means services performed for or to assist individuals with disabilities (as defined in the Americans with Disabilities Act (42 U.S.C. 12102)) that is provided to a person because of the person's status as an individual with a disability.

(26) *Public service for the elderly* means services that are provided to individuals who are aged 62 years or older and that are provided to a person because of the person's status as an individual of that age.

(27) *Qualifying employer* means:

(i)

(A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

(B) A public child or family service agency;

(C) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

(D) A Tribal college or university; or

(E) A nonprofit organization that—

(1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(2) Is not a business organized for profit, a labor union, or a partisan political organization; and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

(28) *Qualifying repayment plan* means:

(i) An income-driven repayment plan under § 685.209;

(ii) The 10-year standard repayment plan under § 685.208(b) or the consolidation loan standard repayment plan with a 10-year repayment term under § 685.208(c); or

(iii) Except for the alternative repayment plan, any other repayment plan if the monthly payment amount is not less than what would have been paid under the 10-year standard repayment plan under § 685.208(b).

(29) *School library services* mean the operations of school libraries or services that support their operation.

(30) *Substantial illegal purpose* means—

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) engaging in the trafficking of children to states for purposes of

emancipation from their lawful parents in violation of Federal or State law;

(v) engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

(34) *Violating State law* means a final, non-default judgment by a State court of:

(i) trespassing;

(ii) disorderly conduct;

(iii) public nuisance;

(iv) vandalism; or

(v) obstruction of highways.

(35) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

\*    \*    \*    \*    \*

(2) Except as provided in paragraph (c)(4) of this section, a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

\*    \*    \*    \*    \*

(4) Effective on or after July 1, 2026, through a standard as described in subsection (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

\*    \*    \*    \*    \*

(e) *Application process.*

\*    \*    \*    \*    \*

(9) If the Secretary has notified the borrower's employer that the employer may no longer satisfy the definition of qualifying employer set forth in subsection (b)(28) of this section, pending a determination made under subsection (h) of this section, the

Secretary notifies the borrower of the potential change in the employer's status.

(10) If the Secretary has determined the borrower's employer has ceased to be qualifying employer as a result of a determination made under subsection (h) of this section, the Secretary notifies the borrower of the change in the employer's status.

\*      \*      \*      \*      \*

(g) *Borrower reconsideration process.*

\*      \*      \*      \*      \*

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this subsection (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in subsection (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.*

(1) The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions. In making such a determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

(i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

(ii) A plea of guilty or *nolo contendere,* whereby the employer admits to have engaged in activities that

have substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in activities that have substantial illegal purpose; or

(iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in subsection (h) of this section.

(2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution.

(i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose.*

(1) The Secretary will determine that a qualifying employer violated the standard under subsection (h) of this section when the Secretary:

(i) Receives an application as referenced under subsection (e) of this section in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose; or

(ii) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's final determination, the Secretary which includes the factors set forth in subsection (j)(2) of this section.

(2) Notwithstanding subsection (i)(1), the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if the employer is operating separately and distinctly, for the purposes of determining whether an employer is eligible.

(j) *Regaining eligibility as a qualifying employer.* An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after—

(1) 10 years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with subsection (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes—

(i) a certification by the employer that it is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a report describing the employer's compliance controls that are designed to ensure that the employer does not continue to engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

(k) *Borrower notification of regained eligibility.* If an employer regains eligibility under subsection (j) of this section, the Secretary shall update the qualifying employer list, which is accessible to borrowers for purposes of certification or application.

[FR Doc. 2025–15665 Filed 8–15–25; 8:45 am]

**BILLING CODE 4000–01–P**

ED_02464



## DEPARTMENT OF EDUCATION

**34 CFR Part 685**

[Docket ID ED–2025–OPE–0016]

RIN 1840–AA28

**William D. Ford Federal Direct Loan (Direct Loan) Program**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary establishes new regulations on the Public Service Loan Forgiveness (PSLF) program in the William D. Ford Federal Direct Loan (Direct Loan) program under 34 CFR 685.219 by adding or clarifying provisions to exclude employers that engage in specific enumerated illegal activities such that they have a substantial illegal purpose, including defining obligations and processes tied to making such a determination of an employer, clarifying that borrowers will receive full credit for work performed, until the effective date of the Secretary's determination that an employer is no longer a qualifying employer under the rule; and establishing methods for an employer to regain eligibility following a determination of ineligibility by the Secretary. These regulations ensure that taxpayer dollars are not misused by preventing PSLF benefits from going to individuals employed by organizations that have a substantial illegal purpose. The revisions strengthen accountability, enhance program integrity, and protect hardworking taxpayers from shouldering the cost of improper subsidies granted to employees of organizations that undermine national security and American values through criminal activity.

**DATES:** These regulations are effective July 1, 2026. For the implementation dates of the regulatory provisions, see the Implementation Date of These Regulations in **SUPPLEMENTARY INFORMATION**.

**FOR FURTHER INFORMATION CONTACT:** Tamy Abernathy, Office of Postsecondary Education, 400 Maryland Ave. SW, Washington, DC 20202. Telephone: (202) 987–0385. Email: *Tamy.Abernathy@ed.gov.*

**SUPPLEMENTARY INFORMATION:**

### Executive Summary

The Department of Education (Department) is committed to ensuring that taxpayer dollars are not used to support organizations engaged in unlawful activities. To uphold this principle, the Secretary will exclude organizations engaged in specific enumerated activities such that they have a substantial illegal purpose from being considered qualifying employers under the Public Service Loan Forgiveness (PSLF) program. The activities indicative of a substantial illegal purpose include aiding and abetting violations of Federal immigration laws, supporting terrorism or engaging in violence for the purpose of obstructing or influencing Federal Government policy, engaging in the chemical and surgical castration or mutilation of children in violation of Federal or state law, engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law, engaging in a pattern of aiding and abetting illegal discrimination, and engaging in a pattern of violating State laws. This action aligns with President Trump's Executive Order *Restoring Public Service Loan Forgiveness,* Executive Order 14235 (Mar. 7, 2025) directing the Department to revise PSLF eligibility criteria to prevent Federal funds from subsidizing activities that undermine national security and American values. The final rule clarifies the definition of a qualifying employer, specifies activities constituting a substantial illegal purpose, outlines the impact on borrower eligibility, and ensures employers are notified and given an opportunity to respond before any adverse decision by the Secretary. These measures strengthen the integrity of the PSLF program and protect American taxpayers from supporting organizations engaged in illegal activities such that the organization has a substantial illegal purpose.

### Purpose of This Regulatory Action

*Summary of the Major Provisions of This Regulatory Action*

The final regulations—
* Amend § 685.219(b) to modify the existing structure of the subsection into the regulatory paragraph structure.
* Amend § 685.219(b) to add definitions for: aiding or abetting, chemical castration or mutilation, child or children, foreign terrorist organizations, illegal discrimination, other Federal Immigration laws, substantial illegal purpose, surgical castration or mutilation, terrorism, trafficking, violating State law, and violence for the purpose of obstructing or influencing Federal Government policy.
* Amend § 685.219(c) to establish that on, or after, July 1, 2026, no payment made by a borrower shall be credited as a qualifying payment for PSLF for any month that a qualifying employer is no longer eligible as a qualifying employer for the PSLF program. Borrowers will receive full credit for work performed until the effective date of the Secretary's determination that an employer engaged in illegal activities such that it has a substantial illegal purpose under the rule.
* Amend § 685.219(e) to require the Secretary to notify borrowers of a qualifying employer's status if the qualifying employer is at risk of becoming or becomes ineligible to participate in the PSLF program.
* Amend § 685.219(g) to clarify that a borrower may not request reconsideration of a determination by the Secretary that resulted in the employer losing status as a qualifying employer because the employer has a substantial illegal purpose.
* Add § 685.219(h) to establish that the Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, and consideration of materiality, that a qualifying employer has engaged in activities enumerated in paragraph (b)(30) on or after July 1, 2026, such that the employer has a substantial illegal purpose. Also, the Secretary will presume certain actions are conclusive evidence that the employer engaged in activities such that it has a substantial illegal purpose.
* Add § 685.219(i) to establish that the Secretary will initiate the process for determining whether a qualifying employer engaged in activities such that it has a substantial illegal purpose when (1) the Secretary receives an application in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose, or (2) the Secretary otherwise determines that the qualifying employer engaged in such activities under the standard set forth in § 685.219(h). The Secretary made a minor technical change from the NPRM to remove an extraneous word "which" from (i)(1)(ii). Further, paragraph (i)(2) clarifies that the Secretary may consider organizations that share the same identification number or other unique identifier to be separate entities if the organization is operating separately and distinctly from another entity with the same identification number (*i.e.,* for the purpose of determining whether an employer sharing such identifier is eligible).
* Add § 685.219(j) to establish that an employer that loses PSLF eligibility and desires to regain eligibility could regain qualifying employer status either (1) 10 years from the date the Secretary makes

a determination under the process in subsection (i), or (2) after the Secretary approves a corrective action plan.

\* Add § 685.219(k) to require that, if an employer regains eligibility to participate in the PSLF program, the Secretary updates, within 30 days, the qualifying employer list.

## Background

The PSLF program was established by the College Cost Reduction and Access Act of 2007 (CCRAA), Public Law 110–84, 121 Stat. 84. In particular, the CCRAA amended section 455(m) of the Higher Education Act of 1965, as amended (HEA), to allow for cancellation of remaining loan balances for eligible Direct Loan borrowers after they made 120 monthly payments under a qualifying repayment plan while working in a qualifying public service.

Following the enactment of the CCRAA, the Department promulgated PSLF regulations at 34 CFR 685.219, which became effective on July 1, 2009. *See Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program,* 73 FR 63232 (Oct. 23, 2008).

Since its original promulgation, 34 CFR 685.219 has been amended seven times. *See* 74 FR 55972 (Oct. 29, 2009); 77 FR 76414 (Dec. 28, 2012); 80 FR 67204 (Oct. 30, 2015); 85 FR 49798 (Aug. 14, 2020); 87 FR 65904 (Nov. 1, 2022); 88 FR 43064 (July 6, 2023); 88 FR 43820 (July 10, 2023).

Of these amendments, two amendments promulgated in 2020 and 2022, respectively, have substantively changed the criteria for qualifying employment for the purposes of participation in PSLF. In 2020, the definition of "public service organization" was substantively changed to allow employees of organizations engaged in religious activities (regardless of whether the borrower's duties included religious instruction, worship services, or any form of proselytizing) to be eligible for PSLF. This change was made in response to the United States Supreme Court decision in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 582 U.S. 449 (2017), and the United States Attorney General's October 7, 2017, Memorandum on Federal Law Protections for Religious Liberty, *https://www.justice.gov/archives/opa/press-release/file/1001886/dl.* This memorandum was written pursuant to Executive Order 13798 on *Promoting Free Speech and Religious Liberty* (May 4, 2017) and was intended to ensure that faith-based entities are not discriminated against due to their religious beliefs and that borrowers choosing to work for such entities (which met the definition of public service organization) could gain the same benefits afforded to borrowers working for non-faith-based entities. In 2022, the Department changed the term "public service organization" to the term "qualifying employer" under 34 CFR 685.219 and substantively changed the underlying way the definition functions. In these regulations, subsection (v)(A) of the definition of qualifying employer referenced another term: "non-governmental public service." Previous iterations of 34 CFR 685.219 provided a list of public services that, if provided by a private organization, allowed it to qualify as a "public service organization," but did not offer any definition for the enumerated public services (except for certain public health roles, which relied on definitions provided by the Bureau of Labor Statistics). This list aligned closely with section 455(m)(3)(B) of the HEA, which defines "public service job." Although the 2022 rule incorporated the bulk of previous version's list of public services into the definition of "non-governmental public service," it also provided specific definitions for each public service incorporated into that definition. Furthermore, the 2022 rule clarified that private organizations providing a non-governmental public service had to be nonprofit organizations to be considered a qualifying employer for the purposes of PSLF, substantially limiting employer eligibility.

The Department, in this final rule, establishes that to be considered a qualifying employer for purposes of the PSLF program, an organization must not engage in illegal activity such that it has a substantial illegal purpose. Organizations that break the law such that they have a substantial illegal purpose are actively harming the public good. *See Mysteryboy Inc.* v. *Comm'r,* 99 T.C.M. (CCH) 1057 (T.C. 2010). This rule prevents Federal funds from subsidizing harmful illegal activities through a program designed to reward public service.

Below, we address the Secretary's broad authority to engage in rulemaking on this topic and provide a brief discussion of the relevant statutory authority regarding what type of organization constitutes a qualifying employer for the purposes of PSLF, the implementation of that authority, and relevant changes to 34 CFR 685.219 since its original promulgation. Additionally, we discuss how the illegality doctrine utilized by the Internal Revenue Service (IRS) serves as a basis for the Department to promulgate regulations to exclude organizations that have engaged in certain illegal activities from the definition of qualifying employers.

The negotiated rulemaking committee that convened June 30 through July 2, 2025, considered draft regulatory text and did not reach consensus because one negotiator disagreed with the draft regulatory language.

On August 18, 2025, the Secretary published a notice of proposed rulemaking (NPRM). The NPRM included the Department's proposed regulations, and these final regulations reflect and respond to the public comments received on the regulatory proposals in the NPRM. These final regulations also contain changes from the NPRM, which are fully explained in the Analysis of Public Comments and Changes section of this document, where applicable.

*Cost and Benefits:* As further detailed in the Regulatory Impact Analysis (RIA), the final regulations will have meaningful implications for borrowers, taxpayers, and the Department. The regulatory changes outlined in this final rule are designed to strengthen the integrity of the PSLF program by ensuring that only borrowers employed by organizations engaged in lawful activities and legitimate public service remain eligible for loan forgiveness. By excluding employers engaged in activities such that they have a substantial illegal purpose, the rule aims to better align PSLF eligibility with the program's statutory intent: to encourage Americans to pursue public service careers that improve their communities. Furthermore, the rule will ensure that the Department is not indirectly subsidizing employers engaged in activities that have a substantial illegal purpose that harm fellow Americans.

For borrowers, the final rule will remove PSLF eligibility whenever they are employed by organizations that do not qualify under the revised criteria. In cases where an employer is deemed to have engaged in activities that breach Federal or State law, affected borrowers will no longer receive credit toward loan forgiveness for the months worked after the determination date of ineligibility as made by the Secretary. However, borrowers will receive full credit for work performed until the effective date of the Secretary's determination that they are no longer a qualifying employer for the purposes of the PSLF program. Although this may delay or prevent loan forgiveness for a subset of borrowers, the overall design of the regulations, including advance notice, transparency around

ED_02466

determinations, and employer recertification pathways, help prevent unexpected or retroactive harm. These borrowers will retain the ability to pursue PSLF through eligible employment elsewhere, thereby preserving the program's intended purpose.

For taxpayers, the final rule reduces the risk of improper use of taxpayer funds by ensuring that credit toward loan forgiveness is only granted in circumstances where individuals are actually engaging in lawful public service. Employers that engage in unlawful activity are not serving the public interest because their actions harm their communities and the public good. By limiting PSLF eligibility to borrowers employed by organizations that do not engage in unlawful conduct, the rule reinforces appropriate commonsense stewardship of Federal funds. Although the exact budgetary impact will depend on the number and size of employers that do not meet the revised definition in this final rule, the regulations are expected to reduce PSLF-related discharges in cases where forgiveness would otherwise go to borrowers employed at organizations acting contrary to the public good.

For the Department, the rule introduces new administrative responsibilities that include reviewing employer conduct, issuing determinations, notifying borrowers of status changes, and entering into and overseeing corrective action plans. Although these tasks will require the reallocation of Department staff and system resources, the use of existing standards, such as definitions grounded in Federal law and doctrines adopted by other agencies, and processes, will allow the Department to administer the regulations efficiently and consistently to prevent improper payments. As in other regulations administered by the Department, the final rule also codifies a clear evidentiary framework, such as relying on court judgments or plea agreements, which limit the need for new investigative and adjudicative processes.

Taken together, these regulations represent a necessary evolution of PSLF oversight. The costs associated with employer review and administration are modest and proportional to the benefits gained, including reducing improper payments and increasing transparency, program integrity, and taxpayer protection. Most importantly, this final rule strengthens the fundamental purpose of PSLF—to encourage borrowers to enter occupations that improve their communities and advance the public good while also guarding against the diversion of Federal benefits to organizations that harm their fellow Americans by engaging in illegal conduct.

*Implementation Date of These Regulations:* These regulations are effective on July 1, 2026. Section 482(c) of the HEA requires that regulations affecting title IV programs be published in final form by November 1, prior to the start of the award year (July 1) to which they apply.

*Public Comment:* On August 18, 2025, the Secretary published an NPRM for these regulations in the **Federal Register**; 13,989 parties submitted comments on the proposed regulations.

## Analysis of Public Comments and Changes

The Department has grouped issues according to the regulatory section or subject and themes, with appropriate sections of the regulations referenced where applicable. We discuss other substantive issues under the sections of the regulations to which they pertain. In instances where individual submissions appeared to be duplicates or near duplicates of comments prepared as part of a write-in campaign, the Department posted one representative sample comment along with the total comment count for that campaign to *www.Regulations.gov.* We considered these comments along with all the other comments received. In instances where individual submissions were bundled together (submitted as a single document or packaged together), the Department posted all the substantive comments included in the submissions along with the total comment count for that document or package to *www.Regulations.gov.* Generally, we do not address minor, non-substantive changes (such as renumbering paragraphs, adding a word, or typographical errors) within this final rule. Additionally, we generally do not address changes or comments recommended by commenters that the statute does not authorize the Secretary to make (such as forgiving all student loans), or comments pertaining to operational processes. Analysis of the comments and of any changes in the regulations since publication of the NPRM follows.

## Process for Out-of-Scope Comments

We do not address comments that are out of scope. For purposes of this final rule, out-of-scope comments are those that are not addressed in the NPRM altogether. Generally, comments that are outside of the scope of the NPRM are comments that do not discuss the content or impact of the proposed regulations or the Department's evidence or reasons for the proposed regulations.

## Request To Extend Public Comment Period

*Comments:* Several commenters explicitly urged the Department to extend the comment period. They argued that the proposed changes were introduced without adequate opportunity for meaningful public participation. Additionally, commenters argued that there was a lack of transparency and stakeholder engagement. They suggested that the short comment period undermined trust and fairness, claiming that important legal aid, nonprofit, and advocacy groups had little chance to weigh in.

*Discussion:* The Department disagrees with the commenters. The Department fully complied with the Administrative Procedure Act (APA) and requirements for negotiated rulemaking in the HEA. The comment period provided through the initial public hearing, negotiated rulemaking, and NPRM notice and comment process met the requirements established in law, giving the public numerous opportunities to provide feedback. Indeed, nearly 14,000 comments were received across diverse stakeholder groups, including those referenced by the commenters, within the established timeframe, demonstrating that interested parties were aware of the proposed changes and able to share feedback. In addition, the public engagement process, including the public comment period referenced by commenters, that the Department followed here is consistent with other title IV, HEA rulemakings. *See e.g.,* Student Assistance General Provisions, 87 FR 41878 (proposed July 13, 2022) (providing for a 30-day comment period); Financial Value Transparency and Gainful Employment, 88 FR 32300 (proposed May 19, 2023) (providing for a 32-day comment period). The public has had ample opportunity to engage and provide feedback throughout the Department's rulemaking process. No substantive input has been ignored.

*Changes:* None.

## Public Service Loan Forgiveness (§ 685.219)

### General Comments

*Comments:* Several commenters provided overarching commentary on the NPRM rather than commenting on specific provisions. Some commenters expressed their opinion that the rule was poorly conceived and duplicative of existing law, while others claimed that it will create confusion and uncertainty

for both borrowers and employers. A recurring theme was the perception that the NPRM lacked clarity on how it will be implemented. Several commenters questioned whether the proposed framework would be administered fairly and consistently. Others stated that finalizing the rule would undermine confidence in the whole Direct Loan program.

*Discussion:* The final rule is not duplicative because the Department does not currently consider whether an otherwise qualifying employer engages in illegal activities such that it has a substantial illegal purpose for PSLF-eligibility purposes. The Department does not agree that the rule will cause confusion because the Department will provide notice to both borrowers and employers in the event an employer is no longer eligible because the Department has determined it engaged in illegal activities such that it has a substantial illegal purpose.

The Department does not think that the rule will undermine confidence in the PSLF program because the rule will ensure that PSLF benefits are only being received by employees of organizations that are serving the public interest. By limiting eligibility in this way, the rule ensures that taxpayer funds are only used to indirectly subsidize employment at employers who are not breaking the law. As such, this final rule should increase confidence in the PSLF program by reducing improper payments to borrowers working for employers who are breaking the law and harming their respective communities.

*Changes:* None.

### General Support for the Regulations

*Comments:* Many commenters expressed gratitude and strong approval for the Department's efforts to reform the PSLF program. They characterized the program as historically confusing, plagued by denial of benefits, and saw the proposed reforms as a long-overdue fix that will restore trust and usability.

*Discussion:* The Department agrees with the commenters and appreciates their support. The PSLF program has faced significant challenges over the years, including high denial rates, administrative barriers, and widespread confusion among borrowers. This final rule delivers clarity, fairness, and accountability for borrowers and qualifying employers under PSLF. It strengthens transparency and ensures PSLF is restored to its intended focus on public service for the betterment of communities. This final rule ends the subsidization of employment at organizations that are not only failing to serve the public interest but are actually

doing harm by engaging in illegal conduct.

*Changes:* None.

*Comments:* Some commenters highlighted that strengthening the integrity of the PSLF program directly supports the recruitment and retention of professionals in public service careers such as teaching, nursing, social work, and government service. They emphasized that these reforms make it more feasible for individuals to dedicate their careers to public service without the burden of unmanageable debt.

*Discussion:* The Department agrees that the PSLF program makes it easier for borrowers to pursue public service careers; however, the rule is unlikely to materially alter those incentives like the commenters suggest. This is because the rule does not expand eligibility for the program and is thus unlikely to induce new borrowers, who are not currently participating or would not otherwise be inclined to participate, to work for a qualifying employer. We agree, however, that strengthening the program's integrity will likely improve public perception and support its long-term sustainability.

*Changes:* None.

*Comments:* Some commenters stressed that PSLF is not only beneficial for borrowers but also for the communities they serve. By making it possible for professionals to remain in public service roles, PSLF helps stabilize organizations that provide education, healthcare, safety, and social services. Several commenters noted that healthy, stable public service organizations generate positive externalities for the economy and society.

*Discussion:* The Department partially agrees with the commenters. PSLF is clearly beneficial to borrowers and the organizations that employ them, but it is also very costly for taxpayers who ultimately must bear the cost of loan forgiveness. Although this rule ensures PSLF has clear and consistent standards for qualifying public service employers in communities across the country, in some cases the program has created perverse incentives for colleges and universities to increase tuition costs and load unsustainable levels of debt onto students.[1] Moreover, the waivers provided by the last Administration—waiving payments specifically required by statute—provided PSLF loan cancellation benefits to thousands of borrowers who were sometimes years

away from eligibility or who would never have been eligible under the statutory requirements of the program.[2] Unlike the temporary and legally questionable actions taken by the last Administration, this final rule addresses a key shortcoming of the PSLF program—granting benefits for employment at organizations engaged in illegal activities such that it has a substantial illegal purpose—through the proper rulemaking process.

*Changes:* None.

*Comments:* Several commenters emphasized that strengthening PSLF will restore public trust, not only in the program itself, but also in the Federal Government's ability to deliver on its promises to support public service careers. They argued that years of denial, poor communication, and unclear rules eroded faith in public service initiatives, and that these reforms provide a chance to demonstrate that government programs can work effectively, transparently, and fairly.

*Discussion:* The Department agrees that strengthening the PSLF program is essential for the restoration of taxpayer trust in PSLF. This final rule ensures that PSLF benefits are not misdirected to those working for organizations that are not serving the public interest. Years of inconsistent administration, ill-conceived waivers, and confusing standards have eroded public confidence in the PSLF program. This rule reverses that trend and delivers much-needed clarity, transparency, and accountability for borrowers and employers.

*Changes:* None.

*Comments:* Approximately 70 comments noted borrowers from underrepresented and economically disadvantaged backgrounds are more likely to pursue careers in public service as a result of the PSLF program. Some comments cited a report commissioned by the National Legal Aid & Defender Association to suggest borrowers are more likely to struggle with student loan debt in the absence of the PSLF program.[3] They praised the PSLF program as a way to level the playing field, enabling a more diverse and representative public service workforce.

*Discussion:* The Department disagrees that PSLF advances equity and inclusion efforts that improperly use

---

[1] Preston Cooper & Alexander Holt, *Turn Public Service Loan Forgiveness into a State Block Grant,* Ctr. on Opportunity and Soc. Mobility: AEIdeas (Apr. 17, 2025), *https://cosm.aei.org/turn-public-service-loan-forgiveness-into-a-state-block-grant/.*

[2] Kaitlin Mulhere, *It Just Got a Lot Easier to Qualify for Public Service Loan Forgiveness,* Money (Oct. 6, 2024), *https://money.com/public-service-loan-forgiveness-changes-waiver/.*

[3] National Legal Aid & Defender Association (NLADA), Public Service Loan Forgiveness and the Justice System (Mar. 2025), *https://www.nlada.org/pslf-and-justice.*

ED_02468

racial goals. PSLF is race-neutral and was not designed with any specific targeting of benefits to borrowers from underrepresented or economically disadvantaged backgrounds. Rather, PSLF is intended to provide financial incentives to borrowers from all backgrounds to work in jobs in the public service sector with qualifying employers. In some cases, the value of PSLF benefits to borrowers may help to incentivize those borrowers to seek employment or to remain employed with PSLF qualifying employers rather than seeking employment in other sectors. This final rule supports this objective by ensuring that PSLF benefits are not improperly granted to any borrower employed by an organization that does not meet the definition of a qualifying employer, regardless of the borrower's racial or socioeconomic background.

*Changes:* None.

*General Opposition to the Regulations*

*Comments:* Several commenters opposed the proposed rule in its entirety. Some commenters expressed their distrust of the Department's motives, suggesting that the rule was less about protecting program integrity and more about restricting access to loan forgiveness. Others feared that the rule will deter participation in public service jobs, and ultimately harm both borrowers and the communities that rely on them.

*Discussion:* The Department rejects the broad, unsubstantiated claims by these commenters. The standards in this rule bring clarity, consistency, and needed accountability to the PSLF program. The Department's motives are not pretextual or designed to limit access to PSLF beyond removing eligibility for organizations that engage in illegal activities such that they have a substantial illegal purpose. If an organization is found to have a substantial illegal purpose, any borrower working for such an employer may look for alternative employment with a qualifying employer if they wish to pursue PSLF. The Department acknowledges that borrowers who remain with an employer that loses eligibility will not receive credit toward loan forgiveness for months of employment at that employer who would have otherwise qualified prior to this final rule. These borrowers will have a choice to seek employment with a different qualifying employer. However, the Department believes that any harm to borrowers is outweighed by the Federal Government's interest in not allowing PSLF benefits to flow to borrowers who work for employers

engaged in illegal conduct. The Department agrees that this final rule will serve as a deterrent for borrowers who may want to work for employers who are engaged in illegal activities such that the employer has a substantial illegal purpose and believes that kind of deterrence is appropriate as it creates incentives for organizations to avoid engaging in illegal activity. Furthermore, the Department emphasizes that this rule provides borrowers with advance notice regarding the types of activities that may constitute a substantial illegal purpose, thereby disqualifying an employer under the PSLF program. This transparency enables borrowers to make informed decisions about whether to begin or continue employment with a given organization. Additionally, borrowers will have sufficient time to assess their employment options and whether those options are impacted by these final regulations.

*Changes:* None.

*Comments:* Several commenters observed that PSLF is already "overly complicated and poorly managed." They argued that adding what they viewed as subjective eligibility rules may deepen borrower confusion, making it harder for professionals in government and nonprofit work to continue through the PSLF program. They argued that borrowers will be penalized by their employer's activities rather than by their own individual actions.

*Discussion:* The Department disagrees. Under this final rule, borrowers will receive full credit for work performed until the effective date of the Secretary's determination that an employer engaged in illegal activities such that it has a substantial illegal purpose. Borrower payments will not count toward time to forgiveness when payments are made after a determination that an employer is an ineligible employer for the PSLF program. The Department believes that any confusion that may be created by this final rule will be outweighed by the corresponding benefits to the integrity of the PSLF program and reductions in indirect benefits to organizations engaged in illegal activity. The focus of this rule is appropriately on employers, as Congress requires the Department to ensure that borrowers are working for a qualifying employer before providing PSLF benefits to a borrower. This final rule is not intended to punish borrowers. The Department is not taking away any credit toward loan forgiveness for any qualifying payment that was made before their employer was deemed ineligible. A determination that an

employer is no longer an eligible employer within the PSLF program has no bearing on a borrower's current or future participation in loan forgiveness programs. However, the Department acknowledges that some borrowers may lose access to PSLF benefits due to their employer's unlawful actions—actions potentially beyond borrowers' control but which the Department cannot overlook. The Department believes this is necessary to prevent future benefits from going to employees of employers that have engaged in illegal activities such that the employer has a substantial illegal purpose.

*Changes:* None.

*Comments:* Many commenters argued that the NPRM lacked clear standards, and that PSLF could be subject to shifting interpretations depending on the political environment. They warned that this uncertainty makes the program appear arbitrary and would leave both employers and employees vulnerable to sudden disqualification. This unpredictability, they argued, would undermine trust in PSLF and weaken its intended role as a stable incentive for public service.

*Discussion:* The Department rejects the claim that PSLF is left open to shifting political winds. This rule provides strong, clear standards anchored in law, not ideology. That clarity provides certainty for borrowers, confidence for employers, and accountability for taxpayers. Qualifying employers will only face uncertainty if they decide not to follow the law. Employers who follow the law will not be disqualified, and because most organizations follow the law, the Department believes the commenters' concerns about widespread changes in incentives to enter public service as a result of the rule are significantly overstated. By codifying objective standards, this final rule ties forgiveness to lawful public service for purposes of the PSLF program.

*Changes:* None.

*Comments:* Commenters claimed that the rule does not explicitly describe how determinations will be made, what counts as activity contrary to law, or how appeals will function. They argued that the absence of detail could create uncertainty for both borrowers and employers.

*Discussion:* The Department rejects the claim that the rule lacks clarity as to how determinations will be made. The Secretary will weigh any evidence presented showing that an organization's activities violated any laws and make a determination if those violations rise to the level of substantial illegal purpose. The Secretary will look

to see if there is a pattern of behavior by the organization, the gravity of the violation, and generally exclude evidence of technical violations of law. When reviewing an employer's conduct, the Secretary will consider any reliable evidence, including countervailing evidence provided by the employer. This final rule also establishes a reconsideration process for employers when they have been determined ineligible. Employers may seek review, submit documentation, and receive written explanations of the Secretary's determination. This approach ensures transparency, protects taxpayers, and maintains borrower confidence. Furthermore, the Due Process Clause of Fifth Amendment ensures that all entities that are subject to a Departmental adjudication are entitled to an unbiased adjudicator. This ensures that all entities have an adjudicator who has not prejudged the law or the facts, as applied, and that all decisions are supported by reliable evidence.

*Changes:* None.

*Comments:* Some commenters noted that, when borrowers lose PSLF benefits, it affects not just them but the communities they serve. Professionals might leave public service for private-sector roles, reducing the workforce available to meet urgent needs in education, healthcare, and social services. Commenters expressed specific concerns about borrowers employed in rural areas where finding another job may be difficult in the event their employer loses PSLF eligibility. They noted that alternative employment options in these areas may be rare, and borrowers may be forced to relocate for other employment opportunities in the event there are no other qualifying employers in their area.

*Discussion:* The Department acknowledges that it is possible if a borrower loses access to PSLF benefits due to this final rule that he or she could leave public service to find a job in the private sector. However, the degree to which this is likely to occur is speculative and will vary widely based upon the borrower's skills and abilities, where the borrower is living, other employment opportunities in the local community, and whether the borrower wants to continue to work in public service. The Department disagrees with the commenter that these speculative equities outweigh the benefits of the rule, which has been previously discussed.

The Department acknowledges there may be potentially fewer qualifying employers in rural communities than in more urbanized areas; however, as shown in Table 5.4 of the Regulatory

Impact Analysis of this final rule, over 1 million borrowers have received PSLF benefits to date across more than 20 sectors of the economy. The Department must balance concerns that disqualification of qualifying employers in an area with few qualifying employers may result in fewer choices for borrowers seeking to benefit from PSLF against its primary responsibility to safeguard American taxpayer dollars and interests by ensuring that PSLF benefits are only received for work at qualifying employers that are serving the public interest.

The Department also disagrees with the assertion that this rule will have a significant macroeconomic impact on labor markets in education, healthcare, and social services in most areas. The commenter did not provide sufficient evidence to support this claim, and the Department finds no basis to conclude that such widespread effects are likely. As noted in the Regulatory Impact Analysis, because we expect most organizations to voluntarily comply with the rule, the Department anticipates that it will take action to remove eligibility for less than ten organizations per year. As presented in Table 5.2 of this final rule, to date, approximately 30 percent of borrowers receiving forgiveness through PSLF were employed by non-governmental entities. Accordingly, the Department believes the commenters' assertion is overstated and that this rule will not materially reduce the available workforce in education, healthcare, and social services.

*Changes:* None.

*Comments:* Several commenters noted that nonprofits, advocacy organizations, and religious institutions may self-censor or avoid lawful but controversial work for fear that PSLF eligibility could be withdrawn based on political interpretations. They stressed that PSLF should not create disincentives for organizations to pursue their missions independently, whether in areas like immigration, reproductive health, or civil rights.

*Discussion:* The Department does not believe the rule will require nonprofits, advocacy organization, or religious institutions to self-censor to avoid losing eligibility as a qualified employer. This final rule explicitly includes references to the U.S. Constitution relating to protecting rights under the First Amendment. This final rule could not, even without such explicit references, be enforced in a manner that contravenes the First Amendment; therefore, commenters' concerns that the Department will impede upon the First Amendment

rights of these organizations are overstated and not consistent with the Department's own legal limitations. Lawful activity will not disqualify an organization, no matter how controversial or unpopular it may be. The Department will enforce the PSLF program neutrally and transparently, consistent with the law. Nonprofits and advocacy groups are free to pursue their missions without fear of interference from the Department, provided their actions are lawful. This rule strikes an appropriate balance between preserving independence, protecting borrowers, and safeguarding taxpayers while keeping the PSLF program focused on lawful, public service as the American people expect.

*Changes:* None.

### Legal Authority

*General Legal Authority To Change and Clarify*

*Comments:* Some commenters questioned the Department's authority to redefine or expand disqualification standards through regulation. They emphasized that the PSLF program was created by Congress with specific statutory language, and any meaningful change to qualifying employment categories should come directly from amendments to the statute rather than regulatory changes. They are worried that regulatory overreach could invite legal challenges, create uncertainty, and ultimately destabilize PSLF for borrowers. Also, some commenters stated that the Department was overreaching its authority, politicizing the PSLF program, and introducing unnecessary complexity into the program.

*Discussion:* The Department rejects the suggestion that this rule exceeds its legal authority. The HEA grants the Secretary explicit power to regulate title IV programs. PSLF is a title IV program, and its proper administration requires clear, enforceable standards that are often established and implemented through regulations issued by the Secretary. Establishing objective standards through the rulemaking process is not overreach and avoids politicizing the PSLF program. It is a lawful and common exercise of authority delegated by Congress. Borrowers deserve clarity and taxpayers deserve accountability, both of which this final rule provides. Furthermore, under the illegality doctrine, courts and the IRS have established that revocation of statutory benefits to organizations engaged in illegal activities is proper if its purposes and activities are illegal or otherwise contrary to public policy. *See*

**48972**    **Federal Register**/Vol. 90, No. 209/Friday, October 31, 2025/Rules and Regulations

*Bob Jones Univ.* v. *United States,* 461 U.S. 574, 591 (1983); [4] *see also Rev. Rul. 75–384,* 1975–2 C.B. 204 ("[i]llegal activities, which violate the minimum standards of acceptable conduct necessary to the preservation of an orderly society, are contrary to the common good and the general welfare of the people in a community and thus are not permissible means of promoting the social welfare . . .") Therefore, this rule fulfills the Department's obligation to enforce PSLF consistent with its statutory purpose—to only benefit those borrowers working for organizations that truly serve a public purpose by helping, not harming, their communities. This rule makes certain borrowers receive forgiveness only for lawful public service by shielding forgiveness from abuse. The Department is faithfully executing the law, not expanding it.

*Changes:* None.

*Comments:* Several commenters pointed specifically to 20 U.S.C. 1087e(m)(3)(B), which outlines definitions of public service job categories, and questioned whether the Department has authority to alter or clarify these categories through rulemaking. They argued that, by creating new standards of disqualification, the Department may be venturing beyond clarifying existing law into substantively redefining the statute, a role they asserted belongs solely with Congress.

*Discussion:* The Department disagrees that the amendments made in this final

---

[4] *Bob Jones University* is frequently invoked when discussing the so-called "public policy doctrine," under which an organization's Section 501(c)(3) tax-exempt status may be revoked for engaging in conduct that is not specifically illegal. This occurs where there "can be no doubt that the activity involved is contrary to a fundamental public policy." *Bob Jones Univ.,* 461 U.S. at 592. In *Bob Jones University,* the Court determined that this standard was met, because the organizations' actions (*i.e.,* the maintenance of racially discriminatory admissions policies) ran contrary to "every pronouncement of this Court and myriad Acts of Congress and Executive Orders." *Id. at* 593. Although the public policy doctrine is similar to (and often discussed alongside) the illegality doctrine, the evidentiary bar set in *Bob Jones University* is different and applicable when revocation of an organization's tax-exempt status is based on conduct which is not explicitly illegal. *Id. at* 591 ("A corollary to the public benefit principle is the requirement, long recognized in the law of trusts, that the purpose of a charitable trust may not be illegal or *violate established public policy.*") (*emphasis added*). By contrast, the bar for revoking an organization's Section 501(c)(3) tax-exempt status for engaging in or encouraging illegal activity is different, because actions that violate laws are inherently contrary to public policy in that the political branches (legislative and executive branches through bicameralism and presentment) have created positive law to counter the conduct at issue. *See I.R.S. Gen. Couns. Mem.* 34631 (Oct. 4, 1971) (*citing I.R.S. Gen. Couns. Mem.* 31376 (Aug. 14, 1959)).

rule are ultra vires. Section 1087e(m)(3)(B) provides the statutory categories, but it is the Department's responsibility to interpret and apply those categories in a way that ensures PSLF operates as the statute requires. This rule does not rewrite the statute. It fills out the statutory scheme Congress placed under the Department's supervision. In defining a public service job under the HEA, Congress listed 18 distinct categories of jobs. Within four of those categories ("public health," "public interest law services," "early childhood education," and "government"), Congress provided parentheticals to provide some additional detail as to what types of jobs within each of those categories they meant to include or exclude. In addition, within the list of public service jobs, Congress included employment at an organization that is described in Section 501(c)(3) of the Internal Revenue Code. In the list of all 18 distinct categories, there is considerable overlap among the categories. For example, the categories of "military service," "law enforcement," "public library sciences," and "public education" are also included within the "government" category. Likewise, there is overlap between "public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization)" and organizations that are described in Section 501(c)(3) of the Internal Revenue Code.

To make sense of these overlapping and arguably duplicative categories, it is important to consider the level of generality at which Congress approached the problem. Indeed, Congress provided for a long list of eligible professions to broadly ensure that all professions that advance the public interest were included in the list. This provides an important clue in interpreting the underlying statute, as the Department must presume that Congress would not want PSLF benefits to be received by employees of organizations that the Department knows are not serving the public interest. This includes organizations that are breaking the law, which is contrary to the public interest. Surely, Congress would not want to reward organizations that break the law and have a substantial illegal purpose by indirectly subsidizing their organizations by providing loan forgiveness to their employees.

Furthermore, although it is possible that the IRS could take independent action to revoke Section 501(c)(3) tax-exempt status from an organization

engaging in illegal conduct, that same organization (absent action from the Department) could remain eligible for PSLF (assuming it still met the requisite criteria for nonprofit organizations) and continue to employ individuals in public service jobs if those jobs meet another part of the definition under 20 U.S.C. 1087e(m)(3). For example, an organization that is organized as a nonprofit and provides State-funded prekindergarten services could lose Section 501(c)(3) status under the Internal Revenue Code but remain an eligible employer under previous versions of the Department's regulation. Similarly, an organization that the Department determines has a substantial illegal purpose may continue to be exempt under Section 501(c)(3) because its tax-exempt status has not been revoked, a determination made by the IRS. This final rule provides that the Department can act in these circumstances, removing eligibility when the Department finds the organization has engaged in illegal activities such that it has a substantial illegal purpose.

This rule advances the statutory scheme Congress created in section 455(m)(3)(B) of the PSLF statute in the HEA, which includes multiple references to public service in defining public service job.

*Changes:* None.

*Comments:* A significant number of commenters argued that the Department lacks statutory authority to apply a "preponderance of the evidence" standard in making employer disqualification determinations. Commenters claimed the "preponderance of the evidence" standard is inappropriately low. They contended that such a standard is inappropriate for decisions with major financial consequences and instead urged exclusive reliance on final judicial or administrative findings. Some commenters indicated that Congress needs to provide explicit authorization for the Department to proceed with this evidentiary framework.

*Discussion:* The Department rejects the claim that it lacks authority to establish an evidentiary standard and has utilized this same standard in other title IV regulations. This rule does not preclude legal activities that assist groups mentioned by the commenters. This includes any lawful work performed by legal aid attorneys, nonprofit law offices, community legal clinics that provide direct legal services, public defense, civil rights litigation and advocacy organizations, and other

activity that support low-income or disadvantaged people.

The Department will solely enforce this rule against organizations that participate in illegal activity such that they have a substantial illegal purpose. Congress, through the HEA, granted broad authority to regulate title IV programs. The preponderance of the evidence standard is well established in administrative law for civil adjudications and is fair and consistent with longstanding Federal practice. It ensures decisions are grounded in fact, not speculation, and allows the Department to act promptly to protect both borrowers and taxpayers. Here, in applying the preponderance of the evidence standard to the substantial illegal purpose test, the Secretary will need to find that it is more likely than not that an organization's illegal activity is more than an insubstantial part of its activities that advance an illegal purpose. Plea agreements or admissions of illegal conduct in settlements could provide sufficient proof of unlawful activity to warrant program action, ensuring accountability without waiting for final judicial or administrative findings that could otherwise delay enforcement and allow misconduct to persist. The Department has the responsibility to safeguard PSLF and ensure taxpayer funds are directed only to encourage lawful public service. This evidentiary framework provides the Department with discretion to act swiftly to ensure that taxpayer resources are not wasted to ensure fairness for employers and borrowers.

*Changes:* None.

*Comments:* Commenters raised concerns that PSLF program eligibility could be used as a political tool to compel alignment with an administration's priorities. They suggested that this could limit free speech and advocacy while potentially undermining the independence of public service groups.

*Discussion:* The Department rejects this unsubstantiated concern. The standards for qualifying employment are not intended, nor do they regulate policy preferences, advocacy, or discriminate based upon viewpoint.

The standards are limited to ensuring that employers meet statutory requirements for lawful public service activities. Organizations that abide by Federal law and the laws of the State in which they operate will not be subject to potential loss of eligibility. PSLF employer eligibility is not conditioned on political alignment or conformity with any administration policies. Determinations regarding whether an organization has engaged in illegal

activities such that it has a substantial illegal purpose will be objective and based on evidence such as judgments of State or Federal courts, guilty pleas of the organization, or statements by the organization admitting that it engaged in such conduct (such as in a settlement agreement). It will not be colored by the policy preferences of an employer. Here, the Department is not regulating viewpoint and will enforce the regulation in a manner that does not take viewpoint into account. This approach does not interfere with the policy preferences or advocacy efforts of public service organizations and safeguards taxpayer funds by ensuring benefits are delivered only to organizations that are not engaged in illegal activities such that they have a substantial illegal purpose. The Department will administer the PSLF program neutrally to keep the program focused on its purpose of supporting careers in qualified public service, notwithstanding the policy preferences or viewpoints of the public service employer.

*Changes:* None.

*Comments:* Many commenters expressed concern that the Department will apply the rule in a way that punishes organizations based on political ideology or affiliation rather than on legitimate unlawful conduct. They worried that nonprofit and advocacy organizations could be stripped of PSLF eligibility because their missions or policy stances differ from the administration.

*Discussion:* The Department will administer the PSLF program in a manner that provides borrowers with the benefits required by statute, while ensuring the responsible stewardship of taxpayer resources. As discussed in the previous comment, the Department cannot take action against an employer because of their viewpoint or policy preferences. However, when employers break the law, such that the organization has a substantial illegal purpose, the Department may take action to safeguard the integrity of the PSLF program by removing eligibility from that employer. The Department cannot and will not prejudge the facts or the law with respect to specific employers, but organizations that follow the law will not be subject to adverse action under this final rule.

*Changes:* None.

*Comments:* Some commenters expressed concern that even if the Department does not intend to use PSLF in a political way, the lack of precise definitions and safeguards could create the perception of arbitrary or politically motivated enforcement. They

emphasized that the appearance of bias can be as damaging as actual bias, eroding public trust and discouraging organizations from engaging in lawful advocacy work.

*Discussion:* The Department recognizes that it is possible that enforcement under the regulation could be perceived as politically motivated, but perceptions are not often reality. The perception of some members of the public as to why the Department takes an action should not control or impair the Department's ability to take action, lest the Department become captive to popular perception of the underlying motivation whether true or not. The Department does not intend to take enforcement action based on pretextual grounds. Adverse action will be taken only where the evidence demonstrates that an organization has a substantial illegal purpose.

If the Department takes action under this regulation, impacted entities will receive notice and an opportunity to respond prior to any determination.

*Changes:* None.

*Comments:* Some commenters claimed that this rule is an overreach of executive power and unconstitutional because it creates new disqualification standards not explicitly authorized by Congress. Other commenters argued that the proposed rule deals with a major question under the Major Questions Doctrine and that the Department lacks a clear congressional authorization to promulgate the rule.

*Discussion:* The Department disagrees that the rule is a form of executive overreach or that it is unconstitutional. The HEA gives the Secretary clear and broad authority to regulate title IV programs, such as PSLF. This final rule is firmly within that authority.

The history surrounding the creation and use of the illegality doctrine is instructive in assessing whether this rule is unconstitutional or is a form of executive overreach. Indeed, courts have upheld the use of the illegality doctrine in the context of administering the Internal Revenue Code relating to organizations that engaged in activities that are illegal or otherwise contrary to public policy. *See e.g., Bob Jones Univ.,* 461 U.S. at 591 (holding that an organization may be denied tax-exempt status if its purposes or activities are illegal or otherwise contrary to public policy), *Church of Scientology of Cal.* v. *Comm'r,* 83 T.C. 381 (1984) (upholding revocation of tax-exempt status for a religious organization because of its conspiracy to defraud the United States, which violated established public policy). These cases demonstrate that the Department is implementing

ED_02472

established legal standards when determining whether organizations are engaging in public service by examining whether they engage in activities that are illegal such that they have a substantial illegal purpose. These actions, like those taken by the IRS, are not unconstitutional nor do they amount to executive overreach. Furthermore, the Department disagrees that the rule is a major question under the Major Questions doctrine. The doctrine generally requires Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance. *West Virginia* v. *EPA,* 597 U.S. 697, 716 (2022) (internal quotations omitted). There is not a bright line standard for what constitutes a major question, but courts look to the breadth of the authority asserted and its economic and political significance. The Supreme Court has found that the Major Questions Doctrine is implicated, for example, where the actions of an agency impact the price of energy for nearly all Americans, where the Secretary attempts to cancel upwards of $500 billion in Federal student loan debt for millions of borrowers, and where millions of health insurance subsidies would be impacted. *See e.g., West Virginia,* 597 U.S. at 716; *Biden* v. *Nebraska,* 600 U.S. 477, 505 (2023), *King* v. *Burwell,* 576 U.S. 473, 135 (2015). Here, the Department estimates that this final rule may impact less than ten employers per year across the country. Furthermore, the rule makes no substantive changes to the legality of certain actions but changes the consequences for breaking the law where an employer has a substantial illegal purpose. The Major Questions Doctrine, as articulated by the Supreme Court, is not applicable when a rule impacts less than ten employers per year and does not prohibit lawful conduct.

*Changes:* None.

*Comments:* Many commenters provided examples of organizations aiding refugees and asylum seekers, which they believe to be lawful activities. Commenters were concerned that depending on political motivations, these actions could be deemed ''illegal.'' Commenters believed that advocacy or humanitarian groups could face disqualification despite acting within the law.

*Discussion:* The Department disagrees with the commenters' concerns. In the first instance, Federal law prohibits individuals from aiding, abetting, counseling, commanding, inducing, or procuring another to commit a crime against the United States. 18 U.S.C. 2. Any individual who engages in such

practices to assist illegal immigrants in breaking Federal law may violate 18 U.S.C. 2. Federal law does not prohibit individuals from advocating for illegal immigrants or representing them in Federal immigration court. Organizations that do not aid or abet in criminal activity will not be disqualified from participating in the PSLF program, while organizations that participate in unlawful behavior may have a substantial illegal purpose depending on the nature of the offenses. PSLF determinations under this final rule will not be made based on the political views or policy preferences of the organization. Rather, any decisions will be made based upon the factual record of the underlying actions the organization has taken and whether such actions violate the law. This rule does not preclude legal activities that assist groups mentioned by the commenters. The Department will only enforce this rule against organizations that participate in illegal activity such that they have a substantial illegal purpose.

*Changes:* None.

*Comments:* Commenters argued that existing statutes governing nonprofit conduct (for example, IRS regulations, State charity laws, and criminal statutes) already prohibit organizations from engaging in illegal activity. Creating additional rules through PSLF is seen as duplicative and unnecessary. Commenters also argued that there may be the potential for an irreconcilable conflict to arise for public service professionals where actions mandated by laws like the Individuals with Disabilities Education Act (IDEA), Emergency Medical Treatment and Active Labor Act (EMTALA), and Family Educational Rights and Privacy Act of 1974 (FERPA) or actions required by professional code, could be subjectively misinterpreted as illegal activities that have a substantial illegal purpose.

*Discussion:* The Department acknowledges that rules at the Federal and State levels broadly prohibit nonprofit organizations from engaging in illegal conduct, but the Department disagrees that this final rule is duplicative of those efforts. Indeed, as explained previously, Congress created a broad definition of public service job to capture a broad array of public service employment. Even if the IRS or a State takes action to revoke an organization's tax-exempt status, the organization may still satisfy the definition of a public service employer and, therefore, would remain eligible for participation in the PSLF program. Accordingly, the Department would

need to act to ensure that any organization that engages in illegal activities such that it has a substantial illegal purpose is not able, through its employees, to benefit from the PSLF program.

The Department considered alternatives here, namely that because the IRS could take independent action, it may not be necessary for the Department to make the changes in this rule. However, just like all executive branch agencies, the IRS has resource constraints that limit its ability to act against organizations under the illegality doctrine and must exercise some degree of prosecutorial discretion. This means that, at least at times, the illegality doctrine will be underenforced. In other words, there may be instances where some organizations that have a substantial illegal purpose continue to have IRS tax-exempt status.

The Department has a heightened interest in ensuring that the PSLF program is administered in a manner that safeguards against improper payments. Indeed, the median balance forgiven for borrowers through PSLF is $65,000 so the Department has a significant monetary interest in ensuring that only months of work in lawful public service employment are counted toward forgiveness.[5] The Department's interest here stands separate and apart from any interest the IRS has in taking action to revoke tax-exempt status, because Congress assigned the Department the responsibility to administer and oversee the PSLF program. Because of the Department's independent interest in preventing misuse of taxpayer resources, as well as the fact that the IRS may not always revoke the tax-exempt status of organizations engaging in activities that amount to having a substantial illegal purpose, the Department does not believe that this final rule is duplicative.

With respect to the commenter's assertion that the rule is duplicative because State taxing authorities or other parts of State government may also act against organizations engaged in activities that amount to having a substantial illegal purpose, the Department disagrees. State action has no bearing on eligibility for the PSLF program, so any State action will not necessarily impact employer eligibility for PSLF, which necessitates the need for the Department to be able to take independent action.

---

[5] FY25 Department of Education Justifications of Appropriation Estimates to the Congress, Volume II, Student Loans Overview, page 9.

Regarding the comments raising the potential for the rule to conflict with existing Federal laws or State professional codes, the Department does not believe this rule conflicts with any laws. If there were a conflict between Federal law and State law with respect to the illegal conduct considered by the Secretary under this final rule, ordinary principles of Federal preemption law would apply. *See McCulloch* v. *Maryland,* 17 U.S. 316, 427 (1819) (holding that a State law in conflict with Federal law is without effect). Nothing in this final rule directly preempts State law, and instead broadly defers to State law. The Department is not aware of any conflicts between this final rule and existing Federal and State laws.

*Changes:* None.

### Illegality Doctrine

*Application of the Illegality Doctrine*

*Comments:* Commenters argued that the Department's proposal improperly utilizes the illegality doctrine developed by the IRS and the courts by applying doctrines developed in a tax context to a statutory loan forgiveness program. Some commenters also argued that the Department has misconstrued the illegality doctrine to cover a much wider range of conduct and activities than the doctrine has been applied to by the IRS, which could open the door to political misuse, disqualifying organizations based on contested interpretations of law rather than clear violations. Additionally, some commenters questioned the Department's authority to identify specific types of illegal conduct as a basis for determining that an organization is not a qualifying employer for the purposes of the PSLF program, instead of considering all illegal conduct.

*Discussion:* The Department disagrees that it is improper for the Department to rely on the illegality doctrine when determining whether an employer qualifies for participation in the PSLF program. PSLF is a statutory benefit designed to encourage public service. The illegality doctrine provides a starting point for the Department to base the concept of excluding organizations with a substantial illegal purpose from PSLF, as the illegality doctrine provides a clear basis for denying certain statutory benefits to organizations whose aims and activities are harmful to the public interest. Furthermore, the substantial amount of case law that has been generated regarding the illegality doctrine demonstrates that courts have long recognized that government benefits are not required to flow to

organizations whose purposes conflict with law. *See, e.g., Bob Jones Univ.,* 461 U.S. at 591 (holding that an organization may be denied tax-exempt status if its purposes or activities are illegal or otherwise contrary to public policy); *Church of Scientology,* 83 T.C. at 506 (holding that denial of an organization's Section 501(c)(3) tax-exempt status was proper where the purpose of the organization was engaging in criminal tax fraud); *Mysteryboy,* 99 T.C.M. (CCH) 1057 (holding that an organization that promoted activities which are prohibited by Federal and State laws did not qualify for tax-exemption under Section 501(c)(3)).

As mentioned above, the history surrounding the creation and use of the illegality doctrine is instructive in assessing whether this final rule is unconstitutional or is a form of executive overreach. Indeed, courts have upheld the use of the illegality doctrine in the context of administering the Internal Revenue Code to revoke tax-exempt status from organizations that have a substantial illegal purpose. The Department rejects the supposition that the illegality doctrine can only be applied within the context of Section 501(c)(3) of the Internal Revenue Code. The way the IRS interprets the Internal Revenue Code is very similar to what the Department is doing in interpreting the phrase ''public service.'' *See e.g., Rev. Rul. 75–384,* 1975–2 C.B. 204 (finding that an organization which encouraged civil disobedience did not qualify for tax-exemption as a Section 501(c)(4) organization operated exclusively for the promotion of ''social welfare,'' on the basis that ''[i]llegal activities, which violate the minimum standards of acceptable conduct necessary to the preservation of an orderly society, are contrary to the common good and the general welfare of the people in a community and thus are not permissible means of promoting the social welfare''). Courts and the IRS have established that denial or revocation of an organization's tax-exempt status is appropriate when its purposes and activities are illegal or otherwise contrary to public policy. *See Bob Jones Univ.,* 461 U.S. at 591; *Rev. Rul. 75–384,* 1975–2 C.B. 204. Both the amount of time and attention an organization spends on the unlawful activities and the seriousness of the unlawful activities are relevant considerations. *See, e.g., I.R.S. Gen. Couns. Mem. 34631* (Oct. 4, 1971)(stating, as an example, that ''[a] great many violations of local pollution regulations relating to a sizable percentage of an organization's

operations would be required to disqualify it from 501(c)(3) exemption'' but ''if only .01% of its activities were directed to robbing banks, it would not be exempt'').[6] Taken together, the Department believes that the illegality doctrine can clearly be applied in scenarios outside of just those where the IRS has utilized it in the past, so long as it is used to respond to conduct that is clearly unlawful and substantial in nature.

In crafting this rule, the Department looked to President Trump's Executive Order on *Restoring Public Service Loan Forgiveness,* Executive Order 14235 (Mar. 7, 2025), which identified the forms of unlawful activity that would merit denying an organization qualifying employer status for the purpose of the PSLF program. Although the Department believes that it would be legally permissible for the Department to deny qualifying employer status to organizations for a wider range of unlawful conduct than those set forth in that Executive Order, the Department believes that the Executive Order clearly indicates the areas that the President has identified as being of greatest concern. Furthermore, the Department's enumeration of specific forms of unlawful activity is consistent with the broad powers of prosecutorial discretion of the executive branch. *See United States* v. *Nixon,* 418 U.S. 683, 693 (1974) (*citing Confiscation Cases,* 74 U.S. 454 (1869); *United States* v. *Cox,* 342 F.2d 167, 171 (5th Cir.), *cert. denied sub nom. Cox* v. *Hauberg,* 381 U.S. 935 (1965)) (''[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case . . .''); *United States* v. *Fokker Servs. B.V.,* 818 F.3d 733, 741 (D.C. Cir. 2016) (*citing Cmty. for Creative Non-Violence* v. *Pierce,* 786 F.2d 1199, 1201 (D.C. Cir. 1986); *ICC* v. *Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 283 (1987)) (''[J]udicial authority is . . . at its most limited when reviewing the Executive's exercise of discretion over charging determinations.'') (cleaned up); *Wayte* v. *United States,* 470 U.S. 598, 607 (1985) (*citing United States* v. *Goodwin,* 457 U.S. 368, 380, n. 11, (1982); *Marshall* v. *Jerrico, Inc.,* 446 U.S. 238, 248 (1980)) (''In our criminal justice system, the Government retains

---

[6] The Department understands and acknowledges that IRS General Counsel Memoranda (''GCMs'') do not represent binding precedent. However, because GCMs demonstrate the way the IRS approached a discrete situation, they include persuasive legal analysis which may be applicable in analogous situations. The GCMs cited within this final rule are cited only as examples that the Department looked to while crafting this rule.

broad discretion as to whom to prosecute.'' (cleaned up)).

The Department understands the March 7, 2025, Executive Order as being a directive from the President regarding how he would like the Department to exercise our prosecutorial discretion in taking enforcement actions where organizations are engaged in illegal conduct, and this final rule is focused on specific illegal conduct that he has determined that the Department should focus on. Finally, the Department believes that the identification of specific forms of unlawful activity will have the effect of reducing uncertainty for borrowers when considering prospective employers and for employers when making business decisions.

*Changes:* None.

*Lack of Statutory Authority*

*Comments:* Many commenters claimed the Department lacks statutory authority under the HEA to impose new disqualification standards in the PSLF program. They argued that Congress already defined ''qualifying employment'' to include work at government entities, certain nonprofits, and organizations exempt from tax under Section 501(c)(3) of the Internal Revenue Code because they are described under Section 501(c)(3) and that the Department cannot narrow or redefine this scope by regulation. Several commenters raised separation-of-powers concerns, stating that only Congress, not an executive agency, can amend the PSLF eligibility framework. Commenters warned that this expansion of administrative discretion could destabilize the program.

*Discussion:* Commenters' claims that the Department lacks authority under 20 U.S.C. 1087e are misplaced. Congress has expressly delegated broad rulemaking authority to the Secretary under the HEA to administer the title IV programs, including PSLF. That authority includes clarifying employment qualifications and establishing conditions under which loan forgiveness may be granted. Although Federal agencies may not create new programs, they are charged with the implementation and oversight of programs created by Congress. That authority includes enumerating procedures for the program and providing clarity for compliance and elimination of improper payment uses. In addition, as stated above, the HEA authorizes the Department to take action to prevent employees of organizations that have a substantial illegal purpose from receiving benefits under the PSLF program. Congress would not have

wanted public funds to support employment that harms the public because it advances illegal activity.

*Changes:* None.

*Duplication of Existing Legal Regimes*

*Comments:* Many commenters argued that existing regulatory regimes already prohibit unlawful activity by nonprofits, charities, and public service organizations. They pointed to IRS oversight, State charity laws, and criminal statutes as sufficient safeguards. They argued that layering additional PSLF-specific disqualification standards is duplicative, unnecessary, and could create conflicting enforcement regimes. Commenters warned that this approach risks burdening compliant organizations and confusing borrowers, while doing little to improve PSLF program integrity.

*Discussion:* The Department disagrees with the view that the PSLF program should rely exclusively on other enforcement mechanisms and other Federal agencies to enforce the provisions of programs enacted under the HEA. As stated previously, tax exemption, State charity oversight, and criminal prosecution all serve distinct purposes, but none are designed to administer title IV loan forgiveness. PSLF is a Federal benefit program, and it requires its own eligibility safeguards to ensure taxpayer resources are not diverted to unlawful activity. The Department cannot abdicate this responsibility to outside agencies. This final rule complements, rather than duplicates, existing law. It uses established legal definitions and works in tandem with the IRS, State, and other Federal entities, while maintaining the Department's independent responsibility to administer the PSLF program—a responsibility that Congress clearly provided to the Department. A determination by the Department regarding whether an organization satisfies the requirements to be considered a qualifying employer for the purposes of PSLF is not a determination by the Department regarding that organization's tax-exempt status.

Borrowers deserve certainty and taxpayers deserve assurance that their dollars are used to encourage lawful activities that promote the public good. This framework delivers both by aligning PSLF with lawful public service and protecting the program's integrity.

*Changes:* None.

*Viewpoint Discrimination First Amendment—Free Speech and Association*

*Comments:* Commenters asserted that the proposed rule violates the First Amendment to the U.S. Constitution by conditioning PSLF program eligibility on the political or ideological missions of employers. They argued that excluding borrowers based on their employer's policy positions constitutes impermissible viewpoint discrimination. Commenters also expressed concern that the rule could reduce lawful advocacy and infringe upon employees' rights to freely associate with nonprofit organizations engaged in public service.

*Discussion:* The Department rejects the claim that this final rule will result in a reduction of lawful advocacy and public service. The United States Supreme Court has repeatedly emphasized that government cannot condition access to public benefits on the surrender of constitutional rights, including freedom of speech and association. *See e.g., Perry* v. *Sindermann,* 408 U.S. 593, 597 (1972) (stating ''this Court has made clear that even though a person has no right to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.'') (cleaned up).

The Department continues to assert that PSLF employer determinations will not be based on the viewpoint or advocacy positions of nonprofit or governmental employers or their employees. Instead, the Department will anchor eligibility exclusively in lawful service to the public, consistent with 20 U.S.C. 1087e(m)(3)(B), which defines qualifying employment to include all government and Section 501(c)(3) organizations. Borrowers and employers may continue to engage in lawful advocacy without fear that PSLF will be used as a tool of ideological enforcement.

*Changes:* None.

*Due Process and Vagueness*

*Comments:* Commenters voiced constitutional concerns under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, specifically in relation to the phrase ''substantial illegal purpose.'' They described this language as vague, ambiguous, and subject to shifting interpretation depending on political context. They

ED_02475

said the rule is unconstitutionally void for vagueness because key terms are ambiguous, subjective, overly broad, ill-defined, lack objective standards, and therefore fail to provide adequate notice of prohibited conduct.

According to commenters, the absence of clear definitions deprives borrowers and employers of fair notice and creates the risk of arbitrary enforcement. Commenters also stated that granting broad discretion to the Secretary without certain procedural safeguards could undermine due process by enabling decisions that could be inconsistent, opaque, or politically motivated.

Additionally, some commenters said the disqualification process violates constitutional due process by failing to provide adequate procedural safeguards and lacks a clear process for notice, a formal hearing, or a meaningful appeal to a neutral adjudicator.

Other commenters stated that the rule is procedurally unjust because it denies individual borrowers due process by failing to provide a clear, sufficient, or accessible appeals process to challenge an employer's disqualification. Commenters argued that employees are more directly and personally harmed under the rule, and as such, they should have recourse to correct potential errors, especially as some employers may choose not to challenge their disqualification.

*Discussion:* The Department takes these due process concerns seriously. Courts have long held that vague standards fail when they create uncertainty and invite arbitrary enforcement. *See e.g., Grayned* v. *City of Rockford,* 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). A law can be considered void for vagueness when an average citizen cannot generally determine what persons are regulated, what conduct is prohibited, or what punishment may be imposed. *See Johnson* v. *United States,* 576 U.S. 591, 595 (2015); *see also Kolender* v. *Lawson,* 461 U.S. 352, 357–58 (1983) (stating that a law is void unless it is defined with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement"); *Vill. of Hoffman Estates* v. *Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 498 (1982) ("A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process."); *Papachristou* v. *City of*

*Jacksonville,* 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that (all persons) are entitled to be informed as to what the State commands or forbids." (*quoting Lanzetta* v. *New Jersey,* 306 U.S. 451, 453 (1939) (cleaned up)). This rule clearly defines to whom the requirements apply, the conduct that is prohibited and the consequence of engaging in illegal activities for an employer who qualifies in the PSLF program. This final rule does not create new substantive prohibitions; it merely changes the consequences for the organization that is engaging in illegal activity such that it has a substantial illegal purpose. The underlying legal prohibitions are broad, but broad prohibitions are permitted so long as there is adequate notice of what is prohibited. Furthermore, the clear and defined parameters of the rule will help the Department avoid arbitrary enforcement of the rule, which is an important goal of the void for vagueness doctrine.

The Department acknowledges that its original definition in the draft regulations first presented to the negotiated rulemaking committee was broader and less precise than what was proposed in the NPRM. To ensure employers and borrowers have fair notice, and after having discussed issues and concerns during negotiated rulemaking, the Department refined the definition of "substantial illegal purpose" and several other definitions in the NPRM to better clarify the illegal activities that could lead to an employer being disqualified from participation in PSLF.

Additionally, under the process proposed in the NPRM, in section 682.219(j), employers will be provided with a notice, a transparent record, and an opportunity to review, respond, and rebut the Department's findings to a neutral adjudicator, thereby ensuring that due process is afforded to all impacted stakeholders and applied fairly and consistently. The rule also provides an opportunity for employers to regain eligibility by following a corrective action plan to come into compliance after a loss of eligibility. If the processes established in this final rule do not resolve a concern, employers can seek judicial review of the Department's decisions in Federal court. The Administrative Procedure Act (APA) provides default rules establishing procedures for judicial review of Federal agency actions. 5 U.S.C. 706. If an employer has exhausted the administrative remedies established in this rule and meets all of

the other legal requirements to file a complaint, it can challenge the Department in Federal court.

Finally, the Department believes that employers are better situated than borrowers to respond to preliminary findings from the Department about the employer's eligibility. Employees may not have sufficient information to provide the Department with a full evidentiary framework to consider because they may not be privy to employer actions or decisions. Employers may include information in their submissions regarding the impact eligibility determinations may have on their employees.

*Changes:* None.

*Equal Protection Concerns*

*Comments:* Several commenters raised concerns that the proposed rule may violate the Fifth Amendment's Due Process Clause, asserting it disproportionately targets organizations that serve marginalized populations and could unlawfully deprive borrowers and employers of PSLF benefits without adequate notice, procedural safeguards, or a meaningful opportunity to be heard. Commenters argued that altering program eligibility or redefining qualifying employment could constitute an arbitrary or retroactive deprivation of benefits on which participants had reasonably relied. Several other commenters also asserted that the proposed rule violates the Due Process Clause of the Fifth Amendment by altering PSLF eligibility criteria in a manner that could deprive borrowers or employers of benefits without adequate procedural safeguards. Some commenters further alleged that the rule would have a disproportionate effect on nonprofit entities serving marginalized or disadvantaged populations, raising concerns under both due process and equal protection principles implicit in the Fifth Amendment.

Approximately 50 commenters further contended that the rule would disproportionately affect organizations serving marginalized or disadvantaged populations, such as those providing legal services, social support, and educational or healthcare access to low-income, minority, and immigrant communities. These commenters asserted that narrowing PSLF eligibility based on organizational mission or activities could effectively exclude nonprofit employers that advance equity and civil rights goals (*e.g.,* in work related to immigrant communities, LGBTQ+ individuals, or racial justice initiatives), thereby compounding inequities the program was designed to mitigate.

ED_02476

*Discussion:* The Department agrees that the PSLF program must be administered in a neutral manner, without targeting organizations because of their viewpoint or activism. The Department would have no basis to remove eligibility from nonprofits engaged in work related to immigrant communities, LGBTQ+ individuals, or racial justice if those organizations are following the law. As such, the Department disagrees that this final rule would unfairly disadvantage the referenced types of groups.

As discussed throughout, the Department promulgates this rule under its authority in 20 U.S.C. 1087e(m) and HEA to administer the PSLF program and ensure consistent, lawful application of its requirements. In evaluating comments addressing constitutional issues, the Department considered whether any aspect of this rule implicates procedural or substantive rights under the Fifth Amendment.

The Department carefully considered concerns regarding the Fifth Amendment and concludes that the rule is fully consistent with constitutional requirements. The rulemaking process provides notice and an opportunity for public comment, as required under the Administrative Procedure Act (5 U.S.C. 553), satisfying the procedural component of due process. This final rule applies prospectively and does not rescind previously granted loan forgiveness or otherwise retroactively alter qualifying employment determinations. Accordingly, it does not implicate a constitutionally protected property interest. *See Bd. of Regents* v. *Roth,* 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.")

With respect to the alleged disparate impact on organizations serving marginalized populations, the Department emphasizes that PSLF eligibility is determined according to statutory criteria established in 20 U.S.C. 1087e(m). Eligibility determinations are made by considering the activities employers engage in that are unlawful either under Federal or State law, without respect to the impact it may or may not have on individuals based upon any protected characteristics. This final rule interprets those provisions in a neutral manner,

without regard to the employer's mission, ideological orientation, or the population it serves. The mere disparate impact of a facially neutral rule does not, without evidence of intentional discrimination, establish a constitutional violation. *See Washington* v. *Davis,* 426 U.S. 229, 242 (1976) (holding that a law which is "neutral on its face and serving ends otherwise within the power of government to pursue," was valid under the Equal Protection Clause despite the law adversely impacting individuals from one race more than others).

The Department therefore finds that the rule neither infringes upon due process rights nor results in an unlawful disparate treatment or denial of equal protection under the Fifth Amendment.

Accordingly, the Department continues to assert that lawful advocacy or provision of services to immigrant communities, LGBTQ+ individuals, or racial justice organizations does not disqualify an employer from participating in the PSLF program. Only where a determination has been made that an organization is engaging in illegal activities such that it has a substantial illegal purpose will PSLF eligibility be at issue.

*Changes:* None.

*Contract Concerns*

*Comments:* Some commenters felt that the rule violates the Contracts Clause by unilaterally renegotiating the terms of existing agreements with borrowers, which they argue breaks the trust of individuals who made significant career and financial decisions in good-faith reliance on the government's promise and allows the Department to withdraw promised benefits based on its opposition to a borrower's work. Similarly, some commenters argued the rule violates legal principles like promissory estoppel, and that the government is legally and morally obligated to honor its commitment after borrowers have upheld their end of the agreement through years of service and payments.

*Discussion:* The Department rejects the contention that the rule violates the Contracts Clause by unilaterally renegotiating the terms of existing agreements with borrowers. In the first instance, the Contracts Clause only applies to States, not the Federal Government. Furthermore, the contractual instrument the Department uses when originating loans, the master promissory note (MPN), explicitly disclaims the notion that terms and conditions of Federal student loans are fixed and cannot be changed through the legal process. When a borrower

signs an MPN, the MPN is valid for additional Federal student loans the borrower takes out for ten years, with certain exceptions. This means that borrowers may receive multiple or serial loans for up to ten years from the date the borrower signed the MPN. By signing the MPN, borrowers agree to the terms and conditions of the loans while acknowledging that terms and conditions of those loans may be changed. Specifically, the MPN explicitly states that its terms and conditions "are determined by the HEA and other federal laws and regulations." [7] MPN at 3. Section 1 of the Borrower's Rights and Responsibilities Statement (BRR) provided with the MPN further clarifies that amendments to the HEA and other Federal laws and regulations may amend the terms of the MPN and cautions that "[d]epending on the effective date of the amendment, amendments to the [HEA or other federal laws and regulations] may modify or remove a benefit that existed at the time that you signed this MPN." MPN at 6. Therefore, by signing the MPN, the borrower acknowledges the possibility that the terms of the agreement between themselves and the Department can be changed and that currently offered benefits may not be available in the future.

The Department rejects the contention that this rule is barred by promissory estoppel. The doctrine of promissory estoppel is commonly understood to be inapplicable in disputes between private parties and the Federal Government. Michael J. Cole, *Don't "Estop" Me Now: Estoppel, Government Contract Law, and Sovereign Immunity if Congress Retroactively Repeals Public Service Loan Forgiveness,* 26.1 Lewis and Clark L. Rev. 154, 169 (2022) (*citing Hubbs* v. *United States,* 20 Cl. Ct. 423, 427–28 (1990), aff'd, 925 F.2d 1480 (Fed. Cir. 1991); *Eliel* v. *United States,* 18 Cl. Ct. 461, 469 (1989), aff'd, 909 F.2d 1495 (Fed. Cir. 1990); *Schwartz* v. *United States,* 16 Cl. Ct. 182, 185 (1989); Ralph C. Nash & John Cibinic, Promissory Estoppel: A Theory Without a Home in Government Contracts, 3 THE NASH & CIBINIC REP. ¶ 52 (July 1989)). Breach of contract disputes involving the Federal Government are governed by the Tucker Act (28 U.S.C. 1491(a)(1)) and Contract Disputes Act (41 U.S.C. 7101–7109), neither of which allow the private parties to obtain relief

---

[7] Master Promissory Note (MPN) Direct Subsidized Loans and Direct Unsubsidized Loans William D. Ford Federal Direct Loan Program, OMB No. 1845–0007 (retrieved Oct. 22, 2025), available at *https://studentaid.gov/mpn/subunsub/preview.*

when they are harmed by the Federal Government's promises.

Even if promissory estoppel was applicable to the Department, the required elements for a promissory estoppel claim could not be satisfied by a borrower whose employer loses its qualifying employer status as a result of this rule. The doctrine of promissory estoppel is rooted in detrimental reliance and requires proof that there was a promise or representation made, that the promise or representation was relied upon by the party asserting the estoppel in such a manner as to change his position for the worse, and that the promise's reliance was reasonable and should have been reasonably expected by the promisor. *See L. Mathematics & Tech., Inc.* v. *United States,* 779 F.2d 675, 678 (Fed. Cir. 1985). Here, the borrower would fail to satisfy the required elements for a promissory estoppel claim because they expressly acknowledged and agreed to the possibility of changes to benefits that existed when they signed the MPN. The MPN disclaims the idea that the terms and conditions of a Federal student loan are unalterable, meaning that any reliance interest is not reasonable. Furthermore, such a borrower would struggle to demonstrate that they were harmed as a result of this reliance, as the borrower would still have received a measurable benefit as a result of working for the formerly-qualifying employer, as all qualifying payments made by the borrower before the date of the organization's loss of qualifying employer status will continue to be counted as such, meaning that the borrower will have made progress toward loan forgiveness through PSLF as a result of their employment.

*Retroactivity Concerns*

*Comments:* Several commenters expressed concerns that the rule is impermissibly retroactive because it adds new requirements that impact existing participants, creates uncertainty, and violates the holdings of cases such as *Landgraf* v. *USI Film Productions,* 511 U.S. 244 (1994), and *Bowen* v. *Georgetown University Hospital,* 488 U.S. 204 (1988), which require express Congressional authorization for rules with retroactive effect. Other commenters argued that the rule improperly penalizes organizations for lawful past conduct. A few commenters suggested that, to prevent unfair outcomes and impermissible retroactivity, any new restrictions must be applied prospectively to new borrowers, new loans, or new employees who begin service after the rule's effective date.

Many commenters stated that current borrowers should not be impacted if their employer loses eligibility to participate in PSLF as a result of this rule.

*Discussion:* The Department disagrees that this final rule has retroactive effect on any current qualifying employers or borrowers employed by such organizations. An organization can only lose or be denied qualifying employer status under this final rule if it engaged in illegal activities such that it has a substantial illegal purpose on or after July 1, 2026, the effective date of this final rule. Those activities are all clearly enumerated within the final rule. The Supreme Court has stated that "considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf,* 511 U.S. at 265. This rule complies with that principle by identifying the prohibited activities and providing that the conduct occurring before a future date will not be a factor when the Department considers whether the organization has a substantial illegal purpose. Both employers and borrowers will have approximately eight months between the publication of this final rule and its effective date, providing sufficient time to understand the types of illegal conduct that could result in an employer losing PSLF eligibility.

With regard to borrowers employed by organizations that are currently qualifying employers, this final rule has no retroactive effect because any qualifying payment that the borrower made during the period of time that such employer was considered a qualifying employer will continue to count as such, including any payments made during the employer reconsideration process, even if the employer ultimately loses that status. In any case, an organization cannot lose or be denied qualifying employer status unless it engaged in illegal activities such that it has a substantial illegal purpose on or after July 1, 2026, meaning that payments made by borrowers employed by a qualifying organization could not possibly cease to be considered qualifying payments until the effective date of this final rule, at the very earliest. Taken together, the rule cannot and does not have a retroactive effect.

Furthermore, the Department rejects the argument that this final rule conflicts with the Supreme Court's rulings in the *Landgraf* and *Bowen* cases. In *Landgraf,* the Supreme Court rejected the plaintiff's argument that new remedies created by the Civil Rights Act of 1991 should apply in a

sexual harassment case, even though the harassment and her resignation occurred before the legislation was passed, with the Court concluding that statutes burdening private rights are not presumed to have retroactive effect unless Congress clearly intended such retroactive effect. *See* 511 U.S. at 270, 285, 286. In *Bowen,* the Supreme Court found that the Secretary of Health and Human Services had exceeded his rulemaking authority by promulgating a wage index rule in 1984 under which Medicare reimbursements paid to hospitals that had been disbursed since 1981 would be recouped, because Congress did not explicitly give the Secretary of Health and Human Services the power to promulgate rules with retroactive effect. *See* 488 U.S. at 204, 210, and 211. This final rule is not in conflict with the Supreme Court's rulings in *Landgraf* or *Bowen* because it only concerns conduct occurring on or after July 1, 2026, and because payments made by borrowers employed by the organization during the period it was a qualifying employer will still be counted toward PSLF forgiveness, regardless of whether the organization later loses its qualifying employer status.

Furthermore, the Department disagrees that this final rule penalizes past lawful conduct. All the activities included within the definition of "substantial illegal purpose" require a violation of relevant State or Federal laws on or after July 1, 2026. An organization will not, and cannot, be penalized for past lawful conduct. To the extent that an organization engages in conduct which later becomes illegal as a result of a change in State or Federal law, only conduct occurring after the effective date of such a change could be considered relevant when considering whether the organization has a substantial illegal purpose, as the conduct was not illegal until that point in time.

Finally, the Department rejects the argument that any new restrictions on qualifying employment must only be applied to new borrowers. The MPN signed by each borrower explicitly states that its terms and conditions "are determined by the HEA and other federal laws and regulations." MPN at 3. Section 1 of the BRR that is provided with the MPN further clarifies that that amendments to the HEA and other Federal laws and regulations may amend the terms of the MPN and specifically cautions that "[d]epending on the effective date of the amendment, amendments to the [HEA or other Federal laws and regulations] may modify or remove a benefit that existed

at the time that you signed this MPN.'' MPN at 6. Because borrowers have been forewarned about the possibility of such changes, the Department believes it is unnecessary to grandfather in existing borrowers, especially when such an approach could result in the Department treating two borrowers differently when both are employed by the same organization, at the same time, and both are making payments. This result would be unfair to borrowers, would undermine the purpose of this final rule, and pose practical difficulties in terms of administration.

**Definitions General (§ 685.219(b))**

*Comments:* Commenters objected to the introduction of new, undefined concepts such as ''substantial illegal purpose,'' ''aiding or abetting,'' or ''violating State law.'' Without precise definitions, they argued, these terms invite inconsistent application across States and agencies.

*Discussion:* The Department disagrees that these terms are undefined or not well understood. These terms are clearly defined in the regulation, and in many instances are cross referenced to existing law that prohibits the underlying conduct. The concept of aiding and abetting is purposefully broad as it prohibits assisting in numerous types of criminal activity, but it is well understood by courts and the public. Likewise, the phrase ''violating State law'' is intentionally broad and encompasses a wide array of conduct, but it is also sufficiently clear and puts employers on notice that State law violations may be considered when determining if an organization has a substantial illegal purpose. Lastly, the term ''substantial illegal purpose'' is also clearly defined in the regulation and puts organizations on notice that the Secretary will consider any illegal conduct from the enumerated list and weigh it to determine if the organization has a substantial illegal purpose.

The purpose of using such terms is to set clear standards for PSLF program eligibility, not to create new interpretations. The Department will also rely on existing findings of unlawful activity by courts or other regulators where appropriate. To the extent that State laws may vary, the Department will defer to the judgments of State courts in determining what constitutes unlawful activity within the jurisdiction where the conduct occurs.

In instances where an organization has locations in more than one State and only broke the law in one or a few States, the Department may still find that the organization has a substantial illegal purpose by weighing all the relevant evidence. However, the Department will not find an organization to have engaged in illegal activity (and weigh that evidence under the substantial illegal purpose test) if the underlying conduct occurred in a State in which the conduct was legal. In other words, unless the State where the conduct occurs prohibits such conduct, the organization has not engaged in illegal conduct, and the Department will not use that conduct as a basis for removing employers from the PSLF program.

*Changes:* None.

*Comments:* Many commenters argued that the definitions provided in the rule are either too vague or sweep too broadly, creating uncertainty for both borrowers and employers. They worried that broad terms could invite inconsistent or arbitrary application, leaving organizations unclear about their eligibility status and borrowers without reliable assurances. Other commenters emphasized that definitions must be precise enough to avoid politicization but flexible enough to cover genuinely unlawful conduct.

*Discussion:* The Department agrees that its definitions are broad but disagrees that they are too vague to be clearly understood. As mentioned above, this final rule establishes definitions that are anchored in law, have precise meanings that provide sufficient notice, are written in a manner in which they can be applied uniformly, and are generally understood by the public.

*Changes:* None.

**Aiding or Abetting (§ 685.219(b)(1))**

*Comments:* Commenters expressed concern that extending PSLF disqualification to organizations deemed to have ''aided or abetted'' unlawful activity would open the door to subjective interpretations. They questioned what level of involvement or association constitutes ''aiding'' and were worried that entities providing indirect support, such as legal advice, medical care, or humanitarian assistance, could be unfairly swept into disqualification. Commenters additionally expressed concern about the application of the definition of ''aiding and abetting'' from 18 U.S.C. 2 to organizations, rather than individuals, and argued that such application is improper because corporations are legal concepts that do not have or share intent. Additionally, commenters urged the Department to clarify that lawful representation of a client accused of participating in substantial illegal activity does not constitute participation in said illegal activity, and requested the Department provide a 'safe harbor' for the activity representation.

*Discussion:* The Department rejects the idea that ordinary, lawful assistance such as legal advice, medical care, or humanitarian support could trigger PSLF disqualification. Attorneys do not break the law, or adopt the views of their clients, by representing individuals in legal proceedings. This includes representing clients who may be unpopular, like terrorists. As such, the Department will not take action against legal employers under this final rule who are lawfully representing clients, including public defenders, or under the Legal Services Corporation Act. The term ''aiding and abetting'' carries a settled legal meaning: intentional participation in unlawful activity. It does not cover lawful support or incidental association. As such, the Department does not believe that it needs to provide a 'safe harbor' consideration for these instances, as they are representative of lawful action undertaken by the eligible employer. Such actions are not illegal and thus would not be considered when determining if an employer has a substantial illegal purpose. The Department believes that it is necessary to include the concept of aiding and abetting within this final rule to address the issue that organizations that are going beyond lawful support or incidental associations are enabling or encouraging others to engage in certain unlawful activities. As such, organizations are just as at odds with the public interest as an organization that directly carries out unlawful activities. For example, if an organization has numerous employees who, at the direction of their employer, aided and abetted in acts of terrorism, the Department could clearly move to disqualify the employer and disallow PSLF benefits from flowing to its employees.

When considering, for PSLF eligibility purposes, whether an organization has aided and abetted illegal discrimination or violations of Federal immigration laws, the Department will carefully examine the balance of the evidence to determine both whether certain unlawful activities occurred and whether there is ''objective indicia'' that the organization sought to further those unlawful activities. *See e.g., Presbyterian & Reformed Pub. Co.* v. *Comm'r,* 743 F.2d 148, 155 (3d Cir. 1984) (''The difficulties inherent in any legal standard predicated upon the subjective intent of an actor are further compounded when that actor is a corporate entity. In such circumstances,

courts forced to pass upon a potentially illicit purpose have looked for objective indicia from which the intent of the actor may be discerned.'' (footnote omitted)). The Department may look to established legal standards associated with employer liability for acts of employees when making these determinations. Isolated incidents of unlawful conduct are unlikely to be sufficient to demonstrate that the employer engages in activities that result in the culmination of it having substantial illegal purpose. However, if there is a pattern and practice where numerous employees have engaged in illegal conduct, at the direction of or with the acquiescence of the employer, the Department may weigh that evidence more strongly in determining if the employer has a substantial illegal purpose, consistent with the doctrine of *respondeat superior. See e.g., Williams* v. *Clerac, LLC,* 635 F. Supp. 3d 607, 613 (N.D. Ohio 2022) (stating that, under the *respondeat superior* doctrine, ''if the employee tortfeasor acts intentionally and willfully for his own personal purposes, the employer is not responsible'' unless the action was ''calculated to facilitate or promote the business for which the [employee] was employed,'' the employer ''fails to take action where the employer knows or has reason to know that one employee poses a risk to other employees,'' or if the employer ''specifically and explicitly ratifies the employee's [tortious] act and adopts it as the employer's own.'' (cleaned up)); *Mylan Labs., Inc.* v. *Akzo, N.V.,* 2 F.3d 56, 63 (4th Cir. 1993) (''[A] corporation is liable for the criminal acts of its employees and agents done within the scope of their employment with the intent to benefit the corporation.'')

*Changes:* None.

### Chemical Castration or Mutilation (§ 685.219(b)(3))

*Comments:* Several commenters stated the definition of ''chemical castration or mutilation'' is especially unclear and controversial. They noted that Federal and State law already regulate medical procedures and questioned why the PSLF program should independently define or police such conduct. Other commenters noted that, without clarity, legitimate medical providers could be penalized simply for offering lawful procedures that might be politically contested. Other commenters recommended various amendments to the definition of ''chemical castration or mutilation.''

*Discussion:* The Department disagrees. The definition of chemical castration or mutilation is not about

lawful medical practices; it is about ensuring that PSLF funds do not support the castration or mutilation of children in violation of Federal or State law. Medical providers performing activities within the bounds of Federal and State law will not be affected. Only conduct that is prohibited by Federal law, or State law in the State where the conduct occurs, is at issue. The standard is anchored in law and will be applied narrowly, based on clear evidence of illegality under Federal law or State law.

Consistent with President Trump's Executive Order on *Protecting Children from Chemical and Surgical Mutilation,* Executive Order 14187 (Jan. 28, 2025), the Department will be guided by the definition of ''chemical and surgical mutilation'' outlined in that Executive Order. As discussed in the NPRM, the Department searched for the most appropriate definition of chemical castration or mutilation and located the January 28, 2025, Executive Order, *Protecting Children From Chemical and Surgical Mutilation,* which provides the basis for the proposed definition. For further discussion and additional sources regarding the rationale for this decision, see *William D. Ford Federal Direct Loan (Direct Loan) Program,* 90 FR 40154, 40159–40160 (Aug. 18, 2025).

*Changes:* None.

### Child or Children (§ 685.219(b)(4))

*Comments:* Commenters asked for clarification on how ''child'' is defined for purposes of PSLF program eligibility. Some commenters worried that the rule could be read inconsistently across different contexts such as Federal law, State family law, or immigration law. They urged the Department to adopt a uniform definition that would purportedly avoid ambiguity and ensure fairness across all borrowers and employers. Commenters also recommended the Department use alternative definitions such as the ''age of majority'', the term ''18 years or younger'', or exempting emancipated minors no matter what their age.

*Discussion:* The Department agrees that uniformity is important. The definition of child in this final rule is tied to the Executive Order on *Protecting Children from Chemical and Surgical Mutilation,* Executive Order 14187 (Jan. 28, 2025), to avoid confusion across States or when used in different contexts. This definition will be applied consistently across the country to ensure fairness and prevent inconsistent application.

*Changes:* None.

### Foreign Terrorist Organizations (§ 685.219(b)(10))

*Comments:* Commenters supported excluding groups tied to terrorism but urged the Department to anchor determinations strictly to Federal law and formal designations. They feared that vague language could allow future administrations to disqualify entities engaged in lawful advocacy or international humanitarian work. Borrowers and employers emphasized that PSLF program eligibility should track clear Federal determinations, not discretionary judgments.

*Discussion:* The Department agrees that PSLF program eligibility must follow formal Federal determinations. Organizations designated as foreign terrorist organizations under U.S. law will be excluded from the PSLF program. This final rule requires the Department to defer to terrorist designations already established by the Federal Government. Borrowers and employers will have certainty that decisions are neutral, grounded in evidence, and tied directly to statutory authority.

*Changes:* None.

### Illegal Discrimination (§ 685.219(b)(12))

*Comments:* Commenters stated that the definition of ''illegal discrimination'' needs precision to avoid misuse. Commenters worried that organizations accused of discrimination, but not formally found liable, could be penalized. Others stressed that PSLF should not create new anti-discrimination standards beyond what is already defined under Federal or State law, to avoid layering duplicative or politically influenced rules.

*Discussion:* The Department agrees that the PSLF program should not create new discrimination standards. This final rule relies strictly on established Federal law and allegations alone will not meet the standard for disqualification. Only organizations found to have engaged in unlawful discrimination will face disqualification.

*Changes:* None.

### Other Federal Immigration Laws (§ 685.219(b)(17))

*Comments:* Commenters said referencing ''other Federal immigration laws'' is too broad and risks sweeping in organizations providing lawful assistance to immigrants, refugees, or asylum seekers. They worried that work such as legal aid, housing support, or medical services could be mischaracterized as unlawful under shifting political climates. They

requested precise language to ensure only clear and adjudicated violations of immigration law trigger disqualification.

*Discussion:* The Department disagrees that referencing ''other Federal immigration laws'' is too broad or may sweep in legal conduct. This final rule will not penalize an organization for providing lawful assistance to immigrants, refugees, or asylum seekers. Disqualification will only occur where it is determined the organization is engaged in illegal conduct, and that conduct is material enough that the organization has a substantial illegal purpose. The phrase ''Federal immigration law'' is broad, but it is easily understood and only applies to Federal law that regulates immigration.

*Changes:* None.

### Qualifying Employer (§ 685.219(b)(27))

*Comments:* Commenters asked for greater clarity on which organizations qualify as government, nonprofit, or public service employers under § 685.219(b)(27). Some argued that uncertainty about whether certain nonprofits, quasi-governmental bodies, or contractors qualify has long plagued the PSLF program. They stressed that borrowers and employers alike need predictable criteria, particularly where functions are performed through delegated authorities, shared services, or nontraditional entities. Without clearer boundaries, they argued, borrowers risk making career choices under uncertainty, only to later discover their service does not qualify for PSLF. Other commenters stated that they feared the new rule would perpetuate confusion rather than resolve it, noting that there was confusion over whether affiliates, contractors, or subcontractors performing public service functions on behalf of government or nonprofit entities count as qualifying employers. They warned that the absence of clear treatment for affiliates, contractors, and subcontractors invites inconsistent outcomes across service providers.

*Discussion:* The Department agrees that clarity is critical so that borrowers can make informed decisions. This final rule does not change the five types of organizations and agencies that are considered as a qualifying employer under the current definition in 34 CFR 685.219(b)(27). Additionally, the government entities, nonprofits, and public service organizations that currently are considered by the Department as qualified employers are listed on the Department's website.

Under this final rule, the Department will update this list only after it takes action to remove an employer, and borrowers who work for that employer will be unable to receive credit for their work toward PSLF forgiveness only after the date of the Department's determination under subsection (h) or after any reconsideration requests or actions by the employer in accordance with subsection (j) of these regulations. These determinations will not be made retroactively, meaning that borrowers will receive credit for any work prior to the Department's determination. This final rule will ensure that borrowers have notice and will have an opportunity to change employers if they wish to continue to make progress toward loan forgiveness through PSLF.

Additionally, for a borrower to receive credit toward PSLF, the borrower must have a public service job working for a qualifying employer. Affiliates, contractors, and subcontractors that are not organizations or agencies meeting the definition of a qualifying employer do not offer public service jobs, so borrowers will not receive PSLF credit by working for those employers. This policy is not changed by this final rule.

*Changes:* None.

*Comments:* Many commenters raised questions about organizations that have both qualifying and non-qualifying functions, or that undergo restructuring, mergers, or spin-offs. They worried that borrowers could lose PSLF credit during employer transitions that are outside their control. Several commenters urged continuity protections, rules for partial qualifying service, and procedures to ensure that employer restructuring does not unfairly strip borrowers of eligibility.

*Discussion:* The Department recognizes the risks created by restructuring and mergers of service organizations. It is possible that restructuring or mergers could change the eligibility of employers for PSLF. Organizations must be qualifying employers under the regulation for their employees to be eligible to participate in PSLF. If after restructuring or a merger, the employer no longer meets the definition of qualifying employer, its employees can no longer receive credit toward loan forgiveness through PSLF. The Department's regulations already account for this, and the Department is not proposing any changes in this final rule to further address this issue.

The Department acknowledges that when employers undergo these types of changes it may create uncertainty for borrowers; however, the PSLF statute is clear when a job is no longer qualifying. To give borrowers credit for working in jobs that do not qualify would violate the statute, so the Department cannot make changes to the regulations to address employers that transition out of their qualifying status.

*Changes:* None.

*Comments:* Commenters expressed uncertainty over how the PSLF program should treat quasi-governmental entities such as special districts, authorities, or instrumentalities. They pointed to wide variations in how State law defines such bodies and asked the Department to establish consistent Federal criteria.

*Discussion:* The Department understands that State law definitions of governmental units vary. The definition of qualifying employer includes ''A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard.'' This definition is broad and captures a variety of organizations and instrumentalities that have been created by State or local governments, so long as the organization is not organized for profit and is not a labor union or a partisan political organization.

*Changes:* None.

*Comments:* Commenters requested standardized documentation requirements for nonprofit eligibility, such as reliance on IRS determination letters, State registration records, or other verifiable public filings. They urged the Department to avoid duplicative documentation requests and align with existing Federal and State oversight systems. Commenters also asked for clarity on whether nonprofits under investigation that are not yet found in violation remain eligible to participate in the PSLF program.

*Discussion:* The Department agrees that nonprofit employers must have clear, standardized documentation requirements. Borrowers and employers should not face duplicative requests or arbitrary standards. The Department will continue to take into evidence objective, verifiable records such as employer provided IRS determination letters and State nonprofit filings. The Department acknowledges that the IRS could only disclose this information pursuant to an exception under 26 U.S.C. 6103. Borrowers can also use the PSLF Help Tool on the Department's website to find employers that the Department already believes are qualifying employers.

Qualifying employers who are under review because they may have a substantial illegal purpose will remain as qualifying employers until a determination is made by the Secretary. This approach respects due process while safeguarding the PSLF program from abuse.

*Changes:* None.

## Substantial Illegal Purpose (§ 685.219(b)(30))

*Comments:* Many commenters said the phrase ''substantial illegal purpose'' is inherently vague and creates risk of overreach. They asked how the term ''substantial'' would be measured, whether it refers to the primary purpose of the organization or any significant unlawful activity, and how determinations would be documented. They emphasized the need for precision to avoid penalizing lawful entities for isolated or contested conduct.

*Discussion:* The Department rejects claims that the phrase ''substantial illegal purpose'' is too vague to be understood. The activities that are included within this term are defined in this final rule. Organizations that have engaged in an illegal activity are not automatically considered to have engaged in an activity with a substantial illegal purpose. Instead, the Secretary considers evidence of activities and whether the materiality of those activities supports a determination that the organization has engaged in illegal activities such that it has a substantial illegal purpose. ''Substantial'' refers to unlawful activity that is central to an organization's purpose or operations, not incidental conduct. Determinations will be based on objective evidence, not speculation.

*Changes:* The Department made changes to the standard and the process in subsections (h), (i), and (j) for determining whether an organization has a substantial illegal purpose to make clear that the Secretary weighs evidence of illegal activity to determine whether that illegal activity is so substantial that the organization has a substantial illegal purpose.

*Comments:* Commenters asked how ''substantial'' would be measured in practice. They worried that isolated incidents, ongoing investigations, or unproven allegations could unfairly trigger PSLF disqualification. Many argued that only sustained and adjudicated illegal activity central to an organization's mission should be considered before disqualification of the employer. They urged the Department to establish multi-factor criteria that weigh scope, frequency, and intent to ensure that disqualification is limited to genuinely unlawful organizational purposes.

*Discussion:* The Department agrees that determinations must be based on real and substantial unlawful activity, not speculation or unproven allegations. This final rule makes clear that eligibility decisions will rest on the materiality of any illegal activities or actions central to the organization's mission, not incidental actions by individuals acting outside the scope of their employment. The Department may consider allegations as a basis to start an inquiry, but the Department must develop the factual record to substantiate any allegations. The Department may also consider evidence that another entity, like a court, has adjudicated an issue when developing the factual basis for any action. Organizations will receive notice of any findings, an opportunity to respond, and an opportunity to rebut such findings. The Department will use clear and objective standards to measure ''substantial,'' weighing the scope, frequency, and intent of the conduct.

*Changes:* The Department clarified the standard and made changes to the process for determining whether an organization has a substantial illegal purpose to make clearer that the Secretary weighs evidence of illegal activity that is enumerated in paragraph (b)(30) to determine whether that illegal activity is so substantial that the organization has a substantial illegal purpose.

## Terrorism (§ 685.219(b)(32))

*Comments:* Commenters agreed that organizations engaged in terrorism should be excluded, but they stressed that the rule must be tightly tied to statutory definitions and formal government determinations. They warned that, without such anchoring, lawful advocacy groups could be vulnerable to being labeled as terrorist-linked based on politics rather than evidence.

*Discussion:* The Department agrees that the PSLF program must exclude organizations engaged in terrorism, and thus eligibility decisions will be tied strictly to statutory definitions and formal government determinations. The Department will be unable to find that an organization is engaged in terrorism if the organization's conduct does not meet the elements necessary to show that they have engaged in terrorism consistent with Federal law and formal designations. The Department must develop factual evidence to support any finding, which ensures that organizations will not be targeted under this provision because of their viewpoint or political advocacy.

*Changes:* There are no substantive changes to the definition of terrorism. The Department removed the phrase ''the Crime and Criminal Procedure'' and the parenthesis around the citation to 18 U.S.C. 2331 for clarity.

## Trafficking (§ 685.219(b)(33))

*Comments:* Commenters broadly supported excluding organizations engaged in trafficking but asked for clear standards for how determinations would be made. They worried that nonprofits providing survivor support or harm reduction services could be swept in if the definition of ''trafficking'' was too broad. They urged the Department to ensure determinations rely on objective legal findings rather than discretionary judgments.

*Discussion:* The Department agrees that PSLF must exclude employers engaged in trafficking. Determination will be based on objective legal findings, not speculation. The Department will be unable to find that an organization is engaged in trafficking if the organization's conduct does not meet the elements necessary to show that they have engaged in such unlawful conduct. Nonprofits providing services to survivors or harm reduction work will not be penalized so long as their conduct is lawful. This final rule makes sure PSLF disqualification is narrowly applied to unlawful trafficking.

*Changes:* None.

## Violating State Law (§ 685.219(b)(34))

*Comments:* Many commenters noted that State laws vary widely and could create inconsistent outcomes for employers across States. They feared that nonprofits or local agencies might be disqualified based on politically driven litigation in one State, even if their conduct would be lawful elsewhere. They recommended that we limit this provision to well-established violations adjudicated by courts rather than allegations or unsettled disputes.

*Discussion:* The Department acknowledges that State laws vary widely. PSLF disqualification will not rest on mere allegations or politically motivated lawsuits. When the Department is considering whether an employer has engaged in illegal activities such that it has a substantial illegal purpose by virtue of having violated State law, only final, non-default judgments against an employer for violations of those State laws listed in the regulation may be used as evidence in making that determination. This includes trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

The narrow scope of this provision limits its application and provides clear notice to borrowers and employers.

*Changes:* None.

**48984**    **Federal Register** / Vol. 90, No. 209 / Friday, October 31, 2025 / Rules and Regulations

**Violence for the Purpose of Obstructing or Influencing Federal Government Policy (§ 685.219(b)(35))**

*Comments:* Commenters strongly supported excluding organizations engaged in violence but worried the definition could be applied too broadly. They asked how the Department will distinguish between unlawful violent activities and lawful protest or advocacy that might involve civil disobedience. They stressed that only adjudicated instances of unlawful violence should trigger PSLF disqualification, to protect First Amendment rights while upholding statutory intent.

*Discussion:* The Department agrees that organizations engaged in unlawful violence must be excluded from PSLF. Violence involves using physical force to hurt, damage, or kill someone or something. The First Amendment does not protect violence; it protects speech and the expression of ideas. The Department will rely on court precedent to distinguish between protected speech and expression and unlawful violence. Even speech advocating for violence is protected, so long as it is not directed to or used to incite imminent lawless action. *See e.g., Brandenburg* v. *Ohio,* 395 U.S. 444 (1969) (holding that a state may not forbid speech advocating the use of force or unlawful conduct unless this advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action). When determining if an organization engages in illegal activities such that it has a substantial illegal purpose, the Department will not weigh evidence of lawfully protected speech or expression against an employer. This ensures First Amendment rights are respected while ensuring that PSLF benefits do not support employees of organizations that engage in violent behavior.

*Changes:* None.

**Borrower Eligibility (§ 685.219(c))**

*Comments:* Many commenters argued that, without clear rules, employees could lose PSLF benefits for reasons they could neither foresee nor control. They argued that workers should not bear the consequences of ambiguous employer classifications or administrative reinterpretations. Commenters urged the Department to ensure that credit continues for all periods of lawful public service, regardless of later disputes about an employer's eligibility.

*Discussion:* The Department understands that employees need to be informed when their employer loses eligibility for reasons that are outside of

their control or that were unforeseeable. The Department will only determine that an organization has a substantial illegal purpose if there is evidence that shows that they have engaged in unlawful conduct. Organizations have the ability, and should have controls in place, to ensure that they do not engage in unlawful conduct. Nothing in this final rule changes the legality regarding the underlying legal offenses, it simply changes the consequences for such unlawful conduct. Where the unlawful conduct is material and meets the other requirements of the regulation, the Department can remove eligibility for PSLF. The Department does not believe Congress intended to prop up and subsidize the unlawful behavior of organizations. Employees will not lose PSLF credit for any payments that previously qualified toward forgiveness before a determination is made. This final rule makes clear that qualifying payments earned during periods of public service will not be removed from the borrower's count toward forgiveness provided those payments were made prior to the Secretary's determination that the employer engaged in illegal activity such that it has a substantial illegal purpose. It is only after the Department has determined that an employer has lost eligibility as a qualifying employer due to engaging in unlawful activities on or after July 1, 2026, that a borrower's payment will not be counted as a qualifying payment. This approach protects workers by preventing retroactive application and ensures that payments made before the Secretary's determination continue to count toward forgiveness.

The PSLF program will honor public service, not penalize borrowers for administrative disputes, and borrowers will retain the ability to pursue employment at another qualified employer. Borrowers will be protected, employers will be held accountable, and taxpayers will know their dollars are used responsibly and in pursuit of lawful activities.

*Changes:* None.

*Comments:* Commenters stressed the need for reliance on protections for those borrowers already serving in qualifying employment. They urged that borrowers should not be penalized mid-service if their employer is later disqualified. Several commenters recommended explicit non-retroactivity provisions, transition rules, and that borrowers who have earned PSLF credit may maintain that same credit when they move to a new, qualifying employer. Additionally, a commenter believed that the final rule should clarify that a borrower's payments

continue to qualify for PSLF until the final determination is made. They also requested the borrower be given a grace period to find new qualifying employment for the purposes of the PSLF program.

Some commenters wrote about specific borrowers who have long-term employment contracts, including medical residents. Commenters expressed the belief that medical residents, and extended term contract employees, have additional restrictions surrounding their employment, limiting their ability to switch jobs in the event their employer loses PSLF eligibility. Some commenters went so far as to claim that losing PSLF eligibility could have career ending consequences if transition flexibility was not provided.

*Discussion:* The Department recognizes that borrowers in the PSLF program have significant reliance interests. The PSLF program was created by Congress in 2007 and requires borrowers to have certain types of student loans, enroll in certain types of repayment programs, and work for a qualifying employer for ten years. Many borrowers structure their life plans around the program, in that they sometimes decide to go to college and incur significant student loan debt in reliance on the program to ultimately subsidize the cost of their education. Furthermore, many borrowers may forgo higher-paying occupations in the private sector to maintain eligibility for the program. The Department believes that the rule appropriately balances the reliance interests of borrowers against the interests of taxpayers and the Federal Government in ensuring that the PSLF program is not supporting illegal activity. In accordance with borrower reliance issues, as explained previously, the Department is only taking action against employers prospectively. Even if an employer has engaged in unlawful conduct in the past, the Department's determination that an organization engaged in activities such that it has a substantial illegal purpose will not impact PSLF credit a borrower has received for working for that employer in the past. And while employees who work for these organizations may desire to continue to work for these organizations, they will have clear notice and the opportunity to change employers after the Department takes action against an employer. The Department believes this appropriately balances the borrower's substantial reliance interests against the Federal Government's interest in not indirectly subsidizing illegal activity.

With respect to the commenter's request that we clarify that a borrower's

ED_02483

payments continue to count toward PSLF until a final determination is made, we note that under this final rule, a borrower remains eligible for PSLF until the date of the Secretary's determination that employer is no longer a qualifying employer. Additionally, after considering the suggestion to include a grace period for a borrower to find new qualifying employment if their employer has been determined to be ineligible for PSLF, we believe that this would be inconsistent with current policy for borrowers who cease employment with qualifying employers for multiple other reasons or who change jobs between qualifying employers. Moreover, under section 685.219(h) of this final rule, borrowers will receive notice that the Secretary has initiated the process to determine whether an employer has engaged in illegal activities such that it could result in a determination that it has a substantial illegal purpose. Although not yet a final determination of employer eligibility, this final notice provides the borrower an opportunity to seek employment with another qualifying employer if they wish to continue to pursue PSLF without risk of interruption.

The Department acknowledges that there may be some medical resident borrowers who may face heightened challenges in changing employers due to the complex terms of their respective employment contracts. Although the Department acknowledges that this puts some borrowers in a more difficult situation, since the Department does not believe the interests of these borrowers outweighs the Department's interests in preserving the integrity of the PSLF program. Delaying the consequences of disqualification would mean that taxpayers would continue to indirectly subsidize the employment of individuals working for an employer engaged in illegal activity. Providing a transition period could reduce employers' incentives to comply with this final rule, including by delaying the timely development and implementation of a corrective action plan with the Department. As such, the Department does not believe that providing a transition period is appropriate. At the same time, the Department notes when an employer loses eligibility, borrowers who work for that employer will receive credit for the month in which eligibility is lost. For example, if an employer loses eligibility on the third day of a given month, the borrower will receive credit for that month.

*Changes:* None.

*Comments:* Commenters suggested that retroactive disqualification of employers could harm borrowers who relied in good faith on their employer's eligibility, creating unfairness and eroding trust in PSLF. They stressed that borrowers should not be penalized for decisions beyond their control.

*Discussion:* The Department agrees. As explained previously, this final rule makes clear that all qualifying payments made while an employer was considered eligible will continue to count, even if that employer is found ineligible later. There will be no retroactive PSLF disqualification of employers due to the reliance interests the borrowers have, as the commenters identified. However, any payment made after an employer is deemed no longer eligible for PSLF will not be counted toward the number of payments to forgiveness. This safeguard protects borrowers' reliance interests and ensures fairness while allowing the Department to act prospectively to maintain program integrity. This approach ensures that workers who have served in good faith are not punished, while also protecting taxpayers by preventing benefits from flowing to unlawful conduct in the future.

*Changes:* None.

*Comments:* Commenters warned that borrowers could lose PSLF eligibility because of sudden employer disqualification, even though workers themselves did nothing wrong. They argued that employees should not be punished for decisions outside of their control.

*Discussion:* The Department acknowledges that there may be instances where specific borrowers who work for employers the Department has determined to have a substantial illegal purpose may not have directly engaged in unlawful activity. The Department, however, must balance that against our interest in ensuring that the PSLF program is not indirectly subsidizing employment at organizations that have a substantial illegal purpose. The Department believes if the employer engages in illegal activities enumerated in paragraph (b)(30), such that it has substantial illegal purpose, that the Department, through the PSLF program, should not indirectly subsidize the employment of its employees. Organizations with a substantial illegal purpose are tainted by their illegal actions, even if some parts of the organization continue to engage in lawful behavior. The concept of a substantial illegal purpose appropriately balances the equities at hand by distinguishing between organizations

that engage in isolated or minor legal violations and those whose core or predominant activities are unlawful. If more than an insubstantial portion of the employer's activities are unlawful, the organization may have a substantial illegal purpose. The Department recognizes that some organizations may have isolated misconduct where specific employees or segregable components engage in illegal conduct without that conduct defining the organization. In such cases, where unlawful activity is limited and not central to the organization's primary mission or operations, the employer would not be considered to have a substantial illegal purpose. This approach ensures that the PSLF program does not penalize borrowers for minor or isolated misconduct within their organizations, while still preventing the program from indirectly subsidizing entities whose principal or defining activities are unlawful.

*Changes:* None.

**Application Process (§ 685.219(e))**

*Comments:* Commenters stressed that timely notification of any Departmental action to remove eligibility from an employer is critical for borrowers to plan their careers and repayment strategies. They warned that without immediate notice, borrowers could be blindsided by sudden disqualification, left with little time to adjust, and placed at risk of financial harm.

*Discussion:* The Department agrees that borrowers should receive notice when the employers lose PSLF eligibility. This final rule requires the Department to provide prompt notification whenever an employer's eligibility changes based on the determination by the Secretary. This protects workers and prevents unnecessary disruption. By mandating clear and proactive communication, this final rule ensures that borrowers have the information they need to make informed decisions regarding their PSLF eligibility. As discussed above, borrowers have significant reliance interests in the PSLF program, but those reliance interests must be balanced against the Department's interest in not indirectly subsidizing employers that have a substantial illegal purpose. Prompt direct notification to the impacted borrowers and broad disclosure on the Department's website are important to mitigate the impact to borrowers.

*Changes:* None.

*Comments:* Commenters emphasized that notification is not just about timing but also about substance. They requested that the notices clearly

explain the reason for an employer's disqualification, the effective date, the borrower's current credit status, and what steps borrowers may take to continue to participate in the PSLF program. Without such detail, commenters argued, notifications could create more confusion than clarity.

*Discussion:* The Department agrees that its notification to affected borrowers must be substantive and should include information about the reason for an employer's disqualification, the effective date, the borrower's current credit status, and what steps borrowers may take to continue to participate in the PSLF program. The Department agrees with commenters that this approach reduces confusion and will provide helpful information to borrowers.

*Changes:* None.

*Comments:* Commenters urged the Department to use multiple communication channels, including email, online borrower dashboards, and paper mail to ensure that critical notifications reach all affected borrowers. They warned that reliance on a single method could leave some unaware of eligibility changes, particularly those borrowers with limited internet access or outdated contact information.

*Discussion:* The Department agrees that notifying borrowers through multiple mediums is appropriate to increase awareness among borrowers. That is why this final rule requires the Department to use multiple channels of communication, including secure electronic notices, borrower dashboard updates, and paper mail where necessary, to ensure all affected individuals and the public are informed about an employer's PSLF eligibility.

*Changes:* None.

*Comments:* Several commenters suggested that the Department should provide transparency for both current participants but also for prospective borrowers considering careers in public service. They recommended public-facing employer eligibility lists that are regularly updated so that individuals entering the workforce can make informed decisions about whether their potential employer qualifies.

*Discussion:* The Department agrees that both current participants and the public should be informed regarding employer eligibility. By informing the public, prospective participants and borrowers considering public service careers will be informed of their options for eligible employment. Accordingly, this final rule requires the Department to maintain and regularly update a

public-facing list of employer eligibility determinations.

*Changes:* None.

*Comments:* Several commenters highlighted that new entrants into repayment should be warned about the possibility of employer disqualification and given transparent, accessible information about how eligibility determinations are made. They stressed that prospective borrowers must have the ability to make informed career and repayment choices with full knowledge of PSLF risks.

*Discussion:* The Department agrees that prospective borrowers deserve transparency regarding the eligibility process for the PSLF program. However, the Department disagrees that we should display such information as a "warning." Employers that have a substantial illegal purpose will lose PSLF eligibility, and the Department will inform borrowers and the public of such determination. Because most employers voluntarily comply with the law, and the Department does not expect this final rule to impact the majority of eligible borrowers, we do not think it is appropriate to label the process as a "warning."

*Changes:* None.

## Borrower Reconsideration Process (§ 685.219(g)) and Employer Reconsideration Process (§ 685.219(h))

*Comments:* Many commenters underscored that a robust reconsideration process is essential to borrower confidence in the PSLF program. They argued that determinations about qualifying employment carry life-changing financial consequences and therefore must include a meaningful right to challenge decisions. Commenters emphasized that reconsideration should not be treated as a perfunctory administrative step but as a genuine safeguard against error.

*Discussion:* It is important to note that the current borrower reconsideration process is not changing in these final regulations. The Department is, however, making it clear that a borrower may not submit a reconsideration request when their employer is determined to no longer be a qualifying employer for the purposes of the PSLF program. This final rule establishes a clear employer reconsideration process that gives employers the right to submit additional information and seek review of determinations. This ensures decisions are not final without all relevant evidence and arguments being considered. This safeguard provides due process to ensure that the Department considers all relevant information prior

to taking action to remove employer eligibility.

*Changes:* In the NPRM, the Department made clear that employers would have notice and the opportunity to respond to any findings before final action is taken. To avoid confusion, the Department inserted an amendment to the regulatory text in a parenthetical in § 685.219(h)(1), which makes it clear that the opportunity to respond is called the "employer reconsideration process."

*Comments:* Many commenters argued that there is the need for greater transparency in the reconsideration process. Commenters asked for clear timelines on when and how reviews would be completed, as well as published standards explaining the criteria applied in reconsideration decisions. Commenters further stressed that the Department should provide written reasons for its determinations, so borrowers understand the basis for decisions.

*Discussion:* The Department partially agrees with the commenters. The final rule requires that determinations be explained in writing and supported by clear reasoning. The employer reconsideration process exists to ensure that the Department has all the relevant information and takes it into account when making decisions. If the Department makes an error based upon the facts or the application of the regulation, the employer reconsideration process will ensure that organizations can bring that to the Department's attention prior to it taking final action. The Department understands the interest borrowers have in a definitive timeline for review of employer reconsideration requests; however, the Department is unable to commit to a specific timeline. Among other things, the Department needs to preserve flexibility to make certain that we have adequate time to consider all the relevant evidence. The Department expects that some employer reconsideration requests will be straightforward and will be able to be processed in a relatively short period of time. On the other hand, some employer reconsideration requests may be complex and involve significant amounts of new information. Complex reconsideration requests will take more time for the Department to process and may require elevated levels of approval. As such, given the complexity that may be involved, the Department is not making changes that would commit the Department to a temporally limited review period. As noted above, a borrower would not be affected by an adverse determination regarding an employer until the employer

reconsideration process is complete. Accordingly, if it takes six months for the Department to reach a final determination that an employer has a substantial illegal purpose, a borrower's qualifying payments made during that six-month period would continue to count toward loan forgiveness.

*Changes:* None.

*Comments:* Commenters expressed concern that delays in the reconsideration process could disadvantage borrowers, particularly if their PSLF progress is frozen during review. Several commenters urged that borrowers should continue accruing PSLF credit while reconsideration is pending so that they are not financially harmed by administrative timelines outside their control.

*Discussion:* The Department agrees. This final rule makes clear that all qualifying payments made while an employer was considered eligible will continue to count, even if the employer's eligibility is under review. Borrowers will continue to be eligible to receive credit toward PSLF if they make qualifying payments while waiting for the Department to complete the employer reconsideration process and make a determination.

*Changes:* None.

*Comments:* Many commenters argued that while reconsideration is an important safeguard, the process remains incomplete without a clear and well-defined appeals mechanism. They raised concerns that, without explicit standards for appeals, determinations may lack legitimacy, leaving borrowers with limited recourse if they believe an error has occurred. Commenters suggested that the Department establish clear appeal pathways with independent review, binding timelines, and published rationales to ensure confidence in outcomes.

*Discussion:* The Department agrees that employer reconsideration is an important procedural step that ensures that due process is provided. For this reason, this final rule includes a reconsideration process. Like all agencies that provide informal adjudications, the Department must provide a process that is consistent with the requirements of the Due Process Clause of the Fifth Amendment to the U.S. Constitution because of the property interests involved in the PSLF program. *See e.g., Pension Ben. Guar. Corp.* v. *LTV Corp.,* 496 U.S. 633, 653–56 (1990) (holding that courts cannot require agencies to provide process beyond what is provided for in the underlying statute or the U.S. Constitution). The Department does not believe an additional internal

reconsideration process is necessary to ensure that the Department makes reasoned decisions. As is generally true with informal adjudications under the APA, the Department's final agency action with respect to PSLF eligibility can be challenged in Federal district court. *See Dep't of Homeland Sec.* v. *Regents of Univ. of Cal.,* 591 U.S. 1, 16 (2020) ("The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." (cleaned up)).

*Changes:* None.

*Comments:* Commenters expressed concern that reconsideration outcomes might vary depending on which office or staff member handles a case, leading to inequities. They emphasized that a standardized process with uniform evidentiary thresholds, transparent procedures, and publicly available examples would promote consistency and fairness. Borrowers want assurance that reconsideration decisions will not hinge on individual discretion but instead follow predictable and published standards.

*Discussion:* The Department agrees that all employers should be treated in an even-handed manner. The results from the reconsideration process should not turn upon the specific staff involved but should instead focus on the facts and how they apply to the regulation. The Department has internal reviews and controls in place with all agency adjudications to prevent variation across staff and minimize the risk of arbitrary and capricious decision-making.

*Changes:* None.

### Standard for Determining Whether a Qualifying Employer Has a Substantial Illegal Purpose (§ 685.219(h))

*Comments:* Many commenters claimed the Department should anchor determinations in objective, evidence-based findings rather than administrative discretion. Suggestions included requiring a final judicial or administrative finding of illegality before disqualification, limiting the scope of review to the unit directly involved in misconduct, and applying a clear evidentiary threshold that prevents speculative or politically motivated judgments. Commenters stressed that such standards would promote fairness, reduce uncertainty, and insulate the program from political manipulation.

*Discussion:* The Department agrees that determinations must be anchored in objective evidence, not speculation or politics. This final rule makes clear that employer disqualification requires the Department to find that an employer has a substantial illegal purpose by a preponderance of the evidence after

weighing the employer's illegal conduct, narrowly focusing on only the illegal conduct enumerated in the regulation. A determination by the Department that an employer engaged in illegal activities such that it has a substantial illegal purpose only represents the Department's conclusion that the organization is not a qualifying employer for the purposes of participation in PSLF and does not represent a determination regarding the organization's tax-exempt status by the IRS. Only the IRS, not the Department, makes determinations regarding tax-exempt status. The Department decided to use the preponderance of the evidence standard because it is a well-established standard in informal agency adjudications and it ensures decisions are based on reliable evidence, not speculative allegations. *See e.g.,* Student Assistance General Provisions, 84 FR 49788 (Sept. 23, 2019). At the same time, the Department does not believe that it is appropriate to only rely on final judicial or administrative rulings before taking action. As discussed, the Department has significant interest in preserving taxpayer resources and preventing PSLF benefits from indirectly subsidizing employers who have a substantial illegal purpose. When the Department finds that an organization's activity is material enough that it has a substantial illegal purpose, we believe that it is the appropriate time to remove PSLF eligibility. Waiting until another entity acts would create unnecessary delays, cost taxpayers more, and make the Department captive to third parties who may or may not have an interest in protecting the Federal fiscal interest. Congress charged the Department with the responsibility to administer the PSLF program. Fully delegating the responsibility for program integrity to a third party and thereby relinquishing the Department's role in safeguarding that integrity would constitute an abdication of its statutory duty. The Department has amended the regulatory provisions under this section to provide clarity that the materiality of any illegal activity is weighed when considering whether an organization has a substantial illegal purpose. An illegal activity alone does not automatically mean an organization has a substantial illegal purpose.

*Changes:* Amended § 685.219(h) to include clarifying language for the standard for determining a qualifying employer has a substantial illegal purpose to include the distinction of illegal activity and substantive illegal purpose.

ED_02486

*Comments:* Commenters raised the concern that legal standards vary widely across States, particularly in areas such as marijuana laws, reproductive health regulations, and immigration enforcement. They argued that, without a Federal baseline, an employer deemed lawful in one jurisdiction could be disqualified in another, leaving borrowers subject to arbitrary geographic disparities. Commenters asked the Department to establish uniform Federal standards or explicitly preempt conflicting State interpretations to ensure equitable treatment for borrowers nationwide.

*Discussion:* The Department recognizes that State laws differ and appropriately drafted the rule to account for variation across States. Organizations will not be penalized if their actions are legal in the State in which they are operating. Although uniform standards would make the adjudication process more streamlined, such standards would not account for the differences across States in our Nation's system of vertical federalism. At the same time, if the Secretary determines that an employer has engaged in activities such that it has a substantial illegal purpose due to illegal conduct in one or more States, the Department may remove eligibility for the entire organization. Where an employer is operating under the same employer identification number (E.I.N.), but a part of the organization is actually separate and distinct, this final rule gives the Department flexibility to divide the employer into separate organizations for the purposes of PSLF eligibility.

With respect to immigration law, the Department disagrees that there is wide variation in immigration law across the country. The Federal Government has broad powers to regulate immigration law, and the immigration laws are uniform on the national level. *See e.g., DeCanas* v. *Bica,* 424 U.S. 351, 354 (1976) (stating that the "[p]ower to regulate immigration is unquestionably exclusively a federal power"); *Arizona* v. *United States,* 567 U.S. 387, 394 (2012) (stating that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens" and holding that several Arizona laws concerning immigration were invalid because they conflicted with Federal immigration laws or intruded on areas where Congress left no room for States to regulate).

*Changes:* None.

*Comments:* Many commenters argued that adjudicatory determinations must be accompanied by published standards, detailed explanations, and clear timelines. Commenters argued that, without these safeguards, PSLF eligibility decisions risk appearing arbitrary and may erode borrower confidence. Many commenters recommended that the Department provide written rationales for each disqualification decision and establish public-facing guidance that borrowers and employers can rely upon to anticipate outcomes.

*Discussion:* The Department agrees that transparency is essential. Borrowers and employers must know how decisions are made, what standards apply, and how to anticipate outcomes. This final rule requires written explanations for disqualification determinations, published standards, and clear timelines so the process is predictable, consistent, and accountable. By providing detailed rationales and public-facing guidance, the Department will ensure that determinations are not hidden, arbitrary, or influenced by politics. Borrowers will know their rights, employers will know their responsibilities, and taxpayers will know the PSLF program is administered with integrity. Transparency strengthens confidence and protects lawful public service.

*Changes:* None.

*Comments:* Commenters argued that PSLF determinations would inevitably reflect politics and that organizations could be punished for their views rather than unlawful conduct. They feared the Department could use this rule to target groups unpopular with those in power.

*Discussion:* The Department disagrees with commenters' argument. Under this final rule, PSLF employer eligibility determinations are based on objective, content-neutral evidence that an organization has engaged in illegal activities such that it has a substantial illegal purpose. All the activities included within the definition of substantial illegal purpose are explicit violations of either State or Federal law, and as such, are actions which inherently do not serve the public good. By basing the components of the definition of substantial illegal purpose on State and Federal law, this final rule protects borrowers from arbitrary or politically motivated disqualification. It safeguards taxpayer funds, improves confidence in the program and ensures PSLF provides benefits for only lawful public service.

*Changes:* None.

## Process for Determining When a Qualifying Employer Engaged in Activities Such That It Has a Substantial Illegal Purpose (§ 685.219(i))

*Comments:* Commenters objected to the idea that an entire organization could be disqualified because of misconduct by a small unit or a few individuals. They argued that blanket determinations would unfairly harm borrowers serving in lawful roles who had nothing to do with the misconduct.

*Discussion:* The Department agrees that broad disqualification could be unfair in certain circumstances, especially when the underlying illegal activity is immaterial or minor, is a result of a rogue employee, or does not rise to a pattern or practice. If more than an insubstantial portion of an organization's conduct and activities are illegal; however, the Department considers that organization to no longer be a qualifying employer for the purpose of PSLF eligibility. And as such, it would be inappropriate to continue to provide PSLF benefits to employees of such an organization. Although isolated and immaterial acts, even if illegal, may not be sufficient to withdraw eligibility because of the reasons commenters identify, if such conduct becomes a substantial part of the organization, the organization ceases to provide a public service and, therefore, the conduct becomes sufficient for the Department to cease providing PSLF benefits. When weighing these instances of illegal conduct, the Department will weigh the frequency in which they have occurred and the seriousness of the offense. In some cases, where the illegal conduct is material and very serious, such as acts of terrorism, the Department may not need to see a pattern of behavior. One act of supporting terrorism may be sufficient to remove eligibility. On the other hand, if the organization has engaged in less serious violations, the Department may need to see a pattern and practice of consistent violations to find that the organization has engaged in activities such that it has a substantial illegal purpose. *See I.R.S. Gen. Couns. Mem. 34631* (Oct. 4, 1971) (stating, as an example, that "[a] great many violations of local pollution regulations relating to a sizable percentage of an organization's operations would be required to disqualify it from 501(c)(3) exemption" but "if only .01% of its activities were directed to robbing banks, it would not be exempt"). Courts have upheld this approach in the context of the Internal Revenue Code, because they have recognized the common-sense principle

that if an organization is engaged in a substantial amount of criminal activity, it is not advancing a tax-exempt purpose. *See e.g., Church of Scientology,* 83 T.C. at 586 (stating, in affirming the IRS's denial of tax-exempt status to an organization that had engaged in tax fraud, "[w]ere we to sustain petitioner's exemption, we would in effect be sanctioning petitioner's right to conspire to thwart the IRS at taxpayer's expense"). Here, the Department is taking a similar approach to ensure that only organizations that are providing a public service are qualifying employers. We reiterate that the process envisioned under § 685.219(i) is for determining when an employer has a substantial illegal purpose for the purposes of PSLF. The process in § 685.219(i) does not make a determination of the employer's tax status under the Internal Revenue Code.

*Changes:* None.

*Comments:* Commenters stated that terms like "substantial illegal purpose" are not sufficiently defined, leaving room for subjective interpretation. They warned this vagueness could open the door to excessive enforcement and uncertainty for nonprofits and public service organizations that operate in politically sensitive areas. Some urged the Department to narrowly define the term, limiting it only to cases where the organization's primary mission is unlawful activity.

*Discussion:* The Department rejects the idea that "substantial illegal purpose" is not sufficiently clear enough to be understood. Organizations that engage in illegal activity do not automatically have a substantial illegal purpose under this final rule. As explained above, the Department will weigh the seriousness of offenses and the frequency with which they occurred when determining if an organization engages in activities enumerated under paragraph (b)(30) such that it has a substantial illegal purpose for PSLF eligibility purposes. Even one instance of an organization supporting terrorism may be sufficient to make such a finding; however, for less serious offenses, the Department will look more generally to see if there is a pattern and practice of illegal behavior. The Department believes if more than an insubstantial amount of illegal conduct is occurring at an organization that it is no longer providing a public service, and its employees should no longer receive PSLF program benefits.

*Changes:* The Department made clarifying changes to the process for determining whether an organization has a substantial illegal purpose to make

clear that the Secretary weighs evidence of illegal activity as described in paragraph (b)(30) to determine whether that illegal activity is so substantial that the organization has a substantial illegal purpose.

*Comments:* Many commenters pressed the Department to draw a clear distinction between an organization's unlawful activities and lawful work performed by its other units or employees. They argued that, absent this protection, borrowers could lose PSLF credit even if their service was in fully compliant divisions of a larger entity. Commenters emphasized that fairness requires shielding employees from organizational misconduct they neither directed nor participated in. Additionally, commenters mentioned that it was unclear how standards would apply to separate entities sharing the same E.I.N. or how partial disqualification would be managed to ensure that eligible employees were not negatively impacted.

*Discussion:* The Department agrees that for PSLF eligibility purposes that it may be appropriate for the Department to have unique identifiers, in certain circumstances, when separate and distinct entities share the same E.I.N., and are operated in a separate and distinct manner. Such unique identifiers will only be necessary if the Secretary determines that a qualifying employer has engaged in illegal activities such that it has a substantial illegal purpose. If multiple qualifying employers share the same E.I.N., the Department will determine the specific employer that is ineligible for PSLF and assign a unique identifier to that organization if the organization is operating separately and distinctly.

At the same time, the Department disagrees with commenters that a component's illegal actions cannot taint the entire organization. For example, an organization that supports terrorism, but also provides food to low-income individuals, likely has a substantial illegal purpose. Providing food to low-income individuals, as admirable as it may be, does not necessarily immunize the organization from its other illegal conduct. The Department acknowledges that this approach may mean that certain borrowers that work for organizations that have a substantial illegal purpose will become ineligible for PSLF, even in instances where the borrower is not engaged in illegal activity. However, the Department believes that its interest in protecting taxpayer resources from going to organizations that harm the public good because they have a substantial illegal purpose outweighs the interests of

borrowers in these narrow circumstances.

*Changes:* None.

*Comments:* Many commenters pointed out that the proposed standard for PSLF eligibility does not clarify what level of involvement qualifies as "engagement" in illegal activity. Commenters feared this vagueness could allow ideological misuse, targeting organizations for political reasons rather than unlawful conduct.

*Discussion:* The Department disagrees with commenters' suggestion and criticism. The term "engage" in the context of the regulation means the organization is taking part in the activity. In other words, it refers to direct participation or purposeful involvement in unlawful conduct by the organization itself. *See Engage: Merriam-Webster.com Dictionary,* Merriam-Webster, *https:// www.merriam-webster.com/dictionary/ engage.* Accessed 7 Oct. 2025. Because this word is sufficiently clear in the context in which it is used, the Department does not think changes to the rule are needed to provide clear notice as to what conduct this final rule seeks to address.

*Changes:* None.

*Comments:* Several commenters suggested that it would be more practical for the Secretary to simply reject incomplete applications rather than treating a failure to certify as conclusive evidence for disqualification, as the risks and costs of the current proposal outweigh any administrative benefit.

*Discussion:* The Department agrees that it will reject individual incomplete applications where an employer fails to certify that it did not participate in activities that have a substantial illegal purpose. Operationally, the Department will reject an individual application if the section about the employer's certification that it did not engage in substantial illegal activities is omitted or missing. The Department, via the borrower, will provide the employer an opportunity to correct the application and provide the requested information. However, when an employer consistently fails or refuses to provide a certification on multiple applications, the Department may consider disqualifying the employer per the process outlined in § 685.219(i).

*Changes:* None.

**Regaining Eligibility as a Qualifying Employer (§ 685.219(j))**

*Comments:* Several commenters argued that once an organization corrects unlawful practices or demonstrates compliance, it should

have a clear pathway to regain PSLF program eligibility. Without this option, they argued, employers could be permanently tainted, unfairly harming employees who continue to perform lawful public service. Commenters recommended corrective action plans, time-limited disqualifications, and procedures for reinstating borrower credit once eligibility is restored.

*Discussion:* The Department recognizes the importance of a clear pathway for employers to regain PSLF program eligibility once unlawful practices are corrected. The goal of this final rule is not permanent exclusion but to ensure that benefits from the PSLF program do not indirectly support employers who have engaged in certain illegal activities. Organizations that take corrective action, demonstrate compliance, and return to lawful operations should have the opportunity to be reinstated as an eligible employer. This final rule provides for 10-year time-limited disqualification and the possibility of restoration. The Department believes the temporal disqualification strikes the right balance and ensures that organizations can regain eligibility. In addition, if the Secretary approves a corrective action plan for the organization, it can regain eligibility on an expedited timeline. Organizations that want to avoid ineligibility altogether may suggest a corrective action plan to the Secretary in tandem with any submission under the employer reconsideration process.

*Changes:* None.

*Comments:* Commenters argued that borrowers and employers could face disqualification without adequate notice or the ability to contest decisions. Some acknowledged that prior qualifying payments would still count, but most said that safeguard alone was not enough.

*Discussion:* The Department disagrees that employers could face disqualification without adequate notice. This final rule requires employers receive notice and the opportunity to respond through the employer disqualification process. This process will ensure notice is provided in advance of any action to disqualify the employer from the PSLF program. Borrowers will be notified directly if they are working for an employer who is no longer eligible because the Department has determined that the organization has a substantial illegal purpose. In addition, the Department will post this information on its website to inform the public. In addition, borrowers will retain credit for all qualifying payments made before an employer's status changes. This

protection shields workers from any harm prior to a determination of employer ineligibility being made by the Secretary.

*Changes:* None.

## Borrower Notification of Regained Eligibility (§ 685.219(k))

*Comments:* Commenters strongly supported requiring the Department to notify borrowers right away when an employer's eligibility changes. They stressed that, without timely notice, borrowers could be blindsided, undermining trust in the PSLF program and causing serious financial harm.

*Discussion:* The Department agrees. Timely notification is not optional, it is essential. This final rule requires prompt notice so borrowers know immediately when their employer's eligibility status changes.

*Changes:* None.

## PSLF Program Administration

*Comments:* Many commenters questioned whether loan servicers currently have the expertise and staffing to administer this rule accurately. They pointed to past problems with inconsistent guidance, long call center delays, and errors in processing borrower accounts. Some commenters argued that, without significant investments in servicer training and oversight, the new rules could worsen confusion and lead to wrongful denials. Others emphasized that servicers should receive standardized guidance and be held accountable for ensuring determinations are applied uniformly.

*Discussion:* The Department acknowledges that servicers have faced challenges in administering certain aspects of the PSLF program in the past. However, the Department does not believe that its servicers will be unable to carry out new responsibilities under this final rule, given the limited scope of those responsibilities. The Department expects that it will only take action to remove PSLF program eligibility for less than ten employers per year. Servicers will have the ability to handle that volume of employer eligibility changes. The Department's Office of Federal Student Aid will ensure that its staff, who handle eligibility determinations, and its servicers, who handle processing, will be trained, monitored, and held accountable for accuracy.

*Changes:* None.

*Comments:* Commenters highlighted concerns that the additional layers of review and determination introduced by the rule could cause lengthy delays in processing applications, reconsiderations, and employer status

updates. Commenters worried that they might be left in limbo for months or even years, undermining the value of the PSLF program as a dependable benefit. Some recommended the Department set strict timelines and performance metrics for application and employment certification form processing to prevent backlogs from eroding confidence in the program.

*Discussion:* The Department rejects the notion that this final rule creates unnecessary delays. The Department is creating internal performance expectations and oversight mechanisms so that applications, reconsiderations, and employer determinations move as quickly and predictably as possible. As explained previously, some reviews for substantial illegal activity will be straightforward and will be quickly processed, while other matters may be more complex and will need several layers of review before an informed decision can be reached. As such, the Department is unable to commit to specific timelines for different parts of the adjudicatory process. At the same time, qualifying employers and their employees will remain eligible to participate in the PSLF program throughout the review process. Only after the Secretary has determined that an organization has engaged in activities such that it has a substantial illegal purpose will borrowers no longer receive monthly PSLF credit for payments made.

*Changes:* None.

*Comments:* Commenters stressed that PSLF must be administered consistently regardless of which servicer handles a borrower's loans. They noted that inconsistent application of standards has been a long-standing problem, with some servicers approving payments or employers that others reject. Commenters urged the Department to adopt uniform servicing protocols, detailed written guidance, and stronger oversight mechanisms to ensure equal treatment across the program.

*Discussion:* The Department agrees that the PSLF program, including regulations under this final rule, must be administered uniformly. Through its ongoing oversight mechanisms, the Department will ensure that both Department staff and vendors adhere to consistent protocols, written guidance, and oversight standards. Borrowers deserve equal treatment, and taxpayers deserve confidence that the PSLF program is administered consistently and fairly.

*Changes:* None.

**Other Notable Public Comments**

*Comments:* Commenters asked for more detail on how the rule will be implemented, including why certain organizations are excluded and how determinations will be documented. They said clearer terms would give borrowers and employers greater predictability and confidence.

*Discussion:* The Department agrees that clarity is essential. This final rule establishes the overarching regulatory framework, and the Department will continue to provide additional information, such as through guidance documents, as necessary to ensure that borrowers and employers understand how eligibility standards are applied. This approach promotes consistency, fairness, and transparency in all determinations. By doing so, the Department strengthens trust in the program, protects borrowers, and safeguards taxpayer interests. It ensures that the PSLF program operates under clear rules, with neutral enforcement, and strong accountability.

*Changes:* None.

*Comment:* A commenter asserted that the final rule failed to address scenarios where a State law changed after a qualifying employer was found to have violated that State law and that violation of State law was used as evidence by the Secretary to determine that an employer has a substantial illegal purpose. The commenter believed that in such cases an employer's eligibility for PSLF should be restored, payments made by borrowers during the period when the employer was disqualified from PSLF should be credited toward PSLF, and the Department should be required to initiate a new process for determining when an employer should be disqualified.

*Discussion:* The Department disagrees with the commenter. Changes to State law do not change the underlying issue that the organization's action were illegal at the time the action was taken. The Department's rule is designed, in part, to deter organizations from engaging in unlawful behavior by creating additional adverse consequences for engaging in that conduct. Consequences that flow from engaging in illegal activity are not automatically nullified if the underlying law is modified, and the Department thinks it would be inappropriate to alter the consequences for that illegal activity automatically here. The final rule provides disqualified employers with a streamlined pathway to regain eligibility as a qualifying employer for PSLF in section 685.219(j). Under that section,

the employer has an opportunity to certify that it is no longer engaging in illegal activities under this final rule, and to provide evidence acceptable to the Secretary to support the compliance certification.

*Changes:* None.

**X. Regulatory Impact Analysis**

*Executive Orders 12866, 13563, and 14192*

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" as defined by that Executive Order and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities;

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order.

The Department estimates the net budgetary impacts to be −$1.616 billion from reductions in transfers from the Federal Government to borrowers who no longer receive credit toward loan forgiveness under PSLF. Quantified economic impacts include annualized transfers of −$179 million at 3 percent discounting and −$191 million at 7 percent discounting, and annual quantified costs of $0.3 to $0.4 million related to compliance costs and administrative updates to government systems. Additionally, the Department expects to allocate a portion of current full-time equivalent employment (FTE) to support the systems, compliance, and oversight functions of this final rule on a continuing basis. The Department estimates that a total of 10 FTEs will be allocated annually on an ongoing basis to systems, compliance, and oversight activities associated with this final rule, with a possible reduction in later outyears as noncompliant employers are disqualified and the expected deterrent effects of the final rule are realized. It is

also important to note that given that the average PSLF loan forgiveness payment amount to date, as shown in Table 5.4, is $75,900 per borrower, such a shift of current staff resources from performing lower value activities to preventing and deterring improper payments in the PSLF program is likely to result in lower overall net costs of these staff resources than without the final rule. Therefore, based on these estimates, the Office of Information and Regulatory Affairs (OIRA) has determined that this final action is "economically significant" under section 3(f)(1) and subject to OMB review under section 6(a)(3) of Executive Order 12866.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires an agency to:

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and considering, among other things and to the extent practicable, the costs of cumulative regulations;

(3) Choose among alternative regulatory approaches and select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives, such as user fees or marketable permits, to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." OIRA has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

The Department finds that the benefits of this final rule outweigh and will justify their costs. In choosing

ED_02490

**48992**    **Federal Register** / Vol. 90, No. 209 / Friday, October 31, 2025 / Rules and Regulations

among alternative regulatory approaches, we selected those approaches that maximize net benefits. In this RIA, we discussed the need for regulatory action, potential costs and benefits, net budget impacts, and the regulatory alternatives we considered.

Elsewhere in this section under the *Paperwork Reduction Act,* we identify and explain burdens specifically associated with information collection requirements.

President Trump's Executive Order on *Unleashing Prosperity Through Deregulation,* Executive Order 14192 (Jan. 31, 2025) directs Federal agencies to manage and reduce regulatory costs while promoting economic growth. It emphasizes reviewing existing regulations and minimizing unnecessary burdens on the public. This rule is not an Executive Order 14192 regulatory action because it does not impose any more than de minimis regulatory costs.

1. Major Rule Designation

Pursuant to Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act (5 U.S.C. 801 *et seq.*), OIRA designated this rule as a ''major rule,'' as defined by 5 U.S.C. 804(2).

2. Need for Regulatory Action

The Department has identified a critical and urgent need for targeted regulatory reform within the PSLF program. The PSLF program, established to encourage public service careers by offering loan forgiveness to eligible borrowers, has faced several operational challenges, eligibility concerns, and administrative burdens that undermine its effectiveness. Despite the program's intent, the current regulatory framework does not restrict eligibility if an organization has a substantial illegal purpose unless the organization ceases to qualify for another reason, such as having its tax-

exempt status revoked by the IRS. As a result, the Department is currently indirectly subsidizing employers who are not engaged in public service because they are engaged in illegal activity and have no independent mechanism to remove such employers from the program.

In response to these challenges, the Department implements targeted regulatory changes designed to strengthen the program's integrity by limiting benefits to borrowers employed by organizations that meet the established public service criteria, including working for employers who perform a public good. This final rule refines the requirements for qualifying employers and makes certain that PSLF benefits are distributed only to those working for organizations that provide a public service, aligned with the goals of the HEA and consistent with the intent of Congress.

3. Summary

TABLE 3.1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS

| Provision | Regulatory section | Description of proposed provision |
|---|---|---|
| **Public Service Loan Forgiveness** | | |
| Definitions | § 685.219(b) | Will add definitions of ''aiding or abetting''; ''chemical castration or mutilation''; ''child or children''; ''foreign terrorist organizations''; ''illegal discrimination''; ''other Federal immigration laws''; ''substantial illegal purpose''; ''surgical castration or mutilation''; ''terrorism''; ''trafficking''; ''violating State law''; and ''violence for the purpose of obstructing or influencing Federal Government policy''. Will revise the definition of ''qualifying employer''. |
| Borrower Eligibility | § 685.219(c) | Will exclude from a credit as a qualifying payment any month where ED has determined that a qualifying employer engaged in activities such that it has a substantial illegal purpose. |
| Application Process | § 685.219(e) | Will create a borrower notification of employers that are at risk of or have lost PSLF qualifying status. |
| Borrower reconsideration process | § 685.219(g) | Will prohibit a borrower from requesting reconsideration if their employer lost eligibility due to engaging in activity such that it has a substantial illegal purpose. |
| Standard for determining whether a qualifying employer has a substantial illegal purpose. | § 685.219(h) | Will create a standard by which the Secretary determines that the qualifying employer has a substantial illegal purpose, including but not limited to reviewing the preponderance of the evidence and basing decisions on materiality of the activities that have a substantial illegal purpose. Also, it will provide the employer an opportunity to respond except in cases where there is conclusive evidence (see discussion or regulatory language for more information) that the employer engages in activities such that it has a substantial illegal purpose. |
| Process for determining when a qualifying employer engaged in activities such that it has a substantial illegal purpose. | § 685.219(i) | Will establish that the Secretary determines that a qualifying employer has a substantial illegal purpose when the Secretary receives that self-certified information on the Public Service Loan Forgiveness Certification and Application (PSLF Form) or makes his or her own determination, unless a corrective action plan is submitted prior to issuance of the determination. Will also note the Secretary's authority to separate entities operating under one identification number. |
| Regaining eligibility | § 685.219(j) | Will allow a qualifying employer to regain eligibility after ten years from the date the Secretary determines it has a substantial illegal purpose or when the Secretary approves a corrective action plan signed by the employer. |
| Borrower notification | § 685.219(k) | Will require the Secretary to update the qualifying employer list within 30 days if an employer regains lost eligibility. |

4. Discussion of Costs and Benefits

The PSLF program is a component of Federal student loan policy that provides benefits to individuals who

enter and continue in public service employment by offering cancellation of remaining Direct student loan balance(s) after 120 qualifying monthly payments

and at least 10 years of full-time employment in qualified public service jobs, which are both required under the PSLF program. However, over time, the

ED_02491

program has faced challenges, including the disbursement of benefits to borrowers employed by organizations whose activities do not align with the program's public service objectives. To address these issues, the Department proposed a series of regulatory changes through the negotiated rulemaking process. These final regulations aim to strengthen the program's integrity, improve its efficiency, and ensure that taxpayer funds are allocated appropriately. Although these changes are expected to generate certain costs, the long-term benefits are substantial, making the program more effective, transparent, and accountable. Below is an analysis of both the costs and benefits of these regulations.

*Costs of the Regulatory Changes:*

The Department acknowledges that implementing the regulations will generate costs. These costs primarily fall into three categories: Department administrative costs, compliance costs for employers, and potential disruptions for borrowers. However, these costs must be viewed in the context of the long-term benefits that the regulations will provide.

One of the immediate costs associated with these regulatory changes will be the need for the Department to update its systems, train staff and vendors, and implement new compliance and monitoring processes. The Department will also need to enhance communication systems to notify employers and borrowers of any changes to a qualifying employer's status in the PSLF program. These changes will require new costs for minor system changes and for changes and increases in customer service activities.

Initial estimates suggest that the administrative costs for the Department will range from $1.5 million to $3 million annually during the first two years of implementation. These funds, from appropriated Student Aid Administration account funds, will be used to ensure that the Department can effectively manage the new employer eligibility determination process, update systems, and conduct necessary training for staff and stakeholders. Also, as noted earlier, on a continuing basis the Department estimates that a total of 10 FTEs will be allocated annually, with a possible reduction in later outyears as noncompliant employers are disqualified and the expected deterrent effects of the final rule are realized.

In general, the Department believes that most employers will already be complying with the requirements of the rule because the employers already have an existing obligation to follow the law.

Some employers may need to make changes to ensure that they follow the law and meet the new eligibility criteria under the regulations if they want to participate in the PSLF program. This will involve reviewing their activities to ensure they are not engaged in any actions that will disqualify them from participating in the PSLF program. For some employers who are not currently following the law, especially smaller organizations or those with limited resources, this process may necessitate consultation with legal counsel or operational adjustments.

Compliance costs for employers are expected to vary by organization, depending on the organization's size and complexity. Larger organizations, such as hospitals or universities, who are not currently complying with the law may incur higher costs as they assess their practices and make any necessary changes to align with this final rule. These costs primarily result from the costs of legal counsel, restructuring efforts, and changes to the organization's documentation processes. At the same time, many organizations are accustomed to attesting to the fact that they are not violating Federal and State law as a condition to participate in other government or non-governmental programs. In circumstances like these, organizations may not need to exert any additional effort, or at most will need to dedicate a *de minimis* amount of additional resources, in order to comply under this final rule. Rather, such organizations will rely on their existing compliance efforts to comply with the rule.

The most significant impacts on borrowers may stem from potential misunderstandings of the final rule that may lead to borrower confusion that delays application of the forgiveness benefit. Borrowers who are employed by organizations disqualified under the new rule will no longer be eligible to receive credit toward loan forgiveness while working for that employer, except in certain circumstances described in the rule. These borrowers would need to transition to qualifying employers to continue receiving credit for their payments. Borrowers who misunderstand the new rule may apply for forgiveness without knowing or understanding the implications of this final rule on their former or current employer, as they may no longer be a qualifying employer.

*Benefits of the Regulatory Changes:*

Despite the initial and ongoing costs, the long-term benefits of this final rule include increased integrity and long-term savings for taxpayers. The most significant benefit of the regulations is

the improvement in the integrity of the PSLF program. By excluding employers engaged in illegal activities such that they have a substantial illegal purpose from the program, the Department affirms taxpayer dollars are only used to support borrowers working for organizations that are engaged in lawful public service. This change will directly address concerns about improper disbursements and misuse of Federal funds. This change also addresses concerns that the Department is indirectly subsidizing illegal activities that the Federal Government broadly aims to prevent.

The PSLF program provides generous benefits to individuals in public service, and these changes will improve the integrity of the program. By revising the PSLF program regulations to only reward service with organizations engaged in lawful activities, the Department expects to achieve substantial savings, as presented in the budget impacts of this final rule.

One of the most important benefits of the regulations is the long-term savings they will generate for taxpayers. By eliminating improper payments, the Department estimates that these regulations will save taxpayers $1.616 billion over the next ten years, resulting from a reduction in PSLF tied to illegal activity. The expected reduction in disbursements will ensure that taxpayer dollars are spent more efficiently and effectively because the benefits borrowers receive are not indirectly supporting organizations engaged in activities such that it has a substantial illegal purpose.

The regulatory changes for the PSLF program aim to enhance the program's integrity and transparency. The regulations will help reduce improper payments and ensure that the program supports individuals employed by eligible organizations that genuinely provide a public service. With these changes, the PSLF program will be more accountable and transparent.

5. Net Budget Impact

Table 5.1 provides an estimate of the net Federal budgetary impact of these regulations that are summarized in Table 3.1 of this RIA. This includes both the effects of a modification to existing loan cohorts and costs for loan cohorts from 2026 to 2035. A cohort reflects all loans originated in a given fiscal year. Consistent with the requirements of the Credit Reform Act of 1990, budget cost estimates for the student loan programs reflect the estimated net present value of all future non-administrative Federal costs associated with a cohort of loans. The approach to estimating the net

**48994**        **Federal Register** / Vol. 90, No. 209 / Friday, October 31, 2025 / Rules and Regulations

budget impact of these final regulations did not change from the NPRM. The primary change in the scores for the final rule is that the baseline for estimating the cost of this final rule is the President's Budget for 2026 (PB2026) as modified for the One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 signed into law on July 4, 2025. As it relates to the estimated impacts of this final rule to PSLF transfers, the most important change is the introduction of the Repayment Assistance Plan (RAP) and changes to eligibility for existing income-driven repayment (IDR) plans.

TABLE 5.1—ESTIMATED BUDGET IMPACT OF THE FINAL RULE

[$ in millions]

| Section | Description | Modification score (1994–2025) | Outyear score (2026–2035) | Total (1994–2035) |
|---|---|---|---|---|
| § 685.219(h) ........................... | Amended definition of qualifying employer ............................. | −$842 | −$774 | −$1,616 |

This final rule defines several terms related to qualifying employment for PSLF and amends the definition of a qualified employer to exclude organizations that engage in activities such that it has a substantial illegal purpose. This is consistent with President's Trump's Executive Order, *Restoring Public Service Loan Forgiveness,* Executive Order 14235 (Mar. 7, 2025). Pursuant to subsection 685.219(h), the Secretary will determine based on a preponderance of the evidence, and after notice and opportunity to respond, whether employers have engaged in activities enumerated in paragraph (b)(30) of the final rule on or after July 1, 2026, such it has a substantial illegal purpose. The Department will presume that any of the following is conclusive evidence that the employer engaged in activities enumerated in paragraph (b)(30) on or after July 1, 2026:

1. A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

2. A plea of guilty or *nolo contendere,* whereby the employer admits to having engaged in activities that have substantial illegal purpose or pleads *nolo contendere* to allegations that the employer engaged in activities that have substantial illegal purpose; or

3. A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose.

Employer qualification will be linked to the E.I.N. used for reporting to the IRS, therefore, employees in one area or agency may be affected by the activities of employees in other organizations under the same E.I.N. Government agencies may have many service areas under a single E.I.N.

The PSLF application data includes variables that distinguish non-profit employers and government employers, as well as the level of government employers. Table 5.2 summarizes the split between all borrowers who have received PSLF in the Department's data as of September 25, 2025, whose greatest time in qualifying employment was with government or non-profit organizations.

TABLE 5.2—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY EMPLOYMENT SECTOR

| Employment sector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Government ........................................................................................................................ | 694,900 | $73,100 |
| Nonprofit ........................................................................................................................... | 305,500 | 82,200 |
| Total ........................................................................................................................... | 1,000,400 | 75,900 |

**Note:** The total number of borrowers whose loans were forgiven may be less than most recent Department estimates due to timing, data availability, and data cleaning. Borrowers are sorted into the sector with the maximum time working toward forgiveness. The number of borrowers and average forgiveness amounts are rounded to the nearest hundred. The total represents the weighted average of the number of borrowers and average forgiveness amount across all borrowers who received PSLF through September of 2025. Totals are rounded to the nearest hundred of the employment sectors and may not equal the total due to rounding. Data extracted September 25, 2025, and represents all borrowers who have received PSLF forgiveness up until that date.

Table 5.3 splits the government category into Federal, State, and local levels. We assume that Federal agencies will comply with the law and do not expect a reduction in forgiveness for Federal employees.

TABLE 5.3—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY GOVERNMENT SUBSECTOR

| Government subsector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Federal Government ......................................... | 100,400 ............................................. | $72,000 |
| Local government ............................................ | 425,500 ............................................. | 71,200 |
| State government ............................................ | 166,600 ............................................. | 78,600 |
| Unknown .......................................................... | 2,400 ............................................. | 75,300 |

ED_02493

TABLE 5.3—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY GOVERNMENT SUBSECTOR—Continued

| Government subsector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Total | 694,900 | 73,100 |

**Note:** The total number of borrowers who have received forgiveness may be less than most recent Department estimates due to timing, data availability, and data cleaning. Borrowers are sorted into the sector with the maximum time working toward forgiveness. The number of borrowers and average forgiveness amounts are rounded to the nearest hundred. The total represents the weighted average of the number of borrowers and average forgiveness amount across all borrowers who received PSLF through September of 2025. Totals are rounded to the nearest hundred of the employment sectors and may not equal the total due to rounding. Data extracted September 25, 2025, and represents all borrowers who have received PSLF forgiveness up until that date.

Based on the activities identified in this final rule, it is likely that organizations in some fields are more likely to be affected than others, either by loss of eligibility, the deterrent effect on their activities, difficulty recruiting employees, or by their employees not being granted PSLF forgiveness and seeking alternate employment. Regardless of the type of employer, service areas that could be most affected by the regulation include, but are not limited to, legal services, governance, social work, healthcare, K–12 education, and higher education. Existing data on employers of borrowers who received forgiveness does not include a service category and employer names do not always indicate what an organization does, but the Department analyzed this data to estimate what share of borrowers who have achieved forgiveness fall into certain service areas and their average forgiveness.[8] This was done by matching keywords from various subsectors to employer names. For example, for healthcare, the keywords included "hospital," "health," "medical," and "clinic".

A portion of employers cannot be classified because some employer names give no indication to their service area, contain misspellings, or have names that do not contain any of the keywords matched. These E.I.N.s are categorized as "Other". Approximately 91 percent of borrowers who have received PSLF were categorized into a subsector category, leaving 9 percent in the "Other" category. In this analysis, we assume that the distribution of borrowers and subsectors in the future will reflect that of those who have received forgiveness. Table 5.4 summarizes the results by service area.

TABLE 5.4—NUMBER OF BORROWERS RECEIVING PSLF AND AVERAGE FORGIVENESS BY EMPLOYMENT SUBSECTOR

| Employment subsector | Number of borrowers who have received forgiveness | Average forgiveness amount |
|---|---|---|
| Agriculture | 3,400 | $64,600 |
| Arts | 2,900 | 62,200 |
| Early Childhood | 1,500 | 63,000 |
| Environmental | 2,700 | 61,400 |
| Fire Rescue | 1,200 | 52,800 |
| Governance | 161,000 | 67,200 |
| Healthcare | 163,900 | 89,400 |
| Higher Education | 108,200 | 84,500 |
| International | 1,300 | 74,900 |
| K–12 Education | 303,500 | 72,500 |
| Law Enforcement | 20,500 | 66,400 |
| Legal | 14,100 | 109,200 |
| Military | 49,900 | 70,200 |
| Other | 84,900 | 72,300 |
| Philanthropy | 5,500 | 74,300 |
| Religious | 14,400 | 69,600 |
| Research | 1,600 | 65,600 |
| Social Services | 48,600 | 75,400 |
| Transportation | 5,700 | 61,500 |
| Utilities & Infrastructure | 2,500 | 60,500 |
| Workforce & Labor | 3,000 | 80,400 |
| Total | 1,000,400 | 75,900 |

**Note:** The total number of borrowers who have received forgiveness may be less than most recent Department estimates due to timing, data availability, and data cleaning. Borrowers are sorted into the sector with the maximum time working toward forgiveness. The number of borrowers and average forgiveness amounts are rounded to the nearest hundred. The total represents the weighted average of the number of borrowers and average forgiveness amount across all borrowers who received PSLF through September of 2025. Totals are rounded to the nearest hundred of the employment sectors and may not equal the total due to rounding. Data extracted September 25, 2025, and represents all borrowers who have received PSLF forgiveness up until that date.

---

[8] Turner, J., Blanchard, K., & Darolia, R. (2025, January). *Where Do Borrowers Who Benefit from Public Service Loan Forgiveness Work?* NEA. https://www.nea.org/sites/default/files/2025-03/ where-do-borrowers-who-benefit-from-pslf-work.pdf.

ED_02494

**48996**    **Federal Register** / Vol. 90, No. 209 / Friday, October 31, 2025 / Rules and Regulations

As we expect most employers to certify that they do not engage in activities with a substantially illegal purpose, the information in Table 5.4 informed our estimates of potential reductions in qualifying employers for PSLF but does not directly translate to the percentage of borrowers assigned to achieve forgiveness in our assumptions for the regulation. We also recognize that employers in other employment subsectors could engage in an activity that results in a loss of eligibility but estimate that these will be anomalies or very small percentages. Therefore, we have included a percentage for all other categories, and some sensitivity runs that are described in the *Methodology for Budgetary Impact* section of this analysis.

Methodology for Budgetary Impact

The Department estimated the budgetary impact of the provisions in this final rule through changes to the PSLF assignment within the Department's IDR assumption. PSLF is randomly assigned to borrowers in our IDR model sample based on percentages that vary by the cohort range in which they enter repayment and highest education level as presented in Table 5.5.

TABLE 5.5—CHANGE IN ASSIGNMENT OF PSLF FOR FINAL RULE

| Percentage of borrowers assigned PSLF | | | |
|---|---|---|---|
| Enter repayment cohort range | 2-Year (%) | 4-Year (%) | Graduate (%) |
| **PB2026 Baseline Scenario** | | | |
| 2016 to 2020 | 10.46 | 18.05 | 21.96 |
| 2021 and later | 14.65 | 28.88 | 30.74 |
| **Final Regulatory Scenario** | | | |
| 2016 to 2020 | 10.25 | 17.69 | 21.52 |
| 2021 and later | 14.35 | 28.30 | 30.13 |
| **Alternate Regulatory Scenario** | | | |
| 2016 to 2020 | 9.83 | 16.96 | 20.64 |
| 2021 and later | 13.77 | 27.14 | 28.90 |

We expect the regulations to have a deterrent effect, reducing the likelihood of qualifying employers engaging in illegal activities. Additionally, borrowers have the option of shifting employers to complete their 120 months of qualifying payments. Therefore, we do not expect a large reduction in borrowers achieving PSLF forgiveness, although savings of $1.6 billion over ten years is significant. We have not increased the effect for future cohorts of loans because, while potential ineligibility starts with July 1, 2026, the effective date of this final rule, employers' ability to appeal and get reinstated and employees' ability to shift positions means the pattern is not necessarily a continued increase in ineligibility.

The changes made in Table 5.5 were derived from applying reductions between 0–5 percent to the employment subsectors identified in Table 5.4 as being most likely to be affected by the regulation (legal, healthcare, social work, higher education, K–12 education, and governance). This results in an estimated total reduction of approximately 0–2 percent.

As explained in the *Paperwork Reduction Act* section, the Department believes that there will be fewer than ten employers affected annually. Within the universe of borrowers who have received forgiveness, approximately 6 percent were employed for their longest time toward forgiveness in the top ten E.I.N.s by forgiven borrower count, excluding Federal employers who are assumed to comply. Therefore, we also ran an alternate high-impact sensitivity that changed the reductions up to 6 percent, see ''PSLF Alternate'' in Table 5.6.

The combined effect of the changes to the percentages in Table 5.5 reduces the number of borrowers achieving PSLF in our IDR assumption and results in the cost savings presented in Table 5.6.

TABLE 5.6—NET BUDGET IMPACT OF CHANGES TO PSLF

| $ mns | PSLF primary | PSLF alternate |
|---|---|---|
| Modification | −$842 | −$2,326 |
| Outlays for Cohorts 2026–2035 | −774 | −2,220 |
| Total | −1,616 | −4,546 |

*Accounting Statement:*

As required by OMB Circular A–4, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these regulations. Table 5.7 provides our best estimate of the changes in annual monetized transfers that may result from these regulations. Expenditures are classified as transfers from the Federal Government to affected student loan borrowers.

ED_02495

TABLE 5.7—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED EXPENDITURES

[In millions]

| Category | Benefits | |
|---|---|---|
| Reduction in taxpayer costs supporting loan forgiveness of those at organizations determined to have a substantial illegal purpose. | Not quantified. | |
| Deterrence of activities with a substantial illegal purpose done by non-profit or governmental organizations. | Not quantified. | |

| Category | Costs | |
|---|---|---|
| | 3% | 7% |
| Costs of compliance with paperwork requirements ........................................................................ | $0.0 | $0.0 |
| Costs incurred by organizations to ensure compliance with regulations ..................................................... | Not quantified. | |
| Administrative costs to Federal Government to update systems and contracts to implement the regulations. | 0.3 | 0.4 |

| Category | Transfers | |
|---|---|---|
| | 3% | 7% |
| Increased transfers from borrowers to Federal Government due to reductions in borrowers achieving PSLF forgiveness. | −179 | −191 |

6. Alternatives Considered

In the interest of ensuring that these final regulations produce the best possible outcome, we considered a broad range of proposals from internal sources as well as from non-Federal negotiators and members of the public as part of the negotiated rulemaking process. However, the ideas presented during negotiated rulemaking largely mirrored the suggestions that the Department received in public comments. As discussed throughout the preamble and accompanying the discussion of each proposed regulatory provision, the Department believes the final rule will prevent taxpayer-funded PSLF benefits from being improperly provided to individuals who are employed by organizations that engage in activities such that it has a substantial illegal purpose, improve the integrity of the PSLF program, and provide protection for taxpayers.

Among some of the key themes discussed was the establishment of standards anchored in objective, evidenced-based findings. This final rule clarifies definitions of qualifying employers and provides a clear standard of determination. This rule makes clear that employer disqualification requires the Department to find that an employer has engaged in activities such that they have a substantial illegal purpose by a preponderance of the evidence after weighing the employer's illegal conduct, narrowly focusing on only the illegal conduct enumerated in the rule. Commenters also sought to broaden or clarify which entities qualify as "public

service organizations", particularly in edge cases such as nonprofit contractors, hybrid organizations, and religious nonprofits. The Department has carefully considered these requests but remains bound by the statutory language defining a "public service organization". The Department believes this final rule preserves flexibility to recognize a wide range of nonprofit and governmental employers while ensuring that the core purposes of the PSLF program are preserved.

7. Regulatory Flexibility Act

The Secretary certifies, under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), that this final regulatory action will not have a significant economic impact on a substantial number of "small entities." For the purposes of this certification, the Department of Education defines small entities to include: (1) nonprofit organizations that are independently owned and operated and not dominant in their field, as defined in 5 U.S.C. 601(4); and (2) local educational agencies (LEAs), school districts, or local governments serving populations of fewer than 50,000, consistent with 5 U.S.C. 601(5). For-profit companies, of any size, are not eligible as qualifying employers under PSLF, and therefore small businesses are not included here as small entities.

This regulatory action does not impose new reporting requirements or compliance burdens on these entities. Any potential effects are minimal, indirect, or result from voluntary participation in a Federal program.

Therefore, the Department concludes that this rule will not have a significant economic impact on a substantial number of small entities, in accordance with 5 U.S.C. 605(b).

These regulations are focused on arrangements between the borrower and the Department. As noted in the *Paperwork Reduction Act* section, the burden related to the final regulations will be assessed in a separate information collection process.

8. Analysis of Public Comments and Changes

*Comments:* Several commenters expressed concern that the Department's RIA did not adequately account for the administrative and compliance costs borne by nonprofit organizations, hospitals, schools, and government employers involved in certifying employment for PSLF.

Commenters, including Counsel for Justice and Candidly, asserted that the Department's cost estimates ($1.5–3 million) underestimate the true burden of annual employment verification, staff training, and data management. They further suggested that the Department's approach diverges from prior economic analyses and omits recurring employer costs. Two anonymous commenters referenced specific sections of the RIA (*Discussion of Costs and Benefits* and *Methodology for Budgetary Impact*) to argue that the Department provided insufficient empirical support for its assumptions and did not identify data sources or methodologies to substantiate employer compliance estimates.

ED_02496

*Discussion:* The Department disagrees. The RIA provides reasonable and appropriate cost estimates. Although some employers may need to make administrative adjustments, those costs are outweighed by the benefits strengthening integrity and transparency that protects borrowers and safeguards taxpayer investment. This rule delivers certainty and strengthens oversight within the PSLF program. The Department is committed to fair implementation that protects both the public servants who rely on PSLF and the taxpayers who fund it.

Following the discussion of costs to borrowers and the Federal Government, the Department also considered potential administrative and compliance costs that may be incurred by employers participating in the PSLF program.

Several commenters asserted that the Department's analysis did not fully account for the administrative and compliance costs that nonprofit organizations, hospitals, schools, and government employers may face in assisting borrowers with PSLF employment certification. Commenters referenced the *Discussion of Costs and Benefits* and *Methodology for Budgetary Impact* sections of the proposed rule and suggested that the Department's estimated costs ($1.5–3 million) understated the true administrative workload associated with employment verification and recordkeeping. In response, the Department carefully reviewed the assumptions underlying its cost estimates and continues to find them reasonable and consistent with both prior rulemakings and current operational practices. The Department's methodology incorporates existing reporting obligations and employer processes already used to certify employment under PSLF and therefore reflects only incremental administrative costs directly attributable to this rule. Although commenters expressed general concern regarding compliance burdens, the Department did not receive quantitative data or supporting documentation sufficient to revise its estimates.

The Department concludes that any incremental employer burden associated with this final rule is expected to be minimal and does not represent a significant economic impact on small entities or affected sectors. As a result, no changes have been made to the RIA based on these comments.

*Changes:* None.

*Comments:* A recurring theme was concern that additional administrative burden and uncertainty may deter professionals from entering or remaining in public service roles.

Commenters stressed that PSLF was designed to attract and retain public service workers, and that overly complex or costly rules could undermine this purpose.

*Discussion:* The Department does not agree with this claim. This final rule strengthens the PSLF program by clarifying eligibility standards and improving transparency so that borrowers and employers understand how the program is administered. These improvements give public service professionals greater confidence to remain in qualifying employment. The PSLF program must be reliable. Borrowers need certainty, and taxpayers require accountability. This rule supports both by keeping the program focused on rewarding lawful public service, consistent with the statute.

*Changes:* None.

*Comments:* A smaller number of commenters noted broader ripple effects if participation in PSLF declines. They suggested that reduced forgiveness would leave borrowers with higher debt burdens and less disposable income, limiting their ability to purchase homes, invest locally, or support their communities. Others argued that attrition in public service roles could weaken schools, healthcare providers, and local governments.

*Discussion:* The Department does not agree with the assertion that this rule will have a significant adverse impact on the economy. Rather, the rule enhances the PSLF program by restoring clarity and consistency in its administration. Borrowers will gain increased confidence in the program, which supports long-term participation in public service employment. This stability helps retain skilled professionals in critical service roles and ensures that PSLF benefits continue to reach those engaged in lawful public service. The rule advances the Department's goal of ensuring responsible use of taxpayer funds.

*Changes:* None.

*Comments:* Commenters highlighted that small nonprofits, community health centers, and local government units lack the infrastructure to absorb compliance costs at the same level as large institutions. They argued that the Department's cost analysis treated all employers uniformly, failing to recognize the disproportionate impact on small entities that operate with limited budgets and staff. These groups feared that compliance requirements could force them to reduce services or reconsider participation in the PSLF program altogether.

*Discussion:* The Department acknowledges that small nonprofits, community health centers, and local government units often operate with limited budgets and have a difficult time with regulatory compliance. However, the Department rejects the claim that this rule imposes disproportionate burdens as the rule does not add new legal requirements. Rather, the rule creates new consequences for failing to abide by existing law. The RIA already accounts for compliance adjustments across a wide range of employer types, and the requirements are narrowly tailored to ensure accountability without excessive paperwork. This rule does not create unnecessary red tape. It creates clarity, consistency, and fairness so borrowers know that only public service will be counted to ensure that taxpayer resources are protected. Accountability applies to all entities receiving the benefit of Federal loan forgiveness.

*Changes:* None.

*Comments:* Some commenters argued that beyond administrative costs, the Department did not fully consider how compliance demands could reduce organizational capacity to deliver essential services. For example, schools and hospitals could be forced to reallocate staff from direct service roles to compliance functions, potentially reducing classroom instruction or patient care. Commenters warned that these indirect costs may be more damaging than direct compliance expenses.

*Discussion:* The Department acknowledges that some organizations that are breaking the law will need to significantly change their existing compliance practices if they want to come into compliance with the rule. However, even in those circumstances, the Department does not believe that compliance requirements will weaken schools, hospitals, or other public service employers. If these organizations are not following the law, they have an independent reason outside of the PSLF program to spend necessary funds to stop violating the law. This final rule is designed to strengthen confidence in the PSLF program, not siphon resources away from public service providers. This rule's administrative safeguards are straightforward, proportional, and necessary to ensure that Federal benefits are delivered only to borrowers working for organizations engaged in lawful activities.

*Changes:* None.

*Comments:* A subset of commenters cautioned that the cumulative effect of compliance costs, administrative risk, and uncertainty could discourage some employers from participating in PSLF at all. They argued that, if organizations

perceive the program as unpredictable or too resource-intensive, they may avoid advertising PSLF benefits to employees or disengage entirely. They argue this would directly undermine the program's intended purpose of expanding access to public service careers.

*Discussion:* The Department acknowledges that some employers may no longer wish to participate in the program or may cease advertising to employees and prospective employees about how working for the organization could lead to PSLF forgiveness. At the same time, employers that voluntarily cease participation in PSLF may do so because they are engaging in activities with a substantial illegal purpose. In these circumstances, the Department believes that voluntary withdrawal is appropriate. Other employers who do not engage in activities with a substantial illegal purpose may also withdraw from PSLF participation. The Department believes that any risks associated with withdrawal by employers who would be eligible is outweighed by the benefits of enhanced integrity to the PSLF program that come from the rule. This final rule ensures all qualified employers are treated consistently, strengthens trust in the program, and makes PSLF a more accountable and transparent program.

*Changes:* None.

*Comments:* A few commenters expressed concern that the cost estimate included in the RIA was unsubstantial or otherwise in conflict with the Department's assertions with respect to the final rule's impact. They also argued that assertions regarding streamlining the PSLF process and anticipated growth in public service recruitment and retention contradicted the Department's projected savings under the rule, and requested the Department reconcile these conflicts.

*Discussion:* The Department acknowledges commenters' concerns regarding the conflict between projected savings under the final rule and anticipated growth in public service employment and made changes to address the inconsistency by reducing the Department's assumption about the anticipated growth in public service employment through the final rule.

*Changes:* Amended preamble language in the RIA section.

### Paperwork Reduction Act

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Section 685.219(i) of these regulatory changes will require an update to the currently approved Public Service Loan Forgiveness Certification and Application, OMB #1845–0110 (PSLF Form). The Department will amend the PSLF form to include the ability for a qualifying employer to certify that it has not engaged in activity that has a substantial illegal purpose. The burden on this information collection will not significantly change for the borrower to complete the form. This form update will be completed and made available for comment through a full public clearance package before being made available for use by the effective date of the regulations. Any burden changes will be assessed to OMB #1845–0110, Public Service Loan Forgiveness Certification and Application. The amendments to the regulation do not significantly change the estimated number of respondents or responses for individuals in this collection. The Department estimates that there will be a nominal change in the number of borrowers completing the PSLF Form. The Department expects that borrowers who currently work for non-qualifying employers will likely submit a form to either switch employers or because they are uncertain about their employer's eligibility status.

Section 685.219(j) of the final regulation will allow an employer to re-establish eligibility for PSLF if the Secretary approves a corrective action plan. The Department believes that, annually, there will be less than ten employers responding to the Department's notice of an initiated action and/or seeking approval of a corrective action plan. No additional burden has been assessed based on this final rule as the anticipated number of annual respondents falls below ten, which is the minimum required for OMB approval of an information collection.

A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with or is subject to a penalty for failure to comply with a collection of information if the collection instrument does not display a currently valid OMB control number.

### Analysis of Public Comments & Changes

*Comments:* Several commenters argued that the proposed requirements could trigger additional reporting and documentation obligations that may not comply with the PRA. They emphasized that duplicative or unclear reporting burdens would impose unnecessary strain on organizations and potentially violate statutory limits. Commenters asked the Department to explicitly evaluate and minimize any new paperwork requirements.

*Discussion:* The Department acknowledges the importance of the PRA and will comply fully with its requirements. However, the claim that this final rule creates duplicative or unlawful reporting burdens is misplaced. The rule does not impose unnecessary or redundant reporting obligations. It aligns PSLF program documentation with existing Federal and State oversight systems and streamlines requirements where possible to avoid duplication. The Department is committed to minimizing burden while preserving accountability. The Department's commitment to promoting sound financial stewardship of government programs, including the PSLF program, while alleviating unnecessary regulatory burdens, is informed in part by President Trump's Executive Order on *Unleashing Prosperity Through Deregulation* (Jan. 31, 2025). PRA review will ensure that any reporting is necessary, clear, and efficient. Borrowers and taxpayers alike deserve a program that is transparent, fair, and protects Federal investment. The Department will enforce the law firmly, while making sure compliance is efficient, lawful, and aligned with statutory obligations.

*Changes:* None.

### Intergovernmental Review

This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of Executive Order 12372 is to foster an intergovernmental partnership and strengthen Federalism. The Executive Order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for this program.

**Federalism**

Executive Order 13132 requires us to provide meaningful and timely input by State and local elected officials in the development of regulatory policies that have Federalism implications. ''Federalism implications'' means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The regulations do not have Federalism implications.

*Accessible Format:* On request to the program contact person(s) listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or another accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov* where you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 685*

Administrative practice and procedure, Colleges and universities, Education, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

**Nicholas Kent,**
*Under Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education amends part 685 of title 34 of the Code of Federal Regulations as follows:

**PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM**

■ 1. The authority citation for part 685 is revised to read as follows:

**Authority:** 20 U.S.C. 1070g, 1087a, *et seq.,* unless otherwise noted.

■ 2. Amend § 685.219 by:
■ a. Adding paragraphs (b)(1) through (b)(35);
■ b. Revising paragraphs (c)(2)introductory text and(c)(4); and
■ c. Adding paragraphs(e)(9) and (10),(g)(7), and (h) through (k).

The additions and revisions read as follows:

**§ 685.219   Public Service Loan Forgiveness Program (PSLF).**

\*      \*      \*      \*      \*

(b) \* \* \*

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

(2) *AmeriCorps service* means service in a position approved by the Corporation for National and Community Service under section 123 of the National and Community Service Act of 1990 (42 U.S.C. 12573).

(3) *Chemical castration or mutilation* means:

(i) The use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

(ii) The use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

(4) *Child or children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

(5) *Civilian service to the military* means providing services to or on behalf of members, veterans, or the families or survivors of deceased members of the U.S. Armed Forces or the National Guard that is provided to a person because of the person's status in one of those groups.

(6) *Early childhood education program* means an early childhood education program as defined in section 103(8) of the Act (20 U.S.C. 1003).

(7) *Eligible Direct Loan* means a Direct Subsidized Loan, a Direct Unsubsidized Loan, a Direct PLUS Loan, or a Direct Consolidation Loan.

(8) *Emergency management* means services that help remediate, lessen, or eliminate the effects or potential effects of emergencies that threaten human life or health, or real property.

(9) *Employee or employed* means an individual:

(i) To whom an organization issues an IRS Form W–2;

(ii) Who receives an IRS Form W–2 from an organization that has contracted with a qualifying employer to provide payroll or similar services for the qualifying employer, and which provides the Form W–2 under that contract;

(iii) who works as a contracted employee for a qualifying employer in a position or providing services which, under applicable State law, cannot be filled or provided by a direct employee of the qualifying employer.

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

(11) *Full-time* means:

(i) Working in qualifying employment in one or more jobs—

(A) A minimum average of 30 hours per week during the period being certified,

(B) A minimum of 30 hours per week throughout a contractual or employment period of at least 8 months in a 12-month period, such as elementary and secondary school teachers and professors and instructors, in higher education, in which case the borrower is deemed to have worked full time; or

(C) The equivalent of 30 hours per week as determined by multiplying each credit or contact hour taught per week by at least 3.35 in non-tenure track employment at an institution of higher education.

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

(13) *Law enforcement* means service that is publicly funded and whose principal activities pertain to crime prevention, control or reduction of crime, or the enforcement of criminal law.

(14) *Military service* means ''active duty'' service or ''full-time National Guard duty'' as defined in section 101(d)(1) and (d)(5) of title 10 in the United States Code and does not include active duty for training or attendance at a service school.

(15) *Non-governmental public service* means services provided by employees of a non-governmental qualified employer where the employer has devoted a majority of its full-time equivalent employees to working in at

least one of the following areas (as defined in this section): emergency management, civilian service to military personnel, military service, public safety, law enforcement, public interest law services, early childhood education, public service for individuals with disabilities or the elderly, public health, public education, public library services, school library, or other school-based services. Service as a member of the U.S. Congress is not qualifying public service employment for purposes of this section.

(16) *Non-tenure track employment* means work performed by adjunct, contingent or part time faculty, teachers, or lecturers who are paid based on the credit hours they teach at institutions of higher education.

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

(18) *Other school-based services* mean the provision of services to schools or students in a school or a school-like setting that are not public education services, such as school health services and school nurse services, social work services in schools, and parent counseling and training.

(19) *Peace Corps position* means a full-time assignment under the Peace Corps Act as provided for under 22 U.S.C. 2504.

(20) *Public education service* means the provision of educational enrichment or support to students in a public school or a public school-like setting, including teaching.

(21) *Public health* means those engaged in the following occupations (as those terms are defined by the Bureau of Labor Statistics): physicians, nurse practitioners, nurses in a clinical setting, health care practitioners, health care support, counselors, social workers, and other community and social service specialists.

(22) *Public interest law* means legal services that are funded in whole or in part by a local, State, Federal, or Tribal government.

(23) *Public library service* means the operation of public libraries or services that support their operation.

(24) *Public safety service* means services that seek to prevent the need for emergency management services.

(25) *Public service for individuals with disabilities* means services performed for or to assist individuals with disabilities (as defined in the Americans with Disabilities Act (42 U.S.C. 12102)) that is provided to a person because of the person's status as an individual with a disability.

(26) *Public service for the elderly* means services that are provided to individuals who are aged 62 years or older and that are provided to a person because of the person's status as an individual of that age.

(27) *Qualifying employer* means:

(i)(A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

(B) A public child or family service agency;

(C) An organization under Section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under Section 501(a) of the Internal Revenue Code;

(D) A Tribal college or university; or

(E) A nonprofit organization that—

(1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(2) Is not a business organized for profit, a labor union, or a partisan political organization; and

(ii) Does not include organizations that engage in activities such that they have a substantial illegal purpose, as defined in this section.

(28) *Qualifying repayment plan* means:

(i) An income-driven repayment plan under § 685.209;

(ii) The 10-year standard repayment plan under § 685.208(b) or the consolidation loan standard repayment plan with a 10-year repayment term under § 685.208(c); or

(iii) Except for the alternative repayment plan, any other repayment plan if the monthly payment amount is not less than what will have been paid under the 10-year standard repayment plan under § 685.208(b).

(29) *School library services* mean the operations of school libraries or services that support their operation.

(30) *Substantial illegal purpose* means:

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) Supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;

(v) Engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) Engaging in a pattern of violating State laws as defined in paragraph (b)(34) of this section.

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

(32) *Terrorism* is defined under 18 U.S.C. 2331.

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

(34) *Violating State law* means a final, non-default judgment by a State court of:

(i) Trespassing;

(ii) Disorderly conduct;

(iii) Public nuisance;

(iv) Vandalism; or

(v) Obstruction of highways.

(35) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) * * *

(2) Except as provided in paragraph (c)(4) of this section, a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

* * * * *

(4) Effective on or after July 1, 2026, through a standard as described in paragraph (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities enumerated in paragraph (b)(30) such that it has a substantial illegal purpose, as described in this section.

* * * * *

(e) * * *

(9) If the Secretary has notified the borrower's employer that the employer may no longer satisfy the definition of qualifying employer set forth in paragraph (b)(28) of this section, pending a determination made under paragraph (h) of this section, the Secretary notifies the borrower of the potential change in the employer's status.

ED_02500

**49002**    **Federal Register** / Vol. 90, No. 209 / Friday, October 31, 2025 / Rules and Regulations

(10) If the Secretary has determined the borrower's employer has ceased to be a qualifying employer as a result of a determination made under paragraph(h) of this section, the Secretary notifies the borrower of the change in the employer's status.

\*    \*    \*    \*    \*

(g) \* \* \*

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this paragraph (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in paragraph (h) of this section.

(h) *Standard for determining whether a qualifying employer has a substantial illegal purpose.*

(1) The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond (which is referred to as the "employer reconsideration process"), that a qualifying employer has engaged on or after July 1, 2026, in illegal activities such that it has a substantial illegal purpose by considering the materiality of any illegal activities or actions as described in paragraph (b)(30) of this section. In making such a determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities enumerated in paragraph (b)(30):

(i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in illegal activities that have a substantial illegal purpose;

(ii) A plea of guilty or *nolo contendere,* whereby the employer admits to have engaged in illegal activities that have a substantial illegal

purpose or pleads *nolo contendere* to allegations that the employer engaged in illegal activities that have substantial illegal purpose; or

(iii) A settlement that includes admission by the employer that it engaged in illegal activities that have a substantial illegal purpose described in paragraph (h) of this section.

(2) Nothing in this paragraph (h)(2)shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution.

(i) *Process for determining when a qualifying employer engaged in activities such that it has a substantial illegal purpose.*

(1) The Secretary will determine that a qualifying employer violated the standard under paragraph (h) of this section when the Secretary:

(i) Receives an application as referenced under paragraph (e) of this section in which the employer fails to certify that it did not participate in activities that have a substantial illegal purpose; or

(ii) Determines that the qualifying employer engaged in activities such that it has a substantial illegal purpose under paragraph (h) of this section, unless, prior to the issuance of the Secretary's determination, the Secretary includes the factors set forth in paragraph (j)(2) of this section.

(2) Notwithstanding paragraph (i)(1) of this section, the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if the employer is operating separately and distinctly, for the purposes of determining whether an employer is eligible.

(j) *Regaining eligibility as a qualifying employer.* An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after—

(1) 10 years from the date the Secretary determines the organization engaged in activities such that it has a substantial illegal purpose in accordance with paragraph (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes—

(i) a certification by the employer that it is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a report describing the employer's compliance controls that are designed to ensure that the employer does not continue to engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

(k) *Borrower notification of regained eligibility.* If an employer regains eligibility under paragraph (j) of this section, the Secretary shall update the qualifying employer list, which is accessible to borrowers for purposes of certification or application.

[FR Doc. 2025–19729 Filed 10–29–25; 8:45 am]

**BILLING CODE 4000–01–P**

ED_02501

PRESIDENTIAL ACTIONS

Restoring Public Service Loan Forgiveness

The White House

March 7, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  In 2007, the Congress established the Public Service Loan Forgiveness (PSLF) Program to encourage Americans to enter the public service sector by promising to forgive their remaining student loans after they completed 10 years of service in those jobs while making 10 years of minimum payments.

The prior administration abused the PSLF Program through a waiver process, using taxpayer funds to pay off loans for employees still years away from the statutorily required number of payments.  Moreover, instead of alleviating worker shortages in necessary occupations, the PSLF Program has misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values, sometimes through criminal means.  The PSLF Program also creates perverse incentives that can increase the cost of tuition, can load students in low-need majors with unsustainable debt, and may push students into organizations that hide under the umbrella of a non-profit designation and degrade our national interest, thus requiring additional Federal funding to correct the negative societal effects caused by these organizations' federally subsidized wrongdoing.

As President of the United States, I have a duty to protect, preserve, and defend the Constitution and our national security, which includes ending the subsidization of illegal

ED_02502

activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and disruption of the public order, which threaten the security and stability of the United States.  Accordingly, it is the policy of my Administration that individuals employed by organizations whose activities have a substantial illegal purpose shall not be eligible for public service loan forgiveness.

Sec. 2.  Restoring Public Service Loan Forgiveness.  The Secretary of Education shall propose revisions to 34 C.F.R. 685.219, Public Service Loan Forgiveness Program, in coordination with the Secretary of the Treasury as appropriate, that ensure the definition of "public service" excludes organizations that engage in activities that have a substantial illegal purpose, including:

(a)  aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(b)  supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(c)  child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law;

(d)  engaging in a pattern of aiding and abetting illegal discrimination; or

(e)  engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States,

ED_02503

its departments, agencies, or entities, its officers, employees, or agents, or any other person.





Subscribe to The White House newsletter

| Your email | SIGN UP |
|---|---|

Text POTUS to 45470 to receive updates

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS

THE WHITE HOUSE

ED_02504

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy



ED_02505

**Discussion Draft as of 06-23-25 for Committee Use Only**

**Issue:** Restoring Public Service Loan Forgiveness (PSLF) Program

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue**

Illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and the disruption of the public order are a threat to our national security and to the social and economic stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct.

Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out her duties under Title IV of the HEA. *See, e.g.,* 20 U.S.C. 1221e-3, ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"); *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

Additionally, on March 7, 2025, President Trump signed Executive Order (E.O.) 14235, Restoring Public Service Loan Forgiveness directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the Public Service Loan Forgiveness (PSLF) Program excludes organizations that engage in activities that have a substantial illegal purpose.

Thus, in order to prevent taxpayer-funded PSLF benefits from being improperly paid to individuals who are employed by organizations that are not providing public service and are in fact, engaged in activities that are a threat to the public, the Secretary is proposing regulations that would exclude from the group of PSLF qualifying employers, any organizations that engage in activities that have a substantial illegal purpose.

**Background**

Section 455(m) of the Higher Education Act of 1965, as amended, established the PSLF Program under which the Secretary cancels outstanding balances on *Eligible Direct Loans* for borrowers who are employed *full-time* in a *public service job* after they make 120 monthly payments under a *qualifying repayment plan.*

Except for the term, *public service job*, which is defined by statute at 20 U.S.C. 1087e(m)(3), the italicized terms above are specifically defined in the current regulations at 34 CFR 685.219(b).

The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by cancelling the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of the regulations at 34 CFR 685.219.

Page **1** of **8**

ED_02506

As of December 2024, over a million borrowers have received PSLF.  This amount includes over 700,000 borrowers who received limited waiver discharges that the prior Administration used taxpayer funds to pay off the loan balances of borrowers who did not make the minimum 120 monthly payments required by the statute.

**Proposal**

The Secretary proposes to amend the PSLF regulations to ensure that the definition of *qualifying employer* excludes organizations that engage in activities that have a substantial illegal purpose.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

**1. Revise the definition of a *Qualifying Employer* –** The Department proposes to revise the definition of *qualifying employer* to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers.

**2. Define activities that have a *substantial illegal purpose* –** The Department proposes to define specific activities as having a substantial illegal purpose. By providing clear definitions for determining whether an organization is not a qualifying employer under the PSLF Program, the Department would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer. To the extent possible, the Department proposes to adopt definitions that are already established in federal or state law. The Department proposes adding definitions for: "aiding or abetting"; "other Federal immigration laws"; "terrorism"; "Foreign Terrorist Organizations"; "chemical castration or mutilation"; "surgical castration or mutilation"; "illegal discrimination"; and "violating state tort laws".

**3. Establish when a qualifying employer has engaged in activities that have a *substantial illegal purpose* –** The Department proposes to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have a substantial illegal purpose and therefore no longer qualifies as a *qualifying employer* for the purposes of PSLF.

**4. Address the impact on a borrower's eligibility for cancellation under the PSLF Program –** The Department proposes that, effective on or after July 1, 2026, and based on an evidentiary standard as defined in the proposed regulations, no payment by the borrower for any month the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose would count toward the borrower's eligibility for cancellation under PSLF.

**5. Give employers the opportunity for notice and the ability to respond –** The Department proposes to provide notice to employers and the ability to respond to any Department findings relating to whether the employer has engaged in an activity that has a substantial illegal purpose. A final judgment by a state or federal court, plea of guilty or *nolo contendere*, or settlement that includes admission by the organization that it engaged in activities that have a

Page **2** of **8**

ED_02507

substantial illegal purpose would constitute conclusive evidence of engaging in activities that have a substantial illegal purpose. This process ensures that employers have the ability to challenge and present evidence prior to the Department making a final decision.

**Proposed amendatory text in redlines to represent additions and edits and paragraph restructuring in new paragraph (b):**

**34 CFR § 685.219 – Public Service Loan Forgiveness**

\* \* \*

(b) *Definitions.* The following definitions apply to this section:

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

\* \* \*

(2) *AmeriCorps service…*

\* \* \*

(3) *Chemical castration or mutilation* means -

(i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

(ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

\* \* \*

(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

\* \* \*

(5) *Civilian service to the military…*

\* \* \*

(6) *Early childhood education program…*

\* \* \*

(7) *Eligible Direct Loan…*

\* \* \*

ED_02508

(8) *Emergency management...*

\* \* \*

(9) *Employee or employed...*

\* \* \*

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

\* \* \*

(11) *Full-time...*

\* \* \*

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

\* \* \*

(13) *Law enforcement...*

\* \* \*

(14) *Military service...*

\* \* \*

(15*) Non-governmental public service...*

\* \* \*

(16)  *Non-tenure track employment...*

\* \* \*

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*).

\* \* \*

(18)  *Other school-based service...*

\* \* \*

ED_02509

(19) *Peace Corps position...*

\* \* \*

(20) *Public education service...*

\* \* \*

(21) *Public health...*

\* \* \*

(22) *Public interest law...*

\* \* \*

(23) *Public library service...*

\* \* \*

(24) *Public safety service...*

\* \* \*

(25) *Public service for individuals with disabilities...*

\* \* \*

(26) *Public service for the elderly...*

\* \* \*

(27) *Qualifying employer* means:

(i)

(A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

(iiB) A public child or family service agency;

(iiiC) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

(ivD) A Tribal college or university; or

(vE) A nonprofit organization that—

Page **5** of **8**

ED_02510

(~~A~~1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(~~B~~2) Is not a business organized for profit, a labor union, or a partisan political organization~~.~~; and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

\* \* \*

(28) *Qualifying repayment plan…*

\* \* \*

(29) *School library services…*

\* \* \*

(30) *Substantial illegal purpose* means –

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children or the trafficking of children to states for purposes of emancipation from their lawful parents, in violation of applicable law;

(iv) engaging in a pattern of aiding and abetting illegal discrimination; or

(v) engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

\* \* \*

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

\* \* \*

Page **6** of **8**

ED_02511

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

* * *

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

* * *

(34) *Violating State tort law* means a final, non-default judgment by a State court of:

       (i) trespassing;

       (ii) disorderly conduct;

       (iii) public nuisance;

       (iv) vandalism; or

       (v) obstruction of highways.

* * *

(35) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

* * *

       (2) Except as provided in paragraph (c)(4) of this section, ~~A~~ a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

* * *

       (4) Effective on or after July 1, 2026, through a standard as described in paragraph (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

* * *

(g) <u>*Borrower* ~~R~~<u>r</u>*econsideration process.*</u>

ED_02512

\* \* \*

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this paragraph (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in paragraph (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

(1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

(2) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

(3) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

(i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose.* The Secretary will determine that a qualifying employer violated the standard under paragraph (h) of this section when the Secretary:

(1) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose; or

(2) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h).

ED_02513

**2025 Negotiated Rulemaking Public Service Loan Forgiveness Committee**

**Session 1, June 30 – July 2, 2025**
**Agenda**

**June 30, 2025**

  I.    Welcome
 II.    Introductions of Federal Team
III.    Opening Remarks – Deputy Under Secretary, James Bergeron
 IV.    Introduction of Non-Federal Negotiators and Overview of the Negotiated Rulemaking Process
  V.    Overview of Executive Order, Restoring Public Service Loan Forgiveness (E.O. 14235), published March 7, 2025 – Deputy Assistant Secretary, Jeffrey Andrade
 VI.    Lunch Break
VII.    Review of Issue Paper and Discussion on Proposed Restructuring of Definitions under § 685.219(b)
VIII.   Discussion on Proposed Amendatory Text to Qualifying Employer under § 685.219(b)(27), and Substantial Illegal Purpose under § 685.219(b)(30)
 IX.    Wrap Up and Questions
  X.    Public Comment

**July 1, 2025**

  I.    Welcome
 II.    Old Business
III.    Review and Discussion of Proposed Amendatory Text under § 685.219(b)(30), (b)(30)(i), (b)(1), (b)(17), (b)(30)(ii), (b)(32), (b)(10), (b)(35), (b)(30)(iii), (b)(4), (b)(3), (b)(31), (b)(33), (b)(30)(iv), (b)(12), (b)(30)(v), and (b)(34) (in order of discussion)
 IV.    Lunch Break
  V.    Review and Discussion of Proposed Amendatory Text under § 685.219(c), (h), and (i)
 VI.    Public Comment

**July 2, 2025**

  I.    Welcome
 II.    Old Business
III.    Review and Discussion of Proposed Amendatory Text under

ED_02514

§ 685.219(g)
 IV.    Lunch Break
 V.    Review and Discussion of Proposed Amendatory Text
 VI.    Final Consensus Check
 VII.    Closing Remarks

2

ED_02515

## 2025 Negotiated Rulemaking
## Public Service Loan Forgiveness
## June 30 – July 2, 2025

**Facilitator (non-voting)**

Facilitator:        Annmarie Weisman, Department of Education

**Non-Federal Negotiators**

**Civil Rights Organizations, Consumer Advocates, and Legal Assistance Organizations that Represent Students and/or Borrowers**

Primary:        Betsy Mayotte, The Institute of Student Loan Advisors

Alternate:        Abby Shafroth, Student Loan Borrower Assistance Project

**Federal Family Education Loan Leaders and/or Guaranty Agencies**

Primary:        Scott Buchanan, Student Loan Servicing Alliance

Alternate:        Alex Ricci, National Council of Higher Education Resources

**Financial Aid Administrators at Postsecondary Institutions**

Primary:        Alyssa Dobson, Slippery Rock University

Alternate:        Helen Faith, University of Virginia

**Organizations Representing Taxpayers and the Public Interest**

Primary:        Thomas John Aiello, National Taxpayers Union

Alternate:        Laurel Taylor, Candidly

**Private Nonprofit Institutions of Higher Education Including Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority-Serving Institutions (Institutions of Higher Education Eligible to Receive Federal Assistance Under Title III, Parts A and F, and Title V of the HEA)**

Primary:        C. Todd Jones, Association of Independent Colleges and Universities of Ohio

Alternate:        Heather Boutell, Vanderbilt University

**Proprietary Institutions of Higher Education**

Primary:        Mary Lyn Hammer, Champion College Solutions

Alternate:        April Boyd, The College of Health Care Professionals

Finalized 6/25/2025

ED_02516

**Public Institutions of Higher Education, Including Historically Black Colleges and Universities, Tribal Colleges and Universities, and Minority-Serving Institutions (Institutions of Higher Education Eligible to Receive Federal Assistance Under Title III, Parts A and F, and Title V of the HEA)**

Primary:          Tracy A. Ireland, The Board of Regents of the University System of Georgia

Alternate:        Kaity McNeill, The University of North Carolina System Office

**State Officials, Including State Higher Education Executive Officers, State Authorizing Agencies and State Attorneys General**

Primary:          Rebecca Stanley, Fifteenth Judicial Circuit Solicitor's Office

Alternate:        J. Charles Smith III, Frederick County State's Attorney's Office

**Student Loan Borrowers in Repayment**

Primary:          Emeka Oguh, PeopleJoy

Alternate:        Sarah Doran, St. Vrain Valley Schools

**U.S. Military Service Members, Veterans, or Groups Representing Them**

Primary:          Robert H. Carey, Jr., National Defense Committee

Alternate:        Faisal Sulman, Student Veterans of America (SVA)


## Federal Negotiator

Negotiator:    Tamy Abernathy, Department of Education


## Office of General Counsel (non-voting)

OGC:              Jacob Lallo, Office of General Counsel

ED_02517

# 2025 Negotiated Rulemaking Public Service Loan Forgiveness Committee

# Protocols

## I.    Mission Statement

The U.S. Department of Education has established this negotiated rulemaking committee to develop proposed student financial assistance regulations pursuant to Sec. 492 of the Higher Education Act of 1965, as amended (HEA).

## II.    Participation

- The committee consists of the following:

    - U.S. Department of Education Federal negotiator
    - Office of General Counsel (non-voting) legal counsel
    - Non-federal primary and alternate negotiators
    - Facilitator (non-voting)

- The primary negotiators and the Federal negotiator will participate for the purpose of negotiating the terms of proposed regulations. The alternate negotiator will only participate as a negotiator in the absence of the primary negotiator or if the primary negotiator decides to have the alternate negotiator speak for the constituency on a particular topic area, as identified in the meeting agenda. Other negotiators on the committee may not serve as a proxy in the absence of the primary and the alternate negotiator for a constituency.

- By agreeing to serve on the committee, members consent to the Department's selection of the facilitator and these Committee protocols.

## III.    Meeting Facilitation

- The facilitator will help to ensure negotiations run smoothly by developing the meeting, agenda, preparing and distributing a record of agreements, and helping parties find areas of agreement and resolve differences. The facilitator will be available to facilitate full committee meetings and any caucuses.

ED_02518

IV.    **Committee Membership**

- The committee may approve additional members if no primary member of the committee objects. All requests to add members must be made no later than the morning of the first day and must include a rationale for consideration by the committee. If the committee agrees to add new members, they must be available to participate immediately upon addition.

- The Department may remove any member or alternate who ceases to be employed by or associated with the community of interests that individual was chosen to represent.

V.    **Decision Making**

- The committee will operate by consensus, which means there must be no dissent by any member for the committee, to be considered that the committee has reached agreement. Members should not block or withhold consensus unless they have substantive reservations about what is proposed. Abstaining will be equivalent to not dissenting.

- All agreements reached during the negotiations will be assumed to be tentative until the call for final agreement on the proposed regulatory language. Committee members may not withdraw their agreement once consensus is achieved.

VI.    **Agreement**

- The goal of the committee is to develop proposed regulations.

- If the committee reaches consensus on the proposed regulations, the Department will use this agreed-upon language in its Notice of Proposed Rulemaking (NPRM), unless the Department reopens the negotiated rulemaking process or provides a written explanation to the negotiators regarding why it has decided to depart from that language. That written explanation will contain a statement of the reasons for altering the consensus-based language, and this statement will be provided to the negotiators in advance of the publication of the proposed regulations. The Department will also identity any changes made after consensus in the preamble to the NPRM, and negotiators are free to comment positively or negatively.

2

ED_02519

- Committee members agree if the committee reaches consensus and the Department uses that proposed language, neither they, their employers, or their sponsoring organization (if applicable) will comment negatively on the NPRM.

- If the committee is unable to reach consensus, the Department may proceed with rulemaking using its own draft language, though it may choose to incorporate elements from topics discussed by the committee.

**VII.    Committee Meetings**

- The Department will maintain a record of tentative and final agreements reached during the negotiation process, as well as any discussions that should be included in the preamble language of the NPRM. Transcriptions and videos of the sessions will be published on the website as soon as they are available.

- The Department will make reasonable efforts to distribute materials to committee members in a timely fashion. Negotiators are encouraged to obtain feedback on the materials from their communities of interest.

- All discussions during negotiations must be presented thoughtfully and respectfully. The facilitator will work to maintain decorum at all times.

- The Department will develop and will work with the facilitator on the final agenda.

- All committee meetings, but not caucuses, are open to the public and to the extent practicable, will also be livestreamed.

- Committee members shall remain fully engaged in the work of the committee and refrain from other activities during the time committee meetings are in session. Breaks will be provided with times announced by the facilitator.

- Negotiators may submit materials electronically to the Department for distribution to the committee, including research, proposals, and alternate regulatory text. Materials submitted to the Department will be shared with the entire committee and made publicly available.

3

ED_02520

## VIII.    Negotiation Process

- The facilitator will announce the topic(s). The first time a topic is discussed during each session, the Federal negotiator will provide an overview of the topic. A committee member who wishes to speak on that topic shall seek recognition in a manner prescribed by the facilitator. The facilitator will determine the order by which committee members speak. Committee members shall wait until called upon to speak and follow facilitator instructions.

- Only one committee member may speak at a time. Members will refrain from interrupting other committee members.

- When called on, a committee member will have up to three minutes to speak. A committee member who exceeds the time may be muted. The facilitator will remind the member when there are 30 seconds remaining. To preserve time for other topics, committee members should refrain from repeating previously-made points on a topic.

## IX.    Caucus Process

- Any primary committee member may call for a caucus, which generally consists of a subset of negotiators. A caucus stops the discussions of the committee.

- When a primary committee member calls for a caucus, the facilitator will collect the names of all committee members who will participate in the caucus.

- The primary committee member who called for the caucus shall state its purpose and request a specific amount of time expected for the caucus. Additional time may be granted at the discretion of the facilitator and the Federal negotiator and the facilitator will notify the other committee members of the extension. Negotiations resume when the caucus has ended.

- The Federal negotiator may limit the meeting length of a caucus to facilitate the orderly completion of the agenda. To maximize the actual committee time, caucuses should only be used to resolve differences currently being discussed.

4

ED_02521

## X.    Safeguards for Members

- Any member may withdraw from the negotiations at any time, without prejudice, by notifying the facilitator in writing.

- Any member whose employment changes during the negotiations will notify the facilitator of that change. The Department will determine if they are still an appropriate representative of the constituency for which they were selected.

- All members and the organizations they represent shall act in good faith in all aspects of these negotiations. Members should refrain from speaking disrespectfully of any member.

- Contact with the media, and other organizations outside the community of interest represented by the member will generally be limited to discussion of the overall objectives and progress of the negotiations. Committee shall not disclose any Material, Non-Public Information, such as discussions within caucuses, outside of the public committee discussions. Members shall refrain from characterizing the views, motives, and interests of other members regarding negotiated rulemaking during contact with the media, other organizations outside the community of interest represented by the member, and to the public.

## XI.    Public Comment

- The Department will reserve 30 minutes for public comment at the end of the day on Monday and Tuesday.

5

ED_02522

**2025 Negotiated Rulemaking Public Service Loan Forgiveness Committee**

**List of Links to Other Laws**

| TERM | AUTHORITY | HYPERLINK | OTHER |
|---|---|---|---|
| Aiding or abetting | 18 U.S.C. 2. | https://www.govinfo.gov/content/pkg/USCODE-2023-title18/pdf/USCODE-2023-title18-partI-chap1-sec2.pdf | |
| Foreign Terrorist Organizations | 8 U.S.C. 1189(a)(2)(A)(ii). | https://www.govinfo.gov/content/pkg/USCODE-2023-title8/pdf/USCODE-2023-title8-chap12-subchapII-partII-sec1189.pdf | List of foreign terrorist organizations designated by the State Department: https://www.state.gov/foreign-terrorist-organizations/ |
| Illegal discrimination | Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*) | Enacted through 12/10/2015: https://www.govinfo.gov/content/pkg/COMPS-342/pdf/COMPS-342.pdf | Statutory compilation of CRA64 |
| | Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*) | Enacted through 12/19/2014: https://www.govinfo.gov/content/pkg/COMPS-803/pdf/COMPS-803.pdf | Statutory compilation of ADA |
| | Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*) | Enacted through 12/10/2015: https://www.govinfo.gov/content/pkg/COMPS-1529/pdf/COMPS-1529.pdf | Statutory compilation of ADEA |
| Other Federal Immigration laws | Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) | Enacted through 1/29/2025: https://www.govinfo.gov/content/pkg/COMPS-1376/pdf/COMPS-1376.pdf | Statutory compilation of INA |
| Aiding or abetting | 8 U.S.C. 1325: Improper entry by alien | https://www.govinfo.gov/content/pkg/USCODE-2023-title8/pdf/USCODE-2023- | See 685.219(b)(30)(i) of "substantial illegal purpose" |

ED_02523

| | | title8-chap12-subchapII-partVIII-sec1325.pdf | |
|---|---|---|---|
| violations of 8 U.S.C. 1325 | | | |
| Terrorism | Crimes and Criminal Procedure (18 U.S.C. 2331). | https://www.govinfo.gov/content/pkg/USCODE-2023-title18/pdf/USCODE-2023-title18-partI-chap113B-sec2331.pdf | 18 U.S.C. 2331(1): international terrorism<br><br>18 U.S.C. 2331(5): domestic terrorism |
| Violence for the purpose of obstructing or influencing Federal Government policy | Obstruction of Justice, Chapter 73 (18 U.S.C. 1501 *et seq*). | https://www.govinfo.gov/content/pkg/USCODE-2023-title18/pdf/USCODE-2023-title18-partI-chap73.pdf | |
| | General list of types of obstructions | https://www.govinfo.gov/content/pkg/USCODE-2023-title18/pdf/USCODE-2023-title18-partI-chap73-front.pdf | |
| | Crime of violence (18 U.S.C. 16). | https://www.govinfo.gov/content/pkg/USCODE-2023-title18/pdf/USCODE-2023-title18-partI-chap1-sec16.pdf | |

2

ED_02524

# PSLF Negotiated Rulemaking Links

1. Current regulations for the Public Service Loan Forgiveness Program at 34 CFR 685.219: https://www.ecfr.gov/current/title-34/section-685.219

2. Data applicable to the *Title IV* student aid programs here: https://studentaid.gov/data-center

3. Information on the 2021—2022 negotiated rulemaking activities for higher education: https://www.ed.gov/laws-and-policy/higher-education-laws-and-policy/higher-education-policy/negotiated-rulemaking-for-higher-education-2021-22

4. The Higher Education Act of 1965, as amended: See separate PDF.

ED_02525

**Issue: Restoring Public Service Loan Forgiveness (PSLF) Program**

**Session 1, June 30 – July 2, 2025**

Statutory citation: Section 455(m) of the Higher Education Act of 1965, as amended (HEA)
Regulatory citation: Section 685.219

**Summary of Issues:**

**Issue #1: The proposal will worsen workforce shortages and increase taxpayer costs.**
The U.S. is projected to face a shortage of 86,000 doctors and 338,000 nurses by 2036. Already, 86% of VA facilities report staffing gaps. These shortages increase wait times, reduce access, and force reliance on costly temp workers—driving up taxpayer costs.

Healthcare workers make up most nonprofit employees, and many carry high student debt. About 75% of nurses and 70% of medical students borrow for school—often over $200K—and **rely on PSLF** to manage repayment.

Education faces similar strain. Over 400,000 teaching roles are vacant or uncertified. Charter schools and other public education employers **depend on PSLF** to retain teachers, especially in low-income areas.

If PSLF-qualifying employers lose eligibility, affected workers may be forced to leave their jobs. In many regions, **noncompetes** or lack of alternatives mean they can't stay local—hurting care, education, and ultimately raising costs for the public.

**Issue #2: "Substantial illegal purpose" is applied inconsistently.**
In the current proposal, some sections require "a pattern of" illegal activity, while others do not. For consistency and fairness, all sections should use the phrase "a pattern of," and that term should be clearly defined (e.g., two or more similar actions over time).

**Issue #3: There's no clear process to reinstate PSLF-eligible employers.**
If an employer is disqualified, the rule doesn't explain how or when they can be reinstated. A clear timetable and set of corrective steps should be included to guide employers and protect affected employees.

**Issue #4: Borrowers may lose PSLF access if their employer refuses to sign the form.**
To verify employment for PSLF, a borrower needs a signature from an **Authorized Official**—usually an HR administrator. These staff members typically just confirm employment dates and Employer Identification Numbers. They are not legal experts and may be unwilling to certify their employer has not engaged in illegal activity. Some may refer the form to legal counsel, causing long delays.

Millions of borrowers could be affected. The rule should:

1

ED_02526

- Allow borrowers to use alternative documents (like W-2s and paystubs) if their employer won't sign; and
- Ensure HR staff are not asked to certify anything before **July 1, 2026**, the effective date of the new rules.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

Proposed Amendatory Text in **bluelines** to represent additions and edits from the Executive Order and Paragraph Restructuring in Paragraph (b): 34 CFR § 685.219 – Public Service Loan Forgiveness

**(b) Definitions. The following definitions apply to this section:**

(b)(36) "A pattern of" means two or more instances of conduct that are similar in nature, occur over time, and demonstrate a consistent practice.

**(30) Substantial illegal purpose means –**

(i) engaging in a pattern of aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) engaging in a pattern of supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in a pattern of the chemical and surgical castration or mutilation of children or the trafficking of children to states for purposes of emancipation from their lawful parents, in violation of applicable law;

**(g) Borrower reconsideration process.**

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this paragraph (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in paragraph (h) of this section. **However, a borrower may request reconsideration if they meet either of the following conditions:**
(a) They are subject to a noncompete agreement that restricts their ability to obtain employment with another qualifying PSLF employer within a 25-mile radius of their current residence or place of employment; or
(b) They are unable, after a good faith effort, to obtain equivalent or better employment at a qualifying PSLF employer within the same 25-mile radius.

2

ED_02527

(h)...

(i)...

**(j) Process for reinstating an employer disqualified for engaging in activities with a substantial illegal purpose.** The Secretary may automatically reinstate an employer determined to be in violation of the standard under paragraph (h) of this section when:

(1) The Secretary receives no conclusive evidence that the employer has engaged in activities that meet the standard described in paragraph (h) during the 12-month period following the date of disqualification.

---

**Suggested revisions to the Public Service Loan Forgiveness (PSLF) & Temporary Expanded PSLF (TEPSLF) Certification & Application Form**
**https://studentaid.gov/sites/default/files/public-service-application-for-forgiveness.pdf**
**(page 6 of 16)**

Notes for completing Section 5B:
If you are unable to have this form completed by an Authorized Official because the organization has closed or you are unable to contact your employer to obtain an acceptable signature, you may be able to certify your employment using alternative documentation. This process will add significant time to the review of this form. If the employment being certified is or was with the U.S. Military, you can submit this form with a Form DD-214 or an SCRA Status Report document that corresponds with the employment period in Question 4, instead of completing Section 5A. If the employment being certified is for any other employer, you must submit documentation that confirms both the FEIN/EIN of the employer AND your period of employment, instead of completing Section 5A. This would include an IRS Form W-2 for every calendar year included in your employment period (with or without corresponding paystubs), OR paystubs for every month that you were employed during the employment period. Any month that cannot be documented will not be certified as eligible employment. Important: If your employer is unwilling to sign Section 5A due to concerns about the legal attestation now required of Authorized Officials—such as certifying that the organization has not engaged in activities with a substantial illegal purpose—you may still submit this form using the alternative documentation process described above.

Additionally, if you are seeking to certify employment for any period prior to July 1, 2026, employers will not be asked to attest to compliance with the standards that go into effect on or after that date. Employment for periods before July 1, 2026 will continue to be verified under the prior standard.

3

ED_02528

Sources:

**Healthcare:**

- The U.S. is projected to face a shortage of **up to 86,000 doctors and 338,000 nurses by 2036**.
  *Source: Association of American Medical Colleges (AAMC), 2023; National Council of State Boards of Nursing (NCSBN)*
- **86% of Veterans Affairs facilities** report staffing shortages, leading to longer wait times and higher costs.
  *Source: U.S. Department of Veterans Affairs, 2022*
- Healthcare professionals are the largest group of nonprofit employees. Around **75% of nurses and 70% of medical students carry student debt**, often exceeding $200,000.
  *Sources: American Association of Colleges of Nursing (AACN); Association of American Medical Colleges (AAMC), 2023*
- Many professionals choose or remain in nonprofit and public service positions due to **PSLF eligibility**. Losing that eligibility will drive resignations or relocations—especially in states where **noncompete clauses** are still enforceable.

**Education:**

- The U.S. is facing a **teacher shortage crisis**, with over **55% of public schools reporting being understaffed** during the 2022–2023 school year.
  *Source: National Center for Education Statistics (NCES), "School Pulse Panel," January 2023*
- Shortages are particularly acute in **special education, STEM fields, and rural or low-income districts**.
  *Source: Learning Policy Institute, "The Teacher Shortage Is Real and Growing," 2023*
- A **2023 National Education Association (NEA) survey** found that nearly **50% of teachers** are considering leaving the profession, and **student debt** is one of the leading contributors to educator stress and attrition.
  *Source: National Education Association, "Teacher Burnout Survey," 2023*
- Many teachers enter and remain in public education with the expectation that their service will qualify for **Public Service Loan Forgiveness**. Narrowing the definition of "qualifying employer" could disqualify certain public schools, **charter school networks**, early childhood education programs, or contract-based positions—driving teachers out of already-struggling schools.
- Teacher turnover costs school systems an average of **$20,000 per educator**, not including the impact on student achievement.
  *Source: Learning Policy Institute, "The Cost of Teacher Turnover," 2017*

4

ED_02529

# 2025 Student Loan and Affordability Committee for PSLF

**Submitted by Mary Lyn Hammer, Champion Col-EDGE Solutions,
on behalf of Proprietary Institutions**

## PUBLICLY-AVAILABLE QUALIFYING EMPLOYERS DATA

*AVAILABLE DATA*

There are two sets of data for PSLF to which the Committee was given access including:

- Data between 11/9/2020 and 1/31/2023, representing **78%** of total applications
- Data between 6/30/2024 and 12/31/2024, representing **22%** of total applications

*\*Note: Data between 2/1/2023 and 6/29/2024 has not been provided*

| PUBLIC SERVICE LOAN FORGIVENESS DATA | JANUARY 2023 DATA 11/9/2020 - 1/31/2023 | | | DECEMBER 2024 DATA 6/30/2024 - 12/31/2024 | | | COMBINED DATA | |
|---|---|---|---|---|---|---|---|---|
| | # of Applications | % of Total | | # of Applications | % of Total | | # of Applications | % of Total |
| PSLF Approved Applications | | | | | | | | |
| Total PSLF Forms Rec'd | 4,557,261 | **78.0%** | | 1,282,700 | 22.0% | | 5,839,961 | |
| Total PSLF Processed | 2,325,240 | **51.0%** | | 688,500 | **53.7%** | | 3,013,740 | **51.6%** |
| | | | | | | | | |
| PSLF Employment Met Requirements | 2,325,240 | | | 688,500 | | | 3,013,740 | |
| Government Employer | 1,358,992 | 58.4% | | 392,900 | 57.1% | | 1,751,892 | 58.1% |
| Non-Profit Employer | 853,550 | 36.7% | | 296,600 | 43.1% | | 1,150,150 | 38.2% |
| | | | | | | | | |
| PSLF Employer & Payments Met Requirements | 52,616 | 2.3% | | 137,900 | 20.0% | | 190,516 | 6.3% |
| Government Employer | 36,233 | 68.9% | | 87,700 | 63.6% | | 123,933 | 65.1% |
| Non-Profit Employer | 16,383 | 31.1% | | 50,200 | 36.4% | | 66,583 | 34.9% |
| | | | | | | | | |
| PSLF Closed and Rejected Applications | 112,698 | 4.8% | | 270,000 | 39.2% | | 382,698 | 12.7% |
| Employer Not Approved | 40,540 | **36.0%** | | 20,400 | 7.6% | | 60,940 | **15.9%** |
| | | | | | | | | |
| **Has open Direct Loans in repayment for at least 120 months, but has less than 120 months of qualifying employment at time of submission** | 856,843 | 39.7% | | Not Provided in Report | Not Provided in Report | | 856,843 | **39.7%** |

*Note: The column between the two data sets reads vertically: "Data Between 2/1/2023 - 6/29/2024 Not Provided"*

*RELEVANT CONCERNS FOUND IN DATA*

Patterns between both data sets show areas of concern for the proper administration of the program as follows:

1. Only **51.6%** of total applications have been processed.
2. Government Employer Data
   a. Employment requirements met – 58.1%
   b. Employer and Payments met requirements – 65.1%
3. Non-profit and Other Employer Data
   a. Employment requirements met – 38.2%
   b. Employer and Payments met requirements – 34.9%

ED_02530

4. Employer Not Approved Data
    a. Jan 2023, representing 78% of total, is **36.0%**
    b. Total of both data total is **15.9%**
5. Payment Requirements met, but Employer Requirements not met (have open Direct Loans in repayment for at least 120 months but _has less than 120 months of qualifying employment at time of submission_) is **39.7%**. This data is not provided with a breakdown of Government and Non-profit details.

Based on data outlined above, the following assumptions are reasonable:

- The government can easily verify eligibility for itself.
- The majority of "unapproved" or "ineligible" qualifying employers belong to the Non-profit sector.
- There is a need for a database of eligible qualifying employers that would empower borrowers to effectively qualify for PSLF, especially those employed by non-profit entities.
- There is a need to develop criteria for notifying employees when an employer becomes ineligible. This will give borrowers an informed choice to either (1) continue to work for an ineligible qualifying employer or (2) seek employment with an eligible employer.

## SUGGESTED REGULATORY LANGUAGE

The following is our suggested regulatory language to be placed within the PSLF regulatory language where the Secretary feels appropriate:

1. The Secretary shall provide public access to data for qualified employers that includes the following data:
    a. Employer Name.
    b. Employer EIN.
    c. Employer Phone.
    d. Employer Address.
    e. Dates Employer Met Qualifying Employer Requirements to include all periods of eligible in ineligible status.
2. The Qualifying Employer shall notify all employees of the date it became ineligible within seven (7) calendar days of receiving notification of its ineligibility. Such notification must be in writing using the current contact information on record for each employee.
3. The Qualifying Employer shall send the Secretary a written confirmation of its compliance with the employee notification requirement within fourteen (14) calendar days of receiving notification of its ineligibility.

ED_02531

ED_02532

# MODIFICATION OF CONFUSING PSLF REGULATORY LANGUAGE FOR STANDARD 10-YEAR REPAYMENT PLANS

The language below, found in **§ 685.219(c)(2)** of existing PSLF regulations, is very confusing and, frankly, I am not even sure of the intent of the language. I think we should clean it up while we are addressing the PSLF; however, we need to understand the intent before drafting corrections and I have requested clarification from ED. Based on the context, I believe the corrections would be technical in nature and not substantive so they should be easily rewritten.

> **(iii)** For a borrower on an income-driven repayment plan under § 685.209, paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the borrower's next annual repayment plan recertification date under the qualifying repayment plan in which the borrower is enrolled;

> > **ML:** ...paying...does what? Is this addressing prepayments? Multiple payments? Is it supposed to give credit for multiple payments with a large payment that covers multiple payments for the purpose of determining PSLF eligibility? What exactly is or is not counted toward PSLF eligibility? I've written thousands of pages of federal regulations and this makes no sense. What is the intent?

> **(iv)** For a borrower on the 10-year standard repayment plan under § 685.208(b) or the consolidation loan standard repayment plan with a 10-year repayment term under § 685.208(c), paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the lesser of 12 months from that date or the date upon which the Secretary receives the borrower's next submission under subsection (e).

> > **ML:** If 120 payments are needed for PSLF and these are 10-year repayment plans, what is this defining? Is it an attempt to qualify people even if they have a repayment schedule that covers 120 payments or less? Is this leaving a door open if the borrower defers payments past 10 years? What is the intent?

ED_02533

ED_02534

**Issue Paper: Restoring Public Service Loan Forgiveness (PSLF)**

**Session 1, June 30 – July 2, 2025**

**Issue:** PSLF Qualifying Months, Reconsideration, and Buy Back

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue:** There are three issues addressed in this proposal

Issue 1: Borrowers are currently denied access to PSLF credits for months that are deemed ineligible for actions out of their control, such as servicer and platform transfers and delays in processing repayment plans and loan consolidations.  If the borrower would be otherwise eligible during these months, the borrower should be given credit for these periods.  Alternatively, the borrower should be able to make their regular required and eligible payments during these periods of administrative forbearance if they should choose to and allow these periods to count towards PSLF.

Issue 2: Borrowers can currently only request reconsideration of what they believe to be an error in a qualifying month of repayment or qualifying employer status after making 120 payments, applying, and being rejected for forgiveness.  As forgiveness review can be many years from the time of the months in question, obtaining and retaining documentation to submit such a dispute can be difficult.  We are proposing allowing a borrower to file for reconsideration for these months or these employers at any time.  This change will also reduce operational costs for the Secretary as more timely requests for review will reduce the possibility of the documents needed will be at other entities or archived.

Issue 3: The current "buy back" process is cumbersome for both borrowers and the Secretary in that it doesn't allow the borrower to request said buy back until they reach 120 qualifying months of employment.  The borrower must then manually submit a request and include proof of income at which point the Secretary must calculate what the payment should have been during the buy back period.  We are proposing that the Secretary proactively and automatically offer the borrower a buy back amount at the end of an eligible period by using the income information already on file at the time of ineligible period.

ED_02535

**Proposed Amendatory Text**

**§ 685.219 Public Service Loan Forgiveness Program (PSLF).**

(a) ***Purpose.*** ...

(c) ***Borrower eligibility.***

(1) A borrower may obtain loan forgiveness under this program if the borrower—

(i) Is not in default on the loan at the time forgiveness is requested;

(ii) Is employed full-time by a qualifying employer or serving in a full-time AmeriCorps or Peace Corps position—

(A) When the borrower satisfied the 120 monthly payments described under paragraph (c)(1)(iii) of this section; and

(B) At the time the borrower applies for forgiveness under paragraph (e) of this section; and

(iii) Satisfies the equivalent of 120 monthly payments after October 1, 2007, as described in paragraph (c)(2) of this section, on eligible Direct loans.

(2) A borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

(i) Paying at least the full scheduled amount due for a monthly payment under the qualifying repayment plan;

(ii) Paying in multiple installments that equal the full scheduled amount due for a monthly payment under the qualifying repayment plan;

(iii) For a borrower on an income-driven repayment plan under § 685.209, paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the borrower's next annual repayment plan recertification date under the qualifying repayment plan in which the borrower is enrolled;

ED_02536

(iv) For a borrower on the 10-year standard repayment plan under § 685.208(b) or the consolidation loan standard repayment plan with a 10-year repayment term under § 685.208(c), paying a lump sum or monthly payment amount that is equal to or greater than the full scheduled amount in advance of the borrower's scheduled payment due date for a period of months not to exceed the period from the Secretary's receipt of the payment until the lesser of 12 months from that date or the date upon which the Secretary receives the borrower's next submission under subsection (e).

(v) Receiving one of the following deferments or forbearances for the month:

(A) Cancer treatment deferment under section 455(f)(3) of the Act;

(B) Economic hardship deferment under § 685.204(g);

(C) Military service deferment under § 685.204(h);

(D) Post-active-duty student deferment under § 685.204(i);

(E) AmeriCorps forbearance under § 685.205(a)(4);

(F) National Guard Duty forbearance under § 685.205(a)(7);

(G) U.S. Department of Defense Student Loan Repayment Program forbearance under § 685.205(a)(9);

(H) Administrative forbearance or mandatory administrative forbearance under § 685.205(b)(8) or (9), or other involuntary forbearance periods \, such as during account transfers, where the borrower has not requested nor can refuse, the administrative forbearance period; and

(vi) Being employed full-time with a qualifying employer, as defined in this section, at any point during the month for which the payment is credited.

(3) If a borrower consolidates one or more Direct Loans into a Direct Consolidation Loan, including a Direct PLUS Loan made to a parent borrower, the weighted average of the payments the borrower made on the Direct Loans prior to consolidating and that met the criteria in paragraphs (c)(2)(i) through (vi) of this section will count as qualifying payments on the Direct Consolidation Loan.

(d) **...**

(g) ***Reconsideration process.***

ED_02537

(1) Within 90 days of the date the Secretary sent a response to a properly submitted and complete employment certification form or the notice of denial of forgiveness under paragraph (e)(8) of this section to the borrower, the borrower may request that the Secretary reconsider whether the borrower's employer or any payment meets the requirements for credit toward forgiveness by requesting reconsideration on a form approved by the Secretary. Borrowers who were denied loan forgiveness under this section after October 1, 2017, and prior to July 1, 2023, have 180 days from the effective date of this Final Rule to request reconsideration. A borrower may request reconsideration within 90 days following denial of forgiveness under paragraph (e)(8) of this section even if they did not previously request reconsideration following a response to a prior employment certification form.

(2) To evaluate a reconsideration request, the Secretary considers—

   (i) Any relevant evidence that is obtained by the Secretary; and

   (ii) Additional supporting documentation not previously provided by the borrower or employer.

(3) The Secretary notifies the borrower of the reconsideration decision and the reason for the Secretary's determination.

(4) If the Secretary determines that the borrower qualifies for forgiveness, the Secretary adjusts the borrower's number of qualifying payments or forgives the loan, as appropriate.

(5) After the Secretary makes a decision on the borrower's reconsideration request, the Secretary's decision is final, and the borrower will not receive additional reconsideration unless the borrower presents additional evidence.

(6) For any months in which a borrower postponed monthly payments under a deferment or forbearance and was employed full-time at a qualifying employer as defined in this section but was in a deferment or forbearance status besides those listed in paragraph (c)(2)(v) of this section, the borrower may obtain credit toward forgiveness for those months, as defined in paragraph (d) of this section, for any months in which the borrower—

   (i)Makes a payment equal to or greater than the amount they would have paid at the time on a qualifying repayment plan during any such voluntary or involuntary deferment or forbearance month;

      a.      Qualifying repayment plans include 10 year standard, borrowers unable to produce income information for the time in question have the option to pay the standard payment

(i) Makes an additional payment equal to or greater than the amount they would have paid at that time on a qualifying repayment plan or

(ii) Otherwise qualified for a $0 payment on an income-driven repayment plan under § 685.209.

(7) Within 90 days of the approval of a period of eligible employment that includes a period of postponed payments as described under paragraph (g)(6) of this section, the Secretary shall notify the borrower of their right to obtain credit toward forgiveness for those months by making additional payments equal to or greater than the amount they would have paid at that time on a qualifying repayment plan and, if the Secretary has sufficient information to so calculate such amount, the Secretary shall notify the borrower of the amount.

(i) If the borrower was on a qualifying repayment plan in the month directly before or directly after the period, the amount will be calculated based on the amount required under that plan

(A) The borrower will be given instructions to submit proof of income for the period if the payment amount used does not reflect their income during this period.

(ii) If the borrower was not on a qualifying repayment plan in the month directly before or after the period, the borrower will be instructed to submit proof of income for the period.

ED_02539

 candidly

June 2025

## Memorandum

RE: The Cost-Effectiveness of Public Service Loan Forgiveness (PSLF)
From: Laurel Taylor
Date: June 29, 2025

# Economic Analysis: The Cost-Effectiveness of Public Service Loan Forgiveness (PSLF)

## Executive Summary

The current PSLF program costs approximately $10-15 billion annually (the ten year cost estimated to be $110 billion) while delivering recruitment and retention value equivalent to $302 billion in salary increases—representing extraordinary taxpayer value at a 20:1+ cost-effectiveness ratio. Restricting qualifying employers would eliminate this cost advantage and force significantly more expensive alternative approaches to maintain essential public service workforces.

## Program Purpose and Economic Rationale

The purpose of the Public Service Loan Forgiveness (PSLF) program is to attract and retain talented and highly-educated individuals—those who have invested significantly in their education and carry student loan debt—into roles that deliver positive externalities for society but are typically associated with lower financial compensation. Without incentives like PSLF, alongside confidence in the viability and durability of the program, these critical positions in areas such as healthcare, education, public safety, government, and non-profit sectors are less attractive to qualified candidates. By offering student loan forgiveness after a period of dedicated public service, PSLF effectively lowers the financial barriers that often deter skilled professionals from pursuing careers focused on the public good.

Recent feedback from PSLF-eligible employers confirms this economic reality:

- Healthcare systems report PSLF as "key to recruiting nurses and hard-to-fill clinical positions"

ED_02540

**candidly**

- Nonprofit organizations describe PSLF as "a major driver to get any form of talent in the marketplace" noting "there is no financial incentive to work for a nonprofit without this program"
- Rural employers identify PSLF as the "critical differentiator compared to other area employers"
- School districts report teachers choosing public service specifically because of loan forgiveness potential

## Cash-Equivalent Analysis: The True Value of PSLF

Using a cash-equivalent analysis reveals the extraordinary financial value PSLF offers to both eligible employees and employers, clearly demonstrating the benefit's effectiveness and efficiency. To quantify PSLF's economic value, we assessed the financial equivalent required to replicate this benefit through direct compensation:

Annual Salary Equivalent: Replacing the PSLF benefit universally across eligible sectors (approximately 33.6 million full-time equivalent public-sector and nonprofit employees) would necessitate a recurring salary increase averaging approximately $9,000 per employee per year, totaling $302 billion annually.

One-time Bonus Equivalent: Alternatively, providing an immediate lump-sum bonus to match the present value of PSLF would require roughly $69,800 per employee, equating to an extraordinary total cost of $2.35 trillion.

## Borrower-level cash-equivalent

| Scenario | Balance Forgiven (year 10) | Present-value (PV) of benefit | Annual raise that PV-matches | Equivalent one-time bonus |
|---|---|---|---|---|
| **Teacher (B.A./M.Ed., $55 k salary, $40 k debt)** | $40k | $24.6k | $ 4.5k | $ 34.9k |
| **Average PSLF borrower ($80k forgiven)** | $80k | $49.1k | $ 9.0k | $ 69.8k |

ED_02541



| Non-profit physician ($120k forgiven) | $120k | $73.7k | $ 13.6k | $ 104.7k |
|---|---|---|---|---|

*Assumptions: 5% discount rate; 29.65% combined federal & payroll tax; no state tax. Physician estimate assumes 10 years in a 501(c)(3) hospital; actual results vary with residency salary years and filing status.*

## Methodology

1. Project forgiveness amount – Assume IDR payments for 120 months while interest subsidies keep the balance roughly flat for lower-income borrowers
2. Discount future benefit – Nominal discount rate = 5%
3. Translate to after-tax dollars – Because PSLF is tax-free, the equivalent salary must deliver the same net present value after 10 years
4. Gross-up for taxes – Apply 29.65% combined federal + payroll tax

## Total Cost Calculation

Since cash compensation would apply to all workers rather than only those with student loans, the taxpayer cost of achieving equivalent total compensation attractiveness equals the per-borrower cash value multiplied by the total number of full-time employees in PSLF-eligible positions:

- Federal government FTEs (civilian): ~4.3 million FTEs (2023 data)
- State + local government: ~20.3 million employees (5.45M state + 14.83M local)
- Total government FTEs: ~24.6 million FTEs
- Total nonprofit employment: ~12.8 million jobs (2022 data), assuming 70% FTE = ~9 million FTEs[1]
- Total eligible workforce: ~33.6 million FTEs

Total cash compensation equivalent: $9,000 × 33.6M employees = over $302 billion per year, or over $3 trillion over a ten-year period. As a one-time bonus, the cost would exceed $2.3 trillion today.

# Cost Implications of Restricting Qualifying Employers

The proposed restrictions on qualifying employers would fundamentally undermine PSLF's cost-effectiveness through several mechanisms:

 **candidly**

### Immediate Workforce Displacement Costs

Organizations losing PSLF eligibility would face immediate pressure to provide alternative compensation to retain current employees who joined specifically for loan forgiveness benefits. Based on our cash-equivalent analysis, this could require salary increases of $4,500–$13,600 per affected employee annually.

### Administrative Complexity and Legal Costs

Determining which organizations engage in "substantial illegal purpose" creates new bureaucratic infrastructure requirements, legal challenges, and ongoing compliance costs. The evidentiary standards and appeals processes outlined in the proposed regulations would require significant administrative resources while creating uncertainty that undermines the program's recruitment value.

### Market Distortion Effects

Arbitrary distinctions between similar organizations serving identical public purposes would create competitive imbalances, forcing "excluded" employers to dramatically increase compensation while "included" employers maintain cost advantages—leading to inefficient resource allocation and service delivery disruptions.

## Risk Analysis: Consequences of Program Restriction

### Immediate Workforce Disruption

Employer feedback reveals the scale of potential disruption:

- Healthcare systems warn that program changes would represent "one of our most significant business challenges"
- Educational institutions note that restrictions would accelerate teacher shortages: "we will not have people going to the teaching industry at all"
- Nonprofit organizations report that changes "would cripple our applicant base"

### Increased Taxpayer Costs

Governments at all levels would face pressure to raise salaries to maintain competitive recruitment, shifting costs from the targeted PSLF program to broader, more expensive compensation increases across entire public sector workforces.

ED_02543



**Service Delivery Impacts**

<u>Rural and underserved communities</u> already struggling with professional staffing would be disproportionately affected, as PSLF currently serves as their primary tool for competing with higher-paying urban and private sector alternatives.

# Fiscal Impact Comparison

| Scenario | Annual Cost | 10-Year Cost | Coverage | Efficiency |
|---|---|---|---|---|
| *Current PSLF Program* | $10–$15 billion | *$100–150 billion* | Targeted to debt holders | 20:1 cost advantage |
| **Universal Salary Increases** | $302 billion | $3+ trillion | All employees | Broad, unfocused |
| **One-time Bonus Equivalent** | n/a | $2.35 trillion | All employees | Immediate, massive cost |

# Conclusion

The PSLF program represents an exceptionally cost-effective policy tool for addressing critical workforce challenges in public service sectors. Rather than requiring hundreds of billions in annual salary increases or trillions in upfront bonus payments to attract qualified professionals to lower-paying but socially essential roles, PSLF achieves the same recruitment and retention objectives at a fraction of the cost—approximately 5% of the equivalent direct compensation approach.

By targeting loan forgiveness specifically to those with educational debt who commit to public service, the program efficiently channels resources where they have maximum impact—enabling governments and nonprofits to compete for talent without dramatically restructuring their compensation systems. The program's current broad eligibility reflects sound economic policy design: targeting maximum public benefit at minimum public cost.

ED_02544



Restricting PSLF qualifying employers would abandon this proven, cost-effective workforce tool in favor of significantly more expensive alternatives, ultimately costing taxpayers billions more while weakening public service delivery. The extraordinary cost-effectiveness of the current program structure—delivering $302 billion in recruitment value for $10-15 billion in annual investment—demonstrates that broad eligibility is not just policy preference but fiscal necessity.

---

[1] *The 70% FTE assumption for nonprofit employment reflects typical employment patterns in the sector, accounting for part-time and contract positions that would not qualify for PSLF.*

ED_02545

Proposed language to protect borrowers currently working toward PSLF.  The negotiators representing Financial Aid Administrators at Postsecondary Institutions and Public Institutions of Higher Education, Including HBCUs, Tribal Colleges, and Minority-Serving Institutions would like to express concern for the impact on individuals who are currently serving in the public sphere at a qualifying employer.  It seems contrary to the intent of the EO to punish individuals while attempting to change institutional behavior.  We request a legacy clause that would ensure that employees who have been working towards forgiveness at a currently approved employer, some of whom may be very close to the 120 benchmark, to finish their obligation to repayment without having to change employers.

We propose to add a simple clause to the regulatory text that allows current borrowers in repayment to finish their service so long as their employer was classified as an eligible entity prior to the enactment of these new regulations.

Language to insert:  Borrowers who were actively in repayment with a qualifying employer prior to the enactment of these regulations will remain eligible for Public Service Loan Forgiveness with continuous employment and repayment status even if their employer becomes classified as ineligible upon enforcement of the new regulations.

We are not married to this language, but hope that the general concern to shelter the individual from harm and focus on the entity comes through; and would also entertain including this in any preamble language as well.

Alyssa Dobson
Helen Faith
Tracy Ireland
Kaity McNeill

ED_02546

Suggested text from Tracy Ireland:

For the following, consider adding language that identifies the secretary as the one making the determination of ineligibility.

(c)(4) Effective on or after July 1, 2026, through a standard as described in paragraph (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination **"by the Secretary"** that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

ED_02547

Proposed language to protect borrowers currently working toward PSLF.  The negotiators representing Financial Aid Administrators at Postsecondary Institutions and Public Institutions of Higher Education, Including HBCUs, Tribal Colleges, and Minority-Serving Institutions would like to express concern for the impact on individuals who are currently serving in the public sphere at a qualifying employer.  It seems contrary to the intent of the EO to punish individuals while attempting to change institutional behavior.  We request a legacy clause that would ensure that employees who have been working towards forgiveness at a currently approved employer, some of whom may be very close to the 120 benchmark, to finish their obligation to repayment without having to change employers.

We propose to add a simple clause to the regulatory text that allows current borrowers in repayment to finish their service so long as their employer was classified as an eligible entity prior to the enactment of these new regulations.

Language to insert:  Borrowers who were actively in repayment with a qualifying employer prior to the enactment of these regulations will remain eligible for Public Service Loan Forgiveness with continuous employment and repayment status even if their employer becomes classified as ineligible upon enforcement of the new regulations.

We are not married to this language, but hope that the general concern to shelter the individual from harm and focus on the entity comes through; and would also entertain including this in any preamble language as well.

Alyssa Dobson
Helen Faith
Tracy Ireland
Kaity McNeill

ED_02548

Suggested text from Tracy Ireland:

(30) Substantial illegal purpose means –

(v) engaging in a pattern of violating State tort laws, **limited to** laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

ED_02549

**From:** Mary Lyn Hammer, representing proprietary institutions

Here is my suggested language for the notice to the employees:

(j) *Employer Notification to Employees.* Process for the employer to notify its employees of its ineligible status are:

(1) The employer shall notify all employees within seven (7) calendar days of receiving the Secretary's notification of its ineligibility status and the date it became effective. Such notification must be in writing using the current contact information on record for each employee.

(2) The employer shall send the Secretary a written confirmation of its compliance with the employee notification requirement within fourteen (14) calendar days of receiving the Secretary's notification of its ineligibility status.

ED_02550

## Standard for Determining a Qualifying Employer for Public Service Loan Forgiveness Proposed Regulatory Text for 34 C.F.R. § 685.219 (h):

**34 C.F.R. § 685.219 (h) – Standard for Determining a Qualifying Employer**

(h) Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose. The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and will not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical.

> (1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;
>
> (2) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or
>
> (3) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

Page **1** of 1

ED_02551

(27) *Qualifying employer* means:

(i)

(A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

(iiB) A public child or family service agency;

(iiiC) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

(ivD) A Tribal college or university; or

(vE) A nonprofit organization that—

(A1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(B2) Is not a business organized for profit, a labor union, or a partisan political organization.; and

(ii) A *Qualifying Employer does not mean:*

(A) Any agency, organization or entity included in 27(i) that engages in activities that have a substantial illegal purpose, as defined in this section.

(iii) *Clarification on Noncompliance — Any Qualifying Employer defined in 27(ii)(A) operating under a shared Employer Identification Number (EIN) shall be solely responsible for its own actions and compliance with this section. A Qualifying Employer found to not be in compliance as defined in 27(ii)(A) shall not impact the eligibility of other Qualifying Employers in 27(i) that share the same EIN.*

ED_02552

Case 1:25-cv-13242-MJJ   Document 43-4   Filed 01/14/26   Page 153 of 223

**Issue: Restoring Public Service Loan Forgiveness (PSLF) Program**

**Session 2, June 30 – July 2, 2025**

Statutory citation: Section 455(m) of the Higher Education Act of 1965, as amended (HEA)
Regulatory citation: Section 685.219

**Summary of Issues:**

Dear Tamy, Jeff and Jacob,

Thank you for taking the time to consider and incorporate feedback. Your recent revisions give me confidence in the integrity and responsiveness of the negotiated rulemaking process.

I believe there is an opportunity to further strengthen the proposed rule by both encouraging employer compliance and preventing unnecessary interruptions in PSLF eligibility for borrowers.

Specifically, we recommend that if an employer is actively participating in a good-faith corrective action plan, the Secretary allow affected borrowers to continue earning PSLF credit **retroactively from the start of the employer's active participation**, pending final reinstatement approval. This approach would preserve borrower trust and continuity of service while maintaining accountability for employers.

Specifically, the proposal would amend Employer Reinstatement Option for Public Service Loan Forgiveness Proposed Regulatory Text for 34 C.F.R. § 685.219 (j) as follows:
**:**
34 C.F.R. § 685.219 (j) – Regaining eligibility as a qualifying employer
(j) Regaining eligibility as a qualifying employer. An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after—
(1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with paragraph (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes —

    (i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

    (ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

ED_02553

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

**(iv)** if the Secretary determines the employer is actively participating in a good-faith corrective action plan, affected borrowers may continue earning qualifying PSLF credit retroactively from the implementation date of the employer's corrective action plan.

ED_02554

**Concern**

Having the Secretary make an independent determination of "substantial illegal activity" by a currently qualified employer, even with the "preponderance of the evidence" standard, effectively makes the Secretary a judicial agency to make what would otherwise be a tort determination that would normally be handled at court and, by the Sixth and Seventh Amendments, would normally provide the qualified employer many due process rights which would not be present in an administrative determination by the Secretary.

Therefore, the Primary Negotiator of U.S. Military Service Members, Veterans, or Groups Representing Them proposes the following changes to the original Issue Paper language submitted by the Department ("2025 PSLF Issue Paper_clean_06.24.25.docx Final").

If the below changes are made to subsection (h), then the additional procedures for "determining when an employer engaged in activities which have a substantial illegal purpose" would be unnecessary, and should be struck.

**Proposed Language**

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* The Secretary is notified by a federal or State criminal court of law that a currently qualified employer engaged in activities that have a substantial illegal purpose:

> (1) A final judgment of violation of criminal law by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

> (2) A plea of guilty or *nolo contendere* to a criminal charge, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

> (3) A settlement or plea bargain to a criminal charge that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

ED_02555

Submitted by Tracy Ireland:

We recommend the following change in section (b) Definitions, item 4:

(4) Child or children for the sole and specific purpose of this section means an individual or individuals under *18* years of age.

Recommend changing the age from 19 to 18. Please provide the rationale using age 19. 18 is the age of adulthood

ED_02556

Suggested text from Mary Lyn Hammer that borrowers should also be notified when the employer is approved for a corrective action plan or is reinstated.

(e) Application process. * * *

(9) If the Secretary has notified the employer that they may be an ineligible employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(10) If the Secretary has determined the employer is no longer a qualifying employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(11) If the Secretary approves a corrective action plan under (j)(2) of this section or the employer's eligibility is reinstated under (j)(1) of this section, the Secretary notifies the borrower of the employer's status

ED_02557

**Concern**

While many, including the current administration, may question the efficacy of providing medical treatment for gender dysphoria to individuals under the age of 18 years, such treatment is legal in most States with the consent of the parents or guardians.  To universally declare gender dysphoria medical treatment a "substantially illegal activity" when in most intra-State medical treatment cases such treatment does not violate either State or federal law, does not comport with what is generally considered "substantially illegal activity."  Furthermore, in all the other specified cases of "substantially illegal activity," they are defined as violations of law, not activities which are contrary to desired policies, as is "chemical castration or mutilation."

Therefore, the Primary Negotiator of U.S. Military Service Members, Veterans, or Groups Representing Them proposes the following changes to the original Issue Paper language submitted by the Department ("2025 PSLF Issue Paper_clean_06.24.25.docx Final").

**Proposed Language**

(3) *Chemical castration or mutilation* means in violation of State or federal law –

> (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

(ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.
*
(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 18 years of age.

ED_02558

Suggested text from Bob Carey:

I will reiterate my concern about the lack of specificity in referencing applicable laws.  Therefore, recommend the following:

(12) *Illegal discrimination* means a violation of ~~any Federal discrimination law including, but not limited to,~~ the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

If there additional specific laws to reference, I have no objection to listing them specifically.

ED_02559

Suggested language from Tracy Ireland:

Additional support for consideration of changing the PSLF definition of child or children age from 19 to 18. The following indicates that the federal government has relied on 18 as the age of majority for a variety of constitutional rights or federal law.

- Jury Duty: To be legally qualified for federal jury service, an individual must be at least 18 years of age.

- Voting: The 26th Amendment to the US Constitution guarantees the right to vote to citizens who are 18 years of age or older.

- Military Service: The minimum age to enlist in the U.S. military is generally 17 with parental consent or 18 without it.

- Employment:

    - The Fair Labor Standards Act (FLSA) sets 18 as the minimum age for non-agricultural occupations declared hazardous by the Secretary of Labor.

    - In non-agricultural employment, youth aged 18 or older may perform any job, including hazardous ones, for unlimited hours.

- Firearm Sales/Possession:

    - Under the Gun Control Act (GCA), individuals must be 18 years of age or older to purchase shotguns, rifles, and related ammunition from licensed dealers.

    - Federal law generally prohibits the possession of a handgun or handgun ammunition by anyone under the age of 18.

ED_02560

**Suggested Text from Katy McNeil:**

**Employer Reinstatement Option for Public Service Loan Forgiveness Proposed Regulatory Text for 34 C.F.R. § 685.219 (j):**

**34 C.F.R. § 685.219 (j) – Regaining eligibility as a qualifying employer**

(j) *Regaining eligibility as a qualifying employer.* An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after —

(1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with paragraph (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes —

(i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

**3) The Secretary shall acknowledge receipt of corrective plan within 60 days.**

**4) Employer reinstatement is effective on the date of acknowledgment of receipt of corrective plan by the Secretary**

ED_02561

Please see the below revised language to be added to protect those sharing an EIN with an employer who is awaiting reinstatement.

"(A) a borrower that is an employee of a qualifying employer in good standing that shares an EIN of another qualifying employer that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section shall be provided the opportunity to participate in a buy back program for any and all months of missed payments due to the actions of the ineligible employer

ED_02562

Suggested text from Thomas Aiello:

I propose adding "no later than 29 days" to section E application process and all three subsections. This would give borrowers one month notice if their may be a change to their employers status as a qualified employers

ED_02563

**Concern**

Post-Department Determination on this proposal: the text in blue below is the updated version of this proposal to address the Department's concern raised by Ms. Abernathy that the Department cannot mandate a court report anything to them.

Having the Secretary make an independent determination of "substantial illegal activity" by a currently qualified employer, even with the "preponderance of the evidence" standard, effectively makes the Secretary a judicial agency to make what would otherwise be a tort determination that would normally be handled at court and, by the Sixth and Seventh Amendments, would normally provide the qualified employer many due process rights which would not be present in an administrative determination by the Secretary.

Therefore, the Primary Negotiator of U.S. Military Service Members, Veterans, or Groups Representing Them proposes the following changes to the original Issue Paper language submitted by the Department ("2025 PSLF Issue Paper_clean_06.24.25.docx Final").

If the below changes are made to subsection (h), then the additional procedures for "determining when an employer engaged in activities which have a substantial illegal purpose" would be unnecessary, and should be struck.

**Proposed Language**

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* The Secretary is ~~notified by~~ aware a federal or State criminal court of law adjudicated that a currently qualified employer engaged in activities that have a substantial illegal purpose, by one of these three methods:

> (1) A final judgment of violation of criminal law by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

> (2) A plea of guilty or *nolo contendere* to a criminal charge, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

> (3) A settlement or plea bargain to a criminal charge that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

ED_02564

<u>Proposal for Restoring Public Service Loan Forgiveness</u>

At root of the "Restoring Public Service Loan Forgiveness" executive order is the concern that PSLF has "misdirected tax dollars into activist organizations that not only fail to serve the public interest, but actually harm our national security and American values, sometimes through criminal means." The EO further states, "As President of the United States, I have a duty to protect, preserve, and defend the Constitution and our national security, which includes ending the subsidization of illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and disruption of the public order, which threaten the security and stability of the United States. Accordingly, it is the policy of my Administration that individuals employed by organizations whose activities have a substantial illegal purpose shall not be eligible for public service loan forgiveness."

These statements, taken together at face value, indicate that the task before this Negotiated Rulemaking committee is to stop directing tax dollars through Public Service Loan Forgiveness to support activities that harm national security and American values through illegal activities, which include illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and disruption of the public order, and to determine how to identify organizations whose activities have a substantial illegal purpose should make them ineligible to participate as qualifying employers for PSLF purposes.

Given the problem identified and the intent of PSLF to assist in "alleviating worker shortages in necessary occupations," our policy calculus must necessarily root out wasteful spending through inappropriate loan forgiveness while continuing to recognize the need to alleviate critical worker shortages in key occupations, including first responders, air traffic controllers, teachers, and health care workers. It is critically important that both of these priorities be in balance to avoid inadvertently worsening existing worker shortages while continuing to allow inappropriate forgiveness of loan balances to individuals engaged through their employment in activities with a substantial illegal purpose. There is great danger that if these priorities are not held in balance, there is tremendous potential to disqualify large employer due to the illegal activity of an isolated individual or department.

In consideration of the problem we have been tasked to address and the risks of unintended consequences of poor execution, the most effectively balanced policy withholds PSLF from isolated bad actors working for qualifying employers while creating a

ED_02565

an objective framework to identify employers with a substantial illegal purpose based on the criminal activity of their employees. We therefore propose that individuals convicted in a court of law of offenses in any of the five categories of illegal activities identified in draft regulatory text carried out in connection with their employment for an otherwise qualifying employer for PSLF purposes lose credit for their months of qualifying service associated with the months during which their crimes were carried out and that organizations with a critical mass of employees convicted in a court of law of offenses in any of the five categories of illegal activities identified in draft regulatory text carried out in the course of their employment for that organization lose their qualifying employer status for PSLF purposes as follows:

- Individuals convicted of offenses in any of the five categories of illegal activities identified in draft regulatory text carried out in connection with their employment shall be disqualified from receiving months of service credit toward PSLF for periods of employment during which the criminal activity is determined to have occurred.
- Organizations with a critical mass of employees convicted of offenses in any of the five categories of illegal activities identified in draft regulatory text carried out in connection with their employment shall be determined to be ineligible employers for PSLF purposes as follows:
  - For organizations with fewer than 10 FTE employees, more than one employee convicted of relevant crimes carried out in connection with their employment for that organization
  - For organizations with greater than 10 FTE employees, greater than 10% of the total FTE workforce convicted of relevant crimes carried out in connection with their employment for that organization

This proposal prevents bad actors from receiving Public Service Loan Forgiveness for illegal activities that threaten national security and American values, identifies organizations engaged in a substantial illegal purpose threatening the security of the stability of the United States, and avoids inadvertently exacerbating critical shortages or workers who are needed to protect the public interest.


To address the potential complexities of the information above, database matches with court records could be used to streamline the processes involved. If it is not feasible to consistently identify whether a crime was connected with the borrower's employment activities, the dates of the crimes occurring during employment could be substituted.

ED_02566

Submitted by the following negotiators and alternates:

Helen Faith, Alternate Negotiator representing Financial Aid Administrators at Postsecondary Institutions

Alyssa Dobson, Primary Negotiator representing Financial Aid Administrators at Postsecondary Institutions

Mary Lyn Hammer, Primary Negotiator representing Proprietary Institutions of Higher Education

April Boyd, Alternate Negotiator representing Proprietary Institutions of Higher Education

Sarah Doran, Alternate Negotiator representing Student Loan Borrowers in Repayment

ED_02567

To: Department of Education, Negotiated Rulemaking Committee

From: FFEL Lenders and Guarantors Constituency

Date: July 1, 2025

Re: Proposal to amend Amendatory Text in Final Day 2 Discussion Paper as of 1pm – Borrower Notification of regained eligibility as a qualifying employer

We continue to believe that it is critical that the Department and the Secretary align rulemaking with the goal of centralizing information and resources, reducing risks of borrower confusion or missing information, and keeping administrative expenses efficient to properly steward taxpayer dollars.  As such we propose to strike the provision [(e)(11)] that would trigger notification of the borrower of a change in status of an employer who regains eligibility. Instead, our proposal [a new paragraph (k)] would require - as part of the employer restoration of eligibility process – a timeline to ensure the database of qualified employers is updated regularly for public and stakeholder transparency.

First, we all know that the Department has spent great effort to develop centralized and online resources that allow borrower to see the relevant information and conduct transactions in the PSLF Help Tool.  Ensuring this workflow is updated in a timely manner would be essential for borrowers, but is also the proper real-time system of record for statuses.  The currently proposed borrower notification in (e)(11) requires extensive record-keeping, ongoing costs, and risks data integrity errors. We are concerned that borrowers relying upon said notification could find it may not be timely, or it could not find its way to the borrower at all because it was sent to a previous address if ED has not pulled current information.  Practically too, it will only reach a subset of borrowers who may need to know this information as it only likely would be triggered by completed certifications or applications, and not those who have merely inquired before about their employer eligibility.  Further, pointing borrowers to a centralized location for all things PSLF makes it easier for third parties, servicers, and ED to counsel borrowers with information on which they can rely in real-time.  This is important especially as dated notifications can become stale or inaccurate later, which a borrower may in the future rely upon to their detriment.

Proposed change as follows:

(e) *Application process.*

* * *

ED_02568

(11) If the Secretary approves a corrective action plan under (j)(2), the Secretary notifies the borrower of the employer's status.

* * *

(j) *Regaining eligibility as a qualifying employer*.

* * *

(k) *Borrower Notification of regained eligibility*.  Once an organization has regained eligibility under paragraph (j) of this section, the Secretary shall update within thirty (30)  days the qualifying employer list,  which is accessible to borrowers for purposes of certification or application.

ED_02569

To: Department of Education, Members of the Negotiated Rulemaking Committee
From: Negotiators for Consumer Advocates and Legal Aid Organizations
Date: July 1, 2025
Re: Proposal to amend proposed 34 CFR § 685.219(b)(27) [Definition of Qualifying Employer]

_____

The Higher Education Act explicitly defines public service job for the purposes of the Public Service Loan Forgiveness Program as follows:

> "The term ''public service job'' means -- (i) a full-time job in emergency management, government
> (excluding time served as a member of Congress) . . .   or at an organization that
> is described in section 501(c)(3) of the Internal Revenue Code of 1986 and
> exempt from taxation under section 501(a) of such Code;

There is no ambiguity in those terms for the Secretary of Education to interpret. And the statute provides no authority for the Department to remove government or 501(c)(3) employers from the definition of public service jobs eligible for PSLF. Additionally, applying the new limits on conduct to 501(c)(3)'s is unnecessary because the IRS already assesses 501(c)(3) organization for impermissible conduct.

We therefore propose that the language in the Department's proposed 34 CFR § 685.219(b)(27) be amended so that it does not apply the new limits on the definition of public service jobs to government and 50(1)(c) organizations, and only applies it to non-501(c)(3) nonprofit organizations. The language would be amended as follows:

(27) *Qualifying employer* means:
> (i)
> > (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;
> > (B) A public child or family service agency;
> > (C) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;
> > (D) A Tribal college or university; or
> > (E) A nonprofit organization that—
> > > (1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and
> > > (2) Is not a business organized for profit, a labor union, or a partisan political organization; and
> > > (ii 3) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

**Discussion Paper: Restoring Public Service Loan Forgiveness (PSLF)**

**Session 1, June 30 – July 2, 2025**

**Issue:** Restoring Public Service Loan Forgiveness (PSLF) Program

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue**

Illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and the disruption of the public order are a threat to our national security and to the social and economic stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct.

Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out her duties under Title IV of the HEA. *See, e.g.,* 20 U.S.C. 1221e-3, ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"); *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

Additionally, on March 7, 2025, President Trump signed Executive Order (E.O.) 14235, Restoring Public Service Loan Forgiveness directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the Public Service Loan Forgiveness (PSLF) Program excludes organizations that engage in activities that have a substantial illegal purpose.

Thus, in order to prevent taxpayer-funded PSLF benefits from being improperly paid to individuals who are employed by organizations that are not providing public service and are in fact, engaged in activities that are a threat to the public, the Secretary is proposing regulations that would exclude from the group of PSLF qualifying employers, any organizations that engage in activities that have a substantial illegal purpose.

**Background**

Section 455(m) of the Higher Education Act of 1965, as amended, established the PSLF Program under which the Secretary cancels outstanding balances on *Eligible Direct Loans* for borrowers who are employed *full-time* in a *public service job* after they make 120 monthly payments under a *qualifying repayment plan.*

Except for the term, *public service job*, which is defined by statute at 20 U.S.C. 1087e(m)(3), the italicized terms above are specifically defined in the current regulations at 34 CFR 685.219(b).

Page **1** of **9**

ED_02571

The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by cancelling the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of the regulations at 34 CFR 685.219.

As of December 2024, over a million borrowers have received PSLF.  This amount includes over 700,000 borrowers who received limited waiver discharges that the prior Administration used taxpayer funds to pay off the loan balances of borrowers who did not make the minimum 120 monthly payments required by the statute.

**Proposal**

The Secretary proposes to amend the PSLF regulations to ensure that the definition of *qualifying employer* excludes organizations that engage in activities that have a substantial illegal purpose.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

**1. Revise the definition of a *Qualifying Employer* –** The Department proposes to revise the definition of *qualifying employer* to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers.

**2. Define activities that have a *substantial illegal purpose* –** The Department proposes to define specific activities as having a substantial illegal purpose. By providing clear definitions for determining whether an organization is not a qualifying employer under the PSLF Program, the Department would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer. To the extent possible, the Department proposes to adopt definitions that are already established in federal or state law. The Department proposes adding definitions for: "aiding or abetting"; "other Federal immigration laws"; "terrorism"; "Foreign Terrorist Organizations"; "chemical castration or mutilation"; "surgical castration or mutilation"; "illegal discrimination"; and "violating state tort laws".

**3. Establish when a qualifying employer has engaged in activities that have a *substantial illegal purpose* –** The Department proposes to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have a substantial illegal purpose and therefore no longer qualifies as a *qualifying employer* for the purposes of PSLF.

**4. Address the impact on a borrower's eligibility for cancellation under the PSLF Program –** The Department proposes that, effective on or after July 1, 2026, and based on an evidentiary standard as defined in the proposed regulations, no payment by the borrower for any month the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose would count toward the borrower's eligibility for cancellation under PSLF.

**5. Give employers the opportunity for notice and the ability to respond –**  The Department proposes to provide notice to employers and the ability to respond to any Department findings

Page **2** of **9**

ED_02572

relating to whether the employer has engaged in an activity that has a substantial illegal purpose. A final judgment by a state or federal court, plea of guilty or *nolo contendere*, or settlement that includes admission by the organization that it engaged in activities that have a substantial illegal purpose would constitute conclusive evidence of engaging in activities that have a substantial illegal purpose. This process ensures that employers have the ability to challenge and present evidence prior to the Department making a final decision.

**Proposed amendatory text in redlines to represent additions and edits and paragraph restructuring in new paragraph (b):**

**34 CFR § 685.219 – Public Service Loan Forgiveness**

* * *

(b) *Definitions.* The following definitions apply to this section:

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

* * *

(2) *AmeriCorps service…*

* * *

(3) *Chemical castration or mutilation* means -

    (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

    (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

* * *

(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

* * *

(5) *Civilian service to the military…*

* * *

(6) *Early childhood education program…*

* * *

Page **3** of **9**

ED_02573

(7) *Eligible Direct Loan…*

\* \* \*

(8) *Emergency management…*

\* \* \*

(9) *Employee or employed…*

\* \* \*

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

\* \* \*

(11) *Full-time…*

\* \* \*

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

\* \* \*

(13) *Law enforcement…*

\* \* \*

(14) *Military service…*

\* \* \*

(15*) Non-governmental public service…*

\* \* \*

(16)  *Non-tenure track employment…*

\* \* \*

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*).

\* \* \*

Page **4** of **9**

ED_02574

(18)  Other school-based service…

* * *

(19) Peace Corps position…

* * *

(20) Public education service…

* * *

(21) Public health…

* * *

(22) Public interest law…

* * *

(23) Public library service…

* * *

(24) Public safety service…

* * *

(25) Public service for individuals with disabilities…

* * *

(26) Public service for the elderly…

 * * *

(27) Qualifying employer means:

   (i)

         (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

         (iiB) A public child or family service agency;

         (iiiC) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

Page **5** of **9**

ED_02575

(~~iv~~D) A Tribal college or university; or

(~~v~~E) A nonprofit organization that—

(~~A~~1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(~~B~~2) Is not a business organized for profit, a labor union, or a partisan political organization~~.~~; and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

* * *

(28) *Qualifying repayment plan…*

* * *

(29) *School library services…*

* * *

(30) *Substantial illegal purpose* means –

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children or the trafficking of children to states for purposes of emancipation from their lawful parents, in violation of applicable law;

(iv) engaging in a pattern of aiding and abetting illegal discrimination; or

(v) engaging in a pattern of violating State ~~tort~~ laws, ~~including laws~~ against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

* * *

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that

Page **6** of **9**

ED_02576

attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

\* \* \*

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

\* \* \*

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

\* \* \*

(34) *Violating State tort law* means a final, non-default judgment by a State court of:

    (i) trespassing;

    (ii) disorderly conduct;

    (iii) public nuisance;

    (iv) vandalism; or

    (v) obstruction of highways.

Formatted: Highlight

\* \* \*

(3534) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

\* \* \*

    (2) Except as provided in paragraph (c)(4) of this section, A a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

\* \* \*

    (4) Effective on or after July 1, 2026, through a standard as described in paragraph (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

Page **7** of **9**

ED_02577

(e) *Application process.*

\* \* \*

(9) If the Secretary has notified the employer that they may be an ineligible employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(10) If the Secretary has determined the employer is no longer a qualifying employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

\* \* \*

(g) *Borrower Rreconsideration process.*

\* \* \*

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this paragraph (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in paragraph (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* (1) The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and will not find that the organization has a substantial illegal purposes if it has only engaged in illegal activities or actions that are minor or purely technical. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

> (i1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

> (2ii) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

> (3iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

Page **8** of **9**

ED_02578

(2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights.

(i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose*. The Secretary will determine that a qualifying employer violated the standard under paragraph (h) of this section when the Secretary:

(1) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose; or

(2) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h).

**Formatted:** Highlight

**Formatted:** Indent: Left: 0", First line: 0.5"

Page **9** of **9**

ED_02579

**Employer Reinstatement Option for Public Service Loan Forgiveness Proposed Regulatory Text for 34 C.F.R. § 685.219 (j)**:

**34 C.F.R. § 685.219 (j) – Regaining eligibility as a qualifying employer**

(j) *Regaining eligibility as a qualifying employer.* An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after —

   (1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with paragraph (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

   (2) The Secretary approves a corrective action plan signed by the employer that includes —

      (i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

      (ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

      (iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

Page **1** of **1**

ED_02580

**Discussion Paper: Restoring Public Service Loan Forgiveness (PSLF)**

**Session 1, June 30 – July 2, 2025**

**Issue:** Restoring Public Service Loan Forgiveness (PSLF) Program

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue**

Illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and the disruption of the public order are a threat to our national security and to the social and economic stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct.

Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out her duties under Title IV of the HEA. *See, e.g.,* 20 U.S.C. 1221e-3, ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"); *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

Additionally, on March 7, 2025, President Trump signed Executive Order (E.O.) 14235, Restoring Public Service Loan Forgiveness directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the Public Service Loan Forgiveness (PSLF) Program excludes organizations that engage in activities that have a substantial illegal purpose.

Thus, in order to prevent taxpayer-funded PSLF benefits from being improperly paid to individuals who are employed by organizations that are not providing public service and are in fact, engaged in activities that are a threat to the public, the Secretary is proposing regulations that would exclude from the group of PSLF qualifying employers, any organizations that engage in activities that have a substantial illegal purpose.

**Background**

Section 455(m) of the Higher Education Act of 1965, as amended, established the PSLF Program under which the Secretary cancels outstanding balances on *Eligible Direct Loans* for borrowers who are employed *full-time* in a *public service job* after they make 120 monthly payments under a *qualifying repayment plan.*

Except for the term, *public service job*, which is defined by statute at 20 U.S.C. 1087e(m)(3), the italicized terms above are specifically defined in the current regulations at 34 CFR 685.219(b).

Page **1** of **10**

ED_02581

The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by cancelling the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of the regulations at 34 CFR 685.219.

As of December 2024, over a million borrowers have received PSLF. This amount includes over 700,000 borrowers who received limited waiver discharges that the prior Administration used taxpayer funds to pay off the loan balances of borrowers who did not make the minimum 120 monthly payments required by the statute.

**Proposal**

The Secretary proposes to amend the PSLF regulations to ensure that the definition of *qualifying employer* excludes organizations that engage in activities that have a substantial illegal purpose.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

**1. Revise the definition of a *Qualifying Employer* –** The Department proposes to revise the definition of *qualifying employer* to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers.

**2. Define activities that have a *substantial illegal purpose* –** The Department proposes to define specific activities as having a substantial illegal purpose. By providing clear definitions for determining whether an organization is not a qualifying employer under the PSLF Program, the Department would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer. To the extent possible, the Department proposes to adopt definitions that are already established in federal or state law. The Department proposes adding definitions for: "aiding or abetting"; "other Federal immigration laws"; "terrorism"; "Foreign Terrorist Organizations"; "chemical castration or mutilation"; "surgical castration or mutilation"; and "illegal discrimination", and "violating state tort laws".

**3. Establish when a qualifying employer has engaged in activities that have a *substantial illegal purpose* –** The Department proposes to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have a substantial illegal purpose and therefore no longer qualifies as a *qualifying employer* for the purposes of PSLF.

**4. Address the impact on a borrower's eligibility for cancellation under the PSLF Program –** The Department proposes that, effective on or after July 1, 2026, and based on an evidentiary standard as defined in the proposed regulations, no payment by the borrower for any month the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose would count toward the borrower's eligibility for cancellation under PSLF.

**5. Give employers the opportunity for notice and the ability to respond –** The Department proposes to provide notice to employers and the ability to respond to any Department findings

Page **2** of **10**

**Formatted:** Highlight

ED_02582

relating to whether the employer has engaged in an activity that has a substantial illegal purpose. A final judgment by a state or federal court, plea of guilty or *nolo contendere*, or settlement that includes admission by the organization that it engaged in activities that have a substantial illegal purpose would constitute conclusive evidence of engaging in activities that have a substantial illegal purpose. This process ensures that employers have the ability to challenge and present evidence prior to the Department making a final decision.

**Proposed amendatory text in redlines to represent additions and edits and paragraph restructuring in new paragraph (b):**

**34 CFR § 685.219 – Public Service Loan Forgiveness**

* * *

(b) *Definitions.* The following definitions apply to this section:

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

* * *

(2) *AmeriCorps service…*

* * *

(3) *Chemical castration or mutilation* means -

    (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

    (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

* * *

(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

* * *

(5) *Civilian service to the military…*

* * *

(6) *Early childhood education program…*

* * *

Page **3** of **10**

ED_02583

(7) *Eligible Direct Loan...*

\* \* \*

(8) *Emergency management...*

\* \* \*

(9) *Employee or employed...*

\* \* \*

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

\* \* \*

(11) *Full-time...*

\* \* \*

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

\* \* \*

(13) *Law enforcement...*

\* \* \*

(14) *Military service...*

\* \* \*

(15) *Non-governmental public service...*

\* \* \*

(16) *Non-tenure track employment...*

\* \* \*

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

**Formatted:** Highlight

\* \* \*

Page **4** of **10**

ED_02584

(18)  Other school-based service…

* * *

(19) Peace Corps position…

* * *

(20) Public education service…

* * *

(21) Public health…

* * *

(22) Public interest law…

* * *

(23) Public library service…

* * *

(24) Public safety service…

* * *

(25) Public service for individuals with disabilities…

* * *

(26) Public service for the elderly…

 * * *

(27) Qualifying employer means:

   (i)

      (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

      (iiB) A public child or family service agency;

      (iiiC) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

Page **5** of **10**

ED_02585

(iv̶D) A Tribal college or university; or

(v̶E) A nonprofit organization that—

(A̶1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(B̶2) Is not a business organized for profit, a labor union, or a partisan political organization.̶; and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

* * *

(28) *Qualifying repayment plan…*

* * *

(29) *School library services…*

* * *

(30) *Substantial illegal purpose* means –

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;or the

(iv), engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law., in violation of applicable law;

(iv̶v) engaging in a pattern of aiding and abetting illegal discrimination; or

(v̶vi) engaging in a pattern of violating State tort laws; including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

* * *

**Formatted:** Highlight

**Formatted:** Highlight

ED_02586

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

\* \* \*

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

\* \* \*

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

\* \* \*

(34) *Violating State tort law* means a final, non-default judgment by a State court of:

  (i) trespassing;

  (ii) disorderly conduct;

  (iii) public nuisance;

  (iv) vandalism; or

  (v) obstruction of highways.

| Formatted: Highlight |

\* \* \*

(3534) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

\* \* \*

  (2) Except as provided in paragraph (c)(4) of this section, A a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

\* \* \*

  (4) Effective on or after July 1, 2026, through a standard as described in paragraph (h) of this section, no payment shall be credited as a qualifying payment for any month

Page **7** of **10**

ED_02587

subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

(e) *Application process.*

* * *

(9) If the Secretary has notified the employer that they may be an ineligible employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(10) If the Secretary has determined the employer is no longer a qualifying employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(11) If the Secretary approves a corrective action plan under (j)(2), the Secretary notifies the borrower of the employer's status.

**Formatted:** Highlight

* * *

(g) *Borrower Rreconsideration process.*

* * *

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this paragraph (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in paragraph (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* (1) The Secretary determines by a preponderance of the evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and will not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

**Formatted:** Highlight

(i1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

**Formatted:** Highlight

(2ii) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

Page **8** of **10**

(3iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

(2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights.

> Formatted: Highlight

> Formatted: Indent Left 0"

(i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose.* The Secretary will determine that a qualifying employer violated the standard under paragraph (h) of this section when the Secretary:

(1) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose; or

(2) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's determination, the Secretary approves a corrective action plan which includes the factors set forth in subsection (j)(2) of this section. Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h).

> Formatted: Highlight

> Formatted: Highlight

> Formatted: Highlight

(j) *Regaining eligibility as a qualifying employer.* An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after —

(1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with paragraph (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes —

(i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

Page **9** of **10**

ED_02589

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

ED_02590

**Discussion Paper: Restoring Public Service Loan Forgiveness (PSLF)**

**Session 1, June 30 – July 2, 2025**

**Issue:** Restoring Public Service Loan Forgiveness (PSLF) Program

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue**

Illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and the disruption of the public order are a threat to our national security and to the social and economic stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct.

Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out her duties under Title IV of the HEA. *See, e.g.,* 20 U.S.C. 1221e-3, ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"); *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

Additionally, on March 7, 2025, President Trump signed Executive Order (E.O.) 14235, Restoring Public Service Loan Forgiveness directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the Public Service Loan Forgiveness (PSLF) Program excludes organizations that engage in activities that have a substantial illegal purpose.

Thus, in order to prevent taxpayer-funded PSLF benefits from being improperly paid to individuals who are employed by organizations that are not providing public service and are in fact, engaged in activities that are a threat to the public, the Secretary is proposing regulations that would exclude from the group of PSLF qualifying employers, any organizations that engage in activities that have a substantial illegal purpose.

**Background**

Section 455(m) of the Higher Education Act of 1965, as amended, established the PSLF Program under which the Secretary cancels outstanding balances on *Eligible Direct Loans* for borrowers who are employed *full-time* in a *public service job* after they make 120 monthly payments under a *qualifying repayment plan.*

Except for the term, *public service job*, which is defined by statute at 20 U.S.C. 1087e(m)(3), the italicized terms above are specifically defined in the current regulations at 34 CFR 685.219(b).

Page **1** of **10**

ED_02591

The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by cancelling the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of the regulations at 34 CFR 685.219.

As of December 2024, over a million borrowers have received PSLF. This amount includes over 700,000 borrowers who received limited waiver discharges that the prior Administration used taxpayer funds to pay off the loan balances of borrowers who did not make the minimum 120 monthly payments required by the statute.

**Proposal**

The Secretary proposes to amend the PSLF regulations to ensure that the definition of *qualifying employer* excludes organizations that engage in activities that have a substantial illegal purpose.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

**1. Revise the definition of a *Qualifying Employer* –** The Department proposes to revise the definition of *qualifying employer* to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers.

**2. Define activities that have a *substantial illegal purpose* –** The Department proposes to define specific activities as having a substantial illegal purpose. By providing clear definitions for determining whether an organization is not a qualifying employer under the PSLF Program, the Department would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer. To the extent possible, the Department proposes to adopt definitions that are already established in federal or state law. The Department proposes adding definitions for: "aiding or abetting"; "other Federal immigration laws"; "terrorism"; "Foreign Terrorist Organizations"; "chemical castration or mutilation"; "surgical castration or mutilation"; and "illegal discrimination", and "violating state tort laws".

> Formatted: Highlight

**3. Establish when a qualifying employer has engaged in activities that have a *substantial illegal purpose* –** The Department proposes to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have a substantial illegal purpose and therefore no longer qualifies as a *qualifying employer* for the purposes of PSLF.

**4. Address the impact on a borrower's eligibility for cancellation under the PSLF Program –** The Department proposes that, effective on or after July 1, 2026, and based on an evidentiary standard as defined in the proposed regulations, no payment by the borrower for any month the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose would count toward the borrower's eligibility for cancellation under PSLF.

**5. Give employers the opportunity for notice and the ability to respond –** The Department proposes to provide notice to employers and the ability to respond to any Department findings

Page **2** of **10**

ED_02592

relating to whether the employer has engaged in an activity that has a substantial illegal purpose. A final judgment by a state or federal court, plea of guilty or *nolo contendere*, or settlement that includes admission by the organization that it engaged in activities that have a substantial illegal purpose would constitute conclusive evidence of engaging in activities that have a substantial illegal purpose. This process ensures that employers have the ability to challenge and present evidence prior to the Department making a final decision.

**Proposed amendatory text in redlines to represent additions and edits and paragraph restructuring in new paragraph (b):**

**34 CFR § 685.219 – Public Service Loan Forgiveness**

\* \* \*

(b) *Definitions.* The following definitions apply to this section:

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

\* \* \*

(2) *AmeriCorps service…*

\* \* \*

(3) *Chemical castration or mutilation* means -

(i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

(ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

\* \* \*

(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

\* \* \*

(5) *Civilian service to the military…*

\* \* \*

(6) *Early childhood education program…*

\* \* \*

Page **3** of **10**

ED_02593

(7) *Eligible Direct Loan…*

\* \* \*

(8) *Emergency management…*

\* \* \*

(9) *Employee or employed…*

\* \* \*

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

\* \* \*

(11) *Full-time…*

\* \* \*

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

\* \* \*

(13) *Law enforcement…*

\* \* \*

(14) *Military service…*

\* \* \*

(15*) Non-governmental public service…*

\* \* \*

(16)  *Non-tenure track employment…*

\* \* \*

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

**Formatted:** Highlight

\* \* \*

Page **4** of **10**

ED_02594

(18)  *Other school-based service…*

\* \* \*

(19) *Peace Corps position…*

\* \* \*

(20) *Public education service…*

\* \* \*

(21) *Public health…*

\* \* \*

(22) *Public interest law…*

\* \* \*

(23) *Public library service…*

\* \* \*

(24) *Public safety service…*

\* \* \*

(25) *Public service for individuals with disabilities…*

\* \* \*

(26) *Public service for the elderly…*

 \* \* \*

(27) *Qualifying employer* means:

    (i)

        (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

        (~~ii~~B) A public child or family service agency;

        (~~iii~~C) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

ED_02595

(ivD) A Tribal college or university; or

(vE) A nonprofit organization that—

(A1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(B2) Is not a business organized for profit, a labor union, or a partisan political organization-; and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

* * *

(28) *Qualifying repayment plan…*

* * *

(29) *School library services…*

* * *

(30) *Substantial illegal purpose* means –

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law; or the

(iv), engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law, in violation of applicable law;

(ivv) engaging in a pattern of aiding and abetting illegal discrimination; or

(vvi) engaging in a pattern of violating State tort laws as defined in paragraph (34) of this subsection, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways.

* * *

**Formatted:** Highlight

**Formatted:** Highlight

**Formatted:** Highlight

Page **6** of **10**

ED_02596

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

* * *

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

* * *

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

* * *

(34) *Violating State ~~tort~~ law* means a final, non-default judgment by a State court of:

> (i) trespassing;
>
> (ii) disorderly conduct;
>
> (iii) public nuisance;
>
> (iv) vandalism; or
>
> (v) obstruction of highways.

* * *

(35) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

* * *

> (2) Except as provided in paragraph (c)(4) of this section, ~~A~~ a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

* * *

> (4) Effective on or after July 1, 2026, through a standard as described in paragraph (h) of this section, no payment shall be credited as a qualifying payment for any month

Page **7** of **10**

ED_02597

subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

(e) *Application process.*

* * *

(9) If the Secretary has notified the employer that they may be an ineligible employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(10) If the Secretary has determined the employer is no longer a qualifying employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(11) If the Secretary approves a corrective action plan under (j)(2), the Secretary notifies the borrower of the employer's status.

**Formatted:** Highlight

* * *

(g) *Borrower Rreconsideration process.*

* * *

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this paragraph (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in paragraph (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* (1) The Secretary determines by a preponderance of the, clear and convincing evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and will not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

**Formatted:** Highlight
**Formatted:** Highlight

(i1) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

**Formatted:** Highlight

(2ii) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

Page **8** of **10**

ED_02598

(3iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in paragraph (h) of this section.

(2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights.

**Formatted:** Highlight

**Formatted:** Indent Left 0"

(i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose.* The Secretary will determine that a qualifying employer violated the standard under paragraph (h) of this section when the Secretary:

(1) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose; or

**Formatted:** Indent Left 0"

(2) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's determination, the Secretary approves a corrective action plan which includes the factors set forth in subsection (j)(2) of this section. Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h).

(1) The Secretary will determine that a qualifying employer violated the standard under paragraph (h) of this section when the Secretary:

**Formatted:** Highlight

(i) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose ; or

(ii) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's determination, the Secretary approves a corrective action plan which includes the factors set forth in subsection (j)(2) of this section.

(2) Notwithstanding subsection (i)(1), the Secretary may, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate for the purposes of determining whether an employer is eligible.

(j) *Regaining eligibility as a qualifying employer.* An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after —

(1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with paragraph (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent

Page **9** of **10**

ED_02599

application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes —

(i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

ED_02600

## Discussion Paper: Restoring Public Service Loan Forgiveness (PSLF)

### Session 1, June 30 – July 2, 2025

**Issue:** Restoring Public Service Loan Forgiveness (PSLF) Program

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue**

Illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and the disruption of the public order are a threat to our national security and to the social and economic stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct.

Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out her duties under Title IV of the HEA. *See, e.g.,* 20 U.S.C. 1221e-3, ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"); *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

Additionally, on March 7, 2025, President Trump signed Executive Order (E.O.) 14235, Restoring Public Service Loan Forgiveness directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the Public Service Loan Forgiveness (PSLF) Program excludes organizations that engage in activities that have a substantial illegal purpose.

Thus, in order to prevent taxpayer-funded PSLF benefits from being improperly paid to individuals who are employed by organizations that are not providing public service and are in fact, engaged in activities that are a threat to the public, the Secretary is proposing regulations that would exclude from the group of PSLF qualifying employers, any organizations that engage in activities that have a substantial illegal purpose.

**Background**

Section 455(m) of the Higher Education Act of 1965, as amended, established the PSLF Program under which the Secretary cancels outstanding balances on *Eligible Direct Loans* for borrowers who are employed *full-time* in a *public service job* after they make 120 monthly payments under a *qualifying repayment plan.*

Except for the term, *public service job*, which is defined by statute at 20 U.S.C. 1087e(m)(3), the italicized terms above are specifically defined in the current regulations at 34 CFR 685.219(b).

ED_02601

The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by cancelling the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of the regulations at 34 CFR 685.219.

As of December 2024, over a million borrowers have received PSLF.  This amount includes over 700,000 borrowers who received limited waiver discharges that the prior Administration used taxpayer funds to pay off the loan balances of borrowers who did not make the minimum 120 monthly payments required by the statute.

**Proposal**

The Secretary proposes to amend the PSLF regulations to ensure that the definition of *qualifying employer* excludes organizations that engage in activities that have a substantial illegal purpose.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

**1. Revise the definition of a *Qualifying Employer* –** The Department proposes to revise the definition of *qualifying employer* to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers.

**2. Define activities that have a *substantial illegal purpose* –** The Department proposes to define specific activities as having a substantial illegal purpose. By providing clear definitions for determining whether an organization is not a qualifying employer under the PSLF Program, the Department would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer. To the extent possible, the Department proposes to adopt definitions that are already established in federal or state law. The Department proposes adding definitions for: "aiding or abetting"; "other Federal immigration laws"; "terrorism"; "Foreign Terrorist Organizations"; "chemical castration or mutilation"; "surgical castration or mutilation"; and "illegal discrimination".

**3. Establish when a qualifying employer has engaged in activities that have a *substantial illegal purpose* –** The Department proposes to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have a substantial illegal purpose and therefore no longer qualifies as a *qualifying employer* for the purposes of PSLF.

**4. Address the impact on a borrower's eligibility for cancellation under the PSLF Program –** The Department proposes that, effective on or after July 1, 2026, and based on an evidentiary standard as defined in the proposed regulations, no payment by the borrower for any month the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose would count toward the borrower's eligibility for cancellation under PSLF.

**5. Give employers the opportunity for notice and the ability to respond  –** The Department proposes to provide notice to employers and the ability to respond to any Department findings relating to whether the employer has engaged in an activity that has a substantial illegal

ED_02602

purpose. A final judgment by a state or federal court, plea of guilty or *nolo contendere*, or settlement that includes admission by the organization that it engaged in activities that have a substantial illegal purpose would constitute conclusive evidence of engaging in activities that have a substantial illegal purpose. This process ensures that employers have the ability to challenge and present evidence prior to the Department making a final decision.

**Proposed amendatory text in redlines to represent additions and edits and paragraph restructuring in new subsection (b):**

**34 CFR § 685.219 – Public Service Loan Forgiveness**

* * *

(b) *Definitions.* The following definitions apply to this section:

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

* * *

(2) *AmeriCorps service…*

* * *

(3) *Chemical castration or mutilation* means -

   (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

   (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

* * *

(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

* * *

(5) *Civilian service to the military…*

* * *

(6) *Early childhood education program…*

* * *

ED_02603

(7) *Eligible Direct Loan…*

\* \* \*

(8) *Emergency management…*

\* \* \*

(9) *Employee or employed…*

\* \* \*

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

\* \* \*

(11) *Full-time…*

\* \* \*

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

\* \* \*

(13) *Law enforcement…*

\* \* \*

(14) *Military service…*

\* \* \*

(15*) Non-governmental public service…*

\* \* \*

(16)  *Non-tenure track employment…*

\* \* \*

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

\* \* \*

ED_02604

(18)  *Other school-based service…*

\* \* \*

(19) *Peace Corps position…*

\* \* \*

(20) *Public education service…*

\* \* \*

(21) *Public health…*

\* \* \*

(22) *Public interest law…*

\* \* \*

(23) *Public library service…*

\* \* \*

(24) *Public safety service…*

\* \* \*

(25) *Public service for individuals with disabilities…*

\* \* \*

(26) *Public service for the elderly…*

 \* \* \*

(27) *Qualifying employer* means:

    (i)

        (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

        (~~ii~~B) A public child or family service agency;

        (~~iii~~C) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

ED_02605

(ivD) A Tribal college or university; or

(vE) A nonprofit organization that—

(A1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(B2) Is not a business organized for profit, a labor union, or a partisan political organization., and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

\* \* \*

(28) *Qualifying repayment plan…*

\* \* \*

(29) *School library services…*

\* \* \*

(30) *Substantial illegal purpose* means –

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law,;

(v) engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.

\* \* \*

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that

attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

\* \* \*

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

\* \* \*

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

\* \* \*

(34) *Violating State law* means a final, non-default judgment by a State court of:

> (i) trespassing;

> (ii) disorderly conduct;

> (iii) public nuisance;

> (iv) vandalism; or

> (v) obstruction of highways.

\* \* \*

(35) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

\* \* \*

> (2) Except as provided in paragraph (c)(4) of this section, ~~A~~ a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

\* \* \*

> (4) Effective on or after July 1, 2026, through a standard as described in subsection (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

ED_02607

(e) *Application process.*

* * *

(9) If the Secretary has notified the employer that they may be an ineligible employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(10) If the Secretary has determined the employer is no longer a qualifying employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(11) If the Secretary approves a corrective action plan under (j)(2), the Secretary notifies the borrower of the employer's status.

* * *

(g) *Borrower Rreconsideration process*.

* * *

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this subsection (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in subsection (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* (1) The Secretary determines by clear and convincing evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and will not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

(i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

(ii) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

(iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in subsection (h) of this section.

ED_02608

(2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights.(i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose.*

(1) The Secretary will determine that a qualifying employer violated the standard under subsection (h) of this section when the Secretary:

(i) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose; or

(ii) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's determination, the Secretary approves a corrective action plan which includes the factors set forth in subsection (j)(2) of this section.

(2) Notwithstanding subsection (i)(1), the Secretary may, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate for the purposes of determining whether an employer is eligible.

(j) *Regaining eligibility as a qualifying employer*. An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after —

(1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with subsection (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes —

(i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

(k) *Borrower notification of regained eligibility*. If an employer regains eligibility under subsection (j) of this section, the Secretary shall update within thirty (30) days the qualifying employer list, which is accessible to borrowers for purposes of certification or application.

Exhibit 1:



Exhibit 2:

# Why is My Employer's Eligibility Split?

Your employer's eligibility for Public Service Loan Forgiveness (PSLF) can be different depending on their status (eligible, undetermined, or ineligible).

An example of a split status might include organizations that switched between a for-profit and nonprofit status. It can also include organizations that formed, merged, or closed after the PSLF Program began in 2007.

If periods of your employer's eligibility for PSLF are **undetermined**, a case will be created when you submit this employer through the PSLF Help Tool. Your employment certification will not be processed until we have completed a review of your case and reached a decision about your employer's PSLF eligibility.

Below are the time periods and eligibility statuses for PSLF during the dates you provided.

## TENNESSEE ASSOCIATION OF ALCOHOL AND DRUG ABUSE SERVICES INC

51-0149497

| Employment Dates | Eligibility Status |
| --- | --- |
| 05/04/2024 - 07/02/2025 | Undetermined |
| 07/04/2017 - 05/03/2024 | Eligible |

ED_02612

Exhibit 3:



ED_02613

**Discussion Paper: Restoring Public Service Loan Forgiveness (PSLF)**

**Session 1, June 30 – July 2, 2025**

**Issue:** Restoring Public Service Loan Forgiveness (PSLF) Program

**Statutory citation:** Section 455(m) of the Higher Education Act of 1965, as amended (HEA)

**Regulatory citation:** Section 685.219

**Summary of Issue**

Illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and the disruption of the public order are a threat to our national security and to the social and economic stability of the United States. The Department has an overriding governmental interest in promoting policies to thwart such unlawful conduct.

Congress has granted the Secretary broad authority to promulgate regulations to administer the Direct Loan Program and to carry out her duties under Title IV of the HEA. *See, e.g.,* 20 U.S.C. 1221e-3, ("The Secretary . . . is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department"); *see also* 20 U.S.C. 1082, 3441, 3474, 3471.

Additionally, on March 7, 2025, President Trump signed Executive Order (E.O.) 14235, Restoring Public Service Loan Forgiveness directing the Secretary of Education to propose revisions to 34 CFR 685.219 that ensure that loan cancellation under the Public Service Loan Forgiveness (PSLF) Program excludes organizations that engage in activities that have a substantial illegal purpose.

Thus, in order to prevent taxpayer-funded PSLF benefits from being improperly paid to individuals who are employed by organizations that are not providing public service and are in fact, engaged in activities that are a threat to the public, the Secretary is proposing regulations that would exclude from the group of PSLF qualifying employers, any organizations that engage in activities that have a substantial illegal purpose.

**Background**

Section 455(m) of the Higher Education Act of 1965, as amended, established the PSLF Program under which the Secretary cancels outstanding balances on *Eligible Direct Loans* for borrowers who are employed *full-time* in a *public service job* after they make 120 monthly payments under a *qualifying repayment plan.*

Except for the term, *public service job*, which is defined by statute at 20 U.S.C. 1087e(m)(3), the italicized terms above are specifically defined in the current regulations at 34 CFR 685.219(b).

ED_02614

The purpose of the PSLF Program is to encourage individuals to enter and continue in full-time public service employment by cancelling the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of the regulations at 34 CFR 685.219.

As of December 2024, over a million borrowers have received PSLF.  This amount includes over 700,000 borrowers who received limited waiver discharges that the prior Administration used taxpayer funds to pay off the loan balances of borrowers who did not make the minimum 120 monthly payments required by the statute.

**Proposal**

The Secretary proposes to amend the PSLF regulations to ensure that the definition of *qualifying employer* excludes organizations that engage in activities that have a substantial illegal purpose.

Specifically, the proposal would amend 34 CFR 685.219 as follows:

**1. Revise the definition of a *Qualifying Employer* –** The Department proposes to revise the definition of *qualifying employer* to ensure that organizations that engage in activities that have a substantial illegal purpose are not considered to be qualifying employers.

**2. Define activities that have a *substantial illegal purpose* –** The Department proposes to define specific activities as having a substantial illegal purpose. By providing clear definitions for determining whether an organization is not a qualifying employer under the PSLF Program, the Department would enable borrowers and employers to better understand what activities could exclude employers from being considered a qualifying employer. To the extent possible, the Department proposes to adopt definitions that are already established in federal or state law. The Department proposes adding definitions for: "aiding or abetting"; "other Federal immigration laws"; "terrorism"; "Foreign Terrorist Organizations"; "chemical castration or mutilation"; "surgical castration or mutilation"; and "illegal discrimination".

**3. Establish when a qualifying employer has engaged in activities that have a *substantial illegal purpose* –** The Department proposes to establish a standard by which the Secretary would determine that a qualifying employer would be deemed as having engaged in activities that have a substantial illegal purpose and therefore no longer qualifies as a *qualifying employer* for the purposes of PSLF.

**4. Address the impact on a borrower's eligibility for cancellation under the PSLF Program –** The Department proposes that, effective on or after July 1, 2026, and based on an evidentiary standard as defined in the proposed regulations, no payment by the borrower for any month the Secretary determines that the qualifying employer engaged in activities that have a substantial illegal purpose would count toward the borrower's eligibility for cancellation under PSLF.

**5. Give employers the opportunity for notice and the ability to respond  –**  The Department proposes to provide notice to employers and the ability to respond to any Department findings relating to whether the employer has engaged in an activity that has a substantial illegal

purpose. A final judgment by a state or federal court, plea of guilty or *nolo contendere*, or settlement that includes admission by the organization that it engaged in activities that have a substantial illegal purpose would constitute conclusive evidence of engaging in activities that have a substantial illegal purpose. This process ensures that employers have the ability to challenge and present evidence prior to the Department making a final decision.

**Proposed amendatory text in redlines to represent additions and edits and paragraph restructuring in new subsection (b):**

**34 CFR § 685.219 – Public Service Loan Forgiveness**

* * *

(b) *Definitions.* The following definitions apply to this section:

(1) *Aiding or abetting* has the same meaning as defined under 18 U.S.C. 2.

* * *

(2) *AmeriCorps service…*

* * *

(3) *Chemical castration or mutilation* means -

   (i) the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and

   (ii) the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex.

* * *

(4) *Child* or *children* for the sole and specific purpose of this section means an individual or individuals under 19 years of age.

* * *

(5) *Civilian service to the military…*

* * *

(6) *Early childhood education program…*

* * *

ED_02616

(7) *Eligible Direct Loan…*

*   *   *

(8) *Emergency management…*

*   *   *

(9) *Employee or employed…*

*   *   *

(10) *Foreign Terrorist Organizations* mean organizations on the list published under paragraph (a)(2)(A)(ii) under the Immigration and Nationality Act (8 U.S.C. 1189).

*   *   *

(11) *Full-time…*

*   *   *

(12) *Illegal discrimination* means a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. 1981 *et seq.*), Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*).

*   *   *

(13) *Law enforcement…*

*   *   *

(14) *Military service…*

*   *   *

(15*) Non-governmental public service…*

*   *   *

(16)  *Non-tenure track employment…*

*   *   *

(17) *Other Federal Immigration laws* mean any violation of the Immigration and Nationality Act (8 U.S.C. 1105 *et seq.*) or any other Federal immigration laws.

*   *   *

ED_02617

(18)  Other school-based service…

* * *

(19) Peace Corps position…

* * *

(20) Public education service…

* * *

(21) Public health…

* * *

(22) Public interest law…

* * *

(23) Public library service…

* * *

(24) Public safety service…

* * *

(25) Public service for individuals with disabilities…

* * *

(26) Public service for the elderly…

 * * *

(27) Qualifying employer means:

   (i)

      (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

      (iiB) A public child or family service agency;

      (iiiC) An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

ED_02618

(~~iv~~D) A Tribal college or university; or

(~~v~~E) A nonprofit organization that—

(~~A~~1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

(~~B~~2) Is not a business organized for profit, a labor union, or a partisan political organization~~.~~; and

(ii) Does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section.

\* \* \*

(28) *Qualifying repayment plan…*

\* \* \*

(29) *School library services*…

\* \* \*

(30) *Substantial illegal purpose* means –

(i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

(iv) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law,;

(v) engaging in a pattern of aiding and abetting illegal discrimination; or

(vi) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.

\* \* \*

(31) *Surgical castration or mutilation* means surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that

ED_02619

attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions.

\* \* \*

(32) *Terrorism* is defined under the Crimes and Criminal Procedure (18 U.S.C. 2331).

\* \* \*

(33) *Trafficking* means transporting a child or children from their State of legal residence to another State without permission or legal consent from the parent or legal guardian for purposes of emancipation from their lawful parents or legal guardian, in violation of applicable law.

\* \* \*

(34) *Violating State law* means a final, non-default judgment by a State court of:

> (i) trespassing;

> (ii) disorderly conduct;

> (iii) public nuisance;

> (iv) vandalism; or

> (v) obstruction of highways.

\* \* \*

(35) *Violence for the purpose of obstructing or influencing Federal Government policy* means violating any part of 18 U.S.C. 1501 *et seq.* by committing a crime of violence as defined under 18 U.S.C. 16.

(c) *Borrower eligibility.*

\* \* \*

> (2) Except as provided in paragraph (c)(4) of this section, ~~A~~ a borrower will be considered to have made monthly payments under paragraph (c)(1)(iii) of this section by—

\* \* \*

> (4) Effective on or after July 1, 2026, through a standard as described in subsection (h) of this section, no payment shall be credited as a qualifying payment for any month subsequent to a determination that a qualifying employer engaged in activities that have a substantial illegal purpose, as described in this section.

ED_02620

(e) *Application process.*

* * *

(9) If the Secretary has notified the employer that they may be an ineligible employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

(10) If the Secretary has determined the employer is no longer a qualifying employer under subsection (h) of this section, the Secretary notifies the borrower of the employer's status.

* * *

(g) *Borrower ~~R~~reconsideration process*.

* * *

(7) Notwithstanding paragraph (g)(1) of this section, a borrower may not request reconsideration under this subsection (g) based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose under the standard described in subsection (h) of this section.

(h) *Standard for determining a qualifying employer engaged in activities that have a substantial illegal purpose.* (1) The Secretary determines by clear and convincing evidence, and after notice and opportunity to respond, that a qualifying employer has engaged on or after July 1, 2026, in activities that have a substantial illegal purpose by considering the materiality of any illegal activities or actions (by gauging both frequency or severity) and will not find that the organization has a substantial illegal purpose if it has only engaged in illegal activities or actions that are minor or purely technical. The Secretary will only use evidence not included in the subclauses (i) - (iii), in instances where those activities or actions of the qualifying employer which have a substantial illegal purpose are severe and pervasive. In making such determination, the Secretary shall presume that any of the following is conclusive evidence that the employer engaged in activities that have a substantial illegal purpose:

(i) A final judgment by a State or Federal court, whereby the employer is found to have engaged in activities that have a substantial illegal purpose;

(ii) A plea of guilty or *nolo contendere*, whereby the employer admits to have engaged in activities that have substantial illegal purpose or pleads nolo contendere to allegations that the employer engaged in activities that have substantial illegal purpose; or

(iii) A settlement that includes admission by the employer that it engaged in activities that have a substantial illegal purpose described in subsection (h) of this section.

ED_02621

(2) Nothing in this subsection shall be construed to authorize the Secretary to determine an employer has a substantial illegal purpose based upon the employer or its employees exercising their First Amendment protected rights, or any other rights protected under the Constitution (i) *Process for determining when an employer engaged in activities that have a substantial illegal purpose.*

(1) The Secretary will determine that a qualifying employer violated the standard under subsection (h) of this section when the Secretary:

(i) Receives an application as referenced under subsection (e) of this section which the employer does not certify that it did not participate in activities that have a substantial illegal purpose; or

(ii) Determines that the qualifying employer engaged in activities that have a substantial illegal purpose under subsection (h) of this section, unless, prior to the issuance of the Secretary's determination, the Secretary approves a corrective action plan which includes the factors set forth in subsection (j)(2) of this section.

(2) Notwithstanding subsection (i)(1), the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if the employer is operating separately and distinctly, for the purposes of determining whether an employer is eligible.

(j) *Regaining eligibility as a qualifying employer*. An organization that loses eligibility for failure to meet the conditions of paragraph (b)(27) of this section may regain eligibility to become a qualifying employer after —

(1) Five years from the date the Secretary determines the organization engaged in activities that have a substantial illegal purpose in accordance with subsection (h) of this section, if, at or after that time, the organization certifies on a borrower's subsequent application that the organization is no longer engaged in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section; or

(2) The Secretary approves a corrective action plan signed by the employer that includes —

(i) a certification that the employer is no longer engaging in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section;

(ii) a plan describing the employer's compliance controls that are designed to ensure that the employer will not engage in activities that have a substantial illegal purpose as defined in paragraph (b)(30) of this section in the future; and

(iii) any other terms or conditions imposed by the Secretary designed to ensure that employers do not engage in actions or activities that have a substantial illegal purpose.

ED_02622

(k) *Borrower notification of regained eligibility*. If an employer regains eligibility under subsection (j) of this section, the Secretary shall update within thirty (30) days the qualifying employer list, which is accessible to borrowers for purposes of certification or application.