## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, CITY OF BOSTON, CITY OF ALBUQUERQUE, CITY OF CHICAGO, CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, AMICA CENTER FOR IMMIGRANT RIGHTS, COALITION FOR HUMANE IMMIGRANT RIGHTS, LEGAL AID SOCIETY OF THE DISTRICT OF COLUMBIA, OASIS LEGAL SERVICES, AMERICAN FEDERATION OF TEACHERS, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, NATIONAL EDUCATION ASSOCIATION, and NATIONAL ASSOCIATION OF SOCIAL WORKERS, <br><br> *Plaintiffs*, <br><br> v. <br><br> LINDA MCMAHON, in her official capacity as SECRETARY OF EDUCATION 400 Maryland Avenue SW Washington, D.C. 20202 <br><br> and <br><br> DEPARTMENT OF EDUCATION 400 Maryland Avenue SW Washington, D.C. 20202 <br><br> *Defendants*. | **Civil Case No. 25-cv-13242-MJJ** |

## AMENDED COMPLAINT

## INTRODUCTION

1.      This lawsuit seeks to restore the promise that a bipartisan Congress made to public-service workers and their employers in establishing the Public Service Loan Forgiveness (PSLF) program nearly 20 years ago: that borrowers will have their student loans forgiven in exchange for completing 10 years of service to their communities and our country.

2.      Public service workers are the lifeblood of our democracy and the backbone of the Nation's economy. They include police officers, nurses, teachers, librarians, social workers, and lawyers who work with low-income populations. People throughout this country can find public service workers in every one of their communities because those workers do jobs that we cannot function without.

3.      In establishing the PSLF program, Congress recognized the need to have talented and dedicated people occupy this workforce—and it also knew that high levels of student loan debt often prohibited those same people from taking these types of jobs. For nearly two decades the program helped to bridge this gap by promising forgiveness of student-loan debt to those who worked in public service jobs. And the PSLF program served its purpose: as of October 2024, more than a million borrowers have had more than $70 billion in student debt discharged through it.[1]

4.      In an attempt to target organizations and jurisdictions whose missions and policies do not align with its political positions on immigration, race, gender, free speech, and public protest, the Trump-Vance Administration has weaponized the PSLF program in a way that defies how Congress designed it. Employers used to be able to qualify for eligibility under the Program by simply providing objective information to allow the Department of Education to verify their

---

[1] *See* White House Archives, *Making Public Service Loan Forgiveness Work for Borrowers and the American People* (Oct. 17, 2024), https://perma.cc/XB5E-2WTN.

government or nonprofit status. But Defendants—Secretary of Education Linda McMahon and the Department of Education—have now promulgated a Rule that purports to allow the Secretary to selectively disqualify employers from participation in the program on the *Secretary's determination* that an employer has engaged in activities with a purported "substantial illegal purpose." Since inauguration, the Trump-Vance administration has baselessly accused law abiding people and organizations of being engaged in "illegal" activities if those activities are at odds with the administration's agenda—from accusing peaceful protesters of being engaged in terrorist activity to claiming that organizations that help provide food and basic services to immigrants are breaking the law.

5.      Plaintiffs—a group of cities and counties, 501(c)(3) nonprofit organizations, and associations representing nurses, teachers, social workers, government employees, and other professionals—serve communities across the United States, including the most vulnerable among us. They are engaged in lawful activities. However, given this Administration's history of targeting nonprofit organizations and government entities that disagree with its policy decisions—and using federal programs, benefits and funding (and the threat of their termination) to compel compliance and chill opposition—they have a credible fear that this new Rule will likewise be used to target them and, in the case of the Associational Plaintiffs, the employers at which their employees work. And Plaintiffs need the promise of the PSLF program both to do their work and attract people to help them do this work.

6.      Defendants' new eligibility requirements are unlawful in both method and goal. The Rule violates the Administrative Procedure Act because it is contrary to and exceeds the statutory authority granted to the Department under the Higher Education Act, which establishes that all government and 501(c)(3) employers are eligible for the PSLF program without limitation

and confers no authority on the Secretary to disqualify any of them; it is arbitrary and capricious; and it contravenes fundamental constitutional principles of free speech.

7.     Accordingly, Plaintiffs bring this action on their own behalf and on behalf of their members for vacatur of the rule and allege for their complaint against Defendants as follows:

## PARTIES

### Plaintiffs

#### *Government Plaintiffs*

8.     Plaintiff City of Boston (Boston) is a municipal corporation organized and existing under and by virtue of the laws of the Commonwealth of Massachusetts.

9.     Plaintiff City of Albuquerque (Albuquerque) is a municipal corporation organized and existing under and by virtue of the laws of the State of New Mexico, and is a charter city.

10.     Plaintiff City of Chicago (Chicago) is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

11.     Plaintiff City and County of San Francisco (San Francisco) is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

12.     Plaintiff County of Santa Clara (Santa Clara) is a charter county and political subdivision of the State of California.

#### *Nonprofit Plaintiffs*

13.     Plaintiff National Council of Nonprofits (NCN) is a national association that represents the interests of nonprofit 501(c)(3) organizations, and is itself a registered 501(c)(3) nonprofit organization located in Washington, D.C.

14.     Plaintiff Amica Center for Immigrant Rights (Amica Center) is a registered 501(c)(3) nonprofit organization that provides legal services to immigrants and their families, and is located in Washington, D.C.

15.     Plaintiff Coalition for Humane Immigrant Rights (CHIRLA) is a registered 501(c)(3) nonprofit organization that serves the immigrant community, including by providing pro bono immigration legal services, and is located in Los Angeles, California.

16.     Plaintiff Legal Aid Society of the District of Columbia (Legal Aid DC) is a registered 501(c)(3) nonprofit organization that provides free civil legal services for persons who cannot afford a lawyer, and is located in Washington, D.C.

17.     Plaintiff Oasis Legal Services is a registered 501(c)(3) nonprofit organization that provides legal services and support to LGBTQ+ immigrants, and is located in Berkeley, California.

### *Associational Plaintiffs*

18.     Plaintiff American Federation of Teachers (AFT) is a membership organization representing 1.8 million teachers, educators, higher education faculty and staff, healthcare professionals, and government employees, and is headquartered in Washington, D.C.

19.     Plaintiff American Federation of State, County, and Municipal Employees, AFL-CIO (AFSCME) is a national labor organization and unincorporated membership association with approximately 1.4 million members organized into approximately 3,400 local unions, 58 councils, and other affiliates in 46 states (including Massachusetts), the District of Columbia, and Puerto Rico, and is headquartered in Washington, D.C.

20.     Plaintiff National Education Association (NEA) is a membership organization representing 3 million educators who mostly work for school districts or other state and local government employers, and is headquartered in Washington, D.C.

21.     Plaintiff National Association of Social Workers (NASW) is the largest membership organization of professional social workers in the United States, and is located in Washington, D.C.

**Defendants**

22.     Defendant Linda McMahon is the Secretary of Education. Secretary McMahon is charged with the supervision and management of all decisions and actions of the Department of Education, including overseeing the PSLF program. She is sued in her official capacity.

23.     Defendant U.S. Department of Education is a federal agency headquartered in Washington, D.C. It is responsible for administering federal student loan and grant programs in the United States, including the PSLF program.

**JURISDICTION AND VENUE**

24.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

25.     This Court has the authority to grant relief requested by Plaintiffs under the APA, 5 U.S.C. § 701, *et seq.*, and under the Court's inherent equitable authority.

26.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and at least one Plaintiff resides in this District and/or has members who reside in this District.

## FACTUAL ALLEGATIONS

I.    **The Public Service Loan Forgiveness Program**

    A. **Congress Creates PSLF and Instructs the Secretary to Forgive Student Loans of Borrowers Who Work at Any Government or 501(c)(3) Employer, Without Restriction.**

27.    In 2007, Congress passed with bipartisan support the College Cost Reduction and Access Act, which, among other things, created the PSLF program. *See* Pub. L. 110-84, 121 Stat. 784 (2007). President George W. Bush signed the Act into law on September 27, 2007.

28.    Congress created PSLF to address a growing shortage of workers in public service jobs, which covers a broad spectrum of employment from nurses and teachers to firefighters and police officers. While these jobs constitute the backbone of this Nation's democracy, they are financially impossible for many people, especially those with increasingly burdensome student debt. The PSLF program was therefore designed to encourage public service and ensure that working in a public-service job did not result in a lifetime of unaffordable student loan debt.

29.    The concept was simple: work for a government, 501(c)(3) nonprofit organization, or other qualifying employer for 10 years while making payments on your loans, after which the federal government would "forgive" or cancel the remaining debt. To date, over one million government and nonprofit workers have had their federal student loans cancelled through the PSLF program.[2]

30.    Consistent with Congress's goals of advancing public service employment, the Act provides that the Secretary of Education "*shall* cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan" for a borrower who "has made 120" eligible "monthly payments on the eligible Federal Direct Loan after October 1, 2007" and "has been employed in a

---

[2] *See* White House Archives, *Making Public Service Loan Forgiveness Work for Borrowers and the American People* (Oct. 17, 2024), https://perma.cc/XB5E-2WTN.

public service job during the period in which the borrower ma[de] each of the 120 payments." 20 U.S.C. § 1087e(m)(1) (emphasis added).

31.    The statutory text is mandatory. Congress did not confer any discretion whatsoever to the Secretary to withhold cancellation based on any criteria—or no criteria at all.

32.    The statute also defines the meaning of "public service job" expansively, as follows:

> [A] full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, . . . public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title.

*Id.* at 1087e(m)(3)(B)(i).

33.    Under Congress's definition, any job in "government" (excluding time served as a member of Congress) or at a 501(c)(3) nonprofit organization categorically qualifies as a "public service job" for the PSLF program.

34.    The Act does not further define the term "public service job" or enumerate any other, alternate meanings. The Act contains no exceptions to the list of jobs enumerated in the definition.

35.    The legislative history bolsters the conclusion that Congress envisioned—and crafted—a capacious category of public-service careers and employers that it intended the PSLF program to benefit.

36.     Lawmakers expressed that PSLF should support borrowers who want "to be teachers, to be in law enforcement, to work in legal aid, to work as a public defender, to work in environmental protection, to work in a variety of areas that are extraordinarily important for our country and for our society,"[3] including those in "emergency management, public safety, . . . public education, early childhood education, childcare, public health and social work in public service agencies, public services for individuals with disabilities and the elderly, public interest legal services, public defenders, school librarians, school-based service providers, teaching full-time at a tribal college or university."[4]

37.     Senator Kennedy emphasized that this enumerated list of employers was "not exclusive, it is inclusive."[5]

38.     Finally, and crucially, the Act does not direct or permit the Secretary of Education or anyone else to create exceptions to the list of qualifying public service jobs. *See* 20 U.S.C. § 1087e(m).

**B.  The Department of Education's Implementing Regulations Never Attempted to Disqualify or Restrict Eligible Employers.**

39.     Following the creation of the PSLF program, the Department of Education issued regulations implementing the program. *See* 34 C.F.R. § 685.219; *Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program*, 73 Fed. Reg. 63232 (Oct. 23, 2008).

40.     Consistent with the language of the statute, those regulations explain that the purpose of the PSLF program is to "encourage individuals to enter and continue in full-time public

---

[3] 153 Cong. Rec. S9437, S9447 (2007).
[4] *Id.* at S9443 (Statement of Sen. Ted Kennedy).
[5] *Id.* at S9452.

service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section." 34 C.F.R. § 685.219(a) (2010).

41.    These original regulations listed broad categories of "qualifying employers" whose employees are eligible, including, among other things, "[a] Federal, State, local, or Tribal government organization, agency, or entity"; a "nonprofit organization under section 501(c)(3) of the Internal Revenue Code that is exempt from taxation under section 501(a) of the Internal Revenue Code." 34 C.F.R. § 685.219(b) (2010). Those categories mirror the categories defined in the statute.

42.    The regulations used the term "public service organization" in place of "public service job" (as was used in the statute). The Department explained that its definition of "public service organization" "is derived from the statutory definition of 'public service job' in section 455(m)(3)(B) of the HEA." *Federal Perkins Loan Program*, 73 Fed. Reg. at 63242. Importantly, that term was "intended to identify broad categories of eligible jobs rather than define specific jobs under those categories." *Id.*

43.    A government or 501(c)(3) nonprofit organization is therefore considered a qualifying employer for the PSLF program pursuant to both the Higher Education Act and its implementing regulations.

44.    Once a borrower has satisfied the requirements of the program, *i.e.*, made 120 monthly payments under a qualifying repayment plan while employed full-time by a qualifying employer, the borrower may apply for loan forgiveness. These requirements are equivalent to those that Congress established in the statute. *Compare* 34 C.F.R. § 685.219(e), *with* 20 U.S.C. § 1087e(m)(1).

45.     Borrowers need not be employed by the same employer for the duration of their 120 monthly payments, nor do they need to make their 120 payments consecutively.[6]

46.     The Department also created an Employment Certification Form (also known as the PSLF Form) for borrowers to "help track [their] progress toward qualifying for PSLF."[7]

47.     When a public-service worker with federal student loan debt wants to receive credit for loan payments made during their employment for purposes of eventually seeking PSLF, they must ask their employers—and any employer from which the worker wants to credit time toward PSLF—to complete the PSLF Form.

48.     Historically the PSLF Form has sought only factual information: the borrower's personal information; the employer's information, including the employer's Federal Employer Identification Number, name, address, and website; the borrower's employment start date, their end date (or whether they are still employed), whether they work part time or full time, and the average hours per week that they work.[8]

49.     The PSLF Form can be completed by anyone who is designated by the employer to complete employees' PSLF Forms and who has access to personnel records sufficient to verify the factual information required.[9] At some public service employers, Human Resources staff complete individual PSLF Forms, whereas at other employers, the borrower's immediate supervisor completes the form.

50.     The PSLF process for employers has therefore been a straightforward, objective, and largely ministerial task.

---

[6] Dep't of Educ., *Public Service Loan Forgiveness FAQ*, https://perma.cc/8AC3-4FLN.
[7] Dep't of Educ., Fed. Student Aid, *Public Service Loan Forgiveness Form*, https://perma.cc/QA7K-EQD7.
[8] *Id*. at 7.
[9] *Id*.

## C.  The PSLF Program Remains an Essential Support for Public Service Workers with Student Loan Debt.

51.    PSLF continues to serve as a critical incentive for people to enter and remain in public-service careers amid a staggeringly high rate of student debt in this country and an affordability crisis that makes it difficult for people to accept lower-paying government or nonprofit jobs. Those problems compelled Congress to create the PSLF program in the first place, and they persist to this day.

52.    Total outstanding federal student debt in the United States has only climbed in the intervening years and now exceeds $1.6 trillion.[10] More than 42 million people have federal student loans; the average borrower owes approximately $40,000 in outstanding loans.[11]

53.    Student loans continue to be a tremendous barrier to entry for people seeking employment in public service jobs, where salaries are generally not as high as comparable private-sector jobs.

54.    And many public service jobs—healthcare, social work, and law, among many others—require additional graduate school education, leading borrowers to take on even more debt to pursue their chosen profession. The upshot is an exacerbated inequality between a person's total student debt and income achievable in public service jobs. Such disparities contribute to labor shortages in critically important public service fields.

55.    For example, social workers—like those who are represented by Associational Plaintiffs—who obtain a Master of Social Work (the terminal degree required to practice clinical

---

[10]  Dep't of Educ., Fed. Student Aid, *Federal Student Aid Portfolio Summary: 2025 Q3*, https://perma.cc/Z466-HZ68.
[11] *Id.*

social work independently) graduate with a mean total student debt of $66,000.[12] Meanwhile, the mean annual starting salary for social workers with that degree is approximately $47,100.[13]

56.     Teachers, like those represented by Plaintiffs AFT and NEA, must obtain a college degree but generally do not receive the same pay and benefits found in the private sector. The average starting salary for a teacher in the 2023-2024 academic year was $46,526, with an average teacher salary of $72,030.[14] Meanwhile, the average student loan debt for teachers is estimated to be $58,700.[15] As a result, borrowers who commit themselves to education too often find themselves struggling to afford basic needs and unable to save for their future due to their student loan debt obligations.

57.     Likewise, firefighters, first responders, and other professionals working for state and local governments, like those represented by Plaintiff AFSCME, must take on considerable debt to obtain specialized training, ranging from medical care to information technology. For example, the starting annual salary for a Boston Police Forensics specialist is $63,208.14,[16] whereas the average student loan debt in Massachusetts is over $36,000.[17]

58.     Or consider nonprofit legal services lawyers, like those who work for Plaintiffs Amica Center for Immigrant Rights, CHIRLA, Legal Aid DC, and Oasis Legal Services, as well as those represented by Plaintiff AFSCME. Seventy percent of law students graduate with student

---

[12] Edward Salsberg et al., *The Social Work Profession: Findings from Three Years of Surveys of New Social Workers*, NASW (Aug. 2020), at 12, https://perma.cc/FMK8-KGM8.
[13] *Id.*
[14] NEA, *2025 Reports: Educator Pay in America* (Apr. 29, 2025), https://perma.cc/GBD8-62W4.
[15] AFT, *AFT Resolution for Student Debt Cancellation* (Sept. 29, 2022), https://perma.cc/YN78-QD3U.
[16] Boston, *Compensation Rate: Boston Police Department Forensics* (Aug. 24, 2023), https://perma.cc/BHY7-KDCY.
[17] Dep't of Educ., Fed. Student Aid, *Portfolio by Location: 2025 Q3* (June 30, 2025), https://perma.cc/7QF4-Z27Q.

debt, and the average law graduate owes $130,000.[18] But lawyers entering public interest jobs, such as those in civil legal services and at legal aid organizations, earn an average of only $64,600.[19]

59.    The financial burdens facing social workers, teachers, nurses, public interest lawyers, and other public service employees are partially responsible for widespread labor shortages in these critical fields. Moreover, the nonprofit sector as a whole is also facing a significant workforce shortage.[20]

60.    PSLF has operated since Congress created it to address these very problems and incentivize people with student loan debt to seek less lucrative government and nonprofit employment. As of October 2024, more than a million borrowers have had more than $70 billion in student debt discharged through the PSLF program.[21] According to data published by the Department in October 2025, 694,900 borrowers who received debt cancellation through PSLF worked in government, and 305,500 worked for qualifying nonprofits.[22]

61.    Among the government workers who have had their loans cancelled, employment in local government jobs accounts for 425,500 borrowers, whereas federal and state government jobs account for 100,400 and 166,600, respectively.[23]

---

[18] Melanie Hanson, *Average Law School Debt*, Education Data Initiative (updated Oct. 1, 2024), https://perma.cc/9KAA-VV6Y.

[19] Nat'l Ass'n for Law Placement, *NALP's Public Service Attorney Salary Survey Shows Pay Remains Lowest at Civil Legal Services Organizations* (May 2024), https://www.nalp.org/0524research.

[20] *See* Nat'l Council of Nonprofits, *2023 Nonprofit Workforce Survey Results: Communities Suffer as Nonprofit Workforce Shortage Crisis Continues* (2023), at 3-4, https://perma.cc/4UBC-MNQP; Ctr. For Effective Philanthropy, *State of Nonprofits in 2023: What Funders Need to Know* (2023), https://perma.cc/HFC7-HGFD.

[21] *See* White House Archives, *Making Public Service Loan Forgiveness Work for Borrowers and the American People* (Oct. 17, 2024), https://perma.cc/XB5E-2WTN.

[22] *William D. Ford Federal Direct Loan (Direct Loan) Program (Final Regulation)*, 90 Fed. Reg. 48966, 48994 (Oct. 31, 2025).

[23] *Id*. (2,400 government borrowers' level of government was unknown).

62.     Although the Department did not publish a breakdown of nonprofit employers by type, it did break down all borrowers' employment by "subsector," which revealed that K-12 education accounts for the profession of over one quarter of borrowers who receive PSLF, at 303,500.[24] The subsequent three largest subsectors were healthcare, governance, and higher education, at 163,900, 161,000, and 108,200, respectively.[25]

63.     PSLF is also a proven recruitment and retention tool for public-service employers.[26]

64.     Nonprofit organizations consistently report that salary competition is the single largest factor harming their ability to attract and retain employees.[27] PSLF helps level the playing field by making the prospect of student debt cancellation an attractive benefit for people who might otherwise find jobs in the private sector—and leave critical public service jobs vacant. Nonprofit and government employers regularly tout their eligibility for PSLF as a recruitment tool for new employees. For example, in a 2023 survey of nonprofit employers conducted by Plaintiff National Council of Nonprofits, respondents identified promoting PSLF as a "notable" strategy for overcoming the workforce shortage.

65.     The Department of Education itself continues to encourage employers to tout their eligibility as a recruitment tool. In a resource for employers, the Department instructs that, "While this is a potentially life-changing benefit for your employee, it's also an opportunity for you. You

---

[24] *Id*.

[25] *Id*.

[26] *See also* Julie Burrell, Coll. & Univ. Pro. Ass'n for Hum. Res., *Public Service Loan Forgiveness: Help Employees Achieve Their Financial Goals*, The Higher Ed Workplace Blog (Sept. 17, 2024), https://perma.cc/JE5Q-LBDC (noting that human resources can use the PSLF program "as part of a retention and recruitment strategy" and that it is "an especially attractive benefit to potential employees").

[27] *See* Nat'l Council of Nonprofits, *2023 Nonprofit Workforce Survey Results: Communities Suffer as the Nonprofit Workforce shortage Crisis Continues* (2023), https://perma.cc/4UBC-MNQP.

can use your eligibility as a qualifying employer for the PSLF . . . program[ ] as a recruitment tool to attract highly qualified employees to your organization.[28]

66.    Indeed, the Department itself acknowledges that a majority of both public sector and private sector employees make "job decisions based on their student loan debt levels," and public service employees in particular "cited PSLF as a significant factor in their decision to pursue and remain in public service." *William D. Ford Federal Direct Loan (Direct Loan) Program (Notice of proposed rule making)*, 90 Fed. Reg. 40154, 40169 (Aug. 18, 2025).

67.    That PSLF is an important recruitment and retention benefit is backed up by survey data. One survey of more than 1,000 healthcare employees found that PSLF plays a "critical role in reducing turnover, improving job satisfaction, and enhancing workforce stability" at nonprofit hospital settings.[29] Among other findings, the study revealed that 71 percent of employees who were "considering a job change cited student loan assistance (including PSLF) as a key factor in their decision."[30] The study also concluded that employers that "promote PSLF-eligible positions see 30 percent lower vacancy rates than those without PSLF-related benefits."[31]

68.    Indeed, even this Administration acknowledges the attractiveness of PSLF as a recruitment tool for public service jobs that serve its political agenda. For example, U.S. Customs and Border Patrol and Immigration and Customs Enforcement have prominently advertised student loan forgiveness as a hiring incentive.[32]

---

[28] Dep't of Educ., Fed. Student Aid, *Tackling the Public Service Loan Forgiveness Form: Employer Tips*, https://perma.cc/P6SW-FY8C.
[29] PeopleJoy, *The Role of PSLF in Nonprofit Hospital Recruitment & Retention*, https://perma.cc/WK6E-7A44.
[30] *Id.*
[31] *Id.*
[32] Dep't of Homeland Sec., Press Release, *DHS Launches 'Defend the Homeland' Nationwide to Recruit Patriots to Join ICE Law Enforcement and Remove Worst of the Worst from U.S.* (July 29, 2025), https://perma.cc/ZEK8-FYES; Customs & Border Prot., *Public Service Loan Forgiveness Program*, https://perma.cc/C546-VC2E.

## II.    The 2025 Executive Order and Final Rule

### A.  President Trump Orders the Department of Education to Adopt Rules That Undermine PSLF.

69.    On March 7, 2025, President Trump signed Executive Order 14,235, "Restoring Public Service Loan Forgiveness."[33]

70.    The Executive Order sets forth the Administration's desire to end the supposed "subsidization of illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and disruption of the public order, which threaten the security and stability of the United States."[34] The Executive Order articulates the Administration's policy aim—that "individuals employed by organizations whose activities have a substantial illegal purpose shall not be eligible for public service loan forgiveness."[35]

71.    The Executive Order directs the Secretary of Education and Secretary of the Treasury to "ensure the definition of 'public service' excludes organizations that engage in activities that have a substantial illegal purpose."[36]

72.    The Executive Order enumerates five such categories:

"(a) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;

(b) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

(c) child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law;

---

[33] Exec. Order 14,235, Restoring Public Service Loan Forgiveness, 90 Fed. Reg. 11885 (Mar. 7, 2025), https://perma.cc/2QTM-XKBY.
[34] *Id.*
[35] *Id.*
[36] *Id.* § 2.

(d) engaging in a pattern of aiding and abetting illegal discrimination; or

(e) engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways."[37]

73.    A Fact Sheet accompanying the publication of the Executive Order explains that the Order is designed to "end taxpayer-funded student loan forgiveness for anti-American activists" and to "end federal support for organizations that harm American values and the public interest."[38]

74.    The Fact Sheet attacks the previous Administration for having "encouraged [students with debt] to join organizations that undermine national security and the societal good."[39]

75.    For example, the Fact Sheet states, without evidence or citation, that the previous administration "was accused of using the student loan forgiveness program to pay pro-Palestinian and pro-Hamas activists and criminals with taxpayer dollars."[40]

76.    The Fact Sheet also states that the Executive Order "refocuses PSLF on its original intent of encouraging Americans to enter essential public service roles, such as nursing, rather than activist groups"[41] and that that the Executive Order "ensur[es] only legitimate public servants benefit, not those engaged in illegal or harmful activities."[42]

**B.  As Directed, the Department Initiates Negotiated Rulemaking to Implement the President's Executive Order.**

77.    The Higher Education Act mandates that changes to the federal student loan program regulations must occur through negotiated rulemaking, in which representatives from

---

[37] *Id.*

[38] The White House, Press Release, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://perma.cc/SAA9-CVVH.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

certain stakeholder groups are selected to meet and "negotiate" the text of any proposed new or amended regulation. *See* 20 U.S.C. § 1098a.

78.    Pursuant to the President's Executive Order, on April 4, 2025, the Department published its intent to establish a negotiated rulemaking committee related to the PSLF regulations.[43]

79.    In a departure from regular Department practice, rather than select separate negotiators for each of the civil rights, consumer advocacy, and legal services communities, the Department combined these three distinct stakeholder groups into one single set of negotiators.[44]

80.    In a further departure from practice, rather than hold multi-day negotiation sessions across a series of weeks over several months, the Department scheduled a single three-day session to come up with the rule. The Department conducted the session on June 30, July 1, and July 2– notably, the days leading up to the July 4th holiday weekend.[45]

81.    In advance of the negotiated rulemaking session, the Department published proposed regulatory language, which largely mirrored that in the Executive Order.

82.    The Department proposed revising the existing definition of PSLF-qualifying employers in Department regulations to exclude organizations that engage in activities that have a "substantial illegal purpose," and proposed adding definitions to identify activities with a "substantial illegal purpose."[46]

---

[43] *Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee*, 90 Fed. Reg. 14741 (Apr. 4, 2025).
[44] *Negotiated Rulemaking Committee; Negotiator Nominations and Schedule of Committee Meetings*, 90 Fed. Reg. 20142 (May 12, 2025).
[45] *Id*.
[46] Dep't of Educ., *Discussion Draft as of 06-23-25 for Committee Use Only* (June 23, 2025), https://perma.cc/VR9H-KJP8.

83.    The Department also proposed two procedures by which the Secretary would determine that an employer had engaged in an activity with a purported substantial illegal purpose and would therefore no longer be eligible for PSLF.[47] First, the Secretary could issue such a finding if an employer failed to certify on an employee's PSLF Form that the employer is not engaged in activities with a purported substantial illegal purpose. Second, the Secretary could undertake her own investigation into a particular employer's activities. After providing notice and an opportunity to respond, the Secretary could determine by a preponderance of the evidence that the employer has engaged in activity with a purported substantial illegal purpose. The proposal did not require a judicial finding or admission of wrongdoing (though it specified that a court order, guilty or no contest plea, or admission would constitute "conclusive evidence"). The initial proposal did not provide for any mechanism by which employers, once disqualified, could regain their eligibility.

84.    The Department cited no statutory authority for these proposed revisions. Nor could it, as explained above: Congress provided that government and 501(c)(3) nonprofit employers are categorically eligible, *see* 20 U.S.C. § 1087e(m)(3)(B)(i), and Congress did not authorize the Department to investigate or strip an employer's eligibility.

85.    Negotiators questioned, among other things, the Department's statutory authority, whether the Department was the most appropriate agency to assess nonprofit organizations' conduct, the Department's targeting of employers, the selection of enumerated illegal activities, and whether there were any examples of PSLF-eligible employers engaged in illegal activities that necessitated the rulemaking. The Department failed to meaningfully engage with or respond to these good-faith questions, and offered only conclusory assertions.

---

[47] *Id.*

86.    Modifications made to the proposed regulation over the negotiation period were minor in scope and did not alter the Administration's stated goal: to create a mechanism for excluding certain government and 501(c)(3) nonprofit employers from PSLF.[48]

**C.  The Department Issues a Notice of Proposed Rulemaking on the PSLF Program.**

87.    On August 18, 2025, Defendants published an NPRM to amend its PSLF regulations to codify the President's Executive Order.[49] The deadline to submit comments was September 17, 2025.[50]

88.    The regulation in the NPRM mirrored the Executive Order and the proposal for negotiated rulemaking.

89.    The Department explained that the changes it proposed "will focus on ensuring that PSLF benefits are directed only to those borrowers who are employed by organizations that serve the public good and uphold public policy, while eliminating the risk of improper payments to those working for organizations engaged in illegal activities."[51]

90.    The Department further asserted that "[t]he costs associated with employer review and administration are modest compared to the significant benefits gained, including increased transparency, program integrity, and taxpayer protection."[52]

91.    The Department explained in the NPRM that it bases its proposal on the IRS's "illegality doctrine"—that organizations with a fundamentally illegal purpose cannot qualify as charities under section 501(c)(3) of the tax code—but does not explain how or why that doctrine should apply to the PSLF program.

---

[48] *Id.*
[49] *William D. Ford Federal Direct Loan (Direct Loan) Program*, 90 Fed. Reg. 40154 (Aug. 18, 2025).
[50] *Id.*
[51] *Id.* at 40166.
[52] *Id.* at 40155.

92.    The proposed rule sought to amend the definition of "qualifying employer" by providing that the term "does not include organizations that engage in activities that have a substantial illegal purpose, as defined in this section."[53]

93.    In line with the Executive Order and the Department's proposals during negotiated rulemaking, the proposed rule defined "substantial illegal purpose" as:

> (i) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
>
> (ii) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;
>
> (iii) engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;
>
> (iv) engaging in the trafficking of children to states for purposes of emancipation from their lawful parents in violation of Federal or State law;
>
> (v) engaging in a pattern of aiding and abetting illegal discrimination; or
>
> (vi) engaging in a pattern of violating State laws as defined in paragraph (34) of this subsection.[54]

94.    The proposed rule also included the procedural framework for disqualifying government or 501(c)(3) nonprofit employers from the PSLF program if (1) an employer fails to certify that it is not engaged in activities with a purported substantial illegal purpose on the PSLF Form, and/or (2) the Secretary determines that the employer has engaged in activities with a purported substantial illegal purpose.[55]

---

[53] 34 C.F.R. 685.219(b)(27)(ii) (proposed), 90 Fed. Reg. at 40160.
[54] 34 C.F.R. § 685.219(b)(30) (proposed), 90 Fed. Reg. at 40175.
[55] 34 C.F.R. § 685.219(i)(1) (proposed), 90 Fed. Reg. at 40167.

95.    The proposed rule expounded on the procedural framework for disqualification. Under the proposed rule:

a.    The Secretary must adopt a preponderance of the evidence standard when determining that an employer has engaged in activity with a purported substantial illegal purpose.[56]

b.    Disqualification of the PSLF program would last for 10 years, at which point an employer can reestablish its eligibility by certifying that it is no longer engaged in activities with a purported substantial illegal purpose.[57]

c.    An employer may avoid disqualification at any point if the Secretary approves a corrective action plan, which requires an admission of having engaged in activities with a purported substantial illegal purpose.[58]

96.    The only discussion of the Department's legal authority—or lack thereof—in its NPRM invokes the agency's "broad authority" to administer the PSLF program.[59]

97.    The Department asserted that its proposed rule would result in reduced borrower confusion over employer eligibility "through making the process more transparent and efficient."[60]

98.    The Department acknowledged that employers will face compliance costs, including "the costs of legal counsel, restructuring efforts, and changes to the organization's documentation processes[,]"[61] but suggested that some employers are accustomed to complying

---

[56] 34 C.F.R. § 685.219(h)(1) (proposed), 90 Fed. Reg. at 40163.
[57] 34 C.F.R. § 685.219(j)(1) (proposed), 90 Fed. Reg. at 40165.
[58] 34 C.F.R. § 685.219(j)(2) (proposed), 90 Fed. Reg. at 40166.
[59] *Id.* at 40,166.
[60] *Id.*
[61] *Id.* at 40168.

with vague and subjective standards and so would only experience "*de minimis*" compliance burdens.[62]

### D. Nearly 14,000 Organizations, Government Agencies, and Individuals Submit Comments About the Proposed Rule.

99.    Defendants received 13,989 comments in response to their NPRM, including comments from Plaintiffs.

100.    In addition to comments from thousands of individual borrowers and employers, Defendants received comments from a wide array of stakeholders affected by the Rule or with an interest in preserving the PSLF program as-is, including: a coalition of over 250 consumer advocacy, civil rights, legal aid, and labor organizations;[63] local governments[64] and 33 local elected officials and policymakers;[65] 64 organizations that promote and protect civil and human rights;[66] Members of Congress, including 24 United States Senators[67] and 59 United States Representatives;[68] national unions and professional associations representing borrowers who work

---

[62] *Id.*

[63] Coal. of 250 Consumer Advoc., Civ. Rts., Legal Aid, & Lab. Orgs., Comment Letter on Proposed Rule to Refine Definitions of a Qualifying Employer for the Purposes of Determining Eligibility for the Public Service Loan Forgiveness Program [hereafter "PSLF Rule"] (Sept. 17, 2025), https://perma.cc/3DRY-QW94.

[64] City and Cnty. of San Francisco, *Comment Letter on PSLF Rule* (Sept. 18, 2025), https://perma.cc/4V34-ASS7; City of Albuquerque, *Comment Letter on PSLF Rule* (Sept. 18, 2025), https://perma.cc/3M49-U87M.

[65] Coal. of Cities & Cntys., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/K3Z7-GRNA.

[66] Coal. of 64 Civ. & Hum. Rts. Grps., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/2WSL-ZXPK.

[67] Members of the U.S. Senate, *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/P8TC-JQW2.

[68] Members of the U.S. House of Representatives, *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/945A-Q3U9.

in public service jobs;[69] coalitions of 501(c)(3) advocacy organizations;[70] a coalition of law students and recent law school graduates;[71] teachers and school districts;[72] nurses, doctors, and medical clinics;[73] legal services organizations;[74] and college and university professors,[75] among others.

101.     Thousands of commenters urged Defendants to withdraw the Rule because of the significant harm it could pose to public service employers. For example, a coalition of nonprofit organizations said: "The proposed rule would have a chilling effect on employers' ability to recruit and retain qualified staff working in critical fields and with rural and other marginalized communities."[76] According to some comments, many of these fields already face a shortage of workers, which would likely be exacerbated if the Rule goes into effect, as a national network of community health centers warned:

---

[69] *See, e.g.*, AFSCME, *Comment Letter on PSLF Rule* (Sept. 16, 2025), https://perma.cc/7HT7-BYWW; AFT, *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/BC2E-WVZ7; NEA, *Comment Letter on PSLF Rule*, https://perma.cc/928B-4X38.

[70] Coal. for Humane Immigrant Rts. (CHIRLA), *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/SRU5-U8EM; GLBTQ Legal Advocates & Defs., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/ENJ6-4QHU; So. Env't. L. Ctr., the Nat. Res. Def. Council, Earthjustice & the Env't L. & Policy Ctr. of the Midwest, *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/EKS7-CQLJ; Council on American-Islamic Rels., New York (CAIR-NY*), Comment Letter on PSLF Rule* (Sept. 16, 2025), https://perma.cc/CB3N-MHLD.

[71] Consumer L. Advocates, Scholars & Students (CLASS) Network et al., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/6C4X-KEQJ.

[72] *See, e.g.* S.F. Unified Sch. Dist., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/JWN2-UFQ7.

[73] *See, e.g.*, BayCare Health Sys., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/QG9M-Q8HD; Nat'l Ass'n of Comm. Health Ctrs., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/59K7-PPRD.

[74] *See, e.g.*, Nat'l Consumer L. Ctr., *Comment Letter on PSLF Rule* (Sept. 17, 2025), https://perma.cc/6NEF-9VPK; Impact Fund, *Comment Letter on Notice of Intent to Establish A Negotiated Rulemaking Committee on Student Loan Repayment* (Sept. 16, 2025), https://perma.cc/3B6C-7SJT.

[75] *See, e.g.*, Prof. Jonathan Glater, *Comment Letter on PSLF Rule* (Sept. 16, 2025), https://perma.cc/CU2A-Q3H8; Prof. Blake Nemec, *Comment Letter on PSLF Rule* (Sept. 15, 2025), https://perma.cc/C2KJ-5JLM; Professors of Tax'n & Non-profit L., *Comment Letter on PSLF Rule* (Sept. 16, 2025), https://perma.cc/46FE-YB48.

[76] Comment of Coal. of 250 Orgs. Comment, *supra*, at 2.

> The PSLF is a vital program to the physicians and the rest of the staff at [community health centers] who are integral to providing health care access to nearly 34 million Americans. Once again, if workers cannot utilize PSLF to help them repay their student loans, they may leave the primary care workforce for better paying jobs, leaving patients with fewer physicians, technicians, and nurses.[77]

102.    Likewise, as Plaintiff City of Albuquerque said:

> If the City were to lose PSLF eligibility, it would likely create an untenable staffing crisis due to employees moving to other eligible employers in Albuquerque, creating immediate staffing shortages and heightening downstream costs such as overtime, temporary staffing, and training. Even if an employer were to try to replace the PSLF benefit with pay increases, it is not a realistic option in tight municipal budgets.[78]

103.    Individual borrowers expressed concern for their livelihoods if their employers, including future employers, are disqualified from PSLF under the Rule: "I fear for my financial future and the financial future of my children," said one current law student who intends to seek PSLF.[79] Similarly, according to a recent law graduate:

> Since graduating law school four years ago, I have found PSLF invaluable, but I am concerned that the proposed rule could affect my future career. I am the first in my family to go to law school, and PSLF made it possible to do what I came to law school to do: seek careers in public interest and public service, including judicial clerkships, that enabled me to help others. The Proposed Rule threatens me and others who might be in a similar situation . . .[80]

104.    Public service employers observed that the rule will impose an unprecedented burden on them to figure out how to comply with it. Plaintiffs and others expressed that the proposed rule introduced inordinate uncertainty to the certification process, leading to substantial costs and expenditure of resources.

---

[77] Comment of Nat'l Ass'n of Comm. Health Ctrs., *supra*, at 2-3.
[78] Comment of City Albuquerque, *supra*, at 2.
[79] Comment of CLASS Network, *supra*, at 9.
[80] *Id.* at 38.

105.    Dozens of comments pointed out that the Higher Education Act does not confer any authority to the Department to disqualify particular employers because they engage in particular activities.[81]

106.    Also, according to members of the U.S. Senate: "At no point did Congress consider, let alone adopt, restrictions on what kinds of 501(c)(3) employers qualify for PSLF. Nor did Congress consider, let alone delegate, authority to the Secretary to disqualify employers based on a partisan or political litmus test."[82]

107.    Comments also asserted that the rule chilled free speech and was unconstitutionally vague.[83]

108.    Finally, some commentors rejected the Department's attempt to justify the Rule based on the IRS "illegality doctrine." For example, a group of law professors with expertise in taxation and nonprofit law analyzed the doctrinal underpinnings of the illegality doctrine and found that the Department mischaracterized and misapplied it to the Rule:

> The proposed rule claims repeatedly that Education adopts well-known standards that are familiar to the public and to the regulators. But that is not so, as even the sources cited by the proposed rule acknowledge. [Citation omitted.] Rather than building on old experience, the proposed rule seems to invent a new concept of "illegality," ignoring the key lessons of IRS experience with the illegality and fundamental public policy doctrine. It is very doubtful Congress could have intended to authorize an inexpert agency to launch such a novel project.[84]

109.    A group of 501(c)(3) tax-exempt organizations voiced similar concerns:

> To the extent Congress contemplated the illegality doctrine, it left enforcement to the IRS—with its auditors, investigatory powers,

---

[81] *See, e.g.*, Legal Def. Fund, *Comment Letter on PSLF Rule* 4-5 (Sept. 17, 2025), https://perma.cc/5RSK-3EVC; Comment of AFSCME, *supra*, at 2.

[82] Comment of U.S. Senators, *supra*, at 3.

[83] *See, e.g.*, Comment of Legal Def. Fund, *supra*, at 12; Comment of Coal. of 64 Civ. and Hum. Rts. Grps., *supra*, at 2; Comment of Prof. Glater, *supra* at 4; Comment of CAIR-NY, *supra*, at 2.

[84] Comment of Tax'n and Nonprofit L. Professors, *supra*, at 10.

procedures, and judicial review. The Department's role is narrower: confirming that an employer remains in good standing with the IRS. . . . The Department of Education lacks investigatory authority over private employers and has no expertise in tax, employment, immigration, health, or state law. Yet the NPRM would assign itself the power to police all tax-exempt organizations on those subjects, and to do so based on a bare preponderance of the evidence. If Congress had intended that result, it would have said so.[85]

### E.  The Department Finalizes the Rule.

110.    Despite the thousands of comments opposing the Rule, the Department finalized the rulemaking in short order and published it in the Federal Register on October 31, 2025.[86] Notably, the Department completed its review of the comments during the federal government shutdown, which indicates that the Secretary determined under the Anti-Deficiency Act that finalizing the rule was excepted activity warranting scarce staff time and resources to rush through a regulation that members of the public widely denounced as illegal and unconstitutional.

111.    The Rule does nothing to address the serious flaws and concerns raised by Plaintiffs and commenters in response to the NPRM.

112.    Indeed, the Rule maintains the same structure and definitions as proposed in the NPRM: the Secretary may still disqualify government and 501(c)(3) nonprofit employers from the PSLF program on the basis that they engage in activities with a purported substantial illegal purpose.[87] The definition of "substantial illegal purpose" did not change from the NPRM to the Rule.[88] The Rule still provides for disqualification (1) if an employer fails to certify that they are not engaged in activities with a purported substantial illegal purpose on the PSLF Form, and/or (2)

---

[85] Comment of So. Env't. L. Ctr., *supra*, at 3-5.
[86] *William D. Ford Federal Direct Loan (Direct Loan) Program*, 90 Fed. Reg. 48966 (Oct. 31, 2025).
[87] *Id.*
[88] 34 C.F.R. § 685.219(b)(30) (proposed), 90 Fed. Reg. at 48983.

if the Secretary determines that the employer, with notice and an opportunity to respond, has engaged in activities with a purported substantial illegal purpose.[89]

113.    In effect, the Department did not make any changes to its proposed rule to address the comments and concerns that it received, described above. Instead, insofar as it responded to comments, it dismissed commenters' concerns with cursory, conclusory, and self-serving responses.

114.    For example, in response to commenters' questions about the Department's legal authority to exclude government and 501(c)(3) nonprofit employers from PSLF and assertions that it lacks this authority,[90] the Department replied only that the Higher Education Act "grants the Secretary explicit power to regulate title IV programs" and that "PSLF is a title IV program[.]"[91] The Department did not adequately explain how it can promulgate regulations that conflict with statute's clear language that government and 501(c)(3) nonprofits are categorically PSLF-eligible employers.

115.    Similarly, although the Department asserts that it "has identified a critical and urgent need for targeted regulatory reform within the PSLF program" as justification for the Rule,[92] it does not cite any example of a currently PSLF-eligible employer being engaged in activities with a purported substantial illegal purpose.

116.    The Department also failed to meaningfully address commenters' concerns about administrative burden, even asserting that the Rule "does not impose new reporting requirements

---

[89] 34 C.F.R. § 685.219(i)(1) (proposed), 90 Fed. Reg. at 48988.
[90] 90 Fed. Reg. at 48971.
[91] *Id.*
[92] *Id.* at 48992.

or compliance burdens on" small entities participating in PSLF.[93] The Department inaccurately calculated the Rule's burden and overall cost.

117.    The Department asserts repeatedly that the Rule increases transparency and clarity.[94] These assertions defy logic, as the Rule replaces a categorical eligibility standard with a subjective one. These assertions are also belied by comments from employers and employees alike—*i.e.,* those for whom the Rule must be legible—that the Rule is not clear, provides no guidance for how to conduct themselves or seek out PSLF-eligible employment, and increases uncertainty.[95]

118.    Additionally, in attempting to justify the Rule, the Department relies on improper factors, such as whether the PSLF program results in increased college tuition.[96]

119.    In summary, the Department has substituted its own PSLF policy for Congress's— a policy that violates constitutional free-speech protections—and has failed to adequately explain its legal basis for doing so, justify the need for the Rule with any specificity, or meaningfully address the real concerns and experiences of employers and employees who face arbitrary enforcement of the Rule.

III.    **The Rule Harms Plaintiffs.**

   A.   **The Rule Is the Administration's Latest Attack on Politically Disfavored People and Entities.**

120.    The Rule—like the Executive Order that directed it—sends a clear message to government and 501(c)(3) nonprofit employers doing work to which the Administration objects: stop, or else. The Administration has repeatedly targeted nonprofit organizations and government

---

[93] *Id.* at 48997.
[94] *See, e.g., id.* at 48969, 48993, 48998, 48999.
[95] *See, e.g., id.* at 48969, 48989, 48998.
[96] *See, e.g., id.* at 48969.

entities that disagree with its policy agenda, using federal programs, benefits, and funding (and the threat of their termination) to compel compliance and chill opposition. This Rule represents yet another attack on politically disfavored local governments and nonprofits that have local laws, policies, and missions that are anathemas to the Administration's views.

121.    Specifically, the Rule authorizes the Secretary to disqualify employers that have "engaged in activities that have a substantial illegal purpose." A closer look at the activities the Administration is targeting, like "aiding or abetting violations of . . . Federal immigration laws" and "engaging in a pattern of aiding and abetting illegal discrimination," are both activities in which the Trump-Vance Administration has repeatedly, and wrongfully, accused several Plaintiffs of engaging. Ironically, several Plaintiffs have brought legal challenges against the Administration for engaging in activities that violate immigration laws and engage in a pattern of illegal discrimination.

122.    Because the Administration seeks to use the PSLF program to baselessly characterize disfavored activities of government entities and nonprofits as "illegal activity," Plaintiffs therefore face a substantial risk that the Secretary of Education will attempt to illegitimately disqualify them from participating in the PSLF program.

123.    The Rule also broadly furthers the Administration's attack on public service and the nonprofit sector. Since taking power, the Administration has slashed nonprofit federal funding[97] and targeted specific organizations with which it disagrees ideologically.[98] Through its

---

[97] Press Release, Nat'l Council of Nonprofts, *President Trump Proposes to Slash Funding for domestic Programs in FY2026* (May 2, 2025), https://perma.cc/VGE5-SGBY.
[98] Press Release, Democracy Forward, *Federal Judge Rules Department of Justice Likely Retaliated Against American Bar Association In Abruptly Cancelling Grants to Support Domestic and Sexual Violence Survivors* (May 14, 2025), https://perma.cc/43VB-UVL2; Aishvarya Kavi, *Judge Rules That Trump Administration Takeover of Institute of Peace Is Illegal*, N.Y. Times (May 19, 2025), https://perma.cc/U7PE-WDN9; Jacob Knutson, *In Dangerous Attack on Left-Leaning Nonprofits, Trump*

efforts to unilaterally dismantle executive agencies, especially through the so-called Department of Government Efficiency, and threats to cut funding for local governments, the Administration has made clear its agenda to undermine public sector service.[99]

### B. The Rule Causes Significant Harm to PSLF-Qualifying Employers and Borrowers Relying on PSLF.

124.    Plaintiffs are all (1) eligible employers (or associations of employers) who employ people in public service jobs in accordance with 20 U.S.C. § 1087e(m)(3)(B), or (2) associations of individuals, many of whom hold federal Direct Student Loans, work in public service jobs, and rely on PSLF and Congress's promise evinced in the Higher Education Act to have their student loans forgiven after ten years of working in public service. All Plaintiffs are aggrieved and have standing to bring this action, as detailed further below, because the Rule directly harms their proprietary and economic interests as employers and as associations of eligible borrowers.

125.    All Plaintiffs stand to suffer—and in fact are already suffering—harm because of the Rule.

126.    The Rule imposes immediate administrative burdens and costs on PSLF employers. They also face direct, immediate, and detrimental injury in their ability to recruit and retain the employees they need to carry out their public service missions.

127.    In addition, even though all Plaintiffs believe the activities in which they engage to be lawful, the Governmental and Nonprofit Plaintiffs have a credible fear that will be disqualified as employers under PSLF on the basis of the Rule's new criteria and the Secretary's considerable discretion.

---

*Orders Government to Go After 'Domestic Terrorism Networks'*, Democracy Docket (Sept. 25, 2025), https://perma.cc/U7SB-2H6Q.
[99] Chris Clow & Jonathan Delozier, *DOGE activities at NeighborWorks America sparks NHC call to action*, Nat'l Hous. Conf. (Apr. 18, 2025), https://perma.cc/X6YF-W9AR.

### 1. Employer Plaintiffs (Government Plaintiffs and Nonprofit Plaintiffs)

128.    As the objects of the regulation, all Employer Plaintiffs—*i.e.,* Government Plaintiffs and Nonprofit Plaintiffs—experience increased administrative burdens, including but not limited to understanding the new eligibility requirements under the regulation, reviewing activities of their dozens of departments and thousands of employees to determine compliance, and potentially restructuring their processes for certifying PSLF forms, given the new eligibility criteria that involve making legal determinations.

129.    Indeed, the Rule contemplates increased compliance costs, especially for larger and more complex organizations, regardless of whether they retain their status as qualifying employers.[100]

130.    Employer Plaintiffs are committed to their employees' financial stability, and therefore actively promote participation in the PSLF program and certify employees' employment status for PSLF when requested. Currently, however, many of them do not have a centralized method of signing employees' PSLF Forms, so in response to the Rule they will have to either retrain staff across various divisions or develop a new, centralized system for certifying employee forms. This will divert money and staff time away from usual responsibilities and programmatic work in order to make PSLF determinations.

131.    Employer Plaintiffs must also expend considerable resources parsing the regulation's vague standards to determine whether or not the Secretary might consider their activities to have a so-called "substantial illegal purpose." They must do this to complete their employees' PSLF Forms, which under the regulation will require employers to certify that they have not engaged in activities with a purported substantial illegal purpose.[101] Whereas the previous

---

[100] *See* 90 Fed. Reg. at 48993.
[101] 34 C.F.R. § 685.219(i)(1)(i) (proposed), 90 Fed. Reg. at 40164.

PSLF Form required only objective information (e.g., the employee's start date), the new PSLF Form will require authorized officials to make a legal determination. That will require consulting with in-house legal departments, taking time away from other pressing matters, or in some cases hiring outside counsel to advise them on how their activities are likely to be interpreted under the Rule. Even an employer whose activities are at low risk of being considered to have a purported substantial illegal purpose must make this determination in order for its employees to certify their employment for PSLF and benefit from the program.

132.    The Rule also significantly impairs Employer Plaintiffs' ability to recruit and retain staff—injuries that are already accruing. As the Department acknowledges, a majority of both public sector and private sector employees make "job decisions based on their student loan debt levels," and public service employees in particular "cited PSLF as a significant factor in their decision to pursue and remain in public service."[102] As public service employers, Plaintiffs typically cannot offer compensation packages that match similar roles as at for-profit employers. Being a PSLF-eligible employer, however, allows them to offer their employees a benefit that the private sector cannot: student debt cancellation.

133.    Employer Plaintiffs therefore advertise themselves as PSLF-eligible employers in job postings and throughout the recruitment process, encourage their employees to take advantage of the program, and update them on changes to the PSLF. Their employees' reliance on debt relief through PSLF also incentivizes them to remain in their current employment while they accrue credit toward that debt relief. If Employer Plaintiffs no longer qualify for PSLF—and indeed, under the present threat of noncompliance—many employers will have to consider spending more

---

[102] 90 Fed. Reg. at 40169.

resources to attract new employees and to offset this benefit loss for current employees. One negotiator estimated that this could cost employees as much as $9,000 annually per employee.[103]

134.    Under the threat of disqualification, or if employers are in fact disqualified, employees who rely on PSLF may depart for an employer that is PSLF-eligible or to a private sector employer, and potential hires may decide to go elsewhere.  The Final Rule therefore harms not only individual employees but also stands to deprive Government and Nonprofit Plaintiffs of experienced staff with deep institutional knowledge, weakening their capacity to deliver essential public services. The resulting loss of talent, continuity, and expertise will harm Plaintiffs in both the short and long term. Indeed, this appears to be the goal of the Rule: to encourage borrowers to pursue "eligible employment elsewhere."[104]

135.    The Rule further places Employer Plaintiffs at a competitive disadvantage with other government and nonprofit employers that are not at risk of losing their PSLF status. Even "the mere existence of the [Rule] alters the balance of bargaining power between employers and employees by creating a disincentive" for employees and prospective employees to accept or stay in a position with Plaintiff employers. *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (per curiam). The effect of the Rule is to "depriv[e] [Plaintiffs] of a significant economic weapon," *id.*, by which to attract and retain talented employees. And that harm is already accruing now, as Employer Plaintiffs' place in the marketplace is altered by the Rule.

136.    In general, Employer Plaintiffs offer comparable compensation and benefits packages to their government and nonprofit peer organizations. As discussed below, they have credible concerns that the Secretary could target them and determine that they are engaged in

---

[103] Laurel Taylor, *Economic Analysis: The Cost-Effectiveness of Public Service Loan Forgiveness (PSLF)*, Candidly (June 29, 2025), https://perma.cc/8CPJ-ZKCQ.
[104] 90 Fed. Reg. at 40155; 90 Fed. Reg. at 48968.

activities with a purported substantial illegal purpose, resulting in their disqualification from PSLF. In that likely instance, Employer Plaintiffs would then no longer be able to offer PSLF as an employee benefit for current and prospective employees, and so they will be disadvantaged in the government and nonprofit labor markets in which they compete.

137.    Similarly, the Rule puts Employer Plaintiffs at a competitive disadvantage relative to for-profit employers, with which they also compete for employees. Plaintiffs recruit and hire college and graduate school-educated employees, and can offer PSLF as an employee benefit to offset relatively lower salaries than the for-profit sector. Their employees could find work as nurses, social workers, lawyers, or teachers, for example, in the private sector, generally for higher pay. Plaintiffs are therefore competing for the same employees as for-profit firms, and they will be disadvantaged if they can no longer offer PSLF benefits as an incentive to offset lower salaries.

138.    Because of the genuine threat that Employer Plaintiffs will be disqualified as an employer under PSLF on the basis of the Rule's new criteria and the Secretary's considerable discretion, Employer Plaintiffs face direct, immediate, and seriously detrimental injury.

### Government Plaintiffs

139.    As government entities, the Plaintiffs City of Albuquerque, City of Boston, City of Chicago, City and County of San Francisco, and County of Santa Clara (Government Plaintiffs) have been qualifying employers for the PSLF program since Congress established the program in 2007.

140.    According to the Department, local governments like Government Plaintiffs employ more PSLF borrowers than any other sector, including the federal government, state governments, and nonprofits.[105] Although Government Plaintiffs strongly believe and maintain

---

[105] *William D. Ford Federal Direct Loan (Direct Loan) Program (Final Regulations)*, 90 Fed. Reg. at 48995.

that they do not engage in any "activities that have a substantial illegal purpose," the importance of the PSLF program to Government Plaintiffs as employers makes them a clear target for an antagonist Administration seeking to punish entities that will not abandon their lawful policies in the face of the Administration's pressure.

141.    In particular, Government Plaintiffs are all local governments with so-called sanctuary jurisdiction laws or policies, which have placed them in the crosshairs of this Administration. Government Plaintiffs' fear that the Administration would use the Rule to disqualify them is reasonable given that the Department of Justice has already placed Albuquerque, Boston, Chicago, and San Francisco on a so-called "Sanctuary Jurisdiction List,"[106] and the Department of Homeland Security previously included Santa Clara on a similar list. The DOJ list's definition of "sanctuary jurisdiction" is substantially identical to one of the definitions in the Rule for activities with a substantial illegal purpose, leading the Government Plaintiffs to fear that the Department of Education, like the Department of Justice and the Department of Homeland Security, will target them with this Rule over the same policies.

142.    Similarly—the Trump-Vance Administration has taken an expansive and extralegal view of what activities violate federal anti-discrimination law.  For example, the Department of Justice recently announced an initiative to use the False Claims Act against entities that purportedly engage in "unlawful discrimination," such as allowing individuals to use the bathroom that aligns with their gender identity.[107] Certain Government Plaintiffs allow individuals to use bathrooms that align with their gender identity, and have other policies that are disfavored by the Trump-Vance Administration but that comply with federal, state, and local civil rights and anti-

---

[106] Dep't of Justice, *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities From Criminal Aliens* (updated Oct. 31, 2025), https://perma.cc/4TSD-GB9M.
[107] *See* Memo from Deputy U.S. Attorney General Blanche regarding Civil Rights Fraud Initiative (May 19, 2025), https://perma.cc/K3CC-YCFX.

discrimination laws as interpreted by courts and articulated in laws, statutes, and ordinances. Government Plaintiffs may nonetheless be targeted under the Rule because of the Administration's unlawful interpretation of anti-discrimination law.

143.    In addition to the harms detailed above, Government Plaintiffs stand to suffer downstream economic injuries if government employees and neighboring public service employers can no longer use PSLF. Government Plaintiffs currently benefit from many public service employers who live, eat, shop, attend events, and otherwise contribute to their economy because of PSLF.  Disqualifying public sector employers like Government Plaintiffs would disrupt local labor markets and require many borrowers to continue paying back loans past when they financially planned to do so—leading to economic losses in the form of decreased consumer spending in their jurisdictions, loss of tax revenue, and other economic repercussions.  If allowed to stand, the Rule will cause these indirect but substantial economic harms to Government Plaintiffs, in addition to its employees and residents.

144.    In sum, as a result of the Rule, Government Plaintiffs are suffering and will continue to suffer injuries related to the regulatory burden and costs associated with the Rule; the competitive disadvantage at which the Rule places them, including with respect to recruitment and retention of employees; and the downstream economic consequences that may follow. Illustrative examples pertinent to each Government Plaintiff are as follows:

### *City of Albuquerque*

145.    City of Albuquerque is the largest city in the state of New Mexico, serving more than 560,000 residents. It employs more than 5,800 personnel, who work across multiple City departments, including, but not limited to, the police department, fire rescue, the international airport, community safety, and emergency management.

146.    As a local government employer, Albuquerque has numerous employees who participate (and have participated) in the PSLF program: a recent survey indicated that of 829 employee responses, 200 employees currently participate in PSLF (24.2%). Additionally, 337 (40.7%) employees indicated that their ability to participate in the PSLF program has an influence on their decision to continue working for the City of Albuquerque.

147.    PSLF is an essential recruiting and retention tool for the City of Albuquerque, particularly for law enforcement, lawyers, engineers, social workers, emergency technicians, and other roles requiring some education or advanced education. In the survey conducted of City employees, approximately 24.2% of responding employees indicated that their ability to join PSLF was a factor in joining the City.

148.    Excluding a municipal employer from PSLF puts existing employees' path to forgiveness at risk and will materially impair the City's ability to recruit and retain qualified personnel. This will increase turnover, reduce institutional knowledge, and, ultimately, degrade public services.

149.    Although Albuquerque maintains that its activities are both legal and important, recent actions taken by the Trump-Vance Administration have raised Albuquerque's considerable fears that Defendants will seek to disqualify the city from PSLF eligibility.

150.    If the City of Albuquerque were to lose its PSLF eligibility, it would likely create an untenable staffing crisis due to employees moving to other eligible private sector employers in Albuquerque, creating immediate staffing shortages and heightening downstream costs such as overtime, temporary staffing, and training. The City does not have the resources operating under a tight municipal budget to try to replace the PSLF benefit with pay increases. Exclusion from the PSLF imposes a significant fiscal risk.

### City of Boston

151.    The City of Boston has a population of more than 675,000 and employs over 21,000 full-time employees.

152.    The City's mission is to provide high-quality city services to residents and visitors, including ensuring public safety, delivering top-notch public education, maintaining a thriving local economy, and building and sustaining reliable infrastructure, all in service of making Boston a welcoming City for everyone.

153.    Although not all City employees have student debt, there are many professions where pursuing higher education is a prerequisite for the job (e.g., teachers).

154.    Although the City's work is both legal and essential to its residents, recent actions by this Administration create uncertainty and concern that the Department will target the City of Boston for disqualification from the PSLF program.

155.    For example, the Department of Justice has sued the City of Boston—as it has numerous other cities, counties, states, and their officials—claiming that certain of its policies related to local participation in federal civil immigration enforcement are unlawful.

156.    If the Department determines the City of Boston is no longer eligible for PSLF, it would have a significant negative impact on its employees who have spent years working towards loan forgiveness.

### City of Chicago

157.    Located in Cook County, Chicago is the largest city in Illinois and the third-largest city in the United States, with a population of over 2.7 million, according to 2024 census estimates. Chicago employs over 32,000 employees.

158.    Chicago's employees provide a wide range of essential services to its residents, including public health services, law enforcement, public transit, and assistance to Chicago's most

vulnerable residents, including survivors of gender-based violence, senior citizens, households experiencing, or at risk of homelessness, and immigrants.

159.    For example, Chicago's Department of Public Health operates seven mental health centers, four immunization clinics, and three clinics that provide free testing and treatment for sexually transmitted infections. It also provides at-home and in-field programs and funds and staffs a network of Women, Infants, and Children (WIC) clinics. The Chicago Police Department is the nation's second-largest municipal law enforcement body and provides critical public safety services to Chicago's diverse communities. Chicago's Department of Transportation is responsible for the maintenance and improvement of Chicago's surface transportation network including roadways, bridges, sidewalks, multi-use trails, and various Chicago Transit Authority stations. Acting through the Chicago Department of Aviation, Chicago also owns and operates O'Hare and Midway airports. Chicago's Department of Family and Support Services (DFSS) is Chicago's primary social services department, connecting residents in need with a wide range of programs to combat homelessness, joblessness, and food insecurity, among others. DFSS works with a network of over 300 community-based and delegate agencies to serve a diverse range of individuals, including children and youth, seniors, job seekers with barriers, victims of domestic violence, and individuals experiencing homelessness.

160.    Chicago has more than 560,000 foreign-born residents living and working within its communities. Chicago prizes this vibrant and diverse population, which contributes to Chicago's social and cultural fabric, as well as to its economy.

161.    For decades, Chicago has adhered to a "Welcoming City" policy that prioritizes local crimefighting and community engagement rather than federal civil immigration enforcement.

That policy promotes cooperation between local law enforcement and the diverse immigrant communities that have long flourished in Chicago.

162.    Because of the genuine threat that Chicago will be disqualified as an employer under PSLF on the basis of the Rule's new criteria and the Secretary's considerable discretion, Chicago faces direct, immediate, and seriously detrimental injury.

### City and County of San Francisco

163.    San Francisco is home to more than 800,000 residents, and tens of thousands of workers commute into San Francisco each day from neighboring Bay Area cities.  San Francisco employs approximately 34,000 people across more than 60 departments and agencies.  Many of these employees perform essential functions, such as providing law enforcement by the San Francisco Police Department and ensuring access to public health and medical care at the city's public hospital and health clinics.

164.    A number of San Francisco employees are PSLF borrowers. On information and belief, San Francisco's Department of Public Health has one of the highest rates of PSLF employees—employees that include many critical public health workers who often must take out student loans to complete years of training and earn required licenses.  The majority of San Francisco's more than 60 departments and agencies each verify and sign PSLF Forms for their specific department's eligible employees upon request. Because the PSLF Form encourages but does not require borrowers to certify their employment annually, it is likely the forms each San Francisco department signs in a given year do not capture all of the employees who are relying on San Francisco's status as a qualifying PSLF employer and who intend to seek loan forgiveness under the PSLF program.

165.     The San Francisco Bay Area's high cost of living makes PSLF especially important to San Francisco. As an employer, San Francisco must compete with high-paying private sector jobs to recruit and retain employees, and one way it does so is through the loan forgiveness provided by PSLF. San Francisco recognizes the importance of PSLF to its employees, and its Office of Financial Empowerment maintains a PSLF webpage for all San Francisco employees and other borrowers.[108] Without PSLF, San Francisco stands to lose a program that gives it a competitive advantage for recruiting and retaining medical professionals, law enforcement agents, and many other critical public servants.

166.     The majority of San Francisco's more than 60 departments and agencies each verify and sign PSLF Forms for their specific department's eligible employees. On information and belief, San Francisco's Department of Public Health has one of the highest rates of PSLF employees—employees that include many critical public health workers who often must take out student loans to complete years of training and earn required licenses.

167.     Although San Francisco maintains that its activities are patently lawful, because of the genuine threat that San Francisco will be disqualified as an employer under PSLF on the basis of the Rule's new criteria and the Secretary's considerable discretion, San Francisco faces direct, immediate, and seriously detrimental injury.  San Francisco has one of the highest costs of living among cities in the United States.

### *County of Santa Clara*

168.     Located in the heart of Silicon Valley, Santa Clara is home to nearly 2 million residents and employs more than 23,000 people.  Santa Clara's mission is to plan for the needs of a dynamic community, provide quality services, and promote a healthy, safe, and prosperous

---

[108] *See* Off. of Fin. Empowerment, *Public Service Loan Forgiveness (PSLF)*, https://perma.cc/VJ4H-R5ZM.

community for all.  Santa Clara's employees are essential to achieving this mission and to fulfilling Santa Clara's duty to serve the community.  For example, Santa Clara medical staff provide critical care at Santa Clara's four public hospitals and associated clinics; Santa Clara social workers provide child welfare services and assist vulnerable families; Santa Clara attorneys prosecute crimes and protect the rights of the accused; and countless other Santa Clara employees perform functions and services that are critical to the safety, health, and well-being of the community.

169.    Many Santa Clara employees are PSLF borrowers. In recent years, Santa Clara has signed PSLF Forms for hundreds of employees. These include employees serving in Santa Clara's Health System, Social Services Agency, District Attorney's Office, and Public Defender's Office, among others. Because the PSLF Form encourages but does not require borrowers to certify their employment annually, it is likely that the PSLF Forms that Santa Clara signs in any given year represent only a fraction of the Santa Clara employees who are relying on Santa Clara's status as a qualifying PSLF employer and who intend to seek loan forgiveness under the PSLF program.

170.    Given Silicon Valley's high cost of living and its thriving private, for-profit sector, PSLF is especially important to Santa Clara and its employees.  As the level of government charged with administering the social safety net, Santa Clara must be able to attract dedicated employees to serve the county's most vulnerable residents.

### **Nonprofit Plaintiffs**

171.    Plaintiffs Amica Center for Immigrant Rights, CHIRLA, Legal Aid Society for the District of Columbia, National Council of Nonprofits, and Oasis Legal Services are 501(c)(3) nonprofit organizations and qualifying employers for PSLF (the Nonprofit Plaintiffs). NCN is also an association of 501(c)(3) nonprofit organizations that are themselves qualifying PSLF employers.

172.     Although Nonprofit Plaintiffs strongly believe and maintain that they do not engage in any "activities that have a substantial illegal purpose," recent statements and actions by this Administration strongly indicate that the Administration will interpret that phrase so broadly that it will encompass patently legal activities in which they engage.

173.     For example, several Nonprofit Plaintiffs and their members promote and engage in Diversity Equity and Inclusion (DEI) practices that, although legal, are similar to many activities that this Administration has repeatedly targeted as "illegal discrimination" in other contexts. Other Nonprofits are committed to serving historically marginalized communities, which the Trump-Vance Administration has denounced as "racist."[109]

174.     Likewise, many Nonprofit Plaintiffs and their members provide numerous immigration-related legal services that, although lawful, are similar to activities that this Administration has previously targeted as "aiding or abetting violations of . . . Federal immigration laws," and are likely to be targeted by the Department as activities with a purported substantially illegal purpose under the Rule.

175.     In sum, as a result of the Rule, Nonprofit Plaintiffs are suffering and will continue to suffer injuries related to the regulatory burden and costs associated with the Rule; the competitive disadvantage at which the Rule place them, including with respect to recruitment and retention of employees; and the chilling of their protected speech and expression. Illustrative examples pertinent to each Nonprofit Plaintiff are as follows:

---

[109] *See* Memo from Deputy U.S. Attorney General Blanche regarding Civil Rights Fraud Initiative (May 19, 2025), https://perma.cc/K3CC-YCFX.

### *Amica Center for Immigrant Rights*

176.    Capital Area Immigrants' Rights Coalition d/b/a the Amica Center for Immigrant Rights (Amica Center) is a 501(c)(3) nonprofit organization based in Washington, D.C. Amica Center employs over 110 full-time employees.

177.    Amica Center's mission is to ensure equal justice for all immigrant adults and children through direct legal representation, impact litigation, education, and client-centered advocacy. Amica Center is driven in its pursuit of a vision for a country with a humane and just immigration system that affords everyone due process and direct legal representation, protects all people seeking safety, and keeps communities together. Amica Center is focused on providing legal services to clients—many of whom are children—who are detained in detention facilities overseen by U.S. Immigration and Customs Enforcement or placed in shelters overseen by the U.S. Department of Health and Human Services.

178.    Since the PSLF rule was first proposed, several of Amica Center's employees have voiced their concerns that working at Amica Center may no longer qualify them for PSLF. One attorney expressed:

> PSLF is the key to my family's financial success and stability. I went into public service not solely because of the mission of my work, which is near and dear to me, but also because of long term debt relief possible through PSLF. Despite making a decade of consistent monthly payments, I owe more in student loans today than I did when I graduated in 2014. I am now 8.5 years into a public service career. Having PSLF taken away from me now means I will never be able to save for a down payment for a home or set away money for emergencies or create a college fund account for my 3-year-old daughter or meaningfully save for retirement. PSLF is the only way a person with my background with working class immigrant parents stands a chance at obtaining pieces of the American Dream.

179.    The Trump-Vance Administration has, to date, tried to shut down Amica Center's work. The Administration has cut all of Amica Center's federal funding streams, which have been

in place for many years. Amica Center is currently in court advocating for the reinstatement of all of these cuts. The Administration has changed the rules to make litigation for Amica Center's clients more difficult, and they have made it harder for Amica Center to find and meet with clients in detention.

180.    If the Department determines Amica Center is no longer eligible for PSLF, Amica Center will face the harms of losing staff, having a harder time hiring staff, and having to expend time and money to keep up its mission at a level commensurate with its current standard.

### *Coalition for Humane Immigrant Rights (CHIRLA)*

181.    CHIRLA is a 501(c)(3) nonprofit organization based in Los Angeles, CA. CHIRLA employs over 200 full-time employees.

182.    CHRILA's mission is to achieve a just society, fully inclusive of immigrants. In furtherance of this goal, it organizes immigrants, including undocumented people, to advocate effectively for their own rights; advocates for pro-immigrant policies at the federal, state, and local levels; offers community education services, including know your rights presentations; and offers immigration legal services. The legal services are provided on a pro bono basis, including removal defense, naturalization, Deferred Action for Childhood Arrivals (DACA) renewal, services delivered on state college campuses, and asylum assistance.

183.    The ability to support their employees' financial well-being through PSLF is imperative to CHIRLA. The PSLF program allows CHIRLA to attract talented attorneys who would otherwise pursue employment within the private sector. Being a PSLF-eligible employer is a significant advantage that sets CHIRLA apart from private employers who compete to hire the same attorneys.

184.    Since the Rule was first proposed, CHIRLA's employees have voiced their concerns that working at CHIRLA may no longer qualify them for PSLF.

185.    One team leader in the Legal Services department said that if CHIRLA could not participate in the PSLF program, so many attorneys would have to leave that it would "destroy" its ability to provide legal services to people on the scale that it does now.

186.    Another team leader in the Legal Services department said that it was the existence of the PSLF program that gave her the financial confidence to even go to law school in the first place.

187.    A third CHIRLA attorney called the situation "despair-inducing" and said that he tries to avoid thinking about it too much to avoid the anxiety that this causes. He added that while he might have the option to work in private law in order to eventually pay down his debt, many opportunities in the private sector will have already closed off to him since he decided to move directly into the public interest space following law school, without first spending time at a private firm such as a "big law" firm.

188.    An additional CHIRLA attorney described the potential loss of PSLF as a "kick in the gut"—that is, the possibility that the PSLF program could be yanked away from her after she spent 7 years participating in it. The financial relief offered by the PSLF program was a very significant factor in her decision to work in the public interest sphere.

189.    Although CHIRLA maintains that its work is both legal and important, recent actions by this Administration make CHIRLA worry that the Department will target it and will disqualify it from the PSLF program. These actions include:

        a.      In February 2025, DHS Secretary Kristi Noem froze and terminated funding
        related to the Citizenship and Integration Grant Program as part of a broader assault on

funding to immigration related programs. This resulted in CHIRLA losing around $100,000 worth of congressionally appropriated funds. In early 2025, the City of Los Angeles was told it would not be receiving the awarded Federal Emergency Management Agency Shelter and Services grant to help recent migrant arrivals. CHIRLA was a subgrantee and as a result lost several million dollars in expected funding.

b.    The White House named CHIRLA as having helped finance and/or plan what they falsely describe as mass riots in Los Angeles in June 2025.

190.    If CHIRLA loses its PSLF eligibility, it will likely lose key staff, including many lawyers who serve in positions of leadership. The loss of these individuals would mean a tremendous loss in institutional knowledge, as some of them have worked at CHIRLA for years as they climbed to reach the positions they are in now. This would impede the ability of these teams and departments to work effectively on their ongoing work, such as providing legal services to clients and engaging in impact litigation in cooperation with other organizations. It would also be challenging for these teams to take on new clients and new cases, and to grow in the ways CHIRLA currently envisions. The resulting harm would force CHIRLA to rebuild some of its most important departments and donors in order to meet the immense need for an organization like it.

### Legal Aid Society of the District of Columbia

191.    The Legal Aid Society of the District of Columbia (Legal Aid DC) is a 501(c)(3) nonprofit organization based in Washington, D.C. Its mission is to make justice real—in individual and systemic ways—for persons living in poverty in the District of Columbia. Legal Aid DC was founded in 1932 and currently employs more than 120 full-time employees.

192.    Legal Aid DC's core activity involves providing free civil legal services in the District of Columbia to people facing life-changing legal crises who cannot afford a lawyer. It

maintains practice areas and projects in several broad areas of law: (1) housing law, (2) family and domestic violence law, (3) public benefits law, (4) consumer law, (5) immigration law, and (6) reentry-related issues confronting people with criminal records. In addition, Legal Aid DC also handles appellate matters through its nationally recognized Barbara McDowell Appellate Advocacy Project, advocates for policies that will benefit its client community through its policy advocacy program, and challenges through litigation illegal practices or policies that harm people living in poverty in the District.

193.    Although Legal Aid DC does not engage in any "activities with a substantial illegal purpose," it nevertheless credibly fears that it may be targeted, and that its status as an eligible employer may be in jeopardy under the new PSLF rules promulgated by the Department of Education, for several reasons.

194.    Central to Legal Aid DC's work is representing and advocating on behalf of people who have very little political, economic, and social capital, and who—in this moment—may be politically disfavored or unpopular. Legal Aid DC's client community is disproportionately comprised of people of color; immigrants; individuals who are limited English proficient or non-English proficient; individuals with disabilities; individuals who are unemployed, under-employed, seasonally employed, or who work in low-wage jobs; individuals who are unhoused or who have unstable housing; individuals with substance use disorders; individuals with mental health conditions; transgender or gender non-binary individuals; and individuals with criminal records and/or who have had experiences with the criminal justice system.

195.    Legal Aid DC is located in the District of Columbia, a jurisdiction that is under intense political pressure and media attention, and one with a unique political relationship with the federal government. Indeed, under this Administration, the District of Columbia has dealt with

significant federal financial scrutiny, oversight, and interference. Among other things, the federal government has exercised undue influence over the District's budget by withholding authorized funds, has taken over its local law enforcement authority, and has deployed the national guard to patrol its streets.

196.    Over the past year, Legal Aid DC, its work, and even individual staff members themselves have been specifically singled out and mischaracterized in mainstream news articles and social media posts by the Administration and by political commentators with connections to the Administration.

197.    Legal Aid DC would be significantly harmed if it loses its PSLF eligibility. Legal Aid DC jobs provide compensation at a level that is competitive with other local nonprofit advocacy organizations in the District of Columbia, but Legal Aid DC salaries still remain substantially below those offered for comparable positions in the private sector, in national nonprofit advocacy organizations, and in government. As such, a large number of Legal Aid DC staff participate in and rely heavily on the PSLF program.

198.    Many of those staff members would not have been able to take jobs at Legal Aid DC or would not be able to stay in jobs at Legal Aid DC if the organization were not an eligible employer under the program. Given the amount of debt that recent college and law school graduates now carry, Legal Aid DC would also have great difficulty recruiting qualified new staff to serve in entry level positions.

199.    One Legal Aid DC attorney stated: "There is no possible way I could work at Legal Aid, or in public interest at all, really, without PSLF. All my professional decisions since age 21—whether and where to go to graduate and law school, what career path to take, where to work—have been based on the knowledge that my loans would be forgiven after 10 years of public service.

To change the rules now after my 8 years in public service would not only leave me with crushing debt but also fundamentally alter the course of my life. The world will have one fewer lawyer fighting on behalf of people living in poverty."

200.    Another attorney expressed that if Legal Aid DC were no longer an eligible employer, her life "would be turned upside down." She continued: "I went to law school with the express intention of devoting my legal career to public service, knowing that that path would mean drastically lower earnings but also knowing that I could make it work with the support of PSLF. My income as a legal services attorney is my sole source of income; I am a first-generation college graduate and have no other financial support nets on which to rely if I were forced to saddle the complete repayment of my $300k+ student loan debt."

201.    Another Legal Aid DC attorney who has completed nearly a third of his 120 expected payments expressed that changing the program at this point would be "incredibly destabilizing." He said: "The PSLF program meant I could go to my dream law school without worrying if I could afford a career in public service after I graduated. It would be impossible for me afford the $300,000 in loans while living in the same community I serve."

### *National Council of Nonprofits*

202.    The National Council of Nonprofits (NCN) is a PSLF-eligible employer with 19 full-time employees. It is also the largest network of nonprofits in the United States and North America. Its direct members include state and regional associations of nonprofits that collectively represent more than 32,000 nonprofit and foundation members across the country, the vast majority of which are also PSLF-eligible employers.

203.    NCN's core work is to champion, connect, and inform the nonprofit sector. As part of that work, NCN addresses challenges faced by its members, including the ongoing severe workforce shortage in the nonprofit sector.

204.    Advocating for a robust PSLF program is central to NCN's mission. As noted above, the PSLF program plays a critical role in mitigating workforce shortages by providing nonprofits with a distinct and powerful recruitment advantage vis-à-vis private sector employers. Accordingly, both NCN and thousands of its members actively rely on their status as eligible employers for the PSLF program to recruit and retain employees. NCN and its members encourage their employees to take advantage of PSLF and regularly help complete PSLF paperwork.

205.    NCN and its members also routinely engage in activities that are substantially similar to activities that this Administration has previously targeted as "illegal discrimination." Many such activities are protected speech, including—for example—programming for employees of color and the deliberate use of inclusive language in its job advertisements and transparency of salary bands to increase diversity among its own employees and help close racial wage gaps.

206.    Many of NCN's members also provide numerous immigration-related legal services that, although lawful, are similar to activities that this Administration has previously targeted as violating immigration law. For example, many NCN members provide services to immigrant communities, such as direct legal services and know-your-rights trainings, and also engage in immigration-related litigation.

207.    The risk of losing PSLF eligibility puts NCN and its members between a rock and a hard place. NCN's members cannot forgo their mission-driven and legal work in order to avoid any activities that could be construed as having a so-called "substantial illegal purpose" under the Department's definition, but given the vagueness of that definition and how the regulation will be interpreted and applied, NCN and its members cannot guarantee their current or future staff that they will always be PSLF-eligible employers.

### *Oasis Legal Services*

208.    Oasis Legal Services (Oasis) is a 501(c)(3) nonprofit organization based in Berkeley, California, and an office in Fresno, California. Oasis employs over twenty full-time employees.

209.    Oasis's mission is to empower low-income LGBTQ+ immigrants who have survived violence and persecution due to their sexuality, gender identity, and/or HIV status by increasing access to quality, culturally responsive legal representation and social services. To further its mission, Oasis provides direct representation to LGBTQ+ immigrants and asylum seekers in a variety of immigration cases, including asylum, lawful permanent residency, naturalization, protection under the Violence Against Women Act, family petitions, and applications for work authorization. Oasis represents clients in Immigration Court in front of the Executive Office of Immigration Review and in front of the United States Citizenship and Immigration Service.

210.    In addition to providing direct legal representation, Oasis also provides case management and social services to its clients, assisting with referrals to healthcare, mental health support, housing navigation, public benefits, and workforce development. Apart from legal and social services, Oasis engages in community education and outreach by presenting trainings to community members and other legal practitioners about LGBTQ+ asylum and other forms of immigration relief. Oasis also trains service providers about how to represent LGBTQ+ immigrants in a culturally responsive way and give client and community facing trainings on Know Your Rights and other immigration topics. Oasis advocates for the inclusion of LGBTQ+ voices and experiences in immigrant spaces and for immigrant voices and experiences in LGBTQ+ spaces, acknowledging and championing the intersectional identities of its clients.

211.    A core part of Oasis's mission is the legal representation and social services it provides to undocumented immigrants. Without violating or assisting with violations of the federal immigration law, Oasis provides services and representation to people present in the United States who do not have lawful immigration status. Oasis also provides assistance to clients who apply for the immigration relief they are eligible for and advocate for them to receive that relief.

212.    Since the Rule was first proposed, Oasis' executive team has met internally to discuss the significant burden it puts on Oasis. For example, to comply with the new rule, Oasis's staff will have to certify that Oasis is not engaged in any activities with a purported substantial illegal purpose as defined in the regulation. This requires a legal determination that is difficult for Oasis to make in the abstract, without more clarity about how the Department will interpret and apply this new term in its regulations.

213.    Because the Final Rule is not clear about whether it will apply to Oasis, it was decided that Oasis will have to hire outside legal counsel to determine the effect the Final Rule will have on it and how it can continue to sign PSLF paperwork and remain an eligible employer. To do this, Oasis will have to divert part of its next year's budget to this new expense and shift money originally planned for trainings and professional development for its staff to pay for outside legal services.

214.    The risk of losing PSLF would be detrimental to Oasis as it will face reputational and financial consequences if found to have a  purported substantial illegal purpose. This could cause Oasis to lose relationships with law firms who represent Oasis's clients pro bono. Oasis could also lose funding that would threaten its ability to continue operations.

215.    The Administration has directly targeted immigration attorneys and nonprofit immigration legal services providers like Oasis in multiple ways:

a.    In the March 22, 2025 presidential memorandum titled, "Preventing Abuses of the Legal System and the Federal Court," President Trump leveled accusations of "unscrupulous behavior by attorneys and law firms" in the immigration system and stated that the immigration bar frequently "coach[es]" clients to lie when presenting their asylum claims in order to qualify for "undeserved relief." The presidential memorandum directed the Attorney General to investigate attorney misconduct among immigration attorneys and prioritize the enforcement of attorney disciplinary procedures.

b.    Beginning in February 2025, the Administration signed a series of Executive Orders targeted at large law firms who have sued the government and provide pro bono support on behalf of immigrants, including LGBTQ+ immigrants, taking away security clearances and access to federal buildings necessary for their work on behalf of clients.

216.    Indeed, Oasis is already losing a longtime staff member who is significantly concerned that continued employment at Oasis could jeopardize their eligibility for PSLF because of potential targeting.

217.    Oasis could fall into any of these arbitrary categories of alleged activities with a so-called substantial illegal purpose and risk losing its PSLF-eligible status. Thus, Oasis would be harmed if the Department determines Oasis is no longer eligible for PSLF, because the organization will lose essential staff, fail to recruit new staff, lose funding and pro bono legal assistance for its clients, and be in danger of losing its nonprofit status.

### 2.  *Associational Plaintiffs*

218.    Plaintiffs American Federation of Teachers (AFT); American Federation of State, County and Municipal Employees (AFSCME); National Association of Social Workers (NASW); and National Education Association (NEA) are associations and unions of employees who work

or intend to work in nonprofit organizations and government agencies and rely on PSLF to achieve cancellation of their federal student loan debt after ten years.

219.    Associational Plaintiffs represent millions of members across the country working for government and 501(c)(3) nonprofit employers that qualify for PSLF. Some of their members are at risk of losing their access to PSLF if the Secretary determines that their employers are engaged in activities with a so-called substantial illegal purpose. This is especially true of members working for employers that have already been targeted by the Trump-Vance Administration for conduct that would be considered to have a purported substantial illegal purpose under the Rule.

220.    Further complicating matters for Associational Plaintiffs' members, the Rule fails to provide clear guidance about what conduct would be considered to have a purported substantial illegal purpose. Consequently, their members cannot make informed decisions about whether to remain in their current roles or to seek new employment, as they cannot determine with sufficient certainty whether the Secretary would disqualify their current or potential employer.

221.    For example, members work for state and local governments that have been identified as so-called "sanctuary jurisdictions" by the Administration. Members also work for PSLF-eligible employers that advocate for diversity, equity, and inclusion programs and affirmative action policies, which the Administration has indicated it considers illegal discrimination, and would also be a basis for disqualification from PSLF.

222.    The Administration has also taken an aggressive policy against public service workers, ranging from the termination of federal probationary employees to the dismantling of federal agencies to defunding state and local programs. Associational Plaintiffs have been vocal opponents of this agenda and credibly fear that the Administration, through the Secretary and Final Rule, will punish its members by cutting off their access to the PSLF program. Without the PSLF

program, Associational Plaintiffs' members will be burdened by their student loans for longer than Congress promised, will face economic hardship, and will be forced to leave their jobs to pursue higher salaries or PSLF-eligibility elsewhere. This creates a significant risk that the Associational Plaintiffs themselves lose members.

223.    Associational Plaintiffs represent borrowers with federal direct loans who will be harmed by the implementation of the Rule because they will lose their ability to count payments made during PSLF if the Department deems their employer ineligible to participate in the PSLF program. Members of Associational Plaintiffs have relied on the promise of PSLF to forgive their student loans after ten years of repayments and have made significant economic and personal decisions affecting themselves and their families in reliance on this program. Accordingly, Associational Plaintiffs' members who are borrowers and seeking PSLF have standing to challenge the Rule in their own right.

224.    The interests of the Associational Plaintiffs, as described below, are germane to the interests of their members in obtaining PSLF and ensuring that their employers are not disqualified from PSLF eligibility due to the Rule.

225.    Associational Plaintiffs are capable and sufficient to represent the interests of their members in this case; indeed, most have acted in their representative capacity to challenge unlawful regulations like those promulgated by the Department.

226.    In sum, as a result of the Rule, Associational Plaintiffs' members who are borrowers stand to be injured by the loss of their ability to participate in the PSLF program and have their student loans forgiven after making the requisite number of payments, and Associational Plaintiffs themselves risk loss of members. Illustrative examples pertinent to each Associational Plaintiff are as follows:

*American Federation of Teachers*

227.    AFT is a membership organization representing 1.8 million pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals nationwide. In addition, the AFT represents approximately 80,000 early childhood educators and nearly 250,000 retiree members. AFT employs 325 full-time employees.

228.    AFT's mission is to promote fairness, democracy, economic opportunity, and high-quality public education, healthcare, and public services for students, their families and communities. It accomplishes this mission by ensuring members receive fair pay and benefits for their critical work, and by fighting for safe working conditions that also benefit students, patients, and all those who use public services. Ensuring the economic security and dignity of AFT's members and their families is at the core of this mission.

229.    Helping its members access and benefit from the PSLF program is critical to AFT's mission. Based on internal data and conversations with its members, AFT believes that many of its members have student loan debt and that 75% of its members work in roles that are eligible for PSLF. AFT members include public school teachers and staff, higher education faculty and staff, health care workers, and state and local government employees, the majority of whom are eligible for PSLF.

230.    AFT conducts a Student Debt Clinic to provide members who are student loan borrowers with education and support with their student loan debt. AFT also regularly sends messages to its members about the benefits of PSLF, maintains an online student loan resource

hub for members, and has partnered with the company Summer to deliver student loan assistance to its members, including enrollment in PSLF.

231.    For many AFT members, PSLF eligibility is a benefit that incentivizes them to seek and remain in public service employment. Many of the professions represented by AFT require a college degree, and PSLF helps defray the cost of this requirement as well as provides a form of financial remuneration for people who could receive higher pay and benefits in the private sector.

232.    Additionally, many AFT members have sought advanced higher education opportunities to help further their careers based on the promise of PSLF. PSLF eligibility is a critical tool for public service employers to attract and retain talent that could find higher pay in the private sector.

233.    PSLF plays an important role in AFT members' past, present, and future financial planning, as some of its members have reported:

    a.    A school psychologist in Minnesota:

> I chose to become a school psychologist because I'm passionate about supporting students, families, and communities in public education. Children spend a significant portion of their lives in school, and by working in this field, I have the opportunity to make a lasting impact without the barriers that many face in accessing basic healthcare. I went into this work knowing it would be fulfilling, but I was also aware of the high rates of burnout and the fact that it's not a high-paying role given the years of education it requires. Had I known that programs like [income-driven repayment] plans and Public Service Loan Forgiveness (PSLF) wouldn't be available to me, I would have seriously reconsidered my decision to go into public service, and learned more toward private practice.

    b.    A teacher in Rhode Island:

> At 45, I was facing the decision to retrain for a second career for the next 20 years of my life. I wanted to become a teacher, but felt I couldn't afford it. When I found out about the PSLF program, I

> decided to enroll. I wanted to teach English in a low-income school,
> and the program would enable me to do so.

234.    Historically, when members cannot rely on their current employers' PSLF eligibility, they have had to consider changing employers or leaving the professional altogether due to the prospect of repaying their loans on relatively lower salaries and without the promise of debt relief after ten years.

### *American Federation of State, County and Municipal Employees*

235.    AFSCME is a membership organization based in Washington, D.C. It has 1.4 million members, located across 46 U.S. states, the District of Columbia, and Puerto Rico. While most of labor organization AFSCME's members are public employees of state and local governments, AFSCME also represents employees of the federal government and private sector employees who do public service work, such as for healthcare institutions and nonprofit organizations. Among the private sector employers of AFSCME members are employers who contract with state and local government or otherwise manage community institutions.

236.    AFSCME's members include librarians, food service workers, corrections officers, 911 call center workers, sanitation workers, healthcare workers, psychologists, early childhood educators, school bus drivers, social workers, workers at museums and other cultural nonprofit organizations, and lawyers for nonprofit legal services organizations, among many other critical public service roles. Its members all have one thing in common: dedication to making our communities stronger, healthier, and safer.

237.    AFSCME's mission is to represent its members, advocate for fairness in the workplace, safety on the job, fair wages, good benefits, a secure retirement, and excellence in public services. This includes ensuring its members have access to a functioning PSLF program.

238.    Many AFSCME members incurred significant student loan debt in training for their careers. The PSLF program helps make it economically feasible for these members to work in public service careers, which are often lower paid than private sector employment. For this reason, AFSCME regularly promotes the PSLF program to its members.

239.    AFSCME members work for employers that are likely to be targeted by the Administration and disqualified from PSLF under the Final Rule. For example, members work for nearly all of the state and local governments that have been identified as so-called "sanctuary jurisdictions" by the Administration, including most of the Plaintiff Local Governments n this case. Members also work for PSLF-eligible employers that advocate for diversity, equity, and inclusion programs and affirmative action policies, which the Administration has indicated it considers illegal discrimination, and would also be a basis for disqualification from PSLF.

### *National Education Association*

240.    NEA is the nation's largest labor union, representing nearly 3 million members who work at every level of education – from pre-school to university graduate programs. Its members include aspiring educators, K-12 classroom teachers, education support professionals, school counselors, school psychologists, and other professional support personnel as well as higher education faculty and staff, who engage in a variety of educational activities both inside and outside of the classroom. NEA has statewide affiliates in every state, the District of Columbia, an affiliate representing federal employees, and local affiliates in almost 14,000 communities across the United States.

241.    NEA's mission is to advocate for education professionals and to unite its members and the nation to fulfill the promise of public education to prepare every student to succeed in a

diverse and interdependent world. This includes supporting members' financial well-being by educating and advocacy with respect to student loan debt.

242.    In pursuit of this goal, NEA educates and assists members with navigating the complicated student loan debt system, including the PSLF program and other debt-relief programs. The vast majority of NEA members work for employers who are "qualifying employers" under the PSLF program. Most work for government entities including public school districts, state colleges and universities, and Department of Defense Education Activity (DoDEA) schools. Others work for educational institutions that are 501(c)(3) organizations.

243.    NEA members and other educators rely heavily on federal financial aid programs to complete their own education and to support their children's education. As a result, many educators rely heavily on PSLF as a financial lifeline.

244.    The promise of loan forgiveness creates an incentive for college students – many of whom join NEA as "Aspiring Educator" members – to pursue careers in education, and for classroom teachers, education support professionals, and other educators – who join NEA as "Active" members – to remain in the profession.

245.    The Rule potentially jeopardizes the eligibility of countless NEA members to obtain debt relief through PSLF. The Rule would disqualify employers who engage in activities with a so-called substantial illegal purpose including "aiding or abetting violations of . . . Federal immigration laws" and "engaging in a pattern of aiding or abetting illegal discrimination." The Administration has made clear that it includes within the scope of these terms a broad range of activities that are lawful and oftentimes engaged in by schools at all levels, including Pre-K through 12 public schools and public colleges and universities. For example:

a.    In March 2025, The Department of Education's Office for Civil Rights opened investigations into 45 universities claiming they engaged in illegal discrimination in violation of Title VI of the Civil Rights Act of 1964 by maintaining race-conscious admissions practices. Under the Final Rule, the Department could potentially disqualify those and other universities if finds their actions unlawful even if the courts determine that the universities violated no law.

b.    The Department has also opened many investigations of PreK-12 schools, alleging they have refused to comply with guidelines on transgender students' rights in violation of Title IX of the Education Amendments of 1972, which prohibits sex-based discrimination in any school or any other education program that receives federal funding.

c.    In June, the Department of Justice filed suit against the Minnesota Office of Higher Education, as well as the State of Minnesota, Governor Tim Walz, and Minnesota Attorney General Keith Ellison, challenging a Minnesota law that grants in-state tuition to residents of Minnesota who are not lawfully present in the United States. The complaint asserts that the law is preempted by federal law.

246.    NEA members work at each of these targeted jurisdictions and employers, and have a credible fear that the Department would disqualify their employers from PSLF on these bases.

### *National Association of Social Workers*

247.    The National Association of Social Workers (NASW) is the largest membership organization of professional social workers in the United States, representing almost 100,000 members nationwide. NASW promotes, develops, and protects the practice of social work and social workers. NASW also advocates to improve public policies that strengthen society.

248.    NASW provides its members with access to trainings, continuing education, credentials, and guidance on ethical and legal issues. NASW also advocates on behalf of its members with elected leaders and policymakers to make critical changes that support the profession and society. This includes promoting and advocating for the PSLF program.

249.    Social workers are one of the largest providers of mental, behavioral, and social care services in the country—services that are critical to ensuring that people can cope with and solve problems in their everyday lives. Social workers are thus found in every facet of community life, including schools, hospitals, behavioral health clinics, senior centers, prisons, child welfare and juvenile services, the military, corporations, courts, private practice, elected office, and in numerous public and private agencies.

250.    However, student loan debt is a tremendous barrier for social workers who seek employment in public service jobs, where salaries are persistently lower than in private sector jobs. Social workers, including many NASW members, tend to have high student debt, but relatively low pay, making participation in the profession financially difficult, particularly in the nonprofit and public sectors. The disparity between debt and compensation is exacerbated by the level of education required to practice in the field. While social workers can work in certain settings with a Bachelor's degree, a Master's of Social Work (MSW) is the terminal degree required to practice in many settings including independent clinical social work. Social workers who obtain a MSW carry a mean total student debt of $67,000,[110] but the mean starting salary for social workers with MSWs is just $47,100.[111] NASW members therefore rely heavily on the PSLF program.

---

[110] Edward Salsberg et al., *The Social Work Profession: Findings from Three Years of Surveys of New Social Workers*, NASW (Aug. 2020), at 12, https://perma.cc/FMK8-KGM8.
[111] *Id.*

251.    Many NASW members work for employers that are likely to be targeted by the Administration using the Final Rule. Many social work jobs in health care, mental health, and substance use disorder services are done by public servants or nonprofit professionals. For example, if local governments and nonprofit organizations are disqualified from PSLF for engaging in particular activities—notwithstanding the work that NASW members do at those employers—the entire workforce would be disqualified, including their particular NASW members.

252.    Many NASW's members rely financially on PSLF and their employer's eligibility when seeking, accepting, or staying in their jobs. Enforcement of the Final Rule against public service employers will create both great uncertainty and financial burden for members. At best, NASW members whose employers lose PSLF status will have to sacrifice their current jobs for a new one with an employer who has retained their PSLF status—an outcome that could be extremely disruptive, even if the social worker is able to obtain such a job. At worst, if such NASW members are unable to obtain new employment, they will simply be unable to benefit from the PSLF program: they will have sacrificed years of higher pay in a private sector job based on the elusive promise of loan forgiveness, only to have the rug pulled out from them. Such members will be stuck with thousands of dollars of debt that they cannot afford.

## CLAIMS FOR RELIEF

### Count I

**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A), (C)**
**Contrary to Law and In Excess of Statutory Authority**
**(Alleged by All Plaintiffs)**

253.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

254.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

255.    The Department of Education is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

256.    The Rule is a final agency action because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). The Rule is therefore subject to judicial review under the APA. *See* 5 U.S.C. § 704.

257.    The Higher Education Act, as amended by the College Cost Reduction and Access Act of 2007, mandates that the "Secretary *shall* cancel" the remaining balance of federal direct student loans of a borrower who has made 120 qualifying payments made during employment at a "public service job." 20 U.S.C. § 1087e(m)(1)-(2) (emphasis added). The statute defines public service jobs as including "government . . . or a [501(c)(3) tax-exempt nonprofit] organization," among other things. *Id.* § 1087e(m)(3).

258.    Defendants, as agents of the Executive Branch, do not have authority under the Higher Education Act or any other statute to deny loan forgiveness to any eligible borrower who meets the PSLF statutory requirements. Nor do they have any authority to restrict what jobs Congress determined count as public service jobs for the purpose of PSLF.

259.    Defendants do not have the authority to investigate and disqualify eligible employers that perform public service jobs, a term legislated by Congress, on the basis of their participation in activities that Defendants view as having a purported substantial illegal purpose.

Nor do Defendants have the authority to identify or define "activities with a substantial illegal purpose"—a phrase that does not appear anywhere in the Higher Education Act and a concept about which the Secretary of Education is not well suited to prescribe regulations. *See* 20 U.S.C. ch. 28.

260. Defendants' interpretation of 20 U.S.C. § 1087e(m), as set forth in the final Rule, is inconsistent with the plain language of the statute.

261. Accordingly, because the Rule purports to grant Defendants authority to curtail eligibility for qualified public service employers or deny loan forgiveness to any borrower who meets the statutory requirements, in the absence of any statutory authorization to do so, the Rule is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations" under the APA, 5 U.S.C. § 706(2)(C).

262. Plaintiffs are within the zone of interest of Section 1087e(m) because they belong to the class of persons regulated by the statute—namely, they are either qualified employers providing "public service jobs" as that term is defined, and/or they represent borrowers of federal Direct loans who would otherwise be eligible for forgiveness but for Defendants' illegal interpretation of the statute.

263. Plaintiffs have been harmed by the actions of Defendants because the Department and Secretary McMahon have promulgated a Rule that forces them to engage in burdensome compliance activities, threatens to cause them economic harm through loss of talent and anticipated increased costs to their hiring and employee compensation, and with respect to the Nonprofit and Associational plaintiffs, chills their protected speech.

**Count II**

**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**
**(Alleged by All Plaintiffs)**

264.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

265.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

266.    An agency cannot depart from prior policies without acknowledging that it is making such a change and explaining its reasoning for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must "examine the relevant data and articulate a satisfactory explanation" when altering or rescinding their rules. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Fox*, 556 U.S. at 515. And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020).

267.    The Rule is arbitrary and capricious because it is based on unsupported assertions, proposes to address a problem that it cannot substantiate, fails to consider contrary record evidence, is internally inconsistent, fails to consider significant reliance interests of borrowers and employers, is vague to the point of failing to provide adequate notice of what is prohibited, and is likely to subject Plaintiffs to arbitrary enforcement.

268.    In its hasty attempt to finalize the Rule, the Department failed to consider the concerns raised by negotiators during the negotiated rulemaking and raised by the thousands of comments filed in response to the proposed rule. These included, but were not limited to, concerns about:

      a.     the Department's legal authority to promulgate the Rule;

      b.     whether the Department is aware of any employers currently engaging in activities with a so-called "substantial illegal purpose" or if it seeks to address a problem that does not exist;

      c.     why certain activities, but not others, were deemed to have a substantial illegal purpose;

      d.     whether the Secretary is qualified to make decisions about the topics covered by the Rule, such as immigration law, unlawful discrimination, or gender-affirming care, or can make a fair and reasonable determination of activities that have a "substantial illegal purpose";

      e.     whether the IRS, rather than the Department of Education, is the proper agency to oversee the legality of 501(c)(3) nonprofit employers' activities;

      f.     fairness considerations for a borrower who becomes ineligible for PSLF cancellation due to the Administration's targeting of their employer; and

      g.     the uncertainty that the new rule would create for employers' recruitment and retention activities, as well as for their ability to sign employees' PSLF Forms, and for borrowers' ability to seek PSLF-eligible employment.

269.    The Rule also significantly departs from the Department's longstanding regulations governing PSLF, which do not cabin eligibility to particular public service employers and do not confer discretion to the Secretary to disqualify eligible employers. This is yet another reliance interest Defendants failed to consider.

270.    The Rule lacks a sufficient reasonable basis, reasoned explanation, or consideration of appropriate factors.

271.    The Rule fails to consider or explain the implications for existing reliance interests.

272.    The Rule fails to account for other legal requirements implicated by the changes it implements, including the Higher Education Act and the First Amendment rights of otherwise-qualifying employers.

273.    The Rule is vague and ambiguous in many respects and invites arbitrary enforcement against Plaintiffs and similarly situated employers.

274.    The Rule is arbitrary and capricious and must be set aside, 5 U.S.C. § 706(2)(A).

275.    Plaintiffs are within the zone of interest of Section 1087e(m) because they belong to the class of persons regulated by the statute—namely, they are either qualified employers providing "public service jobs" as that term is defined, and/or they represent borrowers of federal Direct loans who would otherwise be eligible for forgiveness but for Defendants' illegal interpretation of the statute.

276.    Plaintiffs have been harmed by the actions of Defendants because the Department and Secretary McMahon have promulgated a Rule that forces them to engage in burdensome compliance activities, threatens to cause them economic harm through loss of talent and anticipated increased costs to their hiring and employee compensation, and with respect to the Nonprofit and Associational plaintiffs, chills their protected speech.

### Count III

**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right (Free Speech)**
**(Alleged by Nonprofit Plaintiffs and Associational Plaintiffs)**

277.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

278.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

279.    The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const., amend. I.

280.    Accordingly, the government may not target a subset of messages for disfavored treatment because it dislikes the content of the speech or the viewpoint expressed; condition access to a government program on adherence to the government's preferred message; retaliate against a speaker for engaging in speech that the government disfavors; or promulgate laws so vague or overbroad as to chill a substantial amount of protected speech. The Rule runs afoul of these principles.

281.    Government may not target a subset of messages for disfavored treatment just because it finds those messages offensive. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989). Nor may government distinguish permissible speech from impermissible speech "based on 'the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015)).

282.    The Rule violates the First Amendment's protections against viewpoint-based and content-based speech and expression because it singles out particular kinds of speech and expression—that related to the categories enumerated in the Rule—for disfavored treatment, namely, exclusion from eligibility for the PSLF program for employers.

283.    Nor may government condition participation in a government program based on the participant's exercise of their First Amendment rights of free expression or their adherence to the government's preferred message.

284.    While the government is free to control the contours of its own message when it enlists private speakers to transmit its message, it may not impose viewpoint-based restrictions when it subsidizes private speech or administers a program designed "to encourage a diversity of views from private speakers," *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (quoting

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 834 (1995)), or to "facilitate private speech, not to promote a governmental message." *Id.*

285.    The PSLF program is designed to facilitate the private speech and expression of the range of 501(c)(3) organizations serving communities around the country.

286.    Yet the Rule conditions and impermissibly restricts participation in the program based on whether employers, including Nonprofit Plaintiffs, engage in certain activities that the Administration disfavors, including activities involving their protected speech and expression.

287.    Nonprofit Plaintiffs and their members engage in protected speech and expression in carrying out their missions, including with respect to which clients they represent and how they advocate for their clients in legal and other settings; what positions they take on issues of political or public importance; what materials they share on public-facing platforms; and more.

288.    The Rule forces Plaintiffs to choose between curtailing this constitutionally protected speech and expression or risk losing access to the PSLF program.

289.    Indeed, the Rule conditions Plaintiffs' participation in the PSLF program on Plaintiffs' written affirmation that they are not engaged in any of the poorly defined enumerated activities.

290.    The First Amendment also bars the government from retaliating against the exercise of First Amendment rights. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

291.    Retaliatory actions chill protected speech by "plac[ing] informal restraints on speech allowing the government to produce a result which it could not command directly." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)) (cleaned up). Federal agencies, including Defendants, are prohibited from

"relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression of disfavored speech.'" *Nat'l Rifle Ass'n of America v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

292.    The Rule unlawfully retaliates against Nonprofit Plaintiffs by threatening to punish them—in the form of loss of access to a government program—for their protected speech, including but not limited to their legal advocacy, as described above.

293.    The First Amendment also protects the freedom of speech and freedom of expression from laws that are so overbroad as to prohibit a substantial amount of protected speech. U.S. Const. amend I. A law is unconstitutionally overbroad when its "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

294.    The Rule is overbroad and punishes a substantial amount of protected expression.

295.    The Rule chills Plaintiffs from carrying out protected speech and expression related to the subjects enumerated in the Rule, for fear that they will be investigated and foreclosed from participation in the PSLF program.

296.    The chilling effects of the Rule are only exacerbated by the Rule's vague language, the Administration's ever-shifting views on supposed "illegal activities," and the untrammeled authority that the Rule gives the Secretary to determine when an organization should be excluded from participation in the program. The Rule is written so vaguely that "every application creates an impermissible risk of suppression of ideas." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992); *see also, e.g.*, *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 797-98 (1984).

297.    The Rule is not narrowly tailored to achieve a compelling government interest.

298.    Accordingly, the Rule violates the First Amendment.

299.    Plaintiffs have been harmed by the actions of Defendants because the Department and Secretary McMahon have promulgated a Rule that forces them to engage in burdensome compliance activities, threatens to cause them economic harm through loss of talent and anticipated increased costs to their hiring and employee compensation, and with respect to the Nonprofit and Associational plaintiffs, chills their protected speech.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

1.    Declare that the Rule is unlawful and unconstitutional;

2.    Vacate and set aside the Rule;

3.    Permanently enjoin Defendants from implementing or enforcing the Rule;

4.    Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

5.    Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 10, 2026                          Respectfully submitted,

*/s/ Sarah R. Goetz*

Sarah Goetz*                                      Persis Yu (BBO #685951)
Jennifer Fountain Connolly*                       PROTECT BORROWERS (a fiscally sponsored
Victoria S. Nugent*                               project of the Shared Ascent Fund)
Simon C. Brewer*                                  1025 Connecticut Ave NW, #717
DEMOCRACY FORWARD FOUNDATION                      Washington, DC 20036
P.O. Box 34553                                    Phone: (202) 618-1328
Washington, DC 20043                              persis@protectborrowers.org
Phone: (202) 448-9090
Fax: (202) 796-4426
sgoetz@democracyforward.org
jconnolly@democracyforward.org                    R. T. Winston Berkman-Breen*
vnugent@democracyforward.org                      David S. Nahmias*
sbrewer@democracyforward.org                      Khandice Lofton*
                                                  PROTECT BORROWERS (a fiscally sponsored
                                                  project of the Shared Ascent Fund)
                                                  40 Rector Street, 9th Floor
                                                  New York, NY 10006
                                                  winston@protectborrowers.org
                                                  david.nahmias@protectborrowers.org
                                                  khandice@protectborrowers.org


*Counsel for Plaintiffs National Council of Nonprofits, City of Boston, City of Albuquerque, City of Chicago, Amica Center for Immigrant Rights, Coalition for Humane Immigrant Rights, Legal Aid Society of the District of Columbia, Oasis Legal Services, American Federation of Teachers, American Federation of State, County and Municipal Employees, National Education Association, and National Association of Social Workers*


* Admitted pro hac vice

David Chiu*
*City Attorney*
Yvonne R. Meré*
*Chief Deputy City Attorney*
Mollie M. Lee*
*Chief of Strategic Advocacy*
Molly J. Alarcon*
Sophia L. Cai*
*Deputy City Attorneys*
CITY AND COUNTY OF SAN FRANCISCO
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
Phone: (415) 355-3308
Cityattorney@sfcityatty.org
Yvonne.Mere@sfcityatty.org
Mollie.Lee@sfcityatty.org
Molly.Alarcon@sfcityatty.org
Sophia.Cai@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*

Tony LoPresti*
*County Counsel*
Kavita Narayan*
*Chief Assistant County Counsel*
Meredith A. Johnson*
*Lead Deputy County Counsel*
Laura S. Trice*
Tayryn A. Edwards*
*Deputy County Counsels*
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, Ninth Floor
San José, CA 95110-1770
Phone: (408) 299-5900
Fax: (408) 292-7240
Tony.LoPresti@cco.sccgov.org
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Laura.Trice@cco.sccgov.org
Tayryn.Edwards@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*

* Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2026, a true copy of the foregoing document was electronically filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.


Dated: February 10, 2026                              */s/ Sarah R. Goetz*

                                                      Sarah Goetz