## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

**National Council of Nonprofits** et al.,

       *Plaintiffs*

v.

**Linda McMahon** et al.,

       *Defendants*

**Case No. 25-cv-13242-MJJ**

Leave to file excess pages granted Jan. 27, 2026 (Doc. No. 45)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
## SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 2

Standard of Review ......................................................................................................... 8

Argument ......................................................................................................................... 9

I.      Plaintiffs have Article III standing. ....................................................................... 9

        A.    Plaintiffs have shown concrete, particularized injuries arising from the Rule.......... 10

              1.    Local Governments and Nonprofit Employers face compliance costs, competitive disadvantage, and/or reputational harm because of the Rule................................................................................................... 10

              2.    Employee Associations' borrower members face loss of access to PSLF. ................................................................................................ 13

              3.    Plaintiffs face an imminent risk of enforcement........................... 15

        B.    Plaintiffs' injuries are traceable to the Rule and redressable by this Court.............. 16

II.     The PSLF Rule is unlawful under the APA. ......................................................... 17

        A.    The Rule is contrary to the Higher Education Act and exceeds the statutory authority granted to the Department under the Act. .................................. 17

              1.    The Secretary's interpretation contradicts the plain text of the HEA........... 17

              2.    The statutory scheme only underscores the conclusion that the HEA does not authorize the Secretary to disqualify public-service employers............................................................................................... 18

              3.    The Department failed to cite any legal authority that would justify the Rule. ...................................................................................... 20

        B.    The Rule is arbitrary and capricious......................................................... 22

        C.    The Rule imposes viewpoint-discriminatory restrictions on the PSLF program in violation of the First Amendment.............................................. 31

III.    The Court should declare the PSLF Rule unlawful and vacate it. ....................... 35

Conclusion ...................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Adams v. Watson*,
  10 F.3d 915 (1st Cir. 1993) .......................................................................... 12

*Agency for Int'l Dev. v. All. for Open Soc'y*,
  570 U.S. 205 (2013) ...................................................................................... 33

*Am. Fed'n of Teachers v. Dep't of Educ.*,
  796 F. Supp. 3d 66 (D. Md. 2025) ............................................................... 35

*Asociación De Detallistas De Gasolina De Puerto Rico, Inc. v. Puerto Rico*,
  138 F.4th 686 (1st Cir. 2025) ....................................................................... 18

*Asociación Hosp. Del Maestro, Inc. v. Becerra*,
  10 F.4th 11 (1st Cir. 2021) ........................................................................... 21

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ...................................................................................... 10

*Biden v. Texas*,
  597 U.S. 785 (2022) ...................................................................................... 22

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983) ................................................................................ 21, 22

*Bos. Redevelopment Auth. v. NPS*,
  838 F.3d 42 (1st Cir. 2016) ............................................................................. 8

*Capen v. Campbell*,
  134 F.4th 660 (1st Cir. 2025) ....................................................................... 10

*CFPB v. Accrediting Council for Indep. Colleges & Schs.*,
  854 F.3d 683 (D.C. Cir. 2017) ..................................................................... 19

*City & Cnty. of S.F. v. Trump*,
  No. 25-cv-01350-WHO, 2025 WL 2426858 (N.D. Cal. Aug. 22, 2025) ............... 15

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
  466 F.3d 134 (D.C. Cir. 2006) ..................................................................... 20

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
  129 F.4th 78 (1st Cir. 2025) ......................................................................... 10

*Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*,
  603 U.S. 799 (2024) ...................................................................................... 35

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019).................................................................................................... 29

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)........................................................................................................ 23

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025).................................................................................................... 16

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).................................................................................................... 19

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003)................................................................................. 13

*Gonzales v. Oregon*,
  546 U.S. 243 (2006).............................................................................................. 22, 28

*Harrington v. Chao*,
  280 F.3d 50 (1st Cir. 2002)........................................................................................ 35

*Home Box Office, Inc. v. FCC*,
  567 F.2d 9 (D.C. Cir. 1977)....................................................................................... 24

*Kennedy v. Warren*,
  66 F.4th 1199 (9th Cir. 2023).................................................................................... 13

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001)........................................................................................ 32, 33, 34

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024).................................................................................................... 17

*Massachusetts v. HHS*,
  923 F.3d 209 (1st Cir. 2019)................................................................................... 9, 10

*McGuire v. Reilly*,
  386 F.3d 45 (1st Cir. 2004)........................................................................................ 31

*Minuteman Health, Inc. v. HHS*,
  291 F. Supp. 3d 174 (D. Mass. 2018)......................................................................... 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).................................................................................................. 23, 30

*Museum of Fine Arts, Boston v. Seger-Thomschitz*,
  623 F.3d 1 (1st Cir. 2010).......................................................................................... 22

*N.H. Hosp. Ass'n v. Azar*,
887 F.3d 62 (1st Cir. 2018)...................................................................18

*N.Y. Stock Exch. LLC v. SEC*,
962 F.3d 541 (D.C. Cir. 2020)..............................................................20

*NAACP v. Button*,
371 U.S. 415 (1963).............................................................................33

*Nat'l Ass'n of Broadcasters v. FCC*,
39 F.4th 817 (D.C. Cir. 2022)..............................................................20

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)......................................................................18, 20

*Nat'l Council of Nonprofits v. OMB*,
775 F. Supp. 3d 100 (D.D.C. 2025).......................................................33

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024)......................................................................31, 33

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013)..............................................................25

*Ohio v. EPA*,
603 U.S. 279 (2024).............................................................................23

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
983 F.3d 671 (4th Cir. 2020) ...............................................................11

*Perkins Coie LLP v. DOJ*,
783 F. Supp. 3d 105 (D.D.C. 2025).......................................................35

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)......................................................................31, 33

*Rhode Island Latino Arts v. NEA*,
777 F. Supp. 3d 87 (D.R.I. Apr. 3, 2025). ............................................34

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004)...................................................................31

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995).............................................................31, 33, 34

*Rust v. Sullivan*,
500 U.S. 173 (1991).............................................................................33

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
 508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................................ 33

*Save Jobs USA v. DHS*,
 942 F.3d 504 (D.C. Cir. 2019) ............................................................................ 12

*Sorrell v. IMS Health, Inc.*,
 564 U.S. 552 (2011) ............................................................................................ 31

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) ............................................................................................ 16

*Tennessee v. EEOC*,
 129 F.4th 452 (8th Cir. 2025) ............................................................................. 11

*Texas v. Johnson*,
 491 U.S. 397 (1989) ............................................................................................ 31

*United Food & Comm. Workers Union Local 751 v. Brown Grp.*,
 517 U.S. 544 (1996) ............................................................................................ 15

*Util. Air Regul. Grp. v. EPA*,
 573 U.S. 302 (2014) ............................................................................................ 21

*Webb v. Injured Workers Pharm., LLC*,
 72 F.4th 365 (1st Cir. 2023) ............................................................................... 15

*Window Covering Mfrs. Ass'n v. CPSC*,
 82 F.4th 1273 (D.C. Cir. 2023) .......................................................................... 31

*Zimmerman v. Cambridge Credit Counseling Corp.*,
 409 F.3d 473 (1st Cir. 2005) .............................................................................. 22

**Statutes**

5 U.S.C. § 706(2) ............................................................................... 9, 17, 22, 31

8 U.S.C. § 1325 ........................................................................................................ 5

8 U.S.C. § 1189 ........................................................................................................ 5

20 U.S.C. § 1087a ............................................................................................... 2, 19

20 U.S.C. § 1087e ............................................... 2, 3, 6, 17, 18, 19, 21, 23, 34

20 U.S.C. § 1098a ................................................................................................... 4

20 U.S.C. § 1099c(a) ............................................................................................ 19

20 U.S.C. § 1221e-3 ................................................................................................ 20

26 U.S.C. § 501(c)(3) .............................................................................................. 3

26 U.S.C. § 2611(2)(A) ........................................................................................... 25

Pub. L. 110-84, 121 Stat. 784 (2007) ..................................................................... 2

**Other Authorities**

34 C.F.R. § 685.219 ................................................................................................ 3

73 Fed. Reg. 63232 (Oct. 23, 2008) ....................................................................... 3

153 Cong. Reg. H10257 (Sept. 7, 2007) ................................................................. 3

153 Cong. Rec. S11241 (Sept. 7, 2007) .................................................................. 3

Countering Domestic Terrorism and Organized Political Violence, Nat'l Sec.
    Presidential Memorandum No. 7, 90 Fed. Reg. 47225 (Sept. 25, 2025) ........... 8

Dep't of Educ., Fed. Student Aid, *Tackling the Public Service Loan Forgiveness
    Form: Employer Tips*, https://perma.cc/75DV-V25G ...................................... 24

Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for
    Receiving Federal Financial Assistance and Request for Certification under
    Title VI and *SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AF2G-ZL69 ......... 8

Dep't of Homeland Sec., *Sanctuary Jurisdictions Defying Federal Immigration
    Law*, https://web.archive.org/web/20250529215954/https:/www.dhs.gov/
    sanctuary-jurisdictions (updated May 29, 2025) ............................................... 7

Dep't of Justice, *U.S. Sanctuary Jurisdiction List Following Executive Order
    14287*, https://perma.cc/K7Q9-G4ZN (updated Oct. 31, 2025) ....................... 7

Ending Illegal Discrimination and Restoring Merit-Based Opportunity,
    Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) .................................... 8

Ending Radical and Wasteful Government DEI Programs and Preferencing,
    Exec. Order 14151, 90 Fed. Reg. 8339 (Jan. 21, 2025) .................................... 8

H.R. Rep. 110-210, 110th Cong., 1st Sess. (2007). .......................................... 2, 3

Presidential Memorandum, *Preventing Abuses of the Legal System and the
    Federal Court* (Mar. 22, 2025), https://perma.cc/S4MH-KESL .................... 7, 8

Protecting American Communities from Criminal Aliens, Exec. Order 14287,
    90 Fed. Reg. 18761 (Apr. 28, 2025) ................................................................. 7

White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://perma.cc/SAA9-CVVH ........................................... 4

**INTRODUCTION**

Congress made a promise to public-service workers and their employers when it created the Public Service Loan Forgiveness program: that borrowers will have their student loans forgiven in exchange for completing ten years of service to their communities and our country. It recognized the need to have talented and dedicated people occupy this workforce—and also knew that high levels of student-loan debt often prohibited those same people from taking these types of jobs.

For nearly two decades, the PSLF program has helped to bridge this gap by promising loan forgiveness to borrowers in public-service jobs. And the program serves its purpose: more than a million borrowers have had billions in student debt discharged through it.

In an affront to this congressional mandate, the Trump-Vance Administration has weaponized the PSLF program to target employers whose missions do not align with the Administration's on immigration, diversity and inclusion, gender identity, and public protest. Under a new rule promulgated by Defendants Secretary of Education Linda McMahon and the Department of Education, the Secretary may selectively disqualify employers on the Secretary's determination that an employer has engaged in activities with a "substantial illegal purpose." Through its breadth, ambiguity, and departure from congressional intent, the PSLF Rule threatens the legitimate actions of law-abiding organizations and entities, and itself violates numerous laws.

The Rule violates the Administrative Procedure Act for several independent reasons. It is contrary to and exceeds the statutory authority granted to the Department under the Higher Education Act, which establishes that *all* government and 501(c)(3) employers are qualifying employers for purposes of the PSLF program without limitation and confers no authority on the Secretary to disqualify any of them; it is arbitrary and capricious; and it violates the Free Speech Clause of the First Amendment.

Plaintiffs—a group of cities and counties (Local Governments), tax-exempt organizations (Nonprofit Employers), and associations representing nurses, teachers, social workers, government employees, and other professionals (Employee Associations)—serve communities across the United States and rely on the PSLF program to do their work. They are engaged in lawful activities, such as providing social services and legal representation to immigrants, advocating for diversity and inclusion, or providing essential government services. But they reasonably believe that they will be targeted by the Rule—and indeed are already suffering its ill-effects—undermining their important work, employment in their chosen careers, ability to serve their constituents, and ability to fulfill their missions. Plaintiffs therefore ask this Court to declare the Rule unlawful and set it aside.

## BACKGROUND

### The Public Service Loan Forgiveness Program

In 2007, Congress recognized that the skyrocketing cost of higher education made it increasingly difficult for individuals to enter critical public-service professions, such as teaching, nursing, and public-interest law. To address this problem, Congress enacted, and President George W. Bush signed, legislation creating the PSLF program. *See* College Cost Reduction and Access Act of 2007, Pub. L. 110-84, 121 Stat. 784 (2007) (codified at 20 U.S.C. § 1087e(m)). That statute requires the Department of Education to "cancel the balance of interest and principal due" for any borrower with eligible federal direct student loans once the borrower meets the eligibility criteria.[1] *Id.* § 1087e(m)(1). Lawmakers intended PSLF to "encourage participation" in public-interest careers out of concern that a "growing number of individuals . . . do not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans." H.R.

---

[1] Federal direct student loans are made directly by the federal government to borrowers. *See generally* 20 U.S.C. § 1087a *et seq.*

Rep. 110-210, 110th Cong., 1st Sess., at 48-49 (2007). Congress also explicitly described jobs for "individuals serving the country in professions of national need," including direct legal services, social work, and teaching. *See id*. Members of Congress repeatedly lauded the program as a way to incentivize public service. *See, e.g.*, 153 Cong. Rec. S11241-07, S11242 (Sept. 7, 2007) (statement of Sen. Kennedy); 153 Cong. Reg. H10257 (Sept. 7, 2007) (statement of Rep. Jackson-Lee); *id.* at H10257-58 (statement of Rep. Davis); H10266 (statement of Rep. Langevin).

To be eligible for forgiveness, a borrower must make 120 qualifying payments while "employed in a public service job." 20 U.S.C. § 1087e(m)(1)(B). The statute defines "public service job" expansively. It includes, among other things, any full-time job in government, public health, or public education, or at a 501(c)(3) tax-exempt organization. *Id.* § 1087e(m)(3)(B)(i); *see* 26 U.S.C. § 501(c)(3). The statute confers no authority on the Department to alter this definition or to impose additional restrictions limiting which jobs qualify as public-service jobs.

The Department's initial implementing regulations recognize this limited role, defining a qualifying "public service organization" in a manner directly "derived from the statutory definition of 'public service job.'" 73 Fed. Reg. 63232, 63242 (Oct. 23, 2008). Those regulations establish a basic framework to process loan cancellations under the PSLF program, but they appropriately do not attempt to curtail Congress's broad definition of which employers qualify for the program. *See* 34 C.F.R. § 685.219. The regulations also create a simple, straightforward, and largely ministerial process for employers to certify borrowers' employment and progress toward loan forgiveness under the program. *Id.* § 685.219(e).

**The 2025 PSLF Rule**

On March 7, 2025, President Trump issued Executive Order 14235, directing the Secretary of Education to amend the regulations governing the PSLF program to "ensure the definition of

3

'public service' excludes organizations that engage in activities that have a substantial illegal purpose." AR1310-AR1313. The Executive Order identified five discrete categories of activities that, according to the Executive Order, have such a "substantial illegal purpose": aiding or abetting the violation of immigration laws; "supporting terrorism"; "child abuse," defined to include the provision of gender-affirming care to minors; aiding or abetting so-called "illegal discrimination"; and violating laws related to protest activity. *Id.* The White House characterized the Executive Order's goal as ending access to loan forgiveness for "anti-American activists" and "organizations that harm American values," and ensuring that "only legitimate public servants benefit." Ex. 1, White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://perma.cc/SAA9-CVVH.

To implement the Executive Order, the Department initiated the negotiated-rulemaking process required by the Higher Education Act (HEA). *See* 20 U.S.C. § 1098a. During the three days of negotiations the Department permitted, negotiators—who were selected by the Department to fill various stakeholder categories defined by the HEA and the Secretary—raised concerns about many aspects of the proposed regulatory language, including the Department's legal authority to promulgate regulations excluding governmental or 501(c)(3) nonprofit employers that, by the terms of the statute, qualify for the PSLF program. *See, e.g.*, AR1970 (raising concern that the proposed revisions would "make new programs out of whole cloth"); AR1989 (observing that the proposed language "seems to directly conflict with the Higher Education Act").

The Department declined to address those concerns and published a notice of proposed rulemaking with language that mirrored the Executive Order. *See* AR2462-AR2464. The proposed rule would authorize the Secretary to disqualify any employer on the basis that the employer has engaged in any of six enumerated categories of supposedly illegal activities. AR2442-AR2443.

4

The Department offered just 30 days for public comment (rather than the typical 60 days), during which it received 13,989 comments, including comments from Plaintiffs. AR2467; *see also, e.g.*, AR639-AR648 (City & County of San Francisco); AR657-AR661 (City of Boston; City of Chicago; County of Santa Clara); AR675-AR682 (American Federation of Teachers; American Federation of State, County, and Municipal Employees; National Association of Social Workers; Oasis Legal Services); AR758 (Amica Center); AR768 (National Council of Nonprofits); AR833-AR834 (National Education Association); AR879 (City of Albuquerque).

The Department promulgated a final rule (the PSLF Rule or Rule) on October 31, 2025. AR2465-AR2501. The PSLF Rule—which is scheduled to take effect July 1, 2026—is substantially unchanged from the Administration's initial announcement. It defines "substantial illegal purpose" to mean six categories of activities, and it empowers the Secretary to disqualify from PSLF eligibility any employer whom she determines is engaged in those activities, "such that" the employer itself "has a substantial illegal purpose." AR2465. Those six categories are:

    i.    Aiding or abetting violations of 8 U.S.C. [§] 1325 or other Federal immigration laws;

    ii.    Supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. [§] 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

    iii.    Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;

    iv.    Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;

    v.    Engaging in a pattern of aiding and abetting illegal discrimination; or

    vi.    Engaging in a pattern of violating State laws as defined in paragraph (b)(34) of [the regulation].

AR2500. The underlying statutory text contains no references to these or any other categories of prohibited activities. *See* 20 U.S.C. § 1087e(m).

Beyond the Rule's broad and ambiguous terms, the Rule also grants the Secretary nearly unchecked discretion to determine that an employer is engaged in activities with a substantial illegal purpose. The Secretary may issue such a finding if an employer fails to certify on an employee's PSLF Form that the employer is not engaged in activities with a substantial illegal purpose. *See* AR2500-AR2501. And regardless of employers' certifications, the Secretary may investigate and disqualify from PSLF eligibility any employer that she believes has a substantial illegal purpose. AR2501. The Secretary may make this determination without relying on a judicial determination of illegality, and can do so even if there is a contradictory judicial determination that an employer's activities are lawful. *Id.* Once an employer is disqualified, its employees will no longer be able to pursue PSLF unless they leave their jobs and find new employment with a qualifying employer that is in good standing. *Id*. A disqualification decision lasts a period of ten years or until the Secretary approves an employer's corrective plan. *Id.*

The Department acknowledged that the Rule would impose costs on employers but nevertheless asserted that "[t]he costs associated with employer review and administration are modest compared to the significant benefits gained[.]" AR2467. In particular, the Department recognized that compliance costs will "primarily result from the costs of legal counsel, restructuring efforts, and changes to the organization's documentation processes." AR2492.

Notwithstanding the thousands of comments opposing the regulation, including comments explaining that the Department lacked legal authority to issue the regulation, the Department made no substantive changes to its proposal. AR2467-AR2490. Neither the Rule nor the Administrative

Record contain any evidence of 501(c)(3) organizations, or other PSLF-qualifying employers, engaging in supposed illegal activities.

Although the PSLF Rule purports to target activities and employers with a so-called substantial illegal purpose, the expansive language of the Rule, coupled with the Administration's history of baselessly accusing local governments and nonprofit organizations of carrying out "illegal" activities, betrays the true breadth of the categories enumerated in the Rule and the potential scope of the Rule.

For example, in the immigration context, the Administration has previously characterized lawful actions like limiting the use of local law-enforcement resources for federal immigration-enforcement activities as actions that "obstruct the enforcement of Federal immigration laws." President Trump accused state and local governments—so-called "sanctuary jurisdictions"—of "us[ing] their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," including laws related to "[a]ssisting aliens in violating Federal immigration law," calling their actions a "lawless insurrection" against federal law and the Administration. Protecting American Communities from Criminal Aliens, Exec. Order 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025). The sole basis for this accusation was these jurisdictions' status as "sanctuary jurisdictions." *See* Ex. 2, Dep't of Justice, *U.S. Sanctuary Jurisdiction List Following Executive Order 14287*, https://perma.cc/K7Q9-G4ZN (updated Oct. 31, 2025); Ex. 3, Dep't of Homeland Sec., *Sanctuary Jurisdictions Defying Federal Immigration Law*, https://web.archive.org/web/20250529215954/https://www.dhs.gov/sanctuary-jurisdictions (updated May 29, 2025). The Administration has likewise attacked the immigration bar for instructing clients on how to "circumvent immigration policies . . . and deceive the immigration authorities and courts." Ex. 4,

Presidential Memorandum, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://perma.cc/S4MH-KESL.

The Administration has also repeatedly characterized "illegal discrimination" in broad terms, untethered from genuine legal interpretations of the federal antidiscrimination laws. President Trump has issued executive orders calling "diversity, equity, and inclusion" activities "illegal and immoral," stating that DEI initiatives "violate the civil-rights laws of this Nation" and are a proxy for "illegal, pernicious discrimination." Ending Illegal Discrimination and Restoring Merit-Based Opportunity, Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); *see also* Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order 14151, 90 Fed. Reg. 8339 (Jan. 21, 2025). The Department of Education itself has likewise suggested that DEI programs are illegal. *See* Ex. 5, Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/AF2G-ZL69.

Yet another executive order characterized entities and individuals engaging in protected protest activity as "domestic terrorists" contributing to a "pattern of violent and terroristic activities." *See* Countering Domestic Terrorism and Organized Political Violence, Nat'l Sec. Presidential Memorandum No. 7, 90 Fed. Reg. 47225 (Sept. 25, 2025).

Hence, under the Administration's own understanding of "aiding and abetting" illegal immigration, engaging in unlawful discrimination, and more, the Rule punishes a wide swath of lawful activity simply because the Administration has contempt for the communities those activities seek to protect.

## STANDARD OF REVIEW

In the context of an APA suit, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. NPS*, 838 F.3d 42, 47 (1st Cir. 2016).

At the summary-judgment stage, the court decides, "as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health, Inc. v. HHS*, 291 F. Supp. 3d 174, 189-90 (D. Mass. 2018). The reviewing court must "hold unlawful and set aside" agency action that exceeds the agency's authority, is arbitrary and capricious, or violates the Constitution. 5 U.S.C. § 706(2).

## ARGUMENT

The Rule violates the APA multiple times over. *First*, the Rule conflicts with the plain text of the Higher Education Act, making it not in accordance with law and in excess of statutory authority. That alone provides a sufficient basis for the Court to vacate the Rule. *Second*, the Rule is arbitrary and capricious, because it relies on criteria Congress did not intend it to consider, fails to address a real problem or explain its rejection of alternative solutions, does not account for employers' and employees' reliance interests, invites arbitrary enforcement, regulates topics about which it lacks adequate expertise, and ignores compliance costs. *Third*, the Rule is contrary to the Constitution because it imposes viewpoint-discriminatory restrictions on which employers qualify for the PSLF program, in violation of the First Amendment. Each of these reasons provides an independently sufficient basis to grant Plaintiffs summary judgment and vacate the Rule.

## I.  Plaintiffs have Article III standing.

Plaintiffs—Local Governments, Nonprofit Employers, and Employee Associations—have standing based on injuries to them directly, to their members, or both. These injuries are already occurring or will imminently occur once the Rule takes effect. As to both direct and associational standing, a plaintiff must demonstrate (1) a concrete and particularized injury that is actual or imminent; (2) fairly traceable to the challenged conduct; and (3) likely to be redressed by a favorable judicial decision. *Massachusetts v. HHS*, 923 F.3d 209, 222 (1st Cir. 2019). For associational standing, an organization must further show that (1) "its members would otherwise

have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025). Plaintiffs satisfy these standards.

The Court need only find that one Plaintiff has standing, on one theory of injury, to prevail on the standing analysis. *See Capen v. Campbell*, 134 F.4th 660, 668 (1st Cir. 2025) (observing that "[i]f at least one plaintiff has standing, the suit may proceed"); *accord Biden v. Nebraska*, 600 U.S. 477, 489 (2023). Plaintiffs more than meet their burden here.

### A.   Plaintiffs have shown concrete, particularized injuries arising from the Rule.

Plaintiffs (and, for the Employee Associations, their members) have established actual or imminent injuries that are concrete and particularized. *Massachusetts*, 923 F.3d at 222. These include compliance costs, competitive disadvantage, reputational harms, and borrowers' loss of access to PSLF.

#### 1.   Local Governments and Nonprofit Employers face compliance costs, competitive disadvantage, and/or reputational harm because of the Rule.[2]

##### *Regulatory compliance costs*

Since the Rule was finalized, all Local Government Plaintiffs and all Nonprofit Employer Plaintiffs, as PSLF-qualifying employers, have been incurring—or will incur—costs and increased administrative burdens associated with ascertaining the Rule's effects on their operations and how to comply with its requirements. Those burdens are sufficient to establish their standing, because

---

[2] Plaintiff NCN has standing in its own right as a nonprofit employer and associational standing as an organization with nonprofit-employer members. Many of NCN's employer members are threatened with the loss of PSLF eligibility and thus have standing for the reasons described herein. Ex. 6, Yentel Decl. ¶¶ 28-29. Safeguarding PSLF access for its members is pertinent to NCN's purpose, *id.* ¶¶ 3-9, and resolution of Plaintiffs' claims does not require the participation of its members.

"[t]he imposition of a regulatory burden itself causes injury." *See Tennessee v. EEOC*, 129 F.4th 452, 458 (8th Cir. 2025); *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671 (4th Cir. 2020) (compliance costs to employers established standing).

These Plaintiffs routinely complete PSLF forms for employees participating in PSLF, a process that currently requires a straightforward verification of the borrower's employment. *See, e.g.*, Ex. 7, Brown Decl. ¶¶ 5-7;  Ex. 8, Kafele Decl. ¶ 6; Ex. 9, Kim Decl. ¶ 5; Ex. 10, Huebner Decl. ¶¶ 8-10; Ex. 11, Lawrence Decl. ¶¶ 4-5; Ex. 12, Lukens Decl. ¶ 11; Ex. 13, Salas Decl. ¶¶ 8, 15; Ex. 14, Stoker Decl. ¶¶ 3-4; Ex. 15, Swaruup Decl. ¶ 12; Yentel Decl. ¶¶ 12-13. But in anticipation of the Rule going into effect, and the requirement that employers certify on PSLF forms that they are not engaged in activities with a substantial illegal purpose, AR2500-AR2501, these Plaintiffs have had to, or will have to, decipher the vague requirements of the Rule, Brown Decl. ¶ 9; Lawrence Decl. ¶ 10;  Kim Decl. ¶ 7; Kafele Decl. ¶ 13; Salas Decl. ¶ 16; Stoker Decl. ¶ 12; Swaruup Decl. ¶¶ 13, 21; Yentel Decl. ¶¶ 16-20, 22; collect internal data around their PSLF employment verification processes, Brown Decl. ¶ 10; Kafele Decl. ¶ 11; Kim Decl. ¶ 7; respond to inquiries from employees about the impact of the Rule, Huebner Decl. ¶ 16; Salas Decl. ¶¶ 19-22; Kafele Decl. ¶ 17; Lukens Decl. ¶¶ 12, 15; Stoker Decl. ¶¶ 7, 12; Swaruup Decl. ¶¶ 17-20; Yentel Decl. ¶ 31; employ in-house or outside counsel on an ongoing basis to address their compliance with the Rule and the new employment certification obligations the Rule imposes, Brown Decl. ¶ 9; Huebner Decl. ¶ 15; Salas Decl. ¶ 17; Kafele Decl. ¶ 14; Kim Decl. ¶ 7; Lukens Decl. ¶ 13; Stoker Decl. ¶ 13; Yentel Decl. ¶ 22; and potentially develop new compensation packages, retrain staff, or change the way they handle PSLF paperwork, Huebner Decl. ¶ 15; Brown Decl. ¶ 9; Kafele Decl. ¶ 16; Kim Decl. ¶ 7; Lawrence Decl. ¶ 10; Lukens Decl. ¶¶ 13-14; Salas Decl. ¶ 18; Stoker Decl. ¶¶ 12-14; Yentel Decl. ¶¶ 21-22, 33.

These costs come as no surprise: the Department itself specifically recognized that the Rule would impose "compliance costs for employers." AR2492. Those compliance costs—which Local Government Plaintiffs and Nonprofit Employer Plaintiffs are already incurring now and will continue to incur if the Rule takes effect—satisfy the injury requirement.

### *Competitive disadvantage*

The threat of disqualification or actual loss of PSLF eligibility also puts all Local Government and Nonprofit Employer Plaintiffs at a competitive disadvantage relative to for-profit employers and PSLF-qualifying government or nonprofit employers against whom they compete for talented employees. *See Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993) (explaining doctrine of competitor standing); *cf. Save Jobs USA v. DHS*, 942 F.3d 504, 509 (D.C. Cir. 2019) ("[A]n individual who competes in a labor market has standing to challenge . . . government action that is likely to lead to an increased supply of labor—and thus competition—in that market").

Plaintiffs regularly advertise themselves as PSLF-qualifying employers as a valuable benefit that helps them to compete with private-sector jobs that may offer higher salaries but not eligibility for PSLF. *See, e.g.*, Huebner Dec. ¶¶ 4, 11-13, 17, Exs. A, B; Salas Decl. ¶¶ 10-11; Kafele Decl. ¶¶ 8-9; Lawrence Decl. ¶ 5; Lukens Decl. ¶¶ 8-9; Stoker Decl. ¶¶ 5-6, 8; Swaruup Decl. ¶¶ 7-9; Yentel Decl. ¶¶ 6, 8. And many of Plaintiffs' employees participate in PSLF. *See, e.g.*, Brown Decl. ¶ 6; Huebner Decl. ¶ 8; Kim Decl. ¶ 4; Salas Decl. ¶ 9; Kafele Decl. ¶ 7; Lawrence Decl. ¶ 4; Lukens Decl. ¶ 7; Stoker Decl. ¶¶ 3-4; Swaruup Decl. ¶ 10; Yentel Decl. ¶ 9. Plaintiffs anticipate that even the *threat* of enforcement and the uncertainty created by the Rule will disrupt the financial planning and security of current and prospective employees who are relying on PSLF and thus impede Plaintiffs' ability to maintain and attract the skilled workforce they require. *See, e.g.*, Brown Decl. ¶¶ 8-11; Huebner Decl. ¶ 17; Kafele Decl. ¶ 24; Lawrence

Decl. ¶ 14; Lukens Decl. ¶¶ 14-17, 20; Salas Decl. ¶¶ 18-22, 26; Stoker Decl. ¶¶ 8-9. 18; Swaruup

Decl. ¶¶ 17, 21-22; Yentel Decl. ¶¶ 31-33.

At least one Plaintiff, Oasis Legal Services, has already lost a long-time employee who

fears losing access to PSLF due to the organization's work in immigration services. Kafele Decl.

¶ 17. Oasis expects to incur significant costs due to this turnover. *Id.* ¶ 24. City of Albuquerque

likewise anticipates adjusting its hiring practices and difficulty in recruiting and retaining qualified

candidates and competing with private-sector jobs; it also expects to expend scarce resources to

update its compensation package to accommodate loss of PSLF eligibility. Stoker Decl. ¶¶ 9-12.

### *Reputational injury*

Some Nonprofit Employer Plaintiffs also stand to suffer injury to their reputation if the

Administration labels them as having a "substantial illegal purpose" and targets them for

disqualification. The stigma of such a label will affect their ability to recruit and retain talented

employees, raise money from charitable donations, and more. *See, e.g.*, Kafele Decl. ¶ 19; Yentel

Decl. ¶ 35. Those reputational harms constitute an injury in fact, *Foretich v. United States*, 351

F.3d 1198, 1211 (D.C. Cir. 2003) ("[I]njury to reputation can constitute a cognizable injury."),

because there is a "unique stigma associated with having a government official label someone a

law breaker," *Kennedy v. Warren*, 66 F.4th 1199, 1206 (9th Cir. 2023). Being targeted as the

subject of an investigation into whether an organization engages in activities with a supposed

"substantial illegal purpose"—let alone being disqualified as a PSLF-eligible employer under the

Rule—carries such a stigma and causes reputational harm.

### 2. Employee Associations' borrower members face loss of access to PSLF.

Associational Plaintiffs' members include teachers, social workers, state and local

government employees, and others who work in public-service jobs and have direct student loans.

Ex. 16, Estreet Decl. ¶¶ 7-9; Ex. 17, Lau Decl. ¶¶ 10-11; Ex. 18, Tammelleo Decl. ¶¶ 3, 10-12;

Ex. 19, Thornton Decl. ¶¶ 3-4, 8-9. They entered these jobs because they wanted to serve their communities, and their ability to do so has been made possible by the promise of debt relief through the PSLF program. *E.g.*, Estreet Decl. ¶¶ 15-17; Thornton Decl. ¶¶ 8-9. Many of their members work for employers that stand to be targeted by the Rule—including, for example, members of AFSCME, AFT, and NASW who work for government employers that the Administration has deemed "sanctuary jurisdictions." *See supra* pp. 7-8; Ex. 20, Johnson Decl. ¶ 10; Tammelleo Decl. ¶¶ 5, 18; Thornton Decl. ¶¶ 17-18; Ex. 21, Waddy Decl. ¶ 9.

If the Rule is enforced against their employers, members of Associational Plaintiffs face a substantial risk of losing statutorily eligible time toward PSLF and forgiveness of their loans. Consequently, they will be forced to either incur the financial costs of having to hold and repay their student debt longer than necessary, or else seek a new job that is PSLF-eligible. *See* Estreet Decl. ¶¶ 18-22; Johnson Decl. ¶¶ 11-17; Lau Decl. ¶¶ 13-14; Tammelleo Decl. ¶¶ 19-20; Thornton Decl. ¶ 19; Waddy Decl. ¶¶ 10-12. Such a choice is particularly agonizing for members who have dedicated themselves to public service, who would have to uproot their lives to continue that work, or who have nearly completed their qualifying payments, *e.g.*, Johnson Decl. ¶¶ 11-13, 17; Waddy Decl. ¶ 11. Accordingly, members of Associational Plaintiffs stand to be imminently injured by the Rule.

The other elements of associational standing are also satisfied. Protecting their members' financial wellbeing is germane to their organizations' missions, Estreet Decl. ¶¶ 3-5; Lau Decl. ¶¶ 5-9; Tammelleo Decl. ¶¶ 4, 13-15; Thornton Decl. ¶¶ 3, 10-13, and PSLF is key to their members' ability to work in public service jobs, *see, e.g.*, Johnson Decl. ¶¶ 4-5; Thornton Decl. ¶¶ 14-15; Waddy Decl. ¶ 7. And because this action can and will be decided on the basis of the Administrative Record and Plaintiffs' declarations alone, neither the claim asserted nor the relief

requested requires participation by individual members. *See United Food & Comm. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 552 (1996) (explaining that associational plaintiffs need not establish harm in their own right as long as they establish harm to their members).

### 3. Plaintiffs face an imminent risk of enforcement.

As described above, the Rule has already injured Plaintiffs and will continue to injure them—in the form of administrative costs, competitive and reputational harms, and financial uncertainty—regardless of whether the Department takes immediate enforcement action against any particular Plaintiff or employer. But Plaintiffs also face a demonstrated risk that the PSLF Rule will be enforced against them (or, for Associational Plaintiffs' members, against the members' employers). This threat of enforcement is "sufficiently imminent and substantial" to give rise to Plaintiffs' Article III injuries, *Webb v. Injured Workers Pharm., LLC*, 72 F.4th 365, 375 (1st Cir. 2023).

The imminence of Plaintiffs' injuries is underscored by the breadth of the Trump-Vance Administration's interpretation of core aspects of the Rule, including the meaning of "aiding and abetting" violations of immigration law and "illegal discrimination," as described above, and by actions the Administration has already taken against Plaintiffs for activities that, although lawful, the Secretary could deem to have a "substantial illegal purpose."

For example, Local Government Plaintiffs are already in active litigation with the Administration over its threats to freeze federal funding based on their so-called sanctuary policies, *see City & Cnty. of S.F. v. Trump*, No. 25-cv-01350-WHO, 2025 WL 2426858 (N.D. Cal. Aug. 22, 2025), or its mass immigration enforcement operations, *see* Ex. 22, Kane Decl. ¶¶ 6-9, 12 (Chicago). And the Administration has identified Local Government Plaintiffs as so-called sanctuary jurisdictions that are supposedly engaging in violations of federal immigration laws, threatening various repercussions, including withholding federal funding. Kane Decl. ¶ 13;

Lawrence Decl. ¶ 13; *see supra* pp. 7-8. Nonprofit Employer Plaintiffs have been similarly targeted, *see* Kafele Decl. ¶¶ 20-23; Lukens ¶¶ 18-19; Salas Decl. ¶¶ 24-25; Swaruup Decl. ¶¶ 14-16; Yentel Decl. ¶ 28, as have Associational Plaintiffs' members' workplaces, *see, e.g.*, Johnson Decl. ¶¶ 10, 14; Thornton Decl. ¶¶ 16-17. Those existing threats and accusations create a substantial risk that the Secretary will investigate and disqualify these Plaintiffs and Associational Plaintiffs' members' employers for supposedly "aiding and abetting" violations of immigration law. The Administration has likewise threatened to investigate recipients of federal funding for violations of the False Claims Act and Title VI for administering diversity-related activities, providing gender-affirming care to young people, and permitting individuals to use the restroom associated with their gender identity. *See generally* Kane Decl.; *see also* Lau Decl. ¶¶ 13-15; Swaruup Decl. ¶¶ 14-16; Tammelleo Decl. ¶ 7; Yentel Decl. ¶¶ 25-27; *supra* pp. 7-8.

These actions "render the threatened enforcement [under the PSLF Rule] sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

### B.  Plaintiffs' injuries are traceable to the Rule and redressable by this Court.

"When a plaintiff is the 'object' of a government regulation, there should 'ordinarily' be 'little question' that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025). The Rule is directly responsible for changes to the PSLF program that jeopardize Plaintiffs' and their members' status as PSLF-qualifying employers or participating borrowers. And an order declaring unlawful and vacating the Rule will redress Plaintiffs' injuries by restoring the pre-Rule status quo and allowing the PSLF program to function as Congress intended.

16

## II.  The PSLF Rule is unlawful under the APA.

### A.  The Rule is contrary to the Higher Education Act and exceeds the statutory authority granted to the Department under the Act.

This case begins—and can end—with the statutory text of the HEA. Congress did not authorize the Secretary to disqualify any statutorily qualifying employer from the PSLF program. By creating a framework and process by which the Secretary may selectively disqualify employers engaging in activities it opposes, the Rule violates Congress's unequivocal definition of a qualifying public-service job. The Rule therefore violates the plain and unambiguous text of the HEA, and the Court can and should invalidate the Rule on that basis. *See* 5 U.S.C. § 706(2) (requiring the court to "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority"); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024) (requiring the court to exercise its "independent legal judgment" without deferring to the agency's interpretation). And even if there were any uncertainty as to the Secretary's statutory mandate based on the text alone, the PSLF program's statutory framework in the HEA makes clear that Congress did not intend to authorize her to disqualify PSLF-eligible employers.

### 1.  The Secretary's interpretation contradicts the plain text of the HEA.

The Higher Education Act makes plain that the Department must forgive borrowers' remaining federal student debt after ten years working in statutorily defined public-service jobs and making qualifying payments during that time. 20 U.S.C. § 1087e(m). Section 1087e(m) directs that the Secretary "shall" cancel borrowers' remaining loan balance and any further repayment obligations after a borrower (A) makes 120 monthly payments on a federal Direct Loan while enrolled in an eligible repayment plan, and (B) is employed in a defined "public service job" for those 120 months. *Id.* § 1087e(m)(1)-(2). The statute defines "public service job" as "a full-time job in" one of fifteen professions, including "government (excluding time served as a member of

Congress)," "public education," and at a 501(c)(3) tax-exempt organization. *Id.* § 1087e(m)(3)(B). The definition contains no exceptions apart from one—time served as a member of Congress. *See id.* As that narrow exception shows, Congress knew how to carve out specified employment from its definition of "public service job" and yet chose not to impose any further exceptions.

The cancellation obligations of Section 1087e(m) are mandatory and without limitation. Congress never authorized the Secretary to pick and choose among public-service jobs and disqualify employers that are statutorily eligible—*i.e.*, governments or 501(c)(3) organizations. The statute does not confer any discretion on the Secretary to establish additional criteria for an employer to qualify for the program. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 663-64 (2007) (holding that where a statute required that a permit "'shall' be approved if the specified criteria are met," it was improper to "add[] an additional criterion"). Nor does the statute authorize the Secretary to disqualify, at her sole discretion, a public-service employer that otherwise qualifies under the statute for any reason.

By granting the Secretary unilateral power to disqualify statutorily enumerated employers, such as governments and 501(c)(3) tax-exempt organizations, on any basis, the Rule contradicts the plain text of Section 1087e(m) and Congress's clear intent when it set up the PSLF program. Accordingly, the Secretary acted without statutory authority when she issued the Rule.

### 2. The statutory scheme only underscores the conclusion that the HEA does not authorize the Secretary to disqualify public-service employers.

Because the language is unambiguous, the Court can resolve this case based on the statutory text alone. *See Asociación De Detallistas De Gasolina De Puerto Rico, Inc. v. Puerto Rico*, 138 F.4th 686, 695 (1st Cir. 2025) (the "inquiry begins and ends with the statutory text if a provision is unambiguous"). Nevertheless, the statutory context confirms that the Rule exceeds the Department's authority. *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 73 (1st Cir. 2018) (interpreting

rule based on how "the Secretary's actions fit within the statutory and regulatory scheme").

Congress designed the PSLF program and placed it within a comprehensive statutory scheme in Section 1087e, "Terms and Conditions of Loans," which sets forth Congress's specific, detailed directives to the Department on a wide range of student-loan-related issues. 20 U.S.C. § 1087e. Those instructions range from processing direct student loan applications, setting interest rates and fees, and disbursing loans, to adopting repayment plans, providing for deferment and forbearance from repayment, and even administering loans to servicemembers and their families. Further, that section is situated in Part D, which sets forth the entire statutory framework of the William D. Ford Direct Loan Program and provides careful instructions to the Secretary on disbursing loans to participating higher-education institutions and establishing contracts with third-party loan servicers and debt collectors. *See* 20 U.S.C. §§ 1087a–1087j.

As the HEA's substantial and detailed mandates make clear, Congress knows how to direct the Secretary to create specific programs and procedures to administer the Department's vast student-loan portfolio. If Congress had wanted the Department to evaluate and police employer activities as part of the PSLF program, it would have said so. *Cf., e.g.*, 20 U.S.C. § 1099c(a) (requiring the Secretary to "determine" a higher education institution's "legal authority to operate within a State" for "purposes of qualifying . . . for participation in programs under this subchapter"). The Court must give effect to Congress's decision not to authorize the Department to make such determinations. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (prohibiting agency from issuing rule that was "inconsistent with the administrative structure that Congress enacted"); *CFPB v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017) (agencies do not have "unfettered authority to cast about for potential wrongdoing"). Absent any such direction, the Rule exceeds the Department's authority.

### 3.   The Department failed to cite any legal authority that would justify the Rule.

In an attempt to find authority where none exists, the Department relies on its general grant of authority to regulate student loans. Neither the statutory text nor case law that the Department cites provide it legal authority to promulgate the PSLF Rule.

**a.** First, the Department points to a housekeeping statute containing a generic grant of rulemaking authority regarding programs administered by the Department. AR2470-AR2471; *see* 20 U.S.C. § 1221e-3 (providing general authority to the Secretary "to make, promulgate, issue, rescind, and amend rules and regulations" regarding Departmental programs, "subject to limitations as may be otherwise imposed by law"). That "general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020). Critically, a "generic grant of rulemaking authority" does not authorize an agency "to alter the specific choices Congress made." *Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022). The agency "must abide 'not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Id.* (quoting *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139-40 (D.C. Cir. 2006)).

Those principles foreclose the Department's reliance on its generic authority. Congress has determined what qualifies as a "public service job" by statute. "The provision operates as a ceiling as well as a floor" by specifying the circumstances in which loans "shall" be forgiven, so the Department lacks authority to "engraft[] a[n additional] criterion onto" the ones in the statute, and thereby substantively alter the criteria to be a PSLF-qualifying employer, *Nat'l Ass'n of Home Builders*, 551 U.S. at 663.

The Department also attempts to exclude qualifying employers engaging in six categories of supposedly illegal activities because "[o]rganizations that break the law . . . are actively harming

the public good." AR2499. Yet Congress did not authorize the Department to assess the "public good" or evaluate whether particular jobs serve the public good. Congress made that determination itself when it required the Department to cancel student debt of borrowers working in an enumerated list of "public service job[s]." *See* 20 U.S.C. § 1087e(m)(3)(B). If Congress wanted to bar certain employers from PSLF eligibility, it could do so within constitutional limits. But the Department "has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Asociación Hosp. Del Maestro, Inc. v. Becerra*, 10 F.4th 11, 17 (1st Cir. 2021) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325-26 (2014)).

**b.** The so-called "illegality doctrine" from tax law does not modify the Secretary's obligations to cancel loan debt for qualifying public-service employees under Section 1087e. The Department's reliance on that principle in the rulemaking, *see, e.g.*, AR2470-AR2471, fails.

Under the illegality doctrine, in limited circumstances, the IRS may revoke the tax-exempt status of 501(c)(3) charitable organizations if their purpose is "illegal or violate[s] established public policy." *Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983). But this doctrine applies solely in the context of the Internal Revenue Code, which the Supreme Court construed to incorporate common-law standards of charity based on its text, legislative history, and common-law backdrop. *Id.* at 586-91. The doctrine has no bearing on a student-loan program set out in the HEA and administered by the Secretary of Education, and the Secretary has no authority to act upon it.

Even if the illegality doctrine could somehow apply in this context, that drastic remedy requires overcoming a high hurdle: there must be "no doubt that the activity involved is contrary to a fundamental public policy." *Id.* at 592-93 (concluding, based on a line of case law, legislation, and Executive Orders, that charities engaging in racial discrimination violated fundamental public

policy). By contrast, the list of "activities with a substantially illegal purpose" sweeps in entirely lawful conduct, as described above, and would be far overinclusive of activities that could subject PSLF-qualifying employers to illegality-doctrine consequences.

Moreover, apart from revocation of 501(c)(3) status, the illegality doctrine does not create any other mechanisms to "punish and deter bad behavior by tax-exempt organizations," *Museum of Fine Arts, Boston v. Seger-Thomschitz*, 623 F.3d 1, 11 (1st Cir. 2010), such as disqualification from PSLF eligibility. And in any event, Congress delegated assessment of tax-exempt status to the IRS, not any other agency. *Bob Jones*, 461 U.S. at 596; *see Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 477 (1st Cir. 2005) (declaring that the decision to grant tax-exempt status is committed "in the first instance" to the IRS). The HEA does not delegate any discretion to the Secretary to weigh public-policy concerns over a nonprofit's activities. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (explaining that Congress does not grant "broad and unusual authority through an implicit delegation" in a statute). Finally, it bears noting that the illegality principle applies to public charities, *see Bob Jones*, 461 U.S. at 588, and would not apply to local governments. Accordingly, invoking this doctrine to disqualify government employers from PSLF is nonsensical.

The unambiguous text of the PSLF statute commands the Secretary to forgive loans of public-service workers. It says nothing about restricting those workers' eligibility based on the conduct of an otherwise-qualifying employer. Accordingly, the Rule is contrary to Congress's intent as expressed in the HEA and exceeds the Department's authority.

**B. The Rule is arbitrary and capricious.**

The Rule should also be set aside because it is arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2). Under that standard, agency action must be both "reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 807 (2022). The agency must provide "a

satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. And when an agency changes course, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up). The Rule flunks these elementary standards.

*Reliance on impermissible factors.* As detailed above, Congress did not authorize the Department to consider or evaluate an organization's supposed "illegal purpose" or whether the organization advances some conception of the "public good" (AR2487) in determining eligibility for PSLF. *See* 20 U.S.C. § 1087e(m). As discussed above, the statute sets forth the eligibility criteria for qualifying employers without limitation or exception. *See id*. The Department has exceeded its mandate by introducing and relying upon new eligibility criteria, *i.e.*, whether employers engage in activities the Administration deems "illegal" or contrary to its conception of the public good, "which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43. That alone renders the rule arbitrary and capricious.

*Failure to substantiate the problem.* The Department also fails to substantiate the idea that the Rule addresses a real problem with PSLF employers, when in fact none exists. The Rule purports to address "a key shortcoming of the PSLF program—granting benefits for employment at organizations engaged in illegal activities such that it has a substantial illegal purpose." AR2468.

23

But, despite the fact that comments point out this gap (*see, e.g.*, AR645), the Department does not provide any evidence to support its sweeping assumption that certain PSLF employers are engaging in illegal activities and have wrongfully benefited from the program. At various points, the Department suggests that fewer than ten employers annually would be subject to the restrictions announced in the Rule. *See* AR2495, AR2498. But the Department does not explain the methodology by which it reached these estimates. Even taking the Department's estimate at face value, the small number (out of millions of qualifying employers[3]) further suggests that the supposed problem is miniscule at best, and likely illusory. The Department had an obligation to provide, at the very least, a reasoned basis for imposing these new, burdensome eligibility requirements on PSLF employers. The Department's failure to substantiate the existence of the supposed problem renders it arbitrary and capricious. *See, e.g.*, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (observing that a regulation "may be highly capricious" if the problem it purports to address "does not exist" (internal quotations omitted)).

***Failure to account for reliance interests.*** The Department failed to adequately account for serious reliance interests when promulgating the Rule. PSLF-enrolled employees have made substantial investments enabled by the program, including incurring substantial educational debt and obtaining employment at a qualifying employer. *See, e.g.*, AR156. These interests are upset if an employer loses eligibility, withdraws from the program, or changes its activities because of the rule. The Department's cavalier response—that employees can find a new job, AR2483—denigrates the exact reliance interests of PSLF employers and PSLF-enrolled employees the agency should have considered. In addition, the Department did not consider adverse

---

[3] Ex. 23, Dep't of Educ., Fed. Student Aid, *Tackling the Public Service Loan Forgiveness Form: Employer Tips*, https://perma.cc/75DV-V25G (database includes over 3.7 million qualifying employers).

consequences associated with changing jobs, even if an employee continues to be eligible for PSLF. For example, employees who change employers may lose their vesting in various benefits, such as retirement funds or eligibility for parental or medical leave. *See, e.g.*, 26 U.S.C. § 2611(2)(A) (Family and Medical Leave Act, which requires an employee to be employed for 12 months at employer to qualify). Moreover, the Department made no effort to determine whether employees with specialized skills or located in rural areas will have meaningful opportunities to obtain a new job that qualifies for PSLF benefits. *Cf.* AR2470 (failing to respond substantively to these concerns). The Rule also ignores the substantial investments qualifying employers have made in recruiting, training, and retaining employees based on their PSLF eligibility. *See, e.g.*, AR478-AR479. Given the substantial uncertainty about whether employees can rely on their employer's qualifying status, employers will lose the value of these investments and face difficulty recruiting and retaining qualified candidates.

***Failure to explain its rejection of alternatives.*** The Department failed to consider and reasonably explain its rejection of alternative mechanisms through which any allegedly unlawful conduct by a PSLF-qualifying employer could be addressed. *See, e.g.*, *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("[A]n agency must consider and explain its rejection of reasonably obvious alternatives" (cleaned up)). For example, the IRS has the sole authority to revoke the tax-exempt status of organizations that fail to comply with applicable tax statutes and rules—a significantly less burdensome and more tailored approach than the Rule takes. Additionally, other federal and state regulators enforce the substantive laws that the Rule incorporates by reference, such as anti-discrimination statutes. In rejecting alternatives that would rely on other entities' enforcement, the Department theorized that even if IRS took "action to revoke Section 501(c)(3) tax-exempt status from an organization engaging in illegal conduct," the

same organization "could remain eligible for PSLF." AR2471; *see also* AR2473 (similar for state regulators). The Department cited no evidence that any organization that has had its tax-exempt status revoked by the IRS, or its nonprofit status revoked by a state, has remained or would remain a PSLF-qualifying employer. The absence of any such evidence renders the Rule arbitrary and capricious.

The Department expressed dissatisfaction with other regulators' level of enforcement, pointing to the IRS's "resource constraints" that require it to "exercise some degree of prosecutorial discretion." AR2473. But there is no indication that Congress, in granting the Department authority to administer the PSLF program, intended it to second-guess enforcement decisions and priorities by other federal and state authorities, nor is there evidence that IRS is underenforcing the relevant tax statutes.

***Ambiguous terms that invite arbitrary enforcement.*** The immigration- and discrimination-related definitions of "substantial illegal purpose" also invite arbitrary enforcement and fail to provide clear notice of what is prohibited. Plaintiffs do not know what constitutes "aiding [and] abetting violations of . . . Federal immigration laws," AR2500, or "engaging in a pattern of aiding and abetting illegal discrimination," *id.* This Administration has an expansive and unsupported view—untethered from federal statutes or judicial precedent—of the activities it believes violate these laws. *See supra* pp. 7-8. And because the Rule gives the Secretary discretion to decide whether to disqualify a given employer, Plaintiffs cannot be sure that their compliance with federal law will protect them from disqualification.

The discrimination-related provision is additionally vague, arbitrary, and capricious because the Rule fails to define "engaging in a pattern" of discrimination. Local Government Plaintiffs, for example, are left to speculate as to whether one court ruling deciding that one sub-

agency violated the Americans with Disabilities Act (a statute included in the definition of "[i]llegal discrimination," AR2499), on two occasions means that the entire local government is disqualified. Other aspects of the Rule only compound the risk of inconsistent or arbitrary enforcement. The Rule states that "the Secretary shall, in the event an employer is operating under a shared identification number or other unique identifier, consider the organization to be separate if the employer is operating separately and distinctly, for the purposes of determining whether an employer is eligible." AR2501. But the Secretary gets to decide when a sub-agency of a municipality operates "separately and distinctly." The Rule also directs the Secretary to "presume" that a single "final judgment by a State or Federal court" determining that an employer engaged in activities that have a substantial illegal purpose" is "conclusive evidence" for disqualification. *Id.* By this standard, one ruling that a municipal department failed to provide a reasonable accommodation to a single employee would disqualify thousands of borrowers in that jurisdiction. It is disproportionate, unfair, and substantively unreasonable.

***Failure to consider lack of resources and expertise.*** Relatedly, the Department also failed to articulate how it intends to, and is capable of, adjudicating whether an organization has a substantial illegal purpose. Under the Rule, the Department intends to take evidence and determine whether "unlawful activities occurred." AR2479. But the Department has no expertise in administering broad swaths of federal and state law—such as "federal immigration laws," AR2480-AR2481—that require complex factual and legal determinations. The Department unreasonably expressly rejected commenters' arguments that it should rely on "final judicial and administrative rulings" from competent authorities with relevant expertise. AR2486. Its explanation—that such reliance would "create unnecessary delays, cost taxpayers more, and make the Department captive to third parties," AR2486—is objectively incorrect. Creating a second

administrative system to investigate and attempt to adjudicate these issues would cost taxpayers more than relying on judicial processes already taking place. And rather than making the Department a "captive" of third parties, allowing judicial process to occur would recognize the appropriate role of courts in adjudicating illegal acts. Any "delays," therefore, would be due to legitimate process, and thus are not "unnecessary." Moreover, the Department failed to consider that developing a bespoke, in-house adjudication system could result in a lengthier, duplicative, and less accurate process. The Department also appears to have failed to consider the effect of inconsistent adjudications if the Department reaches one conclusion and the relevant judicial or administrative authorities charged with administering the underlying law reach a different one.

To give just one example, these problems are evident with respect to the Department's treatment of organizations' provision of gender-affirming care. *See, e.g.*, AR2480 (referring to "chemical castration or mutilation"). Under the Rule, the Department apparently intends to determine whether "[m]edical providers [are] performing activities within the bounds of Federal and State law." AR2480. The Department has no relevant expertise in or mandate to assess the propriety of medical care regulated at the state level, and there is no statutory basis for assuming that Congress intended it to make such judgments. *Cf. Gonzales*, 546 U.S. at 269 (holding that the Attorney General lacked expertise over state-regulated medical care). And the Rule offers no reasoned explanation for how the Department could competently determine whether the provision of particular medical care would violate state law or why it would be better at evaluating these questions than the appropriate state licensing and judicial authorities. *See, e.g.*, AR2475.

The Department states that it *intends* to "defer to the judgments of State courts in determining what constitutes unlawful activity within the jurisdiction." AR2479. But the Secretary retains ultimate discretion, rendering that stated intention meaningless. If the Department disagrees

with how state trial courts interpret a state supreme court decision, to which judgment will it "defer"? What if state intermediate courts announce different tests for a governing standard? The Rule never says how the Department will deal with these situations that are sure to arise, particularly when the Department's stated goal is to wade into highly contested waters regarding gender-affirming medical care and other topics.

The Department's lack of expertise on these matters, coupled with the discretion the Secretary affords herself, suggests that the true purpose of the Rule is not to improve the PSLF program's administration, but rather to discourage employers from engaging in activities that conflict with the Administration's policy priorities and punish those who do. The failure to offer "genuine justifications" also violates the "reasoned explanation requirement of administrative law." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

***Failure to consider chilling effects and compliance costs***. The Department also failed to adequately consider important aspects of the problem regarding the effect of the Rule on borrowers and employers. The purpose of the PSLF program is to encourage and incentivize borrowers to pursue public-service careers. *See supra* pp. 2-3. But the Rule undermines that purpose by, at least, injecting uncertainty into whether borrowers can count on having their loans forgiven if their employer is deemed to have a "substantial illegal purpose," and, at worst, will prevent innocent borrowers from obtaining loan forgiveness through no fault of their own. Borrowers may have no way of knowing, let alone controlling, whether their employer engages in activities that will be deemed to fall within the Rule's disqualification criteria. *See, e.g.*, AR645 ("[B]orrowers will be punished for the actions of others, over which they have no control."). That uncertainty will predictably chill borrowers from entering into or remaining at public-service jobs that risk making them ineligible to obtain loan forgiveness. *See, e.g.*, AR220 (comments explaining that the Rule

29

will "discourage highly educated professionals from entering or remaining in lower-paying but critically important public service fields such as teaching, nursing, firefighting, social work, and legal aid."). In turn, that chill will have detrimental effects on communities with fewer qualified individuals entering the public-service professions—the key problem that Congress identified when it created the PSLF program in the first place. *See, e.g.*, AR366 ("Ambiguous eligibility rules may discourage nonprofit and government service, reduce access to critical public services, and undermine the civic participation PSLF was designed to encourage."); *see also supra* pp. 2-3. The Department's failure to adequately evaluate this "important aspect of the problem," particularly given Congress's purpose in enacting PSLF, renders the rule arbitrary and capricious, *State Farm*, 463 U.S. at 43.

Similarly, the Department failed to consider that PSLF-eligible employers would be chilled from engaging in lawful activities because they have a credible fear that the Rule will be enforced against them. *See, e.g.*, AR417, AR697-AR698. The Department suggested that only "organizations that are breaking the law" will need to change their operations and incur administrative costs. AR 2497. That is false. Particularly given the ambiguity inherent in the Department's definitions of what constitutes "substantial illegal purpose," regulated entities may need to modify their operations or forgo legal conduct to avoid enforcement risk under the rule. The Department did not consider or address how those changes would affect employers, employees, or the communities they serve.

Finally, all organizations subject to the Rule will incur compliance costs, such as "consultation with legal counsel," to minimize the risk of enforcement. AR2492. But the Department merely assumed—without support—that compliance costs for organizations would be "minimal" and not have a "significant economic impact on small entities." AR2497. That

unsupported assumption makes Department's cost-benefit analysis arbitrary and capricious. *See Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1288 (D.C. Cir. 2023) (stating that "a serious flaw" in a cost-benefit analysis "can render the resulting rule unreasonable").

### C. The Rule imposes viewpoint-discriminatory restrictions on the PSLF program in violation of the First Amendment.

The PSLF Rule violates Nonprofit Employer Plaintiffs' First Amendment speech rights, because the Rule imposes viewpoint-discriminatory restrictions on a government program otherwise open to all 501(c)(3) tax-exempt employers. Viewpoint-based regulations like the one here are presumptively unconstitutional. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828-29 (1995); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Rule is therefore contrary to constitutional right and must be set aside, 5 U.S.C. § 706(2)(B).

**1.** "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another," *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004), and not merely "incidentally," but "intent[ionally]," "in a way that prefers one particular viewpoint in speech over other perspectives on the same topic," *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). It is "axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," *Rosenberger*, 515 U.S. at 828, or target a subset of messages for disfavored treatment just because it finds those messages offensive, *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed*, 576 U.S. at 163 (citation omitted). Such restrictions are "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024). Hence, viewpoint discrimination is a "blatant" and "egregious" violation of the First Amendment. *Reed*, 576 U.S. at 168, and "all but dispositive" in a First Amendment challenge, *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571-72 (2011).

31

The PSLF Rule is viewpoint discriminatory on its face. The Rule impermissibly discriminates against Nonprofit Employers' viewpoints by selectively targeting certain kinds of organizations because their protected activities and speech are at odds with the Administration's policy priorities. It purports to disqualify and subject to investigation and enforcement government entities and 501(c)(3) organizations that have a supposed "substantial illegal purpose." But the Rule singles out certain discrete kinds of activities—by the Rule's terms, "aiding or abetting" the violation of immigration laws, "supporting terrorism," engaging in activities to facilitate gender-affirming care for minors, or "aiding or abetting" so-called illegal discrimination. Indeed, the Executive Order calling for the rulemaking stated that the purpose of the rule would be to cut off qualifying organizations that the Administration perceives as "anti-American" or as "harm[ing] American values" or not "legitimate" public servants, AR2502-AR2505.

Employers like Nonprofit Employer Plaintiffs regularly convey their own messages and engage in protected private speech in conducting their work, including around subjects that the PSLF Rule targets. They provide legal representation and social services to immigrants, including undocumented people, engage in pro-immigrant impact litigation and policy advocacy, and conduct know-your-rights trainings about encounters with law enforcement. *See* Kafele Decl. ¶¶ 3, 12; Lukens Decl. ¶¶ 3, 10; Salas Decl. ¶¶ 3-4; Swaruup Decl. ¶¶ 15-16; Yentel Decl. ¶ 28. They represent and advocate for politically disfavored and marginalized communities. *See, e.g.*, Swaruup Decl. ¶¶ 3, 15. They advocate for inclusion of LGBTQ+ people and promote DEI practices, including by publishing content on their websites and in their job advertisements. *See, e.g.*, Kafele Decl. ¶ 3; Yentel Decl. ¶ 25. As the Supreme Court has squarely recognized, decisions about whom to represent, the provision of advice to clients, and the presentation of arguments and analyses to the courts are forms of speech protected by the First Amendment. *Legal Servs. Corp.*

*v. Velazquez*, 531 U.S. 533, 544-45 (2001); *see also NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[T]he First Amendment . . . protects vigorous advocacy, certainly of lawful ends, against governmental intrusion," including litigation, which "is thus a form of political expression."). So too are the other kinds of advocacy, public messaging, and community engagement that these Plaintiffs undertake—particularly on subjects of public importance like immigration and DEI.

Particularly given the breadth of the Administration's interpretation of "illegal" activities, the PSLF Rule punishes Nonprofit Employer Plaintiffs' speech by conditioning qualification for a vital government benefit and threatening enforcement against them for engaging in protected expression on certain viewpoints that Nonprofit Employer Plaintiffs express. The Executive may not use its authority to issue benefits to restrict expression of views it disfavors, *see, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205 (2013) (striking down requirement that organizations express opposition to disfavored policies before receiving federal funds), nor "threaten enforcement actions against [entities] in order to punish or suppress" a disfavored viewpoint, *Vullo*, 602 U.S. at 187. Courts regularly strike down such conditions on federal funding. *See, e.g., Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020); *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 127-28 (D.D.C. 2025) ("By appearing to target specific recipients because they associate with certain ideas, [the government] may be crossing a constitutional line."), *appeal docketed*, No. 25-5148 (4th Cir. Apr. 25, 2025).[4]

**2.** To be sure, government is free to control the contours of its own programs when it enlists private speakers to transmit its own message. *See Rust v. Sullivan*, 500 U.S. 173 (1991). But it may

---

[4] Viewpoint discrimination is an "egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829 (internal citation omitted). Even if the Rule were not viewpoint-discriminatory, it would still be subject to strict scrutiny because it is not content neutral. *See Reed*, 576 U.S. at 166.

not impose "viewpoint-based restrictions" when it subsidizes private speech or administers a program designed "to encourage a diversity of views from private speakers." *Velazquez*, 531 U.S. at 542 (quoting *Rosenberger*, 515 U.S. at 834). That is so even where the government program's purpose "is not to encourage a diversity of views," but merely to "facilitate private speech, not to promote a governmental message." *Id.* That distinction is all the more glaring where, as here, the condition in question is not "an intrinsic part of a specific government program," but rather "an effort to impose an extrinsic, extra-statutory condition on top of an existing program." *Rhode Island Latino Arts v. NEA*, 777 F. Supp. 3d 87, 110 (D.R.I. Apr. 3, 2025).

The PSLF program facilitates private speech, not government speech. Congress created the program to encourage public-service employment. When Congress designated all 501(c)(3) organizations as qualifying public-service employers, 20 U.S.C. § 1087e(m)(3)(B)(i), it facilitated private speech: it provided a benefit to tax-exempt organizations that would allow them to do their *own* work, carrying out their *own* missions and conveying their *own* messages. It surely did not intend for each of the more than one million such organizations, *see supra* n.3, to transmit the government's message. The government is not "promot[ing] its own policies" or "advanc[ing] a particular idea," and hence there is no concern that the government's message could be "garbled [or] distorted by" an employer, *Velazquez*, 531 U.S. at 541; *Rosenberger*, 515 U.S. at 833.

**3.** The Department may not skirt the First Amendment's mandate against viewpoint discrimination by simply categorizing the activities that it seeks to punish as "illegal." While the First Amendment does not protect entities from carrying out illegal activities, the PSLF Rule stands to punish Nonprofit Employer Plaintiffs for lawful expression. As described above, the Trump-Vance Administration and the Department itself take a capacious view of what constitutes supposedly illegal aiding and abetting of illegal immigration, unlawful discrimination, and so

forth—interpretations that capture a range of lawful, protected speech activity. *See supra* pp. 7-8. Courts have reached the same conclusion in similar circumstances. *See, e.g.*, *Am. Fed'n of Teachers v. Dep't of Educ.*, 796 F. Supp. 3d 66, 111 (D. Md. 2025) (rejecting notion that Department "could regulate the content of curriculum by dubbing certain types of content categorically discriminatory"); *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 180 (D.D.C. 2025) (law firm engaged in protected speech, and executive order targeting it was unconstitutional despite government's suggesting that firm engaged in unlawful racial discrimination).

If the Department's true aim were to curtail PSLF funding for employers who are engaging in illegal activities, it could have enacted a rule disqualifying employers engaging in illegal activity full stop (setting aside that the Department lacks authority to do so). But it didn't do that—it singled out certain types of content and certain viewpoints for disfavored treatment.

## III. The Court should declare the PSLF Rule unlawful and vacate it.

Plaintiffs have demonstrated that the PSLF rule contravenes the HEA, is arbitrary and capricious, and violates the First Amendment. Vacatur is the proper remedy when a court determines that an agency rule violates the APA. *See, e.g.*, *Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 826-27 (2024) (Kavanaugh, J., concurring). The Court should enter an order (1) declaring that the PSLF Rule violates the APA and (2) vacating the Rule. Such an order will ensure that the PSLF program continues to fulfill the promise Congress made to public servants across the country.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment, declare the Rule unlawful, and vacate the Rule.

Dated: February 13, 2026

Respectfully submitted,

*/s/ Sarah R. Goetz*

Sarah Goetz*
Jennifer Fountain Connolly*
Victoria S. Nugent*
Simon C. Brewer*
Robin F. Thurston+
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
sgoetz@democracyforward.org
jconnolly@democracyforward.org
vnugent@democracyforward.org
sbrewer@democracyforward.org
rthurston@democracyforward.org

Persis Yu (BBO #685951)
PROTECT BORROWERS (a fiscally sponsored
project of the Shared Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, DC 20036
Phone: (202) 618-1328
persis@protectborrowers.org

R. T. Winston Berkman-Breen*
David S. Nahmias*
Khandice Lofton*
PROTECT BORROWERS (a fiscally sponsored
project of the Shared Ascent Fund)
40 Rector Street, 9th Floor
New York, NY 10006
winston@protectborrowers.org
david.nahmias@protectborrowers.org
khandice@protectborrowers.org

*Counsel for Plaintiffs National Council of Nonprofits, City of Boston, City of Albuquerque, City of Chicago, Amica Center for Immigrant Rights, Coalition for Humane Immigrant Rights, Legal Aid Society of the District of Columbia, Oasis Legal Services, American Federation of Teachers, American Federation of State, County and Municipal Employees, National Education Association, and National Association of Social Workers*

* Admitted pro hac vice
+ Pro hac vice application forthcoming

David Chiu*
*City Attorney*
Yvonne R. Meré*
*Chief Deputy City Attorney*
Mollie M. Lee*
*Chief of Strategic Advocacy*
Molly J. Alarcon*
Sophia L. Cai*
*Deputy City Attorneys*
CITY AND COUNTY OF SAN FRANCISCO
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, CA 94102
Phone: (415) 554-4274
Cityattorney@sfcityatty.org
Yvonne.Mere@sfcityatty.org
Mollie.Lee@sfcityatty.org
Molly.Alarcon@sfcityatty.org
Sophia.Cai@sfcityatty.org

*Counsel for Plaintiff City and County of San Francisco*
* Admitted pro hac vice

Tony LoPresti*
*County Counsel*
Kavita Narayan*
*Chief Assistant County Counsel*
Meredith A. Johnson*
*Lead Deputy County Counsel*
Laura S. Trice*
Tayryn A. Edwards*
*Deputy County Counsels*
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, Ninth Floor
San José, CA 95110-1770
Phone: (408) 299-5900
Fax: (408) 292-7240
Tony.LoPresti@cco.sccgov.org
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Laura.Trice@cco.sccgov.org
Tayryn.Edwards@cco.sccgov.org

*Counsel for Plaintiff County of Santa Clara*