# Exhibit 6

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

**National Council of Nonprofits** et al.,

*Plaintiffs*

v.

**Linda McMahon** et al.,

*Defendants*

**Case No. 25-cv-13242-MJJ**

## DECLARATION OF DIANE YENTEL

I, Diane Yentel, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am the President and CEO of the National Council of Nonprofits (NCN). I am above the age of 18 and have personal knowledge of the facts set forth in this Declaration.

2.  NCN is a 501(c)(3) nonprofit organization based in Washington, DC that employs 20 full-time employees.

3.  NCN is the largest network of nonprofits in the United States and North America. Our direct members include state and regional associations of nonprofits; together, we collectively represent more than 37,000 nonprofit and foundation members across the country. NCN's core work is to champion, connect, and inform the nonprofit sector.

**NCN and its members rely on the Public Service Loan Forgiveness (PSLF) program to recruit and retain employees.**

4.  Nationwide and in every community in America, charitable nonprofits provide vital services and are a key and necessary component of the economy, employing more people than the

construction, finance, and manufacturing industries.[1]

5.      However, nonprofits often have difficulty recruiting workers, primarily because the public service salaries available at nonprofits are in direct "salary competition [with] the for-profit and governmental sectors."[2] This salary competition is particularly relevant to workers who carry student debt. Many such borrowers forgo public service jobs because they cannot otherwise cover all living expenses, including their student debt. The result is severe workforce shortages in the nonprofit sector, with nonprofits "experiencing intolerably high job vacancy rates, resulting in growing waiting lists for services."[3]

6.      The PSLF program plays a critical role in mitigating these workforce shortages. Specifically, NCN's status—and thousands of our members' statuses—as PSLF-eligible employers is a distinct and powerful recruitment advantage that sets nonprofits apart from employers in the private sector. Unlike private sector employers, nonprofits can offer their employees the opportunity to have their student loans forgiven after 120 qualifying PSLF loan payments, which takes at least ten years of employment.

7.      Under the PSLF program, charitable nonprofit organizations are thus better able to attract and retain the high-performing workforce needed to achieve their missions and address pressing needs in their communities. PSLF helps ensure these vital institutions have the workforce to successfully and efficiently operate local food banks, serve veterans, assist domestic violence survivors, and provide financial literacy courses, among many other activities.

---

[1] *See* National Council of Nonprofits, *Nonprofit Impact Matters: How America's Charitable Nonprofits Strengthen Communities and Improve Lives* (2019), https://perma.cc/WC9Q-VVQ9.
[2] *See* National Council of Nonprofits, *Nonprofit Workforce Survey Results: Communities Suffer as the Nonprofit Workforce Shortage Crisis Continues* ii (2023), https://perma.cc/W52S-VLQE.
[3] *Id.*

8.      NCN and its members actively rely on their status as eligible employers for the PSLF program to recruit and retain employees, including by stating on job postings that they are a PSLF-eligible organization. Indeed, NCN has published resources encouraging its members to "note your standing as a [PSLF] certified employer" in their "job announcements."[4] NCN has documented an "uptick" in its "job board of employers noting PSLF eligibility as one of the benefits they provide" since new PSLF regulations broadened eligibility in 2023.[5]

9.      We also encourage our employees to take advantage of PSLF and sign their PSLF paperwork when asked to do so. One NCN employee has received forgiveness under PSLF in the past twelve months and an additional six employees are currently in the process of earning forgiveness while working at NCN.

**The new PSLF Rule injures both NCN and its members.**

10.     The new PSLF rule has already injured and will continue to injure NCN and its members in several ways.

11.     First, the new rule imposes a significant regulatory burden, requiring both NCN and its members to invest considerable resources in evaluating and complying with the new rule.

12.     Prior to the new PSLF rule, NCN's status as a PSLF employer was clear because NCN is a 501(c)(3) tax exempt nonprofit organization—a tax status that was sufficient on its own to qualify NCN as a PSLF employer. *See* 34 C.F.R. § 685.219 (2024) (defining "qualifying employer" to include 501(c)(3) organizations without further qualification). The same is true for

---

[4] Tiffany Gourley Carter & Amy Silver O'Leary, National Council of Nonprofits, *The Public Service Loan Forgiveness program still solidly in place – and more valuable than ever to nonprofits and their employees* (July 19, 2023), https://perma.cc/QQ8F-3CFQ.
[5] *Id.*

thousands of NCN's member organizations, the vast majority of which are also 501(c)(3)s, such as the ACLU of South Carolina.[6]

13.     Consistent with the ease of determining PSLF status, completing PSLF paperwork for employees was relatively simple prior to the new rule.[7] Employees were required to fill out a form by entering their personal information, some details about their employment at the PSLF employer, and a small amount of easily obtainable facts regarding the employer (e.g., the employer's federal tax identification number and their contact information). In addition, employers were required to certify on the form that their employees in fact worked at the organization.

14.     Now, however, determining an employer's status under the new PSLF rule is much more complicated, resulting in a compliance and paperwork process that is correspondingly much more burdensome and confusing.

15.     The Final Rule now defines a "qualifying employer" to exclude organizations that the Secretary of Education determines engage in activities that have a "substantial illegal purpose." To enforce this new definition, the Final Rule requires employers to certify on an employee's PSLF paperwork form that the employer does not participate in activities that have a "substantial illegal purpose."

16.     This new enforcement procedure requires NCN and its members to determine whether they are engaging in "activities that have a substantial illegal purpose" within the meaning

---

[6] Some of NCN's members are not 501(c)(3)s, but may also, nevertheless, qualify as "nonprofit organizations" that "provide a non-governmental public service" and are "not a business organized for profit, a labor union, or a partisan political organization." 34 C.F.R. § 685.219 (2024). NCN members also include a very small number of for-profit businesses, which do not qualify as eligible employers under PSLF.

[7] With the PSLF Help Tool, borrowers can use an electronic system to update and save information needed to complete and submit required paperwork.

of the Final Rule—a process that is extraordinarily burdensome given both the complexity and vagueness of the Final Rule's definition of that term.

17.    In fact, the Final Rule defines "substantial illegal purpose" to include six prohibited activities, many of which incorporate large, yet undefined bodies of federal and state law. The six categories of activities also include vague, ambiguous terms. And although the Final Rule does define some terms—providing 13 new definitions of phrases that appear in the six categories—the numerosity of the definitions indicates how much material there is to digest when evaluating compliance. Moreover, the 13 new definitions are often themselves difficult to parse given their own vague contents.

18.    To illustrate the difficulties of understanding the Rule, one of the six activities prohibited by the rule is "engaging in a pattern of aiding and abetting illegal discrimination." Although the Final Rule purports to define both "aiding and abetting" and "illegal discrimination," those definitions are anything but accessible. Beginning with the former, the final rule provides that "[a]iding or abetting has the same meaning as defined under 18 U.S.C. 2," a section of U.S. criminal code that does not itself define "aiding and abetting." Instead, that section merely establishes that "[w]hoever . . . aids, abets" an "offense against the United States" is "punishable as a principal." 8 U.S.C. § 2. In other words, NCN and its members will be forced to dig further to understand how "aiding and abetting" has been understood in this federal criminal context.

19.    As for "illegal discrimination," that term is defined to mean "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 . . . , Americans with Disabilities Act . . . , and the Age Discrimination in Employment Act of 1967[.]" The rule explicitly notes that this list of discrimination laws is "non-exhaustive" and that the Department deliberately included the phrase "including, but not limited to" in order to "reserve[]"

the Secretary's authority to include other Federal anti-discrimination laws in this definition." In other words, the Rule deliberately does not actually inform NCN or its members of the full suite of anti-discrimination laws that need to be analyzed.

20.     To recap, determining compliance with just one of six prohibited categories requires NCN and its members to (1) identify an unknown, yet sweeping, body of federal anti-discrimination laws, (2) understand what activities those laws prohibit, (3) research federal criminal law to determine what it means to "aid and abet" the prohibited discrimination activities, and (4) attempt to discern what constitutes a "pattern" of aiding and abetting.

21.     In short, whereas filling out PSLF paperwork previously required a simple certification that a borrower was employed by NCN or its members, the final rule's paperwork process now requires NCN and its members to expend significant resources to undertake complicated legal research. This burden will especially harm smaller NCN members with fewer human resources staff, including those without any legal expertise.

22.     Indeed, NCN has already expended approximately 50 hours among several staff members trying to understand the Rule and its effects on the organization, its members, and the nonprofit sector at large and respond accordingly. If the Rule takes effect, NCN anticipates devoting many more hours on internal review and spending financial and other resources consulting with outside legal, tax, and human resource experts.

23.     Second, NCN and its members are at risk of losing their PSLF status, an outcome that would in turn result in a wide variety of financial injuries.

24.     Although NCN strongly maintains that it does not engage in any "activities that have a substantial illegal purpose," recent statements and actions by this Administration indicate

that the Administration will interpret that phrase so broadly that it will encompass patently legal activities in which NCN and its members engage.

25.    For example, NCN promotes and engages in Diversity Equity and Inclusion (DEI) practices that, while undoubtedly legal, are similar to many activities that this Administration has repeatedly targeted as "illegal discrimination" in other contexts. Among other things:

   a.  NCN hosts a wide variety of DEI content on its websites, including a webpage dedicated to providing "nonprofits with tools, research, and resources . . . on Diversity, Equity, and Inclusion" so that its members can "operate more effectively, efficiently, and ethically."[8] For example, NCN has posted resources advising its members on how to ensure that its boards are more diverse,[9] how to increase diversity in leadership at nonprofits,[10] and how to expand the pipeline of talent to ultimately lead to a more diverse workforce.[11]

   b.  NCN also follows many of the same practices found in the resources it provides to its members. For example, to increase diversity among its own employees, NCN ensures that its own job advertisements use inclusive language and are posted in markets that are more likely to result in applicants of color.[12] And NCN works to increase equity amongst its workforce once hired, including by increasing

---

[8] National Council of Nonprofits, *Diversity, Equity, and Inclusion* (last visited Feb. 11, 2026), https://perma.cc/7TW6-N8JU.
[9] National Council of Nonprofits, *10 Steps to a More Diverse Board* (Sep. 12, 2017), https://perma.cc/4SZY-7PVT.
[10] National Council of Nonprofits, *How Your Nonprofit Can Join the Race to Lead* (Aug. 15, 2025), https://perma.cc/3FFM-SB5F.
[11] National Council of Nonprofits, *Strengthening your nonprofit through more equitable and inclusive hiring practices* (Dec. 4, 2023), https://perma.cc/9HVJ-C5XJ; National Council of Nonprofits, *Partnerships to Support Nonprofits and Interns: Expanding the Pipeline of Diverse Talent for Nonprofits* (Aug. 17, 2022), https://perma.cc/YU4A-PDNU.
[12] See Inclusive Hiring Practices, *supra* note 11.

transparency around salaries with the goal of mitigating wage gaps between white, male workers and other workers (e.g., women and workers of color).

26.     Although such activities are entirely lawful, this Administration has a lengthy history of harassing and punishing institutions for similar actions.

27.     For example, on March 17, 2025, the Equal Employment Opportunity Commission issued a press release announcing an investigation into 20 law firms for using DEI-related employment practices, which the press release speculated "entail[ed] unlawful disparate treatment" and "discrimination" in "violation of Title VII of the Civil Rights Act of 1964[.]"

28.     Likewise, ACLU-SC (an NCN member) is at risk of losing its PSLF status under the Final Rule's prohibition against "aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws." ACLU-SC provides numerous immigration-related legal services that, although lawful, are similar to activities that this Administration has previously targeted as violating immigration law. Among other things, ACLU-SC:

a.  Provides know-your-rights trainings to immigrants, including to people who do not currently have legal status; and

b.  Files immigration-related lawsuits, such as a suit challenging the Department of Homeland Security's attempts to revoke student visas.

29.     Although ACLU-SC maintains that its work is both legal and important, this Administration has previously accused other institutions of violating immigration law for similar actions.

30.     As noted above, if NCN or its members lose their PSLF status, they will suffer unavoidable negative consequences:

31.     NCN and its members will likely see an increase in the attrition of current employees. For example, at least six employees are currently earning forgiveness under PSLF, four of whom have indicated they may need to seek other employment should NCN no longer be a qualifying employer for PSLF. Likewise, staff at ACLU-SC who currently make PSLF payments have said that they would likely have to find new employment if ACLU-SC loses its PSLF status. In such a scenario, ACLU-SC will have to spend money to hire and train new staff to replace those who leave.

32.     NCN and its members will also lose the competitive advantage that PSLF provides them vis-à-vis the private sector when recruiting talent. During the coronavirus pandemic, for example, NCN determined that an increased number of charitable nonprofits specifically used PSLF as a recruitment tool to combat the workforce crisis nonprofits were experiencing when competing with for profit businesses for the same workers.[13]

33.     Many NCN members would not be able to increase salaries or benefits to compensate any loss in PSLF status. Nonprofits already run on extremely tight margins and are incapable of absorbing additional costs.[14] As one of the leading voices on PSLF and the importance of the program as an attraction and retention tool, NCN will be forced to change webpages, announcements to its network and the nonprofit sector, and personnel and hiring strategies should NCN lose its eligibility status.

---

[13] *See* Nonprofit Workforce Survey Results, *supra* note 2.

[14] For example, when the Department of Labor proposed new overtime thresholds, which would have increased salaries and costs for nonprofits, a third of nonprofit respondents anticipated needing to reduce staff and service levels to comply, demonstrating the difficulty for nonprofits to absorb unexpected additional costs from government action. *See* National Council of Nonprofits, *Nationwide Survey Points to Need for Adjusting Government-Nonprofit Grants/Contracts to Accommodate Changes to Federal Overtime Rules* (2016) https://perma.cc/BJQ7-P5NW.

34.    Third, NCN and its members are injured because the final rule violates their First Amendment rights and chills their protected speech.

35.    Finally, NCN and its members will suffer harm to their reputations if the Secretary of Education investigates them for engaging in supposed "substantial illegal activities," let alone disqualifies them as PSLF employers on that basis. The stain of such an accusation or designation stands to negatively affect NCN's and its members' ability to fundraise, attract members, earn trust in their communities, and otherwise fulfill their missions.

36.    The risk of losing PSLF eligibility puts NCN and its members between a rock and a hard place. NCN's members cannot forgo their mission-driven and legal work in order to avoid any activities that could be construed as having a "substantial illegal purpose" under the Department's definition, but given the vagueness of that definition and how the regulation will be interpreted and applied, NCN and its members cannot guarantee their current or future staff that they will always be PSLF-eligible employers.


I declare under penalty of perjury that the foregoing is true and correct.


Washington, D.C.
February 13, 2026

Diane Yentel
President and CEO
National Council of Nonprofits