IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL COUNCIL OF | ) | |
| NONPROFITS, *et al.*, | ) | |
| Plaintiffs, | ) | CASE NO. 1:25-CV-13242-MJJ |
| v. | ) | (Leave to file granted 2/24/26) |
| | ) | |
| LINDA MCMAHON, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF *AMICI CURIAE* LGBTQ+ EQUALITY ORGANIZATIONS IN SUPPORT
OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................................................. 1

ARGUMENT ........................................................................................................................ 1

  I. THE RULE AND THE HEALTHCARE PROVISION EXCEED THE SECRETARY'S
    STATUTORY AUTHORITY. ......................................................................................... 3

    A. UNDER THE PLAIN TEXT OF THE STATUTE, THE SECRETARY HAS NO
      AUTHORITY TO PROMULGATE THE RULE. ............................................................ 4

    B. CONGRESS DID NOT AUTHORIZE THE SECRETARY OF EDUCATION TO
      DETERMINE WHETHER AN EMPLOYER VIOLATED LAWS REGULATING THE
      PRACTICE OF MEDICINE. .................................................................................... 5

  II. THE PROVISION TARGETING TRANSGENDER HEALTHCARE IS UNLAWFUL
    BECAUSE IT IS TAINTED BY ANIMUS AND DISCRIMINATORY PURPOSE. ............ 9

    A. THE PLAIN TEXT OF THE HEALTHCARE PROVISION IS FACIALLY
      DISCRIMINATORY AND SHOWS ANIMUS. ............................................................ 10

    B. THE HEALTHCARE PROVISION DIRECTLY IMPLEMENTS ONE
      DISCRIMINATORY EXECUTIVE ORDER AND ADOPTS FACIALLY
      DISCRIMINATORY LANGUAGE FROM ANOTHER. ................................................. 11

    C. THE HEALTHCARE PROVISION HAS A SEVERE DISPARATE IMPACT ON
      TRANSGENDER PEOPLE AND IMPOSES OVERBROAD PENALTIES ON
      HEALTHCARE EMPLOYEES. ................................................................................ 12

    D. THE HEALTHCARE PROVISION PROCEDURALLY AND SUBSTANTIVELY
      DEPARTS FROM THE STATUTORY REQUIREMENTS AND PURPOSES OF THE
      PSLF PROGRAM. ............................................................................................... 15

    E. THE HEALTHCARE PROVISION IS PART OF A COORDINATED FEDERAL
      EFFORT TO DENY TRANSGENDER PEOPLE EQUAL RIGHTS AND MEDICALLY
      NECESSARY HEALTHCARE. ................................................................................ 16

CONCLUSION .................................................................................................................... 20

## INTEREST OF AMICI CURIAE

As set forth in Plaintiffs' Motion for Summary Judgment, the Department of Education's amendments to the regulation governing the Public Service Loan Forgiveness program, 90 Fed. Reg. 48966 (Oct. 31, 2025) ("the Rule"), codified at 34 C.F.R. § 685.219, seek to coerce organizations to alter their speech and activities in contravention of the Constitution and the PSLF statute, 20 U.S.C. § 1087e(m). *Amici* submit this memorandum to highlight one provision of the Rule intended to intimidate healthcare providers into terminating essential medical care for transgender patients under age 19 by defining such care as a "substantial illegal purpose." *See* 90 Fed. Reg. at 49000/2, 49001/2 ("Healthcare Provision"). As detailed below, the Healthcare Provision is unlawful because it exceeds the scope of the Secretary of Education's statutory authority, and it is the product of animus and purposeful discrimination against transgender people.

*Amici curiae* are leading public interest legal organizations and advocacy organizations dedicated to creating a just society free of discrimination, including on the basis of sexual orientation, transgender status, and HIV status. *Amici* include GLBTQ Legal Advocates & Defenders, Lambda Legal Defense and Education Fund, Inc., OutFront Minnesota, Equality California, PFLAG Greater Boston, One Colorado, National Black Justice Collective, Services and Advocacy for GLBTQ+ Elders (SAGE), National Women's Law Center, and Our Family Coalition. *Amici* have a shared interest in eliminating discriminatory barriers to healthcare for LGBTQ+ people, including transgender people.

## ARGUMENT

Congress created the Public Service Loan Forgiveness program ("PSLF program") with bipartisan support to incentivize work for the public good. The deal was simple: in exchange for 10 years of payments while working at a "public service job," 20 U.S.C. § 1087e(m)(3)(B), the

Secretary would "cancel" the remainder of a borrower's federal student-loan debt, *id.* § 1087e(m)(1)(A) & (B). Congress also detailed the other parameters of the program and specified the Secretary's administrative responsibilities. *Id.* § 1087e(m)(2) (loan cancellation amount); *id.* § 1087e(m)(3)(A) (defining "eligible Federal Direct Loan"); *id.* § 1087e(m)(4) (specifying that borrowers may not receive a deduction under this subsection and other specified subsections); *id.* § 1087e(m)(1) (directing the Secretary to cancel debt when certain conditions are satisfied).

In directing the Secretary of Education to carry out the PSLF program, Congress did not—explicitly or implicitly—authorize the Secretary to make specialized medical judgments about employers' healthcare practices. Nor did Congress deputize the Secretary to utilize the PSLF program to engage in law enforcement or otherwise ensure that employers were complying with sundry state laws. Yet that is precisely what the Secretary is attempting to do here.

Through this Rule, the Secretary claims the authority to disqualify any "public service job" from the PSLF program if she determines the employer has a "substantial illegal purpose." The Rule goes on to identify prohibited "purposes," including the provision of essential medical treatment for transgender adolescents and young adults under age 19 "in violation of Federal or State law." 90 Fed. Reg. at 49000/2, 49001/2 ("the Healthcare Provision").[1] But to enforce the Healthcare Provision, the Secretary would need to wield extraordinary and unprecedented powers for the Education Department, including by engaging in novel interpretations of laws that hinge on the "reasonable medical judgment of the medical professional." *See, e.g.*, N.C. Gen. Stat. 90-

---

[1] Specifically, the Rule provides: "*Qualifying employer* . . . (ii) Does not include organizations that engage in activities such that they have a substantial illegal purpose, as defined in this section." 90 Fed. Reg. at 49001/2. "*Substantial illegal purpose* means: . . . (iii) Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law." *Id.* "Chemical castration or mutilation" is defined to include "(i) The use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; and (ii) The use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex." *Id.* at 49000/2. And "child or children" is defined as "an individual or individuals under 19 years of age." *Id.*

21.152(b). Nothing in the PSLF statute suggests that Congress "cede[d]" these "medical judgments to an executive official who lacks medical expertise," or intended to grant the Secretary authority to "authoritatively interpret" state laws. *Gonzales v. Oregon*, 546 U.S. 243, 264, 266 (2006). In these ways, the Healthcare Provision exceeds the Secretary's statutory authority.

The Healthcare Provision also cannot survive constitutional scrutiny. The Secretary, following the President's directive, designed the Healthcare Provision to stigmatize and marginalize transgender young people by restricting their access to medically necessary healthcare. As this Court has already recognized, the Administration has repeatedly expressed "disapproval" of transgender people, and it has taken extraordinary actions "to interfere" with a state's "right to protect [transgender adolescent healthcare] within its borders, to harass and intimidate [a provider] to stop providing such care, and to dissuade patients from seeking such care." *In re Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324, 2025 U.S. Dist. LEXIS 175515, at *3, *19-20 (D. Mass. Sept. 9, 2025) (Joun, J.). The Healthcare Provision is anchored in the same animus. Frightening healthcare employers into denying lawful and clinically appropriate medical care to a disfavored class of patients violates the constitutional guarantee of Equal Protection.

At bottom, sensitive healthcare decisions should be made by doctors, patients, and their families based on clinical evaluation—not based on fear that the Secretary of Education, a federal official with no medical expertise, will subsequently determine that providers engaged in illegal medical treatment. The Court should grant Plaintiffs summary judgment and vacate the Rule.

## I.    THE RULE AND THE HEALTHCARE PROVISION EXCEED THE SECRETARY'S STATUTORY AUTHORITY.

In promulgating the Rule and the Healthcare Provision, the Secretary claims authority that has no basis in the text of the PSLF statute. *See* Pls.' Mot. for Summ. J. at 17-18. The Healthcare

3

Provision also requires the Secretary to make legal determinations and medical judgments that fall outside the scope of her expertise as head of the Department of Education. And the Healthcare Provision poses "obvious constitutional problems" to the extent it empowers the Secretary to interpret state laws regulating the practice of medicine in the first instance. *Gonzales*, 546 U.S. at 264. For these reasons, as detailed below, the Rule and the Healthcare Provision are incompatible with the PSLF statute.

### A. UNDER THE PLAIN TEXT OF THE STATUTE, THE SECRETARY HAS NO AUTHORITY TO PROMULGATE THE RULE.

Begin with the text of the statute. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Congress directed that the Secretary "shall cancel" the federal student-loan balance for borrowers who have been employed in a "public service job." 20 U.S.C. § 1087e(m)(1). The statute defines "public service job" to include any "full-time job in . . . public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics)." *Id.* § 1087e(m)(3)(B)(i). A "full-time job . . . at an organization that is described in section 501(c)(3) of [the Internal Revenue Code]" also qualifies. *Id.*

The statutory definition of "public service job[s]" is both unambiguous and categorical. To determine what constitutes a public-health occupation, the statute requires the Secretary to follow definitions provided by the Bureau of Labor Statistics, which is directed by the Labor Secretary. *See* 29 U.S.C. § 2. Similarly, to determine whether an employer is an organization described in section 501(c)(3) of the Internal Revenue Code, the Secretary is bound by the determinations of the Internal Revenue Service under the supervision of the Treasury Secretary. *See* I.R.C. § 7801; *see also* Pls.' Mot. for Summ. J. at 22. In other words, Congress told the Secretary how to determine whether these definitions were satisfied and then left no room to further limit these

statutory terms. As such, the statute does not grant the Secretary any discretion to remove a job from the class of qualifying "public service job[s]" based on its mission, the population it serves, or any other criteria. *See* Pls.' Mot. for Summ. J. at 18.

If Congress wanted to grant the Secretary discretion, it would have done so explicitly. Indeed, in a neighboring subparagraph of the statute, Congress authorized the Secretary to add or remove certain faculty positions from the class of qualifying "public service job[s]" depending on whether they involve "teaching in high-needs subject areas or areas of shortage . . . , as determined by the Secretary." 20 U.S.C. § 1087e(m)(3)(B)(ii). No similar grant of discretion appears in the definition of "public service job" covering healthcare and nonprofit employment, signaling a deliberate Congressional choice. *Id.* § 1087e(m)(3)(B)(i); *Bittner v. United States*, 598 U.S. 85, 94 (2023) (explaining that a difference in language conveys a difference in meaning). The Secretary simply does not have discretion to exclude "public service job[s]" under § 1087e(m)(3)(B)(i) from the PSLF program by adding eligibility requirements untethered to the text of the statute.

### B.    CONGRESS DID NOT AUTHORIZE THE SECRETARY OF EDUCATION TO DETERMINE WHETHER AN EMPLOYER VIOLATED LAWS REGULATING THE PRACTICE OF MEDICINE.

Even if Congress had granted the Secretary authority to exclude a "public service job" from PSLF eligibility, the Healthcare Provision would still exceed her statutory authority because it requires her to independently determine whether an employer engaged in purported substantial illegal activity by providing medical treatment to a transgender individual under age 19. *See* 90 Fed. Reg. at 48981/2 (stating that medical providers will be disqualified "based on clear evidence of illegality under Federal law or State law"). Congress has not authorized the Secretary to interpret state or federal laws regulating medical care in this way. *See* Pls.' Mot. for Summ. J. at 28.

The statutory terms "public service" and "public health," 20 U.S.C. § 1087e(m)(1), (m)(3)(B)(i), "do not call on the [Secretary], or any other executive official, to make an independent assessment of the meaning of federal law," *Gonzales*, 546 U.S. at 263. Nor do they empower the Secretary to "authoritatively interpret" state laws governing medical care. *Id.* at 264. Otherwise, the Secretary's power to deny PSLF eligibility "necessarily would include the greater power" to criminalize certain medical treatments that she alone deems "illegal." 90 Fed. Reg. at 48988/3-48989/1&2; *see Gonzales*, 546 U.S. at 262. Congress did not grant the Secretary such "unrestrained" authority. *Gonzales*, 546 U.S. at 262. Indeed, the PSLF statute "manifests no intent to regulate the practice of medicine generally," *id.* at 270, and "[i]t is highly unlikely that Congress authorized such a sweeping" change to the Secretary's authority by empowering her to resolve medical questions "through such a subtle device as" the definition of "public service job," *Biden v. Nebraska*, 600 U.S. 477, 496 (2023) (cleaned up) (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 (1994)).[2]

The overall statutory scheme confirms that regulating medical care is beyond the Secretary's authority. The statute enacting the PSLF program is in Title 20, which codifies legislation related to education, not public health. The specific statutory provision at issue here, 20 U.S.C. § 1087e, relates to the terms and conditions of loans, not medical care. The statutory text provides that certain types of employment qualify *per se* as a "public service job," including jobs in a range of non-medical fields like "emergency management, government . . . , military service, public safety, [and] law enforcement." *Id.* § 1087e(m)(3)(B)(i). It defies reason that Congress

---

[2] Congress knows how to unambiguously grant the Secretary authority in areas implicating sensitive medical determinations. For example, the Secretary has carefully circumscribed authority to discharge specified loans for student borrowers who "become[] permanently and totally disabled (as determined in accordance with regulations of the Secretary)." 20 U.S.C. § 1087(a)(1). The Secretary has promulgated such regulations, which provide a role for the Social Security Administration and medical professionals in determining permanent and total disability. 34 C.F.R. § 685.213(b)(2). Here, by contrast, Congress did not authorize the Secretary to define "public service job[s]" related to public health in restrictive ways, much less to promulgate regulations that resolve sensitive medical questions.

would hide a broad grant of authority to the Secretary of Education to regulate the provision of medical services through a narrow statutory provision in Title 20 related to student loans.

The Secretary is also "an unlikely recipient" of authority to interpret laws governing the practice of medicine because those laws inevitably involve medical judgments beyond the Secretary's expertise. *Gonzales*, 546 U.S. at 274. Taking one state's law as an example: to determine whether a medical provider in North Carolina has violated state law by providing gender-transition medications to a minor, the Secretary would have to determine whether the "medical professional" made a "reasonable medical judgment" that continuing care was in the patient's best interest. N.C. Gen. Stat. 90-21.152(b); *see* 90 Fed. Reg. at 48981/2 (incorporating substantive standards of federal and state laws regulating medical treatment). The same analysis is required by numerous other state statutes.[3] But nothing in the PSLF statute suggests that Congress intended to "cede" such "medical judgments to an executive official who lacks medical expertise." *Gonzales*, 546 U.S. at 266; *see id.* at 267; *see also King v. Burwell*, 576 U.S. 473, 486 (2015) ("It is especially unlikely that Congress would have delegated this decision to the *IRS*, which has no expertise in crafting health insurance policy of this sort.").

The Secretary's contrary interpretation would also pose independent and "obvious" federalism problems. *Gonzales*, 546 U.S. at 264. The Supreme Court has long recognized that "[s]tate courts are the appropriate tribunals for the decision of questions arising under their local law." *Moore v. Harper*, 600 U.S. 1, 34 (2023) (quoting *Murdock v. Memphis*, 87 U.S. (20 Wall.) 590, 626 (1875)) (cleaned up). Yet the Healthcare Provision would require the Secretary to interpret the scope of these state laws, many of which lack any state judicial interpretation, and

---

[3] *See, e.g.*, Kan. Stat. Ann. § 65-28,139(d)(2); Ky. Rev. Stat. Ann. § 311.372(6); La. Rev. Stat. § 40:1098.2(D); Neb. Rev. Stat. § 71-7305(1), *and* 181 Neb. Admin. Code §§ 8.008(E), 8.013(E); S.D. Codified Laws § 34-24-38; Tenn. Code Ann. § 68-33-103(b)(3); Utah Code Ann. § 58-1-603(3)(b)(iii)(A)–(B).

most of which are less than five years old. Moreover, core principles of federalism generally recognize that states, not the federal government, hold the primary authority to regulate medicine under their general police powers, *see Gonzales*, 546 U.S. at 270, but the Healthcare Provision would allow the Secretary to intrude on that prerogative by interpreting the reach of these various state laws.

Notably, in this very Rule, the Secretary acknowledged the absurdity of her sweeping interpretation by adopting other provisions that are inconsistent with this approach. *See, e.g.*, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024, 1028 (D.C. Cir. 2018) (agency action is arbitrary and capricious when its reasoning is internally inconsistent). For example, the Rule recognizes state courts' exclusive authority to interpret and apply state laws regarding trespass, disorderly conduct, public nuisance, vandalism, and obstruction of highways, by disqualifying employers only if there is a "final, non-default judgment[] against an employer." 90 Fed. Reg. at 48983/3. Then, elsewhere, the Rule disclaims reliance on state law altogether given concerns about notice, uniformity, and administrative burdens associated with interpreting and applying the laws of each state separately to employers in each state. *See id.* at 48981/3 (defining "illegal discrimination" solely by reference to "established Federal law" and not state law); William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154, 40159/3 (Aug. 18, 2025) (explaining why applying state law is impracticable). Of course, the same burdens of enforcing varied state laws apply to the Healthcare Provision. And the risk of reaching an inconsistent conclusion about the meaning of state law is more pronounced here since the laws in question implicate medical judgments and, as noted above, are relatively new and most lack any state judicial guidance.[4]

---

[4] States began passing bills restricting access to gender-transition care just five years ago. *See Bans on Best Practice Medical Care for Transgender Youth*, Movement Advancement Project (last accessed Feb. 17, 2026), https://perma.cc/HPD2-4JFM; *see also* 90 Fed. Reg. at 40159 n.18.

In sum, the Healthcare Provision requires the Secretary of Education to make complicated medical decisions outside her expertise in a way that intrudes on states' authority to enforce their own laws. This staggering power grab is unsupported by the PSLF statute. And it will predictably burden the Department, harm borrowers and employers, and destabilize our federal system—as the Secretary recognized elsewhere in the Rule. For all these reasons, the Healthcare Provision is contrary to the governing PSLF statute and should be vacated.

## II.     THE PROVISION TARGETING TRANSGENDER HEALTHCARE IS UNLAWFUL BECAUSE IT IS TAINTED BY ANIMUS AND DISCRIMINATORY PURPOSE.

The Healthcare Provision is also unlawful because it is the product of animus and purposeful discrimination. Government action violates the constitutional guarantee of Equal Protection when it is based on "negative attitudes," "fear," "irrational prejudice," or "a bare desire to harm a politically unpopular group." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Likewise, if a policy's "avowed purpose and practical effect" is "to impose a disadvantage, a separate status, and so a stigma" on a particular group, it cannot survive rational basis review. *United States v. Windsor*, 570 U.S. 744, 770 (2013). In addition, government action motivated at least in part by an invidious discriminatory purpose is subject to heightened constitutional scrutiny. *See United States v. Skrmetti*, 605 U.S. 495, 516 (2025); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). And government action based on discriminatory attitudes must be set aside as arbitrary and capricious. *Robbins v. Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985); *see also St. Paul's Found. v. Ives*, 29 F.4th 32, 40 (1st Cir. 2022).

To determine whether an invidious discriminatory purpose was a motivating factor in the Department's promulgation of the Healthcare Provision, the Court must make a "sensitive inquiry

into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. "The historical background of the decision is one evidentiary source." *Id.* at 267. "The impact of the official action" is also strongly probative of discrimination, especially if there is a "stark" disparate impact on a vulnerable minority. *Id.* at 266. Departures from ordinary procedures, or "[s]ubstantive departures" from "factors usually considered important by the decisionmaker," may also reveal an official purpose to discriminate. *Id.* at 267. Finally, "[t]he specific sequence of events leading up to the challenged decision . . . may shed some light on the decisionmaker's purposes," especially "if it reveals a series of official actions taken for invidious purposes." *Id.* Here, each of these factors shows that animus and discriminatory purpose drove this policy.

### A.    THE PLAIN TEXT OF THE HEALTHCARE PROVISION IS FACIALLY DISCRIMINATORY AND SHOWS ANIMUS.

The plain text of the Healthcare Provision reveals its invidious discriminatory purpose, as it defines medically necessary healthcare for transgender people as "castration or mutilation," regardless of age. 90 Fed. Reg. at 49000/2. It is hard to imagine a more stigmatizing label. *See In re 2025 UPMC Subpoena*, No. 2:25-mc-01069, 2025 U.S. Dist. LEXIS 265627, at *5-7 (W.D. Pa. Dec. 24, 2025) (describing similarly "incendiary" language as "government[] rhetoric" that shows "more than a whiff of ill-intent").

In addition, under the umbrella of "mutilation," the Healthcare Provision includes the use of puberty blockers "to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex." *See* 90 Fed. Reg. at 49000/2. This language facially discriminates against transgender people: It restricts their access to puberty blockers on a class-wide basis because of their transgender status, and regardless of the diagnosis or medical purpose. That is, if a transgender girl needs puberty blockers for cancer, endometriosis, or another condition, the Healthcare Provision seeks to restrict her access, but the same restriction does not apply if a

non-transgender girl needs puberty blockers for the same conditions. *See Washington v. Trump*, 768 F. Supp. 3d 1239, 1266-67 (W.D. Wash. 2025), *appeal pending*, No. 25-1922 (9th Cir. filed Mar. 24, 2025); *see also PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 446 n.38 (D. Md. 2025) (similar), *appeal pending*, No. 25-1279 (4th Cir. filed Mar. 24, 2025).[5]

Placing the Healthcare Provision in the context of the entire Rule further demonstrates animus and discriminatory intent. In defining medically necessary healthcare for transgender people under age 19 (including legal adults) as a disqualifying activity with a "substantial illegal purpose," the Rule treats this care as comparable to "terrorism." 90 Fed. Reg. at 49001/2; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021) (finding injury to plaintiffs when credit reports labeled class members as potential terrorists). Moreover, the Rule treats most violations of state law—such as negligent homicide, assault, fraud, or criminal medical malpractice—as *not* disqualifying. *See* 90 Fed. Reg. at 49001/3 (defining "[v]iolating State law" to include only trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways). The government lacks any rational reason to equate transgender healthcare with "terrorism" while simultaneously ignoring serious state-law offenses, leaving its justification "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018) (quoting *Romer v. Evans*, 517 U.S. 620, 632, 635 (1996)).

## B.    THE HEALTHCARE PROVISION DIRECTLY IMPLEMENTS ONE DISCRIMINATORY EXECUTIVE ORDER AND ADOPTS FACIALLY DISCRIMINATORY LANGUAGE FROM ANOTHER.

The background of the Healthcare Provision further demonstrates its discriminatory purpose. It was promulgated to comply with Executive Order 14235 ("PSLF EO"), which directed

---

[5] Because the language of the Rule discriminates against "a class of persons identified on the basis of a specified characteristic," it is distinguishable from the transgender-healthcare regulation upheld by the Supreme Court in *United States v. Skrmetti*, which the Court held discriminated on the basis of age and medical use. 605 U.S. at 518.

the Secretary to exclude organizations that engage in "the chemical and surgical castration or mutilation of children" from the PSLF program.[6] The Healthcare Provision's discriminatory and disparaging definition of that term was drawn verbatim from Section 2 of Executive Order 14187 ("Healthcare EO"), which expressly sought to "prohibit or limit" transgender healthcare for adolescents and adults under 19 regardless of medical need.[7] The Healthcare EO expressed disdain for transgender people, asserting they are fighting "a losing war with their own bodies," 90 Fed. Reg. at 8771, and caustically described transgender healthcare as a "stain on our Nation's history" that "must end," *id.* The PSLF EO went even further by describing this medically necessary care as "child abuse," 90 Fed. Reg. at 11885, evincing animus against transgender people, *see Doe v. Ladapo*, 737 F. Supp. 3d 1240, 1272 (N.D. Fla. 2024), *appeal pending sub nom. Doe v. Surgeon Gen.,* No. 24-11996 (11th Cir. argued Jan. 15, 2025), *stay pending appeal granted*, 2024 U.S. App. LEXIS 21601 (11th Cir. Aug. 26, 2024) (per curiam).

### C.    THE HEALTHCARE PROVISION HAS A SEVERE DISPARATE IMPACT ON TRANSGENDER PEOPLE AND IMPOSES OVERBROAD PENALTIES ON HEALTHCARE EMPLOYEES.

In addition, the "disparate impact" of the Healthcare Provision "leads most naturally to an inference of discriminatory purpose." *United States v. Singleterry*, 29 F.3d 733, 741 (1st Cir. 1994). The predictable effect of the Healthcare Provision is to intimidate employers and their borrower-employees into terminating gender-transition care for transgender people under 19. Employers that continue treating this population risk losing PSLF eligibility for all their employees, which could trigger staffing crises and ultimately threaten their day-to-day operations.[8]

---

[6] Restoring Public Service Loan Forgiveness, 90 Fed. Reg. 11885, 11885 (Mar. 7, 2025).
[7] Protecting Children from Chemical and Surgical Mutilation, 90 Fed. Reg. 8771, 8771 (Jan. 28, 2025); *see* Rule, 90 Fed. Reg. at 48981/2 (expressly adopting Executive Order 14187's definition of "castration and mutilation").
[8] Nearly 60% of medical school graduates with student debt plan to participate in the PSLF program, and they hold an average debt of $220,000 each. *See*, *e.g.*, Ass'n of Am. Med. Colls., *Medical School Graduation Questionnaire: 2025 All Schools Summary Report* tbls. 22 & 23 (July 2025), https://perma.cc/Y53D-V3WR (median loan debt for the

And these employers may face additional investigations, prosecutions, or liability flowing from a determination by the Secretary that they engaged in illegal conduct.[9]

Although the Healthcare Provision purports to target only "conduct that is prohibited by Federal law, or State law in the State where the conduct occurs," 90 Fed. Reg. at 48981/2, the Rule leaves the Secretary with wide latitude to determine what would or would not violate these laws. This threat will chill healthcare access even where medical evidence, clinical evaluation, medical ethics, and state law support providing care. *See* Pls.' Mot. for Summ. J. at 30 (describing how "PSLF-eligible employers [will] be chilled from engaging in lawful activities because they have a credible fear that the Rule will be enforced against them"). The Secretary's claimed authority to interpret federal law will also predictably deter gender-transition-care providers from treating transgender adolescents and young adults since the Administration has incorrectly asserted that gender-transition care violates numerous federal laws—including in the Healthcare EO that served as the blueprint for the Healthcare Provision. This provision, like the Administration's executive actions more generally, "seeks to fulfill [the Administration's] policy agenda through compliance born of fear." *See In re 2025 Subpoena to Child.'s Nat'l Hosp.*, No. 25-cv-03780, 2026 U.S. Dist. LEXIS 10523, at *22 (D. Md. Jan. 21, 2026).

By incentivizing healthcare providers to abandon their transgender patients regardless of medical need, the Healthcare Provision also upends the doctor-patient relationship and will harm the health and well-being of transgender adolescents and young adults nationwide. Gender-transition care for this population is supported by established clinical standards and robust

---

70% of medical-school graduates reporting educational debt was $220,000; 57% of medical-school graduates with student debt plan to participate in the PSLF program).

[9] *Cf. Gonzales*, 546 U.S. at 262 (expressing concern that the Attorney General's claim of unrestrained authority to administer a physician registration program would allow him to effectively "criminalize" any physician "conduct he deems illegitimate").

evidence showing its safety, effectiveness, and medical necessity.[10] Transgender adolescents and young adults who have access to gender-transition care reap tremendous benefits, including decreased suicidality, depression, and anxiety, and improved well-being.[11] Losing access to this essential care is harmful and often devastating for transgender young people, who already face widespread discrimination[12] and experience negative health outcomes relative to their peers who are not transgender.[13] Adolescents and young adults who are not transgender will experience none of these harms. This "clear" and "stark" disparate impact "alone" is sufficient to establish an official purpose to discriminate against transgender people. *Arlington Heights*, 429 U.S. at 266.

The Healthcare Provision will also have overbroad consequences for borrower-employees, which further strengthens the inference of animus and discriminatory purpose. Specifically, the

---

[10] *See e.g.*, Joanne LaFleur et al., *Gender-Affirming Medical Treatment for Pediatric Patients with Gender Dysphoria*, Univ. of Utah Coll. of Pharmacy 90-91 (Aug. 6, 2024), https://perma.cc/K4V9-9LPM (finding that medical treatments for gender dysphoria in adolescents are both safe and effective with virtually no regret); Kareen M. Matouk & Melina Wald, *Gender-Affirming Care Saves Lives*, Colum. Univ. Dep't of Psych. (Mar. 30, 2022), https://perma.cc/W5UB-FTPV (discussing known benefits of gender-transition care for youth).

[11] *See, e.g.*, Stephanie Budge et al., *Gender Affirming Care Is Evidence Based for Transgender and Gender-Diverse Youth*, 75 J. Adolesc. Health 851, 852 (2024), https://perma.cc/82ZJ-LYXL ("[T]here are . . . longitudinal and population-based studies showing benefits to GAC in youth, specifically regarding increased well-being and reduction in gender dysphoria, with continuity of care with health-care providers impacting long-term positive adjustment."); Jack L. Turban et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, 17 PLOS ONE 1 (Jan. 12, 2022), https://perma.cc/H8KA-Z8VJ (finding that access to gender-transition care in adolescence is associated with lower odds of suicidal ideation as compared to initiating that same care in adulthood); Diana Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 JAMA Netw. Open 1 (2022), https://perma.cc/AD7W-5R4Z (concluding that gender-affirming medical interventions were associated with lower rates of depression and suicidality among transgender or non-binary youth); Jack Turban, *The Evidence for Trans Youth Gender-Affirming Medical Care*, Psych. Today (Jan. 24, 2022), https://perma.cc/2RLM-D3QC (cataloguing sixteen studies about the impact of gender-affirming medical care for transgender youth and concluding the evidence suggests this care results in favorable mental health outcomes); LaFleur et al., *supra* note 9; Alex R. Dopp et al., *Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth*, RAND Corp. (Nov. 26, 2024), https://perma.cc/5GFJ-QWJM; Annelou de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 1 (Oct. 2014), https://perma.cc/7D3H-BGPY.

[12] *2026 Anti-Trans Bills Tracker*, Trans Legislation Tracker (last accessed Feb. 19, 2026), https://perma.cc/2F5Z-WXGY (701 anti-trans bills introduced nationwide in 2024, 1,022 anti-trans bills introduced in 2025, and 689 anti-trans bills introduced already in 2026).

[13] Nicolas A. Suarez et al., *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students*, U.S. Dep't of Health & Hum. Servs. (Oct. 10, 2024), https://perma.cc/UAY3-QVZV; Brae Anne McArthur et al., *Suicidality and Nonsuicidal Self-Injury in Transgender and Gender Diverse Youth*, 180 JAMA Pediatr. 144 (Dec. 22, 2025), https://perma.cc/6NRW-W4DY.

Healthcare Provision would revoke PSLF eligibility from *all* medical providers and other healthcare employees if their *employer* is disqualified for providing transgender healthcare to patients under age 19—even if they personally played no role in providing the care. *See* Pls.' Mot. for Summ. J. at 29; 34 C.F.R. § 685.219(c)(1)(ii); 90 Fed. Reg. at 49001/2. The severity of this penalty underlines just how far this Administration will go to end medically necessary healthcare for transgender young people; it is a disproportionate cudgel reflecting an arbitrary mismatch between the asserted government interest and the penalty, ultimately inexplicable by anything but animus. *See Romer*, 517 U.S. at 632 (finding animus where the breadth of a law's impact was "discontinuous with the reasons offered for it"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if the agency cannot offer a "rational connection" between facts and policy choices).

### D. THE HEALTHCARE PROVISION PROCEDURALLY AND SUBSTANTIVELY DEPARTS FROM THE STATUTORY REQUIREMENTS AND PURPOSES OF THE PSLF PROGRAM.

In promulgating the Healthcare Provision, the Secretary deviated from important procedural norms and legal requirements, further betraying an invidious discriminatory purpose. Before publishing proposed regulations related to the PSLF program, the Secretary is required to participate in a negotiated rulemaking process. *See* 20 U.S.C. § 1098a(b)(1). Negotiated rulemaking is ordinarily a monthslong process, during which the Secretary considers feedback from key stakeholders in good faith. *See, e.g.*, 89 Fed. Reg. 27564, 27567/3-27568/3 (Apr. 17, 2024) (describing the negotiated rulemaking process related to waiver of certain student-loan debts); 89 Fed. Reg. 60256, 60260/1-60261/1 (July 24, 2024) (describing the negotiated rulemaking process related to program integrity and institutional quality).

Here, the Secretary did not engage in negotiated rulemaking in good faith. The process lasted only three days—far too short to meaningfully consider stakeholders' feedback, and considerably shorter than other recent rulemakings related to student loans. *See* Notice of Proposed Rulemaking, 90 Fed. Reg. at 40157/2. Of course, the brevity is unsurprising; the outcome was preordained. The terms of the Proposed Rule and the final Rule parroted the President's PSLF EO and other related executive orders, including the Healthcare EO. *Compare* PSLF Order, 90 Fed. Reg. at 11885, *with* Notice of Proposed Rulemaking, 90 Fed. Reg. at 40158/3 (following the Healthcare EO's definition of "chemical castration or mutilation"); *and* Rule, 90 Fed. Reg. at 48981/1&2 (same); *see also* Pls.' Mot. for Summ. J. at 4. The Department conducted a Potemkin negotiated rulemaking to justify promulgation of a Rule that mirrors the President's Executive Orders.[14]

The Rule and the Healthcare Provision also depart substantively from the PSLF statute. As set forth above, the Rule establishes eligibility restrictions that have no basis in the statutory text and requires medical judgments that have nothing to do with the explicit statutory factors affecting eligibility for loan forgiveness. 20 U.S.C. §§ 1087e(m)(1), (1)(A), (1)(B)(ii). This substantive departure from the "factors usually considered important" by the Secretary is strong evidence of a discriminatory purpose. *See Arlington Heights*, 429 U.S. at 267.

### E.    THE HEALTHCARE PROVISION IS PART OF A COORDINATED FEDERAL EFFORT TO DENY TRANSGENDER PEOPLE EQUAL RIGHTS AND MEDICALLY NECESSARY HEALTHCARE.

The Healthcare Provision is part of a constellation of official actions designed to deprive transgender people of equal citizenship. As this Court found previously: "Numerous statements by the Administration, executive orders, and memorandums, detail the Administration's goal of

---

[14] Further, as Plaintiffs point out, the public-comment period on the Proposed Rule was just 30 days long "rather than the typical 60." Pls.' Mot. for Summ. J. at 5.

ending [gender-transition care]," which is rooted in "explicit . . . disapproval of the transgender community." *In re Admin. Subpoena No. 25-1431-019*, 2025 U.S. Dist. LEXIS 175515, at *16, *17.

In addition to the facially discriminatory and stigmatizing Healthcare EO described above, the Trump Administration has issued a suite of executive orders intended to strip transgender people of equal rights under law. Like the Healthcare EO, these executive orders contained false and inflammatory language to describe transgender people and their healthcare, and they announced policies to prevent equal participation by transgender people in public life, including with respect to federal funding, homeless shelters, prisons, employment, and international travel;[15] the military;[16] schools;[17] and sports.[18] *See In re Admin. Subpoena No. 25-1431-019*, 2025 U.S. Dist. LEXIS 175515, at *3-4 (citing these executive orders and finding that the Administration's "disapproval of the transgender community [is] well known"); *In re 2025 UPMC Subpoena*, 2025 U.S. Dist. LEXIS 265627, at *8 n.3 (emphasizing "how broad the government's campaign is against transgender people").

For example, Executive Order 14168 adopted definitions of "sex," "women," "girls," "men," "boys," "female," and "male" to ensure no federal laws or policies recognize transgender people. EO 14168 also contained false and denigrating statements about transgender people, including that they transition in order to "gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers," and that their existence is a "false claim." 90 Fed. Reg. at 8615. Based on this and other language,

---

[15] Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025) (Executive Order 14168).
[16] Prioritizing Military Excellence and Readiness, 90 Fed. Reg. 8757 (Jan. 27, 2025) (Executive Order 14183).
[17] Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Jan. 29, 2025) (Executive Order 14190).
[18] Keeping Men Out of Women's Sports, 90 Fed. Reg. 9279 (Feb. 5, 2025) (Executive Order 14201).

multiple courts have held that EO 14168 was motivated by animus against transgender individuals. *See Washington*, 768 F. Supp. 3d at 1277 (holding that EO 14168 "reflects a 'bare desire to harm a politically unpopular group' as its underlying 'actual purpose'"); *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184, 1216 (N.D. Cal. 2025) (holding that the "facially discriminatory objective" to "disapprove of transgender people" in EO 14168 is "not a legitimate government interest"), *appeal docketed*, No. 25-4988 (9th Cir. filed Aug. 7, 2025).

In addition, Executive Order 14183, which prohibited transgender people from serving in the armed forces without exemption, declared: "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service"; "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"; and "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with" the qualities of "humility" and "selflessness." 90 Fed. Reg. at 8757. This language is brazenly demeaning and stigmatizing.

And, as to healthcare specifically, this Court has already recognized that the Administration's "explicit . . . disapproval of the transgender community" has been "reflect[ed]" in a host of official actions designed to end transgender healthcare. *See In re Admin. Subpoena No. 25-1431-019*, 2025 U.S. Dist. LEXIS 175515, at *19. As part of this "shock and awe" campaign, *In re 2025 UPMC Subpoena*, 2025 U.S. Dist. LEXIS 265627, at *8 n.3, the Administration has proposed rules that threaten Medicare, Medicaid, and Children's Health Insurance Program funding for certain providers offering gender-transition care;[19] issued a declaration from the

---

[19] Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children, 90 Fed. Reg. 59441 (Dec. 19, 2025); Medicare and Medicaid Programs; Hospital Conditions of Participation: Prohibiting Sex-Rejecting Procedures for Children, 90 Fed. Reg. 59463 (Dec. 19, 2025).

Secretary of Health and Human Services that could be invoked to exclude providers of gender-transition care from participation in federal healthcare programs;[20] issued notices to grant recipients from the Centers for Disease Control and Prevention and the Health Resources and Services Administration threatening funding for recipients who provide gender-transition care;[21] prohibited military hospitals and clinics from providing gender-transition care to military dependents regardless of age;[22] and issued administrative subpoenas to Boston Children's Hospital and "numerous other hospitals across the country" relating to the hospitals' provision of gender-transition care.[23] And, even more recently, the government is twisting consumer-protection statutes to go after medical associations like the Endocrine Society because of their research and work related to transgender healthcare.[24]

This Court has already confronted the administrative subpoenas to hospitals *In re Administrative Subpoena No. 25-1431-019* and concluded that the administrative subpoena issued to Boston Children's Hospital "was issued for an improper purpose, motivated only by bad faith." 2025 U.S. Dist. LEXIS 175515, at *19-20. The Court determined that the subpoena "reflect[ed]" the Administration's "disapproval" of transgender people and that the Administration's "true purpose of issuing the subpoena [was] to interfere with the Commonwealth of Massachusetts' right to protect [such care] within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care." *Id.* Several other courts have confronted materially identical subpoenas, and "[e]very court to consider the issue agrees." *In re Dep't of Just.*

---

[20] Robert F. Kennedy, Jr., *Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents*, Dep't of Health & Hum. Servs. (Dec. 18, 2025), https://perma.cc/D7NW-FT3A.
[21] *See PFLAG, Inc.*, 769 F. Supp. 3d at 417-18.
[22] *See* Amended Complaint, *Doe v. Dep't of Def.*, No. 8:25-cv-02947 (D. Md. filed Feb. 18, 2026), ECF No. 55.
[23] *In re Admin. Subpoena No. 25-1431-019*, 2025 U.S. Dist. LEXIS 175515, at *1-2.
[24] *See* Complaint, *Endocrine Soc'y v. Fed. Trade Comm'n*, No. 1:26-cv-00512 (D.D.C. filed Feb. 17, 2026), ECF No. 1.

*Admin. Subpoena No. 25-1431-030*, Misc. No. 25-mc-00063-SKC-CYC, ECF No. 35 at 15 (D. Colo. Jan. 5, 2026) (recommendation of magistrate judge).[25]

Taken together, the breadth of the Administration's actions targeting transgender people are "so far removed" from any possible justification that they "raise the inevitable inference" of "animosity toward the class of persons affected." *Romer*, 517 U.S. at 634-35. This same animosity is reflected in the Healthcare Provision, and no legitimate purpose or exceedingly persuasive justification exists that could override the taint of animus and invidious discrimination, rendering the Healthcare Provision unconstitutional and arbitrary and capricious. *See Romer*, 517 U.S. at 634-35; *Arlington Heights*, 429 U.S. at 265-66; *Robbins*, 780 F.2d at 50 n.20.

## CONCLUSION

For all these reasons, the Rule and Healthcare Provision lack a sound statutory basis and raise serious constitutional concerns. The Rule contravenes the relevant statutory text and would mark a radical shift in the allocation of authority over healthcare: from Congress and public health officials to the Secretary of Education. And, the Healthcare Provision is designed to coerce healthcare providers into abandoning their transgender patients and ceasing medically necessary healthcare—setting a dangerous precedent that threatens our entire healthcare system by conditioning access to healthcare benefits on discriminatory government policies rather than individual medical needs. The Court should grant Plaintiffs' Motion for Summary Judgment and set aside the Rule.

---

[25] *See In re Admin. Subpoena No. 25-1431-019*, 2025 U.S. Dist. LEXIS 175515 as well as *In re 2025 UPMC Subpoena*, 2025 U.S. Dist. LEXIS 265627; *Queerdoc, PLLC v. U.S. Dep't of Just.*, No. 2:25-mc-00042, 2025 U.S. Dist. LEXIS 212521 (W.D. Wash. Oct. 27, 2025); *In re Subpoena No. 25-1431-014*, Misc. No. 25-39, 2025 U.S. Dist. LEXIS 229056 (E.D. Pa. Nov. 21, 2025); *see also In re 2025 Subpoena to Child.'s Nat'l Hosp.*, 2026 U.S. Dist. LEXIS 10523 (same but issued after the Colorado opinion).

Dated: February 24, 2026

Respectfully submitted,

*/s/ Joshua Rovenger*
Joshua Rovenger (BBO #688141)          Nathan Maxwell (*pro hac vice* pending)
jrovenger@gladlaw.org                  nmaxwell@lambdalegal.org
Sarah Austin (*pro hac vice* pending)  LAMBDA LEGAL DEFENSE &
saustin@gladlaw.org                    EDUCATION FUND, INC.
Benjamin Marcus (*pro hac vice* pending)  3656 North Halsted Street
bmarcus@gladlaw.org                    Chicago, IL 60613
GLBTQ LEGAL ADVOCATES &                (312) 663-4413
DEFENDERS
18 Tremont Street, Suite 950           *Counsel for Amici Curiae*
Boston, MA 02108
(617) 426-1350

**CERTIFICATE OF SERVICE**

I certify that on this 24th day of February, 2026, I electronically filed the foregoing document with the United States District Court for the District of Massachusetts using the Court's CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the court's CM/ECF system.


Dated: February 24, 2026                    By: /s/ Joshua Rovenger