# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL COUNCIL OF NONPROFITS, *et al.*, <br><br>      Plaintiffs, <br><br> v. <br><br> LINDA MCMAHON, in her official capacity as Secretary of Education, and the U.S. DEPARTMENT OF EDUCATION, <br><br>      Defendants. | Case No. 1:25-CV-13242 <br><br> **Leave to File Amicus Brief Requested on February 24, 2026** |

# BRIEF OF AMICI CURIAE ENVIRONMENTAL ORGANIZATIONS
# IN SUPPORT OF PLAINTIFFS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

RULE 7.1 CORPORATE DISCLOSURE STATEMENT ..................................................... vi

INTERESTS OF *AMICI* ................................................................................................ 1

INTRODUCTION ......................................................................................................... 6

ARGUMENT ............................................................................................................... 7

I.    The Rule Undermines Recruitment and Retention of Graduates into Public
Service Careers by Clouding the PSLF Eligibility of Tax-Exempt Employers ........... 7

    A.    A Public Service Career is a Substantial Commitment ................................... 8

    B.    The Rule Deters Public Interest Careers by Imposing Impossible
Investigatory Burdens on Borrowers ................................................. 10

II.    The Rule transforms PSLF into a discretionary tool to punish disfavored
viewpoints and action ........................................................................................ 13

III.    The PSLF Rule Will Deter Donors by Clouding the Tax-Exempt Status of
Employers ........................................................................................................... 18

CONCLUSION ............................................................................................................ 20

CERTIFICATE OF SERVICE ....................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994).............................................................................................13

*Laird v. Tatum*,
    408 U.S. 1 (1972)...............................................................................................16

*National Education Association v. U.S. Department of Education*,
    779 F. Supp. 3d 149 (D.N.H. Apr. 24, 2025)..........................................................17

*National Rifle Association of America v. Vullo*,
    602 U.S. 175 (2024)...........................................................................................14

*Sustainability Institute v. Trump*,
    No. 2:25-cv-2152-RMG (D.S.C. May 12, 2025)..............................................15, 16

**Constitution**

U.S. Const. amend. I...............................................................................................14, 16

**Statutes**

Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (Nov. 8, 1965)
    (codified at 20 U.S.C. § 1001) .......................................................................18, 20

Inflation Reduction Act, Pub. L. No. 117-169, § 60201, 136 Stat. 1818 (Aug. 16,
    2022) (codified at 42 U.S.C. § 7438)....................................................................15

2 U.S.C. § 5540 ......................................................................................................19

12 U.S.C. § 1701x(h)(4) ...........................................................................................19

15 U.S.C. § 636 (a)(36) ............................................................................................19

20 U.S.C. § 1087e(m) ..............................................................................................10

26 U.S.C. § 501(c)(3)..................................................................................6, 10, 18

34 U.S.C. § 12291(b)(15)(B)(i) ..................................................................................19

38 U.S.C. § 4104A(f)(2) ...........................................................................................19

42 U.S.C. § 18832....................................................................................................19

**Regulatory Material**

Exec. Order No. 14151 §2(b)(i) ................................................................................15

Exec. Order No. 14173 § 4(b)(iii) ............................................................................15

34 C.F.R. § 685.219 (proposed) ................................................................11, 13, 14

87 Fed. Reg. 65904 (Nov. 1, 2022) ..........................................................................10

90 Fed. Reg. 8339 (Jan. 20, 2025) ...........................................................................15

90 Fed. Reg. 8633 (Jan. 21, 2025) ...........................................................................15

90 Fed. Reg. 48966 (Oct. 31, 2025) .................................................................. passim

Internal Revenue Service, *Rev. Proc. 2018-32* 14 (n.d.),
    https://www.irs.gov/pub/irs-drop/rp-18-32.pdf ................................................18

**Other Authorities**

American Bar Association Young Lawyers Division, *2020 Law School Student
    Loan Debt Survey Report* 7 (2020),
    https://www.americanbar.org/content/dam/aba/administrative/young_lawyers/
    2020-student-loan-survey.pdf ...........................................................................9

Jennifer A Dlouhy and Akshat Rathi, *Trump Officials Weight Move Against
    Green Groups*, BLOOMBERG (Apr. 17, 2025),
    https://www.bloomberg.com/news/articles/2025-04-18/trump-officials-weigh-
    earth-day-move-against-green-groups ..............................................................16

Lisa Friedman, *E.P.A. Plans to Close All Environmental Justice Offices*, THE
    NEW YORK TIMES, https://www.nytimes.com/2025/03/11/climate/epa-closure-
    environmental-justice-offices.html ...................................................................16

National Association for Law Placement, *Jobs & JDs Employment for the Class
    of 2024 Selected Findings* 9, Table 1 (2025),
    https://www.nalp.org/uploads/Classof2024SelectedFindings_final.pdf .................9

National Association for Law Placement, *NALP's Public Service Attorney Salary
    Survey Shows Pay Remains Lowest at Civil Legal Services Organizations*
    Table 3 (May, 2024), https://www.nalp.org/0524research .....................................9

Post by President Donald Trump (@realDonaldTrump), Truth Social (Jan. 23,
    2026 at 7:19am ET),
    https://truthsocial.com/@realDonaldTrump/posts/115944376084632033 .............17

*Remarks at a Document Signing Ceremony and an Exchange with Reporters* 15, GOVINFO.GOV (April 17, 2025), https://www.govinfo.gov/content/pkg/DCPD-202500492/pdf/DCPD-202500492.pdf...................................................................................17

U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook: Lawyers*, https://www.bls.gov/ooh/legal/lawyers.htm .....................................................................9

U.S. Environmental Protection Agency, Press Release, *EPA Terminates Biden's Environmental Justice, DEI Arms of Agency*, https://www.epa.gov/newsreleases/epa-terminates-bidens-environmental-justice-dei-arms-agency ........................................................................................................16

Valerie Volcovici and Virginia Furness, *Climate non-profits anticipate fight with Trump over tax status*, REUTERS, https://www.reuters.com/sustainability/cop/climate-non-profits-anticipate-fight-with-trump-over-tax-status-2025-04-21/ .........................................................................16

Video posted by Lee Zeldin (@epaleezeldin), X (Feb 12, 2025 at 19:52 ET), https://x.com/epaleezeldin/status/1889840040622321778 ...........................................16

White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-restores-public-service-loan-forgiveness/................................................................................................................13

**RULE 7.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel of record for *Amici Curiae* Chesapeake Bay Foundation, CleanAIRE NC, Conservation Law Foundation, Dogwood Alliance, Earthjustice, Environmental Law & Policy Center, Georgia Interfaith Power & Light, Greater Greener Gloster Project, MDC, MountainTrue, Natural Resources Defense Council, North Carolina Justice Center, Organized Uplifting Resources & Strategies, Protect our Aquifer, Southern Alliance for Clean Energy, Southern Coalition for Social Justice, Southern Environmental Law Center, and Waterkeeper Alliance. The *Amici* are all private, not-for-profit, non-governmental organizations; none of the *Amici* has a corporate parent, subsidiary, or affiliate; and none issues stock to the public.

## INTERESTS OF *AMICI*

Chesapeake Bay Foundation, CleanAIRE NC, Conservation Law Foundation, Dogwood Alliance, Earthjustice, Environmental Law & Policy Center, Georgia Interfaith Power & Light, Greater Greener Gloster Project, MDC, MountainTrue, Natural Resources Defense Council, North Carolina Justice Center, Organized Uplifting Resources & Strategies, Protect our Aquifer, Southern Alliance for Clean Energy, Southern Environmental Law Center, Southern Coalition for Social Justice, and Waterkeeper Alliance (the "*Amici*") submit this brief as *Amici Curiae* in support of Plaintiffs.[1]

*Amici* are nonprofit organizations focused on improving the environment and eliminating environmental injustices throughout the United States. They range from small grassroots organizations to large nationwide entities. *Amici* protect public health, conserve wildlife and public lands, advance clean energy, combat climate change, and educate the public. Many *Amici* focus their work in low-income and historically marginalized communities. And many use the legal system to protect these communities, including by enforcing federal environmental laws through citizen-suit provisions enacted by Congress, an essential complement to government enforcement. Through litigation, policy advocacy, public education, and community partnerships, *Amici* have pursued lawful public-interest missions since their inception, missions that have been consistently recognized across presidential administrations of both political parties.

*Amici* have long benefited from the stability of the Public Service Loan Forgiveness ("PSLF") program. *Amici* undertake complex legal and technical work advanced by staff who

---

[1] No party or counsel for a party authored this brief in whole or in part. No party, counsel for a party, or person other than *Amici Curiae* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

have obtained advanced degrees, experience that comes with a significant price tag. As nonprofits, *Amici* cannot match private-sector salaries for employees with similar educational experience. Fortunately for *Amici*, many of their employees, motivated by a passion for the public service mission of *Amici*, accept substantial pay reductions for the opportunity to work in public service. For many, however, the financial tradeoff inherent in a public service career would be untenable without PSLF's promise of loan forgiveness. *Amici's* eligibility for PSLF is an important component of their ability to recruit and retain the dedicated and talented employees they require to do their work.

The Chesapeake Bay Foundation is a 501(c)(3) nonprofit organization and is the largest independent conservation organization dedicated solely to saving the Bay. The PSLF program is crucially important to the Chesapeake Bay Foundation's ability to attract, hire, and retain talented employees, including lawyers, fellows, and paraprofessionals, of all economic backgrounds.

CleanAIRE NC is a 501(c)(3) nonprofit organization that works to protect the health of all North Carolinians by pursuing equitable and collaborative strategies to address climate change and air pollution. The PSLF program is essential for CleanAIRE NC to retain the skilled professionals necessary to protect public health and the environment for North Carolina communities.

Conservation Law Foundation is a 501(c)(3) nonprofit organization that protects New England's environment for the benefit of all people. PSLF makes it possible to choose to work at Conservation Law Foundation; in its absence, staff would be unable to forge a career in the not-for-profit sector. PSLF is therefore critical in allowing Conservation Law Foundation to attract top-notch staff and advance its mission.

Dogwood Alliance is a 501(c)(3) nonprofit organization that advances environmental justice and climate action by mobilizing diverse voices to protect Southern forests and communities from industrial logging. Dogwood Alliance relies on the PSLF program as a recruitment and retention tool to attract high-level talent to the environmental non-profit sector. 20% of Dogwood Alliance's workforce participates in PSLF.

Earthjustice is a 501(c)(3) nonprofit public interest environmental law organization that wields the power of the law and the strength of partnership to protect people's health, to preserve magnificent places and wildlife, to advance clean energy, and to combat climate change. Many Earthjustice staff rely on the PSLF program to continue to do this work in the public sector.

Environmental Law & Policy Center ("ELPC") is a 501(c)(3) public interest organization dedicated to protecting the environment, natural resources and public health around the Midwest. ELPC believes PSLF is essential to ensuring that they can hire staff from working and middle-class families. Over the past eight years, ELPC has hired at least nine staff members who participate in the PSLF program.

Georgia Interfaith Power & Light is a 501(c)(3) nonprofit organization based in Georgia. Georgia Interfaith Power & Light's core mission is to inspire and equip communities of faith to organize, implement practical climate solutions, and advocate across Georgia on issues of climate change, environmental justice, and community resilience. Georgia Interfaith Power & Light relies on PSLF to attract and retain talented employees who otherwise might not be able to financially commit to a career at an environmental nonprofit.

Greater Greener Gloster Project is a 501(c)(3) nonprofit organization based in Mississippi that helps to bring about awareness to the environmental and public health issues caused by the Drax Biomass facility, to seek justice for the damages associated with the air pollution, and to

ensure environmental, public health, and quality of life improvements for the residents in the underserved community of Gloster, Mississippi. PSLF is an essential program that supports Greater Greener Gloster Project's ability to attract and retain professionals from all economic backgrounds.

MDC is a 501(c)(3) nonprofit organization based in North Carolina. MDC supports and represents overburdened and underserved populations in 13 states across the U.S. South from its headquarters in Durham, North Carolina. PSLF is critical to MDC's ability to attract, hire, and retain talented staff from all economic backgrounds, especially people with the lived experience of having student debt.

MountainTrue is a 501(c)(3) nonprofit organization that champions resilient forests, clean waters, and healthy communities across the Southern Blue Ridge. PSLF was a significant influence for several of MountainTrue's current staff members in choosing to start, transition, or continue a career in nonprofit public service.

Natural Resources Defense Council ("NRDC") is a 501(c)(3) nonprofit organization that works to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. Without PSLF, many NRDC staff have reported that they would not be able to work at the organization and would instead seek higher-paying work in the private sector. Multiple NRDC staff only chose to go to graduate school, including law school, because they knew PSLF provided a pathway to public service work.

The North Carolina Justice Center is a 501(c)(3) nonprofit legal advocacy organization. The mission of the Justice Center is to secure economic justice, including energy justice, for disadvantaged persons and communities in North Carolina. The organization's ability to recruit and retain its talented staff depends on the availability of PSLF.

Organized Uplifting Resources & Strategies is a 501(c)(3) nonprofit organization based in South Carolina with a mission to be culturally responsive and relatable with resources that reclaim, revitalize, and sustain rural communities. PSLF provides critical financial support to its staff while the organization engages in often under-funded work to support communities in McCormick County, South Carolina.

Protect Our Aquifer is a Memphis-based, bipartisan 501(c)(3) nonprofit organization founded in 2016 to protect the drinking water source for the surrounding counties. Weakening or rolling back PSLF would disproportionately harm small, public-interest nonprofits like Protect Our Aquifer by constraining workforce stability and undermining partnerships that are critical to safeguard clean, affordable drinking water for the communities it serves.

The Southern Alliance for Clean Energy is a 501(c)(3) nonprofit organization that promotes responsible and equitable energy choices for clean, safe, and healthy communities throughout the Southeast. PSLF is a critically important program that has allowed staff to work for Southern Alliance for Clean Energy and carry out its mission.

Southern Coalition for Social Justice is a 501(c)(3) nonprofit organization that partners with communities of color and economically disadvantaged communities across the South to defend and advance their political, social, and economic rights. Many of SCSJ's attorneys and staff are from lower wealth backgrounds and rely on the PSLF program to make long-term public interest careers sustainable. Without the PSLF program, SCSJ would not be able to empower and attract the talent to pursue their mission of expanding justice and advancing equity for historically underserved communities.

The Southern Environmental Law Center ("SELC") is the largest 501(c)(3) nonprofit, nonpartisan environmental legal organization rooted in and focused on the South. A significant

portion of SELC's staff, including attorneys, scientists, communications staff and others rely on PSLF, and without the program SELC would lose a key tool for recruitment and retention of qualified staff.

Waterkeeper Alliance is a 501(c)(3) nonprofit organization and a global movement dedicated to protecting and restoring water quality to ensure that the world's waters are drinkable, fishable, and swimmable. PSLF allows Waterkeeper Alliance to recruit and retain talented professionals who might otherwise be unable to accept significantly lower salaries than in the private sector. Multiple current and prior staff have benefited from the program.

## INTRODUCTION

For decades, *Amici*, who are all recognized by the Internal Revenue Service ("IRS") as tax-exempt nonprofit organizations under 26 U.S.C. § 501(c)(3), have faithfully carried out their charitable purposes. Their employees—lawyers, scientists, engineers, policy experts, organizers, and other professionals—perform the kind of sustained public service Congress sought to encourage when it enacted the PSLF program: long-term work that serves communities and strengthens the rule of law. Because Congress designed PSLF to be a stable, predictable incentive that makes long-term public service careers financially viable, *Amici* have relied on the fact that they are qualified employers under the program to recruit and retain highly qualified and experienced employees.

To motivate public service, Congress provided a bright-line, objective standard to qualify employees of organizations like *Amici* for PSLF. By statutory definition, an employer recognized by the IRS as tax-exempt is a qualifying employer. The Department of Education's ("DOE") final rule on PSLF program in the William D. Ford Federal Direct Loan program (the "Rule") creates discretionary enforcement and its vague standards introduce uncertainty to a statutory

scheme Congress designed to provide clarity.[2] This uncertainty will deter borrowers from committing to public service work. The Rule also invites needless fact-intensive investigations and subjective determinations about an organization's activities. Similar tools have been used to coerce and punish organizations the current Administration does not favor, and the same abuse is possible here. Not only does this risk chilling speech and lawful public service activity and deterring prospective employees from this important work, but the threat of an investigation, regardless of how arbitrary, may deter donors essential to the financial stability of *Amici*.

The Rule thus marks an unjustified shift from a clear statutory regime adopted by a nation that values and celebrates public service to a regulatory structure that empowers selective investigation, chills advocacy, deters philanthropic activity, and potentially places a cloud over disfavored nonprofits. The Rule threatens not only the missions of *Amici*, but also the values and respect for public service that motivated Congress to create the PSLF program.

## ARGUMENT

## I.    The Rule Undermines Recruitment and Retention of Graduates into Public Service Careers by Clouding the PSLF Eligibility of Tax-Exempt Employers

A career in public service is a major commitment with substantial financial and personal risk if loan forgiveness is denied or an employee is forced to abandon their current employer and start their career over. Such a commitment requires confidence in the PSLF program and PSLF eligibility of the employer. The Rule undermines that confidence in contravention of congressional intent by replacing statutory clarity with vague regulatory standards and discretionary enforcement.

---

[2] 90 Fed. Reg. 48966 (Oct. 31, 2025).

A.      A Public Service Career is a Substantial Commitment

DOE recognizes that "borrowers in the PSLF program have significant reliance interests," noting that many "structure their life plans" around the program and incur substantial debt in reliance on eventual loan forgiveness.[3] In this, DOE is correct. As one staffer from *Amicus* NRDC explained:

> To get the education I needed to go down my chosen path, I took on a big financial burden. But I did it with the understanding that with time, commitment, and diligence, I could get my debt forgiven. Thinking I would have my loans forgiven soon enabled my husband and I to take the risk to buy a house, to have a baby, to travel. While we are still frugal, it is helpful knowing soon there will be a time when I won't have to shell out $800/month for my student loans. I could instead spend that on my child's education, on taking him to visit his family, etc. If NRDC was no longer considered to be a qualifying organization, it would be devastating to my family's finances.

The same is true of many other mission-driven professionals who work for the *Amici*. Their employees are highly qualified and often pursue specialized education tailored to public service. Law students seeking environmental public interest careers, for example, must select relevant coursework, clinics, and internships early in their legal careers to remain competitive. Other professionals earn degrees in nonprofit management and related fields that are valued in the nonprofit sector but not rewarded in private industry.

For staff at MountainTrue, for example, the PSLF program was a "significant influence" in "choosing to start a career in nonprofit public service." These staff "made decisions knowing that compensation in a public service career could not compete with other opportunities in the private sector, but the promise of student debt forgiveness for their dedicated service provided a financial incentive to pursue a career of public service."

---

[3] 90 Fed. Reg. 48966, 48984.

Borrowers then redouble their commitment to public service upon graduation, as DOE acknowledges, by "forgo[ing] higher-paying occupations in the private sector . . . ."[4] For example, the median salary for recent law graduates in public interest positions in 2024 was $72,000, compared to $160,000 in private practice.[5] The gap widens over time; experienced attorneys with 11–15 years of experience in public interest organizations earned a median salary of $107,100 in 2023, which staggers behind the 2024 median salary for all lawyers of $151,160, let alone the much higher salaries commanded by those in large private practice law firms.[6] These income disparities weigh heavily on graduates carrying a median law school debt load of $160,000.[7] For example, many staff at *Amicus* Natural Resources Defense Council hold significant loan balances from undergraduate and graduate school that would otherwise be unmanageable on a nonprofit salary. For one NRDC employee:

> Graduating from law school with so much debt would have been crushing on a public interest salary without the relief offered through the program. The program helped me to be able to afford living in the places where I found work, get an earlier start to setting aside money for retirement, forgo jobs with salaries that were multiples of what I was making, and achieve some peace of mind knowing that I had a long but achievable pathway out of debt. It provided me with support I needed to dedicate my career to advancing the public good rather than private gain.

---

[4] *Id.*

[5] Nat'l Ass'n for Law Placement, *Jobs & JDs Employment for the Class of 2024 Selected Findings* 9, Table 1 (2025), https://www.nalp.org/uploads/Classof2024SelectedFindings_final.pdf [https://perma.cc/JT8A-RCUM].

[6] *See* Nat'l Ass'n for Law Placement, *NALP's Public Service Attorney Salary Survey Shows Pay Remains Lowest at Civil Legal Services Organizations* Table 3 (May, 2024), https://www.nalp.org/0524research [https://perma.cc/826X-DLZN]; U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook: Lawyers*, https://www.bls.gov/ooh/legal/lawyers.htm [https://perma.cc/EX52-4DFR] (last updated Aug. 28, 2025).

[7] Am. Bar Ass'n Young Laws. Div., *2020 Law School Student Loan Debt Survey Report* 7 (2020), https://www.americanbar.org/content/dam/aba/administrative/young_lawyers/2020-student-loan-survey.pdf [https://perma.cc/V4PR-79YX].

For many borrowers, a career in public service in a specific specialty, state, or licensing regime also commits them to a small set of potential employers, contrary to DOE's suggestion that they can "seek employment with a different qualifying employer" to avoid disqualification.[8]

## B.    The Rule Deters Public Interest Careers by Imposing Impossible Investigatory Burdens on Borrowers

Congress created the PSLF program "to encourage Americans to pursue public service careers that improve their communities."[9] Significantly, Congress sought to incentivize long public service careers, not short-term employment. Loan forgiveness is conditioned on at least ten years of qualifying public service.[10] This long-time horizon means program stability and predictability are of paramount importance.

A financial incentive can inspire long-term commitment only if the promise of loan forgiveness is certain. The statute eliminates uncertainty by denying agency discretion to withhold loan forgiveness: the Secretary "shall cancel" eligible loans for a qualified borrower who is "employed in a public service job."[11] By statutory definition, "an organization that is described in section 501(c)(3)" of the tax code is such a "public service job."[12] DOE has acknowledged that Congress "automatically qualif[ied]" 501(c)(3) organizations for PSLF.[13] This statutory clarity provides the necessary certainty for borrowers to make the long-term financial commitments required to pursue public interest careers confident in the knowledge that

---

[8] Rule, 90 Fed. Reg. at 48970.
[9] Rule, 90 Fed. Reg. at 48967.
[10] 20 U.S.C. § 1087e(m)(1).
[11] *Id.* § 1087e(m)(1)(B)(i).
[12] *Id.* § 1087e(m)(3)(B)(i).
[13] Institutional Eligibility Under the Higher Education Act of 1965, as Amended; Student Assistance General Provisions; Federal Perkins Loan Program; Federal Family Education Loan Program; and William D. Ford Federal Direct Loan Program, 87 Fed. Reg. 65904, 65972 (Nov. 1, 2022).

if their employer is recognized as tax-exempt by the IRS, they are eligible for PSLF subject to the program's other requirements.

By injecting uncertainty, DOE's departure from the bright lines of the statute will disincentivize individuals from public service careers. Now, instead of relying on a publicly verifiable IRS determination, current and prospective employees must consider the risk that DOE will make a discretionary decision to disqualify their current or prospective employer.

Although DOE describes its new test as targeting an "illegal purpose," this phrase is broadly defined.[14] Under the Rule, an organization devoted to a lawful public purpose may nonetheless be disqualified from PSLF if it engages in one or more "illegal activities" that DOE believes are *tantamount* to a "substantial illegal purpose."[15] Even more challenging, the list of potentially infringing activities is broad, touching the tort law of all 50 states and all federal discrimination and immigration laws and regulations, among other broad categories.[16]

Thus, even though the IRS has recognized all *Amici* as tax-exempt after confirming they are organized and operated to advance a lawful, charitable purpose, *Amici* cannot be sure DOE will conclude they qualify under the vague standards adopted by the Rule. As a result, prospective and current employees now have significantly less confidence that their work with *Amici* will lead to loan forgiveness. Rather, they must account for the risk that DOE will exercise its discretion under the Rule to deny PSLF eligibility based on an alleged violation of one of hundreds of federal or state laws.

This uncertainty serves as a deterrent for talented professionals that may not be able to financially commit to public interest careers with employers that do not qualify for PSLF. For

---

[14] Rule, 90 Fed. Reg. at 48966.
[15] *Id*.
[16] 34 C.F.R. § 685.219(b)(12), (30), (34) (proposed), 90 Fed. Reg. at 49000, 49001.

example, *Amicus* Dogwood Alliance explains how the uncertainty would reduce its ability to attract and retain talent from all financial backgrounds:

> We explicitly use our status as a qualifying employer as a primary recruitment and retention tool to attract high-level talent to the environmental non-profit sector. For an organization of our size, PSLF is a component of our "total compensation" package. If our eligibility were compromised, it would create an immediate barrier to entry for diverse, early-to-mid-career professionals who carry significant student debt while dedicated to forest conservation. We view PSLF not just as a financial benefit, but as a workforce sustainability issue. Without it, the public interest work of protecting Southern forests would become a luxury only affordable to those without student loans, severely undermining our commitment to equity within the movement.

Similarly, the reliability and predictability of PSLF qualification allows Organized Uplifting Resources & Strategies to work in remote and under-resourced communities in McCormick County, South Carolina. According to the organization's CEO, "places like where I'm from are often overlooked and under resourced and finding funding to support a community while trying to support yourself is a struggle." The consistent promise of PSLF has mitigated the financial difficulties of doing this work for their staff.

DOE acknowledges that the Rule "will serve as a deterrent for borrowers" but suggests "advance notice" about the new standard "enables borrowers to make informed decisions."[17] But DOE also concedes that employees "may not have sufficient information" about employer conduct to assess an employer's qualification because they "may not be privy to employer actions or decisions."[18] What is not acknowledged by DOE is a borrower's inability to predict how DOE will apply the Rule's vague standards.

For conduct allegedly related to "illegal discrimination," the borrower's task is especially vexing.[19] Even a diligent borrower who verifies that their employer has never been found liable

---

[17] Rule, 90 Fed. Reg. at 48970.
[18] *Id.* at 48977.
[19] *Id.* at 48966.

for violating discrimination laws still cannot be assured of PSLF eligibility. DOE rejected the possibility of deferring to adjudications by courts or agencies with jurisdiction as it would "make the Department captive to third parties" who may not share the current Administration's priorities.[20] Such priorities, of course, may change from Administration to Administration, compounding the uncertainty.

Moreover, an employer may also lose PSLF eligibility even if it has itself committed no violation, adjudicated or otherwise. DOE will revoke PSLF eligibility for "aiding and abetting" discrimination by others, even though civil rights statutes impose no such liability.[21] By grafting aiding-and-abetting liability to statutes that do not include it, DOE expands those laws beyond their text and precedent, leaving organizations and borrowers to guess how the Department will apply this new theory and giving DOE license to punish conduct that is not, in fact, illegal.

The Rule thus abandons statutory clarity in favor of discretionary and vague standards that borrowers cannot confidently assess for themselves. Without that confidence, they will be deterred from committing to careers in public service, to the detriment of *Amici* who rely on the ability to recruit and retain the highly qualified individuals that rely on the program.

## II.    The Rule transforms PSLF into a discretionary tool to punish disfavored viewpoints and action

The Rule's vague standards do not further the statutory goal of encouraging public service careers. Instead, they are primed to serve the Administration's stated aim to target organizations with missions it deems undesirable. The White House explained that the Executive Order that motivated this Rule sought to shift PSLF away from "activist groups" and stop

---

[20] *Id.* at 48987.
[21] 34 C.F.R. § 685.219(b)(3)(v) (proposed), 90 Fed. Reg. at 49000, 49001; *see Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–77 (1994) (holding that aiding and abetting liability does not exist where Congress did not impose such liability by statute).

"taxpayer funding of radical agendas," refocusing the program on "American values."[22] This is a clear affront to the First Amendment which bars the federal government from "coerc[ing] private parties in order to punish or suppress views that the government disfavors."[23]

The significant discretion embedded within the Rule transforms it into a sword of Damocles, poised to fall on any organizations the Administration wishes to punish. DOE can choose which nonprofits to investigate, decide which alleged "violation[s]" are "material[]" and determine whether alleged violations reflect a "pattern," functions previously reserved to the IRS and the courts.[24] The mere threat of such action is chilling.

It is already clear that DOE does not intend to use this new Rule to ensure broad compliance throughout the country. For the millions of nonprofits operating nationwide, DOE has allocated just 10 employees to oversee compliance.[25] The inevitable result will be the exercise of its broad discretion to bring selective enforcement against politically disfavored organizations whose public advocacy draws its attention and ire.

Any organization targeted by DOE faces the risk of PSLF disqualification for 10 years, unless it agrees to a "corrective action plan" subjecting it to ongoing Department oversight and whatever "terms or conditions" the Secretary imposes.[26] This structure resembles the Administration's use of consent decrees and oversight agreements as leverage to pressure universities and other private institutions to advance the Administration's political priorities. And, as discussed more below, it also mirrors strategies already employed against environmental organizations, including *Amici*.

---

[22] The White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-restores-public-service-loan-forgiveness/ [https://perma.cc/NC56-9Y33].
[23] *National Rifle Association of America v. Vullo*, 602 U.S. 175, 180 (2024).
[24] 34 C.F.R. § 685.219 (b)(12), (b)(30)(v), (b)(30)(vi), (h)(1) (proposed), 90 Fed. Reg. at 49000, 49001, 49002.
[25] Rule, 90 Fed. Reg. at 48991.
[26] 34 C.F.R. § 685.219(j) (proposed), 90 Fed. Reg. at 49002.

14

*Amici* are concerned that the threat of PSLF decertification could be used similarly. *Amici* comply with the law. They work in the public interest. But *Amici* also value diverse workplaces, advocate for climate and environmental justice, and some litigate against the federal government. These are all activities that have drawn threats of investigation and retaliation from the current Administration.

Indeed, the White House, DOE and other agencies have already demonstrated they are willing to use any power that they have to prevent organizations who value diversity or who seek to address environmental injustice from fulfilling their missions. On January 20, 2025, the President ordered agencies to terminate all environmental justice offices and positions.[27] Shortly thereafter, an Executive Order instructed federal agencies to develop measures to deter "DEI programs or principles" and to prepare up to nine potential civil compliance investigations of large nonprofits and other organizations.[28]

Subsequently, the Environmental Protection Agency ("EPA") began to target environmental non-profits who held federal grants focused on environmental justice and climate advocacy. EPA did this even though Congress had explicitly required these grants, via the "Environmental and Climate Justice" block grant program, to be used to address environmental injustice.[29] Nonetheless, EPA grant administrators, armed with a list of forbidden words and concepts began to contact environmental groups, including *Amicus* Clean AIRE NC, and direct them to remove terms such as "advocacy," "minorities," "disproportionate," "historical

---

[27] Exec. Order No. 14151 §2(b)(i), Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025).
[28] Exec. Order No. 14173 § 4(b)(iii), Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633, 8635 (Jan. 21, 2025).
[29] Inflation Reduction Act, Pub. L. No. 117-169, § 60201, 136 Stat. 1818, 2078 (Aug. 16, 2022) (codified at 42 U.S.C. § 7438).

exclusion," and "underserved" from their grant work plans or risk losing grant funding.[30] Some groups were even directed to remove terms like "climate change" and "equitable" from their organizational websites and online mission statements and to "instead focus on job creation and increasing the tax base."[31] Such threats seek not only to coerce speech, but to push these nonprofits away from their fundamental missions, in violation of the First Amendment.[32]

At the same time, EPA announced the elimination of its Environmental Justice divisions characterizing them as "forced discrimination programs" and "an excuse to fund left-wing activists."[33] In a statement, Administrator of the EPA, Lee Zeldin, echoed this message, describing environmental justice work as "tantamount to discrimination" and noting that: "President Trump was elected with a mandate from the American people," which "includes the elimination of forced discrimination programs."[34] Mr. Zeldin frequently labels organizations doing this work as "activist groups," the same language the White House used in its Executive Order that prompted the new PSLF Rule.[35]

Other threats have been less overt but still provide *Amici* with reasonable fear they may be targeted. In the weeks before Earth Day 2025, reports indicated the White House was

---

[30] Supp. Dec. of Gerald Babao, CleanAIRE NC at ¶ ¶ 3, 4, 7, 9, *Sustainability Institute v. Trump*, No. 2:25-cv-2152-RMG (D.S.C. May 12, 2025), ECF No. 149-10.

[31] Supp. Dec. of Bryan Cordell, The Sustainability Institute at ¶ ¶ 3, 4, 5, 7, 8, *Sustainability Institute v. Trump*, No. 2:25-cv-2152-RMG (D.S.C. May 12, 2025), ECF No. 149-7.

[32] *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (explaining that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.").

[33] U.S. Env't Prot. Agency, Press Release, *EPA Terminates Biden's Environmental Justice, DEI Arms of Agency*, https://www.epa.gov/newsreleases/epa-terminates-bidens-environmental-justice-dei-arms-agency [https://perma.cc/ZAK6-ALHT] (last updated Mar. 14, 2025).

[34] Lisa Friedman, *E.P.A. Plans to Close All Environmental Justice Offices*, THE NEW YORK TIMES, https://www.nytimes.com/2025/03/11/climate/epa-closure-environmental-justice-offices.html [https://perma.cc/NFA6-323M] (last updated March 11, 2025).

[35] *See e.g.,* Video posted by Lee Zeldin (@epaleezeldin), X (Feb 12, 2025 at 19:52 ET), https://x.com/epaleezeldin/status/1889840040622321778 [ https://perma.cc/JG9V-G7R2] ("The days of irresponsibly shoveling boatloads of cash to far-left activist groups in the name of environmental justice and climate equity are over.").

considering action against the tax-exempt status of environmental organizations. [36]Although no order was issued, the President publicly confirmed "environmental rights groups" could be targeted.[37] And the President has repeatedly hurled names and threats at environmental groups, going so far as to publicly label those who call attention to climate-related extreme weather as "environmental *insurrectionists*."[38]

DOE has engaged in similar conduct, threatening enforcement of discrimination laws to infringe the free speech of institutions it regulates, in order to advance the Administration's political priorities.[39] It is thus no idle fear that prompts *Amici* to believe that the new Rule may be weaponized against them. Gerald Babao, Deputy Director of *Amicus* Clean AIRE NC notes that the threat follows "a destabilizing pattern of undermining essential environmental organizations." He explains that "such moves cripple [environmental organization's] ability to retain the skilled professionals necessary to protect public health and the environment for North Carolina communities." The Rule—which grants DOE authority to revoke PSLF eligibility for up to ten years unless an organization agrees to a corrective action plan subject to Department-imposed conditions—presents yet one more threat after a year of menace.

---

[36] Jennifer A Dlouhy and Akshat Rathi, *Trump Officials Weight Move Against Green Groups*, BLOOMBERG (Apr. 17, 2025), https://www.bloomberg.com/news/articles/2025-04-18/trump-officials-weigh-earth-day-move-against-green-groups [https://perma.cc/M95Z-EMC7]; Valerie Volcovici and Virginia Furness, *Climate non-profits anticipate fight with Trump over tax status*, REUTERS, https://www.reuters.com/sustainability/cop/climate-non-profits-anticipate-fight-with-trump-over-tax-status-2025-04-21/ [https://perma.cc/3GHV-CXKT] (last updated Apr. 21, 2025).

[37] *Remarks at a Document Signing Ceremony and an Exchange with Reporters* 15, GOVINFO.GOV (April 17, 2025), https://www.govinfo.gov/content/pkg/DCPD-202500492/pdf/DCPD-202500492.pdf [https://perma.cc/TF5D-P4F4].

[38] Post by President Donald Trump (@realDonaldTrump), Truth Social (Jan. 23, 2026 at 7:19am ET), https://truthsocial.com/@realDonaldTrump/posts/115944376084632033 [https://perma.cc/B7J7-MX6G].

[39] *See Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 193-96, 202 (D.N.H. Apr. 24, 2025) (finding viewpoint discrimination and enjoining DOE from bringing enforcement to block race-conscious programming and trainings on "racially charged issues").

III.    **The PSLF Rule Will Deter Donors by Clouding the Tax-Exempt Status of Employers**

As tax-exempt nonprofits, *Amici* depend on philanthropic support to advance their missions. Donor confidence, often reflected in multi-year commitments, takes years to build and can be undermined quickly if an organization's tax status appears uncertain.

The IRS has evaluated the organizing purpose of each of *Amici*, issuing a determination letter confirming their tax-exempt status under Section 501(c)(3). Donors may "generally rely" on an IRS determination letter, but that reliance is not a safe harbor.[40] The IRS may disallow a deduction for contributions made before the IRS publicly announces it has been disqualified, if the donor was "aware of[] the activities or deficiencies" that led to the disqualification.[41]

The Rule threatens to undermine donor reliance on IRS determinations of tax-exempt status. DOE now proposes to make and publicize findings that an organization has engaged in activities amounting to an "illegal purpose" under the "illegality doctrine."[42]

The "illegality doctrine" is a creature of tax law. Section 501(c)(3) exempts nonprofits organized for "charitable" purposes. The Supreme Court in *Bob Jones University v. United States* drew on the legislative history, tradition and text of the tax code, finding "unmistakable evidence that, underlying all relevant parts of the Code, is the intent" to restrict tax exemption through the illegality doctrine.[43] But that ruling addressed tax-exempt status under the Internal Revenue Code only. [44]

---

[40] Internal Revenue Serv., *Rev. Proc. 2018-32* 14 (n.d.), https://www.irs.gov/pub/irs-drop/rp-18-32.pdf [https://perma.cc/L84B-RRKL].
[41] *Id*. at 15.
[42] Rule, 90 Fed. Reg. at 48967.
[43] 461 U.S. 574, 586 (1983).
[44] *Id*. ("Section 501(c)(3) therefore must be analyzed and construed within the framework of the Internal Revenue Code and against the background of the Congressional purposes.").

With no basis in the statutory text of the Higher Education Act ("HEA"), DOE concludes it "must presume" Congress implied the same "illegality doctrine" into the PSLF program.[45] With that leap of logic, DOE converts a tax-law doctrine about tax exempt status into a universal rule governing all "statutory benefits" administered by every federal agency and assumes authority to apply it against all tax-exempt organizations.[46] Taken to its logical conclusion, DOE's theory would mean that Congress likewise silently empowered many other entities such as the Department of Energy, Department of Labor, the Small Business Administration, the Department of Justice, the Department of Housing and Urban Development, and the Chief Administrative Officer of the House of Representatives to step into the IRS's shoes—evaluating nonprofit compliance with all state and federal laws as a predicate to conferring statutory benefits.[47]

Although it disclaims any authority to alter an organization's tax-exempt status, DOE has deliberately positioned itself as a parallel enforcer of tax-law standards, effectively stepping into the shoes of the IRS. Justifying the need for DOE action, the Rule notes that "the IRS has resource constraints . . . and must exercise some degree of prosecutorial discretion" which "means that, at least at times, the illegality doctrine will be underenforced."[48]

---

[45] Rule, 90 Fed. Reg. at 48972.

[46] *Id*. at 48971, 48972.

[47] *See, e.g.,* 42 U.S.C. § 18832 (establishing a pilot program at the Department of Energy to award grants to provide buildings operated by 501(c)(3) organizations with energy-efficiency materials); 38 U.S.C. § 4104A(f)(2) (conditioning grants for veteran skills training on 501(c)(3) status); 15 U.S.C. § 636 (a)(36) (limiting Small Business Administration Paycheck Protection Program eligibility to 501(c)(3) organizations); 34 U.S.C. § 12291(b)(15)(B)(i) (conditioning Department of Justice grants to prevent domestic violence on 501(c)(3) status); 12 U.S.C. § 1701x(h)(4) (limiting Housing and Urban Development financial assistance for housing counseling to 501(c)(3) organizations); 2 U.S.C. § 5540 (authorizing the Chief Administrative Officer of the House of Representatives to dispose of used or surplus furniture and equipment to 501(c)(3) organizations))

[48] *Id.* at 48974.

The Rule is also explicit that DOE purports to enforce tax law standards normally entrusted to the IRS. The Rule "uses established legal definitions and works in tandem with the IRS."[49]

It is well established that Congress left questions of charitable status and enforcement of the illegality doctrine to the IRS, with its investigatory powers, established precedent and clear procedures.[50] DOE's assumption of the authority to make and publicize determinations applying the tax law standards will cloud the tax-exempt status of any affected organization. In practice, even a public investigation suggesting that a nonprofit has an "illegal purpose" would deter donors and threaten the organization's ability to carry out its public service mission.

## CONCLUSION

The Rule is contrary to the clear text and structure of the HEA, which qualifies tax exempt employers like *Amici* for PSLF. The HEA leaves DOE no room to step into the shoes of the IRS and the courts to interpret tax law, tort law, federal discrimination laws, and many others to limit the statutory scope of PSLF. By replacing Congress's bright-line rule with vague standards and selective-investigation mechanisms, DOE injects uncertainty into a program designed to encourage decade-long commitments to public service.

*Amici* respectfully urge the Court to hold the Rule unlawful and set it aside. Doing so will preserve the predictable, viewpoint-neutral framework Congress enacted; protect borrowers' ability to commit to public service; and prevent the Department from using PSLF as a discretionary tool to pressure or punish disfavored nonprofit organizations and the employees who serve the public through them.

---

[49] *Id*. at 48976; *see also id*. at 48975 ("[T]he illegality doctrine can clearly be applied in scenarios outside of just those where the IRS has utilized it in the past. . . .").
[50] *Bob Jones University*, 461 U.S. at 596–97 (explaining that "the responsibility for construing the Code falls to the IRS.")

Date: February 24, 2026

Respectfully submitted,

By: */s/ Margaret M.A. Nivison*_____
Margaret M.A. Nivison, BBO No. 699047
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Phone: (617) 850-1727
Email: mnivison@clf.org

*/s/ D.J. Gerken*
D.J. Gerken
Kimberley Hunter
Hannah Klaus
Southern Environmental Law Center
136 East Rosemary Street, Suite 500
Chapel Hill, NC 27514
Phone: (919) 967-1450
Email: kmeyer@selc.org
          djgerken@selc.org
          hklaus@selc.org

*Counsel for Amici*
*Chesapeake Bay Foundation, CleanAIRE NC,*
*Conservation Law Foundation, Dogwood Alliance,*
*Earthjustice, Georgia Interfaith Power & Light,*
*Greater Greener Gloster Project, MDC,*
*MountainTrue, Natural Resources Defense Council,*
*North Carolina Justice Center, Organized*
*Uplifting Resources & Strategies, Protect Our*
*Aquifer, Southern Alliance for Clean Energy,*
*Southern Coalition for Social Justice, Southern*
*Environmental Law Center, and Waterkeeper Alliance*

*/s/ Robert Michaels*_____
Robert Michaels
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 795-3713
rmichaels@elpc.org

*Counsel for Amici*
*Environmental Law & Policy Center*

21

## CERTIFICATE OF SERVICE

I, Margaret Nivison, certify that this document was filed through the CM/ECF system on February 24, 2026, and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

*/s/ Margaret Nivison*_____
Margaret Nivison