# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL COUNCIL OF )
NONPROFITS, et al., )
 )
        *Plaintiffs*, )
 )
v. )    Case No.: 25-CV-13242-MJJ
 )
LINDA MCMAHON, et al., )
 )
        *Defendants*. )

**[PROPOSED] BRIEF OF *AMICUS CURIAE* THE LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW AND AMERICAN CIVIL LIBERTIES UNION
<u>IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTERESTS OF AMICI ............................................................................................... 1

INTRODUCTION ...................................................................................................... 2

ARGUMENT ............................................................................................................. 4

   1.   The Rule is Unconstitutionally Vague and Susceptible to Arbitrary
      and Discriminatory Enforcement Against Organizations Engaged in
      Racial Justice Advocacy, Threatening to Significantly Undermine
      Their Critical Work ............................................................................................ 4

   2.   The Rule Will Harm Black People Who Engage Heavily in Public
      Service Careers ................................................................................................ 12

      A.    Black People Hold a Disproportionate Share of PSLF-Eligible Jobs .................. 12

      B.    PSLF-Eligible Public Sector Jobs Are a Critical Tool for Tackling
            the Racial Wealth Gap ................................................................................. 13

      C.    Black People Are Disproportionately Economically Vulnerable
            and Rely on Student Debt Relief like PSLF ..................................................... 16

CONCLUSION ....................................................................................................... 20

**INTERESTS OF AMICI**

The Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a nonpartisan civil rights organization founded in 1963 by the nation's leading lawyers at the request of President John F. Kennedy to secure equal justice for all through the rule of law by targeting the inequities confronting Black communities and other communities of color. The Lawyers' Committee uses legal advocacy to achieve racial justice and to ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. To that end, the Lawyers' Committee has participated as counsel or amicus curiae in cases addressing race, ethnicity, and national origin discrimination in a wide range of subjects, including education, employment, health care and fair housing. *See, e.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765 (11th Cir. 2024); *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327 (2020). Lawyers' Committee is committed to defending principles of diversity, equity, and inclusion ("DEI"). To that end, Lawyers' Committee has led litigation challenging government actions that threaten DEI programs nationwide, including to challenge the current administration's wide-ranging assault on lawful DEI programs. *See, e.g.*, *Chi. Women in Trades v. Trump*, 778 F. Supp. 3d 959 (N.D. Ill. 2025); *Freedom Network, USA v. Trump*, No. 25-cv-12419 (N.D. Ill.); *Nat'l Digit. Inclusion All. v. Trump*, No. 1:25-cv-03606 (D.D.C.).

American Civil Liberties Union ("ACLU") has been our nation's guardian of liberty, working in courts, legislatures, and communities to defend and preserve the individual rights and liberties that the Constitution and the law of the United States guarantee to everyone in the country for over 100 years. With more than six million members, activists, and supporters, the ACLU is a nationwide organization that fights tirelessly in all 50 states, Puerto Rico, and Washington D.C. for the principles of liberty and equality. Relevant here, the ACLU is dedicated to upholding racial

equality and combatting racism in all forms, including discrimination in education, housing, fair lending, policing, the criminal justice system, racial profiling, abusive debt collection practices, and indigenous justice. In support of these principles, the ACLU has long led litigation challenging unconstitutional attempts to treat DEI efforts as unlawful in schools and research, including the recent government assault on lawful programs that incorporate values of diversity, equity, and inclusion.[1] *See, e.g.*, *Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025).

## INTRODUCTION

*Amici* urge the court to grant Plaintiffs' motion for summary judgment. The final rule at 34 C.F.R. § 685.219 (the "Rule"), which effectuates Executive Order ("EO") 14235, threatens to upend and unconstitutionally politicize the Public Service Loan Forgiveness ("PSLF") program. The PSLF program, a bipartisan piece of legislation enacted by Congress nearly 20 years ago, was designed to incentivize public service and ensure that public sector workers—including nurses, first responders, teachers, social workers, government employees, and public interest lawyers, many of whom serve our most vulnerable communities, can work in less lucrative positions without fear of debilitating student loan debt. Yet EO 14235 baselessly claims that the "PSLF program has misdirected tax dollars into activist organizations that . . . fail to serve the public interest . . . [and] harm . . . American values, sometimes through criminal means."[2] The accompanying fact sheet by the White House claims that the Executive Order aims to end "taxpayer-funded loan forgiveness for anti-American activists" and refocus taxpayer dollars away

---

[1] *See also Pernell v. Fla. Bd. of Governors of State Uni. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeals docketed*, Nos. 22-13992, 22-13994 (11th Cir. 2022); *Local 8027 v. Edelblut*, No. 21-cv-1077, 2024 WL 2722254 (D.N.H. 2024), *appeal docketed*, No. 24-1690 (1st Cir. 2024); *Black Emergency Res. Team v. Drummond*, 737 F. Supp. 3d 1136 (W.D. Okla. 2024), *appeals docketed*, Nos. 24-6139, 24-6140, 24-6141 (10th Cir. 2024).
[2] Exec. Order No. 14235, 90 Fed. Reg. 11885, 11885 (2025).

from activist groups and criminals.[3]

The Rule vests the Secretary of Education with the sole authority to disqualify an otherwise eligible government or 501(c)(3) nonprofit employer from the PSLF program upon a determination that the employer engaged in activities with a "substantial illegal purpose."[4] If an employer is deemed ineligible for PSLF, employees cannot count employment for that organization towards the required 120 qualifying payments and likely will leave for higher paying jobs to manage their student debt. *Amici* are greatly concerned that the new Rule would severely hinder the ability of nonprofit employers whose views the Administration does not agree with to recruit and retain the diverse talent they need to carry out their mission-driven work.

This vague, standardless rule violates basic precepts of constitutional law and, if implemented, would have profound negative implications for Black student loan borrowers in public sector service jobs who are more likely to carry school debt than white borrowers, and non-profit organizations nationwide that engage in impact litigation, advance policy advocacy, and provide critical services for and on behalf of our country's most marginalized communities.

PSLF is operating as Congress intended, with more than one million workers availing themselves of the PSLF program since its creation.[5] And it is a program that Black student loan recipients, who are overrepresented in PSLF-eligible public sector and nonprofit jobs, benefit from tremendously. The same is true for eligible public sector and non-profit civil rights organizations, including those combatting racial discrimination, whose work depends on attracting top talent with the promise of student loan forgiveness.

---

[3] White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://tinyurl.com/rryc8tbp.
[4] William D. Ford Federal Direct Loan (Direct Loan) Program, Dep't of Educ., 90 Fed. Reg. 48966, 49001 (Oct. 31, 2025).
[5] *See*, *e.g.*, Amir Daftari, *One Million Public Service Workers Debt-Free Under Biden's Loan Forgiveness*, Newsweek (Oct. 17, 2024), https://tinyurl.com/6p3pc92n.

The PSLF program includes as "qualifying employer[s]" all 501(c)(3) non-profit organizations and U.S.-based federal, state, and local government entities. The Internal Revenue Service ("IRS") already enforces the "illegality doctrine" when determining organizations' 501(c)(3) status. *Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983) (explaining that in limited circumstances, the IRS may revoke the tax-exempt status of 501(c)(3) organizations if their purpose is "illegal or violate[s] established public policy"). The Rule does not provide objective standards and instead gives the Secretary discretion to determine "substantial illegality." This standardless delegation creates a very real risk that the Secretary will deem ineligible organizations with views it disfavors.

The Constitution proscribes any governmental enactment that is so vague and standardless that it fails to give notice and encourages discriminatory and arbitrary enforcement. This Rule, which is poorly defined and difficult to administer fairly runs afoul of this standard—and it lays bare the Administration's intent to impermissibly and significantly narrow the class of eligible PSLF employers and weaponize the Department of Education to severely undermine the lawful provision of services and advocacy with which it disagrees.

If upheld, the Rule will worsen existing racial and economic disparities. PSLF is a vital tool for closing the racial wealth gap in this Country. The program, aimed at ensuring the most talented Americans can afford to enter public service and work for nonprofit civil rights advocacy organizations like *amici*, should not be subject to the ideological winds of the day. The Court should vacate the Rule and grant the declaratory and injunctive relief Plaintiffs seek.

## ARGUMENT

1. **The Rule is Unconstitutionally Vague and Susceptible to Arbitrary and Discriminatory Enforcement Against Organizations Engaged in Racial Justice Advocacy, Threatening to Significantly Undermine Their Critical Work.**

The Rule violates the Constitution because it is vague and lacks articulated standards, failing to provide notice to PSLF-eligible employers and borrowers and encouraging discriminatory enforcement that risks violating the First Amendment by imposing viewpoint-based restrictions. This is particularly troubling where the Administration has elsewhere declared broadly that DEI programs are illegal.[6] *Amici* are concerned that the Rule threatens to undermine their work and that of other organizations similarly engaged in racial justice work.

The Rule is unconstitutionally vague in violation of the Fifth Amendment Due Process Clause because it fails to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), and "is so standardless that it authorizes or encourages seriously discriminatory enforcement," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (internal quotation omitted). To satisfy due process, the government must inform "regulated parties . . . what is required of them so they may act accordingly," and do so with "precision and guidance. . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id*. at 253. These concerns apply with particular force where, as here, a vague regulation implicates the speech rights of regulated parties. A more stringent test applies in these circumstances because "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of that forbidden area were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up). The Rule does not meet either of these requirements. It instead blurs the line between prohibited and permissible conduct, allows for

---

[6] *See e.g.,* Exec. Order No. 14173, 90 Fed. Reg. 8633 (2025) (broadly proclaiming DEI and DEIA violate federal civil rights laws); Letter from Craig Trainor, Acting Assistant Sec'y for C.R., Dep't of Educ., to Colleagues (Feb. 14, 2025) (Department of Education letter asserting that DEI programs and initiatives could constitute racial discrimination in violation of federal law and threatening to strip federal funding), https://tinyurl.com/h9b83jst [https://perma.cc/5CCS-MTB5]; Letter from Andrea Lucas, Acting Chair, U.S. Equal Emp. Opportunity Comm'n, to 20 law firms (Mar. 17, 2025) (seeking information from law firms for their efforts to advance diversity, equity, and inclusion in the workplaces and threatening enforcement action), https://tinyurl.com/mr275nx3. *See also infra* pp. 7-10 (discussing court decisions rejecting the Administration's flawed interpretation of the relationship between DEI and federal civil rights laws).

arbitrary and discriminatory enforcement, and creates "an impermissible risk of suppression of ideas." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

The Rule allows the Secretary of Education to selectively disqualify nonprofits from participating in the PSLF program based on nothing more than the Secretary's determination that the nonprofit has an alleged "substantial illegal purpose." 34 C.F.R. § 685.219(b). The Administration does little to define the term "substantial illegal," despite receiving extensive feedback from organizations during the rulemaking process that the Rule neglected to identify what activities could disqualify them from participation.[7] Hardly responding to those concerns, the Administration added a non-exhaustive and undefined list of activities that could lead to disqualification under the Rule. Engaging in "a pattern of aiding and abetting illegal discrimination" was among the activities listed, without explanation. 34 C.F.R. § 685.219(b)(30)(v). Absent a definition of "substantial illegal" and "aiding and abetting illegal discrimination," existing PSLF-eligible nonprofits do not have a reasonable opportunity to know what conduct is prohibited. The Rule is unclear and does not offer the "precision and guidance" necessary to ensure that the Rule is not applied in a discriminatory or arbitrary way. *See Fox Television Stations*, 567 U.S. at 253.

The process by which the Secretary disqualifies a nonprofit organization is equally opaque. The Rule states that the Secretary determines whether an organization has engaged in activities with a "substantial illegal purpose," by "considering the materiality of any illegal activities or actions," 34 C.F.R. § 685.219(h), and the Department has stated that the Secretary will "weigh the

---

[7] *See, e.g.*, Lawyers' Comm. for C.R. Under Law, Comment Letter in Response to the Dep't of Educ.'s Proposed Rulemaking to Amend the Regul. of the Public Serv. Loan Forgiveness Program under 34 C.F.R. § 685.219, Docket ID ED-2025-OPE-0016-7221, at 3-4 (Sept. 17, 2025), https://tinyurl.com/4btv4tww; Coalition of 64 Civil and Human Rights Organizations, Comment Letter regarding same, at 2-4 (Sept. 17, 2025), https://tinyurl.com/mdn74e6z; NAACP Legal Defense and Educational Fund, Inc., Comment Letter regarding same, at 5 (Sept. 17, 2025), https://tinyurl.com/bdzhekmj.

frequency in which [illegal activities] have occurred and the seriousness of the offense[s]." 90 Fed. Reg. 48966, 48988 (2025). Nowhere does the Rule explain how it will make determinations as to illegality and "seriousness." Indeed, it is unclear what "illegal" means in the context of the Rule, given that 501(c)(3) status, the only eligibility criterion in the PSLF statute, is determined by the IRS. Without any objective standards, there is a very real risk that the Secretary will make disqualification decisions that are inconsistent, opaque, and ideologically motivated. In short, it is all but unavoidable that the Department will "shap[e] a vague [rule's] contours through [its] enforcement decisions,"—an approach that is inconsistent with the Constitution's protection against vagueness. *Sessions v. Dimaya*, 584 U.S. 148, 182 (2018) (Gorsuch, J. concurring).

Given the Administration's extensive censorship and targeting of groups engaged in lawful programs that espouse diversity, equity, and inclusion principles, there is reason to believe that the Administration will similarly weaponize the Rule to deem ineligible organizations that engage in civil rights advocacy and tackle discrimination on behalf of Black communities, communities of color, and other marginalized communities. The Administration's own past actions indicate as much, as the Administration has baselessly accused entities and individuals of being anti-American activists engaging in illegal activity if their work is at odds with the Administration's agenda.[8] For example, numerous courts have struck down Executive Orders that purported to sanction law firms that had represented clients or causes with which the Administration disagreed.. *See, e.g.*, *Perkins Coie LLP v. Dep't of Just.*, No. 25-CV-716, 2025 WL 1276857, at *49 (D.D.C. May 2, 2025)

---

[8] *See e.g.,* Letter from Andrea Lucas, Acting Chair, U.S. Equal Emp. Opportunity Comm'n, to 20 Law Firms (Mar. 17, 2025), https://tinyurl.com/mr275nx3 (seeking information from law firms for their efforts to advance diversity, equity, and inclusion in the workplaces and threatening enforcement action), Exec. Order No. 14235, 90 Fed. Reg. 11885 (2025) (indicating that the PSLF program has misdirected tax dollars into activist organizations that fail to serve the public interest and harm American values, sometimes through criminal means); White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025), https://tinyurl.com/rryc8tbp (indicating that E.O. 141235 aims to end "taxpayer-funded loan forgiveness for anti-American activists" and that it aims to refocus taxpayer dollars away from activist groups and criminals.).

(permanently enjoining Executive Order targeting law firm for representing clients and causes disfavored by the Administration), *appeal docketed*, No. 25-5241 (D.C. Cir. 2025); *Jenner & Block LLP v. Dep't of Just.*, No. 25-CV-916, 2025 WL 1482021, at \*26 (D.D.C. May 23, 2025) (same); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, No. 25-CV-917, 2025 WL 1502329, at \*33-34 (D.D.C. May 27, 2025) (same); *Sussman Godfrey v. Exec. Off. Of President*, No. 25-CV-1107, 2025 WL 1779830, at \*28 (D.D.C. June 27, 2025) (same); *see also* Letter from Democracy Forward to Att'y Gen. Bondi, Dep't of Just. (Apr. 2, 2025), https://tinyurl.com/28cph2wx.

In similar circumstances, courts have barred this Administration from conditioning eligibility for government programs on its own generalized assumption that all DEI policies violate federal civil rights laws. In *Washington State Association of Head Start v. Kennedy*, for example, a federal district court enjoined a Trump EO aimed at disqualifying federal funding for any Head Start program that, among other things, operates DEI programming or, in the Administration's words, other programs that "advance[e] or promot[e] . . . discriminatory equity ideology in violation of Federal anti-discrimination laws." No. C25-781-RSM, 2026 WL 35858, at \*2, \*10, \*13 (W.D. Wash. Jan. 6, 2026). There, as here, the federal government contended that the Order "merely emphasize[d]" existing federal anti-discrimination requirements. The Court found the argument was contradicted both by the record and common sense, holding that the EO did not simply require that grant recipients comply with federal anti-discrimination laws; rather, "the Order was meant to advance the Trump Administration's own interpretation of 'discrimination' through the threat of the loss of federal funding and/or F[alse] C[laims] A[ct] investigations and penalties." *Id*. at \*10.

In *American Federation of Teachers v. Department of Education*, the district court vacated

guidance issued by the Department of Education regarding DEI practices in schools, finding it was "textbook viewpoint discrimination." 796 F. Supp. 3d 66, 106-07, 111-13 (D. Md. 2025) (indicating the agency's contrary interpretation lacked factual basis, conflicted with regulations and caselaw, exceeded agency authority, and was contrary to constitutional rights). The court explained that the Department of Education's guidance letter "says to teachers and schools 'if you engage in DEI practices we deem impermissible, you will be punished' but does not provide any clarity on what DEI practices are impermissible." *Id.* at 117. The court added that though the "government strains to argue the Letter only targets discriminatory conduct, and does not reach speech at all," the government's repeated promise that its enforcement is consistent with the First Amendment "rings empty." *Id.* at 111. The Department conceded vacatur, effectively recognizing the unconstitutionality of the guidance. *See Nat'l Educ. Assoc. v. Dep't of Educ.*, No. 25-cv-00091, Dkt. No. 99, Joint Motion to Dismiss (D.N.H. Feb. 3, 2026).

Likewise, *Chicago Women in Trades ("CWIT") v. Trump* involved a challenge to a Trump EO that sought to terminate federal funding for all "DEI" and "equity-related" grants without ever defining those terms. 778 F. Supp. 3d 959 (N.D. Ill. 2025). A federal district court issued a preliminary injunction enjoining the Department of Labor from (1) requiring federal grantees nationwide to certify that they do not operate DEI programs as a condition for receiving federal funding and (2) cancelling the CWIT's federal grant. *Id.* at 984-85. As the court put it when analyzing the anti-DEI language in the EO, the answer to what the Administration considers illegal with respect to diversity, equity, and inclusion is "anything but obvious" since the Administration's "view of what is illegal . . . has changed significantly . . . even though the government . . . has been unwilling to . . . define how it has changed." *Id.* Indeed, the Administration's refusal to define what is "illegal" under the Rule leaves its meaning "entirely to . . . imagination." *Id.*; *see also City of*

*Chi. v. Dep't of Just.*, No. 25 CV 13863, 2026 WL 114294, at *6 (N.D. Ill. Jan. 15, 2026) (rejecting the government's argument that prohibitions on DEI in funding conditions comport with federal anti-discrimination laws and concluding that such conditions appear contrary to anti-discrimination laws).

As courts have repeatedly recognized, this Administration's claims that its actions are intended to root out illegal conduct and unlawful discrimination ring hollow. There is extensive evidence that the Administration's goal is instead to suppress efforts to promote diversity and equity, even if those efforts are lawful and advance the goals of anti-discrimination laws. *See Freedom Network,* No. 25-cv-12419, Am. Compl. Dkt. No. 69 ¶¶ 21, 102, 111-25 (N.D. Ill. Feb. 6, 2026) (collecting examples of efforts to censor activities and expression disfavored by the current Administration). Indeed, following the issuance of Trump's anti-DEI Executive Orders, the Department of Justice published to federal grant recipients a list of prohibited words not to appear in any grant recipients' materials because those words conflict with the Administration's EOs. Included in that list were words used in everyday conversation, such as: "fair," "fairness," "pronouns," "identity," "equitable," "gender," and "culture." The Department of Justice further demanded that federal grant recipients not use these prohibited words on their own websites, training materials, or presentations, revealing the true reason for the Administration's actions: to banish and punish expression with which it disagrees. *Id.*, Dkt. No. 69-3, Ex. C to Am. Compl. (Feb. 6, 2026).

To be clear, efforts to combat discrimination and advance equal opportunity *are not* discrimination. Enacted in this context, the Rule gives organizations ample reason to believe that the Secretary will view lawful practices advancing diversity, equity, and inclusion to be "illegal." And the Rule gives the Secretary broad leeway to decide what programs are "illegal" or have a

"substantial illegal purpose," with virtually no notice to impacted organizations. The Rule does not need to explicitly identify DEI or other equity programs by name to make this threat real. The text of the Rule is vague by design, empowering the Secretary to unlawfully target organizations whose work she disfavors. As the Administration's prior actions suggest, the Rule will be used to advance the Administration's own faulty interpretation of discrimination to fit its agenda.

Unjust enforcement of the Rule would have significant negative effects on both those organizations and the communities they serve. And the Administration appears to not only concede this outcome but desires it. In its view, the Rule is the "kind of deterrence [that] is appropriate" to dissuade borrowers from working at "activist groups" or nonprofits that do work with which the Administration disagrees. 90 Fed. Reg. at 40169; Compl., Dkt. No. 1 ¶ 76. As the Department acknowledges, a majority of both public sector and private sector employees make "job decisions based on their student loan debt levels," and public service employees in particular "cited PSLF as a significant factor in their decision to pursue and remain in public service." 90 Fed. Reg. at 40169. Without the PSLF program, many would be unable to afford to work in public service and would be forced to leave their jobs and the communities they serve for work in the private sector. The Rule's vagueness denies fair notice and allows for arbitrary and discriminatory enforcement in violation of the Due Process Clause.

Similar to the plaintiffs in the lawsuits challenging the anti-DEI executive policies, current PSLF-eligible employers will struggle to know what activities the Administration deems to be "aiding and abetting illegal discrimination" in violation of the Rule. And any discriminatory enforcement of the Rule focused on civil rights organizations *lawfully* advancing civil rights would have devastating consequences for communities still facing the systemic effects of deeply entrenched racism and discrimination.

**2.  The Rule Will Harm Black People Who Engage Heavily in Public Service Careers**

Beyond its constitutional infirmities, the Rule threatens to upend a program that has served Black communities for decades. Black people disproportionately dedicate their careers to public service in PSLF-eligible employment. In part because of the United States' long history of racial discrimination in private sector employment, Black people are overrepresented in government and nonprofit jobs. These positions offer fair pay, robust benefits, and protections against discrimination, providing a critical pathway to economic stability and the middle class. Many of these jobs, however, require a college degree or higher—an expense that for many is only manageable because of PSLF. By erecting new barriers to PSLF-eligible employment and constricting the list of existing eligible employers, the Rule will compound preexisting income and wealth inequality for Black people.

**A.  Black People Hold a Disproportionate Share of PSLF-Eligible Jobs**

The two main categories of PSLF-eligible jobs—501(c)(3) nonprofit organizations and local, state, and federal governments—employ a disproportionate number of Black employees, compared to other types of employment. 501(c)(3) organizations comprise a large percentage of the total U.S. labor force. In 2024, nonprofits were the third-largest non-governmental employment sector nationwide.[9] In 2022 alone, more than 300,000 nonprofit organizations employed approximately 12.8 million workers—almost 10% of the private sector.[10]

Within the vast nonprofit sector, Black people hold as much as 24% of nonprofit jobs, despite comprising only around 12% of the overall U.S. workforce.[11] Black representation extends

---

[9] Independent Sector, *2024 Health of the U.S. Nonprofit Sector: Annual Review* 4, https://tinyurl.com/mryfmd2f.
[10] U.S. Bureau of Labor Stats., *Nonprofits Accounted for 12.8 Million Jobs, 9.9% of Private-Sector Employment, in 2022*, Econ. Daily (Aug. 16, 2024), https://tinyurl.com/395zy4wm.
[11] *Compare id.* (calculating 13% Black representation based on U.S. government data), *with* Cathleen Clerkin et al., *The State of Diversity in the U.S. Nonprofit Sector* 13 tbl. 1 (2024), https://tinyurl.com/2kb2wxza (calculating 24% Black representation based on independent survey).

across all levels of nonprofit employment; notably, approximately 15% of nonprofits are led by Black individuals.[12] The outsized representation of Black people holds true in the other main category of PSLF-eligible work: government jobs. Nearly 1 in 5 Black employees are employed in federal, state, and local governments.[13] As of March 2024, Black people comprised 18% to 19% of the federal workforce, despite representing approximately 12% of the population.[14] The numbers are similar at the state and local level.[15] Because Black Americans are more likely than others to hold positions that rely on PSLF, changes that restrict PSLF eligibility will necessarily disproportionately harm Black employees and their families. This harm is compounded for Black public sector employees, and particularly Black women, who have been disproportionately impacted by the Administration's deep cuts to federal employment in the past year.[16]

## B. PSLF-Eligible Public Sector Jobs Are a Critical Tool for Tackling the Racial Wealth Gap

Employment of Black people and other people of color in PSLF-eligible jobs in the public and nonprofit sectors is a critical tool for reducing the racial wealth gap in the United States. Longstanding structural discrimination has severely limited Black families' access to wealth-building opportunities, making available pathways to economic stability—such as public sector

---

[12] Clerkin, supra *note* 11, at 20.

[13] Michael Madowitz et al., *Public Work Provides Economic Security for Black Families and Communities*, Ctr. for Am. Progress (Oct. 23, 2020), https://tinyurl.com/6a438pxh.

[14] Drew DeSilver, *What the Data Says About Federal Workers,* Pew Rsch. Ctr. (Jan. 7, 2025), https://tinyurl.com/3zu6sr8y (reviewing federal statistics). This is the most recent available data and does not reflect the massive reduction of the federal workforce in 2025. *See* Alex Nowrasteh & Krit Chanwong, *DOGE Produced the Largest Peacetime Workforce Cut on Record, but Spending Kept Rising*, CATO Inst. (Dec. 17, 2025), https://tinyurl.com/mry4kktx; Belle Taylor-McGhee, *Trump-Era Federal Layoffs Hit Black Women Hardest*, Ms. Mag. (Feb. 5, 2026), https://tinyurl.com/yctkchs2.

[15] *See* Monique Morrissey & Jennifer Sherer, *Unions Can Reduce the Public-Sector Pay Gap*, Econ. Policy Inst. (Mar. 14, 2022), https://tinyurl.com/2arbjvkw.

[16] Erica L. Green, *In Trump's Federal Work Force Cuts, Black Women Are Among the Hardest Hit*, N.Y. Times (Aug. 31, 2025), https://tinyurl.com/dmf2cerr (indicating that Black women are employed at nearly double the rate in the federal work force than in the labor force overall, and explaining that the government agencies that were targeted for the deepest cuts had employed the highest percentages of women and people of color); Mitchell Hartman, *Government Job Cuts Have Disproportionate Effect on Black Federal Workers*, Marketplace (May 21, 2025), https://tinyurl.com/5kdaax25 (concluding that cuts to the federal government had a "particular impact" on Black civil servants).

and nonprofit employment—especially consequential. By reducing a key financial barrier to entering and remaining in these careers, PSLF plays an essential role in narrowing persistent racial wealth disparities.

The racial wealth gap is both large and enduring. For much of U.S. history, Black people were systematically excluded from the primary means of wealth-building by government-sanctioned policies including redlining, restrictive covenants, lending discrimination, and encouragement of neighborhood segregation.[17] Additionally, Black students did not have access to the GI Bill's education benefits and faced resistance to integration in higher education.[18] These historic inequities compounded over generations, leaving Black households today with a fraction of the wealth of white households.[19] As a result, average white household wealth is roughly seven times higher than average Black household wealth, and median white wealth is approximately twelve times higher than median Black wealth.[20]

Nonprofit and public sector jobs provide Black people pathways to economic stability that help narrow these persistent disparities. These jobs generally offer decent pay, health care and benefits, retirement security, and relative job stability.[21] As a result, the racial wealth gap is substantially smaller in the public sector than in other industries: while white households hold approximately $10 in wealth for every $1 held by Black households in the private sector, the ratio narrows to approximately $2 to $1 in the public sector.[22] Together, these benefits help insulate

---

[17] Jamie Smith Hopkins, *The Racist History that Helps Explain Our Present Wealth Gap*, Ctr. for Pub. Integrity (Mar. 15, 2022), https://tinyurl.com/u6udvm7u.

[18] Ctr. for Responsible Lending & Nat'l Ass'n for the Advancement of Colored People, *Quicksand: Borrowers of Color & the Student Debt Crisis*, Lumina Found. (July 2019), https://tinyurl.com/2hxw3uft [hereinafter *Borrowers of Color*].

[19] *See* Jon Huntley & Victoria Osorio, *Inheritances by Race*, Penn Wharton Budget Model (Dec. 17, 2021), https://tinyurl.com/2zkubxxz (determining that white households inherit about five times more than Black households).

[20] Janelle Jones, *The Racial Wealth Gap,* Econ. Policy Inst. (Feb. 13, 2017), https://tinyurl.com/5jssr554.

[21] Madowitz, *supra* note 13.

[22] *Id.* at 2, 11 tbl. 1.

Black families from economic shock and provide a durable pathway to the middle class.

One critical way public sector employment enables Black people to accumulate wealth is through expanded access to retirement benefits. More than one third of PSLF-eligible nonprofits, including *amici*, offer retirement plans with employer contributions.[23] Additionally, many government jobs offer defined-benefit pension plans that guarantee lifetime income upon retirement. Up to 92% of state and local government workers have access to these plans.[24] Public sector workers may also have access to 401(k)-style defined-contribution plans in addition to pensions, providing more opportunities for long-term investment.[25] These benefits have a particularly significant impact for Black employees. A recent study of California public employees found that Black employees were nearly twice as likely to participate in a retirement plan (typically a pension plan) when employed in the public sector.[26] Because fewer than 5% of Black households hold stocks, employer-provided retirement plans serve as the primary means by which many Black families access financial markets and build long-term wealth.[27]

Black people in nonprofit and public sector jobs are also more likely than their private sector counterparts to benefit from union membership. Union jobs "are highly beneficial to employees—and Black employees in particular—in a number of ways."[28] Unions promote job stability by protecting workers from arbitrary termination and by guaranteeing paid leave, enabling workers to navigate major life events without risking job loss.[29] Nonwhite union members hold almost five times the median wealth of their nonunion counterparts and are more than 50% more

---

[23] *See* Independent Sector, *Workforce* (2025), https://tinyurl.com/4r6v548y.
[24] David Zook, *How Do Retirement Plans for Private Industry and State and Local Government Workers Compare?*, U.S. Bureau of Labor Stats. (Jan. 2023), https://tinyurl.com/3e8t4aym.
[25] Madowitz, *supra* note 13, at 7–8.
[26] Nari Ree, *Public Pensions Support Race, Class, and Gender Equity in California*, U.C. Berkeley Labor Ctr. (Sept. 13, 2023), https://tinyurl.com/2r3v3teu.
[27] Madowitz, *supra* note 13, at 7–8.
[28] *Id*. at 8.
[29] *Id.*

likely to own their own home.[30] These union-related benefits further underscore how public and nonprofit employment—and the PSLF program that makes such careers financially viable—are critical pathways to economic security for Black families.

Public interest and public service jobs—and the economic benefits and stability they provide—are accessible to many individuals only because of PSLF. Higher education is a prerequisite for many of these positions. An astounding 70% of people in the nonprofit sector have a college degree.[31] Federal employees also have more education than the general public, with more than 55% being college graduates.[32] PSLF makes these degrees more affordable for Black people who commit to public service, enabling access to economic security, wealth-building opportunities, and benefits from which Black families have historically been excluded.

### C. Black People Are Disproportionately Economically Vulnerable and Rely on Student Debt Relief like PSLF

PSLF is a critical tool for all Americans engaged in public service careers, but particularly for lower-income Black borrowers who—due to racial disparities in wealth—rely more heavily on student loans and often have more difficulty repaying them.[33] As *amici* explained, *supra* p. 13, structural racism and pervasive discrimination create a wealth gap that begins at birth and endures through generations. Black women, who face racism *and* sexism, are uniquely disadvantaged because they obtain undergraduate and graduate degrees at the highest rates.[34]

Because, due to structural racism, Black families have lower household income and less

---

[30] Christian E. Weller & David Madland, Ctr. for Am. Progress, Union Membership Narrows the Racial Wealth Gap for Families of Color 4–5 (2018), https://tinyurl.com/e62jraxm.

[31] Independent Sector, *supra* note 9, at 5.

[32] Celine McNicholas & Patrick Oakford, *A Snapshot of the Federal Workforce that is Now Under Attack from the Trump Administration,* Econ. Policy Inst. (Feb. 21, 2025), https://tinyurl.com/fnrk9eny.

[33] Jason N. Houle & Fenaba R. Addo, *Racial Disparities in Student Loan Debt and the Reproduction of the Fragile Black Middle Class*, 5 Socio. Race & Ethnicity 562, 563 (2019), https://tinyurl.com/rh8wd2xj; *Borrowers of Color, supra* note 18, at 7.

[34] Khandice Lofton, *Deep Dive: The State of the Student Debt Crisis for Black Women*, Student Prot. Borrower Ctr. (June 19, 2024), https://tinyurl.com/3jtyvb9y.

wealth than their white peers, Black students are more likely than other racial groups to borrow for their education.[35] "Over half of all families with [Black] heads of household aged 25–40 have student debt, and 85% of [Black] graduates in 2016 took on debt to finance their undergraduate degree."[36] Four years after graduation, Black college graduates tend to carry about $25,000 more in student loan debt than white college graduates.[37] Additionally, Black borrowers who are eligible for PSLF have debt balances that are over $9,000 more than white borrowers.[38] Research analyzing 2022 PSLF reforms suggested that Black borrowers could expect to receive 22% of immediate relief while they were only 18.1% of borrowers.[39]

The racial loan disparity persists across undergraduate and graduate education. Black women have the most student debt of any group a year after completing a bachelor's degree.[40] Black women have nearly double the graduate loan debt than their white woman counterparts 12 months after graduation.[41] Only 14% of Black graduates completed their bachelor's degree without student loan debt, compared to 29% of the total number of graduates.[42] One third of Black college graduates accumulated at least $40,000 in debt, compared to 18% of all college graduates.[43] Similarly, 43% of white master's degree recipients did not borrow student loans, compared to only 19% of their Black counterparts.[44] Black master's degree recipients were more likely to borrow

---

[35] Melanie Hanson, *Student Loan Debt by Race*, Educ. Data Initiative (Feb. 18, 2025), https://tinyurl.com/yckcrmkv.
[36] *Borrowers of Color*, *supra* note 18, at 7.
[37] Judith Scott-Clayton & Jing Li, *Black-White Disparity in Student Loan Debt More Than Triples After Graduation*, Brookings (Oct. 20, 2016), https://tinyurl.com/rs2rj6ak.
[38] Diego A. Barnes, Nathaniel Ruby & Sarah Turner, *Waivers for the Public Service Loan Forgiveness Program: Who Would Benefit from Takeup?* (Nat'l Bureau of Econ. Rsch. Working Paper No. 30208), https://tinyurl.com/yhhzc7s5.
[39] *Id.* at 15.
[40] Victoria Jackson & Brittani Williams, *How Black Women Experience Student Debt*, The Educ. Trust (Apr. 2022), https://tinyurl.com/2fmre7n7.
[41] *Id.*
[42] Sandy Baum, Am. Council on Educ. & The Andrew W. Mellon Found., Student Debt: The Unique Circumstances of African American Students 203 (2019), https://tinyurl.com/3nw6as9v.
[43] *Id.*
[44] *Id.* at 204.

larger amounts, with 16% borrowing $75,000 or more compared to only 7% of white students who obtained a masters' degree.[45] Further compounding these disparities, Black students are more likely to attend for-profit institutions, which are associated with higher levels of debt accumulation and high drop-out rates with limited labor market benefits.[46] Separately, a disproportionate percentage of Black students attend historically Black colleges and universities which award 26% of all bachelor's degrees and 32% of STEM degrees earned by Black students, but have been historically under resourced.[47]

Black students face more barriers to repaying student debt than students from other racial groups due to employment discrimination and racial wealth inequities.[48] Black college graduates may not reap the same economic benefits from a degree as white college graduates.[49] They "are less likely to obtain job offers, and receive offers for lower paying positions with fewer options for career advancements than white college graduates."[50] Once Black graduates enter the workforce, they earn 20% less than their white peers,[51] even when controlling for education level.[52] "Black women must obtain a bachelor's degree or higher to earn more than white men who

---

[45] *Id.*

[46] Houle & Addo, *supra* note 33, at 564.

[47] *See* United Negro Coll. Fund, HBCUs Punching Above Their Weight: A State-Level Analysis of Historically Black College and University Enrollment Data 4, 6 (2019), https://tinyurl.com/47purc2j.

[48] *See Borrowers of Color*, *supra* note 18, at 7; Amy Traub et al., *The Asset Value of Whiteness: Understanding the Racial Wealth Gap,* Demos (Feb. 6, 2017), https://tinyurl.com/y33vmdkm; Katie Nodjimbadem, *The Racial Segregation of American Cities Was Anything But Accidental*, Smithsonian (May 30, 2017), https://tinyurl.com/mr3n36mm.

These racial inequities in wealth persist today and have worsened in recent decades. A recent study noted that between 1983 and 2013, the median Black household wealth declined from $6,800 to $1,700 and the median Latino household wealth declined from $4,000 to $2,000, while the median White household wealth increased from $102,000 to $116,800. Dedrick Asante-Muhammad et al., Instit. of Pol'y Studs., The Road to Zero Wealth: How the Racial Wealth Divide Is Hollowing Out America's Middle Class 5 (2017), https://tinyurl.com/mrymdemx.

[49] Houle & Addo, *supra* note 33, at 564–65.

[50] *Id.* at 564.

[51] *See* Nat'l Ctr. for Educ. Stats., *Annual Earnings by Educational Attainment* (May 2022), https://tinyurl.com/3f48a373.

[52] Bureau of Labor Statistics data shows that median weekly earnings for Latino students with a bachelor's degree are only 83% of what white college graduates earn. Weekly median earnings for Black bachelor's degree holders are

have some college but no degree."[53]

Because of enduring wage discrimination and historic exclusion from generational wealth, Black borrowers have more difficulty repaying their student loans than other groups. On the whole, Black borrowers make less money than their white counterparts, yet carry higher monthly loan payments.[54] An astonishing 48% of Black borrowers owe more on their federal student loans than they initially borrowed four years after earning their bachelor's degrees, compared to only 17% of white borrowers.[55] A 2019 study found that the average Black student loan borrower still owed 95% of their original student loan amount two decades later, while white borrowers had paid off most of their student debt in the same window of time.[56] Given these difficulties of repayment on lower wages, it is no surprise that Black borrowers default on their student loans at higher rates than other racial groups. "[Black] bachelor's degree graduates are unable to afford their loans at five times the rate of white bachelor's degree graduates and are more likely to default than borrowers who never finish a degree."[57] In one study, 57% of Black women who were repaying student loans reported that they were unable to pay essential expenses like rent or mortgage within the past year.[58] Nearly 50% of Black borrowers default on their student loans within a 12-year period, more than twice the rate of their white peers.[59]

PSLF has, historically, helped mitigate racial disparities in student loan outcomes, which impede borrowers of color from securing financial stability and pursuing future educational and

---

only 79% of what white college graduates earn. Bureau of Labor Stats., *Median Weekly Earnings by Educational Attainment in 2014* (Jan. 23, 2015), https://tinyurl.com/4cmay5h8.
[53] Jackson & Williams, *supra* note 40, at 3.
[54] Hanson, *supra* note 35.
[55] White House Initiative on Educational Excellence for Afr. Ams., *Fact Sheet: Black College Graduates and the Student Debt Gap* (Nov. 2016), https://tinyurl.com/yd485h3r.
[56] Laura Sullivan et al., Instit. on Assets & Soc. Pol'y at Brandeis Univ., Stalling Dream: How Student Debt is Disrupting Life Chances and Widening the Racial Wealth Gap 4 (2019), https://tinyurl.com/yvsh4jrb.
[57] *Borrowers of Color*, *supra* note 18, at 7.
[58] Am. Ass'n of Univ. Women, *Deeper in Debt: Women and Student Loans* 2 (2017), https://tinyurl.com/yc7fevvm.
[59] Paul Fain, *Default Crisis for Black Student Borrowers*, Inside Higher Ed (Oct. 16, 2017), https://tinyurl.com/mr3r2s32.

professional prospects. In fact, "Black students finance their education through debt, and thus college degrees actually further contribute to fragility of the upwardly mobile Black middle class."[60] By forgiving all qualifying federal loans for dedicated public servants—regardless of the initial amount borrowed—PSLF evens the playing field for students who borrowed more because of discrimination-driven discrepancies in generational wealth.

## CONCLUSION

The Constitution requires the federal government to give employers and employees adequate notice of the requirements for PSLF eligibility. The Rule does not. Instead, it unconstitutionally arms the Secretary of Education with near-total discretion to disqualify otherwise eligible organizations because they disagree with the ideological agenda of the current Administration. As a result, the Rule gravely threatens the ability of people from historically underserved communities that have been divested of generational wealth, including Black communities and communities of color, to pursue and serve in critical public interest jobs. It also threatens to significantly impair the ability of organizations that serve Black communities and communities of color to recruit and retain top talent, further exacerbating existing barriers to justice. The Court should grant summary judgment to Plaintiffs for these reasons, and for the reasons detailed in Plaintiffs' brief.

---

[60] Andre M. Perry, Marshall Steinbaum & Carl Romer, *Student Loans, the Racial Wealth Divide, and Why We Need Full Student Debt Cancellation,* Brookings (June 23, 2021), https://tinyurl.com/mrx2heaa.

Dated February 24, 2026

Respectfully submitted,

*/s/ Maya A. Brodziak*

Leah Watson *
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St, 18th Flr
New York, NY 10004
lwatson@aclu.org
Tel: (212) 519-7855

Maya A. Brodziak (Mass. Bar No. 696480)
Sumayya Saleh *
Michael Pillera *
Freya Jamison *
Adria Bonillas *
Chavis Jones *
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
mbrodziak@lawyerscommittee.org
ssaleh@lawyerscommittee.org
mpillera@lawyerscommittee.org
fjamison@lawyerscommittee.org
abonillas@lawyerscommittee.org
cjones@lawyerscommittee.org
Tel: (202) 662-8600

*Attorneys for amici curiae*
*Lawyers' Committee for*
*Civil Rights Under Law and*
*American Civil Liberties Union*

*\* Application to appear*
*pro hac vice forthcoming*