**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| NATIONAL COUNCIL OF NONPROFITS *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-13242-MJJ |
| LINDA McMAHON *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-13244-MJJ |
| U.S. DEPARTMENT OF EDUCATION *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OF DECISION</u>**

June 30, 2026

JOUN, D.J.

The Public Service Loan Forgiveness ("PSLF") program was created as a quid pro quo. Many public service professions require educational training that imposes a substantial financial burden on those who complete it. The high levels of student loan debt associated with such training and the relatively low salaries afforded public service workers dissuade many from joining or

continuing in public service. Recognizing the need to encourage matriculation and retention in public service, Congress struck a bargain: the government promises to forgive the balance of a borrower's student loan in exchange for ten years of employment in a qualifying public service job and 120 loan payments.

Last year, as has happened numerous times before then, the Department of Education (the "Department") issued regulations concerning the PSLF program. The new rule, ostensibly promulgated in the name of efficiency, national security, and American values, seeks to disqualify employers from participating in the PSLF program by imposing additional conditions for eligibility. The most substantial change concerns the definition of "qualifying employer." Although the Department concedes that Congress defined which roles constitute a "public service job," it alleges that Congress did not also define the shorter term "public service" and therefore insists that its new regulations are needed to help determine whether a role, in fact, serves the public interest.

Twenty-two states, the District of Columbia, five cities and counties, five nonprofit employers, five employee associations, and more than one hundred amici challenge the lawfulness of the Department's new rule. Zero amici appeared in support of the defendants.

For the reasons set forth below, I agree with the challengers and hold that the Department's latest PSLF rule is unlawful.

## I.    BACKGROUND

### A.    Procedural History

Two related cases challenging the legality of the Department's new PSLF regulations were commenced on November 3, 2025: *Commonwealth of Massachusetts et al. v. U.S. Dept. of Educ. et al.*, No. 25-cv-13244 ("COM") and *National Council of Nonprofits et al. v. McMahon et al.*,

No. 25-cv-13242 ("NCN"). [COM, Doc. No. 1]; [NCN, Doc. No. 1][1]. Both actions are brought against the Department of Education and Linda McMahon in her official capacity as Secretary of Education (collectively, "Defendants"). [COM, Doc. No. 1]; [NCN, Doc. No. 1]. Both complaints allege the same causes of action for their first two counts: the Department's new PSLF regulations are contrary to law and in excess of statutory authority (Count One) and arbitrary and capricious (Count Two). [COM, Doc. No. 92 at ¶¶ 155–77]; [NCN, Doc. No. 46 at ¶¶ 253–76]. The NCN complaint also alleges the new PSLF regulations violate the First Amendment (Count Three). [NCN, Doc. No. 46 at ¶¶ 277–99].

On December 10, 2025, COM Plaintiffs and NCN Plaintiffs (collectively, "Plaintiffs") and Defendants submitted a joint briefing schedule, which I adopted. [COM, Doc. Nos. 81–82]; [NCN, Doc. Nos. 36–37]. Pursuant to that schedule, COM Plaintiffs and NCN Plaintiffs filed separate motions for summary judgment on February 13, 2026. [COM, Doc. No. 93]; [NCN, Doc. No. 48]. On March 13, 2026, Defendants filed a consolidated opposition and cross motion to dismiss or, in the alternative, for summary judgment.[2] [COM, Doc. Nos. 99–100]; [NCN, Doc. Nos. 109–110]. I heard arguments on the motions on June 3, 2026. [COM, Doc. No. 109]; [NCN, Doc. No. 121].

---

[1] On February 2, 2026, COM Plaintiffs and NCN Plaintiffs each filed an amended complaint on their respective dockets. [COM, Doc. No. 92]; [NCN, Doc. No. 46].

[2] Defendants filed their consolidated opposition and cross motion twice and on both dockets. *See* [COM, Doc. Nos. 99–100]; [NCN, Doc. Nos. 109–110]. To the best of my knowledge, the four pleadings are identical. For convenience, this decision refers to that collective pleading as "NCN, Doc. No. 110." Likewise, NCN Plaintiffs filed their reply in support of their motion for summary judgment and opposition to Defendants' consolidated pleading twice on the NCN docket. *See* [NCN, Doc. Nos. 112–113]. Those pleadings also appear to be identical. This decision will therefore refer to that collective pleading as "NCN, Doc. No. 112."

**B.**    <u>**The Department of Education**</u>

The history of the Department of Education is long and need not be recounted in full. Instead, focus is given to the various legislative acts that established the Department of Education and vested authority therein to administer certain programs.

The modern Department was created in 1979 through the Department of Education Organization Act ("DEOA"). Department of Education Organization Act of 1979 ("DEOA"), Pub. L. No. 96-88, 93 Stat. 668 (1979). Recognizing, among many other truths, that "education is fundamental to the development of individual citizens and the progress of the Nation;" "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality," "the American people benefit from a diversity of education settings," and "there is a need for improvement in the management and coordination of Federal education programs," Congress consolidated education functions previously administered by "a large number of Federal agencies" into a single Cabinet-level agency dedicated to education. *Id.*

The Department "administers and coordinates most federal assistance to education" by "implementing laws enacted by Congress" and "executing [the President's] education policies for the nation." *An Overview of the U.S. Department of Education: History and Purpose*, DEPT. OF EDUC. (May 8, 2026), https://www.ed.gov/about/ed-overview/overview-of-us-department-of-education-history-and-purpose.

The Higher Education Act of 1965 ("HEA") is one of the congressional schemes that the Department implements. Higher Education Act of 1965 ("HEA"), Pub. L. No. 89-329, 79 Stat. 1219 (codified at 20 U.S.C. §§ 1001, *et seq.*). At the time of its enactment, which predates the creation of the Department of Education, the HEA vested implementation responsibilities in officers of the Department of Health, Education, and Welfare. *See generally id.* at 1232–54, 1269.

However, when Congress passed the DEOA in 1979, it transferred "all functions of the Secretary of Health, Education, and Welfare and of the Department of Health, Education, and Welfare under . . . the Higher Education Act of 1965" to the Secretary of Education (the "Secretary"). Pub. L. No. 96-88, 93 Stat. 668, 677 (codified at 20 U.S.C. § 3441(a)(2)(C)).

The express purpose of the HEA is "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." HEA, Pub. L. No. 89-329, 79 Stat. 1219. Title IV of the HEA governs the administration of federal financial aid programs, including grants, loans, and work-study programs. *See* HEA, Pub. L. No. 89-329, 79 Stat. 1219 at 1232–54. At the time of its enactment, the only Title IV loan program under the HEA existed in Part B. *See generally* HEA, Pub. L. No. 89-329, 79 Stat. 1236–49. That program, known originally as the "Guaranteed Student Loan Program" and later as the "Federal Family Education Loan Program" or "FFEL Program," incentivized states and private lenders to issue student loans because they were backed by the federal government. *See generally id*.

In the 1990s, Congress established the William D. Ford Federal Direct Loan Program ("Direct Loan Program") in Part D of Title IV. Student Loan Reform Act of 1993, Pub. L. No. 103-66, 107 Stat. 312, 341 (1993) (codified at 20 U.S.C. § 1087e). As its name suggests, the Direct Loan Program permits the government to provide low-interest loans directly to students and/or their parents to help pay the costs of a student's education. *Id.* The FFEL Program and the Direct Loan Program coexisted until 2010, when the FFEL Program was discontinued. Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, 1074. Today, all new federal student loans are issued as Direct Loans. *Id.* at 177–78.

### 1.    **Creation of the PSLF Program**

Congress amended the Direct Loan Program in 2007 to establish PSLF. *See* College Cost Reduction and Access Act of 2007 ("CCRAA"), Pub. L. No. 110-84, 121 Stat. 784 (codified at 20 U.S.C. § 1087e(m)) (the "PSLF Statute"). Lawmakers intended PSLF to "encourage participation" in public service careers out of concern that a "growing number of individuals . . . do not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans." H.R. Rep. 110-210, 110th Cong., 1st Sess., at 48–49 (2007). The program was a bipartisan effort designed to allow students "to pursue a career in public service and be able to take those jobs . . . often at lower pay" and "relieve themselves of the huge burden of debt they face." 153 Cong. Rec. S. 11245 (daily ed. Sept. 7, 2007) (statement of Sen. Sherrod Brown) (cleaned up).

The PSLF Statute provides that the "[t]he Secretary shall cancel the balance of interest and principal due" once the borrower meets the listed eligibility criteria. 20 U.S.C. § 1087e(m)(1). To be eligible for forgiveness, a borrower must make 120 qualifying payments while "employed in a public service job." *Id.* at 1087e(m)(1)(B). The parties agree that Congress defined "public service job" broadly. *See* Final Rule, William D. Ford Direct Loan (Direct Loan) Program ("Final Rule"), 90 Fed. Reg. 48966, 48972 (Oct. 31, 2025) (codified at 34 C.F.R. Part 685) (Defendants: "Congress provided a long list of eligible professions to broadly ensure that all professions that advance the public interest were included in the list."); [NCN, Doc. No. 48-1 at 11] (NCN Plaintiffs: "Congress's broad definition").

When Congress first authorized the PSLF program in 2007, it expansively identified approximately fifteen professions that serve the public interest:

> (i)    a full-time job in emergency management, government, military service, public safety, law enforcement, public health, public education (including early childhood education), social work in a public child or family service

agency, public interest law services (including prosecution or public defense or legal advocacy in low-income communities at a nonprofit organization), public child care, public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code; or

(ii)     teaching as a full-time faculty member at a Tribal College or University as defined in section 316(b) and other faculty teaching in high-needs areas, as determined by the Secretary.

20 U.S.C. § 1087e(m)(3)(B) (2007).

One year later, in 2008, Congress amended the PSLF program to expand the list of professions that serve the public interest and to include a carveout that serving as a member of Congress is not included in the definition of professions that serve the public interest:

(i)     a full-time job in emergency management, government (excluding time served as a member of Congress), military service, public safety, law enforcement, public health (including nurses, nurse practitioners, nurses in a clinical setting, and full-time professionals engaged in health care practitioner occupations and health care support occupations, as such terms are defined by the Bureau of Labor Statistics), public education, social work in a public child or family service agency, public interest law services (including prosecution or public defense or legal advocacy on behalf of low-income communities at a nonprofit organization), early childhood education (including licensed or regulated childcare, Head Start, and State funded prekindergarten), public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and other school-based services, or at an organization that is described in section 501(c)(3) in section 501(c)(3) of title 26 and exempt from taxation under section 501(a) of such title; or

(ii)     teaching as a full-time faculty member at a Tribal College or University as defined in section 1059c(b) of this title and other faculty teaching in high-needs subject areas or areas of shortage (including nurse faculty, foreign language faculty,

7

and part-time faculty at community colleges), as determined by the Secretary.

20 U.S.C. § 1087e(m)(3)(B) (2008).

In 2008, the Department promulgated the first PSLF regulation, codified at 34 C.F.R. § 685.219. Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program (the "PSLF Regulation"), 73 Fed. Reg. 63232 (Oct. 23, 2008) (codified at 34 C.F.R. Parts 674, 682, 685). The stated purpose of the PSLF program, according to the Department, is "to encourage individuals to enter and continue in full-time public service employment by forgiving the remaining balance of their Direct loans after they satisfy the public service and loan payment requirements of this section." 34 C.F.R. § 685.219(a). The first version of the PSLF Regulation tracked the statutory definitions closely, defining "public service organization" as "derived from the statutory definition of 'public service job' in" the PSLF Statute. PSLF Regulation, 73 Fed. Reg. at 63242.

Then, in 2022, the Department revised the PSLF Regulation to replace the defined term "public service organization" with the defined term "qualifying employer." Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program ("SAGP"), 87 Fed. Reg. 41878 (Jul. 13, 2022); Institutional Eligibility Under the Higher Education Act of 1965, as Amended; Student Assistance General Provisions; Federal Perkins Loan Program; Federal Family Education Loan Program; and William D. Ford Federal Direct Loan Program ("IEUHEA"), 87 Fed. Reg. 65904 (Nov. 1, 2022). Under the regulation effective July 1, 2024, which is the current governing regulation, "qualifying employer" means:

> (i)     A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;

(ii)   A public child or family service agency;

(iii)  An organization under section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under section 501(a) of the Internal Revenue Code;

(iv)   A Tribal college or university; or

(v)    A nonprofit organization that—

   (A) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and

   (B) Is not a business organized for profit, a labor union, or a partisan political organization.

34 C.F.R. § 685.219(b). The Department made these changes to "provide greater certainty, simplicity, and clarity to borrowers and employers and ensure that the Department is fulfilling the statutory intent of encouraging borrowers to work in public service." SAGP, 87 Fed. Reg. at 41932.

The current regulations establish a straightforward and objective framework for processing PSLF applications. For instance, the regulations specify that after making the 120 monthly qualified payments while working for a qualifying employer, the borrower may request loan forgiveness by filling out an application approved by the Secretary. 34 C.F.R. § 685.219(e). If the Secretary has sufficient information, the Secretary informs the borrower of their eligibility, and if the Secretary determines that the borrower meets eligibility requirements, the Secretary notifies the borrower and forgives the outstanding balance. *Id.* If the Secretary determines that the borrower is not eligible, the Secretary must notify the borrower and provide the basis for the denial. *Id.*

### 2.   **Executive Order and White House Fact Sheet**

On March 7, 2025, President Trump signed Executive Order 14235 ("Executive Order"). Restoring Public Loan Forgiveness, 90 Fed. Reg. 11885 (Mar. 12, 2025). The Executive Order proceeds in three parts: in Section 1 the President summarizes his perceived issues with the PSLF program and explains the purpose of his order; in Section 2 the President instructs the Secretary to make certain changes to the Department's PSLF regulations; and in Section 3 the President, among

9

other things, explains that his order "shall be implemented consistent with applicable law and subject to the availability of appropriations." *See generally id.* Sections 1 and 2 warrant discussion.

In Section 1, the President proclaims his purported grievances with the PSLF program. *Id.* at 11885. For example, he asserts that the program misdirected tax dollars into activist organizations that do not serve the public interest and "actually harm our society and American values, sometimes through criminal means." *Id.* Likewise, he states that the program "creates perverse incentives," noting that it encourages schools to raise their tuition, students to choose undesirable majors, and individuals to join organizations that "degrade our national interest" because they have "negative societal effects." *Id.*

The President concludes his statement of purpose by explaining that he has a duty to uphold the Constitution and defend our national security and notes that those obligations include "ending the subsidization of illegal activities, including illegal immigration, human smuggling, child trafficking, pervasive damage to public property, and disruption of the public order." *Id.* According to the Executive Order, "it is the policy of [this] Administration that individuals employed by organizations whose activities have a substantial illegal purpose shall not be eligible for public service loan forgiveness." *Id.*

In Section 2, the President instructs the Secretary to propose revisions to the PSLF regulations to exclude certain organizations from participating in the program:

> The Secretary of Education shall propose revisions to 34 C.F.R. 685.219, Public Service Loan Forgiveness Program, in coordination with the Secretary of the Treasury as appropriate, to ensure the definition of 'public service' excludes organizations that engage in activities that have a substantial illegal purpose, including:
> (a) aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
> (b) supporting terrorism, including by facilitating funding to, or the operations of, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging

in violence for the purpose of obstructing or influencing Federal Government policy;

(c) child abuse, including the chemical and surgical castration or mutilation of children or the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents, in violation of applicable law;

(d) engaging in a pattern of aiding and abetting illegal discrimination; or

(e) engaging in a pattern of violating State tort laws, including laws against trespassing, disorderly conduct, public nuisances, vandalism, and obstruction of highways.

*Id.*

Also on March 7, 2025, the White House issued a Fact Sheet characterizing the Executive Order. White House, *Fact Sheet: President Donald J. Trump Restores Public Service Loan Forgiveness* (Mar. 7, 2025) (hereinafter, the "White House Fact Sheet"), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-restores-public-service-loan-forgiveness/. It explains that the Executive Order "protects national security and American values by ending federal support for organizations that harm American values and the public interest" and clarifies its targets as "anti-American activists" and "activist groups." *Id.* It also explains that this action is part of a larger scheme to stop "radical agendas." *Id.* ("This action builds on others [the President] has taken in his second term to align taxpayer dollars with American values, including by terminating radical 'diversity, equity, and inclusion' (DEI) preferences in federal contracting, reinstating the Mexico City Policy to stop federal funding of abortion overseas, and ending radical indoctrination in K-12 schooling.").

### 3.  The New Regulations

In response to the President's directive, the Department began the multi-step process required by the HEA to promulgate a new rule. *See* Notice of Proposed Rulemaking, William D. Ford Federal Direct Loan (Direct Loan) Program, 90 Fed. Reg. 40154, 40157 (Aug. 18, 2025); *see*

*also* 20 U.S.C. § 1098a. After participating in the negotiated rulemaking process, the Department issued a Notice of Proposed Rulemaking ("NPRM") on August 18, 2025. *See generally* NPRM, 90 Fed. Reg. at 40154. The NPRM repeatedly explains that the Secretary will amend the existing PSLF regulations "to exclude employers that engage in activities that have a substantial illegal purpose." *E.g.*, *id.* at 40154 ("[T]he Secretary proposes to exclude any organization that engages in activities that have a substantial illegal purpose from being a qualifying employer for the purposes of the PSLF program."); *id.* at 40160 ("At the direction of the Secretary and consistent with the guidance in E.O. 14235, the Department would revise the definition of *qualifying employer* to exclude organizations that engage in activities that have a substantial illegal purpose.").

The NPRM explains that the PSLF statute "contains a definition of the term *public service job* (setting forth categories of employment that provide a public service), [but] it does not define the term *public service*." *Id.* at 40156. It also explains that "[e]mployers that engage in unlawful activity are not serving the public interest because their actions harm, rather than help, the public good" and it notes that "[b]y limiting PSLF eligibility to borrowers employed by organizations that do not engage in lawful conduct, the rule reinforces appropriate stewardship of federal funds." *Id.* at 40155. It also defines activities that have "a substantial illegal purpose" and sets forth procedures by which the Secretary may determine an employer's eligibility. *Id.* at 40175–76.

The Department promulgated a final rule ("Final Rule") on October 31, 2025, which is scheduled to take effect on July 1, 2026. Final Rule, 90 Fed. Reg. at 48966. Consistent with the Executive Order and NPRM, the Final Rule explains that its purpose is to "add[] or clarify[] provisions to exclude employers that engage in specific enumerated illegal activities such that they have a substantial illegal purpose." *Id.* It continues: "[t]hese regulations ensure that taxpayer

12

dollars are not misused by preventing PSLF benefits from going to individuals employed by organizations that have a substantial illegal purpose. The revisions . . . protect hardworking taxpayers from shouldering the cost of improper subsidies granted to employees of organizations that undermine national security and American values through criminal activity." *Id*.

To accomplish these goals, the Final Rule adds a new subsection (ii) to the definition of qualifying employer, italicized below, so that the term is now defined as:

> (i) (A) A United States-based Federal, State, local, or Tribal government organization, agency, or entity, including the U.S. Armed Forces or the National Guard;
> (B) A public child or family service agency;
> (C) An organization under Section 501(c)(3) of the Internal Revenue Code of 1986 that is exempt from taxation under Section 501(a) of the Internal Revenue Code;
> (D) A Tribal college or university; or
> (E) A nonprofit organization that —
>> (1) Provides a non-governmental public service as defined in this section, attested to by the employer on a form approved by the Secretary; and
>> (2) Is not a business organized for profit, a labor union, or a partisan political organization; and
> (ii) *Does not include organizations that engage in activities such that they have a substantial illegal purpose, as defined in this section.*

34 C.F.R. § 685.219(b)(27) (emphasis added).[3]

The Final Rule identifies six categories of activities having a "substantial illegal purpose," adopting a definition similar to that offered in the Executive Order:

> (i)    Aiding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws;
> (ii)   Supporting terrorism, including by facilitating funding to, or the operations or, cartels designated as Foreign Terrorist Organizations consistent with 8 U.S.C. 1189, or by engaging in violence for the purpose of obstructing or influencing Federal Government policy;

---

[3] All citations to the Final Rule referring to provisions in the PSLF Regulation cite to the provision of the C.F.R. where the Final Rule would be codified upon its effective date.

> (iii) Engaging in the chemical and surgical castration or mutilation of children in violation of Federal or State law;
>
> (iv) Engaging in the trafficking of children to another State for purposes of emancipation from their lawful parents in violation of Federal or State law;
>
> (v) Engaging in a pattern of violating State laws as defined in paragraph (b)(34) of [the regulation].

*Id.* at § 685.219(b)(30).

Under a new framework laid out in the Final Rule, the Secretary "determines by a preponderance of the evidence . . . that a qualifying employer has engaged . . . in illegal activities such that it has a substantial illegal purpose." *Id.* at § 685.219(h)(1). The Secretary may consider certain final judgments by State or Federal courts, pleas of guilty or *nolo contendere*, or settlements as "conclusive evidence that the employer engaged in activities [having a substantial illegal purpose]." *Id.* But nothing in the regulation prohibits the Secretary from considering other evidence. *See generally id.* at § 685.219. Indeed, the Secretary may determine that an employer has a "substantial illegal purpose" if that employer "fails to certify" otherwise. *Id.* at § 685.219(i).

Once an employer is disqualified, otherwise-qualifying loan payments made by its employees will not count, and the Secretary will resume collection of the loan. *See id.* at § 685.219(e). The long-term impact of such a determination is apparent. The Final Rule acknowledges that a disqualification determination will cause affected borrowers to seek employment elsewhere. *See* Final Rule, 90 Fed. Reg. at 48968 ("These borrowers will retain the ability to pursue PSLF through eligible employment elsewhere, thereby preserving the program's intended purpose."). In addition, although a borrower may seek reconsideration of a denial of forgiveness under other circumstances, *see* 35 C.F.R. at § 685.219(g)(1), "a borrower may not request reconsideration . . . based on the Secretary's determination that the organization lost its status as a qualifying employer due to engaging in activities that have a substantial illegal purpose," *id.* at § 685.219(g)(7). By default, an employer is disqualified for ten years unless the Secretary

14

approves a corrective action plan signed by the employer or the employer certifies on a subsequent borrower's application that the organization is no longer engaged in activities that have a substantial illegal purpose and the Secretary accepts that representation. *Id.* at § 685.219(j).

On June 18, 2026, the Department issued a notice requesting an emergency clearance under the Paperwork Reduction Act to update the relevant PSLF certification forms ("Notice"). Agency Information Collection Activities; Public Service Loan Forgiveness (PSLF) & Temporary Expanded PSLF (TEPSLF) Certification and Application ("Notice"), 91 Fed. Reg. 36812 (June 18, 2026). A request for emergency clearance under the Paperwork Reduction Act, once granted by the Office of Management and Budget, permits a federal agency to bypass standard public comment periods to immediately begin collecting information. 44 U.S.C. § 3507(j); 5 C.F.R. § 1320.13. The Notice explains that the Final Rule "require[s] an update to the currently approved Public Service Loan Forgiveness Certification and Application, to comply with E.O. 14325, by revising the certification language to include an attestation, under penalty of perjury, that the employer has not engaged in any activity that has a substantial illegal purpose on or after July 1, 2026." Notice, 91 Fed. Reg. at 36812.

### C.    **Alleged Harm**

Plaintiffs are either entities with employees who participate in the PSLF program or employee associations representing members who participate in the PSLF program. *See generally* [COM, Doc. No. 92]; [NCN, Doc. No. 46]. COM Plaintiffs are sufficiently similar such that they assert the same harms and basis for Article III jurisdiction. *See generally* [COM, Doc. No. 92]. NCN Plaintiffs, however, are more diverse and thus are categorized into three distinct groups: Local Government Plaintiffs, Nonprofit Plaintiffs, and Associational Plaintiffs. *See generally* [NCN, Doc. No. 46]. This makes four groups of plaintiffs across the two dockets. Each group and

the harm(s) they allege they are suffering or will suffer because of the Final Rule are described below.

### 1. State Plaintiffs

COM Plaintiffs consist of twenty-three states or state-like entities (collectively, "COM Plaintiffs" or "State Plaintiffs"). [COM, Doc. No. 92 at ¶¶ 9–31]. State Plaintiffs comprise the Commonwealth of Massachusetts, the State of New York, the State of Colorado, the People of the State of California, the State of Arizona, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Hawai'i, the State of Illinois, the State of Maine, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of Oregon, the State of Rhode Island, the State of Vermont, the Commonwealth of Virginia, the State of Washington, and the State of Wisconsin. [*Id.*].

By virtue of their being government entities, both State Plaintiffs and Local Government Plaintiffs have been qualifying employers for the PSLF program since Congress established the program in 2007. *See* 20 U.S.C. 1087(e)(m)(3)(B) (2007) (PSLF Statute: including "government" in definition of "public service job"); 34 C.F.R. § 685.219 (PSLF Regulation: including "government organization"). State Plaintiffs employ thousands of PSLF-eligible employees in a variety of fields. *See* [COM, Doc. No. 92 at ¶ 145]. Some examples include healthcare, teaching, governance, law enforcement, and emergency response. [*Id.* at ¶¶ 151–54]. The Department concedes that many of those fields will be among those most affected by the Final Rule. *See* Final Rule, 90 Fed. Reg. at 48993 ("Larger organizations, such as hospitals or universities, . . . may incur higher costs as they assess their practices and make any necessary changes to align with this final rule."); NPRM, 90 Fed. Reg. at 40168 (similar); Final Rule, 90 Fed. Reg. at 48995 ("[I]t is likely

that organizations in some fields are more likely to be affected than others. . . [S]ervice areas that could be most affected by the regulation include . . . legal services, governance, social work, healthcare, K–12 education, and higher education."); NPRM, 90 Fed. Reg. at 40170 (similar).

The asserted harms can be classified as business disadvantages to State Plaintiffs and financial losses to its employees and residents if disqualified. *See* [COM, Doc. No. 92 at ¶¶ 145–54]; [COM, Doc. No. 94 at 17–18]. State Plaintiffs claim to rely on PSLF to attract and retain qualified employees for public service jobs. [COM, Doc. No. 94 at 17–18] (explaining that participation in the PSLF program was a substantial benefit that incentivized many of their employees to enter public service); [COM, Doc. No. 92 at ¶¶ 145–54] (same). Accordingly, the threat of disqualification and certainly disqualification itself deter new workers from entering public service and has caused or will cause experienced workers to leave their employment in search of higher-paying private sector roles. [COM, Doc. No. 92 at ¶ 149]; [COM, Doc. No. 94 at 17–18]. In addition to these negative impacts on the available talent pool, the Final Rule imposes increased financial burdens on State Plaintiffs, which must now spend more to recruit new workers. [COM, Doc. No. 92 at ¶ 150]; [COM, Doc. No. 94 at 18]. Moreover, beyond their self-interests, State Plaintiffs are concerned for their employees who will lose PSLF benefits if their employer is disqualified. [COM, Doc. No. 92 at ¶¶ 145–54].

### 2.    Local Government Plaintiffs

The first group of NCN plaintiffs consists of five cities and counties (collectively, "Local Government Plaintiffs"). *See* [NCN, Doc. No. 46 at ¶¶ 8–12]. Local Government Plaintiffs comprise the City of Albuquerque, the City of Boston, the City of Chicago, the City and County of San Francisco, and the County of Santa Clara. [*Id.*].

Like State Plaintiffs, Local Government Plaintiffs have been qualifying employers of the PSLF program since the program's inception, and they employ thousands of employees in a variety of fields. *See* [*id.* at ¶¶ 145–70]. Examples include teaching, law enforcement, healthcare, social services, public interest law, transportation, and more. [*Id.*]. The Department concedes that some of those fields will be among those most affected by the Final Rule. *See* Final Rule, 90 Fed. Reg. at 48995.

Also like State Plaintiffs, Local Government Plaintiffs allege they have suffered or will suffer competitive business disadvantages and that their employees will incur financial losses if disqualified. *See* [NCN, Doc. No. 46 at ¶¶ 132–33] (explaining that Local Government Plaintiffs rely on PSLF benefits to attract and retain talent); [NCN, Doc. No. 48-1 at 20–21] (explaining competitive disadvantages resulting from the Final Rule and potential disruptions to borrowers' lives). In addition, Local Government Plaintiffs stand to suffer downstream economic consequences if borrowers who anticipated and only budgeted for having to pay back a portion of a loan are suddenly obligated to repay the entirety of the balance. [NCN, Doc. No. 46 at ¶ 143]. They anticipate that such an unexpected burden on borrowers will result in reduced consumer spending and lost tax revenue, which will in turn pose substantial hardship on both the local economies and Local Government Plaintiffs. [*Id.*]. Finally, Local Government Plaintiffs are facing and will continue to face increased administrative burdens and financial costs. [*Id.* at ¶¶ 131, 144]; [NCN, Doc. No. 48-1 at 18–20]. The Final Rule imposes a new burden on employers to attest to the Department that they do not engage in substantial illegal activities. *See* Final Rule, 90 Fed. Reg. at 49002; Notice, 91 Fed. Reg. at 36812. Making a legal determination such as this now requires employers to collect internal data, employ in-house or outside counsel on an ongoing basis to address compliance with the Final Rule and new certification obligations, and/or establish new

internal departments. [NCN, Doc. No. 46 at ¶¶ 131–32]; [NCN, Doc. No. 48-1 at 18–20]. Some of these employer plaintiffs will have to develop new compensation packages, retrain staff, and/or change the way PSLF certifications are administered. [NCN, Doc. No. 46 at ¶¶ 131–32]; [NCN, Doc. No. 48-1 at 18–20].

### 3.    Nonprofit Plaintiffs

The second group of NCN plaintiffs consists of five registered 501(c)(3) nonprofit organizations (collectively, "Nonprofit Plaintiffs"). *See* [NCN, Doc. No. 46 at ¶¶ 13–17]. Nonprofit Plaintiffs comprise the Coalition for Humane Immigrant Rights, Capital Area Immigrant's Rights Coalition d/b/a Amica Center for Immigrant Rights, The Legal Aid Society of the District of Columbia, the National Council of Nonprofits, and Oasis Legal Services. [*Id.*].

By virtue of their tax status, Nonprofit Plaintiffs are qualifying employers under the PSLF Statute. 20 U.S.C. 1087(e)(m)(3)(B) (2007) (PLSF Statute: including "an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code" in definition of "public service job"); 20 U.S.C. 1087(e)(m)(3)(B) (2008) (Amended PSLF Statute: similar); 34 C.F.R. § 685.219(b)(27) (PSLF Regulation: similar). Nonprofit Plaintiffs employ hundreds of full-time employees who participate in the PSLF program. [NCN, Doc. No. 46 at ¶¶ 51–68]. Nonprofit Plaintiffs serve diverse public interests, including advocacy, legal aid, and other beneficial programs for immigrants, LGBTQ+ individuals, the impoverished, and other marginalized groups. *See* [*id.* at ¶¶ 171–217]. The Department concedes that some of those fields will be among those most affected by the Final Rule. *See* Final Rule, 90 Fed. Reg. at 48995.

For substantially the same reasons asserted by the first two plaintiff groups, Nonprofit Plaintiffs alleged that they are likewise suffering or will suffer from business disadvantages and

increased administrative burdens and compliance costs and that its employees will incur financial losses if disqualified. [NCN, Doc. No. 46 at ¶ 175] (discussing employee recruiting and retention harms); [NCN, Doc. No. 48-1 at 20–21] (same); [NCN, Doc. No. 46 at ¶ 175] (alleging new regulatory and compliance burdens); [NCN, Doc. No. 48-1 at 18–19] (same); [NCN, Doc. No. 46 at ¶¶ 178, 183, 201] (fearing harm to employees); [NCN, Doc. No. 48-1 at 21–22] (same). In addition, some Nonprofit Plaintiffs claim they will suffer reputational harm that could lead to a loss of investor funding or other beneficial relationships if they are found to have engaged or are suspected of engaging in substantial illegal activity. [NCN, Doc. No. 46 at ¶ 214]; [NCN, Doc. No. 48-1 at 21]. They also fear revocation of their nonprofit status. *See* [NCN, Doc. No. 46 at ¶ 217]; [NCN, Doc. No. 48-1 at 37].

### 4.    **Associational Plaintiffs**

The third group of NCN plaintiffs consist of four associations and/or unions representing the interests of teachers, state and local government employees, social workers, nonprofit organizations, and other public service jobs (collectively, "Associational Plaintiffs"). [NCN, Doc. No. 46 at ¶¶ 18–21]. Associational Plaintiffs comprise American Federation of Teachers ("AFT"); The American Federation of State, County, and Municipal Employees ("AFSCME"); National Education Association ("NEA"); and National Association of Social Workers ("NASW").[4] [*Id.*]. Associational Plaintiffs represent millions of members, many of whom participate in the PSLF program and stand to suffer financial harm if their employer is disqualified. *See* [*id.* at ¶¶ 218, 227, 235, 240, 247].

---

[4] NCN plaintiff National Council of Nonprofits constitutes both a Nonprofit Plaintiff and an Associational Plaintiff. *See* [NCN, Doc. No. 46 at ¶ 171]. To avoid double counting, they are not explicitly named as a plaintiff belonging to the Associational Plaintiffs group, but I accept that that many or all of the arguments asserted by Associational Plaintiffs may also apply to National Council of Nonprofits.

## II.    ARTICLE III INQUIRIES[5]

### A.    <u>Legal Standard</u>

Before addressing the merits of the parties' jurisdictional arguments, I must first determine the appropriate legal standard to apply. The parties fully briefed the issues of Article III standing and ripeness in their cross motions for summary judgment. *See generally* [COM, Doc. No. 94]; [NCN, Doc. Nos. 48, 110]. However, Defendants also moved for dismissal under Fed. R. Civ. P. 12(b)(1). [NCN, Doc. No. 110 at 13–20]. Therefore, I begin my analysis by determining what the parties must prove for their arguments to succeed.

The First Circuit has established two ways to challenge a court's subject matter jurisdiction under Rule 12(b)(1): sufficiency (or facial) challenges and factual challenges. *See Commonwealth of Massachusetts v. Trump*, No. 25-cv-12162, 2026 WL 1584837, at *9 (D. Mass. June 3, 2026) (citing *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001)). The standard of proof needed to survive a 12(b)(1) motion depends on the type of challenge asserted. *See id.*

In a sufficiency challenge, the court considers whether the allegations in the complaint "propound[] an adequate basis for subject-matter jurisdiction." *Valentin*, 254 F.3d at 363 (citations omitted). "In performing this task, the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in [plaintiff's] favor, and dispose of the challenge accordingly." *Id*. (citations omitted). In the First Circuit, "the plausibility standard applicable under Rule 12(b)(6) [applies] to standing determinations at the pleading stage," but "[n]either conclusory assertions nor unfounded

---

[5] In addition to standing and ripeness, Plaintiffs assert arguments satisfying the statutory hurdles to bring a claim under the APA (*e.g.*, zone of interest and final rule requirements). I accept those arguments and find no need to discuss them further given Defendants' failure to address them.

speculation can supply the necessary heft." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730–31 (1st Cir. 2016) (citations omitted).

In contrast, a factual challenge is mounted when the defendant "controvert[s] the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff and proffer[s] materials of evidentiary quality in support of that position." *Valentin*, 254 F.3d at 363. Unlike in a sufficiency challenge, the plaintiff's jurisdictional averments are entitled to "no presumptive weight" in a factual challenge. *Id.* When necessary, the court must engage in "differential factfinding," addressing the merits of the jurisdictional claim by resolving the factual disputes between the parties. *Id.* (citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)).

When a party moves under Fed. R. Civ. P. 56, summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, "[a] movant may not rest upon mere allegations" but instead "must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." *Bellone v. Southwick-Tolland Regional School District*, 748 F.3d 418, 424 (1st Cir. 2014). The court may consider "all of the record materials on file." *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014) (citing Fed. R. Civ. P. 56(c)(1)(a)). In a motion brought under Rule 56, unlike a factual challenge brought under Rule 12, courts do not engage in differential factfinding; instead, summary judgment must be denied if there exists a genuine dispute of material fact. Fed. R. Civ. P. 56(a).

"'The party invoking federal jurisdiction bears the burden of establishing' that [it exists]." *Massachusetts v. United States Dept. of Health & Hum. Servs.*, 923 F.3d 209, 221 (1st Cir. 2019)

22

(quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992)). "Each [jurisdictional element] 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) (citing *Lujan*, 504 U.S. at 561).

Because Consolidated Plaintiffs have moved for summary judgment and bear the burden of satisfying Article III requirements, I will evaluate each jurisdictional issue under the Rule 56 standard. To the extent Defendants clearly articulate an argument brought under Rule 12(b)(1), I will also apply the applicable Rule 12 standard.

For the reasons stated below, Plaintiffs satisfy the Article III requirements.

## B.    <u>Discussion</u>

### 1.    <u>Standing</u>

"[T]he standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). In essence, standing answers the question of *who* may bring suit. All plaintiffs are either employers or employee associations, i.e., none are individual persons. *See generally* [COM, Doc. No. 92]; [NCN, Doc. No. 46]. "[A plaintiff] with individual members may establish Article III standing" in two ways. *Presidents' All. on Higher Educ. and Immigr. v. Noem*, No. 25-cv-11109, 2026 WL 788185, at *6 (D. Mass. Mar. 20, 2026) (quoting *Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025), *petition for cert. filed*, No. 25-899 (U.S. Jan. 30, 2026)) (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

First, the organizational plaintiff may "satisfy[] the three elements of . . . standing based on an 'injury in fact' of its own." *Doe*, 157 F.4th at 47 (quoting *FDA v. All. for Hippocratic Med.*,

602 U.S. 367, 394 (2024)). To meet this burden, the "plaintiff must show (i) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This type of standing is known as direct or organizational standing. *See All. for Hippocratic Med.*, 602 U.S. at 394.

Alternatively, the plaintiff "may establish 'associational standing' to sue in a 'representational capacity'" on behalf of its members. *Doe*, 157 F.4th at 47 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). For this form of standing, the plaintiff "must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.'" *Id.* (quoting *Hunt*, 432 U.S. at 343). The first requirement of associational standing is satisfied if one member of the organization would have standing to sue on their own. *See Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023); *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29 (1st Cir. 2021).

The parties' disagreements over standing primarily concern the injury in fact and causation requirements, there being no dispute that (i) the Final Rule is responsible for the changes to the PSLF program, (ii) vacatur of the Final Rule will redress the plaintiffs' injuries by maintaining the state of the current PSLF program, (iii) protecting the financial interests of its members is germane to the plaintiff organizations' purpose(s), and (iv) individual participation by the plaintiff organizations' members is not necessary. *See* [COM, Doc. No. 94 at 14, 18]; [NCN Doc. No. 110 at 9, 34–36]; [NCN, Doc. No. 48-1 at 22–23]. To satisfy standing, the injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Reddy v.*

24

*Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (internal quotation marks omitted) (citation omitted). The injury and the challenged conduct must share a causal connection, meaning the injury needs to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citing S*imon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)) (internal quotation marks omitted).

Plaintiffs allege multiple theories of injury, including but not limited to increased administrative burdens and compliance costs, threat of enforcement, downstream financial burdens, and a variety of business disadvantages. *See generally* Section I.C. I find it prudent to discuss only the first two.

### a.   <u>Administrative Burdens and Compliance Costs</u>

Local Government Plaintiffs and Nonprofit Plaintiffs argue that they have incurred and will continue to incur administrative burdens and financial costs to comply with the Final Rule. *E.g.*, [NCN, Doc. No. 46 at ¶ 175] ("Nonprofit Plaintiffs are suffering and will continue to suffer injuries related to the regulatory burden and costs associated with the Rule."); [*id.* at ¶ 104] ("Plaintiffs . . . expressed that the proposed rule introduced inordinate uncertainty to the certification process, leading to substantial costs and expenditure of resources."); [*id.* at ¶ 128] ("[Local] Government Plaintiffs and Nonprofit Plaintiffs—experience increased administrative burdens, including but not limited to understanding new eligibility requirements under the regulation, reviewing activities of their dozens of departments and thousands of employees to determine compliance, and potentially restructuring their processes for certifying PSLF forms, given the new eligibility criteria that involve making legal determinations."); [NCN, Doc. No. 48-1 at 18–20] (summarizing employer declarations confirming the same).

Those employer plaintiffs explain that, because they are committed to their employees' financial stability, they actively promote participation in the PSLF program, including by

certifying an individual's employment when requested. [NCN, Doc. No. 46 at ¶ 130]. Under the existing framework, employers certified only objective information, such as an employee's dates of employment. [*Id.* at ¶ 131]. The Final Rule, however, requires employers to make a legal determination about whether they engage in substantial illegal activities, those employer plaintiffs must now train staff, develop centralized systems for certifying employee forms (if they do not already exist), and/or consult with counsel, all of which impose administrative and financial burdens on the employers. [*Id.* at ¶¶ 128–131].

The First Circuit recognizes that "financial harm [is a] quintessential injury in fact." *Foisie v. Worcester Polytechnic Instit.*, 967 F.3d 27, 36 (1st Cir. 2013) (citation omitted). Although it has not explicitly addressed whether increased administrative burdens and costs incurred in attempting to comply with an agency regulation satisfies the injury in fact requirement, each sister circuit that has addressed the issue has held that it does, and I adopt that approach today. *See State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.D.C. 2015) (Kavanaugh, J.) (quoting *Lujan*, 504 U.S. at 561–62) ("The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated."); *Grand River Enters. Six Nations, Ltd. V. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021) ("A regulated entity may plead an 'injury in fact' by plausibly alleging compliance costs associated with an increased regulatory burden."); *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (citation omitted) ("An increased regulatory burden typically satisfies the injury in fact requirement."); *see also Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 293 (3d Cir. 2015) (citing *Sierra Club v. Morton*, 405 U.S. 727, 733–34 (1972)); *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013); *Kentucky v. Yellen*, 54 F.4th 325, 342–43 (6th Cir. 2022) (citations omitted); *Tennessee v. EEOC*, 129 F.4th 452, 457 (8th Cir. 2025); *Shen v. Comm'n, Florida Dept.*

26

*of Agric. & Consumer Servs.*, 158 F.4th 1227, 1247–48 n.3 (11th Cir. 2025) (citations omitted). Likewise, the Supreme Court has found that compliance costs constitute an injury in fact in other contexts. *See Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383, 392 (1988) (citations omitted) (finding plaintiff challenging a Virginia statute on First Amendment grounds suffered an injury in fact based on compliance costs).

Defendants do not appear to dispute that Local Government Plaintiffs and Nonprofit Plaintiffs have already incurred, and will continue to incur, these compliance costs and burdens. *See generally* [NCN, Doc. Nos. 110, 114]. Instead, they seem to challenge standing on the basis that the administrative burdens are not sufficiently severe to confer standing. [NCN, Doc. No. 110 at 15]. Instead, they argue that the asserted burdens are insufficiently significant to establish standing. [*Id.*]. Relying on *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 154 (1967), Defendants contend that, because those plaintiffs maintain they do not engage in unlawful conduct, they need not undertake "significant changes" to avoid enforcement. [NCN, Doc. No. 110 at 15]. The argument misreads *Abbott*. There, the Supreme Court found that the significant administrative and/or practical burdens the plaintiff suffered constituted one of several injuries that conferred standing. *See Abbott Lab'ys*, 387 U.S. at 153–54 (citations omitted). But that does not mean that lesser burdens are insufficient. To the contrary, "[i]n the First Circuit 'it is well-settled . . . that the injury required for standing need not be substantial, it need only exist." *California v. U.S. Dept. of Health & Hum. Servs.*, 811 F. Supp. 3d 183, 198 (D. Mass. 2025) (quoting *Rental Housing Ass'n of Greater Lynn, Inc. v. Hills*, 548 F.2d 388, 290 (1st Cir. 1977)) (citing *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973)).

Defendants also argue that there can be no injury or causation because the harms are self-inflicted. *See* [NCN, Doc. No. 114 at 7] (arguing that plaintiffs are spending their way into

27

standing). The argument fails for two reasons. First, it cannot fairly be said that the alleged harms here are self-inflicted. Employer plaintiffs are obligated to submit certifications under the Final Rule. *See* Final Rule, 90 Fed. Reg. at 40176; Notice, 91 Fed. Reg. at 49002. Whether an employer plaintiff believes it does or does not have a substantial illegal purpose and whether an enforcement action is brought have no bearing on a regulated employer's obligation to certify. *See* Final Rule, 90 Fed. Reg. at 49002; Notice, 91 Fed. Reg. at 40176. Indeed, the Department explicitly acknowledged such costs as part of the cost-benefit analysis that is contained within the Final Rule. Final Rule, 90 Fed. Reg. at 40168; Notice, 91 Fed. Reg. at 48968. Second, even if an employer plaintiff willingly incurred such compliance costs and burdens for the purpose of instituting the litigation, that would not defeat its standing. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296–97 (2022) (citations omitted) ("[T]he Government argues that appellees lack standing because their injuries were 'self-inflicted.' . . . We have never recognized a rule of this kind under Article III. To the contrary, we have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred.").

Plaintiffs have plausibly alleged an injury in fact and the supporting affidavits provide sufficient evidentiary support to establish standing at summary judgment.

### b.    Threat of Enforcement

I need not address Plaintiffs' other alleged theories of injuries because Local Government Plaintiffs and Nonprofit Plaintiffs have standing to proceed on Counts One–Three. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005) (en banc) ("So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief."), *abrogated on other grounds by*, *Parents Involved in*

*Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007). However, Plaintiffs universally assert that the threat of enforcement is sufficient to confer standing. [NCN, Doc. No. 48-1 at 23]; [COM, Doc. No. 94 at 17–18]. I will therefore address those arguments as well, because they further underscore Plaintiffs' standing in this case.

An injury that has not yet occurred may nevertheless satisfy the injury in fact requirement if "the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citations omitted) ("[T]he injury required for standing need not be actualized."); *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 50 (1st Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) ("A future injury is imminent if the threatened injury is certainly impending, or if there is a substantial risk that the harm will occur.") (cleaned up). For example, a plaintiff does not need to wait until an agency has brought an enforcement action against it before it may challenge the lawfulness of a regulation. *Susan B. Anthony List*, 573 U.S. at 148 (citations omitted) ("When an individual is subject to such a threat, an . . . enforcement action is not a prerequisite to challenging the law."); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[We do not] require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."). Whether the threat of prosecution is sufficiently clear "turns very much on the facts of the case." *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 4–5 (1st Cir. 2000). In the First Circuit, "realistic inferences that show a likelihood of prosecution" will suffice. *Id.* at 5. Courts should consider whether the plaintiff "has alleged an intent to engage in conduct that is arguably proscribed by the Government's interpretation . . . [and if there is a history of] 'past enforcement against the same conduct.'" *Commonwealth v. Trump*, 2026 WL 1584837, at *12 (quoting *Susan B. Anthony List*, 573 U.S. at 159, 164) (other citations omitted).

29

Defendants argue "there exists no threat of enforcement because the Department has not made any indication that any of the Plaintiffs will (or are likely to be) the target of any enforcement activity." [NCN, Doc. No. 110 at 15–16]. Indeed, the Final Rule alleges that determinations will be made based on objective criteria and evidence. *See* [*id.*]; *see also* Final Rule, 90 Fed. Reg. at 48973 ("PSLF employer eligibility is not conditioned on political alignment or conformity with any administration policies. Determinations regarding whether an organization has engaged in illegal activities such that it has a substantial illegal purpose will be objective and based on evidence such as judgments of State or Federal courts, guilty pleas of the organization, or statements by the organization admitting that it engaged in such conduct . . . .").

Defendants also highlight commentary to the Final Rule in which the Department appears to disavow prosecuting certain types of actions. *See* [*id.*]; *see also* Final Rule, 90 Fed. Reg. at 48974 ("Federal law does not prohibit individuals from advocating for illegal immigrants or representing them in Federal immigration court."); *id.* at 48978 ("The Department would have no basis to remove eligibility from nonprofits engaged in work related to immigrant communities, LGBTQ+ individuals, or racial justice if those organizations are following the law.").

In the absence of evidence to the contrary, Defendants' arguments might be persuasive. But the Administration's history of prosecution tells a different story. For example, in the "Protecting American Communities from Criminal Aliens" Executive Order, the President accused certain state and local officials of mounting "a lawless insurrection against the supremacy of Federal law" because of their sanctuary jurisdiction status. Exec. Order 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025); [NCN, Doc. No. 48-1 at 15]. The Executive Order accused the sanctuary jurisdictions of violating numerous federal laws, including the prohibition on obstruction of justice, 18 U.S.C. § 1501 *et seq.*, conspiracy against the United States, 18 U.S.C. § 371, and

30

unlawfully harboring or hiring illegal aliens, 18 U.S.C. § 1324. *Id*. The ire toward those with immigration policies contrary to those held by the Administration did not stop there. Despite the Final Rule's language stating that Federal law does not prohibit advocating for undocumented immigrants in court, *see* Final Rule, 90 Fed. Reg. at 48974, the Administration has attacked immigration attorneys for "frequently coach[ing] clients to conceal their past or lie about their circumstances when asserting their asylum claims, all in an attempt to circumvent immigration policies enacted to protect our national security and deceive the immigration authorities and courts into granting them undeserved relief," [NCN, Doc. No. 48-8 at 3]. The President directed the Attorney General and DHS Secretary to seek sanctions against immigration attorneys who bring "fraudulent claims" that "undermine[] the integrity of our immigration laws and the legal profession more broadly." [*Id*.].

Even beyond immigration, the Administration has threatened legal action against generally lawful activity with which it disagrees. In his "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" Executive Order, the President stated that "so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)" policies are violative of federal civil rights laws, instructing the heads of all agencies to "identify up to nine potential civil compliance investigations" of publicly traded and large non-profit corporations or associations, State and local bar and medical associations, and institutions of higher education. Executive Order, 90 Fed. Reg. 8633 (Jan. 21, 2025). The President made this enforcement directive in order to, in his words, "end illegal discrimination." *Id*. In his "Protecting Children From Chemical and Surgical Mutilation" Executive Order, the President threatened criminal prosecutions against providers of transgender healthcare, and cited a criminal statute, 18 U.S.C. § 116, that criminalizes female genital mutilation of children for non-medical necessity by a non-

medical professional. Executive Order, 90 Fed. Reg. 8771 (Jan. 28, 2025). The President made this enforcement directive in order to, in his words, "End[] Reliance on Junk Science" and "Defund[] Chemical and Surgical Mutilation." *Id*.

These same exact goals appear in the Final Rule impacting Plaintiffs. In defining "substantial illegal purpose," the Final Rule includes "[e]ngaging in a pattern of aiding and abetting illegal discrimination," defining "illegal discrimination" as "a violation of any Federal discrimination law." 30 C.F.R. § 685.219(b)(12), (30)(v). The Final Rule likewise defines "substantial illegal purpose" to include "aiding and abetting violations of . . . Federal immigration laws. . . [and] engaging in the chemical and surgical castration or mutilation of children in violation of Federal or state law." 30 C.F.R. § 685.219(b)(30)(i). While the Department asserts it will only apply this criminal aiding and abetting standard to criminal violations, *see, e.g.*, [NCN, Doc. No. 125 at 42] ("The Rule is clear on its face that it only applies to criminal violations using criminal standards."), that assertion is confounded by the language used in the Final Rule itself. For example, the Final Rule defines legal terms, such as "trafficking," in their own words rather than tethering the definition to existing law. *See* 34 C.F.R. § 685.219(b)(33); *see* 18 U.S.C. § 1591.

This factual record leads me to conclude the following. The Administration has both threatened and directed prosecution of broad swaths of activity, including, *inter alia*, any "violations" of any Federal discrimination or immigration laws. In so doing, the Administration provided essentially the same rationale as they provided in the Final Rule defining "substantial illegal activity." Defendants "must proffer more than a conclusory assertion of inapplicability to convince [the Court] that [Plaintiffs] no longer face[] a credible threat of prosecution," *N.H. Lottery Comm'n*, 986 F.3d at 52 (citation omitted) (alterations in original), and the assertions offered by Defendants fail to persuade. *See, e.g.*, [NCN, Doc. No. 125 at 42:23–43:6] (Defendants'

32

counsel asserting that "[t]here is no substantial risk that harm will occur because at this juncture we can only speculate about whether the Department will take any enforcement action" and "the potential future government action at issue here is too uncertain to confer standing.").

### c.    Other Alleged Injuries

Because I have already found that Local Government Plaintiffs and Nonprofit Plaintiffs have incurred and will continue to incur compliance costs and increased administrative burdens and that all Plaintiffs face a sufficiently imminent threat of enforcement, *see supra*, I need not address Plaintiffs' other alleged injuries. The record discussed above is sufficient to confer standing on Plaintiffs for the claims in this case.

### 2.    Ripeness

"While standing is concerned with 'who' is bringing the challenge, ripeness is concerned with 'when' the challenge is brought. In the pre-enforcement context, however, the doctrines of standing and ripeness tend to overlap, so the preceding discussion largely applies here too." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021) (citation omitted).

To determine whether a claim is ripe for judicial review, courts must "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). The fitness inquiry "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends on facts that may not yet be sufficiently developed." *Stern v. U.S. Dist. Court*, 214 F.3d 4, 10 (1st Cir. 2010) (citation omitted). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all. The fact that an event has not occurred can be counterbalanced in this analysis by the fact that a case turns on legal issues 'not likely to be significantly affected by further factual development.'" *McInnis-*

*Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)).

Plaintiffs' claims are fit for review because they turn on purely legal issues (i.e., whether the Department's promulgation of the Final Rule was proper) and because resolution of those issues does not require additional factual development.

The second requirement—hardship—is met if the challenged action causes "a 'direct and immediate' dilemma for the parties." *McInnis*, 319 F.3d at 70 (quoting *Stern v. U.S. Dist. Court*, 214 F.3d 4, 10 (1st Cir. 2010)). "The hardship prong evaluates 'the extent to which withholding judgment will impose hardship—an inquiry that typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties.'" *Id.* (citations omitted).

The hardship requirement is met for multiple reasons. First, Plaintiffs are already incurring and will continue to incur increased administrative and regulatory burdens in response to the new certification requirement. Second, where the threat of enforcement is concerned, as discussed above, Plaintiffs clearly intend to continue their work and their fear of imminent prosecution is reasonable.

## III.    THE PSLF REGULATION

Both COM Plaintiffs and NCN Plaintiffs allege that the Final Rule violates the APA because it is contrary to law and in excess of statutory authority (Count One) and arbitrary and capricious (Count Two). NCN Plaintiffs also allege that it violates the First Amendment (Count Three). The parties filed cross motions for summary judgment on all counts.[6] *See generally* [COM, Doc. No. 93]; [NCN, Doc. Nos. 48, 110]. For the reasons set forth below, I agree with Plaintiffs.

---

[6] Defendants filed a motion to dismiss, or in the alternative, for summary judgment. [NCN, Doc. No. 110 at 13–14]. That pleading summarizes the legal standards applicable to motions filed pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P 56, but it does not offer any arguments concerning failure(s) to state a claim. *See generally* [*id.*]. Accordingly, I need not address dismissal under Rule 12(b)(6).

A. **Legal Standard**

Summary judgment is ordinarily appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1). However, in cases involving review of agency action under the APA, the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record. *See Int'l Junior Coll. Of Bus. & Tech., Inc. v. Duncan*, 802 F.3d 99, 106 (1st Cir. 2015) ("The summary judgment 'rubric' also 'has a special twist in the administrative law context.'") (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). Rather, when administrative action is challenged under the APA "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health, Inc. v. United States Dept. of Health & Hum. Servs.*, 291 F. Supp. 3d 174, 189–90 (D. Mass. 2018) (quoting *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013)); *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 97–98 (1st Cir. 2002) ("That the parties brought the issues forward on cross-motions for summary judgment is not significant; substance must prevail over form, and the fact remains that the parties have presented this matter as a case stated[] on a fully developed administrative record.").

For a challenge brought under the APA, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The APA mandates that the reviewing court "hold unlawful and set aside agency action . . . found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.*

B.      **Discussion**

1.      **Contrary to Law and in Excess of Statutory Authority**

The APA permits a court to vacate an agency regulation if it is contrary to law, § 706(2)(A), or if it was promulgated in excess of the agency's statutory jurisdiction or authority, § 706(2)(C). Either provision provides an independent ground for setting aside a final rule. In practice, however, the distinction is of little consequence when the challenged regulation conflicts with the statute the agency is charged with administering. *New York v. Trump*, 811 F. Supp. 3d 215, 241 (D. Mass. 2025) (citation omitted) ("These two provisions of the APA contain a 'linguistic distinction without a practical difference' in the context of an agency action that is allegedly contrary to statutory requirements."); *Victim Rts. L. Ctr. v. Cardona*, 552 F. Supp. 3d 104, 127 (D. Mass. 2021) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 299 (2013) (additional citations omitted) ("[T]here is no difference, insofar as the validity of the agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has.")). If an agency tasked with administering a statute commits an act outside the scope of the duties it was charged with, it has both exceeded its authority under that statute and has acted in a manner not in conformance with the law. *See City of Arlington*, 569 U.S. at 299. In such instances, the same facts justify setting aside the regulation under either provision of the APA. *See id.*

That is the situation alleged here. Count One asserts two autonomous but related claims. *See generally* [COM, Doc. No. 92 at ¶¶ 155–68]; [NCN, Doc. No. 46 at ¶¶ 253–63]. First, Plaintiffs argue that the Final Rule should be set aside because it purports to grant discretionary power to the Secretary to disqualify employers that Congress deemed eligible and thus conflicts with the PSLF Statute. *See* [COM, Doc. No. 92 at ¶¶ 155–68]; [COM, Doc. No. 94 at 20–30]; [NCN, Doc.

36

No. 46 at ¶¶ 253–63]; [NCN, Doc. No. 48-1 at 25–30]. Second, they argue that it should be set aside because Congress did not authorize the Secretary to use her discretion in this manner and therefore the rule was promulgated in excess of authority. *See* [COM, Doc. No. 92 at ¶¶ 155–68]; [COM, Doc. No. 94 at 20–30]; [NCN, Doc. No. 46 at ¶¶ 253–63]; [NCN, Doc. No. 48-1 at 25–30]. The same analysis yields the same result under either provision of the APA. *See City of Arlington*, 569 U.S. at 299.

### a.    The *Loper Bright* Framework

Fundamental to the exercise of *any* agency power is that it must first be authorized by Congress. *See Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 19 (1st Cir. 2020) ("It is a bedrock principle that the power of an executive agency administering a federal statute is authoritatively prescribed by Congress.") (cleaned up). The grant of authority must be unambiguous and cannot be inferred from congressional silence. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399 (2024) (overturning *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.* 467 U.S. 837 (1984)) (citation omitted) ("[A]n ambiguity is simply not a delegation of law-interpreting power."); *id.* at 400 ("[A]mbiguity is not a delegation to anybody."); *Duffus v. MaineHealth*, 791 F.Supp.3d 61, 77 (D. Me. 2025) (citing *Loper Bright*, 603 U.S. at 404) ("Under *Loper Bright*, express authority is the name of the game: congressional silence is no longer an invitation for regulatory discretion. Absent clear statutory authorization, courts cannot presume Congress intended for an agency to fill statutory gaps or interpret statutory ambiguities."). Naturally then, where no grant exists or the grant is unclear, an agency is without power to act. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citations omitted) ("[A]n agency literally has no power to act unless and until Congress confers power upon it.").

Courts use traditional tools of statutory interpretation to identify and effectuate congressional delegations of authority. *See Loper Bright Enters.*, 603 U.S. at 403 ("Courts interpret

statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences."). That inquiry requires courts "to determine whether the [statutory] language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. . . The plainness or ambiguity of statutory language is determined by reference to the language itself, the context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997) (citations omitted); *see also In re Thinking Machines Corp.*, 67 F.3d 1021, 1025 (1st Cir. 1995) (citation omitted) ("A statute is ambiguous if it can be read in more than one way.").

If a delegation of discretionary authority is identified, the court must employ the three-step framework set forth in *Loper Bright*. As the Sixth Circuit put it: "First, we independently determine the scope of Congress's delegation of authority to the agency. Second, we ensure the delegation doesn't violate the Constitution. And third, we determine whether the agency's interpretation stays within the scope of the delegation." *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) (citing *Loper Bright*, 603 U.S. at 395) (other citations omitted); *see also Loper Bright*, 603 U.S. at 395 ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."); *id.* at 404 ("[J]udges need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA.").

### b.   <u>Specific vs. General Delegations</u>

Before applying the *Loper Bright* framework to this case, it is helpful to examine the types of statutory delegations the Court identified. *Loper Bright* explains that Congress may delegate discretionary authority to agencies along a spectrum. As the Court observed:

> "For example, some statutes expressly delegate to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'"

*Id.* at 394–95 (citations omitted) (cleaned up).

Delegations of the first sort—specific delegations—explicitly instruct an agency to carry out a certain task, and thus there can be no doubt that Congress vested authority in the agency to execute the task described therein. To help articulate this point, the Court provided two examples, each of which expressly authorizes the agency to define statutory terms or prescribe regulatory limitations. *See id.* at 394–95 n.5. The first example concerns an exemption provision of the Fair Labor Standards Act holding that "any employee employed on a causal basis in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (*as such terms are defined and delimited by regulations of the Secretary*)." *Id.* (quoting 29 U.S.C. § 213(a)(15)) (emphasis in original). The second requires notification to Nuclear Regulatory Commission when a facility or activity licensed or regulated pursuant to the Atomic Energy Act "contains a defect which could create a substantial safety hazard, *as defined by regulations which the Commission shall promulgate*." *Id.* (quoting 42 U.S.C. § 5846(a)(2)) (emphasis in original).

Delegations of the second sort—general delegations—exist where Congress has granted an agency broad authority to implement a statutory program or a component of that program without prescribing the precise manner in which the agency must do so. *See id.* at 395 (citation omitted). Again, the Court provided two examples to illustrate this point. *Id.* at 395 n.6. The first example requires the establishment of effluent limitations "'whenever, in the judgment of the Environmental Protection Agency (EPA) Administrator, discharges of pollutants from a point

39

source or group of point sources would interfere with the attainment or maintenance of that water quality which shall assure' various outcomes, such as the 'protection of public health' and 'public water supplies.'" *Id.* (quoting 33 U.S.C. § 1312(a)) (alterations omitted). The second directs EPA to regulate power plants "if the Administrator finds such regulation is appropriate and necessary." *Id.* (quoting 42 U.S.C. § 7412(n)(1)(A)).

It follows from these examples that agencies may redefine a statutory term or modify a statutory limitation only when Congress has expressly delegated that authority. By contrast, a general delegation of rulemaking authority does not permit an agency to alter statutory definitions or substantive limitations because there is no gap for the agency to fill when Congress has spoken directly on the issue. *See id.* 394–95; *see also Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019) ("A general grant of authority cannot displace the clear, specific text of the Act."); *Contender Farms, L.L.P. v. U.S. Dept. of Agric.*, 779 F.3d 258, 273 (5th Cir. 2015) ("[A] broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions."); *Duffus v. MaineHealth*, 791 F. Supp. 3d 61, 80 (D. Me. 2025) ("[A]n agency cannot rely on only a broad delegation to regulate in places where Congress has already spoken by defining or interpreting congressional language.").

c.    **Identification and Scope of Delegations to the Department**

Defendants do not identify a specific statutory delegation in which Congress explicitly authorized the Department to narrow the definition of "public service job," define or regulate the public service, or impose additional eligibility criteria. *See generally* [NCN, Doc. No. 110]. Instead, they invoke a bouquet of statutory provisions that, in their view, confer "broad authority to administer the PSLF program." *See* [*id.* at 20–21] (citing 20 U.S.C. § 1221e-3, *id.* at § 1082(a)(1), *id.* at § 3441(a)(2)(C), *id.* at § 3474, and *id.* at § 3471(a)). I agree that these provisions,

40

to the extent they confer authority at all, are general rather than specific delegations. I do not agree, however, that each pertains to the PSLF program.

I begin with the latter point. One of the provisions on which Defendants rely, 20 U.S.C. § 1082(a)(1), cannot supply the basis for authority to issue any regulation concerning the PSLF program. Defendants are correct that the statute authorizes the Secretary to "prescribe such regulations as may be necessary to carry out the purposes *of this part [B]*." 20 U.S.C. § 1082(a)(1) (emphasis added). However, the plain text of the statute is clear that the grant of authority applies only to Part B of Title IV, which concerns only the FFEL Program. *Id.* The Direct Loan Program—and with it the PSLF program—exists under Part D of Title IV. *See* 20 U.S.C. §§ 1087a–1087j. By its plain terms, therefore, § 1082(a)(1) delegates rulemaking authority only with respect to the FFEL Program, not the Direct Loan Program. Defendants offer no textual or structural basis for extending that delegation beyond the limits Congress imposed. *See generally* [NCN, Doc. No. 110].

With regard to the remaining four provisions, I agree that these are general delegations. *See* [*id.* at 20–21]. Three of those provisions were passed as part of the DEOA, through which Congress created the Department and transferred certain education functions from other agencies to the Department. *See* Section I.B. The first simply authorizes the transfer of functions of the Department of Health, Education, and Welfare and its secretary under the HEA to the Department of Education. *See* 20 U.S.C. § 3441(a)(2)(C).

The second, titled General Authority, outlines the Secretary's authority to administer the functions transferred to the Department under the preceding provision. 20 U.S.C. § 3471(a) (emphasis added) ("In carrying out any function transferred by this chapter, the Secretary . . . *may exercise any authority available by law . . . with respect to such function to the official or agency*

41

*from which such function is transferred*, and the actions of the Secretary in exercising such authority shall have the same force and effect . . . ."). But this delegation is not boundless. By its terms, it authorizes the Secretary to exercise only those powers previously granted to the Department of Health, Education, and Welfare or an officer therein with respect to transferred functions. *See id.* Defendants, however, identify no underlying grant of authority that was transferred to the Department which might bear on the validity of the Final Rule. *See generally* [NCN, Doc. No. 110].

The third provision, titled Rules and Regulations, vests general rulemaking authority in the Department to manage the programs it administers. 20 U.S.C. § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). This appears to be the broadest grant of authority, as it is limited only by what the Secretary determines is "necessary" or "appropriate." *Id.*

The fourth provision, added to the General Education Provisions Act by the Education Amendments of 1974 and titled General Authority of Secretary, grants a similar authority as that authorized in the provision just discussed. *See* 20 U.S.C. § 1221e-3 ("The Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administer by, the Department.").

Although those statutes do vest the Secretary with discretionary authority, they lack specific instructions and therefore constitute general delegations.

42

Finally, Defendants argue that the Illegality Doctrine, a tax law doctrine articulated in *Bob Jones Univ. v. United States*, grants the Department the authority needed to promulgate the Final Rule. [NCN, Doc. No. 110 at 24–25]. That court-made doctrine permits the Internal Revenue Service ("IRS") to revoke the tax-exempt status of nonprofit organizations if their purpose is "illegal or violate[s] established public policy." *See Bob Jones Univ. v. United States*, 461 U.S. 574, 591 (1983). That decision, which primarily concerned racial discrimination, was based (in part) on congressional acquiescence implied from (i) decades of congressional inaction following the IRS's rulings and (ii) the fact that Congress made numerous amendments to the tax code without disturbing the IRS's position. *See Bob Jones Univ.*, 461 U.S. at 599–601. The Court's justification in validating the IRS's action is inapplicable here: Congress has not declined to intervene in the Department's policing of the public good for decades, there is no evidence that the definition of "substantial illegal purpose" is closely aligned with Congressional or common law definitions of that term, and there is no evidence Congress otherwise acquiesces to the Department's implementation of the Final Rule. Furthermore, in the era of *Loper Bright*, grants of authority must be plain and unambiguous, not implied through congressional silence. *See Loper Bright*, 603 U.S. at 399–400. Defendants do not provide a single reason why a judicially co-signed grant of authority to the IRS that is primarily exercised in the face of racial discrimination reflects Congress's unambiguous intent that the Department (which is never mentioned in the doctrine or relevant tax code) wield an even broader authority to regulate the public good. *See generally* [NCN, Doc. No. 110].

In sum, Congress has vested broad discretionary authority in the Department to carry out the functions it is charged with administering but has not delegated any specific authority to revise

the statutory definition of "public service job" or to impose substantive eligibility requirements beyond those Congress itself enacted.

### d.    The Final Rule Exceeds the Scope of Delegated Authority and is Contrary to Law

Having identified the scope of authority Congress delegated to the Department, the next step is to determine whether the Final Rule falls within the bounds of that delegated authority.[7] *See Loper Bright*, 603 U.S. at 404.

The Final Rule exceeds the bounds of delegated authority—in this instance, the Department's general rulemaking authority—if Congress spoke plainly on the matters upon which the Final Rule attempts to regulate. *See Ferrari v. Vitamin Shoppe Indus.*, 70 F.4th 64, 74 (1st Cir. 2023) (citations omitted) ("We have concluded that the text of the statute is clear. Consequently, . . . there is nothing for the agency to interpret – no gap for it to fill . . . .") (first alteration in original); *see also Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 276–77 (2016) (citation omitted) (explaining that a "statute contains such a gap when no statutory provision unambiguously directs the agency to partake in a specific action and the statute expressly authorizes the agency to engage in the process of rulemaking to address that gap") (cleaned up). For there is no gap to fill when Congress speaks unambiguously on a particular issue, and a general grant of rulemaking authority, even a broad one, does not authorize an agency "to alter the specific choices Congress made." *See Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022) (citation omitted) ("A generic grant of rulemaking authority to fill gaps, however, does not allow the FCC to alter the specific choices Congress made."); *Murray Energy Corp.*, 936 F.3d at 627 ("A general grant of authority cannot displace the clear, specific text of the Act."); *Contender Farms, L.L.P.*, 779 F.3d at 273

---

[7] Having concluded below that the Final Rule is contrary to law and exceeds the scope of statutory authorization, I need not address whether the delegation(s) exceed Congress's constitutional authority.

("[A] broad grant of general rulemaking authority does not allow an agency to make amendments to statutory provisions."); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

Plaintiffs' challenge to the Final Rule is that it "establish[es] additional criteria for an employer to qualify for the program" and permits the Secretary to disqualify employers, and in turn borrowers, that are statutorily eligible. *See* [NCN, Doc. No. 48-1 at 25–26]; [COM, Doc. No. 94 at 24]. The legality of such a regulation turns on whether Congress spoke clearly on borrower and employer eligibility requirements for PSLF. *See Ferrari*, 70 F.4th at 74 (explaining that there is no gap to fill if Congress spoke plainly on an issue). If Congress did speak unambiguously on those issues, the Department must abide "not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Nat'l Ass'n of Broads.*, 39 F.4th at 820 (quoting *MCI Telecommunications, Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994)) (other citation omitted).

The PSLF Statute holds that:

> The Secretary shall cancel the balance of interest and principal due . . . on any eligible Federal Direct Loan not in default for a borrower who (A) has made 120 monthly payments on the eligible Federal Direct Loan after October 1, 2007, pursuant to any one or combination of the following [payment plans]; and (B) (i) is employed in a public service job at the time of such forgiveness; and (ii) has been employed in a public service job during the period in which the borrow makes each of the 120 payments described in subparagraph (A).

20 U.S.C. § 1087e(m)(1).

The plain language of the preambulatory clause in that provision—"[t]he Secretary *shall* cancel"—contains a clear directive to the Secretary to perform a particular action. *Id.* (emphasis added). Specifically, she must cancel the balance of an eligible loan for any borrower satisfying

the requirements in subparagraphs (A) and (B). *See, e.g.*, *United States v. Letter from Alexander Hamilton to the Marquis de Lafayette Dated July 21, 1780*, 15 F.4th 515, 524 (1st Cir. 2021) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)) (citation omitted) ("The 'plain and ordinary meaning' of this statutory language is generally the best guide to the legislature's intent . . . [T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."). The text does not leave this up for debate.

The question then becomes whether Congress left a gap for the Department to fill concerning the requirements of subparagraphs (A) and (B). The Final Rule purports to modify only the definition of "public service job" in subparagraph (B). *See generally* 34 C.F.R. § 685.219(b). Therefore, I need not address the other requirements in those two subparagraphs.

Ultimately, there is no doubt that Congress spoke plainly and comprehensively on the scope of the term "public service job." *See* 20 U.S.C. § 1087e(m)(3)(B) ("The term 'public service job' means . . . ."); *Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) (citation omitted) ("As a rule, '[a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.'") (alterations in original). The PSLF Statute defines that term by enumerating fifteen categories of qualifying employment using general terms like "government," "military service," and "public interest law services." *See* 20 U.S.C. § 1087e(m)(3)(B). Notably, Congress did not qualify most of those categories. *See id.* In fact, the PSLF Statute excludes exactly one role from one category. *Id.* (carving out time served as a member of Congress from the "government" category). It is clear from the existence of that one exception and from Congress's decision to define qualifying public service jobs by broad categories of employment rather than by individual roles that Congress made a conscious choice to include all roles within a given category unless expressly excluded. *See Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 499 (1st Cir. 2011)

46

(citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 188 (1978)) ("Because Congress has enumerated a set of express exceptions, rules of statutory interpretation instruct that Congress intended to make no other exceptions than those specified."). The statutory text, though sweeping, is nevertheless unambiguous (and Defendants do not present a good faith argument to the contrary). *See generally* [Doc. Nos. 110, 114]; *see also Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) ("Broad general language is not necessarily ambiguous when congressional objectives require broad terms.").

The overall structure of the HEA supports this conclusion. For example, other provisions governing the Direct Loan Program, like the provision dealing with income verification for income-contingent repayment plans, grant specific authority to the Secretary to set requirements. *See, e.g.*, 20 U.S.C. § 1087e(e)(1) ("The Secretary shall establish procedures for determining the borrower's repayment obligation on that loan for such year, and such other procedures as are necessary to implement effectively income contingent repayment."); *see also* [NCN, Doc. No. 48-1 at 27] (identifying specific delegations in the HEA concerning the Direct Loan Program). Given the inclusion of specific discretionary delegations in other provisions of the HEA, the lack of a corresponding grant in the PSLF Statute suggests Congress did not intend for the Department to revise or otherwise alter the eligibility requirements discussed above. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (citations omitted) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'").

Similarly, Congress knew how to, and in fact did, identify PSLF disqualifying behaviors. *See, e.g.*, 20 U.S.C. § 1091(a)(6) (requiring students to repay funds received through the Direct Loan Program if convicted of fraudulently obtaining those funds). Congress's choice to specify

disqualifying conduct in some provisions while declining to impose comparable limitations on the statutory categories of public service jobs reinforces the conclusion that it spoke comprehensively on the relevant questions. *See Barnhart*, 534 U.S. at 452.

Defendants present no response to these textual and structural arguments.[8] *See generally* [NCN, Doc. No. 110]. Instead, they argue that there is considerable overlap between the categories Congress identified, noting, e.g., that "military service," "law enforcement," "public library sciences," and "public education" are identified as distinct categories even though they fall under the umbrella of "government." [*Id.* at 21–22]. Defendants then present two arguments based on this fact. *See* [*id.*].

First, they invoke the canon of *noscitur a sociis*—that a word is known by the company it keeps—to suggest that "the overlap among the categories provides insight into the types of jobs Congress intended to designate as PSLF eligible." [*Id.* at 21]. The argument is unpersuasive. Defendants never explain how that canon influences the interpretation of the PSLF Statute, nor do I believe that it does. *See generally* [*id.*]. *Noscitur a sociis* "is invoked when a string of statutory terms raises the implication that the words 'grouped in a list should be given related meaning.'" *See S.D. Warren Co. v. Maine Bd. of Environ. Protection*, 547 U.S. 370, 378 (2006) (citations omitted). But Defendants do not argue that any of the statutorily enumerated categories are ambiguous or bear unrelated meaning. *See generally* [NCN, Doc. No. 110]. Nor does the Final Rule interpret one statutory category in light of another. *See generally* 34 C.F.R. § 685.219(b). Instead, it disqualifies *any* employer, regardless of which statutory category of employment it satisfies, if the Secretary determines that the employer has a "substantial illegal purpose." *See id.*

---

[8] To the extent Defendants prop up the validity of the Final Rule on the Department's "belie[f] Congress [did not] intend to . . . subsidize the unlawful behavior of organizations" or based on the Department's understanding that the overarching purpose of PSLF program is to serve the "public interest," those arguments fail because they are not grounded in the statutory text. *See* [NCN, Doc. No. 114 at 10].

The Rule therefore does not resolve ambiguity within the statutory categories; it imposes an additional limitation that appears nowhere in the statute. And, in any event, a canon of statutory construction is a tool for judicial interpretation, not a source of delegated rulemaking authority. *See Loper Bright*, 603 U.S. at 392 (explaining that the task of statutory interpretation is a duty of "courts, not agencies").

Second, Defendants invoke the canon against surplusage to suggest Congress intentionally included overlapping categories of qualifying employment and intended for the Department to resolve the overlap. *See* [NCN, Doc. No. 110 at 21–22]. As a preliminary issue, the argument comes too late. The Department did not invoke the canon against surplusage—or any theory that it was merely reconciling overlapping statutory categories—as the basis for authority in the Final Rule. It is therefore waived. *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (other citation omitted) ("It is a 'foundational principle of administrative law' that judicial review of agency actions is limited to 'the grounds that the agency invoked when it took the action.' An agency may later 'elaborate' on those grounds, but it 'may not provide new ones.'"). But the argument also fails on the merits. As explained above, a canon of construction does not, on its own, carry interpretive force. Additionally, Defendants never explain how Congress's decision to be overinclusive simultaneously authorizes the Department to then narrow those categories.[9] If

---

[9] Defendants fail to cite any authority in support of this position in their opposition and cross-motion or explain how the authority they do cite in a footnote in their sur-reply supports this position. *See* [NCN, Doc. No. 110]; [NCN, Doc. No. 113]. Defendants cannot cite, as they do, to the Final Rule to justify its promulgation of the Final Rule. [NCN, Doc. No. 110 at 21, 23]; [NCN, Doc. No. 113 at 15 n.3]. Indeed, the Department admits that "Congress often intentionally uses statutory terms 'in an overlapping manner' in order to 'better' effectuate its purpose." [NCN, Doc. No. 114 at 11]. And they further admit that Congress's "long list of eligible professions [is meant] to broadly ensure that all professions that advance the public interest were included in that list." [*Id.*] (quoting Final Rule, 90 Fed. Reg. at 48972). All signs therefore point in the same direction: that Congress intended to include the broad categories it identified.

49

anything, the redundancy suggests Congress intended to sweep broadly, not to leave a gap for the Department to fill. Any overlap among the statutory categories does not create ambiguity or otherwise delegate authority to impose additional eligibility restrictions. Moreover, even if I were to assume arguendo that Congress specifically authorized the Department to reconcile overlapping statutory categories, the Final Rule does not do that. *See* 34 C.F.R. § 685.219(b). Rather, it disqualifies employers with a "substantial illegal purpose" irrespective of the statutory category into which they otherwise fall, thereby doing nothing to clarify the relationship amongst the enumerated categories of public service jobs. *See id.*

For the reasons stated above, Congress unequivocally prescribed the requirements for PSLF-eligible public service jobs. The statute does not vest any discretionary authority in the Secretary to disqualify employers (and consequently borrowers) or to alter unambiguous requirements set forth in subparagraphs (A) and (B) of the repayment provision or the statutory definition of "public service jobs." *See Miller v. French*, 530 U.S. 327, 336 (2000) (quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 215 (1962)) ("[W]here Congress has made its intent clear, 'we must give effect to that intent.'"). Consequently, the Final Rule is unlawful because it permits the Secretary to disqualify statutorily eligible employers upon determining that they have a "substantial illegal purpose." 34 C.F.R. § 685.219(b). The Final Rule plainly contradicts the unambiguous text of the PSLF Statute and exceeds the scope of the Department's authority because Congress does not require such a hurdle and did not specifically instruct the Department to impose it. *See Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644, 663– 64 (2007) (explaining that where a statute requires that an agency "shall" take action whenever exclusive statutory prerequisites are met, adding regulatory criterion alters the meaning of the statute); *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 312 (11th Cir. 2025) (quoting *Solar v. City*

*of Farmington*, 2 F.4th 1285, 1289 (10th Cir. 2021)) ("Indeed, '[a]t the level of plain meaning, it seems to us a non sequitur to claim that a[n] [agency] can 'implement' a [statute] by issuing a regulation that is inconsistent with that [statute].'") (alterations in original).

### 2.    Arbitrary and Capricious

As explained above, the Final Rule can be vacated on the independent ground that it was issued in excess of statutory authority and is contrary to law. However, it is worth discussing why the Final Rule is also arbitrary and capricious in violation of the APA.

An agency action is arbitrary and capricious only if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the First Circuit has explained, the arbitrary and capricious standard "is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)).

Plaintiffs have proffered several arguments in support of their APA claim: (1) the Final Rule was issued in reliance on impermissible factors; (2) the Department failed to substantiate that the Final Rule addresses a real problem; (3) the Department failed to consider Plaintiffs' reliance interests; (4) the Department failed to explain why it rejected alternatives; (5) the Final Rule contains ambiguous and vague terms that invite arbitrary enforcement; (6) the Department failed to explain how it will adjudicate whether an organization is engaging in a substantial illegal purpose; (7) the Department failed to consider an important aspect of the problem because the

Final Rule has a chilling effect and organizations subject to the Final Rule will incur compliance costs; (8) there is no rational connection between the Final Rule and the Department's justification, and; (9) the Final Rule targets state employers while excluding federal employers from scrutiny. *See generally* [NCN, Doc. No. 48-1 at 30–39]; [COM, Doc. No. 94 at 30–43].

The Department responds that it has (1) provided a reasoned explanation and rationale for the Final Rule that is plainly connected to the factual record, whether or not Plaintiffs agree with it; (2) the Department has clearly set forth the procedure it will use to implement the Final Rule as well as to adjudicate compliance with the Final Rule; (3) the Department took reasonable steps to achieve its objectives, including considering Plaintiffs' reliance interests, establishing a process by which organizations may retain or regain eligibility, and considering alternatives; (4) the Department has established a process to address the conflicts identified by Plaintiffs—e.g., that compliance with the Final Rule may conflict with state laws, and; (5) Plaintiffs are incorrect that the Final Rule exempts federal employers and employees from compliance. *See generally* [NCN, Doc. No. 110 at 25–32].

Rather than address each of Plaintiffs arguments—recognizing that they may all have merit—I will explain the primary reasons why the Final Rule is arbitrary and capricious.

### a.    No Rational Connection to a Real Problem

To determine whether the Final Rule is arbitrary and capricious, I must determine whether the Department's explanation has "a rational connection between the facts found and the choice made." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). Plaintiffs argue that no such rational connection exists.

First, the Department has not identified a real problem with PSLF employers that the Final Rule purports to address. The regulation explains that the Final Rule's objective is to "exclude employers that engage in specific enumerated illegal activities such that they have a substantial

52

illegal purpose." Final Rule, 90 Fed. Reg. at 48966. The regulation states that "[o]rganizations that break the law such that they have a substantial illegal purpose are actively harming the public good," and the Final Rule "prevents Federal funds from subsidizing harmful illegal activities through a program designed to reward public service." *Id.* at 48967. The Final Rule is also designed to "strengthen[] the fundamental purpose of PSLF—to encourage borrowers to enter occupations that improve their communities and advance the public good while also guarding against the diversion of Federal benefits to organizations that harm their fellow Americans by engaging in illegal conduct." *Id.* at 48968. Plaintiffs argue that the administrative record does not contain any facts that demonstrate that there is a present problem of PSLF employers having a "substantial illegal purpose," or why such a problem must be addressed now, following decades of the PSLF program being in place.

For instance, the administrative record shows that "the Department believes that there will be fewer than ten employers affected annually" by the Final Rule. AR2495. Yet the Department offers no explanation for why a Final Rule with such sweeping consequences is necessary to address the possibility that, at most, ten employers each year may be engaging in illegal activity. Additionally, the record indicates that these employers would constitute only a miniscule fraction of the millions of qualifying employers. That disparity further undermines the existence of a significant problem warranting the Final Rule's broad regulatory response. *See Home Box Off., Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (citation omitted) (holding that a "regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist").

Second, the Department's own explanation for the Final Rule demonstrates the absence of a rational connection between the facts before the agency and its decision to implement the Final

Rule. The Department asserts that the Final Rule "fulfills the Department's obligation to enforce PSLF consistent with its statutory purpose—to only benefit those borrowers working for organizations that truly serve a public purpose by helping, not harming, their communities." Final Rule, 90 Fed. Reg. at 48972. But that rationale bears little relation to the statutory purpose Congress actually enacted. The PSLF statute was designed to *encourage* borrowers to pursue careers in public service, not to *deter* employment with organizations the Department believes may have an illegal purpose. *See* H.R. Rep. 110-210, 110th Cong., 1st Sess., at 48–49 (2007) (Lawmakers intended PSLF to "encourage participation" in public-interest careers out of concern that a "growing number of individuals . . . do not choose to enter into lower paying professions, such as public service, because of growing debt due to student loans.").

Indeed, the Department acknowledges that the Final Rule will have the opposite effect. The administrative record shows that the Department "acknowledges that some employers may no longer wish to participate in the program or may cease advertising to employees and prospective employees about how working for the organization could lead to PSLF forgiveness . . . [t]he Department believes that any risks associated with withdrawal by employers who would be eligible is outweighed by the benefits of enhanced integrity to the PSLF program that come from the rule." *See* AR 2498. But the record provides no reasoned explanation for how the speculative benefit of deterring, at most, a handful of employers engaged in illegal activity outweighs the risks that thousands of millions of employers may no longer participate in the program, or how this Final Rule aligns with the purpose of the PSLF program. *See, e.g.*, AR366 ("Ambiguous eligibility rules may discourage nonprofit and government service, reduce access to critical public services, and undermine the civic participation PSLF was designed to encourage.").

Third, even assuming that employer participation in illegal activity is a problem that must be solved, the Department fails to explain how confining "substantial illegal activity" to six narrow categories will solve that problem. For instance, the White House Fact Sheet explains that the Final Rule is meant to "stop[] taxpayer funds from subsidizing through loan forgiveness activities that advance illegal immigration, terrorism, child abuse, discrimination, and public disruptions." *See* White House Fact Sheet. The White House Fact Sheet shows that the Department's stated purpose—to prevent against "illegal activity"—largely takes aim at issues reflecting specific social policies that the administration is against. *See id*. As Plaintiffs point out, the administrative record is "silent as to why ED excluded innumerate other possible forms of actual unlawful conduct, such as financial fraud and tax evasion, to accomplish its purported goal of restricting PSLF eligibility to support only lawful conduct." [COM, Doc. No. 94 at 32] (citation omitted). If the Department's objective were truly to prevent PSLF from benefiting organizations engaged in unlawful conduct, the record offers no reasoned basis for singling out these six categories while excluding other serious and undisputed forms of illegal activity. That unexplained line-drawing undermines the Department's asserted rationale and suggests that the Final Rule is driven by policy preferences rather than a reasoned effort to address unlawful conduct.

To be sure, a court is not to "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities," but neither is a court "required to exhibit a naiveté from which ordinary citizens are free." *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F. Supp. 3d 119, 178–79 (D. Mass. 2025) (citations omitted). Where, as here, the agency's stated objective is to prevent unlawful conduct, yet the Final Rule targets only a narrow subset of illegal activity aligned with the

Administration's policy agenda without explaining the distinction, the Department has failed to articulate the rational connection that the Administrative Procedure Act requires.

The Final Rule is particularly difficult to reconcile with the Department's treatment of conduct that is lawful in many jurisdictions. For example, the Department identifies "the chemical and surgical castration or mutilation of children" as a form of prohibited activity. 34 C.F.R. § 685.219(b)(30(iii). Yet the procedures to which the Department refers are lawful under the laws of numerous States. Acknowledging this reality, the Department responds that, "[t]o the extent that State laws may vary, the Department will defer to the judgments of State courts in determining what constitutes unlawful activity within the jurisdiction where the conduct occurs." Final Rule, 90 Fed. Reg. at 48980. That response does not resolve the problem. Rather than articulating a clear, administrable standard, the Department effectively leaves eligibility to be determined through piecemeal litigation over whether conduct is lawful under the laws of individual States. The record contains no explanation for how such an approach promotes consistent administration of the PSLF program or advances the Final Rule's stated objective of excluding organizations engaged in unlawful conduct. Instead, it creates uncertainty for employers and borrowers alike and invites inconsistent outcomes across jurisdictions.

Moreover, the Department's acknowledgment that the challenged conduct is lawful in many States while simultaneously identifying it as a category of "illegal activity" for purposes of the Final Rule further illustrates the arbitrary nature of the regulation. At a minimum, the Department fails to explain how a rule premised on preventing "illegal activity" can rationally rely on categories of conduct whose legality varies by jurisdiction. That disconnect underscores the absence of a reasoned explanation linking the Final Rule's stated purpose to the means the Department chose to achieve it. As Plaintiffs explain, "ED fails to explain how including these

56

narrow categories of proscribed conduct in the definition of 'substantial illegal purpose'—to the exclusion of all others—will address the rationale of ensuring that taxpayer dollars are not misused. Instead of rooting out illegal activity, the Final Rule threatens to chill lawful conduct and exhibits unmistakable animus towards groups and initiatives that the Administration disfavors and seeks to punish." [COM, Doc. No. 94 at 24]; *see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55 (D.D.C. 2025) (holding that "furthering the President's wishes cannot be a blank check for [an agency] to do as it pleases. The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision.").

The Department's only response to all of this is that "the connection between the Rule's objective and its direction is plain." [NCN, Doc. No. 110 at 27]. But simply asserting that the Rule is justified—or offering some explanation for it—does not satisfy the APA. The APA requires a reasoned explanation demonstrating a rational connection between the agency's stated objectives, the facts before it, and the regulatory choices it ultimately made. The Department has failed to provide that connection here.

### b.    <u>Vague and Ambiguous</u>

Apart from the absence of a rational connection between the Final Rule's stated objectives and its means, the rule is vague and ambiguous such that employers will not understand their duties under it. Plaintiffs argue that they do not know, for example, what constitutes "aiding [and] abetting violations of . . . Federal immigration laws," AR2500, or "engaging in a pattern of aiding and abetting illegal discrimination," *id.*; [NCN, Doc. No. 48-1 at 34]. Nor can they know whether complying with applicable law is sufficient, "because the Rule gives the Secretary discretion to decide whether to disqualify a given employer." [NCN, Doc. No. 48-1 at 34].

Defendants explain that there is an established process for determining whether an organization is engaging in substantial illegal activity. *See* [NCN, Doc. No. 110 at 31]. They

explain that an "unbiased adjudicator" who "has not prejudged the law or the facts" will "weigh any evidence presented showing that an organization's activities violated any laws" by "look[ing] to see if there is a pattern of behavior by the organization, the gravity of the violation, and generally exclude evidence of technical violations of law." [*Id.*] (citing Final Rule, 90 Fed. Reg. at 48970–71). The adjudicator will "consider any reliable evidence, including countervailing evidence provided by the employer" and determine whether the "employer has a substantial illegal purpose by a preponderance of the evidence after weighing the employer's illegal conduct, narrowly focusing on only the illegal conduct enumerated in the regulation." [*Id.*] (citing Final Rule, 90 Fed. Reg. at 48987). The Final Rule "also provides an opportunity for employers to regain eligibility by following a corrective action plan to come into compliance after a loss of eligibility." [*Id.*]. To conclude whether conduct is illegal, the Department will determine "whether an organization has engaged in illegal activities such that it has a substantial illegal purpose," and those determinations "will be objective and based on evidence such as judgments of State or Federal courts, guilty pleas of the organization, or statements by the organization admitting that it engaged in such conduct." [*Id.*] (citing Final Rule, 90 Fed. Reg. at 48973).

Far from curing the Final Rule's ambiguity, however, the Department's explanation underscores it. The rule does not identify objective legal standards that govern whether an employer is engaged in "substantial illegal activity." Instead, it directs adjudicators to rely on external indicators—including court judgments, guilty pleas, and organizational admissions—that may differ from case to case. Final Rule, 90 Fed. Reg. at 48973. Those indicators do not themselves establish a workable legal standard. Judicial decisions may be appealed, reversed, or limited to particular factual circumstances. Likewise, an organization's admission that it engaged in certain conduct says nothing about whether that conduct is unlawful under the governing law. The Final

Rule therefore leaves employers without meaningful guidance as to what conduct will result in disqualification.

The ambiguity is particularly evident in the Final Rule's treatment of "illegal discrimination." The Final Rule defines a "substantial illegal purpose" to include "[e]ngaging in a pattern of aiding and abetting illegal discrimination." 34 C.F.R. § 685.219(b)(30)(v). It then defines "illegal discrimination" broadly as "a violation of any Federal discrimination law including, but not limited to, the Civil Rights Act of 1964 (42 U.S.C. § 1981 *et seq.*), the Americans with Disabilities Act (42 U.S.C. 12101 *et seq.*), and the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 *et seq.*)." 34 C.F.R. § 685.219(b)(12). Yet the Final Rule invokes a criminal-law concept of "aiding and abetting" without explaining how that doctrine applies to civil anti-discrimination laws. *See* 34 C.F.R. § 685.219(b)(12). Nor does the Final Rule define what constitutes a "pattern" of aiding and abetting. The rule thus leaves regulated entities to speculate about the scope of prohibited conduct while vesting the Department with substantial discretion to determine, after the fact, whether an employer has crossed an undefined line.

Such indeterminate standards create a substantial risk of arbitrary enforcement. As Plaintiffs note, the Administration has prioritized enforcement in areas such as diversity, equity, and inclusion initiatives, raising the possibility that otherwise lawful conduct could be treated as evidence of "illegal discrimination" under the Final Rule's undefined standards. *See* [Doc. No. 48-1 at 16]. Whether or not that possibility ultimately materializes, the Final Rule provides no objective limiting principle to constrain the Department's discretion. The APA requires more. "Reliance on an undefined term is arbitrary and capricious because" it allows an agency "to arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based." *Nat'l Institutes of Health*, 791 F. Supp. 3d at 180 (citation omitted). By failing to

articulate objective standards governing what constitutes "substantial illegal activity," "aiding and abetting," or a "pattern" of unlawful conduct, the Department has left employers to guess at their obligations while reserving broad discretion to determine eligibility on an ad hoc basis. That lack of ascertainable standards is itself a hallmark of arbitrary and capricious decision-making.

<strong>c.     <u>Reliance on Impermissible Factors</u></strong>

Finally, the Final Rule also impermissibly relies on factors that Congress did not intend it to consider. *State Farm*, 463 U.S. at 43. As discussed throughout this opinion, the purpose of the PSLF program is to encourage participation in public service jobs that are often financially burdensome for many individuals. Consistent with that objective, Congress expanded the definition of "public service job" to include a broad swath of professions. The Department's explanation for the Final Rule departs from that statutory purpose. In the White House Fact Sheet, the Administration stated that the Final Rule "refocuses PSLF on its original intent of encouraging Americans to enter essential public service roles, such as nursing, rather than activist groups." *See* [NCN, Doc. No. 48-5 at 2]. Yet the Department itself acknowledges elsewhere that "Congress provided for a long list of eligible professions to broadly ensure that all professions that advance the public interest were included in the list." Final Rule, 90 Fed. Reg. at 48972. Those two explanations are difficult to reconcile. If Congress deliberately adopted an expansive definition of public service jobs, the Department cannot narrow that definition by distinguishing between purportedly "essential" public service occupations and undefined "activist groups" absent some statutory basis for doing so. The administrative record identifies none. Nor does it contain any evidence that Congress intended the PSLF program to prioritize certain categories of public service employment over others.

The same defect appears elsewhere in the Department's stated justifications. The White House Fact Sheet explains that the Final Rule "protects national security and American values."

60

[NCN, Doc. No. 48-5 at 2]. Whatever the merits of those objectives are as matters of public policy, the Department identifies no evidence that Congress enacted the PSLF statute to advance either goal. Nor does the Final Rule define what constitutes "American values," leaving that concept entirely to the Department's discretion. An agency may not justify a regulation by invoking broad policy objectives untethered to the governing statute, particularly where those objectives are themselves undefined. *See Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1233 (9th Cir. 2001) (holding that it is arbitrary and capricious "to issue terms and conditions so vague as to preclude compliance therewith.").

By relying on policy objectives that Congress neither enacted nor identified as relevant to PSLF eligibility, the Department has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. That provides an independent basis for concluding that the Final Rule is arbitrary and capricious.

### 3. <u>First Amendment</u>

NCN Plaintiffs argue that the Final Rule is facially unconstitutional because it discriminates on the basis of viewpoint. [NCN, Doc. No. 48-1 at 40]. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)). Indeed, "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *National Rifle Assoc. of America v. Vullo*, 602 U.S. 175, 187 (2024). This makes viewpoint discrimination a particularly "blatant" and "egregious form of content discrimination," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the

restriction." *Rosenberger*, 515 U.S. at 829 (citations omitted). "The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). However, the government itself may "say what it wishes," and "select the views that it wants to express." *Vullo*, 602 U.S. at 187 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)). But despite the government's freedom to express itself how it wishes, the government has "no power to restrict [the] expression [of] others" based on the expression's "message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Viewpoint discrimination is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571–72 (2011).

NCN Plaintiffs argue that the Final Rule "impermissibly discriminates against Nonprofit Employers' viewpoints by selectively targeting certain kinds of organizations because their protected activities and speech are at odds with the Administration's policy priorities." [NCN, Doc. No. 48-1 at 40]. According to NCN Plaintiffs, the PSLF program facilitates private speech rather than government speech, and the Department therefore may not condition eligibility on the viewpoints expressed by participating employers. [*Id*. at 42]. Though the Final Rule purports to disqualify only organizations with "a supposed 'substantial illegal purpose,'" NCN Plaintiffs emphasize that the Final Rule identifies only a narrow set of activities—including aiding and abetting violations of immigration laws; facilitating gender-affirming care for minors; engaging in diversity, equity, and inclusion initiatives; and supporting terrorism—that closely track the Administration's policy agenda. [*Id*. at 40]. NCN Plaintiffs argue that the Department "may not skirt the First Amendment's mandate against viewpoint discrimination by simply categorizing the activities that it seeks to punish as 'illegal.'" [*Id*. at 42].

62

The Department disagrees with both the posture and the merits of the challenge. It first contends that the First Amendment claim must proceed, if at all, as an as-applied challenge because facial challenges are "'hard to win'" and courts ordinarily resolve constitutional questions "'case by case, not en masse.'" [NCN, Doc. No. 109 at 33] (quoting *Moody v. Net Choice, LLC*, 603 U.S. 707, 723 (2024)). On the merits, the Department argues that the Final Rule merely requires employers to certify compliance with laws they are already obligated to obey and therefore does not burden or chill protected speech. [NCN. Doc. No. 109 at 33–34] (quoting *Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61, 103 (D.D.C. 2025)).

I agree with the Department that facial challenges are "hard to win." [NCN, Doc. No. 109 at 33] (quoting *Moody v. Net Choice, LLC*, 603 U.S. 707, 723 (2024)). As *Moody* likewise indicates, the "preference [for as-applied challenges] makes sense because facial challenges 'often rest on speculation about the law's coverage and its future enforcement.'" *Moody*, 603 U.S. at 723. But that preference is not absolute. A facial challenge is appropriate where a plaintiff demonstrates that a law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023). In that circumstance, the First Amendment's protection of free expression outweighs the government's interest in preserving the statute's lawful applications.

This case falls within that exception. First, NCN Plaintiffs do not speculate about hypothetical applications of the Final Rule; they identify concrete ways in which it burdens protected expression. As local governments, nonprofits employers, and employee associations, NCN Plaintiffs and their members engage in advocacy and provide services involving diversity, equity, and inclusion initiatives; immigrant communities; and gender-affirming care—all activities that the Final Rule either expressly targets or places under a cloud of uncertainty. *See* [NCN, Doc.

63

No. 48-1 at 10]. Indeed, the record further demonstrates that the Final Rule has already chilled protected speech.

For example, at the Amica Center for Immigrant Rights, an immigration attorney noted that the Department has already "tried to shut down our work," leading to worries that the Amica Center will no longer qualify for PLSF. [NCN, Doc. No. 48-16 at ¶¶ 15–19]. Similarly, Albuquerque, New Mexico, which adopted an "Immigrant Friendly Resolution" and is on the Department's targeted "sanctuary jurisdiction" list, faces "significant compliance and administrative burdens" as well as employee retention concerns because of the Final Rule. [NCN, Doc. No. 48-18 at ¶¶ 12–17]. To comply with the Final Rule, the City of Albuquerque believes it would have to change its policies and use discretion in how it serves its residents. [*Id*. at ¶ 17].

Associational Plaintiffs offer another example. A senior director for the American Federation of Teachers shared that many K-12 employees, including teachers and psychologists, are concerned about the risk of losing PSLF because they engage in activity that this Department might deem illegal, including supporting Black History Month, LGBTQ-related programming, and multiculturalism. [NCN, Doc. No. 48-22 at ¶¶ 7, 17–18].

The Department, however, cannot force PSLF beneficiaries to adopt their policy views. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l Inc.*, 570 U.S. 205, 218 (2013). As the Supreme Court noted in *Agency for Int'l Dev.*, "[b]y demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id*. (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). While that case was somewhat different than the present inquiry, as it considered whether federal agencies could require funding recipients to agree in the award document with policies on prostitution and sex trafficking, the First Amendment principles

64

underlying the holding are instructive. Specifically, the Court focused on the fact that the policy requirement in that case "compels as a condition of federal funding the affirmation of a belief." *Agency for Int'l Dev.*, 570 U.S. at 221. The First Amendment prohibits that form of compulsion, yet that is what the Department seeks to do with the Final Rule in this case. For example, the condition in the Final Rule that prohibits "[e]ngaging in a pattern of aiding and abetting illegal discrimination" effectively compels Plaintiffs to affirm the Administration's belief that all diversity, equity, and inclusion practices are illegal. *See* 34 C.F.R. § 685.219(b)(30)(v). But that is a belief, not settled law, and many diversity, equity, and inclusion practices remain legal across the country.

The Department's argument that only unprotected, illegal conduct would be impacted by the Final Rule does not persuade. First, there is no dispute that Plaintiffs must follow the law. *See, e.g.*, [NCN, Doc. No. 48-1 at 10] ("[NCN Plaintiffs] are engaged in lawful activities"). But there is also no genuine dispute of fact as to this Administration's policy priorities, and the existence of those exact policy priorities—curbing illegal immigration, halting gender-affirming care, erasing DEIA practices—in the language of the Final Rule. 34 C.F.R. § 685.219(b)(30). However, lawful (and protected) speech from NCN Plaintiffs is now directly threatened should that lawful activity be construed as violative of the Final Rule.

In the City of Chicago, for example, federal agencies are not solely looking for compliance with the law—they are looking for compliance with policy priorities. *See* [NCN, Doc. No. 48-26 at ¶ 14] (explaining that federal agencies "began conditioning local and state governments' acceptance of federal grant awards on compliance with the Trump administration's policy priorities, including conditions related to immigration enforcement"). Employees who work for non-profit organizations and school systems that provide assistance to undocumented and

nonbinary students likewise fear they may be targeted by the Department for assisting these children. [NCN, Doc. No. 48-22, ¶ 18]. The Department has "no power to restrict [the] expression [of] others," though, based on the expression's ideas or viewpoint. *Reed*, 576 U.S. at 163. The Final Rule effectively does just that by threatening to revoke PSLF eligibility from borrowers who, among other things, lawfully assist immigrants; teach diversity, equity, and inclusion practices; and facilitate gender-affirming care. Although the Department contends that the Final Rule does not target lawful activity, the text of the rule itself does not support that assertion.

The Department's contention that the Final Rule will only target Plaintiffs who aid and abet criminal violations is undermined by the rule's own text. For example, in defining "substantial illegal purpose," the Final Rule includes "[e]ngaging in the trafficking of children." 34 C.F.R. § 685.219(b)(30)(iv). Yet rather than incorporate the established federal definitions of "sex trafficking" or "human trafficking," the Final Rule creates its own definition of "trafficking" that is untethered to existing criminal law. 34 C.F.R. § 685.219(b)(33); *see* 18 U.S.C. § 1591. The Department cannot create new criminal prohibitions through rulemaking. The same problem arises in the Final Rule's treatment of immigration law. It defines "substantial illegal purpose" to include "[a]iding or abetting violations of 8 U.S.C. 1325 or other Federal immigration laws." 34 C.F.R. § 685.219(b)(30)(i). But many federal immigration laws establish civil, rather than criminal, violations and therefore cannot be the basis for aiding and abetting liability. By conflating criminal and civil immigration provisions, the Final Rule injects significant uncertainty into what conduct it purports to prohibit. These ambiguities belie the Department's assertion that the Final Rule "simply restricts [Plaintiffs'] ability to engage in illegal activities." [NCN, Doc. No. 109 at 34]. If the Final Rule itself fails to identify with precision what conduct is "illegal," the Department's determination of illegality is anything but "simple."

66

It is a fundamental principle of our constitutional system that criminal laws must provide clear notice of the conduct they prohibit. A criminal prohibition that is impermissibly vague is constitutionally infirm. *See, e.g.*, *Johnson v. United States,* 576 U.S. 591, 595 (2015). Yet by defining a "substantial illegal purpose" to include conduct beyond established criminal law, the Final Rule departs from that basic principle. Rather than tethering its prohibitions to settled legal standards, the Final Rule leaves PSLF employers to navigate standards that track the Administration's policy priorities. As a result, it fails to provide the "fair notice of the conduct" that due process requires. *Johnson*, 576 U.S. at 591. The Administration undoubtedly enjoys broad authority to advocate for its own policies. It may "say what it wishes" and "select the views that it wants to express." *Vullo*, 602 U.S. at 187 (quoting *Summum*, 555 U.S. at 467). But it may not leverage the PSLF program to compel Plaintiffs to conform their conduct to policy preferences that have not been enacted into law. Administrations change with elections; criminal laws do not. If one administration may redefine "illegal" conduct through regulation(s) to advance its policy objectives, then the next administration could do the same in service of entirely different priorities. The constitutional defect would remain the same. Just as the Final Rule's sweeping reference to "other Federal immigration laws" fails to provide an intelligible limiting principle today, an equally indeterminate reference to some other politically favored or disfavored category of conduct would fare no better tomorrow.

Even assuming the Final Rule has a "plainly legitimate sweep," its vagueness, coupled with the record evidence demonstrating its effect on NCN Plaintiffs, establishes that it threatens a "substantial amount of protected speech." *Hansen*, 599 U.S. at 770. The Final Rule therefore cannot withstand facial constitutional scrutiny.

**IV.    CONCLUSION**

For the foregoing reasons, the Final Rule is contrary to law and promulgated in excess of statutory authority, is arbitrary and capricious, and violates the First Amendment. I therefore hold it unlawful and set it aside. The Final Rule is VACATED.


SO ORDERED.

/s/ Myong J. Joun
United States District Judge